1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF NEW YORK
2

3    UNITED STATES OF AMERICA,          )
                                        ) Case No. 1:19-CR-00227
4                                       )            (JLS)(MJR)
                     Plaintiff,         )
5                                       )
     vs.                                ) April 26th, 2022
6                                       ) 11:05 a.m.
     JOSEPH BONGIOVANNI (1),            )
7    PETER GERACE, JR. (3),             )
                                        )
8                    Defendants.        )

9
                        TRANSCRIPT OF ORAL ARGUMENT
10         BEFORE THE HONORABLE MICHAEL J. ROEMER
                     UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:    TRINI E. ROSS, ESQ.
                           UNITED STATES ATTORNEY
14                         BY:   BRENDAN CULLINANE, ESQ.
                                 JOSEPH TRIPI, ESQ.
15                         ASSISTANT UNITED STATES ATTORNEYS
                           138 Delaware Avenue
16                         Buffalo, NY 14202

17                         U.S. DEPARTMENT OF JUSTICE,
                           CRIMINAL DIVISION
18                         BY:   JORDAN ALAN DICKSON, ESQ.
                           PUBLIC INTEGRITY SECTION
19                         1331 F Street NW
                           Washington, DC 20004
20
     For the Defendant:    HARRINGTON AND MAHONEY
21   BONGIOVANNI           BY:   JAMES P. HARRINGTON, ESQ.
                           70 Niagara Street, Third Floor
22                         Buffalo, NY 14202

23   For the Defendant:    JOSEPH M. LATONA, ESQ.
     GERACE, JR.           403 Main Street, Suite 716
24                         Buffalo, NY 14203

25

```
1    APPEARANCES CONTINUED:

2    Court Reporter:        MEGAN E. PELKA, RPR
                            Robert H. Jackson US Courthouse
3                           2 Niagara Square
                            Buffalo, NY 14202
4                           (716) 364-6449

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  On the record in USA v. Joseph

2   Bongiovanni and Peter Gerace, case 19-CR-227, for oral

3   argument.  Counsel for the government, please state your name

4   for the record.

5          MR. TRIPI:  Joseph Tripi, Brendan Cullinane, and

6   Jordan Dickson for the United States.  Good morning, Judge.

7          THE CLERK:  Thank you.  Counsel for defendant

8   Bongiovanni, please state your name for the record.

9          MR. HARRINGTON:  James Harrington and Mr. Bongiovanni

10  is here, Judge.

11         THE CLERK:  Thank you.  Counsel for defendant Gerace,

12  please state your name for the record.

13         MR. LATONA:  Joseph LaTona and Mr. Gerace is present,

14  Your Honor.

15         THE CLERK:  Thank you.

16         THE COURT:  Good morning, counsel.  We're here for

17  oral argument on the defendants' pretrial motions.  I think

18  we're going to start with the border search.  You want to go

19  first, Mr. Harrington, or you want Mr. Tripi to go first?

20         MR. HARRINGTON:  Either way.  Doesn't matter.

21         THE COURT:  Your call.

22         MR. HARRINGTON:  I'll go first, Judge.  Judge, as you

23  know, you sat through the hearing on this case, and so you're

24  pretty familiar with the facts.  I won't go through those, but

25  it's -- this stop was a return from a vacation of

Case 1:19-cr-00227-JLS-MJR   Document 281   Filed 05/06/22   Page 4 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

2

 1    Mr. Bongiovanni, his wife, and his stepson.  And Buffalo

 2    agents from DHS and Border Patrol arranged for a, quote,

 3    secondary search, including a telephone search of

 4    Mr. Bongiovanni in Baltimore.  I think, though, if the Court

 5    looks at the documents that are submitted in terms of the

 6    emails, it clearly was while a secondary search may have been

 7    done, clearly it was targeted towards Mr. Bongiovanni's

 8    telephone.  And --

 9            THE COURT:  I think there's no doubt, right, that

10    this search was targeted towards Mr. Bongiovanni's alleged

11    criminal activity up here in Buffalo.

12            MR. HARRINGTON:  Correct.

13            THE COURT:  Really nothing to do with the border or

14    anything like that.

15            MR. HARRINGTON:  Right.

16            THE COURT:  Right?

17            MR. HARRINGTON:  The only thing that we have anything

18    beyond Buffalo is -- are the words transnational organized

19    crime.

20            THE COURT:  I was wondering about that.  We'll ask

21    Mr. Tripi.

22            MR. HARRINGTON:  I don't know what that is, Judge,

23    transnational crime.

24            THE COURT:  I think at one point somebody went to

25    Canada or something.  Maybe that's the transnational part of

Case 1:19-cr-00227-JLS-MJR   Document 281   Filed 05/06/22   Page 5 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

3

 1    it.

 2         MR. HARRINGTON:  But, Judge -- so, we have this

 3    request that's made.  And we have random agents that do it.

 4    And they do a random search of his phone.  And lo and behold,

 5    what do they find?  They final a whole list of Italian-

 6    American names in Mr. Bongiovanni's phone, some of whom are

 7    friends, some of whom were former law enforcement officers,

 8    but clearly it was targeted at these Italian names.

 9         And I guess that's what's supposed to be the transnational

10    organized crime.  I don't know.  Nowadays, when I think of

11    transnational organized crime, I think of the Cali Cartel or

12    the Russian Mafia or somebody else.  I certainly don't think

13    of the Italian Mafia.

14         So, anyway, they find some names on the phone, take some

15    photographs of what they see, and that becomes what's been

16    seized and what later is used.  Now, we clearly recognize that

17    *United States v. Ramsey* gives permission at the borders that

18    are far different than they are in ordinary circumstances, but

19    in *United States vs. Riley*, the Supreme Court made a seminal

20    decision in finding that what we have on our phones is really

21    something that we consider to be private.

22         And in our memorandum, we cited to the Court a number of

23    cases, including *Cano* in the Ninth Circuit and *Aigbekaen* in

24    the Fourth Circuit, and an Eastern District case called

25    *DeCicco* and -- all of which the courts have -- seems to be

 1  clawing back from this notion that, or supporting and

 2  expanding the theory, that *Riley* has.

 3          THE COURT:  I don't think there's much doubt if you

 4  were in the Ninth Circuit, this would be an easy call.

 5          MR. HARRINGTON:  Right.

 6          THE COURT:  Right?  I think *Cano* would call for the

 7  suppression of the evidence.  What you're up against, I think,

 8  is this case *Levy* in the Second Circuit, which seems to say

 9  that CBP officers, at the request of some other law

10  enforcement agency, can go ahead and conduct a search.  And

11  that's totally within the scope of the border search exception

12  to the warrant requirement.

13     Whereas *Cano* said, no, that it's not really a border

14  search, right, that's it's beyond the scope of what CBP

15  officers are supposed to do.  And so, you can't have a --

16  you've got to have some suspicion at least as to -- that

17  there's criminal activity.  So, how do you get around *Levy*, I

18  guess, is your big thing?

19          MR. HARRINGTON:  Well, I think it's somewhat

20  distinguishable, Judge, but also, the issue needs to be

21  resolved at some point in time by a higher court even so.  The

22  fact that we have a case that you may find controls you does

23  not mean that Mr. Bongiovanni shouldn't preserve this issue.

24          THE COURT:  Oh, no.  I'm not saying that at all.  I

25  think it's a very close question.  I'm just asking, is there

1  something that, at this point in time -- now *Levy* didn't

2  involve a phone.

3         MR. HARRINGTON:  Right.

4         THE COURT:  It involved a notebook found inside a

5  guy's luggage.

6         MR. HARRINGTON:  Yes.

7         THE COURT:  They took the notebook, they made

8  pictures of it, but that's similar to what happened here,

9  right?  There was pictures taken from images on the phone.

10         MR. HARRINGTON:  But --

11         THE COURT:  Does that somehow --

12         MR. HARRINGTON:  The difference is, that *Riley* has

13  recognized the privacy interest in the phone.  And I don't

14  know of any --

15         THE COURT:  A strong privacy interest.

16         MR. HARRINGTON:  Right.  I don't know of any cases

17  that say you have privacy interest in a notebook that you're

18  carrying with your luggage when you come into the border.  So,

19  I think that the fact that it's a phone and a strong privacy

20  interest helped to take it out of the scope of *Levy*.

21         THE COURT:  Well, there could be two things, kind of,

22  at work here.  There's *Cano*, right, which, for lack of a

23  better term, basically said this isn't a border search, right?

24  This is a search for criminal activity beyond anything to do

25  with the border, right?  Then, there's the issue of, okay, if

1    that doesn't apply, but it's a -- taking *Riley*, that it

2    involves a phone, that raises the level.  So, instead of

3    having no suspicion, you have to have at least reasonable

4    suspicion, right?

5         So, I -- *Levy* seems to address the -- there wasn't a

6    border search issue, right, by saying, they rejected that

7    argument, right?  CBP officers can look for anything, even if

8    it's at the behest of the DEA or somebody else.  But then,

9    some would say, as the Second Circuit is, they didn't decide

10   the issue of does it -- does this type of search -- the search

11   that was at issue in *Levy*, did that raise the level that you

12   had to show?  You had to show some reasonable suspicion.  They

13   said there was reasonable suspicion.  So, we don't really have

14   to decide if you have to are not, right?

15        So, your argument, I guess, is twofold; one can follow

16   *Cano* and say this is beyond the scope of a border search.  I

17   think *Levy* gives you some problems there.  But then you have

18   this issue about does it raise the level to reasonable

19   suspicion, and was there reasonable suspicion?  Mr. Tripi says

20   there was reasonable suspicion.  So even if we raise that

21   level, it's okay.

22             MR. HARRINGTON:  Well, the problem with his argument

23   about reasonable suspicion is, reasonable suspicion in the

24   mind of whom, right?  And the record that you have doesn't

25   show that.

```
 1              THE COURT:  Well, I don't recall any information at

 2   the hearing being brought out about reasonable suspicion.

 3              MR. HARRINGTON:  Neither do I.  That's why I'm saying

 4   the record --

 5              THE COURT:  Nobody got on the stand and says, here's

 6   why we had reasonable suspicion, right?  It was all about

 7   whether or not this is was a basic search or some kind of

 8   advanced search.

 9              MR. HARRINGTON:  Right.  And I mean, again, it goes

10   to that transnational organized crime.  I mean, we don't know

11   what that means.  There's no proof in the record of what that

12   means.  And so, that's the only thing that gives any kind of a

13   rise to reasonable suspicion, but I don't think that that

14   makes it, given the record.

15              THE COURT:  He listed about seven things in his brief

16   as to why there was reasonable suspicion beyond the

17   transnational.  Transnational was kind of thrown in there, I

18   think, along with the Dominican Republic is a drug source

19   country.

