# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,   *       Docket No.
                              1:19-cr-00227-JLS-MJR-1
                        *
                        *       Buffalo, New York
          v.           *       April 14, 2021
                        *       10:00 a.m.
                        *
PETER GERACE, JR.,         *       ORAL ARGUMENT
                        *
          Defendant (3). *
                        *
* * * * * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:         JAMES P. KENNEDY, JR.,
                            UNITED STATES ATTORNEY,
                            By JOSEPH M. TRIPI, ESQ.,
                               BRENDAN T. CULLINANE, ESQ.,
                            Assistant United States Attorneys,
                            Federal Centre,
                            138 Delaware Avenue,
                            Buffalo, New York  14202
                            Assistant United States Attorney
                            Appearing for the United States

For the Defendant:          JOEL L. DANIELS, ESQ.,
                            42 Delaware Avenue,
                            Suite 700,
                            Buffalo, New York  14202.

The Courtroom Deputy:      KIRSTIE L. HENRY

```
 1   Court Reporter:                    BONNIE S. WEBER,
                                        Notary Public,
 2                                      Robert H. Jackson Courthouse,
                                        2 Niagara Square,
 3                                      Buffalo, New York  14202,
                                        Bonnie_Weber@nywd.uscourts.gov.
 4
             Proceedings recorded by mechanical stenography,
 5                  transcript produced by computer.
 6
 7              (Proceedings commenced at 10:00 a.m.)
 8
 9          THE CLERK:  All rise.
10          The United States District Court for the Western
11   District of New York is now in session.  The Honorable John
12   Sinatra presiding.
13          THE COURT:  Please be seated.
14          THE CLERK:  Court calls case number 19-CR-227, United
15   States versus Peter Gerace.  This is the date set for oral
16   argument.
17          Counsel, please state your appearances.
18          MR. TRIPI:  Joseph Tripi and Brendan Cullinane for the
19   United States.
20          Good morning, Your Honor.
21          THE COURT:  Good morning.
22          MR. DANIELS:  Joel Daniels for Mr. Gerace.
23          THE COURT:  Good morning, Counsel.  Good morning,
24   Mr. Gerace.
25          THE DEFENDANT:  Good morning.
```

1         **THE COURT:**  We're here today on Mr. Gerace's motion to

2    amend a condition of his pretrial release.  My review is de novo

3    and we're proceeding today in person because I deem this

4    proceeding essential under Chief Judge Geraci's February 24

5    general order.

6         I studied the papers, spent a lot of time thinking

7    about them.  So I'm more interested in having a back-and-forth

8    conversation with counsel rather than hearing a soup-to-nuts

9    presentation from either side.

10         So with that in mind, is there anything we need to

11    talk about before we get started with some questions from me?

12         **MR. TRIPI:**  No, Judge.

13         **MR. DANIELS:**  I don't believe that would be helpful,

14    Judge.  We've tried, but haven't been successful with it.

15         **THE COURT:**  Okay.  Well, we'll see what we can do

16    here.  If I miss something and you really need to, you know, sum

17    it up at the end, please do that.

18         But I think I'm going to cover everything that you

19    want covered here.  So let me start with, who is talking,

20    Mr. Tripi, on your side today?

21         **MR. TRIPI:**  Yes, Judge.

22         **THE COURT:**  What's the current risk of danger here if

23    Mr. Gerace were allowed to work at Pharaoh's for two or three

24    hours every morning, early, when no one else is there?

25         **MR. TRIPI:**  I think that's the key part, Judge, is I

1   don't know if we can assure that no one else is going to be
2   there.
3           One thing we learned through time on this job is where
4   there is a will, there is a way.  And here, Pharaoh's is
5   essentially the home base for the bulk of Mr. Gerace's criminal
6   activity.
7           And he's charged in certain counts with engaging in
8   that conduct with other people, frankly, who are employed at
9   Pharaoh's and who attend Pharaoh's.
10          So any conditions that allow him to go to that place
11  provides him with opportunities to consult with people that he's
12  engaged in this conduct with.
13          The maintaining of the drug premises count charges
14  Section 2, liability.  The sex trafficking count is a
15  conspiracy.  Obviously, by definition, there is an agreement
16  with at least one other person there.
17          As I indicated in my papers, a number of the essential
18  employees at Pharaoh's are members of the Outlaws Motorcycle
19  Club, who we deem to be a criminal organization.
20          And in my papers, I think you could see from a perusal
21  of that, those people have already, in our view, committed a
22  federal crime potentially by either lying to federal agents or
23  committing perjury to this Court, where they apparently totally
24  contradicted an interview with agents with respect to their
25  ability to do the banking activity at Pharaoh's without

