IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

         v.                                   19-CR-227-JLS

JOSEPH BONGIOVANNI and
PETER GERACE, JR.,

             Defendants.

_____

## GOVERNMENT'S UPDATED RESPONSE TO
## DEFENDANT BONGIOVANNI'S MOTION TO SEVER

THE UNITED STATES OF AMERICA, by and through its attorney, Trini E. Ross, United States Attorney for the Western District of New York, Corey R. Amundson, Chief of the Public Integrity Section, Joseph M. Tripi, David J. Rudroff, and Nicholas T. Cooper, Assistant United States Attorneys, and Jordan Dickson, Trial Attorney, Public Integrity Section, of counsel, hereby files its opposition to the defendant's severance motion (*see* Doc. No. 343).

## I.      FACTUAL BACKGROUND

The defendant is charged via Second Superseding Indictment with violations of Title 18, United States Code, Section 371 (Conspiracy to Defraud the United States; Counts 1-2), Title 21, United States Code, Section 846 (Conspiracy to Distribute Controlled Substances, Count 3), Title 18, United States Code, Section 201(b)(2)(C) (Public Official Accepting a Bribe, Counts 4-5), Title 21, United States Code, Section 846 (Conspiracy to Distribute Controlled Substances, Count 8), Title 18, United States Code, Section 1519 (Obstruction of

Justice, Counts 10-16); and, Title 18, United States Code, Section 1001(a)(2) (False Statements, Counts 17-18).

Co-defendant Peter Gerace is charged with violations of Title 18, United States Code, Section 371 (Conspiracy to Defraud the United States, Count 2); Title 18, United States Code, Sections 201(b)(1)(A) and 201(b)(1)(C) (Paying a Bribe to a Public Official, Count 6) (as the individual paying the bribes alleged in Count 5); Title 21, United States Code, Section 856(a)(1) (Maintaining a Drug-Involved Premises, Count 7); Title 21, United States Code, Section 846 (Conspiracy to Distribute Controlled Substances, Count 8); and, Title 18, United States Code, Section 1594(c) (Conspiracy to Commit Sex Trafficking; Count 9).

The charges stem from defendant Bongiovanni's receipt of bribes and protection of individuals involved in narcotics offenses, including co-defendant Peter Gerace.  Defendant Bongiovanni is charged with co-defendant Gerace in Counts 2 and 8, and is named but not charged in Count 6, which charges Gerace with bribing Bongiovanni.  Similarly, co-defendant Gerace is named but not charged in Count 5, which charges Bongiovanni with accepting bribes from co-defendant Peter Gerace.

With respect to Counts 2 and 5[1], the Second Superseding Indictment alleges that Bongiovanni was bribed by Gerace to, among other things:

---

[1] The time period alleged in Count 2 is "[b]eginning in or about 2005 and continuing until in or about February 2019," and the time period of the bribery in Count 5 is "[b]eginning in or about 2009, and continuing to on or about June 6, 2019," which is the day a federal search warrant was executed at Bongiovanni's residence.

- omit to enforce the drug laws of the United States against Peter Gerace Jr., and against Pharaoh's Gentlemen's Club (PGC) located at 999 Aero Drive, Cheektowaga, New York;

- to falsely advise a Federal Bureau of Investigation (FBI) Special Agent (SA) that Peter Gerace Jr. was a DEA confidential source, thereby inducing the FBI SA to abandon narcotics investigation into Peter Gerace Jr. and PGC;

- to provide advice and information to Peter Gerace Jr.;

- to help Peter Gerace Jr. and PGC avoid federal narcotics investigations;

- to make statements to Bongiovanni's co-worker, a fellow DEA SA, to dissuade and discourage the fellow DEA SA from investigating Peter Gerace Jr., and PGC;

- to make false and misleading statements to other members of law enforcement;

- to provide information about law enforcement methods and techniques; and,

- to help such drug trafficking activities continue.

Count 8, which also incorporates the Introduction, charges both defendants with conspiracy to possess with intent to distribute, and to distribute, controlled substances including cocaine, cocaine base, methamphetamine, amphetamine, marijuana, and heroin; and, to maintain PGC for the purpose of knowingly, intentionally, and unlawfully manufacturing, distributing, and using the aforementioned controlled substances. Moreover, Count 8 alleges, in part, that both defendants conspired to maintain PGC as a drug-involved premises. By protecting PGC and Gerace, Bongiovanni enabled these federal crimes to continue unabated. As a result, the allegations set forth in Count 8 overlap, and are integrally

intertwined, with Count 7 charging Gerace with maintaining PGC as a drug-involved premises.

The Second Superseding Indictment alleges, and the trial evidence will show, that Bongiovanni used his position as a DEA SA to protect co-defendant Gerace and his business, PGC, from federal narcotics investigations and to enable the criminal activity involving Gerace, and occurring at PGC, to continue. This criminal activity includes the sex trafficking conspiracy charged in Count 9. In particular, Count 9 alleges that Gerace conspired to commit sex trafficking through force, fraud, and coercion, which, among other ways, was achieved by preying upon women who were addicted to drugs or became addicted while at PGC, and inducing them through force, fraud, and coercion to engage in commercial sex acts at PGC with co-defendant Gerace, his friends, associates, and customers. Again, through Bongiovanni's paid protection (*see* Counts 2, 5, and 6), the drug and sex trafficking activity (*see* Counts 7, 8, and 9) occurring at PGC, and controlled and permitted by Gerace, was able to occur and continue undetected and uncharged for a lengthy period of time.

