# EXHIBIT B

```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK


    UNITED STATES OF AMERICA,    *       Docket No.
                                 *       1:23-cr-00037-JLS-MJR-1
                                 *
                                 *       Buffalo, New York
                  v.             *       March 27, 2023
                                 *       1:36 p.m.
                                 *
    PETER GERACE, JR.,           *       DETENTION HEARING
                                         CONTINUATION
                                 *
             Defendant (1). *
                                 *
    *  *  *  *  *  *  *  *  *  *  *  *  *  *


                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JOHN L. SINATRA, JR.
                 UNITED STATES DISTRICT JUDGE



APPEARANCES:


For the Government:              TRINI E. ROSS,
                                 UNITED STATES ATTORNEY,
                                 By DAVID RUDROFF, ESQ.,
                                    JOSEPH M. TRIPI, ESQ.,
                                    NICHOLAS COOPER, ESQ.,
                                 Assistant United States Attorneys,
                                 Federal Centre,
                                 138 Delaware Avenue,
                                 Buffalo, New York  14202,
                                 Appearing for the United States
                                 And
                                 JORDAN ALAN DICKSON, ESQ.,
                                 U.S. Department of Justice,
                                 Criminal Division,
                                 Public Integrity Section,
                                 1331 F Street NW,
                                 Washington, DC  20004.
```

```
 1   For the Defendant:           LIPPES MATHIAS WEXLER FRIEDMAN, LLP,
                                  By ERIC M. SOEHNLEIN,  ESQ.,
 2                                50 Fountain Plaza,
                                  Suite 1700,
 3                                Buffalo, New York  14202
                                  And
 4                                TIVERON LAW, PLLC,
                                  By STEVEN M. COHEN, ESQ.,
 5                                   TYLER J. ECKERT, ESQ.,
                                  2410 North Forest Road,
 6                                Suite 301,
                                  Getzville, New York  14068.
 7

 8   The Courtroom Deputy:        KIRSTIE L. HENRY

 9
     The Court Reporter:          BONNIE S. WEBER,
10                                Notary Public,
                                  Robert H. Jackson Courthouse,
11                                2 Niagara Square,
                                  Buffalo, New York  14202,
12                                Bonnie_Weber@nywd.uscourts.gov.

13
                  Proceedings recorded by mechanical stenography,
14                      transcript produced by computer.

15

16                  (Proceedings commenced at 1:36 p.m.)

17

18           THE CLERK:  All rise.

19           The United States District Court for the Western

20   District of New York is now in session.  The Honorable

21   John Sinatra presiding.

22           THE COURT:  Please be seated.

23           THE CLERK:  The Court advises parties and listeners

24   that they are strictly prohibited from recording these

25   proceedings in whole or in part by any device.
```

 1              In United States versus Peter Gerace, Jr., case number

 2    23-CR-37, we're here for a continuation of a detention hearing.

 3              Counsel, please state your appearances for the record.

 4         **MR. TRIPI:**  Joseph Tripi, David Rudroff, and

 5    Nicholas Cooper for the United States.  Good afternoon,

 6    Your Honor.

 7         **MR. SOEHNLEIN:**  Good afternoon, Your Honor.

 8    Eric Soehnlein for Mr. Gerace.

 9         **MR. COHEN:**  Good afternoon, Your Honor.

10    Steven M. Cohen and Tyler Eckert for Mr. Gerace.

11         **THE COURT:**  Okay.  Good afternoon, Counsel.  Good

12    afternoon, Mr. Gerace.

13              Did I miss somebody who needed to make an appearance?

14         **MR. HARRINGTON:**  James Harrington.  I'm here just

15    observing.

16         **THE COURT:**  Okay.  All right.  Just pick a better

17    seat, Mr. Harrington?  That's all?  Did you just pick a better

18    seat?

19         **MR. HARRINGTON:**  Yep.

20         **THE COURT:**  Got it.  All right.

21              So we're going to pick up where we left off on Friday

22    in this detention hearing.

23              And, Mr. Tripi, have you supplied the loan documents

24    to Mr. Soehnlein?

25         **MR. TRIPI:**  Yes, we did.

1      **THE COURT:**  Okay.  Is there anything I need to know

2  further on those loan documents from you, Mr. Tripi, or you,

3  Mr. Soehnlein?

4      **MR. TRIPI:**  Not from us.  If you have anything from

5  Mr. Soehnlein, I would like an opportunity to briefly respond.

6      **MR. SOEHNLEIN:**  Well, Your Honor, this is the

7  continuation of the detention hearing.  And with reflection, we

8  have a lot to say.

9      With respect to the loan documents, Your Honor, there

10  is a number of factors that the Court needs to consider, but I

11  think they demonstrate more of history of compliance than they

12  do any effort to not comply with the law or not to comply with

13  supervised release.

14      As Your Honor may understand, the EIDL program was

15  part of the Federal Government's COVID outreach program -- part

16  of the COVID Assistance Program.

17      Mr. Gerace, like many other business owners, was

18  solicited by a private bank to apply for that.  Mr. Gerace

19  worked with that institution to fill out the application.

20      He worked with his accountant.  He worked with a loan

21  broker through that institution.  He didn't fill out any of the

22  applications on his own, Your Honor.  That was the initial

23  application.

24      Over time, as the program became reauthorized,

25  Mr. Gerace also engaged the help of HoganWillig Law Firm.  And

1   that law firm, at times, assisted him in preparing the

2   applications.

3          The actual questions on the applications, Your Honor

4   -- and I can't emphasize enough that this is an online

5   application; this is not a paper application, okay.

6          And I also can't emphasize enough that this is a COVID

7   era program.  Meaning -- I don't want to say things are the Wild

8   West, but things are not necessarily well understood.

9          The questions with respect to whether or not his

10  business would have had to tick a box because it was sexual

11  nature, things like that; Mr. Gerace has a good faith basis to

12  believe he didn't have to click that box.

