IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

        v.            19-CR-227-JLS

JOSEPH BONGIOVANNI,
PETER GERACE, JR.,

              Defendants.
_____

UNITED STATES OF AMERICA,

        v.            23-CR-37-JLS-MJR

PETER GERACE, JR.,

              Defendant
_____

## GOVERNMENT'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE TO PRECLUDE IOC EVIDENCE

**THE UNITED STATES OF AMERICA**, by and through its attorney, Trini E. Ross, United States Attorney for the Western District of New York, Joseph M. Tripi, David J. Rudroff, and Nicholas T. Cooper, Assistant United States Attorneys, Corey R. Amundson, Chief, United States Department of Justice, Public Integrity Section, and Jordan Dickson, Trial Attorney, United States Department of Justice, Public Integrity Section, of counsel, hereby files its consolidated response in opposition to the defendants' motions in limine seeking to preclude the government from presenting any Italian Organized Crime ("IOC") evidence at trial.  *See* Doc. Nos. 452, 511.

**INTRODUCTION**[1]

Defendants Joseph Bongiovanni ("Bongiovanni") and Peter Gerace Jr. ("Gerace) are charged in an eighteen-count indictment charging: Conspiracy to Defraud the United States (Count 1 & 2); Conspiracy to Distribute Controlled Substances (Counts 3 & 8); Bribery and Receiving of Bribes by a Public Official (Counts 4-6); Maintaining a Drug-Involved Premises (Count 7); Conspiracy to Commit Sex Trafficking- Force, Fraud, and Coercion (Count 9); Obstruction of Justice (Counts 10-16); and, False Statements to the Executive Branch of the United States.

| NAME OF DEFENDANT | COUNT | VIOLATIONS |
|---|---|---|
| JOSEPH BONGIOVANNI | 1 | 18 U.S.C. § 371 |
| | 2 | 18 U.S.C. § 371 |
| | 3 | 21 U.S.C. § 846 |
| | 4 | 18 U.S.C. § 201(b)(2)(C) |
| | 5 | 18 U.S.C. §§ 201(b)(2)(A) & (C) |
| | 8 | 21 U.S.C. § 846 |
| | 10 | 18 U.S.C. § 1519 |
| | 11 | 18 U.S.C. § 1519 |
| | 12 | 18 U.S.C. § 1519 |
| | 13 | 18 U.S.C. § 1519 |
| | 14 | 18 U.S.C. § 1519 |
| | 15 | 18 U.S.C. § 1519 |
| | 16 | 18 U.S.C. § 1519 |
| | 17 | 18 U.S.C. § 1001(a)(2) |
| | 18 | 18 U.S.C. § 1001(a)(2) |
| PETER GERACE, JR. | 2 | 18 U.S.C. § 371 |
| | 6 | 18 U.S.C. §§ 201(b)(1)(A) & (C) |
| | 7 | 21 U.S.C. §§ 856(a)(1) & 2 |
| | 8 | 21 U.S.C. § 846 |
| | 9 | 18 U.S.C. § 1594(C) |

Each of these counts will involve the presentation of IOC evidence in some form. As this Court found when it adopted the Report and Recommendation of United States Magistrate Judge Roemer ("Magistrate Judge Roemer") and rejected the defendants' motions to strike IOC language from the indictment as surplusage, IOC evidence is relevant

---

[1] The Government's Pre-Trial Memorandum, filed under seal on April 26, 2023, is incorporated herein by reference as though set forth fully.

and admissible.  As Magistrate Judge Roemer aptly stated, "references to Italian Organized Crime and similar terms appear to be part and parcel of the *res gestae* of events that was being investigated by the grand jury."  *United States v. Gerace,* No. 119CR227JLSMJR, 2022 WL 17478270, at *10 (W.D.N.Y. Aug. 5, 2022).  Magistrate Judge Roemer's observation was accurate, and IOC evidence is fundamental to the indictment found by the Grand Jury. To now prevent the government from referencing IOC or presenting any evidence related to IOC under the guise of a FRE 401/403 balancing test would be improper and would irreparably prejudice the government's ability to prove its case at trial. There is nothing in the FRE 401/403 balancing test, or the Second Circuit's decision in *United States v. Long*, 917 F.2d 691 (2d Cir. 1990), that warrants the drastic relief the defense seeks in its motion in limine.

This Court should permit IOC evidence in this trial because (1) it is fundamental to the charged conspiracies and the defendants' conduct; (2) it forms the manner and means by which the defendants sought to achieve the objectives of the conspiracies; and (3) it is highly probative of the defendants' motives and of defendant Gerace's ability to exert influence and control over others, including dancers and employees at Pharaohs Gentlemen's Club.

This Court tacitly acknowledged the relevance of IOC evidence when it denied the defendants' motions to strike surplusage from the indictment.[2]  *See* Doc. Nos. 291, at 20-22; 319, at 10.  Accordingly, the Court should deny the defendants' motions seeking to preclude

---

[2] "If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken."  *United States v. DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y. 1978).

highly relevant and probative evidence that is fundamental to the factual issues in this case and should decline the defendant's invitation to use FRE 403 to balance the scales in order to make the trial a contest where the legitimate force of the government's proof at trial will establish that there is none.

## THE GOVERNING LAW

"Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." *United States v. Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001). The movant has the burden of establishing that the evidence is not admissible for any purpose." *United States v. Arrington*, No. 15-CR-33-A, 2022 WL 4077685, at *2 (W.D.N.Y. Sept. 6, 2022).

Federal Rules of Evidence 401, 402, and 403 function as the preliminary gatekeepers for contested evidence. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also United States v. Gomez*, 763 F.3d 845, 853 (7th Cir. 2014); *United States v. Shomo*, 786 F.2d 981, 985 (10th Cir. 1986); *United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. 1981). The standard is expansive. "[E]vidence need not be conclusive in order to be relevant. An incremental effect . . . is sufficient[.]" *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 90 (2d Cir. 2014).

"Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case."

*Huddleston v. United States*, 485 U.S. 681 (1988) (quoting Fed. R. Evid. 401, Advisory Comm. Notes).  If a "chain of inferences leads the trier of fact to conclude the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." *United States v. Quattrone*, 441 F.3d 153, 189 (2d Cir. 2006).[3] Indeed, to be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  The Second Circuit is clear that "[t]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.'"  *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988)).

