IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
───────────────────────────────────────────

UNITED STATES OF AMERICA,

         v.                                    19-CR-227-JLS

JOSEPH BONGIOVANNI,
PETER GERACE, JR.,

               Defendants.
───────────────────────────────────────────

UNITED STATES OF AMERICA,

         v.                                    23-CR-37-JLS-MJR

PETER GERACE, JR.,

               Defendant
───────────────────────────────────────────

## GOVERNMENT'S RESPONSE IN OPPOSITION OF THE DEFENDANT'S SECOND MOTION FOR RECONSIDERATION OF DETENTION

**THE UNITED STATES OF AMERICA**, by and through its attorney, Trini E. Ross, United States Attorney for the Western District of New York, Joseph M. Tripi, David J. Rudroff, and Nicholas T. Cooper, Assistant United States Attorneys, Corey R. Amundson, Chief, United States Department of Justice, Public Integrity Section, and Jordan Dickson, Trial Attorney, United States Department of Justice, Public Integrity Section, of counsel, hereby files this response in opposition to the defendant's motion for reconsideration of detention.

## BACKGROUND AND PROCEDURAL HISTORY

On February 25, 2021, a Grand Jury sitting in the Western District of New York returned an 18-count Second Superseding Indictment in case 19-CR-227-JLS. Defendant

Gerace was charged in Counts 2, 6, 7, 8, and 9 of the Second Superseding Indictment as follows: Count 2 charged defendant Gerace with Conspiracy to Defraud the United States; Count 6 charged defendant Gerace with Paying a Bribe to a Public Official; Count 7 charged defendant Gerace with Maintaining a Drug-Involved Premises; Count 8 charged defendant Gerace with Conspiracy to Distribute Controlled Substances; and Count 9 charged defendant Gerace with Conspiracy to Commit Sex Trafficking. *See* Dkt. 89. Generally, as a perusal of the Second Superseding Indictment readily establishes, most of the conduct underlying the charges relates to the defendant's presence at, involvement in, and control of, Pharaoh's Gentlemen's Club. The charges establish the defendant is presumed to be a flight risk and a danger to the community.

On March 1, 2021, defendant Gerace was arrested in Florida during the COVID-19 pandemic. At an initial appearance in the Southern District of Florida on March 2, 2021, where an attorney from the USAO-WDNY appeared remotely, defendant Gerace was ordered released on various conditions recommended by the government.[1] *See* Dkt. 93. ; *see also* Transcript of Proceedings, March 2, 2021, attached hereto as **Exhibit A**. Notably, at the March 2, 2021, appearance, U.S. Probation in the Southern District of Florida recommended detention, and the defendant initially consented to the conditions of release requested by the government, as follows:

---

[1] This was due to issues related to the pandemic and government representations made to Gerace's prior counsel, Joel Daniels, Esq., regarding seeking conditions of release or moving for detention.

```
 4              THE COURT:  Well, Mr. Daniels, it sounds to me like
 5    those are some major objections to the government's recommended
 6    bond.  If that is the case, then I think you are going to have
 7    to make a decision whether you want to have a bond hearing here
 8    or with the judge in the Western District of New York, because
 9    obviously I am not going to make this decision because it
10    sounds like you want a bond hearing, is what I'm hearing you
11    say.
12              MR. DANIELS:  We don't want that, Judge.  We are
13    willing to go along with the government's recommendation.  We
14    appreciate them allowing him to be released, come back to
15    Buffalo, and appear before a magistrate here, Judge.  We were
16    just opposing for the record some of the conditions that the
17    government was requesting.  But that is your decision, Judge.
```

*See* **Exhibit A** at 22, lines 4-17.  Magistrate Judge Valle further commented, in part, "Well, this was an interesting case because, but for the government's recommendation, this is a case where I think detention would be warranted."  *Id.*, at 25 (lines 3–5).)

On March 4, 2021, U.S. Probation provided an amended memorandum which establishes that the defendant committed an additional crime the day of his arraignment in Florida.  In his original pre-trial services interview, the defendant stated that he had used cocaine one and a half years ago.  However, subsequently to his appearance before Magistrate Judge Valle (and subsequently to the government finalizing its recommendation), U.S. Probation learned that the defendant tested positive for cocaine.  U.S. Probation Officer Assistant Andre McCray's March 4, 2021, Memorandum, which is attached hereto as **Exhibit B**, provided an update in pertinent part:

> **It is to be noted that the time of the defendant's initial drug test conducted in the Southern District of Florida, he tested positive for cocaine. Mr. Gerace reported taking some pills at a social gathering but, did not report cocaine use. At the time of the pretrial services interview, the defendant reported a history of cocaine use, with his last date of use being approximately one and a half years ago.**

*See* **Exhibit B**, at 1 (emphasis in original).  Accordingly, from the outset of this case, defendant Gerace has lied to U.S. Probation.

United States District Court Judge John L. Sinatra, Jr. ("Judge Sinatra"), later reduced the release conditions, over the government's objection, on April 14, 2021, *see* Dkt. 112, and again over the government's objection, on January 19, 2023.  *See* Dkt. 361.

On November 30, 2022, District Court Judge Sinatra set **a date certain trial** for June 21, 2023, and issued a Pre-Trial Order the same day.  *See* Dkts. 324-325.  The government began providing voluminous *Jencks* Act materials in January 2023, after the entry of a Protective Order.  *See* Dkt. 347.

On March 23, 2023, a Grand Jury sitting in the Western District of New York returned a four-count Indictment in case 23-CR-37. Defendant Gerace was charged in Counts 1 through 4 as follows: Count 1 charged defendant Gerace with Tampering with a Witness; Count 2 charged defendant Gerace with Tampering with a Witness; Count 3 charged defendant Gerace with Tampering with a Witness; and Count 4 charged defendant Gerace with Distribution of Cocaine. See Dkt. 1, 23-CR-37-JLS.

On March 24, 2023, defendant Gerace was arraigned on the 23-CR-37 Indictment, and the government moved for detention. A detention hearing for defendant Gerace was held and the government proceeded by proffer. After hearing the government's proffer, the defendant requested a continuance of the detention hearing. *See* **Exhibit C** – Transcript of March 24, 2023, Detention Hearing. The detention hearing was continued on March 27, 2023. The Court ordered the defendant detained pending trial, finding that no condition or combination of conditions w[ould] reasonably assure the safety of any other person and the community. In particular, Judge Sinatra found:

> I've heard everything I heard on Friday and today, all pursuant to the factors in subsection G of 3142, which I've studied at length. Like I noted on Friday, a major focus for me is how I'm to weigh Mr. Gerace's compliance with the conditions in the 19-CR-227 case, on the one hand, with several items to kind of -- the counter way and stand in the face of that; and things like the new detail that I've heard from Mr. Tripi surrounding the Facebook incident, which resulted in the three counts of indicted conduct related to the Facebook incident in this case, including the corroboration of those details. Also new to me is the Government's proffer about Mr. Gerace referring to the victim witness as a snitch prior to the November 19, 2019, alleged conduct, and in real time as well. I still have some concerns as well about the Government's proffer about Mr. Gerace's apparent willingness to use his contacts in the legal system to improperly disadvantage those perceived as being against him. And there, in part, I'm concerned about the Michalski incident, also, as well as the [local police department] detective incident that I heard about on Friday as well. The cocaine and drug supplying and prostitution items aren't good facts either. The loan application issues, at a minimum, present recent untrustworthy activity from June, 2020 and July, 2021. Some of that activity after the releases in the 19-CR case. And in particular, noteworthy is the denial of prior convictions and current indictment, among other items on those applications. I also note that -- I don't know if I need to note that, but I note that witness tampering is something that goes to the heart of the justice system. And I think that's something that, at a minimum, the LaFontaine case accounts for and speaks to. Taking into account all of the G factors, including defendant's past conduct and how that relates to the safety of witnesses in this case and the safety of witnesses in the 19-CR case, I note that defendant's record of compliance is sufficient to rebut the presumption in section E-3. Nevertheless, I find by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person in the community, especially vis-a-vis witnesses against Mr. Gerace. **And I also note that the case law, for**

> **example,** *LaFontaine,* **about detention and witness tampering cases also notes cases about detention and obstruction of justice cases, even absent violence or threats of violence.   Therefore, I order Mr. Gerace detained pending trial**.

*See* Transcript of Proceedings, March 27, 2023, at 33-34, attached hereto as **Exhibit D** (emphasis added).

On March 28, 2023, the government filed its motion for joinder of the indictments, *see* Dkt. 411, and on April 28, 2023, Judge Sinatra ordered that Indictment 23-CR-37 would be consolidated with the Second Superseding Indictment 19-CR-227 for trial.  *See* Dkt. 442.

On April 12, 2023, District Court Judge Sinatra denied defendant Gerace and defendant Bongiovanni's severance motions.  *See* Dkt. 434.

On April 26, 2023, the government timely filed its Pre-Trial Memorandum and Motions in Limine.  *See* Dkt. 441.  The government incorporates the information contained in Dkt. 441 as part of its proffer of evidence in this case as though set forth fully herein.

On April 28, 2023, District Court Judge Sinatra issued a Decision and Order denying severance and granting the government's motion to consolidate Case Nos. 19-Cr-227 and 23-CR-37 for trial.

On May 10, 2023, the government filed a motion to stay (*see* Doc. No. 456) provisions of the Protective Order permitting dissemination of witness names, when it learned that

counsel for defendant Bongiovanni intended to move to withdraw as counsel. The Court granted the motion (*see* Dkt. 458).

On May 16, 2023, defendant Bongiovanni's former attorney filed a motion to withdraw as counsel due to health issues (*see* Dkt. 476), and on May 17, 2023, and District Court Judge Sinatra granted defendant Bongiovanni's former attorney's motion to withdraw and assigned new counsel to represent defendant Bongiovanni, set June 21, 2023, as the date to argue certain motions, and rescheduled the trial for August 14, 2023. *See* Dkt. 484.

On May 22, 2023, the defendant submitted his Motion to Reopen the Detention Hearing and for Pretrial Release, largely consisting of regurgitated arguments that previously failed to sway the Court. *See* Dkts. 490-493.

On May 23, 2023, District Court Judge Sinatra issued an Amended Pre-Trial Order. *See* Dkt. 489. Pursuant to the amended order, trial was scheduled for **a date certain** on August 14, 2023, and witness lists were due on June 16, 2023. *Id.* at 6.

On May 30, 2023, District Court Judge Sinatra issued a Decision and Order denying defendant's Gerace's motion to suppress the results of search warrants and for a *Franks* hearing. *See* Dkt. 496. That same day, on May 30, 2023, the government filed its response to the defendant's motion to reopen the detention hearing and for pretrial release. *See* Dkts. 497 [redacted version publicly filed], 498 [unredacted version filed under seal].

On June 6, 2023, Judge Sinatra issued a Decision and Order (D&O) denying the defendant's motion to reopen the detention hearing. *See* Dkt. 504. In his D&O denying the motion, Judge Sinatra properly held:

> The Court has painstakingly considered all arguments on both sides, balancing Gerace's liberty interest with the need for witness and public safety— specifically, how the existing factors bear on whether the Court can conclude, by clear and convincing evidence, that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *See* 18 U.S.C. § 3142(f). Here, as in all cases, the Court is aware of the need for a careful balance of the competing concerns involved in the analysis of pre-trial release or detention, as well as the implications for Gerace and the public based on where the balance is struck. *See generally United States v. Salerno*, 481 U.S. 739, 746–47, 755 (1987).
>
> In sum, the Court has reviewed the parties' proffers, arguments, and written submissions and identifies no basis, on this record, to grant Gerace's motion for pre-trial release.[1] The Court therefore denies Gerace's motion to re-open the detention hearing and for pre-trial release (Dkt. 491), in its entirety.
>
> SO ORDERED.
>
> Dated:   June 6, 2023
>          Buffalo, New York
>
> JOHN L. SINATRA, JR.
> UNITED STATES DISTRICT JUDGE

Also, on June 6, 2023, defendant Gerace moved for reconsideration of the decision denying defendant Gerace's motion to suppress the results of the execution of search warrants at defendant's home and business. *See* Dkt. 505. The Court directed the government to respond by June 20, 2023. *See* Dkt. 508.

On June 7, 2023, defendant Gerace filed a motion to exclude a government expert (*see* Dkt. 509), and Attorney Cohen filed a motion for reconsideration of denial of his motion to file an untimely motion to suppress cell phone evidence stemming from a border search that occurred in April of 2019. *See* Dkt. 510. Government responses were due June 20, 2023. *See* Dkts. 508, 512.

On June 8, 2023, Gerace was indicted and charged with four counts of wire fraud relating to an Economic Injury Disaster Loan (EIDL) that he obtained while on pre-trial release.  *See* Case No. 23-CR-60.  The allegations set forth in Case No. 23-CR-60 establish that the defendant committed parts of a $2,000,000 Economic Injury Disaster Loan (EIDL) wire fraud while under pre-trial release conditions, and under the supervision of the U.S. Probation Office, in Case No. 19-CR-227.  *See* Indictment, Case No. 23-CR-60-JLS attached as **Exhibit E**.  The Indictment in Case No. 23-CR-60-JLS also provides for increased penalties because the defendant committed the criminal conduct while on release, as follows:

### ALLEGATION PURSUANT TO 18 U.S.C. § 3147

**The Grand Jury Alleges That:**

26.    As the defendant, PETER GERACE, JR., had been released pursuant to Chapter 207 of Title 18, United States Code, at the time of the commission of the felony offenses alleged in Counts 3 and 4 of this Indictment, should the defendant be convicted of Count 3 or Count 4 of this Indictment, the defendant is subject to the term of imprisonment prescribed in Title 18, United States Code, Section 3147(1), in addition to the penalties otherwise provided by law.

**All pursuant to Title 18, United States Code, Section 3147.**

Notably, the Indictment in Case No. 23-CR-60 is a changed circumstance, but one that strongly favors detention.  At the time of the detention hearing on March 24 and 27, 2023, the EIDL Loan Fraud was only proffered information.  Since that time, a Federal Grand Jury has returned a four-count indictment.  Accordingly, in addition to the potential life sentence the defendant faces in Case Nos. 19-CR-227 and 23-CR-37, the defendant faces an additional 46 to 57 months imprisonment on Case No. 23-CR-60, plus an additional mandatory sentence of up to 10 years consecutive to any sentence imposed on this conviction pursuant to 18 U.S.C. § 3147.

9

On June 9, 2023, defendant Gerace filed a motion to dismiss the indictment.  *See* Dkt. 515.

On June 16, 2023, after suffering a string of adverse ruling by Judge Sinatra, and after Gerace's attorney openly questioned Judge Sinatra's integrity in the media, defendant Gerace filed a witness list with over 200 names, and included names of two individuals that triggered a mandatory recusal of Judge Sinatra.  In particular, this followed public comments by defendant Gerace's attorney the Buffalo News on June 6, 2023, "This judge continues to be particularly harsh to Mr. Gerace, and we see no legitimate basis for that," and "[h]e appears to accept whatever the prosecution says at face value, even though they are bare allegations not supported by evidence."  *See*, Lakamp, Patrick, The Buffalo News, June 6, 2023, <https://buffalonews.com/news/local/judge-refuses-to-release-strip-club-owner-ahead-of-bribery-sex--and-drug-trafficking/article_3fd18366-0475-11ee-a8d3-5fb60c07e3c4.html>

On June 21, 2023, Judge Sinatra issued a Text Order recusing himself, as follows: "Given Defendant Peter Gerace, Jr.'s inclusion of two individuals **as supposed character witnesses among the hundreds of individuals on his witness list**, recusal even in the absence of any bias, prejudice, or partiality is now required under 28 U.S.C. 455(b)(5)(iv). The undersigned is hereby recused. These cases (19-CR-227 and 23-CR-37), which have been joined for trial, will be reassigned to another District Judge for all further proceedings. SO ORDERED."  *See* Dkt. 535 (emphasis added).

On June 30, 2023, the parties appeared before this Court and another set-in stone trial date was set for October 23, 2023.  *See* Dkt. 546.  During this appearance, Attorney Cohen

10

convinced this Court not to set the September 25, 2023, trial date the Court had selected, and trial was scheduled for October 23, 2023, notwithstanding the fact that, even with an August 14, 2023, trial date Attorney Cohen was committed to, the trial would have still been underway into October 2023.  *See* Transcript of Proceedings, June 30, 2023.  This was the third set in stone trial date involving over 200 government witnesses.

On July 15, 2023, defense counsel indicated that he has been terminated.  *See* Dkt. 567.

On July 19, 2023, the parties appeared for a status conference related to Gerace's "termination letter."  During the appearance, Attorney Cohen stated "[H]e has fired me for what he perceives to be my failure to follow through on instructions he has given me.  I do not intend to allow my trial strategy to be controlled by a client."  *See* Transcript of Proceedings, on July 19, 2023 ("Tr. 07/19/2023"), at 3.  Also, Attorney Cohen stated for the for the first time, that Gerace's "dissatisfaction with me goes back for a long time."  *Id.* Later during the July 19, 2023, appearance Attorney Cohen made additional comments suggesting that tactics may be involved.  In particular, he stated:

a.   That granting defendant Gerace's motion to reconsider District Court Judge Sinatra's denial of Gerace's untimely motion seeking to suppress cell phone evidence "may dispose of this…we may not even have a problem if Your Honor considers that."  Tr. 07/19/2023, at 13.  This statement suggests that Gerace and/or Attorney Cohen are attempting to goad the Court into reversing District Court Judge Sinatra's prior decision (*see* Doc. Nos. 330 and 368) or risk adjourning this lengthy and complex trial for a fourth time.  These statements and circumstances may appropriately lead the Court to conclude that defendant Gerace is trying to force the Court's hand akin to stating, "either reverse District Court Judge Sinatra's decision, or I am firing my lawyer and causing another delay in this trial."

b.   That "he's not asking for this, but if the Court pushed this [trial] off later on, maybe that could remove the time conflicts," such that other

11

attorneys will accept Gerace's case and get ready for the trial.   Tr.
07/19/2023, at 15.   Here,   the defense implicitly requested an
adjournment of the trial on one hand, while claiming they want a speedy
trial on the other hand (*i.e.*, "The record is crystal clear, Judge, that we
objected to the adjournment even when Mr. Harrington took ill and had
to withdraw, we objected to an adjournment of the trial (*see* Tr.
07/19/2023, at 10).").   While Judge Sinatra previously rejected defense
arguments that defendant Gerace's pre-trial incarceration merits release,
*See* Dkts. 491, 491-1, 497, 498, 504, the defense already started to lay
the groundwork for revisiting the issue of pre-trial detention when
Attorney Cohen stated, "Mr. Gerace has communicated to me that he's
been having a hard time trying to arrange for new counsel while he's
locked up. The facilities there just -- he doesn't have access to a computer
to search for lawyers, and he's going by other inmates who are there as
to who might be a good lawyer.  He just wanted Your Honor to know
that."  *See* Tr. 07/19/2023, at 22-23.

On July 28, 2023, the government filed an affidavit in opposition of withdrawal of
defense counsel (awaiting docketing), and on August 3, 2023, the government filed a
supplemental affidavit in opposition of withdrawal of defense counsel or alternatively to
require any new counsel to be ready for trial on October 23,2023 (awaiting docketing).

On August 8, 2023, defendant Gerace filed a sealed motion for reconsideration of
detention (awaiting docketing).   *See* August 8, 2023, Memorandum of Law at 4
(acknowledging the defendant's motion is one seeking reconsideration).   This response
ensues.

## THE GOVERNING LAW

As this Court has recently acknowledged, the "standard for a motion for
reconsideration is strict, and courts generally will deny a motion for reconsideration unless
the moving party can point to controlling decisions or data that the court overlooked—
matters, in other words, that might reasonably by expected to alter the conclusion reached by

the court." *See* Decisions and Order ("D&O"), Dkt. 576 at 2 (citing *Shrader v. CSX Transp. Inc.,* 70 F.3d 255, 257 (2d Cir. 1995) (punctuation omitted). Reconsideration of a prior decision is generally only justified in one of the following three circumstances: (1) an intervening change in controlling law; (2) new evidence; or (3) the need to correct a clear error of law to prevent manifest injustice. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). Reconsideration should be denied when a movant "seeks solely to relitigate an issue already decided." *Shrader,* 70 F.3d at 257. The standard for granting a motion for reconsideration does not change simply because a case has been reassigned to a different judge. *See* Dkt. 576 at 3 (citing *Arons v. Lalime*, 3 F. Supp. 2d 328, 330 (W.D.N.Y. 1998).

The Second Circuit has made clear that, when a finding of dangerousness is related to violent conduct, it need not be shown that the defendant personally engaged in the violence. *United States v. Colombo*, 777 F.2d 96, 98 (2d Cir. 1985); *see also United States v. Salerno*, 481 U.S. 739, 744 (1987) ("The activities of a criminal organization [...] do not cease with the arrest of its principals and their release on even the most stringent of bail conditions."). As in this case, the government may proceed by proffer. "It is well established in this circuit that proffers are permissible both in the bail determination and bail revocation contexts." *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000). The Second Circuit has held that witness tampering is a crime that threatens the integrity of the trial process and supports a finding that a defendant is a danger to the community. *Id.* (collecting cases).

## STATEMENT OF FACTS: TIMELINE OF MAJOR EVENTS

As set forth in the government's prior arguments and filings in support of detention, the facts of these case, coupled with the defendant's history and characteristics, fully justify

Judge Sinatra's decision to detain the defendant pending trial based upon his dangerousness.

The following timeline applies to the facts of this case:

April 2019:

July 2019:

October 17, 2019:

| October 31: 2019: | Indictment 19-CR-227 was returned charging Bongiovanni, and it referenced Gerace as Coconspirator 1. |
| --- | --- |
| November 19, 2019: | Gerace and others                           sent threatening messages to          .  Witness 2 sent the messages to     using        's phone and Facebook account. |
| December 12, 2019: | Law enforcement executed federal search warrants at PGC and Gerace's residence. |
| October 12, 2020: | Gerace sued               in state court.  The government filed for an injunction of this lawsuit, which was granted by Judge Sinatra.  The Second Circuit affirmed Judge Sinatra's decision on May 26, 2023, and stated, in part, the following: |

> 15      The government's interest in the injunction was to avoid compromising the criminal and
>
> 16      grand jury proceedings by preventing the evasion of justice and abuse of potential government
>
> 17      witnesses.  The Second Superseding Indictment was filed two months prior to the injunction
>
> 18      request.  This indictment explicitly named Gerace as a co-conspirator in an alleged criminal
>
> 19      enterprise that had access to sensitive, confidential law enforcement intelligence and used that
>
> 20      access to evade justice.  At the time the district court considered the injunction, therefore, Gerace
>
> 21      was aware of what the government sought to prove in its charges against him, which is relevant to
>
> 22      the government's concern that Gerace might try to intimidate whomever he thought might testify
>
> 23      against him.  In fact, at the hearing on Gerace's motion to vacate, the government stated that a co-

1   conspirator had admitted that members of the enterprise had access to the names of potential

2   cooperators.  Transcript of Proceedings at 7, *United States v. Gerace*, No. 1:19-CR-00227-JLS-

3   MJR (W.D.N.Y. July 22, 2021), ECF No. 182.  According to the government, "witnesses ha[d]

4   reported being or feeling threatened by Mr. Gerace and/or associates of Mr. Gerace."  *Id.*

*See* Mandate, Case No. 21-2419, Document 138 at 4-5.  The Second Circuit continued, "Here,

the potential interests of the government are considerable, whereas the potential prejudice

faced by Gerace is *de minimis*.  **Indeed, this is exactly the type of case—where a criminal**

**enterprise thrives off of gathering and using confidential law enforcement intelligence—**

**that merits the relief granted by the district court**."  *Id.* at 5 (emphasis added).

December 3, 2020:

March 4, 2021:

January 19, 2023:

January 24, 2023:

---

[2] A copy of the agent's report documenting this interview was provided to the defense as part
of 3500 materials on March 24, 2023.

[3] A copy of this grand jury transcript was provided to the defense as part of 3500 material on
March 24, 2023.

February 3, 2023:      Witness 2 was charged via sealed Criminal Complaint with three counts of witness tampering based upon the events of November 19, 2019, and with one count of false statements due to statements made to the FBI on January 24, 2023.

February 8, 2023:      Criminal Complaint            was unsealed and available on Pacer.  The Second Superseding Indictment charging Gerace and Bongiovanni was attached as Exhibit A of Criminal Complaint         .  Conditions of release were set by United States Magistrate Judge H. Kenneth Schroeder Jr., and available on Pacer.[4]

February 16, 2023:     Witness 2 appeared and proffered with the government.[5] Witness 2's attorney provided the text messages to the government wherein Gerace's attorney asked another attorney to reach out to Witness 2, in pertinent part as follows:

Omg I'm sorry to hear that hunny 😔
Where are you living now?
Are you ok otherwise?
I know Mike well, great guy and great attorney. I'm guessing he's meeting you for the same concern I had as I got a call from Peter Gerace's attorney, Steve Cohen concerned that the feds might be trying to intimidate you or even just bring you in for questioning. He saw that I was your attorney in the past and reached out to me for me to make sure you were OK and knew I'm here if you need representation.
And I want you to know I'm here even if you just need a friend as well 🙂 [6]

---

[4] A copy of the criminal complaint was provided in discovery to the defense as part of discovery on April 11, 2023.  It was available publicly on Pacer since February 8, 2023.

[5] A copy of this proffer report was provided to the defense on May 26, 2023, with 3500 material disclosures.

[6] Witness 2 indicated that she has safety concerns being a witness/cooperator in this case.  A copy of the messages was provided to the defense in discovery on April 11, 2023.

February 23, 2023:

February 27, 2023:

March 3, 2023:          The government filed a motion with affidavit under seal
                        requesting that United States Magistrate Judge H. Kenneth
                        Schroeder, Jr., set a Rule 48(b) dismissal date because his normal
                        practice is to not set such dates.  Magistrate Judge Schroeder
                        issued a Text Order: "For the reasons set forth in the affidavit
                        under seal, the Criminal Complaint shall be deemed dismissed
                        without prejudice pursuant to Rule 48(b) […] effective
                        4/9/2023."

March 7, 2023:

March 9, 2023:

March 14, 2023:         Witness 2 contacted the FBI at the advice of her attorney to
                        report that rats had been thrown on her [mother's] car and her
                        roommate's car.  The FBI conducted follow-up interviews and
                        responded to the location and observed the dead rat.  Witness 2
                        reported that she was very scared after discovery of the second
                        rat.[11]

---

[7]  A copy of this proffer report was provided to the defense on May 26, 2023, with 3500
material disclosures.

[8]  A copy of this proffer report was provided to the defense on May 26, 2023, with 3500
material disclosures.

[9] A copy of this proffer report was provided to the defense on May 26, 2023, with 3500
material disclosures.

[10] A copy of this transcript was provided to the defense on April 11, 2023.

