IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

          v.                                    19-CR-227-LJV

JOSEPH BONGIOVANNI,
PETER GERACE, JR.,

               Defendants.
_____

UNITED STATES OF AMERICA,

          v.                                    23-CR-37-LJV-MJR

PETER GERACE, JR.,

               Defendant
_____

## GOVERNMENT'S MOTION FOR INTRADISTRICT TRANSFER

**THE UNITED STATES OF AMERICA**, by and through its attorney, Trini E. Ross, United States Attorney for the Western District of New York, Joseph M. Tripi, David J. Rudroff, and Nicholas T. Cooper, Assistant United States Attorneys, Corey R. Amundson, Chief, United States Department of Justice, Public Integrity Section, and Jordan Dickson, Trial Attorney, United States Department of Justice, Public Integrity Section, of counsel, hereby moves to transfer this case from Buffalo to Rochester pursuant to Rule 18 of the Federal Rules of Criminal Procedure.

## INTRODUCTION

Although the Constitution requires that a criminal defendant be tried in the district and state in which the crime occurred, there is no Constitutional right to a trial within a given

division or area of that district.  Instead, Federal Rule of Criminal Procedure 18 ("Rule 18")
gives courts broad discretion to fix the place of trial, requiring only that they consider the
convenience of the defendant, victims, and witnesses, and the prompt administration of
justice.  Fed. R. Crim. P. 18.  Although cases in the Western District of New York are
ordinarily assigned to the court location in which the crime is committed, Local Rule of
Criminal Procedure 7, this is no ordinary case.  Rather, the overwhelming media coverage
(exacerbated by defense attorneys' and anonymous "sources" statements to the media), the
attendant threats and intimidation of government witnesses often following those news
stories, concerns for the privacy rights and dignity of victims, and the challenges caused by
selecting a jury in the Buffalo area, all overwhelmingly compel the conclusion that this is a
once-in-a-generation circumstance.  The integrity of the judicial process and the prompt
administration of justice support a transfer of this case to Rochester.

## ARGUMENT

The United States Constitution requires that a criminal trial be held in the state and
district in which the crime was committed.  *See* U.S. Const. Art. III, sec. 2; U.S. Const.,
Amend. VI.  However, the Constitution is silent as to where in the applicable state and district
the trial must occur.  To remedy this, Rule 18, as originally adopted, required that a criminal
trial also be held in the division in which the crime occurred, if applicable.  Fed. R. Crim. P.
18 (1944) (amended 1966).  This proved unfair, however, because only about half of the
districts were separated into divisions, and where districts were so divided, it often had little
to do with the comparative size or population of the district.  *See id.* Advisory Committee
Notes to 1966 amendment.  As such, this requirement was eliminated, and in its current form

Rule 18 provides, in relevant part, "[t]he court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice."

The Local Rules of the Western District of New York recognize that a party may move to transfer a case within the district, *e.g.,* from Buffalo to Rochester. *See* Local Rule of Criminal Procedure 7 ("Parties requesting transfer of a case from Buffalo to Rochester, or vice versa, shall file a written motion requesting such relief, returnable before the Judge to whom the case is originally assigned."). In deciding a motion for an intra-district change of venue, the Court must consider the statutory factors—convenience of the defendant, victims, and witnesses, as well as the prompt administration of justice—but it may also consider other factors, such as docket management, courthouse security, and pretrial publicity. *See United States v. Lipscomb*, 299 F.3d 303, 342 (5th Cir. 2002); *United States v. Mathis*, No. 3:14CR00016, 2015 WL 5012159, at *3 (W.D. Va. Aug. 21, 2015), *aff'd* 932 F.3d 242 (4th Cir. 2019).

Additionally, although Federal Rule of Criminal Procedure 21 concerns inter—rather than intra—district transfers, courts have applied those standards to motions under Rule 18. *See United States v. Lentz*, 352 F. Supp. 2d 718, 721 n.5 (E.D. Va. 2005). In that vein, Rule 21 allows a court to transfer a criminal case either: (1) "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there," Fed. R. Crim. P. 21(a); or (2) "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice. Fed. R. Crim. P. 21(b).

Each of these factors weighs in favor of transferring this trial from Buffalo to Rochester.

