IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

              v.                                        19-CR-227-LJV

JOSEPH BONGIOVANNI,
PETER GERACE, JR.,

                  Defendants.

_____

UNITED STATES OF AMERICA,

              v.                                        23-CR-37-LJV

PETER GERACE, JR.,

                  Defendant

_____

## **GOVERNMENT'S SUR-REPLY TO DEFENDANT'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR PRE-TRIAL RELEASE**

     **THE UNITED STATES OF AMERICA**, by and through its attorney, Trini E. Ross,

United States Attorney for the Western District of New York, Joseph M. Tripi, David J.

Rudroff, Nicholas T. Cooper, and Casey L. Chalbeck, Assistant United States Attorneys,

Corey R. Amundson, Chief, United States Department of Justice, Public Integrity Section,

and Jordan Dickson, Trial Attorney, United States Department of Justice, Public Integrity

Section, of counsel, hereby files this sur-reply in opposition to the defendant's "Motion for Pre-Trial Release," ECF No. 585, (dated Aug. 9, 2023) (the "Motion for Reconsideration").[1]

## I.   INTRODUCTION

Mr. Gerace's Motion for Reconsideration fails at every juncture: jurisdictionally, procedurally, and on the merits.  Jurisdictionally, Mr. Gerace cannot have it both ways: he cannot, on the one hand, ask the Second Circuit to overturn the March 28th detention order and then, on the other, belatedly ask this Court to do the same before the appellate court has ruled.  Even if this Court were to acquire jurisdiction, the Motion for Reconsideration comes **106 days** too late.  And even if the Court were to overlook this inexplicable delay, the Motion falls on the merits.  Mr. Gerace's arguments offer little more than his "own evaluation of . . . the strength of the case against him"—an impermissible basis to reopen a detention hearing under the Bail Reform Act—and otherwise elide an extensive record detailing his dangerousness to the community and his serious risk of obstructing justice if released.  *United States v. Quinones*, No. 13 CR 83S, 2016 WL 1694998, at *1 (W.D.N.Y. Apr. 28, 2016).  Because no new event—and certainly not ███████ death—shows Mr. Gerace is less likely to pose a danger to the community, the Motion should be denied.

## II.   ANALYSIS

### 1.   The Court Lacks Jurisdiction to Consider the Motion for Reconsideration

---

[1]   The information contained in this sur-reply contains references to grand jury testimony and government witnesses whose identities are subject to a protective order.  The government will separately file a redacted motion on the public docket.

For the reasons outlined in the government's Jurisdictional Brief, the Court lacks jurisdiction to consider Mr. Gerace's untimely Motion for Reconsideration.  *See* Gov't's Jurisdictional Br., ECF No. 610, (dated Aug. 22, 2023) (the "Jurisdictional Brief").  To be sure, Mr. Gerace indicated his belief that the Second Circuit's dismissal of his appeal (at his behest) would moot the defect presently depriving this Court of jurisdiction.  *See* Mem. in Further Support of Mot. for Pre-Trial Release, ECF No. 631, (dated Sept. 21, 2023) (the "Second Reply Brief"); Decl. Mark. A. Foti at 3 ¶ 9; *see also United States v. Gerace*, No. 23-6392, Mot. Withdrawal of Appeal, at 4, ECF No. 29.1, (dated Sept. 20, 2023) (noting that, while not "conced[ing] the issue of jurisdiction," Mr. Gerace believes that the "dismissal of [his] appeal" would moot the government's jurisdictional challenge to his "mo[tion] for reconsideration of [his] detention").  Maybe.[2]  But until any such dismissal occurs, this Court lacks jurisdiction over the motion—and Mr. Gerace has failed to show otherwise.  *See Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996) (noting that the "burden of proving jurisdiction is on the party asserting it" (quoting *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994))).

---

[2]     Because the court has no "duty to follow" where the party championing jurisdiction "fails to lead," Mr. Gerace arguably waived any claim to jurisdiction in failing to respond to the government's jurisdictional challenge.  *Raley v. Hyundai Motor Co., Ltd.,* 642 F.3d 1271, 1275 (10th Cir. 2011); *see Herrick Co., Inc. v. SCS Comms., Inc.*, 251 F.3d 315, 324 (2d Cir. 2001) (noting that the obligation to prove jurisdiction extends to the party's "burden of persuasion"); *Am. Vantage Cos., Inc. v. Table Mountain Rancheria*, 292 F.3d 1091, 1101 (9th Cir. 2002) (Fisher, J.) (concluding that the party invoking jurisdiction "waived the issue" by failing to advance any theory in support of the court's jurisdiction); *Fothergill v. United States*, 566 F.3d 248, 251 (1st Cir. 2009) (Selya, J.) (noting that a party's failure to respond to a jurisdictional challenge resulted in the "forfeit[ure]" of any "argument in favor of . . . jurisdiction"); *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008) ("[A]rguments in favor of subject matter jurisdiction can be waived by inattention or deliberate choice"); *Glennborough Homeowners Assoc. v. U.S.P.S.*, 21 F.4th 410, 418 (6th Cir. 2021) (concluding that it is not the "role [of the courts] to 'conjure up' a plaintiff's [jurisdictional] theory when its complaint has not done the same" (quoting *Raley*, 642 F.3d at 1275)).

### 2. Even if the Court Acquires Jurisdiction, Mr. Gerace's Motion for Reconsideration and Second Reply Brief are Procedurally Defective

Any jurisdiction the Court might someday exercise affords Mr. Gerace little relief, as his Motion for Reconsideration comes 134 days after the Court issued its detention order— and **106** days too late. Moreover, despite being on notice of this defect, *see* Jurisdictional Br. at 5 (arguing that Mr. Gerace filed his Motion "long after Rule 59(e)'s 28-day deadline"), Mr. Gerace offered no response to the government's timeliness argument. The law suggests why: the Motion falls squarely outside the filing period. In that regard, Mr. Gerace's Second Reply Brief, which he tethered to his Motion for Reconsideration, is equally untimely and otherwise waived.

