IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

              v.                                      19-CR-227-JLS

JOSEPH BONGIOVANNI,
PETER GERACE, JR.,

                     Defendants.
_____

UNITED STATES OF AMERICA,

              v.                                      23-CR-37-JLS-MJR

PETER GERACE, JR.,

                     Defendant
_____

## GOVERNMENT'S CONSOLIDATED REPLY TO THE DEFENDANTS' OPPOSITION TO THE GOVERNMENT'S MOTION FOR AN INTRADISTRICT TRANSFER

**THE UNITED STATES OF AMERICA**, by and through its attorney, Trini E. Ross, United States Attorney for the Western District of New York, Joseph M. Tripi, Nicholas T. Cooper, Casey L. Chalbeck, Assistant United States Attorneys, Corey R. Amundson, Chief, United States Department of Justice, Public Integrity Section, and Jordan Dickson, Trial Attorney, United States Department of Justice, Public Integrity Section, of counsel, hereby replies to the defendants' responses in opposition to the government's motion to transfer this case to Rochester pursuant to Rule 18 of the Federal Rules of Criminal Procedure, and Rule 7 of the Local Rules of Criminal Procedure.

## ARGUMENT

In opposing the motion for intra-district transfer, the defendants claim that the government failed to apply the correct legal standard; the trial must occur in the Buffalo division to comply with their Sixth Amendment rights; the facts and circumstances of this case do not merit such a transfer; and, finally, because the distance and expense associated with travel to Rochester would prejudice the defendants. These arguments lack merit, fail to consider the realities of this case, and ignore the weighty witness tampering, safety, security, and judicial efficiency considerations described by the government in its motion and sealed supplement in support of an intra-district transfer. *See* ECF Nos. 619, 623.

Under the factors prescribed by Federal Rule of Criminal Procedure 18, the Court should transfer this case to the Rochester division: the security and convenience of victims and witnesses, as well as the administration of justice in this extraordinary case, outweigh the minimal inconvenience travel to Rochester would impose on the defendants.

## I.   LEGAL FRAMEWORK

The Court has the authority to transfer this case to Rochester. Through a combined forty-two pages of briefing (*see* ECF Nos. 645 and 646) the defendants failed to cite a single case or rule supporting their contention that the Court lacks the power to move this case to Rochester, New York. That is because the Court's power is undebatable under the Federal and Local Rules of Criminal Procedure, as well as the caselaw interpreting them.

Consider first Rule 18 of the Federal Rule of Criminal Procedure, which provides:

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in the district where the offense was committed.

> The court must set the place *within* the district with due regard for the convenience of the defendant, *any victim*, and the *witnesses*, and the *prompt administration of justice.*

(Emphases added.)

Consistent with the foregoing, Rule 7 of the Local Rules of Criminal Procedure provides:

> Upon filing of the indictment or information, each criminal case is assigned to a Judge in either Buffalo (typically, cases arising in Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans and Wyoming counties), or Rochester (typically, cases arising in Chemung, Livingston, Monroe, Ontario, Schuyler, Seneca, Steuben, Wayne and Yates counties). The assignment within these areas shall ordinarily be by random selection.  *The Court may transfer cases within the District*, *sua sponte*. Parties requesting transfer of a case from Buffalo to Rochester, or vice versa, shall file a written motion requesting such relief, returnable before the Judge to whom the case is originally assigned.

W.D.N.Y. LOCAL R. CRIM. P. 7 (first emphasis added).

Under these provisions, not only may the Court transfer this case to another division within the district, but it may do so either *sua sponte* or upon a party's motion.

There is no doubt that these rules are constitutional.  The Sixth Amendment instructs that the defendant shall have the right to a trial "by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law. . . ."  U.S. CONST. amend. VI.   By contrast, "[t]here is no constitutional right to trial within a particular judicial division."  *United States v. Florence*, 456 F.2d 46, 50 (4th Cir. 1972); *see also* C. WRIGHT & A. MILLER, 2 FEDERAL PRACTICE AND PROCEDURE § 305 (4th ed.) ("[I]t is clear that there is no constitutional right to trial within a division.").

