UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,


    v.                                                      19-CR-227
                                                            23-CR-37
PETER GERACE, JR.,                                          DECISION & ORDER

          Defendant.

_____


      The government has moved to disqualify Eric Soehnlein, an attorney

representing the defendant, Peter Gerace, Jr.  That motion implicates both Gerace's

"Sixth Amendment right to effective assistance of counsel, and [this Court's]

independent interest in the integrity of [this] legal proceeding and the assurance of a just

verdict."  *United States v. Fulton*, 5 F.3d 605, 612 (2d Cir. 1993) (citing *Wheat v. United

States*, 486 U.S. 153, 160 (1988)).  But as weighty as those issues are, there is far

more at stake in this motion and in this case.  In fact, it is not hyperbole to say that the

rights of all defendants in this District and beyond to the effective assistance of

counsel—and by extension this Court's obligation to preserve the fairness of its criminal

proceedings—are at issue here.

      To decide the government's motion, the Court must determine whether

Soehnlein's representation of Gerace presents a *per se* conflict of interest that cannot

be waived.  More specifically, the Court must analyze whether there is a reasonable

possibility that Soehnlein committed a crime when he put the names of two witnesses

on the defense witness list.  On that question, this Court holds, as a matter of first

impression, that a defense attorney's putting the name of an individual who has been

disclosed in the government's discovery on a witness list—regardless of the intent behind it—is as a matter of law not obstruction of justice under 18 U.S.C. § 1503. Rather, such conduct constitutes "lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding" and is therefore protected by the safe harbor of 18 U.S.C. § 1515(c).

To hold otherwise would create an inherent conflict in the representation of *every* criminal defendant. Rather than ask the question that they are duty-bound by the Constitution to consider—What is in my client's best interest?—defense attorneys would have to ask a second question: What if the government thinks I have a corrupt motive for making this decision? In the moment when the attorney pauses to ask that second question, the defendant's Sixth Amendment right disintegrates because the attorney is now thinking about himself or herself instead of the client. And that runs counter to the obligation of providing zealous representation free from conflict or constraint.[1]

---

[1] There is a second set of allegations involving allegedly falsified affidavits submitted to the Court. Those allegations raise classic obstruction of justice issues, regardless of whether the perpetrator is defense counsel. And those allegations might therefore create an unwaivable conflict of interest if they involve Soehnlein. But the government does not allege that Soehnlein had any involvement in that conduct. Instead, the government suggests that he may be a witness regarding those allegations. Based on the papers submitted and the representations of Soehnlein through his counsel, this Court finds that there is no reasonable possibility that Soehnlein has any information about those affidavits that is not covered by the attorney-client privilege. *See* Discussion, Section II, *infra*. This Court therefore rejects the government's contention that there is a reasonable possibility that Soehnlein will be called as a witness against Gerace on that issue.

Accordingly, this Court finds that Soehnlein does not have a *per se* conflict, and the government's motion to disqualify him is denied.[2]

## BACKGROUND

This case began in October 2019 with the indictment of Gerace's co-defendant, Joseph Bongiovanni, a former DEA agent who was accused, *inter alia*, of conspiracy to distribute controlled substances and taking bribes. Docket Item 1.[3]  In February 2021, Gerace was added as a defendant in a second superseding indictment that charged him with conspiring to defraud the United States, bribing a public official, maintaining drug-involved premises, conspiring to distribute controlled substances, and conspiring to commit sex trafficking. Docket Item 89.

---

[2] In making this decision, this Court acknowledges that the safer move—from the perspective of insulating itself from reversal on appeal—would be to grant the government's motion. *See United States v. Cain*, 671 F.3d 271, 294 (2d Cir. 2012) (observing that "it is unsurprising that" the two "post-*Wheat* cases in which we reversed a trial court's decision with respect to disqualification . . . arose in the context of a defendant's post-conviction challenge to the district court's *refusal* to disqualify the convicted attorney"); *see also id.* at 295 ("It thus appears that, although we have considered challenges to the disqualification of counsel on the basis of a *per se* conflict in at least four cases since *Wheat*, we have never concluded that the trial court abused its discretion in disqualifying a conflicted attorney."). But this Court's duty is to do what is right, not what is safe—a duty that is heightened on an issue as important as this one. And to the extent the government continues to pursue its investigation into the alleged "orchestrated" recusal notwithstanding this Court's conclusion that the conduct at issue is as a matter of law not criminal, it does so at its own peril. The *per se* conflict question—which the government created and which the goverment has the power to eliminate—is a close one. Although this Court firmly believes that it is making the correct decision, the Second Circuit may disagree, putting any conviction of Gerace in jeopardy.

[3] Unless otherwise noted, docket citations are to case number 19-cr-227, and page numbers in docket citations refer to ECF pagination.

In March 2023, Gerace was indicted in a separate case and charged with tampering with a witness and distributing cocaine. *See* Case No. 23-cr-37, Docket Item 1. After the second indictment was issued, the Honorable John L. Sinatra, Jr.—who at the time was the judge presiding over both cases—ordered that Gerace be detained pending trial. Case No. 23-cr-57, Docket Item 7. Judge Sinatra rejected Gerace's and Bongiovanni's requests for a severance and consolidated the indictments. Docket Items 434 and 442.

Judge Sinatra scheduled the joint trial of both defendants to begin on June 21, 2023. Docket Item 324; *see* Docket Item 434. In May 2023, however, Bongiovanni's attorney moved to withdraw due to health issues. Docket Item 476. Judge Sinatra granted that motion, appointed new attorneys to represent Bongiovanni, and rescheduled the trial to begin on August 14, 2023. *See* Docket Item 484. Gerace then moved to reopen his detention hearing and for pretrial release, Docket Item 501, but Judge Sinatra denied that motion, Docket Item 504.

On June 20, 2023, Gerace—who at that time was represented by Soehnlein and attorney Steven M. Cohen—filed his witness list, which included the names of 286 witnesses. Docket Item 529. Judge Sinatra held a status conference several days later to address three of those witnesses. Docket Item 536; *see* Docket Item 660 at 4. The first of the three witnesses turned out not to raise any issues. *See* Docket Item 660 at 4.

With respect to the remaining two witnesses, Judge Sinatra stated that 28 U.S.C. § 455(b)(5)(iv) "mandates a non-waivable recusal by me . . . if either one of those two is

likely to be called as a material witness at trial." Docket Item 660 at 4. Judge Sinatra

then asked why the defense had listed those witnesses. *Id*. at 4-5. Cohen responded:

> If you are asking whether I intend to call them, we have to see how the case plays out. I don't know yet, but, certainly, the [g]overnment felt it was important enough to question about these three individuals—we'll say the two individuals. And they are on my list[,] and they have to stay there[,] and whether I use them depends upon the case that the [g]overnment puts on.

*Id*. at 5. Several minutes later, Cohen reiterated: "Many of those witnesses are there

as a reservation of rights to call them, if the need should arise. And I do reserve my

rights to call them should the need arise [depending on] how the case pans out." *Id*. at

8.

Judge Sinatra then observed that "the statute require[d him] to evaluate whether

they [we]re likely to be called as material witnesses," and he directly asked Gerace's

counsel whether they were likely to be called as material witnesses. *Id*. In response,

Cohen said that one of them was "likely to be called" and the other was "a possibility."

*Id*. at 8-9. Judge Sinatra expressed his view that the placement of the witnesses on the

list "appear[ed] to be gamesmanship." *Id*. at 10. He concluded, however, that "because

the statutory test [wa]s met by . . . Cohen's proffer, [Judge Sinatra was] duty bound to

recuse." *Id*. at 11.

Soehnlein then asked to approach the bench. *Id*. He said that he was "was

concerned about [Judge Sinatra's] comments about gamesmanship and so [he]

want[ed] to make the record crystal clear on that point." *Id*. at 12. Soehnlein then

explained:

> With respect to [one of the two witnesses], a number of allegations the [g]overnment has made in this case ha[ve] to do with . . . Gerace's relationship with law enforcement, payment of money to law enforcement for alleged improper purposes. He does have a relationship with several members of law enforcement. He has a particularly close relationship with

that individual, that is included in payment of money for various things, various charitable contributions and things of that nature.  As a defense attorney and a trial practitioner, that is a very important thing to bring out in front of a jury and I think it's important.  I wanted the record to be made clear and I wanted Your Honor to understand that the decision to include that name wasn't taken lightly.

*Id.*

The case then was reassigned to this Court.  Docket Item 537.  Less than a week later, on June 26, 2023, Soehnlein moved to withdraw as counsel for Gerace.  Docket Item 541.  All counsel on both sides indicated that they had no objection, *see* Docket Item 558, and this Court granted Soehnlein's motion, Docket Item 559.  The Court scheduled trial to begin on October 23, 2023.  *See* Docket Item 558.

On July 15, 2023, Cohen filed a letter stating that Gerace was "terminating [their] professional relationship" and did "not have another lawyer lined up to take this case." Docket Item 567.  This Court held a status conference and ordered further submissions from Cohen.  *See* Docket Item 568.  Following those submissions, the Court ordered Cohen to assist Gerace in finding new counsel and to report back as to whether the new attorney was able to begin trial on October 23, 2023.[4]  *See* Docket Item 580.

