IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

              v.                                    19-CR-227-LJV
                                                      23-CR-37-LJV

PETER GERACE, JR.,

                Defendant
_____

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF EXPERT WITNESS TESTIMONY**

The UNITED STATES OF AMERICA, by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, Joseph M. Tripi, Nicholas T. Cooper, and Casey L. Chalbeck, Assistant United States Attorneys, hereby submits the following memorandum of law in support of the admission of sex trafficking expert witness testimony.

## I.     FACTUAL BACKGROUND

The government seeks to admit the testimony of Rebecca Bender, a subject matter expert on sex and human trafficking. Ms. Bender is an expert in the areas of sex and human trafficking. She is the founder and CEO of the Rebecca Bender Initiative ("RBI") and Elevate Academy. The United States Department of Health and Human Services has appointed Ms. Bender to the National Advisory Council to Congress. She has received numerous public and private awards for her work, as listed page 5 of her curriculum vitae ("CV"), which is attached and incorporated by reference as **Exhibit A**. Ms. Bender has testified or assisted as an expert witness in State Courts in California, Oregon, and Texas. In the last four years specifically, Ms. Bender has testified or assisted as an expert in the following proceeding:

1. State of California v. Herbert Goodwin (testified at trial)
2. State of California v. Jonathan Boyd (testified at trial)
3. State of California v. Samantha Johnson (testified at trial)
4. State of Oregon v. Virgil Rucker (assisted as expert)
5. State of Oregon v. Javeion Drum (assisted as expert)
6. United States v. Tremont "Macknificent" Blakemore (assisted as expert)
7. State of Texas v. Damon Sharrod Cross (testified at trial)
8. Plaintiffs v. Lorin Ashton (drafted report and was deposed)

Through her work at RBI, Ms. Bender has interacted with over 1700 human trafficking survivors through RBI and she has personal experience as an individual who was sex trafficked for approximately six years, including through strip clubs. Ms. Bender trains professionals and law enforcement agencies, including members of the FBI and the Department of Homeland Security Investigations, to identify and investigate sex trafficking committed through the use of force, fraud, and coercion. She has trained over *120,000* community professionals.

In this case, Ms. Bender will testify regarding:

• The dynamics of sex trafficking, including the use of force, fraud, and coercion by sex traffickers.

• The methods of psychological control and manipulation traffickers use over their victims to ensure compliance, including, among others: threats, rewards, violence, preying on known drug addiction or dependence, and false promises;

• The use of drugs to coerce victims into commercial sex acts, including providing drugs to, and then withholding drugs from, known drug addicts to coerce victims into engaging in commercial sex acts.

• Sex traffickers' use of threats to the financial, professional, and reputational well-being of their victims to coerce commercial sex acts. This will include testimony regarding coercion through an employer's control of work shifts and outside employment opportunities, and how the threatening loss of livelihood coerces a victim into engaging in commercial sex acts.

• Why victims continue to engage in sex trafficking when they do not want to, including fear of violence, drug withdrawal, or economic consequences.

• How some sex trafficking victims feel a sense of loyalty to, or dependence upon, their traffickers.

• How it is rare for sex trafficking victims to promptly report their traffickers to law enforcement.

• How traffickers often identify potential victims, including by looking for someone that appears (among other characteristics) easy to control or has a characteristic or need the trafficker can exploit, such as a drug addiction, a need for shelter, or inadequate support outside of the relationship with the trafficker.

More specifically, the government anticipates that Ms. Bender may testify to (1) terms commonly used in sex trafficking cases, such as "pimp," "John," and/or "trick"; (2) factors that make victims more susceptive to influence by traffickers such as an unstable family background, housing insecurity, drug addictions that can be controlled, and mental illness; (3) why traffickers tender to target such individuals (e.g., such victims are easier to control); (4) recruitment strategies, such as being a "finesse pimp" or a "Romeo pimp"—*i.e.*, a trafficker who acts like a boyfriend, provides housing, food, clothes, affection, attention, makes promises of a "better life" and wealth, and otherwise grooms his victims and controls them via manipulation; (5) the logistics of sex trafficking—*i.e.*, venues such as escort/stag agencies, strip clubs, massage parlors, and brothels; (6) control tactics, to include the purpose of using coercion, the types of coercion used in sex trafficking (i.e., economic coercion, like withholding or controlling shifts, withholding drugs, emotional manipulation, etc.); and (7) victimology, to include why victims might stay with their traffickers (e.g., addiction, trauma-bonding, affection, desperation, a sense that the trafficker or the trafficker's venue is their world, and insecurity), why victims may be uncooperative with law enforcement (e.g., shame, fear, or a sense of loyalty to the trafficker).

To give the Court a **general** sense of Ms. Bender's testimony, transcripts of two other sex trafficking experts, Carrie Landau and James Hardie, are attached as **Exhibits B** and **C**, respectively.[1] A panel of the Eighth Circuit recently affirmed the admission of Ms. Landau's testimony. *See United States v. Washington*, 810 F. App'x 478, 481 (8th Cir. 2020) ("We find no abuse of discretion in allowing an expert to testify about the business and jargon of sex trafficking" because "[t]he expert had adequate credentials and sufficient factual data on which to base her testimony"). Likewise, the District Court for the Western District of Michigan affirmed the admission of Mr. Hardie's testimony, concluding that it was relevant to the charges in that case, "particularly as it relate[d] to the means used to recruit and control [ ] victims." *United States v. Jackson*, 299 F.R.D. 543, 547 (W.D. Mich. 2014).

## II.    LEGAL FRAMEWORK

### 1.    Federal Rule of Evidence 702

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. That Rule instructs courts to consider first the expert's qualifications. *See* FED. R. EVID. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence

---

[1]    Ms. Bender's testimony will not be identical to the testimony involved *Washington* and *Jackson*, as the relevant fact patterns in those cases diverge from the facts and charges here. For example, though defendant Washington was, like Mr. Gerace, charged with sex trafficking in violation of 18 U.S.C. § 1591(a), he was also charged with transportation to engage in prostitution in violation of 18 U.S.C. § 2421(a). Consequently, Ms. Landau's testimony focuses, at times, on issues like interstate travel and prostitution that are less relevant to this case. *See* Ex. B at PDF Pg. 32 ("Q. And what is the most common method that you see travel happen during sex trafficking? A. By way of vehicle or public transportation even from state to state, trains, and buses. But vehicle, generally."). Similarly, the child sex trafficking charges at issue in *Jackson* framed Mr. Hardie's testimony in that case. *See* Ex. C at PDF Pg. 5 ("Q. Are there any common traits of child victims of prostitution in terms of their background that you know of? A. Well, typically within the sex trafficking organizations the pimps, and the pimps are the traffickers or the leader of that organization, will recruit victims that are easy to manipulate, so they're essentially looking for somebody that has some sort of weakness.").

or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.").

Next, courts must decide whether the expert's testimony "rests on a reliable foundation or is simply based on 'subjective believe or unsupported speculation.'" *United States v. Kidd*, 385 F. Supp. 3d 259, 263 (S.D.N.Y. 2019) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). If the court determines that a witness is qualified to testify as an expert and that the opinion is reliable, the court must consider whether the proffered testimony will "help the trier of fact." Fed. R. Evid. 702.

As the Supreme Court stated in *Daubert*, the drafting history of Rule 702 reflects the "liberal thrust" of the Federal Rules of Evidence and their "general approach of relaxing the traditional barriers to 'opinion testimony.'" *Daubert*, 509 U.S. at 588 (*citing Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). Indeed, the Second Circuit has advised that "*Daubert* reinforces the idea that there should be a presumption of admissibility of evidence." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995). *Daubert* also "emphasizes the need for flexibility in assessing whether evidence is admissible . . . permit[ting] the trial judge to weigh various considerations pertinent to the issue in question." *Id.* In determining whether to admit or exclude expert testimony, the district court "has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case." *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002).

Under Rule 702, a trial judge must ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Thus, the central task of the trial court is "to make certain that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  The Advisory Committee Notes to Rule 702 make clear that to be admissible as expert testimony, the testimony need not be scientific, but instead may be based on "experience alone—or experience in conjunction with other knowledge, skill, training or education."  Fed. R. Evid. 702, Advisory Committee's Note (2000).  The Supreme Court has also recognized that an expert can draw conclusions from observations based on "extensive and specialized experience."  *Kumho Tire Co.*, 526 U.S. at 156.

In *Daubert*, the Court laid out a list of nonexclusive factors to assist the trial court in its determination of whether an expert's opinion is grounded in "methods and procedures of science," and whether it is more than "subjective belief or unsupportive speculation." *Daubert*, 509 U.S. at 589-93 (factors include whether the theory or technique can be and has been tested, whether it has been subjected to peer review and publication, the known or potential rate of error, the standards that control the technique's operation, and the general acceptance of the theory or technique in the scientific community).  But the Supreme Court emphasized that this inquiry should be a "flexible one" focusing "solely on the principles and methodology, not the conclusions that they generate." *Id.* at 594–95.  *Daubert* further instructs that "[v]igorous crossexamination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.* at 596.

In particular, if an expert's testimony is within "the range where the experts might reasonably differ," the jury, not the trial court, should be the one to decide among the

conflicting views of different experts.  *Kumho Tire*, 526 U.S. at 153.  "Only if the expert's testimony is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *In re Viagra Prods. Liab. Litig.*, 572 F. Supp. 2d 1071, 1078 (D. Minn. 2008) (internal quotations omitted).  Thus, "'the rejection of expert testimony is the exception rather than the rule.'"  *Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*, 2019 WL 1055527, at *1 (S.D.N.Y. Mar. 6, 2019) (citing Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amendments)).

"[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire, 526 U.S. at 142.  Thus, a district court may properly exercise its gatekeeping function without the "formality of a separate hearing[.]"  *United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007); *see also United States v. Barnes*, 411 F. App'x 365, 370 (2d Cir. Jan. 11, 2011) (unpublished). "This is particularly true if, at the time that the expert testimony is presented to the jury, a sufficient basis for allowing the testimony is on the record."  *Williams*, 506 F.3d at 161 (citing 4 Weinstein's Federal Evidence § 702.02 [2]).

### III.    Application

Ms. Bender's specialized testimony on the background, tactics, and dynamics of sex trafficking—phenomena far outside the realm of common knowledge experience—is admissible under Rule 702, will help the jury understand the evidence, and is substantially similar to expert testimony blessed by the Second Circuit and every other court of appeals to address the issue.

**A.    Ms. Bender is qualified to give expert testimony under Rule 702 because her opinions are supported by consider by ample professional and personal experience.**

Ms. Bender is a qualified expert witness on the topic of sex trafficking and prostitution because her opinion testimony is based on significant professional and personal experience related to sex trafficking. *See* Fed. R. Evid. 702(b) (providing that testimony is admissible where it "is based on sufficient facts or data"). Ms. Bender has professionally interacted with over 1,300 human trafficking victims as the founder and CEO of RBI; trained over 115,000 law enforcement professionals in the field of sex trafficking, including members of the FBI and the Department of Homeland Security Investigations; testified or assisted as an expert witness in California, Oregon, and Texas; and is, herself, a survivor of sex trafficking through strip clubs.

As the Supreme Court recognized in *Kumho Tire*, reliability of experts "may focus upon personal knowledge and experience," and that such expertise may turn upon the "particular circumstances of the particular case at issue." 526 U.S. at 150. Consistent with this precedent, there is no requirement that sex trafficking experts claim prestigious academic credentials or extensive clinical experience where, as here, the expert's opinions are rooted in her professional and personal experience. *See United States v. Shine*, No. 20-314, 2022 WL 761520, at *4 (2d Cir. Mar. 14, 2022) (finding no abuse of discretion where district court (Geraci, J.) admitted expert testimony from agent who "testified that she had 13 years of experience on the Human Trafficking Task Force in Buffalo[,] had participated in 40 to 50 human trafficking investigations involving adult victims[,] [and] . . . testified generally about common practices and methods used in the sex trafficking industry"); *United States v. Anderson*, 560 F.3d 275, 281 (5th Cir. 2009) (holding that a sex trafficking expert "was qualified . . . based on his experience" as "the director of a center that provides services for runaways and high-risk adolescent victims and that specializes in serving victims of sexual exploitation"); *United States v. Brooks*, 610 F.3d 1186, 1195–96 (9th Cir. 2010) (holding that a detective was qualified to provide expert sex trafficking experience where "she conducted approximately twenty to twenty-five full-scale child prostitution investigations,

completed approximately fifty extended interviews with pimps and prostitutes, and frequently worked undercover, posing as a street prostitute and posting prostitution ads online"); *accord* Fed. R. Evid. 702 (". . . a witness qualified as an expert by knowledge, skill, *experience*, training, or education, may testify . . . " (emphasis added)).

Furthermore, Ms. Bender's testimony is based on reliable observation. Ms. Bender is qualified to testify about common dynamics between sex traffickers and their victims because, in addition to being a survivor of sex trafficking, herself, she has interviewed 1,300 victim and has trained over one hundred thousand members of law enforcement investigating sex trafficking. In that vein, it is of no moment that Ms. Bender's analysis is not premised upon the exactness of hard science methodologies. As the Second Circuit explained in *United States v. Joseph*:

> Peer review, publication, potential error rate, etc. . . . are not applicable to this kind of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it. In such cases, the place to quibble with [an expert's] academic training is on cross-examination and goes to h[er] testimony's weight . . . not its admissibility.

542 F.3d 13, 21–22 (2d Cir. 2008). Despite *Joseph*'s admonition that an expert's experience is sufficient, ample qualitative research supports Ms. Bender's perspective.[2]

---

[2]    For example, the concept of trauma bonding has been recognized in a wide array of contexts where certain relevant conditions exist, such as power imbalance, coercive control conditions, perceived isolation, and intermittent reward and punishment. It was first recognized in the 1980s in the context of intimate partner abuse (previously referred to as battered women syndrome). *See* Dutton & Painter, *Traumatic Bonding: The Development of Emotional Attachments in Battered Women and Other Relationships of Intermittent Abuse*, 6 VICTIMOLOGY: AN INT'L J. 139 (1981); *see also* Dutton and Painter, *The Battered Woman Syndrome: Effects of Severity and Intermittency of Abuse*, 63(4) Am. J. Orthopsychiatry 614 (1993) (peer-reviewed study involving 50 women who were physically abused and 25 women who were emotionally abused and who had recently left their intimate partner relationships). In 1992, Harvard professor Dr. Judith Herman, considered among the foremost experts on trauma, published *Trauma and Recovery*, which recognized how coercive control leads to trauma bonding in a variety of contexts, including that between prostitute and pimp. *See* Judith Herman, TRAUMA AND RECOVER: THE AFTERMATH OF VIOLENCE—FROM DOMESTIC ABUSE TO POLITICAL TERROR (1992) (discussing the techniques "used to subjugate women, in prostitution, in pornography, and in the home" *See, e.g.*, Kennedy et al., Routes of Recruitment: Pimps' Techniques and Other Circumstances That Lead to Street Prostitution, 15 (2) J. of Aggression, Maltreatment, & Trauma 1, 8 (2007) (citing Dutton and Painter) (qualitative study of 22 subjects, including 10 formerly prostituted women, finding that one element "that often kept these young women with their pimps" was a "form of traumatic bonding similar to that seen in battered women"); Joan A. Reid, *Entrapment and Enmeshment Schemes Used by Sex Traffickers*, 28(6) Sexual Abuse: A J.

