09:27AM

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF NEW YORK
 2
   _____
 3 UNITED STATES OF AMERICA,
                              Case No. 1:19-cr-227
 4            Plaintiff,              1:23-cr-37
   v.                                    (LJV)
 5
   PETER GERACE, JR.,           November 13, 2024
 6
   _____Defendant._____
 7
       TRANSCRIPT EXCERPT - EXAMINATION OF G.R. (PW #2)
 8        BEFORE THE HONORABLE LAWRENCE J. VILARDO
              UNITED STATES DISTRICT JUDGE
 9
   APPEARANCES:    TRINI E. ROSS, UNITED STATES ATTORNEY
10                 BY: JOSEPH M. TRIPI, ESQ.
                       NICHOLAS T. COOPER, ESQ.
11                     CASEY L. CHALBECK, ESQ.
                   Assistant United States Attorneys
12                 Federal Centre, 138 Delaware Avenue
                   Buffalo, New York 14202
13                 For the Plaintiff

14                 THE FOTI LAW FIRM, P.C.
                   BY: MARK ANDREW FOTI, ESQ.
15                 16 West Main Street, Suite 100
                   Rochester, New York 14614
16                    And
                   SOEHNLEIN LAW
17                 BY: ERIC MICHAEL SOEHNLEIN, ESQ.
                   350 Main Street, Suite 2100
18                 Buffalo, New York 14202
                   For the Defendant
19
   PRESENT:        KAREN A. CHAMPOUX, USA PARALEGAL
20                 BRIAN A. BURNS, FBI SPECIAL AGENT
                   MARILYN K. HALLIDAY, HSI SPECIAL AGENT
21
   LAW CLERK:      REBECCA FABIAN IZZO, ESQ.
22
   COURT CLERK:    COLLEEN M. DEMMA
23
   REPORTER:       ANN MEISSNER SAWYER, FCRR, RPR, CRR
24                 Robert H. Jackson Courthouse
                   2 Niagara Square
25                 Buffalo, New York 14202
                   Ann_Sawyer@nywd.uscourts.gov
```

| | | |
|---|---|---|
| 09:36AM | 1 | (Excerpt commenced at 9:58 a.m.) |
| 09:58AM | 2 | (Jury seated at 9:58 a.m.) |
| 09:58AM | 3 | **THE COURT:**  Good morning, everyone. |
| 09:58AM | 4 | **ALL JURORS:**  Good morning. |
| 09:58AM | 5 | **THE COURT:**  The record will reflect that all our |
| 09:58AM | 6 | jurors are present.  I understand we have a hard stop at 5 |
| 09:59AM | 7 | tonight, and a hard stop at 5 tomorrow night because of one of |
| 09:59AM | 8 | our jurors, so we will honor that obviously.  And I appreciate |
| 09:59AM | 9 | you letting me know about those, because -- it's going to be |
| 09:59AM | 10 | unusual that we go past 5, but on a day like yesterday where |
| 09:59AM | 11 | we' were very close to finishing a witness, it just made more |
| 09:59AM | 12 | sense to do that.  So I apologize for that, but we will |
| 09:59AM | 13 | certainly stop by 5 tonight and tomorrow. |
| 09:59AM | 14 | The government can all its next witness. |
| 09:59AM | 15 | **MR. COOPER:**  The government calls G.R. |
| 09:59AM | 16 | |
| 09:59AM | 17 | **G.R. (PROTECTED WITNESS #2),** having been duly called and |
| 10:00AM | 18 | sworn, testified as follows: |
| 10:00AM | 19 | **MR. COOPER:**  May I inquire, Judge? |
| 10:00AM | 20 | **THE COURT:**  You may. |
| 10:00AM | 21 | |
| 10:00AM | 22 | **DIRECT EXAMINATION BY MR. COOPER:** |
| 10:00AM | 23 | Q.  Good morning, G.R. |
| 10:00AM | 24 | A.  Good morning. |
| 10:00AM | 25 | Q.  So, first of all, that's Ann Sawyer.  She's typing down |

| 10:00AM | 1 | everything that we say.  And she reminded me this morning |

10:00AM 1 everything that we say.  And she reminded me this morning

10:00AM 2 that I need to speak nice and slow, especially in the

10:00AM 3 beginning.  So I'm going to do that, and I'm going to ask you

10:00AM 4 to speak nice and slow, and speak right into the microphone

10:00AM 5 so that everyone can hear.  Okay?

10:00AM 6 A.  Okay.

10:00AM 7 Q.  How old are you?

10:00AM 8 A.  39.

10:00AM 9 Q.  39?

10:00AM 10 A.  Yes.

10:00AM 11 Q.  Okay.  And how far did you go in school?

10:01AM 12 A.  Bachelor's degree.

10:01AM 13 Q.  Okay.  What's your bachelor's degree in?

10:01AM 14 A.  Social sciences.

10:01AM 15 Q.  And when did you get that bachelor's degree?

10:01AM 16 A.  I believe it was 2015.

10:01AM 17 **THE COURT:**  Right into the microphone, ma'am.

10:01AM 18 **THE WITNESS:**  Sorry.

10:01AM 19 **MR. COOPER:**  No, it's okay.

10:01AM 20 **THE COURT:**  It's got to pick up your voice, that's

10:01AM 21 all.

10:01AM 22 **THE WITNESS:**  Okay.  2015.

10:01AM 23 **BY MR. COOPER:**

10:01AM 24 Q.  Okay.  And if you want, you can pull it closer to you.

10:01AM 25 There you go.

10:01AM  1      You said 2015.  Where is that degree from?

10:01AM  2  A.  The University at Buffalo.

10:01AM  3  Q.  Okay.  Generally are you living in the Western New York

10:01AM  4  area now?

10:01AM  5  A.  Yes.

10:01AM  6  Q.  Where'd you grow up at?

10:01AM  7  A.  Watkins Glen, New York.

10:01AM  8  Q.  Now, we're gonna cover some things kind of quickly, and

10:01AM  9  then we'll go through it in more detail.  Generally, are

10:01AM  10  there times in your life where you've struggled with

10:01AM  11  addiction to drugs and alcohol?

10:01AM  12  A.  Yes.

10:01AM  13  Q.  Okay.  Before we go into detail about that, are you

10:01AM  14  currently using drugs?

10:01AM  15  A.  No.

10:01AM  16  Q.  Are you currently using alcohol?

10:02AM  17  A.  No.

10:02AM  18  Q.  Would you describe yourself as living sober now?

10:02AM  19  A.  Yes, for almost 13 years.

10:02AM  20  Q.  Okay.  You said 13 years?

10:02AM  21  A.  Almost, yes.

10:02AM  22  Q.  All right.  Let's hit the rewind button now and start

10:02AM  23  kind of towards the beginning.

10:02AM  24      Can you describe for the jury how those problems with

10:02AM  25  addiction began in your life?

| | | |
|---|---|---|
| 10:02AM | 1 | A.  Sure.  Do you want me to go back to, like, when I was a |
| 10:02AM | 2 | teenager? |
| 10:02AM | 3 | Q.  Yeah.  So, like, was that around age 18, 19 when things |
| 10:02AM | 4 | started to become a problem for you?  When was the first time |
| 10:02AM | 5 | you used drugs?  What age? |
| 10:02AM | 6 | A.  17 for drugs, but I started drinking when I was maybe 13. |
| 10:02AM | 7 | Q.  Okay. |
| 10:02AM | 8 | A.  12, 13. |
| 10:02AM | 9 | Q.  You said you used drug for the first time around age 17? |
| 10:02AM | 10 | A.  Yes. |
| 10:02AM | 11 | Q.  Okay.  And what kind of drugs was that? |
| 10:02AM | 12 | A.  I tried cocaine. |
| 10:02AM | 13 | Q.  Where were you living at that time when you were a |
| 10:02AM | 14 | teenager? |
| 10:02AM | 15 | A.  With my grandparents in Watkins Glen, New York. |
| 10:03AM | 16 | Q.  Did you get in trouble around age 19? |
| 10:03AM | 17 | A.  Yes, I did. |
| 10:03AM | 18 | Q.  Can you tell the jury what happened? |
| 10:03AM | 19 | A.  Yes.  I got my first DWI when I was 19 years old living |
| 10:03AM | 20 | with my grandparents. |
| 10:03AM | 21 | Q.  As a result of that DWI at age 19, did your family send |
| 10:03AM | 22 | you to live somewhere else? |
| 10:03AM | 23 | A.  Yes.  My mother was currently residing in Buffalo, |
| 10:03AM | 24 | New York, with her fiancé at the time.  And my grandfather |
| 10:03AM | 25 | just lost his wife, my grandmother, so he couldn't really |

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

6

10:03AM   1   deal with the stress.  So we did a geographical relocation to

10:03AM   2   Buffalo for me.

10:03AM   3   Q.  Were you working at that time?

10:03AM   4   A.  I was going to school full time, and I was waitressing at

10:03AM   5   the Olive Garden.

10:03AM   6   Q.  Okay.  Now, when you say going to school full time, where

10:03AM   7   were you going to school back then?

10:03AM   8   A.  When I was living in Watkins Glen, I was going to Corning

10:03AM   9   Community College, and I transferred to ECC.

10:03AM   10  Q.  Okay.

10:03AM   11  A.  Erie Community College.

10:03AM   12  Q.  And then I asked you if you were working, but let me do a

10:04AM   13  better job with my question.

10:04AM   14      Before you moved to the Buffalo area when you were living

10:04AM   15  in that Watkins Glenn area, were you working at that time?

10:04AM   16  A.  Yes, the Olive Garden, that's where it was.

10:04AM   17  Q.  Got it.  And at the same time you were going to school?

10:04AM   18  A.  Yes.

10:04AM   19  Q.  When you moved to Buffalo, did you set it up so you could

10:04AM   20  continue waitressing at the Olive Garden?

10:04AM   21  A.  Yes.

10:04AM   22  Q.  Okay.  So did you start working at the Olive Garden in

10:04AM   23  the Buffalo area?

10:04AM   24  A.  So, I'm sorry, let me back up.  So, no, I had -- they

10:04AM   25  actually didn't have any positions open.  So I actually took

| | | |
|---|---|---|
| 10:04AM | 1 | a job at Mighty Taco for, like, one day. |
| 10:04AM | 2 | Q.  Okay. |
| 10:04AM | 3 | A.  And I didn't like it. |
| 10:04AM | 4 | Q.  So Mighty Taco for a very short period of time -- |
| 10:04AM | 5 | A.  Yeah, one day. |
| 10:04AM | 6 | Q.  -- is that fair? |
| 10:04AM | 7 | A.  Yeah, fair. |
| 10:04AM | 8 | Q.  Okay.  Now, after Mighty Taco, did you get other |
| 10:04AM | 9 | employment? |
| 10:04AM | 10 | A.  Actually my sister who'd never done it a day in her life |
| 10:04AM | 11 | suggested that I try Rick's Tally-Ho.  It was a strip club, |
| 10:05AM | 12 | an adult entertainment club. |
| 10:05AM | 13 | Q.  Was your sister older or younger than you? |
| 10:05AM | 14 | A.  A few years older. |
| 10:05AM | 15 | Q.  Okay.  And you said she'd never done it a day in her |
| 10:05AM | 16 | life, but she recommended it to you? |
| 10:05AM | 17 | A.  Yeah, she did. |
| 10:05AM | 18 | Q.  And did you give it a shot? |
| 10:05AM | 19 | A.  I did. |
| 10:05AM | 20 | Q.  Okay.  Now I'm not going to go into details at all about |
| 10:05AM | 21 | what happened at Rick's Tally-Ho, but about how long did you |
| 10:05AM | 22 | work there for? |
| 10:05AM | 23 | A.  Maybe, like, a year or two.  And then I transferred to -- |
| 10:05AM | 24 | or, went over to Mademoiselle's. |
| 10:05AM | 25 | Q.  Okay.  And what's Mademoiselle's? |

| | | |
|---|---|---|
| 10:05AM | 1 | A.  It's another gentlemen's club. |
| 10:05AM | 2 | Q.  Okay.  Now, during that time in your life, are you around |
| 10:05AM | 3 | age 19, age 20? |
| 10:05AM | 4 | A.  Yeah, probably 20. |
| 10:05AM | 5 | Q.  Okay.  Did you continue drinking alcohol, abusively? |
| 10:05AM | 6 | A.  Yes. |
| 10:05AM | 7 | Q.  Did you continue to use cocaine? |
| 10:05AM | 8 | A.  Yes. |
| 10:05AM | 9 | Q.  Did you get a second DWI? |
| 10:05AM | 10 | A.  Second and a third, yes. |
| 10:05AM | 11 | Q.  After that third DWI, what happened? |
| 10:05AM | 12 | A.  I got -- the judge sentenced me to -- he gave me rehab, |
| 10:06AM | 13 | and then -- |
| 10:06AM | 14 | Q.  Were you put on probation? |
| 10:06AM | 15 | A.  Yes, felony probation.  And I was to go to an |
| 10:06AM | 16 | outpatient -- inpatient rehab, excuse me. |
| 10:06AM | 17 | Q.  Okay.  Did you go to that inpatient rehab? |
| 10:06AM | 18 | A.  I did. |
| 10:06AM | 19 | Q.  And for a period of time while you're in inpatient rehab, |
| 10:06AM | 20 | did you stay clean and sober? |
| 10:06AM | 21 | A.  Yes, and following my discharge from the outpatient I was |
| 10:06AM | 22 | sober. |
| 10:06AM | 23 | Q.  Got it.  So let's talk about that now. |
| 10:06AM | 24 | Following your discharge from outpatient, were you clean, |
| 10:06AM | 25 | off drugs and alcohol at that time? |

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

9

10:06AM  1   A.  Yes.

10:06AM  2   Q.  Okay.  And about how old were you when you got out of

10:06AM  3   that rehab?

10:06AM  4   A.  I feel like I was still 20.  I can't really remember, it

10:06AM  5   was a long time ago.

10:06AM  6   Q.  Did you continue working as an exotic dancer or stripper?

10:06AM  7   A.  I did.  I went back to that.

10:06AM  8   Q.  Okay.  I cannot do math to save my life, but help me

10:07AM  9   here.  What year approximately would that have been when you

10:07AM 10   got out of rehab if you were about 19 or 20?

10:07AM 11   A.  I was born in 19 --

10:07AM 12   Q.  What year were you born?

10:07AM 13   A.  I was born in '85, so --

10:07AM 14   Q.  Okay.  So '05 you would have been 20; is that right?

10:07AM 15   A.  Yeah, about -- '05 sounds right.

10:07AM 16   Q.  Got it.  Sorry about that.

10:07AM 17       Did there come a time after getting out of rehab and

10:07AM 18   going back to work at Rick's Tally-Ho when you switched over

10:07AM 19   and started working at Pharaoh's Gentlemen's Club?

10:07AM 20   A.  Yes.

10:07AM 21   Q.  Okay.  Would that have been sometime around 2006?

10:07AM 22   A.  Yes, that sounds right.

10:07AM 23   Q.  Okay.  How did you learn about Pharaoh's Gentlemen's

10:07AM 24   Club?

10:07AM 25   A.  My roommate at the time was working there.

10:07AM     1    Q.   Okay.   Who was your roommate?

10:07AM     2    A.   Aja Simpson.

10:07AM     3    Q.   Were there things that you heard about Pharaoh's from Aja

10:07AM     4    that made you interested in going to work there?

10:07AM     5    A.   Yes.

10:07AM     6    Q.   What were those things?

10:07AM     7    A.   She said that it was a clean club, and also there was

10:08AM     8    money there.   Better money.

10:08AM     9    Q.   Okay.   And when you say "better money," do customers

10:08AM    10    bring money to the club?

10:08AM    11    A.   Yes.

10:08AM    12    Q.   And was it your understanding from what you heard from

10:08AM    13    Aja that Pharaoh's had more customers?

10:08AM    14    A.   Better clientele.

10:08AM    15    Q.   Okay.   Was that interesting to you?

10:08AM    16    A.   Yes.

10:08AM    17    Q.   At that time when you go and start to work at Pharaoh's,

10:08AM    18    were you using drugs?

10:08AM    19    A.   No.

10:08AM    20    Q.   Were you drinking --

10:08AM    21    A.   I was still sober.

10:08AM    22    Q.   Were you drinking alcohol?

10:08AM    23    A.   No.

10:08AM    24    Q.   When you started working, were you like an on-the-books

10:08AM    25    employee?

10:08AM 1  A. Not at first, no.

10:08AM 2  Q. What was your employment relationship with the club at

10:08AM 3  first?

10:08AM 4  A. I don't know the term for that form, but I was an

10:08AM 5  independent contractor I guess.

10:08AM 6  Q. Okay. All right. Let's talk about working at Pharaoh's

10:09AM 7  generally and how you get paid, okay?

10:09AM 8  A. Okay.

10:09AM 9  Q. Can you describe for the jury the different ways that a

10:09AM 10 person working as a dancer at Pharaoh's Gentlemen's Club

10:09AM 11 earns money?

10:09AM 12 A. Sure. You can earn money through tips on stage or

10:09AM 13 through lap dances. You get these chips, and the club takes

10:09AM 14 a cut, and they give you a cut from the chips.

10:09AM 15 Q. Got it. And so, I'm gonna break some of this down in a

10:09AM 16 little more detail, and I'm not trying to embarrass you at

10:09AM 17 all, but I want to explain it for these people.

10:09AM 18    When you work at a club like Pharaoh's as a dancer, what

10:09AM 19 kind of clothing do you wear?

10:09AM 20 A. Pretty much very revealing clothing.

10:09AM 21 Q. Okay. Is it similar to, like, a bikini or bathing suit?

10:09AM 22 A. Yeah, yes.

10:09AM 23 Q. Okay. And you mentioned that one way that you can earn

10:09AM 24 money is earning tips doing stage dances; is that correct?

10:09AM 25 A. Yes.

| | | |
|---|---|---|
| 10:09AM | 1 | Q.  Okay.  So, as a dancer working at Pharaoh's, first of |
| 10:09AM | 2 | all, is there a stage inside kind of the main area? |
| 10:10AM | 3 | A.  Yes. |
| 10:10AM | 4 | Q.  And do you get up on that stage and dance? |
| 10:10AM | 5 | A.  Yeah. |
| 10:10AM | 6 | Q.  And when you do that, would customers put money either on |
| 10:10AM | 7 | the stage or in your clothing? |
| 10:10AM | 8 | A.  Correct. |
| 10:10AM | 9 | Q.  Okay.  Now, was Pharaoh's a club that allowed you to be |
| 10:10AM | 10 | fully nude? |
| 10:10AM | 11 | A.  No. |
| 10:10AM | 12 | Q.  Okay.  So, would you remove your top part of your |
| 10:10AM | 13 | clothing? |
| 10:10AM | 14 | A.  Yeah.  You had to wear underwear -- bottoms and pasties. |
| 10:10AM | 15 | Q.  Okay.  And not trying to be crude, but what do you mean |
| 10:10AM | 16 | when you say the word "pasties?"  What is that? |
| 10:10AM | 17 | A.  Pasties cover -- it's a New York State law, I believe, |
| 10:10AM | 18 | but they cover the nipple. |
| 10:10AM | 19 | Q.  Okay.  And so you were -- would it be fair to say you |
| 10:10AM | 20 | were allowed to take your top off, but you had to have |
| 10:10AM | 21 | something covering your nipples? |
| 10:10AM | 22 | A.  Correct. |
| 10:10AM | 23 | Q.  And then you said the bottoms were supposed to stay on; |
| 10:10AM | 24 | is that correct? |
| 10:10AM | 25 | A.  Yes. |

10:10AM    1    Q.  And when you would go do a stage dance, would customers

10:10AM    2    put money down for you?

10:10AM    3    A.  Sure, yes.

10:10AM    4    Q.  And is that one way that you as a dancer were able to

10:10AM    5    earn money?

10:10AM    6    A.  Yes.

10:10AM    7    Q.  Now at that early time when you started working at

10:10AM    8    Pharaoh's, were you getting paid, like, a weekly salary?

10:11AM    9    A.  No, just whatever I was making on tips.

10:11AM   10    Q.  Did you get paid hourly to be there?

10:11AM   11    A.  No.

10:11AM   12    Q.  Okay.  So the way you earned money was customers putting

10:11AM   13    down tips; is that fair?

10:11AM   14    A.  Yes.

10:11AM   15    Q.  A second way that you described was -- I think you used

10:11AM   16    the word "lap dance;" is that correct?

10:11AM   17    A.  Yes.

10:11AM   18    Q.  Okay.  Let's talk a little more geography here.

10:11AM   19        Other than that main area in the club with the stage, is

10:11AM   20    there a separate area in the club where those lap dances

10:11AM   21    happen?

10:11AM   22    A.  Yes, there's a VIP Room.

10:11AM   23    Q.  Okay.  Can you tell the jury a little bit about that?

10:11AM   24    Where is it?  What's it like back there?  Explain it for

10:11AM   25    them.

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

14

| | | |
|---|---|---|
| 10:11AM | 1 | A.  Sure.  Excuse me.  In Pharaoh's, it was off to the |
| 10:11AM | 2 | right-hand side as the stage.  And there's two separate |
| 10:11AM | 3 | rooms.  There's one that's, like, more of an open, I guess, |
| 10:11AM | 4 | seating where, you know, a bunch of people could sit on |
| 10:11AM | 5 | couches or whatever. |
| 10:11AM | 6 | And then there was an actual Champagne Room which is more |
| 10:11AM | 7 | private and more expensive. |
| 10:11AM | 8 | Q.  Got it.  Let's break that down a little. |
| 10:11AM | 9 | So there's a VIP area, and you described there being |
| 10:12AM | 10 | couches in there? |
| 10:12AM | 11 | A.  Yes. |
| 10:12AM | 12 | Q.  And is that -- what's the lighting like in that VIP area? |
| 10:12AM | 13 | A.  Dim. |
| 10:12AM | 14 | Q.  Okay.  I mean, is it completely black?  Are you walking |
| 10:12AM | 15 | into walls? |
| 10:12AM | 16 | A.  No, you can -- |
| 10:12AM | 17 | Q.  Okay. |
| 10:12AM | 18 | A.  -- see. |
| 10:12AM | 19 | Q.  But is it darker? |
| 10:12AM | 20 | A.  Yes, darker. |
| 10:12AM | 21 | Q.  Is that on purpose? |
| 10:12AM | 22 | A.  Yes, it's to set the ambiance, I guess. |
| 10:12AM | 23 | Q.  Okay. |
| 10:12AM | 24 | A.  Sorry.  The ambiance, sorry. |
| 10:12AM | 25 | Q.  It's okay. |

10:12AM    1    A.  Set the mood.

10:12AM    2    Q.  And then I think what you described is -- is there a more

10:12AM    3    private area within that VIP area?

10:12AM    4    A.  Yeah, it's called the Champagne Room.

10:12AM    5    Q.  Okay.  And can you describe how -- is that separated or

10:12AM    6    private, more private than the general VIP area?

10:12AM    7    A.  If I remember correctly, that was off to the left once

10:12AM    8    you paid for the dance.  And it's just, there's -- it's

10:12AM    9    walled off from the other rooms.  You can't really see in

10:12AM    10   there.

10:12AM    11   Q.  Do you recall if there was a door or a curtain or

10:12AM    12   anything like that?

10:12AM    13   A.  I don't think there's a curtain there.

10:12AM    14   Q.  Okay.

10:12AM    15   A.  Just walled off.  There's, like, an opening though.

10:13AM    16   Q.  Got it.  And it's -- and you described walled off so,

10:13AM    17   like, on three sides, I guess, walled off?

10:13AM    18   A.  Kind of, yeah.  But you could still see, like, if you

10:13AM    19   were trying to look.

10:13AM    20   Q.  Sure.

10:13AM    21   A.  You could still see in there.

10:13AM    22   Q.  Absolutely.

10:13AM    23   A.  Yeah.

10:13AM    24   Q.  When you would, let's walk through now how you end up

10:13AM    25   back there.

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

| | | |
|---|---|---|
| 10:13AM | 1 | How would a dancer end up going into either the VIP area |
| 10:13AM | 2 | or the Champagne area with a customer?  How's that happen? |
| 10:13AM | 3 | A.  If you're on the floor and a customer asks for a dance. |
| 10:13AM | 4 | Q.  Yeah, explain.  Just explain it like they've never been |
| 10:13AM | 5 | there before. |
| 10:13AM | 6 | A.  I don't know.  Usually when you're on stage, a customer |
| 10:13AM | 7 | might come up and say, hey, come see me when you get off |
| 10:13AM | 8 | stage, I'd like a private dance. |
| 10:13AM | 9 | Q.  Okay. |
| 10:13AM | 10 | A.  And then you go see the customer, and then you go in and |
| 10:13AM | 11 | buy a private dance. |
| 10:13AM | 12 | Q.  Understood.  Do you recall how much a private dance cost |
| 10:13AM | 13 | when you were working at Pharaoh's? |
| 10:13AM | 14 | A.  I think it was like $22 a dance. |
| 10:13AM | 15 | Q.  You made a face, and you said "I think." |
| 10:13AM | 16 | A.  Well, inflation.  I don't know. |
| 10:13AM | 17 | Q.  That's okay.  It's okay if you don't remember to say I |
| 10:14AM | 18 | don't remember, I'm not sure.  Okay? |
| 10:14AM | 19 | A.  Yeah, I don't remember. |
| 10:14AM | 20 | Q.  So do you remember as you sit here today in 2024 how much |
| 10:14AM | 21 | a private dance cost in 2006? |
| 10:14AM | 22 | A.  No. |
| 10:14AM | 23 | Q.  Okay.  You think it was more than $20? |
| 10:14AM | 24 | A.  Maybe right around there, yeah. |
| 10:14AM | 25 | Q.  Okay.  Would the customer pay you directly and you would |

| | | |
|---|---|---|
| 10:14AM | 1 | keep that money? |
| 10:14AM | 2 | A.  No. |
| 10:14AM | 3 | Q.  Explain how the finances work to them. |
| 10:14AM | 4 | A.  Right.  There was a VIP doorman, and he would also act |
| 10:14AM | 5 | as, like, a salesman.  He'd try to get the customer to buy |
| 10:14AM | 6 | more dances or whatever.  But he would take the money and put |
| 10:14AM | 7 | it in, like, a drawer.  And he would -- he'd write a tally |
| 10:14AM | 8 | mark down also, so he could keep track of how many chips you |
| 10:14AM | 9 | got.  And then he would give you a chip in return. |
| 10:14AM | 10 | Q.  When you say a "chip," is that like a poker chip kind of? |
| 10:14AM | 11 | A.  Yeah, it's exactly what it was. |
| 10:14AM | 12 | Q.  Okay. |
| 10:14AM | 13 | A.  It was worth money. |
| 10:14AM | 14 | Q.  And so the customer would give money to a VIP attendant, |
| 10:14AM | 15 | and you as the dancer would receive a poker chip? |
| 10:15AM | 16 | A.  Yes. |
| 10:15AM | 17 | Q.  How would you turn those poker chips into money at the |
| 10:15AM | 18 | end of the night? |
| 10:15AM | 19 | A.  Yep.  At the end of the night, you go to the same |
| 10:15AM | 20 | doorman, and you give him all your chips, and he would cash |
| 10:15AM | 21 | you out. |
| 10:15AM | 22 | Q.  Now, did you keep all the money from each VIP dance that |
| 10:15AM | 23 | happened? |
| 10:15AM | 24 | A.  No.  The club took a portion of it.  A smaller portion, |
| 10:15AM | 25 | but they took a portion of it. |

10:15AM   1   Q.  So, you kept a percentage, and the club kept a

10:15AM   2   percentage?

10:15AM   3   A.  Yes.

10:15AM   4   Q.  All right.  We're going to come back a little later

10:15AM   5   today, or this morning, and we're going to talk about that in

10:15AM   6   more detail, but I want to move on first.

10:15AM   7       While you worked at Pharaoh's did you come to know who

10:15AM   8   owned the club?

10:15AM   9   A.  Yes.

10:15AM  10   Q.  When you started working there, who owned Pharaoh's

10:15AM  11   Gentlemen's Club?

10:15AM  12   A.  It was my understanding that it was Peter Gerace and Don

10:15AM  13   Parrino.

10:15AM  14   Q.  Okay.  And you mentioned a person named Peter Gerace.  Is

10:15AM  15   that person in court today?

10:15AM  16   A.  Yes.

10:15AM  17   Q.  Can you just point him out and let the jury know what

10:16AM  18   he's wearing for the record?

10:16AM  19   A.  Yeah.  He's sitting over there in a suit and tie right in

10:16AM  20   the middle.

10:16AM  21   Q.  In the middle?

10:16AM  22   A.  Yep.

10:16AM  23           **MR. COOPER:**  For the record, Judge, indicating the

10:16AM  24   defendant.

10:16AM  25           **THE COURT:**  It does.

10:16AM   1        **BY MR. COOPER:**

10:16AM   2   Q.  So when you started working there, Peter and Don Parrino

10:16AM   3   owned the club; is that correct?

10:16AM   4   A.  Yes.

10:16AM   5   Q.  Okay.  Now did Pharaoh's have different -- let's start

10:16AM   6   here.

10:16AM   7        Do you remember how long Pharaoh's was opened generally,

10:16AM   8   like, what hours?

10:16AM   9   A.  I think they opened at noon.  And they were open until 4

10:16AM  10   in the morning.

10:16AM  11   Q.  Okay.  Now were there two different shifts that existed

10:16AM  12   during that noon to 4 a.m. timeframe?

10:16AM  13   A.  Yes.

10:16AM  14   Q.  Okay.  Can we refer to those -- will you know what I'm

10:16AM  15   talking about if I say dayshift and nightshift?

10:16AM  16   A.  Yes.

10:16AM  17   Q.  Okay.  Who ran the dayshift generally?

10:16AM  18   A.  Don Parrino.

10:16AM  19   Q.  Okay.  And who ran the nightshift generally?

10:16AM  20   A.  Usually Peter Gerace.

10:16AM  21   Q.  Did you work -- did you sometimes work dayshifts?

10:16AM  22   A.  Yes.

10:16AM  23   Q.  Did you sometimes work nightshifts?

10:16AM  24   A.  Yes.

10:16AM  25   Q.  Did you observe a difference between the dayshift when

10:17AM    1   Don Parrino was running it and the nightshift when Peter was

10:17AM        running it?

10:17AM    3   A.  Yes.

10:17AM    4   Q.  Can you tell them about that?

10:17AM    5   A.  During the day, it was quiet.  There was a lot of guys on

10:17AM    6   their lunch break.  And, you know, I guess rules were

10:17AM    7   followed.

10:17AM    8      And nighttime, it was day and night.  That expression.

10:17AM    9   And -- and nighttime, it was more of a free for all.  And,

10:17AM   10   yeah, more of a wild atmosphere.

10:17AM   11   Q.  When you say "free for all," what do you mean by that?

10:17AM   12   A.  I don't know.  Dancers drinking more and music was

10:17AM   13   louder, different clientele.

10:17AM   14   Q.  Did you observe drug use?

10:17AM   15   A.  Not at first because I was sober, but yes, eventually I

10:17AM   16   noticed drug use was happening.

10:17AM   17   Q.  Okay.

10:17AM   18   A.  Yes.

10:17AM   19   Q.  That's a great transition point right there.  You

10:17AM   20   mentioned that not at first because you were sober; is that

10:17AM   21   correct?

10:17AM   22   A.  Yes.

10:17AM   23   Q.  Did there become a time while you were working at

10:17AM   24   Pharaoh's when you started using again?

10:18AM   25   A.  Yes.

10:18AM    1    Q.  Okay.  I want to talk about that now.

10:18AM    2        Do you remember approximately when that was?

10:18AM    3    A.  I was in nursing school, I remember.  And this was a

10:18AM    4    spring semester, so it was my second semester in nursing

10:18AM    5    school.  I believe it was towards the end, so it might have

10:18AM    6    been April-ish, maybe.

10:18AM    7    Q.  Got it.  And would that have been in 2009?

10:18AM    8    A.  Yes.

10:18AM    9    Q.  So sometime spring of '09, is that a fair estimate?

10:18AM    10   A.  Yeah.

10:18AM    11   Q.  And just -- we're going to pause for one second, get this

10:18AM    12   out of the way.

10:18AM    13       Today's not the first time we've met, right?

10:18AM    14   A.  Right.

10:18AM    15   Q.  We've sat down and spoken about these same topics before;

10:18AM    16   is that right?

10:18AM    17   A.  Yes.

10:18AM    18   Q.  Okay.  Have I asked you a lot of the same questions I'm

10:18AM    19   asking you today?

10:18AM    20   A.  Yes.

10:18AM    21   Q.  Have you answered a lot of the same questions you're

10:18AM    22   answering today?

10:18AM    23   A.  Yes.

10:18AM    24   Q.  Did that help you feel more comfortable getting up on the

10:18AM    25   witness stand?

10:18AM   1    A.  Yes.

10:19AM   2    Q.  Was it better than getting up there having no clue what I

10:19AM   3    was going to ask you?

10:19AM   4    A.  Yeah.

10:19AM   5    Q.  Let's now jump back into it.

10:19AM   6        Spring of 2009.  What happens that causes you to start

10:19AM   7    using drugs again?  Just describe for them what occurred.

10:19AM   8    A.  I meet this gentleman that I was in rehab with, the rehab

10:19AM   9    that I went to that I was sentenced to when I was 19 or 20.

10:19AM  10    He was actually in the club one night with his sister, K.L.

