1
              **UNITED STATES DISTRICT COURT**
              **WESTERN DISTRICT OF NEW YORK**

2

_____

3  **UNITED STATES OF AMERICA,**

                         Case No. 1:19-cr-227

4            Plaintiff,            1:23-cr-37

  v.                          (LJV)

5

  **PETER GERACE, JR.,**          December 16, 2024

6

             Defendant.

7

     **TRANSCRIPT EXCERPT - EXAMINATION OF L.L. (PW #1)**

8         **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
           **UNITED STATES DISTRICT JUDGE**

9

  <u>**APPEARANCES:**</u>     **TRINI E. ROSS, UNITED STATES ATTORNEY**

10                 **BY: JOSEPH M. TRIPI, ESQ.**
                  **NICHOLAS T. COOPER, ESQ.**

11                    **CASEY L. CHALBECK, ESQ.**
              Assistant United States Attorneys

12                Federal Centre, 138 Delaware Avenue
              Buffalo, New York 14202

13                For the Plaintiff

14                **THE FOTI LAW FIRM, P.C.**
              **BY: MARK ANDREW FOTI, ESQ.**

15                16 West Main Street, Suite 100
              Rochester, New York 14614

16                  And
              **SOEHNLEIN LAW**

17                **BY: ERIC MICHAEL SOEHNLEIN, ESQ.**
              350 Main Street, Suite 2100

18                Buffalo, New York 14202
              For the Defendant

19

  <u>**PRESENT:**</u>       **KAREN A. CHAMPOUX, USA PARALEGAL**

20                **BRIAN A. BURNS, FBI SPECIAL AGENT**
              **MARILYN K. HALLIDAY, HSI SPECIAL AGENT**

21                **OLIVIA A. PROIA, J.D., PARALEGAL**

22  <u>**LAW CLERK:**</u>      **REBECCA FABIAN IZZO, ESQ.**

23  <u>**COURT CLERK:**</u>    **COLLEEN M. DEMMA**

24  <u>**REPORTER:**</u>      **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
             Robert H. Jackson Courthouse

25               2 Niagara Square Buffalo, New York 14202
             Ann_Sawyer@nywd.uscourts.gov

| | | |
|---|---|---|
| 10:02AM | 1 | (Excerpt commenced at 10:02 a.m.) |
| 10:02AM | 2 | (Jury seated at 10:02 a.m.) |
| 10:03AM | 3 | **THE COURT:**  Good morning, everyone. |
| 10:03AM | 4 | **JURORS:**  Good morning. |
| 10:03AM | 5 | **THE COURT:**  Welcome back.  Most of you are smiling |
| 10:03AM | 6 | due to the Bills victory. |
| 10:03AM | 7 | The record will reflect that all our jurors are |
| 10:03AM | 8 | present. |
| 10:03AM | 9 | I remind the witness that she's still under oath. |
| 10:03AM | 10 | And, Mr. Tripi, you may continue. |
| 10:03AM | 11 | **MR. TRIPI:**  Thank you, Your Honor. |
| 10:03AM | 12 | |
| 10:03AM | 13 | **L.L. (PROTECTED WITNESS #1),** having been previously duly |
| 10:03AM | 14 | called and sworn, continued to testify as follows: |
| 10:03AM | 15 | |
| 10:03AM | 16 | **(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:** |
| 10:03AM | 17 | Q.  Good morning, Ms. L.L. |
| 10:03AM | 18 | A.  Good morning. |
| 10:03AM | 19 | Q.  We left off on, I think, Friday, and we had talked -- |
| 10:03AM | 20 | finished talking about physical effects of -- of heroin; do |
| 10:03AM | 21 | you remember that? |
| 10:03AM | 22 | A.  Yes. |
| 10:03AM | 23 | Q.  I'd like to start off today by -- |
| 10:03AM | 24 | **MR. TRIPI:**  For the witness only, pulling up on her |
| 10:03AM | 25 | screen Exhibit 463-3.  This is not in evidence. |

10:03AM  1      **BY MR. TRIPI:**

10:04AM  2   Q.  And, Ms. L.L., on the screen next to you, we're gonna

10:04AM  3   pull up an image.  It should appear momentarily.  I just want

10:04AM  4   you to look at that.  And when you're done, look back at me

10:04AM  5   and I'll ask some more questions, okay?

10:04AM  6   A.  Okay.

10:04AM  7          **MR. TRIPI:**  And can we zoom in, Ms. Champoux, to make

10:04AM  8   the image larger?  Thank you.

10:04AM  9          **BY MR. TRIPI:**

10:04AM  10  Q.  Just take a moment, look at that, and when you're done

10:04AM  11  look up.  Do you recognize that?

10:04AM  12  A.  No.

10:04AM  13  Q.  Are you in that picture?

10:04AM  14  A.  No.

10:04AM  15  Q.  That's not you?

10:04AM  16  A.  No.

10:04AM  17  Q.  Okay.  Is that A.A.?

10:04AM  18  A.  No, that's not A.A.

10:04AM  19  Q.  Oh, okay.  I'll take it down.

10:04AM  20  A.  Okay.

10:04AM  21  Q.  We're off to a flying start.

10:04AM  22      All right.  I'll ask some other questions then.

10:05AM  23      When you first started at Pharaoh's, Ms. L.L., did your

10:05AM  24  appearance, due to your drug use, degrade over time?

10:05AM  25  A.  Yes.

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

4

| | | |
|---|---|---|
| 10:05AM | 1 | Q.  Okay.  I'm going to talk about that more later on.  But |
| 10:05AM | 2 | obviously, when you started as a 20-year-old, you weren't |
| 10:05AM | 3 | addicted to those heavy drugs, right? |
| 10:05AM | 4 | A.  Correct. |
| 10:05AM | 5 | Q.  Over time, those drugs took a physical toll on you, and |
| 10:05AM | 6 | we ended Friday talking about that; is that right? |
| 10:05AM | 7 | A.  Yes. |
| 10:05AM | 8 | Q.  We'll switch some -- switch gears a little bit. |
| 10:05AM | 9 | In terms of the positions of people that worked at |
| 10:06AM | 10 | Pharaoh's, I think the jury's heard a lot about it so I'm |
| 10:06AM | 11 | going to run through the different positions that people work |
| 10:06AM | 12 | at Pharaoh's, okay? |
| 10:06AM | 13 | A.  Okay. |
| 10:06AM | 14 | Q.  There were dancers? |
| 10:06AM | 15 | A.  Dancers. |
| 10:06AM | 16 | Q.  Bartenders? |
| 10:06AM | 17 | A.  Yes. |
| 10:06AM | 18 | Q.  Bouncers or security? |
| 10:06AM | 19 | A.  Yes. |
| 10:06AM | 20 | Q.  And that included the VIP attendant? |
| 10:06AM | 21 | A.  Yes. |
| 10:06AM | 22 | Q.  Managers? |
| 10:06AM | 23 | A.  Yes. |
| 10:06AM | 24 | Q.  Cooks? |
| 10:06AM | 25 | A.  Yes. |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

5

| | | |
|---|---|---|
| 10:06AM | 1 | Q.  And there were shot girls? |
| 10:06AM | 2 | A.  Yes. |
| 10:06AM | 3 | Q.  And then in there was the owner; is that right? |
| 10:06AM | 4 | A.  Yes. |
| 10:06AM | 5 | Q.  Now, the club had different sort of areas in terms of its |
| 10:06AM | 6 | physical layout, right? |
| 10:06AM | 7 | A.  Yes. |
| 10:06AM | 8 | Q.  Was there a main stage? |
| 10:06AM | 9 | A.  Yes. |
| 10:06AM | 10 | Q.  We talked a little bit about it on Friday, and we'll talk |
| 10:06AM | 11 | more about it later, but was there a VIP Room for dances? |
| 10:06AM | 12 | A.  Yes. |
| 10:06AM | 13 | Q.  Was that broken into a regular section with multiple |
| 10:06AM | 14 | couches? |
| 10:06AM | 15 | A.  Yes. |
| 10:06AM | 16 | Q.  Was there a more private portion called the Champagne |
| 10:06AM | 17 | Room? |
| 10:06AM | 18 | A.  Yes. |
| 10:06AM | 19 | Q.  And the distinguishing feature there was the regular VIP |
| 10:07AM | 20 | was single dances purchased one at a time, right? |
| 10:07AM | 21 | A.  Yes. |
| 10:07AM | 22 | Q.  And the Champagne Room were 30-minute dances purchased at |
| 10:07AM | 23 | a higher rate; is that correct? |
| 10:07AM | 24 | A.  Yes. |
| 10:07AM | 25 | Q.  Okay.  There was a downstairs office, right? |

10:07AM    1    A.    Yes.

10:07AM    2    Q.    There were downstairs locker room and dressing room for

10:07AM    3    dancers?

10:07AM    4    A.    Yes.

10:07AM    5    Q.    There was a DJ booth in proximity to that?

10:07AM    6    A.    Yes.

10:07AM    7    Q.    And that sort of was situated between the stage and the

10:07AM    8    woman's dressing room, correct?

10:07AM    9    A.    Correct.

10:07AM   10    Q.    There were public bathrooms on the first floor, right?

10:07AM   11    A.    Yes.

10:07AM   12    Q.    There were also more private bathroom for the dancers off

10:07AM   13    the locker room area, right?

10:07AM   14    A.    Yes.

10:07AM   15    Q.    There was a kitchen area; isn't that true?

10:07AM   16    A.    Yes.

10:07AM   17    Q.    Was there sort of a -- a window where the kitchen would

10:07AM   18    be that they would put the food out?

10:07AM   19    A.    Yes.

10:07AM   20    Q.    Okay.  And -- and then there was a door that would lead

10:08AM   21    to a stairwell that led to the upstairs?

10:08AM   22    A.    Yes.

10:08AM   23    Q.    And, of course, the main bar is across from the stage; is

10:08AM   24    that right?

10:08AM   25    A.    Correct.

10:08AM  1   Q.  Have we just sort of covered the general layout of

10:08AM  2   Pharaoh's?

10:08AM  3   A.  Yes.

10:08AM  4   Q.  Okay.  And based on your time and experience in the club,

10:08AM  5   who controlled that upstairs area?

10:08AM  6   A.  Peter.

10:08AM  7   Q.  This defendant?

10:08AM  8   A.  Yes.

10:08AM  9   Q.  We've heard a bunch about it in terms of how dancers get

10:08AM  10  paid, so I'm going to kind of try go quickly through this

10:08AM  11  part of it.  But, what is a house dance?

10:08AM  12  A.  A house dance is the first dance of the night.  They take

10:08AM  13  your house dance.  So basically it goes to the club.

10:08AM  14  Q.  So the full amount of the payment for your first dance

10:08AM  15  goes directly to the club?

10:08AM  16  A.  Yes.

10:08AM  17  Q.  Okay.  And then after that, is there a split, like, a

10:09AM  18  percentage every dance after that, some goes to the dancer,

10:09AM  19  some goes to the club?

10:09AM  20  A.  Yes.

10:09AM  21  Q.  Now, focusing in on the downstairs in the VIP area, how

10:09AM  22  was the flow of patrons into the VIP handled?

10:09AM  23      And what I mean by that is how does a patron pay for a

10:09AM  24  dance and then obtain a dance?  Can you explain that, how

10:09AM  25  it's supposed to work, for the jury?

10:09AM   1    A.  Yes.  So the dancer and the dancer's customer go up to

10:09AM   2    the VIP stand where there is a manager.  And he pay -- the

10:09AM   3    customer pays for the dance, and then we get chips back.

10:09AM   4    Q.  Okay.  And what do the chips indicate?

10:09AM   5    A.  The chips indicate what kind of dance you did, and for

10:10AM   6    how much.

10:10AM   7    Q.  Okay.  So a single dance would be one color chip?

10:10AM   8    A.  Right.

10:10AM   9    Q.  A Champagne Room dance, another color chip?

10:10AM   10   A.  Yes.

10:10AM   11   Q.  And then you turn in the chips at the end of the night?

10:10AM   12   A.  Yes.

10:10AM   13   Q.  But you don't get a chip for the very first dance that

10:10AM   14   you do?

10:10AM   15   A.  Correct.

10:10AM   16   Q.  When you were there, do you remember how much a single

10:10AM   17   dance cost in the more general part of the VIP?

10:10AM   18   A.  I believe it was 25.

10:10AM   19   Q.  Okay.  And approximately how much, if you recall, did a

10:10AM   20   Champagne Room dance cost?

10:10AM   21   A.  $175.

10:10AM   22   Q.  And what was the duration of a Champagne Room dance?  How

10:10AM   23   long?

10:10AM   24   A.  30 minutes.

10:10AM   25   Q.  Now, was it common for you to get tips for the single

10:11AM    1    dances from the customer?

10:11AM    2    A.  Yes.

10:11AM    3    Q.  Was it also common for you to get tips from the Champagne

10:11AM    4    Room customers?

10:11AM    5    A.  Yes.

10:11AM    6    Q.  Where would you -- where would you store the -- are those

10:11AM    7    tips cash that you're paid directly?

10:11AM    8    A.  At the end of the night?

10:11AM    9    Q.  When a customer gives you a tip, who do they give the

10:11AM   10    money to?

10:11AM   11    A.  Oh, to me.

10:11AM   12    Q.  Where do you put the money?

10:11AM   13    A.  In a Pharaoh's bag, whatever kind of bag the dancer

10:11AM   14    carries with them.

10:11AM   15    Q.  Is it like a small handbag of some sort?

10:11AM   16    A.  Yes.

10:11AM   17    Q.  At the end of the night, do you have to tip the people

10:11AM   18    out?

10:11AM   19    A.  Yes.

10:11AM   20    Q.  Who did you have to tip out yourself at the end of the

10:11AM   21    night?  By position, not name.

10:11AM   22    A.  We would tip out the door guy, DJ, VIP, and the bartender

10:12AM   23    if you drink.

10:12AM   24    Q.  The door guy, DJ, and VIP, were those all men?

10:12AM   25    A.  Yes.

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

10:12AM   1   Q.  Now in the VIP Room and the Champagne Room, you talked

10:12AM   2   about a VIP attendant; is that right?

10:12AM   3   A.  Yes.

10:12AM   4   Q.  Or a manager who works the VIP station?

10:12AM   5   A.  Yes.

10:12AM   6   Q.  Are there -- does that person have, like, a little podium

10:12AM   7   set up in proximity to entrance to the VIP?

10:12AM   8   A.  Yes.

10:12AM   9   Q.  Like a little desk area?

10:12AM  10   A.  Yes.

10:12AM  11   Q.  Is there cameras there?

10:12AM  12   A.  Yes.

10:12AM  13   Q.  What was security supposed to do in terms of monitoring

10:12AM  14   the cameras?

10:12AM  15   A.  They're supposed to watch the cameras and make sure that

10:12AM  16   the -- the dancers in the back don't get, you know, fondled

10:13AM  17   the wrong way, taken advantage of, stuff like that.

10:13AM  18   Q.  Okay.  Were there stated rules of conduct with respect to

10:13AM  19   the VIP and Champagne Room that were supposed to be followed?

10:13AM  20   A.  Yes.

10:13AM  21   Q.  What were the stated rules that were supposed to be

10:13AM  22   followed by the staff there, including the manager monitoring

10:13AM  23   the VIP area?

10:13AM  24   A.  You are supposed to wear pasties through the whole night.

10:13AM  25   You have to keep your bottoms on, your underwear, they have

| | | |
|---|---|---|
| 10:13AM | 1 | to stay on.  No touching.  No touching us inappropriately. |
| 10:14AM | 2 | No kissing.  No sex acts. |
| 10:14AM | 3 | Q.  Of any kind? |
| 10:14AM | 4 | A.  Of any kind. |
| 10:14AM | 5 | Q.  Whose job was it to enforce those rules? |
| 10:14AM | 6 | A.  The owner and the manager. |
| 10:14AM | 7 | Q.  And the dancers as well? |
| 10:14AM | 8 | A.  Yeah. |
| 10:14AM | 9 | Q.  Okay.  And who was most frequently the VIP attendant |
| 10:14AM | 10 | whose job was to monitor the camera and to enforce those |
| 10:14AM | 11 | rules? |
| 10:14AM | 12 | A.  Mostly it was Brian. |
| 10:14AM | 13 | Q.  Who else -- if it wasn't Brian, who would it be? |
| 10:14AM | 14 | A.  There would be Chris and Doug. |
| 10:14AM | 15 | Q.  Is Chris, Chris Chudy? |
| 10:14AM | 16 | A.  Yes. |
| 10:14AM | 17 | Q.  Do you remember Doug's last name? |
| 10:14AM | 18 | A.  Augustinian.  Augustine.  Something like that. |
| 10:15AM | 19 | Q.  Okay.  And did all those people work for the owner? |
| 10:15AM | 20 | A.  Yes. |
| 10:15AM | 21 | Q.  This defendant? |
| 10:15AM | 22 | A.  Yes. |
| 10:15AM | 23 | Q.  Did they all seem like they knew the defendant a long |
| 10:15AM | 24 | time? |
| 10:15AM | 25 | A.  Yes. |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

12

10:15AM   1   Q.  Did anybody in reality enforce those rules from what you

10:15AM   2   saw and what happened to you?

10:15AM   3   A.  No.

10:15AM   4   Q.  How did those rules differ from what actually occurred in

10:15AM   5   the VIP area?

10:15AM   6   A.  In the VIP, none of the rules were followed.  So, you

10:15AM   7   know, girls back there would have the man ejaculate in their

10:15AM   8   pants, pull our hair, kiss us, go in our panties.

10:16AM   9   Q.  And did other sex acts occur as well?

10:16AM  10   A.  Yes.

10:16AM  11   Q.  I think Friday we talked about hand jobs that were --

10:16AM  12   A.  Hand jobs, vaginal, anal, oral.  Yes.

10:16AM  13   Q.  All that.  The longer you or any dancer stayed in the

10:16AM  14   VIP, did the customer have to pay more money?

10:16AM  15   A.  Yes.

10:16AM  16   Q.  The longer that a dancer stayed in the VIP with a

10:16AM  17   customer, did the club make more money?

10:16AM  18   A.  Yes.

10:16AM  19   Q.  Did engaging in sex acts with customers increase the

10:16AM  20   length of time of the dances?

10:16AM  21   A.  Sorry, can you repeat that?

10:16AM  22   Q.  The more sex acts that were occurring in the VIP, did

10:16AM  23   that make the length of time that you were back there or that

10:16AM  24   other dancers were back there with customers longer?

10:16AM  25   A.  Yes.

| | | |
|---|---|---|
| 10:16AM | 1 | Q.  Longer time equals more money? |
| 10:16AM | 2 | A.  Yes. |
| 10:16AM | 3 | Q.  So other than you, who made money off the number of |
| 10:17AM | 4 | dances you performed in the VIP each night? |
| 10:17AM | 5 | **MR. SOEHNLEIN:**  Objection, Your Honor.  I think it's |
| 10:17AM | 6 | speculation. |
| 10:17AM | 7 | **MR. TRIPI:**  Judge, this is clearly 602. |
| 10:17AM | 8 | **THE COURT:**  Hang on.  Yeah, overruled. |
| 10:17AM | 9 | **BY MR. TRIPI:** |
| 10:17AM | 10 | Q.  Who made money off of the numbers you and others dancers |
| 10:17AM | 11 | performed in a VIP? |
| 10:17AM | 12 | A.  The club made money. |
| 10:17AM | 13 | Q.  When you say "the club," does that mean the owner? |
| 10:17AM | 14 | A.  Yes. |
| 10:17AM | 15 | Q.  Who else? |
| 10:17AM | 16 | A.  Door guys.  DJ.  VIP.  Bartenders. |
| 10:17AM | 17 | Q.  So everyone? |
| 10:17AM | 18 | A.  Yes. |
| 10:17AM | 19 | Q.  Now I'm going to ask you about specific individuals |
| 10:17AM | 20 | later, okay -- |
| 10:17AM | 21 | A.  Yes. |
| 10:17AM | 22 | Q.  -- but just generally for now, did you engage in vaginal |
| 10:18AM | 23 | sex in both the VIP and the Champagne Room? |
| 10:18AM | 24 | A.  Yes. |
| 10:18AM | 25 | Q.  Did you witness other dancers do that? |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

14

10:18AM    1    A.  Yes.

10:18AM    2    Q.  Did you engage in anal sex in the VIP and the Champagne

10:18AM    3    Room?

10:18AM    4    A.  Yes.

10:18AM    5    Q.  Did you witness other dancers do that?

10:18AM    6    A.  Yes.

10:18AM    7    Q.  Did you engage in oral sex in the VIP Room and the

10:18AM    8    Champagne Room?

10:18AM    9    A.  Yes.

10:18AM   10    Q.  Did the witness other dancers do that?

10:18AM   11    A.  Yes.

10:18AM   12    Q.  Did you give hand jobs in the -- in the VIP and the

10:18AM   13    Champagne Room?

10:18AM   14    A.  Yes.

10:18AM   15    Q.  Did you witness other dancers do that?

10:18AM   16    A.  Yes.

10:18AM   17    Q.  Were you digitally penetrated, were you fingered, in the

10:18AM   18    VIP and the Champagne Room?

10:18AM   19    A.  Yes.

10:18AM   20    Q.  Did you witness that happen to other dancers?

10:18AM   21    A.  Yes.

10:18AM   22    Q.  And we've talked about this, you know, it sucks I have to

10:18AM   23    ask you these questions, right?

10:18AM   24    A.  Yes, I understand.

10:18AM   25    Q.  Do you understand what we're doing here?

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

15

| 10:18AM | 1 | A. Yes. |
| 10:18AM | 2 | Q. Did you grind on men until they ejaculated? |
| 10:19AM | 3 | A. Yes. |
| 10:19AM | 4 | Q. Did you witness other dancers do that? |
| 10:19AM | 5 | A. Yes. |
| 10:19AM | 6 | Q. Did you kiss and were your breasts fondled? |
| 10:19AM | 7 | A. Yes. |
| 10:19AM | 8 | Q. Did you witness other dancers do that? |
| 10:19AM | 9 | A. Yes. |
| 10:19AM | 10 | Q. Did your pasties and your underwear come off? |
| 10:19AM | 11 | A. Yes. |
| 10:19AM | 12 | Q. Did you witness other dancers do that? |
| 10:19AM | 13 | A. Yes. |
| 10:19AM | 14 | Q. All with cameras right above you in the rooms? |
| 10:19AM | 15 | A. Yep. Yes. Sorry. |
| 10:19AM | 16 | Q. Did you observe customers who engaged in those types of |
| 10:19AM | 17 | sex acts with you tip Brian Rosenthal? |
| 10:19AM | 18 | A. Yes. |
| 10:19AM | 19 | Q. Did you witness customers who engaged in those types of |
| 10:19AM | 20 | sex acts tip Doug Augustyniak? |
| 10:19AM | 21 | A. Yes. |
| 10:19AM | 22 | Q. Did you witness other dancers, customers, tip those two |
| 10:19AM | 23 | individuals after those types of dances were performed? |
| 10:19AM | 24 | A. Yes. |
| 10:19AM | 25 | Q. I should say sex acts, not dances, right? |

10:20AM  1  A.  Correct.

10:20AM  2  Q.  In terms of your experience, did Brian Rosenthal ever

10:20AM  3  stop any of that activity that you just described?

10:20AM  4  A.  No.

10:20AM  5  Q.  Did Doug?

10:20AM  6  A.  No.

10:20AM  7  Q.  Did all of that in your life experience occur after you

10:20AM  8  were severely addicted to heroin and cocaine within two

10:20AM  9  months of working at Pharaoh's?

10:20AM  10  A.  Yes.

10:20AM  11  Q.  Did you ever get praised by any managers or staff about

10:20AM  12  the number of dances you performed?

10:20AM  13  A.  Yes.

10:20AM  14  Q.  Who were some of the people that praised you?

10:20AM  15  A.  The owner and DJ, VIP.

10:20AM  16  Q.  Can you put names to those now?

10:20AM  17  A.  Rob Reed, Peter Gerace, Chris Chudy, Doug, Brian.

10:21AM  18      Did I already say Brian?  Yeah.

10:21AM  19  Q.  Was there a minimum number of dances that a dancer, in

10:21AM  20  order to continue working at Pharaoh's, had to perform in the

10:21AM  21  VIP Room?

10:21AM  22  A.  Yes.

10:21AM  23  Q.  How many?

10:21AM  24  A.  One.

10:21AM  25  Q.  So at least one?

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

17

10:21AM   1    A.  At least one.

10:21AM   2    Q.  So based on your experience, your observations working at

10:21AM   3    Pharaoh's from 2013 to 2018, if a dancer worked and didn't go

10:21AM   4    in the VIP, they were not kept on; is that correct?

10:21AM   5    A.  Yes.

10:21AM   6    Q.  So you can't just go there and just work the stage; is

10:21AM   7    that right?

10:21AM   8    A.  Correct.

10:21AM   9    Q.  Would dancers get warned about not going in the VIP?

10:21AM   10   A.  Yes.

10:21AM   11   Q.  Did everyone know they had to do at least one dance and

10:21AM   12   it went to the house?

10:21AM   13   A.  Yes.

10:21AM   14   Q.  What were the rules about how often you had to work?

10:22AM   15   A.  The rules were at least three days a week, and at least

10:22AM   16   six hour shifts.  Six- to eight-hour shifts.

10:22AM   17   Q.  And how many days did you work per week?

10:22AM   18   A.  I was seven days a week.

10:22AM   19   Q.  Were you required to select a stage name?

10:22AM   20   A.  Yes.

10:22AM   21   Q.  What was your stage name?

10:22AM   22   A.  Gabriella, also known as Gaby.

10:22AM   23   Q.  Did other dancers have other stage names?

10:22AM   24   A.  Yes.

10:22AM   25   Q.  Roughly how many dancers worked there on a weekend?

10:22AM  1    A.  On a weekend?  There could be 100.

10:22AM  2    Q.  Fair to say you didn't know all the dancers?

10:22AM  3    A.  Correct.

10:22AM  4    Q.  Fair to say that of the dancers you did know, you knew

10:22AM  5    even less of their real names, their government names?

10:23AM  6    A.  Yes.

10:23AM  7    Q.  Did dancers -- would dancers travel in from other states

10:23AM  8    or even Canada to work at Pharaoh's for a weekend?

10:23AM  9    A.  Yes.

10:23AM  10   Q.  And then they'd go back to wherever they came from?

10:23AM  11   A.  Yes.

10:23AM  12   Q.  What other states did other dancers come in from to work

10:23AM  13   at Pharaoh's while you were there?

10:23AM  14   A.  So I know there was Canada, Texas, Florida, Georgia,

10:23AM  15   California --

10:23AM  16   Q.  And were there some of those -- were those called feature

10:23AM  17   dancers --

10:23AM  18   A.  Yes.

10:23AM  19   Q.  -- where they would come in from out of town and perform?

10:23AM  20   A.  Yes.

10:23AM  21   Q.  Were there other dancers that lived in closer proximity

10:23AM  22   in nearby states like Pennsylvania and things like that?

10:23AM  23   A.  Yes.

10:23AM  24   Q.  And you mentioned Canada, obviously, is right over the

10:24AM  25   border.

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

10:24AM   1   A.   Yeah.

10:24AM   2   Q.   What was the general environment like when you worked

10:24AM   3   there?

10:24AM   4   A.   It was a big party every day.   That's the best I could,

10:24AM   5   like, explain it.

10:24AM   6   Q.   Okay.   When you first worked there, did anyone sit you

10:24AM   7   down and tell you the rules about drug use?

10:24AM   8   A.   Yes.

10:24AM   9   Q.   Who told you the rules about drug use?

10:24AM  10   A.   Chris.

10:24AM  11   Q.   Chris Chudy?

10:24AM  12   A.   Yes.

10:24AM  13   Q.   Now, based upon your experience and observations, how did

10:24AM  14   the rules you were told about drug use compare with the

10:24AM  15   practice at Pharaoh's?

10:24AM  16   A.   Everything he said was not accurate.   It didn't happen,

10:24AM  17   like, like that.

10:24AM  18   Q.   Was there pervasive drug use?

10:24AM  19   A.   Yes.

10:24AM  20   Q.   Were there people you knew you could get drugs from in

10:25AM  21   the club?

10:25AM  22   A.   Yes.

10:25AM  23   Q.   Did that include heroin and cocaine?

10:25AM  24   A.   Yes.

10:25AM  25   Q.   We'll talk more about that in a moment.

10:25AM     1      How did the stated rule about engaging in sex acts

10:25AM     2   compare to your experience and observations?

10:25AM     3   A.  Can you say that again?  Sorry.

10:25AM     4   Q.  So there was a rule you talked about a little while ago

10:25AM     5   about no sex acts at all.  How did -- how did reality compare

10:25AM     6   to that?

10:25AM     7   A.  It didn't.  The rules didn't happen.  You know what I

10:25AM     8   mean?

10:25AM     9   Q.  So the rules were not enforced?

10:25AM    10   A.  Right.

10:25AM    11   Q.  Based on your observations and your experience, were

10:25AM    12   other dancers using drugs like you?

10:25AM    13   A.  Yes.

10:25AM    14   Q.  Did you use drugs with some of those other dancers?

10:25AM    15   A.  Yes.

10:25AM    16   Q.  Did you observe many other dancers doing drugs inside

10:26AM    17   Pharaoh's?

10:26AM    18   A.  Yes.

10:26AM    19   Q.  What areas of the club have you observed other dancers do

10:26AM    20   drugs inside the club?

10:26AM    21   A.  Locker room, locker bathroom, the other bathroom that's

10:26AM    22   on the main floor, in the VIP Room, right at the bar, and

10:26AM    23   upstairs and downstairs office.

10:26AM    24   Q.  Upstairs, was that area the defendant controlled?

10:26AM    25   A.  Yes.

| | | |
|---|---|---|
| 10:26AM | 1 | Q.  Who can view inside the locker room? |
| 10:27AM | 2 | A.  Rob Reed, DJ. |
| 10:27AM | 3 | Q.  Can managers and bouncers walk -- and the owner walk in |
| 10:27AM | 4 | and out of the woman's locker room whenever they want? |
| 10:27AM | 5 | A.  Yes. |
| 10:27AM | 6 | Q.  Did they? |
| 10:27AM | 7 | A.  Not often. |
| 10:27AM | 8 | Q.  Okay.  In terms of how many dancers you've seen or done |
| 10:27AM | 9 | drugs with, did you hear about talk of even more than that |
| 10:27AM | 10 | doing drugs? |
| 10:27AM | 11 | **MR. SOEHNLEIN:**  Objection. |
| 10:27AM | 12 | **MR. TRIPI:**  It goes to her perception, drugs. |
| 10:27AM | 13 | **THE COURT:**  Hang on.  Did you hear about -- no, |
| 10:27AM | 14 | sustained.  Sustained. |
| 10:27AM | 15 | **BY MR. TRIPI:** |
| 10:27AM | 16 | Q.  I'll rephrase that. |
| 10:27AM | 17 | Are there other people who talked openly about using |
| 10:27AM | 18 | drugs that you never physically saw yourself use drugs? |
| 10:28AM | 19 | A.  Yes. |
| 10:28AM | 20 | Q.  In terms of other employees at the club, so changing from |
| 10:28AM | 21 | dancers for a moment -- and at this point I'm not looking for |
| 10:28AM | 22 | specific names, we'll get into specific names later -- but |
| 10:28AM | 23 | what other types of employees at Pharaoh's by job description |
| 10:28AM | 24 | have you seen do drugs inside Pharaoh's? |
| 10:28AM | 25 | A.  Dancer, DJ, bartenders, owner. |

10:28AM  1   Q.  When you say "owner," are you talking about the

10:28AM  2   defendant?

10:28AM  3   A.  Yes.  Yeah, I think I covered them.

10:28AM  4   Q.  Any other managers?

10:28AM  5   A.  Yes, managers.  But you didn't want names yet?

10:29AM  6   Q.  Not yet.

10:29AM  7   A.  Okay.

10:29AM  8   Q.  With those groups -- dancers, DJ, bartenders, owner,

10:29AM  9   manager -- what areas of the club have you seen those

10:29AM  10  employees use drugs?  Would they be the same?

10:29AM  11  A.  Yes.

10:29AM  12  Q.  In terms of other employees in the club -- and again I'm

10:29AM  13  not looking for specific names at the point, just by job

10:29AM  14  description -- what other types of employees by job

10:29AM  15  description have you seen distribute some type of drugs

10:29AM  16  inside the club?

10:29AM  17  A.  Dancers, DJ, the defendant, bartender.

10:29AM  18  Q.  I want to try to put some numbers now to some of these

10:30AM  19  actions/sex acts in the VIP and the Champagne Room, and then

10:30AM  20  we'll talk about the upstairs, okay?

10:30AM  21  A.  Okay.

10:30AM  22  Q.  Let's talk about the general VIP.  So, multiple couches,

10:30AM  23  single-dance situations.  Okay?

10:30AM  24      Can you estimate the number of men that you've engaged in

10:30AM  25  sex acts -- ranging of the sort of described, so all the way

10:30AM  1  from fondling your private areas, breasts, vagina, all of the

10:30AM  2  way to through penetration, whether it be oral, anal,

10:30AM  3  vaginal, okay -- how many men would be estimate you've

10:30AM  4  personally engaged those type of sex acts with in the general

10:30AM  5  VIP area?

10:30AM  6  A.  500.

10:31AM  7  Q.  Is that the number of men, or the number of sex acts?

10:31AM  8  A.  Both.

10:31AM  9  Q.  Okay.  Did anyone monitoring the cameras ever stop the

10:31AM  10  man who was engaging in that with you?

10:31AM  11  A.  No.

10:31AM  12  Q.  Do you believe among the dancers you were a high earner

10:31AM  13  at Pharaoh's?

10:31AM  14  A.  Yes.

10:31AM  15  Q.  Now I'd like to focus in on the Champagne Room, so the

10:31AM  16  more-private room.

10:31AM  17     Do you have an estimate on the number of men in that

10:31AM  18  more-private part of the VIP?

10:31AM  19  A.  A number of men?  This is throughout the whole time I've

10:32AM  20  been there?

10:32AM  21  Q.  Yeah.

10:32AM  22  A.  Okay.  A couple hundred.  Like, 200.

10:32AM  23  Q.  Would that be more likely where some of the more, like,

10:32AM  24  vaginal and anal sex occurred?

10:32AM  25  A.  Yes.

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

24

| | | |
|---|---|---|
| 10:32AM | 1 | Q.  In the Champagne Room setting for you, did anyone ever |
| 10:32AM | 2 | stop the man who was engaged in that with you? |
| 10:32AM | 3 | A.  No. |
| 10:32AM | 4 | Q.  And you've seen other dancers engage in similar activity? |
| 10:32AM | 5 | A.  Yes. |
| 10:32AM | 6 | Q.  Now in those areas of the VIP, would you see evidence of |
| 10:32AM | 7 | sex acts?  Would you see condoms in that area? |
| 10:32AM | 8 | A.  Yes. |
| 10:32AM | 9 | Q.  Where would you see condoms through the course of a |
| 10:33AM | 10 | night? |
| 10:33AM | 11 | A.  They would be in, like, the bathroom trash cans, or right |
| 10:33AM | 12 | in the couches. |
| 10:33AM | 13 | Q.  Like, are you talking about stuffed between the cushions? |
| 10:33AM | 14 | A.  Yes. |
| 10:33AM | 15 | Q.  Is there a smell -- I don't mean to get too graphic, but |
| 10:33AM | 16 | is there a smell associated with those types of sex acts? |
| 10:33AM | 17 | A.  Yes. |
| 10:33AM | 18 | Q.  Were you able to smell it? |
| 10:33AM | 19 | A.  Yes. |
| 10:33AM | 20 | Q.  Would dancers leave the VIP and ever be asking for things |
| 10:33AM | 21 | like baby wipes? |
| 10:33AM | 22 | A.  Yes. |
| 10:33AM | 23 | Q.  Would they leave the VIP and go and shower? |
| 10:33AM | 24 | A.  Yes. |
| 10:33AM | 25 | Q.  Was there a shower in the dressing room area? |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

25

10:33AM  1   A.  Yes.

10:33AM  2   Q.  So beyond the sex acts themselves, there was cleanup

10:33AM  3   involved; is that right?

10:33AM  4   A.  Yes.  I mean, I can't speak for others, but I would clean

10:33AM  5   myself up.  You know --

10:33AM  6   Q.  But in terms of what you heard, you've heard people

10:33AM  7   asking for baby wipes, things like that?

10:33AM  8   A.  Right, yeah.

10:34AM  9   Q.  I'll get into more specifics of conversations later, but

10:34AM  10  based upon your observations and experiences, did you observe

10:34AM  11  Brian Rosenthal benefit directly financially from the sex

10:34AM  12  acts that you engaged in in the VIP and in the Champagne

10:34AM  13  Room?

10:34AM  14  A.  Yes.

10:34AM  15  Q.  Explain how.

10:34AM  16  A.  Because every time I went back with a customer, he would

10:34AM  17  get tipped more.

10:34AM  18  Q.  By who?

10:34AM  19  A.  By the customer.

10:34AM  20  Q.  Is Brian giving the dance back there?

10:34AM  21  A.  Nope.

10:34AM  22  Q.  What service is he performing for the customer?

10:34AM  23  A.  Nothing.

10:34AM  24  Q.  Based on how things worked, was that tip for not

10:34AM  25  enforcing the rules?

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

26

| | | |
|---|---|---|
| 10:34AM | 1 | A.  Yes. |
| 10:34AM | 2 | Q.  For ignoring the cameras? |
| 10:34AM | 3 | A.  Yes. |
| 10:34AM | 4 | Q.  Were you the only dancer who knew that that was how it |
| 10:34AM | 5 | worked? |
| 10:34AM | 6 | A.  No. |
| 10:34AM | 7 | **MR. SOEHNLEIN:**  Objection. |
| 10:35AM | 8 | **THE COURT:**  Sustained. |
| 10:35AM | 9 | **BY MR. TRIPI:** |
| 10:35AM | 10 | Q.  Did you talk about that type of scenario with many other |
| 10:35AM | 11 | dancers over a period of time? |
| 10:35AM | 12 | A.  Yes. |
| 10:35AM | 13 | Q.  Just a yes or no to that. |
| 10:35AM | 14 | How many times would you estimate you spoke with other |
| 10:35AM | 15 | dancers about that type of scenario? |
| 10:35AM | 16 | A.  Oh, a couple hundred. |
| 10:35AM | 17 | Q.  And how many -- and you've already talked about a couple |
| 10:35AM | 18 | hundred or more when it happened with you directly? |
| 10:35AM | 19 | A.  Right. |
| 10:35AM | 20 | Q.  Based on all of that experience, conversations with |
| 10:35AM | 21 | others, and your own personal experience did you form a |
| 10:35AM | 22 | belief or opinion, just yes or no, as to the reason that |
| 10:35AM | 23 | Brian Rosenthal was being tipped? |
| 10:35AM | 24 | **MR. SOEHNLEIN:**  Objection. |
| 10:35AM | 25 | **MR. TRIPI:**  That's been covered before. |

10:35AM   1    THE COURT:  Did she -- did she form an opinion?  No,

10:35AM   2    overruled.

10:35AM   3         BY MR. TRIPI:

10:35AM   4    Q.  You can answer.

10:35AM   5         THE COURT:  "Yes" or "no."

10:35AM   6         THE WITNESS:  Can you say it again?

10:35AM   7         BY MR. TRIPI:

10:35AM   8    Q.  Just "yes" or "no":  Did you form an opinion about why

10:35AM   9    Brian Rosenthal was being tipped?

10:35AM   10   A.  Yes.

10:35AM   11   Q.  And based on your conversations and your experiences, was

10:35AM   12   your opinion similar to other people?

10:36AM   13   A.  Oh, yes.

10:36AM   14   Q.  What was your opinion?

10:36AM   15   A.  My opinion was that he was getting tipped over to

10:36AM   16   overlook the camera.

10:36AM   17   Q.  Was there, in terms of the type of customer that would go

10:36AM   18   in the VIP and engage in those, was there anything consistent

10:36AM   19   about the type of customer, traits of the customer, that

10:36AM   20   would be permitted to engage in sex acts with you and others

10:36AM   21   in the VIP?

10:36AM   22   A.  I'm not really sure.

10:36AM   23   Q.  Were -- I'll rephrase it.

10:36AM   24   A.  Okay.  I'm sorry.

10:36AM   25   Q.  That's okay.  If you don't understand, sometimes I do a

| | | |
|---|---|---|
| 10:36AM | 1 | poor job, just say -- |
| 10:36AM | 2 | A.  Oh, no. |
| 10:36AM | 3 | Q.  -- just say rephrase your question. |
| 10:36AM | 4 | A.  Okay. |
| 10:36AM | 5 | Q.  Okay? |
| 10:36AM | 6 |    Did most of the men that engaged in those type of acts |
| 10:36AM | 7 | with you and others, based on your observations, seem to have |
| 10:37AM | 8 | a lot of money? |
| 10:37AM | 9 | A.  Yes. |
| 10:37AM | 10 | Q.  Did you ever hear a customer utter a phrase to you in the |
| 10:37AM | 11 | VIP that I'm friends with Peter? |
| 10:37AM | 12 | A.  Yes. |
| 10:37AM | 13 | Q.  What was your understanding of what that meant when you |
| 10:37AM | 14 | would hear that phrase? |
| 10:37AM | 15 | A.  To me, it meant he knows the big boss, so he thinks he |
| 10:37AM | 16 | can get anything from me. |
| 10:37AM | 17 | Q.  Now you've observed, we've talked about oral, anal, |
| 10:37AM | 18 | vaginal, and fingering, and other sex contact in the |
| 10:37AM | 19 | VIP Room.  When you've observed other dancers engage in that, |
| 10:37AM | 20 | were those dancers that you knew? |
| 10:37AM | 21 | A.  Yes. |
| 10:37AM | 22 | Q.  Sometimes were they dancers that you didn't know? |
| 10:37AM | 23 | A.  Yes. |
| 10:37AM | 24 | Q.  Sometimes were they dancers that you worked with? |
| 10:38AM | 25 | A.  Yes. |

10:38AM    1    Q. Sometimes were they dancers who you didn't know?

10:38AM    2    A. Of course, yeah.

10:38AM    3    Q. The ones that you did know, did they have serious drug

10:38AM    4    addictions like you?

10:38AM    5    A. Yes.

10:38AM    6    **MR. SOEHNLEIN:** Objection.

10:38AM    7    **THE COURT:** You objected, Mr. Soehnlein?

10:38AM    8    **MR. TRIPI:** I heard an objection.

10:38AM    9    **MR. SOEHNLEIN:** Yes, Judge. I'm sorry, I thought

10:38AM    10    that the response called for hearsay.

10:38AM    11    **THE COURT:** Yeah, sustained.

10:38AM    12    So the jury will strike that answer.

10:38AM    13    **BY MR. TRIPI:**

10:38AM    14    Q. Well, you've talked about doing drugs with other dancers,

10:38AM    15    right?

10:38AM    16    A. Yes.

10:38AM    17    Q. Some of those other dancers have shared drugs with you?

10:38AM    18    A. Yes.

10:38AM    19    Q. The ones that you shared drugs with and that gave drugs

10:38AM    20    to you, did they have a similar addiction to you?

10:38AM    21    A. Yes.

10:38AM    22    **MR. SOEHNLEIN:** Objection.

10:38AM    23    **MR. TRIPI:** Judge, it's obvious from the questions

10:38AM    24    and answers before it that she has a -- personal observations.

10:38AM    25    **THE COURT:** Addiction, no, I'm going to sustain the

10:39AM    1    objection and the jury will strike the answer.

10:39AM    2         **BY MR. TRIPI:**

10:39AM    3    Q.   Is there anyone in your life that you've ever seen do

10:39AM    4    heroin casually?

10:39AM    5    A.   Yes.

10:39AM    6    Q.   Okay.  Some -- does that often progress to addiction?

10:39AM    7    A.   Yes.

10:39AM    8    Q.   Can you distinguish between someone with a heavy

10:39AM    9    addiction and someone that uses it casually?

10:39AM   10         **MR. SOEHNLEIN:**  Objection.  Foundation.  And I still

10:39AM   11    think that it calls for hearsay.

10:39AM   12         **THE COURT:**  No.  No, overruled.

10:39AM   13         **BY MR. TRIPI:**

10:39AM   14    Q.   Can you distinguish between a casual user and an addict?

10:39AM   15    A.   Yes.

10:39AM   16    Q.   How do you distinguish that?  What are some things that

10:39AM   17    you observe in your day-to-day life that make you make those

10:39AM   18    assessments?

10:39AM   19    A.   Well, someone that doesn't use every day, they don't go

10:39AM   20    out -- or, let me put it this way.

10:39AM   21         Somebody who does use every single day and is in severe

10:39AM   22    addiction, they need that drug that they've been taking,

10:40AM   23    like, right when you wake up.  You have to have it, or you

10:40AM   24    will not function during the day.  You cannot get out of bed.

10:40AM   25    You cannot think straight.  You know?

| | | |
|---|---|---|
| 10:40AM | 1 | And then somebody who doesn't use it every day, they |
| 10:40AM | 2 | don't really go through that.  They can still work and dance |
| 10:40AM | 3 | and do -- do what they need without the drug. |
| 10:40AM | 4 | Q.  In your experience, do most people using heroin progress |
| 10:40AM | 5 | to the severe addiction very quickly? |
| 10:40AM | 6 | A.  Yes. |
| 10:40AM | 7 | Q.  Do you know D.B.? |
| 10:40AM | 8 | A.  Yes. |
| 10:40AM | 9 | Q.  Do you know what her dancer name was? |
| 10:40AM | 10 | A.  Kendra. |
| 10:40AM | 11 | Q.  Is she someone you've used drugs with at Pharaoh's? |
| 10:40AM | 12 | A.  Yes. |
| 10:40AM | 13 | Q.  What types of drugs have you used at Pharaoh's? |
| 10:40AM | 14 | A.  Cocaine and heroin. |
| 10:40AM | 15 | Q.  Based on your relationship with this dancer, Kendra, did |
| 10:40AM | 16 | it seem like her use of the drug mirrored or was similar to |
| 10:41AM | 17 | how you used those drugs? |
| 10:41AM | 18 | A.  Yes. |
| 10:41AM | 19 | **MR. SOEHNLEIN:**  Objection. |
| 10:41AM | 20 | **THE COURT:**  Yeah, hang on.  You need a foundation for |
| 10:41AM | 21 | that, Mr. Tripi.  I don't know what that question means. |
| 10:41AM | 22 | **BY MR. TRIPI:** |
| 10:41AM | 23 | Q.  Did she use heroin and cocaine? |
| 10:41AM | 24 | A.  Yes. |
| 10:41AM | 25 | Q.  How did you use heroin and cocaine? |

10:41AM    1    A.  IV.

10:41AM    2    Q.  Okay.  Did you use heroin in the morning?

10:41AM    3    A.  Yes.

10:41AM    4    Q.  Cocaine throughout the day?

10:41AM    5    A.  Yes.

10:41AM    6    Q.  Did you use heroin in the morning and cocaine throughout

10:41AM    7    the day sometimes with Kendra?

10:41AM    8    A.  Yes.

10:41AM    9    Q.  How about D.P., Kiera?

10:41AM   10    A.  Yes.

10:41AM   11    Q.  Was that similar to your answers that you'd have with

10:41AM   12    Kendra?

10:41AM   13    A.  Yes.

10:41AM   14          MR. SOEHNLEIN:  Objection.

10:41AM   15          MR. TRIPI:  Now --

10:41AM   16          MR. SOEHNLEIN:  Was that similar to which answers,

10:41AM   17    Judge?

10:41AM   18          THE COURT:  Okay.  Sustained.

10:41AM   19          Break it down, Mr. Tripi.

10:41AM   20          BY MR. TRIPI:

10:41AM   21    Q.  Did you use cocaine and heroin with Kiera?

10:41AM   22    A.  Yes.

10:41AM   23    Q.  And that's D.P.?

10:42AM   24    A.  Yes.

10:42AM   25    Q.  And is she someone who actually when you first got there,

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

33

| | | |
|---|---|---|
| 10:42AM | 1 | and I'll talk more about this later, gave you heroin? |
| 10:42AM | 2 | A.  Yes. |
| 10:42AM | 3 | Q.  So you first tried it there based on what she gave you? |
| 10:42AM | 4 | A.  Yes. |
| 10:42AM | 5 | Q.  Is she someone who developed track marks? |
| 10:42AM | 6 | A.  Yes. |
| 10:42AM | 7 | Q.  Are track marks associated commonly with heavy usage? |
| 10:42AM | 8 | A.  Yes. |
| 10:42AM | 9 | Q.  With addiction? |
| 10:42AM | 10 | A.  Yes. |
| 10:42AM | 11 | Q.  Are these foreign concepts that I'm asking you about? |
| 10:42AM | 12 | A.  No. |
| 10:42AM | 13 | Q.  Is this easy stuff for someone who's into drugs? |
| 10:42AM | 14 | A.  No. |
| 10:42AM | 15 | Q.  It's easy stuff to identify, right? |
| 10:42AM | 16 | A.  Oh, yes. |
| 10:42AM | 17 | Q.  Okay.  How about A.A., did you see her use fentanyl? |
| 10:42AM | 18 | A.  Yes. |
| 10:42AM | 19 | Q.  Is that a heavy drug? |
| 10:42AM | 20 | A.  Yes. |
| 10:42AM | 21 | Q.  Was it hard for you to assess in your brain that she was |
| 10:42AM | 22 | a heavy addict? |
| 10:42AM | 23 | A.  No. |
| 10:42AM | 24 | Q.  Okay.  How about Megan Stabler?  Did she use drugs? |
| 10:42AM | 25 | A.  Yes. |

| 10:42AM | 1 | Q. What drugs did Megan Stabler use? |
| 10:42AM | 2 | A. Cocaine. |
| 10:42AM | 3 | Q. Have you used cocaine with her? |
| 10:43AM | 4 | A. Yes. |
| 10:43AM | 5 | Q. Have you used a lot of cocaine with her? |
| 10:43AM | 6 | A. Yes. |
| 10:43AM | 7 | Q. At various places in the club? |
| 10:43AM | 8 | A. Yes. |
| 10:43AM | 9 | Q. Based on the amount of cocaine you used with Megan |
| 10:43AM | 10 | Stabler, did you form an opinion whether she had an addiction |
| 10:43AM | 11 | like you? |
| 10:43AM | 12 | MR. SOEHNLEIN: Objection. |
| 10:43AM | 13 | MR. TRIPI: This is a clear 701 opinion. |
| 10:43AM | 14 | THE COURT: Overruled. |
| 10:43AM | 15 | THE WITNESS: Yes. |
| 10:43AM | 16 | BY MR. TRIPI: |
| 10:43AM | 17 | Q. What was that opinion? |
| 10:43AM | 18 | A. That she has a severe addiction. |
| 10:43AM | 19 | Q. To cocaine? |
| 10:43AM | 20 | A. To cocaine. |
| 10:43AM | 21 | Q. Was there another dancer named R.W.? |
| 10:43AM | 22 | A. Yes. |
| 10:43AM | 23 | Q. Did you use drugs with her? |
| 10:43AM | 24 | A. Yes. |
| 10:43AM | 25 | Q. What kinds of drugs did you use with her? |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

35

| 10:43AM | 1 | A. Heroin and cocaine. |
| 10:43AM | 2 | Q. When you used the heroin and the cocaine, was the heroin |
| 10:43AM | 3 | intravenous or did she sniff it, if you know? |
| 10:43AM | 4 | A. She sniffed it. |
| 10:43AM | 5 | Q. Okay. |
| 10:43AM | 6 | A. Yeah. |
| 10:43AM | 7 | Q. And cocaine was sniffing? |
| 10:43AM | 8 | A. Yes. |
| 10:43AM | 9 | Q. Was she someone who while she worked at Pharaoh's based |
| 10:44AM | 10 | on your observations and interactions, used frequently? |
| 10:44AM | 11 | A. Yes. |
| 10:44AM | 12 | Q. Was there another dancer named M.R.? |
| 10:44AM | 13 | A. Yes. |
| 10:44AM | 14 | Q. Did you observe her use drugs? |
| 10:44AM | 15 | A. Yes. |
| 10:44AM | 16 | Q. Did you ever use with her? |
| 10:44AM | 17 | A. Yes. |
| 10:44AM | 18 | Q. What types of drugs did you use with her? |
| 10:44AM | 19 | A. Cocaine. |
| 10:44AM | 20 | Q. Was there some frequency to your using cocaine with M.R.? |
| 10:44AM | 21 | Often? |
| 10:44AM | 22 | A. Often. |
| 10:44AM | 23 | Q. I think on Friday, you said you'd get there, and you'd |
| 10:44AM | 24 | have to chase it all night long because it lasts about 15 |
| 10:44AM | 25 | minutes; is that right? |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

36

| | | |
|---|---|---|
| 10:44AM | 1 | A.  Yes. |
| 10:44AM | 2 | Q.  Is there another name of another dancer you thought of |
| 10:44AM | 3 | more recently named J.C.? |
| 10:44AM | 4 | A.  Yes. |
| 10:44AM | 5 | Q.  Who is that? |
| 10:44AM | 6 | A.  That is a friend, dancer, of mine that worked at |
| 10:44AM | 7 | Pharaoh's. |
| 10:44AM | 8 | Q.  Did you use drugs with her? |
| 10:44AM | 9 | A.  Yes. |
| 10:44AM | 10 | Q.  What kind of drugs? |
| 10:44AM | 11 | A.  Heroin and cocaine. |
| 10:45AM | 12 | Q.  At the time you were at Pharaoh's with her, when you were |
| 10:45AM | 13 | using with her, did her usage appear to be heavy? |
| 10:45AM | 14 | A.  Yes. |
| 10:45AM | 15 | Q.  Do these dancers include several -- just have you |
| 10:45AM | 16 | observed these dancers engage in some type of sex acts in the |
| 10:45AM | 17 | VIP? |
| 10:45AM | 18 | A.  Yes. |
| 10:45AM | 19 | Q.  Are there others whose names you don't know? |
| 10:45AM | 20 | A.  Yes. |
| 10:45AM | 21 | Q.  Okay.  Now I'd like to focus in on the upstairs area for |
| 10:45AM | 22 | a little bit just in general terms, and then we'll get into |
| 10:45AM | 23 | some specifics, okay? |
| 10:45AM | 24 | Just to set the stage, and I'll get more specifics later |
| 10:46AM | 25 | on, when you were first invited upstairs, were you invited |

| | | |
|---|---|---|
| 10:46AM | 1 | upstairs alone or with others in a group? |
| 10:46AM | 2 | A.  With others. |
| 10:46AM | 3 | Q.  Okay.  And who -- who generally controlled that upstairs |
| 10:46AM | 4 | area? |
| 10:46AM | 5 | A.  The defendant. |
| 10:46AM | 6 | Q.  The very first time you were up there, what activity did |
| 10:46AM | 7 | you engage in? |
| 10:46AM | 8 | A.  Sexual acts. |
| 10:46AM | 9 | Q.  Did you get drugs up there? |
| 10:46AM | 10 | A.  Yes. |
| 10:46AM | 11 | Q.  Over time, have you been upstairs quite a bit? |
| 10:46AM | 12 | A.  Yes. |
| 10:46AM | 13 | Q.  Have you used drugs every time you've been up there? |
| 10:46AM | 14 | A.  Yes. |
| 10:46AM | 15 | Q.  Have you engaged in sex acts every time you've been up |
| 10:46AM | 16 | there? |
| 10:46AM | 17 | A.  Yes. |
| 10:46AM | 18 | Q.  With approximately how many men? |
| 10:46AM | 19 | A.  It could be two at a time, or one. |
| 10:47AM | 20 | Q.  Okay. |
| 10:47AM | 21 | A.  Or do you mean overall? |
| 10:47AM | 22 | Q.  Overall. |
| 10:47AM | 23 | A.  Five or six.  I think it's five. |
| 10:47AM | 24 | Q.  Okay. |
| 10:47AM | 25 | A.  Something like that. |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

10:47AM   1   Q.  Did that five or six include the defendant?

10:47AM   2   A.  Yes.

10:47AM   3   Q.  Did the other five and six include people that you knew

10:47AM   4   had some relationship with the defendant?

10:47AM   5   A.  Yes.

10:47AM   6   Q.  We'll get into those specifics later on, okay?

10:47AM   7       Generally, in your mind, was there a distinction between

10:47AM   8   the men you engaged in the sex acts with in the downstairs

10:47AM   9   VIP and the Champagne Room, was there a difference in terms

10:47AM  10   of their relationships with people in the -- withdrawn.

10:47AM  11       Was there a difference between the men that you engaged

10:47AM  12   in sex acts with downstairs, and the ones that you did in the

10:48AM  13   private upstairs area of Pharaoh's?

10:48AM  14   A.  Yes.

10:48AM  15   Q.  What was the difference in your mind?

10:48AM  16   A.  The difference was the customers that had a lot of money,

10:48AM  17   they would be the ones downstairs in the VIP Rooms.  And

10:48AM  18   people that were real close to the defendant would be the

10:48AM  19   ones to go up.

10:48AM  20   Q.  Now, in the upstairs private area that this defendant

10:48AM  21   controlled, were there cameras?

10:48AM  22   A.  Upstairs?

10:48AM  23   Q.  Yeah.

10:48AM  24   A.  No.

10:48AM  25   Q.  Was there a bouncer attendant monitoring the activity or

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

39

10:48AM     1   supposed to monitor the activity in the upstairs?

10:48AM     2   A.   No, not upstairs.

10:48AM     3   Q.   I'm just talking about the upstairs.

10:48AM     4   A.   Right.

10:48AM     5   Q.   Did it look, for large stretches of your time there, like

10:48AM     6   an apartment with furnishings?

10:48AM     7   A.   Yes.

10:48AM     8   Q.   Did you have to tip anyone out for what you did upstairs?

10:49AM     9   You tipping people out --

10:49AM    10   A.   No.

10:49AM    11   Q.   -- upstairs?

10:49AM    12   A.   No.

10:49AM    13   Q.   Every time you went up there, did you receive, drugs,

10:49AM    14   money, or a combination of the two?

10:49AM    15   A.   Yes.

10:49AM    16   Q.   I want to pivot for a second and get back into drugs for

10:49AM    17   a moment -- or, questions about drugs, I should say.

10:49AM    18      You indicated a moment ago the first time you tried

10:49AM    19   heroin, I think Friday you said it was a couple days after

10:49AM    20   you started working there, and a moment or so ago you

10:49AM    21   indicated the first person who gave you some was D.P., a/k/a

10:49AM    22   Kiera, correct?

10:49AM    23   A.   Yes.

10:49AM    24   Q.   Had she been dancing there before you?

10:49AM    25   A.   Yes.

| | | |
|--|--|--|
| 10:49AM | 1 | Q.  Do you know how long she had been there by the time you |
| 10:49AM | 2 | arrived? |
| 10:49AM | 3 | A.  I know it had to be at least a couple of months, could |
| 10:49AM | 4 | have been longer. |
| 10:49AM | 5 | Q.  After getting it from her after a couple of days, did you |
| 10:50AM | 6 | want to start to use it more, like, pretty quickly? |
| 10:50AM | 7 | A.  Yes. |
| 10:50AM | 8 | Q.  Through her, did you get to know somebody who would |
| 10:50AM | 9 | frequent the club named Scooter? |
| 10:50AM | 10 | A.  Yes. |
| 10:50AM | 11 | Q.  Who was Scooter? |
| 10:50AM | 12 | A.  Scooter was some -- he was a drug dealer.  He would come |
| 10:50AM | 13 | in and serve the girls with drugs. |
| 10:50AM | 14 | Q.  What kind of drugs? |
| 10:50AM | 15 | A.  Cocaine and heroin. |
| 10:50AM | 16 | Q.  Based on your observations, did you form an opinion as to |
| 10:50AM | 17 | relationships that Scooter had with various people in |
| 10:50AM | 18 | Pharaoh's? |
| 10:50AM | 19 | A.  Yes. |
| 10:50AM | 20 | Q.  Did you see Scooter interact with the owner? |
| 10:50AM | 21 | A.  Yes. |
| 10:50AM | 22 | Q.  This defendant? |
| 10:50AM | 23 | A.  Yeah. |
| 10:50AM | 24 | Q.  Do you know Scooter's real name as you sit here today? |
| 10:51AM | 25 | A.  No. |

10:51AM    1    Q.  How often was Scooter at Pharaoh's?

10:51AM    2    A.  He'd be there five to seven days out of the week.

10:51AM    3    Q.  How did Scooter appear to be treated at Pharaoh's, to

10:51AM    4    you?

10:51AM    5    A.  He was, to me, it sounded like Peter's friend, best

10:51AM    6    friend, you know, because he would get free drinks.

10:51AM    7    Q.  So he was treated well?

10:51AM    8    A.  Yes.

10:51AM    9    Q.  Can you describe Scooter generally?

10:51AM   10    A.  He is African-American.  Dark skin.  Kind of on the

10:51AM   11    shorter side.  A little chubbier.  Dark eyes.

10:51AM   12    Q.  I'm going to get into it later on your first -- very

10:52AM   13    first interactions with the defendant.  But for now, in the

10:52AM   14    context of discussing Scooter, did there come a point in time

10:52AM   15    where you had a conversation with the defendant and you

10:52AM   16    indicated that you were using heroin?

10:52AM   17    A.  No.  You worded that right, but can you ask it again?

10:52AM   18    Q.  Did there come a point in time where you had some type of

10:52AM   19    interaction or conversation with the defendant, where you

10:52AM   20    indicated to the defendant that you had begun using heroin?

10:52AM   21    A.  That I had been using it?

10:52AM   22    Q.  That you started using it.

10:52AM   23    A.  Oh, yes.

10:52AM   24    Q.  Do you remember the conversation you engaged in with the

10:52AM   25    defendant?

| | | |
|---|---|---|
| 10:52AM | 1 | A.  No. |
| 10:52AM | 2 | Q.  Let me ask another question, and if -- I'll try refresh |
| 10:52AM | 3 | your memory with a document. |
| 10:52AM | 4 | A.  Okay. |
| 10:52AM | 5 | Q.  Did there come -- did there come a point in time where -- |
| 10:53AM | 6 | let me step it back for a second. |
| 10:53AM | 7 | If you wake up in the morning after your addiction to |
| 10:53AM | 8 | heroin begins, and you don't have heroin, and you show up at |
| 10:53AM | 9 | Pharaoh's, are you able to function well there and earn |
| 10:53AM | 10 | money? |
| 10:53AM | 11 | A.  No. |
| 10:53AM | 12 | Q.  Why? |
| 10:53AM | 13 | A.  Because you're in withdrawal. |
| 10:53AM | 14 | Q.  Okay.  I imagine having chills, diarrhea, vomiting, and |
| 10:53AM | 15 | all the things that you described on Friday aren't very sexy, |
| 10:53AM | 16 | right? |
| 10:53AM | 17 | A.  Correct. |
| 10:53AM | 18 | Q.  Not a good big market for people wanting to go in VIP |
| 10:53AM | 19 | with someone suffering from that -- |
| 10:53AM | 20 | A.  Right. |
| 10:53AM | 21 | Q.  -- is that fair? |
| 10:53AM | 22 | A.  Yes. |
| 10:53AM | 23 | Q.  Were there ever times after you started to become |
| 10:53AM | 24 | addicted, but after you were making good money in the VIP, |
| 10:53AM | 25 | where the defendant made comments to you, or you engaged in |

| | | |
|---|---|---|
| 10:54AM | 1 | conversation about his ability to help up get right for your |
| 10:54AM | 2 | shift? |
| 10:54AM | 3 | A.  Yes. |
| 10:54AM | 4 | Q.  Describe that conversation to the best of your ability. |
| 10:54AM | 5 | A.  Okay.  Let me think here, because there was a couple |
| 10:54AM | 6 | different ones. |
| 10:54AM | 7 | Q.  All right.  So you're -- I heard you mumble to yourself. |
| 10:54AM | 8 | Are you filtering through a couple different conversations |
| 10:54AM | 9 | you've had with the defendant about that topic? |
| 10:54AM | 10 | A.  Yeah. |
| 10:54AM | 11 | Q.  Okay. |
| 10:54AM | 12 | A.  I'm. |
| 10:54AM | 13 | Q.  Would you like something to try to refresh your |
| 10:54AM | 14 | recollection? |
| 10:54AM | 15 | A.  Yeah, please, please, please. |
| 10:54AM | 16 | **MR. TRIPI:**  All right.  Ms. Champoux, for the witness |
| 10:54AM | 17 | only, can we pull up Exhibit 3571E, at page 1. |
| 10:54AM | 18 | **BY MR. TRIPI:** |
| 10:54AM | 19 | Q.  It will show up on your screen. |
| 10:54AM | 20 | A.  Oh. |
| 10:54AM | 21 | Q.  And when it does, just read it to yourself, not out loud, |
| 10:54AM | 22 | and then look back at me when you're done. |
| 10:54AM | 23 | A.  Okay.  Okay. |
| 10:56AM | 24 | **MR. TRIPI:**  Ms. Champoux, can we pull that down? |
| | 25 | |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:56AM  | 1  | **BY MR. TRIPI:**                                            |
| 10:56AM  | 2  | Q.  Did that -- yes or no -- did that refresh your          |
| 10:56AM  | 3  | recollection as to discussions you had with the defendant   |
| 10:56AM  | 4  | about your withdrawing?                                      |
| 10:56AM  | 5  | A.  Yes.                                                     |
| 10:56AM  | 6  | Q.  Okay.  As best you can, what -- what was your           |
| 10:56AM  | 7  | conversation with the defendant?  What did you say, and what |
| 10:56AM  | 8  | did he say?                                                  |
| 10:56AM  | 9  | A.  I can't believe I keep losing my train of thought, and I |
| 10:56AM  | 10 | just read all of that.                                       |
| 10:56AM  | 11 | Oh, my gosh.  Can I have a second?                          |
| 10:56AM  | 12 | Q.  You can have a second, sure, take a moment to think.    |
| 10:56AM  | 13 | A.  Okay.  So -- so I know we had a conversation, Peter and |
| 10:57AM  | 14 | I, when I came in to work sick one day, I told him what was  |
| 10:57AM  | 15 | going on.                                                    |
| 10:57AM  | 16 | Q.  Meaning you were withdrawing from heroin?               |
| 10:57AM  | 17 | A.  Right.                                                   |
| 10:57AM  | 18 | Q.  Okay.                                                    |
| 10:57AM  | 19 | A.  Yeah.  And he said he would help me --                  |
| 10:57AM  | 20 | Q.  Okay.                                                    |
| 10:57AM  | 21 | A.  -- and called a friend.                                 |
| 10:57AM  | 22 | Q.  After that, who was the friend?                         |
| 10:57AM  | 23 | A.  Scooter.                                                 |
| 10:57AM  | 24 | Q.  What happened?                                          |
| 10:57AM  | 25 | A.  Scooter would come to the club, give me what I need, and |

| | | |
|---|---|---|
| 10:57AM | 1 | him and the defendant would work it out. |
| 10:57AM | 2 | Q.  Okay. |
| 10:57AM | 3 | A.  The money situation. |
| 10:57AM | 4 | Q.  After that, would you be able to function and start going |
| 10:58AM | 5 | in the back and doing dances in the VIP? |
| 10:58AM | 6 | A.  Yes. |
| 10:58AM | 7 | Q.  And to be clear, the defendant didn't place the heroin in |
| 10:58AM | 8 | your hands; Scooter did? |
| 10:58AM | 9 | A.  Right.  Correct. |
| 10:58AM | 10 | Q.  How much would you get from Scooter in that scenario that |
| 10:58AM | 11 | you described to get you right in order to be able to |
| 10:58AM | 12 | function during your shift? |
| 10:58AM | 13 | A.  I would get about a gram. |
| 10:58AM | 14 | Q.  Okay.  Were there other times where you would need drugs |
| 10:58AM | 15 | at work -- I think earlier you mentioned you would generally, |
| 10:59AM | 16 | it might have been Friday, use heroin in the morning or at |
| 10:59AM | 17 | the beginning of your shift, and then cocaine throughout the |
| 10:59AM | 18 | shift, and then heroin sort of towards the end; is that |
| 10:59AM | 19 | right? |
| 10:59AM | 20 | A.  Yes. |
| 10:59AM | 21 | Q.  When you would need cocaine throughout your shift, did |
| 10:59AM | 22 | you know different people in Pharaoh's who you can go get it |
| 10:59AM | 23 | from? |
| 10:59AM | 24 | A.  Yes. |
| 10:59AM | 25 | Q.  Who were some of the people you knew you could get it |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

46

| | | |
|---|---|---|
| 10:59AM | 1 | from? |
| 10:59AM | 2 | A.  You want names? |
| 10:59AM | 3 | Q.  Yep. |
| 10:59AM | 4 | A.  Okay.  So, customers.  Scooter.  There was Bobby Black. |
| 10:59AM | 5 | Cherry. |
| 10:59AM | 6 | Q.  Was Cherry another dancer? |
| 10:59AM | 7 | A.  Yes.  Rob Reed.  Megan Stabler. |
| 10:59AM | 8 | Q.  And they ended up getting married, right? |
| 10:59AM | 9 | A.  Yeah. |
| 11:00AM | 10 | Q.  Please continue. |
| 11:00AM | 11 | A.  And Larry. |
| 11:00AM | 12 | Q.  Who is Larry? |
| 11:00AM | 13 | A.  Larry was somebody who came in, like, halfway while I was |
| 11:00AM | 14 | working there, and he was like another manager. |
| 11:00AM | 15 | Q.  And how about the defendant? |
| 11:00AM | 16 | A.  What about him? |
| 11:00AM | 17 | Q.  Would you be able to get cocaine from him? |
| 11:00AM | 18 | A.  Yes. |
| 11:00AM | 19 | Q.  Would that usually have some type of transaction |
| 11:00AM | 20 | surrounding it first though? |
| 11:00AM | 21 | A.  Yes. |
| 11:00AM | 22 | Q.  Okay.  We'll talk about that later. |
| 11:00AM | 23 | A.  Okay. |
| 11:00AM | 24 | Q.  How about Charm.  Do you know Charm? |
| 11:00AM | 25 | A.  I do know Charm. |

11:00AM    1    Q.  Was she someone you would be able to get cocaine from?

11:00AM    2    A.  Yes.

11:00AM    3          **MR. TRIPI:**  Can we pull up Government Exhibit 240L.

11:01AM    4    Next can we do to Government Exhibit 240F.

11:01AM    5          **BY MR. TRIPI:**

11:01AM    6    Q.  Do you see those two photos sort of side by side?

11:01AM    7    A.  Yes.

11:01AM    8    Q.  Do you recognize some of the people in the photos?

11:01AM    9    A.  Yes.

11:01AM   10    Q.  Are any of the people in those photos people you could

11:01AM   11    get drugs from?

11:01AM   12    A.  Yes.

11:01AM   13    Q.  Starting with 240F, can you tap on anybody in that photo

11:01AM   14    that you can get drugs from?  And who is that person?

11:01AM   15    A.  Cherry.

11:01AM   16    Q.  Did you even know her real name?

11:01AM   17    A.  A.A.

11:01AM   18    Q.  Okay.  Anyone else in that photo on the right, 240F?

11:01AM   19    A.  Yeah.  I believe his name was Noah.

11:01AM   20    Q.  Okay.  Is that the guy who's kind of pulling up his

11:01AM   21    shirt?

11:01AM   22    A.  Yes.

11:01AM   23    Q.  Do you see Katrina in that photo?

11:01AM   24    A.  I do.

11:01AM   25    Q.  I don't have to tap her.  Did she ever give you drugs?

| Time | Line | Text |
|---|---|---|
| 11:01AM | 1 | A.  No. |
| 11:02AM | 2 | Q.  Moving on to Exhibit 240L.  By the way -- withdrawn. |
| 11:02AM | 3 | Sticking on 240F, the photo to the right, who was Noah |
| 11:02AM | 4 | associated with in the club? |
| 11:02AM | 5 | A.  The defendant. |
| 11:02AM | 6 | Q.  Okay.  Did he date anybody in the club? |
| 11:02AM | 7 | A.  I know he was dating someone, but I don't know exactly |
| 11:02AM | 8 | who -- |
| 11:02AM | 9 | Q.  Okay. |
| 11:02AM | 10 | A.  -- if she was from the club. |
| 11:02AM | 11 | Q.  Do you know the brunette that's in the picture? |
| 11:02AM | 12 | A.  I don't. |
| 11:02AM | 13 | Q.  Okay.  Let's move over to Exhibit 240L.  Do you recognize |
| 11:02AM | 14 | anyone in that photo that you'd be able to get drugs from |
| 11:02AM | 15 | through the club? |
| 11:02AM | 16 | A.  Yes, Scooter. |
| 11:02AM | 17 | Q.  Okay.  So you're indicating the person in the back row |
| 11:02AM | 18 | there, second from the right, going right to left. |
| 11:02AM | 19 | And the people in the forefront anyway, you're indicating |
| 11:02AM | 20 | that is Scooter? |
| 11:02AM | 21 | A.  Yes. |
| 11:02AM | 22 | Q.  Anybody else that you recognize? |
| 11:02AM | 23 | A.  I do not.  I do not. |
| 11:02AM | 24 | Q.  Okay. |
| 11:02AM | 25 | A.  That's it. |

11:03AM  1   Q.  Setting aside from drug usage, do you recognize any of

11:03AM  2   the other people in the photo, people that you've seen around

11:03AM  3   the club?

11:03AM  4   A.  Yes.

11:03AM  5   Q.  Can you circle their faces distinguishing it from the

11:03AM  6   dots?  Okay.  You're circling a dancer in the background?

11:03AM  7   A.  Yep.

11:03AM  8   Q.  And a black male in the forefront sort of crouched down

11:03AM  9   in the front of the picture with a tan hat; is that right?

11:03AM  10  A.  Yes.

11:03AM  11  Q.  So 240L includes two circles.  Those are people you

11:03AM  12  remember seeing around the club?

11:03AM  13  A.  Yes.

11:03AM  14  Q.  And it includes a person with a dot on their face, you've

11:03AM  15  indicated is Scooter, who you can get drugs from.

11:03AM  16      240F, for record purposes, there's a red dot on the

11:03AM  17  person second from right, I guess, in the photo, first one

11:03AM  18  facing the camera shot, a blond female with a red dot on her

11:03AM  19  face who you've indicated that's Cherry or A.A.  And then

11:03AM  20  there's a male sort of in the center left of the photo,

11:03AM  21  center left of the photo with a hat on, who appears to be

11:03AM  22  lifting up his shirt, you've indicated that was Noah, someone

11:04AM  23  else who was around the club that you could get -- what kind

11:04AM  24  of drug from?

11:04AM  25  A.  Cocaine.

| | | |
|---|---|---|
| 11:04AM | 1 | Q.  Okay. |
| 11:04AM | 2 | **MR. TRIPI:**  We can take those down. |
| 11:04AM | 3 | **BY MR. TRIPI:** |
| 11:04AM | 4 | Q.  All right.  On Friday, I asked you some detail about |
| 11:04AM | 5 | withdrawal symptoms from heroin and a sickness, right? |
| 11:04AM | 6 | But I want to focus in on another part of heroin usage |
| 11:04AM | 7 | that I didn't ask you about, okay? |
| 11:04AM | 8 | Are you familiar with a term "nodding out?" |
| 11:04AM | 9 | A.  Yes. |
| 11:04AM | 10 | Q.  What is "nodding out?" |
| 11:04AM | 11 | A.  Nodding out is when you're at a point where you can |
| 11:05AM | 12 | overdose. |
| 11:05AM | 13 | Q.  So is it associated with using too much heroin? |
| 11:05AM | 14 | A.  Yes. |
| 11:05AM | 15 | Q.  Do people call it nodding out because you basically start |
| 11:05AM | 16 | falling asleep and lose control of your head? |
| 11:05AM | 17 | A.  Yes. |
| 11:05AM | 18 | Q.  Does your head sort of fall into your chest? |
| 11:05AM | 19 | A.  Yes. |
| 11:05AM | 20 | Q.  Have you nodded out at Pharaoh's from using too much |
| 11:05AM | 21 | heroin? |
| 11:05AM | 22 | A.  Yes. |
| 11:05AM | 23 | Q.  Have you observed other dancers nodding out inside |
| 11:05AM | 24 | Pharaoh's from using opiates? |
| 11:05AM | 25 | A.  Yes. |

11:05AM  1  Q.  What different areas inside Pharaoh's have you nodded

11:05AM  2  out?

11:05AM  3  A.  At the bar, in VIP, locker room, right on the main floor,

11:06AM  4  just about everywhere.

11:06AM  5  Q.  If you had to estimate how many times you've nodded out

11:06AM  6  from your heroin usage, can you estimate it, inside

11:06AM  7  Pharaoh's?

11:06AM  8  A.  I would say maybe, like, 100.

11:06AM  9  Q.  Would you use cocaine at times to blunt that feeling

11:06AM  10  of -- of wanting to nod out, or to keep going through your

11:06AM  11  shift?

11:06AM  12  A.  Yes.

11:06AM  13  Q.  How long during your shift could you go without using

11:06AM  14  heroin?  Say you used it in the morning, and you got to work

11:06AM  15  and you weren't sick.  How long into your shift could you go

11:06AM  16  before you started to nod out if you didn't use cocaine?

11:07AM  17  A.  30 minutes.

11:07AM  18  Q.  So within 30 minutes or so, you would seek some cocaine?

11:07AM  19  A.  Yeah.

11:07AM  20  Q.  How long could you go before you started getting really

11:07AM  21  sick?

11:07AM  22  A.  About six hours.  'Cuz, mind you, this isn't -- that

11:07AM  23  wasn't like real heroin, you know?

11:07AM  24  Q.  What do you mean?

11:07AM  25  A.  Like nowadays, it's not real heroin out there, it's like

| | | |
|---|---|---|
| 11:07AM | 1 | fentanyl that they put in heroin.  And then, so -- 'cuz |
| 11:07AM | 2 | heroin, 24 hours -- you're supposed to have 24 hours where |
| 11:07AM | 3 | you don't get sick if it was real. |
| 11:07AM | 4 | Q.  Okay? |
| 11:07AM | 5 | A.  But since it's mixed with fentanyl, you're still getting |
| 11:07AM | 6 | sick in six hours. |
| 11:07AM | 7 | Q.  So you're explaining the difference in your experience |
| 11:07AM | 8 | between heroin and a heroin with mixed with fentanyl? |
| 11:07AM | 9 | A.  Yes. |
| 11:07AM | 10 | Q.  So if you worked an 8 p.m. to 4 a.m. shift, you would |
| 11:08AM | 11 | still need heroin in the course of that shift to not get |
| 11:08AM | 12 | really sick? |
| 11:08AM | 13 | A.  Yes. |
| 11:08AM | 14 | Q.  In addition to the defendant himself and Scooter, I want |
| 11:08AM | 15 | to talk about other associates of the defendant and ask |
| 11:08AM | 16 | whether they've given you drugs.  And then I'll get into more |
| 11:08AM | 17 | specifics of the transaction later on, okay? |
| 11:08AM | 18 | Do you know the defendant's brother, David? |
| 11:08AM | 19 | A.  Yes. |
| 11:08AM | 20 | Q.  Have you obtained drugs from David? |
| 11:09AM | 21 | A.  Yes. |
| 11:09AM | 22 | Q.  What kind of drugs? |
| 11:09AM | 23 | A.  Cocaine. |
| 11:09AM | 24 | Q.  Do you know an individual named Aaron? |
| 11:09AM | 25 | A.  Yes. |

11:09AM    1    Q.  Who was Aaron?

11:09AM    2    A.  Aaron was, I believe, a liquor distributor.  He was

11:09AM    3    somebody close to the defendant.

11:09AM    4    Q.  Has that person given you drugs?

11:09AM    5    A.  Yes.

11:09AM    6    Q.  Now David and Aaron, when they gave you drugs, was it in

11:09AM    7    the context of an exchange for sex?

11:09AM    8    A.  Yes.

11:09AM    9    Q.  I'm going to ask you more details about that later, okay?

11:09AM   10    And you nodded your head, was that a yes?

11:09AM   11    A.  Yes.

11:09AM   12    Q.  Okay.  And earlier you mentioned the name Bobby Black.

11:09AM   13    Was that someone who was a customer who would frequent

11:09AM   14    Pharaoh's?

11:09AM   15    A.  Yes.

11:09AM   16    Q.  Was he someone that you would get drugs from?

11:09AM   17    A.  Yes.

11:09AM   18    Q.  Based on your observations, have you seen that person

11:10AM   19    interact with the defendant?

11:10AM   20    A.  Yes.

11:10AM   21    Q.  I want to step back from Pharaoh's just for a moment and

11:10AM   22    talk about a little bit about the time period of last summer,

11:10AM   23    2023, okay?

11:10AM   24        On Friday, we talked about how you were approached by

11:10AM   25    investigators in July 2020, and you didn't know how they knew

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

| | | |
|---|---|---|
| 11:10AM | 1 | about it or found you, but you gave an interview with them; |
| 11:10AM | 2 | do you remember that? |
| 11:10AM | 3 | A.  Yes. |
| 11:10AM | 4 | Q.  And then shortly after that, within that same month, you |
| 11:10AM | 5 | went into grand jury; do you remember that? |
| 11:10AM | 6 | A.  Yes. |
| 11:10AM | 7 | Q.  Okay.  Just "yes" or "no" to a couple of these questions |
| 11:10AM | 8 | I'd like to get through. |
| 11:10AM | 9 | From 2020 to 2023, was it your understanding that the |
| 11:11AM | 10 | government would take efforts to do their best to make sure |
| 11:11AM | 11 | your identity remained confidential -- |
| 11:11AM | 12 | A.  Yes. |
| 11:11AM | 13 | Q.  -- until trial? |
| 11:11AM | 14 | A.  Yes. |
| 11:11AM | 15 | Q.  Okay.  In the summer of 2023, I won't hold you to dates, |
| 11:11AM | 16 | but did law enforcement working on this case sort of |
| 11:11AM | 17 | reconnect with you in order to reach out to you to say, hey, |
| 11:11AM | 18 | okay, trial is coming up? |
| 11:11AM | 19 | A.  Yes. |
| 11:11AM | 20 | Q.  Okay.  Did that stress you out? |
| 11:11AM | 21 | A.  Yes. |
| 11:11AM | 22 | Q.  In early August of 2023, did you have a slipup where you |
| 11:11AM | 23 | ended up using cocaine? |
| 11:11AM | 24 | A.  Yes. |
| 11:12AM | 25 | Q.  Now, you had been clean for a period of time? |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

55

11:12AM      1    A.  Yes.

11:12AM      2    Q.  If you know, and if you can explain it, and if you can't

11:12AM      3    that's okay, but if you know, what triggered your use at that

11:12AM      4    time?

11:12AM      5    A.  Stress.

11:12AM      6    Q.  Just general --

11:12AM      7    A.  General stress.  Obviously, part of the case, you know.

11:12AM      8    Q.  Okay.  By that point, had you been clean from cocaine for

11:12AM      9    about two-and-a-half years?

11:12AM     10    A.  Yes.

11:12AM     11    Q.  I think we talked about this Friday, but is it basically

11:12AM     12    a daily struggle that you're gonna have to fight every day

11:12AM     13    for the rest of your life?

11:12AM     14    A.  Yes, every day.

11:12AM     15    Q.  Okay.  That day in August that you sort of, that -- not

11:12AM     16    "sort of," that you did slip up using cocaine, describe what

11:12AM     17    happened that day from your perspective and what the FBI did.

11:12AM     18    A.  So, I actually ended up going missing, I believe.  Was

11:13AM     19    that the time?

11:13AM     20    Q.  Would you like something to refresh your recollection?

11:13AM     21    A.  Yes.

11:13AM     22    Q.  Okay.  Let me just try to do that, okay?

11:13AM     23    A.  Yes.

11:13AM     24         **MR. TRIPI:**  Ms. Champoux, for the witness only, can

11:13AM     25    we pull up Government Exhibit 3571AP, for the witness only.

11:13AM    1          THE COURT:  Mr. Tripi, is this a good time for a

11:13AM    2   break?

11:13AM    3          MR. TRIPI:  Sure, Judge.

11:13AM    4          THE COURT:  Let's take our morning break, folks.

11:13AM    5   Please remember my instructions about not communicating about

11:13AM    6   the case with anyone including each other, and don't make up

11:13AM    7   your minds.

11:14AM    8          We'll see you back here in 15, 20 minutes.

11:14AM    9          (Jury excused at 11:14 a.m.)

11:14AM   10          THE COURT:  Did she leave?

11:14AM   11          MR. TRIPI:  I told her, Judge, your same admonitions

11:14AM   12   apply, not to talk to anybody, if that's sufficient.

11:14AM   13          THE COURT:  That's terrific.  Yeah.  That's the only

11:14AM   14   reason I wanted to --

11:14AM   15          Anything we need to put on the record?

11:14AM   16          MR. TRIPI:  No.

11:14AM   17          MR. SOEHNLEIN:  No.

11:14AM   18          THE COURT:  How much more do you have, Mr. Tripi,

11:14AM   19   with this witness?

11:14AM   20          MR. TRIPI:  I hesitate to estimate.  I would say she

11:14AM   21   will probably be one of our longest witnesses of the trial.  I

11:15AM   22   would say maybe I'm halfway through.

11:15AM   23          THE COURT:  Okay.  We're not going to finish the

11:15AM   24   government's case today.

11:15AM   25          MR. TRIPI:  I think we can if we get -- you know, we

11:15AM  1   only have Mr. Burns after that.  If anything, Judge, it will

11:15AM  2   be a little bit in the morning tomorrow, but we'll be close.

11:15AM  3          **THE COURT:**  And is the defense confident that we're

11:15AM  4   going to get through its case in two days?

11:15AM  5          **MR. FOTI:**  So, we -- we've sent the list, the

11:15AM  6   prospective list, and we've been continuing to talk about it

11:15AM  7   since then.  I think the reality is we're probably going to

11:15AM  8   make cuts and consolidate it down to -- if we can consolidate

11:15AM  9   it to one day, if we're calling witnesses, I don't think it's

11:15AM 10   going to take two.

11:15AM 11          **THE COURT:**  You don't think it's going to take two?

11:15AM 12   Okay, good.  Okay.  Great.

11:15AM 13          **MR. TRIPI:**  I am sort of cutting as I go, so it's

11:15AM 14   hard to estimate because I'm --

11:15AM 15          **THE COURT:**  Okay.  And I'm not trying to hurry

11:15AM 16   anyone.  As I said last week is what I don't want to do is try

11:15AM 17   to rush anyone because of the schedule and the holidays and

11:15AM 18   all that kind of stuff.

11:15AM 19          **MR. TRIPI:**  I know.

11:15AM 20          **THE COURT:**  I don't want anyone rushing at all, you

11:16AM 21   do what you have to do in order to put your case in.  I just

11:16AM 22   want to have some idea for my own planning purposes.

11:16AM 23          **MR. TRIPI:**  Yeah, it was hard to estimate not because

11:16AM 24   of the Court, because I, on my own, have skipped over some --

11:16AM 25   so I don't know in the future outline what I'm going to skip

| | | |
|---|---|---|
| 11:16AM | 1 | over. |
| 11:16AM | 2 | **THE COURT:**  Yep. |
| 11:16AM | 3 | **MR. COOPER:**  What time do you plan to break for |
| 11:16AM | 4 | lunch?  I know you've got -- |
| 11:16AM | 5 | **THE COURT:**  12:30.  I've got two matters at 12:30. |
| 11:16AM | 6 | **MR. COOPER:**  Is my matter at 12:30? |
| 11:16AM | 7 | **THE CLERK:**  Yes. |
| 11:16AM | 8 | **MR. COOPER:**  Sorry, I can't keep my own schedule. |
| 11:16AM | 9 | **THE COURT:**  That's all right. |
| 11:16AM | 10 | **THE CLERK:**  All rise. |
| 11:16AM | 11 | (Off the record at 11:16 a.m.) |
| 11:16AM | 12 | (Back on the record at 11:31 a.m.) |
| 11:31AM | 13 | (Jury not present.) |
| 11:31AM | 14 | **THE CLERK:**  All rise. |
| 11:31AM | 15 | **THE COURT:**  Please be seated. |
| 11:31AM | 16 | **THE CLERK:**  We are back on the record for the |
| 11:31AM | 17 | continuation of the jury trial in case numbers 19-cr-227 and |
| 11:31AM | 18 | 23-cr-37, United States of America versus Peter Gerace Jr. |
| 11:31AM | 19 | All counsel and parties are present. |
| 11:31AM | 20 | **THE COURT:**  Okay.  Couple things. |
| 11:32AM | 21 | Juror Number 2 is gonna have his stitches removed at |
| 11:32AM | 22 | 8:30 on Wednesday, so he may be in a few minutes late |
| 11:32AM | 23 | depending on how long that takes. |
| 11:32AM | 24 | And the jury is also asking to have a pizza party and |
| 11:32AM | 25 | to wear their ugly Christmas sweatshirts/sweaters on Wednesday |

11:32AM    1   the 18th.  I see no reason to say no to that.

11:32AM    2            **MR. TRIPI:**  I never understood ugly sweaters, but

11:32AM    3   other than that, I have no objection.

11:32AM    4            **THE COURT:**  I've got one that I always thought was

11:32AM    5   kind of a nice sweater that people tell me is an ugly sweater.

11:32AM    6            Any reason to say no to that?

11:32AM    7            **MR. FOTI:**  No, Judge, I -- just because I guess the

11:32AM    8   conversation we just had might be relevant, so --

11:32AM    9            **THE COURT:**  It's conceivable we're not going on

11:32AM   10   Wednesday.

11:32AM   11            **MR. FOTI:**  Well, yeah.  I think tomorrow, what I was

11:32AM   12   going to ask for was we kind of do the same thing we had

11:32AM   13   talked about doing today, if the government's case finishes.

11:33AM   14   I know we have an argument tomorrow on the -- in terms of

11:33AM   15   the -- we're going to have a charge conference tomorrow, so my

11:33AM   16   request would be that we convey by the charge conference as

11:33AM   17   long as there's a little break in between whether we still

11:33AM   18   intend to put on the case that we're prepared to put on.

11:33AM   19   Because at that point, depending on how things finish up with

11:33AM   20   these last two witnesses, we may make a final decision after

11:33AM   21   talking with Mr. Gerace and whether he's going to testify and

11:33AM   22   evaluate where we're at that we don't intend to call

11:33AM   23   witnesses, in which case Wednesday we don't have -- well,

11:33AM   24   we're not going to have anybody to call.

11:33AM   25            **THE COURT:**  But the government's going to be

11:33AM   1   finished.  The charge conference is not until the end of the

11:33AM   2   day on Tuesday.

11:33AM   3           MR. FOTI:  Yes, that's right.  What I'm asking for is

11:33AM   4   that --

11:33AM   5           THE COURT:  So you won't call anybody?

11:33AM   6           MR. FOTI:  That's what I'm asking for.  I'm asking

11:33AM   7   for sort of the same thing we were going to ask for today,

11:33AM   8   which is we finish up, we be given a little time to talk to

11:33AM   9   Mr. Gerace and evaluate where we're at, whether he's going to

11:33AM  10   testify and make the final decision on calling witnesses.  I

11:34AM  11   know that means --

11:34AM  12           THE COURT:  So we're down tomorrow?

11:34AM  13           MR. FOTI:  We would basically be down tomorrow once

11:34AM  14   we finish the government's case, I expect it's going into

11:34AM  15   tomorrow.

11:34AM  16           MR. COOPER:  Judge, if I can maybe chime in with what

11:34AM  17   Mr. Foti was saying?

11:34AM  18           We were talking about the schedule for the week

11:34AM  19   during for the break a little bit, Mark and I.  And I don't

11:34AM  20   think I'm talking out of school, he'll correct me if I'm

11:34AM  21   wrong.  It sounds like it's possible -- or, if there's gonna

11:34AM  22   be a defense case, it's very likely a one workday defense

11:34AM  23   case.

11:34AM  24           The other alternate is that there may be no defense

11:34AM  25   case.  If there were to be a one workday defense case, it

11:34AM   1   would be Wednesday.  And we would still be keeping with the

11:34AM   2   schedule we've currently set.

11:34AM   3          If there was the other alternate, which is no defense

11:34AM   4   case, then we would be in a position to sum on Wednesday, and

11:34AM   5   so we'd be ahead of schedule.

11:34AM   6          So I don't think anything that Mr. Foti's proposing

11:34AM   7   is -- it's not offensive to me, because we're either on

11:34AM   8   schedule or ahead of schedule.

11:34AM   9          **THE COURT:**  Fine.  Great.  Okay.  I get it.  And then

11:34AM  10   I would charge on Thursday?

11:34AM  11          **MR. COOPER:**  If we summed -- if we summed Wednesday,

11:34AM  12   you would charge Thursday.

11:35AM  13          **THE COURT:**  Yeah.  Which would be better.  It --

11:35AM  14   it -- it would be better.  But let's -- let's play it -- we'll

11:35AM  15   see how it plays out.

11:35AM  16          **MR. FOTI:**  Yeah.

11:35AM  17          **THE COURT:**  Correct?

11:35AM  18          **MR. FOTI:**  And just on that possible scenario, I'm

11:35AM  19   assuming that ugly sweaters and pizza parties don't -- aren't

11:35AM  20   affected by closing arguments, but I just wanted to say that

11:35AM  21   we had this conversation --

11:35AM  22          **THE COURT:**  I don't think that it's gonna change

11:35AM  23   their mindset in anyway, so --

11:35AM  24          **MR. TRIPI:**  I'm wearing a suit either way.

         25

11:35AM    1          **MR. FOTI:**  All I know is after a few pieces of pizza,

11:35AM    2    Judge, I tune out, but I'm sure the jurors will do a better

11:35AM    3    job than I can.

11:35AM    4          **THE COURT:**  Okay.  We'll play it by ear.  But I'll

11:35AM    5    tell them they can -- they can plan on that.  Okay?  Do you

11:35AM    6    have any problem with that, Mr. Foti?

11:35AM    7          **MR. FOTI:**  No.

11:35AM    8          **THE COURT:**  Any problem?

11:35AM    9          **MR. TRIPI:**  No, Judge.

11:35AM    10         **THE COURT:**  Then I'll tell Juror Number 2 to do what

11:35AM    11   he can to get it done quickly, but, you know, we'll see what

11:35AM    12   happens.

11:35AM    13         There was one other thing that I wanted to ask about.

11:35AM    14   I can't remember.  Do you remember?

11:36AM    15         **THE CLERK:**  I don't think you told me.

11:36AM    16         **THE COURT:**  Okay.  Anything else before we bring the

11:36AM    17   jury back?

11:36AM    18         **MR. COOPER:**  No, Judge.

11:36AM    19         **MR. TRIPI:**  No.

11:36AM    20         **MR. SOEHNLEIN:**  Nothing here, Judge.

11:36AM    21         **THE COURT:**  Great.  Okay.  Let's bring them back,

11:36AM    22   please.

11:37AM    23         (Jury seated at 11:37 a.m.)

11:37AM    24         **THE COURT:**  Okay.  The record will reflect that all

11:37AM    25   our jurors are present.

11:37AM  1          So I understand that Juror Number 2 is going to get

11:37AM  2   his stitches removed on Wednesday morning at 8:30.  And that's

11:37AM  3   great.  You should be here pretty close, I think, so get here

11:37AM  4   when you can.

11:37AM  5          And you folks want to have a pizza party and wear

11:38AM  6   ugly Christmas apparel on Wednesday, this coming Wednesday.

11:38AM  7   We see no reason why you can't do that.  So you can.

11:38AM  8          As I told the lawyers, I had a sweater that I thought

11:38AM  9   was a very nice water, and one of my kids asked to borrow it

11:38AM  10  to wear to an ugly Christmas sweater party.  I was very

11:38AM  11  offended, I thought it was a very nice sweater.

11:38AM  12         I remind the witness she's still under oath.

11:38AM  13         Mr. Tripi, you may continue.

11:38AM  14         **MR. TRIPI:**  Thank you, Your Honor.

11:38AM  15         **BY MR. TRIPI:**

11:38AM  16  Q.  I was getting my numbers and letters wrong earlier.

11:38AM  17  We're going to pull up on the screen next to you

11:38AM  18  Exhibit 3571H.  It's for you only to read at this point.

11:38AM  19     Please read it to yourself.  If you need us to switch

11:38AM  20  pages, let us know that as well, and we'll get through the

11:38AM  21  document.  And then we'll have you see if it refreshes your

11:38AM  22  memory, okay?

11:38AM  23  A.  Okay.

11:40AM  24  Q.  Do you need another page?  Or was that enough to refresh

11:40AM  25  your memory?

11:40AM    1    A.    That's enough.

11:40AM    2            **MR. TRIPI:**    Okay.  We can take that down,

11:40AM    3    Ms. Champoux.

11:40AM    4            **BY MR. TRIPI:**

11:40AM    5    Q.    Did that, reviewing page one of Exhibit 3571H, did that

11:40AM    6    refresh your recollection as to the circumstances of

11:40AM    7    August 2nd, 2023?

11:40AM    8    A.    Yes.

11:40AM    9    Q.    Okay.  Did you miss a trial preparation meeting with the

11:40AM    10   U.S. Attorney's Office that day?

11:40AM    11   A.    Yes.

11:40AM    12   Q.    On that day, did you go and use cocaine?

11:40AM    13   A.    Yes.

11:40AM    14   Q.    Did the FBI or members of the FBI task force,

11:40AM    15   specifically special agent -- or, excuse me, Task Force

11:40AM    16   Officer Rondon, he was the same one who had found you in

11:40AM    17   Pennsylvania in 2020, right?

11:40AM    18   A.    Yes.

11:40AM    19   Q.    Did he and a couple of others including Special Agent

11:41AM    20   Butera with the FBI, did they go looking for you?

11:41AM    21   A.    Yes.

11:41AM    22   Q.    Did they find you somewhere?

11:41AM    23   A.    Yes.

11:41AM    24   Q.    Where did they find you, just generally?

11:41AM    25   A.    Inside a drug house.

11:41AM   1    Q.  On the West Side of Buffalo?

11:41AM   2    A.  Yeah.

11:41AM   3    Q.  Did you have a little bit of cocaine on you?

11:41AM   4    A.  Yes.

11:41AM   5    Q.  Did they arrest you and charge you with that cocaine?

11:41AM   6    A.  No.

11:41AM   7    Q.  What did they do?

11:41AM   8    A.  They took me to get help.

11:41AM   9    Q.  Did they take you to ECMC?

11:41AM  10    A.  Yes.

11:41AM  11    Q.  Did you sit there with them for hours?

11:41AM  12    A.  Hours, yes.

11:41AM  13    Q.  Okay.  And you never got prosecuted for that little bit

11:41AM  14    of cocaine, right?

11:41AM  15    A.  Correct.

11:41AM  16    Q.  Did they then take you to a hotel and get you a hotel

11:41AM  17    room out in Amherst, New York?

11:41AM  18    A.  Yes.

11:41AM  19    Q.  Did the FBI house you at a local hotel from August 2nd to

11:42AM  20    August 4th, and then again from August 7 to August 14th --

11:42AM  21    A.  Yes.

11:42AM  22    Q.  -- of 2023?

11:42AM  23    A.  Yes.

11:42AM  24    Q.  Is it your understanding that that was done to keep you

11:42AM  25    in a safe location, and in a safe room?

11:42AM   1    A.  Yes.

11:42AM   2    Q.  As time went on, just "yes" or "no," did the trial, this

11:42AM   3    case, get adjourned?

11:42AM   4    A.  Yes.

11:42AM   5    Q.  Did the amount of housing assistance in terms of living

11:42AM   6    in a safe location, did the amount of your -- of time that

11:42AM   7    you would need to be housed, did it extend?

11:42AM   8    A.  Yes.

11:42AM   9    Q.  Did the FBI, in order to house you in a safe location,

11:42AM   10   provide payments to house you -- to help house you in a safe

11:42AM   11   location?

11:42AM   12   A.  Yes.

11:42AM   13   Q.  I don't want to get into specifics of where you were, but

11:43AM   14   was it hotel room, and then AirBNB, and then apartment-type

11:43AM   15   situation?

11:43AM   16   A.  Yes.

11:43AM   17   Q.  Are we talking, like, the Ritz Carlton, super glamorous

11:43AM   18   places?

11:43AM   19   A.  No.

11:43AM   20   Q.  Okay.  Nevertheless, were they clean, safe rooms for you

11:43AM   21   to live in?

11:43AM   22   A.  Yeah.

11:43AM   23   Q.  Did your child ultimately, your younger kid, also go with

11:43AM   24   you?

11:43AM   25   A.  Yes.

11:43AM 1    Q.  Did you have a fiancé who went with you as well?

11:43AM 2    A.  Yes.

11:43AM 3    Q.  Over time, did you need to drive back and forth also to

11:43AM 4    Cuba, New York, to visit your other child?

11:43AM 5    A.  Yes.

11:43AM 6    Q.  Did you need a vehicle to get yourself to court

11:43AM 7    appearances as necessary, or trial preparation meetings with

11:43AM 8    the government?

11:43AM 9    A.  Yes.

11:43AM 10   Q.  Were you provided with gas cards or money for gas?

11:44AM 11   A.  Yes.

11:44AM 12   Q.  At times, when you had no food, did the FBI help you get

11:44AM 13   food?

11:44AM 14   A.  Yes.

11:44AM 15   Q.  When your vehicle was totaled, did the FBI help you with

11:44AM 16   that?

11:44AM 17   A.  Yes.

11:44AM 18   Q.  Did you basically get in a car accident driving to go

11:44AM 19   visit your other child?

11:44AM 20   A.  Yes.

11:44AM 21   Q.  Did they help you pay for your insurance to make sure you

11:44AM 22   kept a car on the road?

11:44AM 23   A.  Yes.

11:44AM 24   Q.  Now this is all happening, these -- these payments that

11:44AM 25   the FBI is making are happening from 2023, the summer of

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

68

| | | |
|---|---|---|
| 11:44AM | 1 | 2023 -- |
| 11:44AM | 2 | A.  Correct. |
| 11:44AM | 3 | Q.  -- is when it began, correct? |
| 11:44AM | 4 | A.  Yes. |
| 11:44AM | 5 | Q.  And was the trial supposed to happen that summer? |
| 11:44AM | 6 | A.  Yes. |
| 11:44AM | 7 | Q.  And now between 2020 and 2023, there were no payments or |
| 11:45AM | 8 | anything like that, correct? |
| 11:45AM | 9 | A.  Correct. |
| 11:45AM | 10 | Q.  No assistance provided? |
| 11:45AM | 11 | A.  No. |
| 11:45AM | 12 | Q.  Did you seek treatment, additional treatment during that |
| 11:45AM | 13 | time, and did the FBI help connect you with various service |
| 11:45AM | 14 | providers to help you with various treatment issues -- |
| 11:45AM | 15 | A.  Yes. |
| 11:45AM | 16 | Q.  -- that you felt you needed? |
| 11:45AM | 17 | A.  Yes. |
| 11:45AM | 18 | Q.  In 2020, when you were first approached by Task Force |
| 11:45AM | 19 | Officer Rondon, and then testified in grand jury a short time |
| 11:45AM | 20 | later, had any -- had any of those things happened?  Had any |
| 11:45AM | 21 | housing assistance been provided, or any type of assistance? |
| 11:45AM | 22 | A.  No. |
| 11:45AM | 23 | Q.  Okay.  Have you also tried to get your life on a better |
| 11:45AM | 24 | track? |
| 11:45AM | 25 | A.  Yes. |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24
69

11:45AM   1   Q.  I think we talked a little bit about it in the beginning.

11:45AM   2   What have you done during this time to also try to get

11:46AM   3   yourself on track?

11:46AM   4   A.  So far, I've been keeping up with my mental health, which

11:46AM   5   is the biggest thing.  My substance use.  I still go on a

11:46AM   6   daily to keep me clean.

11:46AM   7       I also got a certified peer advocate certification, so

11:46AM   8   now I can help other addicts hopefully.  And it will help me,

11:46AM   9   too, as well.

11:46AM  10   Q.  Have things still been hard for you in life?

11:46AM  11   A.  Yes.

11:46AM  12   Q.  During the course of time, when you were waiting to

11:46AM  13   testify, have there been times when you've gotten frustrated

11:46AM  14   with the FBI and waiting?

11:46AM  15   A.  Yes.

11:46AM  16   Q.  Has that seeped into some of your text messages with

11:46AM  17   them?

11:46AM  18   A.  Yes.

11:46AM  19   Q.  Okay.  Are you sitting there lying and making stuff up

11:47AM  20   for this jury because of assistance the FBI provided you in

11:47AM  21   2023 leading up to this trial?

11:47AM  22   A.  No.

11:47AM  23   Q.  Are you telling the truth?

11:47AM  24   A.  Yes.

11:47AM  25   Q.  Did you tell the truth in your first interview and in

11:47AM    1    grand jury?

11:47AM    2    A.   Yes.

11:47AM    3    Q.   Has anything the FBI has done impact your testimony?

11:47AM    4    A.   No.  Like, not in a negative way, you know what I mean?

11:47AM    5    Q.   You're not making things up because the FBI helped you,

11:47AM    6    right?

11:47AM    7    A.   No.  No, no, no, no.

11:47AM    8    Q.   All right.  I want to get back to your beginnings at

11:48AM    9    Pharaoh's now, specifically back to the beginning of meeting

11:48AM   10    the defendant.

11:48AM   11        How did you meet this defendant after starting work at

11:48AM   12    Pharaoh's?

11:48AM   13    A.   I had met him through Kiera.

11:48AM   14    Q.   Is that D.P.?

11:48AM   15    A.   Yes.

11:48AM   16    Q.   Is she the first one who gave you heroin in the club?

11:48AM   17    A.   Yes.

11:48AM   18    Q.   Where were you within the club when you first met the

11:48AM   19    defendant?

11:48AM   20    A.   At the bar.

11:48AM   21    Q.   Was it shortly after you started?

11:48AM   22    A.   Yes.

11:48AM   23    Q.   Describe your initial interactions with him at the bar.

11:48AM   24    A.   I go to the bar, talk to him.  We have a drink while

11:48AM   25    we're talking.  And the defendant points out a customer, and

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

71

| | | |
|---|---|---|
| 11:48AM | 1 | says he's a good one, you want to go in the back room with |
| 11:49AM | 2 | him, and he will hook you up. |
| 11:49AM | 3 | Q.  Do you remember who that customer was? |
| 11:49AM | 4 | A.  Wayne van Vleet. |
| 11:49AM | 5 | Q.  Okay.  I want to dive into that conversation a little bit |
| 11:49AM | 6 | more, okay? |
| 11:49AM | 7 | A.  Okay. |
| 11:49AM | 8 | Q.  Can you describe Wayne van Vleet's physical appearance? |
| 11:50AM | 9 | A.  6 feet tall, at least.  He's got, like, light orange |
| 11:50AM | 10 | hair-ish.  He's very on the bigger side.  Always wears khaki |
| 11:50AM | 11 | pants and a green shirt. |
| 11:50AM | 12 | Q.  Okay.  We're going to show you what's in evidence as |
| 11:50AM | 13 | Government Exhibit 558.  Do you recognize that individual? |
| 11:50AM | 14 | A.  Yes. |
| 11:50AM | 15 | Q.  Who is that? |
| 11:50AM | 16 | A.  That is Wayne. |
| 11:51AM | 17 | Q.  Okay.  So was it this defendant who first pointed out |
| 11:51AM | 18 | Wayne to you? |
| 11:51AM | 19 | A.  Yes. |
| 11:51AM | 20 | Q.  Was this at a point in time after you had started using |
| 11:51AM | 21 | drugs inside Pharaoh's? |
| 11:51AM | 22 | A.  Yes. |
| 11:51AM | 23 | Q.  When the defendant pointed out Wayne to you, do you |
| 11:51AM | 24 | remember exactly what he said? |
| 11:51AM | 25 | A.  He did say he likes to pull hair and finger people. |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

72

11:51AM   1     So that's basically when I knew what was gonna go on back

11:51AM   2   there.

11:51AM   3   Q.  Did the defendant tell you anything about what Brian

11:51AM   4   would or wouldn't do if you went in the VIP with Wayne?

11:51AM   5   A.  Yes.  He's --

11:51AM   6   Q.  What did the defendant say in that regard?

11:51AM   7   A.  He said that Brian would overlook the camera.

11:51AM   8   Q.  What did you understand "Brian would overlook the camera"

11:52AM   9   to mean?

11:52AM  10   A.  That Wayne can do what he wants to me, and I'm not being

11:52AM  11   watched.

11:52AM  12   Q.  Based on what the defendant said to you, did you approach

11:52AM  13   Wayne?

11:52AM  14   A.  Yes.

11:52AM  15   Q.  Did you approach Wayne because you thought he was gonna

11:52AM  16   pay a lot of money?

11:52AM  17   A.  Yes.

11:52AM  18   Q.  Based on your conversation with the defendant, was it

11:52AM  19   clear to you he wanted you to approach Wayne?

11:52AM  20   A.  Yes.

11:52AM  21   Q.  So describe what you did next.

11:52AM  22   A.  I went in the back with him.

11:52AM  23   Q.  With Wayne?

11:52AM  24   A.  With Wayne.

11:52AM  25   Q.  Describe what happened that first time in the back with

| | | |
|---|---|---|
| 11:52AM | 1 | Wayne. |
| 11:52AM | 2 | A.  He got the Champagne Room, so it was a full half hour. |
| 11:52AM | 3 | He tipped the VIP first. |
| 11:52AM | 4 | Q.  -- who was -- |
| 11:52AM | 5 | A.  Took me back. |
| 11:52AM | 6 | Q.  -- who was the VIP? |
| 11:52AM | 7 | A.  Brian. |
| 11:52AM | 8 | Q.  Okay. |
| 11:53AM | 9 | A.  And we went back, and did the dances, and he ended up |
| 11:53AM | 10 | fingering me and pulling my hair and ejaculating in his |
| 11:53AM | 11 | pants. |
| 11:53AM | 12 | Q.  Was that during that 30-minute Champagne Room dance? |
| 11:53AM | 13 | A.  Yes. |
| 11:53AM | 14 | Q.  Did anyone barge in and stop him when he pulled your |
| 11:53AM | 15 | hair? |
| 11:53AM | 16 | A.  No. |
| 11:53AM | 17 | Q.  Did anyone barge in and stop him when he was fingering |
| 11:53AM | 18 | you? |
| 11:53AM | 19 | A.  No. |
| 11:53AM | 20 | Q.  How did you know he ejaculated? |
| 11:53AM | 21 | A.  His pants were all wet, and I was sticky. |
| 11:53AM | 22 | Q.  How many Champagne Room dances did he buy that day, if |
| 11:53AM | 23 | you remember? |
| 11:53AM | 24 | A.  With me, one. |
| 11:53AM | 25 | Q.  Okay.  Did he tip you as well -- |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

74

| | | |
|---|---|---|
| 11:54AM | 1 | A.  Yes. |
| 11:54AM | 2 | Q.  -- as pay the fee? |
| 11:54AM | 3 | A.  Yes. |
| 11:54AM | 4 | Q.  Do you remember what he tipped you? |
| 11:54AM | 5 | A.  $100. |
| 11:54AM | 6 | Q.  Are you estimating? |
| 11:54AM | 7 | A.  Yes. |
| 11:54AM | 8 | Q.  Did you see him walk over to the VIP attendant? |
| 11:54AM | 9 | A.  Yes. |
| 11:54AM | 10 | Q.  Do you know whether or not he tipped the VIP attendant |
| 11:54AM | 11 | based on your observations? |
| 11:54AM | 12 | A.  Yeah.  I seen him tip before we even went back. |
| 11:54AM | 13 | Q.  So the tip to Brian was first? |
| 11:54AM | 14 | A.  Yes. |
| 11:54AM | 15 | Q.  Did you see how much money was exchanged? |
| 11:54AM | 16 | A.  I think -- I'm just guessing, but I think Brian was 50, |
| 11:54AM | 17 | and then I was $100, the tips. |
| 11:54AM | 18 | **MR. SOEHNLEIN:**  Your Honor, object to her response |
| 11:54AM | 19 | the last question. |
| 11:54AM | 20 | **THE COURT:**  Sustained. |
| 11:54AM | 21 | **MR. TRIPI:**  Okay.  We -- |
| 11:54AM | 22 | **THE COURT:**  And the jury will strike what she was |
| 11:54AM | 23 | just guessing about. |
| 11:54AM | 24 | **BY MR. TRIPI:** |
| 11:54AM | 25 | Q.  Okay.  You can't guess at the amount.  Do you know |

11:54AM    1    exactly how much he tipped Brian?  That's a "yes" or "no."

11:54AM    2    A.  No.

11:55AM    3    Q.  Okay.  Did you see him provide money to Brian before you

11:55AM    4    went back in the VIP with him?

11:55AM    5    A.  Yes.

11:55AM    6    Q.  Over the course of your time at Pharaoh's, after that

11:55AM    7    first time the defendant pointed out Wayne to you, told you

11:55AM    8    to go in the VIP with him, that he's going to finger you and

11:55AM    9    pull your hair, and that Brian will overlook the cameras, how

11:55AM   10    many more times did that same scenario play out between you

11:55AM   11    and Wayne van Vleet at Pharaoh's?

11:55AM   12    A.  Too many to count.

11:55AM   13    Q.  Did Wayne put his fingers in you and fondle you every

11:55AM   14    time?

11:55AM   15    A.  Yes.

11:55AM   16    Q.  Did he pull your hair every time?

11:55AM   17    A.  Yes.

11:55AM   18    Q.  Did he come to ejaculation every time?

11:55AM   19    A.  Yes.

11:55AM   20    Q.  Did you have to clean up every time?

11:55AM   21    A.  Yes.

11:55AM   22    Q.  Did he have to leave and walk right by the VIP and go to

11:56AM   23    the bathroom?

11:56AM   24    A.  Yes.

11:56AM   25    Q.  When your boss told you to take Wayne in the VIP, did you

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

76

| | | |
|---|---|---|
| 11:56AM | 1 | think it was an option? |
| 11:56AM | 2 | A.  No. |
| 11:56AM | 3 | Q.  If you weren't heavily addict to heroin and cocaine, |
| 11:56AM | 4 | would you have taken this guy in the back and done that stuff |
| 11:56AM | 5 | with him? |
| 11:56AM | 6 | A.  No. |
| 11:56AM | 7 | Q.  Would you ever do that in a million years? |
| 11:56AM | 8 | A.  No. |
| 11:56AM | 9 | Q.  Were there cameras right above you in the room every |
| 11:56AM | 10 | time? |
| 11:56AM | 11 | A.  Yes. |
| 11:56AM | 12 | Q.  Did anyone ever stop Wayne? |
| 11:57AM | 13 | A.  Nope. |
| 11:57AM | 14 | Q.  As you understood it, was Wayne a big spender in the |
| 11:57AM | 15 | club? |
| 11:57AM | 16 | A.  Yes. |
| 11:57AM | 17 | Q.  What do people call the big spenders in the club? |
| 11:57AM | 18 | A.  Good customers. |
| 11:57AM | 19 | Q.  Have you ever heard the term "whale?" |
| 11:57AM | 20 | A.  No. |
| 11:57AM | 21 | Q.  Okay.  Good customers? |
| 11:57AM | 22 | A.  Um-hum. |
| 11:57AM | 23 | Q.  Was Wayne considered a good customer? |
| 11:57AM | 24 | A.  Yes. |
| 11:57AM | 25 | Q.  What did you -- what, if anything, did you believe would |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24
77

| | | |
|---|---|---|
| 11:57AM | 1 | happen if, when the defendant pointed Wayne out to you and |
| 11:57AM | 2 | basically said take him in the back, what do you think would |
| 11:57AM | 3 | have happened if you said no, not gonna do that? |
| 11:57AM | 4 | **MR. SOEHNLEIN:** Objection? |
| 11:57AM | 5 | **THE COURT:** Sustained. |
| 11:57AM | 6 | **BY MR. TRIPI:** |
| 11:58AM | 7 | Q. What, if anything, did you fear if you said no to the |
| 11:58AM | 8 | defendant about going in the back with Wayne? |
| 11:58AM | 9 | **MR. SOEHNLEIN:** Objection. |
| 11:58AM | 10 | **THE COURT:** No, overruled. |
| 11:58AM | 11 | **THE WITNESS:** I would fear that I wouldn't be a |
| 11:58AM | 12 | favorite anymore. I wouldn't be able to get on stage as much |
| 11:58AM | 13 | as I did. Maybe not even get another job after that because |
| 11:58AM | 14 | he knows a lot of people. |
| 11:58AM | 15 | **BY MR. TRIPI:** |
| 11:58AM | 16 | Q. What do you mean by maybe not get on stage? Explain that |
| 11:58AM | 17 | for the jury. |
| 11:58AM | 18 | A. So, on stage, there's a rotation for all the girls that |
| 11:58AM | 19 | get to go up. And sometimes they skip the rotation just to |
| 11:58AM | 20 | put the better girl up because they're a favorite. And |
| 11:59AM | 21 | that's, like, the best way I can explain it. |
| 11:59AM | 22 | Q. Do you make money on stage? |
| 11:59AM | 23 | A. Yes. |
| 11:59AM | 24 | Q. If you don't go on stage, do you make less money? |
| 11:59AM | 25 | A. Right. |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

78

| | | |
|---|---|---|
| 11:59AM | 1 | Q.  If you go on stage once a night versus three times a |
| 11:59AM | 2 | night, is that less money? |
| 11:59AM | 3 | A.  Yes. |
| 11:59AM | 4 | Q.  If you go on stage zero times versus three times a night, |
| 11:59AM | 5 | is that no money from the stage? |
| 11:59AM | 6 | A.  Yes. |
| 11:59AM | 7 | Q.  Did you think you might even possibly be fired? |
| 11:59AM | 8 | A.  Yes. |
| 11:59AM | 9 | Q.  Near the first time you interacted with the defendant, |
| 12:00PM | 10 | did you do cocaine with him in the downstairs office? |
| 12:00PM | 11 | A.  Yes. |
| 12:00PM | 12 | Q.  Is that a place you'd done cocaine with him after that |
| 12:00PM | 13 | many times? |
| 12:00PM | 14 | A.  Yes. |
| 12:00PM | 15 | Q.  Near the time you did cocaine with the defendant in the |
| 12:00PM | 16 | downstairs office, did there come a point in time where you |
| 12:00PM | 17 | had a discussion with this defendant where he asked you if |
| 12:00PM | 18 | you'd be willing to meet with men outside of Pharaoh's? |
| 12:00PM | 19 | A.  Yes. |
| 12:00PM | 20 | Q.  Describe that conversation for the jury. |
| 12:00PM | 21 | A.  The defense asked me if I would be willing to go on dates |
| 12:01PM | 22 | outside of Pharaoh's.  And that means basically you go out to |
| 12:01PM | 23 | dinner, get dressed up and, you know, sexual acts after that. |
| 12:01PM | 24 | Q.  When the defendant first mentioned that to you, had you |
| 12:01PM | 25 | ever done that before? |

12:01PM     1   A.   No.

12:01PM     2   Q.   Did you tell him you'd never done that before?

12:01PM     3   A.   Yes.

12:01PM     4   Q.   How did he respond to that?

12:01PM     5   A.   Nonchalantly.  Just like he could teach me how to do it

12:01PM     6   real quick, like no big deal.

12:01PM     7   Q.   After he brought that topic up with you, what did you say

12:02PM     8   to him?

12:02PM     9   A.   I said I would be willing to try.  Not right away.  I

12:02PM    10   know at first I said let me think about it.  Then I'd be

12:02PM    11   willing to try when I had --

12:02PM    12   Q.   In between you telling him let me think about it, did you

12:02PM    13   go back and speak to another dancer?

12:02PM    14   A.   Yes.

12:02PM    15   Q.   Who was that?

12:02PM    16   A.   D.P.

12:02PM    17   Q.   Okay.  Did you and D.P. discuss whether you would try do

12:02PM    18   it together?

12:02PM    19   A.   Yes.

12:02PM    20   Q.   Were you and D.P. both using heroin heavily by that

12:02PM    21   point?

12:02PM    22   A.   Yes.

12:02PM    23   Q.   Did you and D.P. re-approach the defendant and indicate

12:02PM    24   you would be willing?

12:02PM    25   A.   Yes.

12:02PM    1    Q.  Describe that discussion, where you indicated you would

12:02PM    2    be willing to try.

12:02PM    3    A.  We told the defendant we'd be willing to try for a

12:03PM    4    certain amount of money.

12:03PM    5    Q.  What was the amount of money that you said?

12:03PM    6    A.  Two grand.  So one for her, one for me.

12:03PM    7    Q.  What did the defendant say?

12:03PM    8    A.  He said he would make it happen.

12:03PM    9    Q.  After that, did he set you and D.P. up on a date with

12:03PM   10    somebody?

12:03PM   11    A.  Yes.

12:03PM   12    Q.  Describe how he did that.

12:03PM   13    A.  He gets ahold of the person.  The person then contacts us

12:03PM   14    if he's not already in the club.

12:03PM   15    Q.  I'm asking about this specific situation.  How did he do

12:03PM   16    it?  How did it go?

12:03PM   17    A.  Oh, my God.  Do you have something to refresh me?

12:03PM   18         MR. TRIPI:  Can we pull up for the witness only

12:03PM   19    Government Exhibit 3571AA, please?

12:03PM   20         BY MR. TRIPI:

12:03PM   21    Q.  Take a moment, read this to yourself, see if that

12:04PM   22    refreshes your memory.

12:04PM   23         We'll go to the next page.  So we're looking at page 2 of

12:04PM   24    that exhibit?

12:04PM   25    A.  Yes.

USA v Gerace - L.L. - Tripi/Direct - 12/16/24
81

| | | |
|---|---|---|
| 12:04PM | 1 | Q.  Is the print large enough for you to read? |
| 12:04PM | 2 | A.  Yes. |
| 12:04PM | 3 | Q.  Okay.  Take a moment, take your time, look at that.  When |
| 12:04PM | 4 | you're done, look back at me, please. |
| 12:05PM | 5 | A.  Okay. |
| 12:05PM | 6 | Q.  Did that help refresh your recollection as to the |
| 12:05PM | 7 | sequence of events and conversations you had with the |
| 12:06PM | 8 | defendant surrounding him setting you up with a man to go |
| 12:06PM | 9 | outside of Pharaoh's to engage in prostitution? |
| 12:06PM | 10 | A.  Yes. |
| 12:06PM | 11 | **MR. TRIPI:**  Okay.  We can take that down, |
| 12:06PM | 12 | Ms. Champoux. |
| 12:06PM | 13 | **BY MR. TRIPI:** |
| 12:06PM | 14 | Q.  Can you tell the jury what happened in that regard? |
| 12:06PM | 15 | A.  After -- after the date, right? |
| 12:06PM | 16 | Q.  No, we -- I haven't even asked you about the date yet. |
| 12:06PM | 17 | How did it get set up?  Can you go through the discussions |
| 12:06PM | 18 | and how it got set up, please? |
| 12:06PM | 19 | A.  Oh, okay.  It got set up through obviously me and D.P.. |
| 12:06PM | 20 | we didn't talk to the person, Peter set it up.  And then |
| 12:06PM | 21 | eventually we talked to the person. |
| 12:06PM | 22 | Q.  Did this person, this man, do you remember the guy's |
| 12:06PM | 23 | name? |
| 12:06PM | 24 | A.  I don't. |
| 12:06PM | 25 | Q.  Did he come into Pharaoh's? |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

| | | |
|---|---|---|
| 12:06PM | 1 | A.  Yeah. |
| 12:06PM | 2 | Q.  Who arranged that part of it? |
| 12:06PM | 3 | A.  I'm not sure if he just came in to come in, or if he was |
| 12:06PM | 4 | someone who always came in.  I have never -- I never seen |
| 12:07PM | 5 | him. |
| 12:07PM | 6 | Q.  After you talked to the defendant about this situation, |
| 12:07PM | 7 | and then it was arranged for you and D.P. to go on a date |
| 12:07PM | 8 | with him, is that when he came into Pharaoh's? |
| 12:07PM | 9 | A.  Yes. |
| 12:07PM | 10 | Q.  If you recall, did the defendant set that part of it up, |
| 12:07PM | 11 | the initial meeting? |
| 12:07PM | 12 | A.  Yes. |
| 12:07PM | 13 | Q.  Did you and D.P. then go somewhere with that man? |
| 12:07PM | 14 | A.  Yes. |
| 12:07PM | 15 | Q.  Do you remember anything about him?  What he did for a |
| 12:07PM | 16 | living or anything, this man? |
| 12:07PM | 17 | A.  No, I don't know what he did for a living.  I can just |
| 12:07PM | 18 | recall what he looked like a little bit. |
| 12:07PM | 19 | Q.  What did he look like as best you can recall? |
| 12:07PM | 20 | A.  Somewhere in his 40s.  He was tall, dark hair, dark eyes, |
| 12:07PM | 21 | light skinned.  He was Caucasian. |
| 12:07PM | 22 | Q.  Did you get in a vehicle with him? |
| 12:07PM | 23 | A.  Yes. |
| 12:07PM | 24 | Q.  Do you remember what kind of vehicle? |
| 12:08PM | 25 | A.  No. |

| 12:08PM | 1 | Q. Did he take you and D.P. a/k/a Kiera somewhere? |
| 12:08PM | 2 | A. Yes. |
| 12:08PM | 3 | Q. Where did he take you? |
| 12:08PM | 4 | A. We went to The Chop House. |
| 12:08PM | 5 | Q. Is that a restaurant near downtown Buffalo here? |
| 12:08PM | 6 | A. Yes. |
| 12:08PM | 7 | Q. Is that a fancy restaurant? |
| 12:08PM | 8 | A. Yes. |
| 12:08PM | 9 | Q. Were you dressed up? |
| 12:08PM | 10 | A. Yes. |
| 12:08PM | 11 | Q. Was D.P. dressed up? |
| 12:08PM | 12 | A. Yes. |
| 12:08PM | 13 | Q. As the dinner progressed, did you talk about a price for |
| 12:08PM | 14 | sex? |
| 12:08PM | 15 | A. Yes. |
| 12:08PM | 16 | Q. What happened after the dinner? |
| 12:08PM | 17 | A. After the dinner, we never -- we never got paid, because |
| 12:08PM | 18 | he agreed and then didn't. Didn't agree to the money. |
| 12:08PM | 19 | I don't know if the guy thought -- he meant a thousand |
| 12:08PM | 20 | for both of us, but we wanted a thousand each. |
| 12:08PM | 21 | Q. Okay. Did he take you back to Pharaoh's? |
| 12:09PM | 22 | A. Yes. |
| 12:09PM | 23 | Q. Eventually, did you talk to Gerace and explain that it |
| 12:09PM | 24 | didn't happen? |
| 12:09PM | 25 | A. Yes. |

12:09PM   1    Q.  Do you remember his reaction at that time?

12:09PM   2    A.  Yeah.  He just said he could set us up again with someone

12:09PM   3    else if we wanted.

12:09PM   4    Q.  Separate and apart from that, did you have a conversation

12:09PM   5    with D.P. where she talked about being set up on her own date

12:09PM   6    for prostitution?

12:09PM   7    A.  Yes.

12:09PM   8           MR. SOEHNLEIN:  Objection.  Hearsay, Judge.

12:09PM   9           MR. TRIPI:  We can argue this one at the bench,

12:09PM  10    Judge.

12:09PM  11           THE COURT:  Sure, come up.

12:09PM  12           MR. TRIPI:  Thank you.

12:09PM  13           (Sidebar discussion held on the record.)

12:09PM  14           MR. TRIPI:  My argument is it's a coconspirator

12:09PM  15    statement at that point, Your Honor.  D.P. is a fellow dancer

12:10PM  16    in the club.

12:10PM  17           THE COURT:  She's a --

12:10PM  18           MR. TRIPI:  She's a fellow dancer in the club.  She's

12:10PM  19    distributed L.L. heroin.  She was part of the first

12:10PM  20    interaction with Gerace and L.L. where he was setting them up

12:10PM  21    on date to go with this man as she's just indicated.

12:10PM  22           THE COURT:  She's a victim.

12:10PM  23           MR. TRIPI:  Well, victims can also be coconspirators,

12:10PM  24    Your Honor, and --

12:10PM  25           THE COURT:  She can be a coconspirator in a drug

USA v Gerace - L.L. - Tripi/Direct - 12/16/24
85

12:10PM  1  conspiracy.  I'm not so sure about the -- the sex-trafficking

12:10PM  2  part.

12:10PM  3       **MR. TRIPI:**  I don't think that, in order to be

12:10PM  4  relevant, we have to put the coconspirator statement in a

12:10PM  5  particular box or bucket.  It doesn't -- it doesn't need to

12:10PM  6  relate to a charged conspiracy, although both are.  It can be

12:10PM  7  any conspiracy as long as it's in furtherance of some

12:10PM  8  conspiracy.  I would posit to you that we have both here, and

12:10PM  9  so --

12:10PM  10       **THE COURT:**  I have a hard time conceptualizing what

12:10PM  11  linked him --

12:10PM  12       **MR. TRIPI:**  So basically --

12:10PM  13       **THE COURT:**  -- to the conspiracy, it can be a

12:10PM  14  coconspirator -- I mean, the whole point is that he's

12:11PM  15  overcoming the will of these people, how does that jibe

12:11PM  16  with --

12:11PM  17       **MR. TRIPI:**  In the sex trafficking world, you heard

12:11PM  18  from Rebecca Bender there are some times where they use other

12:11PM  19  victims to further victimize victims.  They call them --

12:11PM  20       **THE COURT:**  I don't recall.

12:11PM  21       **MR. COOPER:**  I mean, Mr. Cooper has prosecuted people

12:11PM  22  in the victim/coconspirator locally for this exact same crime

12:11PM  23  and been convicted in federal court.

12:11PM  24       **THE COURT:**  I don't think this comes in.  So the

12:11PM  25  objection is sustained.

| | | |
|---|---|---|
| 12:11PM | 1 | (End of sidebar discussion.) |
| 12:11PM | 2 | **THE COURT:**  The objection is sustained. |
| 12:11PM | 3 | Next question, please. |
| 12:11PM | 4 | **BY MR. TRIPI:** |
| 12:11PM | 5 | Q.  Talking about D.P., did she also have a boyfriend who |
| 12:11PM | 6 | frequented Pharaoh's at the time, who she would also help you |
| 12:12PM | 7 | get -- she would get and give heroin to you through this |
| 12:12PM | 8 | boyfriend who would come to Pharaoh's? |
| 12:12PM | 9 | A.  Yes. |
| 12:12PM | 10 | Q.  Excuse me, I -- do you remember his name or nickname? |
| 12:12PM | 11 | A.  Red. |
| 12:12PM | 12 | Q.  Okay.  Was Red, like, a play on his hair color or |
| 12:12PM | 13 | something? |
| 12:12PM | 14 | A.  I think so, yeah. |
| 12:12PM | 15 | **MR. TRIPI:**  Okay.  For the witness only, can we show |
| 12:12PM | 16 | her Government Exhibit 3571P, please?  P as in pizza.  Can we |
| 12:12PM | 17 | zoom in on it? |
| 12:12PM | 18 | **BY MR. TRIPI:** |
| 12:12PM | 19 | Q.  Do you recognize an individual depicted in Government |
| 12:12PM | 20 | Exhibit 3571P? |
| 12:12PM | 21 | A.  Yes. |
| 12:12PM | 22 | Q.  Do you recognize an individual you know as Red in that |
| 12:13PM | 23 | photo? |
| 12:13PM | 24 | A.  Yes. |
| 12:13PM | 25 | Q.  Does it fairly and accurately depict Red's appearance as |

12:13PM 1  you recall him during the time that you were a dancer at

12:13PM 2  Pharaoh's?

12:13PM 3  A.  Yes.

12:13PM 4      **MR. TRIPI:**  The Government Exhibit offers 3571P,

12:13PM 5  Your Honor.

12:13PM 6      **MR. SOEHNLEIN:**  No objection, Judge.

12:13PM 7      **THE COURT:**  Received without objection.

12:13PM 8      **(GOV Exhibit 3571P was received in evidence.)**

12:13PM 9      **MR. TRIPI:**  If you can just publish that for the

12:13PM 10 jury, please.

12:13PM 11     **BY MR. TRIPI:**

12:13PM 12 Q.  All right.  Do you see a group of guys in that photo

12:13PM 13 there?

12:13PM 14 A.  Yes.

12:13PM 15 Q.  Can you tap on Red, please?

12:13PM 16     **MR. TRIPI:**  Okay.  May the record reflect she's put a

12:13PM 17 red mark on the person second in the photo going from right to

12:13PM 18 left wearing all black with, would that be fair to say, red

12:13PM 19 hair?

12:13PM 20 A.  Yeah.

12:13PM 21     **MR. TRIPI:**  Okay.  Okay.  We can take that down.

12:13PM 22     **BY MR. TRIPI:**

12:13PM 23 Q.  Did D.P. also get heroin from Scooter?

12:14PM 24 A.  Yes.

12:14PM 25 Q.  All right.  We've touched on the upstairs a couple times

12:14PM    1    at this point.  I'd like to get more specific, okay?

12:14PM    2        In the upstairs, what types of drugs if any have you seen

12:14PM    3    this defendant use?

12:14PM    4    A.  Cocaine.

12:14PM    5    Q.  What types of drugs have you seen the defendant

12:14PM    6    distribute?

12:14PM    7    A.  Cocaine.

12:14PM    8    Q.  Did that happen frequently during your tenure at

12:14PM    9    Pharaoh's?

12:14PM   10    A.  Yes.

12:14PM   11    Q.  Sometimes when you went upstairs, were you alone?

12:14PM   12    A.  Yes.

12:14PM   13    Q.  Other times, were you with other dancers?

12:14PM   14    A.  Yes.

12:14PM   15    Q.  At times, were you with other dancers and the defendant

12:15PM   16    and several -- several of his friends?

12:15PM   17    A.  Yes.

12:15PM   18    Q.  Now do you know the names of all of his friends that you

12:15PM   19    went up there with?

12:15PM   20    A.  Yes.

12:15PM   21    Q.  Does that include Aaron who you spoke about earlier?

12:15PM   22    A.  Aaron.

12:15PM   23    Q.  Who else did that include?

12:15PM   24    A.  David.  The defendant.  Rob Reed.  What's the other one?

12:15PM   25    Hang on.  I can't think of the last one, I'm sorry, I'm

12:15PM    1   trying to think.

12:15PM    2   Q.  Do you have another male in your head that you just can't

12:15PM    3   think of right now?

12:15PM    4   A.  Right, yeah.  That's the problem.

12:15PM    5   Q.  When you would go upstairs with the defendant and with

12:15PM    6   other dancers, did you see them use drugs as well?

12:16PM    7   A.  Yes.

12:16PM    8   Q.  Who was the drug supplier in the upstairs?

12:16PM    9   A.  The defendant.

12:16PM   10   Q.  I'm going to show you one photo that's in evidence.

12:16PM   11           **MR. TRIPI:**  We're going to look at Government Exhibit

12:16PM   12   235-A-35.  And can we put it side by side actually with

12:16PM   13   235-A-36.

12:16PM   14           **BY MR. TRIPI:**

12:16PM   15   Q.  Now, in the upstairs, was there a bathroom?

12:16PM   16   A.  Yes.

12:16PM   17   Q.  Looking at 235-A-36 on the right of your screen, does

12:16PM   18   that look like the bathroom you recall?

12:16PM   19   A.  Yes.

12:16PM   20   Q.  Looking at 235-A-35, does that look like a room that's at

12:17PM   21   the end of a hallway?

12:17PM   22   A.  Yes.

12:17PM   23   Q.  Over time, was there more furniture up there?

12:17PM   24   A.  Yes.

12:17PM   25   Q.  Okay.  So this looks like little different in terms of

| 12:17PM | 1 | the furnishings that are left in there? |
| 12:17PM | 2 | A.  Yeah.  Yes. |
| 12:17PM | 3 | Q.  Okay.  I want to ask you about the first time the |
| 12:17PM | 4 | defendant invited you upstairs.  Was it this defendant who |
| 12:17PM | 5 | invited you up? |
| 12:17PM | 6 | A.  Yes. |
| 12:17PM | 7 | **MR. TRIPI:**  Can we take those photos down? |
| 12:17PM | 8 | **BY MR. TRIPI:** |
| 12:17PM | 9 | Q.  At the time he first invited you up, were you, by that |
| 12:17PM | 10 | point in your time at Pharaoh's, heavily addicted to heroin |
| 12:17PM | 11 | and cocaine? |
| 12:17PM | 12 | A.  Yes. |
| 12:17PM | 13 | Q.  When he invited you upstairs that first time, were you |
| 12:18PM | 14 | alone or with another dancer, if you recall? |
| 12:18PM | 15 | A.  I don't remember if I was alone the first time. |
| 12:18PM | 16 | Q.  Okay.  Do you remember what -- how you felt or what you |
| 12:18PM | 17 | were thinking the first time he invited you upstairs? |
| 12:18PM | 18 | A.  Yeah.  I was, like, ready to go get high.  You know? |
| 12:18PM | 19 | That's all I wanted.  Needed. |
| 12:18PM | 20 | Q.  Did you have an impression in your brain, based upon your |
| 12:18PM | 21 | experiences at Pharaoh's, that if you got invited upstairs by |
| 12:18PM | 22 | the defendant, you'd be able to get high? |
| 12:18PM | 23 | A.  Yes. |
| 12:18PM | 24 | Q.  By that point in time in your tenure at Pharaoh's, based |
| 12:18PM | 25 | upon your observations, your experiences with the defendant, |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

91

| | | |
|---|---|---|
| 12:18PM | 1 | your discussions with others, based upon all of your |
| 12:18PM | 2 | experiences at Pharaoh's, did you have -- just "yes" or |
| 12:19PM | 3 | "no" -- an opinion of any connections the defendant might |
| 12:19PM | 4 | have had -- |
| 12:19PM | 5 | A.  Yes. |
| 12:19PM | 6 | Q.  -- to others? |
| 12:19PM | 7 | A.  Yes. |
| 12:19PM | 8 | Q.  Okay.  Before I ask you to state that opinion, is that |
| 12:19PM | 9 | opinion formed based on things the defendant has said to you? |
| 12:19PM | 10 | A.  Not specifically, like, said out of his mouth.  Just by |
| 12:19PM | 11 | people I've seen come in, and bikers, and -- |
| 12:19PM | 12 | Q.  Okay.  So you've seen the types of people he interacts |
| 12:19PM | 13 | with, right? |
| 12:19PM | 14 | A.  Right. |
| 12:19PM | 15 | Q.  Have you seen and heard him speak to other people? |
| 12:19PM | 16 | A.  Yes. |
| 12:19PM | 17 | Q.  I'm not asking you specifics of what he said, but just, |
| 12:19PM | 18 | you've seen how he interacts with people? |
| 12:19PM | 19 | A.  Yes. |
| 12:19PM | 20 | Q.  You've seen how and heard how he's interacted with you? |
| 12:19PM | 21 | A.  Yes. |
| 12:19PM | 22 | Q.  Did you make observations about the way he carried |
| 12:19PM | 23 | himself in your view around Pharaoh's? |
| 12:20PM | 24 | A.  Yeah.  Yes. |
| 12:20PM | 25 | Q.  Did he portray himself as the boss? |

| | | |
|---|---|---|
| 12:20PM | 1 | A.  Yes. |
| 12:20PM | 2 | Q.  Did all of those observations exist before you were |
| 12:20PM | 3 | invited upstairs as well? |
| 12:20PM | 4 | A.  Yes. |
| 12:20PM | 5 | Q.  Did you believe he knew important people? |
| 12:20PM | 6 | A.  Yes. |
| 12:20PM | 7 | Q.  By the time you first went upstairs with the defendant, |
| 12:21PM | 8 | were you using heroin daily? |
| 12:21PM | 9 | A.  Yes. |
| 12:21PM | 10 | Q.  Were you using cocaine daily? |
| 12:21PM | 11 | A.  Yes. |
| 12:21PM | 12 | Q.  Describe what you remember about going upstairs alone |
| 12:21PM | 13 | with the defendant and how that went. |
| 12:21PM | 14 | A.  We went upstairs. |
| 12:21PM | 15 | Q.  Well, talk -- talk about what's the discussion |
| 12:21PM | 16 | downstairs.  Talk them through it. |
| 12:21PM | 17 | Talk the jury through downstairs to upstairs, please. |
| 12:21PM | 18 | A.  Okay.  So, the defendant and I are downstairs at the bar. |
| 12:21PM | 19 | He knows, he can tell by my look I'm not feeling very well. |
| 12:21PM | 20 | **MR. SOEHNLEIN:**  Objection, Your Honor. |
| 12:21PM | 21 | **THE COURT:**  Sustained. |
| 12:21PM | 22 | **BY MR. TRIPI:** |
| 12:21PM | 23 | Q.  Were you feeling well? |
| 12:21PM | 24 | A.  No. |
| 12:21PM | 25 | Q.  Okay.  Please continue. |

12:21PM  1      THE COURT:  The jury will strike what he knew by her

12:21PM  2  looks.

12:21PM  3      Next question, please.

12:21PM  4      BY MR. TRIPI:

12:21PM  5  Q.  Were you not feeling well?

12:22PM  6  A.  Correct.

12:22PM  7  Q.  Okay.  What happens after you're engaging in discussion

12:22PM  8  with him?  Describe it from there.

12:22PM  9      What he said in your conversation, not what you thought

12:22PM 10  he understood.  That's why you got the objection, all right?

12:22PM 11  A.  Okay.  He said he was gonna take me upstairs, and I'll

12:22PM 12  get something out of it.

12:22PM 13  Q.  What did you think that meant?

12:22PM 14  A.  I think that meant I was gonna go up, and either get

12:22PM 15  money or drugs.

12:22PM 16  Q.  If you got money, would you have been able to go

12:22PM 17  somewhere in Pharaoh's and buy drugs?

12:22PM 18  A.  Yes.

12:22PM 19  Q.  And if you got drugs, would your problem that you were

12:22PM 20  having be solved?

12:22PM 21  A.  Yes.

12:22PM 22  Q.  So what was your purpose for agreeing to go upstairs?

12:22PM 23  A.  Just to feel better, to be able to work and make money.

12:22PM 24  Q.  To -- explain what you mean by "feel better."

12:22PM 25  A.  Just to feel normal.  Not even get high.  You don't even

12:22PM  1  get high, you just feel like you would feel right now,

12:23PM  2  because your body is so addicted to it.

12:23PM  3  Q.  Were you trying avoid getting sick?

12:23PM  4  A.  Yes.

12:23PM  5  Q.  Was that sickness what we were talking about Friday when

12:23PM  6  it's worse than COVID?

12:23PM  7  A.  Yes.

12:23PM  8  Q.  The flu times ten?

12:23PM  9  A.  Yes.

12:23PM  10  Q.  When you got upstairs, what happened next?

12:23PM  11  A.  We got upstairs, he pulled out the bag of coke, and we

12:23PM  12  each did some.  And then pulled down his pants.

12:23PM  13  Q.  Who pulled down his pants?

12:23PM  14  A.  He pulled down his pants.

12:23PM  15  Q.  Was he erect at that point?

12:23PM  16  A.  Yes.

12:23PM  17  Q.  What happened next?

12:23PM  18  A.  Then vaginal.

12:23PM  19  Q.  After he gave you the cocaine, did words come out of his

12:24PM  20  mouth before he pulled down his pants?

12:24PM  21  A.  No.

12:24PM  22  Q.  Was there any question in your mind at that point when he

12:24PM  23  pulled down his pants what he expected from you?

12:24PM  24  A.  No question.  Yeah, no.

12:24PM  25  Q.  What was your perception of your own ability to say no in

12:24PM    1    that moment?

12:24PM    2    A.  I really couldn't say no.  There was not one -- not even

12:24PM    3    one willpower in me to say no.

12:24PM    4    Q.  Did he wear protection?

12:24PM    5    A.  Yes.

12:24PM    6    Q.  Have you -- have you previously gone back and forth on

12:25PM    7    that question in your mind?

12:25PM    8    A.  Yes.

12:25PM    9    Q.  Were there times he did and times he didn't?

12:25PM   10    A.  Correct.

12:25PM   11    Q.  At the time you were having sex with him, did you believe

12:25PM   12    he controlled your ability to earn money?

12:25PM   13    A.  Yes.

12:25PM   14    Q.  Did you believe he controlled your ability to work at

12:25PM   15    Pharaoh's?

12:25PM   16    A.  Yes.

12:25PM   17    Q.  What control did he have regarding aspects of your job at

12:25PM   18    Pharaoh's based on your understanding?

12:25PM   19    A.  He controlled everything.  You know --

12:26PM   20    Q.  Explain it to them.

12:26PM   21    A.  He controlled how often you get on stage.

12:26PM   22        If you decided to go to another club, he would make you

12:26PM   23    look bad.

12:26PM   24    Q.  Did you ever have an argument with him or a discussion, I

12:26PM   25    should say, where you said something to the effect I'll just

| 12:26PM | 1 | go work somewhere else? |
| 12:26PM | 2 | A.  Yes. |
| 12:26PM | 3 | Q.  And what did he say when you said that? |
| 12:26PM | 4 | A.  He said that he knows people from all the clubs, and that |
| 12:26PM | 5 | all he has to do is say something and they won't hire me. |
| 12:26PM | 6 | Sorry, jury.  It's, like, hard to talk about.  You know? |
| 12:27PM | 7 | So -- |
| 12:27PM | 8 | Q.  We'll get through it -- |
| 12:27PM | 9 | A.  Yeah. |
| 12:27PM | 10 | Q.  -- one question at a time. |
| 12:27PM | 11 | After you had sex with him in the upstairs, what, if |
| 12:27PM | 12 | anything, changed for you in terms of how you believe you |
| 12:27PM | 13 | were treated in the club? |
| 12:27PM | 14 | A.  It made me feel like I could get whatever I want, you |
| 12:27PM | 15 | know, I could go on stage when I want, I could get drugs when |
| 12:27PM | 16 | I want, money when I want. |
| 12:27PM | 17 | Q.  Did you feel like that was when you became part of the |
| 12:27PM | 18 | group of favorites? |
| 12:27PM | 19 | A.  Yes. |
| 12:27PM | 20 | Q.  Who else did you -- who else would you categorize in that |
| 12:27PM | 21 | group? |
| 12:27PM | 22 | A.  Kiera/D.P.  Kendra.  Cherry.  A.A. and me. |
| 12:28PM | 23 | Q.  Were all five of you, Kiera, Kendra -- sorry, six of |
| 12:28PM | 24 | you -- or, five, I think -- Kiera, Kendra, Cherry, A.A., |
| 12:28PM | 25 | yourself, as you understood it, were you all dancers who |

| 12:28PM | 1 | earned a lot of money there? |
|---|---|---|
| 12:28PM | 2 | A.  Yes. |
| 12:28PM | 3 | Q.  Has Peter brought you upstairs to have threesomes with |
| 12:28PM | 4 | him? |
| 12:28PM | 5 | A.  Yes. |
| 12:28PM | 6 | Q.  Who are some other dancers you've done that with, and the |
| 12:28PM | 7 | defendant? |
| 12:28PM | 8 | A.  A.A. and D.P. |
| 12:28PM | 9 | Q.  How many times has he brought you up there for a |
| 12:29PM | 10 | threesome? |
| 12:29PM | 11 | A.  25.  25, estimate. |
| 12:29PM | 12 | Q.  Is that in addition to the times you were up there alone? |
| 12:29PM | 13 | A.  Yes. |
| 12:29PM | 14 | Q.  When he'd bring you upstairs with for threesome, would |
| 12:29PM | 15 | you do drugs first? |
| 12:29PM | 16 | A.  Yes. |
| 12:29PM | 17 | Q.  Who provided you the drugs? |
| 12:29PM | 18 | A.  The defendant. |
| 12:29PM | 19 | Q.  Then what, if anything, would he say or do after he gave |
| 12:29PM | 20 | you the drugs? |
| 12:29PM | 21 | A.  After he gave me the drugs, then he would want a special |
| 12:29PM | 22 | favor back. |
| 12:29PM | 23 | Q.  Is that how he phrased it, "special favor?" |
| 12:29PM | 24 | A.  Yes. |
| 12:29PM | 25 | Q.  What did "special favor" mean? |

| | | |
|---|---|---|
| 12:29PM | 1 | A.  It could mean any of oral, vaginal, or anal. |
| 12:30PM | 2 | Q.  What did he mean by it when he said it to you? |
| 12:30PM | 3 | **MR. SOEHNLEIN:**  Objection. |
| 12:30PM | 4 | **THE COURT:**  Sustained. |
| 12:30PM | 5 | **BY MR. TRIPI:** |
| 12:30PM | 6 | Q.  What sex acts did you perform on him when he said now |
| 12:30PM | 7 | it's time for a favor? |
| 12:30PM | 8 | A.  Oral. |
| 12:30PM | 9 | Q.  How many times has he given you coke in exchange for |
| 12:30PM | 10 | oral? |
| 12:30PM | 11 | A.  Too many to count. |
| 12:30PM | 12 | Q.  How many times have you had sex with him in exchange with |
| 12:30PM | 13 | him for cocaine? |
| 12:30PM | 14 | A.  Too many to count. |
| 12:30PM | 15 | Q.  How many threesomes did you have upstairs with the |
| 12:30PM | 16 | defendant and other dancers when he gave you drugs first and |
| 12:30PM | 17 | then you had a threesome? |
| 12:30PM | 18 | A.  How many times? |
| 12:30PM | 19 | Q.  Yeah. |
| 12:30PM | 20 | A.  A lot. |
| 12:30PM | 21 | Q.  Then would you clean up and go back downstairs and work |
| 12:31PM | 22 | after you had drugs? |
| 12:31PM | 23 | A.  Yes. |
| 12:31PM | 24 | Q.  How would he signal to you, hey, let's go upstairs? |
| 12:31PM | 25 | Would it always be a discussion?  Or was there a way to |

12:31PM  1   signal to you and you knew what that meant?

12:31PM  2   A.  A head nod.

12:31PM  3   Q.  What do you mean, explain it to them.

12:31PM  4   A.  A head not is, like, when you're looking at somebody and

12:31PM  5   you go.  (Indicating.)

12:31PM  6   Q.  And then what would you do when you saw the defendant

12:31PM  7   indicate nodding with his head.

12:31PM  8       Like, let me say this for the record.

12:31PM  9           **MR. TRIPI:**  She looked at the jury, and she moved her

12:31PM  10  head to the right and upwards twice.

12:31PM  11          **BY MR. TRIPI:**

12:31PM  12  Q.  What did that indicate to you?

12:31PM  13  A.  To go upstairs.

12:31PM  14  Q.  Did you ever have long, deep conversations with him

12:31PM  15  upstairs?

12:31PM  16  A.  No.

12:31PM  17  Q.  Does he know anything about you, other than the fact that

12:31PM  18  you were addicted to drugs and you worked at far?

12:31PM  19          **MR. SOEHNLEIN:**  Objection?

12:31PM  20          **THE COURT:**  Sustained.

12:31PM  21          **BY MR. TRIPI:**

12:31PM  22  Q.  Did you ever tell him anything about yourself personally?

12:31PM  23  A.  No.

12:31PM  24  Q.  But he knew you needed drugs, right?

12:32PM  25  A.  Yeah.

12:32PM  1          **MR. SOEHNLEIN:**  Objection.

12:32PM  2          **THE COURT:**  Stop.  Sustained.

12:32PM  3          The jury will strike that answer.

12:32PM  4          **BY MR. TRIPI:**

12:32PM  5  Q.  Two hours ago in your testimony, you told them about a

12:32PM  6  time when you needed to get right and he called Scooter,

12:32PM  7  right?

12:32PM  8  A.  Yes.

12:32PM  9  Q.  Is that before you ever went upstairs and had sex with

12:32PM  10  him?

12:32PM  11  A.  No.

12:32PM  12  Q.  That was after?

12:32PM  13  A.  I don't know, you're getting me confused.

12:32PM  14  Q.  Am I going too fast?  I'm sorry.

12:32PM  15  A.  No, no.  It's just, like, I don't know if it's before or

12:32PM  16  after because there were so many.

12:32PM  17  Q.  All right.  They're blurring together?

12:32PM  18  A.  Yeah.

12:32PM  19  Q.  When you would need to get right and he would call

12:32PM  20  Scooter -- are you with me --

12:32PM  21  A.  Yes.

12:32PM  22  Q.  -- were you having sex with him upstairs?

12:32PM  23  A.  No.

12:32PM  24  Q.  Okay.  So that came later?

12:32PM  25  A.  Right.

| | | |
|---|---|---|
| 12:32PM | 1 | Q.  Okay. |
| 12:32PM | 2 | A.  Correct. |
| 12:32PM | 3 | Q.  That means, would you agree, by the time you're going |
| 12:32PM | 4 | upstairs, he knew about your relationship with Scooter? |
| 12:32PM | 5 | **MR. SOEHNLEIN:**  Objection. |
| 12:33PM | 6 | **MR. TRIPI:**  Judge, it's obvious from the -- she's |
| 12:33PM | 7 | laid the foundation.  He introduced her to Scooter.  How is |
| 12:33PM | 8 | that not proper testimony for her to then testify under 602 |
| 12:33PM | 9 | about what he knew? |
| 12:33PM | 10 | **THE COURT:**  Okay.  We are going to break for lunch |
| 12:33PM | 11 | now, folks.  I have three matters I need to do between 12:30 |
| 12:33PM | 12 | and 1:30, totally unrelated to this case, other cases. |
| 12:33PM | 13 | So please remember my instructions.  Don't talk about |
| 12:33PM | 14 | this case with anyone, including with each other.  Don't use |
| 12:33PM | 15 | tools of technology to communicate about the case or to learn |
| 12:33PM | 16 | anything about the case. |
| 12:33PM | 17 | Don't read or watch or listen to any news coverage of |
| 12:33PM | 18 | the case if there is any while the trial is in progress.  And |
| 12:33PM | 19 | don't make up your mind until you start deliberating. |
| 12:33PM | 20 | See you back here at 1:30.  Thank you. |
| 12:33PM | 21 | (Jury excused at 12:33 p.m.) |
| 12:33PM | 22 | **MR. COOPER:**  Don't discuss your testimony with |
| 12:33PM | 23 | anyone. |
| 12:34PM | 24 | **THE WITNESS:**  Gotcha. |
| 12:34PM | 25 | **THE COURT:**  Okay.  Ma'am, you're not to talk to |

| 12:34PM | 1 | anybody except your lawyer during the break, okay? |

12:34PM    1    anybody except your lawyer during the break, okay?

12:34PM    2         **THE WITNESS:**  Yes, sir.

12:34PM    3         **THE COURT:**  Okay.  See you back here at 1:30.

12:34PM    4         (Witness excused at 12:34 p.m.)

12:34PM    5         **THE COURT:**  So Mr. Tripi, you're right.  You

12:34PM    6    certainly can argue to the jury that he knew.  But she can't

12:34PM    7    tell you whether he believed what she said to him, or whether

12:34PM    8    he remembered what she said to him, or whether he forgot what

12:35PM    9    she said to him.  So she can't get into his head.

12:35PM   10         You certainly can make an argument to the jury that

12:35PM   11    she told him that he saw what was going on with his eyes.  And

12:35PM   12    I think it's a pretty strong argument, to be honest with you.

12:35PM   13    But I don't think you can ask her what he knew.

12:35PM   14         **MR. TRIPI:**  I think my -- respectfully, Judge, if I

12:35PM   15    can make my pitch.

12:35PM   16         **THE COURT:**  Absolutely.

12:35PM   17         **MR. TRIPI:**  I think that once you've laid as much

12:35PM   18    foundation as I have for about two hours, under Rule 602 and

12:35PM   19    701, I think she can testify to that type of opinion.

12:35PM   20         I think an analogy would be -- an analogy would be I

12:35PM   21    don't think anyone in this courtroom has ever watched me walk

12:35PM   22    into the U.S. Attorney's Office, maybe almost accidentally hit

12:36PM   23    me by -- in a car once, but never actually watched me walk in

12:36PM   24    and do work inside the U.S. Attorney's Office.

12:36PM   25         But because you see me here, we interact, I walk in

12:36PM  1   and I sit here, everyone here has a 602 personal knowledge and

12:36PM  2   a 701 opinion that I work for the U.S. Attorney's Office.

12:36PM  3          None of you have seen my written agreements, none of

12:36PM  4   you have seen me interact with the boss, none of you have seen

12:36PM  5   me in the building, but you all know I work there.  I don't

12:36PM  6   think it's different than what I'm asking here.

12:36PM  7          **THE COURT:**  It's different than what somebody knows

12:36PM  8   or remembers or thinks.

12:36PM  9          **MR. TRIPI:**  Fair enough.

12:36PM  10          **THE COURT:**  I think that's the difference.  But I

12:36PM  11  understand what you're saying.

12:36PM  12          **MR. TRIPI:**  And I understand why you sustained the

12:36PM  13  objection.  I appreciate that.  You don't have to do that, but

12:36PM  14  I appreciate it.  And now I'll move forward.

12:36PM  15          **THE COURT:**  Thank you.  Okay.  Anything more we need

12:36PM  16  to do before we break?

12:36PM  17          **MR. SOEHNLEIN:**  No, Your Honor.

12:36PM  18          **THE COURT:**  Mr. Tripi?

12:36PM  19          **MR. TRIPI:**  No, Judge.

12:36PM  20          **THE COURT:**  Terrific.  See you in an hour.

12:36PM  21          (Off the record at 12:36 p.m.)

01:34PM  22          (Back on the record at 1:34 p.m.)

01:34PM  23          (Jury not present.)

01:34PM  24          **THE CLERK:**  All rise.

01:34PM  25          **THE COURT:**  Please be seated.

01:34PM   1          THE CLERK:  We are back on the record for the

01:34PM   2   continuation of the jury trial in case numbers 19-cr-227 and

01:34PM   3   23-cr-37, United States of America versus Peter Gerace Jr.

01:34PM   4          All counsel and parties are present.

01:34PM   5          THE COURT:  Okay.  Anything we need to do before we

01:35PM   6   bring the witness and the jury back?

01:35PM   7          MR. TRIPI:  Not from the government.

01:35PM   8          MR. SOEHNLEIN:  Nothing here, Judge.

01:35PM   9          THE COURT:  Okay.  Let's do it.  Let's get the

01:35PM  10   witness in, and let's get the jury, please, Pat.

01:36PM  11          (Jury seated at 1:36 p.m.).

01:36PM  12          THE COURT:  The record will reflect that all our

01:36PM  13   jurors, again, are present.

01:36PM  14          I remind the witness that she's still under oath.

01:36PM  15          Mr. Tripi, you may continue.

01:36PM  16          MR. TRIPI:  Thank you, Your Honor.

01:36PM  17          BY MR. TRIPI:

01:36PM  18   Q.  Ms. L.L., was there an occasion when you went upstairs

01:36PM  19   with the defendant, D.P., and A.A., to obtain drugs and to

01:37PM  20   engage in sex acts where the defendant ended up engaging in

01:37PM  21   those sex acts with D.P. and A.A. while you did drugs in the

01:37PM  22   nearby bathroom?

01:37PM  23   A.  Yes.

01:37PM  24   Q.  Can you describe what happened on that occasion for the

01:37PM  25   jury?

01:37PM    1    A.  That occasion, us three girls went up with the defendant.

01:37PM    2    And them two, my other two girls that were dancing, had sex

01:37PM    3    with him.  And he wanted me to, too.  But I was in the

01:37PM    4    bathroom doing what I needed to, to feel right.

01:37PM    5    Q.  Which means what?  Can you be explicit?

01:37PM    6    A.  You know, I'm doing drugs so I can feel better to work.

01:37PM    7    And then I did it.

01:38PM    8        I know, I'm probably not be specific enough, but --

01:38PM    9    Q.  Are you doing your best to explain?

01:38PM   10    A.  I'm trying to do -- yes, yes, yes.

01:38PM   11    Q.  Now, back in July of 2020, after your initial interview

01:38PM   12    with law enforcement on July 16th, 2020, you then went into

01:38PM   13    grand jury; do you remember that?

01:38PM   14    A.  Yes.

01:38PM   15    Q.  Now, in the grand jury, is it accurate to say that when

01:38PM   16    you described the number of times that you engaged in sex

01:38PM   17    acts, meaning sex either vaginal or oral sex with the

01:38PM   18    defendant in the upstairs, at that time you estimated ten

01:38PM   19    times?

01:38PM   20    A.  Okay.

01:38PM   21    Q.  Do you recall that?

01:38PM   22    A.  Yes.

01:38PM   23    Q.  That was your approximate estimate then?

01:38PM   24    A.  Yeah.

01:38PM   25    Q.  Between 2020 and today, as you sit here, have you taken a

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

106

01:39PM   1   lot of time to try to heal yourself and to improve yourself?

01:39PM   2   A.  Yes.

01:39PM   3   Q.  Have you made a lot of progress in your view in your

01:39PM   4   personal recovery between 2020 and now?

01:39PM   5   A.  Say that again?  Sorry.

01:39PM   6   Q.  Have you made a lot -- do you think you've made a lot of

01:39PM   7   progress in your life with your recovery both mentally and

01:39PM   8   physically since 2020?

01:39PM   9   A.  Yes.  I can say that.  I came very far.

01:39PM   10  Q.  In the process of that, have you thought about things

01:39PM   11  some more, and have -- have the number of times that you've

01:39PM   12  been upstairs, have you been able to remember more?

01:39PM   13  A.  Yes.

01:39PM   14  Q.  Have your estimates as to the number of times you went

01:39PM   15  upstairs with this defendant, have they increased as you're

01:40PM   16  sitting here today?

01:40PM   17  A.  Yes.

01:40PM   18  Q.  Are you making up the increased numbers?  Or are you

01:40PM   19  remembering more about what happened to you?

01:40PM   20  A.  I'm just remembering more.

01:40PM   21  Q.  When you go through a -- when you go through a traumatic

01:40PM   22  event or trauma in life, is one way to deal with it to try to

01:40PM   23  forget it?

01:40PM   24  A.  Yes.

01:40PM   25  Q.  Have you worked on remembering over the course of the

01:40PM  1   last four years?

01:40PM  2   A.   Yes.

01:40PM  3   Q.   Are you telling this jury the truth?

01:40PM  4   A.   Yeah.

01:40PM  5   Q.   Is there anything fun about talking about this stuff in

01:40PM  6   front of a bunch of strangers?

01:40PM  7   A.   Absolutely not.  No.

01:40PM  8   Q.   All right.  We talked about individuals who were close to

01:41PM  9   the defendant who you also went upstairs with.  I want to

01:41PM  10  switch to that topic now, okay?

01:41PM  11  A.   Okay.

01:41PM  12  Q.   Earlier in your testimony, you explained that it was the

01:41PM  13  defendant that controlled access to the upstairs; is that

01:41PM  14  right?

01:41PM  15  A.   Yes.

01:41PM  16  Q.   So when you would go upstairs with one of his friends, or

01:41PM  17  his brother David, how would you get up there?

01:41PM  18  A.   The defendant would give them the key.

01:41PM  19  Q.   Is there a door that locked at the bottom of that

01:41PM  20  stairwell?

01:41PM  21  A.   Yes.

01:41PM  22       MR. TRIPI:  Can we pull up Exhibit 235-A-28 in

01:41PM  23  evidence?

01:41PM  24       BY MR. TRIPI:

01:41PM  25  Q.   This is in evidence.  Is this a view from the bottom

01:41PM    1    entry point going to the upstairs, in other words, the stairs

01:41PM    2    that lead to the upstairs?

01:41PM    3    A.  Yeah.

01:41PM    4    Q.  If you were the person taking the pictures, is there

01:41PM    5    basically a door that locks right there?

01:41PM    6    A.  Yes.

01:41PM    7    Q.  Okay.  Are these the stairs that you've walked up many

01:42PM    8    times?

01:42PM    9    A.  Yes.

01:42PM    10            MR. TRIPI:  We can take that down.

01:42PM    11            BY MR. TRIPI:

01:42PM    12    Q.  I want to move on to the defendant's brother in a moment.

01:42PM    13    But generally speaking, tell this jury, why did you engage --

01:42PM    14    look back on your life, why you did engage in the sex acts in

01:42PM    15    the upstairs in exchange for drugs and money at Pharaoh's?

01:42PM    16    A.  I engaged in it to stay part of the favorite girls,

01:42PM    17    because I knew that was the only way to stay not sick from

01:42PM    18    drugs every day.

01:43PM    19    Q.  But for the drugs and the money that you got, would you

01:43PM    20    have done that?  If you didn't -- if you weren't getting

01:43PM    21    drugs and money, would you have done that?

01:43PM    22    A.  No.

01:43PM    23    Q.  Looking back, do you feel that the men who had sex with

01:43PM    24    you in exchange for drugs and money were taking advantage of

01:43PM    25    your addiction?

01:43PM   1          **MR. SOEHNLEIN:**  Objection.

01:43PM   2          **THE WITNESS:**  Yes.

01:43PM   3          **THE COURT:**  Hang on.  Stop.  Stop.  When there's an

01:43PM   4    objection, please don't answer.

01:43PM   5          What's the basis of the objection?

01:43PM   6          **MR. SOEHNLEIN:**  It's a fair state of mind, Judge.

01:43PM   7          **MR. TRIPI:**  It's her own.

01:43PM   8          **THE COURT:**  No, no.  Overruled.

01:43PM   9          **THE WITNESS:**  Yes.

01:43PM   10         **BY MR. TRIPI:**

01:43PM   11   Q.  I'm going to restate my question, because it got

01:43PM   12   interrupted, and then I want you to answer.

01:43PM   13       Do you feel the men who had sex with you in exchange for

01:43PM   14   drugs and money inside Pharaoh's were taking advantage of

01:43PM   15   your addictions?

01:43PM   16   A.  Yes.

01:43PM   17   Q.  How did you meet defendant's brother, David?

01:43PM   18   A.  I met him through the defense.

01:43PM   19   Q.  The defendant?

01:44PM   20   A.  The defendant.

01:44PM   21   Q.  When you say "defense," it makes it sound like

01:44PM   22   it's someone over there.

01:44PM   23   A.  Oh.

01:44PM   24   Q.  It's the defendant, right?

01:44PM   25   A.  Oh, the defendant, yeah.

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

01:44PM  1    Q.  Do you remember your initial interaction with the

01:44PM  2    defendant's brother, David?

01:44PM  3    A.  Yes.

01:44PM  4    Q.  Can you describe what you remember about it for the jury?

01:44PM  5    A.  Yes.  The defendant's brother and I, we were at the bar

01:44PM  6    having a couple drinks.  And he liked coke, too, so he had

01:44PM  7    that on him and offered me some to go upstairs.  And that's

01:44PM  8    exactly what we did.

01:44PM  9    Q.  Were you looking for cocaine in that moment?

01:44PM  10   A.  Yes.

01:44PM  11   Q.  Did you go upstairs with him?

01:44PM  12   A.  Yes.

01:45PM  13   Q.  Did he give you cocaine?

01:45PM  14   A.  Yes.

01:45PM  15   Q.  What happened after he gave you cocaine?

01:45PM  16   A.  Then I did a sexual act for him.

01:45PM  17   Q.  Do you recall what?

01:45PM  18   A.  It was anal.  Yes.  I do recall.

01:45PM  19   Q.  Have you had both vaginal and anal sex with the

01:45PM  20   defendant's brother in the upstairs?

01:45PM  21   A.  Yes.

01:45PM  22   Q.  On those occasions, was it this defendant that provided

01:45PM  23   access to the upstairs?

01:45PM  24   A.  Yes.

01:45PM  25   Q.  On each occasion, did the defendant's brother give you

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

111

| 01:45PM | 1 | some type of drug first? |
| 01:45PM | 2 | A.  Yes. |
| 01:45PM | 3 | Q.  What type of drugs have you gotten from the defendant's |
| 01:45PM | 4 | brother, David? |
| 01:45PM | 5 | A.  Cocaine. |
| 01:45PM | 6 | Q.  Were all sex acts, with both this defendant and his |
| 01:46PM | 7 | brother, that you engaged in at Pharaoh's? |
| 01:46PM | 8 | A.  I missed the beginning of that. |
| 01:46PM | 9 | Q.  Were all sex acts that you engaged in, with this |
| 01:46PM | 10 | defendant and his brother David, at Pharaoh's in the |
| 01:46PM | 11 | upstairs? |
| 01:46PM | 12 | A.  Yes. |
| 01:46PM | 13 | Q.  Earlier, you talked about the defendant's friend Aaron |
| 01:46PM | 14 | who you thought was a liquor distributor; do you remember |
| 01:46PM | 15 | that? |
| 01:46PM | 16 | A.  Yes. |
| 01:46PM | 17 | Q.  What was your understanding of Aaron's relationship with |
| 01:46PM | 18 | the defendant? |
| 01:46PM | 19 | A.  They were real close. |
| 01:46PM | 20 | Q.  By the time you met Aaron, had you already been in the |
| 01:46PM | 21 | upstairs and had sex with the defendant in exchange for |
| 01:46PM | 22 | cocaine? |
| 01:46PM | 23 | A.  Yes. |
| 01:46PM | 24 | Q.  Do you remember how you met Aaron? |
| 01:46PM | 25 | A.  I met Aaron -- I don't remember. |

01:47PM  1  Q.  Was it in Pharaoh's?

01:47PM  2  A.  Yes.  Yeah.

01:47PM  3  Q.  Did Aaron ask you to go upstairs?

01:47PM  4  A.  Yes.

01:47PM  5  Q.  Who provided access to the upstairs?

01:47PM  6  A.  The defendant gave Aaron the key.

01:47PM  7  Q.  Was there a verbal negotiation between you and Aaron?

01:47PM  8      Did you talk about what you wanted and what he wanted?

01:47PM  9  A.  Yes.

01:47PM  10  Q.  What was that conversation?

01:47PM  11  A.  We exchanged vaginal sex for cocaine.

01:47PM  12  Q.  Is that the only type of drug Aaron's ever given you?

01:47PM  13  A.  No.

01:47PM  14  Q.  What other type of drug has Aaron given you?

01:47PM  15  A.  Heroin, as well.

01:47PM  16  Q.  In each instance where you got either cocaine or heroin

01:47PM  17  from Aaron, was that in the upstairs of Pharaoh's?

01:48PM  18  A.  Yes.

01:48PM  19  Q.  Was that in exchange for you performing some type of sex

01:48PM  20  act on Aaron?

01:48PM  21  A.  Yes.

01:48PM  22  Q.  What type of sex acts have you engaged in with Aaron at

01:48PM  23  the upstairs at Pharaoh's?

01:48PM  24  A.  Just about all of it:  Anal, oral, vaginal.

01:48PM  25  Q.  Did Aaron wait until after the sex act to give you the

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

113

01:48PM    1    drugs?

01:48PM    2    A.   Yes.

01:48PM    3    Q.   Approximately how many times would you estimate that

01:48PM    4    you've been upstairs and had some type of sex -- whether

01:48PM    5    oral, anal, or vaginal -- with Aaron in exchange for cocaine

01:48PM    6    or heroin?

01:48PM    7    A.   25.

01:49PM    8    Q.   If you said ten back in grand jury in 2020, would that be

01:49PM    9    a low estimate?

01:49PM   10    A.   Yes.

01:49PM   11    Q.   What makes you say that ten would be a low estimate as

01:49PM   12    you sit there today?

01:49PM   13    A.   Because basically, when we were doing that back then, I

01:50PM   14    wasn't --

01:50PM   15    Q.   You mean grand jury?

01:50PM   16    A.   -- yeah, I wasn't thinking of the whole entire timeframe

01:50PM   17    that I worked there.

01:50PM   18    Q.   What were you thinking of?

01:50PM   19    A.   I guess I -- I was just throwing out an estimate, like,

01:50PM   20    and then when I thought about that it really, like, after

01:50PM   21    that, I'm like, wait, there's 365 days in a year.  Like

01:50PM   22    there's -- there's more times.

01:50PM   23    Q.   Did you engage in the sex acts with Aaron so you could

01:50PM   24    avoid withdrawing from drugs?

01:50PM   25    A.   Yes.

01:50PM     1          **MR. TRIPI:**  If we can pull up Exhibit 241C, please.

01:50PM     2          **BY MR. TRIPI:**

01:50PM     3     Q.  Do you recognize the person depicted in that photo?

01:50PM     4     A.  Yeah.

01:50PM     5     Q.  Who's that?

01:50PM     6     A.  Rob Reed, the DJ.

01:50PM     7     Q.  And does that photo depict him in the DJ booth?

01:51PM     8     A.  Yes.

01:51PM     9     Q.  Based on your experience, and you've touched on, but

01:51PM    10     what's the role of the DJ?  What's the importance of the DJ

01:51PM    11     position at Pharaoh's?

01:51PM    12     A.  The DJ puts the girls on stage in the rotation they

01:51PM    13     should be.  He's supposed to keep an eye over the girls in

01:51PM    14     the locker room.  That's about it.

01:51PM    15     Q.  Who does the DJ report to?

01:51PM    16     A.  He reports to the defendant.

01:51PM    17     Q.  So who did Rob Reed report to?

01:51PM    18     A.  Nobody.

01:51PM    19     Q.  Did he report to the defendant?  Is that what you just

01:51PM    20     said?  The DJ reports to the defendant.

01:51PM    21     A.  Right.

01:51PM    22     Q.  The defendant was the DJ's boss?

01:51PM    23     A.  Correct.  Correct.

01:51PM    24     Q.  Did the DJ act like a manager?

01:52PM    25     A.  Tried to.

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

01:52PM    1    Q.  Did there come a time when you were back in the dressing

01:52PM    2    room at Pharaoh's going through withdrawal sickness when you

01:52PM    3    interacted with Rob Reed?

01:52PM    4    A.  Yes.

01:52PM    5    Q.  Now, do you remember whether that was a day or a

01:52PM    6    nighttime shift?

01:52PM    7    A.  Daytime.

01:52PM    8    Q.  Was it relatively -- was it busy or not so busy?

01:52PM    9    A.  Not so busy.

01:52PM   10    Q.  When you were -- when you were sick -- or, withdraw,

01:52PM   11    withdrawn.

01:52PM   12        When you were starting to get sick or withdrawing, what

01:52PM   13    type of drug were you withdrawing from?

01:52PM   14    A.  Heroin.

01:52PM   15    Q.  Did you have a discussion with Rob Reed in the locker

01:52PM   16    room?

01:52PM   17    A.  Yes.

01:52PM   18    Q.  Did that discussion relate to going upstairs in Pharaoh's

01:52PM   19    with him?

01:52PM   20    A.  Yes.

01:52PM   21    Q.  What did he say to you, and what did you say to him?

01:53PM   22    A.  I went up to him and I asked him if he had had anything

01:53PM   23    he could help me out with to get through my shift.

01:53PM   24        And he said yes, but he wanted a favor back.

01:53PM   25        And we went upstairs.

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

116

01:53PM    1    Q.  On that occasion, how did -- how did he get up there?

01:53PM    2    How did you guys gain access to the upstairs, if you recall?

01:53PM    3    A.  He -- he got the key from Peter.

01:53PM    4    Q.  Do you remember if the defendant directly handed him the

01:53PM    5    key, or if the key was somewhere where DJ Rob Reed knew to

01:53PM    6    get it, if you know?

01:53PM    7    A.  I don't know.

01:53PM    8    Q.  Describe what happened when you went upstairs with Rob

01:53PM    9    Reed.

01:53PM   10    A.  He gives me what I needed first, the drugs.

01:54PM   11    Q.  What was it?

01:54PM   12    A.  Heroin and cocaine.  It was both.

01:54PM   13    Q.  On this particular occasion?

01:54PM   14    A.  Yes.

01:54PM   15    Q.  Okay.

01:54PM   16    A.  Yes.  So I did my heroin, got right, then I did his favor

01:54PM   17    for him.

01:54PM   18    Q.  What was that?

01:54PM   19    A.  That was vaginal.

01:54PM   20    Q.  And then what happened?

01:54PM   21    A.  And then he gave me a little bit of cocaine after that.

01:54PM   22    Q.  Did you have to clean yourself up?

01:54PM   23    A.  Yes.

01:54PM   24    Q.  How did you do that?

01:54PM   25    A.  In the shower downstairs in the locker room.

01:54PM    1    Q.  Is that the only time that happened with Rob Reed, or did

01:54PM    2    it happen more than that?

01:54PM    3    A.  That was the only time with him.

01:55PM    4          MR. TRIPI:  Okay.  For the witness only, can we show

01:55PM    5    the witness Government Exhibit 3571A, at page 19, please.

01:55PM    6          MR. SOEHNLEIN:  Your Honor, I'm gonna object to this.

01:55PM    7    I don't think she said she didn't recall anything.  I don't

01:55PM    8    know why he's showing the witness anything.

01:55PM    9          MR. TRIPI:  Judge, I'm showing a prior inconsistent

01:55PM    10   statement as evidence which is subject to hearsay.

01:55PM    11         THE COURT:  What lines are we talking about?

01:55PM    12         MR. TRIPI:  I've got to get there myself.  Just give

01:55PM    13   me a moment, Judge.

01:55PM    14         Page 19.

01:55PM    15         Ms. Champoux, can we go back to 18 for a moment so I

01:55PM    16   can see that page?  Thank you.  Just right there.  All right.

01:56PM    17   We can scroll to 19 -- sorry.  All right.  Stop there.

01:56PM    18         Beginning at line 10 on 19, Judge.

01:56PM    19         Ms. Champoux, can we scroll to 20 just so I can get

01:56PM    20   the end point, and then we'll go back.

01:56PM    21         Page 19, line 10, Judge, through 19.

01:57PM    22         MR. SOEHNLEIN:  I'm sorry, Your Honor, I don't

01:57PM    23   believe it's consistent.

01:57PM    24         MR. TRIPI:  That's the whole point.

01:57PM    25         THE COURT:  I'm sorry?

| | | |
|---|---|---|
| 01:57PM | 1 | **MR. SOEHNLEIN:** I'm sorry, can we come up, Judge? |
| 01:57PM | 2 | **THE COURT:** Yeah, come on up. |
| 01:57PM | 3 | (Sidebar discussion held on the record.) |
| 01:57PM | 4 | **THE COURT:** It's a prior inconsistent statement, she |
| 01:57PM | 5 | said once, and -- or, she said six times and now she's saying |
| 01:57PM | 6 | once. |
| 01:57PM | 7 | **MR. TRIPI:** And the inconsistency would come in, I'm |
| 01:57PM | 8 | offering it substantively. It's sworn testimony. |
| 01:57PM | 9 | **THE COURT:** It's sworn testimony. |
| 01:57PM | 10 | **MR. SOEHNLEIN:** All right. No, I misheard him |
| 01:58PM | 11 | before. I thought he said he said he was offering it for a |
| 01:58PM | 12 | prior consistent statement. |
| 01:58PM | 13 | **THE COURT:** No, prior inconsistent statement. |
| 01:58PM | 14 | (End of sidebar discussion.) |
| 01:58PM | 15 | **THE COURT:** I understand the objection is withdrawn, |
| 01:58PM | 16 | Mr. Soehnlein? |
| 01:58PM | 17 | **MR. SOEHNLEIN:** That's correct. |
| 01:58PM | 18 | **THE COURT:** Okay. |
| 01:58PM | 19 | **BY MR. TRIPI:** |
| 01:58PM | 20 | Q. I'm going to ask you some questions now, Ms. L.L.. this |
| 01:58PM | 21 | is -- we've established on July 16th, 2020, you testified |
| 01:58PM | 22 | before the grand jury, right? |
| 01:58PM | 23 | A. Yes. |
| 01:58PM | 24 | Q. And I want to ask you, were you asked these questions |
| 01:58PM | 25 | under oath at that time and did you give these answers. |

| | | |
|---|---|---|
| 01:58PM | 1 | Okay?  And you can follow along on your screen if you want. |
| 01:58PM | 2 | I'm looking at page 19, and I'm going to go from lines 10 |
| 01:58PM | 3 | through 15. |
| 01:58PM | 4 | A.  Okay. |
| 01:58PM | 5 | Q.  Okay?  Were you asked this: |
| 01:58PM | 6 | "Question:  How about Rob Reed the DJ?  Can you explain |
| 01:58PM | 7 | how that worked with him? |
| 01:58PM | 8 | "Answer:  He would give me a combination.  I would say |
| 01:58PM | 9 | about six times.  Anal -- I mean, oral and intercourse. |
| 01:58PM | 10 | "Question:  Was that for money or drugs? |
| 01:59PM | 11 | "Answer:  Both: |
| 01:59PM | 12 | "Question:  What kind of drugs would he give you? |
| 01:59PM | 13 | "Answer:  Cocaine." |
| 01:59PM | 14 | Were you asked those questions, did you give those |
| 01:59PM | 15 | answers? |
| 01:59PM | 16 | A.  Yes. |
| 01:59PM | 17 | Q.  Okay. |
| 01:59PM | 18 | **MR. TRIPI:**  You can take that down, Ms. Champoux. |
| 01:59PM | 19 | **BY MR. TRIPI:** |
| 01:59PM | 20 | Q.  Have you covered a lot of stuff, Ms. L.L.? |
| 01:59PM | 21 | A.  Um-hum, yes. |
| 01:59PM | 22 | Q.  Did you forget -- simply forget the estimate you provided |
| 01:59PM | 23 | in grand jury? |
| 01:59PM | 24 | A.  Yeah. |
| 01:59PM | 25 | Q.  Okay. |

| | | |
|---|---|---|
| 01:59PM | 1 | A.  I mean, you know, there's -- |
| 01:59PM | 2 | Q.  I get it. |
| 01:59PM | 3 | A.  Yeah. |
| 01:59PM | 4 | Q.  So was it, just to be clear, and whatever the answer is, |
| 01:59PM | 5 | was it more than one time with Rob Reed? |
| 01:59PM | 6 | A.  It was more than one time -- |
| 01:59PM | 7 | Q.  Okay. |
| 01:59PM | 8 | A.  -- but I don't remember exact -- exactly how many times |
| 01:59PM | 9 | upstairs. |
| 01:59PM | 10 | Q.  Okay.  Sometimes were you provided a combination of money |
| 02:00PM | 11 | and cocaine? |
| 02:00PM | 12 | A.  Yes. |
| 02:00PM | 13 | Q.  With Rob Reed, was there a particular monetary rate that |
| 02:00PM | 14 | would accompany the cocaine if it was oral sex, and another |
| 02:00PM | 15 | amount of money that would accompany vaginal sex? |
| 02:00PM | 16 | A.  Yes. |
| 02:00PM | 17 | Q.  Do you remember those dollar amounts? |
| 02:00PM | 18 | A.  Oral $100, and anal $300. |
| 02:00PM | 19 | Q.  Anal or vaginal? |
| 02:00PM | 20 | A.  Vaginal, sorry.  My bad. |
| 02:00PM | 21 | Q.  Okay.  And what were you going to use the money for? |
| 02:00PM | 22 | A.  To get -- to get more drugs so I could work. |
| 02:00PM | 23 | Q.  Were you severely addicted at this point? |
| 02:00PM | 24 | A.  Oh, yeah. |
| 02:00PM | 25 | Q.  Would you have engaged in any of those sex acts upstairs |

02:01PM    1    with Rob Reed if you weren't addicted to heroin and cocaine?

02:01PM    2    A.  No.

02:01PM    3    Q.  We talked about a downstairs customer earlier named Wayne

02:01PM    4    van Vleet; do you remember that?

02:01PM    5    A.  Yes.

02:01PM    6    Q.  Was there another downstairs Pharaoh's customer who you

02:01PM    7    met at Pharaoh's named Jim Casey?

02:01PM    8    A.  Yes.

02:01PM    9    Q.  Who was that?

02:01PM   10    A.  Jim Casey was a customer that came into Pharaoh's

02:01PM   11    regularly.  I met him through A.A.

02:02PM   12    Q.  A.A.?

02:02PM   13    A.  Yes.

02:02PM   14    Q.  Was that sometime in around 2015 if you had to estimate?

02:02PM   15    A.  Yes.

02:02PM   16    Q.  The first time you met Jim Casey in Pharaoh's, did you

02:02PM   17    engage in a sex act with him and A.A. in the downstairs

02:02PM   18    Champagne Room?

02:02PM   19    A.  Yes.

02:02PM   20    Q.  Describe what transpired in the downstairs Champagne Room

02:02PM   21    between you, Jim Casey, and A.A..

02:02PM   22    A.  Jim wanted both of us back there, me and A.A..  so we

02:02PM   23    went back, did the dances.  And to get more tipped, he wanted

02:02PM   24    to go back and forth from me and her.  So he would, you know,

02:02PM   25    have sex with her vaginally, and then me, and so on.

02:03PM  1  Q.  Was it basically a threesome in the Champagne Room?

02:03PM  2  A.  Yes.

02:03PM  3  Q.  Do you remember who the VIP attendant was?

02:03PM  4  A.  Brian.

02:03PM  5  Q.  Did Brian come in and stop that?

02:03PM  6  A.  No.

02:03PM  7  Q.  Have you observed Jim Casey tip Brian before?

02:03PM  8  A.  Yes.

02:03PM  9  Q.  How many times would you estimate that you engaged in

02:03PM  10  some type of sex act with Jim Casey in the downstairs

02:03PM  11  Champagne Room area at Pharaoh's?

02:03PM  12  A.  Like, five.

02:03PM  13  Q.  What was that for?  Why did you do that?

02:04PM  14  A.  That was to get my fix.

02:04PM  15  Q.  Does that mean you were looking for money for drugs?

02:04PM  16  A.  Yes.

02:04PM  17  Q.  Is that what "get your fix" means?

02:04PM  18  A.  Yeah, sorry.

02:04PM  19  Q.  That's okay.

02:04PM  20      Did you and A.A. also meet with Jim Casey outside of

02:04PM  21  Pharaoh's?

02:04PM  22  A.  Yes.

02:04PM  23  Q.  Did that also involve an exchange of money for drugs --

02:04PM  24  A.  Yes.

02:04PM  25  Q.  -- and sex with you both?

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

123

| | | |
|---|---|---|
| 02:04PM | 1 | A.  Yes. |
| 02:04PM | 2 | Q.  Did that type of activity in your life generally start in |
| 02:04PM | 3 | Pharaoh's? |
| 02:04PM | 4 | A.  Yes. |
| 02:04PM | 5 | Q.  Did that type of activity specifically with Jim Casey |
| 02:04PM | 6 | start in Pharaoh's? |
| 02:04PM | 7 | A.  Yes. |
| 02:04PM | 8 | Q.  All these situations we're talking about in the |
| 02:05PM | 9 | downstairs, if you were not addicted to heroin and cocaine at |
| 02:05PM | 10 | the time, would you have wanted Brian Rosenthal to intervene? |
| 02:05PM | 11 | A.  Yes. |
| 02:05PM | 12 | Q.  I want to ask you about another man in the downstairs |
| 02:05PM | 13 | VIP.  Do you know Joseph Barsuk? |
| 02:05PM | 14 | A.  Yes. |
| 02:05PM | 15 | Q.  Who is that?  Explain him to the jury, in terms of |
| 02:05PM | 16 | meeting him at Pharaoh's. |
| 02:05PM | 17 | A.  Joe, he was a regular that came in every single day.  He |
| 02:05PM | 18 | would be there all night long.  And he'd spend a lot of |
| 02:05PM | 19 | money.  I met him through one of the dancers he liked before |
| 02:05PM | 20 | me.  And again -- |
| 02:05PM | 21 | Q.  Who was that dancer? |
| 02:05PM | 22 | A.  That was Megan Stabler. |
| 02:05PM | 23 | Q.  And what, if you know, what caused the transition from |
| 02:05PM | 24 | him seeing Megan Stabler at Pharaoh's to her introducing him |
| 02:06PM | 25 | to you, and then him seeing you at Pharaoh's? |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

124

02:06PM   1   A.  Well, she basically went on to Rob.

02:06PM   2   Q.  Did she -- did she end up marrying the DJ, Rob Reed?

02:06PM   3   A.  Yes.  So that's why her and Joe, that customer, kind of

02:06PM   4   broke it office.

02:06PM   5   Q.  Did she send Joe, like, refer him to you?

02:06PM   6   A.  Yes.

02:06PM   7   Q.  Was he a former chiropractor?

02:06PM   8   A.  Yes.

02:06PM   9   Q.  Would he travel in from Batavia, New York just to go to

02:06PM  10   Pharaoh's?

02:06PM  11   A.  Yes.

02:06PM  12   Q.  Was he well known among the staff, based on your

02:06PM  13   observations?

02:06PM  14   A.  Yes.

02:06PM  15   Q.  I'm going to show you Exhibit 3571U.  Do you recognize

02:06PM  16   that?

02:06PM  17   A.  That is Joseph Barsuk.

02:06PM  18   Q.  Is that a photo, a facial photo of Joseph Barsuk?

02:06PM  19   A.  Yes.

02:06PM  20   Q.  Does it accurately and fairly depict generally how he

02:07PM  21   would look when he went to Pharaoh's?

02:07PM  22   A.  Yes.

02:07PM  23           MR. TRIPI:  The government offers 3571U.

02:07PM  24           MR. SOEHNLEIN:  No objection.

02:07PM  25           THE COURT:  Received without objection.

02:07PM    1          **(GOV Exhibit 3571U was received in evidence.)**

02:07PM    2              **MR. TRIPI:**  If you can publish that briefly.

02:07PM    3              Okay.  You can take that down.

02:07PM    4              **BY MR. TRIPI:**

02:07PM    5     Q.  Have you previously described to the FBI, in great, great

02:07PM    6     depth, Joseph Barsuk?

02:07PM    7     A.  Yes.

02:07PM    8     Q.  I'm not going to go into that much detail here but when

02:07PM    9     you first met Joe Barsuk and you went into the VIP, did you

02:07PM   10     engage in sex acts with him that very first time?

02:07PM   11     A.  Yes.

02:07PM   12     Q.  What did you engage in in the VIP?

02:07PM   13     A.  You know, to be honest I can't remember, like --

02:08PM   14     Q.  Which it was?

02:08PM   15     A.  -- which, yeah.

02:08PM   16     Q.  Okay.  What was the state of your daily drug use at the

02:08PM   17     time; do you remember that?

02:08PM   18     A.  It was bad.  I was every day, all day, needing it.

02:08PM   19     Q.  By that point in time were your track marks that you

02:08PM   20     showed this jury Friday visible?

02:08PM   21     A.  Yes.

02:08PM   22     Q.  And in fairness, they got even more visible over time,

02:08PM   23     right?

02:08PM   24     A.  Yes.

02:08PM   25     Q.  Have you had sex with Barsuk in the downstairs VIP at

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

02:08PM   1   Pharaoh's?

02:08PM   2   A.   Yes.

02:08PM   3   Q.   Was that because he bought private dances?

02:08PM   4   A.   Yes.

02:08PM   5   Q.   Did anyone ever intervene and stop that activity?

02:08PM   6   A.   No.

02:08PM   7   Q.   Did it happen a bunch of times?

02:09PM   8   A.   Yes.

02:09PM   9   Q.   At some point, did it also occur outside of Pharaoh's

02:09PM  10   with Joseph Barsuk?

02:09PM  11   A.   Yes.

02:09PM  12   Q.   Did it -- did it include him giving you money, or money

02:09PM  13   for drugs each time?

02:09PM  14   A.   Yes.

02:09PM  15   Q.   Earlier there was another individual when we were talking

02:09PM  16   about sex acts.  Was there another person in the downstairs

02:09PM  17   VIP, a different person named Dave, who is not this

02:09PM  18   defendant's brother?

02:09PM  19   A.   Yes.

02:09PM  20   Q.   While you were heavily addicted to heroin and cocaine,

02:10PM  21   did you go into the VIP with this person named Dave --

02:10PM  22   A.   Yeah.

02:10PM  23   Q.   -- and engage in sex acts?

02:10PM  24   A.   Yes.

02:10PM  25   Q.   Did Dave tip the bouncer at the VIP door or the VIP

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

127

| 02:10PM | 1 | attendant, withdrawn, as the door? |
| 02:10PM | 2 | A.  Yes. |
| 02:10PM | 3 | Q.  How many times did you go in the VIP and engage in sex |
| 02:10PM | 4 | with Dave?  Was it more than once? |
| 02:10PM | 5 | A.  Yes. |
| 02:10PM | 6 | Q.  Now, earlier we talked about when the defendant first |
| 02:10PM | 7 | pointed out Wayne van Vleet to you; do you remember that? |
| 02:10PM | 8 | A.  Yes. |
| 02:10PM | 9 | Q.  The defendant told you what Wayne would likely do to you |
| 02:10PM | 10 | in the VIP, right? |
| 02:10PM | 11 | A.  Yes. |
| 02:10PM | 12 | Q.  He told you how Brian would behave, right? |
| 02:10PM | 13 | A.  Yes. |
| 02:10PM | 14 | Q.  Was there another person that the defendant pointed out |
| 02:10PM | 15 | to you, an attorney named Joe Muscato, that he pointed you |
| 02:10PM | 16 | and directed you towards? |
| 02:11PM | 17 | A.  Yes. |
| 02:11PM | 18 | Q.  Was that closer to the end of your time, like, 2017? |
| 02:11PM | 19 | A.  Yes. |
| 02:11PM | 20 | Q.  What, if anything, specifically do you remember the |
| 02:11PM | 21 | defendant saying or, in sum and substance, what did he say |
| 02:11PM | 22 | when he pointed out that attorney to you? |
| 02:11PM | 23 | A.  I just knew he said that he was a good one, he's got a |
| 02:11PM | 24 | lot of money. |
| 02:11PM | 25 | Q.  Would the indication, as you were understanding it, that |

02:11PM    1    this was someone that had a lot of money?

02:11PM    2    A.   Yes.

02:11PM    3         **MR. SOEHNLEIN:**  Objection.  His state of mind.

02:11PM    4         **MR. TRIPI:**  Judge, 611C, I'm trying to develop the

02:11PM    5    testimony here, and I'm just following up on her prior answer.

02:11PM    6         **THE COURT:**  Overruled.

02:11PM    7         **THE WITNESS:**  Okay.  I'm sorry, what?

02:12PM    8         **THE COURT:**  Ann.

02:12PM    9         (The above-requested testimony was then read by the

02:12PM   10    reporter.)

02:12PM   11         **BY MR. TRIPI:**

02:12PM   12    Q.   When the defendant pointed out that person to you, what

02:12PM   13    did you understand that to mean?

02:12PM   14    A.   It meant that if I did favors, I can get a lot more

02:12PM   15    money.

02:12PM   16    Q.   Okay.  Now, after the defendant pointed out that attorney

02:12PM   17    to you, did you approach him?

02:12PM   18    A.   Yes.

02:12PM   19    Q.   Did it just turn out that that particular man wasn't

02:12PM   20    interested in that type of thing?

02:12PM   21    A.   Correct.

02:12PM   22    Q.   So what happened?  Did you just sit and talk a little

02:12PM   23    bit?

02:12PM   24    A.   Yeah.

02:12PM   25    Q.   In that moment in time in your life, though, after the

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

129

| | | |
|---|---|---|
| 02:12PM | 1 | defendant pointed out an attorney indicating to you he had |
| 02:12PM | 2 | money, if that particular attorney would have been interested |
| 02:12PM | 3 | in that type of activity in the VIP, after the defendant |
| 02:13PM | 4 | pointed the person out to you, would you have done it -- |
| 02:13PM | 5 | A.  Yes. |
| 02:13PM | 6 | Q.  -- at that time in your life? |
| 02:13PM | 7 | A.  Yes. |
| 02:13PM | 8 | Q.  At that time in your life, while you were an employee |
| 02:13PM | 9 | inside Pharaoh's, do you think you would have done basically |
| 02:13PM | 10 | anything the defendant told you to do? |
| 02:13PM | 11 | A.  Yes. |
| 02:13PM | 12 | Q.  What, if anything, did the defendant ever say in your |
| 02:13PM | 13 | presence about how many people or the types of people he |
| 02:13PM | 14 | knew? |
| 02:13PM | 15 | A.  Oh I never, like, heard it from his mouth. |
| 02:13PM | 16 | Q.  No, I'm asking you about what he said in terms of, if you |
| 02:13PM | 17 | remember, did you -- did you remember him talking about the |
| 02:13PM | 18 | types of people he knew? |
| 02:13PM | 19 | A.  No. |
| 02:13PM | 20 | Q.  Did you ever hear him say he knew a lot of people? |
| 02:14PM | 21 | A.  Yes. |
| 02:14PM | 22 | Q.  That's what I'm asking you. |
| 02:14PM | 23 | A.  I did, yes. |
| 02:14PM | 24 | Q.  Okay.  Is there a time when you overdosed inside |
| 02:15PM | 25 | Pharaoh's? |

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

02:15PM   1   A.  Yes.

02:15PM   2   Q.  Do you know how many times you overdosed inside

02:15PM   3   Pharaoh's?

02:15PM   4   A.  Too many.

02:15PM   5   Q.  Do you remember an occasion where people tried to bring

02:15PM   6   you back inside Pharaoh's?

02:15PM   7   A.  Yes.

02:15PM   8   Q.  What happened?

02:15PM   9   A.  Larry, that's who I'm gonna speak on.  Is that what

02:15PM  10   you're asking?

02:15PM  11   Q.  I didn't ask you about Larry yet.  I'm gonna -- was there

02:15PM  12   a time in Pharaoh's where you were thrown in the shower, and

02:15PM  13   people were dousing cold water on you?

02:15PM  14   A.  Oh, yes.

02:15PM  15   Q.  What happened on that occasion?

02:15PM  16   A.  That was D.P., she noticed that I was, like, turning

02:15PM  17   purple and blue in my face and lips.  So she put me in the

02:15PM  18   shower with cold water and it snapped me back.

02:16PM  19       And I've done the same for her.

02:16PM  20   Q.  Is your understanding that that is -- was consistent with

02:16PM  21   you being in an overdose situation?

02:16PM  22   A.  Yes.

02:16PM  23   Q.  Now I'm going to ask you about Larry.

02:16PM  24       Was there another -- you mentioned earlier there was

02:16PM  25   another manager that came in after you started at Pharaoh's

USA v Gerace - L.L. - Tripi/Direct - 12/16/24

02:16PM  1  named Larry?

02:16PM  2  A.  Yes.

02:16PM  3  Q.  Was there a night or an occasion where you went to work,

02:16PM  4  remember talking to Larry, and then ended up in a hotel

02:16PM  5  room --

02:16PM  6  A.  Yes.

02:16PM  7  Q.  -- sort of not knowing how you got there?

02:16PM  8  A.  Yes.

02:16PM  9  Q.  Tell the jury what you remember about that occasion.

02:16PM  10  A.  I remember going into work.  I told my manager I was

02:16PM  11  sick.  I didn't make money yet tonight, you know.

02:16PM  12  Q.  Who was the manager?

02:16PM  13  A.  The manager was Larry.  And he gave me some Xanax, which

02:17PM  14  did not help me at all.  It actually made me way worse.

02:17PM  15      And after he gave me the Xanax, I don't remember what

02:17PM  16  happened.  I just remember laying in a hotel room waking up,

02:17PM  17  no clothes on, and he's gone.

02:17PM  18  Q.  Did you feel like sex had been had to your body?

02:17PM  19  A.  Yes.

02:17PM  20  Q.  Did you mention to people information about that night

02:17PM  21  around Pharaoh's?

02:17PM  22  A.  No.

02:17PM  23  Q.  You kept it to yourself?

02:17PM  24  A.  Yes.

02:17PM  25  Q.  Did Larry continue to work there after that?

| | | |
|---|---|---|
| 02:17PM | 1 | A.  Yes. |
| 02:17PM | 2 | MR. TRIPI:  Just a moment. |
| 02:17PM | 3 | BY MR. TRIPI: |
| 02:18PM | 4 | Q.  Have other dancers seen you pass out inside Pharaoh's? |
| 02:18PM | 5 | A.  Yes. |
| 02:18PM | 6 | Q.  Have other staff? |
| 02:18PM | 7 | A.  Yes. |
| 02:18PM | 8 | Q.  Was the last year that you worked in Pharaoh's in about |
| 02:18PM | 9 | 2018 or so? |
| 02:18PM | 10 | A.  Yes. |
| 02:18PM | 11 | Q.  Is 2019 the last year that you've used heroin? |
| 02:19PM | 12 | A.  Yes. |
| 02:19PM | 13 | Q.  Looking back, do you think you ever would have used that |
| 02:19PM | 14 | drug if you didn't work at Pharaoh's? |
| 02:19PM | 15 | A.  No. |
| 02:19PM | 16 | Q.  Do you think you would have been able to stop using that |
| 02:19PM | 17 | drug if you still worked at Pharaoh's? |
| 02:19PM | 18 | A.  No. |
| 02:19PM | 19 | Q.  When you walked into Pharaoh's for your audition, did you |
| 02:19PM | 20 | have any intention of having sex in the way that you've |
| 02:19PM | 21 | described it, for about two days now, with men in exchange |
| 02:19PM | 22 | for drugs and money? |
| 02:19PM | 23 | A.  No. |
| 02:19PM | 24 | Q.  When you walked into Pharaoh's, did you ever have any |
| 02:19PM | 25 | intention of having vaginal and oral sex with this defendant |

02:19PM   1   in exchange for drugs?

02:19PM   2   A.   No.

02:19PM   3   Q.   How about with any of his friends or his brother?

02:19PM   4   A.   No.

02:19PM   5   Q.   How about with any of the men in the VIP Room, van Vleet,

02:19PM   6   Casey, this other guy Dave, any of them?

02:19PM   7   A.   No.

02:19PM   8   Q.   Barsuk?

02:19PM   9   A.   No.

02:19PM   10   Q.   Do you feel like you were taken advantage of because of

02:20PM   11   your addiction that developed?

02:20PM   12   A.   Yes.

02:20PM   13           **MR. TRIPI:**  Just a moment, Judge.

02:20PM   14           No further direct.  Thank you, Judge.

02:20PM   15           **THE COURT:**  Mr. Soehnlein?

02:20PM   16           **MR. SOEHNLEIN:**  Thank you, Judge.

02:20PM   17           Can you please show the witness 3571AM?

02:20PM   18           **THE COURT:**  This is just for the witness?

02:20PM   19           **MS. CHAMPOUX:**  A-N, as in Nancy?

02:20PM   20           **MR. TRIPI:**  Judge, I'm going to object.  There's no

02:20PM   21   foundation for showing.  There's not even a question on the

02:20PM   22   table yet.  We need some foundation.

02:20PM   23

02:20PM   24                   **CROSS-EXAMINATION BY MR. SOEHNLEIN:**

02:20PM   25   Q.   Ms. L.L., you understand that you're under oath today,

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

02:20PM    1   correct?

02:20PM    2   A.  Yes.

02:20PM    3   Q.  And you understand that an obligation of an oath is to

02:20PM    4   tell the truth, correct?

02:20PM    5   A.  The.

02:20PM    6   Q.  The whole truth, correct?

02:20PM    7   A.  Yes.

02:20PM    8   Q.  Nothing but the truth, correct?

02:20PM    9   A.  Yes.

02:20PM   10   Q.  You took the same oath in the grand jury, correct?

02:20PM   11   A.  Yes.

02:20PM   12   Q.  You understood the oath at that time, correct?

02:20PM   13   A.  Yes.

02:20PM   14   Q.  Earlier today on direct, you testified that you had sex

02:20PM   15   with about 500 men in the VIP area of Pharaoh's Gentlemen's

02:21PM   16   Club; is that correct?

02:21PM   17   A.  Yeah.  An estimate.  Yeah.

02:21PM   18   Q.  Okay.

02:21PM   19        MR. SOEHNLEIN:  Can you please show the witness from

02:21PM   20   her grand jury transcript 3571AM, page 26, line 16 please.

02:21PM   21        MS. CHAMPOUX:  A-N as in Nancy, or A --

02:21PM   22        MR. SOEHNLEIN:  A-M as in mother.  If you can show

02:21PM   23   her page 26, please?

02:21PM   24        BY MR. SOEHNLEIN:

02:21PM   25   Q.  You recall testifying on September 7th, 2023?

02:21PM    1    A.  If that's the day, I don't have nothing saying I

02:21PM    2    testified that day, so I don't -- I can't say yes.

02:21PM    3              MR. SOEHNLEIN:  I'm sorry, can you show her the first

02:21PM    4    page now, please?

02:21PM    5              BY MR. SOEHNLEIN:

02:22PM    6    Q.  Okay.  Do you see where it says September 7th, 2023?

02:22PM    7    A.  Yes.

02:22PM    8    Q.  Does that refresh your recollection that you testified in

02:22PM    9    the grand jury on September 7th, 2023?

02:22PM   10    A.  Yes.

02:22PM   11    Q.  Mr. Tripi was asking you questions that day?

02:22PM   12    A.  Yes.

02:22PM   13    Q.  That was in this building?

02:22PM   14    A.  Yes.

02:22PM   15    Q.  You were under oath?

02:22PM   16    A.  Yes.

02:22PM   17    Q.  Okay.

02:22PM   18              MR. SOEHNLEIN:  Okay.  Can you show her page 26,

02:22PM   19    please?

02:22PM   20              BY MR. SOEHNLEIN:

02:22PM   21    Q.  And, once again, earlier today you said the number was

02:22PM   22    500, correct?

02:22PM   23    A.  Yes.

02:22PM   24    Q.  Okay.  On that date in September, were you asked the

02:22PM   25    following question, and did you give the following answer,

02:22PM   1   reading from line 16:

02:22PM   2        "Question:  First during your tenure at Pharaoh's,

02:22PM   3   approximately how many man after you developed your addiction

02:22PM   4   did you engage in sex acts in the VIP area of Pharaoh's with?

02:22PM   5        "Answer:  About 25."

02:22PM   6        Did you give that response to that question?

02:22PM   7        **MR. TRIPI:**  I have a 106 objection, Your Honor, I'd

02:22PM   8   like a -- Judge, if you have it up, my 106 objection goes

02:22PM   9   through line 24.

02:22PM  10        **MR. SOEHNLEIN:**  Okay.  We'll do the whole thing.

02:23PM  11   That's fine.

02:23PM  12        **MR. TRIPI:**  I think the judge is --

02:23PM  13        **THE COURT:**  Hang on.  I think Mr. Soehnlein is going

02:23PM  14   to withdraw that question.

02:23PM  15        **MR. SOEHNLEIN:**  Yeah, we'll keep going that's fine.

02:23PM  16        **BY MR. SOEHNLEIN:**

02:23PM  17   Q.  Okay.  So on September 7th of 2023, were you asked the

02:23PM  18   following questions, and did you give the following answers:

02:23PM  19        "Question:  First, during your tenure at Pharaoh's

02:23PM  20   approximately how many men after you developed your addiction

02:23PM  21   did you engage in sex acts in the VIP area of Pharaoh's with?

02:23PM  22        "Answer:  About 25.

02:23PM  23        "Question:  And that's an approximation?

02:23PM  24        "Answer:  Yeah.

02:23PM  25        "Question:  And how many sex acts would you estimate over

02:23PM  1    time among those 25 men down in the VIP area?

02:23PM  2        "Answer:  A couple hundred."

02:23PM  3        Did I read that accurately?

02:23PM  4    A.  Yes.

02:23PM  5    Q.  Did you answer those questions?

02:23PM  6    A.  I did, yes.

02:23PM  7    Q.  You were asked those questions?

02:23PM  8    A.  Yes.

02:23PM  9    Q.  And you gave those answers, correct?

02:23PM  10   A.  Yes.

02:23PM  11   Q.  And today you estimated 500 men, correct?

02:23PM  12   A.  Yes.

02:23PM  13        **MR. SOEHNLEIN:**  Okay.  You can take that down.

02:23PM  14        **BY MR. SOEHNLEIN:**

02:23PM  15   Q.  Now, in between the time that you were asked those

02:23PM  16   questions and gave those answers, the government has given

02:24PM  17   you a lot of benefits, correct?

02:24PM  18   A.  For one year?  Sure.  This has been going on for five,

02:24PM  19   six years.

02:24PM  20   Q.  Yeah.  And you're right.  They've -- at times they've

02:24PM  21   paid for your car insurance, correct?

02:24PM  22   A.  Correct.

02:24PM  23   Q.  And they've helped you find a new car, correct?

02:24PM  24   A.  A new car?  No.

02:24PM  25   Q.  They provided Uber to you, correct?

138

| | | |
|---|---|---|
| 02:24PM | 1 | A.  Yeah. |
| 02:24PM | 2 | Q.  Yeah.  And they've provided housing to you, correct? |
| 02:24PM | 3 | A.  Yes. |
| 02:24PM | 4 | Q.  And they drove you to and from medical appointments, |
| 02:24PM | 5 | correct? |
| 02:24PM | 6 | A.  Yes. |
| 02:24PM | 7 | Q.  And they also offered to help you with your child custody |
| 02:24PM | 8 | case, correct? |
| 02:24PM | 9 | A.  No. |
| 02:24PM | 10 | Q.  You don't recall that? |
| 02:24PM | 11 | A.  Well, if they offered to help me, I didn't really get |
| 02:24PM | 12 | help with it.  I mean, you know what I mean? |
| 02:24PM | 13 | Q.  It was your understanding that they were gonna help you |
| 02:24PM | 14 | with your child custody case; isn't that right? |
| 02:24PM | 15 | A.  Yes.  And then that all stopped. |
| 02:24PM | 16 | Q.  Hang on.  When you started cooperating with the |
| 02:25PM | 17 | government, it was your understanding that they were gonna to |
| 02:25PM | 18 | help you get custody of your older child, correct? |
| 02:25PM | 19 | A.  I didn't ask them until about seven months in the trial. |
| 02:25PM | 20 | Q.  Okay.  And it was your understanding that they were going |
| 02:25PM | 21 | to help you, correct? |
| 02:25PM | 22 | A.  Okay.  Correct. |
| 02:25PM | 23 | Q.  Yeah.  Okay. |
| 02:25PM | 24 | A.  I thought I said no. |
| 02:25PM | 25 | Q.  So we're gonna talk a little bit today about some things |

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

02:25PM  1   that you regret, okay?  And we're going to skip around at

02:25PM  2   times in your life, okay?

02:25PM  3   A.  Yeah.

02:25PM  4   Q.  If at any point in time you are confused about a

02:25PM  5   question, I want you to let me know.  Can you do that for me?

02:25PM  6   A.  Yes.

02:25PM  7   Q.  Okay.  If at any point in time you need to take a break,

02:25PM  8   I want you to tell me you need a break, okay?

02:25PM  9   A.  All right.

02:25PM  10  Q.  All right?  I just ask that you not ask when a question

02:25PM  11  is pending, okay?  So if I ask a question, you can give the

02:25PM  12  answer, and then you can ask for a break, okay?  Is that fair

02:25PM  13  enough?

02:25PM  14  A.  Okay.  Fair.

02:26PM  15  Q.  Now, do you feel like you were adequately prepared to

02:26PM  16  give your testimony?

02:26PM  17  A.  I wasn't, like, prepared.  But I --

02:26PM  18  Q.  Go ahead, finish.

02:26PM  19  A.  I wasn't prepared at first because it all just popped up.

02:26PM  20  You know what I mean?  I didn't know anything about it.  I

02:26PM  21  didn't know it was even happening until somebody showed up at

02:26PM  22  my house seven hours away.

02:26PM  23  Q.  Okay.  So, when you took the oath last Friday, you recall

02:26PM  24  that, right?

02:26PM  25  A.  Yeah.

| 02:26PM | 1 | Q. You were right here, correct? |
| 02:26PM | 2 | A. Yes. |
| 02:26PM | 3 | Q. Okay. And did you feel like you were adequately prepared |
| 02:26PM | 4 | to answer questions at that time? |
| 02:26PM | 5 | A. Yeah. |
| 02:26PM | 6 | Q. Okay. And what did you do to prepare to answer those |
| 02:26PM | 7 | questions at that time or prior to that time? |
| 02:26PM | 8 | A. I had just met with Tripi. |
| 02:26PM | 9 | Q. Okay. And when did you meet with Tripi? |
| 02:26PM | 10 | A. Couple weeks ago. |
| 02:26PM | 11 | Q. Okay. And who else was there? |
| 02:27PM | 12 | A. Brian. |
| 02:27PM | 13 | Q. Okay. Is that Mr. Burns back there? |
| 02:27PM | 14 | A. Yes. |
| 02:27PM | 15 | Q. Okay. How about Special Agent Smaldino? Was she there? |
| 02:27PM | 16 | A. No. |
| 02:27PM | 17 | Q. Anybody else? |
| 02:27PM | 18 | A. Jackie. |
| 02:27PM | 19 | Q. Okay. |
| 02:27PM | 20 | A. And I don't know the other person's name. |
| 02:27PM | 21 | Q. Okay. |
| 02:27PM | 22 | A. I never met him. |
| 02:27PM | 23 | Q. Is your understanding that Jackie is also an FBI agent? |
| 02:27PM | 24 | A. Yes. |
| 02:27PM | 25 | Q. Now she's not at any of the tables behind me, correct? |

02:27PM    1    A.   No.

02:27PM    2    Q.   Okay.  And then there was another special agent that was

02:27PM    3    there as well?

02:27PM    4    A.   Yes.

02:27PM    5    Q.   Okay.  And that person's not at the tables behind me,

02:27PM    6    correct?

02:27PM    7    A.   Right.

02:27PM    8    Q.   Okay.  Is that person in the gallery back there, do you

02:27PM    9    see in the courtroom?

02:27PM   10    A.   Who?

02:27PM   11    Q.   The other person that you didn't remember their name, are

02:27PM   12    they in the courtroom?

02:27PM   13    A.   Yeah.

02:27PM   14    Q.   Okay.  Can you point them out?

02:27PM   15    A.   I mean, I don't know if he was there.

02:27PM   16    Q.   Are you talking --

02:27PM   17    A.   Bobby.

02:27PM   18    Q.   Are you pointing to the gentleman in the back who just

02:27PM   19    raised his hand?

02:27PM   20    A.   Yes.

02:27PM   21    Q.   Okay.  You said you weren't sure if he was there?

02:28PM   22    A.   Right.

02:28PM   23    Q.   He might have been, he might not have been?

02:28PM   24    A.   Right.

02:28PM   25    Q.   Okay.  And this --

02:28PM    1    A.  But you asked me if I knew somebody back there.

02:28PM    2    Q.  I was asking who else was at the meeting with Tripi that

02:28PM    3    prepared you for this testimony.  The meeting we were just

02:28PM    4    talking about.

02:28PM    5    A.  I -- I just named them all.

02:28PM    6    Q.  Okay.  And it included that gentleman in the back?

02:28PM    7    A.  I -- I'm not sure if he was there in the rooms with me.

02:28PM    8    Q.  Okay.

02:28PM    9    A.  I just know his face.

02:28PM    10   Q.  Okay.

02:28PM    11   A.  That's all I can say.

02:28PM    12   Q.  And that meeting was a couple weeks ago?

02:28PM    13   A.  Yes.

02:28PM    14   Q.  Okay.  Was it in the month of November?

02:28PM    15   A.  December.

02:28PM    16   Q.  It was in the month of December?  Okay.

02:28PM    17       And approximately how long was that meeting?

02:28PM    18   A.  Hour and a half.

02:28PM    19   Q.  Okay.  Now, you don't have a lawyer, correct?

02:28PM    20   A.  Correct.

02:28PM    21   Q.  So, when you meet with the government, you're meeting on

02:28PM    22   your own, correct?

02:28PM    23   A.  Correct.

02:28PM    24   Q.  Okay.  And is there any material that you wanted to

02:28PM    25   review before your testimony that you didn't get a chance to?

02:29PM    1              **MR. TRIPI:**  Object to the relevance here, Judge.

02:29PM    2              **THE WITNESS:**  No.

02:29PM    3              **THE COURT:**  Overruled.

02:29PM    4              **BY MR. SOEHNLEIN:**

02:29PM    5    Q.  No?  You saw all the material that you wanted to see,

02:29PM    6    correct?

02:29PM    7    A.  Yes.

02:29PM    8    Q.  Okay.  And I assume there's nothing about your testimony

02:29PM    9    that you want to change at this time?

02:29PM   10              **MR. TRIPI:**  Objection.  It's not a proper question.

02:29PM   11              **THE WITNESS:**  Correct.

02:29PM   12              **MR. SOEHNLEIN:**  Okay.

02:29PM   13              **THE COURT:**  No, no, overruled.

02:29PM   14              She answered.  Go ahead.

02:29PM   15              **BY MR. SOEHNLEIN:**

02:29PM   16    Q.  Okay.  Now, I want to talk to you a little bit about your

02:29PM   17    substance abuse history, okay?

02:29PM   18        I think you testified that you've been to rehab before,

02:29PM   19    correct?

02:29PM   20    A.  Yes.

02:29PM   21    Q.  How many times have you been to rehab?

02:29PM   22    A.  Since I started working at Pharaoh's, until now, about

02:29PM   23    five times.

02:29PM   24    Q.  Okay.  And when -- when were those rehab stints?

02:29PM   25    A.  They were all 2016, '17, '18.  And the last one was 2019

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

144

02:30PM  1    when I got off the heroin.

02:30PM  2    Q.  Okay.  And those stints, were they inpatient?

02:30PM  3    A.  Yes.

02:30PM  4    Q.  Okay.  So you'd go to rehab, and you'd be basically out

02:30PM  5    of the general public, correct?  You'd be in a hospital

02:30PM  6    setting, correct?

02:30PM  7    A.  Yeah.

02:30PM  8    Q.  Do you recall where they were?

02:30PM  9    A.  White Deer Run.  Clearview in Lewiston.  And Horizon, 291

02:30PM  10   Elm.

02:30PM  11   Q.  Okay.  And white Deer Run, that's in Pennsylvania,

02:30PM  12   correct?

02:30PM  13   A.  Yes.

02:30PM  14   Q.  You named one that's in Lewiston, that's in Niagara

02:30PM  15   County, correct?

02:30PM  16   A.  Yes.

02:30PM  17   Q.  And then one that's here on Elmwood Avenue; is that

02:30PM  18   correct?

02:30PM  19   A.  I don't know if it's on Elmwood?  Elm Street?  291 Elm

02:30PM  20   Street?  I'm not sure.

02:30PM  21   Q.  It's here in Buffalo, correct?

02:30PM  22   A.  Yeah.

02:30PM  23   Q.  And when you went to rehab, did you have people that

02:30PM  24   helped get you checked into rehab?

02:30PM  25   A.  Like the workers?

02:30PM  1   Q.  No.  I mean, like, family, friends, people like that.

02:31PM  2   People that were supporting you going to rehab?

02:31PM  3   A.  Yes.

02:31PM  4   Q.  Who were those people?

02:31PM  5   A.  My parents.

02:31PM  6   Q.  And you -- you have -- I'm sensing you have a close

02:31PM  7   relationship with your parents, correct?

02:31PM  8   A.  On and off.

02:31PM  9   Q.  On and off?  Okay.  They're part of your life, correct?

02:31PM  10  A.  On and off.

02:31PM  11  Q.  On and off.  And they've been there for you over time,

02:31PM  12  correct?

02:31PM  13  A.  Yeah.

02:31PM  14  Q.  All right.  And they're -- they're still in your life

02:31PM  15  now, correct?

02:31PM  16  A.  Right.

02:31PM  17  Q.  Now, each of those times that you went to rehab that we

02:31PM  18  were talking about, you obtained sobriety, correct?

02:31PM  19  A.  Yes.

02:31PM  20  Q.  Okay.  And each of those times, you chose to go back to

02:31PM  21  work at Pharaoh's, correct?

02:31PM  22  A.  Yes.

02:31PM  23  Q.  Okay.  So, just so I understand it, at least in '16, '17,

02:31PM  24  '18, at least three of those times, you had left Pharaoh's to

02:31PM  25  go to drug rehab, correct?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

146

02:31PM  1    A.   Yes.

02:31PM  2    Q.   You had achieved sobriety, correct?

02:31PM  3    A.   Yes.

02:31PM  4    Q.   And then you chose to go back to work at Pharaoh's again,

02:31PM  5    correct?

02:31PM  6    A.   Correct.

02:31PM  7    Q.   And when you chose to go back to work at Pharaoh's again,

02:32PM  8    you represented to people at Pharaoh's that you were clean,

02:32PM  9    correct?

02:32PM  10   A.   Yes.

02:32PM  11   Q.   You represented that you were sober, correct?

02:32PM  12   A.   Yes.

02:32PM  13   Q.   You represented that the old you was done and over with,

02:32PM  14   correct?

02:32PM  15   A.   Yes.

02:32PM  16   Q.   You made a representation that you weren't going to be

02:32PM  17   the same person anymore, correct?

02:32PM  18   A.   Yes.

02:32PM  19   Q.   You told them that you weren't going to use drugs in the

02:32PM  20   club anymore, correct?

02:32PM  21   A.   Yes.

02:32PM  22   Q.   You told them that you weren't going to do heroin

02:32PM  23   anymore, correct?

02:32PM  24   A.   Yes.

02:32PM  25   Q.   You told them you weren't going to do cocaine anymore,

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

02:32PM    1    correct?

02:32PM    2    A.   Yes.

02:32PM    3    Q.   You told them that you had turned over a new leaf,

02:32PM    4    correct?

02:32PM    5    A.   I mean, I don't come out of rehab and say, like,

02:32PM    6    everything you're saying, no.

02:32PM    7    Q.   Okay.  But certainly, you had achieved sobriety, correct?

02:32PM    8    A.   Right.

02:32PM    9    Q.   And you told them that you had been to rehab, correct?

02:32PM   10    A.   Yes.

02:32PM   11    Q.   And you came and asked for your job back, right?

02:32PM   12    A.   Right.

02:32PM   13    Q.   Okay.  Now, no one forced you to go back and try to get

02:32PM   14    the job again, right?

02:32PM   15    A.   Correct.

02:32PM   16    Q.   That was something you wanted to do, right?

02:32PM   17    A.   I wanted to go back to work, yes.  But I didn't want to

02:32PM   18    use.

02:33PM   19    Q.   Okay.  I understand that.  But you wanted to go back to

02:33PM   20    work, right?

02:33PM   21    A.   Yeah.

02:33PM   22    Q.   And you knew what Pharaoh's was at that point in time,

02:33PM   23    correct?

02:33PM   24    A.   Yes.  But --

02:33PM   25    Q.   Because you had been there before, correct?

02:33PM    1    A.  -- there were supposed to be --

02:33PM    2    Q.  You were --

02:33PM    3    A.  -- changes made --

02:33PM    4            **MR. TRIPI:**  Objection.  She's answering the question.

02:33PM    5            **THE COURT:**  No, no.  If he's asking "yes" or "no"

02:33PM    6    answers, and he wants "yes" or "no" answers, he can get "yes"

02:33PM    7    or "no" answers.

02:33PM    8            Overruled.

02:33PM    9            **BY MR. SOEHNLEIN:**

02:33PM   10    Q.  Okay.  And each of those times involved a discussion with

02:33PM   11    management, correct?  Before you came back?

02:33PM   12    A.  Yes.

02:33PM   13    Q.  Yeah.  They didn't just let you show up and start working

02:33PM   14    again after rehab, correct?

02:33PM   15    A.  Before I talked to someone, you mean?

02:33PM   16    Q.  Yeah.

02:33PM   17    A.  You always have to talk to someone before you come.

02:33PM   18    Q.  Exactly.

02:33PM   19    A.  Yeah.

02:33PM   20    Q.  And you represented to them that you had been to rehab,

02:33PM   21    correct?  Correct?

02:33PM   22    A.  I mean, I don't know if every time I came back I was

02:33PM   23    like, oh, I just got out of rehab.  No, I don't know that.

02:33PM   24    Q.  Okay.  Well, you also were fired from Pharaoh's, correct?

02:33PM   25    A.  Correct.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

02:33PM   1    Q.  Several times, correct?

02:34PM   2    A.  I wouldn't say several, I'd say maybe three.

02:34PM   3    Q.  All right.  So you're fired from Pharaoh's three times,

02:34PM   4    correct?  Correct?

02:34PM   5    A.  Yes.

02:34PM   6    Q.  And each of those times was for drug use, correct?

02:34PM   7    A.  Yes.

02:34PM   8    Q.  Yeah.  You were using drugs at the club, correct?

02:34PM   9    A.  Right.

02:34PM   10   Q.  They fired you, right?

02:34PM   11   A.  Right.

02:34PM   12   Q.  You went to rehab, right?

02:34PM   13   A.  Right.

02:34PM   14   Q.  You came back, right?

02:34PM   15   A.  Yes.

02:34PM   16   Q.  Your choice, right?

02:34PM   17   A.  Yes.

02:34PM   18   Q.  All right.  They didn't say, hey, you have to come back

02:34PM   19   after rehab, right?

02:34PM   20   A.  No.

02:34PM   21   Q.  No.  It was your choice, your decision, right?

02:34PM   22   A.  Okay.

02:34PM   23   Q.  Yeah.  That's what you wanted to do, I get it.  That's

02:34PM   24   what you wanted to do, right?

02:34PM   25   A.  I wanted to be involved with prostitution?  Oh, yeah,

02:34PM   1    that's really what I wanted.

02:34PM   2        But once you're stuck in that life, it's hard to get out.

02:34PM   3    Q.  Well, so first, just answer my question.

02:34PM   4        You wanted to go back at the time, correct?

02:34PM   5    A.  Yes.  You just asked that five times.

02:34PM   6            THE WITNESS:  I'm sorry, Judge.

02:35PM   7            BY MR. SOEHNLEIN:

02:35PM   8    Q.  Yeah.  And I understand.  Look, you understand I have a

02:35PM   9    job to do, right?

02:35PM  10    A.  Right.

02:35PM  11    Q.  It's my job to ask questions, right?  You understand

02:35PM  12    that?

02:35PM  13    A.  Yeah.

02:35PM  14    Q.  Okay.  And we're gonna get through it, okay?

02:35PM  15    A.  Okay.

02:35PM  16    Q.  All right.  I understand this isn't pleasant.  I know

02:35PM  17    that.  Okay?  And I hope that you can understand I'm just

02:35PM  18    going to ask questions, okay?

02:35PM  19        Do you need a minute?  It's okay.  It's okay.

02:35PM  20        Let me know when you're ready.

02:35PM  21    A.  Go ahead.  You can go.

02:35PM  22    Q.  Are you okay?

02:35PM  23    A.  Yes.

02:35PM  24    Q.  Do you need a break?  All right.

02:35PM  25        Now, when was the first time you used illegal substances?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

02:35PM   1   A.  First time?  At Pharaoh's.

02:35PM   2   Q.  The very first time was at Pharaoh's?

02:35PM   3   A.  Yes.

02:35PM   4   Q.  Okay.  Now, I think you testified earlier that you got

02:36PM   5   that from D.P., correct?

02:36PM   6   A.  Yes.

02:36PM   7   Q.  Who was another dancer, correct?

02:36PM   8   A.  Yes.

02:36PM   9   Q.  She was a friend of yours, correct?

02:36PM   10  A.  Yes.

02:36PM   11  Q.  And she offered you the drugs, correct?

02:36PM   12  A.  Yes.

02:36PM   13  Q.  And you chose to do them, correct?

02:36PM   14  A.  Yes.

02:36PM   15  Q.  Okay.  She didn't say, hey, these are drugs from Peter or

02:36PM   16  anything like that, correct?

02:36PM   17  A.  Right.

02:36PM   18  Q.  They were drugs from her, right?

02:36PM   19  A.  Yes.

02:36PM   20  Q.  All right.  And you used them with your friend, correct?

02:36PM   21  A.  I used her as my friend?

02:36PM   22  Q.  I'm sorry, you used the drugs with your friend?

02:36PM   23  A.  Oh, yes.

02:36PM   24  Q.  Yeah.  With your friend D.P., correct?

02:36PM   25  A.  Yes.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

02:36PM  1  Q.  And you enjoyed them, right?

02:36PM  2  A.  No, you don't enjoy it.  You don't enjoy having to do

02:36PM  3  something just to feel normal.

02:36PM  4  Q.  Well, but the first time that you used drugs, is it your

02:36PM  5  testimony that you didn't enjoy that?

02:36PM  6  A.  Okay.  So, whatever, I enjoyed it in the beginning.

02:37PM  7  Okay.

02:37PM  8  Q.  Okay.  And so you used it, you enjoyed it, and you made a

02:37PM  9  decision to use it again a second time, correct?

02:37PM  10  A.  Yes.

02:37PM  11  Q.  All right.  And then you made a decision to use a third

02:37PM  12  time, correct?

02:37PM  13  A.  Yes.

02:37PM  14  Q.  And you made a decision to use a fourth time, correct?

02:37PM  15  A.  Yes.

02:37PM  16  Q.  And at some point, you made a decision to use a fiftieth

02:37PM  17  time, right?

02:37PM  18  A.  Well, after your fourth time, you're addicted.

02:37PM  19  Q.  Okay.  But let's talk about that.

02:37PM  20      Just because you're addicted doesn't mean that you're not

02:37PM  21  able to make a choice, does it?

02:37PM  22  A.  No.  You're right.

02:37PM  23  Q.  Yeah.  Even though you're addicted, you can still choose

02:37PM  24  whether to do or not to do something, right?

02:37PM  25  A.  Right.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

153

| 02:37PM | 1 | Q.  Like at points in time when you were addicted, you chose |
| 02:37PM | 2 | to go to rehab, right? |
| 02:37PM | 3 | A.  Yes. |
| 02:37PM | 4 | Q.  Nobody was making you go to rehab, right? |
| 02:37PM | 5 | A.  I mean, at times I was made to go, yes. |
| 02:37PM | 6 | Q.  Okay.  But it was something that you wanted to do, right? |
| 02:38PM | 7 | A.  Right. |
| 02:38PM | 8 | Q.  You made the conscious decision, hey, now I'm going to |
| 02:38PM | 9 | try and get better, right? |
| 02:38PM | 10 | A.  Right. |
| 02:38PM | 11 | Q.  And you were able to do that even though you were |
| 02:38PM | 12 | addicted, right? |
| 02:38PM | 13 | A.  Yes. |
| 02:38PM | 14 | Q.  All right.  And when you're addicted, you make other |
| 02:38PM | 15 | decisions.  You decide whether or not you're gonna get behind |
| 02:38PM | 16 | a wheel of a car, don't you? |
| 02:38PM | 17 | A.  Yes. |
| 02:38PM | 18 | Q.  Right?  And if you're arrested behind a wheel of a car |
| 02:38PM | 19 | when you're addicted, the addiction is not a defense, is it? |
| 02:38PM | 20 | A.  No. |
| 02:38PM | 21 | Q.  And you can do other things that are illegal when you're |
| 02:38PM | 22 | addicted, and the addiction is not a defense to that either, |
| 02:38PM | 23 | is it? |
| 02:38PM | 24 | A.  No. |
| 02:38PM | 25 | Q.  So just because you're addicted doesn't mean that you |

02:38PM   1   can't make choices, correct?

02:38PM   2   A.  Correct.

02:38PM   3   Q.  The addiction might impact your choice, right?

02:38PM   4   A.  Yes.

02:38PM   5   Q.  It might be a consideration behind the choice, right?

02:38PM   6   Right?

02:38PM   7   A.  Yes.

02:38PM   8   Q.  But you're still making the choice, right?

02:38PM   9   A.  Yes.

02:38PM  10   Q.  Okay.  And your addiction started when you chose to use

02:38PM  11   drugs with your friend D.P., correct?

02:39PM  12   A.  Yes.

02:39PM  13   Q.  And then you chose to use drugs again, correct?

02:39PM  14   A.  Yes.

02:39PM  15   Q.  And again, correct?  Right?

02:39PM  16   A.  Yes.

02:39PM  17   Q.  And again, correct?

02:39PM  18   A.  Yes.  Yes.  Yes.

02:39PM  19   Q.  Okay.  All right.  Mr. Gerace didn't get you addicted to

02:39PM  20   drugs, correct?

02:39PM  21   A.  I would say he had a part in it.

02:39PM  22   Q.  Well, you were working at his business when you got

02:39PM  23   addicted, right?

02:39PM  24   A.  Right.

02:39PM  25   Q.  Okay.  It was a bar, right?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

155

02:39PM     1    A.   Yeah.

02:39PM     2    Q.   Okay.  Now, you had been through Lake Shore High School,

02:39PM     3    right?

02:39PM     4    A.   Right.

02:39PM     5    Q.   And when you went to Lake Shore, did they have a DARE

02:39PM     6    program or something like that that you went through?

02:39PM     7    A.   No.

02:39PM     8    Q.   They didn't give you any substance abuse resistance

02:39PM     9    education?

02:39PM    10    A.   Not where I went.

02:39PM    11    Q.   No?  No one ever told you before you started working at

02:39PM    12    Pharaoh's, hey, drugs are addictive?

02:39PM    13    A.   Not really.  My family isn't supportive.  Like, I'm

02:40PM    14    basically on my own.

02:40PM    15    Q.   Okay.  But, so you mean to tell me that when you started

02:40PM    16    using drugs at Pharaoh's Gentlemen's Club, you had no idea

02:40PM    17    that they would be addictive?

02:40PM    18    A.   Honestly, no, that is not what runs through your head.

02:40PM    19    Q.   Okay.  But you had no concept of that at the time that

02:40PM    20    you started using drugs?

02:40PM    21    A.   No.

02:40PM    22    Q.   The first drug you used ever was heroin?

02:40PM    23    A.   Yes.

02:40PM    24    Q.   And you had absolutely no idea that heroin was addictive?

02:40PM    25    A.   No.  That was the first drug that I've ever used, and I

| | | |
|---|---|---|
| 02:40PM | 1 | had no idea. |
| 02:40PM | 2 | Q.  Even though you graduated from Lake Shore High School? |
| 02:40PM | 3 | A.  Yes.  Even though I graduated.  Sometimes I just don't |
| 02:40PM | 4 | have common sense. |
| 02:40PM | 5 | Q.  Okay.  Fair enough. |
| 02:40PM | 6 | Now, when you were addicted, Pharaoh's was not the only |
| 02:40PM | 7 | place where you could get drugs, correct? |
| 02:40PM | 8 | A.  Right. |
| 02:40PM | 9 | Q.  You got drugs from other places, right? |
| 02:40PM | 10 | A.  Yes. |
| 02:40PM | 11 | Q.  You got drugs -- I think I saw on some of your testimony |
| 02:41PM | 12 | you would go down to the East Side and get heroin at times, |
| 02:41PM | 13 | correct? |
| 02:41PM | 14 | A.  Yes. |
| 02:41PM | 15 | Q.  And you would get cocaine from other friends and |
| 02:41PM | 16 | associates outside of Pharaoh's.  Correct? |
| 02:41PM | 17 | A.  Yes. |
| 02:41PM | 18 | Q.  Okay.  So, fair to say that if you lost your job at |
| 02:41PM | 19 | Pharaoh's, you still knew that there were other places where |
| 02:41PM | 20 | you could get drugs, correct? |
| 02:41PM | 21 | A.  Yes. |
| 02:41PM | 22 | Q.  Okay.  You knew that you could go down to -- I think it |
| 02:41PM | 23 | was Genesee and Bailey, and you'd be able to get heroin there |
| 02:41PM | 24 | if you needed to, correct? |
| 02:41PM | 25 | A.  Yes. |

02:41PM  1   Q.  And you knew that you had other friends independent of

02:41PM  2   Pharaoh's where you could get cocaine, correct?

02:41PM  3   A.  Yes.

02:41PM  4   Q.  So your accessibility to drugs was not tied to Pharaoh's

02:41PM  5   Gentlemen's Club, correct?

02:41PM  6   A.  Not correct.

02:41PM  7   Q.  Well, you talked about some other independent places

02:41PM  8   where you're able to get drugs, correct?

02:41PM  9   A.  What?

02:41PM  10  Q.  Strike that.

02:41PM  11      There was a time, you talked about your relationship with

02:41PM  12  Mr. Casey --

02:41PM  13  A.  Yes.

02:41PM  14  Q.  -- do you recall that?  Okay.

02:41PM  15      And you talked about a time that you and D.P. went out to

02:41PM  16  dinner with him; do you remember that?

02:42PM  17  A.  Yes.

02:42PM  18  Q.  And then at dinner, you talked about having sex for

02:42PM  19  money, correct?

02:42PM  20  A.  Yes.

02:42PM  21  Q.  And that dinner was at Dinosaur Barbecue down here,

02:42PM  22  right?

02:42PM  23  A.  Right.

02:42PM  24  Q.  It was not at Pharaoh's, right?

02:42PM  25  A.  Yes.

02:42PM   1    Q.  And then you went back to his place and you had sex for

02:42PM   2    money correct?

02:42PM   3    A.  Yes.

02:42PM   4    Q.  And then in connection with that, you also went and got

02:42PM   5    heroin on the East Side of Buffalo, correct?

02:42PM   6    A.  You mean that same day?

02:42PM   7    Q.  That's my understanding of it.  Is that wrong?

02:42PM   8    A.  Could -- now I have to sit here and rethink about that

02:42PM   9    whole story.

02:42PM  10        Like, I'm not sure if it was the same day.  Is there

02:42PM  11    something I can read?

02:42PM  12    Q.  There could, but I want to ask you a question.  Why did

02:42PM  13    you just call it a story?

02:42PM  14    A.  A what?

02:42PM  15    Q.  Why did you just call it a story?

02:42PM  16    A.  Because there is so many things going on in this trial,

02:42PM  17    that it jumps around.  You know what I mean?  They're little

02:42PM  18    different stories to me.

02:42PM  19    Q.  Okay.

02:42PM  20    A.  Like, and it's hard to just sit here and think about

02:43PM  21    them.

02:43PM  22    Q.  It's hard to keep them straight?

02:43PM  23    A.  Yeah.  When it happened, how long ago.

02:43PM  24    Q.  Yeah.  And about that, substance abuse impacts your

02:43PM  25    memory, right?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

02:43PM    1    A.   Yeah.

02:43PM    2    Q.   Yeah.  If you're using substances heavily, it's difficult

02:43PM    3    to form memories, correct?

02:43PM    4    A.   It can be.

02:43PM    5    Q.   Yeah.  And it also changes your perception of things,

02:43PM    6    doesn't it?

02:43PM    7    A.   Yes.

02:43PM    8    Q.   When you're using substances, and you're addicted, you're

02:43PM    9    hyper focused on substances, correct?  Right?

02:43PM   10    A.   Yes.

02:43PM   11    Q.   And you're hyper focused on getting the drugs, correct?

02:43PM   12    A.   Yes.

02:43PM   13    Q.   And so you might ignore or fail to perceive other things

02:43PM   14    that are going on, correct?

02:43PM   15    A.   Yes.

02:43PM   16    Q.   Okay.  And -- and certainly, it impairs your ability to

02:43PM   17    make memories, correct?

02:43PM   18    A.   Yes.  I'll agree that, yeah.

02:43PM   19    Q.   Yeah.  And it impairs your ability to recall memories,

02:43PM   20    correct?

02:44PM   21    A.   It can.

02:44PM   22    Q.   Okay.

02:44PM   23    A.   Not always.

02:44PM   24    Q.   Okay.  I'm just briefly, just for the -- for the --

02:44PM   25    actually, for everybody because the photo's --

02:44PM 1    **MR. SOEHNLEIN:** Is 490B in evidence?

02:44PM 2    Can you show the witness 490B real quick?  And, I'm

02:44PM 3    sorry, can you zoom in on this bottom photo right there?

02:44PM 4    **BY MR. SOEHNLEIN:**

02:44PM 5    Q.  Do you recognize those people?

02:44PM 6    A.  No.

02:44PM 7    **MR. SOEHNLEIN:** Okay.  You can take that down.

02:44PM 8    Okay.  We'll come back to that in a little bit.

02:44PM 9    **BY MR. SOEHNLEIN:**

02:44PM 10   Q.  So just as a kind of capstone to that, your drug abuse

02:45PM 11   from 2013 to 2018 was very heavy, fair to say?

02:45PM 12   A.  Very what?  Heavy?

02:45PM 13   Q.  Very heavy?

02:45PM 14   A.  Yeah.

02:45PM 15   Q.  Yeah.  You were using multiple times a day, correct?

02:45PM 16   A.  Yes.

02:45PM 17   Q.  Every day, correct?

02:45PM 18   A.  Yes.

02:45PM 19   Q.  Except for those times we talk about in rehab, correct?

02:45PM 20   A.  Yes.

02:45PM 21   Q.  By the way, when you went to the rehab, how long would

02:45PM 22   the rehab stints be?

02:45PM 23   A.  28 days.

02:45PM 24   Q.  Pretty good chunks of time, about a month, right?

02:45PM 25   A.  Yes.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

161

02:45PM  1    Q.  And what kind of treatment would you get there?

02:45PM  2    A.  I would obviously get substance treatment and mental

02:45PM  3    health, because I went to a dual place.

02:45PM  4    Q.  Okay.  And when you say "mental health," that's like you

02:45PM  5    meet with a counsellor one on one, correct?

02:45PM  6    A.  Yes.

02:45PM  7    Q.  And they talk about, you know, how you're feeling about

02:45PM  8    substances, correct?

02:45PM  9    A.  Right.

02:45PM  10   Q.  And they talk about certain triggers for substance abuse,

02:45PM  11   correct?

02:45PM  12   A.  Yes.

02:45PM  13   Q.  And they talk about the way that certain stressors may

02:45PM  14   impact your substance abuse, correct?

02:45PM  15   A.  Yes.

02:45PM  16   Q.  And maybe they talk about being in certain situations

02:45PM  17   that might -- that might trigger substance abuse, correct?

02:46PM  18   A.  Yeah.

02:46PM  19   Q.  And when you were meeting with those mental health

02:46PM  20   counselors, you were open and honest, correct?

02:46PM  21   A.  Yes.

02:46PM  22   Q.  And you talked to them about your drug -- drug abuse in

02:46PM  23   the past, correct?

02:46PM  24   A.  Yes.

02:46PM  25   Q.  And you talked to them about your work at Pharaoh's,

02:46PM   1    correct?

02:46PM   2    A.  Yes.

02:46PM   3    Q.  Right?  And you talked to them about how you had used

02:46PM   4    drugs in the past at Pharaoh's, correct?

02:46PM   5    A.  Yes.

02:46PM   6    Q.  All right.  And presumably they made some recommendations

02:46PM   7    to you, correct?

02:46PM   8    A.  Yes.

02:46PM   9    Q.  Yeah.  And presumably they told you not to go back into

02:46PM   10   those circumstances --

02:46PM   11          **MR. TRIPI:**  Objection.

02:46PM   12          **MR. SOEHNLEIN:**  -- where --

02:46PM   13          **THE COURT:**  Let him finish the question.

02:46PM   14          **BY MR. SOEHNLEIN:**

02:46PM   15   Q.  Okay.  Presumably they told you not to go back into those

02:46PM   16   circumstances, that might be triggers for substance abuse

02:46PM   17   correct?

02:46PM   18          **MR. TRIPI:**  Objection.

02:46PM   19          **THE COURT:**  Hang on.  Stop.  Stop.  Stop.

02:46PM   20          **MR. TRIPI:**  Objection.

02:46PM   21          **THE COURT:**  Basis?

02:46PM   22          **MR. TRIPI:**  Hearsay, and doctor/patient privilege.

02:46PM   23          **THE COURT:**  Overruled.

02:46PM   24          **MR. SOEHNLEIN:**  Can you read back the question?

02:46PM   25   Thank you.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

02:46PM    1            (The above-requested question was then read by the

02:47PM    2    reporter.)

02:47PM    3            **MR. TRIPI:**  Objection, speculation.  I caught the --

02:47PM    4    I caught the first word now, Judge, so calls for speculation.

02:47PM    5            **THE COURT:**  Presumably.

02:47PM    6            **MR. TRIPI:**  Yeah.

02:47PM    7            **THE COURT:**  Do you want to withdraw and rephrase,

02:47PM    8    Mr. Soehnlein?

02:47PM    9            **MR. SOEHNLEIN:**  Sure.

02:47PM   10            **BY MR. SOEHNLEIN:**

02:47PM   11    Q.  They told you not to put yourself in circumstances where

02:47PM   12    you would be likely to use, correct?

02:47PM   13    A.  They work with you to work on that.

02:47PM   14    Q.  Okay.

02:47PM   15    A.  Not go back to that.

02:47PM   16    Q.  Okay.

02:47PM   17    A.  And it doesn't happen overnight.

02:47PM   18    Q.  I get it.  I get it.  It might not even happen over 28

02:47PM   19    days, right?

02:47PM   20    A.  Right.

02:47PM   21    Q.  Yeah.  It might not even happen over three stints,

02:47PM   22    correct?

02:47PM   23    A.  Depending on the person.

02:47PM   24    Q.  Right.  Okay.  But you had that therapy in those

02:47PM   25    inpatient stints, correct?

02:47PM 1  A.  I didn't have no mental health therapy at that time.

02:47PM 2  I've only been getting that since 2019.

02:47PM 3  Q.  So, I'm sorry.  Earlier I asked you about those stints in

02:48PM 4  '16, '17, and '18, and you said you had dual therapy; do you

02:48PM 5  recall that testimony?

02:48PM 6  A.  Well one of them -- one of the rehabs was dual, yes.

02:48PM 7  Q.  Okay.

02:48PM 8  A.  They do not do one on one with you there because it's

02:48PM 9  only 28 and 800 people.

02:48PM 10  Q.  Okay.  So you had -- so the therapy you were talking

02:48PM 11  about was in a group setting, correct?

02:48PM 12  A.  Right.

02:48PM 13  Q.  But it went through some of the same things that we

02:48PM 14  talked about earlier, correct?

02:48PM 15  A.  Yes.

02:48PM 16  Q.  Okay.  And you were discharged from that therapy,

02:48PM 17  correct?

02:48PM 18  A.  Like -- yeah.

02:48PM 19  Q.  Okay.  And you went back to work at Pharaoh's again,

02:48PM 20  correct?

02:48PM 21  A.  Yes.

02:48PM 22  Q.  Okay.  You -- there was some testimony about this, you

02:48PM 23  were first contacted by the government in July of 2020; do

02:48PM 24  you recall that testimony?

02:48PM 25  A.  Yes.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

165

02:48PM  1    Q.  Yeah.  And New York State Police investigator and another

02:48PM  2    investigator came to your house in Pennsylvania; do you

02:49PM  3    recall that?

02:49PM  4    A.  Yes.

02:49PM  5    Q.  And they interviewed you, correct?

02:49PM  6    A.  Yes.

02:49PM  7    Q.  And then about eight days later, you came up to probably

02:49PM  8    this building, and you provided grand jury testimony; do you

02:49PM  9    recall that?

02:49PM 10    A.  Yes.

02:49PM 11    Q.  Okay.  So what I'd like to do with you, if I could get

02:49PM 12    your help with something.  I want to go through each time

02:49PM 13    that you talked with the government, because I want to make

02:49PM 14    sure that we keep it straight.

02:49PM 15        So if I give you a pad and a sheet of paper, can you just

02:49PM 16    write down the dates while I talk about them?

02:49PM 17              **MR. TRIPI:**  Objection.

02:49PM 18              **THE COURT:**  Objection to what?

02:49PM 19              **MR. TRIPI:**  Having her write down dates.  He can work

02:49PM 20    through the documents and refresh her recollection --

02:49PM 21              **THE COURT:**  No.

02:49PM 22              **MR. TRIPI:**  -- rather than have her --

02:49PM 23              **THE COURT:**  No, he can have her write down dates if

02:49PM 24    he wants.  Overruled.

        25

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 02:49PM  | 1  | **BY MR. SOEHNLEIN:**                                     |
| 02:49PM  | 2  | Q.  Okay.  And I'm gonna guess that some of these dates are a |
| 02:49PM  | 3  | little spotty, a little fuzzy to you.  So if there's     |
| 02:50PM  | 4  | something that you don't recall, just let me know and I'll |
| 02:50PM  | 5  | show you documents to refresh, okay?                     |
| 02:50PM  | 6  | A.  Okay.                                                |
| 02:50PM  | 7  | Q.  So the first time was on -- where's my notes here,   |
| 02:50PM  | 8  | 7/8/20; do you recall that?                              |
| 02:50PM  | 9  | A.  Wait, these are the times where I talked to them?    |
| 02:50PM  | 10 | Q.  Where you talked to law enforcement, that's correct. |
| 02:50PM  | 11 | A.  Okay.                                                |
| 02:50PM  | 12 | Q.  And when I say "law enforcement" what I mean is either an |
| 02:50PM  | 13 | investigator, or a prosecutor who's working on this case. |
| 02:50PM  | 14 | A.  Okay.                                                |
| 02:50PM  | 15 | Q.  Okay?  So that's what I mean when I say that.  Okay?  |
| 02:50PM  | 16 | A.  Okay.                                                |
| 02:50PM  | 17 | Q.  All right.  So 7/8/20 was the first time.            |
| 02:50PM  | 18 | Okay.  And then you were subpoenaed to the grand jury on |
| 02:50PM  | 19 | the 16th of that --                                      |
| 02:50PM  | 20 | **MR. TRIPI:**  I was looking down, but I have an        |
| 02:50PM  | 21 | objection.  Did she answer the first date, did he just tell |
| 02:50PM  | 22 | her day a date?  I'm just confused, Judge.               |
| 02:50PM  | 23 | **THE COURT:**  I don't know.                            |
| 02:50PM  | 24 | **THE WITNESS:**  He just answered it.  I didn't get to  |
| 02:50PM  | 25 | say anything about the first date.                       |

02:50PM    1          **MR. TRIPI:**  Okay.

02:50PM    2          **BY MR. SOEHNLEIN:**

02:50PM    3  Q.  Okay.  Do you recall that date?

02:50PM    4  A.  Well, I mean, I -- I can't recall that unless I see

02:51PM    5  something.

02:51PM    6  Q.  That's fine.

02:51PM    7          **MR. SOEHNLEIN:**  Can you show her 3571X, please.

02:51PM    8          **THE WITNESS:**  I mean, I don't want to say yes, and

02:51PM    9  then I'm wrong, because I don't know.

02:51PM   10          **BY MR. SOEHNLEIN:**

02:51PM   11  Q.  And we don't want you to do that.

02:51PM   12  A.  Right.

02:51PM   13  Q.  So we're going show you a document, and see if it

02:51PM   14  refreshes your recollection.

02:51PM   15  A.  Okay.

02:51PM   16  Q.  Okay.  If you can take a look at the screen there.  Okay.

02:51PM   17  Does that refresh your recollection?

02:51PM   18  A.  Yeah.

02:51PM   19  Q.  Okay.  So you'd agree with me that's 7/8/20, correct?

02:51PM   20  A.  Yes.

02:51PM   21  Q.  You met with law enforcement, correct?

02:51PM   22  A.  Yes.

02:51PM   23  Q.  Okay.  And then at some point you were subpoenaed to the

02:51PM   24  grand jury?

02:51PM   25  A.  Yes.

02:51PM  1    Q.  Okay.  Do you recall that date as July 16th of 2020?

02:51PM  2    A.  Can I see the date, please?

02:51PM  3    Q.  Sure.

02:51PM  4          MR. SOEHNLEIN:  Can we show her 3571A, just the first

02:51PM  5    page, please?

02:51PM  6          BY MR. SOEHNLEIN:

02:51PM  7    Q.  Okay.  Do you see where it says July 16th, 2020?

02:52PM  8    A.  Yeah.  In the middle there.

02:52PM  9    Q.  So you'd agree with me, so that's 7/16/20, correct?

02:52PM  10   A.  It just says Thursday, July 16th, 2020.

02:52PM  11         MR. TRIPI:  We'll stipulate.  July 16th, Judge.

02:52PM  12         BY MR. SOEHNLEIN:

02:52PM  13   Q.  Correct.  So on July 16th, 2020, you met with the

02:52PM  14   government again, okay?  Would you write that date down

02:52PM  15   please?

02:52PM  16   A.  Yes.

02:52PM  17   Q.  Thank you.  Okay.

02:52PM  18        And then do you recall meeting with them on March 8th of

02:52PM  19   2023?  I'm just asking, do you recall?

02:52PM  20   A.  2023, you said?

02:52PM  21   Q.  Yeah.  3/8 of 2023; do you recall that?

02:52PM  22   A.  No.

02:52PM  23   Q.  You don't?

02:52PM  24         MR. SOEHNLEIN:  Can you show her 3571S, please.

02:52PM  25         THE WITNESS:  Yeah, I'm sorry.  I'm probably not

| | | |
|---|---|---|
| 02:52PM | 1 | going to recall any of the dates because I don't have them. |
| 02:52PM | 2 | **BY MR. SOEHNLEIN:** |
| 02:52PM | 3 | Q.  That's okay.  I think actually I have the wrong document |
| 02:53PM | 4 | here, and I apologize. |
| 02:53PM | 5 | A.  That's okay. |
| 02:53PM | 6 | **MR. SOEHNLEIN:**  That's all right.  Take that down. |
| 02:53PM | 7 | We'll loop back to that one. |
| 02:53PM | 8 | **BY MR. SOEHNLEIN:** |
| 02:53PM | 9 | Q.  Now, do you recall texting with the government on |
| 02:53PM | 10 | 7/13/2023? |
| 02:53PM | 11 | A.  I have texted -- |
| 02:53PM | 12 | Q.  Yes. |
| 02:53PM | 13 | A.  -- yes. |
| 02:53PM | 14 | Q.  Okay.  So 7/13/2023, do you recall that? |
| 02:53PM | 15 | A.  Can I see the date, please? |
| 02:53PM | 16 | Q.  Sure. |
| 02:53PM | 17 | **MR. SOEHNLEIN:**  Can you show her 3571AC. |
| 02:53PM | 18 | **THE WITNESS:**  Yes. |
| 02:53PM | 19 | **BY MR. SOEHNLEIN:** |
| 02:53PM | 20 | Q.  Do you see that?  Okay.  Very good. |
| 02:54PM | 21 | A.  Oh, wait.  That's July 14th. |
| 02:54PM | 22 | Q.  That's July 14th, isn't that what I asked?  7/14? |
| 02:54PM | 23 | A.  No. |
| 02:54PM | 24 | Q.  Oh, I'm sorry, did I ask 7/13?  Okay.  So 7/14.  Would |
| 02:54PM | 25 | you write 7/14 down, please. |

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

170

02:54PM    1    A.  Yes.  I got it.

02:54PM    2    Q.  All right.  And then you see below that you also texted

02:54PM    3    with them on July 17th?

02:54PM    4    A.  Yes.

02:54PM    5    Q.  So 7/17 of 2023?

02:54PM    6    A.  Yes.

02:54PM    7    Q.  Okay.  Okay.  And then I think there was some testimony

02:54PM    8    that you had, like, a cocaine slipup in 2023; do you recall

02:54PM    9    that?

02:54PM    10    A.  Yes.

02:54PM    11    Q.  Okay.  Now, by the way, at that point in time you chose

02:54PM    12    to use cocaine again, correct?

02:54PM    13    A.  Yes.

02:54PM    14    Q.  Okay.  That -- that -- that was a decision you made at

02:54PM    15    that point in time, correct?

02:54PM    16    A.  Yes.

02:54PM    17    Q.  And you kind of went missing for a period of time, right?

02:54PM    18    A.  I guess if you call overnight -- I mean, staying with a

02:55PM    19    friend overnight, if that's missing, I guess.

02:55PM    20    Q.  Okay.  Well, you had -- you have a significant other,

02:55PM    21    right?

02:55PM    22    A.  Yes.

02:55PM    23    Q.  His name is Jeff?

02:55PM    24    A.  Yes.

02:55PM    25    Q.  He's in the courtroom today?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

171

02:55PM   1   A.   No.

02:55PM   2   Q.   In any event, you didn't tell him where you were going,

02:55PM   3   correct?

02:55PM   4   A.   No, because he didn't need to know.

02:55PM   5   Q.   Okay.  You have a child with him, right?

02:55PM   6   A.   Yes.

02:55PM   7   Q.   Okay.  And he didn't need to know where you were going?

02:55PM   8   A.   He didn't need to know where I was going.  He needed to

02:55PM   9   know when I would be back.

02:55PM  10   Q.   All right.  So any in any event, you went, you used

02:55PM  11   cocaine, and you had some government -- some contact with the

02:55PM  12   government around that point in time, correct?

02:55PM  13   A.   Yes.

02:55PM  14   Q.   Okay.  And I think the testimony on direct that was about

02:55PM  15   August 2nd; do you recall that?

02:55PM  16   A.   Yes.

02:55PM  17   Q.   Okay.  Do you ever recall that, or do you need to see --

02:55PM  18   A.   I do.

02:55PM  19   Q.   So could you write down August 2nd of 2023, please?  Do

02:55PM  20   you recall that?

02:55PM  21   A.   Yep.

02:55PM  22   Q.   Okay.  And then you had a meeting, and you looked at it

02:56PM  23   earlier, we can show it to you again, on August 15th of 2023;

02:56PM  24   do you recall that?

02:56PM  25   A.   A meeting?

02:56PM  1    Q.  Yep.

02:56PM  2    A.  That I missed?

02:56PM  3    Q.  No, no, I think you were present for it.  Do you want to

02:56PM  4    see it, just to refresh your memory?

02:56PM  5         **MR. SOEHNLEIN:**  Can we show her 3571AA, please?

02:56PM  6         **BY MR. SOEHNLEIN:**

02:56PM  7    Q.  Do you see where it says August 15th of 2023?

02:56PM  8    A.  Yes.

02:56PM  9    Q.  Okay.  Does that refresh your memory?

02:56PM  10   A.  Yes.

02:56PM  11   Q.  Okay.  So you met with them on August 15th of 2023.  Did

02:56PM  12   you write that date down?

02:56PM  13   A.  Yes, I did.

02:56PM  14   Q.  Thank you.

02:56PM  15        Now, and then you had another meeting on August 24th of

02:56PM  16   2023; do you recall that?

02:56PM  17   A.  No.

02:56PM  18   Q.  Okay.

02:56PM  19        **MR. SOEHNLEIN:**  Can you show her 3571Q, please.

02:56PM  20        **BY MR. SOEHNLEIN:**

02:57PM  21   Q.  Okay.  Do you see that?

02:57PM  22   A.  Yep.

02:57PM  23   Q.  Yep.

02:57PM  24   A.  Yes.

02:57PM  25        **MR. SOEHNLEIN:**  Actually, can you leave that up for a

02:57PM   1   minute, please?

02:57PM   2          Just for me, can you scroll down, or I guess just for

02:57PM   3   her.  Keep going down please.  Keep going down.

02:57PM   4          Thank you.

02:57PM   5          **BY MR. SOEHNLEIN:**

02:58PM   6   Q.  Do you recall talking about Katrina Nigro in your

02:58PM   7   interviews with the government?

02:58PM   8   A.  I think I mentioned her once or twice.

02:58PM   9   Q.  Okay.

02:58PM  10   A.  Yeah.

02:58PM  11   Q.  And you were friendly with her when you were at the club,

02:58PM  12   correct?

02:58PM  13   A.  Yeah.

02:58PM  14   Q.  Yeah.  When's the last time you spoke with Ms. Nigro?

02:58PM  15   A.  It's been a while.

02:58PM  16   Q.  It's been a while.  Has she reached out to you in

02:58PM  17   connection with this case?

02:58PM  18   A.  No.

02:58PM  19          **MR. SOEHNLEIN:**  Okay.  We can take that down.

02:58PM  20          **BY MR. SOEHNLEIN:**

02:58PM  21   Q.  Now you went in the grand jury again in September --

02:58PM  22   strike that.  September 7th of 2023, that's that transcript

02:58PM  23   we were just looking at earlier.  Do you recall that, or do

02:58PM  24   you want to see it again?

02:58PM  25   A.  You said 9/7/23.

02:58PM | 1 | Q.  Correct?

02:58PM | 2 | A.  That's fine.  I recall.

02:58PM | 3 | Q.  Okay.  Thanks.  And then you said that you also had some

02:58PM | 4 | text communications with the government, correct?

02:58PM | 5 | A.  Yes.

02:58PM | 6 | Q.  Okay.  And I'm going to assume you don't recall all those

02:58PM | 7 | text communications, correct?

02:58PM | 8 | A.  Right.

02:58PM | 9 |        **MR. SOEHNLEIN:**  Okay.  Just for the witness, can you

02:58PM | 10 | show her 3571AS, please?

02:58PM | 11 |        **BY MR. SOEHNLEIN:**

02:59PM | 12 | Q.  Okay.  Do you see that there, Miss?

02:59PM | 13 | A.  Yes.

02:59PM | 14 | Q.  These are text messages between you and a federal agent,

02:59PM | 15 | correct?

02:59PM | 16 | A.  Yes.

02:59PM | 17 | Q.  Who are these text messages with?

02:59PM | 18 | A.  Carly.

02:59PM | 19 | Q.  Carly, that's Carly Smaldino?

02:59PM | 20 | A.  Yes.

02:59PM | 21 | Q.  She's a federal agent?

02:59PM | 22 | A.  Yes.

02:59PM | 23 | Q.  She works for the FBI here in Buffalo, correct?

02:59PM | 24 | A.  Yes.

02:59PM | 25 | Q.  Is she in the courtroom right now?

02:59PM   1   A.   No.

02:59PM   2   Q.   So in any event, do you see there are some dates here on

02:59PM   3   the left side?

02:59PM   4   A.   Yes.

02:59PM   5   Q.   You'd agree with me that this document, it memorializes

02:59PM   6   text messages between you and Special Agent Smaldino?

02:59PM   7   A.   Yes.

02:59PM   8   Q.   Okay.  And you'd agree with me that first communication

02:59PM   9   there is 8/29/23; do you see that?

02:59PM   10  A.   Yes.

02:59PM   11  Q.   Okay.  You had a conversation with her 8/29/23, correct?

02:59PM   12  Okay.  Can you write down that date, please?

02:59PM   13  A.   Yeah.  Got it.

03:00PM   14  Q.   Thank you.

03:00PM   15       **MR. SOEHNLEIN:**  Okay.  Can you scroll down for the

03:00PM   16  witness, please.

03:00PM   17       Okay.  Thank you.

03:00PM   18       **BY MR. SOEHNLEIN:**

03:00PM   19  Q.   And then do you see there's a conversation -- strike

03:00PM   20  that.  Do you recall a conversation you had with her on 8/30

03:00PM   21  of 2023?

03:00PM   22  A.   Yes.

03:00PM   23  Q.   Okay.  That would have been the next day, correct?

03:00PM   24  A.   And 8/31 as well.

03:00PM   25  Q.   Yes, thank you.  All right.  Thank you.

03:00PM    1    **MR. SOEHNLEIN:**  If you can keep scrolling, please.

03:00PM    2         Okay.  If you would stop, please, Ms. Champoux.

03:00PM    3    Thank you.

03:00PM    4    **BY MR. SOEHNLEIN:**

03:00PM    5    Q.  Do you see there it says 9/1 of '23; do you see that?

03:00PM    6    A.  Yes.

03:00PM    7    Q.  Okay.  Does that refresh your recollection you had a

03:00PM    8    conversation with her on 9/1 of '23?  Thank you.  If you can

03:00PM    9    just write down that date as well.

03:00PM   10    A.  Yes.

03:00PM   11    Q.  Thank you.  And then on 9/5 of '23; do you see that?

03:00PM   12    A.  9/5.  Yep.

03:00PM   13    Q.  Okay.  Thank you.

03:00PM   14    A.  I got that written.

03:00PM   15    Q.  And these texts, and we'll talk about some of them later,

03:00PM   16    but these texts are about the government helping you with

03:01PM   17    gas, and insurance, and living expenses, and things like

03:01PM   18    that, correct?

03:01PM   19    A.  Yes.

03:01PM   20    Q.  That's fair?  All right.  But then the texts also

03:01PM   21    reference some other meetings with the government, correct?

03:01PM   22         **MR. TRIPI:**  Objection as to form.

03:01PM   23         **THE WITNESS:**  I don't --

03:01PM   24         **THE COURT:**  Hang on.  Stop, ma'am.  Stop, ma'am.

03:01PM   25         **MR. TRIPI:**  Lack of specificity.  Object as to form.

03:01PM    1          **THE COURT:**  Yeah, sustained.  It's too general,

03:01PM    2   Mr. Soehnlein.  You can be a little more specific.

03:01PM    3          **MR. SOEHNLEIN:**  That's fine, thank you.

03:01PM    4          **BY MR. SOEHNLEIN:**

03:01PM    5   Q.  In any event, you recall a conversation on 9/5 of 2023,

03:01PM    6   correct?

03:01PM    7   A.  Yes.

03:01PM    8          **MR. SOEHNLEIN:**  If you can still continue scrolling,

03:01PM    9   Ms. Champoux.

03:01PM   10          **BY MR. SOEHNLEIN:**

03:01PM   11   Q.  Okay.  Do you recall a conversation on 9/6 of '23?

03:01PM   12   A.  Yes.

03:01PM   13   Q.  Can you write down that date, please?

03:01PM   14   A.  And the 7th.

03:01PM   15   Q.  And the 7th, that's correct.  If -- if -- okay.

03:01PM   16        Do you have the 7th as well?  Thank you.

03:01PM   17   A.  Yes.

03:01PM   18          **MR. SOEHNLEIN:**  Okay.  Can you scroll to the next

03:01PM   19   page, please, Ms. Champoux?

03:01PM   20          **BY MR. SOEHNLEIN:**

03:02PM   21   Q.  Do you recall having a text message conversation with

03:02PM   22   Special Agent Smaldino on 9/8/23?

03:02PM   23   A.  Yes.

03:02PM   24   Q.  Okay.  Would you write down that date as well, please.

03:02PM   25          **MR. SOEHNLEIN:**  And if you would keep going,

03:02PM    1    Ms. Champoux.  Stop right there please.

03:02PM    2    A.  9/11.

03:02PM    3    Q.  Yes.  You see that 9/11/23?

03:02PM    4    A.  Yes.

03:02PM    5    Q.  Okay.  Thank you.

03:02PM    6         **MR. SOEHNLEIN:**  And, Ms. Champoux, if you would keep

03:02PM    7    going.  Okay.

03:02PM    8         **BY MR. SOEHNLEIN:**

03:02PM    9    Q.  And on 9/12, do you see that?

03:02PM   10    A.  Yep.

03:02PM   11    Q.  You recall a conversation on 9/12, correct?

03:02PM   12    A.  Yes.  And 13.

03:02PM   13    Q.  Correct.

03:02PM   14    A.  And 14.

03:02PM   15    Q.  Correct.  Actually, I'll let you ask the questions,

03:02PM   16    you're getting good.  All right.

03:02PM   17         **MR. SOEHNLEIN:**  If you would keep scrolling,

03:02PM   18    Ms. Champoux.

03:02PM   19         **BY MR. SOEHNLEIN:**

03:02PM   20    Q.  Okay.  And do you recall 9/15?

03:03PM   21    A.  Yes.

03:03PM   22    Q.  Okay.  Thank you write down that date.

03:03PM   23    A.  9/15.

03:03PM   24    Q.  And 9/16, you had a conversation, correct?  And do you

03:03PM   25    see 9/18, as well?

| | | |
|---|---|---|
| 03:03PM | 1 | A.  Yes. |
| 03:03PM | 2 | Q.  Thank you.  Will you write that down. |
| 03:03PM | 3 | MR. SOEHNLEIN:  Keep -- if you would keep scrolling. |
| 03:03PM | 4 | Okay.  Stop, please. |
| 03:03PM | 5 | BY MR. SOEHNLEIN: |
| 03:03PM | 6 | Q.  You see -- do you recall 9/20/23? |
| 03:03PM | 7 | A.  Where did we leave off?  18, 20, 21, 22. |
| 03:03PM | 8 | Q.  Wonderful.  If you would write down those dates as well. |
| 03:03PM | 9 | A.  Yeah. |
| 03:03PM | 10 | Q.  Thank you. |
| 03:03PM | 11 | MR. SOEHNLEIN:  Okay.  If you would keep scrolling |
| 03:03PM | 12 | Ms. Champoux.  Right there.  Please, stop. |
| 03:03PM | 13 | BY MR. SOEHNLEIN: |
| 03:04PM | 14 | Q.  Do you recall a conversation on 9/25 of 2023? |
| 03:04PM | 15 | A.  Yes. |
| 03:04PM | 16 | Q.  Okay.  And 9/26? |
| 03:04PM | 17 | A.  Yes. |
| 03:04PM | 18 | Q.  Thank you.  Okay. |
| 03:04PM | 19 | MR. SOEHNLEIN:  If you would keep scrolling, |
| 03:04PM | 20 | Ms. Champoux. |
| 03:04PM | 21 | BY MR. SOEHNLEIN: |
| 03:04PM | 22 | Q.  And do you recall a conversation on 9/27 and 9/28? |
| 03:04PM | 23 | A.  Yes. |
| 03:04PM | 24 | Q.  Okay.  If you would write down those dates as well, |
| 03:04PM | 25 | please. |

03:04PM      1         **MR. SOEHNLEIN:** If you would keep scrolling

03:04PM      2   Ms. Champoux. Stop right there, please. Thank you.

03:04PM      3         **BY MR. SOEHNLEIN:**

03:04PM      4   Q. Do you recall conversation on 9/29?

03:04PM      5   A. Yes.

03:04PM      6   Q. And do you recall a conversation on October 3rd?

03:04PM      7   A. Yes.

03:04PM      8   Q. And do you recall a conversation on October 10th?

03:04PM      9   A. Yes.

03:04PM     10   Q. Okay. And do you recall a conversation on October 11th?

03:04PM     11   A. Yes.

03:04PM     12   Q. Thank you.

03:05PM     13         **MR. SOEHNLEIN:** If you would keep going, please,

03:05PM     14   Ms. Champoux. Stop right there, please.

03:05PM     15         **BY MR. SOEHNLEIN:**

03:05PM     16   Q. Do you recall a conversation on October 12th?

03:05PM     17   A. Yes.

03:05PM     18   Q. And one on October 13th?

03:05PM     19   A. Yeah.

03:05PM     20         **MR. SOEHNLEIN:** If you would keep going,

03:05PM     21   Ms. Champoux.

03:05PM     22         **BY MR. SOEHNLEIN:**

03:05PM     23   Q. And then do you recall --

03:05PM     24         **MR. SOEHNLEIN:** Stop right there, please.

          25

03:05PM    1             **BY MR. SOEHNLEIN:**

03:05PM    2    Q.  -- do you recall a conversation on October 16th?

03:05PM    3    A.  16th, 17, 18.

03:05PM    4    Q.  If you would write those down, please, thank you.

03:05PM    5             **MR. SOEHNLEIN:**  If would you keep going,

03:05PM    6    Ms. Champoux.  All right.  Sorry, we -- there we, go thank

03:05PM    7    you.

03:05PM    8             **BY MR. SOEHNLEIN:**

03:05PM    9    Q.  Do you recall on 10/20, 10/22, 10/23, and 10/24?

03:06PM   10    A.  20, 22, 23, 24, yes.

03:06PM   11    Q.  Yeah.  If you would write those down, thank you.

03:06PM   12    A.  Okay.

03:06PM   13             **MR. SOEHNLEIN:**  If you keep scrolling, Ms. Champoux.

03:06PM   14             **BY MR. SOEHNLEIN:**

03:06PM   15    Q.  Do you recall a conversation on 10/25, 10/26, and 10/27?

03:06PM   16    A.  Am I going to have to write down every single day?  Like,

03:06PM   17    I don't understand.

03:06PM   18             **MR. TRIPI:**  Judge, I'm -- I'll stipulate the entire

03:06PM   19    document in if he wants.

03:06PM   20             **THE WITNESS:**  10/24.

03:06PM   21             **MR. SOEHNLEIN:**  I'm really just trying to nail down

03:06PM   22    the number of conversations, Judge.

03:06PM   23             **THE WITNESS:**  Yeah, I can tell.

03:06PM   24             **MR. SOEHNLEIN:**  Yeah.

03:06PM   25             **THE COURT:**  If you want a stipulation, fine.  If you

03:06PM   1   want to keep going like this --

03:06PM   2        **THE WITNESS:**  I mean, to be honest, I don't want to

03:06PM   3   keep writing every single date.  I thought it would be a

03:06PM   4   couple or something.

03:07PM   5        **BY MR. SOEHNLEIN:**

03:07PM   6   Q.  All right.  So the government --

03:07PM   7        **MR. TRIPI:**  What's the -- yeah, one more second.

03:07PM   8   Sorry.

03:08PM   9        **MR. SOEHNLEIN:**  So, Ms. Champoux, can you just scroll

03:08PM  10   to the very end of this document?

03:08PM  11        **BY MR. SOEHNLEIN:**

03:08PM  12   Q.  Okay.  Do you see the last conversation there is 4/11 of

03:08PM  13   '24, do you see that?

03:08PM  14   A.  Yeah.

03:08PM  15   Q.  Okay.  That would be April 11th of 2024?

03:08PM  16   A.  Yeah.

03:08PM  17   Q.  Okay.  So, hold on, you can stop writing, because me and

03:08PM  18   Mr. Tripi have had a conversation.

03:08PM  19   A.  Okay.

03:08PM  20   Q.  So I'll represent to you that between the point in time

03:08PM  21   that you were first contacted by the government and

03:08PM  22   April 11th of 2024, you had at least 110 conversations with

03:08PM  23   the government in that period of time.

03:08PM  24   A.  Okay.

03:08PM  25   Q.  Okay?  That sounds about right to you?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

| | | |
|---|---|---|
| 03:08PM | 1 | A.  Yes. |
| 03:08PM | 2 | Q.  Okay.  I mean -- |
| 03:08PM | 3 | A.  Right. |
| 03:09PM | 4 | Q.  -- the alternative is this. |
| 03:09PM | 5 | A.  Right. |
| 03:09PM | 6 | Q.  They were -- you were texting with them pretty much every |
| 03:09PM | 7 | day for a period of time, correct? |
| 03:09PM | 8 | A.  I would text them when I would be in DSS all day, because |
| 03:09PM | 9 | I couldn't be on the phone. |
| 03:09PM | 10 | Q.  Well, you texted with them for several different reasons, |
| 03:09PM | 11 | correct? |
| 03:09PM | 12 | A.  Right. |
| 03:09PM | 13 | Q.  Okay.  And we'll go through that.  But what I want to |
| 03:09PM | 14 | establish is that really from the first point of contact in |
| 03:09PM | 15 | 2020 up until April of 2023, the government -- you and the |
| 03:09PM | 16 | government had at least 110 conversations, correct? |
| 03:09PM | 17 | A.  Yes. |
| 03:09PM | 18 | Q.  Yeah.  And at that point in time, the government was |
| 03:09PM | 19 | helping you for housing, correct? |
| 03:09PM | 20 | A.  Yes. |
| 03:09PM | 21 | Q.  And they were helping you to get to doctors appointments, |
| 03:09PM | 22 | correct? |
| 03:09PM | 23 | A.  Yes. |
| 03:09PM | 24 | Q.  And they were helping you with your insurance, correct? |
| 03:09PM | 25 | A.  Yes. |

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

184

03:09PM  1   Q.  And they were helping you with rides, correct?

03:09PM  2   A.  Yes.

03:09PM  3   Q.  And they were giving you living expense money, correct?

03:09PM  4   A.  I only got that once.

03:09PM  5   Q.  Okay.  But they gave you living expense money, correct?

03:10PM  6   A.  Yeah.

03:10PM  7   Q.  And they gave you money that you used for your daughter's

03:10PM  8   birthday at points in time, correct?

03:10PM  9   A.  My daughter's birthday?

03:10PM  10  Q.  Yeah.

03:10PM  11  A.  No.

03:10PM  12  Q.  Okay.  We'll go through it in the texts.

03:10PM  13  A.  I don't know.  Yeah.

03:10PM  14  Q.  Okay.  And -- and they also offered to help your

03:10PM  15  significant other, Jeff, potentially get a job, correct?

03:10PM  16  A.  Yes.

03:10PM  17  Q.  Yes.  They were trying to get him work as well, correct?

03:10PM  18  A.  Right.

03:10PM  19  Q.  And, by the way, at this point in time, he was not

03:10PM  20  working, right?

03:10PM  21  A.  Right.

03:10PM  22  Q.  The family was being supported by the federal government,

03:10PM  23  correct?

03:10PM  24  A.  Yes.

03:10PM  25  Q.  Yeah.  The only income that was coming into your

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

185

03:10PM    1    household was from the federal government, correct?

03:10PM    2    A.  No.  I had DSS always.  I always had food stamps.

03:10PM    3    Q.  Okay.

03:10PM    4    A.  There was a time that they got stolen, that I needed

03:10PM    5    help.

03:10PM    6    Q.  Okay.  But you weren't working, correct?

03:10PM    7    A.  No.

03:10PM    8    Q.  And Jeff wasn't working, correct?

03:11PM    9    A.  Right, but --

03:11PM   10    Q.  And your son was an infant?

03:11PM   11    A.  Right.

03:11PM   12    Q.  And so in terms of income streams that were coming into

03:11PM   13    the house, the federal government in connection with this

03:11PM   14    case is a significant source of income at that point in time,

03:11PM   15    correct?

03:11PM   16    A.  I guess if you -- I wouldn't say significant because I

03:11PM   17    was also supporting myself.

03:11PM   18    Q.  Well, you weren't working, correct?

03:11PM   19    A.  Yes.  But I was getting cash assistance.

03:11PM   20    Q.  Okay.  What's cash assistance?

03:11PM   21    A.  Through DSS.

03:11PM   22    Q.  Okay.  So that was, now the government also helped you

03:11PM   23    get plugged into DSS, correct?

03:11PM   24    A.  No, I did all that on my own.

03:11PM   25    Q.  Okay.  So, maybe we can go through this a little bit

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

186

03:11PM    1    later.  But it's your recollection that the government didn't

03:11PM    2    do anything to help you get into DSS?

03:11PM    3    A.  No I'm not saying like they didn't do anything.  I mean,

03:11PM    4    if I needed a letter stating I was homeless, they would write

03:11PM    5    one.  You know.

03:11PM    6    Q.  Okay.  All right.  They did what they could to

03:11PM    7    facilitate, correct?

03:11PM    8    A.  Right.

03:12PM    9    Q.  And at this point in time, that's what the snapshot of

03:12PM   10    the family looks like in terms of income, correct?

03:12PM   11    A.  Okay.

03:12PM   12    Q.  Is that accurate?

03:12PM   13    A.  I didn't hear your last question.  What?

03:12PM   14    Q.  That's where the family income was coming from at that

03:12PM   15    time, correct?

03:12PM   16    A.  From DSS and the government, yes.

03:12PM   17    Q.  Okay.

03:12PM   18    A.  What -- I don't understand why that matters.

03:12PM   19    Q.  Okay.  Now, I want to take you through Pharaoh's, okay?

03:12PM   20        Now, the actual club itself, and I think you had some

03:12PM   21    testimony, I think you said that there's about 50 dancers on

03:12PM   22    any given night, correct?

03:12PM   23    A.  That was in my estimate.  You said that was in my

03:12PM   24    testimony?

03:12PM   25    Q.  That's what I recall, correct?

03:12PM    1    A.  Okay.  Yes.

03:12PM    2    Q.  Yes?  Well, I mean, is it your testimony?

03:12PM    3    A.  Listen.  I need something to see.  I don't -- I can't

03:12PM    4    remember every single little number.

03:12PM    5    Q.  I'm just asking you how many dancers worked at Pharaoh's

03:13PM    6    on a standard night?

03:13PM    7    A.  There could be ten on one night, there could be 50 the

03:13PM    8    next.  It's always different there.  Could be 100 on the

03:13PM    9    weekend.

03:13PM   10    Q.  Okay.  There could be --

03:13PM   11    A.  There could be two girls.

03:13PM   12    Q.  Okay.  Was there ever a night that there was just two

03:13PM   13    girls working at Pharaoh's Gentlemen's Club?

03:13PM   14    A.  Probably until about 10:00, yeah.

03:13PM   15    Q.  Okay.  And then dancers would come in later on in the

03:13PM   16    evening, correct?

03:13PM   17    A.  Yeah.

03:13PM   18    Q.  Okay.  So it wouldn't be accurate to say that there were

03:13PM   19    only two girls working on that night, correct?

03:13PM   20    A.  Okay.

03:13PM   21    Q.  All right.  Now I want to talk to you a little about --

03:13PM   22    about security at the club.  They had security at the door,

03:13PM   23    correct?

03:13PM   24    A.  Yes.

03:13PM   25    Q.  They had guys who walked around on the floor, correct?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24
188

03:13PM  1    A.  Okay.

03:13PM  2    Q.  They had a VIP attendant, we'll talk about him, right?

03:13PM  3    A.  Yes.

03:13PM  4    Q.  They had cameras, correct?

03:13PM  5    A.  Yes.

03:13PM  6    Q.  And it was your sense when you worked there that the

03:13PM  7    cameras picked up everything in the public areas of the club,

03:13PM  8    correct?

03:13PM  9    A.  The cameras -- the only cameras I seen were in the

03:13PM  10   VIP Room.

03:13PM  11   Q.  Okay.  You were unaware of any other cameras anywhere

03:14PM  12   else in the club?

03:14PM  13   A.  Correct.

03:14PM  14   Q.  Okay.  But you knew there were cameras in the VIP?

03:14PM  15   A.  Yes.

03:14PM  16   Q.  And you knew because the VIP attendant's got that screen

03:14PM  17   in front of him, correct?

03:14PM  18   A.  Yes.

03:14PM  19   Q.  All right.  And he can see each of the couches, right?

03:14PM  20   A.  Yes.

03:14PM  21   Q.  Okay.  And the VIP attendant, who pays the VIP attendant

03:14PM  22   his salary?

03:14PM  23   A.  His salary?

03:14PM  24   Q.  Yeah.  Who's paying him?

03:14PM  25   A.  The owner.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

189

| | | |
|---|---|---|
| 03:14PM | 1 | Q.  And he's being paid to watch the VIP area, correct? |
| 03:14PM | 2 | A.  Correct. |
| 03:14PM | 3 | Q.  All right.  And he's being paid whatever wage -- strike |
| 03:14PM | 4 | that.  You don't know what wage he was being paid by |
| 03:14PM | 5 | Mr. Gerace, correct? |
| 03:14PM | 6 | A.  Correct. |
| 03:14PM | 7 | Q.  But you did have an understanding that he was being paid |
| 03:14PM | 8 | to watch the VIP area, correct? |
| 03:14PM | 9 | A.  Yes. |
| 03:14PM | 10 | Q.  And that VIP area is mostly open, right? |
| 03:14PM | 11 | A.  There's a part that's open, and a part that's not. |
| 03:14PM | 12 | Q.  Right.  And we've got some pictures of it. |
| 03:14PM | 13 | A.  Right. |
| 03:14PM | 14 | Q.  We'll go through it.  But the general VIP area, all the |
| 03:14PM | 15 | couches can see each other, correct? |
| 03:14PM | 16 | A.  In the regular VIP, yes.  Not in the Champagne. |
| 03:14PM | 17 | Q.  Okay.  And there's no door between the attendant and that |
| 03:15PM | 18 | VIP or Champagne Room area, correct? |
| 03:15PM | 19 | A.  Correct. |
| 03:15PM | 20 | Q.  And the VIP attendant is really just feet away, right? |
| 03:15PM | 21 | It's not a very large area? |
| 03:15PM | 22 | A.  Did you say a feet away? |
| 03:15PM | 23 | Q.  He's not that far away? |
| 03:15PM | 24 | A.  Right, it's not that far. |
| 03:15PM | 25 | Q.  Yeah.  It's not -- it's not like he's at the other side |

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

190

03:15PM    1    of the building, correct?

03:15PM    2    A.  Right.

03:15PM    3    Q.  Right, he's just a couple steps away, right?  Correct?

03:15PM    4    A.  Yes.  Maybe like 20 steps.

03:15PM    5    Q.  Okay.  Just pivoting real quick to something a little

03:15PM    6    different.  You don't know Special Agent Bongiovanni, right?

03:15PM    7    A.  No.

03:15PM    8    Q.  You have no idea who that person is, correct?

03:15PM    9    A.  I've heard of him.

03:15PM   10    Q.  Okay.  But you've never met him, correct?

03:15PM   11    A.  I've never met him.

03:15PM   12    Q.  You never saw him, correct?

03:15PM   13    A.  Correct.

03:15PM   14    Q.  Even though you were at Pharaoh's on a pretty regular

03:15PM   15    basis from 2013 to 2018, correct?

03:15PM   16    A.  Yeah.

03:15PM   17    Q.  Except for those stints we talked about where you were

03:15PM   18    fired and went to rehab, correct?

03:15PM   19    A.  Right.

03:15PM   20    Q.  Okay.  And I think you said there were about three of

03:16PM   21    those stints, right?

03:16PM   22        And so if Special Agent Bongiovanni were in this room,

03:16PM   23    you wouldn't be able to pick him out, correct?

03:16PM   24    A.  Correct.

03:16PM   25    Q.  Okay.  You never saw him at the club, correct?

03:16PM   1   A.   No.

03:16PM   2   Q.   And never heard his name?

03:16PM   3   A.   I don't know if I've ever seen him, because I don't

03:16PM   4   know --

03:16PM   5   Q.   You were never introduced to him, correct?

03:16PM   6   A.   Right.  Right.

03:16PM   7   Q.   All right.  You don't know who he is, correct?

03:16PM   8   A.   Correct.

03:16PM   9   Q.   Okay.  Now, I want to ask you about a gentleman named Don

03:16PM  10   Parrino.  Do you recall a gentleman named Don Parrino?

03:16PM  11   A.   Yes.

03:16PM  12   Q.   Okay.  And he was a co-owner of the club, correct?

03:16PM  13   A.   Yes.

03:16PM  14   Q.   Okay.  And there was a point in time where there was a

03:16PM  15   lawsuit about the club; do you recall that?

03:16PM  16   A.   No, I didn't really know too much about it.

03:16PM  17        MR. SOEHNLEIN:  Okay.  So, can we show the witness --

03:16PM  18   actually, show some of these pictures here.  May I?

03:16PM  19        BY MR. SOEHNLEIN:

03:16PM  20   Q.   So these pictures here -- showing the witness, oh, wrong

03:17PM  21   set.

03:17PM  22        240L, 240F, 240E, 240D.  Take a look.  Let me know once

03:17PM  23   you've looked at those photos.

03:17PM  24        Oh, and 240 -- is 240B up there?

03:17PM  25   A.   I've got 240D as in dog.

03:17PM   1   Q.  Okay.  Showing you 240B.  You've seen these pictures

03:17PM   2   before?

03:17PM   3   A.  Yes.

03:17PM   4   Q.  Okay.  Do you have a recollection of what event those

03:17PM   5   pictures were from?

03:17PM   6   A.  I don't.

03:17PM   7   Q.  Are you aware of whether or not there was a grand

03:17PM   8   reopening party in April of 2014?

03:17PM   9   A.  Yes.

03:17PM  10   Q.  Okay.  You recall that, right?

03:17PM  11   A.  I do.

03:17PM  12   Q.  That was a point in time that the Gerace family took

03:18PM  13   control of the club again, correct?

03:18PM  14   A.  Okay, yes.

03:18PM  15   Q.  You recall that?

03:18PM  16   A.  Yes.

03:18PM  17   Q.  And prior to that, Don Parrino had been in charge of the

03:18PM  18   club, correct?

03:18PM  19   A.  Yes.

03:18PM  20   Q.  Yeah.  And Don Parrino had a manager named Larry,

03:18PM  21   correct?

03:18PM  22   A.  Yes.

03:18PM  23   Q.  Larry came in with Don Parrino, correct?

03:18PM  24   A.  Yes.

03:18PM  25   Q.  And he also left with Don Parrino, correct?

03:18PM    1    A.  Yes.

03:18PM    2    Q.  So, if we're talking about Larry being at the club, we're

03:18PM    3    talking about a point in time where Peter Gerace was not in

03:18PM    4    the club, correct?

03:18PM    5    A.  Yeah.

03:18PM    6    Q.  Yeah.  So the testimony that you had earlier about Larry,

03:18PM    7    do you recall that testimony?

03:18PM    8    A.  Yes.

03:18PM    9    Q.  That comes at a point in time where Mr. Gerace is not in

03:18PM   10    the club, correct?

03:18PM   11    A.  Correct.

03:18PM   12    Q.  Okay.  Now, you started working at Pharaoh's in 2013,

03:18PM   13    correct?

03:18PM   14    A.  Yes.

03:18PM   15    Q.  Summer of 2013, correct?

03:18PM   16    A.  Yes.

03:18PM   17    Q.  Okay.  And at that point in time, Mr. Gerace was not in

03:18PM   18    the club, correct?

03:18PM   19    A.  Honestly, I don't -- I don't remember.

03:18PM   20    Q.  Let me see if I can try to refresh your recollection.

03:18PM   21         **MR. SOEHNLEIN:**  Can you show the witness 369L?

03:19PM   22         And I think is this in -- is this in evidence,

03:19PM   23    Ms. Champoux?

03:19PM   24         **MS. CHAMPOUX:**  I believe so.  Yes, I have it.

03:19PM   25         **MR. SOEHNLEIN:**  Okay.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

194

03:19PM    1          **THE COURT:**  This is in evidence?

03:19PM    2          **MS. CHAMPOUX:**  I have it.

03:19PM    3          **THE COURT:**  Hang on.  Let's make sure Ms. Demma has

03:19PM    4     it.

03:19PM    5          **THE CLERK:**  It's in evidence.

03:19PM    6          **THE COURT:**  Okay.  Great.

03:19PM    7          **BY MR. SOEHNLEIN:**

03:19PM    8     Q.  Okay.  So this exhibit shows phone calls between

03:19PM    9     Mr. Gerace and Pharaoh's Gentlemen's Club.  Okay?  You've

03:19PM   10     never seen this before I assume?

03:19PM   11     A.  Right.

03:19PM   12     Q.  Okay.  But you'll note, you started in 2013, correct?

03:19PM   13     A.  Yes.

03:19PM   14     Q.  So you started right here, right?

03:19PM   15     A.  Yes.

03:19PM   16     Q.  Okay.  And you'd agree with me that according to this

03:19PM   17     chart, there's no phone contact between Mr. Gerace and

03:19PM   18     Pharaoh's in December of 2013, correct?

03:19PM   19          **MR. TRIPI:**  Objection as to personal knowledge of

03:19PM   20     interpretation of the chart.

03:19PM   21          **THE COURT:**  No, if she understands it, she can see

03:19PM   22     it, she can answer.

03:19PM   23          **BY MR. SOEHNLEIN:**

03:19PM   24     Q.  Do you understand?

03:19PM   25     A.  Can you ask again?

03:19PM    1    Q.  Sure.  So first of all, as you look at this document, do

03:20PM    2    you understand that this document shows phone calls between

03:20PM    3    Mr. Gerace and Pharaoh's Gentlemen's Club?

03:20PM    4    A.  Yeah.

03:20PM    5    Q.  Okay.  And you understand that the bar, the peak, that is

03:20PM    6    the number of phone calls between Mr. Gerace and the club,

03:20PM    7    correct?

03:20PM    8    A.  Correct.

03:20PM    9    Q.  Okay.  And so you'd agree with me -- by the way, on the

03:20PM   10    bottom are the years?

03:20PM   11    A.  Right.

03:20PM   12    Q.  Do you see that?  There's 2012, 2013, 2014, do you see

03:20PM   13    that?

03:20PM   14    A.  Yes.

03:20PM   15    Q.  And you were hired in 2013, correct?

03:20PM   16    A.  Yes.

03:20PM   17    Q.  So the testimony that you gave about using drugs almost

03:20PM   18    immediately at the point in time that you came to Pharaoh's

03:20PM   19    that was in 2013, right?

03:20PM   20    A.  Yes.

03:20PM   21    Q.  Okay.  So you got introduced to heroin at the club in

03:20PM   22    2013, right?

03:20PM   23    A.  Yes.

03:20PM   24    Q.  You got introduced to cocaine at the club in 2013,

03:20PM   25    correct?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

03:20PM    1    A.   Yes.

03:20PM    2    Q.   Okay.  And at that point in time, Don Parrino was in

03:20PM    3    charge of the club, wasn't he?

03:20PM    4    A.   In my understanding, when I worked there, it was Peter,

03:21PM    5    then they came in like a few months later.  I don't even

03:21PM    6    know, maybe a half a year later or something, then Larry and

03:21PM    7    Don came in.

03:21PM    8    Q.   Okay.  But, well, you'd agree with me, we can agree on a

03:21PM    9    couple things.  You started in 2013?

03:21PM   10    A.   Right.

03:21PM   11    Q.   You testified about that consistently every time that you

03:21PM   12    met with the government, correct?

03:21PM   13    A.   Yes.

03:21PM   14    Q.   To your knowledge?  Okay.

03:21PM   15         And you recall a grand reopening party in April of 2014,

03:21PM   16    correct?

03:21PM   17    A.   Yes.

03:21PM   18    Q.   And you'd agree with me that this exhibit, which is a

03:21PM   19    government exhibit, shows that Mr. Gerace didn't have any

03:21PM   20    phone contact with the club in December of 2012, correct?

03:21PM   21    There's no bar for December of 2012, is there?

03:21PM   22    A.   No.  But I really don't want to deal with that.

03:21PM   23    Q.   Well, I'm just understanding if you -- I'm asking if you

03:21PM   24    understand it.

03:21PM   25    A.   I don't.

03:21PM   1   Q.  You don't understand this exhibit?

03:21PM   2   A.  I'm trying to understand, but I don't.

03:21PM   3           MR. TRIPI:  Objection as to 602, which was my

03:21PM   4   objection at the initial --

03:21PM   5           THE COURT:  I understand.  If she doesn't understand

03:21PM   6   it, then --

03:21PM   7           MR. SOEHNLEIN:  -- then I have to move on, yeah.

03:22PM   8           BY MR. SOEHNLEIN:

03:22PM   9   Q.  Do you understand this exhibit?

03:22PM  10   A.  No.

03:22PM  11   Q.  Okay.  All right.

03:22PM  12           MR. SOEHNLEIN:  Then take it down.

03:22PM  13           BY MR. SOEHNLEIN:

03:22PM  14   Q.  But you do understand that Larry the manager came in with

03:22PM  15   Parrino, right?

03:22PM  16   A.  Yes.

03:22PM  17   Q.  If we're talking about Larry, we're talking about the

03:22PM  18   point in time where Parrino ran the club, correct?

03:22PM  19   A.  Yes.

03:22PM  20   Q.  So, the -- the facts that you shared about coming into

03:22PM  21   work dope sick, and then Larry taking you to a motel, that

03:22PM  22   was on Don Parrino's watch, correct?

03:22PM  23   A.  Yes.

03:22PM  24   Q.  That wouldn't have been on Peter Gerace's watch, correct?

03:22PM  25   A.  Correct.

03:22PM  1  Q.  He wasn't in the club at that time, correct?

03:22PM  2  A.  Correct.

03:22PM  3  Q.  Did the government ever ask you any questions about this?

03:22PM  4  A.  Yes.

03:22PM  5  Q.  Okay.  Little bit, right?

03:22PM  6  A.  Yes.

03:22PM  7  Q.  Okay.  And you'd agree with me that the point in time

03:22PM  8  where you become addicted to drugs at Pharaoh's is 2013,

03:22PM  9  correct?

03:22PM  10 A.  Yes.

03:23PM  11      MR. SOEHNLEIN:  All right.  I want to pivot, Judge.

03:23PM  12 Are we going to take an afternoon break?

03:23PM  13      THE COURT:  How much longer are you going to go?

03:23PM  14      MR. SOEHNLEIN:  Oh, a long time.  A long time.

03:23PM  15      THE COURT:  Then let's take our afternoon break,

03:23PM  16 folks.  Please remember my instructions.  Don't talk with

03:23PM  17 anyone, including each other.  Don't make up your mind.

03:23PM  18      See you back here in about 15 minutes.

03:23PM  19      THE WITNESS:  Judge, what's the latest time I'll be

03:23PM  20 here?

03:23PM  21      THE COURT:  5:30.

03:23PM  22      THE WITNESS:  Okay.

03:23PM  23      (Jury excused at 3:23 p.m.)

03:24PM  24      THE COURT:  Okay.  Anything we need to do before we

03:24PM  25 break?

03:24PM    1          **MR. COOPER:**  Use the bathroom.

03:24PM    2          **THE COURT:**  That would be after we break.

03:24PM    3          **MR. COOPER:**  Sustained.

03:24PM    4          **MR. SOEHNLEIN:**  Nothing here, Judge.

03:24PM    5          **THE COURT:**  Okay.  Thanks.

03:24PM    6          **THE CLERK:**  All rise.

03:24PM    7          (Off the record at 3:24 p.m.)

03:41PM    8          (Back on the record at 3:41 p.m.)

03:41PM    9          (Jury not present.)

03:41PM    10         **THE CLERK:**  All rise.

03:41PM    11         **THE COURT:**  Please be seated.

03:41PM    12         **THE CLERK:**  We are back on the record for the

03:41PM    13    continuation of the jury trial in case numbers 19-cr-227 and

03:41PM    14    23-cr-37, United States of America versus Peter Gerace Jr.

03:41PM    15         All counsel and parties are present.

03:41PM    16         **THE COURT:**  Okay.  Are we ready to go?

03:41PM    17         **MR. SOEHNLEIN:**  Yes.

03:41PM    18         **THE COURT:**  Ready, Mr. Tripi?

03:41PM    19         **MR. TRIPI:**  Yes.

03:41PM    20         **THE COURT:**  Let's get the witness back in.

03:41PM    21         Let's get the jury back in, please.

03:43PM    22         (Jury seated at 3:43 p.m.)

03:43PM    23         **THE COURT:**  The record will reflect that all our

03:43PM    24    jurors are present again.

03:43PM    25         I remind the witness she's still under oath.

| | | |
|---|---|---|
| 03:43PM | 1 | Mr. Soehnlein, you may continue. |
| 03:43PM | 2 | **MR. SOEHNLEIN:**  Thank you, Your Honor. |
| 03:43PM | 3 | **BY MR. SOEHNLEIN:** |
| 03:43PM | 4 | Q.  Good afternoon. |
| 03:43PM | 5 | A.  Good afternoon. |
| 03:43PM | 6 | Q.  I want to tie up one loose end before we go on.  Those |
| 03:43PM | 7 | text messages that we're looking at, those are from |
| 03:43PM | 8 | August 29th of 2023 to April 11th of 2024, correct? |
| 03:43PM | 9 | **MR. TRIPI:**  We'll stipulate to that as being yes, |
| 03:43PM | 10 | Your Honor. |
| 03:43PM | 11 | **THE COURT:**  You want to accept the stipulation? |
| 03:43PM | 12 | **MR. SOEHNLEIN:**  I'll accept the stipulation. |
| 03:43PM | 13 | **THE COURT:**  Great. |
| 03:43PM | 14 | **MR. SOEHNLEIN:**  I just wanted to make sure that was |
| 03:43PM | 15 | clear for the record.  Thank you. |
| 03:43PM | 16 | **BY MR. SOEHNLEIN:** |
| 03:44PM | 17 | Q.  I want to talk to you about the point in time you chose |
| 03:44PM | 18 | to work at Pharaoh's, okay?  So we're going back to when you |
| 03:44PM | 19 | were -- I think were you about 20 years old?  21 years old? |
| 03:44PM | 20 | 18 years old?  How old were you? |
| 03:44PM | 21 | A.  Yeah, 20. |
| 03:44PM | 22 | Q.  Okay.  So you were an adult at that point in time, |
| 03:44PM | 23 | correct? |
| 03:44PM | 24 | A.  Yes. |
| 03:44PM | 25 | Q.  Okay.  And I think you went with some friends, correct? |

03:44PM    1    A.  Yes.

03:44PM    2    Q.  You with A.A.?

03:44PM    3    A.  Yes.

03:44PM    4    Q.  Did you also go with a girl named Rachel?

03:44PM    5    A.  Yes.

03:44PM    6    Q.  Okay.  So the three of you went together to Pharaoh's,

03:44PM    7    correct?

03:44PM    8    A.  Yes.

03:44PM    9    Q.  And you went because you wanted to make money, right?

03:44PM   10    A.  Right.

03:44PM   11    Q.  The money was the draw, correct?

03:44PM   12    A.  Yeah.

03:44PM   13    Q.  Yeah.  And what was going on in your life at that time

03:44PM   14    that you needed quick cash, or that you needed money?

03:44PM   15    A.  Well, it's not that we needed quick cash, it's that we

03:44PM   16    had just graduated high school and we wanted to dance.

03:44PM   17    Q.  Okay.  So you go in, you have an audition with -- I think

03:44PM   18    you had the audition with Brian; is that right?

03:44PM   19    A.  I believe so.

03:45PM   20    Q.  Yeah.  And you go up on stage to do the songs, correct?

03:45PM   21    A.  Yes.

03:45PM   22    Q.  Yeah.  And you -- and then there's a conversation about

03:45PM   23    you potentially being hired, correct?

03:45PM   24    A.  Yeah.

03:45PM   25    Q.  And then Doug hires you, correct?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

202

03:45PM    1    A.  Yes.

03:45PM    2    Q.  Mr. Gerace wasn't at that audition, correct?

03:45PM    3    A.  I didn't see him there.

03:45PM    4    Q.  Okay.  And you had some understanding of what the job was

03:45PM    5    going to entail, correct?

03:45PM    6    A.  Yes.

03:45PM    7    Q.  You knew it was a strip club, correct?

03:45PM    8    A.  Yeah.

03:45PM    9    Q.  And you knew you would be walking around with not a lot

03:45PM    10   of clothes on, correct?

03:45PM    11   A.  Yes.

03:45PM    12   Q.  Okay.  And on that point, I just want to -- I want to

03:45PM    13   understand what it means to be a dancer.

03:45PM    14       So when you are a dancer, you're -- you're engaging with

03:45PM    15   customers, right?

03:45PM    16   A.  Right.

03:45PM    17   Q.  You're -- you are being socially proactive, right?

03:45PM    18   A.  Yes.

03:45PM    19   Q.  You see a guy that's not talking to somebody, you're

03:45PM    20   gonna go talk to them, right?

03:45PM    21   A.  Yes.

03:45PM    22   Q.  And you can choose who you're gonna go talk to, right?

03:45PM    23   A.  Yes.

03:45PM    24   Q.  If there's someone that you don't think is gonna be a

03:45PM    25   very good fit as a customer, you don't have to go talk to

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

203

03:46PM   1    them, right?

03:46PM   2    A.  Right.

03:46PM   3    Q.  But the goal is to earn as much money as possible,

03:46PM   4    correct?

03:46PM   5    A.  Yes.

03:46PM   6    Q.  And the ways that you can earn money, they might talk to

03:46PM   7    you for a little while, and they might give you a tip, right?

03:46PM   8    That happens sometimes?

03:46PM   9    A.  Yes.

03:46PM   10   Q.  And you can go on stage and you can make money on stage,

03:46PM   11   right?

03:46PM   12   A.  Yes.

03:46PM   13   Q.  And you can go back into the VIP area, correct?

03:46PM   14   A.  Yes.

03:46PM   15   Q.  And I guess part of the VIP will be the Champagne Room,

03:46PM   16   right?

03:46PM   17   A.  Yes.

03:46PM   18   Q.  Okay.  So we'll put those two categories together,

03:46PM   19   correct?

03:46PM   20   A.  Yes.

03:46PM   21   Q.  All right.  And then there's an expectation that you're

03:46PM   22   gonna tip out at the end of the night, right?

03:46PM   23   A.  Yes.

03:46PM   24   Q.  Okay.  But there's no set percentage that you have to tip

03:46PM   25   out, right?

03:46PM    1   A.  Not a set percentage, no.

03:46PM    2   Q.  Yeah.  Yeah.  There's an expectation that you're going to

03:46PM    3   be kind, right?

03:46PM    4   A.  Yes.

03:46PM    5   Q.  But you're deciding how much to tip out, right?

03:46PM    6   A.  Yes.

03:46PM    7   Q.  Okay.  That's your decision, correct?

03:46PM    8   A.  Yes.

03:46PM    9   Q.  Okay.  And it's not the case that, you know, you give the

03:46PM   10   doorman a tip, and he says, hey, this isn't enough, or

03:46PM   11   anything like that, right?

03:46PM   12   A.  Right.

03:46PM   13   Q.  Okay.  Now, when you're engaging with those patrons, when

03:47PM   14   you're engaging with those customers, is it fair to say that

03:47PM   15   any patron there is a potential client, right?

03:47PM   16   A.  Yes.

03:47PM   17   Q.  So any patron is potentially someone that's gonna buy a

03:47PM   18   dance from you, correct?

03:47PM   19   A.  Yes.

03:47PM   20   Q.  So you're trying to be pleasant, right?

03:47PM   21   A.  Yes.

03:47PM   22   Q.  Correct?  And you're trying to be engaging, correct?

03:47PM   23   A.  Yes.  Yes.

03:47PM   24   Q.  You're trying to be nice, right?

03:47PM   25   A.  Yes.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

205

03:47PM   1    Q.  You're not standoffish?

03:47PM   2    A.  Right.

03:47PM   3    Q.  And when somebody does express an interest in getting a

03:47PM   4    dance, you are trying to make them believe that you are

03:47PM   5    interested in them, correct?

03:47PM   6    A.  For the most part.

03:47PM   7    Q.  Yeah.

03:47PM   8    A.  I mean, there's many different situations.  People just

03:47PM   9    come in lonely --

03:47PM  10    Q.  Yeah.

03:47PM  11    A.  -- you know, and just want to talk.

03:47PM  12    Q.  Okay.  But you are trying to communicate to them that you

03:47PM  13    want to be with them, right?

03:47PM  14    A.  Not be with them.  I would like to take a dance from

03:47PM  15    them.

03:47PM  16    Q.  Okay.  And part of that entails some degree of

03:47PM  17    communication that that's something you want to do, right?

03:48PM  18    A.  Right.

03:48PM  19    Q.  Okay.  You're representing to them, hey, I would like you

03:48PM  20    to take me in the back for a dance, right?

03:48PM  21    A.  Yes.

03:48PM  22    Q.  I would like you to tip me when I'm on stage, correct?

03:48PM  23    A.  Right.

03:48PM  24    Q.  All right.  That's what you were trying to communicate to

03:48PM  25    the people who are around you at Pharaoh's Gentlemen's Club

03:48PM    1    when you're working there as a dancer, correct?

03:48PM    2    A.  Yes.

03:48PM    3    Q.  And that's the way that you conducted yourself when you

03:48PM    4    were working there, correct?

03:48PM    5    A.  Yes.

03:48PM    6    Q.  Right?  You weren't walking around telling people, no,

03:48PM    7    don't talk to me, or making frown faces at them or anything

03:48PM    8    like that, right?

03:48PM    9    A.  Right.

03:48PM    10   Q.  You're walking around and you're smiling and you're

03:48PM    11   engaging, correct?

03:48PM    12   A.  Yes.

03:48PM    13   Q.  And you're kind of flirty, correct?

03:48PM    14   A.  Yes.

03:48PM    15   Q.  Okay.  Now, I want to also talk to you about this

03:48PM    16   individual that you said was named Scooter.  Do you recall

03:48PM    17   the testimony about Scooter?

03:48PM    18   A.  Yes.

03:49PM    19   Q.  Now your testimony is Scooter was a drug dealer, correct?

03:49PM    20   A.  Yes.

03:49PM    21   Q.  And I think your testimony was that you saw him at the

03:49PM    22   bar at Pharaoh's, correct?

03:49PM    23   A.  Yes.

03:49PM    24   Q.  Okay.  And you never saw him in the upstairs, correct?

03:49PM    25   A.  Correct.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

207

03:49PM   1   Q.  Okay.  And you never saw him exchange money with

03:49PM   2   Mr. Gerace, correct?

03:49PM   3   A.  Correct.

03:49PM   4   Q.  Okay.  And, in fact, you never saw Mr. Gerace exchange

03:49PM   5   money for any drugs; isn't that correct?

03:49PM   6   A.  Correct.

03:49PM   7   Q.  Okay.  And so, Scooter, to some -- strike that.

03:49PM   8       Scooter appeared to be a normal patron, right?

03:49PM   9   A.  Yes.

03:49PM  10   Q.  He wasn't wearing a billboard sign that said I'm a drug

03:49PM  11   dealer, right?

03:49PM  12   A.  Correct.

03:49PM  13   Q.  He looked like a normal guy sitting at the bar, correct?

03:49PM  14   A.  Yes.

03:49PM  15   Q.  And Pharaoh's is a customer service establishment,

03:49PM  16   correct?

03:49PM  17   A.  Yes.

03:49PM  18   Q.  So you observed other -- strike that.

03:49PM  19       You observed managers and other staff members interact

03:49PM  20   with customers, correct?

03:49PM  21   A.  Yes.

03:49PM  22   Q.  And they generally tried to provide customers with

03:49PM  23   customer service, correct?

03:49PM  24   A.  Yes.

03:49PM  25   Q.  Okay.  They would go up to customers and they would ask

03:50PM    1    how they're doing, correct?

03:50PM    2    A.   Yes.

03:50PM    3    Q.   They'd go up to customers and they'd ask if they needed

03:50PM    4    anything, correct?

03:50PM    5    A.   Yes.

03:50PM    6    Q.   And you saw Mr. Gerace do the same things, correct?

03:50PM    7    A.   Yes.

03:50PM    8    Q.   Because Mr. Gerace was the owner, right?

03:50PM    9    A.   Yes.

03:50PM   10    Q.   So it was common for him to kind of do a lap around the

03:50PM   11    room and talk to everybody in the room, correct?

03:50PM   12    A.   Yes.

03:50PM   13    Q.   That's part of being the owner?

03:50PM   14    A.   Right.

03:50PM   15    Q.   Okay.  And when we're talking about Mr. Gerace and

03:50PM   16    observing Mr. Gerace interacting with people at the bar,

03:50PM   17    that's what you're talking about, right?

03:50PM   18    A.   Yes.

03:50PM   19    Q.   Okay.  Now I want to talk to you a little bit about --

03:50PM   20    you -- you said you wanted to be one of the favorites,

03:50PM   21    correct; do you recall that testimony?

03:50PM   22    A.   Yeah.

03:50PM   23    Q.   Okay.  And so my understanding is you viewed that there

03:50PM   24    was -- there were certain girls that were shown favoritism,

03:50PM   25    correct?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

03:50PM    1    A.  Yes.

03:50PM    2    Q.  And there were certain girls that maybe were looked upon

03:50PM    3    in a better light by Mr. Gerace, or other people that were

03:50PM    4    running the club, correct?

03:50PM    5    A.  Yes.

03:50PM    6    Q.  Okay.  And in your view, that had to do with what they

03:51PM    7    were willing to do for the club, correct?

03:51PM    8    A.  Yes.

03:51PM    9    Q.  Now, you were aware that Pharaoh's had a golf tournament?

03:51PM   10    A.  Correct.

03:51PM   11    Q.  Now you never went to the golf tournament, right?

03:51PM   12    A.  Right.

03:51PM   13    Q.  You never knew what went on there, correct?

03:51PM   14    A.  I was just told by the girls.

03:51PM   15    Q.  Right.  And that's -- that would be just be hearsay,

03:51PM   16    right?

03:51PM   17    A.  Right.

03:51PM   18    Q.  You don't have any personal knowledge of that, correct?

03:51PM   19    A.  No.

03:51PM   20    Q.  You have no idea what actually happened there, correct?

03:51PM   21    A.  Right.

03:51PM   22    Q.  Okay.  But you did know there was a golf tournament that

03:51PM   23    was kind of a big deal, right?

03:51PM   24    A.  Yes.

03:51PM   25    Q.  Correct?  And they wanted the girls to work that golf

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

210

| | | |
|---|---|---|
| 03:51PM | 1 | tournament, right? |
| 03:51PM | 2 | A.  Yes. |
| 03:51PM | 3 | Q.  It was important for Pharaoh's, correct? |
| 03:51PM | 4 | A.  Yes. |
| 03:51PM | 5 | Q.  And you were asked to work that golf tournament, correct? |
| 03:51PM | 6 | A.  Yes. |
| 03:51PM | 7 | Q.  Every year that you were there, right? |
| 03:51PM | 8 | A.  Yes. |
| 03:51PM | 9 | Q.  Correct?  And you always declined, right? |
| 03:51PM | 10 | A.  Yes. |
| 03:51PM | 11 | Q.  You made the decision that even though Pharaoh's wants me |
| 03:51PM | 12 | to do this thing, I don't want to do it, correct? |
| 03:51PM | 13 | A.  Right. |
| 03:51PM | 14 | Q.  And even though you declined, you weren't fired, right? |
| 03:51PM | 15 | A.  Right. |
| 03:51PM | 16 | Q.  You were allowed to work there, correct? |
| 03:51PM | 17 | A.  Yes. |
| 03:51PM | 18 | Q.  You weren't punished in any way, right? |
| 03:51PM | 19 | A.  Right. |
| 03:51PM | 20 | Q.  Even though you understood that that was important for |
| 03:51PM | 21 | the club, correct? |
| 03:51PM | 22 | A.  Yes. |
| 03:51PM | 23 | Q.  Right?  It was a big deal around the club, wasn't it? |
| 03:52PM | 24 | A.  Yes. |
| 03:52PM | 25 | Q.  Everybody was talking about it, right? |

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

211

03:52PM        1    A.  Yes.

03:52PM        2    Q.  It was a big annual event, correct?

03:52PM        3    A.  Yes.

03:52PM        4    Q.  People would circle that on their calendars, right?

03:52PM        5    A.  Yeah.

03:52PM        6    Q.  All right.  And you understood -- strike that.

03:52PM        7        You had an opinion that it was important to Mr. Gerace,

03:52PM        8    right?

03:52PM        9    A.  Yes.

03:52PM       10    Q.  Okay.  And you chose not to do it, correct?

03:52PM       11    A.  Correct.

03:52PM       12    Q.  You didn't want to work the golf tournament, right?

03:52PM       13    A.  Right.

03:52PM       14    Q.  Okay.  And -- and you didn't have any sort of punishment

03:52PM       15    for not working the golf tournament, correct?

03:52PM       16    A.  Correct.

03:52PM       17    Q.  Yeah.  Okay.  Now, earlier we talked about some of the

03:52PM       18    decision making when you're addicted; do you recall that

03:52PM       19    testimony?

03:52PM       20    A.  Yes.

03:52PM       21    Q.  And we agreed, I think, that even though you're addicted

03:52PM       22    to narcotics, you can still make decisions, correct?

03:52PM       23    A.  Yes.

03:52PM       24    Q.  Yeah.  And we talked about when you were addicted to

03:52PM       25    narcotics, at times you made decisions to go to rehab,

| | | |
|---|---|---|
| 03:52PM | 1 | correct? |
| 03:52PM | 2 | A.  Yes. |
| 03:52PM | 3 | Q.  Now, there was also times when rehab was presented to |
| 03:52PM | 4 | you, and you made a decision not to go; is that correct? |
| 03:53PM | 5 | A.  Yes. |
| 03:53PM | 6 | Q.  Right?  There was an incident in June of 2016 where you |
| 03:53PM | 7 | had overdosed, correct? |
| 03:53PM | 8 | A.  Yes. |
| 03:53PM | 9 | MR. TRIPI:  Objection. |
| 03:53PM | 10 | BY MR. SOEHNLEIN: |
| 03:53PM | 11 | Q.  And that was outside the club -- |
| 03:53PM | 12 | THE COURT:  Hold on.  Hold on. |
| 03:53PM | 13 | MR. TRIPI:  These are objections based on Rule 608 |
| 03:53PM | 14 | and 609, Your Honor, if you would like to hear argument. |
| 03:53PM | 15 | THE COURT:  Sure.  Come on up. |
| 03:53PM | 16 | (Sidebar discussion held on the record.) |
| 03:53PM | 17 | MR. TRIPI:  I get that the he's entitled to some |
| 03:53PM | 18 | broad latitude on cross in the area of bias, but bias doesn't |
| 03:53PM | 19 | swallow the rules in terms of Rule 608 and 609. |
| 03:53PM | 20 | So, whether she got arrested and chose not to -- in |
| 03:53PM | 21 | 2016 and chose not to go to rehab is -- it's, A, not relevant, |
| 03:53PM | 22 | B, it's not impeaching in any way.  Right?  And C -- |
| 03:53PM | 23 | MR. SOEHNLEIN:  If I -- |
| 03:53PM | 24 | MR. TRIPI:  Sorry, if I can just finish. |
| 03:53PM | 25 | -- and C, like, the last part of that, Judge, would |

03:53PM   1   be not going to rehab has nothing to do with one's credibility

03:54PM   2   or veracity.  And so --

03:54PM   3        And an arrest certainly doesn't qualify for something

03:54PM   4   you can cross-examine on for those purposes.  So that's my 608

03:54PM   5   and 609 objection.

03:54PM   6        **MR. SOEHNLEIN:**  So I thought that I didn't mention

03:54PM   7   the arrest in the question, I said overdose.

03:54PM   8        And the reason I'm offering it is to demonstrate that

03:54PM   9   she can make decisions, which goes to the coercion at that

03:54PM  10   point in time.

03:54PM  11        **MR. TRIPI:**  He did reference an arrest.

03:54PM  12        **MR. SOEHNLEIN:**  It's not in -- it's not in the

03:54PM  13   transcript, Judge.

03:54PM  14        **MR. TRIPI:**  If I misheard it, I misheard it.

03:54PM  15        **THE COURT:**  There were also, as I see it, there were

03:54PM  16   also times when rehab was presented to you, and you made a

03:54PM  17   decision not to go; is that correct?  Yes.

03:54PM  18        Right.  There was an incident in June of 2016 where

03:55PM  19   you had overdosed, correct?  Yes.

03:55PM  20        Objection.

03:55PM  21        **MR. TRIPI:**  I think I heard arrest in that question.

03:55PM  22        **THE COURT:**  Ann, did he say arrest?

03:55PM  23        **COURT REPORTER:**  No, Judge.

03:55PM  24        **MR. TRIPI:**  He said incident, my brain said arrest,

03:55PM  25   that's okay.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

214

03:55PM   1          THE COURT:  No, no, that's fine, Mr. Tripi.  And I'm

03:55PM   2   not suggesting you made it up.  I'm just saying I didn't hear

03:55PM   3   it, Ann didn't hear it, Mr. Soehnlein didn't say it.

03:55PM   4          MR. TRIPI:  Fair enough.

03:55PM   5          MR. SOEHNLEIN:  Yeah.  And I messed up earlier, too,

03:55PM   6   so, you know --

03:55PM   7          (End of sidebar discussion.)

03:55PM   8          THE COURT:  Okay.  The objection is overruled.

03:55PM   9          BY MR. SOEHNLEIN:

03:55PM   10  Q.  So there was an incident in June of 2016 where you

03:55PM   11  overdosed; do you recall that?

03:55PM   12  A.  Yes.

03:55PM   13  Q.  Okay.  And that was outside the club, correct?

03:55PM   14  A.  Yes.

03:55PM   15  Q.  It wasn't at Pharaoh's, correct?

03:55PM   16  A.  Correct.

03:55PM   17  Q.  Okay.  And you were taken to ECMC, correct?

03:55PM   18  A.  Yes.

03:55PM   19  Q.  You were Narcanned, correct?

03:55PM   20  A.  Yes.

03:55PM   21  Q.  And at ECMC, the option to go to rehab was presented to

03:55PM   22  you, correct?

03:55PM   23  A.  Not at ECMC.

03:55PM   24  Q.  You don't recall that, do you?

03:56PM   25          MR. SOEHNLEIN:  Can we show the witness 3571C,

03:56PM    1    please.

03:56PM    2            **THE COURT:**  Hang on.

03:56PM    3            **MR. TRIPI:**  Can we get an answer to that?

03:56PM    4            **THE COURT:**  No, we didn't get an answer.

03:56PM    5            **MR. SOEHNLEIN:**  I'm sorry.

03:56PM    6            **THE WITNESS:**  Yeah, let me see.

03:56PM    7            **BY MR. SOEHNLEIN:**

03:56PM    8    Q.  Okay.  You want to see the exhibit?

03:56PM    9    A.  Yeah.

03:56PM   10            **MR. SOEHNLEIN:**  All right.  Can we show her 3571C,

03:56PM   11    please.

03:56PM   12            **MR. TRIPI:**  Witness only.

03:56PM   13            **MR. SOEHNLEIN:**  Witness only, yes.

03:56PM   14            **BY MR. SOEHNLEIN:**

03:56PM   15    Q.  And what I want you to do is read through the exhibit.

03:56PM   16    When you've got a good sense of it, let us know, and then

03:56PM   17    I'll ask you questions.  Okay?

03:56PM   18       Oh, yeah, and you're going to have to let Ms. Champoux

03:56PM   19    know when you're ready to scroll to the next page, unless you

03:56PM   20    can scroll up there.

03:56PM   21    A.  Oh.  I don't think -- no.  Whoa, I just wrote a big red

03:56PM   22    line.

03:56PM   23            **MR. SOEHNLEIN:**  Sorry, can you move it to page 2?

03:56PM   24    The first page is just the record certification.

03:56PM   25            **THE WITNESS:**  Okay.

| | | |
|---|---|---|
| 03:56PM | 1 | **BY MR. SOEHNLEIN:** |
| 03:56PM | 2 | Q.  When you're done with that page, let her know so you can |
| 03:57PM | 3 | go to the next page and next page.  Review the record. |
| 03:57PM | 4 | A.  I don't really understand -- |
| 03:57PM | 5 | **THE COURT:**  Hang on. |
| 03:57PM | 6 | **BY MR. SOEHNLEIN:** |
| 03:57PM | 7 | Q.  There's not a question pending.  Just if -- when you're |
| 03:57PM | 8 | done reviewing it, let me know, and then we'll ask questions, |
| 03:57PM | 9 | okay?  But I want you to read the whole exhibit, okay.  Or at |
| 03:57PM | 10 | least review it. |
| 03:57PM | 11 | A.  Okay. |
| 03:57PM | 12 | **MR. SOEHNLEIN:**  Okay.  If you can keep going, |
| 03:57PM | 13 | Ms. Champoux. |
| 03:58PM | 14 | **THE WITNESS:**  Okay. |
| 03:58PM | 15 | **MR. SOEHNLEIN:**  Okay.  Next page, too, Ms. Champoux, |
| 03:58PM | 16 | please. |
| 03:58PM | 17 | **THE WITNESS:**  Okay. |
| 03:58PM | 18 | **MR. SOEHNLEIN:**  Okay.  You got it? |
| 03:58PM | 19 | We can take that down, Ms. Champoux. |
| 03:58PM | 20 | **BY MR. SOEHNLEIN:** |
| 03:58PM | 21 | Q.  Did that refresh your memory -- |
| 03:58PM | 22 | A.  Yes. |
| 03:58PM | 23 | Q.  -- of June 2016?  Okay.  So there was an incident where |
| 03:58PM | 24 | you overdosed, correct? |
| 03:58PM | 25 | A.  Yes. |

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

217

03:58PM   1   Q.  And they took you to ECMC, correct?

03:58PM   2   A.  Correct.

03:58PM   3   Q.  And they wanted you to stay there for some treatment,

03:58PM   4   correct?

03:58PM   5   A.  No, that is not what they wanted.

03:58PM   6   Q.  Okay.

03:58PM   7   A.  They wanted me to stay for four to eight hours until all

03:58PM   8   the Narcan wore off of me.  You cannot just sign out.

03:58PM   9   Q.  Okay.

03:59PM  10   A.  So that's what happened.  They didn't -- because it even

03:59PM  11   said that I was going Pennsylvania that day to go to rehab.

03:59PM  12   Q.  Okay.  And you chose to check out of the hospital against

03:59PM  13   medical advice, correct?

03:59PM  14   A.  Yes.

03:59PM  15   Q.  You made the conscious decision I don't want to be here

03:59PM  16   anymore, I'm gonna getaway from here, correct?

03:59PM  17   A.  Yes.

03:59PM  18   Q.  And is it your recollection was because you were going to

03:59PM  19   go to rehab?

03:59PM  20   A.  Yes.

03:59PM  21   Q.  So this overdose occurred, you were kind of going heavy

03:59PM  22   on the narcotics that day because you knew that you were

03:59PM  23   gonna go and try to stop using in the near future?

03:59PM  24   A.  Yes.

03:59PM  25   Q.  And that was another decision that you had made, correct?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24
218

03:59PM     1    A.  Right.

03:59PM     2    Q.  Okay.  So just to understand your decisionmaking at that

03:59PM     3    time, you had chose to go to rehab, correct?  Correct?

03:59PM     4    A.  Yes.

03:59PM     5    Q.  That was in 2016, correct?

03:59PM     6    A.  Yes.

03:59PM     7    Q.  That was when you were working at Pharaoh's, correct?

03:59PM     8    A.  Yes.

03:59PM     9    Q.  And that was your decision, correct?

03:59PM    10    A.  Yes.

03:59PM    11    Q.  And you chose to use heavy because you were going to

03:59PM    12    rehab, correct?

03:59PM    13    A.  Yes.

04:00PM    14    Q.  And that was your decision, correct?

04:00PM    15    A.  Yes.

04:00PM    16    Q.  And then you overdosed, correct?

04:00PM    17    A.  Yes.

04:00PM    18    Q.  And you overdosed outside of the club, correct?

04:00PM    19    A.  Yes.

04:00PM    20    Q.  And you were taken to the hospital, correct?

04:00PM    21    A.  Yes.

04:00PM    22    Q.  And you were given Narcan, correct?

04:00PM    23    A.  Yes.

04:00PM    24    Q.  And the hospital wanted you to stay longer, correct?

04:00PM    25    A.  Yes.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

219

04:00PM  1  Q.  They advised that you stay another two days, correct?

04:00PM  2  A.  Two hours.

04:00PM  3  Q.  Oh, I'm sorry, they advised that you stay another two

04:00PM  4  hours, correct?

04:00PM  5  A.  Yes.

04:00PM  6  Q.  And you chose to leave the hospital against medical

04:00PM  7  advice, correct?

04:00PM  8  A.  Yeah.  Because I knew two hours wasn't gonna do nothing.

04:00PM  9  Q.  Okay.  And those were all decisions that you were making

04:00PM  10  at that point in time in June of 2016, correct?

04:00PM  11  A.  Yes.

04:00PM  12  Q.  All right.  Decisions that you made on your own, correct?

04:00PM  13  A.  Yes.

04:00PM  14  Q.  Okay.  Even though you were addicted to drugs, correct?

04:00PM  15  A.  Yes.

04:00PM  16  Q.  Okay.  You still had that agency that you could choose

04:00PM  17  for yourself, correct?

04:00PM  18  A.  Yes.

04:00PM  19  Q.  Yes.  You could still make decisions for yourself,

04:00PM  20  correct?

04:00PM  21  A.  Yes.

04:00PM  22  Q.  Okay.  I want to ask you some questions about that

04:00PM  23  gentleman named Joe Barsuk; do you recall that gentleman?

04:01PM  24  A.  Yes.

04:01PM  25  Q.  Okay.  Now, I think your testimony was he was a former

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

220

04:01PM    1    chiropractor, correct?

04:01PM    2    A.   Yes.

04:01PM    3    Q.   And he was kind of a regular at Pharaoh's, correct?

04:01PM    4    A.   Yes.

04:01PM    5    Q.   Okay.  And there came a time where you developed a

04:01PM    6    relationship with him in the VIP Room, correct?

04:01PM    7    A.   Yes.

04:01PM    8    Q.   And in the VIP Room, it's your testimony that he's

04:01PM    9    tipping Brian Rosenthal a large sum of money to look the

04:01PM    10   other way, correct?

04:01PM    11   A.   Yes.

04:01PM    12   Q.   Okay.  And that's consistent with your other testimony in

04:01PM    13   the VIP, correct?

04:01PM    14   A.   Yes.

04:01PM    15   Q.   So Mr. Casey is also tipping Mr. Rosenthal a high amount

04:01PM    16   of money, correct?

04:01PM    17   A.   Yes.

04:01PM    18   Q.   And other patrons are also tipping Mr. Rosenthal a high

04:01PM    19   amount of money, correct?

04:01PM    20   A.   Yes.

04:01PM    21   Q.   Okay.  Now Mr. Rosenthal is paid by Mr. Gerace to watch

04:01PM    22   the cameras, correct?

04:01PM    23   A.   Supposed to.

04:01PM    24   Q.   And in that situation, he's paid to watch the cameras,

04:01PM    25   correct?

04:01PM    1    A.  Yes.

04:01PM    2    Q.  That's his job, right?

04:01PM    3    A.  Right.

04:02PM    4    Q.  To keep the VIP safe, correct?

04:02PM    5    A.  Yes.

04:02PM    6    Q.  And here, and you a patron are agreeing that he should be

04:02PM    7    paid more to look the other way, correct?

04:02PM    8    A.  Yes.

04:02PM    9    Q.  When you went back in the VIP, that's what you wanted to

04:02PM   10    have happen, correct?

04:02PM   11    A.  I didn't want that, but I needed that.

04:02PM   12    Q.  Well, hold on, hold on.

04:02PM   13        There's, you had testimony about Mr. Casey; do you recall

04:02PM   14    that testimony?

04:02PM   15    A.  Yes.

04:02PM   16    Q.  Okay.  And you recall that you went back in the VIP with

04:02PM   17    him, along with A.A., correct?

04:02PM   18    A.  Yes.

04:02PM   19    Q.  And Mr. Casey wanted to do something where he was doing a

04:02PM   20    sex act with both of you at the same time, correct?

04:02PM   21    A.  Right.

04:02PM   22    Q.  And I think he offered you -- I think it was $1,000; is

04:02PM   23    that correct?

04:02PM   24    A.  Yes.

04:02PM   25    Q.  And you wanted the $1,000, correct?

04:02PM  1   A.  Yes.

04:02PM  2   Q.  And so you agreed to engage in the sex act, correct?

04:02PM  3   A.  Yes.

04:02PM  4   Q.  And you had an understanding that Brian would be paid off

04:02PM  5   to look the other way, correct?

04:02PM  6   A.  Yes.

04:02PM  7   Q.  Brian would be paid not to do his job, correct?

04:02PM  8   A.  Yeah.

04:02PM  9   Q.  Brian would be paid to violate his obligations to

04:02PM  10  Mr. Gerace, correct?

04:02PM  11  A.  Yes.

04:02PM  12          **MR. TRIPI:**  Objection.

04:02PM  13          **BY MR. SOEHNLEIN:**

04:02PM  14  Q.  And that's --

04:02PM  15          **THE COURT:**  Stop, stop, stop, stop, stop.

04:02PM  16          **MR. TRIPI:**  Objection.  602, personal knowledge.

04:03PM  17          **THE COURT:**  No, overruled.

04:03PM  18          **BY MR. SOEHNLEIN:**

04:03PM  19  Q.  Brian was paid not to do his job, correct?

04:03PM  20  A.  Yes.

04:03PM  21  Q.  And that was something that you wanted to have happen,

04:03PM  22  correct?

04:03PM  23  A.  Yes.

04:03PM  24  Q.  Because you wanted the money, correct?

04:03PM  25  A.  Wait.  Time out.  I -- I'm having a mental block.

04:03PM  1   Q.  Just "yes" or "no."  Yes, no, or I don't know.

04:03PM  2            **MR. TRIPI:**  Objection.  She's allowed to answer.  She

04:03PM  3   said time out, she's thinking.

04:03PM  4            **THE WITNESS:**  Right.

04:03PM  5            **MR. TRIPI:**  Don't shove another question down her

04:03PM  6   throat.

04:03PM  7            **THE WITNESS:**  Yeah, he's going really fast.

04:03PM  8            **THE COURT:**  Okay.  Look it, the jury will strike the

04:03PM  9   trying to shove another question down her throat.

04:03PM  10           **MR. TRIPI:**  I apologize.

04:03PM  11           **THE COURT:**  That's okay.  The jury will strike that.

04:03PM  12           **THE WITNESS:**  Or maybe if you could just --

04:03PM  13           **THE COURT:**  Ma'am, stop.

04:03PM  14           If you want a yes-or-no answer, you can tell the

04:03PM  15   witness I want "yes," "no," or "I can't answer yes or no."

04:03PM  16           Otherwise, give her time to think about it and let

04:03PM  17   her answer.  Okay?

04:03PM  18           **MR. SOEHNLEIN:**  Thank you.

04:03PM  19           **THE COURT:**  Next question.  The question is

04:03PM  20   withdrawn.  New question.

04:03PM  21           **BY MR. SOEHNLEIN:**

04:03PM  22   Q.  Okay.  I think you gave testimony both in the grand jury

04:04PM  23   and earlier that you wanted money to get drugs, correct?

04:04PM  24   A.  Yes.

04:04PM  25   Q.  That's what you wanted to have happen at that point in

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

04:04PM    1    time, correct?

04:04PM    2    A.  When I was dancing?

04:04PM    3    Q.  Yeah.

04:04PM    4    A.  Yeah.

04:04PM    5    Q.  Okay.  And you also understood that if Brian, the VIP

04:04PM    6    attendant, was doing his job correctly, he would not have

04:04PM    7    allowed sex acts to happen in the VIP, correct?

04:04PM    8    A.  Correct.

04:04PM    9    Q.  And when you went back to have sex acts --or, to perform

04:04PM    10   sex acts in the VIP, you knew that he was being paid to look

04:04PM    11   the other way, correct?

04:04PM    12   A.  Yes.

04:04PM    13   Q.  Yeah.  Now, when you were talking about Mr. Casey and

04:04PM    14   Mr. Barsuk, Mr. Gerace was not part of any of those

04:04PM    15   conversations, correct?

04:04PM    16   A.  No.

04:04PM    17   Q.  In fact, you had testimony in the grand jury that

04:04PM    18   Mr. Gerace was rarely there, correct?

04:04PM    19   A.  Correct.

04:04PM    20   Q.  He wasn't really around, right?

04:05PM    21        **MR. TRIPI:**  Objection as to hearsay.  Move to strike.

04:05PM    22   Improper impeachment.  You had testimony in grand jury -- he

04:05PM    23   went quick, so I'm objecting and moving to strike, it's

04:05PM    24   hearsay.

04:05PM    25        **THE COURT:**  The question -- the testimony in the

04:05PM    1    grand jury, yes, so that is sustained.

04:05PM    2         The jury will strike the question and answer about

04:05PM    3    testimony in the grand jury.

04:05PM    4         Next question.

04:05PM    5         **BY MR. SOEHNLEIN:**

04:05PM    6    Q.  Mr. Gerace was rarely there, correct?

04:05PM    7    A.  Correct.

04:05PM    8    Q.  Yeah.  He hired other people to work the club, correct?

04:05PM    9    A.  Yes.

04:05PM   10    Q.  To include managers, correct?

04:05PM   11    A.  Yes.

04:05PM   12    Q.  To include VIP attendants, correct?

04:05PM   13    A.  Yes.

04:05PM   14    Q.  To include bartenders, correct?

04:05PM   15    A.  Yes.

04:05PM   16    Q.  Okay.  And he was paying those people to do their job,

04:05PM   17    correct?

04:05PM   18    A.  Yes.

04:05PM   19    Q.  Okay.  And this VIP scenario that you're talking about

04:05PM   20    included paying the VIP attendant more not to do his job,

04:05PM   21    correct?

04:05PM   22    A.  Yes.

04:05PM   23    Q.  Okay.  Now I think we talked earlier that that you were

04:06PM   24    fired from Pharaoh's multiple times in connection with drug

04:06PM   25    use, correct?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24
226

04:06PM    1    A.  Yes.

04:06PM    2    Q.  Okay.  And -- and that you went to rehab and that you

04:06PM    3    came back, correct?

04:06PM    4    A.  Yes.

04:06PM    5    Q.  Yes?  And when you came back from rehab, you told them

04:06PM    6    that you had been to rehab, correct?

04:06PM    7    A.  Not every single time, I didn't tell them I went in.  But

04:06PM    8    you could just tell my by appearance.

04:06PM    9    Q.  Okay.  You looked better, right?

04:06PM   10    A.  Yep.

04:06PM   11    Q.  You looked healthy?

04:06PM   12    A.  Yes.

04:06PM   13    Q.  You looked drug free, right?

04:06PM   14    A.  Yes.

04:06PM   15    Q.  You were clear minded?

04:06PM   16    A.  Yes.

04:06PM   17    Q.  You were more focused --

04:06PM   18    A.  Yes.

04:06PM   19    Q.  -- correct?  And you were able to answer whatever

04:06PM   20    questions they had, correct?

04:06PM   21    A.  Yes.

04:06PM   22    Q.  Okay.  Now, there did come a time where your locker was

04:06PM   23    searched and drugs were found, correct?

04:06PM   24    A.  Yes.

04:06PM   25    Q.  Okay.  And what drugs were found in your locker?

04:06PM  1    A.  I'm not sure.  It was heroin and cocaine, or one or the

04:07PM  2    other.

04:07PM  3    Q.  Okay.  But there was at least one time where lockers were

04:07PM  4    searched, and they found drugs in yours?

04:07PM  5    A.  Yes.

04:07PM  6    Q.  Okay.  And that was in connection with an incident where

04:07PM  7    you were fired, correct?

04:07PM  8    A.  Yes.

04:07PM  9    Q.  Okay.  So they search your locker, right?  Correct?

04:07PM  10   A.  Yeah.

04:07PM  11   Q.  They find heroin and cocaine, correct?

04:07PM  12   A.  Yes.

04:07PM  13   Q.  They fired you, correct?

04:07PM  14   A.  Yes.

04:07PM  15   Q.  Okay.  You go to rehab, correct?

04:07PM  16   A.  Yes.

04:07PM  17   Q.  You come back to the club, correct?

04:07PM  18   A.  Yes.

04:07PM  19   Q.  And then you start working again, correct?

04:07PM  20   A.  Yes.

04:07PM  21   Q.  Okay.  And that's how it worked, right?

04:07PM  22   A.  Yes.

04:07PM  23   Q.  It was just a revolving door, correct?

04:07PM  24   A.  Yes.

04:07PM  25   Q.  Okay.  Now, you also were trying to hide your drug use

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

04:07PM  1   while you were working at the club, correct?

04:07PM  2   A.   Yes.

04:07PM  3   Q.   Yeah.  You were putting makeup on your track marks,

04:07PM  4   correct?

04:07PM  5   A.   Yes.

04:07PM  6   Q.   And you were trying use -- wear clothing that would cover

04:07PM  7   your arms, correct?

04:07PM  8   A.   Yes.

04:07PM  9   Q.   And your legs sometimes, correct?

04:07PM  10  A.   Yes.

04:07PM  11  Q.   And when you spoke with customers, you didn't tell them

04:07PM  12  that you were addicted, right?

04:07PM  13  A.   Right.

04:07PM  14  Q.   Okay.  You tried hard not to make that obvious, correct?

04:07PM  15  A.   Right.

04:08PM  16  Q.   Okay.  Because you understood that people might not want

04:08PM  17  to pay for a dance with an addicted dancer, right?

04:08PM  18  A.   Correct.

04:08PM  19  Q.   Okay.  So you had a vested interest in doing that,

04:08PM  20  correct?

04:08PM  21  A.   Yes.

04:08PM  22  Q.   But you're still trying to cover it up from everybody,

04:08PM  23  right?

04:08PM  24  A.   Yes.

04:08PM  25  Q.   When you're using drugs at the club, you're using them in

04:08PM    1    private areas, correct?

04:08PM    2    A.   Not always.

04:08PM    3    Q.   Well, you're primarily using it in the locker room or the

04:08PM    4    bathroom off the locker room, correct?

04:08PM    5    A.   Yeah.

04:08PM    6    Q.   Yeah.  There's no cameras in there, right?

04:08PM    7    A.   Right.

04:08PM    8    Q.   Because those are women's changing and women's bathrooms

04:08PM    9    area, right.

04:08PM   10    A.   Yes.

04:08PM   11    Q.   Women wouldn't want to work there if there were cameras

04:08PM   12    there, right?

04:08PM   13    A.   Correct.

04:08PM   14    Q.   You wouldn't want to work there if there were cameras

04:08PM   15    there, right?

04:08PM   16    A.   Yes.

04:08PM   17    Q.   It would be an invasion of privacy, correct?

04:08PM   18    A.   Yes.

04:08PM   19    Q.   But that's where you were choosing to use drugs, correct?

04:08PM   20    A.   Yes.

04:08PM   21    Q.   Because you didn't want people to know, correct?

04:08PM   22    A.   Correct.

04:08PM   23    Q.   Because you knew there would be adverse consequences if

04:08PM   24    they found out, correct?

04:08PM   25    A.   Yeah.

04:08PM  1   Q.  Just like when they searched your locker and they fired

04:08PM  2   you, right?

04:08PM  3   A.  Yes.

04:08PM  4   Q.  Okay.  Now, there was a point in time in the summer of

04:09PM  5   2023 where you were interacting with the government before

04:09PM  6   you had that cocaine slipup; do you recall that period of

04:09PM  7   time?

04:09PM  8   A.  No.

04:09PM  9   Q.  You -- you don't recall, so it's that period of time in

04:09PM  10  connection with some of those text messages that we saw

04:09PM  11  earlier with Special Agent Burns; do you recall that?

04:09PM  12  A.  Yes.

04:09PM  13  Q.  Okay.  And at that point in time, you weren't receiving

04:09PM  14  any government benefits, correct?

04:09PM  15  A.  When?

04:09PM  16  Q.  So I'm talking about July of 2023.

04:09PM  17  A.  July 2023, I wasn't receiving -- I was receiving my

04:09PM  18  Section 8 was getting on, and my -- I had food stamps.

04:09PM  19  Q.  Okay.  But you weren't receiving funding directly from

04:10PM  20  the U.S. Attorney's Office or the FBI, correct?

04:10PM  21  A.  Correct.

04:10PM  22  Q.  Okay.  Now, you did share with the government that at

04:10PM  23  that point in time you and your significant other, Jeff, were

04:10PM  24  engaged in a Medicaid cab scheme; do you recall that?

04:10PM  25  A.  Yes.

04:10PM    1    Q.  Okay.  And that was a scheme where you and him were

04:10PM    2    taking medical cab rides, correct?

04:10PM    3    A.  Yes.

04:10PM    4    Q.  It was an illegal scheme, correct?

04:10PM    5    A.  Yes.

04:10PM    6    Q.  And law enforcement cracked down on it, correct?

04:10PM    7    A.  Yes.

04:10PM    8    Q.  And it was a fraud, right?

04:10PM    9    A.  Yes.

04:10PM   10    Q.  And you were playing a part in it, right?

04:10PM   11    A.  Yes.

04:10PM   12    Q.  And Jeff was playing a part in it, correct?

04:10PM   13    A.  Yes.

04:10PM   14    Q.  And it was against the law, right?

04:10PM   15    A.  Yes.

04:10PM   16    Q.  And you knew it was against the law, right?

04:10PM   17    A.  Yeah.

04:10PM   18    Q.  It was a fraud, right?

04:10PM   19    A.  Yes.

04:10PM   20    Q.  And you told that to the U.S. Attorney's Office in 2023,

04:10PM   21    correct?

04:10PM   22    A.  Yes.

04:10PM   23    Q.  And you've never been prosecuted for that, right?

04:10PM   24    A.  Correct.

04:10PM   25    Q.  They've never threatened you with charged, correct?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

232

| | | |
|---|---|---|
| 04:10PM | 1 | A.  No. |
| 04:10PM | 2 | Q.  All right.  They've never said, you know, we can't use |
| 04:10PM | 3 | you as a witness because you perpetrated this fraud, nothing |
| 04:10PM | 4 | like that, correct? |
| 04:10PM | 5 | A.  Correct. |
| 04:10PM | 6 | Q.  Okay.  And, in fact, you disclosed it to them one time, |
| 04:11PM | 7 | and they never brought it up again, right?  Correct? |
| 04:11PM | 8 | A.  Correct. |
| 04:11PM | 9 | Q.  Even though it involved very clear fraudulent activity, |
| 04:11PM | 10 | correct? |
| 04:11PM | 11 | A.  Yeah, with mostly all of Buffalo though. |
| 04:11PM | 12 | Q.  So but you were doing it, right? |
| 04:11PM | 13 | A.  Yeah. |
| 04:11PM | 14 | Q.  Okay.  And it's your opinion that just kind of -- it's |
| 04:11PM | 15 | very widespread? |
| 04:11PM | 16 | A.  Like, you know, at first when I was getting it, I didn't |
| 04:11PM | 17 | know about it. |
| 04:11PM | 18 | Q.  Okay. |
| 04:11PM | 19 | A.  I had -- |
| 04:11PM | 20 | Q.  But you did learn that it was illegal? |
| 04:11PM | 21 | A.  Right. |
| 04:11PM | 22 | Q.  Right?  And you kept doing, right? |
| 04:11PM | 23 | A.  Well, no.  It got shut down. |
| 04:11PM | 24 | Q.  Okay.  But you learned that it was illegal, right? |
| 04:11PM | 25 | A.  Yes. |

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

233

| | | |
|---|---|---|
| 04:11PM | 1 | Q. Okay. You were doing it, right? |
| 04:11PM | 2 | A. Yes. |
| 04:11PM | 3 | Q. Okay. It was a fraud, right? |
| 04:11PM | 4 | A. Yes. |
| 04:11PM | 5 | Q. And -- and you told the government about it, right? |
| 04:11PM | 6 | A. Yes. |
| 04:11PM | 7 | Q. Okay. And -- and that only came up one time, right? |
| 04:11PM | 8 | A. It might have came up more. |
| 04:11PM | 9 | Q. Okay. Now, but in any event, you were never charged with |
| 04:11PM | 10 | that, correct? |
| 04:12PM | 11 | A. Right. |
| 04:12PM | 12 | Q. Okay. Now, it's your testimony I think that you -- that |
| 04:12PM | 13 | you became addicted to drugs very early at Pharaoh's, |
| 04:12PM | 14 | correct? |
| 04:12PM | 15 | A. Yes. |
| 04:12PM | 16 | Q. Within, I think, the first two weeks or two months or |
| 04:12PM | 17 | something like that, right? |
| 04:12PM | 18 | A. Few months. |
| 04:12PM | 19 | Q. All right. And you used it almost immediately, right? |
| 04:12PM | 20 | A. Yes. |
| 04:12PM | 21 | Q. I think your testimony is, like, on the first shift or |
| 04:12PM | 22 | something like that, correct? |
| 04:12PM | 23 | A. I don't remember exactly. |
| 04:12PM | 24 | Q. Okay. You don't remember the first time you used? |
| 04:12PM | 25 | A. Well, it was not first shift. |

04:12PM    1    Q.  Okay.

04:12PM    2    A.  It would be second shift --

04:12PM    3    Q.  Okay.

04:12PM    4    A.  -- number one.

04:12PM    5        And it wasn't -- it was probably a couple days in that I

04:12PM    6    started using.

04:12PM    7    Q.  Okay.

04:12PM    8    A.  Not, like, the very first day.

04:12PM    9    Q.  Okay.  Well so the -- the testimony that we were just

04:12PM    10   talking about where you were engaged in that illegal Medicare

04:12PM    11   cab scheme, that was in July of 2023, right?

04:12PM    12   A.  Yes.

04:13PM    13   Q.  Correct?

04:13PM    14   A.  Yes.

04:13PM    15   Q.  All right.  And at that point in time, you, your

04:13PM    16   significant other, and your baby boy are living together,

04:13PM    17   correct?

04:13PM    18   A.  Yes.

04:13PM    19   Q.  And are you living in Pennsylvania then, or Buffalo?

04:13PM    20   A.  Cuba, New York.

04:13PM    21   Q.  Cuba, New York?

04:13PM    22   A.  Yes.

04:13PM    23   Q.  Cuba, New York.  And that that scheme gets shut down,

04:13PM    24   correct?

04:13PM    25   A.  Right.

04:13PM  1    Q.  And that was one way that you were making money at the

04:13PM  2    time, correct?

04:13PM  3    A.  Yes.

04:13PM  4    Q.  And one way that Jeff was making money at the time,

04:13PM  5    correct?

04:13PM  6    A.  Yes.

04:13PM  7    Q.  Okay.  So the household income takes a hit at that point

04:13PM  8    in time, correct?

04:13PM  9    A.  Yes.

04:13PM  10   Q.  And then you have that slipup with the cocaine, correct?

04:13PM  11   A.  That wasn't the same year.

04:13PM  12   Q.  We're talking about different years?

04:13PM  13   A.  My slipup was 2023?

04:13PM  14   Q.  Yes.

04:13PM  15   A.  Yes.

04:13PM  16   Q.  Yes.  Okay.  And at the time you had the cocaine slipup,

04:13PM  17   how were you supporting yourself?

04:13PM  18   A.  Through DSS.

04:13PM  19   Q.  Okay.  And what was Jeff doing for work?

04:13PM  20   A.  He paints on the side.

04:13PM  21   Q.  Okay.  And there came a time, and I think we looked at

04:14PM  22   it, on August 15th, that you have a prep meeting with the

04:14PM  23   government?

04:14PM  24   A.  Okay.

04:14PM  25   Q.  Do you recall, we looked at that, and we can look at it

04:14PM      1   again if you need a refresher --

04:14PM      2   A.   Okay.

04:14PM      3   Q.   -- okay?  But on August 15th, I think it's one of the

04:14PM      4   dates that you have there, double check it, August 15th of

04:14PM      5   2023?

04:14PM      6   A.   Yeah.

04:14PM      7   Q.   Okay.  So you had that cocaine slipup in early August,

04:14PM      8   right?

04:14PM      9   A.   Yes.

04:14PM     10   Q.   And the government put you up at a hotel, correct?

04:14PM     11   A.   This?  I don't remember having a slipup in 2023 with

04:14PM     12   cocaine, it was this year over the summer.

04:14PM     13   Q.   It was 2024?

04:14PM     14   A.   Yes.

04:14PM     15   Q.   That you think you had the slipup?

04:14PM     16   A.   I know it was '24.

04:15PM     17   Q.   Let's check and make sure that we get it right.

04:15PM     18   A.   Yeah, I don't remember '23 having that.  I might be wrong

04:15PM     19   though.

04:15PM     20            MR. SOEHNLEIN:  Okay.  Can you show for the witness,

04:15PM     21   can you show her -- let's try Exhibit 3571AM.

04:15PM     22            MS. CHAMPOUX:  As in Mary.

04:15PM     23            MR. SOEHNLEIN:  As in Mary or mother, yeah.

04:15PM     24            MS. CHAMPOUX:  That's the grand jury.

04:15PM     25            MR. SOEHNLEIN:  Yes, just for the witness.

04:15PM   1              BY MR. SOEHNLEIN:

04:15PM   2    Q.  Okay.  So, I'm showing you the cover page to your grand

04:15PM   3    jury testimony.  Do you see where it says September 7th,

04:15PM   4    2023?

04:15PM   5    A.  Yes.

04:15PM   6              MR. SOEHNLEIN:  Okay.  And if we can just scroll

04:15PM   7    down, Ms. Champoux.  And I'm going try and find it.  Keep

04:16PM   8    going down.  Keep going down, please.

04:16PM   9              Keep going down.  Okay.  Stop right there.

04:16PM  10              BY MR. SOEHNLEIN:

04:16PM  11    Q.  If you could just read for yourself, you see how the top

04:16PM  12    of the page there is page 4?

04:16PM  13    A.  I see 5.

04:16PM  14    Q.  I understand.  But the page immediately above that would

04:16PM  15    be 4.

04:16PM  16    A.  Right.

04:16PM  17    Q.  Okay.  So start reading at line 22, and just read through

04:16PM  18    line 4 of the following page, please.

04:16PM  19       Does that refresh your recollection that it was 2023?

04:16PM  20    A.  Yes.

04:16PM  21    Q.  Okay.

04:16PM  22              MR. SOEHNLEIN:  You can take that down now.

04:16PM  23              BY MR. SOEHNLEIN:

04:16PM  24    Q.  All right.  So you have that cocaine slipup in around

04:17PM  25    early August of 2023, correct?

04:17PM 1    A.  Yes.

04:17PM 2    Q.  And the government puts you into a hotel, correct?

04:17PM 3    A.  Yes.

04:17PM 4    Q.  They -- and they kind of help you gather your things,

04:17PM 5    correct?

04:17PM 6    A.  Right.

04:17PM 7    Q.  And -- and I think you had some testimony on direct

04:17PM 8    about, you know, some conversation that you and D.P. had had

04:17PM 9    with Mr. Gerace about going out to dates with other men; do

04:17PM 10   you recall that testimony?

04:17PM 11   A.  Yes.

04:17PM 12   Q.  Okay.  Now, do you recall, did you share that information

04:17PM 13   originally with law enforcement?

04:17PM 14   A.  On what?  I obviously shared the information.

04:17PM 15   Q.  Okay.  But you didn't share it with law enforcement until

04:17PM 16   after they started paying for your housing expenses; isn't

04:17PM 17   that correct?

04:17PM 18   A.  I am not sure.  But --

04:17PM 19   Q.  Okay.

04:17PM 20   A.  -- it definitely had nothing to do with that.

04:17PM 21   Q.  Well, let's just -- let's take it one thing at a time.

04:17PM 22   A.  Some things come back in your memory.

04:17PM 23        **MR. SOEHNLEIN:**  Can you show the witness

04:18PM 24   Exhibit 3571AA.  And if I can go to page 2 of that exhibit,

04:18PM 25   please.

04:18PM    1         BY MR. SOEHNLEIN:

04:18PM    2    Q.  And Miss, if you can just review that, and let me know

04:18PM    3    when you're finished reviewing that page.

04:19PM    4         Are you finished reviewing it?

04:19PM    5    A.  Yes.

04:19PM    6         MR. SOEHNLEIN:  And, Ms. Champoux, if you can just

04:19PM    7    scroll back up.

04:19PM    8         BY MR. SOEHNLEIN:

04:19PM    9    Q.  I'm sorry, you can review it.  But you'd agree with me,

04:19PM   10    this is August 15th of 2023, correct?

04:19PM   11    A.  Yes.

04:19PM   12    Q.  And that was the first time that you shared with law

04:19PM   13    enforcement that you had that conversation with Mr. Gerace

04:19PM   14    and D.P. about going on dates with other guys, correct?

04:20PM   15    A.  Yes.

04:20PM   16    Q.  Okay.  And you also told them at that time that when that

04:20PM   17    conversation took place, you were a wine drinker, you weren't

04:20PM   18    using any drugs at all, correct?

04:20PM   19    A.  Yeah, at the very beginning I drank wine.

04:20PM   20    Q.  Okay.  And so that -- that's not true, correct?

04:20PM   21    A.  What's not true?

04:20PM   22    Q.  Well, so, you -- you gave them information about this

04:20PM   23    conversation with Mr. Gerace that you hadn't shared

04:20PM   24    previously, correct?

04:20PM   25    A.  Just because I didn't share it at our first meeting --

04:20PM    1    Q.  Just "yes" or "no."  You hadn't shared it before,

04:20PM    2    correct?

04:20PM    3    A.  Yes, I have.

04:20PM    4    Q.  You believe that you shared it in 2020?

04:20PM    5    A.  Okay.  That's where your question needs to stay at.  Did

04:20PM    6    I share it in 2020?  No.

04:20PM    7    Q.  Did you share it in 2021?

04:20PM    8    A.  I believe not.

04:20PM    9    Q.  Okay.  Did you share it in 2022?

04:20PM    10   A.  No.

04:20PM    11   Q.  You shared it in 2023?

04:20PM    12   A.  Yes.

04:20PM    13   Q.  Okay.  You shared it after they started paying for your

04:20PM    14   housing, correct?  Yes?

04:20PM    15   A.  Okay.  Yes.

04:20PM    16   Q.  Yes.  Okay.  And when you shared it, you told them that

04:21PM    17   this was a conversation you had with Mr. Gerace at Pharaoh's,

04:21PM    18   correct?

04:21PM    19   A.  Say that again?

04:21PM    20   Q.  When you shared it with them, you told them the

04:21PM    21   conversation took place at Pharaoh's, correct?

04:21PM    22   A.  Yes.

04:21PM    23   Q.  And you told them you were not using drugs at the time,

04:21PM    24   correct?

04:21PM    25   A.  No, I don't believe that.

04:21PM    1    Q.  Okay.  So, it's not your recollection that you told them

04:21PM    2    that you were drinking wine?

04:21PM    3    A.  I know I said I was drinking wine.

04:21PM    4    Q.  Okay.

04:21PM    5    A.  Then it moved to drugs.

04:21PM    6    Q.  Then it moved to drugs?

04:21PM    7    A.  Yes.

04:21PM    8    Q.  Then it changed to drugs?  Okay.

04:21PM    9    A.  Oh, my God.

04:21PM   10    Q.  Now, in the course of time that you were having your

04:21PM   11    housing paid for by or subsidized by federal law enforcement,

04:22PM   12    you were also in contact with them about various housing

04:22PM   13    applications that you were doing, correct?

04:22PM   14    A.  Yes.

04:22PM   15    Q.  And you were letting them know that you were trying to

04:22PM   16    get into specific apartments or specific locations, things

04:22PM   17    like that, correct?

04:22PM   18    A.  Yes.

04:22PM   19    Q.  And -- and that was consistent through September of 2023,

04:22PM   20    correct?

04:22PM   21    A.  I would say 2022.  Because in 2023, I got my Section 8.

04:22PM   22    Q.  Okay.  I want to refresh your recollection.

04:22PM   23          **MR. SOEHNLEIN:**  Can you show the witness 3571AS.  And

04:22PM   24    I'm looking at a conversation from September 11th of 2023.

04:22PM   25          **BY MR. SOEHNLEIN:**

| | | |
|---|---|---|
| 04:22PM | 1 | Q. And, once again, these are text messages with Special |
| 04:22PM | 2 | Agent Smaldino, correct? |
| 04:23PM | 3 | A. Can I get a pen? |
| 04:23PM | 4 | Q. Absolutely. |
| 04:23PM | 5 | A. Thank you. I'm sorry. |
| 04:23PM | 6 | Q. Okay. And so I want you to just review -- well, do you |
| 04:23PM | 7 | want to review the whole day, or do you want me to direct you |
| 04:23PM | 8 | to some specific lines that you I want you to look at? |
| 04:23PM | 9 | A. Yeah, direct. |
| 04:23PM | 10 | Q. Direct? Okay. |
| 04:23PM | 11 | I'm really interested in the lines that start at |
| 04:23PM | 12 | 18:12:59, but I want you to make sure you have a clear |
| 04:23PM | 13 | picture of what's going on here. I'm not trying to trick you |
| 04:23PM | 14 | or -- |
| 04:23PM | 15 | A. No, I know. |
| 04:23PM | 16 | Q. -- or deceive you or anything. So I want to make sure |
| 04:23PM | 17 | you're comfortable. And once you've reviewed it, just let me |
| 04:23PM | 18 | know you've reviewed it, and we can go through a couple |
| 04:23PM | 19 | things. |
| 04:23PM | 20 | You reviewed it, correct? Okay. |
| 04:23PM | 21 | Now at this point in time, you're trying to get into it |
| 04:23PM | 22 | county housing; is that how it works? Or subsidized housing? |
| 04:24PM | 23 | A. Subsidized. |
| 04:24PM | 24 | Q. Yeah. And there's an application in connection with |
| 04:24PM | 25 | subsidized housing, correct? |

04:24PM    1    A.  Yeah.

04:24PM    2    Q.  Okay.  And you have custody of one of your children,

04:24PM    3    correct?

04:24PM    4    A.  Correct.

04:24PM    5    Q.  You told the Housing Authority you had custody of both,

04:24PM    6    correct?

04:24PM    7    A.  Right.

04:24PM    8    Q.  You told them you had custody of both so you could get a

04:24PM    9    bigger unit, correct?

04:24PM    10   A.  Yes.

04:24PM    11   Q.  Yeah.  And you told Special Agent Smaldino that you were

04:24PM    12   doing that, correct?

04:24PM    13   A.  Yes.

04:24PM    14   Q.  And her response was okay, right?

04:24PM    15   A.  Yes.  But because I already had found out that I don't

04:24PM    16   have to have custody, I can have that bigger room just

04:24PM    17   because she comes for visitation.

04:24PM    18   Q.  Hold on.  You -- you told her that you put on the

04:24PM    19   referral that you have custody, correct?

04:24PM    20   A.  Yes.

04:24PM    21   Q.  Okay.  And that's not true, correct?

04:24PM    22   A.  Right.

04:24PM    23   Q.  That is inaccurate, correct?

04:24PM    24   A.  Yes.

04:24PM    25   Q.  And this is at a point in time where you're being paid by

04:24PM   1   the federal government, correct?

04:24PM   2   A.  Somewhere in between there.

04:24PM   3   Q.  Yeah.  The government is giving you money, correct?

04:24PM   4   A.  Yes.

04:24PM   5   Q.  In connection with this case, correct?

04:24PM   6   A.  Yes.

04:25PM   7   Q.  And you are -- you are saying something that's inaccurate

04:25PM   8   to the Subsidized Housing Authority, correct?

04:25PM   9   A.  I guess so.

04:25PM   10  Q.  And you told the FBI that you were doing that, correct?

04:25PM   11  A.  Yep.

04:25PM   12  Q.  And their response was, okay, right?

04:25PM   13  A.  Um-hum.

04:25PM   14  Q.  And, in fact, they offered to call on your behalf,

04:25PM   15  correct?

04:25PM   16  A.  Um-hum.

04:25PM   17  Q.  They didn't stop you from doing that, correct?

04:25PM   18  A.  No.  Why would they?

04:25PM   19  Q.  It was a fraudulent application, correct?

04:25PM   20  A.  Did you just hear me?

04:25PM   21  Q.  I said -- well, I heard you.

04:25PM   22  A.  I told you it's not fraudulent because I get visitation.

04:25PM   23  I don't have to have custody.

04:25PM   24  Q.  You told them you had custody.  Regardless of the

04:25PM   25  reason --

04:25PM  1    A.   Okay.

04:25PM  2    Q.   -- you told them something that was not accurate.

04:25PM  3    A.   Okay.  Because I already -- it's figured out.

04:25PM  4    Q.   But you understand that when you told them you had

04:25PM  5    custody, that was not true.

04:25PM  6    A.   Okay.  But guess what?  I was in the process.

04:26PM  7    Q.   Okay.  You don't have custody today, correct?

04:26PM  8    A.   No.

04:26PM  9    Q.   You still want them to help you get custody, right?

04:26PM  10   A.   No.  They're not helping me get custody of my daughter.

04:26PM  11   That is all me.

04:26PM  12   Q.   All right.  But there was a point in time where you were

04:26PM  13   looking to them for help?

04:26PM  14   A.   I did ask.  And did they do it?  No.

04:26PM  15   Q.   Okay.  I want to talk to you a little bit about

04:26PM  16   Mr. Barsuk, who you mentioned earlier was a gentleman that

04:26PM  17   you met inside the club, correct?

04:26PM  18   A.   Yes.

04:26PM  19   Q.   And you did some VIP dances with him, correct?

04:26PM  20   A.   Yes.

04:26PM  21   Q.   And you came to have a relationship with him outside the

04:26PM  22   club, correct?

04:26PM  23   A.   Yes.

04:26PM  24   Q.   And that included him taking you out to dinner, correct?

04:27PM  25   A.   Yes.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

246

04:27PM   1   Q.  And eventually he bought you some cars, correct?

04:27PM   2   A.  Yes.

04:27PM   3   Q.  And eventually he put up in an apartment, correct?

04:27PM   4   A.  Yes.

04:27PM   5   Q.  And he gave you regular money for drugs, correct?

04:27PM   6   A.  Yes.

04:27PM   7   Q.  And that took place from about 2015 to 2017, correct?

04:27PM   8   A.  Yes.

04:27PM   9   Q.  Okay.  And so do you recall the date in 2015 that that

04:27PM  10   started?

04:27PM  11   A.  The exact day?

04:27PM  12   Q.  Yeah.

04:27PM  13   A.  No.

04:27PM  14   Q.  Do you recall the time of year?

04:27PM  15   A.  No.

04:27PM  16   Q.  No?  Okay.  But while you were with Mr. Barsuk, he's

04:27PM  17   giving you regular money for narcotics, correct?

04:27PM  18   A.  Right.

04:27PM  19   Q.  And you're getting narcotics from all different sources

04:27PM  20   at that point in time, correct?

04:27PM  21   A.  I wouldn't say all different sources, I might have had

04:27PM  22   three or four.

04:27PM  23   Q.  Okay.  And some of those were outside of Pharaoh's,

04:27PM  24   correct?

04:27PM  25   A.  Yes.

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

04:27PM   1    Q.  Okay.  So, at that point in time, if -- if you were fired

04:27PM   2    from Pharaoh's, you still had a relationship with Mr. Barsuk,

04:27PM   3    correct?

04:27PM   4    A.  Yes.

04:27PM   5    Q.  And presumably, he still -- he would have continued to

04:27PM   6    give you money for drugs, correct?

04:28PM   7            MR. TRIPI:  Objection to the "if" and the

04:28PM   8    "presumably."

04:28PM   9            MR. SOEHNLEIN:  Yeah, I'll withdraw it.

04:28PM  10            MR. TRIPI:  I want to strike the last question and

04:28PM  11    answer.

04:28PM  12            THE COURT:  Yes, that question -- I don't know if

04:28PM  13    there was an answer.  If there was an answer, the jury will

04:28PM  14    strike that, too.

04:28PM  15            So, the -- the objection to the form of the question

04:28PM  16    is sustained.

04:28PM  17            BY MR. SOEHNLEIN:

04:28PM  18    Q.  Okay.  You understood that he would give you money for

04:28PM  19    drugs, correct?

04:28PM  20    A.  Yes.

04:28PM  21    Q.  In exchange for that, you had sex with him, correct?

04:28PM  22    A.  Yes.

04:28PM  23    Q.  And he gave you an apartment, right?

04:28PM  24    A.  Yes.

04:28PM  25    Q.  He gave you cars, right?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

248

| | | |
|---|---|---|
| 04:28PM | 1 | A.  Yes. |
| 04:28PM | 2 | Q.  He gave you dinners? |
| 04:28PM | 3 | A.  Yes. |
| 04:28PM | 4 | Q.  He gave you gifts? |
| 04:28PM | 5 | A.  Yes. |
| 04:28PM | 6 | Q.  He treated you like a girlfriend, correct? |
| 04:28PM | 7 | A.  Yes. |
| 04:28PM | 8 | Q.  And you were in this relationship from 2015 to 2017, |
| 04:28PM | 9 | correct? |
| 04:28PM | 10 | A.  I wouldn't -- we weren't, like, relationship-wise.  We |
| 04:28PM | 11 | weren't together.  But, you know, he helped me. |
| 04:28PM | 12 | Q.  But what we just discussed was going on for about that |
| 04:28PM | 13 | two-year period, correct? |
| 04:28PM | 14 | A.  Yes. |
| 04:28PM | 15 | Q.  Now Mr. Gerace -- strike that. |
| 04:28PM | 16 | That -- that welcome back party was in April of 2014, |
| 04:28PM | 17 | correct? |
| 04:29PM | 18 | A.  Sure. |
| 04:29PM | 19 | Q.  Right?  Well, we talked about that earlier before the |
| 04:29PM | 20 | break, correct? |
| 04:29PM | 21 | A.  Okay. |
| 04:29PM | 22 | Q.  Okay.  So from April 2014 to the beginning of 2015, you'd |
| 04:29PM | 23 | agree with me that's about eight months? |
| 04:29PM | 24 | A.  Yes. |
| 04:29PM | 25 | Q.  Okay.  And then you had the relationship with Mr. Barsuk, |

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24
249

04:29PM     1    correct?

04:29PM     2    A.   And then I had the relationship?

04:29PM     3    Q.   Well, you said it was some point in time in 2015,

04:29PM     4    correct?

04:29PM     5    A.   Yeah.

04:29PM     6    Q.   Okay.  Now, when you were in that relationship, you

04:29PM     7    wanted the money for drugs, correct?

04:29PM     8    A.   Right.

04:29PM     9    Q.   You generally understood what was going on, correct?

04:29PM    10    A.   Yes.

04:29PM    11    Q.   You chose to go to dinner with him, correct?

04:29PM    12    A.   Yes.

04:29PM    13    Q.   You chose to let him pay for your apartment, correct?

04:29PM    14    A.   Yes.

04:29PM    15    Q.   You accepted the cars, correct?

04:29PM    16    A.   Yes.

04:29PM    17    Q.   You used the cars, correct?

04:29PM    18    A.   Yes.

04:29PM    19    Q.   You accepted the gifts that he gave?

04:29PM    20    A.   Yes.

04:29PM    21    Q.   And that was all independent of Mr. Gerace, correct?

04:29PM    22    A.   All independent?

04:29PM    23    Q.   Mr. Gerace had nothing to do with that, right?

04:29PM    24    A.   Correct.

04:29PM    25    Q.   Yeah.  That was all outside of the club, correct?

USA v Gerace - L.L. - Soehnlein/Cross - 12/16/24

250

04:29PM 1    A.  Right.

04:29PM 2    Q.  Right.  Now there was this other occasion with Mr. Casey;

04:29PM 3    do you recall that testimony?

04:29PM 4    A.  Yes.

04:29PM 5    Q.  And you Ms. A.A. went out to dinner with him, correct?

04:30PM 6    A.  Yes.

04:30PM 7    Q.  And you negotiated a price of sex for money, correct?

04:30PM 8    A.  Yes.

04:30PM 9    Q.  And that was all outside of the club, correct?

04:30PM 10   A.  Yes.

04:30PM 11   Q.  And that's what you wanted to do, right?

04:30PM 12   A.  Yes.

04:30PM 13   Q.  You wanted money for drugs, correct?

04:30PM 14   A.  Yes.

04:30PM 15   Q.  And you did that outside of Pharaoh's, correct?

04:30PM 16   A.  Yes.

04:30PM 17   Q.  You did that without any involvement from Mr. Gerace,

04:30PM 18   correct?

04:30PM 19   A.  Yes.

04:30PM 20   Q.  You and Ms. A.A. did that on your own, correct?

04:30PM 21   A.  Yes.

04:30PM 22   Q.  You chose to do that, correct?

04:30PM 23   A.  Yes.

04:30PM 24   Q.  All right.  And in connection with those, you chose who

04:30PM 25   you were going to sleep with, correct?

| | | |
|---|---|---|
| 04:30PM | 1 | A.  Yeah.  I guess if you want to say a choice, sure. |
| 04:30PM | 2 | Q.  Yeah.  And you chose where it was gonna happen? |
| 04:30PM | 3 | A.  Um-hum. |
| 04:30PM | 4 | Q.  And you chose how much, right? |
| 04:30PM | 5 | A.  Right. |
| 04:30PM | 6 | Q.  Just a second. |
| 04:30PM | 7 | MR. SOEHNLEIN:  That's all I have.  Thank you. |
| 04:30PM | 8 | THE COURT:  Redirect, Mr. Tripi. |
| 04:30PM | 9 | |
| 04:30PM | 10 | REDIRECT EXAMINATION BY MR. TRIPI: |
| 04:31PM | 11 | Q.  Not too many questions about what happened upstairs with |
| 04:31PM | 12 | the defendant in Pharaoh's the last two hours, huh? |
| 04:31PM | 13 | A.  No. |
| 04:31PM | 14 | MR. SOEHNLEIN:  Objection. |
| 04:31PM | 15 | THE COURT:  Sustained.  Sustained.  The jury will |
| 04:31PM | 16 | strike that. |
| 04:31PM | 17 | Mr. Tripi, you know better. |
| 04:31PM | 18 | BY MR. TRIPI: |
| 04:31PM | 19 | Q.  Was the bulk of what you were talking about in all those |
| 04:31PM | 20 | times you met with government about what happened upstairs at |
| 04:31PM | 21 | Pharaoh's? |
| 04:31PM | 22 | A.  No. |
| 04:31PM | 23 | Q.  With the defendant? |
| 04:31PM | 24 | A.  No. |
| 04:31PM | 25 | Q.  Is that what we were talking about in 2023 and 2020? |

04:31PM   1   A.  Yes.

04:31PM   2   Q.  Okay.  At that time in your life, if somebody told you

04:31PM   3   lick the bottom a toilet seat for drugs, would you have done

04:31PM   4   it?

04:31PM   5   A.  Yes.

04:31PM   6   Q.  Does that feel like a choice?

04:31PM   7   A.  No.

04:32PM   8   Q.  Has everything about life been a struggle since you

04:32PM   9   started at Pharaoh's?

04:32PM  10   A.  Yes.

04:32PM  11   Q.  During those brief patches of times when you worked at

04:32PM  12   Pharaoh's, and you went to 28-day rehabs for a month, and

04:32PM  13   then you got back and you went to Pharaoh's again, were you

04:32PM  14   fired because you used drugs, or because your looks slipped?

04:32PM  15          **MR. SOEHNLEIN:**  Objection.  State of mind.

04:32PM  16          **MR. TRIPI:**  This was on both direct and cross.

04:32PM  17          **THE COURT:**  Sustained.  You need more of a

04:32PM  18   foundation.

04:32PM  19          **BY MR. TRIPI:**

04:32PM  20   Q.  Were you told by this defendant you're being fired

04:32PM  21   because you used cocaine with me?

04:32PM  22   A.  No.

04:33PM  23   Q.  Okay.  Why were you told you were being fired?

04:33PM  24   A.  Because of my appearance.

04:33PM  25   Q.  Mr. Soehnlein was asking you questions, and he said -- he

04:33PM   1   asked a number of questions about "and they told you this,"

04:33PM   2   "and they told you that" after you got out of rehab.  Do you

04:33PM   3   remember that series of questions?

04:33PM   4   A.  Yes.

04:33PM   5   Q.  At one point you said I don't come out of rehab and say

04:33PM   6   everything you are say.  Do you remember stopping him and

04:33PM   7   saying that?

04:33PM   8   A.  Yes.

04:33PM   9   Q.  What did you mean by that?

04:33PM  10   A.  I don't come out of rehab and go tell everybody that's

04:33PM  11   where I was.

04:33PM  12   Q.  Did any of those conversations actually occur where

04:33PM  13   people at Pharaoh's said, are you going to behave yourself

04:33PM  14   now and not use drugs?

04:33PM  15   A.  No.

04:33PM  16   Q.  Did that ever actually happen?

04:33PM  17   A.  No.

04:33PM  18   Q.  Okay.  After you got back from a stint in rehab, did you

04:34PM  19   find yourself back upstairs at Pharaoh's doing cocaine with

04:34PM  20   the defendant?

04:34PM  21   A.  Yes.

04:34PM  22   Q.  Did you find him asking you to do favors in exchange for

04:34PM  23   it?

04:34PM  24   A.  Yes.

04:34PM  25   Q.  Did that include oral sex?

04:34PM  1   A.  Yeah.

04:34PM  2   Q.  Did that include vaginal sex?

04:34PM  3   A.  Yeah.

04:34PM  4   Q.  You were asked some questions about was Pharaoh's being

04:34PM  5   the only place you got drugs, right?

04:34PM  6   A.  Yes.

04:34PM  7   Q.  When you're not -- when you're not being given drugs

04:35PM  8   directly in exchange for sex, do they cost money?

04:35PM  9   A.  Yes.

04:35PM  10  Q.  Do they cost money inside Pharaoh's when you buy them

04:35PM  11  from Charm?

04:35PM  12  A.  Yes.

04:35PM  13  Q.  Do they cost money outside of Pharaoh's?

04:35PM  14  A.  Yes.

04:35PM  15  Q.  Was Pharaoh's the way you knew at that point in your life

04:35PM  16  how to make money working there?

04:35PM  17  A.  No.

04:35PM  18  Q.  No?  Was Pharaoh's, at that point in your life -- just

04:35PM  19  listen to the question.

04:35PM  20      Was that, at that point in your life, was Pharaoh's and

04:35PM  21  dancing there, and doing things you were doing there, was

04:35PM  22  that the way you knew how to make money?

04:35PM  23  A.  Yes.  Yes.

04:35PM  24  Q.  Who's the person that told you they could prevent you

04:35PM  25  from working at other clubs?

USA v Gerace - L.L. - Tripi/Redirect - 12/16/24

255

04:35PM    1    A.   The defendant.

04:35PM    2    Q.   You were asked some questions about your ability to

04:35PM    3    recall and remember things, right?

04:36PM    4    A.   Yes.

04:36PM    5    Q.   Do you recall and remember the things you're talking

04:36PM    6    about at this trial to this jury?

04:36PM    7    A.   Yes.

04:36PM    8    Q.   Are you making up the things that you're telling them for

04:36PM    9    the last couple days?

04:36PM    10   A.   No.

04:36PM    11   Q.   When you used drugs and cocaine or heroin, do you -- do

04:36PM    12   you still have eyes in your head?

04:36PM    13   A.   Yeah.

04:36PM    14   Q.   Do you still have ears?

04:36PM    15   A.   Yes.

04:36PM    16   Q.   Can you still remember things that happened to you?

04:36PM    17   A.   Yes.

04:36PM    18   Q.   When the defendant or Aaron or David gave you drugs and

04:36PM    19   said do me a favor, and you performed oral sex, do you

04:36PM    20   remember doing those things?

04:36PM    21   A.   Yeah.  I try to block it out, but you can't.

04:36PM    22   Q.   Do you remember engaging in the vaginal sex?

04:36PM    23   A.   Yes.

04:36PM    24   Q.   Does every minute about this suck?

04:36PM    25   A.   Yes.

04:36PM  1   Q.  Those brief stints in rehab, when you would go for 28

04:37PM  2   days and come out, was Pharaoh's like a beacon to you?  Did

04:37PM  3   you get drawn back there?

04:37PM  4   A.  Always.

04:37PM  5   Q.  Explain why.

04:37PM  6   A.  Once you get involved in that life, it's -- it's hard to

04:37PM  7   get out of.  And it takes years to work on yourself.  Like,

04:37PM  8   it's already been five years, and I'm just now starting to

04:37PM  9   get my life together.  And I'm 32.  Like, it just sucks.

04:37PM  10  Q.  Did you know Pharaoh's was a place you could get drugs?

04:37PM  11  A.  No.

04:37PM  12  Q.  When you got out of rehab?

04:37PM  13  A.  Yes.

04:37PM  14  Q.  Did you know that was a place you could make money to get

04:37PM  15  drugs?

04:37PM  16  A.  Yes.

04:37PM  17  Q.  After coming out of a 28-day rehab, were you able to --

04:38PM  18  you just said it takes years.  Were you able to resist, after

04:38PM  19  28 days, were you fixed all of a sudden?

04:38PM  20  A.  No.

04:38PM  21  Q.  You were asked about text communications from August of

04:38PM  22  2023 to, I think, April of 2024.  Do you remember that?  And

04:38PM  23  you were writing on a piece of paper and it got tiresome,

04:38PM  24  right?

04:38PM  25  A.  Yes.

04:38PM   1   Q.  Okay.  Were there -- was there supposed to be a trial --

04:38PM   2   just "yes" or "no" -- was there supposed to be a trial in

04:38PM   3   June of 2023?

04:38PM   4   A.  Yes.

04:38PM   5   Q.  Was there supposed to be a trial in August of 2023?

04:38PM   6   A.  Yes.

04:38PM   7   Q.  Was there supposed to be a trial in October of 2023?

04:38PM   8   A.  Yes.

04:38PM   9   Q.  Was there supposed to be a trial in January of 2024?

04:39PM  10   A.  Yes.

04:39PM  11   Q.  Did those delays contribute to having to continue

04:39PM  12   communicating with the FBI?

04:39PM  13   A.  Sorry, what?

04:39PM  14   Q.  Did you have to keep in contact with the FBI?

04:39PM  15   A.  Yes, at every moment.

04:39PM  16   Q.  Did you believe that you needed to be kept in a safe

04:39PM  17   place?

04:39PM  18   A.  Yes.

04:39PM  19   Q.  Was that a concern you expressed from the moment the day

04:39PM  20   that Geraldo Rondon appeared in Pennsylvania?

04:39PM  21   A.  Yes.

04:39PM  22   Q.  You were asked about the FBI getting Jeff a job.  Did

04:39PM  23   they get Jeff a job, or did they tell you your boyfriend

04:39PM  24   should get work?

04:39PM  25   A.  Exactly.  That's exactly what they said.  He needs to go

04:39PM   1   get work.

04:39PM   2   Q.  If you needed a letter saying you were homeless, though,

04:40PM   3   for an application, was that true?

04:40PM   4   A.  Yes.

04:40PM   5   Q.  Did you get that type of letter from the FBI?

04:40PM   6   A.  Yes.

04:40PM   7           **MR. TRIPI:**  Can we pull up Exhibit 369L.

04:40PM   8           **BY MR. TRIPI:**

04:40PM   9   Q.  Remember, you were asked some questions about this; do

04:40PM  10   you remember that?

04:40PM  11   A.  Yes.

04:40PM  12   Q.  Do you know what the hell this document is?

04:40PM  13   A.  No.

04:40PM  14   Q.  Okay.  Now --

04:40PM  15           **MR. TRIPI:**  We can take that down.

04:40PM  16           **BY MR. TRIPI:**

04:40PM  17   Q.  From your memory, and from your experience at Pharaoh's,

04:40PM  18   do you always remember this defendant being there?

04:40PM  19   A.  Yes.

04:40PM  20   Q.  Do you ever, do you, of your personal recollection, ever

04:40PM  21   remember a time when there was significant amounts of time he

04:41PM  22   was gone?

04:41PM  23   A.  No.

04:41PM  24   Q.  Who's the one that walked around like the boss there?

04:41PM  25   A.  Peter.

04:41PM    1    Q.  That guy?

04:41PM    2    A.  Yes.

04:41PM    3    Q.  Who's the one who told you that Wayne van Vleet -- first

04:41PM    4    told you that Wayne van Vleet would pull your hair and finger

04:41PM    5    you in VIP?  Who was the first one who told you that?

04:41PM    6    A.  The defendant.

04:41PM    7    Q.  Who was the one who told you Brian Rosenthal would

04:41PM    8    overlook the camera?

04:41PM    9    A.  The defendant.

04:41PM   10    Q.  When you decided not to work at a Pharaoh's golf

04:41PM   11    tournament, did you stay back at the club and work?

04:41PM   12    A.  Yes.

04:41PM   13    Q.  The club stayed open, right?

04:41PM   14    A.  Yes.

04:41PM   15    Q.  Did you still make Pharaoh's money?

04:42PM   16    A.  Yes.

04:42PM   17    Q.  When the defendant told you Brian will look the other

04:42PM   18    way, did you understand that to mean the defendant knew Brian

04:42PM   19    would let sex acts occur?

04:42PM   20    A.  Yes.

04:42PM   21    Q.  You were asked some questions about Gerace rarely being

04:42PM   22    there.  Was he present when he gave you cocaine?

04:42PM   23    A.  Yes.

04:42PM   24    Q.  Was he present when you gave him oral sex?

04:42PM   25    A.  Yes.

04:42PM 1 Q. Was he present when he had vaginal sex with you?

04:42PM 2 A. Yes.

04:42PM 3 Q. Was he present when he had threesomes with you and others

04:42PM 4 in the upstairs?

04:42PM 5 A. Yes.

04:42PM 6 Q. Was he present when he gave the key to Aaron?

04:42PM 7 A. Yes.

04:42PM 8 Q. Was he present when he gave the key to David?

04:42PM 9 A. Yes.

04:42PM 10 Q. In your view, was it widely known that you had serious

04:43PM 11 addiction problems?

04:43PM 12 A. Yes.

04:43PM 13 Q. You were asked about some -- what Mr. Soehnlein referred

04:43PM 14 to as a Medicaid cab scheme. I just want to touch on that

04:43PM 15 briefly.

04:43PM 16    Basically, were there some people in town that would

04:43PM 17 transport people who had to go get methadone, that included

04:43PM 18 you, and they would put three or four or five people in a

04:43PM 19 vehicle at once, but then pretend they took five rides?

04:43PM 20 A. Yes.

04:43PM 21 Q. And they gave you extra money for that?

04:43PM 22 A. Yes.

04:43PM 23 Q. When you were doing that, and you acknowledged that that

04:44PM 24 was happening to Special Agent Burns, did he tell you that

04:44PM 25 that's actually a crime?

USA v Gerace - L.L. - Tripi/Redirect - 12/16/24

04:44PM  1  A.  Yes.

04:44PM  2  Q.  Did you stop doing it?

04:44PM  3  A.  Yes.

04:44PM  4  Q.  Did he tell you you need to stop doing that?

04:44PM  5  A.  Yes.

04:44PM  6  Q.  Did you have any idea that what the people driving you

04:44PM  7  was doing was illegal when you were doing it, before the

04:44PM  8  agent told you that's illegal?

04:44PM  9  A.  No.

04:44PM  10  Q.  Is it your understanding that principals, the people who

04:44PM  11  were behind that activity, several of them ended up getting

04:44PM  12  arrested for that?

04:44PM  13  A.  Yes.

04:44PM  14  Q.  When you were first asked about -- let me withdraw that.

04:44PM  15      In summer and August of 2023, you talked about it with

04:44PM  16  Mr. Soehnlein, you came in to prepare for what you thought

04:45PM  17  was going to be a trial, right?

04:45PM  18  A.  Yes.

04:45PM  19  Q.  And in the context of that, between 2020 and 2023, you

04:45PM  20  had -- you had been living, even though your identity was

04:45PM  21  secret, you had been living on your own?

04:45PM  22  A.  Yes.

04:45PM  23  Q.  So after 2020 and you're interviewed and you go to grand

04:45PM  24  jury, the rest of 2020, you're not dealing with the FBI,

04:45PM  25  correct?

USA v Gerace - L.L. - Tripi/Redirect - 12/16/24

262

04:45PM    1    A.  Correct.

04:45PM    2    Q.  2021, you're living out there in the world on your own?

04:45PM    3    A.  Correct.

04:45PM    4    Q.  2022, same thing, right?

04:45PM    5    A.  Correct.

04:45PM    6    Q.  2023, trial is approaching, they reconnect with you,

04:45PM    7    right?

04:45PM    8    A.  Yes.

04:45PM    9    Q.  They asked you to move closer to this area?

04:45PM    10    A.  Yes.

04:45PM    11    Q.  Because we needed to get ahold of you --

04:45PM    12    A.  Yes.

04:45PM    13    Q.  -- is that fair?

04:45PM    14    A.  Yes.

04:45PM    15    Q.  You needed some help --

04:45PM    16    A.  Yes.

04:45PM    17    Q.  -- doing that?

04:45PM    18    A.  Yeah.

04:45PM    19    Q.  Did you get rich off of this?

04:45PM    20    A.  No.  No.

04:45PM    21    Q.  Are you still struggling?

04:45PM    22    A.  Every day.

04:46PM    23    Q.  The FBI arranged to have a Christmas tree donated to you,

04:46PM    24    things like that?

04:46PM    25    A.  Yes.

USA v Gerace - L.L. - Tripi/Redirect - 12/16/24

263

04:46PM   1    Q.  Are you making stuff up here because they helped you get

04:46PM   2    diapers for your kid?

04:46PM   3    A.  No.

04:46PM   4    Q.  When you were first being asked more details about

04:46PM   5    specific people in the downstairs VIP, was that in the summer

04:46PM   6    of 2023 preparing for trial?

04:46PM   7    A.  Yes.

04:46PM   8    Q.  When you were asked questions three years earlier in

04:46PM   9    2020, were you answering the questions that were being asked?

04:46PM   10   A.  Yes.

04:46PM   11   Q.  Does anyone just come in and say, hey, tell me everything

04:46PM   12   about your life?  Is that ever how an interview goes?

04:46PM   13   A.  No.

04:46PM   14   Q.  Okay.  Do you know what the hell interviewers want to

04:47PM   15   know from you?  Or do you just answer questions?

04:47PM   16   A.  I just answer questions.

04:47PM   17   Q.  In the summer of 2023, were more specific questions asked

04:47PM   18   of you about specific people that might have been in the

04:47PM   19   downstairs?

04:47PM   20   A.  Yes.

04:47PM   21   Q.  Is that when those names, Wayne van Vleet, Joe Barsuk,

04:47PM   22   and Jim Casey came out of your mouth?

04:47PM   23   A.  Yes.

04:47PM   24   Q.  Was the focal point of questions in the year prior to

04:47PM   25   that mainly about the upstairs?

USA v Gerace - L.L. - Tripi/Redirect - 12/16/24

264

04:47PM    1    A.  Yes.

04:47PM    2    Q.  When those names came out of your mouth in 2023, in the

04:47PM    3    summer of 2023, did you go back into grand jury and talk

04:47PM    4    about what happened with those individuals?

04:47PM    5    A.  Yes.

04:47PM    6    Q.  Did the government questions get more focused and pointed

04:48PM    7    over time?

04:48PM    8    A.  Yes.

04:48PM    9    Q.  More detailed?

04:48PM    10   A.  Yes.

04:48PM    11   Q.  You had a back and forth with Mr. Soehnlein about your

04:48PM    12   housing and your housing application.

04:48PM    13       Do you feel it's fair for the government, when you're

04:48PM    14   being required to testify in a trial like this, to make

04:48PM    15   efforts to ensure you're safe?

04:48PM    16   A.  Yes.

04:48PM    17   Q.  Can you explain what was going on as it related to that

04:48PM    18   application where your daughter -- where you referenced your

04:48PM    19   daughter?  Explain it for the jury so you -- explain it in

04:48PM    20   your own words?

04:48PM    21   A.  Okay.  So when I was applying for my Section 8, they

04:49PM    22   wanted me to put the kids I had custody of on the

04:49PM    23   application.

04:49PM    24       And then when they accept it, I go back and talk to them

04:49PM    25   about my mom has custody of my daughter, but since I get

04:49PM    1    visitation, they will allow another room.  So that's what

04:49PM    2    happened.

04:49PM    3        I wasn't trying to get over on them, no, because it would

04:49PM    4    never work.

04:49PM    5    Q.  You were asked about the government getting involved in

04:49PM    6    your custody issue with your daughter.

04:49PM    7    A.  Yes.

04:49PM    8    Q.  Is that a personal family matter that you're dealing

04:49PM    9    with?

04:49PM    10   A.  Yes.

04:49PM    11   Q.  You were asked about Joe Barsuk.  Does he live in -- did

04:49PM    12   he live at the time in Batavia, New York?

04:49PM    13   A.  Yes.

04:49PM    14   Q.  45 minutes or so away?

04:49PM    15   A.  Yes.

04:49PM    16   Q.  Were you still working at Pharaoh's and was that

04:50PM    17   overlapping time periods?

04:50PM    18   A.  Yes.

04:50PM    19   Q.  Did Mr. Barsuk exploit you outside of Pharaoh's similar

04:50PM    20   to how you were being exploited inside Pharaoh's?

04:50PM    21   A.  Yes.

04:50PM    22   Q.  And remind the jury, where did you first engage in sex

04:50PM    23   with Mr. Barsuk?

04:50PM    24   A.  Pharaoh's.

04:50PM    25   Q.  And you were asked about Jim Casey.  Where did you first

USA v Gerace - L.L. - Soehnlein/Recross - 12/16/24

04:50PM   1    engage in sex with him?

04:50PM   2    A.   Pharaoh's, as well.

04:50PM   3    Q.   And then it continued for a little bit outside with him

04:50PM   4    and A.A.?

04:50PM   5    A.   Yes.

04:50PM   6    Q.   Where did all of this start for you?

04:50PM   7    A.   At Pharaoh's.

04:50PM   8    Q.   Did this defendant play a role?

04:51PM   9    A.   Yes.

04:51PM  10         **MR. TRIPI:**  No further redirect, thank you.

04:51PM  11         **THE COURT:**  Anything more, Mr. Soehnlein?

04:51PM  12         **MR. SOEHNLEIN:**  Just a few questions, Judge.  And

04:51PM  13    we're almost done.

04:51PM  14

04:51PM  15              **RECROSS-EXAMINATION BY MR. SOEHNLEIN:**

04:51PM  16    Q.   When you left rehab those three times and returned to

04:51PM  17    Pharaoh's, did anyone tell you you had to go back to

04:51PM  18    Pharaoh's?

04:51PM  19    A.   No.

04:51PM  20    Q.   No.  When you left rehab, did you have family members and

04:51PM  21    friends that helped you when you got out?

04:51PM  22    A.   Nope.

04:51PM  23    Q.   Okay.  And you returned to Pharaoh's because that's what

04:51PM  24    you wanted to do, correct?

04:51PM  25    A.   Yeah.

USA v Gerace - L.L. - Soehnlein/Recross - 12/16/24

| 04:51PM | 1 | Q. At that point in time, correct? |

04:51PM   1   Q. At that point in time, correct?

04:51PM   2   A. Yes.

04:51PM   3   Q. You knew what it was, correct?

04:51PM   4   A. Yes.

04:51PM   5   Q. And you chose to go there, correct?

04:51PM   6   A. Yes.

04:51PM   7   Q. And those times that Mr. Barsuk and Mr. Casey engaged in

04:52PM   8   sex acts with you in the VIP, each of those times,

04:52PM   9   Mr. Rosenthal was being paid off to look the other way,

04:52PM   10   correct?

04:52PM   11   A. Yes.

04:52PM   12       MR. SOEHNLEIN:  That's all I have.

04:52PM   13       THE COURT:  Anything more, Mr. Tripi?

04:52PM   14       MR. TRIPI:  No, thank you, Judge.

04:52PM   15       THE COURT:  You can step down.  Thank you, ma'am.

04:52PM   16       THE WITNESS:  Okay.

17       (Witness excused at 4:52 p.m.)

18       (Excerpt concluded at 4:52 p.m.)

19        *    *    *    *    *    *    *

20

21

22

23

24

25

1

2                       **CERTIFICATE OF REPORTER**

3

4               In accordance with 28, U.S.C., 753(b), I

5     certify that these original notes are a true and correct

6     record of proceedings in the United States District Court for

7     the Western District of New York on December 16, 2024.

8

9

10                          s/ Ann M. Sawyer
                            Ann M. Sawyer, FCRR, RPR, CRR
11                          Official Court Reporter
                            U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF L.L. (PW #1) - DAY 2**

**DECEMBER 16, 2024**

**W I T N E S S**                                         **P A G E**

**L.L.   PROTECTED WITNESS #1**                              2

  (CONT'D) DIRECT EXAMINATION BY MR. TRIPI:          2

  CROSS-EXAMINATION BY MR. SOEHNLEIN:              133

  REDIRECT EXAMINATION BY MR. TRIPI:               251

  RECROSS-EXAMINATION BY MR. SOEHNLEIN:            266


**E X H I B I T S**                                       **P A G E**

GOV Exhibit 3571P                                          87

GOV Exhibit 3571U                                         125