08:57AM

1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                     Case No. 1:19-cr-227
4              Plaintiff,                       1:23-cr-37
   v.                                              (LJV)
5
   PETER GERACE, JR.,                 December 19, 2024
6
   _____Defendant.
7
          TRANSCRIPT OF JURY TRIAL - CLOSING STATEMENTS
8          BEFORE THE HONORABLE LAWRENCE J. VILARDO
                UNITED STATES DISTRICT JUDGE
9
   APPEARANCES:     TRINI E. ROSS, UNITED STATES ATTORNEY
10                  BY: JOSEPH M. TRIPI, ESQ.
                        NICHOLAS T. COOPER, ESQ.
11                      CASEY L. CHALBECK, ESQ.
                    Assistant United States Attorneys
12                  Federal Centre, 138 Delaware Avenue
                    Buffalo, New York 14202
13                  For the Plaintiff

14                  THE FOTI LAW FIRM, P.C.
                    BY: MARK ANDREW FOTI, ESQ.
15                  16 West Main Street, Suite 100
                    Rochester, New York 14614
16                     And
                    SOEHNLEIN LAW
17                  BY: ERIC MICHAEL SOEHNLEIN, ESQ.
                    350 Main Street, Suite 2100
18                  Buffalo, New York 14202
                    For the Defendant
19
   PRESENT:         KAREN A. CHAMPOUX, USA PARALEGAL
20                  BRIAN A. BURNS, FBI SPECIAL AGENT
                    MARILYN K. HALLIDAY, HSI SPECIAL AGENT
21                  OLIVIA A. PROIA, J.D., PARALEGAL

22 LAW CLERK:       REBECCA FABIAN IZZO, ESQ.

23 COURT CLERK:     COLLEEN M. DEMMA

24 REPORTER:        ANN MEISSNER SAWYER, FCRR, RPR, CRR
                    Robert H. Jackson Courthouse
25                  2 Niagara Square Buffalo, New York 14202
                    Ann_Sawyer@nywd.uscourts.gov

|          |    |                                                         |
|----------|----|---------------------------------------------------------|
| 09:07AM  | 1  | (Proceedings commenced at 9:07 a.m.)                    |
| 09:07AM  | 2  | (Jury not present.)                                     |
| 09:07AM  | 3  | **THE CLERK:**  All rise.  United States District Court |
| 09:07AM  | 4  | for the Western District of New York is now in session, the |
| 09:07AM  | 5  | Honorable Lawrence J. Vilardo presiding.                |
| 09:07AM  | 6  | **THE COURT:**  Please be seated.                       |
| 09:07AM  | 7  | **THE CLERK:**  19-cr-227 and 23-cr-37, United States of |
| 09:07AM  | 8  | America versus Peter Gerace Jr.                         |
| 09:07AM  | 9  | Assistant United States Attorneys Joseph Tripi, and    |
| 09:07AM  | 10 | Nicholas Cooper, and Casey Chalbeck who is appearing by |
| 09:07AM  | 11 | teleconference, and paralegal Karen Champoux, appearing on |
| 09:07AM  | 12 | behalf of the government.                               |
| 09:07AM  | 13 | Also present is FBI Special Agent Brian Burns, and     |
| 09:08AM  | 14 | HSI Special Agent Marilyn Halliday.                     |
| 09:08AM  | 15 | Attorneys Mark Foti and Eric Soehnlein, and paralegal  |
| 09:08AM  | 16 | Olivia Proia, appearing with defendant.  Defendant is present. |
| 09:08AM  | 17 | This is the date set for the continuation of a jury    |
| 09:08AM  | 18 | trial.                                                  |
| 09:08AM  | 19 | **THE COURT:**  Okay.  Anything we need to do before we |
| 09:08AM  | 20 | bring the jury in?                                       |
| 09:08AM  | 21 | **MR. COOPER:**  I guess I just wanted to ask if the   |
| 09:08AM  | 22 | Court has changed its mind with respect to the fear of severe |
| 09:08AM  | 23 | withdrawal system instruction?                          |
| 09:08AM  | 24 | **THE COURT:**  I have not.                             |
| 09:08AM  | 25 | **MR. COOPER:**  Okay.                                  |

| | | |
|---|---|---|
| 09:08AM | 1 | **THE COURT:** Yet, I -- I -- |
| 09:08AM | 2 | **MR. COOPER:** So then I -- I want to sum accordingly, |
| 09:08AM | 3 | that's why I'm asking. |
| 09:08AM | 4 | **THE COURT:** Yeah, yeah. Okay. Anything else? |
| 09:08AM | 5 | **MR. COOPER:** No. |
| 09:08AM | 6 | **THE COURT:** Anything else from the defense? |
| 09:08AM | 7 | **MR. FOTI:** No, Judge. |
| 09:08AM | 8 | **THE COURT:** Okay. So, if you want to take a break at |
| 09:08AM | 9 | some -- I'll give you three hours for this or, you know -- |
| 09:08AM | 10 | **MR. COOPER:** Thereabouts. |
| 09:08AM | 11 | **THE COURT:** -- as much, yeah, as much as you take. |
| 09:08AM | 12 | If you want to break, you let me know. Otherwise, we'll go |
| 09:08AM | 13 | right through. |
| 09:08AM | 14 | **MR. COOPER:** I appreciate it. I have a point in |
| 09:08AM | 15 | there that's probably a little tiny bit past halfway where I |
| 09:08AM | 16 | think it would make sense to break, because I move from one |
| 09:08AM | 17 | section to another, so I'll flag that for you when I get |
| 09:09AM | 18 | there. |
| 09:09AM | 19 | **THE COURT:** That's up to you. And if you don't want |
| 09:09AM | 20 | to break, if you feel like you're rolling along and you don't |
| 09:09AM | 21 | want to break, you can go through it. Otherwise, just let me |
| 09:09AM | 22 | know, Judge, this would be a good time for a break. |
| 09:09AM | 23 | **MR. COOPER:** Got it. That's gonna happen. |
| 09:09AM | 24 | **THE COURT:** Okay. Let's bring them in, please, Pat. |
| 09:11AM | 25 | (Jury seated at 9:11 a.m.) |

USA v Gerace - Closing Argument / Cooper - 12/19/24

4

| | | |
|---|---|---|
| 09:11AM | 1 | **THE COURT:**  Good morning, everyone. |
| 09:11AM | 2 | **THE JURORS:**  Good morning. |
| 09:11AM | 3 | **THE COURT:**  The record will reflect that all our |
| 09:11AM | 4 | jurors are present.  And we're going to begin the summations |
| 09:11AM | 5 | now. |
| 09:11AM | 6 | Mr. Cooper will sum up.  We'll take a relatively |
| 09:11AM | 7 | short lunch, and then the defense will sum up.  And the |
| 09:12AM | 8 | government has an opportunity to give a rebuttal after that. |
| 09:12AM | 9 | Okay? |
| 09:12AM | 10 | So, Mr. Cooper, the floor is yours. |
| 09:12AM | 11 | **MR. COOPER:**  Thanks, Judge. |
| 09:12AM | 12 | Choices.  This case is about choices, yeah.  Let's |
| 09:12AM | 13 | talk about the choices that this defendant made.  The choices |
| 09:12AM | 14 | that Peter Gerace made in his pursuit of money, in his pursuit |
| 09:12AM | 15 | of power, and in his pursuit of his own sexual gratification |
| 09:12AM | 16 | and the sexual gratification of others. |
| 09:12AM | 17 | We can start with money. |
| 09:12AM | 18 | The defendant set up Pharaoh's Gentlemen's Club as a |
| 09:12AM | 19 | drug-involved premises.  That was his business model. |
| 09:12AM | 20 | Your screens aren't working? |
| 09:13AM | 21 | **THE JURORS:**  This one, and that one. |
| 09:13AM | 22 | **THE COURT:**  Mine is not either. |
| 09:13AM | 23 | **MR. COOPER:**  We paused the timer, Judge. |
| 09:13AM | 24 | **THE JURORS:**  Okay.  We're good. |
| 09:13AM | 25 | **MR. COOPER:**  Everybody good?  All right. |

USA v Gerace - Closing Argument / Cooper - 12/19/24

09:13AM  1      May I proceed, Your Honor?

09:13AM  2      **THE COURT:**  Yep.  Of course.

09:13AM  3      **MR. COOPER:**  Thank you.  No, that's okay.

09:13AM  4      All right.  He set up Pharaoh's as a drug-involved

09:13AM  5  premises, and that was part of the business model.  It's how

09:13AM  6  the club was designed to function.  That was on purpose.  This

09:13AM  7  defendant set up Pharaoh's Gentlemen's Club to fuel the

09:13AM  8  addictions of drug-addicted dancers, and he did that to keep

09:13AM  9  them on the floor, to keep them dancing, to keep them walking

09:13AM  10  into the VIP Room with whales like Wayne VanVleet and

09:13AM  11  countless other customers.  And he did that for a reason,

09:13AM  12  because it filled his pockets with money.

09:13AM  13      Every single one of those dances that happened in the

09:13AM  14  VIP area, they only happened when the dancers had the drugs

09:13AM  15  that they need, so it's part of the business model.

09:14AM  16      He set up the club to supply customers with cocaine

09:14AM  17  because the more cocaine customers have access to, the more

09:14AM  18  cocaine they use, the more alcohol they drink which makes him

09:14AM  19  money, the more VIP dances they go and engage in which makes

09:14AM  20  him money, so it's part of the business model.  It's woven

09:14AM  21  into the fabric of his club.

09:14AM  22      These crimes brought the defendant power, and you

09:14AM  23  learned about that.  When you make a place like the upstairs

09:14AM  24  at Pharaoh's where important people, or people you think are

09:14AM  25  important, can go and snort cocaine without consequences, it

09:14AM  1   gives you access to power.  And we're going to talk in detail

09:14AM  2   about it, but think about Judge John Michalski who went

09:14AM  3   upstairs with dancers that this defendant provided, and then

09:14AM  4   forged documents for him.  And who happened to be the judge

09:14AM  5   that was deciding a protective order on controlled purchases

09:14AM  6   of drugs from his club?

09:14AM  7        That's power.  That's access to power that this

09:15AM  8   defendant had because of the way he ran his business, his

09:15AM  9   club.

09:15AM  10        And sexual gratification.  You probably heard more

09:15AM  11  about that than you wanted to during the course of this trial.

09:15AM  12  You heard testimony from witness after witness about how this

09:15AM  13  business, his business, was set up to gratify the sexual

09:15AM  14  desires of not just himself, but others.

09:15AM  15        The defendant, by setting himself up as a source of

09:15AM  16  supply for cocaine and highly addictive opiates like Lortabs

09:15AM  17  and other drugs, he made himself in a position of power to

09:15AM  18  demand sex from women that were heavily addicted to those

09:15AM  19  drugs, whenever he wanted it.

09:15AM  20        But it wasn't just his own sexual with gratification.

09:15AM  21  The business was set up to cater to the sexual gratification

09:15AM  22  of his friends, like Aaron LaMarca the liquor distributor who

09:15AM  23  would go upstairs and have sex with drug addicts that this

09:15AM  24  defendant set him up with; like his brother, David; like other

09:16AM  25  people; Judge Michalski going upstairs with Shelby, his

USA v Gerace - Closing Argument / Cooper - 12/19/24          7

09:16AM    1    drug-addicted employee.  He set it up to function that way.

09:16AM    2         And then you have the downstairs VIP area, part of

09:16AM    3    the business model.  People are looking the other way at his

09:16AM    4    direction.  I suggest to you you're gonna hear a lot about

09:16AM    5    this when the defendant tells L.L., go in the back with Wayne,

09:16AM    6    he's gonna stick his fingers in you, but he'll tip you extra,

09:16AM    7    and Brian will look the other way.  That was this defendant

09:16AM    8    describing how he set up his business so that he could fill

09:16AM    9    his pockets with money.

09:16AM    10        His lawyers told you on their opening statement this

09:16AM    11   case was about choices.  I agree.  This case is about the

09:16AM    12   choices that Peter Gerace made to get what he wanted: Money,

09:16AM    13   power, and sexual gratification.

09:16AM    14        You listened to the witnesses like L.L. who testified

09:16AM    15   just last week into this week.  Witnesses like K.L., P.H.,

09:17AM    16   K.A., and you learned about the wreckage that was left in the

09:17AM    17   wake of the choices that this defendant made so he could

09:17AM    18   pursue the things he wanted, like money, and power, and sexual

09:17AM    19   gratification.

09:17AM    20        It feels like a very long time ago, but during jury

09:17AM    21   selection each of you were selected basically to do a job in

09:17AM    22   service of the country.  You were picked to come here, listen

09:17AM    23   to testimony of witnesses from that stand, review evidence,

09:17AM    24   listen to the law, apply the facts as you determine them to

09:17AM    25   the law as Judge Vilardo instructs it to you, and return a

| | |
|---|---|
| 09:17AM | 1 |
| | just verdict.  That's your job.  So let's get to work. |
| 09:17AM | 2 |
| | There are four main boxes of proof in this case, four |
| 09:17AM | 3 |
| | different categories, and I'm going to try to separate it that |
| 09:17AM | 4 |
| | way so that we can go through it in an organized fashion. |
| 09:17AM | 5 |
| | The first category of proof in this case is |
| 09:17AM | 6 |
| | drug-trafficking proof.  And there's two counts in the |
| 09:18AM | 7 |
| | indictment that represent that category of proof.  So Count 3 |
| 09:18AM | 8 |
| | in the indictment charges the defendant with maintaining a |
| 09:18AM | 9 |
| | drug-involved premises, and Count 4 charges the defendant with |
| 09:18AM | 10 |
| | conspiring to possess with intent to distribute and to |
| 09:18AM | 11 |
| | distribute drugs.  Those are the two drug-trafficking counts. |
| 09:18AM | 12 |
| | The second box is sex trafficking.  And that's |
| 09:18AM | 13 |
| | represented in the indictment in Count 5, conspiracy to commit |
| 09:18AM | 14 |
| | sex trafficking.  And we'll talk more in detail about it in a |
| 09:18AM | 15 |
| | little bit. |
| 09:18AM | 16 |
| | The third category, as you know, is public |
| 09:18AM | 17 |
| | corruption.  Count 1 charges this defendant in a conspiracy |
| 09:18AM | 18 |
| | with Joseph Bongiovanni to defraud the United States, to |
| 09:18AM | 19 |
| | deprive the DEA of the work that Joe Bongiovanni owed them |
| 09:18AM | 20 |
| | essentially. |
| 09:18AM | 21 |
| | The -- the second count in that public corruption |
| 09:18AM | 22 |
| | category is Count 2, and that's paying a bribe to a public |
| 09:18AM | 23 |
| | official.  Those are two separate charges.  We'll cover the |
| 09:19AM | 24 |
| | differences when we get there. |
| 09:19AM | 25 |
| | The final category is witness tampering.  You learned |

---

09:17AM   1   just verdict.  That's your job.  So let's get to work.

09:17AM   2        There are four main boxes of proof in this case, four

09:17AM   3   different categories, and I'm going to try to separate it that

09:17AM   4   way so that we can go through it in an organized fashion.

09:17AM   5        The first category of proof in this case is

09:17AM   6   drug-trafficking proof.  And there's two counts in the

09:18AM   7   indictment that represent that category of proof.  So Count 3

09:18AM   8   in the indictment charges the defendant with maintaining a

09:18AM   9   drug-involved premises, and Count 4 charges the defendant with

09:18AM  10   conspiring to possess with intent to distribute and to

09:18AM  11   distribute drugs.  Those are the two drug-trafficking counts.

09:18AM  12        The second box is sex trafficking.  And that's

09:18AM  13   represented in the indictment in Count 5, conspiracy to commit

09:18AM  14   sex trafficking.  And we'll talk more in detail about it in a

09:18AM  15   little bit.

09:18AM  16        The third category, as you know, is public

09:18AM  17   corruption.  Count 1 charges this defendant in a conspiracy

09:18AM  18   with Joseph Bongiovanni to defraud the United States, to

09:18AM  19   deprive the DEA of the work that Joe Bongiovanni owed them

09:18AM  20   essentially.

09:18AM  21        The -- the second count in that public corruption

09:18AM  22   category is Count 2, and that's paying a bribe to a public

09:18AM  23   official.  Those are two separate charges.  We'll cover the

09:19AM  24   differences when we get there.

09:19AM  25        The final category is witness tampering.  You learned

09:19AM    1    about P.H., you heard from her, and you heard from others

09:19AM    2    about what happened on November 19th, 2019, when the

09:19AM    3    defendant, Crystal Quinn, and C.C., were snorting cocaine

09:19AM    4    together in his basement, attempting to prevent P.H. from

09:19AM    5    continuing to cooperate, sending messages trying to stop her

09:19AM    6    from ever getting in that chair.  That's the fourth category

09:19AM    7    of proof that we'll discuss.

09:19AM    8         We'll break it down, we'll go one at a time.  And I'm

09:19AM    9    going to talk with you about what the elements of each of

09:19AM   10    those crimes are, and then I'm going to talk with you about

09:19AM   11    specific pieces of credible testimony and credible evidence

09:19AM   12    that support you returning a verdict of guilty on each of

09:19AM   13    those crimes.  We'll hit every element, work through it

09:19AM   14    very -- in a very structured fashion.

09:19AM   15         And make no mistake about it, evidence includes

09:20AM   16    testimony from the witness stand.  Evidence doesn't have to be

09:20AM   17    physical boxes and pieces of paper.  When a person comes in

09:20AM   18    and swears an oath to tell the truth, and they talk with you

09:20AM   19    about things they observed, things they experienced, things

09:20AM   20    that happened to their bodies, that's evidence for you to

09:20AM   21    consider.

09:20AM   22         We're going to start with that first category,

09:20AM   23    though.  Let's start with drug trafficking, and we're going to

09:20AM   24    start with Count 3, maintaining a drug-involved premises.

09:20AM   25         The indictment alleges that the defendant maintained

09:20AM 1 Pharaoh's as a drug-involved premises between about 2006 and

09:20AM 2 December 12th, 2019.

09:20AM 3     That crime has three elements.  The first is that the

09:20AM 4 defendant permanently or temporarily used or maintained

09:20AM 5 Pharaoh's Gentlemen's Club;

09:20AM 6     Second, the defendant maintained that place for the

09:21AM 7 purpose of distributing and using controlled substances,

09:21AM 8 drugs; and

09:21AM 9     Third, that the defendant acted knowingly.

09:21AM 10     Those are the three elements, and the judge will give

09:21AM 11 you more detailed instructions later.

09:21AM 12     One note on distribution, though.  You heard us ask

09:21AM 13 witnesses this, we talked about it.  Distribution doesn't

09:21AM 14 require a sale.  Giving someone drugs and getting nothing in

09:21AM 15 return, distribution.

09:21AM 16     Causing another person to give someone drugs.  If I

09:21AM 17 give Joe drugs and say, hey, go give them to Karen, that's a

09:21AM 18 distribution from me.

09:21AM 19     So distribution does not equate to sale, and I'd like

09:21AM 20 for you to keep that in mind as we talk through this here.

09:21AM 21     We'll start with the first element.  It's been

09:21AM 22 established at this trial over and over and over again that

09:21AM 23 the defendant maintained Pharaoh's Gentlemen's Club.  We

09:21AM 24 called, I think, 45 witnesses in the government's case, and I

09:21AM 25 would suggest to you that I'm sure 30 of them discussed the

USA v Gerace - Closing Argument / Cooper - 12/19/24

09:21AM  1   defendant being the owner of Pharaoh's.  So we're going to

09:22AM  2   move through it, but we're not going to spend too much time in

09:22AM  3   that element.

09:22AM  4        I think when the judge instructs you on the law,

09:22AM  5   you're gonna hear him say it's not our burden to prove to you

09:22AM  6   that the defendant was the on-paper owner.  I suggest to you

09:22AM  7   that's not what the law means when it says maintained a place.

09:22AM  8   And I expect you're gonna hear the judge say did the defendant

09:22AM  9   exercise significant supervisory control over the place, over

09:22AM  10  the activities that occurred there, for a period of time.  And

09:22AM  11  let's think about what we learned in this case.

09:22AM  12       First of all, you can start with the 2009 probation

09:22AM  13  search as a -- kind of a lay-up of an example.  Probation goes

09:22AM  14  there at like 8 in the morning before the business is open,

09:22AM  15  and who's there?  The defendant.  That's evidence that the

09:22AM  16  defendant maintained the place, certainly wasn't a customer, a

09:22AM  17  low-level employee.  He was essentially there -- or, I suggest

09:22AM  18  the evidence shows you he was there overnight.

09:22AM  19       Witness after witness got on that stand and told you

09:22AM  20  Peter Gerace was the owner of Pharaoh's Gentlemen's Club.

09:23AM  21       You heard witnesses testify about his ability to hire

09:23AM  22  people.  You heard witnesses testify about his ability to fire

09:23AM  23  people.  That's significant supervisory control.

09:23AM  24       At the end of this case, after six weeks, there

09:23AM  25  should be no doubt left in your mind at all, let alone a

USA v Gerace - Closing Argument / Cooper - 12/19/24

09:23AM  1  reasonable doubt, that the defendant maintained Pharaoh's

09:23AM  2  between '06 and '19.

09:23AM  3       And, by the way, when the judge instructs you on the

09:23AM  4  law, I expect you're not gonna hear him say he had to be in

09:23AM  5  complete control of that place every single day between 2006

09:23AM  6  and 2019.  That's not required under the law.  I want you to

09:23AM  7  pay close attention to what the judge discusses with you about

09:23AM  8  that.

09:23AM  9       You know from listening to the testimony of witnesses

09:23AM  10  throughout the course of this trial that for the vast majority

09:23AM  11  of time between 2006 and 2019, this defendant controlled

09:23AM  12  Pharaoh's Gentlemen's Club.

09:23AM  13       Let's move on to the second element, that Pharaoh's

09:24AM  14  was maintained for the purpose of using and distributing

09:24AM  15  controlled substances.  That's also been proven to you beyond

09:24AM  16  a reasonable doubt.

09:24AM  17       I expect that that -- that the judge is going to tell

09:24AM  18  you that that element doesn't require that we prove to you

09:24AM  19  that using or dealing controlled substances was the only

09:24AM  20  purpose that the defendant maintained the club.  I expect that

09:24AM  21  the judge is going to tell you that we have to prove that the

09:24AM  22  drug activity was a significant or important reason why the

09:24AM  23  defendant maintained the place.  You know it was.

09:24AM  24       There's several reasons why you know that drug

09:24AM  25  activity, using and distributing drugs at Pharaoh's, was a

09:24AM   1   significant and important reason why he maintained that place.

09:24AM   2        The first one's obvious.  The more money the club

09:24AM   3   made, the more money he made.  He's the owner.  Common sense,

09:24AM   4   not rocket science.

09:25AM   5        You heard testimony from numerous witnesses that

09:25AM   6   selling alcohol made the club money, which means it made him

09:25AM   7   money, and that the more cocaine people use, the more they're

09:25AM   8   able to drink.  So that's a part of the business model that

09:25AM   9   this defendant set up, and we're going to get into detail

09:25AM   10  about how he directed cocaine to be distributed in a little

09:25AM   11  while.  But the more cocaine there was flowing through the

09:25AM   12  club, the more alcohol is sold.

09:25AM   13       In addition to that, the defendant was essentially

09:25AM   14  selling this party atmosphere.  And so by allowing,

09:25AM   15  permitting, directing, and encouraging cocaine to flow freely

09:25AM   16  through the club, he made it a place that people like John

09:25AM   17  McDonald and Jeff Anzalone were dying to go.

09:25AM   18       So let's talk about Jeff Anzalone for a second.  Was

09:25AM   19  it -- was it an important purpose for the defendant to bring

09:25AM   20  high-paying customers like Jeff to the club?  Of course.  Jeff

09:25AM   21  said he went to Pharaoh's Gentlemen's Club over 100 times.

09:25AM   22  And I got this -- the Court makes this, let me see if we can

09:26AM   23  find Jeff here.

09:26AM   24       You're gonna be able to take this in the back.  The

09:26AM   25  Court puts together a photo of each witness.  So if you don't

USA v Gerace - Closing Argument / Cooper - 12/19/24

14

09:26AM  1  remember who someone is by their name, you know, you're going

09:26AM  2  to be able to come back and look.

09:26AM  3      But we have Jeff Anzalone.  Jeff went to Pharaoh's

09:26AM  4  over 100 times.  He testified from this witness stand every

09:26AM  5  single time he went there he used cocaine.  And I asked him

09:26AM  6  Jeff, hey, what different areas around Pharaoh's did you use

09:26AM  7  cocaine?  And he listed every place in the club.  He couldn't

09:26AM  8  think of one location where he hadn't used club -- cocaine in

09:26AM  9  the club.

09:26AM  10      Downstairs office?  Yes.  Upstairs office?  Yes.

09:26AM  11  Bar?  Yes.  Tables by the stage?  Yes.  Jeff was doing cocaine

09:26AM  12  all the time in Pharaoh's in every location in Pharaoh's, and

09:26AM  13  he was spending a lot of money there.  And he's not the only

09:26AM  14  person.

09:26AM  15      Think about John McDonald.  John McDonald loved

09:26AM  16  Pharaoh's.  He testified pretty late in the trial, I'm sure

09:27AM  17  you remember him.  John went to Pharaoh's, he distributed

09:27AM  18  cocaine there.  And I asked him how many times have you been

09:27AM  19  to the club?  He said it's uncountable.

09:27AM  20      And what did he like to do?  It was obvious.  He

09:27AM  21  liked to use drugs and distribute drugs.  And the place he

09:27AM  22  chose to go was this defendant's club.  And it's obvious why.

09:27AM  23  Because that's the way the business was set up to function.

09:27AM  24  Bring people like Jeff and John McDonald in to spend their

09:27AM  25  money, to make him rich.

USA v Gerace - Closing Argument / Cooper - 12/19/24

09:27AM 1    This defendant distributed cocaine himself inside of

09:27AM 2  the club, and that's an important part of the reason why he

09:27AM 3  maintained it.  Allowing other dealers like Marcus Black, and

09:27AM 4  Jessica Leyland or Charm, to distribute cocaine inside the

09:27AM 5  club, that was an important reason why the defendant

09:27AM 6  maintained the club.

09:27AM 7    Directing dancers to distribute cocaine to customers,

09:27AM 8  like A.A. told you that she did, and like Kevin Myszka

09:27AM 9  described for you that he procured cocaine that way, that was

09:28AM 10 an important reason why the defendant maintained the club.

09:28AM 11    All of that conduct was designed on purpose to keep

09:28AM 12 people there, to bring in the customer base that he wanted, to

09:28AM 13 keep them spending money, to keep them going into the

09:28AM 14 VIP Room.

09:28AM 15    You heard testimony cocaine use causes arousal.  He's

09:28AM 16 selling sex at his business.  Cocaine use was an -- cocaine

09:28AM 17 use and distribution was an important and significant part of

09:28AM 18 keeping the business humming.

09:28AM 19    And there was some mention on opening statement

09:28AM 20 about, oh, it's all alcohol sales, all the money comes from

09:28AM 21 alcohol.  I submit to you that's inconsistent with everything

09:28AM 22 you heard from witnesses.  But if we focus on alcohol for a

09:28AM 23 second, why are people going to Pharaoh's to buy, like, a $15

09:28AM 24 beer?  Or a drink that's double the price of a bar?  What

09:28AM 25 brings them there?  Sex.  Women.  That's what brings them

09:28AM    1    there.

09:28AM    2         And the defendant's club wasn't going to be able to

09:29AM    3    sell drinks at those over, you know, inflated prices unless

09:29AM    4    customers were going there to engage in what you heard

09:29AM    5    happened in the VIP Room.

09:29AM    6         In order for the dancers to be able to function and

09:29AM    7    go in the VIP Room to work, many of them came in here and

09:29AM    8    testified to you they needed nearly constant access to

09:29AM    9    cocaine, and some of them opiates.  The business wasn't gonna

09:29AM   10    function, it wasn't gonna run, unless there was a steady flow

09:29AM   11    of drugs going through it, and he knew that.  That's not a

09:29AM   12    shock to this defendant.  You heard direct evidence of his

09:29AM   13    knowledge of that.

09:29AM   14         We'll talk about it right now.

09:29AM   15         Think about what E.H. told you.  E.H., you're gonna

09:29AM   16    remember E.H., she's the woman who told Mr. Soehnlein she's on

09:29AM   17    Team Not Getting Jizzed on and Told She Can't Call the Police.

09:29AM   18         E.H. went upstairs to put her luggage away, and she

09:30AM   19    saw the woman who she had just observed downstairs overdosing.

09:30AM   20    She saw her in the upstairs snorting cocaine.  And E.H. looks

09:30AM   21    at the woman, and this defendant looks at E.H., and what

09:30AM   22    happens?  He says to her, I help the girls out if they can't

09:30AM   23    work.  I can get you some, too.

09:30AM   24         That's the business model.  If the women can't work,

09:30AM   25    he's not making any money, so keeping constant access to drugs

USA v Gerace - Closing Argument / Cooper - 12/19/24

09:30AM  1    available at the club was important.  It was significant.

09:30AM  2          G.R. testified to you that when she worked at

09:30AM  3    Pharaoh's in 2009, when she was heavily addicted to cocaine

09:30AM  4    and opiates, that she could not have gotten through a single

09:30AM  5    shift at Pharaoh's without using cocaine or opiates.

09:30AM  6          A.B. testified to you that she worked at Pharaoh's a

09:30AM  7    decade later in 2019, and that she was so heavily addicted to

09:30AM  8    cocaine she used it multiple times per shift, every single

09:30AM  9    shift she worked.  Ms. A.B. testified that if she didn't have

09:31AM  10   cocaine and she started to come down, she became suicidal.

09:31AM  11         And so when you use your common sense and your life

09:31AM  12   experience, and you evaluate Ms. A.B.'s testimony, you know

09:31AM  13   she wasn't going to be going in the VIP Room and giving lap

09:31AM  14   dances and making him money if she didn't have access to

09:31AM  15   cocaine.  That wasn't gonna happen.

09:31AM  16         P.H. told you that when she would go through

09:31AM  17   withdrawals at Pharaoh's, the defendant would provide her with

09:31AM  18   opiates.

09:31AM  19         K.A., who worked at Pharaoh's from about 2012 until

09:31AM  20   about 2014, told you that she used between 2- and $300 per

09:31AM  21   night of heroin and cocaine.  Every night.

09:31AM  22         She said every time she went to work, she got high

09:31AM  23   there on cocaine and heroin.  She testified, importantly I

09:31AM  24   would suggest to you, that she would not have been able to

09:31AM  25   dance if she wasn't high on drugs.

USA v Gerace - Closing Argument / Cooper - 12/19/24

18

09:31AM  1      And that's consistent, this is a pattern that you

09:31AM  2  heard from witness after witness, if I didn't have access to

09:32AM  3  drugs, I would not have been able to work.  That tells you

09:32AM  4  that it was part of the business model.

09:32AM  5      A.A. told you that she worked at Pharaoh's from 2012

09:32AM  6  to 2013.  She testified that she was using between 6- and $900

09:32AM  7  per day of fentanyl, and that she was smoking fentanyl patches

09:32AM  8  every single shift she worked at Pharaoh's.  She said she

09:32AM  9  would not have been able to dance or do anything if she didn't

09:32AM  10 have access to drugs at the club where she's working.

09:32AM  11     R.W. also testified that when she worked at Pharaoh's

09:32AM  12 in 2012, that she got nervous before going on stage the first

09:32AM  13 time, and the DJ was like, oh, you're nervous?  Here.

09:32AM  14 Cocaine.

09:32AM  15     That's how the business runs.  It's ingrained in the

09:32AM  16 business model that this defendant set up.

09:32AM  17     I want to move on now to Wayne VanVleet for a second.

09:32AM  18     Wayne VanVleet is an example of the business model at

09:33AM  19 work.  You heard testimony from more than one witness that he

09:33AM  20 was considered a whale at the club because he was there all

09:33AM  21 the time and he spent a lot of money.

09:33AM  22     Wayne spent all that money in the VIP Room, money

09:33AM  23 that ended up in this defendant's pockets, but Wayne isn't

09:33AM  24 there spending money in the VIP Room unless the dancers are

09:33AM  25 able to go back there with him, and they're not doing that

09:33AM  1  unless they have nearly constant access to drugs.

09:33AM  2      All three women that you heard testify to about

09:33AM  3  interacting with Wayne VanVleet told you they were heavily

09:33AM  4  addicted to drugs at the time, that they would have never let

09:33AM  5  him do what he did to them, and we'll get there, if it wasn't

09:33AM  6  for those drug addictions.

09:33AM  7      So because money was making -- because making money

09:33AM  8  was a significant reason that the defendant maintained the

09:33AM  9  club, making sure that dancers had constant access to drugs

09:33AM  10  was a significant reason that the defendant maintained the

09:33AM  11  club.  It's part of the business model.

09:34AM  12      Another reason that keeping drugs flowing through

09:34AM  13  Pharaoh's was important and significant to this defendant is

09:34AM  14  because of the access to power that it gave him.

09:34AM  15      You heard testimony that the defendant had a private

09:34AM  16  upstairs area where he brought lawyers, and judges,

09:34AM  17  politicians, athletes, at least one actor, and members of

09:34AM  18  powerful motorcycle gangs.  Having access to those people,

09:34AM  19  having something that they wanted, gave him a status and power

09:34AM  20  that he wanted.

09:34AM  21      You know what mattered to him.  He bragged about it.

09:34AM  22  He bragged about the judges, and the important people in law

09:34AM  23  enforcement that he knew.  And you don't need to be a rocket

09:34AM  24  scientist to know why those people wanted to come to Pharaoh's

09:34AM  25  and go upstairs.

USA v Gerace - Closing Argument / Cooper - 12/19/24

09:34AM   1         I suggest to you the testimony established that

09:34AM   2    certain prominent people who wanted to have a place to go and

09:34AM   3    snort cocaine without consequences knew where to go.  They

09:34AM   4    went to this defendant, they went to Pharaoh's Gentlemen's

09:35AM   5    Club.

09:35AM   6         The upstairs at Pharaoh's was maintained on purpose

09:35AM   7    as a place to use and distribute cocaine.  Distribute it to

09:35AM   8    your friends, distribute it to dancers, use it yourself.  That

09:35AM   9    was a significant and important reason why he maintained the

09:35AM   10   club.

09:35AM   11        The third reason that you know using and distributing

09:35AM   12   drugs was the purpose or a significant purpose for the

09:35AM   13   defendant maintaining the club was because it allowed him to

09:35AM   14   have his own personal sex party and drug party upstairs.

09:35AM   15        Let's -- let's recap what we learned about that.

09:35AM   16        C.B. testified, she was a manager, she was the Jets

09:35AM   17   fan, she testified that she was a manager between 2011 and

09:35AM   18   2013.  She told you about the difference between what Don

09:35AM   19   Parrino wanted out of the club and what this defendant wanted.

09:35AM   20        So back in that timeframe when Parrino was still

09:36AM   21   around in 2011 to '13, she said, yeah, Parrino wanted me to

09:36AM   22   wear 4-inch heels and a bolero jacket, which I had to Google,

09:36AM   23   and she said that Peter Gerace wanted her -- wanted it to be

09:36AM   24   Peter's Playhouse.  Those were her words.  And she described

09:36AM   25   for you what she meant by "Peter's Playhouse."

USA v Gerace - Closing Argument / Cooper - 12/19/24

21

09:36AM      1          She told you that she saw the defendant bringing

09:36AM      2    dancers upstairs, and that she saw the dancers come downstairs

09:36AM      3    after, that they appeared to be high on drugs, and that they

09:36AM      4    would ask her for baby wipes, or tell her that they needed to

09:36AM      5    clean themselves up.  She wasn't exactly out on an island with

09:36AM      6    that testimony either.

09:36AM      7          A.G., a/k/a Barbie, she was a short blonde-haired

09:36AM      8    woman who testified probably middle of the trial.  She told

09:36AM      9    you that on her second day working at Pharaoh's, the defendant

09:36AM     10    invited her upstairs with two other women to party.  She told

09:36AM     11    you that she interpreted "party" in that context to mean use

09:36AM     12    drugs with him and have sex with him.  She declined.  And

09:37AM     13    we'll talk about what happened to her in a little bit.

09:37AM     14          G.R. observed the defendant using and distributing

09:37AM     15    cocaine upstairs.  The defendant brought G.R. up there to use

09:37AM     16    drugs, to coerce her into sex, so he could impress his friends

09:37AM     17    like she was a party favor.

09:37AM     18          J.Z. observed the defendant using and distributing

09:37AM     19    cocaine upstairs.

09:37AM     20          A.A. observed the defendant using and distributing

09:37AM     21    cocaine upstairs.

09:37AM     22          A.P. observed the defendant using and distributing

09:37AM     23    cocaine upstairs.

09:37AM     24          A.B. observed the defendant -- she testified the

09:37AM     25    defendant brought her upstairs and gave her cocaine.

09:37AM  1          C.C. said she observed the defendant using and

09:37AM  2  distributing cocaine upstairs up to 20 times, that was her

09:37AM  3  testimony.

09:37AM  4          P.H. testified that she was provided cocaine by the

09:37AM  5  defendant upstairs.  She also testified that she went upstairs

09:37AM  6  with this defendant and a member of the Pagan's Motorcycle

09:37AM  7  Club, and they snorted methamphetamine up there.

09:38AM  8          Katrina Nigro observed the defendant using and

09:38AM  9  distributing cocaine upstairs.

09:38AM  10          K.L. observed the defendant using and distributing

09:38AM  11  cocaine upstairs.  And you know what happened to K.L., you

09:38AM  12  know she was brought upstairs to be coerced into sex.

09:38AM  13          L.L. observed the defendant using and distributing

09:38AM  14  cocaine in the upstairs.

09:38AM  15          This defendant getting to have his own personal

09:38AM  16  space, where vulnerable drug-addicted women were just a

09:38AM  17  staircase away, that was a significant and important reason

09:38AM  18  that he maintained Pharaoh's.  That's the second element.

09:38AM  19          The third element, that the defendant acted

09:38AM  20  knowingly, that he had knowledge.

09:38AM  21          I expect that the judge is going to tell you a person

09:38AM  22  does something knowingly when they do it voluntarily, when

09:38AM  23  it's, you know, on purpose and not by accident or by mistake.

09:38AM  24  That makes sense.

09:38AM  25          You know the defendant knowingly maintained Pharaoh's

09:38AM  1    for the purpose of using and distributing drugs based on his

09:38AM  2    own words and his own actions.

09:39AM  3         We talked about E.H.  When the defendant brings this

09:39AM  4    overdosing dancer upstairs and has her doing lines of coke to

09:39AM  5    wake her up so she can get back to work, and he tells

09:39AM  6    Ms. E.H., I help the girls if they need to work, I can get you

09:39AM  7    some too, that speaks to his knowledge that he was maintaining

09:39AM  8    Pharaoh's for the purpose, a significant or important purpose

09:39AM  9    was to distribute drugs because it kept the business moving.

09:39AM  10        The defendant's actions tell you that he acted

09:39AM  11   knowingly.  L.L. testified that when she showed up to work

09:39AM  12   dope sick going through physical withdrawals from heroin, she

09:39AM  13   was unable to work, she couldn't do anything when she was like

09:39AM  14   that.  She said this defendant called someone and had opiates

09:39AM  15   delivered to her there so that he could get her back on the

09:39AM  16   floor, get her back to work, get her back to filling his

09:39AM  17   pockets up with money.  It has to happen in order for the

09:40AM  18   business to work, and that's how you know the defendant acted

09:40AM  19   knowingly.  His own words and his own actions validate and

09:40AM  20   support that he acted knowingly.

09:40AM  21        Giving cocaine to customers or making cocaine

09:40AM  22   available to customers, that was an important part.  And

09:40AM  23   that's why this defendant chose to allow dealers like Marcus

09:40AM  24   Black -- you heard a lot of testimony about Marcus, one of the

09:40AM  25   preferred drug dealers that this defendant had working at his

09:40AM    1    club, Charm, these were people, A.A., that not only sold drugs

09:40AM    2    at his club, but people he knew that sold drugs at his club,

09:40AM    3    and people that tons of witnesses testified he was incredibly

09:40AM    4    close with.

09:40AM    5         I suggest to you that the proof, the evidence, shows

09:40AM    6    that people like Marcus and Jessica were employees at the club

09:41AM    7    in truth, if not on paper.  Their job was to sell drugs there.

09:41AM    8    They got money, and he had a club with constant access to

09:41AM    9    cocaine, which made his club more money.  So that's Count 3,

09:41AM   10    maintaining a drug-involved premises.

09:41AM   11         I suggest to you that when you start your

09:41AM   12    deliberations, this is just my suggestion, I suggest you start

09:41AM   13    at Count 3.  Work your way through it.

09:41AM   14         Element 1, check, he maintained the place.

09:41AM   15         Element 2, check, he did it for the purpose, a

09:41AM   16    significant purpose of making drugs available, distributing

09:41AM   17    and using them.

09:41AM   18         Element 3, he acted knowingly, check.

09:41AM   19         Proven beyond a reasonable doubt right here in this

09:41AM   20    courtroom.  Find him guilty of Count 3, because his choices,

09:41AM   21    and his conduct, make him guilty of Count 3.

09:41AM   22         Let's talk about Count 4.  Conspiracy to distribute

09:42AM   23    controlled substances between February -- or, between 2009 and

09:42AM   24    February of 2019.

09:42AM   25         Let's talk briefly about conspiracy generally.

USA v Gerace - Closing Argument / Cooper - 12/19/24

25

09:42AM  1    I expect that Judge Vilardo's gonna, you know, he'll
09:42AM  2  instruct you on the law of what a conspiracy is.  I expect
09:42AM  3  he's going to tell you it's basically a criminal partnership.
09:42AM  4  It's an agreement between two or more people to violate some
09:42AM  5  law of the United States.
09:42AM  6    And in Count 4, it's an agreement between this
09:42AM  7  defendant and other people to distribute drugs, and to possess
09:42AM  8  with the intent to distribute drugs.
09:42AM  9    There's two elements to a narcotics conspiracy.
09:42AM  10    First, that two or more people entered the unlawful
09:42AM  11  agreement charged in the indictment; and
09:42AM  12    Second, that the defendant knowingly and willfully
09:42AM  13  became a member of that agreement, of that conspiracy.
09:42AM  14    So in order to know in the first element if -- if two
09:43AM  15  or more people existed in that unlawful agreement charged in
09:43AM  16  the indictment, you need to know what is the unlawful
09:43AM  17  agreement charged in the indictment.  And you'll get the
09:43AM  18  indictment when you go back there, you'll be able to look at
09:43AM  19  it.  But it has two parts, the agreement, you'll see.
09:43AM  20    One, to possess with intent to distribute and
09:43AM  21  distribute cocaine, cocaine base, methamphetamine,
09:43AM  22  amphetamine, marijuana, or heroin, or, to maintain Pharaoh's
09:43AM  23  Gentlemen's Club for the purpose of distributing and using
09:43AM  24  those same drugs that I just listed.
09:43AM  25    To boil it down as simple as possible, the indictment

```
09:43AM     1   charges a conspiracy or an agreement, between two or more

09:43AM     2   people, including him, to distribute drugs or to maintain

09:43AM     3   Pharaoh's for the purpose of using or distributing drugs.

09:43AM     4        If we prove either of those two objects to you,

09:43AM     5   either of those two objects of the conspiracy, I suggest the

09:44AM     6   judge is going to instruct you that that's sufficient, it

09:44AM     7   doesn't have to be both.

09:44AM     8        I submit to you that we've proven both beyond a

09:44AM     9   reasonable doubt.  But keep in mind, either one of those

09:44AM    10   objects of the conspiracy is sufficient to find this defendant

09:44AM    11   guilty.

09:44AM    12        Let's talk about how we proved the existence of an

09:44AM    13   agreement to distribute drugs.

09:44AM    14        Obviously, it's not a scene from a, like, a movie

09:44AM    15   where there's a bunch of villains in costumes sitting around a

09:44AM    16   huge conference table.  That's not how things happen in real

09:44AM    17   life.  I expect that the judge is going to tell you that when

09:44AM    18   you determine whether the agreement existed here, you should

09:44AM    19   keep in mind that it doesn't have to be an express or formal

09:44AM    20   or written agreement.  That's not required under the law.

09:44AM    21        I expect that the judge is going to tell you that you

09:44AM    22   have to find that there was a mutual understanding, spoken or

09:44AM    23   unspoken, a mutual understanding between people to cooperate

09:45AM    24   with each other, to accomplish an unlawful act.  And selling

09:45AM    25   drugs is an unlawful act.
```

USA v Gerace - Closing Argument / Cooper - 12/19/24

09:45AM  1        So did the defendant have a mutual agreement, a

09:45AM  2   mutual understanding, spoken or unspoken, with other people to

09:45AM  3   sell drugs at Pharaoh's?  You know he did.

09:45AM  4        The defendant was in an unlawful agreement.  He had a

09:45AM  5   mutual understanding with his good friend, Marcus Black.  You

09:45AM  6   heard testimony in detail from A.A. that customers would come

09:45AM  7   up to her, they would ask for cocaine, she would go and check

09:45AM  8   with this defendant, hey, should I -- can I get that person

09:45AM  9   cocaine?  And he would say, yeah, go see Marcus.  She'd go to

09:45AM 10   Marcus, she'd get the drugs, and she'd deliver them.  That's a

09:45AM 11   conspiracy right there.  That's it.

09:45AM 12        It's an -- a mutual understanding between those three

09:45AM 13   people to sell drugs at Pharaoh's.

09:45AM 14        And it's not the only conspiracy -- or, the only

09:45AM 15   member of the conspiracy that existed.  The defendant was in

09:46AM 16   that same unlawful agreement, he had that same mutual

09:46AM 17   understanding with Jessica Leyland, another preferred drug

09:46AM 18   dealer who sold to customers and dancers at Pharaoh's.

09:46AM 19        Based on the testimony of L.L., you know the

09:46AM 20   defendant was in an unlawful agreement with Scooter, the

09:46AM 21   person who would drop off heroin to the defendant to provide

09:46AM 22   to L.L. so she could work.

09:46AM 23        Kevin Myszka described for you when he went to

09:46AM 24   Pharaoh's one time that he had been using cocaine, he was a

09:46AM 25   drug addict, he ran out of cocaine, and he wanted to use more.

09:46AM  1    And so in order to stay at the club, Kevin Myszka needed to

09:46AM  2    use more cocaine or else, I submit to you, he was going to

09:46AM  3    leave.  And so he goes to the defendant, and he says hey, can

09:46AM  4    I get some coke?  Or whatever words, I don't think he

09:46AM  5    remembered the exact words he uses, but he asked the defendant

09:46AM  6    for cocaine.

09:47AM  7           Minutes later, a dancer who I submit to you is

09:47AM  8    probably Cherry, probably A.A. here, comes walking over and

09:47AM  9    delivers Kevin Myszka cocaine.  That's the mutual

09:47AM  10   understanding that this defendant had with other members of

09:47AM  11   his drug conspiracy.  Provide drugs to the customers, keep the

09:47AM  12   club flowing, keep the money pouring into my pockets.  It's an

09:47AM  13   agreement to distribute drugs.  People acting together to

09:47AM  14   accomplish an unlawful purpose.

09:47AM  15          The second element, we have to prove the defendant's

09:47AM  16   membership in the conspiracy.  We have to prove to you that

09:47AM  17   this defendant knowingly and willfully and voluntarily became

09:47AM  18   a member of that agreement with that mutual understanding to

09:47AM  19   sell drugs at Pharaoh's, or to maintain Pharaoh's as a

09:47AM  20   drug-involved premises.

09:47AM  21          In determining that, you'll be asked to decide, to --

09:47AM  22   to question yourselves, did he have a stake, like a financial

09:48AM  23   stake or some other type of stake, in the outcome of the

09:48AM  24   conspiracy?  And I suggest to you that you know he did.  In

09:48AM  25   terms of distributing drugs at Pharaoh's, the defendant had an

USA v Gerace - Closing Argument / Cooper - 12/19/24

09:48AM    1    obvious financial motive to allow, permit, encourage, and

09:48AM    2    sometimes direct that to happen, to sometimes do it himself.

09:48AM    3         It made the club more money.  You heard from

09:48AM    4    customers, you heard from dancers, that cocaine was integral

09:48AM    5    to the functioning of the club.

09:48AM    6         You heard from numerous drug-addicted dancers.

09:48AM    7    People that were addicted to Lortabs like K.L., like P.H.

09:48AM    8    They wouldn't have been able to work if they didn't have

09:48AM    9    access to those drugs, so this defendant had a stake, he had a

09:48AM   10    financial interest, in order to keep his business flowing,

09:48AM   11    keep the gears turning, to make sure that drugs were available

09:48AM   12    to be distributed.

09:48AM   13         You heard testimony from A.P., and it was a really

09:49AM   14    long time ago at this point.  She was witness number 2.  But

09:49AM   15    that's A.P., nobody could pronounce her last name, A.P.

09:49AM   16    testified that she had been dating the defendant on and off

09:49AM   17    and she worked at Pharaoh's from 2006 to 2013.  She told you

09:49AM   18    that she knew and she -- think about it, back then she was

09:49AM   19    close to the defendant, they were dating, she knew him to be

09:49AM   20    close friends with Marcus Black.  She told you the defendant

09:49AM   21    would send her to buy cocaine from Marcus and bring it back to

09:49AM   22    him.  That's an -- that's an agreement, a mutual

09:49AM   23    understanding, to use and distribute drugs at Pharaoh's, to

09:49AM   24    maintain Pharaoh's for the purpose of -- of distributing and

09:49AM   25    using drugs.

USA v Gerace - Closing Argument / Cooper - 12/19/24

30

09:49AM  1    A.P. told you that she had personally observed the

09:49AM  2    defendant buying drugs from Marcus.  And all that goes to this

09:49AM  3    question, did he knowingly and willfully become a member of

09:49AM  4    this agreement.  He knew Marcus was a drug dealer, and for

09:49AM  5    years, over the course of 45 witnesses' testimony, you heard

09:49AM  6    about Marcus being at the club all the time, constantly.  That

09:50AM  7    speaks to his knowledge, his willingness to be in this

09:50AM  8    agreement, to have Marcus selling drugs to customers and

09:50AM  9    dancers at Pharaoh's.

09:50AM  10    A.B. told you that she saw Marcus Black frequently at

09:50AM  11    Pharaoh's, and that he interacted most with the defendant.

09:50AM  12    I expect the judge is going to tell you that

09:50AM  13    conspiracies by their nature are secretive, right?  That's the

09:50AM  14    point, you don't want to get caught, you're trying to keep it

09:50AM  15    quiet, so actions often speak louder than words.  I expect

09:50AM  16    that's going to be in his instruction to you.  But think about

09:50AM  17    what you heard from the witnesses.  Marcus Black and Peter

09:50AM  18    thick as thieves, together all the time at the club, and

09:50AM  19    Marcus is there selling cocaine.  That's what he does.  That's

09:50AM  20    his job.

09:50AM  21    You can and should infer from that the obvious, which

09:50AM  22    is they were doing it together.  It was in the defendant's

09:50AM  23    best interest that Marcus sold drugs there, and it was in

09:50AM  24    Marcus's best interest.  Marcus had a ready base of customers

09:51AM  25    at Pharaoh's.  Dancers needed cocaine, customers wanted

09:51AM    1    cocaine, Peter was blowing tons of cocaine upstairs with his

09:51AM    2    friends.  So Marcus was raking in money.  And this defendant

09:51AM    3    needed to keep the coke flowing through the club.  So they

09:51AM    4    have a mutual understanding, they have an agreement, and

09:51AM    5    that's the crime charged in Count 4.

09:51AM    6         You heard from R.W. that she heard Marcus Black

09:51AM    7    advertising with his mouth, with his words, advertising, hey,

09:51AM    8    I got White Girl, I got White Girl for sale.  And there was

09:51AM    9    some cross-examination suggesting that maybe she got it wrong

09:51AM   10    and he was talking about, like, Caucasian women that worked at

09:51AM   11    the club.  But I suggest to you that if you use your common

09:51AM   12    sense, you can dispense with that.  R.W. was a drug addict,

09:51AM   13    and she knew the slang used for drugs, and she told you,

09:51AM   14    testimony that I submit you should find credible, that White

09:51AM   15    Girl was in reference to cocaine when Marcus Black was saying

09:51AM   16    it.  And it's consistent with the testimony of essentially all

09:51AM   17    of the other witnesses that Marcus sold cocaine at the club.

09:52AM   18         Then you have A.A. who came here and told you about

09:52AM   19    her own participation in that conduct.  And I would suggest to

09:52AM   20    you that you can see the -- the way that that built up, the

09:52AM   21    way that the defendant brought A.A. upstairs, she described

09:52AM   22    that for you.  She said the defendant put a credit card with

09:52AM   23    cocaine up to her nose and told her to sniff, she sniffed it.

09:52AM   24    And that's grooming behavior.  It's like, hey, let's get her

09:52AM   25    on board with the drug stuff and we'll use her to hit off the

USA v Gerace - Closing Argument / Cooper - 12/19/24

32

| 09:52AM | 1 | customers. |
| 09:52AM | 2 | Who were the two people that were up there with her? |
| 09:52AM | 3 | Marcus and this defendant.  Bringing her into the fold. |
| 09:52AM | 4 | Peter's not gonna be handing out the drugs to the customers on |
| 09:52AM | 5 | the floor, and this insulates Marcus as well if anybody gets |
| 09:52AM | 6 | caught making a handoff, that's the dancer, that's part of the |
| 09:52AM | 7 | corrupt agreement, the criminal conspiracy that this defendant |
| 09:52AM | 8 | was at the center of at his club. |
| 09:52AM | 9 | Marcus wasn't the only preferred drug dealer.  Let's |
| 09:53AM | 10 | look at Jessica Leyland, a/k/a Charm. |
| 09:53AM | 11 | So these three pictures in evidence, 560, 561, and |
| 09:53AM | 12 | 562, I submit to you that they show you physically how close |
| 09:53AM | 13 | she was to the defendant, and they also depict what you heard |
| 09:53AM | 14 | from the testimony of lots of witnesses during the course of |
| 09:53AM | 15 | this trial. |
| 09:53AM | 16 | A.P., she told you that Charm was very close with the |
| 09:53AM | 17 | defendant, and that Charm was a drug dealer who sold cocaine |
| 09:53AM | 18 | to dancers, employees and customers. |
| 09:53AM | 19 | And, by the way, A.P., who was dating him, was also |
| 09:53AM | 20 | one of the preferred drug dealers who sold cocaine to |
| 09:53AM | 21 | customers at Pharaoh's and dancers at Pharaoh's. |
| 09:53AM | 22 | C.C., she was the defendant's fiancée for a period of |
| 09:53AM | 23 | time.  She testified that Charm sold cocaine, that's Jessica |
| 09:54AM | 24 | here, Charm sold cocaine to people at Pharaoh's.  And she also |
| 09:54AM | 25 | testified when she was asked did the defendant know Charm was |

09:54AM   1   selling cocaine, and C.C. said yeah, it was obvious.

09:54AM   2         C.B. testified that Charm would come out of the

09:54AM   3   feature dressing room, and it would look like a snow globe in

09:54AM   4   there.

09:54AM   5         P.H. testified she knew Jessica Leyland, Charm, to be

09:54AM   6   very, very close and loyal to this defendant.  P.H. testified

09:54AM   7   that the defendant had actually sent her to purchase cocaine

09:54AM   8   from Charm while they were at Pharaoh's.  And that speaks to

09:54AM   9   the defendant's knowledge.  He knows Leyland's a drug dealer,

09:54AM  10   she's someone he's very, very close to, she's loyal to him.

09:54AM  11   You put those pieces together, you know that the defendant

09:54AM  12   wasn't unhappy that Jessica Leyland was selling drugs at the

09:54AM  13   club.  He didn't fire Jessica Leyland for selling drugs at the

09:54AM  14   club.  It's part of the business model.  You need drug dealers

09:54AM  15   there so that dancers and customers can get high.  She was one

09:55AM  16   of the preferred drug dealers at the club.

09:55AM  17         Katrina Nigro told you that the defendant had an

09:55AM  18   arrangement with Charm where Charm would have this stag

09:55AM  19   company help bring women to the club to work there, and that

09:55AM  20   the defendant let her deal drugs at the club.

09:55AM  21         They each had a stake in the outcome.  Think about

09:55AM  22   that, same as Marcus Black's stake.  Charm has customers all

09:55AM  23   over the place.  She's distributing individually-packaged bags

09:55AM  24   of cocaine, so it's not like she has one friend who says hey,

09:55AM  25   can I get a bump?, and she gives it one time to someone.  She

09:55AM     1    got pulled over leaving Pharaoh's, and she had however much

09:55AM     2    cocaine that the state trooper found in her car -- and

09:55AM     3    Mr. Tripi will probably be able to remind me of how much that

09:55AM     4    was -- but it was individually packaged.  It was set up for

09:55AM     5    sale.  That was her business, she made money.  And the

09:55AM     6    defendant, he benefited from it also for all the reasons that

09:55AM     7    we've discussed, and I'm not going to get repetitive.  Well,

09:55AM     8    not more repetitive.

09:56AM     9          Corrupt DEA Agent Joe Bongiovanni, he's a member,

09:56AM    10    he's a member of the narcotics conspiracy.  Here he is.  And

09:56AM    11    we'll talk about him in a lot more detail when we get to the

09:56AM    12    public corruption spot.  But just because he's not handing out

09:56AM    13    drugs at Pharaoh's doesn't mean he doesn't have a role in the

09:56AM    14    conspiracy.

09:56AM    15          He has a very different, very important role in this

09:56AM    16    defendant's narcotics conspiracy:

09:56AM    17          Keep me safe.  When probation comes, or when the FBI

09:56AM    18    starts investigating, or when the DEA starts investigating,

09:56AM    19    shut it down.

09:56AM    20          Give me advice.  Hey, I'm a drug dealer.  Drug

09:56AM    21    dealers, burner phones, can the law enforcement ping those and

09:56AM    22    locate them?  And Bongiovanni responds on retainer for this

09:56AM    23    defendant.  That's his role in the conspiracy.  And we'll dig

09:56AM    24    more into that in a little bit.

09:56AM    25          The judge is -- I expect the judge is going to tell

09:57AM    1    you that not everybody in a conspiracy has to have an equal

09:57AM    2    role, not equal culpability.  The elements, tether

09:57AM    3    yourselves -- I suggest you, you should tether yourself to the

09:57AM    4    elements.  Facts plus law equals verdict.

09:57AM    5         So look at those elements, apply the facts as you

09:57AM    6    decide them, and that's how you should come to a verdict.

09:57AM    7         I want to point out also before we move on from

09:57AM    8    narcotics conspiracy, there's numerous different substances

09:57AM    9    that are listed in the indictment, I read them earlier,

09:57AM    10   cocaine, cocaine base, methamphetamine, amphetamine, heroin,

09:57AM    11   and marijuana.  All those are listed as objects of the

09:57AM    12   conspiracy to use or distribute those substances.

09:57AM    13        You do not have to find that all of those substances

09:57AM    14   were a part of this conspiracy to convict the defendant.  One

09:57AM    15   of them, or any combination of them, is sufficient.  And I

09:57AM    16   expect the judge will instruct you on that when he instructs

09:57AM    17   you on the law.

09:57AM    18        So cocaine.  Right?  Let's start with an easy one.

09:58AM    19   Cocaine, which you heard tons of testimony about, was an

09:58AM    20   obvious object of the mutual agreement, the criminal

09:58AM    21   partnership, to distribute drugs at Pharaoh's.  And because

09:58AM    22   cocaine was one of the substances listed, that's sufficient

09:58AM    23   even if you didn't believe, for example, amphetamine was.

09:58AM    24        Now, I submit to you that you've heard testimony on

09:58AM    25   every substance, and that we've proven this agreement to

09:58AM  1    distribute those drugs beyond a reasonable doubt.

09:58AM  2           Now, the defendant might argue, hey, I -- how could I

09:58AM  3    have possibly known every time Marcus Black was selling drugs?

09:58AM  4    Or how could I have possibly known every customer that Charm

09:58AM  5    was hitting off at the club?

09:58AM  6           That doesn't matter.  The judge is going to explain

09:58AM  7    to you that coconspirators don't need to be apprised or aware

09:58AM  8    of every action that another coconspirator undertakes.  You

09:59AM  9    don't need to know all the details of the conspiracy.

09:59AM  10          I expect the judge is going to tell you that what's

09:59AM  11   necessary is that the defendant must have participated in the

09:59AM  12   conspiracy with knowledge of at least some of its purposes or

09:59AM  13   objectives and with the intention of aiding in the

09:59AM  14   accomplishment of those unlawful ends.  Check.

09:59AM  15          The defendant knew the objective was to sell drugs to

09:59AM  16   customers and dancers and keep the club making money.  He

09:59AM  17   intended to accomplish that objective in the ways we just

09:59AM  18   discussed.  Sometimes handing the drugs out himself, sometimes

09:59AM  19   directing A.A. go to Marcus, and by setting up specific

09:59AM  20   preferred drug dealers that were allowed to work and sell at

09:59AM  21   the club like Jessica Leyland, Marcus Black and others.

09:59AM  22          So that's Count 4, conspiracy to distribute

09:59AM  23   controlled substances.  A mutual understanding and agreement

09:59AM  24   between two or more people to move drugs through the club.  To

09:59AM  25   maintain Pharaoh's as a drug-involved premises.

USA v Gerace - Closing Argument / Cooper - 12/19/24    37

10:00AM    1        Two elements, both met, proven beyond a reasonable

10:00AM    2    doubt right here in this courtroom.

10:00AM    3        Find him guilty of Count 4, because his choices and

10:00AM    4    his conduct make him guilty of Count 4.

10:00AM    5        And that covers the first category of proof, drug

10:00AM    6    trafficking.  I told you we're going to cover four different

10:00AM    7    ones, they're not all equal length, so --

10:00AM    8        The next one, though, is -- is a big one, the next

10:00AM    9    category of proof is sex trafficking.  We're going to cover

10:00AM   10    this category, we'll talk about Count 5, and then I'm going to

10:00AM   11    ask the judge for a break.  So, let's talk about the sex

10:00AM   12    trafficking here.

10:00AM   13        Conspiring to commit sex trafficking between 2009 and

10:00AM   14    2018.  That's what the defendant's charged with in Count 5.

10:00AM   15    And that crime has two different elements.

10:00AM   16        First, that a conspiracy existed to commit sex

10:00AM   17    trafficking of an adult by force, threats of force, fraud, or

10:01AM   18    coercion was formed or reached or entered into by two or more

10:01AM   19    persons.  That's the criminal partnership we were talking

10:01AM   20    about a minute ago.

10:01AM   21        Second, that at some time during the existence of

10:01AM   22    that conspiracy, the defendant knowingly and willfully became

10:01AM   23    a member of the conspiracy.

10:01AM   24        So those are the two elements for Count 5.

10:01AM   25        But in order to understand whether someone is guilty

10:01AM   1   of conspiring to commit sex trafficking, we really need to get

10:01AM   2   into the weeds on what is sex trafficking.  So I'm going to

10:01AM   3   cover those elements with you now, but I want you to keep in

10:01AM   4   mind, and you're smart, you get it, the elements that are

10:01AM   5   required for Count 5 are the two conspiracy elements.

10:01AM   6        But let's talk about what sex trafficking is, the

10:01AM   7   substantive offense.

10:01AM   8        I warn you, the statute is long and it's wordy

10:01AM   9   because there's a lot of different ways to commit sex

10:01AM  10   trafficking of an adult by force or coercion.

10:01AM  11        The first element that the defendant knowingly

10:02AM  12   transported, or recruited, or enticed, or harbored, or

10:02AM  13   provided, or obtained, or maintained, or patronized, or

10:02AM  14   solicited a person by any means.  Or benefited financially in

10:02AM  15   participation -- from participation in a venture which engages

10:02AM  16   in some of those acts.  That's element one, procuring a

10:02AM  17   person, basically.

10:02AM  18        Second, that the defendant knew or was in reckless

10:02AM  19   disregard of the fact that force, fraud, or coercion would be

10:02AM  20   used with respect to this person.

10:02AM  21        Third, that the defendant knew or was in reckless

10:02AM  22   disregard of the fact that this person would be engaged in a

10:02AM  23   commercial sex act, sex in exchange for something of value.

10:02AM  24        And fourth, that the defendant's conduct was in or

10:02AM  25   affecting interstate or foreign commerce.

10:03AM   1          Let's start with the first element.

10:03AM   2          G.R.  The defendant enticed, he solicited, and he

10:03AM   3   provided G.R.

10:03AM   4          A.A.  The defendant enticed, solicited, and provided

10:03AM   5   A.A.

10:03AM   6          L.L., K.A.  The defendant enticed, solicited, and

10:03AM   7   provided them.

10:03AM   8          The defendant enticed, solicited, and provided Shelby

10:03AM   9   Johnston.

10:03AM  10          Think about the testimony of L.L. in particular for a

10:03AM  11   moment.  In that moment that L.L. described for you where the

10:03AM  12   defendant, who knows she's a drug addict, tells her, go in the

10:03AM  13   back with Wayne, he's gonna stick his fingers inside of you,

10:03AM  14   but he'll tip you extra, and Brian will overlook the camera.

10:04AM  15   His words.

10:04AM  16          When the defendant says that to L.L., he's providing

10:04AM  17   her, he's soliciting her.  He's providing her to Wayne, he's

10:04AM  18   soliciting her to go in the back and allow a man to stick his

10:04AM  19   fingers inside of her vagina in exchange for a thing of value,

10:04AM  20   money that he was gonna give her.  He's literally describing

10:04AM  21   the element.  Hey, go in the back with Wayne.  Wayne will

10:04AM  22   stick his fingers in you.  He'll give you extra, and Brian

10:04AM  23   will overlook the cameras.

10:04AM  24          That's the defendant providing, soliciting, L.L.  And

10:04AM  25   that's just one example of when he did it to her.

USA v Gerace - Closing Argument / Cooper - 12/19/24

40

10:04AM   1          Let's talk more in detail about G.R.  When the

10:04AM   2    defendant brought her upstairs at a time when she described

10:04AM   3    for you what her life was like, heavily addicted to drugs,

10:04AM   4    provided her with cocaine, and then told her, go take care of

10:04AM   5    my friend, and I'll take care of you.

10:04AM   6          When he did that, and then sent her into a bathroom

10:05AM   7    to have sex with a stranger, he was providing her.  He was

10:05AM   8    providing her to a stranger.  He was enticing her, soliciting

10:05AM   9    her.  Those are the words that are described in element 1.

10:05AM  10          And you've heard from multiple victims in this case,

10:05AM  11    the way that the defendant provided them, solicited them.

10:05AM  12          We can look at another example.

10:05AM  13          We can talk about K.L.  We can talk about how K.L.

10:05AM  14    described the first time that she used Lortabs because she

10:05AM  15    told the defendant that she had a headache, and he gave her

10:05AM  16    Lortabs, opiate pain medication.  How she became addicted to

10:05AM  17    those.  And how one day when she was at work and she didn't

10:05AM  18    have any, and she was going through physical drug withdrawals,

10:05AM  19    how she went upstairs and told the defendant about that, and

10:05AM  20    how he told her, you know what you have to do.

10:06AM  21          When he said "you know what you have to do," this

10:06AM  22    defendant enticed K.L., the defendant obtained K.L., the

10:06AM  23    defendant patronized K.L.

10:06AM  24          How about recruited?  Recruited is a word in the

10:06AM  25    statute.  Think back to the heart-wrenching testimony from

USA v Gerace - Closing Argument / Cooper - 12/19/24

41

10:06AM    1    L.L. about this defendant grooming her when she's new to the

10:06AM    2    club, telling her, hey, would you be willing to meet up with

10:06AM    3    men outside?

10:06AM    4        I submit to you that that is testimony of the

10:06AM    5    defendant recruiting L.L., whom he would later traffic.

10:06AM    6        So that covers the first element.  You'll have the

10:06AM    7    charge, the judge will give you the law, you can look at all

10:06AM    8    those words -- obtain, provided -- I gave you some examples

10:06AM    9    and we're gonna talk now about the second element.

10:06AM    10        The defendant knew or was in reckless disregard of

10:06AM    11    the fact that force, threats of force, fraud, or coercion

10:07AM    12    would be used with respect to a victim.

10:07AM    13        First and most importantly, let's discuss coercion.

10:07AM    14    I expect that the judge is going to tell you that in part

10:07AM    15    coercion is a threat of serious harm.

10:07AM    16        Serious harm includes physical harm and nonphysical

10:07AM    17    harm.  So let's look at physical harm first.

10:07AM    18        In this case, the serious physical harm, the threat

10:07AM    19    of serious physical harm, is the threat associated with drug

10:07AM    20    withdrawal sickness.  You heard the testimony from the

10:07AM    21    victims.  Many of them described, and we're going to go

10:07AM    22    through it in some detail in a moment, what it's like to

10:07AM    23    experience drug withdrawals.  That's significant serious

10:07AM    24    physical harm.  Vomiting, shaking, the flu times 10, or the

10:07AM    25    flu times 20.

USA v Gerace - Closing Argument / Cooper - 12/19/24

42

10:07AM   1          Waving that power over someone is coercive.  And

10:07AM   2   we'll talk more about it.

10:08AM   3          But serious harm can also be nonphysical, like

10:08AM   4   financial harm.  In this case, financial harm includes the

10:08AM   5   defendant's ability to fire dancers.  Like when he fired, I

10:08AM   6   submit to you he fired A.G. because she wouldn't go upstairs

10:08AM   7   and have sex with him.  That's serious financial harm or the

10:08AM   8   threat of serious financial harm.

10:08AM   9          It includes the defendant's ability to control

10:08AM  10   whether a dancer gets called up on stage and how frequently,

10:08AM  11   controlling their ability to earn money.

10:08AM  12          It includes this defendant's power to prevent a

10:08AM  13   dancer from working elsewhere.  And you heard testimony from

10:08AM  14   L.L.  The defendant -- one time she said to him, hey, I'll

10:08AM  15   just go work somewhere else, and this defendant told you, no,

10:08AM  16   you won't.  I can call anyone at any club, and say whatever I

10:08AM  17   want about you and they won't hire you.

10:08AM  18          You, you know, your recollection controls about

10:08AM  19   exactly what words she used, but the message that this

10:09AM  20   defendant conveyed to her was crystal clear, I can stop you

10:09AM  21   from being able to work somewhere else.  And that's the threat

10:09AM  22   of serious financial harm.  He made them entirely dependant

10:09AM  23   upon himself when he stopped them from working.

10:09AM  24          And you heard testimony from a few people about that.

10:09AM  25   P.H., K.L., C.C., they all described to you that when the

10:09AM  1  defendant began engaging in sex with them, he stopped them

10:09AM  2  from working as dancers.  By doing that, he stopped them from

10:09AM  3  earning money.  And when they don't have money, they can't go

10:09AM  4  get drugs anywhere else except from him.

10:09AM  5          And so by controlling whether the woman has the

10:09AM  6  ability to work at his club, he controls their financial

10:09AM  7  outcome.  And when you exploit that, I suggest to you it's

10:09AM  8  coercion.

10:09AM  9          It makes sense that fear of physical withdrawal

10:09AM  10  symptoms is a form of serious harm.  Think about the evidence,

10:09AM  11  the testimony that you heard.  It painted as clear a picture

10:09AM  12  as possible of the hell of drug addiction.  You heard what I

10:10AM  13  submit to you is consistent, compelling, and testimony that

10:10AM  14  you should find credible from numerous witnesses about the

10:10AM  15  desperation that's associated with drug addiction.

10:10AM  16          And we're not even going to start with a victim,

10:10AM  17  we'll start with Matt Albert.  Matt Albert testified towards

10:10AM  18  the end of the trial.  He was an attorney that was addicted to

10:10AM  19  cocaine and later crack cocaine.  And I asked Matt Albert what

10:10AM  20  it's like that go through withdrawals and what it's like to be

10:10AM  21  a heavy drug addict.

10:10AM  22          And he was on cocaine, this is not opiates.  He said

10:10AM  23  it takes hold of you, it's progressive, it takes over your

10:10AM  24  body and your mind, it's a painful process.

10:10AM  25          And what did he describe?  He described crawling

10:10AM 1    around on the floor trying to smoke cat litter because he

10:10AM 2    thought it might be crack.  That's the coercive power of

10:10AM 3    withdrawing from drugs, and that's cocaine.

10:10AM 4          P.H. described to you that withdrawing from opiates

10:10AM 5    is like having the flu times 20.  She told you, quote, I would

10:11AM 6    do anything to avoid going through withdrawals.

10:11AM 7          P.H. testified, when you're going through

10:11AM 8    withdrawals, all you can think about and care about is getting

10:11AM 9    yourself unsick.  It overcomes the person's world.

10:11AM 10         And you heard that from tons of witnesses in this

10:11AM 11   trial.

10:11AM 12         We'll keep going, K.A.  K.A. described how at a time

10:11AM 13   in her life when she was spending 300 bucks a night on heroin

10:11AM 14   and coke working at Pharaoh's, her choices were driven by

10:11AM 15   addiction.  She said she would go through severe withdrawals

10:11AM 16   if she didn't have enough money to buy her drugs.  K.A.

10:11AM 17   testified that she would never have engaged in the sort of

10:11AM 18   conduct that happened to her in the VIP Room with Wayne

10:11AM 19   VanVleet today because she's not a drug addict anymore.  It's

10:11AM 20   simple.

10:11AM 21         A.A. was spending between 6- and $900 a day just to

10:12AM 22   feed her addiction and avoid withdrawals.  She testified to

10:12AM 23   you that she, quote, did not feel like she had a choice.

10:12AM 24         She testified in a raw, and I submit to you,

10:12AM 25   authentic fashion, that today she views the conduct that

USA v Gerace - Closing Argument / Cooper - 12/19/24

10:12AM   1   happened in the VIP Room as disgusting.  She did it because

10:12AM   2   she, quote, would do anything for drugs at that time.  She

10:12AM   3   told you she needed a minimum of two fentanyl patches to smoke

10:12AM   4   every day just to avoid getting sick, and those cost $250

10:12AM   5   each.

10:12AM   6         R.W. testified to you about what drug addiction is

10:12AM   7   like.  She said when you're addicted, addiction takes control

10:12AM   8   of your decisionmaking.

10:12AM   9         L.L.  She testified about what physical withdrawals

10:12AM  10   from opiates are like.  Here's what she said.  Hot and cold

10:12AM  11   flashes.  Really, really restless.  Can't sit down, can't lay

10:12AM  12   down, can't get up.  Aches and pains, diarrhea, throwing up,

10:13AM  13   can't eat.  Like the flu times ten.  She said withdrawals were

10:13AM  14   a lot worse than when she had COVID.  She described it as a

10:13AM  15   sickness and a pain that she feared.

10:13AM  16         It was something that she testified that she wanted

10:13AM  17   to avoid at all costs.  And I think this quote sums up that

10:13AM  18   testimony best:  L.L. said, I would have done anything not to

10:13AM  19   feel that way, and that's what I did.

10:13AM  20         And the reason why we're here?  The reason why we're

10:13AM  21   talking about this?  Is because this defendant, he knew, he

10:13AM  22   knew the coercive power of drug addicts trying to avoid

10:13AM  23   withdrawals.

10:13AM  24         Think about the admission that he made to Kevin

10:13AM  25   Hughes in the context of having sex with women.  He said,

USA v Gerace - Closing Argument / Cooper - 12/19/24

46

10:13AM  1   quote, you'll be surprised what they do for a little bit of

10:13AM  2   product.  His words.

10:13AM  3        Any doubt, based upon what you know about this

10:14AM  4   defendant, from the testimony you heard in that witness stand

10:14AM  5   that those words came out of his mouth waiting to come to this

10:14AM  6   trial?  He knew.  He did it on purpose.  He preyed upon drug

10:14AM  7   addicts and their drug addictions so that he could get rich

10:14AM  8   off their bodies, so that he could get sexual gratification

10:14AM  9   for himself whenever he wanted it.  That was this defendant's

10:14AM  10  choice.

10:14AM  11       What you learned about the drug-addicted women that

10:14AM  12  worked at Pharaoh's that were engaging in commercial sex

10:14AM  13  there, whether in the upstairs or in the VIP area, is that

10:14AM  14  they were susceptible and vulnerable to coercion because they

10:14AM  15  were drug addicts.  These women were struggling with what

10:14AM  16  they've described to you in detail that I couldn't match about

10:14AM  17  the horror of that drug addiction, desperate for money,

10:14AM  18  desperate for drugs to stave off withdrawals for another few

10:15AM  19  hours.  They were especially susceptible to coercion.

10:15AM  20       And thankfully, the law tells you that you can

10:15AM  21  consider the special vulnerabilities, the specifics of an

10:15AM  22  individual, the special vulnerabilities that exist.  And I

10:15AM  23  submit to you that in this case, the victims were especially

10:15AM  24  vulnerable because they were heavily addicted to cocaine and

10:15AM  25  opiates.

USA v Gerace - Closing Argument / Cooper - 12/19/24

47

10:15AM   1          The sex-trafficking conduct in this case falls into a

10:15AM   2   few different buckets, a few different categories.

10:15AM   3          The first bucket that we'll talk about is the

10:15AM   4   defendant directly coercing women to engage in commercial sex

10:15AM   5   upstairs.

10:15AM   6          The second is the business model in the downstairs

10:15AM   7   VIP area, knowing and recklessly disregarding the fact that

10:15AM   8   women would be coerced, and sometimes forced, to engage in sex

10:15AM   9   acts in the VIP with high-paying customers.

10:15AM   10          And the third bucket will be the defendant

10:15AM   11   coordinating with others like Darryl LaMont and Jessica

10:16AM   12   Leyland to essentially exchange women to traffic between their

10:16AM   13   companies.

10:16AM   14          Let's stay on that first category, the upstairs at

10:16AM   15   Pharaoh's.

10:16AM   16          We'll start with -- we'll start with G.R.

10:16AM   17          The defendant preyed upon G.R. during the darkest and

10:16AM   18   most vulnerable time in her life.  And you saw her today.  You

10:16AM   19   saw what she's like -- well, not today, but you saw her two

10:16AM   20   months ago.  You saw what she's like now.  But she described

10:16AM   21   for you what that time in her life was like when she was

10:16AM   22   heavily addicted to opiates.

10:16AM   23          Picture her for a second at that time.  Thin, I think

10:16AM   24   she said she was 20 or 30 pounds less than she weighs today,

10:16AM   25   and I don't know where she would have that to lose, but she

10:16AM   1   described how heavily addicted she was.

10:16AM   2        When you have that picture in your mind, think now

10:17AM   3   what choice did this defendant make when he was confronted

10:17AM   4   with G.R. in that incredibly vulnerable time in her life?  You

10:17AM   5   want to talk about choices?  Let's talk about his choices.

10:17AM   6        He doesn't choose to say, hey, G.R., why don't you go

10:17AM   7   to drug addiction treatment?  Go to rehab.  I'll hold your job

10:17AM   8   for you.

10:17AM   9        That's not what he did.

10:17AM  10        He doesn't choose to ignore her and leave her

10:17AM  11   downstairs on the floor, dancing and getting high and whatever

10:17AM  12   else she's doing.  He doesn't choose to fire her and say,

10:17AM  13   G.R., get out of the club you're a drug addict.  No.  What

10:17AM  14   choice does this defendant make?  He chooses to prey on her

10:17AM  15   vulnerability to find a way to make it benefit him.  That's

10:17AM  16   what he was about.

10:17AM  17        Knowing G.R. was desperate, desperate for money,

10:17AM  18   desperate for drugs, he brings her upstairs to his private

10:17AM  19   area with his private guests, people he wants to impress.  He

10:17AM  20   gives her a taste, a little cocaine.  And then he tells her,

10:18AM  21   go in the bathroom with my buddy, take care of him, and I'll

10:18AM  22   take care of you.

10:18AM  23        He didn't pick G.R. by accident.  It wasn't eeny

10:18AM  24   meeny miny moe downstairs at Pharaoh's.  He picked her on

10:18AM  25   purpose, because he knew she was a drug addict.  She was

10:18AM    1    friends with the woman he was engaged in sex with at the time,

10:18AM    2    K.L., they were both heavily addicted, and you know he knew.

10:18AM    3         So he picks G.R.  He offers her money to feed her

10:18AM    4    addiction.  Money he knows she can't turn down.  Take care of

10:18AM    5    my friend and I'll take care of you.

10:18AM    6         Now, you might hear something later after I sit down,

10:18AM    7    you might hear, oh, all they did was make her an offer.  All

10:18AM    8    he did was make her an offer.

10:18AM    9         You know better.  You know what he did was make her

10:18AM    10   an offer he knew she couldn't refuse.  She had a $350-a-day

10:19AM    11   drug habit.  She was compelled, driven, coerced by this

10:19AM    12   defendant to have sex for money, something she had never done

10:19AM    13   before.

10:19AM    14        Over the course of a year, a $350-a-day drug habit, I

10:19AM    15   used a calculator, $127,000.  That's how much G.R. was

10:19AM    16   spending approximately on drugs at that time in her life.  He

10:19AM    17   knew exactly what would happen when he told her he would give

10:19AM    18   her drugs and money in exchange to go have sex with someone.

10:19AM    19   He knew she couldn't say no.

10:19AM    20        So for the first time in her life she does it.

10:19AM    21        Think about the coercive atmosphere that existed in

10:19AM    22   that moment.  The defendant's her employer.  This job is the

10:19AM    23   way she makes money to be able to buy $127,000 worth of drugs

10:19AM    24   a year.  The job that she has is the only means that she has

10:19AM    25   to make money to feed her addiction at that time, the only way

10:19AM   1   to stop from getting dope sick.  And he controls whether she

10:19AM   2   keeps the job or not.

10:20AM   3          On top of that, in the back of her mind, she told you

10:20AM   4   is the fact that she thinks he has mob ties.  Those were her

10:20AM   5   words.  And I suggest to you that that adds to the coercive

10:20AM   6   atmosphere.  All that matters is that it was in her head at

10:20AM   7   the time.  She told you, heavily addicted to drugs, upstairs

10:20AM   8   in this private area with a locked door that he controls.

10:20AM   9          All of that combined together created a coercive

10:20AM   10  atmosphere that G.R. couldn't overcome.  And whose fault is

10:20AM   11  it?  It's his fault.  It was his choice.  He set it up that

10:20AM   12  way on purpose.

10:20AM   13         And G.R.'s corroborated.  K.L. testified that after

10:20AM   14  that happened, the defendant told her about it.  He told her,

10:20AM   15  I gave K.L. -- I gave G.R. $300 to have sex with Aaron

10:20AM   16  LaMarca's son, or whoever it was, she described the person,

10:20AM   17  someone he wanted to impress.

10:21AM   18         While we're on the subject of K.L., let's talk about

10:21AM   19  what he did to her.  'Cuz, you know, the defendant didn't just

10:21AM   20  oversee this, he didn't just direct dancers to go and engage

10:21AM   21  in commercial sex with others, he got his hands dirtier than

10:21AM   22  that.  Let's talk about K.L. and his choices with respect to

10:21AM   23  K.L.

10:21AM   24         This defendant chose to give K.L. opiates for the

10:21AM   25  first time when she said she had a headache.  He didn't have

USA v Gerace - Closing Argument / Cooper - 12/19/24

51

```
10:21AM    1    to do that.  His choice.

10:21AM    2         This defendant chose when K.L. was dependant on those

10:21AM    3    drugs, when she was addicted to them, when she got physically

10:21AM    4    sick, the flu times 10, the flu times 20, any time she didn't

10:21AM    5    have those drugs, what did this defendant choose to do when

10:21AM    6    she would come upstairs and ask for them?  When she went

10:21AM    7    upstairs and she said, hey, I'm going through withdrawals, can

10:21AM    8    I get some Lortabs, what was this defendant's choice?

10:22AM    9         Did he give them away?  Sure, K.L., here's some

10:22AM   10    Lortabs go back downstairs.  No.

10:22AM   11         Did he tell her, hey, K.L., you should go to rehab,

10:22AM   12    get some treatment.  Opiate addiction is dangerous.  You're

10:22AM   13    gonna mess your life up.  No.

10:22AM   14         The defendant's choice was to tell K.L., you know

10:22AM   15    what you have to do.  And then zipped down his pants and put

10:22AM   16    his penis in her mouth.  That was his choice, not hers.  No

10:22AM   17    one else's, Peter Gerace's choice, when K.L. was heavily

10:22AM   18    addicted, scared of withdrawals, was to try to get a blow job

10:22AM   19    out of it for himself.  And that's what he got, because she

10:22AM   20    wasn't gonna say no.

10:22AM   21         Do any of you sitting there for a second think that

10:22AM   22    K.L. in that moment, fiending -- fearing physical withdrawals,

10:22AM   23    had a choice of turning down putting his penis in her mouth?

10:22AM   24    No.

10:23AM   25         What you have to do.  His words.
```

10:23AM    1        Imagine for a second -- excuse me.  Imagine for a

10:23AM    2    second that K.L. wasn't a drug addict.  Just follow me for a

10:23AM    3    second.  Imagine K.L.'s not a drug addict and she's a

10:23AM    4    diabetic.  And imagine she doesn't work at a strip club, she

10:23AM    5    works at, you know, an office job.  Imagine she's at work, and

10:23AM    6    she's going through diabetic shock.  She starts to feel the

10:23AM    7    symptoms, she's dizzy, she nauseous, she feels like she's

10:23AM    8    going to lose consciousness.  She's scared.  And in that

10:23AM    9    moment, imagine she thinks to herself, I know my boss Peter

10:23AM    10    has insulin upstairs.  And she walks upstairs, diabetic K.L.,

10:23AM    11    and she says, hey, Peter, I'm going through diabetic shock,

10:23AM    12    I'm scared, I feel dizzy, I'm nauseous, I think I might pass

10:24AM    13    out.  Can I have some of your insulin?

10:24AM    14        And imagine in that moment that her boss said, you

10:24AM    15    know what you have to do, and then stuck his penis in her

10:24AM    16    mouth.  That's coercion.  That's conduct that would turn your

10:24AM    17    stomach.  And it's no different than what he did.

10:24AM    18        I submit to you it makes no difference if she's

10:24AM    19    physically dependant on opiates, or if she's physically

10:24AM    20    dependant on insulin.

10:24AM    21        If you know that that's what's happening to a person,

10:24AM    22    and then you choose to withhold what they need to avoid going

10:24AM    23    through serious harm so that you can get a blow job, that's

10:24AM    24    coercion.

10:24AM    25        He preyed upon K.L.'s drug addiction the same way he

USA v Gerace - Closing Argument / Cooper - 12/19/24

10:24AM 1    preyed upon G.R.'s.  And like I talked about how K.L.

10:24AM 2    corroborated what happened to G.R., K.L. is corroborated by

10:25AM 3    what happened to L.L., years apart.  Years apart.  This

10:25AM 4    defendant engaged in essentially the exact same contact with

10:25AM 5    L.L.  Let's talk about that.

10:25AM 6         L.L. described for you in raw detail how she engaged

10:25AM 7    in sex and sex acts in exchange for cocaine, and opiates, and

10:25AM 8    money, and the combination of all that with this defendant,

10:25AM 9    and his friends, one of his brothers.  She described for you

10:25AM 10   that that was at a time in her life when she was heavily

10:25AM 11   addicted to heroin and cocaine, at a time when she was

10:25AM 12   terrified of the pain of withdrawing from those substances, at

10:25AM 13   a time in her life when she told you she would've done

10:25AM 14   anything to avoid that.

10:25AM 15        What choice did Peter Gerace make?  He chose to tell

10:26AM 16   her, you know what I need, a special favor.  When she's

10:26AM 17   fiending for drugs, when she's going through withdrawals.

10:26AM 18   That's his MO.  He did the exact same thing to K.L.  No

10:26AM 19   discussion.

10:26AM 20        The first time -- think about K.L. described for you

10:26AM 21   the first time it happened.  She told you she went upstairs,

10:26AM 22   he gave her cocaine, and with no words at all he pulled his

10:26AM 23   pants down.  And she testified that she knew what she had to

10:26AM 24   do in that moment.

10:26AM 25        Weeks later, L.L. got on the witness stand and she

10:26AM  1    described the first time that it happened with this defendant.

10:26AM  2    And what did she tell you?  The exact same thing.  Years

10:26AM  3    apart, that happened.

10:26AM  4        He gives her cocaine.  With no words, with no

10:26AM  5    discussion, he pulls his pants down.  L.L. knew in that moment

10:26AM  6    exactly what she had to do.

10:26AM  7        The defendant gave her the drugs she needed, and he

10:26AM  8    had sex with her.

10:26AM  9        In the co -- in the coercive atmosphere that he

10:27AM  10   created, he was her boss, he controlled her ability to earn a

10:27AM  11   living.  And that was just the first time.  L.L. would go on

10:27AM  12   to describe other occasions which she said were, quote, too

10:27AM  13   many times to count, where she would be dope sick and she

10:27AM  14   would go to him at work and ask for drugs.  And the defendant

10:27AM  15   would tell her, you have to give me a special favor.  And he

10:27AM  16   would make her suck on his penis, or he would put his penis in

10:27AM  17   her vagina in exchange for the drugs.

10:27AM  18       She testified to you, she showed you in this

10:27AM  19   courtroom the physical effects of shooting heroin and cocaine

10:27AM  20   into her arms and legs so many times her veins literally

10:27AM  21   collapsed.

10:27AM  22       She goes up there and asks him for drugs, and what

10:27AM  23   choice does he make?  He chooses to brutally victimize her, to

10:27AM  24   treat her like she was property, to treat her like she was

10:28AM  25   less than human.

USA v Gerace - Closing Argument / Cooper - 12/19/24

10:28AM   1         And the defendant didn't just do it himself with

10:28AM   2    L.L., he sent her upstairs with his friends and his brother.

10:28AM   3    And how do you think they knew?  Let's talk about that.

10:28AM   4         You think Aaron LaMarca and David Gerace, his

10:28AM   5    brother, just picked L.L.'s name out of a hat to say, hey,

10:28AM   6    want to go upstairs and party?  I'll give you some drugs.

10:28AM   7         Of course not.  He told them.

10:28AM   8         He told them if you give L.L. some drugs, you can

10:28AM   9    make her have sex with you.  I submit to you that's an obvious

10:28AM   10   inference you should draw.  They weren't randomly selecting

10:28AM   11   dancers and getting lucky.  This defendant, who had already

10:28AM   12   been doing it himself, passed her off, he pimped her out.  It

10:28AM   13   doesn't matter if it happens on a street corner, in a crack

10:28AM   14   house, or in a club with a neon sign.  He pimped her out to

10:28AM   15   his friends, he pimped her out to his brother, he pimped her

10:29AM   16   out to himself.  That's the choice he made.

10:29AM   17            **MR. COOPER:**  Do you have time?

10:29AM   18            **MR. TRIPI:**  43 left.

10:29AM   19            **MR. COOPER:**  Okay.

10:29AM   20        And let's talk about when the defendant doesn't get

10:29AM   21   what he wants.  You have to look no further than the testimony

10:29AM   22   of A.G.  She wasn't addicted to heroin or crack.  She was

10:29AM   23   working at Pharaoh's for two days.  She was making a ton of

10:29AM   24   money, she told you guys she seemed -- she said I was a

10:29AM   25   ringer, I did 13 Champagne Rooms in one night, made a ton of

10:29AM    1    money.

10:29AM    2         The second day she works there, this defendant goes

10:29AM    3    over to her and says, hey, Barbie, I heard you're doing great,

10:29AM    4    you're killing it.  She's like, thanks.  He tries to get her

10:29AM    5    to drink, she's underage.  She says no.  He tries again.  She

10:29AM    6    continues to say no.

10:29AM    7         And then later he goes over to Barbie, A.G., and he

10:29AM    8    has two women with him, and he says, hey, Barbie, let's go

10:30AM    9    upstairs and party.

10:30AM   10         You remember her.  She was short.  She said, no, I'm

10:30AM   11    good.  She had, like, a mousy little voice.  No, I'm good.

10:30AM   12         And he offers her again, hey, why don't we go

10:30AM   13    upstairs and party?  No, I'm good.

10:30AM   14         What happened to A.G.?  She shows up for work day

10:30AM   15    three.  She's met at the door.  You're fired.

10:30AM   16         Every single one of you sitting in this room knows

10:30AM   17    what happened there.

10:30AM   18         She's making the club a lot of money, she's doing

10:30AM   19    great, she's not a drug user.  She certainly wasn't fired for

10:30AM   20    drug use.  He tries to invite her upstairs, which she

10:30AM   21    described as I thought he was going to give me drugs and try

10:30AM   22    to have sex with me, and I didn't want to have anything to do

10:30AM   23    with that, and the next day she's gone.  That's the coercive

10:30AM   24    power of being the boss.

10:30AM   25         Let's talk about the VIP Room sex trafficking.  The

USA v Gerace - Closing Argument / Cooper - 12/19/24

57

10:31AM   1   defendant set up his business to profit off of the

10:31AM   2   victimization of drug-addicted dancers, plain and simple.  He

10:31AM   3   knew and he recklessly disregarded the fact that women were

10:31AM   4   coerced with their drug addictions to engage in commercial sex

10:31AM   5   in the VIP Room, and he got rich from it.  Let's cover all the

10:31AM   6   different evidence, all of the testimony.

10:31AM   7        G.R. said in the VIP Room men would touch her vagina

10:31AM   8   and kiss her body.  She said she observed another dancer

10:31AM   9   having sexual intercourse in the back.  She said on one

10:31AM  10   occasion while in the VIP Room a man masturbated and

10:31AM  11   ejaculated on her while she was dancing on him, no one

10:31AM  12   intervened, no one stopped that, she told you the club made a

10:31AM  13   lot of money from VIP dances.

10:31AM  14        C.B. told you sex acts occurred in the VIP area, and

10:31AM  15   depending on who the dancers were, some of them would get away

10:32AM  16   with it.  That's consistent with what you heard from numerous

10:32AM  17   witnesses about Peter having Peter's favorites.  A.B. also

10:32AM  18   told you about that.

10:32AM  19        E.H. described for you how the instructions she got

10:32AM  20   when she started working at Pharaoh's were grind on him until

10:32AM  21   he gets off.  She testified -- testified about what happened

10:32AM  22   to her when she worked there.  You remember, I'm sure, she

10:32AM  23   said that a man ejaculated on her and she was angry.  She was

10:32AM  24   angry about it when it happened.  And I think she was still

10:32AM  25   angry about it when she was testifying about it here, and she

10:32AM  1   was pissed.

10:32AM  2       And she said she went outside to the VIP attendant

10:32AM  3   and she said, hey, look at the cameras.  Find out who that

10:32AM  4   was.  She's got his semen on her body, and that's not what she

10:32AM  5   signed up for.

10:32AM  6       And they didn't care.  They tell -- they tell her go

10:32AM  7   away.

10:32AM  8       For this defendant, that's the business model.  What

10:32AM  9   kind of customer service would it be to go get the guy in

10:33AM  10  trouble?  Come on, he's spending money here.  That's how he

10:33AM  11  set it up.

10:33AM  12      E.H. put it pretty well.  She said I worked at

10:33AM  13  Pharaoh's, they protect the patrons, not the girls, not the

10:33AM  14  women, is what she said.

10:33AM  15      For this defendant, that kind of conduct was a way

10:33AM  16  for him to live in a nice fancy mansion, and buy sports

10:33AM  17  memorabilia, and have cash on hand to pay bribes to judges and

10:33AM  18  corrupt DEA agents.  Business model.

10:33AM  19      K.A. told you about her experiences in the VIP area.

10:33AM  20  She described that men touched her bare vagina, tried to and

10:33AM  21  did insert fingers into her bare vagina, and exposed their

10:33AM  22  penises to her.

10:33AM  23      She described her encounters with Wayne VanVleet.

10:33AM  24  She described them as, quote, too many to count.  She said

10:33AM  25  Wayne came into Pharaoh's multiple times per week, he spent a

10:33AM    1    lot of money.

10:33AM    2         And you know that money ended up in this defendant's

10:33AM    3    pockets.

10:33AM    4         Wayne would buy large blocks of time in the VIP.  He

10:34AM    5    would tip the attendant extra.  This is all what K.A.

10:34AM    6    described in her testimony.  And then he would attempt to

10:34AM    7    finger her and touch her bare vagina.

10:34AM    8         She explained in graphic detail how Wayne would,

10:34AM    9    quote, force -- force, where have we heard that before, force

10:34AM   10    her body down on his erect penis until he ejaculated on

10:34AM   11    himself.

10:34AM   12         K.A. testified that she didn't enjoy what was

10:34AM   13    happening in the back with Wayne, but she needed the money in

10:34AM   14    order to buy heroin that she was heavily addicted to.  She

10:34AM   15    testified she was high on cocaine and heroin every single time

10:34AM   16    Wayne did that to her in the back.

10:34AM   17         She testified to you that she was covered in track

10:34AM   18    marks, those bruises, those collapsing veins in her body from

10:34AM   19    drug use.  It was obvious that she was addicted to drugs.  It

10:34AM   20    was recklessly disregarded.  No one cared.  She was making

10:34AM   21    money, that's all that mattered.

10:34AM   22         K.A. testified that it didn't just happen to her,

10:34AM   23    other dancers were brought back there with Wayne.  All drug

10:35AM   24    addicts, every one of them that K.A. described.  L.L., Kiera.

10:35AM   25    She told you they're drug addicts just like her.

USA v Gerace - Closing Argument / Cooper - 12/19/24

60

10:35AM    1            He knew.  This defendant knew, the VIP attendant's

10:35AM    2    getting tipped to look the other way.  They knew.

10:35AM    3            Wayne VanVleet, up close and personal with a woman

10:35AM    4    who's obviously heavily addicted to drugs, he knew.  They're

10:35AM    5    all coconspirators.  They're all victimizing this young woman.

10:35AM    6            Wayne pays, this defendant gets a portion of the

10:35AM    7    money, and K.A. she gets molested, and she gets to live with

10:35AM    8    it forever.  That's the business model.

10:35AM    9            It's not just her.  Let's talk about A.A.

10:35AM    10            Do you remember Ms. A.A.?  When I was direct -- doing

10:35AM    11    a direct examination of Ms. A.A., we had this picture up and I

10:35AM    12    started to ask her questions about it, and she paused and she

10:36AM    13    said, can you please take the picture down?  She couldn't even

10:36AM    14    look at him.  Who can blame her?

10:36AM    15            She testified about being so strung out, thin, dark

10:36AM    16    eyes, hollow faced.  She described how Wayne was a regular, he

10:36AM    17    spent a lot of money in the VIP Room.  She told you that Wayne

10:36AM    18    would tip the VIP attendant, and then he would buy long blocks

10:36AM    19    of time in that dark private area with her.  She testified

10:36AM    20    that Wayne would use force, the same thing that K.A. said,

10:36AM    21    Wayne would use force to hold her body in place and try to rub

10:36AM    22    her vagina.

10:36AM    23            She testified that the VIP attendants never once

10:36AM    24    stopped him from doing that.  She testified that they looked

10:36AM    25    the other way.

USA v Gerace - Closing Argument / Cooper - 12/19/24

| | | |
|---|---|---|
| 10:36AM | 1 | Ms. A.A. told you that Wayne's other favorites in the |
| 10:36AM | 2 | club were L.L. and Megan.  Same thing, I submit to you, that |
| 10:37AM | 3 | K.A. told you.  Megan Stabler is a/k/a Kiera, it's her dancer |
| 10:37AM | 4 | name, it's corroboration.  I submit to you that she told you |
| 10:37AM | 5 | L.L. and Kiera, Megan, were -- were both drug addicts, as |
| 10:37AM | 6 | well. |
| 10:37AM | 7 | She provided what I submit to you is impactful, |
| 10:37AM | 8 | credible, and heartbreaking testimony that she didn't feel |
| 10:37AM | 9 | like she had a choice. |
| 10:37AM | 10 | She described another customer who inserted his |
| 10:37AM | 11 | fingers into her vagina, and you'll remember I'm sure that |
| 10:37AM | 12 | testimony.  She said, I kept looking to the cameras.  I kept |
| 10:37AM | 13 | looking to the cameras for help when that was happening, but |
| 10:37AM | 14 | no one came. |
| 10:37AM | 15 | She described how VIP attendants would encourage me |
| 10:37AM | 16 | to go to certain customers, just like this defendant did, by |
| 10:37AM | 17 | the way, with L.L. for Wayne.  Business model.  They would |
| 10:37AM | 18 | encourage her to go to certain customers. |
| 10:37AM | 19 | And here's what she said, and then they would come |
| 10:37AM | 20 | looking for a bigger tip afterwards.  Disgusting.  Predatory |
| 10:37AM | 21 | business model designed to make money off of the molestation |
| 10:37AM | 22 | of drug-addicted women. |
| 10:38AM | 23 | And C.H. corroborated all this.  She testified that |
| 10:38AM | 24 | she would see Wayne VanVleet lick dancers' faces and grab |
| 10:38AM | 25 | them.  She would see him tipping off the VIP attendants.  And |

10:38AM    1    you know exactly what those tips were for.

10:38AM    2        You know the defendant knew what was happening.  And

10:38AM    3    that's important.  You know he recklessly disregarded it at a

10:38AM    4    minimum, but you know he knew 'cuz he told L.L., he told her

10:38AM    5    what was gonna happen with Wayne, and he said Brian will look

10:38AM    6    the other way, all part of an agreement to get rich off these

10:38AM    7    women.  Kept whales like Wayne spending money at the club.

10:38AM    8        A.B.  She testified that she observed sex acts in the

10:38AM    9    VIP area, and she described dancers that were engaging in

10:38AM   10    those sex acts as Peter's favorites.  Huh, I wonder what made

10:38AM   11    them Peter's favorites?  You know.

10:38AM   12        She told you that the same dancers that would tip the

10:39AM   13    VIP attendants and managers, those same dancers would tip them

10:39AM   14    extra money, the VIP attendants and the managers.

10:39AM   15        Ms. A.B. also testified that this defendant, Peter

10:39AM   16    Gerace, he would direct dancers to his friends or big spenders

10:39AM   17    in the VIP area.  That's his role in the sex-trafficking

10:39AM   18    conspiracy.  He directed it to happen, because it made him a

10:39AM   19    lot of money.

10:39AM   20        If you remember when Ms. A.B. was being

10:39AM   21    cross-examined, they tried to suggest to her, like, hey, Brian

10:39AM   22    was supposed to, like, be watching the cameras, he was gonna

10:39AM   23    stop that if it happened.  And she said, just because he was

10:39AM   24    responsible for something doesn't mean he actually followed

10:39AM   25    through with it.  Brian looked the other way for tips.

USA v Gerace - Closing Argument / Cooper - 12/19/24
63

10:39AM    1            She wasn't gonna get told what to say.  She lived it.

10:39AM    2    You know that's how this defendant set up his business model.

10:39AM    3    Ms. A.B. told you.

10:39AM    4            This was really, I submit to you, this is really

10:40AM    5    crucial testimony.  A.B. told you that in conversations with

10:40AM    6    this defendant, he would refer to the VIP Room as "the bank."

10:40AM    7    The bank.  The bank.

10:40AM    8            So, sure, at his trial, they can come up here and

10:40AM    9    say, oh, alcohol sales, guys.  Making money selling drinks.

10:40AM    10           But outside the courtroom?  Before the indictment,

10:40AM    11   talking to A.B., he tells her the VIP Room is the bank.

10:40AM    12           L.L., in addition to K.A. and A.A., L.L., she offered

10:40AM    13   you direct evidence, direct proof that this defendant knew

10:40AM    14   what was going on in the back with Wayne and others.

10:40AM    15           All the sex trafficking that we just discussed was

10:40AM    16   part of a larger conspiracy, a larger agreement between more

10:40AM    17   than one person, right, two or more people, an agreement to

10:41AM    18   engage in that conduct.

10:41AM    19           The law doesn't require that we identify all the

10:41AM    20   coconspirators to you.  The judge will teach you that.  But

10:41AM    21   let's discuss for a minute some of other people that were

10:41AM    22   involved in this agreement to commit sex trafficking, to

10:41AM    23   coerce women to have sex in exchange for a thing of value,

10:41AM    24   drugs and money.

10:41AM    25           The defendant conspired with Wayne VanVleet.  Whether

10:41AM  1    they ever talked to each other or not, doesn't matter.  The

10:41AM  2    judge will tell you they don't need to know each other.

10:41AM  3    They're working together for the same purpose.  Wayne's

10:41AM  4    getting something out of it, Peter's getting something out of

10:41AM  5    it.

10:41AM  6         The defendant conspired with Brian Rosenthal and

10:41AM  7    other VIP attendants who took what amount to bribes to look

10:41AM  8    the other way while men like Wayne VanVleet fingered and

10:41AM  9    molested drug-addicted women in the VIP Room.

10:41AM  10         The defendant conspired with johns, the consumers of

10:41AM  11    the commercial sex that he got rich selling.

10:41AM  12         He conspired with drug dealers that supplied the

10:42AM  13    addicted dancers with the drugs, because without them, the

10:42AM  14    sex-trafficking business was going to grind to a halt.  So the

10:42AM  15    drug dealers are all a part of this conspiracy.

10:42AM  16         And then we get -- let's go -- let's go to Doug

10:42AM  17    Augustyniak for a second.  Do you remember Doug?

10:42AM  18         I submit to you it was pretty clear from the minute

10:42AM  19    that I started asking him questions that Doug was a hostile

10:42AM  20    witness.  Doug, who was -- worked as a VIP attendant, who's

10:42AM  21    good friends with Brian Rosenthal and with this defendant.

10:42AM  22    Doug had something to hide.

10:42AM  23         When Mr. Foti started asking him questions, Doug was

10:42AM  24    a sweet baby angel.  Do you remember?  They didn't have any

10:42AM  25    trouble.  Doug was doing great on cross-examination.  When I

USA v Gerace - Closing Argument / Cooper - 12/19/24

65

10:42AM    1    was up there asking questions, Doug was aggressive.  And it

10:42AM    2    should be no surprise to you, he blurted out during the direct

10:42AM    3    examination that he didn't like me and the government.  I

10:42AM    4    don't care.  What matters is that Doug testified to you about

10:42AM    5    something that I think, I submit to you, you should find

10:42AM    6    credible.

10:42AM    7            He was locked in in grand jury, and Doug Augustyniak

10:43AM    8    came in here and he told you that when a dancer was overdosing

10:43AM    9    downstairs, after she had been upstairs in this defendant's

10:43AM    10   private area partying with him and his friends, she came

10:43AM    11   downstairs and she overdosed.  And what did he tell you?  He

10:43AM    12   didn't call 911.  He didn't call the police while this woman

10:43AM    13   was in medical distress.

10:43AM    14           Who did he call?  His coconspirator, Peter.

10:43AM    15           Doug didn't want the police coming.  I submit to you

10:43AM    16   Doug didn't want the police sniffing around the club.  The

10:43AM    17   club, the drug dealing, the sex trafficking, that was how this

10:43AM    18   defendant and Doug and Brian made a living.  He tried to look

10:43AM    19   you in the face and say I tried to prevent sex acts from

10:43AM    20   happening in the VIP area.

10:43AM    21           You know better.  When you consider whether that

10:43AM    22   testimony was credible, consider in comparison to the

10:43AM    23   testimony from the witness after witness the victims who came

10:43AM    24   in here and described the disgusting things that happened to

10:44AM    25   them.  Doug had something to hide.

USA v Gerace - Closing Argument / Cooper - 12/19/24

66

10:44AM    1              Do you think Doug wants to come in here and say,

10:44AM    2    yeah, I looked the other way in exchange for money?  Totally.

10:44AM    3              Doug wasn't just ignoring it, Doug was profiting from

10:44AM    4    it.  He told you customers like Wayne would come in and, oh,

10:44AM    5    yeah, they'd give us tips, they'd give us tips.  Sure.

10:44AM    6              Well, Doug, what were they giving you a tip for?

10:44AM    7              Doug wasn't going in the back.  Wayne wasn't licking

10:44AM    8    Doug's face.  He wasn't rubbing Doug's groin.  He wasn't

10:44AM    9    ejaculating on Doug.  So why is Doug getting a tip?  Hmm, I

10:44AM   10    wonder.  Maybe it's consistent with the testimony of all the

10:44AM   11    victims that testified that Doug was getting tipped so he'd

10:44AM   12    let it happen.

10:44AM   13              So whether he comes in here and admits it or not, you

10:44AM   14    know what happened.  Doug was getting a cut.

10:44AM   15              His demeanor, his attitude on the witness stand, tell

10:44AM   16    you everything you need to know about him.  To Doug, the

10:45AM   17    victims in this case are a dime a dozen.

10:45AM   18              When I asked him to describe the woman who was

10:45AM   19    overdosing, like, you know, I was -- what I meant was like

10:45AM   20    describe the symptoms.  I said, hey, describe her.  He said

10:45AM   21    oh, I don't know, it was just some girl.

10:45AM   22              Just some girl.  That's what -- that's what the

10:45AM   23    victim who's overdosing is to Doug.  That's how he thinks.  A

10:45AM   24    dime a dozen.  Couldn't care less about what happened to them

10:45AM   25    in the VIP Room.  All he cared about was the money that was

USA v Gerace - Closing Argument / Cooper - 12/19/24

67

10:45AM     1    coming in.

10:45AM     2        And think about who he's loyal to.  Don Parrino fired

10:45AM     3    Doug.  And who brought him back?  Peter.

10:45AM     4        If the argument is made to you, if the argument gets

10:45AM     5    made to you today, or what do you expect, come on, they're

10:45AM     6    strippers, listen real carefully when Judge Vilardo instructs

10:45AM     7    you on the law.  Listen carefully.  I submit to you he's not

10:46AM     8    gonna say, hey, it's okay to coerce a woman into commercial

10:46AM     9    sex if she's a stripper.  Who cares?

10:46AM    10        Not the law in this country.  Reject that argument if

10:46AM    11    it's made to you.

10:46AM    12        The facts provided to you by the dozens of witnesses

10:46AM    13    who lived it, the victims who still live it, prove that

10:46AM    14    Pharaoh's wasn't a strip club, it was a brothel with a neon

10:46AM    15    sign and a liquor license.

10:46AM    16        The defendant isn't some persecuted business owner.

10:46AM    17    Like Rebecca Bender told you, he's a CEO pimp and a Romeo

10:46AM    18    pimp, it doesn't matter that he doesn't wear a purple jacket

10:46AM    19    or a fur hat.

10:46AM    20        That's not in the law.

10:46AM    21        The same rule of laws apply to everyone in this

10:46AM    22    country.  Doesn't matter where you're from, doesn't matter if

10:46AM    23    you have a corrupt DEA agent friend who thinks he can create a

10:46AM    24    two-tiered system of justice for you.  The same rules of law

10:47AM    25    apply to everyone.

USA v Gerace - Closing Argument / Cooper - 12/19/24

68

10:47AM    1        The fact that the defendant hung out with lawyers and

10:47AM    2    judges and cops, who cares?  He cared.  I submit to you, you

10:47AM    3    shouldn't.  It doesn't change the facts.

10:47AM    4        Doing coke with Buffalo Sabres in the upstairs at

10:47AM    5    your club doesn't mean you're not engaged in sex trafficking

10:47AM    6    because the people might be famous.  That's not in the law.

10:47AM    7        Listen carefully when he gives you the law, apply the

10:47AM    8    facts as you decide them, and employ a simple formula:  The

10:47AM    9    facts plus the law equals the verdict.  That's it.

10:47AM    10        I don't think we need to spend too much more time on

10:47AM    11    this, the third element, we've covered coercion in detail.

10:47AM    12    Commercial sex act, doesn't have to be vaginal intercourse,

10:47AM    13    right?  Sticking your fingers inside of a woman's anus or

10:47AM    14    vagina, kissing a woman's bare breasts, rubbing a woman's

10:48AM    15    vagina, all commercial sex acts in this case.  It doesn't have

10:48AM    16    to be the oral sex or vaginal sex that you've heard described.

10:48AM    17    And those things happened in the VIP Room.  But even the

10:48AM    18    rubbing of a woman's bare vagina, that's a commercial sex act

10:48AM    19    in the context of this case.

10:48AM    20        Ejaculating on a woman's body when she's dancing is a

10:48AM    21    sex act.  They're all done in exchange for a thing of value.

10:48AM    22        So that third element, commercial sex act, check.

10:48AM    23        The fourth element, interstate or foreign commerce, I

10:48AM    24    expect the judge is gonna tell you that's de minimis, you just

10:48AM    25    have to find that there's some -- some hook to interstate,

10:48AM  1  some interstate nexus.  Did the act -- did the activity have a

10:48AM  2  minimal effect on interstate commerce?  Of course it did.

10:48AM  3  They're selling alcohol.  The alcohol is not all made in

10:48AM  4  New York, right?  They have a website.  The website effects

10:48AM  5  interstate commerce.

10:48AM  6      Maybe most importantly, they bring dancers in from

10:48AM  7  all over.  You heard multiple witnesses testify to that.

10:48AM  8  Dancers come from other states, they come from Canada.  That

10:49AM  9  effects interstate or foreign commerce.

10:49AM  10      And finally, drugs.  You know by now drugs are an

10:49AM  11  integral part of that business, an integral part of the way he

10:49AM  12  ran that business.  And cocaine doesn't come from New York.

10:49AM  13  Heroin doesn't come from New York.  No one's growing heroin in

10:49AM  14  their backyard, poppy, whatever, that's not happening.  Those

10:49AM  15  are things that effect interstate commerce.

10:49AM  16      So that one, you know, fourth element, check.

10:49AM  17      It was also, this was spurred on by people like

10:49AM  18  Darryl LaMont and Jessica Leyland, so that's part of the

10:49AM  19  conspiracy.  You don't have to find -- you pick how, you know,

10:49AM  20  how the conspiracy existed.  You pick who was involved.  But I

10:49AM  21  submit to you that Darryl LaMont and Jessica Leyland, when

10:49AM  22  they trafficked woman back and forth with Pharaoh's, were

10:49AM  23  engaged in that same conspiracy.  They all knew.

10:49AM  24      This defendant, he knew what was going on at Darryl

10:49AM  25  LaMont's company.  You know he knew.  There's evidence of his

10:49AM  1  knowledge that sex acts were going on.  You heard it from R.W.
10:50AM  2  that there's evidence of it.
10:50AM  3       So first we have pictures, right?  Who are some of
10:50AM  4  the people in common?  Shelby on the left, who this defendant
10:50AM  5  trafficked to Judge Michalski, his buddy, so that the judge
10:50AM  6  would be corrupt for him.
10:50AM  7       Look at these text messages.  They're a little bit
10:50AM  8  distorted here.  310AS.  Peter says to Darryl LaMont, you took
10:50AM  9  one of my best weekend girls -- because they shared
10:50AM 10  employees -- and LaMont tells him, yeah, and she does anal.
10:50AM 11       Any question about whether the defendant knew LaMont
10:50AM 12  was having the women engage in sex acts?  Any doubt?  No.
10:50AM 13       Jessica Leyland.  Katrina Nigro told you Jessica
10:50AM 14  Leyland had an arrangement with the defendant.  She would send
10:50AM 15  the women from Extraordinaire, her stag company, to Pharaoh's
10:50AM 16  to work, and the defendant would let her sell drugs there.
10:50AM 17  That's part of the agreement, they both have a stake.  She's a
10:50AM 18  member of the sex-trafficking conspiracy.
10:50AM 19       So three buckets of that activity, we covered all of
10:50AM 20  three of them.  Upstairs, VIP area, and the -- the exchanging
10:51AM 21  of women with -- with those other stag companies that we
10:51AM 22  discussed.  I submit to you all three buckets in this case
10:51AM 23  have been proven to exist, proven beyond a reasonable doubt.
10:51AM 24       But even if you find only that the upstairs was sex
10:51AM 25  trafficking, still guilty.  Even if you find, hey, only the

USA v Gerace - Closing Argument / Cooper - 12/19/24
71

10:51AM   1   downstairs VIP area where -- where there was force, where

10:51AM   2   Wayne was physically forcing women onto his erect penis, still

10:51AM   3   sex trafficking, still a sex-trafficking conspiracy.

10:51AM   4         So I've presented three buckets to you.  You pick any

10:51AM   5   or all of them, I submit to you they've all been proven beyond

10:51AM   6   a reasonable doubt.

10:51AM   7         Conspiracy to commit sex trafficking by coercion, the

10:51AM   8   second bucket of proof in this case, find him guilty of

10:51AM   9   Count 5 because his choices, over and over again, the choices

10:51AM   10  he made make him guilty of Count 5.

10:51AM   11        **MR. COOPER:**  Judge, I think it's a good time to take

10:51AM   12  that break, please.

10:51AM   13        **THE COURT:**  Okay, folks, we'll take our mid-morning

10:51AM   14  break now.  Please remember my instructions.  Don't talk about

10:51AM   15  the case, even with each other, and don't make up your mind

10:52AM   16  just yet.  Come back at 11:00 and we'll continue.

10:52AM   17        (Jury excused at 10:52 a.m.)

10:52AM   18        **THE COURT:**  Okay.  Anything for the record before we

10:52AM   19  break?

10:52AM   20        **MR. COOPER:**  No, thank you.

10:52AM   21        **MR. FOTI:**  No, thank you.

10:52AM   22        **THE COURT:**  I've got you at 1:40.

10:52AM   23        **MR. COOPER:**  That's what Joe has also.

10:52AM   24        **MR. TRIPI:**  Yeah, 1 hour and 20 remain, yep.

10:52AM   25        **THE COURT:**  1 hour and 20 remain.  Yeah, great.

| 10:52AM | 1 | Thank you.  We'll be back -- let's try keep it close to 11:00, |
| 10:53AM | 2 | please. |
| 10:53AM | 3 | **MR. COOPER:**  Perfect. |
| 10:53AM | 4 | **THE CLERK:**  All rise. |
| 10:53AM | 5 | (Off the record at 10:53 a.m.) |
| 11:02AM | 6 | (Back on the record at 11:02 a.m.) |
| 11:02AM | 7 | (Jury not present.) |
| 11:02AM | 8 | **THE CLERK:**  All rise. |
| 11:02AM | 9 | **THE COURT:**  Please be seated. |
| 11:02AM | 10 | **THE CLERK:**  We are back on the record for the |
| 11:02AM | 11 | continuation of the jury trial in case numbers 19-cr-227 and |
| 11:02AM | 12 | 23-cr-37, United States of America versus Peter Gerace Jr. |
| 11:02AM | 13 | All counsel and parties are present. |
| 11:02AM | 14 | **THE COURT:**  Okay.  Ready to go? |
| 11:02AM | 15 | **MR. COOPER:**  Yes. |
| 11:02AM | 16 | **THE COURT:**  Ready to go? |
| 11:02AM | 17 | **MR. FOTI:**  Yes. |
| 11:02AM | 18 | **THE COURT:**  Okay.  Can we let Pat know? |
| 11:06AM | 19 | We're ready, Pat. |
| 11:06AM | 20 | **OFFICER CORONA:**  Very good. |
| 11:07AM | 21 | (Jury seated at 11:07 a.m.) |
| 11:08AM | 22 | **THE COURT:**  The record will reflect that all our |
| 11:08AM | 23 | jurors, again, are present.  You may continue. |
| 11:08AM | 24 | **MR. COOPER:**  Thanks, Judge. |
| 11:08AM | 25 | So, one last thing to keep in mind that I forgot, and |

USA v Gerace - Closing Argument / Cooper - 12/19/24

11:08AM  1   we have a lot to talk about so I'm going to try to hit it

11:08AM  2   quick, but on the topic of maintaining a drug-involved

11:08AM  3   premises and sex trafficking.  I didn't talk at all about

11:08AM  4   nodding out.  And you heard so many witnesses talk about

11:08AM  5   nodding out at the club.

11:08AM  6        And a bunch of different witnesses testified to you

11:08AM  7   that they themselves would nod out all over the place:  On the

11:08AM  8   floor, at the bar, in the dancing dressing room, in the VIP

11:08AM  9   area.  It was happening all over the place.  And so that's

11:08AM  10  just one final point I wanted to make sure I hit with you on

11:08AM  11  how you know that he knew that drugs were being used

11:09AM  12  everywhere all the time, because dancers were constantly

11:09AM  13  nodding out.  It's another way that you know the defendant

11:09AM  14  knew that these women were heavy drug addicts at the time that

11:09AM  15  he was running his business.

11:09AM  16        And now we're on to the next category.  We're right

11:09AM  17  on schedule.  We're going to talk about public corruption.

11:09AM  18        Count 1, like I told you earlier, is that conspiracy

11:09AM  19  to defraud the United States.  It charges the defendant with

11:09AM  20  conspiring with Joseph Bongiovanni to defraud the United

11:09AM  21  States between 2005 and February of 2019.  We're going to talk

11:09AM  22  about the elements of Count 1 now.

11:09AM  23        First, you're getting good at conspiracy by now I

11:09AM  24  bet, that two or more persons entered an unlawful agreement

11:09AM  25  charged in the indictment;

USA v Gerace - Closing Argument / Cooper - 12/19/24

11:09AM   1          Second, that the defendant knowingly and willfully

11:09AM   2   became a member of that conspiracy;

11:09AM   3          This count has a third element that one of the

11:10AM   4   members of the conspiracy knowingly committed at least one

11:10AM   5   overt act charged in the indictment; and

11:10AM   6          Fourth, that the overt act that you find to have been

11:10AM   7   committed was committed to further some objective of the

11:10AM   8   conspiracy.

11:10AM   9          Those are the four elements for Count 1.

11:10AM  10          The first element, that two or more persons entered

11:10AM  11   the unlawful agreement charged in the indictment.

11:10AM  12          First thing we're gonna do is identify what is the

11:10AM  13   unlawful agreement charged in the indictment.  I'm going to

11:10AM  14   summarize it because the indictment is huge, we're not going

11:10AM  15   to waste time.

11:10AM  16          In sum, it's the unlawful agreement between former

11:10AM  17   Special Agent Joseph Bongiovanni and Peter Gerace to have

11:10AM  18   Bongiovanni be corrupt.  That's the agreement.  To have

11:10AM  19   Bongiovanni protect Peter Gerace from law enforcement

11:10AM  20   investigation, to shelter him from other law enforcement

11:10AM  21   officers, and their illegitimate action.

11:10AM  22          I submit to you that the corrupt agreement was

11:11AM  23   designed on purpose to create a two-tiered system of justice,

11:11AM  24   one for everyone else, and one for this defendant.  It was a

11:11AM  25   mutual understanding, spoken or unspoken, between Peter Gerace

USA v Gerace - Closing Argument / Cooper - 12/19/24

75

11:11AM    1    and Joe Bongiovanni.

11:11AM    2            Let's talk about how we've proven that.

11:11AM    3            First, let's look at the relationship that we know

11:11AM    4    they have, that you know they have, based upon the testimony

11:11AM    5    and the evidence.  They were incredibly close to each other.

11:11AM    6            Lou Selva told you that they grew up together, that

11:11AM    7    they were friends since they were teenagers.  They bar tended

11:11AM    8    together in their early 20s.  You know that Bongiovanni grew

11:11AM    9    up in a -- in a neighborhood where he and Lou Selva described

11:11AM   10    having an affinity looking up to people that they thought were

11:11AM   11    in Italian Organized Crime.  And you know that -- you've heard

11:11AM   12    testimony that this defendant and his family have a reputation

11:11AM   13    for being associated with that.

11:12AM   14            And that's important only because it's a reason why

11:12AM   15    Bongiovanni had a -- had a reason to want to look out for

11:12AM   16    Peter Gerace.  That's why that's being offered to you.

11:12AM   17            Let's think about the testimony of M.U.  She was

11:12AM   18    Bongiovanni's fiancée back from 2005 to 2009.  She was witness

11:12AM   19    number 1 at the trial.  So we're going to pull out the board

11:12AM   20    here, that was M.U., if anybody needs to see what she looked

11:12AM   21    like.

11:12AM   22            And M.U. came in here day 1 of testimony, and she

11:12AM   23    told you that from 2005 to 2009, she was in a relationship

11:12AM   24    with Joe Bongiovanni.  She said that he introduced her towards

11:12AM   25    the beginning of their relationship -- so we're all the way

11:12AM    1    back in '05 -- he introduced her to his good friend, Peter

11:12AM    2    Gerace.  She told you that -- about the things that they would

11:12AM    3    do together.  They went on double dates together.  They went

11:12AM    4    on trips to Niagara on the Lake together.  They took carriage

11:12AM    5    rides together, Peter Gerace and Joe Bongiovanni, all the way

11:13AM    6    back in '05.

11:13AM    7            And M.U. also offered you some significant testimony

11:13AM    8    about how Bongiovanni told her during their relationship that

11:13AM    9    he felt conflicted.  He felt conflicted between the guys he

11:13AM   10    grew up with and his job as a DEA special agent.  That

11:13AM   11    conflict that Bongiovanni described to M.U., I suggest to you,

11:13AM   12    that it's proof that all the way back in 2005 there was a

11:13AM   13    struggle going on in Joe Bongiovanni's mind.

11:13AM   14            The proof, the evidence at this case, shows you that

11:13AM   15    he lost that struggle, and the people of Western New York

11:13AM   16    suffered because of it.  Bongiovanni became corrupt.  And part

11:13AM   17    of his corruption involved protecting this defendant.

11:13AM   18            Let's stay on the relationship for a sec.  It wasn't

11:13AM   19    just 2005 to 2009.

11:13AM   20            T.O., this defendant's former fiancée --

11:14AM   21            If we can zoom in, Ms. Champoux, on just these four

11:14AM   22    people here.

11:14AM   23            -- T.O. told you about a 2011 trip to Las Vegas

11:14AM   24    together.  And here they are, Peter and Joe Bongiovanni, on a

11:14AM   25    prearranged vacation to Las Vegas together.

USA v Gerace - Closing Argument / Cooper - 12/19/24

11:14AM    1      In 2018, 13 years after 2005 when M.U.'s talking to

11:14AM    2   you, 2018, here they are, thick as thieves, right next to each

11:14AM    3   other in the picture.  Peter Gerace, Joe Bongiovanni, P.H., at

11:14AM    4   the time with Peter, and Lindsay, Bongiovanni's now wife.

11:14AM    5      It's a friendship that never wavered.  And if a

11:14AM    6   picture speaks a thousand words, hopefully those pictures can

11:14AM    7   save us some time on the summation here.

11:14AM    8      Let's go to the text messages to see how close they

11:14AM    9   were.

11:14AM   10      Ms. Champoux, can we pull up some of the text

11:14AM   11   messages from 310D?

11:14AM   12      These are this defendant's text messages with

11:15AM   13   Bongiovanni.

11:15AM   14      Peter Gerace:  We need to get together soon.

11:15AM   15      Bongiovanni:  I know, bro.  Maybe lunch soon.  Miss

11:15AM   16   you, bro.  Just get better, bro.  I'll pick you up in the old

11:15AM   17   Buick and we'll hang out.  That's Bongiovanni.

11:15AM   18      Peter:  Love to.  Thanks.  Thanks for the note.

11:15AM   19      Joe:  Always there for you.  Love you, bro.  Sorry

11:15AM   20   I've been crazy busy.  I owe you clams casino we'll get them

11:15AM   21   soon.  Bongiovanni says, hey, we've been friends for 25 years,

11:15AM   22   all good.

11:15AM   23      And this defendant says:  You mean 36 years.

11:15AM   24      Now, that's fun.  We'll get there in a minute.  But

11:15AM   25   that's in 2018 at a time when Bongiovanni is now starting to

11:15AM   1   try to distance himself from this defendant because he

11:15AM   2   realizes it's coming under scrutiny, and all of a sudden he's

11:15AM   3   saying look, we've been friends for 25 years, and this

11:15AM   4   defendant's like no, 36 years we've been friends.  That's the

11:15AM   5   relationship that existed between those two people.

11:15AM   6         I expect that when the judge tells you the law, so

11:15AM   7   that -- that was just setting the stage for the unlawful

11:16AM   8   agreement, the relationship is the background.  But when the

11:16AM   9   judge instructs you on the law, I expect he's going to tell

11:16AM   10  you that with respect to conspiracy, actions speak louder than

11:16AM   11  words, right?

11:16AM   12        Let's talk about the actions of both of those

11:16AM   13  individuals, Joe Bongiovanni and this defendant, that prove to

11:16AM   14  you that they were involved in an unlawful agreement together.

11:16AM   15        It starts back in 2005 with the search warrant at

11:16AM   16  Craig Border's residence.  And what do we know was happening

11:16AM   17  in 2005?  Bongiovanni's close with Peter Gerace, double dates,

11:16AM   18  they're in a close friendship.

11:16AM   19        Craig Border, he told you he was a drug dealer, and

11:16AM   20  earlier in the year in '05 he had been dating R.A., Peter

11:16AM   21  Gerace's then girlfriend.

11:16AM   22        Craig Border told you he had some intimate photos of

11:16AM   23  R.A. in a Playboy Bunny outfit in his house.  He was a weed

11:16AM   24  dealer.  And on December 1st, 2005, the DEA shows up at his

11:17AM   25  house to execute a search warrant.  And you learn from

USA v Gerace - Closing Argument / Cooper - 12/19/24

79

11:17AM    1    Exhibit 11A --

11:17AM    2          And we can just zoom in, Ms. Champoux, on box 9 and

11:17AM    3    10 there?  Thank you.

11:17AM    4          -- who was present for the execution of the search

11:17AM    5    warrant at Craig Border's house?  Joe Bongiovanni.

11:17AM    6          And on December 1st, 2005, when that search is

11:17AM    7    executed, you learn that Craig Border goes back to his

11:17AM    8    apartment, and the intimate photos of R.A. in a Playboy Bunny

11:17AM    9    outfit are gone.

11:17AM   10          I mean, you can use your common sense.  They didn't

11:17AM   11    have evidentiary value in a marijuana-trafficking case.  You

11:17AM   12    know why they were taken.  You'll -- we'll talk about that in

11:17AM   13    a minute.

11:17AM   14          R.A. came in here, though, and she talked to you

11:17AM   15    about this.  And I submit to you that Ms. R.A. had no interest

11:17AM   16    in helping the government at all.  That was apparent from the

11:17AM   17    way she acted on the witness stand when Mr. Tripi asked her

11:17AM   18    questions.  She wanted nothing to do with being present at

11:17AM   19    this trial or providing testimony that could in any way

11:18AM   20    incriminate that defendant.

11:18AM   21          She told you he's her child's father.  I suggest to

11:18AM   22    you, you can see it for what it is.

11:18AM   23          But what did she tell us?  Why did we call her?

11:18AM   24          She told you that she was having an argument with the

11:18AM   25    defendant, and he told her that his friend Joe Bongiovanni had

11:18AM 1   seen photos of her at Craig Border's residence.  This

11:18AM 2   defendant said to her, my friend Joe is a DEA agent, and he

11:18AM 3   did a raid at some guy's house, and he found pictures of you.

11:18AM 4   Those were her words that she described what he said to her

11:18AM 5   back in 2005.

11:18AM 6        R.A. begrudgingly admitted that the defendant told

11:18AM 7   her that Bongiovanni had even shown him the sensitive

11:18AM 8   photographs that he recovered from Craig Border's apartment,

11:18AM 9   things that he seized from a search warrant for no legitimate

11:18AM 10  law-enforcement purpose.

11:18AM 11       What law enforcement officers see, what they see when

11:18AM 12  they go in someone's home because a judge authorizes them to

11:19AM 13  search for evidence of criminal activity, that's

11:19AM 14  law-enforcement sensitive information.  They don't go run

11:19AM 15  around and tell their wife or their friends, hey, you're not

11:19AM 16  gonna believe what I found in John Smith's house.  They have

11:19AM 17  an obligation, a duty, to keep that private.

11:19AM 18       But what did Joe Bongiovanni do?  He tells his

11:19AM 19  friend, Peter Gerace, hey, I saw these pictures of RuthAnn.

11:19AM 20  He shows them to him.

11:19AM 21       And what do we know from the evidence at this case?

11:19AM 22  We know that Bongiovanni knew what R.A. looked like.

11:19AM 23       Let's go to the two photos, or the front and back of

11:19AM 24  the photo that M.U. provided us.

11:19AM 25       And if you can zoom in, Ms. Champoux, on this area

11:19AM    1    thank you.

11:19AM    2         2005/07/21, that's a date on the back of a printed

11:19AM    3    photograph.  July 21st, 2005.  Five months approximately

11:19AM    4    before the search at Craig Border's house, Bongiovanni is on a

11:19AM    5    double date with Gerace and R.A.  Five months earlier.

11:20AM    6         He knows what she looks like, he's in some drug

11:20AM    7    dealer's house, he sees her pictures, these intimate photos,

11:20AM    8    and he takes them.  Corruptly.  For no legitimate purpose.

11:20AM    9    And then he shows them to his friend, Peter Gerace.

11:20AM    10         Now, chronologically, that's the first incident of

11:20AM    11    corruption in this indictment, but it's far from the last.  It

11:20AM    12    was part of the unlawful agreement, whether spoken or

11:20AM    13    unspoken, between Bongiovanni and Gerace, an agreement that

11:20AM    14    Bongiovanni would use his position as a DEA special agent to

11:20AM    15    serve Peter Gerace's interests above the interests of society.

11:20AM    16    To betray his oath to the DEA, and to demonstrate his loyalty

11:20AM    17    instead to this defendant.  And it only gets worse from there.

11:20AM    18         As you learned during this trial, the real reason for

11:20AM    19    that corrupt agreement between the two of them was not to help

11:21AM    20    this defendant win an argument he was having with R.A.  It was

11:21AM    21    for Bongiovanni to use his protection, his position as a DEA

11:21AM    22    special agent, to provide protection and to shield Peter

11:21AM    23    Gerace from investigations, from arrests, and from criminal

11:21AM    24    prosecution.  And for years, that's exactly what he did.

11:21AM    25         We'll start now moving to 2008.  The cold approach.

11:21AM   1   And this is a long time ago, so I'm going to show you Chris

11:21AM   2   Wisniewski, Special Agent Chris Wisniewski from the DEA.  He

11:21AM   3   testified.  He's the third witness at the trial.  You'll have

11:21AM   4   this in the back.

11:21AM   5          You remember -- you remember Chris from the DEA.  He

11:21AM   6   told you that he had an investigation called the Gambino

11:21AM   7   investigation in '08, a big case involving drug dealing and

11:21AM   8   organized crime.  His target, his main target wasn't this

11:21AM   9   defendant.  He was well into his investigation, and he came

11:21AM   10  into possession of an organizational chart --

11:22AM   11         Ms. Champoux is the best.  Thank you, Karen.

11:22AM   12         -- he came into possession of an organizational

11:22AM   13  chart.  He told you TJ Webb from Homeland Security got this

11:22AM   14  from BPD, and Peter Gerace is listed in the center towards the

11:22AM   15  top in a significant place in that organizational chart.  It

11:22AM   16  was an evidentiary lead in the hands of a legitimate DEA

11:22AM   17  special agent, in Chris Wisniewski.  That was a case that

11:22AM   18  Wisniewski told you Bongiovanni had nothing to do with.  He

11:22AM   19  wasn't involved in working on it, it wasn't his case.

11:22AM   20         Wisniewski and Bongiovanni were in the same group,

11:22AM   21  and Bongiovanni came over to him.  Wisniewski testified that

11:22AM   22  Bongiovanni brought up the fact, hey, I saw Peter Gerace's

11:22AM   23  name is on your organizational chart.  I know him from the old

11:22AM   24  neighborhood.  I can do a cold approach.

11:23AM   25         Now, of course, Bongiovanni lies, because he doesn't

11:23AM    1    tell Chris Wisniewski in 2008, hey, look at these, we go on

11:23AM    2    double dates together, we go to Niagara on the Lake, on

11:23AM    3    carriage rides, he doesn't say any of that.  He says oh, I

11:23AM    4    know him from the neighborhood a long time ago, and he tells

11:23AM    5    Chris Wisniewski I can do a cold approach.

11:23AM    6         And we spent a good amount of time with Special Agent

11:23AM    7    Wisniewski, what is a cold approach?  You're looking into an

11:23AM    8    organization, and you go up to one person, you pick someone

11:23AM    9    out of -- you select who you're gonna go to and you basically

11:23AM    10   say, hey, we're doing this investigation, do you want to

11:23AM    11   cooperate with us?  Try to flip them without any charge

11:23AM    12   hanging over their head.  Without any prior contact, without

11:23AM    13   an arrest leading up to it.  You just inform them you're

11:23AM    14   investigating them and see if you can get them to flip.

11:23AM    15   That's what Bongiovanni suggests to Wisniewski.

11:23AM    16        And because Bongiovanni intentionally, on purpose,

11:23AM    17   misled Wisniewski about his relationship with this defendant,

11:24AM    18   Wisniewski agreed.  He was offering to help.  Bongiovanni

11:24AM    19   offered to do a cold approach.

11:24AM    20        You know as you sit here now, you know what happened.

11:24AM    21   Bongiovanni did whatever he did, and he came back to Chris

11:24AM    22   Wisniewski.  He says, hey Chris, that's a dead end, Peter

11:24AM    23   Gerace, that's not going anywhere.  He couldn't give us

11:24AM    24   anything, he can't help us.

11:24AM    25        And Bongiovanni corruptly misleads and persuades

| | | |
|---|---|---|
| 11:24AM | 1 | Special Agent Wisniewski to move on from the center of that |
| 11:24AM | 2 | organizational chart. |
| 11:24AM | 3 | And you know once they do the cold approach, right, |
| 11:24AM | 4 | Bongiovanni's killed two birds with one stone, because he's |
| 11:24AM | 5 | gone to this defendant and he's advised him, hey, buddy, you |
| 11:24AM | 6 | came up, you're on our radar.  That's corruptly protecting |
| 11:24AM | 7 | him. |
| 11:24AM | 8 | And then he goes back to Wisniewski, and I submit to |
| 11:24AM | 9 | you he lies to Wisniewski and says oh, he can't help us, |
| 11:24AM | 10 | he's -- he doesn't know anything, and he directs Wisniewski |
| 11:24AM | 11 | away from him.  All the while misleading him about his actual |
| 11:25AM | 12 | relationship with this defendant. |
| 11:25AM | 13 | That's exactly what the corrupt agreement between |
| 11:25AM | 14 | Bongiovanni and this defendant was all about.  By doing the |
| 11:25AM | 15 | fake cold approach, he moves an investigation away from Peter |
| 11:25AM | 16 | Gerace. |
| 11:25AM | 17 | And Joe Bongiovanni sought to cover his tracks.  You |
| 11:25AM | 18 | have Government Exhibit 30B.  Let's take a look at 30B. |
| 11:25AM | 19 | Ms. Champoux's got it up on the screen for us. |
| 11:25AM | 20 | Bongiovanni writes what Wisniewski testified to you |
| 11:25AM | 21 | is a report filled with false information.  I submit to you |
| 11:25AM | 22 | what he was doing was creating a paper trail.  Wisniewski told |
| 11:25AM | 23 | you this is -- these are lies.  Bongiovanni didn't go get the |
| 11:25AM | 24 | organizational chart, TJ Webb from Homeland Security did.  He |
| 11:25AM | 25 | had nothing to do with it. |

11:25AM   1          But he writes this report, and I submit to you what

11:25AM   2   he's doing here is he's trying create a paper trail for why

11:25AM   3   he's involved in this investigation at all, covering his

11:25AM   4   tracks.

11:25AM   5          One thing we know, he didn't write anything about the

11:25AM   6   cold approach of this defendant in the report.  Nothing there.

11:26AM   7   No details about his conversation with Peter Gerace.

11:26AM   8          What you know for sure from Special Agent

11:26AM   9   Wisniewski's testimony is that Peter Gerace was never a source

11:26AM   10  of information, and he was never a confidential source.

11:26AM   11  Wisniewski told you, yeah, he -- he, Bongiovanni, came back to

11:26AM   12  me and said, yeah, it's going nowhere.

11:26AM   13         So Gerace was not a source of information and he was

11:26AM   14  not a confidential informant for the DEA.  Didn't happen.

11:26AM   15         As you know, that lie that Peter Gerace was a

11:26AM   16  confidential informant, that lie wouldn't come until about a

11:26AM   17  year later when this defendant again gets himself in hot

11:26AM   18  water, this time for violating his pro -- probation

11:26AM   19  conditions, and he calls on his secret agent, his double

11:26AM   20  agent, Joe Bongiovanni.  And what does Bongiovanni do?

11:26AM   21  Consistent with the corrupt agreement, he jumps in and helps

11:26AM   22  immediately.

11:26AM   23         2009, October 31st, probation and FBI do a search

11:27AM   24  together at Pharaoh's Gentlemen's Club.  The defendant tests

11:27AM   25  positive for cocaine, and he finds himself in hot water.

USA v Gerace - Closing Argument / Cooper - 12/19/24

11:27AM   1    Before we go through the details of that a little
11:27AM   2    more, I want to just kind of do an exercise to get everyone's
11:27AM   3    mind on what was going on at Pharaoh's around Halloween of
11:27AM   4    2009.  You heard testimony, different part of the case, but
11:27AM   5    same exact time in real life, you heard testimony from K.L.
11:27AM   6    and G.R. and others, A.P., about the constant drug use at
11:27AM   7    Pharaoh's.  You heard testimony from G.R. and K.L. about what
11:27AM   8    this defendant was doing upstairs at Pharaoh's, coercing them
11:27AM   9    with drugs to have sex with himself and other people.  That's
11:27AM  10    happening in August and in the summer of 2009.

11:27AM  11    Based on the timelines provided to you by K.L. and
11:27AM  12    G.R. and A.P., that's in the immediate lead-up to probation
11:27AM  13    coming and -- I submit to you it should be no surprise to you
11:28AM  14    the defendant tests positive for cocaine when probation shows
11:28AM  15    up, based upon all the testimony you heard about him using
11:28AM  16    cocaine constantly at the club during that timeframe.

11:28AM  17    That's the context.  Providing fentanyl, providing a
11:28AM  18    place to use fentanyl, providing Lortabs and cocaine to women
11:28AM  19    who worked there, that's the context of what he's engaged in,
11:28AM  20    his conduct when probation and the FBI come knocking in 2009.
11:28AM  21    This defendant had a lot to lose.  A lot to be worried about
11:28AM  22    if there was a larger investigation into what was going on at
11:28AM  23    Pharaoh's in 2009.

11:28AM  24    You learned from Peter Lepiane that he was contacted
11:28AM  25    by Tom Herbst from the FBI.  Peter told you that Special Agent

11:28AM  1   Herbst had information that was leading him in the direction

11:28AM  2   of investigating the defendant.  And Peter was a probation

11:28AM  3   officer, he was responsible for supervising the defendant.

11:28AM  4        You know all the information that Herbst had, that

11:29AM  5   was information provided by G.R. and K.L. when they got

11:29AM  6   arrested and provided an interview to the FBI, and they talked

11:29AM  7   about this defendant providing drugs and engaging in

11:29AM  8   commercial sex at his location.

11:29AM  9        Ultimately, it results in a search by probation.

11:29AM  10  They do a search at Pharaoh's, the defendant tests positive

11:29AM  11  during a drug test, and he's in trouble, he's in hot water.

11:29AM  12       No doubt, though, an even bigger concern for him than

11:29AM  13  a dirty urine test from probation is the fact that the FBI is

11:29AM  14  at the search, the FBI along with probation is at his club,

11:29AM  15  and I submit to you in that moment, this defendant knew, got

11:29AM  16  to call on Bongiovanni and do something about this.  That's

11:29AM  17  exactly what he does.

11:29AM  18       As a part of the corrupt agreement that Bongiovanni

11:29AM  19  had with this defendant, he springs into action.  He calls

11:30AM  20  U.S. Probation.  And what does he do?  He lies.

11:30AM  21       He tells them lies.  He tells probation in 2009, oh,

11:30AM  22  yeah, Peter used to be a confidential source of information to

11:30AM  23  me.  No evidence of that at all.  DEA witnesses came here and

11:30AM  24  told you no paperwork, it doesn't exist.  Because it didn't

11:30AM  25  happen.

| | | |
|---|---|---|
| 11:30AM | 1 | Chris Wisniewski told you he never gave information |
| 11:30AM | 2 | in my case in '08.  But Bongiovanni, when he wants probation |
| 11:30AM | 3 | to -- to treat this defendant differently, he tells them oh, |
| 11:30AM | 4 | yeah, he used to be a source of mine.  Lie. |
| 11:30AM | 5 | He told probation that this defendant would be |
| 11:30AM | 6 | willing to cooperate to try to get himself out of trouble.  He |
| 11:30AM | 7 | told them that this defendant would be -- would be willing to |
| 11:30AM | 8 | cooperate to get himself out of trouble.  I submit to you that |
| 11:30AM | 9 | was another lie that Bongiovanni told just to try to -- to |
| 11:30AM | 10 | slow things down to back probation off.  It doesn't matter |
| 11:31AM | 11 | whether it worked or not, whether probation actually changed |
| 11:31AM | 12 | how they act.  Thank God probation did what they were gonna do |
| 11:31AM | 13 | anyway. |
| 11:31AM | 14 | But Bongiovanni's intent, you know, when he's lying |
| 11:31AM | 15 | to them about this defendant is to try to back them off.  Oh, |
| 11:31AM | 16 | leave Peter alone. |
| 11:31AM | 17 | When he later needs go back and create a paper trail, |
| 11:31AM | 18 | he wrote what Wisniewski and -- and I believe Special Agent |
| 11:31AM | 19 | Casullo referred to as a fake DEA-6 report, he goes back and |
| 11:31AM | 20 | he tries to create a paper trail to cover up the lie that he |
| 11:31AM | 21 | told to U.S. Probation about this defendant previously being |
| 11:31AM | 22 | his source.  That's Government Exhibit 30A. |
| 11:31AM | 23 | It's a report that Bongiovanni writes to try cover up |
| 11:31AM | 24 | the corrupt agreement that he has with this defendant.  Gerace |
| 11:31AM | 25 | has acted as a confidential source, and has been able to |

| 11:31AM | 1 | provide information regarding individuals in this case file |
| 11:32AM | 2 | and other narcotics investigations in the past.  Lie. |
| 11:32AM | 3 | This case file, Chris Wisniewski told you that's his |
| 11:32AM | 4 | case file.  Gerace never provided any information about that |
| 11:32AM | 5 | case.  He was a dead end, remember? |
| 11:32AM | 6 | But when the defendant now has reported to |
| 11:32AM | 7 | U.S. Probation who worked in this courthouse that this man |
| 11:32AM | 8 | used to be his informant, all of a sudden he goes back and |
| 11:32AM | 9 | writes a report and he files it away in Chris Wisniewski's old |
| 11:32AM | 10 | case. |
| 11:32AM | 11 | That's a violation of his duties as a DEA agent. |
| 11:32AM | 12 | Can't lie in reports, plain and simple.  And if you do it, |
| 11:32AM | 13 | because you want to cover for your buddy, doesn't matter if |
| 11:32AM | 14 | it's for a bribe, not in the elements, not part of this crime. |
| 11:32AM | 15 | If do you it because he's your friend, that's illegal. |
| 11:32AM | 16 | The bigger problem facing this defendant wasn't |
| 11:33AM | 17 | probation and the dirty urine, it was the FBI.  And he knew |
| 11:33AM | 18 | that, and Bongiovanni knew that, and they had a plan to deal |
| 11:33AM | 19 | with it. |
| 11:33AM | 20 | Bongiovanni lives up to his part of the corrupt |
| 11:33AM | 21 | agreement.  He acts in furtherance of the conspiracy.  He |
| 11:33AM | 22 | kills Special Agent Herbst's investigation into this defendant |
| 11:33AM | 23 | while it's in its infancy. |
| 11:33AM | 24 | And you know how they did it?  It's the Bongiovanni |
| 11:33AM | 25 | trademark.  It's what he would later tell Lou Selva to do, and |

11:33AM  1   try to get Lou Selva, his drug-dealer friend, to do.  He

11:33AM  2   pretends Gerace is his informant to get other law enforcement

11:33AM  3   to back away.

11:33AM  4        So Bongiovanni sets up this meeting with the FBI, and

11:33AM  5   he tells his bosses one.  Lie, he tells his bosses, hey, I'm

11:33AM  6   going to hand Peter Gerace off to the FBI, let them use him.

11:34AM  7   That's a lie.  Didn't happen.

11:34AM  8        Special Agent Herbst told you, that didn't happen.

11:34AM  9        And he tells another lie to the FBI when he meets

11:34AM  10  with them, which is hey, Peter's -- he infers through his

11:34AM  11  action and his words that Peter's his source, he tells Herbst,

11:34AM  12  oh, I've known him a long time.  Herbst, at the time they end

11:34AM  13  up having this meeting with Gerace and Bongiovanni, Herbst was

11:34AM  14  like a 20-plus year FBI agent.  He testified to you that he

11:34AM  15  knows exactly what it's like when you have a meeting and

11:34AM  16  someone hands off an informant to you.  He told you

11:34AM  17  unequivocally.  That's not what happened.

11:34AM  18       He told you that Bongiovanni acted -- acted in a way

11:34AM  19  and said things to hold out to him that Peter Gerace was his

11:34AM  20  informant.

11:34AM  21       And Casullo explained to you the impact that that

11:34AM  22  has.  He gave you some insight into the world of federal law

11:34AM  23  enforcement, and Special Agent Herbst explained to you that

11:34AM  24  you don't step on the toes of another federal agency if

11:34AM  25  they've got someone working as an informant, it's their job to

USA v Gerace - Closing Argument / Cooper - 12/19/24

91

11:35AM   1   deal with that person.  If that person's involved in criminal

11:35AM   2   activity, their job to handle it.

11:35AM   3        So Bongiovanni misleads and misdirects and conceals

11:35AM   4   information from Special Agent Herbst, and the outcome is

11:35AM   5   exactly what this defendant wanted, and it's exactly what

11:35AM   6   Bongiovanni wanted.

11:35AM   7        It caused Herbst to move on to different things,

11:35AM   8   other investigations.  He leaves this defendant alone.  No

11:35AM   9   more looking into Pharaoh's, because he's a DEA informant.

11:35AM   10        Except he's not.  It's a lie told by Bongiovanni as a

11:35AM   11   part of a corrupt agreement, an act in furtherance of a

11:35AM   12   corrupt agreement to create a two-tiered system of justice.

11:35AM   13        Some people get investigated by the FBI and

11:35AM   14   probation, the facts lead them where they lead them, maybe

11:35AM   15   they end up in this courthouse.  And some people, like him,

11:35AM   16   coast.

11:35AM   17        During the meeting, Bongiovanni tries another way to

11:36AM   18   dissuade Herbst.  He says, yeah, your drug case, it sounds

11:36AM   19   like -- it sounds weak.  I don't think anybody would prosecute

11:36AM   20   that.

11:36AM   21        And Herbst tells you he remembers, he responded and

11:36AM   22   said, I already talked to Tony Bruce at the U.S. Attorney's

11:36AM   23   Office.  I got a prosecutor all lined up.

11:36AM   24        And he described for you years later that he

11:36AM   25   remembers what he called the oh, shit look on Joe

11:36AM    1    Bongiovanni's face at that moment, when Bongiovanni realized

11:36AM    2    Herbst had gone further than he thought.  This defendant was

11:36AM    3    exposed more than he thought.

11:36AM    4         You know as you sit here today that what Bongiovanni

11:36AM    5    did by backing Herbst off by trying to back probation off, was

11:36AM    6    create a corrupt no-fly zone over Pharaoh's.  FBI, back off.

11:36AM    7    Corrupt no-fly zone.  Which permitted this defendant to

11:36AM    8    continue the conduct that you now know was going on in the

11:36AM    9    summer of 2009, to continue that conduct unabated for years

11:37AM   10    and years.  To kill a law enforcement investigation, a

11:37AM   11    legitimate law enforcement investigation, you know it's

11:37AM   12    legitimate.  You heard from K.L. and G.R. and A.P. exactly

11:37AM   13    what was happening at that club.  You know Herbst was on the

11:37AM   14    right track, but this defendant's corrupt agreement with Joe

11:37AM   15    Bongiovanni allowed him to continue that conduct for a decade

11:37AM   16    after.

11:37AM   17         And after 2009's not the last time.  The FBI

11:37AM   18    investigation isn't the last time that Bongiovanni intercedes

11:37AM   19    on this defendant's behalf.  And we'll talk about why he did

11:37AM   20    it in a little bit.  But let's move on to 2016.

11:37AM   21         Things start to heat up again in 2016 with Special

11:37AM   22    Agent Anthony Casullo, Tony Casullo, and you heard him

11:37AM   23    testify.  Special Agent Casullo initiates an investigation

11:37AM   24    into this defendant in 2016, and he tells you he's concerned,

11:38AM   25    he reports to his boss -- because he knows Bongiovanni is

11:38AM   1   somewhat friends with Gerace -- he reports to his boss, hey,

11:38AM   2   Joe Bongiovanni's phone might be in Gerace's phone records

11:38AM   3   when I order them.  And Casullo told you his boss said okay,

11:38AM   4   go ahead, order the phone records and we'll deal with it when

11:38AM   5   it happens, if it happens.

11:38AM   6        So Casullo orders the phone records in 2016, this

11:38AM   7   defendant's phone records, and he sees Bongiovanni's number

11:38AM   8   716-818-0966.  He sees the phone number in the phone records,

11:38AM   9   goes to his boss and says, hey, Joe's number's in here what do

11:38AM  10   you want me to do?  The boss says, I'll handle it.

11:38AM  11        So Tony Casullo goes on about, you know, continuing

11:38AM  12   to start an investigation into this defendant.  And he

11:38AM  13   described to you how after that happened, after he told his

11:38AM  14   boss that Bongiovanni's phone number was in Peter Gerace's

11:38AM  15   phone records, his boss became noticeably hostile to him at

11:38AM  16   work -- Bongiovanni, I'm sorry, became noticeably hostile at

11:39AM  17   him at work.  He's pissed off.  Casullo told you he testified

11:39AM  18   that he didn't really understand why at the time.  But, yeah,

11:39AM  19   we're sitting here knowing everything you know, you know why

11:39AM  20   he was pissed.

11:39AM  21        The alarm bells were going on for Bongiovanni again.

11:39AM  22   As we discussed twice already, in '08 and '09, Bongiovanni's

11:39AM  23   going to have to jump in and back people off of Peter Gerace.

11:39AM  24   Prevent them not only from investigating and arresting this

11:39AM  25   defendant, but prevent them from discovering that Bongiovanni

11:39AM  1   himself is involved in protecting him.

11:39AM  2        And this time, it's going to be even harder for

11:39AM  3   Bongiovanni, because it's his own agency that's investigating

11:39AM  4   Peter Gerace.

11:39AM  5        The things he's done in the past to back off the FBI,

11:39AM  6   that's not gonna work.

11:39AM  7        The cold approach that he did with Wisniewski's

11:39AM  8   investigation, that's not gonna work.  The cold approach, this

11:39AM  9   defendant's name had come up in the context of a much larger

11:39AM  10  case.  Casullo was investigating this defendant and Pharaoh's

11:39AM  11  specifically.  It's common sense you don't do a cold approach

11:40AM  12  of your main target.  So that wasn't an option.

11:40AM  13       So what does Bongiovanni do?  Well, when Special

11:40AM  14  Agent Casullo testified to you he's trying to clear the air,

11:40AM  15  and he invites Bongiovanni into a conference room to have a

11:40AM  16  private discussion.

11:40AM  17       I submit to you at that moment, Bongiovanni seizes on

11:40AM  18  the opportunity to press the nuclear button.  He used his

11:40AM  19  bluster and his words to blow up Casullo's investigation into

11:40AM  20  Gerace.  And Casullo described that conversation to you that

11:40AM  21  happened eight years ago in minute detail.  He remembers who

11:40AM  22  spoke first, who spoke second, what words they said.  And I

11:40AM  23  submit to you the reason why Tony Casullo remembers that

11:40AM  24  conversation almost verbatim is because it shocked him to his

11:40AM  25  core.  And that's exactly what Bongiovanni was designing in

USA v Gerace - Closing Argument / Cooper - 12/19/24

95

11:40AM    1    that moment.

11:40AM    2         I submit to you that conversation has haunted Tony

11:41AM    3    Casullo for the rest of his career, and I think you saw that

11:41AM    4    from him when he testified on the witness stand.

11:41AM    5         So they walk into that conference room, and Casullo

11:41AM    6    says he speaks first, and he's apologetic.  He says, hey, Joe,

11:41AM    7    I wasn't trying to jam you up.  I'm not trying to get you in

11:41AM    8    trouble, just running Peter's phone records.  That's all.

11:41AM    9         And he tells you that Bongiovanni immediately is

11:41AM    10   elevated.  He's angry.  Special Agent Casullo testified to you

11:41AM    11   that Bongiovanni's first words to him were, this is bullshit.

11:41AM    12        What's bullshit?  Investigating this defendant?

11:41AM    13        But Bongiovanni's angry about it, and he doesn't stop

11:41AM    14   there.  His anger and his bluster, he's elevated and rambling,

11:41AM    15   and he says, this is bullshit.  And he follows that up by

11:41AM    16   saying, that kid called me, that kid called me when a stripper

11:41AM    17   overdosed in his club, and I told him to get her out of there.

11:41AM    18        A shocking admission.  Shocking when he said it to

11:42AM    19   Tony Casullo in 2016.  I submit it was probably shocking to

11:42AM    20   you when you heard it in 2024.

11:42AM    21        A DEA special agent saying a person that he knew was

11:42AM    22   being investigated by his own agency had called him when a

11:42AM    23   dancer overdosed.  They're supposed to investigate drug

11:42AM    24   overdoses.  And Bongiovanni says, he called me when a stripper

11:42AM    25   overdosed, and I told him get her out of there.

| | | |
|---|---|---|
| 11:42AM | 1 | In a moment of anger, he makes that shocking |
| 11:42AM | 2 | admission.  Get her out of there like she's trash. |
| 11:42AM | 3 | That's the corrupt agreement.  That's the criminal |
| 11:42AM | 4 | conspiracy in action.  Don't investigate the dancer, the |
| 11:42AM | 5 | stripper that's overdosing.  Get her out.  Cover it up. |
| 11:42AM | 6 | Conceal the crimes that are happening. |
| 11:42AM | 7 | And who benefited from that?  Who benefitted from the |
| 11:43AM | 8 | corrupt advice, and the coverups, and the concealments?  He |
| 11:43AM | 9 | did.  Over and over again for years.  From 2008, to 2009, to |
| 11:43AM | 10 | 2016, all the way up until his indictment in this case, he |
| 11:43AM | 11 | benefited from the corrupt agreement with Bongiovanni, his |
| 11:43AM | 12 | agent on retainer. |
| 11:43AM | 13 | And you know for a fact that that conversation that |
| 11:43AM | 14 | Casullo described for you, you know for a fact that it |
| 11:43AM | 15 | happened.  And here's why. |
| 11:43AM | 16 | You heard testimony from Doug Augustyniak, no friend |
| 11:43AM | 17 | to the government.  Doug and Tony have no -- they're not |
| 11:43AM | 18 | related to each other at all.  Doug's a VIP attendant at |
| 11:43AM | 19 | Pharaoh's, Tony Casullo is a DEA agent, I submit to you not a |
| 11:43AM | 20 | corrupt one.  And Doug Augustyniak describes to you a dancer |
| 11:43AM | 21 | overdosing, calling this defendant, and receiving the advice |
| 11:43AM | 22 | from this defendant, get her out of there.  Drop her off at a |
| 11:44AM | 23 | hotel lobby or something. |
| 11:44AM | 24 | He was employing -- this defendant, Peter Gerace, was |
| 11:44AM | 25 | employing the corrupt advice he was getting from his DEA agent |

USA v Gerace - Closing Argument / Cooper - 12/19/24          97

11:44AM    1    on retainer.

11:44AM    2          So let's go back.  That's -- that's corroboration.

11:44AM    3    It's why you know you can believe what Tony Casullo tells you,

11:44AM    4    based on the evidence and the testimony of other witnesses.

11:44AM    5          Let's go back to the conversation.  Casullo tells you

11:44AM    6    that he was shocked, he's trying to process what Bongiovanni

11:44AM    7    just said.  Bongiovanni pressed forward, I submit to you,

11:44AM    8    because he's intent on backing Casullo down.

11:44AM    9          And he asks Casullo in an accusatory tone of voice,

11:44AM   10    he says, isn't he friends with your brother-in-law?

11:44AM   11          And I submit to you, you saw from Tony Casullo, he

11:44AM   12    doesn't care.  His brother-in-law is not him, it's not his

11:44AM   13    friend, he doesn't care.  And he tells Bongiovanni that.  He

11:44AM   14    says, yeah, and my brother-in-law caused a lot of problems.

11:45AM   15          Casullo is not going to back off of an investigation

11:45AM   16    because of who his wife's brother is.  I submit to you his

11:45AM   17    demeanor and his testimony established that for you.

11:45AM   18          So Bongiovanni has to try a new avenue of attack.  So

11:45AM   19    he asks Casullo, Casullo, in an accusatory tone, what, do you

11:45AM   20    hate Italians?

11:45AM   21          And Tony Casullo's, like, no, I'm Italian.  What are

11:45AM   22    you talking about?

11:45AM   23          And Bongiovanni, in a disgusting display of

11:45AM   24    corruption and bigotry, vomited out the words, we should be

11:45AM   25    investigating N-words and S-words, disgusting racial comments

11:45AM    1    uttered for one purpose: To back Tony Casullo down, stop his

11:45AM    2    investigation in its tracks.

11:45AM    3         When he did that, when he said those disgusting

11:45AM    4    racial remarks to Tony Casullo about who the DEA should be

11:46AM    5    investigating, what he did was put Tony Casullo in a dilemma.

11:46AM    6    I submit to you it should have been an easy choice for Tony

11:46AM    7    Casullo, but it wasn't.

11:46AM    8         He gave him two choices.  You go and report this

11:46AM    9    conversation and violate the blue wall of silence and make

11:46AM   10    yourself a pariah in the office, or you back down and shut up.

11:46AM   11    Leave it alone.

11:46AM   12         And for years, to Tony Casullo's shame, that's what

11:46AM   13    he did.  For about two years he didn't report it to his

11:46AM   14    management.

11:46AM   15         That conversation, after Bongiovanni sees Casullo

11:46AM   16    start to calm down, I submit to you, he moves on and he says

11:46AM   17    hey, listen, I'm going to the guy's parents' 50th anniversary.

11:46AM   18    That's what he tells Casullo basically on the way out the

11:46AM   19    door.  I'm going to his parents' 50th wedding anniversary.

11:46AM   20         And Casullo, who had no clue about Government Exhibit

11:46AM   21    310D at that time in 2016, he's corroborated by their text

11:47AM   22    messages where you see Bongiovanni and Gerace texting about

11:47AM   23    it.

11:47AM   24         Casullo, who was new to the Buffalo office and who

11:47AM   25    was worried about being a pariah for accusing another agent of

USA v Gerace - Closing Argument / Cooper - 12/19/24

11:47AM   1   racism and misconduct and corruption, he made the wrong

11:47AM   2   choice, he stayed quiet.  For a little while he kept his mouth

11:47AM   3   shut.

11:47AM   4        But you know that Casullo ultimately did come forward

11:47AM   5   with what you know was the truth, and two years later he

11:47AM   6   reports what Bongiovanni said to him.  And when he did report

11:47AM   7   it, he told you, he faced all of the backlash that he was

11:47AM   8   worried about, which is shameful.

11:47AM   9        Once again, at least temporarily, in 2016,

11:47AM  10   Bongiovanni steps in, and he squashes an investigation into

11:47AM  11   this defendant.  Another example of the conspiracy and the

11:47AM  12   corrupt agreement at work.

11:47AM  13        And the defendant didn't only rely on Bongiovanni to

11:48AM  14   squash investigations into himself.  You heard testimony from

11:48AM  15   Lou Selva that Bongiovanni told Lou Selva, yeah, Peter called

11:48AM  16   me one time to jump in on Anthony's behalf when Anthony got in

11:48AM  17   trouble -- Anthony Gerace got in trouble with drugs in

11:48AM  18   Amherst, and I did.

11:48AM  19        He also used him, in addition to providing protection

11:48AM  20   to himself and his brother and other drug dealers, Gerace used

11:48AM  21   Bongiovanni to get realtime criminal advice.  Let's talk about

11:48AM  22   that.

11:48AM  23        May 4th, 2017.  So we're just about a year after

11:48AM  24   Bongiovanni bullies Casullo away from Gerace, just about a

11:48AM  25   year after that, when Bongiovanni's obviously aware that the

| | | |
|---|---|---|
| 11:48AM | 1 | DEA has an interest in investigating Peter Gerace for drug |
| 11:48AM | 2 | dealing.  May 4th, 2017, this defendant, Peter Gerace, leaves |
| 11:48AM | 3 | this voicemail on the DEA work cell phone of Joe Bongiovanni. |
| 11:48AM | 4 | And I want to play 311, please, Ms. Champoux. |
| 11:49AM | 5 | (Audio was played.) |
| 11:49AM | 6 | **MR. COOPER:**  Hey, Joe, it's Peter.  Listen, I want to |
| 11:49AM | 7 | know, if a guy's dealing drugs, and he's got a regular phone |
| 11:49AM | 8 | or if it's a phone that -- one of those TracFones, is there a |
| 11:49AM | 9 | way you could ping it like the police do to see where you're |
| 11:49AM | 10 | at?  Where they can tell where you're at?  I just want to know |
| 11:49AM | 11 | if you could do that or not.  Give me a call back, 725-1931. |
| 11:49AM | 12 | His words.  A voicemail he left in May of 2017 on a |
| 11:49AM | 13 | DEA special agent's cell phone.  It's crystal clear documented |
| 11:49AM | 14 | example of this defendant asking Bongiovanni for |
| 11:50AM | 15 | law-enforcement sensitive information. |
| 11:50AM | 16 | The reason it's law-enforcement sensitive |
| 11:50AM | 17 | information, I submit to you, is because he's asking about the |
| 11:50AM | 18 | capability to geolocate a specific type of phone.  Whether the |
| 11:50AM | 19 | DEA or the FBI is able to do that or not is not something that |
| 11:50AM | 20 | the DEA and the FBI want drug dealers to know about. |
| 11:50AM | 21 | It's common sense, right?  You don't want that |
| 11:50AM | 22 | information out in the public domain.  It frustrates the |
| 11:50AM | 23 | United States and law enforcement's ability to investigate |
| 11:50AM | 24 | drug-trafficking crimes if drug dealers know the exact tools |
| 11:50AM | 25 | you have to investigate.  So it's law-enforcement sensitive |

USA v Gerace - Closing Argument / Cooper - 12/19/24

101

| | | |
|---|---|---|
| 11:50AM | 1 | information. |
| 11:50AM | 2 | And this defendant brazenly, without a care in the |
| 11:50AM | 3 | world, calls Bongiovanni, says hey, if a guy's selling drugs |
| 11:50AM | 4 | can you ping his TracFone? |
| 11:50AM | 5 | This defendant wasn't writing a college paper.  I |
| 11:50AM | 6 | submit to you that he wasn't curious about something that he |
| 11:50AM | 7 | saw on TV.  In the context of all the evidence and testimony |
| 11:50AM | 8 | that you've heard in this case, you know the defendant was |
| 11:51AM | 9 | involved in distributing drugs.  You know about his brother's |
| 11:51AM | 10 | involvement in distributing drugs.  And here he is in a |
| 11:51AM | 11 | recorded voicemail asking for advice about getting away with |
| 11:51AM | 12 | selling drugs from a sworn DEA agent. |
| 11:51AM | 13 | I submit to you the only reason that this defendant |
| 11:51AM | 14 | felt comfortable doing that is because he's got that agent in |
| 11:51AM | 15 | his pocket.  He wasn't worried about it.  He left it in a |
| 11:51AM | 16 | recorded voicemail. |
| 11:51AM | 17 | And of course he was right, he did have Bongiovanni |
| 11:51AM | 18 | in his pocket, because Bongiovanni answers him. |
| 11:51AM | 19 | We're at 310D, page 42.  Ms. Champoux, can you zoom |
| 11:51AM | 20 | in on the gray box? |
| 11:51AM | 21 | Bongiovanni gets right back to him.  Yes, but you |
| 11:51AM | 22 | would need a warrant in order to get a ping order. |
| 11:51AM | 23 | Retainer.  Bongiovanni was on retainer for this drug |
| 11:51AM | 24 | dealing, sex-trafficking defendant, helping him stay out of |
| 11:51AM | 25 | trouble. |

USA v Gerace - Closing Argument / Cooper - 12/19/24    102

| | |
|---|---|
| 11:51AM | 1 |
| 11:52AM | 2 |
| 11:52AM | 3 |
| 11:52AM | 4 |

11:51AM  1          Just how corrupt was their relationship?  They were

11:52AM  2  doing cocaine together.  They blew cocaine together, think

11:52AM  3  about that.  This defendant felt comfortable enough in the

11:52AM  4  presence of this sworn DEA agent to rip lines of coke with him

11:52AM  5  at Sunset Bay at Tom Doctor's cottage.  P.H., she was there.

11:52AM  6          Let's zoom in on just the right portion of this

11:52AM  7  please, Ms. Champoux.  This is Government Exhibit 127.

11:52AM  8          Here's P.H. on the left.  Next to her in the red

11:52AM  9  shirt is this defendant, and then to the right is Bongiovanni

11:52AM  10  and his wife.  They're at Tom Doctor's little party cottage on

11:52AM  11  Sunset Bay.  And P.H., who at the time didn't know Joe

11:52AM  12  Bongiovanni from a hole in the wall, she goes upstairs with

11:52AM  13  Peter, she says oh, it's -- it's Peter's friend, we go

11:52AM  14  upstairs, and this guy breaks out cocaine and we all used it.

11:52AM  15          At the time she circled his face, she didn't know he

11:52AM  16  was a DEA special agent.  She knew nothing about the

11:52AM  17  significance of it.  But you heard her testify this guy and

11:53AM  18  this guy were using cocaine together at the cottage.

11:53AM  19          And if we can zoom out, Ms. Champoux.

11:53AM  20          The other person that she circled that she also said

11:53AM  21  used cocaine with Bongiovanni and Gerace, is this guy on the

11:53AM  22  left here in the sunglasses, who you've learned is Tom Doctor.

11:53AM  23  She had no clue at the time she circled that person on the

11:53AM  24  left that he was formerly Bongiovanni's task force officer

11:53AM  25  partner, another law enforcement officer.

USA v Gerace - Closing Argument / Cooper - 12/19/24

103

| | | |
|---|---|---|
| 11:53AM | 1 | She picks those two people because those are the two |
| 11:53AM | 2 | people she saw using cocaine.  And how do you know you can |
| 11:53AM | 3 | believe P.H. when she tells you that?  Other than the fact |
| 11:53AM | 4 | that, I submit to you, her testimony on its own should be |
| 11:53AM | 5 | found credible by you, think about the fact that she's |
| 11:53AM | 6 | corroborated by Lou Selva who she doesn't even know. |
| 11:53AM | 7 | Lou Selva also told you he's been to Tom Doctor's |
| 11:53AM | 8 | cottage with Joe Bongiovanni, and they've blown cocaine there. |
| 11:53AM | 9 | Two totally separate people, two totally separate walks of |
| 11:54AM | 10 | life, describing the exact same conduct.  So you know P.H. is |
| 11:54AM | 11 | telling you the truth based on the other evidence in the case. |
| 11:54AM | 12 | The final acts of coverup and corruption occur when |
| 11:54AM | 13 | Bongiovanni finds out that Casullo has reported his comments |
| 11:54AM | 14 | and his relationship with Gerace in the context of his |
| 11:54AM | 15 | relationship with this defendant. |
| 11:54AM | 16 | Bongiovanni knows that his relationship with this |
| 11:54AM | 17 | defendant is under scrutiny, he's racing to retire, spurred on |
| 11:54AM | 18 | by the spotlight that's been placed on him and this defendant |
| 11:54AM | 19 | when Casullo finally does come forward.  And Bongiovanni, on |
| 11:54AM | 20 | his way out the door, tries to create another false, |
| 11:54AM | 21 | misleading, corrupt, concealing, coverup report or memorandum. |
| 11:54AM | 22 | He writes three, a series of three memorandums on his way out |
| 11:55AM | 23 | the door to try to create some paper trial of his relationship |
| 11:55AM | 24 | with Peter Gerace, and it's nonsense. |
| 11:55AM | 25 | He generates these memorandums to draw attention away |

USA v Gerace - Closing Argument / Cooper - 12/19/24

104

| | | |
|---|---|---|
| 11:55AM | 1 | from himself and his corrupt agreement with this defendant. |
| 11:55AM | 2 | Let's take a quick look at those memos, because they |
| 11:55AM | 3 | speak to Bongiovanni's consciousness of guilt, the fact that |
| 11:55AM | 4 | he's lying shows you that he knew what he was doing was wrong. |
| 11:55AM | 5 | Government Exhibit 97. This is the first one, the |
| 11:55AM | 6 | first memo from November 1st, 2018. We're going zoom in on |
| 11:55AM | 7 | the top paragraph. |
| 11:55AM | 8 | It was brought to my attention that Peter Gerace had |
| 11:55AM | 9 | become a target of a federal investigation. Based upon |
| 11:55AM | 10 | intelligence I have received, I have attempted to terminate |
| 11:55AM | 11 | all contact with Gerace. |
| 11:55AM | 12 | Hold on. Bongiovanni, in 2018, is saying oh, I just |
| 11:55AM | 13 | became aware that Gerace is a target of investigation. You |
| 11:55AM | 14 | know that all the way back in 2008 and '9 Bongiovanni knew |
| 11:56AM | 15 | Gerace was a target of federal investigation. So that's a |
| 11:56AM | 16 | lie. And you know it's BS that he's trying to terminate all |
| 11:56AM | 17 | contact with him in 2018. |
| 11:56AM | 18 | You can zoom out of that, Ms. Champoux. |
| 11:56AM | 19 | Okay. The next part of that paragraph, it talks |
| 11:56AM | 20 | about, oh, it should be known any contact I've had with this |
| 11:56AM | 21 | defendant Peter Gerace in the past was minimal in-person |
| 11:56AM | 22 | contact, and primarily consisted of random telephonic |
| 11:56AM | 23 | communication based upon the fact that we were childhood |
| 11:56AM | 24 | friends. Yeah, okay. |
| 11:56AM | 25 | Let's go to Government Exhibit 127, 426-1, 490A. |

USA v Gerace - Closing Argument / Cooper - 12/19/24

105

11:56AM    1              Minimal in-person contact, you know, like vacations

11:56AM    2    to Las Vegas, and carriage rides in Niagara on the Lake, and

11:56AM    3    blowing cocaine together at Sunset Bay.

11:56AM    4              But Bongiovanni left those details out because he was

11:56AM    5    lying.  Random telephonic communication.  You remember the

11:56AM    6    British accent FBI data analyst, Gregory Machin?  Machin blew

11:57AM    7    a hole through that random telephonic communication.  Take a

11:57AM    8    look at their phone contacts if you need that.

11:57AM    9              Bongiovanni didn't just forget to mention that Gerace

11:57AM   10    was leaving him voicemails asking for tips on getting away

11:57AM   11    with drug dealing, he was doing it on purpose.  It was

11:57AM   12    corruption, it was a coverup.

11:57AM   13              Let's go to Government Exhibit 98.

11:57AM   14              The second corrupt, concealing memo designed to hide

11:57AM   15    this conspiracy.  We're gonna look at the bottom of page 1.

11:57AM   16              Thank you, Ms. Champoux.

11:57AM   17              So this is a memo from December 10, 2018.  This is my

11:57AM   18    favorite.  This is Bongiovanni attempting to accurately

11:57AM   19    recount a conversation he had on the phone with Peter Gerace.

11:57AM   20    He's claiming this is a conversation they had in real life.

11:57AM   21              Gerace stated that the person believes internal

11:57AM   22    affairs is watching me because Gerace and I have been friends

11:57AM   23    since we were kids, and now he owns Pharaoh's Gentlemen's

11:57AM   24    Club.

11:57AM   25              I responded that yes, we have been friends for years,

USA v Gerace - Closing Argument / Cooper - 12/19/24

11:58AM  1  but I never come into your club.  And Gerace said he agrees.

11:58AM  2          Anyone believe that conversation happened that way?

11:58AM  3  You know it didn't.

11:58AM  4          Let's go to Government Exhibit 310D at page 10.

11:58AM  5          July 13th, 2015.  Here's Bongiovanni saying to

11:58AM  6  Gerace, leaving my office now.  Gerace says okay, employee

11:58AM  7  entrance on Aero.

11:58AM  8          Hmmm, where's there an employee entrance on Aero

11:58AM  9  Drive?  What did we learn during the course of this trial?

11:58AM  10  There might be more than one business on Aero Drive that has

11:58AM  11  an employee entrance.  Who knows, right?

11:58AM  12          Let's move on to page 54, see if we can find an

11:58AM  13  answer.

11:58AM  14          Bongiovanni texting on April 1, 2018, I'll come see

11:58AM  15  you at Pharaoh's.

11:58AM  16          The evidence shows that Bongiovanni was lying,

11:58AM  17  obviously.  And it's not just the text messages.  K.L. saw

11:59AM  18  Bongiovanni at Pharaoh's.  Katrina Nigro saw Bongiovanni at

11:59AM  19  Pharaoh's.  A.P. saw him at Pharaoh's, met him there, and then

11:59AM  20  got his business card.  Keep in mind, she was a drug dealer.

11:59AM  21          You can take that down.

11:59AM  22          These memos are a load of nonsense.  The only reason

11:59AM  23  they're important is because they show Bongiovanni's

11:59AM  24  consciousness of guilt.  They're an act, an overt act designed

11:59AM  25  to coverup and conceal the conspiracy that existed with this

USA v Gerace - Closing Argument / Cooper - 12/19/24

11:59AM    1    defendant.  He's lying about their relationship.

11:59AM    2        Exhibit 99, the last memo, and we're -- we're getting

11:59AM    3    through here.  Let's look at -- this is the last memo, and

11:59AM    4    it's designed essentially to dirty up Tony Casullo on his way

11:59AM    5    out the door.

11:59AM    6        Just days before he retires, Bongiovanni writes a

11:59AM    7    fairy tale about how he saw Tony Casullo drinking privately

11:59AM    8    with this defendant in 2015 at -- at a restaurant, at Tappo, I

12:00PM    9    think it says, and then later at, let's see, thank you, Big

12:00PM    10    Ditch Brewery and later at Tappo.

12:00PM    11        First of all, if Casullo and Gerace were alone at the

12:00PM    12    Big Ditch Brewery, alone, then what was Bongiovanni doing

12:00PM    13    there?  Was he out on surveillance watching what his best

12:00PM    14    friend was doing?

12:00PM    15        Casullo told you what really happened.  He was at his

12:00PM    16    high school reunion in 2015, and Peter Gerace, this defendant,

12:00PM    17    was essentially pestering him, hey, come on, let's go across

12:00PM    18    the street, there's another DEA agent over there, let's go see

12:00PM    19    him.  Bongiovanni, he's with my brother Anthony.

12:00PM    20        And Casullo told you under oath subject to

12:00PM    21    cross-examination, not in a nonsense memo, in real life, he

12:00PM    22    came in here and told you, eventually I relented and I walked

12:00PM    23    across the street, and I saw Joe Bongiovanni hanging out with

12:00PM    24    Anthony Gerace, this defendant's brother, and a few other

12:01PM    25    people.

USA v Gerace - Closing Argument / Cooper - 12/19/24

108

12:01PM  1      So why did Bongiovanni write this memo?  Well I

12:01PM  2  submit to you on his way out the door, he knows Casullo's

12:01PM  3  reporting about his inappropriate relationship with Gerace,

12:01PM  4  about the comments that he made, and he knows Casullo saw him

12:01PM  5  alone with Anthony Gerace and a group of other people at a

12:01PM  6  bar.  So he basically flips himself into, you know, puts Tony

12:01PM  7  Casullo in his position and says, I saw Tony.  And he tries to

12:01PM  8  create this he-said/he-said situation.

12:01PM  9      But you know, using your good judgement and your

12:01PM  10  common sense, that Tony Casullo was -- testified consistent

12:01PM  11  with all the other proof in this case.  That it was

12:01PM  12  Bongiovanni hanging out with Anthony Gerace, not him.

12:01PM  13      Casullo isn't alone in saying that Bongiovanni hung

12:01PM  14  out with Anthony Gerace.  Kevin Myszka.  Kevin Myszka, over

12:01PM  15  here on the right, he told you he went to Toronto, Canada with

12:01PM  16  Joe Bongiovanni and a group of other people, it was like a

12:02PM  17  cocaine-fueled weekend in Canada.  And who was there?  Joe

12:02PM  18  Bongiovanni and Anthony Gerace.  That's how you know you can

12:02PM  19  trust Special Agent Casullo's testimony.

12:02PM  20      Each of those memos are overt acts in furtherance of

12:02PM  21  the conspiracy.  They're lies designed to cover up the

12:02PM  22  criminal agreement.

12:02PM  23      I expect that the judge is going to instruct you when

12:02PM  24  people are in a conspiracy together, they're legally

12:02PM  25  responsible for each other's actions that are in furtherance

USA v Gerace - Closing Argument / Cooper - 12/19/24

12:02PM  1    of the conspiracy.

12:02PM  2        These lies that Bongiovanni told designed to cover up

12:02PM  3    and mislead are attributable to this defendant.  I submit to

12:02PM  4    you that makes sense, because members of a conspiracy are like

12:02PM  5    members of a team.  They're working towards the same goal.

12:02PM  6        So think about.  I have an analogy, and it's a Bills

12:02PM  7    analogy.  Shocker.

12:02PM  8        Dion Dawkins and Josh Allen, they play for the same

12:02PM  9    team, right?  If Dion Dawkins jumps early and there's a false

12:02PM  10   start penalty, he's not the only one who's moving back five

12:02PM  11   yards.  The whole team gets penalized, because they're working

12:02PM  12   towards the same goal.  They're members of a team.

12:02PM  13       Conspiracy is the same thing.

12:03PM  14       I submit to you all of Bongiovanni's actions

12:03PM  15   corruptly covering up, protecting, shielding this defendant,

12:03PM  16   are legally attributable to this defendant.  Listen carefully

12:03PM  17   when the judge instructs you on the law in that regard.

12:03PM  18       Bongiovanni gives interviews later, and we're going

12:03PM  19   to move through this quick, we're running out of time.

12:03PM  20   Bongiovanni gives interviews later with HSI, and with the

12:03PM  21   Department of Justice OIG, and he lies more.  And he lies in

12:03PM  22   both of these interviews, says he never witnessed Peter Gerace

12:03PM  23   use narcotics.  Lie.

12:03PM  24       Denied that the defendant ever called him while a

12:03PM  25   staff member was overdosing at Pharaoh's.  Lie.

USA v Gerace - Closing Argument / Cooper - 12/19/24

110

12:03PM    1              Denied ever initiating contact with Peter Gerace.

12:03PM    2    Lie.

12:03PM    3              And then in June, he gives an interview at his house

12:03PM    4    during a search warrant, and he says:

12:03PM    5              He does not have a close relationship with the

12:03PM    6    defendant; you know that's not true.

12:03PM    7              Claimed he hasn't spoken with this defendant in over

12:03PM    8    a year; demonstrably false.

12:03PM    9              Denied ever attending a party with the defendant's

12:03PM   10    brother Anthony; you know that's not true, you heard from

12:03PM   11    Kevin Myszka.

12:03PM   12              Claimed that this defendant had once tried cooperate

12:04PM   13    with the DEA and that he recused himself; not true.  That's

12:04PM   14    designed to cover up and protect what happened.

12:04PM   15              And claimed that the Sunset Bay cottage had been --

12:04PM   16    Sunset Bay cottage party had been years earlier; and that was

12:04PM   17    also a lie.  You see the picture and the text messages.  It's

12:04PM   18    in the defendant's text messages with Bongiovanni.  That

12:04PM   19    happened months earlier, not years earlier.

12:04PM   20              So the first element of Count 1, that two or more

12:04PM   21    people entered an unlawful agreement.  Check.

12:04PM   22              The judge will tell you actions speak louder than

12:04PM   23    words, and you don't lose your common sense when you walk

12:04PM   24    through the door.  You look at the entire sphere of what

12:04PM   25    happened over the course of 11 years from '05, more than that,

| | | |
|---|---|---|
| 12:04PM | 1 | '05 to '19, someone else do the math, a long time. |
| 12:04PM | 2 | You look at everything that happened, you put all of |
| 12:04PM | 3 | that together, and I submit you to you there is no other |
| 12:04PM | 4 | reasonable explanation than that these two people were working |
| 12:04PM | 5 | together, they're in a corrupt agreement to have Bongiovanni |
| 12:05PM | 6 | defraud the United States by violating his oath and duties, by |
| 12:05PM | 7 | being loyal to this defendant. |
| 12:05PM | 8 | The second element is that the defendant willfully, |
| 12:05PM | 9 | knowingly, voluntarily became a part of that conspiracy, and |
| 12:05PM | 10 | you know that he did. |
| 12:05PM | 11 | This defendant is the one who called Bongiovanni in |
| 12:05PM | 12 | '09 and told him, hey, probation and the FBI showed up. |
| 12:05PM | 13 | That's an act that shows you he knows he's going to be |
| 12:05PM | 14 | protected from Bongiovanni.  This defendant is the one who |
| 12:05PM | 15 | called Bongiovanni to get him to step in and protect Anthony |
| 12:05PM | 16 | Gerace, another way you know the defendant voluntarily engaged |
| 12:05PM | 17 | in this criminal partnership.  The defendant is the one who |
| 12:05PM | 18 | left a voicemail on Bongiovanni's phone asking for criminal |
| 12:05PM | 19 | advice.  The defendant is the one who called Bongiovanni when |
| 12:05PM | 20 | a dancer was overdosing for criminal advice.  How do I get out |
| 12:05PM | 21 | of this?  What should I do? |
| 12:05PM | 22 | The defendant knew full well that he was in a corrupt |
| 12:05PM | 23 | agreement with Joseph Bongiovanni to be shielded from law |
| 12:05PM | 24 | enforcement investigation. |
| 12:05PM | 25 | This defendant provided envelopes of cash to |

12:06PM   1    Bongiovanni on multiple occasions, more evidence that he was

12:06PM   2    knowingly and willfully a member of a conspiracy, a corrupt

12:06PM   3    agreement.

12:06PM   4          Third element, that an overt act was committed by

12:06PM   5    either a coconspirator.  There's 20 overt acts in the

12:06PM   6    indictment, I don't have time to read them all to you now, but

12:06PM   7    most the things that we just discussed explaining why you know

12:06PM   8    the conspiracy existed are listed as overt acts.

12:06PM   9          2009, interceding with probation and the FBI, those

12:06PM   10   are overt acts.

12:06PM   11         The defendant leaving a voicemail for Bongiovanni

12:06PM   12   asking about the TracFone -- pinging TracFones, that's an

12:06PM   13   overt act listed in the indictment, and you only need to find

12:06PM   14   one overt act, there's 20 of them.  You need to find one

12:06PM   15   beyond a reasonable doubt to satisfy that element.  I suggest

12:06PM   16   to you that when you read through all 20 in -- in

12:06PM   17   chronological order, I suggest to you every single one of them

12:06PM   18   has been proven at this trial beyond a reasonable doubt, but

12:07PM   19   the judge will tell you, you only need to find one.

12:07PM   20         Those -- those memos, designed to cover up and

12:07PM   21   conceal, all of them are overt acts.

12:07PM   22         The fourth element that you have to find is that the

12:07PM   23   overt act that was committed was committed to further the

12:07PM   24   purpose of the conspiracy, and that's a -- a dunker.  The

12:07PM   25   overt act is committed to further the objectives of the

12:07PM    1    criminal partnership.

12:07PM    2        The criminal partnership here is to protect this

12:07PM    3    defendant.  And so all the things that Bongiovanni was doing

12:07PM    4    were designed to protect him.  It's obvious.  When Gerace

12:07PM    5    calls this defendant and asks for -- when Gerace calls

12:07PM    6    Bongiovanni and asked for a law-enforcement sensitive

12:07PM    7    information, that's to further the objective of the

12:07PM    8    conspiracy.  You'll see the objectives laid out in the

12:07PM    9    indictment:  To obtain law-enforcement sensitive information

12:07PM   10    from Bongiovanni, that's an objective of the conspiracy.

12:07PM   11        So the fourth element is met.

12:07PM   12        And that's it.  That's all there is to

12:07PM   13    Count Number 1, conspiracy to defraud the United States.

12:08PM   14        Notice that there isn't an element in there about it

12:08PM   15    being an exchange for money.  That's not required.  We're

12:08PM   16    gonna get there in a second when we talk about Count 2, but

12:08PM   17    for Count 1, it doesn't matter, and I want you to keep that in

12:08PM   18    mind.

12:08PM   19        It's good evidence to consider the fact that this

12:08PM   20    defendant was paying envelopes of cash to Bongiovanni shows

12:08PM   21    you that he knows they're in a corrupt agreement together, but

12:08PM   22    it's not required.

12:08PM   23        Find the defendant guilty of Count 1 because his

12:08PM   24    choices and his conduct make him guilty of Count 1.

12:08PM   25        We're going to move on to Count 2 now.

USA v Gerace - Closing Argument / Cooper - 12/19/24

114

12:08PM    1            Public corruption.  Same category, bribing, paying a

12:08PM    2    bribe to a public official.  One of the elements that you're

12:08PM    3    going to have to find is that the defendant offered, promised,

12:08PM    4    or gave something of value to Joseph Bongiovanni.  We'll talk

12:08PM    5    about it in a minute.  Those are the envelopes of cash.

12:08PM    6            Second, that Bongiovanni was then a public official

12:08PM    7    by virtue of being a special agent of the DEA, proven beyond a

12:08PM    8    reasonable doubt, Bongiovanni was a special agent at the DEA.

12:09PM    9            Third, that the defendant did so with the corrupt

12:09PM   10    intent to influence an official act or to induce that official

12:09PM   11    to perform an act or omit to perform an act.

12:09PM   12            There's two things that are important about this

12:09PM   13    bribery count that I want to focus on, two things that I'd

12:09PM   14    like to focus on with you.  One of them is called mixed

12:09PM   15    motive.  I think the judge is going to instruct you about

12:09PM   16    mixed motive, and he's going to tell you if a payment is made

12:09PM   17    for a multitude of reasons, for a birthday present and also as

12:09PM   18    a part of a scheme to continue having a special agent on

12:09PM   19    retainer, that's fine, people rarely act for one purpose

12:09PM   20    alone.  So if a person has a mixed motive when they provide a

12:09PM   21    financial benefit, that's still sufficient as long as part of

12:09PM   22    that motive was motivated by corrupt intent.  So keep that in

12:09PM   23    mind.

12:09PM   24            The other thing I want to discuss is called stream of

12:09PM   25    benefits.  I expect the judge is going to discuss stream of

USA v Gerace - Closing Argument / Cooper - 12/19/24

115

| | | |
|---|---|---|
| 12:09PM | 1 | benefits with you.  And when he talks about that, I think |
| 12:09PM | 2 | you'll learn that we don't have to prove in Count 2 that any |
| 12:10PM | 3 | specific payment of money was tied directly to any specific |
| 12:10PM | 4 | act or omission by Bongiovanni. |
| 12:10PM | 5 | So, a stream of benefits, essentially, it's |
| 12:10PM | 6 | sufficient in the eyes of the law for us to prove to you |
| 12:10PM | 7 | beyond a reasonable doubt that the bribe or bribes were paid |
| 12:10PM | 8 | in order for this defendant to keep Joe Bongiovanni on |
| 12:10PM | 9 | retainer.  This defendant had Bongiovanni ready on an |
| 12:10PM | 10 | as-needed basis.  When something comes up, jump in and protect |
| 12:10PM | 11 | me.  When I have questions, answer them.  And there's a stream |
| 12:10PM | 12 | of benefits over the course of time in relation to that |
| 12:10PM | 13 | conduct.  And I submit to you that's exactly what happened |
| 12:10PM | 14 | here. |
| 12:10PM | 15 | Based on all the corrupt things that we just talked |
| 12:10PM | 16 | about that Bongiovanni did, you know that Bongiovanni as a DEA |
| 12:10PM | 17 | special agent used his role and his job to protect this |
| 12:10PM | 18 | defendant from investigation.  Testimony and evidence proves |
| 12:10PM | 19 | that. |
| 12:10PM | 20 | The whole purpose of cash bribes, though, is to avoid |
| 12:11PM | 21 | detection, right?  So you don't seize cash bribes.  If someone |
| 12:11PM | 22 | gives you a few thousand dollars in an envelope, you can spend |
| 12:11PM | 23 | that in a couple weekends at Wegmans, you can spend that when |
| 12:11PM | 24 | you go on vacation to Las Vegas with your wife, or Florida. |
| 12:11PM | 25 | Blow some money on a nice hotel, enjoy some extravagant |

USA v Gerace - Closing Argument / Cooper - 12/19/24

116

| | | |
|---|---|---|
| 12:11PM | 1 | dinners, the cash is gone. |
| 12:11PM | 2 | So how do we prove it happened to you?  Well, in |
| 12:11PM | 3 | conspiracies such as this one where people are being |
| 12:11PM | 4 | secretive, where they don't want you to catch them, you |
| 12:11PM | 5 | oftentimes need an insider, you need someone with access.  You |
| 12:11PM | 6 | either have to have one of the defendants flip and start |
| 12:11PM | 7 | telling you what was going on, or you need an insider.  And in |
| 12:11PM | 8 | this case, you have Katrina Nigro. |
| 12:11PM | 9 | And at that time, back in 2000 -- back in early |
| 12:11PM | 10 | 2000s, 2010 window, Katrina Nigro was someone that this |
| 12:11PM | 11 | defendant trusted.  He's someone that she picked, that he |
| 12:11PM | 12 | picked rather, he picked her.  He tried to marry her, but all |
| 12:11PM | 13 | the marriage documents were forged by his corrupt judge |
| 12:12PM | 14 | friend.  But this defendant chose Katrina Nigro, and at the |
| 12:12PM | 15 | time he trusted her.  He picked her as a witness in this case |
| 12:12PM | 16 | when he brought her into his life and involved her in his |
| 12:12PM | 17 | criminal activity. |
| 12:12PM | 18 | So let's talk about what Katrina Nigro told you |
| 12:12PM | 19 | regarding bribe payments, and then we'll talk about how you |
| 12:12PM | 20 | know you can trust what she's telling you. |
| 12:12PM | 21 | Ms. Nigro testified that she met Bongiovanni at |
| 12:12PM | 22 | Pharaoh's through this defendant, through Peter Gerace.  She |
| 12:12PM | 23 | testified that the first time she met him he was in the office |
| 12:12PM | 24 | hanging out with Peter.  And she said over the years, she |
| 12:12PM | 25 | socialized with Bongiovanni and Peter together about eight |

12:12PM    1    times.  Generally, that testimony is corroborated by A.P.,

12:12PM    2    K.L., Lou Selva, all of whom saw Bongiovanni at Pharaoh's.

12:12PM    3    It's also corroborated by the text messages that we talked

12:12PM    4    about a little earlier.  So Katrina Nigro is not out on an

12:12PM    5    island with her testimony that Bongiovanni came to Pharaoh's

12:12PM    6    and socialized with this defendant.

12:12PM    7         Ms. Nigro also testified about a birthday dinner at

12:13PM    8    Boss restaurant.  She testified that this defendant brought

12:13PM    9    her to that party, and that before they went she saw the

12:13PM    10    defendant loading an envelope with cash.  That's what he was

12:13PM    11    doing.  She said that he told her at a time when you know he

12:13PM    12    trusted her -- it's not now, we're not in 2024, this is back

12:13PM    13    in 2015 -- he tells Katrina Nigro I'm giving him $5,000,

12:13PM    14    excuse me.  That's corroborated by the text messages in 310D,

12:13PM    15    pages 11 through 17, where they talk about going to this

12:13PM    16    dinner at Boss restaurant.  These text messages establish that

12:13PM    17    the defendant went to Bongiovanni's birthday at Boss

12:13PM    18    restaurant, and that the defendant, Peter Gerace, he brought

12:13PM    19    two people with him, Katrina and Anthony.

12:13PM    20         $5,000 in cash.  What's that for?  Let's talk about

12:13PM    21    it.

12:13PM    22         $5,000 in cash in an envelope to a DEA special agent

12:13PM    23    who's turning 51 years old in 2015.

12:14PM    24         $5,000.  I submit to you that in the context of

12:14PM    25    everything you know about what was going on in '05, '08, '09,

12:14PM   1   '16, '17, I submit to you in the context of all of that, you

12:14PM   2   know what $5,000 in an envelope to Joe Bongiovanni was for.

12:14PM   3          At a minimum, it was at least partially motivated by

12:14PM   4   a corrupt intent so that this defendant could keep Bongiovanni

12:14PM   5   on retainer.

12:14PM   6          After this payment at Boss restaurant, Bongiovanni

12:14PM   7   would later receive a voicemail from him, from Peter Gerace,

12:14PM   8   saying hey, can you guys track TracFones?  Can you ping them

12:14PM   9   the way cops do?  That's after the $5,000 payment.

12:14PM  10          You know, using your good judgment, your common sense

12:14PM  11   life experience, that 5,000 bucks in an envelope was a bribe.

12:15PM  12   Plain and simple.  And that's not the only bribe payment you

12:15PM  13   heard testimony about.

12:15PM  14          Ms. Nigro described for you times when the defendant

12:15PM  15   wasn't present at Pharaoh's where he asked her to take over

12:15PM  16   handing money to Bongiovanni.  Ms. Nigro described it as

12:15PM  17   follows, quote:  When Peter wasn't in the building and I was

12:15PM  18   in the office, he would tell me to run an envelope out to

12:15PM  19   Bongiovanni, and I would meet him by the side door, the door

12:15PM  20   close to Aero Drive.

12:15PM  21          Hmm, where have we heard that before?  Use the

12:15PM  22   employee entrance on Aero Drive.  That sounds so familiar.

12:15PM  23   That's where the defendant told Bongiovanni to meet him in his

12:15PM  24   own text messages that Katrina Nigro could have no way of

12:15PM  25   knowing about.  She's corroborated about their own

| | | |
|---|---|---|
| 12:15PM | 1 | communications with each other. |
| 12:15PM | 2 | July -- thank you -- July 13th, 2015, just five days |
| 12:15PM | 3 | before that $5,000 payment at Boss restaurant, this defendant |
| 12:15PM | 4 | is telling Bongiovanni to use the employee entrance on Aero. |
| 12:15PM | 5 | She testified that she would hand Bongiovanni |
| 12:16PM | 6 | envelopes with what she knew had cash in them. And again, |
| 12:16PM | 7 | just use your common sense life experience. If you're over |
| 12:16PM | 8 | the age of 18, you know what cash looks like and feels like. |
| 12:16PM | 9 | I mean, maybe things are changing now, but most people have |
| 12:16PM | 10 | handled cash before in their life. It's always the same |
| 12:16PM | 11 | shape, it's always the same length, the same height. Cash is |
| 12:16PM | 12 | distinct, U.S. currency, it's obvious. And Katrina Nigro, who |
| 12:16PM | 13 | handled money often, it was obvious to her what an envelope |
| 12:16PM | 14 | filled with cash was. |
| 12:16PM | 15 | She testified that she would hand Bongiovanni those |
| 12:16PM | 16 | envelopes, and she knew they had cash in them based on how |
| 12:16PM | 17 | they felt and what she saw. |
| 12:16PM | 18 | Ms. Nigro testified that the defendant never told |
| 12:16PM | 19 | her -- Peter never told her what the payments were for, and |
| 12:16PM | 20 | she never asked. She didn't have the full picture, but you |
| 12:16PM | 21 | do. |
| 12:16PM | 22 | I submit that you know based upon all the evidence |
| 12:16PM | 23 | and all the circumstances in this case that it was to keep |
| 12:17PM | 24 | Bongiovanni on retainer, to keep him answering when this |
| 12:17PM | 25 | defendant called. Those bribe payments gave this defendant |

USA v Gerace - Closing Argument / Cooper - 12/19/24

120

12:17PM    1    power.

12:17PM    2        Now I expect they're going to come here and they're

12:17PM    3    going to go hard at Katrina.  I want you to keep in mind a few

12:17PM    4    things.  Think about what she didn't say, 'cuz if Katrina's

12:17PM    5    here on some, you know, evil-genius mission to frame Peter

12:17PM    6    Gerace, why didn't she say things like, oh, the defendant told

12:17PM    7    me he was being protected by Bongiovanni?  She never said

12:17PM    8    that.  That would have helped her evil-genius plan, but she

12:17PM    9    didn't say that.  And I submit to you the reason why she

12:17PM    10   didn't was because when you're telling the truth, you're

12:17PM    11   confined by the facts of what actually happened.  And he kept

12:17PM    12   that quiet, he didn't tell her even though he trusted her that

12:17PM    13   the payments were bribes.  She didn't need to know.

12:17PM    14       She never said that she saw Bongiovanni use cocaine

12:17PM    15   with Gerace.  She could have said that.  She could have used

12:17PM    16   her mouth to make those words, but she didn't say those things

12:17PM    17   even though other people told you they saw it, because Katrina

12:17PM    18   Nigro was confined by what she actually observed.

12:18PM    19       I submit to you that she didn't testify about those

12:18PM    20   things because she doesn't know about them.  That's one other

12:18PM    21   way you know that this was not some evil-genius plan by

12:18PM    22   Katrina.  You should find her testimony credible because it's

12:18PM    23   corroborated by the evidence in the case and other witnesses.

12:18PM    24       Everything we've talked about so far, the entire

12:18PM    25   universe of information in this case, leads to only one

12:18PM   1   reasonable inference about those envelopes, those payments,

12:18PM   2   that cash.  The only reasonable inference I submit to you is

12:18PM   3   that Bongiovanni was receiving that money, being paid that

12:18PM   4   money by this defendant, to be kept on retainer, to step in

12:18PM   5   when he was needed.

12:18PM   6        The first element, that the defendant gave money to

12:18PM   7   Joe Bongiovanni, check.

12:18PM   8        The second element, that Bongiovanni was then a

12:18PM   9   public official, check.

12:18PM   10        The third element, that it was done, those payments

12:18PM   11   were given with a corrupt intent, check.

12:19PM   12        When you go back, I suggest that you should find him

12:19PM   13   guilty of Count 2, because his choices and his conduct are

12:19PM   14   what make him guilty of Count 2.

12:19PM   15        We're going to move a little quicker than I expected

12:19PM   16   through the last category of proof because I'm running out of

12:19PM   17   time here.  Witness tampering, three counts, 6, 7, and 8,

12:19PM   18   cover the same incident of witness tampering, so don't get

12:19PM   19   confused about that it's all one incident, but there's three

12:19PM   20   different legal theories.

12:19PM   21        So there's -- the statutes are all very slightly

12:19PM   22   different, but they each charge a violation of the law related

12:19PM   23   to the November 2019 tampering with P.H.

12:19PM   24        Think about the timeline.  April 2019, P.H. is

12:19PM   25   providing information to federal law enforcement for the very

USA v Gerace - Closing Argument / Cooper - 12/19/24

122

12:19PM      1    first time.

12:19PM      2          His buddy, Greg Trotter, the detective that he's

12:19PM      3    exchanging all these texts with, goes out and arrests P.H. for

12:19PM      4    him basically on command.  And there's some unintended

12:19PM      5    consequences, I submit to you, because when she gets arrested,

12:20PM      6    somebody at Amherst calls the feds and they come to interview

12:20PM      7    her.  And this defendant, he finds out about it.

12:20PM      8          Shortly after that, P.H.'s attacked in a bar by his

12:20PM      9    trusted and loyal ally and drug-dealer friend, Charm, Jessica

12:20PM     10    Leyland.

12:20PM     11          And what does Charm tell P.H.?  Quote, I heard you

12:20PM     12    were talking to the feds.  I'm going to fucking kill you, you

12:20PM     13    snitch.

12:20PM     14          Pretty clear that she's intending that as a threat,

12:20PM     15    pretty clear that it's in relation to P.H. talking with law

12:20PM     16    enforcement, and pretty clear that it's in relation to talking

12:20PM     17    to the feds, which was an interview about him.

12:20PM     18          October 17th, 2019, a few months after that, P.H.

12:20PM     19    secretly testifies before a federal grand jury.  He doesn't

12:20PM     20    know it.

12:20PM     21          November.  A few months after that interview with

12:20PM     22    federal law enforcement, a few months after Charm, one of his

12:20PM     23    trusted allies, had attacked P.H. in a bar and called her a

12:21PM     24    snitch, threatened to kill her, the defendant's downstairs in

12:21PM     25    a basement with C.C. and Crystal Quinn.  And C.C. came here

USA v Gerace - Closing Argument / Cooper - 12/19/24

123

| | | |
|---|---|---|
| 12:21PM | 1 | and she testified to you about what happened. |
| 12:21PM | 2 | And I submit you if you close your eyes, you can |
| 12:21PM | 3 | probably picture it.  They're down in that basement with the |
| 12:21PM | 4 | bar and the dart room -- the dart board, rather, and C.C. told |
| 12:21PM | 5 | you that Peter laid out two 8 Balls of cocaine, which I submit |
| 12:21PM | 6 | to you is a pretty significant amount for three people to use |
| 12:21PM | 7 | in one sitting.  And they're getting incredibly high on |
| 12:21PM | 8 | cocaine.  And this defendant brings up the topic of P.H. being |
| 12:21PM | 9 | snitch. |
| 12:21PM | 10 | And the words that he uses to C.C. and Crystal, he |
| 12:21PM | 11 | says, she's a rat, she's a snitch bitch.  And C.C. told you he |
| 12:21PM | 12 | wasn't joking.  I think she was asked that by defense counsel, |
| 12:21PM | 13 | I think she said he wasn't joking, he was angry.  She |
| 12:21PM | 14 | described how the defendant was getting revved up and how he |
| 12:21PM | 15 | was getting Crystal Quinn revved up.  And that was his close |
| 12:21PM | 16 | ally. |
| 12:21PM | 17 | If you want to think about the control that this |
| 12:22PM | 18 | defendant had over Crystal Quinn, Katrina Nigro described |
| 12:22PM | 19 | walking into the upstairs one day and seeing Crystal Quinn |
| 12:22PM | 20 | doing a line of cocaine off this defendant's genitals.  That's |
| 12:22PM | 21 | the type of control he had over Crystal. |
| 12:22PM | 22 | And you know what happens next, it's exactly what |
| 12:22PM | 23 | this defendant intended.  He gets Crystal Quinn, he induces |
| 12:22PM | 24 | her to do what he wants her to do, which is threaten P.H. |
| 12:22PM | 25 | The defendant later admits when he's in jail awaiting |

USA v Gerace - Closing Argument / Cooper - 12/19/24

124

12:22PM 1    trial on this case, he later admits to Ben Rivera that he

12:22PM 2    wanted this woman to send a message to P.H., but he was pissed

12:22PM 3    that she did it by Facebook Messenger 'cuz that's traceable.

12:22PM 4    I guess hindsight was 20/20 for the defendant.

12:22PM 5            At the time, I submit to you, when he's ripping two

12:22PM 6    8 Balls of cocaine with Crystal, he was egging her on.  What

12:22PM 7    he told Ben Rivera is that he intended her to send that

12:22PM 8    message, to call P.H. a snitch.

12:23PM 9            And what does Crystal Quinn say to her?  There's some

12:23PM 10   typos in it because -- I submit to you because Crystal Quinn

12:23PM 11   was incredibly high on cocaine, and here's what she writes.

12:23PM 12   I've -- I've done my best to make reasonable inferences and

12:23PM 13   correct the typos based on where keys are on the keyboard.

12:23PM 14           She says, hey, you rat ass bitch, it's Crystal.  I'm

12:23PM 15   going to see you, and when I do, well, use your imagination,

12:23PM 16   bitch.  You snitch junkie cunt.

12:23PM 17           I'm not gonna read the whole thing right now because

12:23PM 18   we're running out of time, but the one other sentence in here

12:23PM 19   I want to hit is:  Plan on nothing.  Peter knows better, you

12:23PM 20   fucking narc.

12:23PM 21           "Peter knows better," a reference to this defendant

12:23PM 22   who she was sitting next to when she sent the message.  And

12:23PM 23   "you fucking narc," narc is interchangeable with rat, it's

12:23PM 24   interchangeable with snitch.  It's exactly what he wanted to

12:23PM 25   convey to P.H.  Shut up.  Don't get on that witness stand.

12:23PM   1    Don't talk to law enforcement about me.  Shut her down.

12:23PM   2         Attempt after attempt, he sued her in State court.

12:24PM   3    She doesn't have two dimes to rub together.  You met P.H.

12:24PM   4    Effort after effort, to prevent her from ever getting in that

12:24PM   5    chair and talking to a room of people like you.  He failed,

12:24PM   6    because she came here anyway.

12:24PM   7         Counts 6, 7, and 8 have something called Section 2

12:24PM   8    liability, it's called aiding and abetting, and the judge is

12:24PM   9    going to explain what that means to you and better than I can

12:24PM  10    and in more detail.

12:24PM  11         But aiding and abetting means you don't have to find

12:24PM  12    that the defendant himself sent the messages for him to be

12:24PM  13    guilty of witness tampering.  If he induced Crystal Quinn to

12:24PM  14    send the messages, if he caused Crystal Quinn, if he aided and

12:24PM  15    abetted her in doing it, you can find him guilty of witness

12:24PM  16    tampering.

12:24PM  17         I suggest to you that when you review the elements

12:24PM  18    with the judge on Counts 6, 7, and 8, you'll be convinced

12:24PM  19    beyond a reasonable doubt that we've proven each of them to

12:24PM  20    you.  Find him guilty of witness tampering with respect to

12:25PM  21    P.H., because his conduct and his choices make him guilty.

12:25PM  22         I want to wrap up.  How much time do I have?

12:25PM  23         **MR. TRIPI:**  Four minutes.

12:25PM  24         **MR. COOPER:**  Four minutes?  I'm good.  Last page.

12:25PM  25         Let me have some water first.

USA v Gerace - Closing Argument / Cooper - 12/19/24

12:25PM 1        So, I always try to come up with, like, a theme,

12:25PM 2    right?  In these -- when I give an opening statement, a

12:25PM 3    closing.

12:25PM 4        And the defense attorneys, in their opening

12:25PM 5    statement, their theme was choices.  They told you this case

12:25PM 6    is all about choices.  They made choices.  These women all

12:25PM 7    made choices.  G.R., L.L., wait until you hear from them.

12:25PM 8        Now you've heard from them, and I agree, I'm taking

12:25PM 9    the theme, I love it, this case is about choices.  It's about

12:25PM 10   his choices.  It's about the defendant's decision, his choice,

12:25PM 11   to turn a strip club into a drug-infested dungeon where the

12:26PM 12   chains of addictions keep young women coming back every single

12:26PM 13   day so that this defendant could profit a little more off of

12:26PM 14   the exploitation of their body.

12:26PM 15       His choice to make that his business model.  He did

12:26PM 16   it because it got him rich.  Like when Wayne VanVleet was

12:26PM 17   dropping thousands of dollars from his pockets to lick and

12:26PM 18   finger drug addicts until he came in his pants, he did it

12:26PM 19   because it gave him constant access to drug-addicted women

12:26PM 20   that he could sexually exploit himself.

12:26PM 21       He did it because when you have powerful people like

12:26PM 22   Judge Michalski going upstairs to have sex with the vulnerable

12:26PM 23   drug-addicted women, you become powerful.  You get forged

12:26PM 24   marriage certificates when the judge signs the protective

12:26PM 25   order on controlled buys going on in your club, that was Judge

USA v Gerace - Closing Argument / Cooper - 12/19/24

12:26PM   1   Michalski.

12:26PM   2          When you cater to the elicit sexual desires of

12:26PM   3   powerful men, you become powerful, and that's another reason

12:27PM   4   that he did.

12:27PM   5          This trial's about the defendant's decision to enter

12:27PM   6   into a corrupt agreement to with DEA Special Agent Joe

12:27PM   7   Bongiovanni, to protect him, to keep him on retainer, to

12:27PM   8   provide protection on an as-needed basis.

12:27PM   9          It's about the defendant's decision to cause Crystal

12:27PM  10   Quinn and induce her to threaten P.H., to keep her off that

12:27PM  11   witness stand, something that only he benefited from.

12:27PM  12          They were right.  This case is about choices.  And

12:27PM  13   this defendant, he made his choices.

12:27PM  14          You've heard during the last two months about nearly

12:27PM  15   two decades of Peter Gerace's choices.  And choices have

12:27PM  16   consequences.

12:27PM  17          When you go in the back to deliberate, I ask you to

12:27PM  18   apply a simple formula:  Facts, plus law, equals verdict.

12:27PM  19          If you focus on that, and if you bring your common

12:27PM  20   sense life experience into that room with you, I expect that

12:28PM  21   you will return a verdict that's consistent with justice in

12:28PM  22   this case, and that will be a verdict of guilty on each and

12:28PM  23   every single count in the indictment.

12:28PM  24          I appreciate your patience listening to me talk for

12:28PM  25   three hours.  In a little while, Mr. Tripi's going to come up

USA v Gerace - Proceedings - 12/19/24

128

| | | |
|---|---|---|
| 12:28PM | 1 | on rebuttal, but I want to say thank you for your close |
| 12:28PM | 2 | attention over the course of the last two months on behalf of |
| 12:28PM | 3 | myself, and Casey Chalbeck, and Joe Tripi, and the United |
| 12:28PM | 4 | States. |
| 12:28PM | 5 | THE COURT:  Okay.  Thank you.  Folks, we are now |
| 12:28PM | 6 | going to take our lunch break, we'll go 45 minutes, so back |
| 12:28PM | 7 | here at 1:15. |
| 12:28PM | 8 | Please remember my instructions still about not |
| 12:28PM | 9 | communicating about the case.  Don't use tools of technology |
| 12:28PM | 10 | in any way whatsoever to learn anything about the case or to |
| 12:28PM | 11 | communicate about the case.  If there's any news coverage of |
| 12:28PM | 12 | the case on the TV or radio or anywhere, on computers, |
| 12:28PM | 13 | newspapers, don't read or watch or listen to it.  And please |
| 12:28PM | 14 | don't make up your mind until you start deliberating, which |
| 12:29PM | 15 | will probably be tomorrow morning. |
| 12:29PM | 16 | So, 1:15.  Thanks, very much. |
| 12:29PM | 17 | (Jury excused at 12:29 p.m.) |
| 12:29PM | 18 | THE COURT:  Okay.  Anything before we break? |
| 12:29PM | 19 | MR. COOPER:  Nothing from us, Judge. |
| 12:29PM | 20 | MR. FOTI:  No. |
| 12:29PM | 21 | THE COURT:  I just want to briefly address |
| 12:29PM | 22 | Mr. Tripi's and Mr. Soehnlein's letters from -- from |
| 12:29PM | 23 | yesterday. |
| 12:29PM | 24 | MR. TRIPI:  Yes. |
| 12:29PM | 25 | THE COURT:  I didn't see a lot of disagreement |

USA v Gerace - Proceedings - 12/19/24

129

| | | |
|---|---|---|
| 12:29PM | 1 | between the two of them actually.  I think Mr. Soehnlein's |
| 12:30PM | 2 | pitch was they have not opened the door to anything yet, and I |
| 12:30PM | 3 | didn't read your letter as suggesting that they had. |
| 12:30PM | 4 | **MR. TRIPI:**  Yeah, Judge, I -- I -- I focused on their |
| 12:30PM | 5 | summation and what I -- the permissible bounds of rebuttal. |
| 12:30PM | 6 | In Mr. Soehnlein's responsive letter, he indicated that he -- |
| 12:30PM | 7 | they've not opened the door just by virtue of their cross. |
| 12:30PM | 8 | Can -- I agree that -- with what you just said.  Candidly, |
| 12:30PM | 9 | I've not yet done the research on whether a cross alone can |
| 12:30PM | 10 | open it, I've had someone looking into it.  If I find |
| 12:30PM | 11 | anything, I'll let you know.  But I -- I -- as I stand here in |
| 12:30PM | 12 | this moment in time, I agree. |
| 12:30PM | 13 | **MR. FOTI:**  Judge -- |
| 12:30PM | 14 | **THE COURT:**  The other -- the other issue would be is |
| 12:30PM | 15 | it truly rebuttal if you bring it up in rebuttal.  In other |
| 12:30PM | 16 | words -- |
| 12:30PM | 17 | **MR. TRIPI:**  Well, right. |
| 12:30PM | 18 | **THE COURT:**  Yeah.  So -- |
| 12:30PM | 19 | **MR. TRIPI:**  I have never seen a case where they've |
| 12:30PM | 20 | opened it in cross, but I wanted to take a look. |
| 12:30PM | 21 | **THE COURT:**  Yeah.  But if they did open it in cross, |
| 12:31PM | 22 | then Mr. Cooper should have said something about it -- |
| 12:31PM | 23 | **MR. TRIPI:**  Yes. |
| 12:31PM | 24 | **THE COURT:**  -- not you in rebuttal. |
| 12:31PM | 25 | **MR. TRIPI:**  Well -- |

USA v Gerace - Proceedings - 12/19/24

130

| | | |
|---|---|---|
| 12:31PM | 1 | **MR. FOTI:**  Judge, I -- I didn't see Mr. Soehnlein's |
| 12:31PM | 2 | submission, and I'm doing the closing.  Part of that was |
| 12:31PM | 3 | because I was focused on the closing yesterday.  But I |
| 12:31PM | 4 | certainly -- and it would be good to sort of parse this out |
| 12:31PM | 5 | now so I know how to -- to appropriately fashion this |
| 12:31PM | 6 | discussion in my closing.  But I do intend to, like, I think |
| 12:31PM | 7 | every defense closing I've ever seen or done talk about |
| 12:31PM | 8 | insufficiency of evidence and witnesses you that didn't hear. |
| 12:31PM | 9 | And I understand -- I read Mr. Tripi's submission, and I |
| 12:31PM | 10 | understand the argument that can be made while defendants -- |
| 12:31PM | 11 | defense attorneys have subpoena power too, I don't really have |
| 12:31PM | 12 | an objection to that comment being made at some point during |
| 12:31PM | 13 | the rebuttal.  I -- what I would object to is burden |
| 12:31PM | 14 | shifting -- |
| 12:31PM | 15 | **THE COURT:**  Right. |
| 12:31PM | 16 | **MR. FOTI:**  When you say anything beyond that when |
| 12:31PM | 17 | you're saying they should have called witnesses, you could |
| 12:31PM | 18 | expect that those witnesses would've testified favorably for |
| 12:31PM | 19 | the government -- |
| 12:31PM | 20 | **THE COURT:**  Yep. |
| 12:31PM | 21 | **MR. FOTI:**  -- that shifts the burden. |
| 12:31PM | 22 | **THE COURT:**  And I -- and I would go one step further |
| 12:31PM | 23 | and say that anything you say needs to reenforce that the |
| 12:32PM | 24 | defendant does not have a burden. |
| 12:32PM | 25 | **MR. TRIPI:**  Yeah, I think I dropped a footnote in how |

USA v Gerace - Proceedings - 12/19/24

131

12:32PM  1    I usually say it, or the gist of what I usually say.

12:32PM  2         THE COURT:  Yeah.

12:32PM  3         MR. TRIPI:  And I was -- I actually do think the

12:32PM  4    caselaw, not to go as far as he's concerned about, the caselaw

12:32PM  5    actually permits the government to go a half a step further

12:32PM  6    than I had done in the past which is to say you can infer that

12:32PM  7    those witnesses would not have helped the defense, that's not

12:32PM  8    a burden shift under the 2nd Circuit.  And so I've never

12:32PM  9    actually gone that far, I guess it would be a matter of degree

12:32PM  10   when I hear the defense.

12:32PM  11        THE COURT:  Yeah.  And I -- I just want you to

12:32PM  12   cautious because I think that -- that any -- any remarks you

12:32PM  13   make in that regard ought to be couched in the context of

12:32PM  14   we've got the burden.

12:32PM  15        MR. TRIPI:  I always do that.  I've always done that.

12:32PM  16        THE COURT:  Okay.  Good.  Then we're all on the same

12:32PM  17   page it sounds like.

12:32PM  18        MR. TRIPI:  Yes.

12:32PM  19        THE COURT:  Mr. Tripi, I think you have 32 minutes by

12:32PM  20   my time.

12:32PM  21        MR. TRIPI:  I have 31.  I'll graciously take the

12:32PM  22   extra minute.

12:32PM  23        THE COURT:  Yeah.  I -- I was paying pretty close

12:32PM  24   attention, and I had that at two minutes short of three hours,

12:32PM  25   so --

12:33PM    1          Okay.  So, we will be back at 1:15.  You're ready to

12:33PM    2   go then.  You're still thinking two, two and a half?

12:33PM    3         **MR. FOTI:**  Yeah, probably about that, yeah.

12:33PM    4         **THE COURT:**  Good.  Great.  Terrific.  Again, you've

12:33PM    5   got three and a half.

12:33PM    6         **MR. FOTI:**  Understood.

12:33PM    7         **THE COURT:**  So I'm not cutting you off at all.  And

12:33PM    8   if you want to take a break at any point, that's fine.  If you

12:33PM    9   want to go right through, that's fine, too.

12:33PM   10         **MR. FOTI:**  Okay, thanks.

12:33PM   11         **THE COURT:**  Okay.  Thanks, everybody.

12:33PM   12         **MR. TRIPI:**  Thanks, Judge.

12:33PM   13         **THE CLERK:**  All rise.

12:33PM   14        (Off the record at 12:33 p.m.)

01:16PM   15        (Back on the record at 1:16 p.m.)

01:16PM   16        (Jury not present.)

01:16PM   17         **THE REPORTER:**  All rise.

01:16PM   18         **THE COURT:**  Please be seated.

01:16PM   19         **MR. COOPER:**  I think I'm missing my better half here.

01:16PM   20   He said he was on his way two minutes ago, so he should be

01:16PM   21   here.

01:16PM   22         **THE COURT:**  That's okay.

01:18PM   23         **THE CLERK:**  We are back on the record for the

01:18PM   24   continuation of the jury trial in case numbers 19-cr-227 and

01:18PM   25   23-cr-37, United States of America versus Peter Gerace, Jr.

| | | |
|---|---|---|
| 01:18PM | 1 | All counsel and parties are present. |
| 01:18PM | 2 | **THE COURT:** Are we ready to go? |
| 01:18PM | 3 | **MR. FOTI:** Yes, Judge. I meant to ask earlier, are |
| 01:18PM | 4 | we permitted to use the verdict sheet? Or, I don't know if we |
| 01:18PM | 5 | ever -- if there was any ever determination of whether the |
| 01:18PM | 6 | proposed verdict sheet was all set, but -- |
| 01:18PM | 7 | **THE COURT:** If -- if both sides approved the verdict |
| 01:19PM | 8 | sheet? |
| 01:19PM | 9 | **MR. FOTI:** We didn't have any objection to it. |
| 01:19PM | 10 | **MR. COOPER:** We don't have any objection to the |
| 01:19PM | 11 | proposed verdict sheet, Judge. I looked at it the other day |
| 01:19PM | 12 | when it was brought over. |
| 01:19PM | 13 | **THE COURT:** Okay. And do you have any objection to |
| 01:19PM | 14 | him using it with the jury? |
| 01:19PM | 15 | **MR. COOPER:** Like showing it to them? |
| 01:19PM | 16 | **MR. FOTI:** Yeah, yes. |
| 01:19PM | 17 | **MR. COOPER:** No, they're going to see it anyway. |
| 01:19PM | 18 | **THE COURT:** Yeah, great. |
| 01:19PM | 19 | Okay. Let's bring them in, please, Pat. |
| 01:22PM | 20 | (Jury seated at 1:22 p.m.) |
| 01:22PM | 21 | **THE COURT:** The record will reflect that all our |
| 01:23PM | 22 | jurors again are present. |
| 01:23PM | 23 | Mr. Foti, you may begin. |
| 01:23PM | 24 | **MR. FOTI:** Thank you, Your Honor. |
| 01:23PM | 25 | Good afternoon. |

USA v Gerace - Closing Argument / Foti - 12/19/24
134

01:23PM    1          **THE JURORS:**  Good afternoon.

01:23PM    2          **MR. FOTI:**  So, it's kind of a weird dynamic because

01:23PM    3    we've spent almost two months together, but this is the first

01:23PM    4    time I actually get to talk to you directly.  You heard my

01:23PM    5    name, I'm Mark Foti.  Along with my cocounsel, my tall and

01:23PM    6    nerdy friend and cocounsel, Eric Soehnlein, we represent Peter

01:23PM    7    Gerace.

01:23PM    8          Now, I may refer to him sometimes as Mr. Gerace, and

01:23PM    9    sometimes I may refer to him as Peter.  That's how I know him.

01:23PM   10    You'll know who I'm talking about when I do.

01:23PM   11          He sat there for two months just listening to

01:23PM   12    witnesses that the government cherry picked out of over

01:23PM   13    15 years of his life to come in here and sling mud at him.

01:23PM   14          He sat there for two months just watching these

01:23PM   15    witnesses get up on the stand, witnesses who were paid,

01:24PM   16    witnesses who had charges pending, witnesses who had

01:24PM   17    credibility issues, and he took it, and he endured.  And he

01:24PM   18    did it because he knew that at some point we were going to

01:24PM   19    come to the moment that we're almost at, the moment when you

01:24PM   20    folks are finally going to have this case, the moment when you

01:24PM   21    folks are finally going to be able to evaluate the evidence in

01:24PM   22    this case.

01:24PM   23          Now your job, and I know you know this, your job

01:24PM   24    doesn't end with what the government tells you to think.  Your

01:24PM   25    job doesn't end when the government gets up here and tells

USA v Gerace - Closing Argument / Foti - 12/19/24

135

01:24PM   1   you, well, you heard these things from this witness, so you

01:24PM   2   should just accept that as fact.  That's clearly not how this

01:24PM   3   works.

01:24PM   4        The government referred to something Mr. Soehnlein

01:24PM   5   said in his opening statement that this is a case about

01:25PM   6   choices.  And I understand why the government made the point

01:25PM   7   it did and said there are allegations here that Mr. Gerace

01:25PM   8   made bad choices related to the charges.  They told you that

01:25PM   9   there's choices here that you can consider related to things

01:25PM  10   that have been alleged against Mr. Gerace, and that is part of

01:25PM  11   this case.

01:25PM  12        There's a lot of choices that are part of this case.

01:25PM  13   There are the choices of individuals to apply and work at a

01:25PM  14   strip club.  To do drugs for the very first time.  To continue

01:25PM  15   using drugs.  To engage in commercial sex acts, whether

01:25PM  16   Mr. Gerace knew about it or not, whether they were happening

01:25PM  17   in or out of the club.  Those are all choices.

01:25PM  18        There's also choices of investigators, individuals

01:25PM  19   who had the decision on how to collect evidence for this case,

01:25PM  20   what to present to you.  And the decisions of what tactics not

01:25PM  21   to pursue, even though it would mean less evidence for you to

01:26PM  22   consider.

01:26PM  23        There's the choices of witnesses.  To lie.  To lie to

01:26PM  24   investigators when they go talk to them.  To lie at the grand

01:26PM  25   jury.  To lie in subsequent meetings with the government, and

USA v Gerace - Closing Argument / Foti - 12/19/24

136

01:26PM  1  to lie at all these other proceedings under oath.  Those are

01:26PM  2  the decisions of the witnesses, many of whom testified before

01:26PM  3  you during this trial.

01:26PM  4      And there's the decisions by prosecutors to call

01:26PM  5  those witnesses anyway knowing that they've lied in the past,

01:26PM  6  and carefully cure their direct examinations as much as

01:26PM  7  possible to steer away from reality, to steer away from all

01:26PM  8  their biases and, instead, present you with a narrative

01:26PM  9  consistent with what they were trying to sell you throughout

01:26PM  10  this case.

01:26PM  11      But this is not just a case about choices, this is a

01:26PM  12  case about government overreach.

01:27PM  13      At the beginning of the trial, Mr. Soehnlein talked

01:27PM  14  about all the resources the government has.  I, during the

01:27PM  15  cross-examination of Mr. Burns, went through a long list of

01:27PM  16  dozens of names of agents who were involved in interviews

01:27PM  17  related to this investigation or, as clarified, some sort of

01:27PM  18  offsets of the investigation.  They, on redirect it was

01:27PM  19  pointed out that that number can be inflated when you count

01:27PM  20  all of those individuals who are involved at different points

01:27PM  21  like search warrants.

01:27PM  22      You saw this courtroom just completely filled up a

01:27PM  23  few moments ago, of people who came in support of the

01:27PM  24  government in this case.  Those resources are endless.  The

01:27PM  25  resources to provide financial benefits to witnesses, the

01:27PM    1    ability to put charges on individuals and use it as leverage.

01:27PM    2        But despite all those resources and despite the fact

01:27PM    3    that Mr. Gerace is one man, and we're two attorneys and a

01:28PM    4    paralegal, representing here and presenting a defense, it all

01:28PM    5    does balance out.  And it balances out because of you folks.

01:28PM    6    And it balances out because if do you your job and you follow

01:28PM    7    the instructions, it's not about just what the government

01:28PM    8    collected as part of their resources, and what they curated to

01:28PM    9    present to you.  It becomes about something much bigger than

01:28PM   10    that.

01:28PM   11        This is a case where, like any criminal case, you

01:28PM   12    apply a standard of proof, of proof beyond a reasonable doubt.

01:28PM   13    And you presume Mr. Gerace innocent.

01:28PM   14        We say those things all the time.  You heard it at

01:28PM   15    the beginning of the trial.  But that's powerful stuff when

01:28PM   16    you stop and think about what your responsibility is here

01:28PM   17    about how things are balanced out and how Mr. Gerace gets a

01:28PM   18    fair trial.  It's not that a scenario is presented to you

01:28PM   19    factually and the government argues there's an inference you

01:29PM   20    could draw, and you just have to accept that inference because

01:29PM   21    that's the one the government selected.  It's not that at all.

01:29PM   22    If there's other inferences, if there's other reasonable

01:29PM   23    hypothesis of innocence.

01:29PM   24        You're presuming Mr. Gerace innocent.  You're holding

01:29PM   25    the government to the burden.  You are going to look at the

01:29PM    1    evidence and evaluate and look at all the different reasons

01:29PM    2    why the one version of events and the one argument the

01:29PM    3    government presented may not be correct.

01:29PM    4           Now, I want to talk to you a little bit more about

01:29PM    5    proof beyond a reasonable doubt.

01:29PM    6           The government acknowledges their burden, they

01:29PM    7    reference it, but they don't talk about it in great detail

01:29PM    8    during their closing.  I want to talk about it a little bit

01:29PM    9    more before we go into -- to some the case.

01:29PM    10          The judge is going to instruct you on the law.  And

01:29PM    11   when the judge instructs you on the law, anything he says

01:29PM    12   obviously goes in terms of that.  I'm going to talk a little

01:29PM    13   bit about what I expect you'll hear generally.  I don't --

01:30PM    14   nothing I'm gonna say is anything other than my expectation as

01:30PM    15   to what you'll hear from -- from Judge Vilardo.

01:30PM    16          Reasonable doubt is a doubt that a reasonable person

01:30PM    17   has after carefully weighing all the evidence or lack of

01:30PM    18   evidence.  It's a doubt that would cause a reasonable person

01:30PM    19   to hesitate in a matter of importance in his or her personal

01:30PM    20   life.

01:30PM    21          Proof beyond a reasonable doubt must be proof that's

01:30PM    22   so convincing that a reasonable person would not hesitate to

01:30PM    23   rely upon it in making an important decision.

01:30PM    24          I expect you're gonna hear words similar to that from

01:30PM    25   Judge Vilardo, and I want you to focus on that, the idea of

USA v Gerace - Closing Argument / Foti - 12/19/24

01:30PM   1    hesitation.  That's the way this is framed for you.  That if

01:30PM   2    you are hesitant to accept something as being true, or even if

01:30PM   3    you don't necessarily hesitate but you think a reasonable

01:30PM   4    person would hesitate, that's reasonable doubt.  That's it.

01:31PM   5         That is so simple, and yet so powerful, and is the

01:31PM   6    reason Mr. Gerace gets a fair trial.  And it is a reason that

01:31PM   7    we've been waiting for you this entire time.

01:31PM   8         Now, mindful of those points, the closing remarks I'm

01:31PM   9    going to give you are not intended in any way to limit the

01:31PM   10   potential reasonable doubt in this case, not at all.  I'm not

01:31PM   11   any smarter than any of you folks.  As smart as Mr. Soehnlein

01:31PM   12   may be, he's not any smarter than any of you folks.  Each one

01:31PM   13   of you, when evaluating the evidence, are in a position to

01:31PM   14   pick up on inconsistencies, pick up on things that didn't make

01:31PM   15   sense, pick up on things about the government's argument that

01:31PM   16   were not complete or were not fair.

01:31PM   17        And when you think of those things for the charges,

01:31PM   18   you're not limited to say, well, the defense didn't bring that

01:32PM   19   up.  That's not at all the case.  We could have not gotten up

01:32PM   20   here at all to talk to you at all during the closing.  It

01:32PM   21   wouldn't matter, you would still go back and do your job.  You

01:32PM   22   would still hold the government to their burden.  You would

01:32PM   23   still push back against government overreach.

01:32PM   24        I don't expect that I'm going to be as dynamic as

01:32PM   25   Mr. Cooper.  I'm certainly not going to be able to hit the

USA v Gerace - Closing Argument / Foti - 12/19/24

140

01:32PM    1    same volume that he hits.  It doesn't matter.

01:32PM    2         In the end, we're relying on you, and all I'm gonna

01:32PM    3    do over the course of the next -- I -- I hesitate to estimate,

01:32PM    4    I don't think it will be as long as the government's comments,

01:32PM    5    but over -- during the course of this closing, I'm just gonna

01:32PM    6    point out some observations, some observations about the proof

01:32PM    7    that I think are points of reasonable doubt, and some

01:32PM    8    observations about the arguments that have been presented to

01:32PM    9    you by the government.  Why I don't think they really hold up

01:32PM    10   when you look at things a little bit closer when you

01:32PM    11   critically evaluate the evidence in regards to -- to the

01:32PM    12   charges that are before you.

01:33PM    13        So, my comments are not going to be perfectly

01:33PM    14   organized.  I have a little bit of an outline that I'm

01:33PM    15   referring to, but I'm not reading off a script.  I am going to

01:33PM    16   talk to you generally about, first, the background of this

01:33PM    17   case, what leads up to it.  What leads up to the charges of

01:33PM    18   Mr. Gerace.  Things that you heard in the evidence that you

01:33PM    19   can piece together to -- to better understand how this all

01:33PM    20   came about.

01:33PM    21        Then I'm going to talk to you about the evidence, the

01:33PM    22   lack of evidence, and I'll review the charges with you.  And

01:33PM    23   then I'll finish up with some closing remarks.  Okay?

01:33PM    24        So, where did this case begin two months ago?

01:33PM    25        It seems like a lifetime ago, but if we look back to

01:33PM  1   the first few witnesses after Mr. Bongiovanni's ex-girlfriend,

01:33PM  2   we were talking about a search in 2009.  So we are already

01:34PM  3   going back about 15 years.

01:34PM  4         Now, what happened in 2009?  You heard testimony from

01:34PM  5   a probation officer, Probation Officer Lepiane.  You heard

01:34PM  6   testimony from an FBI agent.

01:34PM  7         An interesting thing happened at the very beginning

01:34PM  8   of the case on direct examination.  There was discussion of

01:34PM  9   what the search was going to be of Pharaoh's.  And during the

01:34PM 10   direct examination, there was very little reference to the

01:34PM 11   fact that part of the discussions leading up to the search, a

01:34PM 12   whole lot what was going on behind the scenes in terms of the

01:34PM 13   investigation was that they didn't know if there was drugs at

01:34PM 14   Pharaoh's.

01:34PM 15         They had heard from two individuals in August, two

01:34PM 16   individuals who ended up being witnesses here today, or in

01:34PM 17   this trial, that there was drug use in Pharaoh's.  K.L., G.R.

01:34PM 18   And by the way, what was represented by them was very

01:34PM 19   different than what they're testifying to 15 years later.  You

01:35PM 20   heard a little bit about that with Ms. K.L., and we'll talk

01:35PM 21   about that in a little while.

01:35PM 22         But they have information that they're going to

01:35PM 23   pursue, try to corroborate, to determine whether these

01:35PM 24   witnesses are credible, whether there's actual -- actual proof

01:35PM 25   consistent what they've heard.  And they agreed to do a search

01:35PM      1    at Pharoah's in 2009, and it was specifically done on

01:35PM      2    Halloween morning, a Saturday morning, assuming that there's

01:35PM      3    going to be partying the night before on a Friday night,

01:35PM      4    parties related to -- to -- to Halloween.

01:35PM      5           And on the morning of -- the early hours of the

01:35PM      6    morning, only a few hours after the place closes, multiple law

01:35PM      7    enforcement agencies show up.  The FBI's there, probation is

01:35PM      8    there, and the Cheektowaga police is there.  There's K-9

01:35PM      9    units.  They go in to Pharoah's, and they don't find any drugs

01:35PM     10    at all.  This is 2009.

01:35PM     11           This is part of the case that's been presented to you

01:36PM     12    because, as we're going to talk about in a little bit, they

01:36PM     13    give you such a wide spread of time, and they give strategic

01:36PM     14    advantages to the government in their presentation of proof,

01:36PM     15    how they can cherry pick evidence.

01:36PM     16           But we go all the way back to 2009, they're alleging

01:36PM     17    this is a drug premises at the time.  They're alleging back in

01:36PM     18    2009 there is a conspiracy to distribute controlled substances

01:36PM     19    from Pharoah's.  And they go in there in the early hours of

01:36PM     20    the morning on Halloween and they don't find drugs, they don't

01:36PM     21    find paraphernalia, they don't find wrapping, packaging

01:36PM     22    associated with it.  They don't find anything that

01:36PM     23    corroborates the rumors and allegations that had amounted to a

01:36PM     24    belief that Peter Gerace is distributing drugs out of

01:36PM     25    Pharoah's back in 2009.

USA v Gerace - Closing Argument / Foti - 12/19/24

01:36PM   1          There was video at Pharaoh's back in 2009.  You heard

01:36PM   2   testimony about that.  Nobody could remember whether they

01:36PM   3   seized it, whether they looked at it, whether they went

01:36PM   4   through it at all.  I think you would probably find that if

01:37PM   5   they did, they would find something very similar to the video

01:37PM   6   that was seized in 2019.  Nothing of relevant value.  No drug

01:37PM   7   use.  No drug transactions.  No drugs on -- anywhere on the

01:37PM   8   cameras that are recording constantly.  A business that makes

01:37PM   9   sure that they have close to 50 cameras throughout the place

01:37PM  10   not just live streaming, but recording so that there is

01:37PM  11   evidence of what is going on in that club.

01:37PM  12          We don't really know much about what was seized or

01:37PM  13   what was looked at back then.  Maybe they didn't look at the

01:37PM  14   cameras, but they were there.  There were cameras back then,

01:37PM  15   you heard testimony of that.  No drugs, no video, no evidence

01:37PM  16   at all of drugs back in 2009.  And no charges.  No criminal

01:37PM  17   charges.

01:37PM  18          And we're going to talk about the Bongiovanni-related

01:37PM  19   component of those charges in a little bit.  You heard just on

01:37PM  20   the closing argument the very first thing they're talking

01:37PM  21   about, well, one of the very first things they're talking

01:38PM  22   about is this search in 2009 suggesting that somehow

01:38PM  23   Mr. Bongiovanni derails the investigation.

01:38PM  24          The investigation that Tom Herbst had wasn't with

01:38PM  25   Mr. Bongiovanni.  He didn't defer to Mr. Bongiovanni.

USA v Gerace - Closing Argument / Foti - 12/19/24

144

01:38PM 1    Mr. Bongiovanni wasn't his supervisor.  Tom Herbst spoke to

01:38PM 2    the U.S. Attorney's Office, he was speaking to prosecutors.

01:38PM 3    They're the ones who were going to make the decision on

01:38PM 4    whether to pursue changes.  And no charges come out of it.

01:38PM 5         The whole idea that Mr. Bongiovanni had anything to

01:38PM 6    do with it makes no sense.  There's no allegation that

01:38PM 7    Mr. Bongiovanni ever talked to the prosecutor.

01:38PM 8         The reality is there was no evidence of it.  That's

01:38PM 9    why it died back in 2009.

01:38PM 10        And as this case went forward, you heard a little

01:38PM 11   indicia and snippets of things that were going on behind the

01:38PM 12   scenes.  It wasn't presented during direct examination, it

01:38PM 13   wasn't really presented to you, it was generally inconsistent

01:38PM 14   with the idea that Mr. Bongiovanni put a cloak over Pharaoh's

01:38PM 15   and it was protected.  But during the cross-examinations it

01:38PM 16   came out that there were other attempts to investigate

01:39PM 17   Pharaoh's at various times over the course of the decade,

01:39PM 18   multiple attempts at undercover buys.

01:39PM 19        We don't know the full extent of any of that.  We

01:39PM 20   just know that no evidence came out of it that was -- was put

01:39PM 21   in front of you during the course of this trial.

01:39PM 22        So, 2009.  The next search is ten years later.  What

01:39PM 23   happens in between?

01:39PM 24        Katrina Nigro, divorce.  Okay?  She got mentioned

01:39PM 25   just a few times on the government's closing.  Which is

USA v Gerace - Closing Argument / Foti - 12/19/24

01:39PM   1    surprising, because she's really the inception of this entire

01:39PM   2    investigation.  She really is their star witness.

01:39PM   3            Katrina Nigro, in 2016, before she ever connects with

01:39PM   4    the U.S. Attorney's Office, is telling Peter Gerace in

01:39PM   5    voicemails, I will destroy you.  I will have your kids taken

01:39PM   6    away.  She's calling CPS and -- you saw the moment on the

01:40PM   7    stand, I'm sure you recall that -- that was counselors, they

01:40PM   8    were doing it.  Then confronted in fact that she told -- she

01:40PM   9    acknowledged the government at some point earlier she had,

01:40PM   10   okay, yeah, I called one time, the rest were counselors, that

01:40PM   11   was it.

01:40PM   12           What about the email you sent from hornyhamster69?

01:40PM   13   Okay, yeah, I did send that too.

01:40PM   14           Just lying to you, and changing her testimony as

01:40PM   15   she's confronted.  A pattern that you saw with multiple

01:40PM   16   witnesses in this trial.

01:40PM   17           Katrina Nigro, back in 2016, was saying I will

01:40PM   18   destroy your life.  She was trying to put false charges on

01:40PM   19   Mr. Gerace.

01:40PM   20           She, herself, was charged with criminal contempt

01:40PM   21   after being told Mr. Gerace doesn't want to pursue charges

01:40PM   22   against you, just leave him alone.  She continued and

01:40PM   23   continued until she was charged.  Then she continued again

01:40PM   24   after a judge told her do not have contact, and she was

01:40PM   25   charged again.  Then she continued again, and she was charged

USA v Gerace - Closing Argument / Foti - 12/19/24

146

01:40PM   1   again.

01:40PM   2          The government put up text messages suggesting that

01:41PM   3   she's -- that because Peter Gerace was talking to friends

01:41PM   4   about it, because they were laughing about the fact that she

01:41PM   5   couldn't stop, she wouldn't leave him alone, and that she was

01:41PM   6   finally charged, that somehow she's the victim of that all

01:41PM   7   that?

01:41PM   8          She was making choices to continue on, to continue to

01:41PM   9   try to be involved in Peter Gerace's life despite a court

01:41PM   10  telling you to stop.  And she admitted that she had a spoof --

01:41PM   11  or, excuse me, a stalker Facebook account, an account that she

01:41PM   12  had for some business and she changed it to a fake name so she

01:41PM   13  could use it to -- as a stalker Facebook account, that was her

01:41PM   14  words.

01:41PM   15         She used spoof phone numbers, and said something

01:41PM   16  about, oh, Peter's the one who taught me how to do that.

01:41PM   17  There's no evidence of that whatsoever other than her saying

01:41PM   18  that.  What we know is that she owns up, yeah, I admitted in

01:41PM   19  the past that, yes, I was using spoof phone numbers to call

01:41PM   20  Peter.

01:41PM   21         And what's more significant than the fact that she

01:42PM   22  was violating a court order and that she wouldn't leave him

01:42PM   23  alone and there's this clear bias that exists, is what else

01:42PM   24  she was doing at that timeframe.  She kept trying to put false

01:42PM   25  charges on Mr. Gerace.  She demonstrated all the way back then

USA v Gerace - Closing Argument / Foti - 12/19/24

01:42PM    1    what she's willing to do.

01:42PM    2         And, by the way, she didn't just try once.  She

01:42PM    3    didn't just try twice or three times.  She went from police

01:42PM    4    agency to police agency.

01:42PM    5         The government may have made some arguments here,

01:42PM    6    well, Detective Trotter ends up being friends with Mr. Gerace

01:42PM    7    and ends up having some communication with him along the way,

01:42PM    8    maybe he's the one driving all of this against Katrina Nigro.

01:42PM    9    That's totally bogus.

01:42PM    10        She went to the state police first, and she said oh,

01:42PM    11   it was because of the geographical location that I went to

01:42PM    12   them.  That's why I didn't go to Amherst, I went to the state

01:42PM    13   police first.

01:42PM    14        But then when they vet the charges and realize

01:42PM    15   they're bogus, and they don't charge her with anything at that

01:42PM    16   point, they just say well, you know, this -- this is not

01:42PM    17   legitimate, we can't file charges based on what you're

01:43PM    18   presenting us with.  She just keeps going to different police

01:43PM    19   agencies until she's finally charged by the Erie County

01:43PM    20   Sheriff's Office with filing charges -- or, filing false

01:43PM    21   reports against Mr. Gerace.

01:43PM    22        That's who Katrina Nigro is.  Somebody who is willing

01:43PM    23   to use the government to pursue her grudge against Mr. Gerace.

01:43PM    24   She demonstrated that back in 2016.  Back when she was telling

01:43PM    25   him she is going to ultimately destroy him.  That's her

USA v Gerace - Closing Argument / Foti - 12/19/24

148

01:43PM 1    objective.

01:43PM 2         Now, what happens in 2019?  The next search at

01:43PM 3    Pharaoh's that you've heard about.

01:43PM 4         And is this one really different than the last one?

01:43PM 5    You saw pictures yesterday pulled up exhibits of some of the

01:43PM 6    proof of drugs.  Did anybody realistically look at those

01:43PM 7    pictures and think, oh, yeah, that's consistent with drug

01:43PM 8    trafficking?  A couple packages of, like, a -- like a vape pen

01:43PM 9    or something like that?  A couple of tiny things in the

01:43PM 10   entirety of Pharaoh's in 2019?

01:44PM 11        And they seized the video, and they go back and look

01:44PM 12   at weeks worth of video, and don't see on a single camera any

01:44PM 13   footage showing any drugs at all.  No perceived drug

01:44PM 14   transactions, no contraband, nothing.

01:44PM 15        But 2019 was different than 2009.  Some of you may

01:44PM 16   have a number of ideas why it was.  There's one in particular

01:44PM 17   that I want to talk about.

01:44PM 18        2019, you heard the search was publicized.

01:44PM 19        2009, they did it in the early hours of the morning,

01:44PM 20   they made efforts to keep it quiet, to just go in, see if the

01:44PM 21   drugs were there, and leave.

01:44PM 22        What did they do in 2019?  They put it on the news.

01:44PM 23        And what was that?  That was a beacon to anybody who

01:44PM 24   had a grudge against Mr. Gerace, anybody who wanted a benefit

01:44PM 25   from the government, anybody who was willing to get lined up

USA v Gerace - Closing Argument / Foti - 12/19/24

149

01:45PM    1    to take that stand and receive something in return.

01:45PM    2            That's the difference between 2019 and 2009.  And

01:45PM    3    that's why we're here today.

01:45PM    4            Because when it goes up on the news, what happens?

01:45PM    5    Katrina Nigro gets on the phone, calls a hotline, says I have

01:45PM    6    all kinds of information about Mr. Gerace.

01:45PM    7            Not the first time she makes a false report.  It's

01:45PM    8    not the last time she makes a false report.  But she responds

01:45PM    9    to the publicity, and immediately we're off to the races.

01:45PM    10           What happens after Katrina Nigro gets in contact with

01:45PM    11   the government, they meet next month and she goes in the grand

01:45PM    12   jury?  They form what she described as a partnership.  And

01:45PM    13   that is what the evidence shows.  Katrina Nigro is the one

01:45PM    14   that launches this whole thing.

01:45PM    15           Yes, there were witnesses that made allegations way

01:45PM    16   back in '09.  Nothing came of it.

01:45PM    17           K.L. in '09 said there was drugs.  She didn't say

01:46PM    18   anything about what she ultimately testified to here.  She

01:46PM    19   said there were Lortabs in the club that she could get from

01:46PM    20   somebody else, she never said Peter Gerace ever gave her

01:46PM    21   Lortabs at all.

01:46PM    22           There was G.R. had spoken to them.  There was other

01:46PM    23   individuals who had spoken to the government.  None of them

01:46PM    24   advanced this investigation forward.

01:46PM    25           Katrina Nigro moves the investigation forward.  She

01:46PM   1   makes all these allegations of upstairs there being high-end

01:46PM   2   prostitution.  She starts naming big names, celebrities,

01:46PM   3   really, really exciting allegations.  And she inflicts every

01:46PM   4   part of this investigation going forward.

01:46PM   5        She starts helping the government find witnesses.

01:46PM   6        How could we rely on anybody that Katrina Nigro

01:46PM   7   contacted first?  Especially because we don't know what

01:46PM   8   communication they had.

01:46PM   9        She says oh, I, gave -- I gave the government my

01:47PM  10   password to my -- my social media.  Come on.  No, she didn't.

01:47PM  11   Nobody remembers that.  Nobody looked at her Facebook records.

01:47PM  12        And frankly I don't know which is worse, the idea

01:47PM  13   that she was lying to you about something else to try to give

01:47PM  14   herself some credibility, or the idea that she would have

01:47PM  15   given the password and the government wouldn't check knowing

01:47PM  16   that she was talking to people that she was saying were

01:47PM  17   witnesses.

01:47PM  18        How many other people did she talk to?  We don't

01:47PM  19   know.

01:47PM  20        We know that there definitely are witnesses who

01:47PM  21   testified at this trial that she did communicate with.  You

01:47PM  22   heard at least one example of K.M. getting involved when

01:47PM  23   Katrina reaches out to her and says, do you want to get in on

01:47PM  24   the lawsuit, a secret grand jury, Peter will definitely lose.

01:47PM  25        Come on.  That's how somebody gets introduced to this

USA v Gerace - Closing Argument / Foti - 12/19/24

01:47PM   1   investigation?  That's somebody who apparently had relevant

01:47PM   2   information?  It starts with Katrina Nigro saying, do you want

01:47PM   3   to get into in on this lawsuit?

01:48PM   4        Katrina Nigro is giving interviews to the Buffalo

01:48PM   5   News where she's acknowledging that she's part of this

01:48PM   6   investigation, she's on social media talking about it?

01:48PM   7        She gives the government the testimony they're

01:48PM   8   looking for.  She talks about clogged buckets of needles that

01:48PM   9   came out of the toilets, just completely nonsensical things.

01:48PM   10  She talks about the upstairs room that she would unlock for

01:48PM   11  Peter and his friends, even though during the course of this

01:48PM   12  trial we learned that she didn't have a key.

01:48PM   13       She talks about giving envelopes to Mr. Bongiovanni,

01:48PM   14  something that you didn't hear testimony from anybody else.

01:48PM   15       She gives them, the government, what they need to

01:48PM   16  fill the gaps to pursue the charges that they've pursued here.

01:48PM   17  And what comes out of that is what you have in front of you,

01:48PM   18  what was referred to by Special Agent Burns as a historical

01:48PM   19  conspiracy.

01:48PM   20       So what is a historical conspiracy?  A historical

01:49PM   21  conspiracy is cherry-picking witnesses instead of giving

01:49PM   22  actual direct hard evidence.  Just giving you testimony from

01:49PM   23  people from various times who will say things that are

01:49PM   24  completely inconsistent with each other, inconsistent with

01:49PM   25  things that they've said in the past.  As long as it's

USA v Gerace - Closing Argument / Foti - 12/19/24

152

01:49PM 1 prejudicial to Mr. Gerace, they'll put them up there.

01:49PM 2         There are other things that could've been done to

01:49PM 3 give you evidence besides just historical testimony from

01:49PM 4 questionable witnesses.  You heard about different types of

01:49PM 5 investigative techniques.

01:49PM 6         Now, the government is not legally obligated to

01:49PM 7 pursue any of those investigative techniques, they don't have

01:49PM 8 to, the judge will tell you that.

01:49PM 9         The judge, I believe, is going to tell you something

01:49PM 10 about this particular area of discussion that came up

01:49PM 11 yesterday, and it's going to indicate in deciding whether the

01:50PM 12 government has met their burden of proof, you may consider

01:50PM 13 testimony of witnesses and argument by counsel that the

01:50PM 14 government did not use specific investigative techniques.  The

01:50PM 15 judge is going to tell you you can consider that.

01:50PM 16         And he's going to tell you, I expect, that you can do

01:50PM 17 that because you should look at all the evidence in the case

01:50PM 18 or lack of evidence in deciding whether Mr. Gerace is guilty

01:50PM 19 or not guilty.

01:50PM 20         There's no legal requirement to use any specific

01:50PM 21 investigative technique, but you are certainly able to

01:50PM 22 consider that in conjunction with your review of the evidence

01:50PM 23 and lack of evidence.

01:50PM 24         Undercover buys, we heard it two different times.

01:50PM 25 And who knows if that's that all there is.  That's the two

USA v Gerace - Closing Argument / Foti - 12/19/24

153

01:50PM   1   that we heard about.  There was something in 2016, I think

01:50PM   2   2018, and we heard testimony from K.A. that if you weren't

01:50PM   3   presented testimony later on about the fact that there were

01:50PM   4   these operations that didn't result in any other purchases,

01:50PM   5   you would have been left with the impression by the government

01:51PM   6   that, hey, look, when we try to go do an undercover buy at

01:51PM   7   Pharaoh's, we get one -- we got one with K.A.  And that is

01:51PM   8   completely inconsistent with what was really going on back

01:51PM   9   then.

01:51PM   10       K.A. did a purchase under the table so cameras

01:51PM   11   couldn't see, and she told the individual here's my phone

01:51PM   12   number, if you ever want to do a deal in the future, we've got

01:51PM   13   to do it outside the club.  She was worried about being fired

01:51PM   14   if she got caught.

01:51PM   15       Now, did she get away with it?  Sure.  There's

01:51PM   16   certain things that, if somebody's careful, they can probably

01:51PM   17   get past the cameras, but it's not with the authorization of

01:51PM   18   management.  There was no okay to do that.  She specifically

01:51PM   19   said future transactions are outside the club.  Did that stop

01:51PM   20   them from going back to the club to try again?  No, of course

01:51PM   21   they went back to try again, never got another undercover

01:51PM   22   purchase.

01:51PM   23       And then you heard about -- about Investigator Santos

01:52PM   24   or New York State Police Santos, who made multiple attempts

01:52PM   25   and said well, I don't think I'm a known commodity so -- and

01:52PM     1    that's why I can't do a purchase.  What is that?  That's just

01:52PM     2    speculation.

01:52PM     3          What mattered is he went in there in a place that was

01:52PM     4    described way back in the opening as a place that's prevalent,

01:52PM     5    that you can get drugs anywhere, anybody can go in and get

01:52PM     6    drugs, it's available to anybody who walks in through the

01:52PM     7    doors at Pharaoh's, and you heard testimony throughout the

01:52PM     8    trial that attempted to advance that narrative.  But what

01:52PM     9    would actually happen when someone went in there and tried to

01:52PM    10    buy drugs?  Nothing.

01:52PM    11          There was testimony that at some point they got a

01:52PM    12    little bit of marijuana.  That was it.  That's not at all

01:52PM    13    consistent with the narrative that was presented to you

01:52PM    14    throughout this trial.

01:52PM    15          Wiretaps.  Trying to say that Judge Michalski has

01:52PM    16    anything to do with wiretaps being used is just nonsense.

01:53PM    17    We're talking about a 10-, 15-year period where Peter Gerace

01:53PM    18    was supposedly being investigated at various times, and nobody

01:53PM    19    tries to pursue a wiretap?

01:53PM    20          Well, because Anthony Gerace was on a deconfliction

01:53PM    21    notice that that somehow relates to why they wouldn't pursue

01:53PM    22    one against Mr. Gerace?

01:53PM    23          I mean, here's something that you know because of the

01:53PM    24    evidence, Jeff Anzalone, one of the government's witnesses was

01:53PM    25    on a wiretap, they got one with him.  He was talking to K.L.

USA v Gerace - Closing Argument / Foti - 12/19/24
155

01:53PM  1    about drug transactions.  He was doing it on a recorded

01:53PM  2    wiretap recording.  So we actually have more evidence of

01:53PM  3    recording of drug transactions for two of the witnesses than

01:53PM  4    we do against Mr. Gerace.  He's on a wiretap of K.L. where

01:53PM  5    she's talking about purchasing Adderall.  There's no recording

01:53PM  6    of Mr. Gerace.

01:53PM  7            And I want to make another point, the government did

01:53PM  8    try to offer you testimony, well, here's why that wouldn't

01:54PM  9    have been feasible.  You may disagree with their argument of

01:54PM  10   why it's not feasible, or you may agree with it.  It doesn't

01:54PM  11   matter.  It doesn't change the burden of proof.  It doesn't

01:54PM  12   mean that suddenly they don't have to present you as much

01:54PM  13   evidence.

01:54PM  14           Did they have to pursue a wiretap?  No.  They don't

01:54PM  15   have to pursue any type of technique.

01:54PM  16           But to the extent that there's evidence missing that

01:54PM  17   would have helped you decide this case, you're able to

01:54PM  18   consider the lack of evidence, any lack of evidence, any gaps

01:54PM  19   in the evidence, any shortcomings in the evidence.  You

01:54PM  20   consider that, it doesn't change because the government has

01:54PM  21   repeatedly had witnesses testify well, Peter Gerace was

01:54PM  22   friends with a lot of law -- a lot of law enforcement.

01:54PM  23           So what?  It doesn't change the verdict.  Not at all.

01:54PM  24           No search warrants at any time during this long

01:54PM  25   period of time of 10 to 15 years in some instance, no search

USA v Gerace - Closing Argument / Foti - 12/19/24

156

01:54PM  1    warrants, the only search warrant -- they do two search

01:55PM  2    warrants which is more than exists in a lot of cases, don't

01:55PM  3    find anything, and the argument is, well, okay there's no

01:55PM  4    evidence really recovered on those.  But do the cameras record

01:55PM  5    anything back in 2013?  No, of course not.  Cameras don't

01:55PM  6    record seven years worth of recording.

01:55PM  7          But had they went in and did a search warrant at any

01:55PM  8    time in that time span, you really believe beyond a reasonable

01:55PM  9    doubt it would've showed something different than what there

01:55PM 10    was in '09 and 2019?  That is nothing but pure conjecture.

01:55PM 11          You have actual in evidence this case that gives rise

01:55PM 12    to reasonable doubt.  A search in '09, in the time span that

01:55PM 13    we're talking about here, producing no evidence, that's

01:55PM 14    reasonable doubt.

01:55PM 15          2019, government, during the course of this

01:55PM 16    investigation, has not filed charges against Mr. Gerace yet.

01:55PM 17    They go to a judge, say we think we have allegations

01:55PM 18    supporting probable cause, they get authorization, go in and

01:55PM 19    get just about nothing.  That's reasonable doubt.

01:56PM 20          The fact that -- that they'll present arguments to

01:56PM 21    you about well, Mr. Bongiovanni was charged at some point at

01:56PM 22    the end of October has nothing to do with the recordings in

01:56PM 23    the VIP area, they go back further than that.  And there's

01:56PM 24    nothing on any one of those cameras consistent with the

01:56PM 25    testimony you've heard from some of the witnesses.  No video,

USA v Gerace - Closing Argument / Foti - 12/19/24

157

01:56PM   1   no pictures, no recordings.

01:56PM   2        They have Mr. Gerace's phone in their possession, his

01:56PM   3   entire life.  And they don't have -- you saw what they think

01:56PM   4   is the strongest evidence of any of the charges they have.

01:56PM   5   They have conversations with Anthony Gerace, people that

01:56PM   6   they've essentially alleged are coconspirators.

01:56PM   7        They had evidence -- they had text messages you heard

01:56PM   8   about with all these other individuals that came up throughout

01:56PM   9   the trial.  You didn't see any of those text messages.  What

01:57PM  10   does that mean?  Would any one of us openly provide our phone

01:57PM  11   and let anybody else just read through the messages?  It's

01:57PM  12   extremely personal.  It's extremely private.  And they have

01:57PM  13   access to all those conversations.  And there's nothing about,

01:57PM  14   to say, well, maybe he was trying to be careful, based on

01:57PM  15   what?

01:57PM  16        Everything they've suggested to you is he's cocky

01:57PM  17   because he has law enforcement friends, he didn't think there

01:57PM  18   was anything to worry about.  You're telling me he never

01:57PM  19   during the course of that time made a single drug transaction

01:57PM  20   even though he's supposedly this drug dealer that they've been

01:57PM  21   talking about?  Never talks about a single sex act on there.

01:57PM  22   The people that he supposedly -- there was almost nobody that

01:57PM  23   we heard testimony about that he communicated with negotiated

01:57PM  24   for a commercial sex act.  I think the only one -- the only

01:57PM  25   one, other than the testimony of G.R. was, was Russell

USA v Gerace - Closing Argument / Foti - 12/19/24

158

01:57PM    1    Salvatore.

01:57PM    2         No messages with Russell Salvatore.  Nothing of

01:58PM    3    relevance presented to you with that at all.  No pictures of

01:58PM    4    Peter Gerace with Russell Salvatore.  He was at his

01:58PM    5    restaurant, Russell Salvatore's not in the picture.  You're

01:58PM    6    telling me that there's evidence to suggest that Russell

01:58PM    7    Salvatore on a phone call that the witness didn't even pretend

01:58PM    8    to be listening in on, she just said she hears -- she hears it

01:58PM    9    because she's in the room, that's evidence of Peter

01:58PM   10    negotiating drugs or negotiating commercial sex acts?

01:58PM   11    Meanwhile on his phone, nothing?  Nothing at all.

01:58PM   12         That gives us a reason to hesitate, doesn't it?

01:58PM   13    That's all it takes.  To look at -- to think about this and

01:58PM   14    think they have his entire life in digital format, and we saw

01:58PM   15    the most there was.  And they interpreted how they wanted to,

01:58PM   16    they had a text message from the judge with no context to it

01:58PM   17    of, let's go get some pussy there.  And they're saying that

01:59PM   18    they think that might have to do with a commercial sex act.

01:59PM   19    Why?  There's nothing to support that.

01:59PM   20         That's the government telling you how to think.  And

01:59PM   21    that's where you come in and you push back against that.

01:59PM   22         That's where you critically think about the evidence

01:59PM   23    and say that doesn't mean that, there has to be more than

01:59PM   24    that.  A message like that does not tell me they're discussing

01:59PM   25    a commercial sex act.

USA v Gerace - Closing Argument / Foti - 12/19/24

159

01:59PM    1          Those messages are all in evidence.  If you sift

01:59PM    2    through them, if you go through them all, you'll see the

01:59PM    3    majority of them are about talking of times to meet up go grab

01:59PM    4    a drink.  A lot of scheduling issues.  These two never can

01:59PM    5    seem to find a time to actually meet up.

01:59PM    6          But they talk about getting together with their

01:59PM    7    families, with Sue, Judge Michalski's wife.  You read those

01:59PM    8    conversations as a whole, they're not much different than any

01:59PM    9    conversation other than one or two messages that were picked

01:59PM   10    out that were maybe vulgar, they're not much different than

01:59PM   11    any conversation you have in your phone, and that's the

02:00PM   12    evidence they picked out of his phone.  That's reasonable

02:00PM   13    doubt.

02:00PM   14          What about the lack of witnesses?  They put -- they

02:00PM   15    put on a number of witnesses here, all sort of within a

02:00PM   16    particular circle, all generally connected to each other in

02:00PM   17    some way.  Some may not be or may be off on a little bit of an

02:00PM   18    island.  We don't know which ones communicated with each

02:00PM   19    other.  We don't know which ones Katrina Nigro communicated

02:00PM   20    with.  They didn't specifically ask those questions for the

02:00PM   21    most part, and we didn't always ask those questions on cross.

02:00PM   22          Who knows if they would've been telling the truth?

02:00PM   23    They've lied about a ton of other things.

02:00PM   24          We've heard that there's all this investigative work

02:00PM   25    with Katrina Nigro, the partner -- the self-described partner

USA v Gerace - Closing Argument / Foti - 12/19/24

160

02:00PM  1   to the government here, collecting these witnesses.  At the

02:00PM  2   end, what you've got were witnesses that were really cherry

02:00PM  3   picked to advance a particular narrative.

02:00PM  4        Think about the pure volume of dancers over the

02:01PM  5   timeframe that we're talking about.  You heard testimony that

02:01PM  6   there were sometimes 50 dancers working a night, in a single

02:01PM  7   night.  More dancers, five times as many dancers as you may

02:01PM  8   have heard witnesses from here at this trial.  In a night.

02:01PM  9   And they brought in witnesses to cover a 10- to 15-year span

02:01PM  10  of time.

02:01PM  11       And I asked some questions about that.  You did

02:01PM  12  interview other people, right?  You interviewed other dancers,

02:01PM  13  you interviewed other managers, you interviewed other people.

02:01PM  14  And the answer's yes, and I didn't ask any specifics.  And

02:01PM  15  frankly the specifics of any conversations they have would be

02:01PM  16  hearsay, it's not for your consideration what was specifically

02:01PM  17  said during those interviews.

02:01PM  18       But what's significant and what is for your

02:01PM  19  consideration and what is in evidence is the government, on

02:01PM  20  redirect, asked Special Agent Burns, well, did you assess

02:01PM  21  their credibility?  Did you assess whether they're

02:01PM  22  forthcoming?

02:02PM  23       Yeah, we determined that some of those -- those

02:02PM  24  witnesses are not credible.

02:02PM  25       They're talking to federal agents.  They obviously

USA v Gerace - Closing Argument / Foti - 12/19/24

02:02PM 1    have to tell the truth.  We'll go through just a couple

02:02PM 2    examples.

02:02PM 3         You'll hear what it is that they find not credible:

02:02PM 4    Anything that doesn't fit the government's narrative.

02:02PM 5         So you've got the witnesses that fit the government's

02:02PM 6    narrative, and there is a sea of witnesses out there that we

02:02PM 7    never heard from.  Witnesses that there's some evidence,

02:02PM 8    regardless of whether they were telling the truth or not,

02:02PM 9    certainly told the government that they've got it wrong.

02:02PM 10        I want to go through some of the points that I think

02:02PM 11   are relevant to assessing credibility.  And -- and some of

02:02PM 12   these points are points that I think you're going to get

02:02PM 13   instructions on that are very specific to things that you can

02:02PM 14   consider as part of credibility.

02:02PM 15        What the government presented during their closing

02:03PM 16   was not arguments for the most part on why you should find

02:03PM 17   these witnesses credible.  There was a few examples of, well,

02:03PM 18   this was corroborated by this, or this was corroborated by

02:03PM 19   that, and we'll talk about that momentarily.  But they didn't

02:03PM 20   get far into the credibility analysis, and I submit we all

02:03PM 21   know that these witnesses were more than comfortable, the

02:03PM 22   majority of them were more than comfortable getting up here

02:03PM 23   and lying.  You saw some of it in realtime.

02:03PM 24        I've never seen anything like it in my career as an

02:03PM 25   attorney when K.L. lied to you folks about things that she

02:03PM    1    didn't think that we had any further follow-up questions on,

02:03PM    2    and then once we got into some specifics, just changed her

02:03PM    3    answer.

02:03PM    4        So a few moments ago, you said something different?

02:03PM    5    You were -- that wasn't true?  Correct.

02:03PM    6        No reaction at all.

02:03PM    7        I mean, you saw it happen with other witnesses.  You

02:03PM    8    saw it happen with Katrina Nigro quite a bit.  When they're

02:03PM    9    caught in something that they're lying about to you, you see

02:03PM   10    some embarrassment, you see some trying to walk it back,

02:04PM   11    trying to explain it, explain why they said something

02:04PM   12    different at different times.

02:04PM   13        Oh, I was confused.  Oh, that's not right.  Yeah,

02:04PM   14    okay, maybe I said that before, but today is what matters.

02:04PM   15        You heard all these different explanations, Ms. K.L.

02:04PM   16    didn't even try.  Yeah, I was lying to you.  Stone cold.

02:04PM   17    Under oath.  Didn't matter to her at all.

02:04PM   18        She thought she -- when I asked her, are you on

02:04PM   19    Adderall?  You take Adderall not prescribed?  She comfortably

02:04PM   20    lies to you and says, no, I only take it as prescribed, I have

02:04PM   21    a prescription.

02:04PM   22        I started asking about particular people.  Oh, yeah.

02:04PM   23    Okay.  Yeah.  I forgot that you have a recording of me buying

02:04PM   24    illegal Adderall from somebody.  I forgot the jury heard about

02:04PM   25    that.  I forgot I was never charged with it, so I forgot that

USA v Gerace - Closing Argument / Foti - 12/19/24

163

02:04PM    1    that recording exists.

02:04PM    2          So, yeah.  Yeah.  I was just lying to you guys a

02:04PM    3    little while ago.  Big deal.  Just totally indifferent to it.

02:04PM    4          Here's some things that I think you'll hear about

02:05PM    5    when assessing credibility.  The judge is going to give you

02:05PM    6    examples of common-sense questions that you should -- you can

02:05PM    7    ask, that you should ask when you critically think about a

02:05PM    8    witness's credibility.

02:05PM    9          Was the -- was the witness candid, frank, forthright?

02:05PM   10          Did the witness seem as if he or she was hiding

02:05PM   11    something or being evasive?

02:05PM   12          How did the witness testify on direct exam compared

02:05PM   13    with the way the witness testified on cross exam?  That's a

02:05PM   14    big one.  And the government pointed that out in the closing

02:05PM   15    that they gave.

02:05PM   16          One of their own witnesses, Doug Augustyniak, they

02:05PM   17    said, well, they were -- they weren't nearly as antagonistic

02:05PM   18    during cross-examination.  They suggested you shouldn't

02:05PM   19    believe our own witness because there's a difference with how

02:05PM   20    he acted on cross-examination and direct examination, except

02:05PM   21    for the part that we want you to believe.  Just disregard the

02:05PM   22    rest.

02:05PM   23          Very much an example of the government telling you

02:05PM   24    how to think.  We're gonna put a witness on the stand and

02:05PM   25    testify under oath.  We are going to call that witness to the

USA v Gerace - Closing Argument / Foti - 12/19/24

164

02:06PM  1   stand, and then we're going to tell you which parts to accept

02:06PM  2   of their testimony, just disregard the rest.  They're not

02:06PM  3   credible.

02:06PM  4        Meanwhile, think about the rest of some of the

02:06PM  5   government witnesses, how they shifted from direct examination

02:06PM  6   to cross-examination.

02:06PM  7        Think about A.A. up there, acting like she was going

02:06PM  8   to start crying with every single question that was asked on

02:06PM  9   direct examination, and then just totally flipping a switch as

02:06PM  10  soon as the cross-examination started.

02:06PM  11       There is something to that in terms of the witness's

02:06PM  12  credibility, something that you are allowed to assess,

02:06PM  13  something that the judge will tell you that you're allowed to

02:06PM  14  consider as part of critically thinking about the witness

02:06PM  15  testimony.

02:06PM  16       Was the witness consistent in his or her testimony,

02:06PM  17  or did he or she contradict himself?  I gave you an example of

02:06PM  18  it happening within seconds.  There were a lot of times

02:06PM  19  throughout this trial where witnesses said one thing during

02:06PM  20  direct, and then contradicted themselves during cross, or

02:07PM  21  during cross, contradicted themselves when they were trying to

02:07PM  22  push back against an answer but realized, okay, maybe I said

02:07PM  23  that in the past.  I forgot, so I'll acknowledge it, yes.

02:07PM  24       The government pointed out some of their own

02:07PM  25  witnesses' contradictions on their own direct examinations.

02:07PM   1   Remember Lou Selva?  Lou Selva got up here and gave what

02:07PM   2   appeared to be a credible answer about whether he ever heard

02:07PM   3   Bongiovanni use a racial slur.  And then the government said

02:07PM   4   well, we asked you about this specifically just about a year

02:07PM   5   ago, and you told us you did, and he starts changing his

02:07PM   6   answer.  The witness who has things to gain for testifying the

02:07PM   7   way the government wants.  Oh, yes, yes, I remember it.

02:07PM   8        And you saw Mr. Tripi react to that.  You saw him

02:07PM   9   raise his voice at the witness.  You saw him say, are you

02:07PM   10  playing games?

02:07PM   11       And with all due respect to Mr. Tripi and Mr. Cooper,

02:07PM   12  if they're willing to yell at the witnesses here in front of

02:08PM   13  all you folks, in front of the judge, in front of defense

02:08PM   14  counsel, and in front of anybody who's sitting in the

02:08PM   15  audience, you can only imagine what happens behind closed

02:08PM   16  doors.

02:08PM   17       The judge will instruct you on other points related

02:08PM   18  to credibility.  Whether you choose to believe a witness or

02:08PM   19  how much you choose to believe can also be influenced by bias.

02:08PM   20  If there's any evidence that a witness is prejudiced or

02:08PM   21  hostile towards Mr. Gerace, the judge will instruct you that

02:08PM   22  you are required to view the witness's testimony with caution,

02:08PM   23  to weigh it with care.  Subject -- subject it to close and

02:08PM   24  careful scrutiny.

02:08PM   25       We saw that with plenty of witnesses.  The government

USA v Gerace - Closing Argument / Foti - 12/19/24

02:08PM   1   tried to pass off, well, they have good reason to be

02:08PM   2   prejudiced against Mr. Gerace.

02:08PM   3            C.B. had good reason to be prejudiced against Mr.

02:08PM   4   Gerace.  She's sending them messages, can't wait to put this

02:09PM   5   guy in jail.  That's the type of thing you're supposed to

02:09PM   6   consider.

02:09PM   7            That's something that's supposed to give you caution

02:09PM   8   when you find out that she's sending messages like that to the

02:09PM   9   government.  Shouldn't be talking about that on direct, but it

02:09PM   10  comes out that there's more going on behind the scenes there

02:09PM   11  than we know about.

02:09PM   12           She's a witness who tells you she saw a sex act once

02:09PM   13  in the VIP Room, and felt like there wasn't really any

02:09PM   14  follow-up on it, and generally tries to give testimony kind of

02:09PM   15  consistent with the government's narrative wherever she could.

02:09PM   16           And what's interesting about her -- well, there's a

02:09PM   17  couple thing that's interesting about her -- but one thing

02:09PM   18  that's interesting is none of that offended her enough to

02:09PM   19  leave.  She didn't say she was on drugs -- on drugs, addicted,

02:09PM   20  had to stay at the job.  She kept working there.  None of it

02:09PM   21  bothered her enough that she left employment at Pharaoh's

02:09PM   22  until her boyfriend was fired.  Then she told management I

02:09PM   23  don't play these games.

02:09PM   24           We don't know what the circumstances are around that,

02:09PM   25  but we know that's when she quits.  Nothing in her tenure at

USA v Gerace - Closing Argument / Foti - 12/19/24

167

02:10PM    1    Pharaoh's was offensive to her enough to quit until they fired

02:10PM    2    her boyfriend, and then she's just somebody who just doesn't

02:10PM    3    play games.

02:10PM    4         And she comes back and goes there as a patron later

02:10PM    5    on.  Which is something you hear about a lot of these

02:10PM    6    witnesses who talk about these horrific experiences, and then

02:10PM    7    they go back.

02:10PM    8         E.H. was another one who was posting on social media

02:10PM    9    about how she's going to send Mr. Gerace to jail, something to

02:10PM   10    that effect, on the morning of her testimony.  Another person

02:10PM   11    who has a clear bias.  It didn't come out exactly what her

02:10PM   12    bias is, but we know she has it.  And you can consider that,

02:10PM   13    and you have -- that has to give you caution when you hear

02:10PM   14    testimony like that.

02:10PM   15         She was straight-up bizarre throughout most of her

02:10PM   16    testimony.  The one thing that's particularly bizarre is when

02:10PM   17    confronted on cross-examination about her bias, when it was

02:10PM   18    brought up that she had been posting on social media about how

02:11PM   19    she's going to send him to jail, she got so combative she

02:11PM   20    started yelling about how she was raped.

02:11PM   21         And then it was clarified because I think all of us

02:11PM   22    were confused what she was referring to, and, oh, it's the

02:11PM   23    thing I talk about on direct examination, that there's the

02:11PM   24    allegation that somebody at some point ejaculated on me.

02:11PM   25    Something that I don't think the evidence to support it is

02:11PM   1   really believable at all when you consider the totality of her

02:11PM   2   testimony.  But she's describing it as such a horrific

02:11PM   3   experience that Pharaoh's is certainly a place she would never

02:11PM   4   go back to, right?

02:11PM   5        She went back a few years later, and said she had one

02:11PM   6   of the best times of her life.  Remember that weird testimony

02:11PM   7   where you asked about you got kicked out that night because

02:11PM   8   you were acting out of control?  Well, yeah, I got kicked out.

02:11PM   9        And you had a bad time, you were pissed, right?  Oh,

02:11PM  10   no, no, I actually had the best time of my life that night.

02:11PM  11        What?  That's one of their witnesses.  That's one of

02:11PM  12   the people that they referred to in their closing statement,

02:12PM  13   somebody that they said you should rely on.

02:12PM  14        The judge, I believe, will instruct you that

02:12PM  15   testimony from witnesses who were using or addicted to drugs

02:12PM  16   when the events that he or she observed took place must be

02:12PM  17   examined with greater scrutiny than the testimony of other

02:12PM  18   witnesses.

02:12PM  19        The government is completely right during their

02:12PM  20   closing, nobody's saying that because someone is addicted to

02:12PM  21   drugs, they can't -- that they can't be a victim of the crime

02:12PM  22   under certain circumstances.  That's not what we have in this

02:12PM  23   trial.  That's not what the -- what -- what the reality is.

02:12PM  24        But of course, of course somebody, just because

02:12PM  25   they're on drugs, can still be a victim of a crime.  That's

USA v Gerace - Closing Argument / Foti - 12/19/24

169

| | | |
|---|---|---|
| 02:12PM | 1 | not the issue. |
| 02:12PM | 2 | The judge is not going to instruct you on anything |
| 02:12PM | 3 | like that, and we're not going to argue that. |
| 02:12PM | 4 | But I will argue consistent with what you'll be |
| 02:12PM | 5 | instructed on is when somebody is heavily using drugs to the |
| 02:12PM | 6 | extent that they say what most of these witnesses say they |
| 02:13PM | 7 | were, where they had no awareness of what was going on half of |
| 02:13PM | 8 | time, and then they come up and testify about specific |
| 02:13PM | 9 | details. Especially when the details have changed over time |
| 02:13PM | 10 | depending on when they meet with the government. |
| 02:13PM | 11 | That's something you can consider. That's not off |
| 02:13PM | 12 | limits. That's totally appropriate. And I believe you will |
| 02:13PM | 13 | be instructed accordingly. |
| 02:13PM | 14 | Witnesses who pleaded guilty after entering into an |
| 02:13PM | 15 | agreement with the government to testify, you should bear in |
| 02:13PM | 16 | mind a witness has entered into such an agreement has an |
| 02:13PM | 17 | interest in this case different from other witnesses. |
| 02:13PM | 18 | A witness who believes he or she may be able to |
| 02:13PM | 19 | obtain his or her freedom, or receive a lighter sentence by |
| 02:13PM | 20 | giving testimony favorable to the prosecution, has a motive to |
| 02:13PM | 21 | testify falsely. That's common sense. It's so obvious. It's |
| 02:13PM | 22 | so ingrained into the law that somebody who strikes a deal and |
| 02:14PM | 23 | says I'm going to get a lighter sentence if I say this or |
| 02:14PM | 24 | that, that it's instructed as one of the things you can |
| 02:14PM | 25 | consider, that you should consider. |

USA v Gerace - Closing Argument / Foti - 12/19/24

170

02:14PM    1        I mean, some of the nonsense that came from these

02:14PM    2    witnesses who are under agreements.  The jailhouse informants?

02:14PM    3    Did any of you folks actually think either of them came across

02:14PM    4    as credible?

02:14PM    5        They write letters.  A case that's in the news,

02:14PM    6    that's highly publicized, they both acknowledge, okay, yeah,

02:14PM    7    people in the jail were talking about Mr. Gerace and the case,

02:14PM    8    we watch the news every night, we check the paper, we check,

02:14PM    9    we are news junkies.

02:14PM    10       And why do you think they're news junkies?  Because

02:14PM    11   opportunities like this present themselves.

02:14PM    12       I mean, the statements that were made were just so

02:14PM    13   perfectly tailored to what the government wanted or needed

02:14PM    14   from them.

02:14PM    15       And all the while, in order to believe the premise

02:14PM    16   that these statements were made, you have to believe

02:15PM    17   Mr. Gerace is just openly talking about criminal conduct.

02:15PM    18       And remember, you've got the cell phones.  They want

02:15PM    19   you to believe that, what, there's no messages because he's so

02:15PM    20   careful?  And then separately tell you this is somebody who

02:15PM    21   gets into a van in front of correctional officers, or at the

02:15PM    22   jail in front of other inmates and correctional officers, and

02:15PM    23   just starts announcing guilt in a way that's perfectly

02:15PM    24   tailored to what the government would want?  Give me a break.

02:15PM    25       That's the type of people they put on the stand to

USA v Gerace - Closing Argument / Foti - 12/19/24

02:15PM   1   testify to you.  That's the type of people they want you to

02:15PM   2   rely on.  And that is reasonable doubt.

02:15PM   3          That's a reason to hesitate.  If Ben Rivera or

02:15PM   4   Hughes -- Kevin Hughes said lend me $500 and I'll give you 500

02:15PM   5   back next week, I imagine most of you are not taking that

02:15PM   6   deal.  Most of you are not going to find that that person's

02:16PM   7   credible or reliable enough to do it.

02:16PM   8          And if any of you are, I imagine at a minimum you

02:16PM   9   would hesitate.  And if any of you are so generous and

02:16PM  10   trusting that you wouldn't hesitate, I would hope that you

02:16PM  11   would find it reasonable if one of your fellow jurors did.

02:16PM  12          Now, we're talking about witnesses, so let's talk

02:16PM  13   about -- we've touched upon it a little bit, but let's talk

02:16PM  14   about really what precedes their testimony.

02:16PM  15          The witnesses that matter the most to the government,

02:16PM  16   you heard about excessive preparation.

02:16PM  17          We're not talking about meeting with them once to

02:16PM  18   kind of go through, here's the questions we're going to ask,

02:16PM  19   and, okay, now we now your answers.  We're talking about

02:16PM  20   meeting with them again and again and again and again.

02:16PM  21   Communication consistently between agents and these witnesses,

02:17PM  22   testimony from grand jury proceedings.

02:17PM  23          And what matters about that?  A few things.  One,

02:17PM  24   you've heard throughout this trial that these witnesses were

02:17PM  25   generally aware that if they lie to a federal agent, they

02:17PM    1    could be charged.  You heard about all these witnesses who

02:17PM    2    have changed their stories at various times lying to federal

02:17PM    3    agents, none of them are charged.

02:17PM    4        Some of them were put into the grand jury because

02:17PM    5    they were brought in at some point before charges were filed,

02:17PM    6    and you heard about that.  And when these witnesses testified,

02:17PM    7    answers that were completely different in the way you

02:17PM    8    testified today.  It wasn't always from the defense.

02:17PM    9    Sometimes the government liked an answer they gave earlier

02:17PM    10   better, they impeached their own witnesses.  Well, you said

02:17PM    11   this on a different date.  Because they actually liked the

02:17PM    12   earlier inconsistencies, so they went with that one instead.

02:17PM    13       These witnesses were prepped through and through, and

02:17PM    14   the government is supposed to -- well, I'm not going to say

02:18PM    15   what the government's supposed to do, but you would hope that

02:18PM    16   if somebody is lying to you, you would disregard them.  You

02:18PM    17   would say this is somebody we can't rely on.  This is not

02:18PM    18   somebody we are going to put in front of a jury and let them

02:18PM    19   give information that that jury could potentially rely on to

02:18PM    20   decide the fate of somebody.

02:18PM    21       With Lou Selva, there was some cross-examination and

02:18PM    22   redirect examination about the yelling.  And it was asked on

02:18PM    23   redirect, well, sort of suggested we only yell at you when we

02:18PM    24   think you're lying about something.

02:18PM    25       Think about what that leads to.  Think about how that

USA v Gerace - Closing Argument / Foti - 12/19/24

173

02:18PM  1    develops the testimony.  You saw it happen on direct

02:18PM  2    examination.  If a witness didn't say something they were

02:18PM  3    supposed to, you saw it on redirect quite a bit.

02:18PM  4          Some of the only times you saw an emotional reaction

02:19PM  5    out of a witness was when they're being yelled at by the

02:19PM  6    prosecutor in front of all you folks in an open courtroom, you

02:19PM  7    see an emotional reaction to that.  It's nothing sincere about

02:19PM  8    that other than somebody isn't comfortable with being yelled

02:19PM  9    at.  And that is in open court, not something that's happening

02:19PM  10   in the privacy of the U.S. Attorney's Office.

02:19PM  11         And probably one of the most significant things that

02:19PM  12   I think should be considered in terms of the direct

02:19PM  13   examination is you folks are the factfinders, you have to

02:19PM  14   critically evaluate the evidence, you have to do your best to

02:19PM  15   find the truth.  And ultimately what you're making a

02:19PM  16   determination on is:  Is there a reasonable doubt?  Did the

02:19PM  17   government make -- did they reach their burden?  Not what do

02:19PM  18   we think is more likely, not what do we think is possibly or

02:19PM  19   probably the case.  You're trying to decide is there a reason

02:19PM  20   to hesitate here.  Is there a reason, a -- a reason, would a

02:20PM  21   reasonable person doubt this evidence, a doubt that the

02:20PM  22   evidence supports one of the elements of the charge?

02:20PM  23         And on direct examination, far too often in this

02:20PM  24   case, you heard a narrative presented by a witness, that you

02:20PM  25   folks had no way of knowing was false, or knowing was just

USA v Gerace - Closing Argument / Foti - 12/19/24

174

02:20PM    1    part of the picture.

02:20PM    2            Those witness would get up say we're going to tell

02:20PM    3    the truth, the whole truth, and nothing but the truth.  And

02:20PM    4    then it's during cross-examination that you find out, oh,

02:20PM    5    there's a whole lot more to this than what the government gave

02:20PM    6    us.

02:20PM    7            I'll give you two examples.  K.L.  There's no

02:20PM    8    question, when you listen to the direct examination without

02:20PM    9    more, that it would have made sense to feel some sort of

02:20PM   10    emotional reaction and feel bad for her.  Feel like this is,

02:20PM   11    in fact, a victim that they're showing us.  Because what they

02:21PM   12    gave you was a story line where she goes up there and

02:21PM   13    Mr. Gerace just pulls his pants off and uses drugs to coerce

02:21PM   14    her into sex, and that's what they give you.

02:21PM   15            And that happens 10 or 15 more times.  That's what

02:21PM   16    you're left with.  That's what they present you as the whole

02:21PM   17    truth, all the truth.

02:21PM   18            And what comes out during the cross-examination?

02:21PM   19    Nothing about that made sense.  She was actually in a

02:21PM   20    relationship with him.  All the way from before Easter, all

02:21PM   21    the way up until the end of her tenure at Pharaoh's.

02:21PM   22            She described it as a romantic relationship.  She

02:21PM   23    said the first night I was there, we were flirting, we went

02:21PM   24    out to dinner, we did things that couples do.

02:21PM   25            Now, I'm not saying that it's not possible for some

USA v Gerace - Closing Argument / Foti - 12/19/24

175

02:21PM    1    of the other things alleged to have happened and also have

02:21PM    2    been in a relationship, but it doesn't make sense here.

02:21PM    3    There's definitely reasonable doubt.  There's definitely

02:21PM    4    reason to believe that if she gives you one version and leaves

02:21PM    5    all that out and doesn't give you the context, there's a

02:22PM    6    reason why they held it back.  Because they didn't want you to

02:22PM    7    know the context.  Because when you know the context, you know

02:22PM    8    nothing she's saying really does make sense here.

02:22PM    9            You found out when she was pulled over back in '09 in

02:22PM   10    August, it's already at the end of the relationship.  She's

02:22PM   11    making allegations against Mr. Gerace, she's not trying to

02:22PM   12    protect him.  Never says anything about Lortabs.  Never says

02:22PM   13    anything about being coerced by him ever.  None of that.

02:22PM   14            What she talks about is cocaine.  She makes an

02:22PM   15    allegation of cocaine, it's not corroborated by the search

02:22PM   16    later on, but that's what she presents up.  That's the

02:22PM   17    allegation she was able to make at that time.

02:22PM   18            Special Agent Tom Callahan, who you did not hear

02:22PM   19    about, met with her back then in '09 when they were in

02:22PM   20    trouble, and that's what she offers up.  She also offers up

02:22PM   21    other information about other drug dealers that she can get

02:22PM   22    drugs from, talking about how that night they were getting

02:22PM   23    drugs from different locations, talking about other people at

02:22PM   24    the club that she could potentially get drugs from.  She

02:22PM   25    specifically named one person at the club that you can get

02:22PM 1   Ecstasy and Lortabs from.  Didn't say that she ever did or

02:23PM 2   ever used Lortabs, but said there was a source for Lortabs in

02:23PM 3   the club, and never mentions Mr. Gerace.

02:23PM 4          And when she gets in trouble again in 2012, again in

02:23PM 5   a jail cell, Tom Callahan shows up to go talk to her.  And

02:23PM 6   still, nothing about Lortabs, nothing about anything coercive.

02:23PM 7          She's making allegations close to the time with no

02:23PM 8   reason to protect Mr. Gerace, and it's nothing like the

02:23PM 9   testimony that you heard on direct.  Nothing at all.

02:23PM 10         When does she first come up with that?  Last year.

02:23PM 11  After she'd already testified at the grand jury, after she had

02:23PM 12  met with agents and talked to them for years.

02:23PM 13         You got a brand new story that was just concocted

02:23PM 14  last year, and it was the story that triggered all the

02:23PM 15  payments that she started receiving, all the expenses:  Hotel

02:23PM 16  rooms, security deposits.  They can frame that however they

02:23PM 17  want.

02:23PM 18         Oh, she was scared.  Suddenly, in 2013, she was

02:24PM 19  scared and needed financial assistance.  The timing of it is

02:24PM 20  very problematic.  It gives you reason to be suspicious.  It

02:24PM 21  gives you reason to hesitate as to her credibility.

02:24PM 22         Friday, they -- they start on direct, you don't want

02:24PM 23  to be here, and she says no.  Okay.  Well, it's easy to say

02:24PM 24  that and then get yourself another weekend of hotel rooms.

02:24PM 25         "They didn't ask" comment is a theme throughout this

02:24PM   1    trial.  Katrina Nigro withheld some very specific information

02:24PM   2    on her direct examination that takes apart everything she

02:24PM   3    testified to.  It was right in the beginning and almost

02:24PM   4    unexpected.  I came back to it at the very end.

02:24PM   5           What did she tell you about her being in the club?

02:24PM   6    She said confidently, didn't even try to walk it back, never

02:24PM   7    realized what she had said.  She told you confidently 2014.

02:25PM   8    2014, late 2014, I wasn't allowed in the club anymore.  I

02:25PM   9    could only go in in the morning.  Peter Gerace wouldn't let me

02:25PM  10    in the club.

02:25PM  11           I think she thought she was insinuating something

02:25PM  12    negative about Mr. Gerace, he wouldn't let her in the club, he

02:25PM  13    didn't want her to see what was going on.

02:25PM  14           Except the problem is that she's testified to you

02:25PM  15    about all these things that were going on in that timeframe

02:25PM  16    that she now revealed to you that she wasn't there.

02:25PM  17           On that summary chart, they have Katrina Nigro listed

02:25PM  18    at the top as evidence of the overdose in 2015.  She said

02:25PM  19    there was two.  It was one piece of evidence that she had

02:25PM  20    changed multiple times.

02:25PM  21           15 overdoses that she personally observed at some

02:25PM  22    point, then eight, then two, then two, then eight, then two.

02:25PM  23    Well, guess when they were?  At a time where she just casually

02:25PM  24    admits she's not in the club anymore.  Peter Gerace wouldn't

02:25PM  25    let her be there.

USA v Gerace - Closing Argument / Foti - 12/19/24

02:25PM  1    What did I ask at the very end?  Did you ever tell

02:26PM  2  the government that?  Oh, they didn't ask.  Think about how

02:26PM  3  problematic that is.

02:26PM  4    Tell me that doesn't give you reasonable doubt.

02:26PM  5  Their star witness reveals that her testimony, some of the

02:26PM  6  most significant parts of her testimony are impossible.  And

02:26PM  7  she says, well, the government didn't ask me about it.

02:26PM  8    What else did she say?  What about the keys?

02:26PM  9  Remember the direct?  I unlocked the door dozens of times.  I

02:26PM  10  unlocked the door for celebrities, for Sabres, for

02:26PM  11  politicians, Peter Gerace would have me unlock the door.

02:26PM  12  Something that doesn't make really sense on its face, but

02:26PM  13  that's what she said.  She told you that she is -- she would

02:26PM  14  bring dancers to the upstairs, and she would unlock the door.

02:26PM  15    On cross, when asked about it, she said oh, I got --

02:26PM  16  I didn't have a key.

02:26PM  17    Is there another key you had access to?  No, I got

02:26PM  18  the key out of Chris Chudy's pocket one time, that was it.

02:26PM  19    Did you tell the government about that?  They didn't

02:27PM  20  ask.

02:27PM  21    Now, payments to witnesses is something that should

02:27PM  22  give you real pause.  Payments for security deposits, payments

02:27PM  23  for hotel rooms, payments for rent, payments for insurance on

02:27PM  24  the car.  Special Agent Brian Burns made a comment about it

02:27PM  25  was evaluated as being worthwhile to secure their testimony.

USA v Gerace - Closing Argument / Foti - 12/19/24

179

02:27PM   1   To secure their testimony, that was language used.

02:27PM   2         It absolutely did secure their testimony.  These were

02:27PM   3   witnesses that were bought and paid for.  And you can and

02:27PM   4   should consider that in assessing the credibility of these

02:27PM   5   witnesses.

02:27PM   6         I submit you should consider any witness that had

02:28PM   7   criminal charges pending, even if the government told them

02:28PM   8   we're not going to -- to help you on your case.

02:28PM   9         People -- K.L. -- K.L. has charges she picked up

02:28PM  10   literally the day that she was supposed to testify in addition

02:28PM  11   to about three other sets of charges.  She says, I'm on my own

02:28PM  12   for that.

02:28PM  13         Okay.  You don't think that she thinks there's some

02:28PM  14   sort of benefit that she could potentially get here?  Having

02:28PM  15   the government on your side?

02:28PM  16         Katrina Nigro, when she first reports this, doesn't

02:28PM  17   tell them about the pending DWIs, but it comes out.  And she

02:28PM  18   says, well, I was always on my own.  I never involved the

02:28PM  19   government in that.  And the government may have never

02:28PM  20   intervened other than, like, a call to verify at some point

02:28PM  21   that she didn't have a particular device on her.

02:28PM  22         She acknowledged that in the text messages, she's

02:28PM  23   messaging Brian Burns telling him I just had my PSI and I'm

02:28PM  24   expecting to just get 10 days and some community service.

02:29PM  25   Does that mean the government provided a benefit?  Maybe not.

02:29PM     1    But she's definitely trying to include them on how a vehicular

02:29PM     2    assault, which was about her 7th DWI, is resulting in ten days

02:29PM     3    in jail.

02:29PM     4         She reveals why they didn't -- they didn't know about

02:29PM     5    some of my other charges in other states, so I was basically

02:29PM     6    pulling one over on the Court.

02:29PM     7         P.H. not only had payments for rent, the payments

02:29PM     8    were given to her directly, and then she used the funds to buy

02:29PM     9    drugs.  And then when they went to confront her on it, she

02:29PM    10    lied about it.  She said, my husband blew it in gambling.

02:29PM    11         Those charges were still pending when she got up on

02:29PM    12    the stand.  She knows those charges are pending.  They're

02:29PM    13    prosecuted by this U.S. Attorney's Office.  You don't think

02:29PM    14    that she's trying to make them happy with whatever she says on

02:29PM    15    the stand when they're still prosecuting her for misusing the

02:29PM    16    funds they gave her in relation to this case?

02:30PM    17         The benefits that L.L. received, paying for car

02:30PM    18    insurance, things that most of us have to take care of

02:30PM    19    ourselves, and all she had to do was give testimony that made

02:30PM    20    the government happy.  And that testimony changed

02:30PM    21    significantly over time.

02:30PM    22         You heard testimony that she said originally, I

02:30PM    23    estimated 25 acts in the VIP Room.  And then within a couple

02:30PM    24    weeks before trial she said oh, I miscalculated, it was

02:30PM    25    probably more like 500.  What?

USA v Gerace - Closing Argument / Foti - 12/19/24

181

02:30PM   1        We're not talking about a difference between 25 and

02:30PM   2   35, or 25 and 50, or 25 and 75.  We just came into a different

02:30PM   3   universe of estimates.

02:31PM   4        She was lying at some point.  She's lying on the

02:31PM   5   stand, is the most likely the case, or she's lying before.

02:31PM   6   And if she's lied even once, and you're in a position where

02:31PM   7   you'd have to testify, you would have hesitate to rely on any

02:31PM   8   of her testimony.  She is not a reliable witness.  She's not

02:31PM   9   somebody you can count on as part of rendering a verdict here.

02:31PM   10       **MR. FOTI:**  Okay.  Just give me a moment.

02:31PM   11       Judge, can we take a short break?

02:31PM   12       **THE COURT:**  Sure, absolutely.

02:31PM   13       So, folks, let's take a ten-minute break.  Remember

02:32PM   14   my instructions about not talking about the case with anyone

02:32PM   15   including each other, not making up your mind.

02:32PM   16       See you back here in about ten minutes.

02:32PM   17       (Jury excused at 2:32 p.m.)

02:32PM   18       **THE COURT:**  Anything for the record from the

02:32PM   19   government?

02:32PM   20       **MR. COOPER:**  No, thank you.

02:32PM   21       **THE COURT:**  From the defense?

02:32PM   22       **MR. FOTI:**  No, thank you, Judge.

02:32PM   23       **THE COURT:**  Okay.  Are you still on target, Mr. Foti,

02:32PM   24   for --

02:32PM   25       **MR. FOTI:**  I believe so.  I believe there's probably

02:33PM   1   about an hour left, maybe a little less.

02:33PM   2           **THE COURT:**  Okay.  Great.  Thanks, everybody.

02:33PM   3           **THE CLERK:**  All rise.

02:33PM   4           (Off the record at 2:33 p.m.)

02:42PM   5           (Back on the record at 2:42 p.m.)

02:42PM   6           (Jury not present.)

02:42PM   7           **THE CLERK:**  All rise.

02:42PM   8           **THE COURT:**  Please be seated.

02:43PM   9           **THE CLERK:**  We are back on the record for the

02:43PM   10  continuation of the jury trial in case numbers 19-cr-227 and

02:43PM   11  23-cr-37, United States of America versus Peter Gerace Jr.

02:43PM   12          All counsel and parties are present.

02:43PM   13          **THE COURT:**  Okay.  Are we ready to continue,

02:43PM   14  Mr. Foti?

02:43PM   15          **MR. FOTI:**  Yes, Judge, thank you.

02:43PM   16          **THE COURT:**  Government -- government ready?

02:43PM   17          **MR. COOPER:**  Yes, Judge, thank you.

02:43PM   18          **THE COURT:**  Okay.  Let's bring them back, please,

02:43PM   19  Pat.

02:43PM   20          **MR. SOEHNLEIN:**  Your Honor, do you -- do you have the

02:43PM   21  exact amount of time that we have left up there?

02:43PM   22          **THE COURT:**  I've got two hours and 21 minutes left.

02:44PM   23          **MR. SOEHNLEIN:**  Thank you, Judge.

02:44PM   24          **MR. FOTI:**  I promise not to go over that.

02:44PM   25          **MR. SOEHNLEIN:**  I'm gonna help him even though he

02:45PM   1   called me a nerd.

02:45PM   2            (Jury seated at 2:45 p.m.)

02:45PM   3            **THE COURT:**  The record will reflect that all our

02:45PM   4   jurors, again, are present.

02:45PM   5            Mr. Foti, you may continue.

02:45PM   6            **MR. FOTI:**  Thank you, Judge.

02:45PM   7            Okay.  So, I want to start talking about the charges.

02:45PM   8            During Mr. Tripi's opening statement and then on the

02:46PM   9   closing arguments by Mr. Cooper, to help kind of work through

02:46PM  10   them, they've kind of broken it into to four different

02:46PM  11   categories of charges, and when the judge instructs you he's

02:46PM  12   not going to place it into four different categories, and he's

02:46PM  13   not going to necessarily frame it that way.

02:46PM  14            For purposes of discussion, I think that that works.

02:46PM  15   So we're going to do that.  We're going to talk about it in

02:46PM  16   sort of the same general categories that the government

02:46PM  17   discussed it as a means of kind of working through them.

02:46PM  18            I'm not -- I don't intend to go in the same order

02:46PM  19   that the government did, I'm going to go in the order of the

02:46PM  20   actual -- or, I might jump around a bit, but I'm going to

02:46PM  21   start at the beginning of the indictment, so I'm going to

02:46PM  22   start with the Bongiovanni-related charges, okay?

02:46PM  23            There were a couple of points made during the closing

02:46PM  24   about things that Mr. Bongiovanni did, and while if he did

02:47PM  25   that, that would be a violation of DEA policy, and if he did

02:47PM  1   that, that would potentially be a crime.

02:47PM  2        And as the very outset of this I want to say

02:47PM  3   Mr. Bongiovanni's not on trial here.  If he did something that

02:47PM  4   was a violation of DEA policy, that doesn't mean you convict

02:47PM  5   Peter Gerace.

02:47PM  6        If he did something that constituted a crime

02:47PM  7   unrelated to Peter Gerace, that doesn't mean you convict Peter

02:47PM  8   Gerace.

02:47PM  9        If he did something that theoretically was a crime

02:47PM  10  that related to Peter Gerace, you still don't convict Peter

02:47PM  11  Gerace, unless you believe the evidence established that Peter

02:47PM  12  was in an agreement with Bongiovanni for it.  That it wasn't

02:47PM  13  just a friend who did something looking out for somebody, it

02:47PM  14  was actually part of an agreement to act unlawfully.

02:47PM  15       So all of that matters because the closing arguments

02:47PM  16  about Mr. Bongiovanni were closing arguments that were really

02:47PM  17  about how Mr. Bongiovanni's guilty of this or that with no

02:48PM  18  real evidence that Peter Gerace was trying to procure any type

02:48PM  19  of benefit other than the allegations that Katrina Nigro made

02:48PM  20  of these envelopes, which it's just not credible at all.

02:48PM  21       So we'll come back to that in a little bit.  But I

02:48PM  22  want to start there and then we'll talk through each of these,

02:48PM  23  these events.

02:48PM  24       What I'm saying is by no way some sort of position or

02:48PM  25  belief that I think Mr. Bongiovanni's guilty of something.  If

02:48PM  1   he ever has been found guilty of anything, or he's ever been

02:48PM  2   found to have violated DEA policy, that's not part of this

02:48PM  3   trial.

02:48PM  4          What's part of this trial is whether there was an

02:48PM  5   unlawful agreement between Mr. Gerace and Mr. Bongiovanni that

02:48PM  6   constituted a conspiracy, and whether the proof supports that

02:48PM  7   beyond a reasonable doubt as to each element, and whether

02:48PM  8   there was the payment of a bribe and whether the proof

02:48PM  9   supports that beyond a reasonable doubt as to each element.

02:48PM  10         Now, the government presented evidence that

02:49PM  11  Mr. Bongiovanni and Peter Gerace were friends.  They go back

02:49PM  12  to childhood.  Nobody's disputing that.  Friendship is not

02:49PM  13  criminal.

02:49PM  14         Somebody becoming friends with somebody else who is

02:49PM  15  in law enforcement does not establish a conspiracy.

02:49PM  16         Somebody talking to their friend, even after they

02:49PM  17  join the DEA, and communicating with them openly on a

02:49PM  18  DEA-issued phone, does not establish a conspiracy if there is

02:49PM  19  not discussion of entering into some sort of agreement or at

02:49PM  20  least an implication of them entering into an agreement to do

02:49PM  21  something unlawful.

02:49PM  22         And to that point, Mr. Bongiovanni communicated with

02:49PM  23  Peter Gerace on his DEA-issued phone which was property of the

02:50PM  24  DEA.  That was not the type of thing that they needed to get

02:50PM  25  some sort of special authorization to get access to.  You

USA v Gerace - Closing Argument / Foti - 12/19/24

186

02:50PM  1   heard testimony, that phone belongs to DEA.  They -- the DEA

02:50PM  2   or investigators in conjunction with administration of DEA

02:50PM  3   could have scooped up that phone at any time.

02:50PM  4        This investigation started before Mr. Bongiovanni

02:50PM  5   went into administrative retirement in February of 2020, and

02:50PM  6   there's no effort to retrieve his phone.  They meet with him,

02:50PM  7   have interviews with him, they never ask to look at his phone

02:50PM  8   or see his phone.  They end up having records, some from

02:50PM  9   Peter's phone and then there's records from the phone

02:50PM  10  companies establishing that there was communication.  The

02:50PM  11  communication was between Peter Gerace and Mr. Bongiovanni on

02:50PM  12  his phone.

02:50PM  13       And there's no discussion of bribery, or can you do

02:50PM  14  this, can you -- can you look out for me, can you intervene?

02:51PM  15  I think I might be in trouble, can you find out if I'm being

02:51PM  16  investigated for something?

02:51PM  17       The most they have is that recording where Peter very

02:51PM  18  casually says something like, hey, I'm wondering if a drug

02:51PM  19  dealer -- and I'm going to misphrase it but something along

02:51PM  20  the lines, wonder if a drug dealer, if they can track these --

02:51PM  21  if they can -- these TracFones, these TracFones.  The way --

02:51PM  22  the wording of it suggests he's asking a question, and there

02:51PM  23  is some context to it that we're missing.  He's not saying

02:51PM  24  anything to suggest he's the drug dealer, or to suggest that

02:51PM  25  he's even asking about a particular drug dealer.

USA v Gerace - Closing Argument / Foti - 12/19/24

02:51PM    1          The reality is, and this is common sense, something

02:51PM    2    like that is not the secret details of an investigation.  He's

02:51PM    3    not asking for the secret details of an investigation, he's

02:51PM    4    asking about what's been referred to as law enforcement

02:51PM    5    techniques.  We all can imagine that that type of question

02:51PM    6    probably could have been answered by Googling, but he called

02:51PM    7    his DEA friend.

02:51PM    8          The idea that he did it because the DEA agent is on

02:51PM    9    retainer is just silly.  He did it to the DEA-issued phone.

02:52PM    10         If you think that that call related to some sort of

02:52PM    11   criminal effort on Mr. Gerace's behalf, why is that the worst

02:52PM    12   thing that could you find?  That would suggest that he's so

02:52PM    13   sloppy he's calling and asking -- leaving voicemails, recorded

02:52PM    14   voicemails, asking about criminal effort, and nowhere else in

02:52PM    15   the text messages, nowhere else is there any evidence of that

02:52PM    16   whatsoever?  That was -- there's no context of that.

02:52PM    17         Suggesting that it's anything other than innocuous is

02:52PM    18   asking you to speculate.  It's not a reasonable inference.

02:52PM    19   It's one inference, but it is one of many inferences that can

02:52PM    20   be drawn as to what was going on.  We have no context at all.

02:52PM    21         They're communicating on Mr. Bongiovanni's DEA-issued

02:52PM    22   phone.  The suggestion and insinuation Mr. Bongiovanni was

02:53PM    23   trying to hide his relationship from Mr. Gerace is just

02:53PM    24   nonsense.

02:53PM    25         Not only was he talking on his DEA-issued phone, he,

USA v Gerace - Closing Argument / Foti - 12/19/24

02:53PM 1    when -- when Peter Gerace was at that -- that reunion where he

02:53PM 2    runs into Casullo, he's not in a criminal conspiracy with

02:53PM 3    Bongiovanni.  If he were, you wouldn't tell the DEA agent

02:53PM 4    who -- that you just ran into, hey, this other DEA agent's

02:53PM 5    across the street, let's go, go see him.

02:53PM 6         That's consistent with a friendship.  That's not

02:53PM 7    consistent with somebody who is -- who is protecting a

02:53PM 8    conspiracy.  It didn't make any sense.

02:53PM 9         I want to go through the events that were discussed

02:53PM 10   in a little bit more detail, and I asked that the government

02:53PM 11   put up Exhibit 555, their -- their -- their summary exhibit,

02:53PM 12   because in this exhibit, they went through and essentially

02:53PM 13   identified the different actions that are referred to in the

02:54PM 14   overt acts and that they talked about on their closing

02:54PM 15   argument so, we're going to kinda use this as a guide post.

02:54PM 16   We'll go through it.

02:54PM 17        I'm going to make a number of points as we go

02:54PM 18   through.  And, again, just to go back to where we were in the

02:54PM 19   beginning, what I say does not limit your ability to

02:54PM 20   critically think about these things, it's not to -- this

02:54PM 21   doesn't prevent you from coming up with other points of

02:54PM 22   argument or other things about what they gave you that doesn't

02:54PM 23   make sense.  This is just some observations that I'm going to

02:54PM 24   make.  Okay?

02:54PM 25        First, go all the way back to the very beginning, the

USA v Gerace - Closing Argument / Foti - 12/19/24

02:54PM    1   2005 Craig Border DEA search.  This is a conversation that the

02:54PM    2   evidence of this relates to R.A. telling you about a

02:54PM    3   conversation that Peter Gerace said that he had with

02:54PM    4   Bongiovanni, and she's recalling details of a conversation

02:54PM    5   that occurred nearly two decades ago.

02:55PM    6        It is so far back that I think we can all expect it

02:55PM    7   would be impossible to remember the nuance of what was said

02:55PM    8   during that conversation or what other circumstances

02:55PM    9   surrounded it.  But even if you are to accept as a general

02:55PM   10   premise, despite two decades of time having passed and despite

02:55PM   11   nothing else from any of the people who were at that search

02:55PM   12   warrant execution, any testimony about what happened there or

02:55PM   13   whether Mr. Bongiovanni had contact with anything, despite

02:55PM   14   not -- none of that being presented to you, if you accept as a

02:55PM   15   general premises -- a general premise that -- that

02:55PM   16   Mr. Bongiovanni ends up sharing something that he shouldn't

02:55PM   17   have with his friend Peter Gerace, that does not establish a

02:55PM   18   conspiracy.  That is a shortcut.  The government is trying to

02:55PM   19   bypass an essential component of this.

02:56PM   20        That is exactly what I was talking about.  If

02:56PM   21   Mr. Bongiovanni did something that he wasn't supposed to do as

02:56PM   22   a DEA agent, you don't just suddenly assume there's a

02:56PM   23   conspiracy between these two.  You don't know what the context

02:56PM   24   of that conversation was, or to the extent that Peter Gerace

02:56PM   25   was entering into an agreement because some information was

USA v Gerace - Closing Argument / Foti - 12/19/24
190

02:56PM   1   shared with him.

02:56PM   2        Mr. Bongiovanni might have done something wrong.  He

02:56PM   3   might have been -- maybe it's something that he should have

02:56PM   4   been reprimanded for the same way Special Agent Casullo was

02:56PM   5   reprimanded over something that happened in Las Vegas

02:56PM   6   involving one of Peter Gerace's best friends.

02:56PM   7        But that's what we're talking about.  We're not

02:56PM   8   talking about a conspiracy.

02:56PM   9        And I want to go forward.  And as we go forward, we

02:56PM   10  get to the 2000 -- or, I'm sorry, we go forward, we get to the

02:56PM   11  2008 Bongiovanni cold approach.  And I want to focus on this

02:56PM   12  one because it's one of the most ridiculous examples of a

02:57PM   13  conspiracy to defraud the United States.

02:57PM   14       On here, they list who the relevant witnesses are.

02:57PM   15  The relevant witness for this particular account is Chris

02:57PM   16  Wisniewski.

02:57PM   17       Chris Wisniewski testified there was an

02:57PM   18  investigation.  Bongiovanni said why don't I -- I know this

02:57PM   19  guy.  He doesn't hide the fact that he knows him, he's

02:57PM   20  upfront.  I know him back in the neighborhood.

02:57PM   21       He doesn't recall 15 years ago Bongiovanni sharing

02:57PM   22  details of when they went out to dinner and things like that.

02:57PM   23  It's like 15 years ago.  Who knows what was actually shared?

02:57PM   24       What he remembers is he at least acknowledges, this

02:57PM   25  is somebody I've known for a long time.  Why don't I try a

02:57PM   1   code approach?

02:57PM   2            No visitation on that that comes through in the

02:57PM   3   evidence.  No -- no one that can reveal that he's a target.

02:57PM   4            The testimony pretty much suggested Peter Geraci or

02:57PM   5   Peter Gerace was not a very serious target of this

02:57PM   6   investigation.  There was the idea that, sure, give it a shot,

02:57PM   7   maybe you can get some information.

02:57PM   8            That was the way Agent Wisniewski testimony's came

02:58PM   9   across.  And the whole premise behind this idea that something

02:58PM  10   inappropriate happened here is that -- and it just came up in

02:58PM  11   closing, this argument that's being presented to you that this

02:58PM  12   cold approach is a way of tripping off Mr. Gerace.

02:58PM  13            Now when we talked to this witness on

02:58PM  14   cross-examination, we talked about how people are tipped off

02:58PM  15   about investigations through a number of investigative

02:58PM  16   techniques, search warrants, being pulled over sometimes or

02:58PM  17   pulled into a room when you're interviewed.

02:58PM  18            Just because a cold approach is one type of

02:58PM  19   investigative technique that reveals that there's a potential

02:58PM  20   involvement in an investigation doesn't mean that's the only

02:58PM  21   way somebody could -- could learn of it.  But there, one of

02:58PM  22   the most interesting -- target letter search warrants aside,

02:58PM  23   one of, I think, the most interesting aspects of -- of how

02:58PM  24   somebody could be tipped off was -- was in this question.

02:59PM  25   Well, first, the question was asked --

02:59PM  1                And by the way, you'll be told by the judge you can

02:59PM  2     ask for read backs of testimony.  Sometimes that helps.  So,

02:59PM  3     this was a long trial, and there are certain times where

02:59PM  4     you're gonna say, okay, I remember something being said on

02:59PM  5     direct, what happened on cross with that witness?  Or, what

02:59PM  6     was the inconsistency between these two individuals.  You'll

02:59PM  7     be able to ask for read backs.

02:59PM  8                I'm going to just refer to a couple of pieces of

02:59PM  9     testimony as we go forward here.

02:59PM  10               Special Agent Wisniewski was asked:  Just to be

02:59PM  11    clear, search warrants and target letters, they're just two

02:59PM  12    specific examples of how somebody could be alerted to the

02:59PM  13    target of the investigation?  He says yes.

02:59PM  14               And then this is the part that I think is most

02:59PM  15    interesting, and just absolutely decimates this allegation

02:59PM  16    that it was all done to tip Peter Gerace off.  And it's so

02:59PM  17    straightforward.

02:59PM  18               Question:  If Mr. Bongiovanni was trying to alert a

02:59PM  19    target to an investigation, is the cold approach the only way

02:59PM  20    to do that?

02:59PM  21               No.

02:59PM  22               Question:  In fact, he can just go tell the person

03:00PM  23    that they're being investigated, couldn't he?

03:00PM  24               Correct.

03:00PM  25               Follow-up question:  He wouldn't have to go through

USA v Gerace - Closing Argument / Foti - 12/19/24

193

03:00PM    1    this effort of involving the DEA and his supervisors, and

03:00PM    2    other people going through official mechanisms to see if

03:00PM    3    information is available, correct?

03:00PM    4            Correct.

03:00PM    5            Think about that.  The government's whole premise

03:00PM    6    falls apart.  He did a cold approach to tip him off?  Why

03:00PM    7    would you alert your supervisors?  Why would you involve the

03:00PM    8    DEA, make official paperwork, to tell somebody that they're

03:00PM    9    being investigated, if you actually have some corrupt intent?

03:00PM   10    Why wouldn't you just go tell them?  There's no documentation

03:00PM   11    of it.

03:00PM   12            Nobody would even necessarily know that you saw the

03:00PM   13    chart.  There'd be no documents the government's pulling up

03:00PM   14    15 years later, misinterpreting, trying to sway a jury away

03:00PM   15    from the truth and towards a narrative.

03:00PM   16            If Mr. Bongiovanni was corrupt the way the government

03:01PM   17    has alleged, it doesn't prove that Mr. Gerace is guilty of

03:01PM   18    anything.

03:01PM   19            But separating us from that for a moment, they didn't

03:01PM   20    prove Mr. Bongiovanni was corrupt.  They certainly didn't with

03:01PM   21    this example.  And if this example gives you reasonable doubt,

03:01PM   22    you should consider that in assessing all of these examples.

03:01PM   23            This is what I said at the beginning of the closing

03:01PM   24    argument.  Your job doesn't end when the government tells you

03:01PM   25    how to think.  Some of you folks have probably already thought

03:01PM   1   about that.  I don't think I'm probably the first one to

03:01PM   2   say -- well, I -- well, the witness was cross-examined on it,

03:01PM   3   so I'm sure some of you did think about it at least.

03:01PM   4          Some of you may have thought about it even if I

03:01PM   5   didn't ask him, which is part of the critical thinking

03:01PM   6   process.  Great.  Well, being told that he went through this

03:01PM   7   process of documenting all of this and involving his

03:01PM   8   supervisors and potentially bringing his partner with him?

03:01PM   9   Because there was testimony that Joseph Palmieri was his

03:01PM   10  partner who may have went with him, Chris Wisniewski didn't

03:02PM   11  know whether he did or not.  All of that to tip him off,

03:02PM   12  instead of just tipping him off?  Doesn't make any sense.

03:02PM   13         Well, then he derails the investigation.  Then the

03:02PM   14  response is, well, there's more to it than that.  Yes, we

03:02PM   15  argue that it was all to tip him off, but we also argued that

03:02PM   16  he came back and said there's no information and that ended

03:02PM   17  it.

03:02PM   18         That's not the case.  Wisniewski never testified to

03:02PM   19  that.  Wisniewski never said I abandoned any interest in

03:02PM   20  Mr. Gerace because of the fact that Mr. Bongiovanni said he

03:02PM   21  didn't have any relevant information.

03:02PM   22         Is that how you think investigations are done?  We go

03:02PM   23  ask potential targets do you have information, they say no,

03:02PM   24  and we say okay, good enough?  That makes no sense at all.

03:02PM   25         This 2005 or 2008 incident, the way they told you to

USA v Gerace - Closing Argument / Foti - 12/19/24

195

03:02PM    1    think about it, is completely contrary to basic logic and

03:02PM    2    common sense.

03:03PM    3           And I understand that at various points in this case

03:03PM    4    there was very much a kitchen-sink approach of we'll just

03:03PM    5    allege different theories and maybe something will stick.  But

03:03PM    6    that's now how this works.

03:03PM    7           If there was any reasonable doubt, if you hesitate as

03:03PM    8    to any element, you have to acquit.  And if they've presented

03:03PM    9    you an argument that should make you wonder about what was

03:03PM   10    presented to you throughout the other arguments, that

03:03PM   11    definitely gives you a reason to hesitate.  That definitely is

03:03PM   12    reasonable doubt.

03:03PM   13           2009, U.S. Probation search.  Mr. Bongiovanni

03:03PM   14    intervenes on Mr. Gerace's behalf and does absolutely nothing.

03:03PM   15    What did the probation officer say on direct?  Didn't impact

03:03PM   16    anything I had to do, that Mr. Bongiovanni reached out.

03:03PM   17           Well, it was his intent.

03:04PM   18           Look, here is how that whole incident played out if

03:04PM   19    you think about the evidence.  Mr. Bongiovanni knows Peter

03:04PM   20    Gerace.  Again, doesn't hide the relationship, says I know

03:04PM   21    him, he goes way back, he's a good guy.  Tries to set up a

03:04PM   22    meeting with the FBI knowing there is somebody investigating

03:04PM   23    the case.

03:04PM   24           They have a conversation where Special Agent

03:04PM   25    Bongiovanni introduces Special Agent Herbst to Mr. Gerace,

USA v Gerace - Closing Argument / Foti - 12/19/24

196

03:04PM   1   makes the connection.  If he really wanted to give

03:04PM   2   Mr. Herbst -- Special Agent Herbst the impression that he's --

03:04PM   3   that he's a confidential source, he didn't need to set up that

03:04PM   4   meeting.  He could have just called and said oh, I've been

03:04PM   5   working with Mr. Gerace for a long time.

03:04PM   6        He set up a meeting giving Mr. Herbst an opportunity

03:04PM   7   to meet with Mr. Gerace.

03:04PM   8        And you heard from Mr. Lepiane that there was a phone

03:04PM   9   call after where Mr. Herbst reported back at that time, oh, he

03:04PM   10  doesn't really have any relevant information right now, but

03:04PM   11  I'll continue to work with him.  That is totally different

03:04PM   12  than that testimony you got.  The testimony that

03:05PM   13  Mr. Bongiovanni derailed the investigation.  That is nonsense.

03:05PM   14  That is not at all what happened back then.

03:05PM   15        Mr. Gerace did not get a single benefit from

03:05PM   16  Mr. Bongiovanni getting involved.  And what did

03:05PM   17  Mr. Bongiovanni do?  He connected Mr. Gerace with Mr. Herbst.

03:05PM   18  Nothing came out of it.

03:05PM   19        This whole idea that Mr. Bongiovanni derailed the

03:05PM   20  investigation back in 2009 is also ridiculous for another

03:05PM   21  reason.  The U.S. Attorney's Office had already been involved

03:05PM   22  in conversations with Mr. Herbst.  Mr. Herbst said I have a

03:05PM   23  prosecutor ready to go.  And the way the government's arguing

03:05PM   24  it to you would suggest that, well, because of this one

03:05PM   25  conversation, the agency that decides to prosecute somebody

03:05PM   1    apparently just never asks about him again.  That makes no

03:05PM   2    sense either.

03:05PM   3            There is holes all over the place in these scenarios

03:05PM   4    that they presented you with.

03:05PM   5            The U.S. Attorney's Office did not prosecute

03:05PM   6    Mr. Gerace after supposedly saying that they might be

03:05PM   7    interested in the case, if you believe the testimony.  And

03:06PM   8    they drop it because, what?  Herbst goes to the U.S.

03:06PM   9    Attorney's Office and says I think that -- I think that

03:06PM   10   Mr. Gerace might be a confidential informant for the DEA?

03:06PM   11   That's the end of the prosecution?  The U.S. Attorney's Office

03:06PM   12   never follows up on that?

03:06PM   13           Are we being serious here?  This is what they tell

03:06PM   14   you to accept?  This is how they tell you to think?  It

03:06PM   15   doesn't take much for this all to fall apart.

03:06PM   16           2015 overdose.  They have Katrina Nigro listed up

03:06PM   17   here.  Katrina Nigro is not there in the evenings in 2015, she

03:06PM   18   testified to that.  When asked about it, she says they didn't

03:06PM   19   ask me.  I just never told them that.

03:06PM   20           Katrina Nigro is not a witness to an overdose.  She

03:07PM   21   does not prove up an incident that apparently happened in

03:07PM   22   2015.

03:07PM   23           Well, there are two other individuals listed here,

03:07PM   24   Doug Augustyniak and Anthony Casullo.  Doug Agustyniak,

03:07PM   25   somebody the government says you shouldn't believe any of his

03:07PM    1    testimony other than the part that we locked him in on in the

03:07PM    2    grand jury.  Doug Augustyniak never gave you any testimony

03:07PM    3    suggest that he's friends with Mr. Gerace.  He left Pharaoh's

03:07PM    4    back in 2018.

03:07PM    5         He said, I'm friends with Brian Rosenthal.  He did

03:07PM    6    not say anything similar about Mr. Gerace.  He did say he has

03:07PM    7    a problem with his prosecution.  Okay.

03:07PM    8         Adding that he friends with Mr. Gerace, or during the

03:07PM    9    cross or redirect or whatever, saying well, you liked your job

03:07PM   10    at Pharaoh's, that's fine, he was not working there anymore.

03:07PM   11    He has no loyalty indicated to Mr. Gerace.  By the time he

03:07PM   12    went into the grand jury he didn't have any loyalty to

03:08PM   13    Mr. Gerace, and that's when they said they locked him into

03:08PM   14    this testimony that this happened in 2015.

03:08PM   15         And they tell you you know that Agent Casullo's story

03:08PM   16    is true because it matches up with Doug Augustyniak.  Now

03:08PM   17    think about this one.  What did -- what did Doug Augustyniak

03:08PM   18    say?  He said he calls Peter Gerace, Peter Gerace says get her

03:08PM   19    out of there.

03:08PM   20         How in the world does that match up with what Agent

03:08PM   21    Casullo claims that Mr. Bongiovanni said?  Because there was

03:08PM   22    an overdose that Mr. Bongiovanni, according to Agent Casullo,

03:08PM   23    years later he gave advice on, who knows what Agent Casullo

03:08PM   24    had heard in the meantime.

03:08PM   25         If you were to believe Agent Casullo's account of

03:08PM    1    what Mr. Bongiovanni said, and then go further to believe what

03:08PM    2    Mr. Bongiovanni had said was true during the course of that

03:08PM    3    conversation, then Doug Augustyniak's testimony would have

03:09PM    4    been Peter Gerace -- I called Peter Gerace, got ahold of him,

03:09PM    5    he said hold on a second, I'm gonna need about five, ten

03:09PM    6    minutes to figure out what to do here, hung up, call him back

03:09PM    7    sometime later.  Okay.  Get the body out of there.

03:09PM    8        That's not the testimony.  The testimony is, right or

03:09PM    9    wrong, if you believe Doug Augustyniak, Peter Gerace reacted

03:09PM   10    saying get her out of there.  Take her somewhere.

03:09PM   11        And that is something that, if it's true, we may all

03:09PM   12    think that that was one of poorest decisions Peter Gerace

03:09PM   13    could have made, and that has nothing to do with the charges

03:09PM   14    before you.  It may be a sin, but as Mr. Soehnlein said in the

03:09PM   15    opening, not every sin is a crime.

03:09PM   16        What we do know is that if you believe that testimony

03:09PM   17    from Doug Augustyniak, a witness the government said you

03:09PM   18    should disregard in every other respect, their own witness, it

03:10PM   19    makes no sense to say you should just pick out the part we --

03:10PM   20    we want you to listen to.  But if you believe his testimony,

03:10PM   21    that couldn't have happened with Bongiovanni.  It doesn't

03:10PM   22    match up.

03:10PM   23        What makes more sense is the rumors and the

03:10PM   24    information that at some point could have gotten to Special

03:10PM   25    Agent Casullo informs on how he describes a conversation later

03:10PM  1    on.  All he had to hear was a rumor that there was an overdose

03:10PM  2    at some point, and he can make the allegation well,

03:10PM  3    Mr. Bongiovanni said that -- that he helped Peter Gerace with

03:10PM  4    an overdose.

03:10PM  5          The government says it matches up to Doug

03:10PM  6    Augustyniak's testimony, and it just doesn't.  There's nothing

03:10PM  7    to support that.  And just on closing arguments, that's how

03:10PM  8    you know it's true, so I guess we don't.

03:10PM  9          I guess with a little bit of thought, we don't just

03:10PM  10   accept what the government tells you.  It just doesn't

03:10PM  11   actually match up.

03:10PM  12         And, again, that's reasonable doubt.  Not just as to

03:10PM  13   this overt act, but as to all of them.

03:10PM  14         Special Agent Casullo's investigation of Gerace.

03:11PM  15   There was clearly so much more about Special Agent Casullo and

03:11PM  16   his relationship with Mr. Gerace than what he testified to on

03:11PM  17   direct.

03:11PM  18         And what was particularly interesting, even though he

03:11PM  19   didn't -- he indicated he didn't recall it at first, but then

03:11PM  20   was asked about some emails that he had sent, and he

03:11PM  21   acknowledges he was having conversations with Special Agent

03:11PM  22   Herbst in 2010 about Peter Gerace and Joe Bongiovanni.  No

03:11PM  23   real testimony from Special Agent Herbst about that, no

03:11PM  24   testimony from Special Agent Casullo about it or, oh, yeah,

03:11PM  25   we -- we might have talked about that or it might have

USA v Gerace - Closing Argument / Foti - 12/19/24

201

03:11PM     1    happened at some point.  There was way more going on behind

03:11PM     2    the scenes than what you were given as jurors.

03:11PM     3            Special Agent Casullo definitely had an interest in

03:12PM     4    Mr. Gerace and Mr. Bongiovanni going back years before he

03:12PM     5    claims that he got interested in Pharaoh's because the class

03:12PM     6    clown said he's gonna go to Pharaoh's and do a line of coke

03:12PM     7    off a stripper's ass.

03:12PM     8            Did anybody believe Special Agent Casullo when I

03:12PM     9    said he was joking when he said that to you, and he said, oh,

03:12PM    10    I took it very seriously.

03:12PM    11            Come on.  He -- he says, I just developed an

03:12PM    12    investigation that day.  I heard things during this reunion

03:12PM    13    that made me think Peter Gerace might -- might be somebody

03:12PM    14    that I want to investigate.  Somebody that --

03:12PM    15            I was talking to, Special Agent Herbst back in 2010,

03:12PM    16    but I'm not going to reveal that to the jury unless confronted

03:12PM    17    with an email I sent.

03:12PM    18            -- somebody that I have some issues going back to

03:12PM    19    Vegas with one of Peter Gerace's best friends that resulted in

03:12PM    20    some sort of reprimand.

03:12PM    21            Don't tell me there's not more going on behind the

03:12PM    22    scenes with Special Agent Casullo.  We did not hear the full

03:13PM    23    story.

03:13PM    24            And this whole thing about this confrontation with

03:13PM    25    Mr. Bongiovanni on its face doesn't make sense.

03:13PM  1          That Mr. Bongiovanni would be worried that there's

03:13PM  2    calls between him and Mr. Gerace doesn't make sense.  They're

03:13PM  3    on his DEA-issued phone.  That's what we're talking about.

03:13PM  4          And if he's concerned about the calls, all he has to

03:13PM  5    do is go say, hey, I'm worried about the calls, let me explain

03:13PM  6    the context.  We're friends going back.  That's not a surprise

03:13PM  7    to you.  You saw -- you saw us -- you saw us out at Tappo

03:13PM  8    together, you came and joined us.  That's all he has to say.

03:13PM  9          The idea that he would say, I'm worried that you're

03:13PM  10   going to check the call logs and find out about a call I made

03:13PM  11   involving an overdose, how does that make sense?  How does it

03:13PM  12   make sense that Mr. Bongiovanni concerned about these call

03:13PM  13   logs being received, which include his DEA-issued phone, would

03:13PM  14   go into a meeting and say, let me tell you about a call that

03:13PM  15   would potentially incriminate me in some way.

03:14PM  16          What?  That's their case?  That's the public

03:14PM  17   corruption?  That is so twisted.  It is not at all based on

03:14PM  18   logic.  It is not based on common sense, and at a minimum, you

03:14PM  19   should hesitate to accept what they're giving you here.

03:14PM  20          We already talked about the voicemail.  All these

03:14PM  21   messages and that's -- you heard the tone of the voice.

03:14PM  22   There's no -- nobody's nervous on that.  Nobody's referencing

03:14PM  23   a particular incident.

03:14PM  24          Was it a stupid voicemail to leave?  Yeah, if you

03:14PM  25   knew you were gonna ultimately end up in a courtroom being

USA v Gerace - Closing Argument / Foti - 12/19/24

203

03:14PM 1    accused of entering into a conspiracy with your friend, then

03:14PM 2    yeah. I'm sure that whatever he wanted to know, he could have

03:14PM 3    looked it up on Google instead.

03:14PM 4        But the idea that that is an overt act, that that's

03:14PM 5    proof of a conspiracy, especially when you consider all of the

03:14PM 6    holes and the logic associated with all these other incidents,

03:15PM 7    that that's it? It's just not. It's not it.

03:15PM 8        And as far as those 2019 memos, I don't know, fine.

03:15PM 9    I think Mr. Bongiovanni knew he was being investigated and

03:15PM 10   tried to say some things to minimize his relationship with

03:15PM 11   Peter Gerace. Okay. It doesn't mean Peter Gerace was part of

03:15PM 12   a conspiracy. It just doesn't.

03:15PM 13       He knew people were trying to make a case against

03:15PM 14   him, that people were gonna twist every interaction he ever

03:15PM 15   had with Peter Gerace. So he may have made reports that --

03:15PM 16   I'm just not even gonna comment on. I'm not saying that

03:15PM 17   they're false or anything, I don't have a position on it. It

03:15PM 18   doesn't matter. It doesn't prove a conspiracy against

03:15PM 19   Mr. Gerace.

03:15PM 20       They did not prove Count 1. They did not. There is

03:15PM 21   reasonable doubt all across those elements. There is reasons

03:16PM 22   to hesitate across those elements. And if you want to just

03:16PM 23   accept what the government's giving you, if you think anybody

03:16PM 24   else is reasonable to hesitate, then you know reasonable doubt

03:16PM 25   exists, and you have to acquit. That's the instruction.

03:16PM   1          You folks, I'm sure, can look at the arguments that

03:16PM   2   have been presented to you and see so many more problems than

03:16PM   3   what I've just presented to you.  You are capable of seeing

03:16PM   4   all of the flaws in what was given to you, it doesn't have to

03:16PM   5   come from my mouth.

03:16PM   6          I imagine and believe that each of you individually

03:16PM   7   and collectively can come up with points well beyond what I

03:16PM   8   just said, I truly do believe that.

03:16PM   9          The only verdict that is supported in Count 1 is a

03:16PM  10   verdict of not guilty.

03:16PM  11          And by extension, Count 2, it basically flows off of

03:16PM  12   that.  But the idea would be also -- presumably have to

03:16PM  13   believe Katrina -- Katrina Nigro about these envelopes,

03:16PM  14   something that she's changed over time, how many envelopes

03:17PM  15   there are, that there's been different testimony about it.

03:17PM  16   The idea that on closing they said, oh, she was in his inner

03:17PM  17   circle, she could be trusted.

03:17PM  18          She told you that in 2014, she wasn't even allowed to

03:17PM  19   be at the club.  Do you think that Peter Gerace is in a

03:17PM  20   conspiracy and he's giving bribes to -- to Joseph Bongiovanni

03:17PM  21   and having to go through Katrina Nigro?  Somebody who had a

03:17PM  22   reputation for dishonesty?  Somebody that it only took a

03:17PM  23   couple more years before the relationship came apart and she

03:17PM  24   was trying put false charges on him, and leaving him

03:17PM  25   voicemails saying I'm going to destroy your life?  Do you

USA v Gerace - Closing Argument / Foti - 12/19/24

03:17PM  1   think that she's the one in the inner circle that he was gonna

03:17PM  2   have deliver envelopes?

03:17PM  3       Do you think there's a reason why the number has

03:17PM  4   changed so many times?  She forgets what she says in the past.

03:17PM  5   The numbers change when she talks to law enforcement on

03:17PM  6   different occasions or she testifies because the details are

03:17PM  7   bogus.

03:17PM  8       Count 2 is not guilty.  There's reasonable doubt all

03:18PM  9   over the place.  Katrina Nigro is not a person that any of us

03:18PM  10  should reasonably think we could rely on.  Every single one of

03:18PM  11  us should feel like we would have to at least hesitate to rely

03:18PM  12  on her on a determination of this importance.

03:18PM  13      Okay.  Count -- Counts 3 and 4 is the drug

03:18PM  14  conspiracy.  I want to make a couple of points here.  First of

03:18PM  15  all, I want to be candid with you.  There is obviously more

03:18PM  16  evidence of drugs than some of the other areas that we're

03:18PM  17  talking about.  Okay?  That doesn't mean that when you hear

03:18PM  18  what the charges are here, that the verdict is guilty.

03:18PM  19      You're not -- they're not -- this is not

03:19PM  20  oversimplified in a way of were there drugs at Pharaoh's?

03:19PM  21  Well, then, convict.

03:19PM  22      I want to talk about both of those charges that

03:19PM  23  relate to the drugs.  First, maintaining a drug-involved

03:19PM  24  premises.

03:19PM  25      Now, a significant respect that drugs are part of it,

USA v Gerace - Closing Argument / Foti - 12/19/24

206

| | | |
|---|---|---|
| 03:19PM | 1 | the government has oversold the case when they say it's part |
| 03:19PM | 2 | of the business model.  That's just not the case. |
| 03:19PM | 3 | You heard a lot of testimony about people being fired |
| 03:19PM | 4 | when they actually got caught with drugs.  Those who were |
| 03:19PM | 5 | using drugs tried to hide it. |
| 03:19PM | 6 | Some of the witnesses -- some of the government's own |
| 03:19PM | 7 | witnesses were fired at some point for drugs, had to go back |
| 03:19PM | 8 | to rehab -- had to go to rehab, and could only come back after |
| 03:19PM | 9 | that.  So the idea that it's built into the business model is |
| 03:19PM | 10 | just not realistic, but to start as a starting point, on the |
| 03:19PM | 11 | maintaining drug premises -- on maintaining a drug premises |
| 03:19PM | 12 | charge, the judge is going to read the charge and the |
| 03:19PM | 13 | instruction, and I believe what you're going to hear is that |
| 03:20PM | 14 | the charge alleged is maintaining a drug-involved premises |
| 03:20PM | 15 | from 2006 to 2009.  Beginning in 2006, ending -- I'm sorry, in |
| 03:20PM | 16 | 2019.  Ending in 2019.  I -- this is easy to confuse. |
| 03:20PM | 17 | The allegation isn't you just have to find beyond a |
| 03:20PM | 18 | reasonable doubt that at some point in that timeframe or for |
| 03:20PM | 19 | some periods of that timeframe or even for the majority of the |
| 03:20PM | 20 | timeframe, he was maintaining a drug premises.  You have to |
| 03:20PM | 21 | find that he was maintaining the drug premises for the |
| 03:20PM | 22 | duration.  That's the charge. |
| 03:20PM | 23 | The government charged it that way.  They said -- |
| 03:20PM | 24 | **MR. TRIPI:**  Objection, misstatement. |
| 03:20PM | 25 | **THE COURT:**  Overruled. |

03:20PM   1        **MR. FOTI:**  -- they said Peter Gerace was engaged in

03:20PM   2    maintaining a drug premises beginning in 2006 up to 2019.  And

03:20PM   3    what did we hear from the witnesses?  Peter Gerace was totally

03:21PM   4    out of the club for a whole year or more.

03:21PM   5        I know some of you may say, well, that sounds like

03:21PM   6    some sort of technicality.  It's not.  That's the charge

03:21PM   7    you're presented with.  Beginning in 2006 all the way up to

03:21PM   8    2019.  If you have reasonable doubt whether he maintained the

03:21PM   9    drug premises for the duration, you are to acquit.

03:21PM  10        The government could've charged this starting in

03:21PM  11    2014, that's not the charge before you.  The charge is going

03:21PM  12    all the way back to 2006.  And what did you hear in terms of

03:21PM  13    testimony?

03:21PM  14        Well, Katrina Nigro, on something that she would have

03:21PM  15    not realized it would ultimately have any relevance to the

03:21PM  16    decisions you have to make acknowledges that he was out.  He

03:21PM  17    was out for -- for probably from 2012 to early 2014.  You know

03:22PM  18    that's the case because it's not just her testimony on that,

03:22PM  19    there's pictures of the grand reopening party that you heard

03:22PM  20    everybody testify about.  And that grand reopening party was

03:22PM  21    anchored to the end of the dispute between the two owners.

03:22PM  22        Don Parrino was an owner back in -- going back to the

03:22PM  23    beginning, all the way up till 2014.  And during the dispute

03:22PM  24    in ownership, you heard multiple witnesses get up here and say

03:22PM  25    things that there was a period of time where Peter Gerace was

USA v Gerace - Closing Argument / Foti - 12/19/24

208

03:22PM   1   out of the club.

03:22PM   2         You not only heard that from witnesses, you saw

03:22PM   3   evidence of it in the government's summary charts.  There was

03:22PM   4   an exhibit that showed the phone calls between Mr. Gerace and

03:22PM   5   Pharaoh's.  And if you looked at the chart, without looking at

03:22PM   6   the individual lines underneath, you would think, oh, look,

03:22PM   7   he's -- he's -- he's making calls to Pharaoh's every single

03:23PM   8   month.

03:23PM   9         But when we talked about it with a witness and got a

03:23PM   10  little more specific, and when you looked at the exhibit in a

03:23PM   11  little bit more detail, you saw he only included lines for the

03:23PM   12  months that Peter Gerace made calls.  And in 2013, there was

03:23PM   13  only one month that there was any attempt to call at all.

03:23PM   14        I think there was some testimony from A.P.

03:23PM   15  consistent, like other witnesses, with Peter Gerace being out

03:23PM   16  of the club, and that he had tried to call at some point to

03:23PM   17  get her back in and was unable to do so.  He had no

03:23PM   18  involvement with that at all.

03:23PM   19        Doug Augustyniak testified, and he didn't just

03:23PM   20  testify on something you can just swipe away because, oh, I

03:23PM   21  was -- the government doesn't want us to believe most of his

03:23PM   22  testimony.  Doug Augustyniak told you that he was fired by the

03:23PM   23  Parrinos, they -- there was a change in a number of positions,

03:23PM   24  and he was one that was out of the club along with Peter

03:23PM   25  Gerace when they were in full ownership.

USA v Gerace - Closing Argument / Foti - 12/19/24

209

03:23PM   1          The government used that as a means to try to attack

03:24PM   2   their own witness's credibility when they said to him:  You

03:24PM   3   got a job back, that was a pretty good job.  You were paid

03:24PM   4   well, right?  It was Peter Gerace who hired you back after

03:24PM   5   they gave control of ownership back again.

03:24PM   6          You're presented with the charge that you're

03:24PM   7   presented with.  It's not a charge you think that should have

03:24PM   8   been presented to you.  It's not about, you know, do we change

03:24PM   9   the charge a little bit to accommodate the way the proof came

03:24PM   10  in.  This is not a small variance of dates.  We're not talking

03:24PM   11  about a few months.  We're talking about an allegation of a

03:24PM   12  continued control of maintenance.

03:24PM   13         You heard the elements already, Mr. Cooper, and

03:24PM   14  you're going to hear them more directly from the judge,

03:24PM   15  maintenance and control.

03:24PM   16         Peter Gerace had no control for over a year.  And the

03:24PM   17  government can on -- well, the government is going to have

03:24PM   18  another opportunity to talk to you on rebuttal, they can tell

03:24PM   19  you how you should disbelieve that.  But we're talking about

03:25PM   20  proof beyond a reasonable doubt, it's their burden.  They --

03:25PM   21  they -- it's their burden to prove that he was maintain --

03:25PM   22  maintaining and controlling the premises all the way back from

03:25PM   23  2006, all the way up to 2019.

03:25PM   24         And they are not going to rebut the evidence that

03:25PM   25  came through their own witnesses that he was out of the club

03:25PM    1    for over a year, to the point where you could never convict

03:25PM    2    beyond reasonable doubt.

03:25PM    3         But the time -- the timeframe matters.  It matters to

03:25PM    4    multiple counts.  It's not just that one.  It's the conspiracy

03:25PM    5    for drug trafficking.  It's the conspiracy for sex

03:25PM    6    trafficking.

03:25PM    7         Candidly, going back a moment, it's probably not the

03:25PM    8    conspiracy, the allegations regarding the conspiracy of -- of

03:25PM    9    public corruption, because that one is not tethered to Peter

03:25PM   10    Gerace engaging in a conspiracy that is anchored to Pharaoh's.

03:25PM   11         Well, I mean, really, that's your determination to

03:26PM   12    make.  And, really, when you look at it, and given the fact

03:26PM   13    that some of the comments on closing were about the idea that

03:26PM   14    Mr. Bongiovanni was protecting Pharaoh's, and Peter Gerace's

03:26PM   15    involvement in Pharaoh's, maybe -- maybe that it does apply

03:26PM   16    there, too, I don't know.  But I am distinguishing it.  There

03:26PM   17    is obviously some difference here.

03:26PM   18         That timeframe wipes out the maintenance charge.  And

03:26PM   19    I would submit when you listen to the instructions and you

03:26PM   20    hear that on these other conspiracy counts that these are

03:26PM   21    conspiracies that are alleged to start well before Peter

03:26PM   22    Gerace is out of the club and continue all the way through

03:26PM   23    until when they are -- when -- when the charge indicates they

03:26PM   24    end, that if you believe there's reasonable doubt as to

03:26PM   25    whether the conspiracy charged in the indictment was committed

USA v Gerace - Closing Argument / Foti - 12/19/24
211

03:26PM   1   based on the fact that there is almost undisputed proof that

03:26PM   2   Peter Gerace was not involved with Pharaoh's for over a year,

03:26PM   3   then you have to acquit on all three of those counts.

03:27PM   4         Now, in addition to that, that -- that theoretically

03:27PM   5   is the end of the analysis.  The government will have an

03:27PM   6   opportunity to rebut, they can argue to you why the conspiracy

03:27PM   7   could survive Mr. Gerace being out of Pharaoh's despite the

03:27PM   8   fact that that should sound a little bit inconsistent with

03:27PM   9   what's been argued to you up to this point.  But if they want

03:27PM   10  to argue that the conspiracy survives, that the conspiracy is

03:27PM   11  a continuing conspiracy that goes through an entire stretch of

03:27PM   12  over a year that Peter Gerace is out of Pharaoh's, that this

03:27PM   13  is one conspiracy that never stops, if they think that there's

03:27PM   14  evidence to support that, then they'll present you those

03:27PM   15  arguments.  If you think there's reasonable doubt, you have to

03:27PM   16  acquit.  And there's other reasons to acquit as well.

03:28PM   17        Understanding that there are -- there is evidence

03:28PM   18  that there was drugs at Pharaoh's, there is still a lack of

03:28PM   19  evidence that really corroborates that Peter Gerace was

03:28PM   20  involved in the way that some of the witnesses said he was.

03:28PM   21        His home was searched, Pharaoh's was searched twice,

03:28PM   22  no evidence of drugs.  There is no pictures of Mr. Gerace with

03:28PM   23  drugs.  There is no recordings other than the one that they

03:28PM   24  gave you of Mr. Gerace ever talking about drugs.  No wiretap

03:28PM   25  calls like they had for Jeff Anzalone and K.L., who was not

03:28PM   1   charged.  No messages on the entirety of his phone with all of

03:28PM   2   these people that the government has referenced as potentially

03:28PM   3   being coconspirators.  Not a single message presented to you

03:28PM   4   recall -- between Peter Gerace and Jessica Leyland out of his

03:28PM   5   phone.

03:28PM   6         There's messages in that phone.  You didn't see them.

03:28PM   7   And why do you think that is?  Nothing consistent with Peter

03:29PM   8   Gerace being involved in the way that some of the witnesses

03:29PM   9   alleged he was.

03:29PM  10         And another thing about this charge, the conspiracy

03:29PM  11   charge.  The conspiracy itself, the agreement is an element.

03:29PM  12   So you do have to fide -- find, in order to find him guilty,

03:29PM  13   proof beyond a reasonable doubt that he was in an agreement

03:29PM  14   with somebody else.  That's more than finding that he used

03:29PM  15   drugs himself.  That's more than finding possession with

03:29PM  16   intent to distribute.

03:29PM  17         You'll see in the indictment, or you'll hear in the

03:29PM  18   indictment, there is a charge of possession with intent to

03:29PM  19   distribute.  It's the last count.  It's a count of possession

03:29PM  20   with -- bless you -- it's a count of possession with intent to

03:29PM  21   distribute based on the allegation that Mr. Gerace had drugs

03:29PM  22   in November at this incident in the basement, the -- the

03:29PM  23   tampering incident.  We're going to talk about that in a

03:29PM  24   little bit.

03:29PM  25         In that situation, what you're finding is:  Did he

USA v Gerace - Closing Argument / Foti - 12/19/24

213

03:29PM 1    possess it?  Did he have the intent to distribute it?  That's

03:30PM 2    it.

03:30PM 3           Conspiracy is a lot more complicated than that.  It's

03:30PM 4    not just did he possess it.  Did he possess it multiple times?

03:30PM 5    Did he buy drugs at some point?  Did he give drugs at some

03:30PM 6    point?  Those things alone don't automatically establish

03:30PM 7    conspiracy.  You have to listen to the judge's instruction.

03:30PM 8    You have to find beyond a reasonable doubt that the conspiracy

03:30PM 9    charged in the indictment in the timeframe that it's charged

03:30PM 10   was an ongoing conspiracy that Mr. Gerace was involved in

03:30PM 11   involving an agreement with others.

03:30PM 12          And you heard testimony of some people who primarily

03:30PM 13   described personal use and incidents that are very similar to

03:30PM 14   the charge of possession with intent to distribute in that

03:30PM 15   November event.  You just don't have dates associated with

03:30PM 16   them, and it's all been wrapped together as a conspiracy

03:30PM 17   count.  But that doesn't mean that there was an agreement

03:30PM 18   consistent with what you would have to find beyond a

03:31PM 19   reasonable doubt.  So that charge is a little bit more

03:31PM 20   complicated than the way maybe it was argued on the closing.

03:31PM 21          And, again, the timeframe is a pretty big piece of

03:31PM 22   this.  If Peter Gerace is out of Pharaoh's for over a year,

03:31PM 23   there's no real way to find beyond a reasonable doubt that

03:31PM 24   he's engaged in this conspiracy for the duration of the

03:31PM 25   conspiracy that is alleged in the indictment.

USA v Gerace - Closing Argument / Foti - 12/19/24

03:31PM  1        Okay.  Count 5 is the sex trafficking.  And sort of

03:31PM  2   at the outset of this, I will again note, well, this one --

03:31PM  3   this one is another one of those kitchen-sink charges.

03:31PM  4        They gave three buckets.  And they said, look, just,

03:31PM  5   you know, pick your poison.  Just find one.  Find him guilty

03:32PM  6   of one of these.  Even if there's problems with each of them

03:32PM  7   individually, just -- just, you know, pick.

03:32PM  8        That's not how it works.  So you don't just find

03:32PM  9   proof beyond a reasonable doubt because they gave you

03:32PM  10  different scenarios to pick from.  It's not about which one is

03:32PM  11  most likely, it's about did they prove the elements beyond a

03:32PM  12  reasonable doubt.  And the three buckets, as they described

03:32PM  13  them, is what happens upstairs, what happens in the VIP area,

03:32PM  14  and the stag parties.  And let's go in reverse order.

03:32PM  15       The stag parties.  Proof beyond a reasonable doubt

03:32PM  16  Mr. Gerace was engaged in a conspiracy because of what?

03:32PM  17  There's testimony that there was dancers that worked at

03:32PM  18  both -- some of these stag parties and Mr. Gerace?  What is

03:32PM  19  there beyond that?

03:32PM  20       Katrina Nigro making some of this up, she said a

03:32PM  21  couple different things.  At one point, she said Peter Gerace

03:32PM  22  sometimes didn't want dancers from the stag party to dance at

03:32PM  23  Pharaoh's because of things that they would do.  She makes a

03:32PM  24  comment about that at some point, which is not consistent with

03:32PM  25  the conspiracy involving the stag parties.  But she does give

03:32PM  1   the government what they're looking for on the stag parties

03:33PM  2   saying, oh, there's some sort of benefit, there's some sort of

03:33PM  3   financial agreement there.

03:33PM  4       And she never really explains it.  And I would submit

03:33PM  5   that that's because it's just absolutely bogus.  There's

03:33PM  6   nowhere else where you see any testimony establishing that

03:33PM  7   there is an actual conspiracy between these two.

03:33PM  8       I think that the evidence is established that there

03:33PM  9   were dancers at Pharaoh's who also danced at these different

03:33PM  10  stag parties.  There's also evidence to establish that dancers

03:33PM  11  would move between clubs.  You heard it from almost --

03:33PM  12      A lot of the dancers, a lot of the government's

03:33PM  13  witnesses say, well, I was dancing at this one club, and then

03:33PM  14  I switched over because I heard good things at Pharaoh's.

03:33PM  15      Some of them said I danced at Pharaoh's, and then I

03:33PM  16  started dancing for the stag parties for a year.

03:33PM  17      That -- there's no conspiracy here between different

03:33PM  18  clubs and different stag parties.  These are separate

03:33PM  19  entities.

03:33PM  20      The government's own witness, A.G., told you that

03:33PM  21  because she danced for No Limit for a year.  The government

03:33PM  22  makes a big point of why she was fired, and we want you to

03:34PM  23  assume that she was fired because she wouldn't go upstairs

03:34PM  24  with Mr. Gerace.  Again, just accept that, because that's what

03:34PM  25  we want to allege here.  We just want you to accept the

03:34PM    1    inference that we want to draw on it.  Okay?

03:34PM    2        Whatever the reason is, what's the most important

03:34PM    3    piece of A.G.'s testimony?  She never went upstairs, she was

03:34PM    4    in the VIP Room for -- for two days straight, never indicates

03:34PM    5    she saw any sex acts, never testifies about anything

03:34PM    6    suggesting there's sex trafficking at Pharaoh's.

03:34PM    7        What she does testify, and this is the most important

03:34PM    8    part of her testimony, is that she went and worked for

03:34PM    9    No Limit for a year, it didn't matter that she was fired at

03:34PM    10   Pharaoh's.  It had nothing to do with it.

03:34PM    11        And I asked her, I asked A.G., are they different?

03:34PM    12        And do you know what her response was?  Do you

03:34PM    13   remember?  Completely different.  She volunteered that in

03:34PM    14   response.

03:34PM    15        The government is trying to sell you a narrative that

03:34PM    16   is totally inconsistent with the evidence.  There is no way

03:35PM    17   it's proof beyond a reasonable doubt to believe that there is

03:35PM    18   a conspiracy between these two separate entities.

03:35PM    19        They showed text messages, and there's this one sort

03:35PM    20   of -- there's an LOL on it, so I don't know what the context

03:35PM    21   it is, but the comment by LaMont, who didn't testify at this

03:35PM    22   trial, but there's the comment about she does anal, LOL.

03:35PM    23   Which is, you know, grotesque.  But that is -- it's -- there's

03:35PM    24   an LOL on there.  There's clearly context that we're missing.

03:35PM    25        What we do have in terms of context before it is a

03:35PM    1    message that's not consistent with conspirators,

03:35PM    2    coconspirators, it's a message that you took one of my top

03:35PM    3    weekend girls.

03:35PM    4         The message before that is Peter Gerace upset that

03:35PM    5    this separate entity resulted in one of his employees being --

03:35PM    6    being taken away.  And there's this -- this response from the

03:36PM    7    individual who did not testify here, that -- there was a joke

03:36PM    8    or maybe it's not, because maybe things were happening at

03:36PM    9    No Limit that was different than Pharaoh's.  What you do see

03:36PM   10    if you look at that exhibit, and you have to look at it, is

03:36PM   11    they stopped talking after that.  Peter Gerace goes a long

03:36PM   12    time without communicating with him again.

03:36PM   13         And the message before, you took one of my top

03:36PM   14    weekend girls, it's pretty clear that they're not

03:36PM   15    coconspirators.  In some respects they're competitors.  They

03:36PM   16    certainly don't act together.

03:36PM   17         They write text messages about LaMont, or about --

03:36PM   18    about LaMont sending -- saying, I'm gonna send a girl to

03:36PM   19    try -- a potential dancer over to you.

03:36PM   20         And if you go a little bit lower in the exhibit,

03:36PM   21    there is a message in evidence that I don't think was

03:36PM   22    highlighted during the trial, but where -- they might have

03:36PM   23    been, I honestly don't remember -- where they talk about her

03:37PM   24    coming in to try out.  The words were "try out."  It wasn't

03:37PM   25    she would automatically becomes an employee for Pharaoh's.  It

03:37PM  1  was somebody who was consistent with the testimony that they

03:37PM  2  would dance in multiple places, they'd dance in multiple

03:37PM  3  clubs, they would move around different clubs, she was

03:37PM  4  somebody who was interested in dancing for Pharaoh's, LaMont

03:37PM  5  referred her over.

03:37PM  6        That is not a conspiracy.  That is simply the nature

03:37PM  7  of the industry, based on the testimony that you've heard.

03:37PM  8  So, just -- let's just wipe out the stags parties.  Complete

03:37PM  9  nonsense.

03:37PM  10       The VIP Room is a little bit more complicated.  Also

03:37PM  11  nonsense, but more complicated, because you have multiple

03:37PM  12  witnesses talking about it.  So it gives you more pause.

03:37PM  13  You've gotta think about what's -- the testimony you heard.

03:37PM  14       But here's the thing about that testimony.  There

03:37PM  15  are, there's -- there's a couple different things about it.

03:38PM  16  One is, you heard from a couple of witnesses who had a

03:38PM  17  financial benefit, who had charges, who had reasons to not

03:38PM  18  trust their credibility on it.  You had another witness that

03:38PM  19  didn't have some of the same credibility issues, A.P., agree

03:38PM  20  with Mr. Cooper -- it's hard to pronounce her last name, so

03:38PM  21  we're going to continue to go with that.  A.P. says didn't see

03:38PM  22  any sex in the VIP Rooms, she says the bouncers were awesome

03:38PM  23  when asked about it.  She says they would interrupt if

03:38PM  24  anything inappropriate was happening.  And she wasn't the only

03:38PM  25  one who said they witnessed bouncers coming in and

USA v Gerace - Closing Argument / Foti - 12/19/24

219

03:38PM   1   interrupting.

03:38PM   2         Some of the same witnesses who said, yeah,

03:38PM   3   occasionally, a patron and one of the dancers would get away

03:38PM   4   with a sex act, I've seen it happen before, would also say, I

03:38PM   5   also saw times where it would get interrupted, where somebody

03:38PM   6   was watching the screen, caught it, and intervened.

03:39PM   7         And the government's witness, Doug Augustyniak, was

03:39PM   8   the only VIP attendant who testified, and he told you that's

03:39PM   9   the reality.  We watch the screen, we're doing multiple things

03:39PM   10  at once, if we see it, we'll intervene.  And he did.

03:39PM   11        And this isn't helpful to the defense.  He wasn't

03:39PM   12  trying to help us.  He told in response, when we were saying

03:39PM   13  well, and nobody -- nobody was trying to pay you off, he says,

03:39PM   14  oh, yeah, some customers tried.

03:39PM   15        So, the government can say, oh, he -- he got up there

03:39PM   16  and was trying to help out.  No, he wasn't.  He was trying to

03:39PM   17  give the answers.  Yeah, he may have a problem with the

03:39PM   18  government, that doesn't mean that he was suddenly lying about

03:39PM   19  everything that they don't want you to -- to -- to credit him

03:39PM   20  for.

03:39PM   21        I asked him nobody -- nobody propositioned you, did

03:39PM   22  they?  He said, oh, yeah, yeah, some people did.  Or he'd say

03:39PM   23  no, he said, if it happened, it was between a customer and a

03:39PM   24  dancer.  It was not allowed.

03:39PM   25        And the last questions with Mr. Augustyniak, sorry,

USA v Gerace - Closing Argument / Foti - 12/19/24

220

03:40PM   1    just give me a second here.

03:40PM   2         I -- I'm so far off my outline.  I may come back to

03:40PM   3    it and actually read you the questions because I have them

03:40PM   4    somewhere.  But the short of it that you probably remember is

03:40PM   5    at the end he acknowledges giving this testimony, the

03:40PM   6    government -- in response to defense questions, the government

03:40PM   7    seized on it a little bit on redirect asking questions about

03:40PM   8    that.

03:40PM   9         And on recross asked, okay, customers tried to

03:41PM   10   proposition you.  That came from customers, not management,

03:41PM   11   right?

03:41PM   12        Correct.

03:41PM   13        In fact, everything that was ever conveyed to you as

03:41PM   14   a VIP attendant from management or from ownership was the

03:41PM   15   opposite of that, right?

03:41PM   16        Yes.

03:41PM   17        It was not the case that ownership had anything to do

03:41PM   18   with that.  And you didn't hear any testimony throughout the

03:41PM   19   trial at all that it did other than L.L.'s testimony.  The one

03:41PM   20   who was getting the car insurance paid, the one who changed

03:41PM   21   her testimony between 25 and 500.

03:41PM   22        L.L. is also the one who said she slept with Peter

03:41PM   23   Gerace's brother, David, somebody you really didn't hear any

03:41PM   24   testimony was ever around the club, and then was shown a

03:41PM   25   picture of David during her cross-examination and said I don't

USA v Gerace - Closing Argument / Foti - 12/19/24

221

03:41PM    1    recognize anybody in that picture.

03:41PM    2         During Brian Burns' cross, showed the same picture

03:41PM    3    and he said, I think -- I believe that's David Gerace and

03:41PM    4    Anthony Gerace.  The redirect was well.

03:41PM    5         People change appearance over time.  Okay.  Well

03:41PM    6    people do change appearance, but that was a lie.  She didn't

03:42PM    7    sleep with David Gerace.  She didn't recognize -- she was

03:42PM    8    shown a picture of him here on the stand, wasn't prepared for

03:42PM    9    it, and she goes, I don't know who's in that picture.

03:42PM   10         L.L. is the only person who conveniently tells you

03:42PM   11    the story of Peter Gerace says, oh, there's Wayne VanVleet, go

03:42PM   12    over there, Brian will look the other way.  A sort of

03:42PM   13    perfectly tailored allegation to try to connect Peter to the

03:42PM   14    VIP Room, something that all the other evidence does not

03:42PM   15    support.  It's not at all believable.

03:42PM   16         And you know what else isn't believable about it?

03:42PM   17    There really is no connection established between Wayne

03:42PM   18    VanVleet and Peter Gerace.  That's pretty much acknowledged on

03:42PM   19    their closing statement.

03:42PM   20         They talk about the conspiracy.  Yeah, they're

03:42PM   21    coconspirators, they don't even know each other.  Peter Gerace

03:42PM   22    doesn't need to know Wayne VanVleet.  They know the evidence

03:42PM   23    doesn't support that.

03:42PM   24         When asked about the other phone contacts, is Wayne

03:43PM   25    VanVleet in his phone?  He has tons of contacts.  He's a

03:43PM  1    business owner, he's got contacts all over the place, from the

03:43PM  2    full spectrum of law enforcement, to people who have

03:43PM  3    allegations against them, to people he grew up with.  He has

03:43PM  4    all of these contacts in his phone.  And Wayne VanVleet, this

03:43PM  5    guy who was supposedly at the club all the time and that

03:43PM  6    L.L.'s testimony they have her say he was -- Peter Gerace's

03:43PM  7    directing her to him, and he's not in Peter Gerace's phone.

03:43PM  8    There's no communication between them, there's no pictures of

03:43PM  9    them together, there's really no other testimony claiming that

03:43PM  10   Peter Gerace even knows who he is.

03:43PM  11            I don't think you should believe for a minute let

03:43PM  12   alone beyond a reasonable doubt that what was going on in the

03:43PM  13   VIP Rooms was consistent with pervasive sex acts.  If there

03:43PM  14   were any, I think the evidence suggests it was an agreement

03:44PM  15   between the dancer and a patron.

03:44PM  16            And a VIP attendant had six screens up in front of

03:44PM  17   him, he's handling the money, he's handling chips, he's doing

03:44PM  18   all these things at once, he's doing the best he can while

03:44PM  19   also supposed to watch the cameras, and there's testimony that

03:44PM  20   when he would catch something he would intervene.  He didn't

03:44PM  21   always catch it.  That doesn't make the VIP attendant a

03:44PM  22   criminal, and it doesn't make Peter Gerace a criminal.  It

03:44PM  23   just does not.

03:44PM  24            And if the VIP attendant was getting paid off to look

03:44PM  25   the other way, that does not mean Peter Gerace knew about it.

03:44PM    1    Again, unless you believe L.L.'s testimony beyond a reasonable

03:44PM    2    doubt, unless you wouldn't hesitate to rely on her in that

03:44PM    3    regard.

03:44PM    4         The cameras don't support it.  The cameras don't

03:44PM    5    support -- went back seven weeks.  The fact that Peter Gerace

03:44PM    6    would make sure the cameras recorded the longest in the VIP

03:44PM    7    area to avoid this type of thing, to make sure that if an

03:45PM    8    allegation is made and directed to him, he has a means of

03:45PM    9    going back and looking.

03:45PM   10         The fact that it exists is reasonable doubt.  The

03:45PM   11    fact that when they pulled this these cameras, there was no

03:45PM   12    relevant information identified.  Oh, there was fondling,

03:45PM   13    there was touching of the breasts, there was kissing in some

03:45PM   14    instances.  Yeah, okay, it's still, not every sin is a crime,

03:45PM   15    it's a lap dance.

03:45PM   16         The government had a chance to review that.  They

03:45PM   17    went through it.  They saw the pants stain on the patrons,

03:45PM   18    they didn't see sex acts.  They saw no vaginal sex, no anal

03:45PM   19    sex, no oral sex.  Nothing of that sort.

03:45PM   20         Okay.  The last area is the upstairs.  And the

03:45PM   21    testimony is -- comes from just -- there's a -- there's a

03:46PM   22    number of witnesses who say they were upstairs and that they

03:46PM   23    used drugs upstairs.  Then there are a much, much more limited

03:46PM   24    number of witnesses who claim to have observed or been

03:46PM   25    involved in sex upstairs.  You have to distinguish those two

03:46PM   1   things.  Okay?  Just because there's testimony about things

03:46PM   2   happening upstairs involving cocaine usage, and that there's

03:46PM   3   rumors about other things that would happen upstairs, that

03:46PM   4   doesn't anchor the two together automatically.

03:46PM   5        You have to isolate who actually said that they

03:46PM   6   observed sex acts.

03:46PM   7        Well, Katrina Nigro, again, says I would go up there

03:46PM   8   and I would find used condoms and it's the smell, all this

03:46PM   9   grotesque testimony that she gave you which, again, just --

03:46PM   10  it's Katrina Nigro.  It's not believable.  And it's

03:46PM   11  inconsistent with the fact that she couldn't go upstairs

03:46PM   12  because she didn't have a key, something the government didn't

03:46PM   13  ask her about.

03:46PM   14       G.R.  If you go back and ask for a read-back of her

03:47PM   15  cross, you will hear a couple of things of note.  And keep in

03:47PM   16  mind, G.R. is really, I mean, on cross, G.R., L.L., K.L., were

03:47PM   17  I think the three that -- unless I missed somebody, I think

03:47PM   18  those were the three that were just referenced by the

03:47PM   19  government in their closing statement, at least three of the

03:47PM   20  main ones that they argued about.

03:47PM   21       We already talked about K.L. earlier.  K.L. was lying

03:47PM   22  to you about a number of things, and it came out that the way

03:47PM   23  they described this interaction is inconsistent with the

03:47PM   24  details that were kept away from you during the direct

03:47PM   25  examination.  So, let's set K.L. aside.

03:47PM    1              L.L., we talked about.  The type of payments she was

03:47PM    2    receiving, just like K.L.  She was getting all kinds of

03:47PM    3    financial expenses to help secure her testimony.  Just like

03:48PM    4    other witnesses with credibility issues, she changed her

03:48PM    5    answers significantly.  She's the one that we just talked

03:48PM    6    about that said she was sleeping with Peter Gerace's brother

03:48PM    7    and was shown a picture, isn't able to identify who she's

03:48PM    8    looking at.

03:48PM    9              L.L. is also one of the three girls who tried out

03:48PM   10    together.  A.A. -- my arrows, as we know from earlier in the

03:48PM   11    trial, are terrible.  R.W.  And there's L.L.

03:48PM   12              Now, why does that matter?  Because L.L. -- all three

03:48PM   13    of them testify.  A.A. testified earlier in the trial.  It may

03:48PM   14    not have been immediately obvious because the government

03:48PM   15    didn't call them back to back.  They called A.A. and R.W.

03:48PM   16    earlier on, and then they waited until the end to call L.L.

03:48PM   17              But if you go back and think about A.A.'s testimony,

03:49PM   18    you'll remember -- and you can get this from a read-back --

03:49PM   19    she doesn't know who Peter Gerace is.  She never met him

03:49PM   20    before.  She's never even been upstairs.

03:49PM   21              L.L. talked about having threesomes with A.A. and

03:49PM   22    Peter Gerace, just like the David Gerace thing, it's just

03:49PM   23    absolutely bogus.

03:49PM   24              These are both government witnesses.  They talk about

03:49PM   25    we called all these witnesses.  They contradict each other.

USA v Gerace - Closing Argument / Foti - 12/19/24

03:49PM  1   Again, I'm not saying that you should believe A.A. instead of

03:49PM  2   L.L., I'm saying you shouldn't believe either of them.

03:49PM  3   Because the test is whether you would hesitate, whether you

03:49PM  4   would have reasonable doubt, whether you can't rely on them.

03:49PM  5   If there's inconsistencies, neither of them are somebody you

03:49PM  6   can rely on.  You would at least hesitate to think that either

03:49PM  7   of these people are reliable.

03:49PM  8           I mean, clearly, A.A. came in and gave testimony that

03:49PM  9   the government wanted.  She wasn't here to help Peter Gerace.

03:49PM  10  She didn't know who he was.  She's never been upstairs.

03:49PM  11  That's just -- that's just the testimony she gave under oath.

03:50PM  12          L.L., who changed her story multiple times, happens

03:50PM  13  to be the one who says oh, L.L., L.L. knows.  Not only knows

03:50PM  14  Peter Gerace, we were having threesomes with him.  Just

03:50PM  15  outrageous.

03:50PM  16          They didn't address any of this in their closing

03:50PM  17  argument.  They just told you they cited examples from these

03:50PM  18  witnesses as if they're gospel.  This is so far from that.

03:50PM  19          Now, going back to G.R., there's two main points I

03:50PM  20  want to get across.  I understand that it's a dicey area to

03:50PM  21  talk about choice in regards to the dancers, especially if

03:50PM  22  they were using drugs.  I understand that gets complicated.  I

03:50PM  23  understand the government wants to seize on that.  Well, they

03:50PM  24  didn't have any choice.

03:50PM  25          That's not what G.R. told you.

USA v Gerace - Closing Argument / Foti - 12/19/24

227

03:50PM  1        In cross, she said it was her choice.  These were her

03:51PM  2   choices.

03:51PM  3        She didn't tell you I was being coerced.  She said I

03:51PM  4   was making these decisions myself.  And coercion is part of

03:51PM  5   this crime.

03:51PM  6        The government can tell you, well, we think it's

03:51PM  7   coercion even if the witness doesn't, so you should find it's

03:51PM  8   coercion.

03:51PM  9        G.R. was capable of making the choice herself, she

03:51PM  10  told you that she was, even if she was using drugs.  She

03:51PM  11  didn't say she was coerced.  Okay?  That's her testimony.

03:51PM  12       She also told you, and this is worth noting, that

03:51PM  13  Mr. -- Peter Gerace said to her, before she had sex with this

03:51PM  14  individual based on her testimony, is take care of my friend

03:51PM  15  and he gives her $200.

03:51PM  16       Now, I want to focus on the last part of that, the

03:51PM  17  monetary amount he gave her.  They're saying $200, that's

03:51PM  18  consistent with I guess propositioning her for sex.

03:52PM  19       This is a strip club.  Her job, by profession, is

03:52PM  20  dancing.  And you heard the $200 is pretty much consistent

03:52PM  21  with a longer dance in the VIP area.

03:52PM  22       She didn't say he told me to have sex with him.  The

03:52PM  23  government can get up here on rebuttal and yell there's no

03:52PM  24  other interpretation of that, but that's not the case at all.

03:52PM  25  That's not the case at all.  You are in a strip club, $200 is

USA v Gerace - Closing Argument / Foti - 12/19/24

03:52PM  1   consistent with a longer dance, not to go back and have sex.

03:52PM  2       They want you to find beyond a reasonable doubt that

03:52PM  3   that's an example of Peter eliciting a commercial sex act.

03:52PM  4   It's one of the only examples that have been given.  There's

03:52PM  5   reasonable doubt there.  Even if there wasn't the issue of the

03:52PM  6   timeframe, even if the evidence didn't support that this

03:52PM  7   conspiracy does not -- there's no way for it to go, the

03:53PM  8   timeframe that -- that has been alleged here.  There's

03:53PM  9   reasonable doubt all day long.

03:53PM  10      Judge, I know I'm probably going a little later than

03:53PM  11  I said.  Do you know how much time I have left?

03:53PM  12      **THE COURT:**  You've got -- hang on -- over an hour.

03:53PM  13      **MR. FOTI:**  Okay.  Thank you, I won't use it, I

03:53PM  14  promise.

03:53PM  15      All right.  The last sort of bucket of charges that

03:53PM  16  were discussed is the November 2019 charges.  Okay?  And

03:54PM  17  they're on here.  We have three witnesses listed as being

03:54PM  18  relevant to that charge:  P.H., Ben Rivera, C.C.

03:54PM  19      Ben Rivera is somebody you would definitely hesitate

03:54PM  20  to trust.  He's somebody that has all kinds of reasons to

03:54PM  21  doubt their testimony.  The instructions are going to be

03:54PM  22  consistent with the fact that you should take great care in

03:54PM  23  deciding whether to assess him as credible.  And, certainly,

03:54PM  24  the instructions on the proof beyond a reasonable doubt is

03:54PM  25  combined with the presumption of innocence all move you

USA v Gerace - Closing Argument / Foti - 12/19/24

229

03:54PM    1    towards the conclusion that Ben Rivera is a hired gun.

03:54PM    2         He talks about an incident that was written about in

03:54PM    3    the newspaper.  The government's best argument against that

03:54PM    4    is, well, in the newspaper article, they didn't talk about the

03:54PM    5    gender.  So what?

03:54PM    6         You mean that he couldn't learn the gender through

03:54PM    7    talking in the jail?  He couldn't have learned it through

03:54PM    8    questions by the government during the course of his

03:54PM    9    debriefing?  That's it, the gender?  Is why you should believe

03:55PM   10    him?  When he tells the government conveniently I have

03:55PM   11    information about something that was in the paper?

03:55PM   12         Ben Rivera's testimony is also inconsistent with the

03:55PM   13    only witness we have to this.  And the government can say,

03:55PM   14    well, there's three witnesses, or there's two other witnesses.

03:55PM   15    There's P.H.

03:55PM   16         P.H. is on the receiving end.  What she knows is she

03:55PM   17    got a message from C.C.'s account, which was apparently

03:55PM   18    drafted by Crystal Quinn.  And she responds the next morning

03:55PM   19    not at all appearing concerned.

03:55PM   20         And I know the government can get up and say, well,

03:55PM   21    you heard her testimony, she was very concerned.

03:55PM   22         You heard what happened with Jessica Leyland, she had

03:55PM   23    every reason to be scared.

03:55PM   24         The response doesn't indicate that at all.  She does

03:55PM   25    respond, she didn't have to respond.  She responds, stay off

USA v Gerace - Closing Argument / Foti - 12/19/24

03:55PM    1    the coke ladies, LOL, or something along those lines.

03:55PM    2         She wasn't there.  She can't testify to what

03:55PM    3    happened.

03:56PM    4         Who's our witness there?  It's C.C.

03:56PM    5         C.C. does not establish that any witness tampering,

03:56PM    6    anything that was written during that message was done at the

03:56PM    7    behest of Peter Gerace.  She gave you specific answers to

03:56PM    8    questions that all cut against that conclusion.  And we're

03:56PM    9    talking about Counts 6 through 8.  They're all of the same

03:56PM   10    charge, just sort of different variations of it.

03:56PM   11         C.C. was asked these questions by Mr. Soehnlein:

03:56PM   12         "You were still in the basement when Crystal had your

03:56PM   13    phone, correct?

03:56PM   14         "Answer:  Yes.

03:56PM   15         "And for the entire time that she had your phone,

03:56PM   16    correct?

03:56PM   17         "Answer:  Yes.

03:56PM   18         "Okay.  You didn't know what Crystal was saying --

03:56PM   19    strike that.  You didn't know what Crystal was typing on her

03:57PM   20    phone when she had it in her hand, correct?

03:57PM   21         "Nope.

03:57PM   22         "Okay.  She didn't read it out loud?

03:57PM   23         "No.

03:57PM   24         "She didn't pass the phone around before sending it?

          25         "No.

1          "She didn't hand the phone to Peter before she sent

2     it?

3          "No.

4          "You're sure about that?

5          "Yes.

6          "You didn't take the phone at any point that night

7     and review the messages?

8          "No.

9          "You didn't take the phone and send any messages,

10    correct?

11         "No.

12         "You never saw Peter Gerace look at phone that night?

13         "No."

14         There's no testimony Peter Gerace directed it.  They

15    have this -- sort of this weird testimony where they try to

16    get you to jump to a particular conclusion that they were --

17    that Peter Gerace was complaining about that he thought --

18    that he thought that P.H. was -- was cooperating or whatever.

19         And then Crystal Quinn, the testimony is Crystal

20    Quinn takes not Peter Gerace's phone, she takes C.C.'s phone,

21    and she sends these messages.

22         And these messages, even though they refer to snitch

23    at some point, and they refer to "ray," which the government

24    has said is "rat," and maybe it is, even though you also heard

25    later on that P.H.'s other name is P.R., whatever it is,

USA v Gerace - Closing Argument / Foti - 12/19/24

03:58PM   1   there's a ton of stuff in there.  It's not about you better

03:58PM   2   not testify.  It's not a threat about, you know, someone's

03:58PM   3   gonna come to you if you -- if you testify.  It's not about

03:58PM   4   that.

03:58PM   5           There is something personal is written all over that.

03:58PM   6   Personal between Crystal Quinn, if she's the one who's writing

03:58PM   7   the messages, and P.H.  The fact that she didn't like her

03:58PM   8   because she's also a snitch, that may have been part of it.

03:58PM   9   But it's not tampering.  And if it was tampering, Peter Gerace

03:58PM   10  certainly was not involved.  Just because he was present does

03:58PM   11  not make him criminally liable.

03:58PM   12          You specifically heard the testimony Crystal Quinn,

03:58PM   13  according to C.C., was acting on her own when she was writing

03:59PM   14  that message out.  She wasn't asking for feedback.  She wasn't

03:59PM   15  reading it to anybody.  She wasn't handing it around.  And you

03:59PM   16  didn't hear any other testimony that suggests that she ever

03:59PM   17  did it at Peter Gerace's request, other than pure insinuation

03:59PM   18  and conjecture.  And that's not proof beyond a reasonable

03:59PM   19  doubt.

03:59PM   20          I just need a moment.

04:00PM   21          I -- I hate to take us backwards, but, oh, maybe I

04:00PM   22  won't, I think I just might have closed out.  Okay.

04:00PM   23          I hate to take us backward, but it's something I did

04:00PM   24  want to read you, part of Doug Augustyniak's testimony and now

04:00PM   25  I have it.  So my cocounsel is a little bit better organized

04:00PM    1    than I am.

04:01PM    2              After -- after -- on cross-examination, Doug

04:01PM    3    Augustyniak revealed, yeah, patrons would try to proposition

04:01PM    4    the VIP attendants.  And after the government tried to ask

04:01PM    5    some questions on that to sort of seize upon it, on redirect I

04:01PM    6    asked to clarify what matters to you as jurors in this trial

04:01PM    7    with Mr. Gerace.

04:01PM    8              "Now you were asked about the VIP attendant, and you

04:01PM    9    were asked about being asked by patrons to look the other way

04:01PM   10    correct?

04:01PM   11              "Correct.

04:01PM   12              "Okay.  That was a question posed to you or a request

04:01PM   13    to you by patrons correct?

04:01PM   14              "Correct.

04:01PM   15              "It didn't come from other staff members, correct?

04:01PM   16              "No.

04:01PM   17              "It didn't come from Mr. Gerace, correct?

04:01PM   18              "No.

04:01PM   19              "At no time during your tenure did Mr. Gerace tell

04:01PM   20    you, I want you to look the other way during VIP dances?

04:01PM   21              "Never has.

04:01PM   22              "Everything that was conveyed to you was the opposite

04:02PM   23    of that in terms of VIP, correct?

04:02PM   24              "That's correct.

04:02PM   25              "You always were supposed to do everything you could

USA v Gerace - Closing Argument / Foti - 12/19/24

234

04:02PM   1   to intervene on sex acts in the VIP area?

04:02PM   2           "Yes.

04:02PM   3           "So the question about patrons asking you, that's

04:02PM   4   completely separate from Mr. Gerace, correct?

04:02PM   5           "Correct.

04:02PM   6           "Mr. Gerace never gave you a tip to look the other

04:02PM   7   way, correct?

04:02PM   8           "Never.  He never tipped us."

04:02PM   9           Which maybe is a reason why he would have an issue

04:02PM   10   with Mr. Gerace besides no longer working there, but it's --

04:02PM   11   it's relevant because the government earlier on in the trial

04:02PM   12   really seemed to be trying to advance a theory, and they were

04:02PM   13   asking questions of the idea that more money was made by the

04:02PM   14   club if tips were given to staff.  And it was something that

04:02PM   15   they were kind of, I think, sort of exploring earlier on in

04:02PM   16   some of the testimony, which obviously isn't -- isn't at all

04:02PM   17   consistent with reality.

04:02PM   18           "Mr. Gerace never gave you a tip to look the other

04:02PM   19   way, correct?

04:02PM   20           "Never.  He never tipped us.

04:02PM   21           "He never asked you to do something like that,

04:02PM   22   correct?

04:02PM   23           "No.

04:02PM   24           "When the VIP attendant would receive a tip from the

04:03PM   25   dancers, there was no payment -- this is where it matters --

USA v Gerace - Closing Argument / Foti - 12/19/24

235

04:03PM   1   there was no payment from the tip towards the club, correct?

04:03PM   2        "Correct.

04:03PM   3        So that was a tip that the VIP attendant, the DJ, and

04:03PM   4   those staff members took home with them, correct?  That didn't

04:03PM   5   go back to the business, correct?

04:03PM   6        "No.

04:03PM   7        "And it didn't go to Mr. Gerace, correct?

04:03PM   8        "No."

04:03PM   9        All right.  Now, in a few moments I'm going to finish

04:03PM  10   up.  The government is gonna get another chance to talk to you

04:03PM  11   and we do not.  Okay?  So this is the point where, as the

04:03PM  12   defense, we turn it over to you.

04:03PM  13        The government's gonna get up and make arguments, and

04:03PM  14   you know that there's things that we would have a response

04:03PM  15   for, but we don't get to give them.

04:04PM  16        This is where we ask you to do the critical thinking

04:04PM  17   that you signed up for.  This is where we ask you to hold the

04:04PM  18   government accountable.  This is where we ask you to push back

04:04PM  19   against government overreach.

04:04PM  20        When I sit down, that's the last time we get to

04:04PM  21   present any argument we thought of, but it's not the last time

04:04PM  22   that you get to think of what the arguments are in response to

04:04PM  23   what's being said to you.

04:04PM  24        All the government resources that were poured into

04:04PM  25   this case, all of them, and what they presented to you were

04:04PM   1   half-truths, inconsistent testimony, witnesses who were paid

04:04PM   2   off, witnesses who were inconsistent, who had lied under oath

04:04PM   3   other times, who lied to you on the stand in this trial, some

04:04PM   4   of them who were totally indifferent about that.

04:05PM   5           This is the point where you deliberate, you can push

04:05PM   6   back against that.  When you consider the burden of proof, the

04:05PM   7   government did not meet that burden.  Because the quality of

04:05PM   8   the evidence that they presented and the lack of evidence, you

04:05PM   9   are to acquit.

04:05PM   10          Colleen, I want to try to do this.

04:05PM   11          **THE CLERK:**  Pull it towards you.

          12          **MR. FOTI:**  Pull it towards me?  Oh, this is -- I

          13   probably just broke it.

          14          Colleen takes care of all of us.

          15          **THE CLERK:**  Okay.

          16          **MR. FOTI:**  Yep.  Thank you, Colleen.

          17          **THE CLERK:**  And then, okay, this is your zoom-in and

          18   zoom-out up here, okay?

          19          **MR. FOTI:**  Okay.

          20          **THE CLERK:**  Got it?

          21          **MR. FOTI:**  Thank you.

          22          **THE CLERK:**  You're welcome.

04:06PM   23          **MR. FOTI:**  This is the jury verdict form.  Tomorrow

04:06PM   24   you are going to receive instructions about the law from the

04:06PM   25   judge, and then Monday you're going to start your

04:06PM   1   deliberation.  It's not ideal to be starting it right before

04:06PM   2   Christmas, but this -- you folks and the government I know is

04:06PM   3   going to agree this, the Court, I believe everybody in this

04:06PM   4   courtroom will agree, you have been some of the most

04:06PM   5   attentive, focused jurors that anybody could hope for.  And

04:06PM   6   despite the holidays, you've all stuck with us.  Everybody

04:06PM   7   here appreciates that.

04:06PM   8        What's next is the instructions from the judge.

04:06PM   9   Monday, you are going to start the deliberation process.  You

04:06PM   10  are going to listen to each other, and if you have hesitations

04:07PM   11  or reasonable doubts, you're going to express that to each

04:07PM   12  other.  Some of them might be agreement with things that we

04:07PM   13  said today.  Some of them, as I mentioned earlier, might be

04:07PM   14  things that we didn't think of or at least didn't talk about

04:07PM   15  during the closing argument.

04:07PM   16       You'll listen to each other, and if you agree that

04:07PM   17  it's reasonable to have a doubt under those circumstances, if

04:07PM   18  it's a reasonable doubt, then you have to acquit to any count

04:07PM   19  where there's an element where reasonable doubt exists.

04:07PM   20       And, again, the instructions are going to essentially

04:07PM   21  suggest that if you think a reasonable person would have that

04:07PM   22  hesitation or doubt, even though maybe you, yourself really

04:07PM   23  don't think you have it, if your fellow juror expresses

04:07PM   24  something and you think about it and say, well, it's

04:07PM   25  reasonable for them to feel that way, that's reasonable doubt,

USA v Gerace - Closing Argument / Foti - 12/19/24

238

| | | |
|---|---|---|
| 04:07PM | 1 | you have to acquit. |
| 04:07PM | 2 | When you get to the point in your deliberation where |
| 04:07PM | 3 | you make a determination on whether there is reasonable doubt |
| 04:08PM | 4 | as to any element of the charge, the verdict only supports -- |
| 04:08PM | 5 | the evidence and lack of evidence only supports one verdict, |
| 04:08PM | 6 | and that is a verdict of not guilty. |
| 04:08PM | 7 | When we get to Count 2, paying a bribe to a public |
| 04:08PM | 8 | official, when you consider the lack of evidence and the |
| 04:08PM | 9 | problems with the evidence here, there's only one verdict that |
| 04:08PM | 10 | the evidence supports, and that is a verdict of not guilty. |
| 04:08PM | 11 | When you get to Count 3, maintaining a drug premises, |
| 04:08PM | 12 | and you listen to those charges, and you hear the way it was |
| 04:08PM | 13 | charged is -- is an allegation that it continued over such a |
| 04:08PM | 14 | span of time, even if there wasn't all this reasonable doubt |
| 04:08PM | 15 | based on lack of evidence, there's no way it was proven based |
| 04:08PM | 16 | on you what heard, the verdict is not guilty. |
| 04:08PM | 17 | When you get to Count 4, conspiracy to distribute a |
| 04:09PM | 18 | controlled substance, and all the reasons we talked about why |
| 04:09PM | 19 | there's reasonable doubt, when you think about the issues with |
| 04:09PM | 20 | the timeframe, when you think about the issues with the |
| 04:09PM | 21 | witnesses, when you think about all the evidence you did not |
| 04:09PM | 22 | hear, the verdict is not guilty. |
| 04:09PM | 23 | When we get to Count 5, conspiracy to commit sex |
| 04:09PM | 24 | trafficking, and you think about the inconsistencies between |
| 04:09PM | 25 | the government's own witnesses, when you think how they tried |

USA v Gerace - Closing Argument / Foti - 12/19/24

239

04:09PM   1   to throw the kitchen sink at you, they tried to tell you,

04:09PM   2   yeah, just any of these buckets and each one came up short,

04:09PM   3   there's only one verdict that's supported by the lack of

04:09PM   4   evidence here, and that is not guilty.

04:09PM   5        When we get to Count 6 -- Count 6, Count 7, Count 8,

04:09PM   6   all tampering with a witness, all the same allegation, all

04:09PM   7   completely inconsistent with the evidence that you have.  And

04:10PM   8   when you evaluate that charge, it is not guilty, not guilty,

04:10PM   9   and not guilty.

04:10PM   10       Finally, I'll leave that one to you.

04:10PM   11       Do you believe C.C. that Peter Gerace is the one who

04:10PM   12   brought drugs there and he possessed it with intent to

04:10PM   13   distribute, there is not a conspiracy element.  There is not a

04:10PM   14   timeframe that extends over a period of time where Mr. Peter

04:10PM   15   Gerace was not in the club.  If you believe that beyond a

04:10PM   16   reasonable doubt, then you may make a verdict of guilty here.

04:10PM   17       But I would suggest, the burden being a high one, and

04:10PM   18   the possibility that somebody else was responsible for

04:10PM   19   bringing the cocaine is enough to acquit as to this, that on

04:11PM   20   this one, as well, the verdict is not guilty.

04:11PM   21       You'll make that determination after you have an

04:11PM   22   opportunity to evaluate all the evidence.

04:11PM   23       Members of the jury, I've been proud to be a part of

04:11PM   24   this trial and to stand in front of you to represent Peter

04:11PM   25   Gerace.  I appreciate you listening throughout the entirety of

USA v Gerace - Proceedings - 12/19/24

240

04:11PM    1   this.

04:11PM    2       Like I said, I won't get another opportunity to talk

04:11PM    3   to you, Eric Soehnlein doesn't get up to talk to you, but we

04:11PM    4   trust that you're going to do your job at this point.  We

04:11PM    5   trust that you're going to hold the government accountable,

04:11PM    6   and you are going to choose to push back against the

04:11PM    7   government overreach in this case.

04:11PM    8       Thank you.

04:11PM    9   **THE COURT:**  Okay.  We're going to take another break

04:11PM   10   now.  Before we do that, though, I want to say something about

04:11PM   11   the objection that Mr. Tripi made that I overruled.

04:11PM   12       I overruled that objection not because I disagree

04:11PM   13   with what Mr. Tripi was saying.  Mr. Tripi said that Mr. Foti

04:12PM   14   had made a misstatement of the law.

04:12PM   15       The reason I overruled the objection is because what

04:12PM   16   lawyers say to you is simply argument.  What they say to you

04:12PM   17   about the facts is not evidence, and you're not to accept what

04:12PM   18   they say simply because they said it.

04:12PM   19       What they say to you about the law is not what the

04:12PM   20   law is.  I'm going to tell you what the law is tomorrow.  So,

04:12PM   21   that's why I overruled the objection.

04:12PM   22       The lawyers can make whatever arguments they want to

04:12PM   23   make to you about the facts and about the law.  You can accept

04:12PM   24   those arguments, you can reject those arguments.  What they

04:12PM   25   say is not evidence, and what they say is not the law.  Okay?

USA v Gerace - Proceedings - 12/19/24

241

| | | |
|---|---|---|
| 04:12PM | 1 | So that's why I overruled that objection. |
| 04:12PM | 2 | We're going to break for about ten minutes.  Let's |
| 04:12PM | 3 | come back at 4:25.  Come back at 4:25 to finish up.  Okay? |
| 04:12PM | 4 | Remember my instructions.  Don't talk about the case |
| 04:12PM | 5 | even with each other, don't make up your minds, folks.  Not |
| 04:12PM | 6 | just yet. |
| 04:12PM | 7 | (Jury excused at 4:12 p.m.) |
| 04:13PM | 8 | **THE COURT:**  Anything before we break? |
| 04:13PM | 9 | **MR. COOPER:**  Just, I want to say I appreciate the |
| 04:13PM | 10 | explanation of the overruled objection.  I think it cleared up |
| 04:13PM | 11 | that the Court wasn't disagreeing with the objection. |
| 04:13PM | 12 | **THE COURT:**  Yep. |
| 04:13PM | 13 | **MR. TRIPI:**  And I did my best not to object -- |
| 04:13PM | 14 | **THE COURT:**  No, no, I know you did, Mr. Tripi.  I -- |
| 04:13PM | 15 | I -- I -- I know you did.  I know you did.  And you know that |
| 04:13PM | 16 | I give very wide latitude in summation for that very reason, |
| 04:13PM | 17 | because I'm going to, you know, I instructed the jury then |
| 04:13PM | 18 | and -- and I will instruct the jury again that what I say is |
| 04:13PM | 19 | the law, not what you say and not what the defense says. |
| 04:13PM | 20 | So I just -- I think it's -- it bears reinforcing |
| 04:14PM | 21 | when there's an objection made, that's all. |
| 04:14PM | 22 | **MR. TRIPI:**  Thank you. |
| 04:14PM | 23 | **THE COURT:**  Okay.  Anything from the defense before |
| 04:14PM | 24 | we break? |
| | 25 | |

USA v Gerace - Proceedings - 12/19/24

242

04:14PM   1          **MR. FOTI:**  No.

04:14PM   2          **MR. SOEHNLEIN:**  No, thank you.

04:14PM   3          **THE COURT:**  Okay.  You've got 32 minutes, and I'm

04:14PM   4   gonna hold you to it.  I'm gonna -- the gong is going at 32.

04:14PM   5          **MR. TRIPI:**  You didn't have to pull the cane on any

04:14PM   6   of the trial, I get it.

04:14PM   7          **THE COURT:**  Okay.  I just want you to understand.

04:14PM   8   Okay.

04:14PM   9          **THE CLERK:**  All rise.

04:24PM  10          (Back on the record at 4:24 p.m.)

04:24PM  11          (Jury not present.)

04:24PM  12          **THE CLERK:**  We are back on the record for the

04:24PM  13   continuation of the jury trial in case numbers 19-CR-27 and

04:25PM  14   23-CR-37, United States of America versus Peter Gerace Jr.

04:25PM  15          All counsel and parties are present.

04:25PM  16          **THE COURT:**  Okay.  Anything that we need to do before

04:25PM  17   we bring the jury back?

04:25PM  18          **MR. TRIPI:**  No, Your Honor.

04:25PM  19          **MR. SOEHNLEIN:**  No, Your Honor.

04:25PM  20          **THE COURT:**  Okay.  At the very end, once we're done,

04:25PM  21   I want to talk about the jury charge.  I've made some

04:25PM  22   decisions on those final -- or, at least some tentative

04:25PM  23   decisions.  We'll have a little more, perhaps, argument

04:25PM  24   tomorrow morning, but I want to -- I want to just give you my

04:25PM  25   thoughts this evening because I know Mr. Soehnlein's not going

04:25PM    1    to be here tomorrow, and I want him to have the opportunity to

04:25PM    2    weigh in through Mr. Foti.  So I think it's only fair to give

04:25PM    3    you an idea of where I'm coming from on those three charges.

04:25PM    4         Okay.  Once Pat -- do you know how to get ahold of

04:27PM    5    Pat?  Can you?

04:27PM    6         (Jury seated at 4:27 p.m.)

04:27PM    7         **THE COURT:**  The record will reflect that all our

04:27PM    8    jurors, again, are present.

04:27PM    9         Mr. Tripi, you may begin.

04:27PM    10        **MR. TRIPI:**  Thank you.  We're almost there.

04:27PM    11        Now is just about the time for you to use your good

04:27PM    12   judgment, your common sense, and your life experience to

04:27PM    13   determine what happened here.  But by now, you know what

04:27PM    14   happened here.

04:27PM    15        And you also know that when you dance between the

04:27PM    16   rain drops, you get wet.

04:28PM    17        Through six weeks, 45 or so witnesses, over 150

04:28PM    18   exhibits in evidence, this defendant right here is soaked in

04:28PM    19   guilt.

04:28PM    20        This is not a kitchen-ink approach.  There's a ton of

04:28PM    21   evidence.  That's the difference.

04:28PM    22        And the defendant's no hero or sitting here for two

04:28PM    23   months, listening to victim after victim whose life he helped

04:28PM    24   ruin through his club, through the path to hell that he sent

04:28PM    25   them down.  Making money off of their bodies, their trauma,

04:28PM   1    and the bank that he called his VIP Room.

04:28PM   2         Now, sure, he doesn't like the facts, the facts that

04:29PM   3    you learned about in this trial, so he attacked the messengers

04:29PM   4    of the facts.  The messengers who brought the evidence to

04:29PM   5    court.  And that's okay.

04:29PM   6         But the government's not on trial here, the defendant

04:29PM   7    is.  This is his trial.  This is about what he did.  These are

04:29PM   8    about his choices.  And it's up to you to decide the facts,

04:29PM   9    and those facts prove him guilty.

04:29PM   10        But the defendant would have you believe in some sort

04:29PM   11   of upside-down world that the agents who investigated his

04:29PM   12   crimes, who exposed Bongiovanni's corrupt relationship with

04:29PM   13   him, who exposed his corrupt connections to a New York State

04:29PM   14   Supreme Court judge, who exposed through the evidence they

04:29PM   15   brought into this courtroom his connections to the Outlaws

04:29PM   16   Motorcycle Club, who provided witnesses who testified about

04:29PM   17   threats of coercion and fear, and his connections or reputed

04:30PM   18   connections to Italian Organized Crime through his family.

04:30PM   19   Somehow, that's the government's fault?  No.

04:30PM   20        These are about his choices, what he did to real

04:30PM   21   people who sat there and told you about it, embarrassed,

04:30PM   22   embarrassed by what they had to talk about.

04:30PM   23        So, you didn't hear much.  You didn't hear much about

04:30PM   24   the facts and the actual testimony from witnesses in this

04:30PM   25   trial and the actual exhibits in the courtroom.  We'll go

04:30PM    1    through some of it.

04:30PM    2        You didn't hear much about specific testimony about

04:30PM    3    what happened at Pharaoh's.  You heard cherry-picked portions?

04:30PM    4    You heard cherry picked?  Cherry-picked sentences of

04:30PM    5    cross-examination.

04:30PM    6        Think back to the direct exam, when people are able

04:30PM    7    to speak freely in terms of open-ended questions, where they

04:31PM    8    say what happened.  Compare that when you're thinking about

04:31PM    9    what was cherry picked here.

04:31PM    10        You didn't hear much about the actual threats made to

04:31PM    11    P.H.?  When Mr. Cooper was reading them, you knew it was

04:31PM    12    coming from Peter because that's whose name Crystal referenced

04:31PM    13    in connection with calling her a narc and a rat.

04:31PM    14        And C.C., C.C. told you he sat feet away while it

04:31PM    15    happened.  Of course, he got buyer's remorse later.

04:31PM    16        So let's get back to reality, the facts that you know

04:31PM    17    happened based on the evidence.

04:31PM    18        Facts?  Joe Bongiovanni and this defendant have been

04:31PM    19    friends for 36 years, his text message.  That's back to 1982.

04:31PM    20        Joe Bongiovanni became a DEA agent here in 2003.  He

04:31PM    21    started funneling information to this defendant in 2005.

04:32PM    22        Is there any surprise with that type of powerful

04:32PM    23    insider working against people like this who investigate cases

04:32PM    24    from the inside that he never got caught?

04:32PM    25        And then double tap that with a corrupt New York

04:32PM    1    State judge, who happens to be the judge on a protective order

04:32PM    2    when the State police are trying to make drug buys in

04:32PM    3    Pharaoh's.  Are any of you shocked that no actual drugs got

04:32PM    4    found?

04:32PM    5         But you have witnesses.  And those witnesses have

04:32PM    6    eyeballs, and brains, and ears, and they came here and told

04:32PM    7    you about it.

04:32PM    8         You want to talk about the drug evidence that wasn't

04:32PM    9    seized?  His corruption relationships are the starting point

04:32PM   10    for that discussion.  And those corrupt relationships, the

04:32PM   11    corrupt relationship with Joseph Bongiovanni, are why he's

04:32PM   12    guilty of Counts 1 and 2.

04:33PM   13         And, you know, there was a lot of talk about, you

04:33PM   14    know, the government this, and the government that, and you

04:33PM   15    only heard testimony.  The judge is going to instruct you on

04:33PM   16    the law.  He's going to tell you testimony is evidence, just

04:33PM   17    like Mr. Cooper did.  Just like Mr. Cooper did.  Because if

04:33PM   18    testimony's not evidence, if testimony is not evidence, then

04:33PM   19    think of this hypothetical:  That any person walking down the

04:33PM   20    street alone who gets robbed is a victim of a crime, that by

04:33PM   21    definition can never be solved?  That's a ridiculous notion.

04:33PM   22    And that's not the law that this judge is going to give to

04:33PM   23    you.

04:33PM   24         So now, getting back to facts that were presented to

04:33PM   25    you during trial, back during opening statements I told you

04:33PM    1    that the defendant picked the most vulnerable women because he

04:33PM    2    could control them.  So he could make enough money through

04:33PM    3    their exploitation in the downstairs VIP Room, the place he

04:34PM    4    called the bank.  And so he could use them as his own sexual

04:34PM    5    playthings for himself and his prominent friends before

04:34PM    6    discarding them for a new model.

04:34PM    7        They were all the same to him.  Just like they were

04:34PM    8    the same to Doug:  Disposable, replaceable, run them into the

04:34PM    9    ground until they're broken, only to be replaced by new

04:34PM   10    favorites.

04:34PM   11        He also picked them because he believed their

04:34PM   12    vulnerabilities were an insurance policy from this day coming.

04:34PM   13    As I said in the beginning, their vulnerability, their

04:34PM   14    addictions, their frailty were part of the business model.

04:34PM   15    Part of the reason he controlled them through their

04:34PM   16    addictions, so if this day came where his conduct came to

04:34PM   17    light, he'd use it against them.

04:34PM   18        He'd use their addictions, their frailties, ones that

04:34PM   19    he enhanced or started, against them as an insurance policy to

04:35PM   20    discredit them so you wouldn't believe them.

04:35PM   21        And that's the defense argument, the one he had in

04:35PM   22    his mind way back when he was doing it, that's the argument

04:35PM   23    you just heard.  Blame the victims.  Don't look over there.

04:35PM   24    Don't look at the defendant.  Don't scrutinize his conduct.

04:35PM   25    Blame the victims.

04:35PM    1        As you know by now, each of them were vulnerable in

04:35PM    2    their own ways.  All of them became addicted to drugs or those

04:35PM    3    addictions worsened exponentially through the drugs either the

04:35PM    4    defendant fed them or others did at Pharaoh's.

04:35PM    5        By now, the evidence has shown you that he

04:35PM    6    underestimated them.  It has shown you through each of their

04:35PM    7    unique yet similar experiences at Pharaoh's over years, 2009

04:35PM    8    it's happening to K.L. and G.R., 2018 it's happening to L.L.,

04:36PM    9    and at times in between.  How he exploited those addictions to

04:36PM   10    get them to behave in ways they're not proud of because he

04:36PM   11    wanted that protection from this day.

04:36PM   12        But in a few moments when you start to deliberate,

04:36PM   13    and really listen to what they said, it'll bind him to

04:36PM   14    justice.

04:36PM   15        When you apply your good judgment, your common sense

04:36PM   16    to what you saw play out in this courtroom, it'll prove his

04:36PM   17    guilt beyond a reasonable doubt of every one of those counts

04:36PM   18    that Mr. Foti just went and checked boxes on.

04:36PM   19        Speaking of that, you just heard a lengthy summation

04:36PM   20    by a skilled advocate for the defendant.  But that's not

04:36PM   21    evidence.  You are the sole arbiters of the facts.  And the

04:36PM   22    facts came from the dozens of witnesses who testified, those

04:36PM   23    150 or so exhibits, and all of that you consider in totality,

04:37PM   24    and it comes together, layer upon layer upon layer, over two

04:37PM   25    months, corroborating each other on the major points, those

USA v Gerace - Rebuttal / Tripi - 12/19/24

249

04:37PM  1    elements that we've proven beyond a reasonable doubt.

04:37PM  2         And that's what we need to prove, are the elements,

04:37PM  3    and each charge only has two or three.  Not every little fact,

04:37PM  4    not every little detail.

04:37PM  5         If I asked you what everybody wore yesterday, you'd

04:37PM  6    probably have a bunch of different answers.  But you'd know

04:37PM  7    for damn sure you all sat in these chairs, right?  The main

04:37PM  8    point would be we had jury duty yesterday.

04:37PM  9         Facts plus law equals verdict.  You heard it before.

04:37PM  10   That's the formula.  The facts come from the evidence in the

04:37PM  11   courtroom.

04:37PM  12        Now the defense repeatedly invited you to speculate.

04:37PM  13   You heard things like you can only imagine, you can only

04:37PM  14   imagine, you can only imagine.  Speculation, imagination, is

04:38PM  15   not evidence.  Not in this courtroom.

04:38PM  16        Rhetorical questions are not evidence.  Suggestions

04:38PM  17   about possibilities and sarcasm is not evidence.

04:38PM  18        It's possible that you're sitting right now in a

04:38PM  19   rocketship to the moon, but the evidence is you're in a

04:38PM  20   federal court building listening for the final time to an

04:38PM  21   attorney talk to you.

04:38PM  22        The evidence is how you perform your duty, your

04:38PM  23   function.  You review the testimony, the exhibits, and you

04:38PM  24   render a verdict based on that.

04:38PM  25        So every invitation you just heard beyond something

04:38PM  1    that was in this courtroom, or an exhibit you can see, reject

04:38PM  2    it.  Reject it.  Those are invitations to speculate, nothing

04:38PM  3    more, reject them.

04:38PM  4         Focus back on the evidence.  Facts plus law equals

04:38PM  5    verdict.  That simple equation applied to the elements

04:39PM  6    Mr. Cooper went through in detail that he's guilty, as sure as

04:39PM  7    you're sitting in those chairs.

04:39PM  8         The proof doesn't need to be perfect.  After all,

04:39PM  9    people aren't perfect.  Nobody is.  Everyone's unique.  Some

04:39PM  10   are in different stages of their recovery.  Some are handling

04:39PM  11   the trauma in their life better than others.  But based on

04:39PM  12   their testimony and the boulders of it, the important parts of

04:39PM  13   it, they corroborate each other and are corroborated by

04:39PM  14   exhibits.

04:39PM  15        And that proof, when you look at it through the

04:39PM  16   proper lens with your common sense and life experience, the

04:39PM  17   proof's overwhelming.  And it establishes each element of each

04:39PM  18   crime that we need to prove beyond a reasonable doubt.

04:39PM  19        A last word about sort of the defendant's arguments

04:39PM  20   in that regard.  The defendant's arguments would be like

04:39PM  21   having you be in a forest, and you know you've entered the

04:39PM  22   forest, but instead of just knowing you're in the forest and

04:39PM  23   calling it a forest, they would have you look to fixate on

04:40PM  24   little flaws on each little tree, and not realize you're

04:40PM  25   standing in a forest.

04:40PM    1        The evidence was all around you in this courtroom.

04:40PM    2    It's there for you, just like you'd be in the forest.  It's

04:40PM    3    obvious where you are, you're in a courtroom with facts that

04:40PM    4    prove this defendant's guilt.

04:40PM    5        Okay.  We can keep up Exhibit 555, Ms. Champoux, just

04:40PM    6    keep it in the background.

04:40PM    7        Choices.  The defendant's -- the defense started this

04:40PM    8    way, they sort of ended this way.  Choices.  This case is

04:40PM    9    about one person's choices, the defendant's.

04:40PM   10        To the extent you heard argument, though, about the

04:40PM   11    different dancers' choices, other than the initial choice to

04:40PM   12    go work at Pharaoh's, these were not choices.  Very quickly

04:40PM   13    after that, they became something much different.

04:40PM   14        This gets back to the business model the defendant

04:41PM   15    set up.  Once there, and once in the throes of addiction that

04:41PM   16    he created like he did with L.L. and others, or he exacerbated

04:41PM   17    like he did with G.R. and others, for those drug-addicted

04:41PM   18    dancers, there became only the illusion of choice.

04:41PM   19        For the drug-addicted dancers that he either pumped

04:41PM   20    up on drugs or helped keep malleable supplying them with

04:41PM   21    drugs, there was no real choice.  They weren't building their

04:41PM   22    résumés to go function in society at that point.  They were

04:41PM   23    addicted to drugs, and he knew that.

04:41PM   24        A dancer operating under those severe addictions

04:41PM   25    where they would do literally anything to avoid being sick,

04:41PM   1    lick the bottom of the toilet seat if requested, is no more

04:41PM   2    able to make a rational and logical choice when it becomes --

04:41PM   3    when it comes to a sex act or anything else important in their

04:41PM   4    life than a child.  That's what you're dealing with here.

04:42PM   5           As Rebecca Bender told you, and based on the other, I

04:42PM   6    submit, powerful testimony you heard, the women who succumbed

04:42PM   7    to the defendant and their business model:  G.R., L.L., K.L.,

04:42PM   8    P.H., A.A., K.A. and others -- they were operating under

04:42PM   9    invisible chains.

04:42PM   10          The defendant and Pharaoh's were like a beacon for

04:42PM   11   the drugs and the money they needed for the drugs.  Because at

04:42PM   12   that point, once his hooks were into them and that lifestyle

04:42PM   13   were hooked into them, they couldn't do anything else.  They

04:42PM   14   couldn't function.  And in that way, he and those working with

04:42PM   15   him, that's how they overcome their will.

04:42PM   16          The whole thing was made to set up like Rebecca

04:42PM   17   Bender educated you about.  To position the dancers as the

04:43PM   18   up-sellers.  Because to the -- the customer, to the unwitting

04:43PM   19   customer -- let's say the regular frat boy who walks in there

04:43PM   20   one night, right, he's not doing anything wrong.  To the

04:43PM   21   regular customers, the dancer's doing these things.

04:43PM   22          But to the whales, the high-paying VIPs, the ones he

04:43PM   23   really wanted to spend thousands and thousands of dollars like

04:43PM   24   Wayne and Joseph Barsuk and those creeps, they knew the deal.

04:43PM   25   And the deal was get your rocks off on these women in one way

04:43PM    1    or the other.  And what's happening?  They're there, that

04:43PM    2    takes more time, that takes a longer dance, and ultimately

04:43PM    3    with the split in the percentage, that's money in his pocket.

04:43PM    4    It's how he ends up with a mansion, a Maserati, a Harley

04:43PM    5    Davidson, a pool with a slide.

04:44PM    6         And then he's got the audacity to sue P.H. who can't

04:44PM    7    rub two pennies together and is homeless living on the street.

04:44PM    8    And then apparently, it's the government's fault for making

04:44PM    9    sure she doesn't die and charging, her as you heard Brian

04:44PM   10    Burns talk about doing.  And then she messes up again because

04:44PM   11    she can't get her life together.  But she was 18 when she

04:44PM   12    walked into his apartment and he gave her coke and a bottle of

04:44PM   13    alcohol.  Those are the facts from that witness stand.

04:44PM   14         So those up-selling dancers, they were his bank.

04:44PM   15    Talk about coercion, control, exploitation?

04:44PM   16         Rebecca Bender explained most sex trafficking, like

04:44PM   17    that which you saw in this trial, is hiding for you in plain

04:44PM   18    sight.

04:44PM   19         The supposed gentleman's club, like Mr. Cooper said,

04:45PM   20    was a brothel with a liquor license and a neon sign.  So

04:45PM   21    people like E.H., who stripped all over the country, still

04:45PM   22    came back here offended by the fact that she got jizzed on and

04:45PM   23    was told she can't call the police.  She's no shrinking

04:45PM   24    violet.  She told you she worked in strip clubs in multiple

04:45PM   25    states.  Yet she was back here -- not bizarre, not bizarre,

04:45PM    1    offended and autistic.  Team Don't Get Jizzed on and Not Call

04:45PM    2    the Police.

04:45PM    3              His bouncers, were Team Grind on Them, because that's

04:45PM    4    what he wanted, to keep these dancers dancing longer, making

04:45PM    5    him more money.

04:45PM    6              So apply the facts plus the law, that will get you to

04:45PM    7    the right verdict:  Guilty.

04:45PM    8              You heard about CEO pimps and Romeo pimps.  He

04:46PM    9    bounced between the two.  Just because he doesn't wear the

04:46PM   10    floppy hat with the cane, nothing different than a pimp.

04:46PM   11    That's what the evidence showed.

04:46PM   12              Talk about threat of severe harm, severe withdrawal?

04:46PM   13    There's no doubt about that.  None.  Based on the drug

04:46PM   14    addictions of these dancers you heard about.

04:46PM   15              Talk about threat of harm?  He employed the leader of

04:46PM   16    the Outlaws Motorcycle Club, first as your cleaner, then as

04:46PM   17    your manager, and having others work there.  Talk about threat

04:46PM   18    of harm?  That's coercion.

04:46PM   19              It's not just the drugs.  It's the drugs; it's the

04:46PM   20    Outlaws; it's him telling people he's in the mob; it's his

04:46PM   21    family reputation; it's him pulling dancers off stage; it's

04:46PM   22    him blackmailing dancers and telling them you won't be able to

04:46PM   23    work anywhere else like he told L.L. when she, I'm sure as you

04:46PM   24    know, based on your good judgment and common sense, mustered

04:46PM   25    up enough courage to say I'll dance elsewhere, and he said no

04:47PM  1    you won't.

04:47PM  2         Do you know how hard that must have been for her,

04:47PM  3    back then, to say that to him?

04:47PM  4         Control.  Coercion.  Domination.  That's what he did.

04:47PM  5         The camera system?  Let's dispense with that.

04:47PM  6         He knew he was under investigation since early 2019.

04:47PM  7    He was stopped.  His brother was arrested and charged, he was

04:47PM  8    stopped, his phone was seized.  There's no camera footage

04:47PM  9    before October 21st, 2019.

04:47PM  10        Maintaining a drug premises?  Let me talk about minor

04:47PM  11   inconsistencies for a moment.  Minor inconsistencies between

04:47PM  12   witnesses are the hallmark of truth.  Nobody remembers

04:47PM  13   something the same way.  That goes back to describe your

04:47PM  14   favorite play from the Bills game last week, you'll all

04:47PM  15   describe it differently, you all saw the same play.  And these

04:48PM  16   dancers saw the same plays play out with their bodies over and

04:48PM  17   over and over again.

04:48PM  18        They talked about maintaining a drug premises.

04:48PM  19   Listen to this, the judge closely.  Permanently or temporarily

04:48PM  20   from 2006 to 2019, he maintained Pharaoh's.

04:48PM  21        The fact that drug distribution was discreet from

04:48PM  22   some customers, that's all that was discreet there, as R.W.

04:48PM  23   explained to you.

04:48PM  24        The judge isn't gonna tell you that the drug use and

04:48PM  25   distribution needed to be open and obvious at all times, just

04:48PM  1   that it was an important part of the business, important part

04:48PM  2   of what was going on there.  Mr. Cooper handled that.

04:48PM  3          And as to the conspiracy, there's two objects.  Not

04:48PM  4   just tied to Pharaoh's.  You don't get to leave Pharaoh's and

04:48PM  5   then go deal drugs at your house.  He's charged with a

04:48PM  6   narcotics conspiracy.  He distributed drugs to Matt Albert in

04:48PM  7   a parking lot at Donut Kraze.  What was that?

04:49PM  8          That wasn't how the conspiracy works.  There's stuff

04:49PM  9   happening at Pharaoh's, but he's still a drug dealer when he

04:49PM 10   walks out and sells to other people.

04:49PM 11          And there's still a conspiracy going on.  Just

04:49PM 12   because he has an ownership dispute in 2013, go to the direct

04:49PM 13   examinations of the witnesses on that point.  You see phone

04:49PM 14   records.  There were still phone calls in 2013.  There's no

04:49PM 15   actual evidence that you saw of any court order or anything

04:49PM 16   like that that Peter Gerace wasn't supposed to be there.

04:49PM 17          And guess what?  You're not supposed to sell drugs

04:49PM 18   either.  He did that anyway.

04:49PM 19          You're not supposed to use drugs on probation.  He

04:49PM 20   did that anyway.

04:49PM 21          So this notion that he wasn't supposed to be at

04:49PM 22   Pharaoh's?  Wrap your minds where that -- those words were

04:49PM 23   first uttered in this courtroom.  It wasn't from that witness

04:49PM 24   stand, it was from this podium from an attorney.

04:49PM 25          Just because they got some people to say yeah, maybe,

USA v Gerace - Rebuttal / Tripi - 12/19/24

04:49PM   1   I don't remember.

04:49PM   2          L.L. told you I don't ever remember a significant

04:50PM   3   stretch where he wasn't there.  I think she would know, as he

04:50PM   4   had vaginal sex and stuck his penis in her mouth while holding

04:50PM   5   drugs over her head.  I think she would know.  You know she

04:50PM   6   would know.

04:50PM   7          Talk about credibility?  P.H.?  She owned what she

04:50PM   8   said about the watch.  The federal investigation wasn't about

04:50PM   9   his stolen watch, members of the jury.

04:50PM  10          K.L.  They didn't ask too much about the moment in

04:50PM  11   time when he pulled his pants down.  Did they ask her much

04:50PM  12   about that?  No.  They wanted to ask her about all the other

04:50PM  13   problems she had in life, problems that happened after he got

04:50PM  14   her addicted to drugs.

04:50PM  15          They want to throw all that in K.L.'s face and trip

04:50PM  16   her up a little bit?  Sure.

04:50PM  17          But remember the moment when she couldn't even speak

04:50PM  18   about when she was alone in the room with him.  Do you think

04:50PM  19   she's some actress, she just missed her calling?  She just

04:50PM  20   missed her Academy Award winning moment?  Or was that trauma

04:51PM  21   that you saw?

04:51PM  22          And it sucked for Mr. Cooper to have to ask her those

04:51PM  23   questions.  But I submit to you it was real, and you all saw

04:51PM  24   it.

04:51PM  25          Katrina Nigro.  I'll get to her in a moment.

04:51PM    1          L.L.  Really?  She's not credible?  Her grand jury

04:51PM    2    testimony was that she engaged in hundreds, a couple hundred

04:51PM    3    sex acts.  They're 25 men, a couple hundred sex acts.  So she

04:51PM    4    testifies about 500 sex acts here.  There's your big

04:51PM    5    inconsistency, guess we should all go home.

04:51PM    6          L.L., who talked for hours, about how different men

04:51PM    7    all connected to this defendant in one way, shape, or form.

04:51PM    8    His brother, his liquor distributor, abused her body, holding

04:51PM    9    drugs over her head like training a dog to go to the bathroom

04:51PM   10    outside.

04:51PM   11          That's an example Rebecca Bender gave you about how

04:52PM   12    the drugs are used to control people.  It's the exact same

04:52PM   13    example she testified about, that's how L.L.'s life was.

04:52PM   14    Making up anal sex and all that stuff?  You know better.

04:52PM   15          Katrina Nigro.  She's only the star witness -- I

04:52PM   16    guess according to the defense, Katrina Nigro should be the

04:52PM   17    only picture on 555.  There's a lot of other stuff up there,

04:52PM   18    there's a lot of other people, there's a lot of other

04:52PM   19    exhibits, but guess what?  Katrina Nigro, she's only a star

04:52PM   20    witness in their minds.  But in your minds, she's one witness

04:52PM   21    who provided information for you to evaluate.

04:52PM   22          So, yes, was she corroborated?  Jenny Carter

04:52PM   23    corroborated her about the wedding, the fraudulent wedding.

04:52PM   24          The forged marriage certificate corroborated her when

04:52PM   25    you compare Anthony Gerace's actual signature on his federal

04:52PM  1    plea agreement with the forgery on the marriage license.

04:52PM  2           The defendant's texts with Bongiovanni establish she

04:52PM  3    was at that dinner where the envelope was handed over.

04:53PM  4           Phone records corroborate her.

04:53PM  5           Judge Michalski's emails to Fred Playtek -- you

04:53PM  6    remember she told you Anthony was mad that his name was

04:53PM  7    forged?  Then Judge Michalski starts trying push through the

04:53PM  8    pistol permit, let's make Anthony happy.

04:53PM  9           The contacts in the defendant's phone match the

04:53PM  10   categories and people that she said went upstairs.  She's

04:53PM  11   Nostradamus now?  She knows all the people in his phone?  Or

04:53PM  12   did she make relevant observations, admit to you that she

04:53PM  13   walked some people up after the defendant would give her the

04:53PM  14   key, including Judge Michalski, and then dancers had sex.

04:53PM  15          There's nothing -- there's nothing, I submit to you

04:53PM  16   there's nothing novel about old men wanting to have sex with

04:53PM  17   young women.  And that's what he did.  And he used drugs, and

04:53PM  18   his position of power to do it for him and his buddies for the

04:54PM  19   reasons Mr. Cooper told you about.

04:54PM  20          Let's talk more.  The text message with Judge

04:54PM  21   Michalski, let's get pussy.  Talking about Shelby.  Mocking

04:54PM  22   Katrina.  All corroborate things Katrina told you.

04:54PM  23          Anthony Casullo, a DEA agent testifying about a

04:54PM  24   conversation with Bongiovanni about overdoses at Pharaoh's,

04:54PM  25   corroborates Katrina.

| | | |
|---|---|---|
| 04:54PM | 1 | Okay, so her estimate -- |
| 04:54PM | 2 | Pull up exhibit with Katrina, 241 or 240, whatever it |
| 04:54PM | 3 | was, Ms. Champoux, I'm sorry, I've got like five minutes left. |
| 04:54PM | 4 | -- all corroborate her, begrudgingly. |
| 04:54PM | 5 | The other one, 240B.  All right.  We'll forget the |
| 04:54PM | 6 | photos. |
| 04:54PM | 7 | She was -- she was in Pharaoh's in 2014.  She's in |
| 04:54PM | 8 | pictures.  Do you want to talk about a conspiracy?  Scooter, |
| 04:54PM | 9 | Darryl LaMont, would give drugs to L.L. when she couldn't |
| 04:55PM | 10 | dance.  Peter made sure L.L. was able to dance because she was |
| 04:55PM | 11 | a favorite who made him a lot of money. |
| 04:55PM | 12 | A picture speaks a thousand words.  That's a picture |
| 04:55PM | 13 | of a conspiracy. |
| 04:55PM | 14 | It didn't end there.  LaMont provided multiple |
| 04:55PM | 15 | services, drugs to dancers, and then they shared personnel. |
| 04:55PM | 16 | So much so that LaMont knows which of this defendant's dancers |
| 04:55PM | 17 | do anal.  Hahaha.  I guess it's a joke. |
| 04:55PM | 18 | Nothing funny about that joke, and you all know it, |
| 04:55PM | 19 | because it's not a joke. |
| 04:55PM | 20 | Who else talked about dancers overdosing?  R.W., |
| 04:55PM | 21 | E.H., L.L. overdosed herself, K.M. |
| 04:55PM | 22 | K.M. coming back from Pennsylvania, no stake in this |
| 04:55PM | 23 | case, tells you the defendant admits the bikers got rid of a |
| 04:55PM | 24 | body.  He doesn't know what they did with it. |
| 04:56PM | 25 | I'm gonna skip ahead a little bit.  I'm going to have |

04:56PM    1    a few minutes to go.

04:56PM    2         The defendant doesn't have to know about each

04:56PM    3    transaction of drugs at Pharaoh's, it was his business model.

04:56PM    4    You heard about it.  Marcus Black, A.A., Cherry, all of those

04:56PM    5    people working, putting drugs in people's hands, he did it

04:56PM    6    himself.

04:56PM    7         But guess what?  The CEO of McDonald's doesn't have

04:56PM    8    to watch people flip burgers, he knows they're being flipped,

04:56PM    9    'cuz it's part of the business.  It's part of the business

04:56PM   10    that makes the CEO money.  That's this defendant.

04:56PM   11         The defendant would have you believe he wasn't there

04:56PM   12    in 2013.  There's zero evidence of that.  No evidence that he

04:56PM   13    wasn't allowed in the club.  No evidence of a court order.  No

04:56PM   14    evidence where hypothetically he starts to care about the law

04:56PM   15    and doesn't show up.

04:56PM   16         But once Don Parrino was fully out of the picture, it

04:56PM   17    revved up more.  Bring in the Outlaws, let's ramp it up more.

04:57PM   18    More drug trafficking, more sex trafficking.

04:57PM   19         And that gap in time that Mr. Foti is talking about,

04:57PM   20    there's zero significance to that.  The judge is going to

04:57PM   21    instruct you on the law.  It's on or about the dates charged

04:57PM   22    in the indictment.  So if someone lays low and doesn't sell

04:57PM   23    drugs for a little while, they're not out of the conspiracy.

04:57PM   24    But you have no evidence that this defendant never stopped,

04:57PM   25    only words from this podium, not that witness stand.

04:57PM   1          L.L. versus A.A.  In the last minute or so that I

04:57PM   2    have, the defense highlighted for you their differences in

04:57PM   3    their testimony.  Well, guess what?  I submit to you that L.L.

04:57PM   4    is further along in her healing, that she is more willing to

04:57PM   5    talk about her traumatic experiences.

04:57PM   6          A.A. couldn't even look at a photo of Wayne VanVleet.

04:57PM   7    L.L. was able to look at him and identify him.

04:57PM   8          Don't hold it against A.A. that she didn't fully

04:58PM   9    disclose all of her trauma before you like L.L. was, or like

04:58PM  10    G.R. was.  But you should believe the parts that she told you,

04:58PM  11    that she mustered the courage to tell you about.

04:58PM  12          Last thing.  They talked to you about missing

04:58PM  13    witnesses, other people who were interviewed.  Well, guess

04:58PM  14    what?  Those were just more invitations to speculate.  Reject

04:58PM  15    it.

04:58PM  16          It's our burden of proof, our burden to prove the

04:58PM  17    case beyond a reasonable doubt.  We embrace that burden.  But

04:58PM  18    the defendant has the ability and the right to subpoena

04:58PM  19    witnesses, so that's just simply not evidence in the case.  So

04:58PM  20    to the extent they want you to speculate?  Reject it.

04:58PM  21          All right.  I'm wrapping it up.  I have 45 seconds to

04:58PM  22    go.  So here we are.  I've got a whole bunch more to say, but

04:59PM  23    I can't say it in that amount of time, so your good judgment,

04:59PM  24    your common sense, your recollections are gonna fill in the

04:59PM  25    gaps of the arguments that I want to make.

USA v Gerace - Proceedings - 12/19/24

263

04:59PM  1      The last thing I'll say is this:  Their faces and

04:59PM  2  their experiences were all unique, yet horribly similar.  He

04:59PM  3  started them down the path to destruction, the one he

04:59PM  4  exploited, the business model he chose, the choices he made,

04:59PM  5  while he was protected by a corrupt federal agent, and when

04:59PM  6  that didn't work anymore he tried to tamper with witnesses.

04:59PM  7      The evidence is overwhelming.  There is no reasonable

04:59PM  8  doubt in this case on the elements we have to prove.  Any

04:59PM  9  doubts you would have would be unreasonable based on the

04:59PM 10  overwhelming evidence that you heard.

04:59PM 11      His choices for over 20 years made him guilty.  So

04:59PM 12  facts, plus law, equals verdict.  He is guilty of every single

04:59PM 13  count, as sure as you're sitting in those chairs.

05:00PM 14      Thank you for your time and attention.  Sorry I spoke

05:00PM 15  so fast at the end there.  Thank you.

05:00PM 16      **THE COURT:**  Okay.  So we are now done for the day.

05:00PM 17      I want you to remember my instructions about not

05:00PM 18  communicating about the case in any way with anyone including

05:00PM 19  each other.  Don't use tools of technology to try to learn

05:00PM 20  anything about the case or to communicate about the case.

05:00PM 21      Don't read, or listen to, or watch any news coverage,

05:00PM 22  if there is any, while the trial's in progress.  And don't

05:00PM 23  make up your mind just yet.

05:00PM 24      Tomorrow morning, 9:00 sharp.  I'm going to start

05:00PM 25  instructing you.  It's going to be a long set of instructions,

USA v Gerace - Proceedings - 12/19/24

264

| | | |
|---|---|---|
| 05:00PM | 1 | two to three hours.  You've got to listen to me for two to |
| 05:00PM | 2 | three hours.  It's hard, I know that.  It's hard for me to |
| 05:00PM | 3 | read it.  And I'm not going to be making much eye contact with |
| 05:00PM | 4 | you because I'm going to be reading because it's so important |
| 05:00PM | 5 | that I get the law right.  So come prepared to listen to me |
| 05:00PM | 6 | and to pay attention to me, because it's important that you |
| 05:01PM | 7 | pay attention to what law is.  That's -- that's the heart of |
| 05:01PM | 8 | what you have to understand so that you can make factual |
| 05:01PM | 9 | decisions and apply the law that I give you to those facts |
| 05:01PM | 10 | that you find.  Okay? |
| 05:01PM | 11 | So get a very good night sleep tonight.  Drive |
| 05:01PM | 12 | carefully.  Be here at 9:00 sharp. |
| 05:01PM | 13 | I want to start right at 9:00 because there's at |
| 05:01PM | 14 | least one juror who wants to be out of here by 12:30, and I |
| 05:01PM | 15 | want you to at least be able to go back into the jury room and |
| 05:01PM | 16 | pick a foreperson, and do the preliminary kinds of things that |
| 05:01PM | 17 | you have to do before you break for the day tomorrow, and then |
| 05:01PM | 18 | come back on Monday.  Okay? |
| 05:01PM | 19 | So thank you all very, very much.  We'll see you |
| 05:01PM | 20 | tomorrow morning at 9:00. |
| 05:01PM | 21 | **JUROR:**  Will those be moved tomorrow? |
| 05:01PM | 22 | **THE COURT:**  I hope so. |
| 05:01PM | 23 | **JUROR:**  I can't see you. |
| 05:02PM | 24 | **THE COURT:**  That's a good thing for you that you |
| 05:02PM | 25 | can't see me. |

USA v Gerace - Proceedings - 12/19/24

265

| | | |
|---|---|---|
| 05:02PM | 1 | **MR. TRIPI:**  Sorry about that. |
| 05:02PM | 2 | (Jury excused at 5:02 p.m.) |
| 05:02PM | 3 | **THE COURT:**  Okay.  Before I talk about the charge |
| 05:02PM | 4 | very briefly, anything for the record from the defense? |
| 05:02PM | 5 | **MR. SOEHNLEIN:**  No, thank you, Judge. |
| 05:02PM | 6 | **MR. FOTI:**  No. |
| 05:02PM | 7 | **THE COURT:**  Okay.  Anything from the government? |
| 05:02PM | 8 | **MR. TRIPI:**  No, thank you, Judge. |
| 05:02PM | 9 | Oops, sorry, go ahead, Mr. Cooper. |
| 05:02PM | 10 | **MR. COOPER:**  Just a reminder.  I spoke with the |
| 05:02PM | 11 | defense about marking that newspaper exhibit that was shown to |
| 05:02PM | 12 | Ben Rivera, we still need to do that. |
| 05:02PM | 13 | **THE COURT:**  Okay.  So, let's -- let's talk about the |
| 05:02PM | 14 | three -- I think the three issues that are remaining. |
| 05:02PM | 15 | First of all, I have thought long and hard, |
| 05:02PM | 16 | Mr. Cooper, about including something about the addiction and |
| 05:02PM | 17 | that being sufficient to -- to show overcoming will and |
| 05:03PM | 18 | coercion and I'm not going to do it.  I think it's a mistake, |
| 05:03PM | 19 | I think that it is singling out evidence.  I think that would |
| 05:03PM | 20 | be unfair to the defendant, and I'm not going to do that. |
| 05:03PM | 21 | You made a fine argument on that.  The defense did |
| 05:03PM | 22 | not really contest that, and I just don't think it's the right |
| 05:03PM | 23 | thing to do. |
| 05:03PM | 24 | And I -- I thought about it, I thought about it lots |
| 05:03PM | 25 | of different ways.  I told you I would, and I have, and I'm |

05:03PM      1    not going to do it.

05:03PM      2           Number 2, with respect to the buyer/seller charge,

05:03PM      3    the requested buyer/seller charge, and with respect to the

05:03PM      4    gratuities versus bribe charge, I've given you proposals that

05:03PM      5    are going to make neither side happy.

05:03PM      6           What I'm going to do is -- what I'm inclined to do,

05:03PM      7    and I'll listen to what you folks have to say, is to include

05:03PM      8    one statement, one sentence about buyer/seller that I think is

05:03PM      9    an accurate statement of the law, and that I think is the only

05:03PM     10    way that buyer/seller -- I mean, all the jury needs to know is

05:04PM     11    that a sale is not a conspiracy.  And so I think they can be

05:04PM     12    told that.

05:04PM     13           But the rest of the stuff -- and I'm willing to

05:04PM     14    listen to the defense argue to me that the rest of the stuff

05:04PM     15    should come in, but the stuff about the length of time of the

05:04PM     16    relationship existed, and the amount of drugs that were

05:04PM     17    exchanged, there's no one sale here.  And so it's -- it's

05:04PM     18    hard.

05:04PM     19           This is not a situation where the proof came in that

05:04PM     20    Joe Smith was the supplier and John Brown was the middleman

05:04PM     21    and sold drugs to somebody else.  Where that might, you know,

05:04PM     22    could be a buyer/seller.  But -- but that's not what we have

05:04PM     23    here.

05:04PM     24           So I think including that one sentence is sufficient.

05:04PM     25    And I'll hear from the government why that one sentence

USA v Gerace - Proceedings - 12/19/24

267

05:04PM    1    shouldn't be included, but I think that that's what I'm

05:04PM    2    inclined to do.

05:04PM    3         And then with respect to the -- the distinction

05:05PM    4    between bribes and gratuities, same sort of thing.  I'm going

05:05PM    5    to give a one-sentence statement when I talk about what a

05:05PM    6    bribe is, and -- and that it doesn't have to be a, you know,

05:05PM    7    perfect quid pro quo, I'm giving you this to do that.  It can

05:05PM    8    be for a stream of benefits sort of thing.

05:05PM    9         I am going to say -- I'm inclined to say, I -- I

05:05PM   10    haven't decided 100 percent, but I'm inclined to say that a

05:05PM   11    payment for something that somebody already did is not a

05:05PM   12    bribe.  I think that's -- that's the law.  I took the quote

05:05PM   13    from the Supreme Court decision, and that's what I'm inclined

05:05PM   14    to do.  I'm not inclined to give anything more on that.

05:05PM   15         **MR. TRIPI:**  Can I be heard on that one first, Judge?

05:05PM   16         **THE COURT:**  Pardon me?

05:05PM   17         **MR. TRIPI:**  Can I be heard on that one first?

05:05PM   18         **THE COURT:**  Sure, yeah.  We're going to do this

05:05PM   19    tomorrow morning.

05:05PM   20         **MR. TRIPI:**  Oh, okay, my fault.

05:05PM   21         **THE COURT:**  Yeah, no, we're going to do this tomorrow

05:05PM   22    morning.  I just wanted to lay this out now so that

05:05PM   23    Mr. Soehnlein can have an opportunity to weigh in to -- with

05:06PM   24    Mr. Foti, and then Mr. Foti -- so I want you folks here at

05:06PM   25    8:30 tomorrow --

05:06PM  1          **MR. TRIPI:**  Okay.

05:06PM  2          **THE COURT:**  -- and we will vet these at 8:30

05:06PM  3  tomorrow, okay?

05:06PM  4          **MR. SOEHNLEIN:**  Thank you, Judge.

05:06PM  5          **MR. TRIPI:**  That sounds a lot better than now.  Thank

05:06PM  6  you.

05:06PM  7          **THE COURT:**  Yeah, I -- I didn't want to do that to

05:06PM  8  you, Mr. Tripi, because I know you're exhausted, Mr. Cooper,

05:06PM  9  is exhausted, Mr. Foti is exhausted, Mr. Soehnlein is

05:06PM  10  exhausted I'm sure, and I'm a little tired myself.  So let's

05:06PM  11  do it tomorrow at 8:30.  Okay?

05:06PM  12          **MR. SOEHNLEIN:**  And, Judge, tomorrow when I'm gone,

05:06PM  13  will you just give a similar statement to the jury like you

05:06PM  14  did for Ms. Chalbeck?

05:06PM  15          **THE COURT:**  I will, absolutely.

05:06PM  16          **MR. SOEHNLEIN:**  Thank you, I appreciate it.

05:06PM  17          **THE COURT:**  Yep, absolutely.

05:06PM  18          Okay.  Anything else from the government?

05:06PM  19          **MR. COOPER:**  No.

05:06PM  20          **MR. TRIPI:**  Nothing else.  I just want to say to the

05:06PM  21  defense team, good job.  That's it.

05:06PM  22          **THE COURT:**  Anything else from the defense?

05:06PM  23          **MR. SOEHNLEIN:**  No, thank you, Judge.

05:06PM  24          **THE COURT:**  Okay.  Terrific.  Thank you all very

05:06PM  25  much.  See you tomorrow morning.

05:06PM     1            **THE CLERK:**  All rise.

05:06PM     2            (Proceedings concluded at 5:06 p.m.)

            3            *       *       *       *       *       *       *

            4

            5

            6

            7

            8                    **CERTIFICATE OF REPORTER**

            9

           10            In accordance with 28, U.S.C., 753(b), I

           11    certify that these original notes are a true and correct

           12    record of proceedings in the United States District Court for

           13    the Western District of New York on December 19, 2024.

           14

           15

           16                        s/ Ann M. Sawyer
                                     _____
           17                        Ann M. Sawyer, FCRR, RPR, CRR
                                     Official Court Reporter
           18                        U.S.D.C., W.D.N.Y.

           19

           20

           21

           22

           23

           24

           25