UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

v.

Case No.: 19-CR-227

JOSEPH BONGIOVANNI,

PETER GERACE, JR.,

Defendants.

_____

UNITED STATES OF AMERICA,

v.

PETER GERACE, JR.,    Case No.: 23-CR-37

Defendant.

_____

### Gerace's Response to the Government's Motion for a Gag Order (Dkt.# 1442)

Peter Gerace, Jr., by and through counsel (Mark A Foti, Esq. and Eric M. Soehnlein, Esq.) provides the following response in opposition to the government's motion for a limited gag order (Dkt.# 1442).

**I.      Introduction**

The government's motion seeks a "gag order" to direct Gerace to "comply with United States Marshal's Service (USMS) policy." Dkt. # 1442 at p. 18.

1

Gerace is an inmate in custody of the USMS. As long as he remains in USMS custody, he is bound by the agency's policies so long as those policies are lawful and fairly applied.

Gerace is also a defendant in cases 19-cr-227/23-cr-37. As such, he is bound by the cases' protective order unless or until it is modified.

To defense counsels' knowledge Gerace has not violated either USMS policy or the protective order. And as the government concedes, a "gag order," or any other order restraining speech or expression, is a "tool of last resort." Id. at p. 10. On this record, it is not appropriate here.[1] The government's motion should be denied.

## II. The Law

### a. Gerace's First Amendment Rights

In *Beard v. Banks*, 548 U.S. 521 (2006), the Supreme Court recognized that "imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment" but "the

---

[1] The government's argument assumes Gerace will violate the protective order when he speaks to the media. If that occurs, Gerace would be subject to contempt or other sanctions for violating the Court's order. From that, two things are clear. First, if the government or the Court believe that Gerace has violated the protective order, a remedy and sanction already exist, and a further procedural mechanism through an additional court order is redundant and unnecessary. Second, because of the protective order and the available sanction, any "gag order" (or any other limitation on Gerace's speech) would only work to further limit speech that does *not* violate the protective order, thus acting as a prior restraint on Gerace's First Amendment rights which, although restricted by his incarceration, Gerace continues to possess.

2

Constitution sometimes permits greater restriction of such rights in a prison than it would elsewhere." Id. at 528 (citing *Turner v. Safley*, 482 U.S. 78, 93 (1987)); *see also Vester v. Rogers*, 795 F.2d 1179, 1182 (4th Cir. 1986) (noting that lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights).

In the First Amendment context, a prison inmate retains those rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. *Pell v. Procunier*, 417 U.S. 817, 822-23, (1974).

The defense acknowledges -- restricting a prisoner's access to face-to-face interviews with media outlets does not violate the First Amendment so long as there are alternative channels of communication open to inmates[2] and the restriction operates in a neutral fashion without regard to the content of the expression. *Pell,* 417 U.S. at 827-28; *Johnson v. Stephan,* 6 F.3d 691, 692 (10th Cir. 1993) ("Denying media access to conduct face-to-face interviews with inmates is constitutional as long as alternative means for communicating with the media are available."); *Jersawitz v. Hanberry,* 783 F.2d 1532, 1534 (11th Cir. 1986)  (affirming application of prison media interview regulation which barred editorial-type television show producer from access to prisoner).

---

[2] The policy appears to restrict media access to in-person or face to face interviews.  It is unclear to what extent telephonic interviews or written communication fall within the policy.

3

Here, the policies set forth by the U.S. Marshal require that, for an in person interview, any news media must obtain "the permission of the U.S. Attorney, the judge, the prisoner, the defense attorney, and the management of the detention facility where the prisoner is located." USMS Policy Directive 1.3(D)(4)(f).  It is the responsibility of the news media – and not the inmate – to obtain approval of the above-mentioned entities.

In the event the policy was being implemented unfairly or improperly as to Gerace, it would give rise to a challenge by Gerace or the media outlet.  In the event the policy was being implemented in a manner designed to prevent the media from reporting in way that the United States Attorney's Office or the Court did not like, it would give rise to a challenge by Gerace or the media outlet.  On its face, however, the regulation is equally applicable to all media, all content, and all inmates.  And to defense counsels' knowledge, to date there has not been a request from any member of the news media as it relates to Gerace.  While application of the policy directive as to Gerace could become the subject of disagreement, discussion, or even litigation, that point has not come, and there is no reason to impose any order on any party at this time.

