

U.S. Department of Justice

United States Attorney
Western District of New York

*Federal Center*   *716/843-5700*
*138 Delaware Avenue*   *fax 716/551-3052*
*Buffalo, New York  14202*   *Writer's Telephone:  716/843-5881*
  *Writer's fax:  716/551-3052*
  *Casey.Chalbeck@usdoj.gov*

April 4, 2025

**VIA PACER**
Hon. Lawrence J. Vilardo
United States District Judge
Robert H. Jackson United States Courthouse
2 Niagara Square
Buffalo, New York 14202

      Re:   *United States of America v. Peter Gerace, Jr.*,
              **Case Numbers: 19-CR-227-LJV; 23-CR-37-LJV**

Dear Judge Vilardo:

      The government offers the following letter in support of its motion for an order to show cause. *See* Mot. for an Order to Show Cause & Hr'g, ECF No. 1457, (dated Mar. 17, 2025). Mr. Gerace opposes such an order for two reasons. *See* Resp. in Opp., ECF No. 1465, (dated Mar. 28, 2025). First, he claims that the U.S. Marshals Service's media policy is limited to in-person interviews and, because he participated in a *telephonic* interview, the policy did not reach his conduct. *See id.* at 8. Second, he argues that the Court's order directing him to comply with policy was not reasonably specific such that he can be said to have willfully violated the Court's order. *See id.* at 9. Because neither argument is availing, and because Mr. Gerace plainly violated the Court's order, the Court should grant the government's motion and order an evidentiary hearing.

      *First*, the USMS media policy is clear: "Prisoner interview requests may only be approved upon the permission of the U.S. Attorney, the judge, the prisoner, the defense attorney, and the management of the detention facility where the prisoner is located." USMS Policy Directive 1.3, at 3, https://www.usmarshals.gov/sites/default/files/media/document/united-states-marshals-service-policy-directives-management.pdf, (last accessed Apr. 4, 2024). An interview is either "a formal meeting in which one or more persons question, consult, or evaluate another person" or "a meeting or conversation in which a writer or reporter asks questions of one or more persons from whom material is sought for a newspaper story, television broadcast, etc." *Interview*, Dictionary.com, https://www.dictionary.com/browse/interview, (last accessed Apr. 4, 2025). Neither definition limits an "interview" to an "in-person" meeting. And no provision of the policy limits the restrictions on interviews to only in-person interviews, as

Mr. Gerace contends. Accordingly, Mr. Gerace's argument fails as a matter of simple textualism.

To accept Mr. Gerace's argument would require the Court to inject limiting language where there is none, something courts routinely decline to do. *See, e.g.*, *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 577 (1995) (explaining that the "absence of limiting language" in the Securities Act results in "broad coverage"); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988) ("This Court will not write nonbinding limits into a silent state statute."); *Kasiotis v. New York Black Car Operators' Inj. Comp. Fund, Inc.*, 90 F.4th 95, 100 (2d Cir. 2024) (rejecting efforts to rewrite a New York State billing statute to include limiting language where "the statute contains no language limiting the application of [a] surcharge [mechanism] to specific line items or components of a bill"). Mr. Gerace offers no reason why this Court should abandon this longstanding interpretative tradition for his benefit, and for his benefit alone.

Because the policy's regulation of inmate "interviews" is unambiguous, and plainly covers all manner of interviews—in-person interviews, video-teleconferenced interviews, telephonic interviews, and the like—there is no basis to consult its larger structure. *Cf. Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 120 (2d Cir. 2007) ("When the text of a statute is ambiguous, we look to 'structure, purpose, and history' to determine whether these construction devices can convincingly resolve the ambiguity . . . ."). But even if the Court did consider the policy's structure, as Mr. Gerace suggests is appropriate, nothing in its broader architecture limits "interviews" to in-person interviews.

Rather, the policy broadly delineates between the media's access to spaces, such as crime scenes, and its access to, and use of, information—a distinction made clear in the first sub-paragraph, which advises that "[m]edia personnel without proper credentials may be denied requested *information* or access to incident scenes." USMS Policy Directive 1.3, *Media*, at 2 ¶ 4(a) (emphasis added). As examples of the former, the policy regulates media access to "sealed perimeter[s] or crime scene[s]". *See id.* at 2 ¶ 4(c). These are the only two "spaces" that the policy purports to specifically restrict access to. *See id.* at 2 ¶ 4(a), 4(c).

