09:09AM

1                   UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,
                                      Case No. 1:19-cr-227
4              Plaintiff,                      1:23-cr-37
   v.                                           (LJV)
5
   PETER GERACE, JR.,                 December 17, 2024
6
   _____Defendant.
7
       TRANSCRIPT EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 2
8            BEFORE THE HONORABLE LAWRENCE J. VILARDO
                 UNITED STATES DISTRICT JUDGE
9
   APPEARANCES:      TRINI E. ROSS, UNITED STATES ATTORNEY
10                   BY: JOSEPH M. TRIPI, ESQ.
                         NICHOLAS T. COOPER, ESQ.
11                       CASEY L. CHALBECK, ESQ.
                     Assistant United States Attorneys
12                   Federal Centre, 138 Delaware Avenue
                     Buffalo, New York 14202
13                   For the Plaintiff

14                   THE FOTI LAW FIRM, P.C.
                     BY: MARK ANDREW FOTI, ESQ.
15                   16 West Main Street, Suite 100
                     Rochester, New York 14614
16                      And
                     SOEHNLEIN LAW
17                   BY: ERIC MICHAEL SOEHNLEIN, ESQ.
                     350 Main Street, Suite 2100
18                   Buffalo, New York 14202
                     For the Defendant
19
   PRESENT:          KAREN A. CHAMPOUX, USA PARALEGAL
20                   BRIAN A. BURNS, FBI SPECIAL AGENT
                     MARILYN K. HALLIDAY, HSI SPECIAL AGENT
21                   OLIVIA A. PROIA, J.D., PARALEGAL

22 LAW CLERK:        REBECCA FABIAN IZZO, ESQ.

23 COURT CLERK:      COLLEEN M. DEMMA

24 REPORTER:         ANN MEISSNER SAWYER, FCRR, RPR, CRR
                     Robert H. Jackson Courthouse
25                   2 Niagara Square Buffalo, New York 14202
                     Ann_Sawyer@nywd.uscourts.gov

09:23AM    1              (Excerpt commenced at 9:23 a.m.)

09:23AM    2              (Jury seated at 9:23 a.m.)

09:23AM    3              **THE COURT:**  Good morning, everyone.

09:23AM    4              **THE JURORS:**  Good morning.

09:23AM    5              **THE COURT:**  Welcome back.  The record will reflect

09:23AM    6    that all our jurors are present.

09:23AM    7              We are going to go until 3:30.  That's the latest

09:23AM    8    that you'll be here today.  And then tomorrow, at 9:00 again.

09:24AM    9              I remind the witness that he's still under oath.

09:24AM   10              And, Mr. Tripi, you may continue.

09:24AM   11              **MR. TRIPI:**  Thank you, Your Honor.

09:24AM   12

09:24AM   13    **B R I A N   B U R N S**, having been previously duly called and

09:24AM   14    sworn, continued to testify as follows:

09:24AM   15

09:24AM   16              **(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:**

09:24AM   17    Q.  Good morning, Special Agent Burns.

09:24AM   18    A.  Good morning, Mr. Tripi.

09:24AM   19    Q.  We didn't speak last night, correct?

09:24AM   20    A.  We did not, it was a quiet night.

09:24AM   21    Q.  Okay.  I'll try not to take offense.

09:24AM   22        All right.  So, we left off yesterday talking about the

09:24AM   23    box with the file folder that was found in Mr. Bongiovanni's

09:24AM   24    residence the day of that search.  I want to ask you about

09:24AM   25    another document that was contained in that file folder.

09:24AM  1    Upon your review of that file folder, did you see a

09:24AM  2  Organized Crime Drug Enforcement Administration Task Force

09:24AM  3  report pertaining to a target named Frank Tripi and an

09:24AM  4  operation named Operation Past Due?

09:24AM  5  A.  Yes, I did.

09:25AM  6        MR. TRIPI:  Ms. Champoux, for the witness only, can

09:25AM  7  we show him Government Exhibit 100A.1-2.

09:25AM  8        BY MR. TRIPI:

09:25AM  9  Q.  And I'll hand you up a hard copy just in case it's easier

09:25AM  10  for you to flip through.  Do you recognize that?

09:25AM  11  A.  Yes.

09:25AM  12  Q.  What that?

09:25AM  13  A.  It's an Organized Crime Drug Enforcement Task Force, it's

09:25AM  14  a pack -- it's basically a summary of the case, and they

09:25AM  15  submit it to a committee.  It was in that file in the

09:25AM  16  basement.

09:25AM  17  Q.  Okay.  And I'll get into what OCDETF is more in just a

09:25AM  18  moment --

09:25AM  19  A.  Certainly.

09:25AM  20  Q.  -- but is that a fair and accurate copy of the document

09:25AM  21  that was among the documents in that file folder that was

09:25AM  22  recovered from Mr. Bongiovanni's residence?

09:25AM  23  A.  Yes, it is.

09:25AM  24        MR. TRIPI:  The government offers Exhibit 100A.A-2,

09:26AM  25  Your Honor.

09:26AM  1          **MR. FOTI:**  I renew my relevance objection.

09:26AM  2          **THE COURT:**  Okay.  Other than that, no objection

09:26AM  3  other than that?

09:26AM  4          **MR. FOTI:**  No.

09:26AM  5          **THE COURT:**  Okay.  So it's received over the

09:26AM  6  objection.

09:26AM  7          **(GOV Exhibit 100A.A-2 was received in evidence.)**

09:26AM  8          **MR. TRIPI:**  All right.  Thank you, Your Honor.

09:26AM  9          May we publish that for the jury?

09:26AM  10         **BY MR. TRIPI:**

09:26AM  11  Q.  And then I'll ask just a couple of questions about this

09:26AM  12  document.

09:26AM  13  A.  Certainly.

09:26AM  14  Q.  Just generally, are you familiar with what an Organized

09:26AM  15  Crime Drug Enforcement Task Force investigation initiation

09:26AM  16  form is?

09:26AM  17  A.  Yes.

09:26AM  18  Q.  Can you describe what that is for the jury just in

09:26AM  19  general terms?

09:26AM  20  A.  OCDETF is a program with the Department of Justice on

09:26AM  21  more significant narcotics investigations.

09:26AM  22  Q.  Can I stop you there?  You just said "OCDETF."  Is that

09:26AM  23  an acronym, O-C-D-E-T-F?

09:26AM  24  A.  Yes, it is.  It's a common lingo for that, but Organized

09:26AM  25  Crime Drug Enforcement Task Force.  They're for larger scale

09:26AM    1    investigations.  It's got to be an organization.

09:26AM    2        And you put together a proposal, and you submit it to the

09:26AM    3    local committee, and it also goes down to main justice, the

09:27AM    4    narcotics section.

09:27AM    5        And then if it's approved, there's additional funding and

09:27AM    6    resources that go along with it.  So it's really designed for

09:27AM    7    larger scale investigations that warrant some more resources

09:27AM    8    and attention.

09:27AM    9    Q.  And is this a draft of that document that was found in

09:27AM   10    Mr. Bongiovanni's residence?

09:27AM   11    A.  Yes, it is.

09:27AM   12    Q.  And do you understand that to be a draft because there

09:27AM   13    are some blanks in the OCDETF investigation number in the

09:27AM   14    upper right-hand corner that I've circled on the screen?

09:27AM   15    A.  Correct.  I think that's -- there's also a signature page

09:27AM   16    that wasn't signed.

09:27AM   17    Q.  Okay.  And in terms of how OCDETF, Organized Crime Drug

09:27AM   18    Enforcement Task Force, case gets initiated, is the agent

09:27AM   19    required -- the case agent required to fill out a document

09:27AM   20    like this, provide information, and explain the general

09:27AM   21    parameters of the investigation and what's expected?

09:28AM   22    A.  Yeah, it's usually done by the case agent and then in

09:28AM   23    concert with who's ever -- what other agents or task force

09:28AM   24    officers are assisting him or her, as well as looping in the

09:28AM   25    U.S. Att -- or, the Assistant United States Attorney that's

09:28AM  1   working on that matter.  So it's usually collaborative

09:28AM  2   effort.

09:28AM  3   Q.  Okay.  On the front page here, you see it says

09:28AM  4   law-enforcement sensitive?

09:28AM  5   A.  That's correct.

09:28AM  6   Q.  What does that mean?

09:28AM  7   A.  That means it should not be disseminated outside of the

09:28AM  8   law enforcement -- these are extremely sensitive documents in

09:28AM  9   that they're targets of investigations, sometimes they

09:28AM  10  reference sources, informants, so it's a very -- it's a

09:28AM  11  law-enforcement sensitive document.

09:28AM  12  Q.  Is that the type of document that a retired agent is

09:28AM  13  permitted to bring home?

09:28AM  14  A.  No, never.

09:28AM  15  Q.  Is it the type of document that an agent is permitted

09:28AM  16  to bring to their house at all?

09:28AM  17  A.  Maybe if you wanted to leave it locked in your car if for

09:28AM  18  some reason you're weren't going back in your office, but you

09:28AM  19  should not maintain that in your house or anywhere other

09:28AM  20  individuals can have access to it.

09:29AM  21  Q.  Okay.  Looking on the first page of this, do you see the

09:29AM  22  operation name?

09:29AM  23  A.  The operation, every OCDETF proposal has to have a name,

09:29AM  24  an operation name.  So this one's Operation Past Due.

09:29AM  25  Q.  And does the front page of that document have who the

09:29AM   1   case attorney was at the U.S. Attorney's Office, as well as

09:29AM   2   the case agents?

09:29AM   3   A.  Yes, it does.

09:29AM   4   Q.  Is Mr. Bongiovanni one of the case agents at all?

09:29AM   5   A.  No, he's not.

09:29AM   6   Q.  Okay.

09:29AM   7              MR. TRIPI:  And can we go to the next page on the

09:29AM   8   screen, Ms. Champoux.

09:29AM   9              BY MR. TRIPI:

09:29AM  10   Q.  Okay.  This second page here, does this list identify a

09:29AM  11   list of targets for this operation that the case agent was

09:29AM  12   contemplating?

09:29AM  13   A.  Yeah.  At the initiation form, you want to put in your

09:29AM  14   major targets of the investigation.

09:29AM  15   Q.  And generally are they sort of ranked in order?

09:29AM  16   A.  Usually, I mean, that's how -- I've done a few of these,

09:29AM  17   and that's how I prepare them.  But generally I would say

09:29AM  18   that's the common practice.

09:29AM  19   Q.  And who was the sort of number 1 target listed here?

09:30AM  20   A.  It's Frank Tripi.

09:30AM  21   Q.  And it lists ten other targets in addition to him?

09:30AM  22   A.  That's correct.

09:30AM  23              MR. TRIPI:  Okay.  Let's go to the next page,

09:30AM  24   Ms. Champoux.

         25

09:30AM    1         **BY MR. TRIPI:**

09:30AM    2    Q.  And is every page of this document labeled

09:30AM    3    law-enforcement sensitive?

09:30AM    4    A.  Yes, at the top and bottom.

09:30AM    5    Q.  Generally, does it -- this page 3, just generally does it

09:30AM    6    indicate the different police or law enforcement agencies

09:30AM    7    that will participating in the investigation?

09:30AM    8    A.  Yes.  Along with their case numbers.

09:30AM    9    Q.  Okay.  And here it has indications for ATF, DEA, IRS,

09:30AM   10    state and local investigators, and the Niagara -- which is

09:30AM   11    Niagara Falls Police Department?

09:30AM   12    A.  Yeah, Chris Clark, was the Niagara Falls Police

09:30AM   13    Department TFO assigned to DEA.

09:30AM   14    Q.  And if we go back to the front page, Chris Clark was the

09:30AM   15    case agent on this?

09:30AM   16    A.  That's correct.

09:30AM   17    Q.  All right.

09:30AM   18         **MR. TRIPI:**  Let's go to page 4.  Generally, I want

09:31AM   19    to --

09:31AM   20         **BY MR. TRIPI:**

09:31AM   21    Q.  Does this indicate that the investigation involves

09:31AM   22    cocaine, crack cocaine, and marijuana in terms of controlled

09:31AM   23    substances?

09:31AM   24    A.  Cocaine, I see cocaine and heroin.

09:31AM   25    Q.  I misread the boxes.  Cocaine, heroin, marijuana, and

09:31AM  1  then other prescription down at the bottom?

09:31AM  2  A.  Yes, it does.

09:31AM  3  Q.  Does it indicate there also may be some money-laundering

09:31AM  4  methods used?

09:31AM  5  A.  Yes, some bulk cash movement and wire transfers, business

09:31AM  6  fronts.

09:31AM  7  Q.  Does it indicate the different districts and states and

09:31AM  8  countries that may be impacted by this investigation?

09:31AM  9  A.  Yes.  Towards the middle of the form, it has Canada,

09:31AM  10  Nevada, and then Northern District of California.

09:31AM  11        **MR. TRIPI:**  Let's go to the next page, Ms. Champoux.

09:31AM  12  We can go past this to the next page.  And we'll advance to

09:32AM  13  the next page.  Let's go to page 8.

09:32AM  14        **BY MR. TRIPI:**

09:32AM  15  Q.  All right.  At the very top of page 8 of this exhibit, is

09:32AM  16  it labeled DEA sensitive?

09:32AM  17  A.  Yes, it is.

09:32AM  18  Q.  And generally, does this portion of the document

09:32AM  19  beginning at page 8 outline the details of the investigation

09:32AM  20  that had transpired, and intelligence that had been gathered

09:32AM  21  up to the date where Agent Clark prepared this initiation

09:32AM  22  form?

09:32AM  23  A.  Yeah.  It's standard.  You want to justify it to the

09:32AM  24  committee or the panel why this warrants an OCDETF

09:32AM  25  designation.

USA v Gerace - Burns - Tripi/Direct - 12/17/24

10

09:32AM  1  Q.  So this outlines the investigation?

09:32AM  2  A.  Correct.

09:32AM  3  Q.  That was done up to that date?

09:32AM  4  A.  Correct.

09:32AM  5  Q.  All right.  And just generally, the document indicates

09:32AM  6  there was investigation in 2013; is that about right?

09:33AM  7  A.  Yes, it does.

09:33AM  8  Q.  Okay.

09:33AM  9        MR. TRIPI:  Can we go on to the next page,

09:33AM 10  Ms. Champoux?

09:33AM 11        BY MR. TRIPI:

09:33AM 12  Q.  I'm just going to leave it up there for a moment.

09:33AM 13      Was part of the focus of the investigation as documented

09:33AM 14  in the report surrounding Frank Tripi and a collection agency

09:33AM 15  called Direct Mediators?

09:33AM 16  A.  Yes, located on Pine Avenue in Niagara Falls.

09:33AM 17        MR. TRIPI:  Okay.  Go to the next page, Ms. Champoux.

09:33AM 18        BY MR. TRIPI:

09:33AM 19  Q.  And again, the rest of this form, does it basically

09:33AM 20  describe some of the parameters of the investigation and the

09:34AM 21  investigative techniques and goals?

09:34AM 22  A.  Yes, as well as the resources that the -- that they're

09:34AM 23  gonna commit to it.

09:34AM 24  Q.  Can you just read under investigative techniques and

09:34AM 25  goals, just under B-1 there, just that first sentence.

09:34AM   1   A.   The overall goals of this investigation are to identify

09:34AM   2   the totality of this drug-trafficking organization, DTO,

09:34AM   3   including but not limited to the command and control

09:34AM   4   elements, smuggling routes, and methods, distribution

09:34AM   5   networks, methods utilized to avoid apprehension by law

09:34AM   6   enforcement, and money-laundering methods.  Upon

09:34AM   7   identification of these elements, it is the intention of the

09:34AM   8   investigating agents to disrupt and dismantle all identified

09:34AM   9   elements of this conspiracy.

09:34AM   10   Q.   All right.  So read on to the next page.

09:34AM   11   A.   Oh, I'm sorry.

09:34AM   12   Q.   That's okay.

09:34AM   13   A.   I wasn't sure.

09:34AM   14   Q.   All right.  Now, you've been in this law enforcement

09:35AM   15   community for -- in the Buffalo area since, I think you said,

09:35AM   16   2008, 2009?

09:35AM   17   A.   A long time.

09:35AM   18   Q.   In terms of reputation in the law enforcement community,

09:35AM   19   does Frank Tripi, the main target of this investigation, have

09:35AM   20   a reputation?

09:35AM   21   A.   Yes, he does.

09:35AM   22   Q.   In your experience, is his reputation one of being an

09:35AM   23   associate or potential associate of Italian Organized Crime

09:35AM   24   in this area?

09:35AM   25   A.   Yes, he is.

09:35AM     1            **MR. FOTI:**  Objection.

09:35AM     2            **THE COURT:**  I'm sorry?

09:35AM     3            **MR. FOTI:**  Objection.

09:35AM     4            **THE COURT:**  Basis?

09:35AM     5            **MR. FOTI:**  Judge, hearsay, 602, relevance.

09:35AM     6            **THE COURT:**  Overruled.

09:35AM     7            **MR. TRIPI:**  Ms. Champoux, we can take that down.

09:35AM     8            Now, I'd like to pull back up Government

09:35AM     9    Exhibit 310AT, Ms. Champoux.  And we can just briefly look at

09:35AM    10    record 48 within that document.

09:36AM    11            **BY MR. TRIPI:**

09:36AM    12    Q.  Now 310AT is the contacts, some of the contacts that were

09:36AM    13    in Mr. -- the defendant's phone, correct?

09:36AM    14    A.  That's correct.

09:36AM    15    Q.  Is there an entry for -- for Frank Tripi?

09:36AM    16    A.  Yes, there is.

09:36AM    17    Q.  Do you see that phone number associated with him?

09:36AM    18    A.  Yes, I do.

09:36AM    19    Q.  Now, Exhibit Number 358 was Mr. Bongiovanni's phone

09:36AM    20    records, correct?

09:36AM    21    A.  That's correct.

09:36AM    22    Q.  Have you reviewed those phone records?

09:36AM    23    A.  Yes, I have.

09:36AM    24    Q.  In Mr. Bongiovanni's phone records, Exhibit 358 I believe

09:36AM    25    it is, did you see contact with this phone number for Frank

USA v Gerace - Burns - Tripi/Direct - 12/17/24

09:36AM  1    Tripi in the year of 2018?

09:36AM  2    A.  Yes, I believe it was October of 2018.

09:36AM  3    Q.  And Mr. Bongiovanni was not part of any investigation of

09:37AM  4    Frank Tripi, you had the agents listed on the report we just

09:37AM  5    read, correct?

09:37AM  6    A.  That's correct.

09:37AM  7         **MR. TRIPI:**  We can take that down, Ms. Champoux.

09:37AM  8         **BY MR. TRIPI:**

09:37AM  9    Q.  In terms of the timeline on October 31st, 2019, was

09:37AM  10   Mr. Bongiovanni charged by indictment?

09:37AM  11   A.  Yes, he was.

09:37AM  12   Q.  In that initial indictment, was it unsealed within or

09:37AM  13   made public within a couple of days after that?

09:37AM  14   A.  Into November, early November.

09:37AM  15   Q.  In that initial document, was this defendant referenced

09:37AM  16   as Coconspirator 1?

09:37AM  17   A.  Yes, he was.

09:37AM  18   Q.  Was a gentleman's club referenced in that document?

09:37AM  19   A.  Not Pharaoh's itself, but a gentleman's club.

09:37AM  20   Q.  At that time, was there media attention surrounding the

09:37AM  21   Bongiovanni indictment?

09:37AM  22   A.  Pretty significant media attention.

09:37AM  23   Q.  Okay.  And so that was about a month and a half before a

09:37AM  24   search warrant was executed at Pharaoh's and this defendant's

09:37AM  25   residence; is that right?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

14

| | | |
|---|---|---|
| 09:37AM | 1 | A.  That's correct. |
| 09:38AM | 2 | Q.  Were those search warrants executed, federal search |
| 09:38AM | 3 | warrants, on December 12th, 2019? |
| 09:38AM | 4 | A.  They were. |
| 09:38AM | 5 | Q.  Were you present for the execution of a federal search |
| 09:38AM | 6 | warrant that day at Pharaoh's Gentlemen's Club -- "that day" |
| 09:38AM | 7 | meaning December 12th, 2019, located at 999 Aero Drive in |
| 09:38AM | 8 | Cheektowaga, New York? |
| 09:38AM | 9 | A.  Yes, I was present for that search warrant. |
| 09:38AM | 10 | Q.  Is that a commercial establishment with a large a bar? |
| 09:38AM | 11 | A.  Yeah, it's Pharaoh's Gentlemen's Club. |
| 09:38AM | 12 | Q.  Based on your investigation and your participation in it, |
| 09:38AM | 13 | is that an establishment that advertises on Facebook and |
| 09:38AM | 14 | other parts of the internet? |
| 09:38AM | 15 | A.  Yes, and the radio as well. |
| 09:38AM | 16 | Q.  Does it have a website promoting its bar, food, and |
| 09:38AM | 17 | gentlemen's club business? |
| 09:38AM | 18 | A.  It does. |
| 09:38AM | 19 | Q.  And you indicated they also advertise on the radio? |
| 09:38AM | 20 | A.  Yes, I've heard their advertisements on 97 Rock. |
| 09:38AM | 21 | Q.  How close is that to the airport? |
| 09:38AM | 22 | A.  Oh, a mile or two, very close. |
| 09:39AM | 23 | Q.  That same day, was there a search at the defendant's |
| 09:39AM | 24 | residence, we've seen the photo a few times, on Luxor Lane? |
| 09:39AM | 25 | A.  Yeah, the search warrants were executed simultaneously. |

USA v Gerace - Burns - Tripi/Direct - 12/17/24                    15

09:39AM    1    Q.  And what does that mean?

09:39AM    2    A.  When you're doing an operation with multiple search

09:39AM    3    warrants, it's advantageous to execute them at the same time

09:39AM    4    because obviously if you hit one place, you know, that person

09:39AM    5    usually calls the other one, and a lot of times you can lose

09:39AM    6    evidence and things like that.  So it's pretty routine that

09:39AM    7    you would want to execute multiple warrants at the same time

09:39AM    8    with different teams.

09:39AM    9    Q.  In terms of the division of labor of the case agents who

09:39AM    10   were on the case by that point, was HSI Special Agent Curtis

09:39AM    11   Ryan sort of the lead over at the defendant's residence

09:39AM    12   search?

09:39AM    13   A.  Yes.  There was some agents, or at least one agent as

09:39AM    14   well.

09:39AM    15   Q.  And were you and Special Agent Halliday over at the

09:39AM    16   location at Pharaoh's Gentlemen's Club?

09:39AM    17   A.  With a number of other law enforcement personnel.

09:39AM    18   Q.  Was the defendant at either location?

09:40AM    19   A.  He was not.

09:40AM    20   Q.  At Pharaoh's, did you have an opportunity to walk around

09:40AM    21   the premises?

09:40AM    22   A.  Yes.  I went mostly on the first floor.

09:40AM    23   Q.  You did a walk-through?

09:40AM    24   A.  Yes.  Not searching.

09:40AM    25   Q.  Did you conduct an interview of John Ermin, who I think

| 09:40AM | 1 | we've heard his nickname is Tommy O, that day? |
| 09:40AM | 2 | A.  Yes, I did. |
| 09:40AM | 3 | Q.  Is he a member of the Outlaws Motorcycle Club? |
| 09:40AM | 4 | A.  He is. |
| 09:40AM | 5 | Q.  Was this search roughly almost -- almost a year after the |
| 09:40AM | 6 | January 2019 search that HSI had executed at Anthony Gerace's |
| 09:40AM | 7 | house in Clarence, New York? |
| 09:40AM | 8 | A.  Yeah, about 11 months. |
| 09:40AM | 9 | Q.  Independently, did Anthony Gerace's case in January of |
| 09:40AM | 10 | 2019 receive some media attention? |
| 09:41AM | 11 | A.  It did. |
| 09:41AM | 12 | Q.  Getting back to the search warrant at Pharaoh's, |
| 09:41AM | 13 | December 12th, 2019, are you aware of whether there was a |
| 09:41AM | 14 | camera system and whether DVRs were recovered during the |
| 09:41AM | 15 | search? |
| 09:41AM | 16 | A.  Oh, yes.  There were three DVRs recovered during that |
| 09:41AM | 17 | search.  I didn't personally seize them, but they were |
| 09:41AM | 18 | recovered, I'm familiar with them. |
| 09:41AM | 19 | Q.  You've reviewed the evidence in the case? |
| 09:41AM | 20 | A.  Evidence, yes. |
| 09:41AM | 21 | Q.  You've reviewed the photos of the search? |
| 09:41AM | 22 | A.  Absolutely. |
| 09:41AM | 23 | Q.  You know how many DVRs were seized that day? |
| 09:41AM | 24 | A.  Yes. |
| 09:41AM | 25 | Q.  You were present while those things were happening? |

09:41AM    1    A.  Yes, I was.

09:41AM    2    Q.  Okay.  Were those three DVRs reviewed by members of the

09:41AM    3    investigative team working with you?

09:41AM    4    A.  Yes, they were.

09:41AM    5    Q.  Are you aware of how long did those three DVR store

09:41AM    6    footage for?

09:41AM    7    A.  Two of the DVRs, I had an understanding that the DVRs had

09:41AM    8    multiple cameras attached to them.  Two of the DVRs

09:41AM    9    maintained footage for two weeks, and then one DVR maintained

09:42AM   10    footage for about seven weeks.

09:42AM   11    Q.  Okay.  So that would be two weeks operating backwards

09:42AM   12    from December 19th -- or, excuse me, December 12th, 2019,

09:42AM   13    correct?

09:42AM   14    A.  That's correct.

09:42AM   15    Q.  For two of the DVRs?

09:42AM   16    A.  Yes.

09:42AM   17    Q.  And then seven weeks for the other?

09:42AM   18    A.  Yeah, six and a half to seven, I believe it was.

09:42AM   19    Q.  So essentially two DVRs had footage going back to late

09:42AM   20    November, and another DVR had footage going back to maybe the

09:42AM   21    end of October?

09:42AM   22    A.  Approximately.

09:42AM   23    Q.  So, those DVRs did not contain any footage from 2013

09:42AM   24    through 2018; is that right?

09:42AM   25    A.  They did not.

USA v Gerace - Burns - Tripi/Direct - 12/17/24

18

09:42AM  1    Q.  And they didn't contain any footage from even September

09:42AM  2    2019; is that right?

09:42AM  3    A.  That's correct.

09:42AM  4    Q.  I want to talk to you a little bit about the

09:42AM  5    investigation itself.  As the investigation progressed, were

09:43AM  6    you and others, beginning in sort of the summer of 2020,

09:43AM  7    trying to locate and interview women who had worked at

09:43AM  8    Pharaoh's?

09:43AM  9    A.  Yes.  We had a number of agents running down different

09:43AM  10   leads trying to identify and interview leads.

09:43AM  11   Q.  For example, is that the same summer that individuals

09:43AM  12   that were helping you on the case, Task Force Officers

09:43AM  13   Geraldo Rondon and Angel Benitos-Santos went to Pennsylvania

09:43AM  14   and found L.L.?

09:43AM  15   A.  Yes.  They were part of different teams going out

09:43AM  16   attempting to locate the dancers and interviewing them.

09:43AM  17   Q.  Did a number of the dancers that you and others located

09:43AM  18   testify at this trial?

09:43AM  19   A.  Yes.

09:43AM  20   Q.  Did the process of trying to identify and locate dancers

09:43AM  21   continue essentially right up until the trial?

09:43AM  22   A.  Absolutely.

09:43AM  23   Q.  Were there challenges associated with dancer names or

09:43AM  24   stage names?

09:43AM  25   A.  Yeah.  It was -- it was difficult because a lot of times

USA v Gerace - Burns - Tripi/Direct - 12/17/24

19

09:44AM  1   we would only get the stage name and not the actual

09:44AM  2   individual's true name.  Some of them were transient, it was

09:44AM  3   hard to find them.  A lot of them didn't have stable housing.

09:44AM  4   Some had left the state.  So there was a lot of those sort of

09:44AM  5   challenges in locating these dancers.  And a lot of them

09:44AM  6   didn't really want to be found.

09:44AM  7   Q.  At times, did some dancers share stage names?  In other

09:44AM  8   words, were there multiple Barbies, for example?

09:44AM  9   A.  Yes, I think there were three or four Barbies, and there

09:44AM  10  was a lot of -- a lot of overlap with some of the names, and

09:44AM  11  trying to figure out who was who was not always easy.

09:44AM  12  Q.  I -- I you think you mentioned, but were some of the

09:44AM  13  dancers from even other states?

09:44AM  14  A.  Yes, other states.

09:44AM  15  Q.  Now, since the investigation commenced, have other

09:44AM  16  witnesses or individuals connected to the investigation in

09:45AM  17  some way become unavailable along the way?

09:45AM  18  A.  Yes, a number of them.

09:45AM  19  Q.  For example, the jury has heard about and seen a photo of

09:45AM  20  Wayne van Vleet.  Is he currently deceased?

09:45AM  21  A.  Yes, he's deceased as of October this year.

09:45AM  22  Q.  Was he interviewed prior to being deceased?

09:45AM  23  A.  Multiple times.

09:45AM  24          **MR. FOTI:**  Objection.

09:45AM  25          **THE COURT:**  I'm sorry?

| | | |
|---|---|---|
| 09:45AM | 1 | **MR. FOTI:**  Objection. |
| 09:45AM | 2 | **THE COURT:**  Was he interviewed? |
| 09:45AM | 3 | **MR. FOTI:**  I'll withdraw the objection to that |
| 09:45AM | 4 | specific question. |
| 09:45AM | 5 | **MR. TRIPI:**  That's as far as I'm going, Judge. |
| 09:45AM | 6 | **THE COURT:**  Pardon me? |
| 09:45AM | 7 | **MR. TRIPI:**  That's as far as I'm going. |
| 09:45AM | 8 | **THE COURT:**  Yeah. |
| 09:45AM | 9 | **BY MR. TRIPI:** |
| 09:45AM | 10 | Q.  Is Crystal Quinn deceased? |
| 09:45AM | 11 | A.  Yes, she is. |
| 09:45AM | 12 | Q.  And the jury may have heard her name in connection with |
| 09:45AM | 13 | sending some of those messages to P.H.? |
| 09:45AM | 14 | A.  The ones from November of -- |
| 09:45AM | 15 | Q.  On Facebook, right? |
| 09:45AM | 16 | A.  That's correct. |
| 09:45AM | 17 | Q.  Is she currently deceased? |
| 09:45AM | 18 | A.  Yes, she is.  She passed away in -- |
| 09:45AM | 19 | Q.  Was she -- |
| 09:45AM | 20 | A.  -- fall -- I'm sorry. |
| 09:45AM | 21 | Q.  -- was she interviewed prior to being deceased? |
| 09:45AM | 22 | A.  Yes, she was.  Multiple times. |
| 09:45AM | 23 | Q.  The jury's heard about New York State Supreme Court Judge |
| 09:45AM | 24 | John Michalski.  Is he currently deceased? |
| 09:46AM | 25 | A.  Yes, he is. |

09:46AM   1   Q.  Did the FBI attempt to interview him prior to his being

09:46AM   2   deceased?

09:46AM   3   A.  Yes, we did.

09:46AM   4   Q.  Did the FBI execute a search warrant at his residence?

09:46AM   5   A.  Yes, we did.

09:46AM   6   Q.  In terms of you've heard some cross-examination as the

09:46AM   7   jury sat through the trial, and you sat at the back table,

09:46AM   8   you've heard some cross-examination of several witnesses

09:46AM   9   about expenses for various things, the housing and

09:46AM   10  transportation that the FBI paid for; do you recall that --

09:46AM   11  A.  Yes, I do.

09:46AM   12  Q.  -- as you sat here?

09:46AM   13      I want to talk a little bit about L.L. for a moment.

09:46AM   14  A.  Certainly.

09:46AM   15  Q.  Okay?  And then I'll go to a couple others.

09:46AM   16  A.  Okay.

09:46AM   17  Q.  Give me one second.  Obviously, the jury saw Ms. L.L.

09:46AM   18  testify as recently as yesterday.  After she testified in the

09:47AM   19  grand jury in July of 2020, was her identity kept secure?

09:47AM   20  A.  Yes, it was.

09:47AM   21  Q.  At that point in time in her life, was she residing on

09:47AM   22  her own approximately three hours away round trip from this

09:47AM   23  courthouse?

09:47AM   24  A.  Yes, she was.

09:47AM   25  Q.  Fast forwarding, as trial approached in the year of 2023,

USA v Gerace - Burns - Tripi/Direct - 12/17/24

09:47AM 1    did she have issues with transportation?

09:47AM 2    A.   Yes.  We had -- she didn't have a -- we had to transport

09:47AM 3    her from where she was residing.

09:47AM 4    Q.   Did that involve agents driving three hours round trip?

09:47AM 5    A.   On some occasions.  She did have a vehicle for a period

09:47AM 6    of time.

09:47AM 7    Q.   Did she also have issues living in proximity to a drug

09:47AM 8    dealer in the town she was living in?

09:47AM 9    A.   Yes.

09:47AM 10   Q.   In your mind as the case agent, did that create a safety

09:47AM 11   issue for her?

09:47AM 12   A.   A safety issue and abuse issue, obviously.

09:47AM 13   Q.   I guess I was lumping drug abuse into the safety issue.

09:48AM 14   A.   Fair enough.

09:48AM 15   Q.   Okay.  As trial approached in the year of 2023, did she

09:48AM 16   become nervous consistent with sort of her original

09:48AM 17   indications when she was first interviewed?

09:48AM 18   A.   Yes.  We were prepared to have a trial, and at that point

09:48AM 19   she -- we -- we obviously explained to her along the way that

09:48AM 20   until there's a trial, no one really knows who you are.  But

09:48AM 21   when there's trial, you're going to be in court and you're

09:48AM 22   gonna be known, and it's gonna be public, your assistance.

09:48AM 23   Q.   And we've heard a little bit about why, but from your

09:48AM 24   perspective as the case agent, why did the FBI assist her

09:48AM 25   with housing?  Can you just explain it for the jury?

09:48AM    1    A.  Well, I mean, we needed to have her available.

09:48AM    2    Obviously, the fact that she came up here, did the trial

09:48AM    3    prep, relapsed, we had to find her, as she testified to, in a

09:49AM    4    drug house.

09:49AM    5        We were concerned that we would need her for the trial,

09:49AM    6    which was scheduled in proximity to when she came up here.

09:49AM    7    So we decided that the safest course of action would be to

09:49AM    8    put her up in a hotel pending this first -- that trial date.

09:49AM    9    Q.  And then did factors related to adjournments of the trial

09:49AM   10    cause that situation to extend?

09:49AM   11    A.  Extend, yeah, for a long time.

09:49AM   12    Q.  Did she also make efforts on her own to obtain her own

09:49AM   13    housing?

09:49AM   14    A.  Yes.

09:49AM   15    Q.  Was she making efforts?

09:49AM   16    A.  Yeah, she was.  I mean, we started with a hotel room for

09:49AM   17    ten days.  And then looking at it, a hotel room is about 110

09:49AM   18    bucks with taxes and all that.  So for ten days, you're up to

09:49AM   19    1,500 bucks.

09:49AM   20        We determined, when it started getting into months, that

09:49AM   21    it would be more -- financially made more financial sense to

09:49AM   22    secure, like, a monthly rental.  Because I think you can get

09:49AM   23    that for like -- we got that for, like 1,300 or 1400.

09:49AM   24        And then we were also able to then work with the property

09:50AM   25    manager that we vetted and felt comfortable with that it was

USA v Gerace - Burns - Tripi/Direct - 12/17/24

24

```
09:50AM     1   a safe location.

09:50AM     2       And then ultimately during that process, she's taking

09:50AM     3   efforts with Section 8 and DSS, and she was ultimately able

09:50AM     4   to secure her own funding or her own Section 8 voucher for

09:50AM     5   housing independent of us.

09:50AM     6   Q.  Okay.  I'd like to move on next to maybe K.L.  We've

09:50AM     7   heard some testimony about the FBI making payments for, I

09:50AM     8   think, hotel room and rent regarding Ms. K.L.; do you recall

09:50AM     9   that?

09:50AM    10   A.  Yes, I do.

09:50AM    11   Q.  Again, was she originally scheduled to potentially

09:50AM    12   testify in 2023?

09:50AM    13   A.  Yes, she was.

09:50AM    14   Q.  And, obviously, your answers with respect to the delays

09:50AM    15   are similar to Ms. L.L., correct?

09:50AM    16   A.  Correct.

09:50AM    17   Q.  Did -- did -- did the FBI assess and determine that

09:50AM    18   Ms. K.L. needed a safe place to stay?

09:50AM    19   A.  Yeah.  Safe, and again, availability a big part of it.

09:51AM    20   We need witnesses here on the days that they're supposed to

09:51AM    21   be here.  So having them in a safe location where you can get

09:51AM    22   them to court is really important for moving the trial along

09:51AM    23   and not missing any witness testimony.

09:51AM    24   Q.  And just a "yes" or "no."  Did Ms. K.L. express

09:51AM    25   reservations and safety concerns along the way?
```

USA v Gerace - Burns - Tripi/Direct - 12/17/24

25

09:51AM  1    A.  Yes, a number of times.

09:51AM  2    Q.  Did that factor into your assessment as to whether to

09:51AM  3    assist with --

09:51AM  4    A.  Absolutely.

09:51AM  5    Q.  -- her?  Were payments handled by the FBI?

09:51AM  6    A.  Yes.  We didn't put money into her hands.  We booked the

09:51AM  7    hotel room for her.

09:51AM  8    Q.  And could you explain in just a couple short sentences, I

09:51AM  9    guess, why you made the decision you did to pay for housing

09:51AM  10   for Ms. K.L.?

09:51AM  11   A.  Again, as I referenced, availability, the need to know

09:51AM  12   where they are, trying to find a witness who maybe doesn't --

09:51AM  13   is apprehensive about testifying, worried about their safety.

09:52AM  14   They go to friends' houses, they go to -- sometimes it takes

09:52AM  15   tremendous efforts to find these witnesses.  So to have

09:52AM  16   them -- and you're always worried about their safety, as

09:52AM  17   well.  So to have a secure location where you know they're

09:52AM  18   gonna be is, I feel, money well spent to secure their

09:52AM  19   testimony.

09:52AM  20   Q.  And you have to get these things approved as well,

09:52AM  21   correct?

09:52AM  22   A.  Yeah, this is not my --

09:52AM  23   Q.  This is not coming out of Brian Burns' pocket?

09:52AM  24   A.  No, not at all.  They -- there's a number of levels of

09:52AM  25   approvals and -- I may suggest it, but it goes to my

09:52AM   1    supervisor, the ASAC is number two in charge, and then the

09:52AM   2    FBI headquarters actually has to agree as well, and they fund

09:52AM   3    the -- they put the money into the Buffalo office funds for

09:52AM   4    witness protection type expenses.

09:52AM   5    Q.   Now I'd like to move on to P.H.

09:52AM   6    A.   Certainly.

09:52AM   7    Q.   Now, there are certain charges that the jury will be

09:52AM   8    asked to decide in this case about threats pertaining to

09:53AM   9    Ms. P.H.; is that right?

09:53AM   10   A.   That's correct.

09:53AM   11   Q.   Did you also have information regarding the event in the

09:53AM   12   bar where Jessica Leyland headlocked her?

09:53AM   13   A.   Yes, we investigated that.

09:53AM   14   Q.   The combination of those things and other factors, did

09:53AM   15   you assess that she needed to be housed in a safe location?

09:53AM   16   A.   We were very concerned about her safety based on those

09:53AM   17   events and other people that had been in her life.

09:53AM   18   Q.   And so describe the expenses and the reasons for the

09:53AM   19   expenses pertaining to Ms. P.H., just sort of at a

09:53AM   20   30,000-foot level?

09:53AM   21   A.   Yeah, I mean, we obviously arrested her on the

09:53AM   22   misdemeanor drug charge.  She was in an inpatient facility

09:53AM   23   for a period of time.  Then she segued to an outpatient --

09:53AM   24   or, I think it's inpatient extended, I forget what they call

09:53AM   25   that.  And then ultimately it got to the point where that

USA v Gerace - Burns - Tripi/Direct - 12/17/24

27

09:53AM    1    facility said she was ready, and we had to make a

09:53AM    2    determination.

09:53AM    3        Again the trials were being continued.  So I think it was

09:54AM    4    January, we made the determination the best bet was to put

09:54AM    5    her in a very modest apartment and fund that.  And, in fact,

09:54AM    6    her landlord didn't even know about her affiliation with us.

09:54AM    7    And we did that for a number of months until she relapsed,

09:54AM    8    and we determined that she stole the money, and we arrested

09:54AM    9    her again.

09:54AM    10   Q.  I want to go back.  You mentioned that you charged her

09:54AM    11   with a misdemeanor drug charge.  Typically, is the FBI

09:54AM    12   involved in arresting drug users?

09:54AM    13   A.  No.  I don't think I've ever done a misdemeanor drug

09:54AM    14   charge in my career.

09:54AM    15   Q.  What was -- what was the purpose behind charging Ms. P.H.

09:54AM    16   with a misdemeanor drug charge at that time?

09:54AM    17   A.  So we had, you know, interacted with her earlier in the

09:54AM    18   investigation.  And then she was in a, kind of, a spiral

09:54AM    19   down.  And she kept committing --

09:54AM    20   Q.  Let me stop you there.

09:54AM    21       When you first became aware of Ms. P.H., how was her

09:54AM    22   health compared to what you're describing as a spiral?

09:54AM    23   A.  Oh, it was dramatically worse over the years of substance

09:55AM    24   abuse, and arrests, and what I would consider kind of --

09:55AM    25   people that are addicts, the kind of charges they pick up.

USA v Gerace - Burns - Tripi/Direct - 12/17/24

28

| | | |
|---|---|---|
| 09:55AM | 1 | They're often caught riding in a car with drug dealers, have |
| 09:55AM | 2 | paraphernalia, commit larcenies to fuel their drug crimes. |
| 09:55AM | 3 | So Ms. P.H. had a series of these arrests, and we would |
| 09:55AM | 4 | try to either get in front of her -- or, we'd get in front of |
| 09:55AM | 5 | her at the time of the arrest.  A lot of times we weren't |
| 09:55AM | 6 | able to do that. |
| 09:55AM | 7 | Or in the way the bail system works, she was able to get |
| 09:55AM | 8 | bail, so she would essentially just stop showing up for her |
| 09:55AM | 9 | next court appearances.  So we'd go to the court appearance. |
| 09:55AM | 10 | Lots of different phone numbers, different places.  It |
| 09:55AM | 11 | took a lot to actually find her. |
| 09:55AM | 12 | Q.  At one point before -- before the decision was made to |
| 09:55AM | 13 | charge her with the misdemeanor drug charge in federal court, |
| 09:55AM | 14 | did you in fact get in front of her and try to set her up |
| 09:55AM | 15 | with treatment -- |
| 09:55AM | 16 | A.  Yeah, we have. |
| 09:55AM | 17 | Q.  -- housing? |
| 09:55AM | 18 | A.  Yeah. |
| 09:55AM | 19 | Q.  Explain what you did. |
| 09:55AM | 20 | A.  So, I think it was -- was it '19 or so?  She reached out, |
| 09:56AM | 21 | and she had a pending case, and she was concerned about her |
| 09:56AM | 22 | safety.  And then myself and Task Force Officer Rondon had |
| 09:56AM | 23 | actually picked her up, and we brought her to PATH, it's a -- |
| 09:56AM | 24 | it's a nonprofit, People Against Trafficking of Humans, and |
| 09:56AM | 25 | they have a lot of resources for individuals like that.  So |

09:56AM    1    we brought her there.

09:56AM    2        They met not -- with us present, they met with

09:56AM    3    counselors.  She met with counselors.  We actually left for a

09:56AM    4    little bit, and they met and they gave her some food and some

09:56AM    5    clothing and stuff with the understanding that they were

09:56AM    6    gonna pick her up the next day and kind of continue to try to

09:56AM    7    get her some help, and then she didn't show up.

09:56AM    8    Q.  And it was PATH who gave her the food and the clothing?

09:56AM    9    A.  They're -- yeah, we don't.  We try to, like, find

09:56AM   10    agencies that do that.  I mean, obviously, the FBI's job is

09:56AM   11    to investigate crimes.  And so we try to identify agencies

09:56AM   12    that can help people in those situations.

09:56AM   13    Q.  And then the next day, it was set up, and she didn't show

09:56AM   14    up?

09:56AM   15    A.  Yeah.  The director of PATH called me and said they had

09:57AM   16    sent a van, and she didn't show up.

09:57AM   17    Q.  At some point later on did you guys find her, after the

09:57AM   18    decision was made to charge her, in a drug house?

09:57AM   19    A.  Yes, it took -- yes, it a few months to actually locate

09:57AM   20    her.  She was kind of couch surfing.

09:57AM   21    Q.  Now, the jury may have heard cross-examination at some

09:57AM   22    point from a witness regarding reimbursements for

09:57AM   23    transportation, a cross-examination about witness fees for

09:57AM   24    being in federal court, things like that.

09:57AM   25        Does the FBI have anything to do with when someone is

USA v Gerace - Burns - Tripi/Direct - 12/17/24

30

| | | |
|---|---|---|
| 09:57AM | 1 | actually subpoenaed to court, paying witness voucher fees, or |
| 09:57AM | 2 | reimbursements for travel expenses? |
| 09:57AM | 3 | A.  Not at all. |
| 09:57AM | 4 | Q.  That's -- that's done through a different entity, and |
| 09:57AM | 5 | it's -- it's statutory; is that right? |
| 09:57AM | 6 | A.  Yeah.  The statute, I mean, you get 40 bucks a day to |
| 09:57AM | 7 | be -- as a witness fee, you get mileage, it's all set out in |
| 09:58AM | 8 | the statute.  So anyone that's a witness, obviously, not a |
| 09:58AM | 9 | government witness, but anyone that's a witness that's here |
| 09:58AM | 10 | is entitled to their witness fee, their -- you know, mileage, |
| 09:58AM | 11 | their expenses like a daily expenses.  It's all set out in |
| 09:58AM | 12 | the statute.  We don't really have anything to do with it |
| 09:58AM | 13 | other than -- I inform the witnesses that there's -- you have |
| 09:58AM | 14 | to sign some paperwork, and that the marshals at some point |
| 09:58AM | 15 | will reimburse them for their expenses under this capitated |
| 09:58AM | 16 | rate that's in statute. |
| 09:58AM | 17 | Q.  It's a nominal fee, similar to what jurors get? |
| 09:58AM | 18 | A.  Yeah, I think jurors get an extra ten bucks. |
| 09:58AM | 19 | Q.  All right.  I want to switch gears now, okay? |
| 09:58AM | 20 | A.  Certainly. |
| 09:58AM | 21 | Q.  As a member of the investigative team, have you received |
| 09:58AM | 22 | and reviewed and helped to isolate text messages that were |
| 09:58AM | 23 | contained in Mr. Gerace's cell phone which was extracted as |
| 09:58AM | 24 | part of Exhibit 310? |
| 09:58AM | 25 | A.  Yes, I have been involved in that. |

09:58AM  1    Q.  I want to hand you up Exhibit 310.  That was

09:59AM  2    authenticated earlier in the trial by Special Agent Curtis

09:59AM  3    Ryan.  Are you also familiar with that same thumb drive that

09:59AM  4    contains the complete extraction of Mr. Gerace's phone?

09:59AM  5    A.  Very familiar.

09:59AM  6    Q.  Have you worked extensively with that?

09:59AM  7    A.  Yes, it's the extraction from the border search.

09:59AM  8    Q.  Have you helped isolate and reviewed different text

09:59AM  9    threads that are contained on that extraction?

09:59AM  10   A.  Yes, I have.

09:59AM  11   Q.  When I say "text threads," I should say text messaging

09:59AM  12   threads.

09:59AM  13   A.  Between Mr. Gerace and other individuals, yes.

09:59AM  14   Q.  Okay.  You've reviewed the extraction?

09:59AM  15   A.  Yes.

09:59AM  16   Q.  You've used it to further your investigation?

09:59AM  17   A.  Yes, on many occasions.

09:59AM  18   Q.  You've spent time reviewing the contents?

09:59AM  19   A.  Yes, and carving them out.

09:59AM  20   Q.  "Carving them out," meaning isolating different text

09:59AM  21   threads?

09:59AM  22   A.  Yes.  It's a picture of the image of your phone with all

09:59AM  23   the different people you text message, so if you want to --

10:00AM  24   you've got to identify the contact, and then pull those

10:00AM  25   particular ones.  And the program does it, the imaging

10:00AM   1   program, so you're able to isolate just the text messages

10:00AM   2   between Mr. Gerace and certain individuals that we were

10:00AM   3   interested in.

10:00AM   4   Q.  Have you extensively reviewed and helped to carve out or

10:00AM   5   scoped text threads contained in the extraction that are

10:00AM   6   relevant to this trial?

10:00AM   7   A.  Yes, I spent a lot of time on that.

10:00AM   8   Q.  Based on your familiarity with the contents of the

10:00AM   9   extraction, did you review and isolate text message threads

10:00AM  10   between the defendant and Judge John Michalski?

10:00AM  11   A.  Yes.  I reviewed those extensively.

10:00AM  12   Q.  Did you isolate and review text message threads between

10:00AM  13   the defendant and Greg Trotter, an Amherst Police Department

10:00AM  14   detective?

10:00AM  15   A.  Yes, I have.

10:00AM  16   Q.  Did you isolate and review text messages threads between

10:00AM  17   the defendant and P.H., also known as P.R.?

10:00AM  18   A.  Yes, I did.

10:00AM  19   Q.  Did you isolate and review text message threads between

10:00AM  20   the defendant and Darryl LaMont?

10:00AM  21   A.  Yes, I did.

10:00AM  22   Q.  How did you identify the number of -- the phone number

10:00AM  23   pertaining to the text message thread that -- as Darryl

10:01AM  24   LaMont's?

10:01AM  25   A.  In reviewing the text thread, it was pretty comfortable

10:01AM  1    it was Mr. LaMont based on the communications, and when you

10:01AM  2    pull them up you'll see the content of the thing.  But then

10:01AM  3    additionally, we had never subscribed that number.  We

10:01AM  4    never -- you can get a subpoena and get a subscriber, and we

10:01AM  5    had not done that.

10:01AM  6         And so on December 2nd, I just made a phone call to it,

10:01AM  7    and kind of pretended I was looking to set up a stag party to

10:01AM  8    that number.  And the individual identified himself as

10:01AM  9    Darryl.

10:01AM  10        And I said, are you still doing parties?  And he's, like,

10:01AM  11   yeah.

10:01AM  12        And I said, where's your website?  He said, it's down.

10:01AM  13        And I essentially told him -- he indicated this was his

10:01AM  14   personal number, not his business one.  So I knew at that

10:01AM  15   point it was Darryl LaMont.

10:01AM  16   Q.  Did he ask you how you got his personal number?

10:01AM  17   A.  Yes, he did.

10:01AM  18   Q.  What did you say?

10:01AM  19   A.  A dude in a bar gave it to me.

10:01AM  20   Q.  Okay.  You were talking a moment ago about the internal

10:02AM  21   content of the text threads as well.  At one point, are there

10:02AM  22   indications that the person is a black male associated with

10:02AM  23   stag parties?

10:02AM  24   A.  Yes.

10:02AM  25   Q.  Are there also indications that a woman named Sunny wrote

10:02AM   1    a text message that said, hey, Darryl's driving so I'm

10:02AM   2    writing, or words to that effect?

10:02AM   3    A.   Exactly.

10:02AM   4    Q.   Did you also isolate and review a text message between

10:02AM   5    Peter Gerace and Chris Chudy?

10:02AM   6    A.   Yes, I did.

10:02AM   7              **MR. FOTI:**  Judge, can we approach?

10:02AM   8              **THE COURT:**  Sure.

10:03AM   9              (Sidebar discussion held on the record.)

10:03AM  10              **MR. FOTI:**  Judge, I think going forward, Mr. Tripi is

10:03AM  11    going to start admitting exhibits containing conversations

10:03AM  12    from within the phone.  And we would object to any of the

10:03AM  13    conversations coming in at least through Mr. Burns, not

10:03AM  14    through the witnesses that were participants of the

10:03AM  15    conversation.  I think it's -- setting aside just the hearsay

10:03AM  16    rules that I would argue, I think there's a general

10:03AM  17    confrontation -- constitutional confrontation issue here.  I

10:03AM  18    can't cross-examine the participants to these conversations

10:03AM  19    and talk about the context, talk about what may have been

10:03AM  20    discussed outside of the text chain.  I can't do anything with

10:03AM  21    this other than --

10:03AM  22              **THE COURT:**  These are text messages between

10:03AM  23    Mr. Gerace and other people?

10:03AM  24              **MR. TRIPI:**  Yeah, this is -- for example, this is

10:03AM  25    between Judge Michalski and Mr. Gerace, similar to what you've

USA v Gerace - Burns - Tripi/Direct - 12/17/24

35

```
10:03AM    1    seen between Bongiovanni and Gerace.  So I would argue the

10:04AM    2    same arguments in response to getting in, like, the

10:04AM    3    Bongiovanni text thread.

10:04AM    4         THE COURT:  So Gerace's, there are no issues

10:04AM    5    (indecipherable).

10:04AM    6         MR. FOTI:  So I don't -- I don't -- I don't have an

10:04AM    7    objection to Bongiovanni and Gerace.  In fact, I think we even

10:04AM    8    stipulated that in.  If not, then we would have.

10:04AM    9         I understand that they're coconspirators.

10:04AM   10         In this case, we're talking about a number of

10:04AM   11    individuals that I don't think have been established as

10:04AM   12    coconspirators in the charges in this indictment.  And --

10:04AM   13         THE COURT:  Who?

10:04AM   14         MR. FOTI:  Well, Judge Michalski, I think, is one of

10:04AM   15    them.

10:04AM   16         THE COURT:  You don't think he's a coconspirator?

10:04AM   17         MR. FOTI:  I don't.  I don't think it's been

10:04AM   18    established yet.

10:04AM   19         THE COURT:  I disagree with that.

10:04AM   20         MR. FOTI:  Chris Chudy.  I don't know who else

10:04AM   21    they're gonna put in.  I think just --

10:04AM   22         MR. TRIPI:  The names that I've just laid out.

10:04AM   23         THE COURT:  Chudy, he's the.

10:04AM   24         MR. TRIPI:  Chudy is the manager.

10:04AM   25         THE COURT:  Right.  Michalski.
```

10:04AM    1          **MR. TRIPI:**  Michalski.  Trotter.

10:04AM    2          **THE COURT:**  Trotter is the Amherst cop.

10:04AM    3          **MR. TRIPI:**  Trotter's the Amherst cop.

10:04AM    4          P.H., but only the thread that relates to Trotter.

10:04AM    5   So that is, he's talking to Trotter about where she is, and

10:05AM    6   then he's talking to P.H. about pretending he's gonna pick her

10:05AM    7   up.  So he that's how the arrest gets arranged.  So you see

10:05AM    8   how he's talking to one and the other.

10:05AM    9          And then Darryl LaMont.  So those are the ones.

10:05AM   10          **THE COURT:**  The only one I'm concerned about is P.H.

10:05AM   11          **MR. TRIPI:**  And actually all of hers are actually

10:05AM   12   contained, because he's also screenshotting Trotter, and

10:05AM   13   sending the same thing he's saying to P.H., he's

10:05AM   14   screenshotting, so it's actually all in Trotter's thread.

10:05AM   15          **THE COURT:**  Okay.

10:05AM   16          **MR. TRIPI:**  You know?

10:05AM   17          **THE COURT:**  I think they're all coconspirators.

10:05AM   18          **MR. FOTI:**  I don't -- I don't know what testimony has

10:05AM   19   established Trotter as a coconspirator, other than --

10:05AM   20   actually, I can't even think of an example, because he was

10:05AM   21   involved in the arrest of individuals in this case, I don't

10:05AM   22   think that establishes him as a coconspirator particular to

10:05AM   23   anything that is charged here.

10:05AM   24          I understand he's been charged by the government

10:05AM   25   separately in regard to lying.

10:05AM   1          THE COURT:  Well, no, but isn't there testimony that

10:05AM   2   Trotter did something in connection with the -- is it the

10:06AM   3   Rolex watch?

10:06AM   4          MR. TRIPI:  Yeah, this is the Rolex arrest.

10:06AM   5          THE COURT:  Yeah.  And that he -- and that Gerace

10:06AM   6   reaches out to him to get her arrested for the -- the Rolex,

10:06AM   7   that he's got some sort of connection with him in that regard.

10:06AM   8          MR. FOTI:  He was an arresting officer on that.

10:06AM   9          MR. TRIPI:  May I -- I don't mean that interrupt,

10:06AM   10  Judge, sorry.

10:06AM   11         THE COURT:  No, go ahead.

10:06AM   12         MR. TRIPI:  On that score, the content of the text as

10:06AM   13  well as what you've heard already, you're right on it, but the

10:06AM   14  context show like, for example, he arrests her.  And a normal

10:06AM   15  police officer isn't telling you what a suspect is saying as a

10:06AM   16  complainant realtime.

10:06AM   17         Gerace is saying, is she talking?  What is she

10:06AM   18  saying?  And he's responding.

10:06AM   19         MR. COOPER:  And just to put a cherry on it, Judge,

10:06AM   20  P.H. is interviewed by federal law enforcement at Trotter's

10:06AM   21  department, and then all of a sudden Jessica Leyland is saying

10:06AM   22  I heard you talked to the feds, you're a snitch.

10:06AM   23         And I think there's an inference that the Court can

10:07AM   24  draw there on top of --

10:07AM   25         THE COURT:  Yeah, certainly my instinct was that

10:07AM  1   Trotter was a coconspirator.  I think Michalski is, as much as

10:07AM  2   I hate to say it, I liked John, but --

10:07AM  3          **MR. TRIPI:**  Everybody did, Judge --

10:07AM  4          **THE COURT:**  I know.

10:07AM  5          **MR. TRIPI:**  -- and nobody wanted that to happen.

10:07AM  6          **THE COURT:**  It breaks my heart.

10:07AM  7          **MR. TRIPI:**  Yeah.

10:07AM  8          **THE COURT:**  But I think he is.  I think that Trotter

10:07AM  9   is.  I think Chudy certainly is.  And --

10:07AM 10          **MR. TRIPI:**  Darryl LaMont.

10:07AM 11          **THE COURT:**  -- Darryl LaMont certainly is.

10:07AM 12          **MR. FOTI:**  Judge, no disrespect.  When you say

10:07AM 13   "certainly," I don't know what testimony there has been that

10:07AM 14   Chris Chudy is a coconspirator other than he works at

10:07AM 15   Pharaoh's.  That doesn't make him a coconspirator.

10:07AM 16          **THE COURT:**  Isn't he one of the people that's been

10:07AM 17   tipped to ignore --

10:07AM 18          **MR. TRIPI:**  He's a manager.  There's been some

10:07AM 19   testimony I think earlier in the trial that he was one of

10:07AM 20   the -- it was Peter and him who had the key.  At some point I

10:07AM 21   think somebody said that.

10:07AM 22          **THE COURT:**  That let people upstairs.

10:07AM 23          **MR. TRIPI:**  Yeah.

10:07AM 24          And then in addition to that, Judge, I think there's

10:07AM 25   been ample testimony about sort of the wide ranging use and

10:08AM    1    distribution that occurs there. I think there's an inference

10:08AM    2    that can be drawn based on his position in management for a

10:08AM    3    long time.

10:08AM    4          And, of course, you can also consider the text. It's

10:08AM    5    one text, and in this text, if you let it in, or I can show it

10:08AM    6    to you ahead of time, it's one text in a very long thread

10:08AM    7    because obviously they've texted a lot, we've isolated one

10:08AM    8    text, and essentially it's Chudy being sort of upset that

10:08AM    9    Gerace has fired someone that -- like a bartender or someone

10:08AM   10    that Chudy liked.

10:08AM   11          And in that exchange, Chudy's like, oh, but if there

10:08AM   12    are girls -- I'm paraphrasing -- if there are girls that party

10:08AM   13    with you upstairs then, then there's no problems.

10:08AM   14          And so right in the text, and that's what the

10:08AM   15    evidentiary value of it, it's showing that one of his managers

10:08AM   16    knows there's a separate set of rules here for the favorites,

10:08AM   17    so that would be the argument stemming from that.

10:09AM   18          **MR. SOEHNLEIN:**  To the extent that there's been

10:09AM   19    testimony about Chudy, it's that the key to the upstairs was

10:09AM   20    in his pocket, and that other people would get it from him,

10:09AM   21    and then let -- it was Katrina that said she could get it from

10:09AM   22    his pocket.

10:09AM   23          That doesn't mean that she necessarily got it from

10:09AM   24    him, by the way.

10:09AM   25          **THE COURT:**  Right.

| | | |
|---|---|---|
| 10:09AM | 1 | **MR. SOEHNLEIN:**  Okay.  The remaining testimony about |
| 10:09AM | 2 | Chudy is that he was a good manager.  That he -- |
| 10:09AM | 3 | **THE COURT:**  Fired people. |
| 10:09AM | 4 | **MR. SOEHNLEIN:**  -- he fired people -- |
| 10:09AM | 5 | **THE COURT:**  What about the context of the -- |
| 10:09AM | 6 | **MR. SOEHNLEIN:**  So also I don't understand it, how -- |
| 10:09AM | 7 | in what way is it trying to be -- |
| 10:09AM | 8 | **MR. TRIPI:**  Would you like to see it? |
| 10:09AM | 9 | **THE COURT:**  Yeah.  So why don't we do everybody |
| 10:09AM | 10 | except Chudy's right now. |
| 10:09AM | 11 | **MR. TRIPI:**  Sure. |
| 10:09AM | 12 | **THE COURT:**  So Michalski, we don't have an argument |
| 10:09AM | 13 | on. |
| 10:09AM | 14 | **MR. FOTI:**  Well, I -- I also, the majority of the |
| 10:09AM | 15 | communication is not in furtherance of the conspiracy.  So |
| 10:09AM | 16 | even if we establish him as a coconspirator, the majority of |
| 10:09AM | 17 | the communication, I went through all the text messages.  Over |
| 10:09AM | 18 | and over again is Judge Michalski and Peter saying do you want |
| 10:09AM | 19 | to meet up for drinks?  Not available this week, Sue's got |
| 10:10AM | 20 | whatever going on. |
| 10:10AM | 21 | I mean, it's just a ton of back and forth about |
| 10:10AM | 22 | scheduling to hang out. |
| 10:10AM | 23 | And I think there's, like, one message like right in |
| 10:10AM | 24 | the beginning about let's get some pussy or something, with no |
| 10:10AM | 25 | real context of it. |

10:10AM  1          **MR. TRIPI:**  It's the very first text.

10:10AM  2          **MR. FOTI:**  Yeah, it's like the first message.  And I

10:10AM  3   get that that -- I guess they're arguing, there's no context

10:10AM  4   to it that that's a statement in furtherance of a conspiracy,

10:10AM  5   but that's like it, and the rest of it is just --

10:10AM  6          **MR. TRIPI:**  Judge, our first argument, and you

10:10AM  7   started to sway, is that these are statements of a party

10:10AM  8   opponent so that none of them are hearsay.

10:10AM  9          Also, let's say you buy Mark's argument full cloth

10:10AM  10  right now that it's not a coconspirator statement.  Statements

10:10AM  11  of a party opponent plus the conversation for context, it

10:10AM  12  should all come in on that analysis alone on top of it.

10:10AM  13         **THE COURT:**  What about all this stuff they're just

10:10AM  14  making arrangements to get together?

10:10AM  15         **MR. TRIPI:**  Well, face-to-face meetings are, like,

10:10AM  16  he's going to meet him on the bench.

10:11AM  17         It's not like a former law partner coming to visit

10:11AM  18  you or something like that.  It's a strip club owner who he

10:11AM  19  hasn't represented since 2006 coming in 2016 and '15, like

10:11AM  20  right in the heart of this.

10:11AM  21         **THE COURT:**  What's the -- what's the -- what is the

10:11AM  22  issue.

10:11AM  23         **MR. TRIPI:**  Well, I think the nature and extent of

10:11AM  24  the relationship, you know, is -- 'cuz conspiracies don't

10:11AM  25  spring up out of nowhere.

10:11AM    1          They discuss Katrina Nigro.  They mock her, you know?

10:11AM    2    And so we need corroborate her knowledge of this situation.

10:11AM    3    They heavily attacked her.

10:11AM    4          They talk about Shelby in a sense that it's

10:11AM    5    corroborative and confirmation of Michalski's connection to

10:11AM    6    Shelby.

10:11AM    7          **THE COURT:**  I'm convinced on that.  So Michalski is

10:11AM    8    okay.

10:11AM    9          **MR. TRIPI:**  Yeah.

10:11AM   10          **THE COURT:**  Who's next?

10:11AM   11          **MR. TRIPI:**  Wherever you want to go.  Darryl.

10:11AM   12          **THE COURT:**  LaMont.  Do you want argument there?

10:11AM   13    He's a coconspirator.

10:11AM   14          **MR. FOTI:**  I don't believe he is.  I think that

10:11AM   15    there's been testimony specifically saying just the only

10:12AM   16    testimony that suggests they're coconspirators is that there's

10:12AM   17    dancers that work for both.  But there's also been testimony

10:12AM   18    that dancers go from club to club, that this is a normal

10:12AM   19    occurrence, that dancers in this industry move between

10:12AM   20    different stag companies, between different clubs.

10:12AM   21          The only testimony I guess that there's any type of,

10:12AM   22    I guess, collaboration between the two that goes just beyond

10:12AM   23    dancers working for both came from Katrina Nigro.  I don't

10:12AM   24    think that that establishes preponderance of coconspirator.

10:12AM   25          You have the alternative testimony from A.G. who was

USA v Gerace - Burns - Tripi/Direct - 12/17/24
43

10:12AM   1    fired by Pharaoh's, who testified they are different

10:12AM   2    companies, they're completely different, I was fired from

10:12AM   3    Pharaoh's.

10:12AM   4          THE COURT:  Can we do -- can we do the Michalski

10:12AM   5    stuff and then take a break?

10:12AM   6          MR. TRIPI:  Sure, we can.  Can I just argue just to

10:12AM   7    cap that part of the argument?

10:12AM   8          THE COURT:  Yes.  I'm inclined to let it all in

10:12AM   9    because it's admissions by, I mean, it's a statement of a

10:12AM   10   party opponent and context.  I mean, I think that it comes in

10:13AM   11   for that reason.

10:13AM   12         MR. FOTI:  But, Judge, that's part of my concern.  I

10:13AM   13   said the hearsay -- there's hearsay objections here,

10:13AM   14   obviously.  But I also have a concern about the context.

10:13AM   15   That's why I'm saying it goes beyond just hearsay, and it's a

10:13AM   16   constitutional issue, it's a confrontation issue.

10:13AM   17         THE COURT:  How so?

10:13AM   18         MR. COOPER:  Peter's available now to call him.

10:13AM   19         THE COURT:  No, no.  But how so?

10:13AM   20         MR. FOTI:  Because, for example, and I do --

10:13AM   21         THE COURT:  Do you have any caselaw that says if

10:13AM   22   you've got an exchange, a back and forth, an exchange of

10:13AM   23   letters, an exchange of emails, an exchange of texts between a

10:13AM   24   defendant and someone, only the defendant's emails come in?

10:13AM   25   And you don't get to put the other ones in unless you have

USA v Gerace - Burns - Tripi/Direct - 12/17/24

44

| | | |
|---|---|---|
| 10:13AM | 1 | context of what the defendant is saying? |
| 10:13AM | 2 | **MR. FOTI:** I don't have a case off the top of my head |
| 10:13AM | 3 | to give to you, Judge. |
| 10:13AM | 4 | **THE COURT:** Well, you knew it was coming in. |
| 10:13AM | 5 | **MR. FOTI:** I don't know that a case like that exists. |
| 10:13AM | 6 | And I know that we do have a constitutional right to |
| 10:13AM | 7 | confrontation. And I've looked at the messages in |
| 10:14AM | 8 | anticipation of today, and I -- and I am looking at these |
| 10:14AM | 9 | messages and there's all kinds of things that there is no |
| 10:14AM | 10 | context to. |
| 10:14AM | 11 | There's call me, and you don't really know where the |
| 10:14AM | 12 | conversation springs off of, what came before, what came |
| 10:14AM | 13 | after. |
| 10:14AM | 14 | **MR. TRIPI:** That's for argument. These two can hash |
| 10:14AM | 15 | it out. |
| 10:14AM | 16 | **THE COURT:** Okay. Let's go. Let's do it. |
| 10:14AM | 17 | (End of sidebar discussion.) |
| 10:14AM | 18 | **BY MR. TRIPI:** |
| 10:14AM | 19 | Q. Okay. I'm going to hand you up Government Exhibit 310AE. |
| 10:14AM | 20 | I'm going to ask you to look through it enough to familiarize |
| 10:14AM | 21 | yourself with what it is, and look back at me when you're |
| 10:14AM | 22 | done. |
| 10:15AM | 23 | A. I'm familiar with it. |
| 10:15AM | 24 | Q. Do you recognize Government Exhibit 310AE? |
| 10:15AM | 25 | A. Yes, I do. |

| 10:15AM | 1 | Q.  What do you recognize it to be? |

A.  It's text messages between Judge John Michalski and Peter Gerace from the phone extraction of 310.

Q.  And are those accurate from the extraction, Exhibit 310?

A.  Yes, it's a printout of them.

            MR. TRIPI:  The government offers 310AE, Your Honor.

            MR. FOTI:  Judge, we just restate the objection that we discussed at the sidebar.

            THE COURT:  Okay.  Overruled.

            **(GOV Exhibit 310AE was received in evidence.)**

            MR. TRIPI:  Okay.  We're going to publish those up on the monitor now, Ms. Champoux.  We can start with page 1, please.

            **BY MR. TRIPI:**

Q.  Now we're going to go through a bunch of these, but we're not going to go through all of them, okay?

A.  Yes.

Q.  Just to orient the jury to the first page, the way it's extracted, IOS, iMessage, SMS, MMS.  Essentially, does that mean text messages?

A.  Yes, text communications.

Q.  Number of participants, two?

A.  Correct.

Q.  In the gray bubbles, would that be the number and the entry of the name as it existed in the phone for Judge

USA v Gerace - Burns - Tripi/Direct - 12/17/24

46

10:16AM    1    Michalski?

10:16AM    2    A.  In the contact, yes.

10:16AM    3    Q.  And in the blue bubbles that you see, are those the

10:16AM    4    written communications for Mr. Gerace?

10:16AM    5    A.  Yes, they are.

10:16AM    6    Q.  Okay.  Now in the conversation details of the extraction,

10:16AM    7    does it tell you how many text there are, or messages, I

10:16AM    8    should say?

10:16AM    9    A.  Yes, 1,027.

10:16AM    10   Q.  And what is the date range from that first message to the

10:16AM    11   last?

10:16AM    12   A.  The first one is 6/10 of 2015, and it goes to April 15th

10:16AM    13   of 2019.  The phone, I believe, was seized on April 19th or

10:16AM    14   April 20th.  April 19th, I believe, 2019.

10:16AM    15   Q.  If I told you April 27th, 2019, does that sound about,

10:16AM    16   right?

10:16AM    17   A.  That's better, yes.

10:16AM    18   Q.  Okay.

10:16AM    19   A.  That's accurate.

10:16AM    20   Q.  So the last text is about two weeks before the phone was

10:16AM    21   seized roughly, give or take?

10:16AM    22   A.  Yeah.  And Mr. Gerace had been out of the country for, I

10:16AM    23   believe, a week or so.

10:16AM    24   Q.  Okay.  I'm going to go through some of these texts.

10:17AM    25        On page 1, the very first text on June 10th, 2015, in the

10:17AM    1   gray box, can you read what Judge Michalski wrote to the

10:17AM    2   defendant?

10:17AM    3   A.  You're funny.  Let's get some pussy there.

10:17AM    4   Q.  Okay.  Let's go to page -- and are there responses in

10:17AM    5   basically -- in the same, within the same minute?

10:17AM    6   A.  Yes.  Where and when, and I want drinks.

10:17AM    7         **MR. TRIPI:**  Okay.  Let's go to page 2, Ms. Champoux.

10:17AM    8         **BY MR. TRIPI:**

10:17AM    9   Q.  Generally, on this page, does it appear that they're in

10:17AM   10   August making arrangements to get together?

10:17AM   11   A.  Yes, that's generally what it says.

10:17AM   12   Q.  Are you familiar with where Judge John Michalski worked,

10:17AM   13   correct?

10:17AM   14   A.  Yes, at the Erie County State Supreme Court building.

10:17AM   15   Well, the court's building, and it's tied to the District

10:17AM   16   Attorney's Office and --

10:17AM   17   Q.  For ease of reference, I'm going to just box an exchange

10:18AM   18   between the two of them on August 30th.  Can you just read

10:18AM   19   those messages?

10:18AM   20   A.  From Judge Michalski:  The middle of the week is good.

10:18AM   21     Mr. Gerace:  Okay.  Mr. Gerace:  T-U-E-S I'm in court at

10:18AM   22   2, your building.

10:18AM   23     And then Michalski -- Judge Michalski indicates:  I

10:18AM   24   should be there stop over.

10:18AM   25         **MR. TRIPI:**  Okay.  Can we go to page 7, Ms. Champoux.

| 10:18AM | 1 | **BY MR. TRIPI:** |

10:18AM  2  Q.  There's a message on October 16th, 2015.  I boxed it just

10:18AM  3  for ease of reference.  Can you read it for the jury?

10:18AM  4  A.  Yes, it's from Mr. Gerace:  Are you bringing the family

10:18AM  5  to Pharaoh's for dinner?  Well, next message, dinner.

10:18AM  6  Q.  And is there a response that same day from the judge?

10:18AM  7  A.  Yes, it was:  Ha ha ha.

10:18AM  8     For context, the previous message was he was going out

10:19AM  9  with his daughter, I think, and his family.

10:19AM  10  Q.  And so that's the ha ha ha?

10:19AM  11  A.  Right.  When he says are you bringing the family to

10:19AM  12  Pharaoh's for dinner?

10:19AM  13     **MR. TRIPI:**  All right.  Let's go to page 13,

10:19AM  14  Ms. Champoux.  Actually can we go to the bottom of 12, I'm

10:19AM  15  sorry.

10:19AM  16     **BY MR. TRIPI:**

10:19AM  17  Q.  There's a message at the bottom of page 12.  Can you read

10:19AM  18  from there to the third message on page 13, please?

10:19AM  19  A.  Sure.  Mr. Gerace:  Did you leave work yet?

10:19AM  20     Judge Michalski:  Just now.

10:19AM  21     Mr. Gerace:  I'll head there now.

10:19AM  22     Judge Michalski:  Okay.

10:19AM  23  Q.  And those are messages on October 28th, 2015?

10:19AM  24  A.  That's correct.

10:19AM  25     **MR. TRIPI:**  Okay.  Can we scroll down to page 14,

| | | |
|---|---|---|
| 10:19AM | 1 | Ms. Champoux. |
| 10:19AM | 2 | **BY MR. TRIPI:** |
| 10:20AM | 3 | Q. You can continue reading messages on October 29th, 2015. |
| 10:20AM | 4 | A. Let's get together next week; it's from Mr. Gerace. |
| 10:20AM | 5 | Judge John Michalski:  Okay. |
| 10:20AM | 6 | Q. And you just read the messages third and -- |
| 10:20AM | 7 | A. Oh, correct. |
| 10:20AM | 8 | Q. Second and third from the bottom, correct? |
| 10:20AM | 9 | A. Correct. |
| 10:20AM | 10 | **MR. TRIPI:**  Let's go to page 15, Ms. Champoux. |
| 10:20AM | 11 | **BY MR. TRIPI:** |
| 10:20AM | 12 | Q. All right.  I want you to read an exchange that was |
| 10:20AM | 13 | November 3rd -- I'm sorry, yeah, November 3rd, 2015. |
| 10:20AM | 14 | A. Okay.  From Mr. Gerace:  I'll be downtown at 9:15.  Are |
| 10:20AM | 15 | you on the bench then? |
| 10:20AM | 16 | Judge Michalski:  No, I am here at Medaille teaching |
| 10:20AM | 17 | until 9:30, and then I head downtown after that. |
| 10:21AM | 18 | And from Mr. Gerace:  Okay, I was gonna say hi. |
| 10:21AM | 19 | **MR. TRIPI:**  Ms. Champoux, can we go to page 16. |
| 10:21AM | 20 | **BY MR. TRIPI:** |
| 10:21AM | 21 | Q. Can you just read the messages and the dates for this |
| 10:21AM | 22 | whole page? |
| 10:21AM | 23 | A. Certainly, so 11/8/15, it's from Mr. Gerace:  Call me. |
| 10:21AM | 24 | 11/9/2015 at 4:05:  Are you at work?; it's from Mr. Gerace. |
| 10:21AM | 25 | Judge John Michalski responds:  Yes. |

10:21AM    1      Peter Gerace responds:  Fuck, I left already.

10:21AM    2      And the bottom message:  She's going to jail tomorrow.

10:21AM    3      And that's on November 9th, 2015 at 5:06.

10:21AM    4          **MR. TRIPI:**  Ms. Champoux, can you scroll down so we

10:21AM    5  catch the last message in that response.

10:21AM    6          **BY MR. TRIPI:**

10:21AM    7  Q.  What does Mr. Gerace say after that?

10:21AM    8  A.  Call me on break.

10:21AM    9      Judge John Michalski says:  Wow.  Okay.

10:22AM   10          **MR. TRIPI:**  And can we scroll down a little further,

10:22AM   11  Ms. Champoux.  All right.  We'll move on to page 19, please.

10:22AM   12          **BY MR. TRIPI:**

10:22AM   13  Q.  Can you read a message November 22nd at 2015, written by

10:22AM   14  the defendant?

10:22AM   15  A.  I have a paper for you.

10:22AM   16  Q.  And then can you read messages on November 23rd, 2015?

10:22AM   17  A.  From Mr. Gerace:  Can I stop by when you get home today

10:22AM   18  for a second?

10:22AM   19      From Judge John Michalski:  Sure.

10:22AM   20          **MR. TRIPI:**  Ms. Champoux, let's go to page 21,

10:22AM   21  please.

10:22AM   22          **BY MR. TRIPI:**

10:22AM   23  Q.  Can you read -- there's some messages that begin on

10:22AM   24  November 25th.  By the way, is this UTC time that we're

10:23AM   25  seeing?

10:23AM    1    A.  That's correct.

10:23AM    2    Q.  So at some points in the year, and I'm terrible at it but

10:23AM    3    we have to do some math to get the correct time?

10:23AM    4    A.  Yeah.  And I'm not much better than you, Mr. Tripi, at

10:23AM    5    that.

10:23AM    6    Q.  Basically is it minus four in the winter, and minus five

10:23AM    7    in the summer?

10:23AM    8    A.  I believe that's correct.  I usually use a cheat sheet.

10:23AM    9    Q.  All right.  So, we have a message at the top that says:

10:23AM   10    Are you home?

10:23AM   11        And there's a response:  800 maple.

10:23AM   12        Given the conversion of the time of those are both likely

10:23AM   13    on November 25th; is that fair to say?

10:23AM   14    A.  That's accurate.

10:23AM   15    Q.  Okay.  And is this basically -- can you read the rest of

10:23AM   16    the messages for that day?  Go through the 26th.

10:23AM   17    A.  Yeah, John Michalski:  Yeah, 800 maple.

10:23AM   18        Mr. Gerace:  Is it busy.

10:23AM   19        Michalski:  Kinda.

10:23AM   20        Mr. Gerace:  Happy Thanksgiving.

10:24AM   21        On November 26th, I think that's it.

10:24AM   22    Q.  We agree that these messages were all the 25th though?

10:24AM   23    A.  That's correct, based on the UTC time.

10:24AM   24    Q.  Jumping ahead to December 1st, 2015, we're gonna stick

10:24AM   25    with this portion through.  Can you read the date and who

10:24AM   1   wrote a message on December 1st?

10:24AM   2   A.   Yes.  Mr. Gerace writes a message on 12/1:  Can you call

10:24AM   3   Clarence?

10:24AM   4        **MR. TRIPI:**  And, Ms. Champoux, can you just scroll

10:24AM   5   down, please.

10:24AM   6        **BY MR. TRIPI:**

10:24AM   7   Q.   Now, in terms of -- in terms of Clarence, do the towns

10:24AM   8   around the Buffalo area have town courts?

10:24AM   9   A.   Yes.  All the towns basically have their own courts.

10:24AM  10   Q.   Does Clarence have a town court?

10:24AM  11   A.   They do.

10:24AM  12   Q.   Okay.  What's the next thing that Mr. Gerace wrote on

10:24AM  13   December 1st?

10:24AM  14   A.   Peter Gerace, 4/15/67.

10:24AM  15   Q.   And what did Mr. Gerace write after that?

10:24AM  16   A.   12/10, 7 p.m.

10:25AM  17   Q.   Generally, do the town courts have court at night?

10:25AM  18   A.   Yes, they do, generally.  A couple days a week, usually.

10:25AM  19   Q.   So this message is December 1st, it's talking about a

10:25AM  20   date December 10th at 7 p.m.; is that right?

10:25AM  21   A.   That's correct.

10:25AM  22   Q.   What's the next message Mr. Gerace writes?

10:25AM  23   A.   Let me know when you're home.

10:25AM  24   Q.   And what did the judge respond, Judge Michalski?

10:25AM  25   A.   I don't believe he did because it's 12/1, and then it

USA v Gerace - Burns - Tripi/Direct - 12/17/24

53

10:25AM    1   jumps to 12/4.

10:25AM    2   Q.  Oh, my fault, thank you.

10:25AM    3         **MR. TRIPI:**  Can we scroll down to page 23,

10:25AM    4   Ms. Champoux.

10:25AM    5         **BY MR. TRIPI:**

10:25AM    6   Q.  Okay.  Now a moment ago we saw the Clarence exchange,

10:25AM    7   right?

10:25AM    8   A.  Correct.

10:25AM    9   Q.  Can you read what -- and that date that Mr. Gerace had

10:25AM   10   texted was 12/10, 7 p.m.?

10:26AM   11   A.  That's correct.

10:26AM   12   Q.  Can you read what Judge Michalski writes as referenced

10:26AM   13   here on page 23 on December 9th to Mr. Gerace?

10:26AM   14   A.  It's from John Michalski:  You don't go to court

10:26AM   15   tomorrow.  You'll be getting something in the mail.

10:26AM   16     And then another message from Judge Michalski:  I am in

10:26AM   17   Columbus right now.  I will get in touch when I get back.

10:26AM   18   Q.  I think you said "you" don't go to court.  Does it say:

10:26AM   19   Hey, don't go to court?

10:26AM   20   A.  I'm sorry, it says:  Hey, don't go to court.

10:26AM   21   Q.  And a message from Mr. Gerace responds:  Okay, thank you.

10:26AM   22   A.  Correct.

10:26AM   23   Q.  And what does the judge, Judge Michalski, respond after

10:26AM   24   that?

10:26AM   25   A.  What address do they have for you?  It would be the one

10:26AM  1   that appears on your license.  Is that the right one?

10:26AM  2   Q.  And is there a response by the defendant?

10:26AM  3   A.  No, I put right one down when I mailed it.

10:26AM  4        **MR. TRIPI:**  Ms. Champoux, can you scroll down a

10:26AM  5   little bit?

10:26AM  6        **BY MR. TRIPI:**

10:26AM  7   Q.  What else did Mr. Gerace write after?

10:26AM  8   A.  95 Spring Meadow Drive, Number 5, Will, 14221.

10:27AM  9   Q.  Is Williamsville in 14221?

10:27AM  10  A.  Yes.

10:27AM  11  Q.  And what did Judge John Michalski respond to that?

10:27AM  12  A.  Perfect.

10:27AM  13  Q.  A couple hours later, what did -- what did the defendant

10:27AM  14  text Judge Michalski?

10:27AM  15  A.  Think about the other thing, please.

10:27AM  16  Q.  Now, in text messages, we've seen nothing that would give

10:27AM  17  context to the "other thing" at this point?

10:27AM  18  A.  Correct.

10:27AM  19  Q.  About 11 days forward in time on December 21st, 2015, did

10:27AM  20  the defendant write Judge Michalski again?

10:27AM  21  A.  Yes, he did.

10:27AM  22  Q.  What did he write?

10:27AM  23  A.  I'll stop in.  What time you on bench?

10:27AM  24      And Judge Michalski responds:  9:30.

10:27AM  25  Q.  Okay.

10:28AM    1         **MR. TRIPI:**  Ms. Champoux, can we go to page 27,

10:28AM    2  skipping ahead a little bit in time.

10:28AM    3         Can you hover between page 26 and 27 just so I can

10:28AM    4  see the -- no, the other way.  Yep.

10:28AM    5         Scroll down a little bit.  Can you keep scrolling?

10:28AM    6  All right.  Stop there.

10:28AM    7         **BY MR. TRIPI:**

10:28AM    8  Q.  Hovering between page 28 and 29, do you see a text of a

10:28AM    9  photo?

10:28AM   10  A.  Yes, I do.

10:28AM   11  Q.  What's the date of that?

10:28AM   12  A.  January 16th, 2016.

10:28AM   13  Q.  And in the middle there, who's depicted?

10:29AM   14  A.  Mr. Gerace.

10:29AM   15  Q.  So the defendant?

10:29AM   16  A.  The defendant, correct.

10:29AM   17  Q.  And who's to the far right of the bottom of the screen, I

10:29AM   18  guess, which would be the right of the photo?

10:29AM   19  A.  John Michalski.  Judge John Michalski.

10:29AM   20         **MR. TRIPI:**  Ms. Champoux, can we scroll down further.

10:29AM   21         **BY MR. TRIPI:**

10:29AM   22  Q.  On December -- excuse me, on January 19th, 2016, does

10:29AM   23  Mr. Gerace text Judge Michalski?

10:29AM   24  A.  Yes, he does.

10:29AM   25  Q.  And is there a response by Judge Michalski?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

56

| | | |
|---|---|---|
| 10:29AM | 1 | A. Yes, there is. |
| 10:29AM | 2 | Q. And what is that exchange? |
| 10:29AM | 3 | A. Are you working, from Defendant Gerace. |
| 10:29AM | 4 | And then John Michalski, on my way. |
| 10:29AM | 5 | Q. And just to be clear, when there's reference to |
| 10:29AM | 6 | "working," Judge Michalski is an active, acting Supreme Court |
| 10:29AM | 7 | judge? |
| 10:29AM | 8 | A. Yes, Court of Claims appointed full-time position as a |
| 10:29AM | 9 | judge. State Supreme Court judge. |
| 10:29AM | 10 | **MR. TRIPI:** Can we keep scrolling, Ms. Champoux? |
| 10:29AM | 11 | Okay. Stop there. |
| 10:30AM | 12 | **BY MR. TRIPI:** |
| 10:30AM | 13 | Q. Generally, near the top here, does it appear they're -- |
| 10:30AM | 14 | that the defendant is trying to make plans? |
| 10:30AM | 15 | A. Yes, it generally -- yes, that's what it appears to be. |
| 10:30AM | 16 | Q. Can you read the bottom two messages on this page, on |
| 10:30AM | 17 | January 20th, 2016, written by the defendant? |
| 10:30AM | 18 | A. Yes. From the defendant: Wish we could squash other |
| 10:30AM | 19 | thing. I'll stop in Tuesday a.m. if you are there about 8:45 |
| 10:30AM | 20 | a.m. |
| 10:30AM | 21 | Q. As you reviewed these as the investigator, did that |
| 10:30AM | 22 | indicate to you that the defendant would go visit the judge |
| 10:30AM | 23 | at his courthouse? |
| 10:30AM | 24 | A. There were a number of messages that were indicative of |
| 10:30AM | 25 | that. |

| | | |
|---|---|---|
| 10:30AM | 1 | **MR. FOTI:** Objection. |
| 10:30AM | 2 | **THE COURT:** I'm sorry? |
| 10:31AM | 3 | **MR. FOTI:** I'm sorry for the pause, Judge, but |
| 10:31AM | 4 | I'll -- I'm going to object to what the messages were |
| 10:31AM | 5 | indicative of. |
| 10:31AM | 6 | The jury has the messages. There's no reason why |
| 10:31AM | 7 | this witness is in a better position to opine on what was |
| 10:31AM | 8 | meant by the participants. |
| 10:31AM | 9 | **THE COURT:** Yeah, I'll sustain the objection and |
| 10:31AM | 10 | strike that answer. Next question. |
| 10:31AM | 11 | **MR. TRIPI:** If I may, Judge, just a brief response. |
| 10:31AM | 12 | The question was as the investigator what they indicate. |
| 10:31AM | 13 | **THE COURT:** No, I understand. I'm going to strike |
| 10:31AM | 14 | the answer. Next question. |
| 10:31AM | 15 | **MR. TRIPI:** All right. We'll go to page 31. Can we |
| 10:31AM | 16 | scroll down just a little bit. |
| 10:31AM | 17 | **BY MR. TRIPI:** |
| 10:31AM | 18 | Q. All right. Can you read the messages -- I'm sorry, can |
| 10:31AM | 19 | you read the messages on January 24th? |
| 10:31AM | 20 | A. Yes. From the defendant: What are you doing, bud? |
| 10:31AM | 21 | Leave June 25th open. Parents surprise 50th wed anniversary. |
| 10:31AM | 22 | Russell's. Only 70 people. |
| 10:32AM | 23 | And Judge Michalski responds: Fun. |
| 10:32AM | 24 | Q. Now earlier in this trial, you sat here and you saw the |
| 10:32AM | 25 | evidence. Did the jury see a photo of Mr. Gerace in what was |

10:32AM  1  the kitchen of Russell's restaurant?

10:32AM  2  A.  Yes, that was an exhibit.

10:32AM  3  Q.  Now that particular exhibit, was the defendant with other

10:32AM  4  individuals like P.H. and people associated with Pharaoh's,

10:32AM  5  correct?

10:32AM  6  A.  Yes, exactly.

10:32AM  7  Q.  Is Russell's -- is there a Russell's owned by Russell

10:32AM  8  Salvatore on Transit Road?

10:32AM  9  A.  Yes, it is.

10:32AM  10  Q.  Is it a restaurant with a connected hotel?

10:32AM  11  A.  Yes, it is.

10:32AM  12  Q.  Is Russell Salvatore someone that you interviewed in this

10:32AM  13  matter?

10:32AM  14  A.  Yes, he is.

10:32AM  15  Q.  Did you also interview sort of the manager of Russell's?

10:32AM  16  A.  Yeah, the -- Mark Jerge, who kind of runs it.  Or runs

10:32AM  17  the hotel, I should say, and the restaurant.

10:32AM  18  Q.  All right.  Now, a couple days later, did you see a

10:33AM  19  message January 26th, 2016?

10:33AM  20  A.  Yes, I do.

10:33AM  21  Q.  What did the defendant write there?

10:33AM  22  A.  Will you be in 8:45 a.m.

10:33AM  23      **MR. TRIPI:**  Can we scroll a little bit, Ms. Champoux?

10:33AM  24      **BY MR. TRIPI:**

10:33AM  25  Q.  And what did Judge Michalski respond there?

10:33AM   1   A.   Prob not.

10:33AM   2         **MR. TRIPI:**   Okay.   Can we go to page 35, please?

10:33AM   3         **BY MR. TRIPI:**

10:33AM   4   Q.   All right.   There's messages January 30th, February 5th,

10:33AM   5   8th, 10th, and 11th, 2016 on this page.   Can you read those

10:33AM   6   messages written by the defendant on those dates?

10:33AM   7   A.   So starting at the top from the defendant:   Call me.

10:33AM   8       Did you think about what we talked about?   Only ten

10:33AM   9   months left.

10:33AM  10   Q.   Hang on there's a gap in days there?

10:33AM  11   A.   That's correct.   Yeah, February 5th.

10:33AM  12       First one's January 30th.   The second one is

10:34AM  13   February 5th, 2016.

10:34AM  14       And then another one on February 5th, 2016.

10:34AM  15       A couple minutes -- three minutes later:   Would make my

10:34AM  16   life easier.

10:34AM  17       And then another one on February 8th, 2016:   Call me.

10:34AM  18       February 10th, 2016, with a question mark.

10:34AM  19       And then February 11th, 2016 with:   H-E-L-L-O-O-O-O.

10:34AM  20       All from the defendant Judge Michalski.

10:34AM  21         **MR. TRIPI:**   Can we move to page 39, Ms. Champoux?

10:34AM  22         **BY MR. TRIPI:**

10:34AM  23   Q.   There's some messages here on March 4th from the

10:34AM  24   defendant to Judge Michalski; is that right?

10:34AM  25   A.   That's correct.

| | | |
|---|---|---|
| 10:34AM | 1 | Q.  Can you read those for the jury? |
| 10:34AM | 2 | A.  From the defendant:  Call me.  I'm going out with Lillo |
| 10:34AM | 3 | Brancato tonight.  I'll be at Russell's. |
| 10:35AM | 4 | Q.  Okay.  I'm gonna stop you there. |
| 10:35AM | 5 | Has the jury seen a photo of this defendant and the actor |
| 10:35AM | 6 | Lillo Brancato together? |
| 10:35AM | 7 | A.  Yes, they have. |
| 10:35AM | 8 | Q.  And I'll be at Russell.  Again, there's a restaurant |
| 10:35AM | 9 | Russell's Steaks, Chops & More on Transit Road? |
| 10:35AM | 10 | A.  The same one I previously discussed. |
| 10:35AM | 11 | Q.  Okay.  And what's the last message there? |
| 10:35AM | 12 | A.  At 6. |
| 10:35AM | 13 | Q.  Okay.  So obviously, we've got to do some math there |
| 10:35AM | 14 | because that text is at 10:14 p.m., correct? |
| 10:35AM | 15 | A.  Yes. |
| 10:35AM | 16 | Q.  That's UTC time? |
| 10:35AM | 17 | A.  That is UTC, yes. |
| 10:35AM | 18 | Q.  All right. |
| 10:35AM | 19 | **MR. TRIPI:**  Let's jump ahead to page 49. |
| 10:35AM | 20 | **BY MR. TRIPI:** |
| 10:35AM | 21 | Q.  I want to look at the messages at the bottom of the |
| 10:36AM | 22 | screen, April 28th, 2016.  Can you read those exchanges for |
| 10:36AM | 23 | the jury? |
| 10:36AM | 24 | A.  From Mr. Gerace:  Can you talk? |
| 10:36AM | 25 | And Judge Michalski:  Sure. |

10:36AM   1   Q.  And this was reviewed earlier in the trial, but there are

10:36AM   2   phone calls between Mr. Gerace and Mr. Michalski through

10:36AM   3   Mr. Gerace's phone records, correct?

10:36AM   4   A.  That's correct.

10:36AM   5          **MR. TRIPI:**  Let's go to page 50, Ms. Champoux.

10:36AM   6          **BY MR. TRIPI:**

10:36AM   7   Q.  I want to focus you in on an exchange on May 20, 2016.

10:36AM   8   Can you read that?

10:36AM   9   A.  That's from the defendant:  You coming to parents' 50th?

10:36AM  10       From Judge Michalski:  Yes.

10:36AM  11   Q.  Did the defendant respond to yes?

10:36AM  12   A.  He responded with:  Thanks.

10:36AM  13          **MR. TRIPI:**  Let's move on to page 51.

10:37AM  14          **BY MR. TRIPI:**

10:37AM  15   Q.  On June 2nd, 2016, is there an exchange?

10:37AM  16   A.  There is.

10:37AM  17   Q.  Can you read that for the jury?

10:37AM  18   A.  From the defendant:  Can you renew parents' vows that

10:37AM  19   night, please?

10:37AM  20       From Judge Michalski:  Sure.

10:37AM  21          **MR. TRIPI:**  Can you scroll up just a little bit,

10:37AM  22   Ms. Champoux.  Or the other way, I guess, down for you.

10:37AM  23          **BY MR. TRIPI:**

10:37AM  24   Q.  This particular photo of this fish, did you also see that

10:37AM  25   photo in a text thread between the defendant and

10:37AM    1    Mr. Bongiovanni?

10:37AM    2    A.  Yes, I did.

10:37AM    3         **MR. TRIPI:**  Let's jump ahead to page 56,

10:37AM    4    Ms. Champoux.  Sorry, we need to hover on 55.  There we go.

10:37AM    5         **BY MR. TRIPI:**

10:37AM    6    Q.  Can you read the exchanges on July 17th, 2016?

10:37AM    7    A.  Yes.  From July 17th, 2016, from the defendant to Mr. --

10:38AM    8    or, Judge Michalski:  Call me later or tomorrow.  I have a

10:38AM    9    question.

10:38AM    10        Judge Michalski gives a thumbs up emoji.

10:38AM    11        Mr. Gerace:  If you're around in a bit, I have to stop

10:38AM    12   and ask you something.

10:38AM    13        Judge Michalski gives a thumbs up.

10:38AM    14        And then the next exchange is on -- is from the defendant

10:38AM    15   on July 18th, 2016.

10:38AM    16        **MR. TRIPI:**  Can you scroll a little, Ms. Champoux?

10:38AM    17        **BY MR. TRIPI:**

10:38AM    18   Q.  Go ahead.

10:38AM    19   A.  C.C., 1/22/85.

10:38AM    20        And a thumbs up from Judge Michalski.

10:38AM    21   Q.  And C.C., she's a witness who testified in this case?

10:38AM    22   A.  Yes.

10:38AM    23   Q.  Does that appear to be her date of birth that's texted

10:38AM    24   next to her name?

10:38AM    25   A.  That is her date of birth.

| | | |
|---|---|---|
| 10:38AM | 1 | Q.  And that's followed up by a thumbs up emoji -- |
| 10:38AM | 2 | A.  That's correct. |
| 10:38AM | 3 | Q.  -- by the judge? |
| 10:38AM | 4 |     And what does the defendant respond? |
| 10:38AM | 5 | A.  Thanks.  Keep me posted. |
| 10:38AM | 6 |         MR. TRIPI:  Let's scroll to the next page, 57, and |
| 10:39AM | 7 | continue with this discussion.  Stop there. |
| 10:39AM | 8 |         BY MR. TRIPI: |
| 10:39AM | 9 | Q.  And do you see another text from the judge, from Judge |
| 10:39AM | 10 | Michalski on July 19th, 2016? |
| 10:39AM | 11 | A.  Yes, I do. |
| 10:39AM | 12 | Q.  And what does it say? |
| 10:39AM | 13 | A.  Peter Todoro is working on an adjournment for Friday. |
| 10:39AM | 14 | Q.  Do you know who Peter Todoro is? |
| 10:39AM | 15 | A.  He's a defense attorney and, I believe, cousins with the |
| 10:39AM | 16 | defendant. |
| 10:39AM | 17 | Q.  And Judge Michalski's the one writing that Peter Todoro |
| 10:39AM | 18 | is working on an adjournment for Friday? |
| 10:39AM | 19 | A.  That's correct. |
| 10:39AM | 20 | Q.  What did the defendant respond? |
| 10:39AM | 21 | A.  Okay.  Thanks. |
| 10:39AM | 22 | Q.  And then earlier we talked about town court judges or |
| 10:39AM | 23 | town courts? |
| 10:39AM | 24 | A.  Yes. |
| 10:39AM | 25 | Q.  Again, do town courts have jurisdiction for traffic |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

64

10:40AM 1    offenses and certain misdemeanor offenses?

10:40AM 2    A.   Yes.  I think they might do a felony initial appearance,

10:40AM 3    but predominantly misdemeanors and traffic violations.

10:40AM 4         MR. TRIPI:  Can we keep scrolling Ms. Champoux.  Keep

10:40AM 5    going down.

10:40AM 6         BY MR. TRIPI:

10:40AM 7    Q.   Okay.  I'd like to focus you in on a message from the

10:40AM 8    defendant September 2nd, 2016.  It's on the bottom of page

10:40AM 9    58.

10:40AM 10   A.   From the defendant to Judge Michalski:  Do you know

10:40AM 11   Officer Trotter?

10:40AM 12        MR. TRIPI:  Can we scroll to the next page,

10:40AM 13   Ms. Champoux?

10:40AM 14        BY MR. TRIPI:

10:40AM 15   Q.   And what did Judge Michalski respond to that?

10:40AM 16   A.   Yes.  Good guy.

10:40AM 17   Q.   And what did the defendant reply?

10:40AM 18   A.   Him and Judge Klein got me order of protection against

10:40AM 19   Katrina.  He's a great guy.  Took great care of me.

10:41AM 20   Q.   And what's the date of that message?

10:41AM 21   A.   December 22nd, 2016.

10:41AM 22   Q.   And did Judge Michalski respond on September 2nd, 2016?

10:41AM 23   A.   About a minute later, Judge Michalski responds:  Yes,

10:41AM 24   agreed.  Geoff Klein, too.

10:41AM 25        MR. TRIPI:  Now, Ms. Champoux, can we side by side

USA v Gerace - Burns - Tripi/Direct - 12/17/24

10:41AM  1   with this page Exhibit 467?

10:41AM  2           **BY MR. TRIPI:**

10:41AM  3   Q.  All right.  So, if we look at the exhibit on the right,

10:41AM  4   the purported marriage between the defendant and Katrina

10:41AM  5   Nigro was on September 18th, 2014; is that right?

10:41AM  6   A.  That's correct.

10:41AM  7   Q.  Almost two years before this text exchange about the --

10:41AM  8   Trotter and the protective order against Katrina, right?

10:41AM  9   A.  That's accurate.

10:41AM  10          **MR. TRIPI:**  You can take 467 down.

10:42AM  11          Continue with the texts.  Stop there.  Stop there.

10:42AM  12  I'm sorry.  Let me catch up with my eyes.

10:42AM  13          **BY MR. TRIPI:**

10:42AM  14  Q.  All right.  At the top of the page, September 2nd, 2016,

10:42AM  15  what did Judge Michalski write?

10:42AM  16  A.  September 2nd, 2016, at the top?

10:42AM  17  Q.  At the top.

10:42AM  18  A.  Yes, agreed.  Geoff Klein, too.

10:42AM  19  Q.  And what did the defendant reply to that, yes, agreed,

10:42AM  20  Geoff Klein too?

10:42AM  21  A.  I don't know him.  I have to meet prosecutor next week.

10:42AM  22  Q.  And what did Judge Michalski respond?

10:42AM  23  A.  The thumbs up emoji.

10:43AM  24          **MR. TRIPI:**  Scroll down a little bit, Ms. Champoux.

10:43AM  25          If we could, I'd like to keep going down to page 62.

10:43AM      1    Let's go to page 64, I'm sorry.

10:43AM      2         **BY MR. TRIPI:**

10:43AM      3    Q.   Okay.   Can you look at the top message there, and read

10:43AM      4    that?

10:43AM      5    A.   From Defendant Gerace:   See you tomorrow.

10:43AM      6    Q.   And what's the date of that?

10:43AM      7    A.   September 17th, 2016.

10:43AM      8    Q.   Okay.   But if you're applying the UTC time, it's really

10:43AM      9    written September 16th; is that right?

10:43AM     10    A.   Yes, that's accurate.

10:43AM     11    Q.   Okay.   And then is the next message on September 19th,

10:44AM     12    2016?

10:44AM     13    A.   Yes, it is.

10:44AM     14    Q.   And does appear to be a screenshot of the text -- a

10:44AM     15    screenshot of something from social media, photo?

10:44AM     16    A.   Yes.   It appears to be a screenshot from social media.

10:44AM     17         **MR. TRIPI:**   Can you scroll down a little bit,

10:44AM     18    Ms. Champoux.

10:44AM     19         **BY MR. TRIPI:**

10:44AM     20    Q.   All right.   And do you recognize the people depicted in

10:44AM     21    the screenshot?

10:44AM     22    A.   Yes, I do.

10:44AM     23    Q.   Can you read the screenshot and tell us who the people

10:44AM     24    are?

10:44AM     25    A.   Happy 70th to the best dad in the world.   John Michalski,

10:44AM    1    can you get out of the picture?

10:44AM    2    Q.  And who are the people in this picture, that shot?

10:44AM    3    A.  Mr. and Mrs. Gerace, as well as John Michalski.

10:44AM    4    Q.  And is Judge Michalski to the far left?

10:44AM    5    A.  Yes, he is.

10:44AM    6         **MR. TRIPI:**  Let's scroll down further.  Keep

10:44AM    7    scrolling, Ms. Champoux.  I'll let you know when to stop.  All

10:44AM    8    right.  On September 19th, let's stop here.  Page 66.

10:44AM    9         **BY MR. TRIPI:**

10:45AM   10    Q.  Can you continue sort of the communications on

10:45AM   11    September 19th, 2016, from the top of the page and go through

10:45AM   12    the bottom?

10:45AM   13    A.  Certainly.  Yeah.  So from the defendant, Mr. Gerace:  We

10:45AM   14    will do again soon.

10:45AM   15         From Judge Michalski:  It was nice to see Anthony too.

10:45AM   16         From Mr. Gerace:  Yes, he not around much.  LOL.  My

10:45AM   17    parents were so happy u and Sue came.

10:45AM   18    Q.  Let me stop you there.  Does Judge Michalski have a wife

10:45AM   19    named Sue or Susie?

10:45AM   20    A.  Yes.

10:45AM   21    Q.  Keep going.

10:45AM   22    A.  From Judge Michalski:  They are great.

10:45AM   23         From Mr. Gerace:  I wanted you there for 50th wed ann and

10:45AM   24    70th B day.

10:45AM   25         **MR. TRIPI:**  Scroll to the next page, please,

USA v Gerace - Burns - Tripi/Direct - 12/17/24

68

| | | |
|---|---|---|
| 10:45AM | 1 | Ms. Champoux. |
| 10:45AM | 2 | **BY MR. TRIPI:** |
| 10:45AM | 3 | Q.  Okay.  I'd like to focus you in on now, jump ahead in |
| 10:45AM | 4 | text message time, to October 26th, 2016.  Can you read those |
| 10:45AM | 5 | messages? |
| 10:45AM | 6 | A.  From Mr. Gerace:  Are you in?  I'm on the fifth floor. |
| 10:46AM | 7 | And then from Judge Michalski:  On trial. |
| 10:46AM | 8 | And from Mr. Gerace:  Okay. |
| 10:46AM | 9 | And then -- |
| 10:46AM | 10 | Q.  There's a gap? |
| 10:46AM | 11 | A.  Yeah, there's a gap. |
| 10:46AM | 12 | **THE COURT:**  Mr. Tripi, we have a juror who needs a |
| 10:46AM | 13 | break. |
| 10:46AM | 14 | **MR. TRIPI:**  Oh, I do too.  That's great. |
| 10:46AM | 15 | Thank you. |
| 10:46AM | 16 | **THE COURT:**  Let's take a break.  Please remember my |
| 10:46AM | 17 | instructions.  Don't talk about the case, even with each |
| 10:46AM | 18 | other.  Don't make up your minds.  See you back here in about |
| 10:46AM | 19 | 15 minutes. |
| 10:46AM | 20 | (Jury excused at 10:46 a.m.) |
| 10:47AM | 21 | **THE COURT:**  Anything for the record before we break? |
| 10:47AM | 22 | **MR. FOTI:**  No, Judge. |
| 10:47AM | 23 | **MR. TRIPI:**  No, thank you. |
| 10:47AM | 24 | **THE COURT:**  Great. |
| 10:47AM | 25 | **THE CLERK:**  All rise. |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

69

| | | |
|---|---|---|
| 10:47AM | 1 | (Off the record at 10:47 a.m.) |
| 10:47AM | 2 | (Back on the record at 11:02 a.m.) |
| 11:02AM | 3 | (Jury not present.) |
| 11:02AM | 4 | **THE CLERK:**  All rise. |
| 11:02AM | 5 | **THE COURT:**  Please be seated. |
| 11:02AM | 6 | **THE CLERK:**  We are back on the record for the jury |
| 11:02AM | 7 | trial in case numbers 19-cr-227 and 23-cr-37, United States of |
| 11:02AM | 8 | America versus Peter Gerace Jr. |
| 11:02AM | 9 | All counsel and parties are present. |
| 11:02AM | 10 | **THE COURT:**  Okay.  So I've thought about this, and |
| 11:02AM | 11 | I've looked at a little bit of the law.  And I think I'm |
| 11:03AM | 12 | correct that the texts all come in with respect to context |
| 11:03AM | 13 | because they're Mr. Gerace's texts, and the texts of the other |
| 11:03AM | 14 | person come in for context. |
| 11:03AM | 15 | But that means that the other person's texts don't |
| 11:03AM | 16 | come in for the truth of what is stated. |
| 11:03AM | 17 | So I think I need to tell the jury that these texts |
| 11:03AM | 18 | are coming in, that the texts are coming in because of the |
| 11:03AM | 19 | defendant's texts, that the texts of the other person are |
| 11:03AM | 20 | being put in just for context to show Mr. Gerace's state of |
| 11:03AM | 21 | mind. |
| 11:03AM | 22 | If there are specific texts that the government |
| 11:03AM | 23 | believes are in furtherance of -- I haven't seen many, I've |
| 11:03AM | 24 | seen a couple that you might argue are in furtherance of the |
| 11:03AM | 25 | conspiracy, and I do think that Judge Michalski is a |

11:03AM  1   coconspirator.  If there are texts that come in substantively

11:03AM  2   because they are in furtherance of the conspiracy, I'll

11:04AM  3   consider that from the government and instruct the jury on

11:04AM  4   that.  But I think that they all come in for context.

11:04AM  5         MR. TRIPI:  Rather than sort of wasting time now,

11:04AM  6   would you be amenable to me getting through it, and then

11:04AM  7   circling back and having argument if there are certain ones

11:04AM  8   that should come in substantively?

11:04AM  9         THE COURT:  Sure.  Yeah.

11:04AM  10        MR. TRIPI:  Is that okay?

11:04AM  11        THE COURT:  Do you want to say anything about that?

11:04AM  12        MR. FOTI:  No, I'm fine with that.

11:04AM  13        THE COURT:  Yeah.  And I think that's how they come

11:04AM  14   in.  I think that -- I think that the in furtherance standard,

11:04AM  15   though, is a pretty high standard.  Statements that are made

11:04AM  16   in furtherance of the conspiracy.

11:04AM  17        MR. TRIPI:  So there might be a couple, Judge, and I

11:04AM  18   don't want to drug us into the muck right now, but there might

11:04AM  19   be a couple.  Like, for example, where it's -- I was with

11:04AM  20   Shelby last night, and the judge just says ha ha ha.  That's

11:04AM  21   not even -- that's not even an assertion of anything, so we

11:05AM  22   can argue whatever inferences we want from that.  I'm just

11:05AM  23   using one example.

11:05AM  24        THE COURT:  Yeah.  So I was thinking, and I was

11:05AM  25   talking with Rebecca about this, I was thinking that maybe the

11:05AM    1    ones where Michalski seems to be helping him out might -- I

11:05AM    2    don't think they are, I don't think they're in furtherance of

11:05AM    3    the conspiracy, so -- especially given the standard.  So --

11:05AM    4         MR. TRIPI:  I'll go back and look, and if I have

11:05AM    5    other arguments, like if it's a present sense --

11:05AM    6         THE COURT:  Great.  Okay.  Are you still thinking you

11:05AM    7    might be done by noon?

11:05AM    8         MR. TRIPI:  I'm gonna try to hoof it, yeah.  I'm

11:05AM    9    gonna try.

11:05AM    10        THE COURT:  Anything more for the record?

11:05AM    11        MR. TRIPI:  No, Judge.

11:05AM    12        THE COURT:  Anything for the record?

11:05AM    13        MR. FOTI:  Judge, I guess, in all of those

11:05AM    14    conversations that the government tends to offer and that the

11:05AM    15    Court is going to accept over objection, one separate

11:05AM    16    conversation -- excuse me.

11:05AM    17        THE COURT:  Are you talking about substantively?

11:05AM    18        MR. FOTI:  No, just accept it for context under

11:05AM    19    the -- within the limits that the Court has indicated --

11:05AM    20        THE COURT:  Yeah.

11:05AM    21        MR. FOTI:  -- it would accept it.

11:06AM    22        There is a conversation that I have particular

11:06AM    23    concern about, particularly if it's just being offered for

11:06AM    24    that purpose, which is the communication with LaMont -- oh,

11:06AM    25    I'm sorry, I think I just referenced a former client.  Darryl

11:06AM    1    LaMont.  The -- there's communication in there where it

11:06AM    2    clearly -- the inference, and I imagine that the jury will

11:06AM    3    draw this, is that they're -- they're joking.  But it could be

11:06AM    4    offensive that the -- the comments made to Peter Gerace are

11:06AM    5    things along the lines of are black people allowed at your

11:06AM    6    golf tournament?  And there's an LOL at the end of it,

11:06AM    7    suggesting that it's a joke.  And then Mr. Gerace, in the text

11:06AM    8    message responds, no, LOL.  And then the follow-up response

11:07AM    9    is, I gotta my Tiger Woods on.

11:07AM    10           And it's clearly -- there's -- it's a joke, but

11:07AM    11   there's racial implications to the joke that could be

11:07AM    12   offensive.  Particularly --

11:07AM    13           THE COURT:  Is that coming in?

11:07AM    14           MR. TRIPI:  It's in the text thread, Your Honor.  I

11:07AM    15   wasn't gonna highlight it.  It's not one that I planned to

11:07AM    16   stop on and talk about.

11:07AM    17           But I guess there is some corroboration as to the

11:07AM    18   golf outings, so, you know --

11:07AM    19           THE COURT:  I get it.  But on 403, I don't think -- I

11:07AM    20   think I'm gonna -- I'm not going to a through in.

11:07AM    21           MR. TRIPI:  So, yeah, I'll certainly skip over it,

11:07AM    22   let me just make sure I have it flagged.

11:07AM    23           THE COURT:  And we can -- and we can --

11:07AM    24           MR. TRIPI:  I can redact it later.

11:07AM    25           THE COURT:  Yeah, redact it, please.  I think that's

11:07AM    1    right.  I think that there's -- there's a chance that that

11:07AM    2    could be taken as offensive.  I understand what you're saying,

11:07AM    3    Mr. Foti, I think it probably was a joke, I don't think it's

11:07AM    4    offensive, but a juror might.

11:07AM    5         **MR. FOTI:**  There's two instances that I can think of.

11:07AM    6    There's that one, and then at the very end of the exhibit I

11:08AM    7    believe there's one that was along the lines of did you have

11:08AM    8    any black people at your birthday party, something like that.

11:08AM    9         **THE COURT:**  Same thing.

11:08AM    10        **MR. TRIPI:**  I don't know where that one is.  Can you

11:08AM    11   help me to find it?

11:08AM    12        **MR. FOTI:**  Yeah, I think I have it.

11:08AM    13        **THE COURT:**  Same thing.

11:08AM    14        **MR. FOTI:**  I think it's at the very end.

11:08AM    15        **THE COURT:**  We don't need to do this now.  We'll do

11:08AM    16   this during a break, right?  But I'm going to keep both out,

11:08AM    17   we're gonna redact those.

11:08AM    18        **MR. FOTI:**  Understood.

11:08AM    19        **THE COURT:**  Anything else in particular, Mr. Foti,

11:08AM    20   you have a problem with?

11:08AM    21        **MR. FOTI:**  So the other one is a little bit more

11:08AM    22   complicated.  It's not race implicated, but there's the

11:08AM    23   comment of Peter Gerace says the message is, you took one of

11:08AM    24   my best weekend girls.

11:08AM    25             And my understanding is that was an expression of

11:08AM    1    frustration.

11:08AM    2        The response back is, again, I think a joke, but I

11:08AM    3    understand why the government would want to offer it, because

11:08AM    4    he says something like, and she today's anal, LOL.

11:08AM    5        **MR. TRIPI:**  Yeah.  I don't care about the LOL at the

11:08AM    6    end of that, Judge.  We definitely think that's a

11:08AM    7    coconspirator statement.  It's talking about a specific sex

11:08AM    8    act done by a specific woman.  And it shows an intimate level

11:09AM    9    of knowledge.  And it shows the flow of personnel between

11:09AM    10    Pharaoh's and No Limit Entertainment.

11:09AM    11        I think that's the whole -- if there's one text in

11:09AM    12    that whole thread, that's the most important text.  So --

11:09AM    13        **THE COURT:**  How is it in furtherance of the

11:09AM    14    conspiracy?

11:09AM    15        **MR. TRIPI:**  Because it's in furtherance of the

11:09AM    16    conspiracy because they're talking about personnel.  They're

11:09AM    17    talking about personnel, a woman --

11:09AM    18        **THE COURT:**  How is LaMont involved in the conspiracy

11:09AM    19    at Pharaoh's?

11:09AM    20        **MR. TRIPI:**  All right.  So we've had plenty of

11:09AM    21    testimony about women who have a nexus between both.

11:09AM    22        **THE COURT:**  Right.

11:09AM    23        **MR. TRIPI:**  Personnel working for each of them.

11:09AM    24        **THE COURT:**  Yes.

11:09AM    25        **MR. TRIPI:**  Sex acts occurring in each location.

11:09AM    1              **THE COURT:**  Yes.

11:09AM    2              **MR. TRIPI:**  You heard E.H. say Peter Gerace

11:09AM    3    introduced her to Darryl LaMont, and she -- she was

11:09AM    4    essentially being asked to go do stag parties, and she says --

11:09AM    5    I don't remember the quote verbatim, that's essentially

11:09AM    6    prostitution, and she -- she -- she declined, she mocked him

11:10AM    7    in a way, and she pretty quickly fell out of favor there and

11:10AM    8    left the club.

11:10AM    9              In this context, there are also multiple instances

11:10AM   10    where they're discussing Shelby, they're also discussing other

11:10AM   11    people in this text thread.  It's LaMont saying --

11:10AM   12              **THE COURT:**  But how is LaMont -- answer this

11:10AM   13    question.  How is LaMont a coconspirator with respect to the

11:10AM   14    sex trafficking at Pharaoh's?  LaMont and --

11:10AM   15              **MR. TRIPI:**  Well, hang on.  Is a sex-trafficking

11:10AM   16    conspiracy.  There are no walls and silos placed up.  It's a

11:10AM   17    sex-trafficking conspiracy.

11:10AM   18              I opened, and we've allowed in proof, and I said that

11:10AM   19    these acts occurred beyond Pharaoh's walls.  And you let in

11:10AM   20    proof over 412 objections.

11:10AM   21              I guess I would go back to your Sauce/Gander

11:10AM   22    Doctrine, Judge.  It extends beyond Pharaoh's walls.

11:10AM   23              And so when it's good to sort of impeach a witness,

11:10AM   24    it comes in, but when it's clearly Darryl LaMont -- just

11:11AM   25    yesterday he was identified in the photo as Scooter as someone

| | | |
|---|---|---|
| 11:11AM | 1 | who the judge -- who Gerace helped arrange heroin for L.L. |
| 11:11AM | 2 | and so she can't work if she's -- |
| 11:11AM | 3 | **THE COURT:**  Let me think about it.  Let me think |
| 11:11AM | 4 | about that one.  Let me think about that. |
| 11:11AM | 5 | We'll keep going.  And let me think about that one. |
| 11:11AM | 6 | Pat, let's bring them back in, please. |
| 11:11AM | 7 | I'm sorry, Mr. Foti. |
| 11:11AM | 8 | **MR. FOTI:**  No, that's it. |
| 11:11AM | 9 | **THE COURT:**  Okay, let's bring them back in. |
| 11:11AM | 10 | **MR. TRIPI:**  I thought the Sauce/Gander Doctrine |
| 11:11AM | 11 | should be documented. |
| 11:11AM | 12 | **THE COURT:**  I know what you meant. |
| 11:11AM | 13 | **MR. TRIPI:**  I was trying to be funny, not offensive, |
| 11:12AM | 14 | Judge.  I hope you didn't take offense. |
| 11:12AM | 15 | **THE COURT:**  No, I get it. |
| 11:12AM | 16 | (Jury seated at 11:12 a.m.) |
| 11:12AM | 17 | **THE COURT:**  Welcome back, folks.  The record will |
| 11:12AM | 18 | reflect that all our jurors are present. |
| 11:12AM | 19 | So I want to explain something to you. |
| 11:12AM | 20 | There are a bunch of text messages that are coming in |
| 11:12AM | 21 | now obviously.  Mr. Gerace's text messages come in for the |
| 11:13AM | 22 | truth of the text messages because they are the defendant's |
| 11:13AM | 23 | text messages. |
| 11:13AM | 24 | The other person in the text message exchange is not |
| 11:13AM | 25 | here to testify.  So those text messages are coming in only to |

11:13AM  1   give context to Mr. Gerace's text messages.  In other words,

11:13AM  2   they're not being admitted for the truth.  If there are

11:13AM  3   statements of fact in those text messages, they're not being

11:13AM  4   admitted for the truth of it.  They're simply being admitted

11:13AM  5   to show Mr. Gerace's state of mind so you can understand

11:13AM  6   Mr. Gerace's state of mind in the context of the text message

11:13AM  7   discussion that's going back and forth.  Okay?  Not for the

11:13AM  8   truth, just to show Mr. Gerace's state of mind and for

11:13AM  9   context.  Got it?

11:13AM  10           **JURORS:**  Got it.

11:13AM  11           **THE COURT:**  Great.  Good.

11:13AM  12           I remind the witness he's still under oath.

11:13AM  13           Mr. Tripi, you may continue.

11:13AM  14           **MR. TRIPI:**  We're back to Exhibit 310AE.  We left off

11:13AM  15   at page 67.  Let move on to page 83, please.

11:14AM  16           Could we scroll down to page 84, please?  Sorry about

11:14AM  17   that.  Keep going.

11:14AM  18           **BY MR. TRIPI:**

11:14AM  19   Q.  Can you read a message from Mr. Gerace from December 27,

11:14AM  20   2016?

11:14AM  21   A.  Our new house, signing tomorrow.

11:14AM  22   Q.  Did that text occur after a couple about it that had sort

11:14AM  23   of photos of houses?

11:14AM  24   A.  Yes.

11:14AM  25   Q.  Interiors of houses?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

78

| | | |
|---|---|---|
| 11:14AM | 1 | A.  Yes. |
| 11:14AM | 2 | Q.  Is there a response by Judge Michalski? |
| 11:14AM | 3 | A.  Spectacular. |
| 11:14AM | 4 | Q.  And what did the defendant respond to that? |
| 11:14AM | 5 | A.  I love it, John.  It took me a long time to get to this |
| 11:14AM | 6 | point. |
| 11:14AM | 7 | **MR. TRIPI:**  Okay.  Let's move forward to page 87, |
| 11:14AM | 8 | Ms. Champoux. |
| 11:14AM | 9 | **BY MR. TRIPI:** |
| 11:14AM | 10 | Q.  Okay.  I'd like you to read what the defendant wrote on |
| 11:15AM | 11 | January 4th, 2017. |
| 11:15AM | 12 | A.  LOL.  I was with Shelby -- or, I was w Shelby. |
| 11:15AM | 13 | Q.  "W" meaning with? |
| 11:15AM | 14 | A.  With, correct. |
| 11:15AM | 15 | Q.  Okay.  And what did Mr. Gerace write after that? |
| 11:15AM | 16 | A.  He asked -- |
| 11:15AM | 17 | Q.  And what did Judge Michalski respond? |
| 11:15AM | 18 | A.  Ha ha ha ha ha ha ha. |
| 11:15AM | 19 | Q.  And is the ha ha ha within a minute of the text? |
| 11:15AM | 20 | A.  Yes. |
| 11:15AM | 21 | Q.  LOLs w Shelby? |
| 11:15AM | 22 | A.  Yes. |
| 11:15AM | 23 | Q.  Within two minutes; is that right? |
| 11:15AM | 24 | A.  Yes, that's accurate. |
| 11:15AM | 25 | Q.  And remind the jury who Shelby is? |

11:15AM   1   A.  Shelby Johnston, she was a dancer at Pharaoh's.

11:15AM   2   Q.  And has the jury also observed a photo of her with other

11:15AM   3   Pharaoh's dancers with Darryl LaMont earlier in the trial?

11:15AM   4   A.  Yes, we have, that's an exhibit.

11:15AM   5   Q.  Okay.  Can you read or describe the text message that was

11:15AM   6   sent on --

11:16AM   7          MR. TRIPI:  Scroll a little bit, please.

11:16AM   8          BY MR. TRIPI:

11:16AM   9   Q.  Describe the text message that was sent from Mr. Gerace

11:16AM  10   on January 5th, 2017 to Judge Michalski.

11:16AM  11   A.  It's a screenshot of a booking photo of Ms. Katrina

11:16AM  12   Nigro.

11:16AM  13   Q.  And just to describe it a little further, it has her

11:16AM  14   face, mugshot, with date intake time?

11:16AM  15   A.  That's correct.

11:16AM  16   Q.  And also has her personal identifying information, age,

11:16AM  17   height, weight?

11:16AM  18   A.  That's correct.

11:16AM  19   Q.  It has a description of the charges?

11:16AM  20   A.  Criminal contempt.

11:16AM  21   Q.  And what bond she had?

11:16AM  22   A.  That's on there, as well.  5,000.

11:16AM  23          MR. TRIPI:  Can you scroll a little bit further.

11:16AM  24          BY MR. TRIPI:

11:16AM  25   Q.  What's the immediate response by the judge?

11:16AM 1   A.  Wow.

11:16AM 2   Q.  Okay.  And what did Mr. Gerace respond after -- the

11:16AM 3   defendant respond after that?

11:16AM 4   A.  Lied to judge today.

11:16AM 5          MR. TRIPI:  Can you keep scrolling, Ms. Champoux?

11:17AM 6   Next page?

11:17AM 7          BY MR. TRIPI:

11:17AM 8   Q.  What did Mr. Gerace, the defendant, write after that?

11:17AM 9   A.  Goes back in two weeks.  When they get Verizon records,

11:17AM 10  then she gets her 2nd charge.

11:17AM 11  Q.  That's all January 5th still?

11:17AM 12  A.  That's correct.

11:17AM 13  Q.  What did Judge Michalski write after that?

11:17AM 14  A.  34 minutes later, Judge Michalski responds:  Unbelievable.

11:17AM 15  Q.  Okay.  Is this roughly two years before Ms. Nigro would

11:17AM 16  have her own vehicular assault case pending in front of Judge

11:17AM 17  Michalski?

11:17AM 18  A.  Yeah, about two years.

11:17AM 19          MR. TRIPI:  Let's go to page 91.  Let's go to page 95

11:17AM 20  actually.  Let's go through these messages on March 15th,

11:18AM 21  please.

11:18AM 22          BY MR. TRIPI:

11:18AM 23  Q.  Can you read what the judge wrote and what defendant's

11:18AM 24  response is?

11:18AM 25  A.  Called and left VM.

11:18AM   1      Gerace responds:  Thanks.  She got a week plus $5,000

11:18AM   2   bail.

11:18AM   3          MR. TRIPI:  Can you scroll through the next page,

11:18AM   4   which would be page 96, Ms. Champoux?

11:18AM   5          BY MR. TRIPI:

11:18AM   6   Q.  And what is -- describe what that text is.

11:18AM   7   A.  Again, it's an -- appears to be a booking photo with some

11:18AM   8   personal identifying information, as well as the charges and

11:18AM   9   bond.

11:18AM  10          MR. TRIPI:  Can you scroll down further Ms. Champoux?

11:18AM  11          BY MR. TRIPI:

11:18AM  12   Q.  And what did -- what was Judge Michalski's immediate

11:18AM  13   response?

11:18AM  14   A.  Ha ha ha ha ha ha.

11:18AM  15   Q.  And is there another message about nine days later on

11:18AM  16   March 25th, 2017?

11:18AM  17   A.  Yes, there is.

11:18AM  18   Q.  And what is that one?

11:18AM  19   A.  It's, again, a booking photo with intake date, and

11:18AM  20   then --

11:19AM  21   Q.  What's the intake date?

11:19AM  22   A.  March 22nd.

11:19AM  23          MR. TRIPI:  Please scroll down, Ms. Champoux.

11:19AM  24          THE WITNESS:  Personal identifying information, as

11:19AM  25   well as the charges.

| | | |
|---|---|---|
| 11:19AM | 1 | **BY MR. TRIPI:** |
| 11:19AM | 2 | Q.  And do these appear to be screenshots of different |
| 11:19AM | 3 | charges? |
| 11:19AM | 4 | A.  Yeah.  They're screenshots of booking photos with the |
| 11:19AM | 5 | charge information. |
| 11:19AM | 6 | Q.  Some of them have bond information, some of them have no |
| 11:19AM | 7 | bond, correct? |
| 11:19AM | 8 | A.  That's correct. |
| 11:19AM | 9 | **MR. TRIPI:**  Scroll down further Ms. Champoux. |
| 11:19AM | 10 | **BY MR. TRIPI:** |
| 11:19AM | 11 | Q.  What did the defendant, after sending the screenshot or |
| 11:19AM | 12 | the -- of the booking photo on March 25th, what did he write |
| 11:19AM | 13 | after that? |
| 11:19AM | 14 | A.  Back in.  No bail. |
| 11:19AM | 15 | Q.  And what did Judge Michalski respond? |
| 11:19AM | 16 | A.  Ha ha ha ha ha ha. |
| 11:19AM | 17 | Q.  And what did the defendant write after that? |
| 11:19AM | 18 | **MR. TRIPI:**  Will you scroll down, Ms. Champoux? |
| 11:19AM | 19 | **THE WITNESS:**  Wasn't supposed to bail out, and failed |
| 11:19AM | 20 | urine. |
| 11:19AM | 21 | **BY MR. TRIPI:** |
| 11:19AM | 22 | Q.  And what did Judge Michalski respond? |
| 11:19AM | 23 | A.  She looks like crap. |
| 11:19AM | 24 | Q.  And then what did the defendant respond to that? |
| 11:20AM | 25 | A.  In until April 17th.  And then the second text, finally. |

| | | |
|---|---|---|
| 11:20AM | 1 | Q.  What did Judge Michalski respond to that? |
| 11:20AM | 2 | A.  Give her enough rope, and dot, dot, dot. |
| 11:20AM | 3 | **MR. TRIPI:**  Let's jump ahead to page 108.  Let's go |
| 11:20AM | 4 | up a little bit, Ms. Champoux, see the picture. |
| 11:20AM | 5 | All right.  Scroll back down, I apologize. |
| 11:20AM | 6 | We'll go to page 135. |
| 11:20AM | 7 | **BY MR. TRIPI:** |
| 11:20AM | 8 | Q.  On July 15th, 2018, is there a series of texts?  Would |
| 11:20AM | 9 | you read those? |
| 11:20AM | 10 | A.  From the defendant to Judge Michalski:  Call when you get |
| 11:20AM | 11 | a minute.  Every -- |
| 11:20AM | 12 | And then the second message:  Carmen Abinati. |
| 11:21AM | 13 | Q.  Is that somebody's name? |
| 11:21AM | 14 | A.  That is. |
| 11:21AM | 15 | Q.  Continue. |
| 11:21AM | 16 | A.  Abinati.  And then female. |
| 11:21AM | 17 | **MR. TRIPI:**  Scroll down a little bit, Ms. Champoux. |
| 11:21AM | 18 | **BY MR. TRIPI:** |
| 11:21AM | 19 | Q.  Does Judge Michalski ask a question here? |
| 11:21AM | 20 | A.  Yes, he does. |
| 11:21AM | 21 | Q.  And what's his question? |
| 11:21AM | 22 | A.  Hey, Pete, does Carmen have a scheduled court date this |
| 11:21AM | 23 | week? |
| 11:21AM | 24 | The defendant responds:  No.  I think they gave her to |
| 11:21AM | 25 | the 20th to just show up on Wednesday.  S-R-Y.  Just saw |

11:21AM  1   message.

11:21AM  2   Q.  And does Judge Michalski respond?

11:21AM  3   A.  Yes, he does.

11:21AM  4   Q.  What does he say?

11:21AM  5   A.  Judge Michalski states:  Have her go tomorrow and talk to

11:21AM  6   the prosecutor.

11:21AM  7   Q.  Now in those town courts that we talked about earlier,

11:21AM  8   are there prosecutors who work in those buildings?

11:21AM  9   A.  Yeah, town prosecutors.

11:21AM  10          **MR. TRIPI:**  Can we scroll down a little further.

11:21AM  11          **BY MR. TRIPI:**

11:21AM  12  Q.  And after Judge Michalski said have her go to court

11:21AM  13  tomorrow and talk to the prosecutor, what did the defendant

11:22AM  14  write?

11:22AM  15  A.  Okay.  What should she say.  Should she say anything?

11:22AM  16  Are you on the bench right now?

11:22AM  17  Q.  And what did Judge Michalski respond?

11:22AM  18  A.  Yes.

11:22AM  19      And Mr. Gerace responds:  What time do you get off the

11:22AM  20  bench?  I'm downstairs closing on my house.

11:22AM  21  Q.  Is the Erie County Clerk where they -- where house

11:22AM  22  closings are, is that the same building that the Supreme

11:22AM  23  Court judges sit in?

11:22AM  24  A.  Yeah.  The clerk's office is in the basement, and then

11:22AM  25  the judges are in the higher floors, depending on which

USA v Gerace - Burns - Tripi/Direct - 12/17/24

11:22AM    1    building they're in.

11:22AM    2    Q.  And what did the defendant write after he said what time

11:22AM    3    do you get off the bench, I'm downstairs closing on my house?

11:22AM    4    A.  I can shoot up.

11:22AM    5    Q.  Okay.  Those are all on July 27th, those last messages

11:22AM    6    that you read?

11:22AM    7    A.  That's correct.

11:22AM    8         **MR. TRIPI:**  Okay.  Let's move forward to page 144.

11:22AM    9         Let's scroll down to 145 please.

11:23AM   10         **BY MR. TRIPI:**

11:23AM   11    Q.  Okay.  Can you review the messages that you see on the

11:23AM   12    screen from September 17th, 2018?

11:23AM   13    A.  Certainly.  From the defendant:  What's up?  Just got

11:23AM   14    back from Vegas last night.  Calling to see what you're

11:23AM   15    doing.

11:23AM   16       Judge Michalski:  On bench.  Will call later.

11:23AM   17       Mr. Gerace:  Okay.

11:23AM   18       And then there's an invitation to a party at Pharaoh's

11:23AM   19    Gentlemen's Club, or a screenshot picture of it.

11:23AM   20         **MR. TRIPI:**  Can we scroll down to page 146,

11:23AM   21    Ms. Champoux.

11:23AM   22         **BY MR. TRIPI:**

11:23AM   23    Q.  In response to the screenshot of the invitation to the

11:23AM   24    Pharaoh's event -- by the way, for record purposes, on that

11:23AM   25    screenshot, are there two women minimally dressed?

USA v Gerace - Burns - Tripi/Direct - 12/17/24
86

11:24AM   1   A.  Yes.

11:24AM   2   Q.  What does Judge Michalski respond to that?

11:24AM   3   A.  Yum.

11:24AM   4        MR. TRIPI:  Let's go to page 151, Ms. Champoux.

11:24AM   5   Let's go hover between 150 and 151.

11:24AM   6        All right.  Let's go to 153.

11:24AM   7        BY MR. TRIPI:

11:24AM   8   Q.  Can you tell us, can you review the messages from

11:24AM   9   October 16th that I've indicated?  October 16th, 2018.

11:24AM   10  A.  From the defendant:  How is November 4 for you and Sue.

11:24AM   11     From Judge Michalski:  I'm going to be in Columbus, Ohio

11:24AM   12  that weekend.

11:24AM   13     Mr. Gerace responds:  How about the 11th.

11:25AM   14     And Judge Michalski responds:  That's great.

11:25AM   15  Q.  About two days later, does the defendant text Judge

11:25AM   16  Michalski another name?

11:25AM   17  A.  Yes.

11:25AM   18  Q.  And what is that name?

11:25AM   19  A.  Angela Dingledey.

11:25AM   20  Q.  Is that someone you're aware of through this

11:25AM   21  investigation?

11:25AM   22  A.  Yes.

11:25AM   23  Q.  Was she interviewed?

11:25AM   24  A.  Yes.

11:25AM   25  Q.  Was she a Pharaoh's dancer?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

87

11:25AM 1  A.  She was.

11:25AM 2  Q.  And after texting the name Angela Dingledey, what -- what

11:25AM 3  else did the defendant follow up with with the judge?

11:25AM 4  A.  I sent the last of her paperwork over today.

11:25AM 5      And the judge responds:  Okay.

11:25AM 6  Q.  All right.  Stop there.

11:25AM 7      Did Judge Michalski then follow up in that conversation

11:25AM 8  on October 25th, 2018?

11:25AM 9  A.  Yes, he did.

11:25AM 10  Q.  What did he say to the defendant?

11:25AM 11  A.  Hey, Peter.  I made contact with the Buffalo Drug Court,

11:25AM 12  and my contact is telling me Angela is not in that drug

11:25AM 13  court.

11:25AM 14  Q.  Does Buffalo City Court have a drug court?

11:26AM 15  A.  Yes, they do.

11:26AM 16  Q.  Judge Michalski did not work at Buffalo City Court,

11:26AM 17  correct?

11:26AM 18  A.  He did not, he worked in State Supreme Court.

11:26AM 19  Q.  On October 25th, 2018, was there another name texted by

11:26AM 20  the defendant?

11:26AM 21  A.  Camilla Archibald.

11:26AM 22  Q.  And what did Judge Michalski respond?

11:26AM 23  A.  That's who I spoke to.

11:26AM 24      **MR. TRIPI:**  Scroll down, Ms. Champoux.

11:26AM 25      Stop there.  Let's go to page 161.

| | | |
|---|---|---|
| 11:26AM | 1 | Can you go up a little bit further?  All right.  Stop |
| 11:27AM | 2 | there.  Let's go to page 165. |
| 11:27AM | 3 | Can you hover between 164 and 165. |
| 11:27AM | 4 | **BY MR. TRIPI:** |
| 11:27AM | 5 | Q.  Okay.  Do you see another text of that same photo we saw |
| 11:27AM | 6 | earlier on November 9th, 2018? |
| 11:27AM | 7 | A.  That's correct. |
| 11:27AM | 8 | **MR. TRIPI:**  Can we scroll down, Ms. Champoux? |
| 11:27AM | 9 | **BY MR. TRIPI:** |
| 11:27AM | 10 | Q.  On November 10th, can you read that exchange? |
| 11:27AM | 11 | A.  The art of fisting. |
| 11:27AM | 12 | From Judge Michalski:  Ha ha ha ha ha ha. |
| 11:27AM | 13 | **MR. TRIPI:**  And can we go to page 178.  Can you |
| 11:28AM | 14 | scroll down, Ms. Champoux? |
| 11:28AM | 15 | **BY MR. TRIPI:** |
| 11:28AM | 16 | Q.  Can you describe the text from Judge Michalski to the |
| 11:28AM | 17 | defendant February 19th, 2019? |
| 11:28AM | 18 | A.  Yeah, it's a Tim Horton's cup with a Roll Up the Rim |
| 11:28AM | 19 | promotion, and then the words, blow job, fellatio. |
| 11:28AM | 20 | Q.  Now you're familiar with the Tim Horton's company.  They |
| 11:28AM | 21 | do those type of promotions where you roll up the rim and you |
| 11:28AM | 22 | can win a cup of coffee? |
| 11:28AM | 23 | A.  Yeah, I'm familiar with those. |
| 11:28AM | 24 | Q.  They don't really have those types of offerings? |
| 11:28AM | 25 | A.  Not that I saw.  Not that I've ever seen. |

| | | |
|---|---|---|
| 11:28AM | 1 | **MR. TRIPI:**  Okay.  Let's scroll down a little bit |
| 11:28AM | 2 | further.  Let's go down.  All right.  I think that's it with |
| 11:28AM | 3 | this one.  We'll take that down. |
| 11:28AM | 4 | **BY MR. TRIPI:** |
| 11:29AM | 5 | Q.  All right.  So in that text thread, did you see a |
| 11:29AM | 6 | reference to Shelby Johnson? |
| 11:29AM | 7 | A.  Yes, I did. |
| 11:29AM | 8 | Q.  Did you see multiple references to Katrina Nigro? |
| 11:29AM | 9 | A.  Yes, I did. |
| 11:29AM | 10 | Q.  And those references to Katrina Nigro were all before she |
| 11:29AM | 11 | had a pending case in front of Judge Michalski? |
| 11:29AM | 12 | A.  Yes, her case was in 2019. |
| 11:29AM | 13 | Q.  And were those references all after the purported |
| 11:29AM | 14 | marriage in 2014? |
| 11:29AM | 15 | A.  Yes, they were. |
| 11:29AM | 16 | Q.  Another text thread that you reviewed and isolated out of |
| 11:29AM | 17 | the extraction was with Detective Greg Trotter; is that |
| 11:29AM | 18 | right? |
| 11:29AM | 19 | A.  That's correct. |
| 11:29AM | 20 | Q.  I'm going to hand you up Government Exhibit 310AT. |
| 11:29AM | 21 | Do you recognize that? |
| 11:29AM | 22 | A.  Yes, I do. |
| 11:29AM | 23 | Q.  What do you recognize it to be? |
| 11:29AM | 24 | A.  A text string, text message exchanges between the |
| 11:30AM | 25 | defendant, Mr. Gerace, and Amherst Detective -- I think it's |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

90

| 11:30AM | 1 | Detective Sergeant Greg Trotter. |
| 11:30AM | 2 | Q.  Have you read that numerous times? |
| 11:30AM | 3 | A.  Yes, many times. |
| 11:30AM | 4 | Q.  Is Exhibit 310AQ accurate from the extraction of the cell |
| 11:30AM | 5 | phone that's Exhibit 310? |
| 11:30AM | 6 | A.  Yes.  Those are the carved-out messages between the two |
| 11:30AM | 7 | of them. |
| 11:30AM | 8 | Q.  Are they accurate? |
| 11:30AM | 9 | A.  They are. |
| 11:30AM | 10 | **MR. TRIPI:**  The government offers 310AQ. |
| 11:30AM | 11 | **MR. FOTI:**  No objection. |
| 11:30AM | 12 | **THE COURT:**  Yeah, so folks, the same thing applies |
| 11:30AM | 13 | here.  These are the defendant's text messages, they come in |
| 11:30AM | 14 | for the truth.  And the other person's text messages do not |
| 11:30AM | 15 | come in for the truth, they come in only to give you an idea |
| 11:30AM | 16 | of the context and the defendant's state of mind.  Okay? |
| 11:30AM | 17 | And with that instruction, Mr. Foti, there's no |
| 11:30AM | 18 | objection? |
| 11:30AM | 19 | **MR. FOTI:**  Correct. |
| 11:30AM | 20 | **THE COURT:**  Okay.  So it's admitted without |
| 11:30AM | 21 | objection. |
| 11:30AM | 22 | **(GOV Exhibit 310AQ was received in evidence.)** |
| 11:30AM | 23 | **MR. TRIPI:**  Thank you, Your Honor. |
| 11:31AM | 24 | Could we pull up Exhibit 310AQ?  Okay. |
| | 25 | |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

91

|           |    |                                                          |
|-----------|----|----------------------------------------------------------|
| 11:31AM   | 1  | **BY MR. TRIPI:**                                        |
| 11:31AM   | 2  | Q.  Similar to what we looked at earlier, are these messages |
| 11:31AM   | 3  | between Greg Trotter and the defendant?                 |
| 11:31AM   | 4  | A.  Yes, they are.                                       |
| 11:31AM   | 5  | Q.  Are there 165 of them?                               |
| 11:31AM   | 6  | A.  They are.                                            |
| 11:31AM   | 7  | Q.  Is the range from the first message to the last     |
| 11:31AM   | 8  | December 20th, 2018 to April 17th, 2019?                 |
| 11:31AM   | 9  | A.  Yes.                                                 |
| 11:31AM   | 10 | Q.  Again, it's UTC time, so you'd have to do some math to |
| 11:31AM   | 11 | figure out the exact time, correct?                     |
| 11:31AM   | 12 | A.  Correct.                                             |
| 11:31AM   | 13 | Q.  All right.  Just the very first -- to orient the jury, |
| 11:31AM   | 14 | the gray boxes are messages by Trotter, the blue are by the |
| 11:31AM   | 15 | defendant; is that right?                                |
| 11:31AM   | 16 | A.  That's accurate.                                     |
| 11:31AM   | 17 | Q.  Can you just read the very first text from Trotter to the |
| 11:31AM   | 18 | defendant on December 20th, 2018?                        |
| 11:31AM   | 19 | A.  From Detective Trotter:  It's Trotter.  I talked to Sliwa |
| 11:31AM   | 20 | yesterday.  Thanks for the invite, but unfortunately I have |
| 11:31AM   | 21 | to work till 11 p.m. tonight.                            |
| 11:31AM   | 22 | Q.  And do you know a Sliwa?                             |
| 11:31AM   | 23 | A.  Yes, he was a lieutenant, I think is what he retired at, |
| 11:32AM   | 24 | the Amherst Police Department.                           |
| 11:32AM   | 25 | Q.  Okay.  And at the time of these messages, Greg Trotter |

11:32AM    1    was a detective at the Amherst Police Department?

11:32AM    2    A.  That's correct.

11:32AM    3    Q.  Okay.

11:32AM    4    A.  He might have been detective sergeant, but certainly an

11:32AM    5    officer.

11:32AM    6         MR. TRIPI:  Can we go to the next page, Ms. Champoux?

11:32AM    7    I'm sorry, go back to page 1 real quick.

11:32AM    8         BY MR. TRIPI:

11:32AM    9    Q.  I need you to read the message right under the first

11:32AM   10    message.

11:32AM   11    A.  Is this your new number?  I keep sending you messages and

11:32AM   12    I get no response.

11:32AM   13    Q.  Okay.  Go to the next page, can you read the message from

11:32AM   14    Trotter, December 20th, 2018?

11:32AM   15    A.  Yeah, sorry, thought you had this one.

11:32AM   16    Q.  And continue reading the December 20th messages.

11:32AM   17    A.  From the defendant:  No, I have it now.  Keep in touch.

11:32AM   18    We got to get a drink.

11:32AM   19         From Trotter, Mr. Trotter:  Absolutely.  Let's get a

11:32AM   20    drink soon.  What time you hanging out up there till tonight?

11:33AM   21         From the defendant:  Usually 10 or 11.  I started at 9

11:33AM   22    this morning.

11:33AM   23    Q.  And at this point in time, the defendant is running

11:33AM   24    Pharaoh's Gentlemen's Club; is that right?

11:33AM   25    A.  That's accurate.

11:33AM    1    Q.  Okay.  In terms of some events that the jury's heard

11:33AM    2    about, was Mr. Trotter the arresting officer of P.H.?

11:33AM    3    A.  Yes, he was one of them.

11:33AM    4    Q.  Was he the arresting officer for several arrests of

11:33AM    5    Katrina Nigro?

11:33AM    6    A.  Yes, he was.

11:33AM    7            **MR. TRIPI:**  Let's go to the next page.

11:33AM    8            **BY MR. TRIPI:**

11:33AM    9    Q.  Can you read the second-to-last message on January 22,

11:33AM   10    2019 from the defendant to Trotter?

11:33AM   11    A.  We've got to have a drink soon.  We never got together

11:33AM   12    during the holidays.

11:33AM   13            **MR. TRIPI:**  Let's go to next page.

11:33AM   14            **BY MR. TRIPI:**

11:33AM   15    Q.  Can you read the second message in gray from Trotter on

11:33AM   16    January 25th, please?

11:34AM   17    A.  Hey, buddy.  Sorry.  Forgot to text back the other day.

11:34AM   18    Let's make this happen soon.  I'm working nights next week,

11:34AM   19    so probably the following week.

11:34AM   20    Q.  All right.  After that text about drinks -- or,

11:34AM   21    withdrawn -- about his schedule, do they sort of move into

11:34AM   22    discussion of a police report that was filed regarding the

11:34AM   23    Rolex watch that the jury's heard about?

11:34AM   24    A.  Yes, they do.

11:34AM   25    Q.  I want you to read the last message on that page,

11:34AM    1    March 6, 2019, at the bottom of the page?

11:34AM    2    A.  Yes.  This is from defendant Gerace:  Because the pawn

11:34AM    3    shop and Vegas Metro Police said that Amherst Police have to

11:34AM    4    get ahold of them and give them the report in order for them

11:34AM    5    to make sure the watch is still there.

11:35AM    6    Q.  Right above that, the defendant asks:  Do you happen to

11:35AM    7    see the police report; is that right?

11:35AM    8    A.  That's accurate.

11:35AM    9         **MR. TRIPI:**  All right.  Let's go to the next page.

11:35AM   10         **BY MR. TRIPI:**

11:35AM   11    Q.  Can you read the very top message at that page in gray

11:35AM   12    from the Detective Trotter?

11:35AM   13    A.  I did not.  Jeff Gilbert got assigned the case, and will

11:35AM   14    get ahold of you tomorrow or Friday.

11:35AM   15         **MR. TRIPI:**  Let's go to the next page.

11:35AM   16         **BY MR. TRIPI:**

11:35AM   17    Q.  Do you recognize generally what's depicted in this

11:35AM   18    message from March 6th, 2019?

11:35AM   19    A.  Yes, I do.

11:35AM   20    Q.  And generally what is that?

11:35AM   21    A.  It's the backyard to Mr. Gerace's house.

11:35AM   22    Q.  Or --

11:35AM   23    A.  Luxor Lane.

11:35AM   24    Q.  Is it similar to what is his yard ended up looking like?

11:35AM   25    A.  Yes.

| | | |
|---|---|---|
| 11:35AM | 1 | Q.  Do you know if that's a rendering or the actual photo? |
| 11:35AM | 2 | A.  I think it's a rendering. |
| 11:35AM | 3 | Q.  Okay. |
| 11:36AM | 4 | A.  Similar, I'm sorry. |
| 11:36AM | 5 | Q.  And what's the message under that from Mr. Gerace to |
| 11:36AM | 6 | Detective Trotter say? |
| 11:36AM | 7 | A.  And a water slide in between the water falls.  You have |
| 11:36AM | 8 | to come over this summer. |
| 11:36AM | 9 | Q.  And what was the response from the detective? |
| 11:36AM | 10 | A.  Come over, question mark?  Looks like I'll be moving in, |
| 11:36AM | 11 | exclamation point, exclamation point. |
| 11:36AM | 12 | MR. TRIPI:  Ms. Champoux, I'd like to move forward. |
| 11:36AM | 13 | Let me get you the page, though, okay? |
| 11:36AM | 14 | Okay.  Can we move to messages on March 7th, 2019. |
| 11:36AM | 15 | It's several pages, though.  Sorry, I don't have a page number |
| 11:36AM | 16 | for you.  That's where I want to go.  Thank you. |
| 11:36AM | 17 | BY MR. TRIPI: |
| 11:36AM | 18 | Q.  All right.  Can you read the two messages basically in |
| 11:37AM | 19 | the middle of the page for March 7th? |
| 11:37AM | 20 | A.  From the defendant to Trotter:  Any luck at all with the |
| 11:37AM | 21 | watch? |
| 11:37AM | 22 | From Mr. Trotter:  Still working on it.  Where was the |
| 11:37AM | 23 | engraving on the watch? |
| 11:37AM | 24 | MR. TRIPI:  Can we go forward about two pages? |
| 11:37AM | 25 | All right.  Stop there.  We need to hover between |

11:37AM    1    pages 13 and 14, I'm sorry.

11:37AM    2              **THE WITNESS:**  Right there.

11:37AM    3              **BY MR. TRIPI:**

11:37AM    4    Q.  All right.  Can you read from the bottom of page 13

11:37AM    5    through the middle of page 14?

11:37AM    6    A.  Sure.  From the defendant:  Any luck yet?  And is he

11:37AM    7    going to be going to pick her up soon?

11:37AM    8       From Detective Trotter:  I wasn't there today.  I'll talk

11:37AM    9    with him tomorrow.

11:37AM   10       From the defendant:  Yeah, I just want to make sure that

11:38AM   11    it is still at the pawn shop and her picked up.

11:38AM   12              **MR. TRIPI:**  Keep scrolling down just a little bit,

11:38AM   13    Ms. Champoux.

11:38AM   14              **BY MR. TRIPI:**

11:38AM   15    Q.  If you can continue reading those messages?

11:38AM   16    A.  From Detective Trotter:  Can't pick her up until we deal

11:38AM   17    with Vegas.

11:38AM   18       From the defendant:  Cool.  Have a good weekend.

11:38AM   19    Q.  All right.  I'd like to forward a couple pages, maybe two

11:38AM   20    pages forward.  Can you read the message March 11th, 2019?

11:38AM   21    A.  From the defendant:  She took more stuff from my house I

11:38AM   22    found out.  Michael Kors jacket, Crystal got back.  Woman's

11:38AM   23    facial tools, electric.  Couple hundred dollars for them.

11:38AM   24    And a pair of girlfriend's American Eagle jeans.  Let me know

11:38AM   25    if we have to do a separate report.

| 11:38AM | 1 | Second message:  Call you in about 20 minutes. |

11:38AM  2          **MR. TRIPI:**  Go to the next page, Ms. Champoux.

11:38AM  3          **BY MR. TRIPI:**

11:38AM  4  Q.  All right.  Can you read the response from Mr. Trotter on

11:38AM  5  March 11?

11:39AM  6  A.  In court this morning.  Pawn shop has a Rolex in their

11:39AM  7  inventory that they are shipping to the main store tomorrow.

11:39AM  8  When they get it, they will send pictures of it to us.  No

11:39AM  9  need for a new police report.

11:39AM  10         **MR. TRIPI:**  Can you go forward about two pages,

11:39AM  11  Ms. Champoux?  Looking for a message March 22nd, 2019.

11:39AM  12         **BY MR. TRIPI:**

11:39AM  13  Q.  Okay.  Can you read this message, March 22nd, 2019, from

11:39AM  14  the defendant to Trotter?

11:39AM  15  A.  Where's my invite to Florida?  LOL.

11:39AM  16         **MR. TRIPI:**  And can you scroll down to the next page,

11:39AM  17  Ms. Champoux.

11:39AM  18         **BY MR. TRIPI:**

11:39AM  19  Q.  Can you read the response to that, Special Agent Burns?

11:39AM  20  A.  Yes.  From Detective Trotter:  Sorry, invited Katrina

11:39AM  21  this time, and a couple little emoji faces.

11:39AM  22  Q.  What are the little emoji faces?

11:39AM  23  A.  I think little laughy ones.

11:39AM  24  Q.  And what's the response from the defendant?

11:40AM  25  A.  Ha ha ha ha ha.  Yes, she said you called her 100 times

11:40AM 1 yesterday.  LOL.

11:40AM 2 Q.  And what's the response from Trotter?

11:40AM 3 A.  Ha ha ha ha ha.

11:40AM 4      **MR. TRIPI:**  Scroll down a little bit, Ms. Champoux.

11:40AM 5      **BY MR. TRIPI:**

11:40AM 6 Q.  What did the defendant say next?

11:40AM 7 A.  Have a great time.  Let me know when you get back.  We'll

11:40AM 8 grab a drink.

11:40AM 9 Q.  And what did Trotter respond?

11:40AM 10 A.  Sounds good.  Thanks, bud.

11:40AM 11      **MR. TRIPI:**  And after that, scroll down just a little

11:40AM 12 bit.  Okay.

11:40AM 13      **BY MR. TRIPI:**

11:40AM 14 Q.  On March 27th, did the defendant text Trotter again?

11:40AM 15 A.  Yes, he did:  Do you know if my watch came in yet?

11:40AM 16      And Detective Trotter responds:  According to Jeff, not

11:40AM 17 yet.

11:40AM 18 Q.  Is Jeff a reference to Jeff Gilbert, another Amherst

11:40AM 19 detective that you've interviewed?

11:40AM 20 A.  Yes, it is.

11:40AM 21 Q.  Okay.  Now, I want to get into April 9th, 2019.  Is that

11:40AM 22 the day that Ms. P.H. was arrested?

11:40AM 23 A.  Yes, it was.

11:40AM 24 Q.  All right.

11:40AM 25      **MR. TRIPI:**  Let's scroll down to messages April 9th,

11:41AM    1    2019, Ms. Champoux.  We can stop there.

11:41AM    2              **BY MR. TRIPI:**

11:41AM    3    Q.  All right.  Can you begin with the message April 9th,

11:41AM    4    2019, with UTC time of 12:55, which I think is earlier in the

11:41AM    5    morning that day, right?

11:41AM    6    A.  Correct.

11:41AM    7    Q.  How many hours earlier, do you know?

11:41AM    8    A.  Three?

11:41AM    9    Q.  Three is definitely not right.

11:41AM   10    A.  No.

11:41AM   11    Q.  It's either four or five?

11:41AM   12    A.  Four or five.  I have a cheat sheet when I do it.

11:41AM   13    Q.  All right.  You don't have your cheat sheet?

11:41AM   14    A.  I don't have my cheat sheet.

11:41AM   15    Q.  Okay.  Give me one second.

11:42AM   16         Would it be fair to say daylight savings is minus four,

11:42AM   17    and not daylight savings it's minus five?

11:42AM   18    A.  That's accurate.

11:42AM   19    Q.  Okay.  April 9, 2019, what's the defendant text?

11:42AM   20    A.  251 Oak Ridge Road.

11:42AM   21    Q.  Where is that located, do you know?

11:42AM   22    A.  It's on Grand Island.

11:42AM   23    Q.  What else did the defendant write after that?

11:42AM   24    A.  She's there right now.

11:42AM   25    Q.  And what did he write after that?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

100

11:42AM  1   A.  251 Oak Ridge Road, Grand Island.

11:42AM  2        **MR. TRIPI:**  Ms. Champoux, can we scroll to the next

11:42AM  3   page?  Stop there.

11:42AM  4        **BY MR. TRIPI:**

11:43AM  5   Q.  Continue with the text please.

11:43AM  6   A.  Right near that pizza place, she thinks I'm going to pick

11:43AM  7   her up at 9:30.

11:43AM  8     Continues.  Let me know if you're going to get her.  She

11:43AM  9   will be there.  She doesn't know where she's spending the

11:43AM  10  night.

11:43AM  11  Q.  In context, are they discussing P.H.?

11:43AM  12  A.  Yes.  She was arrested in the vicinity there, and there's

11:43AM  13  a business Say Cheese Pizza that's in proximity to Oak Ridge.

11:43AM  14  Q.  After those, what does Mr. Trotter write?

11:43AM  15  A.  I'll call you in a couple.

11:43AM  16  Q.  What's the defendant say?

11:43AM  17  A.  Okay.  Because I don't know where she'll be tomorrow.

11:43AM  18     And:  Are you almost there?

11:43AM  19        **MR. TRIPI:**  Okay.  Let's go to the next page,

11:43AM  20  Ms. Champoux.  We're on to page 24.

11:43AM  21        **BY MR. TRIPI:**

11:43AM  22  Q.  Are these texts, are they all basically within minutes of

11:43AM  23  each other that you're reading?

11:43AM  24  A.  Yes.

11:43AM  25  Q.  All right.  What does Detective Trotter say next?

11:43AM  1    A.  We have her.

11:43AM  2        Defendant responds:  Okay.  Did she admit it?

11:43AM  3    Q.  Hang on.  Let's -- is that a question?

11:44AM  4    A.  We have her, is his statement.

11:44AM  5    Q.  Okay.  And then after that from Mr. Gerace, he writes?

11:44AM  6    A.  Okay.

11:44AM  7    Q.  And then after that, what does he say?

11:44AM  8    A.  Did she admit it?

11:44AM  9    Q.  Okay.  And this is, the context is they're discussing the

11:44AM  10   arrest of -- for the watch, right?

11:44AM  11   A.  That's correct.

11:44AM  12   Q.  And what does Trotter say?

11:44AM  13   A.  Not at all.

11:44AM  14   Q.  In your law enforcement training and experience, when

11:44AM  15   you're interviewing or attempting to interview a suspect, do

11:44AM  16   you give realtime updates to a civilian?

11:44AM  17            **MR. FOTI:**  Objection.

11:44AM  18            **THE WITNESS:**  No.

11:44AM  19            **THE COURT:**  Objection.  Basis for the objection?

11:44AM  20            **MR. FOTI:**  Judge, I think I'd have to argue.  Can we

11:44AM  21   approach?

11:44AM  22            **THE COURT:**  Come on up.

11:44AM  23        (Sidebar discussion held on the record.)

11:44AM  24            **MR. FOTI:**  I -- I -- I'm objecting because this is

11:45AM  25   not a lay opinion.  I think he's being called to generally

11:45AM    1    essentially gave expert opinion as law enforcement.  And we're

11:45AM    2    talking about two very different types of law enforcement.

11:45AM    3    They're different jurisdictions, states, federal, his

11:45AM    4    training, he's been trained in Quantico specifically on FBI

11:45AM    5    tactics.  I don't think he can talk about what type of

11:45AM    6    training Mr. Trotter's received, whether this is typical

11:45AM    7    practice, whether this is inappropriate, whether it's a

11:45AM    8    violation of protocols for Amherst Police Department to stay

11:45AM    9    in contact with a victim, whether anything along those lines

11:45AM   10    is inappropriate.

11:45AM   11         I understand why Mr. Tripi is asking it, and I

11:45AM   12    understand that there's a relationship to the extent that

11:45AM   13    they're all law enforcement.  But putting that all under one

11:45AM   14    umbrella and making him an expert as to whether Mr. Trotter

11:45AM   15    was doing anything inappropriate I think goes too far.

11:45AM   16         **THE COURT:**  I'm also very concerned about the

11:45AM   17    2nd Circuit's instruction not to allow folks to be a fact

11:45AM   18    witness and an expert witness.

11:45AM   19         **MR. TRIPI:**  I think we've briefed this issue in terms

11:46AM   20    of 701.  It was in my original trial brief.  And it's a lay

11:46AM   21    opinion as to whether a law enforcement officer shares law

11:46AM   22    enforcement information with a civilian.

11:46AM   23         All of the arguments that Mr. Foti has raised, I

11:46AM   24    think those are more appropriately directed towards weight and

11:46AM   25    he can argue to the jury.

| | | |
|---|---|---|
| 11:46AM | 1 | **THE COURT:** I'll tell you, I don't think so. |
| 11:46AM | 2 | **MR. TRIPI:** Okay. |
| 11:46AM | 3 | **THE COURT:** Because, so, and I've let this stuff in |
| 11:46AM | 4 | when it's with respect to DEA policy. I've let DEA agents |
| 11:46AM | 5 | testify with respect to DEA policy. |
| 11:46AM | 6 | This is him testifying about an opinion as to what's |
| 11:46AM | 7 | appropriate for law enforcement across the board. And I think |
| 11:46AM | 8 | that is more akin to an expert opinion, not a lay opinion. |
| 11:46AM | 9 | I think you need some expertise on that. And because |
| 11:46AM | 10 | he has now -- you know, if he were an Amherst cop, I might |
| 11:46AM | 11 | say -- I might let him testify that's our policy, that's our |
| 11:46AM | 12 | procedure. But he's not. |
| 11:46AM | 13 | And I think this is, therefore, an expert opinion, |
| 11:47AM | 14 | and I'm not going to let it in. |
| 11:47AM | 15 | **MR. TRIPI:** I think it's -- I think there at least is |
| 11:47AM | 16 | fair argument on summation that Mr. Cooper can make along the |
| 11:47AM | 17 | same lines of what I was trying to draw out. |
| 11:47AM | 18 | **THE COURT:** I'm not saying -- |
| 11:47AM | 19 | **MR. TRIPI:** I don't want him to be precluded from |
| 11:47AM | 20 | arguing that. |
| 11:47AM | 21 | **THE COURT:** No, no, no. |
| 11:47AM | 22 | Would you suggest that he can't argue that? |
| 11:47AM | 23 | **MR. FOTI:** No, I think the argument is fair game. |
| 11:47AM | 24 | **MR. TRIPI:** Okay. I just want to make sure that's |
| 11:47AM | 25 | good. |

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 11:47AM  | 1  | (End of sidebar discussion.)                             |
| 11:47AM  | 2  | **THE COURT:** So the objection is sustained, and the    |
| 11:47AM  | 3  | jury will strike the answer if there was an answer, I think |
| 11:47AM  | 4  | there might have been.                                   |
| 11:47AM  | 5  | **BY MR. TRIPI:**                                        |
| 11:47AM  | 6  | Q. After Detective Trotter wrote not at all, did Mr. Gerace |
| 11:47AM  | 7  | follow up 13 seconds later?                              |
| 11:47AM  | 8  | A. Yes, he did.                                          |
| 11:47AM  | 9  | Q. And what did Mr. Gerace ask?                          |
| 11:47AM  | 10 | A. Does she know that you have the receipt from Vegas?   |
| 11:47AM  | 11 | Q. And within that same minute, what did Detective Trotter |
| 11:47AM  | 12 | say?                                                     |
| 11:47AM  | 13 | A. She knows nothing.                                    |
| 11:47AM  | 14 | **MR. TRIPI:** Let's go to the next page.               |
| 11:48AM  | 15 | **BY MR. TRIPI:**                                        |
| 11:48AM  | 16 | Q. And does Mr. -- the defendant respond after that?    |
| 11:48AM  | 17 | A. Yes.                                                  |
| 11:48AM  | 18 | Q. What did he write?                                    |
| 11:48AM  | 19 | A. Oh, okay.                                             |
| 11:48AM  | 20 | Q. And what was Detective Trotter's next text?          |
| 11:48AM  | 21 | A. What was the number she was texting from?  Mr. -- go |
| 11:48AM  | 22 | ahead.                                                   |
| 11:48AM  | 23 | Q. And what did the defendant respond?                  |
| 11:48AM  | 24 | A. An email.                                             |
| 11:48AM  | 25 | Q. Just continue going down the page.                   |

| 11:48AM | 1 | A.  Yep.  Detective Trotter says:  What email? |

11:48AM  2      And then there's a screenshot with an email,

11:48AM  3  P.K.222@Yahoo.

11:48AM  4      And some text communication on the screenshot:  Is he

11:48AM  5  gonna let you leave?

11:48AM  6  Q.  Let me stop you there for a second, let me ask a

11:48AM  7  question.

11:48AM  8      You've also reviewed the texts from Ms. P.H. this same

11:48AM  9  day, texts between Ms. P.H. and Mr. Gerace; is that correct?

11:48AM  10  A.  That's correct.

11:48AM  11  Q.  To contextualize this, and maybe just to save a little

11:48AM  12  bit of time, in the one thread with Ms. P.H., was

11:49AM  13  Defendant Gerace acting as though he was going to come to

11:49AM  14  Grand Island and pick her up?

11:49AM  15  A.  Him or send somebody.

11:49AM  16  Q.  Okay.  Are some of these now that we're looking at

11:49AM  17  screenshots from the texts that were happening simultaneously

11:49AM  18  with Ms. P.H.?

11:49AM  19  A.  Yes, they are.

11:49AM  20      **MR. TRIPI:**  Okay.  We can just scroll down,

11:49AM  21  Ms. Champoux, and give the jury a chance to look.

11:49AM  22      **BY MR. TRIPI:**

11:49AM  23  Q.  In this screenshot, the gray bubbles there are now

11:49AM  24  Ms. P.H., and the blue bubbles are the defendant?

11:49AM  25  A.  That's right.

| | | |
|---|---|---|
| 11:49AM | 1 | **MR. TRIPI:**  Keep scrolling down.  Keep scrolling. |
| 11:49AM | 2 | **BY MR. TRIPI:** |
| 11:49AM | 3 | Q.  After the screenshots on, again, on April 9th, what does |
| 11:49AM | 4 | the defendant write to Detective Trotter? |
| 11:49AM | 5 | A.  That's the number she called me from earlier when she was |
| 11:49AM | 6 | at the bar. |
| 11:49AM | 7 | Q.  And what did Detective Trotter respond? |
| 11:50AM | 8 | A.  What about the email. |
| 11:50AM | 9 | **MR. TRIPI:**  Scroll down further. |
| 11:50AM | 10 | **BY MR. TRIPI:** |
| 11:50AM | 11 | Q.  Are these more screenshots that the defendant provided to |
| 11:50AM | 12 | Trotter and texted? |
| 11:50AM | 13 | A.  Yes. |
| 11:50AM | 14 | Q.  And these were communications with Ms. P.H.? |
| 11:50AM | 15 | A.  Yeah, she was utilizing a web-based email communication. |
| 11:50AM | 16 | **THE COURT:**  Okay.  Again, folks, the emails within |
| 11:50AM | 17 | this and the text messages within this, they can -- they're |
| 11:50AM | 18 | being admitted for the truth of what Mr. Gerace says, not the |
| 11:50AM | 19 | truth of what the person says back to him.  These are text |
| 11:50AM | 20 | messages within the text message.  And the same admonition |
| 11:50AM | 21 | applies to those. |
| 11:50AM | 22 | Go ahead, Mr. Tripi. |
| 11:50AM | 23 | **MR. TRIPI:**  Thank you, Judge. |
| 11:50AM | 24 | If we can keep scrolling down, Ms. Champoux.  Go to |
| 11:50AM | 25 | the next page.  All right. |

11:50AM    1          **BY MR. TRIPI:**

11:51AM    2    Q.  Can you read those messages that I've indicated from

11:51AM    3    April 9th.  We're on page 30 of the exhibit now.

11:51AM    4    A.  From the defendant:  If you open it up, you can see it

11:51AM    5    was sent from an email.

11:51AM    6         Detective Trotter:  Got it, thanks.

11:51AM    7         From the Defendant Gerace:  P.K.222@yahoo.com.

11:51AM    8         From Detective Trotter:  She'll be spending the night.

11:51AM    9         From Gerace:  I'm sure when she ends up seeing the

11:51AM   10    receipt, she will remember real quick.

11:51AM   11         And then a second message:  Thank you.

11:51AM   12    Q.  And when Trotter writes she'll be spending the night, is

11:51AM   13    that consistent, Ms. P.H. was held overnight?

11:52AM   14    A.  That's accurate.

11:52AM   15          **MR. TRIPI:**  Okay.  We can take that down.  Thank you.

11:52AM   16          **BY MR. TRIPI:**

11:52AM   17    Q.  I'm going to hand you up Government Exhibit 310AL-1.  Do

11:52AM   18    you recognize those?

11:52AM   19    A.  Yes, I do.

11:52AM   20    Q.  What do you recognize them to be?

11:52AM   21    A.  They're text communications between the P.K.222@yahoo.com

11:52AM   22    email, as well as the Mr. Gerace from the extraction.

11:52AM   23    Q.  Are they accurate from the extraction?

11:52AM   24    A.  Yes, they are.

11:52AM   25          **MR. TRIPI:**  Judge, the government offers

| 11:52AM | 1 | Exhibit 310AL-1. |

11:52AM    1    Exhibit 310AL-1.

11:52AM    2        **THE COURT:**  Any objection with the same admonition?

11:52AM    3        **MR. FOTI:**  No.

11:52AM    4        **THE COURT:**  Okay.  So, same admonition folks.  I

11:52AM    5    won't repeat it again, but you understand.

11:52AM    6        You're okay with that, Mr. Foti, without repeating it

11:53AM    7    again.

11:53AM    8        **MR. FOTI:**  Yes.

11:53AM    9        **THE COURT:**  Thank you.

11:53AM   10        **BY MR. TRIPI:**

11:53AM   11    Q.  And we're not going to go through these, but the

11:53AM   12    screenshots and the other half of the conversation, just to

11:53AM   13    summarize it, where Mr. Gerace was indicating he or someone

11:53AM   14    was going to come pick P.H. up from that address in Grand

11:53AM   15    Island, those are contained in here?

11:53AM   16    A.  That's correct.

11:53AM   17    Q.  All right.  Earlier you indicated that you also reviewed

11:53AM   18    a text thread between the defendant and Darryl LaMont; do you

11:53AM   19    recall that?

11:53AM   20    A.  Yes, I do.

11:53AM   21    Q.  I'm going to hand you up Government Exhibit 310AS.  Just

11:53AM   22    ignore the tabs, those are for me.

11:53AM   23    A.  Okay.

11:53AM   24    Q.  The --

11:54AM   25    A.  I'm familiar with it.

USA v Gerace - Burns - Tripi/Direct - 12/17/24
109

11:54AM   1   Q.  Do you recognize Government Exhibit 310AS?

11:54AM   2   A.  Yes, I do.

11:54AM   3   Q.  What is that?

11:54AM   4   A.  Those are text communications between the defendant and

11:54AM   5   Darryl LaMont.

11:54AM   6   Q.  What's the phone number associated with LaMont?

11:54AM   7   A.  It's 716-310-1799.

11:54AM   8   Q.  And are those accurate from the extraction of the

11:54AM   9   defendant's phone?

11:54AM   10  A.  They are.

11:54AM   11       **MR. TRIPI:**  The government offers Exhibit 310AS,

11:54AM   12  Your Honor.

11:54AM   13       **MR. FOTI:**  Judge, we had some argument earlier, and

11:54AM   14  there was one issue that I think was unresolved.

11:54AM   15       **THE COURT:**  Okay.  So with the same admonition, other

11:54AM   16  than that one issue, do you have an objection to these coming

11:54AM   17  in?

11:54AM   18       **MR. FOTI:**  Yes.

11:54AM   19       **THE COURT:**  You do?

11:54AM   20       **MR. FOTI:**  Oh, no.  No.  Other than that one issue,

11:54AM   21  no.

11:54AM   22       **THE COURT:**  Okay.  So these are coming in, and we

11:54AM   23  will talk -- before you get do that one --

11:54AM   24       **MR. TRIPI:**  Okay.

11:54AM   25       **THE COURT:**  -- come up and talk about it.

USA v Gerace - Burns - Tripi/Direct - 12/17/24

110

| | | |
|---|---|---|
| 11:54AM | 1 | But these are being admitted with the same |
| 11:54AM | 2 | admonition.  The defendant's are coming in because they're the |
| 11:54AM | 3 | defendant's, but the other ones just come in for his state of |
| 11:54AM | 4 | mind and context. |
| 11:54AM | 5 | **MR. TRIPI:**  Thank you.  All right. |
| 11:54AM | 6 | **(GOV Exhibit 310AS was received in evidence.)** |
| 11:55AM | 7 | **MR. TRIPI:**  Can we pull up the first page just to |
| 11:55AM | 8 | give an idea of the number of texts and the duration, |
| 11:55AM | 9 | Ms. Champoux? |
| 11:55AM | 10 | **BY MR. TRIPI:** |
| 11:55AM | 11 | Q.  Again, blue boxes indicate Mr. Gerace's text, and the |
| 11:55AM | 12 | gray box would be Darryl LaMont with the phone number that |
| 11:55AM | 13 | you personally verified? |
| 11:55AM | 14 | A.  Correct. |
| 11:55AM | 15 | Q.  And the number of messages, is that 118 messages between |
| 11:55AM | 16 | March 6th, 2017 and April 18th of 2019? |
| 11:55AM | 17 | A.  Yes. |
| 11:55AM | 18 | Q.  Okay.  I just want to look at a couple of them. |
| 11:55AM | 19 | **MR. TRIPI:**  Let's go to page 2, Ms. Champoux. |
| 11:55AM | 20 | **BY MR. TRIPI:** |
| 11:55AM | 21 | Q.  Does this -- is this the same screenshot, one of the |
| 11:55AM | 22 | screenshots that we saw with -- of the -- sort of the mugshot |
| 11:55AM | 23 | of Katrina Nigro?  The jury just saw this same screenshot on |
| 11:55AM | 24 | the Michalski thread; is that right? |
| 11:55AM | 25 | A.  Yeah, same screenshot. |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

111

| | | |
|---|---|---|
| 11:55AM | 1 | **MR. TRIPI:** Okay. And scroll just the next two |
| 11:56AM | 2 | pages. |
| 11:56AM | 3 | **BY MR. TRIPI:** |
| 11:56AM | 4 | Q. There's a couple of them sent, correct? |
| 11:56AM | 5 | A. That's correct. |
| 11:56AM | 6 | **MR. TRIPI:** All right. I'd like to scroll down to |
| 11:56AM | 7 | the next page. |
| 11:56AM | 8 | **BY MR. TRIPI:** |
| 11:56AM | 9 | Q. At the bottom there, is -- March 26th, 2019, is there a |
| 11:56AM | 10 | text of a photo of Shelby Johnson to Peter Gerace? |
| 11:56AM | 11 | A. Yes, there is. |
| 11:56AM | 12 | **MR. TRIPI:** Scroll down a little bit. |
| 11:56AM | 13 | And is there message -- stop, please. Thank you. |
| 11:56AM | 14 | **BY MR. TRIPI:** |
| 11:56AM | 15 | Q. And is there written content under the photo? |
| 11:56AM | 16 | A. Shelby is coming back to work in two weeks. |
| 11:56AM | 17 | Q. Okay. And what did Mr. Gerace respond? |
| 11:56AM | 18 | A. Cool. |
| 11:56AM | 19 | **MR. TRIPI:** All right. Ms. Champoux, can you scroll |
| 11:56AM | 20 | a couple of pages? I'm looking at a message June 17th, 2017. |
| 11:57AM | 21 | Thank you. |
| 11:57AM | 22 | **BY MR. TRIPI:** |
| 11:57AM | 23 | Q. On June 17th, 2019, 5:03 p.m., does Mr. LaMont write a |
| 11:57AM | 24 | message to the defendant? |
| 11:57AM | 25 | A. Call me back. It's important. |

11:57AM   1          **MR. TRIPI:**  Judge, can we get an -- as I'm going

11:57AM   2   through it, can we just get an instruction that it's a

11:57AM   3   directive so the admonition doesn't apply --

11:57AM   4          **THE COURT:**  So --

11:57AM   5          **MR. TRIPI:**  -- if you that would be appropriate,

11:57AM   6   Judge.

11:57AM   7          **THE COURT:**  Call me back.

11:57AM   8          **MR. TRIPI:**  Call me back, it's important.

11:57AM   9          **THE COURT:**  Mr. Foti, that is a directive.

11:57AM  10          **MR. FOTI:**  No objection.

11:57AM  11          **THE COURT:**  Right?  No objection?

11:57AM  12          **MR. FOTI:**  Sure.

11:57AM  13          **THE COURT:**  So that's a direction.  So, obviously,

11:57AM  14   there's no truth of the matter, so you can consider that for

11:57AM  15   the substance of it that it was a direction.  Okay.

11:57AM  16          **MR. TRIPI:**  Thank you, Judge.

11:57AM  17          All right.  Ms. Champoux, can we down the screen for

11:57AM  18   the jury for just a moment?

11:57AM  19          It's just for us now?  Ms. Champoux, can you get me

11:57AM  20   to a message June 2nd, 2018.  All right.  I got it.

11:58AM  21          And could we resume the screen for the jury now?

11:58AM  22          **THE CLERK:**  All set.

11:58AM  23          **MR. TRIPI:**  Thank you.

11:58AM  24          **BY MR. TRIPI:**

11:58AM  25   Q.  Can you read that exchange on June 2, 2018, between

11:58AM     1    Mr. LaMont and the defendant.

11:58AM     2    A.   From Mr. LaMont:  Bringing a new girl that never danced

11:58AM     3    before.  I just hired her.  I'm going to introduce her to

11:58AM     4    staff, so she can get a tour, dot, dot, dot, after stags.

11:58AM     5    Q.   Just break that message down, Mr. LaMont runs No Limit

11:58AM     6    Entertainment?

11:58AM     7    A.   Yes, an escort service, stag party service.

11:58AM     8    Q.   Okay.  And at Pharaoh's Gentlemen's Club, women perform

11:58AM     9    exotic dances; is that right?

11:58AM    10    A.   That's correct.

11:58AM    11    Q.   And does Pharaoh's Gentlemen's Club have a staff?

11:59AM    12    A.   Yes.  Yes.  Definitely.

11:59AM    13    Q.   What does Defendant Gerace respond to that?

11:59AM    14    A.   Okay.  Cool.  Thanks.

11:59AM    15    Q.   Give me just a moment, please.

11:59AM    16         **MR. TRIPI:**  Can we take the screen down for the jury

11:59AM    17    one moment?

11:59AM    18         **THE CLERK:**  All set.

11:59AM    19         **MR. TRIPI:**  Ms. Champoux, can you get me to a

11:59AM    20    message, at the top of the page it will be July 15th, 2018.

11:59AM    21    Okay.  Stop there.

11:59AM    22         **THE CLERK:**  Back up.

11:59AM    23         **MR. TRIPI:**  We can go back up for the jury.

11:59AM    24         **BY MR. TRIPI:**

11:59AM    25    Q.   Special Agent Burns, can you read the exchanges on

11:59AM  1   July 15th that are indicated on page 15, please?

11:59AM  2   A.  From Darryl LaMont:  There's a limo of 25 coming to the

11:59AM  3   club in 45, dot, dot, dot.

11:59AM  4       Need bottle service plus a booth, dot, dot, dot.

11:59AM  5       They're coming from Falls.

12:00PM  6       From Defendant Gerace:  I'll see if anything is

12:00PM  7   available.  I'm away.  Tell them to see Nick.

12:00PM  8   Q.  Okay.  Stop there for a second.

12:00PM  9       Are you familiar with and have -- has a manager/employee

12:00PM  10  of Pharaoh's been interviewed with the first name Nick?

12:00PM  11  A.  Yes.

12:00PM  12  Q.  What's Nick's last name?

12:00PM  13  A.  Oh, Ciechalski.  I'm not pronouncing it properly, but --

12:00PM  14  Q.  Please continue.

12:00PM  15  A.  The name, and what, from Mr. Gerace.

12:00PM  16  Q.  And did LaMont respond at the end there?

12:00PM  17  A.  Okay.

12:00PM  18       MR. TRIPI:  And scroll just to the top of the next

12:00PM  19  page.  Maybe a little bit further down.

12:00PM  20       BY MR. TRIPI:

12:00PM  21  Q.  Can you continue reading the July 15th exchanges?

12:00PM  22  A.  From Mr. Gerace:  It's under your name.

12:00PM  23       From Mr. LaMont:  I'm already gone.  They don't know to

12:00PM  24  put it under my name, and I know they are going to Pharaoh's.

12:00PM  25  Not sure if it's going to be their first stop but they will

| | | |
|---|---|---|
| 12:00PM | 1 | for sure be there. |
| 12:01PM | 2 | Sent by Sunny because Darryl is driving. |
| 12:01PM | 3 | Q.  And then does Mr. Gerace respond? |
| 12:01PM | 4 | A.  He does.  I told the guys 30 to 45 minutes, like you |
| 12:01PM | 5 | said.  What is the name, because that's -- that's -- because |
| 12:01PM | 6 | that he saved a VIP section for them. |
| 12:01PM | 7 | From Mr. LaMont:  His name is Harry. |
| 12:01PM | 8 | **MR. TRIPI:**  Ms. Champoux, can we down the screen |
| 12:01PM | 9 | again for the jury please.  And, Ms. Champoux, can you get me |
| 12:01PM | 10 | to a message January 23rd, 2019 please.  It should be the |
| 12:01PM | 11 | second or third page from the end. |
| 12:01PM | 12 | Okay.  Let's go -- all right.  Let's -- sorry, I need |
| 12:01PM | 13 | a date and time.  Thank you.  So we're scrolling between |
| 12:02PM | 14 | page 21 and 22.  Ms. Champoux, can you -- can we have the jury |
| 12:02PM | 15 | view the screen, please? |
| 12:02PM | 16 | **BY MR. TRIPI:** |
| 12:02PM | 17 | Q.  On January 23rd, 2019, did Mr. LaMont send a picture of a |
| 12:02PM | 18 | woman to Mr. Gerace? |
| 12:02PM | 19 | A.  Yes, he did. |
| 12:02PM | 20 | **MR. TRIPI:**  Can you scroll down a little further, |
| 12:02PM | 21 | Ms. Champoux. |
| 12:02PM | 22 | **BY MR. TRIPI:** |
| 12:02PM | 23 | Q.  Underneath the photo, what did Mr. LaMont write? |
| 12:02PM | 24 | A.  New girl I just hired.  Sending her to Pharaoh's Friday |
| 12:02PM | 25 | morning for a dancing job, dot, dot, dot.  Her name is |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

116

| | | |
|---|---|---|
| 12:02PM | 1 | Amanda. |
| 12:02PM | 2 | Q.  Okay.  Now Darryl LaMont doesn't own Pharaoh's, right? |
| 12:02PM | 3 | A.  He does not. |
| 12:02PM | 4 | Q.  The defendant did, right? |
| 12:02PM | 5 | A.  Yes, he did. |
| 12:02PM | 6 | Q.  Okay.  And what does the defendant respond when |
| 12:02PM | 7 | Mr. LaMont writes, new girl I just hired, sending her to |
| 12:02PM | 8 | Pharaoh's Friday morning for a dancing job.  Her name Amanda? |
| 12:02PM | 9 | A.  He responds: Okay.  Let me know.  I'll be there. |
| 12:02PM | 10 | Q.  And what does Mr. LaMont respond? |
| 12:02PM | 11 | A.  She will be there at noon. |
| 12:02PM | 12 | Q.  I'm going to hand you up the hard copy.  And just read |
| 12:03PM | 13 | out loud and stop when you get to sort of the Post-It Notes |
| 12:03PM | 14 | that I'm putting on the page okay? |
| 12:03PM | 15 | **THE COURT:**  Can we take this down now? |
| 12:03PM | 16 | **MR. TRIPI:**  Absolutely. |
| 12:03PM | 17 | **THE COURT:**  Can we post for me what -- |
| 12:03PM | 18 | **MR. TRIPI:**  Yeah. |
| 12:03PM | 19 | **THE COURT:**  -- what you're looking at? |
| 12:03PM | 20 | **MR. TRIPI:**  Yes.  For the judge and the parties only, |
| 12:03PM | 21 | can we move to the last page, Ms. Champoux. |
| 12:03PM | 22 | And, Judge, we're reading that. |
| 12:03PM | 23 | **THE COURT:**  Okay. |
| 12:03PM | 24 | **BY MR. TRIPI:** |
| 12:03PM | 25 | Q.  Just to sort of complete the exchanges about that woman |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

117

12:03PM  1   that was in the photo on January 25, 2019, can you read how

12:04PM  2   they finished that conversation between Mr. LaMont and the

12:04PM  3   defendant?

12:04PM  4   A.   From Mr. LaMont:  Amanda won't be in until a little later

12:04PM  5   to try out, dot, dot, dot.

12:04PM  6      She has an appointment that came up that she has to be

12:04PM  7   at, dot, dot, dot.

12:04PM  8      I'll be in around 4 myself.

12:04PM  9          **MR. TRIPI:**  Judge, sort of the last thing on this is

12:04PM  10  the one message we needed to argue further about.

12:04PM  11         **THE COURT:**  Okay.  So should we break for lunch now?

12:04PM  12         **MR. TRIPI:**  Yeah, Judge.  I think I can be done in

12:04PM  13  the next 30 minutes, so I think it's a good time to break for

12:04PM  14  lunch, and that's about how much I think, 30 to 35 minutes,

12:04PM  15  I'll be finished.

12:04PM  16         **THE COURT:**  Okay.  So let's take a relatively short

12:04PM  17  lunch break.  Let's take 45 minutes.  Please remember my

12:04PM  18  instructions.  Don't talk about the case, don't communicate

12:04PM  19  about it with anyone.  Don't use tools of technology to learn

12:04PM  20  anything about the case or to communicate about the case.  If

12:04PM  21  there's any news coverage of the case on TV or the radio or

12:05PM  22  newspaper or internet or anywhere else, don't read or watch or

12:05PM  23  listen to it.  And don't make up your mind until you start

12:05PM  24  deliberating.

12:05PM  25          We'll see you back here at about a quarter to 1.

| | | |
|---|---|---|
| 12:05PM | 1 | Thanks. |
| 12:05PM | 2 | (Jury excused at 12:05 p.m.) |
| 12:05PM | 3 | **THE COURT:**  Okay.  Should we do the argument now? |
| 12:05PM | 4 | **MR. COOPER:**  Sure, Judge. |
| 12:05PM | 5 | **THE COURT:**  Should we excuse the witness? |
| 12:05PM | 6 | **MR. COOPER:**  Yes, please. |
| 12:05PM | 7 | Get out of here, Brian. |
| 12:05PM | 8 | **THE COURT:**  Mr. Burns, we haven't really been |
| 12:05PM | 9 | admonishing you because you know don't talk to anybody. |
| 12:06PM | 10 | **THE WITNESS:**  Certainly. |
| 12:06PM | 11 | **THE COURT:**  Okay. |
| 12:06PM | 12 | **MR. TRIPI:**  I think I'm gonna let Mr. Cooper handle |
| 12:06PM | 13 | this one. |
| 12:06PM | 14 | **THE COURT:**  And can we put it up on the screen so I |
| 12:06PM | 15 | can see the exchange? |
| 12:06PM | 16 | **MR. TRIPI:**  Yeah.  Karen, it's October 26th, 2017. |
| 12:06PM | 17 | I'll just try to circle them for you, Judge. |
| 12:06PM | 18 | Those are the two, Judge. |
| 12:06PM | 19 | **MR. COOPER:**  So, will you let me know when you're |
| 12:06PM | 20 | ready for the argument, Judge? |
| 12:06PM | 21 | **THE COURT:**  Yeah, I'm ready. |
| 12:06PM | 22 | **MR. COOPER:**  Okay.  So first of all, in terms of |
| 12:06PM | 23 | relevance, which I think it's obvious, it's notice to the |
| 12:06PM | 24 | defendant that Darryl LaMont has this woman engaging in some |
| 12:06PM | 25 | kind of sex acts.  At a minimum, the low bar of relevance |

| | | |
|---|---|---|
| 12:06PM | 1 | here, Darryl LaMont is informing the defendant on a text |
| 12:07PM | 2 | message that the woman engaged in anal sex. |
| 12:07PM | 3 | So, and I want to set aside for a moment what I |
| 12:07PM | 4 | expect Mr. Foti to say is that this is a joke.  He can argue |
| 12:07PM | 5 | it's a joke, and if the defendant wanted to, and obviously |
| 12:07PM | 6 | it's his choice, he can get up and claim it's a joke. |
| 12:07PM | 7 | But the words written on the paper indicate that the |
| 12:07PM | 8 | woman engaged in a sex act, specifically anal sex. |
| 12:07PM | 9 | And the notice to this defendant that LaMont was |
| 12:07PM | 10 | using women to get them to engage in sex acts is at issue in |
| 12:07PM | 11 | this case, which charges a sex-trafficking conspiracy. |
| 12:07PM | 12 | So, as far as relevance goes, the text messages are |
| 12:07PM | 13 | obviously relevant. |
| 12:07PM | 14 | With respect to whether the statement is in |
| 12:07PM | 15 | furtherance of the conspiracy, I would argue to the Court that |
| 12:07PM | 16 | they are.  And when two coconspirators are essentially |
| 12:07PM | 17 | negotiating or arguing about who gets to have this person on a |
| 12:07PM | 18 | particular day, that's in furtherance of the conspiracy, even |
| 12:07PM | 19 | if they're at odds with each other, even if they're both |
| 12:08PM | 20 | saying, like, hey I wanted her this weekend.  That's a |
| 12:08PM | 21 | statement of essentially negotiation.  They don't have to be |
| 12:08PM | 22 | lovey-dovey all the time. |
| 12:08PM | 23 | Peter's appears pissed in the text message.  You took |
| 12:08PM | 24 | one of my top weekend girls. |
| 12:08PM | 25 | And LaMont is essentially throwing it in his face. |

12:08PM   1   Yeah, and she does anal too.

12:08PM   2         So it's relevant, and it's negotiation about the

12:08PM   3   conspiracy.  And you don't have to find that beyond the

12:08PM   4   reasonable doubt at this stage.

12:08PM   5         **THE COURT:**  Mr. Foti?

12:08PM   6         **MR. FOTI:**  Judge, I -- I -- I'm just trying to -- and

12:08PM   7   I don't mean this to be offensive, I'm trying to wrap my mind

12:08PM   8   around the idea that they're negotiating over something,

12:08PM   9   because Peter Gerace is indicating I -- is speaking to him as

12:08PM  10   a competitor in this respect.  There's no request --

12:08PM  11         **THE COURT:**  Yeah, I agree with you.  I don't think

12:08PM  12   it's in furtherance.  It's not gonna come in for the substance

12:08PM  13   of it.  I don't think it comes in in furtherance of the

12:08PM  14   conspiracy.  In fact, I think in light of what the 2nd Circuit

12:08PM  15   has said, this is -- this is almost anything but.

12:09PM  16         I agree with you.  He's saying I stole one of your --

12:09PM  17   you stole one of my girls, and Peter's a little pissed.  That

12:09PM  18   means it's not in furtherance of the conspiracy.  That means

12:09PM  19   it's as a competitor, so I agree with you on that.

12:09PM  20         **MR. TRIPI:**  Judge --

12:09PM  21         **THE COURT:**  Go ahead.

12:09PM  22         **MR. TRIPI:**  -- I'm sorry, one other way that I

12:09PM  23   believe I argued it in briefing if not in a prior iteration of

12:09PM  24   this, I know a lot of water under the bridge, so, the -- I

12:09PM  25   think this is an adoptive admission as well.  Under

12:09PM  1   circumstances where a regular person would deny knowledge, the

12:09PM  2   defendant is silent.  And there's authority for the notion

12:09PM  3   that where someone would deny something or disavow knowledge

12:09PM  4   and they don't, that you can --

12:09PM  5          **THE COURT:**  So he should say no, he doesn't do anal?

12:09PM  6   After he says she does anal, LOL?

12:10PM  7          **MR. TRIPI:**  Or I don't know what you're talking

12:10PM  8   about.  Things like that.

12:10PM  9          **THE COURT:**  No, especially with the LOL.  Especially

12:10PM  10  with the LOL.  No, I don't agree with that.

12:10PM  11         But, so -- so one of the statements that I'm reading

12:10PM  12  from, the United States versus San -- Saneaux case, which is

12:10PM  13  albeit a District Court case, but I think a good one,

12:10PM  14  statements which tend to frustrate or hinder the goals of the

12:10PM  15  conspiracy cannot reasonably be interpreted as furthering the

12:10PM  16  conspiracy.

12:10PM  17         This certainly would have done that here.

12:10PM  18         **MR. TRIPI:**  Judge, if I could jump in?

12:10PM  19         I -- I go back to what I argued to you at the bench,

12:10PM  20  which was -- and I think we started sort of in the lead on

12:10PM  21  this argument, and we've swung back the other way.  And I

12:10PM  22  think what I was trying to explain at the bench was when you

12:10PM  23  have two people in a conspiracy, and they're discussing

12:10PM  24  personnel, that's clearly what's happening here.

12:11PM  25         So they have a dancer who works for both of them and

12:11PM   1   they're discussing personnel.  That's -- that's no different

12:11PM   2   than moving troops around the field, or personnel in a

12:11PM   3   football game.

12:11PM   4        THE COURT:  Mr. Tripi, I understand what you're

12:11PM   5   saying.  I disagree with you.  I disagree.  It's not coming in

12:11PM   6   for the substance.

12:11PM   7        Talk to me about why it shouldn't come in -- talk to

12:11PM   8   me about why on a 401, 403, it shouldn't come in.

12:11PM   9        MR. FOTI:  Yeah.  So, to give you an idea of -- I

12:11PM  10   mean, obviously we have an -- an argument that it's a joke,

12:11PM  11   but an argument doesn't take away the impact of seeing

12:11PM  12   somebody referencing anal in a message that -- I understand

12:11PM  13   what Mr. Tripi's point was -- but there's no response at all

12:11PM  14   or indication that it was even seen.  The next text message is

12:11PM  15   several months later.

12:11PM  16        THE COURT:  But Mr. Cooper -- but Mr. Cooper, I don't

12:11PM  17   think he's got to put it in proof that it was actually seen.

12:11PM  18   And Mr. Cooper is arguing that it comes in for, again, for the

12:12PM  19   defendant's state of mind and context.  And I don't see why it

12:12PM  20   wouldn't come in for that.

12:12PM  21        And I don't think it's unduly prejudicial, given the

12:12PM  22   fact that there's been plenty of -- dear Lord in heaven, this

12:12PM  23   is one of the milder things that has come in in the course of

12:12PM  24   this trial.  There's been all sorts of proof graphically asked

12:12PM  25   about different types of sex in this case.  So I'm -- I'm not

USA v Gerace - Burns - Tripi/Direct - 12/17/24

12:12PM    1    seeing how this is unduly prejudicial.

12:12PM    2          **MR. FOTI:**  Well, I think it's only probative if

12:12PM    3    there's some confirmation Mr. Gerace saw it.  And if there's

12:12PM    4    no indication that he did, there's no continuation of the

12:12PM    5    conversation at all, or any type of digital acknowledgment

12:12PM    6    that it was something that he actually.

12:12PM    7          **MR. COOPER:**  Judge, it still --

12:12PM    8          I'm sorry, Mark.  I didn't mean to cut you off.  I

12:12PM    9    thought you were wrapping up.

12:12PM   10          If it was the last text message ever in the chain,

12:12PM   11    Mr. Foti would have a stronger argument.  But the conversation

12:12PM   12    continues, he can argue that, hey, there's no proof he read

12:13PM   13    this text message, and we can argue the text messages continue

12:13PM   14    on after that, but it's certainly -- it establishes the

12:13PM   15    defendant's notice that Darryl LaMont was having women engage

12:13PM   16    in sex acts, and that's at issue in this trial --

12:13PM   17          **THE COURT:**  Yep.

12:13PM   18          **MR. COOPER:**  -- without question.

12:13PM   19          **MR. FOTI:**  I think that there's a number of reasons

12:13PM   20    the probative value is limited.  One is that we don't have

12:13PM   21    confirmation that he saw it.  And I understand the argument

12:13PM   22    that that only goes to weight, but that is legitimately a

12:13PM   23    point that diminishes the probative value of the message.

12:13PM   24          The fact that there's an LOL on there suggests that

12:13PM   25    there was, one, potentially an intent to make a joke, whether

12:13PM      1   it was a tasteful joke or not, and certainly that Mr. Gerace

12:13PM      2   could have, if he did see it, could have merely interpreted it

12:13PM      3   as a joke.

12:13PM      4        Trying to import some sort of probative value as to

12:13PM      5   what Mr. Gerace's mindset is on a text message that has no

12:13PM      6   further context at all, given the prejudicial nature of it, I

12:13PM      7   don't think it survives a 403 test.

12:14PM      8        MR. COOPER:  Judge, there's almost no -- in this case

12:14PM      9   in the universe of facts that have existed in this courtroom,

12:14PM     10   there's almost no prejudice associated with the word "anal."

12:14PM     11        The reason that they're try -- and I get it, I

12:14PM     12   respect it, it's his job -- but the reason that they're trying

12:14PM     13   so hard to keep it out is because of how much probative value

12:14PM     14   it has.

12:14PM     15        It's Darryl LaMont and Peter Gerace discussing a

12:14PM     16   woman engaging in sex acts.  The fact that the word "anal"

12:14PM     17   exists has almost zero prejudicial value in this case in this

12:14PM     18   universe of facts.

12:14PM     19        THE COURT:  Okay.  I think it comes in.  It comes in

12:14PM     20   only for context.  And that's my decision.

12:14PM     21        MR. COOPER:  For notice -- for notice to the

12:14PM     22   defendant.

12:14PM     23        THE COURT:  For -- for --

12:14PM     24        MR. COOPER:  When you say "context" --

12:14PM     25        THE COURT:  The defendant's state of mind and the

USA v Gerace - Burns - Tripi/Direct - 12/17/24

12:14PM   1   context of the conversation.

12:14PM   2         MR. TRIPI:  Understood.  Thank you.

12:14PM   3         THE COURT:  Okay.  Yes.

12:14PM   4         MR. FOTI:  I just would ask that the ins -- and I

12:14PM   5   don't think it has in the past, but just the instruction not

12:14PM   6   suggest to the jury that there's an indication he saw the

12:14PM   7   message, that's fine.

12:14PM   8         THE COURT:  No, you can argue that.  I'm not gonna

12:14PM   9   say that.

12:14PM  10         MR. FOTI:  No, I understand that.

12:14PM  11         THE COURT:  Of course you can argue that.

12:14PM  12         MR. COOPER:  It's being offered to prove the

12:15PM  13   defendant's knowledge is --

12:15PM  14         THE COURT:  It's being offered to prove the

12:15PM  15   defendant's knowledge.

12:15PM  16         MR. COOPER:  And then you can say --

12:15PM  17         THE COURT:  And then you can say, I mean, if you want

12:15PM  18   to -- if you want to say something at that point, say clarify,

12:15PM  19   you know, there's no indication that he actually saw it, I'd

12:15PM  20   say I'm not saying that.  What I'm saying is it's being

12:15PM  21   offered to show that the defendant knew that, whether he saw

12:15PM  22   it or not doesn't -- we don't know.

12:15PM  23         MR. COOPER:  I would just suggest that that's for

12:15PM  24   cross.  He can cross Special Agent Burns on that.

12:15PM  25         THE COURT:  I guess that's true.

12:15PM  1          **MR. COOPER:**  That's a legal instruction.

12:15PM  2          **MR. FOTI:**  I can't cross Mr. Burns on it.  He doesn't

12:15PM  3  know.

12:15PM  4          **THE COURT:**  That's right.  That's the point.  That's

12:15PM  5  the point.  He's gonna say he doesn't know.

12:15PM  6          Do you know whether Mr. Gerace ever saw this?  I have

12:15PM  7  no idea.

12:15PM  8          **MR. FOTI:**  Yeah, that's -- I think we're not

12:15PM  9  disagreeing with each other, but to the extent that we have no

12:15PM  10  evidence of whether Mr. Gerace saw it, I don't think it should

12:15PM  11  be suggested that he did.

12:15PM  12          **THE COURT:**  So, okay, so let's come up with some

12:15PM  13  language that would you like me to tell the jury that this is

12:15PM  14  being offered to show Mr. Gerace's state of -- I mean, I think

12:16PM  15  that more or less does it.  That it's being -- the government

12:16PM  16  is offering this to show Mr. Gerace's state of mind.

12:16PM  17          I mean, I'm willing to work with you on language that

12:16PM  18  we can -- that -- I mean, I don't think we're really saying

12:16PM  19  anything different on this issue.  And I'm willing to work

12:16PM  20  with you on language.  You've got half an hour to come up with

12:16PM  21  it, okay?

12:16PM  22          **MR. FOTI:**  Understood.

12:16PM  23          **THE COURT:**  Great.  Anything else before we break?

12:16PM  24          **MR. TRIPI:**  The last one we're probably going to

12:16PM  25  argue about is the text thread with Chris Chudy.  It's gonna

USA v Gerace - Burns - Tripi/Direct - 12/17/24

| | | |
|---|---|---|
| 12:16PM | 1 | be a similar type of argument.  Do you want me to just hand it |
| 12:16PM | 2 | up and you want to look at it in chambers and come back? |
| 12:16PM | 3 | **THE COURT:**  Yeah. |
| 12:16PM | 4 | **MR. TRIPI:**  Is that easier for you? |
| 12:16PM | 5 | **THE COURT:**  It's the same sort of thing. |
| 12:16PM | 6 | **MR. TRIPI:**  Same sort of idea.  It's about drugs as |
| 12:16PM | 7 | opposed to sex, but same idea.  And so they're all on |
| 12:16PM | 8 | November 1st, Judge. |
| 12:16PM | 9 | **THE COURT:**  Okay.  Great. |
| 12:16PM | 10 | **MR. TRIPI:**  If you want to do it after -- |
| 12:16PM | 11 | **THE COURT:**  And you're going to go through this, go |
| 12:16PM | 12 | through that, and then what? |
| 12:16PM | 13 | **MR. TRIPI:**  And then I'm going to move into getting |
| 12:16PM | 14 | our chart in. |
| 12:16PM | 15 | **THE COURT:**  And you're going to object to the chart |
| 12:16PM | 16 | or not object to the chart? |
| 12:17PM | 17 | **MR. FOTI:**  No. |
| 12:17PM | 18 | **THE COURT:**  Great.  Thanks, folks. |
| 12:17PM | 19 | **MR. TRIPI:**  Thank you. |
| 12:17PM | 20 | **THE CLERK:**  All rise. |
| 12:17PM | 21 | (Off the record at 12:17 p.m.) |
| 12:54PM | 22 | (Back on the record at 12:54 p.m.) |
| 12:54PM | 23 | (Jury not present.) |
| 12:54PM | 24 | **THE CLERK:**  All rise. |
| 12:54PM | 25 | **THE COURT:**  Please be seated. |

| | | |
|---|---|---|
| 12:54PM | 1 | **THE CLERK:**  We are back on the record for the |
| 12:54PM | 2 | continuation of the jury trial in case numbers 19-cr-227 and |
| 12:54PM | 3 | 23-cr-37, United States of America versus Peter Gerace Jr. |
| 12:54PM | 4 | All counsel and parties are present. |
| 12:54PM | 5 | **THE COURT:**  Okay.  So I've looked at the Chris Chudy |
| 12:54PM | 6 | ones.  I think it's different, Mr. Tripi.  I think that the |
| 12:54PM | 7 | Chris Chudy -- the only reason that they might be relevant is |
| 12:54PM | 8 | for the truth of what Mr. Chudy is saying. |
| 12:54PM | 9 | In other words, he's saying that there are double |
| 12:54PM | 10 | standards.  That do you it all the time for your people.  If |
| 12:54PM | 11 | you're not a biker or a partier, you're nothing.  I'm not |
| 12:54PM | 12 | allowed to watch the cameras. |
| 12:55PM | 13 | So the only reason that could possibly be relevant is |
| 12:55PM | 14 | for the truth, not for Mr. Gerace's state of mind, because |
| 12:55PM | 15 | he's denying it in the context. |
| 12:55PM | 16 | Let me finish.  Please, let me finish. |
| 12:55PM | 17 | And I don't think these could possibly be in |
| 12:55PM | 18 | furtherance of the conspiracy even Mr. -- even if Mr. Chudy is |
| 12:55PM | 19 | a coconspirator because, again, there -- it's a disagreement, |
| 12:55PM | 20 | it's not something that they are doing to further the |
| 12:55PM | 21 | conspiracy. |
| 12:55PM | 22 | So I think it's pure hearsay, and I don't think it's |
| 12:55PM | 23 | coming in, but I will hear your argument. |
| 12:55PM | 24 | **MR. TRIPI:**  And I -- |
| 12:55PM | 25 | **MR. COOPER:**  Judge -- |

| | | |
|---|---|---|
| 12:55PM | 1 | **MR. TRIPI:**  You can follow up, Nick, if you don't |
| 12:55PM | 2 | mind. |
| 12:55PM | 3 | **MR. COOPER:**  Oh, okay. |
| 12:55PM | 4 | **MR. TRIPI:**  He does it to me, too, Judge, I'm sorry. |
| 12:55PM | 5 | **THE COURT:**  No, no, no, that's okay, I get it. |
| 12:55PM | 6 | **MR. TRIPI:**  Yes.  The thing I would argue again, and |
| 12:55PM | 7 | I know you rejected it before the break, but Mr. Gerace |
| 12:55PM | 8 | doesn't respond to any of that directly. |
| 12:55PM | 9 | **THE COURT:**  Yep. |
| 12:55PM | 10 | **MR. TRIPI:**  I think that those circumstances -- my |
| 12:55PM | 11 | argument would be to you an adopted admission.  He goes on to |
| 12:55PM | 12 | other -- he stills addresses it. |
| 12:55PM | 13 | **THE COURT:**  He says no in the last one.  He says no. |
| 12:56PM | 14 | The last -- the last text message is no. |
| 12:56PM | 15 | Go ahead, Mr. Cooper. |
| 12:56PM | 16 | **MR. COOPER:**  Judge, I guess what I would argue |
| 12:56PM | 17 | similar to what I argued earlier with respect to Mr. LaMont is |
| 12:56PM | 18 | that these should come in at a minimum for state of mind, and |
| 12:56PM | 19 | here's why. |
| 12:56PM | 20 | **THE COURT:**  Go ahead. |
| 12:56PM | 21 | **MR. COOPER:**  The defense has argued, and they did so |
| 12:56PM | 22 | as recently as yesterday with respect to Ms. L.L., that the |
| 12:56PM | 23 | fact that Brian was being paid off to look the other way |
| 12:56PM | 24 | doesn't mean that this defendant was aware of illegal conduct |
| 12:56PM | 25 | happening at the club. |

USA v Gerace - Burns - Tripi/Direct - 12/17/24

130

| | | |
|---|---|---|
| 12:56PM | 1 | And here, Chudy is saying there's drug dealing, these |
| 12:56PM | 2 | bikers, and you don't care, you know, you're not concerned |
| 12:56PM | 3 | with it if they're people that party with you. |
| 12:56PM | 4 | And so he's making Gerace directly aware of the |
| 12:56PM | 5 | partiers getting away with things that are inappropriate at |
| 12:56PM | 6 | the club.  I expect there's gonna be a defense summation in |
| 12:56PM | 7 | this case heavily referencing that, like, they can't prove |
| 12:56PM | 8 | Peter knew about this stuff. |
| 12:56PM | 9 | So at a minimum, I would suggest to the Court that it |
| 12:57PM | 10 | needs to come in to show state of mind and awareness.  Here's |
| 12:57PM | 11 | a manager reporting, hey, there's this misconduct happening at |
| 12:57PM | 12 | the club. |
| 12:57PM | 13 | THE COURT:  I don't see him reporting misconduct. |
| 12:57PM | 14 | MR. TRIPI:  I think the focus is the word "partier," |
| 12:57PM | 15 | Judge.  Partier, the connotation is cocaine use. |
| 12:57PM | 16 | THE COURT:  No.  This is not going to come in. |
| 12:57PM | 17 | MR. TRIPI:  Okay.  Can get it back? |
| 12:57PM | 18 | THE COURT:  Number 2 -- no, I'm gonna keep it. |
| 12:57PM | 19 | Number 2.  Juror number 6 says that he knows the |
| 12:57PM | 20 | young lady shown in the last photo that was displayed. |
| 12:57PM | 21 | MR. SOEHNLEIN:  Which photo was that? |
| 12:57PM | 22 | MR. TRIPI:  I think that would have been a text |
| 12:57PM | 23 | thread, there was a young lady, Amanda maybe, was referenced. |
| 12:57PM | 24 | It was in 310.  I think that -- I think that was the last |
| 12:57PM | 25 | photo that -- |

| | | |
|---|---|---|
| 12:57PM | 1 | **MR. COOPER:**  Can you pull up 310AS.  Is it AS? |
| 12:57PM | 2 | **MR. TRIPI:**  It's AS, yes.  And it's the |
| 12:58PM | 3 | second-to-last page of the PDF.  It's towards the end.  There |
| 12:58PM | 4 | you go. |
| 12:58PM | 5 | I think that's the last photo of a young lady that I |
| 12:58PM | 6 | had shown. |
| 12:58PM | 7 | **MR. COOPER:**  Yeah. |
| 12:58PM | 8 | **THE COURT:**  Should we bring him in and ask? |
| 12:58PM | 9 | **MR. TRIPI:**  I think given that it's evidence in the |
| 12:58PM | 10 | case, Judge, I think we have to ask if it's going to impact |
| 12:58PM | 11 | his ability to be fair to either side. |
| 12:58PM | 12 | **MR. FOTI:**  Yeah.  And maybe I think it also would be |
| 12:58PM | 13 | helpful to just note the context under which he knows her. |
| 12:58PM | 14 | **THE COURT:**  Yeah, I agree. |
| 12:58PM | 15 | **MR. COOPER:**  Agree. |
| 12:58PM | 16 | **THE COURT:**  Okay.  So let's bring juror number 6 in, |
| 12:58PM | 17 | please. |
| 12:58PM | 18 | **MR. COOPER:**  Would we be able to just confirm that |
| 12:58PM | 19 | this is what he's speaking about, also maybe quickly show this |
| 12:58PM | 20 | photo? |
| 12:58PM | 21 | **THE COURT:**  Any problem with that? |
| 12:58PM | 22 | **MR. SOEHNLEIN:**  No. |
| 12:58PM | 23 | **THE COURT:**  Yeah. |
| 12:58PM | 24 | **MR. COOPER:**  Just to make sure that we know. |
| 12:58PM | 25 | **THE COURT:**  Yeah, why don't you step down. |

| | | |
|---|---|---|
| 12:58PM | 1 | **THE WITNESS:**  Okay. |
| 12:58PM | 2 | (Mr. Burns exited the courtroom at 12:58 p.m.) |
| 12:58PM | 3 | **MS. CHAMPOUX:**  Should I crop this? |
| 12:58PM | 4 | **MR. COOPER:**  Yeah, I don't think he needs to see her |
| 12:58PM | 5 | lower half to make that assessment. |
| 12:59PM | 6 | **MS. CHAMPOUX:**  It just says Amanda. |
| 12:59PM | 7 | (Juror 6 entered courtroom at 12:59 p.m.) |
| 12:59PM | 8 | **THE COURT:**  You can stay right there.  There's no |
| 12:59PM | 9 | reason for you to go all the way back. |
| 12:59PM | 10 | Pat, do we have a microphone? |
| 12:59PM | 11 | **THE CLERK:**  I'll get it. |
| 12:59PM | 12 | **THE COURT:**  So we're in the courtroom with Juror |
| 12:59PM | 13 | Number 6.  And I understand that you recognized the young lady |
| 12:59PM | 14 | shown in one of the photos that was displayed; is that |
| 12:59PM | 15 | correct? |
| 12:59PM | 16 | **JUROR 6:**  Correct. |
| 12:59PM | 17 | **THE COURT:**  Is it this photo, the one that's up there |
| 12:59PM | 18 | now? |
| 12:59PM | 19 | **JUROR 6:**  Yes. |
| 12:59PM | 20 | **THE COURT:**  Okay.  And how do you know that person? |
| 12:59PM | 21 | **JUROR 6:**  We used to work together at the plant, at |
| 12:59PM | 22 | the General Motors plant. |
| 12:59PM | 23 | **THE COURT:**  Okay.  When was the last time you talked |
| 12:59PM | 24 | to her or saw her? |
| 12:59PM | 25 | **JUROR 6:**  Oh, probably the last day she was there. |

| | | |
|---|---|---|
| 12:59PM | 1 | And that was probably seven years ago. |
| 12:59PM | 2 | **THE COURT:**  Okay.  Anything about the fact that you |
| 12:59PM | 3 | know her and that her photo has now appeared in the context of |
| 12:59PM | 4 | these text messages that's going to affect your ability to be |
| 12:59PM | 5 | fair in this case? |
| 12:59PM | 6 | **JUROR 6:**  No, I just felt I needed to say something. |
| 12:59PM | 7 | **THE COURT:**  Absolutely.  And we're very glad that you |
| 12:59PM | 8 | are.  But is there anything about this that makes you feel |
| 01:00PM | 9 | uncomfortable, or that makes you feel as though you couldn't |
| 01:00PM | 10 | give a fair shake to the defendant, or give a fair shake to |
| 01:00PM | 11 | the government? |
| 01:00PM | 12 | **JURORS 6:**  No. |
| 01:00PM | 13 | **MR. COOPER:**  May I just -- |
| 01:00PM | 14 | **THE COURT:**  Go ahead. |
| 01:00PM | 15 | **MR. COOPER:**  A very long time ago when we were doing |
| 01:00PM | 16 | jury selection, one of the things that came up as a recurring |
| 01:00PM | 17 | theme was keeping the decision-making process when you go in |
| 01:00PM | 18 | the verdict room limited to what happened and what proof came |
| 01:00PM | 19 | in this courtroom. |
| 01:00PM | 20 | If you have had conversations with that person, or |
| 01:00PM | 21 | know things about them, can you promise everybody that you'll |
| 01:00PM | 22 | only decide this case based on proof that came in in this |
| 01:00PM | 23 | courtroom? |
| 01:00PM | 24 | **JUROR 6:**  Yes, I can. |
| 01:00PM | 25 | **MR. COOPER:**  Excellent.  I'm good, Judge. |

| | | |
|---|---|---|
| 01:00PM | 1 | **MR. FOTI:**  No questions. |
| 01:00PM | 2 | **THE COURT:**  Terrific.  Thank you very much.  And you |
| 01:00PM | 3 | did exactly the right thing in telling us.  So, thank you. |
| 01:00PM | 4 | **JUROR 6:**  No problem. |
| 01:00PM | 5 | (Juror 6 exited the courtroom at 1:00 p.m.) |
| 01:00PM | 6 | **THE COURT:**  I think they feel as though when we bring |
| 01:00PM | 7 | them in, they've done something wrong. |
| 01:00PM | 8 | **MR. COOPER:**  Like the principal's office. |
| 01:00PM | 9 | **THE COURT:**  Okay.  Anything else we should do before |
| 01:00PM | 10 | we resume? |
| 01:01PM | 11 | **MR. COOPER:**  No. |
| 01:01PM | 12 | **THE COURT:**  Mr. Tripi? |
| 01:01PM | 13 | **MR. TRIPI:**  No, Judge. |
| 01:01PM | 14 | **THE COURT:**  Mr. Foti? |
| 01:01PM | 15 | **MR. FOTI:**  No, Judge. |
| 01:01PM | 16 | **THE COURT:**  Okay.  Great.  Thank you. |
| 01:01PM | 17 | Let's bring them in, please, Pat. |
| 01:01PM | 18 | **MR. TRIPI:**  We're gonna start with that text message, |
| 01:01PM | 19 | Judge, so I assume you're going to give your instruction right |
| 01:01PM | 20 | after I display it? |
| 01:01PM | 21 | **THE COURT:**  Yes.  Oh, Mr. Foti, did you come up with |
| 01:01PM | 22 | any language you wanted me to use in addition? |
| 01:01PM | 23 | **MR. FOTI:**  What I would ask for is just goes to his |
| 01:01PM | 24 | state of mind to the extent that he may have seen the message, |
| 01:01PM | 25 | and that's it. |

01:01PM  1      **MR. COOPER:**  Judge, I -- I'm not trying to be a pain

01:01PM  2  here, but I don't think that the Court should weigh in on

01:01PM  3  whether or not he saw the message.  The legal ruling is it's

01:01PM  4  being offered for his state of mind.  They can cross-examine

01:01PM  5  the witness, and they can sum up on there's no proof that he

01:01PM  6  saw it.  I'm not -- I don't know that that should really be a

01:01PM  7  part of a legal instruction.

01:01PM  8      **MR. FOTI:**  I didn't ask the Court to weigh it, I just

01:01PM  9  asked to say to the extent that he may have seen the message,

01:02PM  10  which is what the government is saying they want to use it

01:02PM  11  for.

01:02PM  12      **MR. COOPER:**  What are you gonna --

01:02PM  13      **MR. TRIPI:**  Do you want to hold them up, Judge?

01:02PM  14      **THE COURT:**  No, that's okay.  They can come in.

01:02PM  15  You'll hear it when I give it.

01:02PM  16      **MR. COOPER:**  Understood.

01:02PM  17      **THE CLERK:**  Joe, which exhibit number is this?

01:02PM  18      **MR. TRIPI:**  This is 310AS.

01:02PM  19      **THE CLERK:**  Thank you.

01:02PM  20      (Jury seated at 1:02 p.m.)

01:02PM  21      **THE COURT:**  Okay.  Welcome backs, folks.  The record

01:02PM  22  will reflect that all our jurors are present.

01:02PM  23      I remind the witness that he's still under oath.

01:02PM  24      Folks, you're gonna see another text message

01:02PM  25  exchange.  This text message exchange is being offered,

01:03PM   1   again -- Mr. Gerace's text message is being offered for all

01:03PM   2   purposes.  The other person's text message is being offered

01:03PM   3   only to show -- the government says that -- the government

01:03PM   4   believes that it shows Mr. Gerace's state of mind because it's

01:03PM   5   a text message that was sent to him.  Okay?  And it's being

01:03PM   6   admitted only for that.

01:03PM   7            Mr. Tripi, you can continue.

01:03PM   8            **MR. TRIPI:**  Thank you, Your Honor.

01:03PM   9            I'd like to pull up one more message as the judge

01:03PM  10   indicated, the exchange regarding Exhibit 310AS.

01:03PM  11            **BY MR. TRIPI:**

01:03PM  12   Q.  And Special Agent Burns, can you read in the blue box

01:03PM  13   what Mr. Gerace wrote on October 16th, 2017, and Mr. LaMont's

01:03PM  14   response that same day?

01:03PM  15   A.  The defendant stated or text states:  You took one of my

01:03PM  16   top weekend girls.

01:03PM  17       Mr. LaMont responds:  And she does anal, dot, dot, LOL.

01:03PM  18   Q.  Okay.  Now, I want to focus you in on the date and time.

01:04PM  19   We see UTC time for the text by the defendant is

01:04PM  20   October 16th, 2017 at 12:05 p.m.  So given that time of year,

01:04PM  21   I think we've established that would be minus four hours

01:04PM  22   making it that 8:05 a.m.; is that right?

01:04PM  23   A.  That's correct.

01:04PM  24   Q.  All right.  And then the response by Mr. LaMont is at

01:04PM  25   2:03 p.m. UTC time, so minus four hours would put it at about

01:04PM   1   10:03 a.m.; is that right?

01:04PM   2   A.  That's accurate.

01:04PM   3        **MR. TRIPI:**  Okay.  Ms. Champoux, can we flip over to

01:04PM   4   Government Exhibit 359 phone records for Mr. Gerace previously

01:04PM   5   entered into evidence.

01:04PM   6        And can we go to the PDF labeled 2016 to 2018 bills.

01:04PM   7        **BY MR. TRIPI:**

01:04PM   8   Q.  And Mr. -- Special Agent Burns, I'd like to start you at

01:04PM   9   page 567 to orient you as to the year that these bills are

01:04PM  10   in.  Do you see on page 567 a date of February 20th, 2017?

01:05PM  11   A.  Yes, I do.

01:05PM  12   Q.  Is that an indication reading the bills that we're in

01:05PM  13   January of 2017, so we're going follow the months in the far

01:05PM  14   column, and it's going to be the year 2017 until you see

01:05PM  15   we've gone through 12 months; is that right?

01:05PM  16   A.  That's accurate.

01:05PM  17        **MR. TRIPI:**  All right.  Ms. Champoux, can we scroll

01:05PM  18   down, scroll down to page number 955.  But could you scroll

01:05PM  19   just a little bit so they can see the months changing?

01:05PM  20        **BY MR. TRIPI:**

01:05PM  21   Q.  All right.  So there's a lot of call data there.  We're

01:05PM  22   going to jump forward on the PDF to page 955.

01:05PM  23   A.  Okay.

01:05PM  24   Q.  All right.  And I would like to go to a call

01:05PM  25   October 16th, 2017 at 10:04 a.m.

USA v Gerace - Burns - Tripi/Direct - 12/17/24

138

01:05PM 1    All right.  Can we get that bar out of there.

01:06PM 2    All right.  Moments ago, when we were looking at

01:06PM 3 Government Exhibit 310AS, I think you established that the

01:06PM 4 time of Mr. Gerace's text to Mr. LaMont that you took one of

01:06PM 5 my top weekend girls was at approximately 8:05 a.m.; do you

01:06PM 6 recall that?

01:06PM 7 A.  Yes, I do.

01:06PM 8 Q.  Is there a call from Mr. LaMont incoming to Mr. Gerace's

01:06PM 9 phone at about 10:04 a.m. that same day?

01:06PM 10 A.  Yeah, shortly after that last text.

01:06PM 11 Q.  And how long is that incoming call, what's the duration

01:06PM 12 indicated?

01:06PM 13 A.  Two-minute call.

01:06PM 14 Q.  Okay.

01:06PM 15    **MR. TRIPI:**  All right.  We can take that down,

01:06PM 16 Ms. Champoux.

01:06PM 17    **BY MR. TRIPI:**

01:06PM 18 Q.  So that call is the same day, in between the texts; is

01:06PM 19 that right?

01:06PM 20 A.  Yes, that's accurate.

01:06PM 21 Q.  Okay.  All right.  Going back to Mr. Gerace's phone, were

01:07PM 22 you also able to isolate some photographs that were in the

01:07PM 23 phone?

01:07PM 24 A.  Yes.  There were images in the extraction.

01:07PM 25 Q.  And --

USA v Gerace - Burns - Tripi/Direct - 12/17/24

139

01:07PM   1    A.  Pictures.

01:07PM   2    Q.  One of them that was extracted, did that include another

01:07PM   3    picture of him with -- the defendant with Judge Michalski and

01:07PM   4    C.C.?

01:07PM   5    A.  Yes.

01:07PM   6    Q.  I'm going to hand you up Exhibit 310AU-1.

01:07PM   7        Do you recognize that to be an image of a photo that was

01:07PM   8    contained inside Mr. Gerace's phone in the extraction?

01:07PM   9    A.  Yes, I do.

01:07PM  10    Q.  Is it fair and accurate rendering of the photo that was

01:07PM  11    extracted from the phone?

01:07PM  12    A.  Yes, it's a printout.

01:07PM  13            **MR. TRIPI:**  The government offers Exhibit 310AU-1.

01:07PM  14            **MR. FOTI:**  No objection.

01:07PM  15            **THE COURT:**  Received without objection.

01:07PM  16        **(GOV Exhibit 310AU-1 was received in evidence.)**

01:07PM  17            **MR. TRIPI:**  May we publish that, Ms. Champoux?

01:07PM  18            **BY MR. TRIPI:**

01:08PM  19    Q.  Thank you very much.  In the middle, is that the

01:08PM  20    defendant.

01:08PM  21    A.  Yes, it is.

01:08PM  22    Q.  On the left-hand side of the image that we're looking at,

01:08PM  23    is that C.C.?

01:08PM  24    A.  Yes, sir.

01:08PM  25    Q.  Did she testify in this trial?

01:08PM   1    A.  She did.

01:08PM   2    Q.  And on the right-hand side of the photo, on the other

01:08PM   3    side of Mr. Gerace, is that Judge John Michalski?

01:08PM   4    A.  Yes, it is.

01:08PM   5            **MR. TRIPI:**  Okay.  We can take that down.

01:08PM   6            Ms. Champoux, can we go to Government Exhibit 310AT.

01:08PM   7            **THE COURT:**  Is this in?

01:08PM   8            **MR. TRIPI:**  This is in.

01:08PM   9            **BY MR. TRIPI:**

01:08PM   10   Q.  These are the contacts -- this is the exhibit related to

01:08PM   11   the contacts of Mr. Gerace's phone; is that right?

01:08PM   12   A.  That's correct.

01:08PM   13   Q.  All right.  I'm going to go through some questions here.

01:08PM   14   And I might go to some of the entries, but I'm gonna try to

01:08PM   15   speed this up a bit.

01:08PM   16   A.  Okay.

01:08PM   17   Q.  So, we've heard at this trial some testimony about Justin

01:08PM   18   White, an attorney.  Is there a contact in Mr. Gerace's phone

01:08PM   19   for attorney Justin White?

01:08PM   20   A.  Yes, there is.

01:08PM   21   Q.  Are there contacts for other attorneys that have been

01:08PM   22   mentioned by Ms. Nigro during the investigation?

01:08PM   23   A.  Yes, there is.

01:08PM   24   Q.  Are there contacts in Mr. Gerace's phone for former

01:09PM   25   members of the Buffalo Sabres?

01:09PM    1    A.  Yes, there is.

01:09PM    2    Q.  Does that include one who was mentioned by several

01:09PM    3    witnesses to you?

01:09PM    4    A.  Yes, it does.

01:09PM    5    Q.  Are there members of local police law enforcement

01:09PM    6    agencies in Mr. Gerace's phone contacts?

01:09PM    7    A.  Yes, there is.

01:09PM    8    Q.  Are there members of New York State Police in

01:09PM    9    Mr. Gerace's phone contacts?

01:09PM   10    A.  There is.

01:09PM   11    Q.  Obviously, there was a text message thread between

01:09PM   12    Mr. Gerace and Mr. Bongiovanni, that's been in evidence as in

01:09PM   13    Exhibit 310D; is that correct?

01:09PM   14    A.  That's correct.

01:09PM   15    Q.  So within the phone extraction, there were contacts with

01:09PM   16    local, state, and federal authorities, correct?

01:09PM   17    A.  Yes, there was, law enforcement officers.

01:09PM   18    Q.  Record 12 in Exhibit 310AF, we can go there, was there a

01:09PM   19    phone contact for Dan Derenda?

01:09PM   20    A.  There was.

01:09PM   21    Q.  And that was someone Ms. Nigro had mentioned during her

01:09PM   22    testimony?

01:09PM   23    A.  Yes.

01:10PM   24           **MR. FOTI:**  Objection.

01:10PM   25           **THE COURT:**  Sorry?

01:10PM     1           **MR. FOTI:**  Withdrawn.

01:10PM     2           **BY MR. TRIPI:**

01:10PM     3    Q.  Record 2, there's a contact for Jeff Anzalone; is that

01:10PM     4    right?

01:10PM     5    A.  That's correct.

01:10PM     6           **MR. TRIPI:**  I'm a little ahead of Ms. Champoux.

01:10PM     7    Thank you, Ms. Champoux.

01:10PM     8           **BY MR. TRIPI:**

01:10PM     9    Q.  Was he a witness who testified at this trial?

01:10PM    10    A.  Yes, he is.

01:10PM    11    Q.  Record 9.  Is there a contact with a phone number for

01:10PM    12    Chris Chudy?

01:10PM    13    A.  Yes, there is.

01:10PM    14    Q.  Was he a manager at Pharaoh's during the duration of

01:10PM    15    conduct at this trial?

01:10PM    16    A.  He was.

01:10PM    17    Q.  If we go to record 10, is there a contact for Jessica,

01:10PM    18    also known as Charm?

01:10PM    19    A.  There is.

01:10PM    20    Q.  Do you understand that to be Jessica Leyland?

01:10PM    21    A.  That is Jessica Leyland.

01:10PM    22    Q.  Was she a Pharaoh's associate and employee during the

01:10PM    23    time period encompassed by this trial?

01:10PM    24    A.  Yes, she was.

01:10PM    25           **MR. TRIPI:**  Can we also show, Ms. Champoux,

USA v Gerace - Burns - Tripi/Direct - 12/17/24

143

01:10PM  1   Exhibit 562 just to remind the jury about this exhibit.

01:10PM  2          **BY MR. TRIPI:**

01:10PM  3   Q.  All right.  Do we see a photograph here, Exhibit 562, a

01:10PM  4   photo with Charm in the middle of Mr. Gerace and Mr. Reed?

01:10PM  5   A.  Yes, that's Jessica Leyland.

01:11PM  6          **MR. TRIPI:**  Okay.  You can take that down.

01:11PM  7          If we can go back to 310AT, record 13.

01:11PM  8          **BY MR. TRIPI:**

01:11PM  9   Q.  Is there an entry for Tommy Doctor?

01:11PM  10  A.  Yes, there is.

01:11PM  11  Q.  Is that the former DEA task force officer and Buffalo

01:11PM  12  police narcotics detective?

01:11PM  13  A.  Yes, it is.

01:11PM  14         **MR. TRIPI:**  Can we show Exhibit 126, Ms. Champoux.

01:11PM  15  I'm sorry 127.  My fault.

01:11PM  16         **BY MR. TRIPI:**

01:11PM  17  Q.  Is Mr. Doctor circled on the left-hand side of the image

01:11PM  18  in that exhibit?

01:11PM  19  A.  Yes, that is Mr. Doctor.

01:11PM  20  Q.  And there's been testimony about him at this trial?

01:11PM  21  A.  There has been.

01:11PM  22         **MR. TRIPI:**  We can go back to Exhibit 310AT,

01:11PM  23  Ms. Champoux.

01:11PM  24         **BY MR. TRIPI:**

01:11PM  25  Q.  If we can go to record 15, do you see an entry for an

01:12PM   1   Eric Fox?

01:12PM   2   A.  Yes, I do.

01:12PM   3   Q.  And K.L. was a witness in this trial?

01:12PM   4   A.  She was.

01:12PM   5   Q.  During her testimony, you sat here, did Ms. K.L. mention

01:12PM   6   Eric Fox?

01:12PM   7   A.  She did.

01:12PM   8   Q.  We've talked enough about this next person, but record

01:12PM   9   16.  Is that Hot Dog?

01:12PM   10  A.  Yeah, Paul Francoforte.

01:12PM   11  Q.  And I think yesterday we covered the phone contacts and

01:12PM   12  the phone pertaining to him, correct?

01:12PM   13  A.  That's correct.

01:12PM   14  Q.  All right.  We'll move on then.

01:12PM   15      Does Hot Dog, Paul Francoforte, in the law enforcement

01:12PM   16  community have a reputation as being associated with Italian

01:12PM   17  Organized Crime?

01:12PM   18  A.  Yes, he does.

01:12PM   19          **MR. FOTI:**  Objection, relevance.

01:12PM   20          **MR. TRIPI:**  It's the same.

01:12PM   21          **THE COURT:**  Overruled.

01:12PM   22          **MR. TRIPI:**  Can we go to record number 18, please.

01:12PM   23          **BY MR. TRIPI:**

01:12PM   24  Q.  There's been testimony about Marcus Black in this trial;

01:13PM   25  do you recall that?

USA v Gerace - Burns - Tripi/Direct - 12/17/24
145

01:13PM  1   A.  Yes.

01:13PM  2   Q.  Does this entry, record 18, have both a phone number and

01:13PM  3   a Facebook for Marcus Black?

01:13PM  4   A.  It does.

01:13PM  5   Q.  Do you know his true name?

01:13PM  6   A.  Yes, I do.

01:13PM  7   Q.  What is that?

01:13PM  8   A.  Marcus Hatten.

01:13PM  9   Q.  Is that one of the indicators in the Facebook account?

01:13PM  10  A.  Yes, it is.

01:13PM  11          **MR. TRIPI:**  Let's go to record 38.

01:13PM  12          **BY MR. TRIPI:**

01:13PM  13  Q.  Is that an entry and a phone number for K.L.?

01:13PM  14  A.  Yes, it is.

01:13PM  15  Q.  Is she a witness who testified in this case?

01:13PM  16  A.  Yes, she is.

01:13PM  17          **MR. TRIPI:**  Let's go to record number 40, please.

01:13PM  18          **BY MR. TRIPI:**

01:13PM  19  Q.  Is that Tom Napoli?

01:13PM  20  A.  It is.

01:13PM  21          **MR. TRIPI:**  Can we show Exhibit 490A.

01:13PM  22          **BY MR. TRIPI:**

01:13PM  23  Q.  Is this a photo the jury has seen, 490A, a photo that

01:14PM  24  depicts Tom Napoli, the defendant, and Joseph Bongiovanni

01:14PM  25  with others in Las Vegas?

USA v Gerace - Burns - Tripi/Direct - 12/17/24

146

01:14PM   1    A.  Yes, it does.

01:14PM   2         **MR. TRIPI:**  Can we also show Exhibit 127 now?  126.

01:14PM   3    I had those reversed, sorry.

01:14PM   4         **BY MR. TRIPI:**

01:14PM   5    Q.  Does Exhibit 126 on the right of the screen also show Tom

01:14PM   6    Napoli indicated in a photo from Toronto with Joseph

01:14PM   7    Bongiovanni and others?

01:14PM   8    A.  Yes, it does.

01:14PM   9    Q.  Okay.  And did Lou Selva and Kevin Myszka each provide

01:14PM   10   testimony at this trial about Tom Napoli?

01:14PM   11   A.  They did.

01:14PM   12        **MR. TRIPI:**  We can take those down.  Let's go back to

01:14PM   13   Exhibit 310AT.  And we're gonna go to record 45.

01:14PM   14        **BY MR. TRIPI:**

01:14PM   15   Q.  Earlier we went through text messages between the

01:14PM   16   defendant and Greg Trotter; is that correct?

01:14PM   17   A.  That's correct.

01:14PM   18   Q.  And the text thread with Detective Trotter was 310AQ; is

01:14PM   19   that right?

01:15PM   20   A.  That's accurate.

01:15PM   21   Q.  Government Exhibit 251B is a Greg Trotter business card;

01:15PM   22   is that right?

01:15PM   23   A.  That's correct.

01:15PM   24   Q.  There's a phone number on the front, and a handwritten

01:15PM   25   number on the back; is that right?

01:15PM    1    A.  Yes, it does.

01:15PM    2    Q.  Does the handwritten number on the back of Exhibit 251B,

01:15PM    3    is it different than the number that is stored in record

01:15PM    4    number 45?

01:15PM    5    A.  Yes.  This was his Amherst Police Department phone.

01:15PM    6    Q.  Well, you see a phone number on the back of the card,

01:15PM    7    right?

01:15PM    8    A.  Yes.

01:15PM    9    Q.  And that's a 208 number?

01:15PM   10    A.  That is.

01:15PM   11    Q.  And this number stored in Mr. Gerace's phone is

01:15PM   12    different?

01:15PM   13    A.  It is.

01:15PM   14    Q.  In 310AQ, do you remember discussion of Trotter

01:15PM   15    indicating that he had a new phone number?

01:15PM   16    A.  Yes, I do.

01:15PM   17    Q.  And you read those texts earlier today, correct?

01:15PM   18    A.  Yes, I did.

01:15PM   19         **MR. TRIPI:**  All right.  Let's go to record number 48,

01:15PM   20    please, in Exhibit 310AT.

01:15PM   21         **BY MR. TRIPI:**

01:16PM   22    Q.  We've talked about Frank Tripi earlier today; is that

01:16PM   23    right?

01:16PM   24    A.  Yes, we have.

01:16PM   25    Q.  And that was the person indicated in the OCDETF report

USA v Gerace - Burns - Tripi/Direct - 12/17/24

148

| | | |
|---|---|---|
| 01:16PM | 1 | that was located in Defendant Bongiovanni's basement; is that |
| 01:16PM | 2 | right? |
| 01:16PM | 3 | A.  Yes, he was a main subject -- |
| 01:16PM | 4 | Q.  Okay. |
| 01:16PM | 5 | A.  -- identified in that OCDETF. |
| 01:16PM | 6 | **MR. TRIPI:**  Let's go to record 50 in Exhibit 310AT. |
| 01:16PM | 7 | **BY MR. TRIPI:** |
| 01:16PM | 8 | Q.  Is P.R. also known as P.H.? |
| 01:16PM | 9 | A.  Yes, it is. |
| 01:16PM | 10 | Q.  Is Ms. P.H. someone who testified in this trial? |
| 01:16PM | 11 | A.  She was. |
| 01:16PM | 12 | **MR. TRIPI:**  Let's go to record number 51. |
| 01:16PM | 13 | **BY MR. TRIPI:** |
| 01:16PM | 14 | Q.  And this is an entry for Anthony Bro; is that right? |
| 01:16PM | 15 | A.  It is. |
| 01:16PM | 16 | Q.  The defendant has a brother Anthony? |
| 01:16PM | 17 | A.  Anthony Gerace, correct. |
| 01:16PM | 18 | Q.  And during the search is entered into the -- withdrawn. |
| 01:16PM | 19 | During a search of Mr. Anthony Gerace's residence, there |
| 01:16PM | 20 | was a photo of a ledger entered into evidence as |
| 01:16PM | 21 | Exhibit 72A-55; is that right? |
| 01:16PM | 22 | A.  That's correct. |
| 01:16PM | 23 | Q.  And were there names on that sort of ledger photograph |
| 01:16PM | 24 | that overlapped with some of the contacts in the defendant's |
| 01:17PM | 25 | phone? |

01:17PM   1   A.  Yes, it was.

01:17PM   2   Q.  Okay.

01:17PM   3          **MR. TRIPI:**  We can take that down.

01:17PM   4          **BY MR. TRIPI:**

01:17PM   5   Q.  I just want to ask you a couple of questions about

01:17PM   6   RuthAnn Arida.

01:17PM   7   A.  Certainly.

01:17PM   8   Q.  You're aware that on June 26th, 2020, members of the FBI

01:17PM   9   task force working with you met and interviewed Ms. Arida; is

01:17PM  10   that right?

01:17PM  11   A.  That's correct.

01:17PM  12   Q.  After that, Ms. Arida was subpoenaed to testify before

01:17PM  13   the grand jury on September 17th, 2020?

01:17PM  14   A.  She was.

01:17PM  15   Q.  Is that grand jury located in this building?

01:17PM  16   A.  Yes, it's on the third floor.

01:17PM  17   Q.  And were you present to meet her in this building with

01:17PM  18   the AUSA who dealt with her in the grand jury?

01:17PM  19   A.  I was present.

01:17PM  20   Q.  Who was the AUSA who was dealing with her that day?

01:17PM  21   A.  Brendan Cullinane AUSA.

01:17PM  22   Q.  Okay.  And just to clarify, based on an exchange in court

01:17PM  23   here, was I present at all that day with Ms. Arida?

01:17PM  24   A.  Not that I recall.

01:18PM  25   Q.  All right.  You had some text messages with Katrina

USA v Gerace - Burns - Tripi/Direct - 12/17/24

01:18PM   1   Nigro; is that right?

01:18PM   2   A.   That's correct.

01:18PM   3   Q.   Did you and others independently investigate and meet

01:18PM   4   with any witnesses that she provided names of?

01:18PM   5   A.   Yeah, she identified a few individuals who she suggested

01:18PM   6   might be useful to --

01:18PM   7   Q.   Was one of them K.M.?

01:18PM   8   A.   One was, yes.

01:18PM   9   Q.   Did Ms. Nigro know her by, like, a dancer name, Maze?

01:18PM  10   A.   Yes.

01:18PM  11   Q.   Other texts from Ms. Nigro related to things that were

01:18PM  12   going on in her life generally speaking?

01:18PM  13   A.   Yeah.  She would text from time to time with things,

01:18PM  14   items like that.

01:18PM  15   Q.   As a human being, and a member of the community, do you

01:18PM  16   genuinely care about the health and wellness of witnesses who

01:18PM  17   you're interacting with?

01:18PM  18   A.   Yes.

01:18PM  19   Q.   Is there anything wrong with someone texting you about

01:18PM  20   what they're doing to improve themselves?

01:18PM  21   A.   Nothing at all.

01:18PM  22   Q.   If they give you an update on what they may be doing to

01:19PM  23   improve their life, do you ignore them?

01:19PM  24   A.   Not at all.

01:19PM  25   Q.   All right.  Special Agent Burns, during the course of

01:19PM   1   your trial prep in this case, did you work to develop some

01:19PM   2   charts that summarize some of the evidence the jury heard,

01:19PM   3   voluminous evidence and testimony that they heard over the

01:19PM   4   past two months of this trial?

01:19PM   5   A.   Yes.  I put together a chart of the voluminous testimony

01:19PM   6   and the voluminous amount of exhibits.

01:19PM   7   Q.   And generally, did you work with Homeland Security and

01:19PM   8   the U.S. Attorney's Office to create a chart pertaining to

01:19PM   9   the voluminous evidence this jury has heard over the course

01:19PM   10   of roughly two months?

01:19PM   11   A.   Yes, collaboratively we worked on it.

01:19PM   12   Q.   During the course of prep in this case, did you work to

01:19PM   13   work to develop that chart summarizing the evidence and the

01:19PM   14   testimony to create sort of a visual depiction that

01:19PM   15   categorizes exhibits and witnesses with events that are

01:19PM   16   relevant to this trial?

01:19PM   17   A.   Yes.  I built it out.  We started before the trial, and

01:20PM   18   then as the trial has gone on, I've audited it along the way.

01:20PM   19   Q.   Is that commonly referred to as a summary exhibit?

01:20PM   20   A.   Yes, it is.

01:20PM   21   Q.   Is that what you were preparing to try to summarize

01:20PM   22   what's been happening here?

01:20PM   23   A.   Yes.  Some way to organize the voluminous testimony and

01:20PM   24   exhibits in a case of this size.

01:20PM   25   Q.   Okay.  I'm going hand you up a big board marked as

01:20PM   1   Government Exhibit 555.  Do you see it?

01:20PM   2   A.   Yep.

01:20PM   3   Q.   I'm going to arrange the image so you can answer my

01:20PM   4   questions while looking at the exhibit while not displaying

01:20PM   5   it yet.  Okay?

01:20PM   6   A.   Correct.

01:20PM   7   Q.   Generally, can you tell -- tell us what Government

01:20PM   8   Exhibit 555 summarizes?

01:20PM   9   A.   It summarizes the certain events that are the testimony

01:20PM  10   and the exhibits relate to during the course of the

01:20PM  11   conspiracies, and it essentially ties them to the various

01:21PM  12   counts, overt acts, manners and means paragraphs from the

01:21PM  13   indictment.

01:21PM  14   Q.   And is it your understanding the indictment is something

01:21PM  15   the Court will read later on during its charge?

01:21PM  16   A.   That will go to the jury eventually.

01:21PM  17   Q.   Does this exhibit summarize voluminous testimony and

01:21PM  18   evidence and connections that exist between the defendant,

01:21PM  19   Pharaoh's, and different individuals whose names have come up

01:21PM  20   during trial and people who have testified?

01:21PM  21   A.   Yes.  And it relates to the events, certain events that

01:21PM  22   were discussed, and exhibits related to during the course of

01:21PM  23   the trial.

01:21PM  24   Q.   Is every connection or category between events and, sort

01:21PM  25   of, the evidence and the witnesses related to those events

01:21PM  1   based upon testimony and evidence that came in at this trial?

01:21PM  2   A.  Yes, everything that was entered.

01:21PM  3   Q.  How many different individuals are depicted in the chart?

01:22PM  4   A.  Individuals is, you mean, witnesses?

01:22PM  5   Q.  Yes.

01:22PM  6   A.  35.

01:22PM  7   Q.  Now, more than that testified, but not everyone is on the

01:22PM  8   chart; is that right?

01:22PM  9   A.  Correct.

01:22PM  10  Q.  Now in terms of the individuals depicted on the chart,

01:22PM  11  does that include 17 former Pharaoh's dancers?

01:22PM  12  A.  Yes, it does.

01:22PM  13  Q.  Does it include one former manager, C.B.?

01:22PM  14  A.  Yes, it does.

01:22PM  15  Q.  Does it include a former bouncer/manager, Doug

01:22PM  16  Augustyniak?

01:22PM  17  A.  It does.

01:22PM  18  Q.  Does it include four patrons:  John McDonald, Kevin

01:22PM  19  Myszka, Jeff Anzalone and Matthew Albert?

01:22PM  20  A.  Yes, it does.

01:22PM  21  Q.  Coming off of that, sort of linking to the charged

01:22PM  22  sex-trafficking conspiracy counts, is there a line for a

01:22PM  23  witness who testified as an expert, Rebecca Bender?

01:23PM  24  A.  Yes, there is.

01:23PM  25  Q.  Does the chart reference -- what is it, 39 exhibits

01:23PM   1   relating to the different counts and overt acts in an attempt

01:23PM   2   to create a visual depiction for the jury associating the

01:23PM   3   exhibits to events?

01:23PM   4   A.   Yes, 39 exhibits.

01:23PM   5   Q.   Now, as you sit there, are there at least 155 exhibits

01:23PM   6   that have been entered into evidence --

01:23PM   7   A.   Yes.

01:23PM   8   Q.   -- prior to your testimony?

01:23PM   9   A.   Yes, there is.

01:23PM   10   Q.   So not every exhibit is referenced on here?

01:23PM   11   A.   Correct.   I took some of the more pertinent ones to the

01:23PM   12   events.

01:23PM   13             **MR. FOTI:**   Objection.

01:23PM   14             **THE COURT:**   Yeah, sustained.   The jury will strike

01:23PM   15   that.

01:23PM   16             **BY MR. TRIPI:**

01:23PM   17   Q.   Was there an effort made to put enough information to

01:23PM   18   allow the jury to look at this summary exhibit and recall

01:23PM   19   items or occurrences for themselves?

01:24PM   20   A.   Yes.

01:24PM   21   Q.   Does Government Exhibit 555 fairly and accurately

01:24PM   22   summarize the testimony and evidence, and group it in an

01:24PM   23   effort to create a visual summary of the evidence that's come

01:24PM   24   in in the last two months of the trial?

01:24PM   25   A.   It does not summarize the testimony, but it does identify

01:24PM   1    the witnesses and the exhibits.

01:24PM   2    Q.   That was a poorly-phrased question.   It identifies the

01:24PM   3    witnesses so that the jury can recall testimony, and have a

01:24PM   4    visual depiction of the events to which their testimony would

01:24PM   5    have related; is that a better way to phrase that question?

01:24PM   6    A.   Yeah, I'm more comfortable with that.

01:24PM   7    Q.   Okay.   Sorry about that.

01:24PM   8         MR. TRIPI:   Judge, with that foundation, we offer

01:24PM   9    Government Exhibit 555 as an exhibit for the jury to have and

01:24PM  10    to reference as they deem appropriate.

01:24PM  11         MR. FOTI:   Judge, I'm not going to object.   I just --

01:24PM  12    there's a digital version of it that I'd like to be able to

01:24PM  13    use going forward.   So I'm okay with the admission of 555, I

01:24PM  14    would just ask that if they're admitting the demonstrative, I

01:25PM  15    would ask that we also be able to use the digital copy of it.

01:25PM  16         MR. TRIPI:   Yeah, I had planned to do that, Judge.

01:25PM  17    This is so they can take the large board back if they want to

01:25PM  18    use it, and I plan to use the technology.

01:25PM  19         THE COURT:   The digital one, and Mr. Foti will be

01:25PM  20    able to use the digital one as well?

01:25PM  21         MR. TRIPI:   Yes.

01:25PM  22         MR. FOTI:   Sounds good.

01:25PM  23         THE COURT:   With that, no objection?

01:25PM  24         MR. FOTI:   No objection.

01:25PM  25         THE COURT:   Received without objection.

01:25PM      1          **(GOV Exhibit 555 was received in evidence.)**

01:25PM      2          **MR. TRIPI:**  For now, can you put that up on the

01:25PM      3   tripod and --

01:25PM      4          Thank you, Your Honor.

01:25PM      5          Ms. Champoux, can you pull up the digital version of

01:25PM      6   555, please?

01:25PM      7          **BY MR. TRIPI:**

01:25PM      8   Q.  All right.  Special Agent Burns it looks a little small

01:25PM      9   on the screen, right?

01:25PM     10   A.  Put my glasses on, yes.

01:25PM     11   Q.  We're gonna work through it, and what I'd like to do is

01:25PM     12   just have you orient the jury to what's on here so that they

01:25PM     13   can use it if they deem appropriate when they're on their

01:25PM     14   own.

01:25PM     15   A.  Sure.

01:26PM     16          **MR. TRIPI:**  So, Ms. Champoux, what I'd like to do is

01:26PM     17   if we can kind of zoom in on the -- that half of it, maybe

01:26PM     18   from the green line that I wrote, down.  Just kind of trace

01:26PM     19   what I did there.  Or you've got to do a separate line?

01:26PM     20          **MS. CHAMPOUX:**  I'm going to have to go up a little

01:26PM     21   higher.

01:26PM     22          **BY MR. TRIPI:**

01:26PM     23   Q.  I'll work on the bottom half first.  Okay?

01:26PM     24   A.  Yep.

01:26PM     25   Q.  All right.  In the very middle, so we're looking at the

01:26PM   1   bottom half here, we have a photograph of Pharaoh's

01:26PM   2   Gentlemen's Club?

01:26PM   3   A.  Yes, we do.

01:26PM   4   Q.  Is that basically an image that you took from the

01:26PM   5   internet?

01:26PM   6   A.  Yeah, that's the main entrance.

01:26PM   7   Q.  But it's an accurate --

01:26PM   8   A.  Yes.

01:26PM   9   Q.  -- depiction of Pharaoh's; is that right?

01:26PM   10   A.  Yes, that's what it looks like.

01:26PM   11   Q.  So, right under that picture it says Pharaoh's

01:26PM   12   Gentlemen's Club, and then Counts 1, 3 and 4.  And then it

01:27PM   13   has certain overt acts that are referenced from Count 1; is

01:27PM   14   that correct?

01:27PM   15   A.  That's correct.

01:27PM   16   Q.  And what are the overt acts you're referencing there?

01:27PM   17   A.  35 and 36.

01:27PM   18   Q.  Now, below that, there's a box that says drug conspiracy,

01:27PM   19   maintaining Pharaoh's as a drug-involved premises.  What does

01:27PM   20   that indicate on the chart?

01:27PM   21   A.  That is Count 3 in the indictment.

01:27PM   22   Q.  Okay.  And Counts 1, 3, and 4 generally, and the judge

01:27PM   23   will go into more detail later, but is Count 1 a charged

01:27PM   24   conspiracy between Mr. Bongiovanni and Mr. Gerace to defraud

01:27PM   25   the United States; Count 3 a narcotics conspiracy; and

| | | |
|---|---|---|
| 01:27PM | 1 | Count 4 a charge of bribery? |
| 01:27PM | 2 | A.  Count 4, I believe, is a conspiracy to distribute |
| 01:27PM | 3 | narcotics. |
| 01:27PM | 4 | And Count 3 is the maintaining the drug premises. |
| 01:27PM | 5 | And Count 1 is the -- |
| 01:27PM | 6 | Q.  Oh, my fault? |
| 01:27PM | 7 | A.  -- conspiracy to defraud the United States government, or |
| 01:27PM | 8 | the United States. |
| 01:28PM | 9 | Q.  And then below that, you have certain exhibits that are |
| 01:28PM | 10 | delineated? |
| 01:28PM | 11 | A.  That's correct. |
| 01:28PM | 12 | Q.  And what are the descriptions of those exhibits? |
| 01:28PM | 13 | A.  Exhibit 240F is a photo of A.A. a/k/a Cherry. |
| 01:28PM | 14 | 240, I think that's -- |
| 01:28PM | 15 | Q.  L? |
| 01:28PM | 16 | A.  -- L, a photo of Darryl LaMont and Marcus Black. |
| 01:28PM | 17 | 345 is a photo of Marcus Black. |
| 01:28PM | 18 | And then we've got Exhibit 560, 561 562 are photos of the |
| 01:28PM | 19 | defendant and Jessica Leyland a/k/a Charm. |
| 01:28PM | 20 | Q.  And now at the bottom, there's a box that says witnesses |
| 01:28PM | 21 | to conduct at Pharaoh's Gentlemen's Club with a number of |
| 01:28PM | 22 | images with a number of images of generic males and females |
| 01:28PM | 23 | with names; is that right? |
| 01:28PM | 24 | A.  That's correct. |
| 01:28PM | 25 | Q.  Okay.  And what are -- just go through the names that are |

01:28PM    1    in that box of people.

01:28PM    2    A.  Matt Albert, K.A., A.A., Jeff Anzalone, A.A., C.B., A.B.,

01:29PM    3    J.C., A.G., E.H., C.H., P.H., Joseph Krywalski, L.L., K.L.,

01:29PM    4    John McDonald, K.M., Kevin Myszka, Katrina Nigro, A.P., G.R.,

01:29PM    5    J.Z., and R.W.

01:29PM    6    Q.  Are all of those women referenced in that box women who

01:29PM    7    were dancers at some point at Pharaoh's?  With the exception

01:29PM    8    of C.B. who was a manager?

01:29PM    9    A.  Yes, that's correct.

01:29PM   10    Q.  Are all the males referenced, with the exception of

01:29PM   11    Trooper Joseph Krywalski, individuals who were male patrons

01:29PM   12    or customers at Pharaoh's?

01:29PM   13    A.  That's correct.

01:29PM   14    Q.  And all of those people testified at this trial; is that

01:29PM   15    right?

01:29PM   16    A.  They did.

01:29PM   17    Q.  All right.  Now I want to move on to Count 5 coming off

01:29PM   18    of the Pharaoh's box.  And can you follow that along, and

01:29PM   19    explain what that is?

01:29PM   20    A.  Count 5 relates to the conspiracy to commit sex

01:30PM   21    trafficking from '09 to 2018, exhibits related to that, and

01:30PM   22    then connected also to the expert witness, Rebecca Bender.

01:30PM   23    Q.  Now, just to back just for a moment.  There's a line

01:30PM   24    flowing from Pharaoh's Gentlemen's Club to the box of

01:30PM   25    witnesses we talked about, right?

01:30PM    1    A.   Correct.

01:30PM    2    Q.   In terms of a visual depiction, is that an indication

01:30PM    3    that those witnesses relate to the conduct pertaining to

01:30PM    4    those counts and the drug conspiracy?

01:30PM    5    A.   That was what we were going for with that.

01:30PM    6    Q.   Okay.  Now, there's also a line coming from the Pharaoh's

01:30PM    7    box to a box that says conspiracy to commit sex trafficking.

01:30PM    8    And then there's a line that comes down that same box is

01:30PM    9    that, right?

01:30PM   10    A.   That's correct.

01:30PM   11    Q.   And just in terms of when the jury's looking at these

01:30PM   12    lines, can you explain why that flows that way as well?

01:30PM   13    A.   All right.  The conduct at Pharaoh's relates to the

01:31PM   14    charges as a drug conspiracy, and the maintaining of

01:31PM   15    Pharaoh's as a drug-involved premises, as well as the

01:31PM   16    Count 5, the conspiracy to commit sex trafficking.

01:31PM   17         So some exhibits I attached to the conspiracy, sex

01:31PM   18    trafficking, and some I tied more so to the narcotics

01:31PM   19    distribution and operating the drug premises.

01:31PM   20    Q.   And Count 1 is the conspiracy to defraud as well?

01:31PM   21    A.   Right.  The conspiracy to defraud the United States a

01:31PM   22    general conspiracy count.

01:31PM   23    Q.   So, does this visual depiction, was it your effort to aid

01:31PM   24    the jury to categorize witnesses and exhibits pertinent to

01:31PM   25    the charges in Counts 1, 3, 4, and 5?

01:31PM    1    A.  Yes, it was.

01:31PM    2    Q.  Okay.  And now I didn't finish explaining, there's

01:31PM    3    another line coming over to Rebecca Bender who's sort of by

01:31PM    4    herself.  What does that indicate?

01:31PM    5    A.  She essentially is an expert witness as it related to sex

01:32PM    6    trafficking.

01:32PM    7    Q.  Okay.  So, that's why there's a line between her and the

01:32PM    8    box for conspiracy to commit sex trafficking?

01:32PM    9    A.  That's correct.

01:32PM   10    Q.  Okay.  All right.  I think we can zoom out of that for

01:32PM   11    now.

01:32PM   12    A.  All right.  Mr. Tripi, I did want to --

01:32PM   13    Q.  I'm sorry, go through the exhibits.  I'm sorry about

01:32PM   14    that.  Can you explain the exhibits listed under --

01:32PM   15    A.  Yes.  The -- there's a photo of the hallway, upstairs at

01:32PM   16    Pharaoh's that we've seen numerous times throughout the

01:32PM   17    trial.  There's photos of the VIP rooms at Pharaoh's.

01:32PM   18    There's a photo of Darryl LaMont.  A photo of Darryl LaMont

01:32PM   19    Marcus Black.  And then they have their related exhibit

01:32PM   20    numbers, so you'll be able to marry those up.

01:32PM   21        A photo of John Michalski and Gerace, and I believe we

01:32PM   22    only have one of those in evidence at this point, Mr. Tripi?

01:32PM   23    Q.  Yes.  Exhibit 310AU-2, we didn't actually put into

01:33PM   24    evidence; is that right?

01:33PM   25    A.  That's correct.

01:33PM   1   Q.  So that one's not in evidence.

01:33PM   2   A.  Unless you want to display it to me right now.

01:33PM   3   Q.  Sure.  Is this another image that was contained in the

01:33PM   4   phone that Mr. Gerace had?

01:33PM   5   A.  Yes, it's from the phone extraction similar to another

01:33PM   6   picture.

01:33PM   7   Q.  Is that another photo that has Mr. Gerace and Judge

01:33PM   8   Michalski?

01:33PM   9   A.  Yes, as well as Attorney Anthony Cervi.

01:33PM  10   Q.  Is that a fair and accurate copy of an image that was in

01:33PM  11   the phone?

01:33PM  12   A.  It is.

01:33PM  13          **MR. TRIPI:**  I offer the exhibit, Your Honor.

01:33PM  14          **MR. FOTI:**  May I just see it, Judge?

01:33PM  15          No objection.

01:33PM  16          **THE COURT:**  Received without objection.

01:33PM  17          **(GOV Exhibit 310AU-2 was received in evidence.)**

01:33PM  18          **THE CLERK:**  What's the number, Mr. Tripi?

01:33PM  19          **MR. TRIPI:**  310AU-2.

01:33PM  20          **THE CLERK:**  Thank you.

01:33PM  21          **BY MR. TRIPI:**

01:33PM  22   Q.  Now that part of the chart is correct?

01:33PM  23   A.  That's correct.  Well, there's one other error, and it's

01:34PM  24   because of not my using my glasses.  But it's Joseph Barsuk

01:34PM  25   on the chart, but it's actually Barsuk.  I should have had my

01:34PM    1    glasses on when I edited the chart, and I noticed it when we

01:34PM    2    blew it up.

01:34PM    3    Q.   All right.  So you have a typo on the spelling of a name?

01:34PM    4    A.   Yeah, I should have worn my glasses.

01:34PM    5    Q.   All right.  So we have more exhibits that relate to that

01:34PM    6    conspiracy flowing down to towards the witness?

01:34PM    7    A.   That's correct.

01:34PM    8    Q.   And the jury can follow along with the number of the

01:34PM    9    exhibit and a very brief description of what the exhibit is;

01:34PM   10    is that --

01:34PM   11    A.   That's correct.

01:34PM   12         **MR. TRIPI:**  All right.  We can zoom out of that.

01:34PM   13         Can I now have you kind of get that part,

01:34PM   14    Ms. Champoux.

01:34PM   15         **BY MR. TRIPI:**

01:34PM   16    Q.   Okay.  So we just sort of handled the lower part of the

01:34PM   17    chart.

01:34PM   18      Next you have another picture in the middle, that's an

01:34PM   19    Exhibit 120 --

01:35PM   20    A.   -- 7.

01:35PM   21    Q.   -- 7; is that right?

01:35PM   22    A.   I believe that's 127, it's the cottage photo.

01:35PM   23    Q.   Okay.  And describe the lines coming off of there in that

01:35PM   24    direction.

01:35PM   25    A.   So the Count 1 is the conspiracy to defraud the United

01:35PM 1    States with overt act 17.  They relate to the 2005 Craig

01:35PM 2    Border DEA search warrant related to the photographs.

01:35PM 3        And then off of that line is the exhibit from the search

01:35PM 4    warrant at Mr. Border's then-residence back in 2005.  And

01:35PM 5    then it ties to the testimony of Ms. Arida and Mr. Border.

01:35PM 6    Q.  So overt act 17 relates to the incident regarding Craig

01:35PM 7    Border's search warrant and the photos pertaining to

01:35PM 8    Ms. Arida; is that right?

01:35PM 9    A.  That's correct.

01:35PM 10   Q.  The DEA report in evidence about that incident is

01:35PM 11   Exhibit 11A?

01:35PM 12   A.  Correct.

01:35PM 13   Q.  And the two witnesses who referenced it are Ms. Arida and

01:35PM 14   Mr. Border?

01:35PM 15   A.  That's accurate.

01:35PM 16   Q.  Is that how you read that line?

01:35PM 17   A.  That's exactly how you read it.

01:35PM 18   Q.  Let's go up again to the next one now.

01:35PM 19       Count 1, manner and means, paragraphs 4, 5, 7, 8, and

01:36PM 20   9 -- sorry, 8, 10, 11, 12?

01:36PM 21   A.  That's to defraud the United States, relates to

01:36PM 22   Bongiovanni cold approach of Gerace that DEA Special Agent

01:36PM 23   Chris Wisniewski testified, and then the related DEA records

01:36PM 24   that were introduced related.

01:36PM 25   Q.  So you have an indication for Chris Wisniewski being the

USA v Gerace - Burns - Tripi/Direct - 12/17/24
165

01:36PM   1   witness, Exhibits 30B, 30A, and Exhibit 437 relating to his

01:36PM   2   testimony, and a brief description of what the manner and

01:36PM   3   means paragraphs relate to in terms of that event.

01:36PM   4   A.  Yeah, the -- to the reports.

01:36PM   5   Q.  Okay.  Can we move up to -- and now Count 1 repeats

01:36PM   6   itself a number of times on the chart; is that right?

01:36PM   7   A.  Yeah, it's a conspiracy.

01:36PM   8   Q.  Okay.  And this one, this line flows from the photo,

01:36PM   9   Count 1, and it relates to overt acts 19, 20, 21, and 22; is

01:37PM   10   that --

01:37PM   11   A.  That's correct.

01:37PM   12   Q.  And what does the gray box mean?

01:37PM   13   A.  Relates to the 2009 U.S. Probation search of Pharaoh's,

01:37PM   14   and the FBI investigation of Gerace at that time that related

01:37PM   15   to the testimony of Tom Herbst, Dale Kasprzyk, and Peter

01:37PM   16   Lepiane.

01:37PM   17   Q.  Okay.  And so that's over here.  So if you follow the

01:37PM   18   line, those overt acts, that count, brief description of the

01:37PM   19   incident, the exhibits related to the incident, and then the

01:37PM   20   witnesses who testified about it?

01:37PM   21   A.  That's correct.

01:37PM   22        **MR. TRIPI:**  Okay.  And, all right.  Ms. Champoux, can

01:37PM   23   we zoom out, and can you get me maybe that part?

01:37PM   24        Okay.  Can you move it to the middle a little more?

01:37PM   25   Move it up a little.  Thank you.

01:38PM 1        **BY MR. TRIPI:**

01:38PM 2    Q.  All right.  So I want to work from the line going

01:38PM 3    straight up now, okay?

01:38PM 4    A.  Yep.

01:38PM 5    Q.  Can you explain that line, the counts, and overt acts it

01:38PM 6    relates to, the brief description, and the witnesses?

01:38PM 7    A.  Yes.  It's ties back to the picture of Bongiovanni.  It's

01:38PM 8    Count 1 in the conspiracy to commit -- or, conspiracy against

01:38PM 9    the United States, overt acts 26, 35, and then as well it

01:38PM 10   contains Count 2, which is the bribery count.

01:38PM 11   Q.  And I misspoke earlier, Count 2 is the bribery?

01:38PM 12   A.  Correct.

01:38PM 13   Q.  Okay.

01:38PM 14   A.  And then the approximately 2015 overdose at Pharaoh's,

01:38PM 15   and then witnesses that relate to that:  Doug Augustyniak,

01:38PM 16   Anthony Casullo, and Katrina Nigro.

01:38PM 17   Q.  And, again, if there were testimony from other witnesses

01:38PM 18   that also referenced overdoses, you didn't necessarily depict

01:38PM 19   every person who referenced an overdose in that box?

01:38PM 20   A.  Yeah.  We tried keep it so it was understandable and not

01:39PM 21   cluttered and useful.  It is not all encompassing of all the

01:39PM 22   evidence and exhibits at this trial.

01:39PM 23   Q.  For example if we zoom out, and if the jury were to look

01:39PM 24   at people in the box at the bottom, were there some witnesses

01:39PM 25   who referenced overdoses during their testimony?

01:39PM 1   A.  A number of them.

01:39PM 2   Q.  Okay.  Would one be K.M.?

01:39PM 3   A.  Absolutely.

01:39PM 4   Q.  So there was some effort made to group all the witnesses,

01:39PM 5   but the jury will have to work through it in the way they see

01:39PM 6   fit; is that right?

01:39PM 7   A.  Absolutely.  It's just something to aid --

01:39PM 8   Q.  Okay.

01:39PM 9   A.  -- the review, but not all encompassing of witnesses as

01:39PM 10  well as exhibits.

01:39PM 11       **MR. TRIPI:**  Can you get me zoomed back in,

01:39PM 12  Ms. Champoux?  Thank you.

01:39PM 13       **BY MR. TRIPI:**

01:39PM 14  Q.  All right.  Let's go through the next line that I've just

01:39PM 15  indicated.  Just going now, you know, clockwise, like 1:00

01:39PM 16  there.

01:39PM 17  A.  Again, it's relates to Count 1, overt acts 25, 26.  It's

01:40PM 18  2016 S.A. Anthony Casullo investigation of Gerace.  And then

01:40PM 19  there's a number of exhibits that relate to the event, as

01:40PM 20  well as Anthony Casullo's testimony, and he's identified at

01:40PM 21  the edge there.

01:40PM 22  Q.  Okay.  Can we work through the next line regarding

01:40PM 23  Count 1, overt act 27, and Count 2 as well as that way?

01:40PM 24  A.  Yep.  Count 1 is, again, our conspiracy.  That particular

01:40PM 25  event relates to overt act 27.

01:40PM   1    Count 2 is the bribery of a public official.  The event,

01:40PM   2    the 2017 Gerace voicemail to Bongiovanni regarding law

01:40PM   3    enforcement ability to ping a TracFone.  That exhibit is in

01:40PM   4    reference to 311, as well as the text message between Gerace

01:40PM   5    and Bongiovanni, page 42.  And it relates to testimony of

01:40PM   6    Curtis Ryan.

01:40PM   7    Q.  That's page 42 of Exhibit 310D, right?

01:41PM   8    A.  That's correct.

01:41PM   9    Q.  Okay.  And the witness who was going through those text

01:41PM  10    messages and that voicemail was Special Agent Ryan?

01:41PM  11    A.  That's correct.

01:41PM  12    Q.  All right.  Let's move down to this line here, what I've

01:41PM  13    just indicated, referencing Counts 1, 2, and overt acts 29,

01:41PM  14    30, and 31?

01:41PM  15    A.  Correct.  Those relate to the Bongiovanni memos regarding

01:41PM  16    his relationship with Gerace, submitted -- if you look, it's

01:41PM  17    Exhibit 97, 98, 99, those are the three memos authored by

01:41PM  18    Bongiovanni regarding his communication with Gerace, as well

01:41PM  19    as regarding Anthony Casullo.  Additionally, there was the

01:41PM  20    cottage photo.  Again 311, the voicemail from Gerace to

01:41PM  21    Bongiovanni.  Text messages, 310D, between Mr. Gerace and

01:41PM  22    Bongiovanni.  A call detail connection report, the Excel

01:41PM  23    spreadsheet calls between them.  And the Bongiovanni/Gerace

01:41PM  24    dinner photo in 2005, and then the group photo of Gerace and

01:42PM  25    Bongiovanni in Las Vegas 2011.  And, again, the witness who

01:42PM   1    introduced those was Curtis -- or, that relates to testimony

01:42PM   2    was Curtis Ryan.

01:42PM   3    Q.   Now if we work through some of these, for example,

01:42PM   4    cottage photo, P.H. also testified about that; is that right?

01:42PM   5    A.   Correct.

01:42PM   6    Q.   And the -- the call detail reports and the spreadsheets,

01:42PM   7    Greg Machin testified about those?

01:42PM   8    A.   Yeah, the data analyst.  Again, I just couldn't -- it

01:42PM   9    would be too cumbersome and cluttered.

01:42PM   10   Q.   I got you.  I'm just working through some of it.

01:42PM   11   A.   Yeah.

01:42PM   12   Q.   If you go to 426-1, a dinner photo, there was testimony

01:42PM   13   about that from M.U.; is that right?

01:42PM   14   A.   Yes, that's a photo, and Ms. R.A.

01:42PM   15   Q.   And then if we go to 490A, group photo in Las Vegas,

01:42PM   16   there was testimony about that from Tara Ostrowski; is that

01:42PM   17   right?

01:42PM   18   A.   That's correct.

01:42PM   19   Q.   So again, is that just giving you an idea of a witness,

01:42PM   20   not necessarily every witness that relates to an exhibit?

01:43PM   21   A.   That's correct.

01:43PM   22        **MR. TRIPI:**  Okay.  Can we zoom out of that.  And I'd

01:43PM   23   like to kind of zoom in on this part if we could, and finish

01:43PM   24   off the chart.

          25

01:43PM   1          **BY MR. TRIPI:**

01:43PM   2   Q.  Okay.  I think this is the last line we need to go

01:43PM   3   through.  If you could, please, walk the jury through the

01:43PM   4   line from the Pharaoh's box to Counts 6, 7, 8, and 9, please?

01:43PM   5   A.  Sure.  Counts 6, 7, 8 are witness tampering counts in the

01:43PM   6   indictment.

01:43PM   7       And 9 is a distribution of cocaine.

01:43PM   8       And they all relate to the event on or about 11/19/2019,

01:43PM   9   that was in the Luxor Lane residence.

01:43PM   10      The exhibits that relate to that are the photo -- the

01:43PM   11  front photo of Luxor Lane, Mr. Gerace's residence, and the

01:43PM   12  photos that -- from the basement which is 250A-30 and

01:43PM   13  250A-89, and then finally the Facebook messages from Crystal

01:43PM   14  Quinn to P.H.  And then the witnesses that relate to that are

01:44PM   15  C.C., P.H., and then Protected Witness 12.

01:44PM   16  Q.  For example, another example, Kevin Hughes is not on this

01:44PM   17  chart at all, but he was another witness who testified in

01:44PM   18  this case as well, correct?

01:44PM   19  A.  That's right.

01:44PM   20          **MR. TRIPI:**  Okay.  We can zoom out of that,

01:44PM   21  Ms. Champoux.

01:44PM   22          One moment, please, Your Honor.

01:44PM   23          No further direct.  Thank you, Judge.

01:44PM   24          **THE COURT:**  Mr. Foti?

01:44PM   25          **MR. FOTI:**  Yes, Judge.

| | | |
|---|---|---|
| 01:44PM | 1 | **CROSS-EXAMINATION BY MR. FOTI:** |
| 01:45PM | 2 | Q.  Good afternoon, sir. |
| 01:45PM | 3 | A.  Good afternoon, Mr. Foti.  How are you? |
| 01:45PM | 4 | Q.  Good, how are you? |
| 01:45PM | 5 | A.  Good, thanks. |
| 01:45PM | 6 | Q.  Okay.  So you got to move back to Buffalo, it was about |
| 01:45PM | 7 | 2008, right? |
| 01:45PM | 8 | A.  That's correct. |
| 01:45PM | 9 | Q.  And at that point, you're still concluding some of your |
| 01:45PM | 10 | responsibilities in regards to investigations that you still |
| 01:45PM | 11 | had? |
| 01:45PM | 12 | A.  I was residing here, but I was routinely going back to |
| 01:45PM | 13 | Memphis for a couple of years. |
| 01:45PM | 14 | Q.  You'd have to still give testimony in certain |
| 01:45PM | 15 | proceedings? |
| 01:46PM | 16 | A.  Yeah, there were some trials that were wrapping up and |
| 01:46PM | 17 | some sentencing hearings. |
| 01:46PM | 18 | Q.  So other than the fact that you were still traveling back |
| 01:46PM | 19 | to Tennessee to conclude your responsibilities over there, |
| 01:46PM | 20 | you were part of the Niagara Falls field office as of 2008, |
| 01:46PM | 21 | right? |
| 01:46PM | 22 | A.  That's correct, I was assigned there. |
| 01:46PM | 23 | Q.  Okay.  And at some point, you testified that Niagara |
| 01:46PM | 24 | Falls field office closed down based on population reduction |
| 01:46PM | 25 | and things like that? |

01:46PM   1   A.  That was my understanding, yeah.

01:46PM   2   Q.  And when did that happen?

01:46PM   3   A.  I think '11?  2011 or so.

01:46PM   4   Q.  So in 2009, you're not -- you're still in the Niagara

01:46PM   5   Falls field office at that time?

01:46PM   6   A.  That's correct.

01:46PM   7   Q.  And we heard testimony during this trial about the search

01:46PM   8   of Pharaoh's back in 2009, right?

01:46PM   9   A.  That's correct.

01:46PM  10   Q.  And you weren't involved in that in any way?

01:46PM  11   A.  No, I didn't learn about any of that until this case.

01:46PM  12   Q.  Okay.  And you when you say "this case," you're talking

01:46PM  13   about becoming involved in 2019 related to this?

01:46PM  14   A.  Correct, that's correct.

01:46PM  15   Q.  Okay.  So did you work with Tom Herbst at all back then

01:47PM  16   in 2009?

01:47PM  17   A.  I mean, I knew him.  I'd say hi, I was friendly.  We were

01:47PM  18   never partners, and I wasn't involved in the 2009 matter at

01:47PM  19   all.

01:47PM  20   Q.  Any investigation he was pursuing back then did not

01:47PM  21   involve you?

01:47PM  22   A.  Not at all.

01:47PM  23   Q.  Okay.  So you become involved in this investigation, or

01:47PM  24   at least a related investigation around 2019 about a decade

01:47PM  25   later, right?

USA v Gerace - Burns - Foti/Cross - 12/17/24

01:47PM   1   A.  Correct.

01:47PM   2   Q.  And you've testified yesterday and today about some of

01:47PM   3   the evidence that was presented during the course of the

01:47PM   4   trial, right?

01:47PM   5   A.  Yes, I did.

01:47PM   6   Q.  You also talked about certain pieces of evidence that the

01:47PM   7   jury hadn't heard about yet including text messages?

01:47PM   8   A.  That's correct.

01:47PM   9   Q.  And you talked about how during the course of your

01:47PM  10   investigation, you were involved in the collection of

01:47PM  11   evidence, correct?

01:47PM  12   A.  Some of it, yes.

01:47PM  13   Q.  We talked about the search warrant, for example?

01:48PM  14   A.  At Pharaoh's, you mean?  Or --

01:48PM  15   Q.  There was multiple search warrants executed, right?

01:48PM  16   A.  Yes, correct, I was at three of them.

01:48PM  17   Q.  And you were involved in discussions that led up to the

01:48PM  18   execution of those search warrants, correct?

01:48PM  19   A.  That's correct.

01:48PM  20   Q.  Including the search warrant at Pharaoh's, right?

01:48PM  21   A.  Yes, that's correct.

01:48PM  22   Q.  And you were aware of which members of law enforcement

01:48PM  23   would be at each of these searches, correct?

01:48PM  24   A.  Generally, yes.

01:48PM  25   Q.  And you were at, at least, the search of Pharaoh's

01:48PM  1   yourself, right?

01:48PM  2   A.  I was physically present.

01:48PM  3   Q.  And in each of -- and we're gonna talk a little bit more

01:48PM  4   about search warrants, but in each of these situations,

01:48PM  5   evidence was being collected to assist in the investigation,

01:48PM  6   correct?

01:48PM  7   A.  That's correct.

01:48PM  8   Q.  Okay.  And you are also part of the prosecution team,

01:48PM  9   you're the case agent, right?

01:48PM  10  A.  From the FBI side, yes.

01:48PM  11  Q.  So, you're one of the two case agents?  That was no

01:48PM  12  disrespect to agent to Special Agent Halliday.

01:48PM  13  A.  No, none taken I'm sure.

01:48PM  14  Q.  So that makes you a little bit different than the other

01:49PM  15  witnesses who testified in this trial in respect to you being

01:49PM  16  present during the course of the trial, correct?

01:49PM  17  A.  That's correct.

01:49PM  18  Q.  And you understand what a sequestration order is?

01:49PM  19  A.  Yeah, I've been sequestered before during trials.

01:49PM  20  Q.  And that is that witnesses can't sit in and see what

01:49PM  21  other witnesses have to say during the course of a trial,

01:49PM  22  right?

01:49PM  23  A.  Correct.

01:49PM  24  Q.  In your instance, because of your role as the case agent,

01:49PM  25  you sat through all the witness testimony, right?

USA v Gerace - Burns - Foti/Cross - 12/17/24

01:49PM  1    A.  Yeah, we're authorized to sit throughout the trial.

01:49PM  2    Q.  And you've -- and you have assisted throughout the trial

01:49PM  3    in helping the government locate exhibits and have witnesses

01:49PM  4    ready to go?

01:49PM  5    A.  Absolutely.

01:49PM  6    Q.  You played a very significant role in terms of both

01:49PM  7    getting witnesses to court, as well as scheduling witness?

01:49PM  8    A.  Yes, right.  A lot of work.

01:49PM  9    Q.  Okay.  Even before this trial, you were involved in

01:49PM  10   discussions related to who the potential witnesses would be

01:49PM  11   at trial, correct?

01:50PM  12   A.  Yeah.  Kind of collectively look at the witnesses.

01:50PM  13   Q.  And it obviously wasn't -- there was no final decision

01:50PM  14   left to you as to who witnesses were going to be called?

01:50PM  15   A.  No.

01:50PM  16   Q.  You were just part of the team discussion, right?

01:50PM  17   A.  Yeah, that's accurate.

01:50PM  18   Q.  And you were part of -- you were part of discussions as

01:50PM  19   to who would be placed on the government witness list?

01:50PM  20   A.  Yes, I was part of those discussions.

01:50PM  21   Q.  And -- and obviously you understand the government's not

01:50PM  22   obligated to call everybody that's placed on a witness list?

01:50PM  23   A.  Correct.

01:50PM  24   Q.  That's just a list of individuals the government

01:50PM  25   anticipates it may consider calling, right?

01:50PM   1    A.  Yeah, that's accurate.

01:50PM   2    Q.  And you were involved in discussions as to who should be

01:50PM   3    on that specific list, right?

01:50PM   4    A.  Yes, I was.

01:50PM   5    Q.  And you were part of discussions as to who should be

01:50PM   6    called as an actual witness at trial?

01:50PM   7              **MR. TRIPI:**  Objection.  Objection.

01:50PM   8              **THE COURT:**  Basis?

01:50PM   9              **MR. TRIPI:**  I'd like to argue further at the bench if

01:50PM  10    necessary, but 401 and 403 is the anchor of it, Judge.

01:51PM  11              **THE COURT:**  Come on up.

01:51PM  12              (Sidebar discussion held on the record.)

01:51PM  13              **MR. TRIPI:**  So, Judge, I think we're straying into an

01:51PM  14    area where you're gonna instruct the jury on the elements of

01:51PM  15    the proof, and that specific law enforcement techniques, I

01:51PM  16    think you're going to instruct them, are -- are -- are --

01:51PM  17    are -- and essentially we've briefed that a trial is not a

01:51PM  18    trial of the government.

01:51PM  19              So these questions are to stray into why certain

01:51PM  20    people were called and certain people weren't, and that's --

01:51PM  21              **THE COURT:**  He hasn't asked that yet.

01:51PM  22              **MR. TRIPI:**  That's where we're going, so I want to

01:51PM  23    preview the objection further, because we're going to be going

01:51PM  24    there.  And that's -- those are not proper questions, you

01:51PM  25    know, for anybody.  Like, the defendant, it creates an issue

USA v Gerace - Burns - Foti/Cross - 12/17/24

01:51PM  1   within an issue.

01:51PM  2          **THE COURT:**  I agree with that, but I don't see

01:51PM  3   anything objectionable yet.

01:51PM  4          **MR. FOTI:**  I think in most instances that's true.  I

01:52PM  5   am going -- I do intend to try to explore this area in part

01:52PM  6   because the direct has went through and asked about did you

01:52PM  7   interview this person in relation to the investigation, did

01:52PM  8   you interview this person in relation to the investigation.  I

01:52PM  9   may be wrong, but I interpreted it that there was at least an

01:52PM  10  inference that these people, particularly the ones who are

01:52PM  11  deceased, provided favorable information.  I want to explore

01:52PM  12  the fact that there was interviews that go beyond just the

01:52PM  13  ones the government's mentioned, and that a number of these

01:52PM  14  people, including former dancers, a decision was made not to

01:52PM  15  call them as witnesses.

01:52PM  16         **MR. TRIPI:**  But it's -- I think that's not accurate.

01:52PM  17  Respectfully, there were several people, there were objections

01:52PM  18  being made when I was going through the text threads about

01:52PM  19  who's, like, interpreting them.  So in order to link up that

01:52PM  20  it was a person relevant to Pharaoh's, I asked if that person

01:52PM  21  was interviewed, and were they essentially connected to

01:52PM  22  Pharaoh's.  That's as far as I went.  I was trying to

01:52PM  23  contextualize those text messages.

01:52PM  24         **THE COURT:**  And you can ask those same questions

01:53PM  25  about whether people were interviewed, and you can argue to

01:53PM   1   the jury people were interviewed and not called.

01:53PM   2           **MR. FOTI:**  That's not -- I'm not trying to, through

01:53PM   3   my questions, insinuate anything beyond that.  That would be

01:53PM   4   argument later on about that -- that not right now, that's not

01:53PM   5   exact time.

01:53PM   6           **THE COURT:**  But I don't see how you can -- you can't

01:53PM   7   ask him and a decision was not made to call this a witness.

01:53PM   8           **MR. TRIPI:**  Correct.

01:53PM   9           **THE COURT:**  I think you can say that witness didn't

01:53PM  10   testify.

01:53PM  11           **MR. FOTI:**  Fair enough.

01:53PM  12           **THE COURT:**  But I don't think you can link it to the

01:53PM  13   government's decision, because I don't think that's at issue.

01:53PM  14   But you can ask did you interview this person, and that person

01:53PM  15   wasn't called to testify --

01:53PM  16           **MR. FOTI:**  Yeah.

01:53PM  17           **THE COURT:**  -- then you can certainly argue that to

01:53PM  18   them.  I think it's a waste of time because obviously they

01:53PM  19   weren't called.

01:53PM  20           **MR. COOPER:**  I would just ask for one additional kind

01:53PM  21   of boundary with respect to the questions which is I don't

01:53PM  22   think it's appropriate to get into the fact that there's a

01:53PM  23   government witness list that included more people than we

01:53PM  24   called.  That's outside of this jury's purview.

01:53PM  25           Their job is to decide the case based upon the

01:54PM   1   evidence that they heard in the courtroom.

01:54PM   2        If Mark wants to point out that those people didn't

01:54PM   3   testify, that's fine.  I agree with the Court.

01:54PM   4        But suggesting that they were previously on our list

01:54PM   5   is inappropriate to bring in front of a jury.

01:54PM   6        **MR. TRIPI:**  Because, one example, Cindy Moore.

01:54PM   7   Someone's dying.  Like, there are decisions that are made that

01:54PM   8   have nothing to do with --

01:54PM   9        **THE COURT:**  I understand.  No, no, I agree with you.

01:54PM  10        **MR. FOTI:**  I thought I asked the question that's --

01:54PM  11   that's acceptable.  I didn't think I tried to insinuate that

01:54PM  12   you have to pick -- you have to call everybody you put on a

01:54PM  13   witness list.

01:54PM  14        **MR. COOPER:**  No, but I think even talking about the

01:54PM  15   witness list is objectionable.

01:54PM  16        **THE COURT:**  Right.  I don't think you can ask was so

01:54PM  17   and so on the witness list and not called.  I don't think --

01:54PM  18        **MR. FOTI:**  I don't.

01:54PM  19        **THE COURT:**  -- I don't think the jury gets to know

01:54PM  20   that somebody was on a witness list.  Did you interview this

01:54PM  21   person?  Yes.  That person you didn't call.  Next question.

01:54PM  22        **MR. FOTI:**  That's it.  I don't intend to --

01:54PM  23        (End of sidebar discussion.)

01:54PM  24        **THE COURT:**  Okay.  The objection is overruled.

01:54PM  25        Go ahead, next question.

| | | |
|---|---|---|
| 01:54PM | 1 | **BY MR. FOTI:** |
| 01:55PM | 2 | Q.  Okay.  Sir, the jury's heard from certain witnesses, some |
| 01:55PM | 3 | of which are listed on the chart you prepared, correct? |
| 01:55PM | 4 | A.  That's correct. |
| 01:55PM | 5 | Q.  And during direct examination, you talked about a number |
| 01:55PM | 6 | of individuals that you interviewed, either you or other |
| 01:55PM | 7 | agents interviewed, that did not testify, correct? |
| 01:55PM | 8 | A.  That is correct. |
| 01:55PM | 9 | Q.  Okay.  And I think it's established through the questions |
| 01:55PM | 10 | on direct that you agree that obviously every person that you |
| 01:55PM | 11 | interviewed was not somebody who ultimately testified at this |
| 01:55PM | 12 | trial? |
| 01:55PM | 13 | A.  No, definitely. |
| 01:55PM | 14 | Q.  You interviewed a number of people to determine whether |
| 01:55PM | 15 | they would be somebody that you would be interested in, or |
| 01:55PM | 16 | whether the government would potentially be interested in |
| 01:55PM | 17 | eliciting the information that they -- |
| 01:55PM | 18 | **MR. TRIPI:**  Objection. |
| 01:55PM | 19 | **THE COURT:**  Overruled. |
| 01:55PM | 20 | **BY MR. FOTI:** |
| 01:55PM | 21 | Q.  You interviewed a number of people to determine what |
| 01:55PM | 22 | information they would provide, correct? |
| 01:56PM | 23 | A.  That, I think, I'm comfortable answering that.  Yeah, we |
| 01:56PM | 24 | interviewed people to gather information. |
| 01:56PM | 25 | Q.  And when you -- when you interviewed people and they |

USA v Gerace - Burns - Foti/Cross - 12/17/24

01:56PM   1   provided you information, that's information you would share

01:56PM   2   with other members of the investigative team?

01:56PM   3   A.  Yeah, we create reports and --

01:56PM   4   Q.  And those things are considered in the context of your

01:56PM   5   investigation, as well as whether they're viable witnesses,

01:56PM   6   correct?

01:56PM   7   A.  Yeah, it goes into the calculus.

01:56PM   8   Q.  Okay.  You did not conduct each one of these interviews

01:56PM   9   yourself personally, correct?

01:56PM   10  A.  No, I did not.  A number of agents and TFOs assist.

01:56PM   11  Q.  Do you remember during the course of this trial there was

01:56PM   12  some -- there's been a number of questions that we posed, and

01:56PM   13  then there was some back and forth about how many agents were

01:56PM   14  involved in this investigation?  It's come up a few times?

01:56PM   15  A.  Yes, especially during Agent Ryan's testimony.

01:56PM   16  Q.  Okay.  So, you have a better memory than me.

01:56PM   17      I'm going to go through and just ask you about a number

01:57PM   18  of individuals and whether they were involved in the

01:57PM   19  investigation, okay?

01:57PM   20  A.  Yep.

01:57PM   21  Q.  As I do this, I'm going to butcher some of your

01:57PM   22  colleague's names, so apologies to them in advance.

01:57PM   23  A.  I guess my one question I would have is about context,

01:57PM   24  or --

01:57PM   25  Q.  I'm asking at this point generally whether they were

| 01:57PM | 1 | involved in any interviews, or any involvement in the |
| 01:57PM | 2 | investigation at all.  And then I may ask for more specific |
| 01:57PM | 3 | details. |
| 01:57PM | 4 | A.  Okay.  Yep. |
| 01:57PM | 5 | Q.  Okay?  And if you don't recall -- |
| 01:57PM | 6 | A.  Absolutely. |
| 01:57PM | 7 | Q.  -- for some reason, let me know. |
| 01:57PM | 8 | A.  Yep. |
| 01:57PM | 9 | Q.  Adam Penna? |
| 01:57PM | 10 | A.  Yes. |
| 01:57PM | 11 | Q.  Andrea Sciolino? |
| 01:57PM | 12 | A.  Yes.  Close. |
| 01:57PM | 13 | Q.  That's the first of many.  Andrew Clark? |
| 01:57PM | 14 | A.  Andy Clark, yes, I believe he did some interviews. |
| 01:57PM | 15 | Q.  Anthony Butera? |
| 01:57PM | 16 | A.  Yes. |
| 01:57PM | 17 | Q.  Carly Smaldino? |
| 01:57PM | 18 | A.  Yes. |
| 01:57PM | 19 | Q.  Christopher Gabrielle. |
| 01:57PM | 20 | A.  I'm sorry, read it again?  The name, please. |
| 01:57PM | 21 | Q.  Christopher Gabrielle. |
| 01:58PM | 22 | A.  Can I see a document to refresh my memory? |
| 01:58PM | 23 | Q.  I'll come back to it.  Daniel Rales? |
| 01:58PM | 24 | A.  Some of these might be HSI folks. |
| 01:58PM | 25 | Q.  Okay.  So if it's -- if it's somebody from the FBI, |

01:58PM   1   you'll recognize it?

01:58PM   2   A.  Right.  And a number of HSI folks, but I think those two

01:58PM   3   names I don't recognize.

01:58PM   4   Q.  Okay.  Do you -- was there a -- during the course of the

01:58PM   5   trial, the name or Michelle Sercu has come up, hasn't it?

01:58PM   6   A.  It has.

01:58PM   7   Q.  And that is somebody you understood worked at Pharaoh's?

01:58PM   8   A.  Yes.  I believe she -- was she a bartender, possibly?

01:58PM   9   Q.  She was interviewed back in 2019; is that right?

01:58PM  10   A.  Or was she a cleaner?  I'd have to see the report to --

01:58PM  11   to refresh my memory.

01:58PM  12   Q.  Okay.  Do you have any memory of whether she was

01:58PM  13   interviewed or not?

01:58PM  14   A.  I believe she was.

01:58PM  15   Q.  About December of 2019; does that sound right?

01:58PM  16   A.  It might have been the day of the search at Pharaoh's,

01:58PM  17   but I'd have to see the report to really feel comfortable.

01:59PM  18   Q.  Okay.  Daniel Bradels?

01:59PM  19   A.  As in agent?

01:59PM  20   Q.  Yeah.  Is that somebody who was involved?

01:59PM  21   A.  Daniel --

01:59PM  22   Q.  Bradels?  No?

01:59PM  23   A.  No.  I think it's an HSI folk or person.

01:59PM  24   Q.  Dennis Horrigan?

01:59PM  25   A.  I think that's an HSI person.  We have a Tom Horrigan.

USA v Gerace - Burns - Foti/Cross - 12/17/24

| | | |
|---|---|---|
| 01:59PM | 1 | Q.  Gary Jensen? |
| 01:59PM | 2 | A.  Yes, that was one of my partners. |
| 01:59PM | 3 | Q.  Geraldo Rondon? |
| 01:59PM | 4 | A.  Yeah, Geraldo Rondon. |
| 01:59PM | 5 | Q.  Ian Languidine? |
| 01:59PM | 6 | A.  Yes.  Don't feel bad.  I worked with him for two years |
| 01:59PM | 7 | and I still can't pronounce it. |
| 01:59PM | 8 | Q.  Jacqueline Coyne? |
| 01:59PM | 9 | A.  Yes. |
| 01:59PM | 10 | Q.  Jason Kammeraad? |
| 01:59PM | 11 | A.  Yes. |
| 01:59PM | 12 | Q.  Sean Dion? |
| 01:59PM | 13 | A.  I don't know that name. |
| 01:59PM | 14 | Q.  Joseph Spidone? |
| 01:59PM | 15 | A.  Yep, I know Joe Spidone. |
| 01:59PM | 16 | Q.  Keith Bender? |
| 01:59PM | 17 | A.  Yes. |
| 01:59PM | 18 | Q.  Cody Hughes? |
| 02:00PM | 19 | A.  Yep. |
| 02:00PM | 20 | Q.  Luke Humphrey? |
| 02:00PM | 21 | A.  Yes. |
| 02:00PM | 22 | Q.  Ralph Joseph? |
| 02:00PM | 23 | A.  Yes. |
| 02:00PM | 24 | Q.  Rebecca Gworek? |
| 02:00PM | 25 | A.  Yes. |

02:00PM    1    Q.  Richard Cawthorn?

02:00PM    2    A.  Cawthard, yes.

02:00PM    3    Q.  Sean Kelley?

02:00PM    4    A.  Yes.

02:00PM    5    Q.  Steven Olowitnik?

02:00PM    6    A.  He might be a task force officer.

02:00PM    7    Q.  Thomas Darcy?

02:00PM    8    A.  Yes, he's a task force officer.

02:00PM    9    Q.  Thomas Mozg?

02:00PM    10   A.  Mozg, yep.

02:00PM    11   Q.  William Forsythe?

02:00PM    12   A.  Yes.  I'm familiar with Agent Forsythe.

02:00PM    13   Q.  Thomas Callinan?

02:00PM    14   A.  His involvement related to the '09 interviews, so it was

02:00PM    15   before my, kind of like you talked about, whatever was

02:00PM    16   happening in '09.

02:00PM    17   Q.  Everybody I mentioned before him are individuals that

02:00PM    18   had -- that you recognize the names for, are individuals that

02:01PM    19   had some involvement post 2019?

02:01PM    20   A.  Yes.  Correct.

02:01PM    21   Q.  And then Tom Callinan, the point you're making is he had

02:01PM    22   some involvement in the investigation back in '09?

02:01PM    23   A.  Yeah.  He interviewed G.R. and K.L. and worked with Tom

02:01PM    24   Herbst back then.

02:01PM    25   Q.  Right.  And we talked about that a little bit throughout

USA v Gerace - Burns - Foti/Cross - 12/17/24

186

02:01PM  1   the trial, that he had talked to K.L. back in '09?

02:01PM  2   A.  Correct.

02:01PM  3   Q.  And then visited her in the jail in '12?

02:01PM  4   A.  That's correct.

02:01PM  5   Q.  Okay.  And then Special Agent Marilyn Halliday and

02:01PM  6   yourself are the two case agents who have been sitting in the

02:01PM  7   courtroom, correct?

02:01PM  8   A.  That's correct.

02:01PM  9   Q.  And there's other agents who are involved besides the

02:01PM  10  ones that I've named so far?

02:01PM  11  A.  Yeah, when we have a search warrant, we have extra bodies

02:01PM  12  for that sort of thing.

02:01PM  13  Q.  So, back in Curtis Ryan's testimony, when there was some

02:01PM  14  dispute about the number, we can agree that at least in terms

02:01PM  15  of interviews, there's been dozens of agents involved in

02:01PM  16  this, correct?

02:01PM  17  A.  I guess -- some I'd put some context on that in the sense

02:01PM  18  that there's been -- it was a priority case, but there's also

02:02PM  19  been a lot of related investigations, spin-offs, and

02:02PM  20  different matters that kind of tie back to this case.  But

02:02PM  21  there's multiple cases in one.  So I just wanted to kind of

02:02PM  22  put that out there.

02:02PM  23  Q.  Okay.  All right.  Now, you have talked about on direct,

02:02PM  24  and I just asked you a little while ago about individuals who

02:02PM  25  were interviewed but ultimately did not testify at this

02:02PM    1    trial, right?

02:02PM    2    A.  I'm sorry, what was the question?

02:02PM    3    Q.  There were multiple individuals who were interviewed, but

02:02PM    4    did not testify at this trial, correct?

02:02PM    5    A.  Yes, that's correct.

02:02PM    6    Q.  And some of those people include former employees of

02:02PM    7    Pharaoh's, correct?

02:02PM    8    A.  That's correct.

02:02PM    9    Q.  Some of them include former dancers, correct?

02:02PM   10    A.  That's correct.

02:02PM   11    Q.  And we talked about one former employee that was

02:02PM   12    interviewed was Michelle Sercu, correct?

02:02PM   13    A.  Correct.  And I think she was interviewed, I feel pretty

02:02PM   14    comfortable, if I read the report, it's been a long, long

02:02PM   15    time.

02:03PM   16    Q.  Danielle Pericak was interviewed in July of 2020,

02:03PM   17    correct?

02:03PM   18    A.  She -- yes.  I don't that interview, but I know she was

02:03PM   19    interviewed.  I can't say for certain a date, but --

02:03PM   20    Q.  You're aware that she was interviewed by other agents?

02:03PM   21    A.  That is correct.

02:03PM   22    Q.  Okay.  And her name came up during L.L.'s testimony

02:03PM   23    yesterday, correct?

02:03PM   24    A.  Correct.

02:03PM   25    Q.  She was the one that, it was said, had given drugs to the

02:03PM    1    dancer at some point early in her tenure?

02:03PM    2    A.  I believe that's what she testified to.

02:03PM    3    Q.  Okay.  That was somebody that -- that individual,

02:03PM    4    Danielle Pericak, is somebody that you had interviewed

02:03PM    5    before, correct?

02:03PM    6    A.  Yes.  Not me personally, but I know she was interviewed.

02:03PM    7    Q.  That agents interviewed?

02:03PM    8    A.  That's correct.

02:03PM    9    Q.  And she did not testify at this trial, correct?

02:03PM   10    A.  She did not.

02:03PM   11    Q.  Megan Stabler is another -- another former dancer whose

02:03PM   12    name has come up during the course of this trial, correct?

02:04PM   13    A.  Stabler, yes.

02:04PM   14    Q.  She was interviewed in July of 2020 by other agents,

02:04PM   15    correct?

02:04PM   16    A.  Yes.  I don't know about the date, but I know she was

02:04PM   17    interviewed.

02:04PM   18    Q.  You know at some point during the investigation she was

02:04PM   19    interviewed as well?

02:04PM   20    A.  Correct.

02:04PM   21    Q.  And ultimately following that interview, a decision was

02:04PM   22    made that -- not to have her testify at this trial?

02:04PM   23            **MR. TRIPI:**  Objection.

02:04PM   24            **THE COURT:**  Sustained.  You can ask that question.

02:04PM   25    Sustained to the form of the question.

|           |    |                                                           |
|-----------|----|-----------------------------------------------------------|
| 02:04PM   | 1  | **BY MR. FOTI:**                                          |
| 02:04PM   | 2  | Q.  Megan Stabler was talked about during the course of this |
| 02:04PM   | 3  | trial, right?                                             |
| 02:04PM   | 4  | A.  She was, by a number of witnesses, correct.          |
| 02:04PM   | 5  | Q.  She did not testify, correct?                        |
| 02:04PM   | 6  | A.  She did not.                                         |
| 02:04PM   | 7  | Q.  Another name we heard during the course of this trial was |
| 02:04PM   | 8  | DJ Robert Reed?                                          |
| 02:04PM   | 9  | A.  That's correct.                                      |
| 02:04PM   | 10 | Q.  Also an employee of Pharaoh's Gentlemen's Club?      |
| 02:04PM   | 11 | A.  That is correct.                                     |
| 02:04PM   | 12 | Q.  And he was interviewed in February of 23rd of 2021, |
| 02:04PM   | 13 | correct?                                                 |
| 02:04PM   | 14 | A.  I interviewed him.                                   |
| 02:04PM   | 15 | Q.  You were one of at least two agents that interviewed him? |
| 02:05PM   | 16 | A.  Myself and Agent Kammeraad interviewed him, yes.    |
| 02:05PM   | 17 | Q.  Yes.  So he was interviewed.  In this case, it was   |
| 02:05PM   | 18 | actually by you, you were present at this interview?     |
| 02:05PM   | 19 | A.  Yes, I remember it.                                  |
| 02:05PM   | 20 | Q.  And he's been talked about throughout this trial?    |
| 02:05PM   | 21 | A.  He has.                                              |
| 02:05PM   | 22 | Q.  There was at least one picture put in evidence depicting |
| 02:05PM   | 23 | him, correct?                                            |
| 02:05PM   | 24 | A.  Yes, there was.                                      |
| 02:05PM   | 25 | Q.  And you had spoken to him a couple years ago, right? |

| | | |
|---|---|---|
| 02:05PM | 1 | A.  Yes, I did. |
| 02:05PM | 2 | Q.  And he did not testify, correct? |
| 02:05PM | 3 | A.  He did not testify. |
| 02:05PM | 4 | Q.  Another name we have heard throughout this trial that's |
| 02:05PM | 5 | not an employee of Pharaoh's is Russell Salvatore, his name |
| 02:05PM | 6 | has come up a few times, correct? |
| 02:05PM | 7 | A.  Yes, it has. |
| 02:05PM | 8 | Q.  And this, I believe, is another individual that you had |
| 02:05PM | 9 | personally interviewed, correct? |
| 02:05PM | 10 | A.  Yes, I remember. |
| 02:05PM | 11 | Q.  This was in January of 2021? |
| 02:05PM | 12 | A.  That sounds right.  I'll take your word for it. |
| 02:05PM | 13 | Q.  He's the owner of Russell's, right? |
| 02:05PM | 14 | A.  He is. |
| 02:05PM | 15 | Q.  And we saw a picture of Mr. Gerace and other individuals |
| 02:06PM | 16 | in the kitchen at some point at Russell's, right? |
| 02:06PM | 17 | A.  That's correct. |
| 02:06PM | 18 | Q.  No pictures of Mr. Gerace and Russell Salvatore entered |
| 02:06PM | 19 | throughout this trial, correct? |
| 02:06PM | 20 | A.  Not during this trial. |
| 02:06PM | 21 | Q.  And in terms of your interview of Mr. Salvatore, that was |
| 02:06PM | 22 | done at least with one other agent? |
| 02:06PM | 23 | A.  That was also with Jason Kammeraad.  Agent Kammeraad. |
| 02:06PM | 24 | Q.  And he did not testify at this trial? |
| 02:06PM | 25 | A.  He did not. |

02:06PM   1   Q.  Angela Dingledey is another dancer at Pharaoh's that

02:06PM   2   you're familiar with, correct?

02:06PM   3   A.  Yes, I am.

02:06PM   4   Q.  You are familiar with the fact that she was interviewed

02:06PM   5   at some point in 2023, correct?

02:06PM   6   A.  Yes, I remember her interview, I didn't conduct it, but I

02:06PM   7   remember.

02:06PM   8   Q.  You were not present in the interview, but you remember

02:06PM   9   that she was interviewed by other agents?

02:06PM  10   A.  Yes, I do.

02:06PM  11   Q.  And her name I think has come up during the course of

02:07PM  12   this trial.

02:07PM  13   A.  A couple times, I believe.  Or text messages maybe.

02:07PM  14   Q.  She didn't testify here today, correct?

02:07PM  15   A.  She did not.

02:07PM  16   Q.  Now on direct, there was questions about attempting to

02:07PM  17   find dancers and interview dancers, and you had testified

02:07PM  18   that there was challenges in locating some of the dancers,

02:07PM  19   right?

02:07PM  20   A.  Yes, definitely.

02:07PM  21   Q.  And one of the reasons you said there were challenges was

02:07PM  22   because some of them danced with their stage name, correct?

02:07PM  23   A.  Right.  Yeah.  Other witnesses would say you should

02:07PM  24   really interview somebody, but all they had was a dancer

02:07PM  25   name, so --

02:07PM    1    Q. So when you talked about having to follow up on leads

02:07PM    2    regarding dancer names, those were names being given to you

02:07PM    3    by other potential witnesses?

02:08PM    4    A. Yeah. It's a -- yeah, and there was also -- there's a

02:08PM    5    phone -- we got a lot of leads out of John Ermin's phone. He

02:08PM    6    had a lot of the dancer names in there, so we got a lot of

02:08PM    7    leads out of that.

02:08PM    8    Q. When you conducted the search at Pharaoh's, there was

02:08PM    9    also personnel records that were seized, correct?

02:08PM    10    A. I'm sorry, I missed that.

02:08PM    11    Q. During the search of Pharaoh's in December 2019, there

02:08PM    12    were personnel records seized, correct?

02:08PM    13    A. Personnel records, correct.

02:08PM    14    Q. That included applications for -- there was an

02:08PM    15    employment, sort of, introductory form?

02:08PM    16    A. Correct.

02:08PM    17    Q. There was tax-related forms, 1099 forms, correct?

02:08PM    18    A. Correct. I skimmed those. I'm not as familiar with

02:08PM    19    them. But you did trigger my memory, I think those were

02:08PM    20    utilized, too, to sometimes help identify the dancers,

02:08PM    21    because I think they designated their stage names on some of

02:08PM    22    those documents.

02:08PM    23    Q. So you did have employment documentation at least as to a

02:08PM    24    number of employees who had worked at Pharaoh's based on what

02:08PM    25    was seized during the search?

02:08PM  1   A.  Yeah, some of them.  I don't think every one was in

02:09PM  2   there.

02:09PM  3   Q.  I don't know if her name's come up, but there was a

02:09PM  4   dancer named A.C. who was interviewed, correct?  In 2023?

02:09PM  5   A.  A.C.?  I don't remember it offhand.  It certainly is

02:09PM  6   possible.  If you give me a report, it might refresh my

02:09PM  7   memory.

02:09PM  8   Q.  A.N. was a dancer.  She was a dancer that was interviewed

02:09PM  9   last year, correct?

02:09PM  10  A.  That sounds familiar.

02:09PM  11  Q.  She didn't testify at the trial, correct?

02:09PM  12  A.  There was an A.N., did not.

02:09PM  13  Q.  A.C. also didn't testify at this trial, correct?

02:09PM  14  A.  That's correct.

02:09PM  15  Q.  We heard a lot about Jessica Leyland, and she was

02:09PM  16  interviewed by law enforcement at some point, correct?

02:09PM  17  A.  Pursuant to a proffer.

02:09PM  18  Q.  Right.  And that's -- that happened in November of last

02:10PM  19  year, correct?

02:10PM  20  A.  Correct.

02:10PM  21  Q.  She did not testify at this trial, correct?

02:10PM  22  A.  She did not.

02:10PM  23  Q.  I think we attempted his last name earlier, and we

02:10PM  24  referred to him as Nick the manager, Nick Ciechelski?

02:10PM  25  A.  Yes.

| | | |
|---|---|---|
| 02:10PM | 1 | Q.  Right?  He's a former manager at Pharaoh's, correct? |
| 02:10PM | 2 | A.  That's right. |
| 02:10PM | 3 | Q.  And he was also interviewed in September of 2023, |
| 02:10PM | 4 | correct? |
| 02:10PM | 5 | A.  He was interviewed not by myself, but he was interviewed. |
| 02:10PM | 6 | Q.  And he did not testify, correct? |
| 02:10PM | 7 | A.  He did not testify. |
| 02:10PM | 8 | Q.  There's phone records between him and Mr. Gerace that |
| 02:10PM | 9 | were -- |
| 02:10PM | 10 | MR. TRIPI:  Judge, I have an objection to this |
| 02:10PM | 11 | continued line, if we can come up again. |
| 02:10PM | 12 | THE COURT:  Come on up. |
| 02:10PM | 13 | (Sidebar discussion held on the record.) |
| 02:10PM | 14 | MR. TRIPI:  So, I -- I fail to see the relevance much |
| 02:10PM | 15 | less the 403 confusion of the issues of every person on earth. |
| 02:11PM | 16 | They had 200 people on their witness list.  They knew who |
| 02:11PM | 17 | these people are.  This is an exercise, no matter what he |
| 02:11PM | 18 | says, of trying to put the government on trial.  It's |
| 02:11PM | 19 | improper.  It's improper. |
| 02:11PM | 20 | If he wants to get up on summation and say you heard |
| 02:11PM | 21 | no evidence from X person, that's one thing.  But to sit and |
| 02:11PM | 22 | go through 200 names when they have the full ability to call |
| 02:11PM | 23 | whoever the hell they want, it's not proper. |
| 02:11PM | 24 | I've never seen this done in my life to this extent, |
| 02:11PM | 25 | and I don't think it's proper.  I think there's a reason for |

02:11PM  1    it.

02:11PM  2         THE COURT:  Maybe.  I disagree with you.  I think

02:11PM  3    it's getting a little tedious, and I think you're going to

02:11PM  4    start losing the jury.

02:11PM  5         But I think the point is that the government had a

02:11PM  6    whole lot of people that weren't called as witnesses, and the

02:11PM  7    argument can be made those people probably had good things to

02:11PM  8    say about Mr. Gerace.

02:11PM  9         MR. TRIPI:  See, I don't think the latter.  There's

02:11PM  10   zero evidence to support the latter, because a lot of them

02:11PM  11   said not nice things about Mr. Gerace, and we still --

02:11PM  12        THE COURT:  And you can argue -- he can argue that to

02:12PM  13   the jury.  He can say to the jury you should presume.  Why

02:12PM  14   can't he say that?

02:12PM  15        MR. TRIPI:  And then we get up on rebuttal and we say

02:12PM  16   it's our burden, but they have a right to call witnesses.

02:12PM  17        THE COURT:  No, you can't say that.

02:12PM  18        MR. TRIPI:  I've done that before, I've briefed it.

02:12PM  19        THE COURT:  I'd like to see it.

02:12PM  20        MR. TRIPI:  Absolutely.  I will do that, then,

02:12PM  21   because I intend to do that.

02:12PM  22        THE COURT:  Let's keep going.  Are you gonna --

02:12PM  23   you're not going to finish today.

02:12PM  24        MR. TRIPI:  Judge, real quick on that last point,

02:12PM  25   just to -- just to finish the point, when they get up there

02:12PM   1   and argue missing witnesses and this is and that, there is

02:12PM   2   strong law, and I will get it for you before I try to do this,

02:12PM   3   but there is strong law that has invited comment that we can

02:12PM   4   rebut with -- you always couch it first by saying the burden

02:12PM   5   is ours, we embrace that burden.

02:12PM   6           THE COURT:  If you've got law, let me look at it.  If

02:12PM   7   you've got law, I'll look at it.  Let's get going, please.

02:12PM   8           (End of sidebar discussion.)

02:12PM   9           THE COURT:  Okay, we're gonna take a short break,

02:12PM  10   folks.  Please remember my instructions about not discussing

02:12PM  11   the case with each other or anyone else, and not making up

02:13PM  12   your mind.  See you back here in about ten or 15 minutes.

02:13PM  13           (Jury excused at 2:13 p.m.)

02:13PM  14           THE COURT:  Okay.  Anything before we break?

02:13PM  15           MR. COOPER:  I guess just a -- I heard the Court ask

02:13PM  16   Mr. Foti a question before we walked down here about

02:13PM  17   scheduling.  We have an hour, even when we get back from the

02:13PM  18   break, an hour left before the 3:30 charge conference.  I

02:13PM  19   didn't hear Mark answer.

02:13PM  20           THE COURT:  He said no, he's not gonna finish.

02:14PM  21           MR. FOTI:  I don't think so, no.  I might, but I

02:14PM  22   don't think so.

02:14PM  23           MR. COOPER:  The 3:30 stop was for the charge

02:14PM  24   conference, not for a juror?

02:14PM  25           THE COURT:  No, it was because of a juror, right?

02:14PM  1          **MR. COOPER:**  I'm asking, I'm not --

02:14PM  2          **THE CLERK:**  Yes, that is correct.

02:14PM  3          **THE COURT:**  It's for a juror.

02:14PM  4          **MR. COOPER:**  Oh, it is for a juror?

02:14PM  5          **THE COURT:**  And if we don't finish, it's Mr. Tripi's

02:14PM  6  own fault.  I mean, that direct went on for an awful long

02:14PM  7  time.  And so if we don't finish, we don't finish.  But that's

02:14PM  8  not put on the defense, and I'm not going to hurry Mr. Foti.

02:14PM  9          **MR. COOPER:**  I'm not -- I wasn't blaming him.  All I

02:14PM  10  was doing was asking about scheduling because we have,

02:14PM  11  obviously, big things to follow when the resting happens.

02:14PM  12          **THE COURT:**  I understand.  So --

02:14PM  13          **MR. COOPER:**  I'm not casting aspersions on Mark.

02:14PM  14          **THE COURT:**  So if you don't finish, what are we gonna

02:14PM  15  do?

02:14PM  16          **MR. FOTI:**  Well, I think we can still have the charge

02:14PM  17  conference.

02:14PM  18          **THE COURT:**  Yeah.

02:14PM  19          **MR. FOTI:**  We -- we obviously have Rule 29, nobody's

02:14PM  20  surprised that we're gonna make motion arguments at the end of

02:14PM  21  proof.  We won't have spoken to Mr. Gerace yet.

02:14PM  22          I guess -- I haven't conferred with Mr. Soehnlein,

02:15PM  23  but I guess my request would be that we do the original plan

02:15PM  24  of either we are calling our witnesses tomorrow no matter what

02:15PM  25  after we finish the Rule 29, or if not, then we close Thursday

02:15PM    1    and we go back to the charge on Friday.

02:15PM    2            **THE COURT:**  Okay.  Fine.  That's what we'll do.

02:15PM    3            **THE CLERK:**  All rise.

02:15PM    4            (Off the record at 2:15 p.m.)

02:27PM    5            (Back on the record at 2:27 p.m.)

02:27PM    6            (Jury not present.)

02:27PM    7            **THE CLERK:**  All rise.

02:27PM    8            **THE COURT:**  Please be seated.

02:27PM    9            **THE CLERK:**  We are back on the record for the

02:27PM   10    continuation of the jury trial in case numbers 19-cr-227 and

02:28PM   11    23-cr-37, United States of America versus Peter Gerace Jr.

02:28PM   12            All counsel and parties are present.

02:28PM   13            **THE COURT:**  Okay.  Anything before we bring them

02:28PM   14    back?

02:28PM   15            **MR. COOPER:**  Just because we might not get a break

02:28PM   16    before you send the jury home, Brian just mentioned to me he

02:28PM   17    has a medical appointment at 8:30 tomorrow morning.  He

02:28PM   18    expects he would be able to be here at the latest at 9:30

02:28PM   19    tomorrow morning.  Is that okay?  Instead of a 9 a.m. start,

02:28PM   20    would you be okay with a 9:30 start tomorrow since he's --

02:28PM   21            **THE COURT:**  Sure.  As long as we're -- we're not

02:28PM   22    going to sum up tomorrow, so sure.

02:28PM   23            **MR. COOPER:**  Yeah.  Exactly.  In light of that,

02:28PM   24    that's why I was asking.

02:28PM   25            **THE COURT:**  Fine.  Anything we need to do before we

02:28PM   1    resume?

02:28PM   2               **MR. FOTI:**  No.

02:28PM   3               **THE COURT:**  Let's bring them back, please.

02:29PM   4               (Jury seated at 2:29 p.m.)

02:29PM   5               **THE COURT:**  The record will reflect that all our

02:30PM   6    jurors are present.

02:30PM   7               I remind the witness he's still under oath.

02:30PM   8               Mr. Foti, you may continue.

02:30PM   9               **MR. FOTI:**  Thank you, Judge.

02:30PM   10              **BY MR. FOTI:**

02:30PM   11   Q.  Okay.  So to fast forward a little bit, instead of just

02:30PM   12   going through individual names, is it fair to say there were

02:30PM   13   other people dancered -- sorry, other people interviewed

02:30PM   14   besides those I just mentioned?

02:30PM   15   A.  Definitely.

02:30PM   16   Q.  There were other dancers who were interviewed besides the

02:30PM   17   ones I just mentioned?

02:30PM   18   A.  Yes, there were.

02:30PM   19   Q.  Other managers who were interviewed besides those I just

02:30PM   20   mentioned?

02:30PM   21   A.  Yes, there were.

02:30PM   22   Q.  Okay.  And -- and other than the individuals you --

02:30PM   23   that -- that the jury heard from during testimony that you

02:30PM   24   included in your chart, nobody else -- well, withdrawn.

02:30PM   25   Scrap that.

USA v Gerace - Burns - Foti/Cross - 12/17/24

200

02:30PM    1     When you created the chart that -- there's a large,

02:31PM    2    enlarged cardboard copy of over there, you attempted to

02:31PM    3    include every individual who provided substantive

02:31PM    4    observations of what occurred inside Pharaoh's, correct?

02:31PM    5    A.  That testified in this trial.

02:31PM    6    Q.  In this trial.

02:31PM    7    A.  Correct.

02:31PM    8    Q.  And you didn't include individuals that you had

02:31PM    9    interviewed that did not testify, correct?

02:31PM   10    A.  I -- it would only be stuff that was in the courtroom.  I

02:31PM   11    mean, that was the goal of the chart.

02:31PM   12    Q.  Right.  This is a summary exhibit that's based on just

02:31PM   13    what happened in this trial?

02:31PM   14    A.  Correct.

02:31PM   15    Q.  And so obviously, a summary exhibit is not going to

02:31PM   16    include the names of the individuals I just asked you about,

02:31PM   17    correct?

02:31PM   18    A.  That's correct.

02:31PM   19    Q.  It doesn't include the names of the dancers who were

02:31PM   20    interviewed but did not testify, correct?

02:31PM   21    A.  That's correct.

02:31PM   22    Q.  It does not include the names of any managers that you

02:31PM   23    interviewed that did not testify, correct?

02:31PM   24    A.  That's correct.

02:31PM   25    Q.  All right.

02:31PM    1         **MR. FOTI:**  Can we pull up an electronic copy of 555,

02:31PM    2    Government Exhibit 555, please.

02:31PM    3         **BY MR. FOTI:**

02:32PM    4    Q.  Okay.  So this is an electronic version of the summary

02:32PM    5    chart?

02:32PM    6    A.  That's correct.

02:32PM    7    Q.  It's the same thing as what's on the cardboard, but it's

02:32PM    8    on the TV screen for us, right?

02:32PM    9    A.  That's correct.

02:32PM    10   Q.  Okay.  You, in preparing this chart, you included the

02:32PM    11   names of individuals who testified, correct?

02:32PM    12   A.  Yes, I did.

02:32PM    13   Q.  You listed exhibits, correct?

02:32PM    14   A.  Some of the exhibits, yes.

02:32PM    15   Q.  Some of the exhibits that you found to be relevant to a

02:32PM    16   particular topic, correct?

02:32PM    17   A.  Correct.

02:32PM    18   Q.  And you listed certain areas to categorize those exhibits

02:32PM    19   and witnesses, correct?

02:32PM    20   A.  Correct.

02:32PM    21   Q.  Okay.  Now this exhibit doesn't get into the substance

02:32PM    22   of -- other than the association with certain topics, it

02:32PM    23   doesn't get into the substance of these witnesses' testimony,

02:32PM    24   correct?

02:32PM    25   A.  No.  That -- that wasn't -- no, I did not want to

02:33PM  1   interpret witnesses' testimony on the chart.

02:33PM  2   Q.  So in terms of this summary exhibit, it doesn't give any

02:33PM  3   indication of which one of these witnesses were fired from

02:33PM  4   Pharaoh's, correct?

02:33PM  5   A.  I'm sorry, can you repeat the question?

02:33PM  6   Q.  The summary exhibit doesn't give any indication which

02:33PM  7   ones of these witnesses were fired from Pharaoh's, correct?

02:33PM  8   A.  Correct.

02:33PM  9   Q.  It doesn't give any indication of which ones of these

02:33PM  10  witnesses communicated to you that they have a bias against

02:33PM  11  Mr. Gerace, correct?

02:33PM  12  A.  Which -- there's no -- there's nothing related to

02:33PM  13  their -- the chart doesn't have anything related to their

02:33PM  14  testimony.

02:33PM  15  Q.  So, no, there's nothing on the chart that indicates which

02:33PM  16  one of these witnesses communicated to law enforcement that

02:33PM  17  they have a bias against Mr. Gerace, correct?

02:33PM  18  A.  Correct.

02:33PM  19  Q.  There's nothing on this chart that indicates which ones

02:33PM  20  of these witnesses have charges pending currently, correct?

02:33PM  21  A.  Correct.

02:33PM  22  Q.  There's nothing on this witness list -- or, I'm sorry, on

02:34PM  23  this summary exhibit that indicates which ones of these

02:34PM  24  witnesses had charges pending during the course of the

02:34PM  25  investigation, correct?

USA v Gerace - Burns - Foti/Cross - 12/17/24

203

02:34PM 1   A.   Correct.

02:34PM 2   Q.   This list does not indicate which ones of these witnesses

02:34PM 3   received some sort of financial benefit, correct?

02:34PM 4   A.   Some of the ones we paid expenses for, no.

02:34PM 5   Q.   Or a dollar value associated with the benefits, or -- or

02:34PM 6   the expenses?

02:34PM 7   A.   Correct.

02:34PM 8   Q.   Now, during the course of the trial, some of these

02:34PM 9   witnesses were asked about expenses that were paid for them,

02:34PM 10  correct?

02:34PM 11  A.   That's correct.

02:34PM 12  Q.   And specifically, there is one witness over here in the

02:34PM 13  corner that was called in to testify as an expert witness,

02:34PM 14  that was Rebecca Bender, correct?

02:34PM 15  A.   That's correct.

02:34PM 16  Q.   And during her testimony, it came out that she was being

02:34PM 17  paid an hourly rate to testify, correct?

02:34PM 18  A.   That's correct.

02:34PM 19  Q.   And after -- after she concluded her testimony, she sent

02:35PM 20  an invoice for her testimony, correct?

02:35PM 21  A.   I believe she did.

02:35PM 22  Q.   Okay.  And did you -- you understand that the total

02:35PM 23  expenses and the total invoice was $8,7555?

02:35PM 24  A.   I didn't see the invoice.  I think I heard that, a number

02:35PM 25  around there.  Or, I heard about the invoice, but I wouldn't

02:35PM    1    feel comfortable saying the exact number just because I

02:35PM    2    didn't see the invoice.

02:35PM    3    Q.   Okay.  But you were aware that that was sent after her

02:35PM    4    testimony was done?

02:35PM    5    A.   I believe, yeah, again, remember hearing about that.

02:35PM    6    Q.   And even if you're not sure what the specific amount is,

02:35PM    7    the number I just gave you of close to $9,000, that's

02:35PM    8    somewhere consistent with what you had heard?

02:35PM    9    A.   Somewhat, yeah.  It was -- I wasn't part of that.  I

02:35PM    10   remember hearing it.

02:35PM    11   Q.   Understood.

02:35PM    12        **MR. TRIPI:**  Mr. Foti, if you want to give me the

02:35PM    13   document, I'll stipulate to the number.  I just don't have it

02:35PM    14   handy.

02:35PM    15        **MR. FOTI:**  It's, yeah.

02:35PM    16        **MR. TRIPI:**  If you're interested in that, sir.

02:36PM    17        He's going to read a number into the record, Judge,

02:36PM    18   and the government will stipulate.

02:36PM    19        **MR. FOTI:**  So I'm reading in a total on the invoice

02:36PM    20   from Rebecca Bender, and the total invoice is $8,755.98.

02:36PM    21        **MR. TRIPI:**  We stipulate, Judge.

02:36PM    22        **THE COURT:**  Okay.

02:36PM    23        **BY MR. FOTI:**

02:36PM    24   Q.   All right.  Nothing about the summary chart that

02:36PM    25   references her hourly rate, or what her expenses or what her

02:36PM     1    invoice was, correct?

02:36PM     2    A.   No.

02:36PM     3    Q.   This summary chart summarizing the case does not include

02:36PM     4    any inconsistencies that any of these witnesses gave in their

02:36PM     5    testimony with prior testimony, correct?

02:36PM     6    A.   That doesn't encompass any sort of testimony or any kind

02:36PM     7    of interpretations of testimony either from the grand jury or

02:36PM     8    the trial.

02:37PM     9    Q.   So there's nothing on this exhibit that identifies which

02:37PM    10    ones of these witnesses were impeached throughout the trial,

02:37PM    11    correct?

02:37PM    12    A.   Correct.

02:37PM    13    Q.   Okay.  And when I say "impeached," you know I mean they

02:37PM    14    were confronted with prior sworn statements that were

02:37PM    15    different, right?

02:37PM    16    A.   During cross-examination.

02:37PM    17    Q.   Yeah, or direct in this case, right?

02:37PM    18    A.   Correct.

02:37PM    19    Q.   There was a couple direct examination witnesses that were

02:37PM    20    impeached, right?

02:37PM    21    A.   I believe so.

02:37PM    22    Q.   Nothing in this chart references if any of these

02:37PM    23    witnesses gave testimony inconsistent with prior statements

02:37PM    24    they gave to law enforcement, correct?

02:37PM    25    A.   Correct.

02:37PM  1   Q.  And nothing in this chart indicates whether any of these

02:37PM  2   witnesses, during the course of their testimony, gave answers

02:37PM  3   that were inconsistent with the testimony of other witnesses,

02:37PM  4   correct?

02:37PM  5   A.  Correct.

02:37PM  6   Q.  All right.  So, I'm going to --

02:38PM  7       **MR. FOTI:**  Ms. Champoux, can we zoom in on the

02:38PM  8   witnesses to conduct at Pharaoh's Gentlemen's Club section?

02:38PM  9   My fat fingers can't do it unless we make it a little bigger.

02:38PM  10  Okay.

02:38PM  11      **BY MR. FOTI:**

02:38PM  12  Q.  Now we heard from L.L. -- I've never been able to

02:38PM  13  pronounce her last name, it's one more I butcher, but L.L.?

02:38PM  14  A.  L.L., I believe.

02:38PM  15  Q.  Yeah, okay.  Good.  I'm glad we both have problems there.

02:38PM  16      She's the one who testified and just finished up

02:38PM  17  yesterday, correct?

02:38PM  18  A.  That's correct.

02:38PM  19  Q.  Okay.  I've just circled her name, and I circled A.A.

02:38PM  20      You recall during her testimony she was testifying about

02:38PM  21  sex acts that she engaged in with A.A., correct?

02:38PM  22  A.  I recall that.

02:38PM  23      **MR. TRIPI:**  Judge, I'm going to have an objection to

02:39PM  24  the next set of questions in this line.  If he's going to

02:39PM  25  refer to specific testimony I don't think it's appropriate,

02:39PM     1    that's the jury's domain.

02:39PM     2              **THE COURT:**  Hang on.

02:39PM     3              **MR. TRIPI:**  It's hearsay.

02:39PM     4              **THE COURT:**  Well, I don't know what the line is going

02:39PM     5    to be, so to the extent that there's an objection to the last

02:39PM     6    question, you recall during her testimony she was testifying

02:39PM     7    about sex acts she engaged in, that's overruled.

02:39PM     8              Next question.

02:39PM     9              **BY MR. FOTI:**

02:39PM    10    Q.  You recall that testimony, right?

02:39PM    11    A.  I do.

02:39PM    12    Q.  Okay.  And you recall that she testified about engaging

02:40PM    13    in those sex acts with A.A., correct?

02:40PM    14    A.  I recall that.

02:40PM    15    Q.  Okay.  Now, A.A. is one of the witnesses on your summary

02:40PM    16    exhibit, she testified at this trial, correct?

02:40PM    17    A.  She did.

02:40PM    18    Q.  Okay.  And you recall that A.A. indicated she never met

02:40PM    19    Peter Gerace, correct?

02:40PM    20              **MR. TRIPI:**  Objection.  Again this is -- this is what

02:40PM    21    I was talking about, Judge.  This is for the jury to -- we're

02:40PM    22    violating the domain of the jury.  We're going beyond the

02:40PM    23    summary chart.  We're interpreting testimony through a

02:40PM    24    witness.  That's the jury's function.

02:40PM    25              **THE COURT:**  Are you asking whether she testified to

02:40PM    1    that at this trial?

02:40PM    2    **MR. FOTI:** Yes. It was an in-court statement.

02:40PM    3    **THE COURT:** I mean, that is for the jury to recall,

02:40PM    4    right? Why is whether this witness thinks that she testified

02:40PM    5    to that or not relevant?

02:40PM    6    **MR. FOTI:** Well, I -- Judge, as we go through the

02:40PM    7    exhibit -- well, should we approach, I guess?

02:40PM    8    **THE COURT:** Yeah, come on up.

02:41PM    9    (Sidebar discussion held on the record.)

02:41PM    10    **THE COURT:** Are you doing this to impeach him on the

02:41PM    11    exhibit?

02:41PM    12    **MR. FOTI:** I'm not, no, I'm not. I'm not doing that.

02:41PM    13    But he's a summary witness. And, candidly, I just

02:41PM    14    told Joe a little while ago I've never crossed a summary

02:41PM    15    witness before. But my understanding is that they're here to

02:41PM    16    highlight certain pieces of the trial that are relevant for

02:41PM    17    the jury's consideration. And to the extent that there

02:41PM    18    isn't -- I'm not talking about a minor inconsistency, I'm

02:41PM    19    asking didn't A.A. indicate that she had never met Peter

02:41PM    20    before. That's not encroaching on the jury's --

02:41PM    21    **THE COURT:** Well --

02:41PM    22    **MR. TRIPI:** I'm sorry, Judge.

02:41PM    23    **THE COURT:** -- it may be unless you tie it to the

02:41PM    24    exhibit.

     25

02:41PM   1        **MR. FOTI:**  Right.

02:41PM   2        **THE COURT:**  If you're using this to impeach him on

02:41PM   3    the exhibit that he put together, that's one thing.

02:41PM   4        But to ask him, she didn't -- she -- she testified

02:41PM   5    inconsistently with another witness, that alone, I think

02:41PM   6    that's an argument for the jury, that's something for the jury

02:41PM   7    to remember.  Whether he thinks she did or not is irrelevant.

02:42PM   8        If it's relevant to his preparation of the chart in

02:42PM   9    some way --

02:42PM   10       **MR. FOTI:**  Right.

02:42PM   11       **THE COURT:**  -- then I think you can get to that.

02:42PM   12       **MR. FOTI:**  Right.

02:42PM   13       **THE COURT:**  Only in --

02:42PM   14       **MR. TRIPI:**  And, Judge, I think it cannot by

02:42PM   15    definition of what testimony we have so far be relevant to the

02:42PM   16    chart, because he summarized no testimony.  So it's not like

02:42PM   17    he picked and choosed things to include and things he didn't.

02:42PM   18    He gives a visual depiction --

02:42PM   19       **THE COURT:**  I would not sustain an objection.

02:42PM   20       **MR. COOPER:**  Judge, in the last point, on this in

02:42PM   21    Bongiovanni 2, and I know it was a different trial, but it was

02:42PM   22    the exact same scenario.

02:42PM   23       When I was on direct, I had what I considered to be a

02:42PM   24    wonderful direct examination, asking Special Agent Burns did

02:42PM   25    you hear so-and-so testify, and you sustained about -- and I'm

02:42PM    1    not criticizing the Court, but you sustained about a dozen

02:42PM    2    objections in a row because of hearsay.  The objection was

02:42PM    3    hearsay, and you said Special Agent Burns can't say I heard

02:42PM    4    so-and-so testify to X in court.  You prevented me from doing

02:42PM    5    it.

02:42PM    6         **THE COURT:**  I don't remember that being a hearsay

02:42PM    7    objection, but it may very well be a hearsay objection.  But

02:43PM    8    the point is that unless you can tie it into the exhibit or

02:43PM    9    tie it into impeaching him in some way, it doesn't come in.

02:43PM    10        **MR. TRIPI:**  But, Judge, can I ask one more thing?

02:43PM    11   Because this devolves then into a circular thing where then I

02:43PM    12   get up and I redo my redirect of those witnesses through this

02:43PM    13   witness, didn't -- but didn't they say these consistent

02:43PM    14   things.  And I just think it's a path that is not proper.

02:43PM    15        **THE COURT:**  I agree.  And it's not something we're

02:43PM    16   gonna go down unless there is a specific way to tie it into

02:43PM    17   the exhibit.

02:43PM    18             That's all I'm saying.  Let's go.

02:43PM    19             (Sidebar discussion held on the record.)

02:43PM    20        **BY MR. FOTI:**

02:44PM    21   Q.  Okay.  I'm going to withdraw the question I asked.

02:44PM    22        What I do want to just ask a couple quick more follow-up

02:44PM    23   questions while this is still on the screen.

02:44PM    24        In terms of your summary exhibit, sir, you -- there's a

02:44PM    25   heading here.  These are witnesses to conduct at Pharaoh's

USA v Gerace - Burns - Foti/Cross - 12/17/24

02:44PM   1   Gentlemen's Club -- I think that's supposed to say club,

02:44PM   2   but --

02:44PM   3   A.   Oh, another typo, sorry.

02:44PM   4   Q.   That's okay.

02:44PM   5   A.   Yes.

02:44PM   6   Q.   Nobody does more of them than me, so I won't hold it

02:44PM   7   against you.

02:44PM   8       But this is witnesses to conduct, that's what you were

02:44PM   9   trying to convey with regard to these witnesses, correct?

02:44PM   10  A.   Yeah.   We were very careful, when I was, to not interpret

02:44PM   11  the testimony.   I thought that was neutral enough and generic

02:44PM   12  enough that it wasn't interpreting testimony.   So that's why

02:44PM   13  I came up with that header.

02:44PM   14  Q.   And when you say you're not trying to interpret the

02:44PM   15  testimony, you didn't include any commentary in regards to

02:45PM   16  what any of these individuals testified about, correct?

02:45PM   17  A.   Correct.

02:45PM   18  Q.   You didn't include any of the things that I asked about

02:45PM   19  earlier in regard to whether they had been impeached during

02:45PM   20  the course of the trial, correct?

02:45PM   21  A.   Correct.

02:45PM   22  Q.   And when you say witnesses to conduct, you understand

02:45PM   23  that some of these witnesses gave different answers in terms

02:45PM   24  of what conduct they witnessed, correct?

02:45PM   25  A.   What -- to what conduct they witnessed?   Yes.

02:45PM   1    Q.  Okay.

02:45PM   2         **MR. FOTI:**  Okay.  We can take that down.  Thank you,

02:45PM   3    Ms. Champoux.

02:45PM   4         Can we pull up Government Exhibit 490E as in

02:45PM   5    elephant.

02:45PM   6         **MS. CHAMPOUX:**  There is no 490E as in elephant.

02:45PM   7         **MR. FOTI:**  I'm sorry, B as in boy.  Okay.  And can we

02:46PM   8    zoom in on the -- yep.

02:46PM   9         **BY MR. FOTI:**

02:46PM  10    Q.  All right.  Sir, you're familiar with this picture,

02:46PM  11    correct?

02:46PM  12    A.  Correct.

02:46PM  13    Q.  Okay.  And this was entered into evidence during the

02:46PM  14    course of this trial, correct?

02:46PM  15    A.  That's correct.

02:46PM  16    Q.  All right.  And are you familiar with who the individuals

02:46PM  17    in this picture are?

02:46PM  18    A.  Right.  The middle one, definitely.  And I believe I know

02:46PM  19    who the other two are, but I believe it's not 100 percent

02:46PM  20    certain.

02:46PM  21    Q.  Who are the other -- who do you believe the other two

02:46PM  22    individuals are?

02:46PM  23    A.  One on the left is possibly David, and the one on the

02:46PM  24    right is possibly Anthony.

02:46PM  25    Q.  Okay.

02:46PM 1   A.  I could not say with 100 percent certainty.

02:46PM 2   Q.  Okay.  You're not 100 percent, but your understanding is

02:46PM 3   these are the two -- it's Peter Gerace's two brothers,

02:46PM 4   correct?

02:46PM 5   A.  I believe.  I'm just -- I can't say with 100 percent

02:46PM 6   certainty.

02:46PM 7           MR. FOTI:  Okay.  We can take that down, thank you.

02:46PM 8           BY MR. FOTI:

02:46PM 9   Q.  All right.  During the course of this investigation,

02:47PM 10  you -- there was the collection of a number of cellular

02:47PM 11  devices at various points, correct?

02:47PM 12  A.  Correct.

02:47PM 13  Q.  As well as other electronic devices such as computers,

02:47PM 14  correct?

02:47PM 15  A.  Correct.

02:47PM 16  Q.  Tablets, right?

02:47PM 17  A.  Yes.  I'm trying to make a distinction between when you

02:47PM 18  say "this," you mean just related to the -- to this

02:47PM 19  defendant?  Or some of the related cases I was referencing?

02:47PM 20  Q.  In terms of Mr. Peter Gerace, there was one cell phone

02:47PM 21  that you reviewed, correct?

02:47PM 22  A.  Correct.

02:47PM 23  Q.  And that you testified about a number of conversations

02:47PM 24  from that cell phone on your direct examination?

02:47PM 25  A.  Correct, the border search.

USA v Gerace - Burns - Foti/Cross - 12/17/24

02:47PM 1  Q.  And there were other electronic devices seized from his

02:47PM 2  home when the search warrant was executed, correct?

02:47PM 3  A.  Yes.  I recall that.  I wasn't the seizing agent, and I

02:47PM 4  was at Pharaoh's.

02:47PM 5  Q.  Okay.  And there was other phones besides Peter Gerace's

02:48PM 6  that were reviewed, or that extractions were done during the

02:48PM 7  course of the investigation, correct?

02:48PM 8  A.  Definitely.

02:48PM 9  Q.  One that I think is stipulated to is Mr. Bongiovanni's

02:48PM 10  phone, correct?

02:48PM 11  A.  The DEA phone, I believe.

02:48PM 12  Q.  Right.  There was -- there's two phones that

02:48PM 13  Mr. Bongiovanni had that you're aware of, correct?  Different

02:48PM 14  timeframes?

02:48PM 15  A.  Correct.  There was the one that he used while he was a

02:48PM 16  DEA agent, and then there was the one in his retirement,

02:48PM 17  after he retired and after he turned the other phone in.

02:48PM 18  Q.  So the -- and I think there's stipulations related to

02:48PM 19  both of those phones, right?

02:48PM 20  A.  I believe there is.

02:48PM 21  Q.  So those are -- the phone that he as a DEA agent was the

02:48PM 22  one that was wiped when he retired, when -- administrative

02:48PM 23  retirement, correct?

02:48PM 24  A.  Correct.  He turned in, it was wiped.

02:48PM 25  Q.  And then there is the phone that he had post retirement

02:48PM  1  that he started using as his personal phone?

02:48PM  2  A.  Correct.  And that was imaged as well, I believe.

02:48PM  3  Q.  And by "imaged," what you mean is an extraction was made

02:49PM  4  on the phone, correct?

02:49PM  5  A.  Yeah, same thing.  Extraction/image.

02:49PM  6  Q.  And an extraction is like a search of the phone, pulling

02:49PM  7  the data out?

02:49PM  8  A.  Right.  Yeah, there's a computer tool that pulls it and

02:49PM  9  organizes it.

02:49PM  10  Q.  So, other than those two phones, don't have any reason to

02:49PM  11  believe Mr. Bongiovanni ever possessed any other phone,

02:49PM  12  correct?

02:49PM  13  A.  Not that I -- I'd have to see the search log or the

02:49PM  14  seizure log from his house, but there may have been, like,

02:49PM  15  some older phones.  But those are the two that I directly can

02:49PM  16  recall linking to Mr. Bongiovanni.

02:49PM  17  Q.  Okay.  You don't recall any other phones specifically?

02:49PM  18  A.  Not off the top of my head.

02:49PM  19  Q.  Okay.  And I think did you -- did you review Lou Selva's

02:49PM  20  phone at some point?

02:49PM  21  A.  At some point, portions of it.

02:49PM  22  Q.  I think you testified about it, I --

02:49PM  23  A.  Yeah.  Possibly.

02:50PM  24  Q.  Okay.  Now, you reviewed -- you reviewed phones of

02:50PM  25  targets of the investigation including Peter Gerace, Joseph

02:50PM    1    Bongiovanni, and then Lou Selva is another one, right?

02:50PM    2    A.  I believe, yeah, I didn't spend as much time with

02:50PM    3    Mr. Selva's, but --

02:50PM    4    Q.  You didn't generally have the practice of reviewing

02:50PM    5    phones of witnesses, correct?

02:50PM    6    A.  I mean, I think C.C.'s phone was seized.  I didn't review

02:50PM    7    it, someone else did.

02:50PM    8        I'm trying to think of witnesses.

02:50PM    9        I'm sure Myszka's was.  I wasn't part of that

02:50PM    10   investigation.

02:50PM    11       So I get -- I wouldn't feel comfortable saying exactly

02:50PM    12   which -- which ones you're kind of referring to.

02:50PM    13   Q.  Okay.  So you have a recollection of C.C.'s phone being

02:50PM    14   imaged or extracted at some point?

02:50PM    15   A.  Yes, that one, I recall through being at the --

02:51PM    16   Q.  Didn't personally review it?

02:51PM    17   A.  I didn't personally review it.

02:51PM    18   Q.  Kevin Myszka is another one you believe the phone was

02:51PM    19   extracted at some point?

02:51PM    20   A.  I don't know if I can even say that.  I guess based on

02:51PM    21   the fact that he was part of a DEA investigation and was

02:51PM    22   arrested, that's common practice.  But I didn't see that.

02:51PM    23   Q.  It might have happened, but you didn't personally do it?

02:51PM    24   A.  Right.  Correct.

02:51PM    25   Q.  Anybody else that you recall?

02:51PM 1    A.  I think P.H.'s was.  Again, I didn't review it.  I think

02:51PM 2    hers was imaged or copied the day that they talked with her

02:51PM 3    at the police station.

02:51PM 4    Q.  Anybody else?

02:51PM 5    A.  Not that I can recall.  I don't want to rule out that

02:51PM 6    there isn't another one here and there.

02:51PM 7    Q.  Katrina Nigro certainly is not one that you ever searched

02:51PM 8    her phone, correct?

02:51PM 9    A.  We did not.

02:51PM 10   Q.  And Katrina Nigro, you heard her testimony that she gave

02:51PM 11   you the pass code to her phone at some point?  Or no, I'm

02:51PM 12   sorry, it was her social media.  She said she gave you her

02:51PM 13   pass code to her social media?

02:52PM 14   A.  If she did, I don't recall that, and I never asked for

02:52PM 15   it.

02:52PM 16   Q.  You don't remember her doing that, do you?

02:52PM 17   A.  I don't have a distinctive memory of her doing that.  I

02:52PM 18   mean, could she have said it in passing and I don't recall

02:52PM 19   it?  That's possible.

02:52PM 20   Q.  And you don't recall ever going in and reviewing her

02:52PM 21   social media?

02:52PM 22   A.  That, I can say I did not.

02:52PM 23   Q.  Okay.  Other than what Ms. Nigro provided to you in terms

02:52PM 24   of screenshots of conversations she had, you didn't have

02:52PM 25   any other investigation into what contacts she was having

USA v Gerace - Burns - Foti/Cross - 12/17/24

218

| | | |
|---|---|---|
| 02:52PM | 1 | with witnesses, correct? |
| 02:52PM | 2 | A.  No, other than if she shared something with me. |
| 02:52PM | 3 | Q.  Now, one of the phones that spent a lot of time on direct |
| 02:52PM | 4 | was Peter Gerace's phone, correct? |
| 02:52PM | 5 | A.  The border search one, yes. |
| 02:52PM | 6 |      **MR. FOTI:**  Can we pull up 310AT. |
| 02:52PM | 7 |      **BY MR. FOTI:** |
| 02:52PM | 8 | Q.  I'm sorry, I don't mean to hold this up, but this is the |
| 02:53PM | 9 | extraction report, the portion that deals with Mr. Gerace's |
| 02:53PM | 10 | contacts that you were asked about on direct examination, |
| 02:53PM | 11 | correct? |
| 02:53PM | 12 | A.  That's correct. |
| 02:53PM | 13 | Q.  And on direct examination, the government went through |
| 02:53PM | 14 | and they identified the number of individuals who Mr. Gerace |
| 02:53PM | 15 | has as a contact in his phone, correct? |
| 02:53PM | 16 | A.  Correct. |
| 02:53PM | 17 | Q.  And, obviously, having a contact of somebody in a phone |
| 02:53PM | 18 | doesn't by itself mean that there's any communication with |
| 02:53PM | 19 | them, correct? |
| 02:53PM | 20 | A.  Correct.  It's a contact in a -- you would believe that |
| 02:53PM | 21 | their storage of contact there's a purpose for that, but -- |
| 02:53PM | 22 | could you rephrase your question? |
| 02:53PM | 23 | Q.  So, for example, you've got a -- a Smartphone, I imagine, |
| 02:53PM | 24 | correct? |
| 02:53PM | 25 | A.  Yeah.  Or pixel or -- |

02:53PM   1   Q.  So, Android or Apple, same thing, you want to add a

02:53PM   2   contact in your phone, you can add their phone number, their

02:53PM   3   names, correct?

02:53PM   4   A.  Correct.

02:53PM   5   Q.  That doesn't necessarily happen in conjunction with

02:53PM   6   sending a message or communicating, correct?

02:53PM   7   A.  Correct, absolutely.

02:54PM   8   Q.  Somebody might give you their contact information, it may

02:54PM   9   be entered with the expectation that there will be

02:54PM  10   communication down the road, right?

02:54PM  11   A.  Certainly.

02:54PM  12   Q.  And sometimes there may never be communication, correct?

02:54PM  13   A.  Absolutely.

02:54PM  14   Q.  And the contacts that are entered into the phone unless

02:54PM  15   you sort of star it or take some additional step, there's

02:54PM  16   nothing about the contacts that are ranked in term of

02:54PM  17   importance, correct?

02:54PM  18   A.  Not in the contact section.

02:54PM  19   Q.  And in terms of this exhibit, the contacts that you

02:54PM  20   mentioned in this report that's in evidence, doesn't indicate

02:54PM  21   the -- any order related to how much Peter Gerace had contact

02:54PM  22   with these individuals, correct?

02:54PM  23   A.  Correct.

02:54PM  24   Q.  The only thing this report does is indicate that at some

02:54PM  25   point, Peter Gerace or somebody using his phone, entered a

02:54PM     1    contact for the individuals who are listed here, correct?

02:54PM     2    A.   That's correct.

02:54PM     3    Q.   And you reviewed this report during the course of your

02:54PM     4    investigation, right?

02:54PM     5    A.   Yes.

02:54PM     6    Q.   So when Mr. Tripi went through and showed you different

02:54PM     7    pages, those were things that you had seen before, right?

02:55PM     8    A.   Absolutely, yes.

02:55PM     9    Q.   So you're aware of who was entered as a contact in Peter

02:55PM    10    Gerace's phone based on this report, right?

02:55PM    11    A.   Correct.

02:55PM    12    Q.   You're also aware of names that are not in this report,

02:55PM    13    correct?

02:55PM    14    A.   In what context?

02:55PM    15    Q.   So let me ask you.  Is the name Joseph Barsuk in this

02:55PM    16    report?

02:55PM    17    A.   I do not believe it is.

02:55PM    18         **MR. FOTI:**  So, can we pull up side by side with this

02:55PM    19    Government Exhibit -- Exhibit 555?

02:55PM    20         **THE WITNESS:**  I'm sorry, did you -- did you mean the

02:55PM    21    310AT, all the contacts?

02:55PM    22         **BY MR. FOTI:**

02:55PM    23    Q.   Yeah.

02:55PM    24    A.   All the contacts?

02:55PM    25    Q.   I mean both.  So let's start with 310AT, in this document

USA v Gerace - Burns - Foti/Cross - 12/17/24

221

02:55PM  1  that's in evidence, this is -- this is a list of contacts?

02:55PM  2  A.  Some.

02:55PM  3  Q.  Yeah.  And in the report that is now in evidence, Joseph

02:55PM  4  Barsuk is not in that document, correct?

02:55PM  5  A.  I don't believe so.

02:55PM  6  Q.  Okay.

02:55PM  7  A.  I have to look at it, but I don't believe so.

02:56PM  8  Q.  And you don't recall him being in Mr. Gerace's contacts

02:56PM  9  at all, correct?

02:56PM  10  A.  Correct.

02:56PM  11  Q.  If he was, it's something that probably would have been

02:56PM  12  put into this exhibit, fair?

02:56PM  13  A.  I think that's fair.

02:56PM  14  Q.  Okay.  And he's not in this exhibit, correct?

02:56PM  15  A.  He is not.

02:56PM  16  Q.  All right.  There's another individual that's been talked

02:56PM  17  about throughout this trial, an individual named Wayne

02:56PM  18  van Vleet, who you're familiar with, correct?

02:56PM  19  A.  Correct.

02:56PM  20  Q.  All right.  In this exhibit of some of Mr. Gerace's

02:56PM  21  contacts, Wayne van Vleet is not listed, correct?

02:56PM  22  A.  That's correct.

02:56PM  23  Q.  And he is not listed in any of the contacts in Peter

02:56PM  24  Gerace's phone as far as you recall, correct?

02:56PM  25  A.  As far as I recall, correct.

| | | |
|---|---|---|
| 02:56PM | 1 | Q.  If he was, it's very likely that his name would have been |
| 02:56PM | 2 | placed in this report? |
| 02:56PM | 3 | A.  Correct. |
| 02:56PM | 4 | Q.  And it's not there, correct? |
| 02:56PM | 5 | A.  That's correct. |
| 02:56PM | 6 | Q.  Okay. |
| 02:57PM | 7 | **MR. FOTI:**  We can take that down, thank you. |
| 02:57PM | 8 | **BY MR. FOTI:** |
| 02:57PM | 9 | Q.  You become involved in this investigation in 2019, |
| 02:57PM | 10 | correct? |
| 02:57PM | 11 | A.  Correct. |
| 02:57PM | 12 | Q.  All right.  And at some point, you become involved |
| 02:57PM | 13 | initially at some point prior to the search of Pharaoh's in |
| 02:57PM | 14 | December of 2019, correct? |
| 02:57PM | 15 | A.  Correct.  There's a meeting in January, and I think the |
| 02:57PM | 16 | first kind of, like, involvement, like, an investigative step |
| 02:57PM | 17 | moving forward would have been the search of |
| 02:57PM | 18 | Mr. Bongiovanni's residence on June 6th, 2019. |
| 02:57PM | 19 | Q.  Okay.  And I think you said on direct that that search in |
| 02:57PM | 20 | June 2019 is kind of a first significant event that you were |
| 02:57PM | 21 | involved in as part of this investigation, correct? |
| 02:57PM | 22 | A.  Yeah, that's fair. |
| 02:57PM | 23 | Q.  So you -- your initial involvement starts, there's at |
| 02:58PM | 24 | least a meeting in January several months before that search, |
| 02:58PM | 25 | right? |

02:58PM    1    A.   Correct.

02:58PM    2    Q.   And then you're at the search of Mr. Bongiovanni's home?

02:58PM    3    A.   That's correct.

02:58PM    4    Q.   And then towards the end of the year in December, there's

02:58PM    5    the search at Pharaoh's, correct?

02:58PM    6    A.   Correct.

02:58PM    7    Q.   You were asked on direct about the fact that

02:58PM    8    Mr. Bongiovanni at some point was charged with a number of

02:58PM    9    crimes, correct?

02:58PM    10   A.   Yeah.  The end of -- I think he's indicted at the end of

02:58PM    11   October, and it's unsealed in early November.

02:58PM    12   Q.   And you testified on direct that when it was unsealed,

02:58PM    13   there was publicity related to that, correct?

02:58PM    14   A.   That's correct.

02:58PM    15   Q.   Now, in December, you said it was unsealed at some point

02:58PM    16   in November?

02:58PM    17   A.   I thought early, without seeing the document, I think

02:58PM    18   early November.

02:58PM    19   Q.   Okay.  I just wanted to confirm.  I think on direct you

02:58PM    20   had said it was around Halloween that the indictment was

02:58PM    21   filed; is that right?

02:58PM    22   A.   Right.  I think it was under seal, and then I think it

02:58PM    23   was unsealed like early November.

02:58PM    24   Q.   So let's just quickly break that down for the jury.

02:59PM    25   A.   Okay.

02:59PM  1   Q.  When indictment is filed, charges are filed against

02:59PM  2   somebody, in some instances it's initially filed under seal

02:59PM  3   so it's not available to the public, correct?

02:59PM  4   A.  Correct.  Until the defendant has their initial

02:59PM  5   appearance, and then it gets unsealed.

02:59PM  6   Q.  So when you're testifying about you think it might be

02:59PM  7   early November, you're referring to an event where the Court

02:59PM  8   unseals it, and then the indictment becomes public, correct?

02:59PM  9   A.  I believe.  I would want to see it.  It's very specific.

02:59PM  10  Q.  All right.  And then at some point after that, there's

02:59PM  11  the search of Pharaoh's in December about four to five weeks

02:59PM  12  later, right?

02:59PM  13  A.  Yes, that's accurate.

02:59PM  14  Q.  Now, prior to the execution of the searches, were you

02:59PM  15  involved in the investigation into either Mr. Bongiovanni or

02:59PM  16  Mr. Gerace in other ways?

02:59PM  17  A.  I guess I'm wondering what by "other ways" you mean?

03:00PM  18  Q.  Well, let me -- let me -- yeah, let me withdraw that and

03:00PM  19  kind of take a step back.

03:00PM  20      Your history in the FBI includes investigations into

03:00PM  21  while collar matters, correct?

03:00PM  22  A.  That's correct.

03:00PM  23  Q.  Which can occasionally include fraud matters, right?

03:00PM  24  A.  That's correct.

03:00PM  25  Q.  And before that, you have a history of investigating a

03:00PM    1    number of narcotics investigations or matters, correct?

03:00PM    2    A.   That's correct.

03:00PM    3    Q.   And a lot of that was in Tennessee, right?

03:00PM    4    A.   A lot of that, yeah, initially started working narcotics

03:00PM    5    when I first started.

03:00PM    6    Q.   But whether Tennessee or Buffalo, New York, a lot of the

03:00PM    7    same investigative techniques are used in terms of how to

03:00PM    8    advance one of these investigations, correct?

03:00PM    9    A.   Yes.

03:00PM    10   Q.   And so with investigations where there is a narcotic or

03:00PM    11   controlled substance element, undercover agents are sometimes

03:00PM    12   used to try to effectuate purchases, correct?

03:00PM    13   A.   Sometimes, yes.

03:00PM    14   Q.   And undercover officers or agents are members of law

03:01PM    15   enforcement who are acting as if they are a customer or a

03:01PM    16   potential patron of a particular --

03:01PM    17   A.   Yeah.  Correct.

03:01PM    18   Q.   Separate from utilizing undercovers, investigations can

03:01PM    19   utilize cooperating individuals, proactively cooperating

03:01PM    20   defendants, as part of trying to effectuate purchases,

03:01PM    21   correct?

03:01PM    22   A.   It depends on the circumstances.

03:01PM    23   Q.   So obviously in some circumstances, in investigations,

03:01PM    24   you're weighing a number of things such as safety concerns,

03:01PM    25   right?

03:01PM   1   A.  Safety concerns.  I mean, is there -- if it's smaller

03:01PM   2   amounts, are people using it, we can't have them use it.  Is

03:01PM   3   it, you know, gonna take a lot of -- how are we gonna get

03:01PM   4   into the group, things like that.  So there's a lot of

03:01PM   5   variables.  I just don't want to paint it with a broad brush.

03:01PM   6   Q.  Yeah, and I'm not -- what I'm asking about isn't intended

03:01PM   7   to suggest that this is something utilized in every

03:02PM   8   investigation, but it is a tactic that can be used in

03:02PM   9   investigations, correct?

03:02PM  10   A.  Definitely.

03:02PM  11   Q.  Individuals who are proactively cooperating and

03:02PM  12   attempting to sort of act in substitute to an undercover

03:02PM  13   officer, correct?

03:02PM  14   A.  Like an informant, certainly.

03:02PM  15   Q.  Surveillance is used during the course of a lot of

03:02PM  16   investigations, correct?

03:02PM  17   A.  It can be, yeah.

03:02PM  18   Q.  And there was surveillance utilized during the course of

03:02PM  19   this investigation, correct?

03:02PM  20   A.  There was some, not a lot.  This is more what I would

03:02PM  21   call, like, a historical conspiracy.

03:02PM  22   Q.  So in terms of the witnesses who gave observations about

03:02PM  23   Pharaoh's that you summarized, or you listed on your summary

03:02PM  24   chart, a lot of them are testifying to things that happened

03:02PM  25   further in the past, correct?

03:02PM   1   A.  Correct.

03:02PM   2   Q.  But the search in December of 2019, was -- was utilized

03:02PM   3   to collect evidence in regard to this investigation, correct?

03:03PM   4   A.  That's correct.  That was the goal.

03:03PM   5   Q.  And that was a search done at the end of 2019, December

03:03PM   6   2019?

03:03PM   7   A.  Yeah.  December 12th, I believe.

03:03PM   8   Q.  Up to that point, you were still engaging in an

03:03PM   9   investigation prior to the arrest of Mr. Gerace, correct?

03:03PM  10   A.  Correct.

03:03PM  11   Q.  And as part of that investigation, there were a number of

03:03PM  12   tactics that you could use to try to advance that

03:03PM  13   investigation, correct?

03:03PM  14   A.  Yes.

03:03PM  15   Q.  Okay.

03:03PM  16   A.  Correct.

03:03PM  17   Q.  And did you -- did -- during the course of your

03:03PM  18   involvement in the investigation, did you ever -- were you

03:03PM  19   ever involved in an undercover officer or agent attempting to

03:03PM  20   try to make a transaction --

03:03PM  21        **MR. TRIPI:**  Objection at this point, Judge.  Law

03:03PM  22   enforcement techniques are not -- you're going to give an

03:03PM  23   instruction on this, I believe.

03:03PM  24        **THE COURT:**  Well, let him finish the question.

         25

03:03PM 1          **BY MR. FOTI:**

03:03PM 2    Q.  So during the course of your involvement in the

03:03PM 3    investigation, was there ever an attempt to have an

03:03PM 4    undercover either purchase drugs or engage in a commercial

03:03PM 5    sex act at Pharaoh's?

03:03PM 6          **THE COURT:**  Don't answer.

03:04PM 7          **MR. TRIPI:**  Now I have an objection.

03:04PM 8          **THE COURT:**  I -- let me think.

03:04PM 9          Come on up.  Come on up, guys.

03:04PM 10         (Sidebar discussion held on the record.)

03:04PM 11         **THE COURT:**  So, the jury's going to be instructed --

03:04PM 12   you're right, specific investigative techniques are not

03:04PM 13   necessary.

03:04PM 14         But the jury is going to be instructed that they can

03:04PM 15   decide based on the evidence or lack of evidence.

03:04PM 16         **MR. TRIPI:**  And those are -- I think those are two

03:04PM 17   mutually exclusive instructions and things, and he can argue

03:04PM 18   the lack of evidence or the lack of the quality of the

03:04PM 19   evidence and various aspects, but -- based on what has or

03:04PM 20   hasn't entered.  But in terms of, you know, a line of cross

03:04PM 21   that repeatedly hits at the opposite of what you're

03:04PM 22   instructing them as to, you're gonna -- if you give the

03:04PM 23   standard instruction that you normally give, Judge, you're

03:04PM 24   gonna say law enforcement techniques are not for your

03:05PM 25   consideration, ergo, why are we spending so much time on --

03:05PM 1    **THE COURT:**  Yeah.  So why -- Mr. Foti, why -- what is

03:05PM 2    the -- what is the relevance of, I assume the answer to this

03:05PM 3    is gonna be no, he didn't try to do that.  So what's the

03:05PM 4    relevance?

03:05PM 5    **MR. FOTI:**  I think it is relevant to the other charge

03:05PM 6    and the other point that there is certain areas where the jury

03:05PM 7    can consider there to be a lack of evidence.

03:05PM 8    And I understand the point.  I'm not trying to

03:05PM 9    insinuate that there's obligation to engage in a certain

03:05PM 10   tactic or a certain law-enforcement technique.  I don't think

03:05PM 11   I've asked that question.

03:05PM 12   **THE COURT:**  So then what is the relevance to the fact

03:05PM 13   that they didn't make a -- a buy, an undercover buy?

03:05PM 14   **MR. FOTI:**  It does speak to the insufficiency of the

03:05PM 15   evidence.  That that's not something for the jury to be able

03:05PM 16   to consider.

03:05PM 17   **THE COURT:**  No, no, you can argue that were no

03:05PM 18   controlled buys.  That's a fact.

03:05PM 19   **MR. FOTI:**  Okay.  So this thing, I see what you're

03:05PM 20   saying.  The distinction is --

03:05PM 21   **THE COURT:**  You're asking -- you're asking him --

03:06PM 22   **MR. FOTI:**  I -- I don't -- I think it survives a

03:06PM 23   relevance test.  If he's the case agent, he's involved in the

03:06PM 24   investigation, and there's certain things they did do that are

03:06PM 25   fair game and certain things they didn't, it can be considered

03:06PM   1   as part, as long as it's not being insinuated that there was

03:06PM   2   an obligation --

03:06PM   3          **THE COURT:**  There's no evidence of controlled buys,

03:06PM   4   right?

03:06PM   5          **MR. TRIPI:**  So during this investigation, no.  But in

03:06PM   6   candor, on redirect, if we go down this path, there were

03:06PM   7   historical buys attempted by the state police in 2015 and

03:06PM   8   2016.  And then there was a spin-off investigation because two

03:06PM   9   Cheektowaga officers ran the plate of the undercover.  One of

03:06PM  10   the days the plate was run was a day the undercover wasn't

03:06PM  11   there.

03:06PM  12          So there's this whole separate potential corruption

03:06PM  13   investigation spinoff into who from the Cheektowaga police may

03:06PM  14   have, may have, I want to be careful here, may have tipped off

03:06PM  15   a state police investigation.

03:07PM  16          **THE COURT:**  I don't think you can get into there are

03:07PM  17   no controlled buys here.  But I think you can get into

03:07PM  18   investigative techniques that can be used.  So that you can

03:07PM  19   then argue, you heard him say that you can do controlled buys.

03:07PM  20   Is a controlled buy something you do in a drug investigation?

03:07PM  21   Yes.

03:07PM  22          I think you can do that, and then argue that you've

03:07PM  23   got no evidence of controlled buys here.

03:07PM  24          **MR. TRIPI:**  Yeah.  I'll address what I can on

03:07PM  25   redirect, Judge, I got it.

03:07PM    1              (End of sidebar discussion.)

03:07PM    2              **THE COURT:**  So the objection to that question is

03:07PM    3    sustained, but you can ask another question.

03:07PM    4              **BY MR. FOTI:**

03:07PM    5    Q.   Okay.  So in your involvement with the FBI, you're

03:07PM    6    familiar with investigative techniques that can include

03:07PM    7    things like undercover buys in regards to drug trafficking,

03:07PM    8    correct?

03:08PM    9    A.   Correct.

03:08PM   10    Q.   And there can also be undercover transactions in regards

03:08PM   11    to other types of investigations, as well, correct?

03:08PM   12    A.   Bribery?

03:08PM   13    Q.   Bribery would be an example, that's true, right?

03:08PM   14    A.   If that's where you're going, yes.

03:08PM   15    Q.   Sex trafficking is another type of investigation where an

03:08PM   16    undercover --

03:08PM   17    A.   You have to be careful with that.  I mean, a lot of

03:08PM   18    these, if you look at all the circumstances around that,

03:08PM   19    obviously that one would be pretty tenuous, you would have to

03:08PM   20    have a --

03:08PM   21    Q.   You have to be careful because obviously the interaction

03:08PM   22    could go too far, right?

03:08PM   23    A.   Or even, I mean, is that person in danger.  Do you need

03:08PM   24    to effectuate an arrest in the beginning?  I mean, that one

03:08PM   25    would be -- a lot of things to consider before pursuing an

USA v Gerace - Burns - Foti/Cross - 12/17/24

232

03:08PM    1    undercover related to a sex trafficking investigation.

03:08PM    2    Q.  But it can be done, correct?

03:08PM    3    A.  Yeah, it could be done.

03:08PM    4    Q.  Now, search warrants.  The utilization of search warrants

03:08PM    5    are part of conducting an -- it's an investigative technique

03:09PM    6    and part of trying to advance an investigation, correct?

03:09PM    7    A.  That's correct.

03:09PM    8    Q.  Okay.  And there was some testimony about it pretty early

03:09PM    9    on, but a search warrant for the jury is authorization by a

03:09PM    10   court to conduct the search of somebody's property, correct?

03:09PM    11   A.  Correct.  You put together an affidavit.  The judge --

03:09PM    12   you have to present it to the judge.  And if he finds that

03:09PM    13   there's probable cause that evidence of a crime would be at

03:09PM    14   that location or that device, then you're authorized to

03:09PM    15   search it.

03:09PM    16   Q.  So what you're referring to or the answer you just gave

03:09PM    17   was a reference to the procedure that precedes getting the

03:09PM    18   authorization to search, correct?

03:09PM    19   A.  Correct.

03:09PM    20   Q.  It requires a whole lot of writing in some instances,

03:09PM    21   correct?

03:09PM    22   A.  Depending on how involved the probable cause is.

03:09PM    23   Q.  And when you say the probable cause, you're laying out

03:09PM    24   the reason why you believe there's a basis to search a

03:09PM    25   particular area for a particular type of contraband or

USA v Gerace - Burns - Foti/Cross - 12/17/24

233

03:10PM   1   evidence, correct?

03:10PM   2   A.  Correct.

03:10PM   3   Q.  And it's -- it's a different -- totally different type of

03:10PM   4   thing than what the jury has to consider, probable cause is a

03:10PM   5   different type of standard of proof, correct?

03:10PM   6   A.  Yes, it's probable cause versus beyond a reasonable

03:10PM   7   doubt.

03:10PM   8   Q.  And in any event, you get authorization to search an

03:10PM   9   area, and in some instances, as a result of that search, you

03:10PM  10   locate evidence, correct?

03:10PM  11   A.  Correct.

03:10PM  12   Q.  Or in some cases, when you're looking for drugs, for

03:10PM  13   example, you may find the drugs, correct?

03:10PM  14   A.  Correct.

03:10PM  15   Q.  And there was talk about, during the course of this

03:10PM  16   trial, about other searches that were executed including one

03:10PM  17   for Anthony Gerace, right?

03:10PM  18   A.  Correct.

03:10PM  19   Q.  Now, that was a similar procedure about going and getting

03:10PM  20   authorization to conduct a search, correct?

03:10PM  21   A.  Correct.

03:10PM  22   Q.  And in that instances -- in that instance, there was

03:10PM  23   evidence collected of actual drugs, correct?

03:10PM  24   A.  Yes.  Both marijuana, edibles, and firearms.

03:10PM  25   Q.  Now, in terms of the search of Pharaoh's in 2019, I think

USA v Gerace - Burns - Foti/Cross - 12/17/24

03:11PM 1    there was some -- were there drugs found at Pharaoh's in

03:11PM 2    2019?

03:11PM 3    A.  Possibly a small amount.  I think there was some

03:11PM 4    marijuana, some residue, some paraphernalia.

03:11PM 5    Q.  Yeah, I'm having a hard time remembering, too.  But it

03:11PM 6    was something pretty insignificant, correct?

03:11PM 7    A.  I'd have to see the search log to recall, but --

03:11PM 8    Q.  You don't recall what it was?

03:11PM 9    A.  It was -- I believe it was some paraphernalia and maybe a

03:11PM 10   small amount of marijuana off the top of my head.

03:11PM 11   Q.  Okay.

03:11PM 12   A.  Along with records.  I mean, you're talking about

03:11PM 13   evidence, if you're looking just for narcotics, but there was

03:11PM 14   a lot of -- there's some -- a lot of document evidence was

03:11PM 15   also seized.

03:11PM 16   Q.  And we talked a little bit of that earlier that included

03:11PM 17   personnel records, correct?

03:11PM 18   A.  Correct.

03:11PM 19   Q.  That gave you information about prior employees, correct?

03:11PM 20   A.  Correct.

03:11PM 21   Q.  It included financial documents, correct?

03:11PM 22   A.  Yeah, some of the financial records.

03:12PM 23   Q.  And in addition, on direct, you were asked about the

03:12PM 24   seizure of certain video equipment, correct?

03:12PM 25   A.  Correct.

03:12PM    1    Q.   Okay.   Now --

03:12PM    2              **THE COURT:**   Mr. Foti, when you're at a good time to

03:12PM    3    break, I'd like to talk to you folks up at the bench again.

03:12PM    4              Go ahead, you can keep going.

03:12PM    5              **MR. FOTI:**   I think this is the beginning of a whole

03:12PM    6    'nother section.

03:12PM    7              **THE COURT:**   Then come on up.

03:12PM    8              (Sidebar discussion held on the record.)

03:12PM    9              **THE COURT:**   So, I think the questions about whether

03:12PM   10    the government did controlled buys or not are fair game.

03:12PM   11              The charge says, begins, during the trial you have

03:12PM   12    heard testimony of witnesses and argument by counsel that the

03:12PM   13    government did not use specific investigative techniques.  You

03:12PM   14    may consider these facts in deciding whether the government

03:12PM   15    has met its burden of proof because, as I told you, you should

03:12PM   16    look at all the evidence or lack of evidence in deciding

03:12PM   17    whether Mr. Gerace is guilty.

03:12PM   18              You also should understand that there's been a legal

03:13PM   19    requirement that the government use any specific investigative

03:13PM   20    technique to prove its case.  Although law enforcement

03:13PM   21    techniques may be of interest to you, et cetera, et cetera.

03:13PM   22              But -- during the trial, have you heard testimony of

03:13PM   23    witnesses and argument of counsel that the government did not

03:13PM   24    use specific investigative techniques.

03:13PM   25              So, if you want to get into that, you can.

03:13PM   1            Mr. Tripi says he has stuff he wants to get into on

03:13PM   2   redirect, and he can do that.

03:13PM   3            **MR. TRIPI:**  I think he did get some of those

03:13PM   4   questions out, I don't know if he wants to circle back

03:13PM   5   further, but I stopped objecting after our bench conference,

03:13PM   6   and I think he followed up.

03:13PM   7            **THE COURT:**  I understand.  I just want you to know, I

03:13PM   8   want to make it clear, that if you want to get into questions

03:13PM   9   about whether controlled buys were used, and those kinds of

03:13PM  10   things, you can do that.

03:13PM  11            Because as soon as you guys left, I was thinking of

03:13PM  12   what the charge was, and asked Rebecca to send it to me.  And

03:13PM  13   then I realized it does have that preamble in the charge.  So

03:13PM  14   I'm not precluding you, I'm reversing myself on the prior

03:13PM  15   decision, I'm not precluding you from getting into it.

03:14PM  16            **MR. FOTI:**  I've also thought we can do that.

03:14PM  17   Sometimes Mr. Tripi is so convincing that I start to think

03:14PM  18   that --

03:14PM  19            **MR. TRIPI:**  See, I walked away thinking I lost the

03:14PM  20   argument.

03:14PM  21            **THE COURT:**  Yeah.  So, but you can, Mr. Foti, just so

03:14PM  22   you understand.

03:14PM  23            (End of sidebar discussion.)

03:14PM  24            **MR. FOTI:**  We're going until 3:30 judge?

03:14PM  25            **THE COURT:**  Yeah.  I don't think it's a hard stop at

03:14PM   1   3:30.  I think one of our jurors has to leave by 3:45, but

03:14PM   2   yeah.

03:14PM   3          **BY MR. FOTI:**

03:14PM   4   Q.  Okay.  So, sir, I wanted to ask you about something that

03:14PM   5   you briefly testified about on direct, and that's a reference

03:14PM   6   to certain DVR equipment that was seized at Pharaoh's.

03:14PM   7   A.  That's correct.

03:14PM   8   Q.  Okay.  So, now, on direct, you testified that there was

03:14PM   9   essentially three different units, three DVR units located at

03:15PM  10   Pharaoh's in December of 2019, correct?

03:15PM  11   A.  Correct.

03:15PM  12   Q.  Okay.  And when the search was completed, those DVRs had

03:15PM  13   been retained by law enforcement for further review, correct?

03:15PM  14   A.  Correct.

03:15PM  15   Q.  And as part of what you were reviewing was, or part of

03:15PM  16   what was going to be done at that point was looking through

03:15PM  17   the video footage to determine if it has any evidentiary

03:15PM  18   value, correct?

03:15PM  19   A.  Correct.  It was seized pursuant to that.

03:15PM  20   Q.  And when you testified on direct about how far the

03:15PM  21   footage goes back, that was something that was learned during

03:15PM  22   the course of the review of that footage, correct?

03:15PM  23   A.  Correct.  From other agents who did the review.

03:15PM  24   Q.  Okay.  And I think you and Special Agent Marilyn Halliday

03:15PM  25   was personally involved in the review of a significant amount

03:15PM    1    of that footage, correct?

03:15PM    2    A.  Correct.

03:15PM    3    Q.  But obviously, footage of what was happening at Pharaoh's

03:16PM    4    was of interest to everybody on the investigative team,

03:16PM    5    correct?

03:16PM    6    A.  Correct.

03:16PM    7    Q.  And so there were discussions about what was contained in

03:16PM    8    those DVRs, correct?

03:16PM    9    A.  Correct.  From a timeframe, I can't recall.  But I know

03:16PM   10    that there was some discussions about that at some point.

03:16PM   11    Q.  So I'm going to ask you some questions about it, and just

03:16PM   12    answer the ones you can, or if you need --

03:16PM   13    A.  Sure.

03:16PM   14    Q.  -- to have your recollection refreshed, let me know.

03:16PM   15        All right.  Now, as part of keeping this evidence

03:16PM   16    organized, the DVRs were essentially identified as DVR 1, 2,

03:16PM   17    and 3, correct?

03:16PM   18    A.  That's correct.

03:16PM   19    Q.  And you understood DVR 1 to be an equipment that

03:16PM   20    contained video footage of primarily the VIP Room and the

03:16PM   21    stage, correct?

03:16PM   22    A.  I think DVR 1, I believe -- it was I believe eight

03:17PM   23    cameras, six of which were related to the VIP, one of which

03:17PM   24    might have been the edge of the stage, and I think one there

03:17PM   25    ws no recording that was retrievable.

03:17PM    1    Q.    Right.    Okay.    Now earlier on direct you testified about

03:17PM    2    one of the DVRs had footage that goes back, I think you said

03:17PM    3    it was approximately seven weeks, correct?

03:17PM    4    A.    Approximately.

03:17PM    5    Q.    Now when you said that on direct, you were referring to

03:17PM    6    DVR 1, right?

03:17PM    7    A.    Correct.

03:17PM    8    Q.    So DVR 1 has six different camera angles of the VIP

03:17PM    9    rooms, correct?

03:17PM   10    A.    Correct.

03:17PM   11    Q.    And then as you testified to, there's one camera angle in

03:17PM   12    DVR 1 of the stage?

03:17PM   13    A.    Right.    To the left of the stage, I believe.

03:17PM   14    Q.    And then one camera that's sort of a dead camera?

03:17PM   15    A.    Correct.

03:17PM   16    Q.    This footage went back to October 21st of 2019, correct?

03:17PM   17    A.    Correct.

03:17PM   18    Q.    And the search occurs on December 12th of 2019, right?

03:17PM   19    A.    Correct.

03:17PM   20    Q.    So, when you estimated about seven weeks, you're

03:17PM   21    referring to the footage goes back from when you searched

03:18PM   22    back to October 21st of 2019?

03:18PM   23    A.    I -- that sounds correct, without looking at the report.

03:18PM   24    Q.    And that was a date that preceded Mr. Bongiovanni being

03:18PM   25    charged, correct?

03:18PM   1    A.  Correct, was the 19th.

03:18PM   2    Q.  And certainly, it preceded the date of whenever

03:18PM   3    Mr. Bongiovanni's indictment was unsealed, correct?

03:18PM   4    A.  Oh, the beginning of it would be, and then it would go up

03:18PM   5    through the time that it was unsealed.

03:18PM   6    Q.  Okay.  Now, in terms of the geography of Pharaoh's, had

03:18PM   7    you ever been in there prior to -- prior to the search?

03:18PM   8    A.  I had not.

03:18PM   9    Q.  Okay.  So on that day, in addition to any interviews or

03:18PM  10    other responsibilities you had, you also were taking --

03:18PM  11    making observations of the layout, correct?

03:18PM  12    A.  The first one I didn't make it up to the upstairs.

03:18PM  13    Q.  Oh, you didn't go upstairs?

03:18PM  14    A.  No, I did not.

03:18PM  15    Q.  No?

03:18PM  16    A.  No, I spent most of my time with Mr. Ermin.

03:18PM  17    Q.  You talked about that on direct.  Mr. Ermin was another

03:19PM  18    manager that you interviewed?

03:19PM  19    A.  Yeah, Tommy O, a manager.

03:19PM  20    Q.  So he was the general manager at the time that the search

03:19PM  21    was conducted?

03:19PM  22    A.  Correct.  He was there opening it when we got in there.

03:19PM  23    Q.  Okay.  So during the course of the search, there's a

03:19PM  24    point where you have a conversation with Mr. Ermin and ask

03:19PM  25    him questions relevant to the investigation, correct?

USA v Gerace - Burns - Foti/Cross - 12/17/24

241

03:19PM    1    A.  Correct.

03:19PM    2    Q.  You also had to walk through different areas of the first

03:19PM    3    floor; is that fair?

03:19PM    4    A.  That's fair.

03:19PM    5    Q.  Had you walked into the VIP area?

03:19PM    6    A.  I believe the interview, it's been some time, but we were

03:19PM    7    kind of on the edge of it.

03:19PM    8    Q.  In the hallway?

03:19PM    9    A.  I think there was a table near there.  I remember seeing

03:19PM    10   that area a little bit.  I don't think I sat on those

03:19PM    11   couches.

03:19PM    12   Q.  Your loss.

03:19PM    13       So, okay.  So in terms of the geography, you enter

03:19PM    14   Pharaoh's, you remember the -- you remember seeing the main

03:19PM    15   stage, correct?

03:19PM    16   A.  Yeah, absolutely.

03:19PM    17   Q.  Okay.  And you remember -- there's been testimony about

03:20PM    18   that there's sort of a hallway that goes off of that,

03:20PM    19   correct?

03:20PM    20   A.  It came in through kind of like the side, like the

03:20PM    21   employee entrance, and that's when Mr. Ermin was there.  And

03:20PM    22   we walked through there.  There was kind of where you -- I

03:20PM    23   remember the office, I did go in there.  Downstairs office,

03:20PM    24   not upstairs.  And then I thought we ended up at like a

03:20PM    25   little table kind of near the VIP.

USA v Gerace - Burns - Foti/Cross - 12/17/24

242

03:20PM   1   Q.  Okay.  Do you agree that there's -- off of the main floor

03:20PM   2   area, there's sort of two separate hallways, one that goes

03:20PM   3   towards the office, and one that goes towards the VIP; is

03:20PM   4   that your recollection?

03:20PM   5   A.  Best I can recall.  I was pretty focused on Mr. Ermin.

03:20PM   6   Q.  Okay.  Fair enough.  Do you -- you said you think that

03:20PM   7   you had the interview of Mr. Ermin sort of near the entrance

03:20PM   8   or close to the VIP area as you can recall?

03:20PM   9   A.  As I can recall.

03:20PM  10   Q.  You don't recall ever having went into the VIP area?

03:20PM  11   A.  I think I looked in there, or maybe I walked through it.

03:20PM  12   I was really kind of laser focused on Mr. Ermin.  We went

03:21PM  13   spent a lot of time together.

03:21PM  14   Q.  In terms of what you may remember from the VIP area, you

03:21PM  15   agree there's no doors on the VIP areas, correct?

03:21PM  16   A.  I remember seeing, is an open area.  I mean, there might

03:21PM  17   have been a hallway that led to it.

03:21PM  18   Q.  Okay.  That's okay.  In any event, you -- you are at

03:21PM  19   least aware of, during the course of your investigation, that

03:21PM  20   there is a VIP area that -- that can be walked through in the

03:21PM  21   back, correct?

03:21PM  22   A.  Correct, yeah.

03:21PM  23   Q.  And that in the VIP area, there's a number of couches

03:21PM  24   that you referenced a little while ago?

03:21PM  25   A.  Correct, yes.

USA v Gerace - Burns - Foti/Cross - 12/17/24

243

03:21PM 1  Q.  And in some of the rooms in the VIP area, there's

03:21PM 2  multiple couches, correct?

03:21PM 3  A.  Correct.  As I recall.

03:21PM 4  Q.  And your understanding is that there might be multiple

03:21PM 5  dances going on at the same time in the same room, correct?

03:21PM 6  A.  Based on testimony and just pictures from there.

03:21PM 7  Q.  And did you review some of the video footage yourself?

03:21PM 8  A.  I never -- I did not review the video footage myself.

03:21PM 9  Q.  So your understanding of what's in the video footage is

03:21PM 10 just based on communication as part of the investigation?

03:22PM 11 A.  Correct.  Reviewing reports and things like that.

03:22PM 12 Q.  Okay.  In any event, you understood sort of the breakdown

03:22PM 13 of what was depicted in DVR 1 as far as the cameras, correct?

03:22PM 14 A.  Correct, yes.

03:22PM 15 Q.  And you have already testified at this point that for six

03:22PM 16 of the cameras, they were different angles of different rooms

03:22PM 17 inside the VIP area, correct?

03:22PM 18 A.  They were in the -- focused on the VIP area, is probably

03:22PM 19 an accurate way to say it.

03:22PM 20 Q.  And is it your understanding as part of this

03:22PM 21 investigation that those -- that video footage from DVR 1 did

03:22PM 22 depict generally lap dances taking place?

03:22PM 23 A.  Yes, it did.

03:22PM 24 Q.  So from October 31st of 2019 until the time of the

03:22PM 25 search, there were lap dances happening in that VIP area,

03:22PM    1    correct?

03:22PM    2    A.  Correct.

03:22PM    3    Q.  And what was depicted in the cameras on DVR 1 was

03:22PM    4    recordings of those lap dances over about a seven-week

03:23PM    5    period, correct?

03:23PM    6    A.  Correct.

03:23PM    7    Q.  And those were -- is it fair to say that your

03:23PM    8    understanding from being involved in the investigation is

03:23PM    9    those cameras covered different rooms within the VIP area?

03:23PM   10    A.  My understanding is, yeah, they were over the VIP area.

03:23PM   11    I wasn't -- I was aware -- my understanding was there were

03:23PM   12    certain areas that the cameras couldn't see.

03:23PM   13    Q.  So, some of the cameras would -- would kind of peer into

03:23PM   14    one of those little side rooms sort of from the side, right?

03:23PM   15    A.  Possibly.  And, again, that's my understanding.

03:23PM   16    Q.  Okay.

03:23PM   17    A.  But I have not independently reviewed the footage.

03:23PM   18    Q.  Okay.  If I ask you about camera 1 specifically showing a

03:23PM   19    room that's sectioned off into three areas containing

03:23PM   20    different love seats, is that something that you are familiar

03:23PM   21    with?

03:23PM   22    A.  Again, because I didn't review the footage, I know that

03:24PM   23    the cameras covered the VIP area, is what my understanding of

03:24PM   24    it was.  And then I think there's that -- the Champagne area,

03:24PM   25    too, it's attached in some way.

03:24PM    1    Q.  Were you familiar at some point with what each one of

03:24PM    2    those cameras showed?

03:24PM    3    A.  Generally, I would say, again, the -- my understanding

03:24PM    4    was the VIP area.

03:24PM    5    Q.  All right.  And that's what I'm ultimately asking is

03:24PM    6    you're aware a report was produced in regard to what the

03:24PM    7    video footage showed, correct?

03:24PM    8    A.  Yes, I am familiar with that report.

03:24PM    9    Q.  And did you ever review that report?

03:24PM   10    A.  Yes, I've reviewed it.

03:24PM   11    Q.  And would reviewing that report refresh your recollection

03:24PM   12    as to what was depicted on each of those tapes?

03:24PM   13    A.  Yes, it would.

03:24PM   14         MR. FOTI:  Can we, for the witness only, pull up

03:24PM   15    3539ED.  And go to page 2, please.

03:25PM   16         BY MR. FOTI:

03:25PM   17    Q.  Okay.  Is that big enough to read?

03:25PM   18    A.  Yes.

03:25PM   19    Q.  Can you take a moment to look through that in regards to

03:25PM   20    cameras 1 through 3?

03:25PM   21    A.  Certainly.  Do you want me to focus on 1 through 3?

03:25PM   22    Q.  Yeah.  Just what I want to ask about --

03:25PM   23    A.  Okay.

03:25PM   24    Q.  -- is sort of this area.

03:25PM   25    A.  Got it.  Yeah.

USA v Gerace - Burns - Foti/Cross - 12/17/24

03:25PM   1    Q.  And I don't mean to rush you, whenever you're done let us

03:26PM   2    know.

03:26PM   3    A.  Okay.

03:26PM   4    Q.  Okay.  And does that refresh your recollection generally?

03:26PM   5    A.  Generally, yeah.

03:26PM   6    Q.  Okay.  So camera 1 was of a room that was sectioned off

03:26PM   7    into three different areas, correct?

03:26PM   8    A.  That's correct.

03:26PM   9    Q.  Okay.  And the -- in that -- and that particular camera

03:26PM  10    depicted lap dances over the course of a period of time that

03:26PM  11    we talked about, right?

03:26PM  12    A.  That's correct.

03:26PM  13    Q.  And as part of that, there was observations made of

03:26PM  14    things that would typically be part of a lap dance, including

03:26PM  15    dancing, as well as a customer seated as -- during the course

03:26PM  16    of the lap dance, correct?

03:26PM  17    A.  Correct.

03:26PM  18    Q.  The ultimate determination in terms of camera 1 was that

03:27PM  19    it had no relevant information to the investigation, correct?

03:27PM  20    A.  Can I look at the report again?

03:27PM  21    Q.  It should be still pulled up.

03:27PM  22    A.  Yeah.

03:27PM  23    Q.  So just directing your attention to kind of right here.

03:27PM  24        And if, you're looking at the second sentence, refreshes

03:27PM  25    your recollection, let us know?

USA v Gerace - Burns - Foti/Cross - 12/17/24

03:27PM  1   A.   Yeah, that's what the report states.

03:27PM  2   Q.   Okay.  And ultimately, that's consistent with the

03:27PM  3   determination that that footage was not going to be part of

03:27PM  4   this trial, correct?

03:27PM  5   A.   Correct.

03:27PM  6   Q.   Camera 2 was of a different angle inside the VIP area,

03:27PM  7   correct?  Oh, no, I'm sorry.  Camera 2 is of the stage; is

03:27PM  8   that right?

03:27PM  9   A.   That's correct.

03:27PM  10  Q.   And obviously, during the course of this trial, there

03:27PM  11  hasn't been the same type of allegations presented about the

03:27PM  12  stage, but there was no relevant information that was pulled

03:27PM  13  from camera 2, correct?

03:27PM  14  A.   Correct.  That's what the report says.

03:27PM  15  Q.   All right.  Camera 3 was another room in the VIP area, it

03:28PM  16  was a longer room containing a -- a brown love seat/couch,

03:28PM  17  right?

03:28PM  18  A.   That's correct.

03:28PM  19  Q.   Okay.  And again, observations made during the course of

03:28PM  20  the review of that footage that there was lap dances that

03:28PM  21  took place, correct?

03:28PM  22  A.   That's correct.

03:28PM  23  Q.   But ultimately, it was determined there was no relevant

03:28PM  24  information, correct?

03:28PM  25  A.   That's what the report indicates.

USA v Gerace - Burns - Foti/Cross - 12/17/24

248

03:28PM   1    Q.  Okay.  And obviously, that footage wasn't shown to this

03:28PM   2    jury at any point during the trial, correct?

03:28PM   3    A.  That's correct.

03:28PM   4    Q.  Camera 4 was -- was footage of the first room when you

03:28PM   5    first enter the VIP Room, correct?

03:28PM   6    A.  Can I get that quick --

03:28PM   7    Q.  Can we go to the next page?

03:28PM   8    A.  -- next page.  Correct.

03:29PM   9    Q.  Yeah.  And in fact, just to save sort of time here --

03:29PM   10   A.  Yeah.

03:29PM   11   Q.  -- camera 4 and 5 were both different angles within this

03:29PM   12   room, correct?

03:29PM   13   A.  Right.  Camera 4 appears to have one love seat, and the

03:29PM   14   other one has three love seats.

03:29PM   15   Q.  And your understanding is that it covered different

03:29PM   16   angles within one specific room, correct?

03:29PM   17   A.  That's my understanding.

03:29PM   18   Q.  And it's also your understanding that camera 4 did not

03:29PM   19   produce any relevant information to this investigation,

03:29PM   20   correct?

03:29PM   21   A.  That's what the report indicates.

03:29PM   22   Q.  And that was your understanding, is there was no

03:29PM   23   evidentiary value provided to the investigation, correct?

03:29PM   24       Setting aside the report for a second, there was

03:29PM   25   discussion of whether this DVR footage would be helpful,

| | | |
|---|---|---|
| 03:29PM | 1 | right? |
| 03:29PM | 2 | A.  Discussion -- |
| 03:29PM | 3 | **MR. TRIPI:**  Objection, hearsay. |
| 03:29PM | 4 | **THE COURT:**  Hang on.  Sustained. |
| 03:30PM | 5 | **BY MR. FOTI:** |
| 03:30PM | 6 | Q.  The DVR was seized during the course of the search |
| 03:30PM | 7 | warrant in December 2019, correct? |
| 03:30PM | 8 | A.  Correct. |
| 03:30PM | 9 | Q.  And it was seized with the purpose of determining whether |
| 03:30PM | 10 | there was any evidentiary value, correct? |
| 03:30PM | 11 | A.  Correct. |
| 03:30PM | 12 | Q.  And the hours spent reviewing it were -- were the reason |
| 03:30PM | 13 | that it was reviewed was for the purpose of determining |
| 03:30PM | 14 | whether there was, in fact, any evidentiary value to the |
| 03:30PM | 15 | footage, correct? |
| 03:30PM | 16 | A.  Correct. |
| 03:30PM | 17 | Q.  And there was a significant amount of footage to review, |
| 03:30PM | 18 | correct? |
| 03:30PM | 19 | A.  My understanding it was, took us -- it was a significant |
| 03:30PM | 20 | amount of footage. |
| 03:30PM | 21 | Q.  And in terms of the review of that footage, it was your |
| 03:30PM | 22 | understanding as part of this investigation if there was any |
| 03:31PM | 23 | evidentiary value to that, it would be utilized as part of -- |
| 03:31PM | 24 | **MR. TRIPI:**  Objection. |
| 03:31PM | 25 | **THE COURT:**  Sustained. |

03:31PM    1    **BY MR. FOTI:**

03:31PM    2    Q.  In terms of --

03:31PM    3         **THE COURT:**  I'm not precluding you from asking about

03:31PM    4    whether he saw any of that footage.  I want you to understand

03:31PM    5    that.

03:31PM    6         **BY MR. FOTI:**

03:31PM    7    Q.  So, did you -- when we asked about these different

03:31PM    8    cameras, including camera 4 and 5 is what I was specifically

03:31PM    9    asking about, did you review it yourself?

03:31PM   10    A.  I did not.

03:31PM   11    Q.  Okay.  So your understanding about whether it had any

03:31PM   12    relevant information was based on the review of other members

03:31PM   13    of the team, correct?

03:31PM   14    A.  Correct.

03:31PM   15    Q.  Okay.  And is it your understanding that cameras 4 and 5

03:31PM   16    did not have any relevant information?

03:31PM   17    A.  Based on the report, I guess the only caveat, I think

03:31PM   18    this ultimately turned out to be outside the timeframe of our

03:31PM   19    conspiracy.  So, I mean, you're asking about whether it was

03:31PM   20    used or not.  I don't know.

03:32PM   21    Q.  So at the time you just referred to the timeframe of the

03:32PM   22    conspiracy, and you're referencing the timeframe and the

03:32PM   23    charges in the indictment, correct?

03:32PM   24    A.  Correct.

03:32PM   25    Q.  At this point, Mr. Gerace was not charged, correct?

03:32PM    1    A.   Right.

03:32PM    2    Q.   In December, or I guess when the search was conducted,

03:32PM    3    Mr. Gerace had not yet been charged, correct?

03:32PM    4    A.   When the search was conducted, he was not charged.

03:32PM    5    Q.   And do you recall when footage was reviewed?

03:32PM    6    A.   You have to go to the front page of the report.  I think

03:32PM    7    it --

03:32PM    8         THE COURT:  Mr. Foti, we're past 3:30, so wherever

03:32PM    9    you want to stop.  You know, we've got until 3:45, so any time

03:32PM   10    within the next 13 or 14 minutes.

03:32PM   11         MR. FOTI:  Okay.  All right.  Thank you, Judge.

03:33PM   12         Can we go and just to page 1 of the document.

03:33PM   13         BY MR. FOTI:

03:33PM   14    Q.   Does looking at that refresh your recollection?

03:33PM   15    A.   It says date approved 5/10/23.  Maybe the next page, if

03:33PM   16    there's a reference to when it was actually reviewed.

03:33PM   17         MR. FOTI:  Can we go to page 2?

03:33PM   18         THE WITNESS:  Yeah, I mean, the best I can come up

03:33PM   19    with is the date of approval of the document.  I can't

03:33PM   20    definitively say when it was reviewed.

03:33PM   21         BY MR. FOTI:

03:33PM   22    Q.   It was just sometime before that?

03:33PM   23    A.   It was sometime before that, correct.

03:33PM   24    Q.   All right.  And you don't have an independent

03:33PM   25    recollection of when the footage was reviewed based on your

03:33PM      1   conversations with Special Agent Halliday or anybody else?

03:33PM      2   A.  It was closer in proximity to, I think, the date

03:33PM      3   approved.  I think that's accurate.  I don't want to commit

03:33PM      4   to something that I'm not 100 percent certain on.

03:33PM      5               **MR. FOTI:**  Why don't we pause here, Judge?

03:33PM      6               **THE COURT:**  Okay.  Great.  So, folks, we're done for

03:34PM      7   the day.

03:34PM      8          Remember my instructions about not communicating

03:34PM      9   about the case with anyone in any way.  Don't use tools of

03:34PM     10   technology to communicate about the case or to learn about the

03:34PM     11   case in any way.  Don't do any research about the case.  Don't

03:34PM     12   read or watch or listen to any news coverage of the case, if

03:34PM     13   there is any, while the trial is in progress.  And don't make

03:34PM     14   up your minds until you start deliberating.

03:34PM     15          We're going to start at 9:30 tomorrow for a few

03:34PM     16   reasons.  We have a juror who's getting stitches out, I

03:34PM     17   understand.  No?  That's not true?

03:34PM     18               **JUROR 2:**  Yeah, I'll be good tomorrow.

03:34PM     19               **THE COURT:**  And you should be able to be here by

03:34PM     20   9:30, is that --

03:34PM     21               **JUROR 2:**  I should be able to be here by 9.

03:34PM     22               **THE COURT:**  We've got some other reasons.  I have

03:34PM     23   some other things that I need to do.  So we're going to start

03:34PM     24   at 9:30.  We're going to go until -- I don't know when, but no

03:34PM     25   later than 5:30 tomorrow.

03:34PM   1        And then Thursday and -- Thursday, we're gonna go

03:34PM   2   from 9 until 5:30.  And then Friday from 9 until 12:30ish.

03:34PM   3   I'm going to give you my charge on -- the plan right now is

03:35PM   4   for me to give you my charge on Friday morning, which is

03:35PM   5   probably about three, three and a half hours.  So we're going

03:35PM   6   to try do that.  Okay?

03:35PM   7        Thank you very much.  Drive carefully.  Get a good

03:35PM   8   night's sleep.

03:35PM   9            (Jury excused at 3:35 p.m.)

         10            (Excerpt concluded at 3:25 p.m.)

         11            *    *    *    *    *    *    *

         12

         13

         14

         15

         16                **CERTIFICATE OF REPORTER**

         17

         18            In accordance with 28, U.S.C., 753(b), I

         19   certify that these original notes are a true and correct

         20   record of proceedings in the United States District Court for

         21   the Western District of New York on December 17, 2024.

         22

         23                    s/ Ann M. Sawyer
                               _____
                               Ann M. Sawyer, FCRR, RPR, CRR
         24                    Official Court Reporter
                               U.S.D.C., W.D.N.Y.
         25

```
1
2                      TRANSCRIPT INDEX

3        EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 2

4                     DECEMBER 17, 2024

5

6   W I T N E S S                              P A G E

7   B R I A N   B U R N S                         2

8      (CONT'D) DIRECT EXAMINATION BY MR. TRIPI:     2

9      CROSS-EXAMINATION BY MR. FOTI:              171

10

11

12  E X H I B I T S                             P A G E

13  GOV Exhibit 100A.A-2                            4

14  GOV Exhibit 310AE                              45

15  GOV Exhibit 310AQ                              91

16  GOV Exhibit 310AS                             110

17  GOV Exhibit 310AU-1                           139

18  GOV Exhibit 555                               156

19  GOV Exhibit 310AU-2                           163

20

21

22

23

24

25
```