09:26AM

1           **UNITED STATES DISTRICT COURT**
            **WESTERN DISTRICT OF NEW YORK**

2

_____

3  **UNITED STATES OF AMERICA,**

                           Case No. 1:19-cr-227

4          Plaintiff,            1:23-cr-37

  v.                         (LJV)

5

  **PETER GERACE, JR.,**           December 18, 2024

6

               Defendant.

7  _____

     **TRANSCRIPT EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 3**

8        **BEFORE THE HONORABLE LAWRENCE J. VILARDO**

            **UNITED STATES DISTRICT JUDGE**

9

  <u>**APPEARANCES:**</u>     **TRINI E. ROSS, UNITED STATES ATTORNEY**

10               **BY: JOSEPH M. TRIPI, ESQ.**

                 **NICHOLAS T. COOPER, ESQ.**

11                 **CASEY L. CHALBECK, ESQ.**

               Assistant United States Attorneys

12               Federal Centre, 138 Delaware Avenue

               Buffalo, New York 14202

13               For the Plaintiff

14               **THE FOTI LAW FIRM, P.C.**

               **BY: MARK ANDREW FOTI, ESQ.**

15               16 West Main Street, Suite 100

               Rochester, New York 14614

16                 And

               **SOEHNLEIN LAW**

17               **BY: ERIC MICHAEL SOEHNLEIN, ESQ.**

               350 Main Street, Suite 2100

18               Buffalo, New York 14202

               For the Defendant

19

  <u>**PRESENT:**</u>        **KAREN A. CHAMPOUX, USA PARALEGAL**

20               **BRIAN A. BURNS, FBI SPECIAL AGENT**

               **MARILYN K. HALLIDAY, HSI SPECIAL AGENT**

21               **OLIVIA A. PROIA, J.D., PARALEGAL**

22  <u>**LAW CLERK:**</u>     **REBECCA FABIAN IZZO, ESQ.**

23  <u>**COURT CLERK:**</u>    **COLLEEN M. DEMMA**

24  <u>**REPORTER:**</u>      **ANN MEISSNER SAWYER, FCRR, RPR, CRR**

               Robert H. Jackson Courthouse

25               2 Niagara Square Buffalo, New York 14202

               Ann_Sawyer@nywd.uscourts.gov

09:40AM

| | | |
|---|---|---|
| 09:40AM | 1 | (Excerpt commenced at 9:40 a.m.) |
| 09:40AM | 2 | (Jury seated at 9:40 a.m.) |
| 09:40AM | 3 | **THE COURT:**  Good morning, everyone. |
| 09:40AM | 4 | **THE JURORS:**  Good morning. |
| 09:40AM | 5 | **THE COURT:**  I think the Christmas sweaters look |
| 09:40AM | 6 | lovely, which is probably why they make me wear black every |
| 09:40AM | 7 | day.  The record will reflect that all our jurors are present. |
| 09:40AM | 8 | I remind the witness that he's still under oath. |
| 09:40AM | 9 | And, Mr. Foti, you may continue. |
| 09:40AM | 10 | **MR. FOTI:**  Thank you.  All right.  Can we just -- at |
| 09:40AM | 11 | this time, can we just, for just the witness, can we pull up |
| 09:40AM | 12 | Government Exhibit 3539ED as in dog?  And can we go to page 2. |
| 09:40AM | 13 | |
| 09:40AM | 14 | **B R I A N   B U R N S**, having been previously duly called and |
| 09:40AM | 15 | sworn, continued to testify as follows: |
| 09:41AM | 16 | |
| 09:41AM | 17 | **(CONT'D) CROSS-EXAMINATION BY MR. FOTI:** |
| 09:41AM | 18 | Q.  Good morning, Special Agent Burns. |
| 09:41AM | 19 | A.  Good morning, Mr. Foti. |
| 09:41AM | 20 | Q.  You didn't talk to anybody about your testimony during |
| 09:41AM | 21 | the evening break, correct? |
| 09:41AM | 22 | A.  No, it was very quiet and peaceful.  Home early. |
| 09:41AM | 23 | Q.  Okay.  So where we left off, I was asking you yesterday |
| 09:41AM | 24 | about some of the content of a report that was prepared based |
| 09:41AM | 25 | on the review of the DVR, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

3

| 09:41AM | 1 | A. Correct. That I -- I didn't prepare, did you say you -- |
| 09:41AM | 2 | Q. No. A report that was prepared. |
| 09:41AM | 3 | A. Oh, okay. Certainly. |
| 09:41AM | 4 | Q. And I think that was established yesterday, you're not |
| 09:41AM | 5 | the one who prepared the -- |
| 09:41AM | 6 | A. Correct. |
| 09:41AM | 7 | Q. -- report. |
| 09:41AM | 8 | You are familiar with the fact that these reports were |
| 09:41AM | 9 | prepared as part of the investigation, correct? |
| 09:41AM | 10 | A. Yes, I am. |
| 09:41AM | 11 | Q. And you were familiar with what was contained in the |
| 09:41AM | 12 | court -- in the reports related to efforts to review the DVR |
| 09:41AM | 13 | footage, correct? |
| 09:41AM | 14 | A. That's -- that's correct. |
| 09:42AM | 15 | Q. And we're talking about, just to kind of circle back to |
| 09:42AM | 16 | yesterday, we're talking about DVR footage that was seized |
| 09:42AM | 17 | during the search of Pharaoh's on December 12th of 2019, |
| 09:42AM | 18 | correct? |
| 09:42AM | 19 | A. That's correct. |
| 09:42AM | 20 | Q. Okay. Now, up on your screen, right now the jury can't |
| 09:42AM | 21 | see this, but this is the report that I was asking you about |
| 09:42AM | 22 | in regard to DVR 1, correct? |
| 09:42AM | 23 | A. Correct. |
| 09:42AM | 24 | Q. And just to again kind of remind the jury of what we |
| 09:42AM | 25 | discussed yesterday, there were three DVRs that were seized |

09:42AM    1    from Pharaoh's during the search, correct?

09:42AM    2    A.   That's correct.

09:42AM    3    Q.   And they were labeled -- for organization purposes, they

09:42AM    4    were labeled DVR 1, 2, and 3, right?

09:42AM    5    A.   That's correct.

09:42AM    6    Q.   Okay.  And what we had talked about yesterday and what's

09:42AM    7    on the screen right now is all related to DVR 1, correct?

09:42AM    8    A.   That's accurate.

09:42AM    9    Q.   Okay.  Now, this is the DVR that you had testified on

09:42AM   10    direct covers basically a seven-week span, right?

09:42AM   11    A.   That's correct.

09:42AM   12    Q.   And we talked about that a little bit yesterday, that

09:42AM   13    it -- the recordings appear to begin on October 21st of 2019,

09:42AM   14    right?

09:43AM   15    A.   That's correct.

09:43AM   16    Q.   Okay.  Now, at this time, and this is the report that

09:43AM   17    was -- this is the same report that we were talking about

09:43AM   18    yesterday and that you reviewed as part of the investigation

09:43AM   19    related to DVR 1, correct?

09:43AM   20    A.   That's correct.

09:43AM   21    Q.   This report is the same or substantially same condition

09:43AM   22    as -- as any -- any prior time that you reviewed the report

09:43AM   23    as part of the investigation, correct?

09:43AM   24    A.   Yeah.  It's an accurate representation of this report.

          25

| | | |
|---|---|---|
| 09:43AM | 1 | **MR. FOTI:**  Okay.  Judge, at this time, I would move |
| 09:43AM | 2 | Government Exhibit 3539ED into evidence. |
| 09:43AM | 3 | **MR. TRIPI:**  No objection. |
| 09:43AM | 4 | **THE COURT:**  Received without objection. |
| 09:43AM | 5 | **(GOV Exhibit 3539ED was received in evidence.)** |
| 09:43AM | 6 | **MR. FOTI:**  All right.  So if we can publish for the |
| 09:43AM | 7 | jury what's on the screen. |
| 09:43AM | 8 | **THE CLERK:**  You're all set. |
| 09:43AM | 9 | **MR. FOTI:**  Okay.  Thank you. |
| 09:43AM | 10 | **BY MR. FOTI:** |
| 09:43AM | 11 | Q.  Yesterday I was asking you questions about this, and you |
| 09:43AM | 12 | were kind of referring to the document.  We're going to go |
| 09:43AM | 13 | through it with -- in front of the jury so they can see what |
| 09:43AM | 14 | you're seeing, okay? |
| 09:43AM | 15 | A.  Yeah, that will be helpful. |
| 09:44AM | 16 | Q.  Okay.  We talked about what -- what's on this page of the |
| 09:44AM | 17 | report is reference to the three of the cameras that are in |
| 09:44AM | 18 | DVR 1, correct? |
| 09:44AM | 19 | A.  That's correct. |
| 09:44AM | 20 | Q.  Okay.  And I'm just going to briefly circle paragraph |
| 09:44AM | 21 | here to sort of start. |
| 09:44AM | 22 | This is the paragraph I was talking about, that talks |
| 09:44AM | 23 | about there being six different camera angles inside the |
| 09:44AM | 24 | VIP Room, correct? |
| 09:44AM | 25 | A.  That's correct. |

09:44AM  1  Q.  One camera angle of the stage, correct?

09:44AM  2  A.  Correct.

09:44AM  3  Q.  And then as you testified to today, there's one camera

09:44AM  4  that just doesn't have any video, right?

09:44AM  5  A.  That's accurate.

09:44AM  6  Q.  Okay.  And this is -- this paragraph documents the

09:44AM  7  specific times of the recordings that we talked about going

09:44AM  8  from October 21st, 2019, up until December 11th or 12th of

09:44AM  9  2019, correct?

09:44AM  10  A.  That is correct.

09:44AM  11  Q.  Okay.  As this paragraph notes at the end, a review was

09:44AM  12  conducted of the video, and then the summary of each camera

09:44AM  13  is provided below, correct?

09:45AM  14  A.  That's accurate.

09:45AM  15  Q.  All right.  Okay.  Now, camera 1 is -- and I was asking

09:45AM  16  this -- about this yesterday, but this is video footage from

09:45AM  17  a room sectioned off by three areas that each have a brown

09:45AM  18  loveseat-style couch, correct?

09:45AM  19  A.  That's correct.

09:45AM  20  Q.  Okay.  And as far as you know, each one of the couches

09:45AM  21  that are contained in the VIP Room are visible throughout

09:45AM  22  these different cameras, correct?

09:45AM  23  A.  Based on the report, that's what it appears.

09:45AM  24  Q.  Okay.  Now, camera 1, the determination from the review

09:45AM  25  of the agent was that it contained no relevant information,

USA v Gerace - Burns - Foti/Cross - 12/18/24

| | | |
|---|---|---|
| 09:45AM | 1 | correct? |
| 09:45AM | 2 | A.  There's a summary of it, and there is a line in there |
| 09:45AM | 3 | that says camera 1 contains no relevant information. |
| 09:45AM | 4 | Q.  Right.  And we'll go through the summary in a moment. |
| 09:46AM | 5 | But before the summary is provided in the report, the |
| 09:46AM | 6 | determination is provided that the agent didn't find any |
| 09:46AM | 7 | information based on her review, correct? |
| 09:46AM | 8 | A.  Based on the review. |
| 09:46AM | 9 | Q.  And I'm going to circle the paragraph. |
| 09:46AM | 10 | Now, what the -- what the camera 1 shows generally is |
| 09:46AM | 11 | customers coming in and engaging in -- and dancers engaging |
| 09:46AM | 12 | in lap dances, correct? |
| 09:46AM | 13 | A.  That's correct. |
| 09:46AM | 14 | Q.  Okay.  And this paragraph goes on to describe at least |
| 09:46AM | 15 | many of the lap dances that are viewed on camera 1, right? |
| 09:46AM | 16 | A.  Correct. |
| 09:46AM | 17 | Q.  So this indicates that in most cases, the clothing stays, |
| 09:46AM | 18 | the bottom garments stay on, but on a few occasions the |
| 09:46AM | 19 | dancers would take off their bottom garments, correct? |
| 09:46AM | 20 | A.  That's correct. |
| 09:46AM | 21 | Q.  That -- that there's nothing in here indicating that any |
| 09:46AM | 22 | patrons or customers ever took their pants off, correct? |
| 09:46AM | 23 | A.  That's correct. |
| 09:46AM | 24 | Q.  It indicates that the dancer would straddle the male's |
| 09:47AM | 25 | lap and grind her genitals on the male's lap, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

8

| | | |
|---|---|---|
| 09:47AM | 1 | A.  That's correct. |
| 09:47AM | 2 | Q.  It indicates that at least in some of the clips there was |
| 09:47AM | 3 | an observation that the male appeared to be erect, have an |
| 09:47AM | 4 | erection, correct? |
| 09:47AM | 5 | A.  That's what the report states. |
| 09:47AM | 6 | Q.  Okay.  That there's some discussion of how the dance |
| 09:47AM | 7 | would continue, that the dancer would turn around, grind her |
| 09:47AM | 8 | buttocks on the male's lap, correct? |
| 09:47AM | 9 | A.  That's correct. |
| 09:47AM | 10 | Q.  That she would occasionally do the same with her breasts, |
| 09:47AM | 11 | correct? |
| 09:47AM | 12 | A.  That's correct. |
| 09:47AM | 13 | Q.  And in some clips, you can actually see the customers and |
| 09:47AM | 14 | the dancers kissing at some point, correct? |
| 09:47AM | 15 | A.  That's correct. |
| 09:47AM | 16 | Q.  That there would occasionally be some contact where the |
| 09:47AM | 17 | males would fondle the dancer's breasts or other parts of |
| 09:47AM | 18 | their body, correct? |
| 09:47AM | 19 | A.  That's correct. |
| 09:47AM | 20 | Q.  And when a dance concludes, it would appear that, at |
| 09:47AM | 21 | least in most instances, the male would give the dancer |
| 09:47AM | 22 | money, correct? |
| 09:47AM | 23 | A.  That's correct. |
| 09:47AM | 24 | Q.  And your understanding, based on the testimony of this |
| 09:47AM | 25 | trial and based on the investigation, is that if the customer |

09:48AM    1    was giving the dancer money at that point, it was in regard

09:48AM    2    to tips, correct?

09:48AM    3    A.  If it was cash, yes.  If it wasn't the chips, it was

09:48AM    4    cash, it would be a tip.

09:48AM    5    Q.  This describes sort of what is referred to as generally

09:48AM    6    the lap dances that would occur in these clips on camera 1,

09:48AM    7    correct?

09:48AM    8    A.  Correct.

09:48AM    9    Q.  What is not described anywhere is an observation of any

09:48AM   10    type of, in camera 1, there was no observation ever made of

09:48AM   11    any vaginal sex, correct?

09:48AM   12    A.  Correct.

09:48AM   13    Q.  In camera 1, there was no observation ever made of any

09:48AM   14    anal sex, correct?

09:48AM   15    A.  Correct.

09:48AM   16    Q.  In camera 1, there was no observation ever made of any

09:48AM   17    digital penetration, correct?

09:48AM   18    A.  Correct.

09:48AM   19    Q.  Camera 1 indicates that the male customers would keep

09:49AM   20    their pants on throughout the dances, correct?

09:49AM   21    A.  There's no representation of clothes coming off of the

09:49AM   22    males.

09:49AM   23    Q.  So, and when you say "there's no representation," you're

09:49AM   24    saying other than the sentence both the male and female leave

09:49AM   25    their bottom garments on, correct?  With the exception of

USA v Gerace - Burns - Foti/Cross - 12/18/24

09:49AM  1  where the dancer would take her bottom garments off?

09:49AM  2  A.  Correct.

09:49AM  3  Q.  So as far as this report indicates, the male customers

09:49AM  4  would leave their bottom garments on, correct?

09:49AM  5  A.  That's correct.

09:49AM  6  Q.  No observations indicating anything otherwise?

09:49AM  7  A.  Correct.

09:49AM  8  Q.  Okay.  Now, I'll just clear that.

09:49AM  9      Camera 2, as visible from this exhibit, is video footage

09:49AM  10  of the stage and not the VIP Room, correct?

09:49AM  11  A.  That's correct.

09:49AM  12  Q.  So when you talked about yesterday that one of the

09:49AM  13  cameras was outside the VIP Room, that was camera 2?

09:50AM  14  A.  That's correct.

09:50AM  15  Q.  And this indicates that camera 2 shows exotic dancing and

09:50AM  16  customers approaching the stage and giving the dancer money,

09:50AM  17  correct?

09:50AM  18  A.  That's correct.

09:50AM  19  Q.  Nothing indicated that there was anything really besides

09:50AM  20  that happening on camera 2?

09:50AM  21  A.  On camera 2, correct.

09:50AM  22  Q.  And -- and the agent's conclusion within this report is

09:50AM  23  that what says -- says camera 1, but I think the conclusion

09:50AM  24  is there's no relevant information from camera 2?

09:50AM  25  A.  Yeah, I believe it's a typo.

USA v Gerace - Burns - Foti/Cross - 12/18/24

| | | |
|---|---|---|
| 09:50AM | 1 | Q.  Sure.  Okay.  Camera 3 is, once again, we're back in the |
| 09:50AM | 2 | VIP Room, correct? |
| 09:50AM | 3 | A.  Camera 3, yes. |
| 09:50AM | 4 | Q.  And this is video footage of a long room containing a |
| 09:50AM | 5 | brown loveseat-style couch, correct? |
| 09:50AM | 6 | A.  That's correct. |
| 09:50AM | 7 | Q.  Again, the conclusion after reviewing the footage was |
| 09:50AM | 8 | there was no relevant information? |
| 09:50AM | 9 | A.  Correct. |
| 09:50AM | 10 | Q.  Now, similar to camera 1, this report goes through and |
| 09:50AM | 11 | documents what camera 3 generally showed, correct? |
| 09:51AM | 12 | A.  That's correct. |
| 09:51AM | 13 | Q.  Generally showed male customers and dancers engaging in |
| 09:51AM | 14 | lap dances, correct? |
| 09:51AM | 15 | A.  Correct. |
| 09:51AM | 16 | Q.  And then it gives a description generally of those lap |
| 09:51AM | 17 | dances that is very similar to what's in camera 1, correct? |
| 09:51AM | 18 | A.  That's correct. |
| 09:51AM | 19 | Q.  Okay.  And again, in terms of camera 3, no indication |
| 09:51AM | 20 | that there was ever any vaginal sex observed, correct? |
| 09:51AM | 21 | A.  Correct. |
| 09:51AM | 22 | Q.  No anal sex observed in camera 3, correct? |
| 09:51AM | 23 | A.  Correct. |
| 09:51AM | 24 | Q.  No digital penetration, correct? |
| 09:51AM | 25 | A.  Correct. |

09:51AM 1   Q.  No other physical contact where -- that involved a male

09:51AM 2   taking off his pants, correct?

09:51AM 3   A.  Taking -- correct.

09:51AM 4        MR. FOTI:  Okay.  Can we go to the next page of the

09:51AM 5   document, please?

09:51AM 6        BY MR. FOTI:

09:51AM 7   Q.  Okay.  Camera 4.  Again, inside the VIP Room, correct?

09:51AM 8   A.  Correct.

09:51AM 9   Q.  And you can see another one of the couches from camera 4,

09:51AM 10  right?

09:51AM 11  A.  Correct.

09:51AM 12  Q.  And the conclusion in camera 4, again, after reviewing

09:51AM 13  the footage, is that it contained no relevant information,

09:51AM 14  correct?

09:51AM 15  A.  Per the report.

09:51AM 16  Q.  And -- and you were never told anything other than, you

09:52AM 17  don't have any information other than what's in the report

09:52AM 18  regarding what was viewed on the footage, correct?

09:52AM 19  A.  Correct.  As I mentioned yesterday, I had not

09:52AM 20  independently reviewed those.

09:52AM 21  Q.  Right.  So you're relying on the report to essentially

09:52AM 22  inform you of what was viewable and what could be determined

09:52AM 23  by watching the footage, correct?

09:52AM 24  A.  Correct.

09:52AM 25  Q.  Now this report, again, indicates for camera 4 there's no

USA v Gerace - Burns - Foti/Cross - 12/18/24

13

| | | |
|---|---|---|
| 09:52AM | 1 | relevant information, correct? |
| 09:52AM | 2 | A.  Correct. |
| 09:52AM | 3 | Q.  And camera 4 again generally shows male customers and |
| 09:52AM | 4 | dancers engaging in lap dances, correct? |
| 09:52AM | 5 | A.  Correct. |
| 09:52AM | 6 | Q.  And it describes the lap dances very similar to how it |
| 09:52AM | 7 | described the lap dances in camera 1 and camera 3, correct? |
| 09:52AM | 8 | A.  Correct. |
| 09:52AM | 9 | Q.  And, again, it indicates that the males would keep their |
| 09:52AM | 10 | pants on, correct? |
| 09:52AM | 11 | A.  Yes. |
| 09:52AM | 12 | Q.  And, again, in camera 4 there's no indication that there |
| 09:52AM | 13 | was any vaginal sex ever observed in that seven-week period, |
| 09:52AM | 14 | correct? |
| 09:52AM | 15 | A.  Correct. |
| 09:52AM | 16 | Q.  No anal sex observed, correct? |
| 09:52AM | 17 | A.  Correct. |
| 09:52AM | 18 | Q.  No digital penetration, correct? |
| 09:53AM | 19 | A.  Correct. |
| 09:53AM | 20 | Q.  No other sex act identified in here, correct? |
| 09:53AM | 21 | A.  There's groping and kissing. |
| 09:53AM | 22 | Q.  So, okay.  Fair enough.  So there's groping and kissing, |
| 09:53AM | 23 | and I guess we could have -- argue over whether that's a sex |
| 09:53AM | 24 | act.  But definitely no type of penetration of any kind, |
| 09:53AM | 25 | correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

14

09:53AM 1    A.  Correct.

09:53AM 2    Q.  And what's described in here is consistent with what is

09:53AM 3    identified as generally showing male customers and dancers

09:53AM 4    engaging in lap dances, correct?

09:53AM 5    A.  Correct.

09:53AM 6    Q.  Okay.  Camera 5 is a room containing three brown

09:53AM 7    loveseat-style couches, correct?

09:53AM 8    A.  That's correct.

09:53AM 9    Q.  So camera 5, some of the rooms in the VIP area had

09:53AM 10   multiple couches within a single room, correct?

09:53AM 11   A.  Correct, based on the photographs I saw.

09:53AM 12   Q.  Okay.  Because you don't have an independent recollection

09:53AM 13   of the what the VIP Room looked like yourself, correct?

09:53AM 14   A.  I remember generally seeing it, but I don't have a really

09:54AM 15   clear recollection of it.

09:54AM 16   Q.  You said you might have been on the outside at some

09:54AM 17   point, the peripheral --

09:54AM 18   A.  Correct.  I think I looked in there and possibly I walked

09:54AM 19   through.  Again, my focus was engaging with Mr. Ermin.

09:54AM 20   Q.  If you do have a memory of looking into the VIP Room, the

09:54AM 21   first VIP Room that's present has multiple couches, correct?

09:54AM 22        If you don't, if you don't remember.  It's okay.

09:54AM 23   A.  Yeah, I don't clearly remember, but I remember seeing the

09:54AM 24   photos that were used.

09:54AM 25   Q.  Okay.  So we, at least according to this report, it's

USA v Gerace - Burns - Foti/Cross - 12/18/24
15

09:54AM    1    clear that there was a camera showing multiple couches within

09:54AM    2    a single room, correct?

09:54AM    3    A.   Correct.

09:54AM    4    Q.   Okay.  And, again, the conclusion after watching that

09:54AM    5    footage is that there was no relevant information identified,

09:54AM    6    correct?

09:54AM    7    A.   That's what the report states.

09:54AM    8    Q.   Yep.  And, again, it indicates that there are

09:54AM    9    observations made of male customers and dancers engaging in

09:54AM   10    lap dances, correct?

09:54AM   11    A.   Correct.

09:54AM   12    Q.   And in -- it describes those lap dances in a way that's

09:55AM   13    very similar to the other cameras, correct?

09:55AM   14    A.   Correct.

09:55AM   15    Q.   Okay.  And, again, in terms of camera 5, there's no

09:55AM   16    indication that any vaginal sex was ever observed, correct?

09:55AM   17    A.   That's correct.

09:55AM   18    Q.   No anal sex, correct?

09:55AM   19    A.   Correct.

09:55AM   20    Q.   No digital penetration, correct?

09:55AM   21    A.   Correct.

