1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF NEW YORK
2
   _____
3  UNITED STATES OF AMERICA,

                                  Case No. 1:19-cr-227
4               Plaintiff,                  1:23-cr-37
   v.                                          (LJV)
5
   PETER GERACE, JR.,              November 7, 2024
6
                   Defendant.
7  _____

8        TRANSCRIPT EXCERPT - EXAMINATION OF DALE KASPRZYK
            BEFORE THE HONORABLE LAWRENCE J. VILARDO
9                UNITED STATES DISTRICT JUDGE

10 APPEARANCES:      TRINI E. ROSS, UNITED STATES ATTORNEY
                     BY: JOSEPH M. TRIPI, ESQ.
11                       NICHOLAS T. COOPER, ESQ.
                         CASEY L. CHALBECK, ESQ.
12                   Assistant United States Attorneys
                     Federal Centre, 138 Delaware Avenue
13                   Buffalo, New York 14202
                     For the Plaintiff
14
                     THE FOTI LAW FIRM, P.C.
15                   BY: MARK ANDREW FOTI, ESQ.
                     16 West Main Street, Suite 100
16                   Rochester, New York 14614
                        And
17                   SOEHNLEIN LAW
                     BY: ERIC MICHAEL SOEHNLEIN, ESQ.
18                   350 Main Street, Suite 2100
                     Buffalo, New York 14202
19                   For the Defendant

20 PRESENT:          KAREN A. CHAMPOUX, USA PARALEGAL
                     BRIAN A. BURNS, FBI SPECIAL AGENT
21                   MARILYN K. HALLIDAY, HSI SPECIAL AGENT

22 LAW CLERK:        REBECCA FABIAN IZZO, ESQ.

23 COURT CLERK:      COLLEEN M. DEMMA

24 REPORTER:         ANN MEISSNER SAWYER, FCRR, RPR, CRR
                     Robert H. Jackson Courthouse
25                   2 Niagara Square Buffalo, New York 14202
                     Ann_Sawyer@nywd.uscourts.gov

03:46PM

03:46PM  1          (Excerpt commenced at 3:46 p.m.)

03:46PM  2          (Jury seated at 3:46 p.m.)

03:46PM  3          **THE COURT:**  Okay.  The record will reflect that all

03:47PM  4   our jurors are present.

03:47PM  5          We've had a lot of people coming and going in the

03:47PM  6   courtroom, folks.  I just want to remind you, if you see

03:47PM  7   anyone who you know in the courtroom, anybody who's an

03:47PM  8   acquaintance or anybody you know in the back in the courtroom

03:47PM  9   or, obviously, anybody who comes in and testifies or anything

03:47PM 10   like that, let us know so that we can -- so we can handle it.

03:47PM 11   Okay?

03:47PM 12          The government -- the record will reflect all our

03:47PM 13   jurors are present.

03:47PM 14          The government can call its next witness.

03:47PM 15          **MR. TRIPI:**  Thank you, Your Honor.  We call Dale

03:47PM 16   Kasprzyk.

03:47PM 17

03:47PM 18   **D A L E   K A S P R Z Y K**, having been duly called and sworn,

03:48PM 19   testified as follows:

03:48PM 20          **MR. TRIPI:**  May I proceed, Your Honor?

03:48PM 21          **THE COURT:**  You may.

03:48PM 22          **MR. TRIPI:**  All right.  Thank you.

03:48PM 23

03:48PM 24              **DIRECT EXAMINATION BY MR. TRIPI:**

03:48PM 25   Q.  Good afternoon, Mr. Kasprzyk.

03:48PM   1   A.  Good afternoon, sir.

03:48PM   2   Q.  What state do you currently reside in?

03:48PM   3   A.  I currently live in the State of Florida.

03:48PM   4   Q.  How long have you lived there?

03:48PM   5   A.  Approximately 12 months.

03:48PM   6   Q.  Did your property survive these recent hurricanes?

03:48PM   7   A.  Yes, sir, they did.

03:48PM   8   Q.  Good.  So -- but before that, you -- you lived and grew

03:48PM   9   up in the Buffalo area; is that right?

03:48PM   10  A.  Yes, sir.

03:48PM   11  Q.  Where are you from originally?

03:48PM   12  A.  Originally, I grew up in West Seneca, New York.

03:49PM   13  Q.  And where did you go to school?

03:49PM   14  A.  High school, West Seneca East.  And then I went to state

03:49PM   15  college at Buffalo State University College at Buffalo for --

03:49PM   16  for my undergraduate degree.

03:49PM   17  Q.  And what was your degree in?

03:49PM   18  A.  Criminal justice.

03:49PM   19  Q.  And what -- when did you get that degree?

03:49PM   20  A.  Oh, 1990 -- no, 1981.

03:49PM   21  Q.  All right.  What do you currently do for a living?

03:49PM   22  A.  Currently, I am the head of the financial investigations

03:49PM   23  unit for M&T Bank.

03:49PM   24  Q.  How long have you worked for M&T Bank?

03:49PM   25  A.  Approximately eleven years.

03:49PM    1    Q.  How long have you been the head of the financial

03:49PM    2    investigations unit for M&T Bank?

03:49PM    3    A.  Approximately six years.

03:49PM    4    Q.  Prior to that six years where you were the head of the

03:49PM    5    unit, did you do similar work for M&T Bank?

03:49PM    6    A.  Yes, sir.

03:49PM    7    Q.  Just very briefly, what does that work entail?

03:49PM    8    A.  I came to the bank in 2013 when I retired from DEA.  I

03:49PM    9    came there essentially to help build out an enhanced

03:50PM   10    due-diligence program within the BSA department.

03:50PM   11        After that was done, that task was done, I transitioned

03:50PM   12    over to the financial investigations unit, initially managing

03:50PM   13    complex investigations, and then I transitioned into the --

03:50PM   14    to the head of the FIU position.

03:50PM   15    Q.  So your work at M&T Bank, that's a Buffalo-area bank,

03:50PM   16    right?

03:50PM   17    A.  Yes, sir.

03:50PM   18    Q.  That followed a career with the DEA?

03:50PM   19    A.  Yes.

03:50PM   20    Q.  Is that also known as the Drug Enforcement

03:50PM   21    Administration?

03:50PM   22    A.  Yes, sir.

03:50PM   23    Q.  Is the DEA part of the executive branch of the United

03:50PM   24    States, part of the Department of Justice?

03:50PM   25    A.  Yes, sir.

USA v Gerace - Kasprzyk - Tripi/Direct - 11/7/24

5

03:50PM  1  Q.  And how long -- how many years total were you employed by

03:50PM  2  the DEA?

03:50PM  3  A.  I joined the DEA in 1989.  I retired in 2013.  I was with

03:50PM  4  the agency for 25 years.

03:50PM  5  Q.  So 1989 to 2013.  Can you tell the -- this jury sort of

03:50PM  6  your progression through the DEA, the different places you

03:51PM  7  worked and positions you held?

03:51PM  8  A.  I was -- when I joined the DEA in January of 1989, I was

03:51PM  9  assigned to the DEA Training Academy in Quantico, Virginia.

03:51PM  10  I was there for four months.  When I graduated from Quantico,

03:51PM  11  I was assigned back to the Buffalo resident office.

03:51PM  12  Initially I was assigned as a special agent.  Eventually and

03:51PM  13  while working at the DEA, I also worked as an acting group

03:51PM  14  supervisor, a group supervisor, and then finally as the

03:51PM  15  resident agent in charge of the -- the DEA office here in

03:51PM  16  Buffalo.

03:51PM  17  Q.  Okay.  A lot to break down there, and we'll go through it

03:51PM  18  in a little bit.  But as a DEA special agent, when you go

03:51PM  19  through the academy, you take some training, right?

03:51PM  20  A.  Yes, sir.

03:51PM  21  Q.  Can you give the jury just a brief overview of the

03:51PM  22  training that an agent gets when they go through that

03:51PM  23  training and then graduate?

03:51PM  24  A.  Yes.  The -- the training is divided into training

03:51PM  25  segments, training modules.  It includes firearms training.

03:52PM     1    It includes physical fitness.  It includes federal law, the

03:52PM     2    Controlled Substances Act, as it relates to federal drug

03:52PM     3    investigations.

03:52PM     4        It also involves practical exercises, learning how to

03:52PM     5    conduct surveillance, learning how to do drug operations,

03:52PM     6    learning how to -- to interview witnesses and establish

03:52PM     7    confidential informants.

03:52PM     8        So it's a segmented training that helps develop your

03:52PM     9    skill set to become a special agent.

03:52PM    10    Q.  And upon -- how long does that take?  You might have said

03:52PM    11    it, but I missed it.

03:52PM    12    A.  Yes, sir.  It's four months.

03:52PM    13    Q.  And upon graduation from the academy, do DEA agents take

03:52PM    14    an oath?

03:52PM    15    A.  Yes, sir, they do.

03:52PM    16    Q.  And what is the oath that DEA agents take when they

03:52PM    17    graduate from the academy?

03:52PM    18    A.  Your oath is to uphold the laws and Constitution of the

03:52PM    19    United States of America and to uphold the mission of the DEA

03:52PM    20    as you're working as a federal agent.

03:52PM    21    Q.  And we'll dig into that in a little bit.  Once you're

03:53PM    22    sworn as a DEA special agent, you become a public official?

03:53PM    23    A.  Yes, sir.

03:53PM    24    Q.  And you mentioned the DEA's mission.  What is the DEA's

03:53PM    25    mission, just briefly stated and summarized?

03:53PM    1    A.   The DEA's mission is to investigate violations of the

03:53PM    2    Controlled Substances Act, that is Title 21.

03:53PM    3    Q.   Essentially to enforce drug laws of this nation?

03:53PM    4    A.   Yes, sir.

03:53PM    5    Q.   When agents go through the academy like you've gone

03:53PM    6    through, are they trained on what their lawful functions and

03:53PM    7    official duties are?

03:53PM    8    A.   Yes.

03:53PM    9    Q.   I want to go through just some of those and ask you if

03:53PM    10   it's a -- a lawful function or duty of an agent, okay?

03:53PM    11   A.   Yes, sir.

03:53PM    12   Q.   Is it the lawful duty and official function of a DEA

03:53PM    13   agent -- do agents initiate and conduct investigations?

03:53PM    14   A.   Yes.

03:53PM    15   Q.   Do agents interview witnesses and confidential sources?

03:53PM    16   A.   Yes.

03:53PM    17   Q.   Do DEA agents -- are they tasked with protecting the

03:54PM    18   identity of DEA confidential sources and witnesses?

03:54PM    19   A.   Yes, they are.

03:54PM    20   Q.   Do DEA agents need to protect the integrity,

03:54PM    21   confidentiality and operational security of federal and state

03:54PM    22   drug investigations?

03:54PM    23   A.   Yes.

03:54PM    24   Q.   Do DEA agents, is part of the job to collect and preserve

03:54PM    25   evidence?

03:54PM   1   A.   Yes.

03:54PM   2   Q.   Do DEA agents, is it part of their functions and duties

03:54PM   3   to prepare truthful and accurate DEA memoranda and reports?

03:54PM   4   A.   Yes, sir.

03:54PM   5   Q.   Do DEA agents sometimes prepare search warrants and

03:54PM   6   complaint affidavits?

03:54PM   7   A.   Yes, they do.

03:54PM   8   Q.   And must those be honest and accurate?

03:54PM   9   A.   Yes.

03:54PM   10  Q.   Is a duty and function of a DEA agent to document

03:54PM   11  information that is helpful to a current or future

03:54PM   12  investigation?

03:54PM   13  A.   Yes.

03:54PM   14  Q.   Does that also have an obligation to do so accurately and

03:54PM   15  truthfully?

03:54PM   16  A.   Yes, sir.

03:54PM   17  Q.   Do DEA agents arrest individuals who violate federal and

03:54PM   18  state drug laws?

03:54PM   19  A.   Yes, they do.

