09:25AM

1
2

                    **UNITED STATES DISTRICT COURT**
                    **WESTERN DISTRICT OF NEW YORK**

3
_____

**UNITED STATES OF AMERICA,**

                                        Case No. 1:19-cr-227
4                    Plaintiff,                    1:23-cr-37
v.                                                    (LJV)

5
**PETER GERACE, JR.,**                   November 20, 2024

6
                    Defendant.
7
_____

            **TRANSCRIPT EXCERPT - EXAMINATION OF ANTHONY CASULLO**
8              **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
                    **UNITED STATES DISTRICT JUDGE**
9

**APPEARANCES:**        **TRINI E. ROSS, UNITED STATES ATTORNEY**
10                      **BY: JOSEPH M. TRIPI, ESQ.**
                            **NICHOLAS T. COOPER, ESQ.**
11                          **CASEY L. CHALBECK, ESQ.**
                        Assistant United States Attorneys
12                      Federal Centre, 138 Delaware Avenue
                        Buffalo, New York 14202
13                      For the Plaintiff

14                      **THE FOTI LAW FIRM, P.C.**
                        **BY: MARK ANDREW FOTI, ESQ.**
15                      16 West Main Street, Suite 100
                        Rochester, New York 14614
16                          And
                        **SOEHNLEIN LAW**
17                      **BY: ERIC MICHAEL SOEHNLEIN, ESQ.**
                        350 Main Street, Suite 2100
18                      Buffalo, New York 14202
                        For the Defendant
19
**PRESENT:**            **KAREN A. CHAMPOUX, USA PARALEGAL**
20                      **BRIAN A. BURNS, FBI SPECIAL AGENT**
                        **MARILYN K. HALLIDAY, HSI SPECIAL AGENT**
21
**LAW CLERK:**          **REBECCA FABIAN IZZO, ESQ.**
22
**COURT CLERK:**        **COLLEEN M. DEMMA**
23
**REPORTER:**           **ANN MEISSNER SAWYER, FCRR, RPR, CRR**
24                      Robert H. Jackson Courthouse
                        2 Niagara Square Buffalo, New York 14202
25                      Ann_Sawyer@nywd.uscourts.gov

|   | |   |
|---|---|---|
| | 1 | (Excerpt commenced at 4:07 p.m.) |
| 04:07PM | 2 | (Jury is present.) |
| 04:07PM | 3 | **THE COURT:**  The government can call its next witness. |
| 04:07PM | 4 | **MR. COOPER:**  I just spilled my water, sorry. |
| 04:07PM | 5 | The government calls Tony Casullo, Judge. |
| 04:07PM | 6 | |
| 04:07PM | 7 | **A N T H O N Y   C A S U L L O**, having been duly called and |
| 04:07PM | 8 | sworn, testified as follows: |
| 04:07PM | 9 | **MR. COOPER:**  May I inquire, Judge? |
| 04:08PM | 10 | **THE COURT:**  Yes. |
| 04:08PM | 11 | |
| 04:08PM | 12 | **DIRECT EXAMINATION BY MR. COOPER:** |
| 04:08PM | 13 | Q.  Good afternoon, sir. |
| 04:08PM | 14 | A.  Good afternoon. |
| 04:08PM | 15 | Q.  Can you introduce yourself to the jury? |
| 04:08PM | 16 | A.  Yes, hi, my name is Anthony Casullo, I was a special |
| 04:08PM | 17 | agent with the DEA for about 23 years. |
| 04:08PM | 18 | Q.  And where do you live currently? |
| 04:08PM | 19 | A.  I currently live in Clarence, New York. |
| 04:08PM | 20 | Q.  How long have you lived in that Clarence, New York area? |
| 04:08PM | 21 | A.  I purchased the house in about 2012.  And then I worked |
| 04:08PM | 22 | in New York City and went back and forth for about two years. |
| 04:08PM | 23 | So, since 2015. |
| 04:09PM | 24 | Q.  Okay.  Is this Western New York area the area where you |
| 04:09PM | 25 | grew up? |

04:09PM  1    A.  Yes.

04:09PM  2    Q.  Where'd you go to high school at?

04:09PM  3    A.  I went to Saint Joe's Collegiate Institute.

04:09PM  4    Q.  You mentioned in the introduction part that you had a

04:09PM  5    career working at the DEA for about 25 years.  We're gonna

04:09PM  6    cover that in a second.  But currently, are you working?

04:09PM  7    A.  Yeah, I do, I am currently working.

04:09PM  8    Q.  What kind of work do you do currently?

04:09PM  9    A.  I work as a subject matter expert, an advisor for a U.S.

04:09PM  10   technology company.  It's a company that's under contract

04:09PM  11   with the U.S. Department of State to provide foreign

04:09PM  12   assistance to foreign governments on law enforcement systems,

04:09PM  13   like case management systems, intelligence systems.

04:09PM  14   Q.  How long have you worked at that job for?

04:09PM  15   A.  Oh, I think about a year and -- about a year and four

04:09PM  16   months, three months.

04:09PM  17   Q.  Okay.  I want to talk with you now about your career in

04:09PM  18   law enforcement.  How did your career in law enforcement

04:10PM  19   start?

04:10PM  20   A.  It started when I graduated from Canisius College, there

04:10PM  21   were some recruiters at my college, one of them being the

04:10PM  22   Immigration Service at the time, which is now Customs and

04:10PM  23   Border Protection.  Excuse me.  And I spoke with one of the

04:10PM  24   individuals there that was at our college, and ultimately

04:10PM  25   about a year later started working as an immigration

| | | |
|---|---|---|
| 04:10PM | 1 | inspector in Toronto, Canada, doing preflight inspections, |
| 04:10PM | 2 | what you see at the border, but we worked in Canada clearing |
| 04:10PM | 3 | flights before they came to the U.S. |
| 04:10PM | 4 | Q.  What year was that that you started doing that work? |
| 04:10PM | 5 | A.  That was December of 1990. |
| 04:10PM | 6 | Q.  Did you eventually end up working at the DEA? |
| 04:10PM | 7 | A.  I did. |
| 04:10PM | 8 | Q.  Okay.  When did you start working at the DEA? |
| 04:10PM | 9 | A.  I was hired by the DEA in July of 1999. |
| 04:10PM | 10 | Q.  Okay.  And when did you ultimately retire at the DEA? |
| 04:10PM | 11 | A.  I retired from DEA in March of 2022. |
| 04:10PM | 12 | Q.  After you -- well, let's, I guess, start here. |
| 04:11PM | 13 | When you switched over to the DEA, did you go through a |
| 04:11PM | 14 | training academy? |
| 04:11PM | 15 | A.  Yes, I did. |
| 04:11PM | 16 | Q.  About how long did that last? |
| 04:11PM | 17 | A.  I believe it was, like, 20 weeks. |
| 04:11PM | 18 | Q.  What office did you start out in after that training |
| 04:11PM | 19 | academy? |
| 04:11PM | 20 | A.  So I was hired out of the Buffalo office.  Graduated from |
| 04:11PM | 21 | the academy, came back to Buffalo for a month, but my |
| 04:11PM | 22 | assignment that I received when I was at the academy was |
| 04:11PM | 23 | Las Vegas, Nevada. |
| 04:11PM | 24 | Q.  So did your work bring you out to Las Vegas? |
| 04:11PM | 25 | A.  Pardon? |

04:11PM  1    Q.  Did your work bring you out to Las Vegas?

04:11PM  2    A.  Yes.  We moved out to Las Vegas in December of 1999.

04:11PM  3    Q.  Can you just describe for the jury, generally, what kind

04:11PM  4    of work you did at the DEA in Las Vegas?

04:11PM  5    A.  Sure.  Generally, there were several different groups, my

04:11PM  6    first assignment was in a gang task force.  So I worked

04:11PM  7    narcotics investigations in a task force with Las Vegas metro

04:12PM  8    police officers, I believe there were three DEA agents and

04:12PM  9    eight Las Vegas metro gang detectives, and we worked

04:12PM  10   narcotics investigations primarily on gang members and gang

04:12PM  11   organizations in the Clark County, Las Vegas area.

04:12PM  12   Q.  After a period of time working as a DEA special agent in

04:12PM  13   the Las Vegas office, did there come a time when you decided

04:12PM  14   to leave the DEA and go to a different federal agency?

