1                **UNITED STATES DISTRICT COURT**
                **WESTERN DISTRICT OF NEW YORK**

2

    _____

3  **UNITED STATES OF AMERICA,**

                         Case No. 1:19-cr-227

4            Plaintiff,           1:23-cr-37

    v.                         (LJV)

5

  **PETER GERACE, JR.,**           November 21, 2024

6

             Defendant.

7   _____

   **TRANSCRIPT EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 2**

8        **BEFORE THE HONORABLE LAWRENCE J. VILARDO**

           **UNITED STATES DISTRICT JUDGE**

9

  **APPEARANCES:**     **TRINI E. ROSS, UNITED STATES ATTORNEY**

10              **BY: JOSEPH M. TRIPI, ESQ.**

                 **NICHOLAS T. COOPER, ESQ.**

11                **CASEY L. CHALBECK, ESQ.**

              Assistant United States Attorneys

12             Federal Centre, 138 Delaware Avenue

             Buffalo, New York 14202

13             For the Plaintiff

14             **THE FOTI LAW FIRM, P.C.**

             **BY: MARK ANDREW FOTI, ESQ.**

15             16 West Main Street, Suite 100

             Rochester, New York 14614

16               And

             **SOEHNLEIN LAW**

17             **BY: ERIC MICHAEL SOEHNLEIN, ESQ.**

             350 Main Street, Suite 2100

18             Buffalo, New York 14202

             For the Defendant

19

  **PRESENT:**       **KAREN A. CHAMPOUX, USA PARALEGAL**

20             **BRIAN A. BURNS, FBI SPECIAL AGENT**

             **MARILYN K. HALLIDAY, HSI SPECIAL AGENT**

21

  **LAW CLERK:**     **REBECCA FABIAN IZZO, ESQ.**

22

  **COURT CLERK:**   **COLLEEN M. DEMMA**

23

  **REPORTER:**      **ANN MEISSNER SAWYER, FCRR, RPR, CRR**

24             Robert H. Jackson Courthouse

             2 Niagara Square Buffalo, New York 14202

25             Ann_Sawyer@nywd.uscourts.gov

1          (Excerpt commenced at 9:54 a.m.)

2          (Jury is present.)

09:54AM  3          **THE COURT:**  I remind the witness that he's still

09:54AM  4   under oath.

09:54AM  5          You may continue, Mr. Cooper.

09:54AM  6          **MR. COOPER:**  Thank you, Judge.

09:54AM  7

09:54AM  8   **A N T H O N Y   C A S U L L O**, having been previously duly

09:54AM  9   called and sworn, continued to testify as follows:

09:54AM  10

09:54AM  11          **(CONT'D) DIRECT EXAMINATION BY MR. COOPER:**

09:54AM  12  Q.  I think where we left off yesterday, Mr. Casullo, was we

09:54AM  13  were talking about returning -- receiving a return for

09:54AM  14  Peter -- Peter Gerace's phone records, and going to your boss

09:55AM  15  with those results; do you remember that?

09:55AM  16  A.  Yes.

09:55AM  17  Q.  Okay.  Was Bongiovanni's phone number present in the toll

09:55AM  18  records for Peter Gerace's phone?

09:55AM  19  A.  Yes.

09:55AM  20  Q.  Did you advise your supervisor that that was the case?

09:55AM  21  A.  Yes.

09:55AM  22  Q.  Okay.  Did you receive guidance or a directive from your

09:55AM  23  supervisor at that time?

09:55AM  24  A.  Yes.

09:55AM  25  Q.  What did he direct you?

09:55AM   1   A.   He just directed me to continue on with the

09:55AM   2   investigation, and that he was going to be having a

09:55AM   3   conversation with Bongiovanni.

09:55AM   4   Q.   Okay.   Earlier you described that in the beginning of

09:55AM   5   your time at the DEA Buffalo resident office, you had a

09:55AM   6   professional -- friendly relationship with Bongiovanni.   Did

09:55AM   7   that change after you subpoenaed Peter Gerace's phone

09:55AM   8   records?

09:55AM   9   A.   Yes.

09:55AM   10  Q.   Did it change after you brought the fact that

09:56AM   11  Bongiovanni's phone number was present in those records to

09:56AM   12  the attention of your supervisor?

09:56AM   13  A.   Yes.

09:56AM   14  Q.   How so?

09:56AM   15  A.   He was basically ignoring me in the office, wouldn't talk

09:56AM   16  to me.   I could tell that he was upset.

09:56AM   17  Q.   Was it obvious to you?

09:56AM   18  A.   Very obvious.   We had just worked together on a long

09:56AM   19  investigation for eight months, and his behavior was

09:56AM   20  completely different.

09:56AM   21  Q.   Did that make you kind of, you know, uncomfortable for

09:56AM   22  lack of a better word in the workplace?

09:56AM   23  A.   Oh, it did, absolutely.

09:56AM   24  Q.   What, if anything, did you do in response to that?

09:56AM   25  A.   I asked him if he'd be willing to talk to me privately in

09:56AM 1    one of our conference rooms.

09:56AM 2    Q.  Did that happen at the Electric Tower DEA office?

09:56AM 3    A.  Yes.

09:56AM 4    Q.  Okay.  When you asked Bongiovanni if he'd be willing to

09:56AM 5    talk to you privately in a conference room, did he respond?

09:56AM 6    A.  He agreed.

09:56AM 7    Q.  Where'd you go?

09:56AM 8    A.  To that conference room, we have a conference room at the

09:57AM 9    DEA office, it's kind of, it's between the two groups, and

09:57AM 10   it's basically just adjacent to where my group sat.

09:57AM 11   Q.  Now if you -- excuse me.  If you subpoenaed Gerace's

09:57AM 12   phone records around June of 2016, approximately when is this

09:57AM 13   conversation in the conference room with Bongiovanni

09:57AM 14   happening?

09:57AM 15   A.  It was shortly after those phone records came back.

09:57AM 16   Maybe a few days.

09:57AM 17   Q.  Okay.  So we're still talking about the early summer of

09:57AM 18   2016?

09:57AM 19   A.  Yes.

09:57AM 20   Q.  Did you go in the conference room with him?

09:57AM 21   A.  Yes.

09:57AM 22   Q.  Was the door open or closed once you were in there?

09:57AM 23   A.  It was open -- I can't, when we were in there, I can't

09:57AM 24   remember if it was closed when we went in, I think it was

09:57AM 25   open, and then either I closed it or he closed it when we

| | | |
|---|---|---|
| 09:57AM | 1 | went in. |
| 09:57AM | 2 | Q.  Okay.  That's, I guess, the question I'm asking, is once |
| 09:57AM | 3 | you guys go inside, does the door get closed? |
| 09:57AM | 4 | A.  Yes. |
| 09:57AM | 5 | Q.  Is it just the two of you in there? |
| 09:57AM | 6 | A.  Yes. |
| 09:58AM | 7 | Q.  Was that your intention to speak privately with him? |
| 09:58AM | 8 | A.  Yes. |
| 09:58AM | 9 | Q.  Who spoke first to begin the conversation? |
| 09:58AM | 10 | A.  I did. |
| 09:58AM | 11 | Q.  What did you say?  Tell the jury. |
| 09:58AM | 12 | A.  Generally, that I was apologetic, that I wasn't trying to |
| 09:58AM | 13 | get him in trouble, I could tell he was upset, and that that |
| 09:58AM | 14 | was not my intention was to get him in trouble. |
| 09:58AM | 15 | Q.  Did Mr. Bongiovanni respond? |
| 09:58AM | 16 | A.  Yeah, he did. |
| 09:58AM | 17 | Q.  Can you describe for the jury how he responded? |
| 09:58AM | 18 | A.  He was upset.  And he said some things. |
| 09:58AM | 19 | Q.  Explain what you mean when you say he was upset. |
| 09:58AM | 20 | Describe what he looked like, what he was acting like. |
| 09:58AM | 21 | A.  He -- his voice was elevated.  He had an angry look on |
| 09:58AM | 22 | his face.  He was -- he was upset.  He was mad.  He was mad |
| 09:58AM | 23 | at me, he was mad at the situation. |
| 09:58AM | 24 | Q.  Okay.  And after you say to him, hey, I'm not trying to |
| 09:58AM | 25 | get you in trouble, in sum and substance, what are the words |

09:58AM  1   that he says to you?  The first thing he says to you?

09:58AM  2   A.  He said this is bullshit.

09:58AM  3   Q.  Is he saying that in a conversational friendly tone of

09:59AM  4   voice?

09:59AM  5   A.  No, he was still upset.  He was mad.  And, again, he

09:59AM  6   wasn't screaming, but his voice was elevated.

09:59AM  7   Q.  After the defendant says to you this is bullshit, in an

09:59AM  8   elevated voice, who is the next person to speak after that,

09:59AM  9   you or him?

09:59AM  10  A.  He continued to speak.

09:59AM  11  Q.  What did he say?

09:59AM  12  A.  He spontaneously blurted out that that kid called me,

09:59AM  13  referring to Gerace, when a stripper overdosed in his club

09:59AM  14  and I told him, meaning him --

09:59AM  15          **MR. FOTI:**  Objection, Judge.

09:59AM  16          **THE COURT:**  Basis?

09:59AM  17          **MR. FOTI:**  It's hearsay.

09:59AM  18          **MR. COOPER:**  It's a coconspirator statement, Judge.

09:59AM  19          **MR. FOTI:**  No, no, it isn't.  And it's not in

09:59AM  20  furtherance of a conspiracy.

09:59AM  21          **THE COURT:**  Stop.  Stop.  Stop.

09:59AM  22          **MR. TRIPI:**  There has already been a pretrial ruling

09:59AM  23  on this exact conversation, Your Honor.

10:00AM  24          **MR. FOTI:**  Judge, can we -- we should just approach,

10:00AM  25  I think.

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

| 10:00AM | 1 | **THE COURT:**  Yeah, come on up.  Come on up. |
| 10:00AM | 2 | (Sidebar discussion held on the record.) |
| 10:00AM | 3 | **THE COURT:**  This is not a coconspirator statement for |
| 10:00AM | 4 | the conspiracy purposes. |
| 10:00AM | 5 | **MR. FOTI:**  That he's -- that the conversation that |
| 10:00AM | 6 | Mr. Bongiovanni and him are having -- |
| 10:00AM | 7 | **THE COURT:**  Yeah. |
| 10:00AM | 8 | **MR. FOTI:**  -- in regard to -- |
| 10:00AM | 9 | **THE COURT:**  He's trying to talk this guy out of |
| 10:00AM | 10 | prosecuting -- or, out of investigating Gerace. |
| 10:00AM | 11 | **MR. FOTI:**  Any statement along those lines, I guess |
| 10:00AM | 12 | the argument can be made that it's in furtherance. |
| 10:00AM | 13 | But at this point, Mr. Casullo initiated the |
| 10:00AM | 14 | conversation and they're having a conversation about -- about |
| 10:00AM | 15 | whatever he knows about. |
| 10:00AM | 16 | **THE COURT:**  Overruled. |
| 10:00AM | 17 | (Sidebar discussion held on the record.) |
| 10:00AM | 18 | **THE COURT:**  The objection is overruled. |
| 10:00AM | 19 | **MR. COOPER:**  Can you let us know how far we got, |
| 10:00AM | 20 | Ms. Sawyer?  Thank you. |
| 10:00AM | 21 | (The above-requested question was then read by the |
| 10:01AM | 22 | reporter.) |
| 10:01AM | 23 | **BY MR. COOPER:** |
| 10:01AM | 24 | Q.  And I told him, what? |
| 10:01AM | 25 | A.  To get her out of the club. |

10:01AM    1    Q.  Who was saying the words, I told him to get her out of

10:01AM    2    the club?

10:01AM    3    A.  Bongiovanni.

10:01AM    4    Q.  Who's the "him" in that sentence?

10:01AM    5    A.  Gerace.

10:01AM    6    Q.  Was that -- was Gerace the only person up to that point

10:01AM    7    that you were talking about?

10:01AM    8    A.  Yes.

10:01AM    9    Q.  Was the defendant worked up when he said that to you?

10:01AM   10    A.  Yes.

10:01AM   11    Q.  Was he elevated?

10:01AM   12    A.  Same, elevated, worked up.  He was upset.

10:01AM   13            **MS. CHALBECK:**  Nick.

10:01AM   14            **BY MR. COOPER:**

10:01AM   15    Q.  I think I misspoke.  I said "the defendant."  I'm

10:01AM   16    speaking about Bongiovanni.

10:01AM   17        When Bongiovanni's speaking to you, was he elevated?

10:01AM   18    A.  Yes.

10:01AM   19    Q.  Okay.

10:01AM   20            **MR. COOPER:**  Thank you, Casey.

10:02AM   21            **BY MR. COOPER:**

10:02AM   22    Q.  You mentioned that Bongiovanni said to you that kid

10:02AM   23    called me.  Are those the words you recall him using?

10:02AM   24    A.  Yes.

10:02AM   25    Q.  That kid?

10:02AM  1    A.  Yes.

10:02AM  2    Q.  In the context of the conversation that you were a part

10:02AM  3    of, who was "that kid" referring to?

10:02AM  4    A.  Gerace.

10:02AM  5    Q.  Do those words that Bongiovanni said to you in the

10:02AM  6    conference room at DEA stick out in your mind even now eight

10:02AM  7    years later?

10:02AM  8    A.  Oh, it was shocking.

10:02AM  9    Q.  After the defendant told -- or, after Bongiovanni -- I'm

10:02AM  10   sorry -- told you that kid called me when a stripper

10:02AM  11   overdosed and I told him to get her out of the club, what was

10:02AM  12   your immediate reaction when you heard that?

10:02AM  13   A.  Shocked.  Trying process what he had just said.  If he

10:02AM  14   had witnessed -- been part of some conspiracy, some coverup.

10:02AM  15   I'm trying to figure this all out at once because I was so

10:03AM  16   caught off guard when he said it.  It was unsolicited.  He

10:03AM  17   blurted it out.

10:03AM  18       And I went from having a conversation initially thinking

10:03AM  19   of being apologetic, that I wasn't trying to get him involved

10:03AM  20   in something.  Because my belief at the time was maybe he

10:03AM  21   just was careless with who he associated with, or who his

10:03AM  22   friends were, to what he had just said to me -- what I just

10:03AM  23   said.

10:03AM  24       It just was -- it was a shocking thing to hear.

10:03AM  25   Q.  When you walked into the conference room to begin that

10:03AM   1   conversation, were you expecting to hear something like what

10:03AM   2   Bongiovanni said to you?

10:03AM   3   A.  No.  No.  Not at all.

10:03AM   4   Q.  After Bongiovanni said to you that that kid called him

10:03AM   5   when a stripper overdosed at his club and he told him to get

10:03AM   6   her out of there, who spoke next, you or Bongiovanni?

10:04AM   7   A.  He did.  I didn't say anything.

10:04AM   8   Q.  What did he say?

10:04AM   9   A.  He said, isn't he friends with your brother-in-law?

10:04AM  10   Q.  What was his tone of voice when Bongiovanni said to you,

10:04AM  11   isn't he friends with your brother-in-law?

10:04AM  12   A.  It was almost accusatory.

10:04AM  13   Q.  Did you -- who did you believe he was referring to when

10:04AM  14   he said that?  Your brother-in-law?

10:04AM  15   A.  My wife's brother, Phil Domiano.

10:04AM  16   Q.  Okay.  And I'm just gonna kind of work my way through it.

10:04AM  17   In that sentence when Bongiovanni says isn't he friends with

10:04AM  18   your brother-in-law, who is the "he" referring to?

10:04AM  19   A.  Gerace.

10:04AM  20   Q.  Did you respond to that?

10:04AM  21   A.  Yes.

10:04AM  22   Q.  What'd you say?

10:04AM  23   A.  I said, yes, he is.  They are friends.  And my

10:04AM  24   brother-in-law has caused me -- I said, and he has caused me

10:04AM  25   and my wife a lot of problems in the past.

10:04AM  1    Q.  After you said that, who spoke next?

10:04AM  2    A.  He did.

10:05AM  3    Q.  What did -- who's "he?"

10:05AM  4    A.  Bongiovanni.

10:05AM  5    Q.  What did Bongiovanni say when you told him, yeah, you

10:05AM  6    know, he's friends -- yes, my brother-in-law has caused me

10:05AM  7    and my family problems in the past, what did he say next?

10:05AM  8    A.  Something to the effect of it sounds like he's your

10:05AM  9    problem.

10:05AM  10   Q.  Are you Italian, Special Agent Casullo?

10:05AM  11   A.  Italian by descent.  Was my father was Italian, my

10:05AM  12   grandparents were from Italy.  My mother's -- my mother was

10:05AM  13   Italian, so yes.

10:05AM  14   Q.  Special Agent Bongiovanni, did you have an understanding

10:05AM  15   that he was of Italian descent as well?

10:05AM  16   A.  I did have an understanding of that as well, yes.

10:05AM  17   Q.  Did he bring that up during the conversation?

10:05AM  18   A.  Yes, he did.

10:05AM  19   Q.  Can you describe that for the jury, what did he say?

10:05AM  20   A.  He asked me if I hated Italians.

10:05AM  21   Q.  What was his tone of voice when he asked you if you hated

10:05AM  22   Italians?

10:05AM  23   A.  Still almost accusatory, upset.  Yeah.  It was a very,

10:05AM  24   very direct thing that he asked me.

10:05AM  25   Q.  When he asked you if you hated Italians, what did you

10:06AM  1   interpret his meaning to be in the conversation, in the

10:06AM  2   context of the conversation?

10:06AM  3   A.  Sure.  I took that to mean that I was unfairly -- that he

10:06AM  4   didn't want me to target Peter Gerace.  That Peter Gerace is

10:06AM  5   Italian, and -- and why are you targeting other Italians?

10:06AM  6   Like, why would you be that guy doing that?  That's how I

10:06AM  7   took it.

10:06AM  8       You're Italian.  You're gonna target another Italian?

10:06AM  9   That type of thing.

10:06AM  10  Q.  Did that matter to you at all?

10:06AM  11  A.  Did what?

10:06AM  12  Q.  Investigating someone else who was Italian?

10:06AM  13  A.  No.

10:06AM  14  Q.  Did you care about that?

10:06AM  15  A.  No.

10:06AM  16  Q.  In your 20-plus-year career in law enforcement, has that

10:06AM  17  ever mattered to you?

10:06AM  18  A.  No.  And no one has ever said anything like that to me

10:06AM  19  before either.  Ever.

10:06AM  20  Q.  Did you -- did you respond to that when the def -- when

10:06AM  21  Bongiovanni said to you, what, do you hate Italians?

10:06AM  22  A.  I said no.

10:06AM  23  Q.  After you said no, who spoke next?

10:06AM  24  A.  He did.

10:06AM  25  Q.  What did Bongiovanni say next?

10:06AM  1    A.  He said a horrible racial slur.

10:06AM  2    Q.  Okay.  So, I'm not gonna ask you to say the exact words,

10:07AM  3    I'm gonna ask you a -- I'm gonna ask you to recount what

10:07AM  4    Bongiovanni said to you, but you can't use the actual words.

10:07AM  5    So tell the jury what he said to you.

10:07AM  6    A.  He said, we should be investigating black people, but he

10:07AM  7    used the N-word, and he said that we should be investigating

10:07AM  8    Hispanic people, but he used an S-word that was a slur.

10:07AM  9    Q.  When he said that to you, what was Bongiovanni's tone of

10:07AM  10   voice like?

10:07AM  11   A.  He said it quieter.  Not like a whisper, but his voice

10:07AM  12   wasn't as elevated.  It was lower.  It was quieter.

10:07AM  13   Q.  You described earlier when he was making statements to

10:07AM  14   you throughout this conversation, that he was elevated and

10:07AM  15   upset, do you remember describing him being like that?

10:07AM  16   A.  Yes.

10:07AM  17   Q.  When he makes this comment to you using racial slurs that

10:07AM  18   start with the letter N and the letter S talking about who he

10:07AM  19   thinks you should be investigating, did he lower his tone of

10:07AM  20   voice?

10:07AM  21   A.  It -- it again, it wasn't a whisper.  It was almost like

10:08AM  22   he didn't want other people to hear, but we were the only two

10:08AM  23   in the room.

10:08AM  24   Q.  Was it, I guess my question is, was it quieter than

10:08AM  25   earlier parts of the conversation?

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

14

10:08AM     1    A.  Yes.

10:08AM     2    Q.  Were you inside of a federal law enforcement workplace

10:08AM     3    when that conversation is happening?

10:08AM     4    A.  Yes.

10:08AM     5    Q.  When Bongiovanni told you that you should be

10:08AM     6    investigating N-words and S-words, what was your immediate

10:08AM     7    reaction to that?

10:08AM     8    A.  Again, shocked.  Disbelief.  Anger.  That another federal

10:08AM     9    agent would think that I -- or, assume that I would be okay

10:08AM    10    with someone saying that to me.

10:08AM    11        So besides the shock of what he said, the insult to me

10:08AM    12    that I would be okay with that.  That even if he felt that

10:08AM    13    way, that he would say that in front of me.

10:08AM    14    Q.  Who's the next person that spoke after Bongiovanni said

10:08AM    15    that to you?

10:08AM    16    A.  I did.

10:08AM    17    Q.  What did you say?

10:08AM    18    A.  I said, we should be investigating all criminals.

10:08AM    19    Q.  Did he respond to that?  Or did you keep talking?

10:09AM    20    A.  No.  He -- he -- he did go on to say something else.

10:09AM    21    Q.  Okay.  Let's -- we'll pause there for a second.

10:09AM    22        So at this time, in your mind you've described yourself,

10:09AM    23    I think, as shocked and reeling.  Does your, kind of,

10:09AM    24    motivation or -- or drive for what should happen during this

10:09AM    25    conversation change once he says that?

Case 1:19-cr-00227-LJV-MJR    Document 1506    Filed 04/26/25    Page 15 of 154
USA v Gerace - Casullo - Cooper/Direct - 11/21/24

15

10:09AM  1  A.  It's all -- I'm trying to process all of this.  And I'm

10:09AM  2  changing from initially when I went in thinking what I was

10:09AM  3  walking into and what I was trying to address, to at this

10:09AM  4  point, trying to process what he had said earlier, what he

10:09AM  5  just said to me with the racial slurs.  And processing -- it

10:09AM  6  was almost like things that I've learned in law enforcement

10:09AM  7  to stay calm in really bad situations, figure out a way to

10:09AM  8  get out of it, and not alarm him.

10:09AM  9      Because at this point, something's terribly wrong, and I

10:09AM  10  don't want him to know that I feel this way because

10:10AM  11  something's terribly wrong.  And trying to almost hopefully

10:10AM  12  have an opportunity to just get out of that conference room

10:10AM  13  and figure out what the hell I'm gonna do.

10:10AM  14  Q.  In the aftermath of that moment that you just described,

10:10AM  15  did Bongiovanni make some statements to kind of walk back

10:10AM  16  what he had just said?

10:10AM  17  A.  He did.

10:10AM  18  Q.  What did he say?

10:10AM  19  A.  He said that Gerace was more of a white collar criminal,

10:10AM  20  that he was more of a drug user.

10:10AM  21          **MR. FOTI:**  Judge, I'm going to object again.

10:10AM  22          **THE COURT:**  No.  Overruled.

10:10AM  23          **THE WITNESS:**  So, it was almost like he was walking

10:10AM  24  it back.  Which was initially, to me, a relief and an

10:10AM  25  opportunity and a segue to have this -- to get out of this

10:10AM  1  situation.

10:10AM  2          **BY MR. COOPER:**

10:10AM  3  Q.  All right.  Let's stay on that point for one second.

10:11AM  4     At the DEA, as a special agent, is your primary focus

10:11AM  5  investigating white collar criminals?

10:11AM  6  A.  No.

10:11AM  7  Q.  Okay.  Does the DEA primarily investigate crimes like

10:11AM  8  wire fraud or bank fraud?

10:11AM  9  A.  No.

10:11AM  10  Q.  Does the DEA generally pursue investigations against

10:11AM  11  people who are primarily or exclusively drug users?

10:11AM  12  A.  No.

10:11AM  13  Q.  When Bongiovanni said to you that this defendant, Gerace,

10:11AM  14  was more of a white collar type, fraud-type criminal and more

10:11AM  15  of a drug user, did you develop an impression of what

10:11AM  16  Bongiovanni was trying to get you to do?

10:11AM  17  A.  Oh, yeah.  Yes.

10:11AM  18  Q.  Tell them about that.

10:11AM  19  A.  Yeah.  To -- to not investigate Gerace.  He wasn't worth

10:11AM  20  investigating, right?  He's a white collar criminal, he's not

10:11AM  21  a drug trafficker, he's just a user.  He's not a drug

10:11AM  22  trafficker, we shouldn't be doing this.  Why are we wasting

10:11AM  23  our time?

10:11AM  24  Q.  Is that how you interpreted it?

10:11AM  25  A.  Yes.

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

17

| | | |
|---|---|---|
| 10:11AM | 1 | Q.  Did Bongiovanni make statements to you about what he |
| 10:12AM | 2 | would be willing to do if Gerace was, in fact, a drug dealer? |
| 10:12AM | 3 | A.  He did say something. |
| 10:12AM | 4 | Q.  What'd he say? |
| 10:12AM | 5 | A.  He said that if he was dirty, he would nail him to the |
| 10:12AM | 6 | wall. |
| 10:12AM | 7 | Q.  Did you believe that at that point in the conversation? |
| 10:12AM | 8 | A.  No.  No, of course not. |
| 10:12AM | 9 | Q.  Was that, based on your participation in the |
| 10:12AM | 10 | conversation, was that completely inconsistent with |
| 10:12AM | 11 | everything he had said so far? |
| 10:12AM | 12 | A.  It was bizarre.  It was bizarre.  To see someone act the |
| 10:12AM | 13 | way he did initially, to the point and turn this around.  I |
| 10:12AM | 14 | don't know if he thought I would still be okay with what he |
| 10:12AM | 15 | had said. |
| 10:12AM | 16 | **MR. FOTI:**  Objection. |
| 10:12AM | 17 | **THE COURT:**  Sustained.  Just answer the questions, |
| 10:12AM | 18 | please. |
| 10:12AM | 19 | **BY MR. COOPER:** |
| 10:12AM | 20 | Q.  Was it -- I'm going to move on to another question |
| 10:12AM | 21 | Mr. Casullo. |
| 10:12AM | 22 | Did you see that last statement, if he's dirty I'll nail |
| 10:12AM | 23 | him to a wall, did you see that as kind of a way out of the |
| 10:12AM | 24 | conversation in the conference room? |
| 10:12AM | 25 | A.  Yes. |

10:13AM    1    Q.  What happened next?

10:13AM    2    A.  I can't remember if anything was else -- was said

10:13AM    3    relating to that.  But he did go on to say that Gerace's

10:13AM    4    parents were having a 50th wedding anniversary, and his

10:13AM    5    parents were going to be going, Joe Bongiovanni's parents

10:13AM    6    were going to be going to the 50th wedding anniversary.

10:13AM    7    Q.  Did he explain when that was happening?

10:13AM    8    A.  From what I remember it was, like, soon.  I think it was

10:13AM    9    either, like, the next day.  It was, like, very, very soon to

10:13AM   10    when we were talking.

10:13AM   11    Q.  At that point when Bongiovanni is saying that to you, has

10:13AM   12    the temperature lowered a little bit in the conversation?

10:13AM   13    A.  Yes.

10:13AM   14    Q.  Is he still elevated like he was earlier?

10:13AM   15    A.  No.

10:13AM   16    Q.  Had you pushed back and told him I'm continuing my

10:13AM   17    investigation no matter what?  Did you say that to him?

10:13AM   18    A.  No.

10:13AM   19    Q.  And did he kind of cool down?

10:13AM   20    A.  Yes.  Yeah.  He appeared to.

10:14AM   21    Q.  Did you walk out of that room with the impression that

10:14AM   22    Special Agent Bongiovanni did not want you to investigate

10:14AM   23    Peter Gerace?

10:14AM   24    A.  Oh, absolutely.

10:14AM   25    Q.  Fair to say it was a strong impression that you had --

10:14AM    1    A.    Very strong.

10:14AM    2    Q.    -- at that point?

10:14AM    3    A.    Very strong.

10:14AM    4    Q.    At that point, how long had you been a member of the DEA

10:14AM    5    Buffalo resident office?

10:14AM    6    A.    Oh, not even a year.  Eight months, maybe.

10:14AM    7    Q.    How long had Bongiovanni been there?

10:14AM    8    A.    To the best of my knowledge, maybe 18 years.

10:14AM    9    Q.    Up until that point, that day, in the conference room,

10:15AM   10    had anything like that ever happened to you in your DEA

10:15AM   11    career?

10:15AM   12    A.    Not only my DEA career, but my entire law enforcement

10:15AM   13    career, never.  Never.

10:15AM   14    Q.    When you left that conference room after the

10:15AM   15    conversation, did you walk down the hallway and report what

10:15AM   16    happened immediately to your supervisor?

10:15AM   17    A.    No.

10:15AM   18    Q.    Did you eventually report what happened to a DEA

10:15AM   19    supervisor?

10:15AM   20    A.    Yes.

10:15AM   21    Q.    How long after it happened?

10:15AM   22    A.    So that was the summer of 2016.  It was almost -- almost

10:15AM   23    two years.

10:15AM   24    Q.    Did you report it sometime around the summer of 2018?

10:15AM   25    A.    Yes.

10:15AM  1  Q.  I want you to explain to the jury now why you waited two

10:15AM  2  years to tell a DEA supervisor what Joseph Bongiovanni said

10:15AM  3  to you in the conference room.

10:15AM  4  A.  There are numerous reasons.  First, walking out of there,

10:15AM  5  being in shock, trying to figure out as horrible as the

10:16AM  6  racist slurs were, was he involved in some coverup of

10:16AM  7  criminal activity.  Confusion.  How do I handle this?

