1                **UNITED STATES DISTRICT COURT**
                **WESTERN DISTRICT OF NEW YORK**

2

    _____

3  **UNITED STATES OF AMERICA,**

                      Case No. 1:19-cr-227

4          Plaintiff,         1:23-cr-37

    v.                        (LJV)

5

  **PETER GERACE, JR.,**        December 6, 2024

6

              Defendant.

7   _____

      **TRANSCRIPT EXCERPT - EXAMINATION OF R.A. (PW 6)**

8       **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
            **UNITED STATES DISTRICT JUDGE**

9

  <u>**APPEARANCES:**</u>     **TRINI E. ROSS, UNITED STATES ATTORNEY**

10               **BY: JOSEPH M. TRIPI, ESQ.**

                 **NICHOLAS T. COOPER, ESQ.**

11              Assistant United States Attorneys

               Federal Centre, 138 Delaware Avenue

12              Buffalo, New York 14202

               For the Plaintiff

13

               **THE FOTI LAW FIRM, P.C.**

14              **BY: MARK ANDREW FOTI, ESQ.**

               16 West Main Street, Suite 100

15              Rochester, New York 14614

                And

16              **SOEHNLEIN LAW**

              **BY: ERIC MICHAEL SOEHNLEIN, ESQ.**

17              350 Main Street, Suite 2100

              Buffalo, New York 14202

18              For the Defendant

19  <u>**PRESENT:**</u>       **KAREN A. CHAMPOUX, USA PARALEGAL**

              **BRIAN A. BURNS, FBI SPECIAL AGENT**

20              **MARILYN K. HALLIDAY, HSI SPECIAL AGENT**

              **OLIVIA A. PROIA, J.D., PARALEGAL**

21

  <u>**LAW CLERK:**</u>     **REBECCA FABIAN IZZO, ESQ.**

22

  <u>**COURT CLERK:**</u>    **COLLEEN M. DEMMA**

23

  <u>**REPORTER:**</u>      **ANN MEISSNER SAWYER, FCRR, RPR, CRR**

24              Robert H. Jackson Courthouse

              2 Niagara Square Buffalo, New York 14202

25              Ann_Sawyer@nywd.uscourts.gov

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
|          | 1  | (Excerpt commenced at 2:41 p.m.)                           |
| 02:41PM  | 2  | (Jury is present.)                                         |
| 02:41PM  | 3  | **THE COURT:**  The government can call its next witness.  |
| 02:41PM  | 4  | **MR. TRIPI:**  One moment, please, Judge.                 |
| 02:41PM  | 5  | We'll call R.A. next.                                       |
| 02:41PM  | 6  |                                                            |
| 02:41PM  | 7  | **R. A. (PW 6),** having been duly called and sworn, testified as |
| 02:41PM  | 8  | follows:                                                    |
| 02:41PM  | 9  |                                                            |
| 02:41PM  | 10 | **DIRECT EXAMINATION BY MR. TRIPI:**                       |
| 02:42PM  | 11 | Q.  Good afternoon, Ms. R.A.                                |
| 02:42PM  | 12 | A.  Good afternoon.                                         |
| 02:42PM  | 13 | Q.  I don't think we've ever formally met.  I said hello to |
| 02:42PM  | 14 | you in the hallway a few times, but you've kind of dealt with |
| 02:42PM  | 15 | some other prosecutors usually when you've had court matters; |
| 02:42PM  | 16 | is that right?                                              |
| 02:42PM  | 17 | A.  Yes.                                                    |
| 02:42PM  | 18 | Q.  All right.  If you don't understand anything that I'm   |
| 02:42PM  | 19 | asking you, just let me know and I'll try to do better, okay? |
| 02:42PM  | 20 | A.  Okay.                                                   |
| 02:42PM  | 21 | Q.  How old are you, ma'am?  Let's start with an easy       |
| 02:42PM  | 22 | question.                                                   |
| 02:42PM  | 23 | A.  42.                                                     |
| 02:42PM  | 24 | Q.  Sorry to have to ask.  Where were you born and raised?  |
| 02:42PM  | 25 | A.  Pendleton, New York.                                    |

USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24

02:42PM  1  Q.  Is that Niagara County?

02:42PM  2  A.  Yes, it is.

02:42PM  3  Q.  And can you describe your educational background for the

02:43PM  4  jury?

02:43PM  5  A.  Yes.  I have a degree in behavioral science from

02:43PM  6  University of Buffalo.  And I'm currently studying for my

02:43PM  7  master's degree in clinical mental health.

02:43PM  8  Q.  When did you get the behavioral science degree from U.B.?

02:43PM  9  A.  2004 -- sorry, 2024, May.

02:43PM  10  Q.  Congratulations.

02:43PM  11  A.  Thank you.

02:43PM  12  Q.  Before that, as I understand it, you have another degree

02:43PM  13  from Buff State?

02:43PM  14  A.  Yes, social work.

02:43PM  15  Q.  When did you get that?

02:43PM  16  A.  2014, I believe.

02:43PM  17  Q.  Okay.  And you're currently studying for your master's?

02:43PM  18  A.  Yes, I am.  I'm in second year.

02:43PM  19  Q.  Is that in U.B. as well?

02:43PM  20  A.  No, that's at SUNY Fredonia.

02:43PM  21  Q.  And you might have said it, but I missed it.  What's that

02:43PM  22  area in?

02:43PM  23  A.  Clinical mental health counseling.

02:43PM  24  Q.  When do you expect to complete that program?

02:43PM  25  A.  Probably 2027.

USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24

4

02:44PM  1    Q.  Okay.

02:44PM  2    A.  Summer.

02:44PM  3    Q.  Gotcha.  All right.  Are you currently employed?

02:44PM  4    A.  No, I'm a homemaker actually right now and a student.

02:44PM  5    Q.  Previously you've been employed though, right?

02:44PM  6    A.  Yes.

02:44PM  7    Q.  Before you maybe started getting the doctorate, is it?

02:44PM  8    A.  Yes.

02:44PM  9    Q.  What were you doing?

02:44PM  10   A.  I was an -- I'm a chemical dependency counselor.  I'm a

02:44PM  11   CASAC in New York State.

02:44PM  12   Q.  I missed that second part.

02:44PM  13   A.  I have my CASAC in New York State.

02:44PM  14   Q.  What is that?

02:44PM  15   A.  Credentialed drug and alcohol counselor.

02:44PM  16   Q.  Okay.  How long were you a chemical dependency counselor?

02:44PM  17   A.  Four years.

02:44PM  18   Q.  Okay.  All right.  As I understand it, and you correct me

02:44PM  19   if I'm wrong, this is an area you became interested in after

02:44PM  20   some of your own life experiences; is that fair?

02:44PM  21   A.  Absolutely.

02:45PM  22   Q.  So, I hate to do it, but we're going to go back in

02:45PM  23   time --

02:45PM  24   A.  Okay.

02:45PM  25   Q.  -- to that, okay?

02:45PM    1    A.  Sure.

02:45PM    2    Q.  In the early 2000s of your life, were you involved in a

02:45PM    3    different lifestyle?

02:45PM    4    A.  Absolutely, yes.

02:45PM    5    Q.  Can you describe just what you were doing for work and

02:45PM    6    that lifestyle in the early yes 2000s?

02:45PM    7    A.  Early 2000s, probably between 2001 and 2003, early 2000s,

02:45PM    8    I'm not sure exactly, it's a long time ago --

02:45PM    9    Q.  Right.

02:45PM    10   A.  -- I was dancing.  I was an exotic dancer.

02:45PM    11   Q.  And was your -- was your name Diamond?

02:45PM    12   A.  Yes.

02:45PM    13   Q.  And -- and were you dancing at that time, 2001 to 2003,

02:45PM    14   at a specific club, or did you travel around?

02:45PM    15   A.  I worked at one specific club, like, my home club.  But I

02:45PM    16   did travel around.

02:45PM    17   Q.  And which was your home or main club where you danced?

02:46PM    18   A.  Mademoiselle's.

02:46PM    19   Q.  And was that located on Aero Drive?

02:46PM    20   A.  Yes, it was.

02:46PM    21   Q.  777 Aero Drive?

02:46PM    22   A.  Um-hum.

02:46PM    23   Q.  And explain for the jury, just so they have some

02:46PM    24   understanding of traveling around, what does that entail?  Is

02:46PM    25   that --

02:46PM  1   A.  Like, you would dance at one club, and then if you wanted

02:46PM  2   to make more money, or if there was a special event at

02:46PM  3   another club, you would go to that club.

02:46PM  4   Q.  Okay.  Now, I'm going to bounce around a little bit, and

02:46PM  5   I'm not going to try to confuse you with any timelines or

02:46PM  6   anything like that, but --

02:46PM  7   A.  I'm never good with dates, so --

02:46PM  8   Q.  -- but I'm going bounce around just a little bit.  All

02:46PM  9   right?  So, at some point in or about 2005, did you have some

02:46PM  10  type of relationship with a guy named Craig Border?

02:46PM  11  A.  Yes.

02:46PM  12  Q.  Is that somebody that you met where you lived at the

02:46PM  13  Sidway Building on Main Street?

02:46PM  14  A.  Yes.

02:46PM  15  Q.  And that's in Buffalo, New York, for those --

02:46PM  16  A.  Right.

02:46PM  17  Q.  -- who may not know?

02:46PM  18  A.  Yes.

02:46PM  19  Q.  At that time, you were single, right?

02:47PM  20  A.  Yes.

02:47PM  21  Q.  You were not married?

02:47PM  22  A.  Nope.

02:47PM  23  Q.  You were working in the clubs though?

02:47PM  24  A.  Yes.

02:47PM  25  Q.  Okay.  At that point in your time meeting Mr. Border, did

Case 1:19-cr-00227-LJV-MJR   Document 1510   Filed 04/26/25   Page 7 of 60
USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24

7

02:47PM  1   learn or did you understand him to be a marijuana dealer?

02:47PM  2   A.  Yes.

02:47PM  3   Q.  In that time of your life, were you also involved in sort

02:47PM  4   of use of controlled substances?

02:47PM  5   A.  Yes.

02:47PM  6   Q.  At that point in your life, what type of controlled

02:47PM  7   substances did you use?

02:47PM  8   A.  Alcohol, marijuana, cocaine.

02:47PM  9   Q.  Okay.  What time -- I'm timestamping it around when

02:47PM  10  you're seeing Mr. Border, okay?

02:47PM  11  A.  Okay.

02:47PM  12  Q.  What substances were you using most frequently at that

02:47PM  13  point?

02:47PM  14  A.  Probably alcohol and cocaine at that time.  But it's hard

02:47PM  15  to -- I don't know, mostly alcohol, cocaine.

02:47PM  16  Q.  Okay.

02:47PM  17  A.  Yeah.

02:47PM  18  Q.  What was the nature of your cocaine use like?  And what

02:48PM  19  I'm asking is, was it recreational at that point?  Or was it

02:48PM  20  heavy, like, addiction?

02:48PM  21  A.  I don't know.  I mean, addiction is different for

02:48PM  22  everyone.  At this point, you know, I was -- you know, I was

02:48PM  23  younger, so I could withstand using frequently enough.

02:48PM  24     As I got older, it became more difficult to sustain my

02:48PM  25  addiction.

02:48PM   1    Q.   Okay.  Getting back to Mr. Border briefly in 2005, you're

02:48PM   2    not married at that point, you're seeing him.  Did there come

02:48PM   3    a point in time where you took some photos in sort of

02:48PM   4    lingerie, like, Playboy Bunny photos?

02:48PM   5    A.   Yes.

