09:21AM

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF NEW YORK
 2
   _____
 3 UNITED STATES OF AMERICA,
                                    Case No. 1:19-cr-227
 4              Plaintiff,                  1:23-cr-37
   v.                                          (LJV)
 5
   PETER GERACE, JR.,              November 12, 2024
 6

 7 _____
                Defendant.

 8      TRANSCRIPT EXCERPT - EXAMINATION OF THOMAS HERBST
              BEFORE THE HONORABLE LAWRENCE J. VILARDO
 9                 UNITED STATES DISTRICT JUDGE

10 APPEARANCES:       TRINI E. ROSS, UNITED STATES ATTORNEY
                      BY: JOSEPH M. TRIPI, ESQ.
11                        NICHOLAS T. COOPER, ESQ.
                          CASEY L. CHALBECK, ESQ.
12                    Assistant United States Attorneys
                      Federal Centre, 138 Delaware Avenue
13                    Buffalo, New York 14202
                      For the Plaintiff
14
                      THE FOTI LAW FIRM, P.C.
15                    BY: MARK ANDREW FOTI, ESQ.
                      16 West Main Street, Suite 100
16                    Rochester, New York 14614
                        And
17                    SOEHNLEIN LAW
                      BY: ERIC MICHAEL SOEHNLEIN, ESQ.
18                    350 Main Street, Suite 2100
                      Buffalo, New York 14202
19                    For the Defendant

20 PRESENT:           KAREN A. CHAMPOUX, USA PARALEGAL
                      BRIAN A. BURNS, FBI SPECIAL AGENT
21                    MARILYN K. HALLIDAY, HSI SPECIAL AGENT

22 LAW CLERK:         REBECCA FABIAN IZZO, ESQ.

23 COURT CLERK:       COLLEEN M. DEMMA

24 REPORTER:          ANN MEISSNER SAWYER, FCRR, RPR, CRR
                      Robert H. Jackson Courthouse
25                    2 Niagara Square Buffalo, New York 14202
                      Ann_Sawyer@nywd.uscourts.gov
```

02:38PM

| | | |
|---|---|---|
| 02:38PM | 1 | (Excerpt commenced at 2:38 p.m.) |
| 02:38PM | 2 | (Jury is present.) |
| 02:38PM | 3 | **THE COURT:**  The government can call its next witness. |
| 02:38PM | 4 | **MR. COOPER:**  Thank you, Judge.  The government calls |
| 02:38PM | 5 | Thomas Herbst from the FBI. |
| 02:39PM | 6 | |
| 02:39PM | 7 | **T H O M A S   H E R B S T**, having been duly called and sworn, |
| 02:39PM | 8 | testified as follows: |
| 02:39PM | 9 | **MR. COOPER:**  May I inquire, Judge? |
| 02:39PM | 10 | **THE COURT:**  You may. |
| 02:39PM | 11 | |
| 02:39PM | 12 | **DIRECT EXAMINATION BY MR. COOPER:** |
| 02:39PM | 13 | Q.  Good afternoon, sir.  How are you? |
| 02:39PM | 14 | A.  Good afternoon, sir. |
| 02:39PM | 15 | Q.  Can you introduce yourself to the jury? |
| 02:39PM | 16 | A.  Thomas Herbst. |
| 02:39PM | 17 | Q.  Okay.  Where are you from Tom? |
| 02:39PM | 18 | A.  I'm -- I live in Florida now.  I'm originally from |
| 02:39PM | 19 | Buffalo, New York.  Born in Buffalo, raised in South Buffalo, |
| 02:40PM | 20 | graduated from Bishop Timon High School 50 years ago, and |
| 02:40PM | 21 | graduated from the University of Buffalo four years after |
| 02:40PM | 22 | that. |
| 02:40PM | 23 | Q.  Got it.  And ultimately, after you obtained that college |
| 02:40PM | 24 | degree that you just mentioned, what kind of work did you get |
| 02:40PM | 25 | involved in?  Or did you continue your schooling? |

02:40PM  1   A.   Yeah.   Initially I went to law school.   So I finished law

02:40PM  2   school three years later.   And then I came back to the

02:40PM  3   Buffalo area.   And I was a lawyer in the Buffalo, New York

02:40PM  4   area.

02:40PM  5   Q.   Did there come a time when you applied to be a FBI

02:40PM  6   special agent?

02:40PM  7   A.   Yes, I applied to be a FBI special agent in 1985, went

02:40PM  8   through the testing process, the background investigative

02:40PM  9   process, and eventually started with the FBI on June 16th,

02:40PM  10  1986.

02:40PM  11  Q.   Can you describe for the jury the training that you

02:40PM  12  received when you were accepted at -- into the FBI Academy?

02:40PM  13  A.   Well, all FBI agents start at the FBI Academy in

02:41PM  14  Quantico, Virginia.   And I would say it's broken down into

02:41PM  15  three parts, not three equal parts, but three parts.   One

02:41PM  16  part would be physical fitness and defensive -- defensive

02:41PM  17  tactics training.   The second part would be firearms.   And

02:41PM  18  the bulk of it would be what I call academic.

02:41PM  19       Basically, there's two blocks of legal instruction.

02:41PM  20  There's a block of white collar crime instruction.   And then

02:41PM  21  the rest of the instruction is, you're being introduced to

02:41PM  22  different areas that you're going to experience as an FBI

02:41PM  23  agent, whether it be drugs, organized crime, white collar

02:41PM  24  crime.   Any area basically that you might be called on to

02:41PM  25  investigate during your -- your career, you're basically

| | | |
|---|---|---|
| 02:41PM | 1 | exposed to that at the FBI Academy. |
| 02:41PM | 2 | Q.  Got it.  And then after you finish that formal academic |
| 02:41PM | 3 | training at the FBI Academy, do you continue throughout the |
| 02:41PM | 4 | course of your career to receive kind of on-the-job training |
| 02:41PM | 5 | from other agents with more experience? |
| 02:42PM | 6 | A.  Yes.  You're initially assigned a -- a training agent for |
| 02:42PM | 7 | a period of time. |
| 02:42PM | 8 | Q.  When you finished the FBI Academy, where did you first |
| 02:42PM | 9 | get assigned at the FBI? |
| 02:42PM | 10 | A.  My first office was officially Tampa, Florida.  Tampa |
| 02:42PM | 11 | would be the division, but I physically worked out of |
| 02:42PM | 12 | Orlando, Florida. |
| 02:42PM | 13 | Q.  Got it.  When you worked in the Orlando, Florida office, |
| 02:42PM | 14 | did part of your work involve conducting criminal |
| 02:42PM | 15 | investigations into violent crimes? |
| 02:42PM | 16 | A.  Yes.  Initially, I would say that all of my initial work |
| 02:42PM | 17 | in Orlando was under the Bureau's violent crime, major |
| 02:42PM | 18 | offender program, so it would have been probably for a |
| 02:42PM | 19 | two-year period pretty much all violent crimes. |
| 02:42PM | 20 | Q.  Okay.  And did there come a time later in your career |
| 02:42PM | 21 | where you expanded and worked on a variety of general crimes |
| 02:42PM | 22 | or white collar crimes as well? |
| 02:42PM | 23 | A.  Yeah, I did.  Orlando, again, it was a -- like a |
| 02:42PM | 24 | satellite office, so there was only ten agents, so you pretty |
| 02:42PM | 25 | much worked a variety of crime, where like a bigger office, |

02:43PM    1    you might be assigned just to one violation but, in Orlando,

02:43PM    2    you worked everything.

02:43PM    3    Q.  Got it.  Approximately how long were you in that Orlando

02:43PM    4    field office for?

02:43PM    5    A.  Pretty much four years.

02:43PM    6    Q.  Okay.  After that, where did you go next?

02:43PM    7    A.  Washington, D.C.

02:43PM    8    Q.  And how long were you a special agent with the FBI in

02:43PM    9    Washington, D.C.?

02:43PM   10    A.  I think about 17 years.

02:43PM   11    Q.  Okay.  And after that 17 years in Washington, D.C., what

02:43PM   12    was your next assignment?

02:43PM   13    A.  Buffalo, New York.

02:43PM   14    Q.  So eventually you came home?

02:43PM   15    A.  I did.

02:43PM   16    Q.  Okay.  And what year, approximately, did you return to

02:43PM   17    Buffalo?

02:43PM   18    A.  It was late 2007, about Thanksgiving 2007.

02:43PM   19    Q.  What was your first assignment in the Buffalo office?

02:43PM   20    A.  I was at a -- an intel squad for a very short period of

02:43PM   21    time.  Then an opening came up on Squad 4, which is also the

02:43PM   22    Safe Streets Task Force, and so I took that position.

02:43PM   23    Q.  And just to kind of put a -- give us some context, at

02:43PM   24    that point in your career when you're coming back to Buffalo,

02:44PM   25    about how long had you been working for the FBI as a special

02:44PM   1   agent?

02:44PM   2   A.  Over 20 years, I think, 21 years.

02:44PM   3   Q.  Would it be fair to say that you were an experienced

02:44PM   4   agent by that time?

02:44PM   5   A.  Yes, very experienced.

02:44PM   6   Q.  You mentioned that eventually after coming back to

02:44PM   7   Buffalo, you became assigned to Squad 4, also known as the

02:44PM   8   Safe Streets Task Force; is that right?

02:44PM   9   A.  That's correct.

02:44PM  10   Q.  Was that a task force that had a mission of combating

02:44PM  11   violent crimes?

02:44PM  12   A.  The Safe Streets Task Force specifically would be

02:44PM  13   combating street gangs.

02:44PM  14   Q.  Okay.  Now, was combating street gangs the only work that

02:44PM  15   you did while you were in Squad 4?

02:44PM  16   A.  No.  Basically, in the Buffalo office at that time, there

02:44PM  17   was two criminal squads.  One would be a white collar squad,

02:44PM  18   and Squad 4 would have been pretty much all of the other

02:44PM  19   violations except for, like, cyber crimes.

02:44PM  20   Q.  Okay.  And just to give us an idea, when you say "white

02:44PM  21   collar," are we talking about, like, bank fraud-type cases?

02:44PM  22   A.  Yes.

02:44PM  23   Q.  Okay.  And does it expand way beyond that?

02:44PM  24   A.  Yes.

02:44PM  25   Q.  But generally, are there kind of two categories at the

| | | |
|---|---|---|
| 02:44PM | 1 | FBI in Buffalo back then, white collar and violent crime? |
| 02:45PM | 2 | A.  Generally, I'd say that was true, yes. |
| 02:45PM | 3 | Q.  Okay.  Just like a 30,000-foot view. |
| 02:45PM | 4 | During the time that you were working in Squad 4 on the |
| 02:45PM | 5 | Safe Streets Task Force, did you begin working on a project |
| 02:45PM | 6 | that you had attempting to investigate cold case Italian |
| 02:45PM | 7 | Organized Crime-related homicides? |
| 02:45PM | 8 | A.  Yes.  I -- I initiated a case involving Italian Organized |
| 02:45PM | 9 | Crime, and specifically looking at old unsolved homicides. |
| 02:45PM | 10 | Q.  As a part of that investigation, would that have been |
| 02:45PM | 11 | sometime around that, like, 2008, 2009 timeframe? |
| 02:45PM | 12 | A.  Yes. |
| 02:45PM | 13 | Q.  As a part of that investigation, did you have a goal of |
| 02:45PM | 14 | developing an informant or a source of information into |
| 02:45PM | 15 | Italian Organized Crime here in Buffalo? |
| 02:45PM | 16 | A.  Yes.  To -- to work that type of crime, to work, like, |
| 02:45PM | 17 | organized crime, you really need to have an insider's |
| 02:46PM | 18 | perspective.  You need have an insider telling you who's who |
| 02:46PM | 19 | and what they do, so that's exactly what I did. |
| 02:46PM | 20 | Q.  Okay.  And were you looking specifically for a person |
| 02:46PM | 21 | that you thought would have access to information that could |
| 02:46PM | 22 | help you further in investigation? |
| 02:46PM | 23 | A.  Yes. |
| 02:46PM | 24 | Q.  Are you familiar with a person by the name of Peter |
| 02:46PM | 25 | Gerace? |

| | | |
|---|---|---|
| 02:46PM | 1 | A.  Yes. |
| 02:46PM | 2 | Q.  Did that person come up during the course of your |
| 02:46PM | 3 | investigation? |
| 02:46PM | 4 | A.  He did. |
| 02:46PM | 5 | Q.  Can you describe for the jury how that person's name came |
| 02:46PM | 6 | up and approximately when it came up? |
| 02:46PM | 7 | A.  The timing would have been the same -- about the same |
| 02:46PM | 8 | time I opened the case, but his -- I started receiving a lot |
| 02:46PM | 9 | of information that he might have been involved in drug |
| 02:46PM | 10 | activities, drug-trafficking activities.  So, I -- I knew |
| 02:46PM | 11 | that he had a relationship to people in Italian Organized |
| 02:46PM | 12 | Crime so I thought it might be a good -- |
| 02:46PM | 13 | **MR. FOTI:**  Objection. |
| 02:46PM | 14 | **THE COURT:**  Basis? |
| 02:47PM | 15 | **MR. FOTI:**  Objection.  Can we approach? |
| 02:47PM | 16 | **THE COURT:**  Yeah, come on up. |
| 02:47PM | 17 | (Sidebar discussion held on the record.) |
| 02:47PM | 18 | **MR. FOTI:**  Judge, there's a different -- there's a |
| 02:47PM | 19 | difference between the rhetoric that the government has |
| 02:47PM | 20 | advanced in both motion arguments and opening versus what this |
| 02:47PM | 21 | witness testifies to.  I mean, you say we believed or |
| 02:47PM | 22 | purported.  It leads to the conclusion that it's just an |
| 02:47PM | 23 | investigation. |
| 02:47PM | 24 | He -- this witness, both at the Bongiovanni trial and |
| 02:47PM | 25 | he's begun to do it here, testifies to certain items regarding |

02:47PM    1    IOC as if they're fact, saying he has ties to people who are

02:47PM    2    part of IOC.  It not only assumes that IOC exists, but it --

02:48PM    3    it assumes certain facts in regards to Mr. Gerace's

02:48PM    4    relationship.

02:48PM    5         The testimony shouldn't come out that way.  And if it

02:48PM    6    does, I'm going to object every time.

02:48PM    7         **MR. COOPER:**  So my --

02:48PM    8         **THE COURT:**  So I knew that he had a relationship to

02:48PM    9    people in Italian Organized Crime.  The objection is to that

02:48PM    10   statement?

02:48PM    11        **MR. FOTI:**  Yeah, under 602, a witness can only

02:48PM    12   testify to what's in their personal knowledge.  He can say,

02:48PM    13   based on my investigation, I believed that maybe he had these

02:48PM    14   because it informs on his investigation.  Testifying that as a

02:48PM    15   fact is improper.

02:48PM    16        **THE COURT:**  I don't understand.  It's subject to

02:48PM    17   cross-examination, right?

02:48PM    18        **MR. FOTI:**  Well, it -- that may be, but there's still

02:48PM    19   admissibility issues in terms of stating certain facts or

02:48PM    20   purporting certain information as if it's factual and saying

02:48PM    21   that he has ties to people in Italian Organized Crime is both

02:48PM    22   not supported by any personal knowledge and, two, is extremely

02:49PM    23   prejudicial.  It's something that we are very sensitive to.

02:49PM    24        **THE COURT:**  Mr. Cooper?

02:49PM    25        **MR. COOPER:**  So, Judge, the question that's up on

02:49PM   1    your screen, the question that I asked was, can you describe

02:49PM   2    for the jury how that person's name came up and approximately

02:49PM   3    when it came up.

02:49PM   4         And, so, I've -- we've been very careful, I think,

02:49PM   5    through -- through two and a half trials now of formulating

02:49PM   6    the questions in accordance with Your Honor's ruling.  So it's

02:49PM   7    based upon your experience in the law enforcement community,

02:49PM   8    did you believe that person to have relationships to people

02:49PM   9    reputed to be involved in Italian Organized Crime.  The -- the

02:49PM   10   answer got ahead of the question.  I don't have a --

02:49PM   11            **THE COURT:**  So I'm going to strike that sentence --

02:49PM   12            **MR. COOPER:**  I'm fine with that.

02:49PM   13            **THE COURT:**  -- and you can continue your questioning.

02:49PM   14            **MR. COOPER:**  Absolutely.

02:49PM   15            **THE COURT:**  I'm also going to direct the witness

02:49PM   16   simply to answer the questions that are asked.

02:49PM   17            **MR. COOPER:**  We've been there before, Judge.

02:49PM   18            **MR. TRIPI:**  To make it clear, we have no problem with

02:49PM   19   that and we understand where Mark's coming from on that.

02:49PM   20   We're trying to control it as best we can.

