```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 2
     _____
 3   UNITED STATES OF AMERICA,
                                        Case No. 1:19-cr-227
 4                  Plaintiff,               1:23-cr-37
     v.                                        (LJV)
 5
     PETER GERACE, JR.,               December 13, 2024
 6
     _____
 7
         TRANSCRIPT EXCERPT - EXAMINATION OF LOUIS SELVA - DAY 2
 8            BEFORE THE HONORABLE LAWRENCE J. VILARDO
                   UNITED STATES DISTRICT JUDGE
 9
     APPEARANCES:       TRINI E. ROSS, UNITED STATES ATTORNEY
10                      BY: JOSEPH M. TRIPI, ESQ.
                            NICHOLAS T. COOPER, ESQ.
11                          CASEY L. CHALBECK, ESQ.
                        Assistant United States Attorneys
12                      Federal Centre, 138 Delaware Avenue
                        Buffalo, New York 14202
13                      For the Plaintiff

14                      THE FOTI LAW FIRM, P.C.
                        BY: MARK ANDREW FOTI, ESQ.
15                      16 West Main Street, Suite 100
                        Rochester, New York 14614
16                         And
                        SOEHNLEIN LAW
17                      BY: ERIC MICHAEL SOEHNLEIN, ESQ.
                        350 Main Street, Suite 2100
18                      Buffalo, New York 14202
                        For the Defendant
19
     PRESENT:           KAREN A. CHAMPOUX, USA PARALEGAL
20                      BRIAN A. BURNS, FBI SPECIAL AGENT
                        MARILYN K. HALLIDAY, HSI SPECIAL AGENT
21                      OLIVIA A. PROIA, J.D., PARALEGAL

22   LAW CLERK:         REBECCA FABIAN IZZO, ESQ.

23   COURT CLERK:       COLLEEN M. DEMMA

24   REPORTER:          ANN MEISSNER SAWYER, FCRR, RPR, CRR
                        Robert H. Jackson Courthouse
25                      2 Niagara Square Buffalo, New York 14202
                        Ann_Sawyer@nywd.uscourts.gov
```

09:57AM   1              (Excerpt commenced at 9:57 a.m.)

09:57AM   2              (Jury is present.)

09:57AM   3              **THE COURT:**  The record will reflect that all our

09:57AM   4   jurors are present.

09:57AM   5              I remind the witness that he's still under oath.

09:57AM   6              And, Mr. Tripi, you may begin.

09:58AM   7              **MR. TRIPI:**  Thank you, Your Honor.

09:58AM   8

09:58AM   9   **L O U I S   S E L V A**, having been previously duly called and

09:58AM   10  sworn, continued to testify as follows:

09:58AM   11

09:58AM   12              **(CONT'D) DIRECT EXAMINATION BY MR. TRIPI:**

09:58AM   13  Q.  All right.  Mr. Selva, I want to basically pick up where

09:58AM   14  we left off, but yesterday I asked you some questions, I want

09:58AM   15  to kind of follow up on one part.

09:58AM   16      When Mr. Bongiovanni -- yesterday, you testified when

09:58AM   17  Mr. Bongiovanni instructed you to advise law enforcement that

09:58AM   18  you were his informant if law enforcement approached you, by

09:58AM   19  that point in time, had you been involved in your marijuana

09:58AM   20  distribution activity since approximately 2008?

09:58AM   21  A.  Yes, that's correct.

09:58AM   22  Q.  And did Mr. Bongiovanni give you that instruction before

09:58AM   23  your house was searched on August 23rd, 2019?

09:58AM   24  A.  Yes.

09:58AM   25  Q.  Did he remind you about that again after your house was

09:58AM  1   searched on August 23rd, 2019?

09:58AM  2   A.   Yes.

09:58AM  3   Q.   And when he was giving you those instructions and those

09:58AM  4   directives, based on conversations and discussions you had

09:58AM  5   had with Mr. Bongiovanni, he knew you were involved in

09:58AM  6   marijuana distribution with others?

09:59AM  7   A.   That's correct.

09:59AM  8   Q.   Is that a yes?

09:59AM  9   A.   Yes, sir.

09:59AM  10  Q.   Okay.  I want to go backwards in time a little bit to

09:59AM  11  around the year 2001.  By that point in time, were you back

09:59AM  12  living in Buffalo, New York, after a stint in Las Vegas?

09:59AM  13  A.   Yes.

09:59AM  14  Q.   By that point in time in your life, were you going

09:59AM  15  through or about to go through a divorce?

09:59AM  16  A.   Around that time, yes.  It was starting to proceed.

09:59AM  17  Q.   Also around that time in around 2001, did Mr. Bongiovanni

09:59AM  18  return to the Buffalo area after beginning his career as a

09:59AM  19  DEA agent in Florida?

09:59AM  20  A.   He did, yes.

09:59AM  21  Q.   Okay.  By the time Mr. Bongiovanni came back around that

09:59AM  22  2001 timeframe, was he separating from his wife, JoAnn?

09:59AM  23  A.   Yes.  They were living separately I believe.

10:00AM  24  Q.   They were still married?

10:00AM  25  A.   They were still married, yes.

| | | |
|---|---|---|
| 10:00AM | 1 | Q.  At that point in time, did Mr. Bongiovanni have a young |
| 10:00AM | 2 | daughter named Chelsea? |
| 10:00AM | 3 | A.  He did, yes. |
| 10:00AM | 4 | Q.  So, both you and Mr. Bongiovanni are sort of both back in |
| 10:00AM | 5 | the Buffalo area by 2001.  Would it be accurate to say you |
| 10:00AM | 6 | were both going through something similar in your personal |
| 10:00AM | 7 | lives? |
| 10:00AM | 8 | A.  Correct, yes. |
| 10:00AM | 9 | Q.  Where were you working in 2001? |
| 10:00AM | 10 | A.  I was a manager in the wireless business for a company |
| 10:00AM | 11 | called NexTel. |
| 10:00AM | 12 | Q.  Okay. |
| 10:00AM | 13 | A.  And I was also bartending on the weekends. |
| 10:00AM | 14 | Q.  I need you to keep your voice up. |
| 10:00AM | 15 | A.  I'm sorry.  I was working two jobs, wireless business and |
| 10:00AM | 16 | bartending. |
| 10:00AM | 17 | Q.  Where did you bartend? |
| 10:00AM | 18 | A.  At that time, Harry's Harbor. |
| 10:01AM | 19 | Q.  And would Mr. Bongiovanni come visit you while you worked |
| 10:01AM | 20 | at Harry's Harbor? |
| 10:01AM | 21 | A.  Yes. |
| 10:01AM | 22 | Q.  And was that a restaurant and a bar? |
| 10:01AM | 23 | A.  It was on the water, yes. |
| 10:01AM | 24 | Q.  Did you also work with a young lady there named T.O.? |
| 10:01AM | 25 | A.  Yes. |

10:01AM    1    Q.  At some point briefly, did you date Ms. T.O.?

10:01AM    2    A.  I did, yes.

10:01AM    3    Q.  At a later point in life, did you learn that she has

10:01AM    4    dating or had dated Mr. Gerace?

10:01AM    5    A.  I did, yes.

10:01AM    6    Q.  When Mr. Bongiovanni would come to Harry's Harbor, would

10:01AM    7    you and him socialize?

10:01AM    8    A.  I would be -- yes, I would serve him drinks, and we would

10:01AM    9    talk over the bar, yes.

10:01AM    10    Q.  When you weren't working, would you go out socially with

10:01AM    11    Mr. Bongiovanni?

10:01AM    12    A.  Yes.

10:01AM    13    Q.  Did you and he also join the same gym?

10:01AM    14    A.  Yes.

10:01AM    15    Q.  Would you work out together as well when you weren't both

10:01AM    16    working?

10:01AM    17    A.  Yes.

10:02AM    18    Q.  Were you being kept apprised by Mr. Bongiovanni as to the

10:02AM    19    nature of his relationship with his wife JoAnn?

10:02AM    20    A.  Yes.

10:02AM    21    Q.  Eventually, did their separation move towards divorce

10:02AM    22    proceedings?

10:02AM    23    A.  It did.

10:02AM    24    Q.  Did Mr. Bongiovanni hire a lawyer?

10:02AM    25    A.  He did.

10:02AM    1    Q.   From your own personal experience going through your own

10:02AM    2    divorce around that time, do lawyers cost money?

10:02AM    3    A.   They do.

10:02AM    4    Q.   Did you hear Mr. Bongiovanni complain about how much

10:02AM    5    money his divorce was costing him around that timeframe?

10:02AM    6    A.   Yes.

10:02AM    7    Q.   What were the kinds of things you heard him say?

10:02AM    8    A.   Child support, maintenance, he was paying maintenance,

10:02AM    9    alimony, additional expenses.  Just the whole cost of it,

10:02AM   10    just how his expenses have risen.

10:02AM   11    Q.   Was it a frequent topic of conversation?

10:02AM   12    A.   It would be, yes.

10:03AM   13    Q.   Did he make -- did he complain at all about the fact that

10:03AM   14    his ex-wife didn't work?

10:03AM   15    A.   Yes.

10:03AM   16    Q.   Or at that point, the wife he was -- JoAnn, the wife he

10:03AM   17    was divorcing?

10:03AM   18    A.   Yes.

10:03AM   19    Q.   What kinds of things did he say about that?

10:03AM   20    A.   She wasn't contributing.  He has to pay maintenance, a

10:03AM   21    higher amount of maintenance or spousal support, whatever

10:03AM   22    it's called.  The whole nut was really falling on him.  It

10:03AM   23    was --

10:03AM   24    Q.   By her not working, or her working very little, did that

10:03AM   25    increase the amount of payments he would have to make?

USA v Gerace - Selva - Tripi/Direct - 12/13/24

7

| | | |
|---|---|---|
| 10:03AM | 1 | A.  Correct. |
| 10:03AM | 2 | Q.  Was that -- was that basically what he was saying to you? |
| 10:03AM | 3 | A.  Yes. |
| 10:03AM | 4 | Q.  Did he complain about the fact that she had a master's |
| 10:03AM | 5 | degree and didn't work? |
| 10:03AM | 6 | A.  Yes. |
| 10:03AM | 7 | Q.  Was it a source of frustration, based on your |
| 10:03AM | 8 | interactions with him? |
| 10:03AM | 9 | A.  Yes. |
| 10:03AM | 10 | Q.  All right.  I want to get a little more specific about |
| 10:04AM | 11 | some of the types of things Mr. Bongiovanni talked about |
| 10:04AM | 12 | paying for during that time period, okay? |
| 10:04AM | 13 | A.  Okay. |
| 10:04AM | 14 | Q.  About how old was his daughter, Chelsea?  Was she a |
| 10:04AM | 15 | little kid? |
| 10:04AM | 16 | A.  Yes, she's the same age as my younger daughter, so she |
| 10:04AM | 17 | was maybe -- 2001?  Four, five. |
| 10:04AM | 18 | Q.  Okay.  And how long was he talking about having to pay |
| 10:04AM | 19 | for her child support until? |
| 10:04AM | 20 | A.  Well, until she was 21 or graduated college. |
| 10:04AM | 21 | Q.  Did he talk about also having to pay for her private |
| 10:04AM | 22 | school? |
| 10:04AM | 23 | A.  Yes. |
| 10:04AM | 24 | Q.  Did he talk about having to pay for her medical expenses? |
| 10:04AM | 25 | A.  Yes. |

10:04AM    1    Q.  At a point in Chelsea's life, were you aware that she had

10:04AM    2    some medical issues that required more attention?

10:04AM    3    A.  Yes, he had mentioned that, yes.  What they were, I don't

10:05AM    4    remember.

10:05AM    5    Q.  Do you remember where she was being brought for

10:05AM    6    treatments?

10:05AM    7    A.  I don't.

10:05AM    8    Q.  Okay.  While he's going through that, did Mr. Bongiovanni

10:05AM    9    have other financial obligations that you were aware of,

10:05AM   10    other things he was paying for?

10:05AM   11    A.  Yes, he did.

10:05AM   12    Q.  What did you know he had to pay for?

10:05AM   13    A.  Living expenses, truck payment, expenses for his

10:05AM   14    daughter.  I believe at that time he was -- I don't know if

10:05AM   15    it was set in stone yet, the amount that he was paying child

10:05AM   16    support and maintenance, but he was also supporting his

10:05AM   17    soon-to-be ex wife.

10:05AM   18    Q.  Did he also have a truck that he had to pay for?

10:05AM   19    A.  He did.

10:05AM   20    Q.  What kind of truck did he have at that time?

10:05AM   21    A.  It was an Escalade.

10:05AM   22    Q.  Cadillac?

10:05AM   23    A.  Yes.

10:05AM   24    Q.  In terms of his social life as a newly-single man, was he

10:06AM   25    going out more?

| | | |
|---|---|---|
| 10:06AM | 1 | A.  He was. |
| 10:06AM | 2 | Q.  Does going out to bars and restaurants cost money, in |
| 10:06AM | 3 | your life experience? |
| 10:06AM | 4 | A.  It does. |
| 10:06AM | 5 | Q.  While you were going through that, did you go out with |
| 10:06AM | 6 | him? |
| 10:06AM | 7 | A.  I did. |
| 10:06AM | 8 | Q.  Eventually, did you and Mr. Bongiovanni use cocaine |
| 10:06AM | 9 | together? |
| 10:06AM | 10 | A.  We have. |
| 10:06AM | 11 | Q.  And did he do that with you while he was a DEA agent? |
| 10:06AM | 12 | A.  He did. |
| 10:06AM | 13 | **MR. TRIPI:**  Ms. Champoux, if we can please pull up |
| 10:06AM | 14 | Government Exhibit 127?  This is in evidence. |
| 10:06AM | 15 | **BY MR. TRIPI:** |
| 10:06AM | 16 | Q.  Okay.  Just for a moment, I'm going to -- I know you see |
| 10:06AM | 17 | that on the screen.  I'm going to ask some questions before |
| 10:06AM | 18 | we turn to the photo, okay? |
| 10:06AM | 19 | A.  Okay. |
| 10:06AM | 20 | Q.  Mr. Selva? |
| 10:06AM | 21 | A.  Yeah, I'm sorry. |
| 10:06AM | 22 | Q.  Do you know an individual named Tom Doctor? |
| 10:07AM | 23 | A.  Yes. |
| 10:07AM | 24 | Q.  What was Tom Doctor's relationship with Joe Bongiovanni? |
| 10:07AM | 25 | A.  They worked together.  Tom was a part of the DEA task |

| | | |
|---|---|---|
| 10:07AM | 1 | force. |
| 10:07AM | 2 | Q.  So he was a member of law enforcement? |
| 10:07AM | 3 | A.  He was. |
| 10:07AM | 4 | Q.  Was he also a Buffalo police detective? |
| 10:07AM | 5 | A.  He was. |
| 10:07AM | 6 | Q.  Did you know specifically if he was a narcotics detective |
| 10:07AM | 7 | at the time? |
| 10:07AM | 8 | A.  I did. |
| 10:07AM | 9 | Q.  Have you done coke with both Mr. Doctor and |
| 10:07AM | 10 | Mr. Bongiovanni? |
| 10:07AM | 11 | A.  Yes. |
| 10:07AM | 12 | Q.  Where did you do that with them? |
| 10:07AM | 13 | A.  At a cottage in Angola, and -- |
| 10:07AM | 14 | Q.  Is that -- |
| 10:07AM | 15 | A.  -- and Cabo San Lucas. |
| 10:07AM | 16 | Q.  We'll get to Cabo, but I want to stick with the cottage |
| 10:07AM | 17 | for a moment.  Who had a cottage? |
| 10:07AM | 18 | A.  Mr. Doctor. |
| 10:07AM | 19 | Q.  And where is Angola? |
| 10:07AM | 20 | A.  It's along the -- it's going south, I believe, it's |
| 10:08AM | 21 | outside of Buffalo.  There's bars and cottages, summer |
| 10:08AM | 22 | cottages up there, on the water. |
| 10:08AM | 23 | Q.  In proximity to the cottages, is there a bar called |
| 10:08AM | 24 | Mickey Rats? |
| 10:08AM | 25 | A.  There is, yes. |

| | | |
|---|---|---|
| 10:08AM | 1 | Q.  Have you been to Mr. Doctor's cottage? |
| 10:08AM | 2 | A.  A few times, yes. |
| 10:08AM | 3 | Q.  Have you been to the bar Mickey Rats? |
| 10:08AM | 4 | A.  Yes. |
| 10:08AM | 5 | Q.  When you would be at Mr. Doctor's cottage and at the bar |
| 10:08AM | 6 | Mickey Rats, was that with Mr. Bongiovanni? |
| 10:08AM | 7 | A.  Yes. |
| 10:08AM | 8 | Q.  Was it in that context that at the cottage or in the |
| 10:08AM | 9 | Mickey Rats area you used cocaine with them both? |
| 10:08AM | 10 | A.  That's correct. |
| 10:08AM | 11 | Q.  Now, looking at Exhibit 127, you're not in that |
| 10:08AM | 12 | particular photo, correct? |
| 10:08AM | 13 | A.  No, I'm not. |
| 10:08AM | 14 | Q.  Do you see Mr. Bongiovanni? |
| 10:08AM | 15 | A.  I do. |
| 10:08AM | 16 | Q.  Can you tap the screen and show the jury where he's |
| 10:08AM | 17 | standing?  Okay. |
| 10:09AM | 18 | **MR. TRIPI:**  May the record reflect there's a pre-made |
| 10:09AM | 19 | circle there already on the individual in the back row far |
| 10:09AM | 20 | right blue shirt, the witness placed a temporary mark on that |
| 10:09AM | 21 | individual. |
| 10:09AM | 22 | **BY MR. TRIPI:** |
| 10:09AM | 23 | Q.  Do you see Mr. Doctor?  Can you tap the screen and show |
| 10:09AM | 24 | us where he is? |
| 10:09AM | 25 | **MR. TRIPI:**  May the record reflect there's a pre -- |

| | | |
|---|---|---|
| 10:09AM | 1 | there's a blue circle around that individual's head already on |
| 10:09AM | 2 | the photo, but this witness has marked a temporary red dot on |
| 10:09AM | 3 | the individual sort of third from the left of the photo |
| 10:09AM | 4 | wearing no shirt, with a beer bottle up to his lips, and |
| 10:09AM | 5 | sunglasses on. |
| 10:09AM | 6 | **THE WITNESS:**  Correct. |
| 10:09AM | 7 | **BY MR. TRIPI:** |
| 10:09AM | 8 | Q.  Is that a fair description? |
| 10:09AM | 9 | A.  It is. |
| 10:09AM | 10 | Q.  Okay.  And do you see Mr. Gerace in that photo? |
| 10:09AM | 11 | A.  I do, yes. |
| 10:09AM | 12 | Q.  Can you tap the screen and show us where he is? |
| 10:10AM | 13 | **MR. TRIPI:**  May the record reflect he put a temporary |
| 10:10AM | 14 | mark on the individual, front row, second male from right, |
| 10:10AM | 15 | standing slightly in front of the individual in the blue shirt |
| 10:10AM | 16 | that the witness has indicated is Mr. Bongiovanni. |
| 10:10AM | 17 | **BY MR. TRIPI:** |
| 10:10AM | 18 | Q.  Is that a good description, do you think? |
| 10:10AM | 19 | A.  Yes. |
| 10:10AM | 20 | Q.  Okay.  Were you aware that the defendant, in addition to |
| 10:10AM | 21 | knowing Mr. Bongiovanni, also knew Tom Doctor? |
| 10:10AM | 22 | A.  Yes. |
| 10:10AM | 23 | Q.  How long had you known Tom Doctor in life? |
| 10:10AM | 24 | A.  Since my 20s, late 20s. |
| 10:10AM | 25 | Q.  So since before -- did you and Mr. Bongiovanni know |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

13

10:10AM    1    Mr. Doctor from before he was in law enforcement?

10:10AM    2    A.  Yes.

10:10AM    3    Q.  On some level, would it be fair to say that you,

10:10AM    4    Mr. Bongiovanni, this defendant, Mr. Doctor, all met in the

10:10AM    5    timeframe of growing up in the Buffalo area?

10:10AM    6    A.  Within that timeframe, sure.

10:11AM    7    Q.  Okay.  All right.  Now you indicated Angola was one

10:11AM    8    location where you had used cocaine with Mr. Doctor and

10:11AM    9    Mr. Bongiovanni.  We'll talk about it in more detail later.

10:11AM    10    But another location was in Cabo, you said?

10:11AM    11    A.  Yes.

10:11AM    12    Q.  Cabo San Lucas, is that what you're referencing?

10:11AM    13    A.  That's correct.

10:11AM    14    Q.  What -- was that in about 2015?

10:11AM    15    A.  It was.

10:11AM    16    Q.  What was happening there?

10:11AM    17    A.  It was Mr. Bongiovanni's wedding.  It was a destination

10:11AM    18    wedding.

10:11AM    19    Q.  And was Mr. Doctor there?

10:11AM    20    A.  He was.

10:11AM    21    Q.  Were you there?

10:11AM    22    A.  Yes.

10:11AM    23    Q.  Was Mr. Bongiovanni there?

10:11AM    24    A.  Yes.

10:11AM    25    Q.  Was another individual named Tom Napoli there?

USA v Gerace - Selva - Tripi/Direct - 12/13/24

14

| | | |
|---|---|---|
| 10:11AM | 1 | A.  Yes. |
| 10:11AM | 2 | Q.  Okay. |
| 10:11AM | 3 | **MR. TRIPI:**  Ms. Champoux, can we pull up Exhibit 126, |
| 10:11AM | 4 | please? |
| 10:11AM | 5 | **BY MR. TRIPI:** |
| 10:12AM | 6 | Q.  Okay.  Do you see Exhibit 126 on the screen here?  I'm |
| 10:12AM | 7 | just going to get rid of those red dots that were there. |
| 10:12AM | 8 | A.  Yes. |
| 10:12AM | 9 | Q.  Do you see Mr. Bongiovanni in this photo? |
| 10:12AM | 10 | A.  I do. |
| 10:12AM | 11 | Q.  Can you tap the screen and show us where he is? |
| 10:12AM | 12 | **MR. TRIPI:**  May the record reflect the witness placed |
| 10:12AM | 13 | a temporary red dot on the male in this picture that is third |
| 10:12AM | 14 | from the right, moving right to left. |
| 10:12AM | 15 | **BY MR. TRIPI:** |
| 10:12AM | 16 | Q.  And do you see Tom Napoli in this picture? |
| 10:12AM | 17 | A.  Yes. |
| 10:12AM | 18 | Q.  Can you place a red dot on him? |
| 10:12AM | 19 | **MR. TRIPI:**  May the record reflect the witness placed |
| 10:12AM | 20 | a temporary red dot sort of right in the middle of the face of |
| 10:12AM | 21 | an individual he's indicated is Tom Napoli, who the second |
| 10:12AM | 22 | going right to left in the photo. |
| 10:12AM | 23 | **BY MR. TRIPI:** |
| 10:12AM | 24 | Q.  Is Mr. Napoli standing right next to Mr. Bongiovanni in |
| 10:12AM | 25 | that picture? |

10:12AM    1    A.  Yes.

10:12AM    2    Q.  And now in Cabo San Lucas, who were the males present

10:13AM    3    when you guys were using cocaine at the destination wedding?

10:13AM    4    A.  Myself, Tom, Mr. Bongiovanni, Tom Doctor, and -- that's

10:13AM    5    it.

10:13AM    6    Q.  Okay.  So you, Mr. Bongiovanni, Tom Doctor, and Tom

10:13AM    7    Napoli?

10:13AM    8    A.  Yes.

10:13AM    9    Q.  Is that right?

10:13AM    10   A.  That's correct.

10:13AM    11   Q.  Is that in a hotel room?

10:13AM    12   A.  Yes.

10:13AM    13   Q.  Was that sort of before a night of partying and drinking?

10:13AM    14   A.  Yes.

10:13AM    15        **MR. TRIPI:**  Okay.  So can we put those 126 and 127

10:13AM    16   next to each other.  Can we zoom in on 127?  And can we -- is

10:13AM    17   there any way we can split the screen, or no?

10:13AM    18        Too large?  Okay.  That's fine.  Okay.  We'll leave

10:13AM    19   it at that.  We can take those down.

10:13AM    20        **BY MR. TRIPI:**

10:14AM    21   Q.  By 2004, though, was Mr. Bongiovanni -- obviously, he was

10:14AM    22   still working for the DEA; is that right?

10:14AM    23   A.  Yes.

10:14AM    24   Q.  Did he start dating someone new?

10:14AM    25   A.  That, yes, he did.

10:14AM    1    Q.  Okay.

10:14AM    2    A.  At that time.

10:14AM    3        **MR. TRIPI:**  Actually, could we pull up -- I forgot to

10:14AM    4    do one thing.  Pull up 126, 127, and 490A together.

10:14AM    5        Okay.  This isn't going to work right now.

10:14AM    6        Let's go to 490 before I move on, sorry about that.

10:14AM    7    They get too small.  Can we zoom in on just the photo portion?

10:14AM    8        **BY MR. TRIPI:**

10:14AM    9    Q.  In 490A, do you see Tom Napoli?

10:14AM    10   A.  I do, yes.

10:14AM    11   Q.  Could you tap the screen and show the jury where he is?

10:15AM    12       **MR. TRIPI:**  Okay.  May the record reflect the witness

10:15AM    13   placed a temporary red mark on the male who is fourth from the

10:15AM    14   left, going left to right in the photo.

10:15AM    15       **BY MR. TRIPI:**

10:15AM    16   Q.  Do you see the defendant in that photo?

10:15AM    17   A.  Yes.

10:15AM    18   Q.  Can you tap the screen and show us where he is?

10:15AM    19       **MR. TRIPI:**  May the record reflect the witness has

10:15AM    20   placed a temporary red mark on the defendant, who's about in

10:15AM    21   the middle of the picture next to Mr. Napoli.  He's the fourth

10:15AM    22   person as you're going right to left.

10:15AM    23       **BY MR. TRIPI:**

10:15AM    24   Q.  Do you see T.O. in that photo?

10:15AM    25   A.  I do, yes.

10:15AM    1    Q.  Can you tap the screen and show us where she is?

10:15AM    2         **MR. TRIPI:**  May the record reflect the witness has

10:15AM    3    placed a temporary red dot on the person who's third, going

10:15AM    4    right to left across the photo.

10:15AM    5         **BY MR. TRIPI:**

10:15AM    6    Q.  Do you see Mr. Bongiovanni in that photo?

10:15AM    7    A.  Yes.

10:15AM    8    Q.  Can you tap the screen and show the jury where he is?

10:15AM    9         **MR. TRIPI:**  May the record reflect he's the person

10:15AM   10    standing second from right to left in the photo.

10:15AM   11         **BY MR. TRIPI:**

10:15AM   12    Q.  And where is Lindsay, Mr. Bongiovanni's eventual wife?

10:16AM   13    A.  She's right next to him.

10:16AM   14         **MR. TRIPI:**  Okay.  We can take that down.

10:16AM   15         Can we pull up Exhibit 426-1 please?

10:16AM   16         These are all in evidence, Judge.

10:16AM   17         **BY MR. TRIPI:**

10:16AM   18    Q.  Okay.  Another photo, do you recognize the people in this

10:16AM   19    photo?

10:16AM   20    A.  Three of them, yes.

10:16AM   21    Q.  Who are the three you recognize?

10:16AM   22    A.  Mr. Gerace, Mr. Bongiovanni, and I believe that's

10:16AM   23    Mr. Bongiovanni's ex-girlfriend, M.U., I'm not sure.

10:16AM   24    Q.  Okay.  Mr. Bongiovanni's on the far left of that photo?

10:16AM   25    A.  Yes.

| | | |
|---|---|---|
| 10:16AM | 1 | Q.  Is the defendant on the far right in the green shirt? |
| 10:16AM | 2 | A.  Yes. |
| 10:16AM | 3 | Q.  And is Mr. Bongiovanni and his girlfriend, who you |
| 10:17AM | 4 | think's name is M.U., next to him in the photo in the white |
| 10:17AM | 5 | shirt? |
| 10:17AM | 6 | A.  Yes. |
| 10:17AM | 7 | Q.  In about the year 2004, after Mr. Bongiovanni's divorce |
| 10:17AM | 8 | proceedings were underway, did he start dating a woman named |
| 10:17AM | 9 | M.U.? |
| 10:17AM | 10 | A.  Yes. |
| 10:17AM | 11 | Q.  Is that the M.U. that you're referencing in the photo? |
| 10:17AM | 12 | A.  It looks like her, yes. |
| 10:17AM | 13 | Q.  It's been a long time, right? |
| 10:17AM | 14 | A.  Yes, it's been a long time. |
| 10:17AM | 15 | **MR. TRIPI:**  Okay.  We can take that down. |
| 10:17AM | 16 | **BY MR. TRIPI:** |
| 10:17AM | 17 | Q.  As the defendant -- withdrawn. |
| 10:17AM | 18 | As Mr. Bongiovanni started dating M.U., was he spending |
| 10:17AM | 19 | money on her as well? |
| 10:17AM | 20 | A.  Yes. |
| 10:17AM | 21 | Q.  What was their social life like? |
| 10:17AM | 22 | A.  Dinners.  They traveled.  A lot of -- lot of gifts, I |
| 10:17AM | 23 | remember him telling me about. |
| 10:17AM | 24 | Q.  At a point did they get engaged? |
| 10:17AM | 25 | A.  They did. |

10:17AM  1    Q.  Did Mr. Bongiovanni buy a wedding ring?

