UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

         v.                                   19-CR-227
                                               23-CR-37

PETER GERACE, JR.,

                    Defendant.
_____


**MEMORANDUM OF LAW IN SUPPORT OF**
**UNITED STATES' MOTION FOR FORFEITURE OF PROPERTY**


MICHAEL DiGIACOMO
United States Attorney
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202

Elizabeth M. Palma
Assistant U.S. Attorney
(Of Counsel)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

PRELIMINARY STATEMENT .............................................................. 1

PROCEDURAL HISTORY ................................................................... 1

    Testimony Presented at Trial ......................................................... 3

LEGAL ANALYSIS ........................................................................ 12

    Forfeiture Procedure Pursuant to Rule 32.2 ................................... 12

        A.    The Second Superseding Indictment contained Forfeiture Allegations that notified the Defendant of the government's intention to seek the forfeiture of 999 Aero Drive ...................................................... 12

        B.    The Court should determine that 999 Aero Drive is subject to forfeiture and enter a preliminary order of forfeiture directing the forfeiture of 999 Aero Drive .............................................................................. 13

            i.    Forfeiture of facilitating property used in the Defendant's violations of the Drug Offenses and the Sex Trafficking Offense is mandatory ................................................................. 16

                *The Court should find that the requisite nexus exists between 999 Aero Drive and the Defendant's conviction of the Drug Offenses* ..................... 17

                *The Court should find that the requisite nexus exists between 999 Aero Drive and the Defendant's conviction of the Sex Trafficking Offense* ........ 18

            ii.    The Court should promptly enter the Preliminary Order of Forfeiture without regard to any third-party interests ....................... 19

CONCLUSION ............................................................................ 21

## TABLE OF AUTHORITIES

### CASES

*De Almeida v. United States*, 459 F.3d 377 (2d Cir. 2006) -------------------------------------------- 20

*Libretti v. United States*, 516 U.S. 29 (1995) ------------------------------------------------------- 15

*McIntosh v. United States,* 601 U.S. 330 (2024)------------------------------------------------------ 20

*United States v. Anghaie*, No. 1:09CR37–SPM,
   2011 WL 2671242  (N.D. Fla. July 7, 2011)--------------------------------------------------------- 14

*United States v. Annabi*, 746 F.3d 83 (2d Cir. 2014) ------------------------------------------------- 13

*United States v. Bellomo*, 176 F.3d 580 (2d Cir. 1999) ----------------------------------------------- 15

*United States v. Boston,* No. 11–CR–107 (DLI),
   2011 WL 4101109 (E.D.N.Y. Aug. 16, 2011)------------------------------------------------------- 18

*United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007) ---------------------------------------------- 14

*United States v. Daugerdas*, 837 F.3d 212 (2d Cir. 2016) -------------------------------------------- 15

*United States v. Feger*, No. 10–CR–346S,
   2012 WL 1040181 (W.D.N.Y. Mar. 28, 2012) ------------------------------------------------------ 21

*United States v. Gaskin,* No. 00-CR-06148,
   2002 WL 459005 (W.D.N.Y. Jan. 8, 2002)---------------------------------------------------------- 20

*United States v. Grayson Enterprises, Inc.*, 950 F.3d 386 (7th Cir. 2020)------------------------------- 18

*United States v. Jafari*, 85 F. Supp. 3d 679 (W.D.N.Y. 2015)----------------------------------------- 15

*United States v. Kaufman,* No. 21-2589,
   2023 WL 1871669 (2d Cir. Feb. 10, 2023) --------------------------------------------------------- 20

*United States v. Messino*, 382 F.3d 704 (7th Cir. 2004) ---------------------------------------------- 14

*United States v. Monsanto*, 491 U.S. 600 (1989) ---------------------------------------------------- 16

*United States v. Nicolo*, 597 F. Supp.2d 342 (W.D.N.Y. 2009)---------------------------------------- 20

*United States v. Peters*, 732 F.3d 93 (2d Cir. 2013) ------------------------------------------------- 15

*United States v. Sabhnani*, 566 F.Supp.2d 148 (E.D.N.Y. 2008)-------------------------------------- 15

*United States v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010) --------------------------------------------- 17

*United States v. Schlesinger*, 396 F. Supp. 2d 267 (E.D.N.Y. 2005) --------------------------------17, 20

*United States v. Wyly*, 193 F.3d 289 (5th Cir. 1999)------------------------------------------------------ 17

**STATUTES**

Title 18, United States Code, Section 1594(c) ------------------------------------------------- 2, 13, 21

Title 18, United States Code, Section 1594(d)(1)------------------------------------------------- passim

Title 21, United States Code, Section 846------------------------------------------------------------- 2, 21

Title 21, United States Code, Section 853(a)(2)------------------------------------------------- passim

Title 21, United States Code, Section 856(a)(1)------------------------------------------------------ 2, 21

**RULES**

Fed.R.Crim.P. 32.2(a) ------------------------------------------------------------------------------------- 12

Fed.R.Crim.P. 32.2(b) --------------------------------------------------------------------------------- 1, 22

Fed.R.Crim.P. 32.2(b)(1) -----------------------------------------------------------------12, 13, 14, 15

Fed.R.Crim.P. 32.2(b)(2) -----------------------------------------------------------------12, 15, 19, 20

Fed.R.Crim.P. 32.2(b)(4) ------------------------------------------------------------------------------- 12

Fed.R.Crim.P. 32.2(b)(5)(A) ---------------------------------------------------------------------------- 3

Fed.R.Evid. 1101(d)(3) -----------------------------------------------------------------------------15, 16

## Preliminary Statement

The United States of America, by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, Elizabeth M. Palma, Assistant United States Attorney, of counsel, moves for a Preliminary Order of Forfeiture pursuant to Rule 32.2(b) of the Federal Rules of Criminal Procedure, Title 18, United States Code, Section 1594(d)(1), and Title 21, United States Code, Section 853(a)(2), forfeiting the following property:

> The premises, buildings, appurtenances, improvements, fixtures, and real property and fixtures located at 999 Aero Drive, Cheektowaga, New York, and more fully described in a deed filed and recorded in Erie County Clerk's Office, on June 1, 2009 in Book 11162 of Deeds at Page 6131 (hereinafter referred to as "999 Aero Drive").

