UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————

UNITED STATES OF AMERICA,

-v-

JOSEPH BONGIOVANNI,
PETER GERACE, JR.,
                         Defendants.

———————————————————————

Case No.: 19-CR-227

UNITED STATES OF AMERICA,

-v-

PETER GERACE, JR.,
                         Defendant.

———————————————————————

Case No.: 23-CR-37

## AMENDED MOTION FOR JUDGMENT OF AQUITTAL AND/OR A NEW TRIAL

Peter Gerace, Jr., by and through counsel (Mark A Foti, Esq. and Eric M. Soehnlein, Esq.) respectfully submits the following memorandum in support of his motion for a judgment of acquittal and/or a new trial. [1]

---

[1] Although there are distinct issues relevant to Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure, the overarching review of evidence and the interchange between the two rules supports a combined motion. *United States v. Rojas*, 574 F2d 476 (9th Cir. 1978); *United States v. Beran*, 546 F2d 1316, 1319 n.1 (8th Cir. 1976), *cert. denied*, 430 U.S. 916 (1977); *see also Burks v. United States*, 437 US 1, 17 (1978)("In our view it makes no difference that a defendant has sought a new trial as one of his remedies, or even as the sole remedy. It cannot be meaningfully said that a person "waives" his right to a judgment of acquittal by moving for a new trial.")

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................... 3

LEGAL PRINCIPLES ................................................................................................................... 5

   I.      RULE 29 STANDARD ...................................................................................... 5

   II.     RULE 33 STANDARD ...................................................................................... 6

   III.    CONSTIUTIONAL TRIAL RIGHTS .................................................................. 8

      A.     *Right to a Fair Trial* ............................................................................ 8

      B.     *The Burden of Proof* ........................................................................ 10

      C.     *Right to Not Testify* ........................................................................ 12

DISCUSSION .............................................................................................................................. 13

   I.      MOTION FOR JUDGEMENT OF ACQUITTAL .............................................. 13

      A.     *Conspiracy to Defraud and Bribery* .............................................. 13

      B.     *Drug Trafficking* .............................................................................. 26

      C.     *Sex Trafficking* ................................................................................ 34

      D.     *Tampering Counts* .......................................................................... 46

   II.     MOTION FOR A NEW TRIAL ...................................................................... 50

      A.     *Juror Misapplication of the Law* .................................................... 50

      B.     *Impairment of Ability to Present a Defense* .................................. 56

      C.     *Replacement of a Juror During Deliberations* ................................ 61

      D.     *Evidentiary Review* ........................................................................ 63

CONCLUSION ............................................................................................................................ 64

## INTRODUCTION

On July 19, 2024, this Court entered a judgement of acquittal for Joseph Bongiovanni with respect to the charge of accepting a bribe as a public official from Peter Gerace, Jr. Docket Item 1077.

On October 10, 2024, a unanimous jury acquitted Joseph Bongiovanni of entering into a conspiracy with Peter Gerace, Jr.

On December 28, 2024, Peter Gerace, Jr. was convicted of the same conspiracy count that a jury had previously acquitted Joseph Bongiovanni and a count related to paying bribes to Joseph Bongiovanni.

In fact, Mr. Gerace was convicted of almost every count charged, despite multiple issues with the government's evidence, discussed below. The jury even convicted on witness tampering counts, with only one eyewitness, who described events inconsistent with the notion that Mr. Gerace engaged in witness tampering.

Pursuant to the Federal Rules of Criminal Procedure (Fed. R. Crim. P.), the defense intended to move for a judgement of acquittal pursuant to Rule 29 as to each of the counts of conviction or, alternatively, an order for a new trial pursuant to Rule 33 on any counts that a judgement of acquittal is not granted.

Then, during the preparation of these motions, an event occurred that placed the verdict in new light – the juror foreperson started talking to members of the press and ultimately went on-the-record for an interview in which he indicated, among other things

that: he felt sympathetic to the government witnesses, he was not impacted by inconsistencies in government witness testimonies, and he expected the defense to call witnesses and found it "outrageous" that they did not do so (available at https://tinyurl.com/Juror10Interview).

The comments demonstrate the jury was impacted by negative inferences drawn from Mr. Gerace's decision not to testify or call witnesses, because at least one of the jurors (one in a position of leadership no less) placed a burden on the defense not only to call witnesses but to produce a quantity of witnesses similar to the government.

The comments justify a new trial in the interest of justice on any counts that a judgement of acquittal is not entered. Or, at a minimum, the decision should be held in abeyance until a full inquiry should be conducted through a in-depth evidentiary hearing.

Accordingly, for the following reasons, the defense seeks a judgement of acquittal, or alternatively a new trial as to any counts in which a judgement of acquittal is not granted, or an evidentiary hearing on the on the juror(s)'s misapplication of the law in rendering a verdict.

## LEGAL PRINCIPLES

### I.    RULE 29 STANDARD

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

 A Rule 29 motion focuses "on the sufficiency of the evidence presented in the government's case-in-chief." *United States v. Koschuk*, No. 09-CR-323S, 2010 WL 4703504, at *1 (W.D.N.Y. Nov. 19, 2010) (citation omitted); *see also Burks*, 437 U.S. at 10-18.

The test for reviewing the sufficiency of the evidence is whether any rational trier of fact could fairly find the defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government. *Coleman v. Johnson*, 132 S. Ct. 2060 (2012); *Cavazos v. Smith*, 132 S. Ct. 2 (2011); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Taylor*, 816 F.3d 12 (2d Cir. 2016).

In order to succeed on a motion for acquittal the defendant "must establish that no reasonable jury could have convicted him of charged crime based on the evidence presented." *United States v. Facen*, 812 F.3d 280 (2d Cir. 2016).

The rule provides a necessary guarantee for "the fundamental protection of due process of law." *Jackson v. Virginia*, 443 U.S. at 319.

Where the government proves only "coordinated activity" and fails to prove each element of the offense an acquittal is required. *United States v. Sliwo*, 620 F3d 630 (6th Cir. 2010).

"[S]pecious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (emphasis in original) (*citing United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008).

That is because "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.*

In context of Rule 29, this Court has observed that when "the proof presented at trial [gives] 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence'—at least innocence of the crime charged—that proof [is] insufficient as a matter of law to sustain the government's burden." Docket Item 1077 at 18 (*quoting United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).

## II.    RULE 33 STANDARD

Federal Rule of Criminal Procedure 33 allows the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

Rule 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

That discretion includes the ability to weigh the evidence and evaluate the credibility of witnesses. *Id.* In "exceptional circumstances" a trial judge may "intrude upon the jury function of credibility assessment"— for example, where "testimony is patently incredible or defies physical realities." *Id.* at 1414.

When a district court finds there is a real concern that an innocent person may have been convicted, the Court should order a new trial pursuant to Rule 33. *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

A motion for a new trial does not require the court to "view the evidence in the light most favorable to the verdict." *United States v. Hassan*, 844 F.3d 723, 725 (8th Cir. 2016).

Thus, "the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29." *United States v. Ferguson*, 246 F. 3d 129, 134 (2nd Cir. 2001)

The Court's discretion includes the ability to weigh the evidence and find it unsatisfactory or insufficient to support the jury's finding of guilt beyond a reasonable doubt. *See Ferguson*, 246 F. 3d at 137.

However, the Court cannot merely substitute its judgement for that of the jury. *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) ("a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.")

Rather, this Circuit has clarified that for the Court to issue a Rule 33 Order for a new trial "based on the weight of the evidence alone," the evidence must "preponderate[] heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *Id.*

## III.    CONSTIUTIONAL TRIAL RIGHTS

### A.  Right to a Fair Trial

The Constitution guarantees the right to a fair trial. It includes the right to a fair and impartial jury. An impartial jury ensures justice is administered fairly and defendants receive a bias-free result decided by appropriate and competent evidence.  A conviction is manifestly unjust when it is obtained without a fair trial or impartial jury.

These rights are the backbone of our criminal justice system.  The Sixth Amendment grants a criminal defendant the right to a trial "by an impartial jury." See U.S. Const. amend. VI. "The right to an 'impartial jury' is also grounded on principles of due process." *United States v. Barnes*, 604 F.2d 121, 169 (2d Cir. 1979).  The Supreme Court has observed, "one touchstone of a fair trial is an impartial trier of fact -- a jury capable and willing to decide the case solely on the evidence before it." *Sampson v. United States*,

724 F.3d 150, 163 (1st Cir. 2013); *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).

The essence of the constitutional right to an impartial jury is the guarantee of "a fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (quotation omitted). "[I]f a jury is to be provided the defendant, . . . the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Munt v. Grandlienard*, 829 F.3d 610, 614 (8th Cir. 2016). When evaluating whether a defendant's Sixth Amendment right to an impartial jury was violated, courts look to whether the jury's verdict was "free from external causes tending to disturb the exercise of deliberate and unbiassed [sic] judgment." *Bebo v. Medeiros*, 906 F.3d 129, 135 (1st Cir. 2018). The import of that concept is clear -- "a juror who 'could probably be fair and impartial'" should not be considered impartial, because "'probably' is not good enough." *United States v. Sithithongtham*, 192 F.3d 1119, 1121 (8th Cir. 1999).

In connection with the constitutional right to trial by impartial jury, impartiality is not static concept, but can be defined only in relation to specific facts and circumstances. *Farese v. United States*, 428 F.2d 178, 1970 U.S. App. LEXIS 9673 (5th Cir. 1970) (holding that error occurred when $ 750 in large denominations, the existence of which was unknown to the government or defense, was discovered by the jury upon examination of a freshly laundered shirt inside an attached case introduced into evidence).

Due process is also not a static concept: due process means a defendant is entitled to a jury that is capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. *United States v. Modesto*, 43 M.J.315, 319 (C.A.A.F. 1995). "'[E]vidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel'" – not from speculation by the jury or extrinsic evidence.  *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965).

