IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

              v.                                19-CR-227-LJV
                                                    23-CR-37-LJV

PETER GERACE,

                   Defendant.

---

## RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29 AND MOTION FOR A NEW TRIAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33

**Table of Contents**

INTRODUCTION ............................................................. **Error! Bookmark not defined.**

I.    Factual Background ................................................................. 3

  A.    The government's charging of Brian Rosenthal, Jessica Leyland, and Detective Greg Trotter Prior to Trial. ................................................................. 3

  B.    The Evidence at Trial............................................................. 4

    1.    The Defendant's Conspiracy to Distribute Controlled Substances and Operation of Pharoah's as a Drug-Involved Premises ....................................... 4

    2.    The Defendant's Sex Trafficking Conspiracy of Pharoah's Dancers .................. 12

    3.    The Defendant's Corrupt Relationship and Protection by Former DEA Special Agent Joseph Bongiovanni....................................................... 25

    4.    The Defendant's Witness Tampering ................................................. 44

  C.    Non-Evidentiary Trial and Post-Trial Issues ......................................... 48

    1.    The Defense's Closing and the Government's Rebuttal ..................... 48

    2.    The Court's Dismissal of Juror 3.................................................... 54

    3.    Juror 10's Post-Verdict Comments to the Media.............................. 60

II.    LEGAL FRAMEWORKS ............................................................... 62

  A.    The Rule 29 Standard and Evaluating Evidence.................................... 62

  B.    The Rule 33 Standard .............................................................. 66

III.    ANALYSIS ......................................................................... 69

  A.    The Defendant's Rule 29 Motion Should be Denied. ............................. 70

    1.    A rational jury could conclude that the defendant conspired with Bongiovanni to defraud the United States and commit bribery........................... 70

    2.    A rational jury could conclude that the defendant bribed Bongiovanni.............. 87

    3.    A rational jury could conclude that the defendant engaged in a narcotics conspiracy and maintained Pharoah's Gentlemen's Club as a drug-involved premises.95

    4.    A rational jury could conclude that the defendant conspired with others to engage in sex trafficking. ...................................................100

    5.    A rational jury could conclude that the defendant engaged in witness tampering. 105

  B.    The Court Should Deny the Defendant's Rule 33 Motion ...................................109

    1.    Juror 10's statements do not reflect clear, strong, and incontrovertible evidence of juror misconduct and Rule 606 expressly prohibits the kind of inquiry the defendant invites this Court to initiate. ..................................................109

2.    The record fails to substantiate the defendant's claims that the government's charging decisions impaired his ability to present a defense was impaired. ................116

3.    The Court did not abuse its discretion by removing Juror 3, who had recently been hospitalized. ............................................................................................120

4.    This case does not present any exceptional circumstances justifying evidentiary review through a Rule 33 motion...........................................................................121

## INTRODUCTION

On December 27, 2024, after an eight-week trial, a jury found the defendant, Peter Gerace guilty of the following crimes: Conspiracy to Defraud the United States and Commit Bribery (Count 1); Paying a Bribe to a Public Official (Count 2); Maintaining a Drug-Involved Premises (Count 3); Narcotics Conspiracy (Count 4); Sex Trafficking Conspiracy (Count 5); Witness Tampering (Counts 6 and 7); and Possessing with Intent to Distribute and Distribution of Cocaine (Count 9).[1] The jury acquitted the defendant of Count 8, which also charged him with witness tampering.[2]

Through 43 witnesses and 180 government exhibits, the jury heard how the defendant transformed Pharoah's Gentlemen's Club into a drug-ridden brothel; how he used his status as the club's owner, his reputation for being connected to Italian organized crime ("IOC"), and his role as a prolific drug supplier to coerce his drug-addicted employees into providing commercial sex services to both his friends and himself; how he got away with these crimes for years through his corrupt relationship with his childhood friend, Joseph Bongiovanni, a DEA agent who protected the defendant out of admiration for his IOC connections and in exchange for bribes; and how, after Mr. Bongiovanni faced prosecution and as their decade long scheme was unraveling, the defendant took his protection into his own hands—using women who at the time were loyal to him—by tampering with a witness.

In moving for judgments of acquittal, the defendant invites the Court to carve up the government's proof; view pieces of evidence in isolation and divorced from their proper

---

[1]    *See* Jury Verdict, ECF No. 1426, (dated Dec. 27, 2024).

[2]    *See id.* at 9.

context; ignore entire weeks of testimony unfavorable to his interests; make credibility determinations that undermine the jury's verdict; consider extraneous information that the jury did not; and abandon the Rule 29 standard, which requires the Court to assess the evidence in the light most favorable to the government. Each of these methodological errors is improper on Rule 29 review. Viewing the evidence in the light most favorable to the government, it is clear the jury's verdict must stand.

Just as the defendant's Rule 29 motion merits denial, so too does his Rule 33 motion for a new trial. The comments the jury foreperson made to the media in the aftermath of the trial about his own mental impressions cannot, under Federal Rule of Evidence 606, subject the verdict to any inquiry. Nor is there any factual basis to support the defendant's unsupported allegation that the government's decision to charge three individuals connected to his myriad criminal schemes deprived him of his right to call any one of the 286 individuals who appeared on his witness list. Likewise, the defendant's complaint that the Court improperly dismissed an ailing juror who required hospitalization over his objection sounds neither in law nor common sense, as jury duty does not require jurors to sacrifice their health if the defendant so demands. And, lastly, the defendant's argument that this Court should usurp the role of the jury to reweigh the evidence in his favor and grant him a new trial is not premised on the sorts of exceptional facts that warrant that kind of exceptional relief. In sum, because the evidence entitled a rational jury to convict the defendant for the crimes he committed and because there is no basis to grant the defendant a new trial pursuant to Rule 33, his motion should be denied.

## I.    Factual Background

### A.    The government's charging of Brian Rosenthal, Jessica Leyland, and Detective Greg Trotter Prior to Trial.

On June 16, 2023, the defendant transmitted his witness list under seal.  *See* Witness List, ECF No. 529, (filed June 20, 2023).  That witness list contained 286 individuals.  *See id.* 1–51.  Among the 286 proposed witnesses were Brian Rosenthal, who worked under the defendant at Pharoah's Gentlemen's Club; Jessica Leyland, a former Pharoah's employee, drug dealer, and close associate of the defendant's; and Gregory Trotter, an Amherst Police Detective and close friend of the defendant's.  *See id.* at 38 ¶ 214, 28 ¶ 149, 47 ¶ 263.

On September 14, 2023, the government indicted Rosenthal with conspiring to commit sex trafficking, completed sex trafficking, and making a false statement.  *See* Indict., at 1–2, ECF No. 1, Case No. 1:23-CR-102, (dated Sept. 14, 2023).[3]  On October 26, 2023, the government charged Jessica Leyland in an eight-count Criminal Complaint charging her with witness tampering, narcotics conspiracy, and distribution of cocaine.  *See* Compl., at 1–2, ECF No. 4, Case No. 1:23-MJ-5229, (dated Oct. 26, 2023).  Ms. Leyland's charges stemmed from physical assault against P.H. (identified as Victim 1 in the complaint), who is a government witness that testified at trial against the defendant, and her distribution of cocaine to an undercover officer.  *See id.* at 3–11.[4]  On November 28, 2023, the government filed a one-

---

[3]      On July 31, 2025, Rosenthal pleaded guilty to making a false statement or representation to an agency of the United States in violation of 18 U.S.C. § 1001(a)(2), before United States District Court Judge Lawrence J. Vilardo, Jr.  *See* Case No. 1:23-CR-102, ECF No. 97.  In sum and substance, Rosenthal admitted that he lied to the FBI when he stated he never observed drug use and sales inside Pharoah's and that management would not have tolerated drug use and sales when, in truth and in fact, Rosenthal had observed drug use and sales inside Pharoah's, and drug use and sales were tolerated by management.

[4]      On October 2, 2024, Jesscia Leyland pleaded guilty to retaliating against a witness in violation of 18 U.S.C. § 1513(b)(2) before United States Magistrate Judge Michael J. Roemer, *see* Case No. 24-CR-114, ECF No. 39, the Report and Recommendation was adopted on November 30, 2024, by United States District Court Judge Lawrence J. Vilardo, Jr., *see* ECF No. 43, and on April 17, 2025, Ms. Leyland was sentenced to 30

count Criminal Complaint against Amherst Police Detective Gregory Trotter, charging him with making a material false statement to a federal law enforcement officer. *See* Compl., at 1, ECF No. 1, Case No. 1:23-MJ-1173, (dated Nov. 28, 2023). Mr. Trotter's charges stemmed from false statements he gave to the FBI during a September 30, 2022, interview, regarding his relationship and communications with the defendant. *See id.* at 2–29.[5]

On July 31, 2024, the defendant filed a motion to dismiss the indictment, arguing that the government's decision to charge three of his 286 witnesses deprived him from being able to present a meaningful defense. *See generally* Mot. Dismiss, ECF No. 1097, (dated July 31, 2024). The government responded on August 16, 2024. *See* Resp. in Opp. to Mot. to Dismiss, ECF No. 1123, (dated Aug. 16, 2024). In its response, the government noted that the defendant's "alleged deprivation [was] 'entirely speculative,'" as "the trial ha[d] yet to occur.'" *Id.* at 13 (quoting *United States v. Hwa*, No. 18-CR538 (MKB), 2021 WL 11723583, at *42 (E.D.N.Y. Sept. 3, 2021)). On August 30, 2024, the Court denied the defendant's motion. *See* Text Order, ECF No. 1164, (dated Aug. 30, 2024); Minute Entry, ECF No. 1165, (dated Aug. 30, 2024).

### B. <u>The Evidence at Trial</u>

### 1. The Defendant's Conspiracy to Distribute Controlled Substances and Operation of Pharoah's as a Drug-Involved Premises

The trial evidence permitted a reasonable jury to conclude that the defendant operated and controlled Pharoah's as a drug-involved premises from 2006 until 2019. Specifically, a reasonable jury could have concluded that, throughout that time frame, the defendant

---

months imprisonment, *see* ECF No. 53.

[5]    Trotter is scheduled to proceed to trial on August 18, 2025, *see* Case No. 24-CR-60-LJV, ECF No. 87.

possessed, used, and distributed cocaine and other controlled substances, facilitated the distribution of cocaine and other controlled substances, and permitted others to use and distribute drugs at Pharoah's, and from this evidence the jury's verdict on Counts 3 and 4 was amply supported.

### a.    The Defendant's Maintenance of Pharaoh's as A Drug-Involved Premises and Distribution Activity was Profitable and Intertwined with his Sex Trafficking Activity.

At Pharoah's, dancers were required to engaged in VIP dances and to pay a portion of their proceeds to the house and, by extension, the defendant.  The defendant called the VIP room "the bank."[6]  Dancers withdrawing on drugs, and becoming sick was bad for business, and so, when that happened, the defendant would "help" dancers by providing them drugs so they could work.[7]  Some dancers, like L.L., almost continuously needed cocaine, which the defendant and others provided, to get through their shift and avoid the deleterious effects of heroin withdrawal.[8]

The defendant also relished in the party atmosphere at Pharoah's, and he knew that partying with drugs increased profits and, as detailed *infra*, his ability to exploit young and vulnerable drug addicted dancers. For example, A.P. testified that she worked at Pharoah's on-and-off between 2006 and 2013.[9]  During that time period, she observed people smoking

---

[6]    Tr. Tran., at 47, ECF No. 1379 (Nov. 13, 2024) (Test. A.B.).

[7]    *See* Tr. Tran., at 16-21,ECF No. 1469, (dated Nov. 18, 2024) (Test. E.H.) (describing a dancer who was inebriated and overdosing on heroin and that the defendant gave the dancer cocaine and told E.H., "I can – I help the girls if they need to work.").

[8]    Tr. Tran., at 50-51, ECF No. 1441, (dated Dec. 16, 2024) (Test. L.L.) (describing nodding out from heroin use on the verge of overdose approximately 100 times inside Pharoah's and needing cocaine to get through her shift).

[9]    *See* Tr. Tran., at 5–7, (Test. A.P., dated Nov. 7, 2024)

marijuana and using cocaine inside the club.[10]  When A.P. first met the defendant in 2008 at Pharaoh's he gave her money, dispatched her to procure cocaine from drug dealer Marcus Hatten a/k/a Marcus Black, and directed her to return to Pharaoh's with the cocaine.[11]  Additionally, A.P. testified that the defendant purchased cocaine from Black from inside Pharaoh's.[12]  Black, however, was far from the only drug dealer operating within the club.  A.P., herself, sold cocaine there to other dancers, employees, customers, as did the defendant and Leyland.[13]  According to A.P., cocaine consumptions amongst customers was good for business: if customers were high on cocaine, they tended to spend more money at the club.[14]

G.R., who worked at Pharaoh's from 2006 to 2009, echoed A.P.'s assessment that cocaine consumption at the club benefitted the defendant bottom line.  As she put it, cocaine enables users to stay awake longer and drink more alcohol, which Pharaoh's could convert to a profit through alcohol sales.[15]  Likewise, R.W., who worked at Pharaoh's in 2012 and observed drug use amongst both employees and customers, testified that cocaine-use enabled people to drink more alcohol, the sales of which earned the club more money.[16]

In addition to directly distributing drugs like cocaine, the defendant facilitated cocaine distribution to his friends and customers.  For example, the defendant instructed A.A., a

---

[10]    *See id.*

[11]    *See id.* at 8–10.

[12]    *See id.* at 11–12.

[13]    *See id.* at 14, 16–17.

[14]    *See id.* at 16–17.

[15]    *See* Tr. Tran., at 35, (Test. G.R., dated Nov. 13, 2024).

[16]    *See* Tr. Tran., at 19–20, (Test. R.W., dated Nov. 19, 2024); *see also* Tr. Tran., at 27, (Test. C.C., dated Nov. 14, 2024) (explaining that cocaine causes people to become aroused, which would cause them to spend more money at Pharaoh's).

Pharaoh's dancer, to middle cocaine deals between Black and customers.[17]  On one occasion, A.A. approached the defendant after some of his friends asked her for cocaine,[18] and the defendant directed A.A. to "go see Marcus", who subsequently provided her cocaine that she delivered to the defendant's friend and customer.[19]  Ultimately, A.A. middled between five and six cocaine deals for the defendant and Black at Pharaoh's from 2012 and 2018.[20]

Consistent with A.A.'s account, Kevin Myszka described visiting Pharoah's with his friends sometime in 2016 or 2017 and using cocaine there.[21]  When they ran out, Myszka asked the defendant, "can I get any cocaine in here?"  Although Myszka did not remember the defendant verbally responding, a few minutes later a Pharoah's dancer approached him and sold him a gram of cocaine.[22]  Occasionally, customers, such as Matt Albert, who testified that the defendant sold him cocaine about five times including at least once in a downstairs office at Pharoah's, purchased cocaine directly from the defendant.[23]

### b.  The Defendant Supplied Drugs to, and Facilitated Drug Use Amongst his Dancers, Reinforcing their Addictions.

Though the jury heard ample testimony about how drug use amongst the club's clientele increased demand for the business's products—alcohol and sex—the testimony of Pharoah's dancers also established that rampant drug use created and fueled the kind of

---

[17] *See* Tr. Tran., at 29–30, (Test. A.A. dated Nov. 20, 2024).

[18] *See id.*

[19] *See id.*

[20] *See id.* at 34.

[21] *See* Tr. Tran., at 15–16, (Test. Kevin Myszka, dated Nov. 20, 2024).

[22] *Id.* at 19.

[23] *See* Tr. Tran., at 18, (Test. Matt Albert, dated Dec. 6, 2014).

compliant, desperate labor force that the defendant desired. G.R., who was sober when she began working at Pharoah's, descended into an all-consuming drug addiction in the Spring of 2009 after using cocaine at the club with K.L., who was, at that time, a woman the defendant dated, distributed drugs to, and, as detailed *infra*, coerced into having sex.[24] By summer, G.R. was using cocaine and opiates daily, and would regularly enter the upstairs portion of the club with the defendant, the defendant's friends, and other dancers to consume cocaine that the defendant provided for everyone's consumption.[25]

As described above, a dancer's drug addiction did not deter the defendant from distributing drugs to her. To the contrary, supply drugs to drug-addicted women was the defendant's way of ensuring their ability to earn him money.[26] Thus, the defendant distributed cocaine to C.C. between 5 and 20 times, notwithstanding her struggles with cocaine addiction.[27] And, on another occasion, in 2014, the defendant provided cocaine to a dancer as she was overdosing at the club.[28] As the overdosing dancer lay on the couch "sniffing lines," the defendant told E.H., who witnessed the incident, "I help the girls if they need to

---

[24]     *See* Tr. Tran., at 21–23, (Test of G.R., dated Nov. 13, 2024).

[25]     *Id.* at 32–33; *see also* Tr. Tran., at 9–11, (Test. J.Z., dated Nov. 12, 2024) (testifying that she observed the defendant using cocaine in Pharoah's upstairs area and that the defendant distributed cocaine to her while she worked at Pharoah's from 2005 until 2008); Tr. Tran., at 27–32, (Test. A.B., dated Nov. 13, 2024) (testifying that the defendant invited her to the upstairs portion of Pharoah's and gave her cocaine while she worked at Pharoah's in 2019); Tr. Tran., at 11–14, (Test. A.A., dated Nov. 20, 2024) (testifying that the defendant beckoned her upstairs where he awaited with a cocaine dealer, instructed her to sit down, and instructed her to inhale cocaine).

[26]     *See* Tr. Tran., at 16-21,ECF No. 1469, (dated Nov. 18, 2024) (Test. E.H.) (describing a dancer who was inebriated and overdosing on heroin and that the defendant gave the dancer cocaine and told E.H., "I can – I help the girls if they need to work.")

[27]     Tr. Tran., at 29–30, (Test. C.C., dated Nov. 14, 2024).

[28]     *See* Tr. Tran., at 16–17, (Test. E.H., dated Nov. 18, 2024).

work, and I can get you some, too."[29]  Similarly, Katrina Nigro testified that she knew some dancers at PGC to be heavily addicted to Lortabs, that the defendant had access to a supply of Lortabs, and that she observed the defendant distribute Lortabs to a dancer one time because "she [was] really sick and needed it."[30]

    On another occasion, the defendant middled a heroin deal when one dancer, L.L., began to experience withdrawal.[31]  The defendant's friend arrived at the club and delivered a gram of heroin to L.L.[32]  L.L., who worked at Pharoah's almost daily between 2013 and 2015 and then regularly, with some month-long gaps, between 2015 and 2018,  understood that the defendant would "work [] out" the payment for the heroin with his friend.[33]  After receiving the heroin, L.L. was able to continue her shift and continued to give private dances in the club's VIP area.[34]

    Consistent with the defendant's own acknowledgement that drugs could fuel his labor force, K.A., who worked at Pharoah's from 2012 or 2013 to 2014 and suffered from a severe addiction to cocaine and opiates, explained that consuming cocaine and opiates during a shift was critical to her ability to continue working at the club; without them, she would have been

---

[29]    *Id.* at 18.

[30]    Tr. Tran., at 99, ECF No. 1600 (dated Nov. 27, 2024) (Test. Nigro).

[31]    *See* Tr. Tran., at 44, (Test. L.L., dated Dec. 16, 2024).

[32]    *Id.* at 45.

[33]    *See id.* at 44–45; *see also* Tr. Tran., at 14, (Test. L.L., dated Dec. 13, 2024).

[34]    Tr. Tran., at 44–45, (Test. L.L., dated Dec. 16, 2024).

unable to engage in stage or VIP-room dances.[35]  And that, in turn, proved profitable for the club because when K.A. danced, the club—and, by extension, the defendant—made money.[36]

Because drug use simultaneously drove consumer demand and sustained the defendant's labor supply, the defendant fostered an environment where frequent drug use, distribution, and intoxication were part of the fabric of Pharoah's culture.  In fact, K.A. described using drugs during her shift "anywhere [she] wanted to," and purchasing narcotics on demand from other dancers, such as A.A.[37]  Al. A, meanwhile, smoked fentanyl in both public and private bathrooms at the club when she worked there from 2011 to 2012.[38]  She also observed other dancers "nodding out" while on the clock, even in the presence of customers.[39]  Another dancer, R.W., observed similarly extreme drug activity: when she worked at Pharoah's in 2019, she witnessed a dancer overdose on drugs, in addition to observing employees nodding out in the dressing room, at the bar, at tables, by the stage, and while giving private dances.[40]  For her part, L.L.'s addiction was so serious that she needed cocaine every 30 minutes (and heroin every 6 hours), and would obtain cocaine at Pharoah's from the numerous drug dealers who practically set up shop at the club, including the defendant.[41]  John McDonald corroborated these accounts of extensive, open, and permissible

---

[35]     *See* Tr. Tran., at 15 (Test. K.A., dated Nov. 18, 2024).

[36]     *See id.* at 15–17.

[37]     *Id.* at 13, 23.

[38]     Tr. Tran., at 26–30, (Test. Al. A., dated Nov. 19, 2024).

[39]     *See id.* at 26–30.

[40]     Tr. Tran., at 32, (Test. R.W., dated Nov. 19, 2024).

[41]     *See* Tr. Tran., at 45–51, (Test. L.L., dated Dec. 16, 2024).

drug use at the club.[42]  McDonald both used and sold cocaine from 2015 through 2019.[43] During that period, McDonald went to Pharoah's four or five times per week, with the total number of times being "uncountable."[44]  McDonald estimated that he used cocaine at Pharoah's between 100 and 200 times, and potentially every time he went there.[45]  *See id.* When he used cocaine at the club, he "didn't hide it."  To the contrary, McDonald consumed cocaine right out in the open."[46]  In addition to using cocaine, McDonald "frequently" distributed cocaine at the club to its staff and customers.[47]

In like manner, Jeff Anzalone, who has been to Pharoah's approximately 100 times between 2009 and 2018, used cocaine "every time" he was there.[48]  Though Anzalone would often bring his own cocaine to Pharoah's for his personal use and to distribute to others, he also procured cocaine from Pharoah's staff, including the defendant, Leyland and dancer A.A. a/k/a Cherry, as well as defendant's brother, Anthony Gerace.  Like several other witnesses, Anzalone also described consuming cocaine without compunction, using it virtually everywhere in the club, in the upstairs controlled by the defendant, the garage, the kitchen, at the bar, and in the hallways.[49,50]

---

[42]    *See* Tr. Tran., at 8–13, (Test. John McDonald, dated Dec. 11, 2024).

[43]    *See id.* at 8.

[44]     *Id.* at 9.

[45]    *Id.* at 10.

[46]    *Id.*

[47]    *See id.* at 12.

[48]    *See* Tr. Tran., at 11-12, ECF No. 1474, (dated 12/9/2024 (Test. Anzalone).

[49]    *Id.* at 13-19, 24-37.

[50]    The defendant also distributed cocaine outside of Pharoah's, for example including at his residence to Crystal Quinn and C.C. (*see* ECF No. 1383) on the day they threatened P.H. via Facebook, and in

In total, witnesses testified of drug use and distribution at Pharoah's that occurred between 2006 and 2019.[51]

## 2.    The Defendant's Sex Trafficking Conspiracy of Pharoah's Dancers

The jury also heard extensive, detailed, and graphic testimony that the defendant leveraged the drug addictions of his dancers and his status as their boss to coerce them into performing commercial sex acts for himself, his friends, and his customers.[52]  The evidence related to the defendant's sex trafficking conspiracy was further contextualized for the jury by the testimony of an expert witness, Rebecca Bender, who explained there is a strong correlation between drug addiction and the sexual exploitation of victims and how individuals "groom" victims by "trying to begin pushing someone's boundaries, trying to get them normalized to a variety of highly - - highly sexual behavior," and that traffickers are "really good" at identifying each individual victim's vulnerability, sometimes tweaking or

---

in a parking lot on more than one occasion to Matthew Albert (*see* ECF No. 1475).

[51]    Multiple witnesses testified that the defendant exercised control over Pharoah's and distributed drugs at the club and, contrary to the defendant's arguments at trial and in his Rule 29 motion, that the defendant did so at all times relevant to the jury's verdict, including between 2012 and 2014.  *See, e.g.*, Tr. Tran., at 20, (Test. A.P., dated Nov. 7, 2024) ("Q: During the time that you worked at Pharoah's, between about '06, '07, and 2012 or 2012, who ran the club? A: . . . . Well, Peter and Don Parrino . . . were the owners.  And then, I mean, managers run it as well."); Tr. Tran., at 26, (Test. A.A., dated Nov. 20, 2024) ("Q: That first time when you go in the upstairs, with the defendant and he puts the card [containing cocaine] under your nose, was that in the first year that you started working there in 2012? A: Yes."); Tr. Test., at 196 (Test. L.L., Dec. 16, 2024) ("Q: And at that point in time [i.e., 2013, when L.L. first started using drugs], Don Parrino was in charge of the club, wasn't he? A: . . . [W]hen I worked there, it was Peter, then they came in like a few months later.  I don't even know, maybe a half a year later or something, then Larry and Don came in."); *id.* at 258 ("Q: From your memory, and from your experience at Pharoah's, do you *always* remember this defendant being there? A: Yes.  Do you ever, do you, of your personal recollection, ever remember a time when there w[ere] significant amounts of time he was gone?  A: No.  Who's the one that walked around like the boss there?  A: Peter.").

[52]    Dancers came from other states to work at PGC.  Tr. Tran., at 91, ECF No. 1600 (dated Nov. 27, 2024) (Test. Nigro) (describing that Pharoah's dancers came from other states, including Pennsylvania and Ohio).  Pharoah's advertised their club on the internet, which affects interstate or foreign commerce. Tr. Tran., at 14, ECF No. 1494 (dated Dec. 17, 2024) (Test. Burns) (PGC advertises on the Facebook, the internet, and radio).

customizing their recruiting tactics—based on the victims' needs, desires, and dreams.[53]  Bender further explained that traffickers take different forms, and use different tactics, such as CEO traffickers who "us[e] the recruiting tactic of employment," and "Romeo" traffickers who use the guise of a romantic relationship pretending to be a boyfriend – when really their intent is to recruit and traffic someone.[54]  Sex traffickers can use different tactics, including the "CEO" or "Romeo" tactic, and can switch from one tactic to another over time or with different victims.[55]  With that framework in mind, the jury could conclude that the defendant engaged in these types of tactics and was "really good"—excelled, even—at identifying each individual victim's vulnerability to control and coerce her to engage in highly sexualized conduct augment Pharoah's profits, and to benefit himself and his friends.

