UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

-v-

JOSEPH BONGIOVANNI,
PETER GERACE, JR.,
                        Defendants.

_____

Case No.: 19-CR-227

UNITED STATES OF AMERICA,

-v-

PETER GERACE, JR.,
                        Defendant.

_____

Case No.: 23-CR-37

## PETER GERACE, JR.'S REPLY IN FURTHER SUPPORT OF HIS MOTION FOR JUDGMENT OF AQUITTAL AND/OR A NEW TRIAL

Peter Gerace, Jr., by and through counsel (Mark A Foti, Esq. and Eric M. Soehnlein, Esq.), respectfully submits the following memorandum in reply to the government's Response to the defendant's motions for a judgment of acquittal and/or a new trial.

## TABLE OF CONTENTS

**INTRODUCTION**.................................................................... **3**

**DISCUSSION** ........................................................................ **4**

    I.     Reply Regarding the Motion for a New Trial ............................ 4

        A.   *Rule 33 Standard* .................................................... 4

        B.   *The Jury Foreperson's Public Interview* ............................. 5

        C.   *Impairment of Ability to Present a Defense* ...................... 21

    II.    Reply Regarding the Motion for Judgement of Acquittal .................. 28

        A.   *The Rule 29 Standard and Uncontroverted Facts* ............................ 28

        B.   *The Evidence Adduced at Trial Was Materially Different Than What was Proven at Trial* .................................................... 30

        C.   *Maintaining Drug Involved Premises*.............................. 33

        D.   *Narcotics Conspiracy*................................................ 39

        E.   *Sex Trafficking Conspiracy* ........................................ 46

        F.   *Obstruction of Justice Conspiracy with former SA Bongiovanni* .................. 52

        G.   *Witness Tampering* .................................................. 56

        H.   *Bribery* ................................................................ 58

**CONCLUSION** ...................................................................... **59**

## INTRODUCTION

Following the guilty verdicts against Peter Gerace, Jr., the defense moved for a judgement of acquittal as to each count or a new trial as to any remaining counts. Docket Item 1559. The government filed a response. Docket Item 1608. Oral argument is currently scheduled for September 12, 2025, at 10:45 a.m.

The defense hereby submits the following reply to the government's response in advance of oral argument.

The defense addresses the reply regarding the motion for a new trial (Rule 33) first, mindful that the juror foreperson's public interview has demonstrated the verdict was reached without regard to much of the instruction provided by this Court, including specifically, the direction not to give any consideration to the defense's decision not to call witnesses. Instead, the juror foreperson indicated he was "shocked" by that defense's decision not to call witnesses and found it to be "outrageous," demonstrating a desperate need for a new trial on that issue alone.

But while the juror foreperson's public interview establishes the overarching need for a new trial or further inquiry, that issue should be considered in conjunction with other issues, including the fact that many of the "co-conspirators" referenced most frequently by the government during the trial were unavailable to the defense to testify due to the government's decision to charge them after they were listed on the defense

witness list, an issue of elevated importance given the juror's criticism of the defense not to call witnesses.

The defense addresses the judgement of acquittal (Rule 29) second, but as discussed in the memorandum in support of the motion for a new trial, the evidentiary issues are also relevant to the totality of considerations that warrant a new trial for any count that survives the motion for a judgement of acquittal.

Thus, for the foregoing reasons, the defense respectfully requests that this Court grant the motion for a judgement of acquittal and grant a new trial as to any remaining counts or preside over any further inquiry necessary to determine these motions.

<u>**DISCUSSION**</u>

## I.    REPLY REGARDING THE MOTION FOR A NEW TRIAL

### A.  Rule 33 Standard

The "ultimate test on Rule 33 motion is whether letting guilty verdict stand would be manifest injustice." *United States v. Ramerez*, 313 F. Supp. 2d 276 (S.D.N.Y. 2004).  The "interest of justice guides courts on deciding Rule 33 motions." *United States v. Quiles*, 618 F.3d 383 (3d Cir. 2010).  The words of Rule 33, "interest of justice", mandate the broadest inquiry into the nature of the challenged proceeding, and on a motion for new trial the court must review challenged trial proceedings to ensure that dictates of due process have been met. *United States v. Narciso*, 446 F. Supp. 252 (E.D. Mich. 1977).  In that regard, the trial court is granted considerable discretion, and if the trial court finds the verdict

contrary to weight of evidence and that a miscarriage of justice may have resulted, the trial court may set aside verdict and grant a new trial. *United States v. Crittenden*, 46 F.4th 292 (5th Cir. 2022).

The principles of fairness and due process that are at the heart of Rule 33 should counsel the Court to grant Mr. Gerace a new trial.

The foreperson of Mr. Gerace's trial jury made comments that clearly demonstrate he misapplied the law, disregarded the jury instructions, and improperly burden shifted to the defense.  In the lead up to the trial, the prosecution made charging decisions designed to deprive Mr. Gerace of calling the most critical witnesses. In its rebuttal summation, the government invited the jury to engage in burden shifting, knowing that the government had made strategic charging decisions to deprive Mr. Gerace of his ability to obtain testimony from key witnesses.

These issues, along with others raised previously, including the defense's position that a juror was prematurely dismissed, all should be considered in totality and support a new trial. Thus, for the reasons set forth below, the Court should grant Mr. Gerace's Rule 33 motion and order a new trial.

### B. The Jury Foreperson's Public Interview

In its Response, the government states "a juror can presume the defendant innocent, hold the government to its burden, and find the defendant guilty while also later wondering the trial is over whether a different defense tactic—such as using actual

witnesses to present a contrary view of the evidence—would have effected or changed the conclusion in his mind."[1] Docket Item 1608 at 114.

As discussed further below, the juror foreperson did not merely "wonder" if calling witnesses would have changed the outcome. The juror sat down for a public interview[2] and articulated his position that the defense decision to not call witnesses amounted to a failure by defense counsel, a conclusion that no juror could draw if he or she is operating within the confines of the Court's instructions.

Nonetheless, before reviewing the juror's comments in greater depth, it is worth first considering the assertion made regarding the government's hypothetical that a juror can "wonder" if defense witnesses would have altered the outcome.

The jurors are repeatedly told not to engage in speculation (*see Final Instructions*, including "Presumption of Innocence and Burden of Proof"; "Direct and Circumstantial Evidence"; and "Inference Defined (Presumptions)"), but perhaps the government is correct: nothing necessarily prohibits a juror from "wondering" what may have happened if the defense had called witnesses.

---

[1] For purposes of this Reply, it is assumed that the government meant "while also later wondering [when] the trial is over whether…" rather than "also later wondering the trial is over whether a different defense tactic… would have effected or changed the conclusion in his mind."

[2] The government provided a relevant excerpt from the interview in its Response. Docket Item 1608 at 63. The full interview is currently available at https://www.wgrz.com/video/news/crime/juror-10-speaks-about-the-peter-gerace-trial/71-d2017392-efe0-4f63-9fac-480e12bd8060 (a shortened link available at https://tinyurl.com/jurorinterview). The defense seeks to have the whole interview incorporated into the record. The defense will provide an exhibit containing the full video if necessary.

Except if the government had actually proved the case beyond a reasonable doubt, as a just verdict mandates, a juror would have no reason to "wonder" if defense witnesses would alter the outcome.

If a juror is left with reason to believe that there may be other witnesses out there that would have altered the outcome in the defendant's favor, but the witnesses were not called by the defense, the juror is expressing a reason to doubt the solidity of the government's proof.

However, if rather than recognize the reasonable doubt, the juror foreperson, and potentially others, chose to assign blame to defense counsel for not calling the witnesses, then the jury is not reaching a verdict on the proof or lack thereof; rather the jury is reaching a guilty verdict despite an articulated doubt that the government's evidence would withstand additional witnesses. The juror apparently chose to set the doubt aside, because he was disappointed and irritated that the defense did not call the witnesses.

That disappointment was clearly reflected in the juror foreperson's comments. He did not merely "wonder" if the outcome would be altered by defense witnesses, as the government characterizes it. The juror foreperson took a clear position that the defense failed to call witnesses, and the juror acknowledges an emotional reaction to that decision which was clearly averse to Mr. Gerace. The juror indicated the decision not to call witnesses was "outrageous."

These comments should be terrifying to this Court and any entity concerned that juries render their verdicts consistent with judges' instruction and consistent with the presumption of innocence and the government's burden of proof. This Court was clear as to the jury's obligation to not account for a decision not to testify or present evidence in conjunction with deliberations:

> AS I HAVE TOLD YOU SEVERAL TIMES ALREADY, UNDER OUR CONSTITUTION A DEFENDANT HAS NO OBLIGATION TO TESTIFY OR TO PRESENT ANY EVIDENCE, AND IT IS THE GOVERNMENT'S BURDEN TO PROVE MR. GERACE GUILTY BEYOND A REASONABLE DOUBT. A DEFENDANT IS NEVER REQUIRED TO PROVE THAT HE OR SHE IS INNOCENT.
>
> (*Final Instructions*, "Improper Consideration of Defendant's Right Not to Testify").

Compare that to the juror's comments:

> And they rested without one witness. I mean, it's all good and fine to have to cross examine and, and to try impeach witnesses. *But when you're when, when it's your turn, we're all sitting at the edge of our seat*. We've gone through two months of trial. *Now we are gonna hear, you know, what the defense has to say*.
>
> (Juror Interview, https://tinyurl.com/jurorinterview).

