UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

UNITED STATES OF AMERICA

      v.                                                                19-CR-227
                                                                              23-CR-37
PETER GERACE, JR.,                                         DECISION & ORDER

          Defendant.

———————————————————

On December 27, 2024, a jury convicted the defendant, Peter Gerace, Jr., of

conspiring to defraud the United States and to bribe a public official in violation of 18

U.S.C. § 371 (count 1); paying a bribe to a public official in violation of 18 U.S.C.

§ 201(b)(1)(A) and (C) (count 2); maintaining drug-involved premises in violation of 21

U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (count 3); conspiring to distribute controlled

substances and to maintain drug-involved premises in violation of 21 U.S.C. § 846

(count 4); conspiring to commit sex trafficking in violation of 18 U.S.C. § 1594(c) (count

5); tampering with a witness in violation of 18 U.S.C. § 1512(b)(1) and 18 U.S.C. § 2

(count 6); tampering with a witness in violation of 18 U.S.C. § 1512(b)(2)(A) and 18

U.S.C. § 2 (count 7); and possessing with intent to distribute and distributing cocaine in

violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (count 9).  Docket Item 1426 at 2-8, 10.[1]

The jury found Gerace not guilty of tampering with a witness in violation of 18 U.S.C.

§ 1512(b)(3) and 18 U.S.C. § 2 (count 8).  Docket Item 1426 at 9.

---

[1] The citations are to the docket in case number 19-cr-227, and page numbers
refer to ECF pagination.

Gerace has moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or a new trial under Federal Rule of Criminal Procedure 33. Docket Item 1582. After the government responded to that motion, Docket Item 1608, Gerace replied, Docket Item 1618, and this Court heard oral argument, *see* Docket Item 1621. For the reasons that follow, the Court denies Gerace's motion.

## DISCUSSION[2]

### I.    RULE 29 MOTION

#### A.    Legal Standard

A defendant seeking a judgment of acquittal faces a heavy burden: A court can grant a Rule 29 motion only if no "rational trier of fact could have found the essential elements of the crime established beyond a reasonable doubt." *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015) (quoting *United States v. Moore*, 54 F.3d 92, 100 (2d Cir. 1995)). Stated another way, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White,* 673 F.2d 299, 301 (10th Cir. 1982)).

In conducting its analysis, the court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019)

---

[2] The Court assumes the reader's familiarity with the factual background and will recount the facts only as necessary to explain its decision.

(quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)).  That being said, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."  *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotations omitted).

### B.    Count 1

Count 1 charged Gerace with conspiring to bribe former Drug Enforcement Administration ("DEA") Agent Joseph Bongiovanni and to defraud the United States.  Docket Item 1350 at 1-12.  Gerace argues that "[t]here was no competent proof that [he] contemplated that . . . Bongiovanni would engage in activity that violated the law or DEA protocol" or that "Gerace asked or expected . . . Bongiovanni to disregard his duties as a member of federal law enforcement."  Docket Item 1582-1 at 15.  Nor was there "competent proof of a conspiracy," Gerace says.  *Id.*  Therefore, he contends, "[t]he conviction should not stand."  *Id.*

As an initial matter, the government was required to prove only one of the two objectives charged in count 1.  *See United States v. Bilzerian*, 926 F.2d 1285, 1301-02 (2d Cir. 1991).  Therefore, so long as there was sufficient evidence of a conspiracy to achieve either objective—defrauding the United States or committing bribery—the conviction stands.  And for the reasons explained below, there was ample proof that Gerace and Bongiovanni conspired to defraud the United States by Bongiovanni's protecting Gerace and violating Bongiovanni's duties as a DEA agent.[3]

---

[3] The Court therefore need not and does not reach the question of whether the evidence was sufficient to find that Bongiovanni and Gerace conspired to commit the crime of bribery.  Although the Court finds that there was sufficient evidence to find that

First, the jury heard substantial evidence about the longtime friendship between Gerace and Bongiovanni.  *See, e.g.*, Docket Item 1497 at 10-15; Docket Item 1600 at 146-48.  The two men frequently socialized, *see* Docket Item 1497 at 13-14, and they went on double dates together*, see id.* at 8, 11.  Bongiovanni even met up with Gerace on vacation in Las Vegas in 2011, *see* Docket Item 1603 at 145-48, despite the fact that Gerace had a criminal history and had recently been on federal supervised release, *see* Docket Item 1499 at 9-10.

The jury heard that in 2005, Bongiovanni showed Gerace risqué photos of R.A.,[4] Gerace's then-girlfriend, which had been obtained during a DEA search of another individual's house.  *See* Docket Item 1510 at 10-15.   DEA rules required Bongiovanni to keep that information confidential, *see* Docket Item 1507 at 16-19, but the evidence showed that Bongiovanni violated those rules for Gerace's benefit, *see* Docket Item 1510 at 14-15.

