IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.                                                    19-CR-227
                                                      23-CR-37

PETER GERACE JR.,

                            Defendant.

---

### GOVERNMENT'S CONSOLIDATED RESPONSE IN OPPOSITION TO THE DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT, MEMORANDUM IN SUPPORT OF HIS REQUEST FOR A NON-GUIDELINE SENTENCE, AND MOTION FOR A NEW TRIAL

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, Joseph M. Tripi, Nicholas T. Cooper, and Casey L. Chalbeck, Assistant United States Attorneys, of counsel, hereby files this response in opposition to the defendant's objections, ECF No. 1709, to the Pre-Sentence Investigation Report (PSR), request for a non-guideline sentence, ECF No. 1727, and motion for a new trial, ECF No. 1722.

## I.    INTRODUCTION

The defendant's sentencing submission can be summed as follows: he didn't do it—but even if he did, it's the victims' fault, and even if it wasn't, the government is to blame, and even if it is not, *he* is the true victim. That defies reality, does violence to the jury's verdict, insults the brave witnesses who testified against him, and emphasizes the defendant's refusal to accept any responsibility for his serious criminal conduct.

The defendant, a prior convicted federal felon, has been convicted in this case of eight federal felonies, which include some of the most serious crimes in the federal court system: (i) narcotics trafficking, which he concedes is a serious criminal offense;[1] (ii) witness tampering, which, "threat[ens] . . . the integrity of the trial process" that this Court is duty-bound to protect;[2] (iii) conspiracy to commit sex trafficking through force, fraud, and coercion, which preyed upon the drug addictions, unique vulnerabilities, and power disparity between Gerace and each of the six victims identified in the PSR; (iv) conspiracy to defraud the United States and to commit bribery; and (v) bribery of a federal agent, which tears at the fabric of any society premised upon the rule of law.

The defendant's ongoing and serious crimes were undetected for approximately 14 years, from 2005 until 2019, when the federal agent who helped shield his criminal conduct, Joseph Bongiovanni, was arrested and charged as a part of this investigation. The seriousness of the defendant's crimes, and the lives he helped to destroy along the way, merit a guideline sentence of life imprisonment. The defendant's requests for a downward departure or variance below the guidelines should be rejected on the facts, law, and because the defendant's plea for leniency based upon his personal history relies heavily upon the unverifiable and uncorroborated the word of the defendant, a twice proven fraudster.

The defendant's objections to the guidelines set forth in the PSR rely upon the Court to accept arguments that the jury and the Court rejected in denying the defendant's post-verdict Rule 29 and 33 motions. The PSR has appropriately calculated the sentencing

---

[1] *See* ECF No. 1727 at 12 (Mar. 30, 2026) ("The defense concedes that sex trafficking and narcotics trafficking are serious offenses).

[2] *See United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000).

guidelines, and the defendant's objections to the PSR suffer from a myriad of flaws that flow from the same incorrect premises that infected his Rule 29 motion. *See e.g.,* ECF No. 1608 at 4 (*e.g.*, "the defendant invites the Court to carve up the government's proof; view pieces of evidence in isolation and divorced from their proper."); *see also* ECF No. 1667. Just as the defendant's arguments lacked merit in the context of a Rule 29 sufficiency review—they also lack merit in the context of the Court's consideration of the Sentencing Guidelines and sentencing factors under Title 18, United States Code, Section 3553(a).

Objections to a PSR are not a proxy to re-try counts of conviction on paper, or to amplify a deficient Rule 29 motion. The defendant was convicted of all but one count at trial and the law requires the Court to sentence the defendant in accordance with the facts implicit in the jury's verdict. The facts set forth in the PSR simply mirror the core criminal conduct implicit in each count of conviction. Yet, the defendant misapprehends the breadth and scope of information the Court may consider at sentencing and fails to recognize that the burden of proof at sentencing—preponderance of the evidence—is much lower than the burden of proof—beyond a reasonable doubt—at trial. At bottom, the defendant's objections reflect that he refuses to accept the jury's verdict and seeks to have this Court improperly revise the PSR in a manner incongruent with the facts implicit in the jury's verdict.

As described *infra*, the defendant's argument that certain individuals are not "victims" for purposes of calculating the sex trafficking sentencing guidelines lacks merit, is inconsistent with the jury's verdict, this Court's Rule 29 decision, and the facts established at trial. Moreover, the defendant's objections to the drug amount calculated by the PSR ignores large swaths of evidence and omits that the PSR's drug calculations are a *conservative estimate* that

3

does not account for all the various drugs that were used and distributed at Pharoah's, the drug premises maintained by the defendant, or the many drug overdoses that occurred inside it. Furthermore, the defendant's objections related to witness tampering and retaliation would require the Court to ignore relevant facts and rewrite the PSR consistent with the defendant's spin.[3]

Finally, the defendant's motion for a new trial is a meritless last minute Hail Mary in his effort to delay sentencing and should be rejected.

Overall, the defendant's objections and sentencing arguments ignore the jury verdict and seek to have this Court do at sentencing what the defendant could not successfully do at trial: blame the victims and the government for the defendant's heinous long-term criminal conduct that devasted lives and corruptly damaged the public's trust in law enforcement. The defendant's objections and arguments must fail, and the Court should reject the defendant's attempt to artificially limit the evidence, facts, details, and background relevant to the defendant's sentencing.  The Court should proceed with sentencing, apply the guidelines calculations set forth in the PSR, and sentence the defendant to life imprisonment. *See* ECF No. 1677.

## II.    THE GOVERNING LAW

"A guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict." *United States v. Hourihan*, 66 F.3d 458, 465 (2d Cir. 1995).

---

[3] U.S. Probation is required to conduct a presentence investigation and to submit a presentence report to the court.  *See* Guideline § 6A1.1; *see also* FED R. CRIM. P. 32(C). U.S. Probation is an arm of the court, and, in this case, they considered, among other things, the testimony established by the trial transcripts.

Title 18, United States Code, Section 3661 provides that "[N]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of establishing an appropriate sentence."

Title 18, United States Code, Section 3553(a) requires that the Court impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). In determining the sentence, the Court must consider, among other things, the nature and circumstances of the offenses, and the history and characteristics of the defendant.

In executing these statutory responsibilities, the Court is obligated to:  (1) identify the Guidelines range supported by the facts; (2) treat the Guidelines as advisory; and (3) consider the Guidelines together with the other factors outlined in 18 U.S.C. § 3553(a). *United States v. Ratoballi,* 452 F.3d 127, 131-32 (2d Cir. 2006).

To "consider" the Sentencing Guidelines, as required by 18 U.S.C. § 3553(a)(4), the Court must determine the applicable Guideline range in the same manner as before the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), which essentially rendered the Sentencing Guidelines advisory. *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005). An error in determining the applicable Guideline range or the availability of departure authority would be the type of procedural error that could render a sentence unreasonable on appellate review. *United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005). In fact, on appeal, the Second Circuit will view as "inherently suspect a non-Guidelines sentence that rests primarily on factors that are not unique or personal to a particular defendant." *United States v. Ratoballi*, 452 F.3d at 133. "[I]n the overwhelming majority of

cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be [upheld as] reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006).

In *Rita v. United States*, 551 U.S. 338, 346-47 (2007), the Supreme Court held that in reviewing a properly calculated within-Guidelines sentence, an appellate court may apply a presumption of reasonableness. While the Court stressed that the presumption is an appellate court presumption, and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *id.*, at 339, the Court's reasoning is helpful in determining whether a Guidelines sentence is "sufficient, but not greater than necessary, to comply with the purposes" of the sentencing statute.

Specifically, the Court observed that "the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same [18 U.S.C.] § 3553(a) objectives . . . ." *Rita*, 551 U.S. at 348.  Thus, "the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)s objectives." *Id.*, at 350. Accordingly, ". . . when the judge's discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable." *Id.* at 351; *see also Crosby*, 397 F.3d at 113 ("it is important to bear in mind that *Booker* [ ] and Section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."); *cf.*, *United States v. Sindima*, 488 F.3d 81, at 87 (2d Cir. 2007) (while a district court may impose a non-Guidelines sentence based upon Section 3553(a) factors already accounted

for in the Guidelines range, it must explain "why a Guidelines sentence did not sufficiently account for those factors").

### A. The Preponderance of the Evidence Standard Applies to Sentencing, and the Court has Broad Authority to Consider Information Relevant to Sentencing

Determining relevant conduct requires a court to find all facts relevant to the sentencing guidelines range and to make a determination as to which range applies. *See* U.S.S.G. § 1B1.1. The standard of proof required is a preponderance of the evidence. *United States v. Salazar*, 489 F.3d 555, 558 (2d Cir. 2007); *United States v.* Garcia, 413 F.3d 201, 220 n. 15 (2d Cir. 2005); *United States v. Guerra*, 888 F.2d 247, 251 (2d Cir. 1989). The preponderance of evidence standard is satisfied simply when a fact is to be proven is more probable than not. *United States v. Stimpson,* 113 F.4th 350, 354 (3d Cir. 2024); *United States v. Mathis*, 216 F.3d 18, 28 (D.C. Cir. 2000). The much more stringent standard of proof to convict a defendant at trial—proof beyond a reasonable doubt—does not apply to determining relevant conduct under the sentencing guidelines. *Salazar*, 489 F.3d at 557-58 (citing U.S.S.G. § 6A1.3 (commentary) ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case."). Sentencing proceedings are not "second trials," *United States v. Fatico*, 603 F.2d 1053, 1057 (2d Cir. 1979), and a court may use hearsay statements in determining sentence, *United States v. Lee*, 818 F.2d 1052, 1055 (2d Cir. 1997). The sentencing court's discretion is "largely unlimited either as to the kind of information he may consider, or the source from which it may come," and "[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination." *United States v.*

*Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) (citations omitted); [4] *see also* 18 U.S.C. § 3661; *Witte v. United States*, 515 U.S. 389, 397–401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning uncharged criminal conduct, in sentencing a defendant within the range authorized by statute).

## B.  § 1B1.3 Relevant Conduct

The Sentencing Guidelines provide that § 1B1.3 provides that the base offense level, specific offense characteristics, and Chapter Three adjustments are determined by reference to: offense conduct the defendant committed or aided and abetted, *see* § 1B1.3(a)(1)(A); "in the case of jointly undertaken activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, *whether or not charged as a conspiracy*), all acts and omissions of others that were— (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; *that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense*;" *see* § 1B1.3(a)(1)(B) (emphasis added); with respect to a wide variety of offenses (including drug and fraud offenses), "all acts described in subsections (1)(A) and (1)(B) that were part of the same course of conduct or common scheme or plan as the

---

[4] As set forth above, Title 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Moreover, Federal Evidence Rule 1101 provides that the rules of evidence to not apply to sentencing, and the Supreme Court has long held that the use of hearsay at sentencing does not violate due process. *Williams v. Oklahoma*, 358 U.S. 576, 584 (1959); *see also Williams v. New York*, 337 U.S. 241, 246-51 (1949) (citing with approval "the 'age-old practice of seeking information from out-of-court sources to guide [a court's] judgment toward a more enlightened and just sentence.'"); *United States v. Simmons*, 164 F.3d 76, 79 (2d Cir. 1998).

offense of conviction;" *see* § 1B1.3(a)(2); "all harm that resulted from the acts or omissions in subsections (1)(A) and (1)(B), above, and all harm that was the object of such acts and omissions, *see* § 1B1.3(a)(3); and, "any other information specified in the applicable guidelines, *see* § 1B1.3(a)(4).

In the case of a jointly undertaken criminal activity, another's acts and omissions are relevant conduct when the act or omission is (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity. *See* § 1B1.3(a)(1)(B)(i)-(iii). In determining the defendant's accountability for the conduct of others under subsection (a)(1)(B), the sentencing court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement)." § 1B1.3(a)(1)(B), comment. (n.3). "Under the relevant conduct principles of subsection 1B1.3(a)(1)(B), all reasonably foreseeable acts . . . of others in furtherance of [a] conspiracy may be taken into account to determine a defendant's sentence." *United States v. Mulder*, 273 F.3d 91, 118 (2d Cir. 2001) (quoting *United States v. Molina,* 106 F.3d 1118, 1121 (2d Cir.1997) (internal quotation marks omitted)). However, the court must make two particularized findings. First, it must determine "the scope of the criminal activity agreed upon by the defendant." *United States v. Studley,* 47 F.3d 569, 573 (2d Cir. 1995). Second, it "must make a particularized finding as to whether the activity was foreseeable to the defendant." *Id.* at 574. In this vein, the Second Circuit has identified a range of factors that may be relevant to assessing the scope of jointly undertaken criminal activity, including:

> [A]ny explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and other participants; whether the participants pool their . . . resources, or whether they work independently; whether the defendant assisted

9

in designing *and* executing the illegal scheme; and what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct.

*United States v. Pica*, 106 F.4th 197, 201-02 (2d Cir. 2024) (quoting *Studley,* 47 F.3d at 575) (punctuation modified and emphasis omitted).

As set forth above, relevant conduct under § 1B1.3(a)(2) also requires the court to consider "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." Plainly, relevant conduct extends *beyond* the offense of conviction. "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*. § 1B1.3, comment (n. 5(B)(ii)); *see also United States v. Walsh*, 119 F.3d 115, 121 (2d Cir. 1997) (common accomplices and *modus operandi* rendered acts part of a common scheme or plan even though the acts were not directly related to the offense of conviction*)*. "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." § 1B1.3, comment (n. 5(B)(ii)); *see also United States v. Perdomo*, 927 F.2d 111, 114-15 (2d Cir. 1991) (acts not part of a common scheme or plan may nevertheless constitute relevant conduct as part of the same course of conduct). The "course of conduct" principle is "broader" than "common scheme or plan" and captures conduct that

10

does not bear on substantial connections "in terms of participants or overall plan." *United States v. Shonubi*, 998 F.2d 84, 89 (2d Cir. 1993).  The Second Circuit has held that § 1B1.3(a)(2) "is to be interpreted broadly." *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir. 1994).

The Sentencing Commission has also explained that "[i]n certain cases, a defendant may be accountable for particular conduct under more than one subsection of this guideline. If a defendant's accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions under which such accountability might be established."   *See* § 1B1.3, comment. (n. 2). "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range. The range of information that may be considered at sentencing is broader than the range of information upon which the applicable sentencing range is determined." *See* § 1B1.3, comment. (background)

### C.  Grouping Rules

Sentencing Guideline § 3D1.2 delineates how courts are to consider closely related counts. Specifically, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group.  Counts involve substantially the same harm within the meaning of this rule:

(a)    When counts involve the same victim and the same act or transaction.

(b)    When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

(c)     When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d)     When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

### D.     Obstruction of Justice

Guidelines Section 3C1.1 provides a two-level increase in the offense level where the defendant willfully obstructs justice with respect to the investigation, prosecution, or sentencing of the offense of conviction, or attempts to do so. "This adjustment applies if the defendant's obstructive conduct (A) occurred with respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (B) related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant." *See* § 3C1.1, comment. (n. 1). Examples of conduct covered under this enhancement include: "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." *See* § 3C1.1, comment. (n. 4). Moreover, "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction," and "threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction." *See* § 3C1.1, comment. (n. 1). "[T]he defendant is accountable for the defendant's own conduct and for

conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." *See* § 3C1.1, comment. (n. 9). This enhancement clearly applies where a defendant's conduct includes convictions for witness tampering, or where the defendant engaged in pre-charge conduct designed to thwart the investigation or prosecution of the offense. *See United States v. Smith*, 526 F. App'x 256, 258-59 (4th Cir. 2013).

### E. Line-by-Line Challenges to the PSR

The Court is not required to "perform a line-by-line review of the PSR," so long as it "resolve[s] the substantive challenges" thereto. *United States v. Reiss,* 186 F.3d 149, 156-57 (2d Cir. 1999).

### F. Relevant Conduct Versus § 3553(a) Factors

"Although a within-Guidelines sentence is "not presumptively reasonable," the Second Circuit has observed that "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Friedberg*, 558 F.3d 131, 137 (2d Cir. 2009) (internal quotation marks omitted); *see United States v. Pollok*, 139 F.4th 126, 145 (2d Cir. 2025).

"[W]hen a sentencing court turns from calculating a guideline range to determining a sentence, it may consider any information 'concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.'" *United States v. Escobar*, 542 F. App'x 38, 40 (2d Cir. 2013) (unpublished) (quoting *United States v. Broxmeyer*, 699 F.3d 265, 268 (2d Cir. 2012) and 18 U.S.C. § 3661).

## ARGUMENT

### I.    THE PSR's GUIDLINE CALCUTIONS ARE CORRECT.

#### a.  The grouping in the PSR is correct.

The defendant does not object to the grouping of the counts of conviction set forth in the PSR.

Count 1 convicted the defendant of a conspiracy to defraud the United States and to pay bribes to a public official. Count 2 convicted the defendant with a substantive offense of paying bribes to a public official. As the Court has previously observed, there was sufficient evidence to proves these counts. *See* ECF No. 1683 at 3–11. Pursuant to §3D1.2(b), "[a]ll counts involving substantially the same harm shall be grouped together into a single group, and Counts 1 and 2 are grouped as the counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." *See* ECF No. 1677 at ¶75. Thus, counts 1 and 2 are properly grouped in the PSR.