20              MR. HARRINGTON:  But, Judge, the problem we've got

21   is, those things weren't proven in the record.  I mean, you

22   can't get -- that may -- even if it's true, you have to put

23   some proof in the record for you in order for you to make that

24   finding.  He can't just say it in his brief; otherwise, he's a

25   witness.
```

Case 1:19-cr-00227-JLS-MJR   Document 281   Filed 05/06/22   Page 10 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

8

1      Judge -- and then, the next question, of course, is,

2   what's the consequence of what they did?  And we have a

3   situation here where those -- what they got from this search

4   was used in the questioning of Mr. Bongiovanni at his house.

5            THE COURT:  It was used in a bunch of different

6   things, right; affidavits for search warrants, questioning of

7   Mr. Bongiovanni, and we discussed that when we had the

8   hearing, that we might have to return to that depending on

9   how --

10           MR. HARRINGTON:  Right.

11           THE COURT:  If I were to deny the motion to suppress

12   and Judge Sinatra were to agree with me, I think a lot of that

13   stuff goes by the wayside.  If Judge Sinatra ultimately

14   decides it should be suppressed, then we're going to have to

15   go back and figure out what's in and what's out, right, based

16   on that.

17           MR. HARRINGTON:  We also have use of that, Judge, in

18   a number of search warrants that were found.

19           THE COURT:  Yes.

20           MR. HARRINGTON:  The search warrants contain many

21   other things besides just these phones, but we don't have

22   access to the search warrant affidavits.

23           THE COURT:  And the Court would then have to go back

24   and --

25           MR. HARRINGTON:  Right.

Case 1:19-cr-00227-JLS-MJR   Document 281   Filed 05/06/22   Page 11 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

9

1          THE COURT:  -- take that out and then figure out

2    whether there was still probable cause.

3          MR. HARRINGTON:  So, other than any other questions

4    you have, Judge, I think that lays out what the issues are.

5          THE COURT:  Okay.  Mr. Tripi?

6          MR. TRIPI:  Judge, I'll be happy to answer any

7    questions that you have for me, but we've divided up the

8    arguments and Mr. Dickson is going to handle them.

9          THE COURT:  Okay, Mr. Dickson.

10         MR. DICKSON:  May I go to the podium, Judge?

11         THE COURT:  You can sit down, stand up, I draw the

12   line at laying down.

13         MR. DICKSON:  Ready?

14         THE COURT:  Yes.

15         MR. DICKSON:  Your Honor, the government's position

16   is that the defendant's motion to suppress should be denied

17   for three reasons.

18      The first reason, as we laid out in our briefing, is that

19   this search of the defendant's cell phone was consistent with

20   well-established precedent that routine searches of a person's

21   property at the border do not require a warrant, probable

22   cause, or reasonable suspicion.  Just because the piece of

23   property at issue was a cell phone in this case does not

24   change that calculus under any Supreme Court precedent, any

25   Second Circuit precedent, or any precedent other than that

1   from the Ninth Circuit.

2           THE COURT:  You don't think that the *Riley* case --

3   you don't think that ups the ante on this?

4           MR. DICKSON:  Your Honor, I think *Riley* did establish

5   that a person's privacy interest in their cell phone is maybe

6   heightened compared to other pieces of property, but I think

7   importantly, in this context, we are starting from a different

8   place than the court was starting at in *Riley*.  The court in

9   *Ramsey* and in *Montoya de Hernandez* said that the crux of any

10  Fourth Amendment analysis is a balancing test between the

11  government's interest and law enforcement on one side, and a

12  person's privacy interest on the other side.

13      But in the border search context, the Supreme Court has

14  said that the government's interest in law enforcement is

15  fundamentally different than the government's interest within

16  the United States, which was the situation in *Riley*.  The

17  situation in *Riley* was a search incident to arrest from

18  *Shamel*.  And, in that case, the balancing interest is just

19  different here.  So, even if we talk about *Riley* in a

20  heightened --

21          THE COURT:  And this is a border search because it

22  happened at the border?

23          MR. DICKSON:  That's correct, Your Honor.

24          THE COURT:  And nothing whatsoever to do with finding

25  contraband or anything having to do with international travel

1   or anything like that?  This was basically trying to take

2   advantage of the fact that the defendant was at the border to

3   conduct a search of his phone when you wouldn't have been able

4   to do it otherwise, right?  That's really what happened here,

5   right?  The government was trying to take advantage of the

6   situation?

7            MR. DICKSON:  Your Honor, I don't think the

8   government was trying to take advantage of the situation, but

9   what I will say is that --

10           THE COURT:  Well, then, what were they doing?  Were

11  they concerned about whether or not he was smuggling drugs

12  into the country or child pornography in the country?

13           MR. DICKSON:  Certainly not --

14           THE COURT:  It really didn't have anything to do with

15  that, right?

16           MR. DICKSON:  Certainly not child pornography, Your

17  Honor.  The defendant is charged with a conspiracy to

18  distribute narcotics here, but what I will say, as to the

19  issue of --

20           THE COURT:  You're kind of going what happened

21  afterwards to what happened then.

22           MR. DICKSON:  Yes, Your Honor.

23           THE COURT:  At that point, you had no information he

24  was involved with international drug trafficking.

25           MR. DICKSON:  As I think the government laid out in

Case 1:19-cr-00227-JLS-MJR   Document 281   Filed 05/06/22   Page 14 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

12

 1    its brief, Your Honor, there was some information available

 2    to --

 3              THE COURT:  Well, we'll go through that.  Why don't

 4    we go through that now.

 5              MR. DICKSON:  Well, Judge, if I could just say, as it

 6    relates to -- I think your concern that you're bringing up is

 7    about *Cano* from the Ninth Circuit, if I'm understanding you

 8    correctly.  I think that *Cano* created this dichotomy --

 9              THE COURT:  It wasn't just *Cano*.  There was a Fourth

10    Circuit case.

11              MR. DICKSON:  Well, *Cano* created the dichotomy

12    between searching for contraband and searching for evidence of

13    other crimes.  That dichotomy, I don't believe, has been

14    adopted by any other circuit.

15        And, in fact, in the Supreme Court's decision in a case

16    called *Warden v. Hayden,* which is at 387 US 294, the thing the

17    Supreme Court clarified, the reason that *Cano*'s dichotomy here

18    is unworkable between contraband and evidence of other crimes

19    because the Supreme Court said in that case that privacy is

20    disturbed no more by a search directed to purely evidentiary

21    object than it is by a search directed to an instrumentality,

22    fruit, or contraband.

23        And when we're talking about the Fourth Amendment context,

24    that's what we're talking about; the balance between the

25    government's interest in law enforcement and the individual's

1    interest in privacy.  And that balance doesn't shift, in any

2    way, shape, or form, regardless of whether the search was

3    directed at contraband or directed at some other kind of

4    evidence.

5          THE COURT:  Well, *Cano* relied on the CBP duties in

6    the statute, right?

7          MR. DICKSON:  Yes.

8          THE COURT:  I believe I rejected that --

9          MR. DICKSON:  Yes.

10         THE COURT:  -- as to why it wasn't a border search

11   so-to-speak?

12         MR. DICKSON:  Yes, Your Honor --

13         THE COURT:  I'll go back to what the government did

14   here.  I'm not trying to trick you -- is you tried to take

15   advantage of the fact that he was crossing the border.  You

16   really didn't have any border reasons to search the phone.  It

17   was really just, we're going to take advantage of this, try to

18   get evidence on his phone so we can try to go after him up

19   here for other crimes that he's committed up here.

20         MR. DICKSON:  Yes, Your Honor.  We're not disputing

21   that Mr. Bongiovanni was targeted for a search here, that

22   there was a look-out.

23         THE COURT:  And it had no reason whatsoever to do

24   with him traveling back and forth across the border, right?

25         MR. DICKSON:  Well, yes, Your Honor.  I think that

1    that's right although --

2            THE COURT:  Yes, what?  Yes, I'm right?

3            MR. DICKSON:  Yes, I believe you're right, Your Honor

4    although, again, I would say that there is information as

5    we've outlined in our brief that was available at that time

6    that the defendant --

7            THE COURT:  Okay.  Let's go through that.

8            MR. DICKSON:  Okay.  One --

9            THE COURT:  One.  The defendant has been under

10   investigation since July 20th of 2018 which was continuing,

11   expanding, and involved multiple federal agencies.  So,

12   there's reasonable suspicion to believe he might be --

13   criminal activities we're investigating.

14           MR. DICKSON:  Yes, Your Honor.  I think that that's

15   part of it, right?  The --

16           THE COURT:  That can't be the sole thing.

17           MR. DICKSON:  Sure.  I had that HSI believed --

18           THE COURT:  Number two, that there was information

19   that defendant had provided law enforcement sensitive

20   information -- law enforcement sensitive information to non-

21   low enforcement individuals engaged in drug trafficking.

22   Okay.  When did you know that, and who knew it, and how did

23   they know it?

24           MR. DICKSON:  I can't give you a date, Your Honor.

25           THE COURT:  Isn't that critical to my analysis?

```
 1            MR. TRIPI:  Judge --

 2            THE COURT:  You're telling me there's reasonable

 3   suspicion.  You're listing these seven or eight things.  We

 4   didn't have any evidence produced of that.  Some of them are

 5   just generally open-ended things here.

 6            MR. TRIPI:  Your Honor --

 7            THE COURT:  No, Mr. Tripi.  Sit down.  You wanted

 8   this gentleman to argue, so he's arguing.  Have a seat,

 9   please.

10            MR. TRIPI:  Those were --

11            THE COURT:  Have a seat, please.

12            MR. TRIPI:  That was my --

13            THE COURT:  Have a seat, please.

14            MR. TRIPI:  You're asking about --

15            THE COURT:  Have a seat please.  Go ahead.

16            MR. DICKSON:  Yes, Your Honor.  I will say that in

17   this file, we do outline that while we don't have specific

18   dates for each of these pieces of information, I'd agree with

19   you on that, we do --

20            THE COURT:  Okay.  Let's go to number three.  The

21   defendant was closely associated with the co-defendant Peter

22   Gerace.

23            MR. DICKSON:  I'm sorry, Your Honor, could you repeat

24   yourself please?