1   Mr. Gerace.

2          Mr. Ermin is the manager.  He's the international

3   president of the Outlaws and he says in the papers the defense

4   submitted that he can't do the banking.  I'm paraphrasing.

5          And unbeknownst to the defense probably, he gave an

6   interview the day of the search warrant at Pharaoh's to federal

7   law enforcement where he explained he does the banking

8   25 percent of the time because Mr. Gerace is out of town.

9          So there is an example you could point to right in the

10  face of the papers here of people he worked with bending the

11  rules, at a minimum, to his benefit.

12         And I don't think that it's necessarily reasonable for

13  probation to have to go to Pharaoh's to monitor Mr. Gerace when

14  we can assure he's at his house and more easy to monitor there.

15         And there is -- experience and logic probably dictate

16  there's less likelihood that people who would be willing to

17  commit crimes, in the context of Pharaoh's Gentlemen's Club,

18  would risk going to Mr. Gerace's house with the risk of

19  probation showing up there.  So I think that that's the risk.

20         **THE COURT:**  Yeah, you know, I was going to follow up

21  with that and right at the very end, you kind of got me and

22  brought up that point.

23         You know, if he's going to do something at Pharaoh's,

24  why doesn't he do it at his house?  And you're saying that

25  people are less likely to go to his house because probation can

1   come to Pharaoh's and keep an eye on him there.

2            MR. TRIPI:  I understand that, Judge.  It goes back

3   to, I guess, my first sentence, where there is a will, there is

4   a way, sort of undermines my argument a little bit.

5            But I think when you're talking about mitigating risk

6   and assessing dangerousness, it's playing the percentages a bit,

7   and I -- a lot of the -- although there is some conduct that he

8   engaged in at his home, the bulk of the conduct in this very

9   serious indictment occurred at Pharaoh's.

10           THE COURT:  Has there been any indication that

11  Mr. Gerace has participated in illegal conduct at Pharaoh's

12  since his arrest on March -- well, it hasn't been anything since

13  March 1.  Any illegal conduct at all since March 1?

14           MR. TRIPI:  Not that I'm aware of through probation

15  notifying us of anything, no.

16           THE COURT:  What about obstruction?  He was aware of

17  this investigation in December of 2019?

18           MR. TRIPI:  Correct.

19           THE COURT:  At that point in time, any evidence, any

20  indication of obstruction or tampering since then?

21           MR. TRIPI:  We have recently, relatively recently,

22  obtained search warrants for his Facebook account.  There has

23  been a witness that received threats through a Facebook account

24  during a scenario where Mr. Gerace was present with the person

25  who was -- we're still investigating it.  So I don't want to go

 1    too far into it.

 2           But essentially, Mr. Gerace was with a person who was

 3    Facebook messaging a witness, essentially calling the witness a

 4    snitch and things of that nature, which was perceived as a

 5    threat by the witness.

 6           **THE COURT:**  Can you give me a date on that?  When did

 7    that allegedly occur?

 8           **MR. TRIPI:**  If I may consult with Mr. Cullinane.

 9           **THE COURT:**  Sure.

10           **MR. TRIPI:**  That occurred, I'm correct, that that

11    occurred in or about November of 2019, which would have been

12    maybe about a month before the search warrant.

13           But the other thing I would point to, Judge, and I

14    referenced in a footnote, is that Mr. Gerace has sued two people

15    in State Court that he believes to be witnesses.

16           Now, obviously, there are statutes relating to

17    retaliation, relating to the filing of civil suits against

18    potential witnesses as a means of circumventing federal

19    discovery laws, as this case was in the Grand Jury at the time.