Furthermore, several counts of Obstruction of Justice (Counts 12–15) and False Statements (Counts 17–18) directly relate to Bongiovanni's efforts to impede, obstruct, and influence investigation into Bongiovanni and Gerace, and to obstruct investigation into their criminal conduct and the extent and nature of their relationship.

Accordingly, virtually every charge in the Second Superseding Indictment is integrally related and connected to one another, and the proof of each count involves substantial

overlap. A severance would result in the government, parties, witnesses, and the Court conducting two nearly identical and lengthy trials. As explained fully below, Bongiovanni has failed to establish that severance is warranted.

## II.   <u>ARGUMENT</u>

Defendant Bongiovanni's new severance motion[2] (*see* Doc. No. 343) alleges, in conclusory fashion, that severance is required because Count 9 is mis-joined and prejudicial to defendant Bongiovanni. Bongiovanni further argues that the Court should sever all counts pursuant to Rule 14(a) so that Bongiovanni could call Gerace as a witness to purportedly offer exculpatory testimony on Bongiovanni's behalf. Defendant Bongiovanni's motion lacks merit and should be denied.

### A.   **The Governing Law**

There is a strong preference in favor of joint trials in federal court. Joint trials "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused to come to trial." *Bruton v. United States*, 391 U.S. 123, 134 (1968). Joint trials also "serve the interests of justice by avoiding the scandal and inequity of

---

[2] Defendant Bongiovanni has moved previously (*see* Doc. No. 149) for severance regarding Counts 7 and 9, and the government previously responded (*see* Doc. No. 177). The government's prior severance response is incorporated herein by reference as though set forth fully herein. The defendant's "new" severance motion apparently abandons prior claims that joinder of Count 7 requires severance and therefore this response focuses upon the defendant's arguments regarding Count 9. Nevertheless, the analysis that should compel this Court to deny severance, whether predicated upon claimed misjoinder of Count 7, or of Count 9, is essentially the same.

inconsistent verdicts." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987).  In *Marsh*, the Supreme

Court elaborated upon the efficacy of joint trials, as follows:

> It would impair both the efficacy and the fairness of the criminal justice system
> to require […] that prosecutors bring separate proceedings, presenting the same
> evidence again and again, requiring victims and witnesses to repeat the
> inconvenience (and sometimes trauma) of testifying, and randomly favoring
> the last-tried defendants who have the advantage of knowing the prosecutor's
> case beforehand. Joint trials generally serve the interests of justice by avoiding
> inconsistent verdicts and enabling more accurate assessment of relative
> culpability – advantages which sometimes operate to a defendant's benefit.

481 U.S. at 210.

Federal Rule of Criminal Procedure 8(a) permits joinder of offenses against a single

defendant when (1) they are based on the same act or transaction, or (2) based on two or more

acts or transactions connected together or constituting part of a common scheme or plan, or

(3) of the same or similar character.  *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).

Joinder is proper where the same evidence may be used to prove each count.  *United States v.

Blakney*, 941 F.2d 114, 116 (2d Cir. 1991).

Joinder of offenses in multiple defendant cases is dictated by Rule 8(b).  *United States

v. Jones*, 880 F.2d 55, 61 (8th Cir. 1989).  "Joint trials play a critical role in the criminal justice

system."  *Richardson*, 481 U.S. at 209.  Federal Rule of Criminal Procedure 8(b) provides:

> [An] indictment or information may charge 2 or more defendants if they are
> alleged to have participated in the same act or transaction, or in the same series
> of acts or transactions, constituting an offense or offenses. The defendants may
> be charged in one or more counts together or separately. All defendants need
> not be charged in each count.

A non-frivolous conspiracy charge is sufficient to support joinder of the defendants.

*United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1990).  Even if the defendant is not alleged

to be part of a single conspiracy, joinder is proper if a count with which the defendant is charged is integrally related to a conspiracy charge. *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir. 1990). In the Second Circuit, "the same series of acts or transactions" includes criminal acts between two or more individuals that "are unified by some substantial identity of facts or participants or arise out of a common plan or scheme." *United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (internal quotations omitted).

Claims of prejudicial joinder are dealt with in Rule 14 of the Federal Rules of Criminal Procedure. Severance motions should be granted only where joinder presents a serious risk that a specific trial right of a defendant would be compromised or when the jury would be prevented from making a reliable judgment. *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Unless there has been misjoinder, a defendant must show that prejudice from a joint trial is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials. *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998). In other words, once a defendant has been properly joined, severance should be granted only where "the prejudice resulting from a joint trial would be so severe to amount to a miscarriage of justice and the denial of a constitutional fair trial." *United States v. Lockwood*, 2012 U.S. Dist. LEXIS 176208, at *10 (W.D.N.Y. Dec. 12, 2012) (citing *United States v. Spinelli*, 352 F. 3d 48, 55 (2d Cir. 2003)).