13         Both by the volume of sales -- because most of the

14  revenue from his business doesn't come from dances or things of

15  that nature, and also in understanding from the loan officers

16  and other professionals that he had engaged to fill out that

17  application.

18         With respect to the felony conviction, it's

19  Mr. Gerace's belief that he only had to check that box if the

20  felony was in the last ten years, and at the time that he was

21  filling out the application, it was not.

22         Once again, he has a good faith basis for relying on

23  the assistance of others, professionals, in that regard.

24         And finally, Your Honor, with respect to the

25  Government's point that somehow the PPP denial, you know, his --

1    Mr. Gerace's denial of the PPP loan should have played into the

2    EIDL process, that was not in any way communicated or consistent

3    with the advice that he got when he was applying.

4           So, Your Honor, with respect to those EIDL loans, to

5    the extent there is anything wrong with them, you know,

6    Mr. Gerace has a good faith basis for believing he did

7    everything right.

8           More importantly, Your Honor, this is not a grant;

9    this is a loan.  Mr. Gerace has been repaying it monthly with

10   interest.

11          There is no allegation that the money was used

12   improperly.  He continues to make payments every month.  He has

13   not heard from anybody, whether it be the SBA or the Department

14   of Justice or otherwise, before court on Friday, that there was

15   anything wrong with this application or the process that he

16   followed.

17          Your Honor, with reflection, we also have a number of

18   comments on other proof that was offered by the Government on

19   Friday.

20          Having had an opportunity to review it with

21   Mr. Gerace --

22          **THE COURT:**  Hold on there.  Let's do one topic at a

23   time.

24          So Mr. Tripi, regarding the loan applications, any

25   response?

1          **MR. TRIPI:**  Yes, Your Honor.  As I indicated on

2     Friday, there is an online application and all of Mr. Gerace's

3     information to include phone numbers; his e-mail address is

4     entered in there.

5          And the question asks:  Applicant does not present

6     live performances of a prurient sexual nature -- sexual nature

7     or derived directly or indirectly more than de minimis gross

8     revenue through the sales of products or services, or the

9     presentation of any depictions or displays of a prurient sexual

10    nature.

11         And that box is answered:  Yes.  In other words,

12    denying that he's involved in that business.

13         Now, all the information suggests Mr. Gerace filled

14    this out.  But if you have someone in your agency filling it out

15    for you, you are responsible for making sure that it's accurate.

16         So I guess that will be a defense for another day when

17    this case is charged, but from the bail report in this case,

18    Mr. Gerace reported, I think, making $45,000 a month.

19         So Pharaoh's was his employment.  He reported, I

20    think, making $45,000 a month as the hundred percent owner of

21    Pharaoh's.

22         And it's a strip club, so I don't understand how he

23    can answer "yes" to:  Applicant does not present live perform --

24    performances of a prurient sexual nature.

25         Now, then it gets on -- and if he would have checked

1  no, the online portal would not have allowed him to progress

2  with the application.

3          So if he acknowledged that that's what Pharaoh's was

4  about, he wouldn't have been able to proceed past that screen.

5          **MR. SOEHNLEIN:**  Your Honor, if I may be heard on that

6  point?

7          **THE COURT:**  One topic at a time, Mr. Soehnlein.  I'll

8  come back to you and give you the last word on it.

9          **MR. TRIPI:**  So then there is another question on

10  there:  Applicant is not engaged in illegal activity.  And he --

11  it's "yes".

12          We contend that that also was a false statement.  That

13  Pharaoh's was engaged in illegal activity, as reflected by the

14  indictment, that would have been returned some time after that.

15          But at the -- at the -- one of the last questions is

16  -- it's very clear -- not within the last ten years or -- it's

17  for any criminal offense:  Other than a minor vehicle violation,

18  have you ever -- so two words -- any and ever.

19          I mean, he went to St. Joe's, so he understands what

20  those words mean.

21          Any criminal offense:  Have you ever been convicted,

22  pled guilty, pled nolo contendere, been placed on pretrial

23  divergent, or been placed on any form of parole or probation.

24          It's "yes" to all of those things.  He was on

25  supervised release.  He was -- for his Federal conviction.  He

1    was on probation for his State assault conviction.

2            He was convicted of a State misdemeanor.  He was

3    convicted of a Federal felony, so all of those should have been

4    "yes".

5            And if he had someone filling out the form -- which, I

6    highly doubt -- for him, they are under the obligation to do it

7    accurately.

8            He's responsible, but -- see, in our responses we also

9    obtained documents regarding his communications with the SBA.

10   And it's Mr. Gerace, at his e-mail address, at yahoo.com,

11   e-mailing them.

12           It's Mr. Gerace, calling -- and we have their

13   communications -- about his loan.

14           It's on -- when he asks for -- in June -- June 10th,

15   he reaches out to them to check on the status of his April 5th,

16   2020 loan.

17           And there's notes in there.  So he's the one reaching

18   out, and then he's the one who signs the loan documents on

19   June 12th, 2020.

20           **THE COURT:**  Which statements -- in the meantime, while

21   we're waiting for the ELMO to boot up -- which statements,

22   Mr. Tripi, were made in July of 2021, after Mr. Gerace was on

23   pretrial release on the 19-CR case?

24           **MR. TRIPI:**  You want me to fast forward to 2021?

25           **THE COURT:**  Yes.

1    **MR. TRIPI:**  Yes.  So on August 7th, he signed a loan

2    modification to increase the loan.  So just real quick, before I

3    jump right to that --

4          **THE COURT:**  All right.

5          **MR. TRIPI:**  I'm showing you the document for the

6    June 12th application, which he signed it.  He's signing:  Peter

7    Gerace, owner/officer, June 12th.

8          Now, I'll fast forward to the 2021 --

9          **THE COURT:**  And for chronology's sake, Mr. Gerace is

10   arrested and put on pretrial release in the 19-CR case, when in

11   2021 -- March?