Once a court determines a piece of evidence is relevant, it must then weigh the probative value of the evidence under FRE 403, which provides that even relevant evidence may be excluded if its probative value is *substantially outweighed* by a danger of, among other things, unfair prejudice, confusing the issues, or misleading the jury. Fed. R. Evid. 403 (emphasis added).  By design, evidence offered by the Government is prejudicial to a

---

[3] In denying the defendant's motion to strike IOC language from the indictment as surplusage, by adopting the analysis set forth in Magistrate Judge Roemer's Report and Recommendation, this Court has already made a preliminary determination that IOC-related evidence is relevant and admissible, *see* Doc. Nos. 291 at 20-22 and 391 at 10.  While the Court held that it would decide "whether and to what extent" IOC evidence would be permitted at trial, refusal to strike IOC language from the indictment establishes relevance in this case as a general matter.

defendant.  *See Quattrone*, 441 F.3d at 186 ("All evidence introduced against a defendant, if material to an issue in the case, tends to prove guilt, but is not necessarily prejudicial in any sense that matters to the rules of evidence." (citation omitted)).  FRE 403 requires a court to examine whether the evidence is "unfairly" prejudicial.  "Evidence is unfairly prejudicial when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) (internal quotation marks omitted). "Since the trial judge is granted such a powerful tool by Rule 403, he [or she] must take special care to use it sparingly." *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir. 1983) (citation and punctuation omitted).

Simply because evidence is prejudicial is not a reason for exclusion as long as it is sufficiently probative. *United States v. McGuire*, 27 F.3d 457 (10th Cir. 1994). "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis." *United States v. Johnson*, 581 F.3d 320, 327 (6th Cir. 2007). On appeal, "Rule 403 determinations command especial deference because the district court is in the best position to do the balancing mandated by Rule 403." *United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011) (internal quotation marks omitted).

Courts routinely admit evidence and overrule FRE 403 objections in various contexts when it involves evidence of association with organized crime groups, including gangs, Mexican cartels, the mafia, and others.  *See, e.g.*, *United States v. Williams*, 930 F.3d 44, 63 (2d Cir. 2019) (defendant's statements about gang affiliation admitted over the defense's

FRE 403 objection to prove the defendant's intent to possess a weapon in a prosecution for felon in possession of a firearm); *see also United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014) (evidence about a defendant's perceived connection to organized crime was permitted on the issue of fear; "[w]hether the [defendants] were actually connected to organized crime is not dispositive of the admissibility of reputation evidence that tends to show the reasonableness of the victims' fear.  A victim's belief that the [defendants] were connected to organized crime was reasonable and that the [defendants] exploited this belief"); *United States v. Coppola*, 671 F.3d 220, 242 (2d Cir. 2012) (Genovese family's reputation for violence in furtherance of extortionate endeavors); *United States v. Byrd*, 379 Fed. App'x 84, 86 (2d Cir. 2010) (affirming a conviction for possession of a firearm in furtherance of a drug-trafficking conspiracy because evidence of gang membership was relevant to show that "others followed his order"); *United States v. Mulder*, 273 F.3d 91, 103-04 (2d Cir. 2001) (noting that "[b]ad reputation is relevant to the fear element in a Hobbs Act conspiracy since such a reputation frequently conveys a tacit threat of violence" (internal quotation marks omitted)); *United States v. Cummings*, 60 F. Supp. 3d 434, 436 (S.D.N.Y. 2014) (evidence of gang membership admitted to "enable the jury to understand these [d]efendants' relationship and why they would trust one another" in narcotics and firearm prosecution); *see also United States v. Ontiveros*, 598 F. App'x 482, 484 (9th Cir. 2015) (permitting a member of the "Mexican Mafia" to decode contents of jails calls of his coconspirators under Rule 701); *United States v. Teran*, 496 Fed. App'x 287, 293 (4th Cir. 2012) (holding evidence of gang membership was admissible as long as the conduct was "no more sensational than the crime in question"); *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 896 (D.C. Cir. 2010) (holding that the district court did not improperly apply FRE 403 when it

determined that the expert witness's use of terms like "cartel members" and "colluders" did not make his testimony's potential for undue prejudice substantially outweigh its probative value); *United States v. Dota*, 33 F.3d 1179, 1185 (9th Cir. 1994) (testimony was probative and not unduly prejudicial witnesses testified that a codefendant made statements indicating that the defendant had mafia connections to explain the relationship between the two and whether the codefendant would enter a business contract or contract to kill with the defendant); *United States v. Skillman*, 922 F.2d 1370, 1373 (9th Cir. 1990) (defendant's motion in limine to preclude use of the term "skinhead" was properly denied despite the fact that there was no evidence the defendant was a skinhead, because the evidence was relevant and not unduly prejudicial to demonstrate racial animus).

Furthermore, as described *infra*, because this case is fundamentally about a corrupt DEA agent protecting individuals that he believed were IOC members and associates, the nexus to IOC is strong and the Second Circuit's decision in *Long* would sanction the type of evidence the government seeks to introduce in this case.  917 F.2d at 701-02 ("[w]e agree that the fact that Rotondo had contacts in organized labor as a result of his position in the DeCavalcante crime family and demanded a fee for his services was relevant background to explain to the jury how and why he was able to facilitate Hyman's various schemes by introducing him to Long.").

As the Court stated in *United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983):

Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the

application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance. It is not designed to permit the court to even out the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.

(Citations and punctuation omitted).

Because evidence of IOC is both highly relevant and probative to the fundamental facts of this case, and the defendants' wholly fail to meet the exacting burden warranting exclusion, the Court should deny the defendants' motions in limine seeking to preclude such evidence.

## SUMMARY OF THE ARGUMENT

The Court should deny the defendants' motions in limine to preclude IOC evidence because, pursuant to the balancing test set forth in FRE 401/403, the evidence is relevant and its probative value is not substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury.

### A.    BONGIOVANNI

At all times relevant to the indictment, Defendant Bongiovanni was a sworn Drug Enforcement Administration ("DEA") Special Agent ("SA").  Defendant Bongiovanni's duty as a sworn DEA SA obligated him to uphold the Constitution of the United States; to conduct investigations honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction; and to provide the

United States with conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of his duties in his official capacity free from corruption, partiality, improper influence, bias, dishonesty and fraud in dealing with the DEA and other law enforcement agencies.  A sworn DEA SA is duty-bound to investigate cases without bias and impartiality, and agents are required to investigate organized crime groups of all types.  Whether an inner-city street gang, a Mexican Drug Cartel, a motorcycle gang, or drug dealing members and associates of the mafia, a federal agent's oath must be unwavering.