[11] A redacted copy of this FBI report was provided and attached as an exhibit on June 5, 2023,
see Dkt. 503-1 (sealed), Exhibit A.





| | |
|---|---|
| March 21, 2023: | Witness 2 texted the FBI agent, in part, that she was scared and that she believed her dog had been assaulted.[12] |
| March 21, 2023: | The FBI canvassed several pet stores and confirmed that pet stores do not sell rats that look like the rats that were left at Witness 1's house [on her mother and roommate's vehicles].[13] |
| March 23, 2023: | A Grand Jury in the Western District of New York returned an indictment charging Gerace with four counts related to witness tampering and drug distribution.  *See* Case No. 23-CR-37, Dkt. 1. |
| March 27, 2023: | Judge Sinatra detained Gerace.  *See* Case No. 23-CR37, Dkt. 8. |
| March 28, 2023: | The FBI interviewed a witness to the discovery of the dead rats and stated, in pertinent part, that Witness 2 "looked like she had seen a ghost," and was "pretty shook up" about the rats.  Witness |

---

[12] A redacted copy of this FBI report was provided and attached as an exhibit on June 5, 2023, *see* Dkt. 503-1 (sealed), Exhibit B.

[13] A copy of this FBI report was provided and attached as an exhibit on June 5, 2023, *see* Dkt. 503-1 (sealed),  Exhibit C.

| | |
|---|---|
| | 2 stated that it could be because she was "talking with the FBI."[14] |
| April 3, 2023: | Witness 2 entered a Pre-Trial Diversion agreement with the United States Attorney's Office and the United States Probation Office.  That same day, Witness 2 executed a formal cooperation agreement with the United States Attorney's Office. |
| On April 6, 2023: | United States Magistrate Judge H. Kenneth Schroeder, Jr., signed an Order of Dismissal, and dismissed Witness 2's criminal complaint pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure.  *See* _____, Doc. No. 8.  Anyone with access to Pacer could have accessed Witness 2's docket and observed that her complaint was dismissed. |
| May 10, 2023: | The United States Attorney's Office filed its witness list, under seal and pursuant to a protective order, in case number 19-CR-227 and 23-CR-37, listing Witness 2 as a government witness for trial.  Under the terms of the protective order, Gerace's attorney was not permitted to share the names of government witnesses with Gerace.  That same day, the United States Attorney's Office provided Gerace's attorney with Witness 2's proffer statements as 3500 material/Jencks Act Material.  The protective order in place did not permit Gerace access to that material however, as set forth above, Witness 2's cooperation was evident based upon the detention hearings that culminated in Gerace's pretrial detention on March 27, 2023. |
| May 30, 2023: | During Oral Argument on the defendant's first motion for reconsideration of detention (*see* Dkt. 491), Judge Sinatra observed regarding the dead rats, in part: "I think it's probably not a random thing. So we either have Mr. Gerace is involved and knew about it or he didn't or you've got somebody who is acting on his own or her own, right? […] I can't look at it in a vacuum, Mr. Soehnlein. Don't I need to look at what the Government is telling me by way of proffer against the backdrop of everything else I'm hearing in terms of the charged conduct in the 23 indictment, in connection with the outreach from some lawyer to this individual, etcetera? Don't I look at all these facts together?  *See* Tr. 05/31/23 at 21-22. |
| June 6, 2023: | Judge Sinatra denied defendant Gerace's motion for reconsideration of detention.  *See* Dkt. 504. |

---

[14] A redacted copy of this FBI report was provided and attached as an exhibit on June 5, 2023, *see* Dkt. 503-1 (sealed), Exhibit D.

July 7, 2023[15]:          The government received information from a witness who provided the following information:

August 2, 2023:          Witness 2 was found dead.

## **ARGUMENT**

The defendant's motion, which simply regurgitates past arguments previously rejected, does not meet the strict threshold required on a motion for reconsideration.  Contrary to defense claims, there was no information that Judge Sinatra overlooked or undervalued in reaching its sound conclusion that the defendant should be detained.  Since defendant Gerace

---

[15] This is new information since the time Judge Sinatra ordered defendant Gerace detained. The witness is a protected witness, *see* Dkt. 347 and #202 on the Government's Amended Witness List filed under seal on June 16, 2023.

has been detained, there has not been (1) an intervening change in controlling law; (2) new evidence; or (3) the need to correct a clear error of law to prevent manifest injustice. *Virgin Atl. Airways, Ltd.*, 956 F.2d at 1255. To the contrary, the government has proffered additional information circumstantially establishing that defendant Gerace may be engaged in or planning additional witness tampering activity, and that he has stated to a witness that "all snitches should die!"

First, the defendant's claim, unsupported by any case law, that Judge Sinatra did not make written findings of fact is belied by the record. *See* Case No. 23-CR-37, Dkt. 8. Indeed, Judge Sinatra issued his Order of Detention Pending Trial on the standard District Court form AO 472. The Order contained his finding of facts by boxes checked for findings: (i) that there are applicable rebuttable presumptions that the defendant is a flight risk and danger to the community; (ii) that the defendant has rebutted the presumption but that detention is still warranted; (iii) that the Court found that the Government has proven "By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person in the community; (iv) that "**[i]n addition to any findings made on the record at the hearing, the reasons for detention include the following: weight of the evidence against the defendant is strong, subject to lengthy period of incarceration if convicted; prior criminal history** (emphasis added);" and, (v) the Government's detailed proffer- see transcripts from 3/24/2023 and 3/27/23 for analysis." Nothing more was required of Judge Sinatra, and the defendant has not provided any authority to the contrary. In fact, Judge Sinatra did more than necessary by issuing written findings, and by making findings on the record as memorialized in the transcripts of March 24 and 27, 2023. *See* also *United States v. English*, 629 F.3d 311, 321 (2d Cir. 2011) ("the district

court's findings and its reasons for revocation and detention ... may be embodied in a transcript of the proceedings[.]").  Additionally, on June 6, 203, after cases 19-CR-227 and 23-CR-37 were joined for trial, Judge Sinatra issued another D&O detaining the defendant, *see* Dkt. 504, but the defendant ignored this D&O entirely.  Accordingly, the defendant's claim that Judge Sinatra committed clear error and failed to make findings in support of detention lacks merit.

Second, as the defendant acknowledges, the government was permitted to proceed by proffer.  *See Lafontaine, supra, see also United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995) ("The rules of evidence do not apply in a detention hearing. Further, the government may proceed by proffer.") (citations omitted).  However, without additional legal authority or analysis, the defendant claims the government's proffer and Judge Sinatra's reliance upon it offended Due Process.  The defendant's claims lack merit.

The government supported its proffer with information from Witness 2, who sent the messages, and Witness 1, whose account was utilized to send the messages.  The government corroborated its witnesses with text messages (namely, Attorney Cohen utilizing Attorney Michael Bly to circumvent 's attorney of record, Michael D'Amico), Facebook messages, and evidence that Gerace considered a "snitch."  A copy of December 3, 2020, testimony is attached hereto and incorporated by reference as **Exhibit F**.  Additionally, the government proffered information that was assaulted following a secure interview with federal law enforcement at a local police department, and that Gerace had a relationship with a detective involved in arrest and transport to the local police department.

Furthermore, the government proffered considerable information about how defendant Gerace utilized his contacts with former New York State Supreme Court Judge Michalski to disadvantage others, and proffered text messages exchanged between Michalski and Gerace during its proffer.  All of this information appropriately caused Judge Sinatra to conclude, in part, the following:

> Also new to me is the Government's proffer about Mr. Gerace referring to the victim witness as a snitch prior to the November 19, 2019 alleged conduct, and in real time as well.
>
> I still have some concerns as well about the Government's proffer about Mr. Gerace's apparent willingness to use his contacts in the legal system to improperly disadvantage those perceived as being against him.
>
> And there, in part, I'm concerned about [two incidents] that I heard about on Friday as well.
>
> The cocaine and drug supplying and prostitution [proffers] aren't good facts either.

See Dkt. 504, at 2.  Notably, the information available to this Court is further amplified by the additional contained in the Government's Pre-Trial Memorandum and Motions in Limine, see Dkt. 441, and the government's brief regarding the admissibility of IOC evidence, see Dkts. 533 [redacted public version] and 528 [unredacted sealed version], which are incorporated herein by reference as though set forth fully herein.

   The defendant's cherry-picked excerpts from the transcripts do not change the calculus, claims impugning the government, and purported inconsistencies between witnesses do not alter the calculus, or the strength of the government's proof.  On the one hand, Gerace targeted                  , who is an indigent woman with limited means, with a civil lawsuit in an effort to scare her, silence her, and in an effort to circumvent the federal criminal grand jury and discovery procedures.  On the other hand, he identified her as a "snitch" to others loyal to him and she has reported that she has been physically assaulted by one individual

associated with Gerace (before the Facebook threats were made).  Additionally, a Federal Grand Jury determined that she was threatened by Gerace with the help of two other females who, at one time, were loyal to him.  For the purposes of the Bail Reform Act, "an indictment returned by a duly constituted and unbiased grand jury satisfies the Constitution as to the existence of probable cause that the defendant committed the crimes enumerated therein." *United States v. Contreras*, 776 F.2d 51, 54 (2d Cir. 1985)

It is well-settled that a judge "retains the responsibility for assessing the reliability and accuracy of the government's information, whether presented by proffer or by direct proof. Of course, a detention hearing is not to serve as a mini-trial, as discussed above, or as a discovery tool for the defendant. Accordingly, a government proffer need not always spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use. *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986).  Here, the government spelled out its proof in precise detail, and the defendant's claim of a Due Process violation in the manner in which information was presented by the government, or relied upon by Judge Sinatra, lack merit.  Simply put, Judge Sinatra's acceptance and reliance upon the government's detailed proffers did not offend Due Process, and defendant Gerace has failed to reach the high threshold required for this Court to reconsider Judge Sinatra's decision.

## I.   GERACE HAS A PATTERN OF TAMPERING AND INTIMIDATING WITNESSES WHILE ON RELEASE.

As set forth above, since defendant Gerace realized that he was a target of this federal investigation, he and others have engaged in a pattern of attempting to obstruct justice by intimidating and tampering with witnesses.  Courts have recognized the inherent power of a

trial court to remand a defendant, such as defendant Gerace, without bail before trial when such defendant jeopardizes the court's processes by threatening government witnesses.  *United States v. Payden*, 768 F.2d 487, 490 (2d Cir. 1985)

First, after Gerace deduced who several of the witnesses were, he used his vast financial resources to file a civil lawsuit against them in an effort to silence and intimidate them and to dissuade them from cooperating with law enforcement or appearing at court proceedings.  Gerace, a wealthy strip club owner who lives in a large home in Clarence, New York, filed the lawsuit against two women with little means and no assets.  The fact that Gerace hired an attorney to file a lawsuit to obtain an uncollectable judgment demonstrates its nefarious purpose, that is, to intimidate, harass, and deter the witnesses.  In *United States v. Camick*, the Court affirmed a conviction for witness retaliation pursuant to Title 18, United States Code, Section 1513(e) whereupon a defendant filed a civil lawsuit against his former girlfriend after learning his former girlfriend had become a witness against him.  796 F.3d 1206 (10th Cir. 2015).  The Court in *Camick* observed that "to sustain a conviction for obstruction of justice under § 1513(e), the Government was required to show (1) Mr. Camick knowingly took an action with intent to retaliate, (2) his action harmed Ms. Wattley (emotionally, economically, or otherwise), and (3) his retaliation was motivated by Ms. Wattley's cooperation with law enforcement," and affirmed the conviction predicated upon that the circumstances surrounding the filing of the civil lawsuit.  *Camick*, 796 F.3d at 1220.  Defendant Gerace, while not yet charged with this conduct federally, engaged in the same behavior here as to both                                         , and these facts were appropriately proffered by the government and considered by Judge Sinatra.

25

Second, as referenced above, an associate of Gerace assaulted                    shortly after she provided information to the authorities about Gerace.  To the extent there is not direct evidence that Gerace orchestrated the assault, the event nevertheless underscores his dangerousness.  In particular, if Gerace did not direct the assault, it demonstrates that loyal associates of Gerace would act on his behalf to harm or threaten witnesses on sight---even in the absence of a direct instruction.

Third, at the time the threatening Facebook messages were sent

                    were loyal to Gerace.  The Facebook threats exemplify Gerace's ability to motivate and utilize others to tamper with witnesses.  Moreover, the messages were sent while Gerace was in the comfort of his own home and involved use of another person's phone and Facebook account.  Furthermore, the government recently interviewed an additional witness who provided corroborating details that Gerace is responsible for the Facebook threats.[16]  Indeed, while a grand jury determined that there is probable cause to believe Gerace is responsible for the threats, *see* Case No. 23-CR-37-JLS, and its probable cause finding is controlling, the availability of an additional witness since the time of the March 24 and 27, 2023, detention hearings further buttresses the strength of the government's witness tampering case.

Fourth, as detailed above, circumstantial evidence strongly compels the conclusion that Gerace was behind the dead rats that were placed at Witness 2's residence, and the purpose was to intimidate Witness 2 and prevent her from continuing to be a cooperating witness as the case proceeds to trial.

---

[16] This witness' identity will remain protected, *see* Protected Witness 12, *supra*.

    a.  **The Court should weigh the evidence and find Gerace responsible for the dead rats.**

As the above timeline demonstrates, Witness 2 was unbothered from November 19, 2019, when she aided Gerace's efforts to threaten                    until after she began proffering with the government in late February 2023.  It was not until after her complaint was unsealed that Gerace, through his attorney Cohen, reached out to another attorney to send messages to Witness 2.  Moreover, the Gerace defense team knew full well that Witness 2 was represented by her current attorney [and not the attorney that they asked to contact Witness 2] because (a) the complaint charging Witness 2           was publicly docketed and her attorney's name was readily available on Pacer, and (b)  Gerace's attorney had been in contact with Witness 2's actual attorney attempting to arrange an interview of Witness 2 on Gerace's behalf.[17]

Ultimately, as confirmed by her attorney, Witness 2 declined to be interviewed by the Gerace defense team.   Thereafter, the criminal complaint was unsealed.   The criminal complaint established that Witness 2 and Gerace were responsible for threatening          .  After that, the government filed a motion upon sealed affidavit to adjourn the complaint's dismissal deadline.  Based upon the above, Gerace deduced that Witness 2 was cooperating with the government against him.  From that point on, Witness 2 was no longer beholden to Gerace and at that point dead rats started showing up at Witness 2's house.

Indeed, the timing of the appearance of dead rats was no coincidence.  After Gerace deduced Witness 2 was no longer his loyal servant, circumstances establish that he went into

---

[17] These details have been confirmed by Witness 2's attorney.

attack mode in order to intimidate the witness.  Gerace's reaction to Witness 2 cooperating was no different than how he attacked other witnesses through filing a civil lawsuit, or by having proxies send threats to a witness via Facebook.  Indeed, the foregoing is it's indicative of Gerace utilizing, to use his words, his "long reach," to tamper with witnesses.

Importantly, "rat"[18] and "nark" are terms that Witness 2 used when sending Facebook threats to      .  Both are derogatory terms for individuals cooperating with law enforcement and are designed to scare and intimidate witnesses.  Dead rats being left at Witness 2's house sent an even stronger message.  Gerace and Witness 2 have been long-time friends and confidants.  Gerace knows Witness 2 had highly damaging information about him and his criminal activity.

         .  Notwithstanding the fact that the government has been unable to identify specifically who put the dead rats on Witness 2's mother's car,[19] and her roommate's car, the clear implication is undeniable.  The message was that "we know you are a rat and if you continue to cooperate against Gerace you will be killed."

Defendant Gerace would benefit significantly from Witness 2's unavailability.  In addition to providing information about Gerace's involvement in witness tampering, Witness 2 proffered,                              and would have testified at trial about Gerace's

---

[18] It was misspelled ray, but the letter "y" is right next to the letter "t" on a keyboard or phone screen.

[19] The FBI has canvassed the neighborhood and to date has been unable to identify a witness who observed the rats being placed on the vehicles.

admissions that Bongiovanni was protecting Gerace and PGC.  Witness 2's testimony would have been crippling as to Gerace.

As set forth above, on July 7, 2023, the government received information from a witness further establishing that defendant Gerace made statements

On August 2, 2023, Witness 2 was found dead.  Her death remains under investigation,

Defendant Gerace is a danger to the community.  The only thing that has changed since Judge Sinatra arrived twice at that conclusion is that defendant Gerace has been indicted for additional criminal conduct in Case No. 23-CR-60, a key witness against Gerace, who previously had dead rats placed on her mother's vehicle at her house, has been found dead, and a witness reported that Gerace has stated,

The facts and circumstances reveal that defendant Gerace has engaged in extensive witness tampering, and that he plans to engage in more of it undetected. Accordingly, releasing Gerace on any conditions is wholly inadequate and inappropriate.


II.    **ADDITIONAL INFORMATION AND ANALYSIS PERTAINING THE FACTORS SET FORTH IN 18 U.S.C. § 3142(G)**

**(1) The nature and circumstances of the charged offenses**

The nature and circumstances of the charged offense weigh heavily in favor of detention.


In Case No. 19-CR-227, Gerace is facing up to life imprisonment for bribing a DEA agent, conspiring to distribute and distribution of controlled substances, maintaining a drug-involved premises, and for victimizing vulnerable women by exploiting their drug addictions and leveraging the power imbalance between them in order to coerce them into engaging in commercial sex acts with him, his friends, and associates.


In Case No. 23-CR-37, Gerace is facing up to 20 years of imprisonment for distributing cocaine and threatening a woman he perceived to be an important witness against him in Case No. 19-CR-227. Gerace's conduct strikes at the heart of the integrity of the proceedings in this case and compels the conclusion he should remain detained. *See, Payden,* 768 F.2d at 490.

Accordingly, this factor weighs heavily in favor of detention.

### (2) The weight of the evidence against the person[20]

The weight of the evidence against this defendant is very strong. The evidence in this case consists of well-over 100 witnesses, including women Gerace and others exploited and victimized; dozens of exhibits; incriminating text messages from Gerace's phone; and volumes of other evidence.  The government has previously proffered text messages from Gerace's phone between Gerace and deceased Judge Michalski, and another text message exchange, dated October 16, 2017, indicative of sex trafficking as contained from Gerace's stated:

> **Gerace:**      **"You took one of my top weekend girls"**
>
> **Other:**      **"And she does anal…lol**[21]

Based upon the information set forth in the Second Superseding Indictment in Case No. 19-CR-227, Indictment 23-CR-37, the Government's Pre-Trial Memorandum (see Dkt. 441 previously filed under seal), the evidence proffered by the government on March 24, March 27, and May 31, 2023, and as detailed herein and in the government's prior the

---

[20] This is a factor that the U.S. Probation Department does not take into consideration when making its recommendations.

[21] Excerpt of Gerace phone extraction:



evidence is very strong and this factor weighs heavily in favor of detention.

**(3)** **The history and characteristics of the person, including such matters as the person's family ties, employment history, length of residence in the community, criminal history, and record concerning appearance at court proceedings**

The defendant has a prior federal felony convicted felon for a telemarketing fraud scheme wherein he victimized a myriad of victims.  *See* Case No. 00-CR-9, Plea Agreement, Dkt. 165.  The defendant admitted that he was "an organizer, manager, and supervisor int eh criminal activity[.]"  *Id.* at ¶ 9.  The defendant violated his supervised release conditions in that case by using drugs and working at PGC.

The defendant has a history of lying to U.S. Probation in both his prior federal case and upon arrest in this case.  Accordingly, to the extent this Court would need to rely upon representations by the defendant that he would adhere to conditions set—the defendant's representations are unworthy of belief.  The Court should not trust the defendant to adhere to his word.  In prior court appearances, defense counsel has stated that the defendant is on trial for his life.  This Court should consider the cost-benefit analysis from the defendant's perspective.  The risk of tampering with a witness and getting caught (resulting in a remand pending trial) – versus the reward of successfully tampering with witnesses and preventing them from testifying against him at trial (avoiding a potential life sentence).  The defendant has every motive to continue tampering with witnesses should he be released on any conditions.

The defendant also has a history of abusing women in domestic incidents, as previously proffered by the government, and he was convicted of assault based upon one of the incidents involving his ex-wife.

Further, the defendant has engaged in criminal conduct while on pre-trial release, including EIDL loan fraud, which culminated in an Indictment in Case No. 23-CR-60, and as detailed above and in prior proffers his history includes acts of witness tampering and intimidation.  Moreover, he has boasted about having law enforcement and judicial contacts and has described himself to one witness as untouchable.  The information previously proffered to the Court corroborates and supports the defendant's boasts to a witness regarding his law enforcement and judicial contacts.

The defendant's employment at PGC is the location of many of the defendant's crimes. The defendant's employees include members of the Outlaws Motorcycle Club.  One member of the Outlaws MC has previously made false and misleading statements on Gerace's behalf, as outlined in a prior filing in this case (*see* Dkt. 110), and law enforcement has long considered the Outlaws MC to be a dangerous and violent criminal organization.  *See, e.g., United States v. Starrett*, 55 F.3d 1525, 1533 (11th Cir. 1995) ("The Outlaw Motorcycle Club (the "Outlaws") is one of the four largest national 'one-percenter' motorcycle clubs. Witnesses testified that the term 'one-percenter'—usually depicted by the symbol '1% er'—is motorcycle gang parlance meaning that the club is comprised of the one percent of the overall biker population who maintain total independence from society, and who are known to cause the most trouble, or 'raise the most hell.'"); *see also United States v. Bowman*, 302 F.3d 1228, 1231 (11th Cir. 2002) (former international president of the Outlaws convicted of racketeering,

conspiracy to murder, and various other offenses); *United States v. Lawson*, 535 F.3d 434, 438
(6th Cir. 2008), *as amended* (Oct. 9, 2008) (RICO prosecution relating to Outlaws MC "Green
Region", including a murder at a strip club.).

As to family ties, while the defendant's family is located in this area, the defendant's
attorney recently made admissions to The Buffalo News concerning the defendant's relatives,
as follows:

> "There is no way this jury is going to be able to unhear the term Italian
> organized crime," Cohen said. They're not going to unhear the term mafia.
> And they're also not going to be able to unhear the fact that Peter does have
> relatives who were involved in that. Peter himself was never involved in Italian
> organized crime. But he has relatives who likely were."

*See,* https://buffalonews.com/news/local/crime-and-courts/ex-dea-agent-strip-club-owner-
should-be-tried-together-judge-says/article_d2592222-e9ed-11ed-aec6-e7ad940a8f3e.html
(visited June 2, 2023).

Accordingly, this factor weighs heavily in favor of detention.

**(4) The nature and seriousness of any risk of danger if the person is released**

As set forth above, the defendant poses a danger to the community in a multitude of
ways if released.  Whether through witness tampering, fraud schemes, or drug and sex
trafficking activity through PGC, the defendant is an undeniably danger if he is released
pending trial.  Simply put, where there is a will there is a way.

If the defendant is released, U.S. Probation does not have the ability to monitor his activity and meetings 24 hours per day, 7 days per week.  Monitoring of his phone will not provide the content of any communications, or threats, and certainly will not detect whether he is using a burner phone.  Monitoring his location will not work either.  The defendant has committed and engaged in crimes using a computer, and a phone and social media account of a third-party.   If the defendant is out of custody, where his calls, mail, and visits are unmonitored, it is much easier for him to carry on and to place actual or perceived witnesses in danger or in fear.

This Court should not indulge any offer by the defendant to create a de facto jail at his residence because doing so would be woefully insufficient to protect the community. Electronic monitoring, home incarceration, and assurances by the defendant and others that he will comply with conditions are insufficient in the face of the flight risk and danger he poses.  *See, United States v. Mercedes*, 254 F.3d 433, 437 (2d Cir. 2001).  Although the defendant has great means, "[t]he Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails.  It is a fundamental principle of fairness that the law protects 'the interests of rich and poor criminals in equal scale, and its hand extends as far to each.'"  *United Boustani*, 932 F.3d 79, 82 (2d Cir. 2019).

In jail, the content of his calls are monitored and recorded; his visits are documented; and his behavior is monitored and observed.  At home – they are not.

Accordingly, this factor weighs heavily in favor of detention.

III.    **THE DEFENDANT'S PRE-TRIAL DETENTION DOES NOT OFFEND DUE PROCESS OR HIS SIXTH AMENDMENT RIGHT TO COUNSEL.**

The defendant cannot engage in conduct that potentially delays his trial on one hand, such as seeking terminate his lawyer, and then claim that the length of his pre-trial detention offends Due Process. The length of the defendant's pre-trial detention does not offend due process. Indeed, each relevant factor in the analysis weighs heavily in favor of the government. *United States v. Briggs*, 697 F.3d 98, 101 (2d Cir. 2012). First, as set forth above and in the government's prior arguments, the weight of the evidence justifying detention is strong. Second, the government is not responsible for the delay in the start of trial from June 21, 2023, August 14, 2023, October 23, 2023, or at any time. Indeed, in or about last November 2022, the government requested a trial date commencing in April 2023. Third, the amount of time the defendant has spent in pre-trial detention is insignificant. Defendants in the Western District of New York, and elsewhere, are often incarcerated for several years pre-trial before a trial commences. *See United States v. Hill*, 462 F. App'x 125, 127 (2d Cir. 2012) (collecting cases). Defendant Gerace has been detained less than one year.

Similarly, detention in a local jail does not deprive him of his right to counsel. In *United States v. Echeverri*, the court rejected a claim that a defendant's pre-trial detention "over 200 miles round trip" from the Eastern District of New York denied his right to counsel. No. 91-CR-885 (DRH), 1992 WL 81876, at *2 (E.D.N.Y. Mar. 31, 1992); *see also United States v. Allick*, No. CRIM.A. 2011-020, 2012 WL 32630, at *4-5 (D.V.I. Jan. 5, 2012) (no violation of Sixth Amendment right to counsel where counsel had to fly from the Virgin Islands to Puerto Rico where the defendant was detained); *United States v. Goudelock*, No. 18-CR-138 (JLS), 2022 WL 17687999, at *5 (W.D.N.Y. Dec. 15, 2022) (denying motion for a new trial based

upon the defendant's claim that his pre-trial detention violated his Fourteenth Amendment rights and Sixth Amendment right to counsel) (Sinatra, J.).

## **CONCLUSION**

Based upon the foregoing, the Court should not reconsider Judge Sinatra's decision to detain the defendant and should reaffirm his finding that Gerace is a danger to the community.  There has not been an intervening change in controlling law; new evidence; or the need to correct a clear error of law to prevent manifest injustice.  To the contrary, there is additional compelling evidence that that the defendant is a danger to the community.  All of the factors pursuant to Title 18, United States Code, Section 3142(g) weigh heavily in favor of detention, and the time that the defendant will have served in jail before trial neither violates Due Process, nor the defendant's Sixth Amendment right to counsel.

There is no condition or combination of conditions that will reasonably assure the appearance of the defendant and the safety of the community, and the defendant should remain detained pending trial.

DATED:  Buffalo, New York, August 11, 2023.

COREY R. AMUNDSON                          TRINI E. ROSS
U.S. Department of Justice                      United States Attorney
Chief, Public Integrity Section


BY:   s/JORDAN DICKSON               BY:   s/JOSEPH M. TRIPI
      Trial Attorney                              s/NICHOLAS T. COOPER
      Public Integrity Section                 s/DAVID J. RUDROFF
      U.S. Department of Justice            Assistant United States Attorneys
      Criminal Division                         United States Attorney's Office
      1301 New York Ave. NW, Ste. 1000   Western District of New York
      Washington, D.C. 20530              138 Delaware Avenue
      202-597-0508                           Buffalo, New York 14202
      jordan.dickson@usdoj.gov          716.843.5839
                                                   Joseph.Tripi@usdoj.gov

# EXHIBIT A

                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

                      CASE NO. 21-MJ-06112-AOV

UNITED STATES OF AMERICA,
                                        Miami, Florida
                  Plaintiff(s),
                                        March 2, 2021
            vs.