**A.      The Substantial Media Attention this Case has Received in Buffalo Supports a Transfer to Rochester.**

When assessing whether to change venue due to pretrial publicity, the court may consider "the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially." *United States v. Skelos*, 988 F.3d 645, 659 (2d Cir. 2021) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d. Cir. 1990)).  A court may also consider "the size of the venue, and the amount of time that has passed since the bulk of the negative publicity," *i.e.,* the likelihood that the effects of the publicity will dissipate before trial.  *Id.*

Here, this case is easily the most heavily covered federal criminal case in Buffalo, and it has received substantial publicity that will undoubtedly affect public perception of the case. A keyword search of The Buffalo News online archives establishes that at least 71 articles related to this case have been published by that outlet since 2019, and at least 25 articles have been written within the last 8 months leading up to trial.[1]  A copy of articles from November

---

[1] This does not purport to be a comprehensive review of all media coverage of this case.  This review does not include publications, articles, or television coverage by other local outlets, such as WKBW, WIVB, and WGRZ, nor does it include coverage on various blogs, such as www.gangsterreport.com, and does not include analysis regarding how many times stories were shared, re-tweeted, posted, commented upon, or otherwise disseminated.

5, 2019, through September 1, 2023, is attached hereto and incorporated by reference as **Exhibit A**. By any metric, the media coverage is ramping up, and there is no end in sight. As a result, it is highly unlikely that the "effects of the publicity will dissipate before trial." *Id.*

Importantly, aside from standard, printed press releases upon the filing of charges or the resolution of cases, the government has not induced any publicity in this matter. The government repeatedly declines to comment when asked by reporters, and all quotes attributed to the government in these articles are in-court statements made by the assigned prosecutors. It is important to compare that to the myriad comments and interviews provided to the media by defense counsel in which defense attorneys have attacked government motives, denigrated witnesses, and criticized a District Court Judge. A fraction of the defense comments were described in the Government's Motion for a Gag Order, which remains pending. *See* Doc. No. 543. For example:

1.  "Cohen lambasted Gerace's ex-wife, Katrina Nigro, and Assistant U.S. Attorney Joseph Tripi, the lead prosecutor in the ongoing federal investigation into organized crime. 'A disgruntled and disturbed ex-wife has been casting aspersions against some very fine people, and Judge Michalski is one in a long list who have been victimized by her,' Cohen said." *See*, Michel, Lou & Herbeck, Dan, The Buffalo News, Mar. 24, 2022, <https://buffalonews.com/news/local/crime-and-courts/feds-search-home-of-state-supreme-court-justice-john-michalski-who-was-hit-by-train/article_566a67f2-ab82-11ec-8254-ab64dd8b3b22.html>

2.  "It's unfortunate that anyone would believe a word Ms. Nigro says. We know her history. Telling tales is nothing new to her." *See,* Brown, Steve & O'Rourke, Joseph, 2WGRZ News Publication, May 4, 2021, <https://www.wgrz.com/article/news/investigations/the-judge-the-strip-club-owner-and-the-ex-wife/71-c5c6b9d3-87ba-43ee-9adf-d3c23d176e75>

3.  "Steven M. Cohen, an attorney for Peter Gerace, has raised questions about her credibility in a lawsuit accusing her of libeling and slandering

Peter Gerace." *See,* Herbeck, Dan, The Buffalo News, Aug. 29, 2021, <https://buffalonews.com/news/local/crime-and-courts/witness-in-organized-crime-probe-sent-to-jail-for-six-months-for-vehicular-assault/article_5d54c7b8-0116-11ec-9278-1b9ba7fdc3c1.html>

4.   "A disgruntled and disturbed ex-wife has been casting aspersions against some very fine people, and Judge Michalski is one in a long list who have been victimized by her," Cohen said. … "Regrettably, a naive assistant U.S. attorney has swallowed everything this woman says hook, line and sinker." *See*, Herbeck, Dan, The Buffalo News, Mar. 22, 2022, https://buffalonews.com/news/local/crime-and-courts/feds-search-home-of-state-supreme-court-justice-john-michalski-who-was-hit-by-train/article_566a67f2-ab82-11ec-8254-ab64dd8b3b22.html>

5.   "I have no evidence of a crime committed by Mr. Gerace. I don't have the names of a single witness. I am befuddled," Cohen said.https://buffalonews.com/news/local/trial-date-set-for-strip-club-owner-ex-dea-agent-in-organized-crime-case/article_430b4fe8-70ec-11ed-b0d4-bb0f6d5eb35b.html> 6 *See*, Michel, Lou, The Buffalo News, Nov. 22, 2022, <

6.   "My client still is terribly disadvantaged. I don't know the name of a single witness, a single victim, a single transaction for which my client has been indicted. That is ludicrous," he said. "Mr. Tripi continues to say my client is a danger. He hasn't been able to point to a single instance where my client has threatened anyone directly or indirectly," Cohen said.7 *See*, McAndrew, Mike, The Buffalo News, Jan. 11, 2023, <https://buffalonews.com/news/local/crime-and-courts/prosecutors-can-keep-witnesses-secret-for-now-in-bribery-case-tied-to-organized-crime/article_54189566-90f9-11ed-9fa9-5f078216dfae.html>