### a. The Motion for Reconsideration is Time-Barred

Consider, first, the relevant rules of federal procedure. Though the Federal Rules of Criminal Procedure do not expressly provide for reconsideration motions, such motions have traditionally been allowed within the Second Circuit. *See United States v. Clark*, 984 F.2d 31, 33 (2d Cir. 1993). Importantly, however, these motions "are governed by the standard applicable to the equivalent civil filing." *Spigelman v. United States*, No. 05 CR 960 (SAS), 2012 WL 13080639, at *1 (S.D.N.Y. Apr. 9, 2012) (quoting *United States v. Mills*, No. 3:11–cr–133, 2012 WL 75318, at *1 (D. Conn. Jan. 10, 2012)); *see Clark*, 984 F.2d at 32 (holding that the motion to reconsider the district court's federal sentence should be treated as a civil motion to alter or amend the judgment).

Here, Federal Rule of Civil Procedure 59(e) serves as the civil home of Mr. Gerace's Motion for Reconsideration.[3]  *See* FED. R. CIV. P. 59(e) (creating a motion to alter or amend a judgment).  Rule 59(e) instructs that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."  Therefore, because criminal motions for reconsideration are governed like their civil counterparts, Mr. Gerace had 28 days from the date of the Court's detention order to move for reconsideration.  *See Spigelman*, 2012 WL 13080639, at *1; *see also United States v. Yannotti*, 457 F.Supp.2d 385, 390 (S.D.N.Y. 2006) (concluding that, if a civil rule governing motions for reconsideration extends to the criminal contenx, "the entire Rule is applicable, including its time limit for filing").  The Court issued

---

[3]        As Mr. Gerace acknowledges, "[t]he Government has taken the position that" his Motion for Pre-Trial Release is, substantively, a "motion . . . for reconsideration."  Decl. Mark A. Foti, at 7 ¶ 23, (dated Sept. 20, 2023).  There should be no doubt that the government's position is correct—*i.e.*, that Mr. Gerace used a motion for reconsideration as the procedural vehicle to drive his arguments in favor of release.

First, in seeking reconsideration of the detention order, Mr. Gerace cited the standard governing motions for reconsideration in the first sentence of his argument.  *See* Mot. for Reconsideration, at 4, ECF No. 585-2, (dated Aug. 09, 2023) ("Reconsideration of a prior decision is generally only justified in one of the following three circumstances . . . ." (citing *Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)); *see Virgin Atlantic*, 956 F.2d at 1255 ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.").  By invoking—through counsel—the standard for reconsideration and expressly seeking reconsideration of the Court's detention order, "the substance of the motion made clear that [Mr. Gerace] sought relief" through a motion for reconsideration.  *Gonzalez v. Crosby*, 545 U.S. 524, 527 n.1 (2005); *see Kurian v. Forest Hills Hosp.*, 962 F.Supp.2d 460, 467 (E.D.N.Y. 2013) (noting that represented parties are not entitled to the liberal construction standards attendant to *pro se* filings).

Second, when moving to dismiss his pending appeal before the Second Circuit, Mr. Gerace acknowledged that he had "*moved for reconsideration* of [his] detention in the District Court."  *United States v. Gerace*, No. 23-6392, ECF No. 29.3 (Decl. Peter Gerace, Jr.) (dated Sept. 20, 2023) (emphasis added) (citing *United States v. Gerace*, 1:19-CR-227, ECF No. 585).  That is, Mr. Gerace's representations to the Second Circuit evidence his agreement with the government's "position" that his motion is indeed one "for reconsideration."  Decl. Mark A. Foti, at 7 ¶ 23, (dated Sept. 20, 2023).

the detention order on March 28, 2023.  *See* Order of Det., ECF No. 8, (dated March 28, 2023) (the "Detention Order").  Accordingly, Mr. Gerace had until April 25, 2023, to file his motion.  *See* Fed. R. Civ. P. 59(e).  Inexplicably, he waited to do so until August 9, 2023, and, even then, did not so much as attempt to excuse his untimeliness.

Not that an excuse could have benefitted him.  "The time for [moving for reconsideration under Rule 59(e)] . . . is short—28 days from entry of the judgment, *with no possibility of an extension*."  *Banister v. Davis*, 590 U.S. ----, 140 S. Ct. 1698, 1702 (2020) (emphasis added); *Dotson v. City of Syracuse*, 549 F. App'x 6, 7 (2d Cir. 2013) (unpublished) (noting that the 28-day timeline provided in Rule 59(e) "may not be enlarged by the district court" (citing Fed. R. Civ. P. 6(b)(2)); *see also* Fed. R. Civ. P. 6(b)(2) ("A court must not extend the time to act under Rules 50(b) and (d), 52(b), 59(b), (d), and (e), and 60(b).");  *Lichtenberg v. Besicorp Group Inc.*, 204 F.3d 397, 401 (2d Cir. 2000) (finding that Rule 6(b) denies the court the authority to extend the time for a Rule 59(e) motion).

And because Rule 59(e)'s deadline is equal parts short and strict, courts routinely deny even slightly tardy motions for reconsideration on timeliness grounds.  *See, e.g.*, *Baker v. Obama*, 1:22-CV-3125 (LTS), 2022 WL 3756541, at *1 (S.D.N.Y. Aug. 26, 2022) (denying Rule 59(e) motion that was "two days late[]" on timeliness grounds); *Yelle v. Mount St. Mary College*, 1:18-CV-10927 (PMH), 2021 WL 311213, at *3 (S.D.N.Y. Jan. 29, 2021) (concluding that a Rule 59(e) motion filed a month after the 28-day deadline was untimely); *cf. Bo Zhang v. Lucariello*, No. 12-CV-721-MJR, 2017 WL 3841382, at *2 (W.D.N.Y. Feb. 21, 2017) ("Because Zhang did not file his motion within the 28-day period set forth in Rule 59(e), [but, rather, several months later] his motion must be denied as untimely.").

This case merits a similar outcome.  As he explained to the Second Circuit, Mr. Gerace "moved for reconsideration."  *Gerace*, No. 23-6392, ECF No. 29.3, at 1 ¶ 5 (Decl. Peter Gerace, Jr.); Mot. for Reconsideration, ECF No. 585.  That Motion for Reconsideration (ECF No. 585) is untimely by a margin of **106** days.  Mr. Gerace has offered no argument to the contrary, and his "silence has legal significance because it surely waived" any argument that his Motion for Reconsideration was timely.  *City of New York v. Minetta*, 262 F.3d 169, 180 (2d Cir. 2001).  Regardless, both the federal rules and Supreme Court precedent foreclose any possibility of an extension.  *See* FED. R. CIV. P. 6(b)(2); *Davis*, 140 S. Ct. at 1702.   As such, the Motion should—and must—be denied.