As both the Advisory Committee and the judiciary have recognized, Rule 18 and its local analog speak where the Sixth Amendment is silent.  In that vein, Rule 18 articulates clearly the Court's power to move cases with a given district's divisions and the factors it must weigh— "regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice"—before doing so.  *See* FED. R. CRIM. P. 18, Advisory Committee Notes to 1966 amendment (collecting cases); *see also United States v. Jenkins*, No. 19-2778-CR, 2022 WL 3138879, at *6 (2d Cir. Aug. 5, 2022) (recognizing that Rule 18 permits intra-district transfers), *cert. denied*, 143 S. Ct. 533 (2022); *United States v. Livoti*, 8 F.Supp.2d 246, 248 (S.D.N.Y. 1998) (same); *see generally United States v. Nyah*, 35 F.4th 1100, 1106–07 (8th Cir. 2022) (same); *United States v. Alvarez*, 561 F. App'x 375, 381 (5th Cir. 2014) (unpublished) ("Federal Rule of Criminal Procedure 18 governs intradistrict transfers[.]"); *United States v. Florence*, 456 F.2d 46, 50 (4th Cir. 1972) ("Of course, present Rule 18 permits a transfer within the district for the convenience of the defendant and the witnesses." (internal quotations omitted)).

Notably, Rule 18 does place special weight on any one of the four factors but, rather, offers the court "substantial discretion to balance any competing interests." FED. R. CRIM. P. 18.  And, in keeping with that discretion, the procedural history, facts of the case, and the case's context serve as logical reference points in the transfer analysis, especially where, as here, the Court's denial of the motion for a gag order heightens the need for alternative measures to ensure the fair and safe administration of justice.  *See In re App. of Dow Jones & Co.*, 842 F.2d 603, 611 (2d Cir. 1988) (explaining that before imposing gag orders, courts are tasked with determining whether "other available remedies would effectively mitigate . . . prejudicial publicity" and noting that "mitigating measures . . . include change of venue").

## II.    ANALYSIS

Based upon the materials previously submitted by the government (*see* ECF Nos. 619, 623 [under seal]), and further described *infra*, this is the unique case where the Court should grant the government's motion and should transfer the trial of this case to Rochester, New York.  More specifically, three of Rule 18's four factors militate heavily in favor of transferring this case to Rochester, and the fourth—convenience to the defendant—is neutral at best. Convenience, safety, and security for victims and witnesses, alike, as well as the administration of justice strongly weigh in favor of the motion for intra-district transfer. Defendants' minimal inconvenience, by contrast, is insufficient to negate the benefits a transfer would ensure.

### A.    The Victims

Moving this case to Rochester would bring much needed safety and convenience to the victims testifying in this case—a consideration defendants' briefing entirely overlooks. This case has numerous victims, including several whom defendant Gerace employed as dancers at Pharaoh's Gentleman's Club ("PGC").   Defendant Gerace, along with his associates, groomed these vulnerable and drug-addicted women into a life a daily drug use and, using coercion and manipulation, subjected them into engaging in commercial sex acts. Understandably, several of these victims are nervous and scared, and all of them are anxious about publicly recounting—to significant media attention—the deeply personal ways in which defendant Gerace and his associates used their bodies to satisfy the sexual desires of well-paying older men who patronized PGC, other influential men aligned with Gerace, and Gerace himself.  The testimony will be embarrassing and, if the trial is held in Buffalo, the

(already intense) media coverage will be extensive, exacerbating the indignities these victims have already suffered.[1]

While the government understands that the media has a First Amendment right to cover this case, it also has an obligation to point out the obvious—that the continuous reporting about every development in this case has the potential to endanger victims and witnesses.  Since January 2023, when the government began producing 3500 materials to the defense, acts of witness tampering have increased.  Individuals who would seek to tamper with or retaliate against witnesses or victims monitor the news and react accordingly.

For example, the news printed a mugshot and name of a young woman whose identity is not subject to disclosure pursuant to the Protective Order (*see* ECF No. 347) governing this case.  The front-page article reporting her *misdemeanor drug charges* included her mugshot photo and cited "sources familiar with the case" who stated that she is "expected to testify as a government witness at Gerace's upcoming trial."  *See* ECF No. 619-1.[2]  Following that article's publication, a dead rat was placed in the driveway of a relative of that individual (the second incident involving dead rats placed at a residence associated with a potential government witness).  In Buffalo, anonymous sources with access to information, either directly or indirectly, and ready access to reporters could continue to hide behind the First

---

[1] The Court has ordered the identities of these victim women protected.  *See* ECF No. 347.  However, in an effort to be helpful and to aid the defendants and their trial preparations, the government has provided 3500 material and the names of most of its witnesses to the defense under a Protective Order.  Unfortunately, despite the existence of the Protective Order, witnesses have been subjected to witness tampering and other pressures.