The Court also gave Gerace until August 8, 2023, to move for reconsideration of Judge Sinatra's detention order.  *See id.*  Gerace filed that motion, Docket Item 585, and the government responded, Docket Item 591.  On August 15, 2023, Gerace replied and submitted affidavits in support of his reply.  Docket Item 604.

---

[4] Because Gerace was incarcerated and Cohen indicated that Gerace was having difficulty communicating with prospective counsel, the Court instructed Cohen to facilitate those communications.  *See* Docket Item 581 at 11-12.  But mindful of the conflict that arose because of Gerace's terminating Cohen, the Court asked Cohen only to assist Gerace in "get[ting] in contact with lawyers"; the Court did not ask or order him to find counsel for Gerace.  *See id.* at 12-13.

On September 6, 2023, this Court held a status conference to address Gerace's representation.  Docket Item 622.  Cohen indicated that at Gerace's request, Soehnlein and another attorney, Mark Foti, had agreed to represent Gerace.  Docket Item 626 at 3.  Soehnlein and Foti, who both were present in court, then asked that the trial be adjourned until February or March 2024 to give them time to prepare.  *Id.* at 7.  The Court asked about Soehnlein's prior withdrawal, and Soehnlein assured the Court that the issue that had prompted his withdrawal had been "resolved."  *Id.* at 17-18.  The Court then rescheduled jury selection to begin on January 8, 2024.  *Id.* at 22-23.

But on November 21, 2023, that plan unraveled when the government moved, *ex parte*, to disqualify Soehnlein.  Docket Item 666.  The next day, Gerace filed an emergency motion for disclosure, Docket Item 667, and this Court held a status conference about a week later, Docket Item 678.  After the Court observed that Gerace needed to have some idea of what the allegations were before he could respond, Docket Item 679 at 3-4, the government agreed to submit a redacted version of the disqualification motion to the defense, *id.* at 18.

The Court reviewed the government's submission and held another status conference on December 1, 2023.  Docket Item 686.  After an *ex parte* discussion with the government, the Court proposed on the record that the government withdraw its motion to disqualify and submit a new motion that included only the facts relevant to disqualification.  *See id.*  The Court explained that if the government declined that invitation, the Court would provide its own redacted version of the original disqualification motion to the defense.  *See id.*

About two weeks later, the government moved to withdraw its original motion, Docket Item 689, and the Court granted the motion to withdraw, Docket Item 692. The government then filed a revised and superseding motion to disqualify. Docket Item 691. In that motion, the government argues that "[t]here is a reasonable possibility that" Soehnlein "engaged in criminal conduct" when he "exploit[ed] . . . the federal recusal statute to orchestrate Judge Sinatra's recusal" by putting two relatives of Judge Sinatra on the witness list for Gerace's trial.[5] *Id.* at 3, 5. The government further argues that "[e]ven if . . . Soehnlein's conduct was not criminal, he is a subject or witness relative to criminal conduct" involving (1) the alleged conspiracy to orchestrate Judge Sinatra's recusal and (2) allegedly false affidavits that were submitted to this Court in support of Gerace's motion for release in August 2023. *Id.* at 3. This Court set a briefing schedule on the revised motion and canceled the January 8, 2024, trial date. *See* Docket Item 698.

Bongiovanni then moved to sever his trial from Gerace's. Docket Item 697. The government indicated it had no objection to severance so long as Bongiovanni's trial could commence in early February. Docket Item 700 at 2. This Court granted Bongiovanni's motion and scheduled Bongiovanni's trial for February 12, 2024. Docket Item 709. That trial proceeded as planned, *see* Docket Item 762, ending in a partial verdict and mistrial in early April, *see* Docket Item 867.

---

[5] The submissions in support of and in opposition to the government's disqualification motion have been filed under seal as they contain sensitive information. Because it is important that this decision and order be filed publicly, the Court deliberately recounts the facts underlying the motion at a high level, providing only the detail necessary to explain its decision.

In the meantime, this Court appointed attorney Kevin Spitler as *Curcio* counsel for Gerace.  Docket Item 715; *see United States v. Curcio*, 680 F.2d 881, 890 (2d Cir. 1982).  After meeting with Spitler, Gerace, through his trial counsel, responded to the government's revised motion to disqualify.  Docket Items 771 and 773.

Gerace contends that "[t]here is no conflict—*per se* or otherwise—that would warrant disqualification of . . . Soehnlein."  Docket Item 771 at 6.  Among other things, Gerace argues that Soehnlein is protected by the safe harbor provision of the obstruction of justice statute, which provides that "[t]his chapter does not prohibit or punish the providing of lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding."[6]  *Id.* at 35 (quoting 18 U.S.C. § 1515(c)); *see id.* at 36 ("The government's motion omits any discussion of this statutory safeguard because a fair reading of 1515(c) eviscerates the [g]overnment's ability to establish the *mens rea* element of a[n] 18 U.S.C. § 1503 violation.").

The government replied.  Docket Item 798.  Among other things, the government suggests that Soehnlein could be prosecuted for putting names on the witness list if he had "mixed motives" for doing so.  *Id.* at 12-16.  In other words, the government says that if Soehnlein put the names at issue on the witness list both to ensure that they could testify at trial and to get Judge Sinatra to recuse himself, a jury could conclude that Soehnlein committed a crime.  *See id.*

---

[6] Gerace also submitted an *ex parte* supplement to his response.  Docket Item 773.  This Court allowed Gerace to file that submission *ex parte* because it reveals "deep details about the defense['s] trial strategy."  *See id.* at 2.

The defense then moved to make a sealed transcript part of the record for the motion.  Docket Item 805.  This Court granted that motion and heard oral argument on the government's revised motion to disqualify.  Docket Item 824.

In addition to hearing legal argument from the government and the defense (primarily through counsel for Soehnlein), this Court questioned Gerace's *Curcio* counsel, who indicated that he had "discussed this matter with . . . Gerace on two occasions."  Docket Item 825 at 42.  *Curcio* counsel told the Court that Gerace had "indicated to [him that Gerace] wishes that . . . Soehnlein continue as his counsel."  *Id.* The Court then asked *Curcio* counsel:  "And you think [Gerace has] made a reasoned decision that you have no basis to disagree with?"  *Id.* at 43.  *Curcio* counsel responded:  "That is correct, Your Honor."  *Id.*  The Court also asked Gerace directly whether what *Curcio* counsel had stated was correct, and Gerace responded that it was.  *Id.*

Following the oral argument and the colloquy with *Curcio* counsel and Gerace, the Court reserved decision.  *See* Docket Item 824.  On April 12, 2024, this Court issued an order excluding time under the Speedy Trial Act for an additional two weeks under 18 U.S.C. § 3161(h)(7)(A).  *See* Docket Item 865 at 1 (finding that "[b]ased upon the complex and weighty issues presented by the motion, . . .  the interests of justice in a continuance override the defendant's and the public's interests in a speedier trial").  Ten days later—with only four days left for this Court to decide the motion—the government filed an unsolicited supplemental letter brief addressing in detail several

issues that had been discussed at oral argument more than five weeks earlier.[7]  Docket Item 886.

## **LEGAL PRINCIPLES**

### I.   **OBSTRUCTION OF JUSTICE STATUTORY FRAMEWORK**

Chapter 73 of Title 18 of the United States Code prohibits obstruction of justice. *See* 18 U.S.C. §§ 1501-21.  Relevant here, 18 U.S.C. § 1503(a) provides that "[w]hoever corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be [guilty of a crime]."  That section—often referred to as the "omnibus clause" of the statute—serves as a "catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice."  *United States v. Aguilar*, 515 U.S. 593, 597-98 (1995).  To fall under the omnibus clause, "the act must have a relationship in time, causation, or logic with the judicial proceedings."  *Id.* at 599 (citations omitted).  "In other words, the endeavor must have the 'natural and probable effect' of interfering with the due administration of justice."  *Id.* (quoting *United States v. Wood*, 6 F.3d 692, 695 (10th Cir. 1993)).

Simply influencing the administration of justice is not sufficient:  Lawyers do that whenever they argue that a judge should decide an issue or sentence a defendant one way or another.  *See United States v. Fasolino*, 449 F. Supp. 586, 587 (W.D.N.Y. 1978)

---

[7] Because that supplemental brief was unsolicited and submitted so late, this Court considered rejecting it.  But on balance, the Court decided that given the importance of the issues raised in the government's motion to disqualify, the better course was to consider the submission and address its arguments.

(rejecting the contention "that the word 'corruptly' [in section 1503] means any endeavor to influence [a] jurist" and noting that probation officers, attorneys, and defendants all are invited to recommend a sentence to a sentencing judge, which cannot "be construed as corruptly endeavoring to influence the . . . judge"); *see also United States v. Cueto*, 151 F.3d 620, 632 (7th Cir. 1998) ("It is true that, to a certain extent, a lawyer's conduct influences judicial proceedings, or at least attempts to affect the outcome of the proceedings.  However, that influence stems from a lawyer's attempt to advocate his client's interests *within the scope of the law*.").  Instead, the act must have been done "corruptly."