**B.    Ms. Bender's testimony will help the jury understand the evidence, is relevant to the charges, and is not unduly prejudicial.**

Additionally, Ms. Bender's testimony will "help the trier of fact to understand the evidence," Fed. R. Evid. 702, is relevant to the charges, and is not unduly prejudicial.  In that regard, because the terms and methods employed by sex traffickers—as well as the dynamics between traffickers and their victims—is not reflective of everyday, common knowledge accessible to jurors, Ms. Bender's testimony will assist the jury in their evaluation of the evidence.  The Second Circuit and numerous others have already held as much.  *See United States v. Rivera*, No. 22-2780-CR, 2024 WL 2813548, at *2 (2d Cir. June 3, 2024) (finding no error where district court admitted expert sex trafficking testimony, which "would help jurors understand the background psychological concepts at play—including trauma bonding and why a sex trafficking victim might express affection for their trafficker"); *United States v. Shine*, No. 20-314, 2022 WL 761520, at *4 (2d Cir. Mar. 14, 2022) (unpublished) (holding that the district court did not abuse its discretion in admitting sex trafficking expert testimony where expert's testimony "was of a general nature and did not purport to present a view of any of the victims in this case"); *accord United States v. Bridges*,  No. 21-1679, 2022 WL 4244276, at *7 (3d Cir. Sept. 15, 2022) (finding no abuse of discretion where district court admitted expert testimony about "trauma bonds whereby [sexual abuse victims] are loyal to their abusers or feel a strong sense of attachment to their abusers" and further concluding that "an expert educating a jury on general principles of sex trafficking and sexual abuse can be helpful to the fact finder in assessing the fact witness's credibility" (collecting cases)); *United States v. Jennings*, 860 F. App'x 287, 288 (4th Cir. 201) (unpublished) (finding no error plain error

RES. & TREATMENT 491 (2016) (discussing the manipulation tactics and trauma bonds that traffickers leverage against victims).

where district court admitted expert testimony "on the background and culture of sex trafficking" and further noting that "the weight of authority supports the [g]overnment's position" that "the admissible of expert testimony on the culture of sex trafficking and the psychology behind it" is appropriate); *United States v. Anderson*, 560 F.3d 275, 281 (5th Cir. 2009) (finding no abuse of discretion where district court admitted expert testimony regarding "the typical characteristics of adolescent prostitutes and . . . the behavior of pimps"); *United States v. Bryant*, 654 F. App'x 807, 813–14 (6th Cir. 2016) (unpublished) (finding no abuse of discretion where district court admitted expert testimony regarding "complicated pimp/prostitute relationships"); *United States v. Young*, 955 F.3d 608, 615 (7th Cir. 2020) ("The district court did not abuse its discretion by concluding that [the] expert testimony, which defined key terms and explained common sex-trafficking dynamics, was reliable and helpful for the jury."); *United States v. Redd*, 81 F. 4th 822, 830 (8th Cir. 2023) (finding no abuse of discretion where district court admitted expert testimony "regarding sex trafficking, including terminology, characteristics of victims, and methods used by traffickers to recruit and retain women" and further concluding that, "[g]iven the unique terminology and circumstances surrounding sex trafficking, [the expert's] specialized knowledge could help the jury understand the evidence"); *United States v. Llerenas*, 743 F. App'x 86, 89 (9th Cir. 2018) (unpublished) ("[W]e have previously held that 'the relationship between prostitutes and pimps is not the subject of common knowledge,' and therefore that expert testimony in this area can be helpful." (citing cases)); *United States v. Brinson*, 772 F.3d 1314, 1319 (10th Cir. 2014) (finding no abuse of discretion where district court admitted expert testimony defining key terms such as "gorilla pimp", and explaining "the relationship between pimps and their prostitutes," "how pimps recruit prostitutes, and how pimps control prostitutes"); *United*

*States v. Lewis*, 762 F. App'x 786, 796 (11th Cir.) (unpublished), *vacated on other grounds*, 140 S. Ct. 613 (2019) (finding no error where district court admitted expert testimony regarding sex trafficking dynamics and trauma); *cf. United States v. Gaudet*, 933 F.3d 11, 15–16 (1st Cir. 2019) (Barron, J.) (positively crediting testimony from an expert "in the behavior of domestic and sexual assault victims").

Moreover, Ms. Bender will address issues implicated by the charges and the particular events that will be the focus of evidence at trial—*viz.*, Mr. Gerace's use of a coercive scheme to commit sex trafficking. Mr. Gerace, for example, leveraged victims' drugs addictions to coerce them into having sex, and/or engage in sex acts, with him and others. That is, Mr. Gerace manipulated his victims' drug addictions as a means to control them, at times denying them access to addictive substances until sex acts were performed and those preying upon their addictions to coerce them to engage in sex acts and, at times, traditional prostitution.

According to the relevant statute, "coercion" is defined to include "any scheme, plan or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person." 18 U.S.C. § 1591(e)(2)(B). "Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue preforming commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5) (emphasis added). Therefore, the statute directs the trier of fact to consider the background and circumstances of the victim in assessing whether the Mr. Gerace engaged in a coercive scheme, and Ms. Bender's testimony will clearly aid the jury in making those determinations.

Nor can there be any valid concern that Ms. Bender will improperly bolster the government's witnesses.  Ms. Bender will not offer an opinion as to whether any specific victim's treatment constitutes sex trafficking.  Moreover, the Court will properly instruct the jury on how they may evaluate and use expert opinions).  Appellate courts have consistently affirmed the admission of expert sex trafficking testimony with these guardrails in place.  *See, e.g.*, *Rivera*, 2024 WL 2813548, at *3 (affirming admission of sex trafficking expert's testimony where expert "did not directly opine on the credibility of D.P. or N.R.'s testimony, but rather provided general testimony about the dynamics of sex trafficking relationships" and further noting that "[c]ourts have ***routinely*** held that such background testimony ***is not impermissible bolstering***" (emphases added and collecting cases)).  Accordingly, to the extent Mr. Gerace raises these objections, the Court should overrule them.

## IV.    CONCLUSION

The government respectfully asks the Court to permit Ms. Bender to testify.

DATED:  Buffalo, New York, November 1, 2024.

TRINI E. ROSS
United States Attorney

BY:          s/JOSEPH M. TRIPI
             s/NICHOLAS T. COOPER
             s/CASEY L. CHALBECK
             s/CAITLIN M. HIGGINS
             Assistant United States Attorney
             Western District of New York
             138 Delaware Avenue
             Buffalo, New York 14202
             716-843-5839
             Joseph.Tripi@usdoj.gov

Exhibit A


# REBECCA **BENDER, MACT**

Los Angeles, CA | @ImRebeccaBender

## SUBJECT MATTER EXPERT | SPEAKER | AUTHOR | THOUGHT LEADER

## SUMMARY

Experienced communicator and leader, bringing years of expertise to the issue of domestic sex trafficking. Sought after trainer, speaker and presenter, Rebecca is recognized as a national forerunner in her field. With fourteen years of experience, she has successfully worked on numerous cases, trained hundreds of thousands of professionals and directly assisted on the operations and recovery of victims across the country. As a CEO, Rebecca has created programs, written books and curriculum to meet a global need in multiple interagency arenas. As a subject matter expert, Rebecca has spoken on topics that pertain to policy, prevention, intervention, restoration, recovery, demand reduction, predatory tactics employed by traffickers, typologies of crime and best practice for both non-profit management and response by those who have an ability intercept.

Appointed by the US Dept of HHS, to the National Advisory Council to Congress, Rebecca is one of a select group of individuals informing states on next level steps for growth in expanding the response to child sex trafficking.

## HIGHLIGHTS

**Consultant:** Determine individual organization's needs and create strategic development plans for non-profits. Efficiently assists detectives and DA's during investigations and trial as subject matter expert in multiple states.

**Victim Services:** History of developing, funding and implementing successful advocacy and mentoring programs within the non-profit sector. Knowledge of Federal and State resources and services; able to think outside the box under pressure and crisis.

**Public Speaking:** Strong orator, keynote at seminars, conferences, breakout sessions, community presentations, board participation, team facilitation and management, panels, roundtable discussions for stakeholders, universities and more.

**Strategic Advisor:** Assists cities and community leaders in assessing state wide response to the issue, building collaborative multi-disciplinary teams and resourcing and networking service providers through field studies and biggest needs.

GOVERNMENT EXHIBIT

3684A

## SELECTED PROFFESIONAL EXPERIENCE

- International Association of Chief of Police
- World Summit, Jimmy Carter Center: law enforcement track facilitation
- FBI Director Training, San Diego: combatting human trafficking and case study
- Arizona Attorney General: law enforcement and state prosecution training
- FBI Regional Training: Chicago and El Paso
- VICE training: Los Angeles, Phoenix, Chicago, Seattle and more
- FBI Operation Cross Country, Seattle Washington
- Minneapolis Police Super Bowl Command Post: 2018
- JUST Conference Presenter 2014, 2015, 2016, 2017, 2018
- Crimes Against Women Conference, Dallas, TX: Illusion of Choice Case Study, 2017 & 2018
- Oregon State Capitol testimony: SB673 2014
- Expert and Assist on trial and investigation concerning State of Oregon, State of California and State of Texas
- Oxford University and Poppy Project: London, England 2009
- European Freedom Network: Berlin, Germany 2017
- Canada Mounted Royal Police: Nova Scotia 2019

## CONSULTING

- Shared Hope, Central Coast Dream Center, Rejuvenating Women, CRI – Erbil, Iraq, Streetlight, EPIK, Aequitas, A21, New Friends New Life, Love146, Homeland Security, Unbound, Oregon D.O.J. Task Force, Dallas Police Department

## AWARDS

| | |
|---|---|
| 2015 Female Overcomer | DOJ Oregon Trafficking Council Appointee |
| 2016 Hero to Our Generation | |
| 2017 FBI Recognition Award | U.S. National Advisory Council to Congress Appointee |
| 2018 Congressional Appreciation | |
| 2019 Equinox Award | FBI Recognition |
| 2020 Grant Tank Award Winner | Rotarian Community Service Award |
| 2021 Project Moses Award | Paul Harris Fellow |

## MEDIA RECOGNITION

- Ted X
- Washington Post
- Forbes
- Sports Illustrated

- CNN Freedom Day
- CNN Political Response
- Tamron Hall
- The Today Show

- Deadline: Crimes
- Huffington Post
- Associated Press
- Sirius XM - Ellistronics

## AUTHORSHIP
*In Pursuit of Love*, Harper Collins, 2020
*Roadmap to Redemption*, 2013
*Elevate Workbook*, 2015
*Exodus*, Harper Collins, 2022

## ENTREPRENUERSHIP
As the founder and CEO of Elevate Academy, Survivor leader Rebecca Bender has built the largest online school for survivors of human trafficking in the world. With over 1,300 students spanning 6000 U.S. Cities and 17 countries, Elevate has become the go-to globally to assist survivors in getting job ready after escape. They specialize in professional development, leadership and economic empowerment encouraging other survivors to not only dream again but create strategic plans to accomplish those goals and the network / community to support it.

## MULTI-MEDIA
In Rebecca Bender is the author of *In Pursuit of Love*, *Exodus* and *Roadmap to Redemption*. She is an Executive Producer on Showtime's new pilot, *Coercion* and host of an upcoming docuseries.

## EDUCATION
With a Master's Degree in Religious Studies and an undergrad focus in Criminal Justice, Rebecca brings a broad range of insight to victim services and law enforcement.

## REFERRALS
Upon request

Exhibit B

LANDAU - DIRECT

31

1        Are you able to hear okay so far, Ms. Draisey?

2              PROSPECTIVE JUROR DRAISEY:  What's that?  I'm sorry.

3              THE COURT:  Are you able to hear okay so far?

4              PROSPECTIVE JUROR DRAISEY:  Yes.  I'm doing fine.

5   Thank you.

6              THE COURT:  Okay.

7              THE DEPUTY CLERK:  Please raise your right hand.

8              CARRIE LANDAU, GOVERNMENT'S WITNESS, SWORN

9              THE DEPUTY CLERK:  Thank you.  Please have a seat.

10             MR. HERROLD:  And, Judge, just for the record, can I

11  lodge a continuing objection based on my motion?

12             THE COURT:  You may.

13             MR. HERROLD:  Thank you.

14             THE COURT:  Ms. Jennings, whenever you're ready.

15             MS. JENNINGS:  Thank you, Your Honor.

16                        DIRECT EXAMINATION

17  BY MS. JENNINGS:

18  Q.  Please state your name and spell your last name for the

19  record.

20  A.  Carrie Landau, L-a-n-d-a-u.

21  Q.  How are you employed?

22  A.  I am an FBI agent in the Chicago division, FBI south

23  resident agency.

24  Q.  How long have you been a special agent with the FBI?

25  A.  I'm in my 15th year.

LANDAU - DIRECT

32

1  Q.  As a special agent, are you currently assigned to any

2  particular task force?

3  A.  I am.

4  Q.  And what task force is that?

5  A.  I'm assigned to the Will County Safe Streets Violent Crime

6  Task Force in Orland Park, Illinois.

7  Q.  Do you currently specialize in the investigation of any

8  particular type of crime?

9  A.  I do.

10  Q.  What crime is that?

11  A.  Human trafficking with an emphasis in domestic minor sex

12  trafficking.

13  Q.  And when you say domestic minor sex trafficking, can you

14  explain that to the jury?

15  A.  Yes.  Domestic means here in the United States, not

16  international sex trafficking; and minor sex trafficking means

17  the -- anyone under the age of 18.

18  Q.  How many years have you specialized in the investigation of

19  sex trafficking?

20  A.  For 13 years.

21  Q.  Approximately how many sex-trafficking cases have you worked

22  during your career?

23  A.  Over 125 now.

24  Q.  Now, as it relates to investigative purposes only, can you

25  tell the jury what you mean when you say sex trafficking?

1    A.   Yes.  So sex trafficking is the exploitation of one person

2    by another person for the sale of a human being in furtherance

3    of sex in exchange for money.

4    Q.   As an FBI agent, are you familiar with prostitution?

5    A.   I am.

6    Q.   As it relates to investigations only, what does prostitution

7    mean?

8    A.   Prostitution is providing sex acts in exchange for money.

9    Q.   Now, in a moment I'm going to ask you a few more questions

10   about your qualifications.  First of all, I want to ask you,

11   before that, were you asked by the Government to testify in this

12   case?

13   A.   I was.

14   Q.   And are you aware of the general nature of the charges that

15   the defendant is facing?

16   A.   I am.

17   Q.   And what is the general nature of those charges?

18   A.   General nature is human trafficking charges.

19   Q.   Other than the fact that you are testifying here today, have

20   you had any other involvement with this case?

21   A.   No.

22   Q.   Do you know which agency investigated this case?

23   A.   Yes.

24   Q.   And which agency is that?

25   A.   The Federal Bureau of Investigation.

LANDAU - DIRECT

34

1   Q.  Since the FBI is the lead investigative agency in this case,

2   how is it that you were not a part of the investigation?

3   A.  Each agent is assigned a specific area in which they

4   investigate cases.  So my specific area is a five-county area

5   within the Chicago division, which includes five south suburban

6   counties.  So my area of responsibility with respect to

7   investigations would not cover the area that this case does.

8   Q.  Have you reviewed any reports written by law enforcement

9   officers who investigated this case?

10  A.  No.

11  Q.  Have you had any discussions with FBI agents or any other

12  law enforcement officers regarding the facts of this case?

13  A.  I have not.

14  Q.  Have you interviewed the victim in this case?

15  A.  No, I have not.

16  Q.  Have you interviewed the defendant, Antoinne Washington?

17  A.  No, I have not.

18  Q.  Have you interviewed any other witnesses in this case?

19  A.  No.

20  Q.  Is it fair to say that you expect the testimony you are

21  going to provide today about sex trafficking to be general in

22  nature?

23  A.  Yes.

24  Q.  Do you charge a fee for your testimony?

25  A.  I do not.

1    Q.  Does the FBI pay for your travel expenses as a part of

2    testifying in this case?

3    A.  Yes, they do.

4    Q.  Have you testified as an expert witness in other court

5    cases?

6    A.  I have.

7    Q.  How many?

8    A.  Two.

9    Q.  Were those in state or federal court?

10   A.  Those were in federal court.

11   Q.  And were those cases civil or criminal in nature?

12   A.  They were criminal.

13   Q.  Which party, the Government or the defense, asked you to

14   testify in those cases?

15   A.  The Government.

16   Q.  Okay.  Now, Special Agent Landau, I'm going to talk to you a

17   little bit more about your qualifications.  Can you tell the

18   jury about your educational background?

19   A.  Yes.  I have a bachelor's degree in criminal justice with a

20   minor in sociology and a master's degree in criminal justice.  I

21   received both of those degrees at St. Ambrose University in

22   Davenport, Iowa.

23   Q.  Besides going to college in Iowa, have you lived here at

24   other times in your life?

25   A.  Yes.  I grew up here from eighth grade until my senior year,

LANDAU - DIRECT

36

1   went to college, went away for a year or so, and then moved back

2   and then left again upon entering the FBI in 2003.

3   Q.  After you joined the FBI in 2003, what general training did

4   you receive as a special agent?

5   A.  So the general training that we receive, it differs in time

6   periods.  So agents now are receiving a 21-week course of

7   instruction.  I received, at the time in 2003, 17 weeks of

8   training, which included legal training in the classroom to

9   understand criminal law and investigations and prosecutions,

10  interview and interrogation techniques, as well as

11  implementation of the legal framework that we were provided in a

12  role-play type scenario in what they call Hogan's Alley.  We

13  also receive firearms training and self-defense training, as

14  well as some physical fitness training.