10:19AM  11        And we hit it off right away, his sister and I.  She was

10:19AM  12    super cool.  And she was a cocaine user, I guess.  And she

10:19AM  13    offered me some.  And I didn't give it a second thought, and

10:19AM  14    I took it.

10:19AM  15    Q.  Was that the first time that you had met K.L.?

10:19AM  16    A.  Yes.

10:19AM  17    Q.  And you mentioned that you knew her brother who was there

10:20AM  18    with her from rehab?

10:20AM  19    A.  Yes, I was in rehab with him.

10:20AM  20    Q.  When you met K.L. that first night, did you use cocaine

10:20AM  21    with her?

10:20AM  22    A.  Yes.

10:20AM  23    Q.  Okay.  At that point, had you been sober up until that

10:20AM  24    point?

10:20AM  25    A.  Yes.

10:20AM  1    Q.  For a period of time at least?

10:20AM  2    A.  Yeah.

10:20AM  3    Q.  Okay.  And so if we're in 2009, would it be fair to say

10:20AM  4    you had been sober for a couple of years up until the point

10:20AM  5    when you met K.L.?

10:20AM  6    A.  Yeah, for the most -- yes.

10:20AM  7    Q.  Were you going to say for the most part?

10:20AM  8    A.  For the most part, yes.

10:20AM  9    Q.  Okay.

10:20AM  10   A.  Because I had a couple of slips, I wasn't really going

10:20AM  11   to -- I wasn't, like, in a program like I am now.  So I was

10:20AM  12   sober for the most part, yes.  No drugs.

10:20AM  13   Q.  Okay.

10:20AM  14   A.  Yes.

10:20AM  15   Q.  Some slips, were you referring to alcohol use?

10:20AM  16   A.  Yes.

10:20AM  17   Q.  Now when -- did K.L. offer you cocaine?

10:20AM  18   A.  Yes.

10:20AM  19   Q.  Did that happen inside of Pharaoh's?

10:20AM  20   A.  Yeah.

10:20AM  21   Q.  Now, to be clear, she didn't put a gun your head and make

10:20AM  22   you use cocaine, did she?

10:20AM  23   A.  No, she didn't.

10:20AM  24   Q.  Did she threaten you?

10:21AM  25   A.  No, she didn't threaten me.

10:21AM   1    Q.  Did she force you?

10:21AM   2    A.  No, she did not.

10:21AM   3    Q.  At that time when K.L. offered you cocaine, were you

10:21AM   4    actively addicted to cocaine?

10:21AM   5    A.  No, I wasn't.

10:21AM   6    Q.  Was that the only time you ever met K.L.?

10:21AM   7    A.  Up until that point, yes, it was the first time I met

10:21AM   8    her.

10:21AM   9    Q.  After that, did you continue to interact with her?

10:21AM   10   A.  Yes, her and I became really good friends.

10:21AM   11   Q.  Can you describe for the jury how your relationship with

10:21AM   12   K.L. progressed?

10:21AM   13   A.  We continued hanging out.  And we did a lot of stuff

10:21AM   14   together.  Mostly drinking and drugging.  We partied together

10:21AM   15   a lot.

10:21AM   16   Q.  Did you see her at Pharaoh's again after that first time?

10:21AM   17   A.  Yes.

10:21AM   18   Q.  Did she begin frequenting Pharaoh's more often?

10:21AM   19   A.  Yes.

10:21AM   20   Q.  What was bringing her around Pharaoh's if you know?

10:21AM   21   A.  Yeah.  At some point, she started seeing Peter Gerace.

10:21AM   22   Q.  When you say "seeing" him, what do you mean by that?

10:21AM   23   A.  Dating, if that's what you want to call it.  Sleeping

10:21AM   24   with.

10:21AM   25   Q.  Okay.  She was in a sexual relationship with him?

10:22AM   1   A.  Yes.

10:22AM   2   Q.  Would that timeframe be from the spring into the summer

10:22AM   3   of 2009?

10:22AM   4   A.  Roughly, yes.

10:22AM   5   Q.  Now, you mentioned that you continued to see K.L. a lot,

10:22AM   6   and a lot of what you did was, I think you said, drinking and

10:22AM   7   drugging; is that right?

10:22AM   8   A.  Yes.

10:22AM   9   Q.  Once you started using again, did that spiral pretty

10:22AM  10   quickly for you?

10:22AM  11   A.  Yes.

10:22AM  12   Q.  Can you describe for the jury what it's like to slip back

10:22AM  13   into addiction like that?  How does that happen?

10:22AM  14   A.  How does it happen?  You go from doing it once, and like

10:22AM  15   myself, because I'm an alcoholic and an addict, once became

10:22AM  16   daily, and then it was all day every day.  And then there

10:22AM  17   were gaps or timeframes where I'd be up for two to three days

10:22AM  18   on end.  I was spending all my money on it.

10:22AM  19       Should I --

10:22AM  20   Q.  You're doing fine.

10:22AM  21   A.  Should I say this?  At some point I had lost -- I -- I

10:23AM  22   weigh 135 right now, so I was down to 114 pounds.  I looked

10:23AM  23   strung out.  I felt strung out.  And I wasn't even paying my

10:23AM  24   bills.  I was just -- all my money from dancing was going to

10:23AM  25   drugs and alcohol.

10:23AM    1    Q.  At some point in your mind, when you're using drugs daily

10:23AM    2    as you've described, spending all of your money on it, in

10:23AM    3    your mind, does it go from being a choice you're making to

10:23AM    4    something that you have to do?

10:23AM    5    A.  Yes.

10:23AM    6    Q.  Can you explain that in a little more detail to the jury

10:23AM    7    if they haven't experienced that themselves before?

10:23AM    8    A.  Yeah.  I don't know.  It's like a switch gets flipped in

10:23AM    9    your mind.  You just feel compelled to continue.

10:23AM   10        And when I wasn't doing alcohol and drugs, like, if I'd

10:23AM   11    have moments where I was just waking up, I was thinking about

10:23AM   12    it.  I would plan my entire day, week, whatever, around

10:23AM   13    drinking and drugging.

10:23AM   14    Q.  Did you need money to get drugs?

10:23AM   15    A.  Yes.

10:23AM   16    Q.  How were you getting money at that time in the summer of

10:23AM   17    2009?

10:23AM   18    A.  Dancing.

10:23AM   19    Q.  Were you working at Pharaoh's?

10:23AM   20    A.  Yes.

10:24AM   21    Q.  Did there come a time when in addition to cocaine you

10:24AM   22    started using a different type of drug?

10:24AM   23    A.  Opiates, yes.

10:24AM   24    Q.  Was that also in that summer of 2009?

10:24AM   25    A.  Yes.

10:24AM  1   Q.  Who -- well, first of all, what kind of opiate did you

10:24AM  2   start using?

10:24AM  3   A.  Started off as Lortabs.

10:24AM  4   Q.  What's a Lortab?

10:24AM  5   A.  A Lortab is a pain -- a prescription pain pill.  And at

10:24AM  6   some point it turned into heroin.

10:24AM  7   Q.  Okay.  You said it started off as Lortabs.  When you

10:24AM  8   started using Lortabs, were those addictive?

10:24AM  9   A.  Yes, very.

10:24AM  10  Q.  Can you describe to the jury what addiction to opiates

10:24AM  11  like Lortabs, what's that like?

10:24AM  12  A.  That's worse than being addicted to cocaine and/or

10:24AM  13  alcohol.  Without even realizing it, say, when I didn't have

10:24AM  14  the Lortab, I would go into withdrawal, and I would feel like

10:25AM  15  I had a really bad case of the flu.  I would start vomiting,

10:25AM  16  I'd sweat, shake.  You just feel nauseous and fatigued, and

10:25AM  17  your muscles ache.  You feel terrible.

10:25AM  18  Q.  When you're actively addicted to a substance like

10:25AM  19  Lortabs, are you afraid of not having it and going through

10:25AM  20  that withdrawal?

10:25AM  21  A.  Yes, you don't want to experience that feeling on

10:25AM  22  purpose.

10:25AM  23  Q.  Does that fear of withdrawal drive your decisionmaking

10:25AM  24  when you're in active addiction to opiates like that?

10:25AM  25  A.  I would say so, yes.

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

28

10:25AM   1   Q.  Did the Lortab use progress from, like, one pill for the

10:25AM       first time to daily use?

10:25AM   3   A.  Yes.  Just like alcohol and cocaine, it went from a few

10:25AM   4   here and there, to daily use, and then it was all day every

10:25AM   5   day.

10:25AM   6   Q.  Are we talking about that same timeframe of the spring

10:25AM   7   into the summer of 2009?

10:26AM   8   A.  Yes.

10:26AM   9   Q.  By the summer of 2009, are you fully in the throes of

10:26AM   10  addiction to cocaine?

10:26AM   11  A.  Yes.

10:26AM   12  Q.  Are you fully in the throes of addiction to opiates?

10:26AM   13  A.  Yes.

10:26AM   14  Q.  Do you remember where you got Lortabs from the first

10:26AM   15  time?

10:26AM   16  A.  I think I got them from K.L..

10:26AM   17  Q.  Okay.  And is that the same K.L. that we were talking

10:26AM   18  about a moment ago?

10:26AM   19  A.  Yes.

10:26AM   20  Q.  Do you know -- and if you don't, say I don't know -- do

10:26AM   21  you know where K.L. got them from?

10:26AM   22  A.  I don't know.

10:26AM   23  Q.  About how much money would you think in a week you were

10:26AM   24  making during that timeframe in the summer of 2009?

10:26AM   25  A.  Like, two grand a week.

10:26AM   1   Q.  And $2,000 a week that you're making, were you using that

10:26AM   2   to pay your electric bill?

10:27AM   3   A.  No.

10:27AM   4   Q.  Were you paying your rent?

10:27AM   5   A.  No.

10:27AM   6   Q.  What were you using that money on?

10:27AM   7   A.  It all went to drugs.

10:27AM   8   Q.  Okay.  We've talked a little bit about the geography

10:27AM   9   inside the club at Pharaoh's.  I want to talk about a

10:27AM   10  different area of the club now.

10:27AM   11      Are you aware of an upstairs area at Pharaoh's?

10:27AM   12  A.  Yes.

10:27AM   13  Q.  Okay.  And can you talk to the jury a little bit, just

10:27AM   14  the geography, explain that.  What's it look like?  How do

10:27AM   15  you get there?  That kind of thing.

10:27AM   16  A.  I don't really remember how you get there.  This was,

10:27AM   17  again, 19 years ago.  But I know -- I think the staircase

10:27AM   18  was, like, off the kitchen or something, maybe.  You go

10:27AM   19  upstairs.  There's, like, a hallway, there's a bathroom off

10:27AM   20  to the side, a small bathroom, and then there's an another

10:27AM   21  small room that had, like, a couch and, like, a coffee table

10:27AM   22  and speakers in it.

10:27AM   23  Q.  Was it set up kind of like an apartment?

10:27AM   24  A.  Kind of.

10:28AM   25  Q.  When you first started working at Pharaoh's back in the

| | | |
|---|---|---|
| 10:28AM | 1 | '06 timeframe, did you go upstairs frequently? |
| 10:28AM | 2 | A.  No. |
| 10:28AM | 3 | Q.  Okay.  Did there come a time when you started going |
| 10:28AM | 4 | upstairs? |
| 10:28AM | 5 | A.  Yes. |
| 10:28AM | 6 | Q.  What caused you to start going upstairs? |
| 10:28AM | 7 | A.  Well, K.L. was invited upstairs, she was seeing Peter, so |
| 10:28AM | 8 | I would go up with her. |
| 10:28AM | 9 | Q.  Okay.  So is that, again, now we're talking about the |
| 10:28AM | 10 | same timeframe when K.L. comes into your life, starting in |
| 10:28AM | 11 | the spring of '09 into the summer of '09? |
| 10:28AM | 12 | A.  Yes. |
| 10:28AM | 13 | Q.  When you would go upstairs with K.L. and Peter, what |
| 10:28AM | 14 | would happen? |
| 10:28AM | 15 | A.  Party. |
| 10:28AM | 16 | Q.  Okay.  When you say "party," what do you mean? |
| 10:28AM | 17 | A.  Use cocaine, drink, that sort of stuff. |
| 10:28AM | 18 | Q.  Who would provide the cocaine upstairs? |
| 10:28AM | 19 | A.  Usually Peter. |
| 10:28AM | 20 | Q.  Is that this defendant? |
| 10:28AM | 21 | A.  Yes. |
| 10:28AM | 22 | Q.  Were you and K.L. the only two people that would be up |
| 10:28AM | 23 | there partying and using cocaine with the defendant? |
| 10:29AM | 24 | A.  No, there was other people up there. |
| 10:29AM | 25 | Q.  Who do you recall also being up there? |

| | | |
|---|---|---|
| 10:29AM | 1 | A.  Just like other friends of his, sometimes other dancers. |
| 10:29AM | 2 | Q.  Okay.  When you say "friends of his," is that generally |
| 10:29AM | 3 | men? |
| 10:29AM | 4 | A.  Yes. |
| 10:29AM | 5 | Q.  And are the dancers, are they all women? |
| 10:29AM | 6 | A.  Yeah, there's no male dancers there. |
| 10:29AM | 7 | Q.  You said I think a moment ago that the men, you perceived |
| 10:29AM | 8 | as friends of the defendants; is that correct? |
| 10:29AM | 9 | A.  Yes. |
| 10:29AM | 10 | Q.  Is that based on the observations that you made? |
| 10:29AM | 11 | A.  Yeah. |
| 10:29AM | 12 | Q.  Did you see him interacting with those people? |
| 10:29AM | 13 | A.  Yeah. |
| 10:29AM | 14 | Q.  You're 39 years old, you know what friends look like, |
| 10:29AM | 15 | right? |
| 10:29AM | 16 | A.  Yeah. |
| 10:29AM | 17 | Q.  Would you describe those people as people he seemed close |
| 10:29AM | 18 | with? |
| 10:29AM | 19 | A.  Maybe just, yeah, I don't know. |
| 10:29AM | 20 | Q.  Let me ask a better question. |
| 10:29AM | 21 | A.  Yeah. |
| 10:29AM | 22 | Q.  Downstairs there's random customers, right? |
| 10:29AM | 23 | A.  Yes. |
| 10:29AM | 24 | Q.  Were the random customers allowed to go upstairs -- |
| 10:29AM | 25 | A.  No. |

10:29AM    1    Q.   -- and do cocaine with Peter?

10:29AM    2    A.   Some, no.

10:29AM    3    Q.   And I'm not trying to be critical.

10:29AM    4    A.   Yeah, I know.

10:29AM    5    Q.   So was there a distinction in your mind of who got to go

10:30AM    6    upstairs?

10:30AM    7    A.   People he was closer with, yes.

10:30AM    8    Q.   Okay.  Can you describe about how many times you think

10:30AM    9    you went upstairs and did cocaine with Peter and other

10:30AM    10   people?

10:30AM    11   A.   A few, maybe a half a dozen.  A few times.

10:30AM    12   Q.   In those times, about how much cocaine would you see the

10:30AM    13   defendant with?

10:30AM    14   A.   Nothing more than maybe, like, an 8 Ball or something.

10:30AM    15   Q.   Is that about -- if you know?

10:30AM    16   A.   I don't know what the grams are, sorry, I don't know the

10:30AM    17   measurement.

10:30AM    18   Q.   I got a different question for you.

10:30AM    19   A.   Okay.

10:30AM    20   Q.   About how many people would an 8 Ball of cocaine get

10:30AM    21   high?

10:30AM    22   A.   Maybe like four or five.

10:30AM    23   Q.   Okay.

10:30AM    24   A.   Yeah.

10:30AM    25   Q.   You described for the jury a few minutes ago that during

| | | |
|---|---|---|
| 10:30AM | 1 | that timeframe we've been discussing, you became a daily user |
| 10:31AM | 2 | of drugs; is that correct? |
| 10:31AM | 3 | A.  Yes. |
| 10:31AM | 4 | Q.  Were you using cocaine daily? |
| 10:31AM | 5 | A.  Yes. |
| 10:31AM | 6 | Q.  Were you using opiates daily? |
| 10:31AM | 7 | A.  Yes. |
| 10:31AM | 8 | Q.  Okay.  On the days that you would work, were you using |
| 10:31AM | 9 | those drugs while you worked? |
| 10:31AM | 10 | A.  Yes. |
| 10:31AM | 11 | Q.  Did you use cocaine at Pharaoh's? |
| 10:31AM | 12 | A.  Yes. |
| 10:31AM | 13 | Q.  Other than just in the upstairs area? |
| 10:31AM | 14 | A.  Yes. |
| 10:31AM | 15 | Q.  Did you use opiates at Pharaoh's? |
| 10:31AM | 16 | A.  I did. |
| 10:31AM | 17 | Q.  Okay.  Where would you use those drugs if you weren't in |
| 10:31AM | 18 | the upstairs area? |
| 10:31AM | 19 | A.  Go in the bathroom. |
| 10:31AM | 20 | Q.  Okay.  Was that kind of the common place for you? |
| 10:31AM | 21 | A.  Yes. |
| 10:31AM | 22 | Q.  Were you the only dancer that you knew went in the |
| 10:31AM | 23 | bathroom and used drugs? |
| 10:31AM | 24 | A.  No, there was other dancers. |
| 10:31AM | 25 | Q.  Okay.  Do you remember the names of any of the other |

10:31AM    1    dancers that you saw using drugs at Pharaoh's?

10:31AM    2    A.   No.   Like, I could picture what they look like, but I

10:31AM    3    can't remember exactly who they were.

10:31AM    4    Q.   Okay.   And that's maybe a good point to bring up.   Do

10:31AM    5    most people go by their government name?

10:31AM    6    A.   No.   No, they don't.

10:31AM    7    Q.   Okay.   And this is about 15 years ago?   2009?

10:31AM    8    A.   Yeah.   Yeah, it was quite a while ago, yes.

10:32AM    9    Q.   You described for the jury a few moments ago how that

10:32AM    10   drug addiction impacted your physical appearance; do you

10:32AM    11   remember that?

10:32AM    12   A.   Yes.

10:32AM    13   Q.   Were you the only dancer at Pharaoh's who had that

10:32AM    14   physical appearance of being strung out on drugs?

10:32AM    15   A.   No, K.L. started to look that way, too.

10:32AM    16   Q.   Okay.   Was she a daily cocaine user?

10:32AM    17   A.   Yes.

10:32AM    18   Q.   Was she a daily opiate user?

10:32AM    19   A.   Yes.

10:32AM    20   Q.   Would she use those same drugs at Pharaoh's?

10:32AM    21   A.   Yes.

10:32AM    22   Q.   All right.   I want to talk about the effects of those

10:32AM    23   drugs on you when you used them for a moment.   We'll take

10:32AM    24   them one at a time.

10:32AM    25   A.   Okay.

10:32AM   1   Q.  Start with cocaine.  How does cocaine make you feel when

10:32AM   2   you use it like the first couple times before you're, you

10:32AM   3   know, heavily addicted to it?

10:32AM   4   A.  Euphoric.

10:32AM   5   Q.  Okay.  It's a great feeling?

10:32AM   6   A.  Superhuman, yes.  Energized.

10:32AM   7   Q.  Is it a stimulant, do you know?

10:32AM   8   A.  Yes, it's a stimulant.

10:32AM   9   Q.  If you're drinking alcohol, which you've described that

10:33AM  10   you struggled with alcohol use, does cocaine give you the

10:33AM  11   ability to stay up and drink more?

10:33AM  12   A.  Yes.

10:33AM  13   Q.  Is that common based on your life experience?

10:33AM  14   A.  Yes.

10:33AM  15   Q.  Did Pharaoh's sell alcohol?

10:33AM  16   A.  Yes.

10:33AM  17   Q.  Over time, as you become a daily cocaine user, does that

10:33AM  18   euphoric effect continue?

10:33AM  19   A.  No.

10:33AM  20   Q.  Describe that.  Explain it to them.

10:33AM  21   A.  It goes from feeling euphoric and exciting to almost like

10:33AM  22   drinking a cup of coffee, that's what it's equivalent to,

10:33AM  23   because you build a tolerance to it.

10:33AM  24       And then there comes a point where I just -- I need it

10:33AM  25   just to function normally.

10:33AM   1   Q.  What do you mean?  Explain to them that sentence, I need

10:33AM   2   it just to function.  What does it mean?

10:33AM   3   A.  Like, get out of bed.  I'd have no energy and I'd feel,

10:33AM   4   like, lethargic and almost, I don't know, like I was sick,

10:33AM   5   like I had a cold or something.  So I would take cocaine just

10:34AM   6   so I had enough energy to, like, get up and do normal things

10:34AM   7   in the morning like brush my teeth, take a shower, put makeup

10:34AM   8   on, get dressed, let my dogs out.  Like, all those things

10:34AM   9   took a lot of energy.

10:34AM  10   Q.  During that time when you were addicted to cocaine, could

10:34AM  11   you have shown up for work and done a shift dancing at

10:34AM  12   Pharaoh's without cocaine?

10:34AM  13   A.  Not at this point, no.

10:34AM  14   Q.  Okay.  And at that point, did you need to dance at

10:34AM  15   Pharaoh's in order to make money to buy the cocaine?

10:34AM  16   A.  Yes.

10:34AM  17   Q.  Is there a bit of a cycle there?

10:34AM  18   A.  Yes.

10:34AM  19   Q.  Let's move on to the -- oh, one more question about

10:34AM  20   cocaine.  How long did the effects of cocaine last when you

10:34AM  21   use it, approximately?

10:34AM  22   A.  A couple hours.

10:34AM  23   Q.  Okay.

10:34AM  24   A.  But if you're a continuous user, I feel like that is less

10:34AM  25   time, maybe.

10:34AM   1   Q.  You talked about tolerance a minute ago?

10:34AM   2   A.  Yes.

10:34AM   3   Q.  As you develop a tolerance, do you need to use more and

10:34AM   4   more --

10:34AM   5   A.  Frequently.

10:34AM   6   Q.  I'm not being critical.  So Ann can type down my

10:34AM   7   question, just try to wait for me to finish asking --

10:34AM   8   A.  Okay.

10:34AM   9   Q.  -- and then you answer, okay?

10:35AM  10   A.  Okay.

10:35AM  11   Q.  Do you need to use more and more in order to get that

10:35AM  12   same effect from it?

10:35AM  13   A.  Yes.  You to use it more frequently.

10:35AM  14   Q.  Okay.  And how long generally were your shifts that you

10:35AM  15   worked at Pharaoh's?

10:35AM  16   A.  Maybe six hours.

10:35AM  17   Q.  Okay.  And so if you used before you went to Pharaoh's,

10:35AM  18   would the effects wear off before your shift ended?

10:35AM  19   A.  Yes.

10:35AM  20   Q.  Would you need to continue using to continue functioning

10:35AM  21   there?

10:35AM  22   A.  Yes.

10:35AM  23   Q.  All right.  We're going to move on now from cocaine to

10:35AM  24   opiates.  You said it started out with Lortab; is that

10:35AM  25   correct?

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

38

10:35AM    1    A.  Yes.

10:35AM    2    Q.  What's the feeling like the first few times that you use

10:35AM    3    a Lortab?

10:35AM    4    A.  Relaxed.  Same euphoric feeling, just maybe slightly

10:35AM    5    different.  You don't feel stimulated, you feel more, like, I

10:35AM    6    don't know.  Like, calm, I guess.

10:35AM    7    Q.  Okay.  Is -- is a Lortab a stimulant like cocaine?

10:35AM    8    A.  No.

10:35AM    9    Q.  Okay.  If I used the term "opiate" kind of

10:36AM   10    interchangeably, do you understand what I mean by that?

10:36AM   11    A.  Yes.

10:36AM   12    Q.  Okay.  When you used opiates, do they have a physical

10:36AM   13    addiction that takes hold in you?

10:36AM   14    A.  Yes.

10:36AM   15    Q.  What's that -- what's that like?  How's that happen?

10:36AM   16    A.  The physical addiction?

10:36AM   17    Q.  Yeah.

10:36AM   18    A.  Are you asking me what I felt like when I didn't have it?

10:36AM   19    Q.  Yeah.  Like, what -- how do you become addicted to an

10:36AM   20    opiate?  Yeah, what's it like?

10:36AM   21    A.  I don't know.  All's I know is I started taking pills,

10:36AM   22    and just like the cocaine, I built a tolerance, so I would

10:36AM   23    continue to take more and more.

10:36AM   24        And there would come a day where I didn't have it, and I

10:36AM   25    didn't realize that you would experience the withdrawal that

10:36AM    1    you did and that I did.  So, when I didn't have the pill, I

10:36AM    2    went through, like, extreme withdrawal like the sweats,

10:36AM    3    shakes, you know, throwing up, like I had the flu.

10:36AM    4    Q.  Now, if you have those withdrawal symptoms going on,

10:36AM    5    vomiting, shaking, sweating, are you able to work and dance

10:36AM    6    at Pharaoh's?

10:37AM    7    A.  No.

10:37AM    8    Q.  About how much money did a Lortab pill cost back then, do

10:37AM    9    you remember?

10:37AM   10    A.  I think $10.

10:37AM   11    Q.  Okay.  And are you using one pill a day at that time?

10:37AM   12    A.  No.

10:37AM   13    Q.  Can you describe for the jury as it progresses, how many

10:37AM   14    pills do you start using per day?

10:37AM   15    A.  Maybe about -- I was up to, like, ten.  So the habit was

10:37AM   16    anywhere from 100 to $150 a day.

10:37AM   17    Q.  And that's just the Lortabs; is that right?

10:37AM   18    A.  Correct.

10:37AM   19    Q.  In addition to the Lortabs, were you a daily cocaine

10:37AM   20    user?

10:37AM   21    A.  Yes.

10:37AM   22    Q.  Was cocaine expensive as well?

10:37AM   23    A.  Yes.

10:37AM   24    Q.  Do you remember how much you had to pay, what amounts

10:37AM   25    were you buying cocaine in?

| | | |
|---|---|---|
| 10:37AM | 1 | A.  Like, an 8 Ball at a time. |
| 10:37AM | 2 | Q.  Okay.  And-- |
| 10:37AM | 3 | A.  So it was like $200 maybe. |
| 10:37AM | 4 | Q.  Okay.  And would you use that over the course of a day? |
| 10:37AM | 5 | A.  Yes. |
| 10:37AM | 6 | Q.  Okay.  So would it be fair to say you're spending 200 |
| 10:37AM | 7 | bucks a day on cocaine? |
| 10:37AM | 8 | A.  Yes. |
| 10:37AM | 9 | Q.  And you're spending about 100 bucks a day on Lortabs? |
| 10:37AM | 10 | A.  Yeah, maybe more. |
| 10:37AM | 11 | Q.  Maybe more? |
| 10:37AM | 12 | A.  Yeah. |
| 10:37AM | 13 | Q.  So as a conservative estimate, about $300 a day to feed |
| 10:38AM | 14 | the drug habit? |
| 10:38AM | 15 | A.  Yeah.  Yes. |
| 10:38AM | 16 | Q.  If that occurs over seven days times 300, is that about |
| 10:38AM | 17 | 2,000 or $2,100? |
| 10:38AM | 18 | A.  Yeah. |
| 10:38AM | 19 | Q.  Is that about the same amount of money as you were making |
| 10:38AM | 20 | every week showing up to work? |
| 10:38AM | 21 | A.  Yes. |
| 10:38AM | 22 | Q.  You described for the jury before we did any math that |
| 10:38AM | 23 | you felt like you were spending all your money on drugs; is |
| 10:38AM | 24 | that right? |
| 10:38AM | 25 | A.  Yes. |

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

10:38AM  1    Q.  Earlier in the direct examination, you said it's --

10:38AM  2    opiate use started with Lortabs and eventually became heroin;

10:38AM  3    is that correct?

10:38AM  4    A.  Yes.

10:38AM  5    Q.  Where did you get heroin for the first time?

10:38AM  6    A.  Some girl that I -- I think she was dancing at Pharaoh's

10:38AM  7    or maybe I ran into her, but I worked with her at Rick's

10:38AM  8    Tally-Ho.  And she -- we were hanging out with her, K.L. and

10:38AM  9    I were hanging out with her one night, and she had heroin on

10:39AM  10   her.

10:39AM  11   Q.  Did you use it?

10:39AM  12   A.  Yes.

10:39AM  13   Q.  Is that a similar opiate effect on your body to -- to the

10:39AM  14   Lortabs?

10:39AM  15   A.  A little bit different.  It's more instantaneous, like,

10:39AM  16   the effect happens immediately.

10:39AM  17   Q.  Okay.  Was heroin addictive?

10:39AM  18   A.  Very.

10:39AM  19   Q.  Did you continue using heroin?

10:39AM  20   A.  Yes.

10:39AM  21   Q.  Did that spiral and get worse?

10:39AM  22   A.  Yes.

10:39AM  23   Q.  Before you worked at Pharaoh's Gentlemen's Club, had you

10:39AM  24   ever in your life exchanged sex, vaginal intercourse, in

10:40AM  25   exchange for money or drugs?

| | | |
|---|---|---|
| 10:40AM | 1 | A.  No. |
| 10:40AM | 2 | Q.  Is that something you ever thought you'd do before you |
| 10:40AM | 3 | worked at Pharaoh's? |
| 10:40AM | 4 | A.  No. |
| 10:40AM | 5 | Q.  Was that in your life plan? |
| 10:40AM | 6 | A.  No. |
| 10:40AM | 7 | Q.  Did there come a time when that happened? |
| 10:40AM | 8 | A.  Yes. |
| 10:40AM | 9 | Q.  Can you describe for the jury how that played out? |
| 10:40AM | 10 | A.  Yes.  We, K.L. and myself, were -- went upstairs to |
| 10:40AM | 11 | party, hang out, whatever.  There was a couple of guys up |
| 10:40AM | 12 | there.  And -- not exactly sure how it came up, but one of |
| 10:41AM | 13 | the guys was a little bit younger.  And Peter asked me if I |
| 10:41AM | 14 | would hook up with him, and he would, like, take care of me |
| 10:41AM | 15 | or whatever.  And then I had sex with the guy.  When I was |
| 10:41AM | 16 | done having sex with the guy, Peter gave me, like, 200 bucks. |
| 10:41AM | 17 | Q.  Okay.  I want to break that down a little bit more. |
| 10:41AM | 18 | When you went upstairs with K.L., was Peter up there? |
| 10:41AM | 19 | A.  Yes. |
| 10:41AM | 20 | Q.  Was -- were there other men up there? |
| 10:41AM | 21 | A.  Yes. |
| 10:41AM | 22 | Q.  Do you remember if there were other dancers other than |
| 10:41AM | 23 | you and K.L. up there? |
| 10:41AM | 24 | A.  No, I don't remember. |
| 10:41AM | 25 | Q.  Okay.  Were you using drugs? |

10:41AM     1    A.   Yes.

10:41AM     2    Q.   Were you using cocaine?

10:41AM     3    A.   Yes.

10:41AM     4    Q.   Who provided the cocaine that you used upstairs?

10:41AM     5    A.   That, I don't remember that specific time.  I think it

10:41AM     6    was Peter.

10:41AM     7    Q.   Okay.

10:41AM     8    A.   I don't remember.

10:41AM     9    Q.   Well, who controlled access to the upstairs area?

10:41AM    10    A.   Peter.

10:41AM    11    Q.   And I'm not giving you a hard time.

10:42AM    12    A.   Yeah.

10:42AM    13    Q.   This time that we're talking about, now, when you go

10:42AM    14    upstairs, what you just described, were you heavily addicted

10:42AM    15    to cocaine?

10:42AM    16    A.   Yes.

10:42AM    17    Q.   Were you heavily addicted to opiates?

10:42AM    18    A.   Yes.

10:42AM    19    Q.   All those things that you just described for the jury

10:42AM    20    over the course of the last 20 minutes about effects of that

10:42AM    21    addiction and how it -- how it impacted you physically and

10:42AM    22    mentally, were those things actively happening for you at

10:42AM    23    that time?

10:42AM    24    A.   Yes.

10:42AM    25    Q.   You described how you looked, strung out.  That you were

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

44

10:42AM  1   20 pounds lighter than you are today; is that correct?

10:42AM  2   A.  Yes.

10:42AM  3   Q.  Was that obvious and apparent on your body that you were

10:42AM  4   strung out on drugs?

10:42AM  5        MR. SOEHNLEIN:  Objection, calls for speculation.

10:42AM  6        THE COURT:  Yeah, sustained.

10:42AM  7        BY MR. COOPER:

10:42AM  8   Q.  Have you seen other people that look strung out on drugs?

10:42AM  9   A.  Yes.

10:42AM  10  Q.  Okay.  Is that something that you as a layperson, just a

10:42AM  11  normal person living in the world, can observe based with

10:42AM  12  your common sense and your eyes?

10:42AM  13  A.  Yes.

10:42AM  14  Q.  Did you have those physical signs on your body?

10:43AM  15  A.  Yes.  I was 114 pounds.  I had bags under my eyes.  And

10:43AM  16  even with all the pounds of makeup on, I looked terrible.

10:43AM  17  Period.

10:43AM  18  Q.  You described that you had become close with K.L.; is

10:43AM  19  that correct?

10:43AM  20  A.  Yes.

10:43AM  21  Q.  You used drugs with her frequently?