As this Court knows, "[p]rior restraints on speech...are the most serious and the least tolerable infringement on First Amendment rights." *United States v. Combs*, No.24-cr-542, 2024 U.S. Dist. LEXIS 204491, at 5 (S.D.N.Y. Nov. 8, 2024).

4

### b. Gag Order

Before the court may impose any sort of "gag order," it must, among other things, determine whether "other available remedies would effectively mitigate the prejudicial publicity." *In re App. of Dow Jones & Co.*, 842 F.2d 603, 611 (2d Cir. 1988). Consideration of any type of gag order also requires the Court to consider the import and the content of the potential speech that is to be restrained. *See, e.g., Doe v. Gonzalez,* 386 F. Supp.2d 86 (D. Conn. 2005). In that regard, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).

At this juncture it is unclear what the media wishes to discuss with Gerace. The government's motion assumes such an interview would encompass Gerace's feelings about the prosecutors on his case and government action; Gerace's feelings about witnesses that testified against him; or alleged veiled messages to others to cause witness harm.

With regard to the first two categories, the subject matter of the speech at issue in the pending motion places it at the center of First Amendment protection. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of the Amendment was to protect the free discussion of governmental affairs." *Landmark Communications, Inc. v. Virginia*, 435 U.S.

829, 838-39 (1978).  With the exception of information covered by the protective order, which will be addressed below, the potential communication does not violate any law or statute and is a valid exercise of Gerace's First Amendment rights.  The government may not like the content of the speech, but the speech itself is permissible.  It cannot be lawfully restrained.

With regard to Gerace's potential commentary about individuals who testified against him, it should be noted that the government chose to elicit witness testimony in open court, and the witnesses chose to testify in open court – whether it be for pecuniary gain or for benefits in their own cases.  Since the trial at least one "protected" witness chose to meet with media on her own.  Gerace cannot be restrained from commenting on what occurred in the open courthouse.  To the extent Gerace is aware of information about those individuals that comes from confidential or protected materials shared by the government that was not shared in open court, that material is subject to the protective order in this case, and Gerace cannot share it.  Counsel has advised Gerace of this prohibition.

The final category – the government's allegation that Gerace may use an interview to send coded messages – lacks factual basis.  What is more, even if Gerace wanted to achieve that goal, it is unclear how the proposed gag order (mandating Gerace and news outlets to follow the USMS policy) would address that concern.  Gerace is free to meet with people at the jail; he is free to call people at the jail; he is free

to write letters to people from the jail. And there is no evidence beyond mere speculation that he would use the media to disseminate any message aimed at witness harm. The assertion so wholly lacks merit that it must be disregarded.

### III.   Conclusion

Gerace continues to have First Amendment rights even though he is currently incarcerated. As an inmate in the custody of the USMS, he must abide by the USMS policies. As a defendant in the above-referenced case, he must abide by the protective order regarding confidential and protected information shared by the government. In the event USMS policy unfairly or arbitrarily restricts Gerace's First Amendment rights, he and/or the media would have an opportunity to litigate that restraint. In the event that the government or the Court believe Gerace has violated the protective order, there is a mechanism to litigate his compliance and, if necessary, fashion an appropriate sanction.

The government's proposed gag order has no basis in the facts of this case nor in the law. To the extent the government identifies legitimate concerns regarding Gerace's potential statements to the media, the proposed gag order does nothing to legitimately address those concerns. The proposed order is an unwarranted restraint on Gerace's First Amendment rights. The Court should deny the motion.

DATED:     February 18, 2025

| | |
|---|---|
| s/ Mark A. Foti, Esq. | s/ Eric M. Soehnlein, Esq. |
| Mark A. Foti, Esq.<br>**The Foti Law Firm, P.C.**<br>16 W Main Street, Suite 100<br>Rochester, NY 14614<br>(585) 461-1999<br>(585) 491-6512 | Eric M. Soehnlein, Esq.<br>**Soehnlein Law, PLLC**<br>2100 Main Place Tower<br>350 Main Street<br>Buffalo, NY 14202<br>(716) 771-9092 |