The policy's remaining regulations govern not access to spaces but the accessibility and use of information. For example, the media may broadly acquire information by "photographing, taping, recording, or televising law enforcement activity," *id.* at ¶ 4(b), but when the media does so, the policy encourages it to "conceal the faces" of certain individuals, *id.* at 2–3 ¶ 4(d). The interview policy likewise governs the media's access to information—namely, information that the defendant wants to share through a meeting with reporters. *See id.* at 3 ¶ 4(f); *accord Interview*, Dictionary.com, https://www.dictionary.com/browse/interview, (last accessed Apr. 4, 2025). But unlike its other sub-sections, the policy's interview provisions are devoid of any language to support Mr. Gerace's argument that its terms are cabined to certain spaces, like detention facilities, or limited to even certain modes of communicating, like in-person meetings. Instead, the policy refers to interviews, generally.

2

Thus, when the USMS sought to govern access to, or activities within, certain spaces, it used specific language to that effect. *See* USMS Policy Directive 1.3, *Media*, at 2 ¶ 4(c). Conversely, when the USMS wanted to broadly regulate access to, and use of, information, it employed more general terms, undoubtedly to account for reality that information takes many forms and, increasingly, is not confined to clearly demarcated spaces. *See id.* at 2–3 ¶¶ 4(b), 4(d), 4(f). And just as courts presume that Congress's inclusion of "particular language in one section of a statute" and its omission of the same language "in another section of the same Act" is intentional and purposeful, so too do they presume that the disparate inclusion or exclusion of limiting language in agency regulations is the product of considered deliberation. *Russello v. United States*, 464 U.S. 16, 23 (1983).

Moreover, giving the word "interview" its plain, broad, and ordinary meaning makes sense: as the government briefed in its Motion for a Gag Order, interview restrictions promote safety interests within detention facilities by reducing the "risk of institutional violence should a rival group . . . take offense," avoiding a "lack of sensitivity for any outside crime victims," minimizing the "exposure of sensitive information" about "security procedures and planned activities," mitigating "the risk of impact on other ongoing litigation," and lowering the "potential for an inmate to develop celebrity status that contributes to management and control problems within the inmate population." ECF No. 1442, at 15, (filed Feb. 2, 2025) (quoting *ACLU v. Stirling*, 123 F.4th 170, 174 (4th Cir. 2024)); *see also id.* at 16 (comparing the "broad proscription against jailhouse interviews" at issue in *Stirling* with the USMS policy at issue here).[1] Ensuring that interviews do not risk jeopardizing these important interests is precisely why the USMS has a fact-specific, multi-level reviewal process that includes, among others, defense attorneys, the federal judiciary, and federal prosecutors. To impose otherwise non-existent limiting language into the policy undermines these laudable goals and runs counter to the interpretative principles outlined above. For these reasons, Mr. Gerace's interpretation of the policy fails as a matter of law.

*Second*, the Court's order was reasonably specific. The Court unambiguously "order[ed] Gerace . . . to abide by the [USMS] Policy with respect to media interviews of Gerace." Text Order, ECF No. 1454, (dated Mar. 13, 2025). That the factual circumstances giving rise to the government's Motion for a Temporary Stay, and the Court's ultimate order, involved an *in-person* interview does not give Mr. Gerace the license to engage in other modes of interviewing any more than an order preventing him from driving vehicles in the park would entitle him to drive a truck where he initially planned to drive a car.

At bottom, the Order was clear and unmistakable—and, here, Mr. Gerace violated it less than 48 hours after the Court entered it. The Court clearly and specifically ordered Mr. Gerace to comply with the policy; the policy clearly and specifically prohibited interviews unless prior approval was obtained from five separate entities; and, as the defense concedes, Mr. Gerace clearly and specifically knew of that order. The remaining question is whether

---

[1] As this discussion makes clear, the government never tacitly agreed that the policy was limited to the factual circumstances that initiated its motion for a temporary stay. The government respects that courts are bound to adjudicate discrete cases and controversies, and endeavors not to engage in the kind of needless hypothesizing that invites courts to issue error-prone advisory opinions. *See FDA. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024).

Mr. Gerace's conduct was willful. *See United States v. Lynch*, 162 F.3d 737, 735 (2d Cir. 1998). On this question, the Court should order an evidentiary hearing. Accordingly, the government's motion should be granted.

                                                Very truly yours,

                                                MICHAEL DIGIACOMO
                                                United States Attorney

                                BY:    CASEY L. CHALBECK
                                                Assistant United States Attorney

CC:    Mark Foti, Esq.
         Eric Soehnlein, Esq.
         Joseph M. Tripi, Esq.
         Nicholas T. Cooper, Esq.