09:55AM   22    Q.   And, again, in camera 5 the male customers that were

09:55AM   23    observed always kept their pants on, correct?

09:55AM   24    A.   Correct.

09:55AM   25    Q.   Okay.  Camera 6 is a camera of a small room within the

USA v Gerace - Burns - Foti/Cross - 12/18/24

16

09:55AM    1    VIP area that contained a brown loveseat-style couch,

09:55AM    2    correct?

09:55AM    3    A.  Correct.

09:55AM    4    Q.  And I don't want to become too repetitive here, but this

09:55AM    5    is very similar to the other cameras?

09:55AM    6    A.  Yes.

09:55AM    7    Q.  Another determination was made that after viewing the

09:55AM    8    footage on camera 6, there was no relevant information,

09:55AM    9    correct?

09:55AM    10    A.  Correct.

09:55AM    11    Q.  It describes lap dances very similar to the other

09:55AM    12    cameras, correct?

09:55AM    13    A.  It does.

09:55AM    14    Q.  And just like the other cameras, there was no

09:56AM    15    observations of any vaginal sex, correct?

09:56AM    16    A.  Correct.

09:56AM    17    Q.  No anal sex, correct?

09:56AM    18    A.  Correct.

09:56AM    19    Q.  No digital penetration, correct?

09:56AM    20    A.  Correct.

09:56AM    21         **MR. FOTI:**  Okay.  Can we go to the next page, please.

09:56AM    22         **BY MR. FOTI:**

09:56AM    23    Q.  And the last camera that showed footage was camera 7,

09:56AM    24    correct?

09:56AM    25    A.  That's correct.

USA v Gerace - Burns - Foti/Cross - 12/18/24

17

| | | |
|---|---|---|
| 09:56AM | 1 | Q.  And camera 7 is also of a small room within the VIP area |
| 09:56AM | 2 | showing a couch, correct? |
| 09:56AM | 3 | A.  A brown loveseat-style couch, correct. |
| 09:56AM | 4 | Q.  Yep.  And very similar to the other cameras, it's |
| 09:56AM | 5 | indicated that watching the footage showed that there was |
| 09:56AM | 6 | customers and dancers engaging in lap dances, correct? |
| 09:56AM | 7 | A.  That's correct. |
| 09:56AM | 8 | Q.  Dances are described the same way they are in the other |
| 09:56AM | 9 | cameras, correct? |
| 09:56AM | 10 | A.  Correct. |
| 09:56AM | 11 | Q.  A determination is made that there's no relevant |
| 09:56AM | 12 | information, correct? |
| 09:56AM | 13 | A.  That's what report states. |
| 09:56AM | 14 | Q.  And then nobody ever has indicated as part of this |
| 09:56AM | 15 | investigation that who watched the footage that made a |
| 09:56AM | 16 | determination different than that, correct? |
| 09:56AM | 17 | A.  I'm sorry, can you rephrase that? |
| 09:56AM | 18 | Q.  Nobody else watched this footage that indicated that |
| 09:57AM | 19 | there was relevant information contained in these? |
| 09:57AM | 20 | A.  Yeah, I believe they're -- just the one agent reviewed |
| 09:57AM | 21 | it. |
| 09:57AM | 22 | Q.  Okay.  And -- and, again, camera 7, similar to all of the |
| 09:57AM | 23 | other cameras in the VIP Room, there's no indication there |
| 09:57AM | 24 | was any vaginal sex observed, correct? |
| 09:57AM | 25 | A.  Correct. |

USA v Gerace - Burns - Foti/Cross - 12/18/24

18

| | | |
|---|---|---|
| 09:57AM | 1 | Q.  No anal sex observed, correct? |
| 09:57AM | 2 | A.  Correct. |
| 09:57AM | 3 | Q.  No digital penetration, correct? |
| 09:57AM | 4 | A.  Correct. |
| 09:57AM | 5 | Q.  No instance of any male attempting to take his pants off, |
| 09:57AM | 6 | correct? |
| 09:57AM | 7 | A.  Correct. |
| 09:57AM | 8 | **MR. FOTI:**  Okay.  We can take that exhibit down. |
| 09:57AM | 9 | Can we pull up 3539EE.  And can we go to page -- |
| 09:57AM | 10 | **BY MR. FOTI:** |
| 09:57AM | 11 | Q.  Well, first, Special Agent Burns, if you can just look at |
| 09:58AM | 12 | that first page.  This is another report related to DVR 2, |
| 09:58AM | 13 | correct? |
| 09:58AM | 14 | A.  Correct.  This is the report related to DVR 2. |
| 09:58AM | 15 | Q.  Okay.  And DVR 2, we're talking about another one of the |
| 09:58AM | 16 | DVRs that was seized from Pharaoh's in December of 2019? |
| 09:58AM | 17 | A.  Yes, it was 203. |
| 09:58AM | 18 | **MR. FOTI:**  Can we go to page 2, please. |
| 09:58AM | 19 | **BY MR. FOTI:** |
| 09:58AM | 20 | Q.  Okay.  Now, on direct you testified that the other two |
| 09:58AM | 21 | DVR system, DVR 2 and 3, did not record as long of a period |
| 09:58AM | 22 | of time as what was in the VIP Room, correct? |
| 09:58AM | 23 | A.  That's correct. |
| 09:58AM | 24 | Q.  This particular DVR system recorded going back about two |
| 09:58AM | 25 | weeks, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

19

| | | |
|---|---|---|
| 09:58AM | 1 | A.   That's correct. |
| 09:58AM | 2 | Q.   And I think you can see in the report, which is not in |
| 09:58AM | 3 | evidence yet, but I expect will be in a moment -- |
| 09:58AM | 4 | A.   Certainly. |
| 09:58AM | 5 | Q.   -- that the majority of the footage starts from |
| 09:58AM | 6 | November 28th, 2019, and goes until about the time of the |
| 09:59AM | 7 | search, correct? |
| 09:59AM | 8 | A.   Correct, based on the first page. |
| 09:59AM | 9 | Q.   Okay.  Now, this is -- you're familiar with this being a |
| 09:59AM | 10 | report that was prepared based on the review of DVR 2, |
| 09:59AM | 11 | correct? |
| 09:59AM | 12 | A.   Correct. |
| 09:59AM | 13 | Q.   And you were aware that had happened as part of the |
| 09:59AM | 14 | investigation, correct? |
| 09:59AM | 15 | A.   Yes, I was. |
| 09:59AM | 16 | Q.   And you're familiar with this report, correct? |
| 09:59AM | 17 | A.   Yes, I am, generally. |
| 09:59AM | 18 | Q.   And this is the same report that you've reviewed in the |
| 09:59AM | 19 | past in regard to the review of DVR 2, correct? |
| 09:59AM | 20 | A.   That's correct. |
| 09:59AM | 21 | Q.   No changes that you see, correct? |
| 09:59AM | 22 | A.   No. |
| 09:59AM | 23 | **MR. FOTI:**  Okay.  At this time, I would seek to move |
| 09:59AM | 24 | Government Exhibit 3539EE into evidence. |
| 09:59AM | 25 | **MR. TRIPI:**  No objection. |

| | | |
|---|---|---|
| 09:59AM | 1 | **THE COURT:**  Received without objection. |
| 09:59AM | 2 | **(GOV Exhibit 3539EE was received in evidence.)** |
| 09:59AM | 3 | **BY MR. FOTI:** |
| 09:59AM | 4 | Q.  Okay.  Now, I don't know if you remember without going |
| 09:59AM | 5 | through it, but this report is a little bit longer than the |
| 09:59AM | 6 | other one, just based on the page numbers you can see up at |
| 09:59AM | 7 | the top-right corner, correct? |
| 09:59AM | 8 | A.  And the number -- there's quite a few more cameras on |
| 09:59AM | 9 | this -- |
| 09:59AM | 10 | Q.  Right. |
| 10:00AM | 11 | A.  -- DVR. |
| 10:00AM | 12 | Q.  Yep.  On this one, on this particular DVR, there was a |
| 10:00AM | 13 | total of 37 cameras; is that correct? |
| 10:00AM | 14 | A.  That's correct. |
| 10:00AM | 15 | Q.  I think there might have been one that didn't show |
| 10:00AM | 16 | footage, but the majority of them showed footage, correct? |
| 10:00AM | 17 | A.  That's correct. |
| 10:00AM | 18 | Q.  Okay.  And I just, without spending time going through |
| 10:00AM | 19 | what was generally shown on each one, I just want to cover |
| 10:00AM | 20 | what cameras were on this particular DVR. |
| 10:00AM | 21 | So looking at this exhibit -- |
| 10:00AM | 22 | **MR. FOTI:**  This is published to the jury at this |
| 10:00AM | 23 | point? |
| 10:00AM | 24 | **THE CLERK:**  Yes. |
| | 25 | |

10:00AM    1          **MR. FOTI:**  Thank you.

10:00AM    2          **BY MR. FOTI:**

10:00AM    3   Q.  -- so looking at this exhibit, you can see camera 1 is of

10:00AM    4   the front desk, or it says front desk, but it's -- that's

10:00AM    5   located near the front door of Pharaoh's, correct?

10:00AM    6   A.  Yeah, the office is right off the -- the one door.

10:00AM    7   Q.  Yep.  And then camera 2 is a location in the front

10:00AM    8   vestibule of Pharaoh's, correct?

10:00AM    9   A.  Correct.

10:00AM   10   Q.  Camera 3 is a location outside the front entrance looking

10:01AM   11   down, correct?

10:01AM   12   A.  That's correct.

10:01AM   13   Q.  Camera 4 is a location, the left side of Pharaoh's facing

10:01AM   14   the stage, correct?

10:01AM   15   A.  Correct.

10:01AM   16   Q.  Camera 5 is a location, the right side of Pharaoh's

10:01AM   17   facing the stage, correct?

10:01AM   18   A.  That's correct.

10:01AM   19   Q.  Okay.  Now before we move on to the next page, these

10:01AM   20   first five cameras each, in this exhibit that's now in

10:01AM   21   evidence, provide a summary of what was observed in each of

10:01AM   22   these areas, correct?

10:01AM   23   A.  That's correct.

10:01AM   24   Q.  At least what was observed in the video footage that

10:01AM   25   covers this two-week span, right?

USA v Gerace - Burns - Foti/Cross - 12/18/24

| | | |
|---|---|---|
| 10:01AM | 1 | A.  Yes, by the agent that reviewed it, or agents, I can't |
| 10:01AM | 2 | recall if it was multiple. |
| 10:01AM | 3 | Q.  Right.  And to skip asking about each camera |
| 10:01AM | 4 | individually, just looking at this report, this first page of |
| 10:01AM | 5 | the report, would you agree with cameras 1 through 5 a |
| 10:01AM | 6 | determination was made by the agent that there was no |
| 10:01AM | 7 | relevant information on the footage from any of these |
| 10:01AM | 8 | cameras, correct? |
| 10:01AM | 9 | A.  Correct. |
| 10:01AM | 10 | Q.  Okay.  And -- and you would agree, based on your review |
| 10:02AM | 11 | of the report, there was no indication that there was any |
| 10:02AM | 12 | visible drug use, correct? |
| 10:02AM | 13 | A.  Correct. |
| 10:02AM | 14 | Q.  No -- there is no observation of what appears to be a |
| 10:02AM | 15 | drug transaction, correct? |
| 10:02AM | 16 | A.  Correct. |
| 10:02AM | 17 | Q.  No observation of what would appear to be any type of |
| 10:02AM | 18 | illegal contraband, correct? |
| 10:02AM | 19 | A.  Correct. |
| 10:02AM | 20 | **MR. FOTI:**  Okay.  Can we go page 2 of the report, |
| 10:02AM | 21 | please? |
| 10:02AM | 22 | **BY MR. FOTI:** |
| 10:02AM | 23 | Q.  Okay.  Camera 6 is a location on the right side of the |
| 10:02AM | 24 | Pharaoh's bar facing the left side of the bar, correct? |
| 10:02AM | 25 | A.  Yes, correct. |

USA v Gerace - Burns - Foti/Cross - 12/18/24

23

| | | |
|---|---|---|
| 10:02AM | 1 | Q.  And camera 7 is basically the other side of the bar, it's |
| 10:02AM | 2 | the left side of the Pharaoh's bar facing right? |
| 10:02AM | 3 | A.  Correct. |
| 10:02AM | 4 | Q.  Camera 8 is a location near the waitress station on the |
| 10:02AM | 5 | left side of the bar, correct? |
| 10:02AM | 6 | A.  That's correct. |
| 10:02AM | 7 | Q.  Camera 9 is a location over the cash register behind the |
| 10:03AM | 8 | bar, correct? |
| 10:03AM | 9 | A.  That's correct. |
| 10:03AM | 10 | Q.  Camera 10 is a location over the cash register as well? |
| 10:03AM | 11 | A.  Correct. |
| 10:03AM | 12 | Q.  Camera 11 is a location on the right side of the stage of |
| 10:03AM | 13 | Pharaoh's with a view of the bar, correct? |
| 10:03AM | 14 | A.  That's correct. |
| 10:03AM | 15 | Q.  And so the pattern that's -- that is developing here is |
| 10:03AM | 16 | these cameras are of some of the areas of Pharaoh's, they |
| 10:03AM | 17 | have different angles on different portions of that front |
| 10:03AM | 18 | room, correct? |
| 10:03AM | 19 | A.  That's accurate. |
| 10:03AM | 20 | Q.  Okay.  Camera -- I don't know if I asked you about camera |
| 10:03AM | 21 | 11, but camera 11 is the location on the right side of the |
| 10:03AM | 22 | stage with a view of the bar, correct? |
| 10:03AM | 23 | A.  That's correct. |
| 10:03AM | 24 | Q.  Camera 12 is a location at the employee entrance of the |
| 10:03AM | 25 | office, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

24

| | | |
|---|---|---|
| 10:03AM | 1 | A.  That's correct. |
| 10:03AM | 2 | Q.  So that camera would cover an area where employees would |
| 10:03AM | 3 | enter into the building, correct? |
| 10:03AM | 4 | A.  That's correct, for the report. |
| 10:03AM | 5 | Q.  And camera 13 is of the kitchen or prep area within the |
| 10:03AM | 6 | kitchen, correct? |
| 10:03AM | 7 | A.  Of the window -- I recall there was a kind of like a |
| 10:04AM | 8 | restaurant, or -- where you have the window and you put the |
| 10:04AM | 9 | food up. |
| 10:04AM | 10 | Q.  As the report says, the food service window? |
| 10:04AM | 11 | A.  Correct, yes. |
| 10:04AM | 12 | Q.  And camera 14 is video footage of the liquor room, |
| 10:04AM | 13 | correct? |
| 10:04AM | 14 | A.  That's correct. |
| 10:04AM | 15 | Q.  Okay.  And again, I'm going to do this all together. |
| 10:04AM | 16 | Cameras 6 through 14 that are discussed on this page, |
| 10:04AM | 17 | there was observations discussed within this document of what |
| 10:04AM | 18 | was observable for each of these areas, correct? |
| 10:04AM | 19 | A.  That's correct. |
| 10:04AM | 20 | Q.  And in the review of each of these cameras, a |
| 10:04AM | 21 | determination was made that there was no relevant |
| 10:04AM | 22 | information, correct? |
| 10:04AM | 23 | A.  Per the report, correct. |
| 10:04AM | 24 | Q.  So per the report from cameras 6 through 14, there's no |
| 10:04AM | 25 | indication that there was any observations of drug use, |

10:04AM    1    correct?

10:04AM    2    A.  Correct.

10:04AM    3    Q.  No observations of any type of apparent drug transaction,

10:04AM    4    correct?

10:04AM    5    A.  That's correct.

10:04AM    6    Q.  No observation of what appeared to be drugs or

10:04AM    7    contraband, correct?

10:04AM    8    A.  No reference to that activity.

10:04AM    9    Q.  Okay.  And something like that would obviously be pretty

10:04AM    10   significant, correct?

10:05AM    11   A.  Correct.  I would document it.

10:05AM    12   Q.  Yep.

10:05AM    13          **MR. FOTI:**  Can we go to the next page, please.

10:05AM    14          **BY MR. FOTI:**

10:05AM    15   Q.  All right.  Going through this, camera 15, a location

10:05AM    16   behind the bar, correct?

10:05AM    17   A.  Correct.

10:05AM    18   Q.  Camera 16, a location in the pool table area to the left

10:05AM    19   of the stage, correct?

10:05AM    20   A.  Correct.

10:05AM    21   Q.  Camera 17 is in the hallway that leads to the bathroom

10:05AM    22   and the VIP area, correct?

10:05AM    23   A.  Yeah, and the locker room.

10:05AM    24   Q.  And the locker room?

10:05AM    25   A.  Correct.

10:05AM   1   Q.  That's what's indicated on the report, right?

10:05AM   2   A.  On the report, yes.

10:05AM   3   Q.  Okay.  Camera 18 is a location outside where there's a

10:05AM   4   fenced-in area which is a smoking area, correct?

10:05AM   5   A.  That's correct.

10:05AM   6   Q.  And you recall that being sort of just before you go down

10:05AM   7   the hallway to the VIP area?  If you don't, that's fine.

10:05AM   8   A.  Yeah, I don't.  I don't have an independent recollection

10:06AM   9   of that.

10:06AM   10   Q.  You've told us a couple times, you were focused on the

10:06AM   11   interview of John Ermin.

10:06AM   12   A.  Correct.

10:06AM   13   Q.  Camera 19 a location by the employee entrance with a view

10:06AM   14   of the parking lot?

10:06AM   15   A.  Correct.

10:06AM   16   Q.  Camera 20 is a location in the office, correct?

10:06AM   17   A.  That's correct.

10:06AM   18   Q.  Camera 21 is a location that covers the screen of one of

10:06AM   19   the cash registers, right?

10:06AM   20   A.  I'm sorry, which camera was that?

10:06AM   21   Q.  I think I said 21.  I meant to say 21.

10:06AM   22   A.  Yes, that's correct.

10:06AM   23   Q.  Which appears to be in, like, the waitress station area?

10:06AM   24   A.  Correct.  Yeah.

10:06AM   25   Q.  Camera 22 is of the parking lot, or it's a view of one of

USA v Gerace - Burns - Foti/Cross - 12/18/24

27

| 10:06AM | 1 | the areas of the parking lot? |
| 10:06AM | 2 | A.  That's correct. |
| 10:06AM | 3 | Q.  Okay.  Now, again, cameras 15 through 22, each of -- this |
| 10:06AM | 4 | exhibit indicates that there is -- was observations made of |
| 10:07AM | 5 | what was viewable during that two-week span from each of |
| 10:07AM | 6 | these cameras, correct? |
| 10:07AM | 7 | A.  Correct. |
| 10:07AM | 8 | Q.  And a summary is generally given of what you could |
| 10:07AM | 9 | generally see in each of these areas when you review the |
| 10:07AM | 10 | footage, correct? |
| 10:07AM | 11 | A.  That's correct. |
| 10:07AM | 12 | Q.  Okay.  And in -- in each of these, the review of each of |
| 10:07AM | 13 | these cameras, 15 through 22, resulted in the same conclusion |
| 10:07AM | 14 | by the agent that there was no relevant information, correct? |
| 10:07AM | 15 | A.  Correct. |
| 10:07AM | 16 | Q.  And again, in cameras 15 through 22, there was no |
| 10:07AM | 17 | observations of any drug use, correct? |
| 10:07AM | 18 | A.  There's no notation of that. |
| 10:07AM | 19 | Q.  There's no indication that there was an observation of |
| 10:07AM | 20 | any drug transaction, correct? |
| 10:07AM | 21 | A.  Correct. |
| 10:07AM | 22 | Q.  There's no indication that there was any observation of |
| 10:07AM | 23 | what appeared to potentially be drugs, correct? |
| 10:07AM | 24 | A.  Correct. |
| 10:07AM | 25 | Q.  Or any other type of contraband, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

28

10:07AM    1   A.  Correct.

10:07AM    2          **MR. FOTI:**  Okay.  Can we go to the next page, please?

10:07AM    3          We're making our way through here.

10:08AM    4          **BY MR. FOTI:**

10:08AM    5   Q.  Let's just go, put them together, cameras 23 through 25,

10:08AM    6   all footage from different areas of the parking lot outside

10:08AM    7   of Pharaoh's, correct?

10:08AM    8   A.  I'm not -- I mean, the first three relate to the outside

10:08AM    9   of the parking lot.

10:08AM   10   Q.  Right.  So camera 23, camera 24, camera 25 were all

10:08AM   11   cameras viewing different parts of the parking lot?

10:08AM   12   A.  That's correct.

10:08AM   13   Q.  Okay.  Camera 26 is an area with a view of the garage,

10:08AM   14   correct?

10:08AM   15   A.  That's correct.

10:08AM   16   Q.  Back inside of Pharaoh's, camera 27 is a location in the

10:08AM   17   kitchen with a view of the front kitchen area, correct?

10:08AM   18   A.  Correct.

10:08AM   19   Q.  Camera 28 is a location over another one of the cash

10:08AM   20   registers, correct?

10:08AM   21   A.  That's correct.

10:08AM   22   Q.  Same for camera 29, right?

10:08AM   23   A.  Correct.

10:08AM   24   Q.  Camera -- excuse me, camera 30 is a location in the main

10:09AM   25   bar area with a view of the bar, correct?

USA v Gerace - Burns - Foti/Cross - 12/18/24

29

10:09AM    1    A.  Correct.

10:09AM    2    Q.  Camera 31 is a location in the hallway of Pharaoh's with

10:09AM    3    a view of the door that goes to the upstairs, correct?

10:09AM    4    A.  That's correct.

10:09AM    5    Q.  Okay.  On this page, the -- the -- the agent documented

10:09AM    6    summaries of what was viewable in regards to cameras 23

10:09AM    7    through 31, correct?

10:09AM    8    A.  That's correct.

10:09AM    9    Q.  Okay.  And upon reviewing the footage from each of those

10:09AM   10    cameras, a determination was made by the agent that there was

10:09AM   11    no relevant information, correct?

10:09AM   12    A.  Correct.

10:09AM   13    Q.  Okay.  And, again, per all of the cameras that are

10:09AM   14    documented on this page, there was no indication that there

10:09AM   15    was ever an observation made of drug use, correct?

10:09AM   16    A.  There's no indication in the report of any of that.

10:09AM   17    Q.  No indication in the report that there was any

10:09AM   18    observation of what happened to potentially be a drug

10:09AM   19    transaction, correct?

10:09AM   20    A.  Correct.

10:09AM   21    Q.  No indication that there was ever an observation of what

10:10AM   22    could have potentially been drugs, correct?

10:10AM   23    A.  Correct.

10:10AM   24         **MR. FOTI:**  Can we go to the last page, please?

          25

10:10AM    1              **BY MR. FOTI:**

10:10AM    2    Q.  Okay.  Camera 32 is a location in the hallway from the

10:10AM    3    main floor to the ATM locker rooms?

10:10AM    4    A.  Correct.

10:10AM    5    Q.  All right.  Camera 33 is a location over the main floor

10:10AM    6    showing the left side of the stage?

10:10AM    7    A.  That's correct.

10:10AM    8    Q.  Camera 34 is a view of the Pharaoh's beer cooler, right?

10:10AM    9    A.  That's correct.

10:10AM   10    Q.  Camera 35 is a location with a view of the liquor storage

10:10AM   11    area, correct?

10:10AM   12    A.  Correct.

10:10AM   13    Q.  And the last camera listed is camera 37, which is a

10:10AM   14    location over the exit from the bar area out to the hallway,

10:10AM   15    correct?

10:10AM   16    A.  That's correct.

10:10AM   17    Q.  Again, in this last page of the report, cameras 32

10:10AM   18    through 37 provide a summary of what was generally observed

10:10AM   19    when viewing the footage from each of these cameras?

10:11AM   20    A.  Yeah, a briefly summary.

10:11AM   21    Q.  And, again, the determination was made that for cameras

10:11AM   22    32 through 37, there was no relevant information, correct?

10:11AM   23    A.  Correct.