03:55PM   20  Q.   Is it the job of a DEA special agent to prepare and

03:55PM   21  propose DEA cases for prosecution?

03:55PM   22  A.   Yes, it is.

03:55PM   23  Q.   Are DEA agents required to act with honesty and integrity

03:55PM   24  in their representations and communications with prosecutors,

03:55PM   25  other agents, and other members of law enforcement?

USA v Gerace - Kasprzyk - Tripi/Direct - 11/7/24

03:55PM    1    A.  Yes, they are.

03:55PM    2    Q.  Are DEA agents supposed to treat law enforcement

03:55PM    3    sensitive information with care?

03:55PM    4    A.  Yes, sir.

03:55PM    5    Q.  Handle that information appropriately?

03:55PM    6    A.  Yes, sir.

03:55PM    7    Q.  Are DEA agents allowed to tell members of the general

03:55PM    8    public about their cases?

03:55PM    9    A.  No, sir.

03:55PM    10   Q.  Okay.  Are DEA agents trained on standards of conduct?

03:55PM    11   A.  Yes, they are.

03:55PM    12   Q.  I'm not going ask what all the standards of conduct are,

03:56PM    13   but just generally, tell the jury what standards of conduct

03:56PM    14   are.

03:56PM    15   A.  Well, standards -- standards of conduct are outlined in

03:56PM    16   the DEA operations manual which every agent gets when they

03:56PM    17   leave the academy and they arrive at the office that they're

03:56PM    18   assigned to.

03:56PM    19       Those standards of conduct include many of the items

03:56PM    20   that -- that Mr. Tripi just mentioned, being honest, acting

03:56PM    21   in a way that -- that you -- you have -- maintain your

03:56PM    22   integrity, that -- that you're honest with the agents that

03:56PM    23   you're working with, that you're honest with the -- the

03:56PM    24   prosecutors and the judges that -- that you might meet with.

03:56PM    25       It also speaks to conflicts of interest.  And conflicts

03:56PM     1    of interest would involve your interactions with confidential

03:56PM     2    informants, for example.  You cannot have a relationship with

03:56PM     3    a confidential informant.  And you have to be honest about

03:56PM     4    your relationship with a -- a potential drug suspect or a

03:57PM     5    potential confidential.

03:57PM     6    Q.  And -- and you've been an agent who investigates cases

03:57PM     7    and you've also been at the supervisory level, correct?

03:57PM     8    A.  Yes, sir.

03:57PM     9    Q.  I think when you were going through for the jury your

03:57PM    10    different progressions, you said you were a group supervisor

03:57PM    11    at one point, and then you were a resident agent in charge at

03:57PM    12    one point; is that right?

03:57PM    13    A.  That's correct.

03:57PM    14    Q.  Was that all in the Buffalo office?

03:57PM    15    A.  Yes, sir.

03:57PM    16    Q.  What is a group supervisor?  Define that for them.

03:57PM    17    A.  So, in the Buffalo office there are two enforcement

03:57PM    18    groups, Delta 57 and Delta 58.  Each enforcement group has a

03:57PM    19    group supervisor that's in charge of that group.  Those

03:57PM    20    groups contain both special agents as well as task force

03:57PM    21    officers.

03:57PM    22        The job of the group supervisor is to manage that group,

03:57PM    23    to work with them, to meet with them, to talk with them about

03:57PM    24    their case investigations, to sign off and approve those

03:57PM    25    investigations when they're brought to the G.S. for

03:57PM   1   discussion.

03:57PM   2       They help manage the informants.  If there's an informant

03:58PM   3   that is established, the group supervisor will meet with that

03:58PM   4   informant for the initial debrief during that period of time

03:58PM   5   where they're signing up that informant to be used in the

03:58PM   6   office.

03:58PM   7   Q.  Now, in terms of your positions as a supervisor -- I

03:58PM   8   guess, let's go with what's a resident agent in charge then?

03:58PM   9   A.  So the resident agent in charge would be responsible for

03:58PM   10  all operations within the office.  So when I was the -- the

03:58PM   11  resident agent in charge in Buffalo, I was responsible for

03:58PM   12  both of the enforcement groups as well as a diversion group.

03:58PM   13      We had a diversion group in Buffalo as well as the other

03:58PM   14  personnel to include intel analysts and support staff.

03:58PM   15  Q.  Now, as supervisor, are you -- whether it's at the group

03:58PM   16  supervisor level or the resident agent in charge in charge of

03:58PM   17  the office, is part of your duties to also help ensure that

03:58PM   18  agents are complying with the standards of conduct?

03:58PM   19  A.  Yes, sir, it is.

03:58PM   20  Q.  And you've mentioned -- you've mentioned it, I think you

03:59PM   21  answered a question already about it, but is honesty and

03:59PM   22  integrity an important aspect of a DEA agent's job?

03:59PM   23  A.  Yes, sir.

03:59PM   24  Q.  Why is that important?

03:59PM   25  A.  Honesty and integrity is the foundation of the -- the

03:59PM  1    oath that you take as a DEA special agent.  That -- that --

03:59PM  2    if -- if you're not honest and -- and do not apply integrity

03:59PM  3    to your work as a federal agent, you -- you are not able

03:59PM  4    to -- to function well and appropriately.

03:59PM  5    Q.  Why not?

03:59PM  6    A.  Well, think about the work that the agent does.  They --

03:59PM  7    they have to go out and meet with informants.  They have to

03:59PM  8    go out and conduct investigations.  All -- all of that

03:59PM  9    information needs to be collected and reported in a DEA

03:59PM  10   report of information, a DEA-6.

03:59PM  11       When you're collecting that information, you need to be

03:59PM  12   honest and -- and have integrity when you're writing your

03:59PM  13   report.  That report needs to be accurate and the information

04:00PM  14   needs to be factual.

04:00PM  15       You will take that report, and you'll meet with a

04:00PM  16   prosecutor.  You -- you need to be honest when you're talking

04:00PM  17   to that prosecutor and be able to explain to them what it is

04:00PM  18   that you're doing in the investigation that -- that you're

04:00PM  19   conducting.

04:00PM  20   Q.  Is -- is trust among law enforcement inherent in the

04:00PM  21   position of a DEA agent?

04:00PM  22   A.  Yes, sir, it is.

04:00PM  23   Q.  When you were supervising agents, did you trust your

04:00PM  24   agents?

04:00PM  25   A.  I did.

USA v Gerace - Kasprzyk - Tripi/Direct - 11/7/24

13

04:00PM    1    Q.  Is that inherent in the nature of the oath that they take

04:00PM    2    and the training that they get?

04:00PM    3    A.  Yes, sir.

04:00PM    4    Q.  Are you expecting agents that you supervise and work with

04:00PM    5    to be honest and straight up in their reports and in their

04:00PM    6    interactions with you?

04:00PM    7    A.  Yes, sir.

04:00PM    8    Q.  Is part of the work of a supervisor, is it sometimes

04:00PM    9    reviewing reports and signing off on them?

04:00PM    10   A.  Yes.

04:00PM    11   Q.  In your role as a supervisor, when you do that, do you

04:00PM    12   have the time or ability to reinvestigate every single word

04:00PM    13   and sentence that is in a report that a -- a subordinate

04:01PM    14   agent provides to you for sign-off?

04:01PM    15   A.  I do not.

04:01PM    16   Q.  Would it -- would it be possible to do that?

04:01PM    17   A.  It would be impossible.

04:01PM    18   Q.  Why would it be impossible in your view?

04:01PM    19   A.  The -- the volume of investigations that are happening on

04:01PM    20   a daily basis, and the amount of information that comes to

04:01PM    21   you as a group supervisor would make it impossible to go out

04:01PM    22   and reinvestigate every statement and every item of

04:01PM    23   information that's brought to you in a DEA-6 or a report of

04:01PM    24   information.

04:01PM    25   Q.  Now, I'd like to start focusing you in on 2009, that

04:01PM  1    timeframe, okay?

04:01PM  2        Back in 2009, what was your position in the DEA Buffalo

04:01PM  3    office?

04:01PM  4    A.  Sir, I was a group supervisor assigned to Delta 57.

04:01PM  5    Q.  And Delta 57, that's D-57, that's the enforcement group?

04:01PM  6    A.  Yes, sir.

04:01PM  7    Q.  Typically, special agents are assigned to that group?

04:01PM  8    A.  Typically, it's special agents within a smaller

04:01PM  9    complement of task force officers or task force agents

04:02PM  10   assigned to assist.

04:02PM  11   Q.  And we should define that.  What is a task force officer

04:02PM  12   or agent?

04:02PM  13   A.  A task force officer or a task force agent is a local

04:02PM  14   police officer or a local deputy sheriff.  They get assigned

04:02PM  15   to the -- to the DEA office.  They're deputized so they have

04:02PM  16   Title 21 authority and they work alongside special agents to

04:02PM  17   help investigate violation of the Controlled Substance Act.

04:02PM  18   Q.  By Title 21 authority, you means those task force

04:02PM  19   officers or agents can help enforce federal law?

04:02PM  20   A.  Yes, sir.  That's correct.

04:02PM  21   Q.  As a group supervisor in D-57, approximately how many

04:02PM  22   agents and task force officers or task force agents would you

04:02PM  23   be supervising at a given time?

04:02PM  24   A.  In total, there was between 12 and 13 agents and task

04:02PM  25   force agents assigned to that group at any one particular

| | | |
|---|---|---|
| 04:02PM | 1 | time. |
| 04:02PM | 2 | Q.  And within that, do each of them have their own |
| 04:03PM | 3 | caseloads? |
| 04:03PM | 4 | A.  Yes. |
| 04:03PM | 5 | Q.  Basically, are you supervising a lot of agents working a |
| 04:03PM | 6 | lot of cases? |
| 04:03PM | 7 | A.  Correct. |
| 04:03PM | 8 | Q.  And when you're a supervisor in that position, do some of |
| 04:03PM | 9 | the cases range from cases that are under investigation all |
| 04:03PM | 10 | the way to cases that are already investigated and charged in |
| 04:03PM | 11 | federal court? |
| 04:03PM | 12 | A.  Yes.  The cases that you're managing are -- they would be |
| 04:03PM | 13 | at -- at multiple phases of the investigations process.  So |
| 04:03PM | 14 | it could be an initial case that was just started or it could |
| 04:03PM | 15 | be a case that the defendant or a suspect had been arrested |
| 04:03PM | 16 | and was waiting for their court appearance. |
| 04:03PM | 17 | Q.  And sometimes, are cases in the early stages or the |
| 04:03PM | 18 | preliminary stages? |
| 04:03PM | 19 | A.  Yes, sir. |
| 04:03PM | 20 | Q.  That might be a point in time before there's any law |
| 04:03PM | 21 | enforcement action taken in a particular case; is that right? |
| 04:03PM | 22 | A.  Correct. |
| 04:03PM | 23 | Q.  Acquiring information and intelligence? |
| 04:04PM | 24 | A.  Yes, sir. |
| 04:04PM | 25 | Q.  Okay.  All right.  Now, this might seem like a silly |

04:04PM    1   question, but at that point in time, was the DEA interested

04:04PM    2   in investigating people who were selling cocaine?

04:04PM    3   A.  Yes, sir.

04:04PM    4   Q.  Have you heard the term "kilogram" before?

04:04PM    5   A.  Yes, sir.

04:04PM    6   Q.  Kilo?

04:04PM    7   A.  Yes.

04:04PM    8   Q.  Is -- is that a large quantity of cocaine for the Buffalo

04:04PM    9   area?

04:04PM   10   A.  Yes.  A kilogram of cocaine is 2.2 pounds, 1,000 grams.

04:04PM   11   That's a significant quantity of cocaine for Buffalo.

04:04PM   12   Q.  So in 2009, as the group supervisor, would -- would --

04:04PM   13   would you be interested in having agents pursue kilogram

04:04PM   14   level drug suppliers?

04:04PM   15   A.  Yes, I would.

04:04PM   16   Q.  Would you be interested in having agents pursue cases

04:04PM   17   against people who were connected to kilogram-level

04:04PM   18   suppliers?