04:12PM  15   A.  Yes.

04:12PM  16   Q.  Can you describe that for the jury, please?

04:12PM  17   A.  Sure.  So I was working for the DEA when 9/11 happened.

04:12PM  18   And I applied for DEA and FBI both about the same time.

04:12PM  19       After 9/11, I wanted to work terrorism investigations, I

04:12PM  20   had an interest in doing that because of what happened.  And

04:12PM  21   I ended up calling up the FBI recruiter, reactivated my

04:12PM  22   application, and was hired by the FBI about nine months after

04:12PM  23   9/11.

04:12PM  24   Q.  Okay.  So at that point, had you been working for the DEA

04:13PM  25   for about two, two years or so?

04:13PM    1    A.  Correct.

04:13PM    2    Q.  And maybe two-and-a-half years?

04:13PM    3    A.  Um-hum.  It was about two years, yeah.

04:13PM    4    Q.  Okay.  After that, when you contacted this FBI recruiter,

04:13PM    5    did you leave Las Vegas and go somewhere else?

04:13PM    6    A.  I did.

04:13PM    7    Q.  Where'd you go?

04:13PM    8    A.  So I went to the FBI Academy.  Similar to the DEA

04:13PM    9    Academy, it was 20 -- about 20 weeks in Quantico.  And then I

04:13PM   10    received my assignment when I was in Quantico for

04:13PM   11    Fayetteville, North Carolina.  It was a small resident office

04:13PM   12    of about three -- three or four agents in Fayetteville

04:13PM   13    outside Fort Bragg.

04:13PM   14    Q.  Not trying to be cheeky here, but was Fayetteville, North

04:13PM   15    Carolina your first choice?

04:13PM   16    A.  No.  The division was higher up on my list, which was the

04:13PM   17    Charlotte Division, but Fayetteville, which fell underneath

04:13PM   18    it, wasn't.

04:13PM   19    Q.  Okay.  And just -- just to explain real quick,

04:13PM   20    "division," you say, is that a larger geographical area?

04:13PM   21    A.  Right.  The division is the main office, and then within

04:13PM   22    a division there will be smaller offices.  And Fayetteville

04:14PM   23    is one of the smaller offices of the Charlotte Division for

04:14PM   24    the FBI.

04:14PM   25    Q.  Okay.  And I don't want to spend much time on this, but

04:14PM    1    when you were at the Fayetteville office with the FBI, were

04:14PM    2    you able to do the work that you had hoped to do when you

04:14PM    3    switched over to the FBI?

04:14PM    4    A.   No, I barely worked terrorism investigations.  It was

04:14PM    5    just a smaller office.  We worked mostly violent crime and

04:14PM    6    bank robberies.

04:14PM    7    Q.   Were you happy with the area generally where you were

04:14PM    8    living?

04:14PM    9    A.   No.  We -- I did a house-hunting trip, and wasn't really

04:14PM   10    pleased with the area.  I'd have to commute further away from

04:14PM   11    where I wanted to live, possibly up in Raleigh, it was over

04:14PM   12    an hour.  Long story short, I told my wife to hold off on

04:14PM   13    selling the house, it wasn't somewhere that I wanted to send

04:14PM   14    my kids to school in that area, and we ultimately chose --

04:14PM   15    well, I don't want to get too far ahead of you.

04:14PM   16    Q.   No, that's -- you're doing fine, sir.

04:14PM   17    A.   I ended up staying with the FBI for about a year and a

04:14PM   18    half.  I had two years to go back to DEA.  If I waited longer

04:14PM   19    than two years, I'd have to restart the process again, go to

04:15PM   20    the academy again, and I ended up going back to DEA in

04:15PM   21    Las Vegas after about a year and a half with the FBI.

04:15PM   22    Q.   So after that short stint with the FBI, do you take --

04:15PM   23    you decide to move back to DEA about a year and a half a

04:15PM   24    later?

04:15PM   25    A.   It was about a year and a half.

04:15PM   1   Q.   Okay.  Did you end up going back to the Las Vegas office?

04:15PM   2   A.   Yes.

04:15PM   3   Q.   Now, were you hoping to come back home at some point in

04:15PM   4   your career to work in Western New York?

04:15PM   5   A.   That was our plan initially, to come back at some point.

04:15PM   6   Q.   Okay.  Did you have a wife and kids?

04:15PM   7   A.   I do.  I have a wife and four children.

04:15PM   8   Q.   Okay.  And so, was your goal to kind of get back around

04:15PM   9   near family?

04:15PM   10   A.   It was a goal to come back at some point to raise the

04:15PM   11   kids in the Western New York area.  My family was from

04:15PM   12   Western New York, and my wife's family -- had family in

04:15PM   13   Western New York.

04:15PM   14   Q.   Did that eventually happen, that you were able to switch

04:15PM   15   back to New York?

04:15PM   16   A.   Yes.

04:15PM   17   Q.   Can you explain to the jury how that worked out?

04:15PM   18   A.   Sure.  We finally decided to make the move back.  It was

04:15PM   19   around 2012.  So we stayed out there for a while in

04:16PM   20   Las Vegas, we chose to stay until our kids got to high

04:16PM   21   school.  Then we had wanted to come back and have them do

04:16PM   22   high school in Western New York, we thought the schools are

04:16PM   23   better.  So, at the time I wanted to come back, there were no

04:16PM   24   vacancies in the Buffalo office, which falls under the

04:16PM   25   New York office.  The New York office is a division.

04:16PM      1      So, I was told if I went to New York City for two years

04:16PM      2  and work there, as soon as someone retired in Buffalo or left

04:16PM      3  for another assignment, that I could fill that slot.  And

04:16PM      4  that's what I did.

04:16PM      5  Q.  During the two-year period that you worked in the

04:16PM      6  New York City office, did your family live here in Buffalo?

04:16PM      7  A.  They did.  I had a house here, and I had a small

04:16PM      8  apartment in New Jersey, and kind of went back and forth for

04:16PM      9  a couple years.

04:16PM      10 Q.  What year did you eventually get assigned to the DEA

04:16PM      11 Buffalo resident office?

04:16PM      12 A.  I was assigned to Buffalo, it was September of 2015.

04:16PM      13 Q.  Are there different groups at the DEA Buffalo resident

04:17PM      14 office?

04:17PM      15 A.  Yes.

04:17PM      16 Q.  What are they?

04:17PM      17 A.  They're by number.  There was one group that's D-57, it's

04:17PM      18 called a general enforcement group, meaning that it's mostly

04:17PM      19 agents, DEA agents.  And then there were a few local

04:17PM      20 officers, detectives assigned to that group.

04:17PM      21      And then there's another group called D-58, which is

04:17PM      22 called at task force group, which is kind of like the

04:17PM      23 opposite.  It's primarily detectives and task force officers,

04:17PM      24 local and state officers, and maybe two or three agents in

04:17PM      25 the group.

| 04:17PM | 1 | And then the third group is called a tactical diversion |
| 04:17PM | 2 | squad, which is DEA agents and detectives kind of half and |
| 04:17PM | 3 | half that work mostly, like, pharmaceutical-type cases, |
| 04:17PM | 4 | diversion of controlled substances -- controlled substances |
| 04:17PM | 5 | that are being used illicitly. |
| 04:17PM | 6 | Q.  Okay.  So does the third group, diversion, does that |
| 04:17PM | 7 | focus on, like, pharmacies and doctors offices? |
| 04:17PM | 8 | A.  Yeah.  Mostly. |
| 04:18PM | 9 | Q.  Okay.  The other groups, D-57 and D-58, I want to focus |
| 04:18PM | 10 | on that for just a second. |
| 04:18PM | 11 | You talked about special agents.  Is that the title that |
| 04:18PM | 12 | you had after going through the DEA Academy? |
| 04:18PM | 13 | A.  Correct. |
| 04:18PM | 14 | Q.  Did the DEA also permit members of local law enforcement, |
| 04:18PM | 15 | just as an example, let's say the Erie County Sheriff's |
| 04:18PM | 16 | Office, to become task force officers that worked at the DEA |
| 04:18PM | 17 | building with DEA agents? |
| 04:18PM | 18 | A.  Yes.  And that was my experience. |
| 04:18PM | 19 | Q.  Okay.  And so when we -- when we use the phrase "task |
| 04:18PM | 20 | force officer," is that someone who's primarily employed by a |
| 04:18PM | 21 | local or state law enforcement agency? |
| 04:18PM | 22 | A.  Yes. |
| 04:18PM | 23 | Q.  Can it sometimes even be someone from a different federal |
| 04:18PM | 24 | agency? |
| 04:18PM | 25 | A.  Yeah.  They're called task force agents, but it's |

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

04:18PM   1   essentially the same thing.