10:16AM  8      Knowing that if I did report the racist comments, knowing

10:16AM  9  in my experience in law enforcement, sometimes, and it's not

10:16AM 10  uncommon, to get backlash from other agents or officers in

10:16AM 11  the office thinking you're snitching on another agent.  Not

10:16AM 12  being trusted by agents again.  Even management, even

10:16AM 13  management, the backlash possible for management.  Management

10:16AM 14  doesn't want to the have to deal with an internal affairs

10:16AM 15  investigation.

10:16AM 16      And I know it's going right to internal affairs if I say

10:16AM 17  that.  I know, I have that knowledge, that if someone says

10:16AM 18  something like that, that is going to go to an internal

10:16AM 19  affairs investigation.

10:16AM 20      So, as horrible as that is to say, it was almost for

10:16AM 21  myself, knowing that the repercussions of that for me.

10:17AM 22  Q.  Were you worried about being ostracized in an office that

10:17AM 23  you had just gotten assigned to?

10:17AM 24  A.  Yeah, and I had just gotten back to Buffalo, I hadn't

10:17AM 25  even been there a year.  And it took two years of working in

10:17AM 1   New York to even get there.  And I'm thinking I'm here eight

10:17AM 2   months, and all of a sudden I'm gonna be in the middle of

10:17AM 3   this mess.  And I didn't know how to handle it, and I didn't

10:17AM 4   report it to the supervisor.

10:17AM 5   Q.  Did you do the right thing?

10:17AM 6   A.  That is not the right way to handle that.

10:17AM 7   Q.  Looking back, in hind sight now, should you have gone to

10:17AM 8   a supervisor and reported it immediately?

10:17AM 9   A.  Yes.  I should have went through my chain of command and

10:17AM 10  reported that immediately.

10:17AM 11      There was also concern that he was gonna tell Gerace that

10:17AM 12  I was investigating him.  That was a large part of it.

10:17AM 13      Through my whole time -- when I was in there in that

10:17AM 14  office with him and coming out, it was clear in my head at

10:17AM 15  the forefront of it was he's just gonna tell Gerace.

10:17AM 16  Q.  Let's stay on that topic for a second.

10:18AM 17      After that conversation in the conference room with

10:18AM 18  Special Agent Bongiovanni, do you receive an out of the blue,

10:18AM 19  unexpected contact from Peter Gerace?

10:18AM 20  A.  Short time after that, I believe it was a couple weeks, I

10:18AM 21  received a phone call.

10:18AM 22  Q.  Describe that for the jury.

10:18AM 23  A.  I was not at work, I was at home.  I don't remember if it

10:18AM 24  was a weekend.  I got a call on my personal cell phone, not

10:18AM 25  my work cell phone, and it was a 716 number.  I didn't

10:18AM  1   recognize the number, but figured if it was 716 number and

10:18AM  2   it's calling the Vegas number, it's probably someone I know.

10:18AM  3       And I answered it.  And the person on the other end said

10:18AM  4   that they just saw a friend of mine, I think that they were

10:18AM  5   in Ellicottville and they just saw a friend.  And I had no

10:19AM  6   idea who was on the other end saying this.

10:19AM  7   Q.  Okay.  Who was the person that called you?

10:19AM  8   A.  I said, who is this?  He said, it's Gerace.

10:19AM  9   Q.  Did you have the person's phone number saved?

10:19AM  10  A.  No.

10:19AM  11  Q.  Did you recognize the phone number when it called you?

10:19AM  12  A.  No.

10:19AM  13  Q.  Had you ever spoken to Peter Gerace on the phone before

10:19AM  14  that?

10:19AM  15  A.  Peter Gerace has never called me in my entire life up

10:19AM  16  until that point.

10:19AM  17  Q.  Up until just a couple weeks after this conversation with

10:19AM  18  Bongiovanni?

10:19AM  19  A.  Yes.  Ever.

10:19AM  20  Q.  The person that Gerace was telling you on the phone that

10:19AM  21  he saw in Ellicottville, was that person someone you knew or

10:19AM  22  were friends with?

10:19AM  23  A.  The person he was talking about was a close friend of

10:19AM  24  mine that I didn't even know he knew.

10:19AM  25  Q.  Do you know how Peter Gerace got your phone number?

10:19AM     1    A.  Yes.

10:19AM     2    Q.  Can you describe that for the jury.

10:19AM     3    A.  Yes.  So, when I worked in New York City, I would come

10:19AM     4    home back to Buffalo where my family was, where our house is,

10:19AM     5    as frequent as I could.

10:20AM     6         On one of those trips home, I was still actually just

10:20AM     7    pulling into Buffalo after driving for six hours, it was late

10:20AM     8    at night -- not late, but probably about around 9:00 -- I

10:20AM     9    told my wife that I was going to stop at Brennan's Pub on

10:20AM    10    Transit to get some chicken wings before I came home.

10:20AM    11    Q.  Let me pause you right there.  Just give us a time frame.

10:20AM    12    You mentioned this is before you came back to Buffalo.  Would

10:20AM    13    this have been -- what year, you think?

10:20AM    14    A.  So I was in New York City from December '13, so probably

10:20AM    15    would have been somewhere around 2013, '14.

10:20AM    16    Q.  Okay.

10:20AM    17    A.  '14, probably 2014.

10:20AM    18    Q.  Was 2014 about two years earlier than you initiated this

10:20AM    19    investigation into Gerace?

10:20AM    20    A.  Yes.

10:20AM    21    Q.  Okay.  All right.  Continue with the -- the how Gerace

10:20AM    22    got your phone number.

10:20AM    23    A.  So, I told my wife I was gonna go to Brennan's to get

10:20AM    24    chicken wings for my dinner, it was late.

10:20AM    25         She mentioned that her brother was already up there.  So

10:21AM    1    her brother had moved from Las Vegas back to Buffalo at some

10:21AM    2    point while I was in New York City.  And he said -- she said

10:21AM    3    that her brother was up at Brennan's with another friend.

10:21AM    4        And I said, okay.  Well, I'm going there for wings.  And

10:21AM    5    that's what I did.  I went to Brennan's.  And when I walked

10:21AM    6    in, I did see her brother, he was there with another friend

10:21AM    7    of his who I know, as well, from growing up in Kenmore.

10:21AM    8        And while I was there eating my chicken wings, Gerace

10:21AM    9    showed up and walked in.

10:21AM   10    Q.  How did he get your phone number as a result of that?

10:21AM   11    A.  So, when he walked in, which was unexpected to me,

10:21AM   12    because while I was with my wife's brother and the other

10:21AM   13    friend, they never said that Gerace was gonna be showing up.

10:21AM   14    So when he did show up, I was, number 1, surprised, number 2,

10:21AM   15    I was pissed off at her brother that he didn't mention it

10:22AM   16    because he knew I didn't want to be around Peter Gerace, I

10:22AM   17    wouldn't associate with someone like Peter Gerace.

10:22AM   18        But, anyways, I'm in this situation.  I saw Gerace.  We

10:22AM   19    said hi.  I continued to eat my wings, finish my wings.  I

10:22AM   20    was probably there for maybe, I don't know, another 20

10:22AM   21    minutes.  While I was there, my wife called to ask where I

10:22AM   22    was, when I was coming home.

10:22AM   23        I said that I'd be coming home shortly, that I was there

10:22AM   24    with her brother finishing my wings.  And when I hung up the

10:22AM   25    phone, Gerace asked me for my cell phone number.  And I gave

10:22AM    1    it to him.

10:22AM    2        I couldn't think of a reason not to.  He caught me off

10:22AM    3    guard.  It was my personal cell phone, so I gave him my cell

10:22AM    4    phone number.

10:22AM    5    Q.  Did you go to Brennan's that night planning to meet your

10:22AM    6    wife's brother?

10:22AM    7    A.  No.  No.

10:22AM    8    Q.  Did you go to Brennan's that night planning to meet this

10:22AM    9    defendant?

10:22AM   10    A.  No.

10:22AM   11    Q.  Okay.  From that time in 2014 when you provided your cell

10:23AM   12    phone number to the defendant, until the conversation that

10:23AM   13    you had with Bongiovanni in the conference room, did Gerace

10:23AM   14    ever reach out to you and call you on the phone?

10:23AM   15    A.  He never called me on the phone.

10:23AM   16    Q.  Did he ever text you?

10:23AM   17    A.  He did text me once after I gave him the cell phone

10:23AM   18    number.

10:23AM   19    Q.  Describe that for me.

10:23AM   20    A.  I believe it was, again, in 2014, I was actually home

10:23AM   21    again.  It was during -- I think it was 2014, there was a bad

10:23AM   22    storm.  I was home, I didn't have to go back to work for a

10:23AM   23    few days, I was actually shoveling snow.  And I got a text

10:23AM   24    message.  It was from a 716 number, didn't recognize it.  And

10:23AM   25    it said something like, hey, special agent, how's everything

| | | |
|---|---|---|
| 10:23AM | 1 | going in New York? |
| 10:23AM | 2 | And I texted back, who is this? |
| 10:23AM | 3 | And he said, it's Gerace. |
| 10:24AM | 4 | And I said, oh, things are good, Peter.  Things are fine. |
| 10:24AM | 5 | I don't remember what I -- Peter, or Gerace -- yeah, Peter. |
| 10:24AM | 6 | I wouldn't have wrote Gerace.  Things are fine. |
| 10:24AM | 7 | He asked how things were with my family. |
| 10:24AM | 8 | I said, things are fine with my family.  Hope you're |
| 10:24AM | 9 | doing well.  And that was it. |
| 10:24AM | 10 | Q.  Did you carry on months long of text message |
| 10:24AM | 11 | conversations with him? |
| 10:24AM | 12 | A.  No.  No.  And, again, caught off guard, shocked.  I |
| 10:24AM | 13 | remember going upstairs saying, it's weird, Gerace just |
| 10:24AM | 14 | texted me. |
| 10:24AM | 15 | And my wife was kind of, not approving of that, why would |
| 10:24AM | 16 | he text you?  And that was really it at the time. |
| 10:24AM | 17 | Q.  All right.  At any point in your whole life, have you |
| 10:24AM | 18 | been friends with this defendant? |
| 10:24AM | 19 | A.  No. |
| 10:24AM | 20 | Q.  Did you socialize together? |
| 10:24AM | 21 | A.  Never hung out, never went to each other's houses, never |
| 10:24AM | 22 | called each other, never socialized.  No. |
| 10:24AM | 23 | Q.  Can you describe for this jury the context of how you |
| 10:25AM | 24 | ultimately reported to a DEA supervisor the comments that |
| 10:25AM | 25 | Bongiovanni made to you in the conference room? |

10:25AM  1   A.  Explain when that happened?

10:25AM  2   Q.  Explain how it happened, yep.

10:25AM  3   A.  So I was requested to go over to the U.S. Attorney's

10:25AM  4   Office for a meeting.  And I can't remember if they requested

10:25AM  5   for my supervisor to go, but my supervisor did go with me.

10:25AM  6   So me and my supervisor at the time, and I'm in a different

10:25AM  7   group now, not the one from when I was in the group with

10:25AM  8   Bongiovanni, but the task force group.  We both went over to

10:25AM  9   the U.S. Attorney's Office.

10:25AM  10      And while we were at the U.S. Attorney's Office, it was

10:25AM  11  brought to my attention that they had found a report where a

10:25AM  12  girl was found in a parking lot outside of Pharaoh's.

10:25AM  13          **MR. FOTI:**  Objection.

10:25AM  14          **THE COURT:**  Yeah, sustained.

10:26AM  15          **BY MR. COOPER:**

10:25AM  16  Q.  I'm going to ask you some specific questions to try to

10:25AM  17  just tighten up the area that we're covering here.

10:26AM  18      First of all, after that conversation in the conference

10:26AM  19  room with Bongiovanni, did that kind of grind to a halt your

10:26AM  20  investigation into Peter Gerace?

10:26AM  21  A.  The -- the only thing that really progressed initially

10:26AM  22  and after that conversation in the conference room was

10:26AM  23  several things with Anthony Gerace that were brought to my

10:26AM  24  attention, him being a marijuana trafficker.

10:26AM  25  Q.  Okay.  So I'm not asking about things that were brought

| 10:26AM | 1 | to your attention. |
| 10:26AM | 2 | Did you continue after that conversation with Bongiovanni |
| 10:26AM | 3 | to actively pursue an investigation of Peter Gerace, or did |
| 10:26AM | 4 | that conversation kind of beat you back a little bit? |
| 10:26AM | 5 | A.  It slowed things down tremendously. |
| 10:26AM | 6 | Q.  Okay.  'Cuz now we're talking about two years later, I'm |
| 10:26AM | 7 | asking you about how things get brought to the attention of |
| 10:26AM | 8 | your supervisor. |
| 10:26AM | 9 | A.  Right. |
| 10:26AM | 10 | Q.  Is that the summer of 2018? |
| 10:26AM | 11 | A.  Yes. |
| 10:26AM | 12 | Q.  Okay.  And are you made aware that the U.S. Attorney's |
| 10:26AM | 13 | Office is -- is looking for information relating to Peter and |
| 10:26AM | 14 | Anthony Gerace? |
| 10:26AM | 15 | A.  Yes, I was made aware of that. |
| 10:27AM | 16 | Q.  Okay.  After you were made aware of that, did you |
| 10:27AM | 17 | participate in some proffers that were going on with the U.S. |
| 10:27AM | 18 | Attorney's Office and other law enforcement agencies? |
| 10:27AM | 19 | A.  I did participate in a proffer with -- |
| 10:27AM | 20 | Q.  Okay.  Just -- |
| 10:27AM | 21 | A.  Yes. |
| 10:27AM | 22 | Q.  Yep.  Were you informed by the U.S. Attorney's Office to |
| 10:27AM | 23 | look back for historical reporting information regarding |
| 10:27AM | 24 | Peter or Anthony Gerace? |
| 10:27AM | 25 | A.  Yes. |

10:27AM 1    Q.  Okay.  Does that mean go back and look back for old

10:27AM 2    reports in your DEA computer system?

10:27AM 3    A.  Pretty much.  Pretty much, yep.

10:27AM 4    Q.  Were you the only law enforcement agency that was

10:27AM 5    participating at that point with the U.S. Attorney's Office?

10:27AM 6    A.  No.

10:27AM 7    Q.  Okay.  Did you go back and do your part at the DEA to

10:27AM 8    look for historical reporting information on Gerace?

10:27AM 9    A.  Yes.

10:27AM 10   Q.  Did you find a report related to Gerace from back in 2008

10:27AM 11   or '9?

10:27AM 12   A.  I did.

10:27AM 13   Q.  Okay.  Was that your report?

10:27AM 14   A.  No.  It wasn't a report that I wrote.

10:28AM 15   Q.  Where were you in 2009?

10:28AM 16   A.  In 2009, I was in Las Vegas.

10:28AM 17   Q.  Okay.

10:28AM 18   A.  Still.

10:28AM 19   Q.  Whose report was it that you encountered?

10:28AM 20   A.  It was a report written by Joseph Bongiovanni.

10:28AM 21   Q.  Did you provide that report to the U.S. Attorney's

10:28AM 22   Office?

10:28AM 23   A.  Yes.

10:28AM 24   Q.  Why?

10:28AM 25   A.  Because I was requested to see if there were any

10:28AM  1    historical reports, reports of investigation by DEA, on

10:28AM  2    either Peter or Anthony Gerace.

10:28AM  3    Q.  Did you review the contents of the report that

10:28AM  4    Bongiovanni drafted regarding Gerace?

10:28AM  5    A.  Yes, I did.

10:28AM  6    Q.  What was your impression of that report given what you

10:28AM  7    had learned over the course of -- of several years leading up

10:28AM  8    to 2018?

10:28AM  9    A.  That that was a fake report, and he was lying, calling--

10:28AM  10        **MR. FOTI:**  Objection.

10:28AM  11        **THE COURT:**  Overruled.

10:28AM  12        **BY MR. COOPER:**

10:28AM  13   Q.  Go ahead.

10:28AM  14   A.  -- and that he was lying, calling Peter Gerace his

10:29AM  15   informant.

10:29AM  16   Q.  When you looked at it, when you laid eyes on it for the

10:29AM  17   first time, were alarm bells going off in your head?

10:29AM  18   A.  I knew immediately when I read it.  Immediately.

10:29AM  19   Q.  You called it a fake report.  What do you mean by that?

10:29AM  20   A.  Fake in the sense that he was lying in the report.

10:29AM  21        **MR. FOTI:**  Objection.

10:29AM  22        **THE COURT:**  Overruled.

10:29AM  23        **BY MR. COOPER:**

10:29AM  24   Q.  Go ahead.

10:29AM  25   A.  He was lying in the report.  He was calling a friend of

10:29AM  1  his his informant.  He named him by name in the narrative

10:29AM  2  section of a DEA report, which you never do, you only do it

10:29AM  3  by a number.  The report wasn't indexed properly.  There were

10:29AM  4  several things that were wrong about the report.

10:29AM  5          **MR. COOPER:**  Just give me one second.  I'd like to

10:29AM  6  pull up what's in evidence as Government Exhibit 30A.

10:29AM  7          **BY MR. COOPER:**

10:29AM  8  Q.  Can you see this on your screen, sir?

10:30AM  9  A.  Yes.

10:30AM  10 Q.  Do you recognize it?

10:30AM  11 A.  Just give me one moment, please.  Yes.

10:30AM  12 Q.  Is this the fake report that you were referencing a

10:30AM  13 minute ago?

10:30AM  14 A.  Yes.

10:30AM  15 Q.  When Bongiovanni spoke with you in the conference room in

10:30AM  16 2016, did he say, hey, Tony, don't investigate Peter Gerace,

10:30AM  17 he's my confidential source?

10:30AM  18 A.  No.

10:30AM  19 Q.  Did he say, hey, Tony, don't investigate Peter Gerace,

10:30AM  20 he's my source of information?

10:30AM  21 A.  No.

10:30AM  22 Q.  Did he tell you, hey, Peter Gerace, he's provided

10:30AM  23 information in other narcotics investigations, let's work on

10:30AM  24 it together?

10:30AM  25 A.  No.

| | | |
|---|---|---|
| 10:30AM | 1 | Q.  None of that? |
| 10:30AM | 2 | A.  No. |
| 10:30AM | 3 | Q.  When you provided this report, Government Exhibit 30A, to |
| 10:31AM | 4 | the U.S. Attorney's Office, can you describe for the jury how |
| 10:31AM | 5 | that led to you disclosing the information about the |
| 10:31AM | 6 | conversation in the conference room in 2016. |
| 10:31AM | 7 | A.  Could you explain that again? |
| 10:31AM | 8 | Q.  Sure. |
| 10:31AM | 9 | **MR. COOPER:**  Actually, I'm gonna just ask for one |
| 10:31AM | 10 | second, Judge, to try to make sure that we keep an answer |
| 10:31AM | 11 | tight. |
| 10:31AM | 12 | **THE COURT:**  Fine. |
| 10:31AM | 13 | **MR. COOPER:**  Thank you. |
| 10:31AM | 14 | **BY MR. COOPER:** |
| 10:31AM | 15 | Q.  We're gonna try to walk through it chronologically here. |
| 10:31AM | 16 | After you sent that report to the U.S. Attorney's Office, |
| 10:32AM | 17 | did Bongiovanni ever come and approach you about that? |
| 10:32AM | 18 | A.  Yes, he did. |
| 10:32AM | 19 | Q.  Describe that confrontation. |
| 10:32AM | 20 | A.  My partner at the time, Dave Davidzik, who was still |
| 10:32AM | 21 | working in group D-57, he was a task force agent, he was from |
| 10:32AM | 22 | Customs and Border Protection, CBP.  We were partners |
| 10:32AM | 23 | together in D-57.  He gave me a heads-up, because he was |
| 10:32AM | 24 | still working on things related to Gerace while he was in his |
| 10:32AM | 25 | group. |

10:32AM  1    And he said, just to give you a heads-up, Greg, meaning

10:32AM  2  the supervisor, in that group, asked Dave Davidzik why I was

10:32AM  3  over there, and Dave said he told him because Tony found a

10:32AM  4  report where Bongiovanni is calling Gerace his informant.

10:32AM  5    And my old partner told me that Greg had told Bongiovanni

10:32AM  6  that I sent that report to the U.S. Attorney's Office.

10:32AM  7  Q.  So my question is, did Bongiovanni come and confront you

10:33AM  8  about it?

10:33AM  9  A.  So because of that, shortly thereafter, I think it was

10:33AM 10  the same day, Bongiovanni confronted me at my desk.

10:33AM 11  Q.  What was his demeanor like when that happened?

10:33AM 12  A.  He was angry again.

10:33AM 13  Q.  What did he say to you?

10:33AM 14  A.  He said, what is this?  That you sent this bullshit

10:33AM 15  report that I sent to the U.S. Attorney's Office, and wrote

10:33AM 16  years ago, over to the U.S. Attorney's Office.

10:33AM 17  Q.  Was he angry?  Did he appear angry to you that you had

10:33AM 18  provided one of his reports to the U.S. Attorney's Office?

10:33AM 19  A.  He was definitely angry and rattled.

10:33AM 20  Q.  Okay.  Does the DEA work hand in hand with the U.S.

10:33AM 21  Attorney's Office?

10:33AM 22  A.  All of the time.

10:33AM 23  Q.  Is there anything strange or unusual about a DEA special

10:33AM 24  agent sending a DEA report of investigation to a federal

10:33AM 25  prosecutor's office?

10:33AM   1   A.  No, we do it all the time.

10:33AM   2   Q.  I'm going to ask you some specific questions now,

10:34AM       Mr. Casullo.

10:34AM   3

10:34AM   4       In July of 2018, were you at a proffer with an individual

10:34AM   5   named Ron Serio?

10:34AM   6   A.  Yes.

10:34AM   7   Q.  Had Mr. Serio been arrested?

10:34AM   8   A.  Yes.

10:34AM   9   Q.  Was it your understanding that he was arrested by the

10:34AM  10   Erie County Sheriff's Office and the FBI Safe Streets Task

10:34AM  11   Force?

10:34AM  12   A.  Yes.

10:34AM  13   Q.  That was not a DEA investigation; is that correct?

10:34AM  14   A.  No.

10:34AM  15   Q.  Did the U.S. Attorney's Office set up that proffer

10:34AM  16   meeting with Mr. Serio?

10:34AM  17   A.  Yes, they did, they set that up for us.

10:34AM  18   Q.  Okay.  And did the prosecutors tell you or invite you to

10:34AM  19   join that proffer?

10:34AM  20   A.  Yes.  We actually requested it to have it set up in the

10:34AM  21   U.S. Attorney's Office, set that up for us.

10:34AM  22   Q.  Okay.  Did you ever get a chance -- actually, withdrawn.

10:34AM  23       After that proffer, did you attend that actual proffer?

10:34AM  24   A.  I did.

10:34AM  25   Q.  Okay.  After that proffer, did you learn that you could

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

35

10:35AM  1   no longer be a case agent investigating Gerace or Serio?

10:35AM  2   A.  At some point after that, yes.

10:35AM  3   Q.  Okay.  I just want to try to nail down the timeframe

10:35AM  4   here.  That proffer, would that have been around July 20th of

10:36AM  5   2018?

10:36AM  6   A.  Yeah.

10:36AM  7   Q.  Okay.  And after that proffer, approximately two weeks

10:36AM  8   later, in early August of 2018, did you attend a meeting with

10:36AM  9   the U.S. Attorney's Office?

10:36AM  10  A.  Yes.

10:36AM  11  Q.  Who were you there with?

10:36AM  12  A.  My supervisor, Jim McHugh.

10:36AM  13  Q.  Okay.  During that Serio proffer, without getting into

10:36AM  14  anything specifically that was said, did Bongiovanni's name

10:36AM  15  come up during the Serio proffer?

10:36AM  16  A.  Yes.

10:36AM  17  Q.  Okay.  And did his name come up in a way that made him,

10:36AM  18  in your view, a possible subject of an investigation?

10:36AM  19  A.  Yes.

10:36AM  20  Q.  As a result of that, did you attend a meeting on

10:36AM  21  August 1st of 2018 with the U.S. Attorney's Office and Jim

10:36AM  22  McHugh as you described a moment ago?

10:36AM  23  A.  Yes.

10:36AM  24  Q.  During that meeting, did you report what had happened

10:36AM  25  back in July of 2016?

Case 1:19-cr-00227-LJV-MJR    Document 1506    Filed 04/26/25    Page 36 of 154
USA v Gerace - Casullo - Cooper/Direct - 11/21/24

36

| | | |
|---|---|---|
| 10:36AM | 1 | A.  That's when I reported the things that Joe said regarding |
| 10:36AM | 2 | the racial slurs. |
| 10:36AM | 3 | Q.  Was that the first time that you had officially reported |
| 10:36AM | 4 | it to your chain of command? |
| 10:37AM | 5 | A.  To my chain of command, yes. |
| 10:37AM | 6 | Q.  Had you told anyone else about it before that? |
| 10:37AM | 7 | A.  Oh, I told several close friends shortly after it |
| 10:37AM | 8 | happened, what he had said to me, agents that I trusted with |
| 10:37AM | 9 | my life, one being my field training agent that worked in |
| 10:37AM | 10 | Miami, another being an ex-supervisor in Washington, D.C.  A |
| 10:37AM | 11 | couple agents in the office that were close friends of mine, |
| 10:37AM | 12 | one that I worked in with in New York.  Just a handful of |
| 10:37AM | 13 | very close people. |
| 10:37AM | 14 | Q.  Was this conversation in early August of 2018 the first |
| 10:37AM | 15 | time that you reported it to a supervisor in the Buffalo |
| 10:37AM | 16 | resident office? |
| 10:37AM | 17 | A.  Yes. |
| 10:37AM | 18 | Q.  Were you instructed at that point during that August 1st, |
| 10:37AM | 19 | 2018 meeting, that you were going to be essentially walled |
| 10:37AM | 20 | off from investigations into Bongiovanni or Gerace? |
| 10:37AM | 21 | A.  I was told by my office, my resident agent in charge, Ed |
| 10:37AM | 22 | Orgon, shortly after that, that I was no longer to work the |
| 10:38AM | 23 | Gerace investigation. |
| 10:38AM | 24 | **MR. COOPER:**  You can take 30A down please, |
| 10:38AM | 25 | Ms. Champoux. |

10:38AM  1   **BY MR. COOPER:**

10:38AM  2   Q.  The last topic that I want to cover with you is something

10:38AM  3   called DARTS.  Are you familiar with that?

10:38AM  4   A.  Yes.

10:38AM  5   Q.  Can you explain to the jury, I don't think we've spent

10:38AM  6   time on this yet, what is DARTS?

10:38AM  7   A.  So DARTS is a deconfliction system, a DEA deconfliction

10:38AM  8   system.  Meaning that you can query -- you can input phone

10:38AM  9   numbers into this system, along with email addresses, serial

10:39AM 10   numbers from telephones, but mainly it's for telephone

10:39AM 11   numbers.  You can input it into the system to see if other --

10:39AM 12   other agencies or other agents are looking at the same

10:39AM 13   telephone numbers, looking at possibly the same targets.

10:39AM 14   Q.  Does DEA have offices all across the United States of

10:39AM 15   America?

10:39AM 16   A.  Oh, not the just U.S., but globally as well.

10:39AM 17   Q.  Okay.  And do drug traffickers also function across state

10:39AM 18   lines and across country borders?

10:39AM 19   A.  Globally, nationally, yes.

10:39AM 20   Q.  So, does this DARTS deconfliction system allow an agent

10:39AM 21   in a local office like the Buffalo resident office to see if

10:39AM 22   a specific phone number has come up in other areas like

10:39AM 23   Los Angeles, or Honolulu, or anything like that?

10:39AM 24   A.  All the time.

10:39AM 25   Q.  Okay.  And is that a very common system that's used by

10:39AM 1    DEA special agents?

10:39AM 2    A.  I used it daily.

10:39AM 3    Q.  If you were looking into a suspected drug trafficker's

10:39AM 4    phone number, would it be standard practice to put that

10:40AM 5    number into DARTS?

10:40AM 6    A.  It should be.

10:40AM 7    Q.  Okay.  At DEA, were you allowed to investigate people

10:40AM 8    that you were friends with?

10:40AM 9    A.  No.

10:40AM 10   Q.  Okay.  So if you had a close personal friendship with

10:40AM 11   someone, could you be the lead case agent investigating them?

10:40AM 12   A.  No.

10:40AM 13   Q.  How about their family members?

10:40AM 14   A.  No.

10:40AM 15   Q.  Why not?

10:40AM 16   A.  There'd be a conflict of interest.  There would always be

10:40AM 17   a risk of being put in a situation as an agent of being

10:40AM 18   compromised, possibly.

10:40AM 19   Q.  Is DARTS a law enforcement tool?

10:40AM 20   A.  It's a -- DARTS is a law -- DEA law enforcement system.

10:40AM 21   Q.  Okay.  Are you supposed to use it for law enforcement

10:40AM 22   purposes?

10:40AM 23   A.  Official purposes only.  There's actually a warning when

10:40AM 24   you log on every time stating that.

10:40AM 25   Q.  So could you just run your wife's phone number in DARTS

10:40AM    1    for kicks, you know, kicks and giggles or not?

10:41AM    2    A.  Oh, no.  No.  You could get in a lot of trouble for that.

10:41AM    3    Probably fired, actually.

10:41AM    4    Q.  Now, if you uploaded a certain number, let's say John

10:41AM    5    Smith, you put John Smith's phone number in DARTS.  If

10:41AM    6    another agent in a different office had already uploaded that

10:41AM    7    number into DARTS, explain to the jury what would happen.

10:41AM    8    A.  So, if somebody else had already put a number in the

10:41AM    9    system, and then you query the number, it's called a hit,

10:41AM    10    meaning that it finds that number already in the system and

10:41AM    11    it sends an email back to the email account of you as the one

10:41AM    12    who just put it in.  And it also sends an email to the other

10:41AM    13    person that put it in previously.  And it kind of alerts both

10:41AM    14    sides that, hey, there's an overlap here in an investigation.