02:48PM   6    Q.   Did you give those photos to him?  Was it around a

02:48PM   7    birthday or something?

02:48PM   8    A.   I think it was a birthday, or he took pictures.

02:48PM   9    Q.   Okay.

02:48PM   10   A.   Not really sure.

02:48PM   11   Q.   As you understood it, those were pictures he had, right?

02:48PM   12   A.   Yes.

02:48PM   13   Q.   Who was your next boyfriend or relationship after

02:49PM   14   Mr. Border?

02:49PM   15   A.   Peter Gerace.

02:49PM   16   Q.   Were they sort of on the heels of one another?  Like,

02:49PM   17   ending with Border, and then starting with Mr. Gerace?

02:49PM   18   A.   Yes.

02:49PM   19   Q.   Okay.  How did you meet Mr. Gerace?

02:49PM   20   A.   I originally had met him at his family's restaurant,

02:49PM   21   Pietro's.  And then I saw him at Mademoiselle's.

02:49PM   22   Q.   And would a time estimate for when you first met him at

02:49PM   23   Pietro's, would a time estimate be around 2004?  Like, a

02:49PM   24   little bit before this Border relationship, you had met him

02:49PM   25   previously?

02:49PM    1    A.   Yes.

02:49PM    2    Q.   And then in the 2005 time period, is that when you see

02:50PM    3    him at Mademoiselle's roughly?

02:50PM    4    A.   Around that time.

02:50PM    5    Q.   Okay.  In 2005, did you -- when you started seeing

02:50PM    6    Mr. Gerace as opposed to Craig Border, how did that -- how

02:50PM    7    did that transpire?

02:50PM    8    A.   I just stopped seeing Craig because I met Peter.  And I

02:50PM    9    was just basically dating Craig, it was nothing serious.

02:50PM   10    Q.   Right.

02:50PM   11    A.   And I wanted something serious with Peter.

02:50PM   12    Q.   Did you -- did you leave your apartment at the Sidway

02:50PM   13    Building and move in with Peter?

02:50PM   14    A.   I did.

02:50PM   15    Q.   Where did you move into?

02:50PM   16    A.   Windsong.

02:50PM   17    Q.   Is that an apartment complex or a -- what is that?

02:50PM   18    A.   It's like a townhouse/apartment complex type of thing.

02:50PM   19    Q.   And where is that located?

02:50PM   20    A.   Off of Transit, so East Amherst area.

02:50PM   21    Q.   Okay.

02:50PM   22    A.   Williamsville.

02:50PM   23    Q.   When you moved in with Peter, did you relinquish your

02:51PM   24    apartment at the Sidway Building?

02:51PM   25    A.   I did.

USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24

02:51PM   1   Q.  After you started seeing Peter and moved in with him, did

02:51PM   2   there come a time at SoHo downtown here where you met a

02:51PM   3   friend of his named Joe Bongiovanni?

02:51PM   4   A.  Yes.

02:51PM   5   Q.  At that time, when you met Mr. Bongiovanni socially

02:51PM   6   through the defendant, did you know what Mr. Bongiovanni did

02:51PM   7   for a living?

02:51PM   8   A.  No.

02:51PM   9   Q.  Did there come a time when, through the defendant while

02:51PM   10  you were dating the defendant, that you learned what

02:52PM   11  Mr. Bongiovanni did for a living?

02:52PM   12  A.  Yes.

02:52PM   13  Q.  Can you explain that situation for the jury, please?

02:52PM   14  A.  I guess maybe he -- Joe had seen a picture of me in

02:52PM   15  Craig's house.  And I think that was around the time that he

02:52PM   16  was getting raided or something.

02:52PM   17       **MR. SOEHNLEIN:**  Objection, Your Honor.  Can we

02:52PM   18  approach on this issue, please?

02:52PM   19       **THE COURT:**  Sure.

02:52PM   20       **MR. SOEHNLEIN:**  Thank you.

02:52PM   21       (Sidebar discussion held on the record.)

02:52PM   22       **MR. SOEHNLEIN:**  I didn't realize that that was going

02:52PM   23  to be her response to that question, I thought that was going

02:52PM   24  to be another question.  But our problem is it's hearsay

02:52PM   25  within hearsay within hearsay.  Because Border testified that

| | | |
|---|---|---|
| 02:52PM | 1 | he doesn't recall anybody that's at his house, he doesn't |
| 02:52PM | 2 | recall who takes the photo, he doesn't recall telling -- |
| 02:52PM | 3 | **THE COURT:**  She says that Peter told her that |
| 02:52PM | 4 | Bongiovanni told him that -- |
| 02:52PM | 5 | (Undecipherable.) |
| 02:52PM | 6 | **MR. SOEHNLEIN:**  Right, but how do we know -- |
| 02:53PM | 7 | **MR. COOPER:**  She can't hear you, Judge. |
| 02:53PM | 8 | **THE COURT:**  She says that Peter told her that |
| 02:53PM | 9 | Bongiovanni told him he saw the photo.  They're both |
| 02:53PM | 10 | coconspirators, and -- |
| 02:53PM | 11 | **MR. TRIPI:**  Statement of a party opponent. |
| 02:53PM | 12 | **MR. SOEHNLEIN:**  But how do we know what Bongiovanni |
| 02:53PM | 13 | told Peter is accurate? |
| 02:53PM | 14 | **MR. TRIPI:**  Doesn't matter.  It's a statement of |
| 02:53PM | 15 | party opponent.  You can argue whatever you want later. |
| 02:53PM | 16 | **THE COURT:**  Bongiovanni told Peter -- |
| 02:53PM | 17 | **MR. TRIPI:**  What Peter says comes in. |
| 02:53PM | 18 | **THE COURT:**  -- we don't, but each hearsay within |
| 02:53PM | 19 | hearsay is admissible, each of the hearsay branches has an |
| 02:53PM | 20 | exception.  Here, we know that what Peter said to her is |
| 02:53PM | 21 | admissible because he's the defendant.  And what Bongiovanni |
| 02:53PM | 22 | says to Peter is admissible because of the coconspirator |
| 02:53PM | 23 | exception. |
| 02:53PM | 24 | **MR. SOEHNLEIN:**  Yeah. |
| 02:53PM | 25 | **THE COURT:**  So I don't see why -- |

02:53PM  1    **MR. FOTI:**  I think we expected it was gonna come in a

02:53PM  2   little differently than the way it came in.  I understand the

02:53PM  3   Court's point, is that she's saying that Bongiovanni --

02:53PM  4         **THE COURT:**  If you want to argue, I'm willing to

02:54PM  5   listen.  If you think I'm wrong --

02:54PM  6         **MR. FOTI:**  No, no, no.  The way it came in, we tend

02:54PM  7   to agree that it's -- there's -- if she's saying that

02:54PM  8   Bongiovanni said he saw the pictures as opposed to just

02:54PM  9   generally saying there were pictures recovered, I get why it

02:54PM  10  doesn't necessarily --

02:54PM  11        **THE COURT:**  Oh, I see what you're saying.  You're

02:54PM  12  saying that there were pictures -- so somebody may have said

02:54PM  13  to Bongiovanni --

02:54PM  14        **MR. SOEHNLEIN:**  Yeah.  And I think that her prior

02:54PM  15  statements were there were pictures recovered, but here today

02:54PM  16  she's testified a little differently.

02:54PM  17        **MR. FOTI:**  I don't know if she testified --

02:54PM  18        **THE COURT:**  Stop.

02:54PM  19        And, Mr. Tripi, you may be -- you may need to lay

02:54PM  20  more of a foundation, too.  I think she certainly can testify

02:54PM  21  that Bongiovanni says I saw the photos and, you know, at the

02:54PM  22  search and tells Gerace that, and Gerace tells her, that

02:54PM  23  certainly come in.

02:54PM  24        If somebody else tells Bongiovanni, maybe not.

02:54PM  25        **MR. SOEHNLEIN:**  Yeah.  My recollection is at the last

02:54PM   1   trial it was different, the pictures were recovered.

02:55PM   2           **MR. TRIPI:**  There's more of a discussion I'm going to

02:55PM   3   draw out.

02:55PM   4           **THE COURT:**  That Joe had -- yeah, Joe had seen a

02:55PM   5   picture in Craig's house.  That comes in.

02:55PM   6           Okay?  So the objection is overruled.  I'll be

02:55PM   7   attentive to what you're talking about, Mr. Soehnlein.

02:55PM   8           **MR. SOEHNLEIN:**  Thank you very much.

02:55PM   9           (End of sidebar discussion.)

02:55PM  10           **THE COURT:**  Ma'am, could you speak right into the

02:55PM  11   microphone?

02:55PM  12           **THE WITNESS:**  Sure.

02:55PM  13           **THE COURT:**  Some of the jurors are having a hard time

02:55PM  14   hearing you.

02:55PM  15           **THE WITNESS:**  Oh, sorry, guys.  All right.

02:55PM  16           **THE COURT:**  So the objection is overruled.

02:55PM  17           Go ahead, Mr. Tripi.

02:55PM  18           **MR. TRIPI:**  Yes, Your Honor.

02:55PM  19           **BY MR. TRIPI:**

02:55PM  20   Q.  Bear with me, I lost my place.

02:55PM  21   A.  Okay.

02:56PM  22   Q.  I want to set this discussion that you had with Peter up

02:56PM  23   a little bit more.

02:56PM  24       In the context of this discussion that you had with Peter

02:56PM  25   about what Joe said, and -- to him about the pictures in

02:56PM   1    Craig's apartment, were you having sort of an argument or

02:56PM   2    disagreement with Mr. Gerace at the time?

02:56PM   3    A.  I'm not really sure if it was a disagreement or an

02:56PM   4    argument necessarily.  Maybe it was us bickering back and

02:56PM   5    forth or something.

02:56PM   6    Q.  Yeah.  That's all I'm trying to drive at.

02:56PM   7    A.  Oh, okay.

02:56PM   8    Q.  Was there something that was going on where then Peter

02:56PM   9    said to you what Mr. Bongiovanni had told him about the

02:56PM   10   picture?

02:56PM   11   A.  Yes.  Yes.

02:56PM   12   Q.  Okay.  Now, as close as you can --

02:56PM   13   A.  Um-hum.

02:56PM   14   Q.  -- to what Mr. Gerace said to you, what did he say about

02:56PM   15   seeing the Playboy Bunny picture outfit in Craig Border's

02:56PM   16   apartment?

02:56PM   17   A.  He said there was a picture of me.

02:56PM   18   Q.  Anything else?

02:57PM   19   A.  And that he -- and that Joe had seen it during the --

02:57PM   20   during this raid or whatever it was.

02:57PM   21   Q.  That's what I'm driving at.  Is that when you learned

02:57PM   22   that Joe Bongiovanni was a DEA agent?

02:57PM   23   A.  That's when I knew, yeah, 100 percent, um-hum.

02:57PM   24   Q.  Is that because Peter told you Joe works for the DEA and

02:57PM   25   was in a raid and he saw your picture?

02:57PM    1    A.  He didn't necessarily tell me that.  I mean, you assume

02:57PM    2    that, you know, if they're involved in a raid and there's a

02:57PM    3    picture, that you're a DEA agent or some sort of agent.

02:57PM    4    Q.  Okay.  On September 17th, 2020, you were subpoenaed to a

02:57PM    5    federal grand jury?

02:57PM    6    A.  Okay.

02:57PM    7    Q.  Do you remember that?

02:57PM    8    A.  Yep.

02:57PM    9    Q.  And -- have I done something to offend you?

02:57PM   10    A.  No.

02:57PM   11    Q.  Okay.  You remember what I'm talking about here, right?