02:50PM   21            (End of sidebar discussion.)

02:50PM   22            **THE COURT:**  Okay.  So, the objection is sustained.

02:50PM   23         I'm going to strike what the witness said about

02:50PM   24   people in Italian Organized Crime.  The jury will strike that.

02:50PM   25            And I -- and when I tell you to strike that, I

02:50PM      1   understand that you can't -- you know, I tell you don't think

02:50PM      2   about the pink elephant, right?  That's all you're gonna think

02:50PM      3   about is a pink elephant.  I understand that.

02:50PM      4        But what I'm saying to you is that it would be unfair

02:50PM      5   to allow that to affect your verdict in any way.  So I'm not

02:50PM      6   telling you to forget about it, I'm just telling you don't

02:50PM      7   allow it to play any role in your deliberations, okay?

02:50PM      8        So we're gonna strike that.

02:50PM      9        And -- and, please, Mr. Herbst, answer the questions

02:50PM     10   and only the questions that are asked.  You have a tendency to

02:50PM     11   go on a little bit, so try to -- try -- and -- and I know,

02:50PM     12   it's not how we do things in real life, but it's how we do

02:50PM     13   things in the courtroom.  So -- so try to confine your answers

02:50PM     14   just to the question that's being asked.

02:50PM     15        Mr. Cooper, you can now ask another question.

02:50PM     16        **MR. COOPER:**  Thank you, Judge.

02:50PM     17        **BY MR. COOPER:**

02:51PM     18   Q.  So, the last question that I had left off with, Special

02:51PM     19   Agent Herbst, was about -- I asked what led Peter Gerace's

02:51PM     20   name to come up during the course of your investigation.  And

02:51PM     21   I think you started to talk about receiving some information

02:51PM     22   about drug trafficking; is that correct?

02:51PM     23   A.  That's correct.

02:51PM     24   Q.  Okay.  Did you receive some information that Gerace was

02:51PM     25   involved in drug trafficking?

02:51PM    1    A.  Yes.

02:51PM    2    Q.  Okay.  In addition to that information, did you also

02:51PM    3    believe that Gerace was related to people who had a

02:51PM    4    reputation in the law enforcement community for being

02:51PM    5    involved in Italian Organized Crime?

02:51PM    6    A.  Yes.

02:51PM    7    Q.  Okay.  At that point in your career, is it fair to say

02:51PM    8    you'd been a member of the law enforcement community for

02:51PM    9    about 20-plus years?

02:51PM    10   A.  Yes.

02:51PM    11   Q.  Okay.  And are you from the Buffalo area?

02:51PM    12   A.  I am.

02:51PM    13   Q.  And had you returned to work here at this point?

02:51PM    14   A.  I did.

02:51PM    15   Q.  What were the relationships that Peter Gerace had --

02:51PM    16   strike that.

02:51PM    17       Who were the people that Peter Gerace was related to that

02:52PM    18   in the law enforcement community were reputed to be

02:52PM    19   associated with Italian Organized Crime?

02:52PM    20   A.  His grandfather and his uncle.

02:52PM    21   Q.  Okay.  And do you know his grandfather's name?

02:52PM    22   A.  Joseph Todaro, Sr.

02:52PM    23   Q.  Okay.  In your mind back at that time, did Peter Gerace

02:52PM    24   constitute a person who may have had access to the IOC,

02:52PM    25   Italian Organized Crime group that you were interested in

USA v Gerace - Herbst - Cooper/Direct - 11/12/24

13

| | | |
|--|--|--|
| 02:52PM | 1 | investigating? |
| 02:52PM | 2 | A.  Yes. |
| 02:52PM | 3 | Q.  And as a result of that, did you open up a sub file on |
| 02:52PM | 4 | Gerace? |
| 02:52PM | 5 | A.  I did. |
| 02:52PM | 6 | Q.  What, if anything, did you learn during your preliminary |
| 02:52PM | 7 | investigation into Peter Gerace? |
| 02:52PM | 8 | A.  Well, we had -- there was information to believe that he |
| 02:52PM | 9 | was involved in narcotics trafficking. |
| 02:52PM | 10 | Q.  Okay.  Did you learn anything -- |
| 02:52PM | 11 | **MR. COOPER:**  I'm gonna -- I'm gonna lead here.  If |
| 02:52PM | 12 | you need to object, object, but I'm going to ask a specific |
| 02:52PM | 13 | question. |
| 02:52PM | 14 | **BY MR. COOPER:** |
| 02:52PM | 15 | Q.  Did there come a time when you learned that Peter Gerace |
| 02:52PM | 16 | was being supervised by United States federal probation? |
| 02:52PM | 17 | A.  Yes. |
| 02:53PM | 18 | **MR. FOTI:**  No objection. |
| 02:53PM | 19 | **MR. COOPER:**  Thank you. |
| 02:53PM | 20 | **BY MR. COOPER:** |
| 02:53PM | 21 | Q.  What, if anything, did you do when you learned that |
| 02:53PM | 22 | Gerace was being supervised by federal probation? |
| 02:53PM | 23 | A.  I reached out to the supervising probation officer and I |
| 02:53PM | 24 | asked to meet with him and review Mr. Gerace's file. |
| 02:53PM | 25 | Q.  Do you remember that person's name? |

02:53PM    1    A.  Peter Lepiane.

02:53PM    2    Q.  Did you speak with Lepiane around August 31st of 2009?

02:53PM    3    A.  Yes.

02:53PM    4    Q.  Did you share information that you had learned about

02:53PM    5    Gerace with Lepiane?

02:53PM    6    A.  Yes.  I don't know how much detail I can go into, but

02:53PM    7    when I initially reviewed the probation file, I -- the

02:53PM    8    information in the file that Mr. Gerace had been reporting to

02:53PM    9    his probation officer was inconsistent with the information

02:53PM   10    that I knew to be true.

02:53PM   11    Q.  Can you describe what you mean by that for the jury?

02:53PM   12    A.  There was -- you know, at -- at -- at that point, I knew

02:53PM   13    that Mr. Gerace operated the Pharaoh's club.  And in his

02:54PM   14    probation file, it indicated that he was working in his

02:54PM   15    mother's restaurant.

02:54PM   16        I believe that his -- he was -- he had indicated that he

02:54PM   17    was living at a residence in Tonawanda, which he might have

02:54PM   18    had a residence there, but I know he had a place to reside at

02:54PM   19    the strip club.

02:54PM   20        There might have been more, but those are the two things

02:54PM   21    that I can recall at the time that were inconsistent with

02:54PM   22    what I knew -- inconsistent with the information that was in

02:54PM   23    the probation file.

02:54PM   24    Q.  Okay.  And so, did you tell the information that you knew

02:54PM   25    to Peter Lepiane from probation?

02:54PM   1    A.  Yes.

02:54PM   2    Q.  And did he share with you some information that he had

02:54PM   3    about Gerace?  Or about Gerace's conditions, probation

02:54PM   4    conditions?

02:54PM   5    A.  I'm sure he would have shared anything he knew.

02:54PM   6    Q.  Okay.  At that point, did you begin working kind of in

02:54PM   7    concert with U.S. Probation?

02:54PM   8    A.  Yes.  I think based on the information I provided and

02:54PM   9    maybe some other information they had, they were working

02:55PM  10    towards a possible violation of supervision.

02:55PM  11    Q.  Okay.  Were you present with probation on October 31st of

02:55PM  12    2009 for a search of Pharaoh's Gentlemen's Club?

02:55PM  13    A.  Did you say October 31st?

02:55PM  14    Q.  October 31st of 2009.

02:55PM  15    A.  Yes.  I'm sorry, I thought you said August.  Yeah,

02:55PM  16    October, I was.

02:55PM  17    Q.  So I asked you earlier about the first conversation you

02:55PM  18    had with Pete Lepiane, would that have been back in August --

02:55PM  19    the late -- later portion of August in 2009?

02:55PM  20    A.  Yes.  Sometime in that timeframe, in the late summer of

02:55PM  21    2009.

02:55PM  22    Q.  And then about two months later on Halloween of 2009,

02:55PM  23    were you present for the search at Pharaoh's?

02:55PM  24    A.  I was.

02:55PM  25    Q.  Did you have a partner that you worked with at that time?

02:55PM   1   A.  I did.  My primary partner on the Safe Streets Task Force

02:55PM   2   was Detective Robert Cottrell from the Amherst Police

02:55PM   3   Department.

02:55PM   4   Q.  Was he with you that day as well?

02:55PM   5   A.  He was --

02:55PM   6   Q.  Was it your understanding that U.S. Probation had the

02:56PM   7   authority to search Pharaoh's Gentlemen's Club?

02:56PM   8   A.  Yes, they did.

02:56PM   9   Q.  Were they the primary agency leading the search?

02:56PM   10  A.  They were.

02:56PM   11  Q.  Were you there in a support role?

02:56PM   12  A.  My primary -- yes -- yes, but my primary purpose was to

02:56PM   13  attempt to talk to Mr. Gerace.

02:56PM   14  Q.  Can you describe for the jury from your perspective how

02:56PM   15  that search played out, what -- what did you do that day?

02:56PM   16  A.  I did very little searching.  When I went in there, I --

02:56PM   17  Mr. Gerace was already in custody in his office.  And I

02:56PM   18  talked to the supervising probation officer and I asked if it

02:56PM   19  would be okay for me, somebody had to sit with him.  So I

02:56PM   20  asked if it would be okay for me to sit with him instead of

02:56PM   21  the probation officer, and he agreed to that.

02:56PM   22      So I went in and sat with him along with Detective

02:56PM   23  Cottrell from the Amherst Police Department.

02:56PM   24  Q.  Can you describe for the jury how that conversation went?

02:56PM   25  A.  My conversation with Mr. Gerace?

USA v Gerace - Herbst - Cooper/Direct - 11/12/24
17

02:56PM      1    Q.  Correct.

02:56PM      2    A.  Well, the conversation would have lasted during the whole

02:56PM      3    course of the search which probably lasted an hour or less,

02:57PM      4    but it was really a very informal conversation, kind of.

02:57PM      5    Most of the conversation focused on -- we were sitting in his

02:57PM      6    office and there were documents on his desk, so most of the

02:57PM      7    conversation focused on documents that I would have and I

02:57PM      8    would ask him about that, but I was basically trying to build

02:57PM      9    rapport with Mr. Gerace.

02:57PM     10    Q.  Now, before that interview, had you received information

02:57PM     11    from two women who told you about drug dealing happening at

02:57PM     12    Pharaoh's?

02:57PM     13    A.  I had read an FBI 302, which is basically a report that

02:57PM     14    you document of a witness's testimony.  So another FBI agent

02:57PM     15    and another Amherst police officer had interviewed these

02:57PM     16    women and memorialized it in an FD-302, so I had read that

02:57PM     17    report.

02:57PM     18    Q.  You had that information inside your head at the time of

02:57PM     19    the interview; is that fair to say?

02:57PM     20    A.  Yes.

02:57PM     21    Q.  You didn't share that information with Peter Gerace

02:57PM     22    during the interview, did you?

02:57PM     23    A.  No.

02:57PM     24    Q.  Okay.  And so you were trying to gain information from

02:57PM     25    talking to him; is that fair to say?

02:57PM   1   A.  Yeah, I was trying to develop, you know, a relationship

02:58PM   2   with a possible witness or cooperator.

02:58PM   3   Q.  Okay.  And in trying -- in trying to develop a

02:58PM   4   relationship with a possible witness or cooperator, do you

02:58PM   5   try to build rapport?

02:58PM   6   A.  Yes.

02:58PM   7   Q.  Were you trying to build rapport with Gerace that day?

02:58PM   8   A.  Yes.

02:58PM   9   Q.  Did you threaten him or intimidate him in any way?

02:58PM  10   A.  No.

02:58PM  11   Q.  Was the conversation pleasant?

02:58PM  12   A.  Yes, it was.

02:58PM  13   Q.  Was the tone of your voice conversational?

02:58PM  14   A.  Yes.

02:58PM  15   Q.  During that conversation that you had with Gerace on

02:58PM  16   Halloween of 2009, did he offer up any information about

02:58PM  17   people committing crimes?

02:58PM  18   A.  No.  And I'm not sure that I ever asked him any specific

02:58PM  19   questions about that either.

02:58PM  20   Q.  Okay.  Was the goal of that initial conversation to build

02:58PM  21   some trust?

02:58PM  22   A.  Yes.

02:58PM  23   Q.  Ultimately, were you hoping to learn information about

02:58PM  24   people committing crimes from Gerace?

02:58PM  25   A.  Yes.  Ultimately I was hoping that I would develop a

02:58PM   1   relationship with him and that he would cooperate with me or

02:58PM   2   cooperate with the FBI in my investigation.

02:58PM   3   Q.  At any point during that conversation inside of Pharaoh's

02:59PM   4   on Halloween of 2009, did Peter Gerace tell you, hey, Tom, I

02:59PM   5   know about kilo-level cocaine traffickers, help me get out of

02:59PM   6   this mess?  Did he say that to you?

02:59PM   7   A.  No.

02:59PM   8   Q.  I'm going to switch gears for just a second.

02:59PM   9       After the search at Pharaoh's concluded, did there come a

02:59PM  10   time when you were notified by a supervisor at FBI that the

02:59PM  11   DEA wanted to meet with you regarding Peter Gerace?

02:59PM  12   A.  Yes.

02:59PM  13   Q.  What was the name of the supervisor that notified you of

02:59PM  14   that?

02:59PM  15   A.  It was -- my supervisor at the time, his name was James

02:59PM  16   Jancewicz.

02:59PM  17   Q.  Okay.  Now I don't want to get into the contents of the

02:59PM  18   conversation with Jancewicz, but did you have a conversation

02:59PM  19   with him?

02:59PM  20   A.  I did.

02:59PM  21   Q.  And based on that conversation, did you -- were you

02:59PM  22   expecting to receive a phone call from someone?

02:59PM  23   A.  Yes.  I was to receive a phone call from DEA.  I don't

03:00PM  24   know that the individual I was to receive the phone call from

03:00PM  25   was identified, but it was -- I was clear that I would

03:00PM    1    receive a phone call from DEA.

03:00PM    2    Q.  Was that in close proximity after the search at

03:00PM    3    Pharaoh's?

03:00PM    4    A.  Yes.

03:00PM    5    Q.  Okay.  Ultimately, shortly after the search at Pharaoh's,

03:00PM    6    did you receive a phone call from somebody at DEA?

03:00PM    7    A.  I did.  I got a call from Special Agent Bongiovanni.

03:00PM    8    Q.  Can you describe that call for the jury?

03:00PM    9    A.  The essence of that phone call and subsequent phone calls

03:00PM    10   was basically to set up a meeting with him and Mr. Gerace at

03:00PM    11   the DEA office.

03:00PM    12   Q.  Did you know Bongiovanni well before that phone call?

03:00PM    13   A.  I did not.

03:00PM    14   Q.  So when he called you, did he introduce himself?

03:00PM    15   A.  I'm sure he did, yes.

03:00PM    16   Q.  Did he tell you what he was calling about?

03:00PM    17   A.  Yes.

03:00PM    18   Q.  What was he calling about?

03:00PM    19   A.  He was calling to arrange a meeting between me, him and

03:00PM    20   Mr. Gerace.

03:00PM    21   Q.  The fact that Bongiovanni was calling to arrange the

03:01PM    22   meeting between you and Gerace, what did that lead you to

03:01PM    23   believe about Bongiovanni's relationship with Gerace?

03:01PM    24   A.  That Mr. Gerace was cooperating with Agent Bongiovanni in

03:01PM    25   some way.

03:01PM     1    Q.   Okay.  Now at this point in your career, you've been an

03:01PM     2    FBI special agent for about 20 years; is that right?

03:01PM     3    A.   That's right.

03:01PM     4    Q.   Had you handled confidential informants before?

03:01PM     5    A.   Yes.

03:01PM     6    Q.   Had you handled sources of information before?

03:01PM     7    A.   Yes.

03:01PM     8    Q.   Had you been involved in the passing off of information

03:01PM     9    or sources to other agents or other agencies?

03:01PM    10    A.   Probably, but I don't recall specifically.

03:01PM    11    Q.   It's been a long career, right?

03:01PM    12    A.   Yes.

03:01PM    13    Q.   During one of your -- or, during your conversation with

03:01PM    14    Special Agent Bongiovanni, did the topic come up of who you

03:01PM    15    were gonna bring with you to that meeting with Gerace?

03:02PM    16    A.   Yes.  I initially intended to bring my partner, Detective

03:02PM    17    Cottrell from the Amherst Police Department.  And Agent

03:02PM    18    Bongiovanni wanted to have nobody else present.