10:18AM  2    A.  Yes, he did.

10:18AM  3    Q.  Ultimately they didn't get married, right?

10:18AM  4    A.  No, they called it off.

10:18AM  5    Q.  Did he date Ms. M.U. roughly from 2004 to 2009; is that a

10:18AM  6    decent estimate?

10:18AM  7    A.  Yeah, about five years.

10:18AM  8    Q.  I'll get into this timeline a little bit more in a

10:18AM  9    moment, but jumping ready just slightly, after Ms. M.U., did

10:18AM  10   Mr. Bongiovanni start dating his current wife, Lindsay?

10:18AM  11   A.  Not immediately after, but yes, he did, yes.

10:18AM  12   Q.  So his next relationship with someone who you can know

10:18AM  13   the name of is -- is his wife Lindsay?

10:18AM  14   A.  Yes.

10:18AM  15   Q.  At that point, did Mr. Bongiovanni take on any financial

10:18AM  16   obligations related to his then-girlfriend Lindsay in around

10:19AM  17   the year 2009, 2010?

10:19AM  18   A.  He did, yes.

10:19AM  19   Q.  And what were those?

10:19AM  20   A.  He owned a double in North Buffalo on Lovering, and she

10:19AM  21   was actually his tenant.  And then when they started dating,

10:19AM  22   she moved in with him.  And she had a son.  And -- enrolled

10:19AM  23   in nursing school.  And her focus was just going to school,

10:19AM  24   and he would take care of all the living expenses.

10:19AM  25   Q.  So basically, to sum it up, he started paying all of

| | | |
|---|---|---|
| 10:19AM | 1 | Lindsay's bills? |
| 10:19AM | 2 | A.  Correct. |
| 10:19AM | 3 | Q.  And her son's living expenses? |
| 10:19AM | 4 | A.  No, I don't believe so.  The father paid child support. |
| 10:19AM | 5 | Q.  Did they -- did son live with Bongiovanni?, is the |
| 10:19AM | 6 | question. |
| 10:19AM | 7 | A.  Yes. |
| 10:19AM | 8 | Q.  Okay. |
| 10:19AM | 9 | A.  Yes. |
| 10:19AM | 10 | Q.  And did he pay for her schooling, as far as you |
| 10:19AM | 11 | understood it? |
| 10:19AM | 12 | A.  As far as I understand, he was helping her with expenses. |
| 10:19AM | 13 | Q.  Did that include school? |
| 10:20AM | 14 | A.  Yes.  At that time.  Yes. |
| 10:20AM | 15 | Q.  Okay.  When you would interact with Mr. Bongiovanni, as |
| 10:20AM | 16 | such good friends, I'm sure you talked about a number of |
| 10:20AM | 17 | different things -- |
| 10:20AM | 18 | A.  Correct. |
| 10:20AM | 19 | Q.  -- in life, right? |
| 10:20AM | 20 | A.  Yes. |
| 10:20AM | 21 | Q.  In those discussions that you'd have with him, did he |
| 10:20AM | 22 | ever talk about the concept of loyalty to his friends? |
| 10:20AM | 23 | A.  He did, yes. |
| 10:20AM | 24 | Q.  Based on your discussions with him, like, what kinds of |
| 10:20AM | 25 | things did you hear him say about loyalty? |

| | | |
|---|---|---|
| 10:20AM | 1 | A.  Just integrity.  You know, trust, trustworthy.  Worried |
| 10:20AM | 2 | if people were trying to hit on his girlfriend.  That type |
| 10:20AM | 3 | thing. |
| 10:20AM | 4 | Q.  Did he talk about being loyal to friends? |
| 10:20AM | 5 | A.  Yes. |
| 10:20AM | 6 | Q.  What kinds of things do you remember saying about that? |
| 10:21AM | 7 | A.  Just being there for him.  You know, just being honest. |
| 10:21AM | 8 | Having someone's back. |
| 10:21AM | 9 | Q.  Okay.  Is that a phrase he's used with you before? |
| 10:21AM | 10 | A.  Yes. |
| 10:21AM | 11 | Q.  And he's used that phrase, "having your back," in the |
| 10:21AM | 12 | context of you selling drugs; is that right? |
| 10:21AM | 13 | **MR. SOEHNLEIN:**  Objection. |
| 10:21AM | 14 | **THE COURT:**  Basis? |
| 10:21AM | 15 | **MR. SOEHNLEIN:**  I think it runs afoul of -- |
| 10:21AM | 16 | **MR. TRIPI:**  I don't think so at all. |
| 10:21AM | 17 | **THE COURT:**  No.  No, no.  Overruled. |
| 10:21AM | 18 | **THE WITNESS:**  That's correct. |
| 10:21AM | 19 | **BY MR. TRIPI:** |
| 10:21AM | 20 | Q.  When he knew you were selling drugs, he said he'd have |
| 10:21AM | 21 | your back? |
| 10:21AM | 22 | A.  That's correct. |
| 10:21AM | 23 | Q.  Was that him being loyal? |
| 10:21AM | 24 | A.  Yes, sir. |
| 10:21AM | 25 | Q.  That's a different type of integrity than a DEA is |

10:21AM   1   supposed to have; would you agree?

10:21AM   2   A.   Yes.

10:21AM   3   Q.   Okay.  So when you say "integrity," you mean loyalty to

10:21AM   4   friends?

10:21AM   5   A.   That's what I meant.

10:21AM   6   Q.   Were most of Mr. Bongiovanni's friends ones like you that

10:21AM   7   he grew up with in the neighborhood and of Italian descent?

10:22AM   8   A.   Yes.

10:22AM   9         **MR. TRIPI:**  Judge, I have another area I'm going to

10:22AM  10   go into.  I do think I need to come up before I do.

10:22AM  11         **THE COURT:**  Okay.  Come up.

10:22AM  12         (Sidebar discussion held on the record.)

10:22AM  13         **MR. TRIPI:**  So I, Judge, I -- I was going to ask

10:22AM  14   about discussions about race that he had had with

10:22AM  15   Mr. Bongiovanni.

10:22AM  16         **THE COURT:**  Race?

10:22AM  17         **MR. TRIPI:**  Yeah.  You didn't let it in with the

10:22AM  18   Bongiovanni trial because the of 401/403 balancing.  I think

10:22AM  19   that balance weighs differently here.

10:22AM  20         They have a 302 where Mr. Selva has indicated he's

10:22AM  21   heard Mr. Bongiovanni say the "N" word before in the context

10:22AM  22   of, sort of, complaints about work.  And I think it's

10:22AM  23   important here because they chose to cross-examine Anthony

10:22AM  24   Casullo after having this 302 from Selva, they chose to

10:22AM  25   cross-examination Anthony Casullo about whether anyone else he

10:23AM  1   worked with has talked about Mr. Bongiovanni saying the "N"

10:23AM  2   word.

10:23AM  3       And so once they chose to cross-examine someone else

10:23AM  4   about whether the absence of Mr. Bongiovanni using that

10:23AM  5   language, I think it's fair for us to ask a question to

10:23AM  6   another witness who has heard that type of language to balance

10:23AM  7   out that type of cross-examination.

10:23AM  8       And so they had the 302 at -- long ago, while they

10:23AM  9   were crossing Casullo.  And so that's why I want to go into

10:23AM  10  this area.  I think the whole 401/403 balancing is much

10:23AM  11  different than the Bongiovanni trial.

10:23AM  12      **THE COURT:**  Did you -- did you cross-examine

10:23AM  13  Mr. Casullo on that?

10:23AM  14      **MR. SOEHNLEIN:**  I don't know, did you?  He did the --

10:23AM  15      **MR. FOTI:**  I cross-examined him.

10:23AM  16      **THE COURT:**  Did you cross-examine him on --

10:23AM  17      **MR. TRIPI:**  The absence of hearing him say that

10:23AM  18  anyone else saying reporting him saying the "N" word.

10:23AM  19      **THE COURT:**  Whether anyone else reported Bongiovanni

10:23AM  20  saying the "N" word.  I don't remember that question.

10:23AM  21      **MR. FOTI:**  I -- I don't remember.

10:23AM  22      **MR. COOPER:**  Either Kasprzyk or Casullo.  A question

10:24AM  23  might have -- it might have been Kasprzyk.  But the question

10:24AM  24  was asked, you never heard him use racist language, that

10:24AM  25  100,000 percent was asked on cross-examination, either

10:24AM  1    Kasprzyk or Casullo.  And it couldn't -- it couldn't -- I

10:24AM  2    don't think could have been Casullo, because he did hear him

10:24AM  3    use racist language.

10:24AM  4         **MR. FOTI:**  I -- I don't remember it.  But candidly, I

10:24AM  5    may have asked it in context of having heard him use racist

10:24AM  6    language with law enforcement, within law enforcement.

10:24AM  7         **THE COURT:**  So why --

10:24AM  8         **MR. TRIPI:**  Yeah, that's what --

10:24AM  9         **THE COURT:**  -- so why wouldn't you have opened the

10:24AM  10   door for him asking this witness whether he ever heard

10:24AM  11   Bongiovanni use the "N" word.

10:24AM  12        **MR. FOTI:**  Well, if I did ask it, Judge, I was asking

10:24AM  13   it in terms of whether like -- I was trying to establish that

10:24AM  14   it's not likely that Mr. Bongiovanni would have used that type

10:24AM  15   of language to another -- another member of law enforcement,

10:24AM  16   particularly one that he's not close with.

10:24AM  17        What we're dealing with is a conversation that they

10:24AM  18   would try to introduce related to language that he used with a

10:24AM  19   close friend.

10:24AM  20        **THE COURT:**  Well, yeah, but you can cross-examine on

10:24AM  21   it.

10:24AM  22        **MR. SOEHNLEIN:**  I'm sorry, Your Honor, just -- my

10:25AM  23   understanding is what they're trying to show is that

10:25AM  24   Bongiovanni has some affinity for people of Italian descent --

10:25AM  25        **THE COURT:**  Right.

10:25AM 1      **MR. SOEHNLEIN:** -- and has some desire to protect his

10:25AM 2   friends, and some willingness to not follow DEA protocols or

10:25AM 3   DEA rules.  Which would -- which would not be something that

10:25AM 4   Selva would be privy to.  He was never in the DEA, he was

10:25AM 5   never an DEA officer, and Kasprzyk and Casullo were.  Okay?

10:25AM 6   And that's their import.

10:25AM 7          To the extent that that cross happened, I don't

10:25AM 8   recall it either.  But to the extent that it did, the import

10:25AM 9   is here he is at the DEA expressing a view that's

10:25AM 10  diametrically opposed to the law enforcement regime's mission.

10:25AM 11  Okay?

10:25AM 12     **THE COURT:**  Okay.

10:25AM 13     **MR. SOEHNLEIN:**  Selva is not privy to or part of the

10:25AM 14  DEA.  He doesn't know -- I -- I -- even if Bongiovanni's

10:25AM 15  expressing racist views outside the DEA, there's absolutely no

10:26AM 16  evidence that influenced the way he would have interacted

10:26AM 17  within the DEA.

10:26AM 18         The prejudice, however, is clear and extreme, and

10:26AM 19  almost incurable, you know, given the fact that you have

10:26AM 20  people --

10:26AM 21     **THE COURT:**  The prejudice -- the prejudice to Gerace

10:26AM 22  is clear?  Explain the prejudice to Gerace.

10:26AM 23     **MR. SOEHNLEIN:**  The prejudice to Gerace comes from

10:26AM 24  the fact that they're trying to -- the entire -- the entirety

10:26AM 25  of their direct exam on Wednesday sought to establish the

USA v Gerace - Selva - Tripi/Direct - 12/13/24

26

10:26AM   1   close relationship between Bongiovanni and Gerace, and that's

10:26AM   2   something that's been going on throughout the trial.

10:26AM   3        The very first exhibit they introduced was a

10:26AM   4   photograph from 2004 with Bongiovanni and Gerace, that's the

10:26AM   5   theme, that's part of the case.  They want the jurors to

10:26AM   6   believe that, in essence, Bongiovanni and Gerace are one and

10:26AM   7   the same and that, in particular, the racist comment from John

10:26AM   8   Bongiovanni, it -- not only is it highly prejudicial, but we

10:26AM   9   know that it's simply -- it's not true.

10:26AM   10       There's no evidence that Gerace has used racist

10:26AM   11  language.  And that's certainly not relevant to any of the

10:27AM   12  charges that he faces in this indictment.

10:27AM   13       And, so, I think the prejudice is very, very high,

10:27AM   14  while the probative value is extremely low.

10:27AM   15       **MR. COOPER:**  Judge, can I jump in on that?

10:27AM   16       So the reason that the cross was done, the question

10:27AM   17  was asked did you ever hear Bongiovanni use racist language,

10:27AM   18  was to attack Casullo's credibility.  That's why that question

10:27AM   19  gets asked.  Because Tony Casullo testified he said these

10:27AM   20  racist things to me.

10:27AM   21       So to cut against Casullo's credibility, they say to

10:27AM   22  a different witness:  You never heard him say racist language,

10:27AM   23  did you?  And that witness said no.

10:27AM   24       The government, I believe, has the ability -- well, I

10:27AM   25  know we have the ability, and I believe we have the right to

10:27AM  1   rebut that cross-examine that they chose to go down that road

10:27AM  2   by saying to a different witness:  You've heard him say racist

10:27AM  3   stuff before, right?  And that witness will say yes.

10:27AM  4       So they chose to say Tony Casullo's not credible

10:27AM  5   because nobody else ever heard Bongiovanni -- that creates an

10:27AM  6   impression in the jury's mind.

10:27AM  7       **THE COURT:**  You get to ask him simply:  Have you ever

10:28AM  8   heard him use the "N" word?  That's all.

10:28AM  9       **MR. SOEHNLEIN:**  Your Honor, may I make a suggestion?

10:28AM  10      **MR. TRIPI:**  Can I just ask one followup, Eric?  Can I

10:28AM  11  contextualize it, because it was a very specific context.

10:28AM  12      It was Bongiovanni sort of complaining about

10:28AM  13  situations at work.  So have you heard him about complain

10:28AM  14  about situations at work, like an arrest situation, you know,

10:28AM  15  and then he would get kind of elevated and be like that.

10:28AM  16      **THE COURT:**  What's your suggestion?

10:28AM  17      **MR. SOEHNLEIN:**  Can he just ask him have you ever

10:28AM  18  heard him use language referring to race, rather than the

10:28AM  19  specific word.

10:28AM  20      **MR. TRIPI:**  That's too watered down.  It's not

10:28AM  21  realistic.

10:28AM  22      **MR. COOPER:**  The corroboration comes -- and the

10:28AM  23  corroboration comes from the word that was used, right?

10:28AM  24      So Tony Casullo says he used the "N" word.

10:28AM  25      **THE COURT:**  I think you can ask that.  I think you

| | | |
|---|---|---|
| 10:28AM | 1 | can ask that.  And you can ask it in the context for one |
| 10:28AM | 2 | question. |
| 10:28AM | 3 | **MR. TRIPI:**  Yeah, I got you. |
| 10:28AM | 4 | **THE COURT:**  One question. |
| 10:28AM | 5 | (End of sidebar discussion.) |
| 10:28AM | 6 | **MR. TRIPI:**  Can we go up one more second, Judge?  I |
| 10:29AM | 7 | forgot. |
| 10:29AM | 8 | (Sidebar discussion held on the record.) |
| 10:29AM | 9 | **MR. TRIPI:**  Judge, I would even ask for you to give a |
| 10:29AM | 10 | limiting instruction, that it's only as to Mr. Bongiovanni's |
| 10:29AM | 11 | state of mind just to further cabin the -- any prejudice, if |
| 10:29AM | 12 | they want. |
| 10:29AM | 13 | **THE COURT:**  What do you mean? |
| 10:29AM | 14 | **MR. TRIPI:**  If Mr. Bongiovanni has ever said the "N" |
| 10:29AM | 15 | word, and the answer is yes, you can give a limiting |
| 10:29AM | 16 | instruction and say that evidence is only admitted as it |
| 10:29AM | 17 | relates to Mr. Bongiovanni's state of mind, it's not -- you |
| 10:29AM | 18 | know, if they want something like that. |
| 10:29AM | 19 | **THE COURT:**  You can think about it. |
| 10:29AM | 20 | **MR. TRIPI:**  Yeah, I just thought of it. |
| 10:29AM | 21 | **MR. SOEHNLEIN:**  Well, I -- but I want to think about |
| 10:29AM | 22 | it right now.  When would you give the limiting instruction if |
| 10:29AM | 23 | we ask for it?  Would you give it during the charge or you |
| 10:29AM | 24 | would give it -- |
| 10:29AM | 25 | **THE COURT:**  Right now. |

| | | |
|---|---|---|
| 10:29AM | 1 | **MR. SOEHNLEIN:**  Can we just have one second then? |
| 10:29AM | 2 | **THE COURT:**  Yeah. |
| 10:29AM | 3 | **MR. TRIPI:**  And, Judge, obviously it would still be |
| 10:29AM | 4 | argued that him stating it corroborates Casullo, but in terms |
| 10:29AM | 5 | of -- |
| 10:29AM | 6 | **THE COURT:**  I understand.  But this relates only to |
| 10:29AM | 7 | Mr. Bongiovanni and Mr. Bongiovanni's state of mind, not |
| 10:30AM | 8 | Mr. Gerace.  It has nothing to do with Mr. Gerace. |
| 10:30AM | 9 | **MR. COOPER:**  That's fine. |
| 10:30AM | 10 | **MR. SOEHNLEIN:**  We don't want it. |
| 10:30AM | 11 | **THE COURT:**  You don't want it?  Okay. |
| 10:30AM | 12 | (End of sidebar discussion.) |
| 10:30AM | 13 | **MR. TRIPI:**  I thought we broke the huddle early, |
| 10:30AM | 14 | Judge. |
| 10:30AM | 15 | **BY MR. TRIPI:** |
| 10:30AM | 16 | Q.  Okay.  I want to just ask you a couple more questions |
| 10:30AM | 17 | about, sort of, things you discussed with Mr. Bongiovanni. |
| 10:30AM | 18 | Just limit your answers to yes or no, okay? |
| 10:30AM | 19 | A.  Okay. |
| 10:30AM | 20 | Q.  When you would talk with Bongiovanni, were there times |
| 10:30AM | 21 | when he would tell stories about work and express frustration |
| 10:30AM | 22 | about people he's arrested? |
| 10:30AM | 23 | A.  Yes. |
| 10:30AM | 24 | Q.  In that context, have you heard him use the "N" word to |
| 10:30AM | 25 | describe black people? |

| | | |
|---|---|---|
| 10:30AM | 1 | A.  Not that I recall. |
| 10:31AM | 2 | Q.  Have you heard him use the "N" word to describe black |
| 10:31AM | 3 | people? |
| 10:31AM | 4 | A.  Not that I recall, no. |
| 10:31AM | 5 | **MR. TRIPI:**  Okay.  Give me a moment. |
| 10:32AM | 6 | **MR. FOTI:**  Judge, can we approach quickly? |
| 10:32AM | 7 | **THE COURT:**  Sure, come on up. |
| 10:32AM | 8 | (Sidebar discussion held on the record.) |
| 10:32AM | 9 | **MR. FOTI:**  I think if a witness says I don't recall |
| 10:32AM | 10 | that, it's not the same as saying I don't remember whether he |
| 10:32AM | 11 | did or didn't. |
| 10:32AM | 12 | I think they're about to refresh recollection on |
| 10:32AM | 13 | something that's extremely prejudicial.  The answer he gave |
| 10:32AM | 14 | was a no. |
| 10:32AM | 15 | **MR. TRIPI:**  It was I don't recall that.  And he |
| 10:32AM | 16 | said -- he said it in a 302 in August, August 18th, 2024. |
| 10:32AM | 17 | And he said -- Selva stated Bongiovanni used racial |
| 10:32AM | 18 | slurs in conversation with Selva. |
| 10:32AM | 19 | **THE COURT:**  Racial slurs? |
| 10:32AM | 20 | **MR. TRIPI:**  And specifically referred to black |
| 10:32AM | 21 | individuals as "N" and Hispanic as "S."  And he stated those |
| 10:32AM | 22 | slurs -- bottom of 1 and going to page 2. |
| 10:33AM | 23 | **MR. SOEHNLEIN:**  What's the date on that one? |
| 10:33AM | 24 | **MR. TRIPI:**  August 18th, it's A I. |
| 10:33AM | 25 | **MR. SOEHNLEIN:**  A I? |

10:33AM   1        THE COURT:  Have you heard him use the "N" word to

10:33AM   2   describe black people?  Not that I recall, no.

10:33AM   3        MR. TRIPI:  All right.  Well, now I'm going to

10:33AM   4   impeach him under 607.  I can impeach him with an oral

10:33AM   5   statement.  It doesn't come in substantively like a transcript

10:33AM   6   would, but I can impeach him with an inconsistent statement.

10:33AM   7        THE COURT:  What part of it is inconsistent?

10:34AM   8        MR. TRIPI:  His inconsistent statement would be he

10:34AM   9   has heard it, and he has heard him say it.  And so --

10:34AM   10        THE COURT:  What -- where is the prior inconsistent

10:34AM   11   statement?  (Inaudible).

10:34AM   12        MR. TRIPI:  Yeah.  When you -- when you deny knowing

10:34AM   13   something --

10:34AM   14        THE COURT:  Right.

10:34AM   15        MR. TRIPI:  -- that's an inconsistent statement.

10:34AM   16        THE COURT:  You can ask him did you tell the police,

10:34AM   17   and if he says no, you're stuck with it.

10:34AM   18        MR. TRIPI:  I'm going to ask him more questions

10:34AM   19   around this for sure.

10:34AM   20        THE COURT:  You're stuck with it.

10:34AM   21        MR. TRIPI:  Yeah.

10:34AM   22        (End of sidebar discussion.)

10:34AM   23        BY MR. TRIPI:

10:34AM   24   Q.  Now, Mr. Selva, you've testified in two prior proceedings

10:34AM   25   this year, correct?

10:34AM   1   A.  Yes, sir.

10:34AM   2   Q.  And in between those two prior proceedings, you also sat

10:34AM   3   down with the FBI, Special Agent Brian Burns, and others

10:34AM   4   including myself, correct?

10:34AM   5   A.  Correct.

10:34AM   6   Q.  And during those meetings, you were being asked questions

10:34AM   7   about Mr. Bongiovanni; is that right?

10:34AM   8   A.  That's correct.

10:34AM   9   Q.  And did you tell the FBI in one of those meetings that

10:35AM  10   Mr. Bongiovanni used the "N" word?

10:35AM  11           **MR. SOEHNLEIN:**  Objection.

10:35AM  12           **THE COURT:**  Did you tell them that?

10:35AM  13           **THE WITNESS:**  Yes, I must have, yes.

10:35AM  14           **THE COURT:**  Well, why do you say you must have?

10:35AM  15           **THE WITNESS:**  Because I do remember being asked the

10:35AM  16   question, and I did say yes.

10:35AM  17           **BY MR. TRIPI:**

10:35AM  18   Q.  So why, a minute ago, when I asked you did you say no?

10:35AM  19   A.  I forgot the timeframe.  I --

10:35AM  20   Q.  No.  I asked you ever.  Why did you say no?

10:35AM  21   A.  I don't know.  I was wrong.

10:35AM  22   Q.  Were you being honest a minute ago?  Or were you playing

10:35AM  23   games?

10:35AM  24           **THE COURT:**  Let's move on.  Let's move on.  Let's

10:35AM  25   move on.

| 10:35AM | 1 | **THE WITNESS:**  No, I made a mistake. |

10:35AM    1          **THE WITNESS:**  No, I made a mistake.

10:35AM    2          **THE COURT:**  Next question.

10:35AM    3          **MR. TRIPI:**  All right.  So, I need a clear answer to

10:35AM    4     that, I don't think I got one.

10:35AM    5          **THE COURT:**  No, you got the answer, Mr. Tripi.  Let's

10:35AM    6     move on.  We're gonna go to another area.

10:35AM    7          Next question.

10:35AM    8          **BY MR. TRIPI:**

10:36AM    9     Q.  All right.  Does Mr. Gerace own a bar you're aware of?

10:36AM   10     A.  Yes.

10:36AM   11     Q.  What bar is that?

10:36AM   12     A.  Pharaoh's nightclub.

10:36AM   13     Q.  What kind of bar is that?

10:36AM   14     A.  It's a strip club.

10:36AM   15     Q.  Have you been there with Mr. Bongiovanni?

10:36AM   16     A.  I have.

10:36AM   17     Q.  During what timeframe?

10:36AM   18     A.  Right when Mr. Gerace had taken it back over.  I believe

10:36AM   19     there was a falling out he had, and he was now the sole

10:36AM   20     owner.

10:36AM   21     Q.  Was that in the 2014 timeframe?

10:36AM   22     A.  I believe so.  2014, '15.

10:36AM   23     Q.  Do you remember specifically?

10:36AM   24     A.  I don't, but it was that timeframe.

10:37AM   25          **MR. TRIPI:**  For the witness only, can we pull up

10:37AM    1    Exhibit 3540U.  And I'm going to direct his attention to

10:37AM    2    page 5.

10:37AM    3              **BY MR. TRIPI:**

10:37AM    4    Q.  I'm going to see if we can refresh your recollection as

10:37AM    5    to the timeframe, okay?

10:37AM    6    A.  Okay.

10:37AM    7    Q.  Read that to yourself, and when you're done let me know

10:37AM    8    you've read it.

10:37AM    9              **MR. TRIPI:**  Can we zoom in on that, Ms. Champoux, so

10:37AM   10    it's larger for him, please?

10:37AM   11              **THE WITNESS:**  Okay.

10:37AM   12              **BY MR. TRIPI:**

10:37AM   13    Q.  Did that refresh your recollection as to the timeframe?

10:37AM   14    A.  Yes, sir.

10:37AM   15    Q.  What was the approximate timeframe when you went to

10:37AM   16    Pharaoh's with Mr. Bongiovanni?

10:38AM   17    A.  It was around 2013, 2014.

10:38AM   18    Q.  And that's an estimate?

10:38AM   19    A.  That's an estimate, yes.

10:38AM   20    Q.  How many times did you go there?

10:38AM   21    A.  Twice.

10:38AM   22    Q.  On one of those occasions, was there an interaction

10:38AM   23    between Mr. Bongiovanni and Mr. Gerace?

10:38AM   24    A.  Yes.

10:38AM   25    Q.  What was that?  Describe that interaction for the jury.

USA v Gerace - Selva - Tripi/Direct - 12/13/24

35

10:38AM   1   A.  We had went to Pharaoh's.  We were at the bar having a

10:38AM   2   drink.  Mr. Gerace came in, he said hello, and then they

10:38AM   3   stepped aside and had a two- to three-minute, five-minute

10:38AM   4   conversation, whatever it was.

10:38AM   5   Q.  Did they -- was that a one-on-one conversation between

10:38AM   6   Mr. Bongiovanni and Gerace?

10:38AM   7   A.  Yes, they just talked privately.

10:38AM   8   Q.  That was my next question.  Did it appear to be a private

10:38AM   9   conversation between the two of them?

10:38AM   10  A.  It did.

10:38AM   11  Q.  Were you able to hear what they were saying?

10:39AM   12  A.  No, it was loud in there and I was not --

10:39AM   13  Q.  How far did they step away from you?

10:39AM   14  A.  I was in the middle.  To the right, maybe.

10:39AM   15  Q.  Did they go to, like, the end of the bar?

10:39AM   16  A.  To the end of the bar.

10:39AM   17  Q.  When Mr. Bongiovanni -- did he come back over to you

10:39AM   18  then?

10:39AM   19  A.  He did.

10:39AM   20  Q.  Did he tell you anything about what he and Mr. Gerace

10:39AM   21  discussed?

10:39AM   22  A.  No.  No.

10:39AM   23  Q.  Now, your phone number up until the day that your house

10:39AM   24  was searched on August 23rd, 2019, was it 716-903-1654?

10:39AM   25  A.  Yes.

USA v Gerace - Selva - Tripi/Direct - 12/13/24

36

| | | |
|---|---|---|
| 10:39AM | 1 | Q.  Okay. |
| 10:39AM | 2 | **MR. TRIPI:**  Ms. Champoux, can we please pull up |
| 10:39AM | 3 | Government Exhibit 358, please. |
| 10:39AM | 4 | There's going to be some phone records I want you to |
| 10:39AM | 5 | look at. |
| 10:40AM | 6 | **THE WITNESS:**  Okay. |
| 10:40AM | 7 | **MR. TRIPI:**  Can you expand it so I can see that |
| 10:40AM | 8 | better?  Can we move on to Exhibit 359?  Sorry. |
| 10:40AM | 9 | Okay.  Within Exhibit 359, can you open the PDF |
| 10:40AM | 10 | labeled billed calls 2012, 2013. |
| 10:40AM | 11 | **BY MR. TRIPI:** |
| 10:40AM | 12 | Q.  All right.  First I'd like to go to -- here we go. |
| 10:40AM | 13 | Do you see on -- I'm showing you page 911 at the bottom |
| 10:40AM | 14 | of the screen, it might be 912. |
| 10:40AM | 15 | Do you see that's a Verizon wireless detail for Peter |
| 10:40AM | 16 | Gerace, 716-725-1931? |
| 10:40AM | 17 | A.  Yes. |
| 10:40AM | 18 | Q.  Okay.  Do you see above that, May 24th? |
| 10:41AM | 19 | A.  Yes. |
| 10:41AM | 20 | Q.  Is that your phone number, 716-903-1654? |
| 10:41AM | 21 | A.  Yes. |
| 10:41AM | 22 | Q.  And do you see incoming call? |
| 10:41AM | 23 | A.  Yes. |
| 10:41AM | 24 | Q.  Now, you've worked in the wireless industry yourself, |
| 10:41AM | 25 | correct? |

10:41AM    1    A.  Correct.