## Procedural History

1.    On February 25, 2021, a federal grand jury sitting in the Western District of New York returned a Second Superseding Indictment against the Defendant that charged him with violations of Conspiracy to Defraud the United States, Paying a Bribe to a Public Official, Maintaining a Drug-Involved Premises, Conspiracy to Distribute Controlled Substances and Maintain a Drug-Involved Premises, and Conspiracy to Commit Sex Trafficking. *See Second Superseding Indictment,* ECF 89.[1]

---

[1] On March 23, 2023, a federal grand jury sitting in the Western District of New York returned an Indictment, filed under criminal docket number 23-CR-37, charging the Defendant with three counts of Tampering with a Witness and one count of Distribution of Cocaine. On April 28, 2023, the Court granted the government's motion to consolidate for trial the Indictment in 23-CR-37 and the Second Superseding Indictment in 19-CR-227.

1

2.      The Second Superseding Indictment included a section titled "Third Forfeiture Allegation" that notified the Defendant that upon his conviction of Title 21, United States Code, Section 856(a)(1) (Maintaining a Drug-Involved Premises) and/or Title 21, United States Code, Section 846 (Conspiracy to Distribute Controlled Substances and Maintain Drug-Involved Premises) (collectively, hereinafter referred to as the "Drug Offenses"), the United States would seek to forfeit any proceeds or facilitating property of such offenses, including 999 Aero Drive, pursuant to Title 21, United States Code, Sections 853(a)(1), 853(a)(2) and 853(p). *Id.* at p.42–43. Additionally, the section titled "Fourth Forfeiture Allegation" notified the Defendant that upon his conviction of Title 18, United States Code, Section 1594(c) (Conspiracy to Commit Sex Trafficking) (hereinafter referred to as the "Sex Trafficking Offense"), the United States would seek to forfeit proceeds and facilitating property of such offense, including 999 Aero Drive, pursuant to Title 18, United States Code, Sections 1594(d)(1) and 1594(d)(2), and Title 21, United States Code, Section 853(p). *Id.* at 44–45.[2]

3.      On or about December 27, 2024, a jury returned a verdict finding the Defendant guilty of Count 3: Title 21, United States Code, Section 856(a)(1) (Maintaining a Drug-Involved Premises); Count 4: Title 21, United States Code, Section 846 (Conspiracy to Distribute Controlled Substances and Maintain Drug-Involved Premises), and Count 5: Title 18, United States Code, Section 1594(c) (Conspiracy to Commit Sex Trafficking), as well as Count 1: Title 18, United States Code, Section 371, (Conspiracy to Defraud the United States

---

[2] The Third Forfeiture Allegation and the Fourth Forfeiture Allegation allege that 5145 Lexor Lane, Clarence, New York is property subject to forfeiture. The government elected not to pursue forfeiture of this property.

and Commit Bribery); Count 2: Title 18, United States Code, Sections 201(b)(1)(A) and (b)(1)(C) (Paying a Bribe to a Public Official); Count 6: Title 18, United States Code, Section 1512(b)(1) and (2) (Witness Tampering); Count 7: Title 18, United States Code, Section 1512(b)(2)(A) and (2) (Witness Tampering); and Count 9: Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) (Possession with Intent to Distribute and Distribution of Cocaine). *See Jury Verdict*, ECF 1426.  Prior to trial, neither the government nor the Defendant requested the jury be retained to determine the forfeiture of 999 Aero Drive pursuant to Fed. R. Crim. P. 32.2(b)(5)(A).  *See Proposed Jury Instructions by USA*, ECF 1243; Final Pretrial Status Conf., 93:22–24, October 23, 2024.

Testimony Presented at Trial

4.    Witness testimonies presented at trial, in summary, indicated that from 2006 through December 2019, the Defendant knowingly maintained the premises known as Pharaoh's Gentlemen's Club ("Pharaoh's"), located at 999 Aero Drive, as a drug-involved premises where the Defendant and others used and distributed controlled substances. Testimonies also indicated that from 2009 through February 2019, the Defendant and others conspired to distribute controlled substances at 999 Aero Drive and to maintain 999 Aero Drive as a drug-involved premises. 999 Aero Drive was also where the Defendant coerced Pharaoh's dancers to engage in commercial sex acts inside 999 Aero Drive, in furtherance of the conspiracy to commit sex trafficking.

5.    Specifically, the testimonies of Pharaoh's patrons, such as Jeff Anzalone, John McDonald, and Kevin Myszka, and former Pharaoh's dancers and employees, described

relevant conduct that occurred inside 999 Aero Drive during the time period of the convicted offenses.

6.      Jeff Anzalone testified that from approximately 2009 to 2018, he went to Pharaoh's over 100 times and used cocaine every time he was there, including in the downstairs office, upstairs office, at the bar, and the tables near the stage. Trial Tr. Anzalone, 11:11–22; 12:5–19, December 9, 2024. Jeff Anzalone also testified that he was provided cocaine at Pharaoh's from an employee known as "Charm" (Jessica) and another employee known as "Cherry." *Id*. at 13:24–14:5; 15:16–16:6; 16:22–17:17. Similarly, John McDonald testified that from 2015 to 2019, he had openly used cocaine inside Pharaoh's approximately 100 to 200 times. Trial Tr. McDonald, 9:12–10:11, December 11, 2024. Additionally, Kevin Myszka described that one night at Pharaoh's, in or around 2015 through 2017, he asked the Defendant if he could get any cocaine "in here." Trial Tr. Myszka, 14:9–15:18; 18:15–19:9, November 20, 2024. Kevin Myszka then testified that someone who looked like a dancer approached him and gave him a gram of cocaine, which he understood to be from the Defendant, and used it in the Pharaoh's bathroom. *Id*. at 19:10–21:9.