### B.  The Burden of Proof

In criminal cases, the burden is on the government to establish each and every element of the crime charged beyond a reasonable doubt. *United States v. Gaudin*, 515 U.S. 506 (1995); *Jackson v. Virginia*, 443 U.S. 324 (1979); *In re Winship*, 397 U.S. 358, 364 (1970); *Davis v. 307, United States*, 160 U.S. 469 (1895); *United States v. Clark*, 740 F3d 808 (2d Cir. 2014). The burden never shifts to the defendant. The defendant maintains his presumption of innocence throughout the trial. *Wilbur v. Mullaney*, 496 F2d 1303, 1307 (1st Cir. 1974), *affd*, 421 U.S. 684 (1975).

The presumption of innocence is a mandatory presumption in favor of the defendant which can only be overcome by proof of guilt beyond a reasonable doubt. The trial court must make it clear to the jury that it cannot convict unless and until the

government has proved its case beyond a reasonable doubt. *Kentucky v. Whorton*, 441 U.S. 786 (1979); *Taylor v. Kentucky*, 436 U.S. 478 (1978).

"Circumstantial evidence is that evidence which tends to prove a disputed fact, by proof of other facts" *Rumely v. United States*, 293 F. 532. 551 (2d Cir. 1923). Although a conviction may rest solely on circumstantial evidence, *United States v Galati*, 230 F.3d 254 (7th Cir. 2000), there must be a logical and convincing connection between the facts established and the conclusions inferred. *United States v. Bycer*, 593 F.2d 549 (3d Cir. 1979). A conviction may not rest on mere conjecture or speculation. *United States v. Dunmire*, 403 F 3d 722 (10th Cir. 2005); *United States v. Knife*, 592 F2d 472 (8th Cir. 1979).

This Court has previously reviewed the line between "permissible inference and impermissible speculation" as addressed in *United States v. Pauling*, 924 F.3d 649 (2d Cir. 2019):

> As the Second Circuit has explained, "[a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Id*. at 656 (*quoting Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)). "Impermissible speculation, on the other hand, is 'a complete absence of probative facts to support the conclusion reached.'" *Id*. (*quoting Lavender v. Kurn*, 327 U.S. 645, 653 (1946)). And "[w]hile we must defer to a jury's reasonable inferences, we give no deference to impermissible speculation." *Id*. (*citing United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)). In fact, mere speculation—even if reasonable—cannot support a criminal conviction. *See Langston v. Smith*, 630 F.3d 310, 319 (2d Cir. 2011) (*citing Brown v. Palmer*, 441 F.3d 347, 352- 53 (6th Cir.2006)); *see also Pauling*, 924 F.3d at 657 ("[W]here a fact to

be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible. We must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." (alteration in original) (*quoting United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995))).

Docket Item 1077 at 10.

## C.  Right to Not Testify

A defendant in a criminal trial has the right either to take the stand or not, as he chooses, and his failure to take the stand may not be commented upon by the prosecution. 18 U.S.C. § 3481; *Griffin v. California*, 380 U.S. 609 (1965); *Gongora v Thaler*, 710 F3d 267 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 941 (2014).

No unfavorable inference may be drawn from a defendant's failure to testify, 18 U.S.C. § 3481; *Mitchell v. United States*, 526 U.S. 314 (1999); *Carter v. Kentucky*, 450 U.S. 288, 300 (1981).

The importance of the jurors not drawing a negative inference from a defendant's decision to not testify is clear: the trial court must, upon request of the defendant, instruct the jury about the defendant's right not to testify and that no inferences of guilt or prejudice can be drawn from the exercise of that right. *James v. Kentucky*, 466 U.S. 341 (1984); *Carter v. Kentucky*, 450 U.S. 288 (1981). *See also Bruno v. United States*, 308 U.S. 287 (1939).

## DISCUSSION

## I.   MOTION FOR JUDGEMENT OF ACQUITTAL

### A.  Conspiracy to Defraud and Bribery

The first two counts of the indictment are Conspiracy to Defraud the United States (Count 1); and Paying a Bribe to a Public Official (Count 2). Docket Item 1350.[2]

Both counts stem from Mr. Gerace's relationship to his co-defendant in case no. 19-cr-227: Joseph Bongiovanni, a retired DEA special agent, who he maintained a friendship going back to their childhood.

Mr. Bongiovanni was also charged in the conspiracy count, and he was charged with a bribery count, based on the allegation that he was on the receiving end of the purported bribes charged in Count 2. At Mr. Bongiovanni's first trial, the evidence did not establish proof beyond a reasonable doubt, and a jury could not reach a unanimous verdict as to either of these two counts. Docket Item 867.

This Court subsequently entered a judgement of acquittal as to the bribery count (Docket Item 1077), as discussed below. On retrial of the remaining counts, Mr. Bongiovanni was unanimously acquitted of the count charging a conspiracy Mr. Gerace. Docket 1285.

---

[2] All citations to the indictment are made to Docket Item 1350, the Redacted Indictment filed on October 28, 2024. Minor amendments were made to one of the overt acts before the case was submitted to the jury, but it does not appear that version appears on the docket.

Nonetheless, in the trial against Mr. Gerace, based on largely the same evidence to support these counts, a jury convicted of both. For the reasons discussed below, a judgement of acquittal should be entered for each.

### 1. Conspiracy to Defraud (Count 1)

Count 1 of the Amended Superseding Indictment alleges Mr. Gerace conspired with former co-defendant SA Bongiovianni to defraud the United States. Docket Item 1350. Broadly speaking, the government alleged that from 2005 – 2019, Mr. Gerace and SA Bongiovanni conspired to obstruct the lawful objectives and goals of the DEA and to induce/cause SA Bongiovanni to perform acts on behalf of the conspiracy in violation of his official duties as a DEA SA.

In order to satisfy its burden of proof, the government had to establish beyond a reasonable doubt that: Bongiovanni and Gerace entered the unlawful agreement charged in the indictment; that Bongiovanni and Gerace knowingly and willfully became members of the conspiracy; that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the indictment; and that the overt act was committed to further some objective of the conspiracy.

At trial, the government established that Mr. Gerace and Mr. Bongiovanni were childhood friends who continued that friendship into adulthood, which included social interaction at irregular intervals. The defense never disputed that friendship. At no time, however, did the proof demonstrate that Mr. Gerace entered into an unlawful agreement

or that Mr. Gerace sought Mr. Bongiovanni to do anything improper or unlawful on his behalf.   Rather, the proof at trial demonstrated that Mr. Gerace considered Mr. Bongiovanni to be a friend and reached out to him in ways consistent with friendship.

There was no competent proof that Mr. Gerace contemplated that Mr. Bongiovanni would engage in activity that violated the law or DEA protocol; there was no competent proof that Mr. Gerace asked or expected Mr. Bongiovanni to disregard his duties as a member of federal law enforcement; and there was no competent proof of a conspiracy. The conviction should not stand.

a.    The Allegations

According to the Indictment, the conspiracy was carried out by SA Bongiovanni for cash payments or to ingratiate himself to people he viewed as friends or members of IOC.   The Indictment makes several specific allegations about the manner and means of the conspiracy.   Critically, with the exception of the allegation that Mr. Gerace made cash payments to Bongiovanni "on a recurring basis" for protection, all of the allegations concern the conduct and mental state of SA Bongiovanni.

For instance, the indictment alleges SA Bongiovanni did not investigate his friends and used his position at DEA to protect Mr. Gerace; that SA Bongiovanni attempted to dissuade other members of law enforcement from conducting investigations of Mr. Gerace; that SA Bongiovanni provided information to "coconspirators, friends and associates" to continue their drug trafficking activities; that SA Bongiovanni used his

position to dissuade other federal agents from investigating Gerace; that Bongiovanni falsely represented that Gerace was a source of information to protect Gerace and PGC from investigation; that Bongiovanni would deny his connection to Gerace when questioned by federal law enforcement; that Bongiovanni would make efforts to use his position in DEA to help "coconspirators" to "get out of trouble";  and that Bongiovanni would conceal his possession and use of controlled substances, the "bribes" that he received, or the assistance he provided to his friends.  But for the alleged cash payments, there was no allegation of Gerace asking or expecting SA Bongiovanni to act in a way that is improper.

> b.    There is No Evidence Gerace Understood his Relationship with Bongiovanni as Anything Other than Friendship

The evidence at trial demonstrated that Gerace believed Bongiovanni was a friend. Evidence from witnesses such as M.U.[3] and P.H. demonstrated that Mr. Bongiovanni and Mr. Gerace gathered socially throughout the years.  The evidence also demonstrated communication between the two on Mr. Bongiovanni's DEA cell phone.  There was no evidence Mr. Gerace asked Mr. Bongiovanni to engage in improper conduct.

The closest evidence the government has to support this allegation comes from A.P., a former girlfriend of Mr. Gerace's who also worked at PGC.  In her testimony, A.P.

---

[3] For all protected witnesses, the defense has endeavored to refer to them by initials, following the Court's approach in a prior Decision and Order. Docket Item 1077 at 9, n 5.

alleged that Mr. Gerace gave her Mr. Bongiovanni's business card and "said that if [she] had gotten into trouble, that [she] could call him and try to get help." Docket Item 912 at 25. On further examination, A.P. testified she believed the card was just to "like get out of a traffic ticket," and she further acknowledged that she had not sold cocaine at the time Mr. Gerace gave A.P. the business card. *Id.* at 37-38. A.P. also testified that Bongiovanni was treated the same as everyone else when he was physically present at PGC. *Id.* at 36. Simply put, Mr. Gerace's actions evidence he regarded Mr. Bongiovanni as a friend, not as a law enforcement contact that would bend the rules to protect him.

Consistent with A.P.'s testimony, the other acts Bongiovanni allegedly engaged in – whether they were consistent with or contrary to DEA protocols – are also consistent with Mr. Bongiovanni independently acting to help his friend rather than evidence of a criminal enterprise. A friend would tell a friend if they saw a picture of a friend's girlfriend dressed as a Playboy bunny in another man's home; a friend in law enforcement would field a call from another friend and make an appropriate introduction and referral to the authorities; a friend would meet up with another friend to hang out socially at Sunset Beach.