Coerced commercial sex was part of Pharoah's business model.  The defendant's scheme required the dancers to be "upsellers" of commercial sex acts—often at the authority of his direction—because dances lengthened by commercial sex acts provided by drug-addicted, desperate dancers equaled more money in the defendant's "bank."[56]  More specifically, the evidence overwhelmingly established that the defendant required dancers to engage in "dances" in the downstairs VIP and Champagne room—a location the defendant referred to as "the bank"[57]—wherein drug addicted dancers were placed in the position of dancing and engaging in commercial sex acts, with bouncers who intentionally looked the

---

[53]    Tr. Tran., at 35, 92, ECF No. 1378, (dated Nov. 12, 2024) (Test. Bender).

[54]    *Id.* at 90.

[55]    *Id*. at 91-92.

[56]    *Id.* at 104-105 (describing sex trafficking strategies that involve using dancers to upsell into engaging in sex acts).

[57]    Tr. Tran., at 47, ECF No. 1379 (Nov. 13, 2024) (Test. A.B.).

other way and permitted the sex acts to occur,[58] for the financial benefit of Pharaoh's, the defendant's company.

The defendant's sex trafficking of his employees, however, was not limited to the downstairs area of his club. The defendant also controlled the upstairs portion of the club, where he pimped out and sexually coerced several of his employees. Consider first the compelling testimony of G.R., one of the many drug-addicted dancers who worked at the defendant's club. While working for the defendant, G.R.'s drug addiction to opiates, like Lortabs (also known as hydrocodone), and cocaine spiraled to such depths that "when [she] wasn't doing alcohol and drugs," she "was thinking about it," prompting her to "plan [her] entire day, week, whatever, around drinking and drugging."[59] Obtaining drugs was critical for G.R. because when she did not have Lortabs she would enter withdrawals so bad that they mirrored "a really bad case of the flu," complete with vomiting, sweating, shaking, nausea, and fatigue.[60] The fear of re-experiencing withdrawal drove G.R.'s decision making in life.[61] And G.R. practically wore that fear—and the extreme drug addiction undergirding

---

[58]      *Id.* at 74-75 (describing that the VIP bouncer Brain Rosenthal did not stop sex acts that occurred in the VIP—including the dancer's who were the defendant's favorites); *see* Tr. Tran., at 28-30, 55, ECF No. 1469, (dated Nov. 18, 2024) (Test. E.H.) (describing how a patron at Pharaoh's ejaculated on her during a lap dance and she was not permitted to call the police); *see also* Tr. Tran., at 55-56, ECF No. 1366 (dated Nov. 13, 2024) (Test. G.R.) (describing that she observed a dancer named "Joy" having sex in the VIP and that a customer to who she was giving a lap dance exposed himself, masturbated, and finished and that nobody intervened); Tr. Tran., at 14–16, ECF No. 1441, (dated Dec. 16, 2024) (Test. L.L.) (describing engaging in sex acts in the downstairs VIP, including at the defendant's direction); *see also generally* ECF Nos. 1380-81 (dated Nov. 14 & 18, 2024) (Test. P.H.); ECF No. 1453 (dated Nov. 19, 2024) (Test. Al. A.); ECF Nos. 1599-1602 (Test. Katrina Nigro); ECF No. 1451 (dated Nov. 18, 2024) (Test. K.A.).

[59]      Tr. Tran., at 26, ECF No. 1366, (dated Nov. 13, 2024) (Test. G.R.).

[60]      *Id.* at 27.

[61]      *See id.*

it—on her face: she was severely underweight, had bags under her eyes, and "even with all the pounds of makeup on . . . looked terrible."[62]

Of course, the defendant did not need to rely on G.R.'s disheveled, emaciated appearance to know she was locked in the vice grip of addiction: he used drugs with G.R. practically every time he was around her.[63]  The defendant's treatment of G.R. reflected his understanding that she suffered from a severe drug addiction.  One night, heavily addicted to cocaine and opiates, G.R. ascended a staircase to the upstairs area of Pharoah's that the defendant controlled in search for drugs.[64]  While upstairs, G.R. used cocaine with the defendant and others that the defendant distributed.[65]  In the midst of the his cocaine-fueled party, the defendant "asked [G.R.] if [she] would hook up with" one of his friends, told her that he would "take care of [her] or whatever," and then the defendant gave her $200 when G.R. was done having sex with his friend.[66]  G.R. had not planned to go upstairs to have sex with someone,[67] but she knew what the defendant wanted—for her to have sex with his friend,[68] and she did what the boss wanted.[69]  High on cocaine and in need of the job that funded her drug addiction—a drug addiction the defendant encouraged and directly

---

[62]     *Id.* at 44.

[63]     *Id.* at 47.

[64]     *Id.* at 45.

[65]     *Id.* at 43-45.

[66]     *Id.* at 42, 45-46.

[67]     *Id.*at 45.

[68]     *Id.* at 45:18-25.

[69]     *See id.* at 49–50.

contributed to by feeding her drugs—G.R. abided by her boss's desires.[70]  Afterward, G.R. felt "disgusted" at the new "bottom" she reached.[71]

Similarly, the jury heard and observed evidence from K.L., another former Pharoah's dancer, who testified about being addicted to opiates when the defendant coerced her into performing commercial sex acts.  K.L.'s opiate addiction began after the defendant began distributing her Lortab pills.[72]  She soon became addicted and experienced withdrawal symptoms if she did not consume them regularly.[73]  Those symptoms made K.L. feel like she had the flu, and included "sweating, freezing, [feeling] cold, [and] throwing up."[74]

Sometimes, while K.L. suffered through physical withdrawal, the defendant coercively used her withdrawal fears and sickness, and his provision of Lortabs to her, on her engaging in a sex act with him.[75]  Specifically, the defendant "wouldn't give [the Lortabs] to [K.L.], and [she] would get physically sick," at which point the defendant "would say, well, you know what you have to do."[76]  K.L. interpreted that to mean that she had to "give [the defendant] a blow job" for him to release the Lortabs he was withholding.[77]  Though K.L. did not want to give the defendant oral sex on account of her painful physical withdrawal

---

[70]    *Id.*

[71]    *Id.* at 49.

[72]    *See* Tr. Tran., at 41, ECF No. 1470, (dated Dec. 9, 2024) (Test. K.L.).

[73]    *See id.* at 41.

[74]    *Id.*

[75]    *Id.* at 44.

[76]    *Id.*

[77]    *Id.* at 45.

16

symptoms, she did it anyway "[b]ecause [she] had to.  Because . . . [she] felt horrible."  She did not feel like a she had a "choice."[78]

L.L.'s testimony about the way she was groomed and coerced was forceful.  L.L. was another Pharoah's dancer severely addicted to cocaine and heroin by the time the defendant coerced her into performing commercial sex.  L.L. did not begin her employment at Pharoah's addicted, but she used cocaine and heroin two days after she started working there, while on a shift.[79]  Within a couple of months, she was using cocaine and heroin daily.[80]  That was an addiction the defendant contributed to.  During one of their first interactions, the defendant distributed cocaine to L.L. while she worked a shift at Pharoah's, and he would go on to distribute cocaine to L.L. many times during the five year period she worked at the club.[81]

L.L.'s addiction to drugs ruled her life.  When she would wake up, "[t]he first thing [she] ha[d] to do [was] . . . get heroin, because [she] [would] wake up physically sick from not having it for so many hours" while she slept.[82]  "Then when [she would] start feeling a little bit better from the heroin, then [her] body [would] want[] the cocaine.  So, then [she would] have to do that."[83]  When she inevitably needed sleep, L.L. would "have to use heroin again to be able to calm down from all the cocaine" she was consuming at the defendant's club.[84]  L.L.'s body bore signs of the ravaging toll her addiction was inflicting on her life.  "[B]y the

---

[78]    *Id.*

[79]    *See* Tr. Tran., at 19, ECF No. 1440, (dated Dec. 13, 2024) (Test. L.L.).

[80]    *Id.*

[81]    Tr. Tran., at 78, (Test. L.L., Dec. 16, 2024).

[82]    Tr. Tran., at 20, (Test. L.L., Dec. 13, 2024).

[83]    *Id.*

[84]    *Id.*

time [she] was shooting both [cocaine and heroin], . . . it made [her] arms different colors," and she was "looking really bad."[85]   Due to repeated punctures to her veins and muscles caused by intravenous drug use, L.L.'s arms and legs were pocked with scars that were visible fully visible by 2015 as she worked in Pharoah's.[86]

These costs were the price L.L. paid to avoid an even worse fate: withdrawal. Withdrawal, for L.L., started with waves of "hot and cold flashes," then escalated to feelings of "restless[ness] and . . . anxiety" that prevented her from "sit[ting] down."[87]   But getting up afforded L.L. no relief because withdrawal also made her body hurt.[88]   On top of saddling her with "many aches and pains," withdrawal gave her diarrhea, made her vomit, dehydrated her body, and suppressed her appetite.[89]   "I always say [withdrawal is] like the flu times ten. That's the best I can try to put it."[90]

Eventually, the fear of withdrawal and pressure to feed her addiction led to L.L. exchanging oral, vaginal, and anal sex for money or drugs inside the club's VIP and champagne room at the defendant's behest.[91]   Because the cost of "dances" in the VIP and champagne rooms depended on their duration, providing sex acts would prolong the customer's time in the backroom, and thereby earn the club—and, by extension, the

---

[85]       *Id.*

[86]       *See id.* at 23–24.

[87]       *Id.*

[88]       *See id.*

[89]       *See id.*

[90]       *See id.*

[91]       *See* Tr. Tran., at 14–16, ECF No. 1441, (dated Dec. 16, 2024) (Test. L.L.).

defendant—more money.[92]  If dancers did not take customers to the VIP or champagne rooms for private dances, they could face professional discipline from management.[93]

For example, the defendant directed L.L. to go into the VIP room with Wayne VanVleet, a Pharoah's customer notorious for spending large sums of money at the club.[94] The defendant told L.L., "he's a good one, you want to go in the back room with him, and he will hook you up" and "he likes to pull hair and finger people."[95]  The defendant then advised L.L. that "Brian [Rosenthal]," the VIP room attendant tasked with keeping the female dancers safe, "would overlook the camera[s]."[96]  L.L. understood the defendant's comments to mean that VanVleet "c[ould] do what he wants to me, and I'm not being watched."[97]  Just as well, when the defendant directed her to go in the backroom and be penetrated by VanVleet, L.L. did not think it was an option.[98]  And she feared that the defendant would harm her economically—by taking away shifts that permitted her to dance on stage, for which she could earn more money, or getting her blacklisted at other clubs—if she failed to abide his direction.[99] So, L.L. did as the defendant instructed and expected: she took VanVleet to the

---

[92]    *See id.*

[93]    *See id.*

[94]    *See id.* at 71.

[95]    *Id.*

[96]    *Id.* at 72.

[97]    *Id.*

[98]    *Id.* at 74–75.

[99]    *See id.* at 77–78, 96.  The defendant knew, and used, the threat of financial harm against his victims or intended victims.  (*see generally,* Test. A.G., 11/20/2024, ECF No. 1458) (testifying that she worked at Pharoah's for two days, made a lot of money for herself and the club, but was fired after declining to "go upstairs" with the defendant and rejecting his sexual advances); *see also* (L.L. 12/16/2024 at 254) (defendant told L.L. that he could prevent her from working at other clubs).

champagne room, danced for him, and then VanVleet "finger[ed] [her] and pull[ed] [her] hair and ejaculat[ed] in his pants."[100]   VanVleet tipped "Brian [Rosenthal]" the VIP room attendant, thereby injecting even more money into Pharoah's.[101]

That same scenario with VanVleet played out "too many [times" for L.L. to "count."[102, 103]   But VanVleet was not the only man that the defendant directed or arranged for L.L. to engaged in commercial sex with.  On another occasion, the defendant asked her if she "would be willing to go on dates outside of Pharoah's," which "means basically you go out to dinner, get dressed up, and, you know, sexual acts after that."[104]   After L.L. told the defendant that she had never done that before, the defendant acted "[n]onchalantly" and advised that "he could teach me how to do it real quick."[105]   The defendant then arranged for L.L. to go on a "date" in which she would be paid $1,000.[106]

---

[100]    *See* Tr. Tran., at 73, ECF No. 1441, (dated Dec. 16, 2024) (Test. L.L.).

[101]    *See id.* at 73–75.

[102]    *Id.* at 75.  Other witnesses also described sex acts provided by dancers to VanVleet while at Pharoah's.  *See,* Tr. Tran., at 67-68, ECF No. 1451 (dated 11/19/2024) (Test. K.A.) (testifying that Wayne VanVleet was never interrupted while engaging in sexual activity with her in the VIP area, that he spent a lot of money at the club, and that this defendant owned the club); *see also* Tr. Tran., at 16-21, ECF No. 1469, (dated Nov. 18, 2024) (Test. E.H.) (describing a dancer who was inebriated and overdosing on heroin and that the defendant gave the dancer cocaine and told E.H., "I can – I help the girls if they need to work.") .  Wayne VanVleet, a constant VIP customer who spent a large amount of money at PGC, would use force to hold dancers in place on his erect penis and then grind on them until he ejaculated on himself, all while bouncers were paid and looked the other way.  *See, generally*, testimony of K.A. (ECF No. 1451), Al. A (ECF No. 1453), and C.H. (ECF No. 1461).

[103]    Wayne VanVleet, a constant VIP customer who spent a large amount of money at PGC, would use force to hold dancers in place on his erect penis and then grind on them until he ejaculated on himself, all while bouncers were paid and looked the other way.  *See, e.g.*, ECF No. 1451 (dated Nov. 18, 2024) (Test. K.A.); ECF No. 1453 (dated Nov. 19, 2024) (Test. Al. A); ECF No. 1461 (dated Nov. 21, 2024) (Test. C.H.).

[104]    *See* Tr. Tran., at 78, ECF No. 1441, (dated Dec. 16, 2024) (Test. L.L.).

[105]    *Id.* at 79.

[106]    *Id.* at 80.

On another occasion, L.L. was beginning to experience withdrawal at the bar in Pharoah's.[107]  The defendant talked with her and invited her to go upstairs, noting that she would get something out of it.[108]  L.L. understood the defendant to mean that she would either get drugs or money so that she purchase drugs.[109]  When she entered the upstairs area, the defendant "pulled out the bag of coke, and [she and the defendant] each did some."[110]  "And then [the defendant] pulled down his pants."[111]  *Id.*

The defendant was silent as his erect penis came into L.L.'s view.[112]  And there was "no question" in L.L.'s mind what the defendant expected her to do.[113]  L.L.—still going through withdrawal and in her boss's lair—told the jury that she "really couldn't say no. There was not one — not even one willpower in me to say no."[114]

L.L. engaged in sex acts—including oral, vaginal, and anal sex—with approximately 500 men in Pharoah's VIP or champagne rooms.[115]  Of those men, several would inform her that they were friends of the defendant's, which for L.L. "meant he knows the big boss, so he thinks he can get anything from" her.[116]  The defendant also had sex with L.L. repeatedly and

---

[107]    *See id.* at 92.

[108]    *See id.* at 92–93.

[109]    *See id.* at 93.

[110]    *Id.* at 94.

[111]    *Id.*

[112]    *See id.*

[113]    *See id.*

[114]    *Id.* at 95.

[115]    *Id.* at 23.

[116]    *Id.* at 28.

shared her with another person approximately 25 times.[117]  Each time, the defendant would supply drugs that L.L. would consume and then demand a "special favor" that would include oral, vaginal, or anal sex, depending on the defendant's desires.[118]  The defendant also made his upstairs area available for members of his inner-circle to take advantage of L.L.'s drug addiction in exchange for sex, including the Pharaoh's DJ, the defendant's friends, the defendant's brother other David Gerace, and others.[119]

The defendant proudly admitted that he knew exactly how he was  coercing drug-addicted women to engage in commercial sex with himself and others, as he bragged in jail to another witness, "you'd be surprised what they'll do for a little bit of product."[120]  L.L. continues to struggle with her addiction "every day."[121]

Consistent with the expert testimony of Rebecca Bender, and the myriad dancers the defendant and others victimized, Katrina Nigro, who was a fixture at Pharaoh's between roughly 2009 and 2017, and who dated and was purportedly married to the defendant, detailed the way the business-model and the defendant's actions victimized dancers and coerced them to engage in commercial sex acts.  Nigro confirmed that many of the Pharaoh's dancers were addicted to drugs, and that their addictions were worsened and were part of the

---

[117]    *See id.* at 97.

[118]    *See id.*

[119]    *Id.* at 52–53 (describing getting drugs from the defendant's brother David and friend Aaron in exchange for sex); 88 (describing going upstairs to engage in sex acts sometimes alone, and other times with other dancers); 90–97 (describing that the defendant has brought her upstairs with other dug addicted dancers for threesomes); 107 (describing when she went upstairs to have sex with one of the defendant's friends or his brother, "[t]he defendant would give them the key."); 110–118 (describing details of repeated drug induced coerced sex acts with the defendant's brother, friend, and the Pharaoh's DJ in the upstairs controlled by the defendant).

[120]  Tr. Tran., at 11–12, ECF No. 1513, (dated Dec. 10, 2024) (Test. K.H.).

[121]  Tr. Tran., at 293, ECF No. 1441, (dated Dec. 16, 2024) (Test. L.L.).

way the defendant operated the club. Additionally, Nigro confirmed that the defendant ultimately controlled dancers' ability to work and make money on stage.[122] Nigro further confirmed that in the downstairs VIP area, which the defendant called "the bank,"[123] Nigro observed dancers engaging in vaginal sex, oral sex, and giving men "hand jobs."[124] In the upstairs, men who were close with the defendant were given even more privacy to engage in commercial sex acts with drug addicted dancers.[125] At times, the defendant provided access to the upstairs, or had Nigro unlocked the door, so that prominent friends of the defendant, including former New York State Supreme Court Judge John Michalski, could engage in sex acts with Pharaoh's dancers, like Shelby.[126]

Nigro regularly observed Pharaoh's dancers going upstairs—to the area controlled by the defendant—and she described the intersection between the defendant's cocaine distribution and the sex acts that occurred in the upstairs, and she observed clear evidence that dancers were engage in sex acts with the defendant's friends (*i.e.,* used condoms, smelled odors [consistent with sex], lines and residue [of cocaine], used tissues and towels, and signs that the shower had been used).[127] On one occasion, Nigro went upstairs and observed Crystal Quinn doing a line of cocaine off of the defendant's penis.[128] In addition to Judge Michalski, Nigro was also directed by the defendant to unlock the door to the upstairs for other personal

---

[122]    Tr. Tran., at 123-24, ECF No. 1600 (dated Nov. 27, 2024) (Test. Nigro).

[123]    Tr. Tran., at 47, ECF No. 1379 (Nov. 13, 2024) (Test. A.B.).

[124]    Tr. Tran., at 110, ECF No. 1600 (dated Nov. 27, 2024) (Test. Nigro).

[125]    *Id.* at 6 (describing that the defendant hosted parties in the upstairs).

[126]    *Id.* at 56–62.

[127]    *Id.* at 59–62, 140.

[128]    *Id.* at 61–62.

friends of the defendant [to engage in sex acts with dancers].[129]  Those included popular and famous people, such as local professional athletes, an actor, a judge, and attorneys.[130]  One such VIP, liquor distributor Aaron LaMarca, also went upstairs at PGC with a dancer with the stage-name "Gabby".[131,132]  Nigro observed LaMarca going upstairs with a dancer about twice per week – and estimated it probably occurred at least 20 times over the course of years.[133]  The defendant's cocaine parties in the upstairs would include "four or five girls . . . cocaine on body parts . . . a rotating cycle with the ladies . . . it would go on for days," with the defendant distributing the cocaine to keep the party going.[134]

In sum, the evidence established, and the jury was permitted to rationally conclude, that the defendant set up and staffed a business model wherein there was the illusion of choice, but in reality coerced dancers who the defendant and others used for their sexual benefit and profit.   For the drug-addicted dancers that the defendant pumped full of, manipulated, and controlled with drugs, and whose financial future and employment the defendant had power over, there was no choice.  The evidence established that the dancers operating under the defendant's control at Pharaoh's were desperate due to their severe addictions and their unique vulnerabilities and station in life, and in the state where they would do literally anything to avoid being sick, or to lose their job, they were coerced.

---

[129]     *Id.* at 62–63.

[130]     *Id.* at 63–64.

[131]     *Id.* at 89 – 90.

[132]     L.L.'s dancer name was Gabriella or "Gabby."

[133]     *Id.* at 90–91.

[134]     *Id.* at 97-98.

### 3. The Defendant's Corrupt Relationship and Protection by Former DEA Special Agent Joseph Bongiovanni

The defendant and DEA Special Agent Joseph Bongiovanni were close friends long before Bongiovanni ever became a law enforcement officer or a DEA agent.[135] After Bongiovanni commenced his career with the DEA, he moved to Florida and, after a few years, returned to Buffalo, New York.[136]  Once Bongiovanni returned to Buffalo, he reconnected with many of the friends he had before he became a DEA agent, including the defendant.[137]

The defendant was on U.S. Probation supervision because of a federal felony conviction.[138]  Notwithstanding Bongiovanni's status as a DEA agent, Bongiovanni and the defendant were so close that they would go to dinner and on double-dates together.[139] Bongiovanni was loyal to the defendant—owing to their longstanding friendship and Bongiovanni's respect for the defendant's family lineage.[140]

---

[135]     Tr. Tran., at 5, 19-20, ECF No. 1517, (dated 12/11/2024) (Test. Selva); *see also* Tr. Tran., at 146, ECF No. 1600, (dated 11/27/2024) (Test. Nigro) (describing Bongiovanni as "Longtime friends. Very close.").

[136]     Tr. Tran., at 13, ECF No. 1519, (dated 12/13/2024) (Test. Selva).

[137]     *Id.* at 33-34 (describing going to Gerace's club, Pharaoh's, with Bongiovanni on two occasions around 2013 or 2014); *see also*  Tr. Tran., at 15, ECF No. 1497 (dated Nov. 7, 2024) (Test. M.U.) (describing that Bongiovanni felt conflicted between his job [as a DEA agent] and friends, including Gerace, that he had known his whole life); Tr. Tran., at 146-48, ECF No. 1600, (dated 11/27/2024) (Test. Nigro) (explaining that Gerace and Bongiovanni socialized at various places, including bars, and that Bongiovanni has been to Pharaoh's).

[138]     Tr. Tran., ECF No. 1499 (dated Nov. 7, 2024) (Test. Lepiane).

[139]     Tr. Tran., at 10-15, ECF No. 1497 (dated Nov. 7, 2024) (Test. M.U.); *see also* Gov. Exs. 426-1, 426-2.

[140]     Tr. Tran., at 15, ECF No. 1497 (dated Nov. 7, 2024) (Test. M.U.) (describing that Bongiovanni felt conflicted between his job [as a DEA agent] and friends, including Gerace, that he had known his whole life); *see also*  Tr. Tran., at 21, 135 ECF No. 1519, (dated 12/13/2024) (Test. Selva) (describing Bongiovanni's loyalty to his friends and that Bongiovanni discussed the concept of loyalty as including "having someone's back"; and that Bongiovanni respected reputed Italian Organized Crime members); Tr. Tran., at 25, 28 ECF No. 1517, (dated 12/11/2024) (Test. Selva) (describing that Bongiovanni was respectful around reputed

In or about 2005, Bongiovanni demonstrated his willingness to corruptly violate his oath and duty as a DEA agent for the defendant's benefit.[141]  Specifically, Bongiovanni was a member of a search team that executed a search warrant at Craig Border's residence and during the search he came across personal intimate photos that Border had of R.A., a Pharaoh's dancer who was dating the defendant.[142]  Contrary to Bongiovanni's oath and duty, which required him to maintain the confidentiality and integrity of law enforcement sensitive information to which he was privy by virtue of his participation in the search warrant, Bongiovanni shared R.A.'s intimate photos with the defendant, which led to the defendant confronting R.A. about the photos located inside Craig Border's residence.  Particularly, the defendant told R.A. "my friend Joe is a DEA agent, and saw your photo in [Border's] house," and that the defendant saw the photos.[143]

To the defendant, who was involved in significant cocaine distribution and use, both inside Pharaoh's and beyond its walls, Bongiovanni, a corrupt DEA agent, was a valuable commodity.  The defendant was so confident in Bongiovanni's protection that he handed out Bongiovanni's DEA business card to A.P., another on-again-off-again Pharoah's employee whom the defendant dated and who used and distributed cocaine.[144]  The defendant's

---

organized crime figures and that Gerace's grandfather was the reputed leader of IOC in Buffalo).

[141]    Tr. Tran., at 16-19, ECF No. 1507, (dated Nov. 21, 2024) (Test. Miller) (describing DEA agent duty to treat information from search warrants as law enforcement sensitive and that it is impermissible to share such information with friends or members of the public); *see also* Gov. 11A (Bongiovanni was DEA agent at the search of Craig border's residence on December 1, 2005).

[142]    *Id.*; *see also* Tr. Tran., ECF Nos. 1510 and 1512 (Test. R.A.); Tr. Tran., ECF No. 1509 (Test. Border).

[143]    Tr. Tran., at 10, 13-16, 17:18-19, 28:21-23  ECF No. 1510 (dated Dec. 6, 2024) (Test. R.A.)