The juror foreperson's comment reveals a number of concerns. The comment "we're all sitting on the edge of our seat… now we are gonna hear you know, what the defense has to say" strongly suggests that the juror foreperson's expectation that the defense would call witnesses was shared by other jurors.

The juror foreperson's comments immediately following the excerpt above were even more problematic. Recall that the jury was provided with the following instructions:

> THE FACT THAT ONE SIDE CALLED MORE WITNESSES AND INTRODUCED MORE EVIDENCE THAN THE OTHER DOES NOT MEAN THAT YOU SHOULD FIND THE FACTS IN FAVOR OF THE SIDE OFFERING MORE WITNESSES AND EVIDENCE. YOU DO NOT HAVE TO ACCEPT THE TESTIMONY OF ANY WITNESS—EVEN IF THE WITNESS HAS NOT BEEN CONTRADICTED OR IMPEACHED—IF YOU FIND THE WITNESS NOT TO BE CREDIBLE. AGAIN, THE BURDEN OF PROOF IS ON THE GOVERNMENT TO PROVE THAT MR. GERACE IS GUILTY BEYOND A REASONABLE DOUBT, AND MR. GERACE IS PRESUMED INNOCENT. THAT MEANS, AS I HAVE TOLD YOU BEFORE, HE HAS NO OBLIGATION TO PRESENT EVIDENCE OR CALL WITNESSES.

> (*Final Instructions*, "Number of Witnesses").

The juror foreperson went on to say:

> What witnesses can they bring up to, to counterman [sic] what was just what we just was [sic] presented. Show me 10 or 15 or 20 or 30 dancers that came in and said, that didn't happen.

> (Juror Interview, https://tinyurl.com/jurorinterview).

The juror foreperson's comments are almost directly in contradiction to what was instructed of the jury. The comments indeed support that juror foreperson felt Mr. Gerace had an obligation to call witnesses. His comments even go as far as to state that Mr. Gerace should have produced a large number of witnesses, apparently at least 10 - 30 dancers, demonstrating a clear interest in quantity of witnesses over substance of testimony.

Suggesting an obligation by the defense to call any witnesses to contradict government witnesses places an unconstitutional burden on the defendant, particularly in a case such as this, where the contradictions existed within the government's own witnesses, such as government witness A.A. testifying under oath that she never met Mr. Gerace, while government witness L.L. claimed she and A.A. would have threesomes with him.

> They didn't bring one witness to say anything like that. Not a one. And so that was like, okay, I can understand that Peter Gerace wouldn't testify because, you know, that can get pretty ugly in a courtroom if the, you know, for, for the accused to take a stand. But there was no supporting witnesses for the defense. It was shocking.

> (Juror Interview, https://tinyurl.com/jurorinterview).

The comment that the juror foreperson was "shocked" that the defense did not call witnesses does not amount to merely "wondering" if calling defense witnesses would have changed the outcome. The language of the juror clearly and conclusively indicates the decision not to call witnesses had an impact on him – it *shocked* him.

And the juror foreperson went further than that. He said the decision not to call witnesses "was **_outrageous_**" – a far cry from merely wondering about a different potential outcome.

He went on to criticize defense counsel about the decision:

> I think it's *borderline incompetent* that, that his attorneys did not produce any witnesses to counterman what was just told to us for two months.

(Interview (emphasis added))

For the juror to conclude that it was incompetence not to call witnesses is strong, clear indication that he placed an obligation on the defense to produce witnesses, despite the Court's instructions, and the defense failed to meet that obligation, which the juror concluded was incompetence.

> I wanted to hear, okay, bring some witnesses in, bring some dancers in that, again, like I said, that didn't happen. I know why that girl has a bone to pick. I didn't see anything like that happen. There's monitors all over the place. You can't get away with that. I didn't hear any of that from any witnesses.
>
> (Juror Interview, https://tinyurl.com/jurorinterview).

Except testimony regarding bias or benefits or inconsistencies were often explored on cross examination, sometimes extensively. The juror foreperson's position on that:

> Q: Were there any witnesses that you heard testify, and then upon, after the cross-examination, you were convinced that they were not credible?
>
> A: Well, no, because witnesses, the way questions are asked, one way, and then asked another way, and then asked a third way, you can come up with different answers. If somebody said, oh, that happened five times then, and then I testified 25 times then, well, how did you answer it? It's like, you know, it's like how you're defining, or how you're, you know, you're interpreting the question. So the, you know, trying to impeach those witnesses that way, I didn't find it compelling.
>
> (Juror Interview, https://tinyurl.com/jurorinterview).

The juror foreperson's answer is confusing, but one thing is clear, the juror foreperson, and likely others, disregarded cross examination, regardless of whether a

witness testified differently under oath previously, regardless of whether a witness was receiving financial or sentencing benefits to "secure" their testimony, regardless of whether a witness had a bias against Mr. Gerace, and regardless of any other impeachment that occurred.

Of course, this is in stark contrast with the jury's duty to determine credibility.

This Court explicitly instructed the jury:

> IN ASSESSING CREDIBILITY, YOU SHOULD SCRUTINIZE CAREFULLY THE TESTIMONY OF EACH WITNESS, THE CIRCUMSTANCES UNDER WHICH EACH WITNESS TESTIFIED, AND ANYTHING ELSE THAT MAY HELP YOU TO DECIDE THE TRUTH AND THE IMPORTANCE OF EACH WITNESS'S TESTIMONY.
>
> (*Final Instructions*, "Witness Credibility—General Instruction").

The Court went on to instruct the jury that it should ask itself commonsense questions such as "Was the witness consistent in his or her testimony, or did he or she contradict himself or herself?" *Id*.

The juror foreperson appears to bypass this analysis, instead indicating that he didn't have concerns with inconsistent testimony because "questions are asked, one way, and then asked another way, and then asked a third way, you can come up with different answers."

The Court also instructed the jury on other credibility considerations, including "bias and hostility,"[3] "interest in outcome,"[4] "witnesses using or addicted to drugs,"[5] plea agreements[6] and others.

The juror foreperson indicated the only witness that they found to have credibility issues was Gerace's "first wife," the witness that the government identified as hostel to the jury during direct examination.

Meanwhile, the jury found cross examination irrelevant to determinations of credibility, despite the Court's extensive instructions otherwise. One reason why that may be is the final arguments from the government denigrated the value of cross examination:

> So this notion that he wasn't supposed to be at Pharaoh's?
> Wrap your minds where that -- those words were first uttered
> in this courtroom.  It wasn't from that witness stand, it was

---

[3] Evidence that a witness is prejudiced or hostile toward Mr. Gerace or toward the government requires you to view that witness's testimony with caution, to weigh it with care, and to subject it to close and searching scrutiny." (*Final Instructions*, "Bias and Hostility").

[4] "[I]f you find that any witness whose testimony you are considering may have an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it with great care." (*Final Instructions*, "Interest in Outcome").

[5] "[S]uch testimony must be examined with greater scrutiny than the testimony of other witnesses.  the testimony of a witness who was using drugs at the time of the events the witness is testifying about, or who is using drugs or is an addict at the time of his or her testimony, may be less believable because of the effect the drugs may have on the witness's ability to perceive or relate the events in question." (*Final Instructions*, "Witnesses Using or Addicted to Drugs")

[6] "[Y]ou should bear in mind that a witness who has entered into such an agreement has an interest in this case different than other witnesses.  a witness who believes that he or she may be able to obtain his or her own freedom, or receive a lighter sentence, by giving testimony favorable to the prosecution has a motive to testify falsely.  therefore, you must examine such testimony with caution and weigh it with great care." (*Final Instructions*, "Coconspirators' Plea Agreements")

from this podium from an attorney.  Just because they got
some people to say yeah, maybe, I don't remember.

(12/19/24 Transcript at 256-257)

The government was addressing the issue of whether Mr. Gerace was prohibited
from entering the club for a period of time around 2013. In addition to the cellular
evidence demonstrating that Mr. Gerace stopped calling the club at that period of time,
there was definitive confirmation from government witnesses, including government
witness Katrina Nigro[7]. That confirmation was evidence, but the government argued it
was meaningless, because it was brought out through questions by attorneys on cross
examination and the defense "got some people to say yeah."

The jury fully adopted this approach, disregarding cross examination and
credibility issues in their entirety. The juror foreperson reveals this approach when
discussing other evidence. For example, the juror stated in the interview:

> And I wanted to hear, okay, bring some witnesses in, bring
> some dancers in that, again, like I said, that didn't happen. I
> know why that girl has a bone to pick. *I didn't see anything like
> that happen. There's monitors all over the place. You can't get away
> with that. I didn't hear any of that from any witnesses. It would've
> made a difference.*

(Juror Interview, https://tinyurl.com/jurorinterview)
(emphasis added)).

---

[7] Katrina Nigro was not a protected witness, but will generally be referred to as K.N. thoughout this
submissions.

Except witnesses did say that. Multiple witnesses testified that there were monitors all over the place, and that they did not see the type of behavior that other witnesses testified to. Other witnesses said you couldn't get away with it, unless you were being careful to circumvent the cameras so the bouncer and management didn't know about it. And there was testimony from case agent Brian Burns reviewing the reports of HSI SA Halliday confirming review of the monitors in the VIP room for an extended period of time and finding no sex acts.