Later, the jury heard that when Gerace's name surfaced in a 2008 investigation being done by DEA Special Agent Christopher Wisniewski, Bongiovanni offered to do a "cold approach" of Gerace, a law enforcement technique where an agent approaches someone and "asks for their assistance . . . out of the blue."  *See* Docket Item 1498 at

---

Gerace gave Bongiovanni money that Gerace intended as bribes, *see infra* Section I.C, whether the evidence was sufficient to show that Bongiovanni agreed to accept that money in exchange for protection is a closer question.  As noted below, this Court granted Bongiovanni's motion for a judgment of acquittal on the substantive bribery charge following Bongiovanni's first trial, *see United States v. Bongiovanni*, 2024 WL 3487914, at *5 (W.D.N.Y. July 19, 2024), and the jury acquitted Bongiovanni of conspiring with Gerace following Bongiovanni's second trial, *see* Docket Item 1285 at 3; Docket Item 1193 at 17-26.

[4] The Court refers to protected witnesses by their initials throughout this decision and order.

13, 17-18.  Wisniewski testified that a cold approach is "risky" because if those who are approached do not agree to cooperate, they then will know that the agency has some information about them and might "change the way they operate" and "thwart your investigation."  *Id.* at 18-19.  But Wisniewski nevertheless agreed to the cold approach of Gerace because Bongiovanni seemed confident that he could garner Gerace's cooperation.  *Id.* at 29-30.

Bongiovanni told Wisniewski that he "knew [Gerace] from the old neighborhood," but he did not disclose his longtime friendship with Gerace or that they socialized regularly—which would "have raised some red flags for [Wisniewski] about Bongiovanni['s] going to do a cold approach."  *See id.* at 17, 30-31; *see also* Docket Item 1500 at 21 (DEA Special Agent Dale Kasprzyk's agreeing that DEA agents are not "allowed to use close personal friends as confidential sources or sources of information").  Ultimately, Bongiovanni told Wisniewski that Gerace's cooperation "wasn't gonna happen."  Docket Item 1498 at 31.  From all this, the jury could have inferred that the "cold approach" was a ruse that allowed Bongiovanni to alert Gerace that his name had come up in an investigation.

The jury also heard how in 2009, Bongiovanni reached out to Gerace's Probation Officer, Peter Lepiane, after Gerace violated his supervised release to see whether Gerace could "potentially lessen[] his violation sanction by cooperating and providing information."  Docket Item 1499 at 23.  Bongiovanni told Lepiane that "Gerace had been a confidential source of information for him," but he did not tell Lepiane that they were friends.  *Id.* at 28.  And the jury heard that, in fact, there was nothing in the DEA records

indicating that Gerace had ever been a source for Bongiovanni.  *See* Docket Item 1500 at 44.

The jury also heard from FBI Special Agent Thomas Herbst, who testified that Bongiovanni reached out to him when Herbst was investigating Gerace.  Docket Item 1511 at 20.  According to Herbst, Bongiovanni asked for a meeting with Herbst and Gerace, which led Herbst to believe that Gerace was Bongiovanni's confidential source.  *Id.* at 20-21.  Bongiovanni insisted that Herbst come to the meeting alone—that is, without Herbst's partner—which put Herbst "in a difficult position."  *Id.* at 21.  Herbst nevertheless went to the meeting as Bongiovanni asked, *id.* at 23-24, but Gerace did not say anything of substance at that meeting, *id.* at 25-26.

After Gerace left the meeting, Bongiovanni suggested to Herbst that no one at the United States Attorney's Office would be interested in prosecuting Gerace.  *Id.* at 27-28.  When Herbst told Bongiovanni that a prosecutor already was interested in the case, Bongiovanni's "whole composure changed."  *Id.* at 28.  Herbst ultimately dropped the investigation, however, because it seemed clear based on Bongiovanni's representations that "DEA ha[d] an interest in the case, and they want[ed] the FBI to move on."  *Id.* at 30.

DEA Special Agent Anthony Casullo also testified that Bongiovanni tried to dissuade him from pursuing an investigation of Gerace.  *See* Docket Item 1506 at 10-14.  More specifically, Casullo testified that when he was investigating Gerace in 2016, Bongiovanni confronted Casullo and asked him whether he "hated Italians," which Casullo took to mean that Bongiovanni "didn't want [Casullo] to target Peter Gerace."  *Id.* at 11-12.  According to Casullo, Bongiovanni then said, "we should be investigating

6

[B]lack people" and "Hispanic people," but "he used the N-word, and . . . an S-word that was a slur." *Id.* at 13. Casullo also said that Bongiovanni told him that Gerace had called Bongiovanni "when a stripper overdosed in his club" and that Bongiovanni had told Gerace "[t]o get her out of the club." *Id.* at 6-7.

In addition to all that, the jury heard a voicemail that Gerace left for Bongiovanni in 2017 asking whether law enforcement could "ping" TracFones that "drug dealers" use. *See* Docket Item 1608 at 39 (quoting Gov. Ex. 311). Bongiovanni texted Gerace in response and told him that police can "ping" a TracFone but would need a warrant. *See* Docket Item 1603 at 122-23. Homeland Security Investigations Special Agent Curtis Ryan told the jury this was "sensitive law-enforcement" information. *Id.* at 120, 123.