These counts are then grouped with Counts 3, 4, and 9, which are the defendant's convictions for maintaining a drug premises, conspiracy to distribute drugs, and distribution of cocaine pursuant to §3D1.2(c), as one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts. Pursuant to §3D1.3, to determine the offense level applicable to the group, determine the offense level for the most serious of the counts comprising the group (i.e.,

produced the highest offense level). *Id.* at ¶¶ 77–84.[5]

Counts 5, 6, and 7, are grouped because the counts relate to sex trafficking conspiracy (Count 5) involving six sex trafficking victims, and involve witness tampering of a witness who was also a victim of the sex trafficking. *Id.* at ¶¶ 85-122. Each sex trafficking victim is treated as a separate count of conviction for sex trafficking pursuant to Guidelines §2G1.1(d)(1). *Id.* at ¶85. Count 6 and 7, witness tampering directed towards one of the sex trafficking victims, was grouped pursuant to §3D1.3,[6] to determine the offense level applicable to the group because it—the conduct directed towards P.H.—produced the highest offense level for Count Group 2. *Id.* at ¶85; *see* § 3D1.3, comment. (n. 2).

After each count and count group is assigned an adjusted offense level, units are assigned pursuant to Guidelines § 3D1.4(a). *See* ECF No. 1677 at ¶123. As a result, the PSR properly calculated the defendant's total offense level as 43.[7]

---

[5] Here, conspiracy to distribute controlled substances produces the highest offense level as the conduct lasted over a decade (2005 until 2019) and involved a myriad of drugs, such that even using an exceedingly conservative estimate of 1 gram of cocaine per day as a relevant conduct amounts to over 5 kilograms of cocaine.

[6] Guidelines § 3D1.3 provides:

Determine the offense level applicable to each of the Groups as follows:

(a) In the case of counts grouped together pursuant to §3D1.2(a)–(c), the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group.

(b) In the case of counts grouped together pursuant to §3D1.2(d), the offense level applicable to a Group is the offense level corresponding to the aggregated quantity, determined in accordance with Chapter Two and Parts A, B and C of Chapter Three. When the counts involve offenses of the same general type to which different guidelines apply, apply the offense guideline that produces the highest offense level.

[7] The defendant also does not object to the PSR's calculation that the defendant is a Criminal History Category II premised upon his December 14, 2000, prior felony conviction for conspiracy to commit wire fraud, and his prior New York state misdemeanor conviction for assault in the third degree. ECF No. 1677 at ¶¶ 133-34.

**b. The defendant's objections to the drug weight are misplaced because, if anything, the relevant conduct drug weight is underrepresented and inures to the defendant's benefit.**

**[Responding to Defendant's Objection Nos. 1, 2, 3, and 4 of the PSR]**

The defendant's conspiracy to distribute controlled substances and to maintain Pharaoh's as a drug-involved premises produces the highest offense level. The defendant's conduct lasted over a decade, involved a myriad of drugs, and included drugs the defendant and others routinely distributed. Specifically, Count 3 of conviction charged the defendant with maintaining a drug premises at Pharaoh's "Beginning in or about 2006 and continuing until on or about December 12, 2019," for the "purpose of manufacturing, distributing, and using cocaine, cocaine base, methamphetamine, amphetamine (Adderall)," and "marijuana and heroin." ECF No. 1350 at 15. Count 4 of conviction charged the defendant with conspiring to distribute those same controlled substances, and with maintain Pharaoh's as a drug-involved premises, "[b]eginning in or about 2009 and continuing to in or about February 2019." *Id.* at 16. Count 9 of conviction charged the defendant with distribution of cocaine on November 19, 2019. *Id.* at 19.

### i. The drug weight is appropriately estimated by the PSR.

The defendant's assertion that the drug weight attributable to him is overstated should be rejected. *See* ECF No. 1709 at 9-13. If anything, the PSR calculation of relevant conduct as to the drug guidelines is conservative and understated.

"In a drug trafficking conspiracy, a defendant may be sentenced based on all acts and omissions of others that were within the scope of the conspiracy, in furtherance of the conspiracy's criminal objective, and reasonably foreseeable to the defendant. U.S.S.G. §

1B1.3(a)(1)(B)." *United States v. Wiley*, No. 23-6031, 2025 WL 733190, at *7 (2d Cir. Mar. 7, 2025). In this case, the defendant is responsible for the drugs he distributed as well as for those he permitted and facilitated to distribute drugs in and around Pharaoh's. The drug traffickers included the defendant, his friends, employees, and select patrons such as, among others, the DJ at Pharaoh's, Jessica Leyland, Marcus Black, Scooter, his brothers, certain bikers, and other friends of his who distributed drugs to addicted dancers to have sex with them in the defendant's upstairs area at Pharaoh's. "The defendant need not have actual knowledge of the exact quantity of narcotics involved in the entire conspiracy; rather, it is sufficient if he could reasonably have foreseen the quantity involved." *Id.* (quoting *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006)). "Where there has been no seizure of narcotics, or where the quantity seized does not reflect the scale of the offense, the Guidelines require the district court to estimate the amount of drugs involved in the offense." *Id.* (quoting *United States v. Blount*, 291 F.3d 201, 215 (2d Cir. 2002)). "In making that estimation, a sentencing court may rely on any information it knows about, including evidence that would not be admissible at trial[.]" *Id.* (quoting *United States v. McLean*, 287 F.3d 127, 133 (2d Cir. 2002)).

Here, there was ample evidence that the defendant was routinely involved in cocaine use and distribution, and distribution of Lortabs, and that he permitted, directed, or facilitated drug dealing by others at Pharaoh's on a nightly basis. *See* ECF No. 1608 at 7–15 (describing pervasive drug use and distribution by the defendant and others at Pharaohs); *see also* ECF No. 1677 (PSR) at ¶¶ 22–35 (summarizing extensive trial testimony regarding drug trafficking activity at Pharaoh's). There was also ample evidence of several drug overdoses. For example, E.H. described a situation where a dancer was overdosing, and the defendant provided the overdosing dancer with cocaine in an attempt to reverse of effects of the heroin and stated: "I

17

help the girls if they need to work, and I can get you some, too." ECF No. 1677 at ¶ 34.[8] Additionally, the testimony established rampant use and distribution of cocaine, heroin, marijuana, and other drugs at Pharoah's. However, the PSR only held the defendant accountable for 1 gram of cocaine per day, which is an exceedingly conservative estimate based upon the scope, frequency, and duration of the conduct underlying the defendant's drug trafficking-related convictions, *see Wiley supra,* for the time underlying his counts of conviction.[9]

Even assuming that Pharaoh's was closed on Christmas, or on other occasions, an estimate of *only* 1 gram of cocaine per day for the time-period for which the defendant was convicted amounts to well-over 5 kilograms of cocaine. *See* ECF Nos. 1608 at 4–12 (government Rule 29 response in opposition describing extensive trial evidence of drug use and distribution at Pharaohs); *see also* 1683 at 11–13, 16 (Decision & Order denying defendant's Rule 29 motion). The evidence overwhelmingly established that Gerace was the key figure at Pharaoh's who maintained the drug premises and the principal of the drug trafficking conspiracy that operated in lockstep with his sex trafficking conspiracy. As a result,

---

[8] The evidence also established that the defendant sought to conceal, including on one occasion with the advice of Joseph Bongiovanni to "get her out of there," several drug overdoses at Pharaoh's.

[9] *See* Tr. Tran., at 16–21,ECF No. 1469, (dated Nov. 18, 2024) (Test. E.H.) (describing a dancer who was inebriated and overdosing on heroin and that the defendant gave the dancer cocaine and told E.H., "I can – I help the girls if they need to work."); Tr. Tran., at 50–51, ECF No. 1441, (dated Dec. 16, 2024) (Test. L.L.) (describing nodding out from heroin use on the verge of overdose approximately 100 times inside Pharaoh's, and needing cocaine to get through her shift); Tr. Tran., at 64, ECF No. 1470, (dated Dec. 9, 2024) (Test. K.L.) (describing observing dancers at Pharaoh's nod out "[a]ll the time" from heroin in the spring/summer of 2009); Tr. Tran., at 116-117, ECF No. 1600, (dated Nov. 27, 2024) (Test. Nigro); Tr. Tran., at 33, ECF No. 1524 (dated Dec. 13, 2024) (Test. K.M.) (Gerace said "That there was a girl that overdosed [at Pharaoh's], and he got rid of the body. Not him specifically, but he had somebody get rid of the body. Get rid of her."); *See* Tr. Tran., at 50–52, ECF No. 1605, (dated Dec. 10, 2024) (Test. Augustyniak); *see also* Tr. Tran., at 116–17, ECF No. 1600, (dated Nov. 27, 2024) (Test. Nigro) (describing two events wherein two different females overdosed on heroin in or about 2015; "Q. Okay. Was the year — was the estimated year of those two overdoses 2015? A. Yes, I was hands-on with it.").

the drug weight calculated in the PSR, which gives the defendant the benefit of excluding from the calculus fentanyl, heroin, methamphetamine, Lortabs, marijuana, and several drug overdoses, is reasonable, operates to the defendant's benefit, and is the most conservative calculation based upon the facts established at trial.

### ii.  The PSR properly set forth the time-period of the drug activity.

The defendant's claim that the PSR overstates the time-period for which the drug weight should be attributed to him, *see* ECF No. 1709 at 7–13, should be rejected. Consistent with the facts described in the PSR, this Court has determined "—there was evidence from which a jury could reasonably conclude that Gerace maintained Pharaoh's for the entire time period. For example, L.L. testified that throughout the time she worked at the club from 2013 to 2018, *see* Docket Item 1441 at 17, she always remembered Gerace being there and did not remember any significant period of time when he was gone, *see id*. at 258." ECF No. 1683 at 12. ("Q: From your memory, and from your experience at Pharoah's, do you always remember this defendant being there? A: Yes. Q: Do you ever, do you, of your personal recollection, ever remember a time when there w[ere] significant amounts of time he was gone? A: No. Q: Who's the one that walked around like the boss there? A: Peter."). This and other evidence that the defendant always exercised control over Pharoah's and distributed drugs at the club, including between 2012 and 2014, aligns with the jury's guilty verdict on Counts 3 and 4. [10] *See  Hourihan*, 66 F.3d at 465 ("A guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.").

---

[10] *See, e.g.*, Tr. Tran., at 20, (Test. A.P., dated Nov. 7, 2024) ("Q: During the time that you worked at Pharoah's, between about '06, '07, and 2012 or 2012, who ran the club? A: . . . . Well, Peter and Don Parrino . . . were the owners. And then, I mean, managers run it as well."); Tr. Tran., at 26, (Test. A.A., dated Nov. 20, 2024) ("Q: That first time when you go in the upstairs, with the defendant and he puts the card [containing cocaine] under your nose, was that in the first year that you started working there in 2012? A: Yes."); Tr. Test., at 196 (Test.

### iii. The PSR makes proper reference to the defendant's brother, Anthony Gerace.

The defendant's objection to references to his brother, Anthony Gerace, in the PSR lack merit. *See* ECF No. 1709 at 3–4. There was testimony that Anthony Gerace used and distributed cocaine at Pharaohs, and that he distributed marijuana there at times. This evidence is consistent with the jury's verdict and facts set forth in the PSR. *See* ECF No. 1677 at ¶11; *see also* ECF 1608 at 14 (describing Anthony Gerace's cocaine distribution); ECF No. 1600 at 95-96 (describing Anthony Gerace delivering marijuana to the office at Pharaoh's). Moreover, the references to Anthony Gerace do not impact the guidelines calculations set forth in the PSR and the Court is not obligated to "perform a line-by-line review of the PSR," so long as it "resolve[s] the substantive challenges" thereto. *Reiss,* 186 F.3d at 156-57.

### iv. The PSR properly relied upon trial testimony and evidence, and the defendant's attacks on witness credibility must be rejected.

The defendant's attacks on the credibility of witnesses are unoriginal and were rejected by the jury. In further attacking government witnesses in the context of sentencing, the defendant asks this Court to do precisely what it is not permitted to do—resolve credibility determinations in defiance of the jury's verdict. The witnesses who testified, including his ex-wife Ms. Nigro and others, consistently described how the defendant operated his strip club as a sex trafficking operation whereby women were coerced and controlled, in part, through their addictions, which he encouraged, exploited, and often exacerbated. Ms. Nigro in

---

L.L., Dec. 16, 2024) ("Q: And at that point in time [i.e., 2013, when L.L. first started using drugs], Don Parrino was in charge of the club, wasn't he? A: . . . [W]hen I worked there, it was Peter, then they came in like a few months later. I don't even know, maybe a half a year later or something, then Larry and Don came in."); id. at 258 ("Q: From your memory, and from your experience at Pharaoh's, do you always remember this defendant being there? A: Yes. Do you ever, do you, of your personal recollection, ever remember a time when there w[ere] significant amounts of time he was gone? A: No. Who's the one that walked around like the boss there? A: Peter.").

particular was corroborated through text messages between Gerace and his co-defendant, text messages between Gerace and former New York States Supreme Court Judge Michalski, emails from Judge Michalski to the law clerk for the judge who controlled Erie County Pistol permits, falsified marital records, photos, and a myriad of other witnesses—even those who did not like her such as Gerace's other ex-wife, R.A. The defendant's arguments that she was not credible lack merit, were rejected by the jury, and her testimony was—as the government argued during summation and the jury accepted—worthy of belief. There was nothing "patently incredible" or "denie[d] physical realities," about her testimony nor any other exceptional circumstance to justify "intrud[ing] upon the jury function of credibility assessment." *United States v. Rivera*, 2012 WL 2339318, at *16 (E.D.N.Y. June 19, 2012). And, it would defy logic, and is not permitted, for the jury to credit witness testimony in rendering guilty verdicts, the Court to affirm the convictions and the sufficiency of the evidence underlying the verdicts, and then for the Court decline to accept the facts necessarily implicit in the jury's verdict at sentencing. *Hourihan*, 66 F.3d at 465 ("A guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.").

c. **The sex trafficking victims are each properly treated as different counts of conviction.**

**[Responding to Defendant's Objection No. 5 of the PSR]**

According to Gerace, he stands convicted of a sex trafficking conspiracy without any sex trafficking victims. *See* ECF No. 1709 at 13-36 (arguing that all six of the sex trafficking victims identified in the PSR are not sex trafficking victims). If that sounds odd, it is because it is nonsense—under both the facts and the law. *See Hourihan*, 66 F.3d at 465 ("A guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the

21

verdict."). The jury rejected the defendant's claims at trial that there was no coercion as to any of the sex trafficking victims, and it would be clear error for this Court to "reach the independent factual conclusion, contrary to the guilty verdicts," that the victims were not coerced or that "they had  consented in any way to any of the charged sexual acts." *United States v. Martinez*, 110 F.4th 160, 175 (2d Cir. 2024); *cf. United States v. Mumuni*, 946 F.3d 97, 109–10 (2d Cir. 2019) (holding that it was clear error for the district court to "second-guess," at sentencing, whether a defendant who pled guilty to attempted murder actually had the intent or the capability to kill, because the court was bound by "the only legally permissible inference to be drawn from" the guilty plea).

To arrive at an accurate sentencing guidelines calculation, the offense level for each sex trafficking conspiracy victim is calculated separately, even if she was not "specifically cited in the count of conviction." *See, e.g.*, U.S.S.G. § 2G1.1, App. Note 5; *see also* ECF No. 1677 at ¶85. Here, the PSR properly calculated six victims of the defendant's relevant conduct underlying his conviction on count 5. A victim is defined as "a person transported, persuaded, induced, enticed, or coerced to engage in, or travel for the purpose of engaging in, a commercial sex act or prohibited sexual conduct, *whether or not the person consented to the commercial sex act or prohibited sexual conduct*." U.S.S.G. § 2G1.1, App. Note 1 (emphasis added). Thus, the defendant's claims that the victims consented to the commercial sex acts—while unsupported by the evidence—are legally inconsequential.  *See Martinez,* 110 F.4th at 175.

On sufficiency review, this Court rejected the defendant's claim that "all sexual activity was consensual" and determined that "a jury easily could have concluded otherwise." ECF

No. 1683 at 14. This Court continued: "Multiple witnesses, including G.R., K.L., and L.L., testified that while they were working as strippers at Pharoah's, they exchanged sex for drugs or for money to purchase drugs because they were in the throes of drug addiction and desperate to avoid withdrawal" and that "the Second Circuit has held that if the prosecution proceeds under a theory of coerced commercial sex acts, 'reasonable fear of suffering painful withdrawal symptoms if [one] d[oes] not perform commercial sex acts as directed by [the defendant]' is sufficient to satisfy the statute's 'serious harm' requirement." ECF No. 1683 at 13 (quoting *United States v. Shine*, 2022 WL 761520, at *3 (2d Cir. Mar. 14, 2022)) (summary order); *cf. United States v. Ford*, 821 F. App'x 742, 749 (9th Cir. 2020) (the court properly included two victims whose status the defendant challenged among the four sex trafficking victims relevant to sentencing based upon "hearsay statements because such statements were at the very least, accompanied by some minimal indicia of reliability.") (internal quotation and citation omitted).