25            THE COURT:  Yes.  Number three.  The defendant was
```

1  closely associated with the co-defendant, Peter Gerace.

2          MR. DICKSON:  Yes, Your Honor.  Each of these pieces

3  of information that we've outlined here, as we've said in our

4  filing, was known to law enforcement --

5          THE COURT:  How?

6          MR. DICKSON:  -- by the -- through the course of the

7  investigation, Your Honor.

8          THE COURT:  So, this goes back to the number one,

9  you're conducting an investigation?

10         MR. DICKSON:  Right.

11         THE COURT:  When was that known?

12         MR. DICKSON:  Again, I don't have a specific date for

13  you, Your Honor.

14         THE COURT:  Isn't that -- if it's not known until

15  after you got the phone, you couldn't have used it as

16  justification to get the phone, right?

17         MR. DICKSON:  Your Honor, as we say in our filing, at

18  a minimum, by the time the defendant crossed the border on

19  April 23rd, the investigation indicated, among other things,

20  at least the following.  So, prior to --

21         THE COURT:  And I'm -- I should take the government's

22  word for that?

23         MR. DICKSON:  As officers of the Court, Your Honor,

24  we're making that representation to the Court.  Yes.  We

25  did --

1          THE COURT:  With no hearing, with no ability to

2   cross-examine any witnesses or for me to question any witness,

3   we should just take the government's word you had reasonable

4   suspicion before you seized the phone?

5          MR. DICKSON:  We have made that representation to the

6   Court, Your Honor.  The witnesses were called.  I think

7   Special Agent Ryan --

8          THE COURT:  If we have a case where somebody thought

9   somebody was out on the street corner and had a gun and the

10  police officer walked up to him, patted him down and found the

11  gun, and then we have a suppression hearing, right, you think

12  it would be enough just to say there was reasonable suspicion

13  to believe he had a gun without an evidentiary hearing?

14         MR. DICKSON:  I'm not sure about in that context,

15  Your Honor, but I do think, again, as officers of the court,

16  we've made these representations.  The agents were -- or one

17  of the agents, at least, was called to testify in this -- in

18  that evidentiary hearing --

19         THE COURT:  He didn't testify about having reasonable

20  suspicion.

21         MR. DICKSON:  I think he did testify that he had been

22  investigating Mr. Bongiovanni prior to the border search of

23  his phone.

24         THE COURT:  Then I would expect your brief to have

25  this all laid out for me, right?  On this page of this

 1    transcript, here's where he said this.

 2            MR. DICKSON:  Understood.

 3            THE COURT:  That's not here.

 4            MR. DICKSON:  That's not.  That's correct.

 5            THE COURT:  As a matter of fact, the only reference

 6    is to another document in the file which basically said the

 7    same exact thing on this topic.

 8            MR. DICKSON:  Yes, Your Honor.

 9            THE COURT:  Okay.  Number four, that the defendant

10    submitted Drug Enforcement Administration memo containing

11    false statements about his relationship with his co-defendant

12    and related issues to DEA memos he submitted in November 2018,

13    December 2018, and January 2019.

14            MR. DICKSON:  Yes, Your Honor.  And, again, it's the

15    same.  All this information, again, we've made representations

16    that all of that information was known to law enforcement

17    prior to the border search, that the indictment also does

18    provide more specifications onto those dates as to some of

19    those false memos that were written by the defendant, or

20    allegedly written by the defendant, and those dates precede

21    the border search of his phone.  I think critically here, Your

22    Honor, the -- unless --

23            THE COURT:  Have I seen these memos?  Were these

24    memos at the hearing?

25            MR. DICKSON:  The memos, I don't -- no, were not at

Case 1:19-cr-00227-JLS-MJR   Document 281   Filed 05/06/22   Page 21 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

19

1    the hearing, Judge.

2            THE COURT:  Number five.  The defendant made false

3    and misleading statements to other members of law enforcement

4    regarding the relationship of his co-defendant and others.

5    Where did that happen?

6            MR. DICKSON:  Just a moment, Your Honor.  As is

7    alleged in Count 17, Your Honor, it's on or about March 29th,

8    2019.  There were false statements made by the defendant about

9    his relationship with his co-defendant Peter Gerace.

10           THE COURT:  That doesn't say anything more than

11   what's in this paper, right?  But I guess the Grand Jury found

12   that.

13           MR. DICKSON:  Correct, Your Honor.

14           THE COURT:  Right?  The DEA and -- I'm sorry -- that

15   the defendant retired from the DEA and retirement appeared to

16   occur abruptly after the defendant knew he was under some type

17   of investigation.  Okay.  When and how did the defendant know

18   he was under investigation?

19           MR. DICKSON:  I believe that the defendant, at least

20   initially, knew he was under investigation because there was

21   an OPR investigation opened to him that preceded the border

22   search of the phone.  And then again, Your Honor, by at least

23   March 29th, the defendant had been questioned by law

24   enforcement which, again, also precedes the border search of

25   the phone.

Case 1:19-cr-00227-JLS-MJR   Document 281   Filed 05/06/22   Page 22 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

20

1          THE COURT:  Well, I guess, preceded his retirement.

2          MR. DICKSON:  That date didn't precede his

3    retirement, Your Honor.  The retirement, I believe, was

4    February 2nd of that year.

5          THE COURT:  And the Federal Grand Jury had commenced

6    the investigation into the defendant and others.  When did the

7    Grand Jury investigation start?

8          MR. DICKSON:  Let me ask Mr. Tripi, if I may, Judge.

9    We believe that it was approximately March 7th of 2019, Your

10   Honor, when the first witness testified.

11         THE COURT:  Of 20?

12         MR. DICKSON:  Of 2019.

13         THE COURT:  Nineteen.  And then the defendant made

14   false statements regarding, among other things, his

15   relationship with his co-defendant during an interview with

16   the Department of Justice Office of Inspector General agents

17   on March 29th, 2019.

18         MR. DICKSON:  Yes, Your Honor; again, preceding the

19   border search at issue here.

20         THE COURT:  What were the statements and how do we

21   know that they were -- how did you know they were false at

22   that time?

23         MR. DICKSON:  The statements, as alleged in the

24   indictment, from that particular interview, Your Honor, were

25   the defendant denied ever witnessing Peter Gerace consume

 1  narcotics, that the defendant denied that Peter Gerace ever

 2  called him while a staff member or customer was actively

 3  overdosing at the gentlemen's club operated by Peter Gerace,

 4  and that the defendant denied ever initiating contact with

 5  Peter Gerace, Jr., and then those were the three statements

 6  that are alleged in the indictment, Your Honor.

 7          THE COURT:  We know those were false why?

 8          MR. DICKSON:  That's what the Grand Jury found

 9  through the course of the investigation, Your Honor.

10          THE COURT:  Well, the Grand Jury didn't return an

11  indictment until after this happened, right?

12          MR. DICKSON:  That's correct, Your Honor.

13          THE COURT:  So how do I know when the Grand Jury

14  decided that?

15          MR. DICKSON:  The Grand Jury decided this issue after

16  the border search.  The Grand Jury indicted after the border

17  search.

18          THE COURT:  Then they throw in, additionally,

19  defendant was traveling back to the United States from the

20  Dominican Republic, which is a source country for narcotics.

21          MR. DICKSON:  Your Honor, again, as officers of the

22  court, we made that representation and I fully understand

23  that, at least I don't recall any testimony, of that being

24  presented at the evidentiary hearing but, again, the witnesses

25  were --

1          THE COURT:  I just don't recall having the officers

2    of the court argument made to me on evidentiary issues.  Well,

3    that's what we said, so that's true, and I should take it as

4    true.

5          MR. DICKSON:  I understand, Your Honor, the concern.

6    I do think, as officers of the court, there are times where

7    proffers are appropriate, and I think that we've proffered

8    these facts to the Court.  The witnesses were available to be

9    cross-examined if the defense didn't agree with those proffers

10   of evidence here, but I do think that this is a supplementary

11   issue to the immediate issue, which is whether or not the

12   border search itself was routine or not.

13         THE COURT:  I think you're up against it there a

14   little bit though, aren't you?  You think this was a routine?

15   The thing that happened here was routine?

16         MR. DICKSON:  I do, Your Honor.

17         THE COURT:  They looked at his phone.  They made

18   copies of what was in the phone.  That doesn't raise the

19   level?

20         MR. DICKSON:  Your Honor --

21         THE COURT:  That, at least, raises the question.

22         MR. DICKSON:  Certainly --

23         THE COURT:  Certainly in *Levy* where they took

24   pictures of a notebook, the Second Circuit said, well, there's

25   an argument to be made that this raised the level, and you

 1  have to show reasonable suspicion.  They didn't have to decide

 2  that because they said there was reasonable suspicion.  And

 3  you don't think then with *Riley* and everything else, you don't

 4  think that looking at the guy's phone, taking pictures of the

 5  information on the phone doesn't raise the level at that

 6  point?  That's what you're arguing?

 7          MR. DICKSON:  Your Honor, if the defendant's phone

 8  had been hooked up to equipment and then otherwise --

 9          THE COURT:  They tried, they just were unsuccessful.

10          MR. DICKSON:  They did, but because it was

11  unsuccessful, that's just not an issue before the Court

12  right --

13          THE COURT:  And you think that's -- you only get that

14  higher level of scrutiny by you have to hook it up to a

15  machine?  You can go through, look through it, take pictures

16  of anything that's in it, but right now, what's ever in it,

17  and you're good to do?  That's what your position is?

18          MR. TRIPI:  It's not anything in the phone, Your

19  Honor.  The facts at issue in this case only are that Officer

20  Carter clicked on the text message application and the

21  contacts list application.  He testified that he did not --

22          THE COURT:  So if you only look at those two things,

23  you're good to go?  If you make copies of those, you're good

24  to go, it's a basic search, no additional Fourth Amendment

25  protection?

1          MR. DICKSON:  Your Honor, this isn't simply the

2    government here making this representation.  The First Circuit

3    in *Alasaad*, which was decided in --

4          THE COURT:  Is that specifically text messages and

5    contact information?

6          MR. DICKSON:  I don't think it was specifically text

7    message and contacts information.  I don't think the circuit

8    went into that because it was a civil suit brought by a class

9    of plaintiffs, but the First Circuit in *Alasaad* did equate a

10   basic search, as defined by CBP, which is what Officer Carter

11   testified here, to a routine search as defined by the Supreme

12   Court in *Montoya*.

13         THE COURT:  What was the nature of the search in that

14   case?

15         MR. TRIPI:  In *Alasaad*?

16         THE COURT:  Yeah.  They did the same thing, open up

17   the phone, and took pictures and everything else?

18         MR. DICKSON:  Let me look back, Your Honor.  I don't

19   think that the court went into -- yeah.  The court didn't go

20   into detail into the facts of each specific one because I

21   think there were 10 plaintiffs who, as a class, were suing the

22   Department of Homeland Security there.  So, I can't tell you

23   whether or not there were pictures or anything taken of each

24   of the ten plaintiffs' phones, but what I can tell you is that

25   the circuit court did say that a basic search, the same search

Case 1:19-cr-00227-JLS-MJR  Document 281  Filed 05/06/22  Page 27 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

25

1    that was done here, equates to a routine --

2              THE COURT:  How do I know if it was the same search

3    that was done here?  You said you don't know the degree of the

4    search that was done in that case.

5              MR. DICKSON:  That's why --

6              THE COURT:  How do I know that the same search was

7    done here?

8              MR. DICKSON:  I'm guessing --

9              THE COURT:  I know they describe the basic search is

10   when you can look at the phone, right?  You can look at the

11   phone and see if it had a razor blade in it.  You can look at

12   the phone to see it might be made of plastic explosives or

13   something like that, the phone itself.  But this search went

14   beyond that, right?  This search went into the phone to get

15   the contents of what was in the phone.

16             MR. DICKSON:  Respectfully, Your Honor, *Cano* also

17   said that a search of the phone, meaning a manual inspection

18   of the phone, a basic inspection, could be done under the

19   Fourth Amendment.  *Cano's* holding differs from other

20   circuits --

21             THE COURT:  What was the search in *Cano*?  What was it

22   they didn't want searched in *Cano*?

23             MR. DICKSON:  The issue in *Cano* was that there was

24   several steps to the search.  The cell phone was searched

25   manually.  It was scrolled through.  The Ninth Circuit said

1 | that was okay.  That was a --

2 | THE COURT:  That's what *Levy* said, right?

3 | MR. DICKSON:  Right.

4 | THE COURT:  If you look at the notebook and you just

5 | flip through it, that's fine, right?

6 | MR. DICKSON:  Yes.  And then beyond that, Cano's

7 | holding, which is where I think it differs from some of the

8 | rationale or decisions that other courts have made, is that

9 | *Cano* said then if you take a picture of the evidence that you

10 | find, then that requires reasonable suspicion.  That raises

11 | the issue.  And respectfully -- and I --

12 | THE COURT:  That's not what happened here.

13 | MR. DICKSON:  It is what happened here.

14 | THE COURT:  Okay.

15 | MR. DICKSON:  Respectfully, Your Honor, though, I

16 | think --

17 | THE COURT:  That *Cano* is wrong?

18 | MR. DICKSON:  *Cano* is wrong.  And *Cano*, I think,

19 | works in a number of different contexts against the weight of

20 | authority from other circuits and from this circuit in

21 | certain --

22 | THE COURT:  What case in this circuit?

23 | MR. DICKSON:  Not in that particular context, but in

24 | the other context --

25 | THE COURT:  Well, in this context, what does the

1    Second Circuit say?

2           MR. DICKSON:  The Second Circuit has many thoughts on

3    this issue --

4           THE COURT:  They had *Levy*, right?  *Levy* seemed to

5    intimate without deciding that when you got into this,

6    somebody's notebook, and you took pictures of it there, it

7    probably was a heightened interest of privacy, right?

8           MR. DICKSON:  I don't think that *Levy* ever decided

9    that issue, Your Honor.

10          THE COURT:  No, they don't.

11          MR. DICKSON:  And again, I think that -- just give me

12   just a second.

13          THE COURT:  Because here's where I view you're at,

14   okay?  This was a search beyond a basic search, as far as I

15   can tell.  Then you had to show reasonable suspicion, even

16   under *Levy*.  *Levy* doesn't necessarily, I don't think, help you

17   with that.  What was the reasonable suspicion?  Then, we go

18   back to these seven things that you listed in that, which we

19   didn't have an evidentiary hearing on.  There's no evidence

20   presented at the evidentiary hearing we did have, right?

21          MR. DICKSON:  May I confer with counsel?

22          MR. TRIPI:  Judge, I apologize for interrupting

23   earlier.

24   (An off-the-record discussion was held.)

25          MR. DICKSON:  I apologize, Judge.  Did you have a

1   question for me to answer or would you like me just to

2   continue my argument?

3          THE COURT:  Just continue.

4          MR. DICKSON:  Okay.  Your Honor, the posture under

5   which we were operating at the time that we made those

6   representations to the Court about what reasonable suspicion

7   was, was that it was the government's belief that the weight

8   of authority in this context was that the search of the

9   defendant's phone was routine as defined by the Supreme Court;

10  that because it was a basic search, as Officer Carter

11  testified to, in every way, shape and form, that that meant

12  that it was routine.

13         THE COURT:  So you're putting all your eggs in one

14  basket, right, that it was a basic search; therefore, we

15  didn't have to show reasonable suspicion?

16         MR. DICKSON:  It was a basic search, Judge.  That

17  much is clear.  The question is --

18         THE COURT:  I guess I'm not sure that it is clear.

19         MR. DICKSON:  Respectfully, Judge, the language at

20  issue, I think, is routine versus non-routine.  Basic and

21  forensic are terms that CBP uses.  And as --

22         THE COURT:  Well, what terms did the courts use?

23  Don't they use routine and not routine?

24         MR. DICKSON:  Routine and non-routine.

25         THE COURT:  And you're saying this was routine?

1          MR. DICKSON:  Correct, Your Honor.  Because *Alasaad,*

2    in a district court from Maryland, interpreting Fourth Circuit

3    decision in a case called *Saboonchi* said that basic searches

4    will never result in visualization of more than a fraction of

5    the data on the phone, and that agents use it in much the same

6    way a user does, that those searches --

7          THE COURT:  As I said though, if you put your eggs in

8    that basket, I don't know if I go along with it was a -- what

9    were the terms you used?

10          MR. DICKSON:  The Supreme Court has used routine

11   versus --

12          THE COURT:  I'm not sure that it was routine search.

13   I think when you got into the phone and starting taking

14   pictures of stuff that was in the phone, I think that might

15   have raised to non-routine search.

16          MR. DICKSON:  Understood, Your Honor.  And

17   respectfully, I think that --

18          THE COURT:  And then you don't have -- so then you've

19   got to show reasonable suspicion, right?  You didn't do that

20   at the hearing because you put your eggs in one basket, we're

21   going to show the Judge that it was a routine search.

22          MR. DICKSON:  Yes, Your Honor.  And we're, of course,

23   happy, if the Court would be willing, to reopen the hearing to

24   put on that evidence --

25          THE COURT:  Why didn't you do it in the first place?

1    That's what we had a hearing about.

2            MR. DICKSON:  Understood.  We thought that the weight

3    of authority from *Alasaad*, from *Saboonchi* interpreting *Ickes*

4    from the Fourth Circuit said that routine search -- excuse

5    me -- that basic searches as defined by CBP were equivalent to

6    routine searches as defined by the Supreme Court.  And routine

7    searches consistently have been held to not require reasonable

8    suspicion.

9            THE COURT:  You think that under *Riley* the Supreme

10   Court would say this was routine?  You got in the phone, took

11   pictures of what was in the phone, that's routine, that's no

12   problem?

13           MR. DICKSON:  I do, Your Honor, because *Riley* is, as

14   I had mentioned, a different posture than what we are talking

15   about here with the border search.  The increased interest of

16   privacy that an individual has in their phone, I think that is

17   indisputable.

18           THE COURT:  What if you wanted to do a strip search,

19   an anal cavity search?

20           MR. DICKSON:  Those searches have been considered by

21   the Supreme Court in *Montoya de Hernandez* to be not routine.

22   Those types of searchs require --

23           THE COURT:  And only those types.  You don't think

24   getting into somebody's phone and getting out all the

25   information they have in the phone that that's routine?

 1          MR. DICKSON:  If I can address that, Your Honor, the

 2   Supreme Court has only found in one instance ever that a

 3   search required -- at the border required heightened

 4   suspicion.  That was in *Montoya de Hernandez*, and that was

 5   actually a seizure -- because of this whole length of the

 6   seizure.  In that case, the Supreme Court said that x-rays,

 7   body cavity searches, and strip searches are the other types

 8   of searches that are considered not routine.  And the Eleventh

 9   Circuit in --

10          THE COURT:  They didn't say only.

11          MR. DICKSON:  They didn't say only.  They used

12   examples of that.  The Eleventh Circuit, in a case called

13   *Touset*, which is a case that was dealing with cell phones,

14   took that question and addressed it.  And the Eleventh

15   Circuit --

16          THE COURT:  At the border?

17          MR. DICKSON:  In a border search context --

18          THE COURT:  Where they got into a phone and they took

19   pictures?

20          MR. DICKSON:  They searched the defendant's -- this

21   is actually a forensic search.  And the Eleventh Circuit has

22   said that there is no reasonable suspicion required to do even

23   a forensic search of a phone at the border.  And the rationale

24   in *Touset* is that the Supreme Court --

25          THE COURT:  Forensic search meaning hook it up to a

1    machine?

2          MR. DICKSON:  Correct, Your Honor.  Even that doesn't

3    require reasonable suspicion in the Eleventh Circuit.

4          THE COURT:  You don't think in the Second Circuit in

5    the *Levy* case they didn't -- they weren't sure whether making

6    copies of pictures in a notebook would take it to the next

7    level?  You think now they come back and say, well, even if

8    you hook it up to a machine and got all the information on it,