20           We obtained court orders from Judge Arcara to stay

21    those, enjoin those state cases.  But I would point to, there is

22    another indication of Mr. Gerace trying to out witnesses.

23           I mean, what happens when you do that, you out

24    witnesses publically, it creates an environment ripe for other

25    people who you may be associated with criminally to --

1          It creates opportunities for intimidation and public

2   pressure of witnesses who shouldn't be exposed until trial.  So

3   he's already started down that path, in our view, at least.

4          **THE COURT:**  Can't I create a window of opportunity

5   every morning, 7:30 to 10:30, something like that, and impose

6   conditions that he's by himself in that building?  Doesn't that

7   satisfy your concerns, Mr. Tripi?

8          **MR. TRIPI:**  I think -- I don't -- it doesn't satisfy

9   my concerns, Judge.  You certainly have the authority to do so,

10  but it does not, on the whole, satisfy my concerns.

11         **THE COURT:**  Let me talk about the statement in your

12  papers that Mr. Gerace said he hadn't had cocaine in a year and

13  a half, but, in fact, tested positive.  Tell me about that and

14  tell me about how that bears on this issue.

15         **MR. TRIPI:**  Well, anything that is going to be

16  proffered to you on his behalf, counsel's relying on

17  representations from their client.

18         And you have a recent example that is consistent with

19  his prior federal conviction for defrauding the -- conspiracy to

20  defraud the United States.

21         You have a recent example where probation, the day of

22  his arrest, asks him about drug usage.  He admits to using

23  pills, but doesn't acknowledge that he used cocaine.

24         And then after the appearance in Florida, we find out

25  he testified positive for cocaine, indicating that he lied to

1    the probation officer.

2            So he's an unreliable reporter of information to you

3    and I think that's borne out by the fact that he -- or

4    corroborated by the fact that he got employees of his to submit

5    affidavits that we believe are demonstrably false.

6            So you're relying on his representations through

7    counsel, obviously.  Counsel is only as good as the

8    representations from the client and we don't think that the

9    Court should find Mr. Gerace to be a credible reporter to this

10   Court.

11           **THE COURT:**  And I think you may have been referring to

12   the prior federal case in front of Judge Skretny.

13           There was also something in your papers about, I don't

14   know if it was a violation of supervised release or just some

15   miscommunication or misrepresentation to probation about his

16   place of employment.  What's going on there.

17           **MR. TRIPI:**  He was representing that he worked at his

18   family's restaurant on Transit while maintaining employment at

19   Pharaoh's.

20           So they essentially did a probation search of

21   Pharaoh's Gentlemen's Club on October 31st, 2009.  Based upon

22   information probation received from witnesses that he was

23   selling cocaine there.

24           That's attached to my papers as Exhibit D.  The

25   dancers were the reporters of information at that time,

1   indicated that Gerace not only ran the club, but he was

2   distributing cocaine from that location.

3           Obviously, that's also consistent with this

4   indictment.  You have a lengthy stretch of time going back many,

5   many years now, where this conduct is alleged.

6           **THE COURT:**  Was there a violation in that case that

7   was adjudicated?

8           **MR. TRIPI:**  Yes.  It was resolved, I think, by a

9   modification, Judge, but it was in that case, Mr. Bongiovanni,

10  the co-defendant, tied into.

11          Because he had nothing to do with the search and these

12  are laid out somewhat in the -- some of the overt acts of this

13  indictment.

14          Mr. Bongiovanni had nothing to do with that search,

15  but he generated a false report within the DEA system,

16  indicating that Peter Gerace was a confidential source, that he

17  wanted to cooperate.

18          And Bongiovanni reached out to probation in an effort

19  to say, he's going to cooperate and, you know, if you give him

20  essentially a break on this violation.

21          Around that same time, an FBI agent is conducting

22  independent investigation and looking to bring a case against

23  Gerace related to Pharaoh's.  So over a decade ago.

24          But what happens in that scenario is when you have

25  someone who is a confidential source for one federal agency

 1   being investigated by another, well, it reverts back to the

 2   agency who is not controlling their source.

 3         So Bongiovanni represents that Gerace is my source to

 4   probation and to the FBI.  The FBI essentially drops their

 5   investigation of Gerace and then nothing happens.