## B.   Defendant's Misjoinder Claim Lacks Merit

Defendant Bongiovanni is charged in two non-frivolous conspiracy counts (Counts 2 and 8) with co-defendant Gerace. As set forth above, each of the non-conspiracy charges

pending against defendant Bongiovanni and co-defendant Gerace are integrally related to the conspiracy charges.  Furthermore, each of the charges against defendant Bongiovanni and co-defendant Gerace involve criminal acts that "are unified by some substantial identity of facts or participants or arise out of a common plan or scheme."  *Rittweger*, 524 F.3d at 177.  Indeed, Bongiovanni and Gerace conspired to defraud the United States (*see* Count 2), and to distribute controlled substances (*see* Count 8), by Bongiovanni's agreement to help Gerace to conceal and continue his criminal activity, as opportunities arose and in exchange for bribes (*see* Counts 5–6).  All other conduct involving Bongiovanni and Gerace, including Gerace's sex trafficking conspiracy (Count 9), flowed from and is integrally intertwined with the charged conspiracies.  The preference for joint trials is particularly strong where, as here, the defendants have participated in a common plan or scheme.  *See United States v. Rivera*, 273 Fed. Appx. 55, 57 (2d Cir. 2008); (quoting *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998).

Here, defendant Bongiovanni offers one inaccurate conclusory sentence in support of his misjoinder argument: "Count 9 is unrelated to the other conspiracies in which it is alleged that [the defendants] participated."  *See* Doc. No. 343 at 4.  Defendant Bongiovanni's conclusory motion fails to grapple with the allegations of the indictment and the plainly apparent interconnectivity amongst the charges and the defendants.  Defendant Bongiovanni fails to identify how he has been misjoined with co-defendant Gerace, or how *a specific trial right* of defendant Bongiovanni will be *substantially prejudiced* by a joint trial.

Defendant Bongiovanni cannot make the requisite showing to establish misjoinder

because, as the Second Superseding Indictment establishes, defendant Bongiovanni and co-defendant Gerace are jointly charged in a conspiracy to defraud the United States and a narcotics conspiracy, and those conspiracies are intertwined with the bribery, sex trafficking conspiracy, maintaining of PGC as a drug premises, obstruction of justice, and false statements charges. As an example of the interconnectivity amongst the charges and the corresponding proof at trial, a sole trial of Bongiovanni, or a joint trial of Bongiovanni and Gerace, would include testimony from female PGC dancers and employees about dancers overdosing on drugs and the manner in which dancers were coerced to engage in commercial sex acts during the timeframe within which Bongiovanni was protecting Gerace and PGC in exchange for bribes. Specifically, one piece of anticipated testimony includes evidence from a former PGC dancer who will say, in sum and substance, that she previously overdosed at PGC, and that she also once woke up in a hotel near PGC and did not know how she arrived there. It is also anticipated that another PGC employee will testify the employee was once instructed by defendant Gerace to take a dancer who overdosed at PGC to a nearby hotel.[3] Moreover, several witnesses will testify, in sum and substance, that it was known at PGC that they should not call the police unless it was unavoidable, and that several dancers have overdosed on drugs while at PGC, including when Gerace was present. Furthermore, a former co-worker of defendant Bongiovanni will testify that Bongiovanni told his co-worker, in sum and substance, that Gerace called Bongiovanni and told Bongiovanni that a stripper overdosed on drugs at PGC and that Bongiovanni advised Gerace to "get her out" of PGC.[4]

---

[3] There are many hotels near PGC, which is not far from the Buffalo Niagara International Airport.

[4] It is anticipated that there will be testimony about several dancers overdosing on drugs at PGC.

The government submits that the evidence will show that one of the ways in which PGC dancers were coerced into engaging in commercial sex acts was through their drug addictions, that is, they were provided drugs to fuel their addictions and were thereby coerced into having sex with Gerace and/or certain people close to Gerace. Coercion under the sex trafficking conspiracy statute means, in part, that the defendant engaged in a course of behavior intended to cause the victims to believe that if she did not engage in a commercial sex act as directed by the defendant, the victims or their families would suffer serious harm. *See* 18 U.S.C. § 1591(e). Fear of severe withdrawal symptoms from narcotics addiction meets the definition of serious harm under the statute. *United States v. Mack*, 808 F.3d 1074, 1081–82 (6th Cir. 2015). Thus, defendant Bongiovanni's protection of Gerace and PGC from federal investigation, which facilitated narcotics use and distribution at PGC, furthered co-defendant Gerace's ability to conspire to engage in the sex trafficking of women.

Additionally, Bongiovanni's relationship with Gerace; the efforts Bongiovanni made to protect and shield Gerace and PGC from investigation; the background, formation, and contours of the narcotics conspiracy and conspiracy to defraud the United States; the drug possession, use, and drug distribution by Gerace and others at PGC (which included distribution to dancers who committed commercial sex acts in exchange for drugs and/or currency), are all relevant and admissible at either a single-defendant trial of Bongiovanni, or a joint trial with both defendants. Evidence related to the background of the conspiracy, illegal relationship between the participants, or to explain mutual trust that existed between co-conspirators is admissible at trial. *See United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993).