12         **MR. TRIPI:**  He was arrested -- the indictment was

13   returned, I believe, February 25th.  He was arrested by March

14   5th, 2021 and put on release conditions.

15         **THE COURT:**  All right.

16         **MR. TRIPI:**  All right.  So fast forwarding to the

17   August 7th.

18         So August 7th, he signs a loan modification, which I'm

19   putting up on the screen now.  "Peter Gerace", he signs it.

20         It says that the undersigned agrees to be bound by the

21   terms and conditions herein during the term of this loan, and

22   further agrees that no provision stated herein will be waived

23   without prior consent of the SBA.

24         In bold:  Under penalty of perjury of the United

25   States of America, I hereby certify that I am authorized to

1    apply for and obtain a disaster loan on behalf of borrower in

2    connection with the effects of the COVID-19 emergency.

3          It's signed by Peter Gerace in his personal capacity,

4    Pharaoh's GC, Inc.; August 7th, 2021.

5          By that point, he's been on pretrial conditions set by

6    a Florida magistrate judge and Judge Roemer for about five

7    months.  He's clearly indicted.

8          **THE COURT:**  And when are the denials of the

9    indictment, supervised release, parole, et cetera -- when are

10   those denials occurring?

11         **MR. TRIPI:**  Those denials occurred during the initial

12   application, but there is also in this loan document here, there

13   is a statement -- I just need to find it -- certifying that

14   all -- there's been no substantial adverse change in borrower's

15   financial condition since the date of the application of this

16   loan.

17         Adverse changes include, but are not limited to

18   judgment liens, tax liens, mechanics liens, bankruptcy,

19   financial reverses for arrest or conviction of a felony, et

20   cetera.

21         So here's the certification that precedes that suture

22   /THA*EUFPBLG that I just showed you.  And it reads, as I just

23   stated:  Borrower certifies that there has been no substantial

24   adverse change in borrower's financial condition -- I'm skipping

25   over the parens -- since the date of the application of this

1    loan -- which I stated previously was the April 5th, 2020 --

2    adverse changes include, but are not limited to judgment liens,

3    tax liens, mechanics leans, bankruptcy, financial reverses,

4    arrests, or conviction of felony, et cetera.

5            All representations in the borrower's loan

6    application -- and that would date back to the original

7    application -- including all supplementary submissions are true,

8    correct, and complete, and are offered to induce the SBA to make

9    this loan.

10           No claim or applications for any other compensation

11   for disaster losses has been submitted to or requested of any

12   source, and no such other compensation has been received, other

13   than that which borrower has fully disclosed to the SBA.

14           Now, we will have to look further into that, because

15   he was separately looking into PPP, so that might raise that --

16   that question as well.

17           **THE COURT:**  All right.  Let's wrap up on the --

18           **MR. TRIPI:**  On the loan?

19           **THE COURT:**  -- on the loan issue.  Anything else from

20   you, Mr. Tripi?

21           **MR. TRIPI:**  No, Judge.  I'll end it there.

22           **THE COURT:**  Mr. Soehnlein, last word on the loan

23   issue --

24           **MR. SOEHNLEIN:**  Unfortunately, it's going to be more

25   than a word, Your Honor.  I apologize, but I think I need to

1   make the record clear on this.

2          The loan application, Your Honor -- the original loan

3   application, it's done online.  Mr. Gerace is doing it in

4   consultation with other experts.

5          The reapplications come when the private bank that the

6   loan is made through solicit people like Mr. Gerace for

7   additional funds.

8          The additional funding comes so easily; it's click the

9   box.  It's check-the-box-type stuff.

10          Maybe, Your Honor, maybe Mr. Gerace missed something,

11   although we don't think he did, okay?  We think that he relied

12   in good faith on his experts and consultants.

13          More importantly, Your Honor, I don't think that this

14   issue speaks to detention.  To the extent that there is anything

15   that may have been done wrong, Mr. Gerace did it in error.

16          It doesn't evidence dangerousness.  It doesn't

17   evidence any desire to violate supervised release terms, and we

18   believe that the story shows a desire and an effort to comply,

19   which is exactly what probation has told you Mr. Gerace has done

20   while he's been on supervised release, Your Honor.

21          I'm hard pressed to find a case in this district where

22   probation has taken a position that the defendant should be

23   released, and the Government has taken a position, as here, that

24   probation doesn't do a good enough job.

25          That's a novel one to me, Your Honor.  Particularly

1    given the high degree of supervision that Mr. Gerace has

2    experienced, including the monitoring, the GPS monitoring, and

3    things like that.

4         I simply don't think that this issue speaks to

5    detention.  It doesn't speak to dangerousness.  It doesn't speak

6    to witness tampering.  It doesn't speak to return to court.  It

7    doesn't speak to safeguarding the community, Your Honor.

8         I believe that this is a red herring to try and keep

9    Mr. Gerace incarcerated through the trial.

10        **THE COURT:**  Well, we've kind of painted Mr. Macaluso

11   in a box.  He was never consulted on Friday about his

12   recommendation in this 23-CR case, and it's on my list of things

13   to do to ask him.

14        Mr. Macaluso, in the 23-CR case, does probation have a

15   recommendation?

16        **PROBATION OFFICER:**  Yes, Your Honor.  We would

17   recommend that he be released on all his previous conditions,

18   based on -- there is no violation here, because the conduct is

19   from 2019 and his supervision started in 2021.

20        And as previously stated Friday, the two years he's

21   been on supervision, he's had no violations.  There has been no

22   positive drug tests, no issues.

23        He's been extremely compliant in terms of the

24   conditions set by this court.  He's moved from home detention to

25   curfew, and he's been doing well.

1          **THE COURT:**  Thank you, Mr. Macaluso.