Here, it is critical to the government's case and fundamental to the conspiracies charged in Counts 1 and 2 to prove that Bongiovanni violated his sworn duties to protect his drug dealing friends, who included members or associates of ██████████████████ ██████████████, and their associates.  Defendant Bongiovanni shielded and protected individuals connected to organized crime, and corruptly persuaded other members of law enforcement not to investigate such individuals, because he *believed they were connected to organized crime* ██████████████████.  In doing so, Bongiovanni violated his sworn duty and conspired with those he protected to defraud the United States, as alleged in Counts 1 and 2.

The indictment begins with a detailed introduction, which is incorporated into both Counts 1 and 2.  Paragraph 3 of the Introduction alleges:

> The defendant BONGIOVANNI had friends and associates who he knew were involved in possession, use, distribution, and importation of controlled substances.  The defendant BONGIOVANNI's friends and associates who were involved in possession, use, and distribution, and importation of

controlled substances, **included, among others, individuals he believed to be members of, connected to, or associated with Italian Organized Crime (IOC) in the Western District of New York and elsewhere.**

(Emphasis added).

Fundamentally, this case is about *who* Bongiovanni protected and *why* he protected them in violation of his sworn duties. IOC proof is critical to proving the elements of the charged conspiracies and for the jury to understand Bongiovanni's motives, including his criteria for deciding who to protect, which was based on the identities of certain individuals or to whom the individuals were connected. The manner and means by which Bongiovanni protected individuals he believed were members, or associated with, or connected to IOC in the Western District of New York and elsewhere was an integral part of the *res gestae* of the crimes. Accordingly, preclusion of all such evidence would prevent the government from proving the manner and means by which an object of the conspiracy was achieved, and seriously jeopardize the government's ability to prove essential elements of Counts 1 and 2. This alone requires denial of the defendants' motions in limine.

**B.   GERACE**

Defendant Gerace is the owner of Pharaohs Gentlemen's Club ("PGC"). Protected by Bongiovanni, Gerace ran a drug- and sex- trafficking infested club for years without interruption or disruption by law enforcement. IOC evidence related to Gerace, ███████ ████████████████████████████████████████████████████ ████████████████████ is highly relevant and probative of the crimes charged for several reasons.

First, IOC evidence forms the manner and means by which Bongiovanni and Gerace sought to achieve an objective of the conspiracy charged in Count 2 of the indictment. Second, IOC evidence as to Gerace is highly probative of Bongiovanni's violation of his sworn duties and will aid the jury's understanding of how Bongiovanni selected and prioritized who he would shield and protect.  In this vein, IOC evidence will provide important context as to how and why Gerace was part of that group of protected people. Third, IOC evidence as to Gerace will enable the jury to understand why Gerace garnered protection from a DEA SA, and why others, including a former New York State Supreme Court judge, members of law enforcement, political figures, and attorneys, associated with and were beholden to Gerace.  Fourth, IOC evidence as to Gerace will help explain his control of PGC employees, including the coercive environment that enabled Gerace to exploit vulnerable women to engage in commercial sex acts, and why even members of the Outlaws MC who work in PGC are subservient to Gerace and engage in criminal conduct with him and on his behalf.

As a result, the Court should not preclude IOC evidence from this case under the auspices of FRE 401 or 403 because to do so would be to fundamentally transform the nature of this case so as to undermine the charges in the Indictment (which is precisely why the defendants seek to preclude the evidence) and cause the jury to determine the facts based upon an incomplete and improperly sanitized version of events.

# ANALYSIS

## A.  COUNT 1

The Court should deny the defendants' motion in limine and should permit IOC evidence related to Count 1 because preclusion would prevent the government from proving the manner and means by which one of the objectives of the conspiracy charged in Count 1 was achieved.  As a result, preclusion could result in the government's inability to prove essential elements of the crime—a result not contemplated by appropriate FRE 401/403 balancing.

Count 1 incorporates the Introduction and alleges in part:

2.  Beginning in or about 2008 and continuing until in or about August 2019, the exact dates being unknown, in the Western District of New York, and elsewhere, the defendant, JOSEPH BONGIOVANNI, did knowingly, willfully, and unlawfully combine, conspire, and agree with Michael Masecchia and others, known and unknown:

    a.  to defraud the United States and the Drug Enforcement Administration (DEA), an agency of the United States, by interfering with and obstructing by means of deceit, craft, and trickery, the lawful and legitimate governmental functions and rights of the DEA, that is:

        i.  the right to have its business and its affairs, and the transaction of the official business of the DEA conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction; and

        ii.  the right to the conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of his duties by the defendant, JOSEPH BONGIOVANNI, in his official capacity as a DEA SA free from corruption, partiality, improper influence, bias, dishonesty and fraud in dealing with the DEA and other law enforcement agencies;

    b.  directly and indirectly, corruptly to give, offer, and promise a thing of value to a public official, with intent to induce a public

official to do an act and omit to do an act in violation of his lawful duty as opportunities arose, in violation of Title 18, United States Code, Section 201(b)(1)(C); and

c.   directly and indirectly, corruptly to demand, seek, receive, accept, and agree to receive and accept, a thing of value personally, in return for being induced to do an act and omit to do an act in violation of official duty as opportunities arose, in violation of Title 18, United States Code, Section 201(b)(2)(C).

Paragraph 5 of the Introduction alleges that Michael Masecchia "is a member or associate of IOC in the Western District of New York and elsewhere." *See* Doc. No. 89, Introduction ¶5.   In other words, Count 1 alleges that Bongiovanni conspired with a member or associate of IOC to defraud the United States such that IOC evidence is a necessary part of the proof of Count 1.   As charged in Count 1, protecting and shielding members or associates of organized crime was a means of committing the object of the conspiracy and was among the ways in which Bongiovanni conspired to defraud the United States.

The elements of Count 1 (and 2) of the Indictment are: (1) that two or more persons entered the unlawful agreement charged in the indictment; (2) that the defendants knowingly and willfully became members of the conspiracy; (3) that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the indictment; and (4) that the overt act that [the jury finds] to have been committed was committed to further some objective of the conspiracy.[4]

---

[4] Modern Federal Jury Instructions-Criminal ¶ 19.01, Instruction 19-3.

The Manner and Means section of Count 1 alleges how the conspiracy was carried out and is fundamental to defining the scope of the conspiracy.  In proving the elements, the government will need to prove what the conspiracy entailed and how it was carried out.  A plain reading of the Indictment establishes that the IOC allegations, and proof supporting them, are indispensable:

- **It was part of the conspiracy that, in order to build trust and maintain continuity with his coconspirators**, the defendant **BONGIOVANNI did not investigate** his friends and associates and used his position as a DEA SA in Buffalo, New York, to shield his friends and associates, and **others including Masecchia, who he believed were connected to or associated with IOC**, from criminal investigations." *See* Doc. No. 89, Count 1, Manner and Means ¶4 (emphasis added).