PETER GERACE, JR.,

                  Defendant(s).        Pages 1 - 34
------------------------------------------------------------

                            HEARING
            TRANSCRIBED FROM DIGITAL AUDIO RECORDING
             BEFORE THE HONORABLE ALICIA O. VALLE
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):  BRENDAN CULLINANE, ESQ.
                       UNITED STATES ATTORNEY'S OFFICE
                       WESTERN DISTRICT OF NEW YORK
                       138 Delaware Avenue
                       Buffalo, New York 14202
                       (716) 843-5839
                       brendan.cullinane@usdoj.gov


                       JAMES USTYNOSKI, ESQ.
                       UNITED STATES ATTORNEY'S OFFICE
                       SOUTHERN DISTRICT OF FLORIDA
                       99 NE 4th Street
                       Miami, FL 33132
                       (305) 961-9001
                       james.ustynoski@usdoj.gov

```
1    APPEARANCES (CONT'D)

2

3    FOR THE DEFENDANT(S):   JOEL L. DANIELS, ESQ.
                             42 Delaware Avenue
                             Buffalo, NY 14202
4                            (716) 856-5140

5

6    TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                             Court Reporter
7                            jemancari@gmail.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Thereupon,

2    the following proceedings were held:

3         THE DEPUTY CLERK:  United States v. Peter Gerace, case

4    No. 21 6112.

5         Counsel, please announce your appearance for the

6    record.

7         MR. CULLINANE:  Good afternoon, your Honor.  Brendan

8    Cullinane, assistant United States attorney from the Western

9    District of New York, in Buffalo, New York, appearing on behalf

10   of the government today.

11        MR. DANIELS:  Joel Daniels.

12        THE COURT:  Can you repeat all that.  You turned into

13   some mechanical robot talking.

14        MR. CULLINANE:  I apologize, your Honor.  My first

15   name is Brendan, B-R-E-N-D-A-N, and my last name is Cullinane,

16   C-U-L-L-I-N-A-N-E.  I am an AUSA in the Western District of New

17   York, in Buffalo, New York.

18        Thank you.

19        THE COURT:  All right.  Thank you.

20        And locally?

21        MR. DANIELS:  Judge, I'm Joel Daniels, D-A-N-I-E-L-S.

22   I am an attorney in Buffalo, New York, and I am appearing for

23   Mr. Gerace.

24        Thank you.

25        THE COURT:  Thank you.

1              Mr. Daniels, have you filed a permanent appearance on

2       this matter?

3              MR. DANIELS:  I haven't filed anything formally,

4       Judge.  I have been in touch with Mr. Cullinane and our

5       representative of the government in this case.  I have talked

6       to them many times over the last 15 months.

7              THE COURT:  All right.  We will take one step at a

8       time.

9              MR. DANIELS:  Yes.

10             THE COURT:  Mr., is it Gerace or Gerace?  How do I say

11      your name?

12             THE DEFENDANT:  Gerace.

13             THE COURT:  Gerace?

14             THE DEFENDANT:  Gerace.

15             THE COURT:  Thank you, Mr. Gerace.

16             Is that you?  I just want to identify you in the

17      cellblock and confirm that it is you.

18             THE DEFENDANT:  Yes, this is me.

19             THE COURT:  All right.  Thank you.

20             Secondly, Mr. Gerace, I want to confirm that I have

21      your permission to proceed by Zoom.  Normally we would all be

22      in the courtroom, but because of the COVID virus, most of us

23      are working, as you can see, from home, our offices.

24             You do have the right to be in the courtroom if that

25      is what you want, but I am asking whether or not you will allow

1   me to proceed by Zoom.

2            THE DEFENDANT:  Yes, your Honor.

3            THE COURT:  Thank you.

4            Any objection, Mr. Daniels?

5            MR. DANIELS:  None, your Honor.

6            THE COURT:  Mr. Cullinane, from the government?

7            MR. CULLINANE:  No objection.  Thank you, Judge.

8            THE COURT:  All right.  Thank you very much.

9            Mr. Gerace, I want to advise you of your rights in

10  connection with your appearance here this morning.  If you have

11  any questions, please let me know.

12           Also, if at any point during the proceedings there is

13  any kind of equipment malfunction, you can't see me or hear us

14  or whatever, wave your hands, get our attention, so that we can

15  fix the problem.  OK?

16           THE DEFENDANT:  OK.  Is my picture supposed to be up

17  here?

18           THE COURT:  We see you.  I don't think you see

19  yourself maybe.

20           THE DEFENDANT:  OK.  That is fine.

21           THE COURT:  We see you.

22           THE DEFENDANT:  OK.

23           THE COURT:  Do you see our pictures?

24           THE DEFENDANT:  I can see everybody, yes.

25           THE COURT:  OK.  Good.  You know what you look like

1   anyway.

2            All right.  So let me get back on a serious note to

3   advise you of your charges and of your rights.

4            First of all, you have the right to remain silent.

5   Anything that you say can be used against you by the

6   government.  You have the right to have a lawyer to represent

7   you, and of course this morning we have Mr. Daniels here to

8   represent you.  But if you couldn't afford Mr. Daniels, the

9   court would be able to appoint a lawyer for you at no cost if

10  you met certain financial conditions.  OK?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Also, you have the right to have a bond

13  hearing or a detention hearing if the government is requesting

14  that you be detained pending trial.  At that time either myself

15  or another judge would make the decision of whether to release

16  you on a monetary bond or detain you pending trial.

17           Do you understand that, sir?

18           THE DEFENDANT:  Yes, your Honor.

19           THE COURT:  Also, if you are released on a monetary

20  bond, you are nonetheless subject to arrest and revocation of

21  release if you violate any of the non-monetary terms,

22  conditions that I may impose along with the monetary bond.

23           Do you understand that, sir?

24           THE DEFENDANT:  Yes, your Honor.

25           THE COURT:  Also, as I mentioned before, this

1   indictment -- has this been unsealed, Mr. Cullinane?

2            MR. CULLINANE:  Yes, your Honor, it has been unsealed.

3            THE COURT:  So you were arrested pursuant to an

4   indictment that came out of the Western District of New York,

5   not here locally in the Southern District of Florida.  As a

6   result, you are entitled to certain other procedural safeguards

7   in addition to the rights that I just told you about, and I am

8   going to advise you of those.

9            The first one is you have the right to have what's

10  called an identity hearing.  At that hearing the government

11  would have to establish that you are in fact the Peter Gerace

12  that the Western District of New York has charged.  In other

13  words, that they haven't gotten the wrong person.  You can

14  choose to have that hearing or you can choose to waive that

15  hearing, and you can do that with the advice of your lawyer.

16           Do you understand that, sir?

17           THE DEFENDANT:  Yes, your Honor.

18           THE COURT:  You also have the right to have, as I

19  said, the bond hearing or the detention hearing here or in the

20  Western District of New York.  You and your lawyer have to

21  decide where you want to have it.  You only get one shot.

22           Understood?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  And lastly, you have the right to explore

25  resolving this case here in South Florida if you wanted to,

1    pursuant to Rule 20 of the criminal rules, but only if you

2    wanted to plead guilty.  If you wanted to go to trial on these

3    charges, you have to do that in the Western District of New

4    York.

5         Understood?

6         THE DEFENDANT:  Yes, your Honor.

7         THE COURT:  Also, if you wanted to plead guilty here

8    and transfer the case to South Florida, that could only be done

9    if both prosecutors in New York and Florida agree.

10        Understood?

11        THE DEFENDANT:  Yes, your Honor.

12        THE COURT:  Ultimately, you have the right to have the

13   removal hearing here or you can choose to waive your right and

14   go back and answer these charges forthwith in the Western

15   District of New York.

16        Do you understand that, sir?

17        THE DEFENDANT:  Yes, your Honor.

18        THE COURT:  All right.  I am going to ask the

19   prosecutor -- this is a very lengthy indictment and my printer

20   ran out of paper at page 33, so I am going to ask the

21   government to please summarize the charges in the indictment as

22   well as the maximum penalties.

23        MR. CULLINANE:  Thank you, Judge.

24        Judge, the defendant is charged as a defendant in this

25   case along with a codefendant in a second superseding

1   indictment that contains 18 counts.  Defendant Peter Gerace,

2   Jr. is charged in five of those counts, and that includes

3   Counts 2, 6, 7, 8 and 9.

4          Count 2 has a number of paragraphs, which I will

5   summarize in general.

6          In Count 2, the defendant, Peter Gerace, Jr., along

7   with his codefendant, are charged with conspiracy to defraud

8   the United States, in violation of Title 18, United States

9   Code, Section 371.

10          The allegations of the introduction of the indictment

11   are repeated and re-alleged and incorporated by reference as if

12   set forth fully here into Count 2.

13          Additionally, beginning in or about 2005 and

14   continuing until in or about February 2019, the exact dates

15   being unknown, in the Western District of New York and

16   elsewhere, the defendants, including Peter Gerace, Jr. and

17   Joseph Bongiovanni, did knowingly, willfully, and unlawfully

18   combine, conspire, and agree together and with others, known

19   and unknown, to defraud the United States and the DEA by

20   interfering with and obstructing, by means of deceit, craft,

21   and trickery, the lawful and legitimate governmental functions

22   and rights of the DEA, that is, the right to have its business

23   and its affairs, and the transaction of the official business

24   of DEA, conducted honestly and impartially, free from

25   corruption, fraud, improper and undue influence, dishonesty,

unlawful impairment and obstruction; and the right to the
conscientious, loyal, faithful, disinterested and unbiased
services, decisions, actions, and performance of his duties by
the defendant, and in this case codefendant Joseph Bongiovanni,
in his official capacity as a DEA special agent, free from
corruption, impartiality, improper influence, bias, dishonesty
and fraud in dealing with the DEA and other law enforcement
agencies.

Further, directly and indirectly, corruptly to give,
offer, and promise a thing of value to a public official, with
intent to induce the performance of an official act and to
induce a public official to do an act and to omit to do an act
in violation of his lawful duties, as opportunities arose, in
violation of Title 18, United States Code, Section
201(b)(1)(C); and directly and indirectly, corruptly to demand,
seek, receive, accept, and agree to receive and accept, a thing
of value personally, in return for being influenced in the
performance of an official act and for being induced to do an
act and omit to do an act in violation of official duty, as
opportunities arose, in violation of Title 18, United States
Code, Sections 201(b)(2)(A) and 201(b)(2)(C).

As indicated before, the manner and means in which the
act allegedly occurred are described in paragraphs 3 through
36.

The defendant faces a term of imprisonment of not more

1   than five years, a fine of up to $250,000 --

2   　　　　　THE COURT:  I'm sorry.  Can you repeat that?

3   　　　　　MR. CULLINANE:  I'm sorry.

4   　　　　　The defendant as charged faces a term of imprisonment

5   of not more than five years, a fine of up to $250,000, and a

6   term of supervised release up to one year.

7   　　　　　THE COURT:  I'm sorry.  That is on Counts 6 and 7?

8   　　　　　MR. CULLINANE:  Your Honor, that is on Count 2.

9   　　　　　THE COURT:  That was all the conspiracy.

10   　　　　　MR. CULLINANE:  Thank you, Judge.

11   　　　　　Count 6, your Honor, is the next one, and that is

12   paying a bribe to a public official.

13   　　　　　As described in the indictment, beginning in or about

14   2009 and continuing until on or about June 6, 2019, in the

15   Western District of New York, the defendant, Peter Gerace, Jr.,

16   did, directly and indirectly, corruptly give, offer, and

17   promise a thing of value to a public official, namely, a DEA

18   special agent, with intent to induce the performance of an

19   official act and to induce a public official to do an act and

20   omit to do an act in violation of his lawful duty, as

21   opportunities arose; that is, the defendant, Peter Gerace, Jr.,

22   paid and facilitated bribe payments to Joseph Bongiovanni, a

23   DEA special agent, in United States currency to, among other

24   acts, falsely advise a Federal Bureau of Investigation special

25   agent that the defendant, Peter Gerace, Jr., was a DEA

confidential source, thereby inducing the FBI special agent to
abandon a narcotics investigation into the defendant Peter
Gerace, Jr. and Pharaoh's nightclub; to create an official DEA
6 document falsely stating that the defendant Peter Gerace, Jr.
was a DEA source; to provide advice and information to the
defendant Peter Gerace, Jr.; to help the defendant Peter
Gerace, Jr. and Pharaoh's Gentlemen's Club avoid federal
narcotics investigations; to induce Joseph Bongiovanni to use
his position as a DEA special agent to make statements to his
coworker, his fellow DEA special agent, to dissuade and
discourage the fellow DEA special agent from investigating the
defendant Peter Gerace, Jr. and Pharaoh's; to make false and
misleading statements to other members of law enforcement; to
provide information about law enforcement methods and
techniques; to help such drug trafficking activities continue;
and to make false statements in official DEA memoranda in order
to minimize the relationship between Bongiovanni and the
defendant Peter Gerace, Jr. as a means to conceal their
conspiratorial relationship, all in violation of Title 18,
United States Code, Sections 201(b)(1)(A) and Section
201(b)(1)(C).

      As charged in Count 6, the defendant faces a term of
imprisonment of not more than 15 years, a fine of up to
$250,000, and a term of supervised release up to three years.

      Count 7 charges the defendant, Peter Gerace, Jr., with

maintaining a drug-involved premises.

As described in the second superseding indictment, beginning in or about 2006 and continuing until on or about December 12, 2019, in the Western District of New York, the defendant, Peter Gerace, Jr., did knowingly, intentionally, and unlawfully use and maintain a place, that is, the premises known as Pharaoh's Gentlemen's Club, located at 999 Aero Drive, Cheektowaga, New York, for the purpose of manufacturing, distributing, and using cocaine, cocaine base, methamphetamine and amphetamine, also known as Adderall, Schedule II controlled substances, and marijuana and heroin, Schedule I controlled substances, all in violation of Title 21, United States Code, Section 856(a)(1) and Title 18, United States Code, Section 2.

As for Count 7, the defendant faces a term of imprisonment of not more than 20 years, a fine of up to $250,000, and a term of supervised release of up to three years.

Count 8 charges the defendant with conspiracy to distribute controlled substances.

As described in the second superseding indictment, beginning in or about 2009 and continuing until in or about February 2019, in the Western District of New York, the defendants, Joseph Bongiovanni and Peter Gerace, Jr., did knowingly, willfully, and unlawfully combine, conspire and agree together and with others, known and unknown, to commit

the following offenses, that is, to possess with intent to

distribute and to distribute cocaine, cocaine base,

methamphetamine and amphetamine and marijuana and heroin, in

violation of Title 21, United States Code, Sections 841(a)(1)

and 841(b)(1)(C); and to knowingly, intentionally, and

unlawfully use and maintain a place that is the premises known

as Pharaoh's Gentlemen's Club, located at the 999 Aero Drive,

in Cheektowaga, New York, for the purpose of manufacturing,

distributing, and using cocaine, cocaine base, methamphetamine

and amphetamine and marijuana and heroin, all in violation of

Title 21, United States Code, Section 846.

As for Count 8, the defendant faces a term of

imprisonment of not more than 20 years, a fine of up to $1

million, and a term of supervised release of at least three

years.

Finally, your Honor, the defendant is charged in Count

9 with conspiracy to commit sex trafficking.

As described in the second superseding indictment,

beginning in or about 2009 and continuing to in or about 2018,

in the Western District of New York, the defendant, Peter

Gerace, Jr., did knowingly, willfully, and unlawfully combine,

conspire, and agree with others to knowingly recruit, entice,

harbor, transport, provide, obtain, and maintain by any means,

in and affecting interstate and foreign commerce, persons, and

to benefit, financially and by receiving anything of value,

1   from participation in a venture which has engaged in such acts,

2   knowing and in reckless disregard of the fact that means of

3   force, fraud, and coercion, and a combination of such means,

4   would be used to cause such persons to engage in a commercial

5   sex act, in violation of Title 18, United States Code, Sections

6   1591(a) and 1591(b)(1), all in violation of Title 18, United

7   States Code, Section 1594(c).

8           As for this count, Count 9, the defendant faces a term

9   of imprisonment of not less than 15 years and up to life, a

10  fine of up to $250,000, and a term of supervised release of at

11  least three years.

12          THE COURT:  Thank you very much.

13          Mr. Gerace, did you understand everything the

14  government said about the maximum penalties for these offenses?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  All right.  I can summarize them for you

17  if you like.

18          Would you like me to do that --

19          THE DEFENDANT:  No.

20          THE COURT:  -- or you understood?

21          MR. DANIELS:  Not necessary.

22          THE DEFENDANT:  No, I understood.

23          THE COURT:  All right.  Thank you very much.

24          What is the government's position on bond?

25          MR. CULLINANE:  Your Honor, at this time the

1  government has received the Pretrial Services report and,

2  although it recommends detention, the government at this time

3  will move for an order setting conditions of release for the

4  defendant, many of which I've already discussed with

5  defendant's counsel prior to this appearance.

6            THE COURT:  Thank you.

7            Melania, did you send me a Pretrial Services report on

8  this one?

9            PRETRIAL SERVICES OFFICER:  Yes, your Honor.  Yolanda

10 sent it to the court.

11           Do you need me to resend it?

12           THE COURT:  Yes, if you don't mind.  I'm sorry.

13 Unless this is when I ran out of paper, I guess.

14           PRETRIAL SERVICES OFFICER:  I just sent it, your

15 Honor.  Let me know if you received it.

16           THE COURT:  All right.  Thank you.

17           I'm sorry for the delay.  Please wait for me.

18           (Pause)

19           THE COURT:  Got it.  Let me just print it out.

20           All right.  I will be right back.  We just have to go

21 get it from the printer.  Excuse me one second.

22           THE DEFENDANT:  Thank you.

23           (Pause)

24           THE COURT:  Mr. Gerace, this is also a removal

25 hearing, so I'd like to hear from Mr. Daniels what they're

1   hoping to do in terms of identity hearing and removal before I

2   go on to the bond.

3          MR. DANIELS:  Judge, good morning.  We would waive an

4   identity hearing.

5          THE COURT:  Mr. Daniels, can you speak up a little

6   louder, please.

7          MR. DANIELS:  I'm sorry, Judge.  Is that better?  I'm

8   sorry.  Can you hear me?

9          THE COURT:  There is just a lot of noise in the

10  cellblock which interferes.

11         MR. DANIELS:  I'm sorry.

12         THE COURT:  Hold on.  That is OK.  It happens.

13         MR. DANIELS:  Judge, we will waive an identity hearing

14  and we can proceed with the hearing.  We would ask the court to

15  consider --

16         THE COURT:  I'm sorry.  I keep hearing this squeaky

17  chair that I can't hear you over.

18         Does anybody else hear it or am I going crazy?

19         MR. CULLINANE:  I'm having a difficult time as well,

20  Judge Valle.

21         PRETRIAL SERVICES OFFICER:  I also hear it, Judge.

22         THE COURT:  Thank you.  I felt like I am going crazy.

23  All right.  Thank you.

24         Don't move whoever has the squeaky chair.

25         Mr. Daniels, if you could repeat yourself.  I'm so

1 │ sorry to interrupt you.

2 │         MR. DANIELS:  Of course.  That is no problem, Judge.

3 │ We understand.  This is what happens on Zoom.  We all

4 │ understand it and we have to adjust and live with it.  There is

5 │ nothing else we can do about it.

6 │         THE COURT:  I think everybody has to be flexible

7 │ nowadays, right.

8 │         MR. DANIELS:  That is right.  We are.  We certainly

9 │ are.  Yes, Judge.

10 │        We have no objection to an identity hearing.  Excuse

11 │ me.  We will waive an identity hearing.  That is what I meant

12 │ to say.

13 │         THE COURT:  OK.  Thank you.

14 │        In terms of bond, you were saying Mr. Gerace, that is

15 │ when I went to get the Pretrial Services report.

16 │         I'm sorry.  Mr. Cullinane.

17 │         MR. CULLINANE:  Yes, your Honor.  Yes, your Honor.

18 │         THE COURT:  Sorry to butcher your name.

19 │         MR. CULLINANE:  That is OK.  Judge, yes.  The

20 │ government would ask for a number of conditions to be imposed

21 │ here.  We are not asking for a monetary bond of any kind, but

22 │ we are asking that the court place a number of restrictions and

23 │ conditions in place for an order setting conditions of release.

24 │         If I could be heard on that.

25 │         THE COURT:  I'm sorry.  So let's back up.

1          The reason I went to get the Pretrial Services report

2     is because Pretrial Services is recommending detention.  You're

3     saying don't do that, we have an agreement, and release him and

4     he is going to make his way back to the Western District, or

5     what do you want?

6          MR. CULLINANE:  That is correct, your Honor.

7          THE COURT:  So what conditions are you proposing?

8          MR. CULLINANE:  Thank you, your Honor.  First we'd

9     like to ask for electronic monitoring to be imposed, and we'd

10    like that to be followed by a term of or an order for home

11    confinement after he is returned back to the Western District

12    of New York.  I understand he is in custody right now and he

13    may have been staying in a hotel, but we'd ask that he be

14    ordered to immediately return while on electronic monitoring

15    and be placed on home confinement.

16         We'd ask for no contact with his codefendant,

17    coconspirators or victims.

18         We'd ask for, Judge, an order to be imposed that he

19    stay away from Pharaoh's Gentlemen's Club, which is the

20    establishment that was listed in the indictment and that I

21    referenced a number of times.  That is located at an address of

22    999 Aero Drive, Aero spelled A-E-R-O, Drive, in Cheektowaga,

23    New York, which is spelled C-H-E-E-K-T-O-W-A-G-A, New York.

24         An additional order, your Honor, asking him to stay

25    away from any other clubs or establishments that could be

1    described as strip clubs or adult entertainment clubs.

2          We'd ask for, I believe, the standard condition asking

3    for drug testing.

4          We'd ask that the defendant be required to surrender

5    his passport, or it looks like a passport book that he has.

6          We'd ask for no alcohol, no permissible alcohol or

7    drug use.

8          Finally, zero tolerance, your Honor.

9          THE COURT:  What do you mean by "zero tolerance?"

10         MR. CULLINANE:  Well, in this district sometimes, your

11   Honor, we have individuals who may commit an infraction and

12   some courts will impose what they cause zero tolerance, to say

13   that if there is any infraction of any kind, the person will be

14   ordered detained pursuant to a warrant and brought into custody

15   at that time.

16         THE COURT:  Mr. Daniels, any objections to any of the

17   terms that the prosecutor has listed?

18         MR. DANIELS:  Yes, Judge.  I spoke to Mr. Cullinane

19   and Mr. Tripe about those conditions.  Just very briefly,

20   Judge, in the way of background here, Mr. Gerace is 53 years

21   old.  He is divorced.  He lives with his 14-year-old son.  This

22   investigation has been going on for a long time, at least 15

23   months.  He is a long-time resident of Buffalo.  I think he was

24   born and raised here.

25         Concerning electronic monitoring and home confinement

1    and staying out of Pharaoh's, Judge, respectfully, we would

2    object to that.  He is the owner of Pharaoh's and, as

3    Mr. Cullinane rightly described it, it is a gentlemen's club.

4    It opens around noon seven days a week and it stays open until

5    sometimes 3, 4 until the morning.  He is not there 70 percent

6    of the time.  He may go in sometimes around noon or 1 or 2:00

7    in the afternoon and stay for a few hours and just do work in

8    the office.  That's all.  He handles a lot of the paperwork and

9    the business work, and it is a fairly busy place.  But after

10   that, Judge, he isn't there.  He is not there in the evenings.

11        This is his business.  This is what he has been

12   running and owning for the last several years.  The business

13   was owned, I believe, by his mother before that.  So

14   respectfully, Judge, we ask that the court allow him to go to

15   work.  That is what he does.  That is his only business and his

16   only income.

17        As far as not having any contact with the codefendant

18   or codefendants, we understand that, Judge.  But not having any

19   contact with victims, respectfully, we don't know who exactly

20   the victims are.

21        As the court is aware, this is a very lengthy

22   indictment.  It was sealed.  We had not had an opportunity to

23   see it.  It was just emailed to us, I believe, this morning.

24   Hopefully I have enough paper in the printer so I can print it

25   out, but we will review it as soon as we can.  We just don't

1    know who those victims are.

2          The remaining conditions, Judge, we understand and I

3    am sure we can deal with them.

4          THE COURT:  Well, Mr. Daniels, it sounds to me like

5    those are some major objections to the government's recommended

6    bond.  If that is the case, then I think you are going to have

7    to make a decision whether you want to have a bond hearing here

8    or with the judge in the Western District of New York, because

9    obviously I am not going to make this decision because it

10   sounds like you want a bond hearing, is what I'm hearing you

11   say.

12         MR. DANIELS:  We don't want that, Judge.  We are

13   willing to go along with the government's recommendation.  We

14   appreciate them allowing him to be released, come back to

15   Buffalo, and appear before a magistrate here, Judge.  We were

16   just opposing for the record some of the conditions that the

17   government was requesting.  But that is your decision, Judge.

18         THE COURT:  I think your client wants to say

19   something.

20         Do you want to speak to your lawyer, Mr. -- I'm sorry;

21   I forgot your name now -- Gerace?

22         MR. DANIELS:  Judge, that is unnecessary.  I don't

23   have to speak to him about that now.

24         THE COURT:  OK.  I'm sorry.  I am a little confused

25   right now.  So do you want me to have a bond hearing or are you

1    waiving your right to have a bond hearing here and allowing the

2    bond hearing to take place in the Western District of New York?

3         MR. DANIELS:  Yes, Judge.  We would ask that the court

4    allow his release to come back here and we can address that

5    issue here.  We would agree that the government's -- sorry.  We

6    would agree with the government's recommendation for release,

7    allow him to come back here, again with the conditions,

8    Judge --

9         THE COURT:  I'm sorry.

10        MR. DANIELS:  I'm sorry, too, Judge.

11        THE COURT:  It is actually not a squeaky chair.  It

12   sounds like it is the marshal's radio that we are hearing.

13        MR. DANIELS:  That is the way it is.  We understand

14   that.  We were just objecting for the record to some of the

15   conditions that the government was proposing, and I assume

16   those matters could be readdressed once we come back here to

17   Buffalo.  But we'd like to have him released and get back here

18   as soon as he can, Judge.

19        Thank you.

20        THE COURT:  From the government, anything else?

21        MR. CULLINANE:  No, your Honor.  Thank you.

22        THE COURT:  All right.  I understand -- I mean, I'm

23   reviewing -- Tamisha, can you put me in a room with Melania,

24   and I think Mr. Gerace wants to speak to his lawyer at this

25   time.  Maybe Mr. Daniels can call the marshal's cellblock and

1    they can speak.

2           THE DEPUTY CLERK:  OK.  I can provide him with the

3    telephone number.

4           MR. DANIELS:  Sure.

5           THE DEPUTY CLERK:  Mr. Daniels, the number that you

6    can reach Mr. Gerace is 954 area code 660-5823.

7           MR. DANIELS:  Sure.

8           THE DEPUTY CLERK:  Judge, just give me one moment.

9           THE COURT:  Thank you.

10          (Pause)

11          THE DEPUTY CLERK:  We are back on the record, Judge.

12          THE COURT:  Thank you.

13          I took an opportunity to speak with Pretrial Services.

14          With reference to the sex trafficking charge in Count

15   9, does that involve minors or is that adults?

16          MR. CULLINANE:  Adults.

17          THE COURT:  OK.  Good.  Clarification, because

18   otherwise we would have to impose the Adam Walsh condition.  So

19   I wasn't sure about that.

20          MR. CULLINANE:  You're correct, Judge.  I checked the

21   language again and it reflects the language involving force,

22   fraud, and coercion, combination of such means, not the minor

23   part.

24          Thank you, Judge.

25          THE COURT:  OK.  So no minors.

 1           MR. CULLINANE:  Correct.

 2           THE COURT:  All right.  Thank you.

 3           Well, this was an interesting case because but for the

 4      government's recommendation, this is a case where I think

 5      detention would be warranted.  However, this is a case that

 6      emanates from the Western District of New York, and the

 7      prosecutor from the Western District of New York is here.  So I

 8      am going to accept the recommended bond, to which I understand

 9      Mr. Daniels will probably oppose once they get into the Western

10      District of New York.  For now the bond will be set as follows.

11           I am going to order that the defendant be detained in

12      home confinement with allowances only for court appearances,

13      medical visits, attorney visits.

14           He will be having electronic monitoring, and

15      specifically I'm referring to GPS location monitoring, services

16      to be paid by the defendant.

17           The defendant is not to have any contact with any

18      codefendant, in this case Mr. Bongiovanni, or any

19      coconspirators or any victims in the case.

20           The defendant is not to visit Pharaoh's Gentlemen's

21      Club at 999 Aero Drive in Cheektowaga, New York, in the Western

22      District.

23           MR. DANIELS:  Cheektowaga.

24           THE COURT:  And not to visit any other strip clubs,

25      adult entertainment clubs in the district.  Not just in the

1   area, in the district.

2          The defendant is to submit to drug testing as required

3   by Pretrial Services.  He is to relinquish his passport to the

4   Pretrial Services office and not obtain any new passport during

5   the pendency of the case.  He is also not to have any alcohol

6   use or any illegal drug use.

7          I also need to know the address where he is staying

8   here in Florida.  Pretrial Services needs to contact him

9   immediately.

10          The defendant is not to have any firearms or other

11   dangerous weapons.

12          The travel, I am going to restrict it to the Western

13   District of New York and the Southern District of Florida.  He

14   just needs to get himself up there.  Other than that, travel

15   will be limited to the Western District of New York.

16          Any other recommendations from Pretrial Services or

17   the government?

18          Melania.

19          PRETRIAL SERVICES OFFICER:  Your Honor, we would need

20   the address to put it on the record or where he is staying and

21   a phone number.

22          THE COURT:  Mr. Daniels can provide that to you, I

23   guess.

24          MR. DANIELS:  I don't know it, but I would ask

25   Mr. Gerace to provide that to Ms. Vasquez if she asks him,

```
 1    Judge, if that is OK with the court.