7.   Steven M. Cohen, said it is his understanding that all four of the charges involved one witness "who I am very much looking forward to cross-examining under oath." "We are not at all surprised that the U.S. Attorney is attempting to bring additional charges now. It has become apparent that there's no direct evidence against Peter" that he is facing in June in court, Cohen said Saturday." *See*, Becker, Maki, The Buffalo News, Mar. 25, 2023, <https://buffalonews.com/news/local/crime-and-courts/peter-gerace-jr-witness-tampering-human-trafficking-organized-crime/article_5ff462e6-cb43-11ed-a878-63084e90f921.html>

8.   "There is no way this jury is going to be able to unhear the term Italian organized crime," Cohen said. "They're not going to unhear the term mafia. And they're also not going to be able to unhear the fact that Peter does have relatives who were involved in that. Peter himself was never

involved in Italian organized crime. But he has relatives who likely were." […] When the judge tells jurors to disregard something that they have heard or seen in court, it rarely affects the jurors like it is intended, Cohen said. Curative instructions "fall far short of what's in the best interest of our client," he said. *See*, Lakamp, Patrick, The Buffalo News, May 5, 2023, <https://buffalonews.com/news/local/crime-and-courts/ex-dea-agent-strip-club-owner-should-be-tried-together-judge-says/article_d2592222-e9ed-11ed-aec6-e7ad940a8f3e.html>

9.      "The government is doing everything in its power to prevent Gerace's defense from preparing our client for trial," he said. **"**Regrettably, they have found a sympathetic judge who has ordered all these restrictions." *See* Lakamp, Patrick and Michel, Lou, The Buffalo News, May 31, 2023, < https://buffalonews.com/news/local/judge-refuses-to-suppress-evidence-from-searches-of-geraces-home-and-strip-club/article_eeee9966-ff1a-11ed-8610-6fccddc702b4.html>   (emphasis added)

10.     "This judge continues to be particularly harsh to Mr. Gerace, and we see no legitimate basis for that," said Steven M. Cohen, who with attorneys Eric M. Soehnlein and Joseph M. LaTona, represents Gerace. "He appears to accept whatever the prosecution says at face value, even though they are bare allegations not supported by evidence." (Emphasis added.) *See*, Lakamp, Patrick, The Buffalo News, June 6, 2023, <https://buffalonews.com/news/local/judge-refuses-to-release-strip-club-owner-ahead-of-bribery-sex--and-drug-trafficking/article_3fd18366-0475-11ee-a8d3-5fb60c07e3c4.html>

11.     "The assistant United States attorney continues to make allegations and propound innuendo, no evidence," Cohen said. "We look forward to a trial before impartial jurors so that our client can be acquitted and finally move beyond these baseless allegations." "There seems to be no depths to which he will not plunge to attack Mr. Gerace," Cohen said. *See*, Lakamp, Patrick and Michel, Lou, The Buffalo News, June 11, 2023, <https://buffalonews.com/news/local/crime-and-courts/prosecutor-calls-late-judge-michalski-unindicted-co-conspirator-in-gerace-sex-trafficking-case/article_732e1112-0573-11ee-bf9d-ebe59a91d8da.html>

12.     "This is not a case where they have any evidence," Cohen said of the government, even after all of the executed search warrants. "There's nothing going to be on the table. You know, here are the handcuffs that were used to chain the girls to the wall. Doesn't exist. Here's a picture of the container that the girls were shipped off to Shanghai. Doesn't exist. Here are the drugs that were caught or bought on premises. Doesn't exist. So this is all about character." *See*, Lakamp, Patrick, The

>       Buffalo         News,         June         21,         2023,
>       <https://buffalonews.com/news/local/crime-and-courts/judge-
>       recuses-himself-from-strip-club-owner-case-after-voicing-suspicion-of-
>       legal-gamesmanship/article_b3bd89ee-103e-11ee-82da-
>       53ded94b7e1b.html>

*Id.* at 7-12.

As the government has repeatedly emphasized, much of this reporting has unfairly prejudiced the government and increased the risks to government witnesses.  In particular, defense attorneys and others have sought to portray the government as ethnically prejudiced crusaders unfairly prosecuting the defendants for nothing more than their Italian-American ancestry.   As only a small example:

1.   After unsuccessfully moving to dismiss the charges based on selective prosecution, Attorney Harington told the Buffalo News "I still believe it was highly prejudicial and inappropriate for the government to make unfounded claims about Italian Organized Crime in this case in open court, in court papers and in press releases. We'll continue to make our case with District Judge Sinatra." *See* Dan Herbeck, *Judge won't dismiss charges against ex-DEA agent, sees no anti-Italian American bias*, THE BUFFALO NEWS, available at https://buffalonews.com/news/local/crime-and-courts/judge-wont-dismiss-charges-against-ex-dea-agent-sees-no-anti-italian-american-bias/article_3a810cb4-18e5-11ed-a37f-bf3beb2ca644.html.