> **b.    The Second Reply Brief Should Also Be Deemed Untimely and the Arguments Contained Therein Waived**

This conclusion applies with equal force to the Second Reply Brief, which Mr. Gerace filed in "further support" of the Motion for Reconsideration.  Following the appearance of new counsel, Mr. Gerace could have withdrawn his Motion for Reconsideration—which he now distances himself from—and filed a motion to reopen the detention hearing pursuant to 18 U.S.C. § 3142(f)(2)(B).  *See* Decl. Mark A. Foti, at 32–33 ¶¶ 128–34.  Or, if he continued to embrace the arguments raised in the Motion for Reconsideration, Mr. Gerace could have simply filed an additional motion to reopen.  He chose neither.

Instead, in contravention with Second Circuit precedent, Mr. Gerace used the Court's invitation to add "*more*" to *existing* arguments in a second reply brief to advance—over the course of 55 pages—an entirely *new* theory for release.  *See* Minute Entry, ECF No. 622, (dated Sept. 6, 2023) ("Defendant Gerace's *reply to his 585 Motion for Pretrial Release* is now due 9/20/2023." (emphasis added)); Tr. Status Conf., at 4 ("The Court: Okay, So, . . . your *reply*

is due on the 20th?" (emphasis added)); *Cf. id.* at 11 ("The Court: . . . I'm not going to deprive the defense of an opportunity to say something *more* when a new lawyer comes in." (emphasis added)).   And he did so after the government put him on notice that his Motion for Reconsideration is untimely.  *See, e.g.*, Jurisdictional Br. at 2, 6.

Of course, raising arguments for the first time in a reply brief is not only "manifestly unfair" to the opposing party who, absent a sur-reply, "has no opportunity for a written response," but also deprives the Court of "the benefit of the adversarial process."  *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019) (first quoting *Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007); and then quoting *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1278 (10th Cir. 1994)); *see also Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983).

But those bugs to the adversarial process are strategic features to advocates who seek to save their best arguments for last.  *Cf. Puckett v. United States*, 556 U.S. 129, 134 (2009).  So, to deter litigants from undermining, or attempting to undermine, the adversarial process, courts do not consider arguments raised for the first time in reply briefs—even if a sur-reply has been filed.  *See United States v. Davis*, No. 21-1486, 2023 WL 4582002, at *3 (2d Cir. July 18, 2023) ("Davis's attempt, in reply, to reframe his limitations argument as a sufficiency challenge is not properly before this court because it was not raised in his opening brief."); *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived."); *Moore v. Am. Fed'n of State, Cnty. & Mun. Emps. Loc. 1095*, No. 17-CV-704-LJV-MWP, 2022 WL 1497959, at *4 n.5 (W.D.N.Y. May 12, 2022) (disregarding an argument raised for the first time in a reply brief), *aff'd*, No. 22-1123-CV, 2023 WL 4145004 (2d Cir. June 23, 2023); *Mayer v. Neurological Surgery, P.C.*,

No. 15-CV-0864(DRH)(ARL), 2016 WL 347329, at *4 (E.D.N.Y. Jan. 28, 2016) (disregarding an argument raised for the first time even though opposing counsel was given leave to—and did—file a sur-reply).

In that regard, the Court should not reward Mr. Gerace's attempt to circumvent the adversarial process by cleaving his Second Reply Brief from his Motion for Reconsideration. Simply stated, Mr. Gerace chose to hitch his Second Reply Brief—wherein he raised an entirely new set of arguments—to the untimely Motion for Reconsideration, with no procedural guarantee that the government could respond. He should live with the consequences of that decision. The Motion for Reconsideration, inclusive of the Second Reply Brief, is untimely and should be denied. And even if the Motion for Reconsideration were not untimely, the arguments contained in the Second Reply Brief are waived *See* FED. R. CIV. P. 59(e), FED. R. CIV. P. 6(b)(2); *Davis*, 140 S. Ct. at 1702; *Yannotti*, 457 F.Supp.2d at 390.

### 3. Even if the Court Disregards the Underlying Motion's Untimeliness and Mr. Gerace's Waiver, the Arguments Contained in the Second Reply Brief Fail on the Merits

Finally, the arguments contained in the Second Reply Brief fail on the merits. Mr. Gerace principally contends that ███████ death "presents changed circumstances warranting re-opening of the detention hearing." Second Reply Br. at 4 (bold and capitalization omitted). But this argument is premised upon both an erroneous view of the law and the facts the Court previously considered in ordering Mr. Gerace detained. Because ███████ death does not lessen the likelihood that he poses a danger to the community, or a serious risk of obstructing justice, Mr. Gerace's efforts to reopen the detention hearing are unavailing on the merits.

A.      **Legal Standard**

Under the Bail Reform Act, a court has discretion to reopen a bail hearing if information comes to light that is both new and material to the detention question. Specifically, a "hearing" "may be reopened" if:

> the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

18 U.S.C. § 3142(f)(2)(B) (emphases added).[4]  Thus, a defendant must satisfy two necessary conditions before a judge can consider re-opening a detention hearing: he must identify (1) new information that is (2) material to his detention.  In that vein, new information—or material information—alone is insufficient to reopen a detention hearing.  *United States v. Maxwell*, 527 F.Supp.3d 659, 663 (S.D.N.Y. 2021).

Moreover, "[n]ew and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of his character or the strength of the case against him," and must be rooted in "truly changed circumstances, something unexpected, or a significant event," *United States v. Quinones*, No. 13 CR 83S, 2016 WL

---

[4]       Though he invokes § 3142(f)(b)(2), Mr. Gerace principally seeks a form of relief unauthorized by that subsection, namely that "the Court release Mr. Gerace on terms and conditions."  Second Reply Br. at 2.  But § 3142(f)(2)(B) does not authorize the Court to simply release Mr. Gerace.  Rather, the statute specifies that "[i]f the judicial officer finds" that the defendant has carried his burden in showing new, material information bearing on his risk of flight or dangerousness, he or she "may . . . reopen[]" "[t]he *hearing*."  18 U.S.C. § 3142(f)(2)(B) (emphasis added).  A hearing is a "judicial session, usu[ally] open to the public, held for the purpose of deciding issues of fact or of law, sometimes with witnesses testifying"—not an order granting release with conditions.  *Hearing*, BLACK'S LAW DICTIONARY, 11th Ed. (2019).  Thus, at this juncture, the primary relief Mr. Gerace seeks is simply beyond the scope of the Bail Reform Act section he invokes.