[2] The government is unaware of many, if any, *misdemeanor* federal drug cases that have been similarly featured in the Buffalo News.

Amendment rights of the reporters to anonymously leak information to the media.  If past is prologue, such activity will continue and fuel additional acts of witness tampering.  Conversely, there has not been any identifiable media coverage by the Democrat and Chronicle, which is the leading news publication in Rochester, New York.

Though the government raised them in its motion and sealed supplement regarding witness tampering and courtroom security in Buffalo, New York, the defendants' responses ignored these concerns.  Worse, despite having access to sealed filings and 3500 materials specifically identifying the threats posed by the Outlaws MC and the concerns raised by the witnesses, the defendants claim ignorance.  Moreover, the defendants fail to grapple with the fact that the Outlaws MC are employed at PGC and are specifically referenced in the Second Superseding Indictment.  The defendants apparently invite the stressors that impacted the quality and veracity of nervous and scared witnesses that impacted the Kingsmen trial on a daily basis.  Indeed, the defense posits that the concerns identified by the government "are no different than ones experienced by every federal criminal practitioner in this district."  *See* ECF No. 645, at 16.  This is plain wrong.

The lead prosecutor in this case has prosecuted, supervised, or helped to supervise virtually every gang-related homicide prosecution in the Buffalo part of the district since 2008.[3]  None of those cases involved corrupt members of federal law enforcement, or a

---

[3]  The list of cases include: the 10th Street Gang RICO/Murder case, the 7th Street Gang RICO/Murder case, the BFL/CBL RICO/Murder case, the Kingsmen Motorcycle Club RICO/Murder case; *United States v. Thamud Eldridge, et al.*, 09-CR-329-RJA; and *United States v. Misael Montalvo et al.,* 11-CR-366-RJA.  The government's research via a Google News search, discussed *infra*, suggests that this case has had more media coverage in Buffalo than all of these other referenced cases combined.

member the judiciary, including a DEA agent and a New York State Supreme Court Judge. None of those cases impacted the interests of what law enforcement have identified as transnational criminal organizations, such as the Outlaws MC, with a stronghold in the Buffalo area. None of those cases had the same level of concerns with regard to witness tampering and courtroom security. None of those cases involved a defendant, like Gerace, who has bragged about being in the mafia, being untouchable, and that he has extensive reach and the ability to have others tie up his loose ends. Indeed, in its brief exposure to this case in a different context, the Second Circuit has referred to circumstances present in this case as "extraordinary" and in granting an injunction of Gerace's civil lawsuit designed to intimidate and harass potential government witnesses further stated, "this is exactly the type of case— where a criminal enterprise thrives off of gathering and using confidential law enforcement intelligence—that merits the relief granted by the district court. *United States v. Gerace*, No. 21-2419, 2023 WL 3243477, at *2 (2d Cir. May 4, 2023).

The defendant's response to the mountain of witness safety and security concerns identified by the government amount to an edict to the government to "just deal with it." However, just because in other contexts and in past cases the government has been able to "deal with it," does not mean it was right then and it does not mean that the government— or the victims and witnesses—should just have to just "deal with it" now.

Witness tampering, and the safety issues it generates, frustrates one of the trial processes' core aims—the search for truth—and thus poses a "threat to the integrity of the trial process," itself. *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000). Nothing about the witness tampering and security concerns raised by the government should sloughed

off, minimized, or need to be dealt with if a simple intra-district transfer will significantly ameliorate the concerns.  Victims should be able to testify at trial without the constant worry of retaliation—that is more likely to happen in Rochester where individuals who would seek to threaten any victims or witnesses and stare them down in the courtroom will need to travel to do so, and where it is less likely their photos and testimony will be covered by the media on a daily basis and in real time.

Moreover, Rule 18's consideration of the victim's interests runs parallel to, and are consistent with, the considerations animating the Crime Victims' Rights Act ("CVRA"). Under the CVRA a crime victim has "the right to be treated with fairness and with respect for the victims' dignity and privacy."  18 U.S.C. § 3771(a)(8).  Courts are tasked with enforcing victim rights under the CVRA.  Indeed, "the Senate sponsors of the law were clear in their articulation of the overall import of the provision: to promote a liberal reading of the statute in favor of interpretations that promote victims' interest in fairness, respect, and dignity. 'It is not the intent of this bill that its significance be whittled down or marginalized by the courts or the executive branch. This legislation is meant to correct, not continue, the legacy of the poor treatment of crime victims in the criminal process.' *See* Senate Debate at S4269 (statement of Sen. Feinstein)."  *United States v. Turner*, 367 F. Supp. 2d 319, 335 (E.D.N.Y. 2005) (punctuation modified).