Thus, the conduct prohibited by section 1503(a) "consists of an *actus reus* and a *mens rea*."  *United States v. Sampson*, 898 F.3d 287, 299 (2d Cir. 2018).  "The *actus reus* is 'endeavor[ing] to influence, obstruct, or impede, the due administration of justice.'"  *Id.* (alteration in original) (quoting 18 U.S.C. § 1503(a)).  "The *mens rea* is acting 'corruptly,'—that is, with 'a specific intent to obstruct a federal judicial or grand jury proceeding.'"  *Id.* (internal citation omitted) (quoting *United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002)); *see also* 2 Modern Federal Jury Instructions-Criminal ¶ 46.01 (2023) (defining "corruptly" as "having the improper motive or purpose of obstructing justice").

The obstruction of justice statute "does not prohibit or punish the providing of lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding," however.  18 U.S.C. § 1515(c).  That provision—section 1515(c)— often is referred to as the attorney "safe harbor."  *See, e.g.*, *United States v. Simels*, 654 F.3d 161, 174 (2d Cir. 2011).  And while the "lawyer-criminal" can be held liable for

obstruction of justice, *United States v. Cintolo*, 818 F.2d 980, 990 (1st Cir. 1987), the safe harbor prevents the criminalization of a lawyer merely for doing his or her job, *see United States v. Kloess*, 251 F.3d 941, 948 (11th Cir. 2001) ("Section 1515(c) provides a complete defense to the statute because one who is performing bona fide legal representation does not have an improper purpose.  His purpose—to zealously represent his client—is fully protected by the law.").

The caselaw addressing the attorney safe harbor is limited.  The Eleventh Circuit has held that section 1515(c) is an affirmative defense that the defendant must raise but that, once it is raised, the government must "prove[] beyond a reasonable doubt that the defendant's conduct did *not* constitute lawful, bona fide legal representation."  *Id.* at 949 (emphasis added).  The Ninth Circuit likewise has stated that section "1515(c) provides a complete defense to obstruction of justice."  *United States v. Kellington*, 217 F.3d 1084, 1098 (9th Cir. 2000).  A court in the Fourth Circuit has gone even further and held that section 1515(c) is not merely an affirmative defense but an element of an obstruction offense that the government must both plead in the indictment and prove at trial.  *United States v. Jackson*, 926 F. Supp. 2d 691, 717 (E.D.N.C. 2013) (holding that "where an attorney . . . is charged with an obstruction offense . . . , the government must expressly allege as an element of the offense in the indictment that the defendant in engaging in the conduct alleged was not 'providing lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding'" (quoting 18 U.S.C. § 1515(c))).

The Second Circuit has not yet weighed in on this question.[8]  But regardless of who bears the burden of pleading the applicability of section 1515(c), the prevailing caselaw suggests that, once raised, it is the government's burden to prove beyond a reasonable doubt that the lawyer was *not* providing bona fide legal services.  *See Kloess*, 251 F.3d at 949; *Kellington*, 217 F.3d at 1098.

## II.    THE LAW OF *PER SE* CONFLICT

"The right to the effective assistance of counsel . . . includes the right to be represented by an attorney who is free from conflicts of interest."  *United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003).  "This right may be violated if the attorney has '(1) a potential conflict of interest that result[s] in prejudice to the defendant, or (2) an actual conflict of interest that adversely affect[s] the attorney's performance.'"  *Id.* (alterations in original) (quoting *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994)).  "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action."  *Id.* (quoting *Schwarz*, 283 F.3d at 91).  "An attorney has a potential conflict of interest if 'the interests of the defendant may place the attorney under inconsistent duties at some time in the future.'"  *Id.* (quoting *United States v. Kliti*, 156 F.3d 150, 153 n.3 (2d Cir. 1998)).

---

[8] As the government observes in its supplemental submission, the Second Circuit has suggested in dicta that the safe harbor provision constitutes a "defense," but it "has not directly decided the issue."  Docket Item 886 at 3; *see Simels*, 654 F.3d at 174 (referring to section 1515(c) as "the safe harbor defense"); *United States v. St. John*, 267 F. App'x 17, 22 (2d Cir. 2008) (summary order) (declining "to decide whether [section] 1515(c) is a complete or an affirmative defense").

If a district court learns about a defense attorney's "possib[le] . . . conflict of interest," it must first "determine[] whether the attorney has an actual conflict, a potential conflict, or no conflict at all." *Id.* (citing *Levy*, 25 F.3d at 153). "If the court discovers no genuine conflict, it has no further obligation." *Id.* If, however, the court finds an actual or potential conflict, it must determine whether that conflict can knowingly and voluntarily be waived. *Id.*

"When a defendant's right to choose the counsel he wants 'conflicts with the right to an attorney of undivided loyalty, the choice as to which right is to take precedence must generally be left to the defendant.'" *United States v. Arrington*, 941 F.3d 24, 39 (2d Cir. 2019) (quoting *Perez*, 325 F.3d at 125). Thus, if "the court determines that the 'attorney suffers from a lesser [actual] or only a potential conflict,' then it may accept a defendant's knowing and intelligent waiver of his right to conflict-free counsel and permit the defendant to be represented by the attorney of his choice." *Perez*, 325 F.3d at 125 (alteration in original) (quoting *Levy*, 25 F.3d at 153); *see also id.* at 126 ("[C]ourts will not 'assume too paternalistic an attitude in protecting the defendant from himself,' and although the defendant's choice of counsel 'may sometimes seem woefully foolish' to the court, the choice remains his." (quoting *United States v. Curcio*, 694 F.2d 14, 25 (2d Cir. 1982))). But there is an exception to the rule: "When a lawyer's conflict, actual or potential, may result in inadequate representation of a defendant or jeopardize the federal court's institutional interest in the rendition of a just verdict, a trial judge has discretion to disqualify an attorney or decline a proffer of waiver." *Fulton*, 5 F.3d at 612 (citing *Wheat*, 486 U.S. at 162-63).

The Second Circuit has "held that there is an 'actual or constructive denial of the assistance of counsel,' and, as such, a *per se* violation of the Sixth Amendment in two limited circumstances: whe[n] defendant's counsel was unlicensed, and when the attorney has engaged in the defendant's crimes."  *Id.* at 611 (citations omitted); *see id.* at 613 ("Where a government witness implicates defense counsel in a related crime, the resultant conflict so permeates the defense that no meaningful waiver can be obtained. In such a case, we must assume that counsel's fear of, and desire to avoid, criminal charges, or even the reputational damage from an unfounded but ostensibly plausible accusation, will affect virtually every aspect of his or her representation of the defendant.").  For example, the Second Circuit has found a *per se* conflict where the defendant's counsel committed crimes with the defendant's possible co-conspirator, *United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir. 1984), and where both the defendant "and lead trial counsel allegedly imported heroin in concert with [a co-conspirator]," *Fulton*, 5 F.3d at 611.

The Second Circuit also has affirmed orders disqualifying attorneys who were likely to be called to give grand jury testimony against a client.  For example, in *United States v. Cain*, "[t]he government alleged that Cain had been involved in influencing . . . a witness against Cain in a parallel state court prosecution[] to provide perjured affidavits recanting statements that he had made that inculpated Cain."  671 F.3d 271, 292 (2d Cir. 2012).  Because Cain's defense attorney "also represented Cain in the state case" and "had possessed the affidavits and provided them to state prosecutors (who in turn provided them to the federal prosecutor), the government sought [the attorney's] testimony to establish that the affidavits had been in Cain's possession and

that Cain had intended that they be filed in an official proceeding, an element of the offense." *Id.* The attorney was subpoenaed to testify before the grand jury, and Cain's *Curcio* counsel "expressed the view that because [the attorney's] testimony would be used to establish an element of the offense, any conflict was unwaivable." *Id.* After the magistrate judge agreed and disqualified Cain's counsel, the Second Circuit affirmed, finding that it could not "say that the district court abused its discretion in concluding that the risk that [the attorney] would become a witness against his client was sufficient to justify his disqualification." *Id.* at 295.

Similarly, in *United States v. Jones*, "the government represented that [Jones's defense attorney] and others at his law firm were likely to become the subjects of a grand jury investigation based on the possibility that they were passing information between" Jones and another accused drug dealer, whom the attorney also represented. 381 F.3d 114, 120 (2d Cir. 2004). The Second Circuit explained that "[t]his criminal investigation of [the attorney] . . . would be a *per se* unwaivable conflict whether or not [the attorney] immediately withdrew from his representation of [the other accused drug dealer] because of [the attorney's] self-interest in avoiding criminal charges." *Id.*

That being said, "the *per se* rule does not apply any time a court learns that an attorney may have committed a crime; the attorney's alleged criminal activity must be sufficiently related to the charged crimes to create a real possibility that the attorney's vigorous defense of his client will be compromised." *Fulton*, 5 F.3d at 611.

**DISCUSSION**

There are two sets of allegations at play here: the "orchestrated" recusal and the false affidavits.  The Court will address each in turn.