15  Q.  Have you received any training specific to sex trafficking?

16  A.  I have.

17  Q.  From whom have you received that training?

18  A.  Several different arenas where I've received that training;

19  specifically, through the FBI violent crimes against children

20  unit, as well as the National Center for Missing and Exploited

21  Children, different non-government organizations and then some

22  different law schools.

23  Q.  Over what time frame did you receive this training about sex

24  trafficking?

25  A.  The first training I went to was in 2004, and that was when

LANDAU - DIRECT

37

1    I really kind of decided that this was something I wanted to

2    specialize in.

3    Q.   Was there a particular population that your training on sex

4    trafficking focused?

5    A.   Yes.

6    Q.   And what population was that?

7    A.   That is the minor population, so anyone under the age of 18.

8    Q.   Were these trainings that focused on children also useful

9    for the investigation of the sex trafficking of adults?

10   A.   Yes.

11   Q.   And how are they useful?

12   A.   They're useful due to the fact that the framework is

13   essentially the same in the investigation and the path that we

14   lead through our investigation.  So same type of strategies with

15   analysis of phone records and analysis of some other computer

16   programs that we use, different things like that, but also from

17   an interview strategy and just the overall framework of the

18   case.

19   Q.   Are there some differences in the way you interview a child

20   victim versus an adult victim of sex trafficking?

21   A.   Yes.

22   Q.   As far as investigating adult sex trafficking versus child

23   sex trafficking, are there any significant differences that you

24   could explain?

25   A.   I would say the most significant difference would be

1  procedurally when we recover a child involved in domestic minor

2  sex trafficking, as you can expect, there's proper notifications

3  that need to be made to parents and/or the Department of

4  Children and Family Services.  But as far as the overall

5  investigation, that is similar.  Procedurally is a little bit

6  different.

7  Q.  You testified earlier that you have worked on approximately

8  125 sex-trafficking investigations.  How many of those,

9  approximately, involved adult victims?

10  A.  There was only one of those cases that didn't have an adult

11  involved in that case.  Every other one, somewhere, in some

12  fashion, there was an adult involved.

13  Q.  Did you serve as the case agent on any of these

14  investigations?

15  A.  I did.

16  Q.  Approximately how many of the 125?

17  A.  Over three-quarters of those.

18  Q.  And were those 125 sex-trafficking investigations both state

19  and federal?

20  A.  Yes.

21  Q.  Do you know approximately how many were federal?

22  A.  About 35.

23  Q.  Can you tell the jury what it means to be a case agent?

24  A.  Yes.  What it means to be a case agent can be different for

25  different people.  So you can be, we call it, voluntold, meaning

1  a supervisor tells you that this is your new case,

2  congratulations, you're going to work it from beginning to end,

3  or it's something that you generate on your own.

4      So a case agent basically is responsible for getting all

5  the reports together to the United States Attorney's Office for

6  purposes of prosecution and also coordinating and collaborating

7  with local agencies to ensure that the case is running smoothly.

8      And case decisions are made by the case agent.  Also, a

9  case agent starts the case and ends the case so all the way from

10 beginning through trial and through sentencing.

11 Q.  For the cases that you are not the case agent, what role did

12 you play?

13 A.  It just would depend on each case.  If it was a case that we

14 were working with the locals, it might be something like doing

15 the analysis of Facebook records or cell site records or phone

16 records, assisting with getting a victim to an appointment, or

17 simply being on the arrest team for -- for that particular case.

18 Q.  In the course of your career, have you interviewed victims

19 of sex trafficking?

20 A.  I have.

21 Q.  Approximately how many?

22 A.  Over 500.

23 Q.  Approximately how many of those 500 victims have been

24 adults?

25 A.  I would say three-quarters.

LANDAU - DIRECT

40

1  Q.  Approximately how many of those 500 victims you interviewed

2  were male?

3  A.  None.

4  Q.  Can males be victims of sex trafficking?

5  A.  They can.

6  Q.  Now, in the course of your work, have you interviewed

7  suspects in sex-trafficking investigations?

8  A.  I have.

9  Q.  Approximately how many?

10 A.  Over 50.

11 Q.  In the course of your work, have you interviewed clients who

12 pay for sex with women?

13 A.  Yes.

14 Q.  And approximately how many of those have you interviewed?

15 A.  Hundreds.  Too many to count.

16 Q.  Currently, are you a member of any task force related to sex

17 trafficking?

18 A.  I am.

19 Q.  What task force is that?

20 A.  I'm a member of the Cook County Human Trafficking Task

21 Force.

22 Q.  Are you a member of any particular branch of that task

23 force?

24 A.  I am.

25 Q.  Which branch?

LANDAU - DIRECT

41

1  A.   The law enforcement working group.

2  Q.   What is the purpose of the Cook County Human Trafficking

3  Task Force?

4  A.   The purpose of that task force is to coordinate efforts

5  between non-government organizations, law enforcement

6  organizations, victim service providers, as well as trainings

7  and that type of thing.  And so the purpose is kind of to come

8  together to make sure that people are not working the same case

9  without other people knowing or there aren't victims being

10  spoken to by the FBI and a different department or a different

11  investigating agency.

12      So it's meant -- its purpose is meant to keep everyone on

13  the same page, if you will, but also to ensure that victims

14  within the cases are getting the services that they need.

15  Q.   Besides being a member of the Cook County task force, how

16  else have you been involved in that group in the past?

17  A.   I was lucky enough to be part of the group that created the

18  task force in 2009.

19  Q.   In the course of your career with the FBI, have you held any

20  positions within the FBI related to sex trafficking?

21  A.   I have.

22  Q.   What positions are those?

23  A.   I was the crimes against children coordinator for the

24  Chicago division FBI from 2009 to 2015.

25  Q.   What did you do in this role?

LANDAU - DIRECT

42

1   A.   Similar to that of the Cook County human trafficking group,

2   although it wasn't with outside agencies, it was within our own

3   agency, so to coordinate any time a tip or information comes in

4   regarding a missing child, a child that might be involved in sex

5   trafficking; that we would then, myself and another person, so

6   she also held that title at the same time, we worked together to

7   ensure that those tips were appropriately disseminated amongst

8   law enforcement.

9        We also worked with the state's attorney's office and the

10  U.S. Attorney's Office in collaboration with making sure that

11  each case was dealt out appropriately to the area of

12  responsibility.  So in Chicago alone, we have four different --

13  or, excuse me, five different resident agencies because Chicago

14  is so big.  We have a north, a west, a south, and then we have a

15  Rockford office as well.

16       And so my role in that was to ensure that everybody was

17  getting a fair amount of cases but also that people were doing

18  what they needed to do with respect to getting the information

19  to the United States Attorney's Office.

20  Q.   We talked some about the sex-trafficking training that

21  you've received.  Have you trained other persons about sex

22  trafficking?

23  A.   I have.

24  Q.   What groups have you trained?

25  A.   Lawyers from the U.S. Attorney's Office, state lawyers, as

LANDAU - DIRECT

43

1   well as non-government organizations, health care professionals.

2   We've gone into emergency rooms and county health departments to

3   train, schools, guidance counselors, bus drivers, parents,

4   students.  Every group that you can think of, we've trained in

5   some fashion.  Hotel operators, things like that.

6   Q.  Have you received any awards for your work in connection

7   with sex trafficking?

8   A.  I have.

9   Q.  And approximately how many have you received?

10  A.  Seven.

11  Q.  Is there one specific award that sticks out to you?

12  A.  Yes.

13  Q.  Which award is that?

14  A.  That is the United States Attorney's Office Citation for

15  Special Achievement.  I received that last year for our overall

16  work in human-trafficking cases.

17  Q.  Special Agent, we've gone over your education, your

18  training, and your experience.  Based on what we've discussed,

19  are you able to explain to the jury the business of sex

20  trafficking?

21  A.  I am.

22  Q.  Specifically, do you have training and experience regarding

23  the methods that pimps use to recruit and control females?

24  A.  I do.

25  Q.  Do you have training and experience regarding the

LANDAU - DIRECT

44

1   characteristics of women who are targeted by pimps?

2   A.  I do.

3   Q.  Do you have training and experience relating to the common

4   responses and reactions that victims have to being trafficked?

5   A.  I do.

6   Q.  Do you also have training and experience regarding the role

7   of technology in sex trafficking?

8   A.  Yes.

9   Q.  Now, we talked about the victims that you've come into

10  contact with.  All of those have been female.  As a result of

11  your -- of that testimony, are you limiting your testimony today

12  to just female victims?

13  A.  I am.

14  Q.  When you answer my questions today, are those going to be

15  based solely on your training and experience?

16  A.  Yes.

17          MS. JENNINGS:  At this time, Your Honor, the

18  Government asks that Special Agent Carrie Landau be deemed an

19  expert witness in the nature and dynamics of sex trafficking

20  under Federal Rule 702.

21          MR. HERROLD:  I maintain my objection.

22          THE COURT:  The objection is overruled for reasons

23  previously stated, and the witness is so designated as an

24  expert.

25

1  BY MS. JENNINGS:

2  Q.  Now, Special Agent Landau, I'm going to ask you some

3  questions just about the basics of sex trafficking.

4  A.  Okay.

5  Q.  Based on your training and experience, what is the most

6  common scenario in which a woman is trafficked for sex and who

7  are the main actors?

8  A.  The main actors in that scenario generally are a male pimp

9  with a female that they are trafficking.

10 Q.  In the course of your work, have you become familiar with

11 the terms that are used in sex trafficking?

12 A.  I have.

13 Q.  What is a pimp?

14 A.  A pimp is a person who exploits another person by means of

15 control, and that can be accomplished through manipulation

16 tactics, both verbal and physical.  And a pimp generally is a

17 person who takes and collects all of the money involved in sex

18 trafficking.

19 Q.  And what is the pimp exploiting the female to do?

20 A.  To have sex in exchange for money.

21 Q.  What is a john in the context of sex trafficking?

22 A.  A john is a client or a customer.

23 Q.  Can a john also be referred to as a trick?

24 A.  Yes.

25 Q.  And what is a call?

LANDAU - DIRECT

46

1  A.  A call is generally referred to as a date, a date where sex

2  is exchanged for money.

3  Q.  When a female goes on a date, is the female referred to as

4  working in the sex-trafficking world?

5  A.  Yes.

6  Q.  What is a regular?

7  A.  A regular is a client who might come back again and again to

8  the same female or to the same pimp.  So a regular maintains

9  contact either with the pimp or with the female who has provided

10  the service.

11  Q.  What is an in call?

12  A.  An in call is when a client comes in to the female to engage

13  in sex acts.

14  Q.  So the female might be located in a specific place and the

15  client would come to the female?

16  A.  Correct.

17  Q.  So what is an out call?

18  A.  An out call is when the female goes out to the client.  So

19  they might go to the client's house or to a hotel to meet them.

20  Q.  Based on your training and experience, is one of those

21  thought to be more dangerous than the other?

22  A.  Well, I've seen danger in both.

23  Q.  Okay.

24  A.  So I would say the travel causes its own danger, but both

25  are just as dangerous.

47

1    Q.   Have you heard of the term "the life"?

2    A.   Yes.

3    Q.   What does the term "the life" refer to?

4    A.   The life refers to prostitution itself and so engaging in

5    prostitution and illegal activity during the course of selling

6    sex acts in exchange for money.

7    Q.   What does the term "stable" mean?

8    A.   Stable means the family, if you will, or group, much like a

9    gang, that stays together.  And so the pimp is the leader, and

10   the females are the workers within the stable.  So the stable is

11   the group together as it -- as it becomes one.

12   Q.   What does the term "renegade" mean?

13   A.   Renegade can mean a couple of different things, but renegade

14   often refers to somebody who has not yet -- a female generally

15   who has not yet chosen up, who has not picked a pimp yet, who

16   has not decided on who their pimp might be or who has not agreed

17   and/or spoken with that particular pimp.  And they might be out

18   doing sex acts on their own or without pimp oversight.

19   Q.   What does the term "trap" mean?

20   A.   Trap is, in prostitution, generally where the proceeds from

21   the prostitution activities are kept.  So a specific location.

22   It can be a house, it can be a hotel, it can even be a safe at

23   the hotel.

24   Q.   And what does "speaking Greek" mean in the context of sex

25   trafficking?

LANDAU - DIRECT

48

1   A.   Speaking Greek means, for instance, if a john says, "Do you

2   speak Greek?" that might mean -- or that means to have anal sex,

3   do you have anal sex.

4   Q.   You've testified that you've conducted more than 500

5   interviews with victims and at least 50 interviews with suspects

6   or pimps.  Based on these interviews, have you learned that

7   there's different categories of pimps?

8   A.   Yes.

9   Q.   What is the factor that distinguishes one category of pimps

10  from another?

11  A.   It's the behavior of the pimp and how they portray

12  themselves.

13  Q.   What are the general categories of pimps?

14  A.   The general categories of pimps are finesse pimp, a hustler

15  pimp, or a gorilla pimp.

16  Q.   Do some pimps use a combination of these tactics from all

17  three general categories to control females?

18  A.   They do.

19  Q.   Can you describe to the jury what a finesse pimp is?

20  A.   A finesse pimp, generally speaking, is a person, generally a

21  man, who is quick with their tongue and is able to charm females

22  into this life, someone who promises a big return for what

23  they're about to be involved in.

24       And so a finesse pimp sells this idea and this dream as

25  something positive and something that they're going to do

1    together.  There's lots of promises and lots of feelings of love

2    and admiration for the female, and so he comes off as very

3    tricky once they realize what they're into.

4        So a finesse pimp uses building a relationship of trust and

5    happiness initially and sells what quickly becomes a fake dream.

6    Q.  Can you describe a gorilla pimp for the jury?

7    A.  A gorilla pimp starts off by using some of the finesse ways

8    that I just spoke about but often changes, and very quickly, to

9    beating and physical violence and verbal abuse and is generally

10   very, very harsh and awful.

11   Q.  Is fear the primary control tactic for a gorilla pimp?

12   A.  Fear, intimidation, and manipulation are the main three

13   things from a gorilla pimp.

14   Q.  Can you describe a hustler pimp for the jury?

15   A.  A hustler pimp kind of doesn't know what he's doing.  A

16   hustler pimp is more concerned with money, is not so good with

17   his words, but usually has multiple things going on at one time.

18   So might be involved in the drug trade and the sex trade and a

19   gang and is sloppy sometimes and is so concerned with money that

20   often evading law enforcement is a difficult thing for him.

21   Q.  Based on your training and experience, do all pimps use

22   physical force against the females who work for them?

23   A.  No.

24   Q.  For the pimps that do use physical force, what are some of

25   the most common types of force that you see them use?

LANDAU - DIRECT

50

1  A.  Beatings, stompings, rape, burnings.  Those are the ones

2  that come to mind.

3  Q.  And based on your training and experience, do pimps assault

4  females in a way which the injuries would not be visible to

5  another person?

6  A.  Yes.  Oftentimes they won't beat them directly in the face

7  because that's not very good for what the clients want to see,

8  and so oftentimes it's beatings on their backs or their thighs

9  or in the backs of their arms, things like that.

10  Q.  Are there other methods besides physical force that pimps

11  use to control females?

12  A.  Yes.

13  Q.  What are some of those other methods that pimps use?

14  A.  They use confusion.  They use isolation.  The females that

15  I've interviewed in the confusion arena say it's almost like

16  you're damned if you do, you're damned if you don't.  Verbal

17  abuse, lies, threats, threatening family.

18  Q.  What are some things pimps do to isolate females?

19  A.  Isolating often starts off in the very beginning, especially

20  when we're talking about the use of cell phones.  Generally, if

21  a female comes with a phone, quickly either the contacts within

22  the phone are deleted so -- I mean, I think we can all think

23  about how many numbers we don't even know off the top of our

24  heads that are in our cell phones to even dial on our own.  And

25  so they remove those contacts and/or give them a brand new phone

1   and take away the phone.

2       So they can isolate in that fashion, but they can also

3   isolate by keeping them in a hotel room or a specific location

4   for a very long period of time with quotas that need to be met

5   and without visits from the pimp or any outside people other

6   than clients.

7       Oftentimes if there's multiple girls within the stable,

8   they will separate them in different hotels completely so they

9   don't even know that there's other girls working.  They will

10  isolate them from their family, their children, their loved ones

11  by telling them if you don't do A, B, and C, you won't see your

12  family.  Those are some of the ways.

13  Q.  In the course of your work, have you become familiar with

14  the term "bottom bitch" or "bottom"?