10:43AM  22  A.  Yes.

10:43AM  23  Q.  Did you engage socially and party and use drugs with this

10:43AM  24  defendant?

10:43AM  25  A.  Yes.

10:43AM    1    Q.  When you went upstairs, was it your plan to have sex with

10:43AM         someone upstairs?

10:43AM    3    A.  No.

10:43AM    4    Q.  Was that on your mind?

10:43AM    5    A.  No.

10:43AM    6    Q.  Were you driven to go upstairs because you were -- and

10:43AM    7    I'm not trying to embarrass you -- but because you were,

10:43AM    8    like, looking to go have sex?  Is that what was going on in

10:43AM    9    your head?

10:43AM    10   A.  No, I was looking for drugs.

10:43AM    11   Q.  You were looking for what?

10:43AM    12   A.  Drugs.

10:43AM    13   Q.  Okay.  Did you get drugs upstairs?

10:44AM    14   A.  Yes.

10:44AM    15   Q.  Who provided the drugs upstairs?

10:44AM    16   A.  Peter, I guess.

10:44AM    17   Q.  After you used drugs upstairs, how did -- how did this

10:44AM    18   conversation start?  Who brought up sex?

10:44AM    19   A.  Be mindful, this was a long time ago.  I know Peter asked

10:44AM    20   me if I would, like, take -- take care of his friend.

10:44AM    21   Q.  Okay.

10:44AM    22   A.  A buddy of his.

10:44AM    23   Q.  What did you interpret that to mean?

10:44AM    24   A.  Hook up with him, like, have sexual intercourse.

10:44AM    25   Q.  Okay.  Had you ever met his friend before in your life?

| | | |
|---|---|---|
| 10:44AM | 1 | A.  No. |
| 10:44AM | 2 | Q.  Did the defendant offer you something in exchange for |
| 10:44AM | 3 | having sex with his friend? |
| 10:44AM | 4 | A.  Just said he would take care of me. |
| 10:44AM | 5 | Q.  What did you interpret that to mean? |
| 10:44AM | 6 | A.  Money or drugs. |
| 10:45AM | 7 | Q.  Were there any other ways to take care of you that you |
| 10:45AM | 8 | know of? |
| 10:45AM | 9 | A.  No. |
| 10:45AM | 10 | Q.  Did you ultimately receive money? |
| 10:45AM | 11 | A.  Yes. |
| 10:45AM | 12 | Q.  Who gave you money? |
| 10:45AM | 13 | A.  Peter handed it to me when I was done, or when we came |
| 10:45AM | 14 | out of the bathroom. |
| 10:45AM | 15 | Q.  Did you end up having sex with the young man in the |
| 10:45AM | 16 | bathroom? |
| 10:45AM | 17 | A.  Yes. |
| 10:45AM | 18 | Q.  About how old was that person based on what you saw? |
| 10:45AM | 19 | A.  Like, my age. |
| 10:45AM | 20 | Q.  Okay.  And this was 2009, this would have been sometime |
| 10:45AM | 21 | around age 24 for you; is that right? |
| 10:45AM | 22 | A.  Yeah. |
| 10:45AM | 23 | Q.  The $200 that you got in exchange for having sex with |
| 10:46AM | 24 | that person, what'd you spend it on? |
| 10:46AM | 25 | A.  I don't specifically remember now, but my guess is more |

| | | |
|---|---|---|
| 10:46AM | 1 | cocaine. |
| 10:46AM | 2 | Q.  Okay.  Were you using money to buy anything else at that |
| 10:46AM | 3 | time in your life? |
| 10:46AM | 4 | A.  No.  I wasn't paying my bills, and I wasn't paying for |
| 10:46AM | 5 | anything else, no. |
| 10:46AM | 6 | Q.  Based on the time that you had spent around the defendant |
| 10:46AM | 7 | leading up to that night in the upstairs, did he know you |
| 10:46AM | 8 | were a drug addict? |
| 10:46AM | 9 | **MR. SOEHNLEIN:**  Objection, speculation. |
| 10:46AM | 10 | **THE COURT:**  Yeah, sustained.  You can lay more |
| 10:46AM | 11 | foundation, Mr. Cooper. |
| 10:46AM | 12 | **MR. COOPER:**  Okay. |
| 10:46AM | 13 | **BY MR. COOPER:** |
| 10:46AM | 14 | Q.  Did he see you use drugs every time he was with you? |
| 10:46AM | 15 | A.  Yes. |
| 10:46AM | 16 | Q.  All those things about your physical appearance that you |
| 10:46AM | 17 | described a moment ago, did all of those things exist when |
| 10:47AM | 18 | you were hanging out with him? |
| 10:47AM | 19 | A.  Yes. |
| 10:47AM | 20 | Q.  Was he in an intimate relationship with K.L.? |
| 10:47AM | 21 | A.  Yes. |
| 10:47AM | 22 | Q.  Was she the person that you used drugs with the most? |
| 10:47AM | 23 | A.  Yes. |
| 10:47AM | 24 | Q.  Was K.L. a drug addict? |
| 10:47AM | 25 | A.  Yes. |

10:47AM    1    Q.  I'm not asking you to qualify what she is, but based on

10:47AM    2    your observations, was she a daily user of cocaine?

10:47AM    3    A.  Yes.

10:47AM    4    Q.  Was she a daily user of opiates?

10:47AM    5    A.  Yes.

10:47AM    6    Q.  Were you all of those things as well?

10:47AM    7    A.  Yes.

10:47AM    8    Q.  In 2006 when you started working at Pharaoh's, your first

10:47AM    9    day there, your first week there, if this defendant had

10:47AM   10    brought up upstairs and said I want you to go have sex with

10:47AM   11    my friend and I'll take care of you, would you have done it?

10:48AM   12    A.  No.

10:48AM   13    Q.  Why not?

10:48AM   14    A.  Because I didn't really -- I didn't need money then.

10:48AM   15    That wasn't really -- I didn't do that, so, no, I wouldn't

10:48AM   16    have done that.

10:48AM   17    Q.  Are you sure about that?

10:48AM   18    A.  Sure.

10:48AM   19    Q.  Is this stuff comfortable to talk about?

10:48AM   20    A.  No, it's not comfortable.

10:48AM   21    Q.  Have you ever discussed having sex with a person for

10:48AM   22    money upstairs at Pharaoh's publicly like this before?

10:48AM   23    A.  No, I haven't.

10:48AM   24    Q.  Just a few more questions on that topic, and we'll move

10:48AM   25    on.  That day when you went upstairs, who asked you to go

| | | |
|---|---|---|
| 10:48AM | 1 | upstairs?  Were you summoned?  How did you get up there? |
| 10:48AM | 2 | A.  I don't know, I think I just followed K.L. up there, I'm |
| 10:48AM | 3 | not sure. |
| 10:48AM | 4 | Q.  All right.  I want to go into the moment where the |
| 10:49AM | 5 | defendant says to you, I want you to hook up with my friend |
| 10:49AM | 6 | or take care of my friend or whatever he says. |
| 10:49AM | 7 | In that moment, did you need the job that you had at |
| 10:49AM | 8 | Pharaoh's? |
| 10:49AM | 9 | A.  Yes. |
| 10:49AM | 10 | Q.  Was that your way of earning money? |
| 10:49AM | 11 | A.  Yes. |
| 10:49AM | 12 | Q.  Was the money that you earned there money that you spent |
| 10:49AM | 13 | to feed the drug addiction? |
| 10:49AM | 14 | A.  Yes. |
| 10:49AM | 15 | Q.  Was the defendant your boss at that time? |
| 10:49AM | 16 | A.  Yes. |
| 10:49AM | 17 | Q.  Were you standing inside of his club? |
| 10:49AM | 18 | A.  Yes. |
| 10:49AM | 19 | Q.  Were you inside of his private little fiefdom upstairs? |
| 10:49AM | 20 | A.  Yes. |
| 10:49AM | 21 | Q.  After you had sex with the man in the bathroom, did you |
| 10:49AM | 22 | guys talk? |
| 10:49AM | 23 | A.  The guy? |
| 10:49AM | 24 | Q.  Yeah, the guy. |
| 10:49AM | 25 | A.  I don't know. |

| | | |
|---|---|---|
| 10:49AM | 1 | Q.  Did you have anything to talk with him about? |
| 10:49AM | 2 | A.  No. |
| 10:49AM | 3 | Q.  Was there anybody else around when that happened inside |
| 10:50AM | 4 | the bathroom? |
| 10:50AM | 5 | A.  No, not that I can recall, no. |
| 10:50AM | 6 | Q.  Were there other people outside the bathroom in the |
| 10:50AM | 7 | upstairs area? |
| 10:50AM | 8 | A.  Yeah. |
| 10:50AM | 9 | Q.  Was that a new bottom for you? |
| 10:50AM | 10 | A.  Yes, I would say so. |
| 10:50AM | 11 | Q.  Can you describe -- I imagine this is personal stuff to |
| 10:50AM | 12 | talk about, but can you describe for the jury, like, |
| 10:50AM | 13 | emotionally mentally how you felt after that happened in the |
| 10:50AM | 14 | bathroom upstairs? |
| 10:50AM | 15 | A.  So, I didn't feel anything in particular when it was over |
| 10:50AM | 16 | with.  I mean, I was high on drugs, so you don't really feel |
| 10:50AM | 17 | anything.  But I know when I started to come off or come down |
| 10:51AM | 18 | from drugs, I started to reflect on that and other -- the |
| 10:51AM | 19 | dancing and other situations, and it's depressing.  It makes |
| 10:51AM | 20 | you feel very depressed. |
| 10:51AM | 21 | Q.  Did you feel dirty about what had happened? |
| 10:51AM | 22 | A.  Yes, very disgusted. |
| 10:51AM | 23 | Q.  I want to switch gears for a second. |
| 10:51AM | 24 | I want to talk about the VIP Room at Pharaoh's, okay? |
| 10:51AM | 25 | A.  Okay. |

10:51AM   1    Q.  Earlier we talked about lap dances that happen in the VIP

10:51AM   2    Room and the Champagne Room; do you remember that?

10:51AM   3    A.  Yes.

10:51AM   4    Q.  Now, what was the difference between a customer going to

10:51AM   5    the VIP Room and a customer going into that more private

10:51AM   6    Champagne Room?  What -- how'd that happen?

10:51AM   7    A.  Spending more money.

10:51AM   8    Q.  Okay.  Did it cost more to go into the Champagne Room?

10:51AM   9    A.  Yes.

10:51AM  10    Q.  If a customer wanted to buy multiple private dances at

10:52AM  11    once, were they able to do that?

10:52AM  12    A.  Yes.

10:52AM  13    Q.  And would you then as the dancer get multiple chips?

10:52AM  14    A.  Yes.

10:52AM  15    Q.  Each time a dance happens in the back at Pharaoh's, does

10:52AM  16    the club make money?

10:52AM  17    A.  Yes.

10:52AM  18    Q.  Does this defendant own the club?

10:52AM  19    A.  Yes.

10:52AM  20    Q.  Did you as a dancer working there have a financial motive

10:52AM  21    to do more dances in the back?

10:52AM  22    A.  Excuse me.  Yes.

10:52AM  23    Q.  Would that earn you more money?

10:52AM  24    A.  Yes.

10:52AM  25    Q.  Would that also earn the defendant more money?

10:52AM  1    A.  Yeah.

10:52AM  2    Q.  What was supposed to happen in the VIP Room?  What was

10:52AM  3    allowed technically by the rules?

10:52AM  4    A.  I mean, they were contact lap dances, meaning you could

10:52AM  5    sit right on the client's lap.  But the customers were

10:52AM  6    supposed to keep their hands to themselves.  And you had to

10:52AM  7    wear pasties and bottoms.  And I guess, you would dance on

10:52AM  8    'em.

10:52AM  9    Q.  Okay.  Now, you mentioned that the customers were

10:52AM  10   supposed to keep their hands to themselves; is that right?

10:53AM  11   A.  Right.

10:53AM  12   Q.  And you as the dancer were supposed to wear pasties; is

10:53AM  13   that right?

10:53AM  14   A.  Right.

10:53AM  15   Q.  And you were supposed to keep your bottoms on; is that

10:53AM  16   right?

10:53AM  17   A.  Yes.

10:53AM  18   Q.  Was there a person or people who worked at Pharaoh's

10:53AM  19   whose job it was supposedly to enforce those rules?

10:53AM  20   A.  Yeah, the doorman for the VIP.

10:53AM  21   Q.  Okay.  If I say "VIP attendant," will you know what I'm

10:53AM  22   talking about?

10:53AM  23   A.  Yes.

10:53AM  24   Q.  Were there times in that area when customers would engage

10:53AM  25   in conduct that went beyond what you just described was

| 10:53AM | 1 | supposed to happen? |
| 10:53AM | 2 | A.  Yes, sometimes customers would get handsy. |
| 10:53AM | 3 | Q.  I'm going to ask some more personal questions to you. |
| 10:53AM | 4 | Did you go in the back and do those private dances? |
| 10:53AM | 5 | A.  Yes. |
| 10:53AM | 6 | Q.  Were there times when customers tried to move your |
| 10:53AM | 7 | bottoms and touch your bare vagina? |
| 10:53AM | 8 | A.  Yes. |
| 10:53AM | 9 | Q.  Were there times when customers tried to kiss you or kiss |
| 10:53AM | 10 | parts of your body? |
| 10:53AM | 11 | A.  Yes. |
| 10:53AM | 12 | Q.  Were there times when customers touched other private |
| 10:54AM | 13 | areas on your body like your buttocks or your breasts? |
| 10:54AM | 14 | A.  Yes. |
| 10:54AM | 15 | Q.  Okay.  Did those things happen to you once or more than |
| 10:54AM | 16 | once? |
| 10:54AM | 17 | A.  More than once. |
| 10:54AM | 18 | Q.  Okay.  Were you the only dancer that you saw those things |
| 10:54AM | 19 | happen to? |
| 10:54AM | 20 | A.  No. |
| 10:54AM | 21 | Q.  Every time those things happened to you, did the VIP |
| 10:54AM | 22 | attendant come running in and say, hey, get your hands off |
| 10:54AM | 23 | G.R.'s vagina? |
| 10:54AM | 24 | A.  Yeah, for the most part he would. |
| 10:54AM | 25 | Q.  Were there times when that didn't happen? |

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

54

| 10:54AM | 1 | A.  Yeah.  If he was, like, busy because there's cameras back |
| 10:54AM | 2 | there. |
| 10:54AM | 3 | Q.  Got it.  I want to ask you about something else you |
| 10:54AM | 4 | observed in that VIP area. |
| 10:54AM | 5 | Did you observe a dancer having sex, sexual intercourse |
| 10:54AM | 6 | with a customer in the VIP or Champagne area? |
| 10:54AM | 7 | A.  Yes. |
| 10:54AM | 8 | Q.  Can you describe that for the jury? |
| 10:54AM | 9 | A.  Her -- this dancer and myself, I don't really remember |
| 10:54AM | 10 | her name, we were both in the back Champagne Room.  I was |
| 10:55AM | 11 | with some guy, and she was with some guy.  And the guy she |
| 10:55AM | 12 | was with had money, but she had sex with him in the VIP Room. |
| 10:55AM | 13 | Q.  Did you see that happen with your eyes? |
| 10:55AM | 14 | A.  Yes. |
| 10:55AM | 15 | Q.  Okay.  Now, sex, it doesn't happen in one second, right? |
| 10:55AM | 16 | A.  Right. |
| 10:55AM | 17 | Q.  Okay.  And the sex happened in front of you, right? |
| 10:55AM | 18 | A.  Yes. |
| 10:55AM | 19 | Q.  Did it finish to completion?  Did you see that act occur? |
| 10:55AM | 20 | A.  I think so, yeah. |
| 10:55AM | 21 | Q.  It wasn't stopped; is that fair to say? |
| 10:55AM | 22 | A.  Right.  Yes. |
| 10:55AM | 23 | Sorry.  If I could add, they're -- in the Champagne |
| 10:55AM | 24 | Rooms, there are blind spots. |
| 10:55AM | 25 | Q.  Tell them about that. |

10:55AM    1    A.  So there are spots that maybe the cameras can't see.

10:55AM    2    Q.  Do dancers know about that?

10:55AM    3    A.  Yes, I'd imagine so.  I did, so yeah.

10:55AM    4    Q.  When dancers finish their shift at the end of the night,

10:55AM    5    are they required to tip out male employees that work at the

10:56AM    6    club?

10:56AM    7    A.  Just the DJ and the VIP guy.

10:56AM    8    Q.  Okay.  So that's -- the VIP guy, that's who we've been

10:56AM    9    talking about that's supposed to be watching those cameras,

10:56AM   10    right?

10:56AM   11    A.  Yes.

10:56AM   12    Q.  Do dancers tip that person at the end of the night?

10:56AM   13    A.  Yeah.

10:56AM   14    Q.  Do you know if customers ever tip that person separate

10:56AM   15    from the dancer?

10:56AM   16    A.  I don't know about that, no.

10:56AM   17    Q.  Okay.  You haven't seen that happen?

10:56AM   18    A.  No.  Not that I can recall.

10:56AM   19    Q.  Now, the time that you're in that back Champagne Room and

10:56AM   20    you see this other dancer, did you say her name?  I think you

10:56AM   21    said Joy?

10:56AM   22    A.  Yeah, I think that was her name.

10:56AM   23    Q.  You're in this Champagne area with Joy, and you see them

10:56AM   24    having sex in the VIP area.  Do you remember the customer

10:56AM   25    that you were with?

| 10:56AM | 1 | A.  Yes. |
| 10:56AM | 2 | Q.  What sticks out to you about that incident, that |
| 10:56AM | 3 | customer? |
| 10:56AM | 4 | A.  He -- well, I've got to say it because we're on the |
| 10:57AM | 5 | record here.  He masturbated and finished -- |
| 10:57AM | 6 | Q.  Okay. |
| 10:57AM | 7 | A.  -- in the back room. |
| 10:57AM | 8 | Q.  Is that what was supposed to happen in a lap dance? |
| 10:57AM | 9 | A.  No. |
| 10:57AM | 10 | Q.  Anybody run back there and throw him out of the club? |
| 10:57AM | 11 | A.  No. |
| 10:57AM | 12 | Q.  Did he pay you money to go back there with you? |
| 10:57AM | 13 | A.  Yes. |
| 10:57AM | 14 | Q.  Did some of that money go to the club? |
| 10:57AM | 15 | A.  Yes. |
| 10:57AM | 16 | Q.  Did this defendant own the club? |
| 10:57AM | 17 | A.  Yes. |
| 10:57AM | 18 | Q.  Was that a pleasant experience for you? |
| 10:57AM | 19 | A.  No. |
| 10:57AM | 20 | Q.  Okay.  Did you see some people at Pharaoh's get special |
| 10:57AM | 21 | treatment? |
| 10:57AM | 22 | A.  What do you mean by that? |
| 10:57AM | 23 | Q.  Let me ask you this question.  Did you see people come |
| 10:57AM | 24 | into Pharaoh's that you knew to be friends with the |
| 10:58AM | 25 | defendant? |

10:58AM    1    A.   Yeah.   They, yes.   I think you're referring to, like,

10:58AM    2    when they'd get, like, sections of the club, like, roped off

10:58AM    3    or whatever.

10:58AM    4    Q.   Is that something you saw happen?

10:58AM    5    A.   Yeah.

10:58AM    6    Q.   Would you see people that you believed to be, like,

10:58AM    7    people in the legal world, attorneys, judges, that came into

10:58AM    8    Pharaoh's?

10:58AM    9    A.   Yes, I believed them to be.   Yes.

10:58AM    10   Q.   Okay.   During that summer of 2009 when you were heavily

10:58AM    11   addicted to cocaine and opiates, did there cause -- did

10:58AM    12   something happen or did someone say something that caused you

10:58AM    13   to feel like you couldn't get in trouble for it?

10:58AM    14   A.   Yes.   Maybe one time, when K.L. and I were partying with

10:58AM    15   Peter, it was my understanding, if I recall, Peter said he

10:58AM    16   had a friend that was, like, the head of narcotics or

10:58AM    17   something, I don't know.   I believe that's -- it was the head

10:59AM    18   of narcotics in Buffalo.

10:59AM    19   Q.   Okay.   Is that something that this defendant said in

10:59AM    20   front of you that you heard with your ears?

10:59AM    21   A.   Yes.

10:59AM    22   Q.   Okay.   Did that cause you to feel, like, hey, we're

10:59AM    23   invincible, we can't be touched?

10:59AM    24   A.   Yes.

10:59AM    25   Q.   Okay.   Do you know as you sit here whether it was true or

10:59AM    1    not?

10:59AM    2    A.  I actually still don't know if it's true or not.  I don't

10:59AM    3    know.

10:59AM    4    Q.  Okay.  Did it cause you to view this defendant as

10:59AM    5    somebody you believed to be connected to important people?

10:59AM    6    A.  Yeah.

10:59AM    7    Q.  Did it cause you to view this defendant as somebody you

10:59AM    8    believed to be connected to someone who's the head of

10:59AM    9    narcotics in law enforcement?

10:59AM   10    A.  Yes.

10:59AM   11    Q.  Did you believe it at the time when he said it?

10:59AM   12    A.  Yes, I did believe it at the time.

10:59AM   13         **MR. COOPER:**  Judge, are we going to take a morning

10:59AM   14    break?  This might be a good time for me, if you want to keep

11:00AM   15    going.

11:00AM   16         **THE COURT:**  Yeah, I'd like to keep going.

11:00AM   17         **MR. COOPER:**  Got it.

11:00AM   18         **THE COURT:**  We've only been going a little over an

11:00AM   19    hour, I'd like to keep going a little more.

11:00AM   20         **MR. COOPER:**  You good?

11:00AM   21         **THE WITNESS:**  I'm good.

11:00AM   22         **MR. COOPER:**  Okay.

11:00AM   23         **BY MR. COOPER:**

11:00AM   24    Q.  I want to move on now.  We've talked quite a bit about

11:00AM   25    K.L..  was there a time when you received a phone call from

11:00AM    1    this defendant regarding K.L.'s health and wellness?

11:00AM    2    A.  Yes.

11:00AM    3    Q.  What was going on?  Tell them.

11:00AM    4    A.  So K.L. had epilepsy or something.  When we would do

11:00AM    5    cocaine together, sometimes she would have seizures.

11:00AM    6        I got a call from Peter that was, like, early-morning

11:00AM    7    hours, like, I mean the sun was coming up.  And K.L. had had

11:00AM    8    a seizure.  And he asked me if I could come get her from the

11:00AM    9    hotel they were at.

11:00AM    10   Q.  While she was having a seizure?

11:00AM    11   A.  She just had one.

11:00AM    12   Q.  Okay.

11:00AM    13   A.  So he asked me if I could come get her.

11:00AM    14   Q.  Got it.  Were you a doctor?

11:00AM    15   A.  No.

11:00AM    16   Q.  Were you a nurse?

11:01AM    17   A.  No, I'm not a nurse.

11:01AM    18   Q.  Did you work for an ambulance company?

11:01AM    19   A.  No, I did not.

11:01AM    20   Q.  Did he tell you, hey, I just called 911, can you just

11:01AM    21   come sit with K.L. for a bit?

11:01AM    22   A.  No, he didn't say that.

11:01AM    23   Q.  Did you show up?

11:01AM    24   A.  Yes.

11:01AM    25   Q.  What'd you see when you showed up?

11:01AM    1    A.  Went into the hotel room.  The hotel room was a little

11:01AM    2    messy.  There was another girl there.  They had all been

11:01AM    3    partying all night, another dancer from Pharaoh's.  And K.L.

11:01AM    4    was, like, sort of out of it, which you are when you just

11:01AM    5    have, like, one of those seizures.  You're, like, kind of

11:01AM    6    lethargic and not really knowing where you are.

11:01AM    7    Q.  Was there an ambulance there when you got there?

11:01AM    8    A.  No.

11:01AM    9    Q.  What did Peter say to you when you arrived?

11:01AM   10    A.  He just wanted me to take her.  I don't really recall

11:01AM   11    exactly what he said to me.  But he wanted me to take her

11:02AM   12    home.  Because they were, they'd been partying all night in

11:02AM   13    the hotel room.

11:02AM   14    Q.  Did you go into the hotel room?

11:02AM   15    A.  Yes.

11:02AM   16    Q.  Did you see signs of drug use?

11:02AM   17    A.  I didn't see signs of drug use, but I saw the room was

11:02AM   18    messy and used.  I don't know how else to say it.

11:02AM   19    Q.  Okay.  Did there come a time after the events that we've

11:02AM   20    described so far for the jury when you got arrested with

11:02AM   21    K.L.?

11:02AM   22    A.  Yes.

11:02AM   23    Q.  Okay.  Can you describe that night to the best of your

11:02AM   24    recollection for the jury?

11:02AM   25    A.  Yes, I remember we worked that night, or I had worked,

11:02AM    1    K.L. didn't really work a lot at the club, but we went out

11:02AM    2    together afterwards.  And I believe we were downtown, I can't

11:02AM    3    recall.  We met these two college kids, and they said there

11:03AM    4    was, like, a party going on somewhere.  So we hopped in my

11:03AM    5    car, and were going to this party off U.B. campus.  We were

11:03AM    6    in Amherst at this point because it's -- it's north campus

11:03AM    7    area.  We stopped at a convenience store.  K.L. and I are

11:03AM    8    high on cocaine, both acting crazy, I'd imagine if you saw us

11:03AM    9    in the store you probably think we were high.

11:03AM   10        The store clerk called the police on K.L. because of the

11:03AM   11    way she was acting, weird or shady, I don't know.  And the

11:03AM   12    police pulled us over, the Amherst police.

11:03AM   13    Q.  Okay.  When you got pulled over, did you get placed under

11:03AM   14    arrest?

11:03AM   15    A.  Yes.

11:03AM   16    Q.  Were you brought back to a police station?

11:03AM   17    A.  Yes.

11:03AM   18    Q.  Was K.L. also arrested?

11:03AM   19    A.  Yeah, she was arrested also.

11:03AM   20    Q.  Did somebody come to ask you questions while you were

11:04AM   21    there?

11:04AM   22    A.  Yes.  Eventually, it was a detective and then an FBI

11:04AM   23    agent.

11:04AM   24    Q.  Okay.  Did you speak with them?

11:04AM   25    A.  Yes, I did.

| | | |
|---|---|---|
| 11:04AM | 1 | Q.  Did you answer their questions? |
| 11:04AM | 2 | A.  Yes. |
| 11:04AM | 3 | Q.  Was this back in 2009 as well? |
| 11:04AM | 4 | A.  Yes. |
| 11:04AM | 5 | Q.  Got it.  And so when you spoke with these agents or |
| 11:04AM | 6 | officers, whatever, back in 2009, were you hoping in your |
| 11:04AM | 7 | head, like, hey, maybe this will help me get out of trouble? |
| 11:04AM | 8 | A.  Yeah, so I think it's important to mention I was on |
| 11:04AM | 9 | felony probation still from that DWI that I received when I |
| 11:04AM | 10 | was 19, the second and third.  So I was already under |
| 11:04AM | 11 | supervision by the law.  So I didn't want to get in trouble, |
| 11:04AM | 12 | or I wanted to do whatever I could to not get in trouble, I |
| 11:04AM | 13 | guess, would be the word to use or the way to say it.  So I |
| 11:04AM | 14 | was willing to answer their questions. |
| 11:05AM | 15 | Q.  Were you hoping by answering their questions that it |
| 11:05AM | 16 | would give you some benefit for the trouble you just got in? |
| 11:05AM | 17 | A.  Yes, I was hoping that I wouldn't get violated through |
| 11:05AM | 18 | probation, and maybe I wouldn't get charged with what they |
| 11:05AM | 19 | charged me with, which was possession of drugs and a few |
| 11:05AM | 20 | other things. |
| 11:05AM | 21 | Q.  Now, did those hopes -- did they actually pan out? |
| 11:05AM | 22 | A.  No.  They didn't.  I ended up getting in trouble.  And I |
| 11:05AM | 23 | ended up paying a lawyer $5,000, and I had to write my |
| 11:05AM | 24 | probation officer a heartfelt letter, and pretty much begged |
| 11:05AM | 25 | him to let me take the drug court program in Amherst.  That's |

11:05AM   1   what happened.

11:05AM   2   Q.  Did you get the drug court program?

11:06AM   3   A.  Yes.

11:06AM   4   Q.  Now we're talking about 2009, right?

11:06AM   5   A.  Yes.

11:06AM   6   Q.  Were you able to stay sober after that period of time?

11:06AM   7   A.  Well, I was in drug court.  Just like when I got out of

11:06AM   8   rehab the first time, I had a couple of slipups, you'd call

11:06AM   9   them.  I wasn't really invested in any kind of program of

11:06AM   10  recovery.  And yes, for the most part, I was on Suboxone, so

11:06AM   11  maybe like a harm-reduction type program.  And I finished the

11:06AM   12  drug court program successfully.

11:06AM   13  Q.  Did there come a time after that when you got in trouble

11:06AM   14  again?

11:06AM   15  A.  Yeah.  So, after I got off drug court, I got off Suboxone

11:06AM   16  and I ended up relapsing on heroin.

11:06AM   17  Q.  Approximately when was that?  What year?

11:06AM   18  A.  I think 2011.

11:07AM   19  Q.  Did you go back to court?

11:07AM   20  A.  Not right away.  There was a few months in there that I

11:07AM   21  was using heavily again.  And then I end up getting arrested

11:07AM   22  in January of 2012.  I get arrested again.

11:07AM   23  Q.  Okay.  And at that time, in January of 2012, did you

11:07AM   24  get -- did you get clean at that point?

11:07AM   25  A.  Yes, I did.

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

64

| | | |
|---|---|---|
| 11:07AM | 1 | Q.  Okay. |
| 11:07AM | 2 | A.  I spent 17 days in jail.  I went through all my |
| 11:07AM | 3 | withdrawal in jail.  I did sort of like a door-to-door |
| 11:07AM | 4 | placement.  I went home for two days, packed clothes, and |
| 11:07AM | 5 | went to Clearview rehab. |
| 11:07AM | 6 |     And then I got out and I had, I signed up for -- well, |
| 11:07AM | 7 | that's what the lawyer got me, drug court, Buffalo city drug |
| 11:07AM | 8 | court, and I was in the DUI program I think Fiorella, that |
| 11:07AM | 9 | Judge Fiorella ran. |
| 11:07AM | 10 | Q.  Did you ultimately stay sober that time? |
| 11:08AM | 11 | A.  Yes, it's where I began this almost 13 years of sobriety. |
| 11:08AM | 12 | Q.  Now, are you working? |
| 11:08AM | 13 | A.  I am. |
| 11:08AM | 14 | Q.  What kind of work do you do? |
| 11:08AM | 15 | A.  I am a server. |
| 11:08AM | 16 | Q.  Do you pay your bills? |
| 11:08AM | 17 | A.  I do. |
| 11:08AM | 18 | Q.  Do you take care of your kid? |
| 11:08AM | 19 | A.  I do. |
| 11:08AM | 20 | Q.  Has anybody offered you any benefit in exchange for |
| 11:08AM | 21 | coming in here and telling these people what you told them |
| 11:08AM | 22 | today? |
| 11:08AM | 23 | A.  No. |
| 11:08AM | 24 | Q.  Has it been a pleasant experience for you? |
| 11:08AM | 25 | A.  No, because it's taken time away from my son and work, |

| | | |
|---|---|---|
| 11:08AM | 1 | and, you know, other duties that I would do during the day |
| 11:08AM | 2 | while he's at school, so, no. |
| 11:08AM | 3 | Q.  Did you make any of this up because you felt like being |
| 11:08AM | 4 | in that chair? |
| 11:08AM | 5 | A.  No. |
| 11:08AM | 6 | Q.  When you didn't remember, did you say you didn't |
| 11:08AM | 7 | remember? |
| 11:08AM | 8 | A.  Yes. |
| 11:08AM | 9 | Q.  Do you have any strong feelings of hate towards this |
| 11:08AM | 10 | defendant? |
| 11:08AM | 11 | A.  No. |
| 11:08AM | 12 | MR. COOPER:  Can I just have one moment, Judge? |
| 11:08AM | 13 | THE COURT:  Sure. |
| 11:09AM | 14 | BY MR. COOPER: |
| 11:09AM | 15 | Q.  We're getting there, okay? |
| 11:09AM | 16 | A.  Yeah, that's okay. |
| 11:09AM | 17 | Q.  Just a few more questions to kind of hit some details |
| 11:10AM | 18 | that I might have skipped or missed. |
| 11:10AM | 19 | Going back to the upstairs when you have sex with that |
| 11:10AM | 20 | man in the bathroom.  When the defendant gave you cocaine and |
| 11:10AM | 21 | money to have sex with his friend in the bathroom, were you |
| 11:10AM | 22 | aware of the defendant's reputation in the community or his |
| 11:10AM | 23 | family's reputation in the community? |
| 11:10AM | 24 | MR. SOEHNLEIN:  Objection, Your Honor. |
| 11:10AM | 25 | THE COURT:  Was she aware?  No, overruled. |

| | | |
|---|---|---|
| 11:10AM | 1 | **THE WITNESS:**  Which, Peter's? |
| 11:10AM | 2 | **BY MR. COOPER:** |
| 11:10AM | 3 | Q.  Peter's, or Peter's family, did you know about any |
| 11:10AM | 4 | reputation that they had in the community? |
| 11:10AM | 5 | A.  No.  I mean, there was, like, speculation or maybe like |
| 11:10AM | 6 | other dancers talked about, like -- |
| 11:10AM | 7 | **THE COURT:**  Hold on. |
| 11:10AM | 8 | **MR. COOPER:**  So, hold on.  I don't want you to get -- |
| 11:10AM | 9 | I'll follow up. |
| 11:10AM | 10 | **THE COURT:**  Okay.  I just want her to stop. |
| 11:10AM | 11 | **MR. COOPER:**  Absolutely. |
| 11:10AM | 12 | **BY MR. COOPER:** |
| 11:10AM | 13 | Q.  So, I'm going to ask some really specific questions, and |
| 11:11AM | 14 | I just want you to give really specific answers.  There's |
| 11:11AM | 15 | nothing wrong that you did, okay? |
| 11:11AM | 16 | A.  Okay. |
| 11:11AM | 17 | Q.  You mentioned that you were aware of some -- what you |
| 11:11AM | 18 | called speculation; is that right? |
| 11:11AM | 19 | A.  Yeah. |
| 11:11AM | 20 | Q.  Okay.  Without getting into who said what to you, I want |
| 11:11AM | 21 | to know what was in your mind.  What were you -- what was the |
| 11:11AM | 22 | speculation that you were aware of? |
| 11:11AM | 23 | **MR. SOEHNLEIN:**  Objection. |
| 11:11AM | 24 | **THE COURT:**  Sustained. |
| 11:11AM | 25 | **MR. COOPER:**  Judge, can we come up on it? |

11:11AM    1    **THE COURT:**  Sure.