10:11AM   24    Q.  And, again, no indication in this final page of the

10:11AM   25    report that there was ever an observation of any drug use,

| | | |
|---|---|---|
| 10:11AM | 1 | correct? |
| 10:11AM | 2 | A.  Correct. |
| 10:11AM | 3 | Q.  There was never an observation of what appeared to be |
| 10:11AM | 4 | drug transaction, correct? |
| 10:11AM | 5 | A.  Correct. |
| 10:11AM | 6 | Q.  Never an observation of what -- of anything that could |
| 10:11AM | 7 | potentially be drugs, correct? |
| 10:11AM | 8 | A.  Correct. |
| 10:11AM | 9 | Q.  Okay. |
| 10:11AM | 10 | **MR. FOTI:**  We can take down that report. |
| 10:11AM | 11 | Can we pull up Government Exhibit 3539EF? |
| 10:11AM | 12 | **BY MR. FOTI:** |
| 10:11AM | 13 | Q.  Okay.  Sir, this is the report that documents the last of |
| 10:11AM | 14 | the three DVRs, DVR 3, correct? |
| 10:12AM | 15 | A.  Correct. |
| 10:12AM | 16 | Q.  Okay. |
| 10:12AM | 17 | **MR. FOTI:**  Can we go to page 2? |
| 10:12AM | 18 | **BY MR. FOTI:** |
| 10:12AM | 19 | Q.  All right.  And I'm showing you the second page of the |
| 10:12AM | 20 | report.  This is the report that you're familiar with that |
| 10:12AM | 21 | documented what was viewed on the cameras that were contained |
| 10:12AM | 22 | in DVR 3, correct? |
| 10:12AM | 23 | A.  That's correct. |
| 10:12AM | 24 | Q.  And this report is the same as when you've reviewed it in |
| 10:12AM | 25 | the past, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

32

```
10:12AM    1   A.  It is.

10:12AM    2   Q.  No changes that you can observe here, correct?

10:12AM    3   A.  Not that I see.

10:12AM    4          MR. FOTI:  Okay.  At this time, I would move in

10:12AM    5   3539EF.

10:12AM    6          MR. TRIPI:  No objection.

10:12AM    7          THE COURT:  Received without objection.

10:12AM    8          (GOV Exhibit 3539EF was received in evidence.)

10:12AM    9          BY MR. FOTI:

10:12AM   10   Q.  Okay.  Sir, this is the last of the DVRs, correct?

10:12AM   11   A.  The third one, correct.

10:12AM   12   Q.  This one is certainly shorter than DVR 2, right?

10:12AM   13   A.  Yes.

10:12AM   14   Q.  Okay.  We have a total of seven cameras that were

10:12AM   15   viewable on this DVR, correct?

10:12AM   16   A.  That's correct.

10:12AM   17   Q.  And I'm just going to go through these ones, as well.

10:13AM   18      Camera 1 was another location in the hallway of the

10:13AM   19   Pharaoh's kitchen towards the bar area, correct?

10:13AM   20   A.  Correct.

10:13AM   21   Q.  Camera 2 is a location in the main bar area with a view

10:13AM   22   of the bar, correct?

10:13AM   23   A.  Correct.

10:13AM   24   Q.  Location 3 was a location at the door to the hallway

10:13AM   25   leading to the office area over the food prep station and the
```

USA v Gerace - Burns - Foti/Cross - 12/18/24
33

10:13AM   1   kitchen window, correct?

10:13AM   2   A.  Correct.

10:13AM   3   Q.  Camera 4 is a location of the right side of Pharaoh's

10:13AM   4   facing the seating area, correct?

10:13AM   5   A.  Correct.

10:13AM   6   Q.  Camera 5 is a location directly over the VIP podium desk,

10:13AM   7   correct?

10:13AM   8   A.  That's correct.

10:13AM   9   Q.  And your understanding is there was only one VIP podium,

10:13AM  10   correct?

10:13AM  11   A.  That's my understanding.

10:13AM  12   Q.  That's the VIP podium outside of the VIP area, correct?

10:13AM  13   A.  That's correct.

10:13AM  14   Q.  And that's where we, based on your investigation as well

10:13AM  15   as the testimony we've heard through trial, that's where the

10:13AM  16   chips would be exchanged for money before a lap dances occur,

10:13AM  17   correct?

10:13AM  18   A.  That's correct.

10:13AM  19   Q.  If we go to the second page, camera 6 is a location

10:14AM  20   inside the store area that was the left side of the stage,

10:14AM  21   correct?

10:14AM  22   A.  Correct.

10:14AM  23   Q.  And camera 7 is a location inside of the Pharaoh's

10:14AM  24   office, correct?

10:14AM  25   A.  Correct.

USA v Gerace - Burns - Foti/Cross - 12/18/24

34

10:14AM   1        **MR. FOTI:**  Can we go back to the previous page,

10:14AM   2   page 2?

10:14AM   3        **BY MR. FOTI:**

10:14AM   4   Q.  Now, I'm going to ask you generally about the entire

10:14AM   5   document, cameras 1 through 7 on the two pages that we just

10:14AM   6   discussed, each of them provide a brief summary of what is

10:14AM   7   observable based on the footage of those particular areas

10:14AM   8   that the cameras covered, correct?

10:14AM   9   A.  That's what's reported, correct.

10:14AM   10  Q.  And I forgot to ask this.  Just to be clear, this -- the

10:14AM   11  footage on this DVR covers a timeframe from November 30th up

10:14AM   12  to December 12th, correct?

10:14AM   13  A.  Yeah, two weeks approximately.

10:14AM   14  Q.  Yeah.  So, two weeks, or maybe even just short of two

10:14AM   15  weeks on this particular DVR?

10:15AM   16  A.  Yeah, that's accurate.

10:15AM   17  Q.  Now, in terms of these seven cameras, again, a

10:15AM   18  determination was made by the agent reviewing that there was

10:15AM   19  no relevant information on each of the cameras, correct?

10:15AM   20  A.  That's correct.

10:15AM   21  Q.  And in terms of each of these cameras and what was

10:15AM   22  observable, there was no indication that there was any drug

10:15AM   23  transactions observed, correct?

10:15AM   24  A.  That's correct.

10:15AM   25  Q.  There's no indication that there was any drug use

USA v Gerace - Burns - Foti/Cross - 12/18/24

35

| | | |
|---|---|---|
| 10:15AM | 1 | observed, correct? |
| 10:15AM | 2 | A.  Correct. |
| 10:15AM | 3 | Q.  No indication that there was anything that appeared to |
| 10:15AM | 4 | potentially be type of any controlled substance, correct? |
| 10:15AM | 5 | A.  Correct. |
| 10:15AM | 6 | Q.  Or any other type of contraband, correct? |
| 10:15AM | 7 | A.  Per the report, correct. |
| 10:15AM | 8 | **MR. FOTI:**  Okay.  We can take that down. |
| 10:15AM | 9 | **BY MR. FOTI:** |
| 10:16AM | 10 | Q.  Okay.  Sir, yesterday we were talking about different |
| 10:16AM | 11 | investigative tactics that can be used during the course of a |
| 10:16AM | 12 | narcotics investigation, right? |
| 10:16AM | 13 | A.  Generally, yeah. |
| 10:16AM | 14 | Q.  I was just sort of hitting some general areas of |
| 10:16AM | 15 | investigative techniques, correct? |
| 10:16AM | 16 | A.  Generally, in narcotics investigations, I believe that's |
| 10:16AM | 17 | how you framed it. |
| 10:16AM | 18 | Q.  So I had asked you about your experience in narcotics |
| 10:16AM | 19 | investigations, different techniques that you've used in |
| 10:16AM | 20 | different cases, correct? |
| 10:16AM | 21 | A.  Correct. |
| 10:16AM | 22 | Q.  And I had talked to you about being involved in the use |
| 10:16AM | 23 | of undercover transactions, undercover buys, correct? |
| 10:16AM | 24 | A.  Correct. |
| 10:16AM | 25 | Q.  And certainly in your experience in other narcotics |

USA v Gerace - Burns - Foti/Cross - 12/18/24

36

| 10:16AM | 1 | investigations, you've utilized that tactic before, correct? |
| 10:16AM | 2 | A.  In some cases, yes. |
| 10:16AM | 3 | Q.  We talked a little bit about surveillance, which I |
| 10:16AM | 4 | believe you indicated there was at least some surveillance |
| 10:16AM | 5 | throughout the course of this investigation, correct? |
| 10:16AM | 6 | A.  Some, yes. |
| 10:17AM | 7 | Q.  We talked about search warrants, correct? |
| 10:17AM | 8 | A.  Correct. |
| 10:17AM | 9 | Q.  All right.  Now, the first search warrant that you were |
| 10:17AM | 10 | involved in in regards to this investigation was a search of |
| 10:17AM | 11 | Mr. Bongiovanni's home, correct? |
| 10:17AM | 12 | A.  Right, June 6th, 2019. |
| 10:17AM | 13 | **MR. FOTI:**  Can we pull up Government Exhibit 100A.1-1 |
| 10:17AM | 14 | in evidence. |
| 10:17AM | 15 | **BY MR. FOTI:** |
| 10:17AM | 16 | Q.  Okay.  You were asked about this on direct, correct? |
| 10:17AM | 17 | A.  I was. |
| 10:17AM | 18 | Q.  And this is -- this is a document that was located in |
| 10:17AM | 19 | Mr. -- in a box in Mr. Bongiovanni's basement; is that |
| 10:17AM | 20 | correct? |
| 10:17AM | 21 | A.  Yeah, in the Redweld folder. |
| 10:17AM | 22 | Q.  Now, we went through this on direct, but I just want |
| 10:17AM | 23 | to -- because we didn't go through and read every line, it |
| 10:17AM | 24 | probably would have been a waste of time, I want to clarify a |
| 10:17AM | 25 | few things. |

10:17AM   1    A.   Certainly.

10:17AM   2    Q.   All right.   In this document, there is a reference to

10:18AM   3    Anthony Gerace, correct?

10:18AM   4    A.   That's correct.

10:18AM   5    Q.   All right.   And there's a reference to Mr. Bongiovanni

10:18AM   6    taking certain steps to be alerted to any -- alerted through

10:18AM   7    this system in regards to certain things that could happen

10:18AM   8    for Anthony Gerace, correct?

10:18AM   9    A.   For numbers related with him, correct.

10:18AM   10   Q.   Now, in this document, there's no reference to Peter

10:18AM   11   Gerace, correct?

10:18AM   12   A.   There is not.

10:18AM   13   Q.   There's no reference to any phone number associated with

10:18AM   14   Peter Gerace, correct?

10:18AM   15   A.   Correct.

10:18AM   16   Q.   There's nothing about this document that references Peter

10:18AM   17   Gerace in any respect, correct?

10:18AM   18   A.   Not that I recall.

10:18AM   19        **MR. FOTI:**   Okay.   Can we -- we can take that down?

10:18AM   20   Pull up 100A.1-2, which is also in evidence.

10:18AM   21        **BY MR. FOTI:**

10:18AM   22   Q.   This was the other document you were asked about on

10:18AM   23   direct, correct?

10:18AM   24   A.   Correct.

10:18AM   25   Q.   And this was a document that was also located in

USA v Gerace - Burns - Foti/Cross - 12/18/24

38

10:19AM  1    Mr. Bongiovanni's house during the search, correct?

10:19AM  2    A.  In that same box, yes, sir.

10:19AM  3    Q.  Yep.  And here on the first page, it indicates who the

10:19AM  4    task force case agent was in this particular investigation,

10:19AM  5    correct?

10:19AM  6    A.  That's correct.

10:19AM  7    Q.  And that was Christopher Clark, correct?

10:19AM  8    A.  It was.

10:19AM  9    Q.  And then there's special agents who are listed as well

10:19AM  10   from the IRS, and ATF, and DEA, correct?

10:19AM  11   A.  That's correct.

10:19AM  12   Q.  And none of these individuals testified during the course

10:19AM  13   of this trial, correct?

10:19AM  14   A.  They did not.

10:19AM  15           **MR. FOTI:**  Okay.  Can we go to page 2 of this report?

10:19AM  16           **BY MR. FOTI:**

10:19AM  17   Q.  All right.  This report lists 11 names on this particular

10:19AM  18   page on the left side, correct?

10:19AM  19   A.  That's correct.

10:19AM  20   Q.  And you talked about Frank Tripi being one of those

10:19AM  21   individuals, correct?

10:19AM  22   A.  Correct.

10:19AM  23   Q.  There's 11 other names besides Mr. Tripi, correct?

10:20AM  24   A.  I think there's 11 total.

10:20AM  25   Q.  I'm sorry, ten other.

USA v Gerace - Burns - Foti/Cross - 12/18/24
39

10:20AM   1   A.  Ten other.

10:20AM   2   Q.  Better at math.  All right.  So --

10:20AM   3   A.  Correct.

10:20AM   4   Q.  -- better at basic math.

10:20AM   5   A.  Okay.

10:20AM   6   Q.  So ten other names besides Mr. Tripi on this particular

10:20AM   7   document, correct?

10:20AM   8   A.  That's correct.

10:20AM   9   Q.  Okay.  And in none of these names are Peter Gerace,

10:20AM  10   correct?

10:20AM  11   A.  That's correct.

10:20AM  12   Q.  And Peter Gerace is not referenced in this document,

10:20AM  13   correct?

10:20AM  14   A.  He is not referenced in this document.

10:20AM  15          **MR. FOTI:**  Okay.  We can take that down.

10:20AM  16          **BY MR. FOTI:**

10:20AM  17   Q.  Okay.  Obviously, there is a broad spectrum of potential

10:20AM  18   investigative tactics that can be used during the course of

10:20AM  19   investigation, correct?

10:20AM  20   A.  That's correct.

10:20AM  21   Q.  And there's specific techniques that can be used in

10:20AM  22   certain types of investigations like narcotics

10:21AM  23   investigations, correct?

10:21AM  24   A.  That's correct.

10:21AM  25   Q.  And we've talked about a couple of them at this point,

USA v Gerace - Burns - Foti/Cross - 12/18/24

40

10:21AM   1    correct?

10:21AM   2    A.   That's correct.

10:21AM   3    Q.   Another type of technique is to request permission from

10:21AM   4    the Court for authorization to conduct a wiretap, correct?

10:21AM   5    A.   That's a -- it's rarely used because it's pretty --

10:21AM   6    significant resources.  You have to have exhausted all other

10:21AM   7    investigative possibilities, so it's not a common practice

10:21AM   8    because it -- the standard to get there is pretty onerous.

10:21AM   9    Q.   Right.  So we'll walk through that.

10:21AM  10        Like I asked about yesterday, if you were searching a

10:21AM  11    particular location, you have to make an application to the

10:21AM  12    Court, correct?

10:21AM  13    A.   That's correct.

10:21AM  14    Q.   You would have to establish certain allegations that

10:21AM  15    support probable cause, correct?

10:21AM  16    A.   That's correct.

10:21AM  17    Q.   And you have to get the Court's approval to conduct a

10:21AM  18    search of a particular location, right?

10:21AM  19    A.   That's correct.

10:21AM  20    Q.   Now, what you were just referring to is for wiretaps,

10:21AM  21    there's sort of these additional facts that you have to

10:21AM  22    establish, correct?

10:21AM  23    A.   That's correct.

10:21AM  24    Q.   Okay.  So, again, you have to go through some of the same

10:21AM  25    process of establishing that there's allegations to support

USA v Gerace - Burns - Foti/Cross - 12/18/24

10:22AM 1  probable cause, correct?

10:22AM 2  A.  That's correct.

10:22AM 3  Q.  And you have to also establish other points related to

10:22AM 4  whether you've exhausted other resources, or other feasible

10:22AM 5  methods of investigation consistent with the idea that a

10:22AM 6  wiretap is more of a last resort, correct?

10:22AM 7  A.  Correct.

10:22AM 8  Q.  And it doesn't have to be -- it doesn't have to be

10:22AM 9  necessarily the last resort, but you have to at least

10:22AM 10  indicate to the Court that other techniques have been

10:22AM 11  attempted and failed, correct?

10:22AM 12  A.  Yeah.  You have to essentially outline the exhausted

10:22AM 13  other -- other investigative techniques, as well you have to

10:22AM 14  outline that in order to get an understanding of the full and

10:22AM 15  essentially all the subjects of the conspiracy, you have to

10:22AM 16  outline that as well, that this would be a technique that

10:22AM 17  would potentially allow you to get the full size of the

10:22AM 18  organization and all the conspirators.

10:22AM 19  Q.  So you've been involved in an investigation that has

10:23AM 20  utilized wiretaps, correct?

10:23AM 21  A.  Yeah, a number of them through the years.

10:23AM 22  Q.  And in terms of -- I think it predates your involvement

10:23AM 23  with this investigation, but one of the witnesses we heard

10:23AM 24  from at this trial was Jeff Anzalone?

10:23AM 25  A.  Yes.

USA v Gerace - Burns - Foti/Cross - 12/18/24

42

10:23AM  1   Q.  And during the course of his investigation, wiretaps were

10:23AM  2   used?

10:23AM  3   A.  That's my understanding.

10:23AM  4   Q.  We've discussed during this trial at least one specific

10:23AM  5   recording that was picked up on wiretap of Jeff Anzalone and

10:23AM  6   K.L. discussing the purchase of Adderall, correct?

10:23AM  7   A.  Correct.

10:23AM  8   Q.  Okay.  And that was a drug transaction being discussed

10:23AM  9   over the phone that was recorded pursuant to a wiretap,

10:23AM  10  correct?

10:23AM  11  A.  It was.

10:23AM  12  Q.  You weren't involved in the investigation at that time,

10:23AM  13  correct?

10:23AM  14  A.  Yeah, that was not mine.  I was not involved in that

10:23AM  15  Anzalone investigation.

10:23AM  16  Q.  But consistent with what you just told this jury, that

10:23AM  17  was clearly a situation where the government had gotten an

10:23AM  18  authorization from a court to conduct a wiretap, correct?

10:23AM  19  A.  Correct.

10:23AM  20  Q.  They had went through the process that you just discussed

10:23AM  21  of establishing certain things to get that approval, correct?

10:23AM  22  A.  That might have been a state wiretap, not a federal one,

10:24AM  23  I don't recall.

10:24AM  24  Q.  Okay.  And based on your experience, state or federal

10:24AM  25  court, the requirements in this geographical region are very

USA v Gerace - Burns - Foti/Cross - 12/18/24

43

10:24AM   1   similar, correct?

10:24AM   2   A.   My understanding, I haven't done a state wire here, I've

10:24AM   3   only --

10:24AM   4   Q.   That's okay if you don't know.

10:24AM   5   A.   Yeah, I can't say definitively.

10:24AM   6   Q.   All right.   So in any event, there was a wiretap in

10:24AM   7   regards to Mr. Anzalone, correct?

10:24AM   8   A.   That's correct.

10:24AM   9   Q.   And regardless of whether there was differences in the

10:24AM   10   procedure, you're aware that even a state wiretap requires

10:24AM   11   some sort of court authorization?

10:24AM   12   A.   Absolutely.

10:24AM   13   Q.   And that process was -- was something that clearly some

10:24AM   14   members of law enforcement went through to get the wiretap

10:24AM   15   that Mr. Anzalone was recorded on?

10:24AM   16   A.   I believe it was Niagara County along with HSI, Niagara

10:24AM   17   County Sheriff's Office.

10:24AM   18   Q.   Okay.   And we talked about -- it was Mr. Anzalone

10:24AM   19   testified at this trial, correct?

10:25AM   20   A.   He did.

10:25AM   21   Q.   And the content of the recordings throughout his wiretap

10:25AM   22   were not a significant part of this trial, correct?

10:25AM   23   A.   Correct.

10:25AM   24   Q.   I think the only recording that was specifically

10:25AM   25   discussed was the recording involving K.L., correct?

USA v Gerace - Burns - Foti/Cross - 12/18/24

44

10:25AM     1   A.  That's --

10:25AM     2   Q.  Maybe there were others.

10:25AM     3   A.  Yeah, I think you're correct.  I do recall that

10:25AM     4   testimony.

10:25AM     5   Q.  Okay.  Now, no wiretap was pursued in this investigation,

10:25AM     6   correct?

10:25AM     7   A.  No.  It was -- I don't think it was feasible, based on

10:25AM     8   the events of this investigation.

10:25AM     9   Q.  Okay.  So, regardless of whether it was feasible or not,

10:25AM    10   there was no attempt made, correct?

10:25AM    11       You didn't ask for authorization?

10:25AM    12   A.  No.  We weren't even close to getting there.

10:25AM    13   Q.  You didn't ask authorization of the Court to have a

10:25AM    14   wiretap placed on Mr. Bongiovanni's phone, correct?

10:25AM    15   A.  Again, the circumstances in this one weren't even close

10:25AM    16   to something like that.

10:25AM    17   Q.  Okay.  So, the answer is no, you did not attempt that?

10:25AM    18   A.  We did not, no.

10:26AM    19   Q.  And you did not attempt it in regards to Mr. Gerace's

10:26AM    20   phone, correct?

10:26AM    21   A.  Correct.

10:26AM    22   Q.  You had Mr. Gerace's phone number during the course of

10:26AM    23   this investigation?

10:26AM    24   A.  Yes, his phone was seized in April of 2019.

10:26AM    25   Q.  Okay.  And he, Mr. Gerace, as far as you know, never

10:26AM    1    changed the phone number he was using, correct?

10:26AM    2    A.  I believe he might have changed it after that.

10:26AM    3    Q.  Okay.

10:26AM    4    A.  I know he maintained, as I recall, I believe three

10:26AM    5    different phones throughout this investigation.  But maybe,

10:26AM    6    that's going -- I can't say -- say that definitively, but I

10:26AM    7    know there was more than one phone.

10:26AM    8    Q.  You're saying over a period of time?

10:26AM    9    A.  Yes, over the course of our timeframe in the years.

10:26AM   10    Q.  You don't -- you don't recall specifically if he changed

10:26AM   11    the phone number or not?

10:26AM   12    A.  I can't say.  I can't recall.

10:26AM   13    Q.  In any event, if he did, you were aware that he changed

10:26AM   14    the phone number?

10:26AM   15    A.  Correct.

10:26AM   16    Q.  There's no period of time during this investigation where

10:26AM   17    you were struggling to figure out what phone Mr. Gerace was

10:26AM   18    using?

10:26AM   19    A.  It's possible he had a burner, but we certainly had an

10:26AM   20    understanding of his phones throughout the course of the

10:26AM   21    investigation.

10:26AM   22    Q.  Okay.  When you say it's possible he had a burner, you

10:26AM   23    don't have any evidence of that, correct?

10:27AM   24    A.  I don't believe we had any definitive evidence.

10:27AM   25    Q.  You searched his house, correct?

10:27AM    1    A.  I didn't search his house, but --

10:27AM    2    Q.  Well --

10:27AM    3    A.  -- his house was searched.

10:27AM    4    Q.  -- the house was searched?

10:27AM    5    A.  Correct.

10:27AM    6    Q.  And you're familiar with what occurred during the course

10:27AM    7    of that search?

10:27AM    8    A.  Generally.

10:27AM    9    Q.  You don't recall there being any TracFone or burner phone

10:27AM   10    recovered?

10:27AM   11    A.  I couldn't say without looking at the inventory, but I

10:27AM   12    don't recall.

10:27AM   13    Q.  You don't recall?

10:27AM   14    A.  No.

10:27AM   15    Q.  And you don't recall any specific piece of evidence to

10:27AM   16    suggest Mr. Burns -- or, I'm sorry, that Mr. Gerace was ever

10:27AM   17    in possession of a burner phone or TracFone, correct?

10:27AM   18    A.  Not that I recall.

10:27AM   19    Q.  Okay.  Now, you never pursued a wiretap for any phone

10:27AM   20    number that you had associated with Mr. Gerace, correct?

10:27AM   21    A.  That's correct.

10:27AM   22    Q.  There's no recorded phone calls involving Mr. Gerace

10:27AM   23    pursuant to a wiretap on any of his phones, correct?

10:27AM   24    A.  Not pursuant to a wiretap.