04:04PM   19   A.  Yes, sir.

04:04PM   20   Q.  Why -- why would -- as a supervisor, would you be

04:04PM   21   interested in having agents under your supervision

04:04PM   22   investigate people who were connected or underneath

04:05PM   23   kilogram-level suppliers?  Can you explain that for the jury?

04:05PM   24   A.  So, the mission of the DEA, as I mentioned, is to -- to

04:05PM   25   investigate violations of Title 21.  As part of that job, we

04:05PM   1   are -- we -- we -- we target not just the top of the

04:05PM   2   organization, but the entire drug-trafficking organization.

04:05PM   3       To be able to do that, you -- you need to really identify

04:05PM   4   every single member of the drug trafficking conspiracy,

04:05PM   5   gather evidence against those members, and then pull that

04:05PM   6   together in a -- a master case investigation and present that

04:05PM   7   to the prosecutor for prosecution.

04:05PM   8   Q.  And, so, basically, to summarize it, you work into a

04:05PM   9   group and sometimes you start near the bottom and you try to

04:05PM  10   work your way up?

04:05PM  11   A.  That's correct, sir.

04:05PM  12   Q.  All right.  I'd like to switch gears a little bit and

04:06PM  13   then we'll get back to some of that, okay?

04:06PM  14   A.  Yes, sir.

04:06PM  15   Q.  Do you know an individual named Joseph Bongiovanni?

04:06PM  16   A.  Yes, I do.

04:06PM  17   Q.  How do you know him?

04:06PM  18   A.  Joseph Bongiovanni was a special agent assigned to the

04:06PM  19   DEA Buffalo office.  I met him through -- through my time on

04:06PM  20   the job at DEA.

04:06PM  21   Q.  And would it be fair to say he arrived in the Buffalo

04:06PM  22   office in the early 2000s?

04:06PM  23   A.  Yes.  I -- I would say that.  I arrived in 1989.  He came

04:06PM  24   approximately eight, nine, ten years after my arrival.  So I

04:06PM  25   would say late '90s, early 2000, he would have arrived.

04:06PM    1    Q.  And that's an estimate, right?

04:06PM    2    A.  I'm sorry.

04:06PM    3    Q.  That's just an estimate?

04:06PM    4    A.  Yes, sir.

04:06PM    5    Q.  When he arrived in the Buffalo office, were you in a

04:06PM    6    supervisor position yet?

04:06PM    7    A.  No, sir.

04:06PM    8    Q.  Okay.  After he arrived in the Buffalo office, did there

04:06PM    9    come a point in time when you began supervising him?

04:06PM   10    A.  Yes, sir.

04:06PM   11    Q.  Do you remember what year you became a group supervisor?

04:06PM   12    A.  It was approximately 2009 that I became a permanent group

04:07PM   13    supervisor.

04:07PM   14    Q.  And at other points in time, were you an acting group

04:07PM   15    supervisor?

04:07PM   16    A.  Yes, sir.

04:07PM   17    Q.  What does that mean?  They haven't heard that term.

04:07PM   18    A.  So when the permanent group supervisor is out on extended

04:07PM   19    leave, there needs to be an acting group supervisor that

04:07PM   20    would stand in their place to do the job as a -- as -- as the

04:07PM   21    group supervisor.

04:07PM   22        So there -- there were periods of time when the permanent

04:07PM   23    group supervisors were out for extended leave, and during

04:07PM   24    those periods of time, I would be assigned as the acting

04:07PM   25    group supervisor for the group.

04:07PM    1    Q.  And before you were the group supervisor and the acting

04:07PM    2    group supervisor, you worked in D-57 with Joseph Bongiovanni?

04:07PM    3    A.  Yes, sir.

04:07PM    4    Q.  Did he have any other partners that he worked with

04:07PM    5    closely during that timeframe?

04:07PM    6    A.  Yes.

04:07PM    7    Q.  Who -- who were some of his partners that you remember

04:07PM    8    him working closely with?

04:07PM    9    A.  When -- when Joe first came to the office, the first

04:08PM   10    partner that I remember him working with was a Buffalo police

04:08PM   11    officer.  His name was Phil Torre.

04:08PM   12        After Phil Torre, there was another Buffalo police

04:08PM   13    officer that he was working with.  That was Tom Doctor.

04:08PM   14        And after that, there was another police officer, police

04:08PM   15    detective that he was working with, I believe, from the

04:08PM   16    Tonawanda Police Department, and that would have been Joe

04:08PM   17    Palmieri.

04:08PM   18    Q.  Okay.  And those three -- Torre, Doctor, and Palmieri --

04:08PM   19    that was the rough sequence of his partners, right, in

04:08PM   20    chronological order?

04:08PM   21    A.  As it relates to -- to task force agents, yes.

04:08PM   22    Q.  Okay.  What was your general relationship like with

04:08PM   23    Mr. Bongiovanni back in 2009 as his supervisor?

04:08PM   24    A.  I managed Joe.  We were coworkers.

04:08PM   25    Q.  Okay.  So you weren't a personal friend of his outside of

USA v Gerace - Kasprzyk - Tripi/Direct - 11/7/24

20

04:08PM    1    work?

04:08PM    2    A.  I was not.

04:08PM    3    Q.  He wasn't someone you socialized with and did things with

04:09PM    4    outside of the work context, right?

04:09PM    5    A.  No, sir.

04:09PM    6    Q.  I want to get back a little bit to standards of conduct

04:09PM    7    and considerations for an agent, okay?  Just a few more

04:09PM    8    questions in that area.

04:09PM    9        Are DEA agents or anyone in DEA allowed to take a

04:09PM   10    person's race into account as it relates to whether or not to

04:09PM   11    investigate them?

04:09PM   12    A.  No, sir.

04:09PM   13    Q.  Are they allowed to take someone's gender into account as

04:09PM   14    to -- the decision as to whether or not to investigate

04:09PM   15    someone?

04:09PM   16    A.  No, sir.

04:09PM   17    Q.  Are agents allowed to take someone's socioeconomic status

04:10PM   18    into account?

04:10PM   19    A.  No, sir.

04:10PM   20    Q.  Now, I want to ask you about friendships and personal

04:10PM   21    relationships.

04:10PM   22        Are agents allowed to investigate people they have close

04:10PM   23    personal relationships with?

04:10PM   24    A.  No, sir.

04:10PM   25    Q.  Earlier, you talked about conflicts of interest.  Would

04:10PM    1    that be one?

04:10PM    2    A.  Yes, sir, it would be.

04:10PM    3    Q.  Can you explain that in more detail for the jury?

04:10PM    4    A.  Yes, sir.  As a federal narcotics agent working for the

04:10PM    5    DEA, you cannot investigate a friend or a close associate.

04:10PM    6    It is strictly forbidden.  It is something that is outlined

04:10PM    7    at the training academy.  It's also outlined and specified

04:10PM    8    within the DEA operations manual.  What --

04:10PM    9    Q.  And as -- I'm sorry.

04:10PM    10    A.  Go ahead.

04:10PM    11    Q.  As a supervisor of people, of -- of agents, would you

04:10PM    12    permit that to occur if you knew was occurring?

04:10PM    13    A.  I would not.

04:10PM    14    Q.  How -- I think you referenced this earlier.  I'm going to

04:10PM    15    ask you a -- a similar question, but are agents allowed to

04:11PM    16    use close personal friends as confidential sources or sources

04:11PM    17    of information?

04:11PM    18    A.  They are not.

04:11PM    19    Q.  Is that for the same conflict-of-interest reason you

04:11PM    20    outlined?

04:11PM    21    A.  Yes, sir, it is.

04:11PM    22    Q.  In that type of situation as a supervisor, would you

04:11PM    23    prevent that from happening if you were aware of it?

04:11PM    24    A.  I would.

04:11PM    25    Q.  And how is -- how is a way you would handle that?

04:11PM  1    So let's put a scenario where I'm a special agent, and I

04:11PM  2    have a close personal friend who I want to use as a

04:11PM  3    confidential source.  How would you handle that?

04:11PM  4    A.  Well, to begin, I would expect that agent whose friend

04:11PM  5    wanted to be a source, I would expect that agent to come to

04:11PM  6    me and be honest with me and tell me that the person that

04:11PM  7    they were trying to sign up as a source was their friend.

04:11PM  8        If that information was given to me, then I would tell

04:11PM  9    the agent we cannot use -- you cannot be the controlling

04:11PM  10   agent for that particular source, that individual.  You

04:12PM  11   cannot have anything to do with that investigation.

04:12PM  12   Q.  Okay.  And would you reassign it?

04:12PM  13   A.  I would.

04:12PM  14   Q.  Would there be a wall put between the agent with the

04:12PM  15   conflict and the agent working the matter?

04:12PM  16   A.  Yes, sir, there would.

04:12PM  17   Q.  Okay.  So I've used a couple terms now.

04:12PM  18       Confidential source.  What is that?  Define that for the

04:12PM  19   jury.

04:12PM  20   A.  A confidential source is an individual that might come to

04:12PM  21   us at the DEA and want to work with us and provide

04:12PM  22   information about a drug-trafficking organization.

04:12PM  23   Q.  And is there a process that is in place at the DEA for

04:12PM  24   signing up individuals as confidential sources?

04:12PM  25   A.  Yes, there is.

USA v Gerace - Kasprzyk - Tripi/Direct - 11/7/24

04:12PM  1   Q.  Can you describe that process?

04:12PM  2   A.  That process begins with the confidential source coming

04:12PM  3   to the Buffalo office, meeting with the agent, meeting with

04:12PM  4   the group supervisor, discussing what information they have

04:13PM  5   as it relates to the drug-trafficking organization.

04:13PM  6       We would then collect information from the source.  We

04:13PM  7   would take a personal history statement.  We would have them

04:13PM  8   sign a variety of DEA forms including a DEA-473 form, which

04:13PM  9   is a confidential source cooperating agreement form.  We

04:13PM  10  would also take fingerprints, take pictures, and we'd run a

04:13PM  11  background check on that person.

04:13PM  12  Q.  And are -- once -- after the background check, are there

04:13PM  13  sign-offs and approvals that happen?

04:13PM  14  A.  Yes, sir.

04:13PM  15  Q.  At that point, once -- once the person is approved as a

04:13PM  16  confidential source, is their identity protected?

04:13PM  17  A.  Yes.

04:13PM  18  Q.  Does DEA try to go to great lengths to protect identities

04:13PM  19  of confidential sources?

04:13PM  20  A.  Yes, they do.

04:13PM  21  Q.  Are the records that link the person up, their true

04:13PM  22  identity, kept under lock and key?

04:13PM  23  A.  Yes, sir.

04:13PM  24  Q.  Are they referred to generally in reports as confidential

04:14PM  25  source numbers?

04:14PM    1    A.  Correct.

04:14PM    2    Q.  All right.  And you said earlier -- you mentioned the

04:14PM    3    material handling agent.  What's a handling agent for a

04:14PM    4    confidential source?

04:14PM    5    A.  So for every confidential source within the office, there

04:14PM    6    is an agent specifically assigned to that source that is

04:14PM    7    responsible for meeting with them, talking with them,

04:14PM    8    conducting quarterly debrief sessions with that source and

04:14PM    9    ensuring that that information is documented and then

04:14PM   10    provided to the group supervisor.

04:14PM   11    Q.  Okay.  Now, I used a term "source of information."  Is

04:14PM   12    that something that's separate and distinct from a

04:14PM   13    confidential source?

04:14PM   14    A.  Yes, sir, it is.

04:14PM   15    Q.  What is a source of information?

04:14PM   16    A.  A source of information is an individual that may have

04:14PM   17    information about a drug-trafficking organization, but does

04:14PM   18    not want to get as involved as a confidential source.  A

04:15PM   19    confidential source is someone that we would use to

04:15PM   20    potentially go out and do a drug buy and that person's name

04:15PM   21    would have to be protected.