04:18PM   2       We have both state and locals at DEA that will work in

04:18PM   3   groups with agents.  And we also have other federal officers

04:18PM   4   from different agencies, whether it's the Customs and Border

04:18PM   5   Protection, ATF, I've worked with FBI, agents from all

04:18PM   6   different agencies.

04:19PM   7   Q.  Okay.  While you were -- strike that.  Let me move ahead

04:19PM   8   here.

04:19PM   9       While you were at the DEA in Las Vegas, did you work with

04:19PM  10   a boss who had some experience working on organized crime

04:19PM  11   cases?

04:19PM  12   A.  I did.

04:19PM  13   Q.  Okay.  And so back when you're in Las Vegas working with

04:19PM  14   that boss, does the opportunity present itself for you to

04:19PM  15   work on organized crime cases?

04:19PM  16   A.  Yes.

04:19PM  17   Q.  Were you interested in that?

04:19PM  18   A.  Yes.

04:19PM  19   Q.  We're gonna pause there for a second and move to a new

04:19PM  20   topic.

04:19PM  21       When you became a special agent the DEA, did you take an

04:19PM  22   oath?

04:19PM  23   A.  Yes, I did.

04:19PM  24   Q.  Generally, what was the promise that you made when you

04:19PM  25   took that oath?

04:19PM  1   A.  To enforce the U.S. drug laws, excuse me, and to protect

04:19PM  2   the U.S. Constitution from all enemies, both foreign and

04:20PM  3   domestic, essentially.

04:20PM  4   Q.  As a DEA special agent when you went through training,

04:20PM  5   were you given trainings on ethics?

04:20PM  6   A.  Yes.

04:20PM  7   Q.  As a DEA special agent, based on your 20-plus years

04:20PM  8   experience, were you supposed to choose who you investigated

04:20PM  9   based on that person's race or ethnicity?

04:20PM  10  A.  No.

04:20PM  11  Q.  Was that prohibited by DEA policy?

04:20PM  12  A.  Yes.

04:20PM  13  Q.  Mr. Casullo, do you know a person by the name of Joseph

04:20PM  14  Bongiovanni?

04:20PM  15  A.  Yes.

04:20PM  16  Q.  How do you know that person?

04:20PM  17  A.  He was a DEA agent that worked in the Buffalo office

04:20PM  18  while I was in the Buffalo office.

04:20PM  19  Q.  Okay.  How long did you work with Joseph Bongiovanni at

04:20PM  20  the Buffalo resident office?

04:20PM  21  A.  When I first went to Buffalo, we were in the both -- we

04:21PM  22  were both in the same group together.  And I was in that

04:21PM  23  group for maybe I don't know, two, two-and-a-half years.

04:21PM  24      And then I went to the task force group that I explained,

04:21PM  25  the D-58 group, I went to that group after group D-57, and

04:21PM    1    then we were in different groups up until I retired.

04:21PM    2    Q.  Okay.  And so would it be -- well, let me start this way.

04:21PM    3        When you arrived at the DEA Buffalo resident office, was

04:21PM    4    Bongiovanni already working there?

04:21PM    5    A.  Yes.

04:21PM    6    Q.  Was it your understanding that he had been working there

04:21PM    7    for quite some time?

04:21PM    8    A.  Yes.

04:21PM    9    Q.  Did there come a time in or around 2019 when he retired

04:21PM   10    from the DEA?

04:21PM   11    A.  Yes.

04:21PM   12    Q.  Okay.  Were you still working there at that time?

04:21PM   13    A.  Yes.

04:21PM   14    Q.  So, would it be fair to say from about 20 -- is it 2015

04:21PM   15    when you started in Buffalo?

04:21PM   16    A.  September of 2015.

04:21PM   17    Q.  So from about September of 2015 until sometime in early

04:21PM   18    2019, did you work together with Joseph Bongiovanni?

04:21PM   19    A.  Yes.

04:21PM   20    Q.  For a portion of that time, were you in the same group?

04:22PM   21    A.  Yes.

04:22PM   22    Q.  Which group was that?

04:22PM   23    A.  D-57.

04:22PM   24    Q.  When you first arrived to the Buffalo office in or around

04:22PM   25    September of 2015, can you describe for this jury, what was

04:22PM | 1 | your relationship like with Bongiovanni?

04:22PM | 2 | A.  I knew of Joe.  I had met him before.  I had come back

04:22PM | 3 | when I worked in Las Vegas to Buffalo to visit family, and

04:22PM | 4 | sometimes I'd meet some of the Buffalo agents out.

04:22PM | 5 | One agent in particular, we both went to the academy

04:22PM | 6 | together, and he moved back to Buffalo before I did.  So I

04:22PM | 7 | met him maybe once or twice over the summer, so I knew who he

04:22PM | 8 | was.

04:22PM | 9 | Q.  Did you guys have problems at that time?

04:22PM | 10 | A.  No.

04:22PM | 11 | Q.  Did you like him, generally?

04:22PM | 12 | A.  Yeah, he was generally a fine person.

04:22PM | 13 | Q.  Okay.  During the time that you worked at the DEA Buffalo

04:22PM | 14 | resident office, did you ever work on investigations with the

04:22PM | 15 | defendant, or with Joseph Bongiovanni?  I'm sorry.

04:22PM | 16 | A.  Yes, we worked as partners on a couple different

04:23PM | 17 | investigations.

04:23PM | 18 | Q.  I'm going to ask a general question first, and then we

04:23PM | 19 | can get into some more specifics.

04:23PM | 20 | Between 2015 when you started and 2019 when Bongiovanni

04:23PM | 21 | retired, did your relationship with him change?

04:23PM | 22 | A.  Yes.

04:23PM | 23 | Q.  Did it change because of things that he said to you?

04:23PM | 24 | A.  Yes.

04:23PM | 25 | Q.  As you sit here today, can you describe for the jury how

04:23PM    1    you feel about Bongiovanni?

04:23PM    2    A.  I went through different feelings over the time that I

04:23PM    3    knew him, starting with getting along, working cases.  And

04:23PM    4    then things changed where -- to the point now I have no

04:23PM    5    feelings about him.

04:23PM    6        I went through a hard time of someone that I trusted to

04:23PM    7    someone that I didn't trust, and was hurt by it, was angry,

04:23PM    8    was sad, was confused.

04:24PM    9        But at this point in my life, I have no feelings

04:24PM   10    whatsoever for him.

04:24PM   11    Q.  Do you know a person by the name of Peter Gerace?

04:24PM   12    A.  Yes.

04:24PM   13    Q.  How do you know that person?

04:24PM   14    A.  I went to high school with Peter Gerace at Saint Joe's,

04:24PM   15    we were both in the same graduating class.

04:24PM   16    Q.  Were you friends with him in high school?

04:24PM   17    A.  We knew each other.  It was a small school.  But we

04:24PM   18    never -- we never hung out.

04:24PM   19    Q.  Have you ever at any point in your life been friends with

04:24PM   20    Peter Gerace?

04:24PM   21    A.  No.

04:24PM   22    Q.  Did you ever go to dinner with him?

04:24PM   23    A.  No.

04:24PM   24    Q.  Did you ever go on double dates together?

04:24PM   25    A.  No.

04:24PM   1   Q.  Did you ever go on vacation together?

04:24PM   2   A.  No.

04:24PM   3   Q.  Do you have a relation or a family member who you know or

04:24PM   4   you believe to be friends with Mr. Gerace?

04:24PM   5   A.  Yes.

04:24PM   6   Q.  Who's that person?

04:25PM   7   A.  My wife's brother is friends with Peter Gerace.

04:25PM   8   Q.  What's that person's name, your wife's brother?

04:25PM   9   A.  Phil Domiano.