10:41AM    15        The email will typically contain the case number for both

10:41AM    16    the case that was put in initially and your case.  If they're

10:41AM    17    both DEA agents looking at the same number, there will be a

10:41AM    18    little remarks section where you can view comments, it will

10:41AM    19    also say the agent's name or the DEA analyst's name that

10:42AM    20    initially put the number in, and a contact number.  So, both

10:42AM    21    sides are seeing the same thing.

10:42AM    22    Q.  Are those DARTS deconfliction emails automatically

10:42AM    23    generated by the computer system?

10:42AM    24    A.  Yes.

10:42AM    25          **MR. COOPER:**  For the witness only, Ms. Champoux, can

10:42AM     1    we pull up Government Exhibit 26B, as in bravo?

10:42AM     2              **BY MR. COOPER:**

10:42AM     3    Q.  Can you just -- can you see that, Tony?

10:42AM     4    A.  Yes.

10:42AM     5              **MR. COOPER:**  Can you scroll through, Ms. Champoux, to

10:42AM     6    the next page?  And then the next page.

10:43AM     7              **BY MR. COOPER:**

10:43AM     8    Q.  Do you recognize this three-page document, sir?

10:43AM     9    A.  Yes, I do.

10:43AM    10    Q.  What do you recognize this three-page document to be?

10:43AM    11    A.  This is a DARTS deconfliction.

10:43AM    12    Q.  Okay.  And is it a DARTS deconfliction that involved a

10:43AM    13    phone number that you input into DARTS at some point during

10:43AM    14    your DEA career?

10:43AM    15    A.  Yes.

10:43AM    16    Q.  Okay.  So were you a party essentially to this

10:43AM    17    deconfliction notice?

10:43AM    18    A.  So looking at this, this is the notice from -- I put the

10:43AM    19    number into the system, and when I put the number into the

10:43AM    20    system, it generated the response back finding an overlap and

10:43AM    21    showing me what the overlaps are.  It's one of those emails I

10:43AM    22    described that I receive if it hit on a phone number.

10:43AM    23    Q.  I'm going to ask you some specific questions now, just

10:43AM    24    give me one second.

10:43AM    25        Are DARTS deconfliction notices a DEA official record?

10:44AM     1    A.  Yes.

10:44AM     2    Q.  Okay.  Are they made at or near the time that a DARTS

10:44AM     3    entry is made by an agent or an analyst?

10:44AM     4    A.  It's immediate.

10:44AM     5    Q.  Okay.  Is that record, a DARTS deconfliction, kept in the

10:44AM     6    ordinary course of DEA business?

10:44AM     7    A.  Yes.  In an investigative file, yes.

10:44AM     8    Q.  Okay.  Is the DEA under a duty to make that record in the

10:44AM     9    regular practice of their activity?

10:44AM    10    A.  Oh, daily.

10:44AM    11    Q.  Okay.

10:44AM    12        MR. COOPER:  With that foundation, I'd offer

10:44AM    13    Government Exhibit 26B into evidence.

10:44AM    14        MR. FOTI:  Objection, Judge.

10:44AM    15        THE COURT:  Basis?

10:44AM    16        MR. FOTI:  Hearsay.

10:44AM    17        THE COURT:  Overruled.

10:44AM    18        (GOV Exhibit 26B was received in evidence.)

10:44AM    19        MR. COOPER:  Go to page 1, please, Ms. Champoux.

10:44AM    20    Thank you, ma'am.

10:44AM    21        BY MR. COOPER:

10:44AM    22    Q.  So this is a three-page document, it's the first one

10:45AM    23    we're looking at, so I just want to orient everybody.

10:45AM    24        At the top here, I just highlighted a section.  What are

10:45AM    25    we looking at at the top here?

10:45AM    1    A.   The top, the "from" is who put the number in to generate

10:45AM    2    this deconfliction.  The date and time that that was done.

10:45AM    3    And then the "to" is the overlap that I spoke about.  So

10:45AM    4    anybody else that had that number in the system, that's where

10:45AM    5    the "to" should send up.

10:45AM    6        Because it's basically saying I put the number in, so

10:45AM    7    it's from me.  And it's sending this deconfliction that I

10:45AM    8    generated out to the rest of those people.

10:45AM    9    Q.   Got it.  Earlier I asked you if these DARTS deconfliction

10:45AM   10    emails were auto-generated, and you said yes; is that right?

10:45AM   11    A.   Correct.

10:45AM   12    Q.   Where it says here that the email is from you, would it

10:45AM   13    be fair to say you didn't actually sit down and type this

10:45AM   14    email yourself?

10:45AM   15    A.   No.  Like you said, it's auto-generated.

10:45AM   16    Q.   Okay.  But because you're the person who entered the

10:45AM   17    phone number into DARTS, does it appear that it's coming from

10:46AM   18    you?

10:46AM   19    A.   Correct.  When I log into the system, it automatically

10:46AM   20    has me as the person.

10:46AM   21    Q.   Okay.  "To."  Does that list the people or the parties

10:46AM   22    that have investigative overlap with the number that you put

10:46AM   23    in?

10:46AM   24    A.   Yes.

10:46AM   25    Q.   Okay.  Do you see this email address that I just circled

10:46AM   1   there?

10:46AM   2   A.   I do.

10:46AM   3   Q.   Who's that?

10:46AM   4   A.   Joseph Bongiovanni.

10:46AM   5   Q.   Is he one of the people that had investigative overlap

10:46AM   6   with the number that you put in?

10:46AM   7   A.   Yes.

10:46AM   8   Q.   Okay.

10:46AM   9           MR. COOPER:   And then, Ms. Champoux, if we can zoom

10:46AM  10   in on the bottom portion of the page here, please?

10:46AM  11           BY MR. COOPER:

10:46AM  12   Q.   What are we looking at here, sir?  Just, like, orient us

10:46AM  13   to what's on the page.

10:46AM  14   A.   So, again, at the top, the "to" is who's receiving the

10:47AM  15   overlap.  So the other people that had that number in the

10:47AM  16   system before me.  The "from," meaning me, and then the

10:47AM  17   details that I put it in on that date and time, and my case

10:47AM  18   number, and then contact number and email.  Yep.

10:47AM  19   Q.   So up here in bold, is this your name and contact

10:47AM  20   information?

10:47AM  21   A.   Yes.

10:47AM  22   Q.   And it lists the case number you were working on?

10:47AM  23   A.   Yes.

10:47AM  24           MR. COOPER:   You can zoom out of that, please.  And

10:47AM  25   then scroll to the next page, please.  All right.

10:47AM  1    Let's now zoom in, Ms. Champoux, on that next section

10:47AM  2  right there.

10:47AM  3    **BY MR. COOPER:**

10:47AM  4  Q.  All right.  Special Agent Casullo, we're on page 2, and

10:47AM  5  we've zoomed in on the top half essentially of the page.  Is

10:47AM  6  this what the actual deconfliction itself looks like?

10:47AM  7  A.  Yes.

10:47AM  8  Q.  Where it says Trinity item, and then lists a phone

10:47AM  9  number, what is that?  What is that phone number?

10:47AM  10  A.  That's the number that I would have put into the system.

10:47AM  11  So that's the number I'm querying.

10:48AM  12  Q.  Okay.  Can you see your query or your entry into DARTS

10:48AM  13  listed underneath that phone number ending in 5553?

10:48AM  14  A.  Yes.

10:48AM  15  Q.  When did you make your entry?

10:48AM  16  A.  August 2nd, 2018.

10:48AM  17  Q.  What was the remarks section for your entry?

10:48AM  18  A.  Numbers in contact with marijuana trafficker Anthony

10:48AM  19  Gerace.

10:48AM  20  Q.  Is that the brother of Peter Gerace?

10:48AM  21  A.  Yes.

10:48AM  22  Q.  Was there an investigative overlap with a case that

10:48AM  23  Special Agent Bongiovanni was purported to be working on?

10:48AM  24  A.  Yes.

10:48AM  25  Q.  When was that entry made?

| | | |
|---|---|---|
| 10:48AM | 1 | A.  That was made March 20th, 2013. |
| 10:48AM | 2 | Q.  Okay.  And what was the remarks section for Bongiovanni's |
| 10:49AM | 3 | investigation? |
| 10:49AM | 4 | A.  Number part of ongoing narcotics investigation in contact |
| 10:49AM | 5 | with target number 716-578-5296 per S.A. Bongiovanni. |
| 10:49AM | 6 | MR. COOPER:  You can zoom out of that please, |
| 10:49AM | 7 | Ms. Champoux.  And scroll to the next page. |
| 10:49AM | 8 | BY MR. COOPER: |
| 10:49AM | 9 | Q.  Are these additional -- each of these Trinity items, are |
| 10:49AM | 10 | they additional phone numbers that you were running? |
| 10:49AM | 11 | A.  Yeah, that was the same batch.  I running numerous |
| 10:49AM | 12 | numbers, I call them batches, meaning you're running, say, 20 |
| 10:49AM | 13 | numbers at a time, 15 numbers at a time.  So it's the same |
| 10:49AM | 14 | query. |
| 10:49AM | 15 | Q.  Got it. |
| 10:49AM | 16 | MR. COOPER:  We can take that down, Ms. Champoux. |
| 10:49AM | 17 | Judge, would we be able to take a morning break?  Is |
| 10:50AM | 18 | it too early for that, or -- |
| 10:50AM | 19 | THE COURT:  No, we can take a break now. |
| 10:50AM | 20 | MR. COOPER:  Okay, thank you. |
| 10:50AM | 21 | THE COURT:  Okay, folks, let's take our morning break |
| 10:50AM | 22 | now.  So remember my instructions, don't talk with anybody |
| 10:50AM | 23 | about the case, including each other.  Don't make up your |
| 10:50AM | 24 | mind. |
| 10:50AM | 25 | See you back here in about 15 minutes or so. |

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

| | | |
|---|---|---|
| 10:50AM | 1 | (Jury excused at 10:50 a.m.) |
| 10:50AM | 2 | **THE COURT:**  Anything for the record from the defense? |
| 10:50AM | 3 | **MR. SOEHNLEIN:**  No, thank you, Judge. |
| 10:50AM | 4 | **THE COURT:**  From the government? |
| 10:50AM | 5 | **MS. CHALBECK:**  No, Judge. |
| 10:50AM | 6 | **THE COURT:**  Thank you very much.  See you in a few |
| 10:51AM | 7 | minutes. |
| 10:51AM | 8 | **THE CLERK:**  All rise. |
| 10:51AM | 9 | (Off the record at 10:51 a.m.) |
| 11:11AM | 10 | (Back on the record at 11:11 a.m.) |
| 11:11AM | 11 | (Jury not present.) |
| 11:11AM | 12 | **THE CLERK:**  All rise. |
| 11:11AM | 13 | **THE COURT:**  Please be seated. |
| 11:11AM | 14 | **THE CLERK:**  We are back on the record for the |
| 11:11AM | 15 | continuation of the jury trial in case number 19-cr-227 and |
| 11:11AM | 16 | 23-cr-37, United States of America versus Peter Gerace, Jr. |
| 11:11AM | 17 | All counsel and parties are present. |
| 11:11AM | 18 | **THE COURT:**  Okay.  Anything for the record? |
| 11:11AM | 19 | **MR. COOPER:**  No, thank you. |
| 11:11AM | 20 | **THE COURT:**  You're welcome. |
| 11:11AM | 21 | Anything for the record? |
| 11:11AM | 22 | **MR. FOTI:**  No, Judge. |
| 11:11AM | 23 | **THE COURT:**  Okay.  Can we get the witness back in? |
| 11:11AM | 24 | And let's get the jury back in, please. |
| 11:11AM | 25 | Are you okay? |

| 11:11AM | 1 | **MR. COOPER:**  Yeah, thank you. |
| 11:13AM | 2 | (Jury seated at 11:13 a.m.) |
| 11:13AM | 3 | **THE COURT:**  The record will reflect that all our |
| 11:13AM | 4 | jurors again are present. |
| 11:13AM | 5 | I remind the witness that he's still under oath. |
| 11:13AM | 6 | You may continue, Mr. Cooper. |
| 11:13AM | 7 | **MR. COOPER:**  Thank you, Judge. |
| 11:13AM | 8 | **BY MR. COOPER:** |
| 11:13AM | 9 | Q.  Sir, we left off talking about DARTS deconfliction |
| 11:13AM | 10 | notices, and we looked at 26B, as in bravo, which we moved |
| 11:13AM | 11 | in.  That was from August of 2018. |
| 11:13AM | 12 | Did there come a time later in early 2019, when you |
| 11:13AM | 13 | again -- or, excuse me, when you acquired phone records for |
| 11:13AM | 14 | an individual named Anthony Gerace? |
| 11:13AM | 15 | A.  What timeframe? |
| 11:13AM | 16 | Q.  In early 2019. |
| 11:13AM | 17 | A.  I'd have to -- I'd have to see it. |
| 11:13AM | 18 | Q.  Okay.  Do you recall a burglary occurring at a person |
| 11:13AM | 19 | named Michael Sinatra's house? |
| 11:13AM | 20 | A.  Yes. |
| 11:13AM | 21 | Q.  In relation to that event, did you acquire Anthony |
| 11:13AM | 22 | Gerace's phone records? |
| 11:13AM | 23 | A.  Yes, I did. |
| 11:13AM | 24 | Q.  Okay.  And so, if that burglary happened New Year's Eve |
| 11:13AM | 25 | of 2018, December 31st of '18, would you have gotten Gerace's |

11:14AM      1    phone records sometime shortly after that?

11:14AM      2    A.  Yes.

11:14AM      3    Q.  Okay.  After you subpoenaed Anthony Gerace's phone

11:14AM      4    records, did you put his number into DARTS again?

11:14AM      5    A.  Yes.

11:14AM      6    Q.  Okay.  Upon inputting Anthony Gerace's phone number into

11:14AM      7    DARTS in early 2019, did Bongiovanni approach you?

11:14AM      8    A.  Yes.

11:14AM      9    Q.  What was his demeanor like when he approached you?

11:14AM     10    A.  I remember he came over to my side of the office, because

11:14AM     11    I was in his task force group now, he didn't come directly to

11:14AM     12    my desk.  I believe at the time a Homeland Security agent, my

11:14AM     13    partner, Curtis Ryan, was at my desk.

11:14AM     14        So he came in, looked towards my desk, then he went into

11:14AM     15    the office where the secretaries were, walked around a bit.

11:14AM     16    Appeared to wait for Curtis Ryan to leave, and then came over

11:14AM     17    to my desk.

11:14AM     18    Q.  When he came over to your desk, what happened?

11:14AM     19    A.  He said that he saw that I was running phone records on

11:14AM     20    Anthony Gerace.

11:14AM     21    Q.  Did he say anything else about you running phone records

11:15AM     22    on Anthony Gerace?

11:15AM     23    A.  Yes.  Yeah.  He said that he saw the deconfliction, that

11:15AM     24    he received the deconfliction.  I don't know the exact words

11:15AM     25    that he used, but he saw that I was running the toll records.

11:15AM  1   That his wife was friends with Anthony Gerace and his friends

11:15AM  2   on Facebook.  And that he, Joe, couldn't help in the

11:15AM  3   investigation but he could help through his wife's Facebook

11:15AM  4   account and the friends that she had on Facebook to help me

11:15AM  5   with the investigation.

11:15AM  6   Q.  Did he make comments to you about any drug in particular?

11:15AM  7   A.  Oh, he did.

11:15AM  8   Q.  Tell the jury about that.

11:15AM  9   A.  He made a comment during that conversation that I better

11:15AM  10  hurry up and arrest Anthony Gerace before they make marijuana

11:15AM  11  legal.

11:15AM  12  Q.  Did that statement indicate to you that Bongiovanni

11:15AM  13  believed that Anthony Gerace was involved in marijuana

11:15AM  14  distribution?

11:15AM  15  A.  Based on that comment, he had other comments about other

11:16AM  16  drugs, too.

11:16AM  17  Q.  Okay.  Describe those.

11:16AM  18  A.  Yeah.

11:16AM  19          **MR. FOTI:**  I'm going to object.

11:16AM  20          **THE COURT:**  What's the basis?

11:16AM  21          **MR. FOTI:**  Can we approach?

11:16AM  22          **THE COURT:**  Come on up.

11:16AM  23          (Sidebar discussion held on the record.)

11:16AM  24          **THE COURT:**  You can't just say object, you've got to

11:16AM  25  give me a -- you've got to give me an objection hearsay,

| | | |
|---|---|---|
| 11:16AM | 1 | objection relevance, objection something. |
| 11:16AM | 2 | **MR. FOTI:** Right. I understand, Judge, I'm sorry. |
| 11:16AM | 3 | It's a hearsay objection. I understand |
| 11:16AM | 4 | Mr. Bongiovanni may -- there may be a finding that he is a |
| 11:16AM | 5 | coconspirator, but he's talking about Anthony Gerace. And |
| 11:16AM | 6 | he's talking about evidence that supports Anthony Gerace was |
| 11:16AM | 7 | actually committing a crime, it's not in furtherance of the |
| 11:16AM | 8 | conspiracy. |
| 11:16AM | 9 | **THE COURT:** Yeah. How is this in furtherance of the |
| 11:16AM | 10 | conspiracy? |
| 11:16AM | 11 | **MR. COOPER:** This is what Bongiovanni did over and |
| 11:16AM | 12 | over again with respect to the 2009 FBI. He's getting himself |
| 11:16AM | 13 | involved, inserting himself. He uses that as a tactic to |
| 11:17AM | 14 | solicit information from the other law enforcement officer |
| 11:17AM | 15 | about what they have going on. |
| 11:17AM | 16 | You saw this play out, I think, repeatedly. |
| 11:17AM | 17 | **THE COURT:** Well, sure, but that was the Bongiovanni |
| 11:17AM | 18 | trial. |
| 11:17AM | 19 | **MR. COOPER:** Sure. But I'm just explaining. So the, |
| 11:17AM | 20 | I guess, the first argument that I was responding to is how is |
| 11:17AM | 21 | this in furtherance. And the answer is, just because he's |
| 11:17AM | 22 | forward facing and saying, oh, I can help up through my wife's |
| 11:17AM | 23 | Facebook, what he's really doing is gaining the trust of that |
| 11:17AM | 24 | person, and gaining information about what they're doing, what |
| 11:17AM | 25 | they have. That's the first part. |

11:17AM   1        The second part, with respect to it being Anthony

11:17AM   2    Gerace.  Anthony Gerace is a coconspirator in the Peter Gerace

11:17AM   3    and Bongiovanni conspiracy.  And so, getting involved in Tony

11:17AM   4    Casullo's looking into Anthony's phone records is equally

11:17AM   5    relevant.

11:17AM   6        **THE COURT:**  So we've established Anthony Gerace to be

11:17AM   7    a coconspirator in the Bongiovanni and Peter Gerace

11:17AM   8    conspiracy?

11:17AM   9        **MR. TRIPI:**  Do you want to -- yeah, Judge.  We went

11:17AM   10   through this a little bit at the final pretrial.

11:17AM   11       **THE COURT:**  Okay.

11:18AM   12       **MR. TRIPI:**  I pulled -- I pulled just our exchange.

11:18AM   13   There are several manner and means, it's only three pages, I

11:18AM   14   just thought it would be helpful to --

11:18AM   15       There are several manner and means that talk about

11:18AM   16   shielding that overlap conspiracies one and two, we talked

11:18AM   17   about this.

11:18AM   18       **THE COURT:**  Um-hum.

11:18AM   19       **MR. TRIPI:**  We're not representing the whole Serio

11:18AM   20   conspiracy, but there -- there is certain overlap, and Anthony

11:18AM   21   Gerace is key to that.

11:18AM   22       We've already established at this trial so far that

11:18AM   23   Anthony supplies Peter at times with cocaine.

11:18AM   24       You're going to hear testimony later on from Jeffrey

11:18AM   25   Anzalone where he procured cocaine from Anthony and used it

USA v Gerace - Casullo - Cooper/Direct - 11/21/24

52

11:18AM    1    inside Pharaoh's.

11:18AM    2          So I think -- it's not like it's some ancillary

11:18AM    3    member.  It's also Peter's family member.  So brushing back

11:18AM    4    one of the -- one of the key parts of each conspiracy in one

11:18AM    5    in and two, is dissuading fellow members of law enforcement

11:18AM    6    from investigating people that he was protecting.

11:18AM    7          And -- and as it relates to both conspiracies, we

11:19AM    8    submit that there's evidence that Anthony Gerace fits in both

11:19AM    9    of those conspiracies from that perspective.

11:19AM    10         So whether or not Anthony is dealing in marijuana

11:19AM    11   with one and cocaine in the other, he's in both.  He's got one

11:19AM    12   foot in each.  And so, we're not going to some tertiary member

11:19AM    13   of the Serio conspiracy here and trying to pigeon hole that

11:19AM    14   in.

11:19AM    15         Also, you'll hear testimony from Curtis Ryan that

11:19AM    16   even after the search at Anthony's house where guns, a little

11:19AM    17   bit of cocaine, a little bit of steroids, and a lot of

11:19AM    18   marijuana products are recovered, the directive -- and this

11:19AM    19   came in at two trials -- from Anthony to his girlfriend Lauren

11:19AM    20   was call Peter.

11:19AM    21         So when you put all of that together, I think we have

11:19AM    22   a sufficient basis to --

11:19AM    23         **THE COURT:**  The direction --

11:19AM    24         **MR. TRIPI:**  The directive of Anthony as he's being

11:19AM    25   walked out in handcuffs to his girlfriend Lauren is "call

11:19AM  1    Peter."  So when you put all of that together, that's --

11:19AM  2    obviously, some of that is still to come, I think we're

11:19AM  3    squarely --

11:19AM  4         **MR. COOPER:**  Thank you.

11:19AM  5         **MR. FOTI:**  First of all, Judge, I think in regard to

11:20AM  6    the last point, it's very common that when somebody's being

11:20AM  7    arrested, they direct a family member to call somebody else

11:20AM  8    who they think will be able to help them secure counsel.

11:20AM  9         **THE COURT:**  Of course.  But there's other things, so

11:20AM  10   if you took that in the vacuum, if that was the only thing

11:20AM  11   that Mr. Tripi said to me, then I think I undoubtedly would

11:20AM  12   agree with you, but-- but that's not.  So, there's other

11:20AM  13   things, too.

11:20AM  14        **MR. FOTI:**  So, so, I'll work backwards to the other

11:20AM  15   points, too.  Any arguments about regarding whether Anthony is

11:20AM  16   a coconspirator, first of all, as a first preliminary point, I

11:20AM  17   don't think it's been established even on the drug conspiracy,

11:20AM  18   there's anything other than a singular buy-sell.  But setting

11:20AM  19   that aside let's say --

11:20AM  20        **THE COURT:**  Anthony -- Anthony --

11:20AM  21        **MR. FOTI:**  Gerace.

11:20AM  22        **THE COURT:**  No, no, I know.  But buy-sell, you're

11:20AM  23   talking about the buy-sell between Anthony and Peter?

11:20AM  24        **MR. FOTI:**  Yes.  There was testimony about a time

11:20AM  25   that Mr. Gerace came home and that Anthony gave him drugs.  I

11:20AM   1   think that's really the extent of the proof for the most part.

11:20AM   2         **THE COURT:**  For Anthony so far?

11:21AM   3         **MR. FOTI:**  Yes.

11:21AM   4         **THE COURT:**  Do you agree with that?  So far?

11:21AM   5         **MR. COOPER:**  So far, yes.

11:21AM   6         **THE COURT:**  Okay.  Go ahead.

11:21AM   7         **MR. FOTI:**  Even so, even if -- even if there was more

11:21AM   8   proof where a coconspirator relationship had been established

11:21AM   9   in regards to the drugs, that does not overlap automatically

11:21AM  10   into a conspiracy involving Mr. Bongiovanni.  And it's a

11:21AM  11   conspiracy with Mr. Bongiovanni where the statements would

11:21AM  12   have to be in furtherance -- it's -- it's Mr. Bongiovanni's

11:21AM  13   statements that are at issue here, and the statements are

11:21AM  14   hearsay unless they're in furtherance of a conspiracy.  He's

11:21AM  15   talking about Anthony Gerace.

11:21AM  16         **THE COURT:**  But Bongiovanni is involved, right?

11:21AM  17   Aren't there two conspiracies?  The drug conspiracy and --

11:21AM  18         **MR. TRIPI:**  There's a drug conspiracy.

11:21AM  19         **THE COURT:**  -- and a conspiracy to defraud the United

11:21AM  20   States.

11:21AM  21         **MR. TRIPI:**  Correct.

11:21AM  22         **THE COURT:**  And so, those are -- those are two

11:21AM  23   conspiracies.

11:21AM  24         **MR. FOTI:**  So I -- I -- okay.  So, fair, that's a

11:21AM  25   fair point.  So I guess if there was an -- if it was

| 11:21AM | 1 | established that this was in furtherance of the drug |
| 11:22AM | 2 | conspiracy, Mr. Bongiovanni was making these statements about |
| 11:22AM | 3 | Anthony Gerace in furtherance of the drug conspiracy, then |
| 11:22AM | 4 | that would be the argument for why it overcomes hearsay. |
| 11:22AM | 5 | But -- |
| 11:22AM | 6 | **THE COURT:**  But there's -- but there's -- the two |
| 11:22AM | 7 | conspiracies are overlapping in this area, right?  It goes -- |
| 11:22AM | 8 | I mean, the conspiracy to defraud the United States and the |
| 11:22AM | 9 | drug conspiracy, they -- they dovetail. |
| 11:22AM | 10 | **MR. FOTI:**  There's obvious -- yeah, there -- I agree, |
| 11:22AM | 11 | there is, obviously, they're intertwined in different ways, I |
| 11:22AM | 12 | understand. |
| 11:22AM | 13 | **THE COURT:**  Yeah. |
| 11:22AM | 14 | **MR. FOTI:**  I understand.  However, at the end -- at |
| 11:22AM | 15 | the end of the day, you're ultimately still looking at a |
| 11:22AM | 16 | question of if Mr. Bongiovanni's making statements about |
| 11:22AM | 17 | Anthony Gerace, is that statements in furtherance of a |
| 11:22AM | 18 | conspiracy with Peter Gerace here, I don't think Anthony |
| 11:22AM | 19 | Gerace is established as a coconspirator.  I just don't -- |
| 11:22AM | 20 | **MR. COOPER:**  Judge -- |
| 11:22AM | 21 | **THE COURT:**  And I guess that's the question, right? |
| 11:22AM | 22 | And I -- and I agree, I don't think he's been established as a |
| 11:22AM | 23 | coconspirator yet, but you're telling me there's stuff that's |
| 11:22AM | 24 | gonna come in? |
| 11:22AM | 25 | **MR. TRIPI:**  Yeah, with a proffer, all of that. |

| | | |
|---|---|---|
| 11:22AM | 1 | **MR. COOPER:**  And, Judge, for example, like for |
| 11:22AM | 2 | example, Lou Selva is gonna -- I expect is gonna testify that |
| 11:23AM | 3 | he was informed that Bongiovanni interceded on Anthony |
| 11:23AM | 4 | Gerace's behalf when he was involved in a drug arrest.  It's, |
| 11:23AM | 5 | there's a -- a -- |
| 11:23AM | 6 | **THE COURT:**  How is that involved in the Peter Gerace |
| 11:23AM | 7 | conspiracy? |
| 11:23AM | 8 | **MR. COOPER:**  I'm struggling right now. |
| 11:23AM | 9 | **THE COURT:**  No, no, that's okay.  So -- |
| 11:23AM | 10 | **MR. TRIPI:**  So there are -- setting that aside, |
| 11:23AM | 11 | there's different reasons we think some of those statements |
| 11:23AM | 12 | come in through Lou Selva.  We'll argue that when Lou Selva's |
| 11:23AM | 13 | up. |
| 11:23AM | 14 | The -- the key thing we need to remember here is, and |
| 11:23AM | 15 | I think you were hitting it, Your Honor, the -- the -- you |
| 11:23AM | 16 | don't have to say which bucket, which conspiracy bucket the |
| 11:23AM | 17 | statement falls into, both conspiracies coalesce.  And here, |
| 11:23AM | 18 | you have Anthony supplying cocaine to Gerace on an occasion, |
| 11:24AM | 19 | or he supplies it to a dancer and we're proffering under |
| 11:24AM | 20 | 104 -- and I think it's Bourjaily, right -- that you're going |
| 11:24AM | 21 | to hear more testimony from -- from Jeff Anzalone who's |
| 11:24AM | 22 | testified twice about Anthony distributing drugs to him inside |
| 11:24AM | 23 | Pharaoh's and using drugs and setting him up -- |
| 11:24AM | 24 | **THE COURT:**  Inside Pharaoh's? |
| 11:24AM | 25 | **MR. TRIPI:**  Yeah, inside Pharaoh's. |

USA v Gerace - Casullo - Cooper/Direct - 11/21/24
57

| | | |
|---|---|---|
| 11:24AM | 1 | **THE COURT:**  Okay.  Then I'm -- |
| 11:24AM | 2 | **MR. TRIPI:**  Using drugs together, there's the |
| 11:24AM | 3 | maintaining the drug premises part. |
| 11:24AM | 4 | And when the relationship is one of brothers who are |
| 11:24AM | 5 | involved together -- |
| 11:24AM | 6 | **THE COURT:**  No, I agree with that.  I agree that |
| 11:24AM | 7 | there's another level there because they are brothers.  But, |
| 11:24AM | 8 | but so I will allow it, separate to the -- based on the |
| 11:24AM | 9 | government's proffer, and assuming that the Jeff Anzalone |
| 11:24AM | 10 | testimony comes in as Mr. Tripi says that it will. |
| 11:24AM | 11 | **MR. TRIPI:**  And it has come in in two trials.  So if |
| 11:24AM | 12 | he does a 180, it's been in both trials. |
| 11:24AM | 13 | **THE COURT:**  I understand.  You certainly have a |
| 11:24AM | 14 | good-faith basis.  But if it doesn't come in, then we'll jump |
| 11:24AM | 15 | off that bridge when we come to it.  Okay? |
| 11:25AM | 16 | (End of sidebar discussion.) |
| 11:25AM | 17 | **THE COURT:**  The objection is overruled.  You may |
| 11:25AM | 18 | continue. |
| 11:25AM | 19 | **BY MR. COOPER:** |
| 11:25AM | 20 | Q.  We left off with you explaining that Bongiovanni made |
| 11:25AM | 21 | statements to you about Anthony Gerace being involved in |
| 11:25AM | 22 | other drugs; is that right? |
| 11:25AM | 23 | A.  Correct. |
| 11:25AM | 24 | Q.  Can you explain what he said? |
| 11:25AM | 25 | A.  So before he said that about you better hurry up before |

11:25AM  1    they make marijuana legal, he had said that -- that he knew

11:25AM  2    that Anthony Gerace, excuse me, had loads of marijuana

11:25AM  3    delivered to him behind the restaurant, Salvatore's

11:25AM  4    restaurant on Transit, I believe.  That he also sold cocaine

11:25AM  5    to his friends.  And then, but you better hurry up and arrest

11:25AM  6    him before they make marijuana legal.