02:57PM   12    A.  Yes.

02:57PM   13    Q.  Okay.  And you were asked questions by an Assistant

02:58PM   14    United States Attorney named Brendan Cullinane; do you

02:58PM   15    remember that?

02:58PM   16    A.  I don't remember Brendan, no.  I don't know names.

02:58PM   17    Q.  It wasn't me, right?

02:58PM   18    A.  No.

02:58PM   19    Q.  And you were asked a series of questions and answers

02:58PM   20    about this, right?

02:58PM   21    A.  Right.

02:58PM   22    Q.  And all of that preceded with you speaking to federal

02:58PM   23    agents who came to talk to you, right?

02:58PM   24    A.  Right.

02:58PM   25    Q.  They had reached out to your mother, right?

| | | |
|---|---|---|
| 02:58PM | 1 | A.  Yes. |
| 02:58PM | 2 | Q.  Then you had agreed to meet with them, and you talked to |
| 02:58PM | 3 | them in a car, right? |
| 02:58PM | 4 | A.  Yeah. |
| 02:58PM | 5 | Q.  True? |
| 02:58PM | 6 | A.  Yeah. |
| 02:58PM | 7 | Q.  And you were nervous to talk about Peter, correct? |
| 02:58PM | 8 | A.  Was I nervous? |
| 02:58PM | 9 | Q.  Yes or no:  Were you nervous? |
| 02:58PM | 10 | A.  Of course I was nervous, you're talking to FBI agents. |
| 02:58PM | 11 | Q.  You were nervous about Peter. |
| 02:58PM | 12 | A.  Not -- no, I wasn't nervous about Peter, I was nervous |
| 02:58PM | 13 | that, you know -- |
| 02:58PM | 14 | Q.  Yes -- |
| 02:58PM | 15 | A.  -- there were FBI agents at my door. |
| 02:58PM | 16 | Q.  -- yes or no:  Did you express concern about talking |
| 02:58PM | 17 | about Peter? |
| 02:58PM | 18 | A.  Of course. |
| 02:58PM | 19 | Q.  Okay. |
| 02:58PM | 20 | A.  Yes. |
| 02:58PM | 21 | Q.  Now, fast forwarding to grand jury under oath. |
| 02:58PM | 22 | A.  Um-hum. |
| 02:58PM | 23 | Q.  Were you asked this question, did you give this answer: |
| 02:58PM | 24 | Can you please describe that -- I'll go back a little |
| 02:59PM | 25 | further. |

02:59PM    1    This is page 18, lines 17 through 25, going on to line 5

02:59PM    2    of page 19.

02:59PM    3    Were you asked these questions under oath, and did you

02:59PM    4    give these answers:

02:59PM    5    "Question:  All right.  At some point after this meeting

02:59PM    6    in which you meet Joseph Bongiovanni through Peter, did there

02:59PM    7    come an incident in your relationship with Peter that

02:59PM    8    involved Joseph Bongiovanni?

02:59PM    9    "Answer:  Yes."

02:59PM    10   Were you asked that question, did you give that answer?

02:59PM    11   A.  Yes.

02:59PM    12   Q.  Next.  "Question:  Can you please describe that for the

02:59PM    13   grand jury?

02:59PM    14   "Answer:  Prior to dating Peter, I was dating an

02:59PM    15   individual that lived in the building next to me named Craig.

02:59PM    16   He got -- ended up getting raided for marijuana sales.  And

02:59PM    17   later on during, like, that week, leading up to after the

02:59PM    18   raid had happened, Peter came up to me and said my friend Joe

02:59PM    19   is a DEA agent, and saw your photo in the house of Craig.

02:59PM    20   Because I had been there, and the picture was of me.  So

02:59PM    21   that's how I became aware he was a DEA agent."

03:00PM    22   Were you asked those questions, did you give those

03:00PM    23   answers?

03:00PM    24   A.  Obviously I did if it's written down.

03:00PM    25   Q.  Did you ask -- did you get asked those questions and did

Case 1:19-cr-00227-LJV-MJR    Document 1510    Filed 04/26/25    Page 18 of 60
USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24

18

03:00PM     1    you give those answers?

03:00PM     2    A.   Yes.

03:00PM     3    Q.   Okay.  Now, at -- when you were dancing at

03:00PM     4    Mademoiselle's, was an owner named Don Parrino?

03:00PM     5    A.   Yes.

03:00PM     6    Q.   Did Don Parrino and the defendant open a club called

03:00PM     7    Pharaoh's?

03:00PM     8    A.   Yes.

03:00PM     9    Q.   When was that?

03:00PM    10    A.   2005 or '6.

03:00PM    11    Q.   Okay.  Eventually, in 2006, did you become pregnant?

03:01PM    12    A.   Yes.

03:01PM    13    Q.   By this defendant?

03:01PM    14    A.   Yes.

03:01PM    15    Q.   And I guess we've been talking about Peter Gerace, just

03:01PM    16    for the record, can you point him out for us?

03:01PM    17    A.   He's right there.

03:01PM    18    Q.   Pointing to the person in the middle?

03:01PM    19         **MR. TRIPI:**  She's identified the defendant.

03:01PM    20         **THE WITNESS:**  Yep.

03:01PM    21         **THE COURT:**  Yeah, the record reflects that she

03:01PM    22    identified the defendant.

03:01PM    23         **MR. TRIPI:**  Thank you.

03:01PM    24         **THE WITNESS:**  Okay.

           25

| | | |
|---|---|---|
| 03:01PM | 1 | **BY MR. TRIPI:** |
| 03:01PM | 2 | Q.  After you became pregnant, when did you have your son? |
| 03:01PM | 3 | A.  April 10th, 2006. |
| 03:01PM | 4 | Q.  Where were you and the defendant living at that time? |
| 03:02PM | 5 | A.  I was -- I was -- he was living -- we were living in |
| 03:02PM | 6 | Windsong, and I eventually moved in with my mother and |
| 03:02PM | 7 | father. |
| 03:02PM | 8 | Q.  Did you live with him for a time on Joseph Drive, |
| 03:02PM | 9 | 97 Joseph Drive -- |
| 03:02PM | 10 | A.  Yes. |
| 03:02PM | 11 | Q.  -- in the Town of Tonawanda? |
| 03:02PM | 12 | Was that at his grandfather and grandmother's house? |
| 03:02PM | 13 | A.  Yes. |
| 03:02PM | 14 | Q.  Was there an apartment situated there? |
| 03:02PM | 15 | A.  Yeah. |
| 03:02PM | 16 | Q.  How was the apartment situated as related to the house? |
| 03:02PM | 17 | A.  It was above the garage. |
| 03:02PM | 18 | Q.  Okay.  Now, your son's born April 10th, 2006.  Obviously |
| 03:02PM | 19 | doing math, you're pregnant sometime in 2005, right? |
| 03:02PM | 20 | A.  Um-hum. |
| 03:02PM | 21 | Q.  Prior to that, what was the nature of your cocaine use |
| 03:02PM | 22 | when you were with the defendant? |
| 03:02PM | 23 | A.  I wasn't using that often.  But once I got pregnant I |
| 03:03PM | 24 | stopped using altogether. |
| 03:03PM | 25 | Q.  And would you use cocaine with the defendant at the |

03:03PM    1    Windsong apartment?

03:03PM    2    A.  No, I never did.

03:03PM    3    Q.  In the year 2005 before being pregnant, did you use

03:03PM    4    cocaine with the defendant?

03:03PM    5    A.  I may have, yes.

03:03PM    6    Q.  How frequently would you and the defendant use cocaine?

03:03PM    7    A.  It was just recreational.

03:03PM    8    Q.  So how frequently?

03:03PM    9    A.  I don't know.  Maybe once every two weeks, maybe less

03:03PM    10   than that.

03:03PM    11   Q.  Who provided the cocaine when you would use with him?

03:04PM    12   A.  Peter had it.

03:04PM    13   Q.  He had it?

03:04PM    14   A.  Yeah.

03:04PM    15   Q.  Do you know who was giving it to him?

03:04PM    16   A.  No.

03:04PM    17   Q.  All right.  After your son was born on April 10th, 2006,

03:04PM    18   did you and the defendant get married?

03:04PM    19   A.  Yes.

03:04PM    20   Q.  By that point in time, had you met a person named John

03:04PM    21   Michalski through the defendant?

03:04PM    22   A.  Yes.

03:04PM    23   Q.  How did you meet John Michalski who became a judge?

03:04PM    24   A.  He was a friend of Peter's.  We went out to dinner a

03:04PM    25   couple of times.

03:04PM   1   Q.  Were you -- when you went out to dinner with

03:04PM   2   Mr. Michalski, was that before he was a judge initially?

03:04PM   3   A.  Maybe, I'm really not sure.

03:04PM   4   Q.  Okay.  Eventually he becomes a New York State Supreme

03:05PM   5   Court judge, though, right?

03:05PM   6   A.  Yep.

03:05PM   7   Q.  Was he the one that married you and the defendant?

03:05PM   8   A.  Yes.

03:05PM   9   Q.  Where -- where did he marry you?  Where was the ceremony?

03:05PM  10   A.  In his office in the courthouse.

03:05PM  11   Q.  So in the judge's chambers; do you recall that?

03:05PM  12   A.  Yes.

03:05PM  13   Q.  Who was present for it?

03:05PM  14   A.  My mother.

03:05PM  15   Q.  Your son, as well?

03:05PM  16   A.  Yes.

03:05PM  17   Q.  And Peter?  All right.  So your mother was the witness?

03:05PM  18   A.  Yes.

03:05PM  19   Q.  When Pharaoh's opened, were the day-to-day operations of

03:05PM  20   that club ran by Mr. Parrino and the defendant?

03:05PM  21   A.  Yes.

03:05PM  22   Q.  When it initially opened, and I know I'm bouncing back to

03:05PM  23   2005 maybe a little bit, when it initially opened, did you

03:06PM  24   dance there at all?

03:06PM  25   A.  Never.

03:06PM   1   Q.  When it initially opened, did you socialize there?

03:06PM   2   A.  Yeah, maybe for the opening, grand opening party.

03:06PM   3   Q.  So we're talking 2006?

03:06PM   4   A.  Yeah.

03:06PM   5   Q.  2005?

03:06PM   6   A.  Yeah, 2006, between 2005 and 2006.  Yes.

03:06PM   7   Q.  Okay.  Did you use cocaine inside Pharaoh's with the

03:06PM   8   defendant?

03:06PM   9   A.  No, I didn't use it with the defendant in Pharaoh's.

03:06PM  10   Q.  Did you use cocaine inside Pharaoh's?

03:06PM  11   A.  Yes.

03:06PM  12   Q.  Where inside Pharaoh's did you use cocaine?

03:06PM  13   A.  In the bathroom, whatever.  I used a lot of cocaine.

03:06PM  14   Q.  Given your sort of now training, you've distinguished

03:06PM  15   between recreational -- I think you said recreational use.

03:06PM  16   Is there also something that is referred to active addiction?

03:07PM  17   A.  Yes.

03:07PM  18   Q.  Were you ever in active addiction for cocaine?

03:07PM  19   A.  Yes.

03:07PM  20   Q.  When was that?

03:07PM  21   A.  Probably between 2008 and 2013.  Just doing a lot of

03:07PM  22   drinking.

03:07PM  23   Q.  Okay.

03:07PM  24   A.  Which would usually lead to cocaine use.