03:02PM    19    Q.   Was that his request to you?

03:02PM    20    A.   That was his request.

03:02PM    21    Q.   Did that strike you as unusual at the time?

03:02PM    22    A.   Well, it put me in a difficult position, because Bob's my

03:02PM    23    partner, and I'm working with him day in and day out.  And

03:02PM    24    usually at the start of each day it's, like, what are we

03:02PM    25    gonna do today?  And he wasn't gonna be part of that meeting.

USA v Gerace - Herbst - Cooper/Direct - 11/12/24

22

03:02PM  1   Q.  And that was -- withdrawn.

03:02PM  2       Do you know an individual by the name of Tony Bruce?

03:02PM  3   A.  Yes.  Tony Bruce was a federal prosecutor at that time.

03:02PM  4   Q.  And did you make Tony Bruce aware of your interest into

03:02PM  5   an investigation into cold case IOC homicides?

03:02PM  6   A.  A different prosecutor in the office was handling that

03:02PM  7   investigation.  But I probably did have conversations with

03:03PM  8   Mr. Bruce about that.  But more specifically, I had a

03:03PM  9   conversation with him about Mr. Gerace.

03:03PM  10  Q.  Got it.  And maybe I misspoke in my question.

03:03PM  11      Did you speak with Tony Bruce about the information you

03:03PM  12  had received about Gerace being involved in drug dealing?

03:03PM  13  A.  I did.

03:03PM  14  Q.  Did Bruce agree to pursue a case against Peter Gerace for

03:03PM  15  drugs?

03:03PM  16  A.  Yes.  He indicated that based on the information that we

03:03PM  17  had provided to him, that he would prosecute Mr. Gerace.

03:03PM  18  Q.  Now you weren't at the point in your investigation where

03:03PM  19  you were ready to make an arrest; is that fair to say?

03:03PM  20  A.  No, my investigation was at a very preliminary stage.

03:03PM  21  Again, I had just opened a sub file within my main file to

03:03PM  22  try to develop information on Mr. Gerace to be a cooperator.

03:03PM  23  Q.  Would it be fair to say that at that point there were

03:03PM  24  essentially two paths that could have gone forward with

03:03PM  25  Mr. Gerace:  One of cooperation, or one of further

03:04PM    1    investigation on your part?

03:04PM    2    A.   Yes.

03:04PM    3    Q.   So if he had agreed to cooperate and help you out in your

03:04PM    4    case, fair to say you wouldn't have been simultaneously

03:04PM    5    investigating him for drug dealing?

03:04PM    6    A.   That's correct.

03:04PM    7    Q.   Okay.  And if he didn't agree to cooperate, didn't want

03:04PM    8    anything to do with you, would you have pursued a continued

03:04PM    9    investigation into him?

03:04PM   10    A.   Most likely.

03:04PM   11    Q.   A few moments ago you told the jury that Bongiovanni from

03:04PM   12    the DEA called you to set up a meeting with Gerace; do you

03:04PM   13    remember telling them that?

03:04PM   14    A.   I do.

03:04PM   15    Q.   Did that meeting eventually occur?

03:04PM   16    A.   It did.

03:04PM   17    Q.   About how long, if you remember, after the search at

03:04PM   18    Pharaoh's did that meeting occur?

03:04PM   19    A.   Well, I would say within a month.  But I know that there

03:04PM   20    was a lot of stops and starts.  Mr. Gerace was ill at the

03:04PM   21    time, and so he wasn't -- I know that there were a number of

03:04PM   22    conversations between myself and Agent Bongiovanni about

03:04PM   23    scheduling a meeting.  And a lot of times, the time we had

03:04PM   24    scheduled a meeting had to be cancelled because Mr. Gerace

03:04PM   25    was unavailable.

03:05PM   1    Q.   Okay.  And you said Mr. Gerace was ill at the time.  Is

03:05PM   2    that information that Bongiovanni was providing to you?

03:05PM   3    A.   Yes.

03:05PM   4    Q.   Do you know if it was true or not?

03:05PM   5    A.   I think it was true, yes.

03:05PM   6    Q.   I'm not asking what you think, I'm asking what you know.

03:05PM   7    A.   No, I don't know.

03:05PM   8    Q.   So Bongiovanni was providing you that information, right?

03:05PM   9    A.   He was.

03:05PM   10   Q.   And the meeting continued to get adjourned or pushed off?

03:05PM   11   A.   Yes.

03:05PM   12   Q.   Okay.  You said you think it was about a month after the

03:05PM   13   search at Pharaoh's; is that right?

03:05PM   14   A.   Within a month, I would say.

03:05PM   15   Q.   Can you describe for the jury, just walk us through that.

03:05PM   16   Describe what happened.  Where did it occur?

03:05PM   17   A.   The meeting was at the DEA office, which is located in

03:05PM   18   the Electric Tower in Buffalo.  So I went over there.  I went

03:05PM   19   up to their office.  Mr. Bongiovanni met me at the front

03:05PM   20   door.  We introduced ourselves.

03:05PM   21        And then we went down to the mezzanine level of the

03:05PM   22   Electric Building.  So when you go into the Electric

03:06PM   23   Building, there's the main floor you walk in, and then

03:06PM   24   there's a mezzanine level above that.  And so we went there,

03:06PM   25   we were waiting for Mr. Gerace so come.

03:06PM    1    Q.  That mezzanine area, is that a public area inside the

03:06PM    2    building?

03:06PM    3    A.  I think it is, yes.

03:06PM    4    Q.  Can you describe what you recall about your conversation

03:06PM    5    with Bongiovanni before Gerace arrived?

03:06PM    6    A.  I don't really, I mean, I don't think we had any

03:06PM    7    substantive conversation about the meeting.  It was just

03:06PM    8    maybe talk about the FBI, maybe talk about DEA.

03:06PM    9    Q.  Got it.  So just generic --

03:06PM    10   A.  Yes.

03:06PM    11   Q.  -- conversation?

03:06PM    12   A.  Absolutely.

03:06PM    13   Q.  Did there come a time when Gerace arrived?

03:06PM    14   A.  There did.

03:06PM    15   Q.  Can you describe that for the jury?

03:06PM    16   A.  I know at one point there was a phone call either made by

03:06PM    17   Mr. Gerace or Mr. Bongiovanni.  And I do recall seeing

03:06PM    18   Mr. Gerace kind of walk in the building, and Agent

03:06PM    19   Bongiovanni indicating that we were in the mezzanine level,

03:06PM    20   come up.  So he came up.

03:07PM    21   Q.  Okay.  So at some point, Gerace joins you and

03:07PM    22   Bongiovanni?

03:07PM    23   A.  He did, yes.

03:07PM    24   Q.  What happened at that point?

03:07PM    25   A.  We had a meeting, but it wasn't -- I would -- I won't say

USA v Gerace - Herbst - Cooper/Direct - 11/12/24                    26

03:07PM    1    it was a very substantive meeting.  We had conversations back

03:07PM    2    and forth, but it wasn't much of a meeting.

03:07PM    3    Q.  Did Gerace provide you with any information about ongoing

03:07PM    4    criminal activity?

03:07PM    5    A.  No.

03:07PM    6    Q.  What was the impression of the meeting that you had at

03:07PM    7    that time?

03:07PM    8    A.  That it wasn't very substantive.

03:07PM    9    Q.  Did Gerace eventually leave?

03:07PM   10    A.  He did.

03:07PM   11    Q.  Did you stay and continue to talk with Bongiovanni on the

03:07PM   12    mezzanine level?

03:07PM   13    A.  I did.

03:07PM   14    Q.  Can you tell the jury how that conversation went?

03:07PM   15    A.  I recall a couple of things.  He kind of indicated to me

03:07PM   16    that he had known Mr. Gerace for a long time since they were

03:07PM   17    kids.  And I remember him indicating that Mr. Gerace was a

03:07PM   18    good guy.

03:07PM   19    Q.  When Bongiovanni said those things to you, that he had

03:08PM   20    known Gerace for a long time and that he was a good kid, did

03:08PM   21    you respond to that?

03:08PM   22    A.  No, not really.

03:08PM   23    Q.  Did you -- did you talk to Bongiovanni after that?

03:08PM   24    A.  Well, we were continuing to have a conversation, yes,

03:08PM   25    sir.

03:08PM    1    Q.  So what did you say in the continued conversation?

03:08PM    2    A.  Well, at some point, I indicated to Agent Bongiovanni

03:08PM    3    that Mr. Gerace had an issue with the United States Probation

03:08PM    4    Department, number 1.  Agent Bongiovanni did not seem to be

03:08PM    5    very impressed with that.

03:08PM    6        And then I indicated to him that, you know, I had a -- a

03:08PM    7    drug case on Mr. Gerace that -- and I had already gotten a

03:08PM    8    commitment from the United States Attorney's Office to

03:08PM    9    prosecute that.

03:08PM   10    Q.  Let's break that down a bit.

03:08PM   11        So you mentioned that -- you mentioned to Bongiovanni

03:08PM   12    that Gerace has problems with probation; is that right?

03:08PM   13    A.  I did.

03:09PM   14    Q.  And you said Bongiovanni didn't seem impressed with that?

03:09PM   15    A.  That's correct.

03:09PM   16    Q.  Did he seem concerned by it?

03:09PM   17    A.  No.

03:09PM   18    Q.  And then you mentioned that following after that, you

03:09PM   19    told Bongiovanni that you had a drug investigation or a drug

03:09PM   20    case on Gerace; is that correct?

03:09PM   21    A.  I did.

03:09PM   22    Q.  Okay.  Did you tell Bongiovanni generally what your drug

03:09PM   23    case was about?

03:09PM   24    A.  I did.

03:09PM   25    Q.  Okay.  Did Bongiovanni seem impressed by that?

| | | |
|---|---|---|
| 03:09PM | 1 | A.  No, he initially indicated that it was not a very good |
| 03:09PM | 2 | drug case. |
| 03:09PM | 3 | Q.  Okay.  Did he make any comments to you about whether or |
| 03:09PM | 4 | not that case would be prosecuted by the U.S. Attorney's |
| 03:09PM | 5 | Office? |
| 03:09PM | 6 | A.  Yeah.  I know -- I know he clearly said it was not a very |
| 03:09PM | 7 | good drug case, and he may have said that nobody would ever |
| 03:09PM | 8 | prosecute that case. |
| 03:09PM | 9 | Q.  Okay.  In response to him saying nobody would ever |
| 03:09PM | 10 | prosecute that case, did you follow up and tell him about |
| 03:09PM | 11 | your conversation Tony Bruce? |
| 03:09PM | 12 | A.  I did.  I told him I'd already had a conversation with |
| 03:09PM | 13 | the United States Attorney's Office, specifically Tony Bruce. |
| 03:09PM | 14 | And Mr. Bruce had committed to prosecuting Mr. Gerace. |
| 03:09PM | 15 | Q.  Describe for this jury how Bongiovanni reacted when you |
| 03:10PM | 16 | told him that Bruce had already agreed to prosecute the case. |
| 03:10PM | 17 | A.  He -- he -- it was a very marked react -- you know, you |
| 03:10PM | 18 | could tell, his whole complexion, his whole composure changed |
| 03:10PM | 19 | when I indicated to him that Mr. Gerace could be prosecuted. |
| 03:10PM | 20 | Q.  Have you previously described it as having an "oh, shit" |
| 03:10PM | 21 | look on his face? |
| 03:10PM | 22 | A.  I did. |
| 03:10PM | 23 | Q.  Okay. |
| 03:10PM | 24 | A.  To you. |
| 03:10PM | 25 | **MR. FOTI:**  Objection. |

03:10PM  1    **THE COURT:**  Hearsay?

03:10PM  2    **MR. FOTI:**  Yes.

03:10PM  3    **THE COURT:**  Yeah, sustained.

03:10PM  4        The jury will strike that question and answer.

03:10PM  5    **BY MR. COOPER:**

03:10PM  6  Q.  Explain to the jury what Bongiovanni's face looked when

03:10PM  7  you told him --

03:10PM  8  A.  Well --

03:10PM  9  Q.  -- I already spoke to Tony Bruce, and he'll prosecute.

03:10PM  10  A.  Yeah.  You had asked me before and I had explained to you

03:10PM  11  that it was an "oh, shit" look.  That's what I explained to

03:10PM  12  you.

03:10PM  13  Q.  Did you eventually leave that meeting with Joe

03:10PM  14  Bongiovanni?

03:10PM  15  A.  I did.

03:10PM  16  Q.  When you left that meeting with Joe Bongiovanni, what was

03:10PM  17  the impression that you were left with about his relationship

03:10PM  18  with Peter Gerace?

03:10PM  19  A.  That they had a -- that they had basically grown up

03:11PM  20  together.

03:11PM  21  Q.  Okay.

03:11PM  22  A.  They had a longtime relationship.

03:11PM  23  Q.  What about with respect to, I guess, a professional or a

03:11PM  24  source/handler relationship?  What was your impression there?

03:11PM  25  A.  Yeah.  Number 1, I thought they were friends.  And

03:11PM  1    number 2, I thought that, you know, I thought that was the

03:11PM  2    purpose of the meeting, number 1.  But I thought that

03:11PM  3    Mr. Gerace was working for Mr. Bongiovanni, or Agent

03:11PM  4    Bongiovanni as a source.

03:11PM  5    Q.  Okay.  Was that belief that you had based in part on the

03:11PM  6    fact that Bongiovanni was setting up the meeting for you to

03:11PM  7    have with Gerace?

03:11PM  8    A.  Yes.  I mean, number 1, there's a call from the DEA

03:11PM  9    supervisor to the FBI supervisor that information was

03:11PM 10    conveyed to me.

03:11PM 11        And then I got a call from Agent Bongiovanni to set up

03:11PM 12    this meeting.  So that's clearly, you know, DEA has an

03:11PM 13    interest in the case, and they want the FBI to move on.

03:11PM 14    Q.  Okay.  And is that what you did?  Did you move on?

03:11PM 15    A.  I did.

03:11PM 16    Q.  Did the meeting that you had with Bongiovanni, the way he

03:11PM 17    acted and the things he said, cause you to decide to go a

03:12PM 18    different avenue than Peter Gerace?

03:12PM 19    A.  Yes.  Again, I did not have much time invested into the

03:12PM 20    Gerace investigation.  And, again, my purpose was to develop

03:12PM 21    him as a cooperator in the case.  And since DEA had indicated

03:12PM 22    that they had an interest in the case, I decided to move on

03:12PM 23    and pursue other avenues.

03:12PM 24    Q.  Did Bongiovanni ever say to you at all during that

03:12PM 25    meeting, hey, Tom, I've been instructed by my boss to hand

| | | |
|---|---|---|
| 03:12PM | 1 | Peter Gerace over to you.  Here he is.  Use him as a source. |
| 03:12PM | 2 | Did that happen? |
| 03:12PM | 3 | A.  No. |
| 03:12PM | 4 | **MR. COOPER:**  Just one second, please, Judge. |
| 03:13PM | 5 | I have no further direct, Judge.  Thank you. |
| 03:13PM | 6 | **THE COURT:**  We are going to take our afternoon break |
| 03:13PM | 7 | now, so please remember my instructions about not talking |
| 03:13PM | 8 | about the case, even with each other, and not making up your |
| 03:13PM | 9 | mind. |
| 03:13PM | 10 | See you back here in about ten or 15 minutes. |
| 03:13PM | 11 | But you can't leave because we don't have a court |
| 03:13PM | 12 | security officer present. |
| 03:13PM | 13 | **MR. TRIPI:**  No bathroom breaks for Pat. |
| 03:13PM | 14 | **THE COURT:**  Thanks, John. |
| 03:13PM | 15 | **OFFICER ZOLA:**  You're welcome. |
| 03:14PM | 16 | (Jury excused at 3:14 p.m.) |
| 03:14PM | 17 | **THE COURT:**  You're not to talk to anybody.  And |
| 03:14PM | 18 | forgive me for directing you to keep your mouth shut. |
| 03:14PM | 19 | **THE WITNESS:**  I understand, Judge.  I tend to ramble, |
| 03:14PM | 20 | so I understand. |
| 03:14PM | 21 | **THE COURT:**  Anything we need from the defense? |
| 03:14PM | 22 | **MR. FOTI:**  No, Judge. |
| 03:14PM | 23 | **THE COURT:**  Anything from the government? |
| 03:14PM | 24 | **MR. COOPER:**  No, thank you, Judge. |
| 03:14PM | 25 | (Off the record at 3:14 p.m.) |

03:33PM   1                    (Back on the record at 3:33 p.m.)