10:41AM    2    Q.  You're familiar with billed call records?

10:41AM    3    A.  Correct.

10:41AM    4    Q.  So does that indicate there was an incoming call from

10:41AM    5    Mr. Gerace to you on May 24th in the year of 2013?

10:41AM    6    A.  Yes.

10:41AM    7    Q.  Okay.  I'd like to go through some, this was on page 911

10:41AM    8    of the exhibit.  I'd like to go to page 1102.

10:41AM    9        Okay.  I'd like to direct your attention to an entry on

10:41AM   10    October 1st at 9:07 a.m., right here.

10:42AM   11    A.  Yes.

10:42AM   12    Q.  Does that indicate that at 9:07 a.m. you called

10:42AM   13    Mr. Gerace for 11 minutes?

10:42AM   14    A.  Yes.

10:42AM   15    Q.  I think I misspoke on the prior one.  They're Peter's

10:42AM   16    records.  Where it says "incoming," that would mean you

10:42AM   17    called him, right?

10:42AM   18    A.  Yes.

10:42AM   19    Q.  Okay.  And then when it doesn't say incoming, that would

10:42AM   20    be an indication that he called you?

10:42AM   21    A.  Correct.

10:42AM   22    Q.  Okay.  So I think I misspoke on the prior one.

10:42AM   23        But on this entry, October 1st, 9:07 a.m.  Was that your

10:42AM   24    phone number, 716-903-1654?

10:42AM   25    A.  Yes, it is.

| | | |
|---|---|---|
| 10:42AM | 1 | Q.  Does that indicate he made an outgoing call to you for |
| 10:43AM | 2 | 11 minutes? |
| 10:43AM | 3 | A.  Yes. |
| 10:43AM | 4 | Q.  I'd like to move down to 9:24 that same day.  Do you see |
| 10:43AM | 5 | that there? |
| 10:43AM | 6 | A.  Yes. |
| 10:43AM | 7 | Q.  Is that another call for five minutes? |
| 10:43AM | 8 | A.  Yes. |
| 10:43AM | 9 | Q.  Is that, again, from your number to Mr. Gerace? |
| 10:43AM | 10 | A.  Yes. |
| 10:43AM | 11 | Q.  Okay.  Let's go to page 1104.  And I'm looking at calls |
| 10:43AM | 12 | at 6:34, 6:42, and 6:56. |
| 10:43AM | 13 | So beginning the 6:32 p.m. call -- |
| 10:43AM | 14 | MR. TRIPI:  The one right above that, actually.  Next |
| 10:43AM | 15 | one down.  Sorry, you were right. |
| 10:43AM | 16 | BY MR. TRIPI: |
| 10:43AM | 17 | Q.  6:34 p.m., is that another indication of your phone |
| 10:43AM | 18 | number being called by Mr. Gerace? |
| 10:43AM | 19 | A.  Yes. |
| 10:43AM | 20 | Q.  Okay.  6:42 p.m., more call activity, this time you |
| 10:44AM | 21 | calling Mr. Gerace? |
| 10:44AM | 22 | A.  Yes. |
| 10:44AM | 23 | Q.  Let's go to 6:56 p.m.  Is that an outgoing call from |
| 10:44AM | 24 | Mr. Gerace to you? |
| 10:44AM | 25 | A.  Yes. |

10:44AM  1   Q.  Let's go to October 9th.  It's going to be page 1122 at

10:44AM  2   12:59 p.m.  Would that be an outgoing call from Mr. Gerace to

10:44AM  3   you?

10:44AM  4   A.  Yes.

10:44AM  5   Q.  Let's go to 3:07 p.m. that same day.  Would that be

10:44AM  6   another outgoing call from Mr. Gerace to you?

10:44AM  7   A.  Yes.

10:44AM  8   Q.  Let's go to 3:40 p.m. that same day.  Now on page 1123 of

10:44AM  9   the exhibit, were there two sort of back-to-back calls at

10:44AM  10  3:40 and 3:43 both incoming to Mr. Gerace from you?

10:45AM  11  A.  There were, yes.

10:45AM  12  Q.  Let's go to page 1131, and a call October 15th at

10:45AM  13  8:47 a.m.  Is that on outgoing call from you to Mr. Gerace?

10:45AM  14  A.  Yes.

10:45AM  15  Q.  Let's go to 9:13 a.m.  Outgoing call from Mr. Gerace to

10:45AM  16  you?

10:45AM  17  A.  Yes.

10:45AM  18          MR. TRIPI:  Let's go to page 1132, please.

10:45AM  19          BY MR. TRIPI:

10:45AM  20  Q.  Is there another call at 5:45 p.m.?

10:45AM  21  A.  Yes, there is.

10:45AM  22  Q.  Is that a call from Mr. Gerace to you for about two

10:45AM  23  minutes?

10:45AM  24  A.  Yes.

10:45AM  25  Q.  Let's go to page -- October 16th at 9:35 a.m., page 1133.

USA v Gerace - Selva - Tripi/Direct - 12/13/24

40

| | | |
|---|---|---|
| 10:46AM | 1 | Is that an indication of a call from Mr. Gerace to you? |
| 10:46AM | 2 | A.  Yes. |
| 10:46AM | 3 | Q.  Let's go to page 1134 beginning at 4:52 p.m. on |
| 10:46AM | 4 | October 16th.  October 16th from 4:52 p.m. to the call 5:53. |
| 10:46AM | 5 | Is there a series of incoming calls from you to Mr. Gerace? |
| 10:46AM | 6 | A.  Yes. |
| 10:46AM | 7 | Q.  How many of them do you see there? |
| 10:46AM | 8 | A.  Five. |
| 10:46AM | 9 | Q.  Okay.  And then we see page 1134, October 17th at |
| 10:46AM | 10 | 9:37 a.m.  Is that an incoming call from Mr. Gerace to you on |
| 10:47AM | 11 | that date and time? |
| 10:47AM | 12 | A.  Yes. |
| 10:47AM | 13 | **MR. TRIPI:**  Ms. Champoux, can we go to the 2014, 2015 |
| 10:47AM | 14 | PDF of this exhibit.  And can we go to page 573.  And if we |
| 10:47AM | 15 | can go to 11/14/2014 at 6:28 p.m. |
| 10:47AM | 16 | **BY MR. TRIPI:** |
| 10:47AM | 17 | Q.  Is there an incoming call on that date from you to |
| 10:47AM | 18 | Mr. Gerace for about two minutes? |
| 10:47AM | 19 | A.  Yes. |
| 10:47AM | 20 | Q.  Okay.  Now, during -- during that timeframe, were you |
| 10:48AM | 21 | involved in marijuana distribution activity? |
| 10:48AM | 22 | A.  Yes. |
| 10:48AM | 23 | Q.  At some point, did the defendant's younger brother, |
| 10:48AM | 24 | Anthony Gerace, become involved with you and the individuals |
| 10:48AM | 25 | you were selling marijuana with? |

10:48AM   1   A.  Yes.

10:48AM   2           **MR. TRIPI:**  You can take that down.

10:48AM   3           **BY MR. TRIPI:**

10:48AM   4   Q.  What's the defendant's younger brother's name who became

10:48AM   5   involved in the group you were involved in?

10:48AM   6   A.  Anthony.

10:48AM   7   Q.  Sometime around -- I want to go backwards a little bit.

10:49AM   8   Sometime around 2009 -- withdrawn.

10:49AM   9       Was there ever a time when Mr. Bongiovanni, while a DEA

10:49AM  10   agent and while he knew you were involved in marijuana, told

10:49AM  11   you about a situation where he helped this defendant out with

10:49AM  12   U.S. Probation?

10:49AM  13   A.  Yes.

10:49AM  14   Q.  What did Mr. Bongiovanni say?

10:49AM  15           **MR. SOEHNLEIN:**  Objection.

10:49AM  16           **THE COURT:**  Didn't we argue this?

10:49AM  17           **MR. TRIPI:**  Yeah, do you want to --

10:49AM  18           **THE COURT:**  Yeah, come on up.

10:49AM  19           (Sidebar discussion held on the record.)

10:49AM  20           **MR. TRIPI:**  Can I just chime in?  The thing that was

10:49AM  21   held out, and sorry to bring this up earlier, the thing that

10:49AM  22   was held out and sort of left open was the unavailability, and

10:49AM  23   you had asked us to follow up with Mr. Singer and Mr. MacKay,

10:50AM  24   and we did that.  And then we emailed chambers yesterday that

10:50AM  25   Bongiovanni would, in fact, invoke the Fifth Amendment if

10:50AM     1    called at this trial.  And so that was, sort of, out there

10:50AM     2    still.

10:50AM     3          And so in my mind, Judge, once I had that, I thought

10:50AM     4    I was okay to proceed.  So I apologize for not flagging it for

10:50AM     5    these guys.

10:50AM     6          THE COURT:  Me, too.  I remember seeing the email,

10:50AM     7    and so that's --

10:50AM     8          MR. TRIPI:  Yeah.

10:50AM     9          THE COURT:  -- what I thought.

10:50AM    10          MR. SOEHNLEIN:  And so, I mean, that's part of it.

10:50AM    11    Part of it, too, is we're preserving our record around all

10:50AM    12    these things.

10:50AM    13          THE COURT:  Of course.  No, no, no, of course.  I

10:50AM    14    just was forgetting that we had put on the record that he's

10:50AM    15    unavailable.  But you're right, I did say only if he's

10:50AM    16    unavailable.

10:50AM    17          MR. SOEHNLEIN:  And now candid --

10:50AM    18          THE COURT:  Do you have a further objection?  If he's

10:50AM    19    unavailable, do you have a further objection?

10:50AM    20          MR. FOTI:  Yes, Judge.  The rules, the Federal Rules

10:50AM    21    of Evidence I think were just amended December 1st, and it was

10:50AM    22    actually the unavailable -- a declarant from an unavailable

10:51AM    23    witness was amended, I think that the Court's still supposed

10:51AM    24    to consider the totality of the circumstances, including

10:51AM    25    whether there's any corroboration related to it.

USA v Gerace - Selva - Tripi/Direct - 12/13/24

43

| | | |
|---|---|---|
| 10:51AM | 1 | I -- I -- I think that it's not dispositive of |
| 10:51AM | 2 | whether it's a statement against penal interests if the |
| 10:51AM | 3 | witness is unavailable, there's still a sort of general |
| 10:51AM | 4 | consideration of whether it's fair to let the evidence in. |
| 10:51AM | 5 | MR. SOEHNLEIN:  And, Your Honor -- |
| 10:51AM | 6 | MR. COOPER:  Judge, there's tons of corroboration |
| 10:51AM | 7 | here.  Bongiovanni calls Pete Lepiane.  Pete has written |
| 10:51AM | 8 | reports about conversations saying Bongiovanni is interceding |
| 10:51AM | 9 | on Gerace's behalf saying he's a source of information. |
| 10:51AM | 10 | Bongiovanni writes a DEA-6 report corroborating this testimony |
| 10:51AM | 11 | saying Peter Gerace called me and told me he got in trouble |
| 10:51AM | 12 | with probation. |
| 10:51AM | 13 | There's a world of corroboration. |
| 10:51AM | 14 | THE COURT:  Tell me -- tell me, the rule has been |
| 10:52AM | 15 | amended.  Tell me about the amendment. |
| 10:52AM | 16 | MR. FOTI:  So, I -- if you -- Judge, I can pull up |
| 10:52AM | 17 | the change.  But Peter Lepiane also said that nothing |
| 10:52AM | 18 | Mr. Bongiovanni did had any impact. |
| 10:52AM | 19 | THE COURT:  Tell me -- tell me rule. |
| 10:52AM | 20 | MR. FOTI:  I should have -- I should have had it |
| 10:52AM | 21 | ready knowing that this was going to come up, but I -- if you |
| 10:52AM | 22 | give me one second, I'll -- |
| 10:52AM | 23 | MR. TRIPI:  While he's looking for that. |
| 10:52AM | 24 | THE COURT:  Why don't we take a break. |
| 10:52AM | 25 | MR. TRIPI:  Sure. |

10:52AM   1          THE COURT:  I've got the 11:00.  Look at it, we'll
10:52AM   2    come back in a few minutes.
10:52AM   3          MR. FOTI:  Yeah.
10:52AM   4          THE COURT:  It's almost 11:00, take the break and
10:52AM   5    come back.
10:52AM   6          MR. TRIPI:  Sounds good.
10:52AM   7          MR. FOTI:  Thanks.
10:52AM   8          (Sidebar discussion ended.)
10:52AM   9          THE COURT:  Okay.  Folks, we have this legal matter
10:52AM  10    we need to handle, and I also have another matter that I'm
10:52AM  11    doing by Zoom at 11:00, so we're going to take a break now.
10:53AM  12    Probably about 20 minutes or so.
10:53AM  13          Please remember my instructions.  Don't talk about
10:53AM  14    the case, even with each other, and don't make up your mind.
10:53AM  15          And we'll see you back here shortly after 11.
10:53AM  16          (Jury excused at 10:53 a.m.)
10:54AM  17          THE COURT:  Okay.  Mr. Selva, again, you're not to
10:54AM  18    talk to anybody about your testimony during the break.  Okay?
10:54AM  19    Except your lawyer.
10:54AM  20          Anything we need to do before we break?
10:54AM  21          MR. TRIPI:  No, Judge.
10:54AM  22          THE COURT:  Anything from the defense?
10:54AM  23          MR. FOTI:  No.
10:54AM  24          THE CLERK:  All rise.
10:54AM  25          (Off the record at 10:54 a.m.)

11:20AM      1                  (Back on the record at 11:20 a.m.)

11:20AM      2                  (Jury not present.)

11:20AM      3             **THE CLERK:**  All rise.

11:20AM      4             **THE COURT:**  Please be seated.

11:20AM      5             **THE CLERK:**  We are back on the record for the

11:20AM      6       continuation of the jury trial in case numbers 19-cr-227 and

11:20AM      7       23-cr-37, United States of America versus Peter Gerace Jr.

11:20AM      8             All counsel and parties are present.

11:20AM      9             **THE COURT:**  Okay.  Nothing's ever easy.  That

11:20AM     10       telephone conference or Zoom conference took longer than I

11:20AM     11       expected, and I apologize.

11:20AM     12             So on the impeachment with the prior inconsistent

11:20AM     13       statement that was not under oath, I think I need to give the

11:20AM     14       jury a curative instruction on that that it's not being

11:20AM     15       admitted for the truth of the matter, it's being admitted only

11:20AM     16       as to the witness's credibility.  Because it was not under

11:20AM     17       oath.

11:20AM     18             If it's under oath, it can be admitted substantively.

11:20AM     19       If it's not under oath, it can only be admitted to impeach.

11:20AM     20             **MR. TRIPI:**  Which -- which statement are we talking

11:20AM     21       about, Judge?

11:20AM     22             **THE COURT:**  We're talking about the "N" and "S."

11:21AM     23       Bongiovanni's "N" and "S."

11:21AM     24             **MR. TRIPI:**  Judge, I thought by the time we got there

11:21AM     25       that that -- that that was -- his recollection was refreshed

11:21AM  1   essentially.

11:21AM  2          THE COURT:  No, I don't think so.  I think you

11:21AM  3   impeached him with a prior inconsistent statement, and the

11:21AM  4   inconsistent statement was not under oath.  And so under --

11:21AM  5   under rule -- whatever it is, 80 -- 801, if it's under oath,

11:21AM  6   it comes in substantively, if it's not under oath it comes in

11:21AM  7   as -- and he may have -- and he may have said in addition to

11:21AM  8   that, that -- he may have changed his answer to the -- to the

11:21AM  9   question.

11:21AM  10         MR. TRIPI:  That's my understanding of the testimony.

11:21AM  11         THE COURT:  Fine.

11:21AM  12         MR. TRIPI:  Okay.

11:21AM  13         THE COURT:  But I do think that we do the curative

11:21AM  14   instruction.

11:21AM  15         MR. FOTI:  Yeah.  And I think he -- I could be wrong,

11:21AM  16   I think he said yes, I remember being asked -- me talking

11:21AM  17   about that.  I don't think he changed, I think it was just

11:21AM  18   strictly in context of impeachment.

11:22AM  19         THE COURT:  No, no.

11:22AM  20         MR. TRIPI:  I do want an opportunity then, I

11:22AM  21   understand the curative instruction.  But if there's some

11:22AM  22   ambiguity, I want an opportunity to circle back.  Because now

11:22AM  23   he's acknowledged he said it in a prior situation, I want to

11:22AM  24   now make it clear that that's his testimony in court if that

11:22AM  25   has now refreshed his recollection.  I thought that that

| 11:22AM | 1 | became -- it became bifurcated during the exchange, and so I |
|---|---|---|
| 11:22AM | 2 | don't want to run afoul of the Court telling me to move on, |
| 11:22AM | 3 | but if there's some ambiguity there, I want it clear so that |
| 11:22AM | 4 | when Mr. Cooper is arguing that it also impacts the |
| 11:22AM | 5 | credibility of another witness -- |
| 11:22AM | 6 | **THE COURT:** Let's take a look. |
| 11:22AM | 7 | **MR. TRIPI:** Okay. |
| 11:22AM | 8 | **THE COURT:** Let's take a look. |
| 11:23AM | 9 | Annie, do you know where it is? |
| 11:23AM | 10 | **MR. TRIPI:** That exchange with Mr. Selva after the |
| 11:23AM | 11 | conference at the bench regarding the N word. |
| 11:23AM | 12 | **THE COURT:** Okay. I got it. Yeah, he does say I was |
| 11:23AM | 13 | wrong. |
| 11:23AM | 14 | **MR. TRIPI:** Mr. Cooper is free to then make that |
| 11:23AM | 15 | argument as it relates to credibility that Mr. Bongiovanni has |
| 11:23AM | 16 | said it before. |
| 11:23AM | 17 | **THE COURT:** I think that's probably right, but so |
| 11:23AM | 18 | think I still give the curative instruction. |
| 11:23AM | 19 | **MR. TRIPI:** I think that's fine, Judge. But I don't |
| 11:23AM | 20 | want you to then -- |
| 11:23AM | 21 | **THE COURT:** No, I'm not. |
| 11:23AM | 22 | **MR. TRIPI:** -- hamstring Mr. Cooper when he's trying |
| 11:23AM | 23 | to argue it later. |
| 11:23AM | 24 | **THE COURT:** I'm not going to preclude him. And I |
| 11:23AM | 25 | think the defense can argue that he was equivocal or whatever, |

| | | |
|---|---|---|
| 11:23AM | 1 | and the jury can remember what it remembers. |
| 11:23AM | 2 | **MR. TRIPI:** That's fine. |
| 11:23AM | 3 | **THE COURT:** But I do think I need to give the |
| 11:23AM | 4 | curative instruction, because the impeachment with a prior |
| 11:23AM | 5 | inconsistent statement was with a prior inconsistent statement |
| 11:23AM | 6 | that was not under oath. Okay? |
| 11:24AM | 7 | **MR. TRIPI:** I understand that. |
| 11:24AM | 8 | **THE COURT:** Okay. Good. |
| 11:24AM | 9 | Mr. Foti, did you find the new rule? |
| 11:24AM | 10 | **MR. FOTI:** Yeah. Yes, Judge. And I apologize for |
| 11:24AM | 11 | not having it ready earlier. |
| 11:24AM | 12 | **THE COURT:** No, that's okay. |
| 11:24AM | 13 | **MR. FOTI:** I said two days ago when something goes |
| 11:24AM | 14 | wrong, it's me. And that's once again the case. |
| 11:24AM | 15 | **MR. SOEHNLEIN:** That's not true, Judge. |
| 11:24AM | 16 | **MR. FOTI:** Rule 804(b)(3)(B) -- |
| 11:24AM | 17 | **THE COURT:** Okay. Hang on. Let me find the old |
| 11:24AM | 18 | version, which I think I have here -- |
| 11:24AM | 19 | **MR. FOTI:** Sure. |
| 11:24AM | 20 | **THE COURT:** -- at my desk. 804 -- |
| 11:24AM | 21 | **MR. FOTI:** (b), which is the exceptions. |
| 11:24AM | 22 | Then subdivision (3) is statements against interests. |
| 11:24AM | 23 | **THE COURT:** Yep. |
| 11:24AM | 24 | **MR. FOTI:** And then sub (B) under that is -- |
| 11:24AM | 25 | **THE COURT:** Yep. |

11:24AM    1          **MR. FOTI:**  -- the portion that was -- was amended

11:24AM    2    about two weeks ago.

11:24AM    3          The amended version of the rule reads:  If offered in

11:24AM    4    a criminal case, as one that tends to expose the declarant to

11:24AM    5    criminal liability is supported by corroborating circumstances

11:24AM    6    that clearly indicate its trustworthiness --

11:25AM    7          And then this is where there's a modification.

11:25AM    8          -- after considering the totality of circumstances

11:25AM    9    under which it was made and any evidence that supports or

11:25AM   10    undermines it.

11:25AM   11          So, it's -- it's specific.  It just sort of clears up

11:25AM   12    language that the Court before admitting an unavailable

11:25AM   13    witness in a statement of -- against penal interests, there is

11:25AM   14    this additional consideration of the totality of the

11:25AM   15    circumstances.  And the totality of circumstances is language

11:25AM   16    that was specifically added, and --

11:25AM   17          **THE COURT:**  So tell me why the totality of the

11:25AM   18    circumstances should change this.

11:25AM   19          **MR. FOTI:**  So there's been a rule that says the

11:25AM   20    Court's to consider evidence including evidence that

11:25AM   21    undermines the statement.

11:25AM   22          **THE COURT:**  Yeah.

11:25AM   23          **MR. FOTI:**  The evidence that undermines the

11:25AM   24    statement, the statement is Mr. Lepiane was just cited by the

11:25AM   25    government as corroborating evidence, but that's -- that's not

| 11:25AM | 1 | my recollection. |

         My recollection is Mr. Lepiane, at trial, consistent
the prior statements he's made, has always been consistent
that Mr. Bongiovanni had no impact on Mr. Gerace.  He didn't
get him out of trouble, he didn't help him, he didn't have any
impact on the decision that was made of how to impose a
sanction.

         THE COURT:  Okay.  So what's the question you want to
ask, Mr. Tripi?

         MR. COOPER:  Judge, can I just respond briefly to
that?  It's not the right analysis about whether it impacted
Lepiane or not.  What matters is was Bongiovanni trying to
impact Mr. Lepiane.

         THE COURT:  Mr. Cooper, I -- if you let me do it my
way, I know that.  I -- I -- I recognize that.  Which is why I
asked Mr. Tripi what's the question he wants to ask.

         MR. TRIPI:  I just want to get it right.

         THE COURT:  Because the question he asks is did he
intervene in a way that helped Mr. Gerace, that may be a
different analysis than did he intervene to help Mr. Gerace.

         MR. TRIPI:  I think the question I asked, as least as
I have it written here, is -- but I think this is what I
asked, is:  What, if anything, did the defendant ever tell you
about Peter Gerace, Pharaoh's, and a situation involving
U.S. Probation?

| | | |
|---|---|---|
| 11:26AM | 1 | Just to focus him on that. |
| 11:26AM | 2 | So, it was a broad question.  What did |
| 11:27AM | 3 | Mr. Bongiovanni tell you.  And I anticipate the response will |
| 11:27AM | 4 | be, in sum and substance, he -- at the prior trial, he |
| 11:27AM | 5 | testified, he told me Peter got violated, he stepped in to |
| 11:27AM | 6 | help him with U.S. Probation. |
| 11:27AM | 7 | In a prior -- in a prior report, the way he -- at |
| 11:27AM | 8 | least it's documented him saying is he helped Peter stay out |
| 11:27AM | 9 | of jail when he got in trouble with probation. |
| 11:27AM | 10 | So there's some variation in the two ways he |
| 11:27AM | 11 | described it. |
| 11:27AM | 12 | **THE COURT:**  Helped him stay out of jail may be |
| 11:27AM | 13 | different. |
| 11:27AM | 14 | **MR. TRIPI:**  Yeah. |
| 11:27AM | 15 | **THE COURT:**  Yeah. |
| 11:27AM | 16 | **MR. TRIPI:**  So I don't know what exact verbiage we're |
| 11:27AM | 17 | gonna get here, but I -- I think that's the range of answers. |
| 11:27AM | 18 | **THE COURT:**  Well, do you want to try to lead a little |
| 11:27AM | 19 | bit? |
| 11:27AM | 20 | **MR. TRIPI:**  Sure, I can do that, Judge. |
| 11:27AM | 21 | And I just think that to the extent the rule changed |
| 11:27AM | 22 | a week ago, I don't think that changed the rule in the |
| 11:27AM | 23 | 2nd Circuit. |
| 11:27AM | 24 | **THE COURT:**  Well, I don't think it -- it does not |
| 11:27AM | 25 | change my analysis here. |

| | | |
|---|---|---|
| 11:27AM | 1 | **MR. TRIPI:**  Okay. |
| 11:27AM | 2 | **THE COURT:**  I mean, it -- it -- it fine tunes my |
| 11:27AM | 3 | analysis here -- |
| 11:27AM | 4 | **MR. TRIPI:**  Yeah. |
| 11:27AM | 5 | **THE COURT:**  -- but it doesn't cause me to reach a |
| 11:27AM | 6 | different conclusion.  I understand what you're saying. |
| 11:28AM | 7 | **MR. FOTI:**  Well, and I'm generally -- I think I'm on |
| 11:28AM | 8 | the same page, as well.  I think if the answer is about |
| 11:28AM | 9 | Mr. Bongiovanni attempted to intervene in some way, I do think |
| 11:28AM | 10 | the evidence corroborates the point that there was some |
| 11:28AM | 11 | intervention. |
| 11:28AM | 12 | **THE COURT:**  Yeah, great. |
| 11:28AM | 13 | **MR. FOTI:**  But it's different from -- |
| 11:28AM | 14 | **THE COURT:**  Did it work? |
| 11:28AM | 15 | **MR. FOTI:**  Yeah.  Did he -- did he help him stay out |
| 11:28AM | 16 | of jail is a different thing. |
| 11:28AM | 17 | **THE COURT:**  Yeah.  And I don't think either -- and I |
| 11:28AM | 18 | don't think anyone's trying to get there. |
| 11:28AM | 19 | **MR. TRIPI:**  I may not have written the whole quote |
| 11:28AM | 20 | from the prior trial, because I have some dot dot dots.  So, |
| 11:28AM | 21 | but -- |
| 11:28AM | 22 | Ms. Champoux, can we pull up -- just for -- just so |
| 11:28AM | 23 | we can see what it was? |
| 11:28AM | 24 | **THE COURT:**  Go ahead. |
| 11:28AM | 25 | **MR. TRIPI:**  I want to be -- can we pull up 3540AG at |

11:28AM  1   page 72, just because I didn't write the full quote from the

11:28AM  2   trial in my notes here.  Just so we can see what he said at

11:28AM  3   the prior trial.

11:28AM  4       All right.  What, if anything, did the defendant ever

11:29AM  5   tell you about Gerace, Pharaoh's nightclub, and --

11:29AM  6       So it's the exact same question I asked at the last

11:29AM  7   trial.

11:29AM  8       His full answer was:  He told me that Peter had

11:29AM  9   gotten violated, something had happened at the club, and

11:29AM  10  he stepped in to help him out.  He reached out, I believe, to

11:29AM  11  probation.  And I believe Peter was looking at going back

11:29AM  12  to -- he was released from federal custody, I believe he did

11:29AM  13  four months or whatever.

11:29AM  14      It was six months, so I'll have to curate that a

11:29AM  15  little bit.

11:29AM  16      **THE COURT:**  Yeah.  So why don't you just ask him the

11:29AM  17  first part of it.  You know, did he tell you about the fact --

11:29AM  18  that first question.  And then follow up with, did he tell you

11:29AM  19  that he intervened to help him when he got violated by

11:29AM  20  probation?  Something like that.

11:29AM  21      **MR. SOEHNLEIN:**  That's -- I think that's fine with

11:29AM  22  us, Judge.

11:29AM  23      **THE COURT:**  Okay.

11:29AM  24      **MR. SOEHNLEIN:**  But as long as we're here, I sense

11:29AM  25  that the next question then is going to be about the Anthony

11:29AM  1   Gerace comment, which I think there's a different analysis in

11:29AM  2   terms of totality of the circumstances than with -- with

11:30AM  3   respect to the Peter Gerace.

11:30AM  4       THE COURT:  What's the Anthony Gerace question?

11:30AM  5       MR. TRIPI:  Have you ever discussed with Bongiovanni

11:30AM  6   any assistance he provided Anthony Gerace to get out of

11:30AM  7   trouble.

11:30AM  8       And he's going to explain yes, that -- that Peter

11:30AM  9   asked -- Bongiovanni said Peter asked him to essentially step

11:30AM  10  in when Anthony got in trouble with the Amherst Police

11:30AM  11  Department.