7.      With respect to the testimonies of former Pharaoh's dancers and employees, most of them testified that they used drugs, observed other dancers use drugs, got drugs from the Defendant and/or could get drugs from the Defendant and others at 999 Aero Drive:

- J.Z. worked as a dancer and bartender at Pharaoh's from 2005 to 2008, and dated the Defendant's brother, Anthony Gerace, during the same time. Trial Tr. J.Z., 4:2–5:14; 6:2–6, November 12, 2024. J.Z. testified that one time, she went to the upstairs area and saw the Defendant and other dancers use cocaine. *Id*. at 9:13–10:14. She further testified that the Defendant then provided her cocaine. *Id*. at 10:15–10:20; 39:11–20.

- G.R. danced at Pharaoh's from 2006 to 2009. Trial Tr. G.R., 9:17–22; 71:20–25, November 13, 2024. G.R. testified that she, the Defendant, and others, including K.L., used cocaine that the Defendant usually provided in the upstairs area. *Id*. at 30:13–32:33. She also testified that she used cocaine and opiates in the Pharoah's bathroom. *Id*. at 33:11–21. Additionally, G.R. testified that other dancers also went into the bathroom at Pharaoh's to use drugs. *Id*. at 33:22–24.

- A.P. intermittently worked at Pharaoh's between 2006 and 2013 as a dancer, bartender, waitress and shot girl. Trial Tr. A.P., 4:9–5:7, November 7, 2024. A.P. testified that in 2008, the Defendant asked her to pick up cocaine from Marcus Black and bring it back to Pharaoh's, where she used that cocaine with the Defendant. *Id*. at 8:14–10:17. A.P. testified that the Defendant provided cocaine to her and others, which they used in the upstairs area and "general area." *Id*. at 27:20–28:23. A.P. testified that she observed dancers smoking marijuana and using cocaine, as well as observed dancers leaving the bathroom who looked like they had just used heroin. *Id*. at 5:8–7:8. A.P. testified that she sold drugs to dancers, employees, customers, and the Defendant at Pharaoh's. *Id*. at 14:11–19. A.P. also testified that Jessica Leyland ("Charm") and Marcus Black sold drugs to employees, dancers, and customers inside Pharaoh's. *Id*. at 23:19–24:3; 27:6–19. A.P. testified that the Defendant provided her with a private dressing room inside of Pharaoh's where she stored cocaine. *Id*. at 26:8–27:5.

- P.H. intermittently worked at Pharaoh's from 2008 to 2020. Trial Tr. P.H., 14:8–14, November 14, 2014.  P.H. testified that during the time she worked at Pharaoh's, she saw girls smoking marijuana and using cocaine, as well as observed dancers in the dressing room slumped over, who looked like they used heroin or opiates. *Id*. at 14:23–15:6. She also testified that she observed cocaine used in the dressing room, "hallway-type thing off of the bar," upstairs office, and VIP area. *Id*. at 16:6–16; Trial Tr. P.H., 202:15–204:14, November 18, 2024. P.H. also testified that the first time she was in the upstairs office, she saw the Defendant, dancers, and some of his friends drinking champagne and a plate of cocaine being passed around to use. Trial Tr. P.H., 18:23–19:3; 22:2–13, November 14, 2024. P.H. further testified that the Defendant regularly provided cocaine for them to use in the upstairs office. *Id*. at 24:2–10. P.H. testified that she regularly saw the Defendant's close friend, Jessica Leyland ("Charm"), sell cocaine to the Defendant, dancers, and customers at Pharaoh's. *Id*. at 25:5–26:7.

- K.L. worked at Pharaoh's from approximately March 2009 until August 2009. Trial Tr. K.L., 62:24–63:4, December 9, 2024. K.L. testified that she used drugs

at Pharaoh's and that she could get cocaine or drugs from the Defendant, and other Pharaoh's employees including, Jessica ("Charm"), A.P., PJ, and Marcus Black. *Id*. at 23:12–25:1. K.L. also testified that she was able to get cocaine from anywhere in Pharaoh's such as the dressing room and bar, and specifically that the Defendant provided her cocaine in the upstairs area. *Id*. at 25:16–26:8. K.L. testified that based on her observations, 99% of the dancers who worked at Pharaoh's were using drugs while they worked. *Id*. at 26:21–27:2. K.L. testified that the first time she went upstairs with the Defendant, the Defendant provided her, G.R., and N.A. cocaine for them to use before going out to a bar. *Id*. at 32:17–35:7. K.L. also testified that the Defendant gave her Lortabs in both the upstairs area and the downstairs office. *Id*. at 43:4–9.

- C.B. started working at Pharaoh's in 2010 or 2011; first as a cocktail waitress for six months and then as a night manager for three years. Trial Tr. C.B., 4:7–10; 7:19–8:2; 114:24–25, November 14, 2024. She testified that she observed dancers use cocaine, heroin and fentanyl patches. *Id*. at 11:5–11:14; 14:1–5; *see also id.* at 26:23–28:18 (describing how dancers would use cocaine on tables in the dressing rooms); *id*. at 29:20–30:10 (describing how dancers were heating up the fentanyl patch residue on foil in the private bathroom of the dressing room); *id*. at 32:24–33:19 (explaining that she would see dancers intoxicated by opiates on the open floor area of Pharaoh's).

- A.A./PW7 worked as a dancer at Pharaoh's for approximately a year, starting in 2011 or 2012. Trial Tr. A.A./PW7, 83:6–16, November 19, 2024. A.A./PW7 testified that she was physically addicted to opiates and would need to use them to get through her shift. *Id*. at 18:9–20. She testified that when she worked at Pharaoh's, she regularly used pills and would smoke fentanyl in the bathrooms. *Id*. at 18:21–19:23. A.A./PW7 also testified that she used cocaine in the bathrooms or in the locker room/dressing room. *Id*. at 20:3–15. A.A./PW7 testified that she observed dancers, such as L.L. and "Cherry," use cocaine and she observed D.P. ("Kiera") use heroin in the bathroom. *Id*. at 22:14–23:19; *see also id*. at 29:15–17 ("Q: Where in the club did you observe cocaine use? A: That I, like, vividly remember? Would be in, like, the dressing room. The locker, yeah, dressing room."); *id*. at 69:19–70:1 ("Q: Did you feel like you had to hide using cocaine in the dressing room? A: No, not as much. Q: Did you get cocaine at Pharaoh's while you worked there? A: I believe so, yes. Q: Would you be able to acquire cocaine from other dancers who worked at Pharaoh's? A: Yes, I could."); *id*. at 70:8–70:17 (testifying that dancers would smoke marijuana in the front of Pharaoh's in an open and obvious manner). A.A./PW7 testified that she was under the impression that she and others could get cocaine from a bartender known as "Charm." *Id*. at 72:20–73:19.