More critically, there is no credible evidence that Mr. Gerace viewed Mr. Bongiovanni as engaged in criminal or corrupt activity on his behalf. There is no evidence Mr. Gerace asked Mr. Bongiovanni to act unlawfully; there is no evidence Mr. Gerace asked for Mr. Bongiovanni to protect him.

c.     Allegations of Cash Payments are Not Credible and are Insufficient to Sustain a Conviction

The true lynchpin of the government's theory is the allegation that Mr. Gerace paid Mr. Bongiovanni cash bribes "between in or about 2013 and in or about 2016."  The allegations come entirely from Mr. Gerace's ex-wife, Katrina Nigro.  As the Court knows, Ms. Nigro's testimony has changed on several occasions over the last several years.  Ms. Nigro's testimony should be disregarded in its entirety on this issue.

With regard to this trial, Ms. Nigro testified that there was an instance where Mr. Gerace allegedly gave Mr. Bongiovanni cash in a birthday card and that there were "two or three" other instances where she handed Mr. Bongiovanni envelopes she believed were filled with cash. [Nov. 27, 2024 Transcript at 169]. These instances all occurred around the last six months of Ms. Nigro's marriage to Mr. Gerace in 2015. *Id.* In the instances at PGC, Ms. Nigro allegedly gave the envelopes to Mr. Bongiovanni and did not have any further interaction with him. *Id.* Ms. Nigro did not know what the envelopes were for. *Id.* In the case of the birthday card, Ms. Nigro witnessed Mr. Gerace put cash in a card and later give the card to Mr. Bongiovanni at a birthday party at BOSS Restaurant. Undisputedly, the envelopes were provided to Mr. Bongiovanni at times that were removed from official acts.

Because of Bongiovanni and Gerace's longstanding friendship, there are plausible benign explanations for the money.  Text messages between Bongiovanni and Gerace presented at trial addressed Bongiovanni's "possibly going to Phar[ao]h's to settle up the

fee for a golf tournament." *See* Gov't Ex. 310D.  It is likely the envelopes were a reimbursement from Gerace to Bongiovanni—especially because there was no proof of how much cash was in either envelope, and at trial, Nigro testified that Gerace paid many people, including vendors, in cash.  Even if the birthday card had actually contained $5,000, there is no evidence from which the jury could infer, rather than surmise, that the money was not a generous gift for a milestone birthday and wedding earlier that year.

### d.     The Court Should Set Aside the Conviction

To sustain the conviction, the government must prove beyond a reasonable doubt that there was a mutual understanding, either spoken or unspoken, between Gerace and Bongiovanni to cooperate with each other to accomplish an unlawful act.  Here there is no evidence of that unlawful agreement.   Gerace and Bongiovanni were childhood friends.  They remained in contact throughout their lives.  At times, Bongiovanni may have interceded on his own to assist Gerace.  But there is no evidence that Gerace was aware of Bongiovanni's allegedly improper acts, there is no evidence that he wanted Bongiovanni to act improperly, and there is no evidence that he instructed Bongiovanni to act improperly.  On this record, the conspiracy conviction should not stand.

### 2.  Paying a Bribery to a Public Official (Count 2)

Count 2 charges Mr. Gerace with paying a bribe to a public official. Docket Item 1350 at 13-14. More specifically, Count 2 alleges that:

beginning in or about 2009, and continuing to on or about June 6, 2019, Mr. Gerace did, directly and indirectly, corruptly give, offer, and promise a thing of value to a public official, namely a DEA Special Agent, with intent to induce the performance of an official act and to induce a public official to do an act and omit to do an act in violation of his lawful duty, as opportunities arose; that is, the defendant, PETER GERACE JR. paid and facilitated bribe payments to Joseph Bongiovanni, a DEA Special Agent, in United States currency to among other acts, to falsely advise an Federal Bureau of Investigation (FBI) Special Agent (SA) that the defendant PETER GERACE JR. was a DEA confidential source, thereby inducing the FBI SA to abandon a narcotics investigation into the defendant PETER GERACE JR. and Pharaoh's Gentlemen's Club; to create an official DEA 6 document falsely stating that the defendant PETER GERACE JR. was a DEA source; to provide advice and information to the defendant PETER GERACE JR.; to help the defendant PETER GERACE JR. and Pharaoh's Gentlemen's Club avoid federal narcotics investigations; to induce Bongiovanni to use his position as a DEA SA to make statements to his co-worker, a fellow DEA SA, to dissuade and discourage the fellow. DEA SA from investigating the defendant PETER GERACE JR. and Pharaoh's; to make false and misleading statements to other members of law enforcement; to provide information about law enforcement methods and techniques; to help such drug trafficking activities continue; and to make false statements in official DEA memoranda in order to minimize the relationship between Bongiovanni and the defendant PETER GERACE JR. as a means to conceal their conspiratorial relationship.

*Id*.

The elements the government must prove on count 2 are: (1) that between in or about 2009 and on or about June 6, 2019, Mr. Gerace offered, promised or gave money or something else of value to Joseph Bongiovanni; (2) that Mr. Bongiovanni was then a

public official by virtue of his being a drug enforcement administration special agent; and (3) that Mr. Gerace did so with the corrupt intent to influence an official act or to induce that official to perform an act or omit to perform an act in violation of his lawful duty. See 1 Modern Federal Jury Instructions – Criminal ¶ 16.18.201B1(2024).

This charge mirrors the charge against Joseph Bongiovanni of accepting a bribe as a public official. Docket Item 761. The government presented its evidence at a jury trial against Mr. Bongiovanni which concluded with a mistrial when the jury hung on that and other counts. Docket Item 867

Following the jury trial, Mr. Bongiovanni moved for a judgement of acquittal, arguing that the government failed to meet its burden on the first and third elements: i.e. that between in or about 2009 and on or about June 6, 2019, Bongiovanni demanded, sought, received, or agreed to receive or accept something of value; and that Bongiovanni did so with the corrupt intent to be influenced in the performance of an official act or to be induced to do an act or omit to do an act in violation of his official duty.  Docket Item 908; *see also* Docket Item 1040.

On July 19, 2024, this Court granted the judgement of acquittal as to the bribery charge against Mr. Bongiovanni. Docket Item 1077 at 5-22. Mr. Gerace's subsequently moved on grounds of collateral estoppel to dismiss the bribery charge against Mr. Gerace, founded on the same allegations as the bribery charge against Mr. Bongiovanni. Docket Item 1290. That motion is still pending.

In the meantime, the trial against Mr. Gerace proceeded, and in regard to the purported bribes, the government presented evidence that was virtually identical to the evidence presented at Mr. Bongiovanni's first trial. Specifically, the evidence of bribes was almost exclusively based on the testimony of Mr. Gerace's ex-wife, Katrina Nigro.

Ms. Nigro has testified differently at various proceedings in this case. *See e.g.* [Dec. 5, 2024 at 184 (Nigro acknowledging she "gave two different versions of this event [] -- one at the grand jury, and one earlier this year"]. There were significant departures from her testimony at grand jury to the trial testimony she gave against Mr. Bongiovanni and then her ex-husband, Mr. Gerace.

However, by the time she had been prepped for trial, and with the assistance of leading questions, the version of Ms. Nigro's testimony that she gave at Mr. Bongiovanni and Mr. Gerace's trials were generally consistent.

In terms of Ms. Nigro's testimony at Mr. Bongiovanni's trial, this Court observed the following:

> One witness—Katrina Nigro, Gerace's ex-wife—testified that she twice gave Bongiovanni envelopes of what appeared to be cash at Gerace's direction. Docket Item 856 at 47. More specifically, Nigro said that on two occasions approximately six months apart in 2015, Bongiovanni came to the first-floor office of Pharaoh's, and she gave him an envelope containing cash. Id. at 47-48, 66, 68-69. Nigro did not know why Gerace was giving Bongiovanni cash. See id. at 69.
>
> Nigro also testified that Gerace gave Bongiovanni a card with cash at Bongiovanni's 50th birthday party at Boss restaurant.

> Id. at 48-49. According to Nigro, she saw Gerace put money in the card, and Gerace told her that he was giving Bongiovanni $5,000. Id. at 49. Nigro said that the birthday party occurred about three months after the first time Bongiovanni came to Pharaoh's to pick up an envelope from her and three months before the second time. Id. at 66, 68-69. So all three payments occurred in a six-month period in 2015.

> Docket Item 1077 at 6-7

At Mr. Gerace's trial, Ms. Nigro again testified that she gave Mr. Bongiovanni what appeared to be cash envelopes at Mr. Gerace's direction "two or three times that [she] can truly recollect." [Nov. 27, 2024 at 169]. She believed the envelopes contained cash, because she "felt it." [Nov. 27, 2024 at 170-171].

Ms. Nigro also again testified that Gerace gave Bongiovanni a card with cash at Bongiovanni's 50th birthday party at Boss restaurant and again testified that she saw Gerace put money in the card, and Gerace told her that he was giving Bongiovanni $5,000. [Nov. 27, 2024 at 148-149, 151-165].

Similar to the Bongiovanni trial, the testimony on direct attempted to establish that all three (or four) instances occurred in a six-month period. During Ms. Nigro's direct testimony, she is asked a number of leading questions to elicit an estimate that that the incidents occurred within six months before Mr. Bongiovanni's birthday dinner in 2016. [Nov. 27, 2024 at 169-70].

The most significant difference between the testimony of Ms. Nigro at the two trials was the extent to which Ms. Nigro was impeached and her extensive bias and

history of lying was explored. See. e.g. [Nov. 27, 2024 at 141 (Nigro confirming she would left voicemails for Mr. Gerace threatening that she was "going to destroy [Mr. Gerace's] life")].

However, for the purposes of the Rule 29 analysis, Ms. Nigro's credibility has little impact on the issue here. What matters is that, ultimately, the evidence regarding "payments" from Mr. Gerace to Mr. Bongiovanni remains the same or virtually the same between both trials.

Thus, this Court's analysis remains applicable here.

The Court reviewed two challenges to the elements of Count 5 in Mr. Bongiovanni's indictment. Mr. Bongiovanni first argued that there was not enough evidence for the jury to conclude beyond a reasonable doubt that the envelopes contained cash. *See* Docket Item 908 at 7.