[144]    A.P. worked at Pharaoh's from approximately 2007 to 2013. *See id.* at 30:10-12.

instructions to A.P. were clear: she could use Bongiovanni's business card to get out of trouble.[145]

Next, in December 2008, when the defendant's drug activity crept onto the radar of other federal agents, Bongiovanni injected himself into the investigation to protect the defendant. Specifically, DEA Special Agent (SA) Christpher Wisniewski was a lead case agent investigating a drug organization headed by an individual named David Gambino, which was a drug organization that had a suspected nexus to IOC.[146] SA Wisniewski was relatively far along into the investigation when another agent he was working with on the investigation, Homeland Security Investigations (HSI) SA TJ Webb, brought information to Wisniewski's attention inside the DEA office that indicated that the defendant's name was coming up in the Gambino investigation.[147] Bongiovanni, who was not involved in the investigation, overheard SA Wisniewski and SA Webb discussing an organizational chart that SA Webb obtained that linked the defendant to cross-border drug activity.[148] After he overheard the conversation regarding the defendant's link to the Gambino investigation, Bongiovanni, unprompted, approached SA Wisniewski after Webb left the area.[149] During the ensuing Bongiovanni-initiated discussion, Bongiovanni concealed the true nature and extent of his relationship with the defendant from SA Wisniewski, and stated that he knew

---

[145]    Tr. Tran., at 1–25, 40–41, ECF No. 1364, (dated Nov. 7, 2024) (Test. A.P.); *id.* at 25.

[146]    Tr. Tran. at 10–13., ECF No. 1498, (dated Nov. 7, 2024) (Test. Wisniewski).

[147]    *Id.* at 13–17, 24–29 (describing an organizational chart TJ Webb discussed with Wisniewski at the DEA office, which included Peter Gerace's name on the chart).

[148]    *Id.* at 17.

[149]    *Id.* at 17–18.

the defendant from the "old neighborhood" and he could "cold approach"[150] the defendant
to see if he would cooperate in SA Wisniewski's investigation.[151]

Based upon Bongiovanni's misrepresentations, SA Wisniewski agreed to allow
Bongiovanni "cold approach" the defendant.[152]  Because Bongiovanni never informed SA
Wisniewski of the true nature and extent of his relationship with the defendant, Bongiovanni
fraudulently induced SA Wisniewski into permitting him to "cold approach" the defendant,
which effectively enabled Bongiovanni to warn the defendant that his name was coming up
in SA Wisniewski's Gambino investigation.[153]  Ultimately, Bongiovanni reported back to SA
Wisniewski that the defendant was not going to cooperate with the DEA and, with that, the
defendant was notified his name had come up in connection with the Gambino case, and did
not cooperate with the DEA and was not further investigated by Bongiovanni or the DEA.[154]

Less than a year later, Bongiovanni intervened in a second investigation targeting the
defendant.  On October 31, 2009, the U.S. Probation Office for the Western District of New
York ("USPO") conducted a search of Pharoah's based upon investigation and information
provided by the FBI that the defendant was involved in drug distribution.[155]  USPO had

---

[150]    A cold approach involves asking someone if they want to cooperate with an ongoing
investigation without first charging them with a crime.  In terms of investigative techniques, the tactic is risky:
if the individual declines to cooperate, the cold approach can burn the investigation by alerting the individual to
the investigation's existence and their status as a subject or target in it.  *See id.* at 18.

[151]    *Id.* at 17–19.

[152]    *Id.* at 29–30.

[153]    *Id.* at 30–31 (Bongiovanni did not disclose that he had been lifelong friends with Gerace and
that they double dated, texted, and vacationed together, which would have raised red flags for SA Wisniewski
about Bongiovanni doing a cold approach).

[154]    *Id.* at 31; *see also* Gov. Ex. 30B.

[155]    *See* Tr. Tran., at 12–21, ECF No. 1499 (dated Nov. 7, 2024) (Test. Lepiane).

jurisdiction to effectuate the search because the defendant was on supervised release.[156]  After the search, the defendant was drug-tested and tested positive for cocaine.[157]  The defendant subsequently called Bongiovanni who, according to Lou Selva, "stepped in" for the defendant to help him.[158]

Specifically, the Bongiovanni called U.S. Probation Officer Peter Lepiane and falsely stated that the defendant "had been a confidential source of information for [Bongiovanni] in the past" and that the defendant wanted to cooperate with the DEA, "to potentially lessen[]" his exposure with USPO based upon his pending probation violation.[159]  Bongiovanni repeated the substance of these claims in a November 6, 2009 DEA-6 report he authored in the same Matthew Scalia/CS-06-0120 file in which SA Wisniewski had been investigating David Gambino, as described above. [160]  Unlike what the Bongiovanni told SA Wisniewski about the defendant—that is, that the defendant would not help them with their investigation—Bongiovanni stated in his November 6, 2009 DEA-6 report that the defendant "ha[d] acted as a confidential source and has been able to provide information regarding individuals in this case file and other narcotic[s] investigation[s] in the past."[161]  SA Wisniewski, who reviewed Exhibit 30A on the witness stand, testified the statement authored by Bongiovanni regarding the defendant's cooperation in the [Gambino] investigation was

---

[156]   *Id.*

[157]   *Id.* at 22.

[158]   *See* Tr. Tran., at 41, 59–60, ECF No. 1519, (dated Dec. 13, 2024) (Test. Selva); *see also* Gov. Ex. 30A.

[159]   *See* Tr. Tran., at 22–23, ECF No. 1499 (dated Nov. 7, 2024) (Test. Lepiane).

[160]   *See* Gov. Ex. 30A at 1.

[161]   *Id.* at 1.

false.[162] Bongiovanni also indicated in the November 6, 2009 DEA-6 report that the defendant had information about substantial cocaine dealers he would be willing to share for consideration on his pending supervised release violation.[163]

When Bongiovanni submitted the November 6, 2009 DEA-6 report for his supervisor, Dale Kasprzyk's, approval, he again concealed and never disclosed the closeness of his relationship with the defendant.[164] Had he done so, Kasprzyk would not have permitted the defendant to deal or interface with the defendant or work on any matters pertaining to the defendant.[165] Nevertheless, based upon the defendant's false and misleading representations, Kasprzyk directed Bongiovanni to arrange for the defendant to be interviewed by the FBI, the agency that provided USPO the initial information that led to the Pharaoh's probation search and the defendant's supervised release violation.[166] Based upon the report Bongiovanni wrote, and discussions Kasprzyk had with Bongiovanni, Kasprzyk expected either that Bongiovanni would facilitate the defendant's cooperation or, if the defendant did not want to cooperate, because the defendant was connected to kilogram-level cocaine trafficking, that

---

[162]     Tr. Tran., at 40–41, ECF No. 1498 (dated Nov. 7, 2024) (Test. Wisniewski).

[163]     Gov. Ex. 30A at 2.

[164]     Tr. Tran., at 7, ECF No. 1501, (dated Nov. 12, 2024) (Test. Kasprzyk) (testifying that Kasprzyk now believes that Bongiovanni concealed information about Gerace and misled Kasprzyk, who was Bongiovanni's supervisor at the time); *compare* Gov. Ex. 30A, *with* Gov. Ex. 30B.

[165]     Tr. Tran., at 20–32, 47, ECF No. 1500, (dated Nov. 7, 2024) (Test. Kasprzyk)

[166]     *Id.* at 53–55.

Bongiovanni would investigate the defendant—none of which occurred.[167] Kasprzyk never heard from Bongiovanni again regarding the defendant.[168]

Meanwhile, to maintain the façade and to keep up appearances, Bongiovanni arranged a meeting to discuss the defendant with FBI Special Agent Thomas Herbst, who had been at the October 31, 2009, probation search at Pharaoh's where he met the defendant, and was spearheading a narcotics investigation into the defendant that he hoped would result in the defendant's cooperation in a larger investigation into Italian Organized Crime in Buffalo.[169] Bongiovanni called SA Herbst and scheduled a meeting between Bongiovanni, the defendant and SA Herbst meeting.[170]  Bongiovanni specifically advised SA Herbst not to bring his partner, and Bongiovanni's conduct left SA Herbst with the indelible impression that the defendant was, in fact, Bongiovanni's confidential source.[171]  Once at the meeting, Bongiovanni described the defendant as a "good guy," and the meeting was so lacking in substance and meaning, and the defendant's conduct so secretive, that SA Herbst concluded that that the defendant was the defendant's confidential source.[172]

Moreover, Bongiovanni extracted details form SA Herbst regarding the substance of his investigation into the defendant and, in an effort to dissuade SA Herbst from pursuing the defendant, offered his opinion that nobody at the U.S. Attorney's Office would be willing to

---

[167]    *Id.* at 55; *see also* Gov. Ex. 30A.

[168]    *Id.* at 56–57.

[169]    *See* Tr. Tran., at 7–13, 18–19, ECF No. 1511, (dated Nov. 12, 2024) (Test. Herbst).

[170]    *Id.* at 20–21.

[171]    *Id.* at 18–23.

[172]    *Id.* at 23–26, 30.

prosecute the low-quality drug case on the defendant that the FBI had built.[173]  Though SA Herbst had secured a federal prosecutor with interest in the case, he dropped his investigation into the defendant because the DEA had proverbial territory over investigating and charging their confidential sources when they commit crimes.[174]  Nevertheless, despite Bongiovanni's verbal, written, and behavioral representation that the defendant was a DEA confidential source,  DEA Inspector Steven Miller confirmed that the defendant never served the DEA as either a confidential source or witness of any kind.[175]

While receiving the benefits of Bongiovanni's protection, drug use and distribution at Pharaoh's ran rampant.   Myriad witnesses testified about the defendant's narcotics distribution activities, at Pharaoh's and beyond, and described how the defendant used drugs—including cocaine and opiates—to control and coerce dancers to engaged in sex acts

---

[173]    *Id.* at 27–28.

[174]    *Id.* at 30 ("I did not have much time invested into the Gerace investigation. And, again, my purpose was to develop him as a cooperator in the case.  And since DEA [Bongiovanni] had indicated that they had interest in the case, I decided to move on a pursue other avenues.").

[175]    *See* Tr. Tran., at 12-13, ECF No. 1507, (dated Nov. 21, 2024) (Test. Miller); *see also* Tr. Tran., at 44, ECF No. 1501, (dated Nov. 12, 2024) (Test. Kasprzyk); Tr. Tran. at 31, ECF No. 1498, (dated Nov. 7, 2024) (Test. Wisniewski); *compare* Gov. Ex. 30B and 30A.

with him, his friends, and high paying customers, as detailed *supra*.[176]   At times, dancers overdosed.[177]

On one occasion in or about 2015, a dancer overdosed inside Pharaoh's after spending time upstairs—in the area the defendant controlled—with some of the defendant's friends.[178] Someone brought the distressed dancer to the attention of Doug Augustyniak, a bouncer and occasional manager at Pharaoh's, who called the defendant rather than 911 and asked what to do.  This protocol was consistent with the defendant's general instruction that the police should not be called.[179]   The defendant told Augustyniak, not to call 911 for the overdosing

---

[176] *See e.g.,* ECF No. 1364 (dated Nov. 7, 2024) (Test. A.P.); ECF No. 1511 (dated Nov. 12, 2024) (Test. Thomas Herbst); ECF No. 1504 (dated Nov. 12, 2024) (Test. Ziegler); ECF No. 1366 (dated Nov. 13, 2024) (Test. G.R.); ECF No. 1379, (dated Nov. 13, 2024) (Test. A.B.); ECF No. 1379, (dated Nov. 14, 2024) (Test. C.B.); ECF No. 1383, (dated Nov. 14, 2024) (Test. C.C.); ECF Nos. 1380–81 (dated Nov. 14 & 18, 2024) (Test. P.H.); ECF No. 1469, (dated Nov. 18, 2024) (Test. E.H.); ECF No. 1451, dated Nov. 18, 2024) (Test. K.A); ECF No. 1452, (dated Nov. 19, 2024) (Test. Krywalski); ECF No. 1453, (dated Nov. 19. 2024) (Test. A.A.); ECF No. 1459, (dated Nov. 20, 2024) (Test. Myszka); ECF Nos. 1455-56 (dated Nov. 19-20, 2024) (Test. R.W.); ECF No. 1460, (dated Nov. 20, 2024) (Test. A.A.); ECF No. 1518 & 1506 (dated Nov. 20-21) (Test. Casullo); ECF Nos. 1599-1602 (Test. Nigro); ECF No. 1475 (dated Dec. 6, 2024) (Test. Matthew Albert); ECF No. 1474, (dated Dec. 9, 2024) (Test. Anzalone); ECF No. 1470-71 (dated Dec. 9-10, 2024) (Test. K.L.); ECF No. 1605 (dated Dec. 10, 2024) (Test. Augustyniak); ECF No. 1440-41, (dated Dec. 13 &16, 2024) (Test. L.L.).

[177] *See* Tr. Tran., at 16–21,ECF No. 1469, (dated Nov. 18, 2024) (Test. E.H.) (describing a dancer who was inebriated and overdosing on heroin and that the defendant gave the dancer cocaine and told E.H., "I can – I help the girls if they need to work."); Tr. Tran., at 50–51, ECF No. 1441, (dated Dec. 16, 2024) (Test. L.L.) (describing nodding out from heroin use on the verge of overdose approximately 100 times inside Pharaoh's, and needing cocaine to get through her shift); Tr. Tran., at 64, ECF No. 1470, (dated Dec. 9, 2024) (Test. K.L.)  (describing observing dancers at Pharaoh's nod out "[a]ll the time" from heroin in the spring/summer of 2009); Tr. Tran., at 116-117, ECF No. 1600, (dated Nov. 27, 2024) (Test. Nigro); Tr. Tran., at 33, ECF No. 1524 (dated Dec. 13, 2024) (Test. K.M.) (Gerace said "That there was a girl that overdosed [at Pharaoh's], and he got rid of the body. Not him specifically, but he had somebody get rid of the body. Get rid of her.").

[178] *See* Tr. Tran., at 50–52, ECF No. 1605, (dated Dec. 10, 2024) (Test. Augustyniak); *see also* Tr. Tran., at 116–17, ECF No. 1600, (dated Nov. 27, 2024) (Test. Nigro) (describing two events wherein two different females overdosed on heroin in or about 2015; "Q. Okay. Was the year — was the estimated year of those two overdoses 2015? A. Yes, I was hands-on with it.").

[179] *See* Tr. Tran., at 101, ECF No. 1600, (dated Nov. 27, 2024) (Test. Nigro) (explaining that nobody was allowed to call the police and that the protocol per Gerace was to "maybe get a manager first, and then call Peter and they tell you what to do.").

dancer, but rather, to take the overdosing to a local nearby hotel and leave her in the lobby. The substance of what Augustyniak reported was generally consistent with Katrina Nigro and others who reported that dancers overdosed inside Pharaoh's and the defendant did not call the police.[180]

Augustiniak's testimony was also consistent with that of DEA Special Agent Anthony Casullo, who heard through Bongiovanni that the defendant called him about an overdose.[181] By way of background, in 2016, SA Casullo moved back to Buffalo and opened an investigation into the defendant.[182] As an initial step, SA Casullo subpoenaed the defendant's telephone records, which revealed that Bongiovanni had been in telephonic contact with the defendant.[183] Bongiovanni soon found out that SA Casullo had subpoenaed the defendant's toll records and was starting down the path of investigating the defendant.[184] These circumstances led to a heated exchange between SA Casullo and Bongiovanni which made it clear to SA Casullo that Bongiovanni did not want him to investigate the defendant.[185]

---

[180]     *See, e.g.* Tr. Tran., at 101, ECF No. 1600 (dated Nov. 27, 2024) (Test. Nigro) (testifying that the general rule was that nobody at Pharaoh's was allowed to call the police, and that the protocol was to "[m]aybe get a manager first, and then call Peter and they tell you what to do."); *see also* Tr. Tran., at 28–30, 55, ECF No. 1469, (dated Nov. 18, 2024) (Test. E.H.) (describing how a patron at Pharaoh's ejaculated on her during a lap dance and she was not permitted to call the police).

[181]     *See* Tr. Tran., at 4–7, ECF No. 1506 (dated Nov. 21, 2024) (Test. Casullo) (describing June 2016 conversation with Bongiovanni inside the DEA conference room wherein Bongiovanni admitted, in part, "that that kid called me, referring to Gerace, when a stripper overdosed in his club and [Bongiovanni] told [Gerace] … [t]o get her out of the club.").

[182]     *See* Tr. Tran., at 30-31, 34, ECF No. 1518 (dated Nov. 20, 2024) (Test. Casullo).

[183]     *Id.* at 30–41 (describing what tolls are and that when SA Casullo subpoenaed Gerace's toll records he learned that Bongiovanni was in telephonic communication with Gerace).

[184]     Tr. Tran., at 2–3, ECF No. 1506, (dated Nov. 21, 2024) (Test. Casullo).

[185]     *Id.* at 3–16.

SA Casullo initiated the conversation, which occurred inside the DEA office in a private conference room, by attempting to mollify Bongiovanni. SA Casullo told Bongiovanni that he was not "trying to get [him] in trouble."[186] But Bongiovanni, irate, exclaimed: "This is bullshit!"[187] And then he continued: "That kid [i.e., the defendant] called me when a stripper overdosed in the club, I told him to get her out of the club."[188] Bongiovanni then pivoted and asked SA Casullo to confirm that the defendant was "friends with [his] brother-in-law," Phil Domiano.[189] SA Casullo readily acknowledged that the defendant and Domiano were friends—and that his "brother-in-law ha[d] caused [him] and [his] family a lot of problems in the past."[190] Then Bongiovanni lowered his voice and asked, accusatorily, if SA Casullo "hated Italians?" Special Agent Casullo, who is also of Italian descent, said "no" that he did not hate Italians, and further understood that Bongiovanni was making such comments because Bongiovanni did not want SA Casullo to investigate the defendant, who is Italian, or other Italians.[191] And then Bongiovanni declared, in a lower tone of voice, that "[w]e should be investigating N*****s and S***s," using racial slurs for black and Hispanic people.[192] SA Casullo responded that DEA should be investigating all criminals.

---

[186]    *Id.* at 5.

[187]    *Id.* at 6.

[188]    *Id.* at 6–8, 10.

[189]    *Id.* at 10.

[190]    *Id.* at 10–11.

[191]    *Id.* at 11–12.

[192]    *Id.* at 13.

Nevertheless, the defendant's conduct shocked SA Casullo, and successfully stifled SA Casullo's desire to further investigate the defendant for several years—until years later when SA Casullo learned of the U.S. Attorney's Office's investigation into the defendant and attended a proffer.[193]

Meanwhile, learning of SA Casullo's investigation into the defendant in the summer of 2016 neither deterred Bongiovanni from associating with the defendant[194] nor discussing law enforcement material with the defendant, on an as needed basis, at the defendant's request approximately 11 months later.   Specifically, on May 4, 2017, the defendant left for Bongiovanni a voice memo on his phone asking about law enforcement's ability to "ping" Trac Fones that "drug dealers" use.[195]   Trac Fones, often referred to as burner phones, are regularly used by drug dealers to thwart law enforcement's attempts to investigate drug activity.[196]   After receiving the voice message, Bongiovanni responded by text and advised the defendant that police can ping a Trac Phone but would need a warrant.[197]   Law enforcement's ability to ping certain phones, including Trac Fones that many drug dealers may believe are untraceable, is a sensitive technique that members of law enforcement are not supposed to openly share with members of the public.

---

[193]     *Id.* at 14–21, 28–36.

[194]     *See* Tr. Tran., at 33–34, 41–52, ECF No. 1380, (dated Nov. 14, 2024) (Test. P.H.) (describing Gerace and Bongiovanni socializing and using cocaine together at a cottage in the summer of 2018); *see also* Gov. Ex. 127 (2018 photo depicted Bongiovanni and Gerace together at a cottage); Gov. Ex. 310D at 69–70 (Bongiovanni and Gerace discussing meeting up earlier in the day before they were together at Sunset Bay); Tr. Tran., at 134–35, ECF No. 1603 (dated Nov. 25, 2024) (Test. Ryan).

[195]     *See* Gov. Ex. 311.

[196]     *See* Tr. Tran., at 118–24, ECF No. 1603, (dated Nov. 25, 2024) (Test. Ryan).

[197]     *Id.; see also* Gov. Ex. 310D at 42.

After the events of 2005, 2008, and 2009, but before the events of June 2016 and May 4, 2017, as described above, the jury heard testimony that the defendant paid Bongiovanni in envelopes of cash. Katrina Nigro testified that—from the beginning of her time speaking with law enforcement regarding the defendant—she has consistently maintained that the defendant gave Bongiovanni money.[198] In particular, and as corroborated by text messages between Bongiovanni and the defendant,[199] Ms. Nigro attended Bongiovanni's birthday party dinner with the defendant at Boss Restaurant on Hertel Avenue on July 18, 2015.[200] The defendant prepared for the dinner by taking cash out of the safe in the office at Pharaoh's, getting a birthday card, and then putting cash into an envelope with a birthday card.[201] Ms. Nigro saw the defendant put the cash into the birthday card, and the defendant told Ms. Nigro the amount of cash in the card was $5,000.[202] At the restaurant, Ms. Nigro observed the defendant hand Bongiovanni the birthday card envelope that contained the cash.[203] Ms. Nigro further explained that Bongiovanni never had any official role working at Pharaoh's, but there were times when the defendant instructed her to give Bongiovanni envelopes of cash, which Ms. Nigro described as "two to three times that I can truly recollect."[204] Ms. Nigro *estimated* that

---

[198]   *See* Tr. Tran., at 40–41, ECF No. 1602, (dated Dec. 6, 2024) (Test. Katrina Nigro) (testifying that she has consistently maintained that Gerace gave money to both DEA SA Bongiovanni and New York State Supreme Court Judge John Michalski).

[199]   *See* Gov. Ex. 310D at 13–17

[200]   Tr. Tran., at 148, ECF No. 1600, (dated 11/27/2024) (Test. Nigro)

[201]   *Id.* at 151–54.

[202]   *Id.* at 154–55, 165 ("He [Gerace] said he was giving [Bongiovanni] $5,000).

[203]   *Id.* at 167–68.

[204]   *Id.* at 169.

these other occasions wherein she provided cash envelopes to Bongiovanni at the defendant's instruction occurred approximately six months before the aforementioned birthday dinner.[205]

Ms. Nigro detailed the other occasions wherein she provided envelopes of cash at the defendant's direction to Bongiovanni at Pharaoh's, as follows:

Q.    Describe the circumstances in the instances where you were directed by the defendant to give Bongiovanni an envelope with cash in it; do you understand my question?

A.    You said describe the incident?

Q.    Describe the circumstances. So how would it work?

A.    When Peter wasn't in the building and I was in the office, he told me to run an envelope out to him, and we just met at the door.

Q.    What door would you meet Bongiovanni at?

A.    The side office -- door near the office.

Q.    Is that a door that would be characterized by you as the employee entrance?

A.    Yeah. Usually the employees went through the front door, but I guess management and stuff would go in the side.

Q.    Is that door closer to Aero Drive?

A.    Yes.

Q.    At that point in time, the door area where the exchange was made, were there cameras at that location on those –

A.    No.[206]

---

[205]    *Id.* at 169–170.

[206]    *Id.* at 170; *see also* Gov. Ex. 310D at 10 (corroborating Nigro regarding Bongiovanni's use of the entrance on Aero drive used by managers when on July 13, 2015, the defendant directed Bongiovanni to use the "employee ent on Aero" when Bongiovanni arrived to meet the defendant at Pharaoh's).

Ms. Nigro had handled many envelopes of cash at Pharoah's and believed the envelopes the defendant directed her to provide Bongiovanni contained cash.[207]  At no time while she was associated with Pharoah's, or purportedly married to the defendant, did any federal law enforcement shut down Pharoah's, and neither the DEA nor Bongiovanni ever arrested the defendant.[208]  Furthermore, Ms. Nigro testified that the first envelope that the defendant instructed Ms. Nigro to provide an envelope of cash was *the same year* (*i.e.*, 2015) as the overdoses of two Pharoah's dancers that Ms. Nigro detailed during her testimony.[209]  Similar to how Ms. Nigro's testimony corroborated Augustyniak's testimony regarding the fact that dancers overdosed at Pharoah's, Augustyniak's testimony generally corroborated that the defendant had a practice of paying people using envelopes of cash.[210]

As detailed above, SA Casullo aborted his June 2016 investigation into the defendant following Bongiovanni's comments in the DEA conference room.  However, on or about July 20, 2018, the defendant's corrupt relationship with Bongiovanni began to come into focus.  During a proffer interview of Ron Serio on July 20, 2018, members of law enforcement, who

---

[207]    Tr. Tran., at 1170–71, ECF No. 1600, (dated 11/27/2024) (Test. Nigro).

[208]    *Id.* at 171, 173–74.

[209]    *Id.* at 116–17 ("Q. Okay. Was the year -- was the estimated year of those two overdoses 2015? A. Yes, I was hands-on with it."), 173 ("Q. We've been talking in time estimates, so I want to ask a very specific question. In terms of the first envelope you were directed by the  defendant to provide Mr. Bongiovanni, was it the same approximate year as those activities with Brittany and Fiona? A. Yeah, it was.").

[210]    Tr. Tran., at 44–47, ECF No. 1605, (dated Dec. 10, 2024) (Test. Augustyniak) (testifying that on three or four occasions the defendant instructed Augustyniak provide white envelopes to people who showed up at the club begrudgingly acknowledging what was contained  in the envelopes "could be, yes," consistent with cash).

included SA Casullo and HSI Special Agent Curtis Ryan heard comments that linked Bongiovanni to the corrupt protection of the defendant.[211]

By the Fall of 2018, Bongiovanni knew his relationship with the defendant had fallen under scrutiny.  At that point, as he did throughout his protection of the defendant, Bongiovanni continued to minimize the true nature of his relationship with the defendant to conceal their decade long scheme.[212]  Bongiovanni did so by, among other things, writing false DEA memoranda designed to minimize and conceal the decade's long conspiratorial relationship he maintained with the defendant.  In that vein, Bongiovanni wrote memoranda on November 1, 2018, December 10, 2018, and January 28, 2019, wherein he made false and misleading statements to conceal the true nature and extent of his relationship with the defendant and to attempt deflect attention to another DEA agent, SA Casullo, to dissuade

---

[211]    Tr. Tran., at 11–20, ECF No. 1603, (date Nov. 25, 2024) (Test. Ryan) (describing July 20, 2018, proffer of Ron Serio, Ron Serio's mention of Joseph Bongiovanni during the proffer, the need to compartmentalize the investigation so as to ensure Bongiovanni would not be alerted, that the information was limited to individuals with a need to know, and how Serio's disclosures on July 20, 2018, precipitated Casullo's disclosure of the heated June 2016 conference room discussion Casullo had with Bongiovanni about Gerace); *see also* Tr. Tran., at 34–37, ECF No. 1506, (dated Nov. 21, 2024) (Test. Casullo) (describing his attendance at the July 20, 2018, Serio proffer and his August 1, 2018, disclosure of his conversation in the DEA conference room with Bongiovanni in 2016).