So, the jurors did hear exculpatory information from witnesses, but it was drawn out through cross examination, which the jury obviously disregarded. When the juror foreperson said information, such as the abundance of monitors "would've made a difference," apparently it had to be heard from defense witnesses for it to be considered, which places an unlawful and unconstitutional burden on the defendant.

Rather than consider testimony from cross examination, and appropriately weigh credibility, the jury turned to a different consideration: how many witnesses will the defense produce? When the defense declined to present witnesses, expecting the jury to fairly evaluate the government's evidence, the defense irritated the juror foreperson who found the decision "outrageous."

Even though the juror foreperson's comments clearly demonstrate circumvention of the Court's instructions, the government highlights that the juror stated: "We went through that ream of paper, of these jury instructions. We went through it meticulously.

We went through each charging count. Each element of each charging count. We read it out loud and reread it and reread it[.]" Docket Item 1608 at 114.

But the juror foreperson did not state they reread the entirety of the instructions. Indeed, they likely did not deliberate long enough to do that. The juror foreperson specified they went "through each charging count. Each element of each charging count." Unfortunately, each charging count does not reiterate the instructions regarding credibility analysis or the prohibition against burden shifting. The juror foreperson does not once reference efforts to assess credibility, other than the disregard of a single witness categorically hostel to the government.

As the defense expected, the government primarily relied on Rule 606 to argue against further inquiry into the juror issue. The defense addressed this in the underlying motion, noting that denying a further inquiry based on the objective of Rule 606 to protect juror privacy would be a stretch in a situation where the juror at issue took it upon himself to contact multiple new outlets and sit for an interview.

The government goes on to argue that "while Rule 606 may promote the laudatory goal of protecting jurors from post-conviction harassment, adopting the defendant's rationale of suspending the rule where a juror speaks to the media would only undermine the Rule's other interests, namely, the public's confidence in jury verdicts, which could buckle under the stress of drawn out litigation concerning the jurors' once sacrosanct discussions." Docket Item 1608 at 117.

Except, again, the analysis here is far different from other situations where a juror reached out to the Court or the parties, such as *United States v. Baker* or *United States v Bongiovanni*[8].

To briefly review, the government argued that in *Baker* "the Second Circuit found [those facts] insufficient to justify a post-verdict inquiry." Docket Item 1608 at 116. Except the Circuit merely found the specific facts in *Baker* did not trigger a "*mandatory* post-trial juror interview." *Unted States v. Baker*, 899 F. 3d 123, 134 (2018)(emphasis added). The Circuit reiterated that ""[i]t is up to the trial judge to determine the effect of potentially prejudicial occurrences, and the trial judge has broad flexibility in responding to allegations of [juror] misconduct, particularly when the incidents relate to statements made by the jurors themselves, rather than to outside influences." *Id*. at 131. (cleaned up). The appellate review was limited to abuse of discretion. *Id*. at 130.

That exercise of discretion to conduct a post-verdict inquiry was demonstrated by this Court multiple times in *US v Bongiovanni*. In the first instance, a juror attempted to reach out to the government after the conclusion of the first *Bongiovanni* trial, and the government filed a motion, *ex parte*, seeking to interview the juror[9]. Docket Item 890. This Court exercised discretion to grant the government's motion to interview the juror.

---

[8] Baker is relied on heavily in the government's Response, and Bongiovanni involved two instances of jurors reaching out to communicate after the trial, the second of which was the subject of litigation and decided against Mr. Bongiovanni earlier this week. Docket Item 1617.

[9] Bongiovanni opposed the *ex parte* nature of the government's filing. Docket Item 896.

Docket Item 891. The Court "granted [the] motion adding inquiry will be made by government counsel in presence of the Court. Defense counsel [would] not be present." Docket Item 899. Then, in the second instance, this Court received an unsolicited letter from one of the jurors in Bongiovanni's first trial and disclosed it to the parties. Docket Item 1617 at 12. The defense moved for a further inquiry. Docket Item 1573. This Court ultimately denied the defendant's request, citing a particular passage from *Baker*:

> "[b]ecause . . . of the 'evil consequences' likely to result from post-verdict inquiries—'subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering[,] and creating uncertainty in jury verdicts'—such inquiries are not undertaken in the absence of reasonable grounds."

> Docket Item 1617 at 16 (*citing Baker*, 899 F.3d at 131).

Indeed, the defense recognizes that the cited passage includes concerns over "uncertainty in jury verdicts," which was a focal point of the government's argument against further inquiry, discussed above.

But in both *Baker* and *Bongiovanni*, a juror took it upon him or herself to contact one of the parties or the Court, often with hearsay allegations regarding what other jurors

may have allegedly said. Here, the juror contacted multiple media outlets and voluntarily sat for an interview so his comments could be projected into the public spere.[10]

Then, the juror told the public that it is outrageous if a defendant does not choose to call witnesses. That cross examination is generally meaningless. That it was okay to render a verdict against a defendant in this case because the defense did not present the jury with 10-30 witnesses when it was "their turn."

In would be reasonable for any attorney or student of law that heard those public comments to immediately develop doubts as to the fairness or certainty of the jury verdict in this case, leading to reasonable confusion of whether the Court failed to give proper instructions or they were ignored by the jury foreperson and potentially others. Even a lay person with the most basic understanding of the presumption of innocence and/or burden of proof would raise their eyebrows at the juror's public comments.

The public's confidence in jury verdicts would not be put in jeopardy by further inquiry. The confidence in the verdict was placed in jeopardy by the juror foreperson when he went on camera to make statements that conclusively demonstrate he did not follow the law, as instructed.

---

[10] Furthermore, upon information and belief, further inquiry of the juror or reporters that he spoke to will reveal that the juror foreperson is a member of a Facebook group including other jurors from the trial, and the foreperson advised the other jurors that he intended to give a public interview before he did so.

And perhaps worse than the strong likelihood that the juror diminished public confidence that a fair verdict was rendered in this case among those that understand principles of criminal proceedings, is the impact those comments may have on members of the public with no concept of a defendant's right to not present evidence. A member of the public may conclude, without at least further inquiry, that the juror's expression of outrage over the defense decision not to call witnesses was appropriate, and that a verdict can be rendered based on that expectation.

In this case, the interest of justice supports a new trial based on the jury foreperson's public comments, but if the Court requires more information before making that determination, then unlike *Baker* or *Bongiovanni*, the public nature of the juror foreperson's interview creates a set of circumstances where a further inquiry is the only way to ensure confidence that the jury verdict was properly rendered.

### C.  Impairment of Ability to Present a Defense

Mr. Gerace has a Sixth Amendment right to present a defense.  Through the government's decisions to charge key witnesses,[11] done in bad faith, the government precluded Mr. Gerace from presenting a defense in the 19-cr-227/23-cr-37 trial.[12]

### 1.  Mr. Gerace was Deprived of Material and Exculpatory Evidence That Could not be Obtained from Other Means

First, without question, Mr. Gerace was deprived of material and exculpatory evidence.

The purported willingness of Brian Rosenthal to accept bribes from patrons (most notably from Wayne Van Vleet) to disregard his obligations to PGC and permit commercial sex acts in the VIP area of PGC was a critical component of the testimony of L.L., one of the government's main (and perhaps most important) witnesses in the sex trafficking case.  Due to the nature of the testimony, and due to the fact that Mr. Van Vleet is deceased, the only potential source to rebut those allegations would have been the

---

[11] In addition to charging Rosenthal, Trotter and Leyland, the defense notes the government also charged John Ermin, Mr. Gerace's long-time manager, in W.D.N.Y. Case No.: 23-cr-99.  In the event Mr. Ermin was available at trial, he would have been able to provide additional information regarding protocols in place at PGC to prevent commercial sex acts and drug dealing.  He also would likely have been able to provide testimony about bias on the part of several prosecution witnesses. Unlike the testimony of Rosenthal, Trotter and Leyland, however, the defense concedes that Ermin is not the sole source of this information.

[12] The government's charging decisions impacted the entirety of the defense.  Witnesses interviewed by the defense before and during trial expressed their extreme unwillingness to testify for Mr. Gerace because of they believed that providing truthful and exculpatory testimony on Mr. Gerace's behalf would lead to criminal prosecution against them.

testimony of Mr. Rosenthal.  There is no other source of information to rebut those allegations.

Likewise Detective Trotter would provide critical information that was not available from any other source.  In that regard, Detective Trotter would have testified to several falsehoods in the testimony of K.N.   More importantly, Detective Trotter would have provided testimony regarding why and how Amherst Police arrested P.H. in Grand Island, New York after she stole Mr. Gerace's Rolex watch.  At trial (and in post-trial briefing), the government alleged the act was further evidence of Mr. Gerace's efforts to discourage P.H. from cooperating with law enforcement in this prosecution.  Detective Trotter, who was the lead law enforcement official in that investigation and arrest, would have provided testimony explaining the evidence against P.H., policies and protocols of Amherst Police regarding such arrests and, critically, his thought process and decision making in executing that arrest.  There is no other source of information to rebut the government's allegations that the arrest of P.H. was retaliatory and done to discourage P.H.'s cooperation.

The same is true about the prosecution of Jessica Leyland.  As the Court knows, at trial the government made much of an alleged incident at a local bar where Leyland is alleged to have placed P.H. into a headlock and made comments about P.H. cooperating with law enforcement.  Because others perceived Leyland and Mr. Gerace to be close, the government invited the jury to make the inference that Leyland was acting at Mr.