Finally, the jury saw and heard evidence that when questioned about his relationship with Gerace, Bongiovanni tried to distance himself from Gerace and was not forthcoming with the DEA about their relationship. *See* Docket Item 1508 at 7-36.

Given all that evidence—and drawing all inferences in the government's favor as well as crediting all of its witnesses, as this Court must on a Rule 29 motion—there was more than enough evidence to support the jury's verdict that Gerace conspired with Bongiovanni to defraud the United States.

C.    **Count 2**

Count 2 charged Gerace with paying bribes to Bongiovanni. Docket Item 1350 at 13-14. Gerace argues that there was insufficient evidence to sustain this count. *See* Docket Item 1582-1 at 19-26. Among other things, he observes that in the prosecution of Bongiovanni, this Court granted Bongiovanni's motion for a judgment of acquittal on

7

the charge of his receiving bribes from Gerace. *See id.* at 21-26. But that decision—which the Court acknowledged was a close call, *see United States v. Bongiovanni*, 2024 WL 3487914, at *5 (W.D.N.Y. July 19, 2024)—does not compel the same conclusion here for several reasons.

First, there is no collateral estoppel against the government in criminal cases. *See, e.g.*, *United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 100 (2d Cir. 2014) (explaining that "the Supreme Court . . . has long rejected application of nonmutual collateral estoppel against the [g]overnment in criminal trials" (citations omitted)). So the Court's decision in *Bongiovanni* does not govern here; this Court must separately assess the evidence presented at Gerace's trial.

Second, the focus here is on *Gerace's* state of mind, whereas the inquiry in Bongiovanni's case was *Bongiovanni's* state of mind. *See Bongiovanni*, 2024 WL 3487914, at *5 (noting that "focus [of this analysis] has to be on *[Bongiovanni]'s* state of mind and *his* understanding of the circumstances of the payment, not those of [Gerace]" (alterations in original) (internal quotation marks omitted)). More specifically, in Bongiovanni's case, the question was whether Bongiovanni "accept[ed] . . . anything of value . . . *in return for* . . . *being induced* to do or omit to do any act in violation of the official duty of such official or person." *See* 18 U.S.C. § 201(b)(2) (emphasis added). In Gerace's case, by contrast, the question was whether Gerace "g[ave] . . . anything of value . . . *with intent* . . . *to induce* [Bongiovanni] to do or omit to do any act in violation of the lawful duty of such official or person." *See id.* § 201(b)(1) (emphasis added).

This Court previously found that at Bongiovanni's trial, there was insufficient evidence for the jury to reach the conclusion that Bongiovanni accepted money from

Gerace with the intention of providing future protection in exchange.  *See Bongiovanni*, 2024 WL 3487914, at *7 ("Simply put, there is no fact from which the jury could reasonably infer—as opposed to merely speculate—that Bongiovanni received the money from Gerace *with the intent to accept the payment* for continued intervention on Gerace's behalf, as opposed to accepting it as 'a reward for a past official act or [a payment] made in the hope of obtaining general good will.'" (alteration in original) (emphasis added) (quoting *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002))). As the Court explained, "[t]he government needed to prove more than that Bongiovanni was willing to intercede with law enforcement on Gerace's behalf, it needed to prove that Bongiovanni accepted the cash *in exchange for* his continuing to do so."  *Id.* (citation and internal quotation marks omitted).

But that conclusion does not preclude a finding that Gerace *gave* the money with the intent to induce Bongiovanni to protect him.  As the government observes, "a payor may give a thing of value with the intent that it induce the performance or omission of an official act even when the recipient lacks such corrupt intent when accepting it."  Docket Item 1608 at 96; *see United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999) (contrasting elements of accepting versus paying a bribe under section 201).  And indeed, at Gerace's trial there was additional evidence from which a jury could infer that Gerace gave the money—two envelopes filled with cash delivered on separate occasions as well as a $5,000 "birthday gift" in 2015—with the specific intent to induce Bongiovanni to protect him.[5]  *See* Docket Item 1600 at 151-55, 167-74.  Or,

---

[5] The only witness to testify about these payments was Gerace's ex-wife, Katrina Nigro, who, Gerace says, "is a problematic witness that lacks credibility."  Docket Item

put another way, there was ample evidence that Gerace intended the money to induce Bongiovanni "to keep . . . answering when [Gerace] called," as the government argued in closing. *See* Docket Item 1443 at 119.

For example, at both trials, A.P. testified that Gerace gave her Bongiovanni's business card in 2007 and told her to call Bongiovanni if she ever "got into trouble." *See* Docket Item 912 at 27-28, 34 (Bongiovanni trial); Docket Item 1364 at 25, 40-41 (Gerace trial). The statement was made by Gerace, however, there was "[n]o evidence . . . suggesting [that Bongiovanni] was aware of—much less approved of—this action and statement." *See Bongiovanni*, 2024 WL 3487914, at *5 (first alteration in original). So a reasonable inference could be drawn that Gerace's payments were intended to keep Bongiovanni available to help Gerace and his friends, even if Bongiovanni did not know that.