Victims P.H., A.A.2, K.A., K.L, L.L. and G.R., *all* testified at trial under oath and are sex trafficking victims properly counted and calculated under the guidelines as separate counts of the defendant's sex trafficking conspiracy. *See* ECF No. 1677, PSR at ¶¶ 41–43, 44–45, 46–48, 49–53, 54–57, 58–60; *see also* ECF No. 1608 at 12-24.[11] There was strong evidence that Gerace leveraged the drug addictions of his dancers and his status as their boss and owner of

---

[11] The testimony of A.B. also establishes that she was a victim of the defendant's sex trafficking, but his sex trafficking of her occurred outside of the time-period charged in the indictment. Nevertheless, she is a victim of the defendant's drug trafficking, *see* ECF No. 1677 at ¶33; is a victim under the Crime Victims' Rights Act (defining a victim as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense[,]" pursuant to 18 U.S.C. § 3177(e)(2)(A)); and A.B. has written a letter to the Court that ought to be at a minimum considered pursuant to 18 U.S.C. § 3661 (which provides that "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Pharaoh's to coerce them into performing commercial sex acts for himself, his friends, and his customers. ECF No. 1677 at ¶ 36. This included commercial sex acts in both the downstairs VIP room and in Gerace's upstairs private area that he used to coerce his victims to engage in commercial sex acts with Gerace and his inner-circle.[12] *Id.* at ¶¶ 36–40.  For just a few examples:

- G.R. described that she was heavily addicted to drugs, the defendant knew it from having observed her and from using drugs with her, and In the midst of the his cocaine-fueled party, the defendant "asked [G.R.] if [she] would hook up with" one of his friends, told her that he would "take care of [her] or whatever," and then the defendant gave her $200 when G.R. was done having sex with his friend. G.R. had not planned to go upstairs to have sex with someone, but she knew what the defendant wanted—for her to have sex with his friend, and she did what the boss wanted. *See* ECF No. 1608 at 15 (describing testimony).

- K.L. described that she was heavily addicted to Lortabs and that she would get physically sick from withdrawal, at which point the defendant "would say, well, you know what you have to do," which K.L interpreted that she "had to give [the defendant] a blowjob" for him to release the Lortabs he was withholding. *Id.* at 16 (describing testimony). When asked why she performed oral sex on Gerace when she was physically ill, K.L. testified, "Because I had to. Because I had to. I-I had to, I felt horrible. I felt-I felt like I wasn't-I didn't want him to be mad at me." *See* ECF No. 1677 at ¶51.

- L.L. detailed how she was groomed and coerced. After developing a heavy addiction to cocaine and heroin while working at Pharaohs, L.L. exchanging oral, vaginal, and anal sex for money or drugs inside the club's VIP and champagne room at the defendant's behest. This included permitting a high paying customer, Wayne Van Vleet, to finger her in the downstairs VIP room after the defendant, referencing Van Vleet, told L.L. "he's a good one, you want to go in the back room with him, and he will hook you up" and "he likes to pull hair and finger

---

[12] Tr. Tran., at 96-99, ECF No. 1441 (dated Dec. 16, 2024) (Test. L.L.) (naming other dancers and describing how they became the defendant's "favorites" and engaged in threesomes upstairs with the defendant " a lot" in exchange for drugs); id. at 38-39 (describing the difference between downstairs customers who engaged in sex acts with dancers and upstairs as: "The difference was the customers that had a lot of money, they would be the ones downstairs in the VIP Rooms. And people that were real close to the defendant would be the ones to go up."); Tr. Tran., at 110, 123-24, ECF No. 1600 (dated Nov. 27, 2024) (Test. Nigro); Tr. Tran., at 47, ECF No. 1379 (Nov. 13, 2024) (Test. A.B.).

people," which L.L. understood to mean that VanVleet "c[ould] do what he wants to me, and I'm not being watched," in a scenario that played out "many times" in the downstairs VIP. *Id.* at 19. L.L. also described a myriad of commercial sex acts in which she participated with the defendant and his associates in his private upstairs area while she was under the throes of her addiction. *Id.* at 20-22.

- P.H. described that she was 18 years old when she first had sex with Gerace, her boss at Pharaohs, and that he gave her alcohol, cocaine, and then had sex at his apartment. *See* ECF No. 1677 at ¶41. P.H.'s addiction eventually progressed to Lortabs, which the defendant supplied to her when she suffered withdrawal, and that the defendant provided her with cocaine, Lortabs and employment at Pharaohs. When she was asked if she had sex with Gerace in exchange for those things, she testified, *"It was kind of an unwritten thing, yeah, it wasn't like a verbal…."* She further stated that she would not have engaged in sex with Gerace had he not been giving her opiates, cocaine, and alcohol since she was 18 years old. She recalled one (1) night when Gerace, as well as his then-girlfriend, C.C., brought her into their bedroom, and she felt pressured by them to snort Viagra. After snorting the Viagra, she had sexual intercourse with both Gerace and C.C. When PH was asked if there was a power imbalance between herself and Gerace, she testified, "Yes…he was older, authoritative figure. He had money. He was important, well known. And I was not well known and did not have money." P.H. further testified that Gerace had advised her that he had connections to law enforcement officers, and she stated, "I remember him saying that he knows people in high places, and he would make someone disappear if he wanted." *Id.* at 42-43 (emphasis added).

- A.A.2 described her drug addiction and that during her employment at Pharaoh's, while performing dances in the VIP area, customers touched her vagina, attempted to insert their fingers in her vagina, touched her breasts and kissed her. On those occasions, no one came into the VIP area to stop these things from happening. She testified that she went into the VIP area or Champagne room with Wayne VanVleet, a "whale" at the club who spent a lot of money there, on approximately 20 occasions. A.A.2. stated that VanVleet was very "touchy" during dances and would touch her vagina on the outside of her underwear and attempt to touch her bare vagina. Further, he would hold her hips down on his lap, and she could feel his erect penis. He would then ejaculate on himself. She further stated that she allowed these things to happen as she needed the money to purchase her drugs and to avoid withdrawal. A.A.2. reported that the only reason she allowed these things to happen was because she was addicted to drugs. A.A.2. testified that on one (1) occasion, another customer had inserted his fingers into her vagina, and although she looked to the VIP attendants for assistance, no one stopped

this from happening. *See* ECF No. 1677 at ¶45. Gerace knew that, for example, VanVleet was a high paying customer who engaged in commercial sex acts in the VIP with dancers like A.A.2, he coerced and his dancers, like L.L., *see* ECF No. 1608 at 20-22, to engage in commercial sex acts with customers like VanVleet, and he did so because it was profitable—causing him to term the downstair VIP room, where coerced and drug addicted dancers engaged in commercial sex acts, "the bank." *See* ECF No. 1608 at 5.[13]

- K.A. described her employment at Pharaohs, and her addiction to drugs, including Lortabs, cocaine, heroin, and "speed balls" which she used during her shift at Pharaohs to avoid withdrawal sickness. Like other dancers, she described how patrons in the downstairs VIP exposed their penises to her, pulled her hair, attempted to touch her bare vagina, and was essentially forced to grind on a patron's erect—being held in position—until he ejaculated. She further stated that she engaged in these activities to obtain money to buy drugs so that she did not get sick. KA testified that it was her understanding that the VIP attendant was "tipped" to "look the other way" when these types of incidents were occurring. *See* ECF No. 1677 at ¶¶ 46-48.[14]

It is axiomatic that coerced commercial sex in not a "choice" as the defendant advocates throughout his objections. *See* ECF No. 1709 at 36; *cf. Shine*, 2022 WL 761520, at *3 (reasonable fear of suffering painful withdrawal symptoms if one does not perform commercial sex acts as directed by the defendant is sufficient to satisfy the statute's serious harm requirement). And under the guidelines, a victim's purported consent "to the commercial sex act or prohibited sexual conduct" is inconsequential. U.S.S.G. § 2G1.1, App. Note 1. Moreover, the defendant does not, because he cannot, dispute that any of the above-summarized testimony occurred at trial. *Cf. Ford*, 821 F. App'x at 749 (the court properly included two victims whose status the defendant challenged among the four sex trafficking victims relevant to sentencing based upon "hearsay statements because such statements were

---

[13] Citing Tr. Tran., at 47, ECF No. 1379 (Nov. 13, 2024) (Test. A.B.).

[14] This testimony was consistent with testimony provided by L.L., G.R., K.N., and E.H. as to how the downstairs VIP operated, and with expert testimony provided by Rebecca Bender.

at the very least, accompanied by some minimal indicia of reliability."). Thus, the defendant's request for this Court to find that there were no sex trafficking victims is unsustainable and would require the Court to commit clear error by "reach[ing] the independent factual conclusion, contrary to the guilty verdicts," that the victims were not coerced or that "they had consented in any way to any of the charged sexual acts." *Martinez*, 110 F.4th at 175. Indeed, each of the six women referenced in the PSR, and many more who are unnamed and whose full identities may remain unknown to this date, were victims of the defendant's sex trafficking conspiracy, and this Court is bound "to accept the facts necessarily implicit in the verdict." *Hourihan*, 66 F.3d at 465. Here, the facts are that P.H., A.A.2, K.A., K.L, L.L. and G.R. are all victims of the defendant's sex trafficking.

### d. **The PSR properly included the facts pertaining to the witness tampering.**

### [Responding to Defense Objection No. 6]

The defendant's objections to paragraphs 61 through 65 of the PSR should be rejected. Paragraph 61 is based upon trial testimony by P.H., and it is an accurate summary of her testimony, which includes quotations from the trial transcript. It accurately references that Gerace procured P.H.'s arrest in Grand Island through his communication with Gregory Trotter; accurately describes the circumstances of P.H.'s arrest and her interview by federal law enforcement at the Amherst Police Department; correctly states that Gerace bragged to P.H. that he had enlisted the help of one of his "buddies" at the Amherst Police Department to have her arrested on said date; and details the circumstances of Jessica Leyland assaulting P.H. at a bar following her arrest by Detective Trotter and subsequent interview with federal law enforcement. Indeed, the defendant does not, because he cannot, dispute that this evidence was established at the trial. While paragraph 61 did not independently form the basis

27

of a count of conviction, it describes relevant evidence from the trial and is properly included in the PSR. *See* U.S.S.G. § 1B1.4; *see also* 18 U.S.C. § 3661.

Paragraphs 62 through 63 describe the witness tampering of P.H., including the trial testimony and Facebook message underlying the defendant's convictions on counts 6 and 7. Based upon the Facebook message itself, and "the testimony of C.C. and B.R." this Court determined that there was enough for the jury to find beyond a reasonable doubt that Gerace aided and abetted [Crystal] Quinn," who sent the message to P.H. *See* ECF No. 1683 at 16. These paragraphs describe relevant conduct and the Court is bound to sentence the defendant in a manner that accepts "the facts necessarily implicit in the verdict." *Hourihan*, 66 F.3d at 465.[15]

### e. The victim-related adjustment for obstruction of justice for filing civil lawsuits against P.H. and Ms. Nigro is properly applied to count group 1, the drug related convictions.

**[Responding to Defense Objection No. 7]**

Paragraphs 64 and 65 of the PSR describe how the defendant civilly sued two women, P.H. and Ms. Nigro, in state court during the government's investigation of the defendant, and paragraphs 72 and 83 apply an obstruction of justice enhancement to count group 1 (counts 3, 4, and 9) related to this conduct. The civil lawsuit was filed after the defendant realized he was under investigation (as he and his strip club were referenced but not named in the initial indictment charging codefendant Bongiovanni).[16] The PSR properly included

---

[15] While the defendant objected to language summarizing facts in the PSR, he did not object to a two-level obstruction of justice enhancement based upon the Facebook threats to P.H. *See* ECF No. 1677 at ¶ 91; *cf.* ECF No. 1709 at 36-38.

[16] It was clear to the defendant no later than November 5, 2019, that he was a target of a federal investigation. *See* Tr. of Proc. at 14, Mar. 24, 2023 (also available at ECF No. 497-1) ("It would have been absolutely and abundantly clear to Mr. Gerace that he was a target of a Federal investigation no later than November 5, 2019.").

these facts and determined that a two-level enhancement is appropriate pursuant to U.S.S.G. § 3C1.1.

Ms. Nigro and P.H. were two women with intimate knowledge who had spent considerable time with the defendant and at Pharaoh's. They each had detailed and damaging information about the defendant, his criminal conduct, and pervasive drug use and distribution at Pharaoh's, which they provided to law enforcement and to a federal grand jury. While federal authorities and the grand jury were investigating the defendant, after search warrants were executed at Pharaoh's and the defendant's residence, and almost a year after the initial Bongiovanni indictment, which referenced the defendant as Coconspirator 1, was made public, the defendant initiated and filed a state civil lawsuit against both women in October 2020. The lawsuit was based in part upon old information, and the defendant was guessing about facts while using the lawsuit to intimidate, retaliate, and to fish for information about the investigation. The lawsuit included broad and speculative allegations that Nigro "has told local, state, and federal law enforcement officers that [Gerace] has committed crimes in an attempt to cause [Gerace] inconvenience and emotional and financial distress," and that P.H. "provided the FBI with false information alleging that [Gerace] was involved with criminal activity of a state and federal nature . . ." among other allegations. *See* ECF No. 1677 at ¶ 64.

The lawsuit was initiated by Gerace via a verified complaint and was filed with the Erie County Clerk on October 12, 2020. [17] On October 9, 2020, Gerace swore to and signed the verified complaint, which stated: "Peter Gerace, being duly sworn, deposes and says: that

---

[17] Index No, 812394/2020.

29

he is a Plaintiff in the above matter, that he has read the foregoing Verified Complaint, and knows the contents thereof; that same is true to his knowledge except as to those matters alleged to be on information and belief, as to those matters, he believes them to be true." In other words, the allegations contained in the lawsuit are from, belong to, and are attributable to the defendant.[18]

In targeting two women with a lot of information about his criminal activity, but who had little financial means, Gerace targeted and retaliated against P.H. and Ms. Nigro for their historical cooperation with law enforcement; to corruptly persuade them into halting cooperation with federal law enforcement and the federal grand jury; and, to attempt to gain insight into the federal investigation into Gerace, as a potential downstream effect of the civil lawsuit would have been to force P.H. and Ms. Nigro into civil discovery and depositions. The government moved *ex parte* to enjoin the Gerace's state civil lawsuit against P.H and Ms. Nigro, and then-presiding United States District Court Judge John L. Sinatra, Jr., granted the injunction and later denied Gerace's motion to vacate it. *See* ECF No. 1677 at ¶ 65; *see also United States v. Gerace,* 2023 WL 3243477 (2d Cir. 2023); ECF No. 495 (Mandate).

The defendant appealed Judge Sinatra's decision to the Second Circuit Court of Appeals, which affirmed the order granting the injunction. *Id.* In affirming Judge Sinatra's decision, the *Gerace* court observed: "The district court considered on the one hand the government's interest in protecting witnesses from threats and intimidation, preserving grand jury secrecy, and enforcing the federal criminal discovery rules, and on the other, Gerace's interest in obtaining an injunction on the state defendants' speech. [. . . ] Here, the potential

---

[18] Without a plaintiff willing to make allegations, there is no basis to initiate a civil lawsuit.

interests of the government are considerable, whereas the potential prejudice faced by Gerace is *de minimis.* Indeed, this is exactly the type of case—where a criminal enterprise thrives off of gathering and using confidential law enforcement intelligence—that merits the relief granted by the district court." *Id.* at *2 (citations and punctuation omitted).

The government also cited Gerace's civil lawsuit against P.H. and Ms. Nigro in support of its motion to detain the defendant after he was indicted for witness tampering against P.H. in Case No. 23-CR-37, as set forth in convictions on counts 6 and 7. Specifically, during a detention argument on March 24, 2023, the government argued that the defendant's civil lawsuit was another form witness tampering and retaliation, as follows:

> And in that civil lawsuit, which this court later enjoined, he alleged that this witness [P.H.] provided false information to the FBI, in connection with the date of her arrest for the watch. Notably, she didn't talk to the FBI on that day. So the information in the lawsuit was inaccurate from the beginning. But notably, that may support another charge for witness intimidation under Title 18, United States Code, Section 1513(e), and there is support for this in the case law that we're looking into. That statute provides: Whoever knowingly, with intent to retaliate, takes any action harmful to any person, including with the lawful employment or the livelihood of another -- any person, for providing to the law enforcement officer any truthful information, relating to the commission or possible commission of any Federal offense, shall be guilty of a crime.

*See* Tr. of Proc. at 17-18 (Mar. 24, 2023); *see also* ECF Nos. 497-1, 504 (D&O denying motion to re-open detention hearing and for pre-trial release).

Consistent with the foregoing, this Court permitted trial testimony about the state civil lawsuit the defendant filed against P.H. and Ms. Nigro. That testimony, in conjunction with the other evidence, established that the defendant sought to intimidate, retaliate, silence, and discredit these witnesses from cooperating with law enforcement investigating Gerace and Pharaoh's. *See* ECF No. 1677 at ¶¶ 64-65; *see also* 18 U.S.C. § 1513(e); *United States v. Camick*,

796 F.3d 1206, 1219 (10th Cir. 2015) (affirming conviction and finding the evidence was sufficient to sustain conviction for obstruction of justice where the defendant's conduct included filing a civil rights lawsuit against a former romantic partner who would be a witness against him).