9    that wouldn't take it as far?

10         MR. DICKSON:  I think the Eleventh Circuit's

11   rationale is sound.  And if the Second Circuit were to

12   consider the Eleventh Circuit's rationale in *Touset* that they

13   may, in fact, find that.  That's because *Touset* said, Your

14   Honor, that there is a difference when we're talking about a

15   person's bodily integrity versus a piece of a person's

16   property.

17      And, again, this was in the context of considering a

18   search of a cell phone.  They said that it is a fundamentally

19   different exercise for law enforcement to do a strip search or

20   to do a body cavity search than it is to search a piece of

21   property.  And they cited *Flores-Montano,* which is a Supreme

22   Court case, in which --

23         THE COURT:  Was that before or after *Riley*, *Touset*?

24         MR. DICKSON:  It was -- *Touset* was after *Riley*, I

25   believe.  Yeah.  *Touset* was after *Riley*.  But the *Flores-*

1   *Montano* decision preceded *Riley*.  But they did say -- the

2   Eleventh Circuit cited favorably to that to say that the

3   Supreme Court declined to differentiate between different

4   types of property that were at issue at the border, and that

5   SCOTUS -- the Supreme Court has only taken issue with that

6   prolonged seizure from *Montoya de Hernandez.*

7       I think that that's the critical piece here is that even

8   though there may be heightened privacy interests in a cell

9   phone post-*Riley*, the balancing that is the gravamen of any

10  Fourth Amendment inquiry is just fundamentally different at

11  the border than it is in a search incident to arrest within

12  the United States.  The courts have been clear that the

13  government's interest in law enforcement is weighted

14  differently at the border and that's what this Court has to

15  decide.  This Court has to decide --

16          THE COURT:  So, under your theory, at the border,

17  they could take anybody's phone.  They could look -- they

18  could get into the phone and they could start scroll --

19  whatever information they want out of the phone.  You give up

20  any right you have to the privacy of your phone when you cross

21  the border?

22          MR. DICKSON:  I don't think that it's any right

23  necessarily, Your Honor, but I think that in the context --

24          THE COURT:  Well, what right is it?

25          MR. DICKSON:  Well, the factual context that we're

1  dealing with here, again, is not a situation where any

2  encrypted files were accessed --

3        THE COURT:  But only because you couldn't.  Only

4  because you -- the machine didn't work, right?  You were going

5  to do that, right?  And apparently, in this Eleventh Circuit

6  case, they did that, right?  They hooked it up to a machine?

7        MR. DICKSON:  That's correct.

8        THE COURT:  And they said, no.  Not a violation.  You

9  can hook anybody's phone up at the border to a machine.  You

10  can take whatever information you want to off that phone

11  because you're at the border, right, and then use it later in

12  some kind of criminal proceeding.

13        MR. DICKSON:  Because of the different balance of

14  privacy interests that are a reality at the border under --

15        THE COURT:  That's what I'm asking.  You don't have

16  any privacy interest in your phone at the border, right?

17        MR. DICKSON:  The Eleventh Circuit said that there's

18  no reasonable suspicion required regardless of the type --

19        THE COURT:  Right.  So they can take anybody's phone,

20  they can hook it up to a machine, they can take all the

21  information off that phone, and use it for whatever purpose

22  they want because you have no privacy interest in it?

23        MR. DICKSON:  In the Eleventh Circuit, yes, Your

24  Honor.  But, again, we're not asking this Court to make that

25  finding here.  The issue before this Court --

1          THE COURT:  That's the case you're relying on to try

2     to get me to make the finding in this case.  I'm just trying

3     to understand what you're saying.  You're saying that the

4     Eleventh Circuit says there's no privacy interest whatsoever

5     in your phone at the border, right?  That's what you're

6     relying on?

7          MR. DICKSON:  I'm saying that the logic underlying

8     the Eleventh Circuit's opinion in *Touset* is, I think, relevant

9     in a critical aspect and that is that there is a significant

10    difference between a search of a person's body, the inside of

11    a person's body, compared to a cell phone, a computer, a piece

12    of luggage.  There is a fundamental difference between that.

13         THE COURT:  And the Eleventh Circuit case says

14    there's no privacy interest in your phone.

15         MR. DICKSON:  The court does say that.  And, again,

16    we're not asking the Court to make that finding here because

17    that finding wouldn't be pertinent in this case because no

18    forensic search was done.  There was a very limited, basic,

19    cursory search of this defendant's phone done.  But what our

20    position is, is that the search here was routine because --

21         THE COURT:  What's your best case for this is

22    routine, getting into the phone, making copies of the

23    contacts, making copies of the text messages, that that's a

24    basic search or a routine search?

25         MR. DICKSON:  I think *Alasaad* out of the First

Case 1:19-cr-00227-JLS-MJR  Document 281  Filed 05/06/22  Page 38 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

36

1   Circuit is a good case for that, Your Honor.  I also think

2   *Saboonchi*, which is a district court case out of Maryland.

3            THE COURT:  The first one, isn't that the one we said

4   didn't know this --

5            MR. DICKSON:  I don't know the facts of it.

6            THE COURT:  Well then how can we say that that stands

7   for that proposition?

8            MR. DICKSON:  It stands for the proposition that a

9   basic search, as defined by CBP, which is what Officer Carter

10  said was done here, a basic search, as defined by CBP, that

11  that is the equivalent to a routine search done at the border.

12  That's the proposition that *Alasaad* --

13           THE COURT:  You're saying -- well, I'll have to go

14  back and look at the transcript.  I don't remember.  So,

15  clearly, him saying this was a basic search, like he was using

16  terms of art, he's just saying here's what he did.

17           MR. DICKSON:  Your Honor, respectfully, he did use

18  terms of art.  And I asked him to --

19           THE COURT:  All right.  Well, we'll check.

20           MR. DICKSON:  And Mr. Tripi also asked Special Agent

21  Ryan to define those same terms, basic search versus advanced

22  search.  There is reference to those terms in both.

23           THE COURT:  What takes it from basic to not basic?

24           MR. DICKSON:  The --

25           THE COURT:  What's the difference?

1            MR. DICKSON:  Under CBP policy -- and let me just get

2    it right for you here.  So, CBP policy defines an advanced

3    search as any search in which an officer connects external

4    equipment through a wired or wireless connection to an

5    electronic device --

6            THE COURT:  This is a basic search?

7            MR. DICKSON:  An advanced search.

8            THE COURT:  Oh, advanced.

9            MR. DICKSON:  Yeah.  In which an officer connects

10   external equipment through a wired or wireless connection to

11   an electronic device, not merely to gain access to the device,

12   but to review, copy, and/or analyze its contents.  Advanced

13   searches require supervisory approval.

14      And then, CBP goes on to define a basic search as any non-

15   advanced search, so any search that's not conducted by

16   connecting a phone to equipment for the purpose of copying the

17   data within the phone.  And as I think Officer Carter

18   testified to, and Special Agent Ryan testified to, there are

19   significant differences between those two types of searches.

20   Basic searches take 15 to 30 minutes.  I think Officer Carter

21   testified that advanced searches take hours and hours.  Basic

22   searches yield a fraction --

23            THE COURT:  What's your best case for -- that a basic

24   search, as defined by CBP, which I guess I don't know CBP

25   necessarily sets what the legal -- from a Fourth Amendment

1   point, what's good and what's not good, but let's say that

2   they do.  What's your best case that says that that definition

3   is the same as routine search?

4           MR. DICKSON:  *Alasaad* out of the First Circuit.

5       And I agree with you, Your Honor, that CBP doesn't define

6   whether something is constitutionally enforced under the

7   Fourth Amendment.  But *Alasaad* and *Saboonchi* out of the

8   district court in Maryland, which is 990 F. Supp. 2d 536, that

9   cited favorable a Fourth Circuit case called *Ickes*, which is

10  393 F.3d 501, that makes -- and *Saboonchi* said that *Ickes*

11  makes it clear that a routine border search may include a

12  conventional inspection of electronic media and a review of

13  the files on them, just as it may include physical papers.

14      So, those two cases --

15          THE COURT:  What's the cite for that, say that again?

16          MR. DICKSON:  *Saboonchi* cites *Ickes*, which is --

17          THE COURT:  What does *Ickes* cite?

18          MR. DICKSON:  I'm not sure what *Ickes* cites, Your

19  Honor.  I don't have *Ickes* in front of me.  I apologize.

20  Additionally, Your Honor, I will say that in *US v Young*, while

21  I don't know -- which is a case from this district in which

22  Judge McCarthy was writing for Judge Arcara, Judge McCarthy

23  did write that the agent in that case discovered a text

24  message after reviewing the cell phone.  Now, it's unclear in

25  that decision whether a photo was taken or anything else, but

1  he did say he reviewed -- the agent reviewed a text message on

2  an individual's cell phone at the border and Judge McCarthy

3  said that the search of the electronics can be routine and

4  found that this particular search was a permissible routine

5  border search here.

6      The distinction between basic and advanced search, I

7  think, is critical to the Court's inquiry of whether or not

8  this search was routine or not routine as defined by the

9  Supreme Court.  Officer Carter testified that the search was

10 15 minutes long, not hours long like an advanced search.  It

11 yielded --

12          THE COURT:  Let's get off this basic and advanced.

13 That's not what the case law is.  The case law is routine and

14 non-routine.

15          MR. DICKSON:  That's correct, Your Honor.

16          THE COURT:  You want me to accept this CBP

17 interpretation of what's basic and advanced.  I'm not sure

18 that I'm bound by that or anything is bound by that.

19          MR. DICKSON:  I don't think you're bound by it at

20 all, Your Honor.  I just think that the First Circuit and,

21 again, this district court in Maryland have found that that

22 definition is equivalent to routine, as defined by the Supreme

23 Court.  And when a search is routine, there is no --

24          THE COURT:  Let's assume you're wrong and it's not

25 routine.  Where are we then with your case?

Case 1:19-cr-00227-JLS-MJR   Document 281   Filed 05/06/22   Page 42 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

40

1          MR. DICKSON:  If the search is non-routine, then

2     there is a circuit split.  The Eleventh Circuit says no

3     reasonable suspicion is required.  There are other circuits, I

4     think the First Circuit and Fourth Circuit, that say --

5          THE COURT:  I think that goes back to, the Eleventh

6     Circuit says anything goes.

7          MR. DICKSON:  Right.

8          THE COURT:  You give up any right you have to privacy

9     in your phone when you cross the border.  Government can take

10    it and look at it, make copies of it, they can do whatever he

11    want.

12         MR. DICKSON:  Right.  So, the Eleventh Circuit

13    says --

14         THE COURT:  You can do whatever you want.

15         MR. DICKSON:  You can do what you want.  The First

16    Circuit and the Fourth Circuit say that reasonable suspicion

17    is required, and then the Ninth Circuit, which our position is

18    that that's an aberrational holding, goes a step further and

19    says you need to have reasonable suspicion that the phone

20    contains contraband.  Those are the postures that we're in.

21    Our position though is --

22         THE COURT:  Do whatever you want, reasonable

23    suspicion of criminal activity of any type, or Ninth Circuit,

24    only reasonable suspicion of contraband?

25         MR. DICKSON:  Correct, Your Honor.

1            THE COURT:  Okay.

2            MR. DICKSON:  And I think *Irving*, which is a case out

3    of this circuit, and *Levy* as well, I think both stand for the

4    proposition contrary to what the defense has said, that

5    pretext just doesn't matter, that pretext doesn't define

6    whether or not the search is Constitutional.

7            THE COURT:  In the sense *Levy* said that, right?

8            MR. DICKSON:  Yes.

9            THE COURT:  *Levy* wasn't -- said you're not bound by

10   looking for contraband.

11           MR. DICKSON:  Right.

12           THE COURT:  You can look for any type of criminal

13   activity?

14           MR. DICKSON:  Yes, Your Honor, and that the pretext

15   just simply doesn't matter.  And I think where that leads us

16   ultimately is the good faith doctrine here which, again, is

17   another basis that we believe should warrant denial of the

18   defendant's motion to suppress.

19       The Court -- as the Court knows, in *Julius*, which is a

20   Second Circuit case, the court said, exclusion of evidence

21   should be the last resort, not a first impulse.  And *Julius*

22   was interpreting a Supreme Court case in which the court said

23   that in order for evidence to be suppressed, police conduct

24   has to be sufficiently deliberate, that exclusion can

25   meaningfully deter it, and sufficiently culpable that such

 1   deterrence is worth the price paid by the judicial system.

 2       In this context, the backdrop under which Officer Carter

 3   was operating, and his watch commander were operating, they

 4   understood, per their policy, that they were allowed to search

 5   a person's cell phone at the border.  They also understood

 6   that the Second Circuit's decision in *Levy* and *Irving* say that

 7   pretext doesn't -- that it doesn't change whether the search

 8   is constitutional, doesn't change whether the search is

 9   routine or not routine.  It doesn't matter.

10       So, whether or not the defendant was targeted or not, and

11   those officers objectively -- it wouldn't change anything for

12   them.  And they were operating under, I think, case law that

13   said routine searches at the border don't require reasonable

14   suspicion.  And because of that, I think officers were in

15   objective reliance on -- appropriately objective reliance on

16   established case law to conduct this search.

17       And so, even if the Court were to find that this was not

18   routine or were unconstitutional for another reason, the good

19   faith exception should still apply.

20           THE COURT:  Anything else?

21           MR. DICKSON:  And we've also addressed the Doctrine

22   of Inevitable Discovery, Your Honor, in our filing and

23   specifically, that, as the Court knows, a search warrant was

24   ultimately executed on this phone.  The phone was forensically

25   extracted, and so the contents of these photos that were taken

1   at the border would have inevitably been discovered per the

2   terms of that search warrant, too.

3          THE COURT:  Well, there's no question you didn't have

4   probable cause at the time the border search was conducted,

5   right?

6          MR. DICKSON:  That's right.

7          THE COURT:  Right?

8          MR. DICKSON:  That's right.  No probable cause was

9   required.

10          THE COURT:  Are you asking to have the hearing

11   reopened?  Is that what you said?

12          MR. DICKSON:  I'm saying that we don't think the

13   hearing needs to be re-opened because --

14          THE COURT:  I get that a lot.  We don't think we need

15   a hearing, Judge, unless you think we need it.  Well, it's not

16   up to me to decide whether or not I need a hearing or not.

17   It's up to you.  If you think you want to go with what you've

18   got or do you want to reopen the hearing?  Why don't you sit

19   down and talk that over with Mr. Tripi?

20          MR. DICKSON:  Sure.  Thank you.

21          THE COURT:  Mr. Harrington?

22          MR. HARRINGTON:  Judge, I'd just like to comment on

23   the remarks with respect to good faith.  I mean, I think that

24   it's kind of been cobbled together here.  Normally with *Leon*,

25   you've got a -- the judge makes a decision in the search

 1    warrant, and the officer follows it.  That's not what we have

 2    here.  And, again, we don't have any knowledge of what these

 3    officers are trained in or where their good faith comes from.

 4    It may go toward the Court's consideration of the sanction

 5    that these weren't cowboys or rogues or something else up

 6    there.  That may be a factor that they were following their

 7    instructions or something, but I don't think that this is a

 8    good faith exception.  And --

 9            THE COURT:  You didn't -- you usually -- that, like

10    you say, *Leon* is in the context of, you issued a search

11    warrant, maybe the search warrant wasn't up to snuff, but you

12    relied on it in good faith.  Here, we have no magistrate or

13    any type of judicial official review this or anything before

14    the search was done.

15            MR. HARRINGTON:  Correct.  And, Judge, with respect

16    to inevitable discovery, the sequence here is they got this

17    stuff from the phone, and they used that as part of their

18    application for search warrants, including of the phones.  So,

19    the inevitable discovery apparently comes after this happened

20    while you're using this information.  Now, maybe you will make

21    a decision there is enough in there that I would have given

22    them the phones anyway, but that's up to you to determine, but

23    this is not just a simple inevitable discovery case.

24            THE COURT:  Is that it, Mr. Harrington?

25            MR. HARRINGTON:  Yes.

 1              THE COURT:  Anything else from the government?

 2              MR. DICKSON:  Judge, we'd just say that we would ask

 3    the Court to decide the issue as to whether or not this was

 4    routine or non-routine, thus whether or not reasonable

 5    suspicion was required --

 6              THE COURT:  Okay.  So if I say it's non-routine,

 7    you're going in the tank on reasonable suspicion.

 8              MR. DICKSON:  We'd ask that, Judge, to be able to

 9    reopen the hearing at that time if that's what -- the Court's

10    decision.

11              THE COURT:  You want me to go through all that drill

12    and then if I decide there wasn't, then we'll have -- then,

13    and only then, do you want a hearing?

14              MR. DICKSON:  Your Honor, I think we're --

15              THE COURT:  I don't understand why you didn't do it

16    the first time.

17              MR. DICKSON:  Fully understand, Your Honor.  I think

18    we were, as I said, in a different posture --

19              THE COURT:  You put your eggs in one basket, that it

20    was going to be routine.  I'm not sure that it is.  And so,

21    you didn't bother with the reasonable suspicion.

22              MR. DICKSON:  It wasn't that we didn't bother with

23    it, Your Honor, if --

24              THE COURT:  You didn't do it.  You didn't solicit any

25    evidence regarding that issue.

1          MR. DICKSON:  That's right, Your Honor.  So, I think

2    we would lean toward asking the Court to decide the issue but,

3    again, we could ask the Court for some indulgence to be able

4    to reopen the hearing if the Court decides that reasonable

5    suspicion was required.

6          THE COURT:  So, what you really want is, you want me

7    to decide.  And if I say it was non-routine, you're going to

8    appeal that to Judge Sinatra, see what he says, and then come

9    back and ask me for an evidentiary hearing?

10         MR. DICKSON:  I'm not sure the order of operations

11   that would be appropriate, Judge, but I do think that we would

12   ask the Court for some leeway to reopen if the Court were to

13   make that finding.

14         THE COURT:  Mr. Harrington, do you have a position on

15   the hearing?

16         MR. HARRINGTON:  I do, Judge.  I think you gave us an

17   opportunity.  The case has gone on a long time.  We had plenty

18   of time to do it, and the government made a tactical decision.

19   We often do.  Sometimes, we win.  Sometimes, we lose.  I don't

20   think it's fair to Mr. Bongiovanni to allow a reopening of the

21   hearing.

22         THE COURT:  What's your decision on, as officers of

23   the court, I should accept what they say about reasonable

24   suspicion?

25         MR. HARRINGTON:  It's evidence, Judge.  Mr. Tripi

1  didn't testify.  Whoever wrote the brief didn't testify.

2  That's evidence.  I can't come in and say things afterwards

3  and hear about Mr. Bongiovanni told me this, and -- you can't

4  do that.  It's not evidence.  I adamantly oppose that.

5          MR. TRIPI:  Your Honor, if I may, as long as we're

6  talking logistics for one moment?

7          THE COURT:  Sure.

8          MR. TRIPI:  I think the issue with just agreeing to

9  reopen the hearing is that then you get into a panoply of

10  underlying information that the investigation was about,

11  information that they had, and that's a huge discovery device

12  for the defense.  I get why they want to get to that point,

13  but then we're right back into a lot of stuff that's been --

14          THE COURT:  Mr. Tripi, ultimately, the burden is on

15  you to prove that this search was good, right?

16          MR. TRIPI:  We believe we've done that.

17          THE COURT:  Then let's go with that.

18          MR. TRIPI:  We believe we've done that but, at the

19  same time, we don't believe that any other court in this

20  context has found that reasonable suspicion was required.  So

21  then, you get to the good faith and all of that.  If you're

22  going to make that --

23          THE COURT:  I don't know that you can say no other

24  court.  I think the Ninth Circuit has decided --

25          MR. TRIPI:  Other than *Cano*.  Yes.  That's a --