 6         Then that's laid out in the indictment in some of the

 7   overt acts, if you follow chronologically, October 31st,

 8   November 2nd, November 4th.

 9         And Bongiovanni, who had nothing to do with this

10   probation search, is calling probation on his behalf.  And

11   that's another part of it here, Judge.

12         He's charged with bribing a federal agent.  He's got a

13   lot of contacts in law enforcement.  He's got a lot of contacts

14   in the criminal world.

15         And every opportunity that he has where he's not being

16   monitored, or not in jail, frankly, is an opportunity to violate

17   any conditions that this Court sets.

18         **THE COURT:**  All right.  And before I ask Mr. Daniels a

19   couple of questions, you know, I'm thinking about it and, you

20   know, the Government hasn't asked for detention here and there

21   hasn't been a proffer heading in that direction.

22         And I, you know, I understand that this is pretrial

23   and he's presumed innocent and I don't really particularly like

24   it when people tell me that because I know that it is.

25         **MR. TRIPI:**  Right.

1          THE COURT:  But I've got to keep that in mind, too.

2   And if you want to put everything forward and ask for detention,

3   then that's a whole different set of proffers from you.

4          And maybe that's not the amount of detail you prefer

5   to give to the defense right now.  So I'm within this constraint

6   of talking about the condition, right?

7          MR. TRIPI:  Right.

8          THE COURT:  Just the condition, I think.  So let me

9   keep going and I'll come back to you, Mr. Tripi.

10          Mr. Daniels, do you want to say something about the

11   cocaine use first and then we will go to the next few questions?

12          MR. DANIELS:  Yes, Judge.  He was in Florida on

13   vacation and had been with some individuals and apparently, he

14   did test positive for it.

15          And might have been some confusion at the time.  I'm

16   not certain, but I'm not challenging that, Judge.  That

17   apparently, did occur here and he should have been, had he

18   known, he should have been more candid with probation.

19          We're not trying to hide from that.  We're not trying

20   to duck that.  But he's been 100 percent clean since he's been

21   back here, Judge.

22          No alcohol, no substances.  He's following all the

23   rules.  He's been compliant 100 percent.  Mr. Macaluso is here.

24   He can confirm that with the Court.

25          THE COURT:  In your papers, Mr. Daniels, you set forth

1   a number of things that Mr. Gerace does or needs to do or ought

2   to do to run the business on a day-to-day basis.  How has the

3   business been running since he's been arrested on May 1?

4           MR. DANIELS:  It's running well, Judge.  It's a very

5   popular destination for individuals and patrons.  They're quite

6   busy there and it's a very successful gentlemen's club, as we

7   say.

8           THE COURT:  Right.

9           MR. DANIELS:  But he's worked there for a number of

10  years.  His mother owned it in 2005.  He bought it in 2014 and,

11  you know, in the bar and restaurant business, there's an old

12  saying that nobody counts the money better than the owner.

13          And it's a very, very heavy cash business.  I could

14  say to the Court that from what we understand, 80 percent of

15  that business is cash.

16          And routinely in the mornings, when he's available,

17  when he's in town or didn't have a commitment to his son with

18  whom he has -- for whom he has custody, he would be there.

19          And he would count the receipts from the night before

20  which sometimes on weekends, are quite heavy, substantial.  He

21  would make all the deposits, he would balance the checkbooks, he

22  would pay all the bills, he would do all the ordering.

23          That's what he's been doing for years, Judge.  While

24  he's been at home, he has someone else do that for him and he's

25  on the phone with them and back and forth.

1        But I think he would feel a lot more secure if he were

2   able to do that himself.  It's a job that he has done for years

3   and years.

4        Mr. Tripi made mention of a gentleman who has been

5   doing some work there for him.  His name is John Ermin and

6   Mr. Ermin has worked for Mr. Gerace for six or seven years.

7        He's the day manager and he explained to an agent,

8   maybe a year and a half ago, that when Mr. Gerace would be

9   unavailable, he would do the banking and handle all the cash.

10       I spoke -- I have spoken to Mr. Ermin.  He's a very

11  nice guy and he told me that he just isn't comfortable with that

12  responsibility of handling all the cash and making sure

13  everything is right.