When the foregoing is considered in light of allegations contained in the Second Superseding Indictment, including, for example, Count 2, Overt Act 26, which alleges: "[O]n a date unknown to the Grand Jury, in response to a telephone call from defendant Gerace after a stripper overdosed on drugs at Pharaoh's in Cheektowaga, New York, the defendant **BONGIOVANNI** advised the defendant **GERACE** to 'get her out' of the gentlemen's club[,]" it is clear that the proof against Bongiovanni and Gerace overlaps significantly. Accordingly, the joined counts are integrally related to the conspiracies in which the defendants are charged, and joinder is proper. *See Cervone*, 907 F.2d at 341.

Here, Bongiovanni has not met this heavy burden and has failed to show that any prejudice from a joint trial is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials. *See United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998). Prejudice is informed by the crimes with which the defendant has been charged. *See United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *United States v. Sanpedro*, 352 Fed. Appx. 482, 485 (2d Cir. 2009). The very serious charges Bongiovanni faces as a result of violating his oath and duties as a DEA special agent seriously mitigate any prejudice to Bongiovanni as a result of the inclusion of Count 9 in a joint trial with Gerace. Thus, when combined with appropriate limiting and jury instructions, a joint trial will not substantially prejudice any of Bongiovanni's specific trial rights. *United States v. Villegas*, 899 F.2d 1324, 1347 (2d Cir. 1990) (relevant factors in assessing spillover prejudice include the extent to which evidence at a joint trial would be admitted at a single defendant trial, and whether the jury is instructed to assess the evidence against each defendant separately); *Salameh*, 152 F.3d at 116; *see also United States v. Carson*, 702 F.2d 351, 366-367 (2d Cir. 1983)

("[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials"); *United States v. DeVillio*, 983 F.2d 1185, 1192–93 (2d Cir. 1993) (finding an "explicit limiting instruction" not to consider evidence adequately reduced risk of prejudice and did not require severance); *United States v. Losada*, 674 F.2d 167, 171 (2d Cir. 1982) (endorsing jury instructions "to consider the evidence separately with respect to each defendant" as sufficient means to reduce prejudice). Bongiovanni has made no showing that a properly instructed jury will be unable to follow instructions and consider each count and each defendant separately, and there is no basis to conclude defendant Bongiovanni will suffer substantial prejudice of a specific trial right during a joint trial.  And "[i]t is well settled that [a defendant is not] entitled to severance merely because [he] may have a better chance of acquittal in separate trials."  *Zafiro*, 506 U.S. at 540.

In sum, Bongiovanni has not carried, and cannot carry, his heavy burden to establish that *substantial prejudice* would result from a joint trial sufficient to overcome the Supreme Court's preference that individuals who are indicted together, be tried together, s*ee id*. at 537, and his motion for severance should be denied.

## C.      Defendant Bongiovanni's Claim that Severance is Required to Permit Co-defendant Gerace to Testify Lacks Merit

Defendant Bongiovanni also argues that he should be severed from all counts in which he is charged with co-defendant Gerace because Bongiovanni purportedly "wishes to offer exculpatory testimony" from co-defendant Gerace on Bongiovanni's behalf.  *See* Doc. No. 343 at 5.  Co-defendant Gerace purports to be willing to testify on defendant Bongiovanni's behalf if the defendants' trials are severed and, significantly, if co-defendant Gerace is tried

12

first.  *See* Doc. No. 362 at 2–3.  Co-defendant Gerace claims he will be the only person able to provide, in his words, "exculpatory" evidence about (1) the relationship between the defendants during the pertinent period of time, and (2) a general denial that he or Bongiovanni committed the criminal acts with which they are jointly charged.  *See id.* at 3.  Neither Bongiovanni in his motion, nor Gerace in his affidavit, offer any *specific* information about the purported "exculpatory testimony" Gerace would offer on Bongiovanni's behalf.

In deciding whether to grant severance based on the defendant's purported need to call a co-defendant, a district court should consider "(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment."  *United States v. Finkelstein*, 526 F.2d 517, 523–24 (2d Cir. 1975).

For the reasons set forth below, Bongiovanni's motion to sever pursuant to Rule 14(a) premised on the need to call co-defendant Gerace as a witness fails to establish that the *Finkelstein* factors weigh in favor of severance.  His motion lacks merit and should be denied.

### 1.     The Representation that Gerace would Testify is Insufficient.

As to the first *Finkelstein* factor, defendant Bongiovanni has presented only a generic, self-serving affidavit from co-defendant Gerace claiming that Gerace will testify on Bongiovanni's behalf if Gerace is tried first.  *See* Doc. No. 362 at 2–3.  "Self-serving, conclusory statements that exculpatory witnesses will not testify at a joint trial are not

adequate to compel severance." *United States v. Bari*, 750 F.2d 1169, 1177 (2d Cir. 1984).