2          All right.  Is there anything left?  I see there's

3    something new on the overhead.

4          **MR. TRIPI:**  I put something on the screen, Judge,

5    because -- this is just one example of Mr. Gerace calling on

6    April 21st.  This is the note from the SBA.

7          Mr. Gerace called in regards to requesting more funds

8    April 21st, 2021 via e-mail to -- and it gives the e-mail.

9    There has not been anything since, so this is him following up.

10   Mr. Gerace was the one doing this activity.

11         And just to answer the probation issue for a moment;

12   there are plenty of times when we disagree with probation.

13         I'm unaware of a case where someone has a pending

14   indictment and is charged with witness tampering, and the

15   Government has proffered continuing criminal activity, that went

16   undetected by probation, where the person was not detained and

17   where probation had not reversed their recommendation to some

18   extent, and so that's new for me.

19         **THE COURT:**  All right.  The next topic is something

20   else that caught my eye when I was reading the transcript from

21   Friday.

22         And that is -- this suggestion, it's at pages 36 and

23   37, but I'll just give you the topic and I kind of want to walk

24   through this a little more slowly.

25         It's the proffer where someone -- some lawyer in town

1   is contacting one of your witnesses, Mr. Tripi, and offering

2   himself to that witness in case she needs representation.

3        Somebody who -- a witness who is represented already.

4   And the way I kind of read that proffer -- and you're going to

5   give it to me again -- is that that defense lawyer says that

6   he's already spoken to someone on Gerace's team, and he's

7   reaching out to see if she needs counsel.

8        And, obviously, the concern there is -- even just from

9   the ethical side is -- is you can't thrust yourself upon a

10  client, unless you've represented that client beforehand.

11       Mr. Tripi, did I walk through that in my mind

12  correctly when I was reading it?

13       **MR. TRIPI:**  Yes.  And now I'll elaborate on that.

14       **THE COURT:**  Or should we slow it down and take a

15  closer look at it?

16       **MR. TRIPI:**  I will.

17       **THE COURT:**  All right.

18       **MR. TRIPI:**  So there's a witness in this indictment.

19  Frankly, it's the person that actually transmitted the messages.

20       That person was approached by the FBI before being

21  charged by a criminal complaint.

22       Unclear to me as I stand here, whether it was post

23  approach by the FBI or post charging by criminal complaint, but

24  that particular person was represented by a particular defense

25  attorney.

1        That particular defense attorney, who currently

2   represents the witness, has indicated to prosecutors that I'm

3   working with, that he has represented this individual in every

4   criminal matter that this individual has had.

5        All right.  So the current lawyer made that

6   representation to us, and the current lawyer provided the text

7   messages to us by screenshot from his client.

8        And those screenshots -- I don't have in front of me,

9   so I'm going to do my best to paraphrase -- okay.  I have them

10  here.  Thank you.

11       So, I have them in front of me now.  Those text

12  messages were forwarded from the witness to her attorney by

13  screenshot, and then forwarded them to us.

14       And the screenshots were from a person who is

15  apparently an attorney, but also someone who plays in a band in,

16  like, the local bar scene.

17       The witness indicated she knows this attorney/person

18  who is in the band from the bar scene, not from prior

19  representation.

20       So that's what's been represented to us between the

21  witness and her current attorney.  And the current attorney is

22  Michael D'Amico.  No problem putting his name on the record.

23       But the text message -- the solicitation, so-to-speak,

24  reads:  "Hey, (insert name).  It's (insert name).  How have you

25  been?  Are you free to talk at all today?

1          I just want to go over something and make sure you're

2     okay, and let you know, if you need me, I'm here."

3          The witness responds:  "I'm actually headed to

4     Mike D'Amico at 1:30.  After I meet with him, I can give you a

5     call, but I just had a surgical procedure, so I basically can't

6     walk."

7          This individual then texts:  "Oh my God, I'm sorry to

8     hear that, honey.  Where are you living now?  Are you okay

9     otherwise?

10         I know Mike well.  Great guy and great attorney.  I'm

11    guessing he's meeting you for the same concern I had, as I got a

12    call from Peter Gerace's attorney, Steve Cohen, concerning that

13    the Feds might be trying to intimidate you, or even just bring

14    you in for questioning.

15         He saw that I was your attorney in the past and

16    reached out to me for me to make sure you were okay, and knew

17    I'm here if you need representation.  And I want you to know I'm

18    here, even if you just need a friend as well."

19         Then as explained to us, the witness meant to text

20    Mike D'Amico, who has the same first name as this attorney, and

21    wrote:  "By the way, never used him for an attorney.  That's

22    bullshit."

23         The person who reached out got that text, and said,

24    "Never used who as an attorney?"

25         And the witness explained to us -- the witness thought

1   on her feet, and wrote the following:  "Thought you meant Steve

2   Cohen, LOL.  Sorry.  I'm confused.  Have a great day."  Trying

3   to end the communications.

4        This attorney follows up:  "No sorry, hon.  I meant

5   Steve saw that you had me as your attorney and that's why you

6   reached out to me.

7        You have a great day too and let me know how things

8   go.  I'm here if you need, babe."

9        The witness responds:  "Thanks.  I'm just focusing on

10  my recovery."

11       The attorney writes:  "Absolutely.  That's the most

12  important thing right now.  If you need anything, I'm here."

13       Those were the communications that were provided by

14  Mike D'Amico to us.

15       Mr. D'Amico further stated:  To his knowledge, he's

16  represented this particular witness in every case she's had

17  since she was a teenager.

18       **THE COURT:**  Okay.  Let's talk about that topic.

19       Mr. Soehnlein, anything that you wish to say on that

20  topic?

21       **MR. SOEHNLEIN:**  Your Honor, it's -- obviously we don't

22  have the texts and this is the first that I've heard them.  And

23  we certainly would like to have them.