- **It was part of the conspiracy** that, in exchange for payments he received and **in order to ingratiate himself to individuals whom he believed were members and associates of IOC**, the defendant **BONGIOVANNI** utilized his position as a DEA SA to attempt to dissuade other members of law enforcement: **from conducting investigations of** his coconspirators, friends, associates and **individuals the defendant believed to be connected to or associated with IOC, including Masecchia and others**; and from conducting investigations into any individuals who may have been able to expose his criminal activities and those of his friends, associates, and **individuals the defendant believed to be connected to or associated with IOC**." *Id.* at ¶5 (emphasis added).

- **It was part of the conspiracy** that, in exchange for payments he received, **and to ingratiate himself to individuals he believed to be connected to or associated with IOC**, the defendant **BONGIOVANNI** used his position as a DEA SA to gain and provide information about federal investigations …. *Id.* at ¶6 (emphasis added).

- **It was part of the conspiracy** that the defendant **BONGIOVANNI would falsely deny to other agents of the DEA the existence and extent of connections between himself** and individuals he knew to be involved in the possession, use, distribution, and importation of controlled substances, **and individuals he believed were connected to or associated with IOC.** *Id.* at ¶17 (emphasis added).

- **It was part of the conspiracy** that the defendant **BONGIOVANNI would conceal** his possession, use, and distribution of controlled substances, the bribes he received, and **the assistance he provided to** his friends, associates, coconspirators, and **individuals who he believed were members of, connected to, or associated with IOC.** *Id.* at ¶20 (emphasis added).

"Build[ing] trust," "maintain[ing] continuity," "ingratiate[ing] himself," and "falsely deny[ing] the existence and extent of connections between himself . . . and individuals he believed were connected to or associated with IOC," are essential to proving the 1st and 2nd elements, that is, that Bongiovanni "entered an agreement" and that he "willfully became a member of a conspiracy." "To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (internal citations and punctuation omitted). Conspiracies are built upon trust, and jurors may infer a defendant's knowledge of the object of a conspiracy where there is evidence of a trust relationship. *Id.* at 69.

The crux of the charges in the Indictment and the proof of the essential elements of those charges, involves the fact that Bongiovanni protected individuals he believed were members and associates of IOC in violation of his sworn duties. Proof that Bongiovanni entered his conspiratorial agreement may be direct, or circumstantial, and "may include, for example, a defendant's association with conspirators in furtherance of the conspiracy." *Id.*; *see also United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (citations omitted) ("Both the existence of a conspiracy and a given defendant's participation in it with the requisite

knowledge and criminal intent may be established through circumstantial evidence.").   In this regard, the IOC-related proof described by the manner and means is critical to help explain, for example, why Bongiovanni would trust his coconspirators at the risk of his career, pension, and life in prison in furtherance of the conspiracy's objectives.   *See e.g., United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) (expert testimony regarding mafia code of silence); *see also Orena v. United States,* 956 F. Supp. 1071, 1081 (E.D.N.Y. 1997) (describing the concept of omerta).   The fact that Bongiovanni selectively protected and shielded individuals in part *because he believed were IOC members and associates* is highly probative, and direct and circumstantial evidence directed towards these facts is critical to proving the manner and means by which the conspiracy was carried out, and thus the elements one and two of Count 1 (and 2).[5]

The third element requires the government to prove at least one of the overt acts charged in the indictment.   Overt Act 35 of Count 1 specifically alleges that Bongiovanni was informed by a fellow agent that Michael Masecchia was a member or associate of the Buffalo LCN family, and that Bongiovanni engaged in a series of calculated overt acts to protect Masecchia and others.   *See* Doc. No. 89, Count 1, Overt Acts ¶¶ 22-58.   It is also well established in the Second Circuit that where an indictment charges a defendant with a

---

[5] As Magistrate Judge Roemer stated in his Report and Recommendation, "the record demonstrates that to the extent the grand jury heard references to Italian Organized Crime, those references were relevant to the allegations and evidence presented against Bongiovanni, Gerace and their co-conspirators. Moreover, references to Italian Organized Crime and similar terms appear to be part and parcel of the *res gestae* of events that was being investigated by the grand jury." *United States v. Gerace*, No. 119CR227JLSMJR, 2022 WL 17478270, at *10 (W.D.N.Y. Aug. 5, 2022), *report and recommendation adopted sub nom. United States v. Bongiovanni*, No. 19CR227JLSMJR, 2022 WL 17139489 (W.D.N.Y. Nov. 22, 2022).

conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is not other act evidence and is considered "part of the very act charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (internal quotation marks and alterations omitted).   Accordingly, IOC evidence related all of the overt acts, including those related to Masecchia, is not ancillary to this case, but rather it is central to the charge itself and proving the third element, that is, an overt act alleged in the indictment.

The fourth element requires that the overt act was committed to further the objectives of the conspiracy.   Evidence of Bongiovanni's motive to protect certain individuals, such as Masecchia, who he believed to be IOC members and associates ties the overt acts alleged in Count 1 to the objectives of the conspiracy.

In addition to the fact that IOC evidence proves the manner and means of an object of the conspiracy it is highly relevant to Bongiovanni's *motive to engage in all of the entirety of the criminal conduct* charged in the Indictment.   This includes the conspiracies, the bribes, and the cover-up (Obstruction of Justice and False Statements).   "The presence or absence of a motive for the commission of the offense charged is always a legitimate subject of inquiry."   *Pointer v. United States*, 151 U.S. 396, 414 (1894).   Here, Bongiovanni, was motivated in part by an individual's perceived connection to IOC.   "[I]t is commonplace that the law recognizes that there may be multiple motives for human behavior; thus, a specific intent need not be the actor's sole, or even primary, purpose."   *United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2014).   At trial, Bongiovanni may attempt to argue that he did in fact investigate and arrest other Italians.   The IOC evidence

distinguishes someone like ████████ ██ who Bongiovanni investigated and arrested, from people like Massechia, Gerace, █████ and others who Bongiovanni perceived as connected to IOC.   In sum, it is important for the jury to understand the criteria Bongiovanni applied when providing his protection.   Bongiovanni did not just protect any Italian drug trafficker, but rather he protected ones that he believed were members of, associated with, or connected to IOC in the Western District of New York and elsewhere.