 2              THE COURT:  Yes.

 3              Mr. Gerace, can you please provide where you are

 4    staying, the location.

 5              The GPS monitoring -- Melania, is that what you are

 6    asking?  The GPS will be installed immediately?

 7              PRETRIAL SERVICES OFFICER:  That is correct, your

 8    Honor.  Pretrial cases have to get installed within 24 hours.

 9              MR. DANIELS:  May I speak to Mr. Gerace, Judge?

10              THE COURT:  Yes.

11              MR. DANIELS:  Peter, where are you staying?

12              THE COURT:  He's muted.  There you go.

13              MR. DANIELS:  Peter, where are you staying?

14              THE DEFENDANT:  Right now I don't know.  When I leave

15    here -- they took my phone, so I don't know anybody's phone

16    number except my parents' home phone.  So when I leave here I

17    am going to call my parents and tell them to call my friend

18    Dan, who lives down here, and see if he can pick me up because

19    I have nowhere to go.

20              MR. DANIELS:  Where were you staying?

21              THE DEFENDANT:  I was going to stay at the hotel, but

22    this all happened.  I never --

23              MR. DANIELS:  You didn't check in.

24              THE DEFENDANT:  It's gone now.  I checked in but he

25    checked me out.
```

1          MR. DANIELS:  Do you plan to stay with your friend

2    down here, is that it?

3          THE DEFENDANT:  I am going to take a look as soon as I

4    get out of here, I am going to take a look and see how fast I

5    can get a plane out of here because my plane ticket is for

6    Friday.  I am going to see if I can get out sooner.  I am going

7    to see if I can get a nonstop flight.

8          MR. DANIELS:  Could you just mute him again, please,

9    if that is possible.

10          THE DEFENDANT:  I'm sorry?

11          MR. DANIELS:  I am just asking the court if they could

12    mute you for a moment and I can speak to Ms. Vasquez and the

13    court.  Thank you.

14          May I speak to Ms. Vasquez about that, Judge?

15          THE COURT:  Yes.  Go ahead.

16          MR. DANIELS:  Ms. Vasquez, could you speak to

17    Mr. Gerace and find out where he is going to be staying so that

18    you can set up whatever you need.  You will be able to do that?

19          PRETRIAL SERVICES OFFICER:  You mean right now?

20          MR. DANIELS:  Well, at your convenience.

21          PRETRIAL SERVICES OFFICER:  Yes, we need something on

22    the record.

23          MR. DANIELS:  OK.

24          THE COURT:  I think, on the record, the problem is,

25    Melania, that he is saying he doesn't know what he is doing.

1              So it is giving me quite a lot of pause.  I think I am

2      trying to bend over backwards to work with the government on

3      the one hand and with the defense in terms of not holding him,

4      but I think this case might be better suited for a bond

5      hearing.

6              MR. DANIELS:  Judge, we'd like to waive that, not

7      waive it in a sense, but I don't think we need a bond hearing.

8      I am sure we can resolve this and we can provide Ms. Vasquez

9      whatever it is that she is going to need.  Perhaps if I

10     could --

11             THE COURT:  He is not going to be released until she

12     has the information that she requires.

13             MR. DANIELS:  Judge, can I have one minute, beg the

14     indulgence --

15             THE COURT:  Yes, you may call him.

16             MR. DANIELS:  -- I will call him, and hopefully I can

17     provide Ms. Vasquez and the court with whatever they need.  I

18     will call him right now.

19             PRETRIAL SERVICES OFFICER:  And a phone number, too,

20     sir, please.

21             THE COURT:  Bottom line is he will not be released

22     until she has a verifiable address and phone number.

23             MR. DANIELS:  We'll take care of that.

24             I am going to call him right now, Judge.  I'd ask the

25     court not to mute me out because I don't know how to get back

1    on and unmute it.  So I will just step out over on the side.

2           THE COURT:  OK.

3           MR. DANIELS:  Thank you.  Thank you very much, Judge.

4           (Pause)

5           MR. DANIELS:  Judge, thank you very much.  I

6    appreciate that.  I know it is late and it's been a long

7    morning for the court.  Early afternoon.

8           He is staying with a friend in Plantation.  I can get

9    the phone number.  If I could have Ms. Vasquez's number, I can

10   call her directly, give her all the information, and we agree

11   he will stay in custody until Ms. Vasquez is satisfied that she

12   has all the information that she needs.  Hopefully I can

13   provide that to her within 15 minutes.

14          THE COURT:  Melania, I think he wants a phone number

15   from you where he can reach you.

16          PRETRIAL SERVICES OFFICER:  Sorry, your Honor.  I was

17   using my headphones.  I couldn't really hear.

18          It is (954) 769-5547.

19          MR. DANIELS:  May I just repeat that back to you,

20   Ms. Vasquez?

21          PRETRIAL SERVICES OFFICER:  Sure.

22          MR. DANIELS:  (954) 769-5547.

23          PRETRIAL SERVICES OFFICER:  That's correct.

24          MR. DANIELS:  I am going to make a couple of phone

25   calls.  I will get the phone, I will get the address, I will

1   get the phone number, and hopefully we can get done whatever we

2   have to do.

3          THE COURT:  All right.  I take it that, just to recap

4   where we are, you are waiving the identity hearing, I will

5   enter the order of removal, which has to be signed, and the

6   bond has been set.

7          MR. DANIELS:  Yes.

8          THE COURT:  Any other conditions of bond that I

9   missed, Mr. Cullinane?

10         MR. CULLINANE:  Thank you, Judge.  Just two issues I'd

11   like to address.  I may have missed one of them.

12         The only thing I wanted to note is, just after meeting

13   with Ms. Vasquez that the court has ordered him to immediately

14   or quickly thereafter return to the Western District of New

15   York.

16         THE COURT:  Yes.

17         MR. CULLINANE:  Finally, Judge, there was a concern

18   from Mr. Daniels about the identity of certain people.  One

19   person I would like to address for the record that he stay away

20   from and have no contact with, initiate no contact with, is an

21   individual woman named Katrina, that is spelled K-A-T-R-I-N-A,

22   and her last name is Nigro, N-I-G-R-O.  She was formerly

23   referred to as Katrina Gerace.

24         MR. DANIELS:  We know who she is, Judge.

25         THE COURT:  All right.

1          MR. DANIELS:  We will stay away from her.

2          THE COURT:  To the extent that there are other victims

3     identified, it will be the government's responsibility to share

4     those names with the Pretrial Services officer so that they can

5     enforce that restriction.

6          MR. CULLINANE:  Thank you, Judge Valle.

7          THE COURT:  Anything further from either side?

8          MR. CULLINANE:  Nothing further from the government,

9     your Honor.

10          THE COURT:  Mr. Daniels, anything further?

11          MR. DANIELS:  No, nothing.  Thank you very much.

12     Thank you.

13          THE COURT:  So I will or we will have to sign the

14     paperwork, Tamisha, for the waiver.

15          MR. DANIELS:  Yes.  He will sign whatever he has to

16     sign, Judge.

17          THE DEPUTY CLERK:  I can email it to defense counsel.

18          I noted for the record that it was verbally waived.

19          THE COURT:  OK.  Great.

20          PRETRIAL SERVICES OFFICER:  Your Honor, just a quick

21     question.  Did the court impose a no firearms restriction in

22     this case?

23          THE COURT:  I did, didn't I?

24          MR. CULLINANE:  Yes, your Honor.

25          THE DEPUTY CLERK:  Yes, you did.

1          PRETRIAL SERVICES OFFICER:  Thank you, Judge.

2          THE COURT:  Yes, I did.  I said no firearms or other

3    dangerous weapons, surrender the passport, travel restriction

4    to the Western District of New York and Florida only for

5    purposes of getting out of here.  After that, only the Western

6    District of New York.

7          THE DEFENDANT:  Yes.

8          THE COURT:  Also, he should notify Pretrial Services

9    when he will be traveling out to the Western District.

10          All right.  Anything further?

11          MR. DANIELS:  No, Judge.

12          THE COURT:  This is one of the messiest removal

13    hearings we have had.

14          THE DEFENDANT:  Thank you.

15          MR. CULLINANE:  Our apologies, and we owe you a ream

16    of paper.  So thank you, Judge, for your time today.

17          THE COURT:  You're very welcome.

18          All right, everyone.

19          Mr. Gerace, I just want to address you.  One of the

20    things that the government asked for was this zero tolerance

21    order.  We don't usually enter it in this district, but

22    basically what I do in this district is tell the defendants, as

23    I'm about to tell you, how lucky you are because under normal

24    circumstances Pretrial was recommending that you would be

25    detained, and the charges in this case are so substantial that

1    but for the government's recommendation you would be detained.

2              So my pitch to you is understand how lucky you are to

3    be released.  Even though it is an inconvenience that you might

4    not be able to go to Pharaoh's, you wouldn't be able to go to

5    Pharaoh's if you were in jail either.  So look at it that way.

6              Being home detained is certainly an advantage that the

7    government has given you an opportunity, but don't blow it.

8    What I'm saying to is if you fail to abide by any of the

9    conditions in my bond, the bond will be revoked and you will go

10   to jail pending trial.

11             Do you understand that, sir?

12             THE DEFENDANT:  Yes, your Honor.

13             THE COURT:  All right.  Thank you.

14             All right, everyone.  Have a good afternoon and stay

15   safe, all of you.

16             MR. DANIELS:  Thank you, Judge.

17             PRETRIAL SERVICES OFFICER:  Thank you, Judge.

18             MR. CULLINANE:  Thank you.

19             THE COURT:  This concludes our calendar.

20             (Adjourned)

21

22

23

24

25

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


March 29, 2021            s/ Joanne Mancari
                          Joanne Mancari, RPR, CRR, CSR
                          Court Reporter
                          jemancari@gmail.com

# EXHIBIT B

*UNITED STATES PROBATION*
*AND PRETRIAL SERVICE*

# MEMORANDUM

**DATE:**  March 4, 2021

**TO:**  Honorable Michael J. Roemer
U.S. Magistrate Judge

**FROM:**  Andre M. McCray
U.S. Probation Officer Assistant

**SUBJECT:**  Peter Gerace
WD/NY Docket #19-CR-227
SD/FL Docket # 21-MJ-06112
**Updated Information**

On March 1, 2021, the above-named defendant appeared with retained counsel for an initial appearance before U.S. Magistrate Judge, Alicia O. Valle, in the Southern District of Florida, on an indictment and warrant originating from our district. At that time, the defendant was released on a personal surety bond with global positioning satellite system (G.P.S.) via home detention. The Court allowed the defendant to reside in Florida, until his scheduled return to the Western District of New York on Friday, March 3, 2021.

**It is to be noted that the time of the defendant's initial drug test conducted in the Southern District of Florida, he tested positive for cocaine. Mr. Gerace reported taking some pills at a social gathering but, did not report cocaine use. At the time of the pretrial services interview, the defendant reported a history of cocaine use, with his last date of use being approximately one and a half years ago.**

I have reviewed the bail report authored by U.S. Probation Officer, Yolonda N. Rawl, in the Southern District of Florida, in which the recommendation was detention pending the disposition of the case. I respectfully disagree with the aforementioned recommendation. Our office respectfully recommended that the defendant be released on the following conditions imposed by U.S. Magistrate Judge, Alicia O. Valle, in the Southern District of Florida.

Report to Pretrial Services as directed by the U.S. Probation Officer.

Surrender any passport/passport card to the Clerk of the Court. Surrender other international travel documents to the appropriate authorities.

Do not obtain a new passport or other international travel documents.

Travel restricted to: Western District of New York unless Court permission is granted to travel elsewhere.

Remain at a verifiable address as approved by Pretrial Services.

Avoid all contact with codefendants and defendants in related cases unless approved by Pretrial Services.

Avoid all contact with, directly or indirectly, with any person(s) who are or who may become a potential victim or witness in this case.

Possess no firearm/destructive device.

Refrain from any  use of alcohol.

Refrain from the use or unlawful possession of a narcotic drug unless prescribed.

Submit to drug/alcohol testing and/or treatment as directed by Pretrial Services, including co-pay.

Refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing which is required as a condition of release.

Abide by the conditions of the Location Monitoring Program (GPS), to be monitored electronically, via home detention, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearance and court-ordered obligations. You will contribute to the cost of services (co-pay) as directed by the Pretrial Services Officer.

Refrain from obstructing or attempting to obstruct or tamper, in any fashion, with electronic monitoring which is required as a condition of release.

Report within 72 hours, to the Pretrial Services Office any contact with any law enforcement personnel, including, but not limited to any arrest, questioning or traffic stop.

The defendant shall not have any contact with Katrina Nigro.

The defendant shall not visit Pharaoh's Gentlemen's Club located at 999 Aero Drive, Cheektowaga, New York; an order to stay away from the strip clubs.


If Your Honor should have and questions, feel free to contact me at

# EXHIBIT C

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA,   *        Docket No.
                                 1:23-cr-00037-JLS-MJR-1
                            *
                            *        Buffalo, New York
            v.              *        March 24, 2023
                            *        1:03 p.m.
                            *
PETER GERACE, JR.,          *        ARRAIGNMENT
                            *
        Defendant (1).      *
                            *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Government:         TRINI E. ROSS,
                           UNITED STATES ATTORNEY,
                           By DAVID RUDROFF, ESQ.,
                              JOSEPH M. TRIPI, ESQ.,
                              NICHOLAS COOPER, ESQ.,
                           Assistant United States Attorneys,
                           Federal Centre,
                           138 Delaware Avenue,
                           Buffalo, New York  14202,
                           Appearing for the United States
                           And
                           JORDAN ALAN DICKSON, ESQ.,
                           U.S. Department of Justice,
                           Criminal Division,
                           Public Integrity Section,
                           1331 F Street NW,
                           Washington, DC  20004.


For the Defendant:         LIPPES MATHIAS WEXLER FRIEDMAN, LLP,
                           By ERIC M. SOEHNLEIN,  ESQ.,
                           50 Fountain Plaza,
                           Suite 1700,
                           Buffalo, New York  14202.

1    The Courtroom Deputy:      KIRSTIE L. HENRY

2

3    Court Reporter:            BONNIE S. WEBER,
                                Notary Public,
4                               Robert H. Jackson Courthouse,
                                2 Niagara Square,
5                               Buffalo, New York  14202,
                                Bonnie_Weber@nywd.uscourts.gov.
6

7            Proceedings recorded by mechanical stenography,
                    transcript produced by computer.

8

9              (Proceedings commenced at 1:03 p.m.)

10

11           **THE CLERK:**  All rise.

12           The United States District Court for the Western

13   District of New York is now in session.  The Honorable John

14   Sinatra presiding.

15           **THE COURT:**  Please be seated.

16           **THE CLERK:**  United States versus Peter Gerace, Jr.,

17   case number 23-CR-37.  This is the date set for arraignment.

18           Counsel, please state your appearances for the record.

19           **MR. TRIPI:**  Good afternoon, Your Honor.  Joseph Tripi,

20   David Rudroff, Nicholas Cooper, and Jordan Dickson for the

21   United States.

22           **MR. SOEHNLEIN:**  Good afternoon, Your Honor.  Eric

23   Soehnlein with Mr. Gerace.

24           **THE COURT:**  Good afternoon, counsel.

25           Good afternoon, Mr. Gerace.

1            **THE DEFENDANT:**  Good afternoon.

2            **THE COURT:**  Mr. Tripi, are there any victim

3   notifications required at this time?

4            **MR. TRIPI:**  Yes, there are, Your Honor.  We're making

5   efforts to make notifications to the witnesses.

6            **THE COURT:**  And the indictment has been unsealed?

7            **MR. TRIPI:**  I'll make that application now and move to

8   unseal the indictments.

9            I have previously provided it to probation and defense

10  counsel this morning, but I have not asked you to unseal yet, so

11  I'm making that application now.

12           **THE COURT:**  Any objections, Mr. Soehnlein?

13           **MR. SOEHNLEIN:**  No objections, Your Honor.

14           **THE COURT:**  Okay.  That application is granted.

15           Anything else to do?

16           **MR. TRIPI:**  Yes, Your Honor.  There's a four-count

17  indictment charging the defendant with three counts of witness

18  tampering.

19           Each of those three counts each relate to allegations,

20  November 19, 2019.  Each of those three counts carry with it a

21  maximum penalty of 20 years and a $250,000 fine.

22           A fourth count is Count Four, distribution of cocaine,

23  dated November 19, 2019.  All of the alleged crimes are in this

24  district.  That also carries a maximum penalty of $20 million

25  and a $1 million fine.

 1              I assume that the defense will waive a reading of the

 2   indictment and enter a plea of not guilty, but --

 3              **THE COURT:**  Do you concur, Mr. Soehnlein, in that

 4   regard?

 5              Do you represent Mr. Gerace on this indictment?

 6              **MR. SOEHNLEIN:**  I do, Your Honor.  I'm retained.  We

 7   will waive any further reading.  We will enter a plea of not

 8   guilty.

 9              **THE COURT:**  Okay.  All right.  In order to take those

10   not guilty pleas, we're going to administer the oath to

11   Mr. Gerace.

12              So why don't you stand and take the oath, Mr. Gerace.

13              Ms. Henry --

14              **MR. SOEHNLEIN:**  Can I just have one minute with him,

15   Your Honor?

16              **THE COURT:**  Of course.

17              (Discussion off the record.)

18              **MR. SOEHNLEIN:**  Thank you, Judge.

19              **THE COURT:**  Okay, Ms. Henry.

20

21       **PETER GERACE,** having first been duly sworn, testified as

22                              follows:

23

24              **THE DEFENDANT:**  I do.

25              **THE COURT:**  Please be seated, Mr. Gerace.  What's your

1   full name?

2         **THE DEFENDANT:**  Peter Gerace.

3         **THE COURT:**  Okay.

4         **THE DEFENDANT:**  G is a middle initial.

5         **THE COURT:**  All right.  And how old are you?

6         **THE DEFENDANT:**  55.

7         **THE COURT:**  How far along in school did you go,

8   Mr. Gerace?

9         **THE DEFENDANT:**  First year of college.

10        **THE COURT:**  What's your most recent or current

11  employment?

12        **THE DEFENDANT:**  Pharaoh's.

13        **THE COURT:**  Are you currently or have you recently

14  been under the care of a physician or psychiatrist or been

15  hospitalized or treated for narcotics addiction?

16        **THE DEFENDANT:**  I go to a psychiatrist, but not for

17  that.

18        **THE COURT:**  Is there anything about that, what you go

19  to a psychiatrist for that affects your judgment?

20        **THE DEFENDANT:**  No.

21        **THE COURT:**  Does it affect your ability to understand

22  what you are doing here today?

23        **THE DEFENDANT:**  No.

24        **THE COURT:**  Have you taken any drugs, medication,

25  pills, or any alcohol in the last 24 hours?

1          **THE DEFENDANT:**  No.

2          **THE COURT:**  Is Mr. Soehnlein your lawyer?

3          **THE DEFENDANT:**  Yes.

4          **THE COURT:**  Okay.  Have you received a copy of the

5  indictment that Mr. Tripi summarized?

6          **THE DEFENDANT:**  Yes.  It's here.

7          **THE COURT:**  Have you had a chance to discuss it with

8  your lawyer?

9          **THE DEFENDANT:**  Yes.

10          **THE COURT:**  And are you waiving reading of that

11  indictment?

12          **THE DEFENDANT:**  Yes, Your Honor.

13          **THE COURT:**  How do you plead to the four counts in

14  that indictment?

15          **THE DEFENDANT:**  Not guilty.

16          **THE COURT:**  And that's as to all four counts?

17          **THE DEFENDANT:**  Yes, sir.

18          **THE COURT:**  Okay.  As you know, Mr. Gerace, you have

19  the right to an attorney in this case, this new indictment.

20  We'll address the detention request, if any, and the pretrial

21  release issue, if any, next.

22          You have a right to consult your counsel.  You have a

23  right not to make any statement.  If you choose make a

24  statement, that statement may be used against you.

25          Are you aware of all that?

1          **THE DEFENDANT:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  I need to cover the Due Process

3     Protections Act.

4          That statute and Rule 5(f)(1) require me to direct the

5     prosecution to comply with its Brady obligation and that case's

6     progeny, to disclose to the defense all information, admissible

7     or not, that is favorable to the defendant, material either to

8     guilt or punishment and known to the prosecution.

9          Possible consequences for noncompliance may include

10    dismissal of individual charges or the entire case, exclusion of

11    evidence, and professional discipline or court sanctions on the

12    responsible attorneys.

13         I'm going to enter that order now and direct the

14    prosecution to review and comply with it.

15         **MR. TRIPI:**  Understood, Your Honor.

16         **THE COURT:**  Okay.  Here it is.

17         Okay.  As to the arraignment, Mr. Tripi, have I missed

18    anything?

19         **MR. TRIPI:**  No, Your Honor.

20         **THE COURT:**  Mr. Soehnlein --

21         **MR. SOEHNLEIN:**  No, Your Honor.

22         **THE COURT:**  Okay.  Before we get to any detention or

23    release issue, Mr. Tripi, is there anything I need to know about

24    the Government's plans for this indictment vis-a-vis the other

25    pending case that I've got with Mr. Gerace and Mr. Bongiovanni?

1        **MR. TRIPI:**  Yes, Judge.  We do plan within relatively

2   short order to file a motion to join this case with the pending

3   indictment that's set for trial.

4        **THE COURT:**  Okay.  I'm going to be, at some point

5   today, sending you, both sides, to Magistrate Judge Roemer to

6   work out a schedule -- a pretrial schedule.

7        So there will be a referral and pretrial schedule in

8   front of Judge Roemer.  You probably want to let him know your

9   plans as well.

10       **MR. TRIPI:**  Yes, Your Honor.

11       **THE COURT:**  Next, is the Government moving for

12  detention?

13       **MR. TRIPI:**  Yes, Judge.  We are moving for detention.

14       **THE COURT:**  Okay.  And, Mr. Soehnlein, are you

15  prepared to proceed and have a detention hearing now?

16       **MR. SOEHNLEIN:**  Yes, Your Honor.

17       **THE COURT:**  Okay.

18       **MR. TRIPI:**  May I proceed, Your Honor?

19       **THE COURT:**  You may.

20       **MR. TRIPI:**  Your Honor, this four-count indictment, as

21  you know, charges three counts of witness tampering and one

22  count of distribution of cocaine, which occurred November 19,

23  2019.

24       At the outset, I will just note that Count Four of

25  this indictment does carry a presumption of detention pursuant

1  to Title 18, US Code Sections 3142(e)(3)(C) and (f)(1)(C), due

2  to the drug count that's included.  The presumption is that the

3  defendant is a flight risk and a danger to the community.

4          Additionally, Your Honor, we will be proceeding by

5  proffer, as is well-documented is permitted by the Second

6  Circuit in United States versus LaFontaine.  That's a Second

7  Circuit case in year 2000.

8          And interestingly, in that case, Your Honor, before I

9  get to the core of my proffer here, that case involved witness

10  tampering, and it didn't allege any allegation of violence or

11  threats, which is a little bit different here; this involves

12  intimidation and threats.

13          In LaFontaine, the Court said:  We have a record of

14  violence or dangerousness in the sense of threats or is not

15  necessary to support pretrial detention.  Citing to the

16  Ferranti case and the Rodriguez case.

17          Second, Second Circuit said:  Obstruction of justice

18  has been a traditional ground to grant detention by the courts

19  even prior to detention for dangerousness.

20          Which was instituted prior to the Bail Reform Act --

21  excuse me -- instituted by the Bail Reform Act.

22          The Court went on to talk about in the Gotti case,

23  that there was a single incident of witness tampering that

24  constituted a threat to the integrity of the trial process,

25  rather than more generally a danger to the community, so

1    LaFontaine cited to the Gotti case.

2            Further in the LaFontaine case, the Second Circuit

3    stated:  We have held, quote, the sort of electronic

4    surveillance suggested by the defendants can be circumvented.

5            Home detention and electronic monitoring, at best,

6    elaborately replicate a detention facility, without the

7    confidence of security such a facility instills.

8            Citing to Millan with citations and quotations

9    omitted.  That cite to LaFontaine is 210(f)(3)(E), 125, and cite

10   135 Second Circuit 2000.

11           As this Court is aware, the factors to consider are

12   the nature and circumstances of the offense charged when you are

13   weighing whether to detain the defendant; the weight of the

14   evidence against the person.

15           Significantly in the Government's view, the history

16   and characteristics of the person -- which I'll spend some time

17   on; and the nature and seriousness of the danger to any person

18   or the community that would be posed by the person's release.

19           Another case they talked about, the nature and the

20   circumstances of the witness tampering in a criminal proceeding

21   being serious, is relatively a recent case, United States versus

22   Murray.  It's an SDNY case from February of 2023; 2023 Westlaw

23   2055886.

24           And in the Murray case, they quote to the Supreme

25   Court, stating that the Government is not obligated to show that

1   the defendant had any particular law enforcement officer or

2   officers in mind when the defendant acted, observing that

3   witness tampering occurs frequently and most effectively before

4   the victim has engaged in any communication with officers.

5         Another case in this district, United States versus

6   Fernandez, 50 F Supp. 3(b)406409, Western District of New York,

7   December 8, 2014.  In that case the Court stated:  Superseding

8   indictment reflects a finding of probable cause by a Grand Jury,

9   that the defendant engaged in witness tampering, which only

10  further supports a finding that the defendant presents a danger

11  to others in the community.

12        So in this case, Your Honor, I'm going to start with

13  this defendant's conduct towards the witness, who is the victim

14  of the threatening communications that are alleged in the

15  indictment, so a little history is warranted here.

16        On or about April 9, 2019, that victim/witness was

17  arrested by the Amherst Police Department and charged by that

18  department with stealing Mr. Gerace's Rolex.

19        That day, after being arrested, Federal agents were

20  contacted by a supervisor at the Amherst Police Department, and

21  Federal agents responded there and spoke with this witness.

22        In that set of conversations, the witness made

23  statements about this defendant, about fairness, and generally

24  about some of the -- some of the information that culminated in

25  the charges in the indictment.  But to be clear, this was one of

1   many witnesses.  But, generally, it involved information about

2   drug trafficking.

3         Now, I'll note -- and I'll get to this later in my

4   presentation -- that this defendant has many contacts in law

5   enforcement, many friends in high places, to include State

6   judges, members of law enforcement, multiple prior police

7   commissioners of the Buffalo Police Department, police

8   commissioners, friends in police departments -- in local police

9   departments.

10        He has bragged to witnesses that he has contacts in

11  every local police department, political figures, and many

12  others.  And we get that through our investigation through

13  multiple sources of information.

14        But what's clear here, is that on this April 9, 2019,

15  arrest -- I won't name the detective who made the arrest -- but

16  the detective who made the arrest, based upon the defendant's

17  complaint, is the same detective who made multiple arrests of

18  Mr. Gerace's ex-wife, who you've heard.

19        The defense named in many, many court appearances, and

20  even most recently in a court filing before this court:  Well,

21  that detective was the same detective who arrested his ex-wife

22  on multiple occasions for various contempt charges, for conduct

23  that included things as innocuous as liking a Facebook post.

24        While that detective is the same detective that

25  arrested this witness, and subsequent to the arrests of Gerace's

1    ex-wife, and prior to the arrest of the witness here, from text

2    messages in Mr. Gerace's phone, which have been turned over to

3    him -- this whole phone extraction has been turned over, I'll

4    just give you one example.

5              On December 20, 2018, at 19:06 p.m., Gerace texted:

6    "Now I've had it.  Now keep in touch; we've got to get a drink."

7    And there was some communications about needing the phone

8    number.

9              This detective texted back that same day within the

10   next -- 24 seconds later:  "Absolutely.  Let's get a drink

11   soon."  And then another 56 seconds later texted:  "What time

12   you hanging out up there tonight?"

13             So this defendant has had the ability to have friends

14   of his arrest witnesses in this case.

15             **THE COURT:**  Let me pause you there.  I just need to --

16   because otherwise, I'm going to forget to come back to it.

17             **MR. TRIPI:**  Yeah.

18             **THE COURT:**  Is this detective that you are talking

19   now, the same person who alerted Federal law enforcement?

20             **MR. TRIPI:**  To what?

21             **THE COURT:**  To come down and --

22             **MR. TRIPI:**  No.

23             **THE COURT:**  Okay.

24             **MR. TRIPI:**  So the detective arrests -- brings to the

25   station house, and then the supervisor gets involved.  The

1    supervisor contacts Federal law enforcement.

2            **THE COURT:**  Got it.  Okay.  Go ahead.

3            **MR. TRIPI:**  So this witness spoke with some Federal

4    authorities that day, was released, but Federal authorities have

5    no role in what happened regarding the allegation regarding the

6    Rolex watch.

7            In July of 2019, a long-time associate of Mr. Gerace

8    and employee at Pharaoh's attacked that witness and made

9    comments about speaking to the Feds.

10           Now, the Feds, quote, unquote, did not publicize this

11   witness's conversations with them.  Nevertheless, she was

12   assaulted.

13           In October of 2019, the witness testified to the Grand

14   Jury regarding this investigation.  On October 31, 2019, the

15   initial indictment in this case was filed under seal, charging

16   defendant Bongiovanni by name, but clearly referencing Peter

17   Gerace as co-conspirator one, and referencing a gentleman's

18   club.

19           Although at that time, the defendant was not named,

20   Mr. Gerace's actual cell phone number was referenced in one of

21   the overt acts charging Bongiovanni.  That indictment was

22   unsealed November 5, 2019, to a great deal of media attention.

23           It would have been absolutely and abundantly clear to

24   Mr. Gerace that he was a target of a Federal investigation no

25   later than November 5, 2019.

1      But based on these circumstances -- and I submit the

2 corroborating circumstances of a witness against him being

3 assaulted at a bar, it seems he knew well before then.

4      Additionally during that timeline in April, his phone

5 was seized at a border search, so he knew he was a target.

6      November 19, 2019, the defendant was with two female