2.   "[Bongiovanni's] lead defense attorney, James P. Harrington, has repeatedly accused prosecutors of targeting Bongiovanni for "selective prosecution" because he is Italian American."  "'The government has noticed that all of the participants have Italian last names, and as such, has imagined the existence of an Italian American organized crime syndicate,' Harrington said in papers filed last year." *id.*

3.   "Some local defense attorneys and Italian American organizations say they are outraged over [the prosecutor's] repeated references to "Italian organized crime" in court and legal papers, including an indictment."  " 'Just because you have charges against men with vowels in their names, that doesn't make it an 'Italian organized crime' organization,' said Bella's attorney, Thomas J. Eoannou."  Herbeck, Dan & Michel, Lou, *A 'tough-as-nails' prosecutor takes on mob allgations – and criticism for the case*, THE BUFFALO NEWS, https://buffalonews.com/news/local/crime-

and-courts/a-tough-as-nails-prosecutor-takes-on-mob-allegations-and-criticism-for-the-case/article_ffccc8de-39f9-11ed-860a-cbe21beb4db9.html

The defense has also used the media to attack or disparage what it perceives to be key government witnesses. *See,* pages 5-8, *supra*.[2]

As discussed below, the media coverage, fueled in large part by defense comments to the press and "anonymous sources" who have identified government witnesses for the media, will endanger witnesses, encourage witness tampering, stifle witness cooperation (the likely goal of the defendant's media strategy), and frustrate the jury's fact-finding mission as well as the overall orderly administration of justice. *See, e.g.,* Dan Herbeck, THE BUFFALO NEWS, May 6, 2023, *Feds arrest woman expected to testify against strip club owner at upcoming trial* (citing "two sources familiar with the case" that said "[the woman] is expected to testify as a government witness[.]") (included in **Exhibit A**).[3]

Moreover, the Court should reject any claim by Gerace that these tactics were implemented by an attorney he is firing. First, as the government has previously emphasized, Gerace and his current attorneys have a longstanding relationship that continues in several

---

[2] The defense cannot claim to have clean hands with respect to the media attention this case has received. In Mr. Cohen's LinkedIn profile, he emphasizes his ability to use the media in aid of his client's cases. The Court should consider Mr. Cohen's own words when assessing the relative culpability of the parties in garnering media attention: "Cohen **successfully uses media** to garner public support for clients, or conversely to keep matters out of the press." *See* Doc. No. 543, at 2.

[3] The government's witness list is under seal, and a Protective Order prohibits disclosure of witness identities to third parties, including the media. *See* Doc. No. 347.

other matters. *See* Doc. No. 595, at 9-13. Second, the damage is already done—Gerace is not absolved of the impact of the years-long and strategic media campaign he initiated through his attorneys because he now seeks an eleventh-hour substitution of counsel. *See United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972) (affirming conviction where trial court refused to allow counsel to withdraw over differences in strategy with the defendant).

Alternatively, the extensive news reporting has the potential to prejudice the defendants as well as the government because the media saturation could influence the potential jury pool. Specifically, many of the Buffalo News articles report links between the defendants and specifically-named reputed organized crime figures—allegations not contained on the face of the indictment. *See* **Exhibit A.** Other articles report ties between Gerace and prominent former members of law enforcement and the judiciary. *Id.*[4]

The cumulative effect of this media saturation cannot be ignored. According to the Buffalo News itself, as of 2020, 80% of the Buffalo market reads the Buffalo News each week, 398,000 people follow the Buffalo News on social media, and 36 million copies of the Buffalo News were printed in 2019—and this only accounts for one media outlet. *See* Tom Wiley, *The Numbers Tell Our Story*, THE BUFFALO NEWS, Oct. 25, 2020, available at

---

[4] *See* Dan Herbeck*, Former Buffalo Police Commissioner linked to 2006 letter seeking leniency for Peter Gerace*, THE BUFFALO NEWS, May 13, 2021; *see also* Charlie Specht and Lou Michel, *State Supreme Court Justice John Michalski Dead at 61,* THE BUFFALO NEWS, Apr. 5, 2022 ("The judge has been under public scrutiny since he suffered a serious leg injury in February 2021 when he was struck by a slow-moving freight train in Depew in what another judge called a "suicide attempt." The Buffalo News reported that the train incident occurred days after federal agents contacted the judge to question him about his friendship with Cheektowaga strip club owner Peter Gerace Jr., a former client of Michalski.").

https://buffalonews.com/news/local/history/the-numbers-tell-our-story/article_3c44d5ca-155f-11eb-9bf7-8b676778f531.html.  In the Buffalo News's own words, "[e]ach week, The News now reaches 8 out of 10 Buffalo adults."  *Id.*  Given the reach of the Buffalo News, and the attention it has dedicated to this case, it will be difficult to ensure that the parties will receive a fair trial in the Buffalo area.