1694998, at *1 (W.D.N.Y. Apr. 28, 2016) (emphasis added) (quoting *United States v. Jerdine*, No. 08 CR 0481, 2009 WL 4906564, at *3 (N.D. Ohio Dec. 18, 2009)), that "increase the likelihood that the defendant will appear at trial" or "show that the defendant is less likely to pose a danger to the community." *United States v. Watson*, 475 F. App'x 598, 600 (6th Cir. 2012) (unpublished); *see United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *1 (6th Cir. May 21, 2020) (unpublished) ("Courts . . . requir[e] a showing of truly changed circumstances or a significant event.").

In other words, the defendant's evaluation of the strength of the government's case in chief is, as a matter of law, irrelevant to the Court's inquiry: only new information of a significant stature bearing on the defendant's dangerousness to the community or risk of flight may be considered. *See United States v. Schulte*, No. 21-3113, 2022 WL 1316210, at *2 (2d Cir. May 3, 2022) (concluding that reopening a bail hearing generally requires a finding that new information has a material bearing to risk of flight and dangerousness); *United States v. Sandals*, 9 F. App'x 377, 379 (6th Cir. 2001) (unpublished) (concluding that new "information had to be sufficiently material to the issue of dangerousness" "to justify the reopening of the detention hearing"); *Bothra*, 2019 WL 8883664, at *1 (concluding that the district court did not abuse its discretion where defendant-appellant's new information "ha[d] no bearing on . . . the danger his release may pose to the community"); *United States v. Cisneros*, 328 F.3d 610, 614 (10th Cir. 2003) (concluding that reopening a detention hearing "is permissible under this section only when there is new information that would materially influence the judgment about whether there are conditions of release which will reasonably assure that the defendant will not flee and will not harm any other person or the community."). And, even then, the "materiality inquiry" is not "untether[ed] . . . from those facts that the court found

consequential to its earlier detention decision." *United States v. Zhang*, 55 F.4th 141, 148 (2d Cir. 2022).

Furthermore, "[a] bail hearing should not be reopened on the basis of information that was available"—but unused—"to the defendant at the time of the [initial] hearing." *United States v. Esposito*, 354 F.Supp.3d 354, 358 (S.D.N.Y. 2019) (alteration original) (quoting *United States v. Lewis*, No. 16 CR 0212, 2016 WL 6902198, at \*2 (S.D.N.Y. Nov. 16, 2016)); *see also United States v. Dermen* (*Dermen I*), 779 F. App'x 497, 501 (10th Cir. 2019) (unpublished) (affirming the district court's denial of the defendant-appellant's "motion for a detention review" after determining that "there [was] no new information that was unavailable to him at the time of the detention hearing that would justify reopening it"); *United States v. Dermen* (*Dermen II*), 800 F. App'x 665, 669 (10th Cir. 2020) (unpublished) ("[T]he sole purpose of reopening a detention hearing is to give the moving party an opportunity to present evidence that was unavailable at the initial detention hearing."); *United States v. James*, No. 23-50044, 2023 WL 3300973, at \*1 (5th Cir. May 8, 2023) (unpublished) ("James has not established that this information is new or was unknown to him at the time of the previous detention hearing or why he could not have obtained it earlier.").  Stated otherwise, "information is not new if it could have been presented at the previous hearing." *Bothra*, 2019 WL 8883664, at \*1.

Regardless, a re-opened detention hearing is never guaranteed—even if a defendant satisfies these conditions.  *See Zhang*, 55 F.4th at 148. ("[E]ven if Zhang's arguments were otherwise correct, the district court could still decide, in its discretion, not to reopen the detention hearing."); *see also United States v. Schwamborn*, 249 F. App'x 906, 907 (2d Cir. 2007)

(unpublished sum. order) (concluding that the district court did not abuse its discretion "in refusing to reopen the bail hearing because the new evidence offered by Schwamborn is not reasonably likely to affect the outcome of the proceeding as multiple instances of threats remain unrebutted").

**B.**   **Mr. Gerace has not demonstrated a new, material change in circumstances under the Bail Reform Act**

As it relates to ▮▮▮▮▮▮ death, Mr. Gerace's argument boils down to the following proposition: a witness relevant to Mr. Gerace's third indictment—which charged three counts of witness tampering—is now dead, thereby weakening, in his view, the "weight of the evidence" against him and requiring his release. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

This argument is as backwards as it is brazen: it misapprehends the standard Mr. Gerace must satisfy for the Court to re-open the detention hearing and overlooks entire swaths of evidence relied on by the Court illustrating Mr. Gerace's dangerousness and serious risk of obstructionism.  Viewed through the proper legal prism, the facts of this case underscore that Mr. Gerace was—and is—both a danger to the community and a serious risk to the administration of justice.  Accordingly, should the Court reach the merits, it should still deny Mr. Gerace's Motion for Reconsideration.

**i.**   **Mr. Gerace's evaluation of the strength of the case against him is no basis to re-open the detention hearing**

The vast majority of Mr. Gerace's arguments violate a cardinal rule governing the reopening of detention hearings: the "defendant's own evaluation of . . . the strength of the case against him" cannot reopen a detention hearing.  *Quinones*, 2016 WL 1694998, at *1;