Although the CVRA does not guide the Court's Rule 18 analysis,[4] the Court should not cast aside the fact that a Rochester trial, as opposed to a Buffalo trial, will enable will

---

[4] *United States v. Jahani*, No. 1:11-CR-00302-CMA, 2012 WL 6107097, at *1 (D. Colo. Dec. 10, 2012) (the CVRA does not guide the analysis under Rule 18).

protect the privacy and dignity of Gerace's victims.  Specifically, removing the trial from the location where the media spotlight is most intense will allow them to testify with less fear and anxiety.  Indeed, some of the victims still reside in the Buffalo area and, if they are forced to relive their victimization by reading or hearing about it in the media after they testify, they will be revictimized.  Additionally, it is anticipated that several of the victims will be temporarily housed and transported to court by the FBI and, as a result, a trial in Rochester is not inconvenient.  In sum, the CVRA's protection of the victims' right to be treated with fairness and with respect for their dignity and privacy is congruent with Rule 18's edict that the court must set the place *within* the district with due regard for the convenience of […] *any victim*[.]"  *See* FED. R. CRIM. P. 18.

## B.    The Witnesses

The defendants also fail to acknowledge that Rule 18 requires the Court to consider the convenience of the witnesses.  The government's arguments with respect to the victims applies with equal force to the witnesses.  Witnesses against the defendants face the same tampering and safety concerns, which are highlighted by the media coverage (*see* ECF No. 619-1).  Additionally, there are a fair number of civilian witnesses for whom travel to Rochester is no less inconvenient than travel to Buffalo.  In that vein, government witnesses will travel from other states and, in some instances, from towns and counties closer to Rochester.

In terms of convenience of the witnesses and safety and security, several of the government witnesses will be former confidential informants of Bongiovanni's.  These individuals should be permitted to testify in a public courtroom in Rochester, where they are

unknown, as opposed to Buffalo where they were—at one time—confidential informants. Additionally, there will be testimony and reference to Buffalo area investigations, names of witnesses and informants, and other information that Bongiovanni allegedly provided to drug traffickers and IOC members and associates. A location where there is less media coverage will be safer, and thus convenient for the witnesses.

### C.    The Administration of Justice

In light of the nature and factual context of this case, Rule 18's "administration of justice" factor likewise weighs in favor of a transfer to Rochester for three reasons. First, significant media coverage threatens to undermine the trial's fundamental fairness by prejudicing the Buffalo-based jury venire. Second, and as defendants' own briefing makes plain, a Buffalo-based jury is more likely to have developed an assessment of this case's merits based on extrajudicial information. But our law is clear: the Constitution does not guarantee a right to be tried by a jury that "appreciat[es] the import of a public figure in the Western New York region," Def.'s Mem. in Opp. to Gov't's Mot. for Intradistrict Transfer, at 17, ECF No. 646 (dated Oct. 10, 2023), but, rather, "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Third, and in keeping with these principles, a transfer to Rochester will prevent the very kind of jury nullification that defendants appear to invite in seeking a jury biased in their favor.

### 1.    The Nature of the Allegations and Facts of this Case

This is an extraordinary case. This case marks the first time in the history of the Western District of New York that a Drug Enforcement Agency ("DEA") Special Agent ("SA") has been charged with bribery and corruption for accepting protection bribes from

drug dealers and organized crime members and associates, including defendant Gerace. Moreover, the case also involves a sex trafficking conspiracy through force, fraud, and coercion in which drug addicted dancers engaged in commercial sex acts as a result of exploitation of their drug addiction and through other coercive and control measures. It is anticipated that the evidence will establish that the criminal conduct at PGC occurred and persisted, in part, because of protection Bongiovanni provided in exchange for bribes. Furthermore, such conduct was integrally related with Gerace's connections with certain high-profile individuals, attorneys, other members or law enforcement, the judiciary, and others in the Buffalo area.