For the reasons that follow, this Court finds that even if there is a conflict—actual or potential—in Soehnlein's continued representation of Gerace, it is not an unwaivable *per se* conflict.[9]

## I.   THE "ORCHESTRATED" RECUSAL

The government asserts that there is a reasonable possibility that Soehnlein committed a crime by putting two names on Gerace's witness list that Soehnlein knew would cause Judge Sinatra to recuse himself.  Docket Item 691 at 33-63.  Based on an audio recording that the government obtained, the government posits that "a factfinder could determine . . . that *at least one purpose* animating the witness list's construction was to obtain a [different] judge."  *Id.* at 38 (emphasis added).  "In that vein," the government says, "a factfinder may determine that . . . Judge Sinatra's recusal was an end looking for a means, *i.e.*, a relative encompassed under 28 U.S.C. § 455(b)(5)(iv), as opposed to the collateral consequence of a legitimate defense strategy."  Docket Item 691 at 38; *see also id.* at 40 ("In sum, a factfinder could determine that, notwithstanding . . . Soehnlein's representations to the contrary, the defense team's

---

[9] This Court will schedule a status conference to discuss the question of whether Soehnlein has a potential or lesser actual conflict that requires a full-blown *Curcio* hearing and, if necessary, will order further briefing on that question.  Gerace, through counsel, has made clear his view that "[t]here is no conflict."  Docket Item 771 at 33. But the government has not yet had an opportunity to address whether there is still a conflict in light of this Court's analysis of the safe harbor provision.

goal from conception of the witness list was to obtain a different judge by manufacturing Judge Sinatra's recusal.").

The government concedes that one of the two names at issue on the witness list "appeared in the *Jencks* material the government supplied" but claims that its inclusion on the list was "not in a way that would plausibly support a character defense." *Id.* at 41. And there is no dispute that the government produced FBI 302 forms for both witnesses in the discovery that it provided to the defense.[10] *See* Docket Item 825 at 16-17; *see also* Docket Item 771 at 12, 44-45. So there is no question that defense counsel did not create the names from whole cloth or simply name relatives of Judge Sinatra who had nothing to do with the case.

This Court finds that based on the fact that the names of these witnesses were disclosed in the government's discovery, the defense had a legitimate purpose for putting them on the list: "reserv[ing Gerace's] right[] to call them should the need arise" depending on the evidence the government ended up presenting at trial.[11] Docket Item 660 at 8. Moreover, the defense has provided an even more precise—and on its face legitimate—reason why the witness whose *Jencks* material was disclosed might be able to provide material testimony favorable to the defendant. *See* Docket Item 771 at 4-5.

---

[10] The government takes issue with Cohen's statements to Judge Sinatra in which Cohen incorrectly stated that the names of both witnesses appeared in the *Jencks* material. *See* Docket Item 660 at 5; Docket Item 691 at 9-10. Regardless of those statements—which were not made by Soehnlein—there is no dispute that the names of both witnesses appeared in the discovery material that the government provided and that one appeared in the *Jencks* material.

[11] The question of whether a lawyer's putting a completely irrelevant witness on a witness list in an effort to get a judge to recuse can constitute obstruction of justice is not before this Court, and, therefore, the Court need not and does not opine on it.

So the question before this Court is a simple one:  Can defense counsel be criminally prosecuted for listing potential witnesses who might give testimony favorable to the defendant when the government believes that the real reason for listing them was to gain the recusal of the presiding judge?

If defendants are to have the zealous representation of counsel unfettered by worries about counsel's own legal liability, that question can have only one answer.  If lawyers are to be free to make decisions based on their clients' best interests and not on counsel's own interest in avoiding investigation—and perhaps criminal charges— there can be no doubt about that answer.  If the right to counsel has enough substance to withstand the unbridled ability of prosecutors to use their charging discretion to stack the deck, that answer must be no.  And under the law, it is.

### A.  18 U.S.C. §§ 1503(a) and 1515(c)

Start with the statute that the government says is the basis of its investigation of counsel.  Section 1503(a) casts a broad net, including anyone who "corruptly . . . influences"—or tries to influence—"the due administration of justice."  But by definition, prosecutors and defense counsel influence—or try to influence—the administration of justice every day; indeed, their job is to do just that.  So what separates good lawyering from criminal conduct is one word: "corruptly."

Now, some conduct by lawyers clearly crosses the "corrupt" line.  For example, no one would argue that a lawyer can suborn perjury by a witness, *see United States v. Lonich*, 23 F.4th 881, 907 (9th Cir. 2022); or falsify an affidavit, *see United States v. St.*

*John*, 267 F. App'x 17, 20 (2d Cir. 2008) (summary order);[12] or destroy evidence, *see Kellington*, 217 F.3d at 1088, 1098-99; or intimidate or bribe a witness, *see Simels*, 654 F.3d at 174.  A lawyer who does any of those things commits a crime even if he does them on behalf of a client.

But because opinions may differ on whether some things are "corrupt"[13]—and perhaps because of the powerful discretion that prosecutors have to decide whether to investigate and charge crimes—the statute gives lawyers a safe harbor: "[P]roviding . . . lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding" falls outside the scope of the statute.  18 U.S.C. § 1515(c).  So if there is an objectively bona fide reason for taking a certain strategic action on behalf of a client, a lawyer who takes that action—even a lawyer who the

---

[12] The Second Circuit's decision does not recount the facts of this case, but the indictment alleges that the defendants—a lawyer and a private investigator—conspired to obtain false affidavits.  *See* Superseding Indictment, *United States v. St. John*, No. 7:02-cr-1503 (S.D.N.Y. Sept. 4, 2003), 2002 WL 34681933.

[13] Indeed, this Court questions whether an attorney's desire to obtain a judge who the attorney believes would be better for his client qualifies as a "corrupt" motive.  Of course, an attorney could not obtain the recusal of a judge by transgressing the rules of professional responsibility.  *Cf. United States v. Rankin*, 870 F.2d 109, 109-10 (3d Cir. 1989) (finding that indictment sufficiently alleged obstruction of justice against the defendant and his siblings for submitting false affidavits accusing a judge of misconduct in support of a recusal motion).  But at the same time, lawyers are obligated to consider all the ramifications of their strategic decisions for their clients—and arguably, that includes whether a certain action will cause a judge to recuse himself or herself. Indeed, a lawyer could opt *not* to call a witness who might cause the recusal of a favorable judge and that undoubtedly would be a valid strategic decision.  And at oral argument this Court suggested that by filing or failing to file related case forms that would result in the assignment of a case to a certain judge, the government might have engaged—or at least might have created the "reasonable possibility" that it engaged—in judge shopping.  *See* Docket Item 825 at 10-13.  In any event, this Court need not decide that question here because even assuming that the motivation of causing recusal was "corrupt," the presence of a legitimate purpose triggers the protection of the safe harbor.

government might think has a "corrupt" motive—cannot be prosecuted.  And the reason

for the safe harbor is simple:  Without it, a defense attorney would have to think twice

before pursuing a strategy that for some reason the government might think had a

"corrupt" motive.  *See* Brief of the National Ass'n of Criminal Defense Lawyers, Amicus

Curiae, on Behalf of Defendant-Appellee, *United States v. Kloess*, 251 F.3d 941 (11th

Cir. 2001) (No. 00-13080), 2001 WL 34644491, at *15 ("To fulfill its constitutional role,

the defense bar must not be afraid of its shadow—or the shadow of a prosecution [for

obstruction of justice].  The defense bar cannot be expected to act without the

enervating fear of being second-guessed, unless its members are granted the benefit of

the doubt.").

The conceptual distinction between the broad "[o]mnibus" or "catchall" clause of

the statute, *see Aguilar*, 515 U.S. at 598, and the protection of its "safe harbor," *Simels*,

654 F.3d at 174, is the subjective versus the objective.  The statute criminalizes acts

taken with a subjectively corrupt purpose.  But to protect lawyers doing their jobs, the

statute carves out an exception for objectively legitimate strategy.  Indeed, as this Court

observed at oral argument, if that were not so, then the safe harbor would be circular

and meaningless:  Any act done "corruptly" would have no "lawful, bona fide" purpose

and therefore would not be protected; or, from the opposite perspective, any legal

services provided for a "lawful, bona fide" purpose would not be "corrupt" by definition.

*See* Docket Item 825 at 46.

## B. The Government's Position

The government would conflate those two standards and render the safe harbor anything but.  In fact, the government explicitly invites this Court to find that an attorney can be prosecuted for making a strategic decision on behalf of a client that on its face has a legitimate purpose if that decision also has an ulterior "corrupt" motive.  *See* Docket Item 798 at 12-16.  To accept that invitation, this Court would have to find that an attorney who has a "mixed motive" for taking a run-of-the-mill legal action on behalf of his client—for example, placing a relevant witness on a witness list—risks prosecution for obstruction of justice.[14]  And accepting that invitation would be both wrong and dangerous.

The government correctly cites caselaw for the generally unobjectionable proposition that a "defendant's unlawful purpose to obstruct justice is not negated by the simultaneous presence of another motive for his overall conduct."  *See* Docket Item 798 at 14 (quoting *United States v. Smith*, 831 F.3d 1207, 1217 (9th Cir. 2016)); *see also United States v. Howard*, 569 F.2d 1331, 1336 n.9 (5th Cir. 1978) (explaining that section 1503 criminalizes conduct "only if the offending action was prompted, *at least in part*, by a 'corrupt' motive" (emphasis added) (citing *United States v. Fayer*, 523 F.2d 661, 663-64 (2d Cir. 1975))).  But none of the cases upholding a "mixed motive"

---

[14] The government also suggests that Soehnlein made misleading statements to Judge Sinatra about the defense's purpose for putting the witnesses on the list following Judge Sinatra's comment about potential "gamesmanship."  *See* Docket Item 691 at 41.  As an initial matter, based on this Court's review of all the submissions—including Gerace's *ex parte* submission detailing the defense's trial strategy—this Court finds that there is no reasonable possibility that Soehnlein's statements were knowingly false or misleading.  But even assuming they were, Soehnlein's statements could not have "orchestrated" the recusal, as Judge Sinatra already had decided to recuse himself when Soehnlein made them.

prosecution implicate the attorney safe harbor. *See* Docket Item 771 at 54 (Gerace's observing that "[i]n each of the cases cited by the government, there is no objective 'good faith' or 'non-corrupt' basis for the conduct of defense counsel"). And for that reason, the government's argument and the authority it cites in support miss the mark.