15  A.  Yes.

16  Q.  And what does that term mean?

17  A.  A bottom is referred to as such -- and to be honest, when I

18  first started, I was a little confused by it, because a bottom

19  to me sounds like somebody who is low on the totem pole with

20  respect, but it's actually the exact opposite.  It's somebody

21  who has been tasked with being one of the most important people

22  within the stable and/or having a lot of responsibility.

23      And so generally, it's an older female who has been with a

24  pimp for a longer period of time, who has garnered some form of

25  respect by her longevity with the pimp but also by how hard

1    she's worked.

2        And so she is one who often will collect money from other

3    girls and provide that to the pimp.  She provides direction to

4    the other girls and instruction on how to answer prostitution

5    calls and teaches new younger recruits how the life works.  She

6    also is responsible for sometimes renting hotel rooms and/or

7    vehicles and is essentially the pimp's right-hand person.

8    Q.  What are the advantages for the pimp of having a bottom?

9    A.  I think the biggest advantage is that he gets to continue

10   the loyalty that he has with the other girls within the stable

11   and so he's not seen as the bad guy, if you will.  He is often

12   seen as the person who isn't enforcing the rules but is okay

13   with the bottom doing so, and the bottom often becomes the bad

14   guy.

15       Also, it assists in the pimp's inability to be recognized

16   by law enforcement as the person who is in charge of or making

17   the decisions for the girls, and so it keeps him from being

18   flashy to law enforcement.

19   Q.  Based on your training and experience, what is the age range

20   of females who are most likely to be trafficked?

21   A.  The age range is between the ages of 18 and 30 with respect

22   to adults.

23   Q.  What is the most common way a john would hire a female for

24   prostitution?

25   A.  The most common way that a john would hire a female is

1  through the Internet.

2  Q.  Which websites do johns use to find women who are selling

3  sex?

4  A.  Backpage, Craigslist, P411, CityVibe, and Eros.

5  Q.  And is Backpage currently active?

6  A.  It is not.

7  Q.  Why not?

8  A.  The FBI had an investigation in Scottsdale, Arizona that led

9  eventually to the arrest of those individuals responsible for

10  Backpage in May of 2018, and the site is now down.

11  Q.  Before Backpage was down, as part of your job, how

12  frequently did you deal with Backpage?

13  A.  Every day.

14  Q.  And in the context of prostitution or trafficking, how does

15  Backpage work?

16  A.  Backpage is much like a classified ad, so if you're selling

17  anything from concert tickets to a couch to a backhoe, tires,

18  and also it serves as a dating site/prostitution arena.

19  Q.  How do females advertise for sex in exchange for money on

20  Backpage?

21  A.  There were different ways, and as time has progressed with

22  Backpage's evolution, near the time frame that it was going to

23  be going down, it was under the women seeking men to date site,

24  so dating, but it used to be under the escort section.

25  Q.  Do Backpage ads cost money or did they cost money?  Excuse

LANDAU - DIRECT

54

1    me.

2    A.   Yes.

3    Q.   And how much did a Backpage ad cost to post?

4    A.   It depended, but around $12 was the general price.

5    Q.   What information is typically posted on a Backpage ad?

6    A.   Typically on a Backpage ad is first and foremost an enticing

7    picture, and so generally it's a woman who is either barely

8    dressed or -- or in lingerie, and then there is some wording on

9    the ad that explains what is for sale in a covert nature, if you

10   will, and an agreement -- or the hope for an agreement for a

11   date for services.

12        So sometimes there will be -- well, there's always contact

13   information, and so if a client wants to reach out to the person

14   on that advertisement, there's a phone number or an e-mail

15   address or a Facebook account where they can reach out.

16   Q.   Are sometimes available services posted on the Backpage ad?

17   A.   Yes.

18   Q.   And does Backpage or did Backpage have posting boards

19   specific to certain like geographic areas?

20   A.   Yes.

21   Q.   Have you ever seen on a Backpage ad the phrase "No AA"?

22   A.   Yes.

23   Q.   What does that mean?

24   A.   Based on my experience and my interviews with multiple

25   victims and pimps, that means no African-Americans.

LANDAU - DIRECT

55

1  Q.  And based on your training and experience, why do people who

2  are selling sex put that on their ads?

3  A.  Based on the interviews that I've conducted, and we've asked

4  that question as it seems strange and interesting to us all the

5  same, we have been told by multiple victims that pimps have told

6  them not to allow African-Americans because they can steal

7  girls, the men who might come would steal the girls, and then --

8  and use them for their own prostitution business.  They are

9  aggressive, they are violent, and they could rob them or steal

10  from them.

11  Q.  Based on your training and experience, who is the person

12  that posts the ad for the female who is selling sex?

13  A.  Again, that changed over a period of time, but what we've

14  seen now is it is in large part the bottom who makes those

15  advertisements or learns how to and then does so.

16  Q.  Once an ad is posted on Backpage, is there a way that a

17  poster -- the poster of the ad can pay a fee to get that to go

18  back to the top?

19  A.  Yes.

20  Q.  And can you explain like the significance of an ad being at

21  the top?

22  A.  Sure.  So I don't know if any of you have ever sold anything

23  in a garage site sale on the Internet, but it's much the same.

24  So if somebody doesn't -- if a john or a client wants to see the

25  most current women available in his area, in order to keep it at

LANDAU - DIRECT

56

1  the top, there is a process by which you can pay an additional

2  $3 and your ad will be reposted or refreshed, and it will come

3  to the top.

4      So the main reason for that would be to make sure that

5  people who might have been looking at it last night at midnight,

6  who now are looking at it at 6 o'clock in the morning, would see

7  your ad again first at the top, and it provides more

8  accessibility.

9  Q.  How do the people who post the ads typically pay for

10 Backpage ads?

11 A.  Generally speaking, they use a prepaid gift card, or what

12 we've seen on multiple occasions, it's a way in which to remain

13 covert and so no name is associated with it.  You can get it at

14 Walgreens or a 7-Eleven.  We called for them a while Vanilla Sky

15 cards, is what they said on the front of a Visa gift card, and

16 it's just refillable gift card.

17 Q.  Based on your training and experience, are there any reasons

18 why it is the bottom who posts the ads and not the pimp who

19 posts the ads for females who are selling sex?

20 A.  Yes.

21 Q.  What is that reason?

22 A.  Again, I go back to evading law enforcement.  I believe

23 based on other interviews that we conducted with pimps, they

24 have heard about recent cases where things can be associated

25 with a pimp, and so pimps have attempted to get smarter about

LANDAU - DIRECT

57

1   what their role is and put that on to the bottom so will ask the

2   bottom and tell the bottom, "You will be responsible for that,"

3   so it's not associated with them so in no way can any -- any tie

4   come back to the pimp.

5   Q.   So if a john sees an ad and he decides that he wants to

6   contact the female that is advertised in the ad, how does he go

7   about doing that?

8   A.   Generally, he will either make a phone call or send a text

9   message or an inbox message to Facebook or Instagram.   But

10  somehow the john makes initial contact, and what we see mostly

11  is text message.

12  Q.   Once that initial contact is made, what is the most common

13  method by which the clients communicate with the females?

14  A.   I would say 95 percent of what we see is text message back

15  and forth.

16  Q.   And once a client meets with a female for paid sex, is it

17  common for that female to save that john's number and further

18  text him in the future?

19  A.   If the appointment went well in the eyes of the female

20  and/or in the eyes of the pimp, if they received more money or

21  maybe even they didn't have to do as much as they thought that

22  they were agreeing to, they will save that contact and then they

23  will reengage with that individual.

24  Q.   In your experience, do pimps or females ever use websites

25  that they created themselves for advertising?

LANDAU - DIRECT

58

1    A.   Yes.

2    Q.   And what type of information have you seen posted on those

3    websites?

4    A.   On those websites it's more direct about what is for sale.

5    It's a lot of pictures, client reviews, and so they will ask

6    prior regular clients to, essentially much like Trip Advisor,

7    say that things went well with that particular date or call.

8    Q.   What is the most common location where johns will meet with

9    females for paid sex?

10   A.   Motels and hotels.

11   Q.   And based on your training and experience, why is that the

12   preferred location?

13   A.   I think it's the preferred location mostly because it is

14   readily available and you can have privacy.  Unlike at your

15   home, there might be someone else living with the client or the

16   john that doesn't want to -- they don't want them to know that

17   they're involved in such behavior.  And also just how many are

18   available, access.

19   Q.   Now, when a hotel room is booked on behalf of a female who

20   is going to meet a john for paid sex, who is usually the person

21   that's going to make that reservation and pay for the room?

22   A.   It's usually the female.

23   Q.   And based on your training and experience, why is it the

24   female who does that?

25   A.   Based on, again, interviews and my experience after talking

LANDAU - DIRECT

59

1  to over 500 females, it's at the direction of the pimp and that

2  they have been told to make that reservation.

3  Q.  And what purpose does that serve the pimp?

4  A.  Again, it's no tie back to them, and it evades law

5  enforcement for any kind of connection to them.  If, in fact, a

6  sting operation happened or there was some kind of notification

7  to law enforcement that prostitution was ongoing in a hotel

8  room, it would take some time before they made a connection to

9  the pimp.

10 Q.  Based on your training and experience, when a john is

11 scheduling a date with a female, you said usually by text

12 message, with whom does that john communicate to actually

13 schedule the date?

14 A.  The female.

15 Q.  And, again, why is that?

16 A.  Well, I think the main reason is that a male client would

17 not want to be speaking to a pimp about setting up a date for

18 sex.  He would rather talk to the person that he believes he's

19 going to engage in the sex act with.

20 Q.  Are there any other reasons?

21 A.  Just the agreement between the female and the client and,

22 again, to evade law enforcement.

23 Q.  When a john meets a female in a hotel room for sex, is the

24 pimp usually present in the room when the sex act takes place?

25 A.  No.

LANDAU - DIRECT

60

1   Q.  And based on your training and experience, why is the pimp

2   not present?

3   A.  Generally, when people engage in a sex act, they don't want

4   a third party involved in any way, and so especially in this

5   instance, there is this belief that it is a consensual meeting.

6   Q.  When the female is meeting with the john for paid sex, where

7   is the pimp usually at?

8   A.  It depends.  Sometimes they can be in the lobby of the

9   hotel, sometimes they can be close by, at a store or in the

10  parking lot.  And they can even be -- we've had pimps before in

11  the bathroom at hotels.

12  Q.  And based on your training and experience, why is it that

13  the pimps stay so close during the meeting between the female

14  and the john?

15  A.  To ensure that the agreed time -- so they might say we want

16  to meet for $100 for one hour or $100 for an hour and a half,

17  and the pimp wants to know that that's the amount of time that

18  the female is in the company of the john.

19      The pimps sometimes feign security and so they will tell

20  the females, "Look, I'll be close by in case anything bad

21  happens.  I will rescue you.  I will help you."  And then

22  there's also just a means of control and a reason for the pimp

23  to say, "Look, I'm watching at all times."

24  Q.  Based on your training and experience, is it common for

25  pimps to require the females who work for them to communicate at

LANDAU - DIRECT

61

1  the beginning and the end of a date?

2  A.  Yes.

3  Q.  And how is that usually accomplished?

4  A.  Usually that's accomplished via text message.  And so they

5  might say, "Client's here," or, "Here"; "Got money"; "Done," as

6  simple as that.

7  Q.  Okay.  Based on your training and experience, do some pimps

8  require females to actually turn on their cell phones and allow

9  pimps to secretly watch or listen to the date as it's happening?

10  A.  Yes.

11  Q.  And what's the purpose of that?

12  A.  Again, back on control and making sure that the female knows

13  at all times they're being watched by the pimp but also that the

14  agreement is what it is, and also the idea of security and

15  looking out for the female is what often is told to the female.

16  Q.  In the text messaging between the female and the pimp that

17  you talked about at the beginning and the end of the dates, are

18  there sometimes code words for that communication?

19  A.  Yes.

20  Q.  And based on your training and experience, why are code

21  words used?

22  A.  To evade law enforcement, again, and to make sure that law

23  enforcement doesn't catch on to what's happening.

24  Q.  Based on your training and experience, is travel between

25  states sometimes a part of sex trafficking?

1    A.   Yes.

2    Q.   And what is the most common method that you see travel

3    happen during sex trafficking?

4    A.   By way of vehicle or public transportation even from state

5    to state, trains and buses.  But vehicle, generally.

6    Q.   What are some reasons that pimps will travel with the

7    females who work for them?

8    A.   One of the main reasons is if a particular area is what they

9    refer to as hot, meaning that there's a strong law enforcement

10   presence or that they have been noticed at a hotel.

11        The other reason is confusion.  I lived in Iowa most of my

12   life, and so traveling to other states is confusing, not knowing

13   where you're at, and so the Ground Hog Day-type mentality when

14   prostitution is ensuing day to day, the day looks the same, but

15   if you don't know where you are, there's also a strong

16   dependency on the pimp to make sure that you get from place to

17   place and that you know how to get food, where to get food, and

18   where you are.

19   Q.   Based on your training and experience, is it common for

20   pimps to sell or trade females who work for them?

21   A.   It is.

22   Q.   And what are some reasons why those trades or sales would

23   happen?

24   A.   Oftentimes the sale happens because the female has become

25   some type of problem.  Whether that means they're not getting

LANDAU - DIRECT

63

1   along with other girls within the stable or there has been some

2   kind of breakdown in the relationship between the female and the

3   pimp, what used to be a positive relationship or a loving

4   relationship has turned violent, and/or simply because they

5   just -- they want to get rid of the female.

6   Q.  Based on your training and experience, do pimps interact

7   with the families of the females who work for them?

8   A.  Oftentimes, yes.

9   Q.  What does that look like?

10  A.  They -- especially for a finesse pimp and even a hustler

11  pimp, they will sell themselves as such to the family as well.

12  Oftentimes these victims are vulnerable victims and come from

13  less than -- less than adequate housing situations and home life

14  situations, and so oftentimes the pimps will show the family by

15  way of buying or providing for the family and the female a

16  better life and new things, new clothes, even vehicles we've

17  seen purchased or a new apartment for the mom, paying first and

18  last month's rent to show that, "Look, I'm taking care of your

19  child.  I'm a good guy.  I'm a good person."  Even coming over

20  for dinner and putting themselves in that position where they

21  gain that trust so when the daughter is gone for a week or two

22  weeks, mom or dad assume that all is well and they're being

23  taken care of appropriately.

24  Q.  When you were talking about the way that pimps represent

25  themselves to the victims' families, are they representing

LANDAU - DIRECT

64

1   themselves as pimps or some other role in their life?

2   A.   Oh, no.   Just as a boyfriend, a very good boyfriend and

3   somebody who is taking care of their daughter.   It's never

4   representing themselves as a pimp, but maybe sometimes somewhat

5   flashy of look at all these things I have and I'm also going to

6   give these to your daughter and to the family and making false

7   promises to the family even about what type of employment he

8   has.

9   Q.   Is it common also for the pimp to let the female believe

10  that the pimp is her boyfriend or they're going to have a

11  boyfriend-girlfriend-type relationship?

12  A.   Almost always.

13  Q.   Okay.   Based on your training and experience, do pimps have

14  rules that -- do they have rules in place for the females who

15  work for them?

16  A.   Yes.

17  Q.   And what are some of the most common rules that you

18  encounter that pimps have for females?

19  A.   Some of the most common rules are never to look another man

20  in the eye unless it's the client or the john and often even not

21  that.   So always use condoms, never have sex without the

22  exchange of money first, make sure that they always maintain

23  contact with the pimp or the bottom, and to always be

24  appropriately ready to work and dressed appropriately.

25       So never a moment of sleep and/or slacking off.   Most

LANDAU - DIRECT

65

1  people work 8 to 4, Monday through Friday.  This is a constant,

2  nonstop work schedule.

3  Q.  Do the pimps sometimes require the females to call the pimp

4  by a certain name?

5  A.  Yes.

6  Q.  What are some of those names?

7  A.  Daddy and -- that's most often is Daddy.

8  Q.  What about the use of quotas in the context of sex

9  trafficking, how does that work?

10  A.  The use of quotas is often implemented by the pimp at the

11  onset of their involvement, and so he will tell them, "Look, if

12  you don't make $500 today, you are not going to eat," or, "If

13  you don't make a thousand dollars today, you won't see your

14  child"; "If you don't make a thousand dollars today, you won't

15  be able to go home to your family."

16      So the use of quotas is a way in which then to ensure --

17  the pimp to ensure that they will make the money, and if they

18  don't, there are punishments and/or less rewards that happen.