11:11AM    2         (Sidebar discussion held on the record.)

11:11AM    3    **MR. COOPER:**  I'm just going to wait for --

11:11AM    4    **THE COURT:**  Go ahead.

11:11AM    5    **MR. COOPER:**  So the reason that I'm asking to come up

11:11AM    6    on this is because I think I'm not offering this as reputation

11:11AM    7    evidence, I'm offering it as state of mind.  So the question

11:11AM    8    has been premised as at the time that you went upstairs and

11:11AM    9    this directive or opportunity or whatever is posed to you, to

11:11AM    10   have sex with this man, what does she know about this

11:11AM    11   defendant.

11:11AM    12        I have to prove coercion in this case.  So, if she

11:12AM    13   uses the word speculation as a layperson, I don't care how she

11:12AM    14   qualifies it.  I'm trying to get at what's in her head, which

11:12AM    15   is relevant.

11:12AM    16   **THE COURT:**  You can't ask what speculation is.  You

11:12AM    17   can ask her what she thought about his family's position in

11:12AM    18   the community, you can ask that.

11:12AM    19   **MR. COOPER:**  Okay.  So what she believed.

11:12AM    20   **THE COURT:**  You can't ask speculation what she.

11:12AM    21        (Simultaneous talking.)

11:12AM    22   **MR. COOPER:**  I'll fix the form of the question, I

11:12AM    23   missed that.

11:12AM    24   **THE COURT:**  You can object.

11:12AM    25   **MR. SOEHNLEIN:**  And I'm still going to, on a 403

11:12AM   1   basis, because there's --

11:12AM   2        THE COURT:  It's going to depend on how the questions

11:12AM   3   are asked and, you know, and I'll consider it.

11:12AM   4        Go ahead, finish.

11:12AM   5        MR. SOEHNLEIN:  No, it sounds like you're going to go

11:12AM   6   question by question --

11:12AM   7        THE COURT:  Yes.

11:12AM   8        MR. SOEHNLEIN:  -- regardless, so maybe we just

11:12AM   9   handle it question by question.

11:12AM  10        MR. COOPER:  Okay.

11:12AM  11        (End of sidebar discussion.)

11:12AM  12        BY MR. COOPER:

11:12AM  13   Q.  All right.  So, we're going to proceed again with me

11:12AM  14   asking really specific questions.  And just be careful to

11:12AM  15   only answer exactly what I'm asking you; is that fair?

11:13AM  16   A.  Fair.

11:13AM  17   Q.  Okay.  Without getting into what anybody said, had you

11:13AM  18   heard other people talk about the defendant or his family's

11:13AM  19   reputation in the community?

11:13AM  20        MR. SOEHNLEIN:  Objection, Your Honor.

11:13AM  21        THE WITNESS:  Yes.

11:13AM  22        THE COURT:  No, has she heard.  No, overruled.

11:13AM  23        MR. COOPER:  What was the answer?

11:13AM  24        (The above-requested testimony was then read by the

11:13AM  25   reporter.)

| | | |
|---|---|---|
| 11:13AM | 1 | **THE WITNESS:**  Yes. |
| 11:13AM | 2 | **MR. COOPER:**  Thank you. |
| 11:13AM | 3 | **BY MR. COOPER:** |
| 11:13AM | 4 | Q.  Were those things that you had heard, were they in your |
| 11:13AM | 5 | mind, did you know about them, had you heard them before this |
| 11:13AM | 6 | incident in the upstairs with the man at Pharaoh's? |
| 11:13AM | 7 | A.  That, I don't remember. |
| 11:13AM | 8 | Q.  Okay.  Do you recall who you heard talking -- don't say |
| 11:13AM | 9 | what they said -- but do you recall who you heard talking |
| 11:13AM | 10 | about those things? |
| 11:13AM | 11 | **MR. SOEHNLEIN:**  Objection. |
| 11:13AM | 12 | **THE COURT:**  Overruled. |
| 11:13AM | 13 | **THE WITNESS:**  No. |
| 11:13AM | 14 | **BY MR. COOPER:** |
| 11:13AM | 15 | Q.  Do you recall where you were when you heard it? |
| 11:13AM | 16 | A.  No. |
| 11:13AM | 17 | Q.  Okay. |
| 11:13AM | 18 | **MR. COOPER:**  Just one second, please. |
| 11:14AM | 19 | **THE COURT:**  Yep. |
| 11:14AM | 20 | **BY MR. COOPER:** |
| 11:14AM | 21 | Q.  At some point while you worked at Pharaoh's, I understand |
| 11:14AM | 22 | you can't put a day or a date on it, at some point while you |
| 11:14AM | 23 | worked at Pharaoh's did you become aware of what the |
| 11:14AM | 24 | defendant or his family's reputation was in the community? |
| 11:15AM | 25 | **MR. SOEHNLEIN:**  Objection. |

| | | |
|---|---|---|
| 11:15AM | 1 | **THE COURT:** Did she become aware. No, overruled. |
| 11:15AM | 2 | **BY MR. COOPER:** |
| 11:15AM | 3 | Q. While you were working at Pharaoh's? |
| 11:15AM | 4 | A. Yes. |
| 11:15AM | 5 | Q. Okay. This is actually a good segue here. |
| 11:15AM | 6 | After the arrest by the Amherst Police Department, were |
| 11:15AM | 7 | you able to continue working at Pharaoh's for a while after |
| 11:15AM | 8 | that? |
| 11:15AM | 9 | A. Brief period of time. |
| 11:15AM | 10 | Q. Can you explain to the jury why it was a brief period of |
| 11:15AM | 11 | time? What happened? |
| 11:15AM | 12 | A. Brandon, he was the DJ, had told K.L. and I when we came |
| 11:15AM | 13 | back to work after the arrest that if anything so much as a |
| 11:15AM | 14 | Tic Tac fell out of our pocket, that we would be fired. |
| 11:15AM | 15 | Q. Now, as you sit here today, do you know if Brandon got |
| 11:15AM | 16 | that directive from this defendant to tell you that? |
| 11:15AM | 17 | A. I don't know that. I assume so. |
| 11:15AM | 18 | **MR. SOEHNLEIN:** Objection. |
| 11:15AM | 19 | **MR. COOPER:** Does she know?, is the question. |
| 11:15AM | 20 | **THE COURT:** Overruled. |
| 11:15AM | 21 | **THE WITNESS:** I don't know. |
| 11:15AM | 22 | **BY MR. COOPER:** |
| 11:15AM | 23 | Q. Okay. Before receiving that directive, that if so much |
| 11:16AM | 24 | as a Tic Tac falls out of your pocket you're out of here, had |
| 11:16AM | 25 | you been using drugs regularly with the owner of the club? |

USA v Gerace - G.R. - Cooper/Direct - 11/13/24
71

11:16AM  1   A.  Yes.

11:16AM  2   Q.  Did he ever say, hey, you're fired for using drugs?

11:16AM  3   A.  No.

11:16AM  4   Q.  Okay.  Was it the arrest that changed things?

11:16AM  5   A.  Yes, I think so.

11:16AM  6   Q.  The night that you were arrested, did you speak with law

11:16AM  7   enforcement?

11:16AM  8   A.  Yes.

11:16AM  9   Q.  Did you tell them things about this defendant?

11:16AM  10  A.  Yes.

11:16AM  11  Q.  Do you know if he found out about that?

11:16AM  12  A.  I don't know.

11:16AM  13  Q.  Shortly after Brandon Carr makes those statements to you,

11:16AM  14  do you get essentially kind of forced out of Pharaoh's?

11:16AM  15  A.  Yes.

11:16AM  16  Q.  Can you describe that for the jury?

11:16AM  17  A.  Just became an unsavory work environment.  It was -- I

11:16AM  18  don't know.  It was just hard to work there.  And I ended up

11:16AM  19  going back to Rick's Tally-Ho for a little bit.

11:16AM  20  Q.  Okay.  That arrest happened.  Is it -- was that arrest in

11:17AM  21  August of 2009?

11:17AM  22  A.  I believe so, yes.

11:17AM  23  Q.  Okay.  And the timeframe that we've talked about, when

11:17AM  24  you leave, is it shortly after that?

11:17AM  25  A.  Yes.

11:17AM   1   Q.   Okay.  So when I ask you about becoming aware of the

11:17AM   2   defendant or his family's reputation in that community, would

11:17AM   3   that be during that same timeframe with the spiralling drug

11:17AM   4   addiction in the summer of 2009?

11:17AM   5   A.   At some point, yes.

11:17AM   6   Q.   Okay.  Would it be fair to say it's either then or before

11:17AM   7   then when you're working there dating back to '06?

11:17AM   8   A.   It's fair to say that, yes.

11:17AM   9          **MR. COOPER:**  Judge, I think we should come up before

11:17AM   10   I go further.

11:17AM   11          **THE COURT:**  Sure, come on up.

11:17AM   12          (Sidebar discussion held on the record.)

11:17AM   13          **MR. COOPER:**  So I think we got there eventually with

11:18AM   14   the timeframe.

11:18AM   15          **THE COURT:**  Okay.

11:18AM   16          **MR. COOPER:**  And so now I think with the timeframe

11:18AM   17   laid, the argument that I made to you earlier about the

11:18AM   18   operative, what -- what's important to me is what's operating

11:18AM   19   in the person's mind at the time.  And so, my inten -- I just

11:18AM   20   want to be up front, my intention is to essentially re-ask

11:18AM   21   what I asked earlier, but switch out that word "speculation"

11:18AM   22   for did you know -- did you have a belief about -- what was

11:18AM   23   the belief that you had about him or his family's reputation.

11:18AM   24          **THE COURT:**  About his reputation?  No.

11:18AM   25          Because with reputation, reputation can be true or it

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

73

| | | |
|---|---|---|
| 11:18AM | 1 | can be false.  She said it was speculation.  So if it's in her |
| 11:18AM | 2 | head that his family was involved in Italian Organized Crime, |
| 11:18AM | 3 | that's one thing.  If it's in her head that there's |
| 11:18AM | 4 | speculation that his family was involved in organized crime, |
| 11:18AM | 5 | that's entirely -- |
| 11:18AM | 6 | **MR. COOPER:**  Hold on.  May I push back on that |
| 11:18AM | 7 | respectfully a little bit? |
| 11:18AM | 8 | **THE COURT:**  Go ahead. |
| 11:19AM | 9 | **MR. COOPER:**  I think that to use, like, a totally |
| 11:19AM | 10 | divorced analogy from this, if somebody showed up at a small |
| 11:19AM | 11 | business owner -- at a small business owner's business and |
| 11:19AM | 12 | say, hey, I want you to buy my window washing, or whatever, |
| 11:19AM | 13 | you know -- something, and the small business owner believes |
| 11:19AM | 14 | that that person may have a reputation for being in Italian |
| 11:19AM | 15 | Organized Crime, or being related to an -- |
| 11:19AM | 16 | **THE COURT:**  Or even reputation?  No. |
| 11:19AM | 17 | **MR. COOPER:**  May. |
| 11:19AM | 18 | **THE COURT:**  Not may, no. |
| 11:19AM | 19 | **MR. COOPER:**  May I finish the -- |
| 11:19AM | 20 | **THE COURT:**  Go ahead. |
| 11:19AM | 21 | **MR. COOPER:**  May have a reputation for being in, just |
| 11:19AM | 22 | using my -- I'm trying to, like, analyze that, I would think |
| 11:19AM | 23 | that would weigh on the person's mind about, like, hey, how do |
| 11:19AM | 24 | I handle the situation?  If you don't, whether you know for |
| 11:19AM | 25 | sure or not, if you heard that -- |

11:19AM    1          THE COURT:  I'm not saying she's got to know for

11:19AM    2    sure.  I'm not saying that.  What I'm saying is she's got to

11:19AM    3    have a reason to believe that it -- that it is or might be

11:19AM    4    true.

11:19AM    5          MR. TRIPI:  Did people make comments to you about his

11:19AM    6    family?  Yes or no.

11:19AM    7          Did you hear a number of those comments?  Yes, I did.

11:19AM    8          Based on the comments that you heard, did you form a

11:19AM    9    belief in your mind?  I think that's okay.

11:20AM   10          THE COURT:  Yeah, great.  I think that's fine.

11:20AM   11          MR. SOEHNLEIN:  But that's not her testimony.

11:20AM   12          THE COURT:  I understand.

11:20AM   13          MR. COOPER:  I'm going to ask more questions.

11:20AM   14          MR. SOEHNLEIN:  But we've already asked those

11:20AM   15    questions.  We've spent the last 15 minutes talking, going

11:20AM   16    around and around.

11:20AM   17          THE COURT:  He can try again.  He can try again.

11:20AM   18          (End of sidebar discussion.)

11:20AM   19          MR. COOPER:  Can I just have one more second, Judge?

11:20AM   20          THE COURT:  Yes.

11:21AM   21          MR. COOPER:  Thank you.

11:21AM   22          BY MR. COOPER:

11:21AM   23    Q.  Just a couple more slightly different questions.

11:21AM   24        During the time that you worked at Pharaoh's, from '06 to

11:21AM   25    '09, did people make comments to you or in front of you about

| | | |
|---|---|---|
| 11:21AM | 1 | the defendant's family? |
| 11:21AM | 2 | A.  I don't remember. |
| 11:21AM | 3 | Q.  Okay.  So, did people make comments to you about the |
| 11:21AM | 4 | defendant's -- withdrawn. |
| 11:21AM | 5 | Let me -- during the time that you worked at Pharaoh's, |
| 11:21AM | 6 | had you heard things about the defendant or his family that |
| 11:21AM | 7 | caused you to form a belief in your head? |
| 11:21AM | 8 | A.  Yes. |
| 11:21AM | 9 | Q.  What was the belief that you formed in your head? |
| 11:21AM | 10 | A.  I don't know, that Peter was a connected person.  I knew |
| 11:21AM | 11 | he was on -- it was my understanding that he was on parole or |
| 11:21AM | 12 | something.  He just spent time in federal prison maybe. |
| 11:22AM | 13 | Q.  When you say connected -- |
| 11:22AM | 14 | **MR. SOEHNLEIN:**  Object.  Can we come up, Your Honor? |
| 11:22AM | 15 | **THE COURT:**  Sure. |
| 11:22AM | 16 | (Sidebar discussion held on the record.) |
| 11:22AM | 17 | **MR. SOEHNLEIN:**  They've tried four times now with |
| 11:22AM | 18 | this.  All right?  She has not given them any basis for any |
| 11:22AM | 19 | foundation of reputation, and they keep asking questions. |
| 11:22AM | 20 | **THE COURT:**  She just said she thought he was a |
| 11:22AM | 21 | connected person, so ask -- |
| 11:22AM | 22 | **MR. COOPER:**  That's the next question. |
| 11:22AM | 23 | **THE COURT:**  He can certainly ask what that means. |
| 11:22AM | 24 | **MR. FOTI:**  I also, it's a real problem now that she |
| 11:22AM | 25 | just said he went to federal prison.  That's -- |

11:22AM 1      THE COURT:  I'll strike that.

11:22AM 2      MR. FOTI:  It's -- this is -- that's part of the

11:22AM 3  problem where they continue to ask these questions.

11:22AM 4      THE COURT:  No, it's not.  No, it's not.  No, it's

11:22AM 5  not.

11:22AM 6      The federal prison had nothing to do with anything.

11:22AM 7  She just volunteered it.  You can't stop a witness from

11:22AM 8  volunteering.  They have nothing to do with the reputation

11:22AM 9  questions that were being asked.  So the government didn't do

11:22AM 10  anything wrong in that regard.

11:22AM 11      So we'll strike the federal prison, and we'll tell

11:22AM 12  the jury they're not to consider the testimony about whether

11:23AM 13  he was in federal prison or not.  We don't know that.  The

11:23AM 14  witness said she had heard it.  And I will tell them to strike

11:23AM 15  that.  And --

11:23AM 16      MR. COOPER:  I'll follow up on it.

11:23AM 17      THE COURT:  -- you can ask the next question as what

11:23AM 18  she meant by connected.

11:23AM 19      MR. FOTI:  At this --

11:23AM 20      THE COURT:  Go ahead.

11:23AM 21      MR. FOTI:  -- at this point, even if the government

11:23AM 22  didn't intentionally elicit, I won't move for prejudice, I

11:23AM 23  would move for a mistrial based on that.

11:23AM 24      I don't believe a curative instruction can strike it

11:23AM 25  from the mind of the jurors that this -- this -- that the

| | | |
|---|---|---|
| 11:23AM | 1 | defendant's been -- |
| 11:23AM | 2 | **THE COURT:** That this -- |
| 11:23AM | 3 | **MR. FOTI:** -- in federal prison. |
| 11:23AM | 4 | **THE COURT:** -- that this witness heard that defendant |
| 11:23AM | 5 | was in federal prison. Is that what she said? |
| 11:23AM | 6 | She said -- just spent time in federal prison maybe. |
| 11:23AM | 7 | **MR. COOPER:** Judge, it's not even close to manifest |
| 11:23AM | 8 | necessity. |
| 11:23AM | 9 | **THE COURT:** Denied. The motion for a mistrial is |
| 11:24AM | 10 | denied. Let's go. |
| 11:24AM | 11 | (End of sidebar discussion.) |
| 11:24AM | 12 | **THE COURT:** Okay. Folks, the witness said: He just |
| 11:24AM | 13 | spent time in federal prison maybe. |
| 11:24AM | 14 | I'm going to strike that. |
| 11:24AM | 15 | We don't know whether he spent time in federal |
| 11:24AM | 16 | prison, whether he didn't spend time in federal prison. This |
| 11:24AM | 17 | is the witness's speculation, and you're not to consider |
| 11:24AM | 18 | whether or not he spent time in federal prison in any way |
| 11:24AM | 19 | because we don't know that. And the witness doesn't know |
| 11:24AM | 20 | that, she said maybe. |
| 11:24AM | 21 | And so that's to be stricken. Next question. |
| 11:24AM | 22 | **BY MR. COOPER:** |
| 11:24AM | 23 | Q. So in the previous answer -- |
| 11:24AM | 24 | **MR. COOPER:** Can I get a read-back up to the point of |
| 11:24AM | 25 | what the judge just struck and the answer, Ann? I'm sorry. |

| | | |
|---|---|---|
| 11:24AM | 1 | **THE REPORTER:**  Sure. |
| 11:24AM | 2 | **MR. COOPER:**  Thank you. |
| 11:24AM | 3 | (The above-requested testimony was then read by the |
| 11:24AM | 4 | reporter.) |
| 11:24AM | 5 | **THE COURT:**  Right there. |
| 11:24AM | 6 | **MR. COOPER:**  Yep, thank you. |
| 11:24AM | 7 | **BY MR. COOPER:** |
| 11:24AM | 8 | Q.  When you say the word "connected," what do you mean? |
| 11:25AM | 9 | A.  Sounds crazy now, but, like, he had mob ties. |
| 11:25AM | 10 | Q.  Okay.  All right.  And then I just want to finish a few |
| 11:25AM | 11 | more questions about upstairs there. |
| 11:25AM | 12 | When the defendant directed you to go to the bathroom and |
| 11:25AM | 13 | hook up with his friend, did you understand that as have sex? |
| 11:25AM | 14 | A.  Yes. |
| 11:25AM | 15 | Q.  Okay.  Again, I apologize for the personal nature of the |
| 11:25AM | 16 | question, did the man wear a condom? |
| 11:25AM | 17 | A.  Yes. |
| 11:25AM | 18 | Q.  Do you know what that man's status or his connection to |
| 11:26AM | 19 | Peter was? |
| 11:26AM | 20 | A.  No.  I thought he came from a family that had money. |
| 11:26AM | 21 | Q.  Earlier when we were talking about K.L. at the hotel room |
| 11:26AM | 22 | having a seizure, you said they had -- they had partied all |
| 11:26AM | 23 | night.  When you say "partied," what do you mean by that? |
| 11:26AM | 24 | A.  They were drinking and doing cocaine. |
| 11:26AM | 25 | Q.  After you came to get K.L., did you see what the |

11:26AM  1  defendant did?

11:26AM  2  A.  What do you mean?

11:26AM  3  Q.  Do you remember if he stayed or left?

11:26AM  4  A.  No, he stayed in the hotel room.

11:27AM  5  Q.  Okay.

11:27AM  6        **MR. COOPER:**  One second, Judge.

11:27AM  7        No further direct, Judge.  Thank you.

11:27AM  8        **THE COURT:**  Okay.  We're going to take our break now.

11:27AM  9        Please remember my instructions about not

11:27AM  10  communicating about the case including with each other, and

11:27AM  11  not making up your mind.

11:27AM  12        See you back here in about ten or 15 minutes.

11:27AM  13        (Jury excused at 11:27 a.m.)

11:27AM  14        **THE COURT:**  Ma'am, I want to tell you --

11:27AM  15        **MR. COOPER:**  Hang on one second for me.

11:27AM  16        **THE COURT:**  Go ahead, you guys can leave.

11:28AM  17        Ma'am, I just want to tell you, don't talk to anybody

11:28AM  18  about your testimony during the break.  Okay?  That's all.

11:28AM  19        **THE WITNESS:**  Okay.

11:28AM  20        **THE COURT:**  Okay.  Thank you.

11:28AM  21        (Witness excused at 11:28 a.m.)

11:28AM  22        **THE COURT:**  Okay.  Mr. Soehnlein, Mr. Foti, if you

11:28AM  23  want to make more of a record, you're welcome to now.

11:28AM  24        **MR. FOTI:**  Judge, I -- I think I made the motion, it

11:28AM  25  was denied.  I think if there's an issue, I believe we

11:28AM   1   preserved it.  I just, I believe -- sensitive to all the

11:28AM   2   issues that are really collateral to the elements of this

11:28AM   3   offense, and we obviously dealt with it, and went to

11:28AM   4   painstaking efforts to try to navigate past those as much as

11:28AM   5   possible during jury selection.

11:28AM   6        We're aware that there's things that were reported on

11:28AM   7   in the news that could impact people's perception of

11:28AM   8   Mr. Gerace in this case.  I think we did a good job during

11:29AM   9   jury selection.

11:29AM   10       But any time something comes out from a witness that

11:29AM   11  goes beyond what the -- what was expected in terms of evidence

11:29AM   12  that has some bearing on Mr. Gerace and the perception the

11:29AM   13  jury has of Mr. Gerace in a prejudicial manner such as I

11:29AM   14  formed an opinion because in part I heard that he might have

11:29AM   15  went to federal prison, I don't think that that is repairable.

11:29AM   16  So I made the motion for a mistrial.  I understand it's been

11:29AM   17  denied.  But that was the reason for it.

11:29AM   18       And I know it's only one instance, and there was a

11:29AM   19  curative instruction, but I think it's important that we

11:29AM   20  express our opinion when this testimony comes out, and we'll

11:29AM   21  probably continue to do so if it happens again at some point.

11:29AM   22           **THE COURT:**  Of course.

11:29AM   23           **MR. COOPER:**  Judge, if I --

11:29AM   24           **THE COURT:**  Yeah, go ahead.

11:29AM   25           **MR. COOPER:**  I understand you ruled on it, but I want

11:29AM   1   to make a record as well.

11:29AM   2            **THE COURT:**  Yeah, go ahead.

11:29AM   3            **MR. COOPER:**  First of all, it wasn't directly

11:29AM   4   responsive to the question -- while it may have been

11:29AM   5   responsive to the question, it wasn't what anybody was

11:29AM   6   intending to ask about.

11:30AM   7            I think the curative instruction is more than

11:30AM   8   sufficient, especially in a case like this one where there's

11:30AM   9   already been testimony from a federal probation officer about

11:30AM  10   the defendant being on supervision.  I think it's -- I'm not

11:30AM  11   saying it's the same thing, but it's all viewed on a spectrum.

11:30AM  12   And in this case, the jury has proof that you're already

11:30AM  13   letting in.  So I don't think that the harm is -- is that

11:30AM  14   significant.

11:30AM  15            Additionally, I would say that I chose to just walk

11:30AM  16   away from it because I'm satisfied with the testimony I got,

11:30AM  17   but I think that there are legitimate arguments under 403 for

11:30AM  18   that coming in because of how it weighs on her perception of

11:30AM  19   whether she's -- has to do what's pitched out there.  Knowing

11:30AM  20   someone has been to federal prison is scary, that's why she

11:30AM  21   said it.

11:30AM  22            And so, far from it being testimony worthy of a

11:30AM  23   mistrial, I think I could have and maybe should have argued

11:30AM  24   that the testimony should stand, because it all goes to what

11:30AM  25   was in her head at the time.

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

82

| | | |
|---|---|---|
| 11:30AM | 1 | So we walked away from it.  And I apprec -- I |
| 11:31AM | 2 | understand the Court's ruling.  But I just want to make a |
| 11:31AM | 3 | record that I actually think the testimony could have come in |
| 11:31AM | 4 | under 403 given the nature of the charges and the elements. |
| 11:31AM | 5 | **THE COURT:**  Okay.  I'm not so sure I agree with that. |
| 11:31AM | 6 | What I will say is this.  If the defense wants any |
| 11:31AM | 7 | kind of a further curative instruction, I will give it, but |
| 11:31AM | 8 | the motion for a mistrial is denied. |
| 11:31AM | 9 | **MR. FOTI:**  Understood.  Thank you. |
| 11:31AM | 10 | **THE COURT:**  Thank you, all, very much. |
| 11:31AM | 11 | **MR. SOEHNLEIN:**  Your Honor, I'm sorry, I have one |
| 11:31AM | 12 | more thing. |
| 11:31AM | 13 | **THE COURT:**  Go ahead. |
| 11:31AM | 14 | **MR. SOEHNLEIN:**  So, something unanticipated on |
| 11:31AM | 15 | direct.  And I really didn't think the government would do |
| 11:31AM | 16 | this, but it did. |
| 11:31AM | 17 | In its direct exam, it went through subsequent |
| 11:31AM | 18 | arrests that Ms. G.R. had up and through 2012, and to the |
| 11:31AM | 19 | point where she obtained sobriety. |
| 11:31AM | 20 | One of those arrests that they didn't ask about, you |
| 11:31AM | 21 | recall that they asked about DWIs, DWIs, DWIs.  But the |
| 11:31AM | 22 | ultimate arrest was a prostitution arrest. |
| 11:31AM | 23 | And so I believe that they've opened the door and to |
| 11:31AM | 24 | just the fact that that arrest, which was asked about, was in |
| 11:31AM | 25 | fact for prostitution in 2012. |

11:32AM    1          **MR. COOPER:**  So, I -- elicited on direct examination

11:32AM    2    her history up until the point of sobriety.  I don't believe

11:32AM    3    that asking about earlier arrests or convictions opens the

11:32AM    4    door to a later arrest.  I don't see how asking about a 2011

11:32AM    5    or 2012 DWI arrest automatically opens the door to a 2012

11:32AM    6    prostitution arrest.

11:32AM    7          **THE COURT:**  But why wouldn't -- I mean, you asked

11:32AM    8    about a whole series of arrests.  She says, yes, I got

11:32AM    9    arrested for DWI.  Why can't he ask if one of those arrests,

11:32AM   10    one of the times that she was arrested was for prostitution?

11:32AM   11    What's the basis for --

11:32AM   12          **MR. COOPER:**  What's the --

11:32AM   13          **THE COURT:** -- excluding that?

11:32AM   14          **MR. COOPER:**  -- probative value of it?  I would ask,

11:32AM   15    like --

11:32AM   16          **THE COURT:**  To finish --

11:32AM   17          **MR. COOPER:**  -- other than the prejudicial nature of,

11:32AM   18    like, other than the -- other than using the arrest, which

11:33AM   19    it's not a conviction for prostitution.  Like, under the Rules

11:33AM   20    of Evidence, I don't understand what the -- what would be the

11:33AM   21    probative value?  What material fact at issue in the case does

11:33AM   22    it make more or less likely to have occurred that in 2012

11:33AM   23    something happened when the allegation is about what happened

11:33AM   24    in 2009?  It's just to dirty up the witness.

11:33AM   25          **MS. CHALBECK:**  And I would add, Your Honor, that this

| | | |
|---|---|---|
| 11:33AM | 1 | is the kind of material that Rule 412 generally precludes. |
| 11:33AM | 2 | **THE COURT:** Go ahead, Mr. Soehnlein. |
| 11:33AM | 3 | **MR. SOEHNLEIN:** I'm sorry, except Rule 12 precludes |
| 11:33AM | 4 | it only to the extent that the prosecution doesn't open the |
| 11:33AM | 5 | door to it. |
| 11:33AM | 6 | The prosecution has gone through it, and what they're |
| 11:33AM | 7 | trying show, the reason for their -- the eliciting the |
| 11:33AM | 8 | testimony was to show that she struggled with sobriety through |
| 11:33AM | 9 | all this time, her life slowly got better, and she made this |
| 11:33AM | 10 | great recovery once she was outside of Mr. Gerace's orbit. |
| 11:33AM | 11 | It does not accurately portray what that story line |
| 11:33AM | 12 | actually had. |
| 11:33AM | 13 | And, in fact, when she got to that arrest, Mr. Cooper |
| 11:34AM | 14 | had been asking, okay, that was an arrest for DWI?  That was |
| 11:34AM | 15 | an arrest for DWI?  That was an arrest for DWI? |
| 11:34AM | 16 | When he got to that arrest, he didn't ask the |
| 11:34AM | 17 | question what it was for.  2012. |
| 11:34AM | 18 | **THE COURT:** He asked about that arrest? |
| 11:34AM | 19 | **MR. SOEHNLEIN:** That arrest, she talked about. |
| 11:34AM | 20 | **THE COURT:** Did you ask about that arrest? |
| 11:34AM | 21 | **MR. COOPER:** I asked about did -- I was going through |
| 11:34AM | 22 | chronologically through the timeline, I asked about the |
| 11:34AM | 23 | last -- the last one that I asked about was I think she said |
| 11:34AM | 24 | in January of 2012. |
| 11:34AM | 25 | **THE COURT:** Is that the one? |

11:34AM   1          **MR. SOEHNLEIN:**  That's -- that's the one I --

11:34AM   2          **MR. COOPER:**  It's not.

11:34AM   3          **THE COURT:**  I'm going to let him get into it.

11:34AM   4          **MR. COOPER:**  Hold on.

11:34AM   5          **THE COURT:**  I said I'm going to let him get into it.

11:34AM   6  Mr. Cooper said it's not.  Go ahead.

11:34AM   7          **MR. COOPER:**  So January of 2012 is the DWI arrest I

11:34AM   8  believe.  March of 2012, which is what Mr. Soehnlein's

11:34AM   9  referring to, is prostitution arrest.

11:34AM   10         **THE COURT:**  And you did not ask about that?

11:34AM   11         **MR. COOPER:**  I did not ask about that.  I asked about

11:34AM   12  January 2012, that's what puts her in rehab, that's when she

11:34AM   13  gets sober, and that's what I was working through that line of

11:34AM   14  questioning for is how do we get to where we are today.

11:34AM   15         There's nothing misleading about my questioning.

11:34AM   16         An arrest on its own is probative of nothing.  She

11:35AM   17  wasn't convicted of the prostitution.  This is solely and it's

11:35AM   18  completely divorced in time from the allegations in this case

11:35AM   19  in 2009.  So there's not an open-the-door argument to an

11:35AM   20  arrest here.

11:35AM   21         **THE COURT:**  Can he ask if she still was involved in

11:35AM   22  prostitution in 2012?

11:35AM   23         **MR. COOPER:**  We don't believe there's any relevance.

11:35AM   24  It's what 412 exists to prohibit.  And so if it's completely

11:35AM   25  related in time, the rule says that there are very limited

11:35AM     1    exceptions when it can be permissible.

11:35AM     2         The rule exists to prevent exactly what they're

11:35AM     3    trying to do, which is say, hey, because you acted as a

11:35AM     4    prostitute either much earlier or much later, you must have

11:35AM     5    just been consenting to this conduct that's at issue in this

11:35AM     6    case.

11:35AM     7         That's -- that's the only reason for asking about

11:35AM     8    this, and the rule exists to prohibit that.

11:35AM     9         I didn't open the door to it by asking about an

11:35AM    10    earlier arrest that got her in drug treatment.