10:27AM   25    Q.  Okay.  And do you recall any wiretaps picking up phone

| | | |
|---|---|---|
| 10:27AM | 1 | calls of Mr. Gerace in regards to Mr. Anzalone or anybody |
| 10:27AM | 2 | else that you reviewed? |
| 10:28AM | 3 | A.  Not that I recall.  I'm not overly familiar with the |
| 10:28AM | 4 | Anzalone investigation, whether Mr. Gerace was intercepted on |
| 10:28AM | 5 | that or not. |
| 10:28AM | 6 | Q.  Okay.  Whether he was or not, you don't recall ever |
| 10:28AM | 7 | reviewing a recording of Mr. Gerace engaging in a drug |
| 10:28AM | 8 | transaction, correct? |
| 10:28AM | 9 | A.  That's correct. |
| 10:28AM | 10 | Q.  And just because it hasn't come up in this trial, I don't |
| 10:28AM | 11 | think it's come up in there this trial, when you listen to |
| 10:28AM | 12 | recordings from wiretaps, it's sometimes the case that drug |
| 10:28AM | 13 | transactions occur in code, correct? |
| 10:28AM | 14 | A.  Absolutely. |
| 10:28AM | 15 | Q.  So, when you're listening to people talk about a drug |
| 10:28AM | 16 | transaction, you're not just listening to people say can I |
| 10:28AM | 17 | buy some cocaine from you, right? |
| 10:28AM | 18 | A.  It's rare that it's that open, but occasionally. |
| 10:28AM | 19 | Q.  Right.  And in your experience, throughout your |
| 10:28AM | 20 | investigations, you often hear other words that appear to |
| 10:28AM | 21 | indicate there was a transaction occurring? |
| 10:28AM | 22 | A.  It's very common that there's different codes and -- |
| 10:28AM | 23 | Q.  At no point in your investigation did you ever hear a |
| 10:28AM | 24 | phone call involving Mr. Gerace that appeared to be |
| 10:29AM | 25 | consistent with a drug transaction, correct? |

USA v Gerace - Burns - Foti/Cross - 12/18/24

48

10:29AM    1   A.   I did not listen to any recording of Mr. Gerace that I

10:29AM    2   recall, other than the voicemail of his phone, I think that's

10:29AM    3   the only recording.

10:29AM    4   Q.   The voicemail that came in -- that came in earlier in the

10:29AM    5   trial, right?

10:29AM    6   A.   Correct.

10:29AM    7   Q.   Besides that, you never heard any recording via any

10:29AM    8   wiretap that involved Mr. Gerace engaged in what appeared to

10:29AM    9   be a drug transaction, correct?

10:29AM   10   A.   That's correct.

10:29AM   11   Q.   You've never heard any -- I think you indicated the only

10:29AM   12   one you ever heard was that voicemail.  You've never heard

10:29AM   13   any recording at all of Mr. Gerace engaged in any drug

10:29AM   14   transaction, correct?

10:29AM   15   A.   Not that I've heard.

10:30AM   16         **MR. FOTI:**  Okay.  Can -- can we pull up Government

10:30AM   17   Exhibit 555 on the screen, please?

10:30AM   18         Actually, can I just have a minute, Judge?

10:30AM   19         **THE COURT:**  Sure.

10:31AM   20         **BY MR. FOTI:**

10:31AM   21   Q.   This is a digital copy of Government Exhibit 555, which

10:31AM   22   we have on the board over there, correct?

10:31AM   23   A.   That's correct.

10:31AM   24   Q.   Okay.  And in this exhibit, as part of -- yesterday I was

10:31AM   25   asking you about some of the things that -- particularly that

USA v Gerace - Burns - Foti/Cross - 12/18/24

49

10:31AM    1    relate to testimony of some of these witnesses that's not

10:31AM    2    included in this exhibit, correct?

10:31AM    3    A.   Yeah, as I mentioned yesterday, I wasn't -- we were not

10:31AM    4    gonna interpret testimony.  It's not our --

10:31AM    5    Q.   Right.  So there's no documentation of those things I

10:31AM    6    asked about yesterday, such as who received some sort of

10:31AM    7    benefit or payment of expenses, correct?

10:31AM    8    A.   Correct.

10:31AM    9    Q.   And like I asked about yesterday, there's no indication

10:31AM    10   of which ones of these witnesses had been impeached at some

10:32AM    11   point, right?

10:32AM    12   A.   That's right.

10:32AM    13   Q.   Nothing about testimony at all, correct?

10:32AM    14   A.   Correct.

10:32AM    15   Q.   Now what is on here is a list of exhibits that were

10:32AM    16   identified, based on your review, as something that you

10:32AM    17   believed was relevant to the different charges or events that

10:32AM    18   are documented on this, correct?

10:32AM    19   A.   Events, yeah, tied to the counts.

10:32AM    20   Q.   So, for example, the line that goes down coming off of

10:32AM    21   the entrance of Pharaoh's Gentlemen's Club.  It indicates

10:32AM    22   that there's three counts that are relevant to this drug

10:32AM    23   conspiracy allegation, correct?

10:32AM    24   A.   Correct.

10:32AM    25   Q.   And then it lists a number of exhibits that is intended

USA v Gerace - Burns - Foti/Cross - 12/18/24

10:32AM   1   to provide some indication that in this summary chart those

10:32AM   2   appear to be exhibits that are relevant to that particular

10:32AM   3   account, correct?

10:32AM   4   A.  Yeah, some exhibits, we didn't include each and every

10:32AM   5   one.

10:32AM   6   Q.  Yeah, none of the exhibits on this chart include a

10:33AM   7   picture of any drugs that were seized from Pharaoh's,

10:33AM   8   correct?

10:33AM   9   A.  That's correct.

10:33AM   10  Q.  None of the exhibits on this chart are of any drugs that

10:33AM   11  were seized from Peter Gerace's home, correct?

10:33AM   12  A.  Correct.

10:33AM   13  Q.  None of the exhibits on this chart are any pictures of

10:33AM   14  drugs that were seized from either of those locations,

10:33AM   15  correct?

10:33AM   16  A.  That's correct.

10:33AM   17  Q.  None of the -- yesterday, you talked about this is --

10:33AM   18  this was ultimately charged as more of a historical

10:33AM   19  conspiracy, correct?

10:33AM   20  A.  That's correct.

10:33AM   21  Q.  And so there's a wide range of time that's covered in

10:33AM   22  each of these conspiracy counts, correct?

10:33AM   23  A.  That's correct.

10:33AM   24  Q.  Now, none of these exhibits are any pictures that were

10:33AM   25  provided of drugs at any time during the course of that

USA v Gerace - Burns - Foti/Cross - 12/18/24

51

| | | |
|---|---|---|
| 10:33AM | 1 | conspiracy, correct? |
| 10:33AM | 2 | A.  I'm sorry, can you -- |
| 10:33AM | 3 | Q.  So in other words, none of the witnesses that are on the |
| 10:34AM | 4 | bottom -- the bottom two rows there, none of those witnesses |
| 10:34AM | 5 | provided pictures they took inside of Pharaoh's, correct? |
| 10:34AM | 6 | A.  Correct, no pictures.  That they took -- are you |
| 10:34AM | 7 | referring to the witnesses, that they took pictures? |
| 10:34AM | 8 | Q.  Yeah. |
| 10:34AM | 9 | A.  Yes.  Correct. |
| 10:34AM | 10 | Q.  So you don't have any exhibits that reference pictures |
| 10:34AM | 11 | that were taken by these witnesses of things that happened at |
| 10:34AM | 12 | Pharaoh's, correct? |
| 10:34AM | 13 | A.  Correct. |
| 10:34AM | 14 | Q.  No pictures of any drugs located inside Pharaoh's at any |
| 10:34AM | 15 | time during the course of any of these conspiracies, correct? |
| 10:34AM | 16 | A.  Correct. |
| 10:34AM | 17 | Q.  And we saw pictures of Peter Gerace throughout this |
| 10:34AM | 18 | trial.  No pictures of Peter Gerace ever in possession of any |
| 10:34AM | 19 | drugs, correct? |
| 10:34AM | 20 | A.  Correct.  I would add the caveat that most people don't |
| 10:34AM | 21 | take pictures of themselves consuming narcotics. |
| 10:34AM | 22 | Q.  Well, that's fair.  But you've also seen during the |
| 10:34AM | 23 | course of this investigation that some of these witnesses had |
| 10:34AM | 24 | pictures of themselves holding guns, correct? |
| 10:34AM | 25 | A.  Holding guns? |

10:34AM    1    Q.  Do you remember a picture of K.L. and P.H.?

10:34AM    2    A.  Oh, correct.  Yes, I recall that now.

10:35AM    3    Q.  And during the course of your --

10:35AM    4    A.  Sorry.

10:35AM    5    Q.  And in the course of other narcotics investigations,

10:35AM    6    you've definitely seen people posting pictures or providing

10:35AM    7    pictures of large quantities of cash they're in possession

10:35AM    8    of, correct?

10:35AM    9         MR. TRIPI:  Objection of what he's seen in other

10:35AM   10    cases.

10:35AM   11         THE COURT:  Overruled.

10:35AM   12         THE WITNESS:  Correct, yes, I have seen that in other

10:35AM   13    cases.

10:35AM   14         BY MR. FOTI:

10:35AM   15    Q.  It may be stupid, but people do it, right?

10:35AM   16    A.  I would agree with you, it may be stupid, but people do

10:35AM   17    do it.

10:35AM   18    Q.  There was no -- no pictures like that in any of the

10:35AM   19    exhibits contained in this summary chart, correct?

10:35AM   20    A.  Yep.

10:35AM   21    Q.  And there were no -- no pictures like that entered at any

10:35AM   22    point during the course of this trial, correct?

10:35AM   23    A.  Correct.

10:35AM   24    Q.  None of these exhibits are recordings of Mr. Gerace ever

10:35AM   25    talking about any drug transactions, correct?

USA v Gerace - Burns - Foti/Cross - 12/18/24

53

| | | |
|---|---|---|
| 10:35AM | 1 | A. That's correct. |
| 10:35AM | 2 | Q. Or any discussion of drugs at all, correct? |
| 10:35AM | 3 | A. There is an exhibit of a voicemail where he talked about |
| 10:35AM | 4 | tra -- or, the voicemail to Bongiovanni concerning the |
| 10:36AM | 5 | TracFone and drug dealing. |
| 10:36AM | 6 | Q. And, well, and drug dealing -- there was no reference to |
| 10:36AM | 7 | drug dealing in that call, is there? |
| 10:36AM | 8 | A. It relates to a ping order and can you track a -- |
| 10:36AM | 9 | Q. Sure. |
| 10:36AM | 10 | A. -- getting a ping order on a burner phone, essentially a |
| 10:36AM | 11 | TracFone for him. |
| 10:36AM | 12 | Q. Ping orders are not exclusive to drug trafficking |
| 10:36AM | 13 | investigations though, correct? |
| 10:36AM | 14 | A. No, we use them for fugitives and things like that, as |
| 10:36AM | 15 | well. |
| 10:36AM | 16 | Q. So when you say it's a recording related to drugs, you're |
| 10:36AM | 17 | kind of doing a bit of speculation in that regard, right? |
| 10:36AM | 18 | A. I believe he says drugs. I'd have to listen to the |
| 10:36AM | 19 | exhibit again. But I believe he says drug traffickers or |
| 10:36AM | 20 | something. Going from memory. |
| 10:36AM | 21 | Q. He might have said something like that. But in terms of |
| 10:36AM | 22 | whether the recording involves Mr. Gerace discussing a drug |
| 10:36AM | 23 | transaction, there's no discussion of that, correct? |
| 10:36AM | 24 | A. Not a specific transaction, no. |
| 10:36AM | 25 | Q. No. And there's no exhibit on this Government 555 that |

| 10:36AM | 1 | contains a recording like that, correct? |
| 10:36AM | 2 | A.  That contains -- |
| 10:36AM | 3 | Q.  A recording of Mr. Gerace discussing a drug transaction, |
| 10:36AM | 4 | correct? |
| 10:36AM | 5 | A.  Correct. |
| 10:36AM | 6 | Q.  And there's no recording on this exhibit that discuss -- |
| 10:37AM | 7 | of Mr. Gerace discussing any type of commercial sex act, |
| 10:37AM | 8 | correct? |
| 10:37AM | 9 | A.  Some of the Michalski texts could -- |
| 10:37AM | 10 | Q.  I'm just asking about recordings. |
| 10:37AM | 11 | A.  Oh, recordings?  I'm sorry.  Correct. |
| 10:37AM | 12 | Q.  Okay.  So, it's correct that there's no exhibits that |
| 10:37AM | 13 | contain recordings of Mr. Gerace discussing a commercial sex |
| 10:37AM | 14 | act, correct? |
| 10:37AM | 15 | A.  A recording.  I'm sorry, I missed the recording. |
| 10:37AM | 16 | Q.  No, that's okay. |
| 10:37AM | 17 | A.  Correct. |
| 10:37AM | 18 | Q.  And you just referenced text messages that we reviewed on |
| 10:37AM | 19 | direct involving Judge Michalski, correct? |
| 10:37AM | 20 | A.  That's correct. |
| 10:37AM | 21 | Q.  And in -- when you say -- when you kind of said, well, |
| 10:37AM | 22 | some of the messages, which messages are you referring to? |
| 10:37AM | 23 | A.  Oh, I believe the first one where he says get some pussy |
| 10:37AM | 24 | there. |
| 10:37AM | 25 | Q.  Let's get some pussy there? |

10:37AM    1    A.  Yes.

10:37AM    2    Q.  There was no context to it, right?

10:37AM    3    A.  I have context based on the investigation, but I don't

10:37AM    4    have context based on the text message.

10:37AM    5    Q.  Right.  The text messages don't say if they're talking

10:37AM    6    about going out to a bar together, correct?

10:38AM    7    A.  Correct.

10:38AM    8    Q.  It doesn't say what -- there's no context to indicate

10:38AM    9    whether there's a joke associated with that, correct?

10:38AM    10   A.  Correct.

10:38AM    11   Q.  There's nothing indicating what preceded that text

10:38AM    12   message, correct?

10:38AM    13   A.  Correct.

10:38AM    14   Q.  There's no followup that adds some sort of explanation to

10:38AM    15   what that was in reference to, correct?

10:38AM    16   A.  Correct.

10:38AM    17   Q.  There's no text messages in any of these exhibits where

10:38AM    18   there's a discussion of a commercial sex act being -- being

10:38AM    19   negotiated, correct?

10:38AM    20   A.  Negotiated?  No.

10:38AM    21       I guess I'm thinking about that, she does anal on the

10:38AM    22   Lamont one, but I don't see a negotiating.  If you're asking

10:38AM    23   about negotiations, I don't.

10:38AM    24   Q.  And you -- you recall from the text message thread

10:38AM    25   involving Mr. Lamont that after that comment, the

USA v Gerace - Burns - Foti/Cross - 12/18/24

56

10:38AM  1   communication between Mr. Gerace and Mr. Lamont stops for

10:38AM  2   several months, correct?

10:39AM  3   A.   I believe so.  I don't have it in front of me, but I

10:39AM  4   think that's accurate.

10:39AM  5   Q.   And there's no -- there's no context beyond just that

10:39AM  6   message which says LOL at the end, as to what -- whether it

10:39AM  7   was a joke, or whether it was serious, or what it was in

10:39AM  8   reference to, correct?

10:39AM  9   A.   Correct.

10:39AM  10  Q.   In other words, there's no response from Peter Gerace at

10:39AM  11  all to that message, correct?

10:39AM  12  A.   Going off of memory, correct.

10:39AM  13  Q.   All right.  No -- so, going back to my original question,

10:39AM  14  none of these exhibits involve communication of Mr. Gerace

10:39AM  15  where there's negotiation over a commercial sex act, correct?

10:39AM  16  A.   That's correct.

10:39AM  17          **MR. FOTI:**  Okay.  Can I just have one more moment,

10:39AM  18  Judge?

10:39AM  19          **THE COURT:**  Yes.

10:40AM  20          **MR. FOTI:**  Okay.  Special Agent Burns, thank you.

10:40AM  21  Nothing further.

10:40AM  22          **MR. TRIPI:**  Judge, I do have redirect.  I hate to

10:40AM  23  ask, but can we take a five-minute break?

10:40AM  24          **THE COURT:**  No, I think it's a good idea.  That's

10:40AM  25  what I was planning on doing anyway.

USA v Gerace - Burns - Foti/Cross - 12/18/24

57

10:40AM   1          Please remember my instructions about not

10:40AM   2   communicating about the case with anyone including each other,

10:40AM   3   and not making up your mind.

10:40AM   4          See you back here in about ten or 15 minutes.

10:40AM   5          (Jury excused at 10:40 a.m.)

10:41AM   6          **THE COURT:**  So, do you plan to rest after this

10:41AM   7   witness?

10:41AM   8          **MR. TRIPI:**  Yes, Judge.

10:41AM   9          **THE COURT:**  Okay.  So just as -- and how long do you

10:41AM  10   think your redirect's going to go?

10:41AM  11          **MR. TRIPI:**  I hesitate to answer.  30 to 40 minutes

10:41AM  12   at max.

10:41AM  13          **THE COURT:**  Okay.  So, what I'm thinking is once

10:41AM  14   we're done with this witness, the government rests.  We will

10:41AM  15   then break for lunch.  And it will be a long break, because

10:41AM  16   we've got the argument, and you want to meet with Mr. Gerace,

10:41AM  17   which I think is --

10:41AM  18          **MR. FOTI:**  Yes.

10:41AM  19          **THE COURT:**  -- probably very wise.

10:41AM  20          So, and then we'll come back, and I'll tell the jury

10:41AM  21   we're going to take a long lunch and then come back, and we'll

10:41AM  22   have the plan for the rest of the week for you then.

10:41AM  23          **MR. TRIPI:**  Sounds good.

10:41AM  24          **THE COURT:**  And maybe we send them home then,

10:41AM  25   depending on where we are.

USA v Gerace - Burns - Foti/Cross - 12/18/24

58

| | | |
|---|---|---|
| 10:41AM | 1 | **MR. COOPER:**  Depending on what the decision is. |
| 10:42AM | 2 | **THE COURT:**  Yeah.  So, I don't have a problem with |
| 10:42AM | 3 | that.  Or, we continue with proof. |
| 10:42AM | 4 | **MR. FOTI:**  No, that's perfect.  It gives them time |
| 10:42AM | 5 | for their pizza party. |
| 10:42AM | 6 | **THE COURT:**  Yeah. |
| 10:42AM | 7 | **MR. FOTI:**  If we do end up calling witnesses, we have |
| 10:42AM | 8 | the lunch to make sure everybody's here ready to go. |
| 10:42AM | 9 | **THE COURT:**  Yep.  Terrific.  Good. |
| 10:42AM | 10 | So we're not in any rush right now, even if you're |
| 10:42AM | 11 | going to take longer, so we'll take 15, 20 minutes right now |
| 10:42AM | 12 | and come back. |
| 10:42AM | 13 | **MR. TRIPI:**  Sounds good.  And, Judge, just a last |
| 10:42AM | 14 | housekeeping thing.  I think the defense filed something on |
| 10:42AM | 15 | the buyer/seller last night.  I intend to, however today goes, |
| 10:42AM | 16 | get you some type of response today in writing. |
| 10:42AM | 17 | **THE COURT:**  Great. |
| 10:42AM | 18 | **MR. TRIPI:**  It will be short, but I hope that gives |
| 10:42AM | 19 | the Court enough time to look at both filings. |
| 10:42AM | 20 | **THE COURT:**  Yeah.  I think they submitted something |
| 10:42AM | 21 | on two different charges, right?  Buyer/seller and -- |
| 10:42AM | 22 | **MR. SOEHNLEIN:**  And bribery/gratuity. |
| 10:42AM | 23 | **MR. TRIPI:**  I'll do a combined response. |
| 10:42AM | 24 | **THE COURT:**  Great.  Terrific.  Good. |
| 10:42AM | 25 | **MR. SOEHNLEIN:**  And just one more thing from us, |

10:42AM  1  Judge.  Mr. Gerace and I have the last appearance on any

10:42AM  2  Curcio issue today at 12:30 with Judge Roemer.

10:43AM  3          **THE COURT:**  Oh.

10:43AM  4          **MR. SOEHNLEIN:**  So that's just to flag that for the

10:43AM  5  lunch hour.  I don't expect it to take long.  But Judge Roemer

10:43AM  6  scheduled this a while ago.  So I guess it would make sense to

10:43AM  7  be respectful of that --

10:43AM  8          **THE COURT:**  In a different case?

10:43AM  9          **MR. SOEHNLEIN:**  It's in a different case.  That's

10:43AM  10  right.  But it's me and Mr. Gerace.

10:43AM  11          **THE COURT:**  That's fine.  Okay?

10:43AM  12          **MR. TRIPI:**  Okay.

10:43AM  13          **THE COURT:**  Anything else we need to do right now?

10:43AM  14          **MR. TRIPI:**  No, thank you, Judge.

10:43AM  15          **MR. FOTI:**  No.

10:43AM  16          **THE COURT:**  Okay.  Good.  We'll see you folks in a

10:43AM  17  little while.

10:43AM  18          **THE CLERK:**  All rise.

10:43AM  19          (Off the record at 10:43 a.m.)

11:07AM  20          (Back on the record at 11:07 a.m.)

11:08AM  21          (Jury not present.)

11:08AM  22          **THE COURT:**  Please be seated.

11:08AM  23          **THE CLERK:**  We are back on the record for the

11:08AM  24  continuation of the jury trial in case numbers 19-cr-227 and

11:08AM  25  23-cr-37, United States of America versus Peter Gerace, Jr.

| | | |
|---|---|---|
| 11:08AM | 1 | All counsel and parties are present. |
| 11:08AM | 2 | **THE COURT:** Okay. Are we ready to go? |
| 11:08AM | 3 | **MR. TRIPI:** Yes, Judge. |
| 11:08AM | 4 | **THE COURT:** Anything we need to put on the record |
| 11:08AM | 5 | from the government? |
| 11:08AM | 6 | **MR. TRIPI:** I don't think so. |
| 11:08AM | 7 | **THE COURT:** Anything from the defense. |
| 11:08AM | 8 | **MR. FOTI:** No, Judge. |
| 11:08AM | 9 | **THE COURT:** Okay. Let's bring them back, please, |
| 11:08AM | 10 | Pat. |
| 11:09AM | 11 | (Jury seated at 11:09 a.m.) |
| 11:09AM | 12 | **THE COURT:** The record will reflect that all our |
| 11:10AM | 13 | jurors are present. |
| 11:10AM | 14 | I remind the witness that he's still under oath. |
| 11:10AM | 15 | And, Mr. Tripi, you may begin your redirect. |
| 11:10AM | 16 | **MR. TRIPI:** Thank you, Judge. |
| 11:10AM | 17 | |
| 11:10AM | 18 | **REDIRECT EXAMINATION BY MR. TRIPI:** |
| 11:10AM | 19 | Q. Good morning, Special Agent Burns. |
| 11:10AM | 20 | A. Good morning, Mr. Tripi. |
| 11:10AM | 21 | Q. Special Agent Burns, I'm going try to go in a sort of the |
| 11:10AM | 22 | same order that Mr. Foti questioned you on topics. If I jump |
| 11:10AM | 23 | around, I apologize in advance. |
| 11:10AM | 24 | A. That's fine. |
| 11:10AM | 25 | Q. You were asked, I think at the beginning of cross, about |

11:10AM    1    sort of the number of personnel that were involved in aspects

11:10AM    2    of the investigation; do you recall that?

11:10AM    3    A.  I do.

11:10AM    4    Q.  You were asked a number of names of various agents.  My

11:10AM    5    question is, on the day to day, were there far fewer agents

11:10AM    6    involved in the actual day-to-day investigation?

11:10AM    7    A.  Yeah, definitely.

11:10AM    8    Q.  For example, when witnesses need to be transported, do

11:10AM    9    two agents need to be involved in a transport?

11:10AM   10    A.  They do.

11:10AM   11    Q.  When one interview is conducted, do two agents need to be

11:10AM   12    present for that typically?

11:10AM   13    A.  Typically.  I mean, you try to always do that.

11:11AM   14    Q.  Does it mean that those transporting agents, or even an

11:11AM   15    agent who does an interview, is a case agent to the extent

11:11AM   16    you are?

11:11AM   17    A.  No.  Correct.

11:11AM   18    Q.  Okay.  In terms of the day to day for the duration of

11:11AM   19    your time, were the -- essentially the lead case agents

11:11AM   20    yourself, Special Agent Ryan, and Special Agent Halliday, and

11:11AM   21    then others joined on at various points?

11:11AM   22    A.  Yeah, depending.  There was some, as I mentioned on

11:11AM   23    direct, there was some related matters that caused us to kind

11:11AM   24    of add some resources to the case.

11:11AM   25    Q.  Yeah, you mentioned spinoff cases and other

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

62

11:11AM   1    investigations stemming from there, right?

11:11AM   2    A.   Correct.

11:11AM   3    Q.   And some of those other agents had more involvement in

11:11AM   4    those aspects?

11:11AM   5    A.   Yeah, sometimes they were the point on other related

11:11AM   6    matters.

11:11AM   7    Q.   And I don't want to get into the weeds on those other

11:11AM   8    matters --

11:11AM   9    A.   Certainly.

11:11AM   10   Q.   -- but is that an example of why the number of agents can

11:11AM   11   increase that are related to this?