04:15PM   22        A source of information does not meet that threshold and

04:15PM   23    it might be someone who will be considered a witness that

04:15PM   24    might have information that they're willing to share about a

04:15PM   25    drug trafficking group.

04:15PM    1    Q.  And do those names of sources of information, do those

04:15PM    2    names have sort of a lesser level of protection?

04:15PM    3    A.  Yes, sir, they do.

04:15PM    4    Q.  Okay.  Nevertheless, now I'm going to ask you, the same

04:15PM    5    scenario with a source of information.  With the conflicts of

04:15PM    6    interest in mind, would an agent under your supervision be

04:15PM    7    permitted to use a close, personal friend as a source of

04:15PM    8    information in a narcotics investigation or case?

04:15PM    9    A.  No, sir.

04:15PM    10   Q.  Is it the -- is it for the same reason, pertaining to

04:15PM    11   conflicts of interest?

04:15PM    12   A.  Yes, sir.  The same rules are in place.  Whether it's a

04:15PM    13   source of information, or a confidential source or a

04:16PM    14   confidential informant, the same rules are in place.  You

04:16PM    15   cannot work with a friend or a close associate.  That would

04:16PM    16   be a conflict of interest.

04:16PM    17   Q.  Are agents required to document their -- their

04:16PM    18   interactions and communications with confidential sources?

04:16PM    19   A.  Yes, they are.

04:16PM    20   Q.  Are agents required to document their communications and

04:16PM    21   work they do with sources of information?

04:16PM    22   A.  Yes, they are.

04:16PM    23   Q.  Why is it important to document those types of things in

04:16PM    24   the context of a DEA case file or investigation?

04:16PM    25   A.  It -- it's vital that when an agent is talking to a

04:16PM    1    source of information or a confidential source, to collect

04:16PM    2    that information, to -- to document it, and document it

04:16PM    3    accurately, so that they can have a record of what was said

04:16PM    4    to them for later conversations with prosecutors or with

04:16PM    5    other agents.

04:16PM    6        It's also important that if that agent was reassigned to

04:16PM    7    another office, if that agent was on leave, those recorded

04:17PM    8    conversations would be in the case file, would be in the

04:17PM    9    informant file, and would be available to other agents or the

04:17PM    10   group supervisor to be able to reflect back on what sort of

04:17PM    11   information that informant might have had available on the

04:17PM    12   drug-trafficking organization.

04:17PM    13   Q.  So documenting, assistance, a source of information

04:17PM    14   provides in the case is an official duty of a DEA agent?

04:17PM    15   A.  Yes, sir, it is.

04:17PM    16   Q.  And it would be the duty of the agent interacting with

04:17PM    17   that source of information; is that right?

04:17PM    18   A.  That's correct.

04:17PM    19   Q.  And documenting information provided by a confidential

04:17PM    20   source is also an official duty of a DEA agent, correct?

04:17PM    21   A.  Yes, sir.

04:17PM    22   Q.  And it would be an official duty to document both in the

04:17PM    23   source file and in the investigative file; is that right?

04:17PM    24   A.  That's correct.

04:17PM    25   Q.  And I guess it goes without saying at this point, and the

04:17PM   1    obligation is to document accurately, correct?

04:17PM   2    A.  Yes, sir.

04:17PM   3    Q.  Now, I'm going to ask you some specific questions, but

04:18PM   4    did there come a point in time where you had a conversation

04:18PM   5    with Special Agent Bongiovanni about a person named Peter

04:18PM   6    Gerace?

04:18PM   7    A.  Yes, I did.

04:18PM   8    Q.  Was that in 2009 when you were supervising Special Agent

04:18PM   9    Bongiovanni?

04:18PM  10    A.  Yes, sir, it was.

04:18PM  11    Q.  What do you recall Special Agent Bongiovanni telling you

04:18PM  12    about Peter Gerace?

04:18PM  13    A.  Bongiovanni came to me.  He indicated that he had

04:18PM  14    received or gotten a telephone call from Peter Geraci, and

04:18PM  15    that during the call, Geraci had explained to them -- to him

04:18PM  16    that he had gotten in some trouble with U.S. Probation, that

04:18PM  17    he had tested positive for cocaine.

04:18PM  18    Q.  And did the conversation between you and Special Agent

04:18PM  19    Bongiovanni progress from there?

04:18PM  20    A.  Yes, it did.

04:18PM  21    Q.  What was the next part of that discussion?

04:18PM  22    A.  Bongiovanni told me that Gerace had a -- told him that he

04:18PM  23    was interested in cooperating with the DEA, that he had

04:19PM  24    information about drug dealers in the Western New York area,

04:19PM  25    cocaine, drug dealers in the Western New York area.

04:19PM   1    And he wanted to cooperate in exchange for leniency

04:19PM   2  against the potential charges that might be filed against him

04:19PM   3  because of the -- the positive urine test.

04:19PM   4  Q.  Is this anything you directed Bongiovanni to get involved

04:19PM   5  in as his supervisor?

04:19PM   6  A.  I did not.

04:19PM   7  Q.  So he brought this to you?

04:19PM   8  A.  Yes, sir.

04:19PM   9  Q.  Is this the first discussion you ever had with

04:19PM  10  Bongiovanni regarding Peter Gerace, this name?

04:19PM  11  A.  Yes, it was.

04:19PM  12  Q.  During the course of that discussion, did Bongiovanni

04:19PM  13  tell you anything more about Peter Gerace or any relationship

04:19PM  14  he had with Peter Gerace?

04:19PM  15  A.  I -- I asked him, I asked Bongiovanni, how do you know

04:19PM  16  Gerace?

04:19PM  17  Q.  And what did he say to you?

04:19PM  18  A.  He said he knew him from the neighborhood.

04:19PM  19  Q.  Okay.  Did that statement, at the time, he knew him from

04:20PM  20  the neighborhood, did that raise any flags for you?

04:20PM  21  A.  No.

04:20PM  22  Q.  Why not?  Explain that for the jury.

04:20PM  23  A.  It's not unusual when you're working in law enforcement

04:20PM  24  in Buffalo -- Joe had been from Buffalo, I knew that he grew

04:20PM  25  up in Buffalo -- it's not unusual to occasionally run into

04:20PM    1    people that were potential drug traffickers or criminals that

04:20PM    2    he may have known from school or from life.  So that's not

04:20PM    3    completely unusual.

04:20PM    4    Q.  Now, did Bongiovanni tell you that they were close

04:20PM    5    personal friends?

04:20PM    6    A.  He did not.

04:20PM    7    Q.  Is there a distinction in your mind between someone you

04:20PM    8    may have bumped into or grown up with a long time ago versus

04:20PM    9    someone you currently maintain a close relationship with as

04:20PM    10   an agent?

04:20PM    11   A.  Yes, sir, there is.

04:20PM    12   Q.  Explain that distinction and why that distinction is

04:20PM    13   important for you to know.

04:20PM    14   A.  It is important for agents to be honest with their

04:21PM    15   supervisors when they're talking about any sort of

04:21PM    16   relationship that they might have with a potential

04:21PM    17   confidential source or maybe even a target of an

04:21PM    18   investigation.  That -- that relationship, that if it -- if

04:21PM    19   it was more than just someone he might have known from the

04:21PM    20   neighborhood, if it was a relationship that was ongoing and

04:21PM    21   existing, if they were friends, I would have considered that

04:21PM    22   a conflict of interest and that would have been a situation

04:21PM    23   that I would not have allowed Bongiovanni to be involved

04:21PM    24   with.

04:21PM    25   Q.  At any point, did -- did Bongiovanni elaborate on any of

04:21PM  1    his relationship with Mr. Gerace?

04:21PM  2    A.  He did not.

04:21PM  3         **MR. TRIPI:**  Ms. Champoux, can we pull up

04:21PM  4    Exhibit 426-1 in evidence.

04:21PM  5         **BY MR. TRIPI:**

04:21PM  6    Q.  The person at the far -- do you see that photograph on

04:21PM  7    your screen?

04:21PM  8    A.  Yes, sir, I do.

04:21PM  9    Q.  Have you ever seen this photo before?

04:21PM  10   A.  No, sir.

04:21PM  11   Q.  Okay.  First time you've seen it?

04:22PM  12   A.  Yes.

04:22PM  13   Q.  Person at the far left, who's that in the -- I guess

04:22PM  14   that's a purplish-looking shirt?

04:22PM  15   A.  Yes, sir.  That's Joseph Bongiovanni.

04:22PM  16        **MR. TRIPI:**  Okay.  Ms. Champoux, can we split the

04:22PM  17   screen with 426-2.

04:22PM  18        **BY MR. TRIPI:**

04:22PM  19   Q.  And if -- if you look, can you see a date right there,

04:22PM  20   July 21st, 2005?

04:22PM  21   A.  Yes, sir.

04:22PM  22   Q.  I know it's how we used to do things, but does that look

04:22PM  23   like the date of a photo to you?

04:22PM  24   A.  Yes, sir, it does.

04:22PM  25   Q.  Okay.  So, at that point in time, July of 2005, you're a

04:22PM    1    DEA agent in D-57, right?

04:22PM    2    A.  Yes, sir.

04:22PM    3    Q.  Bongiovanni's a DEA agent in D-57, correct?

04:22PM    4    A.  Yes, sir.

04:22PM    5    Q.  Does the photo on the left, 426-1, look like a -- a

04:22PM    6    social situation?

04:22PM    7    A.  Yes, it does.

04:22PM    8    Q.  Did Mr. Bongiovanni ever tell you that he would go to

04:22PM    9    dinner and -- and double dates with Peter Gerace?

04:22PM    10   A.  He did not.

04:23PM    11   Q.  Did he ever tell you they vacationed together?

04:23PM    12   A.  He did not.

04:23PM    13   Q.  Or went to Ellicottville or anything like that together?

04:23PM    14   A.  He did not.

04:23PM    15   Q.  Did he tell you they spoke on the phone?

04:23PM    16   A.  No, sir.

04:23PM    17   Q.  Did he tell you they text messaged?

04:23PM    18   A.  No, sir.

04:23PM    19   Q.  Would that have raised more flags for you?

04:23PM    20   A.  Yes, it would have.

04:23PM    21   Q.  Would you have concluded that to be a conflict of

04:23PM    22   interest?

04:23PM    23   A.  Yes, sir, I would have.

04:23PM    24   Q.  Would you have allowed Mr. Bongiovanni to have any

04:23PM    25   involvement in any matters relating to Peter Gerace?

04:23PM  1    A.  No, sir.  I would not.

04:23PM  2    Q.  Looking at that photo, do you believe in your

04:23PM  3    conversation with Mr. Bongiovanni, he minimized and concealed

04:23PM  4    information from you?

04:23PM  5    A.  Yes, I do.

04:23PM  6         **MR. TRIPI:**  Okay.  We can take that down.

04:24PM  7         **BY MR. TRIPI:**

04:24PM  8    Q.  I'm going to hand you up Government Exhibit 30A.  I

04:24PM  9    believe this has been referenced already, but if not, it's

04:24PM  10   been moved into evidence.

04:24PM  11        So I'm going to ask you to look at this document, okay?

04:24PM  12   And when you're done, just look back at me.  Take your time.

04:24PM  13        Do you recognize the document I've handed up as

04:24PM  14   Government Exhibit 30A?

04:24PM  15   A.  Yes, sir.

04:24PM  16   Q.  What do you recognize that to be?

04:24PM  17   A.  This is a DEA-6 report of investigation prepared by

04:24PM  18   Special Agent Joseph Bongiovanni.

04:24PM  19   Q.  And does that report that Mr. Bongiovanni prepared, how

04:24PM  20   do you recognize it?

04:24PM  21   A.  It is a report that I reviewed previously and -- and

04:24PM  22   signed.

04:24PM  23   Q.  And you -- you -- when you say you reviewed previously

04:24PM  24   and signed, you mean at the time it was submitted to you in

04:25PM  25   the context of your job as his supervisor?

04:25PM   1   A.  Yes, sir.  In November of 2009.