04:25PM  10   Q.  Can you describe for the jury, do you have a relationship

04:25PM  11   with Phil Domiano?

04:25PM  12   A.  No.  I did when I dated my wife and we got married.  But

04:25PM  13   things changed after I moved out to Las Vegas with DEA, and

04:25PM  14   to the point that he's not even allowed at my house.

04:25PM  15   Q.  You said when you were dating your wife.  What year?  I'm

04:25PM  16   not trying to make fun, what year was that, though?

04:25PM  17   A.  Oh, well, I was in college.  So, 1987.

04:25PM  18   Q.  Okay.  A long time ago, is that fair to say?

04:25PM  19   A.  A long time ago, yeah.

04:25PM  20   Q.  In 20 -- in 2015 when you moved back to Buffalo, did you

04:25PM  21   have a relationship with Phil Domiano?

04:25PM  22   A.  No.  He lived in Las Vegas, we lived in Buffalo.  And

04:25PM  23   it -- when I first came back, he still visited a few times.

04:25PM  24   And then things changed to the point that he wasn't allowed

04:26PM  25   at our house at all.

04:26PM    1    Q.  Does Mr. Domiano associate with people, and are those

04:26PM    2    associations that you didn't approve of?

04:26PM    3    A.  Yes.

04:26PM    4    Q.  Did Mr. Domiano's relationship with, you know, family

04:26PM    5    relation to your wife, influence your work at the DEA at all?

04:26PM    6    A.  No.

04:26PM    7    Q.  Does his relationship or your belief that he has a

04:26PM    8    relationship with Peter Gerace, did that influence your work

04:26PM    9    at the DEA at all?

04:26PM   10    A.  No.

04:26PM   11         **MR. COOPER:**  I don't think this is in yet, so for the

04:26PM   12    witness only, can we show Government's Exhibit 99?

04:26PM   13         **BY MR. COOPER:**

04:27PM   14    Q.  I want you to take a moment, sir, and look at that, and

04:27PM   15    then when you're finished with the first page, you tell me,

04:27PM   16    and I'll have Ms. Champoux move to the next page.

04:28PM   17         **MR. COOPER:**  Ms. Champoux, can you go to the next

04:28PM   18    page, please?  And the next page.  And the next page.  And the

04:28PM   19    next page.  And the next page.  And the next page.  And the

04:28PM   20    next page.  And the next page.  And the next page.  And the

04:29PM   21    next page.  And the next page.  And the next page.  And the

04:29PM   22    next page.  And I think one more time, the next page.

04:29PM   23         Is that it, Ms. Champoux?  Or is there more?

04:29PM   24         Oh, there you go.  That's the last page.  Thank you.

          25

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

04:29PM  1        **BY MR. COOPER:**

04:29PM  2   Q.  All right.  So, sir, you just looked at the 17 different

04:29PM  3   pages of Government Exhibit 99, do you recognize that?

04:29PM  4   A.  Just a couple paragraphs in the very first page, I -- not

04:29PM  5   the rest of it.

04:29PM  6   Q.  Got it.  So have you seen that first page, have you seen

04:29PM  7   that before today?

04:29PM  8   A.  Part of it, not all of it.

04:29PM  9   Q.  Got it.

04:29PM  10       **MR. COOPER:**  Can you go back to the first page,

04:29PM  11  Ms. Champoux?

04:29PM  12       **BY MR. COOPER:**

04:29PM  13  Q.  Do you recognize what this is?

04:29PM  14  A.  Yes.

04:29PM  15  Q.  Is it a memorandum, a DEA memorandum?

04:29PM  16  A.  Yes.

04:29PM  17  Q.  Does it have the DEA seal on it?

04:30PM  18  A.  Yes.

04:30PM  19  Q.  Do you recognize the names of the people that are written

04:30PM  20  on it?

04:30PM  21  A.  Yes.

04:30PM  22  Q.  Is there a signature on it?

04:30PM  23  A.  Yes.

04:30PM  24  Q.  Do you recognize that?

04:30PM  25  A.  Yes.

04:30PM      1    Q.   Who signed it?

04:30PM      2    A.   Joseph Bongiovanni.

04:30PM      3    Q.   Okay.  And what's the date on it?

04:30PM      4    A.   January 28th, 2019.

04:30PM      5    Q.   And what's the subject of the memo?

04:30PM      6    A.   Communication with Peter Gerace by Special Agent Anthony

04:30PM      7    Casullo and Phil Domiano.

04:30PM      8    Q.   Who's the memorandum addressed to?

04:30PM      9    A.   To Edward A. Orgon, Jr.

04:30PM     10    Q.   Okay.  And did you know that person?

04:30PM     11    A.   Yes.

04:30PM     12    Q.   Who was that person?

04:30PM     13    A.   That's the resident agent in charge, like, the head of

04:30PM     14    the Buffalo DEA office.

04:30PM     15    Q.   And who's the memo from?

04:30PM     16    A.   It's from Joseph Bongiovanni.

04:30PM     17    Q.   Okay.

04:30PM     18         **MR. COOPER:**  Judge, I'd ask if we can come up just

04:30PM     19    briefly on a conversation.

04:30PM     20         **THE COURT:**  Yeah, come on up.

04:30PM     21         **MR. COOPER:**  Thanks.

04:30PM     22         (Sidebar discussion held on the record.)

04:31PM     23         **MR. COOPER:**  I appreciate it.

04:31PM     24         So, Judge --

04:31PM     25         **THE COURT:**  This is it's gonna come in eventually,

04:31PM    1    right?

04:31PM    2         MR. FOTI:  I think the government will probably say

04:31PM    3    that they expect to lay a foundation and that it eventually

04:31PM    4    will.  I -- that may be the case, but at this point, I don't

04:31PM    5    think the foundation is there, but -- so I will object at this

04:31PM    6    point, but I understand if it's allowed in subject to

04:31PM    7    connection.

04:31PM    8         MR. COOPER:  That's what I asked Mark when I walked

04:31PM    9    over, was I anticipated the objection, I'm going to ask the

04:31PM   10    Court to allow it in subject to connection given that we're

04:31PM   11    going to call a witness who can authenticate it.

04:31PM   12         THE COURT:  And you don't object to that?  Because it

04:31PM   13    is -- it's hearsay now, and there's no hearsay within hearsay

04:31PM   14    in it because it's --

04:31PM   15         MR. COOPER:  I'll end up recalling -- with the

04:31PM   16    Court's permission, what I'll end up doing is recalling Tony

04:31PM   17    after this next witness -- or, that witness ultimately

04:32PM   18    testifies, so I'm trying to avoid that.

04:32PM   19         THE COURT:  So tell me about what you want.

04:32PM   20         MR. FOTI:  I'm fine letting it in subject to

04:32PM   21    connection, but if it's not laid, we'll move to strike it.

04:32PM   22         THE COURT:  Absolutely.

04:32PM   23         (End of sidebar discussion.)

04:32PM   24         MR. COOPER:  Judge, with that limited foundation, and

04:32PM   25    based on our conference at the bench, I'm going to ask to move

04:32PM   1   this Government Exhibit 99 in subject to connection.

04:32PM   2        **THE COURT:**  Mr. Foti?

04:32PM   3        **MR. FOTI:**  No objection under those -- with that

04:32PM   4   understanding.

04:32PM   5        **THE COURT:**  Right.  So, so it's moved into evidence

04:32PM   6   subject to connection.

04:32PM   7        What that means, it's kind of provisionally in

04:32PM   8   evidence now.  Mr. Cooper and the government are going to call

04:32PM   9   a witness later on to authenticate this.  It's not been

04:32PM  10   authenticated yet.

04:32PM  11        But based on the representation of the government

04:32PM  12   that they have a witness who's going to authenticate it, we're

04:32PM  13   going to let it in now so as not to waste time.

04:32PM  14        Go ahead.  So it's admitted subject to connection.

04:32PM  15        **(GOV Exhibit 99 was received in evidence.)**

04:32PM  16        **MR. COOPER:**  Before we publish that, Ms. Champoux,

04:32PM  17   can you zoom in on this portion that I'm highlighting here?

04:32PM  18        All the way across.  Yeah, there you go.

04:33PM  19        Nope, just up to where I highlighted.  Thank you.