11:25AM  7    Q.  Was it your impression during that conversation with

11:26AM  8    Bongiovanni that he was attempting to minimize Anthony

11:26AM  9    Gerace's illegal activity?

11:26AM  10   A.  I perceived it as almost mocking me for working a

11:26AM  11   marijuana investigation.  And number 2, that it wasn't even

11:26AM  12   worth investigating.

11:26AM  13      No one, again, no one has ever said that to me in my

11:26AM  14   entire law enforcement career about marijuana.

11:26AM  15   Q.  Okay.  Did you leave that conversation with Bongiovanni

11:26AM  16   with the impression that he was attempting to dissuade you

11:26AM  17   from investigating Anthony Gerace?

11:26AM  18   A.  Absolutely.  And his way, his -- in my opinion, his --

11:26AM  19   yes.

11:26AM  20            **MR. COOPER:**  Just one second, please, Judge.

11:26AM  21            No further direct, Judge, thank you.

11:26AM  22            **THE COURT:**  Cross-examination?

11:26AM  23            **MR. FOTI:**  Yes, Judge.

11:27AM  24

          25

11:27AM    1    **CROSS-EXAMINATION BY MR. FOTI:**

11:27AM    2    Q.  Good morning.

11:27AM    3    A.  Good morning.

11:27AM    4    Q.  Sir, when did you first meet Peter Gerace?

11:28AM    5    A.  In freshman year of high school, 1981.

11:28AM    6    Q.  Okay.  You didn't meet him before going to Saint Joe's?

11:28AM    7    A.  No.

11:28AM    8    Q.  And when I say "Saint Joe's," sometimes I forget there's

11:28AM    9    jurors from all over the place here, so we're talking about

11:28AM    10   Saint Joseph's Collegiate Institute, right?

11:28AM    11   A.  Yes.

11:28AM    12   Q.  Okay.  That's the high school you talked about attending

11:28AM    13   during your direct-examination, correct?

11:28AM    14   A.  Correct.

11:28AM    15   Q.  And because, you know, some of us know it as Saint Joe's,

11:28AM    16   we -- we're familiar with it, not every juror is, that's an

11:28AM    17   all boys school, right?

11:28AM    18   A.  Correct.

11:28AM    19   Q.  Okay.  Generally, it's a private school, right?

11:28AM    20   A.  Yes.

11:28AM    21   Q.  Generally smaller class sizes, correct?

11:28AM    22   A.  It is.

11:28AM    23   Q.  You have any idea -- you graduated in 1989, correct?

11:28AM    24   A.  '85.

11:28AM    25   Q.  '85?  Okay.  And do you happen to know how big your

11:28AM    1    graduating class was?

11:28AM    2    A.  About 200 students, I believe.

11:28AM    3    Q.  Okay.  Peter Gerace attended Saint Joe's at the same

11:29AM    4    time?

11:29AM    5    A.  We were in the same graduating class.

11:29AM    6    Q.  Okay.  He graduated in '85 as well?

11:29AM    7    A.  Yes.

11:29AM    8    Q.  I'll talk to you about that a little bit more in a

11:29AM    9    moment.

11:29AM   10        First, were you -- you testified that you're married,

11:29AM   11    correct?

11:29AM   12    A.  Correct.

11:29AM   13    Q.  When did you meet your wife?

11:29AM   14    A.  19 -- March of 1987.

11:29AM   15    Q.  Okay.  And so that was -- that was after you graduated

11:29AM   16    from high school?

11:29AM   17    A.  Correct.

11:29AM   18    Q.  Had you -- you said you met her in 1987?

11:29AM   19    A.  I met my wife in March of 1987.

11:29AM   20    Q.  And did there come a time that you became aware that she

11:29AM   21    was familiar with Peter Gerace?

11:29AM   22    A.  Actually, during that timeframe when I met her.

11:29AM   23    Q.  Okay.  So, right from the beginning of -- of your first

11:29AM   24    interactions with your wife, you realized she knows somebody

11:30AM   25    that you went to high school with?

11:30AM   1    A.  Yes, the conversation of Saint Joe's came up.  And her

11:30AM   2    and her friend, when I initially met them, said that they

11:30AM   3    knew Gerace.

11:30AM   4    Q.  Okay.  And you knew who they were talking about, right?

11:30AM   5    A.  Peter Gerace.

11:30AM   6    Q.  Yeah, the -- the -- who was a student in your class,

11:30AM   7    right?

11:30AM   8    A.  Correct.

11:30AM   9    Q.  So she -- did she tell you about the background she has

11:30AM  10    with him?

11:30AM  11    A.  I don't know what that means.

11:30AM  12    Q.  Well, she went to school with him as well, correct?

11:30AM  13    A.  Did she tell me about going to school with him then, or

11:30AM  14    at some point during our relationship?

11:30AM  15    Q.  In the initial conversation, did she tell you that she

11:30AM  16    went to school with Peter Gerace?

11:30AM  17    A.  Not initially.

11:30AM  18    Q.  Okay.  At some point you come to learn that that's the

11:30AM  19    case, right?

11:30AM  20    A.  Correct.

11:30AM  21    Q.  She went to grade school at Saint Andrew's?

11:30AM  22    A.  Correct.

11:30AM  23    Q.  And Peter attended at the same time, correct?

11:30AM  24    A.  Correct.

11:30AM  25    Q.  So he actually went to school with her before he went to

| | | |
|---|---|---|
| 11:30AM | 1 | school with you, correct? |
| 11:30AM | 2 | A.  Correct. |
| 11:30AM | 3 | Q.  And that is from kindergarten up to the eighth grade, |
| 11:30AM | 4 | correct? |
| 11:31AM | 5 | A.  I believe that's what their school was. |
| 11:31AM | 6 | Q.  Okay.  So she went to school with him for approximately |
| 11:31AM | 7 | nine, ten years? |
| 11:31AM | 8 | A.  I don't know if they were together, I just know that they |
| 11:31AM | 9 | went to Saint Andrew's together.  I don't know if it was the |
| 11:31AM | 10 | whole time or not, or what. |
| 11:31AM | 11 | Q.  Okay.  And is Saint Andrew's a small private school? |
| 11:31AM | 12 | A.  It's a small Catholic elementary school. |
| 11:31AM | 13 | Q.  And did your brother-in-law -- your brother-in-law, Phil, |
| 11:31AM | 14 | you testified about him on direct, right? |
| 11:31AM | 15 | A.  Correct. |
| 11:31AM | 16 | Q.  And did he go to Saint Andrew's as well? |
| 11:31AM | 17 | A.  I believe so. |
| 11:31AM | 18 | Q.  Phil, it's Domiano, is that how you pronounce the last |
| 11:31AM | 19 | name? |
| 11:31AM | 20 | A.  Correct. |
| 11:31AM | 21 | Q.  So he went to the same school as -- as Mr. Gerace? |
| 11:31AM | 22 | A.  He went to Saint Andrew's for elementary school and |
| 11:31AM | 23 | Saint Joe's for high school. |
| 11:31AM | 24 | Q.  Did he go to high school at Saint Joe's at the same time |
| 11:31AM | 25 | as you? |

11:31AM    1    A.  I think he was a senior when I was a freshman.

11:31AM    2    Q.  Okay.  Were you aware that Peter Gerace and Phil Domiano

11:32AM    3    were close friends?

11:32AM    4    A.  At what point?

11:32AM    5    Q.  You become aware of that at some point?

11:32AM    6    A.  Yes.

11:32AM    7    Q.  Okay.  When did you become aware of that?

11:32AM    8    A.  Through the time that I was dating my wife, that her

11:32AM    9    brother Phil and Peter were friends, that they grew up

11:32AM   10    together in the same neighborhood.

11:32AM   11    Q.  Okay.  And you started dating her after you met her in

11:32AM   12    '87, right?

11:32AM   13    A.  Correct.

11:32AM   14    Q.  Okay.  So at some time shortly thereafter, that you --

11:32AM   15    you realize that her brother is good friends with Peter

11:32AM   16    Gerace?

11:32AM   17    A.  Correct.

11:32AM   18    Q.  And when did you get married?

11:32AM   19    A.  1992.

11:32AM   20    Q.  Okay.  The entire time you're dating her, you're both

11:33AM   21    still in Buffalo, right?

11:33AM   22    A.  Not the entire time.

11:33AM   23    Q.  Okay.  At some point, you move to Vegas?

11:33AM   24    A.  No.  We started dating in '87.  In 1990, I moved to

11:33AM   25    Toronto, Canada for a job with the Immigration Service.

11:33AM    1    Q.   Okay.  And how long were you there?

11:33AM    2    A.   I was in Toronto for five years.

11:33AM    3    Q.   She moves to Toronto with you at some point?

11:33AM    4    A.   So, right.  So December of 1990, I moved to Toronto.  And

11:33AM    5    then I got married in October of 1992.  So she initially

11:33AM    6    didn't move up, but eventually she did while we were married.

11:33AM    7    Q.   There comes a time when you both move to Las Vegas,

11:33AM    8    correct?

11:33AM    9    A.   That we moved -- my family moved to Las Vegas in December

11:33AM   10    of 1999.

11:33AM   11    Q.   Staying on Buffalo for just a little bit longer, Saint

11:34AM   12    Joe's High School, four years, correct?

11:34AM   13    A.   That's correct.

11:34AM   14    Q.   Okay.  And you said you met Peter Gerace in your freshman

11:34AM   15    year at Saint Joe's, correct?

11:34AM   16    A.   Correct.

11:34AM   17    Q.   So he was there the entire four years?

11:34AM   18    A.   Yes.

11:34AM   19    Q.   And so were you, right?

11:34AM   20    A.   Yes.

11:34AM   21    Q.   All right.  And you would generally see him every single

11:34AM   22    day while you were at school, correct?

11:34AM   23    A.   We weren't really in a lot of classes together, I

11:34AM   24    wouldn't say I would see him every single day.

11:34AM   25    Q.   You did have classes together though, didn't you?

11:34AM   1    A.   We did have a couple classes together.

11:34AM   2    Q.   You played hockey in high school?

11:34AM   3    A.   I did play hockey --

11:34AM   4    Q.   Okay.

11:34AM   5    A.   -- in high school for Saint Joe's.

11:34AM   6    Q.   And at some point Peter played hockey with you?

11:34AM   7    A.   Peter did not play for Saint Joe's at the same time I

11:35AM   8    did.  Not on the same team, I'm sorry.  He was not on the

11:35AM   9    same team as I was for Saint Joe's.

11:35AM   10   Q.   He was not on the same team at Saint Joe's?

11:35AM   11   A.   He played for Saint Joe's at a different -- I played

11:35AM   12   freshman year and senior year, I played travel in the middle.

11:35AM   13   I remember he played for Saint Joe's, but not on any of the

11:35AM   14   teams I played for for Saint Joe's.  There were multiple

11:35AM   15   teams at Saint Joe's, I believe there were like five.

11:35AM   16   Q.   Okay.  You were aware he was playing hockey at some

11:35AM   17   point?

11:35AM   18   A.   He did play hockey from what I remember at -- freshman

11:35AM   19   year at Saint Joe's.

11:35AM   20   Q.   Okay.

11:35AM   21   A.   That's how I initially met him.

11:35AM   22   Q.   Oh, you met him through hockey?

11:35AM   23   A.   Through when I was trying out for hockey at Saint Joe's.

11:35AM   24   Q.   And then during the course of the four years, you end up

11:35AM   25   having some classes together.

11:35AM    1    A.  Correct, I don't know how many, there weren't many, but

11:35AM    2    there were at least -- at least one that I remember.

11:35AM    3    Q.  What class was that?

11:35AM    4    A.  That was a history class with Mr. Wolf.

11:35AM    5    Q.  Okay.  And there may have been other classes, you just

11:35AM    6    don't necessarily recall, right?

11:35AM    7    A.  I can't remember for sure, but I do remember if there

11:36AM    8    were -- there weren't many.

11:36AM    9    Q.  I also heard you were pretty good at baseball?

11:36AM   10    A.  Oh, thank you.  I don't know if that's true, but --

11:36AM   11    Q.  You played baseball though, right?

11:36AM   12    A.  I did.

11:36AM   13    Q.  He -- he -- he tried out for baseball?

11:36AM   14    A.  Okay.

11:36AM   15    Q.  At the same time, right?

11:36AM   16    A.  I don't remember.

11:36AM   17    Q.  Okay.  Okay.  So, let's fast forward to your professional

11:36AM   18    career.  You move to Las Vegas, right?

11:36AM   19    A.  I did.

11:36AM   20    Q.  And that's in 1999?

11:36AM   21    A.  Yes.  December of '99.

11:36AM   22    Q.  Okay.  And you testified on direct about a period of time

11:36AM   23    where you pursued a career in the FBI, correct?

11:36AM   24    A.  That's correct.

11:36AM   25    Q.  You said that was after 9/11, right?

11:36AM   1   A.  Yes.

11:36AM   2   Q.  There was, after 9/11, an increased interest in

11:36AM   3   counterterrorism efforts by the Bureau, correct?

11:37AM   4   A.  Correct.

11:37AM   5   Q.  And there was certainly a number of new professional

11:37AM   6   responsibilities that the Bureau had taken on at that point?

11:37AM   7   A.  I don't know if they were new, but there were more

11:37AM   8   priorities.  They had JTTF terrorism task force before that,

11:37AM   9   but they weren't a priority like they are today and after

11:37AM  10   9/11.

11:37AM  11   Q.  And there were professional opportunities for new agents

11:37AM  12   or potentially new agents to join the FBI at that time?

11:37AM  13   A.  They were doing a lot of hiring after 9/11.

11:37AM  14   Q.  So that's a point when you -- you take a time -- a period

11:37AM  15   of time in your professional career where you work with the

11:37AM  16   FBI, correct?

11:37AM  17   A.  That is correct.

11:37AM  18   Q.  But you ultimately return to Las Vegas, correct?

11:37AM  19   A.  I did.

11:37AM  20   Q.  And what year did you return to Las Vegas?

11:37AM  21   A.  June of 2000 -- July of 2003.  I believe.

11:37AM  22   Q.  Okay.  There comes a time in Las Vegas where your

11:37AM  23   brother-in-law moves out there, correct?

11:37AM  24   A.  He -- he lived in Vegas before we did.

11:38AM  25   Q.  He moved out to Vegas before you took a job there?

11:38AM   1    A.  Oh, years before.  Like, right after I met my wife.

11:38AM   2    Q.  Okay.  So when -- the fact that he lived out there, did

11:38AM   3    that -- was that a consideration for you or your wife when

11:38AM   4    you moved out there?

11:38AM   5    A.  That was my selling point, because my wife did not want

11:38AM   6    to leave Buffalo.  I shouldn't call it a selling point, it

11:38AM   7    was one of the points that she brought up to me and was

11:38AM   8    comforting to her and that I was aware of because she didn't

11:38AM   9    want to leave Western New York.

11:38AM  10    Q.  And was he involved in any criminal activity at that

11:38AM  11    time?

11:38AM  12    A.  Not to my knowledge.

11:38AM  13    Q.  Okay.  There does come a time where you learn that he's

11:38AM  14    involved in criminal activity, correct?

11:38AM  15    A.  There was a time when I did learn that he was involved in

11:38AM  16    a criminal investigation with the Las Vegas police.

11:38AM  17    Q.  Okay.  And you knew before that that he was involved in

11:38AM  18    criminal activity, correct?

11:38AM  19    A.  Excuse me?

11:38AM  20    Q.  You knew before the investigation involving the Las Vegas

11:39AM  21    police that he was involved in criminal activity, correct?

11:39AM  22    A.  No.  And I don't understand, I don't understand that

11:39AM  23    question.  I found out after he was investigated.

11:39AM  24    Q.  You found out after he was investigated?

11:39AM  25    A.  Or, during.

11:39AM  1   Q.  You found out during the course of the investigation?

11:39AM  2   A.  Yes.

11:39AM  3   Q.  All right.  We'll come back to that.

11:39AM  4       There comes a time where you return to New York, and at

11:39AM  5   that time you start at the New York City office, correct?

11:39AM  6   A.  So, yes, I started at the New York field division, the

11:39AM  7   New York City office in December, again, of 2013.

11:39AM  8   Q.  Okay.  And the -- the intention was always to return to

11:39AM  9   Buffalo, right?

11:39AM  10  A.  When I went to New York, the intention was -- and what I

11:39AM  11  was told, we don't have a vacancy in Buffalo now, but if you

11:40AM  12  go and work in the field division as soon as a position opens

11:40AM  13  up, we will move you to Buffalo.

11:40AM  14  Q.  And that was your intention to return to Buffalo when

11:40AM  15  that position opens up?

11:40AM  16  A.  That's why I went to New York, yeah.

11:40AM  17  Q.  Okay.  So, you're still in New York City when this

11:40AM  18  reunion occurs for the Saint Joe's, correct?

11:40AM  19  A.  That's correct.

11:40AM  20  Q.  All right.  And you travelled in for that, correct?

11:40AM  21  A.  Yep.  I didn't travel in specifically for the reunion,

11:40AM  22  but that was a weekend that I did come home.

11:40AM  23  Q.  Okay.  Okay.  So you came home that weekend, and the

11:40AM  24  reunion happened to be scheduled that weekend?

11:40AM  25  A.  Right.  I would have came home either way.

11:40AM    1    Q.  Okay.  So you attend this reunion, this is about June

11:40AM    2    2015?

11:40AM    3    A.  Correct.

11:40AM    4    Q.  All right.  And at the reunion you're seeing a lot of

11:40AM    5    people that you probably haven't seen for a pretty long time

11:40AM    6    at that point, correct?

11:40AM    7    A.  Pretty true, yep.

11:40AM    8    Q.  All right.  This was -- was this the 20 -- this would

11:40AM    9    have been 30th?

11:40AM   10    A.  It would have been, yep.

11:41AM   11    Q.  Had you seen Peter Gerace at any point after graduation

11:41AM   12    prior to this reunion?

11:41AM   13    A.  Sure.  There were a few times I think, yes.

11:41AM   14    Q.  Okay.  Well, you testified to on direct about Brennan's.

11:41AM   15    Was that -- that preceded this?

11:41AM   16    A.  Could you say that again?  I'm sorry.

11:41AM   17    Q.  On direct you testified to a time that you saw Peter

11:41AM   18    Gerace at -- at the bar Brennan's, correct?

11:41AM   19    A.  At Brennan's, correct.

11:41AM   20    Q.  Yeah, was that before the reunion?

11:41AM   21    A.  That would have been, yes, that would have been before.

11:41AM   22    So, 2000 -- around 2014.  And then the reunion was '15.

11:41AM   23    Q.  Okay.  And you had seen him a couple times other than

11:41AM   24    that as well?

11:41AM   25    A.  During what timeframe?

11:41AM    1    Q.    Any timeframe between graduation and the reunion, you had

11:41AM    2    seen him other times?

11:41AM    3    A.    Yes.

11:41AM    4    Q.    Okay.  Do you remember where or when?

11:41AM    5    A.    While I was in college, I played on, like, a men's bar

11:42AM    6    league hockey team.  There was a guy on the team whose

11:42AM    7    cousin -- there was a guy on the team who had a cousin that

11:42AM    8    was cousins with Gerace, and Gerace played on this men's ice

11:42AM    9    hockey team for -- I don't know if it was a year or several

11:42AM   10    games.  So there was that timeframe.

11:42AM   11        And then I may have seen him, I remember once -- no, that

11:42AM   12    was while I was in Vegas.  I saw him once at Cracker Barrel

11:42AM   13    with my wife, like, in passing.  I don't -- I think that's

11:42AM   14    while I was in Vegas.

11:42AM   15    Q.    Okay.  So you have memories of just sort of seeing him a

11:42AM   16    couple times in passing?

11:42AM   17    A.    Yeah, I remember hockey, because it was while I was in

11:42AM   18    college.  And then after that, yeah.

11:42AM   19    Q.    He didn't -- he didn't go to the same college as you?

11:42AM   20    Peter Gerace didn't go to the same college?

11:42AM   21    A.    I don't believe so.

11:42AM   22    Q.    Okay.  But he was playing on this hockey team that --

11:42AM   23    A.    He played on that men's hockey team for, I think it was a

11:42AM   24    year, several games or the year, whatever it was.  And that

11:43AM   25    was while I was in college.

11:43AM    1    Q.   Okay.  All right.  Now, on the night of --

11:43AM    2         MR. FOTI:  Well, actually first, can we pull up

11:43AM    3    Government Exhibit 99 in evidence?  And go to page 13.

11:43AM    4         BY MR. FOTI:

11:43AM    5    Q.   All right.  Sir, is that a picture from the reunion?

11:43AM    6    A.   Correct.

11:43AM    7    Q.   And I'm gonna circle one of the individuals, I'm going to

11:43AM    8    circle one of the individuals on this picture.  I'm circling

11:43AM    9    an individual in a blue shirt.  Is that you?

11:43AM   10    A.   Yes.

11:43AM   11    Q.   This is on the left side of the picture?

11:43AM   12    A.   Yep.

11:43AM   13    Q.   And behind you, is that Peter Gerace?

11:43AM   14    A.   Again, it's so dark and fuzzy, but seeing this picture

11:43AM   15    before, I believe so.  But I can't tell by looking at this

11:44AM   16    picture.

11:44AM   17    Q.   Okay.  So from this picture, you don't actually see him

11:44AM   18    because there's -- you can see there's a little bit of a head

11:44AM   19    behind you, your shoulder?

11:44AM   20    A.   It's blurry.

11:44AM   21    Q.   You don't know if it's Mr. Gerace from the picture?

11:44AM   22    A.   It's dark and blurry, I think so from looking at this,

11:44AM   23    but I can't tell from looking at this.

11:44AM   24         MR. FOTI:  Okay.  Can we go to the next page of the

11:44AM   25    exhibit, page 14?

| | | |
|---|---|---|
| 11:44AM | 1 | I know this is sideways, there's probably a way for |
| 11:44AM | 2 | me -- |
| 11:44AM | 3 | **MR. COOPER:**  She can rotate it.  There you go. |
| 11:44AM | 4 | **MR. FOTI:**  Thank you. |
| 11:44AM | 5 | **BY MR. FOTI:** |
| 11:44AM | 6 | Q.  This picture is a little bit more clear.  You can see the |
| 11:44AM | 7 | face behind you, right? |
| 11:44AM | 8 | A.  Yep. |
| 11:44AM | 9 | Q.  You agree that's Peter Gerace? |
| 11:44AM | 10 | A.  I will agree. |
| 11:44AM | 11 | Q.  Okay.  And this was taken at Big Ditch? |
| 11:44AM | 12 | A.  I'm -- yeah.  That would have been -- so the reunion was |
| 11:44AM | 13 | at Big Ditch, this would have been taken at Big Ditch. |
| 11:44AM | 14 | Q.  And, again, for anybody who's not familiar with it, Big |
| 11:44AM | 15 | Ditch is brewery here in Buffalo? |
| 11:44AM | 16 | A.  Yes, downtown. |
| 11:44AM | 17 | Q.  Yeah, not too far from here, right? |
| 11:44AM | 18 | A.  No. |
| 11:44AM | 19 | Q.  Okay.  And this was obviously an organized event for an |
| 11:45AM | 20 | alumni reunion, correct? |
| 11:45AM | 21 | A.  Correct. |
| 11:45AM | 22 | Q.  You're wearing what appears to be a name tag.  Was that a |
| 11:45AM | 23 | name tag identifying yourself as a graduate of Saint Joe's? |
| 11:45AM | 24 | A.  Yeah, I believe it just had all our names on it. |
| 11:45AM | 25 | Q.  Okay.  Anything -- any other information on it other than |

11:45AM  1   just -- just the name and maybe the year you graduated?

11:45AM  2   A.  I -- I can't remember.

11:45AM  3   Q.  Is it just your class that attended this reunion, or were

11:45AM  4   there other members of other classes that attended?

11:45AM  5   A.  It was just our graduating class.

11:45AM  6   Q.  Okay.  Now, during the course of this reunion, you

11:45AM  7   testified on direct that you heard a couple of statements

11:45AM  8   from other classmates about Peter Gerace, correct?

11:45AM  9   A.  That's correct.

11:45AM  10  Q.  Okay.  And one of the statements was from another --

11:45AM  11  another graduate who said that they were gonna go to

11:45AM  12  Pharaoh's and do lines off -- lines of coke off a stripper's

11:46AM  13  ass, right?

11:46AM  14  A.  Yes.

11:46AM  15  Q.  Okay.  And that individual you -- you identified as John

11:46AM  16  Maher?

11:46AM  17  A.  Correct.

11:46AM  18  Q.  Okay.  And he's -- he's since passed away related to

11:46AM  19  COVID, correct?

11:46AM  20  A.  Correct.

11:46AM  21  Q.  Okay.  And he was joking, or it appeared he was joking

11:46AM  22  when he said that, right?

11:46AM  23  A.  It didn't appear to me.

11:46AM  24  Q.  It -- to you it seemed --

11:46AM  25  A.  I took it.

USA v Gerace - Casullo - Foti/Cross - 11/21/24

11:46AM 1    Q.  -- like he was being serious?

11:46AM 2    A.  I took it serious.

11:46AM 3    Q.  You took it seriously?

11:46AM 4    A.  Yes.

11:46AM 5    Q.  And you -- you were working at the DEA at that time,

11:46AM 6    right?

11:46AM 7    A.  Correct.

11:46AM 8    Q.  And people talk about where they're employed at this

11:46AM 9    point in their life, correct?

11:46AM 10   A.  People do talk about where they're employed.

11:46AM 11   Q.  You weren't trying to hide the fact that you were a

11:46AM 12   member of the DEA, correct?

11:46AM 13   A.  What -- what do you mean?

11:46AM 14   Q.  You weren't -- you weren't concealing your employment

11:46AM 15   from other graduates during the course of this reunion,

11:46AM 16   right?

11:46AM 17   A.  I think a good percentage, at least my friends, already

11:46AM 18   knew I worked for DEA.

11:46AM 19   Q.  Okay, so --

11:46AM 20   A.  I don't know which ones did and didn't, but I know that

11:46AM 21   some people knew I worked for DEA.

11:46AM 22   Q.  And if anybody didn't know and they asked you what you're

11:47AM 23   up to, you're gonna tell them that your -- what your

11:47AM 24   profession is at that point?

11:47AM 25   A.  If someone asked me, based on my classmates, most of them

11:47AM  1    probably, ones that were friends.

11:47AM  2    Q.  Had you talked to John Maher at all that night other than

11:47AM  3    this -- this statement that he made to you?

11:47AM  4    A.  Not that I -- no, not that I remember, no.

11:47AM  5    Q.  Okay.  So your memory is he just makes this unsolicited

11:47AM  6    statement that I'm going to Pharaoh's to do a line of coke

11:47AM  7    off a stripper's ass?

11:47AM  8    A.  Yeah.  He was with, like, three other people, and said it

11:47AM  9    right in front of me.  Right -- right to me.

11:47AM  10       He said, hey, Casullo, we're going to strippers and we're

11:47AM  11   gonna snort coke off stripper's asses.

11:47AM  12   Q.  To the DEA agent in the room?

11:47AM  13   A.  He said it to me.  I don't know if he knew I worked for

11:47AM  14   the DEA, but he said it to me.

11:47AM  15   Q.  And -- and you took him to be serious?

11:47AM  16   A.  Yes, I did.

11:47AM  17   Q.  Okay.

11:47AM  18   A.  I -- I -- I know John Maher, or knew John Maher.

11:47AM  19   Q.  There comes a time in the evening where you go to Tappo,

11:47AM  20   correct?

11:48AM  21   A.  There was.

11:48AM  22   Q.  And Tappo was a restaurant very close to Big Ditch,

11:48AM  23   correct?

11:48AM  24   A.  It was, I believe, diagonal across the street.

11:48AM  25   Q.  All right.  And you go to Tappo with Mr. Gerace, correct?

11:48AM     1    A.  I did agree to walk across the street with Gerace to

11:48AM          Tappo's.

11:48AM     3    Q.  All right.  And was anybody else with the two of you at

11:48AM          that time?

11:48AM     5    A.  No.

11:48AM     6    Q.  Okay.  So he makes this invite to you personally?

11:48AM     7    A.  He said, hey, Bongiovanni's across the street at Tappo's

11:48AM          with my brother, let's go see him.

11:48AM     9        And I said, no, that's all right.

11:48AM    10        And he asked a second time, which I said no.

11:48AM    11        And by the third time I agree, I was like, sure.