03:07PM  25   Q.  Soon after -- soon after Pharaoh's opened, did the

| | | |
|---|---|---|
| 03:07PM | 1 | defendant tell you not to go to the club anymore? |
| 03:07PM | 2 | A.  Yes. |
| 03:07PM | 3 | Q.  What was your understanding of why? |
| 03:07PM | 4 | A.  I -- he just -- he didn't want me there.  I don't know |
| 03:07PM | 5 | exactly why, but he didn't want me there. |
| 03:07PM | 6 | Q.  During that time period, did the defendant engage with |
| 03:07PM | 7 | other women? |
| 03:07PM | 8 | A.  Yes. |
| 03:07PM | 9 | Q.  Were they women at the club? |
| 03:07PM | 10 | A.  Some were. |
| 03:07PM | 11 | Q.  Would that judge that married you, John -- Judge John |
| 03:08PM | 12 | Michalski, did he go to Pharaoh's? |
| 03:08PM | 13 | A.  I don't think I ever seen him there.  Maybe he did go |
| 03:08PM | 14 | there for, like, a grand opening party.  A lot of people were |
| 03:08PM | 15 | present. |
| 03:08PM | 16 | Q.  Did you have a Facebook page back then? |
| 03:08PM | 17 | A.  No. |
| 03:08PM | 18 | Q.  Have you -- did you view Facebook back then? |
| 03:08PM | 19 | A.  No. |
| 03:08PM | 20 | Q.  Did you ever see photos of Judge Michalski in Pharaoh's |
| 03:08PM | 21 | on Facebook? |
| 03:08PM | 22 | A.  No. |
| 03:08PM | 23 | Q.  Okay.  Going back to that grand jury proceeding, were you |
| 03:08PM | 24 | asked these questions and did you give these answers: |
| 03:08PM | 25 | **THE COURT:**  Page and line, please. |

03:08PM    1    **MR. TRIPI:**  I'm trying to find it, Judge, I'm sorry.

03:08PM    2        It's on page 15 of the grand jury.  Okay.  I need to

03:09PM    3    go to 14, line 22, to the end of that page, and then to the

03:09PM    4    top of page 15, line 3.

03:09PM    5        **BY MR. TRIPI:**

03:09PM    6    Q.  You were asked this question, did you give these answers:

03:09PM    7        "Question:  Was Judge Michalski also at Pharaoh's with

03:09PM    8    him sometimes?

03:09PM    9        "Answer:  I believe so.

03:09PM   10        "Question:  Why do you believe that?

03:09PM   11        "Answer:  Because a lot of people went out there, and I

03:09PM   12    would assume he's been there.  I think maybe I saw some

03:09PM   13    pictures in there from Facebook maybe."

03:09PM   14        Were you asked those questions and did you give those

03:09PM   15    answers?

03:09PM   16    A.  Yes.

03:09PM   17    Q.  What year did you and the defendant stop physically

03:10PM   18    living together?

03:10PM   19    A.  I don't know.  The time was very difficult around that

03:10PM   20    time because I was in active addiction.

03:10PM   21    Q.  Okay.  I think we left off -- at the point in time you

03:10PM   22    were married in 2006, are you living at 97 Joseph Drive?

03:10PM   23    A.  Yeah.

03:10PM   24    Q.  Okay.  Was your divorce finalized December 16th, 2010?

03:10PM   25    A.  Yes.

USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24

25

| | | |
|---|---|---|
| 03:10PM | 1 | Q.  Somewhere between 2006 and 2010? |
| 03:10PM | 2 | A.  Um-hum. |
| 03:10PM | 3 | Q.  Did you stop living with the defendant? |
| 03:10PM | 4 | A.  Yes. |
| 03:10PM | 5 | Q.  Where did you go live? |
| 03:10PM | 6 | A.  My mother. |
| 03:10PM | 7 | Q.  So in 2007, 2008, 2009, 2010, you didn't live with the |
| 03:11PM | 8 | defendant, correct?  You did not? |
| 03:11PM | 9 | A.  Did I live with the defendant?  What?  I'm sorry. |
| 03:11PM | 10 | Q.  In 2007 through 2010, when your divorce finalized, you |
| 03:11PM | 11 | did not live with the defendant? |
| 03:11PM | 12 | A.  No. |
| 03:11PM | 13 | Q.  Okay.  After your divorce finalized, would there be times |
| 03:11PM | 14 | when you stayed together though? |
| 03:11PM | 15 | A.  Yes. |
| 03:11PM | 16 | Q.  In the year of 2013, did you move back in with the |
| 03:11PM | 17 | defendant? |
| 03:11PM | 18 | A.  Briefly, yes. |
| 03:11PM | 19 | Q.  On Joseph Drive? |
| 03:11PM | 20 | A.  Yes. |
| 03:11PM | 21 | Q.  And then you moved back out? |
| 03:11PM | 22 | A.  Yep. |
| 03:11PM | 23 | Q.  And during those years, 2007 through 2013, you're not |
| 03:11PM | 24 | going to Pharaoh's; fair to say? |
| 03:11PM | 25 | A.  Fair to say, yes. |

03:11PM  1    Q.  After you move out of Joseph Drive in 2013 all the way to

03:11PM  2    present day, you're not going to Pharaoh's anymore, correct?

03:12PM  3    A.  No.

03:12PM  4    Q.  Poor question on my part, I'll correct it.  Yes, you're

03:12PM  5    not going to Pharaoh's?

03:12PM  6    A.  I'm not going to Pharaoh's.

03:12PM  7    Q.  Okay.  Thank you.

03:12PM  8         THE COURT:  Mr. Tripi, do you have a sense of how

03:12PM  9    much longer you're going to be?

03:12PM  10        MR. TRIPI:  Maybe five or ten minutes, Judge.

03:12PM  11        THE COURT:  Okay.

03:12PM  12        MR. TRIPI:  If we take a break -- if this is a good

03:12PM  13   time for a break, maybe I could tighten it up and be done in a

03:12PM  14   few minutes.

03:12PM  15        THE COURT:  Great.  Let's do that then.

03:12PM  16        So, folks, let's take our afternoon break.  Remember

03:12PM  17   my instructions about not talking about the case including

03:12PM  18   with each other, and not making up your mind.

03:12PM  19        We'll be back in ten or 15 minutes.

03:12PM  20        (Jury excused at 3:12 p.m.)

03:13PM  21        THE COURT:  Okay.  Ms. R.A., don't talk to anybody

03:13PM  22   about your testimony during the break.

03:13PM  23        THE WITNESS:  Okay.

03:13PM  24        THE COURT:  Anything from the government?

03:13PM  25        MR. COOPER:  No, thank you.

| | | |
|---|---|---|
| 03:13PM | 1 | **THE COURT:**  Anything from the defense? |
| 03:13PM | 2 | **MR. FOTI:**  No, thank you. |
| 03:13PM | 3 | **THE COURT:**  We'll see you in about ten or 15 minutes. |
| 03:13PM | 4 | (Off the record at 3:13 p.m.) |
| 03:34PM | 5 | (Back on the record at 3:34 p.m.) |
| 03:34PM | 6 | (Jury not present.) |
| 03:34PM | 7 | (Discussion of next witness Jeffrey Anzalone from |
| 03:34PM | 8 | 3:34 p.m. to 3:35 p.m.) |
| 03:34PM | 9 | (Jury seated at 3:35 p.m.) |
| 03:35PM | 10 | **THE COURT:**  Okay.  Welcome back for the home stretch, |
| 03:35PM | 11 | folks.  I think I forgot to mention that Ms. Chalbeck is not |
| 03:35PM | 12 | here again today.  She had that same matter that she needed to |
| 03:35PM | 13 | attend to today.  Again, I know about it, it's an important |
| 03:35PM | 14 | matter, and we hope that she'll be back with us on Monday. |
| 03:35PM | 15 | The record will reflect that all our jurors are |
| 03:35PM | 16 | present. |
| 03:35PM | 17 | I remind the witness that she's still under oath. |
| 03:35PM | 18 | And, Mr. Tripi, you may continue. |
| 03:35PM | 19 | **MR. TRIPI:**  Thank you, Your Honor. |
| 03:35PM | 20 | **BY MR. TRIPI:** |
| 03:35PM | 21 | Q.  Ms. R.A., a few more minutes, and then I'm going to turn |
| 03:35PM | 22 | over the questioning.  Okay?  I want to circle back to that |
| 03:35PM | 23 | discussion about the pictures. |
| 03:35PM | 24 | A.  Um-hum. |
| 03:35PM | 25 | Q.  There was one question I neglected to ask you. |

03:35PM  1    In that conversation with the defendant, did the

03:35PM  2  defendant also tell you that he had observed the picture that

03:35PM  3  Joe Bongiovanni saw in the house?

03:35PM  4  A.  I'm not sure if he said "observed."

03:35PM  5  Q.  Okay.

03:36PM  6  A.  No.

03:36PM  7  Q.  I'm going to try to refresh your recollection then --

03:36PM  8  A.  Okay.

03:36PM  9  Q.  -- on that, okay?

03:36PM  10    I'm going to show you -- I need the exhibit number

03:36PM  11  actually.  3562A is the number.  We'll show you page 21.

03:36PM  12      MR. TRIPI:  And, Ms. Champoux, if we can do that for

03:36PM  13  the witness only at this time.

03:36PM  14      BY MR. TRIPI:

03:36PM  15  Q.  Look at lines 2 through 4.

03:36PM  16  A.  Okay.

03:36PM  17  Q.  Okay?

03:36PM  18      MR. TRIPI:  You can take that down.

03:36PM  19      THE WITNESS:  Yep.

03:36PM  20      BY MR. TRIPI:

03:36PM  21  Q.  So did Peter tell you that he had actually observed the

03:36PM  22  photo?

03:36PM  23  A.  Yes.

03:36PM  24  Q.  All right.  I want to ask you about another person who

03:36PM  25  was friends with the defendant.  Do you know Dan Derenda?

| 03:37PM | 1 | A.  Yes. |
| 03:37PM | 2 | Q.  Did you -- did you meet him through the defendant? |
| 03:37PM | 3 | A.  Yes. |
| 03:37PM | 4 | Q.  What was the defendant's relationship with Mr. Derenda? |
| 03:37PM | 5 | A.  He was a friend, and he was the godfather of his |
| 03:37PM | 6 | daughter. |
| 03:37PM | 7 | Q.  So, Mr. Derenda has a daughter named Mia? |
| 03:37PM | 8 | A.  Yes. |
| 03:37PM | 9 | Q.  And the defendant is the godfather? |
| 03:37PM | 10 | A.  Yes. |
| 03:37PM | 11 | Q.  When you met Mr. Derenda, was he the Buffalo Police |
| 03:37PM | 12 | Commissioner at the time? |
| 03:37PM | 13 | A.  Yes. |
| 03:37PM | 14 | Q.  Where were you when you met Mr. Derenda through the |
| 03:37PM | 15 | defendant? |
| 03:37PM | 16 | A.  I was at his house. |
| 03:37PM | 17 | Q.  Mr. Derenda's house? |
| 03:37PM | 18 | A.  Yes. |
| 03:37PM | 19 | Q.  Now, I don't want to get into specifics of anything |
| 03:37PM | 20 | underlying, but earlier in your relationship focusing in on |
| 03:37PM | 21 | that 2006 timeframe, okay -- |
| 03:37PM | 22 | A.  Um-hum. |
| 03:37PM | 23 | Q.  -- the defendant was on probation with U.S. Probation; is |
| 03:37PM | 24 | that right? |
| 03:38PM | 25 | A.  Yes. |

03:38PM 1    Q. At some point while he was on probation, did the

03:38PM 2    defendant ask you for clean urine?

03:38PM 3    A. I'm not sure.