03:33PM   2                    (Jury not present.)

03:33PM   3            **THE CLERK:**  We are back on the record for the

03:33PM   4    continuation of the jury trial in case numbers 19-cr-227 and

03:33PM   5    23-cr-37, United States of America versus Peter Gerace, Jr.

03:33PM   6            All counsel and parties are present.

03:33PM   7            **THE COURT:**  Anything we need to put on the record

03:33PM   8    before we begin the cross?

03:33PM   9            **MR. COOPER:**  Nothing from the government.

03:33PM  10            **MR. FOTI:**  No, Judge.

03:33PM  11            **THE COURT:**  Let's bring them back in, please, Pat.

03:35PM  12            (Jury seated at 3:35 p.m.)

03:35PM  13            **THE COURT:**  The record will reflect that all our

03:35PM  14    jurors, again, are present.

03:35PM  15            I remind the witness that he's still under oath.

03:35PM  16            And you may begin your cross-examination.

03:35PM  17            **MR. FOTI:**  Thank you, Judge.

03:35PM  18

03:35PM  19                    **CROSS-EXAMINATION BY MR. FOTI:**

03:35PM  20    Q.  Good afternoon, sir.

03:35PM  21    A.  Good afternoon, sir.

03:35PM  22    Q.  Okay.  So, all right.  Sir, you were subpoenaed to be

03:36PM  23    here, correct?

03:36PM  24    A.  That's correct.

03:36PM  25    Q.  You traveled here from Florida; is that correct?

03:36PM    1    A.  I did.

03:36PM    2    Q.  And you gave testimony today following testimony you've

03:36PM    3    given on other dates as well, correct?

03:36PM    4    A.  That's correct.

03:36PM    5    Q.  You gave testimony at least at some point before a grand

03:36PM    6    jury?

03:36PM    7    A.  I did.

03:36PM    8    Q.  You gave testimony in two trials for Mr. Bongiovanni,

03:36PM    9    correct?

03:36PM   10    A.  I did.

03:36PM   11    Q.  And you have in advance of those dates, you've met with

03:36PM   12    members of the trial team at various times, correct?

03:36PM   13    A.  Prior to the grand jury, I would have.

03:36PM   14       And then I had telephonic conversations with Mr. Cooper

03:36PM   15    prior to the first trial.

03:36PM   16    Q.  When you say "the first trial," you're referring to the

03:36PM   17    first Bongiovanni trial?

03:36PM   18    A.  Yes, February of this year.

03:36PM   19    Q.  Okay.  And do you remember how many times total that you

03:37PM   20    communicated with Mr. Cooper?

03:37PM   21    A.  Two telephone calls.  And then when I got in town for

03:37PM   22    that trial, we might have had one quick phone call.  And then

03:37PM   23    once, like, the day of type of thing.

03:37PM   24    Q.  Okay.  When's of the last time you spoke to Mr. Cooper or

03:37PM   25    anybody from the trial team in advance of your testimony here

USA v Gerace - Herbst - Foti/Cross - 11/12/24

03:37PM  1   today?

03:37PM  2   A.  I haven't had any conversations with them other than to

03:37PM  3   say hello this trip.  Really, the only substantive

03:37PM  4   conversations I had with them would go back to prior to the

03:37PM  5   first trial, so that would have been, like, prior to February

03:37PM  6   of 2023.

03:37PM  7   Q.  February 2024, you mean?

03:37PM  8   A.  2024, I'm sorry.

03:37PM  9   Q.  It was earlier this year, right?

03:37PM  10  A.  Yes, I'm sorry.

03:37PM  11  Q.  And did you review any documentation or any material

03:37PM  12  prior to coming in and testifying today?

03:38PM  13  A.  No.

03:38PM  14  Q.  Now --

03:38PM  15  A.  Oh, I'm sorry, Thursday.  Thursday morning I reviewed my

03:38PM  16  trial transcript from the last Bongiovanni trial.

03:38PM  17  Q.  Okay.  You're not talking about the one in February,

03:38PM  18  you're talking about the one after that?

03:38PM  19  A.  That's correct.

03:38PM  20  Q.  All right.  And that's the only documentation you

03:38PM  21  reviewed before coming to testify today?

03:38PM  22  A.  Yes.

03:38PM  23  Q.  Now, let's talk about your early investigation after you

03:38PM  24  came back to Buffalo.

03:38PM  25      You testified about that on direct.

| | | |
|---|---|---|
| 03:38PM | 1 | A.  I did. |
| 03:38PM | 2 | Q.  And you testified that there was an interest you had in |
| 03:38PM | 3 | investigating a cold case involving either a homicide or a |
| 03:38PM | 4 | number of homicides, correct? |
| 03:38PM | 5 | A.  Yes. |
| 03:38PM | 6 | Q.  Okay.  And there was at least, as part of that |
| 03:38PM | 7 | investigation, there was I believe that those homicides may |
| 03:38PM | 8 | have been in some way related to Italian Organized Crime, |
| 03:38PM | 9 | correct? |
| 03:38PM | 10 | A.  Correct. |
| 03:38PM | 11 | Q.  Those are -- when you say "cold case," what you mean is |
| 03:38PM | 12 | that these are investigations that have since sort of fizzled |
| 03:39PM | 13 | out, nobody was actively investigating them, correct? |
| 03:39PM | 14 | A.  That's correct. |
| 03:39PM | 15 | Q.  And do you remember sort of the timeframe of the apparent |
| 03:39PM | 16 | homicides? |
| 03:39PM | 17 | A.  I think the last homicide would have been the mid-1980s. |
| 03:39PM | 18 | Q.  Mid-1980s? |
| 03:39PM | 19 | A.  Yep. |
| 03:39PM | 20 | Q.  And were you aware that Mr. Gerace would have been in his |
| 03:39PM | 21 | early teens around that time? |
| 03:39PM | 22 | A.  I mean, I didn't -- I didn't believe he was involved. |
| 03:39PM | 23 | Q.  Right.  So that's where I was going with it.  You -- you |
| 03:39PM | 24 | had an interest, as you said on direct, because he had a |
| 03:39PM | 25 | familial relationship with certain people you were interested |

03:39PM  1   in, correct?

03:39PM  2   A.  That's correct.

03:39PM  3   Q.  All right.  You had an interest in seeing if you could

03:39PM  4   flip Mr. Gerace, correct?

03:39PM  5   A.  Yes.

03:39PM  6   Q.  And that is a term of art, essentially meaning you take

03:39PM  7   somebody who's not a witness and turn them into a witness,

03:39PM  8   correct?

03:39PM  9   A.  Yes, a cooperator.

03:39PM  10  Q.  You -- you obtain at least some sort of relationship

03:40PM  11  where they provide information to you?

03:40PM  12  A.  Yes.

03:40PM  13  Q.  And you had an interest in potentially jamming him up in

03:40PM  14  some way, correct?

03:40PM  15  A.  Well, I think he jammed himself up.

03:40PM  16  Q.  Well, let's talk about that.

03:40PM  17     You have, as part of developing sources of information,

03:40PM  18  we say "jam up," we mean somebody gets themselves into

03:40PM  19  trouble, right?

03:40PM  20  A.  Yes.

03:40PM  21  Q.  Okay.  And when that happens, and you have an interest in

03:40PM  22  getting information from that person, you can use the trouble

03:40PM  23  they got into as leverage, correct?

03:40PM  24  A.  Correct.

03:40PM  25  Q.  So, the fact that they now have something hanging over

03:40PM   1   their heads, they have some sort of criminal exposure, you

03:40PM   2   can potentially negotiate with that, correct?

03:40PM   3   A.   Yes, but with, obviously, through the -- through the

03:40PM   4   United States Attorney's Office.

03:40PM   5   Q.   You wouldn't directly negotiate with that, but it's

03:40PM   6   something that could be used as part of negotiation, correct?

03:40PM   7   A.   Yes.

03:40PM   8   Q.   And potentially, the more severe the criminal exposure,

03:41PM   9   the more leverage there is in terms of that negotiation?

03:41PM  10   A.   Correct.

03:41PM  11   Q.   Now, in terms of Mr. Gerace, you indicated that you had

03:41PM  12   obtained some information that there may have been drug use

03:41PM  13   or distribution at the Pharaoh's Gentlemen's Club?

03:41PM  14   A.   Correct.

03:41PM  15   Q.   And I think on direct you explained what that was.  You

03:41PM  16   said there was a 302 report related to this, correct?

03:41PM  17   A.   Yes.  That -- that -- that was not the only source of

03:41PM  18   information, but that was one of the sources of information.

03:41PM  19   Q.   Okay.  Well, in terms of identifiable source of

03:41PM  20   information, that came from somebody you could identify, that

03:41PM  21   was contained in the 302 report, correct?

03:41PM  22   A.   Yes.

03:41PM  23   Q.   And in the terms of the 302 report, you indicated on

03:41PM  24   direct it related to two women, correct?

03:41PM  25   A.   Yes.

03:41PM | 1 | Q.  Do you remember who they were?

03:41PM | 2 | A.  I do not.

03:41PM | 3 | Q.  Did you ever interview those women yourself?

03:41PM | 4 | A.  I did not.

03:41PM | 5 | Q.  The -- do you remember the circumstances under which

03:41PM | 6 | those two women provided that information?

03:41PM | 7 | A.  I'm not sure --

03:41PM | 8 | Q.  It was following a traffic stop, right?

03:41PM | 9 | A.  Yeah, I believe it was initially a traffic stop by the

03:41PM | 10 | Amherst Police Department, and they reached out to somebody.

03:42PM | 11 | So they were eventually interviewed by the FBI and the

03:42PM | 12 | Amherst police officer that was assigned to the JTTF.

03:42PM | 13 | Q.  And was it your understanding that the interview and the

03:42PM | 14 | information that they provided that assisted them in getting

03:42PM | 15 | out of trouble after the traffic stop?

03:42PM | 16 | A.  That they -- the two girls being interviewed, that

03:42PM | 17 | that --

03:42PM | 18 | Q.  Yeah, was it your impression they got out of trouble

03:42PM | 19 | for -- for providing that information?

03:42PM | 20 | A.  They probably -- they probably did.

03:42PM | 21 |          **MR. COOPER:**  Objection.  Objection as to they

03:42PM | 22 | probably.  Lacks personal knowledge.

03:42PM | 23 |          **THE COURT:**  Overruled.

03:42PM | 24 |          **THE WITNESS:**  I don't know, honestly.

 | 25 |

03:42PM  1            **BY MR. FOTI:**

03:42PM  2   Q.  That's okay.  And part of the reason you might not know

03:42PM  3   is because we're talking about 2009?

03:42PM  4   A.  Yes.

03:42PM  5   Q.  You're doing your best to recall the details that you

03:42PM  6   can, correct?

03:42PM  7   A.  That's correct.

03:42PM  8   Q.  You didn't review the 302 before coming here today,

03:42PM  9   correct?

03:42PM  10  A.  I did not.

03:42PM  11  Q.  But at that time, you had reviewed that 302.  And there

03:42PM  12  appeared to be some information relevant to your

03:42PM  13  investigation?

03:42PM  14  A.  In 2009?

03:42PM  15  Q.  In 2009.

03:42PM  16  A.  Yes.

03:42PM  17  Q.  And you didn't conduct any independent investigation at

03:43PM  18  that time into what was in the 302, correct?

03:43PM  19  A.  I did not.

03:43PM  20  Q.  You didn't go and conduct an interview yourself of those

03:43PM  21  two women, correct?

03:43PM  22  A.  I did not.

03:43PM  23  Q.  You were partnered up with Bob Cottrell of the Amherst

03:43PM  24  Police Department, correct?

03:43PM  25  A.  That's correct.

03:43PM    1    Q.  He was on the same task force as you?

03:43PM    2    A.  He was.

03:43PM    3    Q.  That means you two worked on similar investigative

03:43PM    4    objectives, correct?

03:43PM    5    A.  We did.

03:43PM    6    Q.  And you, as far as you know, Bob Cottrell didn't go and

03:43PM    7    interview these two girls, correct?

03:43PM    8    A.  As far as I know, no.

03:43PM    9    Q.  Okay.  Did you ever talk to the agents who authored the

03:43PM    10   report?

03:43PM    11   A.  I did.

03:43PM    12   Q.  Okay.  And did you ever ask if they could facilitate a

03:43PM    13   meeting between yourself and the two women?

03:43PM    14   A.  I'm sure they could have.

03:43PM    15   Q.  Did you ever ask for that -- that meeting, if you

03:43PM    16   remember?

03:43PM    17   A.  No.  Because, I mean, this thing was moving kind of fast.

03:43PM    18   And then by the time I initiated the case, I got a call from

03:43PM    19   DEA, so the case kind of went away.

03:44PM    20      I mean, obviously that would have been one of my next

03:44PM    21   investigative steps, to independent corroborate the

03:44PM    22   information in the 302, but that -- that's not how things

03:44PM    23   proceeded.

03:44PM    24   Q.  Well, the call you're referring to from DEA, that's the

03:44PM    25   call that takes place after the search on October 31st,

03:44PM    1    right?

03:44PM    2    A.   Yes.

03:44PM    3    Q.   So we're backing up.  Right now we're talking about

03:44PM    4    August of 2009, correct?

03:44PM    5    A.   Right.  Right.

03:44PM    6    Q.   You got this information before you reached out to the

03:44PM    7    probation department, correct?  Or the probation office?

03:44PM    8    A.   The information on the 302?

03:44PM    9    Q.   The information -- you had the 302, you had reviewed the

03:44PM   10    302 before reaching out to the U.S. Probation Office,

03:44PM   11    correct?

03:44PM   12    A.   I don't know if the first time I reached out to the

03:44PM   13    probation office.  My recollection is the first time I

03:44PM   14    reached out to the probation office, I certainly -- one of

03:44PM   15    the first things I did was to review their file, and then I

03:44PM   16    realized that the information in the file was inconsistent

03:44PM   17    with the information that I had.

03:44PM   18        At what point I shared the information about the

03:44PM   19    information in the 302, I -- I couldn't tell you.

03:45PM   20    Q.   Well, do you recall actually having met with Officer

03:45PM   21    Lepiane in August of 2009?  August 31st of 2009, do you

03:45PM   22    remember that?

03:45PM   23    A.   Yes.

03:45PM   24    Q.   Okay.  By the time you had met with him, you had reviewed

03:45PM   25    that 302; do you agree with that?

03:45PM  1   A.  If the 302 predates that, then that's correct.

03:45PM  2   Q.  You don't remember?

03:45PM  3   A.  I don't remember.

03:45PM  4   Q.  All right.  Now, when you met with Mr. Lepiane, you had

03:45PM  5   conversations about a potential violation of probation

03:45PM  6   against Mr. Gerace, correct?

03:45PM  7   A.  I don't think I had -- Mr. Lepiane, in the course of our

03:45PM  8   dealings, he might have mentioned.  But I -- it's not like I

03:45PM  9   was asking him to, you know, bring charges, bring a probation

03:45PM  10  violation against Mr. Gerace.

03:45PM  11  Q.  You didn't direct him to file a violation against him?

03:45PM  12  A.  No.

03:45PM  13  Q.  But going back to this timeframe, you did, as we talked

03:45PM  14  about earlier, you had an interest in obtaining leverage

03:46PM  15  against Mr. Gerace, correct?

03:46PM  16  A.  That's correct.

03:46PM  17  Q.  And a violation of probation would have provided that to

03:46PM  18  you, correct?

03:46PM  19  A.  Yes, it would have.

03:46PM  20  Q.  All right.  So you met with him at the end of August to

03:46PM  21  talk about what could potentially be a violation of

03:46PM  22  probation, right?

03:46PM  23  A.  Yes.

03:46PM  24  Q.  All right.  And during the course of that meeting, at

03:46PM  25  some point, there is a discussion of potentially searching

03:46PM   1   Pharaoh's, correct?

03:46PM   2   A.  Yes.

03:46PM   3   Q.  But one of the items of information you provided to

03:46PM   4   Mr. Lepiane is that Mr. Gerace was either employed or had an

03:46PM   5   ownership interest in Pharaoh's, correct?

03:46PM   6   A.  Yes.

03:46PM   7   Q.  Which would have been a violation of one of his

03:46PM   8   conditions?

03:46PM   9   A.  That, I don't know.

03:46PM   10   Q.  Well, based on the information provided to you, it would

03:46PM   11   have potentially been a violation of one of his conditions,

03:46PM   12   right?