11:30AM  12      MR. SOEHNLEIN:  I --

11:30AM  13      MR. FOTI:  Judge, my understanding is there's not

11:30AM  14  really any corroboration of that at all.  Not just in this

11:30AM  15  trial, but in general.  And part of this --

11:30AM  16      THE COURT:  Well, but it doesn't have to

11:30AM  17  corroboration, does there?  It's -- the question -- the rule

11:30AM  18  that you just read to me says is there -- considering the

11:30AM  19  totality of the circumstances, is it -- is it reliable, and is

11:30AM  20  there any reason to doubt it.

11:30AM  21      MR. FOTI:  Yeah.

11:30AM  22      THE COURT:  What reason do I have to doubt it?

11:30AM  23      MR. FOTI:  An arrest of Mr. Gerace at the Amherst

11:31AM  24  Police Department is something that should easily be

11:31AM  25  documented and could be supported by some type of evidence, I

11:31AM    1    don't think there is any.

11:31AM    2         I think -- and I -- at some point we talked to

11:31AM    3    Mr. Bongiovanni's attorneys about it, and they had said that

11:31AM    4    this was -- was discussed more -- I don't know if it was

11:31AM    5    during the course of trial or as part of their prep, but they

11:31AM    6    said consistently their read on it was there was nothing to

11:31AM    7    back up that this ever occurred at well.

11:31AM    8         **MR. SOEHNLEIN:**  Yeah.  And more to the point, Judge,

11:31AM    9    not that this is, you know, anything that would necessarily

11:31AM    10   come out in court, but from reading the documents, Mr. Selva's

11:31AM    11   arrested in 2019, he doesn't report that comment until

11:31AM    12   September of 2023 to law enforcement.

11:31AM    13        **THE COURT:**  Well, you can cross-examine with that.

11:31AM    14   Go ahead.

11:31AM    15        **MR. TRIPI:**  So, Judge --

11:31AM    16        **THE COURT:**  What do you have?

11:31AM    17        **MR. TRIPI:**  -- what I have on that is, first, there

11:31AM    18   wouldn't be an arrest if Mr. Bongiovanni stepped in in

11:31AM    19   sufficient time to kill an arrest, right?

11:31AM    20        But in terms of -- the 2nd Circuit has long held --

11:31AM    21   this United States versus Saggett, that circumstances

11:32AM    22   indicating trustworthiness include where the statement was

11:32AM    23   made to a person whom the declarant believes an ally.

11:32AM    24        I don't think there's any question that Bongiovanni

11:32AM    25   at the time he said that would have believed Lou Selva and him

11:32AM  1    are on the same team.  You know?  So there's a circumstance

11:32AM  2    indicating trustworthiness.

11:32AM  3           So it's not just is it do you have corroboration,

11:32AM  4    there are a number of different circumstances that can

11:32AM  5    indicate trustworthiness.

11:32AM  6           Another is, does the declarant represent an attempt

11:32AM  7    to shift blame?  No, he's taking credit for helping Anthony

11:32AM  8    get out of trouble.  Which, again, that lends to the exception

11:32AM  9    and believability, an indicator of trustworthiness.

11:32AM  10           **THE COURT:**  Tell me -- tell me -- tell me how it's a,

11:32AM  11    I guess, against penal interests, he's --

11:32AM  12           **MR. TRIPI:**  He's a DEA agent.

11:32AM  13           **THE COURT:**  Yeah, he shouldn't be doing --

11:32AM  14           **MR. TRIPI:**  And although the jury doesn't know it,

11:32AM  15    you know under 104 you can consider all the proffers that --

11:32AM  16    it's in the context when Selva and Bongiovanni are in a

11:33AM  17    conspiracy.

11:33AM  18           **THE COURT:**  Yeah.

11:33AM  19           **MR. FOTI:**  Judge, it's a -- even if he killed an

11:33AM  20    arrest somehow, which we're totally speculating on because

11:33AM  21    there's nothing to back that up other than this statement --

11:33AM  22           **MR. COOPER:**  Two trials.

11:33AM  23           **MR. FOTI:**  -- there's typically going to be some

11:33AM  24    documentation of an interaction with an individual.  Even if

11:33AM  25    the arrest itself isn't documented, there's police reports

11:33AM    1    documenting interactions.

11:33AM    2    **THE COURT:** I think it comes in. I think it comes

11:33AM    3    in. I think it can come in, in very general terms that he

11:33AM    4    stepped in to try to help.

11:33AM    5    **MR. COOPER:** That Peter asked, that --

11:33AM    6    **THE COURT:** That Peter asked him to step in to try

11:33AM    7    help Anthony, when Anthony got jammed up with something.

11:33AM    8    Yeah. I think that can come in. But it's got to be

11:33AM    9    pretty general, and in and out.

11:33AM    10    **MR. TRIPI:** Okay.

11:33AM    11    **THE COURT:** Okay. Anything else before we resume?

11:33AM    12    **MR. COOPER:** Judge, Special Agent Burns mentioned to

11:33AM    13    me, and I think it's a good idea, that maybe at some point

11:33AM    14    today it would be wise for you to let the jury know kind of

11:33AM    15    where we're looking scheduling-wise, because Christmas is

11:33AM    16    coming up, and kind of give them an idea of when we think

11:33AM    17    we're gonna --

11:33AM    18    **THE COURT:** Okay. Yeah. I hate to get people's

11:34AM    19    hopes up, but --

11:34AM    20    **MR. COOPER:** Well, it doesn't look like it's gonna be

11:34AM    21    pre-Christmas at this point.

11:34AM    22    **THE COURT:** Yeah, I guess that's true. Okay. Yeah,

11:34AM    23    let me -- let me -- I'll try to figure out something to say

11:34AM    24    maybe right after our lunch break.

11:34AM    25    **MR. TRIPI:** Is there a way that we can leave this up

| 11:34AM | 1 | just for the attorneys for a moment, just so I can get where |
|---|---|---|
| 11:34AM | 2 | I'm gonna stop?  Or I can go get the hardcopy.  I don't want |
| 11:34AM | 3 | to cause too many problems. |
| 11:34AM | 4 | **THE COURT:**  Yeah, just leave it up, but don't put it |
| 11:34AM | 5 | up for the jury. |
| 11:34AM | 6 | **THE CLERK:**  Yeah, I turned off the witness display. |
| 11:34AM | 7 | **MR. TRIPI:**  Okay.  Great. |
| 11:34AM | 8 | **THE COURT:**  Anything else? |
| 11:34AM | 9 | **MR. TRIPI:**  No. |
| 11:34AM | 10 | **MR. SOEHNLEIN:**  No. |
| 11:34AM | 11 | **THE COURT:**  Let's bring them back.  We're just going |
| 11:34AM | 12 | to go for a half an hour now. |
| 11:35AM | 13 | (Jury seated at 11:35 a.m.) |
| 11:36AM | 14 | **THE COURT:**  Okay.  So it was just pointed out to me |
| 11:36AM | 15 | that number 12 is wearing a Patriots jersey, I'm surprised he |
| 11:36AM | 16 | doesn't have a paper bag over his head this season. |
| 11:36AM | 17 | The record will reflect that all our jurors are again |
| 11:36AM | 18 | present. |
| 11:36AM | 19 | I remind the witness that he's still under oath. |
| 11:36AM | 20 | Before you continue, Mr. Tripi, let me tell the jury |
| 11:36AM | 21 | something about -- |
| 11:36AM | 22 | You can sit down, Mr. Selva. |
| 11:36AM | 23 | **THE WITNESS:**  Okay. |
| 11:36AM | 24 | **THE COURT:**  Before you begin, Mr. Tripi, let me tell |
| 11:36AM | 25 | the jury something about some questions and answers that were |

11:36AM   1   just a few minutes ago.

11:36AM   2         So you remember that Mr. Tripi called to the

11:36AM   3   witness's attention a prior statement that he had made to

11:36AM   4   investigators about whether Mr. Bongiovanni had used the "N"

11:36AM   5   word or other racial terms.  That was admitted only for you to

11:36AM   6   assess Mr. Selva's credibility, it's not being admitted --

11:36AM   7   again, this is one of those things that's not being admitted

11:37AM   8   for the truth of it.

11:37AM   9         So whether Mr. Bongiovanni, in fact, used the racial

11:37AM   10  terms that he was -- that the witness was asked about, the

11:37AM   11  truth of that is not in front of you based on that question

11:37AM   12  about whether he said that to police investigators earlier,

11:37AM   13  okay?  That's only for you to assess this witness's

11:37AM   14  credibility with respect to that and anything else.  Okay?

11:37AM   15  Got it?  Great.

11:37AM   16        Mr. Tripi, you may continue.

11:37AM   17        I remind the witness he's still under oath.

11:37AM   18        **THE WITNESS:**  Yes, Your Honor.

11:37AM   19        **BY MR. TRIPI:**

11:37AM   20  Q.  Okay.  I -- I turned to another topic before the break

11:37AM   21  there, so I'm going to start there, okay?

11:37AM   22      Yes or no to this question:  Did Mr. Bongiovanni ever

11:37AM   23  tell you anything about this defendant, Mr. Gerace, Pharaoh's

11:37AM   24  nightclub, and a situation involving U.S. Probation?  Yes or

11:37AM   25  no?

| | | |
|---|---|---|
| 11:37AM | 1 | A. Yes. |
| 11:38AM | 2 | Q. Okay. Did Mr. Bongiovanni tell you that this defendant |
| 11:38AM | 3 | had gotten violated by U.S. Probation, that something |
| 11:38AM | 4 | happened at Pharaoh's, and that Mr. Bongiovanni stepped in to |
| 11:38AM | 5 | help this defendant out? |
| 11:38AM | 6 | A. Yes. |
| 11:38AM | 7 | **MR. TRIPI:** You can take that down, Ms. Champoux, |
| 11:38AM | 8 | thank you. |
| 11:38AM | 9 | **BY MR. TRIPI:** |
| 11:38AM | 10 | Q. In approximately 2015, did you discuss with |
| 11:38AM | 11 | Mr. Bongiovanni some assistance that he provided to Anthony |
| 11:38AM | 12 | Gerace, to help Anthony Gerace get out of trouble? Yes or |
| 11:38AM | 13 | no. |
| 11:38AM | 14 | A. Yes. |
| 11:38AM | 15 | Q. Did Mr. Bongiovanni -- did that come up in the context of |
| 11:38AM | 16 | discussing both Mr. Gerace -- Anthony Gerace and this |
| 11:39AM | 17 | defendant, was there a discussion that involved the topic of |
| 11:39AM | 18 | both of them at some point? |
| 11:39AM | 19 | A. Yes. |
| 11:39AM | 20 | Q. Did Mr. Bongiovanni tell you that this defendant reached |
| 11:39AM | 21 | out to him asking Mr. Bongiovanni to step in on Anthony's |
| 11:39AM | 22 | behalf when Anthony got in trouble with the Amherst Police |
| 11:39AM | 23 | Department? |
| 11:39AM | 24 | A. Yes. |
| 11:39AM | 25 | Q. Did Mr. Bongiovanni in that discussion indicate to you |

USA v Gerace - Selva - Tripi/Direct - 12/13/24
61

| | | |
|---|---|---|
| 11:39AM | 1 | that he did step in? |
| 11:39AM | 2 | A.  He did. |
| 11:39AM | 3 | Q.  Did he indicate to you that he told whoever at Amherst |
| 11:39AM | 4 | police that Anthony Gerace was a cooperator? |
| 11:39AM | 5 | A.  Yes, that's what he said. |
| 11:39AM | 6 | Q.  At the time you had this discussion with Mr. Bongiovanni, |
| 11:39AM | 7 | was Mr. Anthony Gerace involved with you and others that you |
| 11:39AM | 8 | were involved with selling marijuana? |
| 11:39AM | 9 | A.  Yes.  At that time, yes. |
| 11:40AM | 10 | Q.  During the course of their relationship, meaning |
| 11:40AM | 11 | Mr. Gerace and Mr. Bongiovanni, were you aware of any trips |
| 11:40AM | 12 | they took together? |
| 11:40AM | 13 | A.  Yes. |
| 11:40AM | 14 | Q.  Where -- where were you aware that they went together? |
| 11:40AM | 15 | A.  Las Vegas, New York, Toronto, I think.  Niagara Falls. |
| 11:40AM | 16 | Possibly Florida.  But they traveled. |
| 11:40AM | 17 | Q.  Were you aware of Mr. Bongiovanni attending Gerace's |
| 11:40AM | 18 | parents' 50th anniversary? |
| 11:40AM | 19 | A.  Yes, he told me he did, yes. |
| 11:40AM | 20 | Q.  Did your parents have a 50th anniversary? |
| 11:40AM | 21 | A.  Yes. |
| 11:40AM | 22 | Q.  Did Mr. Bongiovanni attend their anniversary? |
| 11:40AM | 23 | A.  No. |
| 11:40AM | 24 | Q.  Is that a reason you remember that he attended |
| 11:40AM | 25 | Mr. Gerace's parents' anniversary? |

11:40AM  1   A.  Yeah.  Yes.

11:41AM  2   Q.  Did Mr. Bongiovanni like nice things, based on your

11:41AM  3   experiences with him?

11:41AM  4   A.  Yes.

11:41AM  5   Q.  Based on your observations, did he like going out for

11:41AM  6   nice dinners?

11:41AM  7   A.  Yes.

11:41AM  8   Q.  Did he like nice clothes?

11:41AM  9   A.  Yes.

11:41AM  10  Q.  And did he and Lindsay, his wife, like to travel?

11:41AM  11  A.  Yes.

11:41AM  12  Q.  Do those things cost money?

11:41AM  13  A.  Yes.

11:41AM  14  Q.  When you would use cocaine with Mr. Bongiovanni, did he

11:42AM  15  ever express to you why he was willing to use cocaine but not

11:42AM  16  marijuana?  Just yes or no first.

11:42AM  17  A.  Yes.

11:42AM  18  Q.  What did he say in that regard?

11:42AM  19  A.  He said that cocaine stays in your system for lesser

11:42AM  20  amount of time.  And if you flush it out from working out and

11:42AM  21  drinking a lot of water, it's not detectable if you were to

11:42AM  22  take a test, where marijuana stays in your system 30 days or

11:42AM  23  so.

11:42AM  24  Q.  Do you know an individual named Paul Francoforte, also

11:42AM  25  known as Hot Dog?

| | | |
|---|---|---|
| 11:42AM | 1 | **MR. SOEHNLEIN:** Objection. Relevance. |
| 11:42AM | 2 | **THE COURT:** Does he know? I'll allow that. |
| 11:42AM | 3 | **MR. TRIPI:** And I'll -- the relevance will become |
| 11:42AM | 4 | clear. |
| 11:42AM | 5 | **THE COURT:** Go ahead. |
| 11:42AM | 6 | **BY MR. TRIPI:** |
| 11:42AM | 7 | Q. Do you know? |
| 11:42AM | 8 | A. Yes. |
| 11:42AM | 9 | Q. At some point, was Mr. Francoforte associated with a |
| 11:42AM | 10 | restaurant on the corner of Hertel and Starin called Boss? |
| 11:43AM | 11 | A. Yes. |
| 11:43AM | 12 | **MR. TRIPI:** Can we pull up Exhibit 310AT, I think |
| 11:43AM | 13 | record number 20. |
| 11:43AM | 14 | **THE COURT:** Is this -- |
| 11:43AM | 15 | **MR. TRIPI:** This is in evidence in this case, yes. |
| 11:43AM | 16 | You passed it. Go up a little bit, please. Top of |
| 11:43AM | 17 | page 9, Ms. Champoux. |
| 11:43AM | 18 | Okay. Can we zoom in on the top of page 9, that box |
| 11:43AM | 19 | there? |
| 11:43AM | 20 | **BY MR. TRIPI:** |
| 11:43AM | 21 | Q. Do you see a first name there? |
| 11:43AM | 22 | A. Yes. |
| 11:43AM | 23 | Q. What's that say? |
| 11:44AM | 24 | A. Pauly. |
| 11:44AM | 25 | Q. Do you see a last name? |

11:44AM    1    A.  Yes.  Hot Dog.

11:44AM    2    Q.  And is Hot Dog that individual's nickname?

11:44AM    3    A.  Yes.

11:44AM    4    Q.  Do you know that individual to be Paul Francoforte?

11:44AM    5    A.  Yes.

11:44AM    6    Q.  And do you see a phone number there?

11:44AM    7    A.  Yes.

11:44AM    8    Q.  What's that number?

11:44AM    9    A.  716-866-2687.

11:44AM   10    Q.  And is this the individual we talked about, Pauly

11:44AM   11    Francoforte, Hot Dog, is that a person who was friends with

11:44AM   12    Mr. Bongiovanni and associated with Boss Restaurant?

11:44AM   13    A.  Yes.

11:44AM   14            MR. TRIPI:  We can take that down.

11:45AM   15            BY MR. TRIPI:

11:45AM   16    Q.  When Mr. Bongiovanni gave you directives and instructions

11:45AM   17    regarding telling law enforcement you were his C.I. if they

11:45AM   18    ever came to ask you questions, was that done face to face?

11:45AM   19    A.  Yes.

11:45AM   20    Q.  Did you and he discuss the importance of having those

11:45AM   21    types of discussions face to face?

11:45AM   22    A.  Yes.

11:45AM   23    Q.  Why was it important to you to have those types of

11:45AM   24    discussions face to face with Mr. Bongiovanni?

11:45AM   25    A.  Not to talk over the phone, and to just get direction

11:45AM  1    from him.

11:45AM  2    Q.  Can you elaborate?  To not talk on the phone, was there a

11:45AM  3    concern about law enforcement tactics?

11:45AM  4    A.  Yes, obviously surveillance, tapping the phones.

11:45AM  5    Q.  Do you mean?  Like, a wiretap?

11:45AM  6    A.  Like a wiretap.

11:45AM  7    Q.  Is that something where you feared people could listen to

11:45AM  8    your conversations?

11:45AM  9    A.  Yes.

11:45AM  10   Q.  Where would you typically meet with Mr. Bongiovanni to

11:45AM  11   have those types of discussions?

11:45AM  12   A.  Various places on Hertel.  We'd meet at a bar.

11:45AM  13   Q.  Did you go to his house?

11:45AM  14   A.  Or his house, yes.

11:46AM  15   Q.  Have you spoken in parks with him?

11:46AM  16   A.  Parks, yes.  We've taken walks.

11:46AM  17   Q.  Okay.  Earlier sort of near the beginning of your

11:46AM  18   testimony, we talked about Mr. Bongiovanni getting married in

11:46AM  19   Cabo San Lucas in February of 2015; do you recall that?

11:46AM  20   A.  I do.

11:46AM  21   Q.  Couple months before that, sort of in the lead-up to the

11:46AM  22   wedding, was there a stag party held for Mr. Bongiovanni?

11:46AM  23   A.  There was.

11:46AM  24   Q.  Is that sort of, like, the bachelor party?

11:46AM  25   A.  Yes.

USA v Gerace - Selva - Tripi/Direct - 12/13/24

66

| | | |
|---|---|---|
| 11:46AM | 1 | Q.  Where was that party held? |
| 11:46AM | 2 | A.  In the Cobblestone District, in Iron Works.  It's a |
| 11:46AM | 3 | bar/restaurant. |
| 11:46AM | 4 | Q.  And for those not from the Buffalo area, is the |
| 11:46AM | 5 | Cobblestone District sort of near where the arena is where |
| 11:46AM | 6 | the Buffalo Sabres play? |
| 11:46AM | 7 | A.  Exactly. |
| 11:46AM | 8 | Q.  And was Iron Works a bar down there? |
| 11:47AM | 9 | A.  Yes. |
| 11:47AM | 10 | Q.  And who arranged the location of the stag party? |
| 11:47AM | 11 | A.  I did. |
| 11:47AM | 12 | Q.  And were you involved -- were you involved handing out |
| 11:47AM | 13 | tickets? |
| 11:47AM | 14 | A.  Yes. |
| 11:47AM | 15 | Q.  Were others, as well? |
| 11:47AM | 16 | A.  Yes. |
| 11:47AM | 17 | Q.  I want to ask you about some of the names of some of the |
| 11:47AM | 18 | people who were at the stag party, okay? |
| 11:47AM | 19 | A.  Okay. |
| 11:47AM | 20 | Q.  Was that individual whose photo we looked at earlier, Tom |
| 11:47AM | 21 | Napoli, was he there? |
| 11:47AM | 22 | A.  Yes. |
| 11:47AM | 23 | Q.  You were there, obviously? |
| 11:47AM | 24 | A.  Yes. |
| 11:47AM | 25 | Q.  Was an individual named Mike Masecchia there? |

11:47AM   1    A.  Yes.

11:47AM   2    Q.  Was this defendant there?

11:47AM   3    A.  Yes.

11:47AM   4    Q.  Was Tom Doctor, whose photo we looked at earlier, there?

11:47AM   5    A.  Yes.

11:47AM   6    Q.  Was -- do you know whether Agent Bongiovanni's partner,

11:48AM   7    Joe Palmieri, was there?

11:48AM   8    A.  I believe he was, yes.

11:48AM   9    Q.  Was an individual named Wayne Anderson there?

11:48AM  10    A.  Yes.

11:48AM  11         **MR. TRIPI:**  Can we pull up Exhibit 310AT, again,

11:48AM  12    please?  I'd like to work -- this is in evidence.  And let's

11:48AM  13    stop on the first page there.

11:48AM  14         **BY MR. TRIPI:**

11:48AM  15    Q.  Do you see where it says forensic examination report?

11:48AM  16    Can you read what it says after case number?

11:48AM  17    A.  Peter George Gerace.

11:48AM  18         **MR. TRIPI:**  Okay.  Let's go to the first page of

11:48AM  19    that, Ms. Champoux.  Or, I'm sorry, the first page of the

11:48AM  20    contacts.

11:48AM  21         **BY MR. TRIPI:**

11:48AM  22    Q.  All right.  Regarding number 2, do you see name there

11:48AM  23    that says Jeff Anzalone with a phone number?

11:48AM  24    A.  Yes.

11:48AM  25    Q.  Okay.  Record number 3, do you see an entry there for

| | | |
|---|---|---|
| 11:48AM | 1 | Wayne Anderson with a phone number? |
| 11:48AM | 2 | A.  Yes. |
| 11:48AM | 3 | **MR. TRIPI:**  Okay.  Let's go to the next page, |
| 11:49AM | 4 | Ms. Champoux.  Let's go to page 6. |
| 11:49AM | 5 | **BY MR. TRIPI:** |
| 11:49AM | 6 | Q.  Record 9, do you see a name Chris Chudy at the bottom? |
| 11:49AM | 7 | A.  Yes, I do. |
| 11:49AM | 8 | Q.  If we can go to page 7 now.  Do you see under record 10 a |
| 11:49AM | 9 | name that's entered as Jessica Charm? |
| 11:49AM | 10 | A.  Yes. |
| 11:49AM | 11 | **MR. TRIPI:**  Can you scroll down to the next page for |
| 11:49AM | 12 | now, Ms. Champoux?  Stop there.  I need to hover between the |
| 11:49AM | 13 | two pages. |
| 11:49AM | 14 | **BY MR. TRIPI:** |
| 11:49AM | 15 | Q.  Do you see a first name and a last name under record |
| 11:49AM | 16 | number 13 there for Tommy Doctor? |
| 11:49AM | 17 | A.  Yes. |
| 11:49AM | 18 | Q.  Is that the person we looked at in the photo earlier, in |
| 11:49AM | 19 | the photo that had Mr. Gerace, Mr. Bongiovanni, and the |
| 11:49AM | 20 | individual with the shirt off drinking a beer? |
| 11:50AM | 21 | A.  It is, yes. |
| 11:50AM | 22 | **MR. TRIPI:**  Can we keep scrolling for now. |
| 11:50AM | 23 | **BY MR. TRIPI:** |
| 11:50AM | 24 | Q.  Okay.  We're now on page 9.  We talked about Pauly |
| 11:50AM | 25 | Hot Dog, right? |

USA v Gerace - Selva - Tripi/Direct - 12/13/24

69

| | | |
|---|---|---|
| 11:50AM | 1 | A.  Yes. |
| 11:50AM | 2 | **MR. TRIPI:**  Okay.  Let's keep scrolling.  Keep going. |
| 11:50AM | 3 | **BY MR. TRIPI:** |
| 11:50AM | 4 | Q.  So there, do you see under record 20 a name, Mike |
| 11:50AM | 5 | Masecchia? |
| 11:50AM | 6 | A.  Yes. |
| 11:50AM | 7 | Q.  Okay.  Under there, record 21, do you see a name Sue |
| 11:50AM | 8 | Michalski? |
| 11:50AM | 9 | A.  Yes. |
| 11:50AM | 10 | **MR. TRIPI:**  Okay.  Keep scrolling. |
| 11:50AM | 11 | **BY MR. TRIPI:** |
| 11:50AM | 12 | Q.  Under record number 22, do you see a name there, Kim |
| 11:50AM | 13 | Mecca? |
| 11:50AM | 14 | A.  Yes. |
| 11:50AM | 15 | Q.  Now who was Kim Mecca to you? |
| 11:50AM | 16 | A.  She was a girl that I went out with. |
| 11:50AM | 17 | Q.  Did she live with you for a period? |
| 11:50AM | 18 | A.  She lived with me for a period, yes. |
| 11:50AM | 19 | Q.  When your house got raided August 23rd, 2019, was Kim |
| 11:51AM | 20 | Mecca there? |
| 11:51AM | 21 | A.  She was. |
| 11:51AM | 22 | Q.  Was she living with you at the time? |
| 11:51AM | 23 | A.  She was. |
| 11:51AM | 24 | **MR. TRIPI:**  Keep scrolling down. |
| | 25 | |

11:51AM     1          **BY MR. TRIPI:**

11:51AM     2     Q.   Do you see record 25?

11:51AM     3     A.   Yes.

11:51AM     4     Q.   Do you see the name Joe Palmieri?

11:51AM     5     A.   I do, yes.

11:51AM     6     Q.   Was he a -- as far as you know, was he a task force

11:51AM     7     officer at the DEA and partners with Joseph Bongiovanni?

11:51AM     8     A.   Yes, he was.

11:51AM     9          **MR. TRIPI:**  Keep scrolling down.  Okay.  Let me stop

11:51AM    10     you there.  Do you see a record -- withdrawn.  I misread the

11:51AM    11     name.  Keep going.

11:51AM    12          Okay.  Stop there.  We're on to page -- looks like

11:52AM    13     15.

11:52AM    14          **BY MR. TRIPI:**

11:52AM    15     Q.   Now, yesterday I asked you if Mr. Bongiovanni dated a

11:52AM    16     woman when he was younger named Dana Panepinto, and whether

11:52AM    17     she was the daughter of a guy named Donnie/Turtle Panepinto;

11:52AM    18     do you remember that?

11:52AM    19     A.   I do.

11:52AM    20     Q.   Do you see a name there, Turtle, with a phone number?

11:52AM    21     A.   Yes.

11:52AM    22     Q.   Okay.

11:52AM    23          **MR. TRIPI:**  Keep scrolling down.

11:52AM    24          **BY MR. TRIPI:**

11:52AM    25     Q.   By the way, record 38, do you see a name K.L.?