- K.A. worked as a dancer at Pharaoh's for approximately two years, starting in or around 2012 and 2013. Trial Tr. K.A., 10:21–11:10, November 18, 2024. K.A. testified that when she worked at Pharaoh's, she was addicted to opiates and that she would use heroin and cocaine in the bathrooms during her shifts. *Id.* at 13:7–14:18. K.A. also testified that another dancer known as "Cherry" gave her drugs at Pharaoh's. *Id.* at 23:14–24.

- A.A./PW8 worked as a dancer at Pharaoh's from 2012 to 2018. Trial Tr. A.A./PW8, 5:8–10; 6:16–22, November 20, 2024. A.A./PW8 testified that within the first year of her employment as a dancer, the Defendant invited her to the upstairs area of Pharaoh's and put a bump of cocaine on a card up to her nose and told her to sniff it. *Id.* at 11:20–14:7; 26:5–8. A.A./PW8 testified that this was the first time she had used cocaine. *Id.* at 11:8–9. A.A./PW8 testified that after the Defendant put that first bump of cocaine up to her nose, she started using it more regularly. *Id.* at 25:3–6. A.A./PW8 testified that the Defendant provided her with cocaine for nearly the entire duration of her employment at Pharaoh's. *Id.* at 26:9–14. A.A./PW8 also testified that she received cocaine and Adderall from Marcus Black and that she observed Marcus Black give cocaine to the Defendant and some patrons at the bar and "on the side of the kitchen" inside Pharaoh's. *Id.* at 17:3–19:8; 26:15–24. A.A./PW8 also described that on five or six occasions, at the Defendant's direction, she went to Marcus at the bar to get cocaine for the Defendant's friends. *Id.* at 33:4–34:19. Marcus would then get cocaine from the bathroom and give it to A.A./PW8 to give to the Defendant's friends, and in exchange, Marcus would give her cocaine for herself. *Id.* at 29:12–33:3. A.A./PW8 testified that she observed Jessica Leyland ("Charm") repeatedly distribute cocaine to the Defendant in the hallway by the kitchen at Pharaoh's. *Id.* at 21:14–21:25; 24:12–25:2. Additionally, A.A./PW8 testified that she observed other dancers frequently use cocaine and heroin. *Id.* at 27:7–16.

- L.L. worked as a dancer at Pharaoh's from 2013 to 2018. Trial Tr. L.L., 14:3–25, December 13, 2024; Trial Tr. L.L., 201:17–202:16, December 16, 2024. L.L. testified that she became addicted to cocaine and heroin at Pharaoh's and had used those drugs "too many [times] to count" inside Pharaoh's. Trial Tr. L.L., 15:1–12, December 13, 2024; *see also id.* at 39:18–25 (testifying that another dancer D.P. "Kiera" had provided her heroin within a couple days after she started working at Pharaoh's). L.L. further testified that she used drugs with some of the other dancers and saw them use drugs in the "[l]ocker room, locker bathroom, other bathroom that's on the main floor, in the VIP Room, right at the bar, and upstairs and downstairs office." Trial Tr. L.L., 20:14–23, December 16, 2024. She testified that she observed the Defendant, dancers, DJ, bartenders, and managers use and distribute drugs in those same areas inside

7

the club. *Id*. at 22:8–17; *see also id*. at 34:1–8 (L.L. testifying that she used cocaine with Megan Stabler "at various places in the club"). L.L. further testified that she was able to get cocaine at Pharaoh's, from customers, "Scooter," "Bobby Black," "Cherry," "Larry," "Charm," the Defendant's brother David, and a liquor distributer "Aaron." *Id*. at 45:21–47:2; 52:14–53:17. Additionally, L.L. testified that she also used cocaine with the Defendant in the downstairs office. *Id*. at 78:9–14.

- E.H. worked at Pharaoh's for three months, starting in October 2014. Trial Tr. E.H., 8:19–23, November 18, 2024. E.H. testified that she witnessed a dancer in the upstairs area of Pharaoh's chopping up and sniffing lines of cocaine, while the Defendant was present. *Id*. at 18:6–9; 19:17–24. She testified that the Defendant stated to her "I help the girls if they need to work, and I can get you some [cocaine] too." *Id*. at 19:25–20:15.

- R.W. worked at Pharaoh's for one month, around August 2012 and again around August 2019. Trial Tr. R.W., 9:8–10; 25:20–26:4, November 19, 2024. R.W. testified that during the first time she worked at Pharaoh's, around August 2012, she had seen dancers, bartenders, and shot girls smoking marijuana and crack cocaine, in the back smoking area. *Id*. at 10:24–13:16. R.W. testified that she also observed dancers use cocaine in the dressing room. *Id*. at 24:20–23. Additionally, R.W. testified that she believes she saw one customer take a bump of cocaine by the stage. *Id*. at 15:25–16:17. R.W. testified that one night a DJ offered her cocaine when she was nervous before going on stage. *Id*. at 25:6–19. R.W. testified that around August 2019, the second time she worked at Pharaoh's, women were using fentanyl intravenously, and she saw used needles in the dancers' bathroom. *Id*. at 26:5–28:8. R.W. also testified that Marcus Black advertised to her and another dancer that he could get them drugs, including cocaine. *Id*. at 35:16–37:15.

- A.B. worked at Pharaoh's in September 2019. Trial Tr. A.B., 10:12–17, November 13, 2024. A.B. testified that the Defendant gave K.C. cocaine that she and K.C. then used in the bathroom of the women's dressing room at Pharaoh's. *Id*. at 21:25–22:25. A.B. described when the Defendant first invited her upstairs, he provided them cocaine that they used. *Id*. at 27:12–32:9. After this first time, the Defendant became her primary supplier of cocaine at Pharaoh's. *Id*. at 65:5–11.