Ms. Nigro provided similar testimony at Mr. Gerace's trial, and the defense agrees with the arguments previously submitted on behalf of Mr. Bongiovanni. It is the defense's position that even if a jury did credit the testimony that Ms. Nigro that she believed the envelopes felt like cash, a rational jury should not be able to conclude beyond a reasonable doubt that the envelopes did in fact contain cash based on the way they felt.

However, in context of Mr. Bongiovanni's Rule 29 motion, this Court disagreed with that position. Docket Item 1077 at 7. Mindful of this Court's prior analysis, for purposes of this motion, the defense focuses on the element regarding whether Mr.

24

Gerace gave money or something of value to Mr. Bongiovanni "with the corrupt intent to influence an official act or to induce that official to perform an act or omit to perform an act in violation of his lawful duty payment was a bribe which appears dispositive."

Specifically, as the jury was charged, "bribery requires a quid pro quo." There must be "a specific intent to give or receive something of value in exchange for an official act." *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404–05 (1999). *See also United States v. Kemp*, 500 F.3d 257, 284 (3d Cir. 2007).

In its Order granting a judgement of acquittal for Count 5 against Mr. Bongiovanni, this Court found that

> "this is a close case that tests the boundary . . . between the drawing of a permissible inference and impermissible speculation, only surmise and guesswork could lead a jury to determine that" the money constituted a bribe rather than (1) a gratuity for past actions or in the hope of future action, or (2) a reimbursement or genuine gift to a longtime friend. See Pauling, 924 F.3d at 662; see also Autuori, 212 F.3d at 120 (explaining that "[t]he jury may not be permitted to conjecture merely, or to conclude upon pure speculation" (quoting United States v. Taylor, 464 F.2d 240, 243 (2d Cir. 1972))).
>
> Docket Item 1077 at 11.

Like the Bongiovanni trial, no one testified about the purpose of the cash. And similarly, there was "no circumstantial evidence from which a jury could infer beyond a reasonable doubt that the payments were bribes, as opposed to being gratuities or benign exchanges between friends." *Id*.

Thus, when looking at the trial evidence, this Court concluded:

> [T]here simply is no evidence—circumstantial or otherwise—from which a rational juror could infer beyond a reasonable doubt that the money was a bribe in exchange for Bongiovanni's taking official acts, rather than a gratuity or benign exchange between friends. *See D'Amato*, 39 F.3d at 1256 (explaining that to defeat a Rule 29 motion, "the government must do more than introduce evidence 'at least as consistent with innocence as with guilt'" *(quoting United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991))). Stated another way, because it is at least equally likely that the money was a gift, a reimbursement, or a gratuity and not a bribe, "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, [and] a reasonable jury must necessarily entertain a reasonable doubt." *Glenn*, 312 F.3d at 70 (citation and internal quotation marks omitted).

> Docket Item 1077 at 12.

Similarly, based on the evidence presented at Mr. Gerace's trial, like Mr. Bongiovanni's trial, "the jury could only speculate that the money from Gerace was given as bribes as opposed to gratuities or even something more benign." Docket Item 1077 at 12.

## B.  Drug Trafficking

There are two counts pertaining to drug trafficking: Maintaining a Drug-Involved Premises (Count 3) and Conspiracy to Distribute Controlled Substance (Count 4).

Both charges contain similar flaws centered on the fact that they both charged an ongoing criminal act allegedly occuring over an extensive distance of time: approximately 14 years for Count 3 and approximately ten years for Count 4.

The time span is problematic for multiple reasons. Both periods of time stretch far beyond what would be typically permitted by the statute of limitations. *See* 18 U.S.C. § 3282 ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.").[4]

In most cases, the statute of limitations begins to run as soon as each element of the offense is alleged to have occurred. *Toussie v. United States*, 397 U.S. 112, 114 (1970). However, the exception to this rule, which was utilized by the government in this case, is where the offense is considered a "continuing offense," in which case the statute of limitations does not begin to run until the offense is alleged to have ended. *Id.*

Because the purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of the offense, and because construing an offense as "continuing" has the effect of extending the period of

---

[4] Statutes of limitations represent legislative assessments of the relative interests of the government and the defendant in administering and receiving criminal justice and to protect the defendant against possible, as opposed to actual, prejudice from the prosecution of overly stale criminal charges. *United States v. Marion*, 404 U.S. 307, 322 (1971).

exposure, the Supreme Court has held that the doctrine of continuing offenses should be applied only in limited circumstances and only when the explicit language of the substantive criminal statute compels that conclusion or the nature of the crime is such that Congress must have intended that it be treated as a continuing one. *See Toussie*, 397 U.S. at 122-23.

The length of the charges in this indictment stretches so far where the timeframe prescribed by the statute of limitations that it arguably tests the limits of what should be permitted by the Due Process Clause of the Fifth Amendment. However, the matter proceeded to trial, perhaps with insufficient pretrial objection from counsel as to the length of time encompassed in the counts.

However, constitutional issues aside, the government's decision to charge two counts premised on a continuing offense lasting a decade or longer in each count gave way to a significant evidentiary issue ripe for an Order of a Judgement of Acquittal.

That is because the law requires "a substantial similarity between the dates charged in the indictment and the dates proven by the evidence," which did not occur in this case.

> The indictment charges that certain crimes occurred on a certain, specific date and that other crimes occurred during a longer time period. For example, Count 1 alleges that certain crimes were committed "beginning in or about 2005 and continuing until in or about February 2019, the exact dates being unknown," and counts 6-9 allege that certain crimes were committed on or about November 19, 2019.

It does not matter that the indictment charges that a crime or a specific act occurred on or about a certain date and the evidence indicates that, in fact, it occurred on another date. The law requires only a substantial similarity between the dates charged in the indictment and the dates proven by the evidence. So a minor and unsubstantial difference does not matter.

In other words, it is not essential that the government prove that the alleged crimes started and ended—or were committed—on the specific dates charged in the indictment. Instead, it is sufficient if you find that the alleged crimes were committed around the period charged in the indictment.

Jury Instruction Re: "Variance – Dates"

The government could not establish continuous criminal conduct that stretched for the entirety of the timeframe alleged in the counts. The government offered isolated examples of drug use by Mr. Gerace or others in his presence over a 10 - 15 year span with no evidence establishing that the conduct was continuous for the entirety of the span.

More importantly, to the extent that the government was required to prove beyond a reasonably doubt a substantial similarity between the dates charged in the indictment, there was a wide temporal gap that developed in the evidence, which the government never accounted for.

Specifically, it was almost entirely undisputed that, regardless of what a rational jury might interpret about Mr. Gerace's intentions, there was a substantial period of time,

right in the middle of the timeframes alleged in counts 3 and 4, that Mr. Gerace was completely disassociated from PGC.

This was confirmed by multiple witnesses. Even Katrina Nigro, clearly without any understanding of the implication for the timeframe in the indictment, acknowledged the period of time multiple times:

> Q. Okay. So for this block of late 2012 to early 2014, the Gerace family is out of the club, right?
>
> A. Yes.
>
> Q. All right. Now, you testified on direct about the return to the club, because there was this, like, a -- basically a grand opening or grand reopening party?
>
> A. Yes.
>
> Q. And what that was referring to is the return of the Gerace family to ownership of the club, right?
>
> A. Yes.
>
> [Dec. 5, 2024 Transcript at 8]

This testimony regarding a "re-opening" was corroborated by multiple government witnesses and exhibits.

Ms. Nigro further suggested she believed advised the government of this period of time in which Mr. Gerace was disassociated with the club.

> Q. In terms of what you testified about, that Mr. Gerace was out of the club from late 2012, 2014, did that come up in your conversations with the government? Yes or no?

If you recall. I mean --

A. It must have. Yeah, it must have.

Q. When you say it must have, you don't --

A. Because I got kicked out of my store because of the fact he was there.

Q. Okay. All right. So you think you did have that conversation?

A. I must have said something probably.

[Dec. 5, 2024 Transcript at 185].

A block of over one year in which Mr. Gerace was not maintaining PGC at all, let alone maintaining as a drug premises. That is not a minor and unsubstantial difference in the dates charged in the indictment. It is an enormous gap, particularly in this case, where on the other side of that gap, the timeframe preceding 2012, is all time outside of the statute of limitations.

There was direct evidence that corroborates Mr. Gerace was not maintaining PGC for that timespan, in any capacity, or engaged in any conspiracy associated with PGC. Specifically, Gregory Machin provided charts, which were entered into evidence, including Government Exhibits 369L and 369M. These exhibits depict the volume of phone calls between Mr. Gerace and PGC over several years.

A close examination of Exhibit 369L shows phone calls drop off in late 2012, and they do not consistently start again until March of 2014, which was acknowledged by the government witness. Docket Item 1492 at 30–37.

The government chose to charge Mr. Gerace with a decade-or-longer timespan. While this decision may have provided the government with substantial strategic benefits, allowing it to draw from incidents that are alleged to have occurred going back almost 20 years in some instances, it also gave way to a fatal defect - the evidence provides for a substantial difference between what was charged in the indictment for all counts tied to illegal activity at PGC.

Thus, an Order granting a Judgement of Acquittal should be granted on all counts relating to conduct at PCG, involving a timeframe than included a period of over a year in which Mr. Gerace was not even stepping foot in the door of the building.

Moreover, as a secondary issue related to the length of time in Counts 3 and 4, the timeframes are so lengthy that the court should examine whether the testimony identifying individual allegations of drug use or distribution over the course nearly 14 years amounts to a continuous conspiracy or whether the timeframe is so expansive as to support the conclusion that Mr. Gerace is actually liable for individual transactions.

As this Court has noted in an unrelated case:

> [A]n agreement simply to buy and sell drugs is not necessarily a conspiracy. In fact, "the mere purchase and sale of drugs does not, without more, amount to a conspiracy to

distribute narcotics." *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015). "[T]he buyer's agreement to buy from the seller and the seller's agreement to sell to the buyer cannot 'be the conspiracy to distribute, for it has no separate criminal object.'" *United States v. Parker*, 554 F.3d 230, 235 (2d Cir. 2009). Even "[e]vidence that a buyer intends to resell the product instead of personally consuming it does not necessarily establish that the buyer has joined the seller's distribution conspiracy." *United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008). And this is so even "if the seller is aware of the buyer's intent to resell" because "more is required than mere knowledge of the purpose of a conspiracy." Id. A conspiracy to distribute requires an agreement to distribute.