[212]    Tr. Tran., at 34, ECF No. 1508, (dated Nov. 21, 2024) (Test. Carpenter) (by November 1, 2018, Bongiovanni had been alerted that his relationship with Gerace had fallen under scrutiny [by members of federal law enforcement]); *see* Gov. Ex. 98 (DEA Memorandum authored by Bongiovanni November 1, 2028); ECF No. 1350 (Redacted Indictment), at Count 1, Manner and Means ¶5 ("It was part of the conspiracy that, in exchange for payments he received and in order to ingratiate himself with individuals whom he believed were members and associates of IOC, Bongiovanni utilized his position as a DEA SA to attempt to dissuade of the members of law enforcement: from conducting investigations into his coconspirators, friends, associates and individuals Bongiovanni believed to be connected to or associated with IOC, including the defendant GERACE and others; and from conducting investigations into any individuals who may have been able to expose his criminal activities and those of his friends, associates, and individuals Bongiovanni believed to be connected to or associated with IOC."); *see also id*. at Manner and Means ¶¶ 7-9, 12.

investigators from digging in and uncovering the decade-long criminal scheme between the defendant and Bongiovanni.[213]

Specifically, on November 1, 2018, Bongiovanni falsely wrote in a DEA memorandum that "any contact I have had with Gerace in the past was minimal in person contact and primarily consisted of random telephonic communication based on the fact we were childhood friends."[214] Moreover, on December 10, 2018, Bongiovanni wrote a memo in which Bongiovanni and the defendant coordinated on a false and self-serving representation in the memo, namely, wherein Bongiovanni wrote of his discussion with the defendant: "I have never come to your club. Gerace said he agrees."[215] Furthermore, on January 28, 2019, Bongiovanni falsely wrote that SA Casullo had a "friendship" and "social affiliation" with the defendant in hopes of misdirecting focus from the corrupt and longstanding relationship between the defendant and Bongiovanni to a dead-end lead that purported to focus investigators in on a non-existent a "friendship" between Casullo and the defendant.[216]

On or about February 1, 2019, which was Bongiovanni's last day at the DEA office, Bongiovanni engaged in additional obstructive behavior designed to destroy and conceal evidence that could potentially expose his decade-long scheme protecting the defendant and

---

[213]     *See* ECF No. 1350, Count 1, Overt Acts 29-31; *see also* Tr. Tran., at 23-57, ECF No. 1508, (dated Nov. 21, 2024) (Test. Carpenter); *see also* Gov. Exs. 97-99; Tr. Tran., at 148-152, ECF No. 1604, (dated Nov. 26, 2024) (Test. Ryan).

[214]     Gov. Ex. 97 at 1.

[215]     Gov. Ex. 98 at 1.

[216]     Gov. Ex. 99 at 1.

others.[217]  In particular, Bongiovanni factory reset his DEA cell phone, which he knew

through his training and experience would wipe the phone and make it impossible to retrieve

any texts or other information shared between Bongiovanni and the defendant (when also

considering he did not back anything up to the cloud), and Bongiovanni removed a box

containing DEA documents, including DARTS deconfliction notices related to the

defendant's brother, Anthony Gerace—a person who used cocaine at Pharaoh's, distributed

cocaine at Pharaoh's and to Pharaoh's clientele, and who sold marijuana to the defendant's

then-wife, Katrina Nigro.[218]  The deconfliction notices alerted Bongiovanni to the fact that

Anthony Gerace's phone number had been subpoenaed by SA Casullo, and other documents

in the box were consistent with Bongiovanni's efforts to obtain law enforcement protect

individuals he believed connected to IOC.[219]

On March 29, 2019, in an additional effort after he retired to dissuade law enforcement

from further pursuing the truth about Bongiovanni and the defendant's corrupt relationship,

Bongiovanni agreed to a voluntary interview with Special Agent David Carpenter, of the

Department of Justice's Office of the Inspector General.  During the ensuing interview,

Bongiovanni made false and misleading statements and representations regarding the true

nature and extent of his relationship with the defendant—for example, denying that they were

---

[217]    *See* ECF No. 1350, Count 1, Overt Acts 32–33; *see also* Tr. Tran., at 137–195, ECF No. 1603, (dated Nov. 25, 2024) (Test. Curtis Ryan); Tr. Tran., at 49–51, ECF No. 1508, (dated Nov. 21, 2024) (Test. David Carpenter); Tr. Tran., at 9–21, ECF No. 1495, (dated Dec. 16, 2024) (Test. Burns); Gov. Exs. 100, 100A.1, 310AT.

[218]    *See generally*, testimony of Katrina Nigro, ECF Nos. 1600 at 95–96, 1601 at 174–75, 1602 at 31; Jessica Ziegler, ECF No. 1504 at 4–16, 34; Jeffrey Anzalone, ECF No. 1474 at 24–31;  Lou Selva, ECF No. 1519 at 40-41, 60-61.

[219]    Tr. Tran., at 9-21, ECF No. 1495, (dated Dec. 16, 2024) (Test. Burns); *see also* Gov. Ex. 100A.

close friends, double-dated, or that they went on pre-planned vacations together—while Bongiovanni was a DEA Special Agent.[220]

On June 6, 2019, agents executed a federal search warrant at Bongiovanni's residence. At that time, they recovered the box of DEA documents described above,[221] and Bongiovanni made more false statements in furtherance of the conspiracy and designed to cover-up his corrupt scheme by concealing the true nature and extent of his relationship with the defendant. For example, Bongiovanni made statements and representations, which were discredited by the evidence at trial,[222] in part as follows: (i) that Bongiovanni and the defendant were not in a close personal relationship;[223] (ii) that it was a one-way relationship wherein communication always came from the defendant and Bongiovanni tried to keep the defendant at arm's length;[224] (iii) that any social encounters between Bongiovanni and the defendant were by pure chance;[225] (iv) that Bongiovanni had never reached out to the defendant to arrange a meeting;[226] (v) that Bongiovanni and the defendant did not celebrate birthdays together;[227] (vi) that Bongiovanni should not be penalized for who he grew up

---

[220]     *See* ECF No. 1350 (Redacted Ind.), Count 1, Manner and Means at ¶¶ 12, 14; *see also* Tr. Tran., at 7-36, ECF No. 1508, (dated Nov. 21, 2024) (Test. Carpenter);  Gov. Exs. 426-1, 426-2, 490A-B, 358–59, 97–99, 310D; Tr. Tran., at 33-52, ECF No. 1380, (dated Nov. 14, 2024) (Test. P.H.); Ex. 127.

[221]     *See* Gov. Exs. 100, 100A.

[222]     *See, e.g.,* Gov. Exs. 126, 127, 236A, 490A, 426-1, 426-2, 490A-B, 358–59, 310D.

[223]     Tr. Tran., at 143, ECF No. 1603, (dated Nov. 25, 2024) (Test. Ryan).

[224]     *Id.* at 143.

[225]     *Id.* at 143–44.

[226]     *Id.* at 144.

[227]     *Compare id.* at 144:–45, *with* Ex. 310D (texts regarding Bongiovanni's birthday dinner at BOSS restaurant).

with—indicating that there was minimal adult relationship with the defendant;[228] and (vii) that Bongiovanni either had never been to Pharoah's.[229] Other statements Bongiovanni made revealed his motive to downplay any association with organized crime, or the defendant's current connection to it, by offering his opinion that Italian Organized Crime was "dead" notwithstanding his further assertion that he never investigated organized crime simply because it "was outside of his wheelhouse."[230]

### 4.    The Defendant's Witness Tampering

Once the defendant's relationship with Bongiovanni attracted law enforcement scrutiny, the defendant took managing his legal liability into his own hands.  By way of background, in April 2019, P.H., the former Pharoah's dancer discussed *supra*, asked the defendant to pick her up from a home in Grand Island, New York.[231]  The defendant told P.H. that he would send his associate to pick her up.[232]  An hour later, two plainclothes Amherst Police detectives confronted P.H. as she answered the door.[233]  One of the detectives, Greg Trotter, arrested P.H. and instructed her "that if [she] knew what was good for [her], that [she'd] shut up."[234]  Trotter, one of the defendant's friends, treated P.H. like "garbage."[235]

---

[228]    *Id.* at 151.

[229]    *Id.* at 153–54.

[230]    *Id.* at 152.

[231]    Tr. Tran., at 54, ECF No. 1380, (dated Nov. 14, 2024) (Test. P.H).

[232]    *Id.* at 55.

[233]    *Id.* at 55–56.

[234]    *Id.* at 56.

[235]    *Id.* at 61.

For his part, the defendant later bragged to P.H. that he had enlisted the help of one of his "buddies" at the Amherst Police department to have her arrested.[236]

However, members of federal law enforcement learned of P.H's arrival at the Amherst Police department, where Trotter had taken her after her arrest, and asked her questions about the defendant that she answered.[237]  Three months later, in July 2019, Leyland a/k/a Charm attacked P.H. at a local bar.[238]  Leyland told P.H that she knew P.H. was talking to federal law enforcement and that she hoped P.H. was not a "snitch."[239]  Leyland then placed P.H in a headlock.[240]

---

[236]     *Id.* at 60.

[237]     *Id.* at 57–58.

[238]     *Id.* at 58–59.

[239]     *Id.* at 58–59.

[240]     *Id.*

P.H. proceeded to testify before the October 2019 Grand Jury convened in Buffalo, New York.[241]  Two weeks prior to her testimony, the defendant disclosed to P.H. that he "wasn't worried about the Feds following him or watching him because they couldn't get him on anything."[242]  Following her testimony, on November 19, 2029, P.H. received a Facebook message from Crystal Quinn.[243]  P.H. knew that the defendant was close to, and confided in, Ms. Quinn.[244]  The message, admitted into evidence as Government's Exhibit 452, is reproduced as follows:





_____

[241]    Tr. Tran., at 11–12, ECF No. 1381 (dated Nov. 18, 2024) (Test. P.H.).

[242]    *Id.*

[243]    *See* Gov. Ex. 452.

[244]    Tr. Tran., at 15, ECF No. 1381 (dated Nov. 18, 2024) (Test. P.H.).

P.H. knew the term "Narc" to be synonymous with "rat" or "snitch".[245]  Although P.H. had previously had disagreements with Ms. Quinn, this was the first time that Ms. Quinn had ever referred to P.H. as a "snitch", a "rat", or a "narc".[246]  P.H. knew the defendant and Ms. Quinn to have connections to members of motorcycle clubs that she perceived as populated by dangerous people.[247]

C.C., a former Pharoah's employee and then-fiancé of the defendant, was present the night that Ms. Quinn sent P.H. the threatening Facebook message.[248]  C.C. was friends with Ms. Quinn and had met her through the defendant.[249]  Echoing P.H., C.C. also knew that the defendant was close to Ms. Quinn and confided in her.[250]  On the night of November 19th, C.C. was present with Ms. Quinn and the defendant in the basement of the defendant's residence, where the three consumed cocaine and alcohol.[251]  The defendant distributed between one and two "eightballs" of cocaine, or between 3.5 and 7 grams, which C.C. explained was "a lot" for three people.[252]

During the trio's cocaine binge, the defendant discussed P.H's cooperation with law enforcement referring to her as "a rat or a narc."[253]  C.C. specifically recalled the defendant

---

[245] *Id.* at 20.

[246] *Id.* at 21.

[247] *Id.* at 24–25.

[248] Tr. Tran., at 69, ECF No. 1383 (dated Nov. 14, 2024) (Test. C.C.).

[249] *Id.* at 68.

[250] *Id.* at 69.

[251] *Id.* at 69.

[252] *Id.* at 69.

[253] *Id.* at 70.

referring to P.H. as a "snitch bitch."[254]  At that point, the defendant's voice was elevated, and

he and Ms. Quinn were "revving each other up," with the defendant encouraging Ms. Quinn's

anger toward P.H.[255]  While the three were all together in the defendant's basement, Ms.

Quinn took C.C.'s phone and used C.C.'s Facebook account to contact and threaten P.H.[256]

Following the threatening Facebook messaging, in October 2020, the defendant sued

P.H. for "lying to the FBI about him [the defendant]."[257]  P.H. believed that the defendant

was suing her because she was talking to federal law enforcement, and he wanted her to

stop.[258]  The pattern of conduct aimed at preventing P.H. from providing information about

the defendant made her fearful for her life.[259]

## C.    Non-Evidentiary Trial and Post-Trial Issues

### 1.    The Defense's Closing and the Government's Rebuttal

On December 18, 2024, and in anticipation of closing arguments scheduled the

following day, the government filed a letter "to assist the Court in evaluating the proper

bounds of rebuttal summation in the event the defendant makes arguments pertaining to

witnesses who did not testify."  Rebuttal Summ. Ltr., at 1, ECF No. 1413, (dated Dec. 18,

2024).  In the letter, the government noted that

> It is well-settled that when a defendant argues to the jury that by not
> calling certain witnesses the prosecutor had effectively concealed from
> the jury evidence that would have been favorable to the defense, the
> prosecutor is "entitled to point out in response that the defendant 'also
> has a . . . right to call witnesses if he wants to.'" *United States v. Drescher*,

---

[254] *Id.* at 70.

[255] *Id.* at 71.

[256] *Id.* at 71–72.

[257] Tr. Tran., at 26–27, ECF No. 1381 (dated Nov. 18, 2024) (Test. P.H.).

[258] *Id.* at 27

[259] *Id.* at 28.

77 F. App'x 45, 47–48 (2d Cir. 2003) (quoting *United States v. Panza*, 750
F.2d 1141, 1153 (2d Cir.1984)).

*Id.* at 1.

The government further noted that it had previously briefed this issue pre-trial and observed that the "defendant never responded to the government's briefing or provided any contrary legal authority." *Id.* at 2 (citing Pre-Tr. Mem. & Mots. in Lim., at 187, ECF No. 441, (dated Apr. 26, 2023)). Thus, the government advised that, "in the event the defendant argues that certain witnesses did not testify at trial," which was "consistent with the defense's cross-examination of FBI Special Agent Brian Burns, the government inted[ed] to respond, as permitted by law, that the defendant has a 'right to call witnesses if he wants to.'" *Id.*

The defendant responded in writing, arguing that "regardless of the content of the defense summation, a constitutional violation occurs if either the defendant alone has information to contradict the government evidence referred to in the rebuttal summation or if the jury 'naturally and necessarily' would interpret the government's rebuttal summation as a comment on the failure of the accused to testify." Def. Resp. Ltr., at 1, ECF No. 1414, (dated Dec. 18, 2024) (quoting *United States v. Bubar*, 567 F.2d 192, 199 (2d Cir. 1977)). Moreover, the defendant argued that "the government's ability to comment on the defense's ability to subpoena witnesses has not been triggered, and even if it were [triggered], the government's ability to comment in such a way in a case like this—where much of the alleged misconduct involves only government witnesses and Mr. Gerace—is limited." *Id.* at 2.

On December 19, 2024, following the government's summation, the Court addressed the government's letter and the defendant's response. *See* Closings Tran., at 130–133, ECF No. 1443, (dated Dec. 19, 2024). The parties and the Court had the following exchange:

49

```
 5              THE COURT:  I just want to briefly address
 6   Mr. Tripi's and Mr. Soehnlein's letters from -- from
 7   yesterday.
 8              MR. TRIPI:  Yes.
 9              THE COURT:  I didn't see a lot of disagreement
10   between the two of them actually.  I think Mr. Soehnlein's
11   pitch was they have not opened the door to anything yet, and I
12   didn't read your letter as suggesting that they had.
13              MR. TRIPI:  Yeah, Judge, I -- I -- I focused on their
14   summation and what I -- the permissible bounds of rebuttal.
15   In Mr. Soehnlein's responsive letter, he indicated that he --
16   they've not opened the door just by virtue of their cross.
17   Can -- I agree that -- with what you just said.  Candidly,
18   I've not yet done the research on whether a cross alone can
19   open it, I've had someone looking into it.  If I find
20   anything, I'll let you know.  But I -- I -- as I stand here in
21   this moment in time, I agree.
22              MR. FOTI:  Judge --
23              THE COURT:  The other -- the other issue would be is
24   it truly rebuttal if you bring it up in rebuttal.  In other
25   words --
```

50

```
1              MR. TRIPI:  Well, right.

2              THE COURT:  Yeah.  So --

3              MR. TRIPI:  I have never seen a case where they've

4   opened it in cross, but I wanted to take a look.

5              THE COURT:  Yeah.  But if they did open it in cross,

6   then Mr. Cooper should have said something about it --

7              MR. TRIPI:  Yes.

8              THE COURT:  -- not you in rebuttal.

9              MR. TRIPI:  Well --

0              MR. FOTI:  Judge, I -- I didn't see Mr. Soehnlein's

1   submission, and I'm doing the closing.  Part of that was

2   because I was focused on the closing yesterday.  But I

3   certainly -- and it would be good to sort of parse this out

4   now so I know how to -- to appropriately fashion this

5   discussion in my closing.  But I do intend to, like, I think

6   every defense closing I've ever seen or done talk about

7   insufficiency of evidence and witnesses you that didn't hear.

8   And I understand -- I read Mr. Tripi's submission, and I

9   understand the argument that can be made while defendants --

0   defense attorneys have subpoena power too, I don't really have

1   an objection to that comment being made at some point during

2   the rebuttal.  I -- what I would object to is burden

3   shifting --

4              THE COURT:  Right.

5              MR. FOTI:  When you say anything beyond that when
```

```
 1    you're saying they should have called witnesses, you could
 2    expect that those witnesses would've testified favorably for
 3    the government --
 4              THE COURT:  Yep.
 5              MR. FOTI:  -- that shifts the burden.
 6              THE COURT:  And I -- and I would go one step further
 7    and say that anything you say needs to reenforce that the
 8    defendant does not have a burden.
 9              MR. TRIPI:  Yeah, I think I dropped a footnote in how
10    I usually say it, or the gist of what I usually say.
11              THE COURT:  Yeah.
12              MR. TRIPI:  And I was -- I actually do think the
13    caselaw, not to go as far as he's concerned about, the caselaw
14    actually permits the government to go a half a step further
15    than I had done in the past which is to say you can infer that
16    those witnesses would not have helped the defense, that's not
17    a burden shift under the 2nd Circuit.  And so I've never
18    actually gone that far, I guess it would be a matter of degree
19    when I hear the defense.
20              THE COURT:  Yeah.  And I -- I just want you to
21    cautious because I think that -- that any -- any remarks you
22    make in that regard ought to be couched in the context of
23    we've got the burden.
24              MR. TRIPI:  I always do that.  I've always done that.
25              THE COURT:  Okay.  Good.  Then we're all on the same
```

```
 1    page it sounds like.
 2              MR. TRIPI:  Yes.
```

*Id.* at 130–33 (emphasis added).

During the defense's summations, counsel for the defendant commented that the government "cherry picked" witnesses to "sling mud" at the defendant; tactically chose not to call certain witnesses, "even though it would mean less evidence for [the jury] to consider"; "curated" the presentation of the evidence; and alluded to a "sea of witnesses out there that [the jury] never heard from. Witnesses that there's some evidence, regardless of whether they were telling the truth or not, certainly told the government that they've got it wrong." *Id.* at 135, 137–38, 162.

On rebuttal, the government responded:

```
14          Last thing.  They talked to you about missing
15   witnesses, other people who were interviewed.  Well, guess
16   what?  Those were just more invitations to speculate.  Reject
17   it.
18          It's our burden of proof, our burden to prove the
19   case beyond a reasonable doubt.  We embrace that burden.  But
20   the defendant has the ability and the right to subpoena
21   witnesses, so that's just simply not evidence in the case.  So
22   to the extent they want you to speculate?  Reject it.
```

*Id.* at 264.

The defendant did not lodge a contemporaneous objection to the government's statements. *See id.* at 264–65. Nor did the defendant raise a belated objection regarding the government's rebuttal, despite being provided an opportunity to make a record by this Court. *See id.* at 265–71.

## 2.     The Court's Dismissal of Juror 3

On December 26, 2024, Juror 3 was unable to appear for deliberations due to an illness.  *See* Minute Entry, ECF No. 1418, (dated Dec. 26, 2024).  The following day, the Court noted that it received a message from Juror 3, who advised that "she was admitted to the hospital yesterday" and would "be released either later today or tomorrow."  R. 29 Tran., at 2, ECF No. [], (dated Dec. 27, 2025);  *see* Minute Entry, ECF No. 1425, (dated Dec. 27, 2024).  The government argued that substitution was appropriate.  *See* R. 29 Tran., at 2 ("Well, Judge, I think I stated the government's position yesterday[;] I think at this point we've got to substitute the juror.").  In response, the parties and the Court had the following exchange:

```
 4          MR. FOTI:  I know there's not really anybody in the
 5    courtroom other than Pat Lakamp but -- because he's taking
 6    notes down, Mr. Gerace came today because he said he knew he
 7    had to, but he also apparently is having some sort of diarrhea
 8    and has been vomiting since yesterday.  So, he's apparently
 9    having some issues.  He can probably tough it out.  But I
10    wanted to say that because that's not -- we're going to make
11    our -- take our position independent of that, which is, and
12    I'll put it on the record, I guess, at this point it doesn't
13    make a difference, our position is after thinking about it
14    yesterday, if the indication is that she would be back by
15    Monday and that this is not longer than that, then we would
16    want to wait for her to come back.
17          THE COURT:  How could we possibly know that?
18          MR. FOTI:  We don't.  And if it's on Monday, the
19    indication is she's still either in the hospital or still not
20    feeling well, we would consent to her release.  But as of
21    right now, because she has the whole weekend to recover, we
22    think there's -- we would think there's a likelihood or
23    probability that she'll be back on Monday, we'd rather wait
24    until Monday knowing that we have two days in between.  So
25    that's going to be our position.
```

```
 1          But, although it's separate from it, it does inform

 2    partially on it, if Mr. Gerace is having stomach issues as

 3    well, he will tough it out.  So we can, but that's another

 4    reason why we would rather wait until Monday.

 5          MR. COOPER:  Judge, a few things.  We -- without

 6    diminishing what's going on with Mr. Gerace for trial, if

 7    there's a day -- it's days where the jury's out because we

 8    don't spend nearly as much time sitting in the courtroom, and

 9    I understand, I'm not trying to be unsympathetic, but I don't

10    think it should be a huge impediment from going forward today.

11    I think it is time to substitute the juror.

12          If we lose another day today, and then Monday we have

13    to substitute, we'd be starting fresh Monday, we'd be down

14    Tuesday and Wednesday.  And having them come back Thursday,

15    that would be a tremendous impediment to the jury for

16    deliberations two weeks in a row.  We rolled the dice

17    yesterday, we came up snake eyes, and we need to move forward.

18          THE COURT:  If we're keeping score, it's one to one,

19    you and me.

20          MR. TRIPI:  I think you're winning.

21          MR. COOPER:  It was Joe's decision yesterday.

22          MR. FOTI:  And our position would be different if

23    this was a Wednesday or a Thursday, part of the decision is,

24    and also some indication that she's going to be out for --

25          THE COURT:  I mean, she's been hospitalized, and
```

55

1    she's not even away, she's still in the hospital now.

2            MR. FOTI:  But they gave her an expectation that

3    she'll be released today or tomorrow, expectation not to go on

4    the following week.

5            MR. TRIPI:  We looked up the medication.  Agent Burns

6    is a pharmacist.  It sounded to us like a 24-hour stomach

7    situation.  And as you pointed out yesterday correctly, she

8    was the juror who was out before.  She clearly has some health

9    issues.  I'm no longer willing to roll the dice, like we said

10   a moment ago.  We'll.

11           THE COURT:  Let's do this in open court.  So we'll do

12   this in open court.

13           MR. TRIPI:  Understood.

14           THE COURT:  So let's go back to the tables.

15           (End of sidebar discussion.)

16           THE COURT:  Okay.  So, Mr. Foti, what is the

17   defense's position?

18           MR. FOTI:  So, Judge, we did have a brief conference

19   where we referred to some medical issues that Mr. Gerace is

20   having, and that is one consideration.  But even independent

21   of that, our position is we would oppose removing the juror,

22   or disqualifying the juror.  I understand the medical issues,

23   the position that we have is because it's a Friday, and she

24   has the weekend to potentially recover.  And there's an

25   indication that she would likely be out of the hospital by

1  today or tomorrow.  Based on that, I think there is a high

2  probability that she'll be able to serve on Monday rather than

3  go back and restart deliberations today and be in the same

4  position on Monday theoretically anyway, we would rather

5  continue with the juror we have, and we would -- we would

6  oppose her removal.

7          And separately, we -- we ask the Court, although,

8  it's not dispositive, we'd ask to the Court to consider what

9  we referenced in terms of Mr. Gerace's medical issue.

10          **MR. COOPER:**  Judge, I'll rely on the record I made at

11  the bench with respect to Mr. Gerace's issue because I don't

12  want to get -- but it doesn't prevent them from going forward,

13  and Mr. Foti hasn't said that it would prevent them from going

14  forward.

15          Separately, with respect to this alternate, or with

16  respect to substituting an alternate with Juror Number 3,

17  yesterday we took a chance, and we lost the day because of

18  that.  I think losing another day today -- we wouldn't be in

19  the same position Monday, because if we don't move forward at

20  all today, Monday comes in and it's day 1 with an alternate.

21  If we substitute today, even if the jury doesn't finish their

22  deliberation today, Monday we're in a better position because

23  the jury's had a full day of deliberation.