Gerace's direction.  If Leyland were available to testify at trial, she would have been able to explain her actions and her thought process leading to that incident, and she would have been able to provide additional facts that led to the incident to demonstrate it did not involve Mr. Gerace.  Because this information is almost entirely confined to Leyland's thought process, it is not available from any other source.

The government's responsive briefing does not dispute the above contentions.

### 2.   The Government Misstates the Law[13]

In response to the defense's motion, the government relies on *Harris v. United States*, 9 F. Supp.2d 246 (S.D.N.Y. 1998) for the proposition that the defense need to show that it subpoenaed potential defense witnesses in order to raise this claim post-trial. Docket Item 1608 at 120-121.  The government's briefing misstates the case law and the *Harris* case.

*Harris* involved a habeas petition brought by a defendant former bank executive after conviction at trial.  In the petition, Harris primarily argued that, in the prosecution of the case, the government had knowingly suborned perjury through prosecution witnesses and had suppressed favorable evidence in violation of *Brady v. Maryland* and related case law.  Part of that argument involved assertions about the way the

---

[13] In previous briefing on this point, the government misstated the holding of *Buie v. Sullivan*, another case in our circuit on this issue that does not place the burden upon the defendant that the government now wishes to impose in this instance.  *See* Docket Item 1127 at 17.

government had treated potential witnesses, who were former bank employees with knowledge of the defendant's alleged financial crimes.

Critically, in *Harris* the potentially exculpatory defense witnesses were never charged with federal crimes. While they were interviewed and polygraphed on several occasions, and while at times they were accused of lying in their statements and testimony, none of the witnesses was ever formally charged or placed in direct legal jeopardy by the United States Attorney's Office. *Id*. at 279. In that regard, in rejecting the petitioner's claim, the court made two important findings: first, that the defense had made insufficient efforts to demonstrate that the witnesses would have testified in the petitioner's defense; and second, that, upon review of the witnesses' grand jury testimony, and it "found no testimony that was exculpatory of [petitioner]". *Id*. at 280, n.17.

The facts are very different here. First, having had discussions with attorneys for the three witnesses in the lead up to trial, the defense flagged this issue before the first witness was ever sworn in this case, making clear its understanding that those witnesses would have asserted their Fifth Amendment right not to testify. Docket Item 1097. Second, the fact that Rosenthal, Trotter and Leyland would have invoked the Fifth Amendment right not to testify if called rendered them unavailable to the defense. *See United States v. Miller*, 954 F.3d 551, 561 (2d Cir. 2020); *United States v. Wilson*, No. 1:19-CR-00155 EAW, 2022 U.S. Dist. LEXIS 210637, at *12 (W.D.N.Y. Nov. 21, 2022).

The government invites the Court to impose a further, impossible burden upon defense counsel in this context.  The burden is not supported by the case law, and it should not be imposed at this time to the detriment of Mr. Gerace's rights.

### 3.  The Government Acted in Bad Faith

The Court does not need the defense to reiterate all the ways the prosecution team has acted in bad faith in the way it has pursued the *four* indictments against Mr. Gerace. The bad faith has encompassed charging decisions (including the decision not to charge prosecution witnesses K.N., P.H. and L.L. when it was clear they had lied in the grand jury and in other testimony), the improper subpoenaing of a defense investigator (including apparent misstatements to Judge Arcara in an *ex parte* proceeding relating to the defense's motion to quash), a seven month long campaign to disqualify defense counsel (with the threat of criminal charges) that was based on an incomplete recitation of the law and a deliberately incomplete factual basis, the bad faith withholding of evidence in case 23-cr-99 (which briefly resulted in the disqualification of the prosecution team), the inclusion of deliberately and knowingly false allegations in the 23-cr-99 indictment, the effort to force Mr. Gerace to take the 23-cr-60 case to trial immediately before the beginning of the 19-cr-227/23-cr-37 case,  and much more.  That bad faith is further laid bare on this issue.

The government interviewed Rosenthal on June 18, 2020, which is the date of the interview forming the basis for the government's false statements charge.[14] Case No. 23-cr-102, Docket Item 1 at 2.  The government interviewed Trotter on September 30, 2022, which is the date of the interview forming the basis of the government's false statements charge.  Case No. 23-mj-1173 at p. 3.  And the conduct giving rise to the charges against Leyland occurred in July, 2019 (Case No. 23-mj-5229, Docket Item 1 at 1), and the government was aware of the allegation at least by February, 2023 (*See, e.g.*, Case No. 23-mj-11 at para. 17), although the government likely knew the allegation much earlier because the individual allegedly assaulted by Leyland is a cooperating witness who was cooperating at the time of the altercation.   Despite that, the government only chose to charge Rosenthal, Trotter and Leyland in the immediate lead up to the 19-cr-227/23-cr-37 trial date at a point in time after the defense had filed its witness list.

Upon additional review, the record is damning.  K.N.'s changed testimony so many times there is no question the government should have charged her with perjury or obstruction. The material differences have been recognized by this Court. *See e.g.* Docket Item 1112 at 5 ("That is certainly materially different."). When the parties argued a *Brady* motion in the lead up to trial. At trial in the 19-cr-227/23-cr-37 case, both L.L. and P.H. acknowledged and admitted to additional federal crimes.  All three witnesses were

---

[14] The other conduct Mr. Rosenthal is charged with dates from 2013-2017.

testifying on the part of the government.  None of those witnesses was charged with those crimes or experienced repercussions.

In stark contrast, Rosenthal, Trotter and Leyland were important defense witnesses who possessed information that was critical to the case and yet otherwise not available to the defense.  In the immediate lead up to trial, and not when the conduct became known to the government, the government chose to charge those individuals.  Given the scope and deliberation attendant to this prosecution, there is no other conclusion other than that the government acted in bad faith.

### 4.   The Law Should Counsel Toward a New Trial

"The Sixth Amendment guarantees criminal defendants the right to present a defense, which includes a right to call witnesses." *Rigas v. United States*, No. 02-CR-1236, 2020 U.S. Dist. LEXIS 86850, 2020 WL 2521530, at *22 (S.D.N.Y. May 15, 2020) (*citing United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000)), aff'd, 848 F. App'x 464 (2d Cir. 2021). "It is elementary that criminal defendants have a right to establish a defense by presenting witnesses." *See Webb v. Texas*, 409 U.S. 95, 98, (1972).  The right to establish a defense by presenting witnesses serves the truth-seeking function of the trial process by protecting against the dangers of judgments "founded on a partial or speculative presentation of the facts." *Williams*, 205 F.3d at 29 (2d Cir. 2000).

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) "[J]udicial or

prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violate the defendant's right to present a defense." *Williams*, 205 F.3d at 29.

Because of the deliberate and calculated actions of the government, Mr. Gerace did not receive that right.  On this record, the government's misconduct in this instance warrants a new trial.  Mr. Gerace's motion pursuant to Rule 33 of the Federal Rules of Criminal Procedure should be granted.

## II.    REPLY REGARDING THE MOTION FOR JUDGEMENT OF ACQUITTAL

### A.  The Rule 29 Standard and Uncontroverted Facts

In the Rule 29 context, "a conviction based on speculation and surmise alone cannot stand." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994). The government "must do more than introduce evidence 'at least as consistent with innocence as with guilt.'" *Id*. (*quoting United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).

But that is what occurred in the trial of the 19-cr-227/23-cr-37 cases.   Time and again, the government introduced evidence of non-criminal -- but perhaps socially objectionable-- conduct on the part of Mr. Gerace and others.  The evidence did not demonstrate conspiratorial conduct aimed at sex or drug trafficking beyond a reasonable doubt.  Rather, the evidence showed conduct and mens rea that was consistent with non-criminal, non-conspiratorial intent and acts.

The defense acknowledges that, within the Rule 29 context, the Court must look at the testimony in the light most favorable to the government.  In reviewing the evidence, however, there are uncontroverted aspects of this case that the Court must acknowledge. In reviewing the evidence, the Court should not forget the sheer volume of government witnesses who received financial compensation[15] or who were testifying in order to limit (or wholly ameliorate) the consequences of their own crimes.[16]  Finally, the Court should account for the fact that many of the witnesses had been terminated from PGC, either for their own substance abuse or for behavior that was adjacent to substance abuse[17].

Throughout the trial, the most critical witnesses had substantial personal motive to work with the government toward Mr. Gerace's conviction.  Just as is contemplated by the jury instructions, the Court should bear that fact in mind when evaluating the evidence.

---

[15] Witnesses L.L., P.H., K.N., and K.L. received financial compensation in connection to their testimony in the prosecution and trial.  Not only did the witnesses receive compensation for their testimony, but, as was demonstrated most starkly in the testimony of K.L. and L.L., their testimony changed dramatically when their personal well-being came to rely more heavily upon monetary support from the government.  L.L.'s testimony regarding bad acts allegedly engaged in by Mr. Gerace amplified after a drug relapse and when she believed her testimony would be rewarded with "witness protection"; K.L.'s testimony of conduct Mr. Gerace allegedly directed at her changed when the government provided compensation to help her address her own homelessness.

[16] Witnesses Lou Selva, Kevin Myska, Jeffrey Anzalone, K.L., P.H., A.A., P.H., B.R. and K.H. testified with an expectation that they would receive a benefit in avoiding criminal charges or mitigating the consequences of pending criminal cases against them.