The Gerace jury also heard extensive testimony about Gerace's relationship with the late New York Supreme Court Justice John Michalski, including testimony that Gerace gave thousands of dollars to Michalski and that Michalski did favors for Gerace. *See, e.g.*, Docket Item 1602 at 30-31, 41. Among other things, there was testimony that Michalski performed a marriage ceremony for Gerace with no witnesses even though witnesses were required by law, Docket Item 1600 at 40-41; that Michalski falsely said that Gerace had a medical issue so that the required 24-hour waiting period could be waived, *id.* at 42; and that Gerace gave Michalski an envelope of cash at a dinner celebrating the wedding, *id.* at 84-85. The jury could reasonably have inferred that this

---

1618 at 58. That, however, is a jury argument that this Court cannot consider on a Rule 29 motion. *See United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000).

prior influence over a public official gave Gerace a reason to think the same would be successful with Bongiovanni.

In any event, the decision in *Bongiovanni* was a very close one, and this Court explicitly acknowledged that any additional evidence likely would have tipped the balance.  *See* 2024 WL 3487914, at *8.  At Gerace's trial, there was additional evidence from which the jury could infer that Gerace intended the money to induce Bongiovanni to protect him.[6]  For all those reasons, the Court finds that sufficient evidence supported count 2 and denies Gerace's Rule 29 motion as to that count.

### D.    Counts 3 and 4

Count 3 charged Gerace with maintaining Pharaoh's Gentlemen's Club ("Pharaoh's" or "PGC") as a drug-involved premises from 2006 to 2019.  Docket Item 1350 at 15.  Count 4 charged Gerace with conspiring with Bongiovanni and others to possess with intent to distribute various drugs and to maintain Pharoah's as a drug-involved premises from 2009 to 2019.  *Id.* at 15-16.  Gerace argues that for both counts, the evidence at trial materially varied from what was charged in the indictment.  Docket Item 1582-1 at 26-33.  More specifically, Gerace says that there was a substantial period of time from 2012 to 2014 when he was not associated with Pharaoh's.  *See id.*  And, Gerace observes, "the law requires 'a substantial similarity between the dates

---

[6] This Court also noted in its *Bongiovanni* decision that "the government in its opening statement referred to the envelopes of cash and the birthday card as 'rewards for a job well done.'"  2024 WL 3487914, at *7 n.11 (citation omitted).  "And while this Court agree[d] with the government that opening statements [we]re not evidence and therefore c[ould not] be the basis for a decision on a Rule 29 motion," the Court observed that it was "telling that even the government had trouble parsing whether Bongiovanni's conduct constituted a bribe or a gratuity."  *Id.*  In sharp contrast, the government's opening in Gerace's trial clearly stated that that the "birthday card of cash[] was a bribe masked as a birthday card."  Docket Item 1362 at 46.

charged in the indictment and the dates proven by the evidence,'" which, he says, "did not occur in this case." *Id.* at 28. That is particularly problematic, Gerace says, because "the timeframe preceding 2012, is all time outside of the statute of limitations." *Id.* at 31.

First, crediting all witnesses—as this Court must on a Rule 29 motion—there was evidence from which a jury could reasonably conclude that Gerace maintained Pharaoh's for the entire time period. For example, L.L. testified that throughout the time she worked at the club from 2013 to 2018, *see* Docket Item 1441 at 17, she always remembered Gerace being there and did not remember any significant period of time when he was gone, *see id.* at 258 ("Q: From your memory, and from your experience at Pharoah's, do you always remember this defendant being there? A: Yes. Q: Do you ever, do you, of your personal recollection, ever remember a time when there w[ere] significant amounts of time he was gone? A: No. Q: Who's the one that walked around like the boss there? A: Peter."). It is not this Court's role on a Rule 29 motion to weigh evidence or resolve inconsistencies. *See United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000).

What is more, even assuming that Gerace is correct and there was a variance regarding the date, to gain a judgment of acquittal, he would have to demonstrate "substantial prejudice." *See United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007) (quoting *United States v. McDermott*, 918 F.2d 319, 326 (2d Cir. 1990)). Although Gerace alludes to prejudice based on the statute of limitations, he does not explain why the evidence of his conduct from 2016 to 2019—undisputedly within the statute of limitations—would not have been sufficient to secure a conviction on counts 3 and 4.

Numerous witnesses testified about Gerace's distribution of cocaine and other drugs at Pharoah's during this time period. And, as the government observes, because the sex trafficking charge has no statute of limitations and much of the sex-trafficking and drug-trafficking evidence was related, most if not all of the pre-2016 conduct would have been admissible anyway. *See* Docket Item 1608 at 102. Thus, even if there was a variance, Gerace cannot meet his burden of showing "substantial prejudice."

For all those reasons, this Court denies Gerace's motion for a judgment of acquittal on counts 3 and 4.