Guidelines § 3C1.1 provides for a two-level increase to the offense level "if (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense[.]" "This adjustment applies if the defendant's obstructive conduct (A) occurred with respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (B) related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant." Here, the lawsuit was initiated almost one-year after the Bongiovanni indictment was unsealed, after a border search of the defendant's phone in April 2019, and after federal searches were executed at Pharaoh's and the defendant's residence in December 2019 (in addition to the fact that his brother, Anthony was arrested and charged in January 2019).[19] Thus, Gerace was on notice as early as April 2019, but certainly no later than December 2019, that he was under federal investigation.

---

[19] The initial indictment charging Bongiovanni, which referenced both Gerace as unnamed Co-conspirator 1 and a gentlemen's club associated with Co-conspirator 1, was filed on October 31, 2019, and made public on November 5, 2019. *See* ECF No. 1, (Ind.) (Count 1, Overt Act ¶¶ 24-27, 49, 51-53, 56 (referencing a gentlemen's club operated by Coconspirator 1), 57, Counts 5, 6, 7, 10, 11); *see also* ECF No. 5 (Minute Entry for arraignment on November 5, 2019).

Undoubtedly, Gerace was aware that he was under federal investigation long before he sued P.H. and Nigro in state court on October 12, 2020.

The defendant's objection to the obstruction enhancement attempts to lay blame to his prior attorney for filing the lawsuit, but it was a lawsuit that the defendant initiated, reviewed, swore to, and verified before it was filed. While the defendant neither cites, nor specifically raises an advice of counsel defense, the defendant has alluded to it. [20] However, even assuming *arguendo* that Gerace's then-counsel acted in good faith, Gerace has not demonstrated that he "honestly and in good faith sought the advice of counsel," "fully and honestly laid all the facts before his counsel," and "in good faith and honestly followed counsel's advice." *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012). Indeed, as the Supreme Court has formulated it:

> [I]f a man honestly and in good faith seeks advice of a lawyer as to what he may lawfully do . . . , and fully and honestly lays all the facts before his counsel, and in good faith and honestly follows such advice, relying upon it and believing it to be correct, and only intends that his acts shall be lawful, he could not be convicted of [a] crime which involves willful and unlawful intent[,] even if such advice were an inaccurate construction of the law. *But, on the other hand, no man can willfully and knowingly violate the law and excuse himself from the consequences thereof by pleading that he followed the advice of counsel.*

*Williamson v. United States*, 207 U.S. 425, 453 (1908) (emphasis added).

---

[20] This Court should further reject the defendant's allusions to an advice-of-counsel defense because, as the defendant knows, were he actually to put his good faith reliance on his prior attorney's advice into issue, he would waive any privilege over the subject matter. "In other words, a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party." *In re Grand Jury Proceedings,* 219 F.3d 175, 182 (2000); *see United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991) ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."); *see also John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003) ("The loss of the privilege in these circumstances is sometimes described as implied waiver, [or] sometimes as "at issue" waiver because it results from the party having placed a contention at issue . . ." (internal citations omitted)).

Here, the preponderance of evidence, *see Salazar*, 489 F.3d at 558, establishes that the defendant willfully and unlawfully filed civil lawsuits against P.H. and Ms. Nigro to tamper with and retaliate against them. As a result, the defendant cannot "excuse himself from the consequences" of his actions "by pleading that he followed the advice of counsel," *Williamson,* 207 U.S. at 453. Accordingly, the PSR properly applied the two-level obstruction enhancement pursuant to Guidelines § 3C1.1 to count group 1.

### f. Conclusion

The defendant's objections to the PSR should be denied, and the defendant should be sentenced to a guideline term of life imprisonment.

## II.     THE DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE OR A VARIANCE TO A BELOW GUIDELINES SENTENCE SHOULD BE DENIED.

Apart from his objections to the PSR, the defendant has separately filed a sentencing memorandum that requests an undefined non-guideline sentence—concluding that the defendant is worthy of "leniency." ECF No. 1727 at 46 (Mar. 30, 2026).[21] The defendant's request for "leniency" amounts to a diatribe against witnesses and screed against the government that was rejected by the jury and every federal judge that has considered his various motions. The defendant's version of the facts are perverse and his request for a below-guideline sentence should be denied.

The defendant begins his motion by doubling-down on his failed trial arguments, that the victims in the case "made deliberate choices to live a party lifestyle" and that it was "their

---

[21] The defendant transmitted this filing by email, has not filed a motion to seal of which the government is aware, and has not filed a redacted version of it.  There is no basis or justification for the defendant to seal, in whole or in part, any portion of his sentencing submission in support of his request for a below-guideline sentence.

choice to engage in sex acts." ECF No. 1727 at 2. But that amounts to a claim of innocence that was rejected by the jury, and the Court must sentence the defendant in accordance with the jury's verdict because "[a] guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict." *Hourihan*, 66 F.3d at 465. The undeniable facts are that the defendant—personally and through others—exploited drug addicted and vulnerable women for sexual gratification and to make substantial profits through their continuous and repeated coerced commercial sex acts.

Next, the defendant attempts to shift focus from his egregious criminal conduct to an attempt to garner sympathy based upon: (i) recently made, unverified, and unsupported claims of childhood sexual trauma; (ii) unsubstantiated and undocumented claims related to his medical history; and, (iii) outdated and overstated mental health claims.

From there, the defendant pivots to weak arguments seeking to dilute the seriousness of the nature and circumstances of the offense, the need to promote respect for the law and to deter future crimes, and to protect the public from further crimes of the defendant.

Lastly, the defendant regurgitates his long list of grievances about the government, which are all meritless and have been rejected by every federal court to have considered them.

In sum, the defendant's request for "leniency" should be denied. The defendant's long-term serious criminal conduct requires the Court to impose the sentence of life imprisonment that properly called for by the sentencing guidelines.

**A. The § 3553(a) factors support a guideline sentence.**

Pursuant to Title 18, United States Code Section 3553(a), the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant; the need for educational, vocational training, medical care, or other correctional treatment; the kinds of sentences available; the sentencing range established by the sentencing guidelines; any pertinent policy statements; the need to avoid unwarranted sentencing disparities; and the need to provide restitution for victims of the offense. *See* 18 U.S.C. § 3553(a)(1)-(7).

Although the bulk of the defendant's request for a non-guideline sentence rehashes unhinged and baseless allegations of prosecutorial misconduct, *see* ECF No. 1727 at 24–45, the defendant also makes passing reference to some of the § 3553(a) factors in support of his request for a non-guideline sentence. The government addresses each argument below.

1.  **The Nature and Circumstances of the Offense and History and Characteristics of the Defendant.**

The advisory guidelines recommend a life sentence. The nature and circumstances of the offense and the history and characteristics of the defendant align with and support a guideline sentence.

a.  **The nature and circumstances of the offenses.**

The nature and circumstances of the offenses are among the worst you will find in this district, or in any other. Undeterred by his prior federal criminal case, which began in 2000,

36

and culminated with the split sentence United District Court Judge William M. Skretny imposed on June 26, 2006, the defendant leveraged his friendship with DEA Special Agent Joseph Bongiovanni bribed him to gain access to law enforcement sensitive information, which progressed from information from a DEA search warrant that revealed provocative photos of Gerace's then-girlfriend, R.A., to information about how ping warrants worked and advice about how to conceal dancer drug overdoses at Pharaoh's (i.e., to "get them out of there"), to concealing their corrupt relationship while dissuading the FBI and DEA from investigating Gerace. Indeed, for approximately the next fourteen years after his first federal conviction, and initially discreetly and in violation of his release conditions, *see* ECF No. 1677 at ¶133,[22] the defendant operated Pharaoh's. During that time, the defendant routinely distributed drugs and exploited drug addicted women to coerce them to engage in commercial sex acts.

Endeavoring to address the nature and circumstances of the offense, on one hand the defendant concedes that "the sex trafficking and narcotics trafficking are serious offenses," ECF No. 1727 at 12, but then on the other hand promptly retracts his concession reiterating his claim of innocence by stating: "sex trafficking victims chose to work at PGC, chose to use narcotics, and chose to engage in commercial sex acts." *Id.* The defendant's determination to continue to blame the victims for his conduct is revolting and was rejected by the jury. Sex trafficking through force, fraud and coercion is the opposite of a choice, and the defendant unquestionably drove the drug induced coercive sexual environment at Pharaoh's. The defendant and others routinely peddled addictive drugs to coerce women to engage in

---

[22] *See also* trial testimony of United States Probation Officer Peter Lepiane.

commercial sex acts; the defendant required the dancers to dance in the VIP room, which the defendant called "the bank," where men sexually exploit dancers; and, the defendant controlled access to the upstairs where he and others that he invited or permitted used drug addicted women to engage in coerced commercial sex to satisfy their sexual desires. In the face of the avalanche of evidence adduced at trial, and after leaving a litany of exploited, abused, and damaged women in his wake, the defendant's argument for leniency is akin to him saying, "who cares, they asked for it." The defendant's decision to double-down to blame the victims for his conduct is awful, underscores his lack of insight into his conduct, shows that he has no remorse, and demonstrates that he is a danger to women and the community.

And make no mistake—Pharaoh's was the defendant's domain from its dubious inception. The trial evidence proved that the defendant operated Pharaoh's from the beginning. The evidence at trial was also consistent with the representations the defendant's parents, friends, and family made to Judge Skretny years earlier when they requested leniency for the defendant during his prior federal sentencing for wire fraud. Specifically, on or about June 14, 2006, the defendant's mother described him as "instrumental to the successful running her businesses, Pietro's **and Pharaohs**," and that "it would be a hardship to run either business without him." *See United States v. Peter Gerace Jr.,* Case No. 00-CR-0009-WMS, ECF No. 187-1 at 9 (emphasis added). Similarly, the defendant's father described the defendant as "a very big help" in his wife's two businesses, because the defendant's father "does not have the knowledge to help or do the things that Peter does for both businesses," and that the livelihoods of the employees of both businesses "depend of (sic) Peter's presence and knowledge." *Id.* The defendant's ex-wife, Deborah, also told Judge Skretny that the defendant "plays an active role in Pietro's and Pharaohs which are owned by his mother." *Id.* at 10.

38

John Michalski, the deceased former New York State Supreme Court Judge, who was featured during testimony at trial as someone that, among other things, partook in the coerced sexual services that the defendant offered at Pharaoh's, wrote a letter on the defendant's behalf wherein he described the defendant as a "great friend" who was "actively involved in the day to day operations" of two businesses—"a restaurant and an adult cabaret." *Id.* at 15. Likewise, Don Parrino, the deceased former co-owner of Pharaoh's, described the defendant as the person who "**acts as the General Manager and is vital to Pharaoh's**," and who is the "**only person within the company who has the vast knowledge and experience to keep [Pharoah's] running**," and that "**I am 70 years old**, **my hours are limited**. **Peter does so much for the company**." *Id.* at 17 (emphasis added). Similarly, a former assistant manager at Pharaoh's, Robert E. Werner, Jr., described the defendant as "vital to Pharaoh's." *Id.* Simply put, the defendant's own supporters show that he was a key figure at Pharoah's in the time-period in which he used it as his drug-fueled, sex-trafficking domain.

Eventually, when it became apparent to the defendant that he was under investigation, the defendant retaliated by filing a civil lawsuit against the women he believed to be responsible for his dilemma. When that did not work, he resorted to more aggressive forms of intimidation and witness tampering, which included distributing cocaine to his former ally, Crystal Quinn, and having her threaten P.H. via a Facebook message on the defendant's behalf (a tactic the defendant later complained about in jail to K.H.). The defendant's conduct was an affront to the criminal justice system and a "threat to the integrity of the trial process." *Lafontaine*, 210 F.3d at 134. (2d Cir. 2000).

The drug trafficking that fueled the sex trafficking —and enriched the defendant— caused multiple drug overdoses, harmed people, and ruined lives.[23] What is more, the defendant tried to leverage the damage and trauma he caused to marginalize his victims, to suggest that nobody should believe them, and to weaponize the trauma he caused to escape responsibility for his serious crimes. In many ways the defendant not only abused their bodies, but also battered their minds.

Against the background of all of this, the defendant paid bribes and maintained a corrupt relationship with a DEA agent that enabled his criminal conduct to expand and flourish. The defendant received law enforcement sensitive information, avoided federal investigators, and received advice from his corrupt DEA agent confederate to "get her out of there," with respect to an overdosing dancer at Pharaoh's. At one point, as P.H. testified, the defendant described himself a "untouchable," and for a long time he was. Indeed, the defendant's ability to leverage his corrupt relationship with a DEA agent to evade investigation, arrest, and prosecution for so long, while continuously engaging in a continuous pattern of dangerous and serious criminal conduct, erodes public trust and rattles the foundation of the criminal justice system. Add to that, when the defendant finally became the focus of a dedicated federal investigation, he tampered with and retaliated against women who had detailed information about his criminal conduct—conduct that in itself threatens the integrity of the trial process.

If anything, the length, duration, and continuous serious criminal conduct demonstrates that the defendant's criminal history is underrepresented, and that the nature

---

[23] Regarding drug overdoses, one witness testified that the defendant made statements indicating that an unknown dancer died of a drug overdose and that bikers helped to take care of the body.

and circumstances of his offense could have driven his guidelines range even higher—off the proverbial chart. *See United States v. Burns*, 893 F.2d 1343, 1346 (D.C.Cir.1990), *rev'd on other grounds*, 501 U.S. 129 (1991) ("We note that a defendant who persists in his criminal activity over a period of years may deserve a harsher sentence than a defendant whose crime was limited in duration because the former has arguably had more opportunities to renounce his illegal schemes."); *United States v. Benskin,* 926 F.2d 562-566 (6th Cir.1991) (affirming an upward departure where the defendant's fraudulent activities continued for nearly five years and resulted in the loss of over 3 million dollars to more than 600 investors); *United States v. Shields*, 939 F.2d 780, 783 (9th Cir. 1991) (the district judge did not err in considering the 14 month duration of a criminal conspiracy to distribute steroids as a factor in support of an upward departure); *United States v. Morberg,* 863 F. Supp. 511, 514–15 (W.D. Mich. 1994); *United States v. Hart*, 803 F.Supp. 53 (E.D. Mich. 1992) (the district court determined that the sentencing guidelines were not adequate and that an upward departure was warranted due to the repetitive nature of the embezzlement, duration of the conduct, and the loss of public confidence underlying a corrupt police chief's seven year embezzlement scheme that amounted to a loss of over 2.3 million dollars); *United States v. Fuentes,* 729 F.Supp. 487, 494 (E.D.Va.1989), *aff'd in part, remanded on other grounds*, 917 F.2d 1302 (4th Cir.1990) (the sentencing court ruled sua sponte that the guidelines range for a criminal conspiracy that involved the distribution of 50 kilograms of cocaine and lasted over a decade was "manifestly inadequate in its failure to account adequately for the dimensions and duration" of the criminal conduct.); *see also Guidelines Manual* (2025), Appendix B at 182 (Pursuant to deleted departure provision § 4A1.3(a), "if reliable information indicates that the criminal history category substantially under-represents the seriousness of the defendant's past criminal

conduct or the likelihood that the defendant will commit other crimes, an upward departure may be warranted.").[24]

Here, the Court should conclude that the nature and circumstances of the defendant's offenses fully support the guidelines range, and that there is no justification for a downward departure or variance. *See Fernandez*, 443 F.3d at 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be [upheld as] reasonable in the particular circumstances.").

**b.    The history and characteristics of the defendant: criminal history.**

The defendant's history and characteristics establish that he is a previously convicted federal felon with a history of domestic abuse and assault. *See* ECF No. 1677 at ¶¶ 133-34. The defendant's conduct in this case occurred after he was convicted in federal court of wire fraud. At sentencing for his wire fraud conviction, the defendant Judge Skretny: "It's not something I would ever let happen again in my life. It's not something I dreamed would happen in my life. Never thought I would hold a felony." *See* Tr. Sent., at 56, 00-CR-0009 (June 26, 2006). But these were just words. The defendant simply never dreamed that he would be caught by law enforcement for his criminal conduct—now twice.