```
 1                THE COURT:  That's a court, right, the Ninth Circuit?

 2                MR. TRIPI:  We contend that's the outlier opinion.

 3    Correct.  But other than that, we think good faith --

 4                THE COURT:  And I thought the Fourth Circuit decided

 5    that, too?

 6                MR. TRIPI:  Cano talked about digital contraband.

 7                THE COURT:  Yeah.

 8                MR. TRIPI:  Yeah.  They were the outlier in the

 9    regard.  But I think even Cano -- I understand you're not --

10    don't love the argument, but even in the Cano decision, they

11    said manual searches are reasonable without inevitable

12    discovery.

13                THE COURT:  I thought US v Aigbekaen.

14                MR. TRIPI:  I'll defer to Mr. Dickson's argument on

15    that regard.  But, Judge, again, if there is a suppression of

16    the information at the border, and we're not suggesting that

17    there should be, that's a limited amount of information.

18                THE COURT:  Then we're going to have to go back and

19    get into how that all affected the search warrants --

20                MR. TRIPI:  Right.  And what you said at the prior

21    hearing is that, we might need to have a second hearing.

22                THE COURT:  Yeah.

23                MR. TRIPI:  Right.  So what I'm saying is --

24                THE COURT:  Well, we had a hearing on whether or not

25    the phone should be --
```

```
1              MR. TRIPI:  But we're --

2              THE COURT:  -- suppressed.  That was that hearing.

3    The other hearing was going to be about if it is suppressed --

4              MR. TRIPI:  Fruit of the poisonous tree --

5              THE COURT:  -- what is actually happening.  Okay.

6              MR. TRIPI:  So the specter of a second hearing still

7    remains is my point.

8              THE COURT:  Yeah, but it wouldn't be about whether or

9    not he showed reasonable suspicion to look at the phone.

10             MR. TRIPI:  We don't want to waive our right to ask

11   you to reopen the hearing.  That's where we're at, Judge.

12             THE COURT:  You can ask anything.  I can't stop you

13   from asking for anything, right?

14             MR. TRIPI:  You can --

15             THE COURT:  You're not asking now, right?  You're

16   telling me you don't want one now.

17             MR. TRIPI:  We're asking you to keep an open mind.

18   That's where we're at.

19             THE COURT:  I always try to keep an open mind,

20   Mr. Tripi.  Okay.  Let's -- Mr. Harrington, why don't we just

21   try to finish off your issues?

22             MR. HARRINGTON:  I thought you were going to do

23   Mr. Gerace's issue, the latest issue.  That's what we told you

24   yesterday.