14       Because as we say, no one does it better than the

15  owner.  Mr. Ermin, who is referred to as Tommy O., was a member,

16  I believe, of Outlaws Motorcycle Club, as Mr. Tripi has

17  mentioned.

18       He rode a Harley motorcycle for some years and I think

19  it -- he was involved in an accident some years ago, too, and it

20  cost him one of his legs.  I believe his left leg, above his

21  knee, was amputated.

22       But he does his best.  He's dependable.  We're not

23  saying he's not, but it's just very difficult for Mr. Gerace not

24  to do this work himself and the ordering, too, of ordering all

25  the food and the liquor.  He has his own system for doing that.

1          And all we're asking the Court is to allow him to go

2     there a few hours in the morning from 7:30 to 10:30 or 8:00 to

3     11:00 under any circumstances or conditions that this Court

4     would approve and just do the work and the routine that he has

5     done for years and years, Judge.

6          THE COURT:  I know that this isn't the test.  It might

7     be coming at it from the other direction, but is there any duty

8     that only Mr. Gerace can fulfill on a day-to-day basis or

9     week-to-week basis?

10         MR. DANIELS:  Well, he's been doing it by himself for

11    years and years.  It's the old story, when you have to depend on

12    others, you are always concerned and sometimes it doesn't work

13    right and there is a lot of questions that go back and forth.

14         It's just something that he feels responsible for.  He

15    feels confident in doing and, as we say, Judge, it's a -- it's a

16    very substantial cash business.

17         And he feels that that's something he should be

18    responsible for himself in making sure everything is handled the

19    right way.

20         THE COURT:  If we created this window that I've been

21    suggesting, maybe 7:30 to 10:30, is Mr. Gerace capable of

22    keeping other people out of the building?

23         In other words, deliveries, beer, liquor, food, the

24    person who is going to mop and sweep, vacuum.  Is he going to be

25    able to create an environment where he's all by himself in

1   there?  Because if he is allowed to do this and we have other

2   people coming and going then the party is over, right?

3           MR. DANIELS:  Judge, we would make every effort to

4   comply with any condition that this Court believes is

5   reasonable.

6           Maybe 8:00 to 11:00 might be a little easier for us

7   than 7:30 to 10:30, but if the Court insists on 7:30 to 10:30,

8   we will do that.

9           We would see to it that we would not be in contact

10  with anyone.  The business doesn't open until 12 o'clock.  No

11  one comes in until noon.  And I'm sure we could make

12  arrangements that we would be able to handle that ourselves.

13          THE COURT:  But I've got something.  I thought I saw

14  Ermin's declaration indicating that he comes in at 11:00.  So I

15  mean, that's part of it.  If I'm going to do this, I have got to

16  avoid overlap.

17          MR. DANIELS:  We will see that Mr. Gerace would be

18  there without the presence of Mr. Ermin, Judge.

19          THE COURT:  Mr. Daniels, would you comment for me on

20  Mr. Tripi's argument about the credibility of the presentation

21  that Ermin's declaration contradicting what he has told the FBI.

22          MR. DANIELS:  Judge, there might have been some

23  measure of confusion there, Judge.  Mr. Ermin, from what he has

24  told me, would handle the money and the deposits when Mr. Gerace

25  would not be available.

1           There may be several reasons for that.  Mr. Gerace may

2     have been on vacation.  He takes frequent vacations.  Number

3     two, he may have a commitment to his son in the morning.

4           He may be unavailable for other reasons in the morning

5     which would cause Mr. Ermin to take care of the banking, but

6     it's for a limited period of time, Judge.

7           Mr. Ermin is aware that that is Mr. Gerace's

8     responsibility and routinely, he almost always handled that and

9     as Mr. Ermin had said to me when I met with him, that there is a

10    lot of cash that comes into Pharaoh's from all the patrons.

11          And he just doesn't feel comfortable with the

12    responsibility of handling all that cash and he would prefer

13    that Mr. Gerace do that himself.

14          THE COURT:  Mr. Tripi, in my view, and maybe I'm going

15    to be proved wrong.  Maybe I won't.  But in my view, allowing

16    this to happen for a window of time in the morning with

17    conditions that nobody else is there and including my clear

18    unwillingness to tolerate a violation of these conditions, isn't

19    it likely that anybody under these circumstances would comply?