Typically, when claiming a co-defendant will only testify at a severed trial, courts receive

affidavits of the co-defendants who intend to provide exculpating testimony. *See, e.g.*, *United*

*States v. Gullo*, 672 F. Supp. 99, 106 (W.D.N.Y. 1987) (Elfvin, J.).  Even when such an affidavit

is presented, a district court is well within its right to find that the affidavit is insufficient to

establish that the co-defendant would testify and waive his Fifth Amendment right at a

severed trial.  *See, e.g.*, *United States v. Freedman*, 317 Fed. Appx. 22, 25–26 (2d Cir. 2008)

(holding district court exercised "sound discretion" in finding that there was reason to doubt

co-defendant would "make good on his promise to testify" despite the co-defendant's affidavit

purporting that he would testify).  A court should question the candor of a co-defendant's

purported willingness to testify only at a severed trial when the co-defendant has not indicated

any intention of pleading guilty or waiving his Fifth Amendment rights.  *See Finkelstein*, 526

F.2d at 524 (observing that it would be "unrealistic to think a co-defendant would be willing

to waive his constitutional privilege against self-incrimination when called as a witness at a

separate trial than he would be willing to insist upon his privilege as a defendant not to take

the stand"); *United States v. Levy*, No. S5 11 Cr. 62(PAC), 2013 WL 787913, at *1 (S.D.N.Y.

Mar. 4, 2013) (finding co-defendant's representations that he would testify on behalf of

defendant at a severed trial to be "weakened" because the co-defendant "ha[d] not otherwise

indicated any intention of pleading guilty or otherwise waiving his Fifth Amendment right

against self-incrimination, and it is doubtful whether he would be more willing to do so at a

separate trial."); *United States v. Shteyman*, No. 10 CR 347(SJ), 2011 WL 2006291, at *12

(E.D.N.Y. May 23, 2011) (finding representation that co-defendant would testify to be

"insufficient" when co-defendant had not made any indication that he would plead guilty or waive his Fifth Amendment rights).

Additionally, a co-defendant's purported willingness to testify for a defendant at a severed trial only if the co-defendant's trial occurs first "smacks of bad faith." *Bari*, 750 F.2d at 1177 ("We think it unlikely that Daniel's co-defendants would actually testify at a separate trial. The offers to testify were expressly conditioned on Daniel being tried last, a condition which smacks of bad faith."); *see also United States v. Standard Drywall Corp.*, 617 F. Supp. 1283, 1298 (E.D.N.Y. 1985) (finding that the first *Finkelstein* factor did not weigh in favor of severance and noting that it is "significant" that the co-defendant's offer to testify on behalf of the defendant was conditioned on the co-defendant being tried first).  Courts have also held that a co-defendant's willingness to testify for the defendant only if tried first is "speculative" because the co-defendant may still have an interest in invoking the Fifth Amendment after his trial is over.  *See United States v. Schlegel*, No. 06-CR-0550 (JS), 2009 WL 3837305, at *2 (E.D.N.Y. Nov. 16, 2009) ("This argument is premised on an unfounded claim that Hatfield would no longer have any Fifth Amendment concerns if her trial proceeded first. Clearly, such an argument is incorrect."); *United States v. Triumph Capital Group, Inc.*, 260 F. Supp. 2d 432, 443 (D. Conn. 2002) (noting that codefendant's Fifth Amendment concerns would continue after his trial, particularly if the co-defendant "[was] convicted in [an] earlier trial and had a motion or appeal pending that challenged his conviction and could result in a new trial.")

Contrary to co-defendant Gerace's representations in his affidavit, the government submits that Gerace will not testify on Bongiovanni's behalf.  Rather, Gerace's affidavit is littered with indicators that his offer to testify for Bongiovanni only at a severed trial is a ploy to, amongst other things, achieve a goal Gerace has long sought—severance from Bongiovanni.  *See, e.g.*, Doc. No. 321 (Gerace's most recent motion for severance); *see also United States v. Wilson,* 11 F.3d 346, 354 (2d Cir. 1993) (noting that the district court did not abuse its discretion where it found that, since the purported co-defendant witness had not pleaded guilty, "it was unrealistic to think" said witness would be any more willing to waive his privilege at a separate trial than at the joint trial, and further determining that the "willingness to testify was a "last-minute ploy[.]"); *see also  United States v. Ferrarini*, 9 F. Supp. 2d 284, 293 (S.D.N.Y. 1998) (noting there is no reason to believe that any of these defendants would be "any more willing to waive his privilege [against self-incrimination] at a separate trial than at the joint trial.") (citation omitted).  In other words, Gerace's affidavit is nothing more than a tactic designed to orchestrate a severance only after obtaining the government's agreement to provide early disclosure of *Jencks* material.  Additionally, orchestrating a severance, particularly under circumstances wherein the government has agreed to produce *Jencks* materials early, would create a situation ripe for witness tampering.