24       However, the thing that jumps out at me, Your Honor,

25  is that nowhere did this attorney say that she wanted to help

1    the witness lie, or that he wanted to help the witness protect

2    Peter, or that she wanted to do anything of that nature.

3           Clearly, what I'm understanding, there was some

4    previous personal relationship, or else -- presumably, the

5    witness would not have responded.

6           It was an amicable relationship, or else the witness

7    would not have responded.  And I didn't hear -- or -- yeah, I

8    didn't hear any text that would indicate that the attorney was

9    trying to suborn perjury, or suggest obstruction, or even

10   suggest that they not meet with Federal authorities in this

11   case.

12          Obviously, I don't know the blow-by-blow.  And if

13   Your Honor wants more information about it, I'd love an

14   opportunity to review it with the defense team and provide you

15   with additional information.

16          But at first blush, it doesn't appear to be any form

17   of witness tampering and more important -- perhaps most

18   importantly, Your Honor, there is nothing there that suggests it

19   came from Mr. Gerace himself.

20          The suggestion is that it came from Gerace's attorney.

21   It does not say Peter told me to call you; Peter told me we had

22   to talk; Peter tells you to not talk to Federal authorities,

23   that's not anywhere in the message, Your Honor.

24          And so I don't believe that that should weigh against

25   Mr. Gerace in Your Honor's calculus on this issue.

1          **THE COURT:**  All right.  I'm not going to consider that

2    issue, but I'm just simply going to say, as an

3    issue-spotting-kind-of-person, it does cause me some concern, so

4    I would advise the defense team to be careful on that front.

5          All right.  So next is Mr. Soehnlein -- other topics,

6    any proffer, any evidence, that sort of thing.

7          **MR. SOEHNLEIN:**  I do have a proffer, Your Honor.  And

8    I think Your Honor knows me, I try hard to be succinct.

9          But the thing that I note from Friday is that most of

10   what the Government relies upon is consistent with prior

11   proffers that the Government has made in favor of detention at

12   other times in this case.

13         It's not new information, Your Honor.  It may be

14   amplified information, but it's not new.  It's stuff that was

15   known to probation when probation made the recommendation for

16   Mr. Gerace's release.

17         It's things that were known to Your Honor or

18   allegations that were known to Your Honor.

19         More importantly, Your Honor, the Government's

20   argument relies on their position that probation can't and does

21   not do its job.

22         That's a new one to me, given the number of cases that

23   they rely on probation's recommendation in favor of detention.

24   This is the first time that that's happened.

25         Your Honor, I wanted to show you -- I'd also like the

1   ELMO --

2           Mr. Tripi, if I can use the ELMO --

3           **MR. TRIPI:**  Certainly.

4           **MR. SOEHNLEIN:**  In my view, Your Honor, the most

5   serious allegation had to do with what the Government had to say

6   about Mr. Tripi -- or sorry, Mr. Gerace's ex-wife.

7           And it's there.  He had a son with the young lady, and

8   I'll get to how he assaulted her in a moment -- but while she

9   was afraid of him and on the run in fear for her life, hiding

10  out, the judge -- excuse me -- this defendant did a pro se

11  motion for a name change, to have his son's name changed to this

12  name.

13          That judge granted it the same day.  The mother was

14  nowhere to be found, but of course, it was applied for and

15  granted the same day.

16          Your Honor, that's a hundred percent untrue.  The

17  woman is sitting right there.  That's Mr. Gerace's ex-wife.

18  We've spoken with her.  This is not true.

19          This is not how the name change happened.  It took

20  several months.  They were both there.  She didn't fear for her

21  life.  That's not true.  That's not accurate.

22          She is sitting right there, supporting Mr. Gerace's

23  release, because they co-parent his 16-year-old son, Nick, who

24  lives primarily with Mr. Gerace.

25          Further down, the Government says in 2010, there was

1    information that the defendant was traveling with a young lady

2    from New York City.

3            There was a tip she had drugs in a false compartment

4    coming through the airport.  At that time, law enforcement had a

5    canine do a sniff.

6            The dog didn't alert, and they decided not to step in

7    and stop and question, but the information about the defendant

8    having a supplier in that timeframe, there is other information

9    that suggests that -- that I've reviewed in this

10   investigation -- so looking back at that tip, it didn't turn out

11   to be anything.  I will consider asking you to consider that

12   part of his history.

13           Your Honor, that was kind of a throwaway ploy at the

14   time, and I guess I didn't catch it as it was going by.

15           But this tells us something about the case, Your

16   Honor.  This tells us that Mr. Gerace has been under

17   investigation for Federal law enforcement for drugs since at

18   least 2010.

19           It's 2023.  In that timeframe, he's been supervised by

20   probation.  There have been multiple search warrants on his

21   homes and businesses.

22           There have been some probation violations --

23   supervised release things.  There's no drugs here, Judge.

24   There's no drugs.  There's no controlled buy.  There's no

25   cocaine in the courtroom.

1          There's no massive quantities of anything.  There's no

2     media of a buy-and-bust from 2010 until now.

3          The Government wants to rely on an unsubstantiated

4     allegation from 2010 to keep Mr. Gerace locked up.  This is

5     where we're at.  There's no there there.

6          **THE COURT REPORTER:**  I'm sorry, what did you say?

7          **MR. SOEHNLEIN:**  There is no there there.  It's

8     colloquialism.  Sorry.  Maybe not a good one.

9          Your Honor, with regard to the new allegations, these

10    are things that the Government has had for four years, as I've

11    said.

12         These are messages the Government has referenced in

13    the past and spoken about in front of Your Honor.

14         The text messages don't -- they do not in any way

15    indicate that Mr. Gerace intends to do violence.  They don't

16    indicate that Mr. Gerace intends to do anything to this witness.

17         What they say is that whoever this third party was,

18    might do some violence.  And it references things that I believe

19    show personal animus between the two women involved that don't

20    involve Mr. Gerace.