Indeed, it is critical for the government to present evidence to the jury distinguishing those individuals that Bongiovanni protected and shielded from those he did not.   A conspiracy to defraud the United States, as alleged in Count 1, paragraph 2(a)(i)-(ii), does not require the loss of money or property.   All that is required is interference or obstruction of the lawful functions of the government.   *United States v. Tajideen*, 319 F. Supp. 3d 445, 459 (D.D.C. 2018) (collecting cases).   As a result, preclusion of all IOC evidence would potentially prevent the government from proving an entire object of the conspiracy charged in Count 1.   *See* Doc. No. 89, Count 1 ¶ 2(a)(i)-(ii).   Regardless of whether Bongiovanni accepted bribes in order to be induced to do an act or omit to do an act as alleged in Count 1, paragraph 2(b)-(c), his official duties required him to investigate cases and follow the evidence wherever it led, including to investigate members and associates of IOC.   In violation of his duties, however, Bongiovanni conspired with some of the individuals he was duty bound to investigate and thereby interfered with and obstructed the lawful and legitimate governmental functions and rights of the DEA.

---

[6] ████████████████████████████████████████████

In sum, preclusion of all IOC evidence from the trial would fundamentally and unfairly change the Indictment returned by the Grand Jury. A whole category of individuals Bongiovanni protected—those he believed to be associated with IOC—would be excised from this trial. Preclusion of IOC evidence under the auspices of FRE 403 could lead to the absurd result whereby, in truth and in fact, Bongiovanni protected organized crime members and associates, but the jury would be required acquit him if it did not find that he agreed to accept bribes or that he did not agree to protect his friends and associates. In other words, excising all IOC proof could result in a finding that a sworn DEA agent did not break the law when he protected individuals that he believed to be IOC members or associates. FRE 403 does not require the Court to sanitize the facts to blunt the legitimate force of the government's proof. *Cf. Naranjo*, 710 F.2d at 1469 ("Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing.").

What Bongiovanni did in this case when he repeatedly violated his sworn duty was inextricably tied to who people were (IOC members and associates) and/or who they were connected to (IOC members and associates). As Magistrate Judge Roemer pointed out in his Report and Recommendation adopted by this Court, "references to Italian Organized Crime and similar terms appear to be part and parcel of the *res gestae* of events that was being investigated by the grand jury." *Gerace*, No. 119CR227JLSMJR, 2022 WL 17478270, at *10. A trial is "a search for the truth," and, in this case, the IOC-related evidence is critical to the jury's role in determining it. *See, Nix v. Whiteside*, 475 U.S. 157, 171 (1986).

Accordingly, the Court should admit the IOC evidence or risk undermining the case and the Indictment returned by the Grand Jury.  Without such evidence, the trial would be "conducted on scenarios" rather than on real facts, a result that is antithetical to both the Federal Rules of Evidence and the criminal justice system as a whole.  *See Naranjo, supra.*

## B.   COUNT 2- ANALYSIS

As with Count 1, the Court should deny the defendants' motion in limine and permit IOC evidence related to Count 2 because preclusion would prevent the government from proving the manner and means by which one of the objectives was achieved and, as a result, could result in the government's inability to prove essential elements.

Count 2 incorporates the Introduction, and alleges the following:

2. Beginning in or about 2005 and continuing until in or about February 2019, the exact dates being unknown, in the Western District of New York, and elsewhere, the defendants, **JOSEPH BONGIOVANNI,** and **PETER GERACE JR.**, did knowingly, willfully, and unlawfully combine, conspire, and agree together and with others, known and unknown:

a.     to defraud the United States and the Drug Enforcement Administration (DEA), an agency of the United States, by interfering with and obstructing by means of deceit, craft, and trickery, the lawful and legitimate governmental functions and rights of the DEA, that is:

i.   the right to have its business and its affairs, and the transaction of the official business of the DEA conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction; and

ii.   the right to the conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of his duties by the defendant, JOSEPH BONGIOVANNI, in his

official capacity as a DEA SA free from corruption, partiality, improper influence, bias, dishonesty and fraud in dealing with the DEA and other law enforcement agencies;

> b. directly and indirectly, corruptly to give, offer, and promise a thing of value to a public official, with intent to induce the performance of an official act and to induce a public official to do an act and omit to do an act in violation of his lawful duty, as opportunities arose, in violation of Title 18, United States Code, Section 201(b)(1)(C); and
> c. directly and indirectly, corruptly to demand, seek, receive, accept, and agree to receive and accept, a thing of value personally, in return for being influenced in the performance of an official act and for being induced to do an act and omit to do an act in violation of official duty, as opportunities arose, in violation of Title 18, United States Code, Section 201(b)(2)(A) and 201(b)(2)(C).

The Manner and Means Section of Count 2 alleges how the conspiracy was carried out and is fundamental to defining it.  In proving the elements, the government will need to prove what the conspiracy entailed and how it was carried out.  A plain reading of the Indictment establishes that the IOC allegations and proof supporting them are indispensable, as follows:

- **It was part of the conspiracy that**, in exchange for payments he received and in order to ingratiate himself to individuals whom he believed were members and associates of IOC, the defendant **BONGIOVANNI utilized his position as a DEA SA to attempt to dissuade other members of law enforcement**: **from conducting investigations of his coconspirators, friends, associates and individuals the defendant believed to be connected to or associated with IOC, including the defendant GERACE and others**; **and from conducting investigations into any individuals who may have been able to expose his criminal activities and those of his friends, associates, and individuals the defendant believed to be connected to or associated with IOC**.  *See* Doc. No. 89, Count 2, Manner and Means ¶ 5 (emphasis added).

- **It was part of the conspiracy that** the defendant **BONGIOVANNI would falsely deny to other agents of the DEA the existence and extent of connections between himself** and individuals he knew to be involved

in the possession, use, distribution, and importation of controlled substances, **and individuals he believed were connected to or associated with IOC.**  *See* Doc. No. 89, Count 2, Manner and Means ¶ 12 (emphasis added).

- **It was part of the conspiracy that** the defendant **BONGIOVANNI** would conceal his possession, use, and distribution of controlled substances, the bribes he received, **and the assistance he provided to his friends, associates, coconspirators, and individuals who he believed were members of, connected to, or associated with IOC**.  *See* Doc. No. 89, Count 2, Manner and Means ¶ 15 (emphasis added).

In other words, Count 2 specifically alleges that Bongiovanni believed Gerace was connected to or associated with IOC, and Bongiovanni utilized his position to dissuade other members of law enforcement from investigating Gerace, and to hide and protect the conspiratorial nature of their relationship.  Bongiovanni acted "in exchange for payments he received and to ingratiate himself to individuals whom he believed were members and associates of IOC,"—a category of people that included Gerace.  It is hard to imagine evidence that is more probative in this case than evidence directed towards the fact that a sworn DEA agent knowingly protected a mafia associate in exchange for bribes and to ingratiate himself with other members or associates of the mafia.