7 associates of his, and as of that date, he'd had conversations

8 clearly describing this witness/victim in this indictment as a

9 snitch.  That is, a snitch that was resulting in the problems he

10 was looking at Federally, being a target.

11      After referring to that witness as a snitch on prior

12 occasions, that brought -- brings us to the night of

13 November 19, 2019, where Mr. Gerace was with two females in his

14 basement.

15      And after having drinks with them and providing each

16 of them cocaine, that all three of them used, Mr. Gerace making

17 comments and statements about the witness in this case being a

18 snitch and a snitch bitch.

19      His colleague -- his confidante, a proxy of his, you

20 might say, made some messages, borrowing the other female's

21 phone, because this witness had taken the steps to block certain

22 people from her Facebook account.

23      But the third person in the room was not blocked, so

24 that provided an avenue for communications.

25      So the one female associate of Mr. Gerace borrows the

1    other female associate of Mr. Gerace's phone, while all three of

2    them are using cocaine and makes statements that are stated out

3    loud as to what those threats are.

4         And it was after Mr. Gerace was making comments about

5    the witness.  I'll read them to you, leaving out names.  The

6    Facebook communication reads:  "Hey, you ray ass bitch" -- I

7    believe that to be a typo, potentially.  Y is next to T on a

8    keyboard.

9         "It" and then name, "I'm good to G" -- should be "good

10   to go."  "See you, and when I do, well, use your imagination,

11   bitch, you snitch junkie cunt.  You are a fucking funny cunt.

12        You do whatever for drugs.  In feeling" -- should be

13   "I'm feeling" -- insert name of second female Gerace associate,

14   "in on how much of a scum bag you are.  But if you want to claim

15   Peter's home like you deserve it, bitch.

16        You deserve nothing, you nasty cunt.  Learn how to be

17   a mother, because your husband was just at my place filling me

18   in on how my" -- it says, "H of a pull."  I believe it should

19   be, "pill head junkie you are.

20        Too bad you couldn't take" -- insert name of second

21   Gerace female associate -- "down.  Oops.  She is too smart

22   because you're the biggest piece of shit I've ever met.

23        That why" -- insert name another female -- "was

24   fucking your husband and being mother to your daughter, you

25   junkie ass pond scum.

1          Plan on nothing.  Peter knows better, you fucking nut.

2     Girl, H" -- should be U.  U and H are next to each other on a

3     keyboard -- "Girl, you don't want to fuck with me.  You know how

4     I get down.  I hope you fucking his, cunt."

5          And then there are some typos.  It talks about

6     shampoo, and then the last line is:  "Ha ha, you are a joke.  Go

7     kill yourself, you dirty cum guzzling whore."

8          When those messages were sent, while those three were

9     together, well after this woman had talked to Federal

10    authorities, testified in the Grand Jury, they are designed to

11    scare the witness.

12         They did scare the witness.  The witness was very

13    familiar with Pharaoh's; very familiar with Gerace; very

14    familiar with his associates; very familiar with the people that

15    run his club, and the biker gang that he employs at his club.

16    It had the designated effect.

17         Now, December 19, 2019, the defendant doesn't stop

18    there.  This witness is one of two females that the defendant

19    sues in State court in sum and substance for slander.

20         And in that civil law suit, which this court later

21    enjoined, he alleged that this witness provided false

22    information to the FBI, in connection with the date of her

23    arrest for the watch.

24         Notably, she didn't talk to the FBI on that day.  So

25    the information in the lawsuit was inaccurate from the

 1   beginning.

 2        But notably, that may support another charge for

 3   witness intimidation under Title 18, United States Code, Section

 4   1513(e), and there is support for this in the case law that

 5   we're looking into.

 6        That statute provides:  Whoever knowingly, with intent

 7   to retaliate, takes any action harmful to any person, including

 8   with the lawful employment or the livelihood of another -- any

 9   person, for providing to the law enforcement officer any

10   truthful information, relating to the commission or possible

11   commission of any Federal offense, shall be guilty of a crime.

12        There is a 10th Circuit case where an individual sued

13   his ex-girlfriend, who became a witness.  The US Attorney

14   charged the case.  The 10th Circuit affirmed the conviction.

15        So although the injunction that you ordered was taken

16   up on appeal, there might be criminal liability with respect to

17   even the filing of that civil lawsuit.

18        Obviously, Gerace is named as a charged defendant in a

19   very serious second superseding indictment.  I'm not going to

20   spend a lot of time on that, because that's in front of Your

21   Honor and it's set for trial.

22        But I do think since it's never been proffered to this

23   Court, and you have to the consider its history and

24   characteristics, there are a couple of things I think the Court

25   should know.

1             And one of them relates to some of the relationships

2     with some of the people that go to Pharaoh's, to include a

3     former State Supreme Court judge.

4             The law provides that "Johns", that is men who receive

5     sex from prostitutes, are liable for Federal sex trafficking

6     crimes.

7             They can be what are referred to as unindicted

8     co-conspirators.  Now, this particular judge I'm talking about

9     is unfortunately deceased former Judge Michalski.

10            But it goes to show you that people in the position of

11    power this defendant has access to, absolutely ruin people's

12    lives.

13            One of the text messages in the defendant's phone,

14    that will be introduced at trial, further corroborating some of

15    the other witnesses that will testify, is that Supreme Court

16    judge texting the defendant:  "You're funny.  Let's get some

17    pussy there."

18            The defendant responding:  "Where and when?"  This is

19    back in 2015.  And the defendant is following up with:  "I want

20    drinks."

21            A former Pharaoh's dancer who will testify at trial

22    and who testified in the Grand Jury, will explain she began at

23    Pharaoh's as an 18-year-old and continued there for

24    approximately five years.

25            When she began working at Pharaoh's, she'd never used

1   drugs.  Within two months, she was addicted to cocaine and

2   heroin and began having sex in exchange for drugs and money,

3   with Gerace and his friends.

4         She explained that other dancers performed sexual

5   favors in exchange for drugs and money, and that managers at

6   Pharaoh's knew what was going on.

7         Gerace gave this young lady cocaine and money in

8   exchange for intercourse and oral sex.  And she did the same by

9   going to a private upstairs area controlled by Gerace -- and I'm

10  paraphrasing; these are not quotes -- with Gerace's friends, his

11  brother, the DJ at his club.

12        This corroborated other information provided by the

13  ex-wife, that they have repeatedly argued to you is so

14  perjurious.

15        This young lady testified in the Grand Jury, and I

16  anticipate will testify at trial in sum and substance, that she

17  felt Gerace and others used her addiction against her to engage

18  in prostitution.  And she had that opinion of other dancers as

19  well.

20        When asked how many times she overdosed at Pharaoh's,

21  this young lady said:  "One time that I can remember."  But

22  seemed to acknowledge there might have been other occasions.

23        Another young lady, who I anticipate will testify, was

24  employed there for about six years.  She made statements against

25  her own penal interest, described girls going upstairs and Peter

1    and his friends, that she knew something was going on.

2         Quote:  For as long as they were up there, girls would

3    come back down and say I need a shower or a baby wipe.

4    Consistent with having had sex -- that's me speaking now, Judge.

5         When asked how many dancers were using drugs inside of

6    Pharaoh's, this witness said:  Probably about 50.  He's the

7    owner.  He was in control.  He provided some of the drugs.

8         Another young lady who I anticipate will testify, she

9    acknowledged becoming involved in prostitution though men she

10   met at Pharaoh's, and knew other dancers were engaged in

11   prostitution there as well.

12        I anticipate evidence about high-end prostitution for

13   important people in this community, to include some potential

14   defense lawyers.

15        One defense lawyer who was mentioned by other

16   witnesses, testified in the Grand Jury and acknowledged that

17   Gerace provided him with cocaine on several occasions, to

18   include at Pharaoh's.

19        That defense lawyer testified in the Grand Jury, and

20   they will be getting his Jencks this week.

21        Regarding some of the high-end prostitution, there was

22   evidence that Judge Michalski was one of those high-end

23   customers, and that he liked the female name Shelby.

24        So when we looked at Mr. Gerace's text communications

25   with that judge, Mr. Gerace texted the judge on January 4th,

1   2017:  "LOL.  I was with Shelby."

2          And then he asked -- I don't know what he asked means

3   -- and the judge responded:  "Ha ha ha ha ha."

4          In 2015, the New York State Police received

5   information that prostitution and narcotic activity was taking

6   place at Pharaoh's, and they began undercover operations there,

7   where they purchased cocaine inside of Pharaoh's in January of

8   2015.

9          The Erie County DA's office at the time, surely

10  unaware of the relationship between Judge Michalski and Peter

11  Gerace, actually went to Judge Michalski to get a protective

12  order to not disclose the names of identifying witnesses in the

13  case until trial of one of the dancers who sold drugs.

14         Michalski -- who I'll get into in a moment -- had, in

15  the defendant's prior criminal case, written a letter on his

16  behalf, acknowledging they were personal friends, didn't recuse,

17  signed the order.  And then ultimately, that case went nowhere.

18  I don't think that was a coincidence.

19         Additional text messages between Michalski and Gerace

20  include -- in the years that that local detective was arresting

21  Gerace's ex-wife, he was sending screenshots of her mug shots to

22  the judge, who mocked her.

23         Who said things like:  Wow.  Unbelievable.  Ha ha ha.

24  And, "She looks like crap.  Give her enough rope."  Those

25  messages were in 2019 -- excuse me -- those messages were in

1  2017.

2          Despite that and despite knowing full well the

3  relationship that he had with Gerace and the witness in this

4  case, when his ex-wife was arrested for driving drunk and

5  hurting someone, the judge heard the case, took the plea.

6          And then only when publicity in this case started, he

7  recused himself prior to sentencing.

8          And that's just one example that I'm willing to talk

9  about today, of people in high places, that we submit the

10  defendant has been able to groom over time.

11          Just like females that he groomed at his club,

12  leveraged relationships with, and ruined lives.

13          That's the type of danger that maybe this Court hasn't

14  seen yet, but that's the type of danger this defendant poses.

15          So despite those text messages in 2017, mocking his

16  ex-wife, the judge handled her case in 2019 in October.  Those

17  messages will be introduced before the Court, corroborating the

18  witnesses in this case.

19          But there is more to his history here.  In 2005, the

20  defendant was convicted of wire fraud for a telemarketing scam

21  where he bilked elderly people out of money with the promise of

22  lavish prizes.

23          It started as a Federal plea agreement.  The defendant

24  admitted he was on organizer.  The plea was to Title 18, US

25  Code, Section 371, conspiracy to commit wire fraud,

1    telemarketing fraud.

2          Among the letters on his behalf at sentencing, again,

3    was the deceased Judge Michalski's letter in support of

4    sentencing.

5          And then deputy police commissioner of the Buffalo

6    Police Department, who later was the Commissioner, including

7    part of the time period of this indictment, that same judge --

8    and I'll get to it -- also handled the defendant's custody and

9    name change of his son.

10         He had a son with a young lady, and I'll get to how he

11   assaulted her in a moment, but while she was afraid of him and

12   on the run in fear for her life, hiding out, the judge -- excuse

13   me -- this defendant did a pro se motion for a name change to

14   have his son's name changed to this name.

15         And that judge granted it the same day.  The mother

16   was nowhere to be found, but, of course, it was applied for and

17   granted the same day.

18         In 2010, there was information that the defendant was

19   traveling with a young lady from New York City.  There was a tip

20   that she had drugs in a false compartment, coming through the

21   airport.

22         At that time, law enforcement had a canine do a sniff.

23   The dog didn't alert, and they decided not to step and question.

24         But the information about the defendant having a

25   supplier throughout that timeframe, there was other information

 1   to suggest that, that I've reviewed in this investigation.

 2          So looking back at that tip that didn't turn out to be

 3   anything, I will consider asking you to consider that part of

 4   his history.

 5          Then while on supervised release in front of Judge

 6   Skretny, he would have received six months in prison, five years

 7   on supervised release, for his wire fraud conviction.

 8          He told probation he wasn't working at Pharaoh's.  He

 9   said he was working at Pietro's.  FBI had to provide probation

10   with information about criminality that the defendant was

11   involved in.  That led to a probation search.

12          See, no offense to probation, they are spread thin,

13   they don't find out about crimes.

14          It takes more law enforcement resources and

15   investigation to find out, except when they get lucky and they

16   do a walkthrough in plain view and someone leaves a gun out.

17   Probation doesn't investigate crimes, Judge.

18          But a canine was walked through Pharaoh's, and a

19   canine hit several locations -- in several locations in the club

20   where marijuana, Lortabs were found.

21          The canine also alerted to two safes that were in the

22   club.  One empty safe, and one safe that had money.

23          But that day, October 31st, 2009, formed part of the

24   violations that occurred in front of Judge Skretny.

25          In 2012, the defendant had a domestic incident with a

1  an ex-girlfriend of his.  He choked her.  She stated that she

2  saw stars, but did not lose consciousness.

3      He punched her in the side of the face, and she

4  stabbed him.  She described a violent interaction between the

5  two that happened in this involvement.

6      A year later -- approximately a year later in 2013 --

7  the defendant was arrested May 2nd, 2013.  He was later

8  convicted of assault in the 3rd degree, an A misdemeanor.

9      It's odd, because the arrest occurs in 2013, but --

10  and he pleads guilty in 2013, but he wasn't sentenced, according

11  to his rap sheet, until October of 2016, to three years of

12  probation.

13      I've not yet looked to see what judge that case was in

14  front of.  I don't have that information.

15      But regarding some of the facts of the underlying

16  strangulation and assault, Buffalo 911 received a call from the

17  woman who then said:  "Never mind.  Never mind."  The caller

18  hung up, but not before dispatcher heard:  "Look what you did to

19  my face."

20      The call was traced to 95 Joseph Drive.  Town of

21  Tonawanda police officers responded and arrived at the scene,

22  spoke to Peter Gerace.  Who stated there weren't any problems.

23      They then spoke to the victim, who had a black eye and

24  a scratch on her neck.  But the victim was denying that anything

25  occurred and said her injuries were the result of playing catch

1  with her son.

2          The police officers on the scene assessed that this

3  defendant and the female were not forthcoming with information.

4  Both insisted the injuries were sustained while playing catch.

5          Ultimately, the young lady was interviewed at the

6  police station, because the police noted in the reports that

7  obviously she was afraid to speak freely in front of Peter

8  Gerace and his extended family.

9          Reading from the excerpt from the police report:

10  "While at our station, she spoke at length in private with a

11  crisis service counselor in our family room with the door

12  closed.

13          I could hear a lot of crying and distraught discussion

14  coming from that room."

15          A little bit further:  "A witness told the police that

16  this victim had been repeatedly a victim of ongoing domestic

17  abuse at the hands of Mr. Gerace for many years, and that the

18  daughter was very afraid of him and his family."

19          Witnesses further -- a witness further reported that

20  the defendant's seven-year-old child at the time, sometimes gets

21  so nervous about his home life that he vomits when he has to

22  return home.

23          A witness reported that this female had been to the

24  hospital on prior occasions for unexplained injuries.

25          They explained that one time this female victim took

1   off to Florida out of fear of being killed by the defendant.

2   And during that time, Gerace went to court and obtained sole

3   custody of the child.

4          I've previously indicated about the name change order

5   that we found during a search warrant of Mr. Gerace's house,

6   signed the same day by Judge Michalski.

7          The family thought she was dead, because she was in

8   such deep hiding.  So much so, that they recorded a Niagara

9   County cadaver dog search various locations for this young lady.

10  They were convinced that she was dead.

11         Yet she was still refusing to sign a police report out

12  of fear.  Ultimately, that case did go forward, and there was a

13  conviction for assault in the 3rd degree.

14         But there is more.  And this is sort of hot off the

15  press, Judge.  Just today our office received a subpoena

16  response from the Small Business Administration regarding the

17  defendant's EIDL loan application during COVID.

18         It's clear from that application that the defendant

19  made several material false statements that resulted ultimately

20  in him acquiring $2 million from the Small Business

21  Administration, based upon material misrepresentations that are

22  in this application.

23         For example, he said he did not provide sexual

24  services at his business.  Had he checked the box yes, it would

25  have been over with.

1          The actual question is:  Applicant does not present
2   live performances of a prurient sexual nature, or derived
3   directly or indirectly, more than through the disclosed revenue,
4   through the sale of products or services or presentation of any
5   depictions or displays of a prurient sexual nature.
6          So he said no, on April 5th of 2020.  The loan was
7   funded to the tune of $150,000 in June of 2020.
8          Around that same time, he had applied for a separate
9   PPP loan and was told and acknowledged in an affidavit filed in
10  Federal Court, that he knew that he was advised that his
11  business was of a prurient sex nature.
12         That litigation was conducted by AUSA Michael Cerroni
13  before District Court Judge Lawrence Vilardo.
14         So as he's fighting that with the PPP people, he then
15  applied for a loan modification in July of 2021, asking for an
16  increase in his EIDL loan, E-I-D-L.  And around July of 2021,
17  it's increased to $500,000.
18         Now, this is after he's told that his business is of a
19  sexual and prurient nature; after he acknowledged that in a
20  sworn affidavit in Federal Court.
21         And as part of the EIDL loan questionnaire that asked
22  of him, one of the questions asks, also, Your Honor:  For any
23  criminal offense, other than a minor vehicle violation, have you
24  ever been convicted, pled guilty, plead nolo contendere or
25  placed on pretrial diversion or been placed on any form of

1  parole or probation, including probation before judgment?  He

2  checked no.

3          He was clearly a Federal felon before Judge Skretny.

4  He had also had a conviction for assault, which he got sentenced

5  to probation on.  So there is another lie.  And he ultimately

6  gets the loan funded to the tune of $2 million.

7          And as of July 2021, he was under Federal indictment.

8  So there is another question that reads:  Are you presently

9  subject to an indictment?  And he says:  No.

10          And when he went to extend the loan, there is

11  questions:  Has anything changed since the last time?  So he

12  should have said yes.  I am now under Federal indictment.

13          He indicates:  No.  And he gets the loan funded to the

14  tune of $2 million.

15          Now, a USA Rudroff is our office's coordinator for

16  COVID prosecutions.  And he estimates that this is the third or

17  fourth largest fraud of COVID since it happened in this

18  district.

19          $2 million, that's the maximum you can get.  I would

20  anticipate charges forthcoming in short order.  We just got this

21  information today.

22          So connections with powerful people; lying; fraud;

23  prior fraud; prior felony convictions; endangering people;

24  scaring them through proxies, because he's not dumb enough to do

25  it directly.  Presumption in the Government's favor.

1          Now, the defense is going to argue:  They knew about

2     this for three years.

3          What I say to that, Judge, truth does not equal proof.

4     It was true three years ago that through proxies, he intimidated

5     and tampered with this young lady.

6          There is a reason there is a five-year statute of

7     limitations; we are well within that.  We now have the proof

8     from everyone else who was involved and the victim of the crime.

9          I ask that you detain him on this indictment for all

10    the reasons stated.  Thank you, Judge.

11          **THE COURT:**  While you're still there, Mr. Tripi, let

12    me ask you -- just about that last point about "truth does not

13    equal proof."

14          Some of the proffers about the first three counts in

15    the indictment are facts that I would have heard in the other

16    case and would have accounted for.

17          **MR. TRIPI:**  I don't think I went into that depth and

18    detail at all.  Because we're a lot closer to trial, they have

19    stuff now.  So there's a balance, Judge.

20          And at that point, we only had it from the one source

21    -- I think -- maybe two.  Certainly not all three.

22          We had recent testimony.  And I'm not going to go much

23    further than that, but there's a difference.

24          What's the old adage?  Trust, but verify.  It was true

25    then; it's verified now.  Now, there's an indictment.  Now, the

1  presumption is triggered.

2            And I didn't go into that level of detail.  I know

3  95 percent of what I told you today, you've not heard before.

4  And there is always a balance with protecting witnesses.  Now,

5  they know this stuff, I'm free to tell you more.

6            **THE COURT:**  Mr. Soehnlein --

7            **MR. SOEHNLEIN:**  Your Honor, it's an interesting and

8  salacious story, and it's the reason that we have trials.

9            I can't possibly respond to all that stuff, and I

10  don't have to respond to a lot of it, because most of it doesn't

11  go to detention.  That's what we're here to talk about.  We're

12  here to talk about detention.

13            The last date I heard the Government reference was

14  2019.  And I might have missed it, but I think it was 2019; is

15  that right?

16            **MR. TRIPI:**  For the stuff in the indictment, 2019 --

17            **MR. SOEHNLEIN:**  '19.

18            **MR. TRIPI:**  The loan stuff was 2021.

19            **MR. SOEHNLEIN:**  All right.  So the stuff that they're

20  seeking detention on is 2019.  Mr. Gerace was charged -- he was

21  indicted in 2021.

22            Mr. Macaluso, he hasn't violated in any way, has he?

23            **PROBATION OFFICER:**  To date -- today, no.

24            **MR. SOEHNLEIN:**  You are still recommending release; is

25  that correct?

1          **PROBATION OFFICER:**  Because the violation -- the new

2    conduct was prior to his supervision, we cannot violate him on

3    anything, no.

4          **MR. SOEHNLEIN:**  So, Your Honor, I think that's the

5    important place to start.

6          Now, to the extent that there is a presumption, okay?

7    The presumption is on that last count.

8          That last count, if you take Mr. Tripi's word for it,

9    is what I would consider to be a recreational use of cocaine.

10   Even on its best day, it is three people together in a basement

11   using cocaine together.

12         We're not talking about bricks of cocaine; we're not

13   talking about firearms; we're not talking about helicopters

14   coming from Miami.  We're talking about three people in a

15   basement, okay.

16         That's the count that triggers the presumption.  And

17   the presumption is rebuttable.  And it's rebutted by the last

18   two and however many months that Mr. Gerace has been on

19   supervised release without re-offense, Your Honor.

20         The proof's in the pudding.  There are terms and

21   conditions that guarantee his return to court, the safety of the

22   community, and he hasn't shown that he won't abide by any of the

23   numerous protective orders.

24         Now, the Government wants timelines.  I like timelines

25   too, Judge.  I like timelines a lot.  This conduct's allegedly

 1   in November of '19, December of '19.

 2          Mr. Gerace gets charged in 2021.  The Government

 3   references it in proffers for a while -- and I wasn't part of

 4   the case then, but I've read them.

 5          And what happened in this case three days ago, we made

 6   a motion to allow Mr. Gerace an opportunity to see some of the

 7   3500 material to assist in defense at trial.

 8          Those motions are under seal -- I'm not going to go

 9   into them.  I'm certainly not going to name names, certainly not

10   people who aren't here, people who may be deceased.

11          But, Your Honor, it's a little suspicious that having

12   that information for that long, this indictment comes three days

13   after we try to give Gerace a fair opportunity to prepare his

14   defense for the trial that's imminent and serious.  It's going

15   to be a fight for his life, Your Honor.

16          So, Your Honor, there are terms and conditions that

17   exist.  There is a presumption that has been rebutted;

18   probation's consenting or recommending his release.

19          And I think those terms and conditions should be

20   continued, Your Honor.

21          **MR. TRIPI:**  Can I have a moment, Judge?

22          **MR. SOEHNLEIN:**  That's all I have.  I can't go on as

23   long as he has.

24          **THE COURT:**  Thank you, Mr. Soehnlein.

25          **MR. SOEHNLEIN:**  Thank you, Judge.

1            **THE COURT:**  Give me one second, Mr. Tripi.

2            All right, Mr. Tripi.

3            And then I'll give you the last word, Mr. Soehnlein.

4            **MR. SOEHNLEIN:**  Thank you, Judge.

5            **MR. TRIPI:**  I'll be very brief, Judge.

6            As to the last point, and I made reference to it, but

7    I just want to put a fine point on it.

8            Probation only knows if the defendant tested positive

9    for cocaine, and he hasn't.

10           And they only know if he's where he's supposed to go

11   to include on this earned leave, that nobody in my office knew

12   existed for 20 years and apparently is a thing.

13           He can go to the casino, and he has.  He can go to

14   Sabres games, and he has.  He can go to dinner, and he does.

15           And as long as he's got access to his cell phone; as

16   long as he can see people in public places; as long as he can

17   speak to people; as long as he can use a computer, he's a danger

18   through proxies.

19           And that's what some of the case law I talked about,

20   we talked about -- that's why witness tampering is so important.

21   It goes to the integrity of the proceedings that we do here.

22           There are other acts of witness tampering that are

23   under active investigation.

24           As to timelines, well, the last witness testified in

25   the Grand Jury on March 16th, before that motion was granted.

 1            After that, there is an internal approval process to

 2    get an indictment approved.  And the last day of the Grand Jury

 3    was yesterday.  So we didn't know that motion was coming.

 4            So that's a coincidence -- an interesting coincidence,

 5    but that's all it was.

 6            One other thing:  You know, there is one young lady

 7    who is a witness in the case, who was charged, and all of a

 8    sudden had people who never represented her as a lawyer -- and

 9    she's represented by a lawyer, texting her about if she needs

10    legal counsel because a member of the defense team is concerned

11    about the Government threatening and intimidating her.

12            I can assure you the Government doesn't threaten and

13    intimidate witnesses.  We investigate that conduct.

14            And unsolicited texts from attorneys to people who are

15    already represented, raises issues ethically, maybe even

16    obstruction.

17            And I'm certainly not saying that Mr. Soehnlein was

18    involved in any of that --

19            **THE COURT:**  Tell me more about that vignette.  When

20    did that happen, Mr. Tripi?

21            **MR. TRIPI:**  That happened after the young lady who

22    sent these messages was charged in a public complaint and before

23    she came in for her first proffer with the Government.

24            And her attorney has represented to us -- I believe

25    this is accurate -- someone interrupt me if I'm wrong -- that he

1    has represented her on every case.

2           So this attorney reaching out, claiming he represented

3    her before, seeing if she is okay -- he mentioned he talked to a

4    specific member of Gerace's defense team who said to check in on

5    her -- and I'm paraphrasing -- because they were concerned about

6    the Government intimidating her.

7           Now, there is a member of the Gerace defense team,

8    that there is other interviews happening of witnesses, of people

9    who are employed by Gerace.

10          Those interviews are happening at Pharaoh's.  Think

11   about that coercive nature.  "Come talk to my attorney at

12   Pharaoh's", the site of the crime, which I'm now allowed to go

13   to, "and fill out a questionnaire."

14          Do you think we're getting accurate information from

15   people in that setting?  I don't.

16          Those are the types of things that are being reported

17   to us, Your Honor.

18          Those are the types of things that should be happening

19   in law offices, not at Pharaoh's.

20          **THE COURT:**  Is it your position, Mr. Tripi, that the

21   factual recitation that I heard from you here today, is much

22   more fulsome than the factual recitation that I heard from you

23   in 19-CR-227?

24          And I guess I'm getting back to your earlier comment,

25   before you sat down before, which is that -- is it the

 1   Government's position that the timeline of the other case, being

 2   where we were back then --

 3            **MR. TRIPI:**  Yes.

 4            **THE COURT:**  -- that it was the Government's election

 5   not to disclose those details to the defendant at that time, and

 6   potentially weigh that against detention versus a release?

 7            **MR. TRIPI:**  Yes.  Well, first, I didn't have all the

 8   details.

 9            **THE COURT:**  Right.  Some of them you certainly did.

10            **MR. TRIPI:**  Some of them I did.  I don't have the

11   transcript in front of me, Your Honor, but I can tell you that

12   initial information was similar in nature.

13            About a year and a half to two years later in 2021, we

14   get a second witness, and this month or early last month, we got

15   a third witness.  So along that timeline, the Government learned

16   additional information.

17            And so I don't know exactly which transcript you're

18   looking at, so I don't want to misstate it.

19            **THE COURT:**  Yep.

20            **MR. TRIPI:**  But certainly, as I sit here today, there

21   is more information the Government knows, and believe it has

22   proffered more information.

23            For example, we didn't have information about him

24   repeatedly talking to this woman about her being a snitch.  We

25   had the message.