By contrast, the government has not located a single news article in the Rochester area's primary newspaper, the Democrat & Chronicle, involving this case.  The relative lack of public awareness of this case in Rochester will ensure that both the government and the defendants receive a fair trial by an untainted jury pool.

Lastly, transferring this case to Rochester, and away from the intense spotlight of the Buffalo media will protect the privacy and dignity of Gerace's victims by allowing them to testify without the specter of a media circus hanging over the proceedings.  Under the Crime Victims' Rights Act ("CVRA"), a crime victim has "the right to be treated with fairness and with respect for the victims' dignity and privacy."  18 U.S.C. § 3771(a)(8).  Both the government and the Court are required to use their best efforts to safeguard these rights for victims.  18 U.S.C. §§ 3771(b)(1) ("the court shall ensure that the crime victim is afforded the rights described in subsection (a)"), and 3771(c)(1) ("Officers and employees of the Department of Justice . . . shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a)").  Many of the government's witnesses are victims of Gerace's sex trafficking activities.  They will be required to testify about deeply personal matters regarding their drug use and commercial sex acts that they were coerced to

perform by Gerace, his friends, and associates.  Some, if not all, of these victims have moved on with their lives or are trying to do so.  All, to a certain extent, are revictimized each time they are required to tell their story.  Some are scared, some are embarrassed, and all of them have a right to respect and dignity as victims.  An intra-district transfer of the case to Rochester, where the media is not intently interested with every development in the case, and where some of the victims do not reside permanently, may enable victims to testify in at least a slightly more dignified way.  In this vein, an intra-district transfer to Rochester is consistent with the CVRA.  The victims who will testify deserve a return to normalcy and a chance to move on that an intra-district transfer to Rochester transfer would provide.

Where, as here, substantial media coverage risks prejudicing the parties, and thereby jeopardizes the orderly administration of justice, the Court should order an intra-district transfer to Rochester.  *See United States v. Gonzalez*, 163 F.3d 255, 259 (5th Cir. 1998) (upholding intra-district transfer where media attention resulted in bomb threats to courthouse and a hung jury, followed by a mistrial after three jurors were inappropriately contacted and urged to convict); *United States v. Faulkner*, 17 F.3d 745 (5th Cir. 1994) (upholding intra-district transfer where substantial media attention led to 60% of Dallas residents forming a pretrial opinion as to the defendant's guilt); *United States v. Weddell*, 800 F.2d 1404, 1406 (5th Cir. 1986) (upholding *sua sponte* intra-district transfer because the parties would not receive a fair trial in the Division where there had been an "inordinate amount of publicity.").  Additionally, where that same media coverage would deprive crime victims of the dignity and respect that they deserve—both under the statute, and as people—the Court should order an intra-district transfer to comply with the CVRA.

**B.**     **Transferring this Case to Rochester will Support the Efficient and Orderly Administration of Justice and the Safety and Security of Witnesses.**

Relatedly, the Court should transfer this case to Rochester because doing so would promote the efficient and orderly administration of justice.  This case will involve testimony regarding witness intimidation and organized crime groups in the Buffalo area.  Additionally, at least one of those organized crime groups has a history of attending criminal trials in which they think they have an interest in an attempt to intimidate witnesses.  Consistent with the government's concerns regarding intensive media coverage, this will also cause significant distress to witnesses and will make it much more difficult to ensure courthouse and courtroom security.  Transferring the case to Rochester will ameliorate these concerns.

**1.**     **Courtroom and Courthouse Security Supports a Transfer to Rochester.**

The government intends to introduce evidence that Gerace has close ties to the Outlaw Motorcycle Club (the "Outlaws").  The Outlaws are one of the largest and most powerful 1%er[5] motorcycle clubs in the United States.  Indeed, the Outlaws are referenced in the Second Superseding Indictment, and several of them work at and manage Pharaohs.

During a lengthy, three-month long RICO trial in Buffalo, New York before now Chief United States District Court Judge Elizabeth A. Wolford, members of the Outlaws attended every day of the trial, sat prominently in the gallery, and took notes.  *See United States v. Willson, et al.*, Case No. 1:15cr142.  In that case—a RICO prosecution of the Kingsmen

---

[5] The term "1%er" is motorcycle gang parlance meaning that the organization is part of the 1% of motorcyclists who maintain total independence from society and live outside the law. It is said to refer to a comment from the American Motorcycle Association in 1960 that 99% of motorcyclists were law-abiding citizens, implying that the last 1% were outlaws.