*Jerdine*, 2009 WL 4906564, at *3 (same); *United States v. Rodriguez-Adorno*, 606 F.Supp.2d 232, 239 (D.P.R. 2009) (concluding that "Congress intended new information [under § 3142(f)(2)(B)] to signify something other than a defendant's own evaluation of the strength of his case"); *United States v. Casillas Montero*, No. CR 22-437 (SCC-MDM), 2023 WL 2214325, at *5 (D.P.R. Feb. 24, 2023) (same); *United States v. Beutler*, No. 1:09-CR-00096-WMS-JJM-7, 2011 WL 3321374, at *2 (W.D.N.Y. Aug. 2, 2011) (McCarthy, M.J.) (same); *United States v. Trinidad-Rivera*, No. 11-CR-116S, 2012 WL 4033373, at *3 (W.D.N.Y. Sept. 12, 2012) (Scott, M.J.) (same); *United States v. Brown*, No. 10-CR-230S, 2012 WL 4103857, at *3 (W.D.N.Y. Sept. 17, 2012) (Scott, M.J.) (same); *United States v. Rivera*, No. 09-CR-619 (SJF), 2010 WL 1687069, at *3 (E.D.N.Y. Apr. 21, 2010) (same); *United States v. Meeks*, No. 10-20123, 2011 WL 4407448, at *4 (E.D. Mich. Sept. 22, 2011) (same); *United States v. Perozzi*, No. CRIM. 09CR117-16-SM, 2009 WL 2929292, at *1 (D.N.H. Sept. 9, 2009) (same).

That rule exists for good reason.  Congress, in crafting the Bail Reform Act, understood that "movant[s] may . . . (and usually will) become aware of new evidence as a result of discovery or investigation, and that evidence will almost certainly bear on the weight of the evidence and the nature of the charge factors considered during a detention review." *Beutler*, 2011 WL 3321374, at *2 (quoting *Rodriguez-Adorno*, 606 F.Supp.2d at 239). Nevertheless, it did not design the "§ 3142(f) hearing"—let alone the reopening process—"to serve either as a 'mini-trial . . . or as a discovery tool for the defendant." *United States v. Davis*, 845 F.2d 412, 415 (2d Cir. 1988) (second omission original) (quoting *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986)).

By construing § 3142(f)(B)(2)'s materiality requirement to preclude a defendant's argument regarding the strength of the government's case in chief, courts have ensured their focus remains trained on Congress's priorities—risk of flight and dangerousness—and thereby given effect to the legislature's intent.   Anything less would invite defendants to re-argue detention whenever the discovery process yielded evidence subject to a defense-favorable gloss, sewing inefficiency and imperiling public safety in the process.[5]   In that regard, enabling defendants to secure a new detention hearing by arguing "the strength of the case against" them would incentivize wrongdoers to obstruct the government's investigations by, for instance, intimidating witnesses upon whom a Grand Jury's probable cause determination might rest into not cooperating—or worse.   *Quinones*, 2016 WL 1694998, at *1.   These are the very kinds of "absurd results" contrary to congressional design that courts refuse to countenance, but that Mr. Gerace would have this Court embrace.[6]   *United States v. Scott*, 990 F.3d 94, 122 n.36 (2d Cir. 2021) (en banc).

---

[5]      Mr. Gerace cites the D.C. Circuit's opinion in *United States v. Peralta*, 849 F.2d 625 (D.C. Cir. 1988) in support of his contention that detention may be reopened based on *his* evaluation of the strength of the government's case in chief.   That question was never squarely before the court but, in any event, *Peralta* stands for no such thing.   There, the court of appeals affirmed the district court's decision to re-open a detention hearing following its denial of the defendant's motion to suppress, as the defendant "might be more inclined to flee following the adverse evidentiary ruling."   *Id.* at 626.   Thus, far from adopting Mr. Gerace's position, *Peralta* concerned the <u>court's</u> consideration of the defendant's flight risk vis-à-vis the evidence at the government's disposal to prove its case.   In other words, to the extent the strength of the government's case in chief was relevant for the purposes of reopening the detention hearing, that relevance was cabined to its relationship on the defendant's flight risk and dangerousness.   A defendant's estimation of evidentiary strength is not, in and of itself, a basis to reopen the detention hearing.   And in light of that principle, it is unsurprising that the Second Circuit, itself, "routinely denie[s] the prevailing defendant-appellant's application for bail pending retrial" even after *it* "ha[s] reversed a defendant's jury conviction and remanded [the case] to the district court for retrial."   *Cf. Schulte*, 2022 WL 1316210, at *2.

[6]      Mr. Gerace never indicates what burden he thinks this evidence against him fails to satisfy but, to the extent he is concerned about the strength of the government's

Indeed, throughout his Second Reply Brief, Mr. Gerace argues ███████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████      ████████████████████████████████████████████

████████████████████████████████▌████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

---

evidence at trial, the government notes that the detention hearing and trial burdens are not to be conflated.  *See United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988).

[7]      Mr. Gerace intimates that the government's investigation into ████████████████ is complete. ████████████████████████████████████████

████      The government emphasizes that the investigation is ongoing—and it notes that it has long been the law in the Second Circuit that a defendant forfeits his confrontation rights when he "engaged in conduct designed to prevent [a] witness from testifying."  *United States v. Vallee*, 304 F. App'x 916, 920 (2d Cir. 2008) (quoting *Giles v. California*, 554 U.S. 353, 359 (2008); *see also United States v. Dhinsa*, 243 F.3d 635, 653–54 (2d Cir. 2001).

Plainly, these arguments are rooted in the (misguided) notion that ▮▮▮▮▮▮ death saps the government's "case against [Mr. Gerace]" of its evidentiary "strength." *Quinones*, 2016 WL 1694998, at *1. Because they reflect nothing more than Mr. Gerace's "assessment of the strength of the case against him, based on his review of the pretrial discovery that he has received," the Second Reply Brief's arguments launch from a premise fundamentally at odds with the standard governing motions to re-open under §3142(f)(2)(B).[8] *Trinidad-Rivera*, 2012 WL 4033373, at *3; *see also Meeks*, 2011 WL 4407448, at *4 (noting that the defendant's own evaluation of the government's case "will inevitably evolve as discovery proceeds" but is irrelevant for the purposes of re-opening a hearing even when "intertwined with evidence of dangerousness in a case where the charges involve threats and agreements to commit violent acts"); *Brown*, 2012 WL 4103857, at *3 (rejecting defendant's argument that he should be released based on "his assessment of the strength of the witness-tampering allegations" made against him). Accordingly, Mr. Gerace's arguments should be rejected.

ii.   **The Court Previously Relied on Ample Evidence Unconnected to** ▮▮▮▮▮▮
     **in Detaining Mr. Gerace**

The undersigned could find no federal case in which a defendant with a history of witness intimidation facing three federal indictments—let alone one alleging sex trafficking