For example, during the course of this case and related investigation, a sitting New York State Supreme Court Judge was implicated in the conduct, his residence was searched by the FBI, and he committed suicide after the FBI searched his residence. *See* ECF. No. 441. Additionally, as referenced by the government and argued at length during detention hearings, victims and witnesses in this case have reported multiple instances of witness tampering activity, and one federal witness died after she signed a cooperation agreement with the government.

### 2. Intensive Media Coverage has Increased the Risk that the Jury Will Have Formulated an Opinion of this Case Based on Extrajudicial Sources

Though this Court cautioned that "this case is not going to get tried in the media," significant media attention has already brought widespread familiarity with the details of this prosecution to the greater Buffalo area. Oral Arg. Tran., at 3, 8, (dated Oct. 13, 2023); *see also* ECF. No. 619-1. In fact, developments in this case have received over twice as much coverage as that given to other organized crime prosecutions combined. As set forth above, using

12

Google News, the government identified approximately thirty-six articles regarding the prosecutions related to the Kingsmen Motorcycle Club; the 10th Street Gang; the 7th Street Gang; the Schuele Boys Gang; and other individual defendants with leadership roles in criminal enterprises subject to high-profile prosecutions in the Buffalo part of the district. By contrast, the government identified approximately seventy-nine articles regrading developments in this case. In other words, media coverage of this case far exceeds the amount of over half-a-dozen organized crime prosecutions twice over.

To be sure, the facts and nature of this case have, undoubtedly, contributed to the extensive media coverage that has followed its developments. But extrajudicial comments—which have extended well beyond all of the defense attorneys currently or formerly assigned to this case—have also invited an unprecedented degree of attention. Indeed, a variety of other federal criminal attorneys, including some with no apparent connection to this case, have made extrajudicial comments to the media about this case in one form or another. *See* ECF Nos. 619-1, 623. In contrast, the prosecutors assigned to this trial have not made any extrajudicial comments about the facts of the case.

Without a gag order and given the breadth and availability of informal or anonymous commentators willing to speak out about this case in the media, the case should be transferred within the district to Rochester. Local print media will undoubtedly keep printing stories adding to the already 400 plus pages of articles the government has already provided (*see* ECF No. 619-1), and local television news stations will continue to intensely cover this case up to and throughout the trial. In fact, there have been numerous additional news articles printed

13

about the case since the government filed its motion (*see* ECF Nos. 619, 619-1, 623), including a front-page article as recently as October 14, 2023.

The Court's denial of the government's Motion for a Gag Order (*see* ECF No. 543) lends further support of the government's Motion for Intra-District Transfer.  Before imposing gag orders, courts are tasked with determining whether "other available remedies would effectively mitigate . . . prejudicial publicity." *In re App. of Dow Jones & Co.*, 842 F.2d 603, 611 (2d Cir. 1988)   And, as the Court acknowledged, one alternative to a gag order is the very kind of venue change sought by the government's motion for intra-district transfer.  *See id.* at 611 (noting that "mitigating measures . . . include change of venue"); *see also* Oral Arg. Tran., at 3, 8, (dated Oct. 13, 2023).  Thus, under *Dow Jones & Co.*'s framework, the Court's denial of the Motion for a Gag Order heightens the need to ensure an impartial, independent jury through other means.  *See generally Nebraska Press Ass'n v. Stuart*, 423 U.S. 1327, 1333 (1975) (acknowledging that a change of venue can help ensure the accused receives an "independent and impartial" jury); *Sheppard v. Maxwell*, 384 U.S. 333, 352–53 (1966) (indicating support for changes in venue to ensure that a defendant receives an impartial jury).  To that end, transferring this case to Rochester protects the jury's independence and impartiality in two important respects.

As the Supreme Court has recognized, the level of pre-trial publicity achieved here threatens the integrity of the trial process, itself, and highlights the necessity for a change in venue.  *See Maxwell*, 384 U.S. at 362 (overturning a conviction because of extensive,

prejudicial, and unmitigated publicity, and noting that "[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences").

The intensity of the media coverage will undoubtedly be diminished if the trial is moved to Rochester, which will serve to convenience victims, witnesses, and aid the orderly progress of the trial and the jury's fact-finding mission.  Moreover, as explained *infra*, moving this trial to a location subject to less media coverage guards against the biases and nullification concerns that defendants invite.