Therefore—as a matter of first impression—this Court holds that an attorney is protected by the safe harbor provision if he or she has an objectively legitimate reason for making a strategic decision on behalf of a client regardless of whether there is a "mixed motive" for that decision. Indeed, the very purpose of the safe harbor is to protect attorneys who have lawful reasons for the actions they take on behalf of a client, and any other holding would threaten the Sixth Amendment right to counsel for every criminal defendant. *Cf.* Greta Fails, *The Boundary Between Zealous Advocacy and Obstruction of Justice After Sarbanes-Oxley*, 68 N.Y.U. ANN. SURV. AM. L. 397, 430 (2012) (explaining that "[t]he fear of potential prosecution for conduct that was previously considered legitimate advocacy on behalf of their clients creates a divided loyalty between [lawyers'] personal livelihood and the representation of their clients, and incentivizes lawyers to look out for themselves"). And this Court further finds that placing the names of individuals identified in discovery on a witness list to reserve the defendant's right to call them should the need arise at trial is without question protected as an action with an objectively legitimate reason.

## C.   The Implications of the Government's Position

At oral argument, the government opened with a quote by Justice Sutherland—one that is framed and hangs in the lobby of the United States Attorney's Office in Buffalo: "The United States Attorney is the representative not of an ordinary party to a

controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see* Docket Item 825 at 4.  That is a noble aspiration, and the Court has no reason to believe that the prosecutors assigned to this case were not trying to follow it here.  But what the government apparently fails to appreciate is that defense attorneys have a fundamentally different role than prosecutors.[15]  In the words of Justice White:

> [D]efense counsel has no comparable obligation to ascertain or present the truth.  Our system assigns him a different mission.  He must be and is interested in preventing the conviction of the innocent, but, absent a voluntary plea of guilty, we also insist that he defend his client whether [the client] is innocent or guilty.  The State has the obligation to present the evidence.  Defense counsel need present nothing, even if he knows what the truth is.  He need not furnish any witnesses to the police, or reveal any confidences of his client, or furnish any other information to help the prosecution's case.  If he can confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure or indecisive, that will be his normal course.  Our interest in not convicting the innocent permits counsel to put the State to its proof, to put the State's case in the worst possible light, regardless of what he thinks or knows to be the truth.  Undoubtedly there are some limits which defense counsel must observe but more often than not, defense counsel will cross-examine a prosecution witness, and impeach him if he can, even if he thinks the witness is telling the truth, just as he will attempt to destroy a witness who he thinks is lying. In this respect, . . . as part of the duty imposed on the most honorable defense counsel, we countenance or require conduct which in many instances has little, if any, relation to the search for truth.

*United States v. Wade*, 388 U.S. 218, 256-58 (1967) (dissenting in part and concurring in part) (footnotes omitted).

---

[15] This Court wants to make clear that its criticism is not directed at this trial team for bringing the motion to disqualify.  On the contrary, this Court agrees that the decisions of others in the United States Attorney's Office to investigate the so-called orchestrated recusal obligated the trial team to bring these issues to the Court's attention.

The government pays lip service to this concept, stating that it "appreciates that defense lawyers must zealously advocate for their clients."  Docket Item 691 at 65.  But its arguments belie that claim.

As an initial matter, conspicuously absent from the government's 70-page opening brief is any mention of the attorney safe harbor provision.[16]  *See* Docket Item 691.  In its reply, the government acknowledges the safe harbor—as it must—but suggests that attorneys can be prosecuted if they have "mixed motives" for a strategic legal decision in the course of representing a client.  *See* Docket Item 798 at 12-16.  That suggestion is nothing short of terrifying.

As Justice White thoughtfully observed, the obligation to zealously advocate for a client is the same whether the client is innocent or guilty.  What is more, even if the lawyer *knows* that the client is guilty, that obligation does not change.  Indeed, one could argue that what Justice White says is the very job of a defense attorney representing a guilty client includes "influenc[ing], obstruct[ing], or imped[ing], the due administration of justice."  *See* 18 U.S.C. § 1503(a).  To do that job, defense attorneys

---

[16] When questioned about this omission at oral argument, the principal author of the brief stated that she "missed the [s]afe [h]arbor [p]rovision" and that "[i]t was not an attempt to conceal anything from the Court."  Docket Item 825 at 8-9.  This Court has no reason to doubt the representation that this attorney made as an officer of the Court, and the Court appreciates the candor of her admission.  But as the Court observed at oral argument, the government's failure to cite a crucial statute reinforces the Court's concern about getting into lawyers' minds to investigate whether a legal action was taken corruptly.  *See id.* at 9 (THE COURT:  "[I]f the sides were flipped here, and the defense had the ability to bring a prosecution against the government for corruptly influencing the Court, [do] you think that . . . it's beyond question that the defendant couldn't bring that prosecution?").

Moreover, this Court has serious concerns about the fact that in a brief accusing a well-respected member of the bar of a crime, no supervisor at the United States Attorney's Office noticed the omission of a legal provision that could absolve him.

must constantly walk the tightrope of zealously advocating for their clients while staying within the bounds of ethics and professional responsibility.  And they must be able to rely on the fact that so long as they do that, they cannot be threatened with prosecution.  Otherwise, a zealous prosecutor might investigate the attorney for, in Justice White's words, "confus[ing] a witness, even a truthful one," or "cross-examin[ing] a prosecution witness, and impeach[ing] him if he can, even if he thinks the witness is telling the truth."[17]  *See Wade,* 388 U.S. at 257-58.

At oral argument, this Court posed a hypothetical:  Suppose a defense attorney has two witnesses, identical in every way, but one will prompt the recusal of a judge who the attorney does not think is good for his client.  If the attorney puts that witness on the list, has that attorney committed a crime?  The government answered that "it's a question of fact that ultimately would be up for a grand jury to decide.  The law says yes."  Docket Item 825 at 15; *see id.* at 29 ("THE COURT: Let me go back to the question that I asked though.  If a lawyer has a legitimate reason to put somebody on a witness list, but in the lawyer's heart of hearts, the only reason that he is putting that person on the witness list is to get rid of the judge, has the lawyer committed a crime that is not protected by the [s]afe [h]arbor?  [THE GOVERNMENT]: I think the lawyer has engaged in conduct meriting an investigation . . . .").  As this Court remarked at oral argument, that is "downright scary."  *Id.* at 25.

---

[17] A philosophy professor might well be able to make a convincing argument that such lawyering is indeed "corrupt."  The point is that unless the harbor is truly safe, there is no limit on the discretion of prosecutors to tilt the playing field by instilling worry in their opponents.

What if the hypothetical were slightly different?  What if one of the two hypothetical witnesses was ever so slightly better for the defendant, but that witness would compel the judge to recuse?  Whom should the lawyer put on the list?  The correct answer, of course, is the witness who is better for the client.  But if that might make the lawyer a subject or target of a federal criminal investigation, a reasonable attorney might well be tempted to put the slightly worse witness on the list.

In this Court's view, preventing that kind of hesitation is the purpose of section 1515(c).  Put another way, the safe harbor protects defense attorneys from being accused of obstructing justice merely for doing their jobs.  Indeed, the safe harbor was enacted because of concerns about prosecutors using their power to harass members of the defense bar.  *See* 132 CONG. REC. H11291 (Oct. 17, 1986) ("The Subcommittee on Criminal Justice has received complaints of prosecutor[s'] harassing members of the defense bar.  Vigorously and zealously representing a client, however, is not a basis for charging an offense under the obstruction of justice chapter.  Section 50(2) therefore amends 18 U.S.C. [§] 1515 to provide specifically that the lawful, bona fide provision of legal representation services does not constitute an offense under any of the obstruction of justice offenses in 18 U.S.C. [chapter] 73." (statement of Rep. Berman)).

The government suggests that a reading of section 1515(c) that does not permit a "mixed motive[]" prosecution "would effectively immunize from scrutiny all but the most unscrupulous members of the bar."  Docket Item 798 at 13.  But that is the point of section 1515(c).[18]  The only lawyers who should fear prosecution for strategic choices

---

[18] Moreover, criminal prosecution is not the only way that lawyers are scrutinized. Lawyers who do not abide by the professional rules of conduct are subject to attorney discipline and damage to their reputations.

they make in representing their clients are those who engage in conduct that is without question criminal—for example, falsifying affidavits, *see St. John*, 267 F. App'x at 20;[19] intimidating witnesses, *see Simels*, 654 F.3d at 172-75; falsely promising clients that the attorney could bribe government officials to drop the charges against the client, *see United States v. Fisch*, 2021 WL 2396435, at *2 (S.D. Tex. Mar. 12, 2021); concocting a representation to prevent a witness from testifying, *see Cintolo*, 818 F.2d at 995; and the like.[20]

In its supplemental letter submission, the government doubles down on its position, arguing that "whether the witness names were found in the discovery materials is of no consequence."  Docket Item 886 at 3 n.2.  Rather, the government says, "[t]he issue is whether the identified witnesses were *actually* material to . . . Gerace's defense."  *Id.* (emphasis added).  In other words, "the issue"—in the government's view—is not whether "Gerace *could* place Judge Sinatra's relatives on his witness list owing to their identification in discovery" but whether that was in fact the defense team's primary reason for doing so.[21]  *See id.* at 2 ("The issue of the actual materiality of the

---

[19] *See* note 12, *supra*.