19  Q.  Based on your training and experience, will pimps punish a

20  female who violates these rules?

21  A.  Yes.

22  Q.  And what are the reasons behind the punishment of a female?

23  A.  I think lots of times what we've seen, especially if a pimp

24  has multiple girls working for him, is to ensure that the other

25  females see what's happening with that particular female who's

1  gotten in trouble, and they then abide and comply.

2      So the use of punishment is to also make sure that you know

3  who is boss and who is in charge, and if you break one of those

4  rules that you know that there is a consequence for that.

5  Q.  Are there books that pimps read to learn the trade of sex

6  trafficking?

7  A.  Yes.

8  Q.  What are some books that you're aware of?

9  A.  *A Look In The Mirror* by Terrence Baker, and then *Pimpology:*

10 *The 48 Laws Of The Game* by Pimpin' Ken.

11 Q.  How frequently are such books a part of your investigations?

12 A.  We see those on a pretty frequent basis.  I would say in 80

13 percent of our cases, we have some indication that the females

14 and/or pimps abide by those books, have read those books, and

15 are part of what they instill in their stable.

16 Q.  Do some pimps have the females read literature related to

17 the sex-trafficking trade?

18 A.  They do.

19 Q.  And do you know some of the books that the females read?

20 A.  I mean, the same books is what we know to be true.  The

21 victims that we've talked to say, yes, the pimps read those and

22 then they tell us to read them.

23 Q.  Based on your training and experience, what is the most

24 common form of payment that a john will use to pay a female for

25 sex?

1   A.   Cash.

2   Q.   And to whom does the john give that cash?

3   A.   Initially, to the female who provided the sex act.

4   Q.   Based on your training and experience, does the female keep

5   that cash?

6   A.   No.

7   Q.   Where does the cash go?

8   A.   The cash generally goes to the bottom or directly to the

9   pimp.

10  Q.   Based on your training and experience, do pimps have sex

11  with the females who work for them?

12  A.   Almost always.

13  Q.   And in your more than 50 interviews with suspects, have you

14  asked them why they have sex with the females who work for them?

15  A.   Yes.

16  Q.   Has there been a consistent answer?

17  A.   Yes.

18  Q.   And what is the answer?

19  A.   And these are their words, not mine.  They say to test out

20  the merchandise.  They say they're not going to put something

21  out into the market, much like a drug trafficker with cocaine.

22  They try it first and then put it out.  And so that's their

23  consistent reasoning.

24  Q.   As a result of this, do pimps sometimes get the females who

25  work for them pregnant?

1  A.  Yes.

2  Q.  And how frequently does that occur?

3  A.  We see that very often in our cases.

4  Q.  The rule that pimps have for females to always use condoms

5  while they're on dates, does that apply for the pimp?

6  A.  It absolutely does not apply to them.  And, in fact, it's

7  almost forbidden in that they must have sex with the pimp

8  without a condom.

9  Q.  Based on your experience, if the female ends up having a

10  baby, what happens to that baby?

11  A.  The baby sometimes will end up in foster care or the bottom

12  will take care of the baby within the stable, depending on the

13  role of the female who had the baby.  Oftentimes the baby will

14  be located in the hotel.  We've recovered several babies in

15  hotels that are there as results of the pimp and female's

16  relationship, and they're right alongside them while they're

17  working.

18  Q.  Do pimps use the children as leverage against females?

19  A.  They do.

20  Q.  And based on your training and experience, once a female

21  gets pregnant, is she just allowed to stop working?

22  A.  No.

23  Q.  What happens?

24  A.  Oftentimes females are given a time period by the pimp.

25  We've seen women that have worked as late up to -- as late in

1   their pregnancy as to eight months.  So they are expected to

2   work, and then once they have the baby, right back working

3   afterwards.

4   Q.  Based on your training and experience, does the relationship

5   between the female and the pimp change after a female becomes

6   pregnant by the pimp?

7   A.  Yes.

8   Q.  And can you describe how that relationship changes?

9   A.  Sometimes we've seen it where it changes positively, where

10  they are expected to work a little bit less and there is a

11  honeymoon period, if you will, where more of the stable has to

12  pick up the slack and they're given some kind of like maternity

13  leave.  But we've also seen it then where quickly it shifts and

14  they say, no, in fact, you do have to keep working.

15      Lots of times too females are confused by what they believe

16  is a bond between them and the pimp and that since they're

17  having a child together that things would be different, and

18  we've seen, especially in violent situations with gorilla pimps,

19  where it's the exact opposite.  It gets worse.

20  Q.  Is there a market for prostitutes who are visibly pregnant?

21  A.  Yes.

22  Q.  I'd like to ask you a couple questions about how the money

23  works in stables.  You testified earlier that the females give

24  the money to the pimps.  How are the females taken care of if

25  they are required to give all their money to the pimps?

LANDAU - DIRECT

70

1    A.   Generally, in our cases, the pimps will provide whatever is

2    necessary.   And I say necessary.   If a female says, look, I need

3    makeup, I need toothpaste, those things will be purchased for

4    them.   But the money, generally, is kept by the pimp and is only

5    doled out by way of going to the store together or him saying,

6    "What do you need?" and going and picking up deodorant,

7    toothpaste, those kinds of things.   But generally speaking,

8    there's very few instances where they're allowed to keep the

9    money that they make.

10   Q.   Based on your training and experience, is that arrangement

11   that you just described explained to the females at the very

12   beginning of her relationship with the pimp?

13   A.   No.

14   Q.   What is the most common split that is told to a female at

15   the beginning of a relationship?

16   A.   The most common split is, "We're going to do this together.

17   We're going to hustle together.   It's a 50/50 split.   I'm your

18   protection.   I'm your security.   You keep 50 percent, I keep 50

19   percent."

20   Q.   Does that change over time in most circumstances?

21   A.   It does.

22   Q.   Based on your training and experience, do pimps target a

23   particular type of female?

24   A.   They do.

25   Q.   What types of females?

LANDAU - DIRECT

71

1   A.  They target the most vulnerable victims; people who are in

2   need of employment, people who are in need of housing, females

3   who are in need of someone to look out for them or take care of

4   them.  We see a lot of females who have been involved in the

5   foster care system or who are receiving some kind of state

6   assistance who are targeted.

7       And then any kind of vulnerability that the pimp can prey

8   on, whether it's a lack of self-esteem, a need for a particular

9   person in their lives, so they prey on whatever that need might

10  be.

11  Q.  Where do pimps go to locate these women?

12  A.  Anywhere and everywhere you can think of.  Malls, strip

13  clubs, schools.  Oftentimes social service agencies.  So we've

14  seen a real influx of this outside of social service agencies

15  where a woman and her children might be going inside to obtain

16  their welfare check for the month or their state aid check and a

17  pimp is outside promising a different new life.  We see it

18  inside prisons, inside jails.  We see it just about everywhere

19  you can imagine.

20  Q.  What are some ways pimps use to entice females to

21  prostitute?

22  A.  I go back to the promise of a dream and the promise of a

23  better life.  And so they will entice them by promising them

24  that things are going to be different and that they're only

25  going to do this for a short time until they can be together and

LANDAU - DIRECT

72

1  have a house and have babies.

2       They will entice them by sometimes their flashy appearance,

3  a car that they have or money that's available.  Sometimes even

4  by a simple party lifestyle or by promising young girls to get

5  their hair done or their nails done or better clothes, things as

6  simple as that.

7  Q.  In your experience, do pimps ever instruct their females who

8  already work for them to recruit other females?

9  A.  Yes.

10 Q.  And based on your training and experience, what are some

11 reasons the female who is already working for the pimp would do

12 this sort of thing?

13 A.  That's an interesting topic because there's a lot of females

14 that do go ahead and recruit other females under the guise and

15 promise that their workload will lessen and that their

16 expectation within the stable will become different.

17      And so there's the idea of rewards and promises such as,

18 hey, you might be able to become the top girl, the bottom, in a

19 stable.  And then also, as strange as it sounds, sometimes when

20 they're lonely and they're alone working in a hotel room, for

21 friendship and for someone to be able to talk to with common

22 ground.

23      And then another reason that they recruit is that sometimes

24 they are in the position of believing that their life is better

25 at that point in time; that they aren't in foster care, that

1   they aren't, you know, in a transitional living program where

2   things aren't so good, and at least they have some money, at

3   least they have some hygiene items, things like that.

4   Q.  What are some ways a female who is already working for a

5   pimp would go about trying to recruit a new woman?

6   A.  That can happen in any venue.  The venue doesn't matter as

7   much.  It can happen right on the street.  We've had several

8   cases where females have been forced to work the track, which is

9   an area of prostitution right on an open street, and they will

10  recruit girls right there.  So it can happen on the street, it

11  can happen through social media, it can happen in malls, it can

12  happen at a movie theater.  It can happen just about anywhere.

13  Q.  And can you explain to the jury what exactly you mean by a

14  track or what a person who is in this lifestyle would refer to

15  as a track?

16  A.  Yeah.  So the track is just an open area or a street where

17  prostitution is frequent, where clients know that's an area

18  where you can go that maybe police don't know about or police do

19  know about that isn't maybe patrolled as well as or at least --

20  yeah, isn't patrolled, maybe, as frequently as it should be.

21  And so the track, like in Chicago, for instance, is sometimes in

22  more seedy areas of the city.

23  Q.  Is the track also sometimes referred to as the blade or

24  walking the blade?

25  A.  Yes.

1  Q.  Are females who successfully recruit a new female rewarded

2  by the pimp, in your experience?

3  A.  Yes.

4  Q.  And what does that look like?

5  A.  It depends.  Sometimes it can be even spending a little bit

6  more time with the pimp.  If the pimp is one who has his girls

7  working out of a hotel and visits on an infrequent basis or a

8  pimp who isn't around as much might say, look, if you recruit a

9  couple girls and it all works out, you know, we'll spend more

10 time together, or you will -- I'll give you $50, or I will make

11 sure that everybody knows you did a good job, even just a pat on

12 the head.  It might be the difference in the day from being

13 beaten or not being beaten.  So it's different.

14 Q.  On the flip side, are girls who either fail to recruit or

15 recruit a female who doesn't work out punished by the pimp?

16 A.  Yes.  We've seen that too.

17 Q.  Based on your training and experience, what are some

18 tangible benefits that a pimp can offer to a female?

19 A.  Housing, money, the promise of a better life, hair, nails,

20 clothes.  We've seen pimps buy vehicles for girls before,

21 clothes for their children, food.  Food is a big one and a

22 simple one, but one that often goes unnoticed, and it is a big

23 benefit.

24 Q.  Based on your experiences, do females initially go along

25 willingly with a pimp to engage in sex acts in exchange for

LANDAU - DIRECT

75

1  money?

2  A.  They do.

3  Q.  And based on your experience, what are some reasons that

4  these women will go along with pimps?

5  A.  I go back to the techniques that are used by pimps in

6  furtherance of what they are trying to do.  And so the confusion

7  and the isolation, the threats, things like that.  They will go

8  along willingly initially thinking that things are going to be

9  okay, that they're going to get this money together, that it's

10  going to be for a short period of time and that life will

11  somehow be better and different.

12  Q.  In your experience, once a pimp gets a female to work for

13  him, that initial enticement is successful, does the

14  relationship change over time?

15  A.  Yes.

16  Q.  How does it change?

17  A.  Depending on the type of pimp that it is, it can change

18  where the female sometimes gets -- realizes what's happening and

19  sees what's happening and questions.  And so the questioning to

20  a pimp is not well received, and so the pimp might start to see

21  the female as a problem and somebody who is not, quote-unquote,

22  down or isn't going with the flow and is not loyal.  And so the

23  relationship changes because the female starts to question, and

24  if they question, well, then they're not following the rules of

25  the game.

76

1        It can change positively if the female is doing very well

2   at the onset and making a lot of money, and it ebbs and flows.

3   And so sometimes I referred to it with some of the females, who

4   said, yes, it's exactly right, of it's like walking on

5   eggshells.  You never know what the day is going to bring.

6   Q.  In your experience, do pimps require victims to sometimes

7   turn over identification?

8   A.  They do.

9   Q.  What are some reasons a pimp would do that?

10  A.  I go back to the standard answer of control and

11  manipulation.  Also, to evade law enforcement.  By the time law

12  enforcement fingerprints someone on a sting operation, the pimp

13  is able to be long out of the picture and gone.  So having the

14  person's identification, oftentimes the females are trained to

15  only use a nickname and when law enforcement approaches for them

16  to ensure that they have rehearsed a different date of birth, a

17  different Social Security number, a different name to evade law

18  enforcement.

19  Q.  Now, Special Agent Landau, I'd like to talk to you a little

20  bit about the behavior of victims that you've observed during

21  your interviews of victims.  Are you aware of situations in

22  which a pimp has physically abused a victim and she has

23  continued to work for him despite that physical abuse?

24  A.  Yes.

25  Q.  And how common is that?

LANDAU - DIRECT

77

1   A.  Especially in the case of dealing with a gorilla pimp, it is

2   very common.  It's so common that oftentimes we will recover a

3   victim involved in this with a gorilla pimp and they go back.

4   Q.  Are you aware of situations in which a victim of a

5   physically abusive pimp manages to leave the pimp but then

6   returns to work for that pimp or another pimp?

7   A.  Yes.

8   Q.  And how often does that occur?

9   A.  I can only think of one or two instances where we haven't

10  recovered a victim and then they left and came back.  So it's

11  very common.

12  Q.  And based on your interviews of sex-trafficking victims,

13  what are some of the reasons they give for returning to pimps

14  who are physically abusive after they get away?

15  A.  Fear.  Fear is one, but also the situation they're going

16  back to sometimes is seen as -- as worse.  We've had young women

17  who have been abused by their parents and so going back to, you

18  know -- maybe even a 21-year-old who is still living at home,

19  going back to that environment is more difficult than sucking it

20  up and being beaten once in a while.  Yeah.  Those types of

21  things.

22  Q.  When you say that they're motivated by fear to return to a

23  physically abusive pimp, in your experience, if they are away

24  from the pimp and can't be abused, what is it that they're

25  afraid of that causes them to return?

LANDAU - DIRECT

78

1  A.  Lots of times if it's that type of pimp, they've already

2  threatened their family, they've already threatened, "Look, I

3  know where you live.  You've taken me by where you went to high

4  school.  You have ingratiated me and I've ingratiated myself

5  into your world.  I know where to find you."  And so they go

6  back lots of times to protect their own family and to just

7  ensure that nobody in their family is hurt.

8  Q.  In your experience, is it common for a victim of sex

9  trafficking to feel shame about their actions?

10  A.  Yes.

11  Q.  Is it common for them to feel shame about their actions even

12  though they might be beaten to take those actions?

13  A.  Yes.

14  Q.  And what have you observed about victims' ability to have

15  insight into what's actually happening in their situation?

16  A.  Oftentimes it takes them a period of time to be away to

17  understand what happened or what is happening.  So for as

18  long -- as a law enforcement officer, my greatest wish is once

19  they are recovered that they are placed into an environment

20  where there is no access for the pimp to get to them.  So the

21  shame and embarrassment that they feel is -- it takes years to

22  get over.

23  Q.  And based on your training and experience, is it common for

24  victims to believe what has happened is their fault?

25  A.  Yes.

LANDAU - DIRECT

79

1  Q.  In your interviews with victims and with suspects, have you

2  learned whether pimps have had discussions with females about

3  law enforcement or what to do if law enforcement catches them?

4  A.  Yes.

5  Q.  And what sorts of things do pimps tell females about law

6  enforcement?

7  A.  They say things like if you talk to law enforcement, no

8  one's going to believe you; if you talk to law enforcement,

9  you're going to be in just as much trouble as I am because

10  you've participated in this illegal activity of prostitution

11  and/or other criminal behavior.

12      They tell them that you can't trust law enforcement,

13  they're going to use your statements against you.  We will never

14  be together again.  You won't see your kids.  You won't see your

15  family.  Law enforcement can't be trusted.  And most of all, if

16  law enforcement is involved in this and you put paper on me,

17  this is the most common, if you put paper on me, meaning if you

18  make a statement against me, I will find you.

19  Q.  Based on your training and experience, what is the role that

20  alcohol or drugs or drug addiction can play in prostitution?

21  A.  It has a big role.  We have seen a significant influx in the

22  use of heroin as a way in which to control victims.  After

23  someone uses heroin and becomes addicted, they're very, very

24  what's referred to as dope sick, the worst type of flu you can

25  imagine if you stop using, and so that is used as a carrot and

LANDAU - DIRECT

80

1  as a means of control by pimps.  And alcohol is a big thing.