11:35AM    11         **MR. SOEHNLEIN:**  Your Honor, the rule has the

11:35AM    12    carve-out that you're allowed to get into that testimony to

11:35AM    13    prevent manifest unfairness to the defendant and to complete

11:35AM    14    the record.

11:35AM    15         Here, what we're trying to do is complete the record.

11:36AM    16         The government chose to go down this road.

11:36AM    17         Mr. Cooper and I had a conversation about it this

11:36AM    18    morning, and he said you don't intend to get into it.

11:36AM    19         I didn't intend to get into it, because I never

11:36AM    20    thought there was any -- any world that existed where they

11:36AM    21    would go down that path and drive right into it.

11:36AM    22         And now that they have, and they've put her life at

11:36AM    23    that point in time at issue --

11:36AM    24         **THE COURT:**  Okay.  So I'm going to think about it.

11:36AM    25    I'm gonna -- I'm gonna -- I'm gonna think about it.  I'm gonna

| | | |
|---|---|---|
| 11:36AM | 1 | take a look at the rule, and I'm gonna think about it. |
| 11:36AM | 2 | Anything else before we break? |
| 11:36AM | 3 | **MR. COOPER:**  No, Judge.  I'd just ask if we need to |
| 11:36AM | 4 | keep arguing it after, that we be given an opportunity to do |
| 11:36AM | 5 | that. |
| 11:36AM | 6 | **THE COURT:**  Yeah -- yeah, I'll listen.  But I'm going |
| 11:36AM | 7 | to think about it now.  Anything more? |
| 11:36AM | 8 | **MR. SOEHNLEIN:**  Nothing else from us, Judge.  Thank |
| 11:36AM | 9 | you. |
| 11:36AM | 10 | **THE COURT:**  Okay. |
| 11:36AM | 11 | **THE CLERK:**  All rise. |
| 11:36AM | 12 | (Off the record at 11:36 a.m.) |
| 11:58AM | 13 | (Back on the record at 11:58 a.m.) |
| 11:58AM | 14 | (Jury not present.) |
| 11:58AM | 15 | **THE CLERK:**  All rise. |
| 11:58AM | 16 | **THE COURT:**  Please be seated. |
| 11:58AM | 17 | **THE CLERK:**  We are back on the record for the |
| 11:58AM | 18 | continuation of the jury trial in case numbers 19-cr-227 and |
| 11:58AM | 19 | 23-cr-37, United States of America versus Peter Gerace, Jr., |
| 11:58AM | 20 | all counsel and parties are present. |
| 11:58AM | 21 | **THE COURT:**  Okay.  So, what concerns me about |
| 11:58AM | 22 | Rule 412 is that it requires a hearing.  And -- obviously |
| 11:58AM | 23 | we're not going to do a hearing in the middle of this trial. |
| 11:58AM | 24 | We've got to put the witness on notice and give her a chance |
| 11:58AM | 25 | to get a lawyer to come in, it looks like.  It's a very |

USA v Gerace - G.R. - Cooper/Direct - 11/13/24

| | | |
|---|---|---|
| 11:58AM | 1 | involved procedure. |
| 11:58AM | 2 | Let me ask you this.  Your concern about the arrest |
| 11:59AM | 3 | in March of -- is it 2012? |
| 11:59AM | 4 | **MR. SOEHNLEIN:**  2012. |
| 11:59AM | 5 | **THE COURT:**  Cutting against the government's |
| 11:59AM | 6 | narrative, why do you need to show that the arrest was for |
| 11:59AM | 7 | prostitution?  Why can't you just simply ask her, you were |
| 11:59AM | 8 | arrested in March of 2012 as well? |
| 11:59AM | 9 | **MR. SOEHNLEIN:**  I think that it does need to be for |
| 11:59AM | 10 | prostitution because the -- what they've gone through is DWI |
| 11:59AM | 11 | arrest, DWI arrest, DWI arrest, which would suggest to the |
| 11:59AM | 12 | jurors that she's just struggling with substance abuse and |
| 11:59AM | 13 | otherwise she's being law abiding.  Otherwise, she's not |
| 11:59AM | 14 | engaging in -- |
| 11:59AM | 15 | **THE COURT:**  But -- but -- but isn't that, doesn't |
| 11:59AM | 16 | that play right into what the government is saying, that the |
| 11:59AM | 17 | fact that it's a prostitution arrest, the only reason you |
| 11:59AM | 18 | could -- you would want to put that in is -- is to show that |
| 11:59AM | 19 | she's got a proclivity to engage in prostitution or that she |
| 11:59AM | 20 | engaged in prostitution after the event, right?  And that's |
| 12:00PM | 21 | exactly what the rule is designed to keep out. |
| 12:00PM | 22 | **MR. SOEHNLEIN:**  The rule is designed to keep that out |
| 12:00PM | 23 | unless it's a manifest prejudice to the defendant. |
| 12:00PM | 24 | **THE COURT:**  Well, I don't see those words in the |
| 12:00PM | 25 | rule.  What am I missing? |

12:00PM   1           MR. SOEHNLEIN:  Isn't the -- and I'm -- I don't have

12:00PM   2   it in front of me, I'm recalling from our earlier motion

12:00PM   3   practice.

12:00PM   4           MR. COOPER:  I have it in front of me, I'll read it.

12:00PM   5   Rule 412 --

12:00PM   6           THE COURT:  You don't have to read the whole thing.

12:00PM   7           MR. COOPER:  The part that -- here are the -- the

12:00PM   8   three exceptions spelled out in the criminal case.

12:00PM   9           A.  Evidence of specific instances of sexual behavior

12:00PM  10   by the alleged victim offered to prove that a person other

12:00PM  11   than the accused was the source of the semen, injury, or other

12:00PM  12   physical evidence.  Obviously inapplicable here.

12:00PM  13           B.  Evidence of specific instances of sexual behavior

12:00PM  14   by the alleged victim with respect to the person accused of

12:00PM  15   the sexual misconduct offered by the accused to prove consent

12:00PM  16   or by the prosecution to rebut.  Does not apply here.

12:01PM  17           C.  Evidence the exclusion of which would violate the

12:01PM  18   constitutional rights of the defendant.  That does not apply

12:01PM  19   here either.  He does not have a constitutional right to dirty

12:01PM  20   up a victim asking about a prostitution arrest three years

12:01PM  21   divorced from the facts that are relevant to the charge in the

12:01PM  22   indictment.  It's just, that's what intention is, and that's

12:01PM  23   what the rule exists to prohibit.

12:01PM  24           THE COURT:  Yeah.  I think, Mr. Soehnlein, you can

12:01PM  25   ask about the arrest, you can't link the arrest to

12:01PM   1    prostitution.  Okay?  So that's what I will allow.

12:01PM   2         **MR. COOPER:**  I'd like for the witness to be advised

12:01PM   3    outside the presence of the jury not to offer up the fact.

12:01PM   4    She's a very candid person, and I expect when the question is

12:01PM   5    posed to her, she may say in her answer.  So I'd ask Your

12:01PM   6    Honor to inform her of your ruling.

12:01PM   7         **MR. SOEHNLEIN:**  I'm sorry, Your Honor, may I ask that

12:01PM   8    the arrest was not a DWI arrest?

12:01PM   9         **THE COURT:**  Yeah.

12:01PM   10        **MR. COOPER:**  What does it matter?  How does that make

12:01PM   11   any material fact at issue in this case more or less to have

12:01PM   12   occurred, or bear on her credibility?  Not at all.

12:02PM   13        **THE COURT:**  Well, it completes the narrative as

12:02PM   14   Mr. Soehnlein says.  So, so the fact that she was arrested,

12:02PM   15   no, I don't think -- I don't think it matters whether it was

12:02PM   16   for DWI or for something else.  So, no, I don't think you can

12:02PM   17   ask that.  But and -- and yeah, I will instruct her --

12:02PM   18        **MR. COOPER:**  Thank you.

12:02PM   19        **THE COURT:**  -- that she -- she should not say that it

12:02PM   20   was for prostitution.

12:02PM   21        **MR. COOPER:**  And for the same reason, and I don't --

12:02PM   22   this has been briefed before Your Honor.

12:02PM   23        The defense filed a notice.  We've never had the

12:02PM   24   hearing, which I think is the party who's intending to offer

12:02PM   25   the evidence is responsible for -- for pushing that forward.

| | | |
|---|---|---|
| 12:02PM | 1 | **THE COURT:**  Of course, Mr. Soehnlein's answer to that |
| 12:02PM | 2 | is he didn't know he was going to do that until your direct. |
| 12:02PM | 3 | **MR. COOPER:**  They opened -- they opened on -- on, I |
| 12:02PM | 4 | believe, this witness engaging in -- in other commercial |
| 12:02PM | 5 | sexual activity after the incident described at Pharaoh's. |
| 12:02PM | 6 | **MR. SOEHNLEIN:**  And Your Honor ruled that if it's |
| 12:02PM | 7 | while she's working at Pharaoh's, then inside, outside, we're |
| 12:03PM | 8 | allowed to ask about it.  And that's what we intend to ask |
| 12:03PM | 9 | about. |
| 12:03PM | 10 | **MR. COOPER:**  Okay. |
| 12:03PM | 11 | **THE COURT:**  Yeah, but that's not-- |
| 12:03PM | 12 | **MR. COOPER:**  Separate from this.  Okay. |
| 12:03PM | 13 | **THE COURT:**  Okay. |
| 12:03PM | 14 | **MR. COOPER:**  All right. |
| 12:03PM | 15 | **THE COURT:**  Okay.  Let's get her back. |
| 12:03PM | 16 | Anything else from the government? |
| 12:03PM | 17 | **MR. COOPER:**  No. |
| 12:03PM | 18 | **THE COURT:**  Anything else from the defense? |
| 12:03PM | 19 | **MR. SOEHNLEIN:**  No, Judge. |
| 12:03PM | 20 | **THE COURT:**  Okay.  We'll go for about an hour. |
| 12:03PM | 21 | I have something that's supposed to be at 12:30? |
| 12:03PM | 22 | **THE CLERK:**  Yes, Judge. |
| 12:03PM | 23 | **THE COURT:**  Okay.  We'll have them wait. |
| 12:03PM | 24 | **THE CLERK:**  Yep. |
| 12:03PM | 25 | **THE COURT:**  So we'll go for about an hour.  And then |

| | | |
|---|---|---|
| 12:03PM | 1 | we'll break for lunch at 1.  Can you let them know -- |
| 12:03PM | 2 | **THE CLERK:**  I will send an email, Judge. |
| 12:03PM | 3 | **THE COURT:**  -- that we'll break at 1? |
| 12:03PM | 4 | Let's bring them in please, Pat. |
| 12:03PM | 5 | **MR. COOPER:**  Can we wait, Judge, to just instruct the |
| 12:03PM | 6 | witness? |
| 12:03PM | 7 | **THE COURT:**  Oh, I'm sorry, yes. |
| 12:03PM | 8 | Yeah, let's get the witness in first.  Yes, thank |
| 12:03PM | 9 | you, Mr. Cooper. |
| 12:03PM | 10 | (Witness seated at 12:03 p.m.  No jury present.) |
| 12:03PM | 11 | **THE COURT:**  Okay.  Ma'am, you're going to be asked |
| 12:03PM | 12 | about -- on cross-examination you may be asked about an arrest |
| 12:03PM | 13 | you had in March of 2012.  You're not to say what that arrest |
| 12:04PM | 14 | was for. |
| 12:04PM | 15 | **THE WITNESS:**  Okay. |
| 12:04PM | 16 | **THE COURT:**  You're not to say the crime that you were |
| 12:04PM | 17 | arrested for.  Okay? |
| 12:04PM | 18 | **THE WITNESS:**  All right. |
| 12:04PM | 19 | **THE COURT:**  Okay.  Let's bring them in, please. |
| 12:04PM | 20 | **MR. COOPER:**  Do you understand that? |
| 12:04PM | 21 | **THE WITNESS:**  Yes, I understand. |
| 12:04PM | 22 | **MR. COOPER:**  Stay standing until they come in, then |
| 12:05PM | 23 | you can sit down.  Okay? |
| 12:05PM | 24 | (Jury seated at 12:05 p.m.) |
| 12:05PM | 25 | **THE COURT:**  The record will reflect that all our |

12:06PM    1    jurors are, again, present.

12:06PM    2            I remind the witness that she's still under oath.

12:06PM    3            And you may begin your cross-examination.

12:06PM    4            **MR. SOEHNLEIN:**  Thank you, Your Honor.

12:06PM    5

12:06PM    6            **CROSS-EXAMINATION BY MR. SOEHNLEIN:**

12:06PM    7    Q.  Good afternoon.

12:06PM    8    A.  Good afternoon.

12:06PM    9    Q.  We've never met before?

12:06PM   10    A.  No.

12:06PM   11    Q.  My name is Eric Soehnlein, I represent Peter Gerace.

12:06PM   12        I'm going to ask you a couple questions to follow up on

12:06PM   13    your direct exam from this morning.  If you don't understand

12:06PM   14    my questions, just let me know, okay?

12:06PM   15    A.  Okay.

12:06PM   16    Q.  Otherwise, if you don't say that, I'll assume that you

12:06PM   17    understood them; is that fair?

12:06PM   18    A.  Fair.

12:06PM   19    Q.  Okay.  Very good.

12:06PM   20        What did you do to get ready to testify?

12:06PM   21    A.  What do you mean?

12:06PM   22    Q.  Well, did you review any documents before your testimony

12:06PM   23    today?

12:06PM   24    A.  Yes.

12:06PM   25    Q.  Okay.  And what did you review?

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24
94

| | | |
|---|---|---|
| 12:06PM | 1 | A. Questions that I was asked. |
| 12:07PM | 2 | Q. Okay. And this was a hard paper copy document? |
| 12:07PM | 3 | A. Yes. |
| 12:07PM | 4 | Q. Okay. And who gave that to you? |
| 12:07PM | 5 | A. The gentleman there. |
| 12:07PM | 6 | Q. The gentlemen there, is that Mr. Cooper? |
| 12:07PM | 7 | A. Yes. |
| 12:07PM | 8 | Q. Okay. Yeah. And you reviewed those questions? |
| 12:07PM | 9 | A. Yeah. |
| 12:07PM | 10 | Q. Whatever they were? |
| 12:07PM | 11 | A. Yeah. |
| 12:07PM | 12 | Q. Okay. How long did you spend reviewing those questions? |
| 12:07PM | 13 | A. This morning? |
| 12:07PM | 14 | Q. Yeah. |
| 12:07PM | 15 | A. Actually, not really at all, maybe five minutes. |
| 12:07PM | 16 | Q. Okay. |
| 12:07PM | 17 | A. Not even. |
| 12:07PM | 18 | Q. And had he given you that before this morning? |
| 12:07PM | 19 | A. Yes. |
| 12:07PM | 20 | Q. Okay. And when did he give you that prior to this |
| 12:07PM | 21 | morning? |
| 12:07PM | 22 | A. Are you -- I'm sorry, I'm not understanding the question. |
| 12:07PM | 23 | Do you mean did he hand me a document to take home? Or |
| 12:07PM | 24 | did he -- are you asking me if I've reviewed the questions |
| 12:07PM | 25 | before today? |

| | | |
|---|---|---|
| 12:07PM | 1 | Q.  Well, let's do -- let's do it both. |
| 12:07PM | 2 | Did he give you any documents to take home? |
| 12:07PM | 3 | A.  No. |
| 12:07PM | 4 | Q.  Okay.  Did you review the questions before today? |
| 12:07PM | 5 | A.  Yes. |
| 12:07PM | 6 | Q.  And you did that this morning? |
| 12:07PM | 7 | A.  Very briefly. |
| 12:08PM | 8 | Q.  Okay. |
| 12:08PM | 9 | A.  Yep. |
| 12:08PM | 10 | Q.  And did he do that at any other times? |
| 12:08PM | 11 | A.  Yes. |
| 12:08PM | 12 | Q.  Okay.  And when did you do that? |
| 12:08PM | 13 | A.  Maybe twice before. |
| 12:08PM | 14 | Q.  Okay.  When -- when was the first time that you did that? |
| 12:08PM | 15 | A.  I think it was after I did the grand jury testimony.  It |
| 12:08PM | 16 | was a questions from that, that's what we reviewed. |
| 12:08PM | 17 | Q.  Okay.  And on the topic of the grand jury testimony, that |
| 12:08PM | 18 | was a proceeding in a room with -- do you recall which |
| 12:08PM | 19 | prosecutor you were with in the grand jury? |
| 12:08PM | 20 | A.  I thought it was -- |
| 12:08PM | 21 | **MR. COOPER:**  Objection to relevance.  What does it |
| 12:08PM | 22 | matter which prosecutor? |
| 12:08PM | 23 | **THE COURT:**  Overruled. |
| 12:08PM | 24 | **THE WITNESS:**  I think it was Joseph Tripi.  I think. |
| 12:08PM | 25 | **BY MR. SOEHNLEIN:** |

12:08PM    1    Q.  Okay.  Mr. Tripi sitting here in the tie?

12:08PM    2    A.  Oh, yeah, sorry.  Sorry.

12:08PM    3    Q.  It was Mr. Tripi, correct?

12:08PM    4    A.  Yeah, he had shorter hair, though.  I don't know why I

12:08PM    5    didn't --

12:08PM    6         **MR. TRIPI:**  Probably less gray, too.

12:09PM    7         **MR. SOEHNLEIN:**  He looks good with long hair.

12:09PM    8         **THE WITNESS:**  He does.

12:09PM    9         **MR. SOEHNLEIN:**  Longer hair.

12:09PM   10         **THE WITNESS:**  He does.

12:09PM   11         **BY MR. SOEHNLEIN:**

12:09PM   12    Q.  So, you met -- you met two times to review the questions

12:09PM   13    and -- and then you met with Mr. Cooper this morning, fair?

12:09PM   14    A.  Yeah, fair.

12:09PM   15    Q.  Okay.  Yeah.  Any other preparation that you did for this

12:09PM   16    testimony?

12:09PM   17    A.  No, just reviewing the questions.

12:09PM   18    Q.  Okay.  I'm gonna ask you some questions, and again, I

12:09PM   19    apologize, I know we're gonna go through some points in your

12:09PM   20    life that are in the past, right?

12:09PM   21    A.  Right.

12:09PM   22    Q.  Sometimes the very distant past, right?

12:09PM   23    A.  Right.

12:09PM   24    Q.  And matters that you put behind you, right?

12:09PM   25    A.  Right.

12:09PM 1   Q.  But I have a job to ask you some questions about those

12:09PM 2   things, you understand that?

12:09PM 3   A.  I understand.

12:09PM 4   Q.  Okay.  On direct exam, Mr. Cooper asked you some

12:10PM 5   questions about the start of your drug use, and the start of

12:10PM 6   your drinking; do you recall those questions?

12:10PM 7   A.  Yes.

12:10PM 8   Q.  Okay.  And I think that you said that at the end of your

12:10PM 9   teenage years, you had been to some sort of rehab program; is

12:10PM 10  that accurate?

12:10PM 11  A.  Correct.

12:10PM 12  Q.  Okay.  That was before the point in time that you had

12:10PM 13  gone to work at Pharaoh's, correct?

12:10PM 14  A.  Yes.

12:10PM 15  Q.  And before the time that you had went to work at strip

12:10PM 16  clubs, correct?

12:10PM 17  A.  No, I was already working in a strip club, when I -- I

12:10PM 18  was working at Mademoiselle's and then I went to the rehab.

12:10PM 19  Q.  Okay.  When you're in the rehab, did you -- did you

12:10PM 20  receive training about how to make smart decisions with

12:10PM 21  respect to drugs and alcohol?

12:10PM 22  A.  To be honest with you, I don't recall at all.

12:10PM 23  Q.  Okay.  The rehab, how long was it?

12:10PM 24  A.  28 days.

12:10PM 25  Q.  Okay.  And where was it?

12:10PM    1    A.   ECMC.

12:10PM    2    Q.   Okay.  Were you inpatient for that?

12:10PM    3    A.   Yes.

12:10PM    4    Q.   That's a pretty intense program, correct?

12:10PM    5    A.   Yeah.

12:10PM    6    Q.   Yeah.  And your friends and family were generally

12:11PM    7    supportive of that, correct?

12:11PM    8    A.   Yes.

12:11PM    9    Q.   Yeah.  You had relationships with your friends and your

12:11PM   10    family at that point in time?

12:11PM   11    A.   Yes.

12:11PM   12    Q.   Supportive relationships, correct?

12:11PM   13    A.   Yeah.

12:11PM   14    Q.   Okay.  And -- and they wanted you to succeed and stay

12:11PM   15    sober, correct?

12:11PM   16    A.   Yes.

12:11PM   17    Q.   You wanted to succeed and stay sober --

12:11PM   18    A.   Yes.

12:11PM   19    Q.   -- correct?

12:11PM   20         And you understood that in order to do that, you had to

12:11PM   21    make healthy choices, correct?

12:11PM   22    A.   Sure, yes.

12:11PM   23    Q.   Smart decision making, correct?

12:11PM   24    A.   Right.

12:11PM   25    Q.   Okay.  Now, before you had worked at Pharaoh's, you had

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

99

<br>

12:11PM  1    been working at, I think you said two other strip clubs,

12:11PM  2    correct?

12:11PM  3    A.  Yes.

12:11PM  4    Q.  Okay.  So fair to say when you applied for a position at

12:11PM  5    Pharaoh's, you understood generally what the job entailed,

12:11PM  6    correct?

12:11PM  7    A.  Yes.

12:11PM  8    Q.  Yeah.  It entails talking to patrons, right?

12:11PM  9    A.  Yes.

12:11PM  10   Q.  Being flirtatious, correct?

12:11PM  11   A.  Yeah.

12:11PM  12   Q.  Dancing on a stage without a lot of clothes on, correct?

12:11PM  13   A.  Right.

12:12PM  14   Q.  Giving lap dances, correct?

12:12PM  15   A.  Right.

12:12PM  16   Q.  Okay.  And, you -- you knew that at certain points in

12:12PM  17   time, the clientele might be a little rough, correct?

12:12PM  18   A.  Yeah.

12:12PM  19   Q.  Yeah.  You talked about that when you talked about -- I

12:12PM  20   think it was Mademoiselle's, correct?

12:12PM  21   A.  Right.

12:12PM  22   Q.  Okay.  And --

12:12PM  23        **MR. COOPER:**  I'm going to object, Judge, object to

12:12PM  24   that last question and answer and move to strike, based on a

12:12PM  25   discussion that we had at the bench this morning on this

| | | |
|---|---|---|
| 12:12PM | 1 | topic. |
| 12:12PM | 2 | **THE COURT:**  No, overruled. |
| 12:12PM | 3 | **MR. SOEHNLEIN:**  All right. |
| 12:12PM | 4 | **BY MR. SOEHNLEIN:** |
| 12:12PM | 5 | Q.  Okay.  Now I think that you -- you talked about a time |
| 12:12PM | 6 | where you auditioned at Pharaoh's, correct? |
| 12:12PM | 7 | A.  Yes. |
| 12:12PM | 8 | Q.  Do you recall who you auditioned for? |
| 12:12PM | 9 | A.  I believe it was Chris. |
| 12:12PM | 10 | Q.  Okay. |
| 12:12PM | 11 | A.  He was the manager during the day. |
| 12:12PM | 12 | Q.  Okay.  You didn't audition with Mr. Gerace, correct? |
| 12:12PM | 13 | A.  No. |
| 12:12PM | 14 | Q.  Okay.  And what did the audition entail? |
| 12:13PM | 15 | A.  You just danced to a song.  A song or two. |
| 12:13PM | 16 | Q.  Okay.  And -- and when you're doing that dance, you're |
| 12:13PM | 17 | wearing whatever you would wear or whatever you would not |
| 12:13PM | 18 | wear -- |
| 12:13PM | 19 | A.  Right. |
| 12:13PM | 20 | Q.  -- when you're doing that -- |
| 12:13PM | 21 | A.  Yes. |
| 12:13PM | 22 | Q.  -- when you work in the club? |
| 12:13PM | 23 | Okay.  So you understood that aspect of the job? |
| 12:13PM | 24 | A.  Sure.  Yes. |
| 12:13PM | 25 | Q.  Okay.  Now, I think you said that -- that you chose to go |

| | | |
|---|---|---|
| 12:13PM | 1 | work at Pharaoh's because the money was better; that was your |
| 12:13PM | 2 | perception? |
| 12:13PM | 3 | A.  Yes. |
| 12:13PM | 4 | Q.  Right.  And you chose to go work at Pharaoh's because you |
| 12:13PM | 5 | had heard some things from your roommate at the time who was |
| 12:13PM | 6 | also working at Pharaoh's, right? |
| 12:13PM | 7 | A.  Yes. |
| 12:13PM | 8 | Q.  And she had reported to you that -- that she had a |
| 12:13PM | 9 | positive experience at Pharaoh's? |
| 12:13PM | 10 | A.  Yes. |
| 12:13PM | 11 | Q.  Okay.  I wanted to follow up.  You said earlier that when |
| 12:13PM | 12 | you first started working at Pharaoh's, you were not aware of |
| 12:13PM | 13 | drug use in the club, correct? |
| 12:13PM | 14 | A.  Right. |
| 12:13PM | 15 | Q.  Right.  Because when you started at Pharaoh's, you |
| 12:13PM | 16 | weren't using drugs, correct? |
| 12:13PM | 17 | A.  Not at the time, right. |
| 12:13PM | 18 | Q.  Not at the time? |
| 12:14PM | 19 | A.  Right. |
| 12:14PM | 20 | Q.  And so as a non-drug user working at the club, you did |
| 12:14PM | 21 | not perceive drugs being present in the club at that time, |
| 12:14PM | 22 | correct? |
| 12:14PM | 23 | A.  No. |
| 12:14PM | 24 | Q.  Yeah.  It wasn't obvious to you, correct? |
| 12:14PM | 25 | A.  No. |

| | | |
|---|---|---|
| 12:14PM | 1 | Q.  And -- and fairly, it wasn't something you were looking |
| 12:14PM | | for at the time either, right? |
| 12:14PM | 3 | A.  Right. |
| 12:14PM | 4 | Q.  Okay.  Now, there came a time where you were introduced |
| 12:14PM | | to drugs again, correct? |
| 12:14PM | 6 | A.  Yes. |
| 12:14PM | 7 | Q.  And that was from K.L., right? |
| 12:14PM | 8 | A.  Yes. |
| 12:14PM | 9 | Q.  And that came at a time where K.L. was not working at |
| 12:14PM | 10 | Pharaoh's, correct? |
| 12:14PM | 11 | A.  No. |
| 12:14PM | 12 | Q.  She was there socially, right? |
| 12:14PM | 13 | A.  Yes. |
| 12:14PM | 14 | Q.  You met her, right? |
| 12:14PM | 15 | A.  Yep. |
| 12:14PM | 16 | Q.  You hit it off with her, right? |
| 12:14PM | 17 | A.  Right. |
| 12:14PM | 18 | Q.  She provided the cocaine to you, correct? |
| 12:14PM | 19 | A.  Yes. |
| 12:14PM | 20 | Q.  And you did it in the bathroom, right? |
| 12:14PM | 21 | A.  Yes. |
| 12:14PM | 22 | Q.  You didn't do it out in the open? |
| 12:14PM | 23 | A.  Right. |
| 12:14PM | 24 | Q.  You didn't do it off the bar -- |
| 12:14PM | 25 | A.  No. |

| | | |
|---|---|---|
| 12:14PM | 1 | Q.  -- right? |
| 12:14PM | 2 | You didn't do it off the stage, right? |
| 12:14PM | 3 | A.  No. |
| 12:14PM | 4 | Q.  Okay.  And it was Ms. K.L.'s idea to go use it in the |
| 12:14PM | 5 | bathroom? |
| 12:14PM | 6 | A.  Pardon me? |
| 12:14PM | 7 | Q.  It was K.L.'s idea to go use it in the bathroom? |
| 12:15PM | 8 | A.  Yes. |
| 12:15PM | 9 | Q.  Yeah. |
| 12:15PM | 10 | A.  I believe so, yeah. |
| 12:15PM | 11 | Q.  Okay.  And in that moment you made the decision that you |
| 12:15PM | 12 | were going to use cocaine, right? |
| 12:15PM | 13 | A.  Yes. |
| 12:15PM | 14 | Q.  Okay.  Now, you and her had been getting along very well |
| 12:15PM | 15 | that night, right? |
| 12:15PM | 16 | A.  Yes.  Yep. |
| 12:15PM | 17 | Q.  It was the first time that you had ever met her, correct? |
| 12:15PM | 18 | A.  Correct. |
| 12:15PM | 19 | Q.  Okay.  And this was before she was dating Mr. Gerace, |
| 12:15PM | 20 | correct? |
| 12:15PM | 21 | A.  Yes. |
| 12:15PM | 22 | Q.  Long before you had ever met Mr. Gerace, correct? |
| 12:15PM | 23 | A.  Well, I had seen him around the club, but I hadn't |
| 12:15PM | 24 | actually formally met him, correct. |
| 12:15PM | 25 | Q.  Correct. |

12:15PM 1 A. I knew who he was.

12:15PM 2 Q. Yeah, you knew who he was, but you hadn't shaken his

12:15PM 3 hand --

12:15PM 4 A. Right, exactly.

12:15PM 5 Q. -- and said, you know, hi, I'm G.R., or anything like

12:15PM 6 that --

12:15PM 7 A. Right.

12:15PM 8 Q. -- right? Okay.

12:15PM 9     And this actually might be a good time to get that out of

12:15PM 10 the way. And I'm sorry for asking this question, but I'm

12:15PM 11 just -- one question and we'll move on. You've never had sex

12:15PM 12 with Mr. Gerace, correct?

12:15PM 13 A. No.

12:15PM 14 Q. Okay. Now, you -- you and K.L. became friends after

12:15PM 15 that, right?

12:15PM 16 A. Yes.

12:15PM 17 Q. You became party buddies?

12:16PM 18 A. Yes.

12:16PM 19 Q. Is that fair to say?

12:16PM 20 A. Um-hum.

12:16PM 21 Q. And in that relationship, you and her, you're using

12:16PM 22 cocaine, you're doing drugs together on a regular basis,

12:16PM 23 correct?

12:16PM 24 A. Yes.

12:16PM 25 Q. You're doing that outside the club, correct?

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

105

| | | |
|---|---|---|
| 12:16PM | 1 | A.  Yes. |
| 12:16PM | 2 | Q.  You're doing that at her house, perhaps? |
| 12:16PM | 3 | A.  Yes. |
| 12:16PM | 4 | Q.  You're doing that at your house, perhaps? |
| 12:16PM | 5 | A.  Yes. |
| 12:16PM | 6 | Q.  You're doing it at other bars and restaurants, perhaps? |
| 12:16PM | 7 | A.  Yes. |
| 12:16PM | 8 | Q.  You're doing it at friends' houses, correct? |
| 12:16PM | 9 | A.  Yes. |
| 12:16PM | 10 | Q.  You're doing in cars, correct? |
| 12:16PM | 11 | A.  Yes. |
| 12:16PM | 12 | Q.  Okay.  There was nothing about Pharaoh's that made the |
| 12:16PM | 13 | drug use exclusive, correct? |
| 12:16PM | 14 | A.  Correct. |
| 12:16PM | 15 | Q.  Okay.  Now, in terms of where -- where the drugs are |
| 12:16PM | 16 | coming from at that point in time, okay, you're buying drugs |
| 12:16PM | 17 | on your own, correct? |
| 12:16PM | 18 | A.  Yes. |
| 12:16PM | 19 | Q.  You're buying drugs from people outside of Pharaoh's, |
| 12:16PM | 20 | right? |
| 12:16PM | 21 | A.  Yes. |
| 12:16PM | 22 | Q.  You're buying drugs from people that are your friends, |
| 12:16PM | 23 | correct? |
| 12:16PM | 24 | A.  Yes. |
| 12:16PM | 25 | Q.  You're buying drugs from people that your friends are |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

| | | |
|---|---|---|
| 12:16PM | 1 | introducing you to, correct? |
| 12:16PM | 2 | A.  Yes. |
| 12:16PM | 3 | Q.  You're not struggling to find drugs, right? |
| 12:16PM | 4 | A.  No. |
| 12:16PM | 5 | Q.  But you're choosing to go use drugs, right? |
| 12:17PM | 6 | A.  Yeah, if that's what you want to call it, yes. |
| 12:17PM | 7 | Q.  Yeah, well, you made the choice to use cocaine, right? |
| 12:17PM | 8 | A.  Right. |
| 12:17PM | 9 | Q.  Okay.  You had -- you had at least gone to rehab at least |
| 12:17PM | 10 | one time prior to that, right? |
| 12:17PM | 11 | A.  Yes. |
| 12:17PM | 12 | Q.  Pretty intense rehab program, right? |
| 12:17PM | 13 | A.  Actually, no, it wasn't an intense program.  They still |
| 12:17PM | 14 | allowed cigarette smoking at ECMC during this time, and the |
| 12:17PM | 15 | program was pretty lax if I could say that. |
| 12:17PM | 16 | Q.  So, but it's 28 days at ECMC, correct? |
| 12:17PM | 17 | A.  Yes. |
| 12:17PM | 18 | Q.  Okay.  And you completed the program, right? |
| 12:17PM | 19 | A.  Yes. |
| 12:17PM | 20 | Q.  And you believed that the fact that they let you smoke |
| 12:17PM | 21 | cigarettes meant that it was lax? |
| 12:17PM | 22 | A.  Yeah.  They've changed a lot since 2020, I'm sorry. |
| 12:17PM | 23 | Q.  Okay.  You don't -- you don't believe they should have |
| 12:17PM | 24 | permitted you to smoke cigarettes? |
| 12:17PM | 25 | **MR. COOPER:**  Objection as to what she believes |

12:17PM    1    smoking cigarettes, like, relevance.