11:11AM   12   A.   Absolutely.

11:11AM   13   Q.   And now you mentioned you were involved in several search

11:12AM   14   warrants.  In your experience, in your involvement in this

11:12AM   15   case, does the number of agents that assist at a search

11:12AM   16   warrant, is that sort of an inflated number of people for a

11:12AM   17   particular event, and then they all go back to their normal

11:12AM   18   jobs?

11:12AM   19   A.   Correct.  For a search warrant, you need an entry team,

11:12AM   20   obviously for safety.  You need seasoned agents.  So that's a

11:12AM   21   multi-agent project for that day until you get the evidence

11:12AM   22   back, get it checked in, things along those lines.

11:12AM   23   Q.   Do people who work in different parts of the office help

11:12AM   24   out essentially for a day, and then go work on other matters?

11:12AM   25   A.   Yeah.  It sometimes it will bleed into the next day to

11:12AM   1   finish up reports and things like that, but they have their

11:12AM   2   own cases as well.

11:12AM   3   Q.  All right.  Now, from there, I think you were asked about

11:12AM   4   a number of people who were interviewed who didn't testify

11:12AM   5   but whose names the jury might have heard at various points

11:13AM   6   of this trial, and maybe some names they didn't hear; do you

11:13AM   7   recall that?

11:13AM   8   A.  I do.

11:13AM   9   Q.  I'd like to go through that sort of generally first.

11:13AM  10       I want to -- I think some of the names that were

11:13AM  11   mentioned were:  Michelle Sercu; D.P.; Megan Stabler; DJ Rob

11:13AM  12   Reed; Russell Salvatore; Angela Dingledey; Angela Newton;

11:13AM  13   Ashley Chapman or Trayham, I'm not sure which; Jessica

11:13AM  14   Leyland; Nick Ciechalski.  Do you remember those names being

11:13AM  15   mentioned yesterday?

11:13AM  16   A.  I do.

11:13AM  17   Q.  Grouping them all together just for a moment, any

11:13AM  18   interviews of those people that the FBI conducted, those

11:13AM  19   interviews were turned over to the defense; is that correct?

11:13AM  20   A.  Absolutely.

11:13AM  21   Q.  Okay.  And now I'd like to go through in a little bit of

11:13AM  22   detail just in general terms, even for the people who the

11:14AM  23   jury did see here, were a number of witnesses nervous to be

11:14AM  24   involved in this case?

11:14AM  25   A.  Yes.  Absolutely.  In this case particularly, between the

11:14AM    1    Outlaws, and the organized crime, and then Mr. Gerace's

11:14AM    2    contacts in the community with law enforcement and judges,

11:14AM    3    I've never had an investigation where the witnesses have been

11:14AM    4    so fearful.

11:14AM    5    Q.  Is it easy or difficult to get witnesses to open up about

11:14AM    6    sexual and private matters?

11:14AM    7    A.  It's -- it's very difficult.  And it's been particularly

11:14AM    8    also if it's a male agent with a female witness, that also

11:14AM    9    adds some difficulty to it.  And building trust over a period

11:14AM    10   of time.

11:14AM    11   Q.  So there are maybe a couple other challenges I didn't

11:14AM    12   even ask you about when I was asking you questions; is that

11:14AM    13   fair to say?

11:14AM    14   A.  Yes, it's absolutely fair to say.

11:14AM    15   Q.  Were all of the -- were all of the witnesses who were

11:15AM    16   interviewed forthcoming?

11:15AM    17   A.  No, not at all.

11:15AM    18   Q.  Okay.

11:15AM    19   A.  Actually.

11:15AM    20   Q.  When you were asked about was D.P., I think her dancer

11:15AM    21   name the jury has heard is Kiera, you -- you've reviewed her

11:15AM    22   interview?

11:15AM    23   A.  It's been a while, but I did -- I've seen it.

11:15AM    24   Q.  Based upon the totality of the investigation and

11:15AM    25   information available to you, did you assess that she was

| | | |
|--|--|--|
| 11:15AM | 1 | forthcoming or less than forthcoming in her interview? |
| 11:15AM | 2 | A.  Less than forthcoming. |
| 11:15AM | 3 | Q.  Okay.  Did you review the Megan Stabler interview? |
| 11:15AM | 4 | A.  It's been a while, but yes, I did. |
| 11:15AM | 5 | Q.  At some point, she was married to Rob Reed the DJ, |
| 11:15AM | 6 | correct? |
| 11:15AM | 7 | A.  That's correct. |
| 11:15AM | 8 | Q.  And she was a longtime Pharaoh's employee? |
| 11:15AM | 9 | A.  Correct. |
| 11:15AM | 10 | Q.  When you reviewed her interview, did you assess that she |
| 11:15AM | 11 | was forthcoming or less than forthcoming? |
| 11:15AM | 12 | A.  Less than forthcoming. |
| 11:15AM | 13 | Q.  Now I want to talk about DJ Rob Reed.  That interview, |
| 11:15AM | 14 | you did personally, correct? |
| 11:16AM | 15 | A.  That I did, correct. |
| 11:16AM | 16 | Q.  Tell the jury about -- I don't want to get into the |
| 11:16AM | 17 | specifics of what he said, but tell the jury about how he |
| 11:16AM | 18 | behaved towards you and the other agent you were with when |
| 11:16AM | 19 | you went to interview him. |
| 11:16AM | 20 | A.  He was very short.  It was a very cold day, he wouldn't |
| 11:16AM | 21 | let us in the house, he stayed in the -- that's why I |
| 11:16AM | 22 | remember.  Obviously, it was important, but also the fact |
| 11:16AM | 23 | that it was -- we were outside for an extended period of |
| 11:16AM | 24 | time.  He did answer some questions, but it was certainly -- |
| 11:16AM | 25 | it was brief.  And it was not a back and forth. |

| | | |
|--|--|--|
| 11:16AM | 1 | Q.  Were you cold? |
| 11:16AM | 2 | A.  I was very cold that day, that's why I remember it was |
| 11:16AM | 3 | windy. |
| 11:16AM | 4 | Q.  Can you contrast that to how L.L. let the agents into her |
| 11:16AM | 5 | house when she didn't know they were coming? |
| 11:16AM | 6 | A.  Yeah.  I mean, most, usually if it's bad weather, in my |
| 11:16AM | 7 | experience, people that are forthcoming will invite you in, |
| 11:16AM | 8 | you'll sit down, you'll have a back and forth, a dialogue. |
| 11:16AM | 9 | Q.  And now in terms of some of the things he said to you, in |
| 11:17AM | 10 | sum and substance -- |
| 11:17AM | 11 | **MR. TRIPI:**  And this is not for the truth, Judge, |
| 11:17AM | 12 | just to flag it. |
| 11:17AM | 13 | **BY MR. TRIPI:** |
| 11:17AM | 14 | Q.  -- but did he say to you in 15 years he never saw a drug |
| 11:17AM | 15 | inside Pharaoh's? |
| 11:17AM | 16 | A.  That's correct. |
| 11:17AM | 17 | Q.  Did that ring hollow to you? |
| 11:17AM | 18 | A.  Oh, extremely hollow.  I thought he was absolutely not |
| 11:17AM | 19 | forthcoming at all. |
| 11:17AM | 20 | Q.  Did you find that statement credible based on the |
| 11:17AM | 21 | information you had developed to that point? |
| 11:17AM | 22 | A.  Not at all. |
| 11:17AM | 23 | Q.  Did DJ Rob Reed give you any leads of people you should |
| 11:17AM | 24 | go talk to like Katrina Nigro did? |
| 11:17AM | 25 | A.  He did not. |

| | | |
|---|---|---|
| 11:17AM | 1 | Q.  Then you were asked about Russell Salvatore; do you |
| 11:17AM | 2 | remember that? |
| 11:17AM | 3 | A.  I do. |
| 11:17AM | 4 | Q.  And you interviewed him? |
| 11:17AM | 5 | A.  I did. |
| 11:17AM | 6 | Q.  And he had you also interview his manager, Mark Jerge; is |
| 11:17AM | 7 | that right? |
| 11:17AM | 8 | A.  Yes, he directed us to Mr. Jerge, who had more details |
| 11:17AM | 9 | about the operations and some of the questions we were |
| 11:17AM | 10 | asking. |
| 11:17AM | 11 | Q.  Through that aspect of the investigation, did you learn |
| 11:17AM | 12 | that the defendant had a standing room at Salvatore's, or |
| 11:18AM | 13 | Russell Salvatore's? |
| 11:18AM | 14 | A.  I believe we knew that previously or suspected -- |
| 11:18AM | 15 | **MR. FOTI:**  Objection. |
| 11:18AM | 16 | **THE COURT:**  I'm sorry. |
| 11:18AM | 17 | **MR. FOTI:**  Objection, that's hearsay. |
| 11:18AM | 18 | **THE COURT:**  Hearsay, yeah.  Sustained. |
| 11:18AM | 19 | The jury will strike that. |
| 11:18AM | 20 | **BY MR. TRIPI:** |
| 11:18AM | 21 | Q.  Did Russell Salvatore deny getting a prostitute from |
| 11:18AM | 22 | Mr. Gerace, but indicate he didn't need to because he was the |
| 11:18AM | 23 | boss of his restaurant? |
| 11:18AM | 24 | A.  Correct.  He did. |
| 11:18AM | 25 | Q.  In the context of that discussion, did you understand |

11:18AM   1   younger women work for him at his restaurant?

11:18AM   2   A.  I did.

11:18AM   3   Q.  Did you assess that as forthcoming or less than

11:18AM   4   forthcoming?

11:18AM   5   A.  Less than forthcoming.

11:18AM   6   Q.  You were asked about Angela Dingledey.  Was she sort of

11:19AM   7   interviewed more towards the tail end, sort of before trial?

11:19AM   8   A.  Correct, yes.

11:19AM   9   Q.  So the investigation was basically over at that point.

11:19AM   10  We were heading towards trial?

11:19AM   11  A.  Yeah, I believe it was post-indictment, and we circled

11:19AM   12  the other way.

11:19AM   13  Q.  Just a name that was out there, and --

11:19AM   14  A.  Yeah, who we got to, and wanted to follow up on.

11:19AM   15  Q.  Was her interview turned over?

11:19AM   16  A.  Yes, it was.

11:19AM   17  Q.  I think there were two names that you didn't recall,

11:19AM   18  Angela Newton and Ashley Chapman, but you were asked about

11:19AM   19  the fact that Jessica Leyland did not testify in this trial;

11:19AM   20  do you recall that?

11:19AM   21  A.  I do.

11:19AM   22  Q.  Was she arrested, charged, and did she plead guilty to

11:19AM   23  witness tampering?

11:19AM   24  A.  She did.

11:19AM   25  Q.  Did she decline to cooperate through her attorney?

11:19AM   1   A.  She did proffer twice, but ultimately declined to
11:19AM   2   cooperate further.
11:19AM   3   Q.  And in those proffers, did you assess the reliability or
11:20AM   4   credibility?
11:20AM   5   A.  It was -- she was less than forthcoming.
11:20AM   6   Q.  And was her witness tampering conviction, her plea,
11:20AM   7   related to her conduct towards P.H.?
11:20AM   8   A.  It was.
11:20AM   9   Q.  Nick Ciechalski, and I can't spell his name, I barely
11:20AM  10   pronounced it right, but do you know who I'm talking about?
11:20AM  11   A.  I do.
11:20AM  12   Q.  He was interviewed?
11:20AM  13   A.  He was.
11:20AM  14   Q.  His interview was turned over to the defense?
11:20AM  15   A.  It was.
11:20AM  16   Q.  And he was a Pharaoh's employee, manager?
11:20AM  17   A.  For later -- later years.
11:20AM  18   Q.  What timeframe?
11:20AM  19   A.  I probably need the report to give you a hard and fast,
11:20AM  20   but I thought it was '18.  '17, '18.  But to testify
11:20AM  21   specifically, I need to look at that document.
11:20AM  22   Q.  I understand.
11:20AM  23       In the interest of time, fair to say it was closer toward
11:20AM  24   the end of the conduct that we're dealing with?
11:20AM  25   A.  As I recall it.

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

11:20AM   1   Q.  Were his interview reports provided to the defense?

11:21AM   2   A.  They were.

11:21AM   3   Q.  In terms of his interview, in part of it did he indicate

11:21AM   4   usually he was out front and not in a position to see things

11:21AM   5   that were happening in the back?

11:21AM   6   A.  As I recall -- I did not interview him, but I recall,

11:21AM   7   that's what I was informed.

11:21AM   8          **MR. FOTI:**  Objection.

11:21AM   9          **THE COURT:**  Sorry?

11:21AM  10          **MR. TRIPI:**  He was asked about assessments he made

11:21AM  11   and so --

11:21AM  12          **THE COURT:**  Just a second.

11:21AM  13          **MR. TRIPI:**  Okay.  I'm sorry, Judge.

11:21AM  14          **THE COURT:**  The objection is sustained, and the jury

11:21AM  15   will strike the answer.

11:21AM  16          Next question.

11:21AM  17          **BY MR. TRIPI:**

11:21AM  18   Q.  I'm going to try to rephrase once.

11:21AM  19      Did you -- did you assess whether Mr. Ciechalski had

11:21AM  20   relevant information to provide?

11:21AM  21   A.  It did not appear he had relevant information to provide.

11:22AM  22   Q.  All right.  And you were asked questions moving onto your

11:22AM  23   chart, it's -- it's -- the large version is sort of next to

11:22AM  24   you back there --

11:22AM  25   A.  Correct.

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

71

| 11:22AM | 1 | Q.  -- in view of the jury.  We can put it up briefly.  I'm |
|---|---|---|

11:22AM   1   Q.  -- in view of the jury.  We can put it up briefly.  I'm

11:22AM   2   not going to go through the chart right now, but just some

11:22AM   3   general questions about it and maybe I'll circle back and put

11:22AM   4   a little more specific later.

11:22AM   5       You were asked questions about sort of witness testimony

11:22AM   6   as it pertains to this chart; do you remember that?

11:22AM   7   A.  Correct.

11:22AM   8   Q.  Fair to say that the chart only summarizes in picture

11:22AM   9   format who testified and exhibits that were introduced?

11:22AM  10   A.  That's correct.

11:22AM  11   Q.  It doesn't summarize testimony at all?

11:23AM  12   A.  Correct.  It does not.  And that was a -- a factor when

11:23AM  13   we put it together.  It was we were not to interpret

11:23AM  14   testimony.

11:23AM  15   Q.  Is that because that's the jury's job?

11:23AM  16   A.  Correct.  It's the jury's job to determine the testimony

11:23AM  17   and interpret it.

11:23AM  18   Q.  Nevertheless, you were asked about various things that

11:23AM  19   you did or did not include on the chart.  Did you summarize

11:23AM  20   how the witnesses were corroborated?

11:23AM  21   A.  I did not.

11:23AM  22   Q.  Did you summarize, for example, how K.A. may have

11:23AM  23   corroborated A.A., for example?

11:23AM  24   A.  Correct, I did not, again --

11:23AM  25   Q.  You didn't summarize any testimony?

11:23AM   1   A.  No, we did not.

11:23AM   2   Q.  So, to ask it in one more concise question, this chart

11:23AM   3   doesn't go through all the ways people were corroborated,

11:23AM   4   correct?

11:23AM   5   A.  No, it does not.

11:23AM   6   Q.  You were asked about a photo, 490B, and you seemed a

11:24AM   7   little bit unsure about who was in it.  But I just want to

11:24AM   8   touch on Exhibit 490B.

11:24AM   9        **MR. TRIPI:**  We can take that down for now.

11:24AM  10        **BY MR. TRIPI:**

11:24AM  11   Q.  Generally, do people's appearances change over time?

11:24AM  12   A.  Absolutely.

11:24AM  13   Q.  We've seen sort of iterations even of the defendant from

11:24AM  14   photographs in 2005, 2011, and later on.  Did his appearance

11:24AM  15   change over time?

11:24AM  16   A.  Yes.

11:24AM  17   Q.  Okay.  So is that a normal human thing that happens as

11:24AM  18   people age?

11:24AM  19   A.  Mine is -- mine has changed, unfortunately.

11:24AM  20   Q.  Same here.  All right.

11:24AM  21        **MR. TRIPI:**  We can take that down.

11:24AM  22        **THE WITNESS:**  And my hairline.

11:24AM  23        **BY MR. TRIPI:**

11:24AM  24   Q.  You were asked about whether Mr. Gerace had

11:24AM  25   communications with certain people, and I think those

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

| | | |
|---|---|---|
| 11:24AM | 1 | questions were sort of based in Exhibit 310AT, which is his |
| 11:25AM | 2 | list of some of the contacts that were in his phone; is that |
| 11:25AM | 3 | right? |
| 11:25AM | 4 | A.  That's right. |
| 11:25AM | 5 | Q.  And now, those weren't all of the contacts in his phone, |
| 11:25AM | 6 | they were some of the contacts? |
| 11:25AM | 7 | A.  That's correct. |
| 11:25AM | 8 | Q.  And nevertheless, between phone records and |
| 11:25AM | 9 | communications from the phone, did he have contact with |
| 11:25AM | 10 | Anthony Gerace? |
| 11:25AM | 11 | A.  Yes, he did. |
| 11:25AM | 12 | Q.  Did he have contact with Tom Doctor? |
| 11:25AM | 13 | A.  Yes, he did. |
| 11:25AM | 14 | Q.  Did he have contact with Judge John Michalski? |
| 11:25AM | 15 | A.  Yes. |
| 11:25AM | 16 | Q.  Did he have contact with Detective Gregory Trotter? |
| 11:25AM | 17 | A.  Certainly. |
| 11:25AM | 18 | Q.  Did he have contact with Darryl LaMont? |
| 11:25AM | 19 | A.  He did. |
| 11:25AM | 20 | Q.  Did he have contact with Susan Michalski, Judge |
| 11:25AM | 21 | Michalski's wife? |
| 11:25AM | 22 | A.  He did. |
| 11:25AM | 23 | Q.  Did he have contact in his phone records with Lou Selva? |
| 11:25AM | 24 | A.  He did. |
| 11:25AM | 25 | Q.  Did he have contact in his text messages with Mike |

11:25AM    1    Masecchia?

11:25AM    2    A.  He did.

11:25AM    3    Q.  Did he have contact with Chris Chudy?

11:25AM    4    A.  He did.

11:25AM    5    Q.  Did he have contact with Tommy O, the Outlaws?

11:25AM    6    A.  He did.

11:25AM    7    Q.  Did he have contact with P.H.?

11:26AM    8    A.  He did.

11:26AM    9    Q.  Did he have contact with a New York State police officer

11:26AM    10    named Rob Vishion?

11:26AM    11    A.  It's Mark -- Mike -- I don't remember his first name, but

11:26AM    12    it's -- Vishion is his last name.  I thought it was Michael,

11:26AM    13    but I could be wrong.

11:26AM    14    Q.  Maybe I got the name wrong.  If I got the name wrong, I

11:26AM    15    apologize.

11:26AM    16         MR. TRIPI:  For the witness only, can we show the

11:26AM    17    Exhibit 310AR just to refresh on the name.

11:26AM    18         Let me know if this refreshes your recollection or

11:26AM    19    mine on the name.

11:26AM    20         It's 310AR for the witness only.  Give me one second.

11:26AM    21         THE CLERK:  I'll take it down.

11:26AM    22         MR. TRIPI:  Yeah, it should be 310AR.

11:26AM    23         THE CLERK:  Okay.

11:26AM    24         BY MR. TRIPI:

11:27AM    25    Q.  Does that refresh your recollection that I got the name

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

75

| 11:27AM | 1 | wrong? |
| 11:27AM | 2 | A.  Correct. |
| 11:27AM | 3 | Q.  What's the name? |
| 11:27AM | 4 | A.  Robert V-I-S-H-I-O-N. |
| 11:27AM | 5 | Q.  Take it down? |
| 11:27AM | 6 | A.  You might have had it right.  Vishion, I'm very |
| 11:27AM | 7 | comfortable with the last name. |
| 11:27AM | 8 | Q.  Is Robert Vishion, was he a New York State police officer |
| 11:27AM | 9 | during the time of this investigation? |
| 11:27AM | 10 | A.  A portion of it, I believe he retired towards the end. |
| 11:27AM | 11 | Q.  Okay.  Did he make references to being in contact with |
| 11:27AM | 12 | another law enforcement officer, last name Sliwa? |
| 11:27AM | 13 | A.  He did. |
| 11:27AM | 14 | Q.  Who was Sliwa? |
| 11:27AM | 15 | A.  I believe he's Mark Sliwa, he was a lieutenant with |
| 11:27AM | 16 | Amherst.  I believe he's retired. |
| 11:27AM | 17 | Q.  Did he have contact with another law enforcement officer |
| 11:27AM | 18 | named Scioli? |
| 11:27AM | 19 | A.  Yeah, Scioli was a New York State trooper.  Who is also, |
| 11:27AM | 20 | I believe, retired now. |
| 11:27AM | 21 | Q.  Did he have contact and communication with former Buffalo |
| 11:28AM | 22 | Police Commissioner Dan Derenda? |
| 11:28AM | 23 | A.  Yes. |
| 11:28AM | 24 | Q.  Did he have contact with former Buffalo Police |
| 11:28AM | 25 | Commissioner Rocco Dina? |

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

76

| | | |
|---|---|---|
| 11:28AM | 1 | A.  Yes. |
| 11:28AM | 2 | Q.  And were there a number of others? |
| 11:28AM | 3 | A.  Law enforcement, yes, there were. |
| 11:28AM | 4 | Q.  I don't want to keep going.  Many other people he had |
| 11:28AM | 5 | contact with? |
| 11:28AM | 6 | A.  Generally, yes.  Absolutely. |
| 11:28AM | 7 | **MR. TRIPI:**  Okay.  Can we pull up Exhibit 240E in |
| 11:28AM | 8 | evidence.  E, as in Evelyn, I guess. |
| 11:28AM | 9 | **BY MR. TRIPI:** |
| 11:28AM | 10 | Q.  Do you know who Anthony Barba is? |
| 11:28AM | 11 | A.  I know the name. |
| 11:28AM | 12 | Q.  Okay. |
| 11:28AM | 13 | A.  I wouldn't know him by appearance. |
| 11:28AM | 14 | Q.  Okay.  We'll take this down then. |
| 11:28AM | 15 | A.  But I'm aware that he was a Buffalo -- I believe |
| 11:28AM | 16 | high-ranking Buffalo police officer.  He's retired, I |
| 11:28AM | 17 | believe. |
| 11:29AM | 18 | Q.  Was he a deputy police commissioner? |
| 11:29AM | 19 | A.  That's correct.  He was. |
| 11:29AM | 20 | **MR. FOTI:**  Judge, can we approach briefly? |
| 11:29AM | 21 | **THE COURT:**  Approach?  Sure, yeah, come up. |
| 11:29AM | 22 | (Sidebar discussion held on the record.) |
| 11:29AM | 23 | **MR. FOTI:**  I haven't been objecting, and I don't know |
| 11:29AM | 24 | how much Mr. Tripi is going with this, but it seems like the |
| 11:29AM | 25 | questions are going towards law enforcement contacts. |

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

11:29AM    1    I don't remember crossing about anything along those

11:29AM    2    lines at all.

11:29AM    3    I definitely did cross about some of the things that

11:29AM    4    have been covered at this point on redirect, but I think this

11:29AM    5    is now an area that I didn't get into.

11:29AM    6    **MR. TRIPI:**  He crossed on 310AT, and there were law

11:29AM    7    enforcement contacts in that -- in the phone, in

11:29AM    8    Exhibit 310AT.  There are also law enforcement contacts in

11:29AM    9    photos, and so that's within the scope of where -- the cross

11:29AM    10    that was done.

11:29AM    11    **THE COURT:**  How so?  Because he talked about an

11:29AM    12    exhibit, that exhibit's wide open to anything you want to put

11:29AM    13    in?

11:30AM    14    **MR. TRIPI:**  I think so.

11:30AM    15    **THE COURT:**  Wasn't the exhibit in on your direct?

11:30AM    16    **MR. TRIPI:**  Yeah, and he crossed on it.  And so I'm

11:30AM    17    now rebutting some of the inferences that he's --

11:30AM    18    **THE COURT:**  What's the rebuttal that you're putting

11:30AM    19    in by noting law enforcement contacts in there?

11:30AM    20    **MR. TRIPI:**  Because there was a cross about these --

11:30AM    21    these are in the contacts in your phone, and you didn't

11:30AM    22    interview everybody.  You didn't -- there are -- it's gonna

11:30AM    23    circle back later, because he crossed him on different law

11:30AM    24    enforcement techniques and challenges.