04:25PM   2   Q.  Is that a fair and accurate copy of the report you signed

04:25PM   3   off on that was presented to you by Bongiovanni, by

04:25PM   4   Mr. Bongiovanni in 2009?

04:25PM   5   A.  Yes, sir, it is.

04:25PM   6        MR. TRIPI:  The government offers Exhibit 30A,

04:25PM   7   Your Honor.

04:25PM   8        MR. SOEHNLEIN:  Just brief voir dire, Your Honor.

04:25PM   9        THE COURT:  Sure.

04:25PM  10        MR. TRIPI:  Would you like the podium?

04:25PM  11        MR. SOEHNLEIN:  Is it okay if I do it from here?

04:25PM  12        THE COURT:  Of course.

04:25PM  13        MR. SOEHNLEIN:  Thank you.

04:25PM  14

04:25PM  15            **VOIR DIRE EXAMINATION BY MR. SOEHNLEIN:**

04:25PM  16   Q.  Good afternoon, Agent Kasprzyk.  Is that your signature

04:25PM  17   on that document?

04:25PM  18   A.  Yes, sir, it is.

04:25PM  19   Q.  You signed this document?

04:25PM  20   A.  The original document?

04:25PM  21   Q.  Yes.

04:25PM  22   A.  Yes, sir.

04:25PM  23        MR. SOEHNLEIN:  No objection.

04:25PM  24        THE COURT:  Okay.  Received without objection, thank

04:25PM  25   you.

04:25PM    1          **(GOV Exhibit 30A was received in evidence.)**

04:25PM    2          **MR. TRIPI:**  Thank you, Your Honor.

04:25PM    3          Okay.  Ms. Champoux, could we please pull that up now

04:25PM    4    that it's in evidence and let it be published to the jury.

04:25PM    5          **THE CLERK:**  You're all set.

04:25PM    6          **MR. TRIPI:**  Thank you very much, Ms. Demma.

04:25PM    7

04:25PM    8          **CONTINUED DIRECT EXAMINATION BY MR. TRIPI:**

04:25PM    9    Q.  Okay.  You can look at the hard copy or the screen,

04:26PM   10    whatever's more comfortable you for.  The jury hasn't seen

04:26PM   11    too many DEA-6 reports yet, so I'd like to just walk through

04:26PM   12    some of the basics, okay?

04:26PM   13    A.  Yes, sir.

04:26PM   14    Q.  The first box along the top that is filled in has a

04:26PM   15    number there.  Do you see that number?

04:26PM   16    A.  Yes.

04:26PM   17    Q.  In this particular case, the number is C2-06-0120.  What

04:26PM   18    is -- what does that number indicate?

04:26PM   19    A.  That's the file number.  C2 represents the Buffalo

04:26PM   20    office.  06 represents the -- the year.  And 0120 represents

04:26PM   21    the particular case number for that year.

04:26PM   22    Q.  Okay.

04:26PM   23          **THE COURT:**  And when you say "the year," you mean the

04:26PM   24    year the file was opened?

04:26PM   25          **THE WITNESS:**  Yes, sir.

04:26PM     1              **BY MR. TRIPI:**

04:26PM     2    Q.  So we see there it's 06.  Does that reference the fiscal

04:26PM     3    year?

04:26PM     4    A.  Yes.

04:26PM     5    Q.  And 120 indicates that would be the 120th case in the '06

04:26PM     6    fiscal year?

04:26PM     7    A.  Yeah.

04:26PM     8    Q.  2006?

04:26PM     9    A.  Yes, sir.

04:26PM    10    Q.  Okay.  And here we have box number 4, there's a WCCIL.

04:27PM    11    Do you see that?

04:27PM    12    A.  Yes, sir.

04:27PM    13    Q.  Under the header G-DEP Identifier, what does that mean?

04:27PM    14    A.  So every drug investigation that the DEA opens and

04:27PM    15    initiates is classified by a G-DEP.  The G-DEP specifies

04:27PM    16    within that coding, that -- that WCC1L coding, that specifies

04:27PM    17    the type of drug organization that's being investigated, the

04:27PM    18    type of drug that might be trafficked by that organization

04:27PM    19    and it generally speaks to the -- the -- the scope of the

04:27PM    20    organization, is it a local organization to Buffalo and

04:27PM    21    Western New York, or is it more of an international or

04:27PM    22    national-based organization.

04:27PM    23    Q.  And do you -- I know it might -- it's been a while, but

04:27PM    24    do you remember what type of drug that would indicate by

04:27PM    25    those letters there?

04:27PM    1    A.   That would be cocaine -- I'm sorry, cocaine trafficking

04:27PM    2    organization.

04:27PM    3    Q.   Okay.  Thank you.  Going to box 5, what -- what

04:28PM    4    information is indicated in box 5 there at the top?

04:28PM    5    A.   That -- that's the file title, so when that case was

04:28PM    6    initially opened in 2006, the target of that investigation

04:28PM    7    would have been Matthew Scalia.

04:28PM    8    Q.   Okay.  You jumped over to box 6 on me there?

04:28PM    9    A.   Oh, I'm sorry.  Did you say 5?

04:28PM   10    Q.   Yeah.  Can we -- so, I won't cover 6 again, you covered

04:28PM   11    that.  Let's go back to 5.

04:28PM   12    A.   Sorry, sir.

04:28PM   13    Q.   No, you're okay.

04:28PM   14    A.   5 is the author of the report.  In this case, it would

04:28PM   15    have been authored by Special Agent Joseph Bongiovanni at the

04:28PM   16    Buffalo resident office and, as noted earlier, he was in

04:28PM   17    group D-57.

04:28PM   18    Q.   Now, I notice that here there's a box number 2.  If says

04:28PM   19    cross file.  And if that box is empty, there's some space

04:28PM   20    there.  What -- what -- what is a cross file reference?  Can

04:28PM   21    you describe that for the jury?

04:28PM   22    A.   Yes, sir.  So, if -- if there was a confidential source

04:28PM   23    or a confidential informant being used within or referenced

04:29PM   24    within the report of investigation, that this report would be

04:29PM   25    cross filed to the confidential informants -- informant file,

04:29PM   1   which is kept separately, so that -- that is why we have a

04:29PM   2   cross file section.

04:29PM   3   Q.  Basically, to make sure that a report that is pertinent

04:29PM   4   in investigation makes it to whatever other file it needs to?

04:29PM   5   A.  Correct.

04:29PM   6   Q.  Whether it be a source file or even another investigative

04:29PM   7   file?

04:29PM   8   A.  It could be a -- a related criminal investigation, maybe

04:29PM   9   having something to do with Scalia or other members of the

04:29PM  10   organization that was involved with another case, yes.

04:29PM  11   Q.  So by having this blank, this means this is not related

04:29PM  12   to any other investigative file, correct?

04:29PM  13   A.  Correct.

04:29PM  14   Q.  And it also means by having this blank, it's not related

04:29PM  15   to a confidential source file?

04:29PM  16   A.  Correct.

04:29PM  17   Q.  Okay.  And we'll get into the details a little bit more,

04:29PM  18   but just to sort of preview it.  And this report, you've seen

04:29PM  19   it before, right?

04:29PM  20   A.  Yes, sir.

04:29PM  21   Q.  Is Mr. Bongiovanni in -- in the body of it, used the term

04:30PM  22   "confidential source," if you recall?

04:30PM  23   A.  I -- I don't recall if he uses that word or a source of

04:30PM  24   information.

04:30PM  25   Q.  We'll get to it, we'll work through it.

04:30PM    1    Now number 7, nothing's filled out there.

04:30PM    2    Number 8, that tells us the date it's prepared; is that

04:30PM    3    right?

04:30PM    4    A.   That's correct, sir.

04:30PM    5    Q.   And number 9, there's a listing for other officers,

04:30PM    6    right?

04:30PM    7    A.   Yes, sir.

04:30PM    8    Q.   What does that mean, other officers section?

04:30PM    9    A.   Other officers would -- will be any -- any individuals

04:30PM   10    that work at the DEA or another law enforcement agency that

04:30PM   11    was involved with the investigation or might have had some

04:30PM   12    contact with the investigation.

04:30PM   13    Q.   Okay.  And so here, there's your name, right?

04:30PM   14    A.   Yes, sir.

04:30PM   15    Q.   But were you an other officer, or were you the person

04:30PM   16    signing off?

04:30PM   17    A.   I was the person signing off.

04:30PM   18    Q.   Okay.  So, in reality, when your name is listed there as

04:30PM   19    other officer, you didn't do any investigation there, right?

04:30PM   20    A.   I did not.

04:30PM   21    Q.   Okay.  So, your name could have been deleted from there,

04:31PM   22    right?

04:31PM   23    A.   Could have been, yes, sir.

04:31PM   24    Q.   And then in the next name, is FBI group supervisor, G.S.,

04:31PM   25    correct?

04:31PM  1    A.  Correct.

04:31PM  2    Q.  James Jancewicz?

04:31PM  3    A.  Yes, sir.

04:31PM  4    Q.  Do you know who that person was at the time?

04:31PM  5    A.  Yes.

04:31PM  6    Q.  Who was Jim -- James Jancewicz?

04:31PM  7    A.  Jim Jancewicz was the supervisor of the FBI Safe Streets

04:31PM  8    Task Force.

04:31PM  9    Q.  Very briefly, first time they've heard that.  What is the

04:31PM  10   FBI Safe Streets Task Force?

04:31PM  11   A.  So the Safe Streets Task Force is a group within the FBI

04:31PM  12   Buffalo office, they work similar investigations that we

04:31PM  13   would work in the DEA.  They work a lot of drug

04:31PM  14   investigations.

04:31PM  15       So, I talked frequently with Jim Jancewicz to talk about

04:31PM  16   overlapping case investigations to make sure that we were

04:31PM  17   appropriately deconflicting and cooperating with -- with each

04:31PM  18   other, if appropriate.

04:31PM  19   Q.  And that term "deconfliction," we haven't heard that.

04:31PM  20   What is deconfliction?

04:31PM  21   A.  So when you're working drug investigations and you target

04:32PM  22   a particular drug suspect, it's important to deconflict with

04:32PM  23   every single law enforcement agency in the area.

04:32PM  24       We don't want to be in a situation where we may be going

04:32PM  25   out and -- and conducting a drug buy from a narcotics

04:32PM   1   suspect, a trafficker, and that same suspect may be a

04:32PM   2   confidential source or may be a target of another law

04:32PM   3   enforcement agency's investigation.  So we need to deconflict

04:32PM   4   to make sure that everybody understands what each agency is

04:32PM   5   working on.

04:32PM   6   Q.  So there's a couple things there.  So you don't duplicate

04:32PM   7   efforts, right?

04:32PM   8   A.  Correct.

04:32PM   9   Q.  So you don't ruin someone else's investigation?

04:32PM  10   A.  Correct.

04:32PM  11   Q.  So they don't ruin your investigation?

04:32PM  12   A.  Correct.

04:32PM  13   Q.  Or to work together to make sure investigations are

04:32PM  14   efficient and collaborative?

04:32PM  15   A.  Yes, sir.

04:32PM  16   Q.  Would those be basically the different ranges of options

04:32PM  17   there for deconfliction?

04:32PM  18   A.  And safety, making sure that -- that everybody's safe and

04:32PM  19   that we all know what each other is doing.

04:32PM  20   Q.  So a DEA team doesn't show up at the same house as an FBI

04:33PM  21   team and mistakes happen and people end up getting hurt,

04:33PM  22   correct?

04:33PM  23   A.  That's correct, sir.

04:33PM  24   Q.  Okay.  There's another name there.  USPO Peter Lepiane.

04:33PM  25   And who is he?

04:33PM  1    A.  Peter was, and I think he still is, a -- a probation

04:33PM  2    officer, parole officer assigned to the United States

04:33PM  3    Probation Department.

04:33PM  4    Q.  Okay.  And box number 10, there's a report regarding

04:33PM  5    portion, and what does that say there?

04:33PM  6    A.  It says, information offered by Peter Gerace regarding

04:33PM  7    narcotics investigation.