04:33PM  20        I'd ask that this be published to the jury.

04:33PM  21        **THE CLERK:**  Go ahead.

04:33PM  22        **MR. COOPER:**  Thank you, ma'am.

04:33PM  23        **BY MR. COOPER:**

04:33PM  24   Q.  Mr. Casullo, can you see this on the screen in front of

04:33PM  25   you?

04:33PM  1    A.  Yes.

04:33PM  2    Q.  Is this a portion of that memo that we talked about?

04:33PM  3    A.  Yes.

04:33PM  4    Q.  Is it your understanding that Joseph Bongiovanni wrote

04:33PM  5    this memo?

04:33PM  6    A.  Yes.

04:33PM  7    Q.  Is it about you?

04:33PM  8    A.  Yes.

04:33PM  9    Q.  Let's go through it.

04:33PM  10        This first sentence here, can you read that out loud to

04:33PM  11   the jury?

04:33PM  12   A.  S.A. Joseph Bongiovanni is writing to inform you of

04:33PM  13   information that he has acquired regarding the social

04:34PM  14   affiliation and recent communications with Peter Gerace by

04:34PM  15   Anthony Casullo and S.A. Casullo's brother-in-law, Phil

04:34PM  16   Domiano.

04:34PM  17   Q.  Do you have a social affiliation with Peter Gerace?

04:34PM  18   A.  No.

04:34PM  19   Q.  Is that sentence true?

04:34PM  20   A.  No.

04:34PM  21   Q.  Can you read the next sentence?

04:34PM  22   A.  In that past, S.A. Bongiovanni has verbally informed you,

04:34PM  23   my group supervisor, Greg Yensan, and our ASAC, David T. Zon,

04:34PM  24   of information confirming the friendship of Domiano, Casullo,

04:34PM  25   and Gerace.

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

| | | |
|---|---|---|
| 04:34PM | 1 | Q.  Is that sentence true? |
| 04:34PM | 2 | A.  No. |
| 04:34PM | 3 | Q.  Were you friends with Phil Domiano? |
| 04:34PM | 4 | A.  No. |
| 04:34PM | 5 | Q.  Were you friends with Peter Gerace? |
| 04:34PM | 6 | A.  No. |
| 04:34PM | 7 | Q.  Can you read the next sentence? |
| 04:34PM | 8 | A.  Furthermore, S.A. Bongiovanni has attached information |
| 04:34PM | 9 | confirming that Domiano was a former manager of Pharaoh's |
| 04:34PM | 10 | Gentlemen's Club in Cheektowaga, New York on behalf of |
| 04:34PM | 11 | Gerace. |
| 04:34PM | 12 | Q.  Do you know whether that sentence is true or not? |
| 04:35PM | 13 | A.  Well, I do now. |
| 04:35PM | 14 | Q.  Okay.  How about that bottom portion there, can you read |
| 04:35PM | 15 | that for the jury? |
| 04:35PM | 16 | A.  S.A. Bongiovanni has personally witnessed S.A. Casullo |
| 04:35PM | 17 | meeting and drinking socially with Peter Gerace alone at the |
| 04:35PM | 18 | Big Ditch Brewery and later at Tappo Italian Restaurant in |
| 04:35PM | 19 | Buffalo, New York at approximately at 9:45 p.m. on the |
| 04:35PM | 20 | evening of June 13th, 2015. |
| 04:35PM | 21 | Q.  Is this a memo -- is it your understanding this is a memo |
| 04:35PM | 22 | that Bongiovanni sent to his boss at the DEA? |
| 04:35PM | 23 | A.  Yes. |
| 04:35PM | 24 | Q.  That portion at the bottom there, about drinking socially |
| 04:35PM | 25 | with Peter Gerace alone at the Big Ditch Brewery, is that |

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

24

04:35PM 1 true?

04:35PM 2 A.  No.

04:35PM 3 Q.  Did you drink alone with him at the Tappo Italian

04:35PM 4 Restaurant in Buffalo?

04:35PM 5 A.  No.

04:36PM 6         **MR. COOPER:**  You can take that down, Ms. Champoux.

04:36PM 7         **BY MR. COOPER:**

04:36PM 8 Q.  In June of 2015, did you attend a high school reunion at

04:36PM 9 the Big Ditch Brewery?

04:36PM 10 A.  Yes.

04:36PM 11 Q.  Were you and Peter Gerace the only people at the high

04:36PM 12 school reunion?

04:36PM 13 A.  No.

04:36PM 14 Q.  Was he your friend when you were at the high school

04:36PM 15 reunion?

04:36PM 16 A.  No.

04:36PM 17 Q.  Was Peter Gerace there?

04:36PM 18 A.  Yes.

04:36PM 19 Q.  Can you describe for the jury what happened at that high

04:36PM 20 school reunion with respect to you and Peter Gerace and

04:36PM 21 Joe -- was Joe Bongiovanni there at the high school reunion?

04:36PM 22 A.  No.

04:36PM 23 Q.  Did you see him that night?

04:36PM 24 A.  I did.

04:36PM 25 Q.  Describe for the jury how that night played out.

| | | |
|---|---|---|
| 04:36PM | 1 | A.  So, through the night, Gerace mentioned to me that |
| 04:36PM | 2 | Bongiovanni was across the street at Tappo Restaurant with |
| 04:36PM | 3 | his brother, Anthony. |
| 04:36PM | 4 | Q.  Now, at that time, this is June of 2015, is this a few |
| 04:36PM | 5 | months before you actually come back to Buffalo to start |
| 04:37PM | 6 | working there? |
| 04:37PM | 7 | A.  Yes. |
| 04:37PM | 8 | Q.  And by that time, in June of 2015, did you know |
| 04:37PM | 9 | Bongiovanni to be a special agent with the DEA? |
| 04:37PM | 10 | A.  Yes. |
| 04:37PM | 11 | Q.  When Peter Gerace approached you and told you that |
| 04:37PM | 12 | Bongiovanni was across the street with his brother, did you |
| 04:37PM | 13 | have an interest, generally, in going to see Bongiovanni? |
| 04:37PM | 14 | A.  Initially, I told him no, I didn't want to go over. |
| 04:37PM | 15 | Q.  What happened then? |
| 04:37PM | 16 | A.  He said he's just across the street, it's like literally |
| 04:37PM | 17 | right there.  He asked me two or three times, and I agreed by |
| 04:37PM | 18 | the third time. |
| 04:37PM | 19 | Q.  Did you go across the street? |
| 04:37PM | 20 | A.  Yes. |
| 04:37PM | 21 | Q.  What did you see when you went there? |
| 04:37PM | 22 | A.  So when I walked in, off to the right I saw Bongiovanni |
| 04:37PM | 23 | sitting at the bar with -- I believe it was, like, three -- |
| 04:37PM | 24 | three or four other individuals. |
| 04:37PM | 25 | Q.  Did you recognize any of them? |

04:37PM    1   A.  I recognized Bongiovanni, not the other three or four.

04:38PM    2   Q.  Okay.  We've been talking about Peter Gerace.  Is he in

04:38PM    3   the courtroom today?

04:38PM    4   A.  Yes.

04:38PM    5   Q.  Can you point him out and identify an article of his

04:38PM    6   clothing for the record?

04:38PM    7   A.  Peter Gerace is wearing a blue tie and a gray suit.

04:38PM    8   Going like this, up and down.  That's Peter Gerace with

04:38PM    9   glasses.

04:38PM   10   Q.  Okay.  Which seat is he sitting in?

04:38PM   11   A.  Between his two attorneys.

04:38PM   12       **MR. COOPER:**  Okay.  So the person in the middle,

04:38PM   13   Judge, I'd ask the record to reflect that he's identified the

04:38PM   14   defendant.

04:38PM   15       **THE COURT:**  It does.

04:38PM   16       **BY MR. COOPER:**

04:38PM   17   Q.  And did you say he was nodding his head while you were

04:38PM   18   looking at him?

04:38PM   19   A.  Yes, he was nodding his head up and down.

04:38PM   20   Q.  When the defendant asked you to walk across the street to

04:38PM   21   see Bongiovanni, did he tell you who Bongiovanni was with?

04:38PM   22   A.  Just his brother.

04:38PM   23   Q.  Whose brother?