11:48AM    12    Q.  Okay.  Had -- had you and Mr. Gerace talked about

11:48AM          Mr. Bongiovanni prior to that point?

11:48AM    14    A.  At the reunion?

11:48AM    15    Q.  Yeah.

11:48AM    16    A.  I don't remember.  I don't remember doing that.  I don't

11:48AM          think so.

11:48AM    18    Q.  As far as you know, any reference to Mr. Bongiovanni was

11:48AM          because of his affiliation with the DEA?

11:49AM    20    A.  I'm assuming he's telling me that because Bongiovanni

11:49AM          worked for DEA and so did I.

11:49AM    22    Q.  Right.  Okay.  You don't recall bringing up Joe

11:49AM          Bongiovanni to Peter Gerace, correct?

11:49AM    24    A.  I don't remember doing that.

11:49AM    25    Q.  Okay.  You just remember that Peter Gerace brings up the

11:49AM   1   fact that he's aware that Joe Bongiovanni's across the

11:49AM   2   street?

11:49AM   3   A.   Said he was across the street with his brother.

11:49AM   4   Q.   And he asked you if you wanted to go across the street

11:49AM   5   with him?

11:49AM   6   A.   He did.

11:49AM   7   Q.   And you've testified now a couple times that -- that he

11:49AM   8   asked you more than once?

11:49AM   9   A.   He did.

11:49AM   10  Q.   Okay.  And you -- your testimony is it's three times that

11:49AM   11  he asked you, and then you agreed to go.

11:49AM   12  A.   Yeah, I was initially reluctant and then I agreed.

11:49AM   13  Q.   Okay.  And nothing changed between the first time and the

11:49AM   14  third time other than he had asked you again?

11:49AM   15  A.   I became curious to see Bongiovanni across the street

11:49AM   16  with Anthony Gerace with my own eyes.

11:49AM   17  Q.   Okay.  So your -- your interest now was -- was actually

11:50AM   18  going across there to see Mr. Bongiovanni?

11:50AM   19  A.   To physically see Joseph Bongiovanni socializing with

11:50AM   20  Anthony Gerace.

11:50AM   21  Q.   Okay.  So your testimony is on the third time you say

11:50AM   22  okay, I'll go across the street with you to Tappo's, and you,

11:50AM   23  you agree to actually go over to the restaurant with

11:50AM   24  Mr. Gerace, right?

11:50AM   25  A.   I walked over, correct.

11:50AM  1   Q.  And the two of you walk over together, right?

11:50AM  2   A.  Yes.

11:50AM  3   Q.  And at -- once you arrive at Tappo's, you do see that

11:50AM  4   Mr. Bongiovanni is there across the street, right?

11:50AM  5   A.  He's at the bar.

11:50AM  6   Q.  Okay.  After Tappo's, did you return to the reunion at

11:50AM  7   any point?

11:50AM  8   A.  We did.

11:50AM  9   Q.  Okay.  When you say "we did," you're talking about?

11:50AM  10  A.  Meaning me, Gerace, and Bongiovanni walked back across.

11:51AM  11  Q.  Mr. Bongiovanni joined you?

11:51AM  12  A.  The three of us walked back.

11:51AM  13  Q.  Okay.  The three of you go back to the reunion and then

11:51AM  14  do you stay there for the rest of the night?

11:51AM  15  A.  Yes.  I did.  Yeah, for however long it was.  It wasn't

11:51AM  16  very long.  I didn't stay very late.  But I did not -- yeah,

11:51AM  17  we went back there.  And from there, I went home.

11:51AM  18  Q.  And how long were you at Tappo's, do you know?  Do you

11:51AM  19  remember?

11:51AM  20  A.  The entire time?  I don't know.  Maybe a couple hours, I

11:51AM  21  can't remember for sure.  It wasn't crazy long.

11:51AM  22  Q.  Okay.  Now, based on -- I believe your testimony is that

11:51AM  23  based on things that you heard at the reunion, you decide to

11:51AM  24  start investigating Mr. Gerace, correct?

11:51AM  25  A.  It led me, at the -- when I got back to Buffalo, at some

11:51AM    1    point, to have a conversation with my supervisor about, hey,

11:51AM    2    maybe we should look into this, what are your thoughts.

11:51AM    3    Q.  Okay.  Is that the conversation you testified about on

11:52AM    4    direct where you had the intention of pursuing a subpoena?

11:52AM    5    Or did you have a conversation before that?

11:52AM    6    A.  No, it was during that same conversation that the

11:52AM    7    subpoena with the phone records came up between me and Greg.

11:52AM    8    I can't remember if he mentioned it, like, hey, subpoena the

11:52AM    9    records, or if I mentioned it to him.  But it was me

11:52AM   10    initially presenting to him maybe we should look into this,

11:52AM   11    what do you think?

11:52AM   12        And then he had -- his comment back to me was, yeah, I

11:52AM   13    think we should.  Other people have tried to investigate this

11:52AM   14    guy before for years.  No one's been able to get him.  And I

11:52AM   15    think that we should pursue this.  I think that we might find

11:52AM   16    a lot of user amounts, but hopefully we can find a source of

11:52AM   17    supply.

11:52AM   18    Q.  Okay.  And while you're testifying here today, you're

11:52AM   19    saying that the reason that you had this conversation was

11:52AM   20    because of what you heard at the reunion?

11:52AM   21    A.  It was enough for me to have a conversation with Greg

11:52AM   22    that maybe we should look into this.

11:52AM   23    Q.  Okay.  And prior to that, you had, even though you didn't

11:53AM   24    testify about it on direct, prior to that you had made

11:53AM   25    attempts to talk to other law enforcement about Mr. Gerace,

11:53AM    1   correct?

11:53AM    2   A.  What do you mean?

11:53AM    3   Q.  I'm asking you, did you ever talk to other law

11:53AM    4   enforcement about Mr. Gerace prior to that meeting?

11:53AM    5   A.  I did talk to the FBI once while I was in Las Vegas about

11:53AM    6   Mr. Gerace.

11:53AM    7   Q.  Was that in 2010?

11:53AM    8   A.  I can't remember, but it's possible.  It would have been

11:53AM    9   during that timeframe.

11:53AM   10   Q.  Would looking at a prior email related to the timeframe

11:53AM   11   help refresh your recollection?

11:53AM   12   A.  Certainly.

11:53AM   13        **MR. FOTI:**  Can we pull up just -- just for the

11:53AM   14   witness Government Exhibit 3557Y?

11:54AM   15        **BY MR. FOTI:**

11:54AM   16   Q.  So that's not in evidence, so don't read it out loud,

11:54AM   17   but--

11:54AM   18   A.  Pardon?

11:54AM   19   Q.  -- just read it to yourself.

11:54AM   20   A.  Pardon?

11:54AM   21   Q.  It's -- it's not in evidence, so don't read it out loud.

11:54AM   22   A.  Okay.  Okay.

11:54AM   23   Q.  Just read it to yourself.

11:54AM   24   A.  Okay.

11:54AM   25   Q.  And let me know when you're done.

USA v Gerace - Casullo - Foti/Cross - 11/21/24

82

| | | |
|---|---|---|
| 11:54AM | 1 | A.  Okay. |
| 11:54AM | 2 | Q.  Okay.  It was around approximately 2010 when you had the |
| 11:54AM | 3 | conversations with the FBI that you referred to? |
| 11:54AM | 4 | A.  Upon seeing that email, I would agree with that. |
| 11:54AM | 5 | Q.  Okay.  It refreshes your recollection that that's at |
| 11:54AM | 6 | least approximately the time, right? |
| 11:54AM | 7 | A.  Correct. |
| 11:54AM | 8 | Q.  Okay.  And you spoke to Tom Herbst at that time, correct? |
| 11:54AM | 9 | A.  I did. |
| 11:54AM | 10 | Q.  All right.  And you also spoke to him about |
| 11:54AM | 11 | Mr. Bongiovanni at that time, correct? |
| 11:54AM | 12 | A.  He brought it up.  Actually, I can't remember who brought |
| 11:54AM | 13 | it up.  But there became an awareness between the two of them |
| 11:55AM | 14 | that they knew each other. |
| 11:55AM | 15 | Q.  Who's the "two of them" you're talking about? |
| 11:55AM | 16 | A.  That Bongiovanni and Gerace were friends. |
| 11:55AM | 17 | Q.  Okay.  That was something that you discussed with |
| 11:55AM | 18 | Mr. Herbst at that time? |
| 11:55AM | 19 | A.  Like, for a second.  Just basically Tom knew that they -- |
| 11:55AM | 20 | Tom Herbst, the FBI agent, knew that they were friends, or |
| 11:55AM | 21 | knew each other. |
| 11:55AM | 22 | Q.  And this is back in around 2010? |
| 11:55AM | 23 | A.  Correct. |
| 11:55AM | 24 | Q.  You're talking about five years before this reunion? |
| 11:55AM | 25 | A.  Correct. |

| | | |
|---|---|---|
| 11:55AM | 1 | Q.  And did Tom Herbst reach out to you or did you reach out |
| 11:55AM | 2 | to him? |
| 11:55AM | 3 | A.  I was talking to Tom Herbst about Gerace, I believe. |
| 11:55AM | 4 | Q.  You reached out to him? |
| 11:55AM | 5 | A.  I reached out to an FBI agent named Bill Fallon who |
| 11:55AM | 6 | initially -- who passed years after this.  Bill Fallon was |
| 11:55AM | 7 | close friends with my sister, lived across the street in |
| 11:55AM | 8 | Clarence.  So I met Bill Fallon when I was going to the DEA |
| 11:55AM | 9 | Academy, because he just got back from the FBI Academy, I |
| 11:56AM | 10 | became close friends with Bill Fallon as well.  He was |
| 11:56AM | 11 | someone that I trusted, a great deal. |
| 11:56AM | 12 | So when I called the FBI, I called Bill Fallon first. |
| 11:56AM | 13 | And then Bill Fallon, who was on the JTTF, put me in contact |
| 11:56AM | 14 | with Tom Herbst because he was on the Safe Streets Task Force |
| 11:56AM | 15 | and was more appropriate for me to talk to him.  He was more |
| 11:56AM | 16 | knowledgeable about those types of things that we were |
| 11:56AM | 17 | working on. |
| 11:56AM | 18 | Q.  Any follow-up conversations with him after 2010? |
| 11:56AM | 19 | **MR. COOPER:**  With whom?  With Bill? |
| 11:56AM | 20 | **BY MR. FOTI:** |
| 11:56AM | 21 | Q.  Any -- sorry, I should rephrase that. |
| 11:56AM | 22 | Any follow-up conversations with Tom Herbst after 2010? |
| 11:56AM | 23 | A.  So I had, I believe, there were several phone calls with |
| 11:56AM | 24 | Tom.  Not about that, but about other cases, too. |
| 11:56AM | 25 | Q.  Okay.  And when you would talk to him about other cases, |

11:56AM    1    would you also talk to him about Peter Gerace?

11:56AM    2    A.  It was just initially, those initial conversations were

11:56AM    3    about Gerace, and then it was really not much after that.  It

11:57AM    4    was more towards an investigation that we were working on at

11:57AM    5    the time on guy by the name of Sam Spano.

11:57AM    6    Q.  Okay.  All right.  So 2015, this is five years after

11:57AM    7    those conversations you had with Tom Herbst, correct?

11:57AM    8    A.  Correct.

11:57AM    9    Q.  And you decide to have a conversation with your

11:57AM   10    supervisor about Mr. Gerace, correct?

11:57AM   11    A.  Correct.

11:57AM   12    Q.  And you tell him, I think that there may be a -- well,

11:57AM   13    the conversation includes a discussion of subpoenaing phone

11:57AM   14    records, correct?

11:57AM   15    A.  Yep, it came up during that conversation.

11:57AM   16    Q.  You don't remember whose idea that was?

11:57AM   17    A.  I can't remember if Greg said, hey, just subpoena the

11:57AM   18    phone number, or if I said we should do it.  It's such a

11:57AM   19    standard practice, I can't remember if it was him or I that

11:57AM   20    decided.

11:57AM   21    Q.  In any event, when it comes up you tell him I think we

11:57AM   22    might see within the call logs Joseph Bongiovanni's phone

11:57AM   23    number?

11:57AM   24    A.  I said it's possible.  Just giving you a heads-up, I

11:58AM   25    don't want you blind sided when these records come back, it's

11:58AM    1    possible that his phone number may come up in the phone

11:58AM    2    records.

11:58AM    3    Q.   Whether you suggested it or not, you've described it as

11:58AM    4    standard practice.  So when you have this conversation, you

11:58AM    5    certainly knew that a subpoena for phone records was a

11:58AM    6    possibility, right?

11:58AM    7    A.   Yeah, definitely of a possibility, beginning stages of --

11:58AM    8    of an investigation.

11:58AM    9    Q.   Okay.  So you initiate this conversation to start an

11:58AM   10    investigation that you knew is going to potentially implicate

11:58AM   11    Mr. Bongiovanni, correct?

11:58AM   12    A.   I wouldn't agree with that at -- at -- at all.  At that

11:58AM   13    point, I had no idea how close of friends they were.  And as

11:58AM   14    far as implicating Bongiovanni, I didn't think that at the

11:58AM   15    time.

11:58AM   16         I knew it was enough to have a conversation so Greg

11:58AM   17    wouldn't be blind sided.  Initially, my beliefs were that Joe

11:58AM   18    had poor judgement and had -- was friends with someone that,

11:58AM   19    based on DEA standards, he probably shouldn't have been

11:58AM   20    friends with.

11:58AM   21    Q.   When you say "Greg," you're, you're --

11:58AM   22    A.   Supervisor.

11:58AM   23    Q.   -- you're talking your supervisor, right?

11:59AM   24    A.   Yep.

11:59AM   25    Q.   He didn't come to you to talk about launching this

11:59AM  1   investigation, right?

11:59AM  2   A.  I brought it to his attention, asked him what his

11:59AM  3   thoughts were.

11:59AM  4   Q.  During the course of that conversation, did you tell him

11:59AM  5   that you went to high school with Mr. Gerace?

11:59AM  6   A.  It's either during that conversation or shortly

11:59AM  7   thereafter, I told him how Gerace and I went to high school

11:59AM  8   together.

11:59AM  9   Q.  Okay.  And did you tell him that your wife went to school

11:59AM  10  with Mr. Gerace?

11:59AM  11  A.  I may have at some point, but not initially.

11:59AM  12  Q.  Okay.  Did you tell him your brother-in-law is close

11:59AM  13  friends with Mr. Gerace?

11:59AM  14  A.  I believe at some point, but I don't think it was

11:59AM  15  initially.

11:59AM  16  Q.  Did you tell him anything that occurred in Las Vegas

11:59AM  17  involving your brother-in-law related to your professional

11:59AM  18  record?

11:59AM  19  A.  No.

11:59AM  20  Q.  And you -- you know what I'm referring to, right?

12:00PM  21  A.  Yes.

12:00PM  22  Q.  Did there come a time where you advised him of that?

12:00PM  23  A.  I don't believe I ever had that conversation with Greg.

12:00PM  24  Q.  Okay.  I want to talk to you briefly about the practice

12:00PM  25  of getting phone records because we talked -- you mentioned

12:00PM    1    it on direct, but I just want to go a little bit deeper into

12:00PM    2    it.  A subpoena is different from a warrant, correct?

12:00PM    3    A.  That's correct.

12:00PM    4    Q.  All right.  You -- you don't have to go to a court for

12:00PM    5    authorization for the subpoena, correct?

12:00PM    6    A.  It depends on the type of subpoena.

12:00PM    7    Q.  This particular type of subpoena you didn't need to,

12:01PM    8    correct?

12:01PM    9    A.  That was -- right.  The one that I issued was an

12:01PM   10    administrative subpoena, that was more or less specific to

12:01PM   11    narcotics investigations.

12:01PM   12    Q.  Okay.  And it's an administrative subpoena that you can

12:01PM   13    issue in your capacity as a special agent with DEA, correct?

12:01PM   14    A.  I can do it.  And then it goes to a supervisor for

12:01PM   15    approval.  And then once a supervisor approves it, it goes

12:01PM   16    directly to the phone carrier, if that's who you're

12:01PM   17    subpoenaing.  You can subpoena other things besides phone

12:01PM   18    carriers.

12:01PM   19    Q.  For this type of subpoena, you don't need to get anybody

12:01PM   20    from the U.S. Attorney's Office involved?

12:01PM   21    A.  They don't have to sign-off on that.  We can make them

12:01PM   22    aware of what we're doing through the course of the

12:01PM   23    investigation, but we don't need their authorization to send

12:01PM   24    an administrative subpoena.

12:01PM   25    Q.  Did you make them aware, was there anybody in the U.S.

| | | |
|---|---|---|
| 12:01PM | 1 | Attorney's Office you were consulting with? |
| 12:01PM | 2 | A.  At that point I don't think we were consulting.  It was |
| 12:01PM | 3 | at the very beginning stages.  So at that point of the |
| 12:01PM | 4 | administrative subpoena, I don't believe so. |
| 12:02PM | 5 | Q.  The only person you consulted with this was your |
| 12:02PM | 6 | supervisor that you were testifying about? |
| 12:02PM | 7 | A.  Correct. |
| 12:02PM | 8 | Q.  That you remember, at least? |
| 12:02PM | 9 | A.  Correct. |
| 12:02PM | 10 | Q.  All right.  So you issue the subpoena and get the return |
| 12:02PM | 11 | of these phone records, correct? |
| 12:02PM | 12 | A.  That's correct. |
| 12:02PM | 13 | Q.  All right.  And you review them, and you specifically |
| 12:02PM | 14 | looked for Mr. Bongiovanni's number, correct? |
| 12:02PM | 15 | A.  I was instructed by my supervisor to look for his number. |
| 12:02PM | 16 | Q.  So you did, you looked for his number? |
| 12:02PM | 17 | A.  And I did. |
| 12:02PM | 18 | Q.  Okay.  And you did locate, according to your testimony |
| 12:02PM | 19 | that there was -- that you saw his phone number in the |
| 12:02PM | 20 | records? |
| 12:02PM | 21 | A.  Right.  When I got the records back, it wasn't the actual |
| 12:02PM | 22 | records.  What happens is it comes back, and then an analyst |
| 12:02PM | 23 | will put it in readable format as opposed to, like, raw data. |
| 12:02PM | 24 | And I had a list of all the numbers that were in contact with |
| 12:02PM | 25 | Gerace's phone, and the frequency of the phone calls and the |

USA v Gerace - Casullo - Foti/Cross - 11/21/24

12:02PM    1    date range.

12:02PM    2    Q.  And what's your recollection in terms of the frequency

12:03PM    3    with the phone calls to Mr. Bongiovanni?

12:03PM    4    A.  Again, I don't remember the exact number.  I believe it

12:03PM    5    was somewhere maybe the top ten most-frequently called

12:03PM    6    numbers, I can't remember for certain.  I -- I do remember it

12:03PM    7    was definitely more than -- than one, it may have been at

12:03PM    8    least several.

12:03PM    9    Q.  Okay.

12:03PM    10   A.  Unless I saw it, I can't remember for certain.

12:03PM    11   Q.  That's okay.  So more than one?

12:03PM    12   A.  It was more than one, I remember that.

12:03PM    13   Q.  And you said it may be in the top ten, and you don't have

12:03PM    14   any memory of what the breakdown is for each of those

12:03PM    15   individuals in the top ten?

12:03PM    16   A.  Unless I saw that frequency report again, I -- I don't

12:03PM    17   remember for sure.

12:03PM    18   Q.  But in any event you see the phone number in there,

12:03PM    19   right?

12:03PM    20   A.  Yep.

12:03PM    21   Q.  And you go talk to your supervisor, correct?

12:03PM    22   A.  And I brought the actual frequency report to my

12:03PM    23   supervisor, showed it to him, and, yes.

12:03PM    24   Q.  Okay.  And did you make any -- did you document in any

12:04PM    25   way your review of that report?

USA v Gerace - Casullo - Foti/Cross - 11/21/24

90

12:04PM   1   A.  Like in what way?  In a, like, in a DEA-6 report of

12:04PM   2   investigation, like in a memo?  Like, what do you mean

12:04PM   3   exactly?

12:04PM   4   Q.  In any way.

12:04PM   5   A.  I did not document in any way on any official DEA form

12:04PM   6   that contact.

12:04PM   7   Q.  And you just mentioned that there's multiple types of

12:04PM   8   forms that you could document it in, correct?

12:04PM   9   A.  No, I just brought it to my supervisor for him to handle.

12:04PM   10  Q.  Okay.  So, you testified on direct that at some point,

12:04PM   11  there's this meeting with Mr. Bongiovanni because of tension

12:04PM   12  that's developed?

12:04PM   13  A.  I asked him if he would meet me in the -- if he would be

12:04PM   14  willing to talk to me in the DEA conference room privately,

12:04PM   15  him and I.

12:04PM   16  Q.  Okay.  And you testified on direct how this conversation

12:04PM   17  that you said happened played out between the two of you,

12:04PM   18  correct?

12:04PM   19  A.  Yes.  I went through that step by step.

12:05PM   20  Q.  And nobody else was present, obviously, correct?

12:05PM   21  A.  It was just Bongiovanni and myself.

12:05PM   22  Q.  Okay.  And you didn't document this afterwards in a

12:05PM   23  DEA-6, correct?

12:05PM   24  A.  I didn't put it in a DEA-6, but I did document in a memo

12:05PM   25  afterwards after being requested by Ed Orgon.  He told me to

12:05PM    1    prepare it for him the next day, and then he never requested

12:05PM    2    it.  He never asked for it.  But I did prepare one.

12:05PM    3    Q.  Okay.

12:05PM    4    A.  But that wasn't until, like, 2018 I believe.

12:05PM    5    Q.  All right.  So, in the -- in the days following that

12:05PM    6    meeting, you don't document it in a memorandum, correct?

12:05PM    7    A.  I did not.

12:05PM    8    Q.  In the days that follow, you didn't document in a DEA-6

12:05PM    9    or anything like that, correct?

12:05PM   10    A.  I did not.

12:05PM   11    Q.  You didn't document it in any way in relation to an

12:05PM   12    investigation of Mr. Gerace, correct?

12:05PM   13    A.  No.

12:05PM   14    Q.  And I'm talking about the days afterwards, and going

12:05PM   15    beyond that, into the months afterwards, you didn't document

12:05PM   16    it in any type of memorandum, correct?

12:06PM   17    A.  No.

12:06PM   18    Q.  Today, you've testified that you told a couple close

12:06PM   19    friends at some point about this conversation?

12:06PM   20    A.  I did.

12:06PM   21    Q.  And who -- who were they?

12:06PM   22    A.  Different special agents that I had worked with.

12:06PM   23    Q.  Yeah.  Who were they?

12:06PM   24    A.  So Amy Roderick.  She was a special agent that was my

12:06PM   25    field training agent when I was in Las Vegas.  She was in

12:06PM    1    Miami.  Her husband was my first boss, who was a special

12:06PM    2    agent in charge.  So Amy Roderick would have been one.

12:06PM    3        Another person would have been Tim Moran, who was my

12:06PM    4    supervisor in Las Vegas at one point, who I told about it,

12:06PM    5    who was working in headquarters at DEA special operations

12:06PM    6    division.

12:06PM    7        I told an agent that I worked with in New York that was

12:06PM    8    working in Buffalo, Steve Chocksey, about it.

12:06PM    9        I told Shane Nastoff, a DEA agent in Buffalo who I worked

12:06PM   10    with and trusted about it.

12:06PM   11        I told a CBP internal affairs officer who was a close

12:07PM   12    friend about it.

12:07PM   13    Q.  You told an internal affairs officer about it?

12:07PM   14    A.  I told a CBP Department of Homeland Security internal

12:07PM   15    affairs officer about it.

12:07PM   16    Q.  And as far as you know, none of these people documented

12:07PM   17    it?

12:07PM   18    A.  I have no knowledge of any of them documenting it.

12:07PM   19    Q.  Did they tell you this is something you have to report?

12:07PM   20    A.  They did not say that to me.  They're, like, oh, boy.

12:07PM   21    Most of them were, like, oh, boy.

12:07PM   22    Q.  So you're talking about at least five different

12:07PM   23    individuals that work for the federal government?

12:07PM   24    A.  They were five -- those five people that I mentioned.

12:07PM   25    And there may have been one or two others, I can't remember

USA v Gerace - Casullo - Foti/Cross - 11/21/24

93

| | | |
|---|---|---|
| 12:07PM | 1 | for sure. |
| 12:07PM | 2 | Q.  And your -- your memory is that each of them just respond |
| 12:07PM | 3 | with a general oh, boy? |
| 12:07PM | 4 | A.  No, it wasn't oh, boy.  I shouldn't explain it like that. |
| 12:07PM | 5 | But the general of, like, that's -- excuse the language, a |
| 12:07PM | 6 | bag of shit to deal with.  Yeah, that's concerning.  Is he |
| 12:07PM | 7 | involved in more?  The racist comments alone are horrifying. |
| 12:08PM | 8 | That would start an internal investigation.  And is there |
| 12:08PM | 9 | even more than that, as far as, is this guy corrupt working |
| 12:08PM | 10 | both sides? |
| 12:08PM | 11 | Q.  Yeah, I mean -- |
| 12:08PM | 12 | A.  That's the sentiment. |
| 12:08PM | 13 | Q.  The alleged racist comments, if somebody believes it, |
| 12:08PM | 14 | they've got -- they have a responsibility to do something |
| 12:08PM | 15 | about it, don't they? |
| 12:08PM | 16 | A.  Yes.  Yes. |
| 12:08PM | 17 | Q.  And Shane Nastoff is somebody you work with in Buffalo, |
| 12:08PM | 18 | correct? |
| 12:08PM | 19 | A.  Yes. |
| 12:08PM | 20 | Q.  And he would work with the DEA in Buffalo, correct? |
| 12:08PM | 21 | A.  Yes. |
| 12:08PM | 22 | Q.  And if you tell him about that, he also has a |
| 12:08PM | 23 | responsibility to report it, correct? |
| 12:08PM | 24 | A.  I'm pretty sure that that's part of the policy. |
| 12:08PM | 25 | Q.  Did he tell you, hey, you've got to report this? |

USA v Gerace - Casullo - Foti/Cross - 11/21/24

| | | |
|---|---|---|
| 12:08PM | 1 | Otherwise, I'm holding on to information that I'm obligated |
| 12:08PM | 2 | to report? |
| 12:08PM | 3 | A.  He never said that. |
| 12:08PM | 4 | Q.  He never told you that you have a responsibility to |
| 12:08PM | 5 | report this? |
| 12:08PM | 6 | A.  No. |
| 12:08PM | 7 | Q.  And you didn't report it? |
| 12:08PM | 8 | A.  I didn't. |
| 12:08PM | 9 | Q.  This -- this conversation that allegedly includes racial |
| 12:08PM | 10 | slurs, you didn't feel was necessary to report at that time? |
| 12:08PM | 11 | A.  Oh, it was necessary, I just chose not to. |
| 12:08PM | 12 | Q.  Okay.  And let's talk about why it's necessary.  You |
| 12:09PM | 13 | talked about on direct that you take an oath, correct? |
| 12:09PM | 14 | A.  That is correct. |
| 12:09PM | 15 | Q.  And that oath isn't just to follow DEA policy, right? |
| 12:09PM | 16 | A.  There's multiple things to that oath. |
| 12:09PM | 17 | Q.  And you specifically talked about protecting the |
| 12:09PM | 18 | Constitution, right? |
| 12:09PM | 19 | A.  Yes. |
| 12:09PM | 20 | Q.  And now you're saying that an agent supposedly made a |
| 12:09PM | 21 | comment to you that he has a racial bias against black people |
| 12:09PM | 22 | and Hispanic people, right? |
| 12:09PM | 23 | A.  Correct. |
| 12:09PM | 24 | Q.  And if you don't say something, then that person is going |
| 12:09PM | 25 | to be able to continue his investigation with a bias into |

12:09PM    1    everything he touches after that, right?

12:09PM    2    A.  I never said anything, and he continued to work in the

12:09PM    3    office, and I was still trying to figure out how to handle

12:09PM    4    it.

12:09PM    5    Q.  So you decided after the supposed conversation you were

12:09PM    6    going to allow a DEA agent to continue investigating

12:09PM    7    individuals that you believed was racist?

12:09PM    8    A.  I was trying --

12:09PM    9         **MR. COOPER:**  Objection.  Objection as to the form of

12:09PM   10    that question.  Allow, Judge.

12:09PM   11         **THE COURT:**  No, overruled.

12:09PM   12         **THE WITNESS:**  I was trying to figure out what to do.

12:09PM   13         **BY MR. FOTI:**

12:09PM   14    Q.  And you talked to at least one other individual in --

12:10PM   15    that works in Buffalo law enforcement, correct?

12:10PM   16    A.  There were the people I just mentioned.

12:10PM   17    Q.  Including Shane Nastoff, correct?

12:10PM   18    A.  Shane was in Buffalo, the CBP internal affairs officer

12:10PM   19    was in Buffalo.  Who else did I mention, Steve Chocksey

12:10PM   20    worked in Buffalo.  So there were three.

12:10PM   21    Q.  You don't know whether these people believed you or not?

12:10PM   22    A.  What -- what do I believe if they believed me?  I believe

12:10PM   23    they believed me.

12:10PM   24    Q.  Your impression is that they believed you?

12:10PM   25    A.  Absolutely.

12:10PM    1    Q.  They acted as if they believed you?

12:10PM    2    A.  Absolutely.

12:10PM    3    Q.  But obviously, if they did believe you, they would have

12:10PM    4    had some responsibility --

12:10PM    5            MR. COOPER:  Objection.

12:10PM    6            BY MR. FOTI:

12:10PM    7    Q.  -- to follow up?

12:10PM    8            MR. COOPER:  Objection.

12:10PM    9            THE COURT:  Overruled.