03:38PM 4    Q. Okay. Let me build that out a little bit.

03:38PM 5       As you understood it, when the defendant was on

03:38PM 6    probation, he couldn't use drugs, right?

03:38PM 7    A. Yes.

03:38PM 8    Q. He could not use cocaine, for example?

03:38PM 9    A. Yes.

03:38PM 10   Q. As you understood it, he was drug tested?

03:38PM 11   A. Yes.

03:38PM 12   Q. And, obviously, drugs are illegal, right?

03:38PM 13   A. Yes.

03:38PM 14   Q. And so I want to show you Government Exhibit 3562A at

03:38PM 15   page 31.

03:38PM 16        **MR. TRIPI:** Actually, I want to go to the bottom of

03:39PM 17   page -- this is for the witness only, bottom of page 30 first.

03:39PM 18        **BY MR. TRIPI:**

03:39PM 19   Q. And then maybe start reading from line 21, down.

03:39PM 20   A. Okay.

03:39PM 21   Q. Okay? Just read it to yourself. And we'll scroll when

03:39PM 22   you let me know, okay?

03:39PM 23   A. Um-hum. Okay.

03:39PM 24        **MR. TRIPI:** Can you scroll a little bit more,

03:39PM 25   Ms. Champoux?

| | | |
|---|---|---|
| 03:39PM | 1 | **BY MR. TRIPI:** |
| 03:39PM | 2 | Q.  All right.  I'd like you to stop reading around line 19, |
| 03:39PM | 3 | which I crossed out so you can't read it.  But go from lines |
| 03:39PM | 4 | 1 through 19 now on page 31. |
| 03:39PM | 5 | A.  Um-hum. |
| 03:39PM | 6 | Q.  Okay. |
| 03:39PM | 7 | **MR. TRIPI:**  We can take that down, Ms. Champoux. |
| 03:39PM | 8 | **BY MR. TRIPI:** |
| 03:39PM | 9 | Q.  My question now is:  After the defendant had a negative |
| 03:39PM | 10 | drug test, did he ask you if you could provide him with clean |
| 03:39PM | 11 | urine? |
| 03:39PM | 12 | A.  Yes. |
| 03:39PM | 13 | Q.  And was it your -- was it your understanding so that he |
| 03:40PM | 14 | would pass future drug tests? |
| 03:40PM | 15 | A.  It was my understanding that he had to test negative. |
| 03:40PM | 16 | Q.  Okay.  Negative is past tense, so he's tested, tested |
| 03:40PM | 17 | negative.  Then he has a conversation with you, correct? |
| 03:40PM | 18 | A.  Yep.  Yes. |
| 03:40PM | 19 | Q.  And his conversation with you is to get clean urine |
| 03:40PM | 20 | moving forward, right? |
| 03:40PM | 21 | A.  Yes. |
| 03:40PM | 22 | Q.  And so that means he wanted clean urine in case he was |
| 03:40PM | 23 | tested in the future, true? |
| 03:40PM | 24 | A.  Yes. |
| 03:40PM | 25 | Q.  Did you give it to him? |

03:40PM   1   A.  I'm not sure if I did or not.

03:40PM   2   Q.  Okay.

03:40PM   3   A.  It was a long time ago.

03:40PM   4        **MR. TRIPI:**  Move to strike the extraneous comment,

03:40PM   5   Your Honor.

03:40PM   6        **THE COURT:**  Yeah.  So just answer his questions,

03:40PM   7   please, ma'am.

03:40PM   8        **THE WITNESS:**  Okay.

03:40PM   9        **THE COURT:**  And we'll strike that last comment.

03:40PM  10        **MR. TRIPI:**  Thank you.

03:40PM  11        **BY MR. TRIPI:**

03:40PM  12   Q.  So did the defendant ask you for clean urine because he

03:41PM  13   might get tested by U.S. Probation; yes or no?

03:41PM  14   A.  Yes.

03:41PM  15   Q.  Based upon your time inside Pharaoh's, and your

03:41PM  16   discussions with the defendant, did you know many of the

03:41PM  17   Pharaoh's dancers to have drug addictions?

03:41PM  18        **MR. SOEHNLEIN:**  Objection.

03:41PM  19        **THE COURT:**  Basis?

03:41PM  20        **MR. SOEHNLEIN:**  Foundation, and 403, Judge.

03:41PM  21        **THE COURT:**  Okay.  Lay a foundation please,

03:41PM  22   Mr. Tripi.

03:41PM  23        **BY MR. TRIPI:**

03:41PM  24   Q.  Have you been inside Pharaoh's?

03:41PM  25   A.  Yes.

03:41PM   1    Q.  We talked about earlier you've used drugs inside

03:41PM   2    Pharaoh's, cocaine, right?

03:41PM   3    A.  Yes.

03:41PM   4    Q.  Have you seen other women walking around inside

03:41PM   5    Pharaoh's?

03:41PM   6    A.  Walking around, yes.

03:41PM   7    Q.  Yeah.  And have you had discussions with the defendant

03:41PM   8    about personnel and people at Pharaoh's?

03:42PM   9    A.  Yes.

03:42PM   10   Q.  Okay.  Based upon your observations and your discussions

03:42PM   11   with the defendant, did you know many dancers at Pharaoh's to

03:42PM   12   have drug addictions; yes or no?

03:42PM   13   A.  Most dancers have drug addictions.

03:42PM   14   Q.  Okay.  But my question is:  Did you know many dancers at

03:42PM   15   Pharaoh's to have drug addictions?

03:42PM   16   A.  Yes.

03:42PM   17   Q.  You knew Don Parrino as well, right?

03:42PM   18   A.  Yes.

03:42PM   19   Q.  Did you hear a conversation between the defendant and Don

03:42PM   20   Parrino where they discussed a dancer named -- I think dancer

03:42PM   21   name G.R., overdosing?

03:43PM   22   A.  Yes, I've heard it.  I'm not sure if I heard it from

03:43PM   23   them, but it was a big, you know, talk around the club.

03:43PM   24   Q.  Did you speak about G.R.'s overdose with the defendant,

03:43PM   25   if you recall?

| | | |
|---|---|---|
| 03:43PM | 1 | A.  I really don't think I did.  I don't remember. |
| 03:43PM | 2 | Q.  Okay.  So we talked about essentially from 2007 on to |
| 03:43PM | 3 | current day your involvement awareness of physically yourself |
| 03:43PM | 4 | being inside Pharaoh's has been limited; is that fair to say? |
| 03:43PM | 5 | A.  I haven't been in Pharaoh's in years. |
| 03:43PM | 6 | Q.  And I think earlier we established maybe 2007 on? |
| 03:43PM | 7 | A.  Yes. |
| 03:43PM | 8 | Q.  Okay.  Would it be accurate to say then that others who |
| 03:44PM | 9 | were there from 2007 on would know more about what was |
| 03:44PM | 10 | transpiring inside Pharaoh's than you? |
| 03:44PM | 11 | A.  Yes. |
| 03:44PM | 12 | Q.  For the times that you were with the defendant, though, |
| 03:44PM | 13 | whether you lived with him or were with him, did this |
| 03:44PM | 14 | defendant always have access to cocaine? |
| 03:44PM | 15 | A.  I'm not sure if he always had access. |
| 03:44PM | 16 | Q.  From your observations and interactions with him, was |
| 03:44PM | 17 | there ever a time where he couldn't get you cocaine when you |
| 03:44PM | 18 | guys wanted to use it? |
| 03:44PM | 19 | A.  I don't know.  I don't know. |
| 03:44PM | 20 | Q.  Well, you lived it, so can you tell the jury? |
| 03:44PM | 21 | Do you ever remember a time when you and Peter wanted to |
| 03:44PM | 22 | use cocaine and you couldn't -- |
| 03:44PM | 23 | A.  If I wanted to use cocaine, I would have -- |
| 03:44PM | 24 | Q.  Well my -- |
| 03:44PM | 25 | A.  -- and I would -- |

03:44PM      1    Q.  -- question is about --

03:44PM      2    A.  -- have got it myself or --

03:44PM      3              **THE COURT:**  One at a time, folks.  One at a time.

03:44PM      4              **MR. TRIPI:**  Thank you, Judge.  Sorry.

03:44PM      5              **BY MR. TRIPI:**

03:44PM      6    Q.  My question was about the defendant.

03:44PM      7    A.  Okay.

03:44PM      8    Q.  Was there ever a time you were with the defendant and he

03:44PM      9    couldn't get you cocaine if you wanted it?

03:44PM     10    A.  He didn't get me cocaine.  I used cocaine with him.

03:44PM     11    Q.  That came out of his pocket?

03:44PM     12    A.  I don't know where it came from.

03:45PM     13    Q.  Well, you didn't conjure it up and make it appear?

03:45PM     14    A.  Well, usually a drug dealer would give it to you, but

03:45PM     15    I -- he's not a drug dealer, so I don't know where he got it

03:45PM     16    from.

03:45PM     17    Q.  Well, that's interesting, because when he has cocaine and

03:45PM     18    he gives it to you to use, what do you think that is?

03:45PM     19    A.  I'm choosing to use it, so I'm an active drug user.

03:45PM     20    Q.  When he gives you cocaine --

03:45PM     21    A.  I didn't pay for it.

03:45PM     22    Q.  Oh, because it's free?  Is that what they're teaching you

03:45PM     23    in school?

03:45PM     24    A.  Excuse me?

03:45PM     25              **MR. SOEHNLEIN:**  Objection.  Argumentative.

03:45PM   1                THE COURT:  Sustained.  Sustained.  Sustained.

03:45PM   2                Next question, Mr. Tripi.

03:45PM   3                BY MR. TRIPI:

03:45PM   4     Q.  So that's the line for you.  If the defendant gives you

03:45PM   5     cocaine for free, he's not a drug dealer?

03:45PM   6                MR. SOEHNLEIN:  Objection.  Argumentative.

03:45PM   7                THE COURT:  Sustained.

03:45PM   8                THE WITNESS:  No, he's not a drug dealer.

03:45PM   9                THE COURT:  Stop.  Stop.

03:45PM   10               Ma'am, when I say sustained, you don't answer.

03:45PM   11               Sustained.

03:45PM   12               Next question, Mr. Tripi.

03:45PM   13               MR. TRIPI:  Judge, under Rule 611(c), I think I can

03:45PM   14     lead a little bit here.

03:45PM   15               THE COURT:  You can lead, yeah.  And they're not

03:46PM   16     objecting to the leading, so --

03:46PM   17               MR. TRIPI:  Yeah.

03:46PM   18               THE COURT:  If you folks think it's appropriate to

03:46PM   19     object, you object.

03:46PM   20               MR. TRIPI:  I'm also proceeding under Rule 607.

03:46PM   21               THE COURT:  I understand.

03:46PM   22               BY MR. TRIPI:

03:46PM   23     Q.  Okay.  When you used cocaine with the defendant, he's the

03:46PM   24     one who produced it for you, correct?

03:46PM   25     A.  Yes.

03:46PM  1    Q.  How many times has the defendant given you cocaine?

03:46PM  2    A.  I don't know how many times.

03:46PM  3    Q.  Is it countless?

03:46PM  4    A.  No.

03:46PM  5    Q.  Can you estimate?

03:46PM  6    A.  I cannot estimate.

03:46PM  7    Q.  Is it more than one?

03:46PM  8    A.  Yes.

03:46PM  9    Q.  Is it more than ten?

03:46PM  10   A.  Maybe.

03:46PM  11   Q.  Those other women that the defendant was going with at

03:47PM  12   Pharaoh's, to your knowledge, was he giving them cocaine too?