03:46PM   13   A.  Which --

03:46PM   14        MR. COOPER:  Objection, Judge.  The witness already

03:46PM   15   said he doesn't know, and it calls for hearsay as well.

03:46PM   16        MR. FOTI:  Okay.

03:46PM   17        THE COURT:  Hang on, hang on.  Do you want to

03:46PM   18   withdraw the question?

03:46PM   19        MR. FOTI:  I'll withdraw.

03:46PM   20        THE COURT:  Go ahead.

03:46PM   21        BY MR. FOTI:

03:46PM   22   Q.  You -- is it your testimony today that the only potential

03:46PM   23   violation you were aware of was the potential drug use or

03:47PM   24   distribution?

03:47PM   25   A.  And then providing the false information to probation.

03:47PM  1   Q.  About the employment?

03:47PM  2   A.  Yes.

03:47PM  3   Q.  Which is what I was just asking about, right?

03:47PM  4       You were aware of that at some point?

03:47PM  5   A.  Yes, I was aware of it, yes.

03:47PM  6   Q.  All right.  So, the -- there's a discussion about

03:47PM  7   searching Pharaoh's at some point, correct?

03:47PM  8   A.  That's correct.

03:47PM  9   Q.  And as part of searching Pharaoh's for that to happen

03:47PM  10  through probation, there has to be a violation of -- there

03:47PM  11  has to be a violation of one of Mr. Gerace's search

03:47PM  12  conditions -- or, I'm sorry.

03:47PM  13      One of Mr. Gerace's search conditions involved -- let me

03:47PM  14  rephrase this again.

03:47PM  15      One of Mr. Gerace's probation conditions involved the

03:47PM  16  ability to search a location that he has control over,

03:47PM  17  correct?

03:47PM  18  A.  I'm not familiar with probation's -- what I -- but I

03:47PM  19  believe that to be correct, yes.

03:47PM  20  Q.  Well, typically if you were going to search a private

03:48PM  21  property or a private business, you would have to go through

03:48PM  22  the process of obtaining a warrant, correct?

03:48PM  23  A.  That's correct.

03:48PM  24  Q.  Or some other exception to a warrant?

03:48PM  25  A.  Correct.

03:48PM    1    Q.   Like consent to search?

03:48PM    2    A.   Yes, that's correct.

03:48PM    3    Q.   All right.  And probation has the ability to search an

03:48PM    4    area without going in and obtaining a warrant, correct?

03:48PM    5    A.   My understanding, based on my conversations with Peter

03:48PM    6    Lepiane and his supervisor at that time, is they do -- it

03:48PM    7    might not be the same way we obtain search warrants, but my

03:48PM    8    understanding is there is some sort of process involved in

03:48PM    9    obtaining a warrant.

03:48PM   10    Q.   Your understanding was that there was an -- some sort of

03:48PM   11    process to obtain a warrant in this case?

03:48PM   12         MR. COOPER:  Objection as to relevance, Judge.  We

03:48PM   13    can --

03:48PM   14         THE COURT:  No.

03:48PM   15         MR. COOPER:  Under 403.

03:48PM   16         THE COURT:  Overruled.  Overruled.

03:48PM   17         BY MR. FOTI:

03:48PM   18    Q.   It was your understanding that there was some process to

03:48PM   19    obtaining a warrant in this case?

03:48PM   20    A.   Yeah, my understanding was that maybe it was

03:48PM   21    administrative, but I -- my understanding was there was a

03:48PM   22    procedure with probation that they obtained a warrant.

03:49PM   23    Q.   Okay.  Is it fair to say you don't know anything about

03:49PM   24    what that process would have involved?

03:49PM   25    A.   That is fair to say.

03:49PM    1    Q.  Okay.  And you don't have any awareness of whether that

03:49PM    2    process would have involved showing probable cause to a judge

03:49PM    3    or anything like that?

03:49PM    4    A.  That's correct.

03:49PM    5    Q.  If you were to obtain a warrant, there are certain

03:49PM    6    requirements you have to fulfill, correct?

03:49PM    7    A.  Absolutely.

03:49PM    8    Q.  You would go to a judge and make an application, correct?

03:49PM    9    A.  Yes.

03:49PM   10    Q.  You would present certain sworn allegations, correct?

03:49PM   11    A.  Correct.

03:49PM   12    Q.  And the -- the effort would include establishing that

03:49PM   13    there's probable cause to search a location, correct?

03:49PM   14    A.  That's correct.

03:49PM   15    Q.  Okay.  You didn't do that in this case, correct?

03:49PM   16    A.  I did not, no.

03:49PM   17    Q.  But you were of the understanding that through probation,

03:49PM   18    a search would be conducted of Pharaoh's, correct?

03:49PM   19    A.  Correct.

03:49PM   20    Q.  And prior to that, there was a surveillance effort of the

03:49PM   21    business, correct?

03:49PM   22    A.  I wouldn't -- yes, but I wouldn't characterize it as a

03:49PM   23    surveillance.  There were spot checks done by a Cheektowaga

03:49PM   24    police officer that was assigned to our task force at the

03:50PM   25    time, just to establish that Mr. Gerace was actually residing

03:50PM    1    there.  And then it was -- there -- a couple of short

03:50PM    2    surveillances on a Friday -- or, on a Saturday morning.

03:50PM    3    Q.  Okay.  And that related to establishing that Mr. Gerace

03:50PM    4    had some control over the location, correct?

03:50PM    5    A.  Yes.

03:50PM    6    Q.  So that the search could be conducted by probation,

03:50PM    7    right?

03:50PM    8    A.  Yeah, I think that the -- and that -- and that he resided

03:50PM    9    there, I guess.

03:50PM    10   Q.  Okay.  And which related to whether the search could be

03:50PM    11   conducted by probation, right?

03:50PM    12   A.  Yes.

03:50PM    13   Q.  Now, you said that the -- you called it, what, spot

03:50PM    14   checks?  What did you just refer to it as?

03:50PM    15   A.  I think I did say spot checks.

03:50PM    16   Q.  Okay.  So, surveillance or spot checks, we're talking

03:50PM    17   about somebody going and watching the location, right?

03:50PM    18   A.  Correct.

03:50PM    19   Q.  All right.  And the person you said you recall doing it

03:50PM    20   was a member of the Cheektowaga Police Department?

03:51PM    21   A.  Yeah.  It was John Wanat.  So John was assigned at that

03:51PM    22   time to the FBI Safe Streets Task Force.

03:51PM    23   Q.  Not a member of the U.S. Probation Office?

03:51PM    24   A.  No.

03:51PM    25   Q.  But on the same Safe Streets Task Force that you were a

03:51PM    1    member of?

03:51PM    2    A.    Yes.

03:51PM    3    Q.    There were discussions of when the search of Pharaoh's

03:51PM    4    would take place, correct?

03:51PM    5    A.    Correct.

03:51PM    6    Q.    You were part of those discussions?

03:51PM    7    A.    Yeah, I was at the meetings, but I didn't pick the date.

03:51PM    8    Q.    Okay.  Do you remember that specifically Halloween was

03:51PM    9    selected, correct?

03:51PM    10    A.    I was at the meeting when probation determined that it

03:51PM    11    was going to be done on October 31st.  I didn't have any

03:51PM    12    input as to when they were going to do their search.

03:51PM    13    Q.    Okay.  But you were aware that there was discussion

03:51PM    14    related to selecting Halloween as the date of the search?

03:51PM    15    A.    Yes.

03:51PM    16    Q.    And it was specifically selected because there was a

03:51PM    17    belief that there was an increased likelihood that drug

03:52PM    18    evidence would be recovered, correct?

03:52PM    19    A.    Yes, I do recall that.

03:52PM    20    Q.    And Halloween on that year, that was a Saturday morning,

03:52PM    21    right?

03:52PM    22    A.    It was.

03:52PM    23    Q.    And you conducted the search early in the morning about

03:52PM    24    8 a.m. would you estimate?

03:52PM    25    A.    Yeah, I think that's probably true.  We met initially at

03:52PM  1    probation, and then went to the premises.

03:52PM  2        And probation has -- they do things differently than we

03:52PM  3    would do if we had a warrant.  So they had to physically see

03:52PM  4    Mr. Gerace before they could enter the premises.  So there

03:52PM  5    was some delay before -- there was some -- we were there

03:52PM  6    early, but there was some delay before we could actually go

03:52PM  7    in.

03:52PM  8    Q.  Were you there before 8 a.m.?

03:52PM  9    A.  Well --

03:52PM  10   Q.  It's okay if you don't remember the time.

03:52PM  11   A.  Yeah, I don't remember the time.  But I know that we

03:52PM  12   initially met at probation.  Their office here, I think it

03:52PM  13   was in the old courthouse.

03:52PM  14   Q.  Okay.

03:52PM  15   A.  And then from there we went to Pharaoh's.  And I was

03:53PM  16   anxious to get it over with because it was a Saturday, I

03:53PM  17   worked Monday through Friday, I had kids at home.  But --

03:53PM  18   Q.  Let me -- let me -- we're just focusing on the timeframe

03:53PM  19   right now, okay?

03:53PM  20   A.  Okay.

03:53PM  21   Q.  Let's keep moving through this sort of piece by piece.

03:53PM  22       So you went to probation that morning, and met up with

03:53PM  23   other members of the search team?

03:53PM  24   A.  Yes.

03:53PM  25   Q.  And that included the different agencies that were

03:53PM    1    involved?

03:53PM    2    A.   Yes.

03:53PM    3    Q.   Or was it just probation officers there, if you remember?

03:53PM    4    A.   It was certainly me.  So that was another agency.  And I

03:53PM    5    want to say that John Wanat was there from the Cheektowaga

03:53PM    6    Police Department.  I don't think that Bob Cottrell was there

03:53PM    7    from Amherst at that time.

03:53PM    8    Q.   He was positioned watching Mr. Gerace and other --

03:53PM    9    A.   Yes.  I don't know if he was there that early or not, but

03:53PM   10    at some point --

03:53PM   11    Q.   He -- he ultimately joins you later?

03:53PM   12    A.   He does.

03:53PM   13    Q.   Whoever was there at probation, you relocate to

03:53PM   14    Pharaoh's, correct?

03:53PM   15    A.   Correct.

03:53PM   16    Q.   And there were other agencies present as part of this

03:53PM   17    search, correct?

03:54PM   18    A.   Well, there's probation.  I was there from the FBI.  And

03:54PM   19    there would have been one officer from Amherst and one

03:54PM   20    officer from Cheektowaga.

03:54PM   21        And then Cheektowaga sent the drug dog.

03:54PM   22        But the two officers -- the Cheektowaga officer and the

03:54PM   23    Amherst officer were assigned to the FBI at the time.

03:54PM   24    Q.   They were part of the task force?

03:54PM   25    A.   Yes.

03:54PM  1    Q.  Okay.  You said Cheektowaga sent a drug dog, that's a

03:54PM  2    K-9, correct?

03:54PM  3    A.  Correct.

03:54PM  4    Q.  Okay.  That is a dog that is specifically trained to pick

03:54PM  5    up scents associated with narcotics or drugs, correct?

03:54PM  6    A.  Yes.

03:54PM  7    Q.  Okay.  And who was responsible for the -- was there a K-9

03:54PM  8    officer there, I'm assuming?

03:54PM  9    A.  Yes, of course.

03:54PM  10   Q.  Who was that?

03:54PM  11   A.  I don't recall his name.  I think his first name is John.

03:54PM  12   I had worked with him before, but I don't recall his name.

03:54PM  13   Q.  Okay.  When you're searching an area where there's the

03:54PM  14   possibility of narcotics or drugs, a K-9 is helpful in

03:54PM  15   determine whether there was -- well, first of all, in

03:55PM  16   locating drugs if there are any, correct?

03:55PM  17   A.  Yes.

03:55PM  18   Q.  Or locating where drugs may have been at a location,

03:55PM  19   correct?

03:55PM  20   A.  Yes.

03:55PM  21   Q.  And you weren't personally responsible, but -- you

03:55PM  22   weren't personally responsible for the K-9 yourself?

03:55PM  23   A.  No.

03:55PM  24   Q.  But you were aware that the K-9 was present?

03:55PM  25   A.  I was.

03:55PM    1    Q.  And obviously, the K-9 wasn't there to go through any

03:55PM    2    documents, correct?

03:55PM    3    A.  That's correct.

03:55PM    4    Q.  It had one purpose, which was related to potential drugs,

03:55PM    5    correct?

03:55PM    6    A.  That's correct.

03:55PM    7    Q.  All right.  Now, there comes a time where you ultimately

03:55PM    8    enter Pharaoh's, the club, correct?

03:55PM    9    A.  Correct.

03:55PM   10    Q.  All right.  Do you have any memory of the layout of

03:55PM   11    Pharaoh's?

03:55PM   12    A.  I'm gonna describe it as a -- as a -- as a big warehouse.

03:55PM   13    But I -- very quickly when I went in, I realized that

03:55PM   14    Mr. Gerace was in his office, so again, I made contact with a

03:55PM   15    probation officer.

03:55PM   16    Q.  I'm asking about the layout.  We'll get there.

03:56PM   17    A.  Okay.

03:56PM   18    Q.  All right.  Do you remember how you entered?  Was it

03:56PM   19    through the front door?  Or was it through a back door?  Do

03:56PM   20    you recall?

03:56PM   21    A.  I would say it was the front door.

03:56PM   22    Q.  Okay.  And when you entered the front door, there's a

03:56PM   23    large stage area, correct?

03:56PM   24    A.  I don't recall that.

03:56PM   25    Q.  All right.  Do you recall the bar or anything like that?

03:56PM   1    A.  I remember there was a bar, yes.

03:56PM   2    Q.  Did you -- I think on direct you said something about you

03:56PM   3    weren't very involved in the actual search of the premises;

03:56PM   4    is that correct?

03:56PM   5    A.  That's correct.

03:56PM   6    Q.  Okay.  Your interest was communicating with Mr. Gerace?

03:56PM   7    A.  Correct.

03:56PM   8    Q.  And you indicated that you went to the office area sort

03:56PM   9    of off the back, correct?

03:56PM  10    A.  Yes.

03:56PM  11    Q.  And that's where Mr. Gerace was?

03:56PM  12    A.  Yes.

03:56PM  13    Q.  Do you recall who he was with when you arrived there?

03:56PM  14    A.  Not specifically, no.

03:56PM  15    Q.  Okay.  But he was in handcuffs, you remember that?

03:56PM  16    A.  He was, yes.

03:56PM  17    Q.  And you asked whether he can be unhandcuffed, correct?

03:56PM  18    A.  Probably.

03:56PM  19    Q.  That would be part of what you talked about on direct,

03:57PM  20    establishing a rapport with somebody, correct?

03:57PM  21    A.  Yes.

03:57PM  22    Q.  All right.  Now, you weren't personally involved in the

03:57PM  23    search, but you would agree that you were aware of what was

03:57PM  24    happening during the course of the search, correct?

03:57PM  25    A.  Not -- well, number 1, I -- I did search the area on his

03:57PM    1    desk.  So, I did do some searching.

03:57PM    2    Q.  Okay.

03:57PM    3    A.  But I -- I could not -- to your second question, I really

03:57PM    4    wasn't aware of what was happening outside, because I was

03:57PM    5    again talking to Mr. Gerace, you know, or eye to eye as you

03:57PM    6    and I are talking now, and it was a separate office.  So,

03:57PM    7    most of the search was outside the office area really, so I

03:57PM    8    wasn't aware of what was happening.

03:57PM    9    Q.  You weren't aware of the pacing of the search?

03:57PM    10   A.  The pacing?

03:57PM    11   Q.  You weren't aware of what rooms the people who were

03:57PM    12   engaged in the search were moving through?

03:57PM    13   A.  No.

03:57PM    14   Q.  Okay.  You were aware that there was a search going on,

03:57PM    15   right?

03:57PM    16   A.  Absolutely.

03:57PM    17   Q.  And you were aware that they were looking for among other

03:58PM    18   things, like paperwork, they were looking for drugs?

03:58PM    19   A.  Yes.

03:58PM    20   Q.  And if anybody had located drugs, they would have likely

03:58PM    21   alerted you to that, correct?

03:58PM    22   A.  Correct.

03:58PM    23   Q.  At no point did anybody alert you to recovering any

03:58PM    24   drugs, correct?

03:58PM    25   A.  Correct.

03:58PM  1  Q.  The K-9 didn't recover any evidence, correct?