USA v Gerace - Selva - Tripi/Direct - 12/13/24
71

| | | |
|---|---|---|
| 11:52AM | 1 | A.  Yes. |
| 11:52AM | 2 | Q.  Now, do you know -- in fairness, do you know who that |
| 11:52AM | 3 | person is? |
| 11:52AM | 4 | A.  I do not, no. |
| 11:52AM | 5 | Q.  Under record 39, do you see a name Lindsay Schuh? |
| 11:52AM | 6 | A.  Yes. |
| 11:52AM | 7 | Q.  Is that now Lindsay Bongiovanni? |
| 11:52AM | 8 | A.  Yes, it is. |
| 11:52AM | 9 | Q.  So it's Mr. Bongiovanni's wife? |
| 11:52AM | 10 | A.  Correct. |
| 11:52AM | 11 | Q.  Under that, do you see record 40, we're on page 16 of |
| 11:53AM | 12 | this exhibit, is that Tom Napoli? |
| 11:53AM | 13 | A.  Yes, it is. |
| 11:53AM | 14 | Q.  And there's a phone number there? |
| 11:53AM | 15 | A.  Yes. |
| 11:53AM | 16 | Q.  And we've discussed him several times, right? |
| 11:53AM | 17 | A.  Yes. |
| 11:53AM | 18 | MR. TRIPI:  Keep scrolling.  I'm gonna stop you |
| 11:53AM | 19 | there. |
| 11:53AM | 20 | BY MR. TRIPI: |
| 11:53AM | 21 | Q.  Do you see record number 45, do you see a name and phone |
| 11:53AM | 22 | number for a Greg Trotter? |
| 11:53AM | 23 | A.  Yes, I do. |
| 11:53AM | 24 | Q.  Do you know who that is? |
| 11:53AM | 25 | A.  I don't. |

| | | |
|---|---|---|
| 11:53AM | 1 | **MR. TRIPI:** On page number -- go down a little. Go |
| 11:53AM | 2 | down. Page number 18. |
| 11:53AM | 3 | **BY MR. TRIPI:** |
| 11:53AM | 4 | Q. Record 46, do you see a name Tommy O with a phone number? |
| 11:53AM | 5 | A. Yes. |
| 11:53AM | 6 | Q. In fairness, do you know who that is? |
| 11:53AM | 7 | A. I don't. |
| 11:53AM | 8 | **MR. TRIPI:** Keep scrolling. Stop there. |
| 11:53AM | 9 | **BY MR. TRIPI:** |
| 11:53AM | 10 | Q. Under record number 48, do you see a name there, Frank |
| 11:53AM | 11 | Tripi? |
| 11:53AM | 12 | A. Yes. |
| 11:53AM | 13 | Q. Do you know who that is? |
| 11:53AM | 14 | A. Yes. |
| 11:53AM | 15 | Q. No relation of mine, right? |
| 11:53AM | 16 | A. Correct. |
| 11:53AM | 17 | Q. Okay. Is he someone that Mr. Bongiovanni also knew? |
| 11:54AM | 18 | A. Yes. |
| 11:54AM | 19 | Q. Under there, record 49, page 19 still, do you see the |
| 11:54AM | 20 | name Joe Tomasello? |
| 11:54AM | 21 | A. Yes. |
| 11:54AM | 22 | Q. Is that someone you know? |
| 11:54AM | 23 | A. Yes. |
| 11:54AM | 24 | Q. Is that someone Mr. Bongiovanni knows? |
| 11:54AM | 25 | A. Yes. |

| | | |
|---|---|---|
| 11:54AM | 1 | **MR. TRIPI:**  Keep scrolling.  Stop there. |
| 11:54AM | 2 | **BY MR. TRIPI:** |
| 11:54AM | 3 | Q.  Record 51, do you see a record for Anthony bro? |
| 11:54AM | 4 | A.  Yes. |
| 11:54AM | 5 | Q.  And we talked about Anthony Gerace, this defendant has a |
| 11:54AM | 6 | brother by that name? |
| 11:54AM | 7 | A.  Yes. |
| 11:54AM | 8 | **MR. TRIPI:**  Keep scrolling. |
| 11:54AM | 9 | Okay.  We're gonna take that down now. |
| 11:54AM | 10 | **BY MR. TRIPI:** |
| 11:55AM | 11 | Q.  By February of 2015, when Mr. Bongiovanni was getting |
| 11:55AM | 12 | married in Cabo San Lucas, had his sort of complaints about |
| 11:55AM | 13 | his finances stopped by that point? |
| 11:55AM | 14 | A.  No. |
| 11:55AM | 15 | Q.  Did he still continue to complain about his finances? |
| 11:55AM | 16 | A.  Yes. |
| 11:55AM | 17 | Q.  Did he pay, though, for a destination wedding though that |
| 11:55AM | 18 | year? |
| 11:55AM | 19 | A.  He did. |
| 11:55AM | 20 | Q.  Were you the best man at that wedding? |
| 11:55AM | 21 | A.  Yes. |
| 11:55AM | 22 | **MR. TRIPI:**  Ms. Champoux, for the witness only -- |
| 11:55AM | 23 | Just give me one moment, Judge. |
| 11:55AM | 24 | **THE COURT:**  How much more do you have, Mr. Tripi? |
| 11:55AM | 25 | **MR. TRIPI:**  Oh, I see the time, Judge.  Maybe, like, |

11:55AM  1    15 more minutes or so.

11:55AM  2          **THE COURT:**  Yeah, so we're gonna have to break.  But

11:55AM  3    go ahead, we'll go until close to noon.

11:55AM  4          **MR. TRIPI:**  Okay.  I'm going to hand you up -- maybe

11:55AM  5    we can end after getting these.

11:55AM  6          **THE COURT:**  Great.

11:55AM  7          **BY MR. TRIPI:**

11:55AM  8    Q.  I'm going to hand you up Exhibits 213-1 through 213-5

11:56AM  9    inclusive.  Take a look at these.  When you're done, look

11:56AM 10    back at me.

11:56AM 11    A.  Okay.  Thank you.

11:56AM 12    Q.  Do you recognize those Exhibits 213-1 through 213-5

11:56AM 13    inclusive?

11:56AM 14    A.  I do.  Yes.

11:56AM 15    Q.  Do those consist of photos of Mr. Bongiovanni's wedding

11:56AM 16    that you were in or that you took, and tweets that you made

11:56AM 17    following the -- at some point in proximity but following the

11:56AM 18    wedding?

11:56AM 19    A.  Yes.

11:56AM 20    Q.  Okay.  Do they all fairly and accurately depict the

11:56AM 21    photos you took and the posting to Twitter of the images of

11:57AM 22    the wedding?

11:57AM 23    A.  Yes.

11:57AM 24          **MR. TRIPI:**  The government offers 213-1 through 5

11:57AM 25    inclusive, Your Honor.

| | | |
|---|---|---|
| 11:57AM | 1 | **MR. SOEHNLEIN:** Can I just take a look at them, Joe? |
| 11:57AM | 2 | **MR. TRIPI:** Sure, no problem. |
| 11:57AM | 3 | **THE COURT:** Sure. |
| 11:57AM | 4 | **MR. SOEHNLEIN:** No objection. |
| 11:57AM | 5 | **THE COURT:** Received without objection. |
| 11:57AM | 6 | **(GOV Exhibit 213-1 through 5 were received in evidence.)** |
| 11:57AM | 7 | **MR. TRIPI:** All right. Do you want me to keep going? |
| 11:57AM | 8 | I was going to publish a couple of them, do you want me to |
| 11:57AM | 9 | keep going? |
| 11:57AM | 10 | **THE COURT:** Why don't we break, because I have |
| 11:57AM | 11 | another matter that I need do at noon. |
| 11:57AM | 12 | So remember my instructions, folks, about not |
| 11:57AM | 13 | communicating about the case with anyone, including each |
| 11:57AM | 14 | other. Don't use tools of technology to communicate about the |
| 11:57AM | 15 | case or to learn anything about the case. Don't read or watch |
| 11:57AM | 16 | or listen to any news coverage, if there is any, while the |
| 11:57AM | 17 | trial is in progress. And don't make up your mind until you |
| 11:58AM | 18 | start deliberating. |
| 11:58AM | 19 | Let's come back close to quarter to 1, and we'll try |
| 11:58AM | 20 | to go a couple hours, take a break, and then go until 4. |
| 11:58AM | 21 | Okay? Thanks very much. |
| 11:58AM | 22 | Oh, and I hope to have an update for you about the |
| 11:58AM | 23 | rest of the trial when you come back after lunch. |
| 11:58AM | 24 | (Jury excused at 11:58 a.m.) |
| 11:59AM | 25 | **THE COURT:** Again, Mr. Selva, you're not to talk to |

USA v Gerace - Selva - Tripi/Direct - 12/13/24
76

| | | |
|---|---|---|
| 11:59AM | 1 | anybody except your lawyer during the break. |
| 11:59AM | 2 | (Witness excused at 11:59 a.m.) |
| 11:59AM | 3 | **THE COURT:**  Anything before we break from Mr. Foti? |
| 11:59AM | 4 | **MR. FOTI:**  No. |
| 11:59AM | 5 | **THE COURT:**  Government? |
| 11:59AM | 6 | **MR. COOPER:**  No, thank you. |
| 11:59AM | 7 | **THE COURT:**  All right.  We'll see you in 45 minutes. |
| 11:59AM | 8 | (Off the record at 11:59 a.m.) |
| 12:50PM | 9 | (Back on the record at 12:50 p.m.) |
| 12:50PM | 10 | (Jury not present.) |
| 12:50PM | 11 | **THE CLERK:**  All rise. |
| 12:50PM | 12 | **THE COURT:**  Please be seated. |
| 12:50PM | 13 | **THE CLERK:**  We are back on the record for the |
| 12:50PM | 14 | continuation of the jury trial in case numbers 19-cr-227 and |
| 12:50PM | 15 | 23-cr-37, United States of America versus Peter Gerace Jr. |
| 12:50PM | 16 | All counsel and parties are present.  Mr. Cooper just |
| 12:50PM | 17 | ran out. |
| 12:50PM | 18 | **THE COURT:**  That's okay.  That's fine. |
| 12:50PM | 19 | Have you thought about charging the jury without |
| 12:50PM | 20 | Mr. Soehnlein present? |
| 12:50PM | 21 | **MR. SOEHNLEIN:**  Yeah, we -- we talked about it, |
| 12:50PM | 22 | Your Honor, and we have not talked with Mr. Gerace about it. |
| 12:50PM | 23 | Think Mr. Foti and I are okay with that, but we would just |
| 12:51PM | 24 | ask -- maybe get through one more break, and we'll ask |
| 12:51PM | 25 | Mr. Gerace and make sure he's all right. |

```
12:51PM    1          THE COURT:  Absolutely, yeah.  It makes sense to me
12:51PM    2   for lots of reasons.  And then maybe even let them to start
12:51PM    3   deliberating with the understanding that if they come back
12:51PM    4   with anything that is substantive as to a request, we don't do
12:51PM    5   it, we send them home and let them start up again when
12:51PM    6   Mr. Soehnlein is back.
12:51PM    7          MR. SOEHNLEIN:  And then I don't have to sit through
12:51PM    8   the charge.
12:51PM    9          THE COURT:  And then you don't have to listen to my
12:51PM   10   voice for as long as you've had to listen to it for most of
12:51PM   11   your adult life, right?
12:51PM   12          MR. SOEHNLEIN:  Well, yeah.
12:51PM   13          MR. COOPER:  He meant to say, I don't get to sit
12:51PM   14   through the charge.  He misspoke.
12:51PM   15          THE COURT:  I get it.  I get it.  I get it.
12:51PM   16          MR. FOTI:  I intend to call him afterwards and tell
12:51PM   17   him how it was, Judge.
12:51PM   18          MS. IZZO:  Riveting.
12:51PM   19          THE COURT:  So what I will do is I'll tell them now.
12:51PM   20          Mr. Tripi, how long is your summation going to go?
12:51PM   21          MR. TRIPI:  Mr. Cooper is closing.
12:52PM   22          THE COURT:  Oh, Mr. Cooper?
12:52PM   23          MR. TRIPI:  I am going to rebut in whatever time is
12:52PM   24   left.  I'll be Mr. Violanti this time, but I'm not gonna do
12:52PM   25   the "I'm gonna talk to you as Joel" routine.
```

USA v Gerace - Selva - Tripi/Direct - 12/13/24

12:52PM   1          MR. COOPER:  I've forbidden him from pretending to be

12:52PM   2   Joel.

12:52PM   3          I think that the summation, Judge, probably we'd be

12:52PM   4   asking for three and a half hours for the entire -- because

12:52PM   5   there's a lot, and there's different types of material.

12:52PM   6          THE COURT:  I was actually thinking three, but

12:52PM   7   let's -- let me think about it.

12:52PM   8          MR. COOPER:  I'll live with whatever you decide.

12:52PM   9          THE COURT:  Yeah.  And who's going to sum up?

12:52PM   10         MR. FOTI:  I am.

12:52PM   11         THE COURT:  And what are you thinking?

12:52PM   12         MR. FOTI:  I -- I would think most likely two and a

12:52PM   13   half to three.

12:52PM   14         THE COURT:  Yeah.  Yeah.  So I want to get it done in

12:52PM   15   one day.  So maybe we'll say three each.  Let's think about

12:52PM   16   three each right now.

12:52PM   17         And so I'll tell them that that may happen on

12:52PM   18   Thursday, and that they may get charged on Friday next week.

12:52PM   19   And we're not making any promises, but that's what we would

12:52PM   20   think is a possibility.  Okay?  Fair enough?

12:53PM   21         MR. FOTI:  And you're not -- Judge, you're just

12:53PM   22   referencing where we're gonna -- we're expecting to end up at

12:53PM   23   the end of the week.  You're not talking about any estimation

12:53PM   24   about how long our case is going on, or whether we're putting

12:53PM   25   on a case at all, right?

| | | |
|---|---|---|
| 12:53PM | 1 | **THE COURT:**  No, just talking in very general terms |
| 12:53PM | 2 | that we are thinking that, you know, that the lawyers may be |
| 12:53PM | 3 | in a position to sum up to you next Thursday, and then I would |
| 12:53PM | 4 | charge you on Friday, so you would begin your deliberations |
| 12:53PM | 5 | perhaps on Friday and then continue the following week.  And |
| 12:53PM | 6 | that -- and leave it at that. |
| 12:53PM | 7 | **MR. FOTI:**  Okay. |
| 12:53PM | 8 | **THE COURT:**  Okay?  Okay.  So anything else before we |
| 12:53PM | 9 | bring them back? |
| 12:53PM | 10 | **MR. SOEHNLEIN:**  One thing briefly, Judge.  Just to |
| 12:53PM | 11 | make a record of it, when I was coming down from the 9th floor |
| 12:53PM | 12 | to the 4th floor, I was with Mr. Glaberson, Ms. Blackman, and |
| 12:53PM | 13 | a marshal.  The elevator doors opened on 7, and a juror walked |
| 12:53PM | 14 | basically right into me, not really, and she said sorry and I |
| 12:54PM | 15 | said sorry, and she stepped off the elevator, and that was it. |
| 12:54PM | 16 | But as long as we're being real careful with that stuff, I |
| 12:54PM | 17 | wanted everyone to be -- |
| 12:54PM | 18 | **THE COURT:**  No, absolutely, we all should be |
| 12:54PM | 19 | transparent about those kinds of things, and I appreciate |
| 12:54PM | 20 | that. |
| 12:54PM | 21 | **MR. COOPER:**  We appreciate it.  We try do the same |
| 12:54PM | 22 | thing, and appreciate you telling us. |
| 12:54PM | 23 | **THE COURT:**  Okay, anything else? |
| 12:54PM | 24 | **MR. SOEHNLEIN:**  No, Judge. |
| 12:54PM | 25 | **THE COURT:**  Anything else from the government? |

| | | |
|---|---|---|
| 12:54PM | 1 | **MR. TRIPI:** No, Judge. |
| 12:54PM | 2 | **THE COURT:** Let's bring them back, please, Joe. |
| 12:55PM | 3 | (Jury seated at 12:55 p.m.) |
| 12:55PM | 4 | **THE COURT:** Okay. The record will reflect all our |
| 12:55PM | 5 | jurors, again, are present. |
| 12:55PM | 6 | So a couple things, folks. |
| 12:55PM | 7 | One, you'll notice Ms. Chalbeck is not here again |
| 12:56PM | 8 | today. Again, she's got an important matter that she needed |
| 12:56PM | 9 | to attend to. I've excused her. It has nothing to do with |
| 12:56PM | 10 | this case. You should not be concerned about it in any way. |
| 12:56PM | 11 | Number 2, I told you I'd give you an update on where |
| 12:56PM | 12 | we think we may be going with the trial. |
| 12:56PM | 13 | There's a chance, it's not a promise, but there's a |
| 12:56PM | 14 | chance that the proof will end on Wednesday next week, and the |
| 12:56PM | 15 | lawyers will sum up to you then on Thursday, and I may give |
| 12:56PM | 16 | you the jury charge on Friday, so you'd start deliberating on |
| 12:56PM | 17 | Friday and continue into next week. |
| 12:56PM | 18 | So, that's -- that's not a promise. You know, lots |
| 12:56PM | 19 | of things have happened to extend this trial: Weather and |
| 12:56PM | 20 | illness and lots of other things. But that's what we think is |
| 12:56PM | 21 | a decent guess right now. Okay? Yes. |
| 12:56PM | 22 | **JUROR:** I'm sorry, so we will be here Friday the |
| 12:56PM | 23 | 20th? |
| 12:56PM | 24 | **THE COURT:** Maybe. |
| 12:57PM | 25 | **JUROR:** Maybe? |

12:57PM | 1 | **THE COURT:** It's still up in the air. Maybe. Maybe.

12:57PM | 2 | There's a decent possibility that you will be, okay?

12:57PM | 3 | I remind the witness that he's still under oath.

12:57PM | 4 | You may continue, Mr. Tripi.

12:57PM | 5 | **MR. TRIPI:** Thank you, Your Honor.

12:57PM | 6 | Ms. Champoux, can we split the screen with

12:57PM | 7 | Exhibit 213-1 now in evidence, and 213-4 now in evidence?

12:57PM | 8 | **BY MR. TRIPI:**

12:57PM | 9 | Q. Okay. When it comes up on the screen, Mr. Selva, it's a

12:57PM | 10 | little bit darker than it is when I hand you the piece of

12:57PM | 11 | paper, right?

12:57PM | 12 | A. Yes.

12:57PM | 13 | Q. In any event, can you see it well enough on the screen?

12:57PM | 14 | A. Yes.

12:57PM | 15 | Q. Looking at 213-1, top photo there, we're looking at

12:57PM | 16 | tweets that you made, right?

12:57PM | 17 | A. Yes.

12:57PM | 18 | Q. Is that top photo you and Mr. Bongiovanni?

12:57PM | 19 | A. Yes.

12:57PM | 20 | Q. Is he the one in the green shirt?

12:58PM | 21 | A. Yes, to the right.

12:58PM | 22 | Q. And what's the setting and scene of the photo?

12:58PM | 23 | A. It's in Cabo San Lucas. I believe it was on a booze

12:58PM | 24 | cruise.

12:58PM | 25 | Q. Okay. Now I'll focus you in on 213-4 at the bottom. Are

12:58PM  1   you and Mr. Bongiovanni also in that photo?

12:58PM  2   A.  Yes.

12:58PM  3   Q.  And who's that photo of?  There's four people there.

12:58PM  4   A.  Mr. Bongiovanni, myself, Tom Napoli, and

12:58PM  5   Mr. Bongiovanni's stepson Matt.

12:58PM  6   Q.  Okay.  Tom Napoli's at the far left?

12:58PM  7   A.  He's at the far left, yes.

12:58PM  8   Q.  Next to him is that Mr. Bongiovanni?

12:58PM  9   A.  Yes.

12:58PM  10  Q.  Then next to him is that you?

12:58PM  11  A.  Yes.

12:58PM  12  Q.  Is that basically a picture of the wedding party?

12:58PM  13  A.  Yes.

12:58PM  14  Q.  Now, the suits that the wedding party is wearing, who

12:58PM  15  bought those?

12:58PM  16  A.  Mr. Bongiovanni.

12:58PM  17  Q.  Okay.  So he paid for your suit?

12:58PM  18  A.  Yes.

12:58PM  19  Q.  Who paid for the wedding?

12:58PM  20  A.  I believe Mr. Bongiovanni.

12:59PM  21          **MR. TRIPI:**  Okay.  We can take those down,

12:59PM  22  Ms. Champoux.

12:59PM  23          **BY MR. TRIPI:**

12:59PM  24  Q.  And again, the actual wedding the tweets, the tweets are

12:59PM  25  in May, but the actual wedding was in February of 2015?

12:59PM 1   A.  Yes.

12:59PM 2   Q.  Okay.  I'd like to fast forward now from 2015 to the

12:59PM 3   fall, roughly the fall of 2018.

12:59PM 4        In the fall of 2018, did Mr. Bongiovanni alert you to

12:59PM 5   some trouble he was having at work?

12:59PM 6   A.  Yes.

12:59PM 7   Q.  Did he start talking about retiring around that time?

12:59PM 8   A.  Yes.

12:59PM 9   Q.  Was a concern he expressed, did it relate to another DEA

12:59PM 10  agent he worked with named Anthony Casullo?

12:59PM 11  A.  Yes.

12:59PM 12  Q.  Prior to that point, as far as you knew, had defendant --

01:00PM 13  had Mr. Bongiovanni been planning to retire?

01:00PM 14  A.  No.

01:00PM 15       **MR. TRIPI:**  Now, if we can pull back up Exhibit 127

01:00PM 16  briefly.  This is in evidence.  I'm sorry, 126.  My fault.

01:00PM 17       **BY MR. TRIPI:**

01:00PM 18  Q.  Now I showed you this photograph before.  Is there

01:00PM 19  another individual in this photograph named Michael Sinatra?

01:00PM 20       **MR. SOEHNLEIN:**  Objection.  Relevance.

01:00PM 21       **MR. TRIPI:**  They've heard testimony about this entire

01:00PM 22  episode from Mr. Myszka.

01:00PM 23       **THE COURT:**  I'll allow this, and we'll see where it

01:00PM 24  goes.

01:00PM 25       **THE WITNESS:**  Yes.

01:00PM   1        **BY MR. TRIPI:**

01:00PM   2    Q.  Can you show the jury where Michael Sinatra is?

01:00PM   3        **MR. TRIPI:**  May the record reflect the witness has

01:00PM   4    indicated the person second from the left in the photo.

01:00PM   5        **BY MR. TRIPI:**

01:01PM   6    Q.  Wearing light gray suit coat; is that right?

01:01PM   7    A.  Correct.

01:01PM   8    Q.  Okay.  Now, in approximately January of 2019, did you

01:01PM   9    learn that Anthony Gerace and Michael Sinatra's houses were

01:01PM   10   raided by law enforcement?

01:01PM   11   A.  Yes.

01:01PM   12       **MR. TRIPI:**  We can take that down, Ms. Champoux.

01:01PM   13       **BY MR. TRIPI:**

01:01PM   14   Q.  After Michael Sinatra and Anthony Gerace's houses were

01:01PM   15   searched, did you speak about it -- just yes or no -- with

01:01PM   16   Mr. Bongiovanni?

01:01PM   17   A.  Yes.

01:01PM   18   Q.  Did you discuss, specifically with Mr. Bongiovanni,

01:01PM   19   Anthony Gerace's house being searched?

01:01PM   20   A.  Yes.

01:01PM   21   Q.  When Mr. Bongiovanni discussed that with you, what was

01:02PM   22   his demeanor?

01:02PM   23   A.  Not himself.  Nervous.

01:02PM   24   Q.  In that timeframe between fall of 2018 and the time

01:02PM   25   following when you heard about Michael Sinatra and Anthony

01:02PM  1    Gerace's house being searched, in that timeframe, did

01:02PM  2    Mr. Bongiovanni comment to you that he was being scrutinized

01:02PM  3    at work over Anthony and Peter Gerace?

01:02PM  4            **MR. SOEHNLEIN:**  Objection.  In furtherance.

01:02PM  5            **THE COURT:**  Oh, yeah.  Hearsay.

01:02PM  6            **MR. TRIPI:**  State of mind, Your Honor.

01:02PM  7            **THE COURT:**  Mr. Bongiovanni's state of mind?

01:02PM  8            **MR. TRIPI:**  Yes.

01:02PM  9            **THE COURT:**  Okay.  So this is not being admitted for

01:02PM  10   the truth of it, it's being admitted to show Mr. Bongiovanni's

01:03PM  11   state of mind.

01:03PM  12           Objection overruled on that -- on that limited

01:03PM  13   ground, and you can answer.

01:03PM  14           **THE WITNESS:**  Yes, it was.

01:03PM  15           **BY MR. TRIPI:**

01:03PM  16   Q.  You said:  Yes, it was.

01:03PM  17       Did you mean:  Yes, he was?

01:03PM  18   A.  Yes.

01:03PM  19   Q.  Okay.  Did you witness Mr. Bongiovanni become

01:03PM  20   increasingly stressed prior to retiring from DEA?

01:03PM  21   A.  Yes.

01:03PM  22   Q.  After he retired from DEA, did you later hear that

01:03PM  23   Mr. Bongiovanni's house was searched in around June of 2019?

01:03PM  24   A.  Yes.

01:03PM  25           **MR. SOEHNLEIN:**  Objection.

USA v Gerace - Selva - Tripi/Direct - 12/13/24
86

01:03PM    1          **THE COURT:**  Yeah, sustained.

01:03PM    2          **BY MR. TRIPI:**

01:03PM    3   Q.  After Mr. Bongiovanni's home was searched in or about

01:04PM    4   June of 2019, did you meet up with him at some point?

01:04PM    5          **MR. SOEHNLEIN:**  Objection.  Same objection, Judge.

01:04PM    6          **MR. TRIPI:**  Judge --

01:04PM    7          **THE COURT:**  Did you meet up with him?  No, overruled.

01:04PM    8          **BY MR. TRIPI:**

01:04PM    9   Q.  Did you meet up with Mr. Bongiovanni after a period of

01:04PM   10   time?

01:04PM   11   A.  After a period of time, yes.

01:04PM   12   Q.  Was there a short period of time where Mr. Bongiovanni

01:04PM   13   was sort of laying low where you couldn't get ahold of him?

01:04PM   14   A.  Yes.

01:04PM   15   Q.  After about month or so, did you and he reconnect?

01:04PM   16   A.  Yes.

01:04PM   17   Q.  At that point after the searches of Anthony and Joe later

01:04PM   18   that same year, were you nervous?

01:04PM   19   A.  Yes.

01:04PM   20   Q.  Did you have a discussion with Mr. Bongiovanni at his

01:05PM   21   house in his driveway?

01:05PM   22   A.  Yes.

01:05PM   23   Q.  Now is that one of the occasions where Mr. Bongiovanni

01:05PM   24   reminded you of what you should say to law enforcement if

01:05PM   25   they approached you?

| | | |
|---|---|---|
| 01:05PM | 1 | A.  It was.  Yes. |
| 01:05PM | 2 | Q.  Was that essentially to tell them you were his informant? |
| 01:05PM | 3 | A.  Correct. |
| 01:05PM | 4 | Q.  And that would have been false, correct? |
| 01:05PM | 5 | A.  Correct. |
| 01:05PM | 6 | Q.  Did you also sort of meet up at a point in time near |
| 01:05PM | 7 | Delaware Park and have a similar discussion? |
| 01:05PM | 8 | A.  Yes. |
| 01:05PM | 9 | Q.  During the walk in the Delaware Park meeting, did you |
| 01:05PM | 10 | also discuss with him Anthony Gerace? |
| 01:05PM | 11 | **MR. SOEHNLEIN:**  Objection. |
| 01:05PM | 12 | **MR. TRIPI:**  It's a "yes" or "no" question, Judge. |
| 01:05PM | 13 | **THE COURT:**  Yeah, overruled. |
| 01:05PM | 14 | **THE WITNESS:**  Yes. |
| 01:05PM | 15 | **BY MR. TRIPI:** |
| 01:05PM | 16 | Q.  During the meeting in the park, what, if any, concerns |
| 01:05PM | 17 | was Mr. Bongiovanni expressing to you regarding Anthony |
| 01:06PM | 18 | Gerace? |
| 01:06PM | 19 | A.  Well, he was -- he was nervous about it, that it would |
| 01:06PM | 20 | come back on him with this whole operation that was going on. |
| 01:06PM | 21 | **MR. SOEHNLEIN:**  Your Honor, can we approach, please? |
| 01:06PM | 22 | **THE COURT:**  Yeah, come on up. |
| 01:06PM | 23 | (Sidebar discussion held on the record.) |
| 01:06PM | 24 | **THE COURT:**  The whole operation going on, I think |
| 01:06PM | 25 | he's talking about the Serio conspiracy, which he shouldn't. |

01:06PM   1   I don't know if that's what he meant, but I don't want to go.

01:06PM   2        MR. TRIPI:  I understand.  I clearly -- my question

01:06PM   3   is clear about Anthony Gerace.  And the problem for the

01:06PM   4   witness is Anthony Gerace is involved across the board.

01:06PM   5        THE COURT:  I understand.

01:06PM   6        MR. TRIPI:  I understand that.  So I can ask a more

01:06PM   7   leading question.

01:06PM   8        THE COURT:  I don't think there's -- I don't think

01:06PM   9   that the answer right now by itself is harmful if we want to

01:06PM  10   let the jury know what he meant by --

01:07PM  11        MR. TRIPI:  Obviously, something's happening if law

01:07PM  12   enforcement is searching Anthony Gerace's house.  They've seen

01:07PM  13   big boxes of marijuana and drugs.

01:07PM  14        THE COURT:  I understand that.

01:07PM  15        MR. TRIPI:  So, I mean, it's not --

01:07PM  16        THE COURT:  I understand that.  But -- but again, I

01:07PM  17   don't want the Serio conspiracy to make its way in through the

01:07PM  18   back door, so --

01:07PM  19        MR. TRIPI:  I'll ask a very pointed question.

01:07PM  20        THE COURT:  I overrule the objection, but I don't

01:07PM  21   want to get into the Serio conspiracy.

01:07PM  22        MR. FOTI:  Yeah, I think the jury hears "operation,"

01:07PM  23   they're going to assume it relates to something involving

01:07PM  24   between Anthony Gerace and Peter Gerace, and we know factually

01:07PM  25   that that's not the case, so I'm worried about the unfair

01:07PM   1    prejudice.

01:07PM   2         THE COURT:  You can clear that up.

01:07PM   3         MR. FOTI:  We certainly could, but we -- we don't

01:07PM   4    want to do it at risk of an argument being presented that now

01:07PM   5    they've opened the door to other things.

01:07PM   6         THE COURT:  He can certainly say right now --

01:07PM   7         MR. TRIPI:  You don't want me to ask that question,

01:07PM   8    I'm sure.

01:07PM   9         THE COURT:  There may be a way to do it, but I don't

01:07PM  10    think that without thinking of a Serio conspiracy.

01:08PM  11         MR. FOTI:  I don't think so either, it's a reference

01:08PM  12    to a conspiracy involving Peter Gerace.

01:08PM  13         MR. TRIPI:  It's Anthony, Judge.  I'm sorry that he

01:08PM  14    was involved in drugs with his brother, and his brother was

01:08PM  15    involved in drugs with Ron Serio.  But that's the reality of

01:08PM  16    life.

01:08PM  17         And he's already talked about Joe telling him he

01:08PM  18    stepped in for Anthony and Peter.

01:08PM  19         THE COURT:  Yeah, and Anthony is involved in the

01:08PM  20    conspiracy that's at issue here in some ways.

01:08PM  21         MR. FOTI:  Some ways in a very min -- it's certainly

01:08PM  22    not an operation.