8.    Because many dancers were addicted to drugs, the Defendant exploited their desperation and coerced the dancers to engage in commercial sex acts at 999 Aero Drive.

Collectively, the testimony of the dancers and one former employee indicated that dancers kissed and grinded on men until they ejaculated, were fondled and fingered, provided hand jobs, and engaged in oral, vaginal, and anal sex in the Pharaoh's VIP Room and Champagne Room:

- A.A./PW7 described her experience with a customer, Wayne Van Vleet, explaining that he "put his hands everywhere," held her down on him, touched her vagina, and attempted to rub her bare vagina in the VIP Room. Trial Tr. A.A./PW7, 38:11–21, November 19, 2024. She testified that while in the VIP Room, Wayne Van Vleet held her against his lap and forced her against his body until he ejaculated, and the person who was watching the camera did not stop him. *Id*. at 42:6–43:2. A.A./PW7 testified that she felt like she did not have a choice, and had to endure Wayne Van Vleet's conduct because she was addicted to drugs and would do anything for money and drugs. *Id*. at 45:11–46:10. A.A./PW7 also testified that one time in the VIP area, a customer inserted his fingers inside of her vagina and she asked that customer to stop. *Id*. at 77:16–78:2. She turned back to look at the camera for help, but the VIP attendant did not stop him. *Id*. at 78:3–18. Additionally, A.A./PW7 testified that when she worked at Pharaoh's, she began spending up to $900 a day on drugs, desperate to avoid withdrawal symptoms. *Id*. at 21:13–22:10; 112:15–113:11. She also testified that she felt like she was controlled by her addiction and had no choice to stop a dance; if she chose to stop the dance, she would lose the ability to get more money from the customer and get in trouble by management. *Id*. at 113:12–114:19.

- K.A. testified she engaged in many backroom dances with Wayne Van Vleet in the VIP Room at Pharaoh's, and that he liked to pull hair, tried to insert his fingers in her vagina, and forced her body down against his erect penis until he ejaculated. *See* GX 558 (photograph of Wayne Van Vleet); Trial Tr. K.A., 22:16–25:25, November 19, 2024. K.A. stated that she would not have engaged in that conduct in the VIP room if she was not addicted to heroin. *Id*. at 27:17–24; *see also id*. at 65:22–66:22 (". . . Q: Okay. Would you choose to go in the VIP Room and engage in that conduct with [Wayne Van Vleet] today? A: No. Q: Why not? A. Because I'm not a drug addict anymore. . . .Q. . . . was that a choice that you made because you needed money to buy drugs? A. Yes. . . .).

- L.L. testified that while working at Pharaoh's she began engaging in commercial sex acts for drugs and money because of her addiction to drugs. Trial Tr. L.L., 15:18–16:9, December 13, 2024. She also testified that

throughout her time working at Pharaoh's, she engaged in 500 sex acts with 500 men in the VIP Area and 200 sex acts with 200 men in the Champagne Room. Trial Tr. L.L., 22:24–23:25, December 16, 2024. L.L. testified that she saw other dancers engaged in similar activities, saw condoms in the VIP area, and heard dancers ask for baby wipes. *Id.* at 24:4–22. Specifically, L.L. testified that the Defendant encouraged her to go into the Champagne Room with Wayne Van Vleet where he fingered her, pulled her hair, and ejaculated in his pants. *Id.* at 70:18–73:13. She stated she would not have done that, had she not been heavily addicted to heroin and cocaine. *Id.* at 76:3–8; *see id.* at 75:25–76:2 (testifying that she did not think taking Wayne Van Vleet in the VIP area was optional). Similarly, L.L. testified that she engaged in sexual acts with Jim Casey, including having a threesome with A.A./PW7, in the Champagne Room. *Id.* at 121:6–122:2. L.L. specifically described that during a time when she was using drugs every day, she engaged in commercial sex acts with Joseph Barsuk and "Dave" in the downstairs VIP area. *Id.* at 125:5–127:5.

- G.R. testified that she observed another dancer having sex in the Champagne Room, while she was with another customer who masturbated and ejaculated during a lap dance. Trial Tr. G.R., 54:3–56:9, November 13, 2024.

- K.L. testified that in the summer of 2009, she observed customers fondling dancers' breast and touching the dancers' vagina-area, in the VIP room. Trial Tr. K.L., 67:8–20, December 9, 2024.

- C.B. testified that while working at Pharaoh's, she observed a customer with his pants down, a dancer providing a hand job, heavy grinding, skin-to-skin contact with dancers' thongs pulled aside, and breast fondling, during VIP dances. Trial Tr. C.B., 40:20–42:18, November 14, 2024. C.B. also testified that she was aware that oral sex occurred. *Id.* at 102:1; 102:21.

- A.A./PW8 testified that after seeing the Defendant bring dancers into the upstairs area, she saw those dancers come downstairs and heard them ask for baby wipes. Trial Tr. A.A./PW8, 16:20–17:2, November 20, 2024.

- E.H. testified that she was instructed to take $20 from the customer, give it to the security guard, and grind on the customer until he ejaculates. Trial Tr. E.H., 27:20–28:11, November 18, 2024. She also described one occasion when a male patron exposed himself and ejaculated on her. *Id.* at 28:12–29:1. She also stated that she saw condoms in the VIP area. *Id.* at 30:17–31:2.

- A.B. testified that she has seen other dancers, she named "Peter's Favorites," engage in sex acts (male customers would finger the dancers and lick their nipples) in the VIP Room. Trial Tr. A.B., 44:4–46:2, November 13, 2024.

9.    Additionally, G.R., K.L., and L.L. testified that they felt coerced to perform sex acts with the Defendant and/or men who had a close relationship with the Defendant, in the upstairs area of 999 Aero Drive:

- G.R. testified that in 2009, when she was addicted to drugs, the Defendant invited her upstairs to "party," gave her cocaine, asked her to "take care" of his friend, and in exchange, he would take care of her. Trial Tr. G.R., 41:23–46:22, November 13, 2024. She testified that while high on cocaine, she had sex with the Defendant's friend in the upstairs bathroom, and then the Defendant handed her $200, that she suspected she used to buy more cocaine. *Id.* at 46:10–47:1.