…

Whether a buyer-seller relationship amounts to a criminal conspiracy "is a highly fact-specific inquiry into whether the circumstances surrounding a buyer-seller relationship establish an agreement to participate in a distribution conspiracy." *Hawkins*, 547 F.3d at 74.

Case No. 17-cr-00049, Docket Item 206 at 4-5

It may be the case that when viewing the evidence in the light most favorable to the government, there is multiple instances of drug use by Mr. Gerace at PGC, and multiple instances where he shared drugs with others, but that does not necessarily amount to a conspiracy, particularly one that spanned the length of the timeframe alleged in the indictment, which further supports the need for a Judgement of Acquittal.

## C.  Sex Trafficking

Count 5 of the Amended Indictment charged Mr. Gerace with Conspiracy to Commit Sex Trafficking in violation of 18 U.S.C. 1594(C).  Contrary to the evidence at trial, the jury returned a verdict of guilty on that count.

While the government never specified its theory, at trial the proof fell into three categories: interaction between Mr. Gerace and outside "stag" companies; conduct that was allegedly permitted in the VIP area of PGC, even though it was against PGC rules; and conduct in the upstairs area of PGC, allegedly directed by Mr. Gerace.

As to each category, however, the evidence was insufficient to support a verdict of guilty.  Activities outside stag companies engaged in were wholly separate and apart from the business or conduct of PGC and Mr. Gerace; sexual activities in the VIP area were not permitted or condoned by Mr. Gerace, and PGC employees engaging in those acts did so surreptitiously and against PGC protocols; and, to the extent the allegations are credible, the alleged commercial sex acts that took place upstairs were done with the consent of the dancers.

### 1. The Crime and its Elements

The government charged Mr. Gerace with conspiring to engage in sex trafficking with other, unnamed individuals.  In this context, conspiracy takes on its usual meaning: a criminal partnership -- a combination or agreement of two or more persons to join together to accomplish some unlawful purpose.  Modern Federal Jury Instructions, ¶

19.01, Instruction 19-2.  In that respect, the government had a burden to prove that Mr.

Gerace was a knowing and voluntary member of any such conspiracy.  Modern Federal

Jury Instructions, ¶ 19.01, Instruction 19-6.

> With respect to the substantive crime, the government had a
> burden to prove that the object of the conspiracy was that
> someone "knowingly in or affecting interstate or foreign
> commerce . . . recruited, enticed, harbored, transported,
> provided, obtained . . . [or] maintained by any means a
> person; or (2) benefitted, financially or by receiving anything
> of value, from participation in a venture which engaged in an
> act described in violation of paragraph (1), knowing, or . . . in
> reckless disregard of the fact, that means of force, threats of
> force, fraud, coercion . . . or any combination of such means
> was used to cause the person to engage in a commercial sex
> act[.]"

> Title 18, United States Code, Section 1591.

## 2. The Stag Party Companies Not Owned or Operated by Gerace

At trial there was testimony about the conduct dancers engaged in when they

chose to work at outside stag companies, particularly No Limit Entertainment, a

company owned by Daryl LaMont.  But the testimony at trial demonstrated those

activities were wholly separate from Mr. Gerace and PGC.

For instance, A.G. testified she worked for No Limit Entertainment as a dancer

both before and after her time as a dancer at PGC.  Speaking about the stag parties, A.G.

testified that No Limits was "a completely separate company" from PGC and Mr. Gerace.

Docket Item 1458 at 48.  The marketing material for No Limit did not reference PGC or

Mr. Gerace. *Id*. at 49.  There was nothing about the companies' material that indicated

they were connected in any way. *Id.* It was always A.G.'s understanding that the two were "completely separate" companies. *Id.* In that regard, A.G. was terminated from PGC and it did not have any impact on her ability to work at No Limit. *Id.* No Limit was owned by Mr. Lamont, and A.G. never saw Mr. Gerace and Mr. LaMont interact. *Id.* She never interacted with Mr. Gerace about No Limit. *Id.* Mr. LaMont never represented he was affiliated with PGC in any way. *Id.* Other dancers who danced at the stag parties through No Limit also worked at other strip clubs different than PGC. *Id.* at 51.

That separation is consistent with the testimony of R.W. In her testimony, R.W. gave graphic testimony of her "audition" for No Limit stags and what she witnessed at the stag parties. She further testified, however, that "no one from Pharoh's told" R.W. to speak with LaMont. Docket Item 1456 at 78. No one ever told R.W. that LaMont worked with Gerace or PGC. *Id.* That LaMont "held himself out to be a big time regular" at PGC. *Id.* at 79. Yet there was no representation that LaMont was linked to PGC by Mr. Gerace or anyone from PGC. *Id.* Further, the audition for No Limit was outside of PGC. *Id.* at 80. No one from PGC was at the audition. *Id.* R.W. did not tell anyone at PGC she was going to work at No Limit. *Id.*

Speaking of No Limit, R.W. further testified that:

> Q. And once again, none of this had anything to do with Pharoh's?
>
> A. It didn't, no.

Q. Yeah. And the money for the stag party goes to Mr. LaMont, as far as you know, correct?

A. Yes.

Q. Okay. And -- and for that matter, you know, when people are working for No Limit, they're not wearing Pharaoh's T-shirts, right?

A. No.

Q. Okay. They're holding themselves out as No Limit, correct?

A. Yes.

Q. Which you understand is a completely separate company, correct?

A. It is.

Q. Right? And that's Mr. LaMont's company, correct?

A. It is.

Q. That's not Mr. Gerace's company?

A. It's not.

*Id.* at 81.

Still later, R.W. testified:

Q. Okay. Same thing at that stag party. Mr. Gerace wasn't at that stag party?

A. He was not, no.

Q. All right. Things that happened at that stag party break the rules at Pharaoh's, correct?

A. Break the rules at Pharaoh's

Q. Yeah. You can't –

A. I don't see how if they're not connected.

Q. Good point. So the things that you saw go on at that stag party –

A. Right.

Q. Okay? And I'm talking about the things that you witnessed other girls doing to each other.

A. Correct.

Q. Okay? We understand what we're talking about?

A. I do.

Q. We don't have to go into it, into detail?

A. No, we don't.

Q. We don't have to get graphic about it?

A. You're right.

Q. Okay. So the things that they were doing there, that would not have been allowed at Pharaoh's?

A. I don't think so, no.

*Id.* at 82.

The clear evidence at trial established that there was no relationship between Mr. Gerace and Mr. LaMont or No Limit stags to engage in sex trafficking. Mr. LaMont's conduct, and the conduct that occurred at the stag parties, were completely separate and apart from Mr. Gerace.

### 3. Conduct in the VIP Area

Throughout the trial, PGC dancers testified about conduct in the PGC "VIP" area – a semi-private section of the club that allowed for more personal dances. Some dancers testified that in the VIP area they engaged in commercial sex acts. The testimony at trial demonstrated that Mr. Gerace did not condone or participate in that activity. To the contrary, Mr. Gerace hired bouncers and attendants whose job it was to supervise the area and not allow commercial sex acts. That included the installation and monitoring of cameras placed throughout the VIP area.

On December 10, 2024, Doug Augustyniak, a former bouncer, VIP attendant and manager testified at trial. In his testimony, Augustyniak testified that he started working at PGC in 2007. Docket Item 1328 at 7. He worked there until 2018. *Id.* at p. 8. He was briefly let go from employment at the club in the 2013-2014 period of time when the Gerace family had an ownership dispute with the Parrino family, but he was hired back by Mr. Gerace. *Id.* at 55-56. He was a bouncer and eventually promoted to manager. *Id.* At various times he fulfilled the role of VIP attendant. *Id.* at 59.

In his time as a bouncer and VIP attendant, Mr. Augustyniak threw out customers and fired dancers for improper conduct that occurred on the floor of the club or in the VIP area. *Id.* at pp 58-59. The VIP attendant watched video monitors that watched the semi-private dances in the VIP area. *Id.* at 62. The VIP attendant enforced PGC rules. *Id.* He made sure there were no inappropriate sex acts occurring. *Id.* The VIP attendant

would throw out customers who acted inappropriately.  *Id.*  Mr. Augustyniak witnessed other VIP attendants, including Brian Rosenthal, act in that manner.  *Id.*

The VIP attendant was able to view a camera on every private dance booth.  *Id.* at 63.  There was no door separating the VIP attendant from the private dance area.  *Id.* at 64.  When Mr. Augustyniak witnessed something inappropriate on the monitor, he would enter the VIP area and stop the dance.  *Id.*  Mr. Augustyniak witnessed other VIP attendants throw out customers.  *Id.* at 65.  Mr. Gerace implemented a walkie-talkie system so that all security at PGC knew what was going on in the VIP area.  *Id.*  Dancers were fired and customers were banned for doing or attempting to do things in the VIP area that broke the rule of PGC.  *Id.* at 65-67.

L.L., a former PGC dancer, testified over the course of two days. As part of her testimony, she testified that she engaged in sex acts with approximately 500 men the VIP area of PGC.  [L.L. Trans at 135].  As a threshold matter, that testimony was patently inconsistent with her prior response in grand jury where she testified she had engaged with approximately 25 such men.  *Id.* at 137.   L.L. also testified that she had been fired from PGC multiple times for drug use, that she had chosen to return to PGC after achieving sobriety, and that as part of that choice she had represented to PGC management she would abide by the rules of the club and remain sober.  Id at 148-150.

More critically, what is clear from L.L.'s testimony is that when she was violating the rules in the VIP area and engaging in commercial sex acts, she was bribing club

management to look the other way and to not do the job PGC and Mr. Gerace paid the VIP attendant to do. *Id.* at 189. L.L. testified that when she would take a customer to the VIP area and engage in commercial sex acts, the customer would tip the VIP attendant a "large sum of money" to "look the other way." Id at 220. The VIP attendant was paid to "ignore his obligations to Mr. Gerace." Id at 222. The VIP attendant was being paid "not to do his job." *Id.* at 225. Mr. Gerace was not part of the conversations with the VIP where they were paid to look the other way. *Id.* at 224.