24          The indication that the juror as been hospitalized, I

25  think, changes the calculus from yesterday.  It was nausea and

```
 1   diarrhea, she had gone to the hospital, which people go to
 2   for -- urgent care essentially.  She's been admitted to the
 3   hospital, she's been hospitalized, and I don't think it would
 4   be smart to put this off again, especially in light of the
 5   fact that it's inconveniencing 15 other jurors and also
 6   because we're down Tuesday and Wednesday next week already.
 7   That's two weeks in a row where we're going to have half
 8   weeks.  This is going to prolong the deliberation which puts a
 9   significant --
10            THE COURT:  I agree, and I think that what I said
11   yesterday and the reason I thought we should have done this
12   yesterday morning is because this juror has been sick before.
13   She's been coughing quite a bit during the course of the
14   trial.  And the fact that she's been hospitalized now, she
15   says she'll be released today or tomorrow, but that sounds to
16   me to be pretty speculative.  She didn't expect to go into the
17   hospital yesterday.
18            So I think that based on all of that, it makes sense,
19   I think the only choice we have really is to substitute.  I
20   don't think it's wise to wait another day.
21            On the if-come that she can come back, if she's got
22   something contagious when she comes back, we lose the whole
23   jury.  I don't think it makes any sense at all to do that.
24            So I think given the fact that she's been sick now
25   for two days in a row now, she was sick earlier during the
```

```
1   trial, that she's been coughing throughout, I think that
2   the -- the -- the wise decision is to substitute, to have the
3   jury begin their deliberations anew, and I'm going to exercise
4   my discretion to do that.
5           So I will come back at 9.  And we'll substitute our
6   first alternate for the -- for Juror Number 3.  And I will
7   instruct them that they have to start their deliberations
8   anew, which means disregarding all prior deliberations and,
9   therefore, we won't do the read-back they asked for.
```

*Id.* at 2–8.

Later, the Court supplemented the record to note the following:

```
21          THE COURT:  Okay.  Two things that I want to raise.
22   One is the fact that -- one thing that I didn't say but that
23   played a role in my decision is the fact that, you know, if
24   this juror is discharged from the hospital today or tomorrow,
25   we don't know whether she's going to be in any frame of mind
```

```
            USA v Peter G. Gerace, Jr. - Jury Trial - 12/27/24        10
1   or able to come in on Monday anyway.  You know, somebody
2   spends two days in the hospital and one night or more, just
3   may not be -- so out of fairness to her, I think it makes
4   sense to do this.
```

*Id.* at 9–10.

After the Court replaced Juror 3 with an alternate, it instructed the jury to begin its deliberations anew. *See id.* at 12. Later that day, the jury issued its verdict against the defendant. *See* Jury Verdict, ECF No. 1426, (dated Dec. 27, 2024).

### 3.     Juror 10's Post-Verdict Comments to the Media

After the defendant provided a lengthy interview to local news media regarding his trial and bemoaning, in his view, the lack of evidence supporting his many convictions, Juror 10, the jury's foreperson, provided an interview of his own. In that interview, and in relevant part, the following exchange occurred:[260]

> **Reporter:**    You get through, I think it was like 45 witnesses, I don't know how many exhibits and everything like that. Um, and then the prosecution rests and it comes time to hear from the defense. And . . . .
>
> **Juror 10:**    And they rested without one witness. I mean, it's all good and fine to have to cross examine and, and to try impeach witnesses. But when you're when, when it's your turn, we're all sitting at the edge of our seat. We've gone through two months of trial. Now we are gonna hear, you know, what the defense has to say. What witnesses can they bring up to, to counterman [sic] what was just what we just was [sic] presented. Show me 10 or 15 or 20 or 30 dancers that came in and said, that didn't happen. And I know that dancer and I, and I know why she has a bone to pick. They didn't bring one witness to say anything like that. Not a one. And so that was like, okay, I can understand that Peter Gerace wouldn't testify because, you know, that can get pretty ugly in a courtroom if the, you know, for, for the accused to take a stand. But there was no supporting witnesses for the defense. It was shocking. I mean, I just felt, I felt personally, I felt this for me, for my own opinion. I sat through two months of trial. I'm developing an opinion

---

[260]     This transcript generally focuses upon those statements that the defendant, in his brief, appears to deem relevant and includes statements that make it clear that Juror 10 told the reporter that the jury followed the Court's instructions. In the event the defendant seeks to use his reply brief or oral argument to claim that Juror 10's other comments reflect juror misconduct, the government reserves its right to respond in writing.

about this case, and I want the opportunity to, to feel differently. And I wasn't given that opportunity. It was outrageous. I, to me, and I think, I think . . . .

I'm not an attorney. I don't know how things work in that field, but I . . . , I think it's borderline incompetent that, that his attorneys did not produce any witnesses to counterman [sic] what was just told to us for two months. We were pounded day after day after day of these of these dancers telling us all these stories. And I wanted to hear, okay, bring some witnesses in, bring some dancers in that, again, like I said, that didn't happen. I know why that girl has a bone to pick. I didn't see anything like that happen. There's monitors all over the place. You can't get away with that. I didn't hear any of that from any witnesses. It would've made a difference. Maybe it made it, maybe we would've deliberated longer. Maybe we would've been hung, but we weren't given any opportunity of to listen to any defense witnesses.

**Reporter**:    And, and you can't sit here and say, well, we would've voted differently had we heard. But you, you, you just don't know. I want, I . . . .

**Juror 10**:    Want an opportunity to be able to consider other, you know, the other, the other side. Not just a cross examination of trying to impeach witnesses for two months coming.

\*\*\*

**Juror 10**:    […] So the temperature of the room was obviously after 2 and 2 months what was going on in these people's mind, is that we were all thinking the same thing. **We didn't just stop there though. We went through that ream of paper, of these jury instructions. We went through it meticulously. We went through each charging count, - Each element of each charging count. We read it out loud and reread it and reread it** and we had people's opinions like, okay, you think he's guilty and lets go through the elements, talk about it lets talk about it and we did. The thing is everybody was agreeing with, the same, the same conclusion. So that's why it took one day to deliberate because everybody was thinking the same way. The what took the longest was those tampering charges. (Emphasis added). […]

61

\*\*\*

**Juror 10**:    Uh in the first in the first day, uh we came, we did this exercise and when the new guy came in, we went through the same exercise again as if it never happened. So because we didn't want to warp the, the alternates mind in any shape or form because we want to get his opinion so we did all the voting again of course we all knew how we were voting so it turned out he was in the same manner of frame of mind.

## II.    LEGAL FRAMEWORKS

### A.    The Rule 29 Standard and Evaluating Evidence

A motion for a judgment of acquittal may be granted after the close of evidence on either side if the evidence is insufficient to sustain a conviction. FED. R. CRIM. P. 29(a). But "a defendant challenging the sufficiency of the evidence 'bears a heavy burden,'" *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)), because rather than considering the evidence on a blank slate, the Court must review it "in the light most favorable to the government." *United States v. Alcius*, 952 F.3d 83, 86 (2d Cir. 2020) (quoting *United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015)); *see generally United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991) (discussing this well-established standard).

In practice, this means that courts must "defer to the jury's rational determinations of the weight of the evidence, the credibility of the witnesses, and choice of the competing inferences that can be drawn from the evidence." *United States v. White*, 7 F.4th 90, 101 (2d Cir. 2021) (internal punctuation omitted); *see United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory[,] and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony."); *see also United States v. Cote*,

544 F.3d 88, 99–100 (2d Cir. 2008) (Sotomayor, J.) (reversing the district court's judgment of acquittal where the district court acquitted, in pertinent part, on "purported inconsistencies" and noting that such inconsistencies go "to the weight the jury should accord the evidence" and did not in that case "justify the grant of a judgment of acquittal"). Likewise, courts must appreciate that "the evidence need not have excluded every possible hypothesis of innocence." *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992); *see United States v. Jackson*, 345 F.3d 59, 66 (2d Cir. 2003) (same).

A note on inferences: "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019). Impermissible speculation, on the other hand, is "a *complete absence* of probative facts to support the conclusion reached." *Lavender v. Kurn*, 327 U.S. 645, 653 (1946) (emphasis added). The former requires deference, whereas the latter does not. *See Pauling*, 924 F.3d at 656.

Taken altogether, the court may grant a Rule 29 motion "*only if* the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Mickens*, No. 20-258, 2021 WL 3136083, at *3 (2d Cir. July 26, 2021) (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (emphasis added); *see Pitre*, 960 F.2d at 1120. Conversely, the court *must* sustain the jury's verdict "if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mangano*, 128 F.4th 442, 464–65 (2d Cir. 2025) (internal quotations omitted).

Deference to the jury's verdict "is especially important when reviewing a conviction of conspiracy […] because a conspiracy by its very nature is a secretive operation, and it is a

63

rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Pitre*, 960 F.2d 1112, 1120–21 (2d Cir. 1992) (citations omitted). "The government may prove the defendant's knowing participation in a conspiracy through circumstantial evidence," which may include "for example, a defendant's association with conspirators in furtherance of the conspiracy. . . his presence at critical stages of the conspiracy that cannot be explained by happenstance . . . items that are of essential significance to the conspiracy. . .," and "[i]n context, acts that exhibit a consciousness of guilt, such as false exculpatory statements […] may also tend to prove knowledge and intent of a conspiracy's purpose, although false exculpatory statements alone do not suffice to establish guilty knowledge," and "a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Anderson,* 747 F.3d 51, 60-61 (2d Cir. 2014). "The government need not prove the defendant's familiarity with all of the conspiracy's details; it may demonstrate simply the defendant's awareness of the general nature and extent" of the conspiracy. It is not necessary to prove that the defendant expressly agreed with other conspirators on a course of action; it is enough, rather, to show that the parties ha[d] a tacit understanding to carry out the prohibited conduct." *Anderson*, 747 F.3d at 61 (citations and punctuation omitted). "[O]nce a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." *Id.* at 1121.

In evaluating evidence, the "law is well established that a federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable

doubt," *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006)*,* and further "[t]he law draws no distinction between direct and circumstantial evidence in requiring the government to carry its burden of proof." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005).  In fact, "[c]ircumstantial evidence can be as compelling as direct evidence[.]" *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).  Indeed, "conspiracies are undertakings in secret and often cannot be proven except through the use of circumstantial evidence," *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010), and that is why deference to the jury's verdict "is especially important when reviewing a conviction of conspiracy […] because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Pitre*, 960 F.2d 1112, 1120–21 (2d Cir. 1992) (citations omitted).

A conspiracy is a partnership crime, distinct from a substantive offense, and features its own elements and penalties.  *See Iannelli v. United States*, 420 U.S. 770, 777 (1975) ("Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes.  Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act."); *Pinkerton v. United States*, 328 U.S. 640, 644 (1946) ("A conspiracy is a partnership in crime.  It has ingredients, as well as implications, distinct from the completion of the unlawful project." (internal citations omitted)).  As such, it "poses distinct dangers quite apart from those of the substantive offense." *Iannelli*, 420 U.S. at 778. "[O]nce a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." *Pitre,* at 1121.

Where there are convictions and acquittals, an acquittal of a substantive count does not preclude conviction on a conspiracy count and, in this vein, a court within the Second

Circuit has aptly observed: "[s]ince 1910, the Supreme Court and the Second Circuit have adhered to the view that the Government may charge and prove a conspiracy to defraud an agency of the United States under 18 U.S.C. § 371 without charging or proving any separate or overlapping substantive violation of a criminal statute." *United States v. Lingat*, No. 1:21-CR-573-MKV, 2024 WL 3594565, at *5 (S.D.N.Y. July 30, 2024).

Finally, regarding multiple object conspiracy charges, "when a defendant is convicted of a multiple object conspiracy by a general verdict, the conviction is sustainable if one of the conspiratorial objects is supported by the evidence, even if the other is not." *United States v. Duncan*, 42 F.3d 97, 105 (2d Cir. 1994) (citing *Griffin v. United States*, 502 U.S. 46, 49 (1991)); *see also United States v. Bilzerian*, 926 F.2d 1285, 1301–02 (2d Cir. 1991) ("A conspiracy conviction based on a multi-object conspiracy may be upheld so long as evidence is sufficient with respect to at least one of the criminal objectives.").

## B.    The Rule 33 Standard

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that *an innocent person* may have been convicted.'" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)) (emphasis added). "Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'" *Id.* at 475–76 (quoting *United States v.*

66

*Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992)). An example of exceptional circumstances is where testimony is "patently incredible or defies physical realities"; "the district court's identification of problematic testimony does not automatically meet this standard." *Id.* at 476.

A defendant may also move for a new trial based on allegations of juror misconduct. *See, e.g.*, *United States v. Stewart*, 433 F.3d 273, 302 (2d Cir. 2006) (regarding a defendant's argument that "the [d]istrict [c]ourt erred by denying Rule 33 relief without holding an evidentiary hearing on alleged juror misconduct"). But this basis for Rule 33 is as equally narrow as the others. That is because, over the course of several centuries, American and English common law evolved to afford "substantial protection to verdict finality." *Pena–Rodriguez v. Colorado*, 580 U.S. 206, 211 (2017). An equally established counterpart, often referred to as the "no-impeachment rule", "assure[s] jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations." *Id.* Congress codified this creature of the common law in Federal Rule of Evidence 606(b)(1), which provides that:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

FED. R. EVID. 606(b)(1).

This no-impeachment rule is subject to only three narrow exceptions: the court may consider evidence that the jury considered "extraneous prejudicial information[;]" that "an

outside influence was improperly brought to bear on any juror;" or that the jury made a clerical mistake when completing the verdict form.  FED. R. EVID. 606(b)(2).[261]

Because the grounds for impeaching a jury's verdict are limited, courts are "reluctant to 'haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.'"  *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983)).  Post-trial investigation of potential juror misconduct is only appropriate where there is "clear, strong, substantial and *incontrovertible evidence . . .* that a specific, non-speculative impropriety has occurred[.]"  *United States v. Stewart*, 590 F.3d 93, 133 (2d Cir. 2009) (quoting *Ianniello*, 866 F.2d at 543) (emphasis added).  Such evidence must also be "competent", bearing the hallmarks of objectivity.  *United States v. Baker*, 899 F.3d 123, 130 (2d Cir. 2018).

Of equal importance, "the proper functioning of the jury system requires that the courts protect jurors from being harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict."  *United States v. Schwarz*, 283 F.3d 76, 97 (2d Cir. 2002) (internal quotation marks omitted).  "[A] district judge has the power, and sometimes the duty, to order that all post-trial investigation of jurors shall be under h[er] supervision."  *United States v. Moten*, 582 F.2d 654, 665 (2d Cir. 1978).  To that end, federal courts "promote[ ] full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be

---

[261] The Supreme Court has also recognized a limited constitutional exception to the no-impeachment rule, applicable only in cases "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant[.]"  *Pena–Rodriguez*, 137 S. Ct. at 869.  In such circumstances, "the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee."  *Id.*

summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict." *Pena–Rodriguez*, 137 S. Ct. at 865. As a result, courts generally only grant leave to interview jurors in the "gravest and most important cases." *Id.* at 858 (internal quotation marks omitted). A district court's discretion when handling allegations of juror misconduct is at its highest when "the alleged prejudice results from statements made by the jurors themselves, and not from media publicity or other outside influences." *United States v. Cox*, 324 F.3d 77, 86 (2d Cir. 2003) (quoting *United States v. Thai*, 29 F.3d 785, 803 (2d Cir. 1994)). And, "in the course of a post-verdict inquiry on this subject, when and if it becomes apparent that . . . reasonable grounds to suspect prejudicial jury impropriety do not exist, the inquiry should end." *United States v. Aiyer*, 33 F.4th 97, 128 (2d Cir. 2022) (quoting *Moon*, 718 F.2d at 1234) (internal quotation marks omitted); *Stewart*, 433 F.3d at 303.

## III.    ANALYSIS

Both of the defendant's motions fail. As a general matter, each of the defendant's arguments suffer from the misguided belief that the Court, sitting in a Rule 29 posture, may reweigh the evidence in the defendant's favor. Because the Court cannot endorse the defendant's self-interested gloss on the evidence, and because the evidence conclusively establishes the defendant's guilt for each of his eight convictions, his Rule 29 motion should be denied. Likewise, the defendant's Rule 33 motion should fail because it fails to allege any exceptional basis that might merit a new trial: Rule 606 prohibits consideration of Juror 10's comments; there is no factual basis to conclude that the defendant was deprived of the ability to present a meaningful defense; the Court properly exercised its discretion in removing the hospitalized juror; and no miscarriage of justice will occur if the Court credits the witness

testimony that the jury—twelve of the defendant's peers, found credible. Accordingly, the defendant's motion should be denied in its entirety and the jury's verdict affirmed.

### A.    The Defendant's Rule 29 Motion Should be Denied.

### 1.    A rational jury could conclude that the defendant conspired with Bongiovanni to defraud the United States and commit bribery.

The defendant first challenges his conviction for Count 1, which charged him with conspiring to defraud the United States and commit bribery. *See* ECF No. 1350. Specifically, the defendant argues that his conviction for Count 1 should be vacated for two core reasons. First, he claims that there was "no *competent* proof that [the defendant] asked or expected [] Bongiovanni to disregard his duties as a member of federal law enforcement[,] and there was no *competent* proof of a conspiracy." Gerace R. 29 Mot., at 15 (emphases added). Second, the defendant contends that the evidence of his cash payments to Bongiovanni are "not credible" and "insufficient to sustain a conviction." *Id.*

Both arguments fail on Rule 29 review, as they invite the Court to consider extraneous information not considered by the trial jury; carve up the government's proof, view pieces of evidence in isolation and divorced from its proper context; ignore outright evidence unfavorable to the defendant; make credibility determinations that undermine the jury's verdict; and reweigh the evidence in the light most favorable to him—not the government. Because, when viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty of Count 1, his motion for a judgment of acquittal on these counts should be denied.

### a.    Legal Framework

Count 1, a violation of 18 U.S.C. 371, charged the defendant with a conspiracy with two objects: to defraud the United States and to commit bribery of a public official. *See* ECF

No. 1350 (Redacted Ind.), Count 1. *United States v. Bilzerian*, 926 F.2d 1285, 1301 (2d Cir. 1991) (§ 371 "prohibits two distinct types of conspiracies[:] conspiracies to defraud the United States and conspiracies to commit an offense against the United States." ). The "defraud clause" is "broader" than its "offense clause" counterpart, which "governs a conspiracy to commit a specific offense[] defined elsewhere in the federal criminal code", and instead "covers agreements to interfere with or to obstruct [the] government's lawful functions", *id.*, and interfere with "integrity of the United States and its agencies," *United States v. Nersesian*, 824 F.2d 1294, 1313 (2d Cir. 1987).

Consistent with the Court's jury instructions, the jury was permitted to convict the defendant under either object of the conspiracy—the  "defraud prong" or the "offense prong"—charged in Count 1.  *See Griffin v. United States*, 502 U.S. 46, 58–60 (1991); *United States v. Duncan*, 42 F.3d 97, 105 (2d Cir. 1994); *Bilzerian*, 926 F.2d at 1301–02 ("A conspiracy conviction based on a multi-object conspiracy may be upheld so long as [the] evidence is sufficient with respect to at least one of the criminal objects.").

 A jury may convict a defendant of conspiring to commit a crime without convicting the defendant of committing the substantive crime.  *Iannelli v. United States*, 420 U.S. 770, 777 (1975) ("Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes. Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.").  The bribery object of the conspiracy in Count 1 differs from the substantive bribery charged in Count 2 because they have different elements. Substantive bribery as charged in Count 2 "requires a showing that something of value was corruptly given, offered, or promised to a public official (as to the giver) or corruptly demanded, sought, received, accepted, or agreed to be received or accepted by a public official

71

(as to the recipient) with intent, *inter alia,* "to influence any official act" (giver) or in return for "being influenced in the performance of any official act" (recipient)." *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999).  Conspiracy to commit bribery, as charged as an object of the conspiracy in Count 1, does not. *United States v. Murray*, 618 F.2d 892, 898 (2d Cir. 1980) ("The essence of the crime of conspiracy is an agreement to put into effect an illegal project."); *United States v. Andrews*, 166 F. App'x 571, 572-73 (2d Cir. 2006) (Sum. Order) (affirming conviction for conspiracy to bribe a public official and rejecting a defense claim of retroactive misjoinder predicated upon the defendant's claim of spillover prejudice due to acquittal of substantive bribery count) *see also* Final Jury Inst., at 58-59; *accord United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977) ("'Agreement is the essential evil at which the crime of conspiracy is directed' and it 'remains the essential element of the crime.'" (quoting *Iannelli*, 420 U.S. at 777 n. 10); *Rosenblatt*, 554 F.2d at 39 (explaining that convictions for conspiracy require the defendant to know of the "essential nature of the conspiratorial plan").

Thus, consistent with the Court's jury instructions, the jury was permitted to find the defendant guilty of Count 1 under either object of the conspiracy—under the defraud prong or the offense prong—and to convict the defendant of based upon the uncorroborated testimony of a single accomplice, or through circumstantial evidence, or both.  *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (stating that the "law is well established that a federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt[.]"); *United States v. Anderson,* 747 F.3d 51, 60–61 (2d Cir. 2014) ("The government may prove the defendant's knowing participation in a

conspiracy through circumstantial evidence," which may include "for example, a defendant's association with conspirators in furtherance of the conspiracy. . . his presence at critical stages of the conspiracy that cannot be explained by happenstance . . . items that are of essential significance to the conspiracy. . .," and "[i]n context, acts that exhibit a consciousness of guilt, such as false exculpatory statements [. . .] may also tend to prove knowledge and intent of a conspiracy's purpose, although false exculpatory statements alone do not suffice to establish guilty knowledge," and "a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.").

"The government need not prove the defendant's familiarity with all of the conspiracy's details; it may demonstrate simply the defendant's awareness of the general nature and extent" of the conspiracy. It is not necessary to prove that the defendant expressly agreed with other conspirators on a course of action; it is enough, rather, to show that the parties ha[d] a tacit understanding to carry out the prohibited conduct." *Anderson*, 747 F.3d at 61 (citations and punctuation omitted). "[T]he law draws no distinction between direct and circumstantial evidence in requiring the government to carry its burden of proof." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005). In fact, "[c]ircumstantial evidence can be as compelling as direct evidence[.]" *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002). Indeed, "conspiracies are undertakings in secret and often cannot be proven except through the use of circumstantial evidence," *Torres*, 604 F.3d at 67, and that is why deference to the jury's verdict "is especially important when reviewing a conviction of conspiracy [. . .] because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United*

*States v. Pitre*, 960 F.2d 1112, 1120–21 (2d Cir. 1992) (citations omitted).  "[O]nce a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming."  *Id.* at 1121.

### b.    Application

The evidence permitted a reasonable jury to find the defendant guilty of Count 1 under both the defraud prong and the offense prong.

### i.    The Defraud Prong

As set forth above, the defendant's guilt under the defraud prong of Count 1 does not rely upon whether the defendant offered Bongiovanni a thing of value, *i.e.*, bribes, "with the corrupt intent to perform an act or omit to perform and act in violation of his lawful duty."  Rather, it "covers agreements to interfere with or to obstruct [the] government's lawful functions", *Bilzerian,* 926 F.2d at 1301, to interfere with "integrity of the United States and its agencies," *Nersesian*, 824 F.2d at 1313.  As charged in Count 1:

> The lawful functions and official duties of DEA SAs included, but were not limited to, initiating and conducting investigations; interviewing witnesses and DEA confidential sources; protecting the identity of witnesses and DEA confidential sources; protecting the integrity, confidentiality, and operational security of federal and state investigations; collecting and preserving evidence; preparing truthful and accurate DEA memoranda and reports; preparing search warrant and criminal complaint affidavits, documenting information that was helpful to current and future DEA investigations; arresting individuals who had violated federal and state drug laws; preparing and proposing DEA cases for prosecution; and acting with honesty and integrity in their representations and communications with prosecutors and other members of law enforcement.

Red. Indict., Introduction at ¶7.  The entirety of the Introduction, including paragraph 7, was incorporated by reference into Count 1, which alleged in part:

### COUNT 1

**(Conspiracy to Defraud the United States)**

**The Grand Jury Further Charges That:**

1.     The allegations of the Introduction are repeated and re-alleged and incorporated by reference as if set forth fully herein.

2.     Beginning in or about 2005 and continuing until in or about February 2019, the exact dates being unknown, in the Western District of New York, and elsewhere, Joseph Bongiovanni and the defendant, **PETER GERACE JR.**, did knowingly, willfully, and unlawfully combine, conspire, and agree together and with others, known and unknown:

    a.     to defraud the United States and the Drug Enforcement Administration (DEA), an agency of the United States, by interfering with and obstructing by means of deceit, craft, and trickery, the lawful and legitimate governmental functions and rights of the DEA, that is:

       i.     the right to have its business and its affairs, and the transaction of the official business of the DEA conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction; and

      ii.     the right to the conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of his duties by Joseph Bongiovanni, in his official capacity as a DEA SA free from corruption, partiality, improper influence, bias, dishonesty and fraud in dealing with the DEA and other law enforcement agencies;

*Id.* at Count 1 ¶¶ 1-2(a)(i)-(ii).

Based upon the direct and circumstantial evidence, the jury was permitted to find that Bongiovanni and the defendant had a corrupt agreement to protect the defendant in violation of his oath and duties to the DEA.  The jury considered voluminous evidence that established a continuous course and pattern of conduct which demonstrated that Bongiovanni corruptly protected the defendant. *See Anderson,* 747 F.3d at 60-61 ("The government may prove the defendant's knowing participation in a conspiracy through circumstantial evidence," which may include "for example, a defendant's association with conspirators in furtherance of the conspiracy. . . his presence at critical stages of the conspiracy that cannot be explained by

happenstance . . . items that are of essential significance to the conspiracy. . .," and "[i]n context, acts that exhibit a consciousness of guilt, such as false exculpatory statements […] may also tend to prove knowledge and intent of a conspiracy's purpose, although false exculpatory statements alone do not suffice to establish guilty knowledge," and "a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt  beyond a reasonable doubt.").

For example, whereas a DEA agent's duties require them to initiate and conduct investigations, *see* ECF No. 1350, Introduction at ¶7—as described above Bongiovanni sought to dissuade and derail potential DEA and FBI investigations into the defendant in 2008 when the defendant's name came up as a drug trafficker in DEA Special Agent Wisniewski's Gambino investigation; when the defendant was the focus of a drug investigation that was in its infancy as conducted by FBI Special Agent Thomas Herbst; and, yet again, when Bongiovanni made strong racist remarks to DEA Special Agent Anthony Casullo which dissuaded and stifled SA Casullo's pursuit of the defendant in June 2016.