[17] E.H. testified she had been thrown out of PGC at a patron.  A.P., L.L. and K.L. testified they had been terminated from employment or otherwise barred from PGC due to substance abuse.

Nonetheless, in the trial against Mr. Gerace, based on largely the same evidence to support these counts, a jury convicted of both. For the reasons discussed below, a judgement of acquittal should be entered for each.

**B.  The Evidence Adduced at Trial Was Materially Different Than What was Proven at Trial**

Evidence adduced at trial that is materially different from the allegations in the indictment, including evidence of a different time period, results in variance.  In the Second Circuit, variance warrants entry of a judgment of acquittal when it results in "substantial prejudice" to the defendant.  *United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007); *United States v. McDermott*, 918 F.2d 319 (2d Cir. 1990).  The test is whether variance infringes upon the substantial rights that indictments exist to protect.  *United States v. Dupre*, 462 F.3d 131, 141 (2d Cir. 2006).

Here, allegations that Mr. Gerace maintained PGC as a drug involved premises and engaged in a narcotics trafficking conspiracy both depend upon Mr. Gerace's unabated control of PGC, with both counts alleging that continuous control of PGC was essential to the count.

As is set forth in the defense's primary motion papers, it is virtually uncontroverted that Mr. Gerace was barred from PGC and did not control any aspect of

PGC from late 2012 until April, 2014 – a period of approximately 19 months.[18]  Testimony of countless witnesses established that he was not involved with operations of PGC at that time.  It is also confirmed by telephone call data, which demonstrates that, during the contested 19 month time period, Mr. Gerace had a single phone call to PGC.

At best, the government's proof at trial demonstrated the existence of two sets of crimes: the crimes that occurred at PGC before the fall of 2012, which were all beyond the statute of limitations in this indictment, and the crimes that occurred between April, 2014 and 2019.  In other words, looking at the evidence in the light most favorable to the government, the government proved two different conspiracies at two different times.

In assessing whether a defendant is prejudiced when the evidence would allow a jury to find multiple conspiracies rather than the single conspiracy alleged, "[o]ne of the principal considerations . . . is the 'spill[-]over effect' of permitting testimony regarding one conspiracy to prejudice the mind of the jury against the defendant who is not a part of  that conspiracy but  another." *United States v. Harris*, 8  F.3d 943, 947 (2d Cir. 1993). Accordingly, courts consider several factors, including: (1) whether the court gave a *Pinkerton* charge; (2) whether out-of-court statements of persons not members of the defendant's conspiracy were  used  against  the  defendant;  (3)  whether there  was

---

[18] The evidence also demonstrated that Mr. Gerace was not in complete control of PGC prior to 2014, as PGC was co-owned by Don Parrino.  Many witnesses testified to the control Parrino and his agents exercised over PGC from 2005-2014.

prejudicial spill-over due to a large number of joined defendants; and (4) whether any inflammatory or shocking evidence (from outside the defendant's conspiracy) came in against the defendant. *See McDermott*, 245 F.3d at 139; *see also Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). After a multiple-conspiracy variance is shown, the presence of just one of these factors may be sufficient to satisfy the prejudice prong. *See United States v. Johansen*, 56 F.3d 347, 351-52 (2d Cir. 1995) (reversing a conviction where the first three elements were not present but where the variance permitted admission of extremely prejudicial evidence).

Mr. Gerace did not have any co-defendants at his trial, and the Court did not give the jury a *Pinkerton* charge. But the government's efforts to prove two different conspiracies at two different times led to the admission of statements and evidence that would have otherwise been inadmissible against Mr. Gerace, causing substantial unfair prejudice. For instance, if the conspiracy was charged properly, evidence of A.P.'s drug use and drug sales in the 2007-2013 time period would not have been admitted at trial and, most notably, her testimony that Mr. Gerace was believed to have had "mob ties" would also not have been admitted at trial; the testimony of R.A. relating to drug use in that time period and that the money to begin PGC came from Mr. Gerace's grandfather, the reputed leader of Buffalo LCN, would not have been admitted at trial; K.L.'s testimony of drug use and drug purchases in the 2009 time frame would have been inadmissible at trial; the 2013 traffic stop of Jessica Leyland, who allegedly possessed

large quantities of cocaine near PGC, would not have been admissible at trial; and C.C.'s observations of Mr. Gerace that pre-dated April 2014 would not have been admissible at trial. This is just a sample of the evidence that otherwise would not have been admissible.

The government was aware of this gap in evidence. Not only did the government have the phone data it introduced at trial, demonstrating Mr. Gerace's lack of contact and control over PGC, but the time gap was also the subject of grand jury testimony from Mr. Gerace's ex-wife and other witnesses. By virtue of the government's wide-ranging charging decision, however, acts of drug transactions and related activity in the period of 2005-2012 was admitted at trial. Had the government appropriately taken account of Mr. Gerace's inability to maintain or control PGC for the 19 month period in 2012-2014, those acts, which included allegations of cocaine and heroin sales and drug use on the part of Mr. Gerace and others, would not have been permitted before the jury.

### C. Maintaining Drug Involved Premises

The government does not dispute the law cited in Mr. Gerace's moving papers. *See* Docket Item 1559-1 at pp 27-29. The government's allegations that Mr. Gerace maintained PGC as a drug involved premises stretch far past the applicable statute of limitations. The government sought to charge that crime on the theory of continuing conduct – that is, that Mr. Gerace engaged in that conduct in a continuous way from the earliest date in the indictment up to the time Mr. Gerace was indicted. In this instance,

the government chose to allege that Mr. Gerace had maintained PGC as a drug involved premises from 2006 until December of 2019. *See, e.g.*, Docket Item 1241 at p. 35.

The proof at trial demonstrated that Mr. Gerace did not maintain or control PGC for a period of time from September, 2012 until April, 2014. Those facts were corroborated with testimony of fact witnesses as well as data provided by government agents through study and analysis of phone records. In its briefing, the government hopes the Court will look past the clear deficiency in the proof. Understanding that it cannot dispute the evidence set forth Mr. Gerace's motion papers, the government attempts to obfuscate the issue.

First, the government points to the testimony of A.P., who worked at the club up to the beginning of 2012. A.P. identifies the people running PGC in that time as Don Parrino and Peter Gerace. Of course, A.P. did not have any knowledge of what went on at the club after her employment, which would include the critical September, 2012 through April, 2014 time frame. Docket Item 1608 at p. 51. What is more, to the extent the government attempts to rely on the testimony of A.P. regarding cocaine use at PGC, the government failed to remind the Court that A.P. was terminated from PGC for possessing cocaine within the premises. Id.

Next, the government points to the testimony of A.A., who recited an occurrence with Mr. Gerace in the upstairs area of PGC in 2012. That testimony does nothing to change the fact that Mr. Gerace was out of PGC later in the 2012 year or that he remained

out of the club until April of 2014.  Simply put, A.A.'s testimony – which was uncredible for several other reasons – is completely unrelated to the fact that Mr. Gerace did not control PGC for a lengthy period of time. [19]

The government's final attempt to save its theory is reliance on the testimony of L.L., potentially the least credible witness of the trial.   Indeed, L.L. told the Court herself that she struggled with memory in this period of time, essentially telling the Court and the jury not to believe her:

> Q. Why did you just call it a story?
>
> A. Because there is so many things going on in this trial, that it jumps around. You know what I mean? They're little different stories to me.
>
> Q. Okay.
>
> A. Like, and it's hard to just sit here and think about them.
>
> Q. It's hard to keep them straight?
>
> A. Yeah. When it happened, how long ago.
>
> Q. Yeah. And about that, substance abuse impacts your memory, right?
>
> A. Yeah.
>
> Q. Yeah. If you're using substances heavily, it's difficult to form memories, correct?
>
> A. It can be.

---

[19] As summarized in the government's lead brief, despite asserting she was present in the upstairs of PGC, A.A. wrongly described details of the upstairs or the direction an individual need to turn on the stairs in order to reach the upstairs of PGC.

Q. Yeah. And it also changes your perception of things, doesn't it?

A. Yes.

Q. When you're using substances, and you're addicted, you're hyper focused on substances, correct? Right?

A. Yes.

Q. And you're hyper focused on getting the drugs, correct?

A. Yes.

Q. And so you might ignore or fail to perceive other things that are going on, correct?

A. Yes.

Q. Okay. And -- and certainly, it impairs your ability to make memories, correct?

A. Yes. I'll agree that, yeah.

Q. Yeah. And it impairs your ability to recall memories, correct?

A. It can.

Docket 1441 at 158-159.

What is more – and in direct contradiction to the representations made by the government -- L.L.'s testimony corroborates the defense's contention that Mr. Gerace was not in control of PGC for a period of time. At most, L.L.'s testimony demonstrates that she lacks knowledge about the point in time that Mr. Gerace did not control PGC, but her testimony corroborates that, for at least some period of time, he did not control the club. In that regard, L.L. testified:

Q. Are you aware of whether or not there was a grand reopening party in April of 2014?

A. Yes.

Q. Okay. You recall that, right?

A. I do.

Q. That was a point in time that the Gerace family took control of the club again, correct?

A. Okay, yes.

Q. You recall that?

A. Yes.

Q. And prior to that, Don Parrino had been in charge of the club, correct?

A. Yes.

Q. Yeah. And Don Parrino had a manager named Larry, correct?

A. Yes.

Q. Larry came in with Don Parrino, correct?

A. Yes.

Q. And he also left with Don Parrino, correct?

A. Yes.

Q. So, if we're talking about Larry being at the club, we're talking about a point in time where Peter Gerace was not in the club, correct?