### E.    Count 5

Count 5 charged Gerace with conspiring with others to engage in sex trafficking. Docket Item 1350 at 16-17. Gerace divides the evidence against him on this count "into three categories: interaction between . . . Gerace and outside 'stag' companies; conduct that was allegedly permitted in the VIP area of PGC, even though it was against PGC rules; and conduct in the upstairs area of PGC, allegedly directed by . . . Gerace." Docket Item 1582-1 at 34. And "[a]s to each category," Gerace says, "the evidence was insufficient to support a verdict of guilty." *Id.* This Court disagrees.

Multiple witnesses, including G.R., K.L., and L.L., testified that while they were working as strippers at Pharoah's, they exchanged sex for drugs or for money to purchase drugs because they were in the throes of drug addiction and desperate to avoid withdrawal. For example, G.R. described one occasion when, heavily addicted to opiates, she went upstairs in search of drugs. Docket Item 1366 at 42-46. Gerace asked her to "hook up with" one of his friends in exchange for $200, which—drawing all

inferences in the government's favor—he knew she desperately needed to purchase drugs. *Id.*

Similarly, K.L. testified that Gerace would withhold Lortab pills from her, causing her to become physically sick from withdrawal. Docket Item 1470 at 44. When he knew that she desperately needed the pills, Gerace "would say, well, you know what you have to do." *Id.* She then would perform oral sex on him in exchange for Lortab pills. *Id.*

Along the same lines, L.L. described how Gerace directed her to go into the VIP room with PCG regular Wayne Van Vleet, telling her "he's a good one, you want to go in the back room with him, and he will hook you up." Docket Item 1441 at 71-75. Gerace warned that "he likes to pull hair and finger people," *id.* at 71, and he added that the VIP room attendant "would overlook the camera[s]," *id.* at 72. This happened "too many [times] to count." *Id.* at 75. But L.L. said that if she had not been "heavily addict[ed] to heroin and cocaine," she would never have done any of that. *Id.* at 76.

L.L. also described a time when Gerace invited her "upstairs," where he gave her cocaine and "then pulled down his pants." *Id.* at 94. L.L. said there was "[n]o question" in her mind what Gerace expected her to do. *Id.* But she "really couldn't say no." *Id.* at 95. Gerace "controlled everything" at Pharaoh's. *Id.* And she had to earn money so that she could avoid withdrawal, which she described as "[t]he flu times ten." *See id.* at 93-94.

While Gerace contends that all this sexual activity was consensual, *see* Docket Item 1582-1 at 45-46, a jury easily could have concluded otherwise. Indeed, the Second Circuit has held that if the prosecution proceeds under a theory of coerced commercial sex acts, "reasonable fear of suffering painful withdrawal symptoms if [one]

d[oes] not perform commercial sex acts as directed by [the defendant]" is sufficient to satisfy the statute's "serious harm" requirement. *See United States v. Shine*, 2022 WL 761520, at *3 (2d Cir. Mar. 14, 2022) (summary order). Moreover, the victims' testimony was bolstered by comments that Gerace made to another witness, K.H., including, "you'd be surprised what they'll do for a little bit of product." Docket Item 1513 at 12.

In sum, there was more than enough evidence for the jury to find that Gerace conspired to commit sex trafficking at Pharoah's.[7] His motion for acquittal on count 5 therefore is denied.

### F.    Counts 6 and 7

Counts 6 and 7 charged Gerace with witness tampering based on a Facebook message that both sides agree Crystal Quinn sent to P.H. on November 19, 2019. *See* Docket Item 1350 at 17; Docket Item 1582-1 at 47. Gerace was charged with aiding and abetting Quinn, *see* Docket Item 1608 at 110, but he argues that there was insufficient evidence that he aided and abetted Quinn's sending the messages, *see* Docket Item 1582-1 at 49-50. This Court again disagrees.

C.C. testified that she, Gerace, and Quinn were "doing cocaine and drinking" in Gerace's basement on the night of November 19, 2019. Docket Item 1383 at 69. When "the topic of P.H." came up, Gerace referred to P.H. as "a rat or a narc" and a "[s]nitch bitch." *Id.* at 70. Gerace and Quinn were "revving each other up" about P.H.'s

---

[7] The evidence connecting Gerace to the stag companies was more attenuated. But because there was ample evidence supporting Gerace's conviction on count 5, this Court need not parse whether the evidence was sufficient to show that Gerace participated in sex trafficking in connection with the stag companies.

disloyalty until Quinn finally took C.C.'s phone and used Facebook to send a threatening message to P.H. *Id.* at 71-73.

C.C.'s testimony alone may not have been enough to meet the government's burden to demonstrate Gerace's participation in the threats. But the government had more: Another witness, B.R.—whom, like all witnesses, the Court must credit on a Rule 29 motion—testified that Gerace told him that Gerace "had another girl send a message to the girl that was ratting on him." Docket Item 1516 at 19-20. Gerace told B.R. that "[h]e was angry because he was under the impression that the girl was gonna send the message in person to the girl that was ratting on him. But evidently, this girl went on Messenger and sent it via Facebook Messenger." *Id.* at 20. Combined with C.C.'s testimony, that was enough for the jury to find Gerace guilty of aiding and abetting witness tampering.