As set forth in the PSR and as established at trial, the defendant engaged in substantial and continuous criminal conduct that was undetected by law enforcement. After the

---

[24] Although the revised sentencing guidelines have deleted most departure provisions previously provided throughout the *Guidelines Manual*, "[t]he removal of departures does not limit the information that courts may consider in imposing a sentence nor does it reflect a view from the Commission that such facts should no longer be considered for the purposes of determining an appropriate sentence." *See Letter of Recipients of the Guidelines Manual,* by United States Sentencing Commission Chair, Carlton W. Reeves, (dated Sept. 3, 2025). The deleted departure provisions are now contained in Appendix B of the 2025 *Guidelines Manual*.

defendant completed his term of supervision stemming from his prior federal conviction, he strangled his ex-wife, R.A., and then pleaded guilty to assaulting her. *See* ECF No. 1677 at ¶ 134. The underlying police report dated May 2, 2013, (which was disclosed to the defendant during discovery and discussed during prior detention proceedings), stated that a witness reported that R.A. had "been the victim of repeated and on-going domestic abuse at the hands of" the defendant for many years, and that R.A. "is very afraid" of the defendant and his family. The witness further reported to the Town of Tonawanda Police Department ("TTPD") that "[R.A.] has been to the hospital in the past for unexplained injuries and [] that in August of 2009, [R.A.] went to ECMC, and had to have a head wound closed by staples because [R.A.] was beaten by Peter Gerace," and that [R.A.] "also took off to Florida at one point out of fear of being killed by Peter Gerace." In the context of the TTPD investigation, a police officer retrieved a recording of the 911 call that led to their investigation and, when the officer listened to that recording, he reported that he "could hear what sounded like [R.A.'s] voice saying, 'I'd need to like um report a domestic um.' When the dispatcher asks for an address, the female caller nervously repeats, 'no, no, no there's no address, there's no address.' A male voice can be heard saying, 'what are you doing?' The female caller then says, 'stop! look at my face.' The male can be heard saying, 'are you gonna tell everybody?' After that the [911] call stops and dial tone can be heard. Buffalo 911 pinged that call to 95 Joseph which led to TTPD patrols responding and locating the obviously injured R.A. Officer Falsone said that at first Peter Gerace was not cooperative when he answered the door but was later smug about the whole thing." *See also* ECF Nos. 414, 497-1, Tr. at 24–28 (Mar. 24, 2023) (detention proffer summarizing the facts underlying the assault conviction).

43

The defendant's assault of R.A., and the violence and implied threats documented by local police officers, is consistent with Gerace's threats to Ms. Nigro, as set forth in her trial testimony; Gerace's statement that he could make someone disappear, as described by P.H. during her trial testimony; Gerace's threats via Crystal Quinn to P.H. via Facebook; and, the witness tampering and retaliation case, *see* Case No. 23-CR-99, currently pending against Gerace (as described in the PSR documenting other charged cases against the defendant). *See* ECF No. 1677 (PSR) at ¶ 140.

Lastly, the defendant has a pending $2,000,000 wire fraud case. *Id.* at ¶ 140. The allegations in that case further support the conclusion that the defendant has a willingness and ability to engage in diverse criminal pursuits. Indeed, between 2000 and 2023 when he was arrested and detained in this case, the defendant has engaged in a variety of crimes while amassing a lengthy criminal history, which includes convictions for: wire fraud, assault, conspiracy to defraud the United States and to commit bribery, narcotics conspiracy, maintaining a drug-involved premises, narcotics distribution, bribery, and sex trafficking conspiracy.

Accordingly, the defendant's criminal history and the diversity and duration of his criminal conduct supports the guidelines set forth in the PSR and cautions against a downward departure or variance.

### c. The history and characteristics of the defendant: personal and medical history.

As a part of his request for "leniency," the defendant has proffered information that he claims to have kept to himself his entire life until this federal sentencing: that he is a victim of childhood sexual trauma. *See* ECF No. 1727 at 20. According to the defendant, there are

44

no sex trafficking victims in this case, and he is the only victim because he claims to be a victim of childhood sexual trauma. Yet, other than his word, there is no evidence to support the defendant's newly revealed claims of childhood sexual trauma.

The timing of the defendant's revelation is no coincidence: the defendant has only made it after being convicted of crimes that could send him to prison for life. And even then, the defendant's refusal to fully participate in the Probation Office's interview process signals his willingness "to foreclose the Court's consideration of his background." *United States v. Osborne*, No. 14-CR-0264(JS), 2026 WL 523162, at *7 (E.D.N.Y. Feb. 25, 2026); *see also United States v. Gotti*, No. 3:18-CR-335 (VAB), 2020 WL 5597487, at *13 (D. Conn. Sept. 18, 2020) (varying *upward* notwithstanding evidence that the defendant experienced "extraordinary sexual trauma . . . in very early childhood", as documented through a mental health examination made part of the sentencing record).   The Court should see through the defendant's façade and should not give any weight to his singular and unverifiable claims.

As a part of his sentencing for his 2006 wire fraud conviction, the defendant and his attorneys provided detailed sentencing submissions in his request for a non-jail sentence. In his prior federal case, there was no mention that the defendant suffered any form of childhood trauma, sexual or otherwise. In fact, in this PSR, his mother described him as "an ideal child who was a good student and had always been very well-liked by others." ECF No. 1677 at ¶159. Similarly, in his prior case, the defendant's rendition of his mental and emotional health was devoid of any reference or indication that he ever suffered from any form of childhood trauma, sexual or otherwise.[25]

---

[25] *See* 00-CR-00009, revised PSR at ¶58 (dated: June 12, 2006).

45

There is simply no credible evidence that the defendant was ever sexually abused. *See* ECF No. 1677 at ¶167. The defendant's description of what he only now claims occurred when he was a child also lacks any verifiable details or corroboration. *Id.* For example, the defendant's account does not name the "older woman in the family" who he claims abused him, or where the conduct supposedly occurred, or how old he was, or the name of the aunt he claims to have confided in regarding the abuse. *Id.* The fact that the defendant first made this revelation while facing the potential life imprisonment for, among other things, sex trafficking, coupled with his "reluctan[ce] to share information," and his failure to provide *any* verifiable details, should be viewed with great skepticism. *Id.*

The defendant's unsubstantiated claims must also be viewed through the lens of his history of deceit and lies. Lying is nothing new to the defendant. For example, after he was arrested in Florida in this case, he lied to probation and stated that he "took some pills" at a social gathering and that he "last used cocaine one and a half years ago." Despite his claims, the defendant tested positive for cocaine use.[26] Moreover, the defendant's prior federal wire fraud conviction is a crime of dishonesty, and in the factual basis of his plea agreement the defendant acknowledged that the scheme relied upon making false statements and representations to victims. *See* Case No. 00-CR-0009-WMS, ECF No. 165 at ¶6; *see also* ECF No. 1677 at ¶133 (PSR, 19-CR-227). After that, in 2007, when U.S. Probation and the New York State Liquor Authority denied the defendant permission to work at Pharaoh's, he did it anyway. ECF No. 1677 at ¶133.[27] When probation interviewed the defendant about working

---

[26] *See* USPO Andre M. McCray, Memorandum (Mar. 4, 2021), attached as Exhibit A.

[27] In part, this culminated in the October 31, 2009, probation search that was featured during trial and is described in the PSR.

at Pharaoh's, he lied and told them he was not working there. *Id.* Thereafter, in 2009, as part of his conduct underlying his conviction for count 1, the defendant and his codefendant, Joseph Bongiovanni, mislead FBI Special Agent (SA) Thomas Herbst into falsely believing that Gerace was Bongiovanni's DEA Confidential Source—a ruse that helped the defendant to avoid further FBI scrutiny from FBI SA Herbst in 2009, and enabled the defendant to continue his criminal activity at Pharaoh's and elsewhere. Then, in 2013, after the defendant assaulted his wife, R.A., the defendant falsely told the Town of Tonawanda police officers, who responded to the residence after tracing R.A.'s 911 call, that there was "no problem." *Id.* at ¶134.[28] Overall, the defendant's conviction in this case for conspiracy to defraud the United States and to commit bribery covers over a decade of dishonesty and corruption. Additionally, the defendant is currently charged in one of the largest COVID-era fraud case in the Western District of New York, and the allegations include the fact that the defendant submitted an online loan application which falsely and fraudulently represented that Pharaoh's did not present live performances of a prurient sexual nature or derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature, and that the defendant falsely and fraudulently represented on the application that he had never been convicted of any criminal offense. *Id.* at ¶139. In sum, the Court should be highly skeptical and should not give weight to the defendant's recently made and unverifiable claim featured in his pitch for "leniency," namely, that he is a victim of unreported childhood sexual abuse.

---

[28] A redacted copy of the police report is attached as Exhibit B.

The defendant's self-reported medical history is also questionable. No medical records or other sources verify the defendant's claim that he underwent back surgery. As set forth in the PSR: "**The defendant indicated** he underwent back surgery in September of 2004, and he continued to have low back pain. **He stated that he** underwent a second surgery six (6) months after the first surgery and had a portion of his tailbone and a bone above his tailbone removed. **The defendant informed** that he again participated in physical therapy and also attended appointments at Munroe Chiropractic in Williamsville, New York. **Records have been requested from Munroe Chiropractic, but to date, no response has been received. As the defendant was unable to recall the name of the facility where he received physical therapy, medical records could not be requested**." ECF No. 1677 at ¶ 164 (Emphasis added). Considering the defendant's obvious interest in seeking to mitigate his sentence, coupled with his lengthy history of lies and dishonesty, the Court should not credit the defendant's unverified statements referencing undocumented medical conditions and treatment.

In this vein, the defendant's mental health claims are also unpersuasive. The defendant's pitch for leniency avers that he "was frequently depressed and emotionally unstable," and that he "frequently abused cocaine." *See* ECF No. 1727 at 7. While that may be true, it is not a mitigating circumstance. The defendant's self-professed emotional instability is not an excuse for over a decade of serious criminal conduct to leverage his relationship with a DEA agent to avoid investigation, arrest, and prosecution; or to sexually exploit and abuse women emotionally and physically for either his personal enrichment or his sexual gratification and those of his friends; or to justify his drug dealing and maintaining a drug premises to ensure that Pharaoh's was a profitable venture. The defendant's calculated, repetitive, and continuous criminal activities are not mitigated by his claims of emotional

instability which, if anything, only serve to underscore the danger he poses because an emotionally unstable individual who lives a life a crime is a danger to the community. Moreover, to the extent the defendant implies that his sentence should be lenient because he has newfound insight into the underlying causes of his criminal conduct, his words are not worth the paper they are written on, especially considering that he refuses to accept any responsibility and adamantly denies that he did anything wrong. Indeed, the defendant has not sought or received treatment for an adjustment disorder with depressed mood and post-traumatic stress disorder, since December 12, 2005, which was before he was sentenced in Case No. 00-CR-00009. *See* ECF No. 1677 at ¶¶ 133, 166. He has not sought treatment since before his prior federal sentencing because he only seeks treatment, or claims to have issues, when he faced with the prospect of a federal prison sentence. Moreover, when asked to verify any of his treatment providers to substantiate his claim that he had been diagnosed with "depression, anxiety, sleep disturbances, nightmares and post-traumatic stress disorder," the defendant "could not recall the names of all of the treatment programs or facilities he has attended for mental health services but stated that he previously attended Horizon Health Services (HHS) in Buffalo, New York." *See* ECF No. 1677 at ¶ 168. The records from HHS indicate that he "was involved in outpatient substance abuse treatment from April 2021 to March 2023, he addressed some mental health issues in treatment," and that "he was struggling with depression, isolation, and anxiety as a result of his legal involvement." *Id.* In other words, the defendant was worried about his legal situation, which is common among virtually every defendant in federal court and is not an appropriate basis upon which to grant a downward departure or variance.

49

Finally, even assuming *arguendo* the veracity of the defendant's personal, physical, and mental health history, none of it mitigates the nature and seriousness of the defendant's offenses, which are among the most serious and depraved crimes that can be prosecuted in federal court.[29]

> **2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant.**

The defendant submits that the need for the sentence imposed to afford adequate deterrence has been satisfied because this prosecution has garnered substantial media attention. *See* ECF No. 1727 at 14-15. The defendant's argument lacks merit.

First, the defendant is facing a guideline sentence of life imprisonment for a myriad of offenses, including sex trafficking conspiracy, and he has served little more than 3 years in custody. The little time the defendant has served in prison is inadequate to promote respect for the law; the need for the sentence to reflect the seriousness of his victimization and continuing criminal conduct while leveraging the corrupt protection of a DEA agent; is inadequate to protect the public—and the witnesses who testified—from further crimes of the defendant; and is inadequate to afford adequate deterrence for the varied, repetitive, and serious crimes the defendant committing spanning well-over a decade. *See Burns*, *supra* at 1346 ("We note that a defendant who persists in his criminal activity over a period of years may

---

[29] All inmates entering BOP facilities are thoroughly screened by medical staff for physical and mental health conditions. They are monitored thereafter through follow-up appointments and chronic care clinics, as necessary. A medical plan of action for an inmate includes a thorough and timely history and physical exam to ascertain the mental health and medical status of each inmate upon their arrival to a BOP facility. Following this screening, the treating Clinical Director and Chief Psychologist may formulate a plan that addresses his/her medical, mental health and activities of daily living. Accordingly, none of the defendant's self-proclaimed personal, medical, or mental health issues warrant a downward departure or variance.

deserve a harsher sentence than a defendant whose crime was limited in duration because the former has arguably had more opportunities to renounce his illegal schemes.").

Second, the defendant has not cited a single case, and the government has not found any, supporting the notion that the Court may downwardly depart or vary a defendant's sentence due to media attention. The Sentencing Guidelines, which are the Court's starting point at sentencing, are not concerned with media coverage of a case, and there is no departure provision premised upon media coverage or notoriety. The First Amendment to the United States Constitution explicitly confers freedom of the press. The §3553(a) factors contemplate that a defendant will be sentenced based upon the facts and circumstances of his case and the characteristics of the individual offender. The §3553(a) factors are not concerned with extraneous matters such as media coverage, and the defendant has not cited a single case to the contrary. Moreover, this case highlights the folly that considering media attention at sentencing would be. As this Court is aware, much of the media attention was generated by defendant and the defendant's counsel making statements to the media, or the defendant sending materials to the media and giving unauthorized interviews to the media from jail. *See* ECF Nos. 543 (government motion for a gag order), 1442 (government motion for gag order regarding Gerace's attempt to give jailhouse interview); *see also* ECF Nos. 1444, 1454, 1457, 1462, 1465, 1477, 1486, 1502, 1520. Finding that deterrence is satisfied because of media attention would be perverse and would incentivize defendants, such as Gerace, to act in outrageous ways to generate media coverage and then argue at sentencing they should receive less prison time because of it. If a defendant's sentence was, or could be, reduced every time a convicted criminal defendant disliked, or did not want, media coverage of his crime, then virtually every defendant sentenced in federal court would be in line for a downward

departure or variance. That, of course, would be absurd and would incentivize defendants to discuss their cases with the press to generate the very media coverage they condemn in their sentencing memos.

Third, the defendant's crimes targeted some of the most vulnerable people in society—women severely addicted to drugs—and he used their vulnerability to exploit them for his sexual desires and financial benefit. The sentence imposed must promote respect for the law because sex trafficking victims are among the most vulnerable victims in the criminal justice system, and must deter other traffickers, pimps, and the Johns (such as those men who solicited commercial sex acts in the downstairs VIP and upstairs private area of Pharaoh's) from exploiting the most vulnerable members of society. The fact that the defendant's sex trafficking involved numerous victims, occurred under the cover of a neon sign with the guise of legitimacy, all while being protected by the defendant's corrupt law enforcement and judicial connections, are extreme aggravating factors that merit the lengthy sentence recommended by the guidelines.

Fourth, the defendant's argument that he will no longer be in position to reoffend such that the Court should mitigate his sentence should be completely unpersuasive. Recidivism, that is the need to protect the public from future crimes of the defendant pursuant to §3553(a)(2)(C), is only one component of the §3553(a) sentencing factors this court must consider. As the government has argued, this Court must consider the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, and providing adequate deterrence, *see* 18 U.S.C. §3553(a)(2)(A)-(B), which are all independently weighty factors. Moreover, the defendant is *already* a recidivist criminal, and the defendant's

52

description of his crimes as being "at their core – are about sex and drugs at and conceptually adjacent to a strip club," *see* ECF No. 1727 at 19, grossly understates the defendant's criminal conduct. Saying his crimes were "conceptually adjacent to a strip club," when the defendant's purpose in operating the strip club was to commit and conceal crimes, is like saying the Buffalo Bills play football conceptually adjacent to Highmark Stadium. The reality is that the defendant simply refuses to acknowledge that he committed a variety of serious crimes because he does not believe he did anything wrong. Nevertheless, this Court has learned about decades of criminal conduct that compels the conclusion that the defendant is a resourceful criminal who is determined to commit crimes and is unwilling to follow the laws of this Nation. All this reenforces that the defendant poses an ongoing danger to the community such that the life sentence recommended by the guidelines is necessary.

### 3. The defendant's claims of prosecutorial misconduct are meritless and irrelevant to sentencing.

The defendant's memorandum in support of a below-guidelines sentence concludes with a regurgitated list of meritless grievances that the defendant has made throughout the case about the government, which have previously been rejected by every judge in the Western District of New York to have considered them. *See* ECF No. 1727 at 24–45.[30] The

---

[30] The caselaw the defendant has cited in support of his argument is inapposite.

In *United States v. Nolan-Cooper,* 155 F.3d 221 (3rd Cir. 1998), the court opined that the undercover officer's conduct, which included having sex with the defendant while operating in his undercover capacity but without authorization from any supervisory personnel, did not rise to the level of a due process violating warranting dismissal but in dicta indicated that such conduct not categorically precluded from the district court's consideration at resentencing. Thus, *Nolan-Cooper* has no relevance to this case.