25             THE COURT:  Okay.  If you want to do that, that's
```

1   fine.  Mr. LaTona, I think that means you're up.

2          MR. LATONA:  Thank you very much, Your Honor.  I'm

3   going to stand.  If I sit too long, the back goes out, Judge.

4      Judge, regarding the defense Rule 6 application for the

5   disclosure of Grand Jury material, the thing I want to address

6   initially is, I was getting on a plane when we filed.  I was

7   headed out to Las Vegas, and the government indicated they

8   felt that the second supplemental submission on that issue

9   should have been sealed.  They then made a motion and got it

10  sealed.

11     And when I got back into town, we submitted a joint

12  defense submission requesting that Your Honor vacate that

13  sealing order basically predicated upon the proposition that,

14  in good faith, we prepared our submission.  We feel strongly

15  that it fully complied with the order -- the protective order

16  under which we were allowed to look at redacted Grand Jury

17  materials.

18     As Your Honor knows, one of the matters that I put in,

19  that was put in that pleading, had to do with an unsworn

20  hearsay opinion from a retired strike force attorney which we

21  did not name that individual.  So, that is --

22          THE COURT:  Well I don't think you named anybody.

23          MR. LATONA:  Pardon me?

24          THE COURT:  You didn't use anybody's name.

25          MR. LATONA:  True.

1           THE COURT:  Except maybe with regard to the

2     defendant's ex-wife.  Did you use her name in there?

3           MR. LATONA:  Well, her name is all over the place

4     based on her mouthing off to the media and basically outing

5     herself.  The only one I did not mention by name would be

6     Mr. Gerace's father because there was an allegation in there.

7     I didn't name him and whatnot, but we proceeded in good

8     faith and we --

9           THE COURT:  Before we go any further --

10          MR. LATONA:  Sure.

11          THE COURT:  -- I want to make sure we're clear as to

12    what happened, okay?  You made a finding, right?

13          MR. LATONA:  Yes.

14          THE COURT:  We got an email.  Was I copied on the

15    email, Mr. Tripi?

16          MR. TRIPI:  I believe chambers was copied and then I

17    followed up with a motion.

18          THE COURT:  That should have been under seal.  I made

19    the decision at that point to put it under seal before I got

20    any motion or anything like that just to preserve the issue,

21    okay?  So I just want to make that clear on the record.

22    That's what happened.  Then Mr. Tripi, I think, followed up

23    with a motion.

24          MR. TRIPI:  I did.

25          THE COURT:  Okay.  I'm sorry.

1            MR. LATONA:  That's true.  And Judge, quite frankly,

2      once Your Honor made that ruling, we had two filings after

3      that that we put under seal to be consistent with Your

4      Honor's --

5            THE COURT:  Sure.  Sure.

6            MR. LATONA:  We've been trying to comply from the

7      get-go and whatnot.  So, that issue was up there, and I don't

8      know if Your Honor is going to decide it or whatever, but

9      clearly, Your Honor, our position is the material was

10     disclosed and it was used consistent with the protective

11     order.

12        I think, number two, our position is that the material,

13     the matters that we mentioned, and it was very circumspect,

14     and it only related to issues that we think can and should, at

15     some point, support a motion to dismiss this indictment.  We

16     were very, very, circumspect.  Our position is that material

17     should have been disclosed under the Brady doctrine and Your

18     Honor's Rule 5 order that is also in place in this particular

19     case.  And I think we all know we've been in the system long

20     enough to --

21           THE COURT:  Did you get the Grand Jury material?

22           MR. LATONA:  Here's what happened, Judge.  We were

23     afforded the opportunity to go to the United States Attorney's

24     Office.  When we went there, there were redacted transcripts

25     that we were allowed to look at.  We didn't get a copy of

1    anything, but we were left in a room.  We were able to make --

2            THE COURT:  Transcripts of the Grand Jury

3    proceedings?

4            MR. LATONA:  Yes.

5            THE COURT:  And they were redacted?

6            MR. LATONA:  Yes.

7            THE COURT:  Okay.

8            MR. LATONA:  Yes.  Yeah.  Grand Jury witness

9    transcripts, witness testimony before the Grand Jury.  That's

10   how it worked and that's what happened, Judge.

11       And, Your Honor, our motion -- originally, in our original

12   omnibus motion, I mean, we wanted full disclosure of

13   everything that Mr. Gerace's ex-wife said because she outed

14   herself as a Grand Jury witness and the whole world knows

15   about that.  Anything else was strictly limited to evidence

16   with regard to Italian organized crime or the Mafia or La Cosa

17   Nostra and the instructions to the Grand Jury regarding that

18   evidence exclusively, not getting into other matters that may

19   well be somewhat relevant to the charges in this particular

20   case.

21       Judge -- and even in our pleadings, we have suggested an

22   alternative, and I think there's precedent for it in this

23   district.  Judge Arcara did it in *Leeper*; Judge McCarthy in

24   *Koschtschuk*, and that is a directive of the government to

25   submit for Your Honor's in camera ex-parte review the Grand

1    Jury evidence and those instructions for Your Honor to be in a

2    position to make a decision what, if any, portion of that

3    should get disclosed to the defense.

4        Now, clearly, Judge, this is an issue in the Second

5    Circuit that won't go away.  Some of the cases we've invited

6    Your Honor's attention to is *Jacobson*, a post-conviction

7    remand by the Second Circuit with a requirement that there be

8    full disclosure of Grand Jury evidence to the defense and then

9    an adversarial hearing.

10       The Second Circuit did it in *Osteppa* and went a step

11   beyond where it criticized improper use of hearsay.  They

12   reversed it and dismissed the indictment.  And the same thing

13   happened in the *Hogan* case; post-conviction reversal and

14   dismissal of the indictment so that this issue is here.

15       And quite frankly, Judge -- and I don't know -- I believe

16   you were with Judge Arcara, but when you look at the dismissal

17   order in *Leeper*, I mean, the conduct there was basically --

18   and the Judge said there's no bad faith.  I think they were

19   just cutting corners.  But in cutting the corners, the

20   defendant did not get the fair and unbiased review of the case

21   that he was entitled to.

22       And Judge McCarthy and Judge Skretny's dismissal of the

23   *Acquest*/Bill Huntress case.  Basically, I think it's on all

24   fours here because the evidence that came in here was the

25   unsworn testimony of a retired strike force lawyer, that I'm

1   going to prosecute.  That's the same thing as saying there's

2   probable cause, which was led to the reversal in the *Acquest*

3   case.

4       Now, Judge, and again, you know, being somewhat

5   circumspect, it is a document we filed yesterday.  I don't

6   know the document number, 42522, but inviting Your Honor's

7   attention to pages 3 and 4, those are the matters, the hearsay

8   matters, that we submit were extremely prejudicial and we

9   submit that that should trigger an order of Your Honor

10  ultimately, maybe after you look at everything, but then we

11  get an opportunity to review it as well and, again, to just

12  limit it to that area where we feel our client was prejudiced

13  in the Grand Jury's activities.

14          THE COURT:  And this is in regard to the Italian

15  organized crime area?

16          MR. LATONA:  Well, it's more than that in the Grand

17  Jury.  There's Mafia, La Cosa Nostra --

18          THE COURT:  Okay.  You're not asking for everything.

19          MR. LATONA:  No, no.  Just -- okay.  IOC was a term

20  of art that was used in the indictment.  I'm going to talk

21  about the striking that as well, but that's right.  You're

22  right on the money.  It's everything having to do with IOC,

23  Mafia, La Cosa Nostra, and what -- just that evidence which

24  Katrina, the ex-wife, was all over the place.  She said it,

25  again, publically.  There should be no limitation on the

1   disclosure of her Grand Jury testimony.

2          THE COURT:  You don't say anything about hearsay.

3   Are you arguing that the -- there can't be hearsay in front of

4   the Grand Jury?

5          MR. LATONA:  Not at all.  And that's not what we're

6   saying.  But what we are saying is that the hearsay came in in

7   a prejudicial matter.  For instance -- well, let's talk about

8   that.  They talk about the Mafia.  There's no firsthand

9   evidence about the Mafia.  They could -- I mean, none.  None

10  whatsoever.  La Cosa Nostra --

11         THE COURT:  This is kind of -- this is in the same

12  vein as -- that it's prejudicial, inflammatory, that's what --

13         MR. LATONA:  Exactly.  But it's hearsay.  When

14  somebody --

15         THE COURT:  Why is hearsay negative?  Because the

16  Rules of Evidence don't apply in front of the Grand Jury.

17         MR. LATONA:  Well, they do.  *Osteppa* -- when the

18  Second Circuit reversed and threw out the indictments, that

19  improper use of hearsay can result in a dismissal of the

20  indictment, that's *Osteppa*, a Second Circuit case.

21         THE COURT:  I'll take a look at it.

22         MR. LATONA:  Yeah.  Yeah.  That's right there on the

23  point.  You know, the other hearsay, Mr. Gerace's father had a

24  position at Local 210 which was associated with the Mafia, La

25  Cosa Nostra.  That's all hearsay and had nothing to do with

1    the case, nothing to do with the legitimate investigation of

2    Mr. Gerace.  Pure poison.

3        There was a situation, again, where they talked about the

4    retired strike force attorney whose name I saw but there's no

5    reason to put that individual's name in here, and that this

6    retired agent talked to him and that the strike force attorney

7    supposedly opined, well, I'm going to prosecute Mr. Gerace.

8    That's the same thing as saying there's probable cause.

9        And the other thing that was in there that was heavily

10   redacted, Judge, is that this retired FBI guy said, well, I

11   originally wanted to flip Gerace because of his familiar

12   relationship with -- and then that was all redacted out there.

13   So, from what I can see, there was just poison in that

14   proceeding and we just want the full and fair opportunity to

15   litigate that issue, and we feel that we've made a very

16   compelling case.  Most respectfully, Judge, we've got to

17   address this issue now.

18            THE COURT:  I guess I -- let me just get -- help me

19   to get straight in my own mind.  You want the Grand Jury

20   transcripts regarding this issue.  I understand that part.

21   Then, this issue came up about sealing whatever it is that --

22   the motion that you made.

23            MR. LATONA:  Right.

24            THE COURT:  Now, you want -- are you arguing that

25   that should be unsealed?  This is something you produced, the

1   motion.

2            MR. LATONA:  Well, no.  They started it.  We've --

3   listen.  Our -- here is our position.

4            THE COURT:  Okay.

5            MR. LATONA:  All right?  There was a protective order

6   in place.  Our access to this material is under the terms and

7   conditions of the protective order.  Part of that order is

8   that nothing includes our use of the material we review as

9   long as we don't identify individuals.  Our filing was

10  consistent with and in accordance with the protective order.

11       Coupled on top of that, it's our position under *Brady* the

12  disclosure had to be made.  That's basically -- now, you --

13           THE COURT:  And I did all that.

14           MR. LATONA:  Okay.

15           THE COURT:  Then there's this issue about the recent

16  filings, should they be sealed or not?  I think Mr. Tripi was

17  saying that was a violation of the protective order.  You're

18  saying it wasn't.  I don't know right now whether it was or

19  wasn't, but do you have -- is there any big need for you to

20  have that out in the public right now?

21           MR. LATONA:  No.  No, Judge.  I'm saying that's why

22  we were consistent with you on --

23           THE COURT:  Right.  Right.

24           MR. HARRINGTON:  We wanted to go on record early just

25  to let you know, Judge, our position is that we didn't violate

1  the protective order, but everything filed since then, out of

2  respect and obedience to your order has been done under seal.

3          THE COURT:  Now I got you.  I got you.  Okay.

4  Mr. Tripi?

5          MR. TRIPI:  May I go -- I'm going to go in the same

6  order that Mr. LaTona did --

7          THE COURT:  Okay.

8          MR. TRIPI:  -- just to address each point, Judge.

9      Let me back up to how they came into possession of the

10  information that they filed publicly.  For, I think, well over

11  a year now, maybe two years, in one of the discovery letters

12  that I produced early, I indicated to Mr. Harrington and other

13  prior counsel, Mr. Daniels at the time, that I would make

14  certain Grand Jury transcripts of law enforcement officers

15  available.

16      As we all know, we don't even have a trial date yet.  I'm

17  under no obligation to do that, but I'm for attorneys being

18  prepared for cases.  I have no problem with that.  So, I made

19  that offer.  Eventually, Mr. Harrington took me up on it

20  first, although he came to review the transcripts second in

21  time.  And then, the firm HoganWillig had an attorney, along

22  with Mr. LaTona, come to my office.

23      I prepared the seven transcripts that I've outlined in

24  docket 274 with limited redactions.  Certain names were

25  redacted, but the core of the substance of the testimony was

1   available for defense counsel's review.  We had a discussion

2   that I was making this available under the terms of the

3   protective order, and the protective order precludes third-

4   party dissemination.

5       Now, at that point in time, in all candor, Judge, had

6   Mr. LaTona or anyone else said, hey, I'm going to write down

7   every word that you make available and essentially create a

8   transcript of the transcript, and then I'm going to file a

9   motion publicly putting out into the ether, without the names,

10  but substance of the Grand Jury proceedings, I would have

11  said, Mr. LaTona, have a good day.  We'll see you and you'll

12  have these later on when we have a trial date.

13      And so, I operated under good faith.  Maybe there was a

14  misunderstanding, but the stuff got filed publicly without a

15  phone call to me, without any hashing it out as to, hey, were

16  we on the same page here?  None of that.  I immediately fired

17  off the email that you were copied on and I called

18  Mr. Harrington and it was clear to me that Mr. Harrington

19  didn't make the filing, even though he signed onto it, and

20  Mr. LaTona was on an airplane.

21      I told Mr. Harrington I'm going to file the motion.  He

22  was willing to do so because he was being a gentleman, but I

23  filed it.  It shouldn't have been filed publicly, is my view.

24  I think I was careful to say whether it's real or perceived

25  violation of the protective order, the government certainly

1    felt taken advantage of in the moment, so we filed the motion

2    that we did.

3            THE COURT:  I think we can cut to the chase.

4    Mr. LaTona isn't arguing right now that it necessarily needs

5    to be disposed of, right?  That's what you just said.

6            MR. LATONA:  That's correct, Judge.

7            THE COURT:  Yeah.  So, let's --

8            MR. TRIPI:  I'll move on past that now, Judge.

9        As to their filing, the second supplemental, it's easy to

10   say in the reply, after having the opportunity to read our

11   response at docket 274, I wasn't really asking for everything.

12   They were.  They were asking for instructions, and there was

13   no limitation in their docket -- their filing at docket 265 as

14   to what they wanted.  They wanted soup-to-nuts instructions

15   and everything, 90 plus witnesses, and so, no.  There was not

16   a limitation.

17       Then, in the reply, after probably looking at our filing,

18   understanding that they haven't met their burden -- see, it's

19   their burden to establish three things; first, that the

20   material sought is needed to avoid a possible injustice in

21   another judicial proceeding.  They have not established that

22   whatsoever.  We're going to have a trial.  Judge Sinatra is

23   going to be the Judge.  He's going to determine under Rule

24   401, 403 what comes in, what doesn't.  An indictment is an

25   allegation.  It's proof of nothing.  That's settled law.  So,

1    there's no injustice.

2       Second, that the need for disclosure outweighs the need

3    for continued secrecy.  I footnote it in my filing, there is

4    still a need for secrecy here.  In a footnote, I cite to

5    *Vondette*.  There's related investigation.  You're aware of the

6    breadth of the investigation from the search warrant

7    affidavits that you have seen.  There have been related search

8    warrants related to this investigation as recently as November

9    and March or April of this year; so, November 2021 and then

10   again in March or April of this year.

11      And three, that the request is structured to cover only

12   what is needed.  They did done none of that.  And I cited a

13   series of Supreme Court cases and district court cases, Second

14   Circuit case, and I quoted from *Petrol Stops*, which is a

15   Supreme Court case; *Douglas Oil v. Petrol Stops Northwest*, 441

16   US 211 at 222.

17      And the quote from that case is that, in considering the

18   effects of disclosure on Grand Jury proceedings, the courts

19   must consider not only the immediate effects upon a particular

20   Grand Jury, but also the possible effect upon the functioning

21   of future Grand Juries.  Persons called upon to testify who

22   will consider the likelihood that their testimony may one day

23   be disclosed to outside parties, fear of the future

24   retribution, or social stigma, may act as a powerful deterrent

25   to those who would come forward and aid the Grand Jury in the

1  performance of its duties.  So, you don't just look at this

2  case, necessarily.  You look at the broad view, all Grand Jury

3  cases.

4          THE COURT:  Now, though, he seems to be narrowing his

5  request where it's just regarding Grand Jury testimony

6  regarding Italian organized crime, or Mafia, or La Cosa

7  Nostra, or whatever you want to call it, but that's all he's

8  looking for.

9          MR. TRIPI:  Right.

10          THE COURT:  And I guess, as a starting point for

11  that, he starts with the indictment, right, which mentioned

12  Italian organized crime.  So, obviously, there was something

13  mentioned to the Grand Jury about it, right, because they put

14  it in the indictment.

15          MR. TRIPI:  Sure.

16          THE COURT:  Right?  And then, he's arguing that from

17  what he knows of the Grand Jury testimony, what he can see

18  that's not redacted and within and combined with what's in the

19  indictment, that there may be improperly prejudicial

20  information given to the Grand Jury regarding Italian

21  organized crime, Mafia, et cetera.

22          MR. TRIPI:  Yeah.  Understand the shifting argument.

23          THE COURT:  I think that's where we are.

24          MR. TRIPI:  Right.  His shifting argument is the age-

25  old tactic of, let's ask for the world, and then we'll reduce

1    it to what we really want.  So I'm --

2          THE COURT:  I'm not going to characterize it one way

3    or the other.

4          MR. TRIPI:  That's --

5          THE COURT:  I think what he's asking for now, anyway,

6    is for this information.  Why shouldn't he be able to get that

7    information if there was information put before the Grand Jury

8    regarding the defendants were involved in the Mafia, Italian

9    organized crime, La Cosa Nostra, whatever?

10         MR. TRIPI:  Well, a couple of reasons.  First, that

11   disclosure, if that was the standard of how you get to the

12   Grand Jury material, that would eviscerate the long-standing

13   presumption of regularity for the Grand Jury.  That's the

14   starting point.  This Grand Jury is presumed valid.  This

15   indictment is presumed valid.

16      And then you look at, you know, what have they put forward

17   in terms of misconduct, right?  And I hesitate to even use

18   that term because there was absolutely no misconduct in the

19   Grand Jury.  The Grand Jury has broad investigatory powers,

20   right?

21      Just a plain reading of this indictment of conspiracy

22   between multiple individuals, you could see how reference to

23   Italian organized crime is relevant.  You have a DEA agent

24   charged with, in multiple counts, of accepting bribes and

25   protecting individuals that includes his friends, associates,

1    and people he believed to be associated with Italian organized

2    crime.  That goes right to the heart of what this indictment

3    is about.  So, if you were to say, oh, well, there's a

4    reference to Italian organized crime in the indictment.  They

5    say that's prejudicial.  All relevant evidence, all evidence

6    is prejudicial.  Any prosecutor will say that.  That's the

7    law.  What the courts are concerned with is, unduly

8    prejudicial or unfair prejudice.  And that's defined by the

9    nature of the investigation.

10       This indictment has ten different federal statues ranging

11   from client conspiracy, conspiracy to defraud the United

12   States, obstruction of justice, sex trafficking, maintaining a

13   drug-involved premises, narcotics conspiracy.  A wide variety

14   of criminal activity was clearly within the scope of the Grand

15   Jury's investigation and I've cited a myriad of cases.  Motive

16   is always relevant.  And the indictment is very nuanced.

17       Nowhere in the indictment does it say, Mr. Bongiovanni is

18   Italian organized crime.  Nowhere in the indictment does it

19   say Mr. Gerace is Italian organized crime.  It focuses on the

20   motive and knowledge of the agent and how others held

21   themselves out to the agent.

22           THE COURT:  How many reference are there in the

23   indictment to Italian organized crime?

24           MR. TRIPI:  I didn't count them all.  It's certainly

25   laid out --

1              THE COURT:  I'm just asking because I was wondering

2      if I could just hear what --

3              MR. TRIPI:  I'll give you one.  I'll read one.  Yes,

4      Judge.  Quoting from page 2 of the second superseding

5      indictment, this would be under Count 1.  Introduction.  I'm

6      sorry, Judge, I'm going to go to Count 1, manner and means.

7      This is at page 5.  This is as an example of how IOC is used.

8      Count 1 is the conspiracy which charges Mr. Bongiovanni and

9      previously before his guilty plea, charged Mr. Masecchia.

10         Paragraph 5.  Manner and means.  It was part of the

11     conspiracy that in exchange for payments he received, and in

12     order to ingratiate himself to individuals whom he believed

13     were members and associates of IOC, the defendant Bongiovanni

14     utilized his position as a DEA special agent to attempt to

15     dissuade other members of law enforcement from conducting

16     investigations of his coconspirators, friends, associates, and

17     individuals the defendant believed to be connected to or

18     associated with IOC, including Masecchia and others, and from

19     conducting investigations into any individuals who may have

20     been able to expose his criminal activities and those of his

21     friends, associates, and individuals the defendant believed to

22     be connected to or associated with IOC.

23         Count 2, that's the indictment -- the charge charging

24     Mr. Bongiovanni and Mr. Gerace has similar language as it

25     relates to the manner and means.

1          THE COURT:  The one you read, is that the first

2     mention of IOC in the --

3          MR. TRIPI:  No, it's the --

4          THE COURT:  Can you just read quickly what the --

5          MR. TRIPI:  The very first mention?  I apologize,

6     Judge.

7       Paragraph 3 in the introduction reads as follows:  The

8     defendant Bongiovanni had friends and associates who he knew

9     were involved in possession, use, distribution, and

10    importation of controlled substances.  The defendant

11    Bongiovanni's friends and associates who were involved in the

12    possession, use and distribution, and importation of

13    controlled substance, included, among others, individuals he

14    believed to be members of, connected to, or associated with

15    the Italian organized crime in the Western District of New

16    York and elsewhere.

17       Now, in the overt acts later on, there's an overt act

18    where a fellow member of law enforcement, you know, there's a

19    whole series of overt acts where he opens a file and it lays

20    all that out, a fellow member of law enforcement sends

21    Mr. Bongiovanni and email that says, hey, Masecchia is an LCN

22    member or associate.  So it's notice to Mr. Bongiovanni.  See,

23    remember, he is part of the law enforcement community at the

24    time.  It could be completely inaccurate.  It could be

25    completely untrue.  But he, in operating as a law enforcement

1    officer who is sworn to following his oath and give honest

2    service to the United States, he's on notice from fellow law

3    enforcement that, hey, you're looking at a Masecchia case.

4    Just so you know, he's LCN associate.

5        There are other law enforcement-related officers or

6    witnesses who would testify similarly.  For example, a

7    financial analyst in the United States Attorney's Office that

8    spoke of Mr. Bongiovanni would attribute from him saying, hey,

9    these guys are X.  He could be totally wrong, inaccurate, it

10   doesn't matter.  It as to his moves.

11       And then separately, we'll have civilian witnesses testify

12   about Mr. Bongiovanni acknowledging his belief that

13   Mr. Masecchia was that -- was a made guy, essentially.  Again,

14   could be totally wrong, but it goes to his belief, his

15   understanding.  And that's the nuance that's in the

16   indictment.

17       And so then fast forward.  They complained about two

18   witnesses in this small set.  I gave them seven transcripts.

19   There's about 90 that went into the Grand Jury, in the specter

20   of the Grand Jury investigation, and I summarized the FBI

21   agent in docket 274.

22       And the import of that is, Gerace gets in trouble with US

23   Probation.  Bongiovanni intercedes on his behalf with US

24   Probation.  As alleged in the indictment, he writes a false

25   DEA-6 report to his bosses saying he's a DEA source when, in

1    fact and in truth, Mr. Gerace is not.

2        And then, he has a meeting with the FBI agent where

3    Mr. Gerace essentially sits next to Bongiovanni.  Bongiovanni

4    says, oh, he's -- essentially, he's a good guy.  There's not

5    much substance to the meeting.  Bongiovanni leaves the FBI

6    agent with the impression that he's my informant.  And, as a

7    result, the FBI leaves whatever investigation.

8        And the context of what the former prosecutor said was,

9    Mr. Bongiovanni left with trying to dissuade fellow members of

10   law enforcement from conducting investigations.  Well, when

11   you say no prosecutor will ever take that case, words to that

12   effect, you're trying to dissuade a fellow member of law

13   enforcement from pursuing --

14            THE COURT:  I guess I --

15            MR. TRIPI:  Did I lose you, Judge?

16            THE COURT:  Well, yeah.  I thought we were talking

17   about IOC Mafia before that.

18            MR. TRIPI:  Yeah, that's the same --

19            THE COURT:  I get it.  Again, I'm not following you

20   now why we're going off on a tangent.

21            MR. TRIPI:  Well, that FBI agent explained his

22   investigation was to pursue essentially an IOC investigation,

23   and that Mr. Gerace was someone he targeted for investigation

24   because of his familial relationships, and then that's all

25   firsthand knowledge.  That's not hearsay.  That's not unduly

Case 1:19-cr-00227-JLS-MJR   Document 281   Filed 05/06/22   Page 72 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

70

1    prejudicial.  That's context.  That's what brings that agent

2    into the meeting with Mr. Bongiovanni.  So, he's conducting an

3    IOC investigation.  It's not -- simply not hearsay.  It's not

4    prejudicial.  It's the firsthand knowledge of that agent.  And

5    so, the whole premise of the fact that IOC, in that context,

6    is unduly prejudicial and inflammatory, it just doesn't hold

7    water.

8        I mean, the cases that they cite, prosecutors were saying

9    things that -- prosecutors were saying not witnesses --

10   prosecutors were saying things to the Grand Jury that the

11   courts found to be beyond the pale, you know, calling someone

12   a hoodlum or something like that should be indicted as a

13   matter of equity.  That's the *Hogan* case.

14       Mr. -- a few moments ago, counsel wanted -- reminded you

15   of *Leeper* which, in 2006, I guess there's a potential you know

16   it better than I do, because I think you might have been

17   clerking for Judge Arcara back in '06 still, but if you were

18   the clerk, Judge, you'll recall that that case was on the eve

19   of trial.  It was on the precipice of trial and there was an

20   element missing from the indictment.