20          This is their window to make it happen and if

21    Mr. Macaluso is checking in or any other governmental agency

22    wants to take a look and see what's going on, isn't there a high

23    likelihood of compliance here?

24          MR. TRIPI:  Judge, one would think so, but we've been

25    more than surprised before and I think that, you know,

1    obviously, the only place that we would ever be sure would be in
2    a detention situation.
3           I understand that's not this.  I just think the next
4    safest thing is what we requested, which is, he is locked down,
5    confined to his home.
6           But I understand the premise of your question, Judge,
7    but given this defendant's track record, both prior to this
8    indictment and as alleged in this indictment, I would answer,
9    no.
10          I don't think we -- I don't think -- maybe anyone who
11   wasn't a felon, who has recently lied to probation and who is
12   alleged to have commit these.  If we're talking about someone
13   else, then sure, but not him.
14          THE COURT:  Mr. Macaluso, you have been listening in.
15   Do you have anything to add at this point, while I'm still
16   considering the issue?
17          MR. MACALUSO:  No, Your Honor.  The defendant has been
18   compliant to date with his conditions.  No alcohol condition.
19   He removed all the alcohol from his residence.
20          He is on active GPS.  We would be able to track him,
21   where he's going, how long he is at the workplace and then I can
22   also pop in to make sure that he is alone on those hours if you
23   do set them.  But we would have no objection to him going to
24   work for a few hours in the morning.
25          THE COURT:  Under the statute, which is

1   18 U.S.C. 3145(a), I must independently determine if the

2   amendment that's requested is consistent with 3142(c)(1).

3          In other words, I must determine whether the

4   conditions imposed are the least restrictive combination of

5   conditions that will reasonably assure the appearance of the

6   person, as required in the safety of any other person in the

7   community.

8          And I've been thinking a lot about this and it's

9   certainly not an easy question and certainly not easy if you are

10  trying to get it just right.

11         As I mentioned earlier, I spent a lot of time

12  pondering this, including now on the bench.  In deciding the

13  motion, I must balance the Government's concerns about safety of

14  others in the community with Mr. Gerace's concerns about

15  operating a lawful business.

16         And I must ensure that I comply with the statute and

17  impose the least restrictive conditions necessary to guard

18  against danger to others in the community, without imposing

19  conditions that border or can be perceived as punitive in a

20  pretrial context.

21         My analysis is -- I'm attempting to drive the analysis

22  this way by the statute and not look solely at, which I think is

23  something in the reverse.

24         Looking solely at what it is that Mr. Gerace

25  absolutely must do to keep his business running because I think

1   that's backwards under the statute.

2          So I'm trying to use that as a relevant consideration

3   but to stay within the confines of the statute which is to

4   impose the conditions that are the least restrictive under the

5   circumstances.

6          I've considered the factors and the statute, including

7   all subsections, and including the nature and circumstances of

8   the offenses charged, the weight of the evidence proffered to

9   date, his history and characteristics and the danger to others

10  in the community.

11         And my analysis of the factors is based, as well, on

12  the transcripts.  I read the transcript out of Florida and the

13  transcript in front of Judge Roemer.

14         And I read the pretrial services memorandum dated

15  March 4, 2021, and I also read the second superseding

16  indictment.

17         After considering all of this, I find that the

18  combination of conditions previously imposed is not the least

19  restrictive combination of conditions to reasonably assure the

20  safety of others in the community.

21         And in particular, I find that the condition that

22  Mr. Gerace stay away from Pharaoh's Gentlemen's Club at 999 Aero

23  Drive, Cheektowaga, is more restrictive than necessary, as

24  stated, to reasonably assure the safety of others and the

25  community.

1          Under these facts, the lesser restrictive condition

2    that he refrain from visiting or working at Pharaoh's, except

3    between certain designated hours serves the purpose of

4    Title 18 3142(c)(1)(B).

5          I therefore grant the motion in part and amend the

6    conditions of his release as follows:

7          The parameters of the home detention condition are

8    modified to allow Mr. Gerace to leave his residence for

9    employment at Pharaoh's between 7:30 a.m. and 10:30 a.m. each

10   day.