Based on the pertinent law described above regarding the first *Finkelstein* factor, there are three reasons this Court should consider Gerace's offer to testify for Bongiovanni to be insincere, unpersuasive, and nothing more than a ploy.  First, Gerace has made no indication that he intends to plead guilty or otherwise take responsibility for his crimes.  As the *Finkelstein* court noted, it would be "unrealistic" to think a defendant who had no intention of pleading

16

guilty would waive his own right against self-incrimination purely to benefit another defendant.   *See* 526 F.2d at 524.   Second, Gerace has made the same conditional representation about his willingness to testify for Bongiovanni only if he is tried first that the Second Circuit said "smacks of bad faith."   *See Bari*, 750 F.2d at 1177; Doc. No. 362 at 3.[5] Third, Gerace clearly found it unnecessary to be thorough or precise about what specifically he could testify to on behalf of Bongiovanni.   Gerace indicated that the testimony he can offer on behalf of Bongiovanni is testimony concerning their relationship and a blanket denial that he and Bongiovanni engaged in criminal wrongdoing.   *See* Doc. No. 362 at 3.   These representations are completely conclusory, self-serving, and generic.   If Gerace were truly serious about being willing to take the grave step of waiving his Fifth Amendment privilege purely for the benefit of Bongiovanni, the Court should expect that Gerace and his counsel would have considered and identified specific, meaningful testimony that Gerace, and only Gerace, could offer for Bongiovanni.   Instead, Gerace makes insincerely generic claims about what his purported testimony will be.   Gerace's claim that he will testify at a severed trial is disingenuous.

Indeed, if the Court grants a severance, and then at trial Gerace refuses to testify despite his stated willingness to do so, there is no recourse.   Neither the Court nor the

---

[5] Should the Court choose to sever the trials, the government will argue that it is within the government's discretion to request to try defendant Bongiovanni first.   The grand jury returned the initial Indictment against defendant Bongiovanni nearly eighteen months prior to the return of the Second Superseding Indictment against co-defendant Gerace.   The Second Circuit has previously noted that a defendant has "no discernible right" to proceed to trial in his preferred order.   *See United States v. Arrington*, 941 F.3d 24, 42 (2d Cir. 2019) (citing *Zafiro*, 506 U.S. at 539–40).   Given that defendant Bongiovanni was the first defendant indicted in this case, equitable considerations should dictate that Bongiovanni be tried first.

government could force Gerace to testify, and the Court would be unable to "rejoin" the defendants mid-trial.  *See Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (holding that a defendant's Fifth Amendment privilege continues after he has been convicted); *see also United States v. Balsys*, 119 F.3d 122, 139 (2d Cir. 1997) (holding that "a waiver of the privilege in one proceeding does not affect the rights of a witness or the accused in another independent proceeding.").  While the Court may be able to apply an obstruction of justice enhancement to Gerace at sentencing for submitting a false affidavit stating that he would testify at a severed trial, any such sanction would be meaningless because, if Gerace is convicted of all charges at trial, Gerace will be facing a potential life sentence regardless of a two-level obstruction enhancement on the sentencing guidelines.[6]  In *Finkelstein* itself, the court noted that where a defendant had not pleaded guilty, it was unrealistic to think that he "would be more willing to waive his constitutional privilege against self-incrimination when called as a witness at a separate trial than he would be willing to insist upon his privilege as a defendant not to take the stand."  526 F.2d at 524.

Accordingly, the first *Finkelstein* factor weighs heavily in favor of denying the defendant's motion for severance, and in favor of the Supreme Court's preference for joint trials.

---

[6] This Court should view any representation by Gerace about what he will do with a high degree of skepticism.  Not only is he facing the potential of life imprisonment, but he is a convicted federal felon whose prior case involved defrauding victims in a telemarketing scheme.  Then, while on supervised release based upon that conviction, he lied to U.S. Probation about where he was working in violation of a condition set by United States District Court Judge William M. Skretny.  Next, upon arrest in this case, he lied to U.S. Probation in Florida pertaining to drug use—he denied it—but a drug test revealed he had used cocaine.

2.      **Gerace's Testimony would be Cumulative.**

As to the second *Finkelstein* factor, Gerace's proposed testimony would be entirely cumulative and conclusory.  Testimony is considered cumulative under the second *Finkelstein* factor if that testimony can be provided by other witnesses, including by the defendant, himself.  *See United States v. Wilson*, 11 F.3d 346, 354 (2d Cir. 1993) ("Hoyos' testimony would be cumulative, given that Romero could have called any number of witnesses, including himself[.]"); *United States v. Attanasio*, 870 F.2d 809, 815 n.3 (2d Cir.1989) (deciding on other grounds, but noting that it would have affirmed a decision denying a motion for severance because the district court had appropriately found that the exculpatory testimony was available from other sources, and thus, would have been cumulative).  In *Levy*, the court found that the co-defendant's proposed testimony of conversations he had privately with the defendant would have been cumulative under *Finkelstein* because the defendant, herself, could have testified to those conversations.  *Levy*, 2013 WL 787913, at *2.  The Second Circuit has also expressed skepticism about a court being able to meaningfully evaluate the importance of a co-defendant's proposed testimony when the description of the proposed testimony is generic and conclusory.  *See Bari*, 750 F.2d at 1177–78.

Gerace's affidavit first claims, in generic fashion, that he is the only person who can testify about his relationship with Bongiovanni during the pertinent period.  *See* Doc. No. 362 at 3.  Gerace's claim is patently false, and the proposed testimony is entirely cumulative.  The government's proof will establish a long-standing relationship between Bongiovanni and Gerace.  The government's proof will consist of, among other things, testimony, photos, phone records, and documents.  There is no shortage of people—not named Peter Gerace—

that Bongiovanni can call who could testify as to the relationship between the two defendants. For example, the below photo, which will be introduced by the government at trial in unredacted format, depicts six other people who were at Cirque Du Soleil in Las Vegas on June 25, 2011, and who could be called by Bongiovanni to testify as to the nature of the relationship between Bongiovanni and Gerace.