21         The Government is going to say, well, we trust but

22    verify, and now we're verified.

23         Given the scope and timing of this investigation,

24    Your Honor, I have to believe the Government has spoken with

25    this witness more than one time.  Perhaps more than twice.

1          It leads me to believe that the first time they spoke

2     with her, she probably either denied wrongdoing, denied the

3     message, or made some other statement to law enforcement that

4     did not corroborate the tampering charge.

5          If the Government is going to rely on her now, I think

6     Your Honor ought to see all of the 302 material, which isn't

7     here.  You didn't see it.

8          Your Honor, I want to talk about proof.  What the

9     Government has -- they've offered words.  They've made some very

10    serious, very scandalous allegations.

11         We know that at least some of them were wrong.  She is

12    here; she can tell you that they are wrong.  That's on the one

13    hand -- remember, you were weighing factors.  The allegations.

14         On the other hand, we have probation and a history of

15    compliance while on supervised release.  We have probation

16    saying, you should let him out, Judge.  There is no need to

17    detain him.

18         Alternatives exist.  Alternatives to incarceration

19    exist that can secure his return to court and safeguard the

20    community.

21         We would submit it's a continuation of the same

22    conditions, but Your Honor is certainly capable of fashioning

23    some other appropriate way of monitoring that would keep him

24    from being incarcerated.

25         Your Honor, Mr. Gerace is not in great health, as I'm

1  sure you understand.  He has cardiac issues.  He suffers from

2  depression.

3          And as is well-documented, incarceration in local

4  facilities is particularly hard for people who have those health

5  concerns, particularly in the era of COVID.

6          What's more though, Your Honor, is he's the sole

7  provider for his 16-year-old son.  He has him 28 days out of the

8  month.  He's had custody of his son since he was four years old.

9          Now, it's true, he does co-parent very well with his

10  child's mother, who is here in support of him, but that son

11  needs his father, particularly in the lead up to trial.

12          More critically, Your Honor, in my estimation,

13  detention will be an undue burden on defense counsel in

14  preparing for this case.

15          We don't have the discovery material.  We don't have

16  the most critical stuff.  It's still forthcoming.

17          As we get it, we need Mr. Gerace to be able to review

18  this stuff and inform us what's true, what's false, where to

19  look, how to investigate defense leads.

20          That process, Your Honor, is unreasonably and unduly

21  hampered if Mr. Gerace is incarcerated in any form.

22          And so, Your Honor, I submit there are terms and

23  conditions that Your Honor can fashion that will safeguard the

24  community, ensure his return to court, and be appropriate that

25  are short of detention, Your Honor.

1          THE COURT:  Mr. Tripi -- I'm sorry.  I thought you

2  were done.

3          MR. SOEHNLEIN:  I'm sorry.

4          THE COURT:  Go ahead.

5          MR. SOEHNLEIN:  Sometimes I stop and really I'm just

6  getting tired.

7          Your Honor, finally, the timing of this motion, after

8  we have made a motion to provide Mr. Gerace with important

9  discovery materials, that we believe show false testimony in

10 front of the Grand Jury is suspect, at best.

11         Your Honor, some of Mr. Tripi's proffer came from that

12 witness.  It did.  Some of the most scandalous, salacious

13 allegations came from that witness.

14         MR. TRIPI:  From what witness?

15         THE COURT:  Hold on, Mr. Tripi.

16         MR. SOEHNLEIN:  And we know, Your Honor, as set forth

17 in our motion, under seal --  we know, Your Honor, that that

18 witness has lied.

19         We also know that the U.S. Attorney's Office went

20 through efforts to rehabilitate that client's testimony in the

21 Grand Jury, as is laid out in our motion.

22         We need to be able to provide that material to

23 Mr. Gerace, so he can inform us what's true, what's false, so we

24 can make a calculation about what to do with that information.

25         It's suspect, Your Honor, that we make that motion on

1    a Tuesday, and the new arrest comes on Friday with the tampering

2    charges.

3           Information that the Government has had for four years

4    -- suddenly there is a new indictment.

5           So, Your Honor, we'd ask you to continue the terms and

6    conditions of Mr. Gerace's release, consistent with the

7    recommendation from the United States Probation.

8           **MR. TRIPI:**  Just a few points, Judge.

9           **THE COURT:**  Yeah.  Before you go there, though, let me

10   ask you to go right to this suggestion from Mr. Soehnlein, that

11   the two women in the basement on the Facebook account somehow

12   were doing this of their own volition, without any involvement

13   of Mr. Gerace; so how do you respond to that?

14          **MR. TRIPI:**  I think the Grand Jury indictment speaks

15   for itself.  We have a probable cause determination by a Federal

16   Grand Jury that heard the evidence.

17          And that Grand Jury considered evidence from the

18   recipient of the messages in the form of Grand Jury transcripts

19   and the other individuals.

20          There is a probable cause finding, so all three other

21   people who had a part in this were considered.

22          And so I think the Second Circuit case law is

23   abundantly clear that it's the indictment that triggers the

24   probable cause determination, and you have an indictment before

25   you.

1        Now, I would note, to go back to probation's

2   recommendation, the probation office in Florida during -- you

3   want to talk about COVID -- during the middle of COVID,

4   recommended that he be detained.

5        Now, it was about five minutes before the detention

6   hearing, and after we made representations to Mr. Daniels about

7   the fact that his client would have been allowed -- had he been

8   arrested in Buffalo, would have been allowed to surrender

9   himself.

10        So, the only reason the Government didn't move for

11   detention was we were battling distance, initially, during the

12   heart of COVID, and we thought that an AUSA who had no clue

13   about any of these facts would be the one left to proffer it.

14        And we had made representations previously to

15   Mr. Daniels that we wanted to uphold.  We weren't anticipating

16   in arresting in Florida at that time.