The government's evidence is hardly surprising given public admissions made by agents and authorized representatives of both Bongiovanni and Gerace in this litigation.  As to Bongiovanni, while of course generally denying any mafia connections or its existence, the defendant acknowledged and admitted the following in his initial publicly filed omnibus motion:



*See* Doc. No. 78, at 25; *see also* Doc. No. 81. [7]  As to Gerace, while of course denying that he

is in the mafia, counsel of record for Gerace admitted that he likely had relatives in the

mafia, as follows:

> "There is no way this jury is going to be able to unhear the term Italian
> organized crime," Cohen said. They're not going to unhear the term mafia.
> And they're also not going to be able to unhear the fact that Peter does have
> relatives who were involved in that. **Peter himself was never involved in
> Italian organized crime. But he has relatives who likely were**."

*See,* https://buffalonews.com/news/local/crime-and-courts/ex-dea-agent-strip-club-owner-

should-be-tried-together-judge-says/article_d2592222-e9ed-11ed-aec6-e7ad940a8f3e.html

(visited June 2, 2023) (emphasis added).


As alleged in the indictment, Bongiovanni was a member of law enforcement in

Buffalo, New York both as an Erie County Sheriff from 1995 to 1998, and then as a DEA

agent in Buffalo, New York from 2001 until February 1, 2019.   During that time,

Bongiovanni worked with other members of law enforcement in the Western District of

New York, including members of the FBI.  Gerace's grandfather, ████████████ had a

---

[7] Gerace's grandfather, ████████████████████████████████  The
defendant eventually filed a redacted version of its motion after the government raised
privacy and witness protection issues with defense counsel, but the information remained
unredacted for approximately 1 day.   In its response, *see* Doc. No. 87, at 65-66, the
government provided notice to Bongiovanni that it would seek to introduce this and other
statements as agency admissions pursuant to FRE 801(d)(2)(D), and the defendant has, to
date, filed no motions in limine to preclude such evidence.

well-known reputation in the community and among law enforcement as the leader of the Buffalo mafia during that time.[8]   Going back further, Bongiovanni has admittedly known Gerace since the sixth grade, *see* Doc. Nos. 78, 81, and since that time there have been at least a dozen articles about ████████ reputation as the leader of the Buffalo mafia, which are marked as trial exhibits and on the government's exhibit list as follows:



---

[8] As set forth below, Bongiovanni admitted knowing that Gerace's grandfather was involved in the mafia during his June 6, 2019, interview with federal law enforcement.

Evidence that Bongiovanni knew or believed that Gerace was associated with IOC (or the mafia or LCN family, or whatever terminology the Court permits) is critical to establishing the manner and means by which an object of the conspiracy was achieved. The object of the conspiracy set forth in Count 2 at paragraphs 2(a)(i)-(ii) does not require any agreement that Bongiovanni accept, or Gerace pay, bribes. Therefore, as with Count 1, IOC evidence as to Gerace (and Bongiovanni's awareness of it) is critical to establishing part of the basis for the trust between Bongiovanni and Gerace, and the manner and means by which an object of the conspiracy was achieved. Preclusion of any and all IOC evidence related to Gerace, and direct and circumstantial establishing Bongiovanni's knowledge of Gerace's connections, would be tantamount to prohibiting the government from proving an object of the conspiracy. Such a ruling would fundamentally change the case and the Indictment returned by the Grand Jury.

Specifically, the Manner and Means section alleges in Count 2 would be proven in part by evidence that Bongiovanni protected Gerace "in exchange for payments he received and to ingratiate himself to individuals whom her believed were members and associates of IOC[.]" *See* Doc. No. 89, Count 2, Manner and Means ¶5. Again, as with Count 1, the object of the conspiracy is not limited to friendship or bribe payments. Preclusion of IOC evidence in this context would potentially prevent the government from proving that Bongiovanni violated his oath to shield, protect, and aid members and associates of organized crime. Evidence of Bongiovanni "ingratiating himself" to such individuals, and establishing that Gerace was one of those individuals, is an integral part of the manner and means by which the government will prove an object of the conspiracy, and ultimately

elements one and two of Count 2, that is, that Bongiovanni and Gerace "entered an agreement" and that they "willfully became [members] of a conspiracy."

Evidence establishing that Gerace was connected to or associated with IOC is also relevant and probative to prove the third element, that is, that an overt act was committed in furtherance of the conspiracy.  Count 2, alleges that part of the conspiracy was carried out by dissuading "other members of law enforcement: from conducting investigations of his coconspirators, friends, associates and individuals the defendant believed to be connected to or associated with IOC, including the defendant GERACE and others; and from conducting investigations into any individuals who may have been able to expose his criminal activities and those of his friends, associates, and individuals the defendant believed to be connected to or associated with IOC[,]"  *see* Doc. No. 89, Count 2, Manner and Means ¶ 5, and numerous overt acts describing how Bongiovanni did that on Gerace's behalf.  *See* Count 2, Overt Acts 19-22.   Indeed, Overt Acts 19-22 specifically describe how Bongiovanni dissuaded an FBI agent, who was investigating Gerace and the Buffalo mafia, from investigating and potentially charging Gerace.  Overt Act 23 describes that Bongiovanni did not document the substance of any contacts he had with Gerace from November 6, 2009 until October 31, 2018 even though "BONGIOVANNI knew and had reason to know that [Gerace] was involved in possession, use, and distribution of controlled substances, and had reason to believe [Gerace] to be a member of, connected to, or associated with IOC."  Overt Act 25 details that Bongiovanni's attempted to dissuade his colleague, ████████ ████████, from investigating Gerace by asking ██████ if he "hated Italians" and by further stating to ████████████████████████████

████████████ that they should be ██████████████████ in a clear effort to

suggest that ██████ should not be investigating Gerace—an Italian person that

Bongiovanni had reason to believe was a member of, connected to, or associated with IOC.

Moreover, Bongiovanni's knowledge and belief of who Gerace was connected to also

provides the context for the false and misleading DEA reports and memos Bongiovanni

submitted to distance himself from Gerace and obscure the true nature of the relationship

between them.  *See* Count 2, Overt Acts 20, 29-31.[9]  Accordingly, IOC evidence related to

Gerace, and direct and circumstantial evidence of Bongiovanni's knowledge and belief, are

critical to proving numerous overt acts.  Precluding such evidence would seriously

jeopardize the government's ability to prove the third element of Count 2, that is, that one of

the members of the conspiracy knowingly committed at least one of the overt acts charged

in the indictment.