```
 1              I probably told you the substance of the message, but

 2     all this other stuff about him blaming this young lady, as well

 3     as another young lady.

 4              And at one point, he blamed his now co-defendant

 5     Bongiovanni.  He blamed those three people for being snitches,

 6     for him being a target.

 7              THE COURT:  And who is he telling that?

 8              MR. TRIPI:  To one of the witnesses in this case.

 9              THE COURT:  Okay.

10              MR. TRIPI:  And so that's certainly all new

11     information that we acquired in the last month or so.

12              THE COURT:  That loan application is brand new?

13              MR. TRIPI:  We got that today.

14              THE COURT:  And what about Michalski thing yet, if you

15     will.  Is that material that was at the time --

16              MR. TRIPI:  That, I don't know.  I don't know what

17     date of the transcript you're looking at, Judge, but certainly

18     it took a while to locate those text messages.

19              I didn't have that at the time.  And the Michalski

20     search warrant, I believe, was earlier.  I don't remember the

21     date of the Michalski search warrant, although it was one of the

22     last ones we did.

23              So a lot of this -- there is a lot of information

24     we've been grinding through.  We've been grinding through it.

25     That was an active investigation too.
```

1          I would have been constrained to be able to say a lot

2     of that, because we were under an active investigation of a

3     judge -- a sitting judge.

4          But certainly, more has been learned since any last

5     proffer.

6          I know for a fact that I didn't have all of this

7     information on the one hand.

8          And on the other hand, to the stuff that I did have, I

9     would have been concerned about witness safety and identifying

10    people through my proffers.

11         **THE COURT:**  So a little bit of both.

12         **MR. TRIPI:**  A little bit of both.  I got the dates

13    here.  The Michalski search warrant, that we obtained in Federal

14    Court, was signed on March 23, 2022.

15         So I don't know how that compares to whatever

16    transcript you're looking at, Judge, but --

17         **THE COURT:**  Mr. Soehnlein, last word on the proffers,

18    if you will.

19         And in that process, tell me why -- I'm just calling

20    it a vignette for lack of a better term -- but the Michalski

21    details or vignette, and the loan application vignette, why

22    don't those issues matter to me?

23         **MR. SOEHNLEIN:**  They don't go to detention, Your

24    Honor.

25         **THE COURT:**  Why not?

1           **MR. SOEHNLEIN:**  Because detention is about return to

2    court and safety of the community, Your Honor.

3           To the extent we're talking about safety of the

4    community, the Government has almost made your point for you.

5           They talked about him going to a Sabres game; they

6    talk about him going to the casino.  They're watching him here.

7    It's not just probation that's watching him.

8           If he would have violated, don't you think they would

9    have charged him additionally in something less after 2019?

10          Where is that proof?  They are watching him all the

11   time, Your Honor.  Why aren't you hearing about that?

12          Why aren't you hearing about him improperly, you know

13   -- in terms of the content of the messages in the indictment,

14   Your Honor -- now, I don't have a copy of the messages, but I

15   heard them just like you did.

16          I heard the person sending the message making a

17   threat.  I heard that.  But I didn't hear anything that tied it

18   back to Gerace.

19          I heard references to Gerace.  But the threat, as I

20   understood it, came from the person sending the message.

21          Nowhere did I hear:  "Oh, you know, Peter is going to

22   take you out."  "Peter is going to do physical harm to you."

23   That's not in the message, Your Honor.  It's not there.  They

24   don't have that.

25          And the law, Your Honor, should favor release in these

 1    situations.  He's been out since 2021.

 2            Terms and conditions exist that allow him to prepare

 3    for his case, which is imminent, that safeguard the community

 4    and ensure his return to court, which is exactly where we are,

 5    Your Honor.

 6            What we're talking about are not things that are

 7    recent, not things that occurred when he was under supervised

 8    release.

 9            And, Your Honor, the fact that the Grand Jury

10    concluded yesterday, our motion to get -- to obtain access to

11    discovery in his prior case was earlier this week, I think is

12    more than just a coincidence, Your Honor.

13            I -- look, I take issue; the Government is going to

14    take issue with me making issue with this.  I take issue with

15    them having an issue with defense attorney interviewing

16    witnesses.

17            That's a critical part of a defense attorney's job.  I

18    don't think there is anything coercive of that.

19            I haven't been involved in any of that, but I don't

20    know there is anything wrong about it, and I will never

21    acknowledge that -- that there is, Your Honor.  I take issue

22    with them even bringing that up as part of a proffer.

23            A lot of the other proof, Your Honor, is proof that we

24    are going to vet in this incredibly lengthy trial that we are

25    going to have, okay?

1          Where there's explanations, and where Mr. Gerace will

2     have an opportunity to fully and fairly defend himself.

3          The Government's proffer, Your Honor, is new to you.

4     It's just as new to me.  It's just as new to him, their spin on

5     these facts.

6          Because this material that we're talking about, we

7     don't have all of it.  We don't have the most important stuff

8     yet.  The Government is not rushing to turn it over.

9          And to the extent that we are getting important things

10    and we want to try to share them with our client, now we have

11    this indictment in an attempt to detain Mr. Gerace, presumably

12    through that June trial.

13         So, Your Honor, the proof is in the pudding here.

14    There is no allegation, as near as I can tell, that he -- that

15    Peter Gerace has done anything wrong while he's been on release

16    for the other Federal case since 2021.

17         And so I'm asking you to continue those terms and

18    conditions, Your Honor.  He knows he's being watched.  He triple

19    knows that he's being watched now.

20         **THE COURT:**  Right.  And so it's safety to the

21    community, if you will.

22         And I'm going to dovetail with that is whether I've

23    got the confidence level that he can abide by the conditions

24    that go to that.

25         And so on the one hand, really, what we have is a

1    record of compliance.

2         **MR. SOEHNLEIN:**  Yes, Your Honor.

3         **THE COURT:**  And on the other hand, what we also have

4    is an easy detention argument in almost every other case.  So

5    that's where I am right now.

6         **MR. SOEHNLEIN:**  But, Your Honor, the detention

7    argument -- I don't think it's that easy.

8         Because the facts that would normally support

9    detention, the case law says that you detain a person in this

10   situation:  One, either because it's a large scale narcotics

11   trafficking crime.

12        That's not what he's charged with in the new

13   indictment, okay?  So let's put that one aside.  Recreational

14   use is what we're talking about.

15        The second thing is:  Threat to the trial process.

16   Threat to the trial process.  That's the LaFontaine.  Threat to

17   the trial process.

18        He's been released for two and a half years awaiting

19   trial.  There has been no threat.  The alleged threat came

20   before the indictment, came a year before the indictment, Your

21   Honor.  That's what we're talking about.  Threat to the trial

22   process.  There is none.

23        And so that's why I'm asking you to continue the terms

24   and conditions, Your Honor.

25        **MR. TRIPI:**  I would just take issue with the record of

1  compliance.

2         As I stated, probation would have no way of knowing

3  that he appears to have committed fraud to the tune of $2

4  million to the Small Business Administration while under this

5  Federal indictment.

6         That crime alone would have at least a 46 to 57 month

7  guideline range, if he's a criminal history category one.  He

8  might be a two.  That's irrespective of the life he's facing on

9  the indictment 227 and the indictment here.

10        **MR. SOEHNLEIN:**  May I be heard on that, Your Honor?

11  This is the first that we're hearing of this.

12        I spoke with Mr. Gerace on a sidebar, okay?  We

13  believe that there is a lot more to that story, that there is a

14  lot more nuance around the loan application.

15        We believe there is a lot more communication with the

16  Federal authorities around the loan.  He's not charged with it.

17        I don't have the loan application in front of me here.

18  I'm learning this as I go, Your Honor.

19        But to the extent you are going to rely on that, I

20  would ask to have the loan application, and I want to have a

21  hearing on it, Judge.

22        **MR. TRIPI:**  Second Circuit allows Government proffer,

23  and that's what we're doing.

24        **THE COURT:**  And so what I'm looking at here and what

25  is new, Mr. Soehnlein, I have facts going to the nature and --

1   and, kind of, the history and characteristics of the defendant.

2          So that's what I'm weighing on the one hand versus

3   compliance on the other.

4          Do you want to speak to that?

5          **MR. SOEHNLEIN:**  I do, Your Honor.  Because this is not

6   something that's new today.

7          Your Honor, the Government has referenced these text

8   messages in the past, is my understanding.  I was not involved

9   in the case at the time, but I have read the transcripts, and I

10  certainly have read the local media, that have made reference to

11  what I assume to be these text messages.

12         These are 2019.  The Government's had them for at

13  least three years.  The indictment is new.  The text messages

14  are not new.

15         The content of the text messages are not new.  What's

16  new is what Mr. Gerace has done while he's been released.

17         Mr. Macaluso, do you feel that you do a good job

18  supervising Mr. Gerace?

19         **PROBATION OFFICER:**  Your Honor, just to speak in terms

20  of probation --

21         **THE COURT:**  Yep, yep.  I'm going to give you a chance

22  now.  So why don't you go ahead, Mr. Macaluso, and tell me what

23  your position is generally.

24         **PROBATION OFFICER:**  Yeah.  Mr. Gerace has had a very

25  high level of supervision.  He is on GPS.  He is monitored 24/7.

1        We've done unannounced home contacts; unannounced work

2   contacts; unannounced drug and alcohol tests.  All have been

3   negative.  We view his maps daily, weekly, monthly, in terms of

4   his GPS mapping.

5        He was on home detention, and then he was switched

6   over to curfew.  Since he's been on curfew and even home

7   detention, there's been no occasion of violations, where he's

8   stepped out of the house or had any curfew violations.

9        All tests have been negative, and he's followed all

10  release conditions in terms -- as they've been set forth by this

11  Court.

12       So there has been no non-compliance on our end in

13  terms of his supervision and following the rules set forth by

14  Your Honor.

15       **MR. TRIPI:**  Judge, stated another way, they know he

16  hasn't tested positive for drugs, and he goes to dinner where he

17  says he's going.  And he's got this earned leave that allows him

18  to do that.

19       **PROBATION OFFICER:**  Well, he's on curfew now, Your

20  Honor, so he can come and go as he pleases.

21       **MR. TRIPI:**  Oh, he's even less.  Earned leave was when

22  it was supposed to be detention.  Now, it's just come and go

23  whenever you want.

24       **PROBATION OFFICER:**  He's on a 6 a.m. to 8 p.m. curfew

25  as you set, Your Honor.

 1          **THE COURT:**  So the last thing you said, Mr. Soehnlein,

 2    was about not having seen the loan application related

 3    documents.

 4          And I want to be sure:  Are you asking to continue

 5    this detention hearing or not?

 6          **MR. SOEHNLEIN:**  In the event that Your Honor is going

 7    to rely on the loan applications and the allegations around the

 8    loan --

 9          **THE COURT:**  I'm going to rely on everything that I've

10    heard here.

11          **MR. SOEHNLEIN:**  You are going to rely on everything

12    you've heard?  Then, Your Honor --

13          **THE COURT:**  So you have think about that,

14    Mr. Soehnlein, as well.  So talk to your client, if you like.

15          **MR. SOEHNLEIN:**  Thank you, Judge.

16          (Discussion off the record.)

17          **MR. SOEHNLEIN:**  Thank you, Your Honor.  I've spoken

18    with Mr. Gerace, and we would like to continue the hearing.

19          I'd like an opportunity to see the loan and further

20    opportunity to review the Government's lengthy proffer in

21    support of detention.

22          **THE COURT:**  Okay.  So the loan application you will

23    get from your own client, I assume.  And then you will ask the

24    court reporter for the transcript?  Is that what you are telling

25    me?

1          **MR. SOEHNLEIN:**  I'm going to ask the Court for a

2    transcript, yeah.

3          **THE COURT:**  Okay.  All right.

4          So do you have anything to say on that application for

5    a continuance, Mr. Tripi?

6          **MR. TRIPI:**  No, Your Honor.  I have no objection to

7    the defense request, and we'll have no problem giving them the

8    loan application, if that's easier.

9          **THE COURT:**  Okay.  During the continuance, the

10   defendant shall be detained under the statute.

11         You are aware of that, Mr. Soehnlein?

12         **MR. SOEHNLEIN:**  I spoke with Mr. Gerace, and we

13   understand that.

14         I also spoke with Mr. Macaluso from probation.  And

15   probation indicated that in the event that Your Honor were

16   willing to do so, they would be able to coordinate home

17   confinement for Mr. Gerace during the period of time, until you

18   could get him back.

19         I don't have my Federal statute book immediately in

20   front of me to know whether or not there is an exception or not,

21   Your Honor.

22         And I would love an opportunity to research and be

23   heard on that, but I can only report to you basically the facts

24   as I know them.

25         **THE COURT:**  Right.  And the way I read subsection (f)

 1   of 3142, you don't have a lot of wiggle room there in this

 2   posture.

 3          Mr. Tripi, do you see it the same way?

 4          **MR. TRIPI:**  Yes, Judge.  I think he shall be detained

 5   pending the determination of the Government's motion for

 6   detention.

 7          **THE COURT:**  Well, where I'm at is the flush language

 8   after (2)(b):  During a continuance, such person shall be

 9   detained.

10          **MR. TRIPI:**  Yes.  Up to three days, if there is a

11   Government request for adjournment, and five days if the defense

12   requests it.

13          **THE COURT:**  Right.  So we can come back here pretty

14   early next week, if you like.

15          **MR. SOEHNLEIN:**  I would like, Your Honor.

16          **THE COURT:**  All right.  We can get you in probably

17   Monday.

18          **MR. SOEHNLEIN:**  That sounds good.

19          **THE COURT:**  Everybody okay, Monday afternoon?

20          **MR. TRIPI:**  I think so, Judge.

21          **MR. SOEHNLEIN:**  Yes, Judge.

22          **MR. TRIPI:**  Let me see if there is a time conflict.

23          **THE COURT:**  All right.  How about 1:30?

24          **MR. TRIPI:**  That will be fine.  Thank you.

25          **MR. SOEHNLEIN:**  That's fine.

1          **THE COURT:**  Okay.  And I think either way -- I'm

2   granting the motion for a continuance.  We'll see you on this

3   issue to be continued Monday at 1:30.

4          I should tell you now, though, that Judge Roemer is

5   ready for you on Tuesday for a schedule.  So either way on

6   Monday, you will be seeing Judge Roemer at 2:00 o'clock on

7   Tuesday for scheduling and whatever else you need to talk to him

8   about.

9          **MR. TRIPI:**  Okay.

10         **THE COURT:**  So that's Judge Roemer piece of it.

11  Speedy trial does not need to be addressed because of the

12  continuance and --

13         **MR. TRIPI:**  The pending motion for detention, Your

14  Honor.

15         **THE COURT:**  We've got the pending motion for the

16  detention, yeah.

17         Should we adjourn the Curcio, step one, or should we

18  do it now, the status conference on the Curcio, the thing that

19  was scheduled for 3:00 o'clock today?

20         We can do it now, or we can do it after our

21  continuation on Monday afternoon.

22         **MR. TRIPI:**  I'll defer to Mr. Soehnlein.

23         **MR. SOEHNLEIN:**  I don't feel strongly about it, Your

24  Honor.  Whatever you want to do.

25         **THE COURT:**  Why don't we do it then.

1            **MR. TRIPI:**  Okay.

2            **THE COURT:**  Why don't we do it then.  All I would do

3    now is a little bit and then call somebody like maybe Kevin

4    Spitler, since he was the Curcio counsel last time, I would

5    reach out to him.

6            In the meantime, Mr. Tripi, bring with you your

7    conflict list maybe?

8            **MR. TRIPI:**  Yes.  I'll work on that.  I'll get that

9    squared away.

10           Judge, the only thing I want to flag was --

11           **THE COURT:**  I know.  I'm flipping kind of over into

12   the other case, which we haven't even called yet so --

13           **MR. TRIPI:**  There may be a need for -- just depending

14   on Your Honor's thoughts, also someone to be contacted for the

15   witness, potentially, that created the issue.

16           **THE COURT:**  Okay.  Just be mindful of that on the

17   Curcio side of things.

18           And my plan would be to call Kevin Spitler, if that --

19   if for some reason he's conflicted out now, I need to know that.

20           **MR. TRIPI:**  I don't believe he is, but I'll double

21   check.

22           **THE COURT:**  All right.  Anything else on this 23-CR-37

23   case?

24           **MR. TRIPI:**  No, Your Honor.  Thank you.

25           **MR. SOEHNLEIN:**  Nothing else, Your Honor.  Thank you.

1          **THE COURT:**  Okay, folks.  So in the meantime,

2   Mr. Gerace is going to be in Marshal's custody, I believe, at

3   this point.

4          No?

5          **MR. TRIPI:**  He is -- I think that that -- thank you,

6   Your Honor.

7          **THE COURT:**  Yes?  Okay.  All right.  Very good.  Thank

8   you.

9          **MR. TRIPI:**  Thank you, Your Honor.

10

11               (Proceedings concluded at 2:18 p.m.)

12                          *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2      In accordance with 28, U.S.C., 753(b), I certify that these

3    original notes are a true and correct record of proceedings in

4     the United States District Court for the Western District of

5         New York before the Honorable John L. Sinatra, Jr.

6

7

8

9

10    _s/ Bonnie S. Weber_              March 25, 2023
        Signature                        Date

11

12   BONNIE S. WEBER, RPR

13   Official Court Reporter
     United States District Court
14   Western District of New York

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA,    *        Docket No.
                                      1:23-cr-00037-JLS-MJR-1
                             *

                             *        Buffalo, New York
            v.               *        March 27, 2023
                             *        1:36 p.m.
                             *
PETER GERACE, JR.,           *        DETENTION HEARING
                                      CONTINUATION
                             *

        Defendant (1).       *
                             *
 *  *  *  *  *  *  *  *  *  *  *  *  *  *

                 TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JOHN L. SINATRA, JR.
             UNITED STATES DISTRICT JUDGE



APPEARANCES:


For the Government:          TRINI E. ROSS,
                            UNITED STATES ATTORNEY,
                            By DAVID RUDROFF, ESQ.,
                              JOSEPH M. TRIPI, ESQ.,
                              NICHOLAS COOPER, ESQ.,
                            Assistant United States Attorneys,
                            Federal Centre,
                            138 Delaware Avenue,
                            Buffalo, New York  14202,
                            Appearing for the United States
                            And
                            JORDAN ALAN DICKSON, ESQ.,
                            U.S. Department of Justice,
                            Criminal Division,
                            Public Integrity Section,
                            1331 F Street NW,
                            Washington, DC  20004.

```
 1   For the Defendant:            LIPPES MATHIAS WEXLER FRIEDMAN, LLP,
                                   By ERIC M. SOEHNLEIN,  ESQ.,
 2                                 50 Fountain Plaza,
                                   Suite 1700,
 3                                 Buffalo, New York  14202
                                   And
 4                                 TIVERON LAW, PLLC,
                                   By STEVEN M. COHEN, ESQ.,
 5                                    TYLER J. ECKERT, ESQ.,
                                   2410 North Forest Road,
 6                                 Suite 301,
                                   Getzville, New York  14068.
 7

 8   The Courtroom Deputy:         KIRSTIE L. HENRY

 9

     The Court Reporter:           BONNIE S. WEBER,
10                                 Notary Public,
                                   Robert H. Jackson Courthouse,
11                                 2 Niagara Square,
                                   Buffalo, New York  14202,
12                                 Bonnie_Weber@nywd.uscourts.gov.

13
                     Proceedings recorded by mechanical stenography,
14                        transcript produced by computer.

15

16               (Proceedings commenced at 1:36 p.m.)