Motorcycle Club—the Outlaws were not specifically mentioned in the Indictment, but the case involved testimony and matters that, in part, related to the Kingsmen, a support club affiliated with the Outlaws.  Despite no direct link to the Outlaws, they monitored the proceedings daily, and their presence at trial created a stressful dynamic in the courtroom, caused issues with witnesses, and risked the orderly administration of justice.

Here, unlike in the Kingsmen case, the Outlaws are specifically referenced in the Indictment, *see* Dkt. 89, Introduction ¶ 4, and they likely have a strong interest in supporting Gerace at trial.  Indeed, the National President of the Outlaws is the manager of Pharaoh's Gentlemen's Club and was present there when federal authorities executed a search warrant on December 12, 2019.  Other members of the Outlaws are employed in various positions at Pharaohs—a location where sex trafficking, drug trafficking, and other unlawful activities are alleged to have occurred.  Further, the National President of the Outlaws submitted an affidavit in support of Gerace's motion to amend his conditions of release in this case. *see* Dkt. 108-2.  Therefore, the Outlaws have an even greater interest in this case than they did in the Kingsmen Motorcycle Club case.  As a result, there is reason to believe that the Outlaws will attend trial daily and cause great risk to the orderly administration of justice.

Moreover, the Outlaws themselves do not even need to attend the trial to accomplish their goals if it is held in Buffalo.  As the dominant 1%er MC in the Buffalo area, the Outlaws have a network of smaller support clubs who can also cause security and logistical issues associated with the trial, even if the Outlaws themselves do not attend.[6]  Indeed, as the

---

[6] *See* Supplemental submission submitted under seal.

government has explained in previous submissions related to Gerace's release or custodial status, *see* Doc. No. 110, at n. 7, law enforcement considers the Outlaws MC to be a dangerous and violent criminal organization, which has been subject to numerous prosecutions nationally. *See, e.g.*, *United States v. Starrett*, 55 F.3d 1525, 1533 (11th Cir. 1995) (noting that "The Outlaw Motorcycle Club (the "Outlaws") is one of the four largest national 'one-percenter' motorcycle clubs[,] . . . who are known to cause the most trouble, or 'raise the most hell.'"); *see also United States v. Bowman*, 302 F.3d 1228, 1231 (11th Cir. 2002) (former international president of the Outlaws convicted of racketeering, conspiracy to murder, and various other offenses); *United States v. Lawson*, 535 F.3d 434, 438 (6th Cir. 2008), as amended (Oct. 9, 2008) (RICO prosecution relating to Outlaws MC "Green Region", including a murder at a strip club.).

A trial in Rochester, New York will significantly reduce security and logistical concerns posed by the Outlaws' presence at trial.  Unlike in Buffalo, the Outlaws are not known to have a substantial presence in the Rochester, New York area, nor do they enjoy the same support of smaller clubs.[7]  As such, it will be more difficult for the Outlaws, or any other individuals loyal to Gerace, to intimidate witnesses or otherwise interfere with trial if it is transferred to Rochester, thus maintaining courthouse security and decorum.

---

[7] Rochester is known by law enforcement to be controlled by a different 1%er MC whose interests are not aligned with the Outlaws.  *See* **Exhibit B**.

2.     **Concerns Regarding Witness Safety and Security Support a Transfer to Rochester.**

Along these same lines, witness safety has always been a concern in this case.  As the government has laid out extensively (*see* Doc. Nos. 332 [ex parte affidavit in support of protective order]; 591 [describing witness tampering]), Gerace and those acting on his behalf have already taken substantial steps to intimidate or interfere with witnesses against him.  The government's concerns for witness safety are far from abstract.

For example, Gerace is indicted for witness tampering based on his role in convincing two acquaintances to send threatening messages via Facebook Messenger to a person that he believed was cooperating with law enforcement.  *See* Case No. 23-CR-37.  Gerace also filed a civil suit against two individuals who he believed were government witnesses, likely in an attempt to pierce the protections of grand jury secrecy and obtain their testimony.  *See* Doc. No. 591 and associated sealed, unredacted version.  Gerace also used an attorney to contact a represented party that he believed was cooperating with law enforcement.  *Id.*  That witness came home one day in March 2023—shortly after it would have been apparent that she was cooperating—to find dead rats on her car.  Several months later, in early August of 2023, that witness died under circumstances that are still being investigated.  *Id.*

Significantly, on August 1, 2023, the government produced *Jencks* materials for a new government witness.  On August 28, 2023, that witness—who had not been bothered or contacted in the four years this case has been pending—came home and found a dead rat in the middle of her driveway.  This is the second government witness since March 2023 who has had a dead rat placed on their property.  The witness notified the FBI, and the incident is

under investigation.  However, it is important to note that this incident closely followed a Buffalo News article in which "two sources" claimed the witness's daughter would testify for the government, the disclosure of the witness' name on the government's witness list, and the disclosure of the witness' *Jencks* materials to the defense.