---

[8]     This conclusion applies with equal force to the other evidence Mr. Gerace contends merits the reopening of his detention hearing—i.e., ▮▮▮▮▮▮

▮▮▮▮▮▮

The Second Reply Brief makes clear that this information is only relevant insofar as it implicates an impermissible consideration under § 3142(f)(2)(B), namely the strength of the government's case. ▮▮▮▮▮▮ Moreover, much of this information was available to Mr. Gerace; he simply did not utilize it. *See Esposito*, 354 F.Supp.3d at 358.

and another alleging witness tampering—has secured pretrial release.  There is a reason for that.  The case for detaining Mr. Gerace was "easy" in March and is just as "easy" now. *United States v.* Gerace, 1:23-37, Tr. Arraignment Tran. at 44, (dated Mar. 24, 2023).  And Mr. Gerace's argument to the contrary fails to hold up.  The record belies his assertion that ███ ███████ testimony was "key to the Court's decision to remand" him.  Second Reply Br. at 3.[9] That is, ██████████ death is not "material to the question of whether [Mr. Gerace] should be released or detained"—at least in the way that he sees it—because any testimony she might have provided hardly "factored into [the Court's] original detention decision."  *Zhang*, 55 F.4th at 144.  As the government illustrated in its "detailed proffer," which it briefly recounts below, Mr. Gerace is dangerous, untrustworthy, and poses a serious risk of obstructing justice in multiple respects unconnected to ██████████.  *See* Detention Order at 3.

    First, in April 2019, an Amherst Police Department detective arrested ████████████ ██████, ██████████████████████████████████████ h.  Amherst Police Department ultimately contacted federal authorities, and ██████████ shared with federal law enforcement information related to Mr. Gerace and Pharoah's.  *See* Tr. Arraignment Tran. at 11–12, (dated Mar. 24,

---

[9]    The government notes that, at the time of Mr. Gerace's actual detention hearing, he did not view the evidence related to ██████████ with such significance.  Rather, in Mr. Gerace's telling, "the most serious allegation" evidencing his dangerous "had to do with what the Government had to say about . . . [his] ex-wife," ████████████████████████ ██████.  *See United States v.* Gerace, 1:23-37, Tr. Arraignment Tran. at 22, (dated Mar. 27, 2023).  Specifically, the government proffered a police report from 2013 in which "[a] witness told the police that this victim"—██████████████████████—had previously been hospitalized for unexplained injuries, and once "took off to Florida out of fear of being killed by the defendant," "had been repeatedly a victim of ongoing domestic abuse at the hands of Mr. Gerace for many years," and that, furthermore, "the defendant's seven-year-old-child at the time, sometimes g[ot] so nervous about his home life that he vomit[ed] when he ha[d] to return home."  Tr. Arraignment Tran. at 27–28.  That police report resulted in a conviction for assault in the 3rd degree.  *Id.* at 28.

2023).   Three months later, in July, a long-time Pharoah's employee and Gerace associate assaulted ▮▮▮▮▮▮ at a bar, and "made comments about [▮] speaking to the Feds."  *Id.* at 14.  Because "witness tampering is something that goes to the heart of the justice system," the detention hearing could have ended with this proffered fact, alone.  Tr. Arraignment Tran. at 34, (dated Mar. 27, 2023); *see United States v. Epstein*, 425 F.Supp.3d 306, 318 (S.D.N.Y. 2019) (noting that "a single incident of witness tampering has been a 'traditional ground for pretrial detention by the courts'" (quoting *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000))).   And there is reason to believe that Mr. Gerace directed or encouraged this assault given that other witnesses overheard him "describing [▮▮▮▮▮▮] . . . as a snitch."   Tr. Arraignment Tran. at 15, (dated Mar. 24, 2023).

Indeed, Mr. Gerace has a history of inspiring his associates to intimidate and threaten witnesses.  For instance, the government proffered that on November 19, 2019, shortly after a federal Grand Jury returned an Indictment referencing Mr. Gerace as Co-Conspirator 1, a witness—not ▮▮▮▮▮▮—provided her phone to convey a threatening message to ▮▮▮▮▮▮. The government read that message—not ▮▮▮▮▮▮ rendition of it—to the Court:

> **The government**:   The Facebook communication reads: "Hey, you ray ass bitch"—
> I believe that to be a typo, potentially.  Y is next to T on a
> keyboard.  "It," and then name, "I'm good to G"—should be
> "good to go."  "See you, and when I do, well, use your
> imagination, bitch, you *snitch* junkie cunt.  You are a fucking
> funny cunt.  You do whatever for drugs.  In feeling"—should be
> "I'm feeling"—insert name of second female Gerace associate,
> "in on how much of a scum bag you are.  But if you want to *claim
> Peter's home like you deserve it*, bitch.  You deserve nothing, you
> nasty cunt.  Learn how to be a mother, because your husband
> was just at my place filling me in how my"—it says, "H of a
> pull."  I believe it should be, "pill head junkie you are."  "Too
> bad you couldn't take"—insert name of second Gerace female
> associate—"down.  Oops.  She is too smart because you're the

> biggest piece of shit I've ever met.  That why"—insert name of another female—"was fucking your husband and being mother to your daughter, you junkie ass pond scum.  Plan on nothing. *Peter knows better*, you fucking nut.  Girl, H"—should be U.  U and H are next to each other on a keyboard—"Girl, you don't want to fuck with me.  You know how I get down.  I hope *you fucking his, cunt*."  And then there are some typos.  It talks about shampoo, and then the last line is: "Ha ha, you are a joke.  Go kill yourself, you dirty cum guzzling whore."

Tr. Arraignment Tran. at 16–17 (emphases added).  As we relayed to the Court then, this message—replete as it was with references to Mr. Gerace—"scare[d] [█████████]," who "was very familiar with Pharaoh's; very familiar with [Mr.] Gerace; very familiar with his associates; very familiar with the people that run his club, and the biker gang that he employs at his club."  *Id.* at 17.