### 3.   Transfer of the Trial to Rochester will Eliminate or Significantly Diminish the Jury Bias and Nullification Concerns Defendants Invite

A transfer to Rochester will also significantly diminish concerns regarding both jury bias and nullification.   "A criminal defendant is guaranteed a trial 'by an impartial jury.'" *United States v. Torres*, 128 F.3d 38, 42 (2d Cir. 1997) (quoting U.S. Const. amend. VI).   In that regard, the central "'touchstone of a fair trial is an impartial trier of fact—a jury capable and willing to decide the case solely on the evidence before it.'" *Id.* (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).

In stark contrast to these prized principles is the concept of jury nullification—that is, the notion that jury may exceed their lawful mandate of neutrally evaluating the facts and applying the law in favor, or against, a defendant due to extrajudicial reasons.  As the Second Circuit explained in *United States v. Thomas*, the federal judiciary "categorically reject[s] the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."  116 F.3d 606, 614 (2d Cir. 1997).  Indeed,

> [a] jury has no more "*right*" to find a "guilty" defendant "not guilty" than it has to find a "not guilty" defendant guilty, and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law. Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.

*Thomas*, 116 F.3d at 615–16 (quoting *United States v. Washington,* 705 F.2d 489, 494 (D.C.Cir.1983)).

But, as evidenced by their briefing and media strategy, a neutral, dispassionate jury is not the kind of jury that defendants seek.  Rather, each defendant has expressed a preference for a jury that has preconceived notions about this case and is biased in their favor.  For example, in his response in opposition to the instant motion, defendant Gerace argued:

> Mr. Gerace is entitled to a trial by a jury of his peers.  That means a jury that resides in or around the same place that he resides.  *That means a jury that has some sense of shared experience with Mr. Gerace – whether that be understanding the geography of Western New York or appreciating the import of a public figure in the Western New York region.*

*See* ECF No. 646 (Emphasis added).  Echoing defendant Gerace, defendant Bongiovanni similarly urged:

> *Transferring this case to Rochester would move the trial to a jury pool that knows almost nothing about the history and subcultures of Buffalo, New York that animate the undercurrents of this case.*  The simple fact of the matter is that many of the names, places, and events expected to be discussed at trial hold implications that are impossible to fully convey to someone unfamiliar with Buffalo history, geography, and culture.  *Thus, if the government wishes to tell a story about pervasive corruption and organized crime spanning years and involving prominent people in the Buffalo area, the defense is severely prejudiced if it cannot meet that story, in front of a jury, who understands the implications behind the references.*  The trial becomes a sanitized picture of real events in front of an unconnected audience.

*See* ECF No. 645 (Emphases added).

These responses strongly suggest a desire to seat Buffalo-area jurors who will be prejudiced in favor of the public figures who may be the subject of testimony and implicated by the defendants' criminal conduct and prejudiced against victims and other witnesses—including former PGC dancers—who reported their activities.  In particular, it appears that the defendants' want the trial to remain in Buffalo: (a) to maximize the extrajudicial stress and anxiety of government witnesses who will testify under media a media spotlight about well-known public figures in the Buffalo area; and, (b) to seat a jury in Buffalo with preconceived notions of the reputation and purity of some of those public figures who, based upon the anticipated testimony of victims and/or witnesses, will be implicated as having procured cocaine and/or prostitution services from defendant Gerace.

Stated otherwise, the defense wants to seat a jury in Buffalo that is more apt to nullify because government witnesses, some of them women who had drug addictions and worked in a strip club, will likely offer testimony about well-known and powerful people in the Buffalo area of whom potential jurors are already biased in favor.  However, causing pressure and anxiety to victims and witnesses through extrajudicial media scrutiny, and seating jurors with preconceived notions of the reputation and purity of individuals who may be the subject of trial testimony—before any evidence is introduced—are not legitimate defense objectives.  *Cf.* U.S. Const. amend. VI; *Torres*, 128 F.3d at 42; *Greenwood*, 464 U.S. at 554.  That is, it is fundamental that a jury's verdict must be based upon facts and evidence introduced at trial, and not based upon extrajudicial knowledge "*about the history and subcultures of Buffalo, New York that animate the undercurrents of this case*[,] or "*understanding the geography of Western New York or appreciating the import of a public figure in the Western New York region.*"  ECF No. 645 (emphases added).  The defendants are not entitled to a venire full of potential jurors with

preconceived notions about the case, which are only exacerbated by the intense media coverage in Buffalo.