[20] The government's suggestion that "the appropriate stage" at which this Court should concern itself with the safe harbor is "trial," Docket Item 798 at 16, fails to appreciate the chilling effect of a federal investigation—not to mention an indictment—of an attorney for merely doing his or her job.

[21] The government also frames the issue as "whether . . . Gerace and/or his attorneys *lied* to Judge Sinatra to *force* his Honor's recusal and delay proceedings." Docket Item 886 at 2.  Based on the parties' submissions, the Court sees no reasonable possibility that the defense team "lied" about the possibility that at least one of these individuals was "likely" to be called as a material witness in Gerace's trial.  But in any event, as noted above, the defense has given an objectively legitimate explanation for why these witnesses may be material if the need arises to call them, and no more is required.

witnesses to . . . Gerace's defense exists independent of whether . . . Gerace and his

attorneys had a 'legitimate reason'—i.e., presence in the discovery—'to put the person

on the witness list.'").

This Court disagrees.  On the contrary, the issue is precisely whether Gerace's

defense team had an objectively legitimate reason for putting the witnesses on the list.

And if they did—as this Court finds is the case here—that is the end of the inquiry.

When an attorney takes some action on behalf of and for the benefit of a client in a

pending case, then as long as there is an objectively lawful and legitimate purpose for

that action, the attorney can take it without fear of personal prosecution.  Stated another

way, the safe harbor prevents the government, this Court, or anyone else from inquiring

into a lawyer's purported ulterior motives for an objectively legitimate decision.[22]

### D.  The Caselaw

Typically, prosecutions of lawyers for obstruction of justice fall into three

categories:

> First, lawyers are prosecuted for obstruction violations in the context of a
> large underlying criminal scheme in which the lawyers were intimately
> involved for their own personal gain and actively obstructed a proceeding
> to cover their tracks.  These prosecutions focus on lawyers' personal
> actions and their personal involvement in criminal schemes like fraud and
> money laundering, not necessarily their advocacy on behalf of their clients.

---

[22] This conclusion applies with equal force to government lawyers, even though
they do not share the same vulnerability to prosecution as the defense.  This Court has
noted several examples of instances in which, if the sides were flipped, the government
could be accused of having a corrupt ulterior motive.  *See* Docket Item 825 at 6-11, 36.
The Court gave those examples not to accuse the government of "bad faith"—as the
government complains in its supplemental letter submission, Docket Item 886 at 6-9—
but to prove a point:  *All* lawyers' strategic decisions are at times vulnerable to a
suspected corrupt motive.  And that is why the safe harbor must protect them *all*—those
who have the discretion to begin a criminal investigation and prosecution and those who
do not.

> Second, lawyers are prosecuted for obstruction violations when an underlying crime in which the lawyers were involved is difficult to prove and it is easier for prosecutors to meet their burden of proof on the obstruction charge.  Third, lawyers are prosecuted for obstruction of justice on its own, not connected to any underlying crimes, when they clearly leap over the line from zealous advocacy into criminal behavior.  For example, lawyers who bribe or threaten witnesses are unmistakably vulnerable to prosecution.

Fails, *supra*, at 414-15 (footnotes omitted).  In all those scenarios, "lawyers' ethical duties align with their legal obligations," and there is no ambiguity as to the line between zealous advocacy and criminal conduct.  *Id.* at 415.

The parties do not cite—nor has this Court found—any case that addresses the precise question presented here: whether an attorney who takes an objectively legitimate legal action on behalf of a client for a suspicious reason can face prosecution under section 1503.  That likely is because such a prosecution has rarely, if ever, been brought.

Indeed, in most cases involving a lawyer's criminal activity, the safe harbor provision is almost superfluous:  Either the conduct was corrupt and illegal, or it was a bona fide legal service; it could not be both.  *See, e.g.*, *St. John*, 267 F. App'x at 22 (finding no clear error in district court's failure to instruct the jury on the safe harbor because "the jury was instructed that it necessarily had to find that the defendants knowingly conspired to pursue an unlawful purpose" and "[t]his instruction, by definition, excludes the possibility of bona fide legal advice constituting criminal behavior"); *Fisch*, 2021 WL 2396435, at *2 (rejecting claim of ineffective assistance of counsel for failing to raise the safe harbor at trial, finding that "Fisch's defense counsel had no basis to pursue what would have been a futile defense"); *see also Lonich*, 23 F.4th at 907 (finding that safe harbor did not protect lawyer who "urged [his client] to testify" to facts that were "either outright false, seriously misleading, or both" regarding a fraudulent

31

financial scheme that the government alleged the lawyer was involved in).[23]  Or the

conduct at issue is not a typical task of a lawyer, but the lawyer argues that it

nonetheless constituted a bona fide legal service.  *See Kellington*, 217 F.3d at 1089

(lawyer charged with obstruction of justice for following his client's instruction to have a

third party destroy evidence prior to the client's fugitive court proceeding).[24]

---

[23] The government notes that the lawyer in *Lonich* "insisted that, in his view, his instructions were consistent with the truth."  Docket Item 886 at 1-2.  According to the government, this suggests that it is permissible to inquire into a lawyer's motivations for taking a certain action in representing a client.  *See id.*  But *Lonich* did not involve a question of mixed motive for taking an objectively legitimate legal action or conduct that fell close to the line between proper advocacy and attorney misconduct.  Indeed, the Ninth Circuit acknowledged that "[l]awyers of course have some latitude in helping clients frame their anticipated testimony in a light most favorable to them, consistent with the truth" but found that the conduct at issue in that case went well beyond that.  *Lonich*, 23 F.4th at 907.  What is more, in *Lonich*, there was a factual question as to whether the defendant was even acting as a lawyer when he committed the acts at issue.  *See id.* (finding that "*even assuming* he had an attorney-client relationship with House or a legal relationship with 101 Houseco (an entity created to perpetuate a fraud), a rational jury could find that Lonich's recorded conversations with House go far beyond 'lawful, bona fide' legal advice" (emphasis added)).

[24] The government relies on *Kellington* for the proposition that "'in the prosecution of a lawyer for conduct stemming from his or her representation of a client,' the government may use evidence—including expert testimony on the lawyer's ethical obligations—'to establish the lawyer's intent and state of mind.'"  Docket Item 886 at 1 (emphasis omitted) (quoting *Kellington*, 217 F.3d at 1098).  But unlike this case, *Kellington* did not involve any objectively legitimate legal action.  On the contrary, as noted above, the lawyer in *Kellington* sought to use evidence of his ethical obligations to absolve himself of an act that common sense suggested was corrupt.  Indeed, although the district court initially granted Kellington a judgment of acquittal, the Ninth Circuit reversed, finding that "[i]t strain[ed] credibility well past the breaking point to assert that Kellington did not know and appreciate the connection between the immediate burning of documents and the fugitive federal court proceeding on Monday."  *United States v. Kellington*, 139 F.3d 909 (9th Cir. 1998).

Moreover, what the lawyer did in *Kellington*—tell a third party to destroy some documents—could not have had a bona fide purpose in connection with the lawyer's role *as a lawyer.*  In other words, the lawyer either told the third party to destroy the documents to help the client's case (in which case the request to destroy the documents was complicit in the destruction of evidence with no bona fide, legitimate purpose in connection with the lawyer's representation of the client) or the documents had nothing

This Court has found one case, however, that is instructive.  In *United States v.*
*Stevens*, an attorney was charged with obstructing a proceeding in violation of 18
U.S.C. § 1512, falsifying and concealing documents in violation of 18 U.S.C. § 1519,
and making false statements in violation of 18 U.S.C. § 1001.  771 F. Supp. 2d 556, 559
(D. Md. 2011).  "The charges arose out of Stevens'[s] response to an inquiry by the
United States Food and Drug Administration ('FDA') into  . . . alleged off-label promotion
[by Stevens's client, GlaxoSmithKlein ('GSK')] of the anti-depressant drug Wellbutrin
SR[.]"  *Id.*  More specifically,

> The United States allege[d] that Stevens obstructed the FDA's investigation
> by withholding and concealing documents and other information about
> GSK's promotional activities for Wellbutrin, including for unapproved uses,
> while representing to the FDA that she had completed her response to its
> inquiry, and that Stevens falsified and altered documents in order to impede
> the FDA's investigation of GSK.  In particular, the [g]overnment allege[d
> that] Stevens withheld slide sets used by speakers at GSK promotional
> events that promoted off-label use of Wellbutrin and withheld information
> regarding compensation received by attendees at promotional events.  The
> [g]overnment [also] allege[d] that Stevens signed and sent to the FDA six
> letters containing materially false statements regarding GSK's promotion of
> Wellbutrin for off-label uses.