2  Lots of females use drugs so that they can cope with what they

3  have been involved in.

4  Q.  In your experience, are there pimps who prefer for their

5  females not to have any type of drug addiction?

6  A.  Yes.

7  Q.  And based on your interviews, what's the reason for that?

8  A.  Because they're harder to control when they are involved

9  with drugs, and it's more costly for the pimp.  So if the only

10  thing they have to provide to them is a slice of pizza once a

11  day and a bottle of lotion, it's a lot cheaper than 15 jabs of

12  heroin.

13  Q.  Based on your experience working with victims, is it common

14  for victims who are immersed in sex trafficking to reach out to

15  law enforcement and tell law enforcement that this is what is

16  happening to them?

17  A.  No.

18  Q.  And based on your interviews of victims, have they given you

19  any reason why they do not reach out to law enforcement?

20  A.  Yes.

21  Q.  And what are some of the most common reasons that you've

22  heard?

23  A.  Some of the most common reasons are, again, what they've

24  been trained to believe is that we aren't going to help them,

25  that law enforcement is the enemy, that law enforcement will

1  take their children away, that law enforcement will make sure

2  that they're the ones behind bars and, again, back to the fear.

3        But also a loyalty, a really, really messed up loyalty to

4  the pimp.  Messed up in, you know, common citizens such as you

5  might say, "Why?  Why loyal?"  The belief that there is going to

6  be a beautiful ending to this or a beautiful beginning that has

7  somehow gone awry in the midst of all of it.

8        So they don't tell law enforcement because they're ashamed

9  and they're embarrassed and they can't believe they've been

10  tricked into this.  Once they realize what they're involved in,

11  they're often told by the pimps too, "Look at what you've done

12  now.  There's no coming back from this, and you're never going

13  to be worth anything."

14  Q.  If women do not report sex trafficking, how is it that law

15  enforcement finds out about it?

16  A.  Lots of times we receive tips and information from hotel

17  employees.  I think we've done a pretty good job of educating

18  not just front desk employees of hotels but also maids, cleaning

19  staff, and people at hotels.

20        Also we get tips from the Polaris Project and National

21  Center for Missing and Exploited Children.  We get tips from

22  non-government organizations so a social service provider who

23  might be working with a family in furtherance of helping them

24  with domestic violence within the home and then they learn about

25  what they believe to be sex trafficking.

LANDAU - DIRECT

82

1     We also get tips from school personnel.  One of our biggest

2   cases was generated by a school bus driver.  And so it comes

3   from all over, and then it's up to law enforcement to respond to

4   those types of tips.

5   Q.  Have you ever had a female directly contact law enforcement?

6   A.  Yes.  One or two times, we have, yes.

7   Q.  And what are the most common circumstances in which females

8   will call law enforcement?

9   A.  Usually a female will contact law enforcement when she is at

10  her breaking point.  And I say one or two times where they've

11  come directly, but there's been other times where it's under the

12  guise of some other reporting mechanism.  So they may contact

13  law enforcement to say, "Hey, there's a loud party going on over

14  here.  You need to come," and law enforcement comes, they

15  question people.

16      We've had females who have winked at police officers, like,

17  "Get me out of this room right now," and law enforcement

18  officers have noticed there was something not right and have

19  spoken to those females.

20      So it's happened, but it's not very often.

21  Q.  What are the most common circumstances, what precipitates a

22  female calling law enforcement?

23  A.  Usually they're at their breaking point.  And I say that

24  with the understanding of everyone's breaking point is

25  different, but they might be at the breaking point because a new

83

1  female is getting more attention within the stable.  They may

2  not -- they may have just received a terrible beating.

3      They may not have met their quota for the night and they're

4  afraid of what's going to happen.  Their relationship with the

5  pimp has gone south and they're afraid that they're going to be

6  sold to another pimp in another state.  There's lots of

7  different reasons for that.

8  Q.  Based on your experience, once a female has sought out the

9  assistance of law enforcement and is talking to a law

10 enforcement officer, is it common for that female to minimize

11 her involvement?

12 A.  Yes.

13 Q.  And how do females minimize their involvement?

14 A.  They might say things like, "This is my first time," "I've

15 only been doing this for a week," "I have only gone on two

16 dates," when it's actually 200.

17     They might say, "That's my boyfriend," the pimp who might

18 be in custody or the person who is being investigated and is in

19 their car in the hotel parking lot.  They might say, you know,

20 "That's my boyfriend."

21     They might minimize by saying, "I only give the massages.

22 There is no sex acts.  I never get any of the money," things

23 like that.

24 Q.  And you touched on this a little bit.  In your experience,

25 do females tend to minimize the involvement of not only

1  themselves but of the pimp?

2  A.  Yes.

3  Q.  And besides saying it's their boyfriend, are there any other

4  ways you're aware of from your interviews of them doing that?

5  A.  Any other ways that they minimize?

6  Q.  The involvement of the pimp.

7  A.  Yeah.  They might say that the pimp is just a driver.  They

8  might say that the pimp is, I mean, someone they don't know at

9  all and completely, you know, feign any kind of knowledge of who

10  that person is.

11  Q.  Have you had experiences with females who initially are not

12  truthful with law enforcement and then after several interviews

13  become truthful with law enforcement?

14  A.  Yes.

15  Q.  And have you had the opportunity to ask them why in the

16  initial interview they were not truthful?

17  A.  Yes.

18  Q.  And has there been a common response?

19  A.  Yes.

20  Q.  And what is that response?

21  A.  They were afraid.  They didn't trust law enforcement.  They

22  were afraid of the pimp, but they were afraid that they were

23  going to be incarcerated.  They were ashamed, embarrassment.

24  They didn't really understand what was happening until they

25  wrapped their mind around from it and are away for a period of

LANDAU - DIRECT

85

1   time.

2       We've interviewed several victims on multiple occasions

3   where each and every interview, things just get a little bit

4   clearer in their mind.

5       I mean, one of the other common things is they don't

6   understand what really was happening, especially if drugs are

7   involved, and then that whole tactic that's been used of lies

8   and threats and confusion and punishment and manipulation, it's

9   just a web of deceit that they can't even see their way through.

10  Q.  Based on your experience, once a female tells a law

11  enforcement officer about what happened, is it common for her

12  to at some point decide that she doesn't want to cooperate

13  anymore?

14  A.  Yes.

15  Q.  And when that happens, is it common for the female to stop

16  any type of communication with law enforcement?

17  A.  Yes.

18  Q.  Is it common for victims to express a desire to not want to

19  testify in court against their pimp?

20  A.  Yes.

21  Q.  And have you had the opportunity to ask victims why they

22  don't want to testify?

23  A.  Yes.

24  Q.  Are there some common explanations that you hear over and

25  over again?

1    A.   Yes.

2    Q.   And what are some of those explanations?

3    A.   I think the most common explanation is, and one that every

4    girl has said in a different way, is, "You actually expect me to

5    go into a courtroom and tell all these perfect strangers my

6    deepest, darkest awful things that happened in my life?  Really,

7    Carrie, really?"  They say that.

8         They say, "I'm embarrassed.  I'm ashamed.  I can't.  I'm

9    afraid.  How do I look at that person that I thought was there

10   for me and tell perfect strangers that he did these horrible

11   things?"

12        Or lots of times too, victims say, "I'm still -- I'm still

13   confused about what happened."  Those are probably the most

14   common responses.

15   Q.   In your experience, have feelings about the pimp interfered

16   with a victim's desire to testify in court?

17   A.   Yes.

18   Q.   And how?  How does that happen?

19   A.   We've had victims cooperating with law enforcement all the

20   way up until trial and end up testifying for the defendant and

21   protecting the defendant based on loyalty and love.  And when

22   things were good, they were really good, but when things were

23   bad, they were bad, but they choose and want to remember the

24   good things and blame themselves a lot for, quote-unquote, going

25   along and being a part of something that has, you know, gotten

1    to this point.

2    Q.  In the course of your work, have you become aware of

3    treatment programs that are available for sex-trafficking

4    victims?

5    A.  Yes.

6    Q.  And have you spoken to people who have been a part of

7    running those programs?

8    A.  Yes.

9    Q.  Have you also spoken with people who have attended those

10   programs?

11   A.  Yes.

12   Q.  And what is the goal of those treatment programs?

13   A.  The goal of those treatment programs is to assist in the

14   female or the victim in becoming whole again.  So to provide

15   them with schooling and education and brighter future and a way

16   to leave the life and become a contributing member of society

17   again.

18          MS. JENNINGS:  No further questions at this time, Your

19   Honor.

20          THE COURT:  All right.  We're going to go ahead and

21   take our afternoon break, then.  It is 2:46.  If the jury will

22   be back in the jury room there at 5 after 3.

23      Thank you.

24          (In open court, with the defendant present, out of the

25   presence of the jury.)

1          THE COURT:  Okay.  Anything we need to talk about?

2     Mr. Herrold?

3          MR. HERROLD:  No, Your Honor.

4          THE COURT:  Okay.  Go ahead and take your breaks, and

5    we'll see you in 20 minutes.

6          (Recess at 2:48 p.m. until 3:09 p.m.)

7          (In open court, with the defendant present, in the

8    presence of the jury.)

9          THE COURT:  Thank you.  You can be seated.  Welcome

10   back.

11     Mr. Herrold, you may begin with your cross-examination

12   whenever you're ready.

13                    CROSS-EXAMINATION

14   BY MR. HERROLD:

15   Q.  Special Agent Landau, just to clarify, Backpage is not or

16   was not a completely illegal website, per se, correct?

17   A.  Correct.

18   Q.  You testified it was a classified site, correct?

19   A.  Yes.

20   Q.  And so there were legal activities on Backpage as well,

21   correct?

22   A.  Correct.

23   Q.  So not everyone who is on Backpage is engaged in

24   prostitution, correct?

25   A.  Correct.

LANDAU - CROSS

89

1  Q.  And not all prostitutes have pimps, correct?

2  A.  Correct.

3  Q.  And not all prostitutes are being sex trafficked, correct?

4  A.  Correct.

5  Q.  There are independent sex workers; is that right?

6  A.  Yes.

7  Q.  People work for themselves, correct?

8  A.  Yes.

9  Q.  Even groups of independent sex workers working together?

10  A.  Yes.

11  Q.  Who wouldn't have necessarily a pimp?

12  A.  That is true.

13  Q.  And aren't being trafficked?

14  A.  That is true.

15  Q.  There's also adult entertainers who are not engaged in

16  prostitution, correct?

17  A.  Yes.

18  Q.  The nature of the activity determines whether it's a crime

19  or not under the law, correct?

20  A.  Correct.

21  Q.  And don't almost all of these types of workers, whether

22  they're prostitutes, independent sex workers, or adult

23  entertainers, use the Internet in some form for marketing

24  purposes?

25  A.  Generally, yes.

1    Q.  It's a way to try and get customers, correct?

2    A.  Yes.

3    Q.  Persons interested in whatever you're offering, legal or

4    illegal, correct?

5    A.  True.

6    Q.  And in the hope that it leads to income for whatever

7    industry or whatever they're offering, correct?

8    A.  Yes.

9              MR. HERROLD:  I don't have anything else, Your Honor.

10             THE COURT:  Ms. Jennings, any redirect?

11             MS. JENNINGS:  No, Your Honor.

12             THE COURT:  Thank you, Agent.  You may step down.

13             THE WITNESS:  Thank you.

14                              (Witness excused.)

15             THE COURT:  Ms. Jennings or Ms. Bruner, you may call

16   your next witness.

17             MS. BRUNER:  The Government calls Sergeant Shane

18   Taylor.

19             THE DEPUTY CLERK:  Please raise your right hand.

20             SHANE TAYLOR, GOVERNMENT'S WITNESS, SWORN

21             THE DEPUTY CLERK:  Thank you.  Please have a seat.

22                        DIRECT EXAMINATION

23   BY MS. BRUNER:

24   Q.  Good afternoon, Sergeant Taylor.  Can you please state your

25   name and spell your last name for the record?

Exhibit C

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                File No. 1:13-CR-246

EDDIE ALLEN JACKSON,

        Defendant.
_____/

Excerpt of Jury Trial
Testimony of James E. Hardie

Before

THE HONORABLE ROBERT HOLMES BELL
United States District Judge
April 29, 2014

APPEARANCES

TESSA K. HESSMILLER             SEAN R. TILTON
RUSSELL A. KAVALHUNA          RICHARD D. STROBA
Assistant U.S. Attorneys      Assistant Federal Public
P.O. Box 208                     Defenders
Grand Rapids, MI 49501        50 Louis, NW, Suite 300
Attorneys for Plaintiff       Grand Rapids, MI 49503
                                  Attorneys for Defendant

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter

```
 1                                      Grand Rapids, Michigan
 2                                      April 29, 2014
 3                                      10:20 a.m.
 4                          -     -     -
 5
 6                     P R O C E E D I N G S
 7
 8                     JAMES E. HARDIE,
 9        A witness called at 10:20 a.m. by the government, sworn
10        by the Court, testified:
11                          DIRECT EXAMINATION
12   BY MS. HESSMILLER:
13   Q    Good morning, Special Agent Hardie.
14   A    Good morning.
15   Q    Can you state your full name and spell it for the record,
16   please?
17   A    Yes.  It's James E. Hardie, H-a-r-d-i-e.
18   Q    And are you a special agent?
19   A    I'm currently a supervisory special agent with the
20   Federal Bureau of Investigation.
21   Q    And where do you currently work?
22   A    I work -- I'm actually assigned as the liaison to the
23   National Center for Missing and Exploited Children.
24   Q    And what do you do there?
25   A    I am -- I'm the liaison.  As a result I focus on sex
```

1    trafficking leads that come in and out of the Center and

2    distribute them and interface with our 69 child exploitation

3    task forces nationwide.

4    Q    So are you kind of a point person for these 69 task

5    forces on topics related to sex trafficking investigations?

6    A    Yes.

7    Q    Have you been part of any national operations to

8    investigate or prosecute sex trafficking?

9    A    Yes.  I have participated in several national operations

10   both while at FBI Headquarters at the National Center and also

11   while -- as a member of a task force in Toledo, Ohio.

12   Q    How many child victims of prostitution have you

13   interviewed?

14   A    Overall, I've been doing this since 2008, I've

15   interviewed hundreds of individuals involved in prostitution

16   operations, and amongst them were dozens of juveniles.

17   Q    And was that during your current role or was that from --

18   you said something about Toledo from 2008?

19   A    Yes.  I've -- even at Headquarters I have continued to

20   interview victims and people involved in prostitution.  We

21   support national operations.  An example of that would be FBI

22   Headquarters sends a detachment of personnel specifically

23   trained in sex trafficking matters to national events such as

24   the Super Bowl, the NBA All-Star Game, the NCAA Final Four.

25   I've participated in three Super Bowls, one in Miami, one in

1    Indianapolis, and most recently this one in the greater New

2    York area.

3    Q    And what was the task force that you were on in Toledo?

4    A    It's called the Northwest Ohio Violent Crimes Against

5    Children Task Force.  It pretty much covers the entire

6    northwest side of the state.

7    Q    And what was your role in that task force?

8    A    I was the coordinator of that task force.  That task

9    force consists of multiple officers and investigators from

10   local police departments there, the State Highway Patrol, the

11   State Bureau of Criminal Identification and Investigation, and

12   other sheriff's offices.

13   Q    So as the coordinator does that mean that you are the

14   leader?

15   A    I was.  I was the leader of that task force.  I was

16   responsible for the day-to-day operations.  I was responsible

17   for coordinating the operations when we went out and did sting

18   operations, things of that nature.  I was responsible for

19   determining which cases we would pursue.  I was -- and I also

20   served as the case agent on many of those cases that we

21   brought forward for prosecution.

22   Q    So while you were the leader of that Toledo task force,

23   what was the topical focus of that task force?

24   A    The main focus of the task force pretty much from 2008

25   until we picked up additional duties related to child

1  pornography was child sex trafficking.

2  Q     So I already asked you about how many child victims of

3  prostitution you've interviewed, and it sounds like quite a

4  few?

5  A     Yes.

6  Q     How about have you ever interviewed any pimps?

7  A     I have.

8  Q     How many would you say?

9  A     I would say probably about a dozen individuals I consider

10  to be pimps or high up in the prostitution organizations.

11  Q     Have you ever done any training for other law enforcement

12  officers on investigating child prostitution cases?

13  A     I have.  Our task forces do quite a bit of training and

14  awareness for law enforcement.  We found that even seasoned

15  officers with this type of crime necessarily don't know what

16  to look for, what indicators to look for when they encounter

17  victims of domestic minor sex trafficking out on the street.