12:17PM    2            **THE COURT:**  I'll allow it.  Go ahead.

12:17PM    3            **THE WITNESS:**  I just -- I take meetings and AA

12:17PM    4    meetings into rehabs now, and they don't allow any of that

12:17PM    5    stuff.  It's different from when I went, that's all.  I just

12:18PM    6    observed it.

12:18PM    7            **BY MR. SOEHNLEIN:**

12:18PM    8    Q.  Okay.  You observed that it's different, but you -- you

12:18PM    9    don't think that the program is insufficient in any way,

12:18PM   10    right?

12:18PM   11    A.  Now or then?

12:18PM   12    Q.  Well, let's -- let me back up.

12:18PM   13        You did the rehab that ECMC offered at the time, correct?

12:18PM   14    A.  Yes.

12:18PM   15    Q.  Okay.  You completed the rehab program, correct?

12:18PM   16    A.  Yes.

12:18PM   17    Q.  Okay.  Subsequent to that rehab program, you chose to use

12:18PM   18    cocaine again, correct?

12:18PM   19    A.  Yes.

12:18PM   20    Q.  Okay.  And you chose to buy drugs again, correct?

12:18PM   21    A.  Yes.

12:18PM   22    Q.  Okay.  Now, when you -- when you went to rehab, you knew

12:18PM   23    that you were becoming addicted to drugs and alcohol,

12:18PM   24    correct?

12:18PM   25    A.  Yes.

12:18PM  1  Q.  Fair to say?  You understood that about yourself, right?

12:18PM  2  A.  Yes.

12:18PM  3  Q.  Okay.  I want to talk to you a little bit about -- a

12:18PM  4  little bit about what it was to be a dancer at Pharaoh's in

12:18PM  5  that 2006 to 2009 time period.  Okay?  Generally.

12:18PM  6     So we're just going to kind of put the drug use to the

12:18PM  7  side for a minute and just talk about that.

12:19PM  8  A.  Okay.

12:19PM  9  Q.  Okay.  And Mr. Cooper touched on this, one way that you

12:19PM  10  could earn money is by dancing on the stage, correct?

12:19PM  11  A.  Yes.

12:19PM  12  Q.  Okay.  Now, the stage money, customer gives that to you.

12:19PM  13  Do you share that with the club in any way?

12:19PM  14  A.  No, it's mine.

12:19PM  15  Q.  Okay.  It's yours.  You make 100 percent of whatever you

12:19PM  16  get paid on the stage, correct?

12:19PM  17  A.  Yes.

12:19PM  18  Q.  Okay.  How about tips from customers for talking to them,

12:19PM  19  did customers tip you just for talking to them?

12:19PM  20  A.  Yes.

12:19PM  21  Q.  Okay.  Tell us, how did that work?

12:19PM  22  A.  I don't know.  Sometimes guys would throw you 10 or $20,

12:19PM  23  I'm not gonna do a dance, but thanks for talking, or

12:19PM  24  whatever.

12:19PM  25  Q.  Okay.

12:19PM   1   A.  Yeah, like that.

12:19PM   2   Q.  Sometimes guys just wanted a conversation or the company?

12:19PM   3   A.  Yeah, sure.

12:19PM   4   Q.  Okay.  Now, when you're having conversations with guys,

12:19PM   5   you're not mean or standoffish to them, right?

12:19PM   6   A.  No.

12:19PM   7   Q.  No.  You're -- you're -- you're flirtatious, correct?

12:19PM   8   A.  I wasn't like that, but --

12:19PM   9   Q.  You weren't?

12:19PM  10   A.  -- but you're supposed to be generally, yes.

12:19PM  11   Q.  Okay.

12:20PM  12   A.  Yeah.

12:20PM  13   Q.  And generally, so, you -- you were -- you were not

12:20PM  14   flirtatious?

12:20PM  15   A.  No, I just talked normally.

12:20PM  16   Q.  Okay.

12:20PM  17   A.  That's how I did it, yeah.

12:20PM  18   Q.  All right.  All right.  But you were, you were willing to

12:20PM  19   engage in a conversation?

12:20PM  20   A.  Correct.

12:20PM  21   Q.  Because you understood that having that conversation was

12:20PM  22   one way of earning additional income, correct?

12:20PM  23   A.  Yes.

12:20PM  24   Q.  Okay.  And, so, when you're having that conversation and

12:20PM  25   you're engaging with customers, what you're signalling to

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

110

| | | |
|---|---|---|
| 12:20PM | 1 | them, is yes, I do want to talk to you, right? |
| 12:20PM | 2 | A.  Right. |
| 12:20PM | 3 | Q.  I do want to hear what you're saying, yes? |
| 12:20PM | 4 | A.  Right. |
| 12:20PM | 5 | Q.  Right.  I do want to understand, you know, whatever we're |
| 12:20PM | 6 | talking about, and I'm interested in it, correct? |
| 12:20PM | 7 | A.  Yes. |
| 12:20PM | 8 | Q.  All right.  Now, the same way when you're dancing on |
| 12:20PM | 9 | stage, do you ever connect with a specific customer that |
| 12:20PM | 10 | might be coming up on the stage to give you a tip or anything |
| 12:20PM | 11 | like that? |
| 12:20PM | 12 | A.  Sure. |
| 12:20PM | 13 | Q.  Yeah.  And when you're on the stage, it's your job to |
| 12:20PM | 14 | message that, yes, I want to be here, I'm interested in what |
| 12:20PM | 15 | I'm doing, correct? |
| 12:20PM | 16 | A.  Sure. |
| 12:20PM | 17 | Q.  Yes? |
| 12:20PM | 18 | A.  Yeah. |
| 12:20PM | 19 | Q.  If you look disinterested, you're going to make less |
| 12:21PM | 20 | money? |
| 12:21PM | 21 | A.  Exactly. |
| 12:21PM | 22 | Q.  Right.  Part of it is an act, right? |
| 12:21PM | 23 | A.  Yes. |
| 12:21PM | 24 | Q.  You're not using your real name, right? |
| 12:21PM | 25 | A.  I did. |

| | | |
|---|---|---|
| 12:21PM | 1 | Q.  You did? |
| 12:21PM | 2 | A.  I did. |
| 12:21PM | 3 | Q.  Okay. |
| 12:21PM | 4 | A.  I like my name, so -- |
| 12:21PM | 5 | Q.  I like your name, too. |
| 12:21PM | 6 | A.  Thank you. |
| 12:21PM | 7 | Q.  Now, the -- but you're performing, right? |
| 12:21PM | 8 | A.  Yes. |
| 12:21PM | 9 | Q.  Okay.  The whole night is a performance, fair? |
| 12:21PM | 10 | A.  Fair. |
| 12:21PM | 11 | Q.  Okay.  And the signalling, the messaging that you're |
| 12:21PM | 12 | giving off to everybody that you're interacting with, is that |
| 12:21PM | 13 | you want to be doing what you're doing, fair? |
| 12:21PM | 14 | A.  Yes. |
| 12:21PM | 15 | Q.  Yeah.  That's one path to earning an income working as a |
| 12:21PM | 16 | dancer in a strip club, right? |
| 12:21PM | 17 | A.  Yes. |
| 12:21PM | 18 | Q.  All right.  Same thing with VIP dances.  When you go back |
| 12:21PM | 19 | into the VIP dances, you don't act standoffish with a |
| 12:21PM | 20 | customer, right? |
| 12:21PM | 21 | A.  No. |
| 12:21PM | 22 | Q.  You don't act disinterested, right? |
| 12:21PM | 23 | A.  Right. |
| 12:21PM | 24 | Q.  You're engaging, correct? |
| 12:21PM | 25 | A.  Yes. |

12:21PM    1    Q.  You're maybe a little bit more flirty than you would be

12:22PM    2    normally?

12:22PM    3    A.  Sure.

12:22PM    4    Q.  And the dancers are supposed to be flirty, right?

12:22PM    5    A.  Right.

12:22PM    6    Q.  Okay.  Now, let's talk about the customers that you are

12:22PM    7    going to interact with.  You choose who you're gonna talk,

12:22PM    8    to, right?

12:22PM    9    A.  Right.

12:22PM    10    Q.  Right.  There's no rule that says you have to talk to

12:22PM    11    every single person that talks to you, right?

12:22PM    12    A.  Right.

12:22PM    13    Q.  Okay.  So, it might be that you just say, you know what?

12:22PM    14    I don't want to talk to this guy, I'm not gonna bother with

12:22PM    15    him, right?

12:22PM    16    A.  Right.

12:22PM    17    Q.  Now, the goal of you working as a dancer is to make

12:22PM    18    money, fair?

12:22PM    19    A.  Fair.

12:22PM    20    Q.  So, you are gonna go to the people that you perceive as

12:22PM    21    paying more money, right?

12:22PM    22    A.  Yes.

12:22PM    23    Q.  Fair?  Okay.  So, what kind of things would you have

12:22PM    24    looked for?

12:22PM    25    A.  Handing me a larger bill on stage.

| 12:22PM | 1 | Q.  Okay.  So if someone handed you had a larger bill on |
|---|---|---|
| 12:22PM | 2 | stage, you would be more likely to go follow up with that |
| 12:22PM | 3 | customer when you got off stage, right? |
| 12:22PM | 4 | A.  Right. |
| 12:23PM | 5 | Q.  Okay.  'Cuz that signals to you this person is interested |
| 12:23PM | 6 | in me, maybe they want to go have a dance, right? |
| 12:23PM | 7 | A.  Right. |
| 12:23PM | 8 | Q.  And then I'm going to make more money, right? |
| 12:23PM | 9 | A.  Right. |
| 12:23PM | 10 | Q.  What else, what other things would you look for? |
| 12:23PM | 11 | A.  I don't know, what kind of drink they have in front of |
| 12:23PM | 12 | them, how they look. |
| 12:23PM | 13 | Q.  Okay.  So let's talk about that. |
| 12:23PM | 14 | What about the drink is going to signal to you that this |
| 12:23PM | 15 | person might have more money? |
| 12:23PM | 16 | A.  Well, maybe if they had a Manhattan versus a Bud Light. |
| 12:23PM | 17 | Q.  Okay. |
| 12:23PM | 18 | A.  Maybe. |
| 12:23PM | 19 | Q.  Because a Manhattan is more expensive, right? |
| 12:23PM | 20 | A.  Yeah. |
| 12:23PM | 21 | Q.  And you assume it's a more sophisticated person, right? |
| 12:23PM | 22 | A.  Yeah. |
| 12:23PM | 23 | Q.  I don't think that's true, by the way. |
| 12:23PM | 24 | A.  No, I -- |
| 12:23PM | 25 | Q.  But that's -- what, if -- |

12:23PM  1   A.  No, right, maybe it costs more money.

12:23PM  2   Q.  Right.  Costs more money, so you're going to be more

12:23PM  3   likely to go and -- and talk to that person, right?

12:23PM  4   A.  Right.

12:23PM  5   Q.  Okay.  You said how they look.  What about how they look?

12:23PM  6   A.  Maybe if they had expensive clothes on, or they were well

12:23PM  7   kept.  I don't know.  Those things.

12:23PM  8   Q.  Okay.  Any specific articles of clothing that you would

12:23PM  9   look for?

12:23PM  10  A.  No, just looks.  Sharper dressed.  I don't know, I would

12:23PM  11  say that.

12:23PM  12  Q.  Okay.  Yeah, but if you saw someone that you perceived as

12:24PM  13  being more sharper dressed, you'd be more likely to go and

12:24PM  14  have a conversation with him, right?

12:24PM  15  A.  Sure.

12:24PM  16  Q.  And when you're having this conversation you're trying to

12:24PM  17  be engaging, and you're trying to signal to them yes, I want

12:24PM  18  to interact with you, correct?

12:24PM  19  A.  Right.

12:24PM  20  Q.  Okay.  I think we might have touched on this, but you

12:24PM  21  have a recollection of how much money you made when you were

12:24PM  22  working at Pharaoh's?

12:24PM  23  A.  We did touch on it, I said about two grand a week I was

12:24PM  24  making.

12:24PM  25  Q.  Okay.  Two grand a week.  And at that point in time,

12:24PM  1  where were you living?

12:24PM  2  A.  In Amherst.

12:24PM  3  Q.  Okay.  I don't need to know the specific address, but

12:24PM  4  could you just give us a street?

12:24PM  5  A.  I think it was Sunrise Boulevard something, it was off

12:24PM  6  Sheridan.

12:24PM  7  Q.  Okay.  All right.  And you had a car?

12:24PM  8  A.  I had a car.

12:24PM  9  Q.  Okay.  What kind of car were you driving?

12:24PM  10  A.  A 650i BMW.

12:24PM  11  Q.  You were driving a BMW at that time?

12:24PM  12  A.  Yes.

12:24PM  13  Q.  Okay.  Making $2,000 a week as a dancer, correct?

12:24PM  14  A.  Yes.

12:24PM  15  Q.  The BMW was late model, right?

12:25PM  16  A.  Yes.

12:25PM  17  Q.  Okay.  And that was the car you were zipping around in

12:25PM  18  doing whatever you were doing, right?

12:25PM  19  A.  Yes.

12:25PM  20  Q.  It's the car that you were arrested in in Amherst, right?

12:25PM  21  A.  Yes.

12:25PM  22  Q.  Yeah, 650 -- what color was it?

12:25PM  23  A.  Black.

12:25PM  24  Q.  Okay.  Leather interior?

12:25PM  25  A.  Yes.

| | | |
|---|---|---|
| 12:25PM | 1 | Q.  Power windows? |
| 12:25PM | 2 | A.  Yep. |
| 12:25PM | 3 | Q.  Pretty quick car? |
| 12:25PM | 4 | A.  Yes. |
| 12:25PM | 5 | Q.  Pretty awesome car? |
| 12:25PM | 6 | A.  Yeah. |
| 12:25PM | 7 | Q.  Yeah, all right.  And that was your car? |
| 12:25PM | 8 | A.  It was not in my name, no. |
| 12:25PM | 9 | Q.  Okay.  But you were driving it? |
| 12:25PM | 10 | A.  I was driving it, yeah. |
| 12:25PM | 11 | Q.  Okay.  So, and all right.  So we talked about that. |
| 12:25PM | 12 |     I want to ask you some questions about -- you talked |
| 12:25PM | 13 | about some VIPs that you might have perceived being in the |
| 12:25PM | 14 | club; do you recall that testimony? |
| 12:25PM | 15 | A.  Yes. |
| 12:25PM | 16 | Q.  And you said that they were people that maybe had a |
| 12:25PM | 17 | private area, right? |
| 12:25PM | 18 | A.  Yes. |
| 12:25PM | 19 | Q.  They seemed to know Mr. Gerace? |
| 12:25PM | 20 | A.  Yeah. |
| 12:25PM | 21 | Q.  You don't know whether or not those people paid for that |
| 12:25PM | 22 | area, right? |
| 12:25PM | 23 | A.  No. |
| 12:25PM | 24 | Q.  No.  It's entirely possible that they did, in fact, pay |
| 12:25PM | 25 | for that area, right? |

12:26PM    1    A.  Sure.

12:26PM    2    Q.  Okay.  And -- and the fact that Mr. Gerace is the

12:26PM    3    owner -- strike that.

12:26PM    4        You'd been in the club long enough to understand that

12:26PM    5    part of the club is customer service, right?

12:26PM    6    A.  Sure.

12:26PM    7    Q.  It's the customer service industry, right?

12:26PM    8    A.  Yes.

12:26PM    9    Q.  And, so, it wouldn't surprise you that Mr. Gerace as the

12:26PM   10    owner might go over and talk to people that had bought a VIP

12:26PM   11    area in the club, correct?

12:26PM   12    A.  Sure.

12:26PM   13    Q.  That's something that a responsible owner would do,

12:26PM   14    right?

12:26PM   15    A.  Sure.

12:26PM   16    Q.  Okay.

12:26PM   17    A.  Yeah.

12:26PM   18    Q.  Okay.  Now, I want to talk to you a little bit about

12:26PM   19    there was some testimony about upstairs; do you recall that

12:26PM   20    testimony?

12:26PM   21    A.  Yes.

12:26PM   22    Q.  Okay.  And I think you said that when you went upstairs

12:26PM   23    usually you went with K.L., right?

12:26PM   24    A.  Yes.

12:26PM   25    Q.  Okay.  So, so K.L. is sort of your avenue to access to

| 12:26PM | 1 | the upstairs, correct? |
| 12:26PM | 2 | A.  Yes. |
| 12:26PM | 3 | Q.  Because she had a with relationship Mr. Gerace at that |
| 12:26PM | 4 | point in time -- |
| 12:26PM | 5 | A.  Yes. |
| 12:26PM | 6 | Q.  -- right?  Okay.  And you never said no, I don't want to |
| 12:27PM | 7 | go upstairs, right? |
| 12:27PM | 8 | A.  No. |
| 12:27PM | 9 | Q.  And by the same token, regular patrons couldn't just walk |
| 12:27PM | 10 | upstairs, correct? |
| 12:27PM | 11 | A.  Right. |
| 12:27PM | 12 | Q.  So what was going on upstairs was separate from what was |
| 12:27PM | 13 | going on in the club, right? |
| 12:27PM | 14 | A.  Sure. |
| 12:27PM | 15 | Q.  Yeah.  And I think you testified earlier that your drug |
| 12:27PM | 16 | use in the club was in the bathroom, correct? |
| 12:27PM | 17 | A.  Right. |
| 12:27PM | 18 | Q.  Okay.  And you're not doing it in the open, right? |
| 12:27PM | 19 | A.  No. |
| 12:27PM | 20 | Q.  There's cameras everywhere, correct? |
| 12:27PM | 21 | A.  Yes. |
| 12:27PM | 22 | Q.  Okay.  Everywhere that's permitted by law, right? |
| 12:27PM | 23 | A.  Correct. |
| 12:27PM | 24 | Q.  Okay.  No cameras in the bathroom, right? |
| 12:27PM | 25 | A.  Right. |

12:27PM  1   Q.  Can't have cameras in the women's bathroom, right?

12:27PM  2   A.  Right.

12:27PM  3   Q.  Okay.  Can't put a male security guard in the women's

12:27PM  4   bathroom, right?

12:27PM  5   A.  Right.

12:27PM  6   Q.  That wouldn't be permissible, right?

12:27PM  7   A.  Correct.

12:27PM  8   Q.  Okay.  But when you're using drugs at the club, you're

12:27PM  9   going to the bathroom, right?

12:27PM  10  A.  Yes.

12:27PM  11  Q.  You didn't feel confident enough to just do it in the

12:27PM  12  open --

12:27PM  13  A.  Right.

12:27PM  14  Q.  -- right?  Okay.

12:27PM  15      And before you started doing drugs again, you never saw

12:27PM  16  anybody else use drugs in the open either, right?

12:27PM  17  A.  No.

12:27PM  18  Q.  Now after you started using drugs, you started to

12:28PM  19  understand that other people were using drugs, too, right?

12:28PM  20  A.  Yes.

12:28PM  21  Q.  Okay.  Now your perception changed because your social

12:28PM  22  circle changed, right?

12:28PM  23  A.  Right.

12:28PM  24  Q.  When you started using drugs, you started hanging out

12:28PM  25  with other people that were using drugs --

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

120

| | | |
|---|---|---|
| 12:28PM | 1 | A.  Right. |
| 12:28PM | 2 | Q.  -- fair? |
| 12:28PM | 3 | A.  Yeah. |
| 12:28PM | 4 | Q.  Yeah.  And, so, because of that, you started to pick up |
| 12:28PM | 5 | on things or notice things that you wouldn't have done when |
| 12:28PM | 6 | you were stone-cold sober, right? |
| 12:28PM | 7 | A.  Right. |
| 12:28PM | 8 | Q.  Okay.  And because part of using the drugs was doing them |
| 12:28PM | 9 | in secret, wasn't it? |
| 12:28PM | 10 | A.  Yes. |
| 12:28PM | 11 | Q.  Yeah.  You can't just to it in the open, right? |
| 12:28PM | 12 | A.  Right. |
| 12:28PM | 13 | Q.  If you did it in the open, you would've been fired, |
| 12:28PM | 14 | right? |
| 12:28PM | 15 | A.  Yeah. |
| 12:28PM | 16 | Q.  Yeah.  You're sure of that? |
| 12:28PM | 17 | A.  Pretty sure. |
| 12:28PM | 18 | Q.  Yeah.  Okay.  Now, you talked about heroin use.  Strike |
| 12:28PM | 19 | that. |
| 12:28PM | 20 | You talked about Lortab use, right? |
| 12:28PM | 21 | A.  Yes. |
| 12:28PM | 22 | Q.  K.L. gave you Lortabs, right? |
| 12:28PM | 23 | A.  To begin with, yes. |
| 12:28PM | 24 | Q.  Yeah.  You don't know where she got them from, right? |
| 12:28PM | 25 | A.  Not that -- no, I can't recall. |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

| | | |
|---|---|---|
| 12:28PM | 1 | Q.  Okay.  And you bought Lortabs on your own, right? |
| 12:29PM | 2 | A.  Yes. |
| 12:29PM | 3 | Q.  Outside the club, right? |
| 12:29PM | 4 | A.  Yeah. |
| 12:29PM | 5 | Q.  Bought them from friends? |
| 12:29PM | 6 | A.  Yes. |
| 12:29PM | 7 | Q.  Bought them from other drug dealers, right? |
| 12:29PM | 8 | A.  Right. |
| 12:29PM | 9 | Q.  Okay.  This is something that you were doing on your own, |
| 12:29PM | 10 | right? |
| 12:29PM | 11 | A.  Right. |
| 12:29PM | 12 | Q.  Okay.  Driving the BMW to a house, buying Lortabs, |
| 12:29PM | 13 | driving back, right? |
| 12:29PM | 14 | A.  Right. |
| 12:29PM | 15 | Q.  Okay.  And same thing with heroin, K.L. introduced you to |
| 12:29PM | 16 | heroin, right? |
| 12:29PM | 17 | A.  No, another dancer did. |
| 12:29PM | 18 | Q.  Oh, I'm sorry, another dancer introduced you to heroin? |
| 12:29PM | 19 | A.  Yes. |
| 12:29PM | 20 | Q.  Right.  Peter Gerace never gave you heroin? |
| 12:29PM | 21 | A.  No. |
| 12:29PM | 22 | Q.  You've never seen Peter Gerace do heroin? |
| 12:29PM | 23 | A.  No. |
| 12:29PM | 24 | Q.  No.  Okay.  Now, at the time of that 2009 arrest that |
| 12:29PM | 25 | we're talking about, you were addicted to heroin, right? |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

122

| | | |
|---|---|---|
| 12:29PM | 1 | A.  Yes. |
| 12:29PM | 2 | Q.  That night you had done heroin, correct? |
| 12:29PM | 3 | A.  I believe so, yes. |
| 12:29PM | 4 | Q.  Okay.  And you had gotten that from a house on the West |
| 12:29PM | 5 | Side, correct? |
| 12:29PM | 6 | A.  Sounds right. |
| 12:29PM | 7 | Q.  Yeah.  You -- you didn't get that heroin from Pharaoh's, |
| 12:29PM | 8 | right? |
| 12:29PM | 9 | A.  No. |
| 12:29PM | 10 | Q.  No.  You wouldn't -- you've never got heroin from |
| 12:29PM | 11 | Pharaoh's? |
| 12:29PM | 12 | A.  No. |
| 12:30PM | 13 | Q.  Okay.  So even with all of the drug use that's going on, |
| 12:30PM | 14 | you have to go outside the club to get the heroin, right? |
| 12:30PM | 15 | A.  Right. |
| 12:30PM | 16 | Q.  And you chose to use heroin? |
| 12:30PM | 17 | A.  Yes. |
| 12:30PM | 18 | Q.  Yeah.  Okay.  Now, the whole time that you're using |
| 12:30PM | 19 | drugs, the whole time that you're -- you're working through |
| 12:30PM | 20 | this addiction, you're continuing to work at Pharaoh's |
| 12:30PM | 21 | because you wanted the money, fair? |
| 12:30PM | 22 | A.  Yes. |
| 12:30PM | 23 | Q.  Right.  And when you were working at Pharaoh's, we |
| 12:30PM | 24 | already talked about it, but from all perspectives, the vibe |
| 12:30PM | 25 | that you're putting out is I'm enthusiastic to be here, I'm |

| | | |
|---|---|---|
| 12:30PM | 1 | enthusiastic to do what I'm doing, fair? |
| 12:30PM | 2 | A.  Sure. |
| 12:30PM | 3 | Q.  Right.  You're not coming in standoffish, right?  Even |
| 12:30PM | 4 | when you're addicted, you're still trying to make money, and |
| 12:30PM | 5 | so the signals that you're giving to people is I'm doing this |
| 12:30PM | 6 | because I want to do this, right? |
| 12:30PM | 7 | A.  Sure. |
| 12:30PM | 8 | Q.  Yeah.  That was an important part of the signalling, |
| 12:30PM | 9 | correct? |
| 12:31PM | 10 | A.  Right. |
| 12:31PM | 11 | Q.  Right.  If you're not doing that, you're not going to |
| 12:31PM | 12 | make money, right? |
| 12:31PM | 13 | A.  Right. |
| 12:31PM | 14 | Q.  Yeah, and then you're going to have to go do something |
| 12:31PM | 15 | else or work at some other club, right? |
| 12:31PM | 16 | A.  Right. |
| 12:31PM | 17 | Q.  Right.  And by the way, on that point, after you left |
| 12:31PM | 18 | Pharaoh's, you didn't struggle to find another job dancing, |
| 12:31PM | 19 | right? |
| 12:31PM | 20 | A.  No, I went back to Rick's. |
| 12:31PM | 21 | Q.  You went back to where you had been before? |
| 12:31PM | 22 | A.  For two months I think, and then I stopped dancing |
| 12:31PM | 23 | altogether. |
| 12:31PM | 24 | Q.  Okay.  But you didn't struggle to get the job, right? |
| 12:31PM | 25 | A.  No. |

12:31PM   1   Q.  Okay.  I want to talk to you now about the incident that

12:31PM   2   we talked about upstairs.

12:31PM   3       Excuse me just for a second here.  Sorry about that.

12:32PM   4       Now, there came a time when you engaged in sex for money,

12:32PM   5   correct?

12:32PM   6   A.  Yes.

12:32PM   7   Q.  Yeah, and we talked about that.  And your recollection is

12:32PM   8   Mr. Gerace asked you to take care of his friend, correct?

12:32PM   9   A.  Right.

12:32PM   10  Q.  You interpreted that as sex for money, correct?

12:32PM   11  A.  Yes.

12:32PM   12  Q.  All right.  And there's one thing that -- that I notice,

12:32PM   13  you testified this morning that you believe that Mr. Gerace

12:32PM   14  gave you the money after the sex act; is that -- am I

12:32PM   15  recalling that correctly?

12:32PM   16  A.  Yes.

12:32PM   17  Q.  Okay.  In the grand jury you testified differently, isn't

12:32PM   18  that, correct?

12:32PM   19  A.  Yes.

12:32PM   20  Q.  Okay.

12:32PM   21  A.  I don't -- I actually don't know.

12:32PM   22  Q.  Okay.  Well, if I showed you your grand jury testimony

12:32PM   23  would that refresh your recollection?

12:32PM   24  A.  Yeah, it could.

12:32PM   25          MR. SOEHNLEIN:  Could we -- could we put up her grand

12:32PM  1  jury testimony, page 19 please, just for her.

12:32PM  2          **MS. CHAMPOUX:**  35?

12:32PM  3          **MR. SOEHNLEIN:**  35 --

12:32PM  4          **MR. COOPER:**  3565A as in apple.  It's page 19.

12:33PM  5          **MR. SOEHNLEIN:**  Just for her, please.

12:33PM  6          **BY MR. SOEHNLEIN:**

12:33PM  7  Q.  So if you want to start, start at line 8 there on that

12:33PM  8  page, just read that until maybe the bottom of the page and

12:33PM  9  let us know when you finish.

12:33PM  10  A.  Okay.  You want me to read it out loud?

12:33PM  11  Q.  No, no, I don't.  I want you to just read it to yourself,

12:33PM  12  I'm sorry.

12:33PM  13  A.  Oh, all right.  Okay.

12:33PM  14  Q.  Okay.  You're finished reading?

12:33PM  15  A.  Yeah.

12:33PM  16          **MR. SOEHNLEIN:**  All right.  We can take that down,

12:33PM  17  thank you.

12:33PM  18          **BY MR. SOEHNLEIN:**

12:33PM  19  Q.  Okay.  So, so Mr. Gerace asks you to entertain his

12:33PM  20  friend's friend, right?

12:33PM  21  A.  Right.

12:34PM  22  Q.  And he gave you $200, right?

12:34PM  23  A.  He gave me $200, yes.

12:34PM  24  Q.  Okay.  And then you went, and you interpreted that as to

12:34PM  25  have sex, and you went and had sex in the bathroom, correct?

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24
126

| | | |
|---|---|---|
| 12:34PM | 1 | A.  Right. |
| 12:34PM | 2 | Q.  Okay.  Now, you were using drugs pretty heavily that |
| 12:34PM | 3 | night, correct? |
| 12:34PM | 4 | A.  Yeah. |
| 12:34PM | 5 | Q.  All right.  Safe to say that your decisionmaking wasn't |
| 12:34PM | 6 | straightforward, correct? |
| 12:34PM | 7 | A.  Yeah.  Correct. |
| 12:34PM | 8 | Q.  Yeah.  You make bad decisions when you're using drugs, |
| 12:34PM | 9 | correct? |
| 12:34PM | 10 | A.  Correct. |
| 12:34PM | 11 | Q.  Okay.  And -- and by the same token, and I think we just |
| 12:34PM | 12 | saw, your recollection of that night is pretty fuzzy, |
| 12:34PM | 13 | correct? |
| 12:34PM | 14 | A.  Yeah, it was a long time ago, but, right. |
| 12:34PM | 15 | Q.  Long time ago, and you were using drugs, right? |
| 12:34PM | 16 | A.  Right. |
| 12:34PM | 17 | Q.  And drinks affect your perception, correct? |
| 12:34PM | 18 | A.  Right. |
| 12:34PM | 19 | Q.  It affects your memory? |
| 12:34PM | 20 | A.  It can, yes. |
| 12:34PM | 21 | Q.  Right.  What was your average drug use per day at that |
| 12:34PM | 22 | point in time? |
| 12:34PM | 23 | A.  That, I can't recall.  It was just a substantial amount. |
| 12:34PM | 24 | Q.  Okay. |
| 12:34PM | 25 | A.  My habit as we were discussing was about $300 a day. |

Case 1:19-cr-00227-LJV-MJR    Document 1366    Filed 11/19/24    Page 127 of 174
USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

127

12:34PM   1   Q.  Yeah, yeah.  All day, every day, right?

12:34PM   2   A.  Right.

12:34PM   3   Q.  Inside the club, outside the club?

12:35PM   4   A.  Right.

12:35PM   5   Q.  Right.  Wake up, you're doing drugs at your house, right?

12:35PM   6   A.  Right.

12:35PM   7   Q.  Doing drugs at K.L.'s house, right?

12:35PM   8   A.  Right.

12:35PM   9   Q.  Doing drugs in the car, right?

12:35PM  10   A.  Right.

12:35PM  11   Q.  Right?

12:35PM  12   A.  Yep.

12:35PM  13   Q.  All over the place.  All right.

12:35PM  14        Now, you -- when -- when you had that conversation with

12:35PM  15   Mr. Gerace, you didn't tell him no, I don't want to do that,

12:35PM  16   correct?

12:35PM  17   A.  Right.

12:35PM  18   Q.  And we talked about your signalling, your messaging,

12:35PM  19   right, at that point in time, was to be enthusiastic and

12:35PM  20   engaging, correct?

12:35PM  21   A.  Sure.

12:35PM  22   Q.  Okay.  And it's your understanding that everybody in

12:35PM  23   Pharaoh's would have perceived that, correct?

12:35PM  24   A.  I guess so, yeah.

12:35PM  25   Q.  Yeah.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

128

12:35PM     1    A.  Sure.

12:35PM     2    Q.  Okay.  And, so, you went and you did that.  And you

12:35PM     3    didn't say anything to him about it afterwards, correct?

12:35PM     4    A.  Right.

12:35PM     5    Q.  No follow-up conversation with Mr. Gerace, right?

12:35PM     6    A.  Right.

12:35PM     7    Q.  And you shared the entirety of the conversation that you

12:35PM     8    had with Mr. Gerace with us here today, correct?

12:35PM     9    A.  Sure.

12:35PM    10    Q.  And so he says, hey, will you entertain my friend?

12:36PM    11        You take it to mean sex for money.  And you go and you

12:36PM    12    have sex with the kid, right?

12:36PM    13    A.  Right.

12:36PM    14    Q.  Fair.  Now, following that, you also had further sex acts

12:36PM    15    with that gentlemen outside the club, correct?

12:36PM    16    A.  Right.

12:36PM    17    Q.  Okay.  And at that point in time, he -- he's calling you

12:36PM    18    on your own, one to one, right?

12:36PM    19    A.  Right.

12:36PM    20    Q.  Right.  He's not involving Mr. Gerace, right?

12:36PM    21    A.  No.

12:36PM    22    Q.  And he's setting up the place with you, right?

12:36PM    23    A.  Yes.  Yep.

12:36PM    24    Q.  The time?