11:30AM    25    **THE COURT:**  Okay.

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

78

| | | |
|---|---|---|
| 11:30AM | 1 | **MR. TRIPI:** And when someone has this level of |
| 11:30AM | 2 | contact with members of law enforcement, it ties the hands of |
| 11:30AM | 3 | law enforcement. There were state police officers involved in |
| 11:30AM | 4 | this investigation. Law enforcement community talks, so that |
| 11:30AM | 5 | ties into the challenges we're going to talk about at the end. |
| 11:30AM | 6 | And so I think it -- it -- it -- it's not just |
| 11:30AM | 7 | directed towards his cross on 310AT, but he ended with you |
| 11:30AM | 8 | didn't do this, you didn't do that. |
| 11:30AM | 9 | **THE COURT:** Yeah. |
| 11:31AM | 10 | **MR. TRIPI:** And there's a lot of reasons for that |
| 11:31AM | 11 | that I kind of need to lay a groundwork for. |
| 11:31AM | 12 | **THE COURT:** Why isn't that legitimately in response |
| 11:31AM | 13 | to the cross-examination about the techniques that you didn't |
| 11:31AM | 14 | use? |
| 11:31AM | 15 | **MR. FOTI:** I guess that argument -- |
| 11:31AM | 16 | **THE COURT:** The answer would be, well, because he had |
| 11:31AM | 17 | so many law enforcement contacts, and he's got to establish |
| 11:31AM | 18 | that he's got the law enforcement contacts to make that |
| 11:31AM | 19 | argument. |
| 11:31AM | 20 | **MR. FOTI:** Yeah, I -- I -- I guess I didn't foresee |
| 11:31AM | 21 | that that's where this was going. I think that is a |
| 11:31AM | 22 | response -- |
| 11:31AM | 23 | **MR. TRIPI:** And I think that this is the -- probably |
| 11:31AM | 24 | in this bucket, this is the last person I'm asking about. He |
| 11:31AM | 25 | didn't know the photo. |

11:31AM   1          THE COURT:  Okay.  I think we've established you can

11:31AM   2   legitimately do this.  You're withdrawing your objection?

11:31AM   3          MR. FOTI:  Yeah, based on that.

11:31AM   4          (End of sidebar discussion.)

11:31AM   5          BY MR. TRIPI:

11:31AM   6   Q.  Okay.  Even if you're not -- you didn't recognize the

11:31AM   7   photo, are you generally aware of Anthony Barba's status as a

11:31AM   8   Buffalo Police Deputy Commissioner?

11:31AM   9   A.  Definitely.

11:31AM  10   Q.  And are you aware of his relationship generally with the

11:32AM  11   defendant?

11:32AM  12   A.  They were friends.

11:32AM  13   Q.  I'm gonna circle back to this later on, but there was

11:32AM  14   cross-examination about various techniques and tactics that

11:32AM  15   were not used in terms of undercovers and C.I.s, I'm going to

11:32AM  16   ask about it again later when I ask you about wiretaps.

11:32AM  17          But to touch on it right where we are now in sort of the

11:32AM  18   same chronology that Mr. Foti was going, just to lay the

11:32AM  19   groundwork, when you came into the investigation, by that

11:32AM  20   point, did you get briefed up and were you aware of two

11:32AM  21   different instances of New York State Police undercovers

11:32AM  22   endeavoring to infiltrate Pharaoh's?

11:32AM  23   A.  Yeah, I did learn about that.  I can't recall exactly

11:32AM  24   when, but --

11:32AM  25   Q.  You were cross-examined about decisions you made though.

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
80

| | | |
|---|---|---|
| 11:32AM | 1 | Did your awareness of those situations factor into |
| 11:33AM | 2 | investigative decisions that were made? |
| 11:33AM | 3 | A.  Yeah, that, and as well as the circumstances of this |
| 11:33AM | 4 | particular -- where we were at in the case, the events of |
| 11:33AM | 5 | that. |
| 11:33AM | 6 | Q.  I'm just asking about that right now though -- |
| 11:33AM | 7 | A.  Absolutely. |
| 11:33AM | 8 | Q.  -- and I'll get to other circumstances later.  Are you |
| 11:33AM | 9 | with me? |
| 11:33AM | 10 | A.  Yep. |
| 11:33AM | 11 | Q.  All right.  Are you familiar with who Joel Catuzza was? |
| 11:33AM | 12 | A.  Yes. |
| 11:33AM | 13 | Q.  Who was that? |
| 11:33AM | 14 | A.  He was a New York State trooper that kind of oversaw the |
| 11:33AM | 15 | undercover -- an attempt to do some undercover purchases, and |
| 11:33AM | 16 | successfully, in Pharaoh's.  I'm not -- |
| 11:33AM | 17 | Q.  Let me ask you, was he a New York State Police undercover |
| 11:33AM | 18 | agent? |
| 11:33AM | 19 | A.  He was. |
| 11:33AM | 20 | Q.  In 2015, early 2016, did he do some work inside Pharaoh's |
| 11:33AM | 21 | that culminated in K.A.'s arrest? |
| 11:33AM | 22 | A.  Yes.  I believe he was the undercover that directly |
| 11:33AM | 23 | purchased from her. |
| 11:33AM | 24 | Q.  Okay.  When you got involved in this investigation, did |
| 11:33AM | 25 | you learn of challenges that arose during Joel Catuzza's |

11:33AM   1   investigation inside Pharaoh's?

11:33AM   2   A.  I did.

11:33AM   3   Q.  Did some of those challenges relate to his undercover

11:34AM   4   license plate being run by members of -- a member of the

11:34AM   5   Cheektowaga Police Department?

11:34AM   6   A.  It did.

11:34AM   7   Q.  Did that cause a spinoff investigation?

11:34AM   8   A.  We did look into that.

11:34AM   9   Q.  Okay.  Is there more looking into that that may be done

11:34AM  10   in the future?

11:34AM  11   A.  Definitely.

11:34AM  12   Q.  And Cheektowaga is where the gentleman's club is located,

11:34AM  13   correct?

11:34AM  14   A.  That's correct.

11:34AM  15   Q.  Did Joel Catuzza express concerns that his undercover

11:34AM  16   license plate was run at a time when he wasn't at Pharaoh's?

11:34AM  17   A.  He did.

11:34AM  18   Q.  Did that factor into your assessments in the

11:34AM  19   investigative decisions made related to the case?

11:34AM  20   A.  Definitely.

11:34AM  21   Q.  In 2018, did you also become aware that another state

11:34AM  22   police investigator named Angel Benitos-Santos made efforts

11:34AM  23   to purchase drugs inside Pharaoh's?

11:34AM  24   A.  Yes.

11:34AM  25   Q.  Did you debrief with Angel Benitos-Santos about that at

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

82

11:35AM  1    some point?

11:35AM  2    A.  Yes, I did.

11:35AM  3    Q.  Did he have a concern when he -- when he tried to make

11:35AM  4    those efforts?

11:35AM  5    A.  He did.

11:35AM  6    Q.  Did he express that concern to you?

11:35AM  7    A.  He did.

11:35AM  8    Q.  Based on those two situations, did you assess, along with

11:35AM  9    the investigative team, that further efforts to use

11:35AM  10   undercovers was not viable?

11:35AM  11   A.  Absolutely.

11:35AM  12   Q.  And now, confidential informants, they might have heard

11:35AM  13   the term a little bit, but that is someone who works -- it

11:35AM  14   might be someone who's in trouble, or someone who is getting

11:35AM  15   paid to work for the government, but that's someone who works

11:35AM  16   as an agent of the government and they pretend to be a

11:35AM  17   criminal; is that a summary?

11:35AM  18   A.  Yeah.

11:35AM  19   Q.  They work confidentially to acquire evidence?

11:35AM  20   A.  They work at our direction.  Most of them are criminals

11:35AM  21   to start with.  But they're at our direction, and employed as

11:35AM  22   a confidential informant to make controlled purchases, or to

11:35AM  23   make recordings, or do those sorts of activities at our

11:36AM  24   direction with our oversight.

11:36AM  25   Q.  Now, and you phrased it better than I did, and I

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

83

11:36AM  1   apologize for that.

11:36AM  2       With confidential informants, is there -- are there

11:36AM  3   concerns using them in the context of this investigation?

11:36AM  4   A.  A number of concerns.

11:36AM  5   Q.  Can you list those, please?

11:36AM  6   A.  Certainly.  I mean, obviously, you're dealing -- I mean,

11:36AM  7   we can't -- we can't authorize an informant to use narcotics.

11:36AM  8   We can't authorize an informant to engage in sex acts for

11:36AM  9   obvious reasons.

11:36AM  10      So particularly, putting an informant into a club, if

11:36AM  11  they've been there routinely and now they're not using

11:36AM  12  cocaine or not using drugs because now they're working for

11:36AM  13  us, you know, that's -- I've had informants say I have to go

11:36AM  14  in there and do a line of coke.

11:36AM  15      Our rules are you can't do that.  And then you say, well,

11:36AM  16  that's not -- we're just not going to be able to pursue that

11:36AM  17  particular investigative technique.

11:36AM  18      So a strip club particularly has a lot of things we would

11:36AM  19  have to consider before we started down that road.

11:37AM  20  Q.  And pivoting off of that, have back to Angel

11:37AM  21  Benitos-Santos, did he indicate in sum and substance his

11:37AM  22  belief he was unable to purchase cocaine because he wasn't a

11:37AM  23  known commodity in the club?

11:37AM  24  A.  He did.

11:37AM  25  Q.  Is it sometimes, in addition to the safety and security

| | | |
|---|---|---|
| 11:37AM | 1 | concerns, is it sometimes a challenge, often a challenge, to |
| 11:37AM | 2 | get a C.I. with access? |
| 11:37AM | 3 | A.  Absolutely.  Usually they're part of the inner group. |
| 11:37AM | 4 | Q.  Is another challenging or complicating factor related to |
| 11:37AM | 5 | the defendant's relationship with a federal law enforcement |
| 11:37AM | 6 | agent named Joseph Bongiovanni? |
| 11:37AM | 7 | A.  That was an impediment, certainly. |
| 11:37AM | 8 | Q.  Were there impediments based upon his connections to |
| 11:37AM | 9 | members of the State police, Buffalo Police Department, and |
| 11:37AM | 10 | local police agencies? |
| 11:37AM | 11 | A.  Yeah.  Mr. Gerace -- the defendant had a lot of |
| 11:37AM | 12 | relationships with various law enforcement agencies in the |
| 11:38AM | 13 | Western New York community.  And that certainly went into our |
| 11:38AM | 14 | decision and calculus in deciding how to pursue certain |
| 11:38AM | 15 | investigative techniques. |
| 11:38AM | 16 | Q.  In Joel Catuzza's investigation, are you aware of the |
| 11:38AM | 17 | State judge that they went to for a protective order to not |
| 11:38AM | 18 | disclose the U.C. information? |
| 11:38AM | 19 | A.  I am. |
| 11:38AM | 20 | Q.  Who was that State judge? |
| 11:38AM | 21 | A.  John Michalski. |
| 11:38AM | 22 | Q.  So was trying that again totally off the table? |
| 11:38AM | 23 | A.  Absolutely. |
| 11:38AM | 24 | Q.  Does that mean you can't get a wiretap? |
| 11:38AM | 25 | A.  Correct.  Those would be steps that would lead up towards |

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
85

| | | |
|---|---|---|
| 11:38AM | 1 | a wiretap, or potentially. |
| 11:38AM | 2 | Q.  Generally, in your experience, is it common when |
| 11:38AM | 3 | individuals know they are subjects or targets of an |
| 11:38AM | 4 | investigation to make efforts to ensure that their conduct |
| 11:38AM | 5 | does not become exposed? |
| 11:38AM | 6 | A.  Absolutely.  They move narcotics.  Maybe they stop |
| 11:39AM | 7 | dealing for a period of time.  Stop talking with certain |
| 11:39AM | 8 | associates.  Change phone numbers.  Those are all things that |
| 11:39AM | 9 | are very common in investigation, if the subjects feel |
| 11:39AM | 10 | they're being looked at or they're being investigated. |
| 11:39AM | 11 | Q.  Do they basically change tactics at times? |
| 11:39AM | 12 | A.  Yeah.  Or they shut down operations for a while. |
| 11:39AM | 13 | Q.  Is changing phones a problem? |
| 11:39AM | 14 | A.  Yeah, definitely. |
| 11:39AM | 15 | Q.  You mentioned burner phones earlier. |
| 11:39AM | 16 | A.  Correct. |
| 11:39AM | 17 | Q.  Do individuals with experience in the drug trade, in your |
| 11:39AM | 18 | experience, utilize burner phones? |
| 11:39AM | 19 | A.  Yes, all the time. |
| 11:39AM | 20 | Q.  What are the additional challenges beyond what you've |
| 11:39AM | 21 | discussed so far when dealing with burner phone? |
| 11:39AM | 22 | A.  Burner phones?  They're not your true name.  They've |
| 11:39AM | 23 | limited minutes.  You drop them. |
| 11:39AM | 24 | If you're trying to get up -- using the wiretap analogy, |
| 11:39AM | 25 | you have to have a period of what we call tolls where we're |

11:39AM  1   running phone numbers to see who they're in communication

11:39AM  2   with.  So if somebody has a burner for a month, dumps it,

11:39AM  3   gets another one, now we've gotta get up and get the tolls

11:39AM  4   for the new phone, identify the new phone, and then really

11:40AM  5   almost starting over when it comes to figuring out who

11:40AM  6   they're in communication with.  And proving that.  Because a

11:40AM  7   lot of times, their associates will have burner phones as

11:40AM  8   well.

11:40AM  9   Q.  I might ask you more about wiretaps later on, but based

11:40AM  10  on all of the things that an agent has to do to even get to

11:40AM  11  the point of requesting a wiretap, does it often take 30 days

11:40AM  12  or more?

11:40AM  13  A.  Absolutely.  Yeah.

11:40AM  14  Q.  When someone drops a burner phone within 30 days, does

11:40AM  15  that make it a challenge?

11:40AM  16  A.  Yeah.  You're kind of starting over again, at least with

11:40AM  17  a phone workup.

11:40AM  18  Q.  In the context of an investigation where there's an

11:40AM  19  active DEA agent who's able to walk the halls of members of

11:40AM  20  law enforcement's offices, is time of the essence?

11:40AM  21  A.  Absolutely.

11:40AM  22  Q.  All right.  You were asked some questions about DVR

11:40AM  23  footage.  I want to ask a couple follow-ups on that.

11:41AM  24  A.  Okay.

11:41AM  25  Q.  I think Mr. Foti started you with -- I'll call it DVR 1,

11:41AM   1   and we're referencing Exhibit 3539ED.  Just a couple of

11:41AM   2   questions about that.

11:41AM   3            **MR. TRIPI:**  Can we pull it up and go to page 2.

11:41AM   4            **BY MR. TRIPI:**

11:41AM   5   Q.  I'm just going to leave it up there, it's in evidence.

11:41AM   6   You can review it if you need it.

11:41AM   7   A.  Certainly.

11:41AM   8   Q.  All right?  The video footage of DVR 1, that went from

11:41AM   9   October -- October 21st, 2019 to December 11th or 12th of

11:41AM  10   2019, the day of the search, right?

11:41AM  11   A.  It did.

11:41AM  12   Q.  Okay.  All right.  Now I want to ask you some questions

11:41AM  13   about things that occurred prior to October 21st, 2019, okay?

11:42AM  14   A.  Certainly.

11:42AM  15   Q.  Was the defendant's brother's house -- was Anthony

11:42AM  16   Gerace's house searched, and was Anthony Gerace arrested on

11:42AM  17   January 28th, 2019?

11:42AM  18   A.  He was.

11:42AM  19   Q.  That was before October 21st, 2019?

11:42AM  20   A.  Correct.

11:42AM  21   Q.  Was the defendant's phone seized and extracted, and

11:42AM  22   ultimately the phone returned to him but the data extracted,

11:42AM  23   on or about April 27th, 2019?

11:42AM  24   A.  Yeah.  At Newark, as he was entering back into the

11:42AM  25   country.

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

88

| 11:42AM | 1 | Q.  And then Special Agent Ryan testified in more detail |

11:42AM   1   Q.  And then Special Agent Ryan testified in more detail

11:42AM   2   about that, correct?

11:42AM   3   A.  He did.

11:42AM   4   Q.  Was that before October 21st, 2019?

11:42AM   5   A.  It was.

11:42AM   6   Q.  Was Defendant Bongiovanni's house searched by federal law

11:42AM   7   enforcement on June 6th, 2019, and was evidence recovered?

11:42AM   8   A.  It was.  And there was evidence recovered.

11:42AM   9   Q.  Was that before October 21st, 2019?

11:42AM   10  A.  It was.

11:43AM   11  Q.  Were searches of Lou Selva and Mike Masecchia's

11:43AM   12  residence, did those occur on August 23rd, 2019?

11:43AM   13  A.  They did.  I was present at Mr. Masecchia's house.

11:43AM   14  Q.  And Masecchia was arrested?

11:43AM   15  A.  He was.

11:43AM   16  Q.  Did those events occur before October 21st, 2019?

11:43AM   17  A.  They did.

11:43AM   18  Q.  Did all of those events happen before the seizure of

11:43AM   19  DVR 1?

11:43AM   20  A.  They did.

11:43AM   21  Q.  Nevertheless, the report that's in evidence, in fairness,

11:43AM   22  you didn't write it, correct?

11:43AM   23  A.  Correct.

11:43AM   24  Q.  In fairness, there was no observations at that point of

11:43AM   25  oral sex, anal sex, vaginal sex, correct?

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
89

| | | |
|---|---|---|
| 11:43AM | 1 | A.  Correct. |
| 11:43AM | 2 | Q.  Nevertheless, the report itself documents fondling, |
| 11:43AM | 3 | right? |
| 11:43AM | 4 | A.  It does. |
| 11:43AM | 5 | Q.  On various cameras? |
| 11:43AM | 6 | A.  On various cameras. |
| 11:43AM | 7 | Q.  It documents kissing? |
| 11:43AM | 8 | A.  It does. |
| 11:43AM | 9 | Q.  It documents grinding? |
| 11:43AM | 10 | A.  It does. |
| 11:43AM | 11 | Q.  It documents erect penises? |
| 11:43AM | 12 | A.  It does. |
| 11:44AM | 13 | Q.  And all of those things occurred after the defendant |
| 11:44AM | 14 | would have been on notice that he was under some type of |
| 11:44AM | 15 | investigation; is that fair? |
| 11:44AM | 16 | A.  Absolutely. |
| 11:44AM | 17 | Q.  In your view, and I'm not trying to be critical, but |
| 11:44AM | 18 | would you have written that sentence, "there's no relevant |
| 11:44AM | 19 | information," in the context of a sex-trafficking case where |
| 11:44AM | 20 | there's fondling, kissing, grinding, and erect penises? |
| 11:44AM | 21 | A.  I would not have.  I was little more familiar with the |
| 11:44AM | 22 | sex-trafficking aspects of the investigation, and from |
| 11:44AM | 23 | interviewing so many of the dancers. |
| 11:44AM | 24 | Q.  Okay.  I can go through camera by camera, but I do want |
| 11:44AM | 25 | to focus on one that's in this report. |

11:44AM    1    Let's go to the last page of this report.  Again, when I

11:44AM    2    say "this report," we're dealing in Exhibit 3539ED.

11:45AM    3    What was recorded for camera 8?

11:45AM    4    A.  No video was recorded.  It was, as I recall, unable to be

11:45AM    5    recovered or wasn't working.

11:45AM    6    Q.  Well, what's it say?

11:45AM    7    A.  It says no video recorded.

11:45AM    8    Q.  Okay.  Have you heard testimony at this trial about there

11:45AM    9    being certain blind spots in Pharaoh's?

11:45AM    10    A.  Yes, I heard that testimony.

11:45AM    11    Q.  If a camera has no video, is that consistent with a blind

11:45AM    12    spot?

11:45AM    13    A.  Absolutely.

11:45AM    14    **MR. TRIPI:**  All right.  You can take that one down.

11:45AM    15    **THE WITNESS:**  And the report indicates there were

11:45AM    16    blind spots.

11:45AM    17    **BY MR. TRIPI:**

11:45AM    18    Q.  I'm sorry, does the report indicate there were blind

11:45AM    19    spots?

11:45AM    20    A.  It does.

11:45AM    21    Q.  What does it say in that regard?

11:45AM    22    A.  If you can bring it back up.

11:45AM    23    **MR. TRIPI:**  Yeah, sure.  Direct us to 3539ED.

11:45AM    24    **BY MR. TRIPI:**

11:45AM    25    Q.  And where are you referencing?

11:45AM   1   A.  I think it was the first page.  This might be the other

11:45AM   2   report.

11:45AM   3   Q.  Oh, yeah.  Let's go to page 2.  The last sentence there,

11:46AM   4   is that where you were looking?

11:46AM   5   A.  That's what I was referring to.

11:46AM   6   Q.  What's it say?

11:46AM   7   A.  There are some areas in the VIP section that are not

11:46AM   8   covered by these camera angles, and therefore not seen on the

11:46AM   9   recordings.

11:46AM   10  Q.  Okay.  I'd like to move on now and just ask you a few

11:46AM   11  more questions.  And I think I'm encompassing all of the DVRs

11:46AM   12  at this point.  Well, let's stick to DVR 1 for a second.

11:46AM   13      None of those cameras showed, in terms of, showed the

11:46AM   14  dressing room, right?

11:46AM   15  A.  Correct.

11:46AM   16  Q.  None of them showed the bathroom?

11:46AM   17  A.  Correct.

11:46AM   18  Q.  None of the DVRs whatsoever showed any views of the

11:46AM   19  upstairs; is that right?

11:46AM   20  A.  Correct.  That's what I recall.

11:46AM   21  Q.  There's been a lot of testimony about what happened

11:46AM   22  upstairs at Pharaoh's; fair to say?

11:46AM   23  A.  There was.

11:46AM   24      **MR. TRIPI:**  Okay.  Now we move on to Exhibit 3539EE.

11:47AM   25  We can publish that.

11:47AM  1   **BY MR. TRIPI:**

11:47AM  2   Q.  This exhibit, the range of the cameras in this exhibit is

11:47AM  3   even shorter than DVR 1, this deals with DVR 2; is that

11:47AM  4   right?

11:47AM  5   A.  That's correct.

11:47AM  6   Q.  And the range here, I think Mr. Foti covered it, but was

11:47AM  7   November 28th, 2019 to December 12th, 2019; is that right?

11:47AM  8   December 11th or 12th?

11:47AM  9   A.  11/28 -- yeah, exactly, to December 11th and 12th,

11:47AM  10  depending on the camera.

11:47AM  11  Q.  Okay.  I don't want to be too repetitive.  But all those

11:47AM  12  questions that I asked you about Anthony Gerace's arrest, the

11:47AM  13  seizure of the defendant's phone, the search at Bongiovanni,

11:47AM  14  the -- the searches at Masecchia and Selva's residence, and

11:47AM  15  Masecchia's arrest, all of those same answers apply here:

11:47AM  16  Those all happened before the very first moment of video

11:47AM  17  coverage; is that right?

11:47AM  18  A.  That's correct.

11:47AM  19  Q.  Additionally, by this point in time, by November 28th,

11:48AM  20  2019, an additional thing happened as it relates to Joseph

11:48AM  21  Bongiovanni; is that right?

11:48AM  22  A.  That's correct.

11:48AM  23  Q.  By that point, was he charged?

11:48AM  24  A.  Yeah.  He was indicted, and the indictment was unsealed.

11:48AM  25  Q.  So that means it was public?

| 11:48AM | 1 | A.  It was public. |

11:48AM 1 A.  It was public.

11:48AM 2 Q.  And I asked you on direct, but there was a lot of media

11:48AM 3 coverage associated with that event?

11:48AM 4 A.  A pretty extensive amount.

11:48AM 5 Q.  Okay.  I'd like to go to the same exhibit and ask you a

11:48AM 6 question about camera 20.  Now, again, I'm not being

11:48AM 7 critical, but you didn't write this report, right?

11:48AM 8 A.  I did not.

11:48AM 9 Q.  Okay.  What does camera 20 say?  Can you read it for the

11:48AM 10 jury?

11:48AM 11 A.  The whole thing?  Located in the PGC office, video

11:48AM 12 footage from 11/28/2019 at 8:54:19 to 12/12/2019 10:29:39.