04:33PM  8    Q.  And now, this report, is -- is all this information that

04:33PM  9    we see here or not see here filled in by the author of the

04:33PM  10   report?

04:33PM  11   A.  Yes, sir, it is.

04:33PM  12   Q.  Okay.  So in this instance, everything that's written in

04:33PM  13   this document is written by Joseph Bongiovanni; is that

04:33PM  14   right?

04:33PM  15   A.  Yes, sir.

04:33PM  16   Q.  Okay.

04:33PM  17          **MR. TRIPI:**  Could we zoom out of that, Ms. Champoux.

04:33PM  18          And now I'd like to get into the -- the details a

04:33PM  19   little bit.  Could we highlight paragraphs 1, 2 and 3, or zoom

04:33PM  20   in, I should say.  Thank you.

04:33PM  21          **BY MR. TRIPI:**

04:34PM  22   Q.  All right.  Was this report, if you recall, submitted to

04:34PM  23   you after your initial discussion with Mr. Bongiovanni?

04:34PM  24   A.  Yes.

04:34PM  25   Q.  Okay.  So after you have that initial discussion with

04:34PM  1   him, he goes back and he types all these words in this

04:34PM  2   report, and then he submits it to you, correct?

04:34PM  3   A.  Correct.

04:34PM  4   Q.  All right.  Let's work through it a little bit.

04:34PM  5   Paragraph 1, what is that paragraph detailing.

04:34PM  6   A.  It is a standard opening sentence within most DEA-6s, and

04:34PM  7   it says references made to all other D -- DEA-6 reports of

04:34PM  8   investigation written to this particular case file.

04:34PM  9   Q.  Now, is that something that appears there automatically

04:34PM  10  or did Mr. Bongiovanni have to type that up?

04:34PM  11  A.  He would have to type that up.

04:34PM  12  Q.  Okay.  So he wrote those words?

04:34PM  13  A.  Yes, sir.

04:34PM  14  Q.  And as the reviewing supervisor, does that indicate to

04:34PM  15  you that there's some relevance to this report to that

04:34PM  16  Matthew Scalia file title?

04:35PM  17  A.  Yes, sir.  That would be -- that would be how I would

04:35PM  18  view that particular sentence.

04:35PM  19  Q.  Okay.  So now we go to paragraph 2.  Can you read that

04:35PM  20  for the jury?

04:35PM  21  A.  On November 1st, 2009, S.A. Joseph Bongiovanni received a

04:35PM  22  telephone call from Peter G. Geraci.  Geraci has acted as a

04:35PM  23  confidential source and has been able to provide information

04:35PM  24  regarding individuals in this case file and other narcotic

04:35PM  25  investigation in the past.

04:35PM  1    Q.   All right.  Can I stop you there?

04:35PM  2    A.   Yes, sir.

04:35PM  3    Q.   Let's look at those first two sentences for a moment.

04:35PM  4    Where Mr. Bongiovanni wrote on November 1st, 2009, he

04:35PM  5    received a telephone call from Peter G. Gerace, did you have

04:35PM  6    any independent knowledge of that phone call?

04:35PM  7    A.   I do not.

04:35PM  8    Q.   Do you know the -- did Mr. Bongiovanni ever provide you

04:35PM  9    the phone number that he spoke on Mr. -- with Mr. Gerace on?

04:36PM  10   A.   He did not.

04:36PM  11   Q.   Did he ever provide you any more detail about that

04:36PM  12   conversation?

04:36PM  13   A.   Beyond what I've testified to, sir, no.

04:36PM  14   Q.   Okay.  Now, the second sentence, Gerace has acted as a

04:36PM  15   confidential source and has been able to provide --

04:36PM  16   withdrawn.

04:36PM  17        Going back to the first sentence, did you instruct

04:36PM  18   Mr. Bongiovanni to -- to -- to have any communications with

04:36PM  19   Peter Gerace or is this coming from Mr. Bongiovanni to you?

04:36PM  20   A.   This came from Bongiovanni to me.

04:36PM  21   Q.   Okay.  That second sentence now, Gerace has acted as a

04:36PM  22   confidential source and has been able to provide information

04:36PM  23   regarding individuals in this case file and other narcotic

04:36PM  24   investigation in the past.

04:36PM  25        Do you see that?

04:36PM    1    A.   I do.

04:36PM    2    Q.   Mr. Bongiovanni wrote all those words?

04:36PM    3    A.   Yes, sir.

04:36PM    4    Q.   When you wrote those words, did you believe them -- when

04:36PM    5    he wrote those words, did you believe them?

04:36PM    6    A.   Yes.

04:36PM    7    Q.   Now, we've talked about confidential sources versus

04:36PM    8    sources of information.  Do you see that, use of the term

04:37PM    9    "confidential source"?

04:37PM   10    A.   Yes, sir, I do.

04:37PM   11    Q.   As you look at that report today, does that -- does that

04:37PM   12    term make any sense to you?

04:37PM   13    A.   No, sir, it does not.

04:37PM   14    Q.   Nevertheless -- well, withdrawn.

04:37PM   15         Can you explain why it doesn't make sense now that you're

04:37PM   16    looking back at this report?

04:37PM   17    A.   To my knowledge, Gerace was not a documented confidential

04:37PM   18    informant or a confidential source for the DEA Buffalo

04:37PM   19    office.

04:37PM   20    Q.   And if he were, would his name -- should his -- should

04:37PM   21    his name have been replaced with a number?

04:37PM   22    A.   Yes, sir.

04:37PM   23    Q.   And if he were, should that box number 2 that we looked

04:37PM   24    at with the cross-references have been filled in with a

04:37PM   25    confidential source file number?

USA v Gerace - Kasprzyk - Tripi/Direct - 11/7/24

04:37PM    1    A.  Yes, sir.

04:37PM    2    Q.  Okay.  When you reviewed this report initially, and

04:37PM    3    signed off on it, did overlook that detail?

04:37PM    4    A.  I remember reading it and seeing it and thinking that

04:37PM    5    maybe Joe was referring to him as a confidential source,

04:37PM    6    but -- but in fact he might have been a source of

04:37PM    7    information.

04:38PM    8    Q.  Okay.  So, when you're reading a report like that as a

04:38PM    9    supervisor, you're seeing there's no confidential source

04:38PM   10    number, you're seeing him referenced by name.  You have a

04:38PM   11    decision to make.  You could kick the report back to him to

04:38PM   12    correct it, or you could keep reading it and approve it; is

04:38PM   13    that right?

04:38PM   14    A.  Correct.

04:38PM   15    Q.  What did you decide -- did you -- did you make a

04:38PM   16    conscious decision in this case to overlook it, or do you

04:38PM   17    remember one way or the other if you just missed it?

04:38PM   18    A.  I -- I don't -- I mean, I don't remember exactly.  It --

04:38PM   19    it's been 15 years ago.

04:38PM   20    Q.  That's okay.

04:38PM   21    A.  But, yes.  I mean I --

04:38PM   22    Q.  As a supervisor, do you get a lot of reports?

04:38PM   23    A.  Yes, sir.

04:38PM   24    Q.  When you find some -- some errors in them, do you always

04:38PM   25    kick them back?

04:38PM  1   A.  No, sir.

04:38PM  2   Q.  Do you -- are you human?

04:38PM  3   A.  Yes, sir.

04:38PM  4   Q.  Do you sometimes maybe miss things, too?

04:38PM  5   A.  Yes, sir.

04:38PM  6   Q.  Is a supervisor of an enforcement group a busy job?

04:38PM  7   A.  Yes, it is.

04:38PM  8   Q.  Now, are you independently investigating every sentence

04:39PM  9   Mr. Bongiovanni writes in this report?

04:39PM  10  A.  I am not.

04:39PM  11  Q.  Okay.  Let's continue -- let's get to the third sentence

04:39PM  12  now.

04:39PM  13      It should be known -- well, you got it, you read it for

04:39PM  14  us.

04:39PM  15  A.  It should be known that Gerace is presently on federal

04:39PM  16  parole and supervised release.

04:39PM  17  Q.  Keep going.

04:39PM  18  A.  At this time, Gerace advised S.A. Bongiovanni that United

04:39PM  19  States Probation Officer Peter Lepiane and agents of the FBI

04:39PM  20  initiated a search of Pharaoh's Gentlemen's Club located at

04:39PM  21  23 Aero Drive in Cheektowaga, New York, on or about

04:39PM  22  October 31st, 2009.  It should be known that Gerace is

04:39PM  23  associated with Pharaoh's Gentlemen's Club.

04:39PM  24  Q.  Okay.  Now, again, going back to conflicts of interest,

04:39PM  25  whether a source of information or a confidential source, had

04:39PM    1    you known, had it been disclosed to you by Mr. Bongiovanni at

04:39PM    2    the time that he had a close personal relationship with

04:39PM    3    Mr. Gerace or a personal relationship as opposed to just

04:40PM    4    knowing him, would you have permitted Mr. Bongiovanni to work

04:40PM    5    on this?

04:40PM    6    A.  I would not.

04:40PM    7    Q.  In the last sentence there, Mr. Bongiovanni wrote about

04:40PM    8    Gerace's association with Pharaoh's Gentlemen's Club.  Do you

04:40PM    9    see that there?

04:40PM    10   A.  Yes, sir, I do.

04:40PM    11   Q.  Did Mr. Bongiovanni ever explain to you how he knew

04:40PM    12   Mr. Gerace was associated with Pharaoh's Gentlemen's Club?

04:40PM    13   A.  He did not.

04:40PM    14   Q.  If you knew information about the relationship between

04:40PM    15   Mr. Gerace and Mr. Bongiovanni that you believe was concealed

04:40PM    16   from you, would you have scrutinized this report more

04:41PM    17   closely?

04:41PM    18   A.  Yes, sir.

04:41PM    19   Q.  Would you have spent more time reviewing it?

04:41PM    20   A.  Yes.

04:41PM    21   Q.  Would you have asked more questions?

04:41PM    22   A.  Yes.

04:41PM    23   Q.  Now, you indicated you worked in law enforcement in this

04:41PM    24   community, I think you said, since 1989?

04:41PM    25   A.  Actually, earlier.  I worked for the Erie County District

04:41PM   1   Attorney's Office as a criminal investigator prior to joining

04:41PM   2   the DEA.  So it would have been about 1987 that -- that I've

04:41PM   3   been in law enforcement in Western New York.

04:41PM   4   Q.  Based on your time living in this community as a citizen,

04:41PM   5   as well as your time being in law enforcement at the DA's

04:41PM   6   office and then in -- in the -- in the DEA, were you familiar

04:41PM   7   with, by reputation, the name Joseph Todaro Sr.?

04:41PM   8   A.  Yes, sir.

04:41PM   9   Q.  Did that person carry a reputation in the law enforcement

04:41PM  10   community and the community as being the reputed leader of

04:42PM  11   Italian Organized Crime in this Buffalo area?

04:42PM  12   A.  Yes, sir.

04:42PM  13   Q.  You were familiar with that reputation at the time of

04:42PM  14   this report, correct?

04:42PM  15   A.  Yes.

04:42PM  16   Q.  Did Mr. Bongiovanni ever disclose to you that Peter

04:42PM  17   Gerace was the grandson of that individual?

04:42PM  18   A.  He did not.

04:42PM  19   Q.  Would that have caused you to scrutinize and -- and take

04:42PM  20   more interest in this -- in this matter?

04:42PM  21   A.  Yes.

04:42PM  22   Q.  All right.  Let's read paragraph 3, please.

04:42PM  23   A.  Gerace advised S.A. Bongiovanni that he was administered

04:42PM  24   a urine test to detect the presence of narcotics in his

04:42PM  25   urine.  Gerace advised S.A. Bongiovanni that he failed the

04:42PM   1   urine test due to the presence of trace amounts of cocaine

04:43PM   2   detected in his urine.