04:38PM   24   A.  Peter's brother, Anthony.

04:38PM   25   Q.  What happened when you walked across the street with the

04:38PM  1  defendant to see Bongiovanni?

04:38PM  2  A.  When I first walked in, we walked up to them, and Joe

04:39PM  3  turned around and seemed really surprised to see me.

04:39PM  4      He said, what are you doing here?  I thought you were in

04:39PM  5  New York.

04:39PM  6      I said, I am still working in New York.  I came home for

04:39PM  7  my reunion.

04:39PM  8      He looked pretty uncomfortable, almost like he didn't

04:39PM  9  want to be there.  He eventually introduced me to Anthony

04:39PM 10  Gerace, who was sitting next to him.  He introduced me to the

04:39PM 11  three other -- or, I believe, there were three other people,

04:39PM 12  I don't remember who they are, but, yeah, he introduced me to

04:39PM 13  Anthony Gerace and to other people.

04:39PM 14  Q.  And when you say he looked surprised to see you, you

04:39PM 15  mean, like, happy surprised?  Or, like, concerned surprised?

04:39PM 16  A.  Like, uncomfortable.

04:39PM 17  Q.  During your time at the DEA, did you ever initiate or

04:39PM 18  attempt to investigate this defendant, Peter Gerace?

04:39PM 19  A.  Yes.

04:39PM 20  Q.  Did that investigation include an investigation of

04:40PM 21  Pharaoh's Gentlemen's Club?

04:40PM 22  A.  Yes.

04:40PM 23  Q.  Did you get very far in that investigation?

04:40PM 24  A.  No.

04:40PM 25  Q.  Okay.  We're going to cover it in more detail.

04:40PM    1        When you did start looking into this defendant?

04:40PM    2   A.  I believe it was summer of 2016.

04:40PM    3   Q.  What brought Mr. Gerace to your attention as a target of

04:40PM    4   an investigation?

04:40PM    5   A.  There were a few things.

04:40PM    6        It was no secret amongst people that I knew, classmates,

04:40PM    7   that he was a --

04:40PM    8            MR. FOTI:  Objection, Judge.

04:40PM    9            MR. COOPER:  Judge, it's the state of mind.

04:40PM   10            THE COURT:  Hang on.  What's the basis of the

04:40PM   11   objection?

04:40PM   12            MR. FOTI:  Hearsay.  It's -- can we approach?  Sorry.

04:40PM   13            THE COURT:  Yeah, come on up.

04:40PM   14            (Sidebar discussion held on the record.)

04:41PM   15            THE COURT:  The question is why he started

04:41PM   16   investigating Gerace.

04:41PM   17            MR. FOTI:  Anything about it being no secret among

04:41PM   18   what other people thought or knew, I -- I'm not entirely sure

04:41PM   19   what his answer is gonna be.  But I expect that --

04:41PM   20            MR. COOPER:  It's in the transcript from his prior

04:41PM   21   testimony, and we covered this topic at the most recent

04:41PM   22   Bongiovanni trial.  And it's not being offered for the truth

04:41PM   23   of the matter asserted.  There's been --

04:41PM   24            MR. FOTI:  Why he's --

04:41PM   25            MR. COOPER:  Correct.  And there's been repeated

04:41PM    1   cross-examination where the explanation has been, Judge, it

04:41PM    2   goes to the investigation.

04:41PM    3           So I have to be able to explain that he didn't pull

04:41PM    4   it out of his hat, or do it because he didn't like him, that's

04:41PM    5   my job.

04:41PM    6       **THE COURT:**  He certainly can testify to why he

04:41PM    7   started investigating him.  Why can't he testify to why he

04:41PM    8   started investigating him?

04:41PM    9       **MR. FOTI:**  I just -- I have 403 concerns about

04:41PM   10   information that he -- as long as it's -- if -- if there's

04:41PM   11   clarification that --

04:41PM   12       **THE COURT:**  Why don't you lead a little bit more.

04:42PM   13   This witness does have a tendency to go on and volunteer

04:42PM   14   stuff.

04:42PM   15       **MR. COOPER:**  That's Tom Herbst, Judge.

04:42PM   16       **THE COURT:**  Pardon me?

04:42PM   17       (Simultaneous speaking.)

04:42PM   18       **THE COURT:**  So why don't you lead a little bit, and

04:42PM   19   try to keep it narrower.  Ask -- you can lead using anything

04:42PM   20   that you think is appropriate, lead.  But -- but I understand

04:42PM   21   Mr. Foti's concern where he starts with something like there's

04:42PM   22   no secret that.  That would concern me, too.

04:42PM   23       **MR. COOPER:**  Okay.

04:42PM   24       **THE COURT:**  So, so, you can ask questions about why

04:42PM   25   he investigated him, and -- and -- but -- but just try to keep

04:42PM  1   it relatively narrow.  I don't think the subject matter is off

04:42PM  2   limits at all, I think it comes in.  The way you couch it may

04:42PM  3   be problematic.  That's all.  Okay?

04:42PM  4          MR. COOPER:  Yep.  Thanks, Judge.

04:43PM  5          (End of sidebar discussion.)

04:43PM  6          MR. COOPER:  Judge, based on the bench conference,

04:43PM  7   I'm going to ask for a second to find some specific questions

04:43PM  8   to ask.

04:43PM  9          THE COURT:  Absolutely.

04:43PM  10         MR. COOPER:  Just bear with me time-wise for a second

04:43PM  11  here.

04:43PM  12         THE COURT:  And you're withdrawing the last question?

04:43PM  13         MR. COOPER:  Based on the discussion, I'm going to

04:43PM  14  ask some leading specific questions, but I just need a minute.

04:43PM  15         THE COURT:  Yep.

04:43PM  16         MR. COOPER:  Thank you.

04:44PM  17         BY MR. COOPER:

04:44PM  18  Q.  While you were at that high school re --

04:44PM  19      Just answer specifically what I'm asking you.

04:44PM  20      You understand what we're doing here?

04:44PM  21  A.  Yes.

04:44PM  22  Q.  Okay.  While you were at that high school reunion in

04:44PM  23  about June of 2015, did a classmate of yours who worked in

04:44PM  24  law enforcement make statements to you that caused you to be

04:44PM  25  interested in pursuing an investigation of Peter Gerace and

04:44PM  1   Pharaoh's Gentlemen's Club?

04:44PM  2   A.  Yes.

04:44PM  3   Q.  Describe for the jury what that person said to you.

04:45PM  4   A.  He said that Gerace was videotaping everybody in his

04:45PM  5   club.

04:45PM  6   Q.  Did he -- sorry.  So I'd like to be a little more

04:45PM  7   specific than that.  Did he tell you specifically something

04:45PM  8   along the lines of that Gerace had recordings of people with

04:45PM  9   strippers?

04:45PM  10  A.  Something along those lines, yeah.

04:45PM  11  Q.  Okay.  At that same reunion, did you hear other

04:45PM  12  classmates making comments about going to Pharaoh's

04:45PM  13  Gentlemen's Club to use cocaine?

04:45PM  14  A.  Yes.

04:45PM  15  Q.  Is that a social activity that you were interested in

04:45PM  16  participating in?

04:45PM  17  A.  No.

04:45PM  18  Q.  At the time, were you a DEA agent?

04:46PM  19  A.  Yes.

04:46PM  20  Q.  Did it stick in your mind and later materialize in an

04:46PM  21  interest in investigating Peter Gerace?

04:46PM  22  A.  Yes.

04:46PM  23          **MR. COOPER:**  Judge, if we can approach just for one

04:46PM  24  more before I ask it?

04:46PM  25          **THE COURT:**  Absolutely.

04:46PM    1            MR. COOPER:  Thank you.

04:46PM    2            (Sidebar discussion on the record.)

04:46PM    3            THE COURT:  Fine.

04:46PM    4            MR. COOPER:  Actually, no.

04:46PM    5            THE COURT:  Oh.

04:46PM    6            MR. COOPER:  So I want to obviously, I understand

04:46PM    7    that this is Mr. Gerace's trial, and so things that came in in

04:46PM    8    Bongiovanni don't necessarily come in in Gerace.  We've been

04:46PM    9    cautious up to this point in the trial of discussing the

04:46PM   10    defendant's status as a federally convicted felon.  That's

04:47PM   11    something I expect he'll testify he was aware of and that

04:47PM   12    factored into his decision to pursue an investigation of that

04:47PM   13    person.  It's common in law enforcement for that to be

04:47PM   14    something that causes you to look at one target versus

04:47PM   15    another.