12:10PM   10            THE WITNESS:  Could you repeat that please?

12:10PM   11            BY MR. FOTI:

12:10PM   12    Q.  If they did believe you, they would have a professional

12:10PM   13    responsibility to follow up, correct?

12:10PM   14    A.  If their policy is the same as DEA's, then they would

12:10PM   15    have -- the ones that worked for DEA, the one that wasn't,

12:10PM   16    I'm -- I believe that his policy was probably the same, they

12:10PM   17    should have.

12:10PM   18    Q.  You know that every federal law enforcement agency has a

12:10PM   19    responsibility to make sure that they're not guided by

12:10PM   20    racism, correct?

12:10PM   21    A.  Of course.  Of course.

12:11PM   22    Q.  And, obviously, if there's an agent that's involved in

12:11PM   23    investigations in Buffalo, New York that's racist, anybody

12:11PM   24    who is a part of law enforcement would have some obligation

12:11PM   25    to report that, correct?

USA v Gerace - Casullo - Foti/Cross - 11/21/24
97

12:11PM    1   A.  If I had said that to him, yes.

12:11PM    2   Q.  And if they believed you, they would have had to do

12:11PM    3   something about it, right?

12:11PM    4   A.  They would've been -- they would have been responsible --

12:11PM    5   they would have had to have done as well, as far as their

12:11PM    6   policy.

12:11PM    7   Q.  As far as you know, nobody ever did?

12:11PM    8   A.  I don't believe so.

12:11PM    9   Q.  As far as you know, nobody ever has any follow-up

12:11PM   10   conversation with their supervisors or anybody else?

12:11PM   11   A.  About what I told them?  I have no idea.  I have no idea

12:11PM   12   who they spoke to.

12:11PM   13   Q.  Okay.  So the point in which this -- you officially

12:12PM   14   report that this conversation happened is in August of 2018,

12:12PM   15   correct?

12:12PM   16   A.  That was the first time I mentioned it to a DEA

12:12PM   17   supervisor.

12:12PM   18   Q.  And you mentioned it to --

12:12PM   19   A.  The U.S. Attorney's Office.

12:12PM   20   Q.  Yeah.  And that was a meeting in regard to a potential

12:12PM   21   conflict that existed, correct?

12:12PM   22   A.  It was brought to my attention that -- do you want me

12:12PM   23   to --

12:12PM   24   Q.  Without getting into the specifics --

12:12PM   25   A.  Sure, sure.

12:12PM   1   Q.  -- generally, the meeting was called because there was

12:12PM   2   the potential that a conflict existed?

12:12PM   3   A.  That there was a possible conflict.

12:12PM   4   Q.  And the potential conflict related to your

12:12PM   5   brother-in-law, correct?

12:12PM   6   A.  That he was present.

12:12PM   7   Q.  And you were asked about your relationship with him,

12:12PM   8   correct?

12:12PM   9   A.  With my wife's brother?

12:12PM  10   Q.  During the course of this meeting, you were asked about

12:12PM  11   your relationship with your brother-in-law, correct?

12:12PM  12   A.  I really don't remember anything in depth other than that

12:12PM  13   being my brother-in-law, and we don't talk.

12:13PM  14   Q.  And you were told at some point that you could no longer

12:13PM  15   continue an investigation into Mr. Gerace, correct?

12:13PM  16   A.  Right.  Not during that meeting at the U.S. Attorney's

12:13PM  17   Office, but afterwards when I had followup meetings with my

12:13PM  18   resident agent in charge.

12:13PM  19   Q.  Okay.  During that meeting, though, the conversation

12:13PM  20   comes up or the during the conversation, your

12:13PM  21   brother-in-law's brought up, correct?

12:13PM  22   A.  During the one with my resident agent in charge.

12:13PM  23   Q.  In August 1st, 2018, the -- during the course of the

12:13PM  24   conversation on August 1st, 2018, your brother-in-law is

12:13PM  25   brought up, correct?

12:13PM    1    A.  I'm sorry, I'm not trying to be difficult, I'm trying

12:13PM    2    to --

12:13PM    3    Q.  No, that's okay.

12:13PM    4    A.  The meeting with my -- with Ed Orgon?  Or the one at the

12:13PM    5    U.S. Attorney's Office?

12:13PM    6    Q.  Well, let's -- let's go through both.

12:13PM    7    A.  Okay.

12:13PM    8    Q.  All right.  When does -- in one of those meetings, your

12:13PM    9    brother-in-law's name is brought up, correct?

12:13PM    10   A.  The one at the U.S. Attorney's Office.  The first one.

12:13PM    11   Q.  Okay.  So the other meeting takes place after you had

12:14PM    12   went to the U.S. Attorney's Office?

12:14PM    13   A.  Based on what I told them.  I had to meet with my

12:14PM    14   resident agent in charge and supervisor alone.

12:14PM    15   Q.  Okay.  So I wasn't being clear because there were two

12:14PM    16   meetings on that date.  So --

12:14PM    17   A.  I don't know if it was the same day, it might have been

12:14PM    18   like the next day.

12:14PM    19   Q.  All right.  Well, I'm specifically asking about the

12:14PM    20   meeting at the U.S. Attorney's Office on August 1st, 2018.

12:14PM    21   A.  Okay.

12:14PM    22   Q.  Okay?  During the course of that meeting, on August 1st,

12:14PM    23   2018, you -- your brother-in-law's name was brought up,

12:14PM    24   correct?

12:14PM    25   A.  It was.

12:14PM   1   Q.  Who brought it up, his name up?

12:14PM   2   A.  The name of the Assistant U.S. Attorney?

12:14PM   3   Q.  Yeah.

12:14PM   4   A.  Joe Tripi.

12:14PM   5   Q.  Okay.  And it was brought up in the context that there

12:14PM   6   could be a potential conflict here, correct?

12:14PM   7   A.  Correct.

12:14PM   8   Q.  Okay.  And did you discuss what happened back in

12:14PM   9   Las Vegas in regards to your brother-in-law?

12:14PM  10   A.  We didn't go into specifics.  I said are you -- I think

12:14PM  11   it was, are you aware of --

12:14PM  12         MR. COOPER:  Judge, I'm going to object to hearsay.

12:14PM  13   The contents of this conversation are hearsay.

12:15PM  14         THE COURT:  Well, the question is:  Did you discuss

12:15PM  15   what happened back in Las Vegas in regards to your

12:15PM  16   brother-in-law?

12:15PM  17         You object to that question.

12:15PM  18         MR. COOPER:  What's happening right now, I'm

12:15PM  19   saying --

12:15PM  20         THE COURT:  I understand that.  He's not -- he's --

12:15PM  21   what I'm pointing out is he's going beyond the question.

12:15PM  22         Do you have a problem with him answering that

12:15PM  23   question?

12:15PM  24         MR. COOPER:  I'm objecting to hearsay as the answer

12:15PM  25   is hearsay.  I'm -- I'm not sure I'm picking up on --

12:15PM  1      **THE COURT:**  Okay.  So, so, Mr. Casullo, I want you to

12:15PM  2  answer the question that was asked.

12:15PM  3      The question that was asked was, hang on:  And did

12:15PM  4  you discuss what happened back in Las Vegas in regards to your

12:15PM  5  brother-in-law?

12:15PM  6      **THE WITNESS:**  Okay.

12:15PM  7      **THE COURT:**  Yes or no?

12:15PM  8      **THE WITNESS:**  Yes, to some extent.  Yes, something

12:15PM  9  was said.

12:15PM  10      **THE COURT:**  Next question.

12:15PM  11      **BY MR. FOTI:**

12:15PM  12  Q.  Something by you?

12:15PM  13  A.  That I said to the AUSA.

12:16PM  14  Q.  Okay.  And it's after this meeting that subsequently

12:16PM  15  you're told that you're no longer going to be involved in the

12:16PM  16  prosecution -- or, the investigation into Mr. Gerace,

12:16PM  17  correct?

12:16PM  18  A.  So, after that meeting, I believe it was either the next

12:16PM  19  day, it wasn't the same day I don't think, but the next day I

12:16PM  20  had to meet with Ed Orgon, the resident agent in charge.  It

12:16PM  21  was during that meeting that I was told that I was off the

12:16PM  22  Gerace investigation.

12:16PM  23  Q.  Okay.  Earlier I asked you if there came a time that you

12:16PM  24  learned that your brother-in-law and Peter Gerace were close

12:16PM  25  friends, right?

12:16PM    1    A.  Yes.

12:16PM    2    Q.  And you -- indicated you did learn that to be the case at

12:16PM    3    some point, correct?

12:16PM    4    A.  At some point, I knew.  I became aware that they were

12:17PM    5    good friends.

12:17PM    6    Q.  Okay.  You certainly knew by 2018, right?

12:17PM    7    A.  Yes.

12:17PM    8    Q.  So when these conversations are happening, you're aware

12:17PM    9    of the relationship between your brother-in-law and Peter

12:17PM   10    Gerace, correct?

12:17PM   11    A.  Yes.

12:17PM   12    Q.  Okay.  And on direct, you testified that your

12:17PM   13    brother-in-law's no longer allowed to even come by the house,

12:17PM   14    correct?

12:17PM   15    A.  He hasn't been for a couple years.  And he tried to come

12:17PM   16    once, and I told my wife he can't be here.  And that was a

12:17PM   17    couple years ago.  It was actually during Thanksgiving.

12:17PM   18    Q.  During Thanksgiving of -- you said a couple years ago,

12:17PM   19    after the --

12:17PM   20    A.  It could have been three years ago, I can't remember.  It

12:17PM   21    was at least two, maybe three.

12:17PM   22    Q.  Post COVID?

12:17PM   23    A.  I don't remember.

12:17PM   24    Q.  Okay.  All right.  When did your brother-in-law move back

12:17PM   25    to Buffalo?

| | | |
|---|---|---|
| 12:17PM | 1 | A.  So sometime while I was working in New York City, which |
| 12:17PM | 2 | was -- so I got to New York City in December of 2013. |
| 12:18PM | 3 | Shortly after that, I think he moved back to Buffalo for a |
| 12:18PM | 4 | couple of months, which was around 2014. |
| 12:18PM | 5 | Q.  So after you leave Las Vegas, he moves after that? |
| 12:18PM | 6 | A.  Yes.  When I went to New York City, he moved back to |
| 12:18PM | 7 | Buffalo for a short period of time. |
| 12:18PM | 8 | Q.  Okay.  Now, I've been alluding to something that happened |
| 12:18PM | 9 | with him back in Las Vegas, and you said you know what I'm |
| 12:18PM | 10 | referring to, right? |
| 12:18PM | 11 | A.  Yes. |
| 12:18PM | 12 | Q.  And that was -- |
| 12:18PM | 13 | MR. COOPER:  Objection.  I'd ask that we come up. |
| 12:18PM | 14 | THE COURT:  Come on up. |
| 12:18PM | 15 | (Sidebar discussion on the record.) |
| 12:18PM | 16 | MR. COOPER:  Judge, it's my understanding that |
| 12:18PM | 17 | there's a pretrial ruling that circumscribes the extent to |
| 12:18PM | 18 | which this topic is going to be covered during the course of |
| 12:18PM | 19 | the trial. |
| 12:18PM | 20 | THE COURT:  Yeah, I remember vaguely. |
| 12:18PM | 21 | MR. COOPER:  Well, that's what I want to conference, |
| 12:18PM | 22 | and so I'm not. |
| 12:19PM | 23 | MR. FOTI:  I only, remember vaguely with him saying |
| 12:19PM | 24 | it, but I -- whatever the analysis was back then, I think it's |
| 12:19PM | 25 | been established that there's a close relationship in 2000 -- |

12:19PM   1   that he's aware of in 2018 when he's making these allegations

12:19PM   2   regarding Phil, his brother-in-law, and Peter Gerace, and any

12:19PM   3   history that -- where he is professionally reprimanded with

12:19PM   4   regards to -- to one of Peter's close friends is relevant.  It

12:19PM   5   goes to bias.

12:19PM   6          THE COURT:  Because?

12:19PM   7          MR. FOTI:  Because it -- it potentially influences a

12:19PM   8   bias that he would have against any of Phil's friends,

12:19PM   9   including Peter Gerace.

12:19PM   10          THE COURT:  Yeah, why not, Mr. Cooper?

12:19PM   11          MR. COOPER:  Judge, because he's spent a lot more

12:19PM   12   time with this issue other than the 30 seconds that we've been

12:19PM   13   up here.  We -- I believe this was briefed, it was argued.

12:19PM   14   And what the ultimate determination that the Court made was

12:20PM   15   that there could be cross-examination, my best recollection of

12:20PM   16   it is cross-examination indicating in sum and substance your

12:20PM   17   brother-in-law caused problems for you when you were out in

12:20PM   18   Las Vegas and that that was it.  And that you weren't getting

12:20PM   19   into discipline.  You're not allowing questioning into

12:20PM   20   potential discipline or underlying facts.

12:20PM   21          THE COURT:  This is starting to come back to me now.

12:20PM   22   So -- so why can't you ask, did your brother-in-law cause

12:20PM   23   problems for you that created issues professionally for you

12:20PM   24   when you were in Las Vegas?

12:20PM   25

12:20PM    1    **MR. FOTI:** Well, I guess as a preliminary point, was

12:20PM    2    that in regards to -- did we brief that? I don't remember

12:20PM    3    briefing that. Or was that Bongiovanni?

12:20PM    4    I think that was an analysis associated with

12:20PM    5    Mr. Bongiovanni. It doesn't have the same friendship with

12:20PM    6    Phil, so my argument would be different than it would be if we

12:20PM    7    were in the Bongiovanni case.

12:20PM    8    **MR. COOPER:** I think it's the exact same argument

12:20PM    9    because Bongiovanni is in --

12:20PM    10    Well, this is my position, you have your position.

12:20PM    11    It's the exact same argument.

12:20PM    12    Because Bongiovanni is in a conspiracy with Gerace,

12:20PM    13    the Bongiovanni attorneys wanted to make the exact same

12:21PM    14    argument.

12:21PM    15    **THE COURT:** Was this -- was this a pretrial ruling in

12:21PM    16    Bongiovanni?

12:21PM    17    **MR. COOPER:** Correct. It's in Bongiovanni. I don't

12:21PM    18    recall it being --

12:21PM    19    **MR. TRIPI:** You -- you chimed in, you -- you gave

12:21PM    20    them the transcript from the rulings that you had and allowed

12:21PM    21    them to brief anything further.

12:21PM    22    And I'm not being critical, they didn't brief it

12:21PM    23    further, so I feel like this is a lot to put on the Court in

12:21PM    24    this moment. If it's going to be a whole --

12:21PM    25    **THE COURT:** This isn't the first time that's

12:21PM    1    happened.

12:21PM    2        **MR. TRIPI:**  I'm not trying to be critical of anybody,

12:21PM    3    okay?  Everyone's advocating.

12:21PM    4        But -- but there's a lot of history here.  Because,

12:21PM    5    in other words, in the Vegas situation as I recall the

12:21PM    6    records, I haven't looked at them in a while, but there's a --

12:21PM    7    there's a referral, it's the issue with an undercover, right?

12:21PM    8        **THE COURT:**  Issue of --

12:21PM    9        **MR. TRIPI:**  Just maybe if I state some facts it will

12:21PM   10    trigger a memory.  But Casullo in 2003 or '4, whatever it is,

12:21PM   11    he's in Las Vegas, he's at a bar, there's an undercover

12:21PM   12    operation going on, they're with his brother-in-law, and

12:22PM   13    there's that sequence of phone calls that leads the agent with

12:22PM   14    the FBI to believe that Casullo might have, like, tipped off

12:22PM   15    or whatever.

12:22PM   16        **THE COURT:**  Yeah.

12:22PM   17        **MR. TRIPI:**  So then there's an investigation that was

12:22PM   18    triggered.

12:22PM   19        **THE COURT:**  Yeah, I know.

12:22PM   20        **MR. TRIPI:**  Ultimately, there's no -- there's no,

12:22PM   21    find -- this is something that if he did that, he would have

12:22PM   22    been fired and prosecuted for it.

12:22PM   23        **THE COURT:**  Yes.

12:22PM   24        **MR. TRIPI:**  So there was no finding.

12:22PM   25        **THE COURT:**  Right.

12:22PM   1          **MR. TRIPI:**  So this is -- there was -- there was some

12:22PM   2   investigation.  I don't remember if there was, like, a letter

12:22PM   3   of reprimand or anything like that.  I don't remember.

12:22PM   4          But certainly later on in life, and we argued this to

12:22PM   5   you before, he then -- Casullo works for the FBI, works with

12:22PM   6   the FBI, and in fact later works in the task force here in the

12:22PM   7   FBI where it's led by a guy who was back in Las Vegas who knew

12:22PM   8   the circumstances at the time.

12:22PM   9          **THE COURT:**  Yeah.  But -- let's get back to, so, so

12:22PM   10  the point you want to make is that the brother-in-law caused

12:22PM   11  problems for him in Las Vegas, right?

12:23PM   12         **MR. FOTI:**  Yeah, I think -- I think I want -- I do

12:23PM   13  want to get -- well, there's something that Eric wanted to

12:23PM   14  add.

12:23PM   15         **MR. SOEHNLEIN:**  I'm sorry, I just wanted, with

12:23PM   16  respect to -- I'm soft spoken.

12:23PM   17         With respect to the timeline, I just want to note

12:23PM   18  that whatever the pretrial ruling was, the pretrial analysis,

12:23PM   19  our final pretrial conference where we argued this was

12:23PM   20  October 25th.  The documents were disclosed to us

12:23PM   21  October 30th.  After that pretrial conference when we got an

12:23PM   22  email for who would be the initial witnesses in the trial is

12:23PM   23  when we got disclosure on this issue.  Just to set the table.

12:23PM   24         **MR. FOTI:**  And Mr. Tripi's not -- I mean, saying that

12:23PM   25  that -- that we erred in some way, but that is true.

USA v Gerace - Casullo - Foti/Cross - 11/21/24

12:23PM   1          THE COURT:  Talk about the issue.  Talk about the

12:23PM   2     issue.

12:23PM   3          MR. FOTI:  In terms of the issue, Judge, I do think

12:23PM   4     the extent matters.  Saying you were reprimanded can mean

12:23PM   5     almost -- it doesn't mean anything.  It means a supervisor

12:23PM   6     could -- could say --

12:23PM   7          THE COURT:  Okay.  We've got to break.  We can't --

12:23PM   8     we can't do this now.  We're going to break for lunch.  I've

12:23PM   9     got a 12:30, we'll come back at 1 and do this.

12:24PM  10          MR. TRIPI:  Can I also make two other brief record

12:24PM  11     things?

12:24PM  12          THE COURT:  Yeah, about this?

12:24PM  13          MR. TRIPI:  Generally about this subject.  But we --

12:24PM  14     so, obviously I was -- I was in a meeting that you just

12:24PM  15     crossed about --

12:24PM  16          THE COURT:  Yeah.

12:24PM  17          MR. TRIPI:  -- with the supervisor.  Just by way of

12:24PM  18     disclosure.  He -- his recollection controls, but -- and he

12:24PM  19     testified that we brought this issue up in that meeting.

12:24PM  20          I will, I initially brought it up with his

12:24PM  21     supervisor, not with him.

12:24PM  22          And then I used the police report that lists Phil

12:24PM  23     Domiano on it initially with him to say the situation is too

12:24PM  24     close.

12:24PM  25          His supervisors followed up probably in the manner he

12:24PM    1    recalls.  But I just want to be clear to the extent I was

12:24PM    2    there, and if it went a little bit different, I want to let

12:24PM    3    you know.

12:24PM    4              **THE COURT:**  Um-hmm.

12:24PM    5              **MR. FOTI:**  I think it said it in one of the

12:24PM    6    memorandums, I think.

12:24PM    7              **MR. TRIPI:**  So, you know, I'm just sitting there, I'm

12:24PM    8    hearing it, and it's a little bit different than I recall it.

12:24PM    9    So I just wanted to make sure to cover the sequence.

12:24PM   10              And then at some point, I don't think this is in any

12:25PM   11    formal interview or whatever, at some point when these events

12:25PM   12    were occurring, you can imagine there were a lot of back and

12:25PM   13    forth between various members of the U.S. Attorney's Office,

12:25PM   14    DEA and DEA agents.

12:25PM   15              At one point I recall having a conversation with

12:25PM   16    Shane Nastoff, and that's information in my brain that he's

12:25PM   17    asking these questions.  Nastoff indicated to me that he

12:25PM   18    learned the information closer in time -- he believed he

12:25PM   19    learned the information closer in time to when DEA management

12:25PM   20    did.  The timing of it wasn't Mark's question.  I think the

12:25PM   21    timing of it was -- was, you know, who did you tell.

12:25PM   22              **MR. FOTI:**  Yeah.

12:25PM   23              **MR. TRIPI:**  But I think that, you know, I think that

12:25PM   24    Nastoff would say I believe I learned it around the time

12:25PM   25    management did.  So, you have that now.

| | | |
|---|---|---|
| 12:25PM | 1 | **MR. FOTI:**  Yeah. |
| 12:25PM | 2 | **MR. TRIPI:**  I'm just trying to think if there's |
| 12:25PM | 3 | anything else surrounding that. |
| 12:25PM | 4 | I think at one point Casullo indicated another name, |
| 12:25PM | 5 | maybe he told Dave Davidzik, you might want to ask about that. |
| 12:26PM | 6 | And Dave Davidzik, my recollection, learned it closer |
| 12:26PM | 7 | in time to when this happened, the -- the June conversation. |
| 12:26PM | 8 | So -- |
| 12:26PM | 9 | **THE COURT:**  Okay. |
| 12:26PM | 10 | **MR. FOTI:**  Thank you, Judge. |
| 12:26PM | 11 | (End of sidebar discussion.) |
| 12:26PM | 12 | **THE COURT:**  Okay.  We have some legal work we have to |
| 12:26PM | 13 | do, and I don't want to waste your time while we're doing it. |
| 12:26PM | 14 | I also have another matter that I've got to handle at |
| 12:26PM | 15 | 12:30, so we are going to break for lunch. |
| 12:26PM | 16 | So remember my instructions.  Don't talk about this |
| 12:26PM | 17 | case with anyone.  Don't communicate electronically or in any |
| 12:26PM | 18 | other way about the case.  Don't research the case |
| 12:26PM | 19 | electronically or in any other way.  Don't read or watch or |
| 12:26PM | 20 | listen to any news coverage, if there is any.  And don't make |
| 12:26PM | 21 | up your mind until you start deliberating. |
| 12:26PM | 22 | Come back at 1:30.  Thanks very much. |
| 12:27PM | 23 | (Jury excused at 12:27 p.m.) |
| 12:27PM | 24 | **THE COURT:**  Okay.  Mr. Casullo, you can step down. |
| 12:27PM | 25 | And you're not to talk to anyone during the break -- |

USA v Gerace - Casullo - Foti/Cross - 11/21/24

| | | |
|---|---|---|
| 12:27PM | 1 | **THE WITNESS:** Yes, Judge. |
| 12:27PM | 2 | **THE COURT:** -- about this case, obviously. |
| 12:27PM | 3 | **THE WITNESS:** Yes, Judge. |
| 12:27PM | 4 | (Witness excused at 12:27 p.m.) |
| 12:27PM | 5 | **THE COURT:** Let's wait until he leaves. |
| 12:27PM | 6 | So, we'll come back at 1 to talk about the issue that |
| 12:27PM | 7 | we were just talking about. I'm gonna want to see what you |
| 12:27PM | 8 | want to get into. And I'll want to know the extent you want |
| 12:27PM | 9 | to get into it. |
| 12:27PM | 10 | **MR. FOTI:** Sure. |
| 12:27PM | 11 | **THE COURT:** And -- and why. And then we'll, we'll |
| 12:27PM | 12 | revisit this issue. |
| 12:28PM | 13 | **MR. TRIPI:** Yeah. My -- I think you -- I think we |
| 12:28PM | 14 | made initially an ex parte, you ordered disclosures, so I'll |
| 12:28PM | 15 | go back and look at those materials. |
| 12:28PM | 16 | **THE COURT:** Yeah, please. |
| 12:28PM | 17 | **MR. TRIPI:** Yeah. |
| 12:28PM | 18 | **THE COURT:** Great. Okay? See you all. |
| 12:28PM | 19 | Anything else that we need to do before we break from |
| 12:28PM | 20 | the defense? |
| 12:28PM | 21 | **MR. SOEHNLEIN:** I don't think so, no. |
| 12:28PM | 22 | **THE COURT:** Okay. From the government? |
| 12:28PM | 23 | **MS. CHALBECK:** No, Judge. |
| 12:28PM | 24 | **THE COURT:** All right, terrific. Okay. We'll see |
| 12:28PM | 25 | you at 1. |

| | | |
|---|---|---|
| 12:28PM | 1 | **THE CLERK:**  All rise. |
| 12:28PM | 2 | (Off the record at 12:28 p.m.) |
| 01:05PM | 3 | (Back on the record at 1:05 p.m.) |
| 01:05PM | 4 | (Jury not present.) |
| 01:05PM | 5 | **THE CLERK:**  All rise. |
| 01:05PM | 6 | **THE COURT:**  Please be seated. |
| 01:05PM | 7 | **THE CLERK:**  We are back on the record for the |
| 01:06PM | 8 | continuation of the jury trial in case number 19-cr-227 and |
| 01:06PM | 9 | 23-cr-37, United States of America versus Peter Gerace, Jr. |
| 01:06PM | 10 | All counsel and parties are present. |
| 01:06PM | 11 | **THE COURT:**  Okay.  So I thought about this a little |
| 01:06PM | 12 | bit.  Let me tell you what my -- my preliminary thoughts are. |
| 01:06PM | 13 | This is a little different than the Bongiovanni case, |
| 01:06PM | 14 | and I do think there -- there may be room for the defense to |
| 01:06PM | 15 | get into a little bit more. |
| 01:06PM | 16 | I don't think the details of what happened in |
| 01:06PM | 17 | Las Vegas are fair game because I don't think the details add |
| 01:06PM | 18 | anything. |
| 01:06PM | 19 | But perhaps -- so tell me, what was the -- what was |
| 01:06PM | 20 | the result?  Was there a reprimand?  What was it? |
| 01:06PM | 21 | **MR. TRIPI:**  I just reviewed it.  I can hand it up to |
| 01:06PM | 22 | you, too, Judge.  But it was ultimately -- there was a letter |
| 01:06PM | 23 | of reprimand that he used poor judgment.  And it was based |
| 01:06PM | 24 | upon the -- the end result was a letter of reprimand for poor |
| 01:07PM | 25 | judgment.  The lynchpin of the analysis essentially was that |

USA v Gerace - Casullo - Foti/Cross - 11/21/24

113

01:07PM 1    he was complaining loudly to his wife about his P-O-S

01:07PM 2    brother-in-law --

01:07PM 3         **THE COURT:**  Right.

01:07PM 4         **MR. TRIPI:**  -- and why he was with an undercover.

01:07PM 5         **THE COURT:**  Right.

01:07PM 6         **MR. TRIPI:**  And the mother overheard --

01:07PM 7         **THE COURT:**  Overhead it.

01:07PM 8         **MR. TRIPI:**  -- and made a phone call.

01:07PM 9         **MR. COOPER:**  And so, Judge, if we -- if you're

01:07PM 10   allowing the letter of reprimand in, which I don't think is

01:07PM 11   probative of his truthfulness in any way, and I don't think it

01:07PM 12   goes to any bias that he has, if you allow that in, then I

01:07PM 13   think I would kind of be required in order to explain to the

01:07PM 14   jury that there's an innocent explanation for all this and

01:07PM 15   what that is.

01:07PM 16        And it kind of becomes this trial within a trial.

01:07PM 17   Because then he's recrossed on those facts that I've

01:07PM 18   directed -- redirected him on.

01:07PM 19        **THE COURT:**  Yeah, I -- I'm not, I'm not inclined to

01:07PM 20   let that in.  But the fact that he received a reprimand, I am

01:07PM 21   inclined to let in.

01:07PM 22        **MR. COOPER:**  But I guess my concern there then,

01:07PM 23   Judge, is that I -- if you're not inclined to let the

01:08PM 24   underlying facts in, it makes it sound worse than it is.

01:08PM 25   Because --

01:08PM  1      **THE COURT:**  Oh, I don't think so.  I don't think so.

01:08PM  2  It's a reprimand.  It's not a -- it's not a -- it's not

01:08PM  3  anything else.

01:08PM  4      Is there anything more -- but let me -- let me just

01:08PM  5  ask this.  Is there anything more that you think you should be

01:08PM  6  allowed to go into?

01:08PM  7      **MR. FOTI:**  No.  No.  I think the reality is for the

01:08PM  8  purposes of what we want to get into it for, the letter of

01:08PM  9  reprimand covers.  I don't think the underlying facts make a

01:08PM  10  difference.

01:08PM  11      I think the underlying facts may ultimately bear on

01:08PM  12  his credibility in some way, but not in a way that I think.

01:08PM  13      **THE COURT:**  So -- so let me ask the government this

01:08PM  14  then.  Is there a way to get in that there was some

01:08PM  15  employment-related action taken that would solve your problem

01:08PM  16  with the word "reprimand?"

01:08PM  17      I mean, I think a reprimand is just such a -- such a

01:08PM  18  mild sanction, but -- but, I mean, is there some -- is there

01:08PM  19  some -- I mean, so -- so if he said there was a job-related

01:09PM  20  sanction, I think that'd be worse, right?  I think that would

01:09PM  21  be worse than a reprimand.