03:47PM  13           **MR. SOEHNLEIN:**  Objection.

03:47PM  14           **THE WITNESS:**  I don't know if he was giving them

03:47PM  15   cocaine.

03:47PM  16           **THE COURT:**  Hold on.  Stop, stop, stop.

03:47PM  17           Stop, stop, stop.

03:47PM  18           Objection, hearsay?

03:47PM  19           **MR. SOEHNLEIN:**  Yeah.

03:47PM  20           **THE COURT:**  Lay a foundation.

03:47PM  21           **BY MR. TRIPI:**

03:47PM  22   Q.  Did you confront him about going with other women at

03:47PM  23   Pharaoh's?

03:47PM  24   A.  Yes.

03:47PM  25   Q.  When he would come home after being at Pharaoh's --

| | | |
|---|---|---|
| 03:47PM | 1 | You've been around people intoxicated by cocaine; is that |
| 03:47PM | 2 | right? |
| 03:47PM | 3 | A.  Yes. |
| 03:47PM | 4 | Q.  You know the physical manifestations of it even before |
| 03:47PM | 5 | your schooling, correct? |
| 03:47PM | 6 | A.  Yes. |
| 03:47PM | 7 | Q.  When he would come home from Pharaoh's, did you make |
| 03:47PM | 8 | observations that led you to conclude he was under the |
| 03:47PM | 9 | influence of cocaine? |
| 03:47PM | 10 | A.  I -- I didn't.  Usually, no, I would be sleeping when he |
| 03:47PM | 11 | came home. |
| 03:47PM | 12 | Q.  Okay.  You testified in the grand jury, right? |
| 03:47PM | 13 | A.  Yes. |
| 03:47PM | 14 | Q.  Okay.  We're gonna just -- give me a second here.  I'll |
| 03:47PM | 15 | find it. |
| 03:47PM | 16 | A.  Okay. |
| 03:48PM | 17 | **MR. TRIPI:**  I'm wrapping up, Judge.  Give me an |
| 03:48PM | 18 | indulgence here. |
| 03:48PM | 19 | **THE COURT:**  Sure. |
| 03:48PM | 20 | **MR. TRIPI:**  Thank you. |
| 03:48PM | 21 | **BY MR. TRIPI:** |
| 03:48PM | 22 | Q.  While I'm doing that, all right, we talked about earlier |
| 03:48PM | 23 | there was a time you weren't allowed at Pharaoh's anymore |
| 03:49PM | 24 | right, very early on? |
| 03:49PM | 25 | A.  Yes. |

03:49PM    1    Q.  In the grand jury, this is Government Exhibit 3562A, I'm

03:49PM    2    on page 12, beginning at line 20.  Were you asked this

03:49PM    3    question and did you give this answer:

03:49PM    4         MR. FOTI:  Hang on, Joe.  What page did you say?

03:49PM    5         MR. TRIPI:  12, and beginning at line 20.  It's going

03:49PM    6    to spill on, I think, to the top of the next page.

03:49PM    7         THE COURT:  Do you have an objection, Mr. Soehnlein

03:49PM    8    or Mr. Foti?

03:49PM    9         MR. SOEHNLEIN:  Yes, Judge.  We're reading the -- the

03:49PM   10    lines that Mr. Tripi -- can we approach, Judge?

03:49PM   11         THE COURT:  Yeah, let me see it.  Bring it up, and

03:49PM   12    you guys can approach.

03:50PM   13         (Sidebar discussion held on the record.)

03:50PM   14         MR. TRIPI:  It's at the bottom.

03:50PM   15         THE COURT:  Yep.

03:50PM   16         MR. TRIPI:  Just a couple.

03:50PM   17         MR. FOTI:  I think it's a 602 objection.  She says in

03:50PM   18    the grand jury:  Most likely, yes.

03:50PM   19         THE COURT:  No, no, but then she says, and he would

03:50PM   20    come home --

03:50PM   21         So I agreed with you up until there.  That he would

03:50PM   22    come home.  And based on your experience, he had been using

03:50PM   23    something?  Yes.

03:50PM   24         MR. TRIPI:  That's where I would end.

03:50PM   25         MR. FOTI:  I don't think within the grand jury

03:50PM   1   there's any foundation for what she's basing that on.  Her

03:50PM   2   prior answer says most likely.  I think she's speculating in

03:50PM   3   the grand jury, and it would be used to impeach her here in

03:50PM   4   terms of what she observed.  I don't think it's a proper

03:50PM   5   impeachment.

03:50PM   6        **MR. TRIPI:**  She said no here, she said yes there.

03:51PM   7        **THE COURT:**  Yeah.  And I don't think that she --

03:51PM   8   you've got to lay a foundation at the grand jury for that.

03:51PM   9        **MR. FOTI:**  No, I agree.

03:51PM   10        **THE COURT:**  So, but, and he's laid the foundation

03:51PM   11   here that she knows what people look like when they're on

03:51PM   12   cocaine.

03:51PM   13        **MR. FOTI:**  Agreed.

03:51PM   14        **THE COURT:**  So, and you would come home, and you

03:51PM   15   would be able to tell, based on your experience, he had been

03:51PM   16   using something?  Yes.

03:51PM   17        **MR. SOEHNLEIN:**  Right.  And I'm sorry to jump in, but

03:51PM   18   the foundation is use of cocaine.  And there, it's using

03:51PM   19   something.  It could be cocaine, it could be drinking, it

03:51PM   20   could be anything.  Using something and using cocaine are

03:51PM   21   different things.

03:51PM   22        **THE COURT:**  I guess that's true.

03:51PM   23        Was it your belief that he was at Pharaoh's or

03:51PM   24   somewhere else and using cocaine?  Most likely, yes.  And/or

03:51PM   25   drinking.  Um-hum.  He would come home and you'd be able to --

03:51PM  1      MR. TRIPI:  And that's why there's the follow up.

03:51PM  2      THE COURT:  Something.  Cocaine or alcohol.  Not

03:51PM  3  necessarily cocaine.

03:51PM  4      MR. TRIPI:  But that's a lot different than no.

03:51PM  5      And when you're on an inconsistency like this, it

03:51PM  6  doesn't have to be --

03:51PM  7      MR. SOEHNLEIN:  It's not a yes.

03:51PM  8      MR. TRIPI:  -- it doesn't have to be a 180 degree.

03:52PM  9  She said no here pretty conclusively.  There's a version of

03:52PM  10  yes there.

03:52PM  11      THE COURT:  Well, she said she was asleep.

03:52PM  12      MR. TRIPI:  Yeah.  That's right.  That's the sum and

03:52PM  13  substance of it, Judge.

03:52PM  14      THE COURT:  I'm going to allow it.

03:52PM  15      MR. TRIPI:  And I'm not going any further.

03:52PM  16      (End of sidebar discussion.)

03:52PM  17      BY MR. TRIPI:

03:52PM  18  Q.  Okay.  In the grand jury, September 17th, 2020, when you

03:52PM  19  were under oath, this is at page 12, beginning at line 20,

03:52PM  20  were you asked this question and did you give this answer:

03:52PM  21    "Question:  Was it your belief that he was at Pharaoh's

03:52PM  22  or somewhere else and using cocaine?

03:52PM  23    "Answer:  Most likely, yes."

03:52PM  24    Were you asked that question, did you give that answer?

03:52PM  25  A.  Most likely, either that or drinking, I --

Case 1:19-cr-00227-LJV-MJR   Document 1510   Filed 04/26/25   Page 42 of 60
USA v Gerace - R.A. (PW 6) - Tripi/Direct - 12/6/24

42

03:52PM    1    **THE COURT:**  Just, just --

03:52PM    2    **THE WITNESS:**  I don't know.

03:52PM    3    **THE COURT:**  The question is --

03:52PM    4    **MR. TRIPI:**  Were you --

03:52PM    5    **THE WITNESS:**  I'm sorry.

03:52PM    6    **THE COURT:**  Ma'am -- ma'am, listen.

03:52PM    7    The question is:  Were you asked that question and

03:52PM    8    did you give that answer --

03:52PM    9    **THE WITNESS:**  Yes.

03:52PM    10    **THE COURT:**  -- at the grand jury?

03:52PM    11    Next question.

03:52PM    12    **BY MR. TRIPI:**

03:52PM    13    Q.  And the next question was:  And/or drinking?

03:52PM    14    And you answered:  Um-hum?

03:53PM    15    A.  Yes.

03:53PM    16    Q.  Were you asked that question and did you give that

03:53PM    17    answer?

03:53PM    18    A.  Um-hum.  Yes.

03:53PM    19    Q.  And then were you asked this question, and did you give

03:53PM    20    this answer:

03:53PM    21    "Question:  And he would come home, and you would be able

03:53PM    22    to tell, based on your experience, he had been using

03:53PM    23    something?

03:53PM    24    "Answer:  Yes."

03:53PM    25    Were you asked that question, and did you give that

03:53PM   1   answer?

03:53PM   2   A.  Yes.

03:53PM   3   Q.  And lastly, did the defendant tell you where he got the

03:53PM   4   money to start Pharaoh's?

03:53PM   5          MR. SOEHNLEIN:  Objection.  Relevance.

03:53PM   6          THE COURT:  Did he tell you?  The question is:  Did

03:53PM   7   he tell you?

03:53PM   8          THE WITNESS:  Did he tell me?  He didn't tell me

03:53PM   9   directly.  No.

03:53PM  10          THE COURT:  Okay.  Anything else, Mr. Tripi?

03:53PM  11          MR. TRIPI:  I have no further direct.  Thank you.

03:53PM  12          THE COURT:  Great.  Cross.

03:53PM  13

03:53PM  14              CROSS-EXAMINATION BY MR. SOEHNLEIN:

03:53PM  15   Q.  Good afternoon, Ms. R.A.  How are you?

03:53PM  16   A.  Good afternoon.

03:53PM  17   Q.  So I want to start.  There were some -- on direct, you

03:53PM  18   had some testimony about conversations that you had had with

03:53PM  19   Mr. Gerace about what was going on at the club; do you recall

03:53PM  20   that testimony?

03:53PM  21   A.  Yes.

03:54PM  22   Q.  And -- and I think some of the testimony had to do with

03:54PM  23   drug use of the dancers; do you recall that?

03:54PM  24   A.  Yes.

03:54PM  25   Q.  Okay.  And you communicated with Mr. Gerace from the time

03:54PM   1   that you met him in 2005 until, I mean, really, until

03:54PM   2   recently, correct?

03:54PM   3   A.  Yes.

03:54PM   4   Q.  You guys share a child in common, correct?

03:54PM   5   A.  Yes.

03:54PM   6   Q.  And you've had discussions with him about -- about the

03:54PM   7   club, right?

03:54PM   8   A.  Yes.

03:54PM   9   Q.  And it's your belief that he wants to keep drugs out of

03:54PM   10  the club, right?

03:54PM   11        **MR. TRIPI:**  Objection, hearsay.  It's based upon

03:54PM   12  their discussions.

03:54PM   13        **THE COURT:**  Sustained.

03:54PM   14        **BY MR. SOEHNLEIN:**

03:54PM   15  Q.  You've had discussions with him about drug use at the

03:54PM   16  club, correct?

03:54PM   17  A.  Yes.

03:54PM   18  Q.  And you've had discussions with him about measures that

03:54PM   19  the club has taken to try to keep drugs out of the club,

03:54PM   20  correct?

03:54PM   21  A.  Yes.

03:54PM   22  Q.  And what have been the sum and substance --

03:54PM   23        **MR. TRIPI:**  Objection.  Calls for hearsay.

03:54PM   24        **THE COURT:**  Sum and substance of those conversations?