03:58PM  2  A.  I wouldn't say that.

03:58PM  3  Q.  The K-9 didn't recover any drugs, correct?

03:58PM  4  A.  Well, he -- no, he did not recover any drugs.

03:58PM  5  Q.  Okay.  And in terms of evidence of drugs, there's other

03:58PM  6  things like paraphernalia that can be recovered?

03:58PM  7  A.  Correct.

03:58PM  8  Q.  Things like baggies?

03:58PM  9  A.  Correct.

03:58PM  10  Q.  Other types of packaging material, right?

03:58PM  11  A.  Well, I don't know that -- are you asking me whether the

03:58PM  12  K-9 would alert to that?  I honestly don't know whether the

03:58PM  13  K-9 would alert to that.  But yeah, that could be recovered,

03:58PM  14  yes.

03:58PM  15  Q.  Yeah, let's set aside the K-9.

03:58PM  16     During the course of a search where there's an interest

03:58PM  17  in looking for drugs, it's not just drugs you're looking for,

03:58PM  18  right?

03:58PM  19  A.  That's correct.

03:58PM  20  Q.  You're looking for other things like paraphernalia,

03:58PM  21  correct?

03:58PM  22  A.  Yeah, anything that would indicate drug activity.

03:59PM  23  Q.  Okay.  And that would include things like what I just

03:59PM  24  mentioned as an example?

03:59PM  25  A.  Yes.

03:59PM    1    Q.  Like packaging material?

03:59PM    2    A.  Yes.

03:59PM    3    Q.  Okay.  And none of that was located, correct?

03:59PM    4    A.  Not as far as I'm aware.

03:59PM    5    Q.  All right.  Now, you personally remained in the office

03:59PM    6    for the majority of the search?

03:59PM    7    A.  Yes, I did.

03:59PM    8    Q.  Now, while you were in the office, you're having a

03:59PM    9    conversation with Mr. Gerace?

03:59PM   10    A.  Yes.

03:59PM   11    Q.  At some point during that meeting, your partner Detective

03:59PM   12    Bob Cottrell, he joins you, correct?

03:59PM   13    A.  Yeah.  I think he was -- I think he was pretty much there

03:59PM   14    the whole time because, as you indicated earlier, he was

03:59PM   15    initially sitting on Mr. Gerace's residence in Tonawanda.

03:59PM   16        But I think I called him and said, hey, it looks like

03:59PM   17    we've seen Mr. Gerace, and we're gonna be able to go in

03:59PM   18    pretty soon.  So I gave him a heads-up, so he wasn't much

03:59PM   19    behind me.

03:59PM   20    Q.  Okay.  So as far as you recall during your conversation

03:59PM   21    with Mr. Gerace, Mr. Cottrell was present for pretty much the

04:00PM   22    entire time?

04:00PM   23    A.  Yes.

04:00PM   24    Q.  Okay.  Following or during the course of that meeting,

04:00PM   25    nothing is discussed related to any type of criminal

04:00PM    1    activity, correct?

04:00PM    2    A.  No.

04:00PM    3    Q.  Okay.  You don't confront him about allegations that two

04:00PM    4    individuals made about drugs?

04:00PM    5    A.  I don't believe I did.

04:00PM    6    Q.  Did you tell him that the search related to anything

04:00PM    7    involving drugs?

04:00PM    8    A.  No.  The preliminary discussions would have been with the

04:00PM    9    probation department.  Between the probation department and

04:00PM    10   Mr. Gerace.

04:00PM    11   Q.  Okay.  So, whatever, and you weren't present at that

04:00PM    12   time?

04:00PM    13   A.  I was not.

04:00PM    14   Q.  So if they advised him that they were looking for

04:00PM    15   anything specific, you wouldn't have --

04:00PM    16   A.  That's correct.

04:00PM    17   Q.  Okay.  The conversation was cordial?

04:00PM    18   A.  Very.

04:00PM    19   Q.  He was respectful to you?

04:00PM    20   A.  He was.

04:00PM    21   Q.  Nothing that stands out in your memory as he said

04:00PM    22   anything that drew a red flag of any kind?

04:00PM    23   A.  No.

04:00PM    24   Q.  Did you have conversations with probation about whether

04:01PM    25   he would be taken into custody that day?

04:01PM    1    A.  I don't recall.

04:01PM    2    Q.  You did become aware at some point that they were

04:01PM    3    choosing not to take him into custody, correct?

04:01PM    4    A.  Yes.

04:01PM    5    Q.  And the Cheektowaga Police Department didn't find that

04:01PM    6    there was a basis to bring any criminal charges against him,

04:01PM    7    correct?

04:01PM    8    A.  When you're saying the Cheektowaga Police Department,

04:01PM    9    you're talking about the one officer that was present as part

04:01PM   10    of the task force?

04:01PM   11    Q.  Nobody brought any criminal charges against him that day?

04:01PM   12    A.  No.

04:01PM   13    Q.  So he was to be released, that was your understanding?

04:01PM   14    A.  Yes.

04:01PM   15    Q.  And you didn't object to that?

04:01PM   16    A.  I had nothing to do with that, that's probation's

04:01PM   17    decision.

04:01PM   18    Q.  Okay.  After the search is over, there comes a time --

04:01PM   19    there comes a few times that you spoke to Mr. Lepiane again,

04:01PM   20    correct?

04:01PM   21    A.  Yes.

04:01PM   22    Q.  All right.  You continued to communicate with him after

04:01PM   23    the search just as you had before the search, correct?

04:02PM   24    A.  Correct.

04:02PM   25    Q.  Do you have any estimate as to how many times you spoke

04:02PM    1    to him after this?

04:02PM    2    A.  At that time, probably once or twice a week.  Maybe twice

04:02PM    3    a week.  You know, certainly, before the search, and then

04:02PM    4    subsequent to the search as things were progressing.  And

04:02PM    5    then eventually obviously things ended.

04:02PM    6    Q.  Okay.  You also -- I may have to back up a little bit

04:02PM    7    here, but you also had had conversations with at least one

04:02PM    8    prosecutor from the U.S. Attorney's Office, right?

04:02PM    9    A.  That's correct.

04:02PM   10    Q.  You talked about that on direct?

04:02PM   11    A.  I did.

04:02PM   12    Q.  Tony Bruce?

04:02PM   13    A.  Correct.

04:02PM   14    Q.  Do you remember when you first spoke to him?

04:02PM   15    A.  It was following the search.  Probation had a policy

04:02PM   16    where they, again, I don't know what their policies are, but

04:02PM   17    I thought they did have some type of warrant, but they

04:02PM   18    certainly had discussed it with the U.S. Attorney's Office

04:02PM   19    before they conducted the search.  And so following the

04:02PM   20    search, they had to meet again with the United States

04:02PM   21    Attorney's Office, and it was during that meeting that I had

04:02PM   22    a discussion with AUSA Bruce.

04:03PM   23    Q.  Did you ever speak to Mr. Bruce about Mr. Gerace prior to

04:03PM   24    the search on October 31st, 2009?

04:03PM   25    A.  I don't think I did, no.

USA v Gerace - Herbst - Foti/Cross - 11/12/24

60

| | | |
|---|---|---|
| 04:03PM | 1 | Q. You don't recall? |
| 04:03PM | 2 | A. I don't recall. |
| 04:03PM | 3 | Q. And you didn't document any meeting with him? |
| 04:03PM | 4 | A. No. |
| 04:03PM | 5 | Q. Okay. So, by the time you meet with Mr. Bruce, or speak |
| 04:03PM | 6 | to Mr. Bruce, as far as you recall, the search had already |
| 04:03PM | 7 | been conducted? |
| 04:03PM | 8 | A. Yes. |
| 04:03PM | 9 | Q. And the search had not turned up any drugs? |
| 04:03PM | 10 | A. Correct. |
| 04:03PM | 11 | Q. At some point in the weeks that followed, you spoke to |
| 04:03PM | 12 | your supervisor about Mr. Gerace, correct? Or, no, I |
| 04:03PM | 13 | guess -- well, you had a conversation with your supervisor |
| 04:03PM | 14 | that you testified about on direct, right? |
| 04:03PM | 15 | A. Right. Prior to the search. |
| 04:03PM | 16 | Q. You had the conversation -- |
| 04:03PM | 17 | A. Oh, I'm sorry. No. No, you're right. Yeah. |
| 04:03PM | 18 | You're talking about the conversation that he got a call |
| 04:04PM | 19 | from DEA? |
| 04:04PM | 20 | Q. Yes. |
| 04:04PM | 21 | A. Okay. Got you. |
| 04:04PM | 22 | Q. We're on the same page now. |
| 04:04PM | 23 | A. I had conversation with my supervisor every day, but -- |
| 04:04PM | 24 | Q. Right. Fair enough. |
| 04:04PM | 25 | When was the conversation we're talking about regarding |

USA v Gerace - Herbst - Foti/Cross - 11/12/24

04:04PM  1  your supervisor mentioning the DEA?

04:04PM  2  A.  I don't recall the exact date.  But it would have been

04:04PM  3  shortly after the search.

04:04PM  4  Q.  Ask who was your supervisor again?

04:04PM  5  A.  James Jancewicz.

04:04PM  6  Q.  And he indicated that you would receive a call from

04:04PM  7  somebody at the DEA?

04:04PM  8  A.  That's correct.

04:04PM  9  Q.  He had spoken to a supervisor over at the DEA?

04:04PM  10  A.  He did.

04:04PM  11  Q.  And he didn't tell you anything to suggest that

04:04PM  12  Mr. Gerace was working with the DEA, correct?

04:04PM  13  A.  Not that I recall today.

04:04PM  14  Q.  Okay.  At some point, Mr. Bongiovanni reaches out to you

04:04PM  15  by phone?

04:04PM  16  A.  Reached out to me, yes.

04:04PM  17  Q.  That's the first time you spoke to Mr. Bongiovanni about

04:04PM  18  Mr. Gerace, correct?

04:04PM  19  A.  Correct.

04:04PM  20  Q.  You had never discussed Mr. Gerace with Mr. Bongiovanni

04:04PM  21  on anything unrelated to this, correct?

04:05PM  22  A.  That's correct.

04:05PM  23  Q.  Okay.  You had multiple conversations with

04:05PM  24  Mr. Bongiovanni related to scheduling, correct?

04:05PM  25  A.  Correct.

04:05PM    1    Q.  And during the course of those conversations, he was

04:05PM    2    always cordial with you, correct?

04:05PM    3    A.  Mr. Bongiovanni?

04:05PM    4    Q.  Mr. Bongiovanni was always cordial during those

04:05PM    5    conversations?

04:05PM    6    A.  Yes, of course.

04:05PM    7    Q.  He never referred to Mr. Gerace as a confidential

04:05PM    8    informant, did he?

04:05PM    9    A.  No.

04:05PM   10    Q.  He never referred to him as a source of information,

04:05PM   11    correct?

04:05PM   12    A.  No.

04:05PM   13    Q.  And during the course of, I think, the direct examination

04:05PM   14    and various points, we've talked about those two things being

04:05PM   15    separate.  You'd agree, a confidential informant is more

04:05PM   16    formal than a source of information, correct?

04:05PM   17    A.  Yes.

04:05PM   18    Q.  Okay.  Can you just describe the difference between the

04:05PM   19    two?  When we say one versus the other?

04:05PM   20    A.  Between a confidential informant?

04:05PM   21    Q.  Confidential informant versus a source of information.

04:05PM   22    What are you referring to when those --

04:05PM   23    A.  Well, when I think of a confidential informant in terms

04:05PM   24    of the FBI, I think of somebody that's documented and, maybe,

04:06PM   25    long term rather than somebody that's providing, like, a

USA v Gerace - Herbst - Foti/Cross - 11/12/24

63

04:06PM   1   single source of information.

04:06PM   2   Q.   So there's something more formal about that?

04:06PM   3   A.   Yes.

04:06PM   4   Q.   There is an established relationship involving a

04:06PM   5   confidential informant, correct?

04:06PM   6   A.   Yes.

04:06PM   7   Q.   And when you say source of information, and distinguish

04:06PM   8   that, you're talking about something much more informal,

04:06PM   9   right?

04:06PM  10   A.   Yes, I mean, a source of information can be a telephone

04:06PM  11   call.

04:06PM  12   Q.   Right.  You -- and you said that you spent a good amount

04:06PM  13   of time working in intel, right?

04:06PM  14   A.   No, that's not correct.

04:06PM  15       When I got to the Buffalo office, I was on an intel

04:06PM  16   squad -- a post 9/11 intel squad for a very short period of

04:06PM  17   time.  But my whole career, I worked criminal investigations.

04:06PM  18   Q.   Okay.  But you would agree that in terms of collecting

04:06PM  19   intelligence, it can come from a variety of sources, correct?

04:06PM  20   A.   Correct.

04:06PM  21   Q.   It can come from formal sources such as confidential

04:06PM  22   informants?

04:06PM  23   A.   Yes.

04:06PM  24   Q.   But you also are going to obtain information from other

04:06PM  25   sources, correct?

04:06PM      1    A.  Correct.

04:06PM      2    Q.  You're not going to wait until you formalize a

04:06PM      3    relationship to utilize information they provide to you,

04:07PM      4    correct?

04:07PM      5    A.  Like, a source of information would be the FBI 302 that

04:07PM      6    we referred to, the two girls that provided information, they

04:07PM      7    would be a source of information.

04:07PM      8    Q.  Fair enough.  They didn't have a formal confidential

04:07PM      9    informant relationship, correct?

04:07PM     10    A.  Correct.

04:07PM     11    Q.  Okay.

04:07PM     12    A.  That I'm aware of.

04:07PM     13    Q.  Right.  Based on what you reviewed on the 302, they

04:07PM     14    didn't have it?

04:07PM     15    A.  No.

04:07PM     16    Q.  Okay.  All right.  So Mr. Bongiovanni never indicates

04:07PM     17    that Mr. Gerace has a formal confidential informant-like

04:07PM     18    relationship, correct?

04:07PM     19    A.  Not to me.

04:07PM     20    Q.  Okay.  And he never indicates to you he's been helpful in

04:07PM     21    terms of getting information or intelligence in any other

04:07PM     22    investigation, correct?

04:07PM     23    A.  That's correct.

04:07PM     24    Q.  So you ultimately do meet with Mr. Bongiovanni and

04:07PM     25    Mr. Gerace, correct?

USA v Gerace - Herbst - Foti/Cross - 11/12/24

65

04:07PM   1   A.  I do.

04:07PM   2   Q.  All right.  And there was attempts to schedule that

04:07PM   3   meeting despite the fact that Mr. Gerace had apparently had

04:07PM   4   the swine flu, right?

04:07PM   5   A.  That's correct.

04:07PM   6   Q.  You wanted to make sure you hold off until he got better,

04:07PM   7   right?

04:07PM   8   A.  Yeah.  There was no urgency on my part, because I was no,

04:08PM   9   again, I think it was the swine flu that was going around.

04:08PM   10  So we all knew at the time that that was really bad.  And so,

04:08PM   11  I've got young kids at home, I've got kids at home.  I did

04:08PM   12  not want to be in contact with him.  So in other words, there

04:08PM   13  was no urgency on that my part.

04:08PM   14      But there seemed to be some urgency on their part to get

04:08PM   15  the meeting going, but I wanted to give Mr. Gerace the time

04:08PM   16  he needed to heal.

04:08PM   17  Q.  Okay.  Fair enough.  So you wanted to make sure he was

04:08PM   18  healthy by the time you see him?

04:08PM   19  A.  Yes.

04:08PM   20  Q.  They ultimately do meet with you, and you testified about

04:08PM   21  that interaction on your direct examination, right?

04:08PM   22  A.  I did.

04:08PM   23  Q.  You didn't come into that meeting with the impression

04:08PM   24  that Mr. Gerace was a source of information for the DEA,

04:08PM   25  correct?

04:08PM    1    A.  No, I wouldn't say -- I wouldn't say that was true.  I --

04:08PM    2    I mean, I obviously went to that meeting knowing that DEA had

04:08PM    3    an interest in Mr. Gerace.  They had reached out to the FBI.

04:09PM    4    This DEA supervisor had reached out to the FBI supervisor,

04:09PM    5    and the FBI supervisor had a conversation with me.

04:09PM    6            MR. FOTI:  Can I just have a moment, Judge?

04:09PM    7            THE COURT:  Sure.

04:09PM    8            BY MR. FOTI:

04:09PM    9    Q.  Okay.  Prior to that meeting, nobody had indicated to you

04:10PM   10    that Mr. Gerace was a source for the DEA, correct?