01:08PM  23         THE COURT:  I agree.  Well --

01:08PM  24         MR. FOTI:  The testimony that we've heard is Anthony

01:08PM  25    gave Peter drugs once when Peter came over with his girlfriend

01:08PM 1    late at night, and that Anthony has sold drugs a couple times

01:08PM 2    in Pharaoh's.

01:08PM 3         THE COURT:  Do you want me to tell the jury to strike

01:08PM 4    the whole operation and let Mr. Tripi reword it a little

01:08PM 5    differently with questions?

01:08PM 6         MR. TRIPI:  Personally, I think that it's right over

01:08PM 7    their head, and all we're doing is drawing attention to it.

01:09PM 8         THE COURT:  So do I.

01:09PM 9         MR. TRIPI:  Yeah, I get it, I get it.

01:09PM 10        MR. FOTI:  So we won't ask for the instruction.

01:09PM 11        THE COURT:  You don't want it, right?  The next

01:09PM 12   question, right?  And let's keep it tight.

01:09PM 13        (End of sidebar discussion.)

01:09PM 14        THE COURT:  Mr. Selva, I want you to speak up right

01:09PM 15   into the microphone, please.

01:09PM 16        THE WITNESS:  Yes, Your Honor.

01:09PM 17        BY MR. TRIPI:

01:09PM 18   Q.  In your discussion with Mr. Bongiovanni as part of it,

01:09PM 19   just listen to this question, as part of your discussion as

01:09PM 20   you walked with Mr. Bongiovanni in the vicinity of Delaware

01:09PM 21   Park, did Mr. Bongiovanni tell you he was concerned that

01:09PM 22   Anthony would flip because Mr. Bongiovanni had helped him

01:09PM 23   before, and he had helped him on a prior arrest?

01:09PM 24   A.  Yes.

01:09PM 25   Q.  Was Bongiovanni concerned about that?

01:09PM  1    A.  He was.

01:09PM  2    Q.  And is that what you talked about earlier when you

01:10PM  3    referenced him stepping in regarding Amherst police?

01:10PM  4    A.  Correct.

01:10PM  5    Q.  Okay.  All right.  I'm going to hand you an exhibit,

01:10PM  6    Government Exhibit 208D.  I'm going to ask you to just take a

01:10PM  7    look at it, and when you're done, look up.

01:10PM  8         **MR. TRIPI:**  Do you need to see it?

01:10PM  9         **MR. SOEHNLEIN:**  Can I?

01:11PM  10        **BY MR. TRIPI:**

01:11PM  11   Q.  Okay.  I'm going to hand you up two exhibits.  Government

01:11PM  12   Exhibit 208D and Government Exhibit 208K.  Take a moment and

01:11PM  13   look at these and then I'm going to have some questions about

01:11PM  14   them, okay?

01:11PM  15   A.  Okay.

01:11PM  16   Q.  Did you have a chance to look at those?

01:12PM  17   A.  I did.

01:12PM  18   Q.  Starting at Exhibit 208D, do you recognize that?

01:12PM  19   A.  I do.

01:12PM  20   Q.  Now going back in time for a moment, back on August 23rd,

01:12PM  21   2019 when the search warrant was executed at your residence,

01:12PM  22   I think yesterday you indicated that you gave your cell phone

01:12PM  23   to HSI for them to search; is that right?

01:13PM  24   A.  That's correct.

01:13PM  25   Q.  And is it your understanding they extracted the data from

01:13PM    1    your phone and then returned your cell phone?

01:13PM    2    A.  Yes.

01:13PM    3    Q.  And since that time, you've looked at the data extracted

01:13PM    4    from your phone, and you've verified that was from your

01:13PM    5    phone, correct?

01:13PM    6    A.  Correct.

01:13PM    7    Q.  Now looking at Exhibit 208D, does that contain contacts

01:13PM    8    that were in your phone at that time?

01:13PM    9    A.  It does, yes.

01:13PM    10   Q.  And do you recognize it because you reviewed it and

01:13PM    11   initialed it?

01:13PM    12   A.  I do, yes.

01:13PM    13   Q.  And you recognize the contacts that were in the phone as

01:13PM    14   being contacts you had?

01:13PM    15   A.  Yes.

01:13PM    16   Q.  Does that Exhibit 208D fairly and accurately depict

01:13PM    17   contacts that were in your phone as of August 23rd, 2019?

01:13PM    18   A.  They do, yes.

01:13PM    19   Q.  Turning to Exhibit 208K.

01:13PM    20   A.  Okay.

01:13PM    21   Q.  Do you remember doing some internet searches on your

01:13PM    22   phone?

01:13PM    23   A.  Yes.

01:13PM    24   Q.  Did some of those internet searches -- were you trying to

01:13PM    25   find out information about Anthony Gerace during the summer

01:14PM    1    of 2019?

01:14PM    2    A.   Yes.

01:14PM    3    Q.   Do you recognize 208K to be searches that you did on your

01:14PM    4    phone looking for information about Anthony Gerace?

01:14PM    5    A.   Yes.

01:14PM    6    Q.   Do those fairly and accurately depict searches you did in

01:14PM    7    your phone for Anthony Gerace?

01:14PM    8    A.   Yes.

01:14PM    9         **MR. TRIPI:**  The government offers 208D and 208K,

01:14PM   10    Your Honor.

01:14PM   11         **MR. SOEHNLEIN:**  No objection.

01:14PM   12         **THE COURT:**  Received without objection.

01:14PM   13    **(GOV Exhibits 208D, 208K were received in evidence.)**

01:14PM   14         **BY MR. TRIPI:**

01:14PM   15    Q.   I'd like to go through first 208D.  We're winding down,

01:14PM   16    Mr. Selva.  We have a couple more things to cover, but we're

01:14PM   17    almost done.

01:14PM   18    A.   Okay.

01:14PM   19         **MR. TRIPI:**  Okay.  Ms. Champoux, can we zoom in on

01:14PM   20    the contact number 1?

01:14PM   21         **BY MR. TRIPI:**

01:14PM   22    Q.   Did you have a contact in your phone for Anthony Gerace

01:14PM   23    with a phone number?

01:14PM   24    A.   Yes.

01:14PM   25    Q.   Okay.

USA v Gerace - Selva - Tripi/Direct - 12/13/24

94

01:15PM 1    MR. TRIPI:  You can zoom out of that.

01:15PM 2    BY MR. TRIPI:

01:15PM 3    Q.  Did you have several contact numbers for Mike Masecchia?

01:15PM 4    A.  Yes.

01:15PM 5    Q.  And that was someone whose name we saw in the contacts

01:15PM 6    for Mr. Gerace's phone earlier?

01:15PM 7    A.  Yes.

01:15PM 8    Q.  In your contacts, how did you have Mr. Masecchia's saved?

01:15PM 9    A.  The name under --

01:15PM 10   Q.  Yeah.

01:15PM 11   A.  His nickname was the Gorilla.

01:15PM 12   Q.  Okay.  So when we see, Gorilla ape, Gorilla new number,

01:15PM 13   Gorilla, Grover Gorilla, are those references to Masecchia?

01:15PM 14   A.  Yes.

01:15PM 15   MR. TRIPI:  So let's go to the next page,

01:15PM 16   Ms. Champoux.

01:15PM 17   BY MR. TRIPI:

01:15PM 18   Q.  Contact number 8, do you see that?

01:15PM 19   A.  Yes.

01:15PM 20   Q.  Is that a phone number you had for Joe Bongiovanni, two

01:15PM 21   phone numbers?

01:15PM 22   A.  Yes.

01:15PM 23   Q.  Now were those phone numbers you had received regarding

01:15PM 24   him after he separated from the DEA?

01:16PM 25   A.  One, yes.  Well, one of them was.

01:16PM   1   Q.  Was his DEA phone number, if you recall it, 818 -- an 818

01:16PM   2   number?

01:16PM   3   A.  It was.

01:16PM   4   Q.  So these are two other numbers you had?

01:16PM   5   A.  Yes.

01:16PM   6        MR. TRIPI:  Okay.  Zoom out of that.

01:16PM   7        BY MR. TRIPI:

01:16PM   8   Q.  Contact number 10.  You have Mr. Bongiovanni's wife's

01:16PM   9   phone number's as well?

01:16PM   10  A.  Yes.

01:16PM   11  Q.  And we saw her in one of the photos earlier in your

01:16PM   12  testimony, correct?

01:16PM   13  A.  Yes.

01:16PM   14  Q.  Okay.

01:16PM   15       MR. TRIPI:  We can zoom out of that.  Scroll down a

01:16PM   16  little bit to contact 11, please.

01:16PM   17       BY MR. TRIPI:

01:16PM   18  Q.  Okay.  Who's that?

01:16PM   19  A.  That's Lillo Brancato, the actor who was actually friends

01:16PM   20  with Kim Mecca who you mentioned earlier.

01:16PM   21  Q.  Okay.

01:16PM   22  A.  And I got to know him through her.

01:16PM   23  Q.  And what were some of the movies or shows he's been in?

01:17PM   24  A.  He was in the movie a Bronx Tale, a few other ones.  He

01:17PM   25  was on The Sopranos, I think Crimson Tide.

USA v Gerace - Selva - Tripi/Direct - 12/13/24
96

| | | |
|---|---|---|
| 01:17PM | 1 | Q.  We're gonna pause here for a moment. |
| 01:17PM | 2 | **MR. TRIPI:**  Ms. Champoux, can we switch back to |
| 01:17PM | 3 | Exhibit 310D now?  Bear with me just a moment. |
| 01:18PM | 4 | Okay.  Ms. Champoux, could we go to a message, |
| 01:18PM | 5 | March 6th, 2016, at 8:53 p.m.  I can't give you a page number |
| 01:18PM | 6 | because this isn't numbered, but if you can scroll down to a |
| 01:18PM | 7 | March 6th, 2016 message in Exhibit 310D. |
| 01:18PM | 8 | 2016, yeah, March 6th.  There you go. |
| 01:18PM | 9 | **BY MR. TRIPI:** |
| 01:18PM | 10 | Q.  All right.  Do you see a photograph there of two people |
| 01:18PM | 11 | on Exhibit 310D? |
| 01:18PM | 12 | A.  Yes. |
| 01:18PM | 13 | Q.  Okay.  Who do you see in that photo? |
| 01:19PM | 14 | A.  Lillo Brancato and Mr. Gerace. |
| 01:19PM | 15 | Q.  Okay.  That's the same Lillo Brancato that you have |
| 01:19PM | 16 | stored in your phone, correct? |
| 01:19PM | 17 | A.  Yes. |
| 01:19PM | 18 | **MR. TRIPI:**  Let's go back to Exhibit 208D.  We'll |
| 01:19PM | 19 | look at contact 13, scrolling a little bit. |
| 01:19PM | 20 | **BY MR. TRIPI:** |
| 01:19PM | 21 | Q.  Is that another number you had for Mike Masecchia? |
| 01:19PM | 22 | A.  Yes. |
| 01:19PM | 23 | Q.  Okay. |
| 01:19PM | 24 | **MR. TRIPI:**  Let's go to the contact under that, |
| 01:19PM | 25 | contact 14. |

01:19PM     1          **BY MR. TRIPI:**

01:19PM     2     Q.  Did you have a contact for Michael Sinatra?

01:19PM     3     A.  Yes.

01:19PM     4     Q.  Is that the same person we saw in that Exhibit 126 a

01:19PM     5     moment ago?

01:19PM     6     A.  Yeah.

01:19PM     7     Q.  The photograph?

01:19PM     8     A.  Yes.

01:19PM     9     Q.  Okay.  It's the same person who was in the picture with

01:19PM    10     Mr. Bongiovanni?

01:19PM    11     A.  Yes, sir.

01:19PM    12          **MR. TRIPI:**  Okay.  Scroll out of that.

01:19PM    13          **BY MR. TRIPI:**

01:20PM    14     Q.  And we went through phone records earlier where you were

01:20PM    15     in contact with Mr. Gerace, but you had him as a contact in

01:20PM    16     your phone, and you had his number saved; is that right?

01:20PM    17     A.  That's correct.

01:20PM    18          **MR. TRIPI:**  Okay.  We can zoom out of that.  If we

01:20PM    19     can zoom in on 18 and 19.

01:20PM    20          **BY MR. TRIPI:**

01:20PM    21     Q.  When we were looking through contacts for Mr. Gerace's

01:20PM    22     phone, we saw a person named Wayne Anderson.  Do you also

01:20PM    23     have Wayne Anderson's contact information?

01:20PM    24     A.  Yes.

01:20PM    25     Q.  Is he someone you've known for a long time?

01:20PM    1    A.  Yes.

01:20PM    2    Q.  Is that someone who also knows Mr. Bongiovanni?

01:20PM    3    A.  Yes.

01:20PM    4    Q.  By the way, does Mr. Masecchia also know Mr. Bongiovanni?

01:20PM    5    A.  He does.

01:20PM    6    Q.  For a long time?

01:20PM    7    A.  He does.

01:20PM    8    Q.  Since childhood?

01:20PM    9    A.  Since childhood, yes.

01:20PM   10          **MR. TRIPI:**  Keep scrolling down.  Stop there.

01:20PM   11          **BY MR. TRIPI:**

01:20PM   12    Q.  Okay.  Now earlier in Mr. Gerace's phone, we looked at a

01:20PM   13    person named Turtle; do you remember that?

01:20PM   14    A.  Yes.

01:20PM   15    Q.  And now you have a contact named Donnie Panepinto?

01:21PM   16    A.  That's Mr. Panepinto's son.

01:21PM   17    Q.  So the Donnie that you have in your phone is Turtle's

01:21PM   18    son?

01:21PM   19    A.  Yes.

01:21PM   20    Q.  And I think you indicated already that Mr. Bongiovanni

01:21PM   21    previously dated Dana?

01:21PM   22    A.  Yes.

01:21PM   23          **MR. TRIPI:**  We can zoom out of that.  Are we at the

01:21PM   24    bottom?

          25

01:21PM   1         **BY MR. TRIPI:**

01:21PM   2    Q.  And the last one there was a Frank Tripi in Mr. Gerace's

01:21PM   3    phone; do you remember that?

01:21PM   4    A.  Yes.

01:21PM   5    Q.  Exhibit 310AT, to be specific, do you remember you looked

01:21PM   6    at that?

01:21PM   7    A.  Yes, I do.  Yes.

01:21PM   8    Q.  Remember I showed you the first page?

01:21PM   9    A.  Yes.

01:21PM  10    Q.  Do you see a Frank Tripi spelled with one P this time?

01:21PM  11    A.  Yes.

01:21PM  12    Q.  Again, no relation to mine though?

01:21PM  13    A.  Correct.

01:21PM  14         **MR. TRIPI:**  We can take that down, I think.

01:21PM  15         Oops, we've got more.  Keep going.

01:21PM  16         Stop a little bit.  Keep going.

01:22PM  17         **BY MR. TRIPI:**

01:22PM  18    Q.  Oh, yeah, we've talked about Tom Napoli.  You also had

01:22PM  19    contact for him in terms of Facebook and phone numbers; is

01:22PM  20    that right?

01:22PM  21    A.  That's correct.

01:22PM  22         **MR. TRIPI:**  Are we at the bottom?

01:22PM  23         **MS. CHAMPOUX:**  Yep.

01:22PM  24         **MR. TRIPI:**  Okay.  We can take that down, thank you

01:22PM  25    very much.

01:22PM   1            All right.  We're going to switch over to Exhibit

01:22PM   2   208K now, and go to -- I think the second page of that.

01:22PM   3            If we can zoom in on the searched items.

01:22PM   4            **BY MR. TRIPI:**

01:22PM   5   Q.  After Mr. Gerace -- Anthony Gerace's house was searched

01:22PM   6   in January, and after Mr. Bongiovanni's house was searched in

01:22PM   7   June, did you start to search for information about Anthony

01:22PM   8   Gerace on the internet?

01:22PM   9   A.  Yes.

01:22PM  10   Q.  Were you trying to get information about his case?

01:23PM  11   A.  Yes.

01:23PM  12   Q.  Was that at the time you were becoming increasingly

01:23PM  13   concerned?

01:23PM  14   A.  Yes.

01:23PM  15   Q.  About two months after you did -- a little less than two

01:23PM  16   months after you did your first search on June 30th, 2019,

01:23PM  17   down at the bottom here, was your house searched?

01:23PM  18   A.  Yes.

01:23PM  19   Q.  How many times after the warrant was executed at

01:23PM  20   Mr. Bongiovanni's house did he meet with you and remind you

01:23PM  21   that the cover story was to pretend that you were his

01:23PM  22   informant?

01:23PM  23   A.  A few times.

01:23PM  24   Q.  More than once?

01:23PM  25   A.  More than once.

01:23PM   1   Q.  More than twice?

01:23PM   2   A.  More than twice, yes.

01:23PM   3   Q.  Was -- were those in public places or at his house?

01:23PM   4   A.  At his house.  And then I believe one time we were in a

01:24PM   5   public place, a bar.  But mostly the -- it was at his house,

01:24PM   6   yes.

01:24PM   7   Q.  You remember several meetings?

01:24PM   8   A.  Yes, it was --

01:24PM   9           **MR. TRIPI:**  One moment, please, Your Honor.

01:24PM  10           **THE COURT:**  Yes.

01:24PM  11           **BY MR. TRIPI:**

01:24PM  12   Q.  I think I skipped over one thing, so we're almost done.

01:24PM  13           **MR. TRIPI:**  Can you pull up 109AB?

01:24PM  14           **THE COURT:**  In evidence?

01:24PM  15           **MR. TRIPI:**  Yeah, it is in evidence, Judge.

01:24PM  16           **BY MR. TRIPI:**

01:24PM  17   Q.  Is this a car, do you recognize this?

01:24PM  18   A.  Yes.

01:24PM  19   Q.  Did you take that photo of Mr. Bongiovanni in that

01:24PM  20   vehicle?

01:24PM  21   A.  I did, yes.

01:24PM  22   Q.  When Mr. Bongiovanni first purchased that vehicle, did it

01:24PM  23   look like that?  Was it in that condition?  Or did he restore

01:25PM  24   it?

01:25PM  25   A.  He restored it.

01:25PM     1    Q.  Did he do a lot of work on it as far as you know?

01:25PM     2    A.  Yes.

01:25PM     3    Q.  Did that happen as his financial condition improved?

01:25PM     4    A.  Yes.

01:25PM     5          **MR. TRIPI:**  Okay.  Nothing further, Judge.

01:25PM     6          **THE COURT:**  Mr. Soehnlein.

01:25PM     7

01:25PM     8          **CROSS-EXAMINATION BY MR. SOEHNLEIN:**

01:25PM     9    Q.  Mr. Selva, what is a cooperation agreement?

01:25PM    10    A.  What is a cooperation agreement?

01:25PM    11    Q.  Yeah.  Yeah.

01:25PM    12    A.  That I'm gonna tell the truth, I mean, I was signed -- I

01:25PM    13    signed an agreement with them.

01:25PM    14    Q.  And you haven't been charged with a crime, correct?

01:25PM    15    A.  No.

01:25PM    16    Q.  And the cooperation agreement doesn't necessarily

01:25PM    17    contemplate you will be charged with a crime, correct?

01:25PM    18    A.  There's nothing guaranteed.

01:25PM    19    Q.  Yeah.  And that's an agreement between yourself and the

01:25PM    20    United States Attorney's Office, correct?

01:25PM    21    A.  Correct.

01:25PM    22    Q.  And these prosecutors behind me, they're from the same

01:26PM    23    United States Attorney's Office that you have that agreement

01:26PM    24    with, correct?

01:26PM    25    A.  Correct.

01:26PM  1   Q.  And that United States Attorney's Office is the same

01:26PM  2   office that will decide whether or not to bring charges

01:26PM  3   against you, correct?

01:26PM  4   A.  Yes.

01:26PM  5   Q.  Now, as part of that cooperation agreement, you have to

01:26PM  6   show up whenever they want you to show up, correct?

01:26PM  7   A.  Correct.

01:26PM  8   Q.  You have to testify whenever they want you to testify,

01:26PM  9   correct?

01:26PM  10  A.  Correct.

01:26PM  11  Q.  You have to meet with them whenever they want to meet

01:26PM  12  with you, correct?

01:26PM  13  A.  Correct.

01:26PM  14  Q.  And with respect to this case, how many different times

01:26PM  15  did they change the date of your testimony?

01:26PM  16  A.  Today?  I don't know, a few.  I'm not, you know.

01:26PM  17  Q.  Yeah, they kept changing the date on you, correct?

01:26PM  18  A.  Correct.

01:26PM  19  Q.  And you never told them that you couldn't be there,

01:26PM  20  correct?

01:26PM  21  A.  No.

01:26PM  22  Q.  You never told them that you had any scheduling issues or

01:26PM  23  anything like that, correct?

01:26PM  24  A.  Any time I was told, I'd rearranged my schedule.

01:26PM  25  Q.  Yeah.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

104

| | | |
|---|---|---|
| 01:26PM | 1 | A.  The work schedule. |
| 01:26PM | 2 | Q.  Yeah.  Because this is the most important thing going on |
| 01:26PM | 3 | for you right now, correct? |
| 01:26PM | 4 | A.  It's important, yes. |
| 01:26PM | 5 | Q.  Well, it's not just important, it's the most important |
| 01:27PM | 6 | thing? |
| 01:27PM | 7 | A.  Yes. |
| 01:27PM | 8 | Q.  I mean, because depending on how you do here is -- is |
| 01:27PM | 9 | going to play into whether or not you're ever charged |
| 01:27PM | 10 | correct? |
| 01:27PM | 11 | **MR. TRIPI:**  Objection. |
| 01:27PM | 12 | **THE COURT:**  Overruled. |
| 01:27PM | 13 | **THE WITNESS:**  Correct. |
| 01:27PM | 14 | **BY MR. SOEHNLEIN:** |
| 01:27PM | 15 | Q.  Yeah.  And that decision, the judge doesn't make the |
| 01:27PM | 16 | decision of whether or not you're charged, correct? |
| 01:27PM | 17 | A.  Correct. |
| 01:27PM | 18 | Q.  And your lawyer doesn't get to make that decision of |
| 01:27PM | 19 | whether or not you're charged, correct? |
| 01:27PM | 20 | A.  Correct. |
| 01:27PM | 21 | Q.  That's only the United States Attorney's Office, correct? |
| 01:27PM | 22 | A.  That's correct. |
| 01:27PM | 23 | Q.  Okay.  So you've got a lot on the line here, correct? |
| 01:27PM | 24 | A.  Correct. |
| 01:27PM | 25 | Q.  Might be one of the most important days of your life, |

01:27PM    1    right?

01:27PM    2    A.   Correct.

01:27PM    3    Q.   Okay.  Now, on -- on August 23rd, 2019, your house was

01:27PM    4    searched; do you recall that?

01:27PM    5    A.   That's correct.

01:27PM    6    Q.   The search was early in the morning, correct?

01:27PM    7    A.   It was.

01:27PM    8    Q.   Flash bangs?

01:27PM    9    A.   Yes, they broke the door down.

01:28PM    10   Q.   Yeah.  Do you recall how many agents came into your

01:28PM    11   house?

01:28PM    12   A.   I don't remember.  There was a bunch of them.  I don't,

01:28PM    13   there was numerous.

01:28PM    14   Q.   Yeah.  And you weren't expecting that to happen, correct?

01:28PM    15   A.   No.

01:28PM    16   Q.   Yeah.  That was very scary, wasn't it?

01:28PM    17   A.   Yes.  It was scary, yes.

01:28PM    18   Q.   You were in the house?

01:28PM    19   A.   Yes.

01:28PM    20   Q.   You were asleep?

01:28PM    21   A.   No.

01:28PM    22   Q.   No?  You were awake?

01:28PM    23   A.   I was actually having a cup of coffee getting ready to go

01:28PM    24   to work.

01:28PM    25   Q.   And you were getting ready to go to work as an Erie

01:28PM   1   County sheriff, correct?

01:28PM   2   A.   Yes.

01:28PM   3   Q.   Sheriff's deputy, I should say.

01:28PM   4   A.   Correct.

01:28PM   5   Q.   You work at the holding center, correct?

01:28PM   6   A.   Correct.

01:28PM   7   Q.   And you'd had that job for a couple of years at that

01:28PM   8   point?

01:28PM   9   A.   No, I just -- I had just gotten it in March, so --

01:28PM   10   Q.   Okay.

01:28PM   11   A.   Six months.

01:28PM   12   Q.   Okay.  And before that, you had gone through the academy

01:28PM   13   and the training, correct?

01:28PM   14   A.   Correct.  The academy was 12 weeks, yes.

01:28PM   15   Q.   So you had gone through 12 weeks of training, and then

01:28PM   16   you had the job about six months at that point?

01:28PM   17   A.   Correct.

01:28PM   18   Q.   And you were getting ready to go to work, correct?

01:29PM   19   A.   Correct.

01:29PM   20   Q.   And Ms. Mecca was there with you, as well?

01:29PM   21   A.   She was.

01:29PM   22   Q.   And she was your girlfriend at the time?

01:29PM   23   A.   Correct.

01:29PM   24   Q.   And how long had you been together?

01:29PM   25   A.   A few years.  Almost three years.

01:29PM   1   Q. And -- and that was a stressful experience, correct?

01:29PM   2   A. Yes.

01:29PM   3   Q. Describe what thoughts were going through your head.

01:29PM   4   A. Well, it was startling. First -- there were a lot of

01:29PM   5   thoughts.

01:29PM   6   Q. You were thinking about your future, correct?

01:29PM   7   A. Correct.

01:29PM   8   Q. You were thinking about the people who were closest to

01:29PM   9   you?

01:29PM   10   A. Correct.

01:29PM   11   Q. You were hoping you weren't going to go to jail?

01:29PM   12   A. Correct.

01:29PM   13   Q. You were hoping maybe you could keep your job, correct?

01:29PM   14   A. I knew -- well, the thought was going through my mind

01:29PM   15   that I'd have to resign.

01:29PM   16   Q. Okay. And you resigned that day?

01:29PM   17   A. I resigned that day.

01:29PM   18   Q. Yeah. You went into work, and you resigned, correct?

01:29PM   19   A. After I called my attorney, yes.

01:29PM   20   Q. Okay. And because you had some law enforcement training,

01:29PM   21   you did have law enforcement training before that, correct?

01:30PM   22   A. I did, correct?

01:30PM   23   Q. We talked about that.

01:30PM   24   And immediately, you met with the people that were

01:30PM   25   searching your house, correct?

01:30PM    1    A.  Not immediately.  I mean the few days later it was on

01:30PM    2    the --

01:30PM    3    Q.  Well, that day, you consented to a search of your cell

01:30PM    4    phone, correct?

01:30PM    5    A.  Correct.

01:30PM    6    Q.  And you gave some statements to law enforcement, correct?

01:30PM    7    A.  Correct.

01:30PM    8    Q.  You told them some information, correct?

01:30PM    9    A.  Correct.

01:30PM    10    Q.  All right.  Even though you understood you had a right to

01:30PM    11    remain silent, correct?

01:30PM    12    A.  Correct.  It was general information.

01:30PM    13    Q.  Okay.  But you shared that information with them,

01:30PM    14    correct?

01:30PM    15    A.  Yes.

01:30PM    16    Q.  And then you made arrangements to meet with them again on

01:30PM    17    Monday, correct?

01:30PM    18    A.  Yes, with my attorney.

01:30PM    19    Q.  Yeah.  Because the search was on a Friday morning,

01:30PM    20    correct?

01:30PM    21    A.  Correct.

01:30PM    22    Q.  Okay.  So you didn't hesitate to cooperate, correct?

01:30PM    23    A.  I didn't hesitate to speak to them, no.

01:30PM    24    Q.  In fact, you were eager to speak with them, correct?

01:30PM    25    A.  I wanted to speak to them, yes.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

01:30PM  1   Q.  Yeah.  Yeah.  Over the weekend, you were thinking through

01:30PM  2   all these issues on Saturday and Sunday, correct?

01:30PM  3   A.  Correct.

01:30PM  4   Q.  You're worried about your future, correct?

01:31PM  5   A.  Correct.

01:31PM  6   Q.  You were worried about whether or not you're gonna get

01:31PM  7   charged with a crime, correct?

01:31PM  8   A.  Correct.

01:31PM  9   Q.  You're worried about whether or not you're gonna go to

01:31PM  10  prison, correct?

01:31PM  11  A.  Sure, correct.

01:31PM  12  Q.  You're thinking about the people who are close to you?

01:31PM  13  A.  Correct.

01:31PM  14  Q.  You're thinking about what impact that would have on them

01:31PM  15  if you had to go to prison, correct?

01:31PM  16  A.  Correct.

01:31PM  17  Q.  You're thinking about your family?

01:31PM  18  A.  Correct.

01:31PM  19  Q.  All right.  And so then you went ahead and you met with

01:31PM  20  law enforcement on August 26th of 2019 at the U.S. Attorney's

01:31PM  21  Office, correct?

01:31PM  22  A.  Correct.

01:31PM  23  Q.  That was the first time that you sat down to cooperate,

01:31PM  24  correct?

01:31PM  25  A.  That's correct.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

01:31PM  1   Q.  And you knew from your law enforcement training that it

01:31PM  2   was important to be truthful, correct?

01:31PM  3   A.  Correct.

01:31PM  4   Q.  And honest, correct?

01:31PM  5   A.  Correct.

01:31PM  6   Q.  And you also knew that you'd get more cooperation credit

01:31PM  7   if you shared more information, correct?

01:31PM  8   A.  That's correct.

01:31PM  9   Q.  And that's consistent with the cooperation agreement,

01:31PM  10  right?