- K.L. testified that the Defendant told her that he gave G.R. money to have sex with one of the Defendant's friends in the upstairs area at Pharaoh's. Trial Tr. K.L., 58:1–24, December 9, 2024. Additionally, K.L. testified that in 2009, when she was a frequent cocaine user, she and the Defendant went upstairs, and he gave her cocaine to use. *Id.* at 35:10–38:24. He then put porn on the TV and pulled his pants down. *Id.* at 38:25–39:3. She performed oral sex and had vaginal sex with him because she felt like she had to. *Id.* at 40:9–40:20; *see also id.* at 40:25–41:2 (stating that she engaged in sexual encounters with the Defendant upstairs at least ten to fifteen times). She also testified that there were other occasions where she would ask him for Lortabs during her withdrawals, which he provided to her, on the condition that she engage in a sexual act with him. *Id.* at 44:8–45:17.

- In summary, L.L stated that every time she was in the upstairs area of Pharaoh's, she engaged in sex acts with the Defendant and men with a close relationship to the Defendant in exchange for money and drugs. *See* Trial Tr. L.L., 37:6–38:19; 39:13–15, December 16, 2024; *id.* at 93:11–96:16 (testifying that she had sex with the Defendant after he gave her drugs because she did not feel like she could deny him; he was in control of different aspects of her job at Pharaoh's that would change how much money she earned); *id.* at 97:3–98:20 (describing that the Defendant brought L.L. and other dancers to the upstairs area, provided them drugs, and had them perform sexual acts, including threesomes, vaginal, oral, and anal intercourse with him); *id.* at 110:1–111:12

11

(describing the occasions when the Defendant's brother David offered her cocaine to go upstairs, and they engaged in anal and/or vaginal sex); *id*. at 112:3–113:25 (describing that she would have oral, anal, or vaginal sex with Aaron in the upstairs area, in exchange for cocaine and heroin so she could avoid withdrawal symptoms); *id*. at 115:1–121:2 (describing having sex with Rob Reed for money and drugs in the upstairs area and stating she would not have done so had she not been addicted to drugs).

## LEGAL ANALYSIS

Forfeiture Procedure Pursuant to Rule 32.2

10.     Rule 32.2 of the Federal Rules of Criminal Procedure governs the criminal forfeiture sought by the government in this case. In order to seek forfeiture of property, the government must first provide notice to the Defendant of the government's intention to seek forfeiture in the indictment. Fed.R.Crim.P. 32.2(a). Second, the Court must, as soon as practical following a finding of guilt on any substantive charges, determine if the property in question is subject to forfeiture, and if so, enter a preliminary order of forfeiture. Fed.R.Crim.P. 32.2(b)(1)-(2). Third, the Court must make the order of forfeiture part of the Defendant's sentence and include it in the judgment. Fed.R.Crim.P. 32.2(b)(4).

A.  The Second Superseding Indictment contained Forfeiture Allegations that notified the Defendant of the government's intention to seek the forfeiture of 999 Aero Drive

11.     As a threshold requirement, "[a] court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute." Fed.R.Crim.P. 32.2(a); *United States v. Annabi*, 746 F.3d 83, 86

12

(2d Cir. 2014) (held that forfeiture must be limited to that authorized by the statute cited as the basis for forfeiture, and of which the defendant had notice).

12.    As indicated above, the government provided notice to the Defendant in the Second Superseding Indictment within the sections titled "Third Forfeiture Allegation" and "Fourth Forfeiture Allegation," that upon his conviction of the Drug Offenses and the Sex Trafficking Offense, the United States would seek to forfeit 999 Aero Drive pursuant to Title 21, United States Code, Sections 853(a)(1), 853(a)(2) and 853(p), and Title 18, United States Code, Sections 1594(d)(1) and 1594(d)(2) and Title 21, United States Code, Section 853(p), respectively. *Second Superseding Indictment,* ECF 89, p. 42–45. Now that the Defendant has been convicted of the Drug Offenses and the Sex Trafficking Offense and the Second Superseding Indictment contained notice to the Defendant, the Court may enter a judgment of forfeiture as part of the Defendant's sentence. As such, the government moves the Court to determine that 999 Aero Drive is subject to forfeiture pursuant to the applicable forfeiture statutes, Title 21, United States Code, Section 853(a)(2),  Title 18, United States Code, Section 1594(d)(1), and Rule 32.2(b) of the Federal Rules of Criminal Procedure.

B.    The Court should determine that 999 Aero Drive is subject to forfeiture and enter a preliminary order of forfeiture directing the forfeiture of 999 Aero Drive

13.    Now that the jury convicted the Defendant on counts for which criminal forfeiture is sought, Rule 32.2(b)(1) requires this Court to determine the forfeiture of property. Rule 32.2(b)(1) provides in relevant part:

(b) Entering a Preliminary Order of Forfeiture

(1) *Forfeiture Phase of Trial*

    (A) *Forfeiture Determinations.* As soon as practical after a verdict . . . of guilty, . . . on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. . . .

    (B) *Evidence and Hearing.* The court's determination may be based on evidence already in the record, . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable. . . .

    14.    As stated above, since the government is seeking the forfeiture of specific property, 999 Aero Drive, the Court must determine whether the government has established the "requisite nexus" between 999 Aero Drive and the Drug Offenses and the Sex Trafficking Offense. Fed.R.Crim.P. 32.2(b)(1)(A). To establish the requisite nexus, the government is required to discern that the forfeiture standard set forth in the applicable statutes exists between 999 Aero Drive and the Drug Offenses and the Sex Trafficking Offense. *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) (violation on which forfeiture is based must be specific violations of which the defendant was convicted; not some other violation); *United States v. Messino*, 382 F.3d 704, 714 (7th Cir. 2004) (must be a connection between property subject to forfeiture and the underlying criminal activity "on which the conviction rests"). *United States v. Anghaie*, No. 1:09CR37–SPM, 2011 WL 2671242 *1 (N.D. Fla. July 7, 2011) (acknowledging that there is no general purpose statute authorizing forfeiture; forfeiture standards for various separate offenses are set forth in appropriate and applicable forfeiture statutes).