That is also consistent with the testimony of A.A. In her testimony, A.A. testified about her time in the VIP area. She also testified, however, that if a VIP attendant was watching the screen and saw something inappropriate happening, they were supposed to intervene. Docket Item 1453 at 94. A.A. testified she did see VIP attendants intervene to stop dances when something inappropriate was occurring. *Id.* at 95, 97-100. With regard to her own experience, when she wanted a VIP attendant to intervene and the VIP attendant did not, A.A. conceded the attendant likely just missed the act on the monitor and that it only occurred one time. *Id.* Perhaps most importantly, A.A. testified at length that she cultivated relationships with VIP area "regulars" outside of PGC, against PGC rules and without PGC knowledge, to create a stream of financial benefits to herself. *Id.* at 100-105. Those relationships completely separate and apart from A.A.'s employment at PGC.

### 4. Conduct in the Upstairs Area

Throughout trial, the government alleged that the upstairs area of PGC was a private area for Mr. Gerace and his friends where dancers were given drugs and money in exchange for commercial sex acts, which were alleged to have been procured through coercion.

The principal witness in this regard is Mr. Gerace's ex-wife, Katrina Nigro.  In her wide-ranging and wholly uncredible testimony, Ms. Nigro alleged she allowed dancers and patrons into the upstairs area of PGC for drug fueled sex parties.[5] As her testimony unraveled, however, it was revealed that the upstairs of PGC was locked and she did not have a key.  Her testimony:

> Q. Okay. You talked, I want to shift just a little bit. During the time that you were there at the reopening, 2014 to 2016, there was a general manager at that time who was employed by the club, correct?
>
> A. Yes.
>
> Q. That was Mr. Chudy?
>
> A. Yes, Chris Chudy.
>
> Q. You talked about him briefly on direct?
>
> A. Yes.
>
> Q. I think you referenced him in regard to who else would have a key to the upstairs?

---

[5] To be clear, Ms. Nigro never alleged she participated in the conduct upstairs.

A. Yes.

Q. Okay. So, your understanding was that there were two people who had keys, correct?

A. That I know of, yes.

Q. Yeah. Okay. And you knew that Peter had a key to go upstairs, correct?

A. Yes. Q. And you knew Chris Chudy had a key?

A. Yes.

Q. And who else besides the two of them had keys?

A. I don't know. I'm sure there's an emergency one somewhere.

Q. Okay. If there was, you don't know where it was?

A. Yeah, I don't know.

[Dec. 5, 2024 Transcript at 20-21 (Nigro Testimony)].

Crediting Ms. Nigro's testimony is wholly dependent on her unlocking the door to the upstairs part of PGC to permit access to dancers, patrons and others. Her testimony revealed, however, that she did not have a key and was foreclosed from gaining access to the upstairs part of the club. Simply put, Ms. Nigro's testimony is wholly contradictory and uncredible, and it cannot sustain the charges against Mr. Gerace.

Other dancers that testified about events in the upstairs indicated that they engaged in commercial sex acts of their own volition, without force, fraud or coercion. G.R. testified that when she was a dancer at PGC, she went upstairs with her friend to use drugs of her own volition. Docket Item 1366 at 42, 118. She never refused the

invitation to go upstairs. *Id.* Rosier was addicted to drugs before working at PGC, and she chose to use drugs on her own, without any involvement of Mr. Gerace. *Id.* at 112-120, 132-134.

While upstairs on one occasion, G.R. testified that Mr. Gerace asked her to "take care of" his friend. *Id.* at 45, 124. On cross exam, Rosier acknowledged Mr. Gerace actually asked her to "entertain" his friend. *Id.* at 128. What that meant was never explicitly stated; rather G.R. interpreted it as having sex with his friend. *Id.* at 124. G.R. testified that she had sex with the man referenced, and afterward Mr. Gerace gave her $200. *Id.* at 45. That is the amount of money consistent with a long, private dance. *Id.* Rosier acknowledged she was using drugs and drinking heavily and her recollection of the night was impaired. *Id.* at 126. Further, and perhaps most critically, G.R. acknowledged she went on to have further sex for money meet ups with that man throughout the summer, where she chose the time, the place and the amount – and that she did so without Mr. Gerace's involvement in any way. *Id.* Stated another way, Rosier's testimony demonstrated that she engaged in commercial sex acts of her own volition and not due to force, fraud or coercion on the part of Mr. Gerace or others.

L.L.'s testimony also evidences that acts in the upstairs of the club were that dancer's personal choice. L.L. testified she was invited upstairs to do drugs and she

engaged in sex acts.[6]  [L.L. trans. at 38]. She testified that she chose to go upstairs so that she could "get something out of it" – which she clarified to mean money to purchase drugs. *Id.* at 93.  L.L. testified she understood that she was addicted to substances, had had substance abuse counseling, understood that PGC meant she was going to be in proximity to controlled substances, and she chose to work at PGC even after achieving sobriety.  *Id.* at 136-140.  In that regard, L.L. testified she chose to work at PGC knowing that she would be propositioned for commercial sex acts.  *Id.* She was not forced to do that; it was something she wanted to do. *Id.* at 147.[7]  Further, even though she was addicted to drugs at times she worked at PGC, she testified she was still able to make choices.  *Id.* at 152-153.[8]  In that regard, she testified that she did make the choices, including the choice to engage in a commercial sex-based relationship with a local chiropractor completely unrelated to PGC while she was working at PGC.  *Id.* at 218, 243-247.

Taken as a whole, L.L.'s testimony shows: (1) that she consciously chose to engage in the behavior she did when she was sober and clear-headed; and (2) at all times she

---

[6] The defense believes L.L.'s testimony should not be credited at all.  She testified she was brought upstairs to have sex with A.A.; A.A. testified she never had sex with the defendant.  L.L. Trans. at p. 97.  L.L. also testified she had sex with members of Mr. Gerace's family, but she did not recognize those individuals in photographs.  Id. at p. 107, 160.

[7] L.L. was also fired from PGC at least three times for drug use.  *Id*. at 148.

[8] L.L. also testified she made the decision to engage in commercial sex acts wholly independent of PGC at the same time she was working at PGC with an individual named Casey.  *Id*. at 157.

retained her volition, including making the choice to engage in commercial sex acts for

money, where she chose where, who, what act, and how much..

### D. Tampering Counts

At trial, Mr. Gerace faced three counts relating to alleged witness tampering in

Counts 6, 7 and 8 of the amended indictment, all stemming from a social media message

sent to P.H. on November 19, 2019. Specifically, at trial Mr. Gerace was charged with:

> (1)    knowingly using intimidation, threatening, and
> corruptly persuading, and attempting to use intimidation,
> threaten, and corruptly persuade Witness 1, by sending
> intimidating, threatening, and harassing Facebook messages
> to Witness 1 with the intent to influence, delay, and prevent
> the testimony of Witness 1 in an official proceeding, that is, a
> federal grand jury investigation and subsequent criminal
> proceedings involving the defendant, PETER GERACE, JR.,
> in the United States District Court for the Western District of
> New York. All in violation of Title 18, United States Code,
> Sections 1512(b)(1) and 2;

> (2)    knowingly using intimidation, threatening, and
> corruptly persuading, and attempting to use intimidation,
> threaten, and corruptly persuade Witness 1, by sending
> intimidating, threatening, and harassing Facebook messages
> to Witness 1 with the intent to cause and induce Witness 1 to
> withhold testimony from an official proceeding, that is, a
> federal grand jury investigation, and subsequent criminal
> proceedings involving the defendant, PETER GERACE, JR.,
> in the United States District Court for the Western District of
> New York. All in violation of Title 18, United States Code,
> Sections 1512(b)(2)(A) and 2; and

> (3)    knowingly using intimidation, threatening, and
> corruptly persuading, and attempting to use intimidation,
> threaten, and corruptly persuade Witness 1, by sending
> intimidating, threatening, and harassing Facebook messages

to Witness 1 with the intent to hinder, delay, and prevent communication to a law enforcement officer and judge of the United States of information relating to the commission and possible commission of a federal offense. All in violation of Title 18, United States Code, Sections 1512(b)(3) and 2.

The jury returned a verdict of guilty on Counts 6 and 7. It acquitted Mr. Gerace on Count 8. The evidence at trial was insufficient to convict Mr. Gerace on any of the tampering counts. The Court should enter a judgment of acquittal as to Counts 6 and 7.

### 1. Relevant Facts

The 3 counts stem from the same social media message. The parties all agree the message was sent by Crystal Quinn to P.H. on November 19, 2019. Docket Item 1383 at 69.

On that point, C.C. testified that Crystal Quinn, Mr. Gerace and C.C. were "doing cocaine and drinking" in Mr. Gerace's basement. *Id.* C.C. testified that all three of them were participating in the drinking and drug use. *Id.* C.C. testified that, during that interaction, "the topic of [P.H.] came up." *Id.* at 70. Specifically, C.C. testified that:

> [P.H.], I think, dated Peter at one point. And the conver— something came up about a Rolex, how he had given her a Rolex, and she had moved to Vegas and she had pawned it, and he claimed it was stolen. He told the cops it was stolen. So, therefore, she had spoke to police about different things. And so they were referring to her as a rat or a narc.
>
> *Id.*

C.C. further testified that Mr. Gerace referred to Ms. Hunt as a "snitch bitch." *Id.* C.C. testified that "they," meaning Mr. Gerace and Ms. Quinn were "not happy" when

they were talking about Ms. Hunt. *Id.* at 71. C.C. also testified that they were "revving each other up." *Id.* C.C. further testified that Ms. Quinn was "loyal" to Mr. Gerace. *Id.* at 72.