Moreover, the jury was permitted to conclude that Bongiovanni violated his oath and duty to the DEA, which required him "to protect[] the integrity, confidentiality, and operational security of federal and state investigations," *see* ECF No. 1350, Introduction at ¶7.  In this vein, the jury heard testimony and evidence from which they could readily infer a corrupt agreement existed because in 2005 Bongiovanni disclosed to the defendant the existence of R.A.'s photos from a search warrant conducted at Craig Border's residence. Moreover, the evidence and circumstances established that Bongiovanni mislead SA Christopher Wisniewski when Bongiovanni concealed the true nature and extent of his

76

relationship with the defendant, and that Bongiovanni used the ruse of a "cold approach" to warn the defendant that his name had come up as a drug trafficker in SA Wisniewski's Gambino investigation.  Furthermore, the evidence and circumstances firmly established that Bongiovanni wanted to stifle SA Casullo's budding investigation into the defendant and dissuade Special Agent Casullo from investigating the defendant in June of 2016 when Bongiovanni stated to Special Agent Casullo, in sum and substance, "We should be investigating N*****s and S***s," and not individuals of Italian decent, like the defendant. Additionally, the jury could also readily conclude from the evidence, including HSI Special Agent Curtis Ryan's testimony, the text messages between Bongiovanni and the defendant (*see* Gov. Ex. 310D), and the voicemail the defendant left Bongiovanni (*see* Gov. Ex. 311), that Bongiovanni disclosed sensitive law enforcement capabilities to a drug trafficker in violation of his oath and duty to "to protect[] the integrity, confidentiality, and operational security of federal and state investigations," when, in response to the defendant's inquiry about law enforcement's ability to "ping" trac phones (a prepaid phone often favored by drug traffickers), Bongiovanni disclosed sensitive law enforcement capabilities related to law enforcement's ability to geolocate prepaid trac phones.

Bongiovanni's DEA oath and duty also required him to "collect[] and preserv[e] evidence, and to "prepar[e] truthful and accurate DEA memoranda and reports."  *See* ECF No. 1350, Introduction at ¶7.  Based on the evidence at trial, the jury was readily permitted to conclude Bongiovanni violated his oath and duty in this regard numerous times by writing untruthful and inaccurate DEA memoranda and reports, and by failing to collect and preserve evidence as part of his corrupt protection of the defendant.  For example, based upon the testimony of Christpher Wisniewski, Dale Kasprzyk, Steven Miller, Thomas Herbst, Peter

Lepiane, and Anthony Casullo, as described above, the jury was permitted to conclude that Bongiovanni misrepresented that the defendant was a DEA confidential source, or source of information, when the defendant was neither and, as a result, Bongiovanni prepared a false DEA 6 report, *see* Gov. Ex. 30A, wherein Bongiovanni wrote that the defendant "ha[d] acted as a confidential source and has been able to provide information regarding individuals in this case file and other narcotic[s] investigation[s] in the past." Moreover, upon review of Gov. Ex. 30A, the jury was further permitted to conclude that the report was both false and misleading and that it failed to preserve evidence, because Bongiovanni did not provide the defendant's phone number in the indexing section of the report, and because Bongiovanni falsely reported that the defendant's NADDIS number was pending when, in truth and in fact, the defendant has had a NADDIS number since 1992. *See* Gov. Ex. 30A at 2; Gov. Ex. 437.[262]

Furthermore, Bongiovanni failed to write a follow-up DEA-6 related to his meeting with FBI SA Herbst and the defendant at the DEA and, based upon FBI SA Herbst's and DEA SA Kasprzyk's testimony, the jury was permitted to infer that Bongiovanni's intentional decision not to document the meeting violated his duty to collect and preserve evidence—i.e., what the defendant said during the meeting, and violated Bongiovanni's duty to be truthful and honest in his interactions with other agents, *see* ECF No. 1350 at Introduction ¶7.

---

[262]    Gov. Ex. 30A pertains to a DEA document authored by Bongiovanni which does not list a phone number, address, or any other identifiers related to the defendant, in contravention of DEA practice and procedure. Moreover, the report indicates that the defendant's NADDIS number is "pending." Bongiovanni authored this report on November 6, 2009. *See also* Dale Kasprzyk testimony, detailed *supra.* Gov. Ex. 437, by contrast, establishes that the defendant had a NADDIS number since 1992.

Similarly, the evidence was sufficient for the jury to conclude that Bongiovanni wrote several false and misleading DEA memoranda, *see* Gov. Exs. 97-99, which were designed to conceal and cover-up the conspiratorial scheme by falsely misrepresenting the true nature and extent of Bongiovanni and the defendant's relationship that Bongiovanni made several false and misleading statements to investigators—to Special Agent Carpenter on March 29, 2019, and to Special Agent Curtis Ryan on June 6, 2019, which were designed to conceal, mislead, and misdirect agents away from further investigating the corrupt scheme that had existed between the defendant and the defendant for many years.

The defendant attempts to undermine the straightforward application of the facts determined by the jury by arguing, in essence, that the government was required to prove his knowing participation in the conspiracy through direct evidence. *See, e.g.*, Gerace R. 29 Mot., at 16 ("There was no evidence Mr. Gerace *asked* Mr. Bongiovanni to engage in improper conduct." (emphasis added). But the law of conspiracy does not require the government to prove a defendant's knowing participation in a conspiracy through direct evidence. *See Anderson*, 747 F.3d at 60–61. Rather, circumstantial evidence, including evidence that the defendant associated "with conspirators in furtherance of the conspiracy [and] his presence at critical stages of the conspiracy that cannot be explained by happenstance," is an acceptable means of proving a defendant's knowing involvement in the conspiracy. *Id.*

In any event, Bongiovanni and the defendant's conduct establishes multiple incidents through which a reasonable jury could conclude that the defendant knowingly participated in a conspiracy to defraud the United States and commit bribery. First, following a 2005 search of Border's residence, Bongiovanni shared with the defendant intimate photos of R.A. that

he obtained without authorization from the residence.[263]  The defendant, in turn, weaponized the defendant's disclosure against R.A. during a romantic dispute.[264]  From this, the jury was permitted to conclude that Bongiovanni was willing to abdicate his responsibilities as a DEA Special Agent for the defendant's benefit, and that the defendant was all too eager to capitalize on Bongiovanni's nascent corruption.

From there, the jury was also permitted to conclude that this dynamic continued—and deepened—three years later, when Bongiovanni intervened in SA Wisniewski's investigation targeting David Gambino, the defendant, and others.  The jury could reasonably determine from Bongiovanni's concealment of the extent and nature of his relationship with the defendant, that his execution of the risky "cold approach" technique on the defendant was done to intentionally alert the defendant of an active federal investigation targeting him, all while providing Bongiovanni with official cover.

That same conclusion applies to Bongiovanni's 2009 intervention with USPO and the FBI.  Indeed, from the evidence related to that intervention, the jury could reasonably conclude that the defendant was an active and knowing participant in Bongiovanni's protection scheme.  Government's Exhibit 30A, for instance, is a report authored by Bongiovanni detailed the defendant's offer to provide "information regarding individuals who are trafficking narcotics in the Buffalo area" in exchange for "considering on [his] pending supervised release violation."[265]  Though the defendant benefitted from Bongiovanni's intervention—his supervised release was not revoked—he never did provide any information

---

[263]    Tr. Tran., ECF Nos. 1510 and 1512 (Test. R.A.); Tr. Tran., ECF No. 1509 (Test. Border).

[264]    Tr. Tran., at 10, 13–16, 17, 28, ECF No. 1510 (dated Dec. 6, 2024) (Test. R.A.).

[265]    *See* Gov. Ex. 30A.

to the DEA "regarding individuals who are trafficking in narcotics in the Buffalo area," as he initially advertised.[266] Nor did the defendant provide any information to the FBI SA Herbst, despite participating in Bongiovanni's scheme that purported the defendant to be Bongiovanni's confidential source.[267]

The defendant's own statements are consistent with the jury's reasonable determination that the defendant knowingly participated in the conspiracy charged in Count 1. For example, as detailed *supra*, the defendant's instruction to A.P., a cocaine dealer and user, to call Bongiovanni if she ever needed to get out of trouble only make sense if the defendant, himself, believed that Bongiovanni would intervene to get him out of trouble. But Bongiovanni's job was to arrest people like A.P. and the defendant, who Bongiovanni's own statements linked to kilo-level cocaine distribution, not secure their release when other law enforcement officers attempted to hold them accountable. On that score, Bongiovanni's admission to SA Casullo that the defendant called him when an exotic dancer overdosed in Pharoah's illustrates that the defendant *did* believe that Bongiovanni would help him when his legal liability spiked, just as Bongiovanni's admission that he told the defendant to "get her out of there" reflected his own willingness to abdicate his duty as a federal law enforcement officer to protect the defendant.

Furthermore, on May 4, 2017, after Bongiovanni knew that Gerace had (i) come up as a drug trafficker in SA Wisniewski's 2008 Gambino investigation; (ii) was a target of FBI

---

[266]    *Id.*

[267]    *See* Tr. Tran., at 7—3, 18–19, 23–30, ECF No. 1511, (dated Nov. 12, 2024) (Test. Thomas Herbst).

SA Herbst in 2009; and, (iii) was going to be targeted in June 2016 by DEA SA Anthony Casullo, Bongiovanni *still* responded to Gerace's voicemail message requesting advice about law enforcement's ability to "ping" Trac Fones, which are throw away burner phones favored by drug dealers attempting to thwart law enforcement. And, finally, as detailed above, the jury was permitted to conclude that the defendant was knowingly and corruptly trying to provide Bongiovanni with cover when he told Bongiovanni, after law enforcement began scrutinizing their relationship, that Bongiovanni had never come to Pharoah's—a statement that Bongiovanni included in his DEA memoranda, which was undeniably proven false by the defendant's own text messages with Bongiovanni.

In sum, Bongiovanni's oath and duty to the DEA required him to act with honestly and integrity to investigate, arrest, and help prosecute drug dealers, but the evidence demonstrated an agreement whereby the defendant procured Bongiovanni's corrupt protection for many years. Bongiovanni showed up when the defendant needed him, and the defendant used information provided by Bongiovanni to advance his interests. Based upon what they said and did, there was substantial evidence from which the jury could infer the existence of the corrupt agreement charged in Count 1 between the defendant and Bongiovanni. *See Torres*, 604 F.3d at 67 ("[C]onspiracies are undertakings in secret and often cannot be proven except through the use of circumstantial evidence"); *Anderson,* 747 F.3d 51, 60–61 (noting that "[t]he government may prove the defendant's knowing participation in a conspiracy through circumstantial evidence," which may include "for example, a defendant's association with conspirators in furtherance of the conspiracy. . . his presence at critical stages of the conspiracy that cannot be explained by happenstance . . . items that are of essential significance to the conspiracy. . .," and "[i]n context, acts that exhibit a consciousness of guilt,

such as false exculpatory statements […] may also tend to prove knowledge and intent of a conspiracy's purpose, although false exculpatory statements alone do not suffice to establish guilty knowledge," and "a federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." (internal quotations omitted)); *Anderson*, 747 F.3d at 61 ("The government need not prove the defendant's familiarity with all of the conspiracy's details; it may demonstrate simply the defendant's awareness of the general nature and extent of the conspiracy.  It is not necessary to prove that the defendant expressly agreed with other conspirators on a course of action; it is enough, rather, to show that the parties ha[d] a tacit understanding to carry out the prohibited conduct." (citations and internal quotations omitted)).  As such, the jury was permitted to conclude that the defendant knowingly and intentionally conspired with Bongiovanni to defraud the United States.

### ii.    The Offense Prong

A reasonable jury also could have concluded that the defendant conspired with Bongiovanni to commit bribery, as alleged in Count 1's offense prong, and paid bribes to Bongiovanni, as alleged in Count 2.  Bongiovanni and the defendant's relationship was rife with corruption for well over a decade.  During that period, Ms. Nigro testified that the defendant paid Bongiovanni multiple envelops containing cash, in addition to a birthday gift of $5,000.  Even the defendant concedes that these "cash payments" are evidence that he "ask[ed] or expect[ed] [ ] Bongiovanni to act in a way that [was] improper."  Gerace R. 29 Mot., at 16.

Additionally, the jury was permitted to infer and conclude that the payments from

Gerace to Bongiovanni, including the $5,000 birthday envelope, were to keep Bongiovanni on retainer for the defendant "as opportunities arose."

First, the jury heard more information about the defendant's payments and methods to influence public officials, such as Judge Michalski, than the jury did in *Bongiovanni I*—this evidence provided further context to Katrina Nigro's testimony as it related to the defendant and Bongiovanni. Second, as detailed *supra*, unlike at *Bongiovanni I*, the *Gerace* jury heard evidence from Doug Augustyniak that corroborated Nigro's account that the defendant paid individuals envelopes of cash. Third, as detailed above, the payments Nigro made to Bongiovanni at Pharaoh's at the defendant's direction were after Bongiovanni leaked search warrant information to Gerace in 2005; after Bongiovanni interjected himself using a "cold approach" ruse and circumstances established Bongiovanni notified the defendant of SA Wisniewski's Gambino investigation; after Bongiovanni interceded and misled FBI SA Herbst and caused him to drop his the defendant's investigation in 2009 and Bongiovanni authored a fictitious and fraudulent DEA 6 report describing the defendant as a confidential source; approximately within six months before the July 2016 birthday dinner, which means the payments were made shortly after overdoses of Pharaoh's dancers in 2015; and, the payments—including the July 2016 "birthday" card envelope containing $5,000—were made in close proximity to Bongiovanni's efforts to dissuade SA Casullo from investigating the defendant in June 2016.

The payments were also made *before* Bongiovanni provided the defendant advice about law enforcement's ability to "ping" Trac Fones on May 4, 2017; before Bongiovanni wrote false DEA memoranda on November 1, 2018, December 10, 2018, and January 28, 2019, wherein Bongiovanni sought to conceal and cover-up his corrupt protection of the defendant;

before Bongiovanni made false statements to DOJ-OIG on March 29, 2019, minimizing his relationship to the defendant in an effort to continue to cover-up and conceal their corrupt scheme and to dissuade DOJ-OIG front continuing to investigate; and before Bongiovanni made false statements to HSI SA Curtis Ryan on June 6, 2019, minimizing his relationship with the defendant, attempting to characterize the defendant as a drug user and white collar criminal—not a narcotic distributing sex trafficker who had dancers overdose at his club, and claiming that IOC was "dead" in an effort to further dissuade HSI SA Curtis Ryan from investigating the defendant and any connections to IOC.

These facts and circumstances permitted the jury to infer and conclude that Bongiovanni was on the defendant's retainer before, during, and after the timeframes about which Katrina Nigro had direct knowledge of payments and are evidence of a classic "as opportunities arise" theory of bribery as the course of conduct between Bongiovanni and the defendanat—from 2005 through 2019—established as clear pattern of corrupt protection that demonstrated a general understanding of the information and protection Bongiovanni was to provide the defendant as opportunities arose. *Skelos*, 988 F.3d at 655; *see also United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007) (Sotomayor, J.) ("While it frequently will be true that particular bribes or extorted payments are linked at the time of the corrupt agreement to particular official acts, that will not always be the case—for example, because the opportunity to undertake the requested act has not arisen, or because the payment is one of a series to ensure an ongoing commitment to perform acts to further the payor's interests"); *Anderson*, 747 F.3d at 60-61 ("The government may prove the defendant's knowing participation in a conspiracy through circumstantial evidence," which may include "for example, a defendant's association with conspirators in furtherance of the conspiracy. . . his presence at critical stages

of the conspiracy that cannot be explained by happenstance . . . items that are of essential significance to the conspiracy. . .," and **"[i]n context, acts that exhibit a consciousness of guilt, such as false exculpatory statements […] may also tend to prove knowledge and intent of a conspiracy's purpose**, although false exculpatory statements alone do not suffice to establish guilty knowledge," and "a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt  beyond a reasonable doubt.") (emphasis added).

Importantly, the defendant challenges this evidence, however, by characterizing it as "not credible" and "insufficient" to sustain a conviction.  *Id.* at 18.  To support his claim that the evidence lacked credibility, the defendant urges that the Court "disregard[]" Ms. Nigro's testimony "in its entirety" due to purported discrepancies between her grand jury testimony and trial testimony.  But this argument flies headlong into settled precedent holding that "Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence," but instead mandates that it "give full play to the right of the jury to determine credibility."   *Cote*, 544 F.3d at 99–100.  Ms. Nigro, who was corroborated in a myriad of ways across a spectrum of issues as described *supra*, was subject to an extensive and exhaustive cross-examination by the defense and the jury clearly found her credible.  *See Florez*, 447 F.3d at 156.

Lastly, the defendant offers several "plausible[,] benign explanations for the money," including the baseless assertion that it was "likely" that "the envelopes were a reimbursement from [the defendant] to Bongiovanni."  Gerace R. 29 Mot., at 19.  The jury clearly did not think so and, in any case, "the government need not negate every possible theory of

innocence," even though accepting thousands of dollars in cash from someone repeatedly targeted by federal law enforcement and admittedly connected to kilo-level cocaine distribution is hardly the stuff of "innocence."[268]  *Cote*, 544 F.3d at 98.  Consequently, the evidence permitted a reasonable jury to conclude that the defendant conspired with Bongiovanni to defraud the United States and commit bribery.

### 2.    A rational jury could conclude that the defendant bribed Bongiovanni

The defendant next challenges his conviction for Count 2, which charged him with bribing Bongiovanni between 2009 and 2019.  The defendant argues that his conviction for Count 2 must be vacated because this Court acquitted Bongiovanni's acceptance of bribes following a mistrial in *Bongiovanni I*.  Gerace R. 29 Mot., at 22–24.  More generally, he argues that the evidence did not show that he "gave money or something of value to [ ] Bongiovanni with the corrupt intent to influence an official act or to induce that official to perform an act or omit to perform an act in violation of his lawful duty . . . ."  *Id.* at 25 (internal quotations omitted).  Echoing the Court's acquittal of Bongiovanni for a similar charge, the defendant insists that "there was no circumstantial evidence from which a jury could infer beyond a reasonable doubt that the payments were bribes, as opposed to being gratuities or benign exchanges between friends."  *Id.* at 26.

These arguments fail for four reasons.  First, doctrines of collateral estoppel do not extend to Rule 29 review such that the Court's acquittal of Bongiovanni for bribery related to this defendant does not require it to acquit this defendant of bribery related to Bongiovanni. Second, and relatedly, the *Bongiovanni I* and *Gerace* trials focused on a different defendant's intent and involved different evidence, making the Court's prior analysis of Bongiovanni's

---

[268]    *See* Gov. Ex. 30A at 2.

intent when receiving cash payments from the defendant inapposite to the focus here: the defendant's intent when giving cash payments to Bongiovanni. Third, the *Gerace* trial featured more evidence regarding the extent and nature of the defendant's corrupt relationship with Bongiovanni and his motivation for securing Bongiovanni's protection services than did *Bongiovanni I*, such that a reasonable jury could conclude that the defendant did, in fact, corruptly pay Bongiovanni with the intent that doing so would influence his official actions. Fourth, as the defendant concedes, the evidence is sufficient to show that he paid an illegal gratuity, which is a lesser-included offense to bribery. *See* Gerace R. 29 Mot., at 26.; *United States v. Ganim*, 510 F.3d 134, 152 (2d Cir. 2007) (Sotomayor, J.) (recognizing that receiving illegal gratuities is a lesser included offense to receiving a bribe). Nevertheless, because the defendant "d[id] not request [a lesser included offense] charge, . . . its omission is not error" for the purposes of affirming the jury's verdict. *United States v. Seijo*, 537 F.2d 694, 699 n.5 (2d Cir. 1976). Accordingly, the defendant's challenge to Count 2 should be denied.

> a.    **Legal Framework**

Count 2 charged the defendant with substantive bribery in violation of Title 18, United States Code, Sections 201(b)(1)(A) and 201(b)(1)(C). *See* ECF No. 1350 (Redacted Ind.), Count 2. In particular, Count 2 alleged, in part, that "Beginning in or about 2009, and continuing to on or about June 6, 2019, . . . the defendant "did, directly and indirectly, corruptly give, offer, and promise a thing of value to a public official, namely, a DEA Special Agent, with intent to induce the performance of an official act and to induce a public official to do an act and omit to do an act in violation of his lawful duty, as opportunities arose[.]" *Id.*

As the Court instructed, the elements required the government to prove: (1) that Gerace "offered, promised or gave something of value," to Bongiovanni; (2) that Bongiovanni was "a public official by virtue of his being a Drug Enforcement Administration Special Agent;" and, (3) that Gerace "did so with the corrupt intent to perform an act or omit to perform and act in violation of his lawful duty. *See* Jury Instr. at 87; *see also* 18 U.S.C. § 201(b)(2)*; United States v. Sun-Diamond Growers of California,* 526 U.S. 398, 404–05 (1999) ("[F]or bribery there must be a quid pro quo—a specific intent to give or receive something of value in exchange for an official act) (emphasis in original); *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002) ("The 'corrupt' intent necessary to a bribery conviction is in the nature of a quid pro quo requirement"). The corrupt agreement need not be expressly stated. *See Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J. concurring); *United States v. Benjamin*, 95 F.4th 60, 68 (2d Cir. 2024). Instead, "the jury may infer such an agreement based on evidence of the official's 'implicit promise to use his official position to serve the interests of the bribegiver.'" *Benjamin*, 95 F.4th at 71 (emphasis in original) (quoting Evans, 504 U.S. at 257); *see also McDonnell v. United States*, 579 U.S. 550, 567 (2016) ("The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain.").

Commonly, the bribe payor will provide one or more payments in exchange for multiple official acts or violations of duty, without a one-for-one relationship between each payment and a specific act. This form of bribery is typically referred to as the "as opportunities arise" theory. "Put differently, this theory means that the government does not have to prove an explicit promise to perform a particular act made at the time of payment so long as the general nature of the act to be taken was understood at the time of the payment." *United States*

*v. Skelos*, 988 F.3d 645, 655 (2d Cir. 2021) (internal quotation marks omitted); *see Ganim*, 510 F.3d at 147 ("While it frequently will be true that particular bribes or extorted payments are linked at the time of the corrupt agreement to particular official acts, that will not always be the case—for example, because the opportunity to undertake the requested act has not arisen, or because the payment is one of a series to ensure an ongoing commitment to perform acts to further the payor's interests"); *see also Woodward v. United States*, 905 F.3d 40, 46 (1st Cir. 2018) ("Thus, we remain confident that a 'stream of benefits' theory of bribery remains valid [after *McDonnell*]"); *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) ("[T]he federal bribery and honest services fraud statutes . . . criminalize scheme[s] involving payments at regular intervals in exchange for specific official acts as the opportunities to commit those acts arise, even if the opportunity to undertake the requested act has not arisen, and even if the payment is not exchanged for a particular act but given with the expectation that the official will exercise particular kinds of influence."); *United States v. Ciavarella*, 716 F.3d 705, 730 (3rd Cir. 2013) (stating that "the bribery theory does not require that each quid, or item of value, be linked to a specific quo, or official act. Rather, a bribe may come in the form of a 'stream of benefits'" in honest services mail fraud case).

A quid quo pro may be shown where "the defendant agreed to accept things of value in exchange for performing official acts on an as-needed basis, so that [when]ever the opportunity presented itself, he would take specific action on the payor's behalf." *United States v. Jefferson*, 2012 WL 990234 (4th Cir. March 29, 2012).[269]

---

[269]    A gratuity is a lesser-included offense of bribery, *see United States v. Alfisi*, 308 F.3d 144, 152 (2d Cir. 2002), and "Although both the bribery and illegal gratuity statutes relate to giving a thing of value to a public official, or a public official accepting a thing of value, the illegal gratuity statute, on its face, is one-sided. That is, an illegal gratuity does not require an intent to influence or be influenced. The gratuity is a reward for an action that a public official has already taken, or for an action that the public official has committed to take in

In addition to "official acts" the law prohibits giving or accepting a payment in exchange for violating one's duties as a public official or for colluding in a fraud against the government. 18 U.S.C. § 201(b)(1)(C); *see also Parks v. United States*, 355 F.2d 167 (5th Cir.1965) (explicitly finding that defendant's arrangement to pay an Air Force sergeant to sell names of new recruits constituted inducement to do an act in violation of the sergeant's lawful duty); *United States v. Cruz*, 946 F.2d 122, 123 (11th Cir.1991) (defendant convicted under bribery statute for providing an investigative target with "information relating to the IRS and FBI's investigations in exchange for money"); *United States v. Lanci*, 669 F.2d 391 (6th Cir.1982) (defendant convicted of bribery and conspiracy for his role in arranging to bribe an FBI employee to divulge confidential information, such as the names of FBI informants). *Cf. United States v. Gjieli*, 717 F.2d 968, 974 (6th Cir.1983) (holding that the "official duty" provision is broader than the "official act" provision in that only the latter requires that "the act induced fall within the federal employee's official function").

Indeed, in explaining the breadth of official duty bribery, the Second Circuit has cautioned where, as here, "the official duties require the exercise of some judgment or discretion," that "if the government must prove beyond a reasonable doubt actual or intended violations of official duties, many highly culpable payments would go underpunished as unlawful gratuities, or unpunished altogether. *United States v. Alfisi*, 308 F.3d 144, 151 (2d Cir. 2002).

---

the future. The bribery statute, however, requires proof of a quid pro quo, that is, an intent on the part of the public official to perform acts on his payor's behalf. In other words, the public official's intent to perform acts for the payor—required for a bribery offense—is the exchange, or quid pro quo, missing from the illegal gratuity scenario." *Jefferson*, 674 F.3d at 358, *as amended* (Mar. 29, 2012).