A. Yeah.

Q. Yeah. So the testimony that you had earlier about Larry, do you recall that testimony?

A. Yes.

Q. That comes at a point in time where Mr. Gerace is not in the club, correct?

A. Correct.

Q. Okay. Now, you started working at Pharaoh's in 2013, correct?

A. Yes.

Q. Summer of 2013, correct?

A. Yes.

Docket 1441 at 190-193.

The statute of limitations protects criminal defendants from unfair and unjust prosecution. In this case, the length of the charges in this indictment stretch far beyond the timeframe prescribed by the statute of limitations, testing the limits of what should be permitted by the Due Process Clause of the Fifth Amendment. The government's theory for stretching the statute of limitations – that the criminal conduct was continuous – is at odds with the factual record developed at trial. Indeed, if the appropriate facts were introduced at trial, no conduct relating to the drug involved premises would be permitted to be considered before April of 2014 – extracting a significant amount of evidence from the trial record.

If Due Process means anything, the government's allegations that Mr. Gerace maintained a drug involved premises must fail.

### D.  Narcotics Conspiracy

In the defense's primary motion papers, the defense noted the burden that is incumbent upon the government in pursuing charges like this across a 15-year time span. Just like the premises related count, the government must prove a continuous drug conspiracy similar to the allegations in the indictment – in this instance, continuous activity that stretches from 2005 until approximately 2020.  The government did not and could not meet that burden.

First, the evidence demonstrates Mr. Gerace did not engage in a drug trafficking conspiracy with anyone.   Rather, as the testimony of Doug Augustyniak and others demonstrated, Mr. Gerace wanted to keep drugs out of PGC, with Mr. Gerace going so far as firing dancers who had significant drug problems (e.g., L.L.,, G.R.), firing employees who were caught engaging in drug-related activity outside of PGC (e.g., Jessica Leyland), throwing out and permanently barring customers from PGC who were using narcotics (e.g., John McDonald), having bouncers and club staff enforce rules designed to keep narcotics out of PGC (e.g., Doug Augustyniak), and installing and monitoring a state of the art camera system designed to monitor the premises and guard against unlawful activity (*See generally* testimony of Brian Burns, A.A. and K.N.).  Indeed, it is noteworthy that, on cross examination, the majority of patrons and dancers testified they engaged in narcotics activity in private areas of the PGC to avoid detection by

management.    Dancers testified that, when they were non-drug users, they were not aware of drug use in the club.  *See, e.g.*, Docket Item 1366 at pp 101-102.

In support of its position, the government cherry picks testimony from the trial to show isolated instances of drug use by Mr. Gerace and others.[20]  First, the government points to the fact that G.R., who was sober (after having previously been to rehab for drug addiction) was introduced to drugs by K.L. when K.L. was a patron at PGC.   But G.R.'s testimony demonstrates that that event had nothing to do with Mr. Gerace:

> Q: Okay. Now, there came a time where you were introduced to drugs again, correct?
>
> A. Yes.
>
> Q. And that was from K.L., right?
>
> A. Yes.
>
> Q. And that came at a time where K.L. was not working at Pharaoh's, correct?
>
> A. No.
>
> Q. She was there socially, right?
>
> A. Yes.
>
> Q. You met her, right?

---

[20] The government relies on testimony from E.H.  E.H.'s testimony must be disregarded.  First, she suffers from a disease that impacts her ability to perceive social situations and recall events which was not disclosed by the government and only came to light on cross examination.  Second, E.H.'s social media, which was the subject of cross-exam, demonstrated an extreme bias against Mr. Gerace, celebrating the fact that she was assisting in his conviction.   This is consistent with the fact that she was removed from PGC when she was there as a patron.

A. Yep.

Q. You hit it off with her, right?

A. Right.

Q. She provided the cocaine to you, correct?

A. Yes.

Q. And you did it in the bathroom, right?

A. Yes.

Q. You didn't do it out in the open?

A. Right.

Q. You didn't do it off the bar –

A. No.

Q.-- right? You didn't do it off the stage, right?

A. No.

Q. Okay. And it was Ms. K.L.'s idea to go use it in the bathroom?

A. Pardon me?

Q. It was K.L.'s idea to go use it in the bathroom?

A. Yes.

Q. Yeah. A. I believe so, yeah.

Q. Okay. And in that moment you made the decision that you were going to use cocaine, right?

A. Yes.

Q. Okay. Now, you and her had been getting along very well that night, right?

A. Yes. Yep.

Q. It was the first time that you had ever met her, correct?

A. Correct.

Q. Okay. And this was before she was dating Mr. Gerace, correct?

A. Yes.

Q. Long before you had ever met Mr. Gerace, correct?

A. Well, I had seen him around the club, but I hadn't actually formally met him, correct.

 Q. Correct

A. I knew who he was.

Q. Yeah, you knew who he was, but you hadn't shaken his hand –

A. Right, exactly.

Q.-- and said, you know, hi, I'm G.R., or anything like that –

 A. Right.

Docket Item 1366 at 101-104.

Likewise, G.R.'s subsequent drug use, which included heavy use daily, had nothing to do with Mr. Gerace. G.R. testified that she and K.L. used drugs both inside and outside of PGC, with and without Mr. Gerace. G.R.'s activities do not evidence a conspiracy to distribute narcotics; they evidence the activity of someone addicted to drugs who is procuring and using those drugs by any means available.

The government's reliance on Mr. Gerace's relationship with C.C. is also misplaced. The government asserts that Mr. Gerace's cocaine use with C.C. was part of Mr. Gerace's efforts to supply drugs to dancers and to reinforce their addictions. Docket Item 1608 at p. 8. In that regard, when she was working as a dancer at PGC, C.C. testified she used cocaine "in the bathroom" that was in the dressing room at PGC to avoid detection. C.C. Trans. at pp 21-22. C.C. did not use cocaine in the open; she did not use cocaine in the public areas of the club.

As the Court knows, C.C. was in a romantic relationship with Mr. Gerace and lived with him for a period of time. C.C.'s testimony indicates her struggles with addiction really began when she was in the romantic relationship with Mr. Gerace; critically, however, she noted that she stopped dancing at PGC at the time she started to be in a romantic relationship with Mr. Gerace. Id. at pp 20-21. Simply put, there is no nexus between C.C.'s cocaine abuse, which appears to have been personal/recreational, and PGC or any conspiracy to traffic narcotics through PGC.

The government also asserts that testimony of K.N., who allegedly witnessed Mr. Gerace distribute Loratabs to a dancer on a single occasion evidences the narcotic conspiracy. That is not the case. Even if K.N.'s testimony were true (and it is not), at best K.N.'s observations would support a charge for narcotic distribution, not an ongoing conspiracy to distribute narcotics.

That is the same conclusion with regard to the government's assertions about L.L. found at page 9 of the government's briefing. The government asserts that L.L's testimony establishes that Mr. Gerace "middled" a drug deal to get heroin for L.L. when she was a dancer at PGC. On cross examination, however, L.L. said the following, indicating that she did not actually know that Mr. Gerace played any role in getting drugs from a drug dealer named Scooter:

> Q. Now your testimony is Scooter was a drug dealer, correct?
>
> A. Yes.
>
> Q. And I think your testimony was that you saw him at the bar at Pharaoh's, correct?
>
> A. Yes.
>
> Q. Okay. And you never saw him in the upstairs, correct?
>
> A. Correct.
>
> Q. Okay. And you never saw him exchange money with Mr. Gerace, correct?
>
> A. Correct.
>
> Q. Okay. And, in fact, you never saw Mr. Gerace exchange money for any drugs; isn't that correct?
>
> A. Correct.
>
> Q. Okay. And so, Scooter, to some -- strike that. Scooter appeared to be a normal patron, right?
>
> A. Yes.
>
> Q. He wasn't wearing a billboard sign that said I'm a drug dealer, right?

A. Correct.

Q. He looked like a normal guy sitting at the bar, correct?

A. Yes

Docket 1441 at 206-208.

The same is true about the government's reliance on the testimony of K.A.  While it may have been true that K.A. was a severely addicted dancer at PGC, her testimony established that she never met Mr. Gerace, never received drugs from Mr. Gerace, and that in using narcotics in PGC she took pains to ensure she was not caught by management or staff, who she feared would fire her.

Finally, the government attempts to rely upon the testimony of customers John McDonald and Jeff Anzalone who used drugs at PGC.  Of course, both witnesses were cooperating in the prosecution of Mr. Gerace to lessen their own federal drug charges. And what the government forgets to mention is that John McDonald was thrown out of PGC and barred from the premises for erratic and sophomoric behavior consistent with drug use.