Gerace makes several other arguments, such as that "C.C. did not see . . . Gerace look at the phone that night at any time" and that C.C. "didn't know what . . . Quinn was writing when [Quinn] possessed the phone." Docket Item 1582-1 at 49. But those were arguments for the jury. Based on the testimony of C.C. and B.R.—the credibility of which is solely within the province of the jury—there was enough for the jury to find beyond a reasonable doubt that Gerace aided and abetted Quinn. Gerace's motion for a judgment of acquittal on counts 6 and 7 therefore is denied.

### G.    Count 9

Gerace does not argue that the evidence was insufficient on count 9, *see generally* Docket Item 1582-1, which charged him with distributing cocaine on November 19, 2019, *see* Docket Item 1350 at 19. And this Court agrees with the

government that C.C.'s testimony alone was sufficient to meet its burden on this count. *See* Docket Item 1608 at 111 n.289.

## II.    RULE 33 MOTION

### A.    Legal Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "A district court should grant a new trial motion if it 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988)).  "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict."  *Id.*  And when considering a motion for a new trial, a district judge "is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner."  *Id.* (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978)); *see also United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992) (stating that a court also may make determinations as to witness credibility).

But while courts have greater discretion under Rule 33 than under Rule 29, they still must exercise their authority "sparingly" and grant a Rule 33 motion only in "the most extraordinary circumstances."  *Sanchez*, 969 F.2d at 1414.  In other words, there must be a real concern that an innocent person may have been convicted before a court should intervene.  *Id.*

This Court has no such concern here.  Nor do any of the specific arguments that Gerace raises warrant a new trial.

### B.    Replacement of Juror During Deliberations

After two days of deliberations, a juror—Juror 3—reported to the Court that she was ill and unable to attend trial.  *See* Docket Items 1416-18.  The Court decided that the jury would not deliberate that day in the hope that the juror would recover quickly.  Docket Item 1418.  The next day, however, the juror reported that she was "still ill and [had been] admitted to [the] hospital."  *See* Docket Item 1425.  Over the defense's objection, the Court discharged the juror, replaced her with an alternate, and instructed the jury to begin their deliberations anew.  *See id.*  The jury returned a verdict later that day.  *See id.*

Gerace argues that the Court did not have good cause to replace the juror, as is required under Federal Rule of Criminal Procedure 24(c)(3).  Docket Item 1582-1 at 62; *see United States v. Delva*, 858 F.3d 135, 158 (2d Cir. 2017) (explaining that a "trial judge is authorized to remove a juror for 'good cause' after deliberations have begun and to replace that juror with an alternate, so long as the reconstituted jury is instructed to begin deliberations anew").  "Although the juror had been unable to report for deliberations for two days," Gerace says, "there was a likelihood the juror may have been able to report the following day, resulting in only a short adjournment of deliberations (less than one day)."  Docket Item 1582-1 at 62.  The government counters that "[u]nable to predict the future, the Court appropriately considered Juror 3's history of illness, the fact of her hospitalization, the defendant's interest in having twelve jurors healthy enough to participate in deliberations, and the other jurors' interest in resuming deliberations and not being exposed to potential illnesses when excusing Juror 3."  Docket Item 1608 at 123.

Rule 24(c)(3) "provide[s] the trial court with wide latitude to make an 'informed decision' on 'all kinds of problems—temporary as well as those of long duration—that may befall a juror during jury deliberations.'" *United States v. Gibson*, 135 F.3d 257, 259 (2d Cir. 1998) (quoting *United States v. Reese*, 33 F.3d 166, 173 (2d Cir. 1994)). This Court agrees with the government that there was good cause to discharge Juror 3, especially because there was no way of knowing when—or even whether—the juror would be able to return.

In fact, the Court did not immediately discharge Juror 3 when she became ill; instead, it waited a day to see whether her condition would improve. But her condition did not improve. On the contrary, she was admitted to the hospital. *See* Docket Item 1565 at 2. Moreover, this was not the first time this juror had been ill. *See id.* at 7 (the Court's noting that the juror had "been sick before" and was "coughing quite a bit during the course of the trial"). So at that point, the Court was concerned both about Juror 3's health and about the potential exposure of the other jurors to something that might well have been contagious. *See id.* (the Court's expressing concern that "if she's got something contagious when she comes back, we lose the whole jury"). The decision to replace Juror 3 therefore was appropriate and well within the Court's discretion. *Cf. Gibson*, 135 F.3d at 260 (holding that the district court acted "clearly within [its] discretion" when dismissing an elderly juror with a history of illness after she collapsed in the subway and was hospitalized).

Gerace's motion for a new trial based on the replacement of Juror 3 therefore is denied.