Similarly, *United States v. Lopez*, 106 F.3d 309 (9th Cir. 1997), which provides little analysis, is irrelevant to this case. *Lopez* involved a situation where the sentencing court downwardly departed three levels because of prejudice the defendant suffered when the government engaged in plea negotiations with the defendant in absence of his attorney. Such conduct "seriously affected" "Lopez's opportunity for full and fair plea negotiations." *Id.* at 311.

defendant's meritless attacks on the government are nothing new. On October 27, 2021, United States Magistrate Judge Michael J. Roemer stated, "you have no evidence of [animus] other than [the prosecution] is aggressively pursuing this case," ECF No. 224 at 12: 8-10, in response to meritless accusations made by the defendant against the government. The defendant's meritless grievances have continued, but they merely criticize lawful and appropriate law enforcement investigation; rely upon inaccurate and misstated facts; and should be rejected as irrelevant to the Court's determination of an appropriate sentence. The government briefly responds to each complaint below.

*Border Search of the Defendant's Cell Phone.* The defendant claims that his cell phone was inappropriately searched at the U.S. border, but the search of the defendant's cell phone at the border was appropriate, similar border search issues were litigated as to codefendant Bongiovanni, and the defendant's motion pertaining to his cell phone was denied. Searches at the international border, where "the [g]overnment's interest in preventing the entry of unwanted persons and effects is at its zenith," *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004), have long been held exempt from the warrant requirement. *Id.* at 152–53. Here, the defendant's cell phone was searched under circumstances similar to that of his codefendant, Joseph Bongiovanni, and Bongiovanni's motion to suppress the border search of his cell phone was denied. In denying Bongiovanni's motion to suppress the results of the border search of his cell phone, United States District Court Judge John L. Sinatra stated: "Based upon the current state of the case law that binds this Court, the search of Bongiovanni's cell phone does not appear to violate the Fourth Amendment— notwithstanding the gravitational pull that *Riley v. California*, 573 U.S. 373 (2014) exerts on the issue. Upon its *de novo* review, therefore, the Court accepts and adopts Judge Roemer's

54

recommendation to apply the good faith exception and deny Bongiovanni's motion to suppress evidence from the border search of his cell phone." ECF No. 319 at 4-5. Over a year after Bongiovanni's motion to suppress evidence from the border search of his cell phone, Gerace requested permission to file an untimely suppression motion seeking to suppress the border search of his cellphone, and Judge Sinatra adopted Judge Roemer's report and recommendation denying that request. ECF Nos. 330, 368. Thereafter, this Court denied the defendant's motion seeking reconsideration of those decisions. ECF No. 655. Accordingly, there is no merit to the defendant's claim of improper government conduct related to the border search of his cellular phone.

*Utilizing administrative tax warrants to conduct the search of PGC and seizure of PGC records.* The defendant's argument is premised upon inaccurate facts. Pharaoh's was searched pursuant to a federal search warrant on December 12, 2019, and the search warrant was heavily litigated. *See e.g.,* ECF Nos. 113, 119, 121, 123, 132, 194, 210, 225, 349, 496, 576. Accordingly, there is no merit to the defendant's claim of improper government conduct regarding the purported use of administrative warrants to search Pharaoh's.

*Arrest of Gerace in Florida*. Defendant Gerace was arrested by federal agents after he was federally indicted and a valid federal arrest warrant was issued. Accordingly, there is no merit to the defendant's claim of improper government conduct regarding the defendant's arrest in Florida.

*Relying upon the testimony of Ms. Nigro.* As set forth above, there was no improper government conduct regarding the use of grand jury or trial testimony of Ms. Nigro, or any other witness. The defendant's claim that "the government expressed its belief that K.N.'s

grand jury testimony was at times untruthful" is inaccurate. Indeed, in a filing on June 7, 2024, the government stated:

> The government has also discussed matters with [Ms. Nigro's] attorney, and those conversations support the inference that has been victimized and traumatized by Gerace (which is consistent with information the government has related to other of Gerace's intimate partners). [Ms. Nigro's] attorney believes she has consistently made efforts to recall information accurately and to the best of her ability. In turn, the government has identified corroboration for much of [Ms. Nigro's] testimony. As to matters [Ms. Nigro's] has discussed wherein her information may be [] singular in nature, or that has limited corroboration, ultimately it will be up to a jury to determine whether or to what extent to credit testimony—that is what trials are for. *California v. Green*, 399 U.S. 149, 158(1970) (cross-examination is "the 'greatest legal engine ever invented for the discovery of truth." (citing 5 Wigmore s 1367)).

ECF No. 999, 1000 (redacted) at 13, n. 12. Indeed, while the defendant tried to attack Ms. Nigro's credibility throughout the litigation, the investigation corroborated Ms. Nigro's in many ways, including: through text messages between Gerace and his co-defendant Joseph Bongiovanni; text messages between Gerace and former New York States Supreme Court Judge Michalski; emails from Judge Michalski to the law clerk for the judge who controlled Erie County Pistol permits; falsified marital records; photos; and, through other witnesses (including one who did not like Ms. Nigro — Gerace's other ex-wife, R.A.). The defendant's argument that Ms. Nigro's was not credible was rejected by the jury through their verdict. Accordingly, there is no merit to the defendant's claim of improper government conduct regarding witness Ms. Nigro's, or any other witness.

*Seeking to Detain Gerace for Witness Tampering*. The defendant's claim that the government sought to detain Gerace to prevent him from assisting in his defense, *see* ECF No, 1727 at 25, lacks merit. The government consented to his release on conditions at the inception of the case, after Gerace was arrested in Florida, notwithstanding that the

magistrate judge in Florida expressed a belief that the charges warranted detention. *See* ECF No. 110 at 3 (Magistrate Judge Valle commented, in part, "Well, this was an interesting case because, but for the government's recommendation, this is a case where I think detention would be warranted."); *see also* ECF No. 110-1 (transcript of proceedings in Florida). Indeed, Gerace's then-attorney stated at his initial appearance: "We appreciate [the government] allowing him to be released, come back to Buffalo, and appear before a magistrate, Judge." ECF No. 110 at 3. The government moved to detain Gerace only after he was later indicted for witness tampering, and both Judge Sinatra and this Court agreed with the government and detained the defendant pending trial. *See* ECF Nos. 413, 414, 423, 499, 500, 504, 585, 591, 631. By the time this Cout denied the defendant's request to reconsider his detention status, the defendant had three pending federal indictments: the bribery/sex and narcotics trafficking case (19-CR-227); the witness tampering case (23-CR-37); and, an EIDL fraud case (23-CR-60) that remains pending. *See* ECF Nos. 651, 653.  Accordingly, there is no merit to the defendant's claim of improper government conduct regarding the government's motion to detain the defendant after he was indicted for witness tampering.

*Charging Witnesses of the Defendant's Witness List.* The witnesses, who the defendant purports to be his witnesses, including Brian Rosenthal, Gregory Trotter, and Jessica Leyland, were prosecuted individually for their federal crimes, and each of them were convicted in their respective cases.[31] Indeed, the defendant previously moved to dismiss and for a new trial premised upon these same arguments, and this Court denied them. *See* ECF Nos. 1097, 1097-1, 1123, 1274 at 45, 1559, 1559-1, 1608, 1618, 1164, 1683 at 24-25. Accordingly, there is no

---

[31] John Ermin was charged in Case No. 23-CR-99 with a firearm offense and with Gerace and others in a conspiracy to tamper with and retaliate against a witness, and to defraud the United States. That case, which involves the murder of a federal witness, remains pending.

merit to the defendant's claim of improper government conduct regarding its prosecution of other individuals who committed federal crimes.

*Expenses paid to certain witnesses.* The defendant suggests that the government paid witnesses for their trail testimony, *see* ECF No. 1727 at 25, but his argument is misplaced. Certain witnesses—sex trafficking victims—were temporarily relocated and/or had certain expenses paid to ensure their safety prior to trial. The payment information was disclosed to the defense, which used it to cross-examine the witnesses. There is nothing improper about the government making efforts to ensure the safety, security, and availability of witnesses at trial, and there is no merit to the defendant's claims of government impropriety.

*Inconsistent testimony between L.L. and A.A.1.* As this Court is aware, resolution of inconsistent testimony is within the sole province of the jury. Both of these witnesses provided testimony regarding drugs and the coercive and abusive sexual environment at Pharaoh's. Accordingly, there is no merit to the defendant's claim of improper government conduct regarding any inconsistent testimony between L.L. and A.A.1.

*Motions for Curcio hearings and to disqualify.* The government made appropriate motions to determine the nature and extent of conflicts of interest. As to Gerace's former attorney Joel Daniels, the defendant refused to waive a potential conflict of interest. *See* Minute Entry 08/10/2021 ("Defendant advises the Court that he does not waive conflict as to his attorney Joel Daniels. Court discharges Kevin Spitler as *Curcio* counsel and advises him to submit his expenses to be paid from the District Court Fund. Defense counsel indicate that attorney Steven Cohen will take over as trial counsel for Mr. Gerace. Attorney Joseph LaTona will continue in his capacity as defense counsel to Mr. Gerace, limited to pretrial matters only.

Mr. Daniels will file his withdrawal or substitution of counsel document."); *see also* ECF Nos. 999-1000. As to one of his current attorneys Eric Soehnlein, the Court received substantial briefing, heard oral argument, resolved the motions in a manner that permitted the defendant to waive and conflicts that may have existed as to Mr. Soehnlein, and ensured the defendant had access to counsel of his choice, Mr. Foti and Mr. Soehnlein.[32] An issue strongly contested is not evidence of improper conduct, and this Court did not determine otherwise. *See* ECF No. 889; *see also* ECF No. 999 at 47-50.[33] In this vein, this Court has also previously rejected the defendant's claim that the government improperly subpoenaed a private investigator. *See* ECF No. 1624 ("The Court previously reserved decision on the portion of Gerace's motion for sanctions related to the government's subpoenaing Paul Lawrence. *See* Docket Item 1164. The Court has carefully reviewed the government's ex parte response to Gerace's motion to quash the subpoena to Lawrence and the transcript of the ex parte oral argument before Hon. Richard J. Arcara. Based on that review, this Court DENIES Gerace's motion for sanctions related to the subpoena to Lawrence and finds that disclosure of the ex parte documents and transcript is not required in the matter before this Court.");[34] *see also* ECF No. 999-1000 (describing grand jury proceedings and argument before United States District Court Judge Richard J. Arcara)*.* Accordingly, there is no merit to any of the defendant's claims of improper government conduct regarding the government's motions to disqualify, to determine conflicts of interest, or to subpoena a private investigator.

---

[32] Because the defendant has sought to incorporate its prior filings on this issue by reference, the government likewise incorporates by reference its prior briefing on the conflict issues by reference as though set forth fully herein. *See* ECF Nos. 666, 689, 691, 919, 997, 999, 1000.

[33] ECF No. 1000 is the unredacted version of ECF No. 999.

[34] The defendant's memorandum erroneously claims the Court did not resolve this issue, *see* ECF No. 1727 at 38-39.

*References to Anthony Gerace at trial.* As set forth above, trial testimony pertaining to Anthony Gerace was relevant, admissible, and permitted by the Court. Testimony regarding Anthony Gerace was included in reference to the fraudulent marriage between defendant Gerace and Ms. Nigro that was officiated by Judge Michalski; the forgery of Anthony Gerace's signature as a witness on the marriage certificate; Judge Michalski's efforts thereafter to exert his influence to push through Anthony Gerace's pistol permit application; and, Anthony Gerace's role in drug activity, including drug use and distribution at Pharaoh's and elsewhere and the federal search warrant executed at his residence. Accordingly, there is no merit to the defendant's claim of improper government conduct regarding the evidence pertaining to Anthony Gerace.

*The term Italian Organized Crime (IOC).* During pre-trial litigation, the defendant moved to strike as surplusage the use of the term IOC from the indictment and to preclude IOC-related evidence at trial. The defendant's motions were denied. *See* ECF Nos. 148, 178, 185, 250, 314, 319, 657 at 56-57 (Court: "Okay. So here's what we're going to do. I'm not going to preclude terms in their entirety because they may be needed to, as Mr. Tripi said, to explain emails, to explain references that were made, things that were said. So what I will say is the term 'Italian Organized Crime,' because it's used in the indictment, can be used at trial without limitation. The terms 'Mafia' and 'La Cosa Nostra' should be used only when necessary; that is, only when they are needed to explain something that someone said, or that is in an email, or something along those lines."). All the federal judges, who considered the defendant's arguments regarding the indictment's use of the term IOC and the admissibility of IOC evidence at trial, denied the defendant's motions. Accordingly, there is no merit to the

defendant's claim of improper government conduct regarding references to IOC in the indictment, during court appearances, or through the introduction of IOC evidence at trial.

*The use of jailhouse informants.* The defendant's claim that the government sought to delay trial to cultivate jailhouse witnesses lacks merit. There is nothing novel or controversial about the use of jailhouse witnesses, and the government contends that it was the party consistently seeking to advance the case towards trial. The fact that jailhouse witnesses testified during Gerace's trial is merely a function of who Gerace chose to speak with about his case while he was incarcerated. Accordingly, there is no merit to the defendant's claim of improper government conduct regarding the use of jailhouse witnesses.

## B. Conclusion

Gerace is a prior federally convicted felon who is convicted of engaging in virtually every serious federal felony in the United States code. He has substantial corrupt connections, and he used his position, contacts, influence, and power to distribute controlled substances and to disadvantage vulnerable members of the community—young women whom he coerced and exploited through their drug addictions and his position of authority to be used as discardable playthings—to enrich himself and to satisfy the sexual desires of Gerace, his friends, and those in positions of prominence and power aligned with him. His conduct was calculated, systematic, and continuous for well-over a decade, and the application of the §3553(a) factors is congruous with the life sentence of imprisonment that is properly recommended by the sentencing guidelines.

### III.     The Defendant's Motion for a New Trial Should Be Denied.

On March 31, 2026, the Court granted the defendant's request to adjourn sentencing so that the defendant could supplement his sentencing submissions to make additional sentencing arguments related to his claims of conflict with his former counsel, Gerace Attorney 1. *See* ECF No. 1710. Rather than filing a supplemental sentencing submission, as the Court contemplated and the parties discussed, the defendant filed a motion for a new trial. *See* ECF No. 1722. The defendant's motion for a new trial lacks merit, is an attempt to cause this Court to adjourn sentencing that is long overdue, and should be denied.

Relying upon the *United States v. Williams*, 372 F.3d 96 (2d Cir. 2004), the defendant contends that he should be granted a new trial because his former counsel, Gerace Attorney 1, harbored a conflict of interest, which caused Gerace Attorney 1 not to pursue a plea agreement on his behalf. Setting aside for a moment that the defendant's reliance upon *Williams* is misplaced because it is factually and legally inconsequential to this case, the frivolous nature of defendant Gerace's motion is readily apparent from his post-conviction jailhouse interview with WGRZ's Dave Mckinley, in which defendant Gerace  stated: "They offered me 30 years. If they would have offered me a misdemeanor, I would have said no. I did not do any of this."[35, 36]

---

[35] *Gerace: "They'll never take my club*," available at: https://www.youtube.com/watch?v=4IlNeppkS00 (last visited April 15, 2026).

[36] On October 17, 2024, at 2:44p.m., the government sent the following email communication to defendant Gerace's attorney's, Mr. Soehnlein and Mr. Foti:

> We have been authorized and directed to offer a plea to resolve cases 19-cr-227/23-cr-37, which are scheduled for trial in a few weeks.  Subject to an indication that your client is interested, and subsequent to any necessary consultation with victims pursuant to the CVRA, the offer would be to plea guilty to sex trafficking conspiracy with an 11(c)(1)(C) range of 30 years of imprisonment.  Please advise if your client has any interest in this disposition.

A new trial would change nothing and is unwarranted. This Court ensured that Gerace had conflict-free counsel of his choice at trial, and the defendant has not suffered any prejudice. As the Court is aware through extensive briefing and argument in the context of the government's motion to disqualify attorney Mr. Soehnlein, the information necessary to inform Gerace Attorney 1's conduct did not become apparent to the government until on or about November 9, 2023, which was over three months after this Court relieved Gerace Attorney 1 from representing defendant Gerace and after the government received and reviewed an audio recording from investigator Paul Lawrence.