21       The AUSA at the time essentially rushed an indictment

22   together because the Grand Jury that had heard the initial

23   indictment had expired, and in there, characterized the fact

24   that a prior Grand Jury had voted an indictment.  This is just

25   to fix a typographical error and sort of --

1           THE COURT:  It's all coming back to me now.

2           MR. TRIPI:  -- diluted the presentation.  And Judge

3   Arcara found that this was not an independent Grand Juror

4   finding and dismissed that indictment without prejudice.

5   That's not here.  These are witnesses with firsthand

6   knowledge.

7           The other one is a DEA task force officer whom they've

8   characterized as a Niagara Falls Police Department Detective,

9   who was a detective, but he's also a DEA task force officer.

10  And he was conducting an investigation in or about 2013 that

11  Mr. Bongiovanni had nothing to do with.  And in his view, in

12  his opinion, the people he was investigating were connected to

13  Italian organized crime.  That's his personal views, personal

14  opinion, as someone who is doing the investigation.

15          And then he went on, essentially, to testify that his

16  documents outlining his investigation should not have been in

17  Mr. Bongiovanni's custody, because he learned that it was

18  found in his house.  And so, that's not prejudicial.  That's

19  not unduly prejudicial.  It's highly probative.  It's highly

20  relevant to these charges.

21          There could be an inference that a jury could later make

22  that Mr. Bongiovanni obtained a report that he shouldn't have

23  had, and certainly shouldn't have had in his house in

24  retirement, perhaps to tip people off, or to tell someone

25  about that leads to tipping off the targets of the

1   investigation.  That will be up to the jury.  That's what

2   trials are for.

3       And now, to the extent that they talk about Katrina

4   Gerace, it's interesting to me that I gave them seven

5   transcripts of law enforcement officers and somehow, that

6   turns into an untimely, out-of-time filing to get Katrina

7   Gerace's Grand Jury transcript.  Somehow, she makes her way

8   into their filing, but they say, oh, she's all over the place

9   here and there.

10      She gave a Buffalo News interview where she acknowledged

11   she testified in the Grand Jury.  The specifics are not

12   public.  So, let's be accurate about what is in the public

13   realm and what is not.  What's not in the public realm are the

14   specifics about what she testified about.  Now, they've

15   received stuff in discovery.  I turned over her jail calls

16   from 2017.  I turned over a lot of stuff about her, but what

17   they don't have is the Grand Jury transcript.  That's what

18   trials are for.

19      And based upon how these transcripts were handled, I'm not

20   going to turn it over until we have a firm trial date and some

21   additional protections are in place.  They have not come close

22   to establishing any of the three prongs they need to, and I

23   guess that's all I have to say about it, and I'll -- unless

24   you have questions, Judge.

25              THE COURT:  Thank you.  Mr. LaTona?

1          MR. LATONA:  Judge, if I may, he indicated that when

2    I went over there to visit, I never indicated to him it would

3    be used.  What I want to do and when we went over it, he and I

4    on that case, the protective order reads in pertinent part,

5    ordered that nothing in this order shall preclude counsel for

6    the defendant or the defendant from disclosing the material

7    during the course of the litigation of this action in pretrial

8    proceedings and memoranda filed at trial or in post-trial

9    proceedings.  And then it went on to say don't identify

10   individuals.

11       I was operating under that order.  They drafted it.  We

12   agreed to it, and you signed it.  So that's how we were

13   proceeding.  He wants to say that somehow, oh, our request has

14   now -- is broad, and I want to invite Your Honor's attention

15   to document 147 filed on July 12th, 2021, the original Rule 6

16   motion.  And basically, going through this IOC stuff and then

17   the request -- the defense requested disclosure of all

18   evidence regarding IOC that was presented to the Grand Jury

19   with all jury instructions regarding that evidence.

20       In addition, we requested, back in July, reviewing this

21   Ms. Nigro's outing herself.  The defendant submits that the

22   Court should disclose the testimony of -- all testimony

23   delivered by Ms. Nigro with any legal instructions.  So, it

24   hasn't shifted at all, and that's why the pleadings that we

25   submitted supplement the original one.  We've been consistent

1    from the get-go.

2            THE COURT:  How would Ms. Nigro's Grand Jury

3    testimony relate to this issue about prejudicial reference to

4    Mafia, Italian organized crime?

5            MR. LATONA:  Well, Judge, in a news article, she's

6    blabbing about Peter Gerace being a mobster and things like

7    that.  And in a lot of the pleadings that I've -- that are

8    part of this record, I mean, I could go back and characterize

9    each document number, each exhibit number, that she's blabbing

10   at all over the western world.  So, obviously, there's no

11   reason for secrecy or protection or anything, and we feel that

12   her testimony irreparably prejudiced the Grand Jury when

13   coupled with the other matters that we have brought to your

14   attention in the supplemental pleadings.

15       We do contend that there was misconduct.  When you read

16   *Williams* and *Leeper*, because *Leeper* said you have a right as a

17   target to an unbiased Grand Jury.  Judge Arcara followed

18   *Williams* as, indeed, he had to.  But when you look at

19   *Williams*, okay, in that particular footnote where the court

20   talks about the types of misconduct and the various rules that

21   are violated that could give right to a dismissal, they

22   specifically talk about prosecutors and others.

23       Obviously, they're talking about witnesses; particularly

24   those who haven't been schooled or properly prepared by the

25   people who call them into the situation.

1      Hearsay.  Okay.  Here's the situation.  This agent goes, I

2   want to talk to Peter Gerace because of his family

3   relationships and I'm looking at organized crime.  That's what

4   I'm looking into.  And I wanted to flip him.  So, the hearsay

5   is not his family members, who names I never saw because they

6   were redacted.  The hearsay is, these people are involved in

7   organized crime and they're his family members and he must

8   know about it.  He's probably part of it, that's why I want to

9   flip him.

10      There it is.  That's all in -- now, from the get-go in

11   this particular case, the prosecution has consistently

12   contended this.  We're not going to prove or argue that Peter

13   Gerace was an organized crime member or that Bongiovanni was.

14   The only relevance in this case is that Bongiovanni might have

15   believed that certain people were IOC or organized crime.

16      And if that's the case, if we don't get the Grand Jury

17   disclosure, and I'm going to talk about the surplusage and get

18   that IOC out, that we've got to be severed.  We've got to be

19   severed away from him because they have conceded it has no

20   relevance whatsoever to Peter Gerace.

21          MR. TRIPI:  We've conceded nothing of the sort.

22          THE COURT:  I can only give you about a minute.

23          MR. TRIPI:  Oh, okay.  We've conceded nothing of the

24   sort.  In docket 178, at page 5, there's a half a sentence

25   that's inartfully written in the hundreds of thousands of

1   pages that we wrote that seizing on to say that where we said

2   that the government will not argue that Gerace members were,

3   in fact, members of IOC.  What we were trying to explain there

4   is, it doesn't matter if they actually were, which I think

5   I've articulated in a number of other points in the filing.

6   Proof will certainly focus upon their reputation.  As you

7   know, family reputation, there's a hearsay exception for that.

8        And defendant Bongiovanni's knowledge.  Okay.  As I've

9   articulated already, as it relates to Gerace, particularly if

10  he's telling people he is Mafia or he's at Pharaoh's and he's

11  saying things like, do you know who my family is?  There may

12  be some testimony at trial to that effect.  That goes, A, to

13  the conspiracy with Bongiovanni, but also to the force, fraud

14  and coercion aspect of the sex trafficking, the fear.

15       He's got Outlaws working for him.  There may be

16  information that he's representing himself to be, maybe

17  nothing he's not, but representing himself to be a mob guy.

18  That goes to the coercive environment at Pharaoh's and the

19  victimization of certain females as we believe will show at

20  the trial to include Ms. Gerace has been -- Ms. Nigro has been

21  named a lot.

22       And we're going to wait 'til the trial to try the case,

23  but she's got her own counsel.  Brian Comerford is her

24  attorney, and we believe she is going to be a victim in a

25  number of ways that sets several other people, women, in

1    Pharaoh's were also victims.  And although she might not have

2    been trafficked, she's a victim here as well.  And we believe

3    that's what the proof will show.

4            THE COURT:  Okay.

5            MR. LATONA:  One last thing.  Family reputation?

6    That's nonsense unless there's concrete evidence.  And Judge,

7    that kind of is a segue into the surplusage.

8            THE COURT:  Okay.  We're going to go into that next.

9    I just want to -- just give me one second.  Megan?  Are you

10   okay?

11           THE REPORTER:  No, I'd like a break.

12           THE COURT:  Okay.  We're going to take a ten-minute

13   break.  Come back at five to one.

14   (A recess was taken from 12:44 p.m. to 12:57 p.m.)

15           THE CLERK:  All rise.

16           THE COURT:  Have a seat.

17           THE CLERK:  We are now back on the record in the USA

18   v Bongiovanni and Gerace case.

19           THE COURT:  Mr. LaTona, we're going to surplusage.

20           MR. LATONA:  Yes, Your Honor.  That's correct.  And I

21   just note for the record, Judge, document 250 is a

22   supplemental memo that I filed on this issue and attached to

23   it is a chart which specifies exactly where in the indictment

24   there is reference to IOC.  So, this would be the material

25   that we would want to have --

1            THE COURT:  What was that document number?

2            MR. LATONA:  Two-fifty, Judge.

3            THE COURT:  Okay.  I'm sure I read it at one point,

4    but that will be helpful.

5            MR. LATONA:  Yeah.  There's a nice chart here that

6    lays out all the surplusage that we want deleted from the

7    document.

8            THE COURT:  Okay.

9            MR. LATONA:  Basically, all we're asking Your Honor

10   to do is to follow Judge Arcara's decision in the *Allen* case

11   where he looked at it, he found that the portions of the

12   indictment that were prejudicial would impact and possibly

13   poison the jury before any evidence was offered.

14           THE COURT:  What was the surplusage?  Was that --

15           MR. LATONA:  Killer Kev.  That was the situation.

16      Here, we want to get rid of the IOC, but in following

17   Judge Arcara's decision, we are not in any way, shape, or

18   manner even thinking of asking Your Honor to crop the trial

19   evidence.

20      Like Judge Arcara said in *Allen*, it's out of the

21   indictment.  I don't want the jury prejudiced before proof

22   without allowing you -- if you can persuade me it comes in,

23   then it comes in.  And that's all we've been asking and that's

24   a fair resolution.  The only other thing in that particular

25   filing, Judge, was -- and I was previously unaware of it, but

1   there were two Second Circuit cases, one involving Chinese

2   individuals, the other Hispanic, where basically the Second

3   Circuit says, injecting ethnicity into a criminal prosecution

4   as some indicia of guilt is improper, and we don't want to

5   have it in the Second Circuit.  And that's clear -- that

6   also -- those cases are cited in 250, which we filed at 250.

7           THE COURT:  Okay.  Thank, sir.  Mr. Tripi?

8           MR. TRIPI:  Again, Judge, this is a case -- the IOC

9   references in this case, I've read a few of them for -- to you

10  today.  I won't repeat it.  It's about motive and it frames

11  the context of the conspiracy that was between Mr. Bongiovanni

12  and Mr. Gerace as alleged.

13      That *Allen* case was mine.  What was far different in the

14  case cited, that was before Judge Arcara, it's far different

15  in the sense that the nickname Killer Kev was labelling an

16  individual as, essentially, a killer before there was any

17  proof.  And the judge --

18          THE COURT:  Not an individual, the defendant.

19          MR. TRIPI:  The individual defendant, yes.  And the

20  judge, Judge Arcara, was persuaded by the *Farmer* case, which I

21  tried to distinguish at the time, as *Farmer* involved a

22  prosecutor getting up on summation and I think called the

23  defendant Murder, which was his alias, 40 plus times during

24  the course of the summation, if I'm not mistaken.  Again, that

25  was labeling the defendant a murderer, far different here in

1    the context in which IOC is used.  That's my argument.  Motive

2    is always highly relevant.  Motions to strike are rarely

3    granted.  The allegations are not ethnicity.  It's about

4    motive in this case.

5            THE COURT:  Okay.  All right.  Mr. LaTona, since

6    you're up, we'll go to your motion to suppress.  You moved to

7    suppress federal search warrants for his residence at Luxor

8    Lane on November 29th, 2019 and February 26th, 2021.  A

9    federal warrant to search Pharaoh's night club -- Gentlemen's

10   Club on November 29th, 2019, and a federal search warrant to

11   search a cell phone seized from the defendant on February

12   28th, 2021.

13           MR. TRIPI:  Judge --

14           MR. LATONA:  That is a scatter gun.  Maybe I'm --

15           MR. TRIPI:  Could I -- just one question, Joe?

16           MR. LATONA:  Sure.  Yeah.  Go ahead.

17           MR. TRIPI:  I thought those issues had been already

18   litigated and decided by Judge Sinatra's orders.  We litigated

19   the search warrants several times before Your Honor.  Those

20   were appealed up to Judge Sinatra.  That's why --

21           THE COURT:  The issue about whether they should be

22   sealed or unsealed?

23           MR. TRIPI:  Sealed or unsealed as well as Franks

24   hearing.  Those issues also went up to Judge Sinatra, so I

25   just don't know what remains.

1          THE COURT:  I think Mr. LaTona is about to tell us.

2          MR. TRIPI:  I might not agree.

3          MR. LATONA:  Judge, yeah.  I mean, it's right that we

4  originally moved to have the applications unsealed.  You

5  disagreed.  Judge Sinatra disagreed.  But in his opinion, he

6  said not at this stage, not at this stage.  And he cited an

7  Eastern District case, *United States v. Howlett*.

8     Now, in *Howlett*, the parties, the prosecution and defense,

9  agreed that three months prior to the trial, the applications

10  would be given to the defense and the defense given several

11  weeks to make suppression motions.  That is an issue that's up

12  in front of Judge Sinatra.  Quite frankly, I did do a scatter

13  gun situation on these applications and these warrants that I

14  haven't looked at.  The one only I could look at and have

15  addressed is the cell phones warrant.

16          THE COURT:  Cell phones.

17          MR. LATONA:  And as Your Honor will recall, I wanted

18  a Franks hearing.  You disagreed.  The Court indicated -- you

19  said I can do it on the face of the application and basically,

20  the issues that are -- would warrant suppression is, number

21  one, there's no nexus between the telephone and the so-called

22  use and distribution of narcotics by Mr. Gerace.  No

23  indication that any of these people who claim they saw him in

24  possession at his business or at his home, that they were

25  invited there over the phone.  No nexus whatsoever.  And I

1   know that Mister -- the government has indicated, well, the

2   affiant talked about his training and experience.  We've cited

3   a number of cases to Your Honor indicating that just doesn't

4   cut it.  There has to be specific factual allegations with

5   regard to nexus.

6       The other thing, Judge, regards staleness, because these

7   allegations are in there, but there's no statement as to when

8   they happened.  And Your Honor will recall in the pleading --

9            THE COURT:  We had that argument, right?  You brought

10  up the staleness before?

11           MR. TRIPI:  Yes.

12           MR. LATONA:  Yes, I did.  That -- I brought it up in

13  the context of let's have a Franks hearing.  You disagreed.

14  Now I'm bringing it up in the context it's facially

15  insufficient on the face of the warrant.

16           THE COURT:  Based on staleness?

17           MR. LATONA:  Exactly, because I never -- they never

18  said it.

19           THE COURT:  Okay.

20           MR. LATONA:  Judge, one other thing on this.  We made

21  a motion under Rule 12 for the disclosure of various

22  evidentiary items to see if we should suppress it.  Now, what

23  Your Honor did is, Your Honor said, look.  And we also --

24  that's the motion we made to unseal the warrants.  You said, I

25  just want to deal with the warrants.  I don't want to deal

1   with this other stuff.  So, this is docket number 113.  So,

2   the second motion about the Rule 12 request is still

3   outstanding.

4       For instance, in our request, we ask were there any

5   intercepted communications, any kind of wiretapping, any kind

6   of bugging or were there any warrantless seizures of material.

7   Now, I understand the government -- we asked for it

8   informally.  They said make a motion.  We did make a motion.

9   So, now it's ripe for your decision.

10      But what I understand from Mr. Gerace is that in

11  approximately at some point in 2019, he was abroad.  He came

12  back and his cell phone was seized.  And other lawyers were

13  involved a little bit at that point.  And my understanding is

14  what Mister --

15          THE COURT:  This was when, Mr. LaTona?

16          MR. LATONA:  Twenty-nineteen.  This is a warrantless

17  seizure of --

18          THE COURT:  Now, this is the first I've heard of

19  this, right?

20          MR. LATONA:  No, I -- Judge, we have asked -- I

21  understand.  I'm not --

22          MR. TRIPI:  Hang on right there.  They've had

23  discovery of that since the minute they were indicted, all

24  right?  So, this is not new information.  So, don't say that

25  the defense -- Mr. Daniels had it, Mr. Cohen has it, and

1    Mr. LaTona has it.

2            MR. LATONA:  Well, what we wanted was all of the

3    information and, you know, whatever they had extracted.  Then,

4    here's the one thing --

5            MR. TRIPI:  They have all of that.

6            MR. LATONA:  Here's the one thing we don't know.  Was

7    that used in any way, shape, or manner to get the warrant in

8    2019?  We don't know that, because we've never seen those

9    applications.  So, that, you know, that's an issue that we

10   have.

11           MR. TRIPI:  If he's got a border search issue, he's

12   never raised it.  They've been provided the extraction two

13   years ago roughly, information from the extraction, texts

14   between Bongiovanni and Gerace, whole bunch of information

15   from the extraction --

16           THE COURT:  Can you just tell me -- he looked at the

17   border search?

18           MR. TRIPI:  Yeah.  So, Mister -- within a short

19   period of time from when Mr. Bongiovanni travelled, Mr. Gerace

20   also travelled.  He was also subject to a border search.  Same

21   thing --

22           THE COURT:  Where did he travel to?

23           MR. TRIPI:  He traveled -- the name of the country

24   where he was escapes me.  If I said the Dominican, I might be

25   wrong.  I might be conflating the two.  It was somewhere in

1    the Caribbean.

2           THE COURT:  And essentially, something very similar

3    happened?

4           MR. TRIPI:  Something very similar happened.  His

5    phone was seized, searched, returned to Mr. Eoannou within a

6    couple days.  His phone was given back to him, and law

7    enforcement retained the extraction and did conduct an

8    investigation.

9       They've had that information for about two years, so if

10   they wanted to move to suppress it, they should have.  I

11   thought they were making a tactical decision to try to

12   distance themselves from that phone.  I have no idea.  But

13   they've had that stuff.  I have a discovery binder.  I can

14   tell you exactly when, but it was a couple years --

15          THE COURT:  What about Title 3?

16          MR. TRIPI:  There were no Title 3 intercepts.  And,

17   in fact, the indictment here, there's an overt act that's a

18   voicemail message.  I don't remember the number of the overt

19   act, I can look it up, but there's a voicemail message that's

20   left to Bongiovanni from Gerace.  That was from Gerace's

21   phone.  That's how we got it.  So, that information is

22   essentially on the face of the indictment.

23          THE COURT:  And the defendants have that?

24          MR. TRIPI:  Yes.  Yes.

25          MR. LATONA:  What we don't have is whether or not

 1  anything -- any of that material was used to get the search

 2  warrants.

 3         MR. TRIPI:  That's irrelevant.

 4         MR. LATONA:  It's not irrelevant.

 5         THE COURT:  Yeah, but -- yeah, well, I guess, why

 6  would it be relevant?

 7         MR. LATONA:  Well, it could be relevant in terms of

 8  any kind of potential taint.  I mean, if we don't know --

 9         THE COURT:  Taint from what?

10         MR. LATONA:  From improper seizure of --

11         THE COURT:  Yeah, but you didn't move to suppress

12  that.  You've had the information.  You didn't move to

13  suppress that.

14         MR. LATONA:  That's because we don't know whether or

15  not they're in the warrants.

16         THE COURT:  No.  I think that boat has sailed,

17  Mr. LaTona.

18         MR. LATONA:  Okay.  Judge, the only other thing is

19  Bill of Particulars.  We'll rely on the pleadings.

20         THE COURT:  Okay.  Well, you also have a motion to

21  dismiss Count 7 and Count 9.  You want to just rely on the

22  papers for that?

23         MR. LATONA:  Yeah.  I'm going to rely on the papers

24  for anything that's outstanding, and wrap it up.

25         THE COURT:  Okay.  All right.  Thank you, sir.

Case 1:19-cr-00227-JLS-MJR Document 281 Filed 05/06/22 Page 89 of 96
US v BONGIOVANNI, et al -- 04/26/2022 -- ORAL ARGUMENT

87

1    Mr. Harrington?

2          MR. TRIPI:  Judge, just on the *Howlett*, I think all

3    those issues are up in front of Judge Sinatra in terms of

4    search warrants and I would say that what was argued here

5    regarding the cell phones is a rehash or regurgitation of

6    issues you and Judge Sinatra have decided regarding the Gerace

7    cell phone.

8          THE COURT:  Regarding what?

9          MR. TRIPI:  The Gerace cell phone.  Mr. LaTona

10   started repeating arguments that I believe have already been

11   decided.

12         THE COURT:  Yeah, but is Judge Sinatra deciding --

13   he's got an argument, from what he knows from, I mean, because

14   we didn't unseal the cell phone thing, right?

15         MR. TRIPI:  Judge Sinatra indicated to me there might

16   come a point in time, and Mr. LaTona can correct me if I'm

17   misstating it, but there may come a point in time where Judge

18   Sinatra may ask me to go in chambers, create a record of

19   ongoing nature of the investigation and he'll assess from

20   there.

21         THE COURT:  I got that.  But is there a reason -- now

22   he's raising an argument about staleness, right?  The warrant

23   was known -- from what he has, the information he has, the

24   warrant is no good because of staleness.  Why can't I address

25   that now?

 1              MR. TRIPI:  I think you already did.  That's what I'm

 2    saying.  I think that was already addressed by yourself and

 3    Judge Sinatra.  If I'm wrong --

 4              THE COURT:  I'll double check.

 5              MR. TRIPI:  If I'm wrong, I think we addressed

 6    staleness in the affidavit in terms of ongoing --

 7              MR. LATONA:  No, no.  Judge, the only thing that

 8    you've decided, I used staleness as a predicate to get a

 9    Franks hearing.  You said no.  End of story.  It's still

10    viable on the face of the affidavit.

11              THE COURT:  And you're also saying, without a Franks

12    hearing or whatever, the information was stale and it

13    should -- the warrant shouldn't have been issued?

14              MR. LATONA:  Right.

15              THE COURT:  I don't think I decided that already.

16    I'll figure that out.  All right.  Mr. Harrington?

17              MR. HARRINGTON:  Judge, I think most of what I have

18    to do here is just really housekeeping.

19              THE COURT:  Okay.  Okay.

20              MR. HARRINGTON:  As I prepared for this, I realize I

21    should have apologized to the Court for, I think, for the

22    forms of these motions.  I think we all tried to work through

23    it when we had a superseding indictment, but anyway -- because

24    there's some cross-pollination here on motions and the others.

25        One motion, Judge, from docket number 81 which were our --

1  excuse me.  I am going backwards here.  It should start with

2  docket number 81.  That is January of 2021.  Judge, in that

3  motion, there are a number of bases that we're asking the

4  Court to consider dismissal of the counts of the indictment

5  against Mr. Bongiovanni and one of them is the motion for

6  vindictive prosecution.

7      The problem with that motion, Judge, is we briefed it, and

8  it's in the motion, but as this case goes along and the closer

9  it gets to trial, this is probably a motion that if it is

10  completely addressed is probably going to really wait until

11  just before trial, I would assume, because I think that when

12  we get 3500 material, there's going to be a lot more

13  information to go to, but we filed it just to preserve the

14  issue, Judge.

15      Judge, there's motions for Bills of Particulars in both

16  this motion and in the one that was filed on docket number

17  149.  And, for this motion, it's -- what we've asked for are

18  paragraphs -- pages 33 through 36 in our memo.  That's for the

19  81 docket.  And for the 149 docket, for our July 12th, '21

20  motion, it's paragraphs 11 through 28.  We've asked for

21  extensive Bills of Particulars.  I won't raise any further

22  argument unless the Court wants.

23          THE COURT:  Okay.

24          MR. HARRINGTON:  Judge, I think we've addressed the

25  suppression issues.  One was withdrawn.  The other, we had a

1   hearing on.  There is, in our motions, a request for the Court

2   to look at the no-knock part of the search warrant that was

3   granted and we're still reserving that.  We have an extensive

4   brief on that.

5        And then, Judge, the other things that are remaining are

6   just standard things like 404(b), 609, and when the 3500

7   material is supplied, but the last real motion that's

8   extremely important, and you asked Mr. LaTona about it, are

9   the severance on Counts 7 and 9.  I don't know if, Judge, you

10  were going to deal with severance or you want the trial judge

11  to do it?

12          THE COURT:  Usually I defer to the trial judge.

13          MR. HARRINGTON:  As that applies for counts and

14  people, correct?

15          THE COURT:  Right.  That's how the judge is going to

16  run the trial, and I don't like to step on their toes.

17          MR. HARRINGTON:  We wanted just to preserve that.

18          THE COURT:  Oh, no.  Okay.  There's your motion to

19  sever from Mr. Gerace on Count 7 and 9, and Mr. Gerace's

20  motion to sever from Mr. Bongiovanni on Count 2 and 8.

21          MR. HARRINGTON:  Right.

22          MR. TRIPI:  And then Mr. Gerace wants to sever his

23  Counts 2 and 8 from 7 and 9, I believe.  So we're looking at

24  four trials if they get their way, Judge.

25          MR. HARRINGTON:  Judge, the only reason I'm standing

1   here is because I didn't want these younger people to think I

2   couldn't.

3           THE COURT:  All right.

4           MR. TRIPI:  Judge, the only thing I have left to say

5   is, on the no-knock warrant, we'll rely on our briefing for

6   every area that Mr. Harrington is relying on his briefing.  As

7   it relates to the no-knock warrant, suppression would not be a

8   remedy under *Hudson v. Michigan*, Supreme Court case in *US v*

9   *Acosta*, Second Circuit 2007.  The cases cited by the defense,

10  where suppression was contemplated, predate those controlling

11  precedents.  That's our position.  Thank you.

12          THE COURT:  Anything else?

13          MR. HARRINGTON:  No, Judge.

14          THE COURT:  Mr. Tripi, I'm going to give you an

15  opportunity, if you want to, to brief further the first issue

16  we discussed today, the phones.  Hang on one second.  Okay.

17  If you wanted to brief -- if you want to really hone down on

18  the best cases you got for routine versus non-routine search.

19  If it's not routine, what specific evidence there is in the

20  record, as it now stands, that there was reasonable suspicion

21  here, and your position regarding reopening the hearing.

22      Okay.  Also, there was -- a case just came out a couple

23  days ago in the Eastern District of New York *United States vs.*

24  *Kamaldoss*.  Looking for the cite here.  I don't see it on this

25  copy that I have.  That was in the Eastern District, came out