11         The condition that he stay away from Pharaoh's is

12   modified to state that he shall not visit Pharaoh's, except

13   between those hours, 7:30 to 10:30 a.m., each day.

14         On days that he is there working at Pharaoh's, he is

15   to proceed directly from his residence to Pharaoh's and is to

16   return directly to his residence.  If he needs to make any stops

17   along the way, he can work with Mr. Macaluso on that and get

18   those pre-approved.

19         When he's working at Pharaoh's, Mr. Gerace must be

20   alone.  He must not meet with or encounter any other employees

21   of Pharaoh's.

22         He must not accept any deliveries of any kind and must

23   not interact with any other person.  He shall arrange employee

24   and delivery schedules to comply with this condition.

25         One additional condition that I wanted to get some

 1  input from counsel on is this.  My, you know, what I'm doing

 2  here is I've got to try to imagine a way to make this work, a

 3  way that's fair.

 4          And one of the things that occurs to me is the concern

 5  he's already got conditions that he's not to tamper with

 6  witnesses or obstruct justice, those sorts of things.

 7          But is there a concern about current employees there,

 8  that he might tend to communicate with current employees there

 9  in a way that's, you know, leaving notes at their lockers.  I

10  don't know what the situation is.  Do I need to worry about

11  something like that, Mr. Tripi?

12          MR. TRIPI:  That is certainly going to be a challenge.

13  There is a locker room where there is dancers.  There is office

14  space.  There is area behind the bar.

15          So, Judge, I don't know how, quite frankly, I don't

16  know how we would mitigate against leaving notes and things like

17  that.  But yes, there are certain areas and plenty of places to

18  leave notes or instructions.

19          THE COURT:  Mr. Daniels, do you have a comment about

20  that subtopic?

21          MR. DANIELS:  Just two things, Judge.  I understand

22  the Court has directed that Mr. Gerace be there alone from 7:30

23  to 10:30.

24          He tells me that there is a cleaning lady that comes

25  in from 9:00 to 12:00 and she sprays COVID protection,

1    anti-COVID sprays around the premises and generally cleans up.

2              If the Court insists, we will tell her to come at

3    another time.  But I just bring that to the Court's attention.

4    Maybe the Court would allow that lady to be there at that time

5    to clean up.  They open at noon.  So that's why they wanted to

6    have all that done before noon.

7              Secondly, Mr. Gerace certainly understands all the

8    conditions.  He's not to have contact with witnesses or

9    co-conspirators.

10             We're not sure who a lot of those people are but as

11   far as employees go or goes, he does have phone contact with

12   them during the day or in the evening.  It might be a phone call

13   where they ask him some things.  He does speak to them.  But

14   that's just routine business, Judge.

15             We understand the parameters here.  We understand what

16   we're supposed to do, what we're not supposed to do, and we

17   continue to comply and we will comply.  Thank you.

18             MR. TRIPI:  Judge, the only thing I would add to that

19   is he's the owner of the building.  He could modify his opening

20   and start time if he needed to, to also comply with the Court's

21   time parameters, so.

22             THE COURT:  Do you have a particular concern about

23   overlap between Mr. Gerace and the cleaning lady?

24             MR. TRIPI:  Don't know who the cleaning lady is,

25   offhand.  We provided interviews from several Pharaoh's

 1   employees.

 2          The cleaning lady, I believe to be at one point, was

 3   John Ermin's wife.  So if it's still that same person, then now

 4   you know who it is.

 5          MR. DANIELS:  May I just have a moment?

 6          THE COURT:  Yeah, sure.

 7          MR. DANIELS:  Thank you.

 8          (Discussion off the record.)

 9          MR. DANIELS:  The cleaning lady, her name is Jennifer.

10   I'm not sure of her last name.  She's been there for a long

11   time.  That's her job.  Gets there early in the morning and --

12   excuse me.

13          What time does she leave?

14          THE DEFENDANT:  Noon or 1:00.

15          MR. DANIELS:  She leaves at noon or 1:00, depending on

16   deliveries and she cleans the place.