*See* Doc. No. 177-1.   Another photo, which will be introduced by the government in unredacted format at trial, depicts Bongiovanni and Gerace together at a cottage in or about July 2018, as follows:



Similar to the Cirque Du Soleil photo, there are twelve other people depicted in the above photo who potentially could be called as a witness by Bongiovanni to testify as to the relationship between Bongiovanni and Gerace.  Bongiovanni will have the opportunity to cross examine government witnesses who testify about the relationship between the defendants.  And to the extent cross examination fails to provide a satisfactory picture of the relationship between Bongiovanni and Gerace, Bongiovanni can call any number of witnesses, including spouses, parents, and mutual friends, or testify, himself.  Accordingly, any testimony by Gerace as to the duration and nature of his relationship with Bongiovanni would be cumulative of the volumes of other evidence the government will introduce at trial and that Bongiovanni could introduce during his case-in-chief.

Next, Gerace's affidavit claims, in conclusory fashion, that he is the only person who can testify that "I did not offer or pay directly or indirectly to him anything of value for any reason or purpose, that we did not conspire to defraud the United States or conspire to distribute controlled substances, and that he and I did not engage in any other criminal behavior with or for each other."  Doc. No. 362 at 3.  These general denials of criminality are not only conclusory but entirely cumulative.  First, these general denials that track the language of the Second Superseding Indictment offer nothing more than a "not guilty" plea by Gerace.  Whether Gerace denies committing crimes on the stand or simply pleads not guilty, the government is still put to its burden in the same manner.  Gerace's proposed testimony does not offer anything new to the factfinder.  Additionally, to the extent Gerace proposes that he will testify that Bongiovanni did not engage in criminal activity, Bongiovanni can offer that same exact testimony, himself.  The *Finkelstein* court found "[w]hile the repetition of such testimony might have increased the likelihood that it would be believed, the fact remains that the expected testimony [ ] would have been almost entirely cumulative." 526 F.2d 524.  Thus, even if Bongiovanni were to argue that Gerace could bolster Bongiovanni's own denial of wrongdoing, that proposed testimony would still be cumulative.

Accordingly, the second *Finkelstein* factor weighs heavily in favor of denying the defendant's motion for severance, and in favor of the Supreme Court's preference for joint trials.

### 3.    Gerace would be Subject to Substantial Impeachment.

Jumping to the fourth *Finkelstein* factor, co-defendant Gerace would face substantial impeachment evidence pursuant to Federal Rules of Evidence 608 and 609.  Rule 608(b)

allows cross-examination into "'specific instances of conduct" if the conduct is 'probative of [that witness's character for] truthfulness or untruthfulness.'" *United States v. Cedeno*, 644 F.3d 79, 82 (2d Cir. 2011). Additionally, felony convictions are admissible on cross-examination pursuant to Rule 609, subject to certain time limitations. *United States v. Sliker*, 751 F.2d 477, 495–96 (2d Cir. 1984) (observing that the fourth *Finklestein* factor weighed against the defendant wherein the purported co-defendant witness would have been subject to devastating impeachment based, in part, upon numerous prior arrests for fraud-related crimes). Gerace has a prior federal felony conviction for fraud based upon a telemarketing scheme, which is a crime of dishonesty. Specifically, on January 12, 2000, Gerace was indicted and charged with a violation of Title 18, United States Code, Section 371, which was a telemarketing fraud scheme involving dishonest acts supervised by Gerace. On November 23, 2005, Gerace pleaded guilty to telemarketing fraud and admitted, in part, that he was an "organizer, manager, and supervisor," of the criminal activity that involved making false statements to victims from a "pitch book" (i.e., advising victims of the likelihood they could receive a Cadillac or $5,000). *See* Case No. 00-CR-0009-WMS, Doc. No. 165 at ¶¶ 6-7.

Moreover, Gerace has a documented history of making false and misleading statements to U.S. Probation, both in the context of his prior federal case and upon arrest in Florida in this case. In particular, subsequently to his appearance before Magistrate Judge Valle (and subsequent to the government finalizing its recommendation), U.S. Probation learned that the defendant tested positive for cocaine. U.S. Probation Officer Assistant Andre McCray's March 4, 2021, Memorandum provided an update as follows:

> It is to be noted that the time of the defendant's initial drug test conducted in the Southern District of Florida, he tested positive for cocaine. Mr. Gerace

> reported taking some pills at a social gathering but, did not report cocaine use. At the time of the pretrial services interview, the defendant reported a history of cocaine use, with his last date of use being approximately one and a half years ago.

*See* Doc. Nos. 110, 110-3.