17        So -- but that -- interestingly, that Florida

18   probation department recommended detention, just on the face of

19   the indictment.  Nevertheless, we agreed to conditions, but a

20   whole lot has changed since then.

21        So the defense proffer is that probation knows all

22   these things.

23        Probation didn't know anything that I said yesterday,

24   because all they did was get the reclamation from Florida and

25   disagree with it while submitting a memo that says:  Oh, by the

1   way -- Andre McCray wrote a memo that says he lied to the

2   Florida Probation Department, because he said he didn't do drugs

3   and he tested positive for cocaine.  So that addresses a little

4   bit of that.

5         I heard Mr. Gerace has health issues for the first

6   time.  When he was arrested the other day, he was on his way to

7   the gym, dressed in gym clothes.

8         So apparently it doesn't block him from working out.

9   I submit to you, he's just fine.

10         The Government laid out the timeline of its

11   indictment, and one of the acquired witnesses on Friday.

12         No later than March 14th was approval sought to return

13   the indictment in this matter; well before any defense motion.

14         If you would like to call Criminal Chief Kresse, have

15   at it.  But as an officer of the Court, that's the date we

16   purposed charging him, and that's our internal process that I

17   just put on the record.

18         In terms of pointing to Mr. Gerace's ex-wife in the

19   back, I feel bad for Ms. Arida to be placed in this situation.

20         To have a documented history of abuse, to have a child

21   in common with this man, and now be called out to come to court

22   and sit there and pretend you're okay with this, or what?

23         What's the alternative for her with that show that was

24   displayed a moment ago?

25         The facts are, we recovered the order signed by Judge

1    Michalski, Mr. Gerace's good friend.

2            It was a pro se order signed July 7th, 2008, the same

3    day as the pro se application.

4            And in it, it wrote:  The order -- the order does not

5    indicate that Arida was present or on notice of the petition.

6            The order states:  It appearing that notice is not

7    required to be given to any person, and the Court being

8    satisfied -- apparently because of the personal relationship

9    between the judge and Mr. Gerace -- there is no reasonable

10   objection to the change of name proposed.

11           He signs the order, as followed.  This excerpt is from

12   the search warrant application of Judge Michalski.

13           And so, I'd ask you to disregard that little show from

14   a few moments ago.  He's continuing to commit crimes.  He will

15   continue to commit crimes.

16           He's a danger to the community.  He has resources

17   making him a flight risk.  The indictment triggers the statutory

18   presumption that he's a flight risk and a danger, and the weight

19   of the evidence clearly shows this Court that he is and he

20   should be detained.

21           **THE COURT:**  Thank you, Mr. Tripi.

22           Mr. Soehnlein, last word.

23           **MR. SOEHNLEIN:**  Thank you, Your Honor.

24           Your Honor, this hearing is about a return to court,

25   safeguarding the community, making sure that Mr. Gerace is not a

1    flight risk.

2          His history of supervision shows that he's none of

3    those things, Your Honor.  There are certainly terms and

4    conditions that Your Honor could impose, short of detention, to

5    ensure that those things are done.

6          While there may be a presumption, it's rebutted by the

7    time that he's been on supervised release, Your Honor.  Even the

8    time that -- even the time when the Government alleges that he

9    was under investigation, he didn't go anywhere.  He didn't fly

10   out of town.

11         He didn't skip town.  He's here to answer the charges.

12   He engaged attorneys.  He's made it to every court appearance.

13         Aside from the EIDL controversy, there's no other

14   criminality during that time.  Not only is probation watching

15   him, but you know that Federal law enforcement is watching him

16   during that time as well.

17         Your Honor, we ask that you continue the terms and

18   conditions of his release.

19         **THE COURT:**  Thank you, Mr. Soehnlein.

20         All right.  So I'm going to walk through my thoughts

21   about my conclusion and my reasons and then, obviously, there

22   will be a standard order that comes -- a written order to make

23   sure that I've tracked all the items.

24         I've heard everything I heard on Friday and today, all

25   pursuant to the factors in subsection G of 3142, which I've

1   studied at length.

2          Like I noted on Friday, a major focus for me is how

3   I'm to weigh Mr. Gerace's compliance with the conditions in the

4   19-CR-227 case, on the one hand, with several items to kind

5   of -- the counter way and stand in the face of that; and things

6   like the new detail that I've heard from Mr. Tripi surrounding

7   the Facebook incident, which resulted in the three counts of

8   indicted conduct related to the Facebook incident in this case,

9   including the corroboration of those details.

10          Also new to me is the Government's proffer about

11   Mr. Gerace referring to the victim witness as a snitch prior to

12   the November 19, 2019 alleged conduct, and in real time as well.

13          I still have some concerns as well about the

14   Government's proffer about Mr. Gerace's apparent willingness to

15   use his contacts in the legal system to improperly disadvantage

16   those perceived as being against him.

17          And there, in part, I'm concerned about the Michalski

18   incident, also, as well as the Amherst Police Department

19   detective incident that I heard about on Friday as well.

20          The cocaine and drug supplying and prostitution items

21   aren't good facts either.

22          The loan application issues, at a minimum, present

23   recent untrustworthy activity from June, 2020 and July, 2021.

24   Some of that activity after the releases in the 19-CR case.

25          And in particular, noteworthy is the denial of prior

1  convictions and current indictment, among other items on those

2  applications.

3          I also note that -- I don't know if I need to note

4  that, but I note that witness tampering is something that goes

5  to the heart of the justice system.

6          And I think that's something that, at a minimum, the

7  LaFontaine case accounts for and speaks to.

8          Taking into account all of the G factors, including

9  defendant's past conduct and how that relates to the safety of

10  witnesses in this case and the safety of witnesses in the 19-CR

11  case, I note that defendant's record of compliance is sufficient

12  to rebut the presumption in section E-3.