        The fourth element requires that an overt act was committed to further the objectives

of the conspiracy.  Evidence of Bongiovanni's motive to protect certain individuals, who he

believed to be IOC members and associates such as Gerace, is necessary to tie a litany of the

overt acts alleged in Count 2 to objectives of the conspiracy.  If IOC evidence as to Gerace is

precluded, then a significant aspect of the manner and means by which the conspiracy was

carried out would be excised from the trial and the government may be unable to prove and

object of the conspiracy between Bongiovanni and Gerace.  *See* Count 2, at ¶2(a)(i)-(ii).  As

with Count 1, this may lead to an absurd result whereby in truth and in fact, Bongiovanni

---

[9] Count 2, Overt Acts 29-31 are also substantive Obstruction of Justice charges in violation
of Title 18, United States Code, Section 1519, which incorporate the Introduction and
Count 2 by reference as though set forth fully.  *See* Counts 12-14.

protected organized crime members and associates, but the jury would be required to acquit

him in the event that it did not find that he agreed to accept bribes or that he did not agree to

protect his friends and associates.   In other words, excising all IOC proof could result in a

finding that a sworn DEA agent did not break the law when he protected Gerace and other

individuals that he believed to be IOC members or associates.   This is precisely the type of

scenario where the Court should refrain from using FRE 403 to unfairly sanitize the

government's case.[10]   *See Jamil*, 707 F.2d at 642 (Rule 403 should be used sparingly); *see also*

*Naranjo*, 710 F.2d at 1469 (Rule 403 "is not designed to permit the court to even out the

weight of the evidence, to mitigate a crime, or to make a contest where there is little or

none").

## C. <u>COUNT 18- ANALYSIS</u>

IOC evidence as to Gerace is highly relevant to the materiality of the false statements

Bongiovanni made to law enforcement, as alleged in Count 18. [11]

On June 6, 2019, the FBI, Department of Justice Office of the Inspector General

("DOJ OIG"), and Homeland Security Investigations ("HSI") executed a search warrant at

Bongiovanni's residence.   At that time, Bongiovanni was uncharged and no federal search

warrants had been executed targeting Gerace.   During the execution of the search warrant,

---

[10] The Introduction and Count 2 are also incorporated by reference into Counts 5, 6, 12-14, and 15.

[11] The purpose of § 1001 is to protect the authorized functions of the various governmental departments from any type of misleading or deceptive practice and from the adverse consequences that might result from such deceptive practices.   *See* Modern Federal Jury Instructions ¶ 36.01, Instruction 36-2.

law enforcement recovered a box of DEA file materials related to individuals Bongiovanni was protecting (*see* Count 1, Overt Act, 55).  Photos of the materials Bongiovanni removed from the DEA and stored in his basement follow:





(the referenced file was located inside Bongiovanni's basement in the box pictured above)


During the interview, Bongiovanni made several materially false statements denying and downplaying his relationship with Gerace.  *See* Count 18.  Bongiovanni also admitted that Gerace's grandfather "had something to do with the mafia."  As a result, evidence that Bongiovanni knew or believed Gerace was a member, associate, or connected to IOC will be highly relevant to the jury's determination of Bongiovanni's motive to make false

statements and to determining the materiality and willfulness of the false statements. Some

relevant excerpts from Bongiovanni's interview as to Gerace follow:

> BONGIOVANNI denied he was in a close relationship with Peter GERACE, and said there were a lot
> of times that he saw Peter GERACE and walked the other way. BONGIOVANNI would not go to lunch
> with Peter GERACE, and said that had been his personal policy for years. BONGIOVANNI denied he
> ever "reached out" to Peter GERACE to arrange a meeting.
>
> BONGIOVANNI had not spoken with Peter GERACE in over a year. Peter GERACE recently tried to
> call BONGIOVANNI's wife ▮▮▮▮▮▮
>
> BONGIOVANNI and Peter GERACE did not celebrate birthdays together.
>
> BONGIOVANNI said Peter GERACE is a "pain in the ass." Peter GERACE is obnoxious and you want to
> get away from him.
>
> BONGIOVANNI said you cannot penalize a person for growing up in the same circle, speaking about
> himself and Peter GERACE.
>
> Peter GERACE's grandfather had something to do with the mafia. Peter GERACE's uncle owns the
> pizza place (referring to ▮▮▮▮ Pizza). BONGIOVANNI was not close enough with Peter GERACE to
> know if Peter GERACE was involved with the mafia.

Bongiovanni also made statements that organized crime in Buffalo was "dead,"

while demonstrating he had no legitimate basis for his claim by also stating that he had

never investigated it, as follows:

> BONGIOVANNI stated organized crime is "dead" in Buffalo, NY. BONGIOVANNI said he does not know
> anything about organized crime and never conducted an organized crime investigation because it
> was "out of his wheelhouse." BONGIOVANNI said new agents always want to sit on ▮▮▮▮ and make
> an organized crime case.

[12]

At one point during the interview, as relevant to Count 1, Bongiovanni tried to

explain that he removed the DEA file pertaining to ▮▮▮▮▮▮ from the DEA office because

he "knew there was an ongoing investigation of Italian Organized Crime," and he wanted

to be able to verify "everything was on the up and up." Some relevant excerpts from the

report further documenting Bongiovanni's statements follows:

---

[12] As set forth *infra*, in 2013 Bongiovanni was specifically advised by a fellow-agent, ▮▮▮▮▮
▮▮, that Michael Masecchia was a member or associate of the ▮▮▮▮▮▮▮▮▮▮▮.
Accordingly, this IOC evidence is highly probative and necessary for the jury to consider in
determining the facts underlying all of the charges, not just the false statements alleged in
Count 18.



A complete copy of the interview report is attached as **Exhibit A**.[13]

Clearly, the IOC evidence is highly relevant to all counts of this Indictment, including providing the context of Bongiovanni's interview with federal law enforcement on June 6, 2019, and establishing the willfulness and materiality of his false statements pursuant to Title 18, United States Code, Section 1001(a)(2).

## EVIDENCE THAT SHOULD BE ADMITTED DURING THE GOVERNMENT'S CASE-IN-CHIEF

The Court should admit all of the evidence described in the Government's Pre-Trial Memorandum, and the specific evidence described below.[14]

---

[13] Bongiovanni withdrew his motion to suppress his June 6, 2019, interview statements the day of the evidentiary hearing before United States Magistrate Judge Michael J. Roemer. *See* Transcript of Proceedings, November 18, 2012, at 4, 78-80; *see also* Doc. Nos. 292, 319.