17

18           THE CLERK:  All rise.

19           The United States District Court for the Western

20   District of New York is now in session.  The Honorable

21   John Sinatra presiding.

22           THE COURT:  Please be seated.

23           THE CLERK:  The Court advises parties and listeners

24   that they are strictly prohibited from recording these

25   proceedings in whole or in part by any device.
```

 1          In United States versus Peter Gerace, Jr., case number

 2    23-CR-37, we're here for a continuation of a detention hearing.

 3          Counsel, please state your appearances for the record.

 4          **MR. TRIPI:**  Joseph Tripi, David Rudroff, and

 5    Nicholas Cooper for the United States.  Good afternoon,

 6    Your Honor.

 7          **MR. SOEHNLEIN:**  Good afternoon, Your Honor.

 8    Eric Soehnlein for Mr. Gerace.

 9          **MR. COHEN:**  Good afternoon, Your Honor.

10    Steven M. Cohen and Tyler Eckert for Mr. Gerace.

11          **THE COURT:**  Okay.  Good afternoon, Counsel.  Good

12    afternoon, Mr. Gerace.

13          Did I miss somebody who needed to make an appearance?

14          **MR. HARRINGTON:**  James Harrington.  I'm here just

15    observing.

16          **THE COURT:**  Okay.  All right.  Just pick a better

17    seat, Mr. Harrington?  That's all?  Did you just pick a better

18    seat?

19          **MR. HARRINGTON:**  Yep.

20          **THE COURT:**  Got it.  All right.

21          So we're going to pick up where we left off on Friday

22    in this detention hearing.

23          And, Mr. Tripi, have you supplied the loan documents

24    to Mr. Soehnlein?

25          **MR. TRIPI:**  Yes, we did.

1          **THE COURT:**  Okay.  Is there anything I need to know

2    further on those loan documents from you, Mr. Tripi, or you,

3    Mr. Soehnlein?

4          **MR. TRIPI:**  Not from us.  If you have anything from

5    Mr. Soehnlein, I would like an opportunity to briefly respond.

6          **MR. SOEHNLEIN:**  Well, Your Honor, this is the

7    continuation of the detention hearing.  And with reflection, we

8    have a lot to say.

9          With respect to the loan documents, Your Honor, there

10   is a number of factors that the Court needs to consider, but I

11   think they demonstrate more of history of compliance than they

12   do any effort to not comply with the law or not to comply with

13   supervised release.

14         As Your Honor may understand, the EIDL program was

15   part of the Federal Government's COVID outreach program -- part

16   of the COVID Assistance Program.

17         Mr. Gerace, like many other business owners, was

18   solicited by a private bank to apply for that.  Mr. Gerace

19   worked with that institution to fill out the application.

20         He worked with his accountant.  He worked with a loan

21   broker through that institution.  He didn't fill out any of the

22   applications on his own, Your Honor.  That was the initial

23   application.

24         Over time, as the program became reauthorized,

25   Mr. Gerace also engaged the help of HoganWillig Law Firm.  And

1    that law firm, at times, assisted him in preparing the

2    applications.

3         The actual questions on the applications, Your Honor

4    -- and I can't emphasize enough that this is an online

5    application; this is not a paper application, okay.

6         And I also can't emphasize enough that this is a COVID

7    era program.  Meaning -- I don't want to say things are the Wild

8    West, but things are not necessarily well understood.

9         The questions with respect to whether or not his

10   business would have had to tick a box because it was sexual

11   nature, things like that; Mr. Gerace has a good faith basis to

12   believe he didn't have to click that box.

13        Both by the volume of sales -- because most of the

14   revenue from his business doesn't come from dances or things of

15   that nature, and also in understanding from the loan officers

16   and other professionals that he had engaged to fill out that

17   application.

18        With respect to the felony conviction, it's

19   Mr. Gerace's belief that he only had to check that box if the

20   felony was in the last ten years, and at the time that he was

21   filling out the application, it was not.

22        Once again, he has a good faith basis for relying on

23   the assistance of others, professionals, in that regard.

24        And finally, Your Honor, with respect to the

25   Government's point that somehow the PPP denial, you know, his --

1    Mr. Gerace's denial of the PPP loan should have played into the

2    EIDL process, that was not in any way communicated or consistent

3    with the advice that he got when he was applying.

4            So, Your Honor, with respect to those EIDL loans, to

5    the extent there is anything wrong with them, you know,

6    Mr. Gerace has a good faith basis for believing he did

7    everything right.

8            More importantly, Your Honor, this is not a grant;

9    this is a loan.  Mr. Gerace has been repaying it monthly with

10   interest.

11           There is no allegation that the money was used

12   improperly.  He continues to make payments every month.  He has

13   not heard from anybody, whether it be the SBA or the Department

14   of Justice or otherwise, before court on Friday, that there was

15   anything wrong with this application or the process that he

16   followed.

17           Your Honor, with reflection, we also have a number of

18   comments on other proof that was offered by the Government on

19   Friday.

20           Having had an opportunity to review it with

21   Mr. Gerace --

22           **THE COURT:**  Hold on there.  Let's do one topic at a

23   time.

24           So Mr. Tripi, regarding the loan applications, any

25   response?

1          **MR. TRIPI:**  Yes, Your Honor.  As I indicated on

2     Friday, there is an online application and all of Mr. Gerace's

3     information to include phone numbers; his e-mail address is

4     entered in there.

5          And the question asks:  Applicant does not present

6     live performances of a prurient sexual nature -- sexual nature

7     or derived directly or indirectly more than de minimis gross

8     revenue through the sales of products or services, or the

9     presentation of any depictions or displays of a prurient sexual

10    nature.

11         And that box is answered:  Yes.  In other words,

12    denying that he's involved in that business.

13         Now, all the information suggests Mr. Gerace filled

14    this out.  But if you have someone in your agency filling it out

15    for you, you are responsible for making sure that it's accurate.

16         So I guess that will be a defense for another day when

17    this case is charged, but from the bail report in this case,

18    Mr. Gerace reported, I think, making $45,000 a month.

19         So Pharaoh's was his employment.  He reported, I

20    think, making $45,000 a month as the hundred percent owner of

21    Pharaoh's.

22         And it's a strip club, so I don't understand how he

23    can answer "yes" to:  Applicant does not present live perform --

24    performances of a prurient sexual nature.

25         Now, then it gets on -- and if he would have checked

1    no, the online portal would not have allowed him to progress

2    with the application.

3             So if he acknowledged that that's what Pharaoh's was

4    about, he wouldn't have been able to proceed past that screen.

5             **MR. SOEHNLEIN:**  Your Honor, if I may be heard on that

6    point?

7             **THE COURT:**  One topic at a time, Mr. Soehnlein.  I'll

8    come back to you and give you the last word on it.

9             **MR. TRIPI:**  So then there is another question on

10   there:  Applicant is not engaged in illegal activity.  And he --

11   it's "yes".

12            We contend that that also was a false statement.  That

13   Pharaoh's was engaged in illegal activity, as reflected by the

14   indictment, that would have been returned some time after that.

15            But at the -- at the -- one of the last questions is

16   -- it's very clear -- not within the last ten years or -- it's

17   for any criminal offense:  Other than a minor vehicle violation,

18   have you ever -- so two words -- any and ever.

19            I mean, he went to St. Joe's, so he understands what

20   those words mean.

21            Any criminal offense:  Have you ever been convicted,

22   pled guilty, pled nolo contendere, been placed on pretrial

23   divergent, or been placed on any form of parole or probation.

24            It's "yes" to all of those things.  He was on

25   supervised release.  He was -- for his Federal conviction.  He

 1   was on probation for his State assault conviction.

 2          He was convicted of a State misdemeanor.  He was

 3   convicted of a Federal felony, so all of those should have been

 4   "yes".

 5          And if he had someone filling out the form -- which, I

 6   highly doubt -- for him, they are under the obligation to do it

 7   accurately.

 8          He's responsible, but -- see, in our responses we also

 9   obtained documents regarding his communications with the SBA.

10   And it's Mr. Gerace, at his e-mail address, at yahoo.com,

11   e-mailing them.

12          It's Mr. Gerace, calling -- and we have their

13   communications -- about his loan.

14          It's on -- when he asks for -- in June -- June 10th,

15   he reaches out to them to check on the status of his April 5th,

16   2020 loan.

17          And there's notes in there.  So he's the one reaching

18   out, and then he's the one who signs the loan documents on

19   June 12th, 2020.

20          **THE COURT:**  Which statements -- in the meantime, while

21   we're waiting for the ELMO to boot up -- which statements,

22   Mr. Tripi, were made in July of 2021, after Mr. Gerace was on

23   pretrial release on the 19-CR case?

24          **MR. TRIPI:**  You want me to fast forward to 2021?

25          **THE COURT:**  Yes.

1          **MR. TRIPI:**  Yes.  So on August 7th, he signed a loan

2    modification to increase the loan.  So just real quick, before I

3    jump right to that --

4          **THE COURT:**  All right.

5          **MR. TRIPI:**  I'm showing you the document for the

6    June 12th application, which he signed it.  He's signing:  Peter

7    Gerace, owner/officer, June 12th.

8          Now, I'll fast forward to the 2021 --

9          **THE COURT:**  And for chronology's sake, Mr. Gerace is

10   arrested and put on pretrial release in the 19-CR case, when in

11   2021 -- March?

12         **MR. TRIPI:**  He was arrested -- the indictment was

13   returned, I believe, February 25th.  He was arrested by March

14   5th, 2021 and put on release conditions.

15         **THE COURT:**  All right.

16         **MR. TRIPI:**  All right.  So fast forwarding to the

17   August 7th.

18         So August 7th, he signs a loan modification, which I'm

19   putting up on the screen now.  "Peter Gerace", he signs it.

20         It says that the undersigned agrees to be bound by the

21   terms and conditions herein during the term of this loan, and

22   further agrees that no provision stated herein will be waived

23   without prior consent of the SBA.

24         In bold:  Under penalty of perjury of the United

25   States of America, I hereby certify that I am authorized to

1    apply for and obtain a disaster loan on behalf of borrower in

2    connection with the effects of the COVID-19 emergency.

3            It's signed by Peter Gerace in his personal capacity,

4    Pharaoh's GC, Inc.; August 7th, 2021.

5            By that point, he's been on pretrial conditions set by

6    a Florida magistrate judge and Judge Roemer for about five

7    months.  He's clearly indicted.

8            **THE COURT:**  And when are the denials of the

9    indictment, supervised release, parole, et cetera -- when are

10   those denials occurring?

11           **MR. TRIPI:**  Those denials occurred during the initial

12   application, but there is also in this loan document here, there

13   is a statement -- I just need to find it -- certifying that

14   all -- there's been no substantial adverse change in borrower's

15   financial condition since the date of the application of this

16   loan.

17           Adverse changes include, but are not limited to

18   judgment liens, tax liens, mechanics liens, bankruptcy,

19   financial reverses for arrest or conviction of a felony, et

20   cetera.

21           So here's the certification that precedes that suture

22   /THA*EUFPBLG that I just showed you.  And it reads, as I just

23   stated:  Borrower certifies that there has been no substantial

24   adverse change in borrower's financial condition -- I'm skipping

25   over the parens -- since the date of the application of this

1    loan -- which I stated previously was the April 5th, 2020 --

2    adverse changes include, but are not limited to judgment liens,

3    tax liens, mechanics leans, bankruptcy, financial reverses,

4    arrests, or conviction of felony, et cetera.

5          All representations in the borrower's loan

6    application -- and that would date back to the original

7    application -- including all supplementary submissions are true,

8    correct, and complete, and are offered to induce the SBA to make

9    this loan.

10         No claim or applications for any other compensation

11   for disaster losses has been submitted to or requested of any

12   source, and no such other compensation has been received, other

13   than that which borrower has fully disclosed to the SBA.

14         Now, we will have to look further into that, because

15   he was separately looking into PPP, so that might raise that --

16   that question as well.

17         **THE COURT:**  All right.  Let's wrap up on the --

18         **MR. TRIPI:**  On the loan?

19         **THE COURT:**  -- on the loan issue.  Anything else from

20   you, Mr. Tripi?

21         **MR. TRIPI:**  No, Judge.  I'll end it there.

22         **THE COURT:**  Mr. Soehnlein, last word on the loan

23   issue --

24         **MR. SOEHNLEIN:**  Unfortunately, it's going to be more

25   than a word, Your Honor.  I apologize, but I think I need to

1   make the record clear on this.

2          The loan application, Your Honor -- the original loan

3   application, it's done online.  Mr. Gerace is doing it in

4   consultation with other experts.

5          The reapplications come when the private bank that the

6   loan is made through solicit people like Mr. Gerace for

7   additional funds.

8          The additional funding comes so easily; it's click the

9   box.  It's check-the-box-type stuff.

10          Maybe, Your Honor, maybe Mr. Gerace missed something,

11   although we don't think he did, okay?  We think that he relied

12   in good faith on his experts and consultants.

13          More importantly, Your Honor, I don't think that this

14   issue speaks to detention.  To the extent that there is anything

15   that may have been done wrong, Mr. Gerace did it in error.

16          It doesn't evidence dangerousness.  It doesn't

17   evidence any desire to violate supervised release terms, and we

18   believe that the story shows a desire and an effort to comply,

19   which is exactly what probation has told you Mr. Gerace has done

20   while he's been on supervised release, Your Honor.

21          I'm hard pressed to find a case in this district where

22   probation has taken a position that the defendant should be

23   released, and the Government has taken a position, as here, that

24   probation doesn't do a good enough job.

25          That's a novel one to me, Your Honor.  Particularly

1    given the high degree of supervision that Mr. Gerace has

2    experienced, including the monitoring, the GPS monitoring, and

3    things like that.

4         I simply don't think that this issue speaks to

5    detention.  It doesn't speak to dangerousness.  It doesn't speak

6    to witness tampering.  It doesn't speak to return to court.  It

7    doesn't speak to safeguarding the community, Your Honor.

8         I believe that this is a red herring to try and keep

9    Mr. Gerace incarcerated through the trial.

10        **THE COURT:**  Well, we've kind of painted Mr. Macaluso

11   in a box.  He was never consulted on Friday about his

12   recommendation in this 23-CR case, and it's on my list of things

13   to do to ask him.

14        Mr. Macaluso, in the 23-CR case, does probation have a

15   recommendation?

16        **PROBATION OFFICER:**  Yes, Your Honor.  We would

17   recommend that he be released on all his previous conditions,

18   based on -- there is no violation here, because the conduct is

19   from 2019 and his supervision started in 2021.

20        And as previously stated Friday, the two years he's

21   been on supervision, he's had no violations.  There has been no

22   positive drug tests, no issues.

23        He's been extremely compliant in terms of the

24   conditions set by this court.  He's moved from home detention to

25   curfew, and he's been doing well.

1          **THE COURT:**  Thank you, Mr. Macaluso.

2          All right.  Is there anything left?  I see there's

3    something new on the overhead.

4          **MR. TRIPI:**  I put something on the screen, Judge,

5    because -- this is just one example of Mr. Gerace calling on

6    April 21st.  This is the note from the SBA.

7          Mr. Gerace called in regards to requesting more funds

8    April 21st, 2021 via e-mail to -- and it gives the e-mail.

9    There has not been anything since, so this is him following up.

10   Mr. Gerace was the one doing this activity.

11         And just to answer the probation issue for a moment;

12   there are plenty of times when we disagree with probation.

13         I'm unaware of a case where someone has a pending

14   indictment and is charged with witness tampering, and the

15   Government has proffered continuing criminal activity, that went

16   undetected by probation, where the person was not detained and

17   where probation had not reversed their recommendation to some

18   extent, and so that's new for me.

19         **THE COURT:**  All right.  The next topic is something

20   else that caught my eye when I was reading the transcript from

21   Friday.

22         And that is -- this suggestion, it's at pages 36 and

23   37, but I'll just give you the topic and I kind of want to walk

24   through this a little more slowly.

25         It's the proffer where someone -- some lawyer in town

1  is contacting one of your witnesses, Mr. Tripi, and offering

2  himself to that witness in case she needs representation.

3          Somebody who -- a witness who is represented already.

4  And the way I kind of read that proffer -- and you're going to

5  give it to me again -- is that that defense lawyer says that

6  he's already spoken to someone on Gerace's team, and he's

7  reaching out to see if she needs counsel.

8          And, obviously, the concern there is -- even just from

9  the ethical side is -- is you can't thrust yourself upon a

10  client, unless you've represented that client beforehand.

11          Mr. Tripi, did I walk through that in my mind

12  correctly when I was reading it?

13          **MR. TRIPI:**  Yes.  And now I'll elaborate on that.

14          **THE COURT:**  Or should we slow it down and take a

15  closer look at it?

16          **MR. TRIPI:**  I will.

17          **THE COURT:**  All right.

18          **MR. TRIPI:**  So there's a witness in this indictment.

19  Frankly, it's the person that actually transmitted the messages.

20          That person was approached by the FBI before being

21  charged by a criminal complaint.

22          Unclear to me as I stand here, whether it was post

23  approach by the FBI or post charging by criminal complaint, but

24  that particular person was represented by a particular defense

25  attorney.

1          That particular defense attorney, who currently

2    represents the witness, has indicated to prosecutors that I'm

3    working with, that he has represented this individual in every

4    criminal matter that this individual has had.

5          All right.  So the current lawyer made that

6    representation to us, and the current lawyer provided the text

7    messages to us by screenshot from his client.

8          And those screenshots -- I don't have in front of me,

9    so I'm going to do my best to paraphrase -- okay.  I have them

10   here.  Thank you.

11         So, I have them in front of me now.  Those text

12   messages were forwarded from the witness to her attorney by

13   screenshot, and then forwarded them to us.

14         And the screenshots were from a person who is

15   apparently an attorney, but also someone who plays in a band in,

16   like, the local bar scene.

17         The witness indicated she knows this attorney/person

18   who is in the band from the bar scene, not from prior

19   representation.

20         So that's what's been represented to us between the

21   witness and her current attorney.  And the current attorney is

22   Michael D'Amico.  No problem putting his name on the record.

23         But the text message -- the solicitation, so-to-speak,

24   reads:  "Hey, (insert name).  It's (insert name).  How have you

25   been?  Are you free to talk at all today?

1          I just want to go over something and make sure you're

2     okay, and let you know, if you need me, I'm here."

3          The witness responds:  "I'm actually headed to

4     Mike D'Amico at 1:30.  After I meet with him, I can give you a

5     call, but I just had a surgical procedure, so I basically can't

6     walk."

7          This individual then texts:  "Oh my God, I'm sorry to

8     hear that, honey.  Where are you living now?  Are you okay

9     otherwise?

10         I know Mike well.  Great guy and great attorney.  I'm

11    guessing he's meeting you for the same concern I had, as I got a

12    call from Peter Gerace's attorney, Steve Cohen, concerning that

13    the Feds might be trying to intimidate you, or even just bring

14    you in for questioning.

15         He saw that I was your attorney in the past and

16    reached out to me for me to make sure you were okay, and knew

17    I'm here if you need representation.  And I want you to know I'm

18    here, even if you just need a friend as well."

19         Then as explained to us, the witness meant to text

20    Mike D'Amico, who has the same first name as this attorney, and

21    wrote:  "By the way, never used him for an attorney.  That's

22    bullshit."

23         The person who reached out got that text, and said,

24    "Never used who as an attorney?"

25         And the witness explained to us -- the witness thought

1   on her feet, and wrote the following:  "Thought you meant Steve

2   Cohen, LOL.  Sorry.  I'm confused.  Have a great day."  Trying

3   to end the communications.

4        This attorney follows up:  "No sorry, hon.  I meant

5   Steve saw that you had me as your attorney and that's why you

6   reached out to me.

7        You have a great day too and let me know how things

8   go.  I'm here if you need, babe."

9        The witness responds:  "Thanks.  I'm just focusing on

10   my recovery."

11        The attorney writes:  "Absolutely.  That's the most

12   important thing right now.  If you need anything, I'm here."

13        Those were the communications that were provided by

14   Mike D'Amico to us.

15        Mr. D'Amico further stated:  To his knowledge, he's

16   represented this particular witness in every case she's had

17   since she was a teenager.

18        **THE COURT:**  Okay.  Let's talk about that topic.

19        Mr. Soehnlein, anything that you wish to say on that

20   topic?

21        **MR. SOEHNLEIN:**  Your Honor, it's -- obviously we don't

22   have the texts and this is the first that I've heard them.  And

23   we certainly would like to have them.

24        However, the thing that jumps out at me, Your Honor,

25   is that nowhere did this attorney say that she wanted to help

1    the witness lie, or that he wanted to help the witness protect

2    Peter, or that she wanted to do anything of that nature.

3          Clearly, what I'm understanding, there was some

4    previous personal relationship, or else -- presumably, the

5    witness would not have responded.

6          It was an amicable relationship, or else the witness

7    would not have responded.  And I didn't hear -- or -- yeah, I

8    didn't hear any text that would indicate that the attorney was

9    trying to suborn perjury, or suggest obstruction, or even

10   suggest that they not meet with Federal authorities in this

11   case.

12         Obviously, I don't know the blow-by-blow.  And if

13   Your Honor wants more information about it, I'd love an

14   opportunity to review it with the defense team and provide you

15   with additional information.

16         But at first blush, it doesn't appear to be any form

17   of witness tampering and more important -- perhaps most

18   importantly, Your Honor, there is nothing there that suggests it

19   came from Mr. Gerace himself.

20         The suggestion is that it came from Gerace's attorney.

21   It does not say Peter told me to call you; Peter told me we had

22   to talk; Peter tells you to not talk to Federal authorities,

23   that's not anywhere in the message, Your Honor.

24         And so I don't believe that that should weigh against

25   Mr. Gerace in Your Honor's calculus on this issue.

1          **THE COURT:**  All right.  I'm not going to consider that

2     issue, but I'm just simply going to say, as an

3     issue-spotting-kind-of-person, it does cause me some concern, so

4     I would advise the defense team to be careful on that front.

5          All right.  So next is Mr. Soehnlein -- other topics,

6     any proffer, any evidence, that sort of thing.

7          **MR. SOEHNLEIN:**  I do have a proffer, Your Honor.  And

8     I think Your Honor knows me, I try hard to be succinct.

9          But the thing that I note from Friday is that most of

10    what the Government relies upon is consistent with prior

11    proffers that the Government has made in favor of detention at

12    other times in this case.

13          It's not new information, Your Honor.  It may be

14    amplified information, but it's not new.  It's stuff that was

15    known to probation when probation made the recommendation for

16    Mr. Gerace's release.

17          It's things that were known to Your Honor or

18    allegations that were known to Your Honor.

19          More importantly, Your Honor, the Government's

20    argument relies on their position that probation can't and does

21    not do its job.

22          That's a new one to me, given the number of cases that

23    they rely on probation's recommendation in favor of detention.

24    This is the first time that that's happened.

25          Your Honor, I wanted to show you -- I'd also like the

1    ELMO --

2            Mr. Tripi, if I can use the ELMO --

3            **MR. TRIPI:**  Certainly.

4            **MR. SOEHNLEIN:**  In my view, Your Honor, the most

5    serious allegation had to do with what the Government had to say

6    about Mr. Tripi -- or sorry, Mr. Gerace's ex-wife.

7            And it's there.  He had a son with the young lady, and

8    I'll get to how he assaulted her in a moment -- but while she

9    was afraid of him and on the run in fear for her life, hiding

10   out, the judge -- excuse me -- this defendant did a pro se

11   motion for a name change, to have his son's name changed to this

12   name.

13           That judge granted it the same day.  The mother was

14   nowhere to be found, but of course, it was applied for and

15   granted the same day.

16           Your Honor, that's a hundred percent untrue.  The

17   woman is sitting right there.  That's Mr. Gerace's ex-wife.

18   We've spoken with her.  This is not true.

19           This is not how the name change happened.  It took

20   several months.  They were both there.  She didn't fear for her

21   life.  That's not true.  That's not accurate.

22           She is sitting right there, supporting Mr. Gerace's

23   release, because they co-parent his 16-year-old son, Nick, who

24   lives primarily with Mr. Gerace.

25           Further down, the Government says in 2010, there was

1    information that the defendant was traveling with a young lady

2    from New York City.

3          There was a tip she had drugs in a false compartment

4    coming through the airport.  At that time, law enforcement had a

5    canine do a sniff.

6          The dog didn't alert, and they decided not to step in

7    and stop and question, but the information about the defendant

8    having a supplier in that timeframe, there is other information

9    that suggests that -- that I've reviewed in this

10   investigation -- so looking back at that tip, it didn't turn out

11   to be anything.  I will consider asking you to consider that

12   part of his history.

13         Your Honor, that was kind of a throwaway ploy at the

14   time, and I guess I didn't catch it as it was going by.

15         But this tells us something about the case, Your

16   Honor.  This tells us that Mr. Gerace has been under

17   investigation for Federal law enforcement for drugs since at

18   least 2010.

19         It's 2023.  In that timeframe, he's been supervised by

20   probation.  There have been multiple search warrants on his

21   homes and businesses.

22         There have been some probation violations --

23   supervised release things.  There's no drugs here, Judge.

24   There's no drugs.  There's no controlled buy.  There's no

25   cocaine in the courtroom.

1        There's no massive quantities of anything.  There's no

2   media of a buy-and-bust from 2010 until now.

3        The Government wants to rely on an unsubstantiated

4   allegation from 2010 to keep Mr. Gerace locked up.  This is

5   where we're at.  There's no there there.

6        **THE COURT REPORTER:**  I'm sorry, what did you say?

7        **MR. SOEHNLEIN:**  There is no there there.  It's

8   colloquialism.  Sorry.  Maybe not a good one.

9        Your Honor, with regard to the new allegations, these

10  are things that the Government has had for four years, as I've

11  said.

12       These are messages the Government has referenced in

13  the past and spoken about in front of Your Honor.

14       The text messages don't -- they do not in any way

15  indicate that Mr. Gerace intends to do violence.  They don't

16  indicate that Mr. Gerace intends to do anything to this witness.

17       What they say is that whoever this third party was,

18  might do some violence.  And it references things that I believe

19  show personal animus between the two women involved that don't

20  involve Mr. Gerace.

21       The Government is going to say, well, we trust but

22  verify, and now we're verified.

23       Given the scope and timing of this investigation,

24  Your Honor, I have to believe the Government has spoken with

25  this witness more than one time.  Perhaps more than twice.

1            It leads me to believe that the first time they spoke

2    with her, she probably either denied wrongdoing, denied the

3    message, or made some other statement to law enforcement that

4    did not corroborate the tampering charge.

5            If the Government is going to rely on her now, I think

6    Your Honor ought to see all of the 302 material, which isn't

7    here.  You didn't see it.

8            Your Honor, I want to talk about proof.  What the

9    Government has -- they've offered words.  They've made some very

10   serious, very scandalous allegations.

11           We know that at least some of them were wrong.  She is

12   here; she can tell you that they are wrong.  That's on the one

13   hand -- remember, you were weighing factors.  The allegations.

14           On the other hand, we have probation and a history of

15   compliance while on supervised release.  We have probation

16   saying, you should let him out, Judge.  There is no need to

17   detain him.

18           Alternatives exist.  Alternatives to incarceration

19   exist that can secure his return to court and safeguard the

20   community.

21           We would submit it's a continuation of the same

22   conditions, but Your Honor is certainly capable of fashioning

23   some other appropriate way of monitoring that would keep him

24   from being incarcerated.

25           Your Honor, Mr. Gerace is not in great health, as I'm

1    sure you understand.  He has cardiac issues.  He suffers from

2    depression.

3           And as is well-documented, incarceration in local

4    facilities is particularly hard for people who have those health

5    concerns, particularly in the era of COVID.

6           What's more though, Your Honor, is he's the sole

7    provider for his 16-year-old son.  He has him 28 days out of the

8    month.  He's had custody of his son since he was four years old.

9           Now, it's true, he does co-parent very well with his

10   child's mother, who is here in support of him, but that son

11   needs his father, particularly in the lead up to trial.

12          More critically, Your Honor, in my estimation,

13   detention will be an undue burden on defense counsel in

14   preparing for this case.

15          We don't have the discovery material.  We don't have

16   the most critical stuff.  It's still forthcoming.