These examples are in addition to the numerous witnesses who have expressed fear and trepidation while preparing for trial.  Several witnesses have expressed fear for their physical safety; several have asked about the Witness Protection Program; and several have fled the Buffalo area—all out of fear of the defendants and their associates.  One witness has stated, in sum and substance, that he/she fears Gerace because he "knows all these judges," and "knows cops in every jurisdiction."  Other witnesses have reported that Gerace has stated he could "make people disappear if he wanted to," that he described himself as "untouchable," that he has stated, in sum and substance, that "the FBI can't protect everyone," and he has a "long reach" and "serious people to tie up his loose ends."  For his part, Bongiovanni provided names of sources and individuals who were under investigation to his organized crime associates.  One person to whom Bongiovanni provided information was co-defendant Michael Masecchia, who pled guilty and, as alleged in the Indictment, is an IOC member.  In his plea agreement, Masecchia admitted that Bongiovanni passed law enforcement sensitive information to Masecchia and others.  Transfer to Rochester is warranted based on the defendants' connections to organized crime groups and figures headquartered in and around Buffalo, New York.

Importantly, several witnesses have also expressed that transfer the trial to Rochester would remedy some of their fear of testifying, which would serve the orderly administration of justice.[8]   A trial is a search for the truth, and in this case an intra-district transfer to Rochester will aid the jury's fact-finding mission.

An intra-district transfer will protect both witness safety and the integrity of the judicial process.   *C.f. United States v. Alberto-Lopez*, Case No. CR H-15-564-S3, 2019 WL 6064935, at *4 (S.D. Tex. Nov. 15, 2019) (denying motion to transfer because the defendant's criminal organization was known to have a strong presence in the division to which the defendant wanted the case transferred).   It is also the least intrusive way to accomplish these goals.   For example, the government is not asking for a closed courtroom, even though some courts have done so to prevent witness intimidation and tampering—particularly during testimony of witnesses who have been subject to intimidation previously.   *See, e.g., Tucker v. Superintendent Graterford SCI*, 677 F. App'x 768, 777 (3d Cir. 2017) ("on each day the courtroom was closed, witnesses testified who either had already been tampered with or intimidated, or for whom there was a strong likelihood of tampering or intimidation.").

Instead, an intra-district transfer of this case away from the defendants' organized crime associates and individuals who would tamper with and intimidate witnesses, strikes the proper balance.   It protects the integrity of the proceedings and ensured the courtroom will be

---

[8] Transferring the case to Rochester would not unduly inconvenience witnesses.   *See* Fed. R. Crim. P. 18.   While many of the government's witnesses do live in the Western New York area, some of the witnesses live equidistant from Buffalo and Rochester, and the government intends to call witnesses from at least six states.

open and public while significantly diminishing the likely intimidation tactics that plagued

the Kingsmen trial and others.  *See, e.g., United States v. Eldridge,* 860 F. App'x 773, 777–78 (2d

Cir. 2021) (affirming conviction where there was a partial courtroom closure after law

enforcement started asking observers for identification after witnesses began to be tampered

with following opening statements).[9]


An intra-district transfer would mitigate legitimate concerns about witness

intimidation and safety and would also eliminate potential appellate issues caused by

remedial measures such as partial courtroom closures.  Therefore, an intra-district transfer to

Rochester is the least intrusive means to protect witness security and the orderly

administration of justice.


### 3.    Logistical Concerns Regarding Jury Selection Support a Transfer to Rochester.

Lastly, the orderly and efficient administration of justice requires that the Court

efficiently select an unbiased jury.  This case involves over 400 witnesses, accounting for all

government and defense witness lists.  This alone will make it difficult to select a jury in which

no one has a relationship with witnesses.  Moreover, many witnesses live in other parts of the

country, and some witnesses live closer to Rochester or are located equidistant from Buffalo

---

[9] Here, the lead prosecutor is the same as in *Eldridge* and in the Kingsmen Motorcycle Club case.  The government is experiencing greater extrajudicial issues than it did in either of those lengthy RICO Murder cases, and it anticipates even greater challenges to courtroom and witness security moving forward.  These concerns are exacerbated by the unabated media campaign implemented by the defense, particularly defendant Gerace.

and Rochester.   In order words, a trial in Rochester will not inconvenience non-law enforcement witnesses to a substantial degree more than a trial in Buffalo would.