Mr. Gerace makes much of the fact that he did not personally send the Facebook message (and is conspicuously silent with regards to his employee's assault of █████████).  ███████ ██████████████████████  But intimidating witnesses through associates is no defense.  *See, e.g.*, *United States v. Gotti*, 794 F.2d 773, 778 (2d Cir. 1986) (noting, in affirming the district court's decision to deny the defendant bail, that the "evidence tended to show that [Mr.] Gotti *or persons acting in concert with him* did threaten [a] witness" by giving him "a kick in the ass" as a "warning not to testify" (emphasis added)); *Epstein*, 425 F.Supp.3d at 317 (noting that the defendant's "representative . . . intimidated, threatened, and/or made payments to potential witnesses").  And, in reviewing the evidence in its totality, the Court had—and has—ample reason to infer that Mr. Gerace's associates assaulted and intimidated witnesses at his behest. *Cf. Gotti*, 794 F.2d at 778–79 ("Appellant points out that some items of evidence might support contrary inferences.  For example, he argues, the members of the Gambino family who

threatened [the witness] may not have been acting at [Mr.] Gotti's direction.  There is nothing
to show, however, that the inferences the district court did draw from the evidence were
clearly erroneous, or even implausible.").

Bracketing his associates' conduct from the picture, Mr. Gerace's own obstructionist
actions were also sufficient to detain him.  Specifically, Mr. Gerace sued ███████ in state
court for slander—for "provid[ing] false information to the FBI"—to punish ██ past (and
prevent any future) cooperation.[10]  Tr. Arraignment Tran. at 17.; *see also* Gov't's Resp. at 14
(noting that Mr. Gerace's civil suit came after law enforcement executed federal search
warrants at PGC and Mr. Gerace's residence).  This effort to "harm . . . the integrity of [ ]
criminal proceedings" by intimidating "two individuals" who he "believe[d] [to be] witnesses
. . . against him," was nothing short of "extraordinary."  *United States v. Gerace*, No. 21-2419,
2023 WL 3243477, at *2, *1 (2d Cir. May 4, 2023) (unpublished).  As the government noted
in its proffer, this action, itself, could expose Mr. Gerace to additional criminal liability.  *See*
Tr. Arraignment Tran. at 18; *see United States v. Camick*, 796 F.3d 1206, 1221 (10th Cir. 2015)
(affirming a defendant's conviction for obstruction of justice after he filed a civil lawsuit
against a former romantic partner).  *See* Tr. Arraignment Tran. at 34, (dated Mar. 27, 2023)
("I note that witness tampering is something that goes to the heart of the justice system.")
(Sinatra, J.).

In any event, this "extraordinary" conduct, *Gerace*, 2023 WL 3243477, at *1, was
emboldened by Mr. Gerace's long history of abusing legal process—and authority—to

---

[10]    Mr. Gerace also sued another one of his former wives, who was legally
disadvantaged by Mr. Gerace's relationship with a New York state Supreme Court judge.

"improperly disadvantage those [he] perceived as being against him," *See United States v. Gerace*, 1:23-37, Tr. Arraignment Tran. at 33, (dated Mar. 27, 2023) (Sinatra, J.).   For instance, the Amherst Police Department detective who arrested ███████ was "the same detective who made multiple arrests of Mr. Gerace's ex-wife."   Tr. Arraignment Tran. at 12, (dated Mar. 24, 2023).  Mr. Gerace maintained a personal relationship with this detective— evidenced by text messages the government read into the record—and leveraged that relationship "to have . . . witnesses in this case" arrested.  *Id.* at 13.

This reach extended past the law enforcement arms of government.  As proffered, Mr. Gerace's close relationship with a former state Supreme Court judge, who was one of his "customers" for "high-end prostitution," benefitted him in his legal affairs.   *Id.* at 21. Consider the government's proffer regarding the state's investigation into Mr. Gerace:

> In 2015, the New York State Police received information that prostitution and narcotic activity was taking place at Pharoaoh's, and they began undercover operations there, where they purchased cocaine inside of Pharoah's in January of 2015.  The Erie County DA's office at the time, surely unaware of the relationship between Judge Michalski and [Mr.] Gerace, actually went to Judge Michalski to get a protective order to not disclose the names of identifying witnesses in the case until trial of one of the dancers who sold drugs.  [Judge] Michalski . . . didn't recuse, signed the order.  And then ultimately, that case went nowhere.

*Id.* at 22.  Mr. Gerace also leveraged his relationship with Judge Michalski to interfere in custody matters related to one of his ex-wives, and criminal matters involving another ex-wife, whom text messages showed Judge Michalski mocked to Mr. Gerace, and whom Mr. Gerace repeatedly had arrested.  *See id.* at 22–24.  None of this evidence implicates ███████, rendering ███ death wholly immaterial to the issue of Mr. Gerace's dangerousness or risk of obstructing justice.

There is more still. Combined with his associates' efforts to physically harm and harass victims, Mr. Gerace's exploitation of "vulnerable women" offered grounds for detention. *United States v. Baker*, 349 F.Supp.3d 1113, 1135 (D.N.M. 2018) (where defendant was alleged to specifically target "vulnerable women" and where he attempted to contact an alleged victim, finding that the defendant "would be a danger to society if released"); *see also Epstein*, 425 F.Supp.3d at 315 (favorably citing *Baker*). In particular, the government discussed at length that Mr. Gerace grooms young victims with drugs and then leverages their addictions to the drugs he supplies for sex. One victim—who "began [working] at Pharoah's as an 18-year-old and . . . . [w]ithin two months . . . was addicted to cocaine and heroin"— described "having sex in exchange for drugs and money[] with [Mr.] Gerace." Tr. Arraignment Tran. at 19–20. Make no mistake, this grooming had an obstructionist valence, too, because Mr. Gerace crafted the impression that no one would hold him accountable by "bragg[ing] to witnesses that he ha[d] contacts in every local police department," and knew "political figures." *Id.* at 12. And that image, as discussed *supra*, was not entirely unfounded given that Judge ████ would text Mr. Gerace, "Let's get some pussy," *id.* at 19, made references to procuring sexual services from the women working under Mr. Gerace, and intervened in Mr. Gerace's legal affairs.