Moreover, the constitutional guarantee of a fair or impartial jury protects the integrity of the trial process, not just the defendants.  Defendants might invite jury nullification and bias because they think it serves them today, but if convicted following trial, they will undoubtedly argue the inverse in a 2255 motion.  That is why a judge's job is to be "ever watchful to prevent prejudicial occurrences," *Smith v. Phillips*, 455 U.S. 209, 217 (1982), which is consistent with the Court's authority under Rule 18 and Local Rule 7 to *sua sponte* transfer cases within a judicial district.  Simply put, this case should be decided on the merits based upon the evidence or lack of evidence presented in court—and not based upon information or preconceived notions that potential jurors bring with them to the courtroom exacerbated by the intense media coverage of this case.  Any pressure exerted upon victims and witnesses should be through the legitimate force of cross examination in court.  *California v. Green*, 399 U.S. 149, 158 (1970) (cross-examination is the greatest legal engine ever invented for the discovery of truth).

In sum, given the nature and circumstances of the case, the virtually unprecedented local media coverage, the nature of the anticipated trial testimony, and the defendants' desires to ensure a venire full of potential jurors with preconceived notions, the Court's initial step to prevent or mitigate the substantial risk of jury nullification should be to transfer the trial to Rochester where there has been virtually no media coverage and the public or prominent names who may be mentioned during trial will be far less prominent and/or controversial in Rochester.

**D.    Claims that a Transfer to Rochester New York will Substantially Prejudice Defendants Lack Merit**

Finally, a transfer of this trial from Buffalo to Rochester will not substantially prejudice either defendant in this case.   Defendant Bongiovanni claims that moving the trial to Rochester will cause an inconvenience for himself and his attorneys.   ECF No. 645, § II(A). Defendant Gerace similarly claims that moving the trial to Rochester will unfairly prejudice the defendant and inconvenience his attorneys.   ECF No. 646, § III.   Neither of the defendants' claims move the needle.

Defendant Bongiovanni primarily cites to the distance he and his attorneys would be required to travel for a Rochester-based trial, stating "[t]he Rochester Division courthouse is approximately 75 miles from Mr. Bongiovanni's home and his attorneys' places of business." ECF No. 645, § II(A).   Although Gerace does not have the same concerns due to his custodial status, he raises similar objections due to the distance his potential witnesses would need to travel to be present for a Rochester trial.   ECF No. 646, § III.

What neither defendant seems to grapple with is the reality that, for many residents of Western New York, a 75-mile trip to the nearest United States Courthouse is already the case. For example, the distance from the center of Jamestown, New York to the United States Courthouse in Buffalo, New York is exactly 75 miles.   When residents of Jamestown, New York are charged with violations of Federal Law, they are routinely required to travel the 75-miles to attend to their cases in Buffalo, New York.   Even more, residents of Clymer, New York, tucked away in the Southwestern-most corner of New York State, would face a 90-mile drive to attend a federal criminal case in the Western District of New York.   Likewise, a resident of Wellsville, New York would face an 85-mile drive to the Buffalo courthouse and

a 95-mile drive to the Rochester courthouse.  Nevertheless, if a resident of Wellsville were charged with a violation of Federal Law in the Western District of New York, they would be expected to attend their trial.

Additionally, it is not only Federal defendants who are frequently faced with such travel in the Western District of New York.  Citizens selected to serve on petit juries or Federal Grand Juries are routinely required to travel distances of 75 miles or greater to uphold their duties.  Absent extenuating circumstances such as physical infirmity, they are not excused due to their proximity to the Court.  This Court should be well aware of this reality, as it has empaneled Grand Juries and selected petit juries that have doubtless consisted of residents from the Southern Tier of New York.  In short, traveling lengthy distances is—unlike being subject to tampering, media scrutiny, and threats—part of the reality of living in a geographically expansive district.

Defendants' other claims of inconvenience are similarly unavailing.  Defendant Gerace and Defendant Bongiovanni both argue that a Rochester trial will inconvenience their respective attorneys.  With respect to defendant Gerace's motion, the government notes that while mentioning that "both [attorneys] have made provision to try this case in Buffalo," the defendant overlooked that one of his two lawyers, Mr. Foti, is based out of Rochester, New York.  Simply searching Mr. Foti's practice on Google establishes that his practice, "The Foti Law Firm, P.C." has an address of 16 W Main St #100, Rochester, New York 14614.  His office is quite literally around the corner from the Rochester courthouse, and his commute would consist of a 4-minute walk (or a 2-minute drive, in the event of inclement weather) should the trial be transferred.