*Id.* (internal citations omitted).

The case went to trial before the Honorable Roger W. Titus, a United States
District Judge in the District of Maryland.  At the close of the government's case,
Stevens moved for a judgment of acquittal under Federal Rule of Criminal Procedure
29(a).  *See* Transcript of Oral Argument at 3, *United States v. Stevens*, No. 8:10-cr-

---

to do with the case (in which case the request to destroy the documents was not
connected in any way with the lawyer's role as lawyer).  Either way, the safe harbor was
inapplicable.

0694 (D. Md. May 11, 2022), ECF No. 190 ("*Stevens* Transcript").  Based on the safe

harbor, Judge Titus granted the motion on the charge of obstructing justice.[25]  *Id.* at 6.

Judge Titus began by noting that most of the evidence presented at trial was

information that is normally protected by the attorney-client privilege.  *Id.* at 3.  Those

documents had been produced, however, under an order issued by a magistrate judge

in the District of Massachusetts invoking the crime-fraud exception.  *Id.*  Judge Titus

commented that "[w]ith the 20/20 vision of hindsight, and that's always the place to be in

terms of wisdom, the Massachusetts Order was an unfortunate one" and "access should

not have been granted."  *Id.* at 5.  In any event, Judge Titus continued, those

documents

> show that this was a [lawyer] that was not engaged to assist a client to
> perpetrate a crime or fraud.  Instead, the privileged documents in this case
> show a studied, thoughtful analysis of an extremely broad request from the
> [FDA] and an enormous effort to assemble information and respond on
> behalf of the client.
>
> The responses that were given by the defendant in this case may not have
> been perfect; they may not have satisfied the FDA.  They were, however,
> sent to the FDA in the course of her bona fide legal representation of a client
> and in good faith reliance of both external and internal lawyers for [GSK].

*Id.*  Based on that assessment, Judge Titus granted Stevens's motion on the obstruction

charges.  *Id.* at 6 (concluding that section 1515(c) "is an absolute bar" and "on the basis

of this record[,] . . . no reasonable juror could conclude otherwise beyond a reasonable

doubt").

In reaching his decision, Judge Titus made several comments that are relevant

here.  He first noted that "the [s]afe [h]arbor [p]rovision is designed specifically to protect

---

[25] The court also granted Stevens's Rule 29 motion with respect to the false
statement counts but on different grounds.  *See Stevens* Transcript at 6-10.

an attorney who is acting in accordance with the obligation that every lawyer has to zealously represent his or her client[s] and place their position in the most favorable possible light." *Id.* Indeed, Judge Titus said, "[t]hat is the obligation of a lawyer as pointed out in the proceedings in Congress when 1515(c) was adopted." *Id.* At that time, "[t]he Subcommittee on Criminal Justice had received complaints of prosecutors harassing members of the defense bar" and wanted to make clear "that vigorously and zealously representing a client is no[t] a basis for charging an offense under the [o]bstruction of [j]ustice chapter." *Id.*

Judge Titus added that

there are serious implications for the practice of law generated by this prosecution. Lawyers can never assist a client in the commission of a crime or a fraud, and that's well established. Lawyers do not get a free pass to commit crimes. I have presided over other trials of lawyers and have sent some to jail.

. . .

However, a lawyer should never fear prosecution because of advice . . . given to a client . . . , and a client should never fear that its confidences will be divulged unless its purpose in consulting the lawyer was for the purpose of committing a crime or a fraud.

There is an enormous potential for abuse in allowing prosecution of an attorney for the giving of legal advice. I conclude that the defendant in this case should never have been prosecuted and she should be permitted to resume her career.

The institutional problem that causes me . . . great concern is that while lawyers should not get a free pass, the Court should be vigilant to permit the practice of law to be carried on, to be engaged in, and to allow lawyers to do their job of zealously representing the interests of their client[s]. Anything that interferes with that is something that the court system should not countenance.

*Id.* at 9-10.

The First Circuit's decision in *Cintolo* also lends some insight.  In that case, an attorney was charged "with one count of conspiracy to obstruct justice, 18 U.S.C. §§ 371, 1503, and two substantive counts of obstruction of justice, 18 U.S.C. § 1503."  *Cintolo*, 818 F.2d at 983.  The government alleged that Cintolo had conspired with Gennaro Angiulo to obstruct justice "by befouling the proceedings of a federal grand jury investigating the criminal activities of the Angiulo gang."  *Id.* at 984. "According to the indictment, Cintolo set out to accomplish this nefarious end through the use of his position as attorney of record for Walter LaFreniere, a witness before the grand jury, to acquire information about the ongoing investigation for Angiulo's benefit." *Id.*  "The indictment further charged Cintolo with knowingly assisting Angiulo in his efforts to inhibit LaFreniere, *after the latter had been granted immunity*, from testifying truthfully before the grand jury, or from cooperating in any way with the investigation." *Id.* (emphasis added).

At trial, Cintolo "testified that, although he was aware of Angiulo's involvement in illegal businesses, he had not acted with the intent corruptly to obstruct or impede justice while representing LaFreniere."  *Id.* at 989.  Rather, "he claimed to have been cooperating—or pretending to cooperate—with Angiulo solely to enhance his ability to counsel his true client (LaFreniere)."  *Id.*  "The jury obviously disbelieved these assertions and drew a different set of inferences."  *Id.*  Ultimately, "[a]fter a lengthy trial, the jury found [Cintolo] guilty on the conspiracy count, but not guilty on the substantive obstruction counts."  *Id.* at 983.

On appeal, Cintolo again argued "that his authentic motive in pursuing [his] perilous course of conduct was to obtain information from Angiulo that would assist him

36

in representing the interests of LaFreniere." *Id.* at 989.  Cintolo urged the First Circuit to accept this explanation notwithstanding the jury's rejection of it.  *Id.*

In a thoughtful opinion, the First Circuit noted that "[a]s important a role as defense counsel serve—and we do not minimize its importance one whit—the acceptance of a retainer by a lawyer in a criminal case cannot become functionally equivalent to the lawyer's acceptance of a roving commission to flout the criminal law with impunity." *Id.* at 990.  In the First Circuit's view, Cintolo's "suggestion that the jury be precluded, as a matter of law, from drawing its own (reasonable) conclusions as to why any defendant—or, more narrowly put, a lawyer-defendant—committed acts not unlawful in and of themselves would do enormous violence to the statute and play unwarranted havoc with its enforcement." *Id.* at 991; *see id.* at 996 ("emphatically reject[ing] the notion that a law degree, like some sorcerer's amulet, can ward off the rigors of the criminal law").

Importantly, however, the *Cintolo* court noted that "[t]he question of whether an attorney who does no more than file motions, make court appearances, and the like—however dilatory they may seem, however much they may slow the progress of a grand jury probe—can ever be subject to [section] 1503 liability for such conduct alone, is not before us." *Id.* at 995.  Indeed, the First Circuit observed, "[w]e *recognize the dangers that are present if prosecutors can be allowed to inquire into motive in such confined circumstances*, and we respect the importance of allowing defense counsel to perform legitimate activities without let or hindrance." *Id.* (emphasis added).  The First Circuit did "not see [Cintolo's] case, however, edging into that *forbidden terrain*." *Id.* (emphasis added).

Likewise, in *Cueto*, the Seventh Circuit affirmed the conviction of a lawyer who had "corrupt[ly] endeavor[ed] to protect [an] illegal gambling operation and to safeguard his own financial interest."  151 F.3d at 631.  Among other things, the indictment alleged that the defendant, Amiel Cueto—who was not the attorney of record—"corruptly endeavored to influence, obstruct, and impede the proceedings in federal district court by preparing and filing and urging defense counsel to prepare and file false pleadings and court papers in connection with the racketeering case."  *Id.* at 629.

The Seventh Circuit rejected the contention that lawyers are immune from prosecution for illegal activities conducted through the guise of litigation and held that "the omnibus clause of [section] 1503 may be used to prosecute a lawyer's litigation-related criminality."  *Id.* at 632.  "Although we appreciate that it is of significant importance to avoid chilling vigorous advocacy and to maintain the balance of effective representation," the Seventh Circuit explained, "we also recognize that a lawyer's misconduct and criminal acts are not absolutely immune from prosecution."  *Id.*

The court noted, however, that "[i]t is undisputed that an attorney may use any *lawful* means to defend his client, and there is no risk of criminal liability if those means employed by the attorney in his endeavors to represent his client remain within the scope of lawful conduct."  *Id.* at 631.  And crucially, like the First Circuit in *Cintolo*, the Seventh Circuit stated: "We respect the importance of allowing defense counsel to perform legitimate activities without hindrance and *recognize the potential dangers that could arise if prosecutors were permitted to inquire into the motives of criminal defense attorneys ad hoc*."  *Id.* at 634 (emphasis added).  The court concluded that the facts before it—a lawyer protecting his own financial interest in an illegal gambling operation

38

by filing and urging defense counsel to file false pleadings and court papers—did "not create that avenue of inquiry" and emphasized that its "conclusion [wa]s limited to the specific facts of th[at] case." *Id.*

What the Court gleans from this admittedly sparse caselaw is that while lawyers cannot use their J.D.s to escape prosecution for criminal conduct, it is equally important that a lawyer not risk prosecution for conduct that is objectively within the bounds of the rules of professional responsibility.  This is even more crucial in the context of criminal defense where the client's Sixth Amendment right is at stake.  In order for criminal defense attorneys to keep a singular focus on their clients' interests—as the Constitution requires—they must not fear prosecution based on an action that some prosecutor might think has a secret, ulterior motive.