18  I have developed and taught an advanced sex trafficking

19  investigation course at the Ohio Peace Officers' Training

20  Academy.  I was asked by the Department of Justice and the

21  United States Embassy in Serbia to teach and develop a course

22  of instructions for their officers, judges, prosecutors, and

23  social service agencies there, and I've taught and presented

24  at multiple conferences.

25  Q     And you're not the case agent in this case, are you?

```
 1    A    I am not.
 2    Q    How much do you know about this case?
 3    A    I know very little with the exception that it involves
 4    domestic minor sex trafficking.
 5    Q    So the facts of this case have not really influenced what
 6    you're here to testify about?
 7    A    No.
 8    Q    Now, I want to talk to you about recruiting children into
 9    sex trafficking or prostitution.  Are there any common traits
10    of child victims of prostitution in terms of their background
11    that you know of?
12    A    Well, typically within the sex trafficking organizations
13    the pimps, and the pimps are the traffickers or the leader of
14    that organization, will recruit victims that are easy to
15    manipulate, so they're essentially looking for somebody that
16    has some sort of weakness.  They essentially prey on the
17    weak.  They find somebody that has a weakness that they can
18    fulfill.  That person may have mental health issues.  They may
19    have substance abuse issues.  They may have been abused as a
20    child.  They may have -- they may have come from a horrible
21    home and they've run away.  They may come from a home where
22    there is some control and they may offer drugs or alcohol as
23    sort of enticement or recruitment.  There's just a multitude
24    of factors.  The pimp is basically going to come in and
25    fulfill the void or prey on that victim's weakness to get them
```

1    to basically have sex for money for them.

2    Q    And what about in your experience are the child victims

3    of prostitution of a lower economic status or a higher or does

4    it not matter?

5    A    Pimps will recruit across the board.  They look for a

6    child with a particular weakness.  But, you know, what I've

7    found in my experience is that a lot of the children will come

8    from lower socioeconomic status.  They'll come from broken

9    homes.  A lot of them are in foster care or have had some

10   exposure with Child Protective Services.

11   Q    And why do pimps target -- pimps do target kids as

12   prostitutes.  Why do they choose kids instead of adults?

13   A    Well, I'll just put it the way that a pimp put it to me

14   when I asked him that specific question.  He told me that

15   children were easier to manipulate and it was easier to

16   fulfill their wants and desires.  For example, I had a pimp

17   buy the affection of a child victim in a particular case with

18   a stuffed animal.  She thought she was in a

19   boyfriend-girlfriend relationship with that particular

20   victim -- with that particular pimp and, you know, he bought

21   her love and affection with a stuffed animal.

22   Q    Now, I hear you talking a lot about love and affection.

23   How is love and affection used in this pimp-prostitute

24   dynamic?

25   A    Well, there's basically two types of pimps out there.

```
 1   There's variations on this, but there's basically two types of
 2   pimps.  You have what we call a gorilla pimp who's a pimp
 3   that's beating their victims down.  They control with brute
 4   force.  Smackdowns are quite common, you know, a lot of verbal
 5   abuse as well.
 6          Then you have what we call a finesse pimp, and a
 7   finesse pimp basically uses their words to control their
 8   victims.  They find that weakness and they'll manipulate that
 9   victim into doing what they want to do.  Sometimes if the
10   victim thinks they're in a boyfriend-girlfriend relationship
11   with the pimp, which oftentimes they do, they may withhold
12   affection.  They may, you know, just make the person not feel
13   included with the group, the other prostitutes or victims
14   within that pimp's stable.
15   Q    What's a stable?
16   A    In the -- I'll use terms here, but within the
17   prostitution lifestyle, it's essentially a subculture, there's
18   street vernacular that's used.  There's rules of the game.
19   The game is actually what is referred to of those involved in
20   the prostitution lifestyle as the prostitution lifestyle.
21   It's called the game.  Anyone that's not a member of the
22   lifestyle or a member of the game or involved in prostitution,
23   they would be called squares.  The pimp is the ultimate
24   controller of his stable.  The stable is the group of victims
25   that work and prostitute for a particular pimp, so a pimp may
```

1    have multiple girls in their particular stable.  It's kind of

2    akin to referring to them as essentially cattle, that they're

3    property.

4    Q    So can one pimp use two different techniques, the finesse

5    pimp and the gorilla pimp, interchangeably, or do you usually

6    find a pimp is either one or the other?

7    A    They may use the techniques interchangeably, but a pimp

8    usually will grasp onto a style that he knows will work for

9    him, he or she knows will work for them.  Pimps are basically

10    going to do what they need to do to get that victim to engage

11    in acts of prostitution.

12    Q    Have you ever heard of pimps using someone else to help

13    recruit or manage other prostitutes?

14    A    Yes.  Oftentimes within a prostitution organization, sex

15    trafficking organization, there will be persons within that

16    organization that fulfill different roles.  Sometimes there's

17    a particular victim that is kind of the top girl.  It's the

18    number one girl.  They sort of run point for the pimp to run

19    the day-to-day activities, kind of break in the new girls as

20    to what they need to do, sometimes enforce the rules of the

21    pimp, you know, collect monies, things like that.  They still

22    prostitute for the pimp, but they're at a higher level in the

23    organization.  Now, this protects the pimp because it keeps

24    the pimp insulated from the criminal activity because they've

25    got a person in the middle of it that's got all the exposure

1    while they sit back and just basically direct the

2    organization.

3    Q    Is it common for that middle level manager to be a young

4    female who can relate to other prostitutes?

5    A    Yeah.  It always -- it always would be a -- for the most

6    part would be a girl within the organization that's engaged in

7    prostitution.

8    Q    I want to switch gears and ask you how prostitution

9    actually works.  Are there different ways or locations of

10   implementing the prostitution business?

11   A    Yeah, there's multiple different venues where we see

12   prostitution occurring.  That may be a -- there's a lot of

13   prostitution that occurs on the Internet using Web sites such

14   as Back Page, My Red Book, other prostitution-oriented Web

15   sites where people post advertisements, and the johns, which

16   are the clients, the people that actually see the prostitutes

17   and engage in acts of prostitution, will call and set up

18   dates.  We have truck stops.  There are massage parlors.

19   There's illegal brothels, and there's also places which we

20   call the street or the track.  It's also referred to as the

21   stroll within the prostitution subculture.  It is a location,

22   and most cities have a particular area where pimps will bring

23   their girls to work and the girls can walk up and down the

24   street and solicit johns to engage in acts of prostitution.

25   Q    Do pimps generally operate in the city that they live or

1    does it vary?

2    A    It varies.  Pimps will go wherever they can make the

3    money.  That's why we send detachments to places like the

4    Super Bowl and those major events because there's a large base

5    of clientele that are willing to pay for the services of a

6    prostitute.  Sometimes a city may not have a track or a stroll

7    or it might not be a lucrative place to work, so the pimps

8    will bring their girls to different locations to work.

9         In Toledo with my task force, we are what's

10   considered an origin city.  It means that the pimps and the

11   prostitutes and the victims will come from that city, but

12   oftentimes they'll go other places to work.  It wasn't unusual

13   for our victims to be driven up to Detroit, to be sent to

14   Pennsylvania.  We had a huge case where victims from Toledo

15   were trafficked to a truck stop in Harrisburg, Pennsylvania.

16   It's not unusual at all for a pimp to bring his victims to a

17   different location to work.

18   Q    Why would a prostitute even need a pimp?  Why not just go

19   work the street and keep all the money?

20   A    The streets are a rough place to be, particularly if

21   you're a young female out on the street.  Prostitution's a

22   rough lifestyle.  Many of even the adults that are engaged in

23   acts of prostitution and have been prostitutes for years are

24   victims of rapes, beatings, stabbings, things like that.  The

25   pimp will oftentimes prey upon the fears of these especially

```
 1    young vulnerable victims and purport to keep them safe, to

 2    keep all these bad things from happening to them, when in all

 3    actuality they're being manipulated by the pimp and the pimp's

 4    just as bad as, you know, what could happen to them on the

 5    street.

 6    Q    Have you ever seen pimps providing cell phones for girls

 7    that work for him?

 8    A    Yes.  The cell phone essentially, for lack of a better

 9    term, I'll call it an electronic leash.  It's a way for the

10    pimp to always have control of that victim.  Sometimes the

11    pimps will tell their victims that they need to text them when

12    they have a call, when they've got a client, and text when

13    they're done.  They will check in with them at random.  You

14    know, it's just another way for the pimp to control their

15    victim.

16    Q    And is it common for pimps who provide cell phones to

17    provide all of the girls with cell phones or just the top girl

18    or how does that work?

19    A    It varies.  Sometimes only the top girl will get a cell

20    phone.  Sometimes -- they're not going to give a cell phone to

21    somebody that -- typically they will not give a cell phone to

22    somebody that they haven't broken in, that they're not sure,

23    that they think isn't going to follow the rules.  It typically

24    is somebody that, you know, they feel they have some control

25    over.  They'll give them that extra little bit of -- well,
```

1   they think it's freedom, but it's actually an electronic

2   leash, and it's another means of control.

3   Q    In the street prostitution -- you talked about online and

4   various types of prostitution, truck stops.  In the street

5   prostitution model, can you talk about what would be the

6   common traits of a track or a stroll?

7   A    Sure.  Well, a track or stroll is typically a street in a

8   particular city where prostitution is prevalent.  You may

9   walk -- you may be on a track and not know it.  You know, the

10  victims will walk up and down the street.  They may be in

11  regular clothes.  They're not in, you know, what you would --

12  like lingerie or something like that walking up and down the

13  street.

14        Typically before a pimp will bring their victims out

15  to the track, they'll establish some ground rules.  They'll

16  say, you know, these are my rules, you know.  Always use

17  condoms for oral and intercourse.  No kissing on the mouth.

18  They'll set fees.  They'll say, you know, charge this much,

19  charge that much.  You know, they'll set boundaries.  They'll

20  say, hey, walk from Main Street all the way down to Elm

21  Street, but be careful because there's police on this street

22  or there's something going on here, this is another pimp's

23  territory there.

24        They'll instruct the victims what to do.

25  Oftentimes, you know, they'll instruct the victims to make eye

1   contact with the vehicles as they're driving by.  When the car

2   drives by, if they engage somebody in the car and it looks

3   like they might be able to set up a date, sometimes the pimp

4   will instruct them to just make the arrangements right there

5   on the track if they think it's free of law enforcement or

6   they'll tell them to go up a block, go down a side street or

7   down an alley to negotiate the prices, and then they'll go

8   elsewhere and engage in the acts of prostitution, you know, on

9   that side street or alley.

10  Q    I heard you mentioning undercover cops.  Is there any

11  protocol for avoiding getting caught by an undercover cop?

12  A    Pimps will tell their girls, you know, ask the guy if

13  he's a police officer or, you know, try to test them to see --

14  you know, look for a radio in the car, look for certain

15  things.  They'll give them guidance.  Sometimes they may know

16  what the police drive in a particular area, so they'll say if

17  you see this, you know, gold minivan, be careful because it's

18  the police, things of that nature.

19  Q    Have you ever heard of a trap house?

20  A    Yeah.  Trap houses are something that's fairly common.

21  It's basically a -- it's basically a house in a neighborhood

22  that nobody really lives there.  It's kind of set up for all

23  kinds of seedy activities such as, you know, drug use.  It's

24  kind of like a crack house.  People can go in there and use

25  drugs.  People can go in there and engage in acts of

1    prostitution.

2           A lot of times pimps will have a trap house or

3    somewhere where the victims can take their johns to engage in

4    acts of prostitution.  Sometimes there might be a house that's

5    known -- it's sort of an illegal brothel.  It's somewhere

6    that's known for prostitution and pimps will bring their girls

7    there to work.  For example, we had a lot of seasonal or

8    migrant workers in northwest Ohio.  Some of the areas were

9    pretty rural.  The farmers had certain houses where the

10   migrants would engage in acts of prostitution with girls from

11   Toledo that would drive out there specifically to prostitute.

12   The pimps would -- if the pimps were -- if they were under

13   pimp control, the pimps would drop their victims off there

14   and, you know, a girl may go to a particular house and have

15   sex anywhere from five to fifteen times that night engaging in

16   acts of prostitution.

17   Q    Now, when you say migrant workers, are you talking about

18   people from other countries who are in the United States?

19   A    Yeah.  They're seasonal workers that come in from other

20   countries to work in the fields.

21   Q    Would the term Mexican house have any significance to

22   you?

23   A    A lot of the houses that this occurs in, in my experience

24   the houses that I've seen were Hispanic.

25   Q    And from what you know, would men who frequent those

1    houses have a racial preference for any type of particular

2    race for a girl?

3            MR. TILTON:  Objection.  This seems beyond the scope

4    of the expert's testimony.

5            THE COURT:  Agreed.  Sustained.

6    BY MS. HESSMILLER:

7    Q    Now, what about condoms, Special Agent Hardie?  Why would

8    a pimp provide girls with condoms?

9    A    Well, number one, the pimp doesn't want to put out for

10   lack of a better term bad product, so they don't want a girl

11   out there that would have STDs or something that a john could

12   catch because then they won't get repeat business.  A lot of

13   clients, a lot of the johns see girls multiple times.

14           The pimp also will use the condoms -- sometimes

15   they'll buy a specific number of condoms and they'll actually

16   keep track, and it's a way for them to actually keep track of

17   how much they should be paid from the particular victim.  So

18   let's say a pimp is charging a hundred bucks for sexual

19   intercourse and telling the girl to charge that much and he

20   gives her three condoms, then she better come back to the pimp

21   with $300.  I mean, he'll know that she should have that much.

22   Q    Is it common for pimps to exercise some form of

23   supervisory control over girls who are on the street?

24   A    Yeah.  It's not unusual, especially when a pimp is

25   either -- a pimp is new to the game, isn't that experienced,

1    or the girl is somewhat new to the game, the victim's new to

2    the game.  They may stay down the street.  Sometimes

3    experienced pimps will actually stay on the street and watch

4    their girls while they work the track.  It kind of instills

5    that mentality in the victim that, hey, I'm always going to be

6    just around the corner and you're never going to really get

7    away from me.  Sometimes the pimps or other girls within the

8    stable may be very, very close to the hotel room where the

9    john is visiting or is engaging in acts of prostitution with

10   the victim.  They may wait in the lobby.  They may wait

11   somewhere fairly close.

12   Q    Why is that?

13   A    It's just a lot of times they'll have one or two rooms

14   within the hotel and they're trying to see multiple clients,

15   so there will be a room shuffle because really the john

16   doesn't want to come in a room and have a pimp right there.

17   There have been girls and people that have hidden in a

18   bathroom.  I've heard of somebody actually hiding under the

19   bed just to stay out of the way when the acts of prostitution

20   are occurring.  Sometimes, you know, the pimps may actually

21   rob the johns, so the johns will come in thinking that they're

22   going to have sex with one of the prostitutes and the pimp

23   will actually end up rolling the john is what they call it.

24   Q    How about -- you said sometimes the pimp will be a little

25   bit of a distance away, but within view.  What about walking

1   like half a block or a block behind or in front of the girl?

2   Have you seen that?

3   A     Yeah.   Sometimes pimps will be within the immediate

4   vicinity of their victims.   Sometimes they may actually -- you

5   may have a couple pimps that are working a particular area of

6   the track and they may socialize and just keep track of their

7   girls.   I do see that.   I have seen that before.

8   Q     Have you seen -- what do you know about drugs and alcohol

9   in this context?

10  A     Drugs and alcohol are used as a means of control.   I've

11  seen drugs and alcohol, you know, marijuana and alcohol used

12  as a recruitment tool.   You know, hey, come to my house, you

13  can have marijuana, you can have alcohol, you know, it's kind

14  of, you know, a cool place to hang out, when the pimps are

15  trying to recruit the girls.   I've seen pimps exploit

16  substance abuse issues within their victims.   I've seen pimps

17  keep their girls hooked on heroin and provide them heroin to

18  continue engaging in acts of prostitution, prescription drugs,

19  things of that nature.

20  Q     Is it common for drugs or alcohol to be provided to the

21  girls for free while they're working?

22  A     It could be a benefit.   You know, I mean, you say the

23  word free, but --

24  Q     Without the girls having to buy it themselves or pay for

25  it?

1    A    It could happen, yes.

2    Q    What about providing gifts to girls?  Where does that

3    fall into your analysis?