12:36PM    25    A.  Yep.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

129

| | | |
|---|---|---|
| 12:36PM | 1 | Q.  You negotiate how much money it's gonna be? |
| 12:36PM | 2 | A.  Right. |
| 12:36PM | 3 | Q.  You negotiate what the act is gonna be? |
| 12:36PM | 4 | A.  Right. |
| 12:36PM | 5 | Q.  Okay.  And -- and you never told him no, no, no, I don't |
| 12:36PM | 6 | want to do that, right? |
| 12:36PM | 7 | A.  Right. |
| 12:36PM | 8 | Q.  You never shared any of that money with Mr. Gerace? |
| 12:36PM | 9 | A.  No. |
| 12:36PM | 10 | Q.  And, in fact, you never told Mr. Gerace about that? |
| 12:36PM | 11 | A.  No. |
| 12:36PM | 12 | Q.  Right.  In fact, you hid it from him, right? |
| 12:36PM | 13 | A.  It wasn't hiding it, I just didn't talk to him. |
| 12:36PM | 14 | Q.  Yeah.  He would have had no way of knowing you were doing |
| 12:36PM | 15 | that, right? |
| 12:36PM | 16 | A.  Exactly. |
| 12:36PM | 17 | Q.  Okay.  Because this was something you were doing |
| 12:37PM | 18 | completely on your own, right? |
| 12:37PM | 19 | A.  Right. |
| 12:37PM | 20 | Q.  Right.  This is -- this is -- you're deciding to continue |
| 12:37PM | 21 | a prostitution relationship with this guy outside the club on |
| 12:37PM | 22 | your own, correct? |
| 12:37PM | 23 | A.  Right. |
| 12:37PM | 24 | Q.  Your choice, right? |
| 12:37PM | 25 | A.  Right. |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

130

| | | |
|---|---|---|
| 12:37PM | 1 | Q.  Right?  You chose the place, right? |
| 12:37PM | 2 | A.  Right. |
| 12:37PM | 3 | Q.  You chose how much? |
| 12:37PM | 4 | A.  Right. |
| 12:37PM | 5 | Q.  Right?  You chose the acts, correct? |
| 12:37PM | 6 | A.  Right. |
| 12:37PM | 7 | Q.  You could have said no to the acts if you wanted to, |
| 12:37PM | 8 | right? |
| 12:37PM | 9 | A.  Sure. |
| 12:37PM | 10 | Q.  But that wasn't what you wanted to do at that time in |
| 12:37PM | 11 | your life, right? |
| 12:37PM | 12 | A.  I needed the money. |
| 12:37PM | 13 | Q.  Yeah, yeah.  And how many times do you think you did that |
| 12:37PM | 14 | with that other gentleman? |
| 12:37PM | 15 | A.  Just a few. |
| 12:37PM | 16 | Q.  Okay.  More than two? |
| 12:37PM | 17 | A.  Maybe about two or three. |
| 12:37PM | 18 | Q.  Okay.  And he would contact you directly, right? |
| 12:37PM | 19 | A.  Right. |
| 12:37PM | 20 | Q.  Didn't involve Mr. Gerace? |
| 12:37PM | 21 | A.  Right. |
| 12:37PM | 22 | Q.  As far as you know, Mr. Gerace had no idea it was going |
| 12:37PM | 23 | on? |
| 12:37PM | 24 | A.  Right. |
| 12:38PM | 25 | Q.  Okay.  Now, one thing I meant to circle back to.  When |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

131

| | | |
|---|---|---|
| 12:38PM | 1 | you recall that period of time where you were working at |
| 12:38PM | 2 | Pharaoh's, you hadn't met K.L. yet, right? |
| 12:38PM | 3 | A.  Right. |
| 12:38PM | 4 | Q.  Meeting K.L. is kind of a turning point for you, right? |
| 12:38PM | 5 | A.  Yes. |
| 12:38PM | 6 | Q.  K.L. is sort of the onramp to drug use again, right? |
| 12:38PM | 7 | A.  Yeah. |
| 12:38PM | 8 | Q.  Yeah, K.L. -- K.L. -- K.L. helped you engage in a lot of |
| 12:38PM | 9 | poor decisionmaking, right? |
| 12:38PM | 10 | A.  Yeah. |
| 12:38PM | 11 | Q.  Yeah.  The relationship with K.L. was pretty damaging to |
| 12:38PM | 12 | you, correct? |
| 12:38PM | 13 | A.  Yes. |
| 12:38PM | 14 | Q.  Yeah.  She -- she -- she wasn't a really good friend to |
| 12:38PM | 15 | you? |
| 12:38PM | 16 | A.  Well, at the time I thought she was a good friend, but I |
| 12:38PM | 17 | guess not, no. |
| 12:38PM | 18 | Q.  Yeah, you don't believe that now, she was not, no. |
| 12:38PM | 19 | A.  No. |
| 12:38PM | 20 | Q.  Okay.  Now, at that point in time, you mentioned that |
| 12:38PM | 21 | even though you were sober, you were still drinking from time |
| 12:38PM | 22 | to time, correct? |
| 12:38PM | 23 | A.  Yes. |
| 12:38PM | 24 | Q.  Okay.  And you called these slip-ups, right? |
| 12:38PM | 25 | A.  Yes. |

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

132

| | | |
|---|---|---|
| 12:38PM | 1 | Q.  Okay.  You were drinking, and you weren't proud of these |
| 12:39PM | 2 | slip-ups at the time I assume, right? |
| 12:39PM | 3 | A.  No. |
| 12:39PM | 4 | Q.  Okay.  And there came a time after each slip-up where you |
| 12:39PM | 5 | thought to yourself, oh, my gosh, I don't want to do that, I |
| 12:39PM | 6 | don't want to go down that road, right?  Okay.  You continued |
| 12:39PM | 7 | to work at Pharaoh's, right? |
| 12:39PM | 8 | A.  Right. |
| 12:39PM | 9 | Q.  Which is a bar, right? |
| 12:39PM | 10 | A.  Right. |
| 12:39PM | 11 | Q.  Which is a place where customers will buy you drinks, |
| 12:39PM | 12 | right? |
| 12:39PM | 13 | A.  Right. |
| 12:39PM | 14 | Q.  Right.  You've had a customer offer to buy you a drink? |
| 12:39PM | 15 | A.  Sure. |
| 12:39PM | 16 | Q.  More than ten times, I bet? |
| 12:39PM | 17 | A.  Right. |
| 12:39PM | 18 | Q.  More than 100 times, I bet? |
| 12:39PM | 19 | A.  Right. |
| 12:39PM | 20 | Q.  That's a very, very common practice, right? |
| 12:39PM | 21 | A.  Right. |
| 12:39PM | 22 | Q.  Okay.  I want to talk to you about that, the night of |
| 12:39PM | 23 | that Amherst arrest. |
| 12:39PM | 24 |     You said that -- I think we already established that you |
| 12:39PM | 25 | were high on heroin that night, right? |

12:39PM   1   A.   I believe so, yes.

12:39PM   2   Q.   Okay.  And you just bought heroin from the West Side,

12:39PM   3   right?

12:39PM   4   A.   Yes.

12:39PM   5   Q.   And you had gone down to Chippewa Street which is only a

12:39PM   6   half a block from here, and you had met some guys and you

12:39PM   7   were gonna party with them, correct?

12:39PM   8   A.   Right.

12:40PM   9   Q.   And you're driving, you're in the BMW?

12:40PM  10   A.   Right.

12:40PM  11   Q.   But K.L.'s driving?

12:40PM  12   A.   Right.

12:40PM  13   Q.   Okay.  And you're zipping off out of to Amherst when you

12:40PM  14   get pulled over, right?

12:40PM  15   A.   Right.

12:40PM  16   Q.   And you get pulled over with heroin, right?

12:40PM  17   A.   Right.

12:40PM  18   Q.   Which is pretty serious, right?

12:40PM  19   A.   Right.

12:40PM  20   Q.   It would have been the most trouble that you had been

12:40PM  21   involved in at any point in your life up until then?

12:40PM  22   A.   No.  The DWIs were -- I got in trouble for the DWIs.

12:40PM  23   That was pretty serious.

12:40PM  24   Q.   Okay.  It's still pretty serious trouble?

12:40PM  25   A.   Yes.  Yeah, very serious.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24
134

12:40PM  1  Q.  Yeah, very serious.  And -- and so, when you have an

12:40PM  2  opportunity to speak with law enforcement, you told them what

12:40PM  3  you knew about Mr. Gerace right away, right?

12:40PM  4  A.  Yes.  They asked me some questions, I answered, yes.

12:40PM  5  Q.  There was no filter on what you were sharing with them,

12:40PM  6  right?

12:40PM  7  A.  Correct.

12:40PM  8  Q.  Because you understood it would have been a crime to lie

12:40PM  9  to the FBI, right?

12:40PM  10  A.  Yes.

12:40PM  11  Q.  Yeah.  And federal law enforcement, right?

12:40PM  12  A.  Right.

12:40PM  13  Q.  And they were there, right?

12:40PM  14  A.  Right.

12:40PM  15  Q.  And it didn't take them long to get there, did it?

12:40PM  16  A.  No.

12:40PM  17  Q.  Yeah.  They found out that you had information about

12:41PM  18  Gerace, right?

12:41PM  19  A.  Yes.

12:41PM  20  Q.  Yeah.  And then they were there to hear the information

12:41PM  21  almost immediately, right?

12:41PM  22  A.  I think so, yeah.

12:41PM  23  Q.  Yeah.  Now, you weren't afraid of sharing information

12:41PM  24  about Peter?

12:41PM  25  A.  No.

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

135

12:41PM    1    Q.  No.  You shared everything you knew immediately to get

12:41PM    2    yourself out of trouble, right?  Or to try to?

12:41PM    3    A.  Right.  As they were asking questions, I answered them,

12:41PM    4    correct, thinking that I would get out of trouble, correct.

12:41PM    5    Q.  Yeah.  Yeah.  There was no apprehension about, oh, you

12:41PM    6    know, I -- I -- I want to protect Peter, nothing like that?

12:41PM    7    A.  No.

12:41PM    8    Q.  You didn't want to protect Mr. Gerace?

12:41PM    9    A.  No.

12:41PM   10    Q.  You didn't want to protect Pharaoh's?

12:41PM   11    A.  No.

12:41PM   12    Q.  No.  And -- and you -- you strike that.

12:41PM   13        So, you shared with them all the information that you

12:41PM   14    had, right?

12:41PM   15    A.  Right.

12:41PM   16    Q.  Okay.  And I want to talk to you a little bit now about

12:42PM   17    the VIP area, and you shared a time about in the VIP Room

12:42PM   18    that you recall with a dancer name Joy; do you recall that?

12:42PM   19    A.  Yeah.

12:42PM   20    Q.  Okay.  When you first met with law enforcement here you

12:42PM   21    didn't recall that instance, right?

12:42PM   22    A.  No.

12:42PM   23    Q.  No.  You only recalled it like recently within the last

12:42PM   24    month, right?

12:42PM   25    A.  Yeah.

12:42PM   1   Q.   So -- so, you met with the U.S. Attorney's Office for the

12:42PM   2   first time I think in 2020; is that right?

12:42PM   3   A.   Sounds right.

12:42PM   4   Q.   Right.  And they -- they -- they got your name because of

12:42PM   5   the 2009 arrest, correct?

12:42PM   6   A.   Correct.

12:42PM   7        **MR. COOPER:**  Objection as to how we got her name.

12:42PM   8   How would she know that?

12:42PM   9        **THE COURT:**  I would like her understanding of it, so

12:42PM  10   overruled.

12:42PM  11        **BY MR. SOEHNLEIN:**

12:42PM  12   Q.   Okay.  Do you have an understanding of how they came to

12:42PM  13   know?

12:42PM  14   A.   That would be my understanding.

12:42PM  15   Q.   Yeah.  Yeah.

12:42PM  16   A.   Yeah.

12:42PM  17   Q.   Because, because they -- they, well, strike that.

12:42PM  18        Now, so you first met with them in 2020, right?

12:42PM  19   A.   Right.

12:43PM  20   Q.   And you didn't share this story about Joy in the VIP Room

12:43PM  21   then, right?

12:43PM  22   A.   Right.

12:43PM  23   Q.   And you went into the grand jury and you testified and

12:43PM  24   you didn't share it there either?

12:43PM  25   A.   Right.

12:43PM   1   Q.  Okay.  And you just recalled it within the last month,

12:43PM   2   right?

12:43PM   3   A.  About that, yeah.

12:43PM   4   Q.  Yeah, okay.  Now, that event, when you're witnessing Joy

12:43PM   5   and the other man, did Joy appear like she was being forced

12:43PM   6   in any way?

12:43PM   7   A.  No.

12:43PM   8   Q.  She was being threatened?

12:43PM   9   A.  No.

12:43PM  10   Q.  No?  It looked like that was something that she wanted to

12:43PM  11   do at the time, correct?

12:43PM  12   A.  Yeah.

12:43PM  13   Q.  And I think that you said that you believed that that the

12:43PM  14   customer and Joy may have had a relationship outside of the

12:43PM  15   club, right?

12:43PM  16   A.  Yes.

12:43PM  17   Q.  Right?  It was your understanding that they were like

12:43PM  18   boyfriend and girlfriend, right?

12:43PM  19   A.  Or something.  No, she was a lesbian, so, no.  Sorry.

12:43PM  20   No.  They weren't dating.  But they had some kind of

12:43PM  21   relationship, yes.

12:43PM  22   Q.  Okay.  That -- and that was your understanding based on

12:43PM  23   what you were perceiving, right?

12:43PM  24   A.  Right.

12:43PM  25   Q.  Okay.  So this was not just a random patron, right?

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

| | | |
|---|---|---|
| 12:43PM | 1 | A.  Right. |
| 12:43PM | 2 | Q.  It was a patron that she knew? |
| 12:44PM | 3 | A.  Customer. |
| 12:44PM | 4 | Q.  A customer that she knew, yeah. |
| 12:44PM | 5 | A.  Yes. |
| 12:44PM | 6 | Q.  Do you call them customers or patrons?  Customers? |
| 12:44PM | 7 | A.  Patrons sounds classier, but customers. |
| 12:44PM | 8 | Q.  Okay.  We'll go with customers.  We're going try and |
| 12:44PM | 9 | strike that balance at some point in this trial. |
| 12:44PM | 10 | A.  Okay. |
| 12:44PM | 11 | Q.  Okay.  And you never reported what you saw in the VIP |
| 12:44PM | 12 | Room, correct? |
| 12:44PM | 13 | A.  No. |
| 12:44PM | 14 | Q.  You never told the VIP attendant, right? |
| 12:44PM | 15 | A.  No. |
| 12:44PM | 16 | Q.  And that's because in your head, this is what she wanted |
| 12:44PM | 17 | to do, right? |
| 12:44PM | 18 | A.  Right. |
| 12:44PM | 19 | Q.  That she -- she didn't find it objectionable, so you |
| 12:44PM | 20 | really didn't care, right? |
| 12:44PM | 21 | A.  Right. |
| 12:44PM | 22 | Q.  Okay.  You weren't thinking about the rules of the club |
| 12:44PM | 23 | at that point in time, right? |
| 12:44PM | 24 | A.  Correct. |
| 12:44PM | 25 | Q.  Correct.  You weren't consulting the rule book, right? |

12:44PM 1    A.  No.

12:44PM 2    Q.  Okay.  Now, one other question -- now one other line of

12:44PM 3    questions, there was some testimony about K.L. at a hotel and

12:44PM 4    Mr. Gerace called you in the early-morning hours; do you

12:44PM 5    recall that testimony?

12:44PM 6    A.  Yes.

12:44PM 7    Q.  Now this wasn't the first time she had an adverse

12:45PM 8    reaction to using drugs, correct?

12:45PM 9    A.  Right, she had them frequently.

12:45PM 10   Q.  Yeah.

12:45PM 11   A.  She had epilepsy.

12:45PM 12   Q.  Yeah, and you had been in nursing school, right?

12:45PM 13   A.  For a year, yes.

12:45PM 14   Q.  Okay, yeah.  And, so, when you heard that -- that she had

12:45PM 15   had this drug reaction, it didn't surprise you, right?

12:45PM 16   A.  Right.

12:45PM 17   Q.  You knew that she would be okay, right?

12:45PM 18   A.  Based on what happened before, yes.

12:45PM 19   Q.  Yes.  And also you and K.L. didn't want to get in

12:45PM 20   trouble, right?

12:45PM 21   A.  Well, I wasn't with her at the time, but you mean when

12:45PM 22   she had them with me, is that what you're asking?

12:45PM 23   Q.  Well, let me ask you this.  You knew K.L., right?

12:45PM 24   A.  Yes.

12:45PM 25   Q.  You guys were friends, right?

USA v Gerace - G.R. - Soehnlein/Cross - 11/13/24

12:45PM  1   A.  Right.

12:45PM  2   Q.  Very close friends at that point in time, right?

12:45PM  3   A.  Yes.

12:45PM  4   Q.  You had an understanding of her drug use, correct?

12:45PM  5   A.  Yes.

12:45PM  6   Q.  You had an understand that she liked to use drugs, right?

12:45PM  7   A.  Yes.

12:45PM  8   Q.  You had an understanding that she didn't want to get in

12:45PM  9   trouble for using drugs, correct?

12:45PM  10  A.  Correct.

12:45PM  11  Q.  And you understood that if -- if an ambulance or law

12:45PM  12  enforcement would have been called to that hotel, then

12:45PM  13  there's a good possibility that she would've gotten in

12:45PM  14  trouble, correct?

12:45PM  15  A.  Correct.

12:45PM  16  Q.  She didn't want to get in trouble, did she?

12:45PM  17  A.  No.

12:45PM  18  Q.  Okay.  And, so, it didn't surprise you when Mr. Gerace

12:45PM  19  asked you to come to the hotel, correct?

12:46PM  20  A.  No.

12:46PM  21  Q.  You knew that K.L. would be okay?

12:46PM  22  A.  Yeah.

12:46PM  23  Q.  Okay.  Because you had experienced it before?

12:46PM  24  A.  Right.

12:46PM  25  Q.  Right.  It wasn't really a big deal to you then, it was

12:46PM   1   just something that you had to deal with, correct?

12:46PM   2   A.  Well, still scary because I didn't fully understand what

12:46PM   3   was going on until I got there.

12:46PM   4   Q.  Okay.  It was -- it was scary, but it was within the

12:46PM   5   realm of what your experience had been before that, right?

12:46PM   6   A.  Sure.

12:46PM   7   Q.  How many times had K.L. done that before that?

12:46PM   8   A.  Around me, I think like twice before.

12:46PM   9   Q.  Okay.  And you had dealt with it on your own, right?

12:46PM  10   A.  Yes.

12:46PM  11   Q.  You hadn't called an ambulance?

12:46PM  12   A.  No.

12:46PM  13   Q.  You didn't call police?

12:46PM  14   A.  No.

12:46PM  15   Q.  Okay.  All right.

12:46PM  16        **MR. SOEHNLEIN:**  I think that might be all I have.

12:46PM  17   Can you just give me one second?

12:46PM  18        **THE WITNESS:**  Sure.

12:46PM  19        **MR. SOEHNLEIN:**  That's all I have, thank you very

12:46PM  20   much.

12:46PM  21        **THE COURT:**  Any redirect, Mr. Cooper?

12:46PM  22        **MR. COOPER:**  Yes, Judge.  How much time do I have?

12:46PM  23        **THE COURT:**  Well, I want to break at 1 if we can.

12:46PM  24        **MR. COOPER:**  Okay.  We may need to break while I'm

12:47PM  25   still redirecting, but I'm happy to start.

**REDIRECT EXAMINATION BY MR. COOPER:**

Q.   On cross-examination, quite a few times Mr. Soehnlein asked you about what happened in the upstairs bathroom when Peter told you to take care of his friend; do you remember that?

A.   Right.

Q.   And you went and that person put his penis inside your vagina, right?

A.   Yes.

Q.   Was there any confusion in the discussion or the -- the words that Peter said to you?  Did you interpret them clearly?

A.   I believe so, yes.

Q.   Okay.  Any confusion in your mind about what he meant when he said, go take care of my buddy?

A.   No.

Q.   Okay.  So those questions about how you interpreted it, was it clear to you?

A.   Yes.

Q.   Was it obvious?

A.   Yeah.

Q.   Did you think he meant go play Connect 4 with his friend in the bathroom?

A.   No.  No.  I don't think that.

Q.   Did you think he meant, hey, go talk to him about, you

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

143

12:48PM  1   know, what your life was like before you came to work here?

12:48PM  2   Is that how you interpreted it?

12:48PM  3   A.   No.

12:48PM  4   Q.   Did the friend seem surprised when you guys went in the

12:48PM  5   bathroom and had sex?

12:48PM  6   A.   No.

12:48PM  7   Q.   He didn't seem shocked, oh, my God, this woman is taking

12:48PM  8   her clothes off.  That didn't happen?

12:48PM  9   A.   No.

12:48PM  10  Q.   There was no confusion, was there?

12:48PM  11  A.   No.

12:48PM  12  Q.   Let's talk about the BMW.  You were asked some questions

12:48PM  13  about the BMW.  Mr. Soehnlein asked you, oh, nice car you're

12:48PM  14  zipping around; you remember those questions?

12:48PM  15  A.   Yes.

12:48PM  16  Q.   Did you ever pay for that at all?

12:48PM  17  A.   No, I didn't.

12:48PM  18  Q.   Was someone else paying for it?

12:48PM  19  A.   Yes.

12:48PM  20  Q.   During that time in your life, were you spending all your

12:49PM  21  money on drugs?

12:49PM  22  A.   Yes.

12:49PM  23  Q.   Did the BMW last?

12:49PM  24  A.   No, it got repossessed.

12:49PM  25  Q.   Okay.  You were asked some questions about the vibe that

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

144

| | | |
|---|---|---|
| 12:49PM | 1 | you were putting out, being enthusiastic; do you remember |
| 12:49PM | 2 | those questions? |
| 12:49PM | 3 | A.  Yeah. |
| 12:49PM | 4 | Q.  Okay.  At the time, let's take summer of 2009, as a heavy |
| 12:49PM | 5 | drug addict using opiates and cocaine every single day to get |
| 12:49PM | 6 | through your shifts, would you describe your generic vibe as |
| 12:49PM | 7 | enthusiastic and excited to be at work? |
| 12:49PM | 8 | A.  Not really.  But -- |
| 12:49PM | 9 | Q.  Okay.  And how about this?  When you walked upstairs the |
| 12:49PM | 10 | night Peter gave you $200 to have sex with his friend, did |
| 12:49PM | 11 | you have a sign around your neck that said I want to have sex |
| 12:49PM | 12 | for money? |
| 12:49PM | 13 | A.  No. |
| 12:49PM | 14 | Q.  Were you putting out a vibe that said I'd like for you to |
| 12:49PM | 15 | sell my body to this man I've never met before?  Was that the |
| 12:49PM | 16 | vibe you were putting out? |
| 12:49PM | 17 | A.  No. |
| 12:49PM | 18 | Q.  Towards the end of the cross there, you were asked some |
| 12:50PM | 19 | questions about K.L.'s seizures, specifically the night that |
| 12:50PM | 20 | you went to the hotel to pick her up; do you remember that? |
| 12:50PM | 21 | A.  Yes. |
| 12:50PM | 22 | Q.  Okay.  That was back around 2009, right? |
| 12:50PM | 23 | A.  Right. |
| 12:50PM | 24 | Q.  As you sit here today, do you have a clear memory of |
| 12:50PM | 25 | exactly what words Peter Gerace said to you when he called |

| | | |
|---|---|---|
| 12:50PM | 1 | you on the phone? |
| 12:50PM | 2 | A.  No. |
| 12:50PM | 3 | Q.  Would looking at a statement that you made back in 2020 |
| 12:50PM | 4 | help refresh your memory? |
| 12:50PM | 5 | A.  Yeah.  Sure, it would. |
| 12:50PM | 6 | **MR. COOPER:**  I'm holding 3565G, and I'm on page 3 of |
| 12:50PM | 7 | 4.  May I approach the witness? |
| 12:50PM | 8 | **THE COURT:**  Sure. |
| 12:50PM | 9 | **BY MR. COOPER:** |
| 12:50PM | 10 | Q.  Just read this paragraph to yourself, not out loud. |
| 12:50PM | 11 | A.  Okay. |
| 12:50PM | 12 | Q.  And look back up at me when you're finished. |
| 12:51PM | 13 | A.  All set. |
| 12:51PM | 14 | Q.  Okay. |
| 12:51PM | 15 | **MR. COOPER:**  May I approach? |
| 12:51PM | 16 | **THE COURT:**  You may. |
| 12:51PM | 17 | **MR. COOPER:**  Thanks. |
| 12:51PM | 18 | **BY MR. COOPER:** |
| 12:51PM | 19 | Q.  Would looking at your grand jury testimony when you |
| 12:51PM | 20 | testified back in December of 2020, would that help refresh |
| 12:51PM | 21 | your memory about the details of that night? |
| 12:51PM | 22 | A.  Sure. |
| 12:51PM | 23 | **MR. COOPER:**  I'm holding what's marked for |
| 12:51PM | 24 | identification as 3565A as in apple, and I'm on page 27. |
| 12:51PM | 25 | **BY MR. COOPER:** |

12:52PM    1    Q.  Starting from around here, read to the bottom of this

12:52PM    2    page.

12:52PM    3    A.  Sure.

12:52PM    4    Q.  And then I'll come back and get it when you're done.

12:52PM    5    A.  Yeah.

12:52PM    6    Q.  Okay.

12:52PM    7            **MR. COOPER:**  May I approach?

12:52PM    8            **THE COURT:**  Yes.

12:52PM    9            **MR. COOPER:**  Thank you.

12:52PM   10            **THE WITNESS:**  Here you go.

12:52PM   11            **MR. COOPER:**  Thank you.

12:52PM   12            **BY MR. COOPER:**

12:52PM   13    Q.  Do you recall what Peter said to you when he called you

12:53PM   14    when K.L. was seizing from cocaine use in his hotel room?

12:53PM   15    A.  Yes.  He was -- he wanted me to come pick her up from the

12:53PM   16    hotel room.  And he said -- I'm sorry, you're asking me what

12:53PM   17    he said to me exactly?

12:53PM   18    Q.  Yeah.  What do you recall about what he said to you on

12:53PM   19    the phone first when you --

12:53PM   20    A.  Oh.  Okay.

12:53PM   21    Q.  Okay.

12:53PM   22    A.  I don't remember even rereading that, I'm just telling

12:53PM   23    you what I remember--

12:53PM   24    Q.  Sure.

12:53PM   25    A.  -- from sitting here today.

| | | |
|---|---|---|
| 12:53PM | 1 | Q.  Yeah, I'm liking it. |
| 12:53PM | 2 | A.  I don't remember exactly.  I just remember he wanted me |
| 12:53PM | 3 | to come and get her out of the hotel room right away. |
| 12:53PM | 4 | Q.  Okay.  When you showed up, what do you recall happening |
| 12:53PM | 5 | when you showed up? |
| 12:53PM | 6 | A.  Went into the hotel room, and K.L. was, like, all |
| 12:53PM | 7 | dishevelled and, like, waking up, like -- like when people |
| 12:53PM | 8 | have, like, those grand mal seizures they're like almost like |
| 12:53PM | 9 | they have amnesia and they're just, like, kind of out of it. |
| 12:53PM | 10 | And that's what I remember about that.  That's how she was. |
| 12:53PM | 11 | Just like she had just had a seizure. |
| 12:54PM | 12 | Q.  Do you recall Peter Gerace telling you that he didn't |
| 12:54PM | 13 | want K.L. to die in the hotel room, but he wouldn't call 911? |
| 12:54PM | 14 | A.  Yes, I do. |
| 12:54PM | 15 | Q.  This defendant said those words to you? |
| 12:54PM | 16 | A.  Yes. |
| 12:54PM | 17 | Q.  So when Mr. Soehnlein was asking you about whether, you |
| 12:54PM | 18 | know, you had seen this happen before, do you -- did you know |
| 12:54PM | 19 | at the time whether she was gonna be okay or not?  Did you |
| 12:54PM | 20 | know that? |
| 12:54PM | 21 | A.  No.  Because I didn't know what they were doing in the |
| 12:54PM | 22 | ho -- like, I didn't know what drugs they were using and |
| 12:54PM | 23 | stuff, so I didn't exactly know.  But I had seen it happen |
| 12:54PM | 24 | before, and she was okay.  But I didn't know everything, all |
| 12:54PM | 25 | the details, no. |

| | | |
|---|---|---|
| 12:54PM | 1 | Q. And it turns out that she was okay, right? |
| 12:54PM | 2 | A. Yeah. |
| 12:54PM | 3 | Q. That's what happened. |
| 12:54PM | 4 | A. She was fine, yeah. |
| 12:54PM | 5 | Q. But the defendant said to you, I don't want her to die in |
| 12:54PM | 6 | here, right? |
| 12:54PM | 7 | A. Right. |
| 12:54PM | 8 | Q. Those were his words? |
| 12:54PM | 9 | A. Right. |
| 12:54PM | 10 | Q. Okay. But he didn't call an ambulance did he? |
| 12:54PM | 11 | A. No. |
| 12:54PM | 12 | Q. A couple of times during cross-examination you were asked |
| 12:55PM | 13 | questions about whether you -- the choices that you made; do |
| 12:55PM | 14 | you remember being asked those questions? |
| 12:55PM | 15 | A. Yes. |
| 12:55PM | 16 | Q. Okay. You've been clean and sober about 13 years now, |
| 12:55PM | 17 | correct? |
| 12:55PM | 18 | A. Yeah. |
| 12:55PM | 19 | Q. Is your ability to make choices today different than what |
| 12:55PM | 20 | your ability was like to make choices in the summer of 2009? |
| 12:55PM | 21 | A. Yes. |
| 12:55PM | 22 | Q. Okay. When you're deep in the throes of addiction that |
| 12:55PM | 23 | you spent a long time describing to this jury, is it |
| 12:55PM | 24 | different in your brain, like, how your brain perceives |
| 12:56PM | 25 | choices that are presented to you? |

12:56PM    1    A.  Yes.

12:56PM    2    Q.  Okay.  Are you driven and motivated by that addiction?

12:56PM    3    A.  Today, no.

12:56PM    4    Q.  No, I'm sorry, back then in 2009?

12:56PM    5    A.  Yes.

12:56PM    6    Q.  In the summer?

12:56PM    7    A.  Yes.

12:56PM    8    Q.  Okay.  When the defendant told you that he'd give you

12:56PM    9    $200 to take care of his buddy, and you went in the bathroom

12:56PM    10    and had sex with that man, was that a decision that was

12:56PM    11    driven by the fact that you were heavily addicted to drugs

12:56PM    12    and needed that money?

12:56PM    13    A.  Yes.  I did need that money.

12:56PM    14    Q.  If someone asked you today, hey, go have sex with someone

12:57PM    15    in that back room over there on the side of the courtroom for

12:57PM    16    $200, would you do it?

12:57PM    17    A.  No.

12:57PM    18    Q.  You were asked on cross-examination about whether you

12:57PM    19    continued to see that individual afterwards and have sex for

12:57PM    20    money; do you remember that question?

12:57PM    21    A.  Yes.

12:57PM    22    Q.  Can you explain to the jury, did it become easier to do

12:57PM    23    that after the defendant had already put you up to it once?

12:57PM    24    A.  Yeah.

12:57PM    25    Q.  Can you explain that to them?  What do you mean by that?

12:57PM  1   A.  When you're, like, an addict I guess or an alcoholic,

12:57PM  2   like, I would set these invisible bars for myself saying,

12:58PM  3   like, if I'm, like, for example, I'll never drink in the

12:58PM  4   morning, or I'll never have sex for money.  And when you're

12:58PM  5   addicted those bars become lowered or nonexistent.

12:58PM  6       And that's exactly what happened after this incident.  It

12:58PM  7   was just easier to do that again, to have sex for money.  And

12:58PM  8   it was like a new way to earn money so I could buy drugs.  I

12:58PM  9   don't know.

12:58PM  10  Q.  Who introduced you to that?

12:58PM  11  A.  Pardon me?

12:58PM  12  Q.  Who made that a new way for you to earn money?  Who

12:58PM  13  brought this into your life?

12:58PM  14  A.  Well, it was that incident upstairs.  I mean, that was --

12:58PM  15  that was how it first happened.  So, Peter, I guess, or K.L..

12:58PM  16  I don't know.

12:58PM  17  Q.  Who -- well, who said go take care of my buddy?  Peter or

12:58PM  18  K.L.?

12:58PM  19  A.  Peter.

12:58PM  20  Q.  Okay.  Who gave you $200?

12:59PM  21  A.  Peter.

12:59PM  22  Q.  You were asked on cross-examination about whether your

12:59PM  23  memory was fuzzy on that night; do you remember being asked

12:59PM  24  that?

12:59PM  25  A.  Yes.

12:59PM    1    Q.  Okay.  You provided the jury with some details, right?

12:59PM    2    A.  Right.

12:59PM    3    Q.  Okay.  Did you make any of those details up?

12:59PM    4    A.  No.

12:59PM    5    Q.  Do you recall those details happening?

12:59PM    6    A.  Yes.

12:59PM    7    Q.  Is that fuzzy at all?

12:59PM    8    A.  No.

12:59PM    9    Q.  Okay.  Was it a pretty -- is it a pretty, like, iconic

12:59PM   10    event in your memory, the first time that you had sex in

12:59PM   11    exchange for money?

12:59PM   12    A.  Yeah.

12:59PM   13    Q.  It stands out in your mind?

12:59PM   14    A.  Sure.