11:48AM 13 Camera 20 contains no relevant information.  Camera 20

11:49AM 14 generally shows employees such as Peter Gerace Jr., Peter

11:49AM 15 Gerace Sr., Anthony Gerace, John Ermin a/k/a Tommy O, Nick

11:49AM 16 Ciechalski, and the others doing typical office work.

11:49AM 17 Q.  So the defendant, his brother Anthony, and Tommy O the

11:49AM 18 Outlaws leader are on camera at the club in the office?

11:49AM 19 A.  In the office.

11:49AM 20 Q.  And we've heard testimony about -- at this trial from

11:49AM 21 witnesses about the first floor office; is that right?

11:49AM 22 A.  That's correct.

11:49AM 23 **MR. TRIPI:**  We can take that down.

11:49AM 24 **BY MR. TRIPI:**

11:49AM 25 Q.  As to 3539EE, none of those cameras covered the upstairs,

| 11:49AM | 1 | correct? |

11:49AM    1    correct?

11:49AM    2    A.  That's correct.

11:49AM    3    Q.  None of those cameras covered the dressing rooms or the

11:49AM    4    bathrooms, correct?

11:49AM    5    A.  That's correct.

11:49AM    6    Q.  All right.

11:49AM    7    **MR. TRIPI:**  Let's move on to 3539EF.

11:49AM    8    **BY MR. TRIPI:**

11:50AM    9    Q.  And this deals with DVR 3 that you were questioned about?

11:50AM    10    A.  Yes, it does.

11:50AM    11    **MR. TRIPI:**  Let's go to page 2, Ms. Champoux.

11:50AM    12    **BY MR. TRIPI:**

11:50AM    13    Q.  The range on this DVR was November 13th to December 12th,

11:50AM    14    2019, and it showed seven cameras; is that right?

11:50AM    15    A.  Yeah.  11 -- what was the date range?

11:50AM    16    Q.  Oh, maybe I got it wrong.

11:50AM    17    There was a camera that showed November 30th to

11:50AM    18    December 12th; is that right?

11:50AM    19    A.  That's correct.

11:50AM    20    Q.  That's the range on this DVR?

11:50AM    21    A.  Correct.

11:50AM    22    Q.  Okay.  Again, all of those events regarding Anthony

11:50AM    23    Gerace, the defendant's phone being seized at the border,

11:50AM    24    Mike Masecchia, Lou Selva, Joe Bongiovanni's search, all

11:50AM    25    happened before the first moment of footage on this DVR,

| | | |
|---|---|---|
| 11:50AM | 1 | correct? |
| 11:50AM | 2 | A.  Correct. |
| 11:50AM | 3 | Q.  In addition to that, Joseph Bongiovanni's arrest and |
| 11:50AM | 4 | unsealing of his indictment occurred before the first moment |
| 11:51AM | 5 | of footage on this DVR? |
| 11:51AM | 6 | A.  It did. |
| 11:51AM | 7 | Q.  Now, just in terms of notice, when Mr. Bongiovanni's |
| 11:51AM | 8 | indictment was unsealed, was there a paragraph in it publicly |
| 11:51AM | 9 | available that referred to a stripper overdose at a |
| 11:51AM | 10 | gentleman's club operated by Coconspirator 1 in Cheektowaga, |
| 11:51AM | 11 | New York, and that Bongiovanni advised Coconspirator 1 to get |
| 11:51AM | 12 | her out of the gentleman's club? |
| 11:51AM | 13 | A.  That language was in the indictment. |
| 11:51AM | 14 | Q.  So that was publicly available to anyone that would have |
| 11:51AM | 15 | read the indictment? |
| 11:51AM | 16 | A.  It was. |
| 11:51AM | 17 | Q.  And I think we established on direct, Coconspirator 1 at |
| 11:51AM | 18 | that time was a reference to the defendant? |
| 11:51AM | 19 | A.  Correct.  He was not charged at that point, so you |
| 11:51AM | 20 | wouldn't utilize his name. |
| 11:51AM | 21 | Q.  Did you do a lot more interviews pertaining to the |
| 11:51AM | 22 | defendant after Bongiovanni was charged? |
| 11:51AM | 23 | A.  Yes.  Significant. |
| 11:51AM | 24 | Q.  Or caused them to be done by others? |
| 11:52AM | 25 | A.  Yeah, a significant amount of work went in after that. |

11:52AM    1    Q.  All right.  So, were investigative leaks a concern and

11:52AM    2    challenge in this investigation?

11:52AM    3    A.  Definitely.

11:52AM    4    Q.  Explain why.

11:52AM    5    A.  Because of Mr. Gerace's contacts in law enforcement, it

11:52AM    6    was always in the back of our minds, you know, looking at all

11:52AM    7    the associates he had, and all the associated law enforcement

11:52AM    8    members from Western New York, the different departments,

11:52AM    9    obviously the Bongiovanni piece, it was -- it was a serious

11:52AM    10   concern in this investigation.

11:52AM    11   Q.  Are there members of the State police who work on FBI

11:52AM    12   task forces?

11:52AM    13   A.  They are.

11:52AM    14   Q.  Do some of them work in this case?

11:52AM    15   A.  Some do, yes.

11:52AM    16   Q.  Is there a -- is there a concern if they are just talking

11:52AM    17   in their office space amongst each other, and someone they

11:52AM    18   don't know has a connection to a target overhears it, was

11:52AM    19   that a concern?

11:52AM    20   A.  That's a concern.  I will say the -- the agents on our --

11:53AM    21   or, the officers on our task force are well vetted, and we

11:53AM    22   certainly made a point to -- to clue them in on, you know,

11:53AM    23   our concerns and that sort of thing.

11:53AM    24   Q.  HSI had task force officers as well, right?

11:53AM    25   A.  Absolutely.

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

11:53AM   1   Q.  In other words, in an investigation like this, with this

11:53AM   2   many law enforcement contacts, at the outset do you know

11:53AM   3   everything and every contact and every communication?

11:53AM   4   A.  Not even close.

11:53AM   5   Q.  Does that make it a major concern?

11:53AM   6   A.  Major concern.  Especially on the larger, like on the

11:53AM   7   search warrant executions.  You have to, by design, you need

11:53AM   8   to have marked units, so that expands the number of people

11:53AM   9   involved.  You need to --

11:53AM  10   Q.  What do you mean by a marked unit?

11:53AM  11   A.  I'm sorry.  Patrol car with lights.  For safety reasons

11:53AM  12   we always, at search warrants almost always, sometimes you

11:53AM  13   can get permission not to, but you want a marked unit there.

11:53AM  14   So the place you're searching, the individuals in the

11:53AM  15   residence or business, realize that this is law enforcement

11:54AM  16   action, and not maybe another drug dealer robbing them.

11:54AM  17       So that was a big concern.  You just, by its nature, you

11:54AM  18   have to expand the people in the know, so to speak, including

11:54AM  19   supervisors and bosses.

11:54AM  20       So search warrants are -- were a big concern when you

11:54AM  21   have to execute those.

11:54AM  22   Q.  How many former Buffalo police commissioners did the

11:54AM  23   defendant have some type of a relationship with?

11:54AM  24   A.  Two.

11:54AM  25   Q.  How many New York State police officers did he have some

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
98

11:54AM    1    type of relationship with?

11:54AM    2    A.  Going -- I think it was five at least, or possibly four.

11:54AM    3    A number of them.

11:54AM    4    Q.  You're estimating?

11:54AM    5    A.  I'm estimating.  I would need my records.

11:54AM    6    Q.  How many other local officers did he have some type of

11:54AM    7    relationship?  And by "local," I mean town, Cheektowaga,

11:54AM    8    Amherst, wherever.

11:54AM    9    A.  Looking at his contacts, and then based on some of our

11:54AM   10    investigative efforts, it was -- it would say 12 to 15.

11:54AM   11    Again, I'd need my records before I would lock in to solid

11:54AM   12    numbers.

11:54AM   13    Q.  As you sit here today, do you know the full extent of

11:55AM   14    everybody he knew?

11:55AM   15    A.  No, I do not.

11:55AM   16         MR. TRIPI:  Can we pull up Exhibit 100A.1-1?

11:55AM   17         BY MR. TRIPI:

11:55AM   18    Q.  All right.  I don't remember want to spend a ton of time

11:55AM   19    on this, but on direct you referenced how this is a DARTS

11:55AM   20    deconfliction email notice, and it has a reference of Paul

11:55AM   21    Francoforte's phone number, and a reference to a number in

11:55AM   22    contact with Anthony Gerace; do you remember that?

11:55AM   23    A.  That's correct, yes.

11:55AM   24    Q.  Would this document have given Joe Bongiovanni notice --

11:55AM   25    A.  Absolutely.

| 11:55AM | 1 | Q.  -- as a DEA agent of whether or not Anthony Gerace or |

11:55AM  1    Q.  -- as a DEA agent of whether or not Anthony Gerace or

11:55AM  2    Paul Francoforte were on a wiretap?

11:55AM  3    A.  It would on a wiretap, yes.

11:55AM  4    Q.  Okay.

11:55AM  5    A.  Not --

11:55AM  6    Q.  Okay.

11:55AM  7    A.  Yeah.

11:55AM  8    Q.  That's a yes?

11:55AM  9    A.  That's a yes.

11:55AM  10   Q.  If Anthony Gerace's phone is tapped, just explain the

11:56AM  11   basics of a wiretap.  If Anthony Gerace's phone is tapped,

11:56AM  12   and the defendant were in contact with him, would that

11:56AM  13   communication be captured by a wire?

11:56AM  14   A.  Yeah.  A wiretap, you get all the calls coming in and

11:56AM  15   out.

11:56AM  16   Q.  So does Bongiovanni having notice of whether Anthony

11:56AM  17   Gerace's phone provides some insight as to whether this

11:56AM  18   defendant might be on a wiretap?

11:56AM  19   A.  It does.

11:56AM  20   Q.  And this document specifically indicates there's no

11:56AM  21   wiretaps on them?

11:56AM  22   A.  Correct.

11:56AM  23   Q.  Okay.

11:56AM  24        **MR. TRIPI:**  You can take that down.

11:56AM  25        Can we pull up Exhibit 100A.1-2?

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
100

11:56AM    1          **BY MR. TRIPI:**

11:56AM    2    Q.  I don't want to spend a lot of time on this, but this is

11:57AM    3    the OCDETF report for Operation Past Due related to Frank

11:57AM    4    Tripi; is that correct?

11:57AM    5    A.  It is.

11:57AM    6    Q.  You've been trained by the FBI?

11:57AM    7    A.  Yes, I have.

11:57AM    8    Q.  You've worked cases with the DEA agents?

11:57AM    9    A.  Yes.

11:57AM    10   Q.  You've worked cases with ATF?

11:57AM    11   A.  Certainly have.

11:57AM    12   Q.  You've worked cases with IRS?

11:57AM    13   A.  I have.

11:57AM    14   Q.  You've worked cases with New York State Police?

11:57AM    15   A.  I have.

11:57AM    16   Q.  You've worked cases with the Buffalo Police Department?

11:57AM    17   A.  Yep.

11:57AM    18   Q.  Other local agencies, as well?

11:57AM    19   A.  Yeah.  Quite a few.

11:57AM    20   Q.  You've had conversations with other members of law

11:57AM    21   enforcement generally in your career?

11:57AM    22   A.  Oh, yeah, lots.

11:57AM    23   Q.  Based upon all of your training and experience, and all

11:57AM    24   of your contacts and communications over the years with other

11:57AM    25   experienced members of law enforcement, I should say you've

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

101

| | | |
|---|---|---|
| 11:57AM | 1 | worked with HSI? |
| 11:57AM | 2 | A.  Yes, I missed that one. |
| 11:57AM | 3 | Q.  Is there any legitimate law enforcement purpose for a |
| 11:57AM | 4 | retired agent to have a draft OCDETF report that's |
| 11:58AM | 5 | law-enforcement sensitive in their residence at retirement? |
| 11:58AM | 6 | A.  Absolutely not. |
| 11:58AM | 7 | **MR. TRIPI:**  We can take that down. |
| 11:58AM | 8 | **BY MR. TRIPI:** |
| 11:58AM | 9 | Q.  Okay.  I've covered a lot earlier about the investigative |
| 11:58AM | 10 | technique of a wiretap, so I'm not going to spend a lot more |
| 11:58AM | 11 | time asking those questions over again.  But I do want to |
| 11:58AM | 12 | play you Government Exhibit 311 in the context of you being |
| 11:58AM | 13 | asked about whether a wiretap was viable or feasible.  I want |
| 11:58AM | 14 | to play that for you. |
| 11:58AM | 15 | A.  Okay. |
| 11:58AM | 16 | Q.  And ask you some questions, okay? |
| 11:58AM | 17 | **MR. TRIPI:**  Can we play Government Exhibit 311, |
| 11:58AM | 18 | please? |
| 11:58AM | 19 | I don't think we have audio.  Stop it, please, I need |
| 11:59AM | 20 | the audio up more. |
| 11:59AM | 21 | (Audio was played.) |
| 11:59AM | 22 | **BY MR. TRIPI:** |
| 11:59AM | 23 | Q.  Does the defendant mention drugs in the recording? |
| 11:59AM | 24 | A.  He does. |
| 11:59AM | 25 | Q.  Does the defendant mention TracFones? |

11:59AM   1   A.  He does.

11:59AM   2   Q.  In your experience, is a TracFone a common burner phone?

11:59AM   3   A.  Yeah.  A TracFone, burner phone, interchangable.

11:59AM   4   Q.  It's a prepaid phone that is often disposed of?

11:59AM   5   A.  Correct, And not in your name.

11:59AM   6   Q.  And we looked at it earlier, did Joseph Bongiovanni

12:00PM   7   respond to that message?

12:00PM   8   A.  He did.

12:00PM   9   Q.  And was that all after about a year or so after Anthony

12:00PM  10   Casullo and Mr. Bongiovanni had that exchange inside the DEA

12:00PM  11   office?

12:00PM  12   A.  It was.

12:00PM  13   Q.  So explain now why a wiretap was not feasible in this

12:00PM  14   case.

12:00PM  15   A.  Certainly.  I mean, having access to a -- an active DEA

12:00PM  16   agent who could check files, who could provide information on

12:00PM  17   law enforcement techniques, that would, I -- I think preclude

12:00PM  18   realistically pursuing a wiretap in this case.

12:00PM  19   Q.  Okay.  We talked earlier now about informants, right?

12:00PM  20   A.  Correct.

12:00PM  21   Q.  And we talked about challenges of getting an informant

12:00PM  22   into Pharaoh's; is that right?

12:00PM  23   A.  We did.

12:00PM  24   Q.  Did part of the investigation into Bongiovanni also

12:00PM  25   relate to him passing along the identities of informants to

12:00PM    1    individuals like Lou Selva?

12:00PM    2    A.  It did.

12:00PM    3    Q.  Did that concern take this technique completely off the

12:01PM    4    table?

12:01PM    5    A.  Yeah.  The factors -- that, and the other factors in this

12:01PM    6    case, it was not viable.  This was not a case for a wiretap.

12:01PM    7    Q.  And is that based on all of your experience?

12:01PM    8    A.  Yes.

12:01PM    9    Q.  Is that based on all of the experience of all the trained

12:01PM   10    agents that worked on this case with you?

12:01PM   11    A.  Yeah, in consultation with the prosecutors.

12:01PM   12    Q.  When you do investigations and when you put a case

12:01PM   13    together, do you tailor the techniques that you utilize to a

12:01PM   14    particular case you're dealing with?

12:01PM   15    A.  Yes.  Most cases are -- all cases have different factors

12:01PM   16    that you have to consider when you're coming up with

12:01PM   17    strategies and investigative techniques you're gonna pursue

12:01PM   18    or attempt.

12:01PM   19    Q.  Is that what was done in this case?

12:01PM   20    A.  Absolutely.

12:01PM   21    Q.  Now, you were asked earlier on cross if you reviewed a

12:01PM   22    report of the defendant engaged in drug transactions, I think

12:02PM   23    that was the question.

12:02PM   24        Did you conduct numerous interviews and have interviews

12:02PM   25    conducted of numerous witnesses who reported the defendant

12:02PM   1   engaged in drug transactions?

12:02PM   2   A.   Yeah, a large number of witnesses.

12:02PM   3   Q.   Did you interview witnesses and have witnesses

12:02PM   4   interviewed who reported and testified in this trial about

12:02PM   5   sex acts committed at Pharaoh's and with this defendant?

12:02PM   6   A.   We did.  Or I did, I guess.

12:02PM   7   Q.   You were asked some questions about whether there was

12:02PM   8   drug paraphernalia inside Pharaoh's on December 12th, 2019.

12:02PM   9        **MR. TRIPI:**  Ms. Champoux, can we pull up just briefly

12:02PM  10   Exhibit 235A-110.

12:03PM  11        **BY MR. TRIPI:**

12:03PM  12   Q.   Okay.  Now this is a photo from the search of Pharaoh's;

12:03PM  13   is that right?

12:03PM  14   A.   That's correct.

12:03PM  15   Q.   Do you see some drug-related evidence in this photo?

12:03PM  16   A.   Yeah.  Appears to be a couple blunts.

12:03PM  17   Q.   Is a blunt basically a marijuana-wrapped cigarette?

12:03PM  18   A.   Yeah, a cigar, cigarette.

12:03PM  19        **MR. TRIPI:**  Let's go to 235A-A119.

12:03PM  20        **BY MR. TRIPI:**

12:03PM  21   Q.   On December -- what's depicted in this photo?

12:03PM  22   A.   Appears to be some paraphernalia.  Pipes.

12:03PM  23   Q.   Some type of smoking device?

12:03PM  24   A.   Yeah, that's what it appears to be.  I would have to see

12:03PM  25   it physically to say definitively.

12:03PM  1    Q.  Based on your experience, does it look like a smoking

12:03PM  2    device?

12:03PM  3    A.  It does, it looks like paraphernalia.

12:03PM  4    Q.  Is that why it was photographed?

12:03PM  5    A.  Yes.

12:03PM  6    Q.  Is that some evidence of drug paraphernalia at Pharaoh's?

12:03PM  7    A.  Some evidence, yes.

12:04PM  8         **MR. TRIPI:**  Let's show Exhibit 235A-A115.

12:04PM  9         **BY MR. TRIPI:**

12:04PM  10   Q.  I think Special Agent Ryan testified about this earlier,

12:04PM  11   but what does that look like?

12:04PM  12   A.  Could be, like, hash oil possibly or --

12:04PM  13   Q.  Does it appear to be some type of THC product?

12:04PM  14   A.  Yeah, it does.

12:04PM  15   Q.  Is that some evidence of drug evidence at Pharaoh's?

12:04PM  16   A.  It is.

12:04PM  17   Q.  Okay.  And this was all after all of those events we

12:04PM  18   talked about, and after Mr. Bongiovanni was already charged;

12:04PM  19   is that right?

12:04PM  20   A.  That's correct.

12:04PM  21        **MR. TRIPI:**  Okay.  All right.  Can we pull up

12:04PM  22   Exhibit 555 on the screen?

12:04PM  23        **THE COURT:**  Mr. Tripi, we've been going almost an

12:04PM  24   hour.

12:04PM  25        **MR. TRIPI:**  I'm in my last section, I don't know, do

| | | |
|---|---|---|
| 12:04PM | 1 | you want to break now, Judge? |
| 12:04PM | 2 | **THE COURT:**  Well, no, I don't want to break now, but |
| 12:04PM | 3 | we've got things that we have to do at 12:30, I think you |
| 12:04PM | 4 | know, and just -- |
| 12:04PM | 5 | **MR. TRIPI:**  I'm almost done. |
| 12:04PM | 6 | **THE COURT:**  Okay. |
| 12:04PM | 7 | **MR. TRIPI:**  We're in the last -- the home stretch. |
| 12:05PM | 8 | **THE COURT:**  All right. |
| 12:05PM | 9 | **BY MR. TRIPI:** |
| 12:05PM | 10 | Q.  You were asked about the timeframe of the cameras and all |
| 12:05PM | 11 | that; do you remember that? |
| 12:05PM | 12 | A.  I do. |
| 12:05PM | 13 | Q.  Based on the duration that each individual was employed |
| 12:05PM | 14 | at Pharaoh's, I'm going to ask the same questions. |
| 12:05PM | 15 | The earliest footage from Pharaoh's is from October 21st, |
| 12:05PM | 16 | 2019; is that right? |
| 12:05PM | 17 | A.  That's correct. |
| 12:05PM | 18 | Q.  Would that have captured anything that occurred with |
| 12:05PM | 19 | L.L.? |
| 12:05PM | 20 | A.  It would not. |
| 12:05PM | 21 | Q.  Would that have captured anything that occurred with |
| 12:05PM | 22 | A.A.? |
| 12:05PM | 23 | A.  Would not. |
| 12:05PM | 24 | Q.  Would that have captured anything that occurred with |
| 12:05PM | 25 | K.A.? |

USA v Gerace - Burns - Tripi/Redirect - 12/18/24

12:05PM  1   A.  Would not.

12:05PM  2   Q.  Would that have captured anything that occurred with

12:05PM  3   P.H.?

12:05PM  4   A.  In '19, she did reconnect with -- no, it would not.

12:05PM  5   Q.  October, right?

12:05PM  6   A.  October, right.

12:05PM  7   Q.  Would that have captured anything that occurred with Matt

12:05PM  8   Albert?

12:05PM  9   A.  Nope.

12:05PM  10  Q.  Would that have captured anything related to the car stop

12:05PM  11  of Charm that Joseph Krywalski talked about?

12:05PM  12  A.  Would not.

12:05PM  13  Q.  Would that have captured anything related to Jeff

12:06PM  14  Anzalone's testimony?

12:06PM  15  A.  Would not.

12:06PM  16  Q.  Would that have captured anything related to K.L.'s

12:06PM  17  testimony?

12:06PM  18  A.  Would not.

12:06PM  19  Q.  Would that have captured anything related to A.A.'s

12:06PM  20  testimony?

12:06PM  21  A.  Would not.

12:06PM  22  Q.  Would that have captured anything related to John

12:06PM  23  McDonald's testimony?

12:06PM  24  A.  Would not.

12:06PM  25  Q.  Would that have captured anything related to C.B.'s

12:06PM    1    testimony?

12:06PM    2    A.   Would not.

12:06PM    3    Q.   Would that have captured anything related to K.M.'s

12:06PM    4    testimony, with her testimony related to the house, at

12:06PM    5    Pharaoh's, and a comment that Mr. Gerace made?

12:06PM    6    A.   It would not.

12:06PM    7    Q.   Would it have captured anything related to Kevin Myszka's

12:06PM    8    testimony?

12:06PM    9    A.   Would not.

12:06PM   10    Q.   Anything related to A.B.'s testimony in this trial?

12:06PM   11    A.   Would not.

12:06PM   12    Q.   Would that have captured anything related to Katrina

12:06PM   13    Nigro's testimony?

12:06PM   14    A.   Nope.

12:06PM   15    Q.   How about J.C.?

12:06PM   16    A.   Would not.

12:06PM   17    Q.   How about A.P.?

12:06PM   18    A.   Would not.

12:06PM   19    Q.   How about A.G.?

12:06PM   20    A.   Would not.

12:06PM   21    Q.   How about G.R.?

12:06PM   22    A.   Would not.

12:06PM   23    Q.   How about E.H.?  She worked there in 2014, right?

12:06PM   24    A.   Correct.

12:06PM   25    Q.   How about J.Z.?