04:43PM   3       Gerace advised S.A. Bongiovanni that he believe he had

04:43PM   4   now violated his term of supervised release.  Gerace stated

04:43PM   5   that he was prepared to offer information regarding

04:43PM   6   individuals who are trafficking in narcotics in the Buffalo

04:43PM   7   area.

04:43PM   8       Gerace stated he wanted to offer this information in lieu

04:43PM   9   of consideration on this pending supervised release violation

04:43PM  10   due to the failed urine test.

04:43PM  11   Q.  Was Bongiovanni becoming involved in Gerace's probation

04:43PM  12   issue as documented here something Bongiovanni did totally on

04:43PM  13   his own?

04:43PM  14   A.  Yes.

04:43PM  15   Q.  This might be redundant, but did you direct him to do

04:43PM  16   anything regarding Mr. Gerace's probation violation at this

04:43PM  17   point?

04:43PM  18   A.  At that point, no.

04:43PM  19   Q.  Okay.  Was it your understanding that Bongiovanni was

04:43PM  20   claiming Gerace was offering to cooperate with the DEA?

04:43PM  21   A.  Yes, sir.

04:44PM  22   Q.  Was information about drug traffickers as detailed in

04:44PM  23   here something the DEA would have considered valuable --

04:44PM  24   valuable to pursue?

04:44PM  25   A.  Yes, sir.

04:44PM   1         **MR. TRIPI:**  Okay.  Let's go to page 2, Ms. Champoux.

04:44PM   2         Could you read, and zoom in on paragraph 4 for him,

04:44PM   3    so he can see it easier.

04:44PM   4         **BY MR. TRIPI:**

04:44PM   5    Q.  And could you read paragraph 4 for the jury, please?

04:44PM   6    A.  On November 2nd, 2009, Gerace arrived at the DEA Buffalo

04:44PM   7    resident office and spoke briefly to S.A. Bongiovanni.

04:44PM   8       Gerace stated that he knew significant cocaine

04:44PM   9    traffickers capable of moving kilo quantities of cocaine out

04:44PM   10   of various distribution houses located in the North Buffalo

04:44PM   11   and South Buffalo areas.

04:44PM   12      Gerace stated that he would not offer additional

04:44PM   13   information until he received a good faith commitment from

04:44PM   14   USPO Lepiane that he would receive consideration on his

04:44PM   15   violation in lieu of information he is willing to provide.

04:45PM   16   Q.  Now, is someone in your experience, is someone who knows

04:45PM   17   significant cocaine traffickers capable of moving kilogram

04:45PM   18   quantities, is that someone who is often uniquely placed in

04:45PM   19   an organization?

04:45PM   20   A.  Yes, sir.

04:45PM   21   Q.  Is that someone who is often, in your experience,

04:45PM   22   involved in cocaine distribution?

04:45PM   23   A.  Yes, sir.

04:45PM   24   Q.  Given that information, if Mr. Gerace as purported in

04:45PM   25   this report, were not offering to act as a confidential

04:45PM   1    source as Mr. Bongiovanni wrote it in the report at least, as

04:45PM   2    the DEA supervisor, would you have wanted to investigate

04:45PM   3    Gerace?

04:45PM   4    A.  Yes, sir.

04:46PM   5            **MR. TRIPI:**  Can we zoom out.  Actually, keep that up.

04:46PM   6            **BY MR. TRIPI:**

04:46PM   7    Q.  Now, before you mentioned Gerace arrived at the DEA

04:46PM   8    Buffalo resident office and spoke briefly with

04:46PM   9    S.A. Bongiovanni.  Are -- even if he were a confidential

04:46PM   10   source, use the language that was used in the report for a

04:46PM   11   moment, is Bongiovanni by policy supposed to talk to Gerace

04:46PM   12   alone?

04:46PM   13   A.  No, sir.

04:46PM   14   Q.  If he's a source of information, is Bongiovanni by policy

04:46PM   15   supposed to talk to Gerace alone?

04:46PM   16   A.  No, sir.

04:46PM   17   Q.  Is there supposed to be a -- a witness to every

04:46PM   18   discussion an agent has with a witness, yes or no?

04:46PM   19   A.  Yes.

04:46PM   20   Q.  Is there supposed to be a -- a witness to every

04:46PM   21   conversation an agent has with a source of information?

04:46PM   22   A.  Yes.

04:46PM   23   Q.  Is there supposed to be another DEA agent witness to

04:46PM   24   every discussion an agent has with a confidential source?

04:46PM   25   A.  Yes, sir.

04:46PM   1   Q.  Reading what Bongiovanni wrote in that first sentence,

04:47PM   2   does it indicate to you he met alone with Gerace?

04:47PM   3   A.  Yes, sir.

04:47PM   4   Q.  So that means there's no witnesses to the discussion?

04:47PM   5   A.  Yes, sir.

04:47PM   6   Q.  Now, you indicated before, when a confidential source is

04:47PM   7   signed up, the group supervisor sits in on that initial

04:47PM   8   sign-up, correct?

04:47PM   9   A.  Yes, sir.

04:47PM  10   Q.  Did Bongiovanni ask you to sit in the meeting with him

04:47PM  11   and Gerace?

04:47PM  12   A.  No, he did not.

04:47PM  13         **MR. TRIPI:**  Okay.  We can zoom out of that and we can

04:47PM  14   zoom in on paragraph 5, please.

04:47PM  15         Thank you, Ms. Champoux.

04:47PM  16         **BY MR. TRIPI:**

04:47PM  17   Q.  All right.  Can you see that okay?  Can you read that for

04:47PM  18   the jury, please?

04:47PM  19   A.  Yes, sir.  Later on that same date, S.A. Bongiovanni

04:48PM  20   reported this information to G.S. Kasprzyk of the Buffalo

04:48PM  21   resident office.  G.S. Kasprzyk contacted FBI G.S. James

04:48PM  22   Jancewicz to better understand the FBI's interest in Gerace

04:48PM  23   as well as their participation in the search at the Pharaoh's

04:48PM  24   club.

04:48PM  25         FBI G.S. Jancewicz stated that the FBI was very

04:48PM  1  interested in interviewing Gerace on various issues regarding

04:48PM  2  the Pharaoh's club and other FBI investigations.

04:48PM  3  Q.  All right.  We've already talked about FBI supervisor

04:48PM  4  Jancewicz, right?

04:48PM  5  A.  Yes, sir.

04:48PM  6  Q.  Was it Bongiovanni coming to you what prompted you to

04:48PM  7  contact James Jancewicz?

04:48PM  8  A.  Yes.

04:48PM  9  Q.  Why did you do that?

04:48PM  10  A.  When Bongiovanni described to me the -- the situation

04:48PM  11  with Gerace and -- and the events at -- at Pharaoh's, that

04:49PM  12  prompted the -- the potential or pending parole violation or

04:49PM  13  supervised release violation, I -- I knew from that

04:49PM  14  conversation that the FBI had an interest in Gerace.

04:49PM  15      And I -- I felt then that it was important for to us

04:49PM  16  deconflict with the FBI and to cooperate with them on any

04:49PM  17  information that Gerace might be able to provide to the DEA

04:49PM  18  or to law enforcement.

04:49PM  19  Q.  And essentially -- well, so your next step then, you --

04:49PM  20  you contact Jancewicz?

04:49PM  21  A.  I contact --

04:49PM  22  Q.  Basically at the defendant's prompting by giving you this

04:49PM  23  information, you -- you call James Jancewicz?

04:49PM  24  A.  I -- I talked to Jim.  Jim indicates to me that -- that

04:50PM  25  they have an interest in talking to Gerace, and at that

04:50PM    1    point, I tell Bongiovanni that you need to call Jim

04:50PM    2    Jancewicz, coordinate with him and set up an interview with

04:50PM    3    Gerace so that the FBI can meet with him.

04:50PM    4    Q.  And was it your -- your -- your understanding the FBI was

04:50PM    5    interested in talking with Gerace?

04:50PM    6    A.  Yes, sir, it was.

04:50PM    7    Q.  And did you want Special Agent Bongiovanni to do

04:50PM    8    everything he could to facilitate that?

04:50PM    9    A.  Yes, sir.

04:50PM   10    Q.  Did you direct the defend -- or, withdrawn.

04:50PM   11        Did you direct Mr. Bongiovanni to ensure the FBI spoke

04:50PM   12    directly with Gerace about the drug trafficking information

04:50PM   13    contained in this document?

04:50PM   14    A.  Yes, sir, I did.

04:50PM   15    Q.  Did Bongiovanni indicate to you he would do that?

04:50PM   16    A.  Yes, he did.

04:50PM   17    Q.  Now, if the FBI had not been interested in working with

04:51PM   18    Peter Gerace, what would you have expected this --

04:51PM   19    Mr. Bongiovanni to do as it related to Mr. Gerace?

04:51PM   20    A.  We would follow the procedure and protocol for signing up

04:51PM   21    Gerace as a confidential informant.

04:51PM   22    Q.  Is that because what was purported to you in this

04:51PM   23    document, what you thought Gerace wanted to do?

04:51PM   24    A.  Correct.

04:51PM   25    Q.  And if it later turned out that you learned Gerace was

04:51PM   1   not interested in being a cooperator, would you have expected

04:51PM   2   investigation of Mr. Gerace?

04:51PM   3   A.   Yes, sir.

04:51PM   4   Q.   So one of two things:  Either Gerace is gonna sign up and

04:51PM   5   cooperate, or he's connected to kilogram-level dealers and

04:51PM   6   he's going to be investigated.  Are those the two options you

04:52PM   7   expect of a trained agent under your supervision in this

04:52PM   8   situation?

04:52PM   9   A.   Yes, sir.

04:52PM   10        **MR. TRIPI:**  Okay.  Let's go on to paragraph 6 and

04:52PM   11   zoom in on that.

04:52PM   12        **BY MR. TRIPI:**

04:52PM   13   Q.   Can you read paragraph 6 for them.  I might have jumped

04:52PM   14   ahead of you a little bit, but go ahead.

04:52PM   15   A.   G.S. Kasprzyk instructed S.A. Bongiovanni to set up an

04:52PM   16   interview with Gerace and FBI agents in the near future.

04:52PM   17   S.A. Bongiovanni has contacted the FBI Buffalo office and

04:52PM   18   plans are being formulated for this meeting.

04:52PM   19        S.A. Bongiovanni has contacted USPO Lepiane and informed

04:52PM   20   him of Gerace's willingness to cooperate with DEA and FBI in

04:52PM   21   lieu of consideration on penalties pending due to his

04:52PM   22   violation of supervised release.

04:52PM   23        USPO Lepiane stated that he would discuss this issue with

04:53PM   24   AUSA Anthony Bruce and would later advise.

04:53PM   25   Q.   That's a new name.  Is Anthony Bruce someone who was

04:53PM 1   formerly a prosecutor at the U.S. Attorney's Office?

04:53PM 2   A.  Yes, sir, he is.

04:53PM 3         **MR. TRIPI:**  Now, let's zoom out of that.

04:53PM 4         **BY MR. TRIPI:**

04:53PM 5   Q.  Paragraph 7 just says this investigation continues,

04:53PM 6   correct?

04:53PM 7   A.  Yes, sir.

04:53PM 8   Q.  And -- and going back, what date did you sign off on this

04:53PM 9   report?

04:53PM 10  A.  November 6th, 2009.

04:53PM 11        **MR. TRIPI:**  Ms. Champoux, can we go to the first page

04:53PM 12  again.  Just the --

04:53PM 13        **BY MR. TRIPI:**

04:53PM 14  Q.  And so it has Mr. Bongiovanni's signature and then yours

04:53PM 15  underneath it down at the bottom here?

04:53PM 16  A.  Yes, sir.

04:53PM 17        **MR. TRIPI:**  And go back to page 2, Ms. Champoux, if

04:53PM 18  we could.

04:53PM 19        **BY MR. TRIPI:**

04:53PM 20  Q.  Now, Mr. Kasprzyk, did Mr. Bongiovanni ever tell you that

04:53PM 21  he actually set up an interview between Mr. Gerace and the

04:53PM 22  FBI?