04:47PM   16            I don't know, I wanted to come up and discuss it.  I

04:47PM   17    think it goes to the same basis.  If there's a way for me to

04:47PM   18    soften it, they've already heard from Lepiane that he was on

04:47PM   19    federal probation.  I want to front it for you and see where

04:47PM   20    your position is on it.

04:47PM   21            MR. FOTI:  Judge, I think my problem, I understand

04:47PM   22    there's a reason being provided, and I think the reason it's

04:47PM   23    being provided in good faith for why you want to ask about it.

04:47PM   24    But it's also -- that can be the beginning of the target of

04:47PM   25    any investigation.  In any case where somebody has a prior

04:47PM     1    felony, if that factored into the considerations of the

04:47PM     2    investigators, it would become part of the trial.  And that's

04:47PM     3    clearly not the case.

04:48PM     4         THE COURT:  No, but it could add to the equation.  It

04:48PM     5    could be -- it could be, you know, an incremental additional

04:48PM     6    reason.  Again, so the jury knows that he's on release, they

04:48PM     7    know -- they know that he has a conviction of some sort.  Why

04:48PM     8    do you have to give them any more than that?

04:48PM     9         MR. COOPER:  No, that's fine.  I'm just trying to

04:48PM    10    front it because I don't want to have a big blowup.

04:48PM    11         THE COURT:  I thought the pretrial ruling was they

04:48PM    12    could get into the fact that he has a conviction, but they

04:48PM    13    can't get into the fact that he has a felony, so that's what I

04:48PM    14    understood.

04:48PM    15         MR. COOPER:  Okay.

04:48PM    16         THE COURT:  So -- so I don't have a problem with

04:48PM    17    your, again, leading, and using the word "conviction," not

04:48PM    18    using the word "felony."

04:48PM    19         MR. COOPER:  All right.

04:48PM    20         THE COURT:  It's a fine line, but I think may be

04:48PM    21    important.

04:48PM    22         MR. COOPER:  Got it.  Okay.  That's what I'll do.

04:48PM    23         MR. FOTI:  Understood.

04:48PM    24         (End of sidebar discussion.)

04:48PM    25         BY MR. COOPER:

04:48PM    1    Q.  Sir, I'm going to ask you a very specific question, and I

04:48PM    2    want you to give me a yes-or-no answer to this one, okay?

04:48PM    3    A.  Okay.

04:48PM    4    Q.  At that time, were you aware that this defendant had a

04:49PM    5    prior conviction?  Yes or no.

04:49PM    6    A.  Yes.

04:49PM    7    Q.  Okay.  As a law enforcement officer, is that something,

04:49PM    8    generally, that can factor into your analysis of who's a

04:49PM    9    viable target for investigation?

04:49PM   10    A.  Being a prior felon?

04:49PM   11    Q.  Well, being -- having any prior conviction, is that

04:49PM   12    something that can factor into your analysis?

04:49PM   13    A.  Sure.

04:49PM   14         **MR. FOTI:**  Judge, can we approach?

04:49PM   15         **THE COURT:**  Yeah, come on up.

04:49PM   16         (Sidebar discussion on the record.)

04:49PM   17         **THE COURT:**  That wasn't Mr. Cooper's fault.

04:49PM   18         **MR. FOTI:**  Well, it was -- it wasn't, except there is

04:49PM   19    witness prep where that type of thing is supposed to be

04:49PM   20    avoided when we make decisions to keep things out.

04:49PM   21         **THE COURT:**  So I'm going to instruct the jury to

04:49PM   22    disregard the use of the word "felon," and he's testified that

04:49PM   23    he had a conviction, and that's all we know.

04:49PM   24         **MR. FOTI:**  I'd also, I was going to ask for this

04:50PM   25    earlier, if there's going to be a curative instruction, I'd

04:50PM  1   also ask to include a curative instruction letting the jury

04:50PM  2   know that any statements that he testified to from classmates,

04:50PM  3   not being offered for the truth of the matter asserted, that

04:50PM  4   the jury is not to speculate as to anything in regards to

04:50PM  5   whether there's any truthfulness to anything that was said.

04:50PM  6          **THE COURT:**  Talking about drug use at Pharaoh's?

04:50PM  7          **MR. FOTI:**  The drug -- really, the most prejudicial

04:50PM  8   thing is this idea that he's gonna blackmail people with

04:50PM  9   recordings, that he said classmates were telling him that he

04:50PM 10   has videos of people.  I mean --

04:50PM 11          **THE COURT:**  That's being offered for --

04:50PM 12          **MR. COOPER:**  Just for his state of mind.

04:50PM 13          **THE COURT:**  Right.

04:50PM 14          **MR. COOPER:**  And that's -- I've tried to couch my

04:50PM 15   questions in that way.  And that's what I was trying to --

04:50PM 16          **THE COURT:**  Mr. Cooper, I -- I disagree with Mr. Foti

04:50PM 17   that you did anything that at all that caused this.  So

04:50PM 18   believe me, you don't have to defend yourself, okay?

04:50PM 19          **MR. COOPER:**  Okay.

04:50PM 20          **THE COURT:**  So I will give those two curative

04:50PM 21   instructions.  Okay?

04:50PM 22          **MR. FOTI:**  Yes.

04:50PM 23          (End of sidebar discussion.)

04:50PM 24          **THE COURT:**  Okay, folks.  So -- so two things that I

04:50PM 25   want to talk to you about.

USA v Gerace - Casullo - Cooper/Direct - 11/20/24

36

04:51PM  1        One is that the testimony that this witness gave

04:51PM  2   about things that people said to him at the reunion about

04:51PM  3   Mr. Gerace and Pharaoh's, those are being offered only for the

04:51PM  4   witness's state of mind.  Whether those things are true or

04:51PM  5   not, we don't know.  Again, this is pure hearsay.  But it's

04:51PM  6   not really hearsay because when it's offered for somebody's

04:51PM  7   state of mind, the law says that's not hearsay.  Okay?

04:51PM  8        But it's just for his state of mind.  We don't know

04:51PM  9   whether those things are true or not, because it's something

04:51PM  10  that somebody else is saying that that person may have heard,

04:51PM  11  or we don't -- we have no idea how that person knew.

04:51PM  12       That person's not going to testify who said it to

04:51PM  13  Mr. Casullo, so we really don't know whether that's true or

04:51PM  14  not.  We know that he heard it, and we know that that's one of

04:51PM  15  the things that triggered him to do the investigation.  But we

04:51PM  16  don't know whether what he heard is true.  Okay?

04:51PM  17       So that's number 1.

04:51PM  18       Number 2, he just used the word "felon."  We don't

04:51PM  19  know that either.

04:51PM  20       Mr. Cooper asked whether he was convicted, and we

04:51PM  21  know that he was convicted of something, we don't know what he

04:52PM  22  was convicted of.  And again, you're not -- I'm going to

04:52PM  23  strike the testimony about convicted felon, and you're to only

04:52PM  24  understand that Mr. Gerace was convicted of something.  Okay?

04:52PM  25  That's all.

04:52PM    1            Go ahead.

04:52PM    2            **MR. COOPER:**  Thank you, Judge.

04:52PM    3            **BY MR. COOPER:**

04:52PM    4    Q.  So, my question very specifically, does the fact that

04:52PM    5    somebody has a prior conviction, can that weigh on your

04:52PM    6    decision as an investigator to pursue that person?

04:52PM    7    A.  Yes.

04:52PM    8    Q.  Okay.  I think you told me a few moments ago that it was

04:52PM    9    sometime in 2016 when you decided to begin this

04:52PM   10    investigation; is that correct?

04:52PM   11    A.  Yes.

04:52PM   12    Q.  What was the first investigative step that you took?

04:52PM   13    A.  I had a conversation with my supervisor of the group.

04:52PM   14    Q.  Okay.  And is that something that's standard to do?

04:53PM   15    A.  Yeah.  Pretty much.

04:53PM   16    Q.  Okay.  Are you familiar with the word "tolls?"