01:09PM  22      But, but I'm open to discussion about whether there

01:09PM  23  is a way to phrase it in -- in a different way that allows the

01:09PM  24  jury --

01:09PM  25      So the reason is, because -- because Gerace is

01:09PM    1    friends -- is such good friends with this guy, it's different

01:09PM    2    than Bongiovanni.  It's different.  The bias that results from

01:09PM    3    what Domiano does to Casullo is different against Mr. Gerace

01:09PM    4    than it is against Mr. Bongiovanni.  It's a different --

01:09PM    5    it's -- it's a difference of kind in the bias that he might

01:09PM    6    have.  And so I -- and so for that reason, I think that

01:09PM    7    there's a little bit, not a lot, but a little bit more the

01:09PM    8    defense is entitled to do in this case than it was in

01:09PM    9    Bongiovanni.

01:09PM   10          **MR. COOPER:**  Can we confer for a moment?

01:09PM   11          **THE COURT:**  Absolutely.

01:10PM   12          **MR. COOPER:**  Judge, what we just discussed is if the

01:11PM   13    Court is inclined to allow defense counsel to question about

01:11PM   14    the existence of a letter of reprimand related to Domiano and

01:11PM   15    Casullo's, you know, familial relationship with that person,

01:11PM   16    what we would request is the ability on redirect in a leading

01:11PM   17    fashion to elicit from the witness, isn't it true, sir, that

01:11PM   18    that letter of reprimand was related to you complaining about

01:11PM   19    the associations that your brother-in-law had out loud in

01:11PM   20    front of your wife?  Like, it needs to -- from our position,

01:11PM   21    if the letter of reprimand comes up in association with

01:11PM   22    Casullo in a vacuum, and no additional facts are offered,

01:11PM   23    that's -- I -- I view that as very prejudicial to the

01:11PM   24    government.

01:11PM   25          Because I know Mr. Foti and Mr. Soehnlein are good

01:11PM   1   advocates, and they're going to use the -- the absence of

01:11PM   2   information surrounding that in an effective way for their

01:11PM   3   client.  The actual facts --

01:11PM   4        **THE COURT:**  Let me ask the defense:  Do you object to

01:11PM   5   the facts of this getting in?

01:11PM   6        **MR. FOTI:**  I don't object to the facts if we're

01:11PM   7   talking about the full universe of facts.

01:12PM   8        **THE COURT:**  Right.  Okay.

01:12PM   9        **MR. FOTI:**  Yeah.

01:12PM  10        **THE COURT:**  So if you do that, I'll let them get into

01:12PM  11   everything.

01:12PM  12        **MR. TRIPI:**  Well, that's -- that's -- I guess that's

01:12PM  13   what we're talking about, Judge.

01:12PM  14        If -- if on -- on the reprimand piece, I think that a

01:12PM  15   limited amount of redirect should be permitted then to mete

01:12PM  16   that without opening the door to the whole underlying

01:12PM  17   consolation of facts because --

01:12PM  18        **THE COURT:**  I think -- I think -- I think you can

01:12PM  19   have it one of two ways, Mr. Tripi.  I think you can -- you

01:12PM  20   can leave it at reprimand, or we can talk about the whole kit

01:12PM  21   and caboodle.

01:12PM  22        But I -- but I -- I don't think you can slice it so

01:12PM  23   thin that you get to put the facts about it in that you want

01:12PM  24   to put in and not have the defense put everything in.  So, so

01:12PM  25   I'll leave that to you.

01:12PM  1          But -- but -- so, they can get into the fact that

01:12PM  2    there was a reprimand.  If you open the door on redirect with

01:12PM  3    the facts of the reprimand, I'm going to let them get into

01:12PM  4    everything with respect to the reprimand.  And it's just

01:13PM  5    gonna -- I think it will be a tremendous waste of time.  But

01:13PM  6    if you want to do that, we'll do it.

01:13PM  7          **MR. TRIPI:**  I -- we get into -- we start getting into

01:13PM  8    403, that's our -- that's our argument for why the reprimand

01:13PM  9    doesn't come in.

01:13PM  10         **MR. FOTI:**  And, Judge, if they want to -- look, I

01:13PM  11   think the -- if they want to on redirect get into sort of the

01:13PM  12   minimal impact of a reprimand, I'm not gonna argue that that

01:13PM  13   opens the door to anything or that's improper.

01:13PM  14         **THE COURT:**  Right.  I think that's right.

01:13PM  15         **MR. FOTI:**  But obviously, if they get into the

01:13PM  16   underlying facts, then yes.

01:13PM  17         **THE COURT:**  I think that's right.  I think, you know,

01:13PM  18   is a reprimand the least -- the -- the least serious form

01:13PM  19   of -- of --

01:13PM  20         **MR. COOPER:**  Can we have one second?

01:13PM  21         **THE COURT:**  Something along those lines.

01:16PM  22         **MR. TRIPI:**  Judge, I'm going to read from the letter

01:16PM  23   if I may.

01:16PM  24         **THE COURT:**  Go ahead.

01:16PM  25         **MR. TRIPI:**  The -- it says that the -- proposed

01:16PM    1    issue, a letter of reprimand based on the charge of poor

01:16PM    2    judgment.

01:16PM    3         And that poor judgment wasn't associating with

01:16PM    4    Domiano or anything like that.  That poor judgment was limited

01:16PM    5    to the decision to speak in an unauthorized place, his

01:16PM    6    residence, about matters --

01:16PM    7         **THE COURT:**  Involving Domiano?

01:16PM    8         **MR. TRIPI:**  Yeah.

01:16PM    9         **THE COURT:**  And so, I guess what I'm saying is, if --

01:16PM   10    if there's cross about you received a letter of reprimand for

01:16PM   11    poor judgment, just cabining the redirect to did that letter

01:17PM   12    of reprimand -- because they didn't find all those other

01:17PM   13    things, all the underlying things.  They didn't find he did

01:17PM   14    anything wrong other than making the decision to speak in a

01:17PM   15    place he shouldn't have been speaking about work, about

01:17PM   16    Domiano.

01:17PM   17         And so, in a very tight fashion, just like reprimand

01:17PM   18    is tight, I think there's a way to craft a direct -- a

01:17PM   19    redirect that, of course, that you have signed off on in

01:17PM   20    advance, that doesn't open the door to everything, that

01:17PM   21    strikes a proper balance.

01:17PM   22         **THE COURT:**  Mr. Foti may agree with that, but -- but

01:17PM   23    you -- you do it at your own risk.

01:17PM   24         So -- so, you know, it sounds to me like Mr. Foti

01:17PM   25    is -- is agreeing with that.

01:17PM    1          If you guys want to talk about how far you can go

01:17PM    2    and -- and Mr. Foti will tell you what -- what his recross

01:17PM    3    would be, fine.  But I'm telling you that I think that you may

01:17PM    4    be opening a door by doing that sort of redirect.  I

01:17PM    5    think -- I think you can do a redirect on how -- how benign a

01:18PM    6    penalty a reprimand is.  I don't think there's anything that

01:18PM    7    would open any doors with respect to that.  That it's, you

01:18PM    8    know, the least -- I think it probably is the least serious

01:18PM    9    sanction that can be imposed.

01:18PM   10          MR. TRIPI:  Because they went through the Douglas

01:18PM   11    factors.  It says serious with no malicious intent; prior to

01:18PM   12    disciplinary record, none; effect on offense on ability to

01:18PM   13    perform job, no trust issues with management; consistency with

01:18PM   14    other penalties, consistent; consistency with agency penalty

01:18PM   15    guideline, consistent; notoriety of defense, minimal;

01:18PM   16    potential for rehabilitation, excellent, based on prior work

01:18PM   17    record and remorse of actions.

01:18PM   18          THE COURT:  I think you can get into that.

01:18PM   19          MR. TRIPI:  So --

01:18PM   20          THE COURT:  That doesn't sound -- that doesn't sound

01:18PM   21    like that would open any doors.

01:18PM   22          Mr. Foti, do you agree with that?

01:18PM   23          MR. FOTI:  Yeah, I don't think that gets into any

01:18PM   24    underlying facts.

01:18PM   25          THE COURT:  Okay.  As long as you don't get into the

| | | |
|---|---|---|
| 01:18PM | 1 | facts.  If you get into the facts, you're opening the door to |
| 01:19PM | 2 | the facts. |
| 01:19PM | 3 | **MR. TRIPI:**  Understood. |
| 01:19PM | 4 | **THE COURT:**  Okay?  Okay. |
| 01:19PM | 5 | Anything else we need to do?  I'm-- |
| 01:19PM | 6 | **MR. COOPER:**  Yes. |
| 01:19PM | 7 | **THE COURT:**  -- gonna take another break. |
| 01:19PM | 8 | Go ahead. |
| 01:19PM | 9 | **MR. COOPER:**  Sorry.  Thank you.  I think we just need |
| 01:19PM | 10 | to let him know, because we've had -- this is a different |
| 01:19PM | 11 | ruling than the two times he's previously testified, so I |
| 01:19PM | 12 | think the Court just needs to let the witness know outside the |
| 01:19PM | 13 | presence of the jury that there's gonna be cross on this |
| 01:19PM | 14 | different from the last proceeding. |
| 01:19PM | 15 | **THE COURT:**  Um-hmm. |
| 01:19PM | 16 | **MR. COOPER:**  And -- and that it's -- it's gonna be in |
| 01:19PM | 17 | a manner that's just a yes or no, I hope, you know, to -- to |
| 01:19PM | 18 | not open the door on their end to facts that shouldn't come |
| 01:19PM | 19 | in. |
| 01:19PM | 20 | **THE COURT:**  And we're not going to get into the facts |
| 01:19PM | 21 | of what happened. |
| 01:19PM | 22 | **MR. COOPER:**  Yeah. |
| 01:19PM | 23 | **THE COURT:**  Yep.  Okay.  I'm happy to do that. |
| 01:19PM | 24 | Any objection from the defense to my doing that? |
| | 25 | |

01:19PM    1          **MR. FOTI:**  No, Judge.

01:19PM    2          **THE COURT:**  Great.

01:19PM    3          **MR. FOTI:**  I -- it's really just going to be a couple

01:19PM    4    questions based on the --

01:19PM    5          **THE COURT:**  Yep.

01:19PM    6          **MR. FOTI:**  -- way that we've --

01:19PM    7          **THE COURT:**  Yeah.  Great.  Terrific.

01:19PM    8          Okay.  Is he available?  Can we bring him in?

01:19PM    9          **MR. COOPER:**  Yeah.

01:19PM   10          **THE CLERK:**  Judge, before we get that, we have a note

01:19PM   11    from Pat.

01:20PM   12          **THE COURT:**  Oh.  So the jury has asked what the term

01:20PM   13    "proffer" means.

01:20PM   14          **MR. FOTI:**  Oh, I can --

01:20PM   15          **THE COURT:**  Another one of those words.

01:20PM   16          **MR. FOTI:**  I can cover it with a question or two,

01:20PM   17    Judge.

01:20PM   18          **THE COURT:**  Do you?  You have some questions that

01:20PM   19    might clear it up?

01:20PM   20          **MR. FOTI:**  Well, yeah.  I could cover it right -- or,

01:20PM   21    either way.  You could advise -- I'm fine with you advising

01:20PM   22    the jury, or I can ask him, and if you feel like he still

01:20PM   23    needs to be advised then --

01:20PM   24          **THE COURT:**  Yeah, why don't you ask some questions on

01:20PM   25    it, and we can fix it.

USA v Gerace - Casullo - Foti/Cross - 11/21/24

122

01:20PM   1          **MR. FOTI:**  Okay.

01:20PM   2          **THE COURT:**  Okay.  It's funny, you know, words that

01:20PM   3     are second nature to all of us --

01:20PM   4          **MR. FOTI:**  Yeah.

01:20PM   5          **THE COURT:**  -- lots of people don't understand.

01:20PM   6          (Anthony Casullo seated at 1:20.  Jury not present.)

01:20PM   7          **THE COURT:**  Okay.  You can sit, Mr. Casullo.

01:20PM   8     So we're here with Mr. Casullo, but none of the

01:20PM   9     jurors present.  And I've just made a ruling, Mr. Casullo,

01:20PM   10    that is a little different than the ruling in the Bongiovanni

01:21PM   11    trials.  And that is that the defendant -- the defense counsel

01:21PM   12    is going to be able to cross-examine you with the fact that

01:21PM   13    you received a reprimand for exercising poor judgment when you

01:21PM   14    were in Las Vegas.

01:21PM   15    But they can't get into the facts of that in any way.

01:21PM   16    And the government is not going to get into the facts of that

01:21PM   17    in any way.  The government may ask you if a reprimand is the

01:21PM   18    least severe sanction you can get.  They may get into some of

01:21PM   19    the findings that -- not the factual findings, but some of the

01:21PM   20    standards for a reprimand as opposed to more serious

01:21PM   21    sanctions, but not the facts.

01:21PM   22    So when you answer, just yes-or-no answers.  And

01:21PM   23    don't try to explain with the facts of what is -- of what

01:21PM   24    happened out there.  Okay?

01:21PM   25          **THE WITNESS:**  Okay, Judge.

USA v Gerace - Casullo - Foti/Cross - 11/21/24

123

| | | |
|---|---|---|
| 01:21PM | 1 | **THE COURT:**  Okay? |
| 01:21PM | 2 | **MR. COOPER:**  Just to add to that, Judge. |
| 01:21PM | 3 | **THE COURT:**  Go ahead. |
| 01:21PM | 4 | **MR. COOPER:**  I expect the defense will ask if you |
| 01:22PM | 5 | received a letter of reprimand, and if that was related to |
| 01:22PM | 6 | Mr. Domiano. |
| 01:22PM | 7 | **THE COURT:**  Yes, of course.  Yes. |
| 01:22PM | 8 | **MR. COOPER:**  And just yes or no to the -- |
| 01:22PM | 9 | **THE COURT:**  Yeah, the fact -- the fact that it was |
| 01:22PM | 10 | related, I mean, that's why I'm allowing them to ask about it, |
| 01:22PM | 11 | because it was related to the brother-in-law. |
| 01:22PM | 12 | But -- but, again, not the facts.  I don't want the |
| 01:22PM | 13 | facts to go beyond that.  It was a letter of reprimand, it was |
| 01:22PM | 14 | related to your brother-in-law. |
| 01:22PM | 15 | **THE WITNESS:**  Okay, Judge. |
| 01:22PM | 16 | **THE COURT:**  Okay?  Got it? |
| 01:22PM | 17 | **THE WITNESS:**  Yes. |
| 01:22PM | 18 | **THE COURT:**  Great.  Okay. |
| 01:22PM | 19 | Anything else, folks? |
| 01:22PM | 20 | **MR. FOTI:**  No. |
| 01:22PM | 21 | **THE COURT:**  Okay.  And -- and Mr. Foti's probably |
| 01:22PM | 22 | going to ask you, the jury doesn't know what the word |
| 01:22PM | 23 | "proffer" meant.  So -- so Mr. Foti's going to try to ask you |
| 01:22PM | 24 | some questions to follow up on Mr. Cooper's direct examination |
| 01:22PM | 25 | about what a proffer is. |

| | | |
|---|---|---|
| 01:22PM | 1 | **THE WITNESS:** Okay, Judge. |
| 01:22PM | 2 | **THE COURT:** Okay? Great. |
| 01:22PM | 3 | **THE WITNESS:** Sounds good. |
| 01:22PM | 4 | **THE COURT:** Okay. Good. Thanks, everybody. |
| 01:22PM | 5 | **THE CLERK:** All rise. |
| 01:22PM | 6 | (Off the record at 1:22 p.m.) |
| 01:29PM | 7 | (Back on the record at 1:29 p.m.) |
| 01:29PM | 8 | (Jury not present.) |
| 01:29PM | 9 | **THE CLERK:** All rise. |
| 01:29PM | 10 | **THE COURT:** Please be seated. |
| 01:29PM | 11 | **THE CLERK:** We are back on the record for the |

01:29PM  12  continuation in the jury trial in case numbers 19-cr-227 and

01:29PM  13  23-cr-37, United States of America versus Peter Gerace, Jr.

01:29PM  14       All counsel and parties are present.

01:29PM  15       **THE COURT:** Okay. Colleen tells me I left rather

01:30PM  16  abruptly, I didn't mean to. I've got a lot of things on my

01:30PM  17  mind, and I'm juggling a lot of different things. So I

01:30PM  18  apologize if I was rude when I left the -- the bench.

01:30PM  19       **THE CLERK:** I didn't say he was rude.

01:30PM  20       **THE COURT:** She didn't say rude, but she just said.

01:30PM  21       **THE CLERK:** I said you usually ease out, like, okay,

01:30PM  22  the jury will be back at 1:30.

01:30PM  23       **MR. SOEHNLEIN:** I thought you exited with gusto,

01:30PM  24  Your Honor.

01:30PM  25       **THE COURT:** What's that? I'm sorry?

| | | |
|---|---|---|
| 01:30PM | 1 | **MR. SOEHNLEIN:** I thought you left with gusto. |
| 01:30PM | 2 | **THE COURT:** Thank you. I just, you know, I've got a |
| 01:30PM | 3 | lot of balls in the air right now, and they're all coming |
| 01:30PM | 4 | crashing down at once, so -- |
| 01:30PM | 5 | Anything else we need to do before we bring the |
| 01:30PM | 6 | witness back and the jury back? |
| 01:30PM | 7 | **MR. COOPER:** Nothing from us, Judge. Thank you. |
| 01:30PM | 8 | **THE COURT:** Great. Terrific. |
| 01:30PM | 9 | Okay. So let's bring the witness back, and let's |
| 01:30PM | 10 | bring the jury back. |
| 01:32PM | 11 | (Witness and Jury seated at 1:32 p.m.) |
| 01:32PM | 12 | **THE COURT:** The record will reflect that all our |
| 01:32PM | 13 | jurors are, again, present. |
| 01:32PM | 14 | I remind the witness he's still under oath. |
| 01:32PM | 15 | And you may continue the cross. |
| 01:32PM | 16 | **MR. FOTI:** Thank you, Judge. |
| 01:32PM | 17 | **BY MR. FOTI:** |
| 01:32PM | 18 | Q. Okay. Good afternoon again, sir. |
| 01:32PM | 19 | A. Good afternoon. |
| 01:32PM | 20 | Q. I'm going to shift gears briefly here from where we left |
| 01:33PM | 21 | off, ask about something else that you talked about on |
| 01:33PM | 22 | direct. |
| 01:33PM | 23 | You indicated that before you were no longer permitted to |
| 01:33PM | 24 | participate in this investigation, you had participated in a |
| 01:33PM | 25 | number of investigative steps, correct? |

USA v Gerace - Casullo - Foti/Cross - 11/21/24

126

| | | |
|---|---|---|
| 01:33PM | 1 | A.  Yes. |
| 01:33PM | 2 | Q.  Okay.  And you testified on direct about having |
| 01:33PM | 3 | participated in what was referred to as proffers, correct? |
| 01:33PM | 4 | A.  Correct. |
| 01:33PM | 5 | Q.  Okay.  Now a proffer is generally a meeting with somebody |
| 01:33PM | 6 | who is believed -- between law enforcement and somebody who |
| 01:33PM | 7 | it's believed may have information that law enforcement's |
| 01:33PM | 8 | interested in, right? |
| 01:33PM | 9 | A.  Correct. |
| 01:33PM | 10 | Q.  Sometimes it's a person who's been charged with a crime? |
| 01:33PM | 11 | A.  True. |
| 01:33PM | 12 | Q.  Sometimes it's a target of an investigation? |
| 01:33PM | 13 | A.  Yes. |
| 01:33PM | 14 | Q.  Sometimes it is a witness who hasn't even been |
| 01:33PM | 15 | categorized as something as significant as a target, right? |
| 01:33PM | 16 | A.  True. |
| 01:33PM | 17 | Q.  Sometimes there's agreements in place as to how the |
| 01:33PM | 18 | information can be used after the proffer, correct? |
| 01:33PM | 19 | A.  Yes. |
| 01:33PM | 20 | Q.  The point is, if there's a proffer that takes place, |
| 01:34PM | 21 | you're gonna have law enforcement present, right? |
| 01:34PM | 22 | A.  Yes. |
| 01:34PM | 23 | Q.  And you're gonna have at least one person that they're |
| 01:34PM | 24 | interested in interviewing, correct? |
| 01:34PM | 25 | A.  Correct. |

01:34PM   1   Q.  And proffers may be helpful in terms of gathering

01:34PM   2   information that law enforcement's looking for, right?

01:34PM   3   A.  Right.

01:34PM   4   Q.  Some proffers go absolutely nowhere, right?

01:34PM   5   A.  True.

01:34PM   6   Q.  And you said that you had participated in a number of

01:34PM   7   proffers related to this investigation, correct?

01:34PM   8   A.  I believe it was just one.

01:34PM   9   Q.  Just the one proffer?

01:34PM  10   A.  Correct.

01:34PM  11   Q.  And that's what you were referring to, right?

01:34PM  12   A.  Yes.

01:34PM  13   Q.  Okay.  I'm gonna briefly talk to you about this last

01:34PM  14   conversation you talked about on direct involving

01:34PM  15   Mr. Bongiovanni.  That was a conversation primarily about

01:34PM  16   Anthony Gerace, correct?

01:34PM  17   A.  The last conversation we had.

01:34PM  18   Q.  The last conversation with Mr. Bongiovanni was about

01:35PM  19   Anthony Gerace, right?

01:35PM  20   A.  When he came over to my desk, is that what we're talking

01:35PM  21   about?

01:35PM  22   Q.  Yes.

01:35PM  23   A.  Yes.

01:35PM  24   Q.  Okay.  And you said he made a number of comments that

01:35PM  25   sort of downplayed the significance of marijuana; is that

01:35PM   1   fair?

01:35PM   2   A.   Just that last comment.

01:35PM   3   Q.   About you better prosecute him before it's made legal?

01:35PM   4   A.   You better hurry up and arrest him before they make

01:35PM   5   marijuana legal.

01:35PM   6   Q.   I think on direct you made a comment along the lines of

01:35PM   7   you hadn't really heard anything like that from another agent

01:35PM   8   during the entirety of your career, correct?

01:35PM   9   A.   Correct.

01:35PM   10   Q.   And that's what you interpreted as an attempt by

01:35PM   11   Mr. Bongiovanni to have some influence over your

01:35PM   12   decisionmaking in the investigation?

01:35PM   13   A.   That's how I perceived it.

01:35PM   14   Q.   Okay.  And when was this that this -- this conversation

01:35PM   15   took place, time-wise?  Date-wise?

01:35PM   16   A.   I think it was -- I can't remember if it was the end of

01:35PM   17   the summer of '18 or beginning of '19.  I think it was -- it

01:36PM   18   would have been the summer of '18.  Like, August of '18,

01:36PM   19   right around that time period.

01:36PM   20   Q.   Okay.

01:36PM   21   A.   I believe, I could be wrong, it could be January of '19.

01:36PM   22   Q.   Okay.  The point that I'm ultimately getting to here is

01:36PM   23   the laws in regard to marijuana across the country had

01:36PM   24   shifted significantly in 2018 or 2019, from where they were

01:36PM   25   when you started at the DEA, correct?

01:36PM   1   A.  Federally, or --

01:36PM   2   Q.  I'm talking about laws in different jurisdictions across

01:36PM   3   the country, there had been significant changes, right?

01:36PM   4   A.  To the best of my knowledge, not federally.  I know in

01:36PM   5   different states, different things change.  But not

01:36PM   6   federally.

01:36PM   7   Q.  Oh, sure.  In terms of federal law, marijuana has

01:36PM   8   generally remained criminalized, correct?

01:36PM   9   A.  Correct.

01:36PM  10   Q.  But by 2018, 2019, there was a shift in the states where

01:36PM  11   a number of states were beginning to legalize marijuana,

01:36PM  12   correct?

01:37PM  13   A.  I would agree with that.

01:37PM  14   Q.  Or at least decriminalize it, and maybe make it less

01:37PM  15   severe, the sanctions that were imposed?

01:37PM  16   A.  Correct.

01:37PM  17   Q.  And even on a federal level, it was known to you that

01:37PM  18   there was at least conversations about policy related to the

01:37PM  19   legalization of marijuana at that point, correct?

01:37PM  20   A.  I don't know if it was so much about the legalization,

01:37PM  21   but the reclassification of marijuana, being classified as a

01:37PM  22   Schedule I, the most dangerous, to a different schedule, is

01:37PM  23   was what my knowledge was of the discussions with the federal

01:37PM  24   level, within DEA.

01:37PM  25   Q.  Okay.  Within the organization that you were employed by?

01:37PM   1   A.  The organization, before Congress, from our

01:37PM   2   administrator, different things that I read and saw, things

01:37PM   3   like that.

01:37PM   4   Q.  So in terms of your experience with the DEA, you knew

01:37PM   5   there were ongoing conversations about at least the

01:37PM   6   classification of marijuana scheduling?

01:37PM   7   A.  To change the classification.

01:37PM   8   Q.  And when you talk about scheduling, you're talking about

01:37PM   9   sort of the category of severity of --

01:37PM  10   A.  Of seriousness.

01:37PM  11   Q.  Yeah.  It relates to addictiveness, addictive quality

01:38PM  12   of -- of the drug, right?

01:38PM  13           **MR. COOPER:**  I would object to relevance at this

01:38PM  14   point.

01:38PM  15           **THE COURT:**  Yeah, sustained.

01:38PM  16           **BY MR. FOTI:**

01:38PM  17   Q.  So, in any event, the conversation you have with

01:38PM  18   Mr. Bongiovanni, it occurs at a time where at least state, in

01:38PM  19   certain states, legalization had begun to occur?

01:38PM  20   A.  To the best of my knowledge, yes.

01:38PM  21   Q.  And -- and do you know when marijuana was -- obviously,

01:38PM  22   you're a federal agent, but do you know when marijuana was

01:38PM  23   decriminalized in New York?

01:38PM  24   A.  No.

01:38PM  25   Q.  Okay.  In any event, 2018, 2019, the -- at least the

USA v Gerace - Casullo - Foti/Cross - 11/21/24

| | | |
|---|---|---|
| 01:38PM | 1 | state laws on marijuana had shifted from where they were in |
| 01:38PM | 2 | the '90s? |
| 01:38PM | 3 | A.  From the '90s, yes. |
| 01:38PM | 4 | Q.  And -- and they -- the shift had been shifting at that |
| 01:38PM | 5 | point from where you -- where the laws on marijuana were |
| 01:38PM | 6 | during the majority of your career, correct? |
| 01:38PM | 7 | A.  I was more familiar with the Nevada State law than the |
| 01:38PM | 8 | New York State law.  But within the State of Nevada, it had |
| 01:38PM | 9 | shifted.  And I was aware of it shifting in New York State, |
| 01:38PM | 10 | as well, and several other states from just reading open |
| 01:39PM | 11 | source news stories. |
| 01:39PM | 12 | Q.  Okay.  While you were in Nevada, you were -- you were in |
| 01:39PM | 13 | the DEA office in Las Vegas, correct? |
| 01:39PM | 14 | A.  I was. |
| 01:39PM | 15 | Q.  Okay.  And I'm going to ask you a couple of specific |
| 01:39PM | 16 | questions.  Just in terms of background, I think we covered |
| 01:39PM | 17 | some of this.  But when you moved out to Las Vegas, your |
| 01:39PM | 18 | brother-in-law Phil Domiano, I don't know why I just suddenly |
| 01:39PM | 19 | had trouble pronouncing that, he was already living out |
| 01:39PM | 20 | there, right? |
| 01:39PM | 21 | A.  He was. |
| 01:39PM | 22 | Q.  Okay.  And some point after you moved out there, you |
| 01:39PM | 23 | joined the DEA field office for the, in Las Vegas, correct? |
| 01:39PM | 24 | A.  Started July of '99 with DEA in Las Vegas. |
| 01:39PM | 25 | Q.  And while you were -- |

| | | |
|---|---|---|
| 01:39PM | 1 | A.  I'm sorry.  I'm sorry.  It was December '99 that I |
| 01:40PM | 2 | arrived in Vegas. |
| 01:40PM | 3 | Q.  Okay.  Thank you for the clarification. |
| 01:40PM | 4 | While you're at that office, at some point after that, |
| 01:40PM | 5 | there came -- did there come a time that you received a |
| 01:40PM | 6 | letter of reprimand? |
| 01:40PM | 7 | A.  Yes. |
| 01:40PM | 8 | Q.  Okay.  And that was a letter of reprimand based on a |
| 01:40PM | 9 | charge of poor judgment, correct? |
| 01:40PM | 10 | A.  It was a charge of poor judgment, yes. |
| 01:40PM | 11 | Q.  And the charge that was referenced in that letter was in |
| 01:40PM | 12 | reference to or was related to your brother-in-law, Phil |
| 01:40PM | 13 | Domiano? |
| 01:40PM | 14 | A.  Yes. |
| 01:40PM | 15 | **MR. FOTI:**  Can I just have a minute Judge? |
| 01:41PM | 16 | All right.  Thank you, sir.  Nothing further at this |
| 01:41PM | 17 | time. |
| 01:41PM | 18 | **THE COURT:**  Redirect? |
| 01:41PM | 19 | **MR. COOPER:**  Yeah, just briefly, Judge, please. |
| 01:41PM | 20 | |
| 01:41PM | 21 | **REDIRECT EXAMINATION BY MR. COOPER:** |
| 01:41PM | 22 | Q.  On that last topic first, let's hit that. |
| 01:41PM | 23 | Do you recall what year that letter of reprimand was |
| 01:41PM | 24 | from? |
| 01:41PM | 25 | A.  I believe when I received the actual letter of reprimand |

USA v Gerace - Casullo - Cooper/Redirect - 11/21/24

01:41PM   1   may have been 2004, 2005.

01:41PM   2   Q.  2004 or 2005?

01:41PM   3   A.  Yes.

01:41PM   4   Q.  Okay.  So is that about ten years before you move back to

01:41PM   5   Buffalo?

01:41PM   6   A.  Yes.  Yeah.

01:42PM   7   Q.  Okay.

01:42PM   8   A.  Yeah, at least.  At least ten.

01:42PM   9   Q.  Okay.  Ten or more; is that right?

01:42PM  10   A.  Yep.  I believe so.