03:54PM   25        **MR. SOEHNLEIN:**  Yeah.

03:54PM   1          **THE COURT:**  Sustained.

03:54PM   2          **BY MR. SOEHNLEIN:**

03:55PM   3   Q.  Have you formed an opinion, based on your time knowing

03:55PM   4   the defendant and speaking with Mr. Gerace, as to whether or

03:55PM   5   not he wants drugs in Pharaoh's?

03:55PM   6          **MR. TRIPI:**  Objection.

03:55PM   7          **THE COURT:**  Sustained.

03:55PM   8          **MR. FOTI:**  Eric.

03:55PM   9          **BY MR. SOEHNLEIN:**

03:55PM  10   Q.  Ms. R.A., you -- you lived with the defendant for a

03:55PM  11   number of years, correct?

03:55PM  12   A.  Yes.

03:55PM  13   Q.  And I think there's some testimony that you and he would

03:55PM  14   occasionally use cocaine together recreationally, correct?

03:55PM  15   A.  Yes.

03:55PM  16   Q.  And your -- your cocaine use eventually grew over time,

03:55PM  17   correct?

03:56PM  18   A.  Yes.

03:56PM  19   Q.  And eventually you got to a point in your life where you

03:56PM  20   achieved sobriety --

03:56PM  21   A.  Yes.

03:56PM  22   Q.  -- correct?  And how long have you been sober now?

03:56PM  23   A.  I've been in recovery since January of 2017, so almost

03:56PM  24   eight years.

03:56PM  25   Q.  Okay.  Now at the point earlier in time when you were

03:56PM   1   using, you didn't recognize the signs of the beginning of

03:56PM   2   addiction at that time, correct?

03:56PM   3   A.   I didn't recognize the signs?

03:56PM   4   Q.   Yeah.

03:56PM   5   A.   Well, no.

03:56PM   6   Q.   Yeah.

03:56PM   7   A.   Not with -- like, with myself, no.

03:56PM   8   Q.   Yeah.  And -- and with regard to Mr. Gerace, would it be

03:56PM   9   your testimony that, to your knowledge, your cocaine use and

03:56PM  10   his cocaine use around that time was relatively similar?

03:56PM  11   A.   I think my drug use was -- it was out of control.

03:56PM  12   Q.   Okay.  And do you think that he exhibited signs of

03:56PM  13   addiction at the point in time where you guys were together

03:57PM  14   from that 2005 to 2017 period?

03:57PM  15   A.   No.

03:57PM  16   Q.   Okay.  Now, I think there was some testimony about your

03:57PM  17   meetings with the government; do you recall that testimony?

03:57PM  18   A.   Yes.

03:57PM  19   Q.   Okay.  And I think that you -- you testified that they

03:57PM  20   met you, and they met you in a car at some point in time?

03:57PM  21   A.   Yes.

03:57PM  22   Q.   Where was that?

03:57PM  23   A.   I recall they showed up to my work.  They -- it was --

03:57PM  24   they showed up to my old apartment.

03:57PM  25   Q.   They showed up to multiple places?

03:57PM  1   A.  Multiple places, yes.

03:57PM  2   Q.  Okay.  And eventually you met with them, correct?

03:57PM  3   A.  Yes.

03:57PM  4   Q.  And eventually in the grand jury, correct?

03:57PM  5   A.  Yes.

03:57PM  6   Q.  And then you had follow-up meetings with them over time,

03:57PM  7   correct?

03:57PM  8   A.  Yes.

03:57PM  9   Q.  And you testified in collateral -- in collateral

03:57PM  10  proceedings as well, correct?

03:57PM  11  A.  Yes.

03:57PM  12  Q.  And it was in those meetings they would ask you questions

03:58PM  13  about Mr. Gerace, correct?

03:58PM  14  A.  Yes.

03:58PM  15  Q.  They had asked you questions about Pharaoh's, correct?

03:58PM  16  A.  Yes.

03:58PM  17  Q.  And they would want to know what you knew about what

03:58PM  18  happened at the club, correct?

03:58PM  19  A.  Yes.

03:58PM  20  Q.  And what you knew about other individuals in Mr. Gerace's

03:58PM  21  life, correct?

03:58PM  22  A.  Yes.

03:58PM  23  Q.  And you shared all information with them that you believe

03:58PM  24  was relevant, correct?

03:58PM  25  A.  Yes.

03:58PM  1   Q.  And sometimes they followed up on that information,

03:58PM  2   correct?

03:58PM  3   A.  Yes.

03:58PM  4          MR. TRIPI:  Objection as to what -- withdrawn.

03:58PM  5   Object.  I misspoke.  Objection as to what the government did.

03:58PM  6   Rule 602, and move to strike.

03:58PM  7          THE COURT:  Stop.

03:58PM  8          MR. SOEHNLEIN:  I'll withdraw.

03:58PM  9          THE COURT:  Okay.  Fine.  The question is withdrawn.

03:58PM 10          MR. SOEHNLEIN:  I'll withdraw.

03:58PM 11          BY MR. SOEHNLEIN:

03:58PM 12   Q.  Sometimes you'd give responses, and then they'd ask you

03:58PM 13   for more information, correct?

03:58PM 14   A.  Yes.

03:58PM 15   Q.  And this is information that they're seeking from you,

03:58PM 16   correct?

03:58PM 17   A.  Yes.

03:58PM 18   Q.  But sometimes, you'd share information and they wouldn't

03:58PM 19   follow up on it; is that correct?

03:58PM 20          MR. TRIPI:  Objection.  We can come up if you want,

03:58PM 21   Judge.

03:58PM 22          THE COURT:  How would she know that, Mr. Soehnlein?

03:58PM 23   Whether they followed up on information that she provided

03:58PM 24   them?

03:59PM 25          The objection -- the objection is sustained without

03:59PM  1    more of a foundation.

03:59PM  2              BY MR. SOEHNLEIN:

03:59PM  3    Q.  Okay.  There came a time where you communicated with the

03:59PM  4    government about Katrina Nigro, correct?

03:59PM  5    A.  Yes.

03:59PM  6    Q.  You -- in June of this year, you sent the government an

03:59PM  7    email about Ms. Nigro, correct?

03:59PM  8    A.  I did.

03:59PM  9    Q.  And what was -- what was the sum and substance of the

03:59PM 10    email?

03:59PM 11              MR. TRIPI:  Objection, hearsay.

03:59PM 12              THE COURT:  Sustained.

03:59PM 13              BY MR. SOEHNLEIN:

03:59PM 14    Q.  You -- you sent them an email calling her a compulsive

03:59PM 15    liar, correct?

03:59PM 16              MR. TRIPI:  Objection.

03:59PM 17              THE COURT:  Sustained.  Sustained.  Sustained.

03:59PM 18    Mr. Soehnlein, it's hearsay.

03:59PM 19              MR. SOEHNLEIN:  It's what she wrote, Judge.

03:59PM 20              MR. COOPER:  It's hearsay.

03:59PM 21              MR. TRIPI:  Objection, hearsay.

03:59PM 22              THE COURT:  It's still hearsay.

03:59PM 23              BY MR. SOEHNLEIN:

03:59PM 24    Q.  How long have you known Ms. Nigro?

03:59PM 25    A.  A long time.

Case 1:19-cr-00227-LJV-MJR    Document 1510    Filed 04/26/25    Page 50 of 60
USA v Gerace - R.A. (PW 6) - Soehnlein/Cross - 12/6/24

50

03:59PM  1   Q.  When -- do you recall a year that you first met her?

03:59PM  2   A.  Early 2000s.

03:59PM  3   Q.  It was before you met Mr. Gerace, correct?

03:59PM  4   A.  Yes.

03:59PM  5   Q.  And how did you meet her?

03:59PM  6   A.  In the club -- clubs.

03:59PM  7   Q.  You were talking about strip clubs?

03:59PM  8   A.  Yeah.

03:59PM  9   Q.  Gentlemen's clubs?

03:59PM  10  A.  Yes.

03:59PM  11  Q.  And she was a dancer?

03:59PM  12  A.  Yes.

03:59PM  13  Q.  You were a dancer?

03:59PM  14  A.  Yes.

03:59PM  15  Q.  And you were working in the -- the same locations at that

04:00PM  16  time?

04:00PM  17  A.  Yes.

04:00PM  18  Q.  Okay.  And you continued to have some relationship with

04:00PM  19  her after she became involved with Mr. Gerace, correct?

04:00PM  20  A.  Yes, somewhat.  I had to.

04:00PM  21  Q.  Yeah.  Because you and Mr. Gerace share a child together,

04:00PM  22  right?

04:00PM  23  A.  Yes.

04:00PM  24  Q.  And so to a certain extent, you had to co-parent with

04:00PM  25  Ms. Nigro, correct?

04:00PM   1   A.  Yes.

04:00PM   2   Q.  And in the -- in that circle of individuals, that -- that

04:00PM   3   group of people that are in that strip club industry, in your

04:00PM   4   view, did Ms. Nigro have a reputation?

04:00PM   5   A.  Yes.

04:00PM   6   Q.  And what was that reputation?

04:00PM   7   A.  She was a liar.  And she was manipulative.

04:00PM   8   Q.  And what's the basis for that?

04:00PM   9           **MR. TRIPI:**  Objection.

04:00PM   10          **THE COURT:**  I'm sorry?

04:00PM   11          **MR. TRIPI:**  Objection, the basis would be hearsay.

04:00PM   12          **THE COURT:**  No.  No.  Overruled.

04:00PM   13          **BY MR. SOEHNLEIN:**

04:00PM   14  Q.  What's your basis for saying that Ms. Nigro is

04:00PM   15  manipulative?

04:00PM   16          **THE COURT:**  No, no, no.

04:00PM   17          **MR. TRIPI:**  Objection, that's personal.

04:00PM   18          **THE COURT:**  Sustained.  That's not what she said.

04:01PM   19          She said she had a reputation for it.

04:01PM   20          **MR. SOEHNLEIN:**  Okay.

04:01PM   21          **THE COURT:**  So what's the basis for her believing

04:01PM   22  that that was her reputation; can be the question.

04:01PM   23          **BY MR. SOEHNLEIN:**

04:01PM   24  Q.  Okay.  What's the basis for your belief that that was her

04:01PM   25  reputation?

| | | |
|---|---|---|
| 04:01PM | 1 | A.  She would lie to a lot of -- |
| 04:01PM | 2 | **THE COURT:**  No, no, no, ma'am. |
| 04:01PM | 3 | What's -- what's -- what's your basis for believing |
| 04:01PM | 4 | that was her reputation? |
| 04:01PM | 5 | Not specific instances.  What was the basis for your |
| 04:01PM | 6 | belief that it was her reputation? |
| 04:01PM | 7 | You can answer that just generally. |
| 04:01PM | 8 | **THE WITNESS:**  Okay.  Other dancers, and other |
| 04:01PM | 9 | customers would say things. |
| 04:01PM | 10 | **THE COURT:**  Okay.  Great.  Next question. |
| 04:01PM | 11 | **MR. SOEHNLEIN:**  Yeah. |
| 04:01PM | 12 | **BY MR. SOEHNLEIN:** |
| 04:01PM | 13 | Q.  And you had that communication with the government in |
| 04:01PM | 14 | June of this past year, correct? |
| 04:01PM | 15 | A.  Yes. |
| 04:01PM | 16 | **MR. TRIPI:**  Objection, move to strike. |
| 04:01PM | 17 | **THE COURT:**  Yeah. |
| 04:01PM | 18 | **MR. TRIPI:**  Circle back. |
| 04:01PM | 19 | **THE COURT:**  Stricken.  Yes. |
| 04:01PM | 20 | Mr. Soehnlein, you can't ask her about things that |
| 04:01PM | 21 | she said to the government.  That is hearsay. |
| 04:01PM | 22 | Come up.  Come up, guys. |
| 04:01PM | 23 | **MR. SOEHNLEIN:**  I'm sorry. |
| 04:02PM | 24 | (Sidebar discussion held on the record.) |
| 04:02PM | 25 | **MR. SOEHNLEIN:**  Judge, I'm not following how things |

04:02PM   1   that she said to the government is hearsay, it's what she

04:02PM   2   said.