04:10PM   11    A.  I don't -- I don't think that word was ever used.

04:10PM   12    Q.  Okay.  You may have made -- you may have come to certain

04:10PM   13    conclusions based on the circumstances, but nobody told you

04:10PM   14    that?

04:10PM   15    A.  That's correct.

04:10PM   16    Q.  Okay.  Your supervisor didn't tell you that, correct?

04:10PM   17    A.  No.

04:10PM   18    Q.  And Mr. Bongiovanni didn't tell you that, correct?

04:10PM   19    A.  No.

04:10PM   20    Q.  And Mr. Gerace, on October 31st when he was talking to

04:10PM   21    you, didn't say I'm working with Mr. Bongiovanni, correct?

04:10PM   22    A.  That's correct.

04:10PM   23    Q.  Okay.  And during the course of that meeting, Mr. Gerace

04:10PM   24    never talked about having previously worked with

04:10PM   25    Mr. Bongiovanni, or -- or he didn't indicate to you that he

04:10PM   1   was currently working Mr. Bongiovanni, correct?

04:10PM   2   A.  I think I missed the first part of the question.  You

04:10PM   3   said Mr. Gerace?

04:10PM   4   Q.  Let me withdraw that.

04:10PM   5       During the course of that meeting, you spoke to both

04:10PM   6   Mr. Bongiovanni and Mr. Gerace, correct?

04:10PM   7   A.  Correct.

04:10PM   8   Q.  And during the course of the meeting, Mr. Gerace never

04:10PM   9   refers to Mr. Bongiovanni as his handler or somebody that

04:11PM  10   he's working with, correct?

04:11PM  11   A.  That's correct.

04:11PM  12   Q.  And Mr. Bongiovanni never refers to Mr. Gerace as

04:11PM  13   somebody that he is working with, correct?

04:11PM  14   A.  That's correct.

04:11PM  15   Q.  Okay.  You drew a number of impressions regarding the

04:11PM  16   relationship between Mr. Gerace and Mr. Bongiovanni from that

04:11PM  17   meeting, correct?

04:11PM  18   A.  Correct.

04:11PM  19   Q.  You didn't ask questions about that relationship,

04:11PM  20   correct?

04:11PM  21   A.  That's correct.

04:11PM  22   Q.  The meeting was very professional, right?

04:11PM  23   A.  Yes.

04:11PM  24   Q.  You did come with other impressions regarding their

04:11PM  25   relationship in regard to how long they've known each other,

04:11PM   1    correct?

04:11PM   2    A.   I did not come to the meeting with that impression?

04:11PM   3    Q.   So, during the course of the meeting, you got the

04:11PM   4    impression that Mr. Bongiovanni had known Mr. Gerace for a

04:11PM   5    long time?

04:11PM   6    A.   Yes.  Right.

04:11PM   7    Q.   That's something you testified on direct?

04:11PM   8    A.   Right.  Correct.

04:11PM   9    Q.   But that wasn't something that they withheld from you

04:11PM   10   during the course of the meeting, correct?

04:11PM   11   A.   No.

04:11PM   12   Q.   Mr. Bongiovanni was pretty upfront about have a long

04:11PM   13   history with Mr. Gerace, correct?

04:11PM   14   A.   My recollection is that -- I that conversation after

04:12PM   15   Mr. Gerace left, but they weren't attempting to hide it.

04:12PM   16   Q.   Okay.  Fair enough.  So Mr. Gerace leaves, and

04:12PM   17   Mr. Bongiovanni talks about having had a long relationship

04:12PM   18   with Mr. Gerace?

04:12PM   19   A.   Right.  And then obviously during the course of the

04:12PM   20   relationship, I could tell that they appeared to be friends.

04:12PM   21   Q.   So what Mr. Bongiovanni said to you afterwards was

04:12PM   22   consistent with your observations during the course --

04:12PM   23   A.   Correct.

04:12PM   24   Q.   You said you had another impression from the meeting that

04:12PM   25   they had known each other since they were kids, correct?

04:12PM   1   A.   Well, Mr. Bongiovanni told me that directly.

04:12PM   2   Q.   Okay.  And that was, again, consistent with your

04:12PM   3   observations, correct?

04:12PM   4   A.   Yes.

04:12PM   5   Q.   After this meeting is over, you never go back and talk to

04:12PM   6   your supervisor about the meeting, do you?

04:12PM   7   A.   I probably did.  I don't recall.  But, again, you talk to

04:12PM   8   your supervisor every day, so I probably did.

04:12PM   9   Q.   But you don't have any recollection of what would have

04:12PM   10  been discussed?

04:12PM   11  A.   No.

04:12PM   12  Q.   You don't recall raising any red flags that

04:12PM   13  Mr. Bongiovanni and Mr. Gerace have known each other since

04:13PM   14  they were kids, do you?

04:13PM   15  A.   No.

04:13PM   16  Q.   You indicated your impression was that Mr. Gerace was

04:13PM   17  working with the DEA, correct?

04:13PM   18  A.   Yes.

04:13PM   19  Q.   Okay.  And that is in spite of the fact that you were

04:13PM   20  told that they'd been friends since they were kids, correct?

04:13PM   21  A.   Yes.

04:13PM   22  Q.   Now, Mr. Bongiovanni never told you that Mr. Gerace's

04:13PM   23  working with him as an informant, correct?

04:13PM   24  A.   Correct.

04:13PM   25  Q.   That was never said when Mr. Gerace was present, right?

04:13PM   1   A.  Right.  That word was never used, right.

04:13PM   2   Q.  It was also never said after Mr. Gerace left, correct?

04:13PM   3   A.  Correct.

04:13PM   4   Q.  He was upfront about their longstanding relationship

04:13PM   5   though, right?

04:13PM   6   A.  He was.

04:13PM   7   Q.  To the extent you talked to your supervisor, you don't

04:13PM   8   recall what you discussed, correct?

04:13PM   9   A.  That's correct.

04:13PM   10  Q.  All right.  You also never documented anything about this

04:13PM   11  meeting in a report, correct?

04:13PM   12  A.  I did not.

04:13PM   13  Q.  You didn't -- if there was information that was pertinent

04:13PM   14  to your investigation, you would have documented it, correct?

04:14PM   15  A.  If there was, if there was useful information discussed

04:14PM   16  at that meeting, I would have documented it, yes.

04:14PM   17  Q.  Or if there was anything that was of concern about the

04:14PM   18  relationship between Mr. Bongiovanni and Mr. Gerace you would

04:14PM   19  have documented it, correct?

04:14PM   20  A.  Yes.

04:14PM   21  Q.  You did not document anything?

04:14PM   22  A.  I did not.

04:14PM   23  Q.  Did you go back and talk to Tony Bruce after this

04:14PM   24  meeting, if you recall?

04:14PM   25  A.  I don't recall.  I mean, I was at the U.S. Attorney's

04:14PM    1    Office frequently, so -- and Tony was not assigned to any

04:14PM    2    case that I was working other than the one we talked about

04:14PM    3    here.

04:14PM    4        So as I would make my way through the U.S. Attorney's

04:14PM    5    Office, it wasn't uncommon for me to stop and talk to

04:14PM    6    different guys, so I might have, but nothing formal.

04:14PM    7    Q.  So, if you spoke to Mr. Bruce again, it was probably in

04:14PM    8    passing at the U.S. Attorney's Office?

04:14PM    9    A.  Yes.

04:14PM   10    Q.  You don't have any recollection of that meeting?

04:14PM   11    A.  I don't.

04:14PM   12    Q.  Mr. Bruce is the one who said he was willing to prosecute

04:15PM   13    Mr. Gerace, correct?

04:15PM   14    A.  That's correct.

04:15PM   15    Q.  You didn't have any follow-up meeting to discuss the

04:15PM   16    relationship between Mr. Gerace and Mr. Bongiovanni?

04:15PM   17    A.  No.  Because my case went away.

04:15PM   18    Q.  Okay.  Mr. Bongiovanni never asked you to refrain from

04:15PM   19    reaching out to Mr. Gerace, correct?

04:15PM   20    A.  To Mr. Gerace?

04:15PM   21    Q.  Mr. Bongiovanni never asked you to refrain from reaching

04:15PM   22    out to Mr. Gerace, correct?

04:15PM   23    A.  No, but I wouldn't have done that.

04:15PM   24    Q.  He didn't ask you?

04:15PM   25    A.  He did not.

04:15PM    1    Q.  And -- and you didn't ever reach out to Mr. Gerace again,

04:15PM    2    correct?

04:15PM    3    A.  No, I ended up closing the investigation.

04:15PM    4    Q.  That's not something Mr. Bongiovanni asked you to do, is

04:15PM    5    it?

04:15PM    6    A.  I wouldn't say that.  I mean, that was kind of the

04:15PM    7    purpose of the meeting, to --

04:15PM    8    Q.  Hold on.  When you say it's the purpose of the meeting,

04:15PM    9    did anybody ever say that?  That they wanted you to close the

04:16PM   10    investigation?

04:16PM   11    A.  Not in those words.

04:16PM   12    Q.  Did your supervisor ever tell you to close the

04:16PM   13    investigation?

04:16PM   14    A.  No.

04:16PM   15    Q.  Did Mr. Bongiovanni ever tell you to close the

04:16PM   16    investigation?

04:16PM   17    A.  Obviously he -- he couldn't.

04:16PM   18    Q.  All right.  So when you say it's the purpose of your

04:16PM   19    meeting, you're talking about your perception of things?

04:16PM   20    A.  Yes.

04:16PM   21    Q.  You had prior to that meeting an open investigation; is

04:16PM   22    that right?

04:16PM   23    A.  Yes.

04:16PM   24    Q.  And you didn't document the reason you decided to close

04:16PM   25    that investigation?

04:16PM   1   A.  Oh, I did not close the investigation, I just closed

04:16PM   2   the -- I did not pursue the sub file against Mr. Gerace.  The

04:16PM   3   investigation wasn't closed.

04:16PM   4   Q.  Okay.  You did talk to Mr. Lepiane again after that

04:16PM   5   meeting, didn't you?

04:16PM   6   A.  Yes.

04:16PM   7   Q.  And you told him that you had met with Mr. Gerace, right?

04:16PM   8   A.  Yes.

04:16PM   9   Q.  You told him he didn't really have any useful information

04:16PM   10  for you?

04:16PM   11  A.  Yes.

04:16PM   12  Q.  You indicated you would continue to work with him if

04:16PM   13  possible, right?

04:16PM   14  A.  Yes.

04:16PM   15  Q.  This was after the meeting with Mr. Bongiovanni, correct?

04:16PM   16  A.  Yes.

04:16PM   17  Q.  But you never did meet with Mr. Gerace again, correct?

04:17PM   18  A.  Correct.

04:17PM   19  Q.  Nobody was stopping you from meeting Mr. Gerace, correct?

04:17PM   20  A.  I guess that's correct.

04:17PM   21  Q.  Okay.  It was your choice?

04:17PM   22  A.  Right.

04:17PM   23  Q.  Okay.

04:17PM   24          **MR. FOTI:**  May I just have a moment, Judge?

04:17PM   25          **THE COURT:**  Sure.

04:18PM   1          **MR. FOTI:**  Sir, thank you very much.  Have safe

04:18PM   2   travels back to Florida, okay?

04:18PM   3          **THE WITNESS:**  Thank you, sir.

04:18PM   4          **THE COURT:**  Any redirect?

04:18PM   5          **MR. COOPER:**  You're not done yet, Tom.

04:18PM   6          Just a couple questions, Judge.

04:18PM   7

04:18PM   8          **REDIRECT EXAMINATION BY MR. COOPER:**

04:18PM   9   Q.  I'm going to start from the end of the cross and kind of

04:18PM  10   work my way backwards.

04:18PM  11      At the end of the cross-examination, Mr. Foti was asking

04:18PM  12   you some questions about whether you were ever -- whether

04:18PM  13   anyone at the DEA ever told you, you know, to refrain from

04:18PM  14   reaching out to Gerace again; do you remember being asked

04:18PM  15   those questions?

04:18PM  16   A.  Yes.

04:18PM  17   Q.  It looked like you had a little more to say there.

04:18PM  18      Would it have been unusual for you to reach out to

04:18PM  19   somebody you believed was a source for another agent at a

04:18PM  20   different agency?

04:18PM  21   A.  You would -- you would never do that.

04:18PM  22   Q.  Explain that to the jury.

04:18PM  23   A.  Oh, it's a -- a confidential source is a confidential

04:18PM  24   source.  So it's relationship between you and that

04:18PM  25   individual.

04:18PM  1    And I think the DEA's probably similar to us, but in the

04:19PM  2  FBI, I mean, we don't even -- we -- their true name is

04:19PM  3  documented at some point, but we don't even use their true

04:19PM  4  name when we contact them.  It's a confidential relationship.

04:19PM  5  And, you know, if you talk to other people about it, it's no

04:19PM  6  longer.

04:19PM  7  Q.  At this time, when this meeting is happening at the

04:19PM  8  mezzanine level of the Electric Tower, had you been a special

04:19PM  9  agent in federal law enforcement for well over 20 years?

04:19PM  10  A.  Yes.

04:19PM  11  Q.  So in the context of that 20-plus years experience, did

04:19PM  12  the way that Bongiovanni acted and the things that he said to

04:19PM  13  you during the phone call and during the meeting lead you to

04:19PM  14  the conclusion that Gerace was his source?

04:19PM  15  A.  Yes.

04:19PM  16  Q.  Is that based on your 20-plus years experience?

04:19PM  17  A.  Yes.

04:19PM  18  Q.  Are there things that you can determine based on that

04:19PM  19  20-plus years experience without them being explicitly said

04:19PM  20  to you?

04:19PM  21  A.  Yes.  I mean, you don't have to -- you don't have to tell

04:19PM  22  somebody that somebody's a source.  Again, repeating myself,

04:20PM  23  but the DEA called the FBI, and said let -- our guy's gonna

04:20PM  24  call your guy, and let's get together and basically work this

04:20PM  25  out.

04:20PM   1   Q.   And you were also asked some questions on

04:20PM   2   cross-examination about whether Bongiovanni was upfront with

04:20PM   3   you about his relationship with Gerace; do you remember being

04:20PM   4   asked those questions?

04:20PM   5   A.   Not specifically, but yes.

04:20PM   6   Q.   Okay.  That topic?

04:20PM   7   A.   Yes.

04:20PM   8   Q.   Do you remember being asked about that topic?

04:20PM   9        Did Bongiovanni essentially tell you that he grew up with

04:20PM   10  Gerace?

04:20PM   11  A.   He did.

04:20PM   12  Q.   Okay.  Did he go into much more detail than that?

04:20PM   13  A.   No.

04:20PM   14  Q.   Did he tell you they went on double dates together?

04:20PM   15  A.   No.

04:20PM   16  Q.   Did he tell you they socialized, like, recently up to

04:20PM   17  that point?

04:20PM   18  A.   No.

04:20PM   19  Q.   Did he tell you that they talked on the phone?

04:20PM   20  A.   No.  All he said --

04:20PM   21  Q.   Hold on, sir.  I'm not -- just answer that question.

04:20PM   22        Did he tell you that they talked on the phone?

04:20PM   23  A.   No.

04:20PM   24  Q.   Did he tell you that they exchanged text messages?

04:20PM   25  A.   No.

04:20PM  1    Q.  Okay.  To the best of your ability now, in 2024, what do

04:20PM  2    you recall Bongiovanni saying about his relationship with

04:20PM  3    Gerace?

04:20PM  4    A.  That they had a long-term relationship, I mean, in terms

04:21PM  5    of they grew up together, and that he was a good kid.

04:21PM  6    Q.  Okay.  That they grew up together, and that he was a good

04:21PM  7    kid, right?

04:21PM  8    A.  Yes.

04:21PM  9    Q.  Did Bongiovanni give you details about, you know, present

04:21PM  10   day in 2009, details about their relationship?

04:21PM  11   A.  No.

04:21PM  12   Q.  Do you know what Bongiovanni told his boss about his

04:21PM  13   relationship with Gerace?

04:21PM  14   A.  No.

04:21PM  15   Q.  His boss would know that, right?

04:21PM  16   A.  Correct.

04:21PM  17   Q.  When you were asked some questions on cross-examination

04:21PM  18   about the involvement of a K-9 at the search at Pharaoh's, do

04:21PM  19   you remember being asked those questions?

04:21PM  20   A.  I do.