01:31PM  11  A.  Correct.

01:31PM  12  Q.  The agreement you have in place now, correct?

01:31PM  13  A.  Correct.

01:31PM  14  Q.  The more you give, the more you get, right?

01:32PM  15  A.  I guess.  I'm not sure.  Nothing's been guaranteed.

01:32PM  16  Q.  Right.  Well, you wouldn't be here today if you didn't

01:32PM  17  think was gonna help you, would you?

01:32PM  18  A.  Correct.

01:32PM  19  Q.  You're not enjoying this, correct?

01:32PM  20  A.  Correct.

01:32PM  21  Q.  All right.  And you've done this a couple of times now,

01:32PM  22  right?

01:32PM  23  A.  Correct.

01:32PM  24  Q.  In other matters, correct?

01:32PM  25  A.  Correct.

01:32PM    1    Q.   Okay.  Now, you met with law enforcement on August 26th,

01:32PM    2    2019 with your lawyer, right?

01:32PM    3    A.   Correct.

01:32PM    4    Q.   Okay.  And so I don't want to get into the substance of

01:32PM    5    the conversation, but you knew you that part of the proffer

01:32PM    6    was being honest, correct?

01:32PM    7    A.   Correct.

01:32PM    8    Q.   And you were not honest, right?

01:32PM    9    A.   Not fully at that point, no.

01:32PM   10    Q.   No.  Because later, on direct, they talk about how on

01:32PM   11    September 4th, you had a polygraph exam you that failed,

01:32PM   12    correct?

01:32PM   13    A.   That's correct.

01:32PM   14    Q.   Okay.  And so at the first proffer, you were not honest,

01:32PM   15    correct?

01:32PM   16    A.   Correct.

01:32PM   17    Q.   All right.  And that's a crime, correct?

01:32PM   18    A.   Well, we would -- more information was coming out.

01:33PM   19    Q.   Okay.  More information was coming out as they confronted

01:33PM   20    you with it, right?

01:33PM   21    A.   Correct.

01:33PM   22    Q.   Yeah.  You would give one set of facts, correct?

01:33PM   23    A.   Correct.

01:33PM   24    Q.   And then the prosecutors would confront you with another

01:33PM   25    set of facts, correct?

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

112

01:33PM   1   A.  Correct.

01:33PM   2   Q.  Okay.  And ultimately, it came out that be were being

01:33PM   3   untruthful, correct?

01:33PM   4   A.  On the polygraph, yes.

01:33PM   5   Q.  Yeah.  Now they didn't charge you with obstruction that

01:33PM   6   the time, correct?

01:33PM   7   A.  No.

01:33PM   8   Q.  No.  They didn't charge you with making a false statement

01:33PM   9   at that time, correct?

01:33PM   10  A.  No.

01:33PM   11  Q.  They met with you further, correct?

01:33PM   12  A.  Correct.

01:33PM   13  Q.  All right.  They met with you again -- so we talked about

01:33PM   14  August 26th of 2019, and then you took that polygraph on

01:33PM   15  September 4th, 2019, correct?

01:33PM   16  A.  Correct.

01:33PM   17  Q.  And then you met with them again on September 19th, 2019?

01:33PM   18  A.  That's correct.

01:33PM   19  Q.  And then you met with them again on October 1st, 2019,

01:33PM   20  correct?

01:33PM   21  A.  That's correct.

01:33PM   22  Q.  And you met with them again on October 3rd, 2019,

01:33PM   23  correct?

01:33PM   24  A.  That's correct.

01:33PM   25  Q.  And you with met with them again on October 25th, 2019,

01:34PM  1   correct?

01:34PM  2   A.  That's correct.

01:34PM  3   Q.  Okay.  And then eventually, you got into that cooperation

01:34PM  4   agreement in May of 2020, correct?

01:34PM  5   A.  Correct.

01:34PM  6   Q.  And you recall that.  You came down to the U.S.

01:34PM  7   Attorney's Office with your attorney, correct?

01:34PM  8   A.  That's correct.

01:34PM  9   Q.  And then they had a further interview with you that day

01:34PM 10   too?

01:34PM 11   A.  That's correct.

01:34PM 12   Q.  Okay.  Now, these interviews, who are you meeting with

01:34PM 13   during the course of these interviews?  Who do you recall?

01:34PM 14   A.  The U.S. Attorney and their teams.

01:34PM 15   Q.  Okay.  And so what specific individuals?

01:34PM 16   A.  U.S. Attorney Joe Tripi.

01:34PM 17        **MR. TRIPI:**  Assistant.  Assistant.

01:34PM 18        **THE WITNESS:**  Assistant, I'm sorry.

01:34PM 19        **MR. TRIPI:**  Don't promote me.

01:34PM 20        **THE WITNESS:**  Brian Burns.  Marilyn Halliday.

01:34PM 21   Nicholas Cooper.

01:34PM 22        **BY MR. SOEHNLEIN:**

01:34PM 23   Q.  Is there anybody sitting at the two tables behind me

01:34PM 24   today that you didn't meet with in the course of your

01:34PM 25   cooperation?

01:34PM    1    A.   I believe so, yes.

01:34PM    2    Q.   You met with all of them, correct?

01:34PM    3    A.   Yes.

01:34PM    4    Q.   Those are the people who were in the room, correct?

01:34PM    5    A.   Yes.

01:35PM    6    Q.   And there were some additional agents as well at certain

01:35PM    7    times, correct?

01:35PM    8    A.   Yes.

01:35PM    9    Q.   So, you get that cooperation agreement in May 2020

01:35PM   10    correct?

01:35PM   11    A.   Correct.

01:35PM   12    Q.   Correct?  And then you meet with them again in September

01:35PM   13    of 2020, correct?

01:35PM   14    A.   Correct.

01:35PM   15    Q.   Okay.  And then you meet with them again in March of

01:35PM   16    2021, correct?  On March 4th?

01:35PM   17    A.   Correct.

01:35PM   18    Q.   And you meet with them again on March 10th of 2021,

01:35PM   19    correct?

01:35PM   20    A.   Correct.

01:35PM   21    Q.   And then you meet with them on August 18th of 2023,

01:35PM   22    correct?

01:35PM   23    A.   Correct.

01:35PM   24    Q.   And then you meet with them on August 30th of 2023,

01:35PM   25    correct?

01:35PM     1    A.  That's correct.

01:35PM     2    Q.  And then you meet with them again on September 8th of

01:35PM     3    2023, correct?

01:35PM     4    A.  Correct.

01:35PM     5    Q.  And then you meet with them again on September 15th,

01:35PM     6    2023, correct?

01:35PM     7    A.  Correct.

01:35PM     8    Q.  And then you meet with them again on September 26th of

01:35PM     9    2023, correct?

01:35PM    10    A.  Correct.

01:35PM    11    Q.  And then you meet with them again on October 16th of

01:35PM    12    2023, correct?

01:35PM    13    A.  Correct.

01:35PM    14    Q.  And then you meet with them on January 31st of 2024,

01:35PM    15    correct?

01:35PM    16    A.  Correct.

01:35PM    17    Q.  And then you meet with them again on February 4th of

01:35PM    18    2024, correct?

01:35PM    19    A.  Correct.

01:35PM    20    Q.  And then you meet with them again on February 18th of

01:36PM    21    2024, correct?

01:36PM    22    A.  Correct.

01:36PM    23    Q.  And then you meet with them again on February 19th of

01:36PM    24    2024, correct?

01:36PM    25    A.  Correct.

USA v Gerace - Selva - Soehlein/Cross - 12/13/24

116

| | | |
|---|---|---|
| 01:36PM | 1 | Q.  And then you met with them again in connection with this |
| 01:36PM | 2 | testimony, correct? |
| 01:36PM | 3 | A.  With this? |
| 01:36PM | 4 | Q.  Yeah. |
| 01:36PM | 5 | A.  No. |
| 01:36PM | 6 | Q.  No?  You haven't had any further meetings with them? |
| 01:36PM | 7 | A.  No. |
| 01:36PM | 8 | Q.  Okay.  Now, in the time that you're having those |
| 01:36PM | 9 | meetings, you understood that the more information you share, |
| 01:36PM | 10 | the more you get out of cooperation, correct? |
| 01:36PM | 11 | A.  I guess. |
| 01:36PM | 12 | Q.  Yeah. |
| 01:36PM | 13 | A.  Correct. |
| 01:36PM | 14 | Q.  Well, it -- and you were trying to get as much |
| 01:36PM | 15 | cooperation credit as you could, correct? |
| 01:36PM | 16 | A.  I was being honest with them. |
| 01:36PM | 17 | Q.  Okay.  And sharing all the information that you knew, |
| 01:36PM | 18 | correct? |
| 01:36PM | 19 | A.  Yes. |
| 01:36PM | 20 | Q.  And trying to be honest, correct? |
| 01:36PM | 21 | A.  I was. |
| 01:36PM | 22 | Q.  Although, well -- not fully honest, right? |
| 01:36PM | 23 | A.  Well -- |
| 01:36PM | 24 | Q.  A swing and a miss the first time, right? |
| 01:36PM | 25 | A.  As we went further on, yes, it started, correct. |

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24                117

01:36PM  1   Q.  All right.  So I want to turn our attention just briefly.

01:37PM  2       You had some testimony about some statements with respect

01:37PM  3   to Anthony Gerace and a conversation you had with Joe

01:37PM  4   Bongiovanni; do you recall those statements?

01:37PM  5   A.  Yes.

01:37PM  6   Q.  Do you ever recall that testimony, correct?

01:37PM  7   A.  Yes.

01:37PM  8   Q.  All right.  Now, you were an Erie County Sheriff's deputy

01:37PM  9   for a period of time, correct?

01:37PM  10  A.  Correct.

01:37PM  11  Q.  You went through the academy, correct?

01:37PM  12  A.  Correct.

01:37PM  13  Q.  And you understood that most things that are done in law

01:37PM  14  enforcement are documented, correct?

01:37PM  15  A.  Correct.

01:37PM  16  Q.  Usually if you interview a suspect, there's some sort of

01:37PM  17  report that's generated?

01:37PM  18  A.  Yes.

01:37PM  19  Q.  If there's a person of interest in respect to an

01:37PM  20  incident, usually there's something that's generated, right?

01:37PM  21  A.  Correct.

01:37PM  22  Q.  Because in law enforcement, not document means not done,

01:37PM  23  right?

01:37PM  24  A.  Correct.

01:37PM  25  Q.  Everything that law enforcement does is documented in

01:37PM    1    some way, shape, or form, correct?

01:37PM    2    A.  Correct.

01:37PM    3    Q.  To your knowledge, correct?

01:37PM    4    A.  To my knowledge.

01:37PM    5    Q.  And you were in law enforcement, correct?

01:37PM    6    A.  Yes.

01:37PM    7    Q.  Okay.  At any point in time, have you ever seen a report

01:38PM    8    of Anthony Gerace having interaction with the Amherst Police

01:38PM    9    Department?

01:38PM   10    A.  Did I ever see a report?  No.

01:38PM   11    Q.  You've never seen that?

01:38PM   12    A.  No.

01:38PM   13    Q.  All right.  But from your knowledge, would that

01:38PM   14    information be readily available?

01:38PM   15            **MR. TRIPI:**  Objection.  602.

01:38PM   16            **THE COURT:**  Overruled.

01:38PM   17            **THE WITNESS:**  I would not have readily availability

01:38PM   18    of that.

01:38PM   19            **BY MR. SOEHNLEIN:**

01:38PM   20    Q.  No.  But to law enforcement, it would be available

01:38PM   21    correct?

01:38PM   22            **MR. TRIPI:**  Objection.  Now we're arguing with the

01:38PM   23    witness.

01:38PM   24            **THE COURT:**  Overruled.

          25

01:38PM    1    **BY MR. SOEHNLEIN:**

01:38PM    2    Q.  To law enforcement --

01:38PM    3    A.  To law enforcement it would be, yes.

01:38PM    4    Q.  Yeah.  They'd be able to make a call or make a request

01:38PM    5    and get that information, right?

01:38PM    6    A.  Correct.

01:38PM    7    Q.  It wouldn't be hard to find, right?

01:38PM    8    A.  Correct.

01:38PM    9    Q.  Okay.  Now, you had some testimony about

01:38PM    10    Mr. Bongiovanni's child support and alimony; do you remember

01:38PM    11    that?

01:38PM    12    A.  Yes.

01:38PM    13    Q.  Okay.  Now, and you're divorced yourself, correct?

01:38PM    14    A.  I am.

01:38PM    15    Q.  Child-support payments are either an agreement between

01:38PM    16    the parties or set by the Court?

01:38PM    17    A.  Correct.

01:39PM    18    Q.  And both parties usually have attorneys, correct?

01:39PM    19    A.  Correct.

01:39PM    20    Q.  And Mr. Bongiovanni had an attorney?

01:39PM    21    A.  I believe so, yes.

01:39PM    22    Q.  Yeah.  And his wife had an attorney as well?

01:39PM    23    A.  Yes.

01:39PM    24    Q.  Okay.  And so to your understanding, those agreements

01:39PM    25    generally look at a person's income, correct?

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

01:39PM    1    A.  Correct.

01:39PM    2    Q.  And their earning potential, correct?

01:39PM    3    A.  Correct.

01:39PM    4    Q.  That's usually how the amount is set, correct?

01:39PM    5    A.  That's correct.

01:39PM    6    Q.  Okay.  All right.  I want to ask you some questions about

01:39PM    7    that Cabo wedding.  Do you recall there was some -- there was

01:39PM    8    some testimony about you going --

01:39PM    9    A.  Yes.

01:39PM    10   Q.  -- to Cabo.  Now you were Mr. Bongiovanni's best friend,

01:39PM    11   correct?

01:39PM    12   A.  Yes, we were close, yes.

01:39PM    13   Q.  Yeah.  Well, best friends, right?

01:39PM    14   A.  Yes.

01:39PM    15   Q.  You considered him your best friend, correct?

01:39PM    16   A.  Yes.

01:39PM    17   Q.  Different than a normal friendship, best friends, right?

01:39PM    18   A.  Correct.

01:39PM    19   Q.  And you were the best man at that wedding, correct?

01:39PM    20   A.  Yes.

01:39PM    21   Q.  Okay.  And you traveled to Cabo, right?

01:39PM    22   A.  Yes.

01:39PM    23   Q.  And other people traveled to Cabo, correct?

01:39PM    24   A.  Yes.

01:39PM    25   Q.  Okay.  And Mr. Gerace did not go to Cabo, did he?

01:39PM  1    A.  No.

01:39PM  2    Q.  He was not there --

01:39PM  3    A.  He was not.

01:39PM  4    Q.  -- correct?  Yeah.

01:40PM  5        Now, I think that you also had some testimony about some

01:40PM  6    trips that you thought that Mr. Bongiovanni took with

01:40PM  7    Mr. Gerace; do you recall that testimony?

01:40PM  8    A.  Yes.

01:40PM  9    Q.  And I think that -- that you said that one of the trips

01:40PM  10   was to Toronto; do you recall that?

01:40PM  11   A.  Yes.

01:40PM  12   Q.  You don't know that though, right?

01:40PM  13   A.  I don't know that, but I -- I'm going by what

01:40PM  14   Mr. Bongiovanni had told me they had traveled together.

01:40PM  15   Q.  Okay.  Well, you recall that picture that Mr. Tripi

01:40PM  16   showed you that was kind of in a hotel lobby; do you remember

01:40PM  17   that?

01:40PM  18   A.  I believe that was in Las Vegas, if I'm not mistaken.

01:40PM  19   Q.  You believe that that one was in Las Vegas?

01:40PM  20   A.  I don't know.  That's one of the places he said they

01:40PM  21   traveled to.

01:40PM  22   Q.  Okay.  I'm talking about the one that's just all guys.

01:40PM  23   A.  Yes, I don't know where the was at.

01:40PM  24   Q.  All right.  Mr. Gerace is not in that photo, right?

01:40PM  25   A.  No, correct.

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

122

01:40PM      1    Q.  You don't know where that photo was taken?

01:40PM      2    A.  I don't, no.

01:40PM      3    Q.  You don't know where that trip was to?

01:40PM      4    A.  I don't.

01:40PM      5    Q.  You know Mr. Gerace -- Peter Gerace was not there?

01:41PM      6    A.  He was not in that photo, correct.

01:41PM      7    Q.  Okay.  We had some testimony last time we were here

01:41PM      8    whenever that was, a couple days ago, about respect growing

01:41PM      9    up, correct; do you recall that?

01:41PM     10    A.  Yes.

01:41PM     11    Q.  Conversations that you had had with Mr. Bongiovanni when

01:41PM     12    you were kids, correct?

01:41PM     13    A.  Correct.

01:41PM     14    Q.  All right.  And fair to say those conversations were like

01:41PM     15    40 years ago, right?

01:41PM     16    A.  Yeah, correct.  Kids.

01:41PM     17    Q.  These are conversations when you're in grammar school and

01:41PM     18    high school, correct?

01:41PM     19    A.  Teenagers, yes.

01:41PM     20    Q.  Yeah.  Yeah.  And -- and in -- in your upbringing, was it

01:41PM     21    important to respect your elders?

01:41PM     22    A.  Yes.

01:41PM     23    Q.  Was it important to be a gentleman?

01:41PM     24    A.  Yes.

01:41PM     25    Q.  Was it important to respect people who were known in the

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24
123

01:41PM    1    community?

01:41PM    2    A.   Yes.

01:41PM    3    Q.   Was it important to the respect law enforcement?

01:41PM    4    A.   Yes.

01:41PM    5    Q.   Did you also respect sports stars and celebrities and

01:41PM    6    things like that?

01:41PM    7    A.   Sure.

01:41PM    8    Q.   Yeah.  And Mr. Bongiovanni did all those things too,

01:42PM    9    correct?

01:42PM    10   A.   Yes.

01:42PM    11   Q.   He was a gentleman, right?

01:42PM    12   A.   Yes.

01:42PM    13   Q.   He wasn't mean to anybody, correct?

01:42PM    14   A.   No.

01:42PM    15   Q.   Now, there's some conversations -- strike that.

01:42PM    16        There was some testimony about Mr. Bongiovanni apparently

01:42PM    17   telling you to act like an informant, correct?

01:42PM    18   A.   Correct.

01:42PM    19   Q.   Now, he never told you that he told Mr. Gerace to act

01:42PM    20   like an informant, correct?

01:42PM    21   A.   No.

01:42PM    22   Q.   He never told you that, correct?

01:42PM    23   A.   No.

01:42PM    24   Q.   Okay.  And that conversation with respect to his brother,

01:42PM    25   he told you that Peter had called him about Amherst, correct?

USA v Gerace - Selva - Soehlein/Cross - 12/13/24

01:42PM  1    A.  Correct.

01:42PM  2    Q.  Peter didn't tell him what to do with respect to Amherst,

01:42PM  3    correct?

01:42PM  4    A.  He said he asked for help.

01:42PM  5    Q.  Okay.  Just asked for help, correct?

01:42PM  6    A.  That's correct.

01:42PM  7    Q.  He asked for help, right?

01:42PM  8    A.  Right, correct.

01:42PM  9    Q.  Now, when you were in Erie County Sheriff's deputy, did

01:43PM  10   you know that other deputies would have friends or family

01:43PM  11   reach out to them for help?

01:43PM  12   A.  Yes.

01:43PM  13   Q.  Was that something that was commonplace?

01:43PM  14   A.  Sure, if somebody -- yes.

01:43PM  15   Q.  Okay.  And they'd help out for -- or, strike that.

01:43PM  16       They would reach out for traffic matters maybe?

01:43PM  17   A.  It -- yeah, I mean, it could be a few things, yes.

01:43PM  18   Q.  Yeah.  Any number of things, right?

01:43PM  19   A.  Right.

01:43PM  20   Q.  People have contact with law enforcement, and they call

01:43PM  21   someone they know in law enforcement for help, correct?

01:43PM  22   A.  Correct.

01:43PM  23   Q.  And when you were a sheriff's deputy, no one told that

01:43PM  24   all that was improper, correct?

01:43PM  25   A.  Correct.

01:43PM   1   Q.  That was commonplace, right?

01:43PM   2   A.  I don't know if it was commonplace, no one ever told me

01:43PM   3   it was, you know, wrong.

01:43PM   4   Q.  Okay.  But when you learned about it, it didn't raise any

01:43PM   5   red flags for you, correct?

01:43PM   6   A.  No.

01:43PM   7   Q.  Okay.  Now, we talked a little bit about the importance

01:43PM   8   much being honest; do you recall that testimony?

01:43PM   9   A.  Yes.

01:43PM   10  Q.  And the importance of being candid in your cooperation,

01:43PM   11  correct?

01:44PM   12  A.  Correct.

01:44PM   13  Q.  And we talked about how -- how it was important that --

01:44PM   14  important to you early on to share all the information that

01:44PM   15  you knew in the investigation, correct?

01:44PM   16  A.  Correct.  What I was asked, yes.

01:44PM   17  Q.  Yeah.  And in -- in the early parts of the investigation,

01:44PM   18  they were asking you questions about Mr. Gerace, correct?

01:44PM   19  A.  At times, yes.

01:44PM   20  Q.  They asked you questions about Pharaoh's, correct?

01:44PM   21  A.  Yes.

01:44PM   22  Q.  Okay.  And -- and you didn't -- strike that.

01:44PM   23       And that started in 2019, we agreed, correct?

01:44PM   24  A.  I believe so, yes.

01:44PM   25  Q.  Okay.  And you didn't share anything with law enforcement

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24

01:44PM    1    about you and Mr. Bongiovanni going to Pharaoh's until

01:44PM    2    September of 2023, correct?

01:44PM    3    A.  I don't recall.  I don't remember when.  But --

01:44PM    4    Q.  Okay.  Would reviewing the FBI report refresh your

01:44PM    5    recollection?

01:44PM    6    A.  Yes.

01:44PM    7            MR. SOEHNLEIN:  Can you show the witness 3540U?

01:44PM    8            BY MR. SOEHNLEIN:

01:45PM    9    Q.  Okay.  You'd agree with me the date on this document is

01:45PM   10    September 8th, 2023?

01:45PM   11    A.  Yes.

01:45PM   12    Q.  Okay.  Thank you.

01:45PM   13            MR. SOEHNLEIN:  Ms. Champoux, can you scroll down so

01:45PM   14    he can review it?

01:45PM   15            I think we have to go down a little further than

01:45PM   16    that.

01:45PM   17            Maybe a little further than that.

01:45PM   18            Maybe a little further than that.  There we go.

01:45PM   19            BY MR. SOEHNLEIN:

01:45PM   20    Q.  Do you see that right there?

01:45PM   21    A.  Yes.

01:45PM   22    Q.  Just read it, let me know when you're finished reviewing

01:45PM   23    it.

01:45PM   24    A.  Okay.

01:45PM   25    Q.  So you'd agree with me that you shared that information

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24
127

01:46PM    1   in September of 2023, correct?

01:46PM    2   A.  Correct.  That's when it was brought up and asked,

01:46PM    3   correct.

01:46PM    4   Q.  Well, hold on.  But they had been asking you questions

01:46PM    5   about Pharaoh's for four years at that the point in time,

01:46PM    6   correct?

01:46PM    7   A.  Not a lot.  Just if I was familiar with it, and --

01:46PM    8   Q.  But some, right?

01:46PM    9   A.  Some, yeah.

01:46PM   10   Q.  They asked you some?

01:46PM   11   A.  Right.

01:46PM   12   Q.  Familiar with it?  You're talking about you went there

01:46PM   13   with the guy, right?

01:46PM   14   A.  Right.

01:46PM   15   Q.  You didn't say that for four years.

01:46PM   16   A.  I really wasn't asked if I went there.  I'm kind of

01:46PM   17   confused on the question.

01:46PM   18   Q.  They asked you if you were familiar with it?

01:46PM   19   A.  Yeah.  And I told them on two occasions that I went.

01:46PM   20   Q.  But they asked you that in 2019.

01:46PM   21   A.  They asked me if I was familiar with it.

01:46PM   22   Q.  Okay.  And you didn't tell them that you had gone there

01:46PM   23   with Bongiovanni until 2023, correct?

01:46PM   24   A.  Correct.

01:46PM   25   Q.  Four years later, this information comes out that you and

USA v Gerace - Selva - Soehnlein/Cross - 12/13/24
128

| 01:46PM | 1 | Bongiovanni had gone to Pharaoh's, correct? |
| 01:46PM | 2 | A.  Correct. |
| 01:46PM | 3 | Q.  You didn't share it in 2019, right? |
| 01:47PM | 4 | A.  Okay. |
| 01:47PM | 5 | Q.  You didn't share it in 2020? |
| 01:47PM | 6 | A.  No. |
| 01:47PM | 7 | Q.  You didn't share it in 2021 -- |
| 01:47PM | 8 | A.  No. |
| 01:47PM | 9 | Q.  -- right?  You didn't share it in 2022? |
| 01:47PM | 10 | A.  No. |
| 01:47PM | 11 | Q.  You didn't share it until September of 2023. |
| 01:47PM | 12 | A.  Yeah.  I believe that's when it was -- it came up again. |
| 01:47PM | 13 | Q.  All right.  Now that's also the same time that you shared |
| 01:47PM | 14 | this conversation about Anthony Gerace in the park, correct? |
| 01:47PM | 15 | A.  Correct. |
| 01:47PM | 16 | Q.  Now you know that they asked you questions about Anthony |
| 01:47PM | 17 | Gerace, right? |
| 01:47PM | 18 | A.  Correct. |
| 01:47PM | 19 | Q.  And it comes out four years later, correct? |
| 01:47PM | 20 | A.  No, there was other questions asked before that. |
| 01:47PM | 21 | Q.  Okay.  Now, you and Mr. Bongiovanni were best friends, |
| 01:47PM | 22 | right? |
| 01:47PM | 23 | A.  Yes. |
| 01:47PM | 24 | Q.  Talked to each other almost every day, correct? |
| 01:47PM | 25 | A.  Not every day but, you know, we spoke regularly. |

| | | |
|---|---|---|
| 01:47PM | 1 | Q.  Several times a week, correct? |
| 01:47PM | 2 | A.  Yes, a few times a week, yes. |
| 01:47PM | 3 | Q.  You called each other? |
| 01:48PM | 4 | A.  Yes. |
| 01:48PM | 5 | Q.  You texted each other? |
| 01:48PM | 6 | A.  Yes. |
| 01:48PM | 7 | Q.  You went to each other's house? |
| 01:48PM | 8 | A.  On occasion, yes. |
| 01:48PM | 9 | Q.  You worked out together? |
| 01:48PM | 10 | A.  Yes. |
| 01:48PM | 11 | Q.  You went to dinner together? |
| 01:48PM | 12 | A.  Not dinners much, no. |
| 01:48PM | 13 | Q.  You ate meals together? |
| 01:48PM | 14 | A.  Yeah, on occasion. |
| 01:48PM | 15 | Q.  Yeah.  All right.  And so you were around each other with |
| 01:48PM | 16 | some frequency, correct? |
| 01:48PM | 17 | A.  Yes. |
| 01:48PM | 18 | Q.  And the only time that you recall him being at Pharaoh's |
| 01:48PM | 19 | is just these two occasions that you testified to on direct, |
| 01:48PM | 20 | correct? |
| 01:48PM | 21 | A.  Well, that's with me, when I went him. |
| 01:48PM | 22 | Q.  Okay. |
| 01:48PM | 23 | A.  I was there twice. |
| 01:48PM | 24 | Q.  All right.  But you -- but you were around him with a lot |
| 01:48PM | 25 | of frequency, right? |

Case 1:19-cr-00227-LJV-MJR    Document 1519    Filed 04/29/25    Page 130 of 151
USA v Gerace - Selva - Tripi/Redirect - 12/13/24

130

01:48PM   1    A.   Yes.

01:48PM   2    Q.   You were his best friend?

01:48PM   3    A.   Yes.

01:48PM   4    Q.   You were the best man in his wedding, correct?

01:48PM   5    A.   Correct.

01:48PM   6         **MR. SOEHNLEIN:**  Just a second, Judge.

01:49PM   7         That's all I have.  Thank you, Judge.

01:49PM   8         **THE COURT:**  Redirect?

01:49PM   9         **MR. TRIPI:**  Yes, Judge, thank you.

01:49PM  10

01:49PM  11              **REDIRECT EXAMINATION BY MR. TRIPI:**

01:49PM  12    Q.   All right.  A few more questions for you, okay?

01:49PM  13    A.   Okay.

01:49PM  14    Q.   Okay.  Just bear with me a minute.

01:49PM  15         All right.  I'm gonna sort of start where Mr. Soehnlein

01:49PM  16    did and kind of go in the same order of things, okay?

01:49PM  17    A.   Okay.

01:49PM  18    Q.   He started with your cooperation agreement.  As you sit

01:49PM  19    here today, is there any promise that you have, any wink and

01:49PM  20    a nod, anything like that, that you won't be charged or go to

01:49PM  21    jail?

01:49PM  22    A.   No.

01:49PM  23    Q.   Has anyone from the government ever said anything

01:49PM  24    different to you?

01:49PM  25    A.   No.

01:49PM    1    Q.  You have a written agreement, right?

01:49PM    2    A.  Correct.

01:49PM    3    Q.  And are you required to do anything other than tell the

01:50PM    4    truth under that agreement?

01:50PM    5    A.  That's correct.

01:50PM    6    Q.  Does your agreement require it?

01:50PM    7    A.  Yes.