15.     The government bears the burden of establishing that 999 Aero Drive is subject to forfeiture only by a preponderance of the evidence. *United States v. Daugerdas*, 837 F.3d 212, 231 (2d Cir. 2016) ("For a criminal forfeiture order to pass muster, the government must establish, by a preponderance of the evidence, the 'requisite nexus between the property and the offense.'") (quoting Fed. R. Crim. P. 32.2(b)(1)(A)); *United States v. Peters*, 732 F.3d 93, 98 (2d Cir. 2013) (preponderance standard applies to criminal forfeiture); *United States v. Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999) ("It follows as a matter of logic that, absent any indication to the contrary in the statutory text, criminal forfeiture . . . depends on the preponderance of the evidence."); *United States v. Sabhnani*, 566 F.Supp.2d 148, 150–51 (E.D.N.Y. 2008), *aff'd*, 599 F.3d 215 (2d Cir. 2010) ("It is well settled in the Second Circuit that once the defendant is convicted of an offense on proof beyond a reasonable doubt, the government is only required to establish the forfeitability of the property subject to criminal forfeiture as a result of that offense by a preponderance of the evidence.").

16.     Rule 32.2(b)(1)(B) states that the evidence to prove that 999 Aero Drive is subject to forfeiture may be "evidence already in the record," or any additional evidence accepted by the Court as "relevant and reliable." Fed.R.Crim.P 32.2(b)(1)(B). Because forfeiture is a part of the sentence imposed, the Federal Rules of Evidence are inapplicable. *See Libretti v. United States*, 516 U.S. 29, 38–41 (1995); Fed.R.Evid. 1101(d)(3). Thus, additional evidence that would otherwise not be admissible in a proceeding governed by the Federal Rules of Evidence, may be relied upon when considering whether the government has established the requisite nexus between the property and the convicted offenses. *United States v. Jafari*, 85 F. Supp. 3d 679, 684–85 (W.D.N.Y. 2015) ("[C]ourts may consider hearsay

and other inadmissible evidence so long as it is sufficiently reliable." (citing Fed.R.Evid. 1101(d)(3)).

     i.  <u>Forfeiture of facilitating property used in the Defendant's violations of the Drug Offenses and the Sex Trafficking Offense is mandatory</u>

17.    Title 21, United States Code, Section 853(a)(2) provides that "[a]ny person convicted of [violations of Title 21, United States Code, Sections 846 and 856(a)(1)] ***shall*** forfeit to the United States, irrespective of any provision of State law -- . . . any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such violation[s]." (emphasis added). *See United States v. Monsanto*, 491 U.S. 600, 607 (1989) (finding the use of "shall" in Title 21, United States Code, Section 853(a) rendered forfeiture mandatory under that statute and observing that "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory . . .").

18.    Similarly, Title 18, United States Code, Section 1594(d)(1) provides that "[t]he court, in imposing sentence on any person convicted of a violation of [Title 18, United States Code, Section 1594(c)], ***shall*** order, in addition to any other sentence imposed and irrespective of any provision of State law, that such person shall forfeit to the United States—(1) such person's interest in any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of such violation, and any property traceable to such property." (emphasis added).

19.    To state it concisely, both forfeiture statutes, Section 853(a)(2) and Section 1594(d)(1), require the forfeiture of facilitating property. Title 21, United States Code, Section 853(a)(2); Title 18, United States Code, Section 1594(d)(1). Facilitating property is any

property that makes the crime easier to commit or harder to detect, in any substantial way. *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271 (E.D.N.Y. 2005) ("'Facilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance,'" quoting *United States v. Wyly*, 193 F.3d 289, 302 (5th Cir. 1999)). Facilitating property need not be indispensable to the commission of the convicted offenses and need not be used exclusively for illegal conduct to be facilitating property. *United States v. Sabhnani*, 599 F.3d 215, 261–62 (2d Cir. 2010). Therefore, all that is necessary is that the government prove that 999 Aero Drive was used "in any manner or part" to commit or to facilitate the commission of the convicted offenses. *Id.* If a portion of 999 Aero Drive was used in any way to facilitate the convicted offenses, then the entire property is forfeitable. *Id.* (affirming the forfeiture of a whole house where the defendant used the office in house to facilitate criminal conduct; the office was part of the house, not detached, not separately owned).

### The Court should find that the requisite nexus exists between 999 Aero Drive and the Defendant's conviction of the Drug Offenses

20.     Here, the Court should find that the requisite nexus exists between 999 Aero Drive and the Drug Offenses. Specifically, the Court should find that 999 Aero Drive was property used, in any manner or part, to commit, or to facilitate the commission of the Drug Offenses. Title 21, United States Code, Section 853(a)(2). The jury convicted the Defendant of the Drug Offenses, of which 999 Aero Drive was the subject drug-involved premises. Therefore, by necessity, the jury has already found that the requisite nexus exists between 999 Aero Drive and the Drug Offenses. By finding the Defendant guilty of maintaining a drug-involved premises for the purpose of distributing and using drugs, the jury has also found,

beyond a reasonable doubt, that 999 Aero Drive was property used, in any manner or part, in the commission of such violations. As such, the Court should find that 999 Aero Drive is subject to forfeiture pursuant to Title 21, United States Code, Section 853(a)(2). *See United States v. Boston,* No. 11–CR–107 DLI, 2011 WL 4101109 *1 (E.D.N.Y. Aug. 16, 2011) (holding that by finding defendant guilty of felon in possession of firearm, jury necessarily must have found that defendant illegally possessed the firearm subject to forfeiture, which automatically makes the forfeiture of the firearm mandatory); *United States v. Grayson Enterprises, Inc.*, 950 F.3d 386, 409 (7th Cir. 2020) (a guilty verdict at trial necessarily included a finding that a building (warehouse) used to shield, harbor or conceal, facilitated the offense; the court may enter an order forfeiting the warehouse without asking the government for a proposed order).