With respect to the actual message, C.C. testified there was a time when Ms. Quinn took C.C.'s cell phone. *Id.* C.C. had the Facebook app on the phone. *Id.* Ms. Quinn used the Facebook Messenger account to contact Phlycia Hunt. *Id.* C.C. did not know what Ms. Quinn was saying at the time. *Id.* at 73. The next morning, she reviewed the Facebook message that gave rise to the allegations in this case, apparently sent by Ms. Quinn from C.C.'s cell phone. *Id.*

C.C. read the Facebook message into the record. *Id.* at pp 75-79. The threats in the message come from Ms. Quinn personally. *Id.* at 99. The message does not include threats from Mr. Gerace. *Id.* The message does not indicate the threats are being made by Mr. Gerace. *Id.*

C.C. had known Ms. Quinn for "years." *Id.* at 98. C.C. testified Ms. Quinn was "hotheaded." *Id.* Ms. Quinn was capable to rev herself up. *Id.* Ms. Quinn and P.H. also had a relationship independent of Mr. Gerace, and they did not like each other. *Id.*; *see also* Docket Item 1383 at 14, 21. P.H. responded to the message the following morning, during waking hours. Docket Item 1383 at 80. Ms. Hunt's response was "lol," which means "laugh out loud." *Id.* In Ms. Caruso's experience, that means someone is taking the statement as a joke. *Id.*

On cross examination, C.C. further testified that she was still in the basement when Ms. Quinn had C.C.'s phone. *Id.* at 100. She was in the basement for the entire time Ms. Quinn had her phone. *Id.* She didn't know what Ms. Quinn was writing when she possessed the phone. *Id.* Ms. Quinn did not read the message out loud. *Id.* She did not pass the phone around before sending the message. *Id.* She did not hand the phone to Mr. Gerace before she sent the message. *Id.* C.C. did not take the phone at any point that night and review the messages. *Id.* at 101. C.C. didn't take the phone and send any messages that night. *Id.* And C.C. did not see Mr. Gerace look at the phone that night at any time. *Id.*

### 2. No Proof That Gerace "Knowingly" Caused Messages to Be Sent to P.H.

The facts cannot be disputed: Ms. Quinn was a "hothead" and had an independent disagreement with P.H. Ms. Quinn wrote the messages to P.H. Mr. Gerace did not. Ms. Quinn wrote the message to P.H. without Mr. Gerace assisting in the composition of the messages. She did so without Mr. Gerace reviewing the messages before they were sent. And the content of the messages indicates that it would be Ms. Quinn, and not anyone else, who was threatening to exert physical harm to P.H.

There is no testimony and no evidence that Mr. Gerace was aware of the messages, reviewed the messages, approved of the messages, or instructed Ms. Quinn to send the messages. In that vein, there is also no evidence or testimony indicating Mr. Gerace

wanted to stop P.H. from testifying in any official proceeding or stop her from speaking with law enforcement or to the Court in any capacity.

The witness tampering counts require that Mr. Gerace's actions that would have caused the messages to have been sent to Ms. Quinn be done "knowingly."  "An act is done knowingly when it is done voluntarily and intentionally and not because of accident, mistake, or some other innocent reason."  Dkt. # 1241 at p. 39.  At most, the facts suggest that Ms. Quinn had a conversation with Mr. Gerace and Ms. Caruso that influenced her to send the messages to P.H.; but there is no evidence Mr. Gerace "voluntarily" or "intentionally" directed Ms. Quinn to send the messages.

There is no proof to sustain the mens rea element of Counts 6 and 7 beyond a reasonable doubt.  Factually, there is no nexus between the observed conduct of Mr. Gerace and the message sent by Ms. Quinn to P.H. Thus, on this record, this Court should acquit Mr. Gerace of the witness tampering counts where the jury did not acquit him.

## II.    MOTION FOR A NEW TRIAL

### A.  Juror Misapplication of the Law

At the conclusion of the multi-month jury trial, the foreperson of the jury in this case reached out to the media and shared his thoughts about the case and insight into his deliberation and decision-making.   In doing so, the foreperson made statements suggesting that he ignored the jury instructions and the law and decided this case on an impermissible basis – Mr. Gerace's choice not to present a defense but instead to rely

upon the presumption of innocence and the burden of proof that the government must exceed to sustain a conviction.

The juror's comments come in a larger context. As the Court knows, in the lead up to the trial, the government chose to charge several individuals on the defense witness list that the defense believes would have provided helpful, exculpatory testimony to Mr. Gerace. The defense believes those charging decisions deprived Mr. Gerace of his Sixth Amendment Right to present a defense. Those government charging decisions were the subject of pretrial motion practice on that issue. The defense renews that motion at this time.

The juror's comments also come in the context of statements the prosecution made in the rebuttal summation – statements that suggested the defense had equal ability to call witnesses and elicit testimony. In this prosecution in particular, and as the prior motion practice made clear, the parties well-know that statement was not true.

The juror's statements made to the media evidence 'clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety has occurred.' The statements make clear that the foreperson of the jury misapplied the law. It is likely that misapplication was the result of statements made by the prosecution on rebuttal. That impropriety doubtlessly influenced the verdict in this case. The Court should permit a limited inquiry of the juror, to be supervised by the Court, to make a fulsome record on

this issue to ensure that it is preserved for Mr. Gerace's motions to set aside the verdict and/or for a new trial.

### 1.   Need for an Evidentiary Hearing

A post-verdict inquiry into allegations of juror misconduct is required "when there is clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983); *see also United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989).

Allegations of impropriety must be "concrete allegations of inappropriate conduct that constitute competent and relevant evidence," but the defense notes such allegations need not be "irrebuttable [because] if the allegations were conclusive, there would be no need for a hearing." United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989).

"It is up to the trial judge to determine the effect of potentially prejudicial occurrences," *United States v. Vitale*, 459 F.3d 190, 197 (2d Cir. 2006) (citation omitted), and the "trial judge has broad flexibility in responding to allegations of [juror] misconduct, particularly when the incidents relate to statements made by the jurors themselves, rather than to outside influences," *Sabhnani*, 599 F.3d at 250.

### 2.   The Juror Foreperson's Burden Shifting

A jury verdict premised on a standard of less than beyond a reasonable doubt – which thereby shifts the burden of proof from the prosecution to the defendant or that

suggests a higher degree of doubt than "reasonable" doubt is necessary for acquittal--is constitutionally deficient.  The Supreme Court and the Second Circuit have held that any such deficiency is a per se ground for reversal of a criminal conviction. Because the Sixth Amendment and Due Process require a jury verdict of guilty "beyond a reasonable doubt," a guilty verdict rendered by a jury applying a less demanding standard of proof is not a jury verdict at all within the meaning of the Sixth Amendment. *Sullivan v. Louisiana*, 508 U.S. 278, 280 (1993); *Vargas v. Keane*, 86 F.3d 1273, 1276 (2d Cir. 1996); *Ballard v. Walker*, 772 F. Supp. 1335, 1337 (E.D.N.Y. 1991) (Due process protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.).

Juror 10's interview suggests that is what occurred.  Specifically, in statements to the media, Juror 10 makes clear that, in reaching his decision, he looked at the volume of witnesses and evidence elicited by the government, and he anticipated that the defense would provide potentially up to 40 witnesses to rebut the allegations made by government witnesses.  It also appears Juror 10 held Mr. Gerace's decision to rely on the presumption of innocence and the burden of proof against him – explicitly noting that the defense failed to call any witnesses as a reason for his vote, in contradiction to well-settled law.

But Juror 10's reasoning is problematic not only because it disregards the jury instructions and the law, but also because, in a case where the government chose to

charge important defense witnesses in the lead up to trial and thereby preclude their trial testimony, Juror 10 seemingly embraced the comments made by the government on rebuttal which suggested the defense had an equal ability to subpoena witnesses to trial. Of course, in this case, the government's assertion was factually incorrect.   As a practical point the defense never has an equal ability to subpoena witnesses to trial; in this case, the defense's ability to elicit helpful testimony was severely limited by the government's conduct.

Juror 10's disregard for the law was a specific impropriety which, while not usually something the parties are aware of, was made aware to the parties by virtue of his submitting to a voluntary post-verdict interview.   Moreover, the government's conduct – both in its charging decisions and in its commentary during rebuttal summation – are improprieties which doubtlessly influenced Juror 10's decision making and the resultant verdict.

On this record, the Court should permit a limited inquiry of Juror 10 to make a fulsome record.

### 3.  Rule 606 Does Not Foreclose this Inquiry

In response to the instant motion, the defense anticipates the government will argue that the inquiry is foreclosed by Rule 606 of the Federal Rules of Evidence.  That is not the case.

Federal Rule of Evidence 606(b)(1) bars jurors from testifying "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment" But, the rule is not absolute, and it will yield "to the need for juror testimony in situations where there is a reduced potential for harassment or embarrassment of jurors, such as when evidence concerning objective facts is sought." *United States v. Moten*, 582 F.2d 654, 664-65 (2d Cir. 1978) (explaining that Rule 606(b) allows for testimony "concerning 'whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror'" (*quoting Mattox v. United States*, 146 U.S. 140, 148-49, (1892))).

Importantly, where there is "clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant," the court should permit the interview. *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983).

The facts of this case should counsel the Court to permit the interview.

As a threshold matter, the rule was enacted in large part to protect jurors from post-verdict harassment. Here, Juror 10 chose to submit to a highly publicized media interview with a television news station. He did not seek privacy; he embraced publicly.

Simply put, where a juror chose to enter the public eye, concerns of privacy or harassment are limited, if not wholly non-existent.

As to the merits, the defense has litigated the conduct of the prosecution for years, pointing out that the charging decisions of the prosecution severely limited – if not wholly precluded – Mr. Gerace's ability to present a defense. Juror 10's public statements not only demonstrate that he misapplied the law; the statements also demonstrate that the government's campaign against individuals who could provide helpful, exculpatory testimony on Mr. Gerace's behalf had a important impact on the trial and the verdict reached by the jurors.

This record presents "clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant," and it should counsel the Court to allow the limited inquiry requested by the defense.