### b.    Application

The defendant's challenges to Count 2 uniformly fail.  First, the defendant's reliance on this Court's acquittal of Bongiovanni following the mistrial in *Bongiovanni I* is fundamentally misplaced because principles of non-mutual collateral estoppel do not extend to Rule 29 review.  As the Supreme Court has already explained, extending the preclusive effect of judgments in other cases to criminal legal practice is "plainly unwarranted."  *Standefer v. United States*, 447 U.S. 10, 24 (1980); *United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 100 (2d Cir. 2014) ("To begin with, the Supreme Court has held that nonmutual collateral estoppel is generally unavailable against the Government, and has long rejected application of nonmutual collateral estoppel against the Government in criminal trials." (internal citations omitted and citing *United States v. Mendoza*, 464 U.S. 154, 159–64 (1984))).  This Court has already rejected the defendant's efforts to ride the coattails of its acquittal vis-à-vis Bongiovanni—and it should not resurrect them here in contravention of controlling precedent and the jury's determination of guilt.  *See generally* Mot. Dismiss, ECF No. 1290, (dated Oct. 15, 2024); Gov. Resp. in Oppo., ECF No. 1295, (dated Oct. 18, 2024); *United States v. Bernhardt*, 840 F.2d 1441, 1447–48 (9th Cir. 1988) (rejecting the appellants' efforts to apply non-mutual collateral estoppel against the government where codefendants were previously acquitted of certain counts).

This is especially true considering that the Court's acquittal related to allegations that Bongiovanni *accepted* a bribe as a public official, whereas the defendant is charged with *paying* a bribe to a public official.  *See* Red. Indict., at 13–14.  In pertinent part, that charge required the government to prove that the defendant gave a thing of value "with [the] intent *to induce*" the performance or omission of an official act.  *Id.* at 13 (emphasis added).  By contrast,

Bongiovanni was charged with accepting a thing of value with the intent "to be influenced." *United States v. Bongiovanni*, No. 19-CR-227, 2024 WL 3487914, at *3 (W.D.N.Y. July 19, 2024) (noting that Bongiovanni was charged with accepting a thing of value "with the corrupt intent to be influenced in the performance of an official act or to be induced to do an act or omit to do an act in violation of his official duty"); *Sun-Diamond*, 526 U.S. at 404.

For our purposes, that distinction makes a difference. After all, a payor may give a thing of value with the intent that it induce the performance or omission of an official act even when the recipient lacks such corrupt intent when accepting it. In such circumstances, a jury (and a Court) may properly conclude that the payor gave something of value with the intent to influence an official act where the public official lacked a reciprocal intent to be influenced. *See Sun-Diamond*, 526 U.S. at 404. Thus, setting aside that the defendant's arguments must all fail because *Bongiovanni I* was tried before a different jury, featured different evidence, and involved a distinct charge—the Court's focus in *Bongiovanni* centered on the public official's intent when accepting money from the defendant, whereas here it must train its sights on the defendant's intent as he paid Bongiovanni.

"[M]otive"—as well as the "course of conduct" between the payor and the recipient—can support the "infer[ence]" that the *payor* intended to commit bribery. *Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring). And here, the evidence showed that the defendant (1) had a powerful motive for retaining Bongiovanni's protection against future law enforcement scrutiny and (2) engaged in a course of conduct with Bongiovanni from a which a reasonable jury could conclude that Bongiovanni protected the defendant. Specifically, the defendant, a convicted felon, distributed drugs and sex trafficked multiple women through Pharoah's, where he personally promoted rampant drug distribution, covered up drug

overdoses, and exploited drug-addicted women for commercial sex.  Additionally, the course of conduct between the defendant and Bongiovanni—ranging from Bongiovanni's leaking search warrant information to the defendant in 2005, to his 2008 intervention in SA Wisniewski's Gambino investigation, and his 2009 intercession in SA Herbst's investigation to his directive to the defendant to abscond with an overdosing dancer and blustering attempt to shutdown SA Casullo's investigation into the defendant—illuminates precisely why the defendant thought he could "influence" Bongiovanni's actions with money.  *Sun-Diamond*, 526 U.S. at 405.  In that respect, the evidence permitted a reasonable jury to conclude that the defendant paid money to Bongiovanni with the intent to have Bongiovanni on retainer—as opportunities arose—should circumstances arise (as they did several times) that necessitated Bongiovanni's corrupt intervention to contain and mitigate the defendant's legal liability.

Finally, the defendant was on notice that his conduct, at minimum, could have amounted to an illegal gratuity.  *See* Gerace R. 29 Mot., at 26.  Paying a gratuity is a lesser included offense to paying a bribe.  *See Ganim*, 510 F.3d at 152; *see also Alfisi,* 308 F.3d at 152. Nevertheless, because the defendant "d[id] not request [a lesser included offense] charge, . . . its omission is not error" for the purposes of affirming the jury's verdict.  *Seijo*, 537 F.2d at 699 n.5.  To old otherwise would essentially reward a defendant for "sandbagging the district judge by failing to object [to jury instructions] and then" seeking an acquittal on account that an alternative jury instruction could have been supplied but was not.  *DeLeon v. Strack*, 234 F.3d 84, 86 (2d Cir. 2000).  For all these reasons, the defendant's motion for a judgment of acquittal as to Count 2 should be denied.

3.    **A rational jury could conclude that the defendant engaged in a narcotics conspiracy and maintained Pharoah's Gentlemen's Club as a drug-involved premises.**

The defendant's challenge to his convictions for Counts 3 and 4 similarly fail. Count 3 charged the defendant him with maintaining Pharoah's as a drug-involved premises from 2006 until December 2019. *See* Red. Indict., at 15. Count 4 charged him with conspiring with Bongiovanni and others, known and unknown, to possess with intent to distribute various drugs and to maintain Pharoah's as a drug-involved premises from 2009 until February 2019. *See id.* at 16. The defendant's challenge to these convictions center on two propositions: (1) that "[t]he government could not establish continuous criminal conduct that stretched for the entirety of the timeframe alleged in the counts" and (2) there existed "[a] block of over one year in which [the defendant] was not maintaining [Pharoah's] at all, let alone maintaining [it] as a drug premises." Gerace R. 29/33 Mot., at 29, 31. These arguments falter for two reasons. First, the evidence at trial established continuous narcotics-related conduct involving the defendant at Pharoah's between 2006 and 2019. Second, any variance in dates of the conspiracy between the indictment and proof was not prejudicial, because the government established—and the defendant does not contest—that rampant drug use and distribution persisted at Pharoah's through 2018 and 2019, both of which were well within the statute of limitations.

a.    **Legal Framework**

i.    **The elements**

The defendant was convicted for maintaining Pharoah's as a drug-involved premises between 2006 and 2019 in violation of 21 U.S.C. § 856(a)(1). "To convict under this statute, the government was required to prove that the defendant[] (1) used a place; (2) for the purpose

95

of distributing or packaging controlled substances; and (3) did so knowingly." *United States v. Willis*, 14 F.4th 170, 184 (2d Cir. 2021) (internal quotations omitted). For the jury to convict under 21 U.S.C. § 846, the narcotics conspiracy statute pertinent to Count 4, the government had to prove that two or more persons entered the unlawful agreement charged in the indictment and that the defendant knowingly and willfully joined and became a member of that unlawful agreement. Gerace Jury Instructions, at 123.

### ii. Variances

A variance occurs when the evidence adduced at trial proves facts "materially different" than the facts alleged in an indictment. *United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir. 1988). In most instances a variance will not require granting a judgment of acquittal, because the Second Circuit employs a fairly "relaxed" standard regarding "the effect of time allegations." *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983). The Second Circuit has "permitted significant flexibility in proof, provided that the defendant was given notice of the 'core of criminality' to be proven at trial." *Id.* (quoting *United States v. Sindona*, 636 F.2d 792, 797–98 (2d Cir.1980)). A variance only warrants entry of a judgment of acquittal when it results in "substantial prejudice" to the defendant. *See United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007); *United States v. McDermott*, 918 F.2d 319, 326 (2d Cir. 1990). To determine whether a variance is prejudicial, the court must decide "whether the variance infringes on the 'substantial rights' that indictments exist to protect—'to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy.'" *United States v. Dupre*, 462 F.3d 131, 141 (2d Cir. 2006) (quoting *United States v. D'Anna*, 450 F.2d 1201, 1204 (2d Cir. 1971)).

In the Second Circuit, "an indictment date only needs to be substantially similar to the date established at trial." *United States v. Teague*, 93 F.3d 81, 84 (2d Cir. 1996) (internal citations and quotations omitted); *United States v. Morgenstern*, 933 F.2d 1108, 1115 (2d Cir.1991) (holding that "the district court correctly instructed the jury that there had to be a substantial similarity between the indictment and the proof in order to find the defendant guilty" (internal citations and quotations omitted)).

However, where the dates of a conspiracy proven at trial are within the dates charged in the indictment, courts conclude that the variance is not prejudicial. *See Heimann*, 705 F.2d at 666 ("Particularly with respect to allegations of time, we have permitted proof to vary from the indictment provided that the proof fell within the period charged."); *United States v. Wilson*, 134 F.3d 855, 865 (7th Cir. 1998) ("If the conspiracy charged in the indictment includes the smaller conspiracy found by the jury, then the variance will not be fatal, since the indictment would have sufficiently notified the defendants of the Government's accusations.").

### b.    Application

The defendant's challenges to Counts 3 and 4 first fail because evidence established that he maintained Pharoah's as a drug-involved premises and worked with others, such as Leyland, Scooter, Black, A.P., and other members of the staff; his friends; and his family members to distribute narcotics to dancers and customers alike. For each year between 2006 and 2019, the government presented multiple witnesses who testified that drug use and distribution at Pharoah's was open, notorious, rampant, and encouraged or facilitated by the defendant. The government's proof also established that the defendant exercised control over

the club, including by walking around like the boss, from 2012 through 2014, the time period that the defendant incorrectly states he was absent from Pharoah's.[270]

Even assuming *arguendo* that the defendant was not physically inside Pharoah's during certain periods of time, it does him no good under established precedent, as his involvement in a conspiracy is not contingent on his physical presence. *United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002) ("It is well established that where the government has shown that a conspiracy existed and that a given defendant was a member of it, his membership is presumed to continue until the last overt act by any of the coconspirators, unless the defendant proves that the conspiracy was terminated or that he took affirmative steps to withdraw."). "Positive evidence of withdrawal is required in order to provide assurance that the defendant genuinely removed himself from the conspiracy and is not simply attempting an after-the-fact escape from liability." *Id.* (citing *United States v. Greenfield,* 44 F.3d 1141, 1150 (2d Cir. 1995)).[271]

Likewise, the existence of a variance between the dates alleged in the indictment and the evidence adduced at trial does not automatically entitle the defendant to an acquittal where, as here, the defendant has failed to demonstrate how such a variance substantially prejudiced him. *See Rigas*, 490 F.3d at 226 ("A variance only warrants entry of a judgment of acquittal when it results in 'substantial prejudice' to the defendant."). The defendant attempts

---

[270]    *See, e.g.,* n. 51.

[271]    "A single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations. Nor is a single conspiracy transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance. Nor are multiple conspiracies necessarily created by periodic inactivity on the part of the conspirators." *Spigelman v. United States*, No. 10 CIV. 7579 SAS, 2012 WL 3594304, at *13 (S.D.N.Y. Aug. 21, 2012)(collecting cases, internal quotations and citations omitted).

to carry this heavy burden by making passing reference to the statute of limitations.  *See* Gerace R. 29/33 Mot., at 27 (arguing that the "time span is problematic for multiple reasons," including that "both [of the] periods [charged in Counts 3 and 4] stretch far beyond what would be typically permitted by the statute of limitations" (citing 18 U.S.C. § 3282)).  But this argument is nothing more than a red herring.

The defendant was indicted on February 25, 2021.  *See* Sec. Super. Indict., ECF No. 89, (dated Feb. 25, 2021).  Thus, even if the government's proof was limited to conduct occurring between 2016 and 2019, which it was not, the evidence still overwhelmingly established his guilt as to both Counts 3 and 4.[272]  Furthermore, the defendant was not prejudiced by evidence of his narcotics trafficking predating 2016 because such evidence is relevant to how the defendant sex trafficked the female dancers who worked for him.  Because there is no statute of limitations with respect to sex trafficking, the evidence of the defendant's narcotics trafficking would have been admissible anyways.  *See* 18 U.S.C. § 3299 ("Notwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense under . . . section 1591").  The defendant makes no effort to explain how such a variance could have prejudiced him under these circumstances, let alone substantially prejudiced him.  Thus, even were defendant correct that the evidence varied from the indictment's allegations, he has failed to explain why it requires an acquittal.  For all these reasons, the defendant's challenges to Counts 3 and 4 must be denied.

---

[272] *See e.g.,* Section I(B)(1), *supra*.

### 4.  A rational jury could conclude that the defendant conspired with others to engage in sex trafficking.

The defendant next contends that the evidence was "insufficient to support a verdict of guilty" as to Count 5, which charged him with conspiring with others to commit sex trafficking.  But contrary to the defendant's review of the trial evidence, which he promotes in the light most favorable to himself, Rule 29 review requires this Court to consider the evidence in the light most favorable to the government.  The evidence was strong, *see* Section I(B)(2), *supra*, and considered with the proper standard in mind, the evidence was more than sufficient to permit a reasonable jury to conclude that the defendant conspired with others to sex traffic the female dancers who worked for him at Pharoah's.

### a.  Legal Framework

Title 18, United States Code, Section 1594(c) makes it a crime to "conspire[] with another to violate section 1591," of the same chapter.

Section 1591, in turns, provides for punishment of any individual:

> (a) Who[ ] knowingly—
>
> > (1)  in or affecting interstate or foreign commerce, ... recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
> >
> > (2)  benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> [while also] knowing[ ] . . . that means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a commercial sex act, . . . .

18 U.S.C. § 1591(a) (emphasis added).

Section 1591 goes on to define a "commercial sex act" as "any sex act, on account of which *anything of value* is given to or received by any person." *Id.* § 1591(e)(3) (emphasis added). "Coercion" is defined as "threats of serious harm to or physical restraint against any person;" "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to our physical restraint against any person"; or "abuse or threatened abuse of law or the legal process." *Id.* § 1591(e)(2). "Serious harm," in turn, "means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." *Id.* § 1591(e)(5).

A "reasonable fear of suffering painful withdrawal symptoms if [one] d[oes] not perform commercial sex acts as directed by [the defendant]" is sufficient to satisfy the statute's "serious harm" requirement if the prosecution proceeds under a theory of coerced commercial sex acts. *United States v. Shine*, No. 20-314, 2022 WL 761520, at *3 (2d Cir. Mar. 14, 2022).

### b. Application

A reasonable jury could conclude that the defendant conspired with others to sex traffic drug-addicted dancers who worked for him at Pharoah's. Specifically, the evidence established that the defendant recruited, enticed, solicited, and provided multiple women, including G.R., K.L., and L.L, for the purposes of obtaining commercial sex.[273] As well, the

---

[273]    *See* Tr. Tran., at 45–46, (Test. G.R., dated Nov. 13, 2024); Tr. Tran., at 70–75, (Test. L.L., dated Dec. 16, 2024); Tr. Tran., at 44–45, (Test. K.L., dated Dec. 9, 2024).

evidence established that the defendant knew, or was in reckless disregard of the fact, that force, threats of force, fraud, or coercion would be used to cause those victims and other dancers to engage in a commercial sex acts. "The Second Circuit, and other circuit courts, have referenced the practice of providing, withholding, and threatening to withhold drugs as evidence of coercion to engage in commercial sex acts." *United States v. Bongiovanni*, No. 19CR227JLSMJR, 2023 WL 3143894, at *6 (W.D.N.Y. Apr. 28, 2023) (collecting cases).

Here a reasonable jury could have concluded that the defendant "manipulat[ed] vulnerable women by exploiting their drug addictions in exchange for prostitution services", including but not limited to exploiting their reasonable fear of drug-withdrawal. *United States v. Wysinger*, 64 F.4th 207, 212 (4th Cir. 2023). As described above, G.R., K.L., and L.L. each testified that they exchanged sex for drugs or money to purchase drugs due to the severity of their drug addictions and, in particular, their desires to avoid withdrawal. The evidence also established that the defendant knew that all three victims were heavily addicted to drugs, including opiates and cocaine. G.R. was severely underweight and looked visibly "awful" due to her drug addiction. K.L. was addicted to the Lortabs that the defendant first provided her, and was actively in withdrawal—which gave her flu-like symptoms—when the defendant told her "you know what you have to do." And L.L.'s addiction to heroin and cocaine were so severe that her arms changed colors and developed scarring track marks caused by extensive intravenous drug use.

The defendant also alluded to K.H. that he knew that drug addiction would drive his female employees to engage in commercial sex: "you'd be surprised what they'll do," the defendant said, "for a little bit of product."[274] L.L. also described other drug addicted dancers

---

[274] Tr. Tran., at 11–12, ECF No. 1513 (dated Dec. 10, 2024) (Test. K.H.).

who similarly engaged in commercial sex acts and, as a result, were among the defendant's "favorites," and Katrina Nigro testified about other dancers who were addicted to drugs and who engaged in sex acts both in the downstairs VIP area—which the defendant called "the bank" according to A.B., and in the private upstairs area controlled by the defendant.[275]

But serious harm also includes non-physical harm, such as financial harm. For example, the defendant knew, and used, the threat of financial harm against L.L. to keep her at Pharoah's, where she engaged in numerous sex acts for the defendant and some 500 customers, injecting money into the club's sex-and-drug fueled stream of commerce. And he was, at minimum, in reckless disregard of the fact that his role as G.R.'s boss at the job she needed to fund her all-consuming drug addiction compelled her to provide vaginal intercourse to one of the defendant's friends.[276]

On a larger level, as described in Section I(B)(2), *supra*, the defendant created a business model, knowing and recklessly disregarding the fact that drug-addicted women would be coerced to engage in sex acts in the VIP and champagne rooms at Pharoah's with high-paying customers. The defendant specifically informed L.L. that the VIP attendant, "Brian," "will overlook the cameras" before directing her to go to the back rooms with

---

[275]    Tr. Tran., at 96-99, ECF No. 1441 (dated Dec. 16, 2024) (Test. L.L.) (naming other dancers and describing how they became the defendant's "favorites" and engaged in threesomes upstairs with the defendant " a lot" in exchange for drugs); *id.* at 38-39 (describing the difference between downstairs customers who engaged in sex acts with dancers and upstairs as: "The difference was the customers that had a lot of money, they would be the ones downstairs in the VIP Rooms. And people that were real close to the defendant would be the ones to go up."); Tr. Tran., at 110, 123-24, ECF No. 1600 (dated Nov. 27, 2024) (Test. Nigro); Tr. Tran., at 47, ECF No. 1379 (Nov. 13, 2024) (Test. A.B.).

[276]    *See also* Tr. Tran., at 15–16, 19, 25–26 ECF No. 1458, (Test. A.G., dated Nov. 20, 2024) (testifying that she worked at Pharoah's for two days, made a lot of money for herself and the club, but was fired after declining to "go upstairs" with the defendant and rejecting his sexual advances when he invited her upstairs with other women under each of his arms).

VanVleet where he would digitally penetrate her vagina.[277]  The result was that, to continuously stave off withdrawal symptoms connected with the drug addiction that the defendant caused by promoting rampant drug use at Pharoah's, L.L. had to have sex with some 500 men and the defendant, himself, over the course of her five-year tenure at the club. And then, of course, after she received payment, L.L. could purchase narcotics from any one of several drug dealers close to the defendant who he effectively licensed to distribute drugs at his club.

Similarly to L.L.'s detailed testimony, Katrina Nigro's testimony which established that drug addicted dancers engaged in vaginal, oral, and hand jobs in the downstairs VIP.[278] A. B. testified that VIP bouncer Brain Rosenthal did not stop sex acts that occurred in the VIP—including the dancers who were the defendant's favorites.[279]  Furthermore,  E.H., Al. A., and G.R., all described situations when men ejaculated on them or in their presence in the VIP room and nobody helped them or intervened.[280]  The result the defendant intended—

---

[277]    *See* Tr. Tran., at 71-72, ECF No. 1441, (dated Dec. 16, 2024) (Test. L.L.).

[278]    Tr. Tran., at 110, ECF No. 1600 (dated Nov. 27, 2024) (Test. Nigro).

[279]    Tr. Tran., at 47, 74-75 ECF No. 1379 (Nov. 13, 2024) (Test. A.B.); (describing that the VIP bouncer Brain Rosenthal did not stop sex acts that occurred in the VIP—including the dancers who were the defendant's favorites).

[280]    Tr. Tran., at 28-30, 55, ECF No. 1469, (dated Nov. 18, 2024) (Test. E.H.) (describing how a patron at Pharoah's ejaculated on her during a lap dance and she was not permitted to call the police); *see also* Tr. Tran., at 55-56, ECF No. 1366 (dated Nov. 13, 2024) (Test. G.R.) (describing that she observed a dancer named "Joy" having sex in the VIP and that a customer to who she was giving a lap dance exposed himself, masturbated, and finished and that nobody intervened); Tr. Tran., at 14–16, ECF No. 1441, (dated Dec. 16, 2024) (Test. L.L.) (describing engaging in sex acts in the downstairs VIP, including at the defendant's direction); Tr. Tran., at 31-43 (testifying that "I thought, like, I would do a dance in front of them but, like, not on them. But I found out when I started working that it is on them. And there's a lot of physical touching and contact[,]" and that she needed money for drugs and customers in the downstairs VIP touched her vagina, kissed her breasts, kissed her, including that frequent and high paying VIP customer Wayne Vanvleet would often hold her in position on his lap until he ejaculated, and nobody monitoring the VIP cameras—*i.e.*, Pharoah's security who work for the defendant—ever intervened to stop Vanvleet.).

consistent with Rebecca Benders testimony about how dancers are often placed in the position of being the "upsellers"[281]—was that the defendant directly earned money from commercial sex customers who rented the champagne and VIP rooms at Pharoah's, the VIP attendants benefitted from the customers for looking the other way, and the defendant's drug-dealing co-conspirators profited after the drug-addicted dancer spent her commercial sex proceeds on the drugs the defendant got her addicted to. In short, the defendant, working with others, created an entire commercial sex and narcotics economy premised upon the exploitation of vulnerable, desperate, and drug-addicted dancers. Accordingly, when the evidence is viewed in the light most favorable to the government, the jury's verdict was amply supported and the defendant's conviction for Count 5 must be affirmed.

### 5. A rational jury could conclude that the defendant engaged in witness tampering.

Next, the defendant challenges his conviction as to Counts 6 and 7.[282] Count 6 charged the defendant with witness tampering under 18 U.S.C. §§ 1512(b)(1) and 2.[283] Count 7 charged the defendant with witness tampering under 18 U.S.C. §§ 1512(b)(2)(A) and 2.[284] Both counts stemmed from the threatening Facebook message P.H. received on November 19, 2019.[285] The defendant argues that "[t]he evidence at trial was insufficient to convict [him] of any of the tampering counts" because there was "no proof that [the defendant] 'knowingly'

---

[281]    Tr. Tran., at 104–05 ECF No. 1378, (dated Nov. 12, 2024) (Test. Bender) (describing sex trafficking strategies that involve using dancers to upsell into engaging in sex acts).

[282]    ECF No. 1426 at 7–8.

[283]    *See* Red. Indict., at 17–18.

[284]    *Id.*

[285]    *See id.*

caused messages to be sent to P.H.," and asks that this Court acquit him of the witness tampering convictions.  Gerace R. 29/33 Mot., at 47, 49.  Because the evidence permitted a reasonable jury to find the defendant guilty of Counts 6 and 7, the motion should be denied.

### a.  Legal Framework

Count 6 alleged that on or about November 19, 2029, the defendant and others

> did knowingly use intimidation, threaten, and corruptly persuade, and attempt to use intimidation, threaten, and corruptly persuade Witness 1, a person known to the Grand Jury, by sending intimidating, threatening, and harassing Facebook messages to [P.H.] with the intent to influence, delay, and prevent the testimony of [P.H.] in an official proceeding, that is, a federal grand jury investigation and subsequent criminal proceedings involving the defendant.

> All in violation of Title 18, United States Code, Sections 1512(b)(1) and 2.[286]

Count 7 similarly alleged that, on that same date, the defendant and others

> did knowingly use intimidation, threaten, and corruptly persuade, and attempt to use  intimidation, threaten, and corruptly persuade [P.H.], a person known to the Grand Jury, by sending intimidating, threatening, and harassing Facebook messages to [P.H.] with the intent to cause and induce Witness 1 to withhold testimony from an official proceeding, that is, a federal grand jury investigation, and subsequent criminal proceedings involving the defendant

> All in violation of Title 18, United States Code, Sections 1512(b)(2)(A) and 2.[287]

To prove witness tampering in violation of § 1512(b)(1), the government must establish that the defendant "knowingly use[d] intimidation, threaten[ed], or corruptly persuade[ed] another person, or attempt[ed] to do so . . . with intent to influence, delay, or prevent the testimony of any person in an official proceeding."  *United States v. Konopski*, 685 F. App'x 63,

---

[286]    *Id.* at 17.

[287]    *Id.* at 18.

65 (2d Cir. 2017) (unpublished) (quoting § 1512(b)(1)).  Likewise, "to prove a violation of 18

U.S.C. § 1512(b)(2)[(A)], the government must establish that the defendant 'knowingly . . .

corruptly persuade[d]' or 'attempt[ed]' to persuade another with the intent to cause that

person to 'withhold [ ] testimony' from an official proceeding." *United States v. Quattrone*, 441

F.3d 153, 175 (2d Cir. 2006).

Additionally, both Counts 6 and 7 charge the defendant with aiding and abetting the

witness tampering offense pursuant to 18 U.S.C. § 2.  That statute provides that "any person

who 'aids, abets, counsels, commands, induces or procures' the commission of such a crime

'is punishable as a principal.'"  *Konopski*, 685 F. App'x at 65 (quoting 18 U.S.C. § 2(a)).  To

aid and abet a crime, a defendant must not just "in some sort associate himself with the

venture," but also "participate in it as in something that he wishes to bring about" and "seek

by his action to make it succeed." *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949).

"As at common law, a person is liable under § 2 for aiding and abetting a crime if (and

only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of

facilitating the offense's commission."  *Rosemond v. United States*, 572 U.S. 65, 71 (2014); *see

also Hicks v. United States*, 150 U.S. 442, 449 (1893) (accomplice liability attaches to conduct

done "with the intention of encouraging and abetting" the crime).

But these elements do not require the government to prove that the defendant

facilitated "every part" of the criminal venture.  *Rosemond*, 572 U.S. at 73.  The Second Circuit

has held, "[a] defendant can be convicted as an aider and abettor without proof that he

participated in each and every element of the offense."  *United States v. Sigalow*, 812 F.2d 782,

785 (2d Cir. 1987).  Consistent with this, the principle underlying § 2 liability is that "all who

shared in [the offense's] execution have equal responsibility before the law," irrespective of their different roles.  *United States v. Johnson*, 319 U.S. 503, 515 (1943).