With regard to Jeff Anzalone,[21] his testimony established that he usually brought his own cocaine to PGC (Docket Item 1474 at p. 13), that to the extent he did buy cocaine

---

[21] The defense believes Anzalone's testimony should be wholly disregarded. In his testimony, he acknowledged that the time period he was testifying to was a "blur" and that it created significant memory issued.  Docket Item 1474 at 39-40.

at PGC, it was from dealers who would sell to him both inside and outside of the club (Id. at pp 20-26), that most of the time he would buy cocaine outside of the club and then bring it inside the club, hiding it from security (id at 67-68), that at one point in time Mr. Gerace's brother, Anthony Gerace, assisted Anzalone in purchasing a quantity of cocaine from a bar that was not PGC (id), and that at one time Anzalone was invited to the garage area of PGC to do cocaine with Anthony Gerace (id at 35) and one time Anzalone was invited upstairs to do cocaine with Mr. Gerace (id.).    On cross examination, Anzalone acknowledged that when he did use cocaine at PGC he was trying to do so clandestinely, and he further acknowledged that he never bought cocaine from Anthony Gerace or from Mr. Gerace (id at 66).  Simply put, Anzalone's testimony establishes that he was addicted to cocaine, was procuring and using cocaine everywhere that he could, and that there was no agreement between Anzalone and Mr. Gerace or Mr. Gerace and anyone else to distribute narcotics at PGC consistent with the allegations in the indictment.

### E.  Sex Trafficking Conspiracy

In its primary motion papers, the defense laid out the government's apparent theory of sex-trafficking conspiracy:   Mr. Gerace's interactions with outside stag companies; the conduct in the VIP area of PGC; and conduct in the upstairs of PGC.  In its response, the government has apparently abandoned the theory that Mr. Gerace conspired with outside stag parties.  Docket Item 1608 at p. 12.  Instead, the government attempts to mischaracterize other evidence adduced at trial.

First, the government asserts that the dancers at PGC were "upsellers" of sex acts for the financial benefit of Mr. Gerace and PGC. That misrepresents the evidence. As the Court knows, the prostitution acts engaged in by L.L., A.A. and G.R. were done outside of the club, independent of the dancers' work at PGC. Money was paid from patrons to the dancers. L.L. and A.A. testified they engaged in this behavior in a way that kept it clandestine from PGC. What is more, the alleged "upselling" of sex acts in the VIP area did not provide a financial benefit to Mr. Gerace or to PGC. The sexual acts that would take place and the price of the act was negotiated between the dancer and the patron; PGC staff, who was there to enforce the rules set by Mr. Gerace to guard against prostitution, were bribed by the dancer or the patron to look the other way. The financial benefit for commercial sex acts in the VIP area flowed to the dancer and the bouncer. Mr. Gerace did not see any economic benefit from the acts. The government's theory is just that, a theory unsupported by the evidence at trial.

The government makes much of the testimony of G.R., whose testimony regarding a single occurrence in the upstairs of PGC the government asserts evidences an act of coerced prostitution. It does not. As the Court knows, G.R. testified that when she was a dancer at PGC, she went upstairs with her friend to use drugs of her own volition. G.R. Trans. p. 42, 118. She never refused the invitation to go upstairs. *Id.* Rosier was addicted to drugs before working at PGC, and she chose to use drugs on her own, without any involvement of Mr. Gerace. *Id.* at 112-120, 132-134.

47

With regard to the specific instance, G.R. testified that Mr. Gerace asked her to "take care of" his friend.  *Id.* at 45, 124.  On cross exam, G.R. acknowledged Mr. Gerace actually asked her to "entertain" his friend.  *Id.* at 128.  What that meant was never explicitly stated, but G.R. interpreted it as having sex with his friend.  *Id.* at 124. G.R. testified that she had sex with the man referenced, and afterward Mr. Gerace gave her $200.  *Id.* at 45.  That is the amount of money consistent with a long, private dance.  *Id.* What is more, G.R. acknowledged she was using drugs and drinking heavily and her recollection of the night was impaired.  *Id.* at 126.  G.R. testified she went on to have further sex for money meet ups with that man throughout the summer, where she chose the time, the place and the amount – and that she did so without Mr. Gerace's involvement in any way.  *Id.*  Stated another way, G.R's testimony may have evidenced an act of prostitution, but it was not an act that was done with coercion or force by Mr. Gerace.

The government also tries to make much of the testimony of K.L., who asserted that Mr. Gerace withheld Loratabs from her when she was addicted and that he would only give them to her after she performed a sex act upon him.  The testimony is entirely uncredible.  As the Court knows from K.L.'s cross examination, she met with the government on several occasions for nearly a decade, beginning when she was in custody in Amherst in 2012.  She shared details of her relationship with Mr. Gerace and with other relevant witnesses, her observations at PGC, and her personal drug use.  Despite these

lengthy interviews with federal law enforcement, she did not make any statements or share any details about Loratabs or the type of conduct she testified about at trial until trial. Docket Item 1471 at pp 49-51.   K.L.'s testimony is also uncredible for other reasons, including the fact that she was facing criminal charges at the time she was testifying and that she had received significant benefits from the government, including rooming and other compensation, in connection with her testimony. Simply put, the more her personal well-being depended upon pleasing the government, the more her testimony evolved to make Mr. Gerace appear more culpable.

The government's reliance on the testimony of L.L. is also misplaced.   The government makes much of L.L.'s drug addiction and suggests it was a lever for coercion by Mr. Gerace and others.  It may be true that L.L. was addicted to drugs while she worked at PGC;  but it is also true that she was fired from PGC repeatedly for drug use, she went to rehab for that drug use, she chose to return to work at PGC after completing rehab, and she had made representations to PGC staff that she would not engage in drug use while working at the club.  L.L. Trans. at pp 136-140.

Indeed, L.L.'s testimony also demonstrates she engaged in commercial sex acts independent of Mr. Gerace of her own volition and for her own benefit.  In that respect, her trial testimony included details of her relationship with a local chiropractor that encompassed L.L. engaging in commercial sex acts for cars, lodging, cash and drugs.  Id. at 218, 243-247.

Taken as a whole, L.L.'s testimony shows: (1) that she consciously chose to engage in the behavior she did when she was sober and clear-headed; and (2) at all times she retained her volition, including making the choice to engage in commercial sex acts for money, where she chose where, who, what act, and how much.

The government's assertions about Mr. Gerace's "economic coercion" – e.g., his ability to control the times the dancers worked at the club and therefore manipulate their activity – is also without foundation. Numerous former dancers, including G.R. and P.H. testified they went to work at PGC because of the money and the flexibility of scheduling. Several others confirmed that they were able to choose when they worked (*see*, e.g., R.W. and L.L.). Throughout the trial testimony, the only purported victim of Mr. Gerace who was limited in their ability to work at PGC was L.L., who was limited because she was fired for narcotic use and then who was permitted to return to PGC after going to rehab. What is more, there was no testimony from any dancer that Mr. Gerace was able to limit the dancer's ability to work at other gentlemen's clubs.

Finally, the government alleges that Wayne VanVleet, a regular customer at PGC, was able to assert complete control over the dancers at PGC in the VIP area. That assertion is wholly unsupported by the trial testimony. C.H., a protected witness and former PGC dancer, testified as follows:

> Q: Did you give Wayne VIP Room dances?
>
> A. When I first started working there, yes.

Q. Did Wayne try to push your boundaries?

A. He did.

Q. What would Wayne try to do?

A. He would try to be inappropriate. Try and position me inappropriately over his leg. He would try and bring me close and lick on my chest. But I distanced myself away from him, because I'm not putting myself in a position where I'm not feeling safe.

Q. Did you feel unsafe with Wayne before you established firmer boundaries with him?

A. When he tried, yes. But once I established a boundary, we were fine.

Docket Item 1461 at 12.

Speaking of her observations of other dancers with VanVleet, C.H. further testified:

Q. Just a couple questions. You just gave some testimony about your observations regarding a gentleman named Wayne VanVleet; do you recall that testimony?

A. Yes, sir.

Q. And you recalled some -- some observations you made about a dancer named Wednesday, correct?

A. Yes.

Q. Okay. And Wednesday, from your observations, had gone back into the VIP with Mr. Wayne VanVleet, correct?

A. Yes, sir.

Q. And she performed a dance, correct?

A. Yes.

Q. She performed multiple dances, correct?

A. Yes.

Q. And -- and you know Wednesday from your work at the club, correct?

A. Coworker, correct.

Q. Coworker, correct. And she never said to you that that was something she didn't want to do, correct?

A. Correct, but she complained about it in the back.

Q. Okay. But she -- she did it, correct?

A. Correct.

Q. And she took the money from Mr. VanVleet, correct?

A. Yes.

*Id*. at 17-18.

The evidence adduced at trial was insufficient to sustain a charge for sex trafficking conspiracy. The Court should enter judgment of acquittal on Mr. Gerace's behalf on that Count.

### F.  Obstruction of Justice Conspiracy with former SA Bongiovanni

To sustain a conviction for the alleged obstruction conspiracy between former SA Bongiovanni and Mr. Gerace, the government had the burden to prove beyond a reasonable doubt that there was a mutual understanding, either spoken or unspoken, between Gerace and Bongiovanni to cooperate with each other to accomplish an unlawful act. At trial there was no evidence of an unlawful agreement. Gerace and Bongiovanni

were childhood friends. They remained in contact throughout their lives. At times, Bongiovanni may have interceded on his own to assist Gerace. But there is no evidence that Gerace was aware of Bongiovanni's allegedly improper acts, and there is no evidence that he wanted Bongiovanni to act improperly.