C.    **Juror 10's Interview**

Several months after the verdict, Juror 10—the foreperson—gave a news interview in this high-profile case.  Among other things, Juror 10 said that it was "shocking" and "outrageous" for the defense to call no witnesses and that he thought it was "borderline incompetent" of Gerace's attorneys not to produce any testimony.  *See* Docket Item 1608 at 63-64.  Gerace moves for an evidentiary hearing, and ultimately a new trial, based on these comments.  *See* Docket Item 1582-1 at 50-56.  He says these "statements suggest[] that [the juror] ignored the jury instructions and the law and decided this case on an impermissible basis—. . . Gerace's choice not to present a defense but instead to rely upon the presumption of innocence and the burden of proof that the government must exceed to sustain a conviction."  *Id.* at 50-51.

"[A] defendant who seeks a new trial based on allegations of juror misconduct faces a very high hurdle."  *United States v. Stewart*, 317 F. Supp. 2d 432, 436 (S.D.N.Y. 2004).  Only where there is "clear, strong, substantial[,] and incontrovertible evidence . . . that a specific, non-speculative impropriety has occurred" is a post-verdict inquiry of jurors appropriate.  *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983)); *see Anderson v. Miller*, 346 F.3d 315, 327 (2d Cir. 2003) (explaining "that possible *internal* abnormalities in a jury will not be inquired into *except 'in the gravest and most important cases'*" (quoting *United States v. Dioguardi*, 492 F.2d 70, 79 n.12 (2d. Cir. 1974))).

The Court has carefully considered Juror 10's comments and the relevant standard.  For the reasons that follow, the Court finds that Gerace has not met the high bar of showing "clear, strong, substantial[,] and incontrovertible evidence . . . that a

specific, non-speculative impropriety has occurred" and that he therefore is not entitled to a hearing or a new trial.

Juror 10 said the following in his news interview:

**Reporter:**  You get through, I think it was like 45 witnesses, I don't know how many exhibits and everything like that.  Um, and then the prosecution rests and it comes time to hear from the defense.  And . . . .

**Juror 10:**  And they rested without one witness. I mean, it's all good and fine to have to cross examine and, and to try impeach witnesses.  But when you're when, when it's your turn, we're all sitting at the edge of our seat. We've gone through two months of trial.  Now we are gonna hear, you know, what the defense has to say.  What witnesses can they bring up to, to counter[] what was just . . . presented.  Show me 10 or 15 or 20 or 30 dancers that came in and said, that didn't happen.  And I know that dancer and I, and I know why she has a bone to pick.  They didn't bring one witness to say anything like that.  Not a one.  And so that was like, okay, I can understand that Peter Gerace wouldn't testify because, you know, that can get pretty ugly in a courtroom if the, you know, for, for the accused to take a stand. But there was no supporting witnesses for the defense.  It was shocking.  I mean, I just felt, I felt personally, I felt this for me, for my own opinion. I sat through two months of trial.  I'm developing an opinion about this case, and I want the opportunity to, to feel differently.  And I wasn't given that opportunity. It was outrageous. I, to me, and I think . . . I'm not an attorney.  I don't know how things work in that field, but . . . I think it's borderline incompetent that, that his attorneys did not produce any witnesses to counter[] what was just told to us for two months.  We were pounded day after day after day of these of these dancers telling us all these stories.  And I wanted to hear, okay, bring some witnesses in, bring some dancers in that again, like I said, that didn't happen.  I know why that girl has a bone to pick.  I didn't see anything like that happen. There's monitors all over the place.  You can't get away with that.  I didn't hear any of that from any witnesses.  It would've made a difference.  Maybe it made it,

maybe we would've deliberated longer.  Maybe we would've been hung, but we weren't given any opportunity of to listen to any defense witnesses.

**Reporter:** And, and you can't sit here and say, well, we would've voted differently had we heard. But you, you, you just don't know. I want, I . . .

**Juror 10:** Want an opportunity to be able to consider other, you know, the other, the other side.  Not just a cross examination of trying to impeach witnesses for two months coming.

Docket Item 1608 at 63-64; *see Juror 10 speaks about the Peter Gerace trial*, WGRZ (Mar. 31, 2025, 5:08 PM), https://www.wgrz.com/video/news/crime/juror-10-speaks-about-the-peter-gerace-trial/71-d2017392-efe0-4f63-9fac-480e12bd8060.

Based on that interview, the Court first finds that an evidentiary hearing is barred by Federal Rule of Evidence 606(b)(1).  Rule 606(b)(1) prohibits jurors from testifying "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  Fed. R. Evid. 606(b)(1).  "The Advisory Committee Note explains that this exclusionary rule is designed to promote 'freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment.'"  *United States v. Moten*, 582 F.2d 654, 664 (2d Cir. 1978) (quoting Fed. R. Evid. 606(b) advisory committee's note on proposed rules).  "The exclusionary rule is not absolute, however, but yields to the need for juror testimony in situations where there is a reduced potential for harassment or embarrassment of jurors, such as when evidence concerning objective facts is sought."  *Id.* at 664-65.  "Thus, the rule admits testimony concerning whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."  *Id.* at 665 (citation and internal quotation marks omitted).

Here, the interview gives no reason to believe that there was "extraneous prejudicial information improperly brought to the jury's attention" or "any outside influence . . . brought to bear upon any juror." Rather, Gerace contends that Juror 10 improperly applied the law in weighing the evidence. Inquiring about that would inevitably involve probing "statement[s] made or incident[s] that occurred during the jury's deliberations; the effect of [certain testimony or lack thereof] on that juror's or another juror's vote; or [the] juror's mental processes concerning the verdict or indictment." *See* Fed. R. Evid. 606(b)(1). And that is precisely the type of inquiry from which Rule 606(b)(1) is designed to protect jurors. *See United States v. Stewart*, 433 F.3d 273, 308 (2d Cir. 2006) (finding that district court "did not abuse its discretion by refusing to order a new trial or an evidentiary hearing that was clearly proscribed by Rule 606(b)"); *Moon*, 718 F.2d at 1235 (affirming district court's decision not to conduct further inquiry because juror "could only have been questioned about 'whether any outside influence was improperly brought to bear upon' her, and could not have been asked about 'the effect of [the incident] upon [her] mind or emotions as influencing [her] to assent to or dissent from the verdict'" (alterations in original) (quoting Fed. R. Evid. 606(b)(1))).

Moreover, Juror 10's comments do not incontrovertibly suggest that he did not follow this Court's instructions. In particular, there is no indication that Juror 10 shifted the burden to Gerace. Rather, Juror 10's comments suggest that he found the government's witnesses to be credible and determined after those witnesses testified that the government had met its burden. Without evidence from the defense, Juror 10

suggested, there was nothing that might have led him to change his mind. But that does not mean that he did not hold the government to its burden.[8]

On the contrary, Juror 10 also said that the jury "went through that ream of paper, of these jury instructions. We went through it meticulously. We went through each charging count[.] Each element of each charging count. We read it out loud and reread it and reread it." *See* Docket Item 1608 at 64 (emphasis omitted). And Juror 10 also noted that when the new juror was substituted, they began anew and "went through the same exercise again as if it never happened," just as the Court instructed them to do. *See id.* at 65. All that suggests that both Juror 10 and the rest of the jurors followed this Court's instructions.

For all those reasons, the Court finds that Gerace has not cleared the high hurdle required for a post-verdict inquiry of the jury or a new trial under Rule 33.

### D.    Impairment of Ability to Present a Defense

Gerace also argues that the government's decision to indict three of the people on his witness list "took away [his] ability to rebut critical aspects of the case." Docket Item 1582-1 at 59. This Court already rejected that argument when it denied Gerace's earlier motion to dismiss. *See* Docket Item 1274 at 45 (finding that "the government's decision to charge certain of the witnesses here after they appeared on the [defense] witness list" fell "squarely within the government's executive function" absent some

---

[8] Nor is there any indication that Juror 10 improperly held Gerace's decision not to testify against him. In fact, Juror 10 said that he could "understand that Peter Gerace wouldn't testify because . . . that can get pretty ugly in a courtroom . . . for the accused to take the stand." *See* Docket Item 1608 at 63.

suggestion that the government did not "have a basis for the charges").  The Court sees no reason to revisit that decision.[9]

### E.    Weight of the Evidence

Finally, Gerace observes that this Court has broader discretion in the context of a Rule 33 motion to weigh the evidence and the credibility of the witnesses.  Based on that review, Gerace says, this Court should grant a new trial based on a "miscarriage of justice."  Docket Item 1582-1 at 63 (quoting *Sanchez*, 969 F.2d at 1413).  Having heard all the testimony and observed the witnesses, however, the Court finds no miscarriage of justice and therefore denies Gerace's motion for a new trial based on the weight of the evidence.

### CONCLUSION

For all those reasons, this Court DENIES Gerace's motion for a judgment of acquittal or new trial.

---

[9] In a supplemental submission, Gerace moved to add this Court's decision in *United States v. Trotter*, 2026 WL 73768 (W.D.N.Y. Jan. 9, 2026), to the record in support of his post-trial motions.  Docket Item 1681.  Gerace said that *Trotter* "complete[d] the factual narrative of what happened in the criminal cases where the United States Attorney's Office charged defense witnesses after their names appeared on the Gerace witness list."  *Id.* ¶ 8.  This Court granted Gerace's motion to add its *Trotter* decision to the record.  *See* Docket Item 1682.  But the *Trotter* decision does not change this Court's conclusion that it does not have the power to interfere with the executive branch's charging decisions so long as there is a basis for the charges.  On the contrary, in *Trotter*, the Court found that there was sufficient evidence for a reasonable juror to find Trotter guilty of making one of the charged statements, *see* 2026 WL 73768, at *8-11, so the Court cannot say that the charge did not have a basis.

SO ORDERED.

Dated:      March 6, 2026
            Buffalo, New York


                                    /s/ Lawrence J. Vilardo
                                   _____
                                   LAWRENCE J. VILARDO
                                   UNITED STATES DISTRICT JUDGE