Soon thereafter, the government moved to disqualify Mr. Soehnlein, and the defendant was exposed to all the facts underlying the government's theory of obstruction that took place—between the effort to fraudulently induce Judge Sinatra's recusal to the effort to fraudulently induce this Court into releasing the defendant from pre-trial detention through the submission of falsified affidavits—from June 2023 until August 2023. *See* ECF No. 691; *see also* ECF No. 889 (Court's Decision and Order discussing conduct, including that of Gerace Attorney 1). In that brief, ECF No. 691, which was filed on December 12, 2023, the government referenced Gerace Attorney 1 as a potential co-conspirator in a scheme to commit obstruct justice. *See id.* at 2, 5, 16–20, 25–26, 27, 65. Moreover, in January 2024, the grand jury investigating Crystal Quinn's death returned a Second Superseding Indictment in 1:23-CR-99 that alleged "Gerace Attorney 1", submitted a witness list that forced Judge Sinatra's recusal and submitted falsified affidavits for this Court's consideration. *See* ECF. 24, 1:23-CR-99. Were there any doubt about Gerace Attorney 1's status in that prosecution, it was

---

On October 23, 2024, the terms of the government's proposed offer were placed on the record, and Mr. Soehnlein advised the Court, in the defendant's presence, that defendant Gerace was not interested in the plea offer. *See* ECF No. 1316.

erased on March 15, 2024, when the government stated during an oral argument before this Court, that Gerace Attorney 1 was an unindicted co-conspirator. *See* ECF 825 (Tr. Oral Arg. at 44-45) (Mar. 15, 2024) ("as charged in that case [23-CR-99], Gerace Attorney 1 is an unindicted, essentially, coconspirator in that count with Mr. Gerace. . . .So Mr. Soehnlein is a potential witness against them both [in 23-CR-99]."). Remarkably, the defendant has memory-holed these events and his knowledge of Gerace Attorney 1's status, treating the government's March 11, 2026, filing in Case No. 23-CR-99 identifying Gerace Attorney 1 (again) as an unindicted co-conspirator—in the context of discussing co-conspirator statements exempted from the bar against hearsay and other issues suited for motions *in limine*—as breaking news.

For good reason, in the 954 days since this Court relieved Gerace Attorney 1 from representing defendant Gerace on September 6, 2023, the defendant's team did not think Gerace Attorney 1's status as an unindicted co-conspirator in Case No. 23-CR-99 merited a *Curcio* hearing, a new trial, or any other relief in this case. The remedy, pre-conviction, for *per se* conflicted counsel is a new, conflict-free attorney. *See, e.g.*, *United States v. Jones*, 381 F.3d 114, 120 (2d Cir. 2004) (affirming a district court's disqualification of an attorney under the *per se* conflict doctrine where the attorney was likely to "become the subject[] of a grand jury investigation" or a witness in the defendant's trial). The defendant obtained conflict-free counsel—at minimum through Mr. Foti—after Gerace Attorney 1 exited the case, and well before the facts animating any conflict between the defendant and Gerace Attorney 1 became legible to the government.

64

For the first time, on the eve of sentencing, the defendant intimates that this remedy was not good enough. In his view, the mere fact that at one point, however briefly, Gerace Attorney 1 labored under a *per se* conflict of interest entitles him to a new trial or some other form of extraordinary relief. The defendant neither explains why the Sixth Amendment supports that proposition nor reconciles its logical consequences with core Sixth Amendment values. Indeed, though our entire constitutional framework turns, in large measure, on respect "for the integrity of the court," entitling defendants to the extraordinary relief the defendant urges would perversely encourage defendants to enlist their attorneys aid in wrongdoing closely connected to that for which they are on trial, thereby engendering chaos and distrust in criminal proceedings. *Wheat v. United States*, 486 U.S. 153, 162 (1988) (quoting *United States v. Dolan*, 570 F.2d 1177, 1184 (3d Cir. 1978)).

The defendant's position is also irreconcilable with prior Second Circuit holdings. Had *Jones* unfolded according to the defendant's logic, the Second Circuit should have granted the defendant a new trial, a sentencing reduction, or some other extraordinary relief owing to the fact that, at one point, his attorney labored under a *per se* conflict. Instead, the Second Circuit affirmed Jones's convictions. *See Jones*, 381 F.3d at 123. Likewise, in *United States v. Lewis*, 850 F. App'x 81 (2d Cir. 2021) (unpublished), a Second Circuit panel rejected the defendant's request that the government be barred from *re-trying* him after evidence emerged, mid-trial, that his attorney had corruptly sought to influence witness testimony. *Id.* at 82–83. The panel said nothing of Lewis deserving a sentencing windfall, if ultimately, convicted.

The defendant's reliance on *United States v. Williams*, 372 F.3d 96 (2d Cir. 2004), an *actual conflicts* case that employed a narrow remedy tailored to the facts, does not govern here.

65

*Williams* began in January 1999, when a grand jury indicted defendant Williams or his role as the principal administrator of a continuing criminal enterprise that was believed to have been one of the largest supplies of cocaine in Buffalo, NY. Several search warrants revealed firearms in residences used by Williams. In March 1999, a cooperating defendant testified before the grand jury that he saw Williams's attorney, Leonardo, providing Williams with firearm silencers. He further testified that he observed Williams deliver handguns and silencers for Leonardo to modify and make more effective. By the fall of 1999, the government learned that Leonardo was under investigation in multiple jurisdictions for both money laundering and narcotics violations. Then, in May 2000, Leonardo's business partner was murdered with a silenced automatic firearm. Leonardo became the subject of the murder investigation and made incriminating statements to a confidential informant implicating him in his partner's murder.

In December 2000, Leonardo was arrested on federal drug and firearm charges. Leonardo continued to represent Williams until January 2001 when he was disqualified and Williams retained new counsel. In August 2001, Leonardo pleaded guilty to facilitating the murder of his partner, money laundering, and trafficking cocaine.

That same month, Williams moved to dismiss the indictment, arguing that Leonardo's conflict of interest violated his Sixth Amendment right to counsel, arguing both that Leonardo had a *per se* conflict and an actual conflict of interest. The district court denied Williams' motion on October 1, 2001, and Williams' case proceeded to trial almost two months later, on November 26, 2001. A jury convicted him at trial, and the district court sentenced him to

two concurrent life terms of imprisonment, a concurrent term of 20 years, and 5 years to run consecutive to his life sentences.

On appeal, Williams abandoned his claim that Leonardo represented while laboring under a *per se* conflict, arguing only that he suffered from an actual conflict of interest owing to his integration in Williams' criminal scheme and efforts to discourage Williams from cooperating. The Second Circuit agreed that Leonardo labored under an actual conflict of interest that prejudiced Williams, as Leonardo actively discouraged Williams from cooperating and taking a plea when doing so would have greatly inured to Williams' benefit. Yet, the Second Circuit denied Williams' request for a new trial, concluding that doing so "would be inappropriate, as Leonardo's actual conflict of interest did not affect the conduct of Williams' trial." *Id.* at 110. "Nor would a new trial relieve in any way the constitutional error suffered by Williams—ineffective assistance of counsel during the pretrial stage and the possibility that cooperation purposely was not pursued." *Id.* Instead, the Second Circuit remanded the case for resentencing consistent with "the terms [he] would have received had he been given proper legal advice." *Id.*

The differences between *Williams* and this case are manifest. Unlike *Williams*, this case involves no allegation that Gerace Attorney 1 conspired with the defendant about the matters that *resulted* in his indictment in this case, or the facts and circumstances that were the subject of the trial proof. Moreover, here, unlike *Williams*, Mr. Daniels, and not Gerace Attorney 1, originally represented the defendant when he was indicted. Any wrongdoing with Gerace Attorney 1 covers, at most, a few months period over two years into the defendant's prosecution. Even then, the defendant has previously invited the Court to hold that any

67

attorney effort to fraudulently induce Judge Sinatra into recusing from the case was not criminal under 18 U.S.C. §1515(c). He cannot now imply, let alone argue outright, that the Court's interpretation of § 1515(c) does not extend to Gerace Attorney 1's conduct in the recusal scheme. *Cf. United States v. Wellington*, 417 F.3d 284, 290 (2d Cir. 2005) ( "[D]efendant cannot complain of an error that he himself invited . . . ."). Consequently, the defendant is limited to arguing that Gerace Attorney 1's criminal conduct revolves around the falsified affidavits, and those falsified affidavits were part of a vigorous effort to secure the defendant's release on bail—an issue and a result the defendant implicitly concedes that Gerace Attorney 1 and Gerace were fully aligned in achieving. *See* ECF No. 1722 at ¶ 113 ("**in advancing Mr. Gerace's interests** to be released from custody before trial, Gerace Attorney 1 had a strong motive to deceive the Court about the preparation of allegedly false affidavits.") (emphasis added).

Yet, Gerace Attorney 1 is alleged to have falsified affidavits only in August 2023, as he was exiting the case and after the Court ordered him to stay on. In *Williams*, by contrast, Leonardo labored under a conflict throughout his almost two years long representation of the defendant. Also, unlike *Williams*, there is no allegation that Gerace Attorney 1 discouraged the defendant from cooperating, pleading, or otherwise failed to give the defendant "proper legal advice" due to the conflict. *Williams*, 372 F.3d at 96. In fact, as described above, Gerace has confirmed that he would not even have taken a misdemeanor plea if one had been offered. Indeed, long before June 2023, when Gerace Attorney 1 caused the filing of the defense witness list, Gerace had committed to going to trial, not cooperating with the government (which never invited him to cooperate), or plead guilty to his charges (which he still, to this day, denies committing).  And were that not enough, the defendant in *Williams* enjoyed only

a nine-month window between Leonardo's disqualification and his CCE trial. Here, after Gerace Attorney 1 exited the case, Gerace was represented by two attorneys, one of whom, Mr. Soehnlein, was already intimately familiar with the case, for well-over a year before his trial started. During that time, Gerace's defense team, led by his current attorneys of record, and consistent with the defendant's desires, never sought a plea agreement. They also litigated fulsomely on the defendant's behalf and pressed multiple substantive motions that, if granted, would have benefitted him, and aggressively defended him during trial.

Just as importantly, unlike *Williams*, this Court wisely "apprised" Mr. Gerace of the conflicts stemming from the alleged orchestrated and fraudulent recusal and the falsified affidavits soon after the government brought it to the Court's attention. Though Gerace Attorney 1's conduct was discussed throughout the government's disqualification briefing, the only reason why the government did not move to disqualify Gerace Attorney 1 at that time is because he had already exited the case. In short, the defendant knew full well "the facts underlying" the *per se* conflict between him and Gerace Attorney 1—and did nothing until this latest Hail Mary. *Williams*, 372 F.3d at 105. If he thought those facts genuinely required an additional *Curcio* hearing, or some other relief, he was obligated to raise that to the Court's attention long ago. *See Cuyler v. Sullivan*, 446 U.S. 335, 346–47 (1980) ("Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial.").

All these factual differences render *Williams* nearly entirely inapposite. *Williams*, however, offers some instruction that the defendant conveniently overlooks. Specifically, *Williams* admonished:

> We are aware, of course, of the potential to abuse the system by hiring conflicted counsel in order **to have an opportunity to contest the effectiveness of that counsel should a court or jury resolve matters unfavorably for a defendant.** Implicit in such attempts to game the system, however, **is an understanding that a defendant could challenge the effectiveness of counsel based on the conflict of interest.** Any defendant attempting **such a scheme is implicitly aware that the underlying facts constituting the conflict can translate into a judicially recognized conflict of interest**. Thus, if there were **any evidence at all** that Williams was seeking to exploit the conflict of interest rules by retaining conflict counsel, **we would treat the case quite differently**, as we might have been able to **infer the possibility that the defendant could translate the underlying facts constituting the conflict into knowledge of the conflict itself.**

372 F.3d at 110 (emphases added).

The gamesmanship the Second Circuit warned of would be rewarded if the Court grants the defendant's motion for a new trial. Due to the disqualification litigation, the defendant has long had "an understanding that [he] could challenge the effectiveness based on the conflict of interest" described in that litigation involving him, Mr. Soehnlein, and Gerace Attorney 1. *Id.* For that reason, the defendant has been more than "implicitly aware that the underlying facts" in the disqualification litigation could "translate into a judicially recognized conflict of interest": that litigation *explicitly* informed him of the facts underlying any conflict with Gerace Attorney 1 to a likely unprecedented degree. *Id.* And despite that knowledge, the defendant has seemingly lied in wait, hoping to "exploit" and enlarge "the conflict of interest rules" now that the "jury [has] resolve[d] matters unfavorably for" him. *Id.* The Second Circuit stated plainly what it would do if this situation were to arise: it would rule "differently" by denying the defendant's bid for relief. *Id.* This Court should not share the defendant's blind eye to the Second Circuit's remonstrance against the sandbagging he embraces here. *See Puckett v. United States*, 556 U.S. 129, 135 (2009) (explaining that a party's

70

"[f]ailure to abide by th[e] contemporaneous-objection rule ordinarily precludes the raising on appeal of the unpreserved claim of trial error" and disincentivizes "sandbagging," or the practice of "remaining silent about [an] objection and belatedly raising the error only if the case does not conclude in his favor").

Finally, in *Williams*, who was convicted following trial, most significant to Williams' claims was that "his sentence is unconstitutional because his pretrial representation was impaired by an actual conflict of interest that effectively denied Williams the opportunity to enter into a cooperation agreement or other plea agreement with the government." 372 F.3d at 99. Here, it bears repeating that defendant Gerace continues to profess his innocence; rejected a plea offer and essentially mocked the government's offer to the media stating: "if they would have offered me a misdemeanor, I would have said no. I did not do any of this;" and Gerace still makes no representation in his motion for a new trial that he was ever interested in a plea offer or that he would ever have sought to cooperate with the government. Lastly, *Williams,* the principle case relied upon by the defendant, explicitly rejected Williams' request for a new trial because the conflict of interest did not affect the outcome of the trial. *Williams*, 372 F.3d at 110. Thus, granting a new trial on these facts would be unprecedented and inappropriate.

In summary, this case is not *Williams*, where the government had information from a cooperator, which it increasingly corroborated, that implicated the attorney in the defendant's crimes "for approximately two years," all while the attorney continued to represent the defendant in the matter. *Williams*, 372 F.3d at 104.[37] Here, by the time the pieces of the

---

[37] This case is also unlike *Williams* insofar as this Court also did not know about the information related to Gerace Attorney 1's conflict until after it relieved Gerace Attorney 1 and assigned Gerace's current attorneys.

investigation were forming and Gerace Attorney 1's conduct was contextualized through a recording that was obtained and subsequently reviewed by the government on November 9, 2023, Gerace Attorney 1 had not represented Gerace for approximately three months. Thereafter, the government needed to review and evaluate historical events aided and contextualized by the recording, and during that time Gerace Attorney 1 no longer represented the defendant. During litigation, while represented by his current attorneys, Gerace pursued the same strategy—*i.e.*, he attempted to discredit Ms. Nigro and other witnesses—just as he had throughout the litigation when he was represented by Gerace Attorney 1 (and as he continues to argue in his sentencing filings). Moreover, while represented by his current attorneys, Gerace did not pursue any plea discussions, and rejected an offer of 30 years that was initiated by the government. By the time Gerace proceeded to trial over a year after this Court relieved Gerace Attorney 1, he was represented by conflict free counsel and he remains represented by conflict-free counsel of his choice pending sentencing. Nothing more is required, and there is no merit to the defendant's motion for a new trial.

Accordingly, the Court should deny the defendant's motion for a new trial and proceed with sentencing as scheduled.

---

372 F.3d at 108 ("it is undisputed that the government and the Western District of New York had knowledge of the conflict long before Leonardo's ultimate disqualification. Yet, Williams was never informed of the conflict by either the court or the government until the government's disqualification motion on January 8, 2001.").

## CONCLUSION

The defendant's objections to the PSR, his request for a below-guideline sentence, and his motion for a new trial should be denied and the Court sentence the defendant to a guideline sentence of life imprisonment.

DATED:  Buffalo, New York, April 17, 2026.

MICHAEL DIGIACOMO
United States Attorney


BY:    s/JOSEPH M. TRIPI
       s/NICHOLAS T. COOPER
       s/CASEY L. CHALBECK
       Assistant United States Attorneys
       United States Attorney's Office
       Western District of New York

73

# EXHIBIT A

*UNITED STATES PROBATION*
*AND PRETRIAL SERVICE*

# MEMORANDUM

**DATE:**  March 4, 2021

**TO:**  Honorable Michael J. Roemer
U.S. Magistrate Judge

**FROM:**  Andre M. McCray
U.S. Probation Officer Assistant

**SUBJECT:**  Peter Gerace
WD/NY Docket #19-CR-227
SD/FL Docket # 21-MJ-06112
**Updated Information**

On March 1, 2021, the above-named defendant appeared with retained counsel for an initial appearance before U.S. Magistrate Judge, Alicia O. Valle, in the Southern District of Florida, on an indictment and warrant originating from our district. At that time, the defendant was released on a personal surety bond with global positioning satellite system (G.P.S.) via home detention. The Court allowed the defendant to reside in Florida, until his scheduled return to the Western District of New York on Friday, March 3, 2021.

**It is to be noted that the time of the defendant's initial drug test conducted in the Southern District of Florida, he tested positive for cocaine. Mr. Gerace reported taking some pills at a social gathering but, did not report cocaine use. At the time of the pretrial services interview, the defendant reported a history of cocaine use, with his last date of use being approximately one and a half years ago.**

I have reviewed the bail report authored by U.S. Probation Officer, Yolonda N. Rawl, in the Southern District of Florida, in which the recommendation was detention pending the disposition of the case. I respectfully disagree with the aforementioned recommendation. Our office respectfully recommended that the defendant be released on the following conditions imposed by U.S. Magistrate Judge, Alicia O. Valle, in the Southern District of Florida.

Report to Pretrial Services as directed by the U.S. Probation Officer.

Surrender any passport/passport card to the Clerk of the Court. Surrender other international travel documents to the appropriate authorities.

Do not obtain a new passport or other international travel documents.

Travel restricted to: Western District of New York unless Court permission is granted to travel elsewhere.

Remain at a verifiable address as approved by Pretrial Services.

Avoid all contact with codefendants and defendants in related cases unless approved by Pretrial Services.

Avoid all contact with, directly or indirectly, with any person(s) who are or who may become a potential victim or witness in this case.

Possess no firearm/destructive device.

Refrain from any  use of alcohol.

Refrain from the use or unlawful possession of a narcotic drug unless prescribed.

Submit to drug/alcohol testing and/or treatment as directed by Pretrial Services, including co-pay.

Refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing which is required as a condition of release.

Abide by the conditions of the Location Monitoring Program (GPS), to be monitored electronically, via home detention, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearance and court-ordered obligations. You will contribute to the cost of services (co-pay) as directed by the Pretrial Services Officer.

Refrain from obstructing or attempting to obstruct or tamper, in any fashion, with electronic monitoring which is required as a condition of release.

Report within 72 hours, to the Pretrial Services Office any contact with any law enforcement personnel, including, but not limited to any arrest, questioning or traffic stop.

The defendant shall not have any contact with Katrina Nigro.

The defendant shall not visit Pharaoh's Gentlemen's Club located at 999 Aero Drive, Cheektowaga, New York; an order to stay away from the strip clubs.

If Your Honor should have and questions, feel free to contact me at (716)-449-4314.

# EXHIBIT B



**Town of Tonawanda**

# POLICE REPORT
## STRANGULATION 2ND

Complaint

**13-317831**

Report Date & Time
**5/2/13  10:34**

| INCIDENT | | | | Status: | **Cleared By Arrest** |
|---|---|---|---|---|---|

| Address of Occurence | Occ. Date & Time | District | Day of Week | Type of Premise |
|---|---|---|---|---|
| **95 JOSEPH DR** | **5/2/13  10:34** | **51** | **Thursday** | **Single Family Home** |

| Officers: | **111 - WLODARCZYK** | **477 - VALINT** | Rep. Off.: | **477 - VALINT** |
|---|---|---|---|---|
| | **437 - FALSONE** | **R081 - HAWKE** | Supervisor: | **503 - KRIER** |

### CHILD - 1

███ █████ ████ ████ ████ ██ ██ ██ ██ ██ ██ ██
██████ ███ ██ ██ ██ ██ ██ ██ ███ ne

| Height | Weight | Hair | Eyes | Build | Complexion | Glasses | Scars/Marks/Tattoos |
|---|---|---|---|---|---|---|---|

### OFFENDER - 1

| Last Name | First Name | MI | Ext | Birth Date | Race | Sex | Age | Juvenile | Arrested |
|---|---|---|---|---|---|---|---|---|---|
| **GERACE** | **PETER** | **G** | **JR** | ████ | **W** | **M** | **46** | **N** | **N** |

| Address | City | State | Zip | Home Phone | Work Phone |
|---|---|---|---|---|---|
| **95 JOSEPH DR** | **TONAWANDA TOWN** | **NY** | **14150** | **(716) 725-1931** | |

| Height | Weight | Hair | Eyes | Build | Complexion | Glasses | Scars/Marks/Tattoos |
|---|---|---|---|---|---|---|---|
| **5'07** | **208** | **GRY** | **HAZ** | **M** | **FAR** | | |

### SUSPECT - 1

| Last Name | First Name | MI | Ext | Birth Date | Race | Sex | Age | Juvenile | Arrested |
|---|---|---|---|---|---|---|---|---|---|
| **GERACE** | **PETER** | **G** | **JR** | ████ | **W** | **M** | **46** | **N** | **Y** |

| Address | City | State | Zip | Home Phone | Work Phone |
|---|---|---|---|---|---|
| **95 JOSEPH DR** | **TONAWANDA TOWN** | **NY** | **14150** | **(716) 725-1931** | |

| Height | Weight | Hair | Eyes | Build | Complexion | Glasses | Scars/Marks/Tattoos |
|---|---|---|---|---|---|---|---|
| **5'07** | **208** | **GRY** | **HAZ** | **M** | **FAR** | | |

### VICTIM - 1

| Last Name | First Name | MI | Ext | Birth Date | Race | Sex | Age | Juvenile | Arrested |
|---|---|---|---|---|---|---|---|---|---|
| **A**████ | **R**████ | | ██ | ████ | **W** | **F** | **30** | **N** | **N** |

| Address | City | State | Zip | Home Phone | Work Phone |
|---|---|---|---|---|---|
| **95 JOSEPH DR** | **TONAWANDA TOWN** | **NY** | **14150** | ████ | |

| Height | Weight | Hair | Eyes | Build | Complexion | Glasses | Scars/Marks/Tattoos |
|---|---|---|---|---|---|---|---|

### OFFENSES

| Law | Section | CA | CL | DG | Description |
|---|---|---|---|---|---|
| PL | 120.00-01 | M | A | 3 | **ASLT 3-W/INT CAUSE PHYS INJURY** |
| PL | 121.12 | F | D | 2 | **STRANGULATION 2ND DEGREE** |

### ARREST - 1

| Arrest # | Name | | Arrest Date | Arrest Address |
|---|---|---|---|---|
| **15389** | **GERACE, PETER G.** ████ | | **05/02/2013** | **MAPLE RD / AMHERST** |

| Status | Type | Arresting Officers |
|---|---|---|
| **Held** | **Complaint** | |

| Law | Section | CA | CL | DG | Description | Counts |
|---|---|---|---|---|---|---|
| PL | 120.00-01 | M | A | 3 | **ASLT 3-W/INT CAUSE PHYS INJURY** | 1 |
| PL | 121.12 | F | D | 2 | **STRANGULATION 2ND DEGREE** | 1 |

### NARRATIVE

| | **Town of Tonawanda** | Complaint |
|---|---|---|
| | **POLICE REPORT** | **13-317831** |
| | **STRANGULATION 2ND** | Report Date & Time<br>5/2/13  10:34 |

| **POLICE REPORT** | Date Entered: **6/20/2013  11:14:13AM** | Typist: **DANIELLE CHMIEL** | Officer: **BRIAN VALINT** |
|---|---|---|---|

BUFFALO 911 RECEIVED A CALL FROM A WOMAN WHO STATED "NEVER MIND, NEVER MIND". THE CALLER HUNG UP BUT NOT BEFORE DISPATCH HEARD, " LOOK WHAT YOU DID TO MY FACE". THE CALL WAS TRACED TO 95 JOSEPH DR. MYSELF, OFC. FALSONE, AND OFC. WLODARCZYK ARRIVED ON SCENE. WE SPOKE TO PETER GERACE WHO STATED THERE WAS NO PROBLEMS. WE THEN SPOKE TO R████ A███, GERACE'S GIRLFRIEND. MS. A███ HAD A BLACK RIGHT EYE AND A SCRATCH ON HER NECK. A███ WAS ADAMANT THE INJURIES WERE SUSTAINED WHILE SHE WAS PLAYING CATCH WITH HER SON AT BASEBALL LAST NIGHT. GERACE STATED THE INJURIES OCCURRED WHILE A███ WAS PLAYING CATCH AT HOME.

MR. GERACE AND MS. A███ WERE NOT FORTHCOMING WITH INFORMATION. BOTH KEPT INSISTING THAT THE INJURIES WERE SUSTAINED WHILE PLAYING CATCH.

MS. A███ CONSENTED TO COME TO 1835 SHERIDAN DR. TO MEET WITH DET. HEARITT AND A COUNSELOR FROM CRISIS SERVICES.

THROUGHOUT THE ENTIRE ENCOUNTER WITH MS. A███, SHE APPEARED NERVOUS AND FRIGHTENED. IT DOES NOT APPEAR THAT MS. A███ IS BEING TRUTHFUL ABOUT HOW SHE SUSTAINED HER INJURIES.

PO FALSONE TOOK PICTURES OF MS. A███'S INJURIES WITH 51 CAMERA. CPS WAS CONTACTED.   107

SEE DOMESTIC INCIDENT REPORT.

| **SUPPLEMENT # 1** | Date Entered: **5/2/2013  12:34:42PM** | Typist: **THOMAS FALSONE** | Officer: **BRIAN VALINT** |
|---|---|---|---|

I responded to 95 Joseph Drive to the report of a woman needing help.  Once the woman, later identified as R████ M. A███, began speaking it was apparent that she was in some type of altercation as her stories were less than truthful.  Ms. A███ appeared in fear for her life.

Ms. A███ was asked if she would return to our Police dept. in order to speak with one of our crisis service counselor's and a domestic violence detective as she refused to cooperate with any police action.  Ms A███ agreed, see supporting deposition and DIR prepared by Ofc. B. Valint. Ms. A███ was interviewed by FOB Detectives once back at 1835 Sheridan.

While at 1835 Sheridan Drive, I took photographs of numerous injuries that Ms. A███ explained were the result of a missed baseball during a game of catch.   Ms. A███ had bruises/swelling on both forearms, both upper arms, both sides of her neck, a significant right eye bruise, and right jaw.  It must be noted that the bruising seen on Ms. A███ face during our initial encounter at 95 Joseph Drive, became progressively worse when I later photographed her at 1835 Sheridan Drive. More bruising and swelling were present.  Photographs were returned to the Lieutenant's office for downloading...055

| Officers: **111 - WLODARCZYK** | Supervisor: **503 - KRIER** |
|---|---|
| Date Printed:  **3/15/2022**    **9:27:09AM** | Page: 2 |

| | | |
|---|---|---|
| **Town of Tonawanda** | | Complaint |
| **POLICE REPORT** | | **13-317831** |
| **STRANGULATION 2ND** | | Report Date & Time 5/2/13  10:34 |

**SUPPLEMENT # 2**    Date Entered: **5/3/2013  8:44:37AM**    Typist: **WILLIAM KRIER**    Officer: **WILLIAM KRIER**

I spoke to Lt. Diehl over the phone on 5/2/2013 regarding this incident and he suggested that they bring the victim, R████ A███ in to speak to someone at our station because she was obviously afraid to speak freely in front of Peter Gerace and his extended family.

While at our station R████ A███ spoke at length in private to Crisis Services Counselor ████████ in our family room with the door closed. I could hear a lot of crying and distraught discussion coming from that room. ████████████ ███████ responded to the police station as well. They found out about the incident from a neighbor on Joseph Drive that is somehow related to the A███ family.

████████████████ told us how ████████ has been the victim of repeated and on-going domestic abuse at the hands of Peter Gerace for many years. ████████ said that ████████ is very afraid of Peter Gerace and his family

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

According to R██████, the child was home sick from school on Thursday, May 2nd, 2013. ████████████ suspects that the child may have been nauseous because of the violence in the home.

████████████ said that ████████ has been to the hospital in the past for unexplained injuries and she said that in August of 2009, she went to ECMC, and had to have a head wound closed by staples because she was beaten by Peter Gerace. R██████ ████████████████████████ also took off to Florida at one point out of fear of being killed by Peter Gerace. During that time, Peter Gerace went to court and obtained sole custody of the child. R████ did not tell her family where she went during that time and the A███ family had a Niagara County cadaver dog search various locations for their daughter. ████████████████████████████████████████

I tried to convince R████ to sign a supporting deposition that said that Peter Gerace caused her injuries and she nervously shook her head saying, "oh, no, no, no no police, no arrest." She was visibly afraid when she said that.

R████ said that her face and other parts really hurt and she wanted to go to the hospital. Crisis Services Counselor ████████ went with her and stayed with her at Kenmore Mercy Hospital along with ████████████.

I went to Central Police Services to retrieve a recording of the 911 call made to them earlier that led to this investigation. When I listened to that recording I could hear what sounded like R████ voice saying, "I'd need to like um report a domestic um." When the dispatcher asks for an address the female caller nervously repeats, "no, no, no there's no address, there's no address." A male voice can be heard saying, "what are you doing?" The female caller then says, "stop! look at my face." The male can be heard saying, " are you gonna tell everybody?" After that the call stops and dial tone can be heard. Buffalo 911 pinged that call to 95 Joseph which led to our patrols responding and locating the obviously injured R████ A███. Officer Falsone said that at first Peter Gerace was not cooperative when he answered the door but was later smug about the whole thing.

Around 2:50 PM I received a phone call from ████████████ from the hospital that R████ A███ was now willing to complete a deposition about what happened. I met Officer Heft at the hospital and she took that deposition from R████ A███. In the deposition, R████ A███ explained how Peter Gerace had repeatedly punched her in the face and arms while holding her down. She also explained how he choked her to the point where she remembers gasping for air. She is not sure if she lost consciousness. In my experience I have seen victims of strangulation commonly make that statement that is consistent with being choked to the point of passing out.

Patrols returned to Joseph Drive to attempt to arrest Peter Gerace with negative results.

Peter Gerace was later found by Officer Falsone at Millard Suburban Hospital and taken into custody by Amherst PD .

He was charged with assault 3rd (120.00-1 "A" misdemeanor) and strangulation 2nd ( PL 121.12 "D" felony).

C/A

| | |
|---|---|
| Officers: **111 - WLODARCZYK** | Supervisor: **503 - KRIER** |
| Date Printed:   3/15/2022     9:27:09AM | Page: 3 |

| | |
|---|---|
| **Town of Tonawanda** | Complaint |
| **POLICE REPORT** | **13-317831** |
| **STRANGULATION 2ND** | Report Date & Time |
| | 5/2/13  10:34 |

403

| **SUPPLEMENT # 3** | Date Entered: **5/3/2013  10:09:54AM** | Typist: **THOMAS FALSONE** | Officer: **THOMAS FALSONE** |
|---|---|---|---|

On 5/02/13 at approx. 3:00pm, I returned to 95 Joseph Drive with Ofc. Valint in an attempt to locate Peter G. Gerace, dob: ███████ .  While on scene, a black BMW pulled into the driveway, NYREG: CGF-8097.  The driver, Peter G. Gerace, █████ , is the father of the Peter G. Gerace dob: ███████ , the suspect  we were looking to speak with.

The father explained that his son was at Milliard Fillmore Suburban seeking medical attention for FLU like symptoms. The father was on location to taken his grandson to his home at 53 Autumnview Rd, Williamsville, NY 14221.

I then asked the father if he was at a baseball game with Ms. A████ and his grandson on 5/01/13.  The father indicated "yes".  The father went on to say that Ms. A████ was sneaking back to her vehicle in order to drink alcohol as she has a drinking problem.  The father was then asked if she sustained any injuries while at the game, like possibly getting hit by a baseball?  The father indicated, "no, why? who said that".  The father was advised that his son (suspect) advised us that Ms. A████ was hit in the face by a baseball while at the game yesterday.  The father went on to say, " I don't know why he would have said that, she wasn't injured at all."

It must also be noted that during my initial conversation with Ms. A████ , at approx. 11:00am on 5/2/13, she advised me that she did not have custody of her juvenile son.  Ms. A████ also stated that she has absolutely no fear that her son would be harmed by the suspect.  The father confirmed that his son (suspect) has full custody...055

| **SUPPLEMENT # 4** | Date Entered: **5/3/2013  10:45:08AM** | Typist: **MICHAEL WLODARCZYK** | Officer: **THOMAS FALSONE** |
|---|---|---|---|

On the above date and time I responded to 95 Joseph for Unknown Trouble. I spoke with Peter Gerace at length and he stated that Ms. A████ had been injured at their son's baseball game. Mr. Gerace stated he and his son had been sick and that he was "not a violent man, and I don't hit girls, ever". While speaking with Mr. Gerace I noticed a very small mark on his right hand. The middle knuckle of both of Mr. Gerace's hands appeared to be red and possibly swollen. When I asked Mr. Gerace if he was left-handed or right, he stated right, then looked down at his hands and stated "oh these marks are old, plus I've been moving for the last few days, it probably happened then". Mr. Gerace provided this information to me before I ever mentioned that I noticed marks on his hands. During the entire encounter, Mr. Gerace insisted that nothing had happened, and that he had done nothing wrong. Mr. Gerace's demeanor during the entire conversation was confident and uncaring about the situation at hand.

111

| **SUPPLEMENT # 5** | Date Entered: **6/20/2013  11:29:32AM** | Typist: **DANIELLE CHMIEL** | Officer: **FRANK DIRIENZO** |
|---|---|---|---|

GERACE WAS PICKED UP AT MILLARD FILLMORE SUBURBAN HOSPITAL AND TRANSPORTED TO 1835, BY OFC. ENGLERT AND MYSELF.  GERACE WAS PLACED IN CELL #8 AND HIS BELONGINGS WERE PLACED IN LOCKER #8. HIS PEDIGREE INFORMATION WAS LOGGED ON CARD #13-0276.  HIS BELONGINGS WERE SEALED WITH SEAL #0985.  GERACE WAS EVALUATED BY PARAMEDIC BOTHAM DUE TO A COMPLAINT OF A SICK STOMACH.  094

| Officers: **111 - WLODARCZYK** | Supervisor: **503 - KRIER** |
|---|---|
| Date Printed:   3/15/2022        9:27:09AM | Page: 4 |