```
 1   April 22nd, 2022.  I'll give you two weeks to do that,

 2   Mr. Tripi.

 3            MR. TRIPI:  Sure.

 4            THE COURT:  Mr. Harrington, I'll give you a week or

 5   do you want two weeks to respond?

 6            MR. HARRINGTON:  A week is all right, Judge.

 7            THE COURT:  So, two weeks.

 8            THE CLERK:  May 10th, and the response will be May

 9   17th.

10            THE COURT:  At that point, I'll consider all the

11   motions submitted.

12            MR. TRIPI:  Yes, Judge.  Thank you.

13            MR. HARRINGTON:  Judge, will you make it two weeks?

14   I've got another thing coming up.

15            THE COURT:  Got you.

16            THE CLERK:  May 24th.

17            MR. HARRINGTON:  Thank you.

18            THE COURT:  Things else then, Mr. Tripi?

19            MR. TRIPI:  No.  Thank you, Judge.

20            THE COURT:  Mr. Dickson?

21            MR. DICKSON:  No, Your Honor.

22            MR. CULLINANE:  Nothing from me.

23            THE COURT:  Mr. LaTona?

24            MR. LATONA:  No thanks, Judge.

25            THE COURT:  Mr. Harrington?
```

1          MR. HARRINGTON:  No, Judge.

2          THE COURT:  All right.  Have a great day.  Stay safe.

3    (Proceedings concluded at 1:17 p.m.)

1                    *    *    *    *    *    *    *

2

3           I certify that the foregoing is a

4      correct transcription of the proceedings

5      recorded by me in this matter.

6

7

8

9                          s/ Megan E. Pelka, RPR

10                         Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25