17          THE COURT:  I'm not hearing from the Government that

18   it was particularly concerned about this Jennifer, if she is a

19   witness or something else in your case.  Mr. Tripi, you don't

20   believe that to be the case, do you?

21          MR. TRIPI:  I would ask that she be fully identified

22   and if we need to follow up with her directly at some point, we

23   could.

24          I'm not saying she needs to be identified on the

25   record but at least to probation, have her fully identified and

1  we can give it a shot, go from there.

2          THE COURT:  Is that acceptable?

3          MR. DANIELS:  Certainly, Your Honor.

4          THE COURT:  In terms of identification to

5  Mr. Macaluso?

6          MR. DANIELS:  Certainly.  We will call Mr. Macaluso.

7  We will give him all the information.

8          THE COURT:  If there is a particular concern about how

9  she relates to this lawsuit with this criminal case, then we can

10  worry about that next, okay?

11          MR. DANIELS:  We will take care of that, Judge.

12          THE COURT:  All right.  I am going to impose this

13  additional condition with one exception.  So this is for

14  Mr. Macaluso can get it clearly and everyone can pay attention.

15          So no communicating with employees while you are

16  there, Mr. Gerace, in writing, notes, that sort of thing.  And

17  I'm going to give you exceptions.

18          Your managers, if you need to leave them a checklist,

19  fine, but I don't want you communicating with any of the other

20  employees by leaving notes for them during the day, okay?  I

21  think that's probably sufficiently stated, Mr. Macaluso.  So you

22  can write it up, okay?

23          MR. MACALUSO:  All right.

24          THE COURT:  Mr. Gerace, if you have any doubt or

25  question about whether a certain task, I've tried to carve this

1    up and thread the needle carefully.

2            So if you are in doubt about any of this, speak with

3    Mr. Macaluso first.  I really would rather not have a situation

4    where you're coming in and telling me you made a mistake and

5    didn't think about it.

6            I'd rather you think about it first and vet it with

7    Mr. Macaluso, so that we're not back here talking about whether

8    you violated something.

9            Do you understand that?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  Also, if you violate any of the conditions

12   I just described, and that will be set forth in the written

13   order, a warrant may issued for your arrest and you may be

14   detained for the entirety of your case, pending trial.

15           If, while on this release, you violate 18 U.S.C. 1503,

16   intimidation of witnesses, jurors, and officers of the Court;

17   1510, which is obstruction of criminal investigation; 1512,

18   tampering with a witness, victim, or informant; 1513,

19   retaliating against the witness, victim, or informant, you may

20   be charged with a separate offense for that conduct.

21           Do you understand that?

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:  Mr. Macaluso, do you have anything to add

24   or comments on the conditions that I've stated?

25           MR. MACALUSO:  Just a question, Your Honor.  It's 7:30

1    to 10:30 daily, correct?

2              THE COURT:  Correct.

3              MR. MACALUSO:  Okay.  Thank you.

4              THE COURT:  And you will be typing this up --

5              MR. MACALUSO:  Yes.

6              THE COURT:  -- or making it?

7              MR. MACALUSO:  Yes.  I can send up so ordered.

8              THE COURT:  Okay.  Yeah.  It doesn't need to be typed.

9    Sometimes they're handwritten.  So either way, you will be

10   preparing it and I'll sign it?

11             MR. MACALUSO:  Yes.

12             THE COURT:  All right.  Mr. Gerace remains released,

13   pending trial on the conditions I just explained, pursuant to

14   18 U.S.C. 3142(b) and (c).

15             The transcript of my oral ruling shall constitute my

16   written findings and decision on Mr. Gerace's motion.

17             Counsel, do you have anything?  I have nothing

18   further.  Do either of you?

19             MR. TRIPI:  No, Your Honor.

20             MR. DANIELS:  No, Judge.

21             THE COURT:  Okay.  Very good.  Thank you.

22

23                  (Proceedings concluded at 10:37 a.m.)

24                          *    *    *

25

"I certify that the foregoing is a correct transcript, to the best of my ability, from the record of proceedings in the above-entitled matter."


_s/ Bonnie S. Weber_          May 3, 2021
    Signature                      Date

BONNIE S. WEBER

Official Court Reporter
United States District Court
Western District of New York