Other areas of impeachment include, but are not limited to, Gerace's lengthy history of drug use.  U.S. Probation has documented Gerace's history of cocaine use in the context of his prior federal case, and upon arrest in this case.  Moreover, Gerace's prior business partner in PGC (although Gerace's parents were "on paper" as the owners) filed a civil lawsuit and, during the course of the litigation, alleged, in part, that Gerace used and allowed others to use cocaine at PGC.  The impeachment of Gerace by virtue of his drug use only becomes more potent when considered in conjunction with Gerace's claim that he will testify that he did not conspire to distribute controlled substances, and that he did not engage in any other criminal behavior with or for Bongiovanni.  *See* Doc. No. 362 at 3.  Finally, as a charged defendant in this case, Gerace's bias would subject him to withering cross-examination.

Accordingly, the fourth *Finkelstein* factor weighs heavily in favor of denying the defendant's motion for severance and in favor of the Supreme Court's preference for joint trials.

4.   **Severance would not Serve the Interests of Judicial Economy and would Create Substantial Hardship for Witnesses, Victims, the Court, and the Government.**

Finally, in assessing the third *Finkelstein* factor, the efficiency prong, severing Bongiovanni from Gerace would create immense inefficiencies.[7]   The government has previously indicated that its witness list may consist of upwards of 100 witnesses or more, and that the government's case alone could last between eight to twelve weeks.   A severance would require dozens of witnesses to be called to testify twice to the same facts.   Additionally, substantial government manpower and resources would be expended in arranging travel for witnesses on multiple occasions, serving multiple rounds of subpoenas, and other logistical expenses.

A severance would also create a tactical advantage for the last tried defendant and would expose witness names for a lengthy period of time, which would exacerbate concerns that witnesses could be influenced, or tampered with.   *See United States v. Moses*, 19-CR-6074 (EAW), 2020 WL 289281, at *5 (W.D.N.Y. Jan. 21, 2020) (stating that joint trials avoid "victims and witnesses having to testify repeatedly" and "favoring the 'last-tried defendants who have the advantage of knowing the prosecutor's case beforehand") (citing *Richardson v. Marsh*, 481 U.S. 200, 210 (1987).

In addition to the prosecutorial and law enforcement resources that would be sacrificed, the public would be called to serve as jurors on multiple occasions, and the Court

---

[7] The government also adopts this argument in relation to the defendant's misjoinder and prejudicial spillover claim, as the reasoning remains the same.

would waste precious time and resources.  Indeed, two trials of this length would tie this Court, and its staff, up for six months or longer—impacting other criminal defendants, some of whom may be detained.  Courts can hardly afford to lose valuable time on the heels of and in the midst of a global pandemic.  In all, it "takes no mental calisthenics to see that the only reward for further slicing this case into even more trials is diminishing returns to efficiency, and a waste of judicial resources." *Shteyman*, 2011 WL 2006291, at *12.  Even if Gerace could offer some non-cumulative and slightly exculpatory testimony on Bongiovanni's behalf, the purported exculpatory value of any such testimony would be vastly outweighed by requiring the government, witnesses, victims, the court, and the public to endure two lengthy and complex trials.  *United States v. Ferguson*, 653 F.3d 61, 87–88 (2d Cir.), *opinion amended and superseded*, 676 F.3d 260 (2d Cir. 2011) (denying severance and noting "that the exculpatory value of the statement would be hugely outweighed by staging another multi-week trial (with another potential appeal).").

Accordingly, the third *Finkelstein* factor weighs heavily in favor of denying the defendant's motion for severance and in favor of the Supreme Court's preference for joint trials.

In summary, Bongiovanni's speculative and conclusory allegations are wholly insufficient to sustain his heavy burden in gaining a severance in this matter.  *See United States v. Ventura*, 724 F.2d 305, 312 (2d Cir. 1983) (where "defendants . . . are jointly indicted [they] should be jointly tried").  For these reasons, the motion to sever, pursuant to Rule 14, should be denied.

## CONCLUSION

The government respectfully requests that the Court deny defendant Bongiovanni's motion for severance.

DATED:  Buffalo, New York, January 27, 2023.


COREY R. AMUNDSON                    TRINI E. ROSS
Chief, Public Integrity Section      United States Attorney
U.S. Department of Justice            Western District of New York


BY:   s/JORDAN DICKSON          BY:   s/JOSEPH M. TRIPI
      Trial Attorney                  Assistant United States Attorney
      Public Integrity Section        Western District of New York
      U.S. Department of Justice      138 Delaware Avenue
      Criminal Division               Buffalo, New York 14202
      1301 New York Ave. NW, Suite 1000   716-843-5839
      Washington, D.C. 20530          Joseph.Tripi@usdoj.gov
      202-597-0508
      Jordan.Dickson@usdoj.gov  BY:   s/DAVID J. RUDROFF
                                      Assistant United States Attorney
                                      United States Attorney's Office
                                      Western District of New York
                                      138 Delaware Avenue
                                      Buffalo, New York  14202
                                      716-843-5806
                                      David.Rudroff@usdoj.gov

                                BY:   s/NICHOLAS T. COOPER
                                      Assistant United States Attorney
                                      United States Attorney's Office
                                      Western District of New York
                                      138 Delaware Avenue
                                      Buffalo, New York  14202
                                      716-843-5830
                                      Nicholas.Cooper@usdoj.gov