13          Nevertheless, I find by clear and convincing evidence

14  that no condition or combination of conditions will reasonably

15  assure the safety of any other person in the community,

16  especially vis-a-vis witnesses against Mr. Gerace.

17          And I also note that the case law, for example,

18  LaFontaine, about detention and witness tampering cases also

19  notes cases about detention and obstruction of justice cases,

20  even absent violence or threats of violence.

21          Therefore, I order Mr. Gerace detained pending trial.

22  He -- at the end of this proceeding, will be committed to the

23  custody of the Attorney General.  The balance of the order

24  that's forthcoming will follow.

25          We need to look at and think about a couple things,

1    next, given this 23-CR case conclusion.

2         It triggers a couple of things in my mind, which is

3    what are we doing about the release order in the 19-CR case.

4         Is there going to be a violation proceeding, and/or is

5    the hearing -- there was never a detention hearing in that case,

6    so we can't reopen it under the statute under -- again,

7    subsection F, the flush language.

8         The point is -- we've got incongruous orders out

9    there.  Certainly, the detention order is going to trump, but I

10   still have to deal with the fact that we've got an order in the

11   19-case, so we've got to deal with that some some way.

12        Mr. Tripi, what's your suggestion?

13        **MR. TRIPI:**  I think the indictment in this case is a

14   changed circumstance that would allow for the Court to consider

15   the fact that it's now heard additional information and entered

16   a detention order.

17        **THE COURT:**  Right.  Well, why don't you submit

18   something and --

19        **MR. TRIPI:**  I will.

20        **THE COURT:**  -- and then give the defense a chance to

21   respond to that.

22        I -- even before I came out here, Mr. Soehnlein,

23   Mr. Cohen, I'm acutely aware that the trial date is 12 weeks

24   away or so.

25        I've accounted for that before I came out here and

1   now, and listening to Mr. Soehnlein reminded me of it.

2            So what I'm -- defendants prepare for trial from

3   county jails here all the time.  I'm sure it's not fun, but it

4   happens, and it's the norm for them.

5            So what I want to say is, is this:  I'll consider

6   every motion on the merits.  I always do.

7            But if you're going to make a motion for temporary

8   release to prepare for trial, it can't be on this record,

9   because I've already considered all these things.

10           So there's got to be something new and compelling for

11  me to consider in order to justify something like a temporary

12  release under subdivision I.

13           Remember you have Judge Roemer tomorrow, I believe, at

14  2 o'clock.  Is there anything else that we need to talk about in

15  the 23-CR case?

16           **MR. TRIPI:**  No, Your Honor.

17           **MR. SOEHNLEIN:**  Nothing further, Your Honor.

18           **THE COURT:**  Okay.  So let's call the 19-case, and

19  we're going to do the Curcio piece now.  Status conference on

20  the Curcio motion.

21           **THE CLERK:**  Court calls United States versus

22  Peter Gerace, Jr., case number 19-CR-227 for a status

23  conference.

24           Counsel, please state your appearances.

25           **MR. TRIPI:**  Joseph Tripi, David Rudroff, and

1    Nicholas Cooper for the United States.  Good afternoon.

2         **MR. SOEHNLEIN:**  Eric Soehnlein, Steve Cohen for

3    Peter Gerace.

4         **MR. COHEN:**  Tyler Eckert as well, Your Honor.

5         **THE COURT:**  I'm sorry, what's that?

6         **MR. COHEN:**  I beg your pardon, sir.  Tyler Eckert,

7    E-C-K-E-R-T, is here as well.  He's sitting behind me.

8         **THE COURT:**  Okay.  So on the Curcio process, there is

9    the motion to determine whether a conflict exists and what to do

10   about it.

11        There's been a response from Mr. Soehnlein, and I have

12   a call in to Mr. Spitler to see what his availability is like,

13   since he seems to be of -- by conflict purposes, available to

14   us, and he served as Curcio counsel once before in this case for

15   Mr. Gerace.

16        So I'd like to use him again, if he's available and

17   willing to do it.  He hasn't gotten back to me yet.

18        I know that I think I heard you say, Mr. Tripi, that

19   he wasn't around today anyway, which is why he hasn't called me

20   back.

21        **MR. TRIPI:**  There was sort of a family emergency

22   today.

23        **THE COURT:**  Okay.  So when he calls me -- I'm going to

24   leave the next appearance on this Curcio process unscheduled, so

25   that we can see what his calendar looks like when he calls me

 1   back.

 2          And then I'll put out a text order and have you come

 3   back and we'll do part two of Curcio and then part three after

 4   that, so that's probably all I can do at this point on that

 5   front.

 6          Mr. Tripi --

 7          **MR. TRIPI:**  I have nothing else, Judge.

 8          **THE COURT:**  Mr. Soehnlein?

 9          **MR. SOEHNLEIN:**  Nothing further, Judge.

10          **THE COURT:**  Mr. Cohen?

11          **MR. COHEN:**  Nothing further, Judge.

12          **THE COURT:**  All right.  So that does it for the Curcio

13   process status conference in the 19-CR case.

14          If there is nothing further from any of you, the

15   defendant will remain detained pending trial in the 23-CR-37

16   case, which is what brought us here in the first place.

17          Okay.  Thank you.

18          **MR. TRIPI:**  Thank you.

19

20          (Proceedings concluded at 2:28 p.m.)

21                          *   *   *

22

23

24

25

1

2      In accordance with 28, U.S.C., 753(b), I certify that these

3   original notes are a true and correct record of proceedings in

4    the United States District Court for the Western District of

5        New York before the Honorable John L. Sinatra, Jr.

6

7

8

9

10   _s/ Bonnie S. Weber_                    March 31, 2023
        Signature                              Date

11

12   BONNIE S. WEBER, RPR

13
     Official Court Reporter
14   United States District Court
     Western District of New York

15

16

17

18

19

20

21

22

23

24

25