[14] The evidence described herein is not exhaustive of all potential witness testimony relating to IOC and the government reserves its right to seek to offer additional evidence not specified herein. This section is intended to give the Court an overview of the nature of the IOC evidence the government intends to introduce.











































































**UNITED STATES V. LONG IS DISTINGUISHABLE AND DOES NOT SUPPORT PRECLUSION OF EVIDENCE PURSUANT TO RULE 403 IN THIS CASE**

The facts, circumstances, and manner of proof regarding IOC evidence in this case, as described *supra*, are readily distinguishable from the facts, circumstances, and manner of proof addressed by the Second Circuit in *United States v. Long*, 917 F.2d 691 (2d Cir. 1990).

The *Long* Court analyzed organized crime-related proof in two contexts: (1) expert testimony about the hierarchical structure, jargon, and various criminal activities related to organized crime generally; and (2) the hypothetical questioning of character witnesses requiring the witness to assume the defendants' guilt as to the charged conduct in the case. *Id.* at 701-04.  The holding in *Long* does not issue a broad-sweeping prohibition against organized crime-related proof.  The government does not intend to call an expert witness to testify as to generalized information about IOC in this case.  The government does not

intend to question character witnesses using guilt-assuming hypothetical questions. The analysis and holding in *Long* do not fit the facts, circumstances, and manner of proof in the instant case.

In fact, the *Long* Court noted that it would have approved of the sort of proof the government intends to introduce in the instant case, stating "[w]e agree that *the fact* that Rotondo had contacts in organized labor as a result of his position in the DeCavalcante crime family and demanded a fee for his services was relevant background to explain to the jury how and why he was able to facilitate Hyman's various schemes by introducing him to Long." *Id.* at 701-02. Instead, the Court in *Long* took issue with the use of expert testimony relating to the structure and general (unrelated) activities of organized crime, stating "Hyman, however, could have testified to that fact, and there was no need to call an expert. . ." *Id.* The Court in *Long* acknowledged that proof about Rotondo (an unindicted co-conspirator) and his association with organized crime would be "relevant background to explain to the jury" how and why the criminal conduct occurred in that case. *Id.*

That same analysis applies to the facts of the instant case. As one example of many discussed *supra*, it will be highly relevant to explain to the jury that defendant Bongiovanni was aware that Masecchia was reputed to be a member of IOC in establishing a motive that defendant Bongiovanni had for shielding Masecchia and his organization from investigation and prosecution. ████████████████████████████████████████
████████████████████████████████████████.

The testimony will not come from the sort of generic, broad-sweeping expert testimony that the Second Circuit disfavored in *Long*.

The *Long* Court held, in the context of its FRE 403 analysis regarding expert testimony, that "generalized information" about organized crime was "quite prejudicial in a case with so thin a nexus to organized crime." *Id.* at 702. The Second Circuit noted that, in *Long*, "the enterprise alleged . . . was not a crime family, and the sharing of proceeds from Hyman's illegal activities with Rotondo was the sole nexus with organized crime." *Id.* In the instant case, the government does not intend to call an expert witness to offer testimony regarding general information about IOC. The IOC evidence the government intends to introduce is far more specific and tailored to the counts charged in the Superseding Indictment. Here, there is not only a nexus to IOC, but evidence of IOC is inextricably intertwined with charges in the indictment. As set forth above, the indictment explicitly alleges that Bongiovanni was protecting people he believed were members of or associates of organized crime. The fact that the evidence is damaging to the defendant does not make it irrelevant or unduly prejudicial. The government is not attempting to inject evidence of IOC into a trial where it is otherwise extrinsic. Rather, the defendants introduced IOC into this trial by virtue of their conduct, their statements, their motivations, and their associations.

This Court should consider the Second Circuit's holding in *Russo* as far more instructive in determining the admissibility of IOC evidence in this case. 302 F.3d 37. In *Russo*, a case charging witness tampering and obstruction of justice, the government gave

notice that it intended to introduce evidence of the defendants' roles in an organized crime family to explain the motivations of the defendants and to explain the conduct of certain government witnesses. *Id.* at 41. The defendants moved to preclude the evidence, and the district court ultimately denied the defendants' motions, stating that it was "reasonably satisfied the government cannot try this case in a credible way without the reference to organized crime." *Id.* At the conclusion of proof in the case, the district court specifically instructed the jury that mere membership in an organized crime family, even if that were proven, would be insufficient to convict the defendants of the charged crimes. *Id.* at 42. On appeal, the defendants in Russo claimed that the evidence relating to their membership in organized crime was irrelevant and prejudicial. *Id.* at 43. The Second Circuit found "no merit" in the defendants' claim that the evidence was not relevant and enumerated numerous examples of how the evidence of the defendants' involvement in organized crime provided necessary background and context to the jury. *Id.* at 43. The Second Circuit also noted that the organized crime evidence contextualized the behavior of a government witness whom the defense attempted to paint as paranoid, unbalanced, hysterical, and troubled, stating "the defendant's organized crime affiliations supported the government's argument that [the witnesses'] unorthodox behavior was attributable simply to the fact that she was scared, and should not impeach her credibility." *Id.* Ultimately, the Court held that the defendants' affiliation with an organized crime family was "highly relevant" based upon the facts and circumstances of the case. *Id.*

## MOTION TO SEAL

Because the government's opposition includes grand jury information, information that was produced to the defendants pursuant to the Protective Order (*see* Doc. No. 347), and because the defendant Gerace's original motion in limine was made under seal, the government respectfully requests that its opposition be filed under seal except that a redacted version of this response in opposition, which redacts references to witnesses, grand jury, and protected materials, will subsequently be publicly filed.

## CONCLUSION

The defendants' motions to preclude IOC evidence should be denied and the Court should admit such IOC evidence because it is fundamental to the charges.   Preclusion would significantly alter the indictment, the charges, and prejudice the government by sanitizing this case in a manner FRE 403 does not proscribe.


COREY R. AMUNDSON                    TRINI E. ROSS
Chief                                United States Attorney


BY:   s/JORDAN DICKSON         BY:   s/JOSEPH M. TRIPI
      Trial Attorney                 s/NICHOLAS T. COOPER
      Public Integrity Section       s/DAVID J. RUDROFF
      U.S. Department of Justice     Assistant United States Attorney
      Criminal Division             United States Attorney's Office
      1301 New York Ave. NW, Ste. 1000   Western District of New York
      Washington, D.C. 20530         138 Delaware Avenue
      202-597-0508                   Buffalo, New York 14202
      jordan.dickson@usdoj.gov       716.843.5839
                                     Joseph.Tripi@usdoj.gov