17          As we get it, we need Mr. Gerace to be able to review

18   this stuff and inform us what's true, what's false, where to

19   look, how to investigate defense leads.

20          That process, Your Honor, is unreasonably and unduly

21   hampered if Mr. Gerace is incarcerated in any form.

22          And so, Your Honor, I submit there are terms and

23   conditions that Your Honor can fashion that will safeguard the

24   community, ensure his return to court, and be appropriate that

25   are short of detention, Your Honor.

1          **THE COURT:**  Mr. Tripi -- I'm sorry.  I thought you

2   were done.

3          **MR. SOEHNLEIN:**  I'm sorry.

4          **THE COURT:**  Go ahead.

5          **MR. SOEHNLEIN:**  Sometimes I stop and really I'm just

6   getting tired.

7          Your Honor, finally, the timing of this motion, after

8   we have made a motion to provide Mr. Gerace with important

9   discovery materials, that we believe show false testimony in

10  front of the Grand Jury is suspect, at best.

11         Your Honor, some of Mr. Tripi's proffer came from that

12  witness.  It did.  Some of the most scandalous, salacious

13  allegations came from that witness.

14         **MR. TRIPI:**  From what witness?

15         **THE COURT:**  Hold on, Mr. Tripi.

16         **MR. SOEHNLEIN:**  And we know, Your Honor, as set forth

17  in our motion, under seal --  we know, Your Honor, that that

18  witness has lied.

19         We also know that the U.S. Attorney's Office went

20  through efforts to rehabilitate that client's testimony in the

21  Grand Jury, as is laid out in our motion.

22         We need to be able to provide that material to

23  Mr. Gerace, so he can inform us what's true, what's false, so we

24  can make a calculation about what to do with that information.

25         It's suspect, Your Honor, that we make that motion on

 1  a Tuesday, and the new arrest comes on Friday with the tampering

 2  charges.

 3        Information that the Government has had for four years

 4  -- suddenly there is a new indictment.

 5        So, Your Honor, we'd ask you to continue the terms and

 6  conditions of Mr. Gerace's release, consistent with the

 7  recommendation from the United States Probation.

 8        **MR. TRIPI:**  Just a few points, Judge.

 9        **THE COURT:**  Yeah.  Before you go there, though, let me

10  ask you to go right to this suggestion from Mr. Soehnlein, that

11  the two women in the basement on the Facebook account somehow

12  were doing this of their own volition, without any involvement

13  of Mr. Gerace; so how do you respond to that?

14        **MR. TRIPI:**  I think the Grand Jury indictment speaks

15  for itself.  We have a probable cause determination by a Federal

16  Grand Jury that heard the evidence.

17        And that Grand Jury considered evidence from the

18  recipient of the messages in the form of Grand Jury transcripts

19  and the other individuals.

20        There is a probable cause finding, so all three other

21  people who had a part in this were considered.

22        And so I think the Second Circuit case law is

23  abundantly clear that it's the indictment that triggers the

24  probable cause determination, and you have an indictment before

25  you.

1          Now, I would note, to go back to probation's

2    recommendation, the probation office in Florida during -- you

3    want to talk about COVID -- during the middle of COVID,

4    recommended that he be detained.

5          Now, it was about five minutes before the detention

6    hearing, and after we made representations to Mr. Daniels about

7    the fact that his client would have been allowed -- had he been

8    arrested in Buffalo, would have been allowed to surrender

9    himself.

10          So, the only reason the Government didn't move for

11    detention was we were battling distance, initially, during the

12    heart of COVID, and we thought that an AUSA who had no clue

13    about any of these facts would be the one left to proffer it.

14          And we had made representations previously to

15    Mr. Daniels that we wanted to uphold.  We weren't anticipating

16    in arresting in Florida at that time.

17          So -- but that -- interestingly, that Florida

18    probation department recommended detention, just on the face of

19    the indictment.  Nevertheless, we agreed to conditions, but a

20    whole lot has changed since then.

21          So the defense proffer is that probation knows all

22    these things.

23          Probation didn't know anything that I said yesterday,

24    because all they did was get the reclamation from Florida and

25    disagree with it while submitting a memo that says:  Oh, by the

1    way -- Andre McCray wrote a memo that says he lied to the

2    Florida Probation Department, because he said he didn't do drugs

3    and he tested positive for cocaine.  So that addresses a little

4    bit of that.

5         I heard Mr. Gerace has health issues for the first

6    time.  When he was arrested the other day, he was on his way to

7    the gym, dressed in gym clothes.

8         So apparently it doesn't block him from working out.

9    I submit to you, he's just fine.

10        The Government laid out the timeline of its

11   indictment, and one of the acquired witnesses on Friday.

12        No later than March 14th was approval sought to return

13   the indictment in this matter; well before any defense motion.

14        If you would like to call Criminal Chief Kresse, have

15   at it.  But as an officer of the Court, that's the date we

16   purposed charging him, and that's our internal process that I

17   just put on the record.

18        In terms of pointing to Mr. Gerace's ex-wife in the

19   back, I feel bad for Ms. Arida to be placed in this situation.

20        To have a documented history of abuse, to have a child

21   in common with this man, and now be called out to come to court

22   and sit there and pretend you're okay with this, or what?

23        What's the alternative for her with that show that was

24   displayed a moment ago?

25        The facts are, we recovered the order signed by Judge

 1   Michalski, Mr. Gerace's good friend.

 2          It was a pro se order signed July 7th, 2008, the same

 3   day as the pro se application.

 4          And in it, it wrote:  The order -- the order does not

 5   indicate that Arida was present or on notice of the petition.

 6          The order states:  It appearing that notice is not

 7   required to be given to any person, and the Court being

 8   satisfied -- apparently because of the personal relationship

 9   between the judge and Mr. Gerace -- there is no reasonable

10   objection to the change of name proposed.

11          He signs the order, as followed.  This excerpt is from

12   the search warrant application of Judge Michalski.

13          And so, I'd ask you to disregard that little show from

14   a few moments ago.  He's continuing to commit crimes.  He will

15   continue to commit crimes.

16          He's a danger to the community.  He has resources

17   making him a flight risk.  The indictment triggers the statutory

18   presumption that he's a flight risk and a danger, and the weight

19   of the evidence clearly shows this Court that he is and he

20   should be detained.

21          **THE COURT:**  Thank you, Mr. Tripi.

22          Mr. Soehnlein, last word.

23          **MR. SOEHNLEIN:**  Thank you, Your Honor.

24          Your Honor, this hearing is about a return to court,

25   safeguarding the community, making sure that Mr. Gerace is not a

1    flight risk.

2            His history of supervision shows that he's none of

3    those things, Your Honor.  There are certainly terms and

4    conditions that Your Honor could impose, short of detention, to

5    ensure that those things are done.

6            While there may be a presumption, it's rebutted by the

7    time that he's been on supervised release, Your Honor.  Even the

8    time that -- even the time when the Government alleges that he

9    was under investigation, he didn't go anywhere.  He didn't fly

10   out of town.

11           He didn't skip town.  He's here to answer the charges.

12   He engaged attorneys.  He's made it to every court appearance.

13           Aside from the EIDL controversy, there's no other

14   criminality during that time.  Not only is probation watching

15   him, but you know that Federal law enforcement is watching him

16   during that time as well.

17           Your Honor, we ask that you continue the terms and

18   conditions of his release.

19           **THE COURT:**  Thank you, Mr. Soehnlein.

20           All right.  So I'm going to walk through my thoughts

21   about my conclusion and my reasons and then, obviously, there

22   will be a standard order that comes -- a written order to make

23   sure that I've tracked all the items.

24           I've heard everything I heard on Friday and today, all

25   pursuant to the factors in subsection G of 3142, which I've

1    studied at length.

2         Like I noted on Friday, a major focus for me is how

3    I'm to weigh Mr. Gerace's compliance with the conditions in the

4    19-CR-227 case, on the one hand, with several items to kind

5    of -- the counter way and stand in the face of that; and things

6    like the new detail that I've heard from Mr. Tripi surrounding

7    the Facebook incident, which resulted in the three counts of

8    indicted conduct related to the Facebook incident in this case,

9    including the corroboration of those details.

10        Also new to me is the Government's proffer about

11   Mr. Gerace referring to the victim witness as a snitch prior to

12   the November 19, 2019 alleged conduct, and in real time as well.

13        I still have some concerns as well about the

14   Government's proffer about Mr. Gerace's apparent willingness to

15   use his contacts in the legal system to improperly disadvantage

16   those perceived as being against him.

17        And there, in part, I'm concerned about the Michalski

18   incident, also, as well as the Amherst Police Department

19   detective incident that I heard about on Friday as well.

20        The cocaine and drug supplying and prostitution items

21   aren't good facts either.

22        The loan application issues, at a minimum, present

23   recent untrustworthy activity from June, 2020 and July, 2021.

24   Some of that activity after the releases in the 19-CR case.

25        And in particular, noteworthy is the denial of prior

1    convictions and current indictment, among other items on those

2    applications.

3          I also note that -- I don't know if I need to note

4    that, but I note that witness tampering is something that goes

5    to the heart of the justice system.

6          And I think that's something that, at a minimum, the

7    LaFontaine case accounts for and speaks to.

8          Taking into account all of the G factors, including

9    defendant's past conduct and how that relates to the safety of

10   witnesses in this case and the safety of witnesses in the 19-CR

11   case, I note that defendant's record of compliance is sufficient

12   to rebut the presumption in section E-3.

13         Nevertheless, I find by clear and convincing evidence

14   that no condition or combination of conditions will reasonably

15   assure the safety of any other person in the community,

16   especially vis-a-vis witnesses against Mr. Gerace.

17         And I also note that the case law, for example,

18   LaFontaine, about detention and witness tampering cases also

19   notes cases about detention and obstruction of justice cases,

20   even absent violence or threats of violence.

21         Therefore, I order Mr. Gerace detained pending trial.

22   He -- at the end of this proceeding, will be committed to the

23   custody of the Attorney General.  The balance of the order

24   that's forthcoming will follow.

25         We need to look at and think about a couple things,

 1    next, given this 23-CR case conclusion.

 2            It triggers a couple of things in my mind, which is

 3    what are we doing about the release order in the 19-CR case.

 4            Is there going to be a violation proceeding, and/or is

 5    the hearing -- there was never a detention hearing in that case,

 6    so we can't reopen it under the statute under -- again,

 7    subsection F, the flush language.

 8            The point is -- we've got incongruous orders out

 9    there.  Certainly, the detention order is going to trump, but I

10    still have to deal with the fact that we've got an order in the

11    19-case, so we've got to deal with that some some way.

12            Mr. Tripi, what's your suggestion?

13            **MR. TRIPI:**  I think the indictment in this case is a

14    changed circumstance that would allow for the Court to consider

15    the fact that it's now heard additional information and entered

16    a detention order.

17            **THE COURT:**  Right.  Well, why don't you submit

18    something and --

19            **MR. TRIPI:**  I will.

20            **THE COURT:**  -- and then give the defense a chance to

21    respond to that.

22            I -- even before I came out here, Mr. Soehnlein,

23    Mr. Cohen, I'm acutely aware that the trial date is 12 weeks

24    away or so.

25            I've accounted for that before I came out here and

 1   now, and listening to Mr. Soehnlein reminded me of it.

 2        So what I'm -- defendants prepare for trial from

 3   county jails here all the time.  I'm sure it's not fun, but it

 4   happens, and it's the norm for them.

 5        So what I want to say is, is this:  I'll consider

 6   every motion on the merits.  I always do.

 7        But if you're going to make a motion for temporary

 8   release to prepare for trial, it can't be on this record,

 9   because I've already considered all these things.

10        So there's got to be something new and compelling for

11   me to consider in order to justify something like a temporary

12   release under subdivision I.

13        Remember you have Judge Roemer tomorrow, I believe, at

14   2 o'clock.  Is there anything else that we need to talk about in

15   the 23-CR case?

16        **MR. TRIPI:**  No, Your Honor.

17        **MR. SOEHNLEIN:**  Nothing further, Your Honor.

18        **THE COURT:**  Okay.  So let's call the 19-case, and

19   we're going to do the Curcio piece now.  Status conference on

20   the Curcio motion.

21        **THE CLERK:**  Court calls United States versus

22   Peter Gerace, Jr., case number 19-CR-227 for a status

23   conference.

24        Counsel, please state your appearances.

25        **MR. TRIPI:**  Joseph Tripi, David Rudroff, and

1    Nicholas Cooper for the United States.  Good afternoon.

2           **MR. SOEHNLEIN:**  Eric Soehnlein, Steve Cohen for

3    Peter Gerace.

4           **MR. COHEN:**  Tyler Eckert as well, Your Honor.

5           **THE COURT:**  I'm sorry, what's that?

6           **MR. COHEN:**  I beg your pardon, sir.  Tyler Eckert,

7    E-C-K-E-R-T, is here as well.  He's sitting behind me.

8           **THE COURT:**  Okay.  So on the Curcio process, there is

9    the motion to determine whether a conflict exists and what to do

10   about it.

11          There's been a response from Mr. Soehnlein, and I have

12   a call in to Mr. Spitler to see what his availability is like,

13   since he seems to be of -- by conflict purposes, available to

14   us, and he served as Curcio counsel once before in this case for

15   Mr. Gerace.

16          So I'd like to use him again, if he's available and

17   willing to do it.  He hasn't gotten back to me yet.

18          I know that I think I heard you say, Mr. Tripi, that

19   he wasn't around today anyway, which is why he hasn't called me

20   back.

21          **MR. TRIPI:**  There was sort of a family emergency

22   today.

23          **THE COURT:**  Okay.  So when he calls me -- I'm going to

24   leave the next appearance on this Curcio process unscheduled, so

25   that we can see what his calendar looks like when he calls me

1    back.

2          And then I'll put out a text order and have you come

3    back and we'll do part two of Curcio and then part three after

4    that, so that's probably all I can do at this point on that

5    front.

6          Mr. Tripi --

7          **MR. TRIPI:**  I have nothing else, Judge.

8          **THE COURT:**  Mr. Soehnlein?

9          **MR. SOEHNLEIN:**  Nothing further, Judge.

10         **THE COURT:**  Mr. Cohen?

11         **MR. COHEN:**  Nothing further, Judge.

12         **THE COURT:**  All right.  So that does it for the Curcio

13   process status conference in the 19-CR case.

14         If there is nothing further from any of you, the

15   defendant will remain detained pending trial in the 23-CR-37

16   case, which is what brought us here in the first place.

17         Okay.  Thank you.

18         **MR. TRIPI:**  Thank you.

19

20               (Proceedings concluded at 2:28 p.m.)

21                          *   *   *

22

23

24

25

1

2         In accordance with 28, U.S.C., 753(b), I certify that these

3    original notes are a true and correct record of proceedings in

4     the United States District Court for the Western District of

5          New York before the Honorable John L. Sinatra, Jr.

6

7

8

9

10    _s/ Bonnie S. Weber_              __March 31, 2023__
      Signature                        Date

11

12   BONNIE S. WEBER, RPR

13   Official Court Reporter
14   United States District Court
     Western District of New York

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E

# IN THE DISTRICT COURT OF THE UNITED STATES

## for the Western District of New York

_____

|  |  |
|---|---|
| | **MARCH 2023 GRAND JURY** (Impaneled 03/24/2023) |
| **THE UNITED STATES OF AMERICA** | **INDICTMENT** |
| *-vs-* | **Violations:** Title 18, United States Code, Sections 1343, and 2 (4 Counts, Section 3147 Allegation, and 1 Forfeiture Allegation) |
| **PETER GERACE, JR.** | |

## INTRODUCTION

### The Grand Jury Charges That:

At all times relevant to this Indictment:

1.      Defendant PETER GERACE, JR. ("GERACE") was a resident of Clarence, New York, within the Western District of New York.

2.      Pharaohs GC, Inc. ("PGC") was a domestic corporation incorporated under the laws of the State of New York on or about March 25, 2005.  PGC had a principal place of business at 999 Aero Drive, Cheektowaga, New York.  GERACE was the 100% owner of PGC and served as the Chief Executive Officer of PGC.

3.      PGC was a "gentlemen's club" or "strip club."  PGC offered live sexual performances to patrons in the form of exotic and/or nude dancing, *i.e.* "stripping" and/or "lap dances."  PGC employed dancers as independent contractors or W-2 employees.  The dancers charged PGC's patrons for private or semi-private lap dances.  Dancers charged the

patrons a fixed rate per song and accepted tips. The dancers would then contribute a portion of the funds received to PGC.

### The Small Business Administration and Economic Injury Disaster Loan Program

4.      The United States Small Business Administration ("SBA") is an agency within the Executive branch of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities following disasters.

5.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 that was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of financial relief was the Economic Injury Disaster Loan ("EIDL") Program. The EIDL Program was designed to provide low-interest loans to qualifying small businesses to help them meet financial obligations and operating expenses that would have been met had a disaster not occurred.

6.      To obtain a loan under the EIDL Program, a qualifying business was required to submit an online EIDL application to the SBA with truthful and accurate information. The EIDL application was required to be signed by an authorized representative of the business. The applicant was required to certify, among other things, that: (a) "[the] applicant does not present live performances of a prurient sexual nature or derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature;" (b) the applicant was not "presently

2

subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction"; and (c) the applicant had not ever "been convicted, plead guilty, plead nolo contender, been placed on pretrial diversion, or been placed on any form of parole or probation" "for any criminal offense." The questions on the application, including these specific questions, were material to the SBA's determination of eligibility for an EIDL.

7.      Before an EIDL could be disbursed, the applicant was required to review and sign a Loan Authorization and Agreement ("LA&A"). By signing the LA&A, the applicant certified, among other things, that "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this loan." This certification was material to determining eligibility for an EIDL.

8.      An applicant under the EIDL Program could also apply to modify an EIDL to, among other things, increase the amount of the loan. If the modification application was approved, the applicant was required to review, certify, and execute an Amended LA&A. By executing the Amended LA&A, the applicant certified, among other things, that: (a) "[t]here has been no substantial adverse change in Borrower's financial condition . . . since the date of the application for this Loan[ ] (Adverse changes include, but are not limited to: judgement liens, tax liens, mechanic's liens, bankruptcy, financial reverses, arrest or conviction of felony, etc."; and (b) "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete, and are offered to induce SBA to make this loan." This certification was material to determining eligibility for modification of an existing EIDL.

## COUNTS 1 - 4

### (Wire Fraud)

### The Grand Jury Further Charges That:

9.      The allegations in paragraphs 1 through 8 of the Introduction of this Indictment are incorporated herein by reference.

10.      Between in or about March 2020, the exact date being unknown, and on or about December 2021, in the Western District of New York, and elsewhere, the defendant, PETER GERACE, JR., did devise, and intend to devise, a scheme and artifice to defraud the SBA and to obtain money and property from the SBA by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice did transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds.

11.      The purpose of the scheme and artifice was for GERACE to trick and mislead the SBA into approving a loan and two loan modifications under the EIDL Program by providing false material information to the SBA and certifying the truth, correctness, and completeness of that information. Specifically, as to the initial EIDL application, GERACE falsely certified that PGC did not present live performances of a prurient sexual nature, or derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature; and that he had never been convicted for any criminal offense. As to the two loan modifications, GERACE falsely certified that, since the date of the initial EIDL application, there had been no substantial adverse change in PGC's financial condition, and he had not been arrested for a felony.

4

**The April 5, 2020 Economic Injury Disaster Loan Application**

12.     On or about April 5, 2020, GERACE submitted an online loan application under the EIDL Program to the SBA on behalf of PGC. The loan application was electronically submitted by GERACE, and caused to be submitted by GERACE, from the Western District of New York to servers located outside the State of New York.

13.     In the April 5, 2020 EIDL application, GERACE falsely and fraudulently represented to the SBA that PGC did not present live performances of a prurient sexual nature or derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature.

14.     In the April 5, 2020 EIDL application, GERACE also falsely and fraudulently represented to the SBA that he had never been convicted of any criminal offense.

15.     On June 12, 2020, GERACE executed the LA&A in support of his fraudulent April 5, 2020 EIDL application. In that Agreement, GERACE certified that "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete, and are offered to induce SBA to make this loan." In fact, as GERACE then and there well knew, the representations on PGC's EIDL application were "not true, correct, and complete" because: (a) PGC operated as a strip club, and, as such, presented live performances of a prurient sexual nature, and derived directly or indirectly more than de minimis gross revenue through the sale of products and services, and the presentation of depictions and displays of a prurient sexual nature; and (b) because GERACE was previously convicted of a criminal offense, that is, a conviction in United States District Court for the Western District of New York, on or about November 23, 2005, for Conspiracy

to Commit Wire Fraud in violation of 18 U.S.C. § 371. The LA&A application was electronically submitted by GERACE, and caused to be submitted by GERACE, from the Western District of New York to servers located outside the State of New York.

16.    Based on GERACE's false and fraudulent certifications, the SBA approved the loan application on or about June 12, 2020, and disbursed $150,000 in United States funds to PGC under the EIDL Program.

**The August 7, 2021 Economic Injury Disaster Loan Increase Application**

17.    Between on or about April 21, 2021, and on or about May 21, 2021, GERACE contacted the SBA and requested that the amount PGC borrowed under the EIDL be increased.

18.    On or about August 7, 2021, GERACE executed an Amended LA&A, seeking to increase the loan he received under the EIDL Program to $500,000. In the Amended LA&A, GERACE again falsely certified that "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete, and are offered to induce SBA to make this loan." In fact, as GERACE then and there well knew, the representations on PGC's EIDL application were "not true, correct, and complete" because, as described above: (a) PGC still operated as a strip club and presented live performances of a prurient sexual nature and derived more than de minimis gross revenue through the sale of products and services, and the presentation of depictions and displays of a prurient sexual nature; and (b) GERACE had been convicted of a criminal offense, that is, a federal felony in 2005. The false Amended LA&A application was electronically submitted by GERACE from the Western District of New York to servers located outside the State of New York.

19.     In the Amended LA&A, GERACE further certified that "[t]here has been no substantial adverse change in Borrower's financial condition . . . since the date of the application for this loan[ ] (Adverse changes include, but are not limited to: judgement liens, tax liens, mechanic's liens, bankruptcy, financial reverses, arrest or conviction of a felony, etc.)." In fact, as GERACE then and there well knew, GERACE and PGC had experienced substantial adverse changes in financial circumstances since the date of the application for the EIDL. Specifically: (a) on or about February 25, 2021, GERACE was indicted and subsequently arrested on felony offenses charged in United States District Court for the Western District of New York in Case No. 19-CR-00227; and (b) as part of that indictment, "the premises, buildings, appurtenances, improvements, fixtures, and real property" associated with or owned by GERACE and PGC at 999 Aero Drive, Cheektowaga, New York had been designated subject to criminal forfeiture.

20.     Based on GERACE's false and fraudulent certifications, the SBA approved the loan modification, and on or about August 10, 2021, disbursed an additional $350,000 to PGC under the EIDL Program.

**The December 19, 2021 Economic Injury Disaster Loan Increase Application**

21.     On or about September 27, 2021, GERACE again contacted the SBA and requested that the amount PGC borrowed under the EIDL be increased.

22.     On or about December 19, 2021, GERACE executed a Second Amended LA&A, increasing the loan he received under the EIDL Program to $2,000,000. In the Second Amended LA&A, GERACE again falsely certified that "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and

complete, and are offered to induce SBA to make this loan." In fact, as GERACE then and there well knew, the representations on PGC's EIDL application were not "true, correct, and complete" because, as described above: (a) PGC still operated as a strip club and presented live performances of a prurient sexual nature and derived more than de minimis gross revenue through the sale of products and services, and the presentation of depictions and displays of a prurient sexual nature; and (b) GERACE had been convicted of a criminal offense, that is, a federal felony in 2005. The Second Amended LA&A application was electronically submitted by GERACE from the Western District of New York to servers located outside the State of New York.

23.     In the Second Amended LA&A, GERACE further certified that "[t]here has been no substantial adverse change in Borrower's financial condition . . . since the date of the application for this loan[ ] (Adverse changes include, but are not limited to: judgement liens, tax liens, mechanic's liens, bankruptcy, financial reverses, arrest or conviction of a felony, etc.)." In fact, as GERACE then and there well knew, GERACE and PGC had experienced substantial adverse changes in financial circumstances since the date of the application for the EIDL. Specifically: (a) on or about February 25, 2021, GERACE was indicted and subsequently arrested on felony offenses charged in United States District Court for the Western District of New York in Case No. 19-CR-00227; and (b) as part of that indictment, the "the premises, buildings, appurtenances, improvements, fixtures, and real property" associated with or owned by GERACE and PGC at 999 Aero Drive, Cheektowaga, New York had been designated subject to criminal forfeiture.

24.     Based on these false and fraudulent certifications, the SBA approved the loan modification, and on or about December 23, 2021, disbursed an additional $1,500,000 to PGC under the EIDL Program.

25.     On or about the dates set forth below, in the Western District of New York, and elsewhere, the defendant, PETER GERACE, JR., for the purpose of executing the scheme and artifice, did transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, that is, the wire communications set forth below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 1 | April 5, 2020 | Electronic submission of a false Economic Injury Disaster Loan application from Buffalo, New York to a United States Small Business Association contractor in West Des Moines, Iowa, via internet portal. |
| 2 | June 12, 2020 | Electronic submission of a false Loan Authorization and Agreement and other closing documents in support of the fraudulent April 5, 2020 EIDL application via DocuSign from Buffalo, New York to DocuSign servers outside of New York State. |
| 3 | August 7, 2021 | Electronic submission of a false Amended Loan Authorization and Agreement and other closing documents via DocuSign from Buffalo, New York to DocuSign servers outside of New York State. |
| 4 | December 19, 2021 | Electronic submission of a second false Amended Loan Authorization and Agreement and other closing documents via DocuSign from Buffalo, New York to DocuSign servers outside of New York State. |

**All in violation of Title 18, United States Code, Sections 1343 and 2.**

## ALLEGATION PURSUANT TO 18 U.S.C. § 3147

**The Grand Jury Alleges That:**

26.     As the defendant, PETER GERACE, JR., had been released pursuant to Chapter 207 of Title 18, United States Code, at the time of the commission of the felony offenses alleged in Counts 3 and 4 of this Indictment, should the defendant be convicted of Count 3 or Count 4 of this Indictment, the defendant is subject to the term of imprisonment prescribed in Title 18, United States Code, Section 3147(1), in addition to the penalties otherwise provided by law.

**All pursuant to Title 18, United States Code, Section 3147.**


## FORFEITURE ALLEGATION

**The Grand Jury Alleges That:**

27.     Upon conviction of any offense alleged in Counts 1 through 4 of this Indictment, the defendant, PETER GERACE, JR., shall forfeit to the United States, all his right, title and interest in any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offenses, including but not limited to:

> **MONEY JUDGMENT:**
>
> The sum of approximately two million dollars ($2,000,000) in United States currency that represents proceeds that defendant obtained from his involvement in the criminal conduct, which if not readily available will become a monetary judgment and will serve as a lien against the defendant's property, wherever situated, with interest to accrue at the prevailing rate per annum until fully satisfied in the event this amount is not located.

If any of the property described above, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third person;

(c)     has been placed beyond the jurisdiction of the Court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and it is the intent of the United States to seek forfeiture of any other property of said defendant up to the value of the monetary judgment.

**All pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2) and 982(b)(1); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c).**

DATED:  Buffalo, New York, June 8, 2023.

TRINI E. ROSS
United States Attorney

BY:     S/DAVID J. RUDROFF
DAVID J. RUDROFF
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716/843-5806
David.Rudroff@usdoj.gov

A TRUE BILL:

S/FOREPERSON
FOREPERSON

11

# EXHIBIT F

ovember

say

f the

you

9?

1 months