Additionally, this case involves many individuals who are well-known in the Buffalo area, including attorneys, political figures, businessmen, members of law enforcement, and at least one judge.  *See* Supplemental submission under seal, referenced herein and filed under seal as **Exhibit B**.[10]  The government anticipates that the jury will hear testimony about the activities of these individuals, and that testimony may evoke strong feelings among the jury. Recently, in the trial of *United States v. Michael Luehrsen*, Case No. 21-CR-120, this Court was forced to undergo a lengthy voir dire process due to strong feelings among the venire regarding just one individual with the same last name as an individual at issue here.  The number of witnesses and the nature of the anticipated testimony will make selecting a jury in Buffalo virtually impossible.  Empaneling an impartial jury with no strong feelings—one way or the other—toward these high-profile names will be easier in Rochester than in Buffalo. Accordingly, the prompt administration of justice counsels in favor of transferring the case to Rochester.

**C.    Transferring the Case to Rochester will Serve the Defendants' and Public's Speedy Trial Rights.**

Rule 18's "second textual factor—'due regard to . . . the prompt administration of justice'—is in part a literal command that trials comply with the Speedy Trial Act."  *United*

---

[10] The government has included in **Exhibit B** a request to file that exhibit under seal.  **Exhibit B** contains grand jury material subject to a protective order.  *See* Dkt. 347.

*States v. Lipscomb*, 299 F.3d 303, 341 (5th Cir. 2002).   This factor militates in favor of transferring this case to Rochester.

It has been approximately four years since the first Indictment was returned charging Bongiovanni and identifying Gerace as unnamed Co-conspirator 1.   Although the time that has elapsed between then and now has been excluded for Speedy Trial Act purposes, Gerace is now detained and both he and Bongiovanni have expressed Speedy Trial concerns during recent proceedings.   *See* Doc. No. 596, at 2.   Moreover, the parties have now been given and prepared for three trial dates (with another request to adjourn trial expected as Gerace attempts to retain new counsel).[11]   Although the delays thus far were caused by one or both defendants, the Second Circuit has held that the government suffers the consequences of extensive delay—even if, as here, the delay is not attributable to government actions.   *United States v. Black*, 918 F.3d 243, 260 (2d Cir. 2019) ("we routinely count neutral delay such as negligence or overcrowded courts against the government because the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.") (internal quotation marks omitted).

While the government is only requesting a transfer of the location of the trial, and not a different judge, a transfer to Rochester will serve the "prompt administration of justice" because it will allow the Court to efficiently assemble an impartial jury, as well as prevent the

---

[11] As set forth above, the continuing delays initiated by the defense are unfair to victims and witnesses.  *See* 18 U.S.C 3771(a)(7) (The CVRA provides that the rights conferred to victims includes "the right to proceedings free from unreasonable delay.").

disruption and delay that would come with a trial in Buffalo and all its media and witness security challenges.  *See Fed.* R. Crim. P. 18.

**D.     The Timing of the Government's Request.**

Since the government began providing 3500 materials to the defense in January 2023, and particularly since March 2023, witnesses have been tampered with and dead rats have been placed on cars and in witness's driveways.  Intense and unrelenting media coverage has been exacerbated by a calculated defense effort to exert pressure on witnesses through comments made to the media in Buffalo.  Simultaneously, the defense teams have worked to adjourn each trial date, beginning with the original June 2023 trial date, thereby allowing more time for the defendants and their associates to intimidate witnesses and otherwise influence the outcome of this case.

The government first brought this issue to the Court's attention in its Pre-Trial Memorandum (filed on April 26, 2023,) and warned the defense that it would move for a Gag Order if the defense did not modify its behavior and stop its campaign to try this case in the media.  *See* Doc. No. 441.  The government's notice had no effect, and instead the defense seemingly doubled down and further fueled the media coverage.  As a result, the government was forced to move for a Gag Order (filed on June 27, 2023), which remains pending and has not been argued in the approximately 70 days since it was filed.  *See* Doc No. 543.  The defense's use of the media, and the independent media attention on this case, has only intensified as this case moves toward trial.  In fact, since January 2023 there have been approximately three full-featured stories about this case in The Buffalo News per month.  This

22

case has reached a critical point in which the interests of justice would be best served by transferring the trial to Rochester, New York.

## **CONCLUSION**

The government respectfully requests that the Court enter an Order transferring this case to the Rochester court location of the Western District of New York.


COREY R. AMUNDSON                     TRINI E. ROSS
Chief                                 United States Attorney


BY:   s/JORDAN DICKSON         BY:   s/JOSEPH M. TRIPI
      Trial Attorney                 s/NICHOLAS T. COOPER
      Public Integrity Section       s/DAVID J. RUDROFF
      U.S. Department of Justice      Assistant United States Attorney
      Criminal Division              United States Attorney's Office
      1301 New York Ave. NW, Ste. 1000   Western District of New York
      Washington, D.C. 20530         138 Delaware Avenue
      202-597-0508                   Buffalo, New York 14202
      jordan.dickson@usdoj.gov       716.843.5839
                                     Joseph.Tripi@usdoj.gov