To the extent Mr. Gerace tried to explain away the evidence implicating his dangerousness and tendency to obstruct justice, the Court had little reason to credit his excuses. After all, Mr. Gerace fraudulently procured a $2 million federal loan while under federal indictment by falsely attesting that Pharoah's, a strip club, (1) "does not present live performances of a prurient sexual nature . . . or derive[] directly or indirectly more than de minimis gross revenue through the sales of products or services, or the presentation of any

depictions or displays of a prurient sexual nature," (2) that Pharoah's was not "engaged in illegal activity," and (3) that he had never "been convicted, plead guilty, pled nolo contendere, been placed on pretrial diver[sion], or been placed on any form of parole or probation." Tr. Arraignment Tran. at 7–8, (dated Mar. 27, 2023); *see generally id.* at 7–12.

Unsurprisingly, the Court cited all these facts in elucidating its decision to detain Mr. Gerace.  As the Court explained:

> [A] major focus for me is how I'm to weigh Mr. Gerace's compliance with conditions in the 19-CR-227 case, on the one hand, with several items to . . . counter . . . and stand in the face of that; and things like the new detail that I've heard from Mr. Tripi surrounding the Facebook incident, which resulted in the three counts of indicted conduct related to the Facebook incident in this case, including the corroboration of those details.[11]
>
> Also new to me is the Government's proffer about Mr. Gerace referring to the victim witness as a snitch prior to the November 19, 2019 alleged conduct, and in real time as well.
>
> I still have some concerns as well about the Government's proffer about Mr. Gerace's apparent willingness to use his contacts in the legal system to improperly disadvantage those perceived as being against him.  And there, in part, I'm concerned about the Michalski incident, also, as well as the Amherst Police Department detective incident that I heard about on Friday as well.
>
> The cocaine and drug supplying and prostitution items aren't good facts either.

---

[11]     The government has reason to believe that Mr. Gerace did not comply with the conditions of his pre-trial release.  The government notes that the Order Setting Conditions of Release explicitly instructed him to "[a]void all contact, directly or indirectly, with any persons who are or who may become a victim *or potential witness* in the subject investigation or prosecution."  *United States v. Gerace*, 1:19-CR-227, ECF No. 105, (dated Mar. 19, 2021) (emphasis added). ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████.

The loan application issues, at a minimum, present recent untrustworthy activity from June, 2020 and July, 2021. Some of that activity after the releases in the 19-CR case. And in particular, noteworthy is the denial of prior convictions and [the] current indictment, among other items on those applications.

I also note that—and I don't know if I need to note that, but I note that witness tampering is something that goes to the heart of the justice system. And I think that's something that, at a minimum, the *LaFontaine* case accounts for and speaks to.

Taking into account all of the G factors, including defendant's past conduct and how it relates to the safety of witnesses in this case and the safety of witnesses in the 19-CR case, I note that defendant's record of compliance is sufficient to rebut the presumption in section E-3.

Nevertheless, I find by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person in the community, especially vis-à-vis witnesses against Mr. Gerace.

*Id.* at 33–34.

This review of the evidence confirms what the Court already knows: ███████████ ████████ was not ████████████████████████████████████ ████████████████ The Court detained Mr. Gerace because his employee physically assaulted a witness to punish her cooperation with federal law enforcement; because he, himself, referred to witnesses in this case as snitches; because he attempted to silence a witness through civil legal process; because he has long leveraged his relationships with compromised legal actors—law enforcement and otherwise—to protect himself and punish those he views as threats; and because Mr. Gerace has done all of this to evade accountability for, among other things, his sexual exploitation of vulnerable young women. In view of all this evidence, Mr. Gerace cannot credibly claim that ████████████ statements serve as the lynchpin to the Court's decision to detain him—and he certainly cannot show that ███ death makes him materially

"less likely to pose a danger to the community." *Watson*, 475 F. App'x at 600; *Cf. Schulte*, 2022 WL 1316210, at *2.

  **C.**  **Even if ▮▮▮▮▮ death qualifies as a new, material change under the Bail Reform Act, the Court should exercise its discretion against re-opening the detention hearing.**

  Finally, even if ▮▮▮▮▮ death qualifies as a new, material change in circumstances under § 3142(f)(2)(B), the Court should nevertheless exercise its discretion against re-opening the detention hearing. *See Zhang*, 55 F.4th at 148 (emphasizing that, under the Bail Reform Act, the district court's power to reopen the detention hearing is discretionary). A second detention hearing is not "untether[ed] . . . from those facts that the court found consequential to its earlier detention decision," and since the March 24th and 27th detention hearing, the case in favor of Mr. Gerace's detention has only grown stronger. *Id.*

  As detailed in the government's initial response brief, ▮▮▮▮▮ reported to the FBI that dead rats were placed ▮▮▮▮▮ and ▮▮▮▮▮ vehicles and, weeks before ▮▮ ▮▮▮▮ was found dead, another witness observed Mr. Gerace stating that "all snitches should die!" Gov't Resp. Br. at 21. If the Court re-opened the detention hearing, the government would proffer this statement, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮, additional information regarding threats and risks to witnesses in this case, and is prepared to argue that the U.S. Probation Office's prior supervision of Mr. Gerace was not fulsome enough to adequately inform its assessment of his compliance.[12] The undersigned knows of no case in

---

[12]   The U.S. Probation Office's supervision of Mr. Gerace commenced on March 3, 2021, and continued until he was detained on March 24, 2023, for a total of 751 days. During this period, Probation required Mr. Gerace to submit to drug testing only ten times, or 1.33% of the days he was under supervision. Probation visited him at home only twenty-two times, or 2.92% of the days Mr. Gerace was under supervision. Most concerningly,

which a detained defendant, with a history of obstructionism and an existing finding of

dangerousness, secured pre-trial release under such circumstances.   The case for detention

was "easy" before, and it is only easier now.   Tr. Arraignment Tran. at 44, (dated Mar. 24,

2023).

DATED:   Buffalo, New York, October 5, 2023.


TRINI E. ROSS
United States Attorney


BY:   s/CASEY L. CHALBECK
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5881
Casey.Chalbeck@usdoj.gov

BY:   s/JOSEPH M. TRIPI
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716/843-5839
Joseph.Tripi@usdoj.gov

---

Probation conducted no drug testing on Mr. Gerace for **eight months** (from January 9, 2022, through August 30, 2022), no alcohol testing for seventeen months (from April 5, 2021, through September 6, 2022), and no drug testing for nearly another five months (from October 11, 2022, through March 8, 2023).   Other defendants are subject to far more scrutiny.