Defendant Bongiovanni argues this same point with respect to one of the government's attorneys, pointing out that AUSA Cooper "resides in and works out of the Rochester office." While AUSA Cooper does not "reside in" either of the government's offices, it is worth pointing out that he has traveled from the Rochester-area to the Buffalo office for work, nearly every day, since August.  Needless to say, sometimes work requires travel.  The Court, itself, has put this principle into practice.

In *United States v. Pirk et al.*, 284 F. Supp. 3d 398 (W.D.N.Y. 2018), a case cited by defendant Bongiovanni in his response, Chief Judge Wolford presided over the Buffalo jury trial for approximately 5 months, despite being based out of the Rochester courthouse.  In that same case, counsel for at least one of the defendants (also appointed as a member of the CJA panel) traveled from Rochester to Buffalo every day for the trial.  In fact, it is routine for members of the CJA panel from the Rochester area to be assigned to represent a defendant in a case based in Buffalo, and vice versa.   Travel and other expenses related to such representation are anticipated.  Compensation for travel and other expenses commensurate with such representation are financed under the Criminal Justice Act and related statutes.  *See United States Courts – Chapter 2 § 230: Compensation and Expenses of Appointed Counsel*

(*https://www.uscourts.gov/rules-policies/judiciary-policies/cja-guidelines/chapter-2-ss-230-compensation-and-expenses*).

Defendant Bongiovanni argues that such expenses "present another reason for denying the government's motion."  ECF No. 645, at n.4.  While cost to the taxpayer should be considered by the Court, it is not dispositive, particularly when weighed against the other factors and costs associated with witness tampering, convenience to victims and witnesses, and the time and expense it will take to select a jury in Buffalo, where media saturation exists, as opposed to Rochester, where it does not.  The Court's obligation to the defendants, to the government, and to the public, is not to provide the cheapest trial possible.  Indeed, in *Geders v. United States*, the Supreme Court stated "[a] criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none.  The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process." 425 U.S. 80, 86, (1976).  Ensuring the integrity of the trial in this case, which will further the pursuit of the truth and of a just outcome, necessarily outweighs the general desire for the most economical solution.

Defendant Gerace argues that an intradistrict transfer prejudices the defendant by "unfairly straining" his attorneys by "interject[ing] substantial expenses. . . that were not contemplated in undertaking representation."   ECF No. 646 at § III.  The defendant's argument that the possibility of a trial in Rochester was not contemplated in determining whether to undertake representation of defendant Gerace is belied by the record.  The government filed its motion for intra-district transfer on September 6, 2023, at 11:23 A.M.

22

*See* ECF No. 618.  The Notice of Appearance for attorney Foti was entered nearly six hours later at 5:07 P.M.  *See* ECF No. 620.  The Notice of Appearance for attorney Soehnlein was entered at 5:29 PM.  *See* ECF No. 621.  The status conference on September 6, 2023, was held at 12:30 PM, during which the government's motion for intradistrict transfer was discussed. *See* ECF No. 626, p. 29, Transcript of September 6, 2023, Status Conference.  Attorney Foti and Attorney Soehnlein were present for that status conference.  *Id.*  Neither of them indicated to the Court that the government's recent motion for intradistrict transfer could potentially prevent them from accepting representation of defendant Gerace.  *Id.*  The defendant's conclusory claim that moving the trial to Rochester will "adversely and unfairly prejudice Mr. Gerace," without providing any useful explanation as to how, lacks merit.

## CONCLUSION

The factors the Court must consider pursuant to Rule 18 weigh heavily in favor of transferring this case to Rochester.  Accordingly, the government respectfully submits that the Court should enter an Order transferring the trial of this case to the Rochester court location of the Western District of New York.

COREY R. AMUNDSON                  TRINI E. ROSS
Chief                              United States Attorney


BY:  s/JORDAN DICKSON          BY:  s/JOSEPH M. TRIPI
     Trial Attorney                 s/NICHOLAS T. COOPER
     Public Integrity Section       s/CASEY L. CHALBECK
     U.S. Department of Justice      Assistant United States Attorney
     Criminal Division              United States Attorney's Office
     1301 New York Ave. NW, Ste. 1000   Western District of New York
     Washington, D.C. 20530         138 Delaware Avenue
     202-597-0508                   Buffalo, New York 14202
     jordan.dickson@usdoj.gov       716.843.5839
                                    Joseph.Tripi@usdoj.gov