The case before this Court is precisely the type of case about which the courts in *Cintolo* and *Cueto* cautioned.[26]  It is a case in which criminal liability hinges on the government being "permitted to inquire into the motives of criminal defense attorneys" for an action that they had a reasonable justification—and arguably an obligation—to take.  *See Cueto*, 151 F.3d at 634; *Cintolo*, 818 F.2d at 995; *see also Stevens* Transcript at 10 ("There is an enormous potential for abuse in allowing prosecution of an attorney for the giving of legal advice.").

Allowing prosecution of defense counsel in this type of case "would chill the client's right to receive objective unbiased advice by placing the lawyer who advocates

---

[26] Interestingly, neither *Cintolo* nor *Cueto* dealt explicitly with the safe harbor—in *Cintolo*, presumably because the provision had not been enacted at the time of the defendant's trial.  In both cases, the courts were merely analyzing the applicability of section 1503 to attorneys' conduct.  But those courts' warnings are all the more glaring in the light of the safe harbor provision.

an aggressive strategy, but not one who advocates a collaborative strategy, in legal

jeopardy."  Brief of Amicus Curiae New York Council of Defense Lawyers in Support of

Petitioner, *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) (No. 04-368),

2005 WL 435901, at *3.[27]  Moreover, it would "create[] the risk that the unscrupulous

defendant (the one most frequently in need of legal representation) will at some point

turn around and attempt to use his attorney's advice against the attorney."  *Id.* at *15.

That prospect is particularly troubling given that most, if not all, seasoned defense

---

[27] In *United States v. Arthur Andersen, LLP*, the Fifth Circuit affirmed the conviction under 18 U.S.C. § 1512(b)(2) of Arthur Andersen, LLP—an accounting and consulting firm—in connection with the dramatic demise of the Enron Corporation.  374 F.3d 281, 284 (5th Cir. 2004); *see* 18 U.S.C. § 1512(b) ("Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . cause or induce any person to[] (A) . . . withhold a record, document, or other object, from an official proceeding; [or] (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding . . . shall be [guilty of a crime].").  The Fifth Circuit held that "[s]ection 1512(b)(2) does not require that the defendant act willfully, and does not provide that a defendant may be convicted only if the defendant knows his conduct is unlawful."  *Arthur Andersen*, 374 F.3d at 299.  According to the Fifth Circuit, "one could act with an improper purpose even if one did not know that the actions were unlawful."  *Id.* at 299-300.

The Supreme Court granted certiorari, and the New York Council of Defense Lawyers filed a powerful amicus brief arguing that even though the case did not involve lawyers, the implication for criminal defense attorneys would be profoundly dangerous.  Brief of Amicus Curiae, *Arthur Andersen*, 2005 WL 435901.  Among other things, the Council of Defense Lawyers argued that for a variety of reasons—including the circular language of the statute and the lack of case law interpreting it—the presence of the safe harbor did "not allay the concerns that the construction adopted below would criminalize advice and conduct by attorneys acting as zealous advocates."  *Id.* at *9-10.

Ultimately, the Supreme Court reversed the Fifth Circuit and held that "[o]nly persons conscious of wrongdoing can be said to 'knowingly . . . corruptly persuad[e].'  And limiting criminality to persuaders conscious of their wrongdoing sensibly allows [section] 1512(b) to reach only those with the level of 'culpability . . . we usually require in order to impose criminal liability.'"  *Arthur Andersen*, 544 U.S. at 706 (alterations in original) (quoting *Aguilar*, 515 U.S. at 602).

attorneys have had the experience of zealously representing a client who ultimately is convicted—either at trial or by pleading guilty—and who subsequently files a habeas petition accusing the attorney of misconduct.  And "[i]n that event"—if a mixed-motive prosecution is allowed—"all that would stand between the attorney and criminal investigation is the judgment of a prosecutor."  *Id.*

For all those reasons, this Court finds that Soehnlein's actions are protected by the safe harbor provision, and, for that reason, there is not a reasonable possibility that he committed a crime in submitting Gerace's witness list.  Therefore, even if there is a conflict of some sort, there is no *per se* unwaivable conflict.

## II.    THE ALLEGEDLY FALSE AFFIDAVITS

There is no question that an attorney's submitting false affidavits to a court can constitute obstruction of justice.  Indeed, that is precisely the type of act that the safe harbor does not protect.[28]  The question, then, is whether there is a reasonable possibility that Soehnlein had some involvement in or knowledge of the alleged conduct such that his interests are adverse to those of his client.

---

[28] Submitting a false affidavit has no objectively lawful, bona fide purpose.  So if a lawyer does that, the question is whether the lawyer knew the affidavit to be false and therefore acted corruptly.  Because filing the false affidavit had no objectively lawful, bona fide purpose, the safe harbor provision would not preclude inquiry into the lawyer's state of mind.  *Cf. Cueto*, 151 F.3d at 632 ("There is a discernable difference between an honest lawyer who unintentionally submits a false statement to the court and an attorney with specific corrupt intentions who files papers in bad faith knowing that they contain false representations and/or inaccurate facts in an attempt to hinder judicial proceedings.").  And if there was a dispute about whether or not the affidavit was false, the question in a context like the one presented here would be whether there was a reasonable possibility that the affidavit was false; if so, the lawyer's disqualification likely would be required.

The government conceded at oral argument that it has no evidence that Soehnlein was involved in submitting the allegedly false affidavits.  *See* Docket Item 825 at 30-31 (THE COURT: "What evidence do [you] have that . . . Soehnlein was involved in that, or would be a witness to it, given the fact that he had already left his representation of . . . Gerace when those affidavits were prepared?  [THE GOVERNMENT]: So, involved in it, Judge, I would say that I can think of right now[,] none.").  The government instead argued that there is "a reasonable possibility that [Soehnlein] was a witness to events surrounding [the false affidavits]" because "he rejoined the representation of Mr. Gerace, who very likely was involved in the decisions to pursue the false affidavits."  *Id.* at 31.  But as this Court noted at oral argument—and as the government acknowledged—any conversations *after the fact* between Soehnlein and Gerace about criminal activity in which Gerace had participated are protected by the attorney-client privilege.  *See id.* at 31-32; *see also SEC v. Collector's Coffee Inc.*, 338 F.R.D. 309, 316 (S.D.N.Y. 2021) (explaining that "the crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud.  Instead, the client communication or attorney work product in question must *itself* be in furtherance of the crime or fraud." (alterations omitted) (quoting *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995))).

So the government is left with the argument that there is a reasonable possibility that Soehnlein had conversations with Gerace about Gerace's intent to submit false affidavits even though Soehnlein withdrew two months before the affidavits were submitted and more than a month before the events to which the affidavits referred.  Simply put, that is not plausible, let alone a reasonable possibility.

This conclusion is bolstered by the representations to the Court by Soehnlein's counsel and by *Curcio* counsel for Gerace, both of whom have assured the Court that—based on what they know—there is no conflict.  *See* Docket Item 825 at 41-43; *cf. Cain*, 671 F.3d at 292 (affirming disqualification of defense counsel after *Curcio* counsel "expressed the view that . . . [the] conflict was unwaivable").

Thus, this Court finds that there is not a reasonable possibility that Soehnlein will be called as a witness against Gerace with respect to the allegedly falsified affidavits.

## **CONCLUSION**

On the sixtieth anniversary of the Supreme Court's decision in *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963), United States Attorney General Merrick Garland observed that "[c]riminal defense attorneys put the government's case to the test," and "[i]n so doing, they make every part of our system fairer, more equal, and more just." Merrick B. Garland, U.S. Att'y Gen., Remarks at the Office of Access to Justice's *Gideon* Celebration (Mar. 17, 2023).[29]  Indeed, Garland added, "only the presence of counsel zealously defending their clients' rights can ensure public confidence in the legitimacy of judicial proceedings, regardless of their outcome."  *Id.*  But in order to zealously advocate for their clients—as the Constitution demands—lawyers must not fear prosecution for legitimate strategic decisions.  A criminal defense lawyer can ask only one question in making a legitimate strategic decision:  Is this the best thing for my client?

---

[29] *Available at* https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-remarks-office-access-justices-gideon.

It is not undue drama to say that if a lawyer can be prosecuted for obstruction of justice based on "mixed motives" for an objectively bona fide legal action taken on behalf of a client, that will create a conflict for every defense attorney's representation of every client.  Lawyers should not have to worry that their objectively legitimate strategic decisions will lead to a criminal investigation whenever the government perceives a nefarious motive.  This Court's holding today seeks to ensure that they do not have to.  And in doing so, the Court safeguards defendants' Sixth Amendment right to conflict-free counsel.

In sum, for all the reasons stated above, this Court finds that there is not a reasonable possibility that Soehnlein has committed or witnessed a crime.  There is no *per se* conflict, and, therefore, the government's motion to disqualify, Docket Item 691, is DENIED.


        SO ORDERED.

        Dated:   April 25, 2024
                 Buffalo, New York



                                        */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE


44