4    A    Well, the gifts is -- I apologize.  The gifts are fairly

5    common.  Pimps will oftentimes attempt to buy the affection of

6    victims in their stable with gifts.  It may be something as

7    simple as like a stuffed animal as I talked about before, or I

8    had a particular instance I can recall where a pimp bought two

9    of his victims, these were adults, a jacket and a purse, and

10   the victim was so taken with the fact that this pimp bought

11   her these things she kept the tag from the coat and wrote down

12   that the pimp had bought her and her friend the purse on this

13   date because a lot of times these victims come from nothing,

14   and something just as trivial as a purse or a jacket means the

15   world to them.

16   Q    Is it common for pimps to tell the girls who work for

17   them that they're pretty?

18   A    Absolutely.

19   Q    Is it important to the customers that the girls really

20   are pretty?

21   A    It's -- really, a client or a john is going to look for

22   what they're attracted to, so oftentimes the pimp may say to a

23   girl they're the most beautiful person in the entire world.

24   You know, it's just a manipulation.  It's just a tactic to get

25   them to do what they want to do.  They may not be the most

1   beautiful person in the world.

2          So a john is pretty much going to try to set a date

3   with somebody that's readily accessible, so sometimes it will

4   matter to them.  Sometimes they'll -- you know, especially on

5   the Internet dates, if they're not happy with a particular

6   person, they may say, you know, I'm not interested and refuse

7   to go forward.  But, you know, it really doesn't matter.

8   Q    How do tattoos play into this, if at all?

9   A    Tattoos are a big thing within the prostitution

10  subculture.  Tattoos are essentially a form of branding.  It's

11  almost as if, you know, cattle get branded.  Pimps will often

12  brand their victims with tattoos.  The tattoos could be the

13  pimp's name.  It could be something that says Daddy's girl.

14  You would think that, you know, if you would normally see a

15  tattoo and it says Daddy's girl, you would think it was, you

16  know, something for the victim's father.  It's not.  Daddy is

17  what the girls often will refer to the pimp as.  Sometimes it

18  might be something as simple as like a shape or a -- like I

19  know a pimp that uses stars.  All his girls have particular

20  stars on their body.

21  Q    Now, you've interviewed a lot of child victims recovered

22  from prostitution.  Is that what you said earlier?

23  A    Yes.

24  Q    In your interviews with the victims of child

25  prostitution, is it common for them to tell the whole story

```
 1    right off the bat or is it common to disclose over time?
 2    A    No.  One of the things that's very, very important is the
 3    pimp has instilled in the victim that law enforcement is
 4    horrible.  They're the worst thing in the world.  Do not talk
 5    to them.  You know, a lot of times if they're a finesse pimp,
 6    they've played on that girl's emotions and they'll say, you
 7    know, if you talk to them, I'm gonna go away for ten to
 8    fifteen years and you'll never see me again.  So, you know,
 9    it's very common with the initial contacts that a victim will
10    not disclose the entire -- entirely what had occurred.
11    Q    Have you seen that happen for girls who are trying to
12    protect the pimp in some cases?
13    A    The victims, even when a pimp is incarcerated, the
14    loyalty to the pimp is something that's instilled in that
15    victim.  You know, there have been persons that have continued
16    to send monies to their pimp while they've been incarcerated.
17    There have been -- I've experienced myself where a victim,
18    clearly a victim of human trafficking will come into court and
19    testify and testify and say that nothing happened because
20    they're so concerned with protecting that pimp.
21    Q    I heard you say human trafficking.  Is that the same as
22    sex trafficking and prostitution?
23    A    Essentially the same.  Human trafficking can incorporate
24    labor and other types of trafficking, but sex trafficking is.
25    Q    And is it common for child victims of prostitution --
```

1    have you ever seen child victims of prostitution who are

2    afraid of retaliation if they tell law enforcement about their

3    pimp?

4    A     Yes.  Yes, and, you know, that's a common theme as well

5    is, you know, if you tell the police, I will kill you, I will

6    kill your family, you know, I know where you live, things like

7    that.

8    Q     And in your investigative practices do you interview

9    victims multiple times or usually is it just once and that's

10   the end of it?

11   A     It's usually multiple interviews of the victims.

12              MS. HESSMILLER:  Just a moment, please.

13              Thank you, Your Honor.  Nothing further.

14              THE COURT:  Let's take a brief recess at this time,

15   ladies and gentlemen, and then we'll continue.  You may be

16   excused.

17   (Proceedings recessed at 10:51 a.m.; reconvened at 11:10 a.m.)

18              THE COURT:  You may be seated.  Thank you.  We'll

19   proceed with cross-examination at this time.  Mr. Tilton?

20              MR. TILTON:  Thank you, Your Honor.

21                         CROSS-EXAMINATION

22   BY MR. TILTON:

23   Q     Good morning.

24   A     Good morning.

25   Q     You never conducted any independent investigation of this

1    case?

2    A    No.

3    Q    You never interviewed any witnesses?

4    A    No.

5    Q    You never investigated Division Avenue in Grand Rapids?

6    A    No.

7    Q    And what goes on there?

8    A    No.

9    Q    Or any of the stores or hotels in that area?

10   A    No.

11   Q    You never investigated anything in this case related to

12   Muskegon?

13   A    No.

14   Q    Now, you described minor prostitutes as being easy to

15   manipulate?

16   A    Well, I said that the pimp described them as being easy

17   to manipulate.

18   Q    Well, you also described them as --

19   A    Yes, but I was told that by a pimp.

20   Q    Okay.  Have you found that to be true during your

21   interviews?

22   A    I would not manipulate a person during an interview.  I

23   would simply seek the truth.

24   Q    You'd seek the truth, and you have specialized training

25   to do that?

```
 1   A     I do.

 2   Q     You've been trained in protocol to interview a minor

 3   witness?

 4   A     Yes.

 5   Q     Because you want to be careful not to inject anything

 6   subjective into that interview?

 7   A     Correct.

 8   Q     You want to be able to get at the truth?

 9   A     Correct.

10   Q     And you testified that even seasoned law officers don't

11   know what to look for in a case like this?

12   A     They wouldn't -- the outward signs of trafficking are not

13   readily apparent unless you know what you're looking for.

14   Q     And so that would include when they're investigating

15   those cases their interactions with possible witnesses?

16   A     That they may not realize that they're -- I don't

17   understand your question.  Could you --

18   Q     Well, it's a -- you have very specialized training?

19   A     Yes.

20   Q     And your training helps you when you're interviewing

21   witnesses in these types of cases?

22   A     It is of assistance when we conduct interviews, yes.

23   Q     You rely on it?

24   A     What's that?

25   Q     You rely on that training?
```

1    A    It helps you conduct a forensically sound interview, yes.

2    Q    And if someone who didn't have that training conducted

3    the interview, they may not get the same results as you,

4    someone who has that training?

5    A    Not necessarily.

6    Q    So they may get the same results, but they may not get

7    the same results?

8    A    Yes.

9    Q    Now, the government in different jurisdictions has

10   recognized a need for protocol in these types of cases when

11   interviewing witnesses.  Is that a fair statement?

12   A    I'm not familiar with what other jurisdictions may or may

13   not have precluded.

14   Q    Are you familiar with the State of Michigan Governor's

15   Task Force on Children's Justice and Family Independence

16   Agency and their forensic interviewing protocol?

17   A    I'm familiar that they have a protocol, but I'm not

18   familiar with the details.

19   Q    You're not familiar with the details, so you don't know

20   if that protocol was followed in this case?

21   A    I don't know what their protocol is.

22   Q    Let me ask the question again.  So you don't know if it

23   was followed or not here?

24   A    I didn't review any interviews from this case.

25   Q    Now, you've testified about a number of theories that

1    you've developed over your career?

2    A     I've testified to my experience.

3    Q     And that's not based on any kind of graduate schooling?

4    A     No.

5    Q     You're not a psychiatrist, psychologist, sociologist?

6    A     No.

7    Q     You haven't conducted any scientific studies in this

8    area?

9    A     No.

10   Q     You're not published in any peer-reviewed journals on

11   this subject?

12   A     No.

13   Q     Do you follow the scientific research in this area?

14          MS. HESSMILLER:  Objection, Your Honor.  He's not

15   testifying on scientific knowledge.  These questions are not

16   relevant.

17          MR. TILTON:  He's testifying about his expertise,

18   and I'm specifically asking about the scientific research

19   conducted in this area of his expertise.

20          THE COURT:  Presuming there is some.  I think that's

21   the question.  Ask the preliminary question.

22   BY MR. TILTON:

23   Q     Has there been scientific testing done in this area?

24   A     There are numerous studies that are out there, but I'm

25   not familiar and I could not speak to those studies.

1    Q    You're not familiar with the results of the studies?

2    A    I couldn't -- I couldn't accurately speak to those

3    studies.

4    Q    Are you familiar with studies that show in New York City

5    90 percent of child prostitutes have said that they did not

6    have a pimp?

7    A    What study are you quoting?

8    Q    Well, let me ask a preliminary question.  Are you

9    familiar with the Journal of Sexuality Research and Social

10   Policy?

11   A    I have not reviewed any studies from that.

12   Q    Well, the study is, "Is Child to Adult as Victim is to

13   Criminal?  Social Policy and Street-Based Sex Work in the

14   USA," authored by professors at the John Jay College of the

15   City University of New York.

16   A    I couldn't speak to how that study was conducted, how

17   they obtained their information.  I just know from my

18   experience many of the victims upon initial recovery will say

19   that -- maybe they won't tell us the whole truth.  Maybe

20   they'll say that they aren't working under pimp control.  They

21   may try to protect the pimp.  That's just what I can say from

22   my experience.

23   Q    But you have nothing to refute any scientific data that

24   would say otherwise?

25   A    I'm not testifying to scientific data today.

1    Q    That wasn't my question.  My question is do you have

2    anything to refute any scientific data that would say

3    otherwise?

4    A    I didn't conduct -- I didn't conduct a study, no.

5    Q    Excuse me?

6    A    I did not conduct a study.

7    Q    Let me ask the question one more time.

8         THE COURT:  No.  He answered it.  Proceed on.

9    BY MR. TILTON:

10   Q    Now, you testified about two different types of pimps in

11   relationships between pimp and prostitute?

12   A    Yes.

13   Q    But in fact there are many different types of

14   relationships between pimps and prostitutes?

15   A    Are you talking about relationships or are you talking

16   about types of pimps?

17   Q    I'm talking about -- well, let me step back a little

18   bit.  Pimp and prostitute relationships, both business and

19   personal, can be very complex?

20   A    There are complexities and there are nuances with every

21   relationship, yes.

22   Q    And so beyond this gorilla pimp and beyond this finesse

23   pimp, there are other types of relationships that pimps and

24   prostitutes have?

25   A    Well, the pimp-prostitute relationship is basically the

```
1    same across the board.  The pimp will manipulate the victim

2    into performing acts of sex under their direction, and

3    oftentimes the victim will give some if not all of the monies

4    to that pimp.  The elements of fraud, force, or coercion, you

5    know, through manipulations and other means are inherent in

6    any pimp-prostitute relationship.

7    Q    You ever come across a relationship, a pimp-prostitute

8    relationship where a husband and wife perhaps don't have money

9    to support themselves, so the wife voluntarily enters into

10   prostitution?

11   A    So what is the pimp in that particular instance doing?

12   If the woman's out making money and they're not doing it under

13   the husband's direction, what is the pimp's role in that?  If

14   you're calling --

15   Q    They may be providing child care, food preparation, any

16   type of --

17   A    Okay, that's not a pimp.  A pimp maintains control of

18   their victim.  A pimp, you know, sets ground rules.  That's

19   not a pimp-prostitute relationship.

20   Q    That's not a pimp in your definition?

21   A    That's essentially survival sex if an adult in that

22   particular position decided that that's the means that they're

23   going to take to make money.  I can't speak to it, but I mean

24   as a -- what influence does that other person have or doesn't

25   have?  I don't know.
```

1    Q    Well, you've interviewed a lot of prostitutes in your

2    life, right?

3    A    Yes.

4    Q    And you've never come across a relationship like that?

5    A    Not all -- not all persons involved in prostitution that

6    I've interviewed are under pimp control.  I've found typically

7    with the ones that are younger, the juveniles, oftentimes they

8    are under pimp control.

9    Q    But not always?

10   A    Well, I'm trying to think of an instance where I

11   didn't -- I can't -- I cannot say universally that there isn't

12   a juvenile under there that's engaging in perhaps what they

13   call survival sex.  But survival sex, if a pimp is aware that

14   a juvenile has had survival sex in the past, they will use

15   that to exploit the juvenile into going into prostitution for

16   them.

17   Q    Are you familiar with scientific studies that have looked

18   at what are called transient households where there will be a

19   group of juveniles living in perhaps a trap house and they'll

20   be engaging in prostitution and acting as pimps for one

21   another?

22   A    What study are you specifically quoting?

23   Q    Again, I'm back to the John Jay study.

24         MS. HESSMILLER:  Your Honor, he's already said he's

25   not familiar with that study.

```
 1                THE COURT:  Just a minute.  Let him answer the
 2    question.  Ask the question.
 3                MR. TILTON:  The question again?
 4                THE COURT:  He asked you.
 5                MR. TILTON:  Oh, I didn't hear his question.
 6                THE WITNESS:  What study are you specifically
 7    quoting?
 8    BY MR. TILTON:
 9    Q    Again, this is the same study I referred to earlier.
10    A    As I stated before, I'm not familiar with that study.
11    Q    Okay.  and you're not familiar with those types of
12    relationships?
13    A    Other juveniles prostituting other juveniles?
14    Q    Well, it's --
15    A    What are you getting at?  I don't understand what you're
16    trying to --
17    Q    It's more of a symbiotic relationship, but I withdraw the
18    question.  I don't think it's necessary.  I think you've
19    answered it enough.
20                Because you haven't interviewed this case
21    specifically, you're not able to say today which of your
22    theories would apply to the facts of this case?
23    A    No.  I'm simply testifying to pimp control based on my
24    experience and how things work in a sex trafficking
25    organization.
```

```
 1    Q     But not based on the facts of this specific case?
 2    A     No.
 3                MR. TILTON:  Thank you.
 4                THE COURT:  Redirect?
 5                      REDIRECT EXAMINATION
 6    BY MS. HESSMILLER:
 7    Q     Special Agent Hardie, when you're talking about pimp
 8    control, how does it -- how does the fact that a minor who
 9    cannot drive, who's being driven around by a pimp play into
10    that analysis?
11    A     Well, that's one of the things.  Sometimes pimps will
12    bring their victims to locations that are geographically
13    distant from their support base, and I say support base
14    because a lot of times these victims come from places where
15    they don't really have a support base.  But they're in
16    unfamiliar surroundings, so you can almost picture yourself
17    somewhere where you've never been, you have no means of
18    leaving.  It increases the dependency of the victim on the
19    pimp.
20    Q     So if a pimp brings a juvenile to a location that she's
21    not familiar with and she has no means of transportation and
22    he leaves her there for a little while, could that victim
23    still be under pimp control?
24    A     Oh, absolutely.  And there's a phenomenon, it's called
25    automatic within the lifestyle, where once a pimp knows they
```

1    have the ultimate control over that victim, they will send

2    their victims to places across the country.  The victims will

3    work in those locations and Western Union or bring the money

4    back to that pimp because they have that much control over

5    their victims.

6              MS. HESSMILLER:  Thank you, Your Honor.  Nothing

7    further.

8              THE COURT:  Anything else on recross?

9              MR. TILTON:  Just briefly, Your Honor.

10                        RECROSS-EXAMINATION

11   BY MR. TILTON:

12   Q    Out of all the victims or witnesses or prostitutes that

13   you've ever interviewed, have any of them lied about one

14   person, said that one person was --

15             MS. HESSMILLER:  Objection, Your Honor.  It's beyond

16   the scope of the redirect.

17             THE COURT:  It is.  Sustained.

18             MR. TILTON:  No further questions.

19             THE COURT:  Very well.  You may be excused.  Thank

20   you, sir.

21             (Testimony of James E. Hardie concluded.)

22

23

24

25

I N D E X

Government's Witness:                                        Page


JAMES E. HARDIE

        Direct Examination by Ms. Hessmiller            2

        Cross-Examination by Mr. Tilton                22

        Redirect Examination by Ms. Hessmiller         32

        Recross-Examination by Mr. Tilton              33

CERTIFICATE OF REPORTER

I, Kevin W. Gaugier, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth.

I do further certify that the foregoing transcript was prepared by me.

/s/  Kevin W. Gaugier

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter
110 Michigan N.W.
622 Federal Building
Grand Rapids, MI 49503