12:59PM   15    Q.  Have you heard the term "nodding out" before?

12:59PM   16    A.  Yes.

12:59PM   17    Q.  Do you know what that means?

12:59PM   18        **MR. SOEHNLEIN:**  Objection, Your Honor.  This is

12:59PM   19    beyond the scope of direct.

01:00PM   20        **MR. COOPER:**  This is not beyond the scope of direct.

01:00PM   21    There were questions about whether Mr. Gerace knew that she

01:00PM   22    was using certain drugs, and I'm going to probe that now.

01:00PM   23        **THE COURT:**  Okay, overruled.

01:00PM   24        **THE WITNESS:**  Yes.

01:00PM   25        **BY MR. COOPER:**

01:00PM    1    Q.  What's it mean to nod out?

01:00PM    2    A.  To close your eyes and, like, pass out while you're still

01:00PM    3    sitting up almost.

01:00PM    4    Q.  Okay.  And is that something that happens when people use

01:00PM    5    opiates heavily?

01:00PM    6    A.  Yes.

01:00PM    7    Q.  Do you see that happen with people at Pharaoh's?

01:00PM    8    A.  It happened to me.

01:00PM    9    Q.  Describe that for the jury.

01:00PM   10    A.  Well, when I became heroin addicted, there were times

01:00PM   11    where I would be nodding out at work.  Or, you know, I'd be

01:00PM   12    in and out of, like, consciousness, but you're still like

01:00PM   13    sitting up.  Your eyes would close, you'd sway back and

01:00PM   14    forth, almost look like you're drunk.  That's how it was.

01:00PM   15    Q.  Is that a result of opiate use?

01:00PM   16    A.  Yes.

01:00PM   17    Q.  You said it would happen to you at work.  Did it happen

01:00PM   18    once or more than once?

01:00PM   19    A.  A couple of times.

01:00PM   20    Q.  You were asked questions about the fact that K.L. was a

01:01PM   21    bad influence on you; you remember being asked those

01:01PM   22    questions?

01:01PM   23    A.  Right.

01:01PM   24    Q.  Okay.  Did K.L. ever tell you I'll give you $200 to go

01:01PM   25    have sex with my friend?

01:01PM  1   A.  No.

01:01PM  2   Q.  That didn't happen?

01:01PM  3   A.  No.

01:01PM  4   Q.  Do you remember whether other dancers who worked at

01:01PM  5   Pharaoh's that you observed or were aware of were asked to do

01:01PM  6   that same thing by this defendant, have sex with someone for

01:01PM  7   money?

01:01PM  8   A.  No.

01:01PM  9          MR. SOEHNLEIN:  Objection, beyond the scope.

01:02PM  10         THE COURT:  Sustained.

01:02PM  11         Are you getting close, Mr. Cooper?

01:02PM  12         MR. COOPER:  Excuse me?

01:02PM  13         THE COURT:  Are you getting close?

01:02PM  14         MR. COOPER:  Yes.

01:02PM  15         THE COURT:  Okay.

01:02PM  16         MR. COOPER:  Excuse me, just give me one second to

01:02PM  17   find my place.

01:02PM  18         BY MR. COOPER:

01:02PM  19   Q.  Oh, you were asked some questions on cross-examination

01:02PM  20   about the meeting that you had with the FBI back in 2009 when

01:02PM  21   you were arrested; do you remember that?

01:02PM  22   A.  Yes.

01:02PM  23   Q.  Did you answer the questions that they were asking you?

01:03PM  24   A.  Yes.

01:03PM  25   Q.  Okay.  You were also asked some questions about the --

01:03PM    1    what you provided this jury, the information you provided

01:03PM    2    this jury about Joy having sexual intercourse in the

01:03PM    3    Champagne Room; do you remember that?

01:03PM    4    A.  Yes.

01:03PM    5    Q.  And Mr. Soehnlein asked you on cross-examination if you

01:03PM    6    first mentioned that this month; is that right?

01:03PM    7    A.  Yeah.

01:03PM    8    Q.  Let's talk about that a little bit.

01:03PM    9         Earlier on my first direct examination, I asked you if

01:03PM    10   you and I had sat down and prepped before you testified,

01:03PM    11   right?

01:03PM    12   A.  Right.

01:03PM    13   Q.  Did you find that helpful?

01:03PM    14   A.  A little bit, yeah.

01:03PM    15   Q.  Okay.  And when we sat down and talked, did I sometimes

01:03PM    16   ask you different questions?

01:03PM    17   A.  Sometimes, but it was like kind of the same thing.

01:03PM    18   Q.  Okay.  And with respect to the information about Joy, do

01:03PM    19   you recall in that meeting me asking you questions

01:03PM    20   specifically about what happened in the Champagne Room?

01:03PM    21   A.  Yes.

01:03PM    22   Q.  Would you disagree with me that you weren't asked that

01:03PM    23   question in the grand jury?

01:03PM    24   A.  Right.

01:03PM    25   Q.  Okay.  And when I asked you that question, did you tell

01:03PM   1   me what you recalled?

01:03PM   2   A.   Yes.

01:04PM   3   Q.   You were asked questions about whether K.L. wanted to get

01:04PM   4   in trouble, do you remember those questions, with respect to

01:04PM   5   the seizure at the hotel?

01:04PM   6   A.   Right.

01:04PM   7   Q.   Was there a rule that you were aware of at Pharaoh's that

01:04PM   8   the defendant set about not calling an ambulance or the

01:04PM   9   police?

01:04PM   10          **MR. SOEHNLEIN:**  Objection, beyond the scope.

01:04PM   11          **THE COURT:**  Sustained.

01:04PM   12          **MR. COOPER:**  Judge --

01:04PM   13          **THE COURT:**  Sustained.

01:04PM   14          **MR. COOPER:**  Can I -- I'd like to come up and argue

01:04PM   15   it then.

01:04PM   16          **THE COURT:**  No.  Sustained.

01:04PM   17          **BY MR. COOPER:**

01:04PM   18   Q.   You were asked questions on cross-examination about

01:04PM   19   whether it was K.L.'s fear of getting in trouble or the

01:04PM   20   defendant telling you not to call an ambulance; do you

01:05PM   21   remember being asked about that topic on cross-examination?

01:05PM   22   A.   Yes.

01:05PM   23   Q.   Okay.  Are you aware of whether the defendant set rules

01:05PM   24   about whether people should call an ambulance?

01:05PM   25          **MR. SOEHNLEIN:**  Objection, beyond the scope.

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

156

01:05PM  1      **THE COURT:**  Sustained.

01:05PM  2          **MR. COOPER:**  Judge, I'd like to be heard on it.

01:05PM  3      **THE COURT:**  Mr. Cooper, it's five minutes after 1.

01:05PM  4  If you're gonna finish your redirect, finish the redirect.

01:05PM  5          **MR. COOPER:**  Will I be allowed to argue it if we

01:05PM  6  break then?  I -- I'm just trying to--

01:05PM  7      **THE COURT:**  Okay.  Folks, we're going to take our

01:05PM  8  lunch break now.  Okay?  So you folks remember my

01:05PM  9  instructions.

01:05PM 10      Don't talk about this case with anyone.  Don't talk

01:05PM 11  about it with each other.  Don't use tools of technology to

01:05PM 12  research the case, to learn anything about the case or

01:05PM 13  communicate anything about the case.

01:05PM 14      Don't read or watch or listen to any news coverage of

01:05PM 15  the case, if there is any, while the case in progress.  Don't

01:05PM 16  make up your mind about anything until the case is submitted

01:05PM 17  to you.

01:05PM 18      Be back here at five minutes after 2.  Thank you.

01:05PM 19          (Jury excused at 1:05 p.m.)

01:06PM 20      **THE COURT:**  Hey, Ma'am, don't talk to anybody about

01:06PM 21  your testimony during the lunch break.  Sorry that you're

01:06PM 22  going to have to come back, but that's the way it is.

01:06PM 23          **THE WITNESS:**  Okay.

01:06PM 24          **THE COURT:**  Okay, thanks.

01:06PM 25          (Witness excused at 1:06 p.m.)

01:06PM  1      **THE COURT:**  Okay.  Mr. Cooper, make your record.

01:06PM  2      **MR. COOPER:**  Judge, the purpose of redirect

01:06PM  3  examination is to rehabilitate points that were brought up on

01:07PM  4  cross-examination.

01:07PM  5      **THE COURT:**  Yep.

01:07PM  6      **MR. COOPER:**  The point that was brought up on

01:07PM  7  cross-examination with this witness was to ask about K.L. not

01:07PM  8  wanting to get in trouble.

01:07PM  9      K.L.'s not the person who called her to say come get

01:07PM  10  her out of here, it was the defendant.

01:07PM  11      I'm in possession of facts that I expect this witness

01:07PM  12  to testify to that will rebut the argument that the defense

01:07PM  13  raised on cross-examination.

01:07PM  14      **THE COURT:**  Rebut what argument that the defendant

01:07PM  15  raised?

01:07PM  16      **MR. COOPER:**  That it was K.L. -- that K.L. is the

01:07PM  17  motivating force behind an ambulance not being called the

01:07PM  18  night of her seizure.

01:07PM  19      Judge, I resp -- I feel like if it was a half an hour

01:07PM  20  before the lunch break, this would be an area --

01:07PM  21      **THE COURT:**  No.

01:07PM  22      **MR. COOPER:**  -- I wasn't even able to come up and

01:07PM  23  argue it, and so I respectfully -- nobody feels worse --

01:07PM  24      **THE COURT:**  You don't know what my ruling is gonna

01:07PM  25  be.  You're not going to get into what rules in the club are

01:07PM   1   with respect to a phone call that's made from a hotel room.

01:07PM   2   That's not coming in.  So you can argue until you're blue in

01:07PM   3   the face, and you make whatever record you want.

01:07PM   4           Make whatever record you want.  Try to convince me.

01:08PM   5   Go ahead.

01:08PM   6           **MR. COOPER:**  Judge, it's a -- it's a rule set by the

01:08PM   7   defendant about not calling 911 so that people don't get in

01:08PM   8   trouble.  I would suggest to you that the same behavior the

01:08PM   9   defendant is engaging in in the club, which is doing cocaine

01:08PM   10  in the upstairs area, dancers overdosing, whatever it is, is

01:08PM   11  consistent with the instance here.

01:08PM   12          She worked for him.  Those rules that he's expressed

01:08PM   13  to her are relevant proof for the jury to hear, and it's -- I

01:08PM   14  believe it's within the scope of the cross-examination when

01:08PM   15  there's a -- an argument made that K.L. not wanting to get in

01:08PM   16  trouble is the driving force.

01:08PM   17          They even asked, like, did K.L. want you to call an

01:08PM   18  ambulance?  Or did K.L. -- had you called an ambulance in the

01:08PM   19  past?  This is -- it's --

01:08PM   20          **THE COURT:**  And you can argue to the jury that it

01:08PM   21  wasn't K.L. that made that decision, it was Mr. Gerace.  And

01:08PM   22  the testimony about the rule in Pharaoh's is already in.  So

01:08PM   23  you're not gonna get into this now.  I believe that this

01:08PM   24  question is beyond the scope of the cross-examination that

01:08PM   25  Mr. Soehnlein did.

01:09PM   1            **MR. TRIPI:**  Judge, I have one other --

01:09PM   2            **THE COURT:**  Go ahead.

01:09PM   3            **MR. TRIPI:**  I may as well just argue it now because

01:09PM   4   I'm going to talk to Mr. Cooper over the lunch break, I don't

01:09PM   5   want you to blame him if he comes back and asks a question.

01:09PM   6            So, there was some cross-examination also about the

01:09PM   7   downstairs VIP in the club, so we're separate from the drug

01:09PM   8   rules about -- there was some cross about, you know, the

01:09PM   9   bouncer would come in, there were no sex acts allowed, that he

01:09PM  10   would break it up, if you recall some of that cross.

01:09PM  11            **THE COURT:**  I do.

01:09PM  12            **MR. TRIPI:**  In -- in the club, we're gonna -- I'm

01:09PM  13   gonna talk to Mr. Cooper, but I anticipate maybe some redirect

01:09PM  14   questions about Ms. G.R.'s awareness of other dancers also

01:09PM  15   engaging in sex acts in the upstairs.

01:09PM  16            Now, the stated rule is no sex acts in the club.  She

01:09PM  17   develops a perception, she testified about it in grand jury so

01:09PM  18   you haven't heard it yet on direct, but it's within the scope

01:10PM  19   of this cross-examination regarding the upstairs.  She

01:10PM  20   develops a perception and an understanding that other women

01:10PM  21   are engaged in sex acts as well --

01:10PM  22            **THE COURT:**  Why wasn't that asked on -- why wasn't

01:10PM  23   that asked on direct?

01:10PM  24            **MR. TRIPI:**  I don't -- I don't have an answer for

01:10PM  25   that, Judge, but it is within the scope of the cross.  And if

01:10PM    1    it's not, Judge, if it's not--

01:10PM    2           **THE COURT:**  How is -- how is it within the scope of

01:10PM    3    the cross -- how is whether there were sex acts being engaged

01:10PM    4    in upstairs within the scope of a cross that talks about

01:10PM    5    bouncers downstairs?

01:10PM    6           **MR. TRIPI:**  Well, I -- I hear you, but I think that's

01:10PM    7    slices the bologna a little then.  It's the owner, it's the

01:10PM    8    premises, the whole premises is charged as a drug-involved

01:10PM    9    premises.  The sex and the drugs are intertwined, that's our

01:10PM   10    whole theory of the case.  And if it should have been on the

01:10PM   11    direct direct-exam, then I'd ask for a little bit of latitude

01:10PM   12    to circle back to that, because it's in the grand jury,

01:10PM   13    they're aware of it, it's not something we're making up here

01:11PM   14    on the fly.  I intend to circle back to that.

01:11PM   15           But you would infer, rules for the downstairs, no sex

01:11PM   16    acts, means no sex acts in the club.  They crossed on that.

01:11PM   17           **THE COURT:**  Okay.  Mr. Soehnlein.

01:11PM   18           **MR. SOEHNLEIN:**  Your Honor, I -- I had a part of my

01:11PM   19    cross that was for that, and they didn't bring it up.  And so

01:11PM   20    I didn't do it.

01:11PM   21           And so, I mean, clearly, at least in my head, I

01:11PM   22    thought that that was not something they were gonna pursue

01:11PM   23    with this witness.

01:11PM   24           **THE COURT:**  Yeah, I think Mr. Soehnlein's right, I'm

01:11PM   25    not going to allow it.

01:11PM   1    **MR. TRIPI:**  But, Judge, you can allow recross on

01:11PM   2    that.  We're asking for a little latitude on that.

01:11PM   3    **THE COURT:**  I understand.  No.

01:11PM   4    **MR. TRIPI:**  This is -- this is my last pitch, Judge.

01:11PM   5    **THE COURT:**  Go ahead.

01:11PM   6    **MR. TRIPI:**  This is not a trial where we're gonna

01:11PM   7    have witnesses on the stand two and three days.  You had that

01:11PM   8    last trial.  This is a significant government witness, and

01:11PM   9    it's extending a little longer, but she's not going to be on

01:11PM   10   the stand for two days, I'm asking for a little latitude from

01:11PM   11   the Court with a key witness in the government's proof.

01:11PM   12   **THE COURT:**  No.  We're going to move this case along,

01:12PM   13   and we're not going back and reopening things.

01:12PM   14   **MR. TRIPI:**  But --

01:12PM   15   **THE COURT:**  I've made -- I've made my decision,

01:12PM   16   Mr. Tripi.

01:12PM   17   **MR. TRIPI:**  But this is a --

01:12PM   18   **THE COURT:**  I need you to -- I'm giving you -- I'm --

01:12PM   19   look it.  I have been giving you a lot of latitude.  I'm not

01:12PM   20   going to let you -- I think it's beyond the scope of the

01:12PM   21   cross, and I'm not going to let you reopen the direct.

01:12PM   22   End of story.

01:12PM   23   **MR. TRIPI:**  He did cross on the upstairs though.  He

01:12PM   24   didn't avoid upstairs altogether.

01:12PM   25   **MR. SOEHNLEIN:**  I crossed -- I crossed on the

01:12PM  1  conversation she had with Gerace upstairs.

01:12PM  2      **MR. TRIPI:**  That -- that conversation is happening in

01:12PM  3  the context, Judge, where four or five other men are with

01:12PM  4  other dancers.

01:12PM  5      **MR. SOEHNLEIN:**  They didn't say that on direct.

01:12PM  6      **MR. TRIPI:**  Can I finish here?

01:12PM  7      You can't slice the bologna that thin, Judge.

01:12PM  8      He crosses on the upstairs, in the conversation there

01:12PM  9  are other people there, other things are happening.  That is

01:12PM  10  within the scope of redirect.

01:12PM  11      It might not -- he could've -- he could have avoided

01:12PM  12  upstairs altogether, he didn't.  That's my pitch.

01:12PM  13      **THE COURT:**  Okay.  My ruling is the same.  Okay?

01:12PM  14      We'll see you folks at five -- five after 2.

01:13PM  15      **MR. FOTI:**  You have a matter, Judge, right before.

01:13PM  16      **THE COURT:**  I do.

01:13PM  17      **THE CLERK:**  Yes.

01:13PM  18      (Off the record at 1:13 p.m.)

02:13PM  19      (Back on the record at 2:13 p.m.)

02:13PM  20      (Jury not present.)

02:13PM  21      **THE CLERK:**  All rise.

02:13PM  22      **THE COURT:**  Please be seated.

02:13PM  23      **THE CLERK:**  We are back on the record for the

02:13PM  24  continuation of the jury trial in case numbers 19-CR-227 and

02:14PM  25  23-CR-37, United States of America versus Peter Gerace, Jr.

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

02:14PM    1              All counsel and parties are present.

02:14PM    2         **THE COURT:**  Okay.  I'm good about --

02:14PM    3              Good afternoon, everybody.  I'm good about letting

02:14PM    4    you folks make a record, and I will continue to be good about

02:14PM    5    making you folks -- letting you folks make a record when I've

02:14PM    6    made my mind up about something.

02:14PM    7              I understand the issue with respect to the rules at

02:14PM    8    Pharaoh's very well.  I honestly don't understand how whether

02:14PM    9    K.L. wanted to get into trouble or not had anything to do with

02:14PM   10    what Mr. Gerace was thinking when he called the witness.  So

02:14PM   11    I'm not sure how that line of cross was relevant.

02:14PM   12              I certainly don't think that any rules at Pharaoh's

02:14PM   13    have anything at all to do with whether K.L. wanted to get in

02:14PM   14    trouble or not.  And -- and I don't think that it -- it gives

02:14PM   15    the government any more ammunition with which to argue that

02:15PM   16    Mr. Gerace wasn't motivated by K.L.'s not wanting to get into

02:15PM   17    trouble.  In fact, I don't even see the link between K.L.'s

02:15PM   18    not getting into trouble, and Mr. Gerace's motivation.

02:15PM   19              So -- so my mind was made up on that issue, and I

02:15PM   20    wanted to get the witness off the stand before lunch, and I

02:15PM   21    didn't want to hear more oral argument.

02:15PM   22              I get to decide whether I hear more oral argument.

02:15PM   23    And it generally is going to be based on whether I think

02:15PM   24    there's an opening for me to be convinced by you, because if

02:15PM   25    there's not, then I will let you make a record on the break.

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

164

01 | 02:15PM | So that is why I didn't ask for argument at the bench, and why

02:15PM 1 So that is why I didn't ask for argument at the bench, and why

02:15PM 2 I was trying -- I was a bit impatient, perhaps I should be

02:15PM 3 more patient.  When you become a federal judge they take some

02:15PM 4 of your patience away, and I -- perhaps I should have been

02:15PM 5 more patient, and I'm sorry for not being more patient, but

02:15PM 6 that was the reason for my impatience.

02:16PM 7      Is there anything more you'd like to say on that or

02:16PM 8 anything else?

02:16PM 9      **MR. COOPER:**  Just that this is trial number 3, and

02:16PM 10 one year in front of you, and I think every single time

02:16PM 11 something's come up, you're always open to hearing argument on

02:16PM 12 it.  And so patience is something that I think you show a fair

02:16PM 13 amount of.

02:16PM 14      I think what caught me off guard is that I've grown

02:16PM 15 to accustomed to that being accepted by you when we ask.  And

02:16PM 16 then when you say no --

02:16PM 17      **THE COURT:**  Which I why I thought I needed to explain

02:16PM 18 it now.

02:16PM 19      **MR. COOPER:**  And I'm explaining -- I guess what I'm

02:16PM 20 saying is I shouldn't take it for granted, you are allowed to

02:16PM 21 say, no, Mr. Cooper, keep doing your job and I have to listen

02:16PM 22 to that.

02:16PM 23      So I didn't mean to be disobedient to your ruling, I

02:16PM 24 just was surprised and kind of caught off guard.

02:16PM 25      **THE COURT:**  And I understand.  I get it.  And it's in

02:16PM    1    the past.  Okay?

02:16PM    2        MR. COOPER:  Yep.  And I'm prepared to finish the

02:16PM    3    redirect.  So I'm ready when you are.

02:16PM    4        THE COURT:  Great.  Anything we need to do before we

02:16PM    5    bring her back in?

02:16PM    6        MR. SOEHNLEIN:  No, thank you, Judge.

02:17PM    7        THE COURT:  Okay.  Let's bring the witness back in,

02:17PM    8    and let's bring the jury back in.

02:17PM    9        MR. TRIPI:  One brief heads up, Judge, not related to

02:17PM   10    this witness.  Just -- I think we can, it's up to Mr. Foti,

02:17PM   11    but he's handling the next witness, it will be A.B.  I think

02:17PM   12    for 85 to 90 percent of the direct there's, you know, he'll

02:17PM   13    object when he deems it necessary, but there's one issue we

02:17PM   14    might want to flag and before I get into it.  So my thought

02:17PM   15    is, I'll get started, and when I get close to that, maybe it

02:17PM   16    will be time to a break anyway --

02:17PM   17        THE COURT:  Great.

02:17PM   18        MR. TRIPI:  -- and we can handle it that way.  But I

02:17PM   19    just wanted to flag it for you.

02:17PM   20        THE COURT:  Perfect.

02:17PM   21        MR. TRIPI:  Is that okay, Mark?

02:17PM   22        MR. FOTI:  Yes.

02:17PM   23        THE COURT:  Thank you, Mr. Tripi.

02:17PM   24        MR. COOPER:  You can get her back in, too, thank you.

02:18PM   25        (Witness and Jury seated at 2:18 p.m.)

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24

02:18PM    1    **THE COURT:** The record will reflect that all our

02:19PM    2    jurors, again, are present.

02:19PM    3    I remind the witness that she's still under oath.

02:19PM    4    And, Mr. Cooper, you may continue your redirect.

02:19PM    5    **MR. COOPER:** Thank you, Judge.

02:19PM    6    **BY MR. COOPER:**

02:19PM    7    Q. Good afternoon, Ms. G.R.

02:19PM    8    A. Hello.

02:19PM    9    Q. All right. The judge just reminded you that you're still

02:19PM    10    under oath. Are you a little annoyed that I didn't get you

02:19PM    11    out of here before lunch?

02:19PM    12    A. I'm not gonna lie, yes.

02:19PM    13    **THE COURT:** I tried. I tried.

02:19PM    14    **THE WITNESS:** I know you did.

02:19PM    15    **BY MR. COOPER:**

02:19PM    16    Q. I'm sorry about that. I'm trying do the best I can here,

02:19PM    17    so just bear with me. Hopefully a couple of minutes of me

02:19PM    18    asking questions and we'll wrap up. Okay?

02:19PM    19    On cross-examination, you were asked questions about who

02:19PM    20    you auditioned for when you first started working at

02:19PM    21    Pharaoh's, and I think you said Chris; do you remember that?

02:19PM    22    A. Yes.

02:19PM    23    Q. Do you know Chris's last name?

02:19PM    24    A. No.

02:19PM    25    Q. Okay. Was he a manager at Pharaoh's?

USA v Gerace - G.R. - Cooper/Redirect - 11/13/24
167

02:19PM  1    A.  Yes.

02:19PM  2    Q.  Okay.  Is it a name you think you'd recognize if you

02:20PM  3    heard it again, or you never knew it?

02:20PM  4    A.  I don't think I ever knew, I just know what he looked

02:20PM  5    like.

02:20PM  6    Q.  Got it.  Did Chris, that manager, did he work for this

02:20PM  7    defendant?

02:20PM  8    A.  Yes.

02:20PM  9    Q.  Okay.  At one time -- on cross-examination I think the

02:20PM  10   name Brandon Carr came up; do you remember that?

02:20PM  11   A.  Yes.

02:20PM  12   Q.  Did he -- what was his role at Pharaoh's?

02:20PM  13   A.  He was a DJ.

02:20PM  14   Q.  Okay.  And as a DJ, did he work for the defendant?

02:20PM  15   A.  Yes.

02:20PM  16   Q.  You were asked some questions on cross-examination about

02:20PM  17   how being an exotic dancer is a bit of a performance; do you

02:20PM  18   remember being asked those questions?

02:20PM  19   A.  Yeah.

02:20PM  20   Q.  Okay.  In the summer of 2009, was your addiction to

02:20PM  21   cocaine a performance?

02:20PM  22   A.  No.

02:20PM  23   Q.  Was your addiction to Lortabs a performance?

02:20PM  24   A.  No.

02:20PM  25   Q.  Were you acting that out?

| | | |
|---|---|---|
| 02:20PM | 1 | A.  No. |
| 02:20PM | 2 | Q.  When you lost 20 pounds, was it for a movie role? |
| 02:20PM | 3 | A.  No. |
| 02:20PM | 4 | Q.  You were asked some questions on cross-examination about |
| 02:21PM | 5 | that Amherst arrest and the conversation that you had with |
| 02:21PM | 6 | law enforcement; do you remember those questions? |
| 02:21PM | 7 | A.  Yes. |
| 02:21PM | 8 | Q.  Do you know who bailed K.L. out? |
| 02:21PM | 9 | A.  Peter. |
| 02:21PM | 10 | Q.  And finally, you were asked some questions on |
| 02:21PM | 11 | cross-examination about the upstairs area at Pharaoh's the |
| 02:21PM | 12 | night Peter gave you money to have sex with someone. |
| 02:21PM | 13 | I'd like for you to describe for the jury to the best of |
| 02:21PM | 14 | your ability to remember who was upstairs when that happened. |
| 02:21PM | 15 | **MR. SOEHNLEIN:**  Objection, beyond the scope. |
| 02:21PM | 16 | **THE COURT:**  No, overruled. |
| 02:21PM | 17 | **BY MR. COOPER:** |
| 02:21PM | 18 | Q.  Go ahead. |
| 02:21PM | 19 | A.  That was a really long time ago.  But I know it was me |
| 02:21PM | 20 | and K.L..  a bunch of nameless, faceless, like, people that |
| 02:21PM | 21 | were, like, guy friends of his.  And Peter. |
| 02:21PM | 22 | Q.  You said nameless, faceless guy friends of his; is that |
| 02:21PM | 23 | correct? |
| 02:22PM | 24 | A.  Yeah, like, I don't remember what he looked like or who |
| 02:22PM | 25 | they were. |

02:22PM  1    Q.  Okay.  Friends of whose?

02:22PM  2    A.  Peter's.

02:22PM  3    Q.  Okay.  And can you estimate was that about five, about

02:22PM  4    ten, do you remember?

02:22PM  5    A.  Not really, no.

02:22PM  6    Q.  Okay.  Would looking at your grand jury testimony help

02:22PM  7    you remember?

02:22PM  8    A.  Yeah, if you gave it to me.

02:22PM  9    Q.  Just give me one second to find it.

02:22PM  10       I'm looking at 3565A, and now I'm on page 18.

02:22PM  11       There's some sticky notes on here, just ignore that.  I'm

02:22PM  12   going to show you page 18, and there's kind of an underlying

02:22PM  13   paragraph, so I'll direct your attention to that.

02:22PM  14            **MR. COOPER:**  May I approach, Judge?

02:22PM  15            **THE COURT:**  Yes, you can.

02:23PM  16            **THE WITNESS:**  Okay.  Yeah, that looks about right.

02:23PM  17            **BY MR. COOPER:**

02:23PM  18   Q.  Okay.  So did that looking at that without reading from

02:23PM  19   that, just answer this, did looking at that refresh your

02:23PM  20   memory?

02:23PM  21   A.  Yes.  Sounds about right, like I said.

02:23PM  22   Q.  Okay.

02:23PM  23            **MR. COOPER:**  Can I approach?

02:23PM  24            **THE COURT:**  Sure.

         25

02:23PM   1        **BY MR. COOPER:**

02:23PM   2   Q.  About how many of Peter's friends do you remember being

02:23PM   3   upstairs?

02:23PM   4   A.  Like a half a dozen.

02:23PM   5   Q.  Okay.  And were there other dancers upstairs as well?

02:23PM   6   A.  No.

02:23PM   7   Q.  So you remember yourself and K.L.?

02:23PM   8   A.  Yes.  That I can remember.

02:23PM   9   Q.  You were asked questions on cross-examination about

02:24PM   10  choices quite a few times; do you remember that?

02:24PM   11  A.  Yes.

02:24PM   12  Q.  Before you got heavily addicted to coke and heroin while

02:24PM   13  you were working at Pharaoh's, in the earlier time when you

02:24PM   14  worked at Pharaoh's, pre-addiction, did this defendant ever

02:24PM   15  try to get you to have sex with his friends for money?

02:24PM   16  A.  No.

02:24PM   17  Q.  Okay.

02:24PM   18        **MR. COOPER:**  I'm finished.  Thank you, Judge.

02:24PM   19        **THE COURT:**  Anything more?

02:24PM   20        **MR. SOEHNLEIN:**  Less than a minute, Judge.

02:24PM   21

02:24PM   22        **RECROSS-EXAMINATION BY MR. SOEHNLEIN:**

02:24PM   23  Q.  Thank you for your patience.

02:24PM   24     When you're addicted to narcotics, you can still make

02:24PM   25  choices, right?

02:24PM    1    A.  Yeah.

02:24PM    2    Q.  Right?  You made the choice to walk through the door into

02:24PM    3    Pharaoh's every day, correct?

02:24PM    4    A.  Right.

02:24PM    5    Q.  You made the decision what outfit you were gonna wear,

02:24PM    6    right?

02:24PM    7    A.  Yes.

02:24PM    8    Q.  You made the decision what car you were gonna drive,

02:24PM    9    right?

02:24PM   10    A.  Right.

02:24PM   11    Q.  And sometimes when you're addicted, you make choices,

02:24PM   12    there's consequences to those choices; isn't that right?

02:24PM   13    A.  Right.

02:24PM   14    Q.  But you can get arrested for those choices, right?

02:24PM   15    A.  Right.

02:24PM   16    Q.  You can get in trouble for those decisions, right?

02:24PM   17    A.  Right.

02:24PM   18    Q.  You can do things you regret because of those decisions;

02:25PM   19    isn't that right?

02:25PM   20    A.  Right.

02:25PM   21    Q.  Peter Gerace didn't get you addicted to drugs did he?

02:25PM   22    A.  No.

02:25PM   23            **MR. SOEHNLEIN:**  That's all I have.

02:25PM   24            **THE COURT:**  Anything more?

02:25PM   25

02:25PM     1            **RE-REDIRECT EXAMINATION BY MR. COOPER:**

02:25PM     2   Q.   When you were addicted to drugs, did he give you money to

02:25PM     3   have sex with one of his friends?

02:25PM     4         **MR. SOEHNLEIN:**  Objection.

02:25PM     5         **THE COURT:**  Overruled.

02:25PM     6         **THE WITNESS:**  Yes.

02:25PM     7         **MR. COOPER:**  I'm good, thanks, Judge.

02:25PM     8         **THE COURT:**  You can step down, ma'am, thank you.

02:25PM     9         (Witness excused at 2:25 p.m.)

            10         (Excerpt concluded at 2:25 p.m.)

            11          *     *     *     *     *     *     *

            12

            13

            14

            15

            16

            17

            18

            19

            20

            21

            22

            23

            24

            25

1

2                         **CERTIFICATE OF REPORTER**

3

4                     In accordance with 28, U.S.C., 753(b), I

5        certify that these original notes are a true and correct

6        record of proceedings in the United States District Court for

7        the Western District of New York on November 13, 2024.

8

9

10                               s/ Ann M. Sawyer
                              Ann M. Sawyer, FCRR, RPR, CRR
11                            Official Court Reporter
                              U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF G.R.(PROTECTED WITNESS #2)**

**NOVEMBER 13, 2024**

**W I T N E S S**                                    **P A G E**

**G.R. (PROTECTED WITNESS #2)**                       2

  DIRECT EXAMINATION BY MR. COOPER:                  2

  CROSS-EXAMINATION BY MR. SOEHNLEIN:                93

  REDIRECT EXAMINATION BY MR. COOPER:                142

  RECROSS-EXAMINATION BY MR. SOEHNLEIN:              170

  RE-REDIRECT EXAMINATION BY MR. COOPER:             172