USA v Gerace - Burns - Tripi/Redirect - 12/18/24
109

| | | |
|---|---|---|
| 12:06PM | 1 | A.  Would not. |
| 12:06PM | 2 | Q.  How about C.H.? |
| 12:06PM | 3 | A.  She's possibly there in '19. |
| 12:06PM | 4 | Q.  Okay.  How about R.W.? |
| 12:07PM | 5 | A.  Would not. |
| 12:07PM | 6 | Q.  How about C.C.? |
| 12:07PM | 7 | A.  Would not. |
| 12:07PM | 8 | Q.  How about Doug Augustyniak? |
| 12:07PM | 9 | A.  He's gone by then. |
| 12:07PM | 10 | Q.  Yep.  Withdrawn, I didn't mean to say yep. |
| 12:07PM | 11 | How about the conduct between Anthony Casullo and Joseph |
| 12:07PM | 12 | Bongiovanni at DEA? |
| 12:07PM | 13 | A.  Correct, it would not. |
| 12:07PM | 14 | Q.  How about investigative activities by Special Agent Ryan? |
| 12:07PM | 15 | A.  Would not. |
| 12:07PM | 16 | Q.  How about the events between Craig Border, R.A. and -- |
| 12:07PM | 17 | pertaining to the defendant in 2005? |
| 12:07PM | 18 | A.  Would not. |
| 12:07PM | 19 | Q.  How about the cold approach related to Chris Wisniewski? |
| 12:07PM | 20 | A.  Would not. |
| 12:07PM | 21 | Q.  How about any of the events of 2009 related to Exhibit |
| 12:07PM | 22 | 30A and the 2009 probation search and FBI meeting with |
| 12:07PM | 23 | Bongiovanni? |
| 12:07PM | 24 | A.  It would not. |
| 12:07PM | 25 | Q.  Okay.  So none of the camera footage from October 21st, |

USA v Gerace - Burns - Foti/Recross - 12/18/24

110

| 12:07PM | 1 | 2019 or later undermines anything anyone talked about; is |
| 12:07PM | 2 | that right? |
| 12:07PM | 3 | A.  Correct. |
| 12:07PM | 4 | Q.  All right. |
| 12:07PM | 5 | **MR. TRIPI:**  Nothing further, Judge. |
| 12:08PM | 6 | **THE COURT:**  Mr. Foti? |
| 12:08PM | 7 | |
| 12:08PM | 8 | **RECROSS-EXAMINATION BY MR. FOTI:** |
| 12:08PM | 9 | Q.  Okay.  On redirect, you were asked about assessing the |
| 12:08PM | 10 | forthcomingness and credibility of individuals that were |
| 12:08PM | 11 | interviewed, correct? |
| 12:08PM | 12 | A.  Correct. |
| 12:08PM | 13 | Q.  You were asked about a number of individuals who were |
| 12:08PM | 14 | interviewed, but ultimately did not testify in this trial? |
| 12:08PM | 15 | A.  That's correct. |
| 12:08PM | 16 | Q.  And you were specifically asked questions about specific |
| 12:08PM | 17 | names and whether you found what the information they gave |
| 12:08PM | 18 | you to be credible or not, correct? |
| 12:08PM | 19 | A.  Forthcoming I think was the question. |
| 12:08PM | 20 | Q.  Forthcoming, and you assessed -- well -- well, to the |
| 12:08PM | 21 | extent that the question was about whether they were |
| 12:08PM | 22 | forthcoming or not, Michelle Sercu answered questions about |
| 12:08PM | 23 | Pharaoh's, correct? |
| 12:08PM | 24 | A.  Yeah, that one I wasn't as familiar with, but yes, she |
| 12:09PM | 25 | answered questions about Pharaoh's. |

USA v Gerace - Burns - Foti/Recross - 12/18/24

111

| | | |
|---|---|---|
| 12:09PM | 1 | Q.  And by the time she was interviewed, she had become a |
| 12:09PM | 2 | night manager, correct? |
| 12:09PM | 3 | A.  I believe that, as I mentioned on my -- in my cross, |
| 12:09PM | 4 | I -- I don't remember that one as well. |
| 12:09PM | 5 | Q.  Okay.  And in terms of Michelle Sercu, she provided |
| 12:09PM | 6 | information that drugs and prostitution was not tolerated? |
| 12:09PM | 7 | MR. TRIPI:  Objection. |
| 12:09PM | 8 | THE COURT:  Basis? |
| 12:09PM | 9 | MR. TRIPI:  Hearsay. |
| 12:09PM | 10 | THE COURT:  Overruled. |
| 12:09PM | 11 | THE WITNESS:  I would need to -- I would just need to |
| 12:09PM | 12 | read the report to say definitively, Mr. Foti. |
| 12:09PM | 13 | BY MR. FOTI: |
| 12:09PM | 14 | Q.  Okay.  To the extent that you said on redirect that she |
| 12:09PM | 15 | was not forthcoming, you do agree that she was answering |
| 12:09PM | 16 | questions about drugs and prostitution? |
| 12:09PM | 17 | MR. TRIPI:  Objection to the extent it |
| 12:09PM | 18 | mischaracterizes her testimony.  I didn't ask whether she was |
| 12:09PM | 19 | forthcoming or not with respect to that person, so -- |
| 12:09PM | 20 | THE COURT:  Overruled. |
| 12:09PM | 21 | BY MR. FOTI: |
| 12:09PM | 22 | Q.  To the extent you were asked about Ms. Sercu at all, you |
| 12:09PM | 23 | had indicated you were aware that she had been interviewed, |
| 12:09PM | 24 | correct? |
| 12:09PM | 25 | A.  Correct. |

USA v Gerace - Burns - Foti/Recross - 12/18/24                112

12:09PM    1    Q.  And you were aware that she indicated there was no drugs

12:09PM    2    and prostitution in the club, correct?

12:09PM    3    A.  Which is completely contradictory to all the evidence we

12:10PM    4    gathered to that point.

12:10PM    5    Q.  When you're talking about assessing credibility, you're

12:10PM    6    talking about a decision of whether they're providing

12:10PM    7    information consistent with the narrative that is developing

12:10PM    8    as part of your investigation?

12:10PM    9    A.  I disagree with the term "narrative."  I mean, we follow

12:10PM   10    evidence.

12:10PM   11    Q.  Well, you specifically gave an example of something

12:10PM   12    Robert Reed said during his interview that you found not to

12:10PM   13    be credible as part of his interview, correct?

12:10PM   14    A.  Correct.

12:10PM   15    Q.  And he wasn't the only one who told you that there was no

12:10PM   16    drugs in the club, correct?

12:10PM   17    A.  Yeah, there was some of the people that said that.

12:10PM   18    Q.  You talked about, on redirect, the interview -- you

12:10PM   19    recall there was an interview of D.P., correct?

12:10PM   20    A.  Correct.

12:10PM   21    Q.  And she was also somebody who indicated drugs are not

12:10PM   22    tolerated in the club, correct?

12:10PM   23    A.  Correct.

12:10PM   24    Q.  And sex acts are not tolerated in the club?

12:10PM   25    A.  Correct.

USA v Gerace - Burns - Foti/Recross - 12/18/24

113

| | | |
|---|---|---|
| 12:10PM | 1 | Q.  She said if you get caught doing a sex act, you would be |
| 12:10PM | 2 | fired, correct? |
| 12:10PM | 3 | A.  Without having a report in front of me, I -- |
| 12:10PM | 4 | Q.  No reason to disagree with me? |
| 12:10PM | 5 | A.  No reason to disagree.  I agree with that. |
| 12:10PM | 6 | Q.  You were asked about Megan Stabler -- |
| 12:10PM | 7 | **MR. TRIPI:**  Judge, I have hearsay objections. |
| 12:10PM | 8 | **THE COURT:**  Overruled. |
| 12:11PM | 9 | **BY MR. FOTI:** |
| 12:11PM | 10 | Q.  You were asked about Megan Stabler on redirect, correct? |
| 12:11PM | 11 | A.  I was. |
| 12:11PM | 12 | Q.  And you made assessments about whether you believed what |
| 12:11PM | 13 | she had -- the information that she had to offer, correct? |
| 12:11PM | 14 | A.  Correct. |
| 12:11PM | 15 | Q.  The information she had to offer was sex acts are not |
| 12:11PM | 16 | allowed in the club, correct? |
| 12:11PM | 17 | A.  I -- I'd have to see the report on that one. |
| 12:11PM | 18 | Q.  Well, you have no reason to disagree with that, right? |
| 12:11PM | 19 | A.  I don't have a reason to disagree -- |
| 12:11PM | 20 | Q.  Okay. |
| 12:11PM | 21 | A.  -- with you on that, Mr. Foti. |
| 12:11PM | 22 | Q.  You have no reason to disagree that Megan Stabler |
| 12:11PM | 23 | provided information that if you got caught engaging in sex |
| 12:11PM | 24 | acts, you would be fired, correct? |
| 12:11PM | 25 | A.  She may have said that.  I mean, that's contradictory to |

12:11PM    1    all the evidence that we've gathered in this case.

12:11PM    2    Q.  It's not contradictory to the other individuals that I

12:11PM    3    just asked about interviewing, correct?

12:11PM    4    A.  It appeared that there were certain individuals who were

12:11PM    5    still very loyal to Mr. Gerace, that worked there, and that

12:11PM    6    went into our decision of whether they were forthcoming or

12:11PM    7    not.

12:11PM    8    Q.  So -- okay.  Well, there's a number of people you

12:11PM    9    interviewed that were still working there, and the

12:11PM    10   individuals I just asked about except for Ms. Sercu were not

12:11PM    11   working there anymore, correct?

12:11PM    12   A.  Pericak might have.

12:11PM    13   Q.  Maybe I'm wrong.  Let me ask you about this.  You talked

12:11PM    14   about -- you were asked about on redirect Angela Dingledey,

12:12PM    15   correct?

12:12PM    16   A.  Correct.

12:12PM    17   Q.  That was somebody who was interviewed, correct?

12:12PM    18   A.  It was.

12:12PM    19   Q.  And she was a dancer being terminated for being caught

12:12PM    20   with Xanax, correct?

12:12PM    21   A.  I'm trying to recall that one.  I know she -- it

12:12PM    22   definitely -- I don't have reason to disagree with you on

12:12PM    23   that.  I will say it was clear that Mr. Gerace was still

12:12PM    24   present in her life and involved --

12:12PM    25   Q.  You're --

12:12PM    1    A.  -- helping her.

12:12PM    2    Q.  Oh, to the extent that Mr. Gerace was helping her, she

12:12PM    3    wasn't working at Pharaoh's anymore, correct?

12:12PM    4    A.  Yeah.  I think he -- he bailed her out of some charges,

12:12PM    5    assaulting a police officer in Tennessee or something.  I'm

12:12PM    6    going from memory.  So --

12:12PM    7    Q.  So Mr. Gerace is maintaining a relationship with her, but

12:12PM    8    he's not allowing her to work at the club because she was

12:12PM    9    caught with Xanax?

12:12PM   10         **MR. TRIPI:**  Objection as to what Mr. Gerace was

12:12PM   11    doing.

12:12PM   12         **THE COURT:**  Overruled.

12:12PM   13         Folks, I am overruling these objections, and -- and

12:12PM   14    the testimony is not coming in for the truth of it, it's

12:12PM   15    coming in with respect to this witness's credibility and --

12:13PM   16    and his assessment of what he said about his assessment of the

12:13PM   17    veracity of these people and why they weren't followed up

12:13PM   18    with.  Okay?  So that's why it's being admitted.  It's not

12:13PM   19    being admitted for the truth of the statements that were made.

12:13PM   20         Go ahead.  Keep going.

12:13PM   21         **BY MR. FOTI:**

12:13PM   22    Q.  You talked about on redirect interviewing Russell

12:13PM   23    Salvatore, correct?

12:13PM   24    A.  That's correct.

12:13PM   25    Q.  And he made what maybe was an obnoxious statement about

USA v Gerace - Burns - Foti/Recross - 12/18/24

12:13PM  1   he wouldn't need a prostitute because he's the owner of a

12:13PM  2   restaurant and he's popular with women or something like

12:13PM  3   that?

12:13PM  4   A.  Yeah, I think he said -- it related to he could help

12:13PM  5   them -- put -- give them better tables for, I guess, parties.

12:13PM  6   And a waitress would get a better station, maybe a better

12:13PM  7   assignment and make more money.  That was the context of that

12:13PM  8   statement about everyone wants to be with the boss.

12:13PM  9   Q.  The initial context of statement is he said I've never

12:13PM  10  hired a prostitute from Mr. Gerace, correct?

12:13PM  11  A.  Correct.

12:13PM  12  Q.  And without pulling back up 555 again, there's pictures

12:14PM  13  of Mr. Gerace with a number of individuals over the course of

12:14PM  14  a 15-year span, correct?

12:14PM  15  A.  Correct.

12:14PM  16  Q.  That have been offered at this trial, right?

12:14PM  17  A.  Yes, sir.

12:14PM  18  Q.  And there's a picture of Mr. Gerace with a number of

12:14PM  19  individuals in the kitchen when he went to Pharaoh's at some

12:14PM  20  point, correct?

12:14PM  21  A.  Correct.

12:14PM  22  Q.  There's no pictures of Mr. Gerace with Russell Salvatore

12:14PM  23  at any point, correct?

12:14PM  24  A.  Not -- I don't -- not -- not that was exhibited as in

12:14PM  25  evidence here.

USA v Gerace - Burns - Foti/Recross - 12/18/24

117

12:14PM    1    Q.  And did you, as part of your review of Mr. Gerace's

12:14PM    2    phone, review contacts between Mr. Gerace and Mr. Salvatore?

12:14PM    3    A.  I don't recall any, but I -- I don't recall any.

12:14PM    4    Q.  You had Mr. Gerace's phone, correct?

12:14PM    5    A.  I did.

12:14PM    6    Q.  There was a search conducted of that phone, correct?

12:14PM    7    A.  Correct.

12:14PM    8    Q.  The jury saw contacts that came out of that phone,

12:14PM    9    correct?

12:14PM   10    A.  Correct.

12:14PM   11    Q.  And you don't recall reviewing any contacts between

12:14PM   12    Mr. Salvatore and Mr. Gerace?

12:14PM   13    A.  Not as I sit here right now.  It's possible.

12:14PM   14    Q.  On redirect, you talked about other contacts out of that

12:15PM   15    phone including contacts that Mr. Gerace had with individuals

12:15PM   16    in addition to those that were admitted into evidence during

12:15PM   17    your direct, right?

12:15PM   18    A.  Yes.

12:15PM   19    Q.  Some of the names included Anthony Gerace, right?

12:15PM   20    A.  Correct.

12:15PM   21    Q.  Sue Michalski, correct?

12:15PM   22    A.  Correct.

12:15PM   23    Q.  Lou Selva, correct?

12:15PM   24    A.  Correct.

12:15PM   25    Q.  Trooper Vishion, correct?

| | | |
|---|---|---|
| 12:15PM | 1 | A.  Yes. |
| 12:15PM | 2 | Q.  None of those conversations are in evidence and before |
| 12:15PM | 3 | this jury, correct? |
| 12:15PM | 4 | A.  That is correct. |
| 12:15PM | 5 | Q.  Okay.  And when you reviewed those conversations, there |
| 12:15PM | 6 | was no discussions of any drug transactions, correct? |
| 12:15PM | 7 | A.  Correct. |
| 12:15PM | 8 | Q.  There was no discussions of commercial sex acts, correct? |
| 12:15PM | 9 | A.  Correct. |
| 12:15PM | 10 | Q.  And in fact, nowhere in any of the other discussions |
| 12:15PM | 11 | reviewed in that phone were there discussions of drug |
| 12:15PM | 12 | transactions, correct? |
| 12:15PM | 13 | A.  Correct. |
| 12:15PM | 14 | Q.  And no discussions of commercial sex acts, correct? |
| 12:15PM | 15 | A.  Again, as I -- I mean, the Michalski ones, I feel have a |
| 12:15PM | 16 | nexus to that. |
| 12:15PM | 17 | Q.  You have an opinion about the ones that are in front of |
| 12:15PM | 18 | the jury, right? |
| 12:15PM | 19 | A.  I do. |
| 12:16PM | 20 | Q.  In terms of all the other contacts that are in that |
| 12:16PM | 21 | phone, anything you recall that the jury didn't see in terms |
| 12:16PM | 22 | of commercial sex acts? |
| 12:16PM | 23 | A.  Not that I recall. |
| 12:16PM | 24 | Q.  You talked about a couple of undercover operations, one |
| 12:16PM | 25 | in 2016 to '17, and one in 2018, correct? |

USA v Gerace - Burns - Foti/Recross - 12/18/24

119

| | | |
|---|---|---|
| 12:16PM | 1 | A.  I did. |
| 12:16PM | 2 | Q.  Okay.  And you talked about -- you were asked questions |
| 12:16PM | 3 | about the one in 2016 and '17 and a particular officer that |
| 12:16PM | 4 | was involved was referenced during the redirect, correct? |
| 12:16PM | 5 | A.  He was. |
| 12:16PM | 6 | Q.  And Investigator Frank Vitko was the case agent, correct? |
| 12:16PM | 7 | A.  Yeah, I think he was a supervisor.  Catuzza was the |
| 12:16PM | 8 | undercover. |
| 12:16PM | 9 | Q.  Okay.  You said that that was -- was stopped at some |
| 12:16PM | 10 | point because there was some sort of mixup or conflict where |
| 12:16PM | 11 | the Cheektowaga Police Department ran a plate, and that was a |
| 12:16PM | 12 | reason for discontinuing the investigation? |
| 12:16PM | 13 | MR. TRIPI:  Objection as to mixup. |
| 12:16PM | 14 | MR. FOTI:  I don't know -- |
| 12:16PM | 15 | MR. TRIPI:  Mischaracterizes the testimony. |
| 12:16PM | 16 | THE COURT:  Overruled. |
| 12:16PM | 17 | THE WITNESS:  I'm sorry, can you repeat the question? |
| 12:16PM | 18 | BY MR. FOTI: |
| 12:16PM | 19 | Q.  The investigation apparently comes to an end at some |
| 12:17PM | 20 | point because a plate is run or something by the Cheektowaga |
| 12:17PM | 21 | Police Department? |
| 12:17PM | 22 | A.  Yeah, I didn't get the impression that was the -- I think |
| 12:17PM | 23 | it was a number of factors, not just that. |
| 12:17PM | 24 | Q.  Well, yeah, that was one that you testified to on |
| 12:17PM | 25 | redirect, right? |

12:17PM   1   A.   Correct.

12:17PM   2   Q.   One of the other factors is there was multiple attempts

12:17PM   3   to do undercover purchases, correct?

12:17PM   4   A.   Trying to remember the conversation with Mr. Catuzza.

12:17PM   5   Q.   You did talk about the fact that there was one successful

12:17PM   6   undercover purchase involving Ms. K.A., correct?

12:17PM   7   A.   Right.  I thought that there was another, maybe,

12:17PM   8   marijuana one.  But I could be conflating --

12:17PM   9   Q.   You might be thinking about Mr. Santos.

12:17PM  10   A.   I'm sorry?  I may be conflating --

12:17PM  11   Q.   Yeah.  In terms of the 2016 to 2017, there was an attempt

12:17PM  12   to make an undercover purchase in March 6th of 2015, correct?

12:17PM  13   A.   I -- I would need the records, but I have no reason to

12:17PM  14   disagree with you.

12:17PM  15   Q.   And another attempt that -- you would not disagree there

12:17PM  16   was also another attempt on April 30th of 2015, correct?

12:17PM  17   A.   That sounds right.  It's been a while since I looked at

12:17PM  18   that file.

12:17PM  19   Q.   That's okay.  What you would agree with is there was

12:18PM  20   multiple attempts not involving Ms. K.A. at Pharaoh's where

12:18PM  21   there was a failure to be able to have an undercover

12:18PM  22   purchase, correct?

12:18PM  23   A.   I would agree with that.

12:18PM  24   Q.   And ultimately, they call off that investigation?

12:18PM  25   A.   Correct.

121

12:18PM    1    Q.  Okay.  And then you talked about the more recent attempts

12:18PM    2    in 2018 involving Mr. Santos, correct?

12:18PM    3    A.  Correct.

12:18PM    4    Q.  And I think there was some success at getting, like, some

12:18PM    5    marijuana at some point?

12:18PM    6    A.  Correct.

12:18PM    7    Q.  But the attempt was to see if he could get cocaine,

12:18PM    8    correct?

12:18PM    9    A.  That was the ultimate goal of that.

12:18PM    10   Q.  And I think the -- the question on redirect was he

12:18PM    11   expressed that he was, his belief, that he was unable to

12:18PM    12   purchase cocaine because he's not a known commodity, correct?

12:18PM    13   A.  Correct.

12:18PM    14   Q.  Okay.  And the takeaway from that is he was unable to

12:18PM    15   purchase cocaine, correct?

12:18PM    16   A.  He was unable to purchase cocaine.

12:18PM    17   Q.  He made multiple attempts, right?

12:18PM    18   A.  I think he went in there two or three times, maybe.

12:18PM    19   Q.  And unable to purchase cocaine each time he went in,

12:18PM    20   correct?

12:18PM    21   A.  He did have conversations about it, but was unable to.

12:18PM    22   Q.  Had conversations, and was unable to purchase cocaine,

12:18PM    23   right?

12:19PM    24   A.  That's correct.

12:19PM    25   Q.  There was a question about wiretaps and a reference to

12:19PM    1    Judge Michalski being involved in -- as a judge back in 2016,

12:19PM    2    2017, that was overseeing certain requests by law

12:19PM    3    enforcement; is that right?  Something about --

12:19PM    4    A.  No, that related to the undercover operation.  There

12:19PM    5    was -- and, again, I don't -- I -- I -- I know the document,

12:19PM    6    but I would need to see it to be specific, but there was I

12:19PM    7    think a request made to the Court not to disclose part of the

12:19PM    8    undercover, I think, related to K.A.  Because if you charge

12:19PM    9    someone, they have an obligation to turn over evidence, but

12:19PM   10    sometimes you can get permission to pull back some of that

12:19PM   11    evidence.

12:19PM   12        I think that's what that documented related to.  But

12:19PM   13    Judge Michalski was the individual that it was presented to.

12:19PM   14    And Mr. Catuzza obviously didn't have any idea about the

12:19PM   15    relationship.

12:19PM   16    Q.  Ms. K.A., when she was ultimately charged, she was

12:19PM   17    charged with three undercover transactions involving drugs,

12:19PM   18    correct?

12:19PM   19    A.  Correct.

12:20PM   20    Q.  Not four that she was actually involved in, correct?

12:20PM   21    A.  Yeah.  I'd have to look at the indictment, but I think it

12:20PM   22    was three.

12:20PM   23    Q.  She wasn't charged with the undercover purchase at

12:20PM   24    Pharaoh's, correct?

12:20PM   25    A.  I think it was considered as, like, relevant conduct, but

USA v Gerace - Burns - Foti/Recross - 12/18/24

123

12:20PM   1   it wasn't in the indictment I don't believe.

12:20PM   2   Q.  Okay.  And in terms of just sort of circling back on the

12:20PM   3   issue of wiretaps, if you, as an FBI special agent, were to

12:20PM   4   seek a wiretap, and I think you already said you're not

12:20PM   5   really familiar with State procedures, correct?

12:20PM   6   A.  Correct.

12:20PM   7   Q.  Judge Michalski is a State judge, correct?

12:20PM   8   A.  He is.

12:20PM   9   Q.  If you were to put an application in for authorization,

12:20PM   10  you would be going to a federal magistrate?

12:20PM   11  A.  Federal wiretap, yes.

12:20PM   12  Q.  And Judge Michalski would have nothing to do with that,

12:20PM   13  correct?

12:20PM   14  A.  Correct.

12:20PM   15          **MR. FOTI:**  May I just have a moment, Judge?

12:20PM   16          Nothing further, Judge.

12:21PM   17          **THE COURT:**  Anything more, Mr. Tripi?

12:21PM   18          **MR. TRIPI:**  No, thank you, Judge.

12:21PM   19          **THE COURT:**  Okay.  You may step down, sir.  Thank you

12:21PM   20  very much.

12:21PM   21          **THE WITNESS:**  Thank you.

12:21PM   22          (Witness excused at 12:21 p.m.)

          23          (Excerpt concluded at 12:21 p.m.)

          24          *    *    *    *    *    *    *

          25

1

2                       **CERTIFICATE OF REPORTER**

3

4              In accordance with 28, U.S.C., 753(b), I

5    certify that these original notes are a true and correct

6    record of proceedings in the United States District Court for

7    the Western District of New York on December 18, 2024.

8

9                         s/ Ann M. Sawyer
                          Ann M. Sawyer, FCRR, RPR, CRR
10                        Official Court Reporter
                          U.S.D.C., W.D.N.Y.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**TRANSCRIPT INDEX**

**EXCERPT - EXAMINATION OF BRIAN BURNS - DAY 3**

**DECEMBER 18, 2024**

**W I T N E S S**                                    **P A G E**

**B R I A N   B U R N S**                               2

  (CONT'D) CROSS-EXAMINATION BY MR. FOTI:          2

  REDIRECT EXAMINATION BY MR. TRIPI:              60

  RECROSS-EXAMINATION BY MR. FOTI:                110


**E X H I B I T S**                                  **P A G E**

GOV Exhibit 3539ED                                   5

GOV Exhibit 3539EE                                  20

GOV Exhibit 3539EF                                  32