04:53PM 23  A.  He did not.

04:53PM 24  Q.  Do you know whether that interview ever happened?

04:53PM 25  A.  At the time?

04:54PM  1   Q.  At the time.

04:54PM  2   A.  At the time.  No.

04:54PM  3   Q.  Did Mr. Bongiovanni ever ask you at that time as a

04:54PM  4   supervisor to sign off on another DEA-6 about any kind of

04:54PM  5   meeting that Mr. Bongiovanni had between Bongiovanni, Gerace,

04:54PM  6   and the FBI?

04:54PM  7   A.  He did not.

04:54PM  8   Q.  Did Mr. Bongiovanni ever say, hey, you know what?  I've

04:54PM  9   been thinking about those standards of conduct and the ethics

04:54PM  10  trainings that we had, and I -- I need to recuse myself from

04:54PM  11  this Gerace matter?

04:54PM  12  A.  He did not.

04:54PM  13  Q.  Looking at the indexing section, do you see that?

04:54PM  14  A.  Yes, sir.

04:54PM  15       **MR. TRIPI:**  Let's zoom in on the indexing section if

04:54PM  16  we could.

04:54PM  17       **BY MR. TRIPI:**

04:54PM  18  Q.  In the indexing section, what type of information is an

04:54PM  19  agent supposed to document in the indexing section?

04:55PM  20  A.  The indexing section is a -- a location for the agent to

04:55PM  21  place all biographical information about a particular drug

04:55PM  22  suspect, so the name, the date of birth, telephone number,

04:55PM  23  address.  Anything that you may have uncovered through your

04:55PM  24  investigation would be included in the NADDIS section.

04:55PM  25  Q.  In this indexing section, did Mr. Bongiovanni write a

| | | |
|---|---|---|
| 04:55PM | 1 | phone number for Mr. Gerace? |
| 04:55PM | 2 | A.  He did not. |
| 04:55PM | 3 | Q.  Did he write a date of birth? |
| 04:55PM | 4 | A.  He did not. |
| 04:55PM | 5 | Q.  Did he write an address? |
| 04:55PM | 6 | A.  He did not. |
| 04:55PM | 7 | Q.  He wrote NADDIS number pending; do you see that? |
| 04:55PM | 8 | A.  I see that.  Yes, sir. |
| 04:55PM | 9 | Q.  What does that indicate to you as the supervisor signing |
| 04:55PM | 10 | off? |
| 04:55PM | 11 | A.  This would indicate to me that the biographical |
| 04:55PM | 12 | information that I just mentioned was listed in another |
| 04:55PM | 13 | report, and that information was not quite yet logged into |
| 04:55PM | 14 | NADDIS and wasn't there yet so there would be no NADDIS |
| 04:55PM | 15 | number. |
| 04:55PM | 16 | Q.  When it says pending, is that something that usually gets |
| 04:55PM | 17 | entered into NADDIS in pretty close proximity? |
| 04:55PM | 18 | A.  Yes, sir. |
| 04:55PM | 19 | Q.  So if Mr. Gerace in fact had a NADDIS number going back |
| 04:56PM | 20 | many years, would pending be an accurate description of that? |
| 04:56PM | 21 | A.  It would not be. |
| 04:56PM | 22 | Q.  Okay.  Are you familiar with NADDIS reports? |
| 04:56PM | 23 | A.  Yes, sir. |
| 04:56PM | 24 | Q.  As a supervisor, you've handled them and reviewed them? |
| 04:56PM | 25 | A.  Yes. |

04:56PM    1    Q.  Are NADDIS reports documents that are kept in the DEA's

04:56PM    2    ordinary course of business?

04:56PM    3    A.  Yes, they are.

04:56PM    4    Q.  Is it the regular course of business for the DEA to make

04:56PM    5    and keep NADDIS reports information on NADDIS numbers?

04:56PM    6    A.  Correct.

04:56PM    7    Q.  And are the people entering that information under an

04:56PM    8    obligation to do so accurately and report the NADDIS

04:56PM    9    information?

04:56PM   10    A.  Yes, sir, they are.

04:56PM   11         **MR. TRIPI:**  Okay.  I'm going to hand you up an

04:56PM   12    exhibit, Government Exhibit 437.  Take a look at that.  Can

04:56PM   13    you see there?

04:56PM   14         **MR. SOEHNLEIN:**  We don't have it.

04:56PM   15         **MR. TRIPI:**  I'll -- I'll bring -- I'll bring it back

04:56PM   16    to you in a second.

04:56PM   17         **MR. SOEHNLEIN:**  Oh, okay.  Thanks.

04:56PM   18         **MR. TRIPI:**  Take a look at that first and then I'll

04:56PM   19    go show it to counsel.

04:57PM   20         **THE WITNESS:**  Yes, sir.

04:57PM   21         **MR. TRIPI:**  I'm just gonna take it and show counsel

04:57PM   22    for a moment.

04:57PM   23         **BY MR. TRIPI:**

04:57PM   24    Q.  So did you see Government Exhibit 437?

04:57PM   25    A.  Yes, sir, I did.

| | | |
|---|---|---|
| 04:57PM | 1 | Q.  Was that something called a NADDIS full report? |
| 04:57PM | 2 | A.  Yes, sir. |
| 04:57PM | 3 | Q.  Is that a document that was made in the ordinary course |
| 04:57PM | 4 | of DEA business? |
| 04:57PM | 5 | A.  Yes, it was. |
| 04:57PM | 6 | Q.  Was it the regular course of DEA business to make and |
| 04:57PM | 7 | keep that record? |
| 04:57PM | 8 | A.  Yes, it is. |
| 04:57PM | 9 | Q.  Were the entries made at or near the time of the -- |
| 04:57PM | 10 | the -- the information recorded in it? |
| 04:57PM | 11 | A.  Yes, they are. |
| 04:57PM | 12 | **MR. TRIPI:**  Judge, the government offers Exhibit 437. |
| 04:58PM | 13 | **MR. SOEHNLEIN:**  No objection. |
| 04:58PM | 14 | **THE COURT:**  Received without objection. |
| 04:58PM | 15 | **MR. TRIPI:**  Thank you. |
| 04:58PM | 16 | **(GOV Exhibit 437 was received in evidence.)** |
| 04:58PM | 17 | **MR. TRIPI:**  Ms. Champoux, can we split the screen.  I |
| 04:58PM | 18 | just -- and I just want to show the first page of 437. |
| 04:58PM | 19 | **BY MR. TRIPI:** |
| 04:58PM | 20 | Q.  Now, before I get to the NADDIS report on the right, |
| 04:58PM | 21 | Exhibit 437, is on the right of the screen, Exhibit 30A is on |
| 04:58PM | 22 | the left of the screen, okay? |
| 04:58PM | 23 | A.  Yes. |
| 04:58PM | 24 | Q.  And on the right, we have a full NADDIS report; do you |
| 04:58PM | 25 | see that? |

04:58PM   1    A.  Yes, sir, I do.

04:58PM   2    Q.  Okay.  Now, you indicated a moment ago NADDIS pending

04:58PM   3    means that information is getting loaded into NADDIS, right?

04:58PM   4    A.  Yes, sir.

04:58PM   5    Q.  Generally speaking, in your experience, does that take a

04:58PM   6    couple days to a week?

04:58PM   7    A.  Yes, that's accurate.

04:58PM   8    Q.  All right.  So it wouldn't take years and years and years

04:58PM   9    for a NADDIS number to be assigned, correct?

04:58PM   10   A.  No, sir, correct.

04:58PM   11   Q.  Now, if we look at the document on the right,

04:59PM   12   Exhibit 437, do you see a NADDIS number and a date of a

04:59PM   13   NADDIS record regarding Peter Gerace?

04:59PM   14   A.  Yes, sir, I do.

04:59PM   15   Q.  What -- what was the date of the NADDIS record for Peter

04:59PM   16   Gerace?

04:59PM   17   A.  The date of record would have been January 16th, 1992.

04:59PM   18   Q.  Okay.  So does that mean in the DEA system, there was

04:59PM   19   information about Mr. Gerace going back all the way to 1992?

04:59PM   20   A.  Yes, sir, it does.

04:59PM   21   Q.  So is -- when Mr. Bongiovanni wrote NADDIS number

04:59PM   22   pending, is that accurate?

04:59PM   23   A.  No, sir.

04:59PM   24          **THE COURT:**  Mr. Tripi, it's just about 5.  Is this a

04:59PM   25   good time to break?

04:59PM    1         **MR. TRIPI:**  Yes, Judge.

04:59PM    2         **THE COURT:**  Okay.  Thank you.

04:59PM    3         So we are now going to break for the weekend.  Please

04:59PM    4    remember my instructions about not discussing any aspect of

04:59PM    5    the case with anyone.  So, over -- this is a long weekend.

04:59PM    6    You're going to be together with family, you'll watching the

04:59PM    7    Bills game.  Somebody's gonna be having a beer next to you and

04:59PM    8    they're going to say, come on, you can tell me about this

05:00PM    9    trial.

05:00PM   10         When they ask you that, remember this face and

05:00PM   11    remember how angry this face is going to look if you talk to

05:00PM   12    anybody about the case, okay?  Don't talk to -- if they --

05:00PM   13    tell them, the judge told us not to, I can't talk about the

05:00PM   14    case, I can't say a word.

05:00PM   15         Don't use -- do any research on your own, including

05:00PM   16    using tools of technology to communicate about the case or to

05:00PM   17    learn anything about the case.

05:00PM   18         If there's any news coverage of the case, don't read

05:00PM   19    or watch or listen to that news coverage, whether it's on TV

05:00PM   20    or the radio or on the internet or in the newspaper, if there

05:00PM   21    is any.  And please remember not to make up your mind about

05:00PM   22    anything until the case has been finally submitted to you.

05:00PM   23         Okay.  Have a great weekend.  Get a good night's

05:00PM   24    sleep on Monday, we will see you Tuesday at 9:30 here.  And

05:00PM   25    drive carefully.  Thanks very much, everybody.

05:00PM    1             (Jury excused at 5:00 p.m.)

05:01PM    2         **THE COURT:** Okay. You can step down, sir. Thank

05:01PM    3 you. We'll see you on Tuesday morning, I'm afraid.

05:01PM    4         **MR. TRIPI:** And Mr. Kasprzyk, I'm just going to say

05:01PM    5 it in front of everybody. I'm not going to talk to you.

05:01PM    6 Don't talk to anybody on our team. If you do, whether at the

05:01PM    7 Bills game, nothing about the case.

05:01PM    8         **THE COURT:** Don't talk to anybody about your

05:01PM    9 testimony at all between now and Tuesday morning. Thank you.

05:01PM   10            (Witness excused at 5:01 p.m.)

  11            (Excerpt concluded at 5:01 p.m.)

  12        *    *    *    *    *    *    *

  16                   **CERTIFICATE OF REPORTER**

  18            In accordance with 28, U.S.C., 753(b), I

  19 certify that these original notes are a true and correct

  20 record of proceedings in the United States District Court for

  21 the Western District of New York on November 7, 2024.

  23                  s/ Ann M. Sawyer

                           Ann M. Sawyer, FCRR, RPR, CRR

  24                  Official Court Reporter

                           U.S.D.C., W.D.N.Y.

  25

1

2                        **TRANSCRIPT INDEX**

3            **EXCERPT - EXAMINATION OF DALE KASPRZYK**

4                        **NOVEMBER 7, 2024**

5

6

7      **W I T N E S S**                              **P A G E**

8      **D A L E    K A S P R Z Y K**                 2

9         DIRECT EXAMINATION BY MR. TRIPI:            2

10       VOIR DIRE EXAMINATION BY MR. SOEHNLEIN:      33

11       CONTINUED DIRECT EXAMINATION BY MR. TRIPI:   34

12

13

14     **E X H I B I T**                              **P A G E**

15     GOV Exhibit 30A                                34

16     GOV Exhibit 437                                60

17

18

19

20

21

22

23

24

25