04:53PM   17    A.  Yes.

04:53PM   18    Q.  Like, T-O-L-L-S?

04:53PM   19    A.  Yes.

04:53PM   20    Q.  What are tolls?

04:53PM   21    A.  Tolls are phone records of communications between two

04:53PM   22    numbers, two people, that show, you know -- there's -- it

04:53PM   23    shows a phone number, it shows a duration, a date, a duration

04:53PM   24    of time.

04:53PM   25    Q.  Okay.  Do toll records -- so, hypothetically, let's say

| | | |
|---|---|---|
| 04:53PM | 1 | John Smith texted you.  Would toll records show what John |
| 04:53PM | 2 | Smith said to you in the text message? |
| 04:53PM | 3 | A.  No.  It doesn't show content. |
| 04:53PM | 4 | Q.  Okay.  And so, if John Smith called you, would a toll |
| 04:53PM | 5 | record indicate what John Smith said to you? |
| 04:53PM | 6 | A.  No. |
| 04:53PM | 7 | Q.  Do toll records list out, kind of like, in an Excel |
| 04:53PM | 8 | spreadsheet form or PDF, do they list out just the existence |
| 04:53PM | 9 | of incoming and outgoing calls? |
| 04:53PM | 10 | A.  Yes. |
| 04:53PM | 11 | Q.  Okay.  Are toll records, subpoenaing them, getting them, |
| 04:53PM | 12 | reviewing them, is that a big part of what you do at the DEA? |
| 04:53PM | 13 | A.  Sure.  It's one of the first steps we take in an |
| 04:54PM | 14 | investigation. |
| 04:54PM | 15 | Q.  Okay.  Is that common for a DEA agent in a drug |
| 04:54PM | 16 | investigation? |
| 04:54PM | 17 | A.  Very common. |
| 04:54PM | 18 | Q.  Why is it common in a drug investigation to subpoena and |
| 04:54PM | 19 | acquire toll records of a target? |
| 04:54PM | 20 | A.  Sure.  The way you're trained, in most drug |
| 04:54PM | 21 | investigations, is that there's the possibility that it may |
| 04:54PM | 22 | be a conspiracy, meaning other people being involved.  People |
| 04:54PM | 23 | that may be suppliers, or couriers, or source of supply that |
| 04:54PM | 24 | supplies drugs. |
| 04:54PM | 25 | So you're trying to identify the possibility of a |

04:54PM 1  conspiracy, and other individuals that might be involved with

04:54PM 2  that criminal activity.

04:54PM 3  Q.  Is it an effective tool in beginning an investigation?

04:54PM 4  A.  Yes.

04:54PM 5  Q.  Is it -- it's not the only thing you do, right?

04:54PM 6  A.  No.

04:54PM 7  Q.  Did you make a determination early on in that

04:54PM 8  investigation into Peter Gerace to subpoena and acquire

04:54PM 9  Mr. Gerace's tolls or phone records?

04:55PM 10 A.  Yes.

04:55PM 11 Q.  Did you discuss that with anybody before you did it?

04:55PM 12 A.  Yes.

04:55PM 13 Q.  Who did you discuss it with?

04:55PM 14 A.  With the group supervisor, Greg Yensan.

04:55PM 15 Q.  Why did you discuss that with your group supervisor, Greg

04:55PM 16 Yensan, before you did it?

04:55PM 17 A.  First, because for me to get a subpoena approved, it

04:55PM 18 would go through him, so I wanted to make him aware of it.

04:55PM 19 Number 1.

04:55PM 20    And number 2, I was aware that Joseph Bongiovanni, I

04:55PM 21 believed that he was friends with Peter Gerace, so I wanted

04:55PM 22 to give him a heads-up that if I pulled phone records that it

04:55PM 23 was possible that Joseph Bongiovanni's phone number may show

04:55PM 24 up in the phone records.

04:55PM 25 Q.  At that time, did you have any problem with Joe

04:55PM    1    Bongiovanni?

04:55PM    2    A.  No.  No.

04:55PM    3    Q.  Earlier you described that when you started working at

04:55PM    4    DEA, the relationship was fine, you worked on cases together.

04:55PM    5    Was that the status at the time in 2016 when you acquired the

04:55PM    6    toll records?

04:55PM    7    A.  Yes.

04:55PM    8    Q.  Were you trying to get Bongiovanni in trouble?

04:56PM    9    A.  No.

04:56PM    10   Q.  Did you eventually obtain a subpoena return that gave you

04:56PM    11   Mr. Gerace's phone records?

04:56PM    12   A.  Yes.

04:56PM    13   Q.  Is that for all time, or for a limited period of time?

04:56PM    14   A.  It's -- you can detail the timeframe that you want phone

04:56PM    15   records.  And it's typically 30 months is what it typically

04:56PM    16   is.  You can change it beyond that, beyond that if you want,

04:56PM    17   but it may take longer for the records to come back.  But

04:56PM    18   typically, like, it defaults to 30 days.

04:56PM    19   Q.  Okay.  So during your answer, you said 30 months and 30

04:56PM    20   days.

04:56PM    21   A.  I'm sorry.

04:56PM    22   Q.  That's okay.

04:56PM    23   A.  Yep.

04:56PM    24   Q.  Which one is it?

04:56PM    25   A.  It's 30 days, I'm sorry.  Not 30 months.

04:56PM  1   Q.   Okay.  So a month -- 30 months?  30 days, is that the

04:56PM  2   standard length of time that you get back?

04:56PM  3   A.   Yes.

04:56PM  4   Q.   And you can ask for more or less if you want to?

04:56PM  5   A.   Correct.

04:56PM  6   Q.   When you got Mr. Gerace's phone records back, did you

04:56PM  7   recognize the phone number of anybody that Gerace had been in

04:56PM  8   contact with?

04:56PM  9   A.   Yes.

04:56PM  10  Q.   Who?

04:56PM  11  A.   Joseph Bongiovanni.

04:57PM  12  Q.   When you saw that Bongiovanni had been in contact with

04:57PM  13  Mr. Gerace, and vice versa, what did you do?

04:57PM  14  A.   Before when I explained to my supervisor that

04:57PM  15  Bongiovanni's number might be with the phone records, he told

04:57PM  16  me to subpoena the numbers and to see if that number was in

04:57PM  17  the phone records, and if was, to bring him the records.

04:57PM  18  Q.   Did you follow that instruction from your boss?

04:57PM  19  A.   And that's exactly what I did.

04:57PM  20  Q.   Okay.

04:57PM  21           **THE COURT:**  Mr. Cooper, is this a good time to --

04:57PM  22           **MR. COOPER:**  Yeah, I'm certainly not finishing, so --

04:57PM  23           **THE COURT:**  Okay.  So, folks, we were going to break

04:57PM  24  for the day.  Remember my instructions about not communicating

04:57PM  25  about the case with anyone.  Don't use tools --

04:57PM   1          I know you're getting sick of hearing me, but I'm

04:57PM   2     going to do it every day, twice a day, because it's so darn

04:57PM   3     important.

04:57PM   4          So don't use tools of technology to research the case

04:57PM   5     or to communicate about the case with anyone.  Don't read or

04:57PM   6     watch or listen to any news coverage of the case, if there is

04:57PM   7     any, while the case is on trial.  And don't make up your mind

04:58PM   8     about anything until you start deliberating.

04:58PM   9          See you tomorrow morning at 9:30.  Get a good night's

04:58PM   10    sleep.  Drive carefully.  Thank you very much.

04:58PM   11         (Jury excused at 4:58 p.m.)

04:58PM   12         **THE COURT:**  Okay.  Mr. Casullo, I think you know

04:58PM   13    you're not to talk to anybody about your testimony between now

04:58PM   14    and tomorrow morning.

04:58PM   15         **THE WITNESS:**  Yes, Judge.

04:58PM   16         **THE COURT:**  Anything from the defense?

04:58PM   17         **MR. FOTI:**  No.

04:58PM   18         **THE COURT:**  Anything from the government?

04:58PM   19         **MR. COOPER:**  I just have one request, but you can go

04:58PM   20    Tony, if you're good.

04:58PM   21         **THE COURT:**  Yes.

04:58PM   22         (Witness excused at 4:58 p.m.)

          23

          24

          25