01:42PM  11   Q.  Okay.  On the subject of that, I'm going to also ask you

01:42PM  12   some specific questions like Mr. Foti did, these are going to

01:42PM  13   be yes-or-no questions; do you understand?

01:42PM  14   A.  Yes.

01:42PM  15   Q.  Okay.  With respect to that letter of reprimand, did your

01:42PM  16   agency find that there was no malicious intent?

01:42PM  17   A.  Yes.

01:42PM  18   Q.  Did your agency find that you had no trust issues with

01:42PM  19   management?

01:42PM  20   A.  Yes.

01:42PM  21   Q.  Did your agency find that you had an excellent prior work

01:42PM  22   record and remorse about what occurred?

01:42PM  23   A.  Yes.

01:42PM  24   Q.  Did they find that it was from family-related issues?

01:42PM  25   A.  Yes.

01:42PM    1    Q.  Okay.  You were asked some questions on cross-examination

01:42PM    2    about marijuana laws in the around the time that Bongiovanni

01:42PM    3    tells you, you better hurry up and arrest Anthony Gerace

01:42PM    4    before they make it legal; do you remember that?

01:42PM    5    A.  Yes.

01:42PM    6    Q.  Okay.  As a DEA agent, were both you and Joe Bongiovanni

01:43PM    7    responsible for enforcing federal drug laws?

01:43PM    8    A.  Yes.

01:43PM    9    Q.  Is that under Title 21 of the United States Code?

01:43PM    10    A.  Yes.

01:43PM    11    Q.  Does that have anything do with whether New York or

01:43PM    12    Nevada or any other state decriminalizes marijuana?

01:43PM    13    A.  No.

01:43PM    14    Q.  Nothing at all, right?

01:43PM    15    A.  No.

01:43PM    16    Q.  Okay.  At the time Bongiovanni said it, was a sworn DEA

01:43PM    17    agent responsible for investigating and pushing forward for

01:43PM    18    prosecution people who trafficked in large amounts of

01:43PM    19    marijuana?

01:43PM    20    A.  Yes.

01:43PM    21    Q.  Was that part of your job?

01:43PM    22    A.  Yes.

01:43PM    23    Q.  Was it part of Bongiovanni's job?

01:43PM    24    A.  Yes.

01:43PM    25    Q.  Did individual DEA agents get to decide like, hey,

01:43PM   1   New York's decriminalizing it, so I just don't care anymore.

01:43PM   2   A.  No.

01:43PM   3   Q.  Okay.  You were asked some questions on cross-examination

01:44PM   4   about ultimately being walled off from the investigation into

01:44PM   5   Bongiovanni and an investigation into Gerace; do you remember

01:44PM   6   being asked questions about that?

01:44PM   7   A.  Yes.

01:44PM   8   Q.  Was it your understanding that you were walled off

01:44PM   9   because you had been determined to be a fact witness in that

01:44PM  10   case?

01:44PM  11   A.  Yes.

01:44PM  12   Q.  I want to kind of walk through for the -- make sure the

01:44PM  13   jury understands.  When we say "fact witness," do you

01:44PM  14   understand what I'm talking about?

01:44PM  15   A.  Yes.

01:44PM  16   Q.  Okay.  As a law enforcement officer, generally, is your

01:44PM  17   role that of an investigating agent?

01:44PM  18   A.  That's correct.

01:44PM  19   Q.  Okay.  Did the circumstances surrounding things

01:44PM  20   Bongiovanni had said to you and your interactions with him

01:44PM  21   kind of shift your role to a person who would end up on the

01:44PM  22   witness stand testifying in -- in proceedings?

01:44PM  23   A.  Yes.

01:45PM  24   Q.  Was that your understanding of why you were walled off

01:45PM  25   from working on those cases?

01:45PM    1    A.  Yes.

01:45PM    2    Q.  Mr. Foti asked you some questions towards the beginning

01:45PM    3    of his cross-examination about the classmate who made

01:45PM    4    comments about sniffing coke off of strippers' bodies, and he

01:45PM    5    asked you if you took him seriously; do you remember that

01:45PM    6    question?

01:45PM    7    A.  Yes.

01:45PM    8    Q.  And I think -- I forget the person's first name, but you

01:45PM    9    said I know -- what's his first name?

01:45PM    10    A.  John.

01:45PM    11    Q.  John Mayer, is that it?

01:45PM    12    A.  Maher.

01:45PM    13    Q.  Maher, sorry.  John Mayer is the musician.  John Maher.

01:45PM    14       You said I know John Maher, right?  Is that what you said

01:45PM    15    in response to his question?

01:45PM    16    A.  Correct.

01:45PM    17    Q.  Why did knowing John Maher cause you to take that

01:45PM    18    seriously?  Tell them.

01:45PM    19    A.  He was on the wild side.  Partying, drugs, alcohol.

01:45PM    20    Q.  Was it consistent with what you knew about him?

01:46PM    21    A.  Yes.

01:46PM    22    Q.  When Mr. Foti asked you some questions on

01:46PM    23    cross-examination about conversations that you had with FBI

01:46PM    24    Special Agent Tom Herbst around the time of 2010; do you

01:46PM    25    remember those questions?

01:46PM    1    A.  Yes.

01:46PM    2    Q.  Okay.  I think twice on cross you indicated that you came

01:46PM    3    to an understanding that Herbst knew that Gerace and

01:46PM    4    Bongiovanni knew each other; is that what you learned from

01:46PM    5    those communications?

01:46PM    6    A.  Yes.

01:46PM    7    Q.  Okay.  You were asked some questions about the fact that

01:47PM    8    when you discovered Bongiovanni's phone number in Gerace's

01:47PM    9    records, that you didn't document that in a 6; do you recall

01:47PM    10    that?

01:47PM    11    A.  I recall.

01:47PM    12    Q.  Okay.  Were you investigating Bongiovanni at that time?

01:47PM    13    A.  No.

01:47PM    14    Q.  Did you alert your supervisor as you had been directed to

01:47PM    15    do?

01:47PM    16    A.  Yes.

01:47PM    17    Q.  Did he direct you to put it in a 6?

01:47PM    18    A.  No.

01:47PM    19    Q.  Did you view it at that time, at that moment, as a part

01:47PM    20    of an investigation that you had going on?

01:47PM    21    A.  No.

01:47PM    22    Q.  Was it just kind of an uncomfortable thing that was

01:47PM    23    occurring in the workplace?

01:47PM    24    A.  Yes.

01:47PM    25         **THE COURT:**  You're talking about a 6, I think --

01:47PM   1          MR. COOPER:  I'm sorry.

01:47PM   2          THE COURT:  It might be a good idea to let the jury

01:47PM   3   know what a 6 is.

01:47PM   4          MR. COOPER:  Thank you.  I appreciate that, Judge.

01:47PM   5   And sometimes I take that for granted.

01:47PM   6          BY MR. COOPER:

01:47PM   7   Q.  DEA puts things in reports; is that right?

01:47PM   8   A.  Correct.

01:47PM   9   Q.  Reports of investigations that agents document, are those

01:47PM   10   called DEA-6 reports?

01:47PM   11   A.  Correct.

01:47PM   12          MR. COOPER:  So, Ms. Champoux, can we pull up 30A for

01:47PM   13   one second?  Well, for more than one second.  Keep it up

01:47PM   14   there.

01:47PM   15          BY MR. COOPER:

01:47PM   16   Q.  Is this an example of a DEA-6 report?

01:48PM   17   A.  Yes.

01:48PM   18   Q.  And up here where it says report of investigation, is

01:48PM   19   this where you document investigative activity?

01:48PM   20   A.  That's correct.

01:48PM   21   Q.  Okay.

01:48PM   22          MR. COOPER:  You can take that down, Ms. Champoux.

01:48PM   23          BY MR. COOPER:

01:48PM   24   Q.  At the time that you discovered Bongiovanni's phone

01:48PM   25   number in Mr. Gerace's phone records, did you view that as a

USA v Gerace - Casullo - Cooper/Redirect - 11/21/24

139

01:48PM  1  part of your investigative activity?

01:48PM  2  A.  No.

01:48PM  3  Q.  Okay.  Years later, did it become pertinent to you?

01:48PM  4  A.  It became pertinent, and after meeting with him in the

01:48PM  5  conference room, things shifted.

01:48PM  6  Q.  Okay.  But at that time when it first is known to you,

01:48PM  7  it's just uncomfortable, right?

01:48PM  8  A.  Correct.

01:48PM  9  Q.  You were asked some questions by Mr. Foti on

01:48PM  10 cross-examination about Government Exhibit 99 at page 14.

01:48PM  11        **MR. COOPER:**  On the left side of the screen,

01:49PM  12 Ms. Champoux, can you pull up Government Exhibit 99 and go to

01:49PM  13 page 14?

01:49PM  14        And just if you're able to -- thank you so much.

01:49PM  15        And then on the right side of the screen can you pull

01:49PM  16 up what's in evidence as Government Exhibit 426-1.

01:49PM  17        **BY MR. COOPER:**

01:49PM  18 Q.  On the left, is that a picture of your high school

01:49PM  19 reunion, for your 30-year high school reunion?

01:49PM  20 A.  Yes.

01:49PM  21 Q.  Can you estimate for the jury about how many people do

01:49PM  22 you think were there?

01:49PM  23 A.  50 or so, maybe.

01:49PM  24 Q.  Okay.  Can you tell the jury how many people are in the

01:49PM  25 picture on the right?

01:49PM  1   A.  Four.

01:49PM  2   Q.  Okay.  In the left, in the picture on the left, everybody

01:49PM  3   has those white stickers on their shirt.  What's that?

01:49PM  4   A.  Name tags.

01:49PM  5   Q.  Does anybody have name tags on in the picture on the,

01:49PM  6   right?

01:49PM  7   A.  No.

01:49PM  8   Q.  Why do people wear name tags?

01:49PM  9   A.  Over the years people aren't in contact, they look

01:49PM  10  different after 30 years, and you might not know who's who in

01:50PM  11  your class.

01:50PM  12  Q.  It's because not everybody in that picture might even

01:50PM  13  know each other, right?

01:50PM  14      **MR. FOTI:**  Judge, objection.

01:50PM  15      **THE COURT:**  No, overruled.

01:50PM  16      **BY MR. COOPER:**

01:50PM  17  Q.  They might not recognize each other, right?

01:50PM  18  A.  They might not recognize each other is my belief.

01:50PM  19  Q.  Okay.  Do the people in the picture on the right in

01:50PM  20  426-1, do they appear to know each other?

01:50PM  21  A.  I mean, looking at that picture, yes.

01:50PM  22  Q.  Okay.  No name tags, right?

01:50PM  23  A.  No.

01:50PM  24  Q.  This picture on the left, Government Exhibit 99 at

01:50PM  25  page 14, are you close personal friends with everyone in the

01:50PM    1    picture?

01:50PM    2    A.  No.

01:50PM    3    Q.  Do you maintain contact with everyone in the picture?

01:50PM    4    A.  No.

01:50PM    5    Q.  Why are you in the picture?

01:50PM    6    A.  Because I graduated in that graduating class.

01:50PM    7    Q.  Okay.

01:50PM    8        **MR. COOPER:**  You can take those down, Ms. Champoux,

01:50PM    9    thank you.

01:50PM    10       **BY MR. COOPER:**

01:50PM    11   Q.  You were asked some questions on cross-examination about

01:50PM    12   whether you were on a -- I think a, like, a men's league

01:51PM    13   hockey team with the defendant when you were in college?

01:51PM    14   A.  Correct.

01:51PM    15   Q.  Okay.  How many people participated in that activity?

01:51PM    16   A.  On that team?

01:51PM    17   Q.  Sure.

01:51PM    18   A.  Maybe 20.

01:51PM    19   Q.  Okay.  And were you close personal friends with all 20

01:51PM    20   people?

01:51PM    21   A.  No.

01:51PM    22   Q.  Did you just play rec league hockey with them?

01:51PM    23   A.  Yeah.  I had a friend of a friend that who knew someone,

01:51PM    24   and I was out of high school and wanted to still play hockey.

01:51PM    25   Q.  Got it.  You were asked some questions about the

01:51PM    1    different people that you disclosed the racist remarks that

01:51PM    2    Bongiovanni made to you; do you remember being asked those

01:51PM    3    questions?

01:51PM    4    A.   Yes.

01:51PM    5    Q.   Was it your responsibility, sir, to report to management

01:51PM    6    when it happened?

01:51PM    7    A.   It was my responsibility, correct.

01:51PM    8    Q.   You should have done that, right?

01:52PM    9    A.   Yes.

01:52PM   10    Q.   Okay.  Did you tell other people about what happened

01:52PM   11    because it troubled you?

01:52PM   12    A.   Yes, very troubling.

01:52PM   13    Q.   Okay.  I think on direct examination, you described it as

01:52PM   14    a something like a shit sandwich that happened, is that -- is

01:52PM   15    that how it felt?  Like you had something awful to deal with?

01:52PM   16    A.   It was a horrible situation, yes.

01:52PM   17    Q.   Okay.  You told these other people about it, is it fair

01:52PM   18    to say, based on your involvement in those conversations,

01:52PM   19    none of them were jumping and chomping at the bit to get

01:52PM   20    involved in your shit sandwich?

01:52PM   21    A.   No.

01:52PM   22    Q.   Okay.  Ultimately, you described on direct examination

01:52PM   23    reasons why you made the choice that you made which was to

01:52PM   24    not immediately report it; do you remember describing that?

01:52PM   25    A.   Yes.

01:52PM  1   Q.  And on cross-examination, you were questioned about when

01:53PM  2   you chose to report it.  Let's focus on that.

01:53PM  3       When you ultimately did report what Joe Bongiovanni said

01:53PM  4   to you about who you should be investigating and when he used

01:53PM  5   racial slurs, when you reported that, what happened to you at

01:53PM  6   work?

01:53PM  7   A.  Multiple things.  Things that I believe basically came

01:53PM  8   true.  It was very hurtful, still bothers me.

01:53PM  9       People that I trusted a lot stopped talking to me, not

01:53PM  10  knowing the full facts that I couldn't talk about anyways.

01:53PM  11      A police officer that was assigned to our office as a

01:53PM  12  task force officer that I knew from the police academy when I

01:53PM  13  was a police officer, literally crossed the street when she

01:53PM  14  saw me.

01:53PM  15      People on my own group ostracized me to some extent that

01:53PM  16  I worked nights on a wiretap case just so I wouldn't have to

01:53PM  17  go into the office.

01:53PM  18      There were numerous things.

01:53PM  19  Q.  Did it cause you a lot of hard, like, difficulty and

01:54PM  20  hardship at work?

01:54PM  21  A.  Probably more than anything else that happened in the

01:54PM  22  whole --

01:54PM  23  Q.  Was it a pleasant experience for you after?

01:54PM  24  A.  It was the worst experience of my career.

01:54PM  25  Q.  Is that what you had feared when you chose to hold into

01:54PM    1    it -- hold onto it and not report it?

01:54PM    2    A.  Yeah, it all came true.

01:54PM    3    Q.  By reporting it, did you get some benefit, did things get

01:54PM    4    good for you in any way?

01:54PM    5    A.  No.

01:54PM    6           MR. COOPER:  Just one second please, Judge.

01:55PM    7           BY MR. COOPER:

01:55PM    8    Q.  Just to put a finer point on that, did you ultimately

01:55PM    9    transfer to a task force at the FBI?

01:55PM    10   A.  I did.

01:55PM    11   Q.  Why?

01:55PM    12   A.  The supervisor of that group was a friend of mine from

01:55PM    13   Las Vegas, the FBI agent, he worked in our office in

01:55PM    14   Las Vegas, and they were starting a new task force.  And he

01:55PM    15   asked if I would be interested to come over to the task

01:55PM    16   force.  And I jumped at the opportunity to work with them and

01:55PM    17   get out of my office because of the situation that was going

01:55PM    18   on in my office.

01:55PM    19       And I didn't think I'd be allowed to -- I didn't think

01:55PM    20   DEA would allow me to go work at FBI.  But his special agent

01:55PM    21   in charge met with my special agent in charge in New York

01:55PM    22   City, and they allowed me to go over.  And it was probably

01:55PM    23   the best year and a half, two years of my time in Buffalo.

01:55PM    24          MR. COOPER:  I'm good, Judge, thank you.

01:55PM    25          THE COURT:  Any re-cross?

01:55PM    1          **MR. FOTI:**  Yes, Judge.

01:55PM    2

01:55PM    3                  **RECROSS-EXAMINATION BY MR. FOTI:**

01:56PM    4   Q.  Sir, when you saw Peter Gerace in college for the hockey,

01:56PM    5   you didn't need a name tag to recognize him, did you?

01:56PM    6   A.  No.

01:56PM    7   Q.  When you saw him at Brennan's, the bar that you said

01:56PM    8   you -- you gave him your phone number at, you didn't need --

01:56PM    9   he didn't need a name tag for you to recognize him, correct?

01:56PM   10   A.  No.

01:56PM   11   Q.  And you weren't wearing a name tag, correct?

01:56PM   12   A.  No.

01:56PM   13   Q.  And he recognized you there, correct?

01:56PM   14   A.  Yes.

01:56PM   15   Q.  And you even had a conversation that ended in giving

01:56PM   16   Mr. Gerace your phone number, correct?

01:56PM   17   A.  Correct.

01:56PM   18   Q.  At the reunion, you were both wearing name tags, right?

01:56PM   19   A.  Yes.

01:56PM   20   Q.  You didn't need the name tag to recognize that Peter

01:56PM   21   Gerace was Peter Gerace, right?

01:56PM   22   A.  No.

01:56PM   23   Q.  And presumably, he would have recognized you whether you

01:56PM   24   were wearing the name tag or not, right?

01:56PM   25   A.  Yes.

USA v Gerace - Casullo - Foti/Recross - 11/21/24

146

01:56PM 1  Q.  You talked about just now how after making the claim that

01:57PM 2  Mr. Bongiovanni used racial slurs, the number of members of

01:57PM 3  law enforcement didn't want to interact with you anymore; is

01:57PM 4  that right?

01:57PM 5  A.  There were numerous in my office.

01:57PM 6  Q.  Okay.  And -- and you said there was even an incident of

01:57PM 7  somebody that you had previously known cross the street and

01:57PM 8  it appeared they were trying avoid you?

01:57PM 9  A.  Correct.

01:57PM 10  Q.  And this was a perception developed based on the way

01:57PM 11  people were acting towards you within your office, correct?

01:57PM 12  A.  It was based on that, the timeframe, everything.

01:57PM 13  Q.  Did anybody communicate to you that, hey, we don't think

01:57PM 14  you should have said what you said about Mr. Bongiovanni?

01:57PM 15          **MR. COOPER:**  Objection.  Calls for hearsay.

01:57PM 16          **THE COURT:**  No.  Absolutely not.  Overruled.

01:57PM 17          **THE WITNESS:**  Could you repeat the question?

01:57PM 18          **BY MR. FOTI:**

01:57PM 19  Q.  Did anybody have a conversation with you about it within

01:57PM 20  your office, these people you're talking about?

01:58PM 21  A.  Oh, they wouldn't talk to me.

01:58PM 22  Q.  They wouldn't talk to you?

01:58PM 23  A.  No.

01:58PM 24  Q.  Okay.  So nobody told you that they're upset with you

01:58PM 25  because you -- you'd gave the story about Mr. Bongiovanni?

01:58PM    1    A.  They didn't talk to me.

01:58PM    2    Q.  Okay.  That was something that you perceived based on the

01:58PM    3    timing of all of this, right?

01:58PM    4    A.  Absolutely.

01:58PM    5    Q.  All right.  And you have no idea whether those people

01:58PM    6    believed anything that you alleged happened in that meeting?

01:58PM    7    A.  I'm sorry, could you repeat that question?

01:58PM    8    Q.  You have no idea whether any of these people in your

01:58PM    9    office believed anything that you said about what happened in

01:58PM   10    that meeting?

01:58PM   11            **MR. COOPER:**  Objection, Judge.

01:58PM   12            **THE COURT:**  Overruled.

01:58PM   13            **THE WITNESS:**  Whether I knew if they believed?  I'm

01:58PM   14    sorry, I'm trying to understand the question.

01:58PM   15            **BY MR. FOTI:**

01:58PM   16    Q.  It's okay.  You didn't talk to anybody in your office

01:58PM   17    about this, right?  You said they wouldn't talk to you

01:58PM   18    anymore?

01:58PM   19    A.  They didn't.  They stopped talking to me, several people.

01:58PM   20    Q.  Okay.  You never asked them what their opinions were on

01:58PM   21    the fact that you reported this, this alleged conversation?

01:58PM   22    A.  I never asked them that.

01:58PM   23    Q.  They never told you what their position is on it, right?

01:58PM   24    A.  They didn't talk to me.

01:58PM   25    Q.  Nobody told you whether they believe it or not, right?

01:58PM    1    A.  They didn't talk to me.

01:59PM    2          MR. FOTI:  Could I just have a moment, Judge?

01:59PM    3          THE COURT:  Sure.

01:59PM    4          MR. FOTI:  I have nothing further, thank you.

01:59PM    5

01:59PM    6                RE-REDIRECT EXAMINATION BY MR. COOPER:

01:59PM    7    Q.  The people who ignored you, were they people that were

01:59PM    8    close in the office with Bongiovanni?

01:59PM    9    A.  Some.

01:59PM    10   Q.  You said that people didn't discuss it with you.  Did

01:59PM    11   people essentially bad mouth you in your own office about

01:59PM    12   what you did?

01:59PM    13   A.  I believe so.

01:59PM    14   Q.  Did you learn --

01:59PM    15         MR. FOTI:  Objection.

01:59PM    16         THE COURT:  Yeah, sustained.  Let's have some

01:59PM    17   foundation for that.

01:59PM    18         MR. COOPER:  Sure.

01:59PM    19         BY MR. COOPER:

01:59PM    20   Q.  Were there comments made about the fact that you brought

01:59PM    21   a report over to the U.S. Attorney's Office regarding a

01:59PM    22   report that Bongiovanni had written, were there comments made

02:00PM    23   about you providing reports to the U.S. Attorney's Office or

02:00PM    24   working closely with the U.S. Attorney's Office?

02:00PM    25   A.  Oh.  There were comments about me working with the U.S.

02:00PM    1    Attorney's Office regarding this investigation.

02:00PM    2    Q.  Okay.  And is that in relation to what you disclosed with

02:00PM    3    respect to Mr. Bongiovanni?

02:00PM    4    A.  Oh, I believe so.

02:00PM    5    Q.  Okay.  Tell the jury what they were.

02:00PM    6    A.  Oh, I --

02:00PM    7             MR. FOTI:  Objection, Judge.

02:00PM    8             THE COURT:  Sustained.  Unless -- unless -- the first

02:00PM    9    question that you asked could call for hearsay, and we're not

02:00PM   10    going to get into hearsay.  If it's -- if it's not hearsay,

02:00PM   11    it's a different story.

02:00PM   12             MR. COOPER:  Judge, I'm certainly not offering it for

02:00PM   13    the truth of the matter asserted.  If you know what the ans --

02:00PM   14             I can come up and proffer what I expect the answers

02:00PM   15    are gonna be, it's not hearsay.

02:00PM   16             THE COURT:  Come on up.  It may be hearsay.

02:00PM   17             MR. COOPER:  I'm sorry, my position is that I don't

02:00PM   18    believe it's hearsay.

02:00PM   19             (Sidebar discussion held on the record.)

02:00PM   20             THE COURT:  So -- so if he heard these things

02:00PM   21    himself --

02:00PM   22             MR. COOPER:  Yeah.

02:00PM   23             THE COURT:  -- then they're not hearsay.

02:01PM   24             MR. COOPER:  Yeah, he did.

02:01PM   25             THE COURT:  If somebody says to him so-and-so bad

02:01PM    1    mouthed you, that's a whole different story.

02:01PM    2         **MR. COOPER:**  I can do a better job.

02:01PM    3         **THE COURT:**  Okay.  That's fine.  I just want you to

02:01PM    4    understand --

02:01PM    5         **MR. COOPER:**  I do.

02:01PM    6         **THE COURT:**  -- that there could be a layer of hearsay

02:01PM    7    here that you're not recognizing.

02:01PM    8         **MR. COOPER:**  I appreciate -- I appreciate that.  I'll

02:01PM    9    do a tighter job asking the question then.

02:01PM    10        **MR. TRIPI:**  People told him, told him directly things

02:01PM    11   like they should take a crane to the U.S. Attorney's Office,

02:01PM    12   directly to him.

02:01PM    13        **THE COURT:**  He should?  I think you should?

02:01PM    14        **MR. TRIPI:**  No, they -- they commented directly to

02:01PM    15   Casullo, like, they basically talked smack to him, and he will

02:01PM    16   be able to firsthand relay --

02:01PM    17        **MR. COOPER:**  That he heard it.

02:01PM    18        **THE COURT:**  Like, you're a jerk for talking to the

02:01PM    19   U.S. Attorney's Office, in essence?

02:01PM    20        **MR. TRIPI:**  Correct.  Yes.

02:01PM    21        **THE COURT:**  That's fine.  That's a different story.

02:01PM    22        **MR. COOPER:**  Understood.  I'll lay a foundation.

02:01PM    23        (Sidebar discussion ended.)

02:01PM    24        **BY MR. COOPER:**

02:01PM    25   Q.  I just want to be clear exactly on what I'm asking you.

02:01PM   1    I'm asking you about things that you heard with your own

02:01PM   2    ears come out of other people's mouths.

02:01PM   3    Did you hear with your ears other people essentially

02:01PM   4    talking smack or saying negative things about your decision

02:01PM   5    to report this conduct to the U.S. Attorney's Office?

02:02PM   6    A.  It was things about working with the U.S. Attorney's

02:02PM   7    Office.

02:02PM   8    Q.  Okay.  That you heard; is that fair?

02:02PM   9    A.  Oh, right in front of me.

02:02PM   10   Q.  From your DEA colleagues?

02:02PM   11   A.  Two in particular that were in my group in the task force

02:02PM   12   before I went over to the FBI.

02:02PM   13   Q.  Tell the jury what you heard.

02:02PM   14   A.  One individual said that we shouldn't work with the U.S.

02:02PM   15   Attorney's Office.  We should use a crane and destroy the

02:02PM   16   building.

02:02PM   17   We had another -- another agent said right in front of me

02:02PM   18   that my partner, Curtis Ryan, from Homeland Security was a

02:02PM   19   rat bastard, and some day he'll get his.

02:02PM   20   Q.  What's it mean to be a "rat bastard," in that context?

02:02PM   21   A.  A rat bastard means to inform or say something about

02:02PM   22   another person, a snitch.

02:02PM   23   Q.  Have you heard of that thin blue line spoken about

02:02PM   24   before?

02:02PM   25   A.  Oh, absolutely.

02:02PM   1   Q.  What's that mean?

02:02PM   2   A.  "Thin blue line" means even when there's wrongdoing,

02:02PM   3   officers are unwilling to come forward and speak in order to

02:02PM   4   keep their secrecy and their unit together.

02:02PM   5   Q.  Were those comments directed at you indicating that you

02:02PM   6   violated some unspoken agreement not to talk about law

02:03PM   7   enforcement misconduct?

02:03PM   8   A.  I -- absolutely.

02:03PM   9           **MR. FOTI:**  Objection.

02:03PM  10           **THE COURT:**  I'm sorry?

02:03PM  11           **MR. FOTI:**  Objection.

02:03PM  12           **THE COURT:**  Yeah, sustained.  The jury will strike

02:03PM  13   that answer.

02:03PM  14           **BY MR. COOPER:**

02:03PM  15   Q.  When you reported that Joe Bongiovanni, at the time a DEA

02:03PM  16   special agent, said racist things to you in relation to your

02:03PM  17   investigation of his friend Peter Gerace, did you get

02:03PM  18   ostracized at work by your DEA colleagues?

02:03PM  19   A.  Absolutely.

02:03PM  20   Q.  Was that fun for you?

02:03PM  21   A.  It was miserable.

02:03PM  22           **MR. COOPER:**  Okay.  I'm good.  Thank you, Judge.

02:03PM  23           **THE COURT:**  Anything more Mr. Foti?

02:03PM  24           **MR. FOTI:**  No, thank you, Judge.

02:03PM  25           **THE COURT:**  Okay.  You can step down, sir.  Thank

02:03PM    1    you.

02:03PM    2            **THE WITNESS:**  Thank you, Judge.

02:03PM    3            (Witness excused at 2:03 p.m.)

           4            (Excerpt concluded at 2:03 p.m.)

           5            *     *     *     *     *     *     *

           6

           7

           8

           9

          10

          11            **CERTIFICATE OF REPORTER**

          12

          13            In accordance with 28, U.S.C., 753(b), I

          14    certify that these original notes are a true and correct

          15    record of proceedings in the United States District Court for

          16    the Western District of New York on November 21, 2024.

          17

          18

          19                    s/ Ann M. Sawyer
                                Ann M. Sawyer, FCRR, RPR, CRR
          20                    Official Court Reporter
                                U.S.D.C., W.D.N.Y.
          21

          22

          23

          24

          25

<u>**TRANSCRIPT INDEX**</u>

<u>**EXCERPT - EXAMINATION OF ANTHONY CASULLO - DAY 2**</u>

<u>**NOVEMBER 21, 2024**</u>

<u>**W I T N E S S**</u>                                          <u>**P A G E**</u>

**A N T H O N Y   C A S U L L O**                          2

  (CONT'D) DIRECT EXAMINATION BY MR. COOPER:        2

  CROSS-EXAMINATION BY MR. FOTI:                    59

  REDIRECT EXAMINATION BY MR. COOPER:               132

  RECROSS-EXAMINATION BY MR. FOTI:                  145

  RE-REDIRECT EXAMINATION BY MR. COOPER:            148


<u>**E X H I B I T**</u>                                          <u>**P A G E**</u>

GOV Exhibit 26B                                      41