04:02PM   3         **MR. COOPER:**  Out-of-court statements.

04:02PM   4         **THE COURT:**  It's an out-of-court statement.

04:02PM   5         **MR. SOEHNLEIN:**  That she said.

04:02PM   6         **MR. COOPER:**  That's the definition of hearsay.

04:02PM   7   Out-of-court statements offered to prove the truth of the

04:02PM   8   matter asserted.  It's not something that she said in the

04:02PM   9   courtroom, so it's hearsay.

04:02PM  10         **MR. SOEHNLEIN:**  I'm -- I'm -- I'm not talking about

04:02PM  11   the substance of the -- I'm talking about the fact that she

04:02PM  12   communicated with the government, and they never asked her

04:02PM  13   any -- any followup about it.  That's what I'm asking.

04:02PM  14         She made the statement.  It's not hearsay.

04:02PM  15         **MR. TRIPI:**  It is, Eric.

04:02PM  16         **THE COURT:**  Why -- why is it not hearsay?  It's out

04:02PM  17   of court.

04:02PM  18         **MR. FOTI:**  I would argue it's not hearsay because the

04:02PM  19   purpose of hearsay is to prevent an out-of-court statement and

04:02PM  20   to avoid the inability to confront the statement that's being

04:02PM  21   made because you don't have a declarant in the courtroom.

04:02PM  22         We have the declarant on the stand.

04:02PM  23         **THE COURT:**  No, no, no, but whether the declarant is

04:02PM  24   on the stand or not, it's still hearsay.

04:02PM  25         If I said -- if I told somebody the light was red.  I

04:03PM    1   can now testify the light was red.

04:03PM    2       But I can't testify I told somebody the light was

04:03PM    3   red.  That's hearsay.

04:03PM    4      **MR. SOEHNLEIN:**  And I'm sorry.  And I'm sorry, and

04:03PM    5   that's not -- that's not the reason it's being offered, Judge.

04:03PM    6      **THE COURT:**  Okay.

04:03PM    7      **MR. SOEHNLEIN:**  The reason it's being offered for,

04:03PM    8   okay, is that there's -- is that there's points in time where

04:03PM    9   she gives an information, and then there's follow-up inquiries

04:03PM   10   to her because they're trying to cultivate their case.

04:03PM   11      She gives them information that doesn't help the

04:03PM   12   government's case, and there's no follow-up.  There's no

04:03PM   13   investigation as far as she knows.

04:03PM   14      **THE COURT:**  But why is that relevant?

04:03PM   15      **MR. TRIPI:**  Yeah, you're not allowed to put the

04:03PM   16   government on trial.  That's -- you gave a specific

04:03PM   17   instruction about that.

04:03PM   18      **MR. SOEHNLEIN:**  But, Your Honor, I think it's

04:03PM   19   absolutely relevant, because part of the direct had to do with

04:03PM   20   her preparation with the government.  And what -- including

04:03PM   21   to -- including with this meeting in the car that, you know,

04:03PM   22   is elicited for reasons that I don't understand, and the

04:03PM   23   meeting before the grand jury, and things like that.

04:04PM   24      So if they're going to open the door to what

04:04PM   25   investigative steps the government took with respect to Ms.

04:04PM    1    R.A., I think it's fair game.

04:04PM    2         **MR. TRIPI:**  It was relevant because she's a hostile

04:04PM    3    witness based on her demeanor, body language, and fear.

04:04PM    4         **THE COURT:**  Okay.

04:04PM    5         **MR. TRIPI:**  That's why that was relevant.  And the

04:04PM    6    rest of it doesn't change the hearsay of it.  So --

04:04PM    7         **THE COURT:**  Well, but why haven't you opened the

04:04PM    8    door --

04:04PM    9         **MR. TRIPI:**  To what?

04:04PM   10         **THE COURT:**  I'm sorry?

04:04PM   11         **MR. TRIPI:**  To what?  I --

04:04PM   12         **THE COURT:**  Why haven't you opened the door to what

04:04PM   13    followup the government did or didn't do?

04:04PM   14         **MR. TRIPI:**  Okay.  So, she sent -- he wants to get in

04:04PM   15    an email from June after we've tried Bongiovanni once.

04:04PM   16         Like, we have an indictment, like, what -- if that

04:04PM   17    comes in, then there is no hearsay line, Judge.  It's not like

04:04PM   18    we were investigating the case at that point.

04:04PM   19         **THE COURT:**  So, Mr. Soehnlein, she tells -- sends the

04:04PM   20    government something that says that R.A. is a liar; is that

04:04PM   21    the --

04:04PM   22         **MR. TRIPI:**  Katrina Nigro.

04:04PM   23         **THE COURT:**  -- or Katrina Nigro is a liar; is that --

04:04PM   24         **MR. TRIPI:**  Sum and substance.

04:04PM   25         **MR. SOEHNLEIN:**  Compulsive liar.  It's like a -- and

04:05PM    1    I'm not seeking to admit the email.  I'm not gonna seek to do

04:05PM    2    that.

04:05PM    3         **THE COURT:**  But the fact that she told the

04:05PM    4    government -- why -- she's already testified that the woman's

04:05PM    5    reputation is that she's a liar.

04:05PM    6         I think she can testify to her opinion as well,

04:05PM    7    right?

04:05PM    8         **MR. TRIPI:**  She can testify as to opinion.  But now

04:05PM    9    this area now, let's be clear, I'm letting it go because now I

04:05PM   10    get to cross her.  And they've adopted her as their witness

04:05PM   11    for these purposes.  I've let it go on purpose because now I

04:05PM   12    get to cross her.

04:05PM   13         **THE COURT:**  Okay.  So, in any event, why is the fact

04:05PM   14    that she told the government that she's a liar, why is that

04:05PM   15    relevant?

04:05PM   16         **MR. SOEHNLEIN:**  Because it shows -- well, first of

04:05PM   17    all, I still think that they opened the door to --

04:05PM   18         **THE COURT:**  Shows what?  It shows that the government

04:05PM   19    chose not to follow up on something that the government chose

04:05PM   20    not to follow up on.  How it that relevant to Mr. Gerace's

04:05PM   21    case?

04:05PM   22         **MR. FOTI:**  Can I just -- if the government's going to

04:06PM   23    cross on this, I think then it's going to be relevant at that

04:06PM   24    time.  So, if they're indicating they're gonna do it, we can

04:06PM   25    get into it now, or if you want to wait, we can wait.  But --

04:06PM   1          **MR. TRIPI:**  Well, hearsay doesn't come in just

04:06PM   2   because I get to cross.

04:06PM   3          **MR. FOTI:**  If he's crossing on Nigro, in terms of her

04:06PM   4   understanding of Nigro's credibility and things along those

04:06PM   5   lines, of course any communication and specific bad acts are

04:06PM   6   going to become --

04:06PM   7          **MR. TRIPI:**  That's not accurate at all.

04:06PM   8          **MR. FOTI:**  They already opened the door.

04:06PM   9          **THE COURT:**  We're going to break for the day.

04:06PM   10         **MR. TRIPI:**  That's fine.  My last bit on this, Judge,

04:06PM   11  is you dealt with this exact situation in the last trial.

04:06PM   12  This opens the door to her impeachment, not Ms. Nigro's.  They

04:06PM   13  had Ms. Nigro on the stand, they could cross Ms. Nigro until

04:06PM   14  the cows come home.

04:06PM   15         **MR. COOPER:**  And you ruled on this in Bongiovanni 2

04:06PM   16  when it came up, and you ruled on it and you said, A, we got

04:06PM   17  to cross-examine and, B, that specific acts don't come in.

04:06PM   18         We briefed it, and you ruled on it.  It's the same

04:06PM   19  exact same occurrence here.

04:06PM   20         **MR. TRIPI:**  Fair enough.

04:06PM   21         (Sidebar discussion held on the record.)

04:07PM   22         **THE COURT:**  Okay.  I don't know if this is good news

04:07PM   23  or bad news, but we're done for the week.  We have a legal

04:07PM   24  issue that has come up now that we're going to have to resolve

04:07PM   25  before this can continue.

04:07PM    1          So, and the legal issue is not going to take a long,

04:07PM    2    long time, but it's just -- I'm not going to waste your time

04:07PM    3    keeping you here while we're arguing this here when it may

04:07PM    4    take an hour to argue it, and then I've got to send you home

04:07PM    5    and you haven't done anything.  So I might as well send you

04:07PM    6    home now.

04:07PM    7          So remember over the weekend, you're going to be with

04:07PM    8    family, don't talk about this case, don't communicate about it

04:07PM    9    with anyone, electronically or otherwise.  Don't use any

04:07PM   10    electronic means to learn anything about it case.  Don't try

04:07PM   11    to learn anything about the case in any way whatsoever.

04:07PM   12          If there's any news coverage of the case, on TV, on

04:07PM   13    the radio, in the newspaper, anywhere else, don't read or

04:07PM   14    watch or listen to it.  And don't make up your mind about

04:07PM   15    anything until you start deliberating.

04:07PM   16          We'll see you Monday at 9:30.  Next week is 9:30

04:07PM   17    until 5 every day except Friday, when we have a relatively

04:08PM   18    early quit because of me.  Okay?

04:08PM   19          Thank you very much.  Have a great weekend.  Go,

04:08PM   20    Bills --

04:08PM   21          **THE WITNESS:**  Go Bills.

04:08PM   22          **THE JURORS:**  Go Bills.

04:08PM   23          **THE COURT:**  -- and we'll see you early Monday

04:08PM   24    morning.

04:08PM   25          **THE WITNESS:**  Go Bills.

04:08PM    1           (Jury excused at 4:08 p.m.)

04:08PM    2           **THE COURT:**  Okay.  Ms. R.A. please don't talk to

04:08PM    3   anybody about your testimony over the weekend.  We'll see you

04:08PM    4   on Monday morning at 9:30.  You can step down now.

04:08PM    5           (Witness excused at 4:08 p.m.)

         6           (Excerpt concluded at 4:08 p.m.)

         7            *    *    *    *    *    *    *    *

         8

         9

       10

       11

       12

       13

       14                 **CERTIFICATE OF REPORTER**

       15

       16           In accordance with 28, U.S.C., 753(b), I

       17   certify that these original notes are a true and correct

       18   record of proceedings in the United States District Court for

       19   the Western District of New York on December 6, 2024.

       20

       21

       22             s/ Ann M. Sawyer
                          Ann M. Sawyer, FCRR, RPR, CRR

       23                     Official Court Reporter
                          U.S.D.C., W.D.N.Y.

       24

       25

```
 1

 2                    TRANSCRIPT INDEX

 3           EXCERPT - EXAMINATION OF R.A. (PW 6)

 4                    DECEMBER 6, 2024

 5

 6

 7   W I T N E S S                           P A G E

 8   R. A.  (PW 6)                              2

 9      DIRECT EXAMINATION BY MR. TRIPI:         2

10      CROSS-EXAMINATION BY MR. SOEHNLEIN:     43

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```