04:21PM  21   Q.  It seemed like you had a little something more to say.

04:21PM  22   You were asked about whether drugs were recovered, and they

04:21PM  23   weren't, right?

04:21PM  24   A.  Right.

04:21PM  25   Q.  Did the K-9 alert while he was at Pharaoh's?

04:21PM    1    A.  Yes.

04:21PM    2    Q.  Is a K-9 alerting, is it doing its job trying to find

04:22PM    3    drugs?

04:22PM    4    A.  Yes.

04:22PM    5    Q.  Okay.  Even if drugs are gone, based upon your 20-plus

04:22PM    6    years experience, can a K-9 sometimes alert because drugs had

04:22PM    7    been present?

04:22PM    8    A.  Yes.

04:22PM    9    Q.  Okay.  We're not going to spend too much time on this,

04:22PM    10   but you were asked a bunch of questions about probation's

04:22PM    11   search authority; do you remember being asked that?

04:22PM    12   A.  Yes.

04:22PM    13   Q.  Have you ever worked for probation?

04:22PM    14   A.  No.

04:22PM    15   Q.  Do you know specifically what probation needs to do to

04:22PM    16   search a home?

04:22PM    17   A.  No.

04:22PM    18   Q.  Peter Lepiane, he worked for probation, right?

04:22PM    19   A.  Yes.

04:22PM    20   Q.  Still does?

04:22PM    21   A.  Still does.

04:22PM    22   Q.  Okay.  And he would have a better idea of what probation

04:22PM    23   needs to do in order to conduct a search, right?

04:22PM    24   A.  He would.

04:22PM    25   Q.  Okay.  As a special agent for the Federal Bureau of

04:22PM  1  Investigation, would it be fair to say that it's not your

04:23PM  2  responsibility to investigate potential violations of

04:23PM  3  supervision and bring them to the district court?  Is that

04:23PM  4  your job?

04:23PM  5  A.  No.

04:23PM  6  Q.  Is that probation's job?

04:23PM  7  A.  Yes.

04:23PM  8  Q.  Do you sometimes help probation in doing their job?

04:23PM  9  A.  Yes.

04:23PM  10  Q.  You were asked on cross-examination about whether the two

04:23PM  11  women who were interviewed by another TFO and another special

04:23PM  12  agent from the FBI got out of trouble; do you remember being

04:23PM  13  asked that question?

04:23PM  14  A.  I do.

04:23PM  15  Q.  You have no idea if that happened or not, do you?

04:23PM  16  A.  I don't.

04:23PM  17  Q.  Okay.

04:23PM  18         MR. COOPER:  Just one second, please.

04:23PM  19         BY MR. COOPER:

04:23PM  20  Q.  You were asked on cross-examination if you remember the

04:23PM  21  identity of those two women; do you remember being asked that

04:23PM  22  question?

04:23PM  23  A.  Yes.

04:23PM  24  Q.  You said you didn't remember, right?

04:23PM  25  A.  That's correct.

04:23PM   1    Q.  Okay.

04:24PM   2         MR. COOPER:  Judge, I'm holding what's marked for

04:24PM   3    identification as Government Exhibit 3565D, as in David.  May

04:24PM   4    I approach the witness?

04:24PM   5         THE COURT:  Sure.

04:24PM   6         MR. COOPER:  Do you need to see it, Mark?

04:24PM   7         MR. FOTI:  Which one is it, 35?

04:24PM   8         MR. COOPER:  3565D.

04:24PM   9         May I approach?

04:24PM  10         THE COURT:  You may.

04:24PM  11         BY MR. COOPER:

04:24PM  12    Q.  Don't read from this.  Just take a moment, read it to

04:24PM  13    yourself, look back up when you're done.

04:24PM  14         And do you want me to put it on the screen?

04:24PM  15    A.  That would be better.

04:24PM  16         MR. COOPER:  Karen, can you pull up on the screen

04:24PM  17    3565D, as in David.

04:24PM  18         THE WITNESS:  Can you blow it up?

04:24PM  19         MR. COOPER:  Can you zoom in on the first paragraph,

04:24PM  20    or the first couple.

04:24PM  21         THE WITNESS:  Yes.  That's good.

04:24PM  22         Do you want me to read the first paragraph?

04:25PM  23         BY MR. COOPER:

04:25PM  24    Q.  I don't want you to read it out loud.

04:25PM  25         Did reviewing that refresh your memory about those two

04:25PM    1    individuals?  Just yes or no.

04:25PM    2    A.  Well, yes as to one.  I don't see the second one.  It's

04:25PM    3    an FD-302.

04:25PM    4    Q.  I don't want you to read from the document.  I'm asking

04:25PM    5    you if you look at the document, if it refreshes your memory

04:25PM    6    about those two women.

04:25PM    7    A.  Yes.

04:25PM    8    Q.  Yes, it does?

04:25PM    9    A.  Yes.

04:25PM    10           MR. COOPER:  Okay.  Ms. Champoux, can you take that

04:25PM    11   down?

04:25PM    12           THE WITNESS:  Yes.

04:25PM    13           BY MR. COOPER:

04:25PM    14   Q.  Was one of them named G.R.?

04:25PM    15   A.  Yes.

04:25PM    16   Q.  Was one of them named K.L.?

04:25PM    17   A.  Yes.

04:25PM    18   Q.  Did looking at that report help you to remember their

04:25PM    19   names?

04:25PM    20   A.  Yes.

04:25PM    21   Q.  It's been a long time, right?

04:25PM    22   A.  Right.

04:25PM    23   Q.  You were also asked on cross-examination about whether

04:25PM    24   you followed up and conducted interviews of those women

04:25PM    25   yourself; do you remember being asked those questions?

04:26PM    1    A.  Yes.

04:26PM    2    Q.  And if, at that meeting with Bongiovanni, Peter Gerace

04:26PM    3    was -- it was clear to you that Peter Gerace was not a source

04:26PM    4    for the DEA, if that had been the case, would you have

04:26PM    5    pursued an investigation into Gerace?

04:26PM    6    A.  Yes.  If DEA had no interest in Mr. Gerace at that time,

04:26PM    7    I would have continued my investigation into Mr. Gerace.

04:26PM    8    Q.  Okay.  And you told Mr. Foti on cross-examination that

04:26PM    9    you, in fact, did not continue your investigation; is that

04:26PM   10    right?

04:26PM   11    A.  Right.  I did not close my file, but I did not pursue

04:26PM   12    that avenue.

04:26PM   13    Q.  The avenue of Gerace?

04:26PM   14    A.  Yes.

04:26PM   15    Q.  Is that because of how Bongiovanni acted and what he said

04:26PM   16    before and during that meeting in October or November of

04:26PM   17    2009?

04:26PM   18    A.  Yes.

04:26PM   19    Q.  You were asked some questions on cross-examination about

04:27PM   20    whether Bongiovanni ever told you about -- or, Bongiovanni or

04:27PM   21    Gerace ever told you about Gerace's knowledge of cocaine

04:27PM   22    trafficking; do you remember that?

04:27PM   23    A.  Can you ask the question again?

04:27PM   24    Q.  Yeah.  On cross-examination, Mr. Foti, he asked you some

04:27PM   25    questions about whether you were told during the meeting at

04:27PM    1    the mezzanine that that Gerace had information about cocaine

04:27PM    2    trafficking; do you remember Mr. Foti asking you that?

04:27PM    3    A.  Yes.

04:27PM    4    Q.  Okay.

04:27PM    5         MR. COOPER:  Ms. Champoux, can you pull up Government

04:27PM    6    Exhibit 30A in evidence, please?

04:27PM    7         THE WITNESS:  This is in evidence?

04:27PM    8         BY MR. COOPER:

04:27PM    9    Q.  This is in evidence.  So I think everybody should be able

04:27PM   10    to see it, and can you see it on the screen there?

04:27PM   11    A.  Yeah, but can you blow it up, please?

04:27PM   12         MR. COOPER:  Ms. Champoux, can you get the first

04:27PM   13    couple paragraphs there?  Thank you.

04:27PM   14         BY MR. COOPER:

04:27PM   15    Q.  Do you see paragraph 2 in front of you?

04:27PM   16    A.  I do.

04:27PM   17    Q.  The second sentence of paragraph 2, can you read that out

04:27PM   18    loud?

04:27PM   19    A.  The one it starts it should?

04:28PM   20    Q.  No, the one that starts Gerace.  The second one.

04:28PM   21    A.  Gerace has acted as a confidential source and has been

04:28PM   22    able to provide information regarding individuals in this

04:28PM   23    case file and other narcotic investigations in the past.

04:28PM   24    Q.  All right.  Pause right there.

04:28PM   25         Is that sentence consistent with the impression that you

| | | |
|---|---|---|
| 04:28PM | 1 | were left with from interacting with Bongiovanni? |
| 04:28PM | 2 | A.  Yes, it clearly says confidential source. |
| 04:28PM | 3 | Q.  Okay.  Now at the time that you met with Bongiovanni |
| 04:28PM | 4 | about Gerace, did he show you this report? |
| 04:28PM | 5 | A.  No. |
| 04:28PM | 6 | Q.  Did you know it existed? |
| 04:28PM | 7 | A.  No. |
| 04:28PM | 8 | Q.  Did you not see it until the year 2024? |
| 04:28PM | 9 | Do you remember the first time you saw this? |
| 04:28PM | 10 | A.  Yeah, you showed it to me prior to the first trial, I |
| 04:28PM | 11 | believe. |
| 04:28PM | 12 | Q.  Okay.  That was this year, right? |
| 04:28PM | 13 | A.  This year. |
| 04:28PM | 14 | Q.  I want to direct your attention to the sentence in |
| 04:28PM | 15 | paragraph 3.  I drew a mark on it.  It says Gerace stated; do |
| 04:29PM | 16 | you see that? |
| 04:29PM | 17 | A.  I do. |
| 04:29PM | 18 | Q.  Read that sentence out loud. |
| 04:29PM | 19 | A.  Gerace stated that he was prepared to offer information |
| 04:29PM | 20 | regarding individuals who are trafficking in narcotics in the |
| 04:29PM | 21 | Buffalo area. |
| 04:29PM | 22 | Q.  Stop right there. |
| 04:29PM | 23 | Did Bongiovanni tell you that when he met with you? |
| 04:29PM | 24 | A.  No. |
| 04:29PM | 25 | **MR. COOPER:**  You can zoom out of that, Ms. Champoux. |

04:29PM    1           Can we go to the next page?

04:29PM    2           **BY MR. COOPER:**

04:29PM    3    Q.  Let's look at paragraph 4.  Do you see the sentence

04:29PM    4    starting Gerace stated that he?  Second sentence.

04:29PM    5    A.  Yes, I see that.

04:29PM    6    Q.  Can you read that out loud for the jury?

04:29PM    7    A.  Gerace stated that he knew significant cocaine

04:29PM    8    traffickers capable of moving kilo quantities of cocaine out

04:29PM    9    of various distribution houses located in the North Buffalo

04:29PM   10    and South Buffalo areas.

04:29PM   11    Q.  Did Bongiovanni tell you about that?

04:29PM   12    A.  No.

04:29PM   13    Q.  Did Gerace mention it during this meeting?

04:29PM   14    A.  No.

04:29PM   15    Q.  Did it come up at all?

04:29PM   16    A.  No.

04:29PM   17    Q.  Paragraph 6 of this report.  Can you read that first

04:30PM   18    sentence?

04:30PM   19    A.  G.S. Kasprzyk instructed S.A. Bongiovanni to set up an

04:30PM   20    interview with Gerace and FBI agents in the near future.

04:30PM   21    Q.  That interview happened, right, sir?

04:30PM   22    A.  I wouldn't call it an interview, a meeting happened.

04:30PM   23    Q.  Okay.  And during the meeting that happened, did he tell

04:30PM   24    you, Bongiovanni, did he tell you any of the stuff that's

04:30PM   25    written in this report?

04:30PM      1    A.  No.

04:30PM      2    Q.  This report, it's written before that meeting happened,

04:30PM      3    right, sir?

04:30PM      4    A.  I'd have to look at the date of the DEA-6, but I think it

04:30PM      5    would have to be, yes.  Can you blow it up?

04:30PM      6    Q.  Do you see the date prepared here?

04:30PM      7    A.  I'm not familiar --

04:31PM      8    Q.  That's okay, I'll circle it for you.

04:31PM      9    A.  Okay.  Gotcha.  Yeah, I have seen DEA forms before, but

04:31PM     10    yeah, the date is November 6, 2009.

04:31PM     11    Q.  Okay.  And as you sit here today, do you recall the date

04:31PM     12    that the meeting happened at the mezzanine in the Electric

04:31PM     13    Tower?

04:31PM     14    A.  No, but it would have been later than that, because

04:31PM     15    again, we had trouble setting up a meeting.

04:31PM     16    Q.  Okay.  You're confident in that?

04:31PM     17    A.  Yeah, because the search was October 31st.  And this is

04:31PM     18    November 6th.  So it would have been after that.

04:31PM     19            **MR. COOPER:**  You can zoom out of that, Ms. Champoux.

04:31PM     20    Thank you.  And leave the document up for one second.

04:31PM     21            Can I just have one second, Judge?

04:31PM     22            **THE COURT:**  Sure.

04:31PM     23            **MR. COOPER:**  No further redirect, Judge.

04:32PM     24            **THE COURT:**  Thank you.  Anything further, Mr. Foti?

04:32PM     25            **MR. FOTI:**  Just -- just briefly, while this exhibit

04:32PM    1    is -- is the exhibit still up for everybody?

04:32PM    2            THE COURT:  Yes.

04:32PM    3            MR. FOTI:  Okay.  Can we zoom in through boxes 11

04:32PM    4    through 15, just the bottom?

04:32PM    5

04:32PM    6                 RECROSS-EXAMINATION BY MR. FOTI:

04:32PM    7    Q.  Okay.  This is still Exhibit 30A in evidence, sir.  On

04:32PM    8    box 12, is there a name?

04:32PM    9    A.  Yes.

04:32PM   10    Q.  And who is that?

04:32PM   11    A.  S.A. Joseph Bongiovanni.

04:32PM   12    Q.  Okay.  That's the agent that we've been talking about,

04:32PM   13    right?

04:32PM   14    A.  Correct.

04:32PM   15    Q.  Okay.  And then underneath it, it's box 14, right?

04:32PM   16    A.  Yes.

04:32PM   17    Q.  And that is a box for a supervisor to sign off on the

04:32PM   18    report, correct?

04:32PM   19    A.  Correct.

04:32PM   20    Q.  And whose name is there?

04:32PM   21    A.  Dale Kasprzyk.

04:32PM   22    Q.  Okay.  And above his name, it says approved, correct?

04:32PM   23    A.  Yes.

04:32PM   24    Q.  And he dated it in box 15, correct?

04:32PM   25    A.  It appears -- yeah, it looks like he signed it in 14, and

04:33PM 1    dated it in 15.

04:33PM 2            **MR. FOTI:**  Okay.  Nothing further, Judge.

04:33PM 3            **MR. COOPER:**  I'm good.  Thank you, Judge.

04:33PM 4            **THE COURT:**  Okay.  You can step down, sir.  Thank you

5    very much.

04:33PM 6            **THE WITNESS:**  Thank you very much.

7            (Witness excused at 4:33 p.m.)

8            (Excerpt concluded at 4:33 p.m.)

9                *    *    *    *    *    *    *

10

11

12

13

14

15                    **CERTIFICATE OF REPORTER**

16

17                In accordance with 28, U.S.C., 753(b), I

18    certify that these original notes are a true and correct

19    record of proceedings in the United States District Court for

20    the Western District of New York on November 12, 2024.

21

22                    s/ Ann M. Sawyer

                      Ann M. Sawyer, FCRR, RPR, CRR
23                    Official Court Reporter
                      U.S.D.C., W.D.N.Y.

24

25

1

2                    **TRANSCRIPT INDEX**

3           **EXCERPT - EXAMINATION OF THOMAS HERBST**

4                    **NOVEMBER 12, 2024**

5

6

7    **W I T N E S S**                        **P A G E**

8    **T H O M A S   H E R B S T**            2

9      DIRECT EXAMINATION BY MR. COOPER:      2

10     CROSS-EXAMINATION BY MR. FOTI:         32

11     REDIRECT EXAMINATION BY MR. COOPER:    74

12     RECROSS-EXAMINATION BY MR. FOTI:       87

13

14

15

16

17

18

19

20

21

22

23

24

25