01:50PM    8    Q.  If you weren't to tell the truth, could you be charged

01:50PM    9    with more things?

01:50PM   10    A.  Yes.

01:50PM   11    Q.  If you were to lie in front of this grand jury -- or,

01:50PM   12    excuse me, jury, you could be charged with perjury?

01:50PM   13    A.  Yes, sir.

01:50PM   14    Q.  Obstruction of justice?

01:50PM   15    A.  Yes.

01:50PM   16    Q.  All right.  Now, you were asked about more cooperation

01:50PM   17    and all that.  Fair to say you've also testified before a

01:50PM   18    federal grand jury and in other proceedings?

01:50PM   19    A.  Yes.

01:50PM   20    Q.  Fair to say that the scope of your testimony and

01:50PM   21    information you've provided spans well beyond Defendant

01:50PM   22    Gerace?

01:50PM   23    A.  Yes.

01:50PM   24    Q.  Now, when you were first approached by law enforcement at

01:50PM   25    your house the day of that search warrant, August 23rd, 2019,

01:50PM 1  did you start to talk a little bit about Mr. Bongiovanni?

01:50PM 2  A.  Yes.  Very --

01:51PM 3  Q.  At that point, it wasn't everything you knew?

01:51PM 4  A.  No.  No.

01:51PM 5  Q.  Did you withhold information like Mr. Soehnlein said?

01:51PM 6  A.  Yes.

01:51PM 7  Q.  And I think you tried to articulate it, but as time went

01:51PM 8  on, did you provide more and more information?

01:51PM 9  A.  Yes.

01:51PM 10  Q.  Were you asked more and more questions?

01:51PM 11  A.  I was.

01:51PM 12  Q.  Now, Mr. Soehnlein focused you in on that September 4th,

01:51PM 13  2019 polygraph, and talked about you failing.

01:51PM 14      I'm just gonna ask you directly.  Did you fail because

01:51PM 15  you claimed you were Joe Bongiovanni's informant?

01:51PM 16  A.  Yes.

01:51PM 17  Q.  Okay.  That was a lie?

01:51PM 18  A.  It was a lie.

01:51PM 19  Q.  That was a lie that Bongiovanni fed you?

01:51PM 20  A.  Right.

01:51PM 21  Q.  And you tried to carry through on it?

01:51PM 22  A.  Correct.

01:51PM 23  Q.  After that, did you become more and more forthcoming?

01:51PM 24  A.  I did.

01:51PM 25  Q.  Does that lead to your sitting in this witness stand?

01:51PM    1    A.  It does.

01:51PM    2    Q.  Now, Mr. Soehnlein crossed you about all your meetings

01:52PM    3    with the government from August 23rd, 2019 to October 25th,

01:52PM    4    2019; do you remember that?

01:52PM    5    A.  Yes.

01:52PM    6    Q.  You went through all those dates up through that point.

01:52PM    7        All of those meetings were before Mr. Bongiovanni was

01:52PM    8    charged, correct?

01:52PM    9    A.  Correct.

01:52PM    10   Q.  And did you testify in grand jury before Mr. Bongiovanni

01:52PM    11   was charged?

01:52PM    12   A.  Yes.

01:52PM    13   Q.  And all those meetings, did they cover a lot more

01:52PM    14   information than the questions you're being asked at this

01:52PM    15   trial?

01:52PM    16   A.  Yes.

01:52PM    17   Q.  Now, let's switch over, talk a little bit about Anthony

01:52PM    18   Gerace's arrest, and your discussions along those lines,

01:52PM    19   okay?

01:52PM    20       You were asked about the fact that you're an Erie County

01:52PM    21   sheriff, and are things documented in law enforcement; do you

01:52PM    22   remember those general questions?

01:52PM    23   A.  Yes.

01:52PM    24   Q.  Now you're not a member of the Amherst Police Department,

01:52PM    25   right?

01:52PM   1    A.  I was not, no.

01:52PM   2    Q.  Would you have access to anything that they generate?

01:52PM   3    A.  No.

01:53PM   4    Q.  Okay.  Now, do you know whether Bongiovanni squashed any

01:53PM   5    arrest of Anthony Gerace before it ever happened?

01:53PM   6          **MR. SOEHNLEIN:**  Objection.

01:53PM   7          **MR. TRIPI:**  He opened this door.

01:53PM   8          **THE COURT:**  Does he know?

01:53PM   9          **MR. SOEHNLEIN:**  Yeah, I withdraw it.  I thought the

01:53PM  10    question came out a little differently.

01:53PM  11          **BY MR. TRIPI:**

01:53PM  12    Q.  Do you know whether Bongiovanni squashed any arrest of

01:53PM  13    Anthony Gerace before it ever happened?

01:53PM  14    A.  No.

01:53PM  15    Q.  If Bongiovanni squashed an investigation before it was

01:53PM  16    documented, there would be no report?

01:53PM  17          **MR. SOEHNLEIN:**  Objection.

01:53PM  18          **THE COURT:**  Sustained, sustained, sustained.

01:53PM  19          **BY MR. TRIPI:**

01:53PM  20    Q.  Okay.  Now you were asked about finances; do you remember

01:53PM  21    that?

01:53PM  22    A.  Yes.

01:53PM  23    Q.  Mr. Bongiovanni's finances?

01:53PM  24       In your commonsense life experience, the money that you

01:53PM  25    were earning from illegal activity, did you put your illegal

01:53PM   1   money in the bank and report it?

01:53PM   2   A.  No.

01:53PM   3   Q.  Okay.  In your commonsense life experience, do people put

01:53PM   4   money from illicit gains into the bank and then report it to

01:54PM   5   their attorney?

01:54PM   6   A.  No.

01:54PM   7   Q.  You were asked about respect to elders and respect to

01:54PM   8   athletes and stuff like that.  Was the type of respect you

01:54PM   9   were talking about yesterday when you were talking about

01:54PM   10  Mr. Bongiovanni showing respect to reputed Italian Organized

01:54PM   11  Crime members in the neighborhood, was it a different type of

01:54PM   12  respect?

01:54PM   13  A.  Yes.

01:54PM   14  Q.  It's not the same hold-the-door-for-an-old-lady type

01:54PM   15  respect, right?

01:54PM   16  A.  No.

01:54PM   17  Q.  Back to the topic of helping people through his position

01:54PM   18  as a DEA agent.  You were asked questions about you didn't

01:54PM   19  know what Bongiovanni meant when he said helping Anthony

01:54PM   20  Gerace when Peter asked him to help Anthony Gerace, and you

01:54PM   21  were asked some questions about law enforcement and whether

01:54PM   22  you were asked to help people; do you remember that?

01:55PM   23  A.  Yes.

01:55PM   24  Q.  All those questions?

01:55PM   25  A.  Yes.

| | | |
|---|---|---|
| 01:55PM | 1 | Q.  As you sit here, given your life experience and your |
| 01:55PM | 2 | interactions with Mr. Bongiovanni, is a sworn DEA agent |
| 01:55PM | 3 | supposed to help individuals involved in drug dealing, or |
| 01:55PM | 4 | arrest them? |
| 01:55PM | 5 | A.  Arrest them. |
| 01:55PM | 6 | Q.  You were asked a lot of questions about whether the first |
| 01:55PM | 7 | time you mentioned Peter Gerace was in September of 2023 |
| 01:55PM | 8 | after four years of questions; do you remember that? |
| 01:55PM | 9 | A.  Yes. |
| 01:55PM | 10 | Q.  Do you remember all the times that you were asked |
| 01:55PM | 11 | questions and mentioned Mr. Gerace or Pharaoh's? |
| 01:55PM | 12 | A.  I don't. |
| 01:55PM | 13 | Q.  Okay.  I'm gonna ask you to take a look at Government |
| 01:55PM | 14 | Exhibit 3540I.  Let's start with page 1. |
| 01:55PM | 15 | **MR. TRIPI:**  For the witness only. |
| 01:55PM | 16 | **BY MR. TRIPI:** |
| 01:55PM | 17 | Q.  All right.  Just look at your screen.  And when you're |
| 01:55PM | 18 | done, look back at me.  I'm gonna keep it up just because I'm |
| 01:56PM | 19 | gonna walk through this a bit, but want you to not look at |
| 01:56PM | 20 | the screen initially.  Okay? |
| 01:56PM | 21 | Does that refresh your recollection as to a date that you |
| 01:56PM | 22 | had an interview? |
| 01:56PM | 23 | A.  Yes. |
| 01:56PM | 24 | Q.  Okay.  You've got to look back at me. |
| 01:56PM | 25 | A.  Yes. |

01:56PM    1    Q.  Is that September 11th, 2019?

01:56PM    2    A.  Yes.

01:56PM    3    Q.  All right.

01:56PM    4         MR. TRIPI:  Ms. Champoux, can we advance to page 6 of

01:56PM    5    that, please?

01:56PM    6         BY MR. TRIPI:

01:56PM    7    Q.  Okay.  We're gonna go to -- I want you to read page 6

01:56PM    8    through 7.  Let us know when you're done reading page 6

01:56PM    9    through 7.

01:56PM   10    A.  Where you've highlighted at the bottom?

01:56PM   11    Q.  Yep.

01:57PM   12    A.  Okay.

01:57PM   13         MR. TRIPI:  Let's go to page 7, please.

01:57PM   14         BY MR. TRIPI:

01:57PM   15    Q.  Read that to yourself.

01:59PM   16    A.  Okay.

01:59PM   17    Q.  Okay.  To the extent you were just asked questions about

01:59PM   18    not talking about Peter Gerace for four years, was that

01:59PM   19    accurate?

01:59PM   20    A.  No.

01:59PM   21    Q.  Okay.  Did you talk about Peter Gerace back on

01:59PM   22    September 11th, 2019?

01:59PM   23    A.  Yes.

01:59PM   24    Q.  Did you -- look at me, please.

01:59PM   25    A.  Yes, sir.

USA v Gerace - Selva - Tripi/Redirect - 12/13/24
138

| | | |
|---|---|---|
| 01:59PM | 1 | Q.  Did you talk about Pharaoh's? |
| 01:59PM | 2 | A.  Yes. |
| 01:59PM | 3 | Q.  Did you talk about Anthony Gerace? |
| 01:59PM | 4 | A.  Yes. |
| 01:59PM | 5 | Q.  Okay.  Do you remember the next date you provided some |
| 01:59PM | 6 | information about them? |
| 01:59PM | 7 | A.  I don't. |
| 01:59PM | 8 | Q.  Okay.  Be fair to say a lot of the questioning early on |
| 01:59PM | 9 | particularly was focused on Mr. Bongiovanni, though? |
| 01:59PM | 10 | A.  Yes. |
| 01:59PM | 11 | Q.  And then as time went on, it shifted to other people? |
| 01:59PM | 12 | A.  Yes. |
| 01:59PM | 13 | Q.  Okay.  We agree that September 11th, 2019, is four years |
| 01:59PM | 14 | earlier than September of 2023 that you were being asked |
| 01:59PM | 15 | questions about, correct? |
| 02:00PM | 16 | A.  Correct. |
| 02:00PM | 17 | Q.  Okay.  Now, over time, too, did things occur to you over |
| 02:00PM | 18 | time? |
| 02:00PM | 19 | A.  Yes. |
| 02:00PM | 20 | Q.  Were some of those things that occurred to you over time |
| 02:00PM | 21 | triggered by more specific questions you were asked? |
| 02:00PM | 22 | A.  Exactly, yes. |
| 02:00PM | 23 | Q.  Okay.  Do you remember everything you talked about on a |
| 02:00PM | 24 | meeting March 10th, 2021? |
| 02:00PM | 25 | A.  No. |

| | | |
|---|---|---|
| 02:00PM | 1 | Q.  Okay.  If we can go to Exhibit 3540M, please as in Mary. |
| 02:00PM | 2 | And we'll go to page 2.  Read that to yourself, page 2.  Let |
| 02:01PM | 3 | us know when you want us to move to page 3. |
| 02:01PM | 4 | A.  Okay. |
| 02:01PM | 5 | **MR. TRIPI:**  Can we go to page 3, please? |
| 02:03PM | 6 | **THE WITNESS:**  Okay. |
| 02:03PM | 7 | **BY MR. TRIPI:** |
| 02:03PM | 8 | Q.  Did you provide information about Peter and Anthony |
| 02:03PM | 9 | Gerace during that meeting in March of 2021? |
| 02:03PM | 10 | A.  Yes. |
| 02:03PM | 11 | Q.  Okay.  Now, do you remember, Mr. Selva, do you remember |
| 02:03PM | 12 | what specific questions you were being asked? |
| 02:03PM | 13 | A.  I don't. |
| 02:03PM | 14 | Q.  Do you remember if you were asked, hey, did you ever go |
| 02:03PM | 15 | to Pharaoh's with Bongiovanni? |
| 02:03PM | 16 | A.  I don't know. |
| 02:03PM | 17 | Q.  Do you know when the first time you were asked that |
| 02:03PM | 18 | specific question was? |
| 02:03PM | 19 | A.  I don't. |
| 02:03PM | 20 | Q.  Okay.  Had that specific question been asked about you |
| 02:03PM | 21 | and -- of you in September of 2019, would you have said two |
| 02:03PM | 22 | times, just like you told this jury? |
| 02:03PM | 23 | A.  Yes. |
| 02:03PM | 24 | **MR. TRIPI:**  All right, Judge, I have no further |
| 02:03PM | 25 | redirect. |

| 02:03PM | 1 | **THE COURT:** Anything more, Mr. Soehnlein? |
| 02:03PM | 2 | **MR. SOEHNLEIN:** Just briefly. |
| 02:03PM | 3 | |
| 02:03PM | 4 | **RECROSS-EXAMINATION BY MR. SOEHNLEIN:** |
| 02:03PM | 5 | Q. Mr. Tripi just asked you if you had been asked that |
| 02:03PM | 6 | question in September of 2019, the answer would have been two |
| 02:04PM | 7 | times, right? He just asked you that question? |
| 02:04PM | 8 | A. Yes. |
| 02:04PM | 9 | Q. Okay. |
| 02:04PM | 10 | **MR. SOEHNLEIN:** Can you show the witness 3540I, |
| 02:04PM | 11 | page 6, please. |
| 02:04PM | 12 | **BY MR. SOEHNLEIN:** |
| 02:04PM | 13 | Q. And reviewing these reports, it's refreshing your memory, |
| 02:04PM | 14 | right? |
| 02:04PM | 15 | A. Correct. |
| 02:04PM | 16 | Q. And by the way, so, you'd agree with me that this is a |
| 02:04PM | 17 | report from September of 2019, correct? |
| 02:04PM | 18 | A. Correct. |
| 02:04PM | 19 | Q. The exact same time period that Mr. Tripi was just asking |
| 02:04PM | 20 | you about, correct? |
| 02:04PM | 21 | A. That's correct. |
| 02:04PM | 22 | Q. Can you just review the second line up what's written |
| 02:04PM | 23 | right there? |
| 02:04PM | 24 | A. Second line up? |
| 02:04PM | 25 | Q. Yeah, the second line from the bottom. What's it say? |

02:04PM    1    Well, does it refresh your recollection.

02:04PM    2    A.   Yes.

02:04PM    3    Q.   You told them Bongiovanni never went to Pharaoh's?

02:04PM    4    A.   In 2019.

02:04PM    5    Q.   In 2019, you told them Bongiovanni never went to

02:04PM    6    Pharaoh's, correct?

02:05PM    7    A.   Correct.

02:05PM    8    Q.   And in 2023, you told them that you went there with him

02:05PM    9    two times, correct?

02:05PM   10    A.   Correct.

02:05PM   11    Q.   So you lied in 2019?

02:05PM   12    A.   No, he -- I -- I was referencing with me he went.  He

02:05PM   13    went with me.

02:05PM   14    Q.   So, when he went with you, that doesn't mean he went?

02:05PM   15    A.   No, that's how I was answering the question, he went with

02:05PM   16    me.

02:05PM   17    Q.   He went with you?

02:05PM   18    A.   Right.

02:05PM   19    Q.   But in 2019, you told them he didn't go at all?

02:05PM   20    A.   Not with me in 2019, that's how I was referencing the

02:05PM   21    question.

02:05PM   22    Q.   I'm sorry, but you said he never went at all in 2019,

02:05PM   23    correct?

02:05PM   24    A.   Right, with --

02:05PM   25    Q.   Never went ever, correct?

02:05PM    1    A.  I believe the question was phrased if he ever went me.

02:05PM    2    And I --

02:05PM    3    Q.  You'd agree with me that's not what's reflected in the

02:05PM    4    report.

02:05PM    5    A.  That's correct.

02:05PM    6    Q.  What you said in 2023 is not accurate, is it?

02:05PM    7    A.  We went twice in Pharaoh's, him and I.

02:06PM    8    Q.  So then what you said in 2019 is a lie?

02:06PM    9    A.  It was asked a different way.  He never -- I was

02:06PM   10    referenced if he went with me.

02:06PM   11    Q.  It's not confusing, Mr. Selva.

02:06PM   12    A.  I understand that --

02:06PM   13    Q.  You're wrong --

02:06PM   14          THE COURT:  One at a time.

02:06PM   15          BY MR. SOEHNLEIN:

02:06PM   16    Q.  In 2019, you told them he never went to Pharaoh's,

02:06PM   17    period, correct?

02:06PM   18    A.  Correct.

02:06PM   19    Q.  And in 2023, you said he went twice with me, correct?

02:06PM   20    A.  Correct.

02:06PM   21    Q.  So what you said in 2019 was not accurate?

02:06PM   22    A.  Not accurate that he went with me.

02:06PM   23    Q.  You understand that you have to be truthful and honest in

02:06PM   24    those meetings?

02:06PM   25    A.  I am.  Maybe I answered it -- maybe I answered it wrong,

USA v Gerace - Selva - Soehnlein/Recross - 12/13/24

143

02:06PM   1   but he -- I was there twice with him.

02:06PM   2   Q.  Now it's possible that maybe you got a little tripped up

02:06PM   3   in the questions, right?

02:06PM   4   A.  Correct.

02:06PM   5   Q.  Okay.  Because those meetings, those are kind of high

02:06PM   6   stress, correct?

02:06PM   7   A.  Correct.

02:06PM   8   Q.  A lot's on the line, right?

02:06PM   9   A.  There's a lot of questions.

02:06PM   10  Q.  And you're with the same prosecutors that you're with

02:07PM   11  here, correct?

02:07PM   12  A.  Correct.

02:07PM   13  Q.  All right.  Now earlier this morning, Mr. Tripi yelled at

02:07PM   14  you.  You recall that, right?

02:07PM   15  A.  Yes.

02:07PM   16  Q.  That's happened before, hasn't it?

02:07PM   17  A.  Yes.

02:07PM   18  Q.  That's happened more than once, hasn't it?

02:07PM   19  A.  A few times.

02:07PM   20  Q.  You're in those meetings, and it's just you and the

02:07PM   21  prosecutors, right?

02:07PM   22  A.  Yes.

02:07PM   23  Q.  There's no judge there?

02:07PM   24  A.  No.

02:07PM   25  Q.  There's no jury there?

| | | |
|---|---|---|
| 02:07PM | 1 | A.  No. |
| 02:07PM | 2 | Q.  And they tell you to tell the truth, right? |
| 02:07PM | 3 | A.  Correct. |
| 02:07PM | 4 | Q.  But they act like that toward you, don't they? |
| 02:07PM | 5 | A.  They act professional. |
| 02:07PM | 6 | Q.  It's not the first time he yelled at you. |
| 02:07PM | 7 | A.  I mean, yelling and raising your voice, I mean, being |
| 02:07PM | 8 | direct. |
| 02:07PM | 9 | Q.  Is that how you would describe how he treated you this |
| 02:07PM | 10 | morning, being direct? |
| 02:07PM | 11 | A.  Being direct, yes.  Raising his voice, yes. |
| 02:07PM | 12 | Q.  That's scared you when he did that, didn't it? |
| 02:07PM | 13 | A.  He got my attention. |
| 02:07PM | 14 | Q.  Yeah, because you've got a lot on the line, right? |
| 02:07PM | 15 | A.  Yes. |
| 02:07PM | 16 | Q.  And you weren't making him happy, were you? |
| 02:08PM | 17 | **MR. TRIPI:**  Objection as to whether he was making me |
| 02:08PM | 18 | happy. |
| 02:08PM | 19 | **THE COURT:**  Overruled. |
| 02:08PM | 20 | **THE WITNESS:**  I don't know if I was making him happy |
| 02:08PM | 21 | or not.  He was just -- that's his demeanor.  He was asking me |
| 02:08PM | 22 | a direct question. |
| 02:08PM | 23 | **BY MR. SOEHNLEIN:** |
| 02:08PM | 24 | Q.  That's just his demeanor? |
| 02:08PM | 25 | A.  At times. |

02:08PM    1          **MR. SOEHNLEIN:**  That's all I have.

02:08PM    2

02:08PM    3              **RE-REDIRECT EXAMINATION BY MR. TRIPI:**

02:08PM    4    Q.  Sometimes in those meetings, you were lying, right?

02:08PM    5    A.  Yes.

02:08PM    6    Q.  You were holding back information?

02:08PM    7    A.  Yes.

02:08PM    8    Q.  Did you expect direct questions when you were lying?

02:08PM    9    A.  Yes.

02:08PM   10    Q.  Were you doing the wrong thing?

02:08PM   11    A.  Yes.

02:08PM   12    Q.  When you've been yelled at before, is that because you

02:08PM   13    asked if you were gonna not have to go to jail?

02:08PM   14    A.  No.

02:08PM   15    Q.  Have I -- have I told you repeatedly your entire

02:08PM   16    agreement is in writing, and there are no promises?

02:08PM   17    A.  Yes.

02:08PM   18    Q.  When you ask me about that agreement, is that when I get

02:08PM   19    firm with you?

02:08PM   20    A.  Yes.

02:08PM   21    Q.  Do I remind you your agreement is in writing?

02:08PM   22    A.  Yes.

02:08PM   23    Q.  And that there are no promises?

02:08PM   24    A.  Yes.

02:09PM   25    Q.  Have I ever told you to do anything other than tell the

USA v Gerace - Selva - Tripi/Re-Redirect - 12/13/24

146

| | | |
|---|---|---|
| 02:09PM | 1 | truth? |
| 02:09PM | 2 | A.  No. |
| 02:09PM | 3 | Q.  Now, are you a grown man? |
| 02:09PM | 4 | A.  Yes. |
| 02:09PM | 5 | Q.  When you're in those meetings, you're with your lawyer? |
| 02:09PM | 6 | A.  Yes. |
| 02:09PM | 7 | Q.  Do you have any issue with the way I speak with you or |
| 02:09PM | 8 | the way you speak with me? |
| 02:09PM | 9 | A.  No. |
| 02:09PM | 10 | Q.  Okay.  Sometimes do you raise your voice, too? |
| 02:09PM | 11 | A.  Yes. |
| 02:09PM | 12 | Q.  Is that sometimes how grown men speak to each other? |
| 02:09PM | 13 | A.  Yes. |
| 02:09PM | 14 | Q.  Okay.  Any issue with that? |
| 02:09PM | 15 | A.  No. |
| 02:09PM | 16 | Q.  Any misconceptions about what you're supposed to say on |
| 02:09PM | 17 | the stand in terms of truth or not truth? |
| 02:09PM | 18 | A.  No. |
| 02:09PM | 19 | Q.  Okay.  Now, you were just shown a report.  You didn't |
| 02:09PM | 20 | write the report that you were shown, you didn't sign the |
| 02:09PM | 21 | report, correct? |
| 02:09PM | 22 | A.  Correct. |
| 02:09PM | 23 | Q.  But you testified in grand jury about Mr. Gerace and |
| 02:09PM | 24 | Mr. Bongiovanni, correct? |
| 02:09PM | 25 | A.  Correct. |

| | | |
|---|---|---|
| 02:09PM | 1 | Q.  And then you testified at two other proceedings this |
| 02:09PM | 2 | year, and you've been consistent about two times you went to |
| 02:10PM | 3 | Pharaoh's with Mr. Bongiovanni; is that true? |
| 02:10PM | 4 | A.  That's correct. |
| 02:10PM | 5 | Q.  All right. |
| 02:10PM | 6 | **MR. TRIPI:**  Bear with me just a moment. |
| 02:10PM | 7 | By the way, is it the U.S. Attorney's Office who |
| 02:10PM | 8 | decides your cooperation, or is it me? |
| 02:10PM | 9 | **MR. SOEHNLEIN:**  Objection. |
| 02:10PM | 10 | **THE COURT:**  Sustained. |
| 02:10PM | 11 | **MR. TRIPI:**  He knows the answer to that. |
| 02:10PM | 12 | **THE WITNESS:**  It's the U.S. Attorney. |
| 02:10PM | 13 | **THE COURT:**  Mr. Selva, when I say "sustained," you |
| 02:10PM | 14 | don't answer the question. |
| 02:10PM | 15 | **THE WITNESS:**  I'm sorry, Your Honor. |
| 02:10PM | 16 | **THE COURT:**  What's the basis of that? |
| 02:10PM | 17 | **MR. SOEHNLEIN:**  I believe it calls for speculation |
| 02:10PM | 18 | and hearsay, Judge. |
| 02:10PM | 19 | **THE COURT:**  So lay a foun -- so the jury will strike |
| 02:11PM | 20 | that answer.  You can lay a foundation. |
| 02:11PM | 21 | **BY MR. TRIPI:** |
| 02:11PM | 22 | Q.  Do you know who the ultimate decisionmaker is? |
| 02:11PM | 23 | A.  I don't. |
| 02:11PM | 24 | Q.  Do you think it's me, or someone above me? |
| 02:11PM | 25 | A.  Someone above. |

02:11PM    1          **MR. SOEHNLEIN:**  Same objection, Judge.

02:11PM    2          **THE COURT:**  Well, unless there's a foundation for

02:11PM    3    that, Mr. Tripi, I --

02:11PM    4          **MR. TRIPI:**  It's his perception, Judge.

02:11PM    5          **THE COURT:**  I understand that.  But he's got to have

02:11PM    6    a reason for the perception.  So if there's a reason for it,

02:11PM    7    then lay the foundation for it.

02:11PM    8          **BY MR. TRIPI:**

02:11PM    9    Q.  Do you have a reason in your brain for the answer you're

02:11PM   10    about to give when I ask you that question?

02:11PM   11    A.  Yes.

02:11PM   12    Q.  Okay.  Is it a reason that you formed in your mind?

02:11PM   13    A.  Yes.

02:11PM   14    Q.  Do you believe that anyone in this room is the ultimate

02:11PM   15    decisionmaker on your case?

02:11PM   16    A.  No.

02:11PM   17          **MR. SOEHNLEIN:**  Objection.

02:11PM   18          **THE WITNESS:**  No.

02:11PM   19          **THE COURT:**  Overruled.

02:11PM   20          And, again, folks, this is for his state of mind, not

02:11PM   21    what is in fact the case, okay?

02:11PM   22          **BY MR. TRIPI:**

02:13PM   23    Q.  When you testified in the grand jury, was that

02:13PM   24    October 3rd, 2019?

02:13PM   25    A.  Yes.

02:13PM  1    Q.  Were you asked questions about Mr. Bongiovanni?

02:13PM  2    A.  Yes.

02:13PM  3    Q.  Were you asked questions about Mr. Gerace?

02:13PM  4    A.  Yes.

02:13PM  5    Q.  Did you answer a number of specific questions you were

02:13PM  6    asked at that time about Mr. Gerace?

02:13PM  7    A.  Yes.

02:13PM  8    Q.  Did a lot of it cover a lot the same topics you testified

02:13PM  9    to here at trial?

02:13PM  10   A.  Yes.

02:13PM  11            MR. TRIPI:  Nothing further, Judge.

02:13PM  12            THE COURT:  Anything more?

02:13PM  13            MR. SOEHNLEIN:  Nothing, Judge.  Thank you.

02:13PM  14            THE COURT:  You can step down, sir, thank you.

02:13PM  15            THE WITNESS:  Thank you, Your Honor.

02:13PM  16            (Witness excused at 2:13 p.m.)

         17            (Excerpt concluded at 2:13 p.m.)

         18             *    *    *    *    *    *    *

         19

         20

         21

         22

         23

         24

         25

1

2                        **<u>CERTIFICATE OF REPORTER</u>**

3

4                In accordance with 28, U.S.C., 753(b), I

5      certify that these original notes are a true and correct

6      record of proceedings in the United States District Court for

7      the Western District of New York on December 13, 2024.

8

9

10                              s/ Ann M. Sawyer
                               Ann M. Sawyer, FCRR, RPR, CRR
11                             Official Court Reporter
                               U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **TRANSCRIPT INDEX**

3              **EXCERPT - EXAMINATION OF LOUIS SELVA - DAY 2**

4                          **DECEMBER 13, 2024**

5

6

7      **W I T N E S S**                              **P A G E**

8      **L O U I S    S E L V A**                         2

9        (CONT'D) DIRECT EXAMINATION BY MR. TRIPI:      2

10       CROSS-EXAMINATION BY MR. SOEHNLEIN:          102

11       REDIRECT EXAMINATION BY MR. TRIPI:           130

12       RECROSS-EXAMINATION BY MR. SOEHNLEIN:        140

13       RE-REDIRECT EXAMINATION BY MR. TRIPI:        145

14

15

16     **E X H I B I T S**                            **P A G E**

17     GOV Exhibit 213-1 through 5                     75

18     GOV Exhibits 208D, 208K                         93

19

20

21

22

23

24

25