### The Court should find that the requisite nexus exists between 999 Aero Drive and the Defendant's conviction of the Sex Trafficking Offense

21.     Additionally, the Court should find that the requisite nexus exists between 999 Aero Drive and the Sex Trafficking Offense. Namely, that 999 Aero Drive was property involved in or used to commit or to facilitate the commission of the Sex Trafficking Offense. Title 18, United States Code, Section 1594(d)(1). As described by the former Pharaoh's dancers' and employees' testimonies, 999 Aero Drive provided the Defendant a location to carry out the conspiracy to sex traffic the dancers by means that preyed upon the power imbalance and exploited the dancers' vulnerabilities by coercing them to perform sex acts in exchange for money and drugs. *See supra* ¶¶ 8–9. Some of the former Pharaoh's dancers' testimonies indicated that they were encouraged or expressly told to provide commercial sex acts to customers in the VIP area and/or the Champagne Room. *See supra* ¶ 8. Some of the

former Pharaoh's dancers testified that because they feared withdrawal symptoms or the potential loss of income, they engaged in sexual acts with the Defendant or the Defendant's friends in the upstairs area that the Defendant controlled. *See supra* ¶ 9. For more than ten years, these areas within 999 Aero Drive made the commercial sex acts easier to commit and harder to detect thereby establishing that the property more than incidentally facilitated the Defendant's conspiracy to commit sex trafficking. The requirement that 999 Aero Drive is substantially connected to the Sex Trafficking Offense is easily satisfied based upon the testimonies of the dancers that commercial sex acts were frequently happening in the VIP area, Champagne Room, and the upstairs portion of 999 Aero Drive for the duration of the conspiracy. As such, the Court should find that 999 Aero Drive is subject to forfeiture pursuant to Title 18, United States Code, Section 1594(d)(1).

    ii.  <u>The Court should promptly enter the Preliminary Order of Forfeiture without regard to any third-party interests</u>

22. Once the Court determines that property is subject to forfeiture, Rule 32.2(b)(2) directs the Court to "promptly" enter a preliminary order of forfeiture, "sufficiently in advance of sentencing." Specifically, Rule 32.2(b)(2) states:

> (2) Preliminary Order
>
> (A) *Contents of a Specific Order*. If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture . . . directing the forfeiture of specific property . . . . The court must enter the order without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c).
>
> (B) *Timing*. Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications

before the order becomes final as to the defendant under
Rule 32.2(b)(4).

*See generally McIntosh v. United States,* 601 U.S. 330, 342–45 (2024) (holding that Rule 32.2(b)(2)(B) is a time-related directive, and thereby affirming the Second Circuit holding that the entry of a preliminary order after sentencing is not invalid when the district court ordered forfeiture at sentencing); *United States v. Kaufman,* No. 21-2589, 2023 WL 1871669, *6 (2d Cir. Feb. 10, 2023) (entry of the "preliminary order of forfeiture during, rather than 'in advance of,' sentencing" did not invalidate the order).

23.    Additionally, Rule 32.2(b)(2)(A) requires the Court to disregard any third party's interests. Ownership becomes a question for the Court alone to determine in the ancillary proceeding, and therefore should not be considered prior to the entry of a preliminary order of forfeiture. *United States v. Gaskin,* No. 00-CR-06148, 2002 WL 459005, *9 n.4 (W.D.N.Y. Jan. 8, 2002); *De Almeida v. United States*, 459 F.3d 377, 381 (2d Cir. 2006) ("[C]riminal forfeiture is not a measure restricted to property owned by the criminal defendant . . . ."); *United States v. Nicolo*, 597 F. Supp.2d 342, 346 (W.D.N.Y. 2009) (in the forfeiture phase of the trial, the court "is not to consider potentially thorny issues concerning third party ownership of property sought to be forfeited;" if the Government establishes the required nexus to the offense, the property must be forfeited).

24.    Similarly, a defendant cannot object to the entry of a preliminary order of forfeiture by claiming that the property belongs to someone other than the defendant. *United States v. Schlesinger*, 396 F. Supp. 2d 267, 273 (E.D.N.Y. 2005) (the extent of defendant's interest in the property and any other party's interest is decided in the ancillary proceeding, not when the court is deciding whether to issue a preliminary order of forfeiture); *United States*

*v. Feger*, No. 10–CR–346S, 2012 WL 1040181, *6 (W.D.N.Y. Mar. 28, 2012) (overruling defendant's objection that a firearm should not be forfeited because it belonged to his brother; under Rule 32.2(b)(2)(A), the court must enter a preliminary order of forfeiture without regard to ownership; the brother may file a claim in the ancillary proceeding).

25.    At the Oral Argument on Motion for Appointment of Counsel held on December 26, 2024, the Defendant stated that his mother owns 999 Aero Drive. *See* Oral Arg. on Mot. for Appointment of Counsel Tr. 19:16–19, December 26, 2024. For the reasons set forth previously, the Court should determine 999 Aero Drive is subject to forfeiture and promptly enter a preliminary order of forfeiture without regard to his mother's interests, pursuant to Rule 32.2(b)(2)(A), Title 21, United States Code, Section 853(a)(2), and Title 18, United States Code, Section 1594(d)(1).

CONCLUSION

WHEREFORE, the United States respectfully requests that this Court determine that 999 Aero Drive is property that was used to commit or facilitate the Defendant's violations of Title 21, United States Code, Section 856(a)(1) (Maintaining a Drug-Involved Premises), Title 21, United States Code, Section 846 (Conspiracy to Distribute Controlled Substances and Maintain Drug-Involved Premises), and Title 18, United States Code, Section 1594(c) (Conspiracy to Commit Sex Trafficking) and therefore enter the proposed Preliminary Order of Forfeiture forfeiting 999 Aero Drive, pursuant to Federal Rule of Criminal Procedure

32.2(b), Title 21, United States Code, Section 853(a)(2), and Title 18, United States Code, Section 1594(d)(1).

Dated: May 28, 2025
          Buffalo, New York

                                   MICHAEL DIGIACOMO
                                   United States Attorney
                                   Western District of New York

                              By: s/Elizabeth M. Palma
                                   Assistant United States Attorney
                                   United States Attorney's Office
                                   Western District of New York
                                   138 Delaware Avenue
                                   Buffalo, New York 14202
                                   (716) 843-5860
                                   elizabeth.palma@usdoj.gov