### B.  Impairment of Ability to Present a Defense

The defense previous moved to dismiss the indictment against Mr. Gerace because of the government's decision to strategically charge key witnesses. Docket Item 1097.[9] At trial, the motivation and the prejudice of the government's charging decision was made even more clear. Indeed, some government witnesses acknowledged that they had

---

[9] In asserting this argument, the defense restates and relies on the prior briefing submitted in connection with Docket Item 1097.

committed multiple felonies in their cooperation with the government against Mr. Gerace, yet they were never charged with criminality and did not fear criminal prosecution.[10]  Yet witnesses that would provide helpful, exculpatory testimony to Mr. Gerace were charged in the lead up to trial after they appeared on the defense witness list.

Years before the filing of the Gerace witness list, the government interviewed Brian Rosenthal and knew he would provide helpful and exculpatory information to Mr. Gerace.  At the same time, the government also knew the allegations that would eventually lead to criminal charges against Mr. Rosenthal.  Mr. Rosenthal was only charged with a federal crime after he was listed on the Gerace witness list.

Over a year before the filing of the defense witness list, the government interviewed Detective Gregory Trotter and knew he would provide helpful and exculpatory information to Mr. Gerace – including testimony that would undercut the testimony of government witness Katrina Nigro.  At the same time, the government also knew the allegations that would eventually lead to criminal charges against Detective Trotter.  Detective Trotter was only charged with a federal crime after he was listed on the Gerace witness list.

---

[10] Witnesses P.H. and L.L. both acknowledged they engaged in conduct that violated federal law, and both testified they did not fear criminal prosecution.

Several years prior to the filing of the defense witness list, the government knew Jessica Leyland would provide helpful and exculpatory information to Mr. Gerace. At the same time, the government also knew the allegations that would eventually lead to criminal charges against Ms. Leyland. Ms. Leyland was only charged with a federal crime after she was listed on the Gerace witness list.

In responding to the prior motion, the government made no effort to dispute that Rosenthal, Trotter and Leyland were charged because of their involvement with Mr. Gerace. The government also did not dispute that Rosenthal, Trotter and Leyland were charged because they would provide helpful and exculpatory testimony to Mr. Gerace. Rather, the government's argument is simply this: it charged those individuals when it charged them because, in the government's view, it can do so without consequence and without regard to Mr. Gerace's rights.

At the most recent trial, the prejudice of the government's misconduct was laid bare.

First, as noted earlier, at least one juror expected Mr. Gerace to call witnesses in equal measure to the number of witnesses called by the government, explicitly holding Mr. Gerace's decision to not call any witnesses against him. The government's decision to charge Mr. Rosenthal, Detective Trotter and Ms. Leyland foreclosed their testimony, and also made it so that other witnesses who could have provided exculpatory information were unwilling to come forward on Mr. Gerace's behalf.

More critically, by charging Rosenthal, Trotter and Leyland, the government took away Mr. Gerace's ability to rebut critical aspects of the case. Rosenthal's testimony would have rebutted assertions about the pervasiveness of commercial sex acts in the VIP area, and it would have been in direct contradiction to the allegations of L.L., a key government witness.

The testimony of Detective Trotter would have rebutted several factual assertions made by Mr. Gerace's ex wife, Katrina Nigro, and more importantly it would have demonstrated to the jury that the allegations made by Ms. Nigro had been investigated by law enforcement and were largely disregarded before the federal government chose to prosecute Gerace.

Finally, the testimony of Leyland would have undercut evidence of drug dealing and witness tampering in the case.[11]  Leyland's testimony would have demonstrated that her acts were done without the involvement of Gerace and that the drug activity was not pervasive as alleged by government witnesses.  What is more, Leyland's testimony would have explicitly made clear that Leyland's interaction with P.H. where she allegedly placed P.H. into a headlock was done without any involvement of Gerace.

"The Sixth Amendment guarantees criminal defendants the right to present a defense, which includes a right to call witnesses." *Rigas v. United States*, No. 02-CR-1236,

---

[11] In the lead up to trial, the defense was provided with a 302 of an interview with Leyland.  In the interview, Leyland made a number of statements that were helpful and exculpatory to the defense.

2020 U.S. Dist. LEXIS 86850, 2020 WL 2521530, at *22 (S.D.N.Y. May 15, 2020) (citing *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000)), aff'd, 848 F. App'x 464 (2d Cir. 2021). "It is elementary that criminal defendants have a right to establish a defense by presenting witnesses." *See Webb v. Texas*, 409 U.S. 95, 98, (1972).

The right to establish a defense by presenting witnesses serves the truth-seeking function of the trial process by protecting against the dangers of judgments "founded on a partial or speculative presentation of the facts." *Williams*, 205 F.3d at 29 (2d Cir. 2000).

"A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense -- a right to his day in court -- are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel. " *In re Oliver*, 333 U. S. 257, 273 (1948)(emphasis added).

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)  "[J]udicial or prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violate the defendant's right to present a defense." *Williams*, 205 F.3d at 29.

"To demonstrate a due process violation based on the government's intimidation of witnesses, the defendant must show three elements: (1) that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means,

(2) bad faith on the part of the government, and (3) that the absence of fundamental fairness infected the prosecution." *United States v. Lebedev*, 932 F.3d 40, 55 (2d Cir. 2019) (quoting id.); *United States v. Chartier*, No. 17-CR-0372(JS), 2021 U.S. Dist. LEXIS 161972, at *62-63 (E.D.N.Y. Aug. 26, 2021).

As is set forth above, and as was set forth in prior motion practice, all elements are present here.  Mr. Gerace was denied his right to present a defense.  The convictions should not stand.

### C.  Replacement of a Juror During Deliberations

As the Court knows, finding an appropriate jury in this case was complicated by pre-trial publicity, potential juror sensitivities to issues and topics that were presented by the proof at trial, and by the duration of the case.  Because of the unique and complicated nature of this trial, once the jury was impaneled, counsel understandably made decisions to present and confront proof with an eye toward the jurors who were impaneled and anticipated to deliberate in this case.

After summations, the Court read the jury charge to the jury on December 20, 2024, and the jury began deliberations. Docket Item 1416.  The jury continued deliberations on December 23, 2024, after which time they were discharged for the Christmas holiday. Docket Item 1417.  On December 26, 2024, a juror reported that she was ill and not able to attend Court.

The Court instructed that the trial be down that day and that no deliberations should occur.  Dkt. # 1418. The following day, the same juror reported they were still ill and had been to the hospital.  The Court discharged the juror and replaced the juror with an alternate.  The defense objected, noting that it was possible the juror could return for deliberations the following day. Docket Item 1425. After the juror was replaced by an alternate, the jury returned the verdict later that same day. Docket Item 1426.

Under Federal Rule of Criminal Procedure 24(c)(3), the district court is authorized to dismiss a juror during deliberations and replace him or her with an alternate juror, so long as deliberations begin anew. *See, e.g., United States v. Delva*, 858 F.3d 135, 158 (2d Cir. 2017).  The standard for removing a juror under Rule 24(c) is "good cause." *Delva*, 858 F.3d at 158.  The defense concedes, "'[g]ood cause' encompasses a variety of problems that may arise with respect to the jury." *United States v. Vartanian*, 476 F.3d 1095, 1098 (9th Cir. 2007).

The defense does not believe the "good cause" standard was met in this instance. Although the juror had been unable to report for deliberations for two days, there was a likelihood the juror may have been able to report the following day, resulting in only a short adjournment of deliberations (less than one day).

It is impossible to know what the juror's opinion on the evidence truly was, but during the course of the trial, the defense team had made multiple observations of the juror's demeanor in the courtroom, which caused the defense to believe the juror was

reacting positively to cross examination on certain material issues consistent with certain defense theories.

In light of the foregoing, the defense maintains its objection to the dismissal of the juror, and asks that it be considered among the other issues supporting a new trial.

### D. Evidentiary Review

As was set forth above, the evidence at trial supports the motion for this Court to set aside the verdict, grant Mr. Gerace's motion pursuant to Rule 29, and enter a judgment of acquittal on the charges referenced above.

If the Court does not enter a judgment of acquittal, however, the Court should still grant Mr. Gerace a new trial under Rule 33.  On a motion for a new trial under Rule 33, the Court may "set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (citation omitted). Thus, in a Rule 33 context, the Court's discretion is considerably broader than under Rule 29. The Court may weigh the evidence and consider the credibility of witnesses, but it may also look to additional factors "to avert a perceived miscarriage of justice." Sanchez, 969 F.2d at 1413.

While evidence deficiencies alone can be the basis for a new trial, in this case, there are more reasons than just the evidence adduced at trial to order a new trial.  The record demonstrates the jury misunderstood and misapplied the law, improperly holding Mr. Gerace's decision not to testify and not to call witnesses against him. Mr. Gerace's ability

to call witnesses was substantially impaired by the government's decision to charge witnesses that would provide helpful and exculpatory testimony on his behalf. The government's motive was laid bare at trial, as the testimony showed the government chose to charge those witnesses who were helpful to Gerace while also not charging witnesses who admitted to committing federal offenses in connection with their cooperation in this case when those witnesses provided testimony consistent with the government's narrative.  What is more, comments by the prosecution in summation improperly invited the jury to misapply the law in this way, suggesting to the jury that it should hold Mr. Gerace's decision not to call witnesses against him in deliberating about the charges in the case.

The prejudice to Mr. Gerace is plain.  The jury did not follow the law.  And in not following the law, it convicted Mr. Gerace, creating the miscarriage of justice that Rule 33 is designed to protect against. To protect the fairness and integrity of the proceedings, the Court should vacate the conviction and order a new trial.

## CONCLUSION

Accordingly, for all of the foregoing reasons, the defense seeks a judgement of acquittal as to each count of conviction, or, alternatively, a new trial as to any counts in which a judgement of acquittal is not granted, or an evidentiary hearing on the juror(s)'s misapplication of the law in rendering a verdict.

DATED:        July 10, 2025

Mark A. Foti, Esq.                                    Eric M. Soehnlein, Esq.
**The Foti Law Firm, P.C.**                           **Soehnlein Law, PLLC**
16 W Main Street, Suite 100                           2100 Main Place Tower
Rochester, NY 14614                                   350 Main Street
(585) 461-1999                                        Buffalo, NY 14202
(585) 491-6512                                        (716) 771-9092