### b.   Application

The evidence permitted a reasonable jury to conclude that the defendant aided and abetted Ms. Quinn's transmission of the threatening Facebook message to P.H. the night of November 19, 2019, for two reasons.  For starters, the evidence at trial permitted the jury to conclude that the defendant knowingly participated in the witness tampering scheme against P.H.  Specifically, B.R. testified that the defendant told him that he "had another girl send a message to the girl that was ratting on him" but was "very angry because he was under the impression that the girl was gonna send the message in person . . . . But evidently, this girl went on Messenger and sent it via Facebook Messenger."[288]  C.C. and P.H.'s testimony establish that "the girl" the defendant was upset at was Ms. Quinn, who sent the threatening message via C.C.'s Facebook Messenger application.  Likewise, the evidence showed that the defendant distributed cocaine to Ms. Quinn,[289] "revved" her up vis-à-vis P.H., and supplied her with the words—like "snitch", "rat", and "nark"—that she would use to intimidate P.H.  The jury could fairly infer that the defendant knew how to manipulate and control Ms. Quinn considering he had previously had her to snort cocaine off of his penis.[290]

---

[288]   Tr. Tran., at 19–20, (Test. B.R., dated Dec. 11, 2024).

[289]   C.C. testified that Gerace distribute the cocaine to both C.C. and Crystal Quinn.  C.C.'s testimony alone is sufficient to establish the defendant's guilt on Count 9.  *See* Tr. Tran., at 69-70, ECF No. 1383, (dated Nov. 14, 2024 (Test. C.C.) (the defendant supplied an "eight ball" or two of cocaine and used it with C.C. and Crustal Quinn on November 19, 2019).  *See Florez, supra*.

[290]   Tr. Tran., at 61–62, ECF No. 1600, (dated Nov. 27, 2024) (Test. Nigro).

All of this evidence forms the "essential conduct" of the witness tampering as charged and thus bears on the defendant's liability under § 2. *Rosemond*, 572 U.S. at 74. In that regard, the defendant's admissions to B.R. plainly permitted the jury to conclude that his "state of mind extend[ed] to the entire crime", as he intended for Ms. Quinn to send a message to P.H. and only quibbled with the medium through which she decided to transmit that message— *viz.*, through Facebook messenger as opposed to in person. *Id.* at 75–76. Because the evidence permitted a rational jury to conclude that the defendant was guilty for Counts 6 and 7, his motion for judgment of acquittal as to those counts should be denied.

### B.    The Court Should Deny the Defendant's Rule 33 Motion

In the alternative to receiving judgments of acquittal, the defendant asks this Court to grant him a new trial for four reasons: (1) purported juror misconduct; (2) purported prosecutorial misconduct related to the government's pre-trial charging decisions; (3) the excusal of a sick juror during the defendant's trial; and (4) the purported incredibility of the government's evidence. The Court should also deny the defendant's Rule 33 motion, as it fails to allege any extraordinary basis for relief.

### 1.    Juror 10's statements do not reflect clear, strong, and incontrovertible evidence of juror misconduct and Rule 606 expressly prohibits the kind of inquiry the defendant invites this Court to initiate.

A post-verdict jury inquiry is required only where there is "clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety has occurred." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989). "Courts should therefore be reluctant to 'haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.'" *United States v. Wilbern*, 484 F. Supp.

3d 79, 85–86 (W.D.N.Y. 2020), *aff'd,* No. 20-3494-CR, 2022 WL 10225144 (2d Cir. Oct. 18, 2022) (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983).

Overlooking this weighty standard, the defendant argues that the Court should open a post-verdict inquiry regarding Juror 10's interview with the media, which he claims "suggest[s] that [Juror 10] ignored the jury instructions and the law and decided this case on an impermissible basis—[the defendant's] choice not to present a defense but instead rely upon the presumption of innocence and" the government's burden of proof.  Gerace R. 29/33 Mot., at 50–51.  In the defendant's view, Juror 10's "statements . . . to the media evidence 'clear, strong, substantial, and incontrovertible evidence that a specific, non-speculative impropriety . . . occurred" because they "make clear that [Juror 10] misapplied the law." *Id.* at 51.  The defendant further contends that Juror 10's "comments come in a larger context"— *viz.*, the government's decision to charge three individuals on the defendant's lengthy witness list,[291] which he maintains "deprived [him] of his Sixth Amendment [r]ight to present a defense" and "statements the prosecution made in the rebuttal summation . . . that suggested the defense had equal ability to call witnesses and elicit testimony." *Id.* at 51.  Each of these arguments fails on the merits.

First, Juror 10's comments do not clearly, strongly, or incontrovertibly establish that either he or any other juror gave short shrift to the Court's instructions.  Rather, Juror 10 commented that he "wanted the opportunity to feel differently" than he felt about the case after sitting through "two months" of the government's presentation.  As part of his comments regarding the defense's team's tactical decision not to call any witnesses, Juror 10 speculated

---

[291]    This is not part of the trial record that was before the jury and is thus irrelevant to post-conviction statements made by Juror 10.

that had the jury heard from witnesses offering a different perspective of what occurred at Pharoah's, it might have "deliberated longer" and "[m]aybe . . . would've . . . hung." Juror 10 did not say that he failed to hold the government to its burden of proving the defendant's guilt beyond a reasonable doubt. Gerace R. 29/33 Mot., at 53. Nor did Juror 10 "make[] clear that, *in reaching his decision*, . . . he anticipated that the defense would provide potentially up to 40 witnesses to rebut the allegations made by the government witnesses." *Id.* To the contrary, Juror 10's speculative reflections about the defendant's trial are the stuff of normal Monday morning quarterbacking to which any long-suffering Buffalo Bills fan can relate. After all, a juror can presume the defendant innocent, hold the government to its burden, and find the defendant guilty while also later wondering the trial is over whether a different defense tactic—such as using actual witnesses to present a contrary view of the evidence— would have effected or changed the conclusion in his mind.

Indeed, nowhere did Juror 10 state with the clarity, specificity, and incontrovertibility demanded by the law that he disregarded the government's burden or based his decision on the defense's failure to call any witnesses as opposed to the strength of the government's evidence. To the contrary, Juror 10 was unwavering in his conviction that he followed the Court's instructions. In fact, Juror 10 stated: "We went through that ream of paper, of these jury instructions. We went through it meticulously. We went through each charging count. Each element of each charging count. We read it out loud and reread it and reread it[.]" Thus, Juror 10's comments underscores that he—like the other jurors—followed the jury instructions and was convinced beyond a reasonable doubt—based on the evidence presented in court—that the defendant was guilty of the crimes charged and, when it was all over (and after numerous instances of Gerace post-trial giving interviews in the print and television

111

media professing his innocence) Juror 10 merely lamented that the defense's tactical decision not to present any witnesses deprived him to ability to challenge the opinion he had formulated as to the defendant's guilt. Such lamentations are not incompatible with compliance with the Court's instructions, particularly those relevant to the government's burden and the presumption of innocence.

The Second Circuit has affirmed a district court's decision denying a motion for a post-verdict inquiry in circumstances more questionable than those here. In *United States v. Baker*, the Second Circuit affirmed the district court's denial of the defendant's motion for a post-verdict inquiry after a juror (incidentally, a different Juror 10) wrote a page-and-a-half long email alleging that (1) the jurors discussed the case "during virtually every break" despite being instructed not to and (2) after the verdict, he heard another juror say that he "knew the defendant was guilty the first time he saw him (before he was sworn in as a juror)." 899 F.3d 123, 131 (2d Cir. 2018). In affirming the district court's exercise of discretion not to subject the verdict to any post-trial inquiry, the Second Circuit noted that the juror's allegations "relate to 'statements made by the jurors themselves, rather than to outside influences.'" *Id.* (quoting *Sabhanani*, 599 F.3d at 250). In such circumstances, the district court's discretion to deny a post-verdict-inquiry motion is at its highest. *See id.* In that case, the district court did not abuse its discretion as to the first alleged statement because the allegation "sa[id] nothing about the content" of the jury's pre-deliberations discussions about the case. *Id.* at 132. Moreover, the court reasoned that "even assuming, *arguendo*, that premature deliberations occurred, . . . Rule 606(b) of the Federal Rules of Evidence prohibited the jurors from impeaching their verdict by testifying about the effect of such deliberations on the verdict, rendering the inquiry futile from the start." *Id.* In light of *Baker*, Juror 10's reflections on the

trial and the defense's strategy plainly is not the stuff that post-verdict inquiries are designed to address.

The defendant-appellant's second allegation did not fare any better.  Even though the juror's alleged statement that "he knew the defendant was guilty the first time he saw him" might give rise to the inference that the juror disobeyed the Court's instructions or was animated by bias or hostility, the Second Circuit advised that, "without more", it did "not constitute clear, strong, and incontrovertible evidence" that the juror committed misconduct. *Id.* at 134.  The defendant did "not come close to showing that his case f[ell] within th[e]" rare category of cases in which the court would not presume the jurors remained true to their oath. *Id.*

The facts here are far less concerning than those in *Baker*, which the Second Circuit found insufficient to justify a post-verdict inquiry.  At no point did Juror 10 indicate that either he or any other juror prejudged the defendant, harbored bias or hostility against him, or disregarded the Court's instructions.  In fact, Juror 10's comments stand for the opposite proposition in all three respects: Juror 10 thought the defense's case, at the outset, was a "slam dunk", presumed the defendant innocent, and explicitly followed the Court's instructions. Consequently, there is no basis from which the defendant can legitimately claim that Juror 10's comments reflect a clear, specific, strong, and incontrovertible basis of misconduct.

Moreover, Rule 606 prohibits using Juror 10's comments to impeach the jury's verdict. Here, the gravamen of the defendant's complaint—that Juror 10 failed to hold the government to its burden or held the defendant's right not to call witnesses against him during deliberations—would require Juror 10 to testify about "the effect of" the defense's strategy "on [his] . . . vote," which would also require Juror 10 to divulge his mental processes on the

113

verdict.  FED. R. EVID. 606(b)(1).  Rule 606 strictly and expressly prohibits this exercise.  *See id.*; *see also Warger*, 574 U.S. at 48 ("Rule 606(b) prohibit[s] the use of any evidence of juror deliberations, subject only to the express exceptions for extraneous information and outside influences.").

Resisting this conclusion, the defendant invites this Court to simply ignore Rule 606 because Juror 10 "chose to submit to a highly publicized media interview . . . ."  Def. R. 29/33 Mots., at 55.  Though the government is not surprised by the defendant's argument that consent to one act—here, a media interview—equates to consent to much more—namely, being hauled into federal court and questioned—that is not the law.  Rule 606 does not limit its applicability to only those situations where jurors refuse comment to the news media.  *Cf. Warger*, 574 U.S. at 48 (rejecting the appellant-defendant's attempts to rewrite Rule 606 to fit his circumstances).  And while Rule 606 may promote the laudatory goal of protecting jurors from post-conviction harassment, adopting the defendant's rationale of suspending the rule where a juror speaks to the media would only undermine the Rule's other interests, namely, the public's confidence in jury verdicts, which could buckle under the stress of drawn out litigation concerning the jurors' once sacrosanct discussions.

Should the Court decline that invitation, the defendant pivots to asserting that Rule 606 does not apply where the Court concludes that a specific, clear, and incontrovertible instance of misconduct occurred—here, again, that the Juror misapplied the government's burden of proof and held against the defendant his failure to call any witnesses.  *See* Def. R. 29/33 Motes., at 55.  The Eighth Circuit rejected an analogous argument in *United States v. Rodriguez*, 116 F.3d 1225 (8th Cir.1997).  In that case, the defendant-appellant argued that the jury improperly considered his failure to testify during deliberations.  *See id.* at 1226–27.

Because his decision not to testify did not constitute "evidence, and should not have been considered," he sought a post-verdict inquiry that he attempted to reconcile with Rule 606(b)(1) by claiming that improperly considered evidence satisfies the Rule's "outside influence" exception about which jurors may testify. *Id.* The Eighth Circuit rejected that argument, concluding that Rule 606 prohibited any testimony about the jury's deliberations, notwithstanding the possibility that the jurors discussed the defendant's decision not to testify. *See id.* at 1227.

The Second Circuit approvingly discussed *Rodriguez* in *United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006). There, a juror gave a post-trial interview to a media organization—a fact that prompted no comment from the Second Circuit regarding Rule 606's applicability—and stated that the jurors considered evidence against the defendant-appellant that they were instructed only to consider as to his co-defendant. *See id.* at 307. The defendant-appellant claimed that the jury's failure to abide by the Court's instructions implicated his "Sixth Amendment rights" and thus sought a post-verdict inquiry of the jurors. *Id.* at 608. Disagreeing, the Second Circuit held that the district court "did not abuse its discretion by refusing to order a new trial or an evidentiary hearing that was clearly proscribed by Rule 606(b)." Thus, contrary to defendant's suggestion that the Rule must yield to the specific, concrete allegations impropriety, *Rodriguez* and *Stewart* affirm that Rule 606 affords no exception to a defendant's constitutional claims.[292]

That brings us to the defendant's last contention: that the government's decision to charge three of the 286 individuals identified on his witness list "severely limited—if not

---

[292]     The only exception to Rule 606 not reflected in the Rule's text concerns comments made during deliberations reflecting racial animus—an issue clearly not impacted by Juror 10's comments.

wholly precluded—[his] ability to present a defense," and that this, in turn, "had an important impact on the trial and the verdict reached by the jurors."  Def. R. 29/33 Mots., at 56.

This argument is as speculative as it is divorced from reality.  Not only did Juror 10 never state that he voted to convict the defendant *because* the defense failed to call any witnesses, but the defense team repeatedly represented to government counsel and this Court that it was narrowing down its list of witnesses to call for their case, and anticipated that its case would span multiple days, if not multiple weeks.  *See* Exs. A–C.  Now, seeming to have forgotten its own representations to the Court and the government, the defense seeks to rewrite history by blaming the government for their own strategic reason not to call any witnesses.  This Court should reject the defendant's effort to obtain a new trial based on such an amnesiac accounting of the facts. Accordingly, the defendant's motion for a post-verdict inquiry should be denied.

**2.      The record fails to substantiate the defendant's claims that the government's charging decisions impaired his ability to present a defense was impaired.**

Relatedly, and separate from his speculative take on Juror 10's interview, the defendant argues that the Court should grant him a new trial because the government charged three of the 286 people listed on his witness list.  *See id.* at 56–61.  Specifically, the defendant argues that "by charging Rosenthal, Trotter, and Leyland, the government took away Mr. Gerace's ability to rebut critical aspects of the case."  *Id.* at 59.  In this vein, he claims that "(1) . . . he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means, (2) bad faith on the part of the government, and (3) the absence of fundamental fairness infected the prosecution."  *Id.* at 60–61 (quoting *United States v. Lebedev*, 932 F.3d 40, 55 (2d Cir. 2019)).

The defendant previously raised these arguments in an unsuccessful motion to dismiss the indictment. Their merit has not appreciated in value since then. The defendant cites no evidence (1) that he issued subpoenas to Rosenthal, Trotter, and Leyland; (2) that all three told him they would not comply with a lawfully issued subpoena; or (3) that he unsuccessfully sought to enforce compliance with the subpoena with the Court. To the contrary, in a December 2nd email sent to the Court underscoring that it had yet to issue any legal process, the defense explained that it would like to call Leyland, Rosenthal, and Trotter "but . . . *anticipate*[*d*] that [they] *may* be unable to [call those witnesses] based on advice of counsel." *See* Ex. A. (E-mail dated Dec. 2, 2024) (emphasis added).[293] Notwithstanding its anticipation as to those three witnesses, the defense listed 48 individuals who it thought they might possibly call. *See id.* Nine days later, the defense identified 15 individuals who it was "still actively considering cal[l]ing." *See* Ex. B (E-mailed dated Dec. 11, 2024). Then, on December 16, 2024, the defense sent the government a *Touhy* letter, indicating its desire to call HSI Special Agent Marilyn Halliday. *See* Ex. C (E-Mail dated Dec. 16, 2024). Once more, the defense offered nothing by way of an explanation as to whether, and to what extent, they intended to make use of Leyland, Rosenthal, and Trotter as part of a defense case.

Just as well, the defense makes no representation to this Court now that it unsuccessfully served legal process on those witnesses. Because "none of the witnesses now identified by [the defendant] as having been subject to government [misconduct of some kind] was subpoenaed by [the defendant] to testify . . . we cannot know what response the witnesses or their counsel, or the government, would have made to that traditional means for obtaining

---

[293]    The defense also noted that they wanted to call Joseph Bongiovanni as a witness, even though a jury had already found him guilty of multiple counts relating to his dishonesty.

117

testimony." *Harris v. United States*, 9 F. Supp. 2d 246, 279 (S.D.N.Y. 1998), *aff'd*, 216 F.3d 1072 (2d Cir. 2000). Accordingly, the defense's claim that the government's charging decisions impaired, precluded, or otherwise abridged its ability to provide a defense is wholly speculative. *See also United States v. Chase*, No. 04-CR-135, 2005 WL 3263910, at *2 (D. Vt. 2005) (finding the defendant's witness intimidation claim to be without merit in part because he could not provide evidence of any witness being dissuaded from testifying).

Furthermore, to the extent the defendant called any witness and they pleaded the Fifth, that is conduct not caused by the government to prevent testimony but, rather, a choice the witness makes in consultation with independent counsel. Indeed, in *United States v. Parks*, defense counsel requested that certain government witnesses be appointed counsel because the witnesses had potential criminal exposure. The Court heeded that request and appointed counsel for said witnesses for the express purpose of protecting those individuals' rights *vis-à-vis* their obligation to provide testimony. The same concept is true here. If the defendant's proffered testimony as to each of these witnesses is true (which, based on the evidence, it is not), he fails to explain why the witnesses would invoke their Fifth Amendment privilege in the first place.

Finally, the central premise of the defendant's claim—that the government targeted Leyland, Rosenthal, and Trotter due to their presence on the defendant's witness list—is equal parts false and legally meritless. The Second Circuit squarely rejected this argument in *Buie v. Sullivan*, 923 F.2d 10 (2d Cir. 1990). There, the defendant asserted, as this defendant does, that the government arrested a witness who would provide exculpatory evidence for the defendant and did so in bad faith. With respect to the timing of the arrest, the *Buie* court held that:

We cannot, however, second guess law enforcement's belief as to when probable cause first existed, so long as it is clear, as it is here, that probable cause did exist at the time of the arrest. Once probable cause exists, of course, law enforcement is legitimately empowered, but not required, to arrest the suspect. More importantly, "[p]rosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe an accused is guilty." *United States v. Lovasco*, 431 U.S. 783, 790-91 (1977). An investigative delay caused by a prosecutor's hesitancy to seek an indictment until he is persuaded he can successfully prosecute the suspect is reasonable and does not offend due process. *Id.* at 795. Thus, the timing of Canady's arrest is not sufficient to establish either bad faith or a violation of Buie's sixth amendment rights.

*Buie*, 923 F.2d at 13.

That wisdom applies here, too. As defendant concedes, the government spoke to the individuals prior to the defendant filing his witness list. He does not contest the criminal conduct underlying the charges of these defendants, he simply attacks the timing of said charges. The defendant, however, has no power to immunize his criminal cohorts by placing their names on a witness list and the government is not obligated to investigate or charge cases pursuant to the defendant's preferred timeline. Thus, that the government properly charged the individuals after the defendant filed his witness list does not amount to a bad faith charging decision. *See id.*; *see also United States v. Bieganowski*, 313 F.3d 264, 292 (5th Cir. 2002) (holding the government "is always entitled to attempt to avert perjury and to punish criminal conduct"); *United States v. Santtini*, 963 F.2d 585, 596–97 (3d Cir. 1992) (noting "compelling interest in arresting [potential defense witness] and prosecuting him for his crimes" as well as "institutional interest in maintaining [the government's] power to arrest" individuals violating the law); *cf.* U.S. Const. art. 2, § 1, cl. 1 (investing the duty in the head of the Executive Branch, of which the Department of Justice is a part, to "take care that the laws be faithfully

executed"). The government's charging decisions were entirely proper. Accordingly, the defendant's Rule 33 motion on this basis should be denied.

### 3. The Court did not abuse its discretion by removing Juror 3, who had recently been hospitalized.

The defendant next seeks a new trial on the basis that the Court abused its discretion when replacing Juror 3, who could not deliberate for multiple days and had recently been hospitalized. *See* Def. R. 29/33 Mots., at 61–64. According to the defendant, Federal Rule of Criminal Procedure 23(b)'s "good cause" standard was not "met in this instance" because "there was a likelihood [that] the juror may have been able to report the following day, resulting only a short adjournment of deliberations (less than one day)." *Id.* at 62. This motion should also be denied.

Specifically, Juror 3's illness rendered her unable to deliberate for two days, December 26th and December 27th. The morning of the 27th, Juror 3 informed the Court that she had been hospitalized and anticipated being released later that day. However, release from a hospital does not equate to feeling well enough to deliberate. Unable to predict the future, the Court appropriately considered Juror 3's history of illness, the fact of her hospitalization, the defendant's interest in having twelve jurors healthy enough to participate in deliberations, and the other jurors' interest in resuming deliberations and not being exposed to potential illnesses when excusing Juror 3. In addition, Juror 3 was older, and the deliberations occurred in December, during a Buffalo winter. Under these circumstances and considering that the defendant's belief in the juror's ultimate return was entirely speculative, the Court was well within its discretion to find that "good cause" existed to replace Juror 3. *See United States v. Gibson*, 135 F.3d 257, 260 (2d Cir. 1998) (holding that the district court acted "clearly within [its] discretion" when dismissing an elderly juror with a history of illness after she collapsed

in the subway and was hospitalized during a bitterly cold winter).  Accordingly, the defendant's Rule 33 motion as to this issue should be denied.

### 4.    This case does not present any exceptional circumstances justifying evidentiary review through a Rule 33 motion.

Lastly, the defendant asks the Court to grant him a new trial under Rule 33 by reweighing the evidence and considering the credibility of the witnesses.  *See* Def. R. 29/33 Mots., at 63.  In his view, this is necessary because the witnesses against Mr. Gerace were generally not credible, the government "substantially impaired" his ability to present a defense, and the prosecution "improperly invited the jury to misapply the law" during its rebuttal.  *Id.* at 63–64.  These arguments should be rejected for at least three reasons.

First, "[a] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand."  *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021) (internal quotations omitted and cleaned up).  For evidence to "preponderate heavily against the verdict" it must be "patently incredible or def[y] physical realities."  *Id.* (internal quotations omitted).  Otherwise, a district court "must defer to the jury's resolution of conflicting evidence."  *Id.* (internal quotations omitted).  None of the trial evidence establishing the defendant's guilt falls into these narrow categories.

Second, as already explained, the government did not substantially impair the defendant's ability to present a defense.  The defendant had ample opportunity to call witnesses, represented to the Court and the government the names of witnesses it anticipated calling, and tactically chose not to call them.  *See* Exs. A–C.  The defense's retrospective and speculative misgivings over its strategy cannot be fairly laid at the government's feet,

121

especially where, as here, the defense has made no showing that they even attempted to call any of the individuals identified on the witness lists they shared.

Third, the defendant mischaracterizes the government's rebuttal. Counsel for the defendant expressly stated that he did not "really have an objection" to the government commenting during rebuttal that "defense attorneys have subpoena power, too." Closings Tran., at 131. Rather, his objection was to any comment the government may make that shifted the burden onto the defense to produce evidence. *See id.* Consistent with this, after the defense's commented that the government cherry-picked witnesses and declined to call witnesses who would have undermined its theory, the government noted that the "defendant ha[d] the ability and the right to subpoena witnesses" and his allusion to missing witnesses was an invitation to "speculate" about evidence that did not exist in the case. *Id.* at 264. At the same time, the government emphasized that it "embrace[d] [its] burden" to "prove the case beyond a reasonable doubt." *Id.* The defendant neither objected to the government's comment in real-time nor levied an objection after the Court invited it to make an additional record. *See id.* at 267 ("The Court: Okay. Before I talk about the charge very briefly, anything for the record from the defense? Attorney Soehnlein: No, thank you, Judge.").

The defense's explicit blessing of the government's anticipated comment regarding the defense's subpoena power and its subsequent declination to object when government counsel stated on rebuttal that the "defendant ha[d] the ability and the right to subpoena witnesses," too, should be rejected as both invited error and waiver. *Id.* at 264; *see United States v. Bastian*, 770 F.3d 212, 219 (2d Cir. 2014) ("Under the invited error doctrine, appellate courts are especially reluctant to provide relief on the basis of procedural errors that a defendant himself invited or provoked the district court to commit." (internal quotations omitted)). Here, the

122

defendant asks the Court to reward his express approval of a government rebuttal point that he now believes offended one of his rights. This Court should decline to do so.

More fundamentally, the government's comment was not improper. The defense knowingly opened the door to the government's comment when it alluded to missing witnesses. The government's observation that the defense also possessed subpoena power was necessary to ensure that the jury was not left with the false impression that the defense was unable to call witnesses. *See United States v. Drescher*, 77 F. App'x 45, 47–48 (2d Cir. 2003) (unpublished) (noting that when a defendant argues to the jury that by not calling certain witnesses the prosecutor has effectively concealed from the jury evidence that would have been favorable to the defense, the prosecutor is "entitled to point out in response that the defendant also has a . . . right to call witnesses if he wants to" (internal quotations omitted)).

In sum, because all three bases for the defendant's Rule 33 motion for an evidentiary review fail, the motion should be denied. **CONCLUSION**

For all the foregoing reasons, and based upon all evidence adduced at trial, the defendant's Rule 29 and Rule 33 Motions should be denied in its entirety.

DATED:  Buffalo, New York, August 4, 2025.

MICHAEL DIGIACOMO
United States Attorney


BY:   s/JOSEPH M. TRIPI
      s/NICHOLAS T. COOPER
      s/CASEY L. CHALBECK
      Assistant United States Attorney
      United States Attorney's Office
      Western District of New York
      138 Delaware Avenue
      Buffalo, New York 14202