The government's response mischaracterizes the evidence at trial. For instance, the government relies on the fact that SA Bongiovanni allegedly told Mr. Gerace that intimate photos of R.A. existed in Craig Border's house when it was searched by federal law enforcement. This occurred at a time that SA Bongiovanni and Mr. Gerace were friendly and were going on double dates as couples. There is no evidence that Mr. Gerace solicited this information; the evidence only points to a friend sharing information with another friend about the woman he is dating. There is no evidence of the meeting of the minds to accomplish anything unlawful.

The government also relies on the fact that Mr. Gerace allegedly handed SA Bongiovanni's business card to A.P. In her testimony, however, A.P. only said that Mr. Gerace gave her Mr. Bongiovanni's business card and "said that if [she] had gotten into trouble, that [she] could call him and try to get help." A.P. Trans. at p. 25. On further examination, A.P. testified she believed the card was just to "like get out of a traffic ticket," and she further acknowledged that she had not sold cocaine at the time Mr. Gerace gave A.P. the business card. Id. at pp 37-38. A.P. also testified that Bongiovanni was treated the same as everyone else when he was physically present at PGC. Id. at p. 36. Simply

put, Mr. Gerace's actions evidence he regarded Mr. Bongiovanni as a friend, not as a law enforcement contact that would bend the rules to protect him.   In other words, Mr. Gerace acted like a normal person who has a friend in local law enforcement;   the interaction does not evidence a conspiracy to obstruct justice.

The government's reliance on SA Bongiovanni's activity with regard to the 2008 and 2009 investigations of Mr. Gerace remains a red herring.  Regardless of what SA Bongiovanni allegedly did with respect to Mr. Gerace's contact with federal law enforcement in that period, there is no evidence Mr. Gerace solicited the conduct, condoned the conduct or was even aware of the conduct.  Indeed, while the government alleges a conspiracy between SA Bongiovanni and Mr. Gerace in this time period, there is no evidence that Mr. Gerace was even aware of the conduct of SA Bongiovanni.  To the extent SA Bongiovanni's conduct evidences breaches of DEA protocol, the evidence shows these breaches were the product of SA Bongiovanni alone.

The government also relies on an alleged 2015 overdose at PGC as evidence that Mr. Gerace and SA Bongiovanni conspired to obstruct justice.  In the government's version of events, a dancer overdosed at PGC in 2015 and Mr. Gerace contacted SA Bongiovanni, who allegedly instructed that the dancer should be taken to a nearby hotel and left in the lobby.

Putting aside the voluminous evidence demonstrating that this event likely never happened, even if it did occur, it cannot support a conviction for obstruction of justice.

As the Court well knows, to sustain a conviction the government must demonstrate that Mr. Gerace entered a conspiracy with SA Bongiovanni knowing that the object of the conspiracy was unlawful.   *See* Modern Federal Jury Instructions-Criminal ¶ 19.01, Instruction 19-4.   On this record, the evidence demonstrates that when Mr. Gerace had an issue at PGC he reached out to a member of law enforcement that he knew for advice; it does not evidence that Mr. Gerace knew there was anything improper about his doing so, and it does not evidence a conspiracy to break the law. [22]

That is also the case with regard to the May 2017 voicemail and response from SA Bongiovanni.  Even accepting that SA Bongiovanni's response that "pinging" a Tracfone required a warrant was law enforcement sensitive information, there is no evidence to suggest that Mr. Gerace sought information from Mr. Gerace with any understanding or in contemplation of SA Bongiovanni violating any law enforcement related duty in providing that response.  There is no evidence that Mr. Gerace asked SA Bongiovanni to violate any duty or obligation he had as a federal agent in answering that question. Rather, the interaction proves, once again, that Mr. Gerace and SA Bongiovanni were friends and that Mr. Gerace reached out to SA Bongiovanni the same way he would any other friend.

---

[22] This conclusion is also supported by the testimony of former Special Agent Casullo.  If SA Bongiovanni believed there was anything improper about him giving instruction to Mr. Gerace or that his actions constituted an obstruction of DEA functions, SA Bongiovanni would not have freely told Casullo about the interaction in a meeting in 2016.

SA Bongiovanni's actions in 2018 and 2019, which encompass his actions at the end of his tenure as a DEA agent, have nothing to do with Mr. Gerace. There is no evidence Mr. Gerace solicited or was aware of SA Bongiovanni's actions when he was writing DEA memos, handing in his DEA phone, or when he was making entries into deconfliction databases.

### G. Witness Tampering

Mr. Gerace faced three counts relating to alleged witness tampering in Counts 6, 7 and 8 of the amended indictment, all stemming from a social media message sent to P.H. on November 19, 2019. The jury acquitted Mr. Gerace of Count 8 and rendered a conviction as to Counts 6 and 7.

The government does not dispute the key facts noted in the defense's primary motion papers. The government does not dispute that Crystal Quinn sent the threatening text message and that Mr. Gerace did not. The government does not dispute that Crystal Quinn had an independent animus against P.H. that had nothing to do with Mr. Gerace. The government does not dispute that the threats contained in the message come from Crystal Quinn personally. The government does not dispute that the message does not indicate that it came from Mr. Gerace or was composed at Mr. Gerace's direction. The government does not dispute C.C.'s testimony that Mr. Gerace did not review, possess or compose anything on C.C.'s phone at the time the message was sent. The government

does not dispute C.C.'s testimony that Crystal Quinn was a "hothead," capable of "revving herself up."

The government's evidence is primarily based on two incidents that are unrelated. The government points to P.H.'s arrest in Grand Island prior to the incident, where P.H. was arrested for having stolen Mr. Gerace's Rolex watch, an event P.H. lied about to law enforcement and others for years but for which P.H. was, in fact, culpable.  This arrest, carried out by local law enforcement for a legitimate larceny, does not evidence tampering.

The government also relies on that fact that, after the alleged tampering incident, Jessica Leyland alleged placed P.H. in a headlock in a local bar.  Putting aside the fact that an event that occurred after the message is wholly irrelevant to whether or not tampering occurred on November 10, 2023, the government also failed to adduce any tie between Ms. Leyland's allegedly placing P.H. into a headlock and any involvement with regard to Mr. Gerace.  Simply put, there was no evidence Mr. Gerace solicited, condoned or even was aware of the headlock incident, either in real time or after.

There is no proof to sustain the mens rea element of Counts 6 and 7 beyond a reasonable doubt.  Factually, there is no nexus between the observed conduct of Mr. Gerace and the message sent by Ms. Quinn to Ms. Hunt.  And on this record, the Court should acquit Mr. Gerace of the witness tampering counts where the jury did not acquit him.

### H.  Bribery

The government's allegations of bribery rely entirely on the testimony of Mr. Gerace's ex-wife, K.N. The Court is well-aware that K.N. is a problematic witness that lacks credibility.

Putting aside K.N.'s obvious credibility issues and crediting K.N.'s testimony for purposes of Rule 29 analysis, there is no evidence that Mr. Gerace bribed SA Bongiovanni. In the last six months of their marriage in 2015, K.N. testified that there was an instance where Mr. Gerace allegedly gave Mr. Bongiovanni cash in a birthday card and that there were "two or three" other instances where she handed Mr. Bongiovanni envelopes she believed were filled with cash. [Nov. 27, 2024 Transcript at 169].

In the instances at PGC, K.N. allegedly gave the envelopes to Mr. Bongiovanni and did not have any further interaction with him. *Id.* K.N. did not know what the envelopes were for. *Id.*

In the case of the birthday card, K.N. witnessed Mr. Gerace put cash in a card and later give the card to Mr. Bongiovanni at a birthday party at BOSS Restaurant. Undisputedly, the envelopes were provided to Mr. Bongiovanni at times that were removed from official acts.  Without question, each payment is linked to more-likely, non-nefarious events:  Mr. Bongiovanni's birthday and Mr. Gerace's golf tournament.

In reply, the government asserts these payments may be tied to an instance when a dancer was allegedly overdosing at PGC, Mr. Gerace contacted SA Bongiovanni, and

SA Bongiovanni allegedly instructed Mr. Gerace to "get her out of there." At no time, however, did the government establish whether the alleged phone call and instruction came before, between or after the alleged cash envelope payments.

In the context of the Bribery count, the jury was charged that "bribery requires a quid pro quo." There must be "a specific intent to give or receive something of value in exchange for an official act." *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404–05 (1999). *See also United States v. Kemp*, 500 F.3d 257, 284 (3d Cir. 2007). Here, just as in the Bongiovanni trial, no one testified as to the purpose of the cash payments, and the reasonable inferences drawn from the type and timing of the payments as that they were non-criminal payments between friends. On this record, the jury could only speculate as to the purpose of the cash payments, and speculation is not enough to sustain a conviction.

On this record, the Court should enter judgment of acquittal on the Bribery count.

## CONCLUSION

Accordingly, for all of the foregoing reasons, and for those originally raised in the memorandum in support of its motions, the defense respectfully request this Court issue a judgement of acquittal as to each count of conviction, or, alternatively, a new trial as to any counts in which a judgement of acquittal is not granted, or an evidentiary hearing on the juror(s)'s misapplication of the law in rendering a verdict.

DATED:          August 29, 2025

Mark A. Foti, Esq.                                    Eric M. Soehnlein, Esq.
**The Foti Law Firm, P.C.**                           **Soehnlein Law, PLLC**
16 W Main Street, Suite 100                          2100 Main Place Tower
Rochester, NY 14614                                  350 Main Street
(585) 461-1999                                       Buffalo